Sarah R. London
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
slondon@lchb.com
Telephone: 415.956.1000
Fax: 415.956.1008

*Proposed Interim Plaintiffs' Liaison Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 19-md-02913-WHO<br><br>**PLAINTIFFS' POSITION STATEMENT** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

    A.     JUUL Designed Its E-Cigarettes to Have Youth-Enticing Flavors and to Deliver More Nicotine Without the Harshness and Undesirability of Traditional Cigarettes ........................................................................................ 2

    B.     JUUL Marketed Its Products to Minors ................................................................ 5

    C.     JUUL's Marketing Towards Adult Smokers Is Deceptive and Unlawful ............. 7

    D.     Altria and Philip Morris Fund and Perpetuate the JUUL Epidemic. ..................... 8

PARTIES ................................................................................................................................... 9

CLAIMS .................................................................................................................................. 10

FACTUAL AND LEGAL ISSUES ......................................................................................... 10

    A.     Factual Issues ....................................................................................................... 10

    B.     Legal Issues ......................................................................................................... 12

LITIGATION HISTORY AND SUMMARY OF CASES ...................................................... 13

    A.     *Colgate v. JUUL Labs Inc.* .................................................................................. 13

    B.     Additional Purchaser/User Class Claims. ........................................................... 13

    C.     Individual Personal Injury Cases ........................................................................ 14

    D.     Municipal, School District, and Public Nuisance Cases ..................................... 15

DISCOVERY STATUS ........................................................................................................... 15

COORDINATION OF VARIOUS CLAIMS AND ACTIONS .............................................. 16

STATUS OF RELATED FEDERAL AND STATE ACTIONS ............................................. 16

Pursuant to Pretrial Order No. 1 (PTO No. 1), Plaintiffs submit this preliminary outline of some initial factual and legal issues as well as general matters related to the claims before the Court and those anticipated to arise. This statement is a cooperative effort by counsel for plaintiffs who have appeared in the MDL. All counsel identified on Exhibit A were given the opportunity to provide input and submit suggested comments regarding this Position Statement.

## INTRODUCTION

Vaping, particularly among youths and adolescents, is a public health epidemic.[1] In 2018, more than 3.6 million middle and high school students reported using e-cigarettes in the past 30 days, a dramatic increase of over 1.5 million children since 2017.[2] The percentage of 12th grade students who reported vaping nicotine in the past 30 days nearly doubled over the course of one year.[3] This increase in child substance abuse is the largest in the 43-year history of the National Youth Tobacco Survey, and coincides with the emergence and overwhelming popularity of JUUL, an e-cigarette manufactured and launched by JUUL Labs, Inc. in June 2015.[4] By the end of 2017—less than two years after its launch—JUUL had overtaken its competitors to become the most sold e-cigarette in the United States. As described below, JUUL accomplished this feat through its deliberative design and marketing of its product—all of which targeted the youth market. This MDL reflects a concerted effort to remedy the multitude of harms JUUL has inflicted on millions of people.

---

[1] *Surgeon General's Advisory on E-cigarette Use Among Youth*, OFFICE OF THE SURGEON GENERAL, https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[2] *Results from 2018 National Youth Tobacco Survey Show Dramatic Increase in E-Cigarette Use Among Youth Over Past Year*, U.S. FOOD AND DRUG ADMIN. (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/results-2018-national-youth-tobacco-survey-show-dramatic-increase-e-cigarette-use-among-youth-over.

[3] *National Adolescent Drug Trends in 2018: Vaping Surges, Largest Year-to-Year Increase in Substance Use Ever Recorded in the U.S. for 10th and 12th Grade Students*, UNIVERSITY OF MICHIGAN INSTITUTE FOR SOCIAL RESEARCH (Dec. 17, 2018), http://monitoringthefuture.org/pressreleases/18drugpr.pdf.

[4] *See id.*

### A. JUUL Designed Its E-Cigarettes to Have Youth-Enticing Flavors and to Deliver More Nicotine Without the Harshness and Undesirability of Traditional Cigarettes

JUUL has acknowledged that while designing its e-cigarette, it researched tobacco industry documents made public as a result of the Master Settlement Agreement between dozens of states' attorneys general and the four largest U.S. cigarette manufacturers. JUUL co-founder James Monsees stated that he believed the cigarette was "the most successful consumer product of all time," so JUUL designed its e-cigarette to recreate the "magic and luxury of the tobacco category."[5] JUUL accomplished this (and its successful overtaking and expansion of the e-cigarette market) by minimizing the harshness and undesirability associated with nicotine intake—giving JUUL the ability to palatably deliver higher amounts of nicotine than traditional cigarettes and other e-cigarettes. JUUL describes this design in U.S. patent No. 9,215,895 ("JUUL's patent"), which uses a process for combining benzoic acids with nicotine to produce nicotine salts. The usage of nicotine salts, by way of a complex chemical reaction, manipulated the nicotine pH as to minimize the "throat hit" users experience when vaping. The resulting non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation. JUUL's nicotine formulation denies users the sensory feedback that tells them they are inhaling large amounts of something harmful. Indeed, several researchers have concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth," due to the combination of providing a potent nicotine kick with minimal throat irritation.[6] The elimination of the throat-hit provides no benefit to existing smokers who are already tolerant of—and may even prefer—the effect based on prior tobacco use.

Additionally, a "pod" of JUUL's chemically engineered nicotine salt solution delivers approximately twice the amount of nicotine to the body as an entire pack of traditional cigarettes.

---

[5] Interview with James Monsees, ONBOARDLY (April 30, 2014), https://web.archive.org/web/20160307151834/http://onboardly.com/entrepreneur-interviews/an-interview-with-james-monsees/.

[6] Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEMICAL RES. TOXICOLOGY 431, 433 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6008736/pdf/tx8b00097.pdf.

This is due, in part, to physical limitations inherent in combustible cigarettes. A cigarette that delivers around one milligram of nicotine in smoke retains "about 14-20 milligrams of nicotine in the unsmoked rod,"[7] for an overall delivery of 5-7% of the cigarette's total nicotine content. As a result, an entire pack of cigarettes can deliver only approximately 21.4-27.8 mg of nicotine,[8] or around half of the nicotine content JUUL reports is in its pods. According to blood plasma studies cited in JUUL's Patent, JUUL's nicotine salts also are absorbed far more quickly by the body, producing the buzz sensation that is popular among users. Those studies reported that nicotine uptake was up to four times higher for nicotine salt formulations than traditional cigarettes. This all makes JUUL not only more addictive than traditional cigarettes, but easier for non-smokers to initiate.

In addition, JUUL designed its product to appeal to children by using sweet and fruity flavors. Internal tobacco industry documents now publicly available establish that the tobacco industry targeted minors in the same way. For example, in a 1972 Brown & Williamson internal memorandum titled "Youth Cigarette – New Concepts," it found that "it's a well-known fact that teenagers like sweet products." [9] A 1979 Lorillard memorandum similarly found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.[10]

JUUL followed this playbook. JUUL's pods were made available in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. These appealing flavors have had a marked effect on e-

---

[7] *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 337 (2006).

[8] Martin J. Jarvis et al., *Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, 93 J. NAT'L. CANCER INST., no. 2, Jan. 17, 2001, at 134-138.

[9] Marketing Innovations, Inc., *Brown & Williamson Tobacco Corp. Project Report: Youth Cigarette—New Concepts*, U.C.S.F. TRUTH TOBACCO INDUSTRY DOCUMENTS (Sept. 1972), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=hzpd0040.

[10] FLAVORED TOBACCO FAQS, STUDENTS WORKING AGAINST TOBACCO, http://swatflorida.com/uploads/fightresource/Flavored%20Tobacco%20Industry%20Quotes%20and%20Facts.pdf (last visited Oct. 22, 2019) (citing Sedgefield Idea Sessions 790606-790607, June 8, 1979, Bates No. 81513681/3691).

cigarette adoption by underage "vapers." A national survey found that that 81 percent of youth aged 12-17 who had ever used e-cigarettes used a flavored e-cigarette the first time they tried the product, and that 85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month.[11] Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like,"[12] and 74% of youth surveyed in a recent study indicated that their first use of a JUUL was of a flavored pod.[13]

JUUL's design also creates increased abuse and addiction among youth. Called the "iPhone of e-cigarettes," the JUUL device is shaped like a USB drive and is compatible with disposable nicotine cartridges called "JUULpods."[14] JUUL designed the device to be easily concealed, (a "stealth vape") so that it can be hidden from parents and teachers alike.[15] JUUL also features a light-up "party mode" that displays a rainbow of colors when the device is waved around.[16] It is hard to imagine adult smokers desiring that feature, but it is easy to understand how it would appeal to adolescents.

Because of JUUL's design—eliminating the throat hit, increasing the amount of nicotine that can be delivered to the body, and its youth-oriented design and flavors—JUUL increases the risk of youth initiation and addiction and makes the product more dangerous and easier to abuse for all users.

---

[11] *See* B.K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 J. AM. MED. ASS'N, no. 17, Nov. 3, 2015, at 1871-73.

[12] *Id.*

[13] Karma McKelvey et al., *Adolescents' and Young Adults' Use and Perceptions of Pod-Based Electronic Cigarettes*, 1 J. AM. MED. ASS'N, no. 6, Oct. 19, 2018, at 1-13.

[14] Jidong Huang et al., *Vaping Versus JUULing: How the Extraordinary Growth and Marketing of JUUL Transformed the US Retail E-Cigarette Market*, 28 TOBACCO CONTROL, May 31, 2018, at 146-151, https://tobaccocontrol.bmj.com/content/28/2/146.

[15] Divya Ramamurthi et al., *JUUL and Other Stealth Vaporisers: Hiding the Habit from Parents and Teachers*, TOBACCO CONTROL, Sept. 15, 2018, https://tobaccocontrol.bmj.com/content/early/2018/09/15/tobaccocontrol-2018-054455. *See also* Angus Chen, *Teenagers Embrace JUUL, Saying It's Discreet Enough to Vape in Class*, NPR (Dec. 4, 2017), https://www.npr.org/sections/health-shots/2017/12/04/568273801/teenagers-embrace-juul-saying-its-discreet-enough-to-vape-in-class.

[16] Jon Hos, *Getting Your Juul into Party Mode*, VAPEDRIVE (July 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode/.

### B. JUUL Marketed Its Products to Minors

As R.J. Reynolds Tobacco Company's Vice-President of Marketing explained in 1974, the "young adult market . . . represent[s] tomorrow's cigarette business."[17] Capitalizing on the tobacco industry's published playbook, JUUL likewise fixated on the youth market. JUUL utilized a well-funded, highly sophisticated online advertising campaign allowing JUUL to reach millions of youth through, among other things, viral hashtag marketing campaigns and social media influencers on YouTube, Instagram, Twitter, and Facebook. To broaden the reach of its campaign, JUUL also used social media "influencers" to push its product on young people. Influencers are "high-social net worth" individuals who have developed large social media followings—*i.e.*, the "cool kids" of the social media world. People follow influencers because they tend to deliver lots of high quality, interesting photos and content, and because they are known to be trend-setters. Most of JUUL's influencers were, like the models in its ads, young and attractive. They had numerous underage followers and represented an idealized future self that adolescents could achieve by taking up JUUL products.

Hashtag marketing was another key feature of JUUL's viral marketing campaign. To drive consumer participation in its ad campaign, JUUL peppered its advertising and social media posts with hashtags, including those referencing JUUL and vaping (*e.g.* #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, including #mothersday, #goldenglobes, #nyc, etc. JUUL used this marketing technique to effectively turn its customers into salespeople, exponentially multiplying the number of teenagers it was able to influence.

JUUL also copied tobacco advertising strategies by designing its social media posts to echo the sense of style, coolness, and youthful rebellion once embodied by cigarettes. Former FDA Commissioner David Kessler recently wrote that the blueprint for JUUL "could easily have been taken straight out of the tobacco industry's playbook."[18] In fact, it was. JUUL co-founder

---

[17] UCSF LIBRARY, TRUTH TOBACCO INDUSTRY DOCUMENTS (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091.

[18] David Kessler, *Opinion: Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In,* N.Y. TIMES (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.

James Monsees indicated in a 2018 interview that "the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them."[19] A side-by-side comparison of numerous JUUL advertisements shows that its imagery directly parallels that previously adopted by cigarette manufacturers. For example, to announce JUUL's release in June 2015, JUUL launched the "Vaporized" advertising campaign that was aimed at a youth audience.[20] The campaign used young stylish models, bold colors, and memorable imagery. The Vaporized campaign advertisements highlighted themes of sexual attractiveness, thinness, independence, rebelliousness, and being cool. JUUL furthered courted the youth market by hosting numerous entertainment-themed launch parties where attendees were encouraged to pose for playful photographs while using JUUL products.

JUUL also downplayed the risk of addiction associated with nicotine. JUUL's packaging and advertisements initially failed to warn users that the product contained nicotine, that nicotine was addictive, or that there were any risks associated with using JUUL. This contributed to the misconception among youth that JUUL did not contain nicotine and was a safe product. A national survey of JUUL users between the ages of 15-24 revealed that 63 percent of JUUL users did not know that JUUL always contains nicotine.[21] Further, a recent investigation revealed that JUUL also collected consumer data on children as young as eight years old and in at least one instance marketed its products as "totally safe" in a school classroom under the guise of addiction education.[22] Even today, JUUL fails to warn that nicotine is particularly dangerous to youth and that it causes long-term changes in neural functioning.

---

[19] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, STANFORD RESEARCH INTO THE IMPACT OF TOBACCO ADVERTISING (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[20] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign"*, ADAGE (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/.

[21] J.G. Willett et al., *Recognition, Use and Perceptions of JUUL Among Youth and Young Adults*, 28 TOBACCO CONTROL 054273, Dec. 17, 2018, at 115-116, https://tobaccocontrol.bmj.com/content/28/1/115.

[22] Caitlin O'Kane, *Juul Told a 9th Grade Class Their Products Were 'Totally Safe,' According to Teens' Testimony*, CBS NEWS (July 25, 2019, 8:53 PM), https://www.cbsnews.com/news/juul-came-to-a-9th-grade-classroom-and-told-teens-their-products-were-totally-safe-according-to-

Separate from the inadequate disclosures about nicotine, JUUL to this day fails to warn about the potential harm that might be caused by inhaling the other ingredients in its products, including the flavorants, propellants, and chemicals formed from the heating elements. JUUL omits all these warnings even though JUUL's former CEO Kevin Burns has admitted that the long-term effects of using its devices are unknown.[23]

JUUL's marketing campaign has been wildly successful at initiating youth on JUUL. During his final week in office, former FDA chief Scott Gottlieb stated unequivocally: "[t]here's no question the JUUL product drove a lot of the youth use" and is largely responsible for "[t]he dramatic spike of youth [vaping]."[24] As Gottlieb continued, "if you go back and look at [JUUL's] marketing campaigns from 2015 and 2016, it's hard not to look at that marketing and conclude that it's not going to be appealing to a youth, to a teenager."

### C. JUUL's Marketing Towards Adult Smokers Is Deceptive and Unlawful

Although much of the focus of media attention and government investigations has been on the youth vaping epidemic, JUUL's conduct vis-à-vis adults is also highly misleading and unlawful. JUUL has attempted to repair its image by falsely portraying itself as the heroic savior on a quest to save adult smokers from deadly cigarettes. JUUL claims that it contains nicotine "equivalent to 1 pack of cigarettes or 200 puffs,"[25] when, in fact, due to the pharmacokinetics of JUUL's highly potent nicotine salt formula, described above, JUUL delivers approximately twice the amount of nicotine as a pack of cigarettes. JUUL also claims to be the "alternative for adult

---

teens-testimonies/.

[23] *E.g.*, Hayley Petersen, *'Don't Vape. Don't Use Juul': Juul CEO Issues Stark Warning to Non-Smokers As He Admits Long-Term Effects of Vaping Are Unknown*, BUSINESS INSIDER (Aug. 29, 2019), https://www.businessinsider.in/dont-vape-dont-use-juul-juul-ceo-issues-stark-warning-to-non-smokers-as-he-admits-long-term-effects-of-vaping-are-unknown/articleshow/70898430.cms.

[24] Julia Belluz, *Scott Gottlieb's Last Word as FDA Chief: Juul Drove a Youth Addiction Crisis* (Apr. 5, 2019), https://www.vox.com/science-and-health/2019/4/5/18287073/vaping-juul-fda-scott-gottlieb. The Court may take judicial notice of Dr. Gottlieb's interview under Federal Rule of Evidence 201.

[25] Troy Farah, *Teens May Not Know That All JUUL Vapes Contain Addictive Nicotine*, VICE (Apr. 18, 2018), https://www.vice.com/en_us/article/43bpb9/does-juul-contain-nicotine. *See also* JUUL SAVINGS CALCULATOR, JUUL, https://www.juul.com/calculator (last visited Oct. 22, 2019) ("One 5% strength JUULpod is designed to replace one pack of cigarettes in both amount (20 cigarettes~200 puffs) and nicotine strength).

smokers"[26] when it has never been approved by the FDA as a smoking cessation device and is more likely to aggravate than ameliorate nicotine addiction. On September 9, 2019, the FDA sent JUUL a warning letter for adulterating its products by marketing them as modified risk tobacco products without FDA approval,[27] which subsequently led to JUUL announcing that it was discontinuing its "make the switch" advertising campaign.[28]

### D. Altria and Philip Morris Fund and Perpetuate the JUUL Epidemic.

Altria Group, Inc. owns Philip Morris USA and manufactures Marlboro, the most popular youth cigarette in the United States. Negotiations between JUUL and Altria began likely in 2017 (and possibly earlier).[29] In mid-2018, Altria's CEO, Howard A. Willard III told the FDA that Altria was "committed to helping reverse the current [e-cigarette] use trend among youth," and agreed to remove Altria's pod-based MarkTen Elite cigarettes until Altria received premarket approval from the FDA. Despite this "commitment" to prevent youth vaping, Altria chose to acquire a 35.5% stake in JUUL in December of 2018 at a cost of $13.8 billion.

As part of this acquisition, Altria agreed to provide logistical and distribution services to JUUL, access to prime retail shelf space next to Marlboro (the county's most popular cigarette), cigarette pack inserts and inserts, and assistance with regulatory matters and government affairs. Altria's involvement in JUUL depended when JUUL recently replaced its former CEO, Kevin Burns, with K.C. Crosthwaite, Altria's former chief growth officer and longtime executive. Crosthwaite's first major hire came days later with the addition of Joe Murillo, Altria's former regulatory head.[30]

---

[26] OUR RESPONSIBILITY, JUUL, https://www.juul.com/our-responsibility (last visited Oct. 22, 2019) ("We believe JUUL is the first viable alternative for adult smokers.").

[27] Warning Letter from Ann Simoneau, Director of the Office of Compliance and Enforcement for the Center for Tobacco Products at the U.S. Food and Drug Administration to Kevin Burns, CEO of JUUL Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[28] Sheila Kaplan et al., *Juul Replaces its C.E.O. with a Tobacco Executive*, N.Y. TIMES (Sept. 25, 2019), https://www.nytimes.com/2019/09/25/health/juul-vaping.html.

[29] Lauren Hirsch and Angelica LaVita, *Altria Board Approves $13 Billion Investment in E-Cigarette Company Juul*, CNBC (Dec. 19, 2018), https://www.cnbc.com/2018/12/19/juul-altria-boards-approve-altrias-13-billion-investment-in-juul.html ("Talks between Altria and JUUL [had] been on and off over the past 14 months, the people said.").

[30] Rishika Chatteriee, *Juul Hires Altria Executive to Handle Regulation Amid Vaping Crisis*, REUTERS (Oct. 1, 2019), https://www.reuters.com/article/us-juul-executives/juul-hires-altria-

## PARTIES

Plaintiffs in MDL-2913 typically fall into the following categories:

1. Purchasers and users of the JUUL device and JUULpods,[31] who seek equitable relief or compensation for economic losses and/or personal injuries. These include:

   a. Persons who allege personal injuries caused by their usage of JUUL, including nicotine addiction, seizures, strokes, collapsed lungs, life-threatening pneumonia, chronic bronchitis, mood, learning, and behavioral disorders, mental problems, attempted suicide, and suicide;

   b. Persons who seek restitution of amounts expended on JUUL products;

   c. Persons who seek class treatment of one or more of these claims for monetary relief;

   d. Persons who seek class treatment of one or more of these claims for determination of particular issues—such as whether JUUL's conduct was likely to deceive reasonable consumers and whether its products are unreasonably dangerous; and

   e. Persons who seek class treatment of one of or more of these claims for injunctive and other legal or equitable relief, including cessation of deceptive and unlawful practices, creation of education and treatment programs and future medical monitoring of the health of users.

2. Public entity and other third-party entities (*e.g.* school districts and counties) seeking damages, injunctive relief, and abatement for public nuisance caused by JUUL and other related claims, on a class or individual basis.

The defendants in this MDL include JUUL Labs, Inc., PAX Labs, Inc., Altria Group, Inc. and Philip Morris USA, Inc. Other potential defendants may include tobacco companies, industry groups, investors and investment firms, tobacco product distributors, wholesalers, tobacco scientists, online marketplaces, marketing firms, social media promoters, product designers, and

---

executive-to-handle-regulation-amid-vaping-crisis-idUSKBN1WH029.

[31] Where these individuals are minors, the nominal plaintiffs may be their adult guardians. In addition, parents and family members may have their own claims for medical and other expenses paid on behalf of the minors.

1  other individuals involved in the underlying conduct. Retail stores that marketed, advertised,
2  and/or sold JUUL to consumers also may be included as defendants in some cases transferred to
3  the MDL. Some cases transferred to this MDL involve retail defendants that are residents of the
4  state where the case was originally filed; thus, diversity jurisdiction does not exist, and this court
5  lacks jurisdiction over those cases.

## CLAIMS

Generally, Plaintiffs bring products liability claims, consumer protection violation claims, and negligence claims arising out of the design, marketing, or sale of JUUL products.  Plaintiffs assert that JUUL's product was defectively designed, and that JUUL knew—or should have known, researched and investigated—the potential for its products to cause addiction in new nicotine users, exacerbate addiction in experienced nicotine users, and cause other negative health outcomes.  Plaintiffs further allege that they were not warned of the risks associated with JUUL use and that, had they been, they would not have used JUUL products.

Certain Plaintiffs also bring claims for false advertising, fraud, fraudulent concealment, unjust enrichment, medical monitoring and breach of warranty.  Some of the class actions assert federal RICO claims against Altria Group, Inc., Philip Morris USA or unnamed marketing entities.

Certain Plaintiffs also seek equitable relief, including cessation of deceptive and unlawful practices and creation of education and treatment programs.  Finally, the public entity and other third-party entity plaintiffs seek reimbursement for expenses and costs related to preventing and reducing JUUL usage among youths, and funds to abate the public nuisance created by JUUL.

## FACTUAL AND LEGAL ISSUES

There are a number of factual and legal issues that will need to be addressed in this litigation, many of which are common.  Among the factual and legal issues to be resolved are the following:

**A.    Factual Issues**

1.    JUUL's knowledge of the dangerous and addictive nature of its products;

2. The timing of JUUL's knowledge of the dangerous and addictive nature of its products;

3. JUUL's market research into to potential user populations of the product, including JUUL's knowledge of the potential for JUUL to be used among minors;

4. JUUL's description of its ENDS' nicotine content;

5. JUUL's knowledge and utilization of tobacco industry marketing tactics;

6. JUUL's marketing activities, including those that were directed to minors and those that implied that JUUL was a less risky alternative to smoking;

7. JUUL's ability to monitor users of JUUL products;

8. JUUL's monitoring of adverse events associated with usage of JUUL products;

9. JUUL's sales and distribution practices, including JUUL's online age verification practices;

10. JUUL's research and testing leading to the development of the current design of the JUUL product;

11. JUUL's design and manufacturing processes;

12. JUUL's use of benzoic acid to modify the ability to inhale or absorb aerosolized nicotine;

13. The physical operation of JUUL's ENDS, including nicotine and toxicant emissions;

14. The health risks posed by JUUL's products;

15. The pharmacokinetics of JUUL's products, the design of JUUL's pharmacokinetic studies, and JUUL's pharmacokinetics-based marketing materials;

16. The nicotine content of JUUL pods;

17. The safety (or lack thereof) of the constituent elements in the JUUL pods for inhalation and JUUL's knowledge thereof;

18. The scope and sufficiency of warnings provided by JUUL to potential users; and

19. The role that other persons or entities played in furthering JUUL's conduct.

**B.     Legal Issues**

1.     Various party discovery issues, including issues concerning privilege, preservation, spoliation, confidentiality, electronic discovery, and previously unproduced or withheld discovery materials;

2.     Various non-party discovery issues, including discovery from the FDA, social media entities, marketing firms, influencers, former JUUL employees, consultants, and contractors, as well as non-United States individuals and entities;

3.     Choice of law issues, including whether a particular state's substantive law controls the claims of all, or some portion, of the transferred cases;

4.     The liability of JUUL affiliates and third parties for the harm flowing from their role in the marketing, sale, and distribution of JUUL, including agency and/or coconspirator liability of sales representatives, distributors, marketing firms, influencers, and consultants;

5.     Whether any of plaintiffs are preempted;

6.     Whether plaintiffs in the various putative class actions have satisfied the requirements of Fed. R. Civ. P. 23 such that classes may properly be certified for economic loss, medical screening and monitoring, or other legal or equitable theories;

7.     As it concerns such class actions, the proper class definition, form and method of notice to class members (if notice is required), and the timing and circumstances concerning the exclusion of potential class members from the class;

8.     The sufficiency, pursuant to Fed. R. Evid. 702-703, of the parties' expert opinions on technical or scientific issues;

9.     The availability of evidentiary presumptions, including presumptions regarding authenticity and business records exceptions to the hearsay rule;

10.    Jurisdictional issues, including issues relating to wrongful removal, improper joinder, and remand for want of subject matter jurisdiction; and

11.    The timing and circumstances for remand of cases transferred to this MDL pursuant to 28 U.S.C. § 1407.

# LITIGATION HISTORY AND SUMMARY OF CASES

### A.  *Colgate v. JUUL Labs Inc.*

The first-filed case in this MDL is *Colgate, et al. v. JUUL Labs, Inc.,* No. 3:18-cv-02499-WHO, alleging class claims for false advertising, defective products, consumer protection statute violations, fraud, unfair business practices, and unjust enrichment. The initial complaint was filed on April 26, 2018. On November 27, 2018, this Court consolidated *Colgate* and two subsequently filed class action cases with similar claims.[32] *Colgate*, ECF 71. On January 30, 2019, the *Colgate* Plaintiffs filed a 384-page Consolidated Amended Complaint ("CAC") alleging violations of state and federal law from 44 plaintiffs in 22 states.

The claims in *Colgate* have survived two motions to dismiss. *Id.*, ECF 66 and 139. In its orders on those two motions, this Court ruled that the *Colgate* Plaintiffs have adequately pleaded claims for false advertising and deceptive business practices, fraud, unjust enrichment, failure to warn, negligent misrepresentation, manufacturing and design defect, breach of implied warranty, violation of the Magnusson-Moss Warranty Act ("MMWA"), and unfair and unlawful business practices. The Court also held that the Tobacco Control Act did not preempt Plaintiffs' false advertising claims to the extent they were based on advertising (including point of sale ads) or false statements of nicotine content on JUUL product labels. The Court further denied a motion to strike portions of the amended *Colgate* complaint and a motion to compel arbitration with respect to the *Colgate* CAC.

The *Colgate* CAC proposes multistate and individual state law classes for each of the alleged violations of state law, a nationwide class for the MMWA claim. In most cases, classes are proposed for all purchasers, along with subclasses of minor purchasers.

### B.  **Additional Purchaser/User Class Claims.**

Later-filed class actions have proposed further claims in addition to those proposed by the *Colgate* CAC. For example, several complaints listed in Exhibit B include RICO claims based on an alleged conspiracy between JUUL and Altria to bypass advertising restrictions placed on Altria

---

[32] The two original cases consolidated with Colgate were *Viscomi et al. v. JUUL Labs, Inc.*, No. 3:18-cv-06808-WHO (E.D. Pa. Aug. 31, 2018), and *J.Y. et. al. v. JUUL Labs, Inc.*, No. 3:18-cv-06776-WHO (S.D. Fla. Oct. 10, 2018).

by the Master Settlement Agreement. Other potential class claims include RICO claims directed to conspiracy between JUUL and third-party promoters, including marketing companies, influencers and/or affiliate advertisers who sold or promoted JUUL on JUUL's behalf.[33] Still other actions allege claims for, or expressly seek the relief of, medical monitoring. Some complaints seek other specified injunctive relief in the form of education and treatment programs for minors.

### C. <u>Individual Personal Injury Cases</u>

A large and growing number of cases filed and pending transfer to this MDL are individual personal injury complaints filed on behalf of users of JUUL and their families. In part like some of the class complaints, many of the personal injury complaints allege claims sounding in product liability, negligence, strict liability, and fraud. However, unlike the class actions, the claims asserted by these plaintiffs are for personal injuries, seeking economic and non-economic damages for injuries involving nicotine addiction, seizures, strokes, collapsed lungs, life-threatening pneumonia, chronic bronchitis, mood, learning, and behavioral disorders, attempted suicide, and suicide.

The injuries suffered by the personal injury plaintiffs are often permanent and life-changing. The consequences of youth addiction are pronounced, often leading to behavioral and social issues that can result in long-term developmental problems. Likewise, as evidenced by the recent increase of respiratory injuries, including deaths, from vaping, excessive use of e-cigarettes like JUUL can result in permanent pulmonary injury. Similarly, strokes and seizures caused by JUUL are also catastrophic, often proving fatal or leaving plaintiffs wholly incapacitated.

The injuries suffered by these plaintiffs are unique and personal. For instance, many plaintiffs claiming an injury of addiction have alleged facts supporting the degree of their addiction—for example, frequency of use, severe cravings, withdrawal symptoms, emotional problems, mental health problems, suicidal thoughts, etc.—but have not been formally diagnosed as suffering from nicotine addiction by a healthcare provider. Other plaintiffs, such as those who have suffered a stroke or a seizure, have documented hospitalizations and associated medical

---

[33] *See, e.g., Phillips v. JUUL Labs Inc. et al.*, No. 2:19-cv-04172 (W.D. Mo. Aug. 21, 2019).

1   care. For many plaintiffs, their injuries are continuing, and likely worsening, as they continue to
2   use the product given their addiction. Given the varying injuries alleged, and the complexities
3   associated with addressing them within the youth population, there is a distinct need for flexibility
4   in demonstrating a plaintiff's injuries and the path forward for making them whole.

5   Finally, and depending on the state law at issue in a case, plaintiffs seek punitive damages.

### D. Municipal, School District, and Public Nuisance Cases

7   Multiple governmental entities, including King County, the most populous county in
8   Washington State; Montgomery County, the most populous county in Maryland; and school
9   districts in Kansas, Missouri, New York and Washington, have filed their own suits. These
10  government claims are often based on similar factual and legal allegations as the class and
11  individual claims, but they typically assert public nuisance as one of the primary claims and seek
12  abatement as well as damages as a remedy. These governmental entities seek monetary relief to
13  assist them in providing the resources required to fund the public health efforts necessary to abate
14  the nuisance of the youth vaping epidemic are what local governments and schools are seeking in
15  this litigation, and this remedy is distinct from the remedies sought by individuals with personal
16  injuries or classes of consumers. These public nuisance actions have been filed as both individual
17  cases and class actions. These nuisance claims will raise unique factual and legal issues—for
18  example, the nature of the public nuisance and whether Defendants were a substantial
19  contributing factor to the nuisance.

20  Schools will likely play a role in implementing abatement programs developed by local
21  government health departments and others, and may require additional staff time and funds to do
22  so. Schools are also facing costs distinct from the damages sought by individual plaintiffs,
23  including modifications to school restrooms, and significant time spent by teachers,
24  administrators, nurses, counselors, and other staff; indeed, some school districts have created new
25  staff positions just to address the epidemic vaping rates in their schools.

## DISCOVERY STATUS

27  Although discovery has begun in the *Colgate* action, with approximately 100,000
28  documents produced by Defendants, that is only the tip of the iceberg. Soon after production

began, JUUL moved to stay all proceedings pending a decision on its petition to create an MDL, arguing that the scope of discovery would change if an MDL were created, and that counsel for other plaintiffs would have a right to weigh in on the scope of that discovery. The Court granted JUUL's motion.

Given the massive scope and breadth of this MDL, it is contemplated that while many of the *Colgate* discovery requests may be adopted here in part, the Plaintiff's Steering Committee will likely propound additional discovery suited to address the additional legal theories presented in these consolidated proceedings. There likely will need to be changes made to the ESI protocols, custodian lists, time period searched, and more.[34] As other defendants are added, there will be yet more discovery required. No depositions have yet been requested, scheduled or taken.

## COORDINATION OF VARIOUS CLAIMS AND ACTIONS

The Plaintiffs, once organized into a steering committee, will consider and propose the best structure for the development, management, and prosecution of the various claims asserted by the varying types of plaintiffs, including individuals, classes, and private and public entities.

## STATUS OF RELATED FEDERAL AND STATE ACTIONS

The Judicial Counsel of the State of California has coordinated all JUUL-related litigation in Los Angeles County. Upon appointment of the Plaintiffs' leadership, that leadership will determine whether one or more of those appointed firms, or another firm, is best suited to act as state-federal liaison counsel and will make a proposal on that issue for the Court to address by the second Case Management Conference.

---

[34] *Colgate* plaintiffs are prepared to share documents produced by JUUL and obtained from third parties with the PSC and plaintiffs' counsel as soon as the parties agree on an appropriate Protective Order.

DATED: October 23, 2019

Respectfully submitted,

*/s/ Sarah R. London*
Sarah R. London

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
slondon@lchb.com
Telephone:  415.956.1000
Fax:  415.956.1008

*Proposed Interim Plaintiffs' Liaison Counsel*

1852008.1 - 17 - PLAINTIFFS' POSITION STATEMENT
CASE NO. 19-MD-02913-WHO