Joseph R. Saveri (State Bar No. 130064)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com

*Interim Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: JUUL LABS, INC. ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL DIRECT PURCHASER ACTIONS | Case No. 3:20-cv-02345-WHO<br><br>THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

Page


INTRODUCTION ....................................................................................... 1

JURISDICTION AND VENUE ....................................................................... 3

INTRADISTRICT ASSIGNMENT ................................................................... 3

PARTIES ................................................................................................. 4

A. Plaintiffs ............................................................................................ 4

B. Corporate Defendants ............................................................................ 4

C. Individual Defendants ............................................................................ 5

AGENTS AND CO-CONSPIRATORS .............................................................. 9

CLASS ALLEGATIONS ................................................................................ 9

FACTUAL ALLEGATIONS .......................................................................... 11

A. Industry Background ............................................................................ 11

B. JLI and Altria Agree to Divide and Allocate Markets and Not to Compete in the Closed-System E-Vapor Market ......................................................... 15

THE FTC ACTION .................................................................................... 23

MARKET STRUCTURE .............................................................................. 24

A. Relevant Market ................................................................................... 24

B. Market Concentration ........................................................................... 27

C. The Closed-System E-Vapor Market Has High Barriers to Entry ..................... 28

D. Market Power ...................................................................................... 29

ANTICOMPETITIVE EFFECTS OUTWEIGH PROCOMPETITIVE BENEFITS, IF ANY ......... 29

A. Anticompetitive Effects ......................................................................... 29

B. Absence of Procompetitive Benefits ......................................................... 32

HARM TO COMPETITION AND ANTITRUST INJURY ......................................... 33

CLAIMS FOR RELIEF ................................................................................ 34

DEMAND FOR JUDGMENT ......................................................................... 37

JURY TRIAL DEMANDED ........................................................................... 38

Plaintiffs Jake Sieber, Devin Black, and Robert Thompson, on behalf of themselves and all others similarly situated, bring this Consolidated Class Action Complaint against Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc., ("JLI") for violations of Section 1 the Sherman Act, 15 U.S.C. § 1, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 16 of the Clayton Act, 15 U.S.C. § 26, as follows:

## INTRODUCTION

Plaintiffs allege on information and belief as follows:

1. This is an antitrust class action against Defendants Altria and JLI, concerning anticompetitive agreements between them in which Altria agreed to refrain from competing against JLI in the United States market for closed-system e-vapor products ("Closed-System E-Vapor") by withdrawing from the market in return for a substantial ownership interest in JLI. Through these agreements, Altria and JLI agreed to cease competing and divide and allocate the Closed-System E-Vapor market. Plaintiffs seek damages and injunctive relief for the collusive and concerted restraint of trade orchestrated by Defendants.

2. E-Vapor products are electronic devices that deliver nicotine to a user by vaporizing a liquid nicotine solution. In a closed system, the liquid is contained in a pre-filled, sealed cartridge, pod, or tank. JLI was and is the dominant player in the Closed-System E-Vapor market in the United States.

3. Altria is one of the country's largest tobacco companies. In light of declining sales in the market for traditional combustible cigarettes and a shift by consumers to alternative nicotine delivery devices, Altria viewed participation in the Closed-System E-Vapor market as essential to its long-term survival. In 2013, Altria entered the market through its subsidiary Nu Mark LLC. Its flagship product was the MarkTen e-cigarette. By mid-2017, Altria's MarkTen e-cigarette had achieved the second-highest market share in the Closed-System E-Vapor market.

4. In 2015, JLI entered the Closed-System E-Vapor market and made relatively modest gains with consumers. However, by mid-2017, JLI began to experience rapid growth, quickly captured a substantial market share, and overtook the MarkTen e-cigarette. By 2018, JLI had obtained revenue market share of over 70 percent, stunning Altria and other competitors. Altria believed that participation in the Closed-System E-Vapor market was a strategic priority that was essential to its long-

term survival. JLI's swift rise posed a grave competitive threat to Altria in the Closed-System E-Vapor market and had potential implications for Altria in the traditional cigarette market.

5. In response to that threat, Altria adopted a two-prong strategy: aggressively competing with JLI through price promotion and expanding and accelerating development of its portfolio of products, while simultaneously engaging in discussions of either acquiring or gaining a majority ownership stake in JLI.

6. Specifically, in February 2018, Altria introduced a new product known as the MarkTen Elite—a pod-based product closely resembling JLI's product. At the same time, Altria heavily invested in research and advertising to promote and develop its Closed-System E-Vapor products, MarkTen and MarkTen Elite. By mid-2018, Altria was reporting to investor groups that its products were gaining traction with consumers.

7. At the same time, Altria attempted to negotiate with JLI to acquire an ownership interest in JLI. At first, JLI refused. But in the fall of 2018, JLI agreed to negotiate with Altria, under the condition that Altria stop competing with JLI in the Closed-System E-Vapor market. In particular, JLI refused to proceed with negotiations unless and until Altria had withdrawn its products. At first, Altria refused. On October 25, 2018, however, Altria agreed with JLI to cease competing with JLI and announced its intention to withdraw its MarkTen products from the market.

8. Two months later, on or about December 7, 2018, Altria announced its intention to cease competing in the Closed-System E-Vapor market entirely. Approximately two weeks after making this announcement, on December 20, 2018, Altria disclosed that it had entered into a series of agreements with JLI (collectively, the "Transaction"). Among other things, the Transaction provided that Altria would acquire certain ownership interests in JLI and other rights, in exchange for $12.8 billion in cash and an agreement with Altria to withdraw from and exit the Closed-System E-Vapor market.

9. The Transaction was anticompetitive, and its effects are enduring. Defendants' conduct has illegally restrained competition in the Closed-System E-Vapor market in violation of the Sherman and Clayton Acts. As a direct and proximate result of Defendants' anticompetitive conduct, prices for Closed-System E-Vapor were raised, fixed, maintained, and/or stabilized at supracompetitive levels. Altria's investment in JLI and Altria's exit from the market eliminated its existing Closed-System E-

Vapor products and halted its ongoing innovation efforts toward developing new and improved products. Thus, consumers, including Plaintiffs and members of the Class, lost the benefit of current and future head-to-head competition between Altria and JLI, and between Altria and other competitors.

## JURISDICTION AND VENUE

10. Plaintiffs bring this action on their own behalf as well as that of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 7 of the Clayton Act, 15 U.S.C. § 18, as well as any and all equitable relief afforded them under the federal laws pleaded herein.

11. Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## INTRADISTRICT ASSIGNMENT

12. Pursuant to Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws was substantially conducted with, directed to or impacted Plaintiffs and members of the Class in counties located within the Division. Furthermore, JLI's principal place of business is located within this Division.

## PARTIES

### A. Plaintiffs

13. Plaintiff Jake Sieber is a resident of the State of Texas. Sieber purchased Closed-System E-Vapor products, including devices and pods, directly from JLI during the relevant period. Sieber created an account with JLI on Juul.com before August 8, 2018. Sieber did not agree to arbitrate his claims against JLI. Sieber was injured in connection with his purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

14. Plaintiff Devin Black is a resident of the State of New York. Black purchased Closed System E-Vapor products, including devices and pods, directly from JLI during the relevant period. Black created an account with JLI on Juul.com before August 8, 2018. Black did not agree to arbitrate his claims against JLI. Black was injured in connection with his purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

15. Plaintiff Robert Thompson is a resident of the State of Florida. Thompson purchased Closed System E-Vapor products, including devices and pods, directly from JLI during the relevant period. Thompson created an account with JLI on Juul.com before August 8, 2018. Thompson did not agree to arbitrate his claims against JLI. Thompson was injured in connection with his purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

### B. Corporate Defendants

16. Defendant Juul Labs, Inc. ("JLI"), is a Delaware corporation with its principal place of business located at 560 20th Street, San Francisco, California. JLI is the leading manufacturer of Closed-System E-Vapor products, generating over $1 billion in sales in 2018. During the Class Period, JLI sold Closed-System E-Vapor products, including devices and pods, under the brand name JUUL directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. JLI is a party to the anticompetitive and unlawful agreements alleged herein.

17. Defendant Altria Group, Inc. ("Altria") is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia. Altria is one of the country's largest tobacco companies and was, prior to the anticompetitive Transaction alleged, a manufacturer of Closed-System E-Vapor products. Before exiting the Closed-System E-Vapor market pursuant to the Transaction, Altria sold

Closed-System E-Vapor products, including devices, cartridges and pods, directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. Altria is a party to the anticompetitive and unlawful Transaction alleged herein. Prior to the anticompetitive and illegal Transaction, Altria sold and marketed Closed-System E-Vapor products under the brand names MarkTen and Green Smoke, and a closed-system pod-based product under the brand name MarkTen Elite. In 2018, Altria generated over $25 billion in sales.

**C. Individual Defendants**

18. Defendant Kevin "KC" Crosthwaite is the Chief Executive Officer and Chairman of Juul Labs, Inc. Crosthwaite is a resident and citizen of Virginia. Crosthwaite became CEO of JLI in September 2019. Before that, from June 2018 to September 2019, Crosthwaite was the Chief Growth Officer for Altria. In that role, he was involved in the development and growth of Altria's Nu Mark MarkTen product line, which directly competed with JLI. Crosthwaite actively and knowingly engaged in the anticompetitive conduct alleged herein. Crosthwaite was instrumental in negotiating Altria's attempts to acquire and ultimately invest in JLI. Crosthwaite was instrumental in negotiating and implementing the anticompetitive provisions of the Transaction. Crosthwaite implemented the Transaction, by among other things, overseeing the withdrawal of the MarkTen products, as well as Altria's due diligence of JLI. In January 2019, Crosthwaite was named as Altria's "independent" observer on JLI's Board of Directors. Plaintiffs are informed and believe, and on that basis allege, that Crosthwaite benefited personally from the anticompetitive nature of the Transaction either through direct shareholding in the parties to the Transaction or through other forms of compensation and financial benefits.

19. Defendant Nicholas J. Pritzker is a venture capital investor and co-founder of Tao Capital Partners. Tao Invest, the direct investment entity affiliated with Tao Capital Partners, was a significant early investor in JLI. Pritzker has, at all relevant times, been a member of JLI's Board of Directors. Pritzker joined JLI's Board of Directors in December 2017 and was a member of the Board when it authorized the anticompetitive Transaction. In 2018, Pritzker represented to Altria that he and Defendant Riaz Valani controlled a combined 44% of JLI's stock. Pritzker is a resident and citizen of the State of California. Pritzker obtained substantial income from the proceeds of the anticompetitive

agreement. Pritzker was instrumental in negotiating and implementing the anticompetitive provisions of the Transaction. Pritzker actively and knowingly engaged in the anticompetitive conduct alleged herein. Pritzker attended meetings and communicated with employees of Altria in order to enter into the anticompetitive Transaction.

20. Defendant Riaz Valani is a venture capital investor and General Partner at private-equity investment firm Global Asset Capital. Global Asset Capital is a significant investor in JLI. Valani has, at all relevant times, been a member of JLI's Board of Directors, including when it authorized the anticompetitive Transaction. Valani has been listed as a JLI board member on SEC filings beginning as early as 2011. In 2018, Valani represented to Altria that he and Pritzker controlled a combined 44% of JLI's stock. Valani is a resident and citizen of California. Valani obtained substantial income from the proceeds of the Transaction. Valani actively and knowingly engaged in the anticompetitive conduct alleged herein. Valani attended meetings and communicated with employees of Altria in order to enter and implement the anticompetitive Transaction.

21. Defendant Dinyar Devitre has, at all relevant times, been a member of the Board of Directors of Altria, including when it authorized the anticompetitive Transaction, and currently chairs Altria's Finance Committee. Devitre is a resident and citizen of New York. Devitre actively and knowingly engaged in the anticompetitive conduct alleged herein. Devitre was instrumental in negotiating and implementing the anticompetitive provisions of the Transaction. Devitre attended meetings and communicated with employees and board members of JLI in order to enter and implement the anticompetitive Transaction. Plaintiffs are informed and believe, and on that basis allege, that Devitre benefited personally from the anticompetitive nature of the Transaction either through direct shareholding in the parties to the Transaction or through other forms of compensation and financial benefits.

22. Defendant Kevin Burns was Chief Executive Office of JLI from December 2017 to September 2019. Burns is a resident and citizen of California. Burns actively and knowingly engaged in the anticompetitive conduct alleged herein. Burns was instrumental in negotiating and implementing the anticompetitive provisions of the Transaction. Burns attended meetings and communicated with

employees of Altria in order to enter and implement the anticompetitive Transaction. Burns obtained substantial income from the proceeds of the anticompetitive Transaction.

23. Defendant James Monsees is a co-founder of JLI, was its Chief Product Officer at all relevant times until March 2020, and was a member of the Board of Directors of JLI when it authorized the anticompetitive Transaction. Monsees has been an officer and director of JLI at all relevant times. Monsees is a resident and citizen of California. Monsees actively and knowingly engaged in the anticompetitive conduct alleged herein. Monsees attended meetings and communicated with employees of Altria in order to enter and implement the anticompetitive Transaction. Monsees obtained substantial income from the proceeds of the anticompetitive Transaction.

24. Defendant Adam Bowen is the Chief Technology Officer, a co-founder at JLI, and a member of the Board of JLI, including when it authorized the anticompetitive Transaction. Bowen has been an officer and director of JLI at all relevant times. Bowen is a resident and citizen of the State of California. Bowen actively and knowingly engaged in the anticompetitive conduct alleged herein. Bowen attended meetings and communicated with employees of Altria in order to enter and implement the anticompetitive Transaction. Bowen obtained substantial income from the proceeds of the anticompetitive Transaction.

25. Defendant Gerald Masoudi was the Chief Legal Officer at JLI from July 2018 until October 2020. Masoudi is a resident and citizen of Virginia. Masoudi actively and knowingly engaged in the anticompetitive conduct alleged herein. Masoudi was instrumental in negotiating and implementing the anticompetitive provisions of the Transaction. Masoudi communicated with employees of Altria in order to enter and implement the anticompetitive Transaction. Plaintiffs are informed and believe, and on that basis allege, that Masoudi benefited personally from the anticompetitive nature of the Transaction either through direct shareholding in the parties to the Transaction or through other forms of compensation and financial benefits.

26. Defendant Timothy Danaher was the Chief Financial Officer at JLI from approximately October 2014 to October 2019. Danaher is a resident and citizen of California. Danaher actively and knowingly engaged in the anticompetitive conduct alleged herein. Danaher was instrumental in negotiating and implementing the anticompetitive provisions of the Transaction. Danaher attended

meetings and communicated with employees of Altria in order to enter and implement the anticompetitive Transaction. Plaintiffs are informed and believe, and on that basis allege, that Danaher benefited personally from the anticompetitive nature of the Transaction either through direct shareholding in the parties to the Transaction or through other forms of compensation and financial benefits.

27. Defendant Howard Willard was Chairman and CEO of Altria from May 2018 until April 2020. Before that, Willard served in numerous leadership positions during his more than 25-year career at Altria—including Chief Operating Officer, Chief Financial Officer and Executive Vice President of Strategy and Business Development. Willard is a resident and citizen of Virginia. Willard actively and knowingly engaged in the anticompetitive conduct alleged herein. Willard was instrumental in negotiating and implementing the anticompetitive provisions of the Transaction. Willard attended meetings and communicated with employees of JLI in order to enter the anticompetitive Transaction. Plaintiffs are informed and believe, and on that basis allege, that Willard benefited personally from the anticompetitive nature of the Transaction either through direct shareholding in the parties to the Transaction or through other forms of compensation and financial benefits.

28. Defendant William ("Billy") Gifford currently serves as CEO of Altria. Before that, Gifford has served in numerous senior leadership roles during his more than 25-year career at Altria, including most recently Vice Chairman and Chief Financial Officer. Gifford is a resident and citizen of the Virginia. Gifford actively and knowingly engaged in the anticompetitive conduct alleged herein. Gifford was instrumental in negotiating and implementing the anticompetitive provisions of the Transaction. Gifford attended meetings and communicated with employees of JLI in order to enter and implement the anticompetitive Transaction. Plaintiffs are informed and believe, and on that basis allege, that Gifford benefited personally from the anticompetitive nature of the Transaction either through direct shareholding in the parties to the Transaction or through other forms of compensation and financial benefits.

29. Defendant Murray Garnick is Executive Vice President and General Counsel at Altria. Garnick is a resident and citizen of Virginia. Garnick actively and knowingly engaged in the anticompetitive conduct alleged herein. Garnick was instrumental in negotiating and implementing the

anticompetitive provisions of the Transaction. For example, Garnick communicated with employees of JLI in order to enter and implement the anticompetitive Transaction. Plaintiffs are informed and believe, and on that basis allege, that Garnick benefited personally from the anticompetitive nature of the Transaction either through direct shareholding in the parties to the Transaction or through other forms of compensation and financial benefits.

## AGENTS AND CO-CONSPIRATORS

30. The anticompetitive and unlawful acts alleged against the Corporate Defendants in this consolidated class action complaint were authorized, ordered or performed by the Corporate Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Corporate Defendants' businesses or affairs.

31. The Corporate Defendants' agents operated under the explicit and apparent authority of their principals.

32. Each Corporate Defendant, and its subsidiaries, affiliates and agents operated as a single unified entity.

33. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

34. Each Defendant acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ALLEGATIONS

35. Plaintiffs bring this action for damages and injunctive relief on behalf of themselves and all others similarly situated as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All persons or entities in the United States that purchased Closed-System E-Vapor products, including devices and pods, directly from Juul from October 5, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

This definition specifically excludes the following person or entities:

a. Any of the Defendants named herein;

b. Any of the Defendants' co-conspirators;

c. Any of Defendants' parent companies, subsidiaries, and affiliates;

d. Any of Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents;

e. All governmental entities; and

f. The judges and chambers staff in this case, as well as any members of their immediate families.

36. Plaintiffs do not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

37. Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs directly purchased a Closed-System E-Vapor product, including devices and pods, from JLI. Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

38. Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a. Whether Defendants combined or conspired with one another to not compete in the market for Closed-System E-Vapor products, including devices and pods, sold at any time during the Class Period to purchasers in the United States;

b. Whether Defendants combined or conspired with one another to fix, raise, maintain and/or stabilize prices for Closed-System E-Vapor products, including devices and pods, sold at any time during the Class Period to purchasers in the United States;

c. Whether Defendants combined or conspired with one another to divide or allocate the market for Closed-System E-Vapor products, including devices and pods, sold at any time during the Class Period to purchasers in the United States;

d. Whether Defendants' conduct caused the prices of Closed-System E-Vapor products, including devices and pods, sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained or stabilized at supracompetitive prices;

e. Whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages;

f. Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

39. These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

40. Plaintiffs will fairly and adequately represent the interests of the Class because they purchased Closed-System E-Vapor products, including devices and pods, directly from JLI and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

41. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

42. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

43. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

### A. Industry Background

44. The discovery of the negative impacts of tobacco use in the 1990's and early 2000's changed American society. Laws were enacted banning cigarette smoking in public places such as restaurants and bars. The prohibition sparked changes in Americans' smoking habits and added to

increasing social stigma. Dramatically increased taxes on cigarettes provided another disincentive to smoke, and many Americans gave up smoking to live a healthier life. Rates of traditional smoking among the younger generations decreased drastically.

45. The first modern E-Vapor products appeared in the United States market by the mid-2000s. Around 2010, traditional tobacco companies started either entering the market with their own products or acquiring existing E-Vapor companies.

46. In 2007, Pax Labs ("Pax") was founded by James Monsees and Adam Bowen, graduates of the design program at Stanford University. Initially, Pax was called Ploom. In 2017, JLI was spun out of Pax. In this complaint, Pax is referred to as JLI.

47. Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product." Because of "some problems" inherent in the cigarette, JLI's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category." Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." With a focus on recreating the "ritual and elegance that smoking once exemplified," Monsees and Bowen founded JLI to "meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."

48. In 2013, Altria entered the Closed-System E-Vapor market through its subsidiary Nu Mark with the brand MarkTen. The MarkTen was a cig-a-like product that was designed to look and feel like a traditional cigarette.

49. Over the next several years, Altria spent well over $100 million acquiring other existing Closed-System E-Vapor products in order to augment its portfolio.

50. In 2015, JLI launched the JUUL, a Closed-System E-Vapor product in a discreet "pod-based" format. JLI's Closed-System E-Vapor product is comprised of three products: (1) the device ("JUUL"), which looks and feels like a small USB drive, (2) pods containing E-Liquid ("JUULpods"), and (3) a charger. These products are shown below.




51. The JUUL deployed a chemical breakthrough in the speed of its nicotine delivery. Since the 1960s, tobacco companies have manufactured cigarettes that freebase nicotine using ammonia, which liberates the nicotine so that it can be quickly absorbed into the lungs and the brain. As one addiction expert has said, "[t]he modern cigarette does to nicotine what crack does to cocaine." JLI discovered that by adding benzoic acid to nicotine salts, which occur naturally in tobacco, they could mimic a cigarette's rapid nicotine delivery. E-Liquid (also known as E-juice, vape juice, and vapor liquid) is the fluid used in vaporizers and electronic cigarettes that creates the actual vapor. JUUL uses a proprietary blend of E-Liquid. According to Bowen, because it contains ten times as much nicotine as other e-cigarettes, JUUL packs a "bigger punch" as compared to other, similar products in the market. Bowen also stated that the idea behind the blend was to eliminate the need for smokers to go back to cigarettes after an unsatisfying experience with vaping.

52. Another novel aspect of the JUUL was its easy-to-use pod-based design, which allowed consumers to quickly replace the E-Liquid to continue smoking. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JLI's patented E-Liquid and a coil heater. When a sensor in the JUUL detects the movement of air caused by suction on the JUULpod, the battery in the JUUL activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. JUULpods are disposable and must

be replaced after the E-Liquid is exhausted. JUULpods come in a variety of flavors and are available in both 5.0% and 3.0% nicotine strengths.

53. A light embedded in the JUUL serves as a battery level indicator and lights up in a "party mode" display of a rainbow of colors when the device is waved around. The party mode is particularly appealing to younger consumers and contributed to JLI's success in the market.

54. The physical design of the JUUL, including its circuit board, and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, JLI can finely tune the amount of nicotine vapor the JUUL delivers.

55. JLI's Closed-System E-Vapor product quickly gained traction among consumers, rapidly surpassing Altria and securing the largest share of the Closed-System E-Vapor market. JUUL was attractive to a new generation of smokers that valued its sleek design, easy-to-use pods in flavors like cucumber, mango, and mint, and discrete, scentless smoke.

56. Since its launch in 2015, JLI has become the dominant Closed-System E-Vapor manufacturer in the United States. Its revenues grew by 700% in 2017. According to a Wells Fargo report, as of August 2018, JLI had the largest market share in the e-cigarette category with 53% share of volumes and 72% share of revenue over the previous 52-week period.

57. In July 2017, JLI was spun out of Pax as an independent company, with Tyler Goldman, former CEO of Pax, named as CEO of JLI. In December 2017, Goldman was replaced by Kevin Burns. Monsees worked as Chief Product Officer and served as a member of the Board of Directors at JLI. Bowen worked as Chief Technology Officer and served as a member of the Board of Directors at JLI.

58. In late-2017, Altria acquired the rights to a pod-based product. In February 2018, Altria began marketing a closed-system pod-based product as the MarkTen Elite. Using the MarkTen Elite, Altria sought to compete directly with JLI's sleek, pod-based e-vapor product.

59. Like the JUUL, the MarkTen Elite offered a variety of pod flavors in disposable capsules. Each pod contained 1.5ml of liquid nicotine. The MarkTen Elite is shown below:




60. Altria management emphasized the importance of the Closed-System E-Vapor market in its investor presentations and through internal incentive compensation plans. For example, in a November 2017 presentation to investors, Altria detailed the "substantial amount of work" it has already undertaken to prepare numerous regulatory applications for submission to the FDA for e-vapor products. Altria explained that its "significant investments in regulatory science have laid the groundwork for these submissions, and much of the foundational research is already underway." In February 2018, Altria's then-COO Howard Willard explained, "Nu Mark's goal is to lead the U.S. e-vapor category with a portfolio of superior, potentially reduced-risk products that . . . generate cigarette-like margins at scale."

**B. JLI and Altria Agree to Divide and Allocate Markets and Not to Compete in the Closed-System E-Vapor Market**

61. Beginning in 2017, Altria pursued a two-pronged strategy of attempting to acquire a competitor in the Closed-System E-Vapor space while simultaneously competing aggressively within it.

62. Early on, JLI was identified as the most promising target because of its rapidly increasing market share and popularity with consumers.

63. In 2017, JLI entertained but rebuffed Altria's initial overtures of acquisition, and instead chose to compete with Altria in the Closed-System E-Vapor market, particularly with respect to price. However, despite having recently become the market leader, JLI was concerned that Altria would use its reputation, experience in the tobacco business, and abundant human and capital resources to compete with respect to product innovation and price. In short, Altria was also a competitive threat to JLI.

64. On November 9, 2017, Howard Willard and Billy Gifford—Altria's then-CFO—held a meeting with "key Pax investors." Altria's goal was to "[c]omplete an investment / acquisition that provides access to Juul product and Pax capabilities."

65. On November 21, 2017, Willard and Jon Moore, Nu Mark's Director of Marketing, had a call with representatives from Goldman Sachs (Pax's financial advisor) to discuss the potential deal.

66. In the ensuing months, Perella Weinberg Partners (Altria's financial advisor) engaged with Goldman Sachs regarding the potential deal and facilitated further discussions between Altria and JLI.

67. In early 2018, Altria again approached JLI to acquire an ownership interest in JLI, including potentially acquiring or merging with the company. As before, JLI initially resisted Altria's efforts, seeking to impose onerous anticompetitive preconditions on the discussions. Among other things, JLI sought to obtain Altria's agreement, in exchange for valuable consideration, to control or allocate the market for Closed-System E-Vapor products.

68. On April 13, 2018, Willard sent Kevin Burns, JLI's then Chief Executive Officer, and JLI Board members Nick Pritzker and Riaz Valani, an email, copying Gifford, recommending a "Follow Up Discussion" early the following week during which he and Gifford would be prepared to share various proposals, including a proposal that "proposes a way for us to collaborate on . . . Sharing market and financial projections to gain agreement on the standalone and partnership value for the enterprise; ii) An efficient and appropriate due diligence process; and iii) A process to ensure that the strategy alignment and chemistry between our respective operating teams is supportive of a productive partnership that can create substantial value above what is achievable under a standalone scenario in a dynamic tobacco category environment."

69. On April 20, 2018, Burns sent Willard a letter reflecting JLI's "current thinking on price, payment and related terms." Among the key terms outlined was that "JUUL's and Altria's respective anti-trust counsel would discuss and develop a plan with respect to seeking and obtaining regulatory approval for the majority investment, including the treatment of any competitive products owned by Altria."

70. As part of these discussions, JLI had made clear to Altria that a condition of any investment would be that Altria stop competing with JLI in the market for Closed-System E-Vapor products. For example:

- Timothy Danaher, JLI's former CFO, stated: "So we had always -- we had always contemplated that Altria would be subject to a noncompete in the e-vapor category as part of any transaction with us."
- Burns, the former CEO of JLI, explained: "I don't think it's practical in terms of Altria wanting to have a significant stake in the company, have transparency on all the major strategic and operational priorities . . . and in parallel at the same time be competing with us against that product roadmap and those products."
- Valani, who was an early investor in JLI and a JLI Board Director, as well as a key negotiator of the Transaction, stated: "I think that Altria, you know, we felt that it was a risk we shouldn't take, you know, being, you know, in bed with them in any way and having the ability for them to have something that they have a greater incentive to sell that directly . . . ."

71. According to filings with the Securities and Exchange Commission, on or about July 10, 2018, Pritzker and Valani further invested hundreds of millions of dollars into JLI.

72. On July 30, 2018, in advance of a meeting between JLI's lead negotiators, Pritzker emailed Willard an opening term sheet for discussions. The term sheet included the following non-compete term:

> Promptly and in no event later than nine months following the purchase, subject to the license referenced above, [Altria] will divest (or if divestiture is not reasonably practicable, contribute at no cost to [JLI], and if such contribution is not reasonably practicable, then cease to operate), all [Altria] assets related to the field in the U.S., including all electronic nicotine delivery systems and products it acquired, developed or has under development.

73. JLI presented Altria with three options for meeting its demand for getting out of the e-cigarette business: (1) divest its e-cigarette assets; (2) contribute those assets to JLI; or (3) cease operating those assets entirely. Continued competition from Altria's Closed-System E-Vapor products

was the only option clearly off the table. Danaher, JLI's former CFO, confirmed that "what [JLI was] more concerned with is we want a non-compete. How it's going to be accomplished, right, needs to be determined, and, frankly, we were putting the onus on [Altria] to figure it out."

74. On August 1, 2018, the lead negotiators from each side met at the Park Hyatt Hotel in Washington, DC to discuss terms. JLI was represented by Pritzker, Valani, and Burns. Altria was represented by Willard, and Gifford, Altria's then-Chief Financial Officer (and current CEO). No attorneys were present at this meeting. The participants discussed various business terms, including anticompetitive agreements not to compete.

75. After this meeting, Altria's top executives understood that ceasing to compete in the Closed-System E-Vapor business was a condition for reaching a deal with JLI. Altria's draft talking points dated August 5, 2018, for Mr. Willard to use on a call with JLI, noted that "[i]f we establish this partnership, then we expect that Altria will . . . potentially exit our own vapor business," and that "Altria has come a long way to accommodate you in this process, including . . . [[d]emonstrating flexibility with our existing vapor business, if necessary in order to form the partnership]."

76. In another version of its draft talking points, also dated August 5, 2018, Altria stated more broadly that, if an agreement could not be reached, Altria was prepared to "break off these discussions, shake hands, and agree to be competitors."

77. On August 9, 2018, Altria's Gifford sent over a markup of the term sheet to JLI's Pritzker, Valani, and Burns that was "to serve as the basis of discussion at our upcoming meeting." That markup deleted a provision that would have required Altria to divest its e-cigarette business, contribute it to JLI, or cease to operate it.

78. During the August 9, 2018 meeting of the JLI Board of Directors, the Board "generally expressed disappointment at many of the terms contained in the [Altria] summary of terms."

79. On August 15, 2018, Valani met with Dinny Devitre ("Devitre"), one of Altria's Board Members, at Mr. Devitre's office in New York. The purpose of this discussion was to go over a few key points of disagreement prior to a planned negotiating session in San Francisco between the Defendants. In connection with this discussion, JLI delivered a blunt message to Altria: "You have retained the right under certain circumstances to compete not only with existing MarkTen products, but also with

products under development and future products. The commitment to divest MarkTen has been stricken. This is not acceptable to us."

80. After negotiations between Defendants were suspended temporarily, Altria's executives knew that they had to reaffirm their commitment to meeting JLI's demands if they were to restart talks successfully and reach an agreement.

81. On October 5, 2018, Altria's Willard sent JLI's Pritzker, Valani, and Burns a letter:

> Altria would agree that it, and its current and future subsidiaries, will not compete in a manner consistent with our previous discussions in the U.S. e-vapor market for any period exclusive of the aforementioned transition period during which it provides support services.

82. Upon receiving this letter, Burns forwarded it to JLI's Chief Legal Officer with a simple note: "Game on Again." The concessions contained in this letter were indispensable in restarting the stalled negotiations. Soon after, Altria began to take key steps that would facilitate a possible wind down of its Closed-System E-Vapor business and implement the anticompetitive agreement.

83. On October 25, 2018, in a letter to the FDA, Altria announced that it was temporarily halting its MarkTen Elite business, ostensibly out of concern that pod-based systems and nontraditional flavors could be contributing to youth usage. Almost immediately, under this pretext, Altria began to remove its MarkTen Elite products from the market. A few days later, Altria and JLI agreed to basic deal terms, which included Altria refraining from competing in the Closed-System E-Vapor market.

84. As a hedge against this agreement, however, Altria sought to put MarkTen Elite "to bed in such a way that it can be easily revised [sic] later if the agile team wants to pursue it."

85. On October 29, 2018, Garnick sent an email to Carmine Reale, Senior Assistant General Counsel at Altria, stating "We have a list of competitors for the term sheet – we developed it in SF – do you have it?"

86. On November 12, 2018, JLI's Pritzker, Valani, Burns, Chief Legal Officer Jerry Masoudi, and Chief Financial Officer Timothy Danaher, and Altria's Willard, Crosthwaite, and Garnick participated in a conference call to "touch base."

87. During the week of November 12, 2018, members of the Altria due diligence team flew to San Francisco for a "Diligence Trip." Diligence meetings were held throughout the week. Among the

attendees were Burns, Danaher, JLI Americas President Bob Robbins, Chief Product Officer James Monsees, Chief Technology Officers Adam Bowen, Chief Legal Officer Jerry Masoudi; and Altria's Kevin Crosthwaite, Anthony Reale, TJ Edlich, David Wise, Brian Blaylock, Louanna Heuhsen, Mark Bradby, Mark Cruise, Rob Buell, Jason Flora, Matt Romyak, and Nicole Bielawski.

88. On November 15, 2018, Garnick emailed Willard, Gifford, and Crosthwaite, stating that "if [JLI] goes forward, we need to consider canceling MarkTen now (and saving money by not doing the HPHC analysis)."

89. On December 7, 2018, after five years of continuous participation in the Closed-System E-Vapor market, Altria announced its decision to wind down its remaining Closed-System E-Vapor business, including its MarkTen cig-a-like.

90. On December 9, 2018, Garrick, Altria's General Counsel, emailed Masoudi, Chief Legal Officer at JLI, to discuss the deal. In response to Masoudi's inquiry about whether Defendants could sign a non-compete that would go into effect prior to antitrust clearance, Garnick reassured him that "[t]his is of course a nonissue, since we are not in the market anymore."

91. On December 11, 2018, Altria held a board of directors meeting to "review the proposed [JLI] transaction and the anticipated impact on [Altria]." Board members John T. Casteen III, Dinyar S. Devitre, Thomas F. Farrell II, Debra J. Kelly-Ennis, W. Leo Kiely II, Kathryn B. McQuade, Mark E. Newman, Nabil Y. Sakkab, Virginia E. Shanks, and Howard Willard attended. Murray Garnick, William Gifford, and Kevin Crosthwaite were also present. Crosthwaite reminded the Board of the Closed-System E-Vapor investment thesis and the history of discussions with [JLI]."

92. On December 20, 2018, less than two weeks after Altria announced its decision to discontinue its Closed-System E-Vapor operations, JLI and Altria executed a series of agreements, including a Purchase Agreement, Relationship Agreement, Services Agreement, Intellectual Property License Agreement, and Voting Agreement (collectively, the "Transaction").

93. Pursuant to the Purchase Agreement, Altria purchased a 35% non-voting stake in JLI for $12.8 billion in cash.

94. By its terms, the Purchase Agreement incorporates the Relationship Agreement; the Services Agreement; the Intellectual Property License Agreement; and the Voting Agreement.

95. The Relationship Agreement provides, among other things, that Altria and JLI would not compete with one another. In particular, the Relationship Agreement contains a "Non-Compete" provision, which provides, in pertinent part that:

> [Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . Notwithstanding the foregoing, (x) [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . . .

In so doing, Altria agreed to withdraw from the Closed-System E-Vapor market, allocating it to JLI.

96. Under the terms of the Relationship Agreement, this Non-Compete went into effect early in 2019.

97. The Services Agreement provided, among other things, that Altria would provide certain services to JLI. In particular, Altria agreed to lease retail store shelf space to JLI. Altria also agreed to provide certain regulatory consulting, distribution support, as well as direct marketing support and sales services.

98. The Services Agreement had an initial six-year term, subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency. If the Services Agreement were to expire, Altria could discontinue the Non-Compete agreement, at which point it would lose its right to appoint members to JLI's Board of Directors and its pre-emptive right to maintain its 35% stake in the company, but would regain its ability to compete in the market. As described below, the Services Agreement was subsequently amended.

99. Under the Intellectual Property License Agreement, Altria granted JLI a non-exclusive irrevocable license to Altria's e-vapor intellectual property.

100. The Voting Agreement provided, among other things, that Altria would obtain seats on JLI's Board of Directors following conversion of its shares.

101. The Transaction was not submitted to the Department of Justice or the Federal Trade Commission on the grounds that the Hart-Scott-Rodino Act did not require notification. The Transaction valued JLI at roughly $38 billion, more than double JLI's reported value less than seven months earlier, demonstrating JLI's competitive success.

102. As a direct consequence of the Transaction, Altria discontinued its efforts related to the organic development of e-vapor products, including e-vapor research and development, innovation, and PMTA preparation efforts. The Transaction also closed routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market. As JLI summarized in a set of draft talking points announcing the Transaction: "$12 billion dollars that could have been spent competing with JUUL and our mission will now be used to help JUUL and our mission."

103. On February 4, 2019, Defendants filed for Hart-Scott-Rodino clearance to convert Altria's interest into voting securities (the "Antitrust Conversion") and to grant Altria permission to appoint three (of nine) members of JLI's Board of Directors, as provided by the Voting Agreement.

104. On January 30, 2020, JLI and Altria announced amendments to their agreement, including an Amended Purchase Agreement, an Amended Relationship Agreement, an Amended Services Agreement, and a Revised Voting Agreement.

105. Under the Revised Voting Agreement, after the Antitrust Conversion, Altria had the right to: (i) appoint two (of nine) JLI directors; (ii) nominate one (of three) JLI independent directors; (iii) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (iv) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility for managing litigation involving both Altria and JLI, i.e., "Joint Litigation Matters"); and (iv) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change JLI's senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement also granted JLI's CEO: (i) a

seat on the JLI Board of Directors; (ii) a seat on the Litigation Oversight Committee; and (iii) a seat on the Litigation Subcommittee.

106. The Amended Relationship Agreement gave Altria the option to be released from the Non-Compete if JLI were to be prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial valuation of $12.8 billion.

107. The Amended Services Agreement eliminates all services except for regulatory support services. The amendment was effective at signing except with regard to Altria's provision of retail shelf space to JLI, which service was set to expire after March 31, 2020.

108. The Transaction eliminated a competitive threat to JLI's market dominance and required Altria to dedicate its vast resources, including distribution and shelf space, to ensure JLI's market dominance.

## THE FTC ACTION

109. On April 1, 2020, the Federal Trade Commission ("FTC") filed a complaint against Altria and JLI under Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), alleging the Transaction violated Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

110. The FTC alleged that the Defendants' conduct unreasonably restrained competition, and that the Transaction substantially lessened competition in the United States market for Closed-System E-Cigarettes by eliminating competition between Altria and JLI on price, innovation, promotional activity, and shelf space. The FTC uses the term "Closed-System E-Cigarettes," which is synonymous with the term "Closed-System E-Vapor" that the Plaintiffs use to define the relevant market. The term "Closed-System E-Vapor" is consistent with Defendants' usage in internal documents.

## MARKET STRUCTURE

### A. Relevant Market

111. The relevant product market for the purposes of this action is the Closed-System E-Vapor market.

112. Closed-System E-Vapor products are battery-powered devices that vaporize a liquid solution containing E-Liquid. Closed-System E-Vapor products consist of a device housing a battery and a heating mechanism, and sealed cartridges, pods, or tanks that are filled with E-Liquid. When engaged by pressing the power button on the device, or in some cases simply by inhaling, the battery heats an element in the device called the cartomizer. This is a small component that contains a heating coil wrapped in polyfill. The polyfill wrapping soaks up the E-Liquid, which is then heated until it turns into vapor for inhalation. Closed-System E-Vapor products include three primary types of products: e-cigarettes (also known as "cig-a-likes"), closed system tanks, and closed system pods.

113. Cig-a-likes are also known as e-cigarettes. They imitate the look and feel of a traditional (combustible) cigarette. They use a rechargeable or disposable battery, combined with disposable E-Liquid cartridges.



114. Closed-system tanks work in much the same way as cig-a-likes, but don't imitate the look and feel of a traditional (combustible) cigarette. They are generally a little larger than cig-a-likes and tend to offer longer battery life.

115. Closed-system pods look like USB drives, and are particularly appealing to younger consumers. They use a rechargeable or disposable battery, combined with disposable E-Liquid cartridges.

116. Altria sold cig-a-likes under the brand name MarkTen and Green Smoke. Altria sold



closed-system pods under the brand name MarkTen Elite.

117. JLI sold closed-system pods under the brand name JUUL.

118. Closed-System E-Vapor products often use disposable cartridges, pods, or tanks that contain E-Liquid in traditional tobacco and menthol flavors, and prior to an FDA flavor ban that went into effect February 2020, other non-traditional flavors like Mango, Cucumber, Crème, Fruit, Winter Mint, Crème, Vineyard Blend, Strawberry Brûlée, Glacier Mint, and Apple. These cartridges, pods, and



tanks are configured specifically to the particular device model. Consumers purchase the primary Closed-System E-Vapor device and are thereafter constrained to use of compatible cartridges, pods or tanks or must purchase a new device. These disposable components are sold in aftermarkets to the primary devices' foremarket.

119. Closed-System E-Vapor products—cig-a-likes, closed-system tanks and closed-system pods—offer a simple, convenient, discrete, and relatively inexpensive alternative to traditional (combustible) cigarettes. Closed-System E-Vapor products use scentless smoke that quickly disperses. Closed-System E-Vapor products are easy to store in your pocket, difficult to break, and have sufficient battery life to last through the day.

120. The Closed-System E-Vapor market ***does not include*** open-tank e-vapor products. Closed-System E-Vapor products are largely sold in different channels than open-tank e-vapor products, and open-tank customers tend to seek a different experience than closed-system customers.

121. Manufacturers sell their Closed-System E-Vapor products directly to consumers and entities. The vast majority of Closed-System E-Vapor products are sold through a multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of Closed-System E-Vapor products, focusing on the highest velocity brands. In contrast, open-tank e-vapor products are sold almost exclusively at dedicated vape shops, retail outlets that typically carry an extensive selection of E-Liquids and parts for open-tank products and offer a high level of customer service.

122. Open-tank products also offer a different experience to customers than Closed-System E-Vapor products. Unlike Closed-System E-Vapor, open tank products offer a customizable and engaging experience because customers can select from (and mix together) a wide assortment of E-Liquids and customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).

123. Due to their customizable and complex design, open-tank e-vapor products are more expensive than Closed-System E-Vapor and require more technical know-how.

124. Defendants understood and defined the Closed-System E-Vapor market to exclude open-tank e-vapor products. In a March 2018 Presentation, Altria included the following slide:




125. Defendants also viewed their JUUL and MarkTen Elite products as direct competitors, and set prices based on competition with each other and with other closed-system products. Defendants further acknowledged that their Closed-System E-Vapor products did not compete as closely with open-tank products.

126. Closed-System E-Vapor products differ from open-tank products in their appeal to consumers because they are discreet due to their small size, convenient due to their self-contained, ready-to-use format, and trendy due to their sleek design. Open-tank products are not an adequate substitute for Closed-System E-Vapor products. Open-tank products are larger, more complex, require more manual operation by the user and are more expensive. Open-tank products generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

127. The relevant geographic market is no broader than the United States. Because of FDA's requirements (described below), foreign firms cannot import e-vapor products into the United States without prior FDA approval.

128. According to Nielson data, retail sales of e-vapor products in the United States in 2018 constituted approximately $2.8 billion.

**B. Market Concentration**

129. At the time of Altria's exit, the relevant market was already highly concentrated. Following Altria's exit, it became even more concentrated.

130. The Department of Justice and Federal Trade Commission, consistent with the Horizontal Merger Guidelines and federal court decisions, measure market concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by totaling the squares of the market shares of each firm in the relevant market. Under the Horizontal Merger Guidelines, a merger is presumed to enhance market power when the merger increases the HHI by more than 200 points in a highly concentrated market, i.e., in a market where the HHI is above 2500.

131. In the United States market for Closed-System E-Vapor products, the Transaction resulted in a post-Transaction HHI exceeding 2,500, with an increase in HHI of more than 200. Thus, the Transaction resulted in concentration that establishes a presumption of competitive harm in the relevant market.

**C. The Closed-System E-Vapor Market Has High Barriers to Entry**

132. Under the FDA regulatory framework, a manufacturer of a new tobacco product, including an e-cigarette, must submit to the FDA a Premarket Tobacco Product Application ("PMTA") and receive the FDA's approval before marketing that product. An e-cigarette that was on the market prior to August 8, 2016 may remain on the market, but the manufacturer of that product was required to have filed a PMTA by May 12, 2020 to continue marketing it. The manufacturer must remove the product in the event the PMTA is denied. An e-cigarette that was not on the market prior to August 8, 2016 cannot be marketed until it receives PMTA approval. At the time Defendants executed the Transaction, the deadline for an in-market applicant to file its PMTA had been extended to August 8, 2022.

133. Preparing a PMTA requires a significant amount of resources—time, personnel, and money—which can range from several hundreds of thousands to multiple millions of dollars per product.

134. The FDA announced on January 2, 2020 that it had finalized a new enforcement policy prohibiting all non-tobacco/non-menthol flavors for cartridge-based e-cigarettes until a PMTA authorization, which went into effect on February 6, 2020.

**D. Market Power**

135. Throughout the Class Period, JLI dominated the relevant market and maintained power to control prices and exclude competition in that market.

136. According to a Wells Fargo report on the tobacco industry based on Nielsen scanner data, JLI had amassed a 72 percent market share by August of 2018. Altria's market share at that time was 8 percent.

137. According to the same Wells Fargo report, Altria began withdrawing its products from the market in October 2018. By November, Altria's market share had fallen to 4 percent, and JLI's had grown to over 75 percent. By December 2018, Altria had removed its products from the market entirely. The Transaction not only eliminated one of JLI's most successful competitors, it gave JLI access to Altria's vast resources and capital.

138. The Transaction was intended to, and did, significantly increase JLI's market share and market power in the relevant market.

**ANTICOMPETITIVE EFFECTS OUTWEIGH PROCOMPETITIVE BENEFITS, IF ANY**

**A. Anticompetitive Effects**

139. Defendants' illegal agreements had the purpose and effect of raising fixing, maintaining and/or stabilizing prices, reducing output, reducing innovation and eliminating consumer choice.

140. The purpose and effect of the Transaction was for Altria to withdraw from current and future competition in exchange for a share of the monopoly prices JLI was able to charge, and would be able to charge in the future due to its dominant position.

141. The Transaction also closed routes to other potential acquisitions or partnerships through which Altria might have continued to participate in the relevant market.

142. JLI's conduct as alleged herein had the purpose, capacity, tendency, and effect of restraining competition unreasonably, and the transaction substantially lessened competition, in the United States market for Closed-System E-Vapor products, in the following ways, among others:

a. Eliminating Altria's competing products from the relevant market, including promotional activity to create awareness and drive sales, thereby eliminating current and future price competition between JLI and Altria;

b. Eliminating current and future technological innovation competition between JLI and Altria to create higher quality products;

c. Eliminating current and future competition between JLI and Altria for shelf space at retailers through rebates and other incentives; and

d. Eliminating strategic and independent decision making by JLI, affecting JLI's competitive strategies, through acquisition of membership by Atria on several governing boards, including the Board of Directors, of JLI.

143. Before Altria's agreement to exit the market, Altria and Juul competed vigorously with each other in the Closed-System E-Vapor market.

144. Altria's agreement to exit the relevant market eliminated one of JLI's most potent rivals. As a large, well-established, and well-funded company with longstanding relationships and significant shelf space with retailers nationwide, Altria had the resources and infrastructure to drive sales and compete aggressively with JLI. The Transaction removed that actual and potential competition.

145. Altria leveraged its ownership of leading brands across multiple tobacco categories in order to secure substantial and favorable shelf space at retailers throughout the United States. In 2018, for example, to JLI's alarm, Altria launched a major campaign to secure shelf space for its innovative tobacco products (including Closed-System E-Vapor products), offering retailers product discounts, slotting fees, and fixture payments. Altria used its extensive distribution network to expand its distribution of MarkTen Elite from zero to 25,000 retail doors in just the nine months from February to October 2018. After the Transaction, instead of competing for shelf space, Altria leased its shelf space to JLI, effectively replacing its own MarkTen products with JLI's product.

146. Before the shut-down of Nu Mark, JLI and Altria relied on price competition through promotions to drive sales of their respective e-cigarette products. In addition, each monitored the other's pricing in setting its own strategy. Altria's decision to withdraw its MarkTen products brought this price competition to an end.

147. In addition to price competition, JLI and Altria competed through product innovation, including device features and E-Liquid formulations. For example, it was JLI's success that prompted Altria to acquire and further develop various pod-based products (including the MarkTen Elite), and to

commit significant resources toward developing E-Liquid formulations with nicotine salts and higher nicotine concentrations.

148. According to a September 4, 2020 Wall Street Journal Article, Juul began piloting a usage monitor in 2019. "The feature allowed consumers to track the number of puffs they took on a Juul vaporizer" through a connection to a phone application and "gave users the option to create a daily alert when they reached a certain number of puffs." According to current and former employees, "the puff-tracking feature could have provided support to users who wanted to quit by helping them gradually taper down their consumption." Instead, under Crosthwaite's leadership, JLI's "top product-development priority now is technology aimed at restricting access by those under 21."

149. Based upon documents submitted to the FTC from Defendants, it appears that before committing to the Transaction, Altria intended to compete over the long term. Altria's documents and executive statements repeatedly evince their recognition that e-cigarettes were the future of the tobacco industry and their absolute commitment to participate in that future. For example:

- Joseph Murillo, Altria's former SVP of Regulatory Affairs, admitted: "And so we knew that the e-vapor category was a super important reduced risk opportunity for the company, and we were, you know, doing everything we could to advance that."
- Martin Barrington, Altria's former CEO, stated to investors: "So we'll be clear: We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products."
- Defendant Howard Willard, Altria's former CEO, in an interview with the Wall Street Journal, stated: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."

150. In the fall of 2018, as a hedge against the risk that a deal with JLI might fall through, Altria began implementing a "Plan B" that included the formation of "Growth Teams" that were charged with developing next-generation e-cigarette products. At the time, Altria executives were willing to commit millions of dollars to these efforts, but they ended once the Transaction was executed.

151. Instead of continuing to pursue its ambitions in the relevant market through competition, including aggressive price promotions, product development, and incentives for shelf

space, Altria sought a short cut to market leadership and monopoly profit by investing in its competitor. Altria agreed to abandon its long-standing and significant efforts at current and future competition in exchange for a significant share of JLI's profits, in part being derived from a significantly less competitive marketplace. As a result, Juul and Altria's transaction led to undue concentration in the Closed-System E-Vapor market.

**B. Absence of Procompetitive Benefits**

152. Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the conduct alleged substantially lessened competition in the relevant market.

153. Defendants cannot demonstrate pro-competitive benefits of the conduct alleged that could not have been achieved through alternative means that would have been less restrictive on competition than the conduct alleged.

154. Defendants cannot demonstrate that entry into the relevant market by new competitors or expansion by existing competitors would be timely, likely, or sufficient to offset the anticompetitive effects of the conduct alleged.

155. The entry of new competitors into the relevant market is unlikely because the regulatory approval process is exceptionally time-consuming and expensive. Defendants themselves estimate that preparing a PMTA for an e-vapor product would require approximately two and a half years after finalizing the product design. No manufacturer has achieved PMTA approval for an e-cigarette product, but Philip Morris International, a multi-national tobacco manufacturer, submitted a PMTA application for its iQOS heat-not-burn ("HNB") device (which is comparable to an e-cigarette in technical complexity) in May 2017 and received approval two years later in April 2019. Altria estimated "that a PMTA for an [e-cigarette] would cost approximately $6 million per [] SKU" and JLI estimated between $5 and $10 million per SKU. Defendants' internal documents suggest that these figures may significantly underestimate the costs of the PMTA process.

156. In addition to achieving regulatory approval, a new entrant would need to: (i) develop or acquire a product; (ii) manufacture the product at quality and scale; (iii) sell the product; (iv) develop a distribution system; and (v) develop a marketing plan, including a plan to secure shelf space in retail outlets.

157. Existing Closed-System E-Vapor competitors cannot effectively replace the lost competition because: (i) they lack Altria's brand strength to secure favorable shelf space at retailers; (ii) they lack the substantial resources Altria had at its disposal to commit to e-vapor research and development as well as to pursuing regulatory approval; or (iii) the FDA's enforcement of restrictions on E-Liquid flavors has negatively impacted the competitive presence of Closed-System E-Vapor competitors other than JLI, who had voluntarily discontinued its flavors earlier.

158. Open-tank products manufacturers are not likely to replace the lost competition, in part because the impending PMTA deadline will likely cause many of them to shut down, and because they are largely sold in the separate "vape shop" sales channel and would not likely be able to expand rapidly into convenience stores, where Closed-System E-Vapor are typically sold.

159. Defendants' unlawful conduct eliminated competition in the relevant market and deprived Plaintiff and the Class of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

**HARM TO COMPETITION AND ANTITRUST INJURY**

160. Defendants' contract, combination and conspiracy as set forth herein has had the following effects, among others:

a. Price competition among Defendants in the sale, marketing and distribution of Closed-System E-Vapor products during the Class Period to purchasers in the United States has been restrained;

b. Prices for Closed-System E-Vapor products sold by Defendants during the Class Period to purchasers in the United States have been raised, fixed, maintained, and/or stabilized at artificial and non-competitive levels; and

c. The supplies of Defendants' Closed-System E-Vapor products available for sale during the Class Period to purchasers in the United States has been artificially and unjustifiably restrained.

d. Innovation in the Closed-System E-Vapor market in the United States has been unreasonably restrained, with regard to device and E-Liquid products.

## CLAIMS FOR RELIEF

## COUNT ONE

## RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (Against all Defendants)

161. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

162. Defendants entered into and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition with respect to the sale, marketing and distribution of Closed-System E-Vapor products sold to purchasers in the United States.

163. In particular, Defendants have contracted, combined and conspired to divide and allocate the market for Closed-System E-Vapor products to raise, fix, maintain and/or stabilize the prices of Closed-System E-Vapor products sold to purchasers in the United States.

164. The aforesaid violations of Section 1 consisted of an unlawful agreement in Altria agreed to withdraw from the relevant market and in exchange JLI gave Altria an interest in JLI's continuing business in the relevant market. The purpose of this agreement was to fix, raise, maintain and/or stabilize prices of Closed-System E-Vapor products as well as stifle innovation.

165. For the purposes of formulating and effectuating their combination or conspiracy, Defendants did those things they combined or conspired to do, including (1) participating in meetings and conversations to eliminate competition from the market and (2) agreeing to not compete and allocate or divide the market for Closed-System E-Vapor products between them.

166. Defendants' anticompetitive and unlawful conduct is per se illegal.

167. The Transaction was effected and, as a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and class members were injured in their business or property.

## COUNT TWO

## RESTRAINT OF TRADE IN VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18 (Against Defendants Altria and JLI)

168. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

169. The Transaction, as described above, in which Altria received a substantial ownership stake in JLI on the condition that Altria withdraw its existing Closed-System E-Vapor products from the market and halt its innovation on future products, substantially lessened competition in the market for Closed-System E-Vapor products in the United States.

170. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and class members were injured in their business or property.

171. This offense is likely to continue unless injunctive relief is granted.

172. Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged in this complaint.

## COUNT THREE

## DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT AND SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 26 (Against Defendants Altria and JLI)

173. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

174. Plaintiffs seek declaratory and injunctive relief under the federal antitrust laws.

175. Plaintiffs' allegations described herein constitute a violation of Sections 1of the Sherman Act.

176. Defendants effectuated a scheme to restrain trade and substantially lessen competition in the United States market for Closed-System E-Vapor products.

177. There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect.

178. As a direct and proximate result of Defendants' anticompetitive scheme, as alleged herein, Plaintiffs and the Class were harmed as aforesaid.

179. The goal, purpose and/or effect of the scheme was to prevent and/or delay competition in order to charge supracompetitive prices for Closed-System E-Vapor products without a substantial loss of sales.

180. The anticompetitive agreements alleged herein should be declared invalid and unenforceable.

181. Plaintiffs and the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury includes paying higher prices for Closed-System E-Vapor products than they would have paid in the absence of those violations. These injuries will continue unless halted.

182. Plaintiffs and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a Declaratory Judgment that Defendants' conduct constitutes a violation of § 1 of the Sherman Act.

183. Plaintiffs and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## DEMAND FOR JUDGMENT

**WHEREFORE**, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

184. This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel;

185. Defendants have contracted, combined, and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

186. Defendants have combined in a way that substantially lessened competition or tended to create a monopoly in the market for Closed-System E-Vapor products in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

187. Plaintiffs and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 7 of the Clayton Act, 15 U.S.C. § 18;

188. Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

189. Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

a. A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants; and

b. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein; and

c. Divestiture of Altria's equity stake in JLI and rescission of Altria's purchase of that stake.

190. Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class.

191. Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law.

192. Plaintiffs and the Class receive such other or further relief as may be just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: September 7, 2023

By: */s/ Joseph R. Saveri*
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com

*Interim Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Class*

John D. Radice (*pro hac vice* forthcoming)
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502
Facsimile: (609) 385-0745
Email: jradice@radicelawfirm.com

Michael M. Buchman (*pro hac vice*)
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
Telephone: (212) 577-0040
Facsimile: (212) 577-0054
Email: mbuchman@motleyrice.com

Catherine Smith (*pro hac vice* forthcoming)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Email: csmith@gustafsongluek.com

Stephanie M. Beige (*pro hac vice* forthcoming)
**BERNSTEIN LIEBHARD LLP**
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email: beige@bernlieb.com

W. Joseph Bruckner (MN #147758)
(admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: wjbruckner@locklaw.com

John Alden Meade (admitted pro hac vice)
**MEADE YOUNG LLC**
909 Poydras St., Suite 1600
New Orleans, LA 70112
Telephone: (504) 799-3102
Facsimile: (504) 717-2846
Email: jam@meadeyoung.com

J. Barton Goplerud
**SHINDLER, ANDERSON, GOPLERUD & WEESE, P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone: (515) 223-4567
Facsimile: (515) 223-8887
Email: goplerud@sagwlaw.com

Joshua Grabar (*pro hac vice* forthcoming)
**GRABAR LAW OFFICES**
1650 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Facsimile: (267) 507-6048
Email: jgrabar@grabarlaw.com

Terry Gross (SBN #103878)
**GROSS & BELSKY P.C.**
201 Spear Street, Suite 1100,
San Francisco, California 94105
Telephone: (415) 544-0200
Email: terry@grossbelsky.com

David Cates (*pro hac vice* forthcoming)
**CATES MAHONEY, LLC**
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone: (618) 277-3644
Facsimile: (618) 277-7882
Email: dcates@cateslaw.com

*Counsel for Plaintiffs*