[Submitting Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 19-md-02913-WHO |
| THIS DOCUMENT RELATES TO: CLASS ACTIONS | **CONSOLIDATED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................. 1

II.  PARTIES ............................................................................................................. 5

    A.  Plaintiffs ................................................................................................. 5

    B.  Defendants ............................................................................................. 5

III.  JURISDICTION AND VENUE ........................................................................... 8

IV.  FACTUAL ALLEGATIONS .............................................................................. 8

    A.  Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time." ............................................................. 8

    B.  Defendants' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction. .................................................... 16

        1.  Defendants Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction. ................. 16

        2.  Following the Cigarette Industry Playbook, Defendants Sought to Market a Product that would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes ...................................... 19

        3.  Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company. ................................................................................ 25

    C.  JLI and Bowen Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction. ......................................................................... 31

        1.  JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale........................................................ 31

        2.  JLI's Initial Experiments Measured Non-Smokers "Buzz" Levels and Perceptions of Throat Harshness .......................................................... 32

        3.  JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes. .......................................................................................... 35

        4.  JLI and the Management Defendants Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted................................................................... 42

        5.  JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection. ... 44

i

6.  JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation. .................. 48

    a.  JIL Develops Flavored JUUL Products That Would Appeal to Youth ..................................................................................... 48

    b.  Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market. ................................................... 51

D.  Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe ................................................ 56

    1.  The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content. ................................... 56

    2.  JLI, the Management Defendants, and Altria Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Was False and Misleading. ........................................... 61

    3.  Defendants Used Food and Coffee Themes to Give False Impression that JUUL Products Were Safe and Healthy ................................................ 66

    4.  JLI's "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device. ................................ 70

    5.  JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public About the Harms and Benefits of E-Cigarettes. ................................................................. 81

    6.  Altria Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to JLI ....................................................... 89

E.  Defendants Targeted the Youth Market ................................................ 90

    1.  JLI Emulated the Marketing of Cigarette Companies. ........................... 91

    2.  The Management Defendants Intentionally Marketed JUUL to Young People ............................................................................. 93

    3.  JLI Advertising Exploited Young People's Psychological Vulnerabilities .96

    4.  JLI Pushed the Vaporized Campaign Into Youth Targeted Channels ... 101

        a.  JLI Placed Its Vaporized Ads on Youth Oriented Websites and Media. ....................................................................... 101

        b.  JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience ................................................ 103

        c.  JLI Used Viral Marketing Techniques Known to Reach Young People .......................................................................... 106

ii

5.      JLI Targeted Youth Retail Locations.....................................108

6.      JLI Hosted Parties to Create a Youthful Brand and Gave Away Free
        Products to Get New Consumers Hooked. ............................109

7.      The Management Defendants' Direction and Participation in the Youth
        Marketing Schemes...................................................................112

        a.      The Management Defendants, and in particular Bowen, Monsees,
                Pritzker, Huh, and Valani, oversaw the youth marketing scheme.112

        b.      Pritzker, Huh, and Valani Were Able to Direct and Participate in
                the Youth Marketing Because They Seized Control of the JLI
                Board of Directors......................................................117

8.      JLI and the Management Defendants Knew Their Efforts Were Wildly
        Successful in Building a Youth Market and Took Coordinated Action to
        Ensure That Youth Could Purchase JUUL Products. ...........120

        a.      JLI's Strategy Worked. ...............................................120

        b.      JLI Closely Tracked Its Progress in Reaching Young Customers
                through Social Media and Online Marketing...........................122

9.      JLI Coordinates with Veratad Technologies To Expand Youth Access to
        JUUL Products...........................................................................125

10.     JLI Engaged in a Sham "Youth Prevention" Campaign......................133

11.     The FDA Warned JUUL and Others That Their Conduct is Unlawful.136

12.     In Response to Regulatory Scrutiny, Defendants Misled the Public,
        Regulators, and Congress that JLI Did Not Target Youth....................138

F.      Altria Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's
        Position as the Dominant E-Cigarette.................................................142

        1.      Before Altria's Investment in JLI, Altria and JLI Exchanged Market
                Information Pertaining to Key Decisions. ..............................142

        2.      JLI, the Management Defendants and Altria Coordinated to Market
                JUUL in Highly-Visible Retail Locations ..............................144

        3.      Altria Contributes to the Success of JLI's and the Management
                Defendants' Scheme Through a Range of Coordinated Activities........145

G.      JLI, Altria, and Others Have Successfully Caused More Young People to Start
        Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health
        Crisis. .......................................................................................149

        1.      Defendants' Scheme Caused Consumers to be Misled into Believing that
                JUUL was Safe and Healthy......................................................149

iii

2.  Use of JUUL by Minors Has Skyrocketed ............................. 151

H. JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products........................................................................................ 156

 1.  E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI. ........................................................... 156

 2.  JLI, the Management Defendants, and Altria Defendants Successfully Shielded the Popular Mint Flavor from Regulation............................. 159

 3.  In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic. ................................. 168

 4.  The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done............................... 169

I. JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries....................................................... 171

 1.  JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries . 171

 2.  JUUL Products Cause Cardiovascular Injuries..................................... 177

 3.  JUUL Products Cause and Contribute to Seizure(s)............................ 178

 4.  Animal Studies Demonstrate Carcinogenic Potential of JUUL............. 180

V. INTERSTATE AND INTRASTATE COMMERCE.................................................. 181

VI. CLASS ACTION ALLEGATIONS........................................................................ 181

 A. Nationwide Class .......................................................................... 181

 B. State Classes and Subclasses ......................................................... 181

 C. Class Exclusions .......................................................................... 187

 D. Rule 23 Prerequisites .................................................................... 188

VII. CAUSES OF ACTION ....................................................................................... 189

 A. Causes of Action Brought on Behalf of the Nationwide Class and the California Subclass ....................................................................... 189

 1.  Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)......................................................... 189

iv

2. Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*)..................................................................193

3. Violation of the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*)..................................................................195

4. Common Law Fraud .................................................................197

5. Breach of the Implied Warranty of Merchantability.............................199

6. Unjust Enrichment ...................................................................200

B. Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(c)).......................................................201

1. Description of the Nicotine Market Expansion Enterprise ...................202

2. Conduct of the Nicotine Market Expansion Enterprise .......................204

3. Pattern of Racketeering Activity..................................................208

4. Harm to Plaintiffs...................................................................216

C. Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(d))......................................................218

D. Violation of the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*)..220

E. Causes of Action Brought on Behalf of the State Classes ................................222

1. Alabama .............................................................................222

a. Violation of the Alabama Deceptive Trade Practices Act (Ala. Code § 8-19-1, *et seq.*)............................................................222

b. Common Law Fraud .........................................................225

c. Breach of the Implied Warranty of Merchantability.................227

d. Unjust Enrichment ...........................................................229

2. Alaska ...............................................................................230

a. Violation of the Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. § 45.50.471, *et seq.*) ....................230

b. Common Law Fraud .........................................................234

c. Breach of the Implied Warranty of Merchantability.................236

d. Unjust Enrichment ...........................................................237

3. Arizona...............................................................................239

v

a.   Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. § 44-1521, *et seq.*)................................................................239

b.   Common Law Fraud ...................................................................242

c.   Breach of the Implied Warranty of Merchantability.................244

d.   Unjust Enrichment ....................................................................245

4.   Arkansas.................................................................................................247

a.   Violation of the Arkansas Deceptive Trade Practices Act (Ark. Code § 4-88-101, *et seq.*)................................................247

b.   Common Law Fraud ...................................................................250

c.   Breach of the Implied Warranty of Merchantability.................252

d.   Unjust Enrichment ....................................................................254

5.   Colorado.................................................................................................255

a.   Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, *et seq.*)................................................255

b.   Common Law Fraud ...................................................................258

c.   Breach of the Implied Warranty of Merchantability.................260

d.   Unjust Enrichment ....................................................................262

6.   Connecticut ............................................................................................263

a.   Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq.*)........................................263

b.   Common Law Fraud ...................................................................266

c.   Breach of the Implied Warranty of Merchantability.................268

d.   Unjust Enrichment ....................................................................270

7.   Delaware ................................................................................................271

a.   Violation of the Delaware Consumer Fraud Act (Del. Code tit. 6 § 2511, *et seq.*)................................................................271

b.   Violation of the Delaware Deceptive Trade Practices Act (Del. Code tit. 6 § 2531, *et seq.*)............................................273

c.   Common Law Fraud ...................................................................276

d.   Breach of the Implied Warranty of Merchantability.................278

e.   Unjust Enrichment ....................................................................280

8.   District of Columbia ..............................................................................281

a.   Violation of the D.C. Consumer Protection Procedures Act (D.C. Code § 28-3901, *et seq.*)............................................281

vi

|  |  | b. | Common Law Fraud | 284 |
|  |  | c. | Breach of the Implied Warranty of Merchantability | 286 |
|  |  | d. | Unjust Enrichment | 288 |
|  | 9. | Florida | | 289 |
|  |  | a. | Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*) | 289 |
|  |  | b. | Violation of the Florida False Advertising Law (Fla. Stat. §§ 817.06 and 817.41, *et seq.*) | 292 |
|  |  | c. | Common Law Fraud | 295 |
|  |  | d. | Breach of the Implied Warranty of Merchantability | 297 |
|  |  | e. | Unjust Enrichment | 298 |
|  | 10. | Georgia | | 299 |
|  |  | a. | Violation of the Georgia Uniform Deceptive Trade Practices Act (Ga. Code § 10-1-370, *et seq.*) | 299 |
|  |  | b. | Violation of the Georgia Fair Business Practices Act (Ga. Code § 10-1-390, *et seq.*) | 302 |
|  |  | c. | Common Law Fraud | 305 |
|  |  | d. | Breach of the Implied Warranty of Merchantability | 308 |
|  |  | e. | Unjust Enrichment | 309 |
|  | 11. | Hawaii | | 310 |
|  |  | a. | Violation of the Hawaii Unfair and Deceptive Trade Practices Act (Haw. Rev. Stat. § 480-1, *et seq.*) | 310 |
|  |  | b. | Violation of the Hawaii Uniform Deceptive Trade Practice Act (Haw. Rev. Stat. § 481A-1, *et seq.*) | 313 |
|  |  | c. | Common Law Fraud | 316 |
|  |  | d. | Breach of the Implied Warranty of Merchantability | 318 |
|  |  | e. | Unjust Enrichment | 319 |
|  | 12. | Idaho | | 321 |
|  |  | a. | Violation of the Idaho Consumer Protection Act (Idaho Code § 48-601, *et seq.*) | 321 |
|  |  | b. | Common Law Fraud | 324 |
|  |  | c. | Breach of the Implied Warranty of Merchantability | 326 |
|  |  | d. | Unjust Enrichment | 328 |
|  | 13. | Illinois | | 329 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

a.    Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. § 505/1, *et seq.*)................ 329

b.    Common Law Fraud ........................................................ 332

c.    Breach of the Implied Warranty of Merchantability................ 334

d.    Unjust Enrichment .......................................................... 336

14.    Indiana............................................................................ 337

a.    Violation of Indiana's Deceptive Consumer Sales Act (Ind. Code §§ 24-5-0.5-1, *et seq*). ................................................... 337

b.    Common Law Fraud ........................................................ 341

c.    Breach of the Implied Warranty of Merchantability................ 343

d.    Unjust Enrichment .......................................................... 344

15.    Iowa............................................................................... 346

a.    Violation of the Iowa Consumer Fraud Act (Iowa Code § 714H.1, *et seq.*)...................................................................... 346

b.    Common Law Fraud ........................................................ 349

c.    Breach of the Implied Warranty of Merchantability................ 351

d.    Unjust Enrichment .......................................................... 352

16.    Kansas............................................................................ 353

a.    Violation of Kansas Consumer Protection Act (Kan. Stat. Ann. § 50-623, *et seq.*).......................................................... 354

b.    Common Law Fraud ........................................................ 357

c.    Breach of the Implied Warranty of Merchantability................ 359

d.    Unjust Enrichment .......................................................... 361

17.    Kentucky ........................................................................ 362

a.    Violation of Kentucky Consumer Protection Act (Ky. Rev. Stat. Ann. § 367.110, *et seq.*)................................................. 362

b.    Common Law Fraud ........................................................ 365

c.    Breach of the Implied Warranty of Merchantability................ 367

d.    Unjust Enrichment .......................................................... 369

18.    Louisiana........................................................................ 370

a.    Violation of Louisiana Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. § 51:1401, *et seq.*) ........... 370

b.    Common Law Fraud ........................................................ 373

c.    Breach of the Implied Warranty of Merchantability................ 375

|   |   | d. | Unjust Enrichment ................................................................... 377 |
| 19. | | Maine ................................................................................................. 378 |
|   |   | a. | Violation of Maine Unfair Trade Practices Act (5 M.R.S.A. § 205-A, *et seq.*)......................................................... 378 |
|   |   | b. | Violation of Maine Uniform Deceptive Trade Practices Act (10 M.R.S.A. § 1211, *et seq.*).......................................... 381 |
|   |   | c. | Common Law Fraud ................................................................ 384 |
|   |   | d. | Breach of the Implied Warranty of Merchantability................. 386 |
|   |   | e. | Unjust Enrichment ................................................................... 387 |
| 20. | | Maryland ............................................................................................ 388 |
|   |   | a. | Violation of Maryland Consumer Protection Act (Md. Code Ann. Com. Law § 13-101, *et seq.*)..................................... 389 |
|   |   | b. | Common Law Fraud ................................................................ 392 |
|   |   | c. | Breach of the Implied Warranty of Merchantability................. 394 |
|   |   | d. | Unjust Enrichment ................................................................... 396 |
| 21. | | Massachusetts .................................................................................... 397 |
|   |   | a. | Violation of Massachusetts Regulation of Business Practice and Consumer Protection Act (M.G.L.A. 93A, § 1, *et seq.*) ............ 397 |
|   |   | b. | Common Law Fraud ................................................................ 400 |
|   |   | c. | Breach of the Implied Warranty of Merchantability................. 402 |
|   |   | d. | Unjust Enrichment ................................................................... 404 |
| 22. | | Michigan ............................................................................................ 405 |
|   |   | a. | Violation of Michigan Consumer Protection Act (M.C.L.A. § 445.901, *et seq.*)............................................................. 405 |
|   |   | b. | Common Law Fraud ................................................................ 408 |
|   |   | c. | Breach of the Implied Warranty of Merchantability................. 410 |
|   |   | d. | Unjust Enrichment ................................................................... 411 |
| 23. | | Minnesota ........................................................................................... 412 |
|   |   | a. | Violation of Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.69)........................................................... 412 |
|   |   | b. | Violation of Minnesota False Statement in Advertising Law (Minn. Stat. § 325F.67)........................................................... 415 |
|   |   | c. | Violation of Minnesota Deceptive Trade Practices Act (Minn. Stat. § 325D.43, *et seq.*)......................................... 418 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

|   |   | d. | Common Law Fraud ................................................ 420 |
|   |   | e. | Breach of the Implied Warranty of Merchantability ................ 422 |
|   |   | f. | Unjust Enrichment ................................................ 423 |
| 24. | Mississippi ................................................................. 425 |
|   |   | a. | Violation of Mississippi Consumer Protection Act (Miss. Code Ann. § 75-24-1, *et seq.*) ............................ 425 |
|   |   | b. | Common Law Fraud ................................................ 427 |
|   |   | c. | Breach of the Implied Warranty of Merchantability ................ 429 |
|   |   | d. | Unjust Enrichment ................................................ 431 |
| 25. | Missouri ................................................................... 432 |
|   |   | a. | Violation of Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*) ................................ 432 |
|   |   | b. | Common Law Fraud ................................................ 435 |
|   |   | c. | Breach of the Implied Warranty of Merchantability ................ 437 |
|   |   | d. | Unjust Enrichment ................................................ 439 |
| 26. | Montana .................................................................... 440 |
|   |   | a. | Violation of Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. § 30-14-101, *et seq.*) ........... 440 |
|   |   | b. | Common Law Fraud ................................................ 443 |
|   |   | c. | Breach of the Implied Warranty of Merchantability ................ 445 |
|   |   | d. | Unjust Enrichment ................................................ 446 |
| 27. | Nebraska ................................................................... 447 |
|   |   | a. | Violation of the Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-1601, *et seq.*) ........................... 448 |
|   |   | b. | Violation of the Nebraska Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. §§ 87-301, *et seq.*) ........................... 451 |
|   |   | c. | Common Law Fraud ................................................ 453 |
|   |   | d. | Breach of the Implied Warranty of Merchantability ................ 455 |
|   |   | e. | Unjust Enrichment ................................................ 457 |
| 28. | Nevada ..................................................................... 458 |
|   |   | a. | Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq.*) ........................... 458 |
|   |   | b. | Common Law Fraud ................................................ 461 |
|   |   | c. | Breach of the Implied Warranty of Merchantability ................ 463 |

|  |  | d. | Unjust Enrichment ................................................................... 465 |
| 29. |  | New Hampshire ........................................................................... 466 |
|  | a. | Violation of the New Hampshire Regulation of Business Practices for Consumer Protection (N.H. Rev. Stat. §§ 358-A:1, *et seq.*) 466 |
|  | b. | Common Law Fraud ................................................................... 469 |
|  | c. | Breach of the Implied Warranty of Merchantability................. 471 |
|  | d. | Unjust Enrichment ................................................................... 473 |
| 30. |  | New Jersey .................................................................................. 474 |
|  | a. | Common Law Fraud ................................................................... 474 |
|  | b. | Breach of the Implied Warranty of Merchantability................. 476 |
|  | c. | Unjust Enrichment ................................................................... 478 |
| 31. |  | New Mexico .................................................................................. 479 |
|  | a. | Violation of the New Mexico Unfair Trade Practices Act (N.M. Stat. § 57-12-1) ...................................................................... 479 |
|  | b. | Common Law Fraud ................................................................... 482 |
|  | c. | Breach of the Implied Warranty of Merchantability................. 485 |
|  | d. | Unjust Enrichment ................................................................... 486 |
| 32. |  | New York .................................................................................... 487 |
|  | a. | Violation of New York General Business Law § 349 ............... 487 |
|  | b. | Violation of New York General Business Law § 350 ............... 490 |
|  | c. | Common Law Fraud ................................................................... 492 |
|  | d. | Breach of the Implied Warranty of Merchantability................. 494 |
|  | e. | Unjust Enrichment ................................................................... 496 |
| 33. |  | North Carolina ........................................................................... 497 |
|  | a. | Violation of the North Carolina Unfair & Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, *et seq.*)...................... 497 |
|  | b. | Common Law Fraud ................................................................... 500 |
|  | c. | Breach of the Implied Warranty of Merchantability................. 502 |
|  | d. | Unjust Enrichment ................................................................... 504 |
| 34. |  | North Dakota............................................................................... 505 |
|  | a. | Violation of North Dakota Consumer Fraud Act (N.D. Cent. Code § 51-15-01, *et seq.*) ...................................................................... 505 |

|  |  | b. | Violation of North Dakota False Advertising Law (N.D. Cent. Code § 51-12-08) ...................................................... 508 |
|  |  | c. | Common Law Fraud .......................................................... 510 |
|  |  | d. | Breach of the Implied Warranty of Merchantability.................. 513 |
|  |  | e. | Unjust Enrichment ............................................................ 514 |
|  | 35. | Ohio.................................................................................................. 515 |
|  |  | a. | Violation of the Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §§ 1345.01, *et seq.*)................................. 515 |
|  |  | b. | Violation of the Ohio Deceptive Trade Practices Act (Ohio Rev. Code §§ 4165.01 - .04) ................................................ 519 |
|  |  | c. | Common Law Fraud .......................................................... 521 |
|  |  | d. | Breach of the Implied Warranty of Merchantability.................. 523 |
|  |  | e. | Unjust Enrichment ............................................................ 524 |
|  | 36. | Oklahoma ......................................................................................... 526 |
|  |  | a. | Violation of the Oklahoma Consumer Protection Act (Okla. Stat. tit. 15, §§ 751, *et seq.*)................................................. 526 |
|  |  | b. | Violation of the Oklahoma Deceptive Trade Practices Act (Okla. Stat. tit. 78, §§ 51, *et seq.*) ........................................ 529 |
|  |  | c. | Common Law Fraud .......................................................... 531 |
|  |  | d. | Breach of the Implied Warranty of Merchantability.................. 533 |
|  |  | e. | Unjust Enrichment ............................................................ 535 |
|  | 37. | Oregon.............................................................................................. 536 |
|  |  | a. | Violation of the Oregon Unfair Trade Practices Act (Or. Rev. Stat. §§ 646.605, *et seq.*)..................................................... 536 |
|  |  | b. | Common Law Fraud .......................................................... 539 |
|  |  | c. | Breach of the Implied Warranty of Merchantability.................. 541 |
|  |  | d. | Unjust Enrichment ............................................................ 543 |
|  | 38. | Pennsylvania .................................................................................... 544 |
|  |  | a. | Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. Ann. §§ 201-1, *et seq.*) 544 |
|  |  | b. | Common Law Fraud .......................................................... 547 |
|  |  | c. | Breach of the Implied Warranty of Merchantability.................. 549 |
|  |  | d. | Unjust Enrichment ............................................................ 550 |
|  | 39. | Rhode Island .................................................................................... 551 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

a.      Violation of the Rhode Island Unfair Trade Practice and
        Consumer Protection Act (6 R.I. Gen. Laws §§ 13.1-1, *et seq.*) 551

b.      Common Law Fraud ...................................................................... 555

c.      Breach of the Implied Warranty of Merchantability.................. 557

d.      Unjust Enrichment ....................................................................... 558

40.     South Carolina ...................................................................................... 559

a.      Violation of the South Carolina Unfair Trade Practices Act (S.C.
        Code Ann. §§ 39-5-10, *et seq.*).................................................. 559

b.      Common Law Fraud ...................................................................... 562

c.      Breach of the Implied Warranty of Merchantability.................. 565

d.      Unjust Enrichment ....................................................................... 566

41.     South Dakota......................................................................................... 567

a.      Violation of the South Dakota Deceptive Trade Practices and
        Consumer Protection Act (S.D. Codified Laws §§ 37-24-1, *et
        seq.*)............................................................................................. 567

b.      Common Law Fraud ...................................................................... 570

c.      Breach of the Implied Warranty of Merchantability.................. 572

d.      Unjust Enrichment ....................................................................... 574

42.     Tennessee .............................................................................................. 575

a.      Violation of the Tennessee Consumer Protection Act (Tenn. Code
        Ann. §§ 47-18-101, *et seq.*) ...................................................... 575

b.      Common Law Intentional Misrepresentation ............................ 578

c.      Breach of the Implied Warranty of Merchantability.................. 580

d.      Unjust Enrichment ....................................................................... 582

43.     Texas ..................................................................................................... 583

a.      Violation of the Texas Deceptive Trade Practices-Consumer
        Protection Act (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)....... 583

b.      Common Law Fraud ...................................................................... 586

c.      Breach of the Implied Warranty of Merchantability.................. 589

d.      Unjust Enrichment ....................................................................... 590

44.     Utah....................................................................................................... 591

a.      Violation of the Utah Consumer Sales Practices Act (Utah Code
        Ann. §§ 13-11-1, *et seq.*) .......................................................... 591

b.   Violation of the Utah Truth in Advertising Law (Utah Code Ann. §§ 13-11a-1, *et seq.*)..................................................594

c.   Common Law Fraud ..................................................596

d.   Breach of the Implied Warranty of Merchantability.................599

e.   Unjust Enrichment ..................................................600

45.   Vermont ..................................................601

a.   Violation of the Vermont Consumer Protection Act (Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*)..................................................601

b.   Common Law Fraud ..................................................604

c.   Breach of the Implied Warranty of Merchantability.................606

d.   Unjust Enrichment ..................................................608

46.   Virginia ..................................................609

a.   Violation of the Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, *et seq.*)..................................................609

b.   Common Law Fraud ..................................................612

c.   Breach of the Implied Warranty of Merchantability.................614

d.   Unjust Enrichment ..................................................616

47.   Washington ..................................................617

a.   Violation of the Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010, *et seq.*)..................................................617

b.   Common Law Fraud ..................................................620

c.   Breach of the Implied Warranty of Merchantability.................622

d.   Unjust Enrichment ..................................................624

48.   West Virginia ..................................................625

a.   Violation of the West Virginia Consumer Credit and Protection Act (W. Va. Code §§ 46A-6-101, *et seq.*) ..................................................625

b.   Common Law Fraud ..................................................628

c.   Breach of the Implied Warranty of Merchantability.................630

d.   Unjust Enrichment ..................................................631

49.   Wisconsin ..................................................632

a.   Violation of the Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.18)..................................................633

b.   Common Law Fraud ..................................................635

c.   Breach of the Implied Warranty of Merchantability.................637

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

             d.      Unjust Enrichment .................................................................... 638

     50.     Wyoming ................................................................................................ 640

             a.      Violation of the Wyoming Consumer Protection Act (Wyo. Stat. Ann. §§ 40-12-101, *et seq.*) ........................................................ 640

             b.      Common Law Fraud ............................................................... 643

             c.      Breach of the Implied Warranty of Merchantability ................. 645

             d.      Unjust Enrichment ................................................................ 647

VIII.   PRAYER FOR RELIEF .................................................................................... 648

IX.    RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS ........................... 649

X.     DEMAND FOR JURY TRIAL ........................................................................... 649

# I.       INTRODUCTION

1.       The battle to end nicotine addiction and its associated diseases and death has consumed our nation's public health resources for more than half a century. After five decades of tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on the path to victory. By 2014, rates of smoking and nicotine addiction in this country were finally at an all-time low, particularly among teenagers. Until now.  The United States, closer than ever to consigning the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic of historic proportions. The swift rise in a new generation of nicotine addicts has overwhelmed parents, schools, and the medical community, drawing governmental intervention at nearly every level—but it's too little, too late.

2.       This public health crisis is no accident. What had been lauded as progress in curbing cigarette use, JUUL Labs Inc.'s (JLI) co-founders Adam Bowen and James Monsees viewed as opportunity.  Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier.  To achieve that common purpose, they knew they would need to create and market a product that would make nicotine cool again, without any of the stigma associated with cigarettes. With help from their early investors and board members, who include Nicolas Pritzker, Huyoung Huh, and Riaz Valani (together, the "Management Defendants"), they succeeded in hooking millions of youth, intercepting millions of adults trying to overcome their nicotine addictions, and, of course, earning billions of dollars in profits.

3.       Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant Altria.  JLI was created in the image of the iconic American cigarette companies, which JLI founders praised for creating "the most successful consumer product of all time. . . . an amazing product."  The secret to that "amazing product"?  Nicotine, a chemical that has deleterious effects on the developing brains of youths, and is the fundamental reason that people persist in using tobacco products posing the risk of pulmonary injuries, cardiovascular disease and other

serious, often fatal, conditions.   Through careful study of decades of cigarette industry documents, JLI knew that the key to developing and sustaining addiction was the amount and the efficiency of the nicotine delivery.

4.     Three tactics were central to decades of cigarette industry market dominance: product design to maximize addiction; mass deception; and targeting of youth.   JLI and its co-conspirators adopted and mastered them all.   *First*, JLI and Bowen designed JUUL products to create and sustain addiction, not break it.   JLI and Bowen were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what JLI and Bowen designed was a starter product, not a cessation or cigarette replacement product.   JLI and Bowen also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

5.     *Second*, JLI, the Management Defendants and Altria engaged in a campaign of deceit, through sophisticated mass media and social media communications, advertisements and otherwise, about the purpose and dangers of JUUL products.   JUUL products' packaging and advertising grossly understates the nicotine content in its products.   Advertising campaigns featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a normal part of a daily routine, and as safe as caffeine. In partnership with Altria, JLI adopted a "Make the Switch" campaign to mislead consumers into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions.   JLI, the Management Defendants, and Altria also concealed the results of studies that revealed that JUUL products were far more powerfully addictive than was disclosed.   JLI's deceptive marketing scheme was carried out across the country through broad distribution channels: veteran cigarette industry wholesalers, distributors and retailers ensured that JUUL products would become widely available to a new market of nicotine-newcomers, especially youth.   JLI and the Management Defendants joined with these veteran cigarette industry marketers to

secure premium shelf space for vivid displays at convenience stores, like 7-11, and gas stations, including Chevron, that would lure e-cigarette users, young and old, who would become long-term customers. These marketing efforts have been resounding successes—when JUUL products were climbing in sales, most adults and youth believed that e-cigarettes did not contain nicotine at all.

6.    *Third*, JLI and the Management Defendants, just like cigarette companies before them, targeted kids as their customer base.  One of JLI's ███████ was the need to ███████ ███████  JUUL products were designed to appear slick and high-tech like a cool gadget, including video-game-like features like "party mode."  JLI offered kid-friendly flavors like mango and cool mint, and partnered with Altria to create and preserve the market for mint-flavored products—all because Defendants knew that flavors get young people hooked.  Under the guise of youth smoking prevention, JLI sent representatives directly to schools to study teenager e-cigarette preferences.

7.    JLI and the Management Defendants reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for cigarettes because they cause young people to start smoking) with cutting-edge viral marketing campaigns and social media.  They hired young models and advertised using bright, "fun" themes, including on media long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and educational tools to students in middle school and high school.  JLI and the Management Defendants also employed young social-media "influencers" and celebrities popular with teenagers.  When regulators and Congress caught onto JLI's relentless focus on children, JLI and the Management Defendants simply lied, even though they knew well that they had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful.  JUUL products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018.  The Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."

8.      It should come as little surprise that JLI and the Management Defendants' misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company.  Well before Altria announced its investment in JUUL, the connections between the two companies ran deep.  JLI and Altria collaborated to grow the e-cigarette market and the number of users addicted to nicotine, including by sharing data and information and coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes. Altria's investment in JLI is not merely a financial proposition, but a key element of Defendants' plan to stave off regulation and keep their most potent and popular products on the market. JLI has benefitted from Altria's expertise in designing and marketing addictive products, and in thwarting regulation.

9.      There is no doubt about it—JLI, the Management Defendants, Altria, and their co-Defendants have created this public health crisis.  At the heart of this disastrous epidemic are the concerted efforts of JLI, its co-conspirators, and all those in JUUL's supply and distribution chain to continuously expand their market share and profits by preying upon a vulnerable young population and deceiving the public about the true nature of the products they were selling. Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air.   Worse, the flavors in JUUL products are themselves toxic and dangerous, and have never been adequately tested to ensure they are safe for inhalation. According to the most recent scientific literature, JUUL products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Yet JUUL products and advertising contain no health risk warnings at all. Many smokers, believing that JUUL would help them "make the switch," ended up only further trapped in their nicotine addiction.  Older adults who switch to JUUL are more susceptible to cardiovascular and pulmonary problems, and CDC data shows that older patients hospitalized due to vaping lung related conditions had much longer hospital stays than younger patients. And a generation of kids is now hooked, ensuring long-term survival of the nicotine industry because, today just as in the 1950s, 90% of smokers start as children.

10.     Hundreds of individual and class actions have been filed in state and federal courts on behalf of the countless victims of JUUL's e-cigarettes. On August 10, 2019, the Judicial Panel on Multidistrict Litigation consolidated all such actions then pending for pretrial purposes in this Court.  *See In re Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, 396 F.Supp.3d 1366 (J.P.M.L. 2019).  On January 13, 2020, this Court directed the filing of Master Complaints on behalf of the Plaintiffs.  ECF No. 351.  Plaintiffs submit this Consolidated Class Action Complaint seeking compensatory and punitive damages, restitution, disgorgement, and other relief arising from the conduct alleged in this complaint

## II.     PARTIES

### A.     Plaintiffs

11.     Allegations specific to each plaintiff are included in Appendix A.

### B.     Defendants

12.     Defendant JUUL Labs, Inc. ("JLI") is a Delaware corporation, having its principal place of business in San Francisco, California. Ploom, Inc., a predecessor company to JLI, was incorporated in Delaware on March 12, 2007. In 2015, Ploom, Inc. changed its name to PAX Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name, PAX Labs, Inc. That new subsidiary, PAX Labs, Inc. ("PAX"), was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

13.     JUUL, designs, manufactures, sells, markets, advertises, promotes and distributes JUUL e-cigarettes devices, JUUL pods and accessories (collectively "JUUL" or "JUUL products"). Prior to the formation of separate entities PAX Labs, Inc. and JLI in or around April 2017, JUUL designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the name PAX Labs, Inc.

14.     Together with its predecessors, JUUL Labs, Inc is referred to herein as "JLI."

15.     Defendant ALTRIA GROUP, INC., (together with its wholly owned subsidiaries and their predecessors, "Altria" or the "Altria Defendants") is a Virginia corporation, having its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers

and marketers of tobacco products, manufacturing and selling combustible cigarettes for more than a century. Defendant Philip Morris USA, Inc. ("Philip Morris"), is a wholly-owned subsidiary of Altria. Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia. Philip Morris is engaged in the manufacture and sale of e-cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

16.     On December 20, 2018, Altria purchased a 35% stake in JLI. Altria and JLI executed a Services Agreement that provides that Altria, through its subsidiaries, Philip Morris, Altria Client Services LLC, and Altria Group Distribution Company, would assist JLI in the selling, marketing, promoting, and distributing of JUUL, among other things.



Altria Group Distribution Company

19.     Defendant James Monsees is a resident of the San Francisco Bay Area. In 2007, he co-founded Ploom with Adam Bowen. He served as Chief Executive Officer of JLI until October 2015. Since October 2015, he has been Chief Product Officer of JLI. At all relevant times, he has been a member of the Board of Directors of JLI.

20.     Defendant Adam Bowen is a resident of the San Francisco Bay Area. In 2007, he co-founded Ploom with Monsees. At all relevant times, he has been Chief Technology Officer and a member of the Board of Directors of JLI.

21.     Defendant Nicholas Pritzker is a resident of San Francisco, California, and a

member of the Pritzker family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Pritzker received a J.D. from the University of Chicago. He served as president of the Hyatt Hotels Corporation and was a member of its Board of Directors from 1980 to 2007. More recently, he co-founded Tao Capital, an early investor in, among other companies, Tesla Motors and Uber. In 2007, he invested in JLI.[1]

22.     Defendant Hoyoung Huh lives and works in the Silicon Valley area. He holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering. He has been CEO or a Board member of numerous biotechnology businesses, including Geron Corporation. Huh has been on the Board of Directors of JLI since at least June 2015.

23.     Defendant Riaz Valani lives near San Jose and is a general partner at Global Asset Capital, a San Francisco-based private equity investment firm. He has been on the Board of Directors of JLI since at least May 2011.[5]

---

[1] Ainsley Harris, How JUUL went from a Stanford thesis to $16 billion startup, Fast Company (March 8, 2020 4:11PM PST), https://www.fastcompany.com/90263212/how-JUUL-went-from-a-stanford-thesis-to-16-billion-startup

[2] INREJUUL_00371187

[3] INREJUUL_00327603.

[4] INREJUUL_00327603.

[5] Ploom, Inc., Notice of Exempt Offering of Securities (Form D) (May, 5 2011), https://www.sec.gov/Archives/edgar/data/1520049/000152004911000001/xslFormDX01/primary_doc.xml

[6] INREJUUL_00327603.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   24.     Defendants Monsees, Bowen, Pritzker, Huh, and Valani are referred to

2   collectively as the "Management Defendants."

3   25.     Defendants JLI, the Altria Defendants, Monsees, Bowen, Pritzker, Huh, and

4   Valani are referred to collectively as the "RICO Defendants."

5   **III.    JURISDICTION AND VENUE**

6   26.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness

7   Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship

8   from one Defendant, there are more than 100 class members nationwide; and the aggregate

9   amount in controversy exceeds $5,000,000 and minimal diversity exists.

10   27.     Defendants JUUL and the Altria Defendants have significant contacts in each

11   States and Territories of the United States, such that personal jurisdiction would be proper in

12   any of them. Defendants Monsees, Bowen, Pritzker, Huh, and Valani reside within the Northern

13   District of California and are subject to the general jurisdiction of this Court.

14   28.     A substantial part of the events and omissions giving rise to Plaintiffs' causes of

15   action occurred in and/or emanated from this District. Pursuant to 28 U.S.C. § 1391(a), venue is

16   proper in said District.

17   **IV.    FACTUAL ALLEGATIONS**

18   **A.     Each Defendant Was Instrumental in Seeking to Develop and Market the**

19   **Blockbuster Sequel to Combustible Cigarettes, the "Most Successful**

20   **Consumer Product of All Time."**

21   29.     JLI's co-founder James Monsees has described the cigarette as "the most

22   successful consumer product of all time . . . an amazing product."[7] This statement, which

23   ignores the fact that cigarettes have caused more deaths than any other human invention,

24   contained a kernel of truth. When U.S. smoking rates peaked in the mid-1960s, 42% of adults

25   smoked cigarettes. Cigarettes were everywhere; people smoked on airplanes, in movie theatres,

26

27   [7] Kathleen Chaykowski, *Billionaires-to-be: Cigarette Breakers–James Monsees and Adam Bowen Have Cornered the US E-Cigarette Market with Juul. Up Next: The World*, Forbes

28   India (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

at the office, and at sports games. Movie stars and sports heroes smoked. Cigarette advertising wallpapered American life, glamorizing smoking as sophisticated, cool, and the thing to do.

30.    But in reality, of course, this "successful" product has long been the world's leading cause of preventable death.

31.    Citing "some problems" inherent in the cigarette, Monsees and JLI co-founder Adam Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[8] Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[9] Successfully capitalizing on this opportunity would mean not only billions of dollars in short-term revenue but lucrative acquisition by a cigarette industry power player.

32.    Bowen and Monsees took the first major step toward realizing their vision by deliberately creating an extremely potent nicotine product that looked nothing like a cigarette. But achieving widespread adoption of their highly addictive product required resources and expertise beyond those posessed by Bowen, Monsees or others at JLI.

33.    When it became clear that Bowen and Monsees could not achieve vision of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life through JLI by themselves, the Management Defendants planned a fundamental shift in roles to allow Pritzker, Huh, and Valani to direct and take control of JLI and use it to commit the Defendants' unlawful acts.

34.    Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Huh, and Valani formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.

35.    Prior to the installation of Tyler Goldman as JLI's new CEO in August 2016,

---

[8] Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*, SOLID SMACK (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods/
[9] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  Defendants Pritzker, Huh, and Valani used their newly formed Executive Committee to expand

2  the number of addicted e-cigarette users through fraudulent advertising and representations to

3  the public. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively

4  tak[ing] over the company."[10]

5  [11]

6      36.    But the Management Defendants couldn't create a massive market for JUUL on

7  their own; they needed an ally that knew the business. They turned to Altria in the Spring of

8  2017. While Defendants JLI, Bowen, Monsees, Huh, and Valani are relative newcomers to the

9  tobacco industry, Altria has been manufacturing and selling "combustible" cigarettes for more

10  than a century. And Defendant Pritzker, for his part, has been long familiar with the tobacco

11  industry from his family's ownership of chewing-tobacco giant Conwood before selling it to

12  Reynolds American, Inc., a subsidiary of British American Tobacco. Notwithstanding their

13  different histories, JLI and the Management Defendants, for their part, invited Altria into the

14  fold as an ally with ample resources to further expand the market of nicotine-addicted e-

15  cigarette users and to keep litigation and regulation at bay. While JLI, Monsees, and Bowen

16  publicly claimed to be out to "disrupt" the industry, they and the other Management Defendants

17  privately negotiated and ultimately relinquished a 35% ownership stake in the company to a

18  cigarette giant.

19      37.    Cigarette companies have long known that profitable growth requires a pipeline

20  of "replacement" customers. Altria, after decades of tobacco litigation and regulation, had little

21  ability to recruit new smokers in the ways that had driven Philip Morris's success through most

22  of the 1900s. In 2017, Altria's combustible cigarette products were facing increasing regulatory

23  pressures. In late July 2017, Altria's stock value plummeted shortly after the FDA announced

24  that it would reduce the amount of nicotine allowed in cigarettes with an eye toward reaching

---

[10] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html
[11] INREJUUL_00278359.

    CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

non-addictive levels.[12] In late 2017, Altria, and other major cigarette companies, also finally complied with a consent decree from the 1990s tobacco litigation that required them to issue corrective advertising statements that highlighted the addictiveness and health impacts of smoking cigarettes.[13]

38.     Due in large part to this litigation and regulation, cigarette use has been declining in the United States in the last decade, especially among youth.[14] Altria estimates that the cigarette industry declined by 4% in 2017 and by 4.5% in 2018, and it predicted a continued 4% to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.[15] Altria later adjusted the estimated rate of decline to 4% to 6%, to reflect efforts to increase the legal age for cigarette smoking to 21.[16]

39.     Altria's own efforts at marketing an e-cigarette product had, however, proven largely unsuccessful. Altria had launched the MarkTen product nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for the market leader at that time, blu e-cigarettes.[17] Of the $88.1 million spent on e-cigarette advertising in 2014, nearly 40% of that was Altria's MarkTen campaign, at $35 million.[18] Altria was clear in its intent to

---

[12] *See* Dan Caplinger, *Altria Group in 2017: The Year in Review*, The Motley Fool (Dec. 18, 2017), https://www.fool.com/investing/2017/12/18/altria-group-in-2017-the-year-in-review.aspx.

[13] https://www.law360.com/articles/1037281/tobacco-cos-settle-long-running-health-warning-dispute

[14] *Current Cigarette Smoking Among Adults In the United States*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (last visited February 10, 2020); *Youth and Tobacco Use*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last visited February 10, 2020).

[15] *Altria's Fourth-Quarter 2018 Earnings Conference Call*, Altria (Jan. 31, 2019), http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.

[16] *Altria Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Bus. (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.

[17] Jennifer Cantrell et al., *Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace*, Tobacco Control 25 (10) (2015), http://dx.doi.org/10.1136/tobaccocontrol-2015-052532.

[18] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at the time of MarkTen's launch.[19] The original MarkTen was a "cigalike," designed to mimic the look and feel of a combustible cigarette. Altria had also been acquiring small companies in the vaping industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."[20] In 2016, Altria acquired a vape product called Cync, from Vape Forward.[21] Cync is a small vapor device that uses prefilled pods in a variety of flavors, similar to the JUUL.

40.     In February 2017, Altria told investors at the 2017 Consumer Analyst Group of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made excellent progress toward its long-term aspiration of becoming a leader in e-vapor."[22] In his remarks, Altria's current CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year. It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations." He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately \$2.5 billion."[23] In 2017, Altria's MarkTen e-cigarettes had a market share of only 13.7%, well behind

---

[19] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[20] Mike Esterl, *Altria To Launch MarkTen E-Cigarette Nationally*, Wall St. J. (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378; Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth* at 12 (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

[21] Remarks by Jody Begley, 2017 Altria Investor Day (Nov. 2, 2017), http://media.corporate-ir.net/media_files/IROL/80/80855/2017InvestorDay/Remarks_and_Reconciliations.pdf.

[22] Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, CEO and President, and other members of Altria's senior management team 2017 Consumer Analyst Group of New York (CAGNY), (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.

[23] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

JLI's growing market share of 40%.[24] Thus, despite its public statements to the contrary, Altria knew that it would not achieve its goal of dominating the e-cigarette market through its own inferior products.

41.     With smoking on the decline, litigation and regulatory controls were ramping up and threatening Altria's ability to attract new smokers, and Altria's own e-cigarette product proving unsuccessful, Altria's best bet for maintaining a market by increasing users addicted to nicotine was to partner with JLI (1) to maintain or increase the number of users hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first scheme.

42.     For those reasons and others, ██████████████████████████████████████████████████████████████████████████████████████████████████[25] and Ploom's advisory committee included Altria's former growth officer. In Altria's words, the company followed "JUUL's journey rather closely" from its early beginnings.[26]

43.     According to Howard Willard, Altria's CEO, Altria first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" beginning in the Spring of 2017.[27] ████████████████████████████████████████████████████████████████[28] By the Fall of 2017, JLI, the Management Defendants, and Altria had agreed to and had taken coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

---

[24] Richard Craver, *Vuse falls further behind Juul on e-cig sales*, Winston-Salem Journal (Dec. 14, 2017), https://www.journalnow.com/business/vuse-falls-further-behind-juul-on-e-cig-sales/article_ed14c6bc-5421-5806-9d32-bba0e8f86571.html.

[25] INREJUUL_00278740.

[26] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.

[27] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[28] INREJUUL_00349529.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

44. ███████████████████████████████████████

█████████████████████[29] These confidential discussions with Altria would have involved key employees and officers of JLI, which would have included Defendants Monsees, Bowen, Pritzker, Huh, and/or Valani. During this roughly 18-month period, it was JLI (through its executives and employees—including Tyler Goldman and his successors) and Altria (through its executives and employees) that primarily directed and conducted fraudulent acts designed to grow the market of nicotine-addicted e-cigarette users, although Bowen, Monsees, Pritzker, Huh, and Valani remained critical to the success of these efforts. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI and Altria, and Altria's investment in JLI, would not have been possible.

45. In December 2018, Altria decided to take the next step in its coordination with JLI and the Management Defendants by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This arrangement was profitable for both companies, as well as Defendants Monsees, Bowen, Prtizker, Huh, and Valani. JLI employees received $2 billion in bonuses, which, split among the Company's 1,500 employees, was approximately $1.3 million per employee;[30] Altria received millions of loyal teen customers; and Defendants Monsees, Bowen, Pritzker, Huh, and Valani received untold sums of money and saw the value of their shares in JLI skyrocket, allowing them to cash out via a special dividend and bonus, as well as through stock sales that were not available to other of JLI's minority shareholders.[31] In deciding to make a huge investment in JUUL, Altria took into account that the e-cigarette industry would see significant year-over-year growth in the near term, and that "JUUL continu[es] to be a growth driver for the e-vapor category."[32]

---

[29] *Id.*

[30] Olivia Zaleski, *Juul Employees to Get $2 Billion Bonus in Altria Deal*, BLOOMBERG (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-altria-deal.

[31] Tiffany Kary, *JUUL Founders Sued for Self-Dealing Over Altria's $12.8 Billion*, Bloomberg (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-dealing-over-altria-s-12-8-billion.

[32] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

46.     This investment further intertwined JLI and the Altira Defendants. According to the terms of its investment, Altria may appoint one third of JLI's board. And in October 2019, JLI's CEO resigned to be replaced by another career Altria executive, K.C. Crosthwaite. The key employees within JUUL—including Bowen, Monsees, Pritzker, Huh, and/or Valani—would have been instrumental in bringing Crosthwaithe on board at JLI. Crosthwaite had most recently served as the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work to assist Altria's companies, including with digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Crosthwaite knows the cigarette industry's playbook all too well, having previously served as the president and CEO of Phillip Morris USA, the vice president and general manager at Marlboro—the leading cigarette brand among youth, and the vice president of strategy and business development of at Altria Client Services LLC.

47.     In addition, Joe Murillo, who headed regulatory affairs for Altria, and served as President and General Manager of Nu Mark, LLC (Altria's e-cigarette business), became JLI's chief regulatory officer in October 2019.

48.     Both before and after Altria's investment, JLI, through its employees and officers, provided Altria with critical information regarding the design and nicotine content of the JUUL product, the labeling of the JUUL product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor preferences, and regulatory strategies. Altria, for its part, guided JLI and the Management Defendants in these areas and helped them devise and execute schemes to maintain and expand the e-cigarette market.

49.     JLI, the Management Defendants, and Altria worked together to implement their shared goal of growing a new market in the image of the combustible cigarette market through a multi-pronged strategy to: (1) create an highly addictive product that consumers would not associate with cigarettes and that would appeal to the lucrative youth market, (2) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit, (3) actively attract young users through targeted marketing, and (4) use a variety

1    of tools, including false and deceptive statements to the public and regulators, to delay
2    regulation of e-cigarettes. As detailed more fully throughout this Complaint, each of the
3    Defendants played a critical role—at times overlapping and varying over time—in each of these
4    strategies.

5        **B.    Defendants' Strategy Was to Create a Nicotine Product That Would**
6             **Maximize Profits Through Addiction.**

7            **1.    Defendants Understood that the "Magic" Behind Cigarettes'**
8                 **Stratospheric Commercial Success Was Nicotine Addiction.**

9        50.    The first step in replicating the success of combustible cigarettes was to create a
10   product that, like combustible cigarettes, was based on getting users addicted to the nicotine in
11   the product. Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is
12   highly addictive and the key ingredient that drives addiction to cigarettes. Nicotine's addictive
13   properties are similar to heroin and cocaine.[33]

14       51.    Route of administration and speed of delivery are key to understanding nicotine's
15   addictive potential. Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report
16   on nicotine addiction, wrote: "After a puff, high levels of nicotine reach the brain in 10–20
17   s[econds], faster than with intravenous administration, producing rapid behavioral
18   reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of
19   nicotine and related effects during smoking, and makes smoking the most reinforcing and
20   dependence-producing form of nicotine administration."[34]

21       52.    Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by
22   smoking … results in high levels of nicotine in the central nervous system with little time for
23   development of tolerance. The result is a more intense pharmacologic action. The short time
24   interval between puffing and nicotine entering the brain also allows the smoker to titrate the

---

[33] *See e.g.,* US Department of Health and Human Services. *Nicotine Addiction: A Report of the Surgeon General.* DHHS Publication Number (CDC) 88-8406, (1988).

[34] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 Handb. Exp. Pharmacol., 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/

dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[35]

53.     Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

54.     Kids are particularly vulnerable to nicotine addiction, as Defendants know well. As described by the United States Surgeon General, "Tobacco use is a pediatric epidemic." Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[36]

55.     The above statements apply equally, if not more so, to e-cigarettes. Further, the Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses— are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[37] The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control,

---

[35] *Id.*

[36] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html

[37] *Know The Risks: E-Cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.html

deficits in attention and cognition, and mood disorders.[38] A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[39]

56.     In 2014, the United States Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease), lung diseases (chronic obstructive pulmonary disease (COPD) and lung cancer), cancer almost anywhere in the body, and birth defects.[40]

57.     It took five decades of public health initiatives, government intervention, impact litigation, consumer education and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

58.     By 2014, the number of adults that reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.[41] By 2014, teen smoking also hit a record low.[42] In June 2014, the Centers for

---

[38] Menglu Yuan et al., *Nicotine and the Adolescent Brain*, 593 J. of Physiology 3397 (2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/; U.S Surgeon General and U.S. Centers for Disease Control & Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes and Young People* (2019), https://e-cigarettes.surgeongeneral.gov/.

[39] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function*, 2 Cold Spring Harbor Persp. Med. 12 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/

[40] US Department of Health and Human Services. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.

[41] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, *Trends in Cigarette Smoking Among High School Students—United States*, 1991-2001, 51 MORBIDITY AND MORTALITY WEEKLY REPORT 409 (May 17, 2002), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5119a1.htm; Teresa W. Wang et al., *Tobacco Product Use Among Adults—United States, 2017*, 67 MORBIDITY AND MORTALITY WEEKLY REPORT 1225 (Nov. 9, 2018),

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  Disease Control and Prevention ("CDC") reported that "in achieving a teen smoking rate of 15.7

2  percent, the United States has met its national Healthy People 2020 objective of reducing

3  adolescent cigarette use to 16 percent or less."

4        59.  The United States Surgeon General reported in 2014 that: "We are at a historic

5  moment in our fight to end the epidemic of tobacco use that continues to kill more of our

6  citizens than any other preventable cause. The good news is that we know which strategies work

7  best. By applying these strategies more fully and more aggressively, we can move closer to our

8  goal of making the next generation tobacco-free."[43]

9        60.  Where the public health community saw progress in curbing the use of cigarettes

10  and nicotine addiction, Defendants saw an opportunity.

11        **2.**  **Following the Cigarette Industry Playbook, Defendants Sought to**

12            **Market a Product that would Create and Sustain Nicotine Addiction,**

13            **but Without the Stigma Associated with Cigarettes**

14        61.  Seeking to build and dominate a new market for nicotine products without the

15  baggage of combustible cigarettes (i.e. well-established link to death and disease), JLI

16  engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling

17  higher levels of consumer addiction than ever before. JLI marketed that highly-addictive device

18  as healthy, safe, cool and available in kid-friendly flavors.

19        62.  In doing so, JLI followed the cigarette industry's playbook. Monsees admitted

20  that when creating JLI, he and Bowen carefully studied the marketing strategies,

21

22

23  https://www.cdc.gov/mmwr/volumes/67/wr/pdfs/mm6744a2-H.pdf; US Department of Health
and Human Services. *2014 Surgeon General's Report: The Health Consequences of Smoking—*

24  *50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-
anniversary/index.htm#report.

25  [42] Press Release, Centers for Disease Control and Prevention, *Cigarette smoking among U.S.*
*high school students at lowest level in 22 years* (June 12, 2014),

26  https://www.cdc.gov/media/releases/2014/p0612-YRBS.html.

27  [43] US Department of Health and Human Services. *LET'S MAKE THE NEXT GENERATION*
*TOBACCO-FREE: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking*

28  *and Health,* https://www.hhs.gov/sites/default/files/consequences-smoking-consumer-
guide.pdf

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement between the state Attorneys General of forty-six states, five U.S. territories, the District of Columbia and the four largest cigarette manufacturers in the United States. "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[44]

63.     In a thesis presentation Bowen and Monsees gave in 2004, Monsees candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[45] JLI researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[46] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

64.     Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in way that would be easy to ingest—without the nausea, cough, or other aversive side effects that many new smokers experienced. In the 1970s, R.J. Reynolds scientists eventually found a solution: Combine the high-pH nicotine with a low-pH acid. The result was a neutralized compound referred to as nicotine salt. In a 1973 RJR memorandum titled "Cigarette concept to

---

[44] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/

[45] Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, Tech Crunch (Feb. 27, 2019, 7:51 am PST), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/

[46] *Id.*

assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive. A young RJ Reynolds chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."[47] Pefetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salts. As described in herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

65.     JLI also engaged former cigarette industry researchers to consult on the design of their product. As Monsees noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty."[48] The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."[49]

66.     One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device (2) the JUUL pod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUUL pods that contain liquid that includes nicotine, flavoring and other additives. Each JUUL pod is a

---

[47] Thomas A. Perfetti, *Smoking Satisfaction and Tar/Nicotine Control* (Dec. 7, 1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-salts-investigation.pdf
[48] David Pierce, *This Might Just Be the First Great E-Cig*, WIRED (Apr. 21, 2015, 8:00 AM), www.wired.com/2015/04/pax-juul-ecig/
[49] *Id.*

plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[50]



67.     JLI sells the JUUL pods in packs of four or two pods, and until recently, in a variety of enticing flavors. Many of the flavors have no combustible cigarette analog, including "cool" cucumber, fruit medley, "cool" mint, and crème brûlée. Figure 1 shows the JLI device and a JLI "Starter Kit" with four flavored JUUL pods:

---

[50] *E-cigarettes and vapor products*, King County, https://www.kingcounty.gov/depts/health/tobacco/data/e-cigarettes.aspx (last visited Mar. 8, 2020).

1

**Figure 1**



68.     JLI attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[51]

69.     JLI even took this message to ninth graders: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[52]

---

[51] U.S. Food and Drug Administration Warning Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.
[52] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
                                                                                    Case No. 19-md-02913-WHO

70.     This was not just a rogue employee. Internal messaging around JUUL, crafted by the executives, emphasized that JUUL was safer than smoking. In a ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████[53]█████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████[54]████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████[55] The consistency of the wording in these presentations more than a year apart shows that this was standard company language.

71.     JLI's mission was not to improve public health. Rather, JLI sought to introduce a new generation of consumers to nicotine. JLI's business model was never about reducing addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[56]

72.     JLI, Bowen, and Monsees achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided consumers with palatable access to high-concentrations of nicotine like never before. Since the JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700 percent in 2017 alone. By 2019, JLI owned three-quarters of the e-cigarette market.[57]

---

[53] INREJUUL_00441986 (emphasis added).

[54] JLI00373324.

[55] JLI00373328 (emphasis added).

[56] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. Times (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html

[57] Dick Durbin et al., *Durbin & Senators to JUUL: You are More Interested in Profits Than Public Health*, Durbin Newsroom (Apr. 8, 2019), https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-are-more-interested-in-profits-than-public-health

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1

2

### 3.    Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company.

3       73.    JLI, along with the Management Defendants, worked together to maintain and

4  expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and

5  growing customer base.

6       74.    That growing customer base was crucial to JLI's and the Management

7  Defendants' long term objective—lucrative acquisition by another company. They recognized

8  that JLI's product, with its potential to dominate the nicotine products market by hooking new

9  users, would appeal to one segment of the economy in particular: the cigarette industry.

10      75.    JLI and the Management Defendants also recognized that their business goal—

11 becoming part of the cigarette industry—was unlikely to endear them to the consumers that they

12 needed to purchase their products. Years of anti-smoking campaigns have successfully

13 stigmatized cigarette smoking. When Monsees and Bowen presented their thesis and product

14 design to their classmates, they included a clip from a South Park episode showing the

15 characters assembled at the Museum of Tolerance and shaming a smoker.[58]

16      76.    Monsees and Bowen needed to shape social norms such that the public attitude

17 towards e-cigarettes would allow consumers to use their product without the stigma and self-

18 consciousness smokers experienced. Monsees and Bowen saw a market opportunity in a

19 generation of non-smoking consumers brought up on anti-smoking norms. In Monsees' words,

20 they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco

21 but don't self-identify with—or don't necessarily want to be associated with—cigarettes."[59]

22      77.    Part of this approach was consistently portraying JUUL as an enemy of the

23 cigarette industry, with a publicly announced goal of eliminating the cigarette. In an interview,

24

25

26

[58] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground,
https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/

27 [59] *Id.*; *see also,* INREJUUL 00064696 ███████████████████████

28 ████████████████████████████████████████████████████

Bowen asserted that he and Monsees spent a lot of time talking about "the kind of typical thoughts of evil Big Tobacco companies like coming down and squashing you."[60] The "Mission Statement" on JLI's homepage proclaims:

> Our mission is to transition the world's billion adult smokers away from combustible cigarettes, eliminate their use, and combat underage usage of our products.
>
> We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire.[61]

In fact, JLI's Chief Administrative Officer has publicly stated that the goal behind JLI is "eliminating cigarettes."[62]

78.     This public message of eliminating cigarettes and challenging tobacco companies stands in direct contrast with JLI's actual business and investment strategy. From the beginning, Bowen and Monsees actively sought the investment and assistance of major cigarette companies. Bowen and Monsees' initial foray into the e-cigarette business, Ploom, launched its e-cigarette as the ModelOne in 2010, using pods of loose-leaf tobacco heated by butane. It did not catch on. Ploom only sold a few thousand devices. By then a company with a dozen employees, Ploom was faltering, in need of money, technological expertise, and marketing savvy.[63]

79.     Help came from Japan Tobacco International ("Japan Tobacco"), a division of Japan Tobacco Inc., the fourth-largest tobacco company in the world. In December 2011, Japan Tobacco and Ploom entered into a strategic agreement, which gave Japan Tobacco a minority stake in Ploom and made it a strategic partner. In a statement regarding the agreement, Monsees

---

[60] Alison Keeley, *Vice Made Nice? A high-tech alternative to cigarettes*, Stanford Magazine, https://stanfordmag.org/contents/vice-made-nice

[61] *Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values

[62] Ashley Gould, *JUUL Labs is committed to eliminating cigarettes,* Cal Matters, (March 18, 2019).

[63] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

said, "We are very pleased to partner with [Japan Tobacco] as their deep expertise, global distribution networks and capital resources will enable us to enter our next phase of growth and capitalize on global expansion opportunities."[64] As Bowen explained in an interview, "We were still doing a lot of our own internal product development, but now we had access to floors of scientists at [Japan Tobacco]."[65]

80.     According to internal documents,



[66]

[67] In addition,

[68]

81.     JLI and the Management Defendants

[69] According to

[64] *Innovative Partnership for Ploom and Japan Tobacco International JTI to Take Minority Share in Ploom*, Japan Tobacco Int'l (Dec. 8, 2011), https://www.jti.com/sites/default/files/press-releases/documents/2011/innovative-partnership-for-ploom-and-japan-tobacco-international.pdf

[65] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html

[66] INREJUUL_00371423 (██████████).

[67] INREJUUL_00371447.

[68] INREJUUL_00371458-INREJUUL_00371459.

[69] INREJUUL_0016386 (██████████).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

[70] The end result of the process would be

.[71]

82.

[72]

83.     According   to

[73]

---

[70] *Id.*

[71] *Id.*

[72] INREJUUL_0016399.

[73] INREJUUL_0016400-INREJUUL_0016401.

[74]

84.    Consistent with

[75]

85.    The

---

[75] INREJUUL_00061757 ).

[76] INREJUUL_00061833.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

86.     This goal—acquisition by a major cigarette company—was a motive that the JLI and the Management Defendants would return to in making decisions about the manufacture and marketing of JUUL products. As an example, [REDACTED]

[REDACTED] [77] Bowen knew that to achieve the ultimate goal of acquisition, JLI and the Management Defendants would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

87.     JLI and the Management Defendants sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction of, its users; and, second, by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people whose addiction would last the longest and be the most profitable for the Defendants.

---

[77] INREJUUL_00294198.

1
2

      C.      **JLI and Bowen Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction.**

3
4
5
6
7
8
9
10
11
12
13
14
15

      88.      JLI was well-aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity. One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."[78] It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers. Claude Teague of R.J. Reynolds titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market." In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[79] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." As seen below, JLI heeded Dr. Teague's advice.

16
17

      1.      **JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale.**

18
19
20
21

      89.      As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users, who were primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

22
23

      90.      E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in

24
25
26
27
28

---

[78] Internal Memo from T.L. Achey (Lorillard Tobacco Company) to Curtis Judge, Product Information, (August 1978).

[79] Internal Memo from Claude Teague (R.J. Reynolds), Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market, (Feb. 2, 1973).

a palatable form.[80] Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine.[81] When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user.[82] This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit."[83] While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.

91.     Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day.[84] None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

92.     Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

### 2. JLI's Initial Experiments Measured Non-Smokers "Buzz" Levels and Perceptions of Throat Harshness

93.     JLI intentionally designed its product to mimimize "throat hit" and maximize "buzz."



---

[80] Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL and the High-nicotine Product Market*, 28 Tobacco Control 623 (2019).
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

94.    In these early tests, ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████[85] The aim was to develop a nicotine salt formulation that maximized buzz, minimized harshness. "Employees tested new liquid-nicotine formulations on themselves or on strangers taking smoke breaks on the street. Sometimes, the mix packed too much punch – enough nicotine to make some testers' hands shake or send them to the bathroom to vomit . . . ."[86]

95.    The ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████[87]

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

█████ ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

---

[85] INREJUUL_00002903.

[86] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/

[87] INREJUUL_00002903.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

97. A later study by Anna K. Duell et al., which examined 4% benzoate solutions—the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit. The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley" flavor was 0.05 and in "Crème Brulee" was 0.07.[88] Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine. For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84,[89] resulting in over 14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[90]

98. Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youths. The cigarette industry has long recognized this; a published study of industry documents concluded that "product design changes which make cigarettes more palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."[91] The Duell study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[92]

99. Reducing the harshness of nicotine also allows more frequent use of e-cigarettes, for longer periods of time, and masks the amount of nicotine being delivered. By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction. The Duell study further concluded that

---

[88] U.S. Patent No. 9,215, 895; Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 432 (Fig. 3).

[89] Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431 (*hereinafter* "Duell Study").

[90] *Id.* at 431–34.

[91] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. Times (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html

[92] Duell Study at 433 (citing Willett, J. G., et al., *Recognition, use and perceptions of JUUL among youth and young adults*, Tobacco Control, 054273 (2018)).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  JLI's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is

2  "particularly problematic for public health."[93]

3       **3.**   **JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than**

4            **Cigarettes.**

5       100.   In 2014, after ███████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████████

8  ██████████  From these measurements, the scientists calculated key pharmacokinetic parameters,

9  including maximum concentration of nicotine in the blood (Cmax) and total nicotine exposure

10  (Area Under the Curve or AUC). JLI reported the results in U.S. Patent No. 9,215,895 (the '895

11  patent), for which JLI applied on October 10, 2014,[96] and which was granted in December 2015.

12  The named inventors on the patent were Adam Bowen and Chenyue Xing

13       101.   Among the formulations was a 4% benzoate formulation, which was made with

14  3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin.[97] As a

15  comparator, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes. The



---

[93] *Id.* at 431.

[94] INREJUUL_00350930.

[95] *Id.*

[96] This application was a continuation of U.S. Patent Application No. 14/271,071, filed May 6, 2014, which claimed the benefit of U.S. Provisional Patent Application Serial No. 61/820,128, filed May 6, 2014, and U.S. Provisional Patent Application Serial No. 61/912,507, filed December 5, 2013.

[97] U.S. Patent No. 9,215,895 at 19:63-20:4.

[98] INREJUUL_00024437.



102.    According to Table 1 in the patent, the Cmax (the maximum nicotine concentration in blood) for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL, which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

103.    Describing these results, JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [i.e., JLI's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette."[99] The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."[100]

---

[99] U.S. Patent No. 9,215, 895, at 7:51-55 (filed Dec. 22, 2015) (emphasis added).
[100] *Id.* at 7:63-8:4.

104.     In other words, JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick"[101] that drives addiction and abuse.[102] Because "nicotine yield is strongly correlated with tobacco consumption,"[103] a JUUL pod with more nicotine will strongly correlate with higher rates of consumption of JUUL pods, generating more revenue for JUUL. For example, a historic cigarette industry study that looked at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[104] In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

105.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[105] The Reilly study tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered 164 ± 41 micrograms of nicotine per 75 mL puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 µg/puff.[106] Correcting to account for the different puff sizes between these two studies, this suggests that, at 75 mL/puff,

---

[101] Internal Memo from Frank G. Colby (R.J. Reynolds), *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market*, (Dec. 4, 1973).

[102] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease, A Report of the Surgeon General* at 181 (2010), https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf

[103] Martin J. Jarvis et al., *Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, 93 Nt'l Cancer Inst. 134 (Jan. 17, 2001), https://academic.oup.com/jnci/article/93/2/134/2906355

[104] Letter from Peggy Martin to Study Participants, *Resume of Results from Eight-Week Smoking Study*, UCSF Library, 1003285443-5443 (Sept. 10, 1971).

[105] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 Nicotine Tobacco Research 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584

[106] Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 Tobacco Control ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

a Marlboro would deliver about 114-145 µg/puff. In other words, the Reilly study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

106.    Additionally, depending on how the product is used, an e-cigarette with the 4% benzoate solution is capable of delivering doses that are materially higher ████████████████ ███████. As a paper published by the European Union notes: "[A]n e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[107] With at least 59 mg/ml of nicotine in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/ml amount), a JUUL pod easily exceeds the nicotine dose of a combustible cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and other countries have considered similar regulations.[108]

107.    ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████[109]:

_____

[107] E-Cigarettes, European Comm'n, https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited February 10, 2020) (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

[108] Charis Girvalaki et al., *Discrepancies in Reported Versus Measured Nicotine Content of E-cigarette Refill Liquids Across Nine European Countries Before and After the Implementation of the EU Tobacco Products Directive*, 55 Eur. Respir. J. 1900941 (2020), https://doi.org/10.1183/13993003.00941-2019

[109] INREJUUL_00442040-INREJUUL_00442080, INREJUUL_00442064



108.   Given the concentration of nicotine in a JUUL pod, four to five milligrams of JUUL e-liquid contains about 200-250 micrograms (µg) of nicotine. As noted by

[110] In other words, JUUL's precisely calibrated nicotine delivery system was specifically engineered to aerosolize

[111]

109.   JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists

---

[110] INREJUUL_00347306.
[111] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

"didn't want to introduce a new product with stronger addictive power."[112] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold."[113] For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]"[114] But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."[115]

110.    As another option, JLI could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine exceeding those of a cigarette on a per-puff basis. Instead, it ████████████████████████████████████████████[116]████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████████[117]

111.    Further warnings about the addictive power of the JUUL e-cigarette—and its appeal to youths—came ████████████████████████████ ███ ████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████[118]██████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

---

[112] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

[113] *Id*.

[114] *Id*.

[115] Id.

[116] INREJUUL_00431693

[117] INREJUUL_00351218; INREJUUL_00351239.

[118] JLI00365905.



112.

113.

114.

115.   In late 2014, knowing the results

All JUUL formulations at launch used the same amount of nicotine and benzoic acid as did the formulation that resulted in the highest nicotine blood levels ████████████████. JUUL pods were foreseeably exceptionally addictive, particularly when used by persons without prior exposure to nicotine.

---

[119] *Id.* (emphasis added).
[120] JLI00365709.
[121] JLI00365176.
[122] INREJUUL_00058345.
[123] *Id.*
[124] JLI00364678.
[125] JLI00364487.

1

2

3

      **4.**      **JLI and the Management Defendants Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted.**

4

5

6

7

116.    The JUUL e-cigarette launched in 2015. After the launch, JLI and the Management Defendants continued to collect information about the addictiveness of JUUL. This information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness.

8

9

117.    For example,  He wrote:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

118.   Another example came just days later. On [redacted]

[redacted] [127]

119.   Additionally, [redacted]

[redacted] [128] This is consistent with a central goal of the product's design: capturing "users with the first hit." [129]

120.   None of this information was a surprise, nor did it cause JLI or the Management Defendants to change JLI's products or marketing. In fact, they embraced it. [redacted]

[redacted] [130]

121.   The following year, JLI and the Management Defendants obtained even more evidence that the amount of nicotine in JUULpods was needlessly high. [redacted]

[redacted] [131] Similarly, [redacted]

---

[126] INREJUUL_00264888-INREJUUL_00264890.
[127] INREJUUL_00230416.
[128] INREJUUL_00434580-INREJUUL_00434590.
[129] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette.
[130] INREJUUL_00228928-INREJUUL_00228930.
[131] INREJUUL_00260068.

[132]

122. 

[133]

123. 

[134]

124. 

[135]

125. 

[136]

126. 

[137]

**5.**   **JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection.**

127.   Not only did JUUL contain high levels of nictoine that delivered a strong "buzz"

---

[132] INREJUUL_00260065.
[133] INREJUUL_00244200.
[134] *Id.*
[135] *Id.*
[136] *Id.*
[137] *Id.*

from the first puff, JLI designed its product to look appealing to youth and non-smokers. In

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████[138]███████████████████

128.    JLI's strategy to position a nicotine-delivery device as the cool thing to do is not new. Decades before, Dr. Teague from R.J. Reynolds observed: "pre-smokers" face "psychological pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance, while at the same time emphasizing 'doing one's own thing.'"[139] Again, JUUL followed the cigarette playbook verbatim.

129.    JLI knew that among its target audience, young people, cigarette smoking had become increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix.

130.    Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, a young users can, and do, use JUUL—in class or at home—without detection.

131.    The JUUL device is small and discrete. Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be charged in a computer's USB drive. This design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces, like schools.

---

[138] INREJUUL_00057291 et seq.

[139] Claude Teague, Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market, (internal RJR memo) (Feb. 2, 1973).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17



18 132. Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and

high-tech, which made it appealing to youth. JLI co-founder Bowen drew on his experience as a

design engineer at Apple to make JUUL resonate with Apple's popular aesthetics. This high-

tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This

wasn't smoking or vaping, this was JUULing."[140] The evocation of technology makes JUUL

familiar and desirable to the younger tech-savvy generation, particularly teenagers. According

to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now,

normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little

bit more so we're like, we can use it, we're not going to have any trouble with it because you

27

28

---

[140] *How JUUL Made Nicotine Go Viral*, Vox (Aug. 10, 2018),
https://www.youtube.com/watch?v=AFOpoKBUyok

can trust it."[141] A 16-year-old agreed, explaining that "the tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products. And then this is another product. And it's just another product. Until you're addicted to nicotine."[142]

133.    JUUL's design also included an LED light, which allowed users to active "party mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors, so that the rainbow colors are visible while the person inhales from the JUUL device. "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors permanently. Party mode on the JUUL is described by users to be "like an Easter egg in a video game" and allows for "some cool tricks that are going to drive [] friends crazy."[143] This feature was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it even more appealing and "cool" to young users.



---

[141] *Id.*

[142] *Id.*

[143] Jon Hos, *Getting Your Juul Into Party Mode*, (Jul. 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode.

6.    **JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation.**

a.    **JIL Develops Flavored JUUL Products That Would Appeal to Youth.**

134.    Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine.[144] A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[145]

135.    In June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint).




136.    JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.




---

[144] A Sept. 1972 Brown & Williamson internal memorandum titled "Youth Cigarette New Concepts," observed that "it's a well known fact that teenagers like sweet products." A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.

[145] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html

137.    In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[146] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of e-cigarettes" because these products are "so appealing" to children."[147]

138.    The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors. A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[148]

139.    Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine.[149] Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

140.    In a recent study, 74% of youth surveyed indicated that their first use of a JUUL

---

[146] Daniel J. DeNoon, *FDA Bans Flavored Cigarettes: Ban Includes Cigarettes With Clove, Candy, and Fruit Flavors*, WebMD (Sept. 22, 2009), https://www.webmd.com/smoking-cessation/news/20090922/fda-bans-flavored-cigarettes#2.

[147] https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children

[148] *See* Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 JAMA 1871 (2015). Another peer-reviewed study concluded that young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their peers who have not used e-cigarettes. *See* Brian A. Primack, et al. *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, 131 Am. J. Med. 443.e1 (2018).

[149] *See How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Chapter 4 (Centers for Disease Control and Prevention ed. 2010), https://www.ncbi.nlm.nih. gov/books/NBK53018/ #ch4.s92.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

was of a flavored JUUL pod.[150]

141.    Research shows that when youth see advertisements for flavored e-cigarettes, they believe the advertisements and products are intended for them.[151]

142.    A significant majority of under-age users chose flavored e-cigarette products.[152] By at least ████████████████████████████████████████████ ██████[153] Instead of taking corrective action or withdrawing the kid friendly flavors, JLI capitalized on their popularity with kids.

143.    JLI asserts that it did not intend its flavors to appeal to underage consumers. After eleven Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Dick Durbin[154]. JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

144.    A former JUUL manager, who spoke to The New York Times on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they

---

[150] Karma McKelvey et al., *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA Network Open e183535 (2018), https://doi:10.1001/jamanetworkopen.2018.3535

[151] D.C. Petrescu, et al. *What is the Impact of E-Cigarette Adverts on Children's Perceptions of Tobacco Smoking? An Experimental Study*, 26 Tobacco Control 421 (2016); Julia C. Chen-Sankey, et al. *Perceived Ease of Flavored E-Cigarette Use and E-Cigarette Use Progression Among Youth Never Tobacco Users*, 14 PLoS ONE 1 (2019).

[152] Karen A. Cullen et al., E-cigarette Use Among Youth in the United States, 2019, 322 JAMA, 2095 (2019), https://tinyurl.com/y3g75gmg ("Among current exclusive e-cigarette users, an estimated 72.2% . . . of high school students and 59.2% . . . of middle school students used flavored e-cigarettes. . . .").

[153] *See* INREJLI_00265068 (████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████

[154] https://www.politico.com/story/2018/12/08/juul-lobbying-washington-1052219

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[155]

145.    JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUUL pods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUUL pods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

### b.    Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market.

146.    While JLI and the Management Defendants were developing and marketing their flavored products to appeal to and recruit youth, Altria, recognizing the value of those young "replacement smokers" committed itself to the cause. With the shared goal to grow the number of nicotine-addicted users, and as detailed further herein, JLI, the Management Defendants, and Altria set out to do whatever was necessary to create and preserve the lucrative market for flavors. In order to maximize the value of its mint line of JUULpods, JLI, with the support of the Management Defendants, chemically and socially engineered its mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

147.    In July 2013, Reynolds American Inc.[156] released the Vuse, the first-known cartridge-based nicotine salt e-cigaretteto reach the domestic market.[157] Altria entered the

---

[155] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html

[156] Reynolds is now a wholly owned subsidiary of British American Tobacco.

[157] See FAQs, RJR Vapor Co., LLC, http://www.vusevapor.com/faqs/product/ ("Since Vuse's launch in 2013, all of our closed systems available for sale nationally (i.e., Vuse Solo, Vuse Ciro, Vuse Vibe, and Vuse Alto) include nicotine salts.") (last visited Feb. 10, 2020).

nicotine salt market one month later, with the MarkTen cig-a-like.[158] JLI would enter the market in June 2015.

148.    Though mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories,[159] Reynolds, Altria and JLI had all introduced mint-flavored products within a year of each company's initial release. By mid-2014, Reynolds had added "Mint, Rich Mint, Spearmint, [and] Wintergreen" to its Vuse lineup.[160] By February 2015, Altria's Nu Mark LLC, under the leadership of Joe Murillo (JLI's current regulatory head), released a Winter Mint flavor for MarkTen.

149.    Unlike Reynolds and Altria, which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUULpods.

150.    JLI's flavored JUULpods were particularly popular with its underage users and, when mango was introduced, it was the underage user's flavor of choice.

151.    JLI, the Management Defendants, and Altria recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors. So, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape regulation and preserve JLI's astronomical sales figures.

i.    **JLI Manipulates Chemistry of Mint JUUL Pods.**

152.    One recent study found that JLI's mango had the lowest free-base content, making it the least harsh formula; and that mint had the highest free-base content (30% more free-base than mango), making mint the formula with the strongest nicotine impact:[161]

---

[158] Additional Info, Nu Mark LLC, https://markten.com ("certain varieties" of MarkTen Original "contain acetic acid, benzoic acid, and lactic acid.")

[159] *See* M.B. Harrell *et al.*, *Flavored e-cigarette use: Characterizing youth, young adult, and adult users*, 5 Preventive Medicine Reports, 33-40, § 3.3 (Mar. 2017), https://www.sciencedirect.com/science/article/pii/S2211335516301346

[160] *See* Sen. Richard Durbin, et al., *Gateway to Addiction?* (April 14, 2014), *available at* https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf

[161] See Duell AK, et al. *Nicotine in tobacco product aerosols: 'It's déjà vu all over again'* Tob Control, 5 ((Dec. 17, 2019), *available at*

| Benzoic acid | $C_{HA}/C_{Nic}$ | $\alpha_{fb}$ |
|---|---|---|
| JUUL 'Cool Mint' (5% nicotine) | 0.97* | 0.13 |
| JUUL 'Classic Menthol' (5% nicotine) | 0.98* | 0.13 |
| JUUL 'Crème Brûlée' (5% nicotine) | 0.97* | 0.12 |
| JUUL 'Fruit Medley' (5% nicotine) | 0.99* | 0.12 |
| JUUL 'Cool Cucumber' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Classic Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Virginia Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL "Mango" (5% nicotine) | 0.99* | 0.09 |
| JUUL "Virginia Tobacco" (3% nicotine) | 0.94* | 0.14 |
| JUUL 'Mint' (3% nicotine) | 1.04* | 0.11 |
| Averages for JUUL | 0.99±0.03 SD | 0.12±0.01 |

Anna K. Duell et al., Nicotine in tobacco product aerosols: 'It's déjà vu all over again'

153.     These findings evidence JLI, the Management Defendants, and the Altria Defendants' plan to make the flavor whose lifespan they were working hard to preserve the most potent when it got into the hands of nonsmokers, including youth.

### ii.     JLI's Youth Surveillance Programs Confirmed that Mint JUUL Pods are Preferred by Teens.

154.     In January 2018, Kevin Burns,  JLI's new CEO, deployed his experience as the former CEO of a yogurt company to begin developing JUUL's flavor portfolio.

155.     One part of this initiative included studying consumer reactions to flavor names. [162]

156.     In April 2018, JLI received a document request from the FDA on April 24, 2018, seeking information about the design and marketing of JLI's products, among other things. [163]

157.     In response, JLI announced a commitment of $30 million to youth prevention efforts and began sending JLI representatives to schools to present what were essentially

---

https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/12/16/tobaccocontrol-2019-055275.full.pdf

[162] INREJUUL_00053206.

[163] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Apr. 24, 2018), https://www.fda.gov/media/112339/download

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

advertising campaigns for JUUL products. This conduct resulted in a Warning Letter from the FDA's Center for Tobacco Products to JLI in September 2019.[164]

Under the ███████████████████████████████████████████

159. ███████████████████████████████████████████[166]

███████████████████████████████████████████[167]

160. ███████████████████████████████████████████

███████████████████[168] ███████████████[169]

161. ███████████████████████████████████████████

███████████[170]

162. In other words, ███████████████████████████████████████████ This is unsurprising, as the "Mint"

---

[164] *Juul Labs, Inc. Warning Letter*, U.S. Food & Drug Admin. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019

[165] INREJUUL_00121627 (████████████); INREJUUL_00124965 (████).

[166] *Id.*

[167] INREJUUL_00035325.

[168] INREJUUL_00124965.

[169] *Id.*

[170] INREJUUL_00035325.

flavor was designed not to taste like a Menthol cigarette. Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport" cigarette that "doesn't have that good peppermint taste like [C]ool [M]int."[171]

163.  According to Siddharth Breja, who was senior vice president for global finance at JLI, after JLI pulled most flavored pods, including mango, from the market in an claimed attempt to reduce youth usage of JUUL, then-CEO Kevin Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[172] And it was public knowledge that mint and menthol have a well-documented history of facilitating youth tobacco use, as Dr. Jonathan Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.[173]

164.

---

[171] Reddit, *How does Classic Menthol compare to Cool Mint*, https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_cool_mint/ (last visited February 10, 2020)

[172] Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html

[173] Examining Juul's Role in the Youth Nicotine Epidemic, Testimony of Jonathan Winickoff Before the U.S. House of Representatives Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy, ("Winickoff Testimony") at 3, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf

165.    With that knowledge and with no genuine interest in youth prevention, and as detailed below, JLI, the Management Defendants, and Altria committed to work to preserve mint as a flavor for as long as possible. Indeed, to further this goal, Defendants Pritzker and Valani poured additional money into JLI a mere two months later as part of a $600 million funding round.[174]

166.    By keeping mint on the market long after other flavors were pulled, these Defendants continued to expand the number of addicted e-cigarette users.

**D.    Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe.**

167.    Having created a product designed to hook users to its nicotine, JLI had to mislead consumers into believing JUUL was something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL poses. Defendants devised and knowingly carried out a material scheme to defraud consumers by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products, (b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party groups to spread false and misleading narratives about e-cigarettes, and JUUL in particular.

**1.    The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.**

168.    Every 5% strength JUUL pod package represents that one pod is equivalent to one pack of cigarettes. This statement is deceptive, false and misleading. As

---

[174] Crunchbase, *JUUL Raises $650M Of Its $1.25B Mega-Round*, 2018-07-10 (Last Visited 2019-12-26) https://news.crunchbase.com/news/juul-raises-650m-of-its-1-25b-mega-round/

[REDACTED][175]

169.    In addition, and as JLI and the Management Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain 10–15 mg of nicotine per cigarette[176] and each cigarette yields between 1.0 to 1.4 mg of nicotine,[177] meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, have been found to deliver at least 82% of the nicotine contained in a JUUL pod to the user.[178] [REDACTED]

[REDACTED][179]

170.    Defendants also knew that the use of benzoic acid and nicotine salts in JUUL pods affects pH and facilitates "absorption of nicotine across biological membranes."[180] JUUL's e-liquid formulation is highly addictive not only because it contains a high concentration of nicotine, but because it contains a particularly potent form of nicotine, i.e., nicotine salts. [REDACTED][181] And the Altria Defendants were aware of the research showing the potency of nicotine salts from their many years in the tobacco business.

171.    JLI and Defendant Bowen, [REDACTED]

---

[175] INREJUUL_00279931.

[176] Neal L Benowitz and Jack E Henningfield, *Reducing the nicotine content to make cigarettes less addictive*, Tobacco Control 22 Supp. 1, i14-17 (May 2013), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3632983/

[177] Lynn T. Kozlowski and Janine L. Pilliteri, *Compensation for Nicotine by Smokers of Lower Yield Cigarettes*, 7 Smoking and Tobacco Control Monograph 161, 164 (1983), https://cancercontrol.cancer.gov/brp/tcrb/monographs/7/m7_12.pdf

[178] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 Nicotine Tobacco Research 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584 (about 82%, for averages of 164 µg per puff).

[179] See, e.g., INREJUUL_00023597 ([REDACTED]).

[180] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 Handb. Exp. Pharmacol., 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/

[181] INREJUUL_00278408.

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ sought to engineer test results that

2   differed from those results and were more consistent with JLI's deceptive messaging. ▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮[182]▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As Defendants

10  JLI and Bowen knew, this difference is critical. ▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[183]▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮[184]

15  172.

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮[185]

19  173.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[186]

24  174.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25

26  [182] INREJUUL_00014159-INREJUUL_00014226.

27  [183] INREJUUL_00002526-INREJUUL_00002625.
    [184] INREJUUL_00002526-INREJUUL_00002625.
    [185] Id.

28  [186] INREJUUL_00351717-INREJUUL_00351719.

CONSOLIDATED CLASS ACTION COMPLAINT
                                                      Case No. 19-md-02913-WHO



175.    JLI and the Management Defendants knew that

to market JUUL as providing a nicotine experience on par with a cigarette, even though they designed JUUL to ensure that was not true. In reality, there were never any measured test results in accord with JLI's marketing to distributors, retailers, and the public at large.

176.    In the United States, the unsupported extrapolations from what

were used to create charts, which JLI posted on its website, shared with journalists, sent to retailers, and distributed to third party promoters, showing that JUUL's 5% solution achieved a pk profile just below that of a cigarette. For example, the following chart appeared on the online publication TechCrunch[188]



177.

[189]

[190]

178.    These misrepresentations to the public were not accidental, nor were they the work of a rogue employee.

[191]

Thus, Defendants Bowen, Monsees, Pritzker, and Valani were privy to both the . And they *knew* that the data JLI (then Ploom) was pushing on the

---

[189] *See* JLI00363360.
[190] INREJUUL_00448896.
[191] INREJUUL_00016443-INREJUUL_00016507.

public was false and misleading, but none made any efforts to correct or withdraw those false and misleading statements.  Aside from submitting the testing protocol and ▮▮▮▮▮▮▮▮ with the '895 patent, JLI, Bowen, Monsees, Prtizker, and Valani otherwise ignored the ▮▮▮▮▮▮ and omitted it from public discussion of JUUL's nicotine delivery.

2.    **JLI, the Management Defendants, and Altria Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Was False and Misleading.**

179.    As set forth above, the statements in JLI advertisements and on JUUL pod packaging that each JUUL pod contains about as much nicotine as a pack of cigarettes are deceptive, false and misleading. Defendants knew this.

180.    JLI and the Management Defendants caused deceptive, false and misleading statements that a JUUL pod had an equivalent amount of nicotine as one pack of cigarettes to be distributed via the wires and mails. These Defendants have thus materially misrepresented the nicotine content of JUUL products to the consuming public including Plaintiffs, through acts of mail and wire fraud.

181.    By no later than October 30, 2016 (and likely earlier), the JLI Website—which, as discussed above, the Management Defendants on JLI's Board of Directors reviewed and approved—advertised that "[e]ach JUULpod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs."[192] The language on the website would later change, but still maintained the same fraudulent misrepresentation—i.e., that "[e]ach 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery."[193]

182.    As noted above, JLI and the Management Defendants directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUUL pods and deceptive, misleading and fraudulent statements regarding JUUL's nicotine

---

[192] JUULpod, JUUL Labs, Inc. (Oct. 30, 2016), https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/

[193] What is Vaping?, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/What-is-Vaping-How-to-Vape

content. And although they knew that these statements, which they caused to be transmitted over the wires and mails, were untrue, JLI and the Management Defendants have made no effort to retract such statements or correct their lies.

183. In addition to approving the JLI website, knowing that it contained deceptive, misleading and false statements, JLI (through its employees) and the Management Defendants also were directly responsible for the interstate transport, *via* U.S. mail, of JUULpod packaging contained misrepresentations and omissions. [194]

184. JUUL pod packages that were sent *via* U.S. mail stated that a single Juul pod is "approximately equivalent to about 1 pack of cigarettes."[195] These statements, as well as the statements on the JLI website, are false and misleading.

185. The statement on the JLI website, and in its advertisements and packaging, that each JUUL pod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is false and likely to deceive and mislead, because the actual amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes

186. The Altria Defendants greatly expanded the reach of this fraud by providing its retail and distribution might for JLI products, causing millions of JUUL pods to be sent via U.S. mail with packaging stating that JUUL pods contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[196] JLI, the Management Defendants, and the Altria Defendants knew that these statements were false and misleading, but nevertheless utilized JUUL product packing, marketing and advertising to maintain their fraud.

187. The Altria Defendants knew in 2017 that a JUUL pod delivered more nicotine

---

[194] INREJUUL_00278408.

[195] Juul Labs, Feb. 14, 2018, 10:35 a.m. Tweet, https://twitter.com/JUULvapor/status/963844069519773698

[196] *Id.*

than one pack of cigarettes. In 2017, the Altria Defendants launched its MarkTen Bold e-cigarette, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JUUL was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, the Altria Defendants chose to bring a less potent 4% formulation to market.

188.    According to the Altria Defendants own pharmacokinetic testing as reflected in the chart below, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, the Altria Defendants' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.



Figure 1: Presented at Altria Group Inc.'s November 1, 2017 Investor Day Presentation. MarkTen Bold 4%

189.    Based on its own internal knowledge, the Altria Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data it received from JLI, the Altria Defendants' due diligence undoubtedly included a careful examination of JLI's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

190.    Thus, JLI, the Management Defendants, and the Altria Defendants knew that the statement on JUUL pod packaging that each JUUL pod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead.

Neither the Altria Defendants nor JLI or the Management Defendants have made any effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL pods. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving consumers.

191.    From JUUL's pre-release announcements to this day, JLI has continuously represented that each pod is approximately equivalent to a pack of cigarettes. These claims, which JLI repeats widely in advertisements, press releases, and its web site, have been distributed *via* the wires and mails and disseminated by reputable and widely reliable sources that accepted those representations as true.[197]

192.    Not only have JLI and the Management Defendants misrepresented or concealed the actual amount of nicotine consumed *via* JUUL pods, but they also did not effectively or fully inform users about the risks associated with the potent dose of nicotine delivered by JLI's products. Despite going through numerous revisions since 2015, the JUUL packaging did not include nicotine addiction warnings until JLI was forced to add them in August 2018.

---

[197] *See* Truth Initiative, *6 Important Facts about Juul (last visited March 4, 2020),* https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul; Erin Brodwin, *An e-cigarette with twice the nicotine of comparable devices is taking over highschools – and scientists are sounding the alarm, Business Insider, (April 30, 2108, 12:03 pm)* https://www.businessinsider.com/juul-e-cig-vaping-health-effects-2018-3; Caroline Kee, *Everything you need to know about the JUUL, including the health effects,* Buzzfeed News, (February 5, 2018, 5:51 pm) https://www.buzzfeednews.com/article/carolinekee/juul-ecigarette-vape-health-effects; Jan Hoffman, *The Price of Cool: A teenager, a juul and nicotine addiction,* New York Times, (November 16, 2018) https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html; Sarah Milov, *Like the tobacco industry, e-cigarette manufacturers are targeting children,* The Washington Post, (September 23, 2018, 6:00 a.m.) https://www.washingtonpost.com/outlook/2018/09/23/like-tobacco-industry-e-cigarette-manufacturers-are-targeting-children/; Washington State Department of Health, *What are vapor products?, (Last Visited March 4, 2020),* https://www.doh.wa.gov/YouandYourFamily/Tobacco/VaporProducts

193.    Moreover, the form of nicotine JUUL pods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume,[199] leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUUL pods in fact contain approximately the same nicotine as a solution that is 6% nicotine by volume.

194.    The "5% strength" statement in Defendants' advertisements misrepresents the most material feature of the JUUL product—the nicotine content—and has misled consumers to their detriment. Resellers, apparently  assuming that "5% strength" means "50mg/ml" nicotine by volume, compound confusion among consumers by stating that JUUL pods contain "50 mg/ml," which they do not.[200]

195.    If JLI and the Management Defendants did not know when JLI released JUUL pods that the "5% strength" representation in Defendants' advertisements was misleading, they learned that there was widespread confusion about the JUUL pods' nicotine content. By 2017, studies revealed that smokers did not understand "5% strength," and some understood that

---

[198] *See*  INREJUUL_00444332

, *see e.g.* INREJUUL_00021583 (                                                 ).

[199] See, e.g., https://www.whitecloudelectroniccigarettes.com/blog/nicotine-measurements/; American E-Liquids Manufacturing Standards Association, *E-Liquids Manufacturing Standards*, § 1.05 (2017) (quantifying e-liquid nicotine content in terms of volume), https://www.aemsa.org/wp-content/uploads/2017/03/AEMSA-Standards-v2.3.3.pdf.

[200] See, e.g. Tracy Vapors, Starter Kits, http://web.archive.org/web/20190422143424/https://www.tracyvapors.com/collections/starter-kit; Lindsey Fox, *JUUL Vapor Review, Ecigarette Reviewed, (March 20, 2017)* https://ecigarettereviewed.com/juul-review ("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); Jason Artman, *JUUL E-Cigarette Review*, eCig One (Oct. 26, 2016) https://ecigone.com/e¬cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); West Coast Vape Supply, http://web.archive.org/web/20190718190102/https://westcoastvapesupply.com/products/juul-starter-kit ("5% . . . 50 mg"); Vapor4Life*, How Much Nicotine Is In a JUUL?* ("Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter)."), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/.

CONSOLIDATED CLASS ACTION COMPLAINT
                                                                  Case No. 19-md-02913-WHO

phrase to mean 5% of a cigarette. ████████████████████████████[201]
JLI and the Management Defendants (and later the Altria Defendants) did nothing to stop or correct this confusion about the nicotine content.

196.    The "5% strength" statement in Defendants' advertisements is also misleading. At least two independent studies testing multiple varieties of JUUL pods have likewise found significantly higher concentrations of nicotine than the 59 mg/mL JUUL's website represents, suggesting that the difference in the total nicotine content of a JUUL pod vs. a pack of combustilble cigarettes could be even greater.[202]

### 3.    Defendants Used Food and Coffee Themes to Give False Impression that JUUL Products Were Safe and Healthy.

197.    In late 2015, JLI and the Management Defendants employed a deceptive marketing scheme to downplay the harms of e-cigarettes with a food-based advertising campaign called "Save Room for JUUL." The campaign framed JUUL's addictive pods as "flavors" to be paired with foods.[203] JLI described its Crème Brûlée nicotine pods as "the perfect evening treat" that would allow users to "indulge in dessert without the spoon."[204]  In one 2016 email, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."[205] JLI similarly promoted

---

[201] INREJUUL_00123540.

[202] *See* Pankow JF, et al., *Benzene formation in electronic cigarettes*, 12 PLoS ONE 1 (2017); *See also* Anna K. Duell, et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431-434 (2018)

[203] Erin Brodwin, *$15 billion startup JUUL used 'relaxation, freedom, and sex appeal' to market its crème-brulee-flavored e-cigs on Twitter and Instagram*—but its success has come at a big cost, Business Insider, Oct. 26, 2018, https://www.businessinsider.com/juul-e-cig-marketing-youtube-twitter-instagram-social-media-advertising-study-2018-10

[204] http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors

[205] http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors

the fruit medley pods using images of ripe berries. JLI described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint."[206]









---

206

http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors

198.     Again, none of these advertisements disclosed that JUUL was addictive and unsafe.

199.     In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.[207] JLI's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.

200.     JLI's reference to coffee is no mere marketing gimmick, it reflects the larger effort to mislead customers into believing that JUUL is no more harmful than coffee, reinforcing the false and dangerous concept if a substance is "not harmful," then addiction to that substance cannot be harmful.

---

[207] *Id.*



201.    Defendants knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

1

2

### 4.   JLI's "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device.

3   202.   JLI, the Altria Defendants, and the Management Defendants recognized that one

4   of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and

5   thus JLI's staggering market share), was to mislead potential customers about the true nature of

6   JUUL products. Defendants knew that if it became public that JUUL was designed as a way to

7   introduce nicotine to youth and otherwise hook new users with its potent nicotine content and

8   delivery, it would not survive the public and regulatory backlash. Therefore, JLI (with the

9   knowledge and support of the Management Defendants) and the Altria Defendants repeatedly

10   made false nad misleading statements to the public that JUUL was created and designed as a

11   smoking cessation device, and falsely and misleadingly used the mails and wires to spread the

12   subterfuge. JLI, the Management Defendants, and the Altria Defendants committed these

13   deceptive, misleading and fraudulent acts intentionally and knowingly. In making these

14   representations, JLI, the Management Defendants, and the Altria Defendants intended that

15   consumers, the public, and regulators rely on misrepresentations that JUUL products were

16   designed to assist smoking cessation.

17   203.   The most blatant evidence of the cover-up scheme was the January 2019, $10

18   million "*Make the Switch*" television advertising campaign. This campaign, which was the

19   continuation of JLI's web-based Switch campaign, was announced less than a month after the

20   Altria Defendants announced Altria's investment in JLI.

21   204.   The "*Make the Switch*" television ads featured former smokers aged 37 to 54

22   discussing "how JUUL helped them quit smoking."[208] According to JLI's Vice President of

23   Marketing, the "*Make the Switch*" campaign was "an honest, straight down the middle of the

24   fairway, very clear communication about what we're trying to do as a company."[209] These

25

26   [208] Angelica LaVito, *JLI combats criticism with new TV ad campaign featuring adult smokers*

27   *who    quit    after    switching    to    e-cigarettes*,    CNBC    (Jan.    8,    2019), https://www.cnbc.com/2019/01/07/juul-highlights-smokers-switching-to-e-cigarettes-in-ad-campaign.html

28   [209] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

statements were false as JUUL was not intended to be a smoking cessation device. JLI and the Management Defendants committed acts of wire fraud when they caused the "Make the Switch" campaign to air on television with the fraudulent intent of deceiving and misleading the public, the United States Congress, and government regulators into believing that JLI is and had been focused solely on targeting adult smokers. The Altria Defendants also committed acts of mail fraud when they caused tens of thousands, if not millions, of written versions of the *Make the Switch* campaign to be distributed with packages of Altria's combustible cigarettes.

205.    Defendants continually sought to frame JUUL products as smoking cessation devices in their public statements and on their website. Defendant Monsees explained during his testimony before Congress:

> ***The history of cessations products have extremely low efficacy. That is the problem we are trying to solve here.*** So, if we can give consumers an alternative and market it right next to other cigarettes, then we can actually make something work.
>
> [T]raditional nicotine replacement therapies, which are generally regarded as the gold standard for tools, right, for quitting, those are nicotine in a patch or a gum form, typically, and the efficacy rates on those hover just below about a 10 percent or so. JUUL-we ran a very large study of JUUL consumers, ex-smokers who had picked up JUUL, and looked at them, looked at their usage on a longitudinal basis, which is usually the way that we want to look at this, in a sophisticated fashion ... what we found was that after 90 days, 54 percent of those smokers had stopped smoking completely, for a minimum of 30 days already. And the most interesting part of this study is that if you follow it out further, to 180 days, that number continues to go up dramatically, and that is quite the opposite of what happens with traditional nicotine replacement therapies.[210]

206.    In response to a direct question about whether people buy JUUL to stop smoking, Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[211]

207.    Other illustrative and non-exhaustive examples include the following:

---

[210] Testimony of James Monsees, Co-founder and Chief Product Officer, JUUL Labs, Inc., Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, *Hearing on Examining JUUL's Role in the Youth Nicotine Epidemic: Part* 2 (July 25, 2019), https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii

[211] *Id.*

*Statements by Defendant JLI:*[212]

- "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by **eliminating cigarettes**. We envision a world where fewer adults use cigarettes, and **where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirel**y, should they so desire." (JLI Website, April 2018 (or earlier));[213]

- "JUUL Labs, which exists to **help adult smokers switch** off of combustible cigarettes." (JLI Website, September 19, 2019); and,[214]

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);[215]

*Statements by the Altria Defendants:*

- "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, **a world leader in switching adult smokers** . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Altria Website, December 20, 2018);[216] and,

---

[212] Although these statements are attributed to Defendant JLI, JLI's Board of Directors had ███████████████████████, accordingly, Defendants Bowen, Monsees, Pritzker, Huh, and Valani are each directly responsible for the transmission of these fraudulent statements.

[213] *Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values (last visited February 7, 2020).

[214] CONSUMER UPDATE: 9/19, JUUL Labs, Inc (Sept. 19, 2019), https://newsroom.juul.com/consumer-update-9-19/

[215] JLI Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of then-CEO Kevin Burns).

[216] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BUSINESSWIRE (Dec. 20, 2018, 7:00 AM EST), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate

- "We believe e-vapor products present an **important opportunity to adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18).[217]

- "We have long said that **providing adult smokers with superior, satisfying products with the potential to reduce harm** is the best way to achieve tobacco harm reduction. **Through Juul**, we are making the biggest investment in our history toward that goal."[218]

- "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also **support and even accelerate transition to noncombustible alternative products by adult smokers**." (Altria Earning Call, January 31, 2019)[219]

- We expect the **JUUL product features that have driven JUUL's success in switching adult smokers in the U.S.** to strongly appeal to international adult cigarette smokers. (Altria Earning Call, January 31, 2019)[220]

208.   Defendants knew at the time of making these statements that they were false, deceptive and misleading. JUUL does not have FDA approval as a cessation product.

209.   The *Switch* advertisements reinforced the impression left by the testimony of JLI's co-founder, clearly linking JUUL to cessation and quitting. For example:

---

[217] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018).

[218] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, (Dec. 20. 2018), Business Wire, https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate

[219] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018. (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx

[220] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018. (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx

210.    Representative Rashida Tlaib, upon presenting this ad to Monsees, had the following exchange:

**Rep. Tlaib:** After 30 lines, starting with "quit," the ad says "switch," followed by no further mentions of start smoking again. You were a smoker. Does this ad give a smoker hope that there might be a way to quit cigarettes for good?

**Mr. Monsees:** I think the intention of this ad is to make it very clear to consumers that there is an alternative, finally, to combustible cigarettes. I am one of those people.[221]

---

[221] James Monsees, *Testimony of James Monsees before the U.S. House of Representatives Committee on Oversight and Reform and Consumer* ("Monsees Testimony") at 3, U.S. HOUSE COMMITTEE ON OVERSIGHT & REFORM (July 31, 2019), https://www.c-

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

211.   Defendants' tacit message in their *Switch* advertisements is: switch because, unlike cigarettes, JUUL is harmless to your health.

212.   Defendants' false, deceptive and misleading *Switch* campaign suggests that smoking and JUULing are mutually exclusive and that purchasing a JUUL will "switch" a smoker to a non-smoker.

213.   Defendants know that a large number of smokers who use JUUL products do not end up switching but end up consuming cigarettes and JUUL.

214.   JLI has advertised cost-savings calculators as part of its *Switch* campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (*i.e.,* a pack a day smoker is presumed to consume one JUUL pod a day). Defendants know that the calculator is misleading because smokers who switch to JUUL typically increase their nicotine intake or end up consuming both combustible cigarettes and JUUL products, rendering the calculator misleading at best.

215.   JUUL labels and advertisements also marketed the product as an "alternative" to cigarettes:



216.   Other advertisements similarly marketed the product as smoking "evolved":

span.org/video/?c4811191/user-clip-wasserman-grothman-tlaib-question-monsees at 12:33-13:04.

Page 75



217.    The goal of these advertisements was to convey the deceptive, misleading and false impression that JUUL products could help consumers quit smoking and break nicotine addiction in a way that was healthy and safe. But, as noted above, that was simply not the case. Defendants never disclosed to consumers that JUUL e-cigarettes and JUUL pods are at least as, if not more, addictive than combustible cigarettes. And each of JLI, the Management Defendants, and the Altria Defendants received data to this effect, as discussed above, and were aware of this fact.

218.    In addition, the notions that JUUL products are designed only for existing cigarette smokers, and safer than combustible cigarettes are belied by JLI's own knowledge, marketing plan and intentions on several fronts. *First*, Defendants sought to grow a new group of consumers of nicotine products (e.g., "vapers"), not just to market to the shrinking number of existing cigarette smokers. *Second,* JLI and Bowen designed the JUUL device to be easy to use for youth and others who have never smoked and to create and exacerbate nicotine addiction by encouraging ingestion of excessive amounts of nicotine. *Third,* as noted above, JLI's own internal testing revealed that JUUL products were often more potent than combustible cigarette smokers prefer. Each of the Management Defendants knew this from his position on JLI's Board of Directors, and the Altria Defendants knew the same when they began to actively coordinate with JLI and the Management Defendants. Despite this knowledge, these Defendants made numerous deceptive, false and misleading public statements that JUUL was intended to be a cessation device.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   219.   JUUL is not a product adults typically use to quit smoking. Researchers have

2   found that as of 2018, only 7.9% of American adults had ever used USB shaped vape devices,

3   like JUUL, and only 2% of adults currently used them.[222] And as mentioned above, youth were

4   16 times more likely to use the USB-shaped JUUL than adults.[223]

5   220.   JLI's own marketing research indicated that the JUUL was not appropriate as a

6   cessation device for adults.



18   221.   The deceptive, misleading and fraudulent nature of the "*Make the Switch*"

19   campaign is evident when comparing the campaign's advertisements to JUUL's initial

20   advertising, as demonstrated below. The fact that these advertisements are for the same product

[222] Kristy L Marynak et al., *Use and reasons for use of electronic vapour products shaped like USB flash drivers among a national sample of adults*, 28 Tobacco Control 685 (Nov. 2019), https://tobaccocontrol.bmj.com/content/28/6/685

[223] D.M. Vallone et al., Prevalence and correlates of JLI use among a national sample of youth and young adults, Tobacco Control (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693

[224] JLI00365905.

[225] *Id.* (emphasis added).

[226] JLI00365709.

[227] JLI00364678.

[228] JLI00364487.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

confirms that, notwithstanding the advice JLI and the Altria Defendants received from their media consultants, the Defendants never intended to target only adult smokers.







And



CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

222.   Defendants ensured that JUUL was the *opposite* of a "tool[] to reduce or eliminate" nicotine consumption. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[229] As described above, JLI and Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

223.   The *Switch* campaign also does not disclose or warn about the risks of using multiple tobacco products, "dual use" or that the JUUL is not a smoking cessation product. In addition to the heightened risks of addiction that multiple tobacco product use poses, one recent study found that persons who use e-cigarettes and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that e-cigarettes and cigarettes generate individually.[230]

224.   The FDA and other government regulators, enforcing existing laws addressing e-cigarettes,[231] publicly criticized the "*Make the Switch*" campaign and other efforts by Defendants to depict JUUL as a smoking cessation device. Section 911(b)(2)(A)(i) of the Federal Food, Drug, and Cosmetics Act (FDCA) (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."[232]

---

[229] CDC et al., Nicotine Addiction: Past and Present, How Tobacco Smoke Causes Disease (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92

[230] Julie B Wang, et al., *Cigarette and E-Cigarette Dual use and Risk of Cardiopulmonary Symptoms in the Health eHeart Study*, 13 PLoS ONE 1 (2018).

[231] Section 911(b)(2)(A)(i) of the FDCA (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."

[232] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

225.    In late 2019, and in response to the House of Representatives hearings in which JLI executives testified, the FDA issued two warning letters to JLI detailing its concern that JLI was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products" within the meaning of the FDCA.[233]

226.    Then, in its September 9, 2019 letter to JLI, the FDA notified JLI that its advertising slogans such as "99% safer," "much safer," and "a safer alternative" than cigarettes was "particularly concerning because [those] statements were made directly to children in school."[234] The FDA concluded that in using advertising language that e-cigarettes were safer than cigarettes, JLI had violated Sections 902(8) and 911 by marketing JUUL products as "modified risk tobacco products" without prior approval.[235]

227.    The September 9, 2019 letter also detailed the FDA's concerns with JLI's "*Switch*" marketing campaign. "[T]roubled by recent testimony" that JLI had given to the House Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, the FDA noted that JLI's *Switch* advertising campaign "may also convey that switching to JUUL is a safer alternative to cigarettes."[236]

228.    The FDA specifically highlighted the *Switch* campaign slogans which referenced smoking cigarettes, or attempts to quit smoking, followed by "*Make the Switch*." The FDA stated that JLI's campaign was in violation of multiple FDA regulations and the FDCA subsections, and that JLI's *Switch* campaign purported to tell the public that using e-cigarettes was an alternative to smoking, or a possible cessation tool.[237]

229.    On the same day, the FDA requested that JLI provide all documents related to its decision to market the Switch campaign to the Cheyenne River Sioux Tribe, in light of the

---

[233] U.S. Food and Drug Administration Warning Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019
[234] *Id.*
[235] *Id.*
[236] U.S. Food and Drug Administration Center for Tobacco Products Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/media/130859/download
[237] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

testimony by JLI that it had taken a "public health" approach to Native American tribes, and had sought healthcare professionals to refer Native American smokers to JLI's Switching Program.[238]

230. [239], [240].

### 5.    JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public About the Harms and Benefits of E-Cigarettes.

231.    Through a collective and parallel effort of funding, leadership, and board membership, JLI, the Altria Defendants and others in the e-cigarette industry leveraged third-parties, ranging from industry-funded non-governmental organizations to online blogs more accessible to youth, to mislead the public about the impacts of consuming e-cigarettes.

232.    An assortment of lobbyists, trade associations, and online publications have coordinated with the e-cigarette industry, including JLI and the Altria Defendants, to promote a consistent message that consuming e-cigarettes is not harmful, that nicotine is not harmful, and that the impacts of e-cigarettes are greatly exaggerated. These organizations receive funding from the e-cigarette industry, feature executives on those companies's boards of directors, and in return, promote industry products, industry views, or fund "independent" studies of their own that reach the same conclusions as e-cigarette industry-funded research.

---

[238] *Id.*

[239]   Kevin McCauley*, Altria Taps Mercury For Tobacco Regulation Work*, O'Dwyer's (Jun. 4, 2018), https://www.odwyerpr.com/story/public/10754/2018-06-04/altria-taps-mercury-for-tobacco-regulation-work.html

[240] *See, e.g.,* INREJUUL_00262168; INREJUUL_00262226-INREJUUL_00262227.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a)   The American Vaping Association

233.    The American Vaping Association ("AVA") is a pro-e-cigarette lobby group founded by Greg Conley, who notably publishes articles criticizing the CDC for its stance on restricting e-cigarette use.[241] Other executive members of the AVA possess business interests in e-cigarettes; for example, Treasurer David J. Danzak Jr. is associated with an e-cigarette business called Vapornine LLC.[242] Vice-President Antoinette Lanza is an owner of an exclusively e-cigarette shop in Hoboken, New Jersey called Smokeless Image.[243] Half of the AVA's functional expenses are for lobbying efforts.[244] It lists several sponsors, all of which are e-cigarette, e-liquid, or cigarette companies.[245]

234.    Conley has a prolific social media presence and frequently appears on television and radio to tout the benefits of consuming e-cigarettes and dispute negative news. The AVA website lists "studies" which are uniformly authored by noted industry-funded or industry-friendly authors, such as Polosa and Shahab.[246] AVA lists CASAA, Not Blowing Smoke, and the VTA, all established fronts for the e-cigarette industry, as "Resources."

235.    The AVA receives its funding from sponsors, who are organized into tiers such as Platinum, Gold, Silver, Bronze, and Green.[247] Current advertised sponsors include e-cigarette

---

[241] Jeff Stier, The War on E-Cigarettes | National Review Nationalreview.com (2011), https://www.nationalreview.com/2011/09/war-e-cigarettes-jeff-stier-gregory-conley/

[242] Vaporine LLC's business information page, Buzzfile, http://www.buzzfile.com/business/Vapornine-LLC-904-372-3244 (last visited Mar. 4, 2020).

[243] Stacy Jones, *Tobacco regulators mull more oversight as e-cigarettes see increased popularity*, NJ.com (Updated Mar. 30, 2019; Posted July 08, 2013), https://www.nj.com/business/2013/07/tobacco_regulators_mull_more_o.html

[244] Form 990, American Vaping Association Inc.'s Return of Organization Exempt from Income Tax, 2018, irs.com, https://apps.irs.gov/pub/epostcard/cor/464203951_201812_990O_2019122716980021.pdf (last visited Mar. 4, 2020).

[245] AVA Sponsors page, American Vaping Association, https://vaping.org/about-us/ava-sponsors/ (last visited Mar. 4, 2020).

[246] Research Reports page, American Vaping Association, https://vaping.org/research-report/(last visited Mar. 4, 2020).

[247] AVA Sponsors page, American Vaping Association, https://vaping.org/about-us/ava-sponsors/ (last visited Mar. 4, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

distributors and retailers such as E-Cigarette Empire, and VaporBeast.[248] Prior sponsors are a who's who of e-cigarette retailers. In 2016, Platinum sponsors included AltSmoke and Vapor Kings, while Gold sponsors included the now defunct Smokeless Image.[249]

236.    On social media, the AVA regularly downplays the risks of consuming e-cigarettes, criticizes negative coverage as myths or exaggerations, and lauds efforts to curb any regulation of the e-cigarette industry.[250]

237.    JLI actively sought out the AVA to promote JUUL. ████████████████
███████████████████████████████████████████████████
███████████████████████████████████████[251]

238.    In 2018, JLI took advantage of its coordinated efforts with the AVA to downplay the risks associated with JUUL. ████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████[252]████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████[253]

239.    The AVA also coordinated with JLI on pro-e-cigarette research. In March 2018, Conley facilitated a conversation between Dr. Konstantinos Farsalinos, a researcher at the University of Patras, Greece, who regularly publishes e-cigarette industry-friendly articles, and

---

[248] *Id.*

[249] AVA Sponsors page, American Vaping Association, Wayback Machine – Internet Archive (Aug. 14, 2017), https://web.archive.org/web/20170814221226/http://vaping.org/about-us/ava-sponsors/

[250] American Vaping Assn (@AVABoard), Twitter, https://twitter.com/AVABoard (last visited Mar. 4, 2020).

[251] INREJUUL_00278889

[252] *See* INREJUUL_00173252 (████████████████ .

[253] *Id.*

Gal Cohen, then Director of Scientific Affairs at JLI.[254]

240.

**b)      Vaping360**

241.    Vaping360 is a website dedicated to news regarding the e-cigarette industry. The website boasts "40 million smokers and vaping enthusiasts reached since 2015." This entity has a big social media presence and huge publication strategy.

242.    Vaping360's main message misleads the public about the health impacts of consuming e-cigarettes. Vaping360 has published various articles, including "10 Lies and Myths About Juuling Exposed."[257] This article, published in May 9, 2018, claimed, among other things, that JUUL was not as dangerous as smoking; JUUL did not cause cancer or "popcorn lung"; JUUL was not popular among teenagers, nor did JLI sell kid-friendly flavors or flavors aimed to entice young people; and the nicotine in JUUL is "a relatively mild drug, [and] may cause dependence."[258]

243.    Vaping360 regularly published articles praising, promoting, or downplaying the

[254] Juul Labs, *JUUL Labs Presents Findings at the Global Forum on Nicotine 2018,* Cision PR Newswire (June 15, 2018, 08:30 ET) ( https://www.prnewswire.com/news-releases/juul-labs-presents-findings-at-the-global-forum-on-nicotine-2018-300666743.html
[255] INREJUUL_00173252; INREJUUL_00278889
[256] *Id.*
[257] Jim McDonald, *10 Lies and Myths About Juuling Exposed*, Vaping 360 (May 9, 2018), https://vaping360.com/lifestyle/juuling/
[258] *Id.*

risks of JUUL, including, among others: "These Scientists Want to Kill Smokers' Hope (For Vaping)"; "UK Scientists to WHO: Your Vape Report Is Junk"; "One Free Pack JUUL Coupon Codes 2019"; and an article disparaging anti-smoking advocacy group Truth Initiative by claiming that "Truth Initiative Promo Encourages Risky Teen Behavior."[259]

244.    One of the main writers at Vaping360 is Jim McDonald who aggressively attacks any negative science as fake news. For example, McDonald frequently posts on social media platforms, including on Facebook and Twitter, but also comments on others posts extensively disputing negative news about consuming e-cigarettes.[260]



Vaping360 has taken funding from e-cigarette manufacturers, and in return coordinates with e-cigarette manufacturers to promote their products, while publishing favorable content.

246.

[261]

[262]

[263]

247.

[259] Jim McDonald, *Truth Initiative Promo Encourages Risky Teen Behavior*, Vaping 360 (Jan. 9, 2020), https://vaping360.com/vape-news/87705/truth-initiative-promo-encourages-risky-teen-behavior/

[260] Jim McDonald, *Mass. Senate Passes Worst Vaping Law in the Countr*, Vaping 360 (Nov. 21, 2019), https://vaping360.com/vape-news/86852/mass-senate-passes-worst-vaping-law-in-the-country/; Jim McDonald, *Meet the Rich Moms Who Want to Ban Vaping,* Vaping 360 (Oct. 8, 2018), https://vaping360.com/vape-news/71696/meet-the-rich-moms-who-want-to-ban-vaping/

[261] INREJUUL_00143870.

[262] *Id.*

[263] *Id.*

[264]

248.    In 2018, McDonald continued to write articles specifically praising JLI, such as "Coming Soon: A JUUL to Help You Quit JUULing" and "10 Lies and Myths About JUULing Exposed."[265] As of 2020, Vaping360 continues to offer discounts for JUUL products.[266]

### c)    Foundation for a Smoke-Free World

249.    The Foundation was founded in 2017, and presents itself as a public health organization, purportedly "advancing global progress in smoking cessation and harm reduction."[267] It is funded entirely by Philip Morris International, which in 2017 announced a $1 billion commitment to fund the Foundation.[268] The Foundation's 2018 Form 990 lists only one donor: PMI Global Services, Inc., or Philip Morris International, with a contribution of $80 million.[269]

250.    The Foundation is headed by Derek Yach, a noted advocate and promoter of e-cigarettes and consuming e-cigarettes.[270]

251.    In 2018, the Foundation announced that it would support Centers of Excellence to conduct tobacco control research.[271] This tactic is a well-known tool of the cigarette industry,

---

[264] INREJUUL_00139196

[265] Jim McDonald, *Coming Soon: A JUUL to Help You Quit Juuling,* Vaping 360 (Sept. 7, 2018), https://vaping360.com/vape-news/70262/coming-soon-a-juul-to-help-you-quit-juuling/

[266] [One FREE Pack] JUUL Coupon Codes 2019, Vaping 360 (Aug. 24, 2018) https://vaping360.com/vape-coupons/juul-coupon-promo-code/

[267] Home - Foundation for a Smoke-Free World, Foundation for a Smoke-Free World (2020), https://www.smokefreeworld.org/

[268] David Meyer, Philip Morris Pledges Almost $1 Billion to Anti-Smoking Fight (2017), https://www.webcitation.org/6tjyBv4dA

[269] Return of Private Foundation, (2018), https://web.archive.org/web/20190828104138/https://www.smokefreeworld.org/sites/default/files/uploads/documents/fsfw_2018_form_990-pf_public_inspection.pdf

[270] David Yach, Anti-smoking advocates should embrace e-cigarettes National Post (2015), https://nationalpost.com/opinion/derek-yach-anti-smoking-advocates-should-embrace-e-cigarettes

[271] Support Global Research | Foundation for a Smoke-Free World, Web.archive.org (2020), https://web.archive.org/web/20180531105105/https://www.smokefreeworld.org/our-areas-focus/support-global-research

which has a history of funding "research" centers to promote industry-friendly views, such as the Center for Indoor Air Research, which promulgated industry-funded studies that sowed doubt about the addictiveness of nicotine, claimed that indoor air quality was unaffected by cigarette smoke and downplayed the harms of cigarettes broadly. Institutes such as the Center for Indoor Air Research were forced to dissolve as part of the Master Settlement Agreement in 1998.

252.    A 2017 report in The Verge detailed the e-cigarette industry's apparently coordinated efforts to use biased research to downplay the risks of consuming e-cigarettes.[272] For example, e-cigarette manufacturers routinely conduct studies focusing on the "good news" about e-cigarettes, *i.e.* they release less harmful aerosolized chemicals than combustible cigarettes, or that their aerosol lingers for less time indoors than combustible cigarettes.[273] Industry-funded authors then regularly cite to each other's studies in their own research.[274] On information and belief, JLI and Altria, among others in the e-cigarette industry, funnel their industry-funded studies to friendly pro-industry groups knowing that those entities will misrepresent the results as evidence that e-cigarettes are safe, or not harmful.

d)    **Vapor Technology Association**

---

[272] Liza Gross, Vaping companies are using the same old tricks as Big Tobacco The Verge (2017), https://www.theverge.com/2017/11/16/16658358/vape-lobby-vaping-health-risks-nicotine-big-tobacco-marketing.

[273] *See, e.g.*, J. Margham, et al., *Chemical Composition of Aerosol from an E-Cigarette: A Quantitative Comparison with Cigarette Smoke*, 29 Chem. Res. Toxicol. 1662 (2016); Tanvir Walele, et al., *Evaluation of the safety profile of an electronic vapour product used for two years by smokers in a real-life setting*,92 Reg. Toxicol. Pharmacol. 226 (2018); D. Martuzevicius, et al., *Characterization of the Spatial and Temporal Dispersion Differences Between Exhaled E-Cigarette Mist and Cigarette Smoke*, 21 Nicotine & Tobacco Res. 1371 (2019).

[274] *See, e.g.*, Gene Gillman, et al., *Determining the impact of flavored e-liquids on aldehyde production during Vaping*, 112 Reg. Toxicol. Pharmacol. 1 (2020); Colin Mendelsohn and Alex Wodak, *Legalising Vaping in Australia* The McKell Institute (March 2019), https://pdfs.semanticscholar.org/3e13/8e46419913a29f8fc9ddad52ec771f73fa76.pdf; Violeta Kaunelienė, et al., *Impact of Using a Tobacco Heating System (THS) on Indoor Air Quality in a Nightclub*, 19 Aerosol and Air Qual. Res. 1961 (2019); Maya Mitova, et al., *Human chemical signature: Investigation on the influence of human presence and selected activities on concentrations of airborne constituents*, 257 Environmental Pollution 1 (2020).

253.     The Vapor Technology Association (VTA) bills itself as a trade association and advocates for the e-cigarette industry. It was founded in January 2016, with the banner tagline on its website reading "VAPE IS HOPE."[275]

254.     In 2018, JLI, SMOK, VMR, Turning Point Brands, and Joyetech were all featured as "Platinum Members," a level of memebership that required a $100,000 annual contribution. Thus, JLI paid VTA $100,000 in 2018 to become a Platinum Member, and in return, VTA offered JLI a board seat; invitations to lobbying strategy meetings; access to the FDA, other federal agencies, and members of Congress; and conference participation.[276]

255.     The VTA, like other lobbying and trade association groups in the industry, advocates for less regulation of e-cigarettes, and testifies in opposition to flavor bans.[277]

### f)     Retailer Lobbying

256.     Retailers have also taken to creating subsidiaries or wholly owned companies whose purpose is to produce quasi-journalistic content to promote consuming e-cigarettes, discredit health initiatives, and suggest that consuming e-cigarettes has no harmful health impacts. The best example of this is the website SoupWire, which publishes articles and editorials that promote consuming e-cigarettes and criticizes studies that look at the negative impacts of consuming e-cigarettes.[278] For example, when JLI donated $7.5 million towards a study on the impacts of consuming e-cigarettes on teens, a SoupWire report concluded that the study will likely find "nothing Earth-shattering."[279]

---

[275] Vape is Hope, Vapor Technology Association, Wayback Machine – Internet Archive (Feb. 25, 2016), https://web.archive.org/web/20160225154600/http://www.vaportechnology.org:80/

[276] Some of Our Members, Vapor Technology Association, Wayback Machine – Internet Archive (Nov. 28, 2018), https://web.archive.org/web/20181128162940/https://vaportechnology.org/membership/

[277] Vapor Technology Association, https://vaportechnology.org/ (last visited Mar. 4, 2020).

[278] Soupwire – The Truth About Vaping, https://soupwire.com/ (last visited Mar. 4, 2020).

[279] Jeff Hawkins, *JUUL Donates $7.5 Million to Teen Vaping Study*, Soupwire – The Truth About Vaping (July 2, 2019), https://soupwire.com/juul-donates-7-5-million-to-teen-vaping-study/

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1
2

      **6.**      **Altria Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to JLI**

3
4
5
6
7

     257.    Altria's announcement that it intended to invest in JLI came less than two months after it told the FDA that Altria "believe[s] that pod-based products significantly contribute to the rise in youth use of e-vapor products" and that it accordingly would be removing its own pod-based products from the market.[280] Altria made the same representations to its investors.[281]

8
9
10
11
12
13
14
15
16
17
18
19
20

     258.    Although Altria claimed its investment in JLI had an altruistic motive—" When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders," Altria recently confirmed that JLI has not even availed itself of that experience[282]. In Altria's October 2019 letter to Senator Dick Durbin, Altria CEO Howard Willard acknowledged that while Altria "offered to JUUL services relating to underage prevention efforts," to date "JUUL has not accepted Altria's offers of assistance in addressing underage vaping relating issues."[283] Willard has stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."[284] but as Altria knew, as reflected in its letter to the FDA just two months prior, that mission involved had resulted in usage throughout the youth market. Altira's admission that pod-based products contributed to underage use show that Altria knew its investment in JLI would "strengthen[] its financial

21
22
23
24
25
26
27
28

---

[280] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018)
[281] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript, (October 25, 2018) https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx
[282] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018. (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx
[283] Letter from Howard A. Willard III to Senator Richard J. Durbin (October 14, 2019) (emphasis added).
[284] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, Business Wire (Dec. 20, 2018, 7:00 AM EST), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1    profile and enhance[] future growth prospects" specifically because JLI dominated the youth

2    market for e-cigarettes.[285]

3        259.    Altria recognized JLI's market share dominance in the e-cigarette market as the

4    path to Altria's continued viability and profitability. In a January 31, 2019 earnings call, Altria

5    explained that "[w]hen you add to JUUL's already substantial capabilities, our underage

6    tobacco prevention expertise and ability to directly connect with adult smokers, we see a

7    compelling future with long-term benefits for both adult tobacco consumers and our

8    shareholders. We are excited about JUUL's domestic growth and international prospects and

9    their potential impact on our investment."[286] JUUL's growth was, as Altria well knew, due to

10   the product's viral popularity among teens. Willard briefly acknowledged the youth vaping

11   crisis, stating, "Briefly touching on the regulatory environment, the FDA and many others are

12   concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue

13   that we and others in the industry must continue to address aggressively and promptly.[287]

14       260.    Altria's representations that it intended to help JUUL curb the prevalence of

15   underage use was false and misleading. As discussed below, Altria coordinated with JUUL to

16   capture and maintain the youth market.

17   **E.     Defendants Targeted the Youth Market**

18       261.    Having created a product, like combustible cigarettes, that sought to get users

19   addicted to nicotine, and while taking steps to ensure that consumers and regulators did not

20   appreciate the true nicotine content or potential harm from using JUULs, to successfully sink

21   their high-tech nicotine hook into American consumers, JLI, Bowen, and Monsees needed

22   investors willing to adopt the tactics of the cigarette industry as their own. They found those

23   investors in Pritzker, Huh, and Valani.

24

25   [285] Press Release, *Altria Makes $12.8 Billion Minority Investment In Juul To Accelerate Harm Reduction And Drive Growth*, Altria (Dec. 20, 2018),

26   https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm.

27   [286] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018. (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx

28   [287] *Id.*

262.    Under the leadership of the Management Defendants, JLI marketed nicotine to kids. JLI and the Management Defendants deployed a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages to ensure their uptake and distribution among young consumers. JLI and the Management Defendants' campaign was wildly successful—burying their hook into kids and initiating a public health crisis.

## 1.    JLI Emulated the Marketing of Cigarette Companies.

263.    As Defendants know, nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.[288] The overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation."[289]

264.    Struggling to define their own identities, teenagers are particularly vulnerable to image-heavy advertisements that psychologically cue them on the "right" way to look and behave amongst peers.[290] Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation.[291]

265.    For decades, cigarette companies spun smoking as signifier of adulthood. This turned smoking into a way for teenagers to project independence and enhance their image among their peers.[292]

266.    Youth marketing was critical to the success of cigarette companies. In the 1950s, Philip Morris—now JUUL's corporate affiliate—intentionally marketed cigarettes to young people as a pool from which to "replace smokers" to ensure the economic future of the cigarette

---

[288] *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet*, Surgeon Gen., https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth-tobacco-use-factsheet/index.html (last visited Dec. 9, 2019).

[289] *USA v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006) (J. Kessler).

[290] *Id.* at 578.

[291] *Id.* at 570, 590

[292] *Id.* at 1072.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

industry.[293]

267.    Philip Morris's documents set out their youth strategy, explaining: "Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens".[294]

268.    It wasn't just Philip Morris. The strategy of hooking kids was an open secret in the cigarette industry.[295]

269.    As detailed below, JLI and the Management Defendants sought to emulate this approach. Indeed, Monsees admitted to using historical cigarette ads to inform JLI's own advertising campaign.[296]

270.    The emulation is obvious. A side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.[297]

---

[293] *U.S. v. Philip Morris*, No. 99- 2496 (D.D.C. Aug. 17, 2006), ECF No. 5750 (Amended Final Opinion), at 972.

[294] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

[295] C.A. Tucker, *Marketing Plans Presentation to RJRI B of D* at 2, U.C.S.F. Truth Tobacco Industry Documents (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (RJ Reynolds executive explaining that the "young adult . . . market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years.").

[296] Matthew Perone and Richard Lardner, AP News, *Juul exec: Never intended electronic cigarette for teens* (July 26, 2019), https://apnews.com/4b615e5fc9a042498c619d674ed0dc33; Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees

[297] *See* Appendix B, Ads 9-50.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22



23
24

271.     JLI and the Management Defendants deployed this same strategy, but adapted it

to modern advertising tactics.

25
26

**2.     The Management Defendants Intentionally Marketed JUUL to**
**Young People.**

27
28

272.     The risk that children would use a new e-cigarette product was well known and

well publicized in the months leading up to the launch of the JUUL e-cigarette. For example, in

April 2015, the CDC published the results from its 2014 National Youth Tobacco Survey.[298] The CDC found that "[i]n 2014, e-cigarettes were the most commonly used tobacco product among middle (3.9%) and high (13.4%) school students."[299] Moreover, "[b]etween 2011 and 2014, statistically significant increases were observed among these students for current use of both e-cigarettes and hookahs (p<0.05), while decreases were observed for current use of more traditional products, such as cigarettes and cigars, resulting in no change in overall tobacco use."[300] The CDC blamed e-cigarette marketing, the use of "a mixture of 'sex, free samples, [and] flavors' the same things that were originally found to be problematic with cigarette ads."[301]

273.    Seeking to enter this nascent youth market for e-cigarettes, JLI intentionally targeted youth from its inception. In March 2015, Management Defendants supervised the advertising campaigns that would accompany the launch of JUUL.

274.    Consistent with Monsees' position that he has no "qualms" with marketing to people that were not yet addicted to nicotine,[302] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[303]

275.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████[304]

---

[298] Centers for Disease Control and Prevention, *Tobacco Use Among Middle and High School Students — United States, 2011–2014*, Morbidity and Mortality Weekly Report (MMWR) 64(14);381-385 (April 17, 2015), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a3.htm

[299] *Id.*

[300] *Id.*

[301] Jacob Kastrenakes, *More teens are vaping instead of smoking,* The Verge (Apr. 16, 2015), https://www.theverge.com/2015/4/16/8429639/teen-ecigarette-use-triples-vaping-beats-smoking

[302] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html.

[303] INREJUUL_00441209

[304] INREJUUL_00057298-INREJUUL_00057487

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO



[305] Put differently, their target consumer was an adolescent.

276.   JLI professedly wanted kids to think JUUL was cool.

[306]

[307]

,"[308] For example,

[309]

[310]

[311]

277.   This focus on          continued up to and after launch.

[312]

[313]

---

[305] INREJUUL_00057298-INREJUUL_00057487
[306] INREJUUL_00057289.
[307] INREJUUL_00057293.
[308] INREJUUL_00057293.
[309] INREJUUL_00057293.
[310] INREJUUL_00057293.
[311] INREJUUL 00441325-INREJUUL_00441326.
[312] JLI00218598.
[313] JLI00206206.



278.    JLI identified

279.    With this goal in mind,

280.    In short order, the phrase "it's cool to JUUL" became an anthem among kids while youth e-cigarette use skyrocketed.

### 3.    JLI Advertising Exploited Young People's Psychological Vulnerabilities.

281.    Informed by decades of tobacco marketing, JLI ran a consistent, simple message: JUUL is used by young, popular, attractive, and stylish people.

282.    This was not the only marketing scheme JLI could have adopted. JLI had other options. In 2014, JLI engaged a Calgary-based advertising agency, Cult Collective, to complete a "diagnostic" evaluation of the JUUL brand and to make recommendations regarding the best

---

[314] JLI00222528.

[315] JLI00461564.

[316] JLI00235965.

[317] JLI00514343 ███████████████████████████████

[318] INREJUUL_00161703-INREJUUL_00161715

[319] Id.

[320] INREJUUL_00277080-INREJUUL_00277104

advertising strategy to market the JUUL e-cigarette.

283.    In keeping with typical e-cigarette marketing, which messaged to existing smokers looking to quit, Cult Collective recommended that JUUL position its e-cigarette technology as the focus of its advertisements. Cult Collective presented JUUL with exemplar advertisements that used images of a boom box and a joy stick, juxtaposed against the JUUL e-cigarette, with the tag line: "Everything changes. JUUL the evoluution of smoking."



284.    This campaign expressly invokes combustible cigarettes and positions the JUUL as a technological upgrade for the modern smoker.

285.    JLI rejected this approach.

286.    Instead, in June of 2015, JLI launched the "Vaporized" advertising campaign.[321] The express mission ███████████████████████████████████████ ██████[322]

287.    Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models, bold colors, and highlighted themes of sexual

[321] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/

[322] INREJUUL_00057291-INREJUUL_00057295

attractiveness, thinness, independence, rebelliousness and being "cool."[323]

288.    The targeting of young consumers was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teen than mature adults."[324]



---

[323] *See* Appendix B, Advertisement 1 (example of targeting of young people).

[324] Robert K. Jackler, The Role of the Company in the Juul Teen Epidemic, Testimony for the House Subcommittee on Economic and Consumer Policy (Jul. 24, 2019), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

289.    In the months leading up to the launch of JUUL e-cigarettes, ███████

████████████████████████████████████████████[325]███

████████████████████████████████████████████████████

█████[326]█████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████[327] The Management Defendants knew that the ads targeted youth, but "Juul's board of directors signed off on the company's launch plans[.]"[328] In addition, "Monsees, who was CEO at the time, personally reviewed images from the billboard photo shoot while it was in session."[329] A senior manager later told the New York Times that "he and others in the company were well aware" that the marketing campaign "could

---

[325] INREJUUL_00371285.

[326] INREJUUL_00371314.

[327] INREJUUL_00174387.

[328] Ainsley Harris, *How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?,* Fast Company (Nov. 19, 2018), https://www.fastcompany.com/90262821/how-juul-founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018

[329] *Id.*

1    appeal to" teenagers.[330]

2        290.    As part of the Vaporized campaign, JLI advertised on a 12-panel display over

3    Times Square.[331] Billboard advertising of cigarettes has for years been unlawful under the

4    Master Settlement Agreement.



        291.    ████████████████████████████████████████████

                                    [332]
████████████

        292.    In fact, JLI's Vaporized campaign was so effective that it gained national

attention on an October 15th, 2015 episode of Late Night with Stephen Colbert, who ridiculed

the notion that the young, dancing models were consistent with a target market of adult

smokers. As Colbert joked after viewing the close-up video of young models dancing in place,

"[y]eah! There is something about vaping that just makes me want to dance in a way that

---

[330] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html

[331] *See* Appendix B, image 14; *see also* https://inrejuul.myportfolio.com (also available at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_ mt068.php) (last accessed January 25, 2019) (additional images and videos).

[332] INREJUUL_00093933-INREJUUL_00093934

1  doesn't require much lung strength. . . . And it's not just ads featuring hip young triangles that
2  appeal to the youths. . . . There is no reason to worry about the long-term effects of vaping,
3  because e-cigarettes are so new that their long-term effects are still unknown."[333]

4  293.  The Vaporized campaign was not limited to the Times Square billboards
5  however.  The ads were also placed in nationally-distributed magazines, and the videos were
6  displayed on screens at the top of point-of-sale JUUL kiosks provided by JUUL to retailers
7  across the country.

8  294.  To the extent that the Vaporized advertisements disclosed that JUUL contained
9  nicotine, the warnings were in small print against low-contrast backgrounds, making them easy
10  to overlook. By way of comparison, cigarette advertisements, are required to display a health
11  warning in high contrast black and white, covering 20% of the image.

12  295.  Likewise, JLI's social media ads did not disclose any health risks of using JUUL
13  until May of 2018, when they were required to warn of addiction. But even then, JUUL placed
14  these warnings in areas that were only viewable if the social media user clicked on the "full
15  version" of the JLI post, which is not how teens typically engage with social media
16  advertising.[334] Notably, on Twitter, a social media platform that is geared towards reading text,
17  and on Facebook, where some users do read text, JLI typically did not include the disclaimer in
18  its advertisements at all.[335]

19          **4.      JLI Pushed the Vaporized Campaign Into Youth Targeted Channels.**

20              **a.      JLI Placed Its Vaporized Ads on Youth Oriented Websites**
21                   **and Media.**

22  296.  JLI engaged programmatic media buyers to place advertisements on websites
23  attractive to children, adolescents in middle school and high school, and underage college
24  students. These advertisements, which included the images of models from the Vaporized

25

26

27  [333] https://www.youtube.com/watch?v=PMtGca_7leM
   [334] *Se* Appendix B, Advertisement 3.
28  [335] *See* Appendix B, Advertisement 65; *see also* Juul Image Galleries (2015-2018) SRITA
   Collection, https://inrejuul.myportfolio.com/twitter-1.

campaign, began appearing on websites as early as June 2015. The chosen websites included: nickjr.com (the website for a children's television network run by Nickelodeon Group); the Cartoon Network's website at cartoonnetwork.com; allfreekidscrafts.com; hellokids.com; and kidsgameheroes.com.

297.    A picture of the homepage of nickjr.com is below:



298.    JLI also purchased banner advertisements on websites providing games targeted to younger girls,[336] educational websites for middle school and high school students,[337] and other teen-targeted websites.[338]

299.    JLI knew what it was doing. ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[336] The sites included dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlgames.com, and girlsgogames.com.

[337] *E.g.,* coolmath-games.com. JUUL also purchased advertisements on basic-mathematics.com, coolmath.com, math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, and purplemath.com.

[338] *E.g.,* teen.com, seventeen.com, justjaredjr.com, and hireteen.com. JUUL purchased advertisements on websites for high school students hoping to attend college such as collegeconfidential.com and collegeview.com.

███████████ [339] Nevertheless, JLI continued to push its campaign on websites with young demographics.

300.   JLI promoted the Vaporized campaign on Facebook, Instagram, and Twitter.

301.   JLI could have employed age-gating on its social media accounts to prevent underage consumers from viewing its Vaporized advertisements, but chose not to do so.

302.   The Vaporized campaign included the largest e-cigarette smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year.

303.   JLI promoted Vaporized through Vice Magazine, which bills itself as the "#1 youth media brand" in the world.[340]



304.   By 2016, an estimated 20.5 million U.S. middle and high school students were exposed to advertisements for e-cigarettes, including JUUL.[341]

**b.   JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience.**

305.   JLI used ████████████████████████████████████

---

[339] INREJUUL_00082179-INREJUUL_00082185

[340] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9

[341] Kristy Marynak et al., *Exposure to Electronic Cigarette Advertising Among Middle and High School Students – United States, 2014-2016*, CDC: Morbidity and Mortality Weekly Report (Mar. 16, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a3.htm

1 ████████████████████████████████████████████

2 ████████████████████[342] Influencers are prized sources of brand promotion on

3 social media networks.

4     306.    Like its Vaporized campaign, ███████████████████

5 ████████████████████████████████████████████

6 ███████████[343] In keeping with this strategy, JLI targeted influencers that were young

7 and popular with adolescents. One influencer JLI targeted was Tavi Gevinson, who was

8 nineteen years old in the summer of 2015. The year before, Rolling Stone magazine described

9 Gevinson as "possibly the most influential 18-year-old in America."[344]

10     307.    JLI contracted with Grit to enlist influencers by sending them free JUUL e-

11 cigarettes. Grit provided free JUULs to Luka Sabbat, known as the "the Internet's Coolest

12 Teenager,"[345] who was 17 years old during the summer of 2015.

13     308.   ███████████████████████████████████

14 ████████████████████████████████████████████

15 ███████████████████████[346]

16     309.    JLI encouraged its distributors, wholesalers, and other resellers—either explicitly

17 or implicitly— to hire affiliates and influencers to promote JLI's brand and products. Even if

18 not paid directly by JLI, these influencers profited from the promotion of JUUL products either

19 because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-

20

---

21 [342] *See* INREJUUL_00091138 ████████████████████████

22 ████████████████████████████████████████████

23 ██████████████.

[343] INREJUUL_00057293

24 [344] Alex Morris, *Tavi Gevinson: A Power Teen's New Direction*, Rolling Stone (Aug. 14, 2014,

25 3:57 PM), https://www.rollingstone.com/culture/culture-features/tavi-gevinson-a-power-teens-new-direction-232286/

[345] Alexis Barnett, *Who Is Luka Sabbat? Meet the Internet's Coolest Teenager*, Complex (Aug.

26 17, 2015), https://www.complex.com/style/luka-sabbat-interview-on-youth-kanye-west-and-fashion

27 [346] *See*, INREJUUL_00091141 ████████████████████████████

██████████████).

28

compatible products.

310.    For example, one YouTube user Donnysmokes (Donny Karle, age twenty-one) created a JUUL promotional video in 2017 that garnered roughly 52,000 views, many of which were from users under the age of eighteen.[347] Since that time, Karle has made a series of videos, including one titled "How to HIDE & HIT Your JUUL at SCHOOL WITHOUT Getting CAUGHT."[348] Karle has admitted to earning approximately $1200 a month from unspecified sources simply from posting videos of himself consuming e-cigarettes, especially of JUUL products online.[349]

311.    At least one JLI sales representative sent DonnySmokes a private message thanking him for promoting JUUL products on social media. Similarly, JUUL repeatedly thanked and encouraged the owner of the @JUULnation Instagram account for his posting of youth-oriented JUUL content on Instagram.

312.    ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ JLI's affiliates promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter and routinely failed to disclose that they were being paid to promote JUUL products.

313.    As with much of the marketing strategy for JUUL, the practices described above are prohibited by the Master Settlement Agreement.

---

[347] Robert K. Jackler, The Role of the Company in the Juul Teen Epidemic, Testimony for the House Subcommittee on Economic and Consumer Policy (Jul. 24, 2019), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf

[348] Id.

[349] Allie Conti, This 21-year-old is Making Thousands a Month Vaping on YouTube (Feb. 5, 2018 9:30 AM), https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month¬vaping-on-youtube

[350] INREJUUL_00113437-INREJUUL_00113441

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

c.      **JLI Used Viral Marketing Techniques Known to Reach**
        **Young People.**

314.    JLI deployed "viral marketing" techniques to great success. Viral marketing is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[351] Viral marketing effectively converts customers into salespeople, who, by sharing their use of a product (on social media or otherwise), repeat a company's representations and endorse the product within their network. The success of viral marketing depends on peer-to-peer transmission. Hence, a successful viral marketing campaign looks like a series of unrelated, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaigns.

315.    Social media platforms are the most effective way to launch viral marketing campaigns among young people. As of May 2018, among teenagers, 95% reported use of a smart phone, 85% use YouTube, 72% use Instagram, and 45% reported being online "constantly."[352]

316.    A key feature of JLI's viral marketing campaign was inviting user-generated content. This strategy revolves around prompting social media followers to provide their own JUUL-related content—e.g., post a selfie in your favorite place to use JUUL. The response provided by a user is then typically distributed—by the social media platform employed—into the user's personal network. In this way, brands can infiltrate online communities with personalized content that promotes their product (e.g. a picture of a friend using a JUUL e-cigarette at the beach). Within a few months of the JLI's commercial release in June 2015, a former JLI executive reportedly told the New York Times that JLI "quickly realized that

---

[351] N. Deepa et al., *Viral Marketing as an On-Line Marketing Medium*, IOSR J. of Bus. And Management 18, http://www.iosrjournals.org/iosr-jbm/papers/ncibppte-volume-2/1115.pdf; P. R. Datta, D. N. Chowdhury & B.R. Chakraborty, *Viral Marketing: New Form of Word-of-Mouth Through Internet*, 3 The Business Review 69 (2005).

[352] Monica Anderson And Jingjing Jiang, *Teens, Social Media & Technology 2018: Appendix A: Detailed Tables* (May 31, 2018), https://www.pewresearch.org/internet/2018/05/31/teens-technology-appendix-a-detailed-tables/

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[353]

317.    To drive consumer participation in its ad campaign, JLI peppered its advertising and social media posts with hashtags, including those referencing JLI and consuming e-cigarettes (e.g., #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████[354]



318.    JUUL users began taking photos of themselves using JUUL devices and putting them on social media with the hashtag #juul. They were creating JUUL content that looked and felt like real JUUL ads: featuring young people having fun and using JUUL. The flavor-based hashtag campaigns #MangoMonday and #coolmint generated hundreds of thousands of user-generated posts.

---

[353] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[354] INREJUUL_00093294

319.     JLI could have stepped in and attempted to stop the use of its trademark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL." It could have sought to shut down infringing accounts such as @doit4juul and @JUULgirls. It did not do so.

**5.     JLI Targeted Youth Retail Locations.**

320.     Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to point of sale tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed.

321.     For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales. JLI knows that nicotine-naïve young people frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL increased the likelihood that these people would purchase its product.

322.     JLI marketed its products extensively in convenience stores, employing video and product displays with bright colors and young adults using and displaying the JUUL device. The retail marketing worked and, by late 2017, JUUL became the most popular e-cigarette sold in convenience stores according to Nielsen data.[355]

323.     Like all in-store cigarette advertising, JLI's point–of–sale materials played a major role in driving youth addiction. JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the JUUL store locator and offering discounts. And JLI actively encouraged its retailers to leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

324.     Before JUUL's launch in 2015, JLI and Cult Collective developed packaging and

---

[355] Laura Bach, *JUUL and Youth: Rising E-Cigarette Popularity*, Campaign for Tobacco-Free Kids (July 6, 2018), http://www.kdheks.gov/tobacco/download/Campaign_for_tobacco-free_kids_rising_popularity_of_e-cigarettes.pdf

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

in-store displays that looked similar to iPhone packaging, which JLI knew would resonate with young people and further JLI's campaign to be the "the iPhone of e-cigarettes."

325.

356



**6.     JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Consumers Hooked.**

326.    JLI also sponsored at least twenty-five live social events for its products in California, Florida, New York, and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, or was addictive.[357] Instead, the invitations traded on PAX Lab, Inc.'s (PAX) reputation as a manufacturer of marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties.[358] Photographs from these events indicate that they drew a youthful crowd. Product promotion through sponsored events was a long-standing practice for cigarette companies, but is now prohibited.

---

[356] INREJUUL_00370796-INREJUUL_00370806, 805
[357] *See* Appendix B, Advertisements 78-81.
[358] *Id.*








327.    At these live social events, JLI gave attendees free JUUL "Starter Kits," which contain a JUUL device and 4 JUUL pods of various flavors. JLI gave away samples at music events without age restrictions, including Outside Lands in San Francisco's Golden Gate Park.

328.    Giving away free samples is prohibited conduct for a cigarette company under the Master Settlement Agreement.

329.    JLI also held sampling events in stores. ████████████████████████████ ████████████████████████████████████████[359] Documents obtained by the New York Attorney General show that JLI recruited young "brand ambassadors" to staff these events and required a dress code that included skinny jeans, high-top sneakers or booties, and an iPhone in a JUUL-branded case.[360]



330.    Though JLI publicly acknowledged in October 2017 that it is unlawful to distribute free samples of its products at live events,[361] it continued to reach out to new users by

---

[359] INREJUUL_00160394

[360] Jake Offenhartz, *Juul Hooked Teens Through Sick Parties and Hip Ambassadors, NY AG Says*, Gothamist (Nov. 19, 2019 2:02 PM), https://gothamist.com/news/juul-hooked-teens-through-sick-parties-and-hip-ambassadors-ny-ag-says; Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9

[361] *See* Nik Davis (@bigbabynik), Twitter (Nov. 17, 2017 1:11 PM), https://twitter.com/JLIvapor/status/931630885887266816; Robert K. Jackler, The Role of the Company in the Juul Teen Epidemic, Testimony for the House Subcommittee on Economic and Consumer Policy (Jul. 24, 2019),

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1    offering samples, sometimes at $1 "demo events." Like so many of JLI's initiatives, promotions

2    of this kind are prohibited for cigarette companies by the Master Settlement Agreement.

3         331.    The effect—and purpose—of JLI's Vaporized giveaways was to flood major

4    cities with products that would hook thousands of new users, and to generate buzz for the brand

5    among urban trendsetters who would then spread JLI's message to their friends via word of

6    mouth and social media.

7         332.    According to BeCore, one of the firms responsible for designing and

8    implementing JLI's live events, JLI distributed the nicotine-equivalent of approximately

9    500,000 packs of cigarettes at all twenty-five events.[362] And this was just to get people started.

10              **7.    The Management Defendants' Direction and Participation in the**

11                     **Youth Marketing Schemes.**

12                     **a.    The Management Defendants, and in particular Bowen,**

13                            **Monsees, Pritzker, Huh, and Valani, oversaw the youth**

14                            **marketing scheme.**

15        333.    The Management Defendants were well aware that JUUL branding was oriented

16   toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine.

17   The Management Defendants directed and approved JUUL branding to be oriented toward

18   teenagers.

19

20

21

22

23

---

24   https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-
     JacklerR-20190724.pdf

25   
26   [362] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*,
     Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019),
27   http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf. at 9

28   [363] *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the
     Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform,
     House of Representatives*, 116th Cong. 70 (2019) (statement of James Monsees, CPO, JLI Labs)

334.   After launch, executives and directors discussed whether to rein in the advertising to teenagers. ████████████████████████████████████

████████████████████████████ [364] ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ [365] ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ [366] ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ [367] ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██ [368] ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ [369]

335.   But some company leaders, including Huh, opposed any actions to curb youth sales. Youth sales were a large potential source of revenue.[370] As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people

---

[364] JLI00206239.

[365] JLI00214617.

[366] JLI00214617.

[367] JLI00214617.

[368] JLI00214617.

[369] JLI00214617.

[370] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM GMT), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

had no problem with 500 percent year-over-year growth."[371] And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.[372]

336.     In October 2015, JLI leadership resolved the debate in favor of selling to teens.



337.

376 Pax Labs modified the age verification system so that 92% of users were able to pass the age gate.[377] By changing the age verification process so that users were more likely to pass— —Pax Labs deliberately chose to continue selling to underage purchasers.

338.

[371] *Id.*
[372] *Id.*
[373] The Vaporized advertising campaign continued at least into early 2016. Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 7.
[374] INREJUUL_00276445.
[375] Native attachment to INREJUUL_00078494.
[376] JLI00068428.
[377] Kate Horowitz's LinkedIn profile (last visited March 9, 2020), https://www.linkedin.com/in/k8horowitz

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1 ███████████████████████████████████████████████████

2 ████████████████████████████████████[378] But JLI did not run this

3 campaign then and in fact did not begin focusing its advertising on switching from combustible

4 cigarettes until 2018.[379]

5      339.    By March 2016, however, JLI employees internally recognized that JLI's efforts

6 to market to children were too obvious. ████████████████████████████████

7 ███████████████████████████████████████████████████

8 ████████████████████[380]████████████████████████████

9 ███████████████████████████████████████████████████

10 ███████████████████[381]█████████████████████████████

11 ███████████████████████████████████████████████████

12 ███████[382]██████████████████████████████████████████

13 ███████████████████████████████████████████████████

14 █████████████████████████████████████[383]████████████

15 ███████████████████████████████████████████████████

16 ███████████████████████████████████████████████████

17 ███████████[384] Around this time, Pax Labs reoriented its JUUL advertising from the

18 explicitly youth-oriented Vaporized campaign to a more subtle approach to appeal to the young.

19 The advertising's key themes continued to include pleasure/relaxation, socialization/romance,

---

[378] JLI00214617.

[379] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*,
Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019),
http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 16.

[380] INREJUUL_00178377.

[381] INREJUUL_00061469.

[382] INREJUUL_00178379.

[383] INREJUUL_00178384.

[384] INREJUUL_00061274.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

and flavors[385]—all of which still appealed to teenagers.

340.    The Management Defendants continued to direct and approve misleading marketing campaigns long after launch. For example, JLI deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns, and ads cross-promoting mango and mint. Through their positions on the JLI Board of Directors, the Management Defendants were directly responsible for this marketing, as they had "final say" over all of JLI's marketing activities.[386] In other words, JLI and the Management Defendants controlled the messaging around JUUL products.

341.    Notably, none of JLI's early advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed that JUUL contains high amounts of nicotine; indeed, many of those advertisements did not advertise JUUL's nicotine content whatsoever.

342.    Likewise, none of JLI's advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed the health risks from consuming JUUL products.

343.    JLI and the Management Defendants knew of course that JUUL contained an ultra-high concentration of nicotine, and that ultra-high concentration of nicotine was designed to addict. They also knew that e-cigarette products, including JUUL, would expose users to increased health risks, including risks to their lungs and cardiovascular system. Despite that knowledge, JLI and the Management Defendants took affirmative actions, the natural consequence of which was the approval and transmission of these false and misleading advertisements that did not include a disclosure of JUUL's high nicotine content and concentration, nor any health risks at all.

---

[385] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 9.

[386] *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, House of Representatives*, 116th Cong. 70 (2019) (statement of James Monsees, CPO, JLI Labs).

1

2

3

            **b.**      **Pritzker, Huh, and Valani Were Able to Direct and Participate in the Youth Marketing Because They Seized Control of the JLI Board of Directors.**

4      344.    Although Defendants Bowen and Monsees were the visionaries behind JLI and

5 the most hands-on in its early stages, by the time JLI was pushing its marketing campaigns in

6 early-to mid-2015, JLI (through the individuals running the company), Bowen, Monsees,

7 Pritzker, Huh, and Valani were each intimately involved in the planning and execution of

8 activities.

9      345.    For example, ████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████[387]████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████

14      346.    But the Management Defendants at this point were taking actions that went

15 beyond the regular and legitimate business operations of JLI. At the same time ████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████[388]

20      347.    And at the same time the Management Defendants had approved the early JLI

21 marketing campaigns that were intentionally targeting youth, the Management Defendants were

22 planning a fundamental shift in roles to allow Defendants Pritzker, Huh, and Valani to take

23 charge of the instrumentalities of JLI, including its employees and resources.

24      348.    Specifically, in October 2015, Monsees stepped down from his role as Chief

25 Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Huh, and

26 Valani formed an Executive Committee of the JLI Board of Directors that would take charge of

27

28

---

[387] INREJUUL_00056077 [Confidential].

[388] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

fraudulently marketing JUUL products, including to youth. The Management Defendants, and in particular Huh, wanted to continue their fraudulent marketing, knowing that these ads were also targeted to youth, "argu[ing] that the company couldn't be blamed for youth nicotine addiction."[389]

349.   JLI's organizational charts later reflected the executive committee in the place of a CEO. ████████████████████████████████████████████████████
████████████████████████████ [390]

350.   ████████████████████████████████████████████████
██████████████ [391]

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[389] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/
[390] *See* INREJUUL_00016456 (██████████).
[391] INREJUUL_00278332 (██████████████); INREJUUL_00061420 (██████████████).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

[392] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[393] Also, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[394] Additionally, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [395] ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

352.    Similarly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [396]

353.    Over the next year, until the installation of a new CEO in August 2016, Defendants Pritzker, Huh, and Valani used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[397] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [398] Despite any potential internal misgivings about their fraudulent conduct, notably, none of Management Defendants terminated their relationship with

---

[392] *See* INREJUUL_00278406 *et seq.* (▮▮▮▮▮▮▮▮▮▮▮); INREJUUL_00278410 *et seq.* (▮▮▮▮▮▮▮▮▮▮).

[393] *See* INREJUUL_00278404 *et seq.* (▮▮▮▮▮▮▮▮▮▮); INREJUUL_00278402 *et seq.* (▮▮▮▮▮▮▮▮▮▮).

[394] INREJUUL_00278405 (▮▮▮▮▮▮▮▮).

[395] INREJUUL_00278405 (▮▮▮▮▮▮▮▮).

[396] INREJUUL_00061856.

[397] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html

[398] INREJUUL_00278359.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

JLI during this time period.

> **8.     JLI and the Management Defendants Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products.**
>
> **a.     JLI's Strategy Worked.**

354.    The Management Defendants knew that the JUUL marketing campaigns they directed and approved were successful in targeting youth. As Reuters has reported, "the first signs that JUUL had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where they could buy more JUULs, along with the cartridge-like disposable 'pods' that contain the liquid nicotine."[399] A former senior manager told the New York Times that "[s]ome people bought more JLI kits on the company's website than they could individually use—sometimes 10 or more devices." He added that "[f]irst, they just knew it was being bought for resale," but later "when they saw the social media, in fall and winter of 2015, they suspected it was teens."[400] Adam Bowen admitted that "he was aware early on of the risks e-cigarettes posed to teenagers[.]"[401] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[402] It was common knowledge within JLI that JUULs were being sold to children.

355.    After the Vaporized campaign, retail stores began selling out of JUUL products,

---

[399] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM GMT), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[400] Matt Richtel and Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html
[401] *Id.*
[402] INREJUUL_00339938 (emphasis added).

and JLI had a difficult time trying to meet demand coming from its online ordering platform.

356.     Furthermore, it was obvious to those outside the company that JLI was selling JUUL products to children. In June 2015, reporting on the "Vaporized" campaign that accompanied the JUUL launch, AdAge reported that John Schachter, director of state communications for Campaign for Tobacco-Free Kids, "expressed concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design" and added that there had been "obvious trends that appeal to adolescents in e-cigarette campaigns[.]"[403] Robert Jackler, a Stanford physician who investigated JLI's launch campaign, concluded that "JLI's launch campaign was patently youth-oriented."[404] JLI's commercials' attempts to appeal to teenagers were so obvious that, by October 2015, Stephen Colbert ran a satirical segment on it that noted, among other things: "And it's not just ads featuring hip young triangles that appeal to the youths; so do vape flavors like cotton candy, gummi bear, and skittles."[405]

357.     Moreover, the Management Defendants knew that kids were marketing JLI products on social media, and some even sought to take advantage of that to build the JLI brand. For example,



[403] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/

[404] Erin Brodwin, *See how Juul turned teens into influencers and threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cig company,* Business Insider (Nov 26, 2018, 6:07 AM), https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11

[405] The Late Show with Stephen Colbert, YOUTUBE (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM The "triangles" ad was a JUUL ad; the listed flavors were not, but JUUL also had flavors that appealed to children.

[406] JLI00382271.

[407] JLI00382271.

1

2

          **b.**     **JLI Closely Tracked Its Progress in Reaching Young**

               **Customers through Social Media and Online Marketing**

3

     358.    Tracking the behaviours and preferences of youth that are under twenty-one, and

4

especially those under eighteen, has long been essential to the successful marketing of tobacco

5

products. Whether the activity is called "tracking" or "targeting," the purpose has always been

6

the same: getting young people to start smoking and keeping them as customers.

7

     359.    As early as 1953, Philip Morris was gathering survey data on the smoking habits

8

of "a cross section of men and women 15 years of age and over."[408] Commenting on these data,

9

George Weissman, then-Vice President of Philip Morris, observed that "we have our greatest

10

strength in the 15-24 age group."[409]

11

     360.    Traditional approaches to youth tracking (e.g., interviews conducted face-to-face

12

or over the telephone) were limited, however, in that they often failed to capture data from

13

certain subsets of the target market. As a Philip Morris employee noted in a June 12, 1970

14

memorandum, Marlboro smokers were "among the types of young people our survey misses of

15

necessity (on campus college students, those in the military and those under 18 years of

16

age)."[410]

17

     361.    However, modern technology has removed many of the hurdles that made youth

18

tracking difficult in decades past. With e-mail, social media and online forums, JLI can track,

19

and has consistently tracked and monitored its target youth market, including those below the

20

minimum legal age to purchase or use JUUL products.

21

     362.    Using the tools available to it, JLI would have known that its viral marketing

22

program was a resounding success, and in particular with young people.

23

     363.    Between 2015 and 2017, JUUL-related posts on Twitter increased quadratically,

24

25

26

---

27

[408] Philip Morris Vice President for Research and Development, Why One Smokes, First Draft, 1969, Autumn (Minnesota Trial)

[409] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 581 (D.D.C. 2006).

28

[410] *Id*. at 1007.

which is the exact result to be expected from an effective viral marketing campaign.[411] Its growth on Instagram was likely even more rapid.

364.    A 2018 study of JLI's sales and presence on social media platforms found that JLI grew nearly 700%, yet spent "no recorded money" in the first half of 2017 on major advertising channels, and spent only $20,000 on business-to-business advertising.[412] Despite JLI's apparently minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.[413]

365.    On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.[414]

366.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the authors to question whether JLI was paying for positive reviews and JUUL-related social media content.

367.    The lead author of the study concluded that JLI was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.[415]

368.    A separate study of e-cigarette advertising on mobile devices, where young people spend most of their day consuming media, found that 74% of total advertising

---

[411] *See* Brittany Emelle, et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.

[412] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, TOBACCO CONTROL (May 31, 2018), http://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-0543

[413] *Id.*

[414] *Id.*

[415] Laura Kelley, *JUUL Sales Among Young People Fueled by Social Media, Says Study*, The Washington Times (June 4, 2018), https://www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/ (last visited June 4, 2018).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

impressions were for JUUL products.[416]

369.    A 2019 study found that as much as half of JUUL's Twitter followers were aged thirteen to seventeen.[417]

370.    A 2019 study characterizing JUUL-related Instagram posts between March and May 2018 found that among nearly 15,000 relevant posts from over 5,000 unique Instagram accounts, more than half were related to youth or youth lifestyle.[418]

371.    Some Twitter users have reported what appear to be JUUL bots.[419] Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content.[420]

372.    By April 2018, searching "JUUL" on YouTube yielded 137,000 videos with forty-three videos having over 100,000 views.[421] Of these, a huge number were plainly related to underage use, including: 1,730 videos on "hiding JUUL in school," 789 on "JUUL in school bathroom," 992 on "hiding JUUL at home," and 241 on "hiding JUUL in Sharpie."[422]

373.    In 2018, JLI was internally collecting hundreds of social media posts—directed at JLI—informing it of JUUL's wild popularity with young people and in many cases requesting that JLI do something to stop it.[423]

---

[416] *See* Brittany Emelle, et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes

[417] Steven Reinberg, *Study: Half of Juul's Twitter followers are teens, young adults*, United Press International HealthDay News, (May 20, 219, 5:31 PM) https://www.upi.com/Health_News/2019/05/20/Study-Half-of-Juuls-Twitter-followers-are-teens-young-adults/1981558384957/

[418] Lauren Czaplicki et al*., Characterizing JUUL-related posts on Instagram*, (August 1, 2019), https://tobaccocontrol.bmj.com/content/early/2019/07/30/tobaccocontrol-2018-054824

[419] One example of what appear to be JUUL bots in action on Twitter is available at: https://twitter.com/search?q=juul%20bot&src=typd

[420] Hennrythejuul (@hennrythejuul), Twitter, (March 4, 2020, 9:35 am) https://twitter.com/hennrythejuul

[421] Divya Ramamurthi et al.,, *JUUL and Other Stealth Vaporizers: Hiding the Habit from Parents and Teachers, Tobacco Control 2019,* https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/6/610.full.pdf

[422] *Id*.

[423] Complaint at 60, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019).

1

2

### 9.    JLI Coordinates with Veratad Technologies To Expand Youth Access to JUUL Products.

374.    At the same time JLI and the Management Defendants were taking coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base through unlawful marketing and distribution activities, they were coordinating with an outside entity—Veratad Technologies LLC—to get JUULs into the hands of the largest number of consumers possible.

375.    JLI's website, including its online store, was pivotal to these efforts.



424

376.    JLI coordinated with Veratad to provide age verification services for its website

---

424 INREJUUL_00329660

from 2015 to 2018. Veratad has also provided age verification services to other e-cigarette sellers, including Lorillard[425] ████████[426] Consistent with the claim on Veratad's website that "*You can create your own verification rules*," the company encouraged sellers like JLI to set the desired compliance level for age verification. As a member of a major e-cigarette trade organization, Veratad also offered insight into what competitors were doing, and offered to "guide your setup to follow industry best practices for age verification."

377.    Though it is illegal to sell and ship e-cigarettes to minors under both state and federal law, JLI and Veratad designed and implemented an age verification system designed to maximize the number of prospective purchasers who "pass" the process rather than to minimize the number of underage sales.[427] As a result of these intentionally permissive age verification practices, JLI and Veratad used online payment systems and the US mails to ship tens of millions of dollars of JUULpods to unverified customers, many of whom were minors.

378.    From June 2015 through the end of 2018, the age verification process on JLI's website typically prompted prospective purchasers to submit their name, address, and date of birth, which JLI forwarded to Veratad. Veratad then attempted to match all or some limited part of the consumer's information to a person of the minimum legal sales age in its database. If Veratad was able to locate a sufficient match of the prospective purchaser to a person of the minimum legal sales age in its database, then it would return a "pass" result to JLI. If Veratad was unable to make such a match, Veratad returned a "fail" result to JLI.

379.    If Veratad returned a "fail" result to JLI, rather than decline the prospective purchaser, JLI would prompt the person to enter an "alternate" address. If Veratad still could not find a match based on this alternate address, JLI would prompt the consumer to enter the last four digits of his or her social security number.

380.    If Veratad, supplied with the last four digits of a consumer's social security

---

[425] Sen. Richard Durbin, *et al.*, *Gateway to Addiction?* (April 14, 2014), *available at* https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf
[426] INREJUUL_00174362.
[427] Complaint at 165, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019)

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   number, still could not match the consumer to a person of the minimum legal sales age in its

2   database, JLI would prompt the consumer to upload an image or photograph of his or her

3   driver's license or another governmental identification document. A JLI employee would then

4   conduct a personal review of the image and decide whether the consumer was of the minimum

5   legal sales age.

6       381.   Crucially, Veratad's age verification system was purposefully flexible, so JLI

7   and Veratad could work together to decide just how closely a prospective purchaser's personal

8   information had to match records in Veratad's database in order to "pass" the age verification

9   process. JLI and Veratad could also set, or modify, the applicable minimum legal sales age to be

10  used for verification.

11      382.   By the fall of 2015, JLI and Veratad knew that bulk purchases were being made

12  for resale on JLI's website by minors and for resale to minors.[428] Nevertheless, ████████

13  ███████████████████████████████████████████████████████████████████

14  ███████████████[429] JLI repeatedly sought, and Veratad repeatedly recommended and directed,

15  changes to the age verification process so that more prospective JUUL purchasers would "pass."

16  Both did so in an effort to increase direct sales of JLI's e-cigarettes without regard to whether its

17  less stringent age verification process would permit more underage consumers to purchase

18  them.

19      383.   Between June 2015 and August 2017 (and perhaps even through early 2018), JLI

20  and Veratad tailored the age verification system to "pass" prospective purchasers even if certain

21  portions of the purchaser's personal information—e.g., the purchaser's street address or date of

22  birth—did not match the information corresponding to a person of the minimum legal sales age

23  in Veratad's database.[430]

24  ───────────────────────

25  [428] Matt Richtel and Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?:
    The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating*

26  *whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018),
    https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html

27  [429] INREJUUL_00276489-INREJUUL_00276490

28  [430] Complaint at 43, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019).  A
    January 29, 2018 email exchange between Tom Canfarotta, Director of Strategic Accounts &

384.     Similarly, between June 2015 and August 2017, JLI and Veratad tailored the system to "pass" a prospective purchaser under certain circumstances even when the prospective purchaser's year of birth did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.

385.     JLI and Veratad sought to increase "pass" rates by modifying the age verification system to allow users multiple opportunities to change their personal information if a match was not initially found in an appropriate government database. A Veratad Performance Report from August 5, 2017 shows that, for 1,963 consumers Veratad recorded 3,794 transactions—an average of 1.93 attempts per consumer.[431] Only 966 consumers—less than half—passed age verification on the first attempt.[432] By allowing consumers to alter their personal information and attempt age verification up to three times, JLI was able to increase its database match pass rate from 49.2% to 61.2%.[433]

386.



[434]

Client Quality Services at Veratad, and Annie Kennedy, JUUL's Compliance Manager, reveals this to have been the case. Kennedy asked Canfarotta why a particular customer had "passed via the address step (public record check)…but we've since learned that is not a correct address—so we're curious as to how it passed." In response, Canfarotta wrote, "Your current rule set does not require a full address match." He went on to explain that approval of the customer was not an anomaly or a mistake; instead, Veratad's age verification system was working exactly the way it was designed.

[431] *Id.*

[432] *Id.*

[433] *Id.*

[434] INREJUUL_00184119.

1      388.  ███████████████████████████████

2  ███████████████████████████████████████[435] Customer

service representatives would go so far as to alter identifying information for them; a Slack chat

among customer service representatives confirmed that representatives were authorized to

"adjust the street address, apartment number, or zip code" associated with shipment.[436]

389.   The age verification procedures designed by JLI and Veratad have allowed

hundreds of thousands of e-cigarette products to be sold and/or delivered to fictitious

individuals at fictitious addresses.[437] Many of these improper sales may have been made to

underage purchasers or to resellers who sold the products to underage consumers on the grey

market.[438]

390.   By divorcing the address from the other customer data in the age verification

process, JLI and Veratad allowed consumers to request that tobacco products be sent to

locations other than their permanent legal residences.[439] For example, JUUL sent thousands of

orders to commercial high rises and office parks.[440] It is unlikely these orders would have been

approved had JUUL and Veratad required that addresses provided by users match information

in an appropriate government database and followed the requirement that the shipping address

and billing address be the same.[441]

391.   The failure of the JLI/Veratad age verification procedure was intentional.[442] And

despite JLI and Veratad's concerted effort to enable the sale of federally regulated tobacco

products to minors, ███████████████████████████

███████████████████████████████████████

---

[435] INREJUUL_00215324-INREJUUL_00215325
[436] Complaint at 169, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019)
[437] Complaint at 138, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019)
[438] *Id.*
[439] Complaint at 146, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019)
[440] Complaint at 147, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019)
[441] *Id.*
[442] Complaint at 173, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019)



In August 2017, JLI responded to public scrutiny by publicly stating that it would increase the purchase age on its website to 21+ by August 23, 2017.

---

[443] INREJUUL00178123-24.
[444] INREJUUL_00264882-84.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

**Sunday Savings**
1 message

JUUL <hello@juulvapor.com>                              Sun, Aug 20, 2017 at 7:46 PM
Reply-To: JUUL <hello@juulvapor.com>
To:

Experience the easiest way to enjoy JUUL and save 15% on each and every purchase.

# JUUL

## Save 15% Today

SAVE NOW

Try Auto-Ship for free shipping and 15% savings
on each and every JUUL order.

**Save Money**          **Free Delivery**          **Cancel Anytime**
Enjoy 15% savings       JUULpods delivered to      No contracts.
on JUULpods.            your door every month.     No stress.

mango          cool mint          virginia tobacco

fruit medley          creme brulee

**5 Great Flavors To Choose From**
SHOP JUULPODS >

**Changes to JUUL Minimum Age Policy**
Starting this Wednesday 8/23/17, the minimum age to purchase
products on JUULvapor.com will be 21+.
Existing age-verified Auto-Ship subscribers will not be impacted by this change.

**Need Help?**
Contact JUUL Support
Live support is available everyday, 6am-10pm PT.

JUULVAPOR          JUUL          JUULVAPOR.COM

**JUUL** ● @JUULvapor · 28 Jul 2017
#ICYMI: Mango is now in Auto-ship! Get the #JUULpod flavor you love delivered
& save 15%. Sign up today: bit.ly/2su3cXJ

# mango
## now in auto-ship

♡          ⊔ 5          19

393.    Further underscoring their common purpose of growing the e-cigarette market, even if that meant selling to youth, JLI and Veratad did not require that the year of birth and last four digits of the social security number match exactly the information corresponding to a person of the minimum legal sales age in Veratad's database until August 2018.

395.    Not only did JLI and Veratad's efforts result in more sales to minors, it also allowed JLI to build a marketing email list that included minors—a data set that would prove highly valuable to Altria.

396.    In the summer of 2017, JLI engaged a company called Tower Data to determine the ages of the persons associated with email addresses on its email marketing list. According to this analysis, approximately 269,000 email addresses on JLI's email marketing list were not associated with a record of an individual who had "passed" JLI's age verification process.[445] Additionally, approximately 40,000 email addresses on JLI's email marketing list were associated with records of individuals who had "failed" JLI's own age verification process.[446] Tower Data informed JLI that 83% of the approximately 420,000 email addresses on JLI's marketing list could not be matched with the record of an individual at least eighteen years of age.[447]

397.    Despite knowing that their marketing list included minors, JLI continued to use that marketing list to sell JUUL products, and then shared that list with Altria to use for its marketing purposes.

398.    JLI and the Management Defendants knew, however, that it was not enough to

---

[445] Complaint at 121, *Commonwealth of Massachusetts v. Juul Labs Inc.*, (Mass. Super. Ct. Feb. 12, 2020), in the Business Litigation Session of Suffolk County Superior Court, https://www.mass.gov/doc/juul-complaint/download; Janice Tan logo, *E-cigarette firm JUUL sued for using programmatic buying to target adolescents* (Feb. 14, 2020), https://www.marketing-interactive.com/e-cigarette-firm-juul-sued-for-using-programmatic-buying-to-target-adolescents
[446] *Id*.
[447] *Id*.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

disseminate advertisements and marketing materials that promote JLI to youth or to open online sales to youth, while omitting mention of JUUL's nicotine content and manipulated potency. To truly expand the nicotine market, they needed to deceive those purchasing a JUUL device and JUULpods as to how much nicotine they were actually consuming. And, through Pritzker, Huh, and Valani's control of JLI's Board of Directors, they did just that.

### 10.   JLI Engaged in a Sham "Youth Prevention" Campaign

399.   By April 2017, JLI had determined that the publicity around its marketing to children was a problem. ████████████████████████████████████████████████████████████████████████████████████████████████████████████[448]█████████████████"[449]   While ostensibly aimed at reducing youth sales, JLI's youth prevention program actually served to increase, not reduce, sales to children.

400.   ████████████████████████████████████████████████████████[450] JLI paid schools for access to their students during school time, in summer school, and during a Saturday School Program that was billed as "an alternative to 'traditional discipline' for children caught using e-cigarettes in school."[451]   JLI created the curriculum for these programs, and, like the "Think Don't Smoke" campaign by Philip Morris, which "insidiously encourage[d] kids to use tobacco and become addicted Philip Morris customers[,]"[452]   JLI's programs were shams intended to encourage youth vaping, not curb it. According to testimony before Congress, during at least one presentation, "[n]o parents or teachers were in the room, and JUUL's messaging was that the product was 'totally safe.' The

---

[448] INREJUUL_00264878; *see also* INREJUUL_00265042 (████████████████████████ ████████████).

[449] *See, e.g.*, INREJUUL_00211242.

[450] INREJUUL_00173409.

[451] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf

[452] William V. Corr, *American Legacy Foundation Study Shows Philip Morris 'Think Don't Smoke' Youth Anti-Smoking Campaign is a Sham*, Campaign for Tobacco Free Kids (May 29, 2002), https://www.tobaccofreekids.org/press-releases/id_0499

presenter even demonstrated to the kids how to use a JUUL."[453] Furthermore, JLI "provided the children snacks" and "collect[ed] student information from the sessions."[454]

401.    The problems with JLI's youth prevention programs were widespread. According to outside analyses, "the JUUL Curriculum is not portraying the harmful details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use."[455] Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL products as among the potentially harmful products to avoid.[456] As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs] to be a vaping device, but they don't call it that. So when you say to a young person, 'Vapes or e-cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"[457]

402.    Internal emails confirm both that JLI employees knew about the similarities of JLI's "youth prevention program" to the earlier pretextual antismoking campaigns by the cigarette industry and that JLI management at the highest levels was personally involved in these efforts.

[458]

[453] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf
[454] Id.
[455] Victoria Albert, *Juul Prevention Program Didn't School Kids on Dangers, Expert Says: SMOKE AND MIRRORS. JUUL—which made up 68 percent of the e-cigarette market as of mid-June—seems to have taken a page from the playbook of Big Tobacco*, The Daily Beast (Oct. 19, 2018), https://www.thedailybeast.com/juul-prevention-program-didnt-school-kids-on-dangers-expert-says
[456] Id.
[457] Id.
[458] INREJUUL_00197608.
[459] INREJUUL_00197607.

[REDACTED]

[REDACTED]

[460]

[REDACTED][461]  The paper concluded that "the Philip Morris campaign had a counterproductive influence."[462]

403.    JLI also bought access to teenagers at programs outside of school. For example,

[REDACTED]

[463] Similarly,

[464]

[465]

JLI paid nearly 70% of the cost of hiring eight teachers, eight instructional aides, and three other support personnel for the program.[466]

404.    [REDACTED]

[467]

---

[460] INREJUUL_00196624.

[461] INREJUUL_00265202.

[462] Matthew C. Farrelly, et al*., Getting to the Truth: Evaluating National Tobacco Countermarketing Campaigns*, 92 Am. J. Public Health 901 (2002).

[463] JLI-HOR-00002181 – 00002182.

[464] INREJUUL_00194247; Invoice to JUUL Labs from The Freedom & Democracy Schools, Inc. for $134,000 dated June 21, 2018, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00003711.pdf

[465] INREJUUL_0019428.

[466] *The Freedom & Democracy Schools, Inc. Proposal to JUUL Labs for Funding the Healthy Life Adventures Summer Pilot* (June 9, 2018), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00002789_Redacted.pdf

[467] INREJUUL_00194646.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  ████████████████████████████████████████████

2  ██████████[468] Eventually, JLI ended this version of the youth prevention program, but the

3  damage had been done: following the playbook of the tobacco industry, JLI had hooked more

4  kids on nicotine.

5      405.   The Board was intimately involved in these "youth prevention" activities. For

6  example, ████████████████████████████████████████

7  ████████████████████████████████████████████

8  ██████[469]

9      **11.    The FDA Warned JUUL and Others That Their Conduct is Unlawful**

10      406.   Throughout 2018, the FDA put JLI and others in the e-cigarette industry on

11  notice that their practices of marketing to minors needed to stop. It issued a series of warnings

12  letters and enforcement actions:

13      407.   On February 24, 2018, the FDA sent a letter to JLI expressing concern about the

14  popularity of its products among youth and demanding that JLI produce documents regarding its

15  marketing practices.[470]

16      408.   In April 2018, the FDA conducted an undercover enforcement effort, which

17  resulted in fifty-six warning letters issued to online retailers, and six civil money complaints to

18  retail establishments, all of which were related to the illegal sale of e-cigarettes to minors.[471]

19  Manufacturers such as JLI were also sent letters requesting documents regarding their

20  marketing and sales methods.[472]

21      409.   In May 2018, the FDA again issued more warning letters to manufacturers,

22

---

23  [468] INREJUUL_00194646.

24  [469] JLI00151300.

25  [470] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Apr. 24, 2018),

26  https://www.fda.gov/media/112339/download

27  [471] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. Food & Drug Admin. (Jan. 2020), https://www.fda.gov/media/133880/download

28  [472] *Id*.

distributors, and retailers of e-liquids for labeling and advertising violations; these labels and advertisements targeted children and resembled children's food items such as candy or cookies.[473]

- In September 2018, the FDA engaged in several other regulatory enforcement actions, issuing over 1300 warning letters and civil money complaints to e-cigarette and e-liquid retailers and distributors.[474]

- On September 12, 2018, the FDA sent letters to JLI and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[475] The FDA additionally requested manufacturers to enhance their compliance monitoring mechanisms, implement stricter age verification methods, and limit quantities and volume of e-cigarette products that could be purchased at a time.[476]

410.    Finally, in October 2018, the FDA raided JLI's headquarters and seized more than a thousand documents relating to JLI's sales and marketing practices.[477] Since then, the FDA, the Federal Trade Commission, multiple state attorneys general and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into JLI's role in the youth vaping epidemic and whether JLI's marketing practices purposefully

---

[473] *Id.*

[474] *Id.*

[475] *Letter from US FDA to Kevin Burns*, U.S. Food & Drug Admin. (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[476] Press Release, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access: Warning letters and civil money penalty complaints to retailers are largest coordinated enforcement effort in agency history; FDA requests manufacturers provide plan for mitigating youth sales within 60 days; warns it may restrict flavored e-cigarettes to*, US Food & Drug Administration (Sept. 11, 2018), https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more

[477] Laurie McGinley, *FDA Seizes Juul E-Cigarette Documents in Surprise Inspection of Headquarters*, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documentssurprise-inspection-headquarters/

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

targeted youth.

411.    Siddharth Breja, who was senior vice president for global finance at Juul Labs, "claims that after the F.D.A. raided Juul headquarters in October 2018, seeking internal documents, Mr. Burns instructed Mr. Breja and other executives not to put anything relating to regulatory or safety issues in writing, so that the F.D.A. could not get them in the future."[478]

### 12.    In Response to Regulatory Scrutiny, Defendants Misled the Public, Regulators, and Congress that JLI Did Not Target Youth

412.    To shield their youth-driven success from scrutiny, Altria, JLI, and the Management Defendants' had a long-running strategy to feign ignorance over JLI and the Management Defendants' youth marketing efforts and youth access to JLI's products. They were well aware that JLI's conduct in targeting underage users was reprehensible and unlawful, and that if it became widely known that this was how JLI obtained its massive market share, there would be a public outcry and calls for stricter regulation or a ban on JLI's products. Given the increasing public and regulatory scrutiny of JLI's market share and marketing tactics, a dis-information campaign was urgently needed to protect the Defendants' bottom line. For this reason, JLI, the Management Defendants, and Altria all hid JLI's conduct by vociferously denying that JLI had marketed to and targeted youth and instead falsely claimed that JLI engaged in youth prevention. Defendants continued to make these statements while and after actively and successfully trying to market to and recruit youth non-smokers. These false statements were designed to protect JLI's market share, and Altria's investment, by concealing JLI's misconduct.

413.    For example, after 11 senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and mango, JLI visited Capitol Hill and told senators that it never intended its products to appeal to kids and did not realize youth were using its products, according to a staffer for Sen. Dick Durbin (D-Ill.).

---

[478] Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   JLI's statements to Congress—which parallel similar protests of innocence by tobacco company

2   executives—were false.

3       414.    JLI also engaged in wire fraud when it made public statements seeking to

4   disavow the notion that it had targeted and sought to addict teens:

5       • "It's a really, really important issue. **We don't want kids using our products**."
         (CNBC Interview of JLI's Chief Administrative Officer, December 14, 2017)[479]

6
7       • "We market our products responsibly, following strict guidelines to have material
         directly **exclusively toward adult smokers and never to youth audiences**." (JLI
         Social Media Post, March 14, 2018)[480]

8
9       • "Of course, we understand that **parents and lawmakers are concerned about
         underage use of JUUL. As are we**. We can't restate this enough. As an
         independent company that is not big tobacco, we are driven by our mission and
         commitment to adult smokers." (JLI CEO Kevin Burns Letter to JUUL
         Community on Reddit, July 18, 2018)[481]

10
11
12      • "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL
         products. We certainly don't want youth using the product. It is bad for public
         health, and it is bad for our mission. JUUL Labs and FDA share a common goal –
         preventing youth from initiating on nicotine. . . . **Our intent was never to have
         youth use JUUL products**." (JLI Website, November 12, 2018)[482]

13
14
15      • "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult
         smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate
         on nicotine." (JLI Website, November 13, 2018)[483]

16
17      • "First of all, I'd tell them that I'm sorry that their child's using the product. **It's
         not intended for them**. I hope there was nothing that we did that made it
         appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have

18
19

20
21  [479] Angelica LaVito, *Nearly one-quarter of tees are using pot*, CNBC (Dec. 14, 2017),
    https://www.cnbc.com/2017/12/13/marijuana-and-nicotine-vaping-popular-among-teens-
22  according-to-study.html (Interview with Ashely Gould, JUUL Chief Administrative Officer).

23  [480] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*,
    Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019),
24  http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (citing a
    JUUL social media post from March 14, 2018).

25  [481] *A Letter to the JUUL Community from CEO Kevin Burns* (July 18, 2018), Reddit,
    https://www.reddit.com/r/juul/comments/8zvlbh/a_letter_to_the_juul_community_from_ceo_k
26  evin/

27  [482] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-
    labs-action-plan/ (statement of Ken Burns, former CEO of JUUL).

28  [483] Juul Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-
    labs-action-plan/ (statement of then-CEO Kevin Burns)

empatly for them, in terms of what the challenges they're going through."
(CNBC Interview of JLI CEO, July 13, 2019)[484]

- "We have **no higher priority than to prevent youth usage of our products** which is why we have taken aggressive, industry leading actions to combat youth usage." (JLI Website, August 29, 2019)[485]

- James Monsees, one of the company's co-founders, said **selling JUUL products to youth was "antithetical to the company's mission."**(James Monsees' Statement to New York Times, August 27, 2019)[486]

- "**We have never marketed to youth and we never will**."(JLI Statement to Los Angeles Times, September 24, 2019) [487]

- "As scientists, product designers and engineers, we believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. **Our goal is to maximize the positive and reduce the negative.**" (JLI Website, March 6, 2020)[488]

415.    As the JLI Board of Directors had "final say" over all of JLI's marketing efforts, these statements regarding JLI's marketing efforts can be imputed to the Management Defendants, who were therefore directly responsible for the messaging over the marketing of JUUL products.

416.    However, JLI, the Management Defendants, and Altria realized that attempting to shift public opinion through fraudulent statements was not enough to achieve their goal of staving off regulation. To accomplish this goal, they would also need to deceive the FDA and Congress. And so they set out to do just that through statements and testimony by JLI representatives. These include, but are not limited to, the following:

---

[484] Angelica LaVito, *As JLI grapples with teen vaping 'epidemic,' CEO tells parent 'I'm sorry'*, CNBC (July 13, 2019), https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html

[485] *Our Actions to Combat Underage Use*, JUUL Labs, Inc. (Aug. 29, 2019), https://newsroom.juul.com/ouractions-to-combat-underage-use/ (JUUL statement in response to lawsuits).

[486] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html

[487] Michael Hiltzik, *Column: Studies show how JLI exploited social media to get teens to start vaping*, L.A. Times (Sept. 24, 2019), https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens (statement made on behalf of JUUL).

[488] *Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values (last visited March 6, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

*Statements by JLI to the FDA:*

- "JUUL was not designed for youth, **nor has any marketing or research effort since the product's inception been targeted to youth**." (Letter to FDA, June 15, 2018).[489]
- "With this response, the Company hopes FDA comes to appreciate why the product was developed and **how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers**." (Letter to FDA, June 15, 2018).[490]

*Statements by Altria to the FDA:*

- "**[W]e do not believe we have a current issue with youth access** to or use of our pod-based products, we do not want to risk contributing to the issue." (Letter from Altria CEO to FDA Commissioner Scott Gottlieb, October 25, 2018).[491]
- "We believe e-vapor products present an important opportunity to **adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18)

*Statements by JLI to Congress:*

- "**We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products**. . . .That is a serious problem. Our company has no higher priority than combatting underage use." (Testimony of James Monsees, July 25, 2019).[492]
- "Our product is **intended to help smokers stop smoking combustible cigarettes**." (Ashley Gould, JLI Chief Administrative Officer, Testimony before House Committee on Oversight and Reform, July 25, 2019).[493]

*Statements by Altria to Congress:*

- "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and **had quickly become a very compelling product among adult vapers**. We decided to pursue an economic interest in JUUL, believing that an investment would **significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products** and strengthen our competitive

---

[489] Letter from JUUL's Counsel at Sidley Austin to Dr. Matthew Holman, FDA at 2 (June 15, 2018).

[490] *Id.* at 3.

[491] Letter from Altria CEO Howard Willard to Dr. Scott Gottlieb, FDA at 2 (October 25, 2018).

[492] Examining JUUL's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the House Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy at 1 (July 25, 2019), https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-MonseesJ-20190725.pdf (testimony of JUUL Founder James Monsees).

[493] Ashley Gould, *Testimony of Ashley Gould: Hearing on E-Cigarettes and Teen Usage, Day 2* at 01:53:25, U.S. House Committee on Oversight & Reform (July 25, 2019), https://www.c-span.org/video/?462992-1/hearing-cigarettes-teen-usage-day-2&start=6431

---

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

position with regards to potentially reduced risk products." (Letter from Altria CEO to Senator Durbin, October 14, 2019).[494]

417.    Each of the foregoing statements constitutes an act of wire fraud. JLI, Monsees, and Altria made these statements, knowing they would be transmitted via wire, with the intent to deceive the public, the FDA, and Congress as to the Defendants' true intentions of hooking underage users.

418.    Their disinformation scheme was successful. While certain groups such as the American Medical Association were calling for a "sweeping ban on vaping products,"[495] no such ban has been implemented to date. Accordingly, JLI's highly addictive products remain on the market and available to underage users.

## F.    Altria Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette.

### 1.    Before Altria's Investment in JLI, Altria and JLI Exchanged Market Information Pertaining to Key Decisions.

419.    ███████████ JLI and Avail Vapor ("Avail"), a chain of more than 100 high-end vape stores,[496] ███████████████████████████████████[497]

420.    On November 2, 2017, Altria announced that it had acquired a minority interest in Avail.[498] Altria's comments to investors highlighted that the investment allowed Altria access to Avail's "extensive data around adult vaper purchasing patterns," and "full-service analytical

---

[494] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[495] Karen Zraick, *A.M.A. Urges Ban on Vaping Products as JLI is Sued by More States*, N.Y. Times (Nov. 19, 2019), https://www.nytimes.com/2019/11/19/health/juul-lawsuit-ny-california.html

[496] *About Us,* Avail Vapor, https://www.availvapor.com/about-us (last visited February 10, 2020).

[497] INREJUUL_00066273

[498] Rich Duprey, *Is Altria Trying to Corner the E-Cig Market?*, The Motley Fool (Jan. 7, 2018), https://www.fool.com/investing/2018/01/07/is-altria-trying-to-corner-the-e-cig-market.aspx; Lauren Thomas, *Altria shares plunge after FDA releases road map to curb tobacco-related deaths*, CNBC (July 28, 2017), https://www.cnbc.com/2017/07/28/altria-shares-fall-after-fda-releases-roadmap-to-curb-tobacco-related-deaths-.html

1    science laboratory," located in Altria's hometown of Richmond, Virginia.[499]

2        421.    On November 21, 2017—three weeks after Altria announced its investment in

3    Avail—JLI and Avail entered into a distribution agreement, which has been renewed twice—

4    once in November 19, 2018 and again on January 8, 2019.[500]

5        422.    Through its investment in Avail, Altria had access to sales data for JUUL

6    products long before the companies exchanged diligence in connection with Altria's investment

7    in JLI. Although JLI represented to Congress that "[JLI's] data [from Avail] was not available

8    to Altria,"[501] statements in Altria's October 2019 letter to Congress suggest otherwise.

9        423.    In that letter, Altria admitted that it possessed JUUL sales data that corresponds

10   to the very same time period in which JLI began selling its products at Avail stores, starting in

11   late 2017.[502] That sales data showed that JLI was dominating the e-cigarette market during this

12   time period.[503] By November 2017, JLI had sold one million units of its blockbuster product,

13   boasting 621% growth in year-to-year sales and capturing 32% of e-cigarette sales tracked by

14   Nielsen.[504] Sales of Altria's own e-cigarettes, on the other hand, trailed behind both the JUUL

15   and British American Tobacco's Vuse. Altria sought to grow JLI's market dominance and

16   young customer base. JLI, in the regulatory crosshairs, needed Altria's experience and its

17   influence in Washington.

18       424.    Altria recognized that JLI had, against the backdrop of steadily declining

19   cigarette sales, created the right product to addict a new generation to nicotine. JLI faced

20

21   [499] *Experience Altria* (Investor Day Presentation), Altria (Nov. 1, 2017),
     http://investor.altria.com/Cache/1001243382.PDF

22   [500] Responses of JUUL Labs, Inc. to Questions for the Record - July 25, 2019 Hearing Before
23   House Committee on Oversight and Reform, 28 (January 12, 2020) ("House Oversight January
     2020 Response").

24   [501] *Id*.

25   [502] Letter from Howard A. Willard III to Senator Richard J. Durbin, 6 (October 14, 2019)
     (emphasis added).

26   [503] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).
     (emphasis added).

27   [504] Melia Robinson, *How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette
28   and generated $224 million in sales in a year, Business Insider* (Nov. 21, 2017),
     https://www.businessinsider.com/juul-e-cigarette-one-million-units-sold-2017-11

CONSOLIDATED CLASS ACTION COMPLAINT
                                          Case No. 19-md-02913-WHO

existential threats, however, from regulatory and congressional scrutiny, and public outrage over the growing vaping epidemic.

425.    JLI, Altria, and the Management Defendants thus began to coordinate their activities in 2017 through Avail Vapor. This back-channel, and the information it provided Altria, allowed Altria to take actions to benefit itself, JLI, and the Management Defendants without drawing the scrutiny of the public and regulators that they knew would inevitably follow a formal announcement of a partnership between JLI and Altria.

2.    **JLI, the Management Defendants and Altria Coordinated to Market JUUL in Highly-Visible Retail Locations**

426.    JLI, the Management Defendants, and Altria's coordination continued in other ways throughout 2018 as they prepared for Altria's equity investment in JLI.

427.    A key aspect of this early coordination was Altria's acquisition of shelf-space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products. By acquiring shelf space, Altria took steps to ensure that JUUL products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.[505]

428.    Altria's own relatively unsuccessful e-cigarette products did not warrant the investment. Altria spent approximately $100 million in 2018 to secure shelf-space at retailers for e-cigarette products—purportedly for the MarkTen e-cigarette that Altria stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small scale in only 25,000 stores.[506] By comparison, the 2014 launch of the original MarkTen resulted in product placement in 60,000 stores in the first month in the western United States alone.[507] Yet Altria's payments for shelf space were a mixture of "cash and display fixtures in exchange for a

---

[505] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 161, 164 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

[506] Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, N.Y. Times (Oct. 25, 2018), https://www.nytimes.com/2018/10/25/health/altria-vaping-ecigarettes.html

[507] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Storew News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

commitment that its e-cigarettes would occupy prime shelf space for at least two years."[508]

429.    In reality, Altria spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JLI's massive, ill-gotten market share. It has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction JUUL created, but because a non-compete was a "part of its deal with J[LI]."[509]

430.    When Altria later announced its $12.8 billion investment in JLI, part of the agreement between the two companies was that Altria would provide JLI with this premium shelf space.[510]

431.    Altria's purchase of shelf space in 2018 shows how Altria, JLI, and the Management Defendants were coordinating even before Altria announced its investment in JLI. Altria's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them—retail establishments.[511]

### 3.    Altria Contributes to the Success of JLI's and the Management Defendants' Scheme Through a Range of Coordinated Activities

432.    While JLI and Altria remain separate corporate entities in name, following its equity investment in JLI, Altria and JLI forged even greater significant, systemic links, *i.e.*, shared leadership, contractual relationships, financial ties, and continuing coordination of activities.

433.    In 2019, two key Altria executives became JLI's CEO and head of regulatory affairs, respectively.

---

[508] Jennifer Maloney & John McKinnon, *Altria-JLI Deal Is Stuck in Antitrust Review*, Wall St. J. (Jan. 17, 2020), https://www.wsj.com/articles/altria-juul-deal-is-stuck-in-antitrust-review-11579257002

[509] *Id.*

[510] *Id.*

[511] Laura Bach, *Where Do Youth Get Their E-Cigarettes?*, Campaign for Tobacco Free Kids (Dec. 3, 2019), https://www.tobaccofreekids.org/assets/factsheets/0403.pdf

---

434.    K.C. Crosthwaite, who was president of Altria Client Services when the company carried out a study that would later be used by Altria to shield JUUL's mint pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was Altria's chief growth officer.

435.    Joe Murillo, who launched the MarkTen line at Altria and more recently headed regulatory affairs for Altria, is now JLI's chief regulatory officer.[512] A 24-year career Altria executive, Murillo previously ran Altria's e-cigarette business, Nu Mark, "before Altria pulled its e-cigarettes off the market as part of its deal with J[UUL]."[513]

436.    In addition to its effective takeover of JUUL, Altria provides services to JLI in furtherance of their common goal of expanding the number of nicotine-addicted e-cigarette users, in the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs."[514] These services include, among other things:

   a.    "Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services."

   b.    "Making available [Altria's] previously contracted shelf space with certain retailers," thus allowing JUUL products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth.

   c.    "Executing direct mail and email campaigns and related activities. . . ."

   d.    "Leveraging Altria's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon."

   e.    "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."[515]

437.    Altria also worked with JLI to cross-market JUUL and Marlboro cigarettes. For

---

[512] Jennifer Maloney, *JLI Hires Another Top Altria Executive*, Wall St. J. (Oct. 1, 2019), *available at* https://www.wsj.com/articles/juul-hires-another-top-altriaexecutive-11569971306

[513] *Id.*

[514] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III at 11 (2019).

[515] *Id.* at 13.

example, Altria offered coupons for JUUL starter kits inside packs of Marlboro cigarettes.[516]



438.    Altria's investment in JLI was not only a financial contribution; rather, it was an important aspect of JLI, Altria, and the Management Defendants' plan to continue growing the user base, stave off regulation, and keep JLI's most potent and popular products on the market and available to kids and the public at large. Altria is and was working to actively help expand sales of JLI's products. Altria's investment brings legal and regulatory benefits to JLI, by helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure.

439.    Altria also brings lobbying muscle to the table, which has played an important role in JLI, Altria, and the Management Defendants' scheme of staving off regulation by preventing new federal or state legislation targeting JUUL or the e-cigarette category more broadly. Altria "has a potent lobbying network in Washington [D.C.] and around the country."[517] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where Altria ends and JLI

---

[516] Points for us!, Reddit (Sep. 16, 2019),
https://www.reddit.com/r/juul/comments/d50jku/points_for_us/ (depicting an image of a Marlboro carton with a JUUL starter kit coupon inside).

[517] Shelia Kaplan, *In Washington, JLI Vows to Curb Youth Vaping. Its Lobbying in States Runs Counter to That Pledge.*, N.Y. Times (Apr. 28, 2019),
https://www.nytimes.com/2019/04/28/health/juul-lobbying-statesecigarettes.html

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

begins."[518] While an Altria spokesman has denied that there was any contractual services agreement for lobbying between JLI and Altria, he admitted that he did not know what informal advice and conversations Altria has had with JLI about lobbying efforts. Since JLI, the Management Defendants, and Altria joined forces, JLI's spending on lobbying has risen significantly. JLI spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.[519]

440.    In addition, Altria's arrangement with JLI greatly expands JLI's retail footprint. While JUUL products have typically been sold in 90,000 U.S. retail outlets, Altria reaches 230,000 U.S. outlets. Altria also brings its logistics and distribution experience (although, after increasing public scrutiny, Altria announced on January 30, 2020 that it would limit its support to regulatory efforts beginning in March 2020[520]). And importantly, as noted above, Altria gives JLI access to shelf space that it had obtained under fraudulent pretenses. This is not just any shelf space; it is space near Altria's blockbuster Marlboro cigarettes, and other premium products and retail displays. The arrangement allows JLI's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

441.    Altria decided to make a significant investment in JLI to further its efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, which ultimately benefits Altria by ensuring a new generation of customers for its products. In fact, when announcing its investment, Altria explained that its investment in JLI "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JLI expand its reach and

---

[518] *Id.*

[519] Center for Responsive Politics, Client Profile: JUUL Labs, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2019&id=D000070920 (last visited February 6, 2020).

[520] Nathan Bomey, *Marlboro maker Altria distances itself from vaping giant JLI amid legal scrutiny*, USA Today (Jan. 31, 2020), https://www.usatoday.com/story/money/2020/01/31/juul-altria-distances-itself-e-cigarette-maker-amid-scrutiny/4618993002/

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  efficiency."[521] Altria has helped JLI maintain and expand its market share—a market share that,
2  based on Altria's own October 25, 2018 letter to the FDA, it believes was gained by employing
3  marketing and advertising practices that contributed to youth e-cigarette use.

4  **G.    JLI, Altria, and Others Have Successfully Caused More Young People to**
5  **Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and**
6  **Public Health Crisis.**

7  442.    Defendants' tactics have misled the public regarding the addictiveness and safety
8  of e-cigarettes generally, and JUUL products specifically, resulting in an epidemic of e-cigarette
9  use among youth in particular.

10  443.    Defendants' advertising and third-party strategy, as discussed above, ensured that
11  everyone from adults to young children, would believe JUULing was a cool, fun, and safe
12  activity.

13  444.    To this day, JLI has not fully disclosed the health risks associated with its
14  products, has not recalled or modified its products despite the known risks, and continues to
15  foster a public health crisis, placing millions of people in harm's way.

16  **1.    Defendants' Scheme Caused Consumers to be Misled into Believing**
17  **that JUUL was Safe and Healthy.**

18  445.    In 2016, the National Institute on Drug Abuse issued findings regarding "Teens
19  and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring,
20  rather than nicotine.[522]

21  446.    Two years later, despite the ongoing efforts of public health advocates, a 2018
22  study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained
23
24

_____

25  [521] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and*
26  *Drive Growth*, BUSINESSWIRE (Dec. 20, 2018, 7:00 AM EST),
     https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-
27  Investment-JUUL-Accelerate
     [522] Teens and E-cigarettes, National Institute on Drug Abuse,
28  https://www.drugabuse.gov/related-topics/trends-statistics/infographics/teens-e-cigarettes (last
     visited Mar. 4, 2020).

unaware that JUUL products contain nicotine.[523] Further, the study found that respondents using e-cigarettes were less likely to report that e-cigarettes were harmful to their health, that people can get addicted to e-cigarettes, or that smoke from others' e-cigarettes was harmful.[524]

447.    Similarly, in 2018, a literature review of seventy-two articles published in the International Journal of Environmental Research and Public Health found that e-cigarettes were perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes.[525] Further, researchers found that specific flavors (including dessert and fruit flavors) were perceived to be less harmful than tobacco flavors among adult and youth e-cigarette users.[526] In addition, researchers found that youth e-cigarette users perceived e-cigarettes as safe to use and fashionable.[527]

448.    In 2019, a study published in Pediatrics found that 40% of participants reported using nicotine-free e-cigarette products, when in fact the products they were using contained significant levels of nicotine.[528]

449.    In 2019, a study published in the British Medical Journal Open systematically reviewed all peer-reviewed scientific literature published on e-cigarette perceptions through March 2018 which included fifty-one articles.[529] Researchers found consistent evidence showing that flavors attract both youth and young adults to use e-cigarettes.[530] In addition,

---

[523] Jeffrey G. Willett et al. *Recognition, Use and Perceptions of Juul Among Youth and Young Adults,* 28 Tobacco Control 054273 (2019).

[524] *Id.*

[525] *Id.*

[526] Kim A. G. J. Romijnders et al., *Perceptions and Reasons Regarding E-Cigarette Use Among Users and Non-Users: A Narrative Literature Review*, 15 Int'l J. of Envtl. Research & Public Health 1190 (2018), https://doi: 10.3390/ijerph15061190.

[527] *Id.*

[528] Rachel Boykan et al., *Self-Reported Use of Tobacco, E-Cigarettes, and Marijuana versus Urinary Biomarkers*, 143 Pediatrics (2019), https://doi.org/10.1542/peds.2018-3531.

[529] Meernik, et al, Impact of Non-Menthol Flavours in E-Cigarettes on Perceptions and Use: An Updated Systematic Review, *BMJ Open*, 9:e031598 (2019), available at https://bmjopen.bmj.com/content/9/10/e031598.

[530] *Id.*

among this same group, fruit and dessert flavors decrease the perception that e-cigarettes are harmful, while increasing the willingness to try e-cigarettes.[531]

### 2.   Use of JUUL by Minors Has Skyrocketed

450.   On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent e-cigarette use from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."[532]

451.   The percentage of 12th grade students who reported consuming nicotine almost doubled between 2017 and 2018, rising from 11% to 20.9%.[533] This increase was "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade."

452.   By 2018 approximately 3.6 million middle and high school students were consuming e-cigarettes regularly,[534] and one in five 12th graders reported used an e-cigarette containing nicotine in the last 30 days.[535] As of late 2019, 5 million students reported active use of e-cigarettes, with 27.5% of high school students and 10.5% of middle school students using them within the last thirty days and with most youth reporting JUUL as their usual brand.[536]

---

[531] *Id.*

[532] *National Adolescent Drug Trends in 2018*, University of Michigan Institute for Social Research (Dec. 17, 2018), http://monitoringthefuture.org/pressreleases/18drugpr.pdf

[533] News Release, *Teens Using Vaping Devices in Record Numbers* (Dec. 17, 2018) https://www.nih.gov/news-events/news-releases/teens-using-vaping-devices-record-numbers (last visited Mar. 9, 2020 7:43 PM)

[534] *See* Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have no Clear Path to Quitting*, N.Y. Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html

[535] *Id.*

[536] National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey; Karen Cullen, et al., *e-Cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO



453.    The Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[537] Then FDA Commissioner Dr. Gottlieb described the increase in e-cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for an "epidemic" of nicotine use among teenagers.[538] The rapid—indeed infectious—adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products."[539] CDC Director Robert Redfield agreed, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."[540] Then-Commissioner Gottlieb identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."[541]

454.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr.

---

[537] Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit

[538] *FDA Launches New, Comprehensive Campaign to Warn Kids About the Dangers of E-Cigarette Use as Part of Agency's Youth Tobacco Prevention Plan, Amid Evidence of Sharply Rising Use Among Kids* (Sept. 18, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm

[539] *Id.*

[540] Amir Vera, *Texas Governor Signs Law Increasing the Age to Buy Tobacco Products to 21*, CNN (June 8, 2019), https://www-m.cnn.com/2019/06/08/health/texas-new-tobacco-law/index.html

[541] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."[542] The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."

455.    The JUUL youth addiction epidemic spread rapidly across high schools in the United States. JUUL surged in popularity, largely through social media networks, and created patterns of youth usage, illegal youth transactions, and addiction, that are consistent with this account from Reddit in 2017:

> Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say 'can I put my pod in ur juul?' and are in there every block. I myself spent about 180$ on mango pods and bought out a store, and sold these pods for 10$ a pod, making myself an absolutely massive profit in literally 9 days. Given because I'm 18 with a car and that's the tobacco age around here, I always get offers to get pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make i[t] their own, every day you can find the pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.[543]

456.    In response to the post above, several others reported similar experiences:

> a.      "[T]his is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is."[544]

> b.      "Same thing at my school. JUUL fiend is a term too."[545]

---

[542] Surgeon General's Advisory on E-cigarette Use Among Youth, (2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf

[543] *What's Juul in School*, https://www.reddit.com/r/juul/comments/61is7i/whats_juul_in_school/ (last visited Dec. 19, 2018).

[544] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

c. "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are."[546]

d. "[S]ame [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once, and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is."[547]

e. "[T]he same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now."[548]

f. "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a pod man?'"[549]

g. "It's the same at my school and just about every other school in Colorado."[550]

h. "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic.'"[551]

i. "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one."[552].

j. "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping."[553]

k. "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you

[545] *Id.*

[546] *Id.*

[547] *Id.*

[548] *Id.*

[549] *Id.*

[550] *Id.*

[551] *Id.* (citing *Juuls Now Rule the School as Students Frenzy Over E-cig* (Oct. 5, 2016), https://imgur.com/a/BKepw).

[552] *Id.*

[553] *Id.*

have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul. It's a craze. I love it, I've made an insane amount of money. It's something that has swept through our age group and has truly taken over. And it happened almost overnight."554

457.    The following graph illustrates JLI's responsibility for the nationwide youth e-cigarette epidemic. While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth. Through that same timeframe, youth e-cigarette rates nearly doubled from more than 11% in 2017 to more than 20% in 2018. Through October 5, 2019 (the last date for which data was available), rates of youth e-cigarette use continued to increase, tracking the growth of JUUL.



458.    The unique features of the JUUL e-cigarette—high nicotine delivery, low harshness, and easy-to-conceal design—have caused patterns of addiction with no historical

<hr />

554 *Id.* (emphasis added).

555 The area graph depicts e-cigarette unit sale volumes in retail outlets tracked by Nielsen by manufacturer and month from 2013 through October 5, 2019; the line graph depicts national high school and middle school e-cigarette past-30-day usage rates as percentages from 2013 through 2019, with each data point representing a year. *See* Nielsen: Tobacco All Channel Data; National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey; *see also* Complaint at 2 (Figure 1), *Commonwealth of Penn. v. Juul Labs, Inc.*, (Ct. Common Pleas, Feb. 10, 2020).

1    precedent. It is not uncommon for fifteen-year-old students, even those who live at home with

2    their parents, to consume two or more JUUL pods a day.

3        **H.    JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its**

4              **Products**

5              **1.    E-Cigarette Manufacturers Successfully Blocked the Types of**

6                    **Regulations that Reduced Cigarette Sales, Creating the Perfect**

7                    **Opportunity for JLI.**

8        459.   One of the main reasons e-cigarettes like JUUL were so appealing from an

9    investment and business development perspective is that, unlike combustible cigarettes, e-

10   cigarettes were relatively unregulated. This regulatory void was not an accident; the cigarette

11   industry, and then the e-cigarette industry, spent significant resources blocking, frustrating, and

12   delaying government action. A 1996 article in the *Yale Law & Policy Review* detailed how

13   cigarette companies vehemently opposed the FDA mid-1990s rules on tobacco products, using

14   lawsuits, notice-and-comment, and arguments related to the FDA's jurisdiction to delay or undo

15   any regulatory efforts.[556]

16       460.   In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control

17   Act (TCA). The TCA amended the Federal Food, Drug, and Cosmetic Act to allow the FDA to

18   regulate tobacco products.

19       461.   Although the TCA granted the FDA immediate authority to regulate combustible

20   cigarettes, it did not give the FDA explicit authority over all types of tobacco products—

21   including those that had not yet been invented or were not yet popular. To "deem" a product for

22   regulation, the FDA must issue a "deeming rule" that specifically designates a tobacco product,

23   such as e-cigarettes, as falling within the purview of the FDA's authority under the TCA.

24       462.   The TCA also mandated that all "new" tobacco products (i.e., any product not on

25   the market as of February 15, 2007) undergo a premarket authorization process before they

26   could be sold in the United States.

27   _____

28   [556] Melvin Davis, *Developments in Policy: The FDA's Tobacco Regulations* 15 Yale L. &
     Policy Rev. 399 (1996).

CONSOLIDATED CLASS ACTION COMPLAINT
                                                Case No. 19-md-02913-WHO

463.    Four years later, on April 25, 2014, the FDA finally issued a proposed rule deeming e-cigarettes for regulation under the Tobacco Act ("2014 Proposed Rule").

464.    Once issued, the e-cigarette industry, together with its newfound allies, parent companies, and investors—the cigarette industry and pro-e-cigarette lobbyists—set to work to dilute the rule's effectiveness. For example, in comments to the 2014 Proposed Rule, companies such as Johnson Creek Enterprises (one of the first e-liquid manufacturers) stated that the "FDA [] blatantly ignored evidence that our products improve people's lives."[557]

465.    The New York Times reported that Altria was leading the effort to dilute, diminish, or remove e-cigarette regulations. Notwithstanding Altria's professed concern about flavors attracting youth customers, Altria submitted comments in August 2014 in response to the proposed rule opposing the regulation of flavors. Altria asserted that restrictions could result in more illicit sales, and that adults also liked fruity and sweet e-cigarette flavors.[558]

466.    In 2015, Altria lobbied Capitol Hill with its own draft legislation to eliminate the new requirement that most e-cigarettes already on sale in the United States be evaluated retroactively to determine if they are "appropriate for the protection of public health." In effect, Altria lobbied to "grandfather" all existing e-cigarette brands, including JUUL, into a lax regulatory regime. That proposed legislation was endorsed by R.J. Reynolds. Altria delivered its proposal, entitled "F.D.A. Deeming Clarification Act of 2015," to Representative Tom Cole of Oklahoma, who introduced the bill two weeks later using Altria's draft verbatim.[559] Seventy other representatives signed on to Altria's legislation.[560]

[557] Eric Lipton, *A Lobbyist Wrote the Bill.Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (2020), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html

[558] Altria Client Services Inc., Comment Letter on Proposed Rule Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act at 47-48 (August 8, 2014), https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/ALCS-NuMark-Comments-FDA-2014-N-0189.pdf

[559] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (2020), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.

[560] *Id.*

467.   The e-cigarette industry, along with the intertwined cigarette industry, was able to leverage support among Members of Congress such as Representative Cole and Representative Sanford Bishop of Georgia, who advocated for cigarette industry interests and opposed retroactive evaluation of e-cigarette products. Both Cole and Bishop echoed a common cigarette and e-cigarette industry refrain, that any regulations proposed by the FDA would bankrupt small businesses, even though the overwhelming majority of e-cigarettes were manufactured and distributed by large cigarette companies.

468.   Representatives Cole and Bishop received some of the largest cigarette industry contributions of any member of the U.S. House of Representatives, with Representative Bishop receiving $13,000 from Altria, and Representative Cole $10,000 from Altria in the 2015-2016 cycle.[561]

469.   By thwarting and delaying regulation, or by ensuring what regulation did pass was laced with industry-friendly components, the e-cigarette industry, including Defendants, hobbled the FDA—and by extension—Congress's efforts to regulate e-cigarettes. Simultaneously, the e-cigarette industry continued to market their products to youth, and it coordinated to sow doubt and confusion about the addictiveness and health impacts of e-cigarettes.

470.   Even after the FDA issued its final deeming rule in 2016, e-cigarette industry lobbying continued to pay dividends to companies like JLI. In 2017, when Dr. Scott Gottlieb took over as the FDA Commissioner, one of his first major acts was to grant e-cigarette companies a four-year extension to comply with the deeming rule, even as data indicated sharp increases in teen e-cigarette use.[562] Gottlieb had previously served on the board of Kure, a chain of e-cigarette lounges in the United States, though he fully divested before taking the helm at

---

[561] *Id.*; The Politics, Rep. Tom Cole - Oklahoma District 04 OpenSecrets (2017), https://www.opensecrets.org/members-of-congress/contributors?cid=N00025726&cycle=2016
[562] Katie Thomas & Sheila Kaplan, E-Cigarettes Went Unchecked in 10 Years of Federal Inaction N.Y. Times (2019), https://www.nytimes.com/2019/10/14/health/vaping-e-cigarettes-fda.html (last visited Mar 4, 2020).

the FDA.[563]

471.    The four-year extension was celebrated by e-cigarette lobbyists. Greg Conley, president of the American Vaping Association (AVA), stated that but for the extension, "over 99 percent of vaper products available on the market today would be banned next year."[564] Despite the minimal research publicly available on the health effect of e-cigarettes, Ray Story, who had since become commissioner of the Tobacco Vapor Electronic Cigarette Association, lauded the decision: "Absolutely, it's a good thing . . . [w]hen you look at harm reduction, it's a no brainer."[565]

### 2.    JLI, the Management Defendants, and Altria Defendants Successfully Shielded the Popular Mint Flavor from Regulation.

472.    JLI, the Management Defendants, and Altria Defendants had a two-fold plan for staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on the market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of JLI's role in the youth vaping epidemic. These schemes involved acts of mail and wire fraud, with the intent to deceive the FDA, Congress, and the public at large.

473.    First, JLI, the Management Defendants, and Altria publicly defended mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated that mint users are not former menthol smokers. Second, by fighting to keep mint as the last flavor on the market, the cigarette industry could continue to appeal to non-smokers, including youth. JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to convince the FDA into leaving the mint flavor on the market, sacrificing other flavors in the process.

474.    On August 2, 2018, JLI met with the FDA to discuss a proposed youth-

---

[563] Zeke Faux & Dune Lawrence, Bloomberg - Are you a robot? Bloomberg, (2017), https://www.bloomberg.com/news/articles/2017-04-19/vaping-venture-poses-potential-conflict-for-trump-s-fda-nominee

[564] Sheila Kaplan, F.D.A. Delays Rules That Would Have Limited E-Cigarettes on Market N.Y. Times (2017), https://www.nytimes.com/2017/07/28/health/electronic-cigarette-tobacco-nicotine-fda.html.

[565] *Id.*

behavioral study regarding the prevalence of use, perceptions of use, and intentions to use JUUL and other tobacco products among adolescents aged 13-17 years (the "Youth Prevalence Study").[566]

475.    On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had ever used a JUUL, and that only 0.8% of youth had used a JUUL in the last 30 days. ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[567] Specifically, the study found that 47% of youth who reported use of a JUUL device in the last 30-days professed to using mango most often, with only about 12% reporting the same for mint.

476.    JLI's study was a sham. JLI, the Management Defendants, and Altria knew their reported data was inconsistent ███████████████████████████████████████████ ███████████████ JLI's report featured responses to a carefully selected survey question— which *single* flavor youth used most often?—that obscured the widespread use of mint JUUL pods among youth.

477.    Ironically, just a few days after JLI submitted the misleading Youth Prevalence Study to the FDA, the National Youth Tobacco Survey was released. Revealing the depths of the deception of JLI's Youth Prevalence Study, which found that only 1.5% of youth were current users of e-cigarettes, the National Youth Tobacco Survey found that 20.8% of high school student were current users (*i.e.*, consumed e-cigarettes within the last 30 days).

478.    The Youth Prevalence Study that JLI submitted to the FDA, either via U.S. mail or by electronic transmission, was false and misleading. JLI, the Management Defendants, and Altria knew as much. Indeed, they counted on it.

479.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria, JLI and other e-cigarette manufacturers, requesting a

---

[566] Letter from Joanna Engelke, JUUL Labs, Inc., to David Portnoy, Ph.D., M.P.H., FDA Center for Tobacco Products (November 5, 2018).
[567] *Id.* at 3.

"detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[568]

480. As evidenced by Altria's recent admission that negotiations with JLI were ongoing in late 2017,[569] Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, allow JLI to continue marketing mint JUUL pods.[570]

481. Defendants' plan centered on efforts to deceive the FDA that (1) mint was more akin to Tobacco and Menthol than other flavors; and (2) kids did not prefer mint.

482. JLI took the first step in this coordinated effort to deceive the FDA. In response to then-Commissioner Gottlieb's September 25, 2018 letter, JLI prepared an "Action Plan," which it presented to the FDA at an October 16, 2018 meeting, and presented to the public on November 12, 2018. The substance of JLI's presentation to the FDA and its public-facing Action Plan were largely identical.[571] ████████████████████████████████

████████████████████[572]████████████████████████████

████████████████████████████████████

483. But this statement was not true. ████████████████████████

████████████████████████████[573] In JLI's Action Plan, then-CEO Burns stated that only products that "mirror what is currently available for combustible cigarettes—tobacco and menthol-based products (menthol and mint pods)—

---

[568] Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 25, 2018); Letter from Scott Gottlieb, M.D. to Altria Group Inc. (Sept. 25, 2018).

[569] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[570] *See United States v. Jones*, 712 F.2d 1316, 1320-21 (9th Cir. 1983) ("It is enough that the mails be used as part of a 'lulling' scheme by reassuring the victim that all is well and discouraging him from investigating and uncovering the fraud.").

[571] JUUL did not include in its Action Plan a proposal for Bluetooth or Wi-Fi equipped devices that was included in JLI's October presentation.

[572] JUUL Labs, Inc. *FDA Presentation*, 2 (████████████); INREJUUL_00182989.

[573] *Id.*

will be sold to retail stores."[574]

484.    In both JLI's October 2018 presentation to the FDA and JLI's Action Plan that was shared with the public, JLI and its CEO fraudulently characterized mint as a non-flavored cigarette product, akin to tobacco and menthol cigarettes, suggesting that it was a product for adult smokers. The image below was included in both the public-facing Action Plan and JLI's presentation to the FDA.



485.    JLI knew that non-smoking youth liked mint as much as any flavor.

486.



[575] Indeed,

[576]

[577]

487.    Most importantly, JLI knew that mint was the most popular JUUL pod. Though other flavors might draw new customers, JLI's most addictive "flavor" predictably became its

[574] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/
[575] INREJUUL_00265069
[576] INREJUUL_00079307-INREJUUL_00079409, at 395.
[577] *Id.*

most popular.

488.   The characterization of mint as an adult tobacco product was also fraudulent because JLI ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████ As alleged in a Whistleblower Complaint, JLI's then-CEO told his employees: "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."[578]

489.   On October 25, 2018, less than ten days after JLI presented its fraudulent, misleading Action Plan to the FDA, Altria's CEO Howard Willard submitted a letter in response to the FDA's call to combat the youth epidemic. Willard's letter was a clear indication of Altria's willingness to continue the fraudulent scheme and deception of the FDA. While Willard's letter confirmed that Altria understood that JLI's conduct and product was addicting many children to nicotine, this letter repeated the misleading statement that mint was a "traditional tobacco flavor" despite Altria and JLI knowing it was no such thing. Willard then claimed that the youth epidemic was caused, in part, by "flavors that go beyond traditional tobacco flavors"—which, according to JLI and Altria, did not include mint—and announced that Altria would discontinue all MarkTen flavors except for "traditional tobacco, menthol and mint flavors." Willard asserted that these three flavors were essential for transitioning smokers. But Willard, and Altria, knew this was not true.[579]

490.   That same day—October 25, 2018—Altria continued its deception on an earnings call with investors. Altria fraudulently described its decision to remove its pod-based products from the market as one intended to address the dramatic increase in youth e-cigarette use, while it was only weeks away from publicly announcing its 35% stake in JLI:

We recently met with Commissioner Gottlieb to discuss steps that could be taken

---

[578] Angelica LaVito, *Former JLI executive sues over retaliation, claims company knowingly sold tainted nicotine pods*, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/former-juul-executive-sues-over-retaliation-claims-company-knowingly-sold-tainted-pods.html
[579] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

to address underage access and use. Consistent with our discussion with the FDA and because we believe in the long-term promise of e-vapor products and harm reduction, we're taking immediate action to address this complex situation.

First, Nu Mark will remove from the market MarkTen Elite and Apex by MarkTen pod-based products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Second, for our remaining MarkTen and Green Smoke cig-a-like products, Nu Mark will sell only tobacco, menthol and mint varieties. Nu Mark will discontinue the sale of all other flavor variants of our cig-a-like products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Although we don't believe we have a current issue with youth access or use of our e-vapor products, we are taking this action, because we don't want to risk contributing to the issue.

After removing Nu Mark's pod-based products and cig-a-like flavor variants, approximately 80% of Nu Mark's e-vapor volume in the third quarter of 2018 will remain on the market. [580]

491.    Willard reiterated that "pod-based products and flavored products" were behind the increase in youth use of e-cigarettes:

I mean, I think the way we thought about this was that we believe e-vapor has a lot of opportunity to convert adult cigarette smokers in the short, medium and long-term, but clearly, this significant increase in youth usage of the products puts that at risk and we think rapid and significant action is necessary. And I think as we looked at the data that is available in some of the remarks from the FDA, I think we concluded that the driver of the recent increase we think is pod-based products and flavored products and so we thought that the two actions that we took addressed the drivers of the increased youth usage here in the short run.[581]

492.    Willard emphasized that Altria's withdrawal of its own pod-based products was intended to address youth use: "[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward." He later said: "And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue."[582] As noted above, however,

---

[580] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript
MO earnings call for the period ending September 30, 2018 (Oct. 25, 2018),
https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx
[581] *Id.*
[582] *Id.*

it has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction that JLI created, but because a non-compete clause was a "part of its deal with J[LI]."[583]

493.    Thus, while Altria publicly announced that it would pull its pod-based products to combat youth usage, and publicly seemed to support removal of youth-friendly flavors, its defense of mint as a tobacco-analog was actually part of the scheme to protect the profits associated with JLI's mint JUUL pods, one of JLI's strongest products with the highest nicotine content and highest popularity among non-smokers and youth.

494.    In support of his arguments to the FDA that mint was a flavor for adult smokers, Willard cited to a study that Altria had conducted and presented at a conference that JLI attended.[584] But Willard did *not* disclose that Altria's "study" was merely a "quasi-experimental online survey" and not a true scientific study.[585] Notably, JLI's current CEO, K.C. Crosthwaite, was the President and Chief Growth Officer of Altria Client Services, which conducted Altria's mint "study" in Spring 2017, the same time that the Management Defendants and Altria began their "confidential negotiations."[586] Willard did not disclose that this study was contradicted by the "youth prevention" data provided by JLI during its acquisition due-diligence showing that mint was popular among teens.

495.    Through these letters, Altria sought to prevent the FDA—which was actively considering regulating flavors[587]—from banning JLI's mint JUULpods.

496.    Acting in concert, JLI and Altria committed acts of mail or wire fraud when (1)

---

[583] *Id.*

[584] Jessica Parker Zdinak, Ph.D., ALTRIA CLIENT SERVICES, *E-vapor Product Appeal Among Tobacco Users and Non-users and the Role of Flavor in Tobacco Harm Reduction*, 72nd Tobacco Science Research Conference, (September 18, 2018), available at https://sciences.altria.com/library/media/Project/Altria/Sciences/library/conferences/2018%20TSRC%20J%20Zdniak%20Presentation.pdf

[585] *Id.*

[586] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[587] Alex Lardieri, *FDA Considers Ban on E-Cigarette Flavors Amid 'Epidemic' Use By Teens*, U.S. News & World Report (September 12, 2018), https://www.usnews.com/news/health-care-news/articles/2018-09-12/fda-considers-ban-on-e-cigarette-flavors-amid-epidemic-use-by-teens

---

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

JLI transmitted its Action Plan to the FDA and the public; and (2) Altria transmitted Willard's letter to the FDA.

497.   At the heart of these acts of fraud was Defendants' characterization of mint as a tobacco product that was targeted to adult smokers. This characterization was fraudulent because Defendants knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products. Altria supported this plan and helped execute it. Together, these actions by JLI and Altria ensured that mint would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

498.   The deceptive scheme worked—the FDA did not protest JLI and Altria's plan. And on December 20, 2018, one month after JLI announced its Action Plan to keep selling mint, Altria made a $12.8 billion equity investment in JLI.

499.   By February of 2019, the FDA became aware that it had been deceived by JLI and Altria. On February 6, 2019, then-FDA commissioner Gottlieb wrote JLI and Altria demanding in-person meetings, excoriating Altria for its "newly announced plans with JUUL [that] *contradict the commitments you made to the FDA*" in a prior meeting and Willard's October 25, 2018 letter to the FDA.[588] Gottlieb's letter to JLI alleged that JLI's conduct was "inconsistent with its previous representations to the FDA."[589]

500.   The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Then-Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any alleged steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

501.   JLI and Altria met with Gottlieb in March 2019 in a meeting the then-

---

[588] Letter from Scott Gottlieb to Howard Willard, Altria (February 9, 2019).
[589] Letter from Scott Gottlieb to Kevin Burns, JUUL Labs, Inc. (February 9, 2019).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Commissioner described as "difficult."[590] Gottlieb "did not come away with any evidence that public health concerns drove Altria's decision to invest in JLI, and instead said it looked like a business decision. According to reporting by the New York Times, Gottlieb angrily criticized JLI's lobbying of Congress and the White House, stating:

> We have taken your meetings, returned your calls and I had personally met with you more times than I met with any other regulated company, and yet you still tried to go around us to the Hill and White House and undermine our public health efforts. I was trying to curb the illegal use by kids of your product and you are fighting me on it."[591]

502.    But just a week after the "difficult" meeting with JLI and Altria, Gottlieb posted a statement about the FDA's new e-cigarette policy, proposing to ban all flavors *except* "tobacco-, mint- and menthol-flavored products."[592] He cited the strong support of President Trump (whose administration JLI had aggressively lobbied[593]), and also cited "recent evidence indicat[ing] that mint- and menthol-flavored ENDS products are preferred more by adults than minors."[594] Just a few weeks later, Gottlieb resigned from his position as commissioner of the FDA.

503.    The scheme had succeeded in saving mint JUUL pods, as well as each Defendant's bottom line. JLI's sale of mint JUUL pods rose from one third of its sales in September 2018 to approximately two thirds in February 2019. JLI's 2019 revenues were estimated to be between $2.36 billion and $3.4 billion, and mint JUUL pods accounted for

---

[590] Kate Rooney & Angelica LaVito, *Altria Shares Fall After FDA's Gottlieb Describes 'Difficult' Meeting on Juul*, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html

[591] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html

[592] Statement from FDA Commissioner Scott Gottlieb, M.D., on advancing new policies aimed at preventing youth access to, and appeal of, flavored tobacco products, including e-cigarettes and cigars (Mar. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-advancing-new-policies-aimed-preventing-youth-access

[593] Evan Sully and Ben Brody, *JLI Spent Record $1.2 Million Lobbying as Regulators Stepped Up*, Washington Post (Oct. 22, 2019), https://www.washingtonpost.com/business/on-small-business/juul-spent-record-12-million-lobbying-as-regulators-stepped-up/2019/10/22/2a0dbc52-f4de-11e9-b2d2-1f37c9d82dbb_story.html

[594] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
                                        Case No. 19-md-02913-WHO

approximately 75% of JLI's total 2019 sales. And because mint remained on the market until JLI withdrew it in November 2019 in the face of growing scrutiny,[595] thousands, if not millions, of underage JUUL users suffered the consequences.

504.    As former New York City Mayor Mike Bloomberg stated: "JUUL's decision to keep mint- and menthol-flavored e-cigarettes on the shelves is a page right out of the tobacco industry's playbook."[596]

505.    JLI continues to sell menthol-flavored products.[597]

### 3.    In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic.

506.    In 2017, the FDA announced that it would be taking steps to regulate e-cigarette devices such as JUUL. In late 2017, the FDA initiated its investigation of e-cigarette companies' advertising and sales practices. But, as noted above, the FDA's 2017 Compliance Policy issued a four-year extension for compliance with the 2016 deeming rule, apparently to "balance between regulation and encouraging development of innovative tobacco products that may be less harmful than cigarettes."[598] In March 2018, the 2017 Compliance Policy was challenged by the American Academy of Pediatrics, along with other public health organizations concerned that a compliance extension for the e-cigarette industry would allow more e-cigarette products into the market and continue to addict thousands of youth.[599]

507.    In March 2019, the FDA drafted guidance that modified the 2017 Compliance Policy, but it did not go into full effect. However, on May 15, 2019, the lawsuit filed by the American Academy of Pediatrics was successful—the U.S. District Court for the District of

---

[595] Ellen Huet, *JLI Pulls Mint-Flavor Vaping Products, but Menthol Remains*, Bloomberg (Nov. 7, 2019), https://www.bloomberg.com/news/articles/2019-11-07/juul-stops-selling-mint-flavored-vaping-products

[596] *Id.*

[597] Sheila Kaplan, *Juul Halts Sales of Mint, Its Top-Selling e-Cigarette Flavor*, N.Y. Times (Nov. 7, 2019), https://www.nytimes.com/2019/11/07/health/vaping-juul-mint-flavors.html

[598] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. Food & Drug Admin. (Jan. 2020), https://www.fda.gov/media/133880/download

[599] *Id.*

1    Maryland vacated the 2017 Compliance Policy, and directed the FDA to "require that premarket

2    authorization applications for all new deemed products" ("new" referred to any product

3    launched after February 15, 2007 and thus would include JUUL) be submitted within ten

4    months, by May 2020.[600]

5           508.    In January 2020, the FDA issued: Enforcement Priorities for Electronic Nicotine

6    Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket

7    Authorization: Guidance for Industry (2020 FDA Guidance), directed at the e-cigarette industry,

8    which detailed the FDA's plan to prioritize enforcement of regulations prohibiting the sale of

9    flavored e-cigarette products and prohibiting the targeting of youth and minors.[601] The 2020

10   FDA Guidance focused on flavored e-cigarettes that appeal to children, including fruit and mint:

11   "[C]ompanies that do not cease manufacture, distribution and sale of unauthorized flavored

12   cartridge-based e-cigarettes . . . within 30 days risk FDA enforcement actions."[602]

### 4.    The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done

15          509.    By the time the FDA acted, youth consumption of e-cigarettes had already

16   reached an all-time high, and the e-cigarette industry's presence on social media became an

17   unstoppable force. The 2020 FDA Guidance acknowledges that two of the largest 2019 surveys

18   of youth cigarette use found that e-cigarette use had reached the highest levels ever recorded.[603]

19   By December 2019, there were over 2,500 reported cases of e-cigarette related hospitalization

---

[600] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. Food & Drug Admin. (Jan. 2020), https://www.fda.gov/media/133880/download; *Am. Academy of Pediatrics, et al. v. Food and Drug Admin. et al.*, 379 F. Supp. 3d 461, 496 (D. Md. 2019).

[601] *Id.*

[602] *FDA Finalizes Enforcement Policy on Unauthorized Flavored Cartridge-Based E-Cigarettes That Appeal to Children, Including Fruit and Mint*, FDA News Release (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

[603] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. Food & Drug Admin. (Jan. 2020), https://www.fda.gov/media/133880/download

1  for lung injury, including over fifty confirmed deaths.[604] Despite the FDA's efforts between

2  2017 and 2019, youth consumption of e-cigarettes doubled among middle and high school

3  students over the same period.[605] In 2019, the total number of middle and high school students

4  reporting current use of e-cigarettes surpassed five million for the first time in history.[606]

5       510.    JLI's presence on social media has also persisted, even without further initiation

6  by JLI—the hallmark of a successful viral marketing campaign. When the "#juul" hashtag was

7  first used on social media, it was a series of thirteen tweets on Twitter. By the time JLI

8  announced it would shut down its Instagram account, "#juul" had been featured in over 250,000

9  posts on Instagram. A study by Stanford University found that in the eight months after JLI

10  ceased all promotional postings, community posting accelerated, to nearly half a million posts.

11  Whereas before JLI exited Instagram, "#juul" appeared on average in 315 posts per day, that

12  number tripled to 1084 posts per day after JLI shut down its Instagram account.[607]

13       511.    The FDA's anti-e-cigarette campaign on social media was aimed at youth and

14  middle and high school students. The campaign used the slogan "The Real Cost" to educate

15  youth on social media platforms about the health impacts of e-cigarette consumption—the real

16  cost of using e-cigarettes. A recent study from the University of California Berkeley found that

17  since September 2018, when the FDA's social media campaign began, the hashtag

18  "#TheRealCost" was used about fifty times per month on Instagram. By comparison, e-cigarette

19  related hashtags were used as many as 10,000 times more often. Despite the FDA's social media

20  intervention, the number of e-cigarette related posts, and the median number of likes (a strong

21  metric of viewer engagement) the posts received, increased three-fold and six-fold,

22

23

24

25  [604] Karen A. Cullen et al., E-cigarette Use Among Youth in the United States, 2019, 322
    JAMA, 2095 (2019).

26  [605] *Id*.

27  [606] *Id*.

    [607] Robert K. Jackler et al., *Rapid Growth of JUUL Hashtags After the Company Ceased Social
28  Media Promotion*, Stanford Research Into the Impact of Tobacco Advertising (July 22, 2019),
    http://tobacco.stanford.edu/tobacco_main/publications/Hashtag_JUUL_Project_7-22-19F.pdf

respectively.[608]

512.    In short, by the time the FDA reacted to the epidemic created by Defendants, millions of youth were addicted to e-cigarettes and nicotine, and were sharing e-cigarette related posts on social media on their own.

I.      **JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries**

1.      **JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries**

513.    The use of e-cigarettes, including JUUL, cause significant lung toxicity[609] and have been implicated in multiple severe pathological lung injuries.

514.    Recent studies have demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[610] An impaired epithelial barrier function allows greater passage of inhaled chemicals into the body, increasing inflammation both locally in the lungs and systemically. This can lead to acute and chronic lung injury as well as exposure to, and increased susceptibility to, respiratory infections in users of e-cigarettes, including JUUL.[611]

515.    Research has also demonstrated that ultrafine metal particles from heating

---

[608] Julia Vassey, *#Vape: Measuring E-cigarette Influence on Instagram With Deep Learning and Text Analysis*, 4 Frontiers in Commc'n 75 (2019), https://www.frontiersin.org/articles/10.3389/fcomm.2019.00075/full

[609] Lauren F. Chun et al., *Pulmonary Toxicity of E-cigarettes*, 313 Am. J. Physio. Lung Cell Mol. Physiol L193 (May 18, 2017). https://www.ncbi.nlm.nih.gov/pubmed/28522559.

[610] Thivanka Muthumalage, et al., *E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes*, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.

[611] Laura E. Crotty Alexander et al. *Chronic Inhalation of E-cigarette Vapor Containing Nicotine Disrupts Airway Barrier Function and Induces Systemic Inflammation and Multiorgan Fibrosis in Mice*, 314 Am. J. Physiol. Regul. Comp. Physiol. R834 (2018), https://journals.physiology.org/doi/full/10.1152/ajpregu.00270.2017; Pieter S. Hiemstra et al., *The Innate Immune Function of Airway Epithelial Cells in Inflammatory Lung Disease*, 45 Eur. Respir. J. 1150 (2015), https://erj.ersjournals.com/content/45/4/1150

devices have been found in e-cigarette aerosol, and in e-cigarette user's lungs.[612]

516.    In addition, exposure to JUUL aerosol has been shown to significantly impair endothelial function comparable to impairment of endothelial function caused by use of combustible cigarettes.[613]

517.    It is well-established that endothelial dysfunction and injury from direct toxic effects of inhalants such as cigarette smoke, can cause lung injuries such as chronic obstructive pulmonary disease (COPD), emphysema, asthma and chronic bronchitis.[614]

518.    Recent epidemiological and toxicological studies detected links between asthma frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.[615]

519.    A study published in December 2019, found that among individuals who never smoked combustible cigarettes, current e-cigarette use was associated with 75% higher odds of chronic bronchitis, emphysema, and COPD compared to those who never used e-cigarettes.[616]

520.    In addition, the flavoring compounds used in e-cigarettes such as JUUL, include numerous chemicals known to be toxins if inhaled, such as diacetyl, acetyl propionyl, and benzaldehyde. These chemicals are linked to serious lung disease.[617]

---

[612] Alessandra Caporale et al., *Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI*, 293 Radiology 97 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31429679

[613] Poonam Rao et al., *Juul and Combusted Cigarettes Comparably Impair Endothelial Function*, 6 Tob. Regul. Sci. 30 (2020). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6953758/

[614] Francesca Polverino et al. *COPD as an Endothelial Disorder: Endothelial Injury Linking Lesions in the Lungs and Other Organs?* 8 Pulm. Circ. 1 (2018), https://www.ncbi.nlm.nih.gov/pubmed/29468936

[615] Phillip W. Clapp and Ilona Jaspers, *Electronic Cigarettes: Their Constituents and Potential Links to Asthma*, 79 Curr Allergy Asthma Rep. 17 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28983782

[616] Albert D. Osei, et al., *Association Between E-Cigarette Use and Chronic Obstructive Pulmonary Disease by Smoking Status: Behavioral Risk Factor Surveillance System 2016 and 2017*, 132 Am. J. Prev. Med. 949 (2019), https://www.ncbi.nlm.nih.gov/pubmed/30853474

[617] Centers for Disease Control & Prevention, *Flavorings-Related Lung Disease* (Oct. 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/default.html; Won Hee Lee *et al.*, *Modeling Cardiovascular Risks of E-Cigarettes with Human-Induced Pluripotent Stem Cell-Derived Endothelial Cells.* 73 J. Am. College of Cardiology 2722 (2019),

521.    A multitude of published case reports have linked e-cigarette use, including JUUL, to a variety of acute inhalational lung injuries such as lipoid pneumonia, bronchiolitis obliterans (popcorn lung), alveolar hemorrhage, eosinophilic pneumonia, hypersensitivity pneumonitis, chemical pneumonitis and collapsed lungs, among others.

522.    In 2012, one article reported on the case of a 42-year-old woman admitted with a seven-month history of dyspnea, cough, and fevers that began when the patient had begun using e-cigarettes. The authors hypothesized the source of lipoid pneumonia was e-cigarette use, due to "glycerin-based oils found in e-cigarette nicotine vapor" added to "make the visual smoke when the solution is vaporized."[618]

523.    A 2014 report described a 20-year-old previously healthy U.S. active-duty male sailor who presented with a three-day history of "persistent cough, shortness of breath, and facial flushing" which began an hour after using an e-cigarette device. The patient was diagnosed with acute eosinophilic pneumonia. The patient was given prednisone and discharged after five days in the hospital, with improvement of his symptoms and significant resolution of lung opacity.[619]

524.    In 2015, Atkins and Drescher reported the case of a 60-year-old man admitted repeatedly with weakness, chills, cough, a fever, and hypoxemia, with "bilateral upper lung zone crackles." The patient revealed before each emergency room admittance he had used e-cigarettes and was was diagnosed with "suspected acute hypersensitivity pneumonitis, related to ENDS" and had no further episodes with cessation of e-cigarette use.

525.    In another case in 2015, a 31-year-old woman was admitted to the hospital for dyspnea and cough. The patient "became increasingly hypoxic and was intubated due to

---

https://www.ncbi.nlm.nih.gov/pubmed/31146818; Sheila Kaplan & Matt Richtel, *Mysterious Vaping Illness That's 'Becoming an Epidemic,'* N.Y. Times (Aug. 31, 2019), https://www.nytimes.com/2019/08/31/health/vaping-marijuana-ecigarettes-sickness.html

[618] Lindsay McCauley et al., *An Unexpected Consequence of Electronic Cigarette Use.* 141 Chest 1110 (2012).

[619] Darshan Thota & Emi Latham, *Case Report of Electronic Cigarettes Possibly Associated with Eosinophilic Pneumonitis in a Previously Healthy Active-duty Sailor.* 47 J. Emerg. Med. 15 (2014).

concerns of acute respiratory distress syndrome." The patient was started on IV steroids and diagnosed with lipoid pneumonia, given the close temporality of her recent initiation of e-cigarettes three months prior to her onset of symptoms. The patient rapidly improved with steroids and cessation of use of e-cigarettes.[620] A different published a case report in 2015 describes bilateral pneumonia and pleural effusions associated with e-cigarette use.[621]

526.    In 2016, another case report described the case of a 27-year-old otherwise healthy man who was admitted to the hospital with dyspnea, cough, fever, and hemoptysis after increasing use of e-cigarettes for seven months prior to presentation, initiated in an effort to decrease his combustible tobacco dependence. The patient worsened and required intubation and mechanical ventilator support. There were no notable findings on microorganism workup, "making infectious etiology for his pneumonia very unlikely.".[622]

527.    Also in January 2020, another article reported on a teenager who developed acute fibrinous organizing pneumonia (AFOP) after using JUUL as well as other vaping products. AFOP presents with diffuse ground glass infiltrates and intra-alveolar fibrin balls. Subpleural sparing and pneumomediastinum described elsewhere in vaping associated lung injury were also seen. The authors noted that this patient's presentation fit with existing literature, but his young age, choice of e-cigarette, and lung pathology were considered unique. The images characterized AFOP, a newly evolving rare lung pathology, which is now associated with vaping.[623]

528.    Additional published case reports and case series were published since 2016 noting serious and significant acute lung injuries associated with vaping or e-cigarette use. Despite the increasing reports in the published medical literature and the widespread use of

---

[620] Sujal Modi et al., *Acute Lipoid Pneumonia Secondary to E-Cigarettes Use: An Unlikely Replacement for Cigarettes*, 148 Chest 382 (2015).
[621] Kendall Moore et al., *Bilateral Pneumonia and Pleural Effusions Subsequent to Electronic Cigarette Use*, 3 Open Journal of Emergency Medicine 18 (2015).
[622] Ronnie D. Mantilla et al., *Vapor Lung: Bronchiolitis Obliterans Organizing Pneumonia (BOOP) in Patient with E-Cigarette Use*, 193 Am. J. of Respiratory and Critical Care Med. A6513 (2016).
[623] Monica A. Lu et al., *Vaping-related Lung Injury in an Adolescent*, 201 American J. of Respiratory & Critical Care Med. 481(2020).

1  JUUL among teenagers, JLI did not take any steps to warn the public and consumers of the risks
2  of JUUL products.

3      529.    Over the summer of 2019, healthcare providers started to note an influx of acute
4  respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes. This
5  prompted a Center for Disease Control ("CDC") investigation of an outbreak of vaping
6  associated lung injuries. The reported injuries mirrored the injuries that had been reported in the
7  medical literature since 2012. In October 2019, the CDC issued treatment guidelines to assist
8  doctors in clinical practice. The CDC defined a new recognized medical condition referred to as
9  E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI).

10      530.    Researchers noted that the recent proliferation of vaping-related cases, known as
11  EVALI, demonstrated a heterogeneous collection of pneumonitis patterns that include acute
12  eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and
13  acute respiratory distress syndrome (ARDS), diffuse alveolar hemorrhage, hypersensitivity
14  pneumonitis, and the rare giant-cell interstitial pneumonitis. Active infection (which would
15  include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical
16  presentation, but acute toxic lung injury did seem to fit.[624]

17      531.    Further, a recent publication in 2020 noted that there were almost 2000 cases of
18  EVALI at the time it was written. The authors further noted that Vitamin E acetate was one
19  possible cause of the recent outbreak but there may be more than one cause and therefore,
20  everyone should refrain from using any e-cigarette or vaping products.[625]

21      532.    Another publication in January 2020 noted that there were a number of patients
22  who were diagnosed with EVALI who reported the use of nicotine only e-cigarettes. The
23  authors concluded that EVALI was also associated with nicotine only products.[626]

24
25  [624] David C. Christiani, *Vaping-Induced Injury*, 68 New England J. Med. 787 (2019).
26  [625] Sascha Ellington et al., *Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use-*
27  *Associated Lung Injury—United States, August 2019–January 2020,* 69 Morbidity and Mortality Weekly Rep. 44 (2020).
28  [626] Isaac Ghinai et al., *Characteristics of Persons Who Report Using Only Nicotine-Containing Products Among Interviewed Patients with E-cigarette, or Vaping, Product Use-Associated*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

533.    In addition, multiple reports have been published in the medical literature of acute alveolar hemorrhage caused by e-cigarette use.[627] Diffuse alveolar hemorrhage (DAH) is a life-threatening disorder which refers to bleeding that originates in the pulmonary microvasculature. It often results in acute respiratory failure.[628] Hypersensitivity pneumonitis has been linked to the use of e-cigarettes, such as JUUL, since 2015.[629] In 2018, researchers published the first reported case of hypersensitivity pneumonitis and acute respiratory distress syndrome (ARDS) as a risk of e-cigarette use in an adolescent.[630] Recent case reports have also linked spontaneous pneumothorax (lung collapse) to vaping and use of e-cigarettes.[631][632]

534.    The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation and death.

535.    It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, acute respiratory distress syndrome (ARDS), asthma, emphysema and COPD. Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL.

536.    The failure to properly and adequately test the safety of JUUL prior to marketing

---

*Lung Injury - Illinois, August-December 2019*, 69 Morbidity and Mortality Weekly Rep. 84 (2020).

[627] Michael Agustin et al., *Diffuse Alveolar Hemorrhage Induced by Vaping*, 2018 Case Rep. Pulmonol. 1 (2018); Peter J. Edmonds et al., *Vaping-induced Diffuse Alveolar Hemorrhage*, 29 Respiratory Med. Case Reports 1 (2020).

[628] Brandi R. Newsome & Juan E. Morales, *Diffuse Alveolar Hemorrhage*, 104 Southern Med. J. 269 (2011).

[629] Graham Atkins et al., *Acute Inhalational Lung Injury Related to the Use of Electronic Nicotine Delivery Systems (ENDS)*, 148 Chest 83A (2015).

[630] Casey G. Sommerfield et al., *Hypersensitivity Pneumonitis and Acute Respiratory Distress Syndrome From E-Cigarette Use*, 141 Pediatrics 1 (2018).

[631] Alex Bonilla et al., *Recurrent Spontaneous Pneumothoraces and Vaping in an 18-year-old Man: A Case Report and Review of the Literature*, 13 J. of Med. Case Reports 283 (2019), https://doi.org/10.1186/s13256-019-2215-4

[632] Munish Sharma et al., *A Case Report of Secondary Spontaneous Pneumothorax Induced by Vape*, 11 Cureus e6067 (2019), https://doi:10.7759/cureus.6067

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   it to the public, including teenagers and young adults, and continuing in the face of the

2   onslaught of publications in the medical literature demonstrating an association with e-cigarette

3   use and significant lung injuries, amounts to a reckless disregard for public safety.

### 2.    JUUL Products Cause Cardiovascular Injuries

5   537.   In addition to severe lung injuries and addiction, JUUL products cause

6   significant and severe risks of cardiovascular injuries. Studies have shown that use of e-

7   cigarettes such as JUUL increase the risk of strokes and heart attacks.[633]

8   538.   Research has demonstrated that e-cigarettes significantly increase blood pressure

9   and arterial stiffness, which also increases the risk of strokes and heart attacks.[634] Further,

10  scientists have found that e-cigarettes cause oxidative stress, which leads to vascular disease and

11  damage, known risk factors for cardiovascular injuries.[635]

12  539.   Biological and epidemiologic studies have found that significant associations

13  exist between e-cigarette use and myocardial infarctions (heart attacks), which appear to be

14  dose-dependent. Biological investigations support this association, whereby a prothrombotic

15  phenotype may develop after exposure to nicotine-containing e-cigarette vapors.[636]

16  540.   Researcher Floridan Rader and others found that chronic e-cigarette users

---

[633] *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries,* American Stroke Association News Release*, Abstract 9, Session A2 (Jan. 30, 2019), https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries; Mohindar R. Vindhyal et al., *Impact on Cardiovascular Outcomes Among E-cigarette Users: A Review From National Health Interview Surveys,* 73 J. of the Am. College of Cardiology Suppl. 2 (2019), www.onlinejacc.org/content/73/9_Supplement_2/11.; Paul M. Ndunda & Tabitha M. Muutu, *Electronic Cigarette Use is Associated with a Higher Risk of Stroke,* 50 Int'l Stroke Conference 2019 Oral Abstracts: Community/Risk Factors, Suppl. 1, Abst. 9, www.ahajournals.org/doi/10.1161/str.50.suppl_1.9.

[634] Charalambos Vlachopoulos et al., *Electronic Cigarette Smoking Increases Aortic Stiffness and Blood Pressure in Young Smokers,* 67 J. Am. Coll. Cardiol. (2016).

[635] Dennis Thompson, *Vaping May Hurt the Lining of Your Blood Vessels*, WebMD HealthDay Reporter (May 28, 2019), www.webmd.com/mental-health/addiction/news/20190528/vaping-may-hurt-the-lining-of-your-blood-vessels#1; JUUL e-cigarettes and JUUL pods deliver dangerous toxins and carcinogens to users. The ingredients in JUUL pods include glycerol, propylene glycol, nicotine, benzoic acid, and flavoring chemicals. *See* What Are JUULpods?, www.juul.com/learn/pods (last visited Mar. 9, 2020 8:25 PM).

[636] Giuseppe Lippi & Emmanuel J. Favaloro, *An Update on Biological and Clinical Associations Between E-Cigarettes and Myocardial Infarction*, Semin. Thromb. Hemost. (2019), https//:doi.org/10.1055/s-0039-3402451.

1   demonstrated substantially impaired coronary microvascular endothelial function, even more

2   pronounced than that seen in chronic tobacco cigarette users. These findings also suggested that

3   chronic e-cigarette use leads to measurable and persistent adverse vascular effects that are not

4   directly related to nicotine.[637]

5       541.   Talal Alzahrani found that daily e-cigarette use was associated with an increased

6   risk of myocardial infarction.[638]

7       542.   A systematic review of the literature found that acute mainstream exposure to

8   aerosol from JUUL, or from previous generations of e-cigarettes using free-base nicotine,

9   impaired vascular function comparably to combusted cigarette smoke and delivered

10  considerably more nicotine to the blood on a per puff basis.[639]

11      543.   The overarching conclusion from dozens of studies published in the past 8 years

12  is that use of e-cigarettes, including JUUL, increases the risk of cardiovascular injury which can

13  lead to strokes, heart attacks and death. JLI never warned the public or consumers of the serious

14  and significant risk of cardiovascular injuries associated with its products.

15      **3.**       **JUUL Products Cause and Contribute to Seizure(s)**

16      544.   On April 3, 2019 the FDA Center for Tobacco Products issued a Special

17  Announcement notifying the public of an increase in reports of tobacco-related seizures,

18  specifically relating to an increase in e-cigarette use, particularly among youth.[640]

19      545.   Additionally, FDA Commissioner Gottlieb and the Principal Deputy

20  Commissioner Amy Abernethy issued a joint statement addressing the FDA's ongoing scientific

21  investigation of seizures following e-cigarette use as a potential safety issue in youth and young

22

23  [637] Florian Rader et al., E-Cigarette Use and Subclinical Cardiac Effects, medRxiv (preprint) https//:doi:https://doi.org/10.1101/2020.01.16.20017780 (2020).

24
25  [638] Talal Alzahrani et al., *Association Between Electronic Cigarette Use and Myocardial Infarction*, 55 Am. J. Preventive Med. 455 (2018)

26  [639] Nicholas Buchanan et al. *Cardiovascular Risk of Electronic Cigarettes: A Review of Preclinical and Clinical Studies,* 116 Cardiovascular Research 40 (2019)

27  [640] *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. Food & Drug Administration (April 10, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults

28

adults. The statement identifies seizures following e-cigarette use as a source of concern for the FDA, adding that in addition to the 35 reported cases from 2010 to early 2019, the FDA "recognize[s] that not all of the cases may be reported" due to their voluntary nature.[641]

546.     Symptomatic nicotine toxicity is a consequence of excessive vaping.[642] As the FDA acknowledges in their statement, "seizures or convulsions are known potential side effects of nicotine toxicity."[643] It is well-documented that nicotine poisoning can cause seizures, including ingestion of e-cigarette fluid.[644] Nicotine-induced seizure has long been considered a possible side effect of long-term nicotine exposure.[645] JUUL's high nicotine content and addictive nature cause JUUL users to be highly susceptible to seizures. Moreover, it has been suggested that the use of e-cigarettes has been associated with an exacerbation of seizures in individuals who are predisposed.[646]

547.     Seizures following e-cigarette use are a significant cause for concern due to the unnecessarily high levels of nicotine delivered, by design, via JUUL. As described herein, JLI intentionally designed its products to deliver a higher amount of nicotine, particularly targeting young people, and then failed to warn of the subsequent risks. JUUL devices were deliberately

---

[641] Scott Gottlieb & Amy Abernethy, *Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's Ongoing Scientific Investigation of Potential Safety Issue Related to Seizures Reported Following E-cigarette Use, Particularly in Youth and Young Adults* (April 3, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-and-principal-deputy-commissioner-amy-abernethy-md-phd

[642] Adrienne Hughes et al., *An Epidemiologic and Clinical Description of E-cigarette Toxicity*, 57 Clin. Toxicol. 287 (2018), https://doi: 10.1080/15563650.2018.1510503.

[643] *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. Food & Drug Administration (April 10, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults

[644] Gerdinique C. Maessen et al., *Nicotine Intoxication by E-cigarette Liquids: A Study of Case Reports, Pathophysiology*, 58 Clinical Toxicology 1 (2020), https://www.tandfonline.com/doi/full/10.1080/15563650.2019.1636994.

[645] Lucinda L. Miner et al., *The Effect of Chronic Nicotine Treatment on Nicotine-induced Seizures,* 95 Psychopharmacology 52 (2018), https://doi.org/10.1007/BF00212766.

[646] Jessica D. Wharton et al. *Increased Seizure Frequency Temporally Related to Vaping: Where There's Vapor, There's Seizures?* 104 Pediatric Neurology 66 (2020).

designed to deliver higher concentrations of nicotine per puff as compared to cigarettes, creating the risk for addiction as well as the risk of seizure due to potentially toxic levels of nicotine exposure.

548.    JLI never warned the public or consumers of the risk of seizures associated with the use of e-cigarettes including JUUL.

### 4.    Animal Studies Demonstrate Carcinogenic Potential of JUUL

549.    Several studies conducted on animals show a significant likelihood that JUUL could cause cancer for users.

550.    In 2017, a report by Donatella Canistro and others found that e-cigarettes induce toxicological effects that can raise the risk of cancer.[647] Similarly, a 2018 study measured the DNA damage induced by nitrosamines in the organs (lung, bladder, and heart) of mice subjected to e-cigarette vapor and concluded that e-cigarette vapor induces DNA damage in all three organs and reduces DNA-repair functions and proteins in mouse lungs. They further found that nicotine-derived nitrosamine ketone can induce the same effects and enhance mutational susceptibility and tumorigenic transformation of cultured human bronchial epithelial and urothelial cells (leading them to believe that vaping could contribute to heart disease and lung and bladder cancer in humans).[648] And in 2019, a report by Moon-shong Tang and others found that exposure to e-cigarette vapor, induced lung adenocarcinoma and bladder urothelial hyperplasia in mice.[649]

551.    There is a likely association between e-cigarettes, including JUUL, and cancer. Long term epidemiological studies will likely reveal an increased risk of cancer among this generation of youth who were unwitting targets of JLI in complete and utter reckless disregard for their safety.

---

[647] Donatella Canistro et al., *E-cigarettes Induce Toxicological Effects That Can Raise the Cancer Risk*, 7 Scientific Reports 1 (2017).

[648] Hyun-Wook Lee et al., *E-cigarette Smoke Damages DNA and Reduces Repair Activity in Mouse Heart, Lung, and Bladder as well as in Human Lung and Bladder Cells*, 115 PNAS E1560 (2018).

[649] Moon-shong Tang, et al., *Electronic-cigarette Smoke Induces Lung Adenocarcinoma and Bladder Urothelial Hyperplasia in Mice*, 116 PNAS 21727 (2019).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

## V.      INTERSTATE AND INTRASTATE COMMERCE

552.    Defendants' conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

553.    At all material times, Defendants participated in the manufacture, marketing, promotion, distribution, and sale substantial amounts of JUUL products in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States

554.    Defendants' conduct also had substantial intrastate effects in that, among other things, JUUL products were advertised and sold in each state and the District of Columbia. At least thousands of individuals in each state and the District of Columbia were impacted by Defendants' fraudulent, deceptive, and unfair conduct. As alleged below, absent Defendants' unlawful conduct, Plaintiffs and class members within each state and the District of Columbia would not have purchased JUUL products or would have paid less for them.

## VI.     CLASS ACTION ALLEGATIONS

555.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of classes defined as follows:

### A.      Nationwide Class

556.    The Nationwide Class is defined as:

> All persons who purchased, in the United States, a JUUL e-cigarette and/or JUUL pods.

### B.      State Classes and Subclasses

557.    As an alternative or in addition to the Nationwide Class, Plaintiffs allege a separate class for each State and the District of Columbia based upon the applicable laws set forth in the alternate state law counts. Each class is defined as follows for the claims asserted under a particular jurisdiction's law:

558.    The Alabama Subclass is defined as:

> All persons who purchased, in Alabama, a JUUL e-cigarette and/or JUUL pods.

559.    The Alabama Direct Purchaser Subclass is defined as:

All persons who purchased, in Alabama, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

560.    The Alaska Subclass is defined as:

All persons who purchased, in Alaska, a JUUL e-cigarette and/or JUUL pods.

561.    The Arizona Subclass is defined as:

All persons who purchased, in Arizona, a JUUL e-cigarette and/or JUUL pods.

562.    The Arkansas Subclass is defined as:

All persons who purchased, in Akansas, a JUUL e-cigarette and/or JUUL pods.

563.    The California Subclass is defined as:

All persons who purchased, in California, a JUUL e-cigarette and/or JUUL pods.

564.    The Colorado Subclass is defined as:

All persons who purchased, in Colorado, a JUUL e-cigarette and/or JUUL pods.

565.    The Connecticut Subclass is defined as:

All persons who purchased, in Connecticut, a JUUL e-cigarette and/or JUUL pods.

566.    The Delaware Subclass is defined as:

All persons who purchased, in Delaware, a JUUL e-cigarette and/or JUUL pods.

567.    The District of Columbia Subclass is defined as:

All persons who purchased, in District of Columbia, a JUUL e-cigarette and/or JUUL pods.

568.    The Florida Subclass is defined as:

All persons who purchased, in Florida, a JUUL e-cigarette and/or JUUL pods.

569.    The Georgia Subclass is defined as:

All persons who purchased, in Georgia, a JUUL e-cigarette and/or JUUL pods.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

570.   The Georgia Direct Purchaser Subclass is defined as:

All persons who purchased, in Georgia, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

571.   The Hawaii Subclass is defined as:

All persons who purchased, in Hawaii, a JUUL e-cigarette and/or JUUL pods.

572.   The Idaho Subclass is defined as:

All persons who purchased, in Idaho, a JUUL e-cigarette and/or JUUL pods.

573.   The Illinois Subclass is defined as:

All persons who purchased, in Illinois, a JUUL e-cigarette and/or JUUL pods.

574.   The Illinois Direct Purchaser Subclass is defined as:

All persons who purchased, in Illinois, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

575.   The Indiana Subclass is defined as:

All persons who purchased, in Indiana, a JUUL e-cigarette and/or JUUL pods.

576.   The Iowa Subclass is defined as:

All persons who purchased, in Iowa, a JUUL e-cigarette and/or JUUL pods.

577.   The Kansas Subclass is defined as:

All persons who purchased, in Kansas, a JUUL e-cigarette and/or JUUL pods.

578.   The Kentucky Subclass is defined as:

All persons who purchased, in Kentucky, a JUUL e-cigarette and/or JUUL pods.

579.   The Kentucky Direct Purchaser Subclass is defined as:

All persons who purchased, in Kentucky, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

580.   The Louisiana Subclass is defined as:

1

2

All persons who purchased, in Louisiana, a JUUL e-cigarette and/or JUUL pods.

581.   The Maine Subclass is defined as:

All persons who purchased, in Maine, a JUUL e-cigarette and/or JUUL pods.

582.   The Maryland Subclass is defined as:

All persons who purchased, in Maryland, a JUUL e-cigarette and/or JUUL pods.

583.   The Massachusetts Subclass is defined as:

All persons who purchased, in Massachusetts, a JUUL e-cigarette and/or JUUL pods.

584.   The Michigan Subclass is defined as:

All persons who purchased, in Michigan, a JUUL e-cigarette and/or JUUL pods.

585.   The Minnesota Subclass is defined as:

All persons who purchased, in Minnesota, a JUUL e-cigarette and/or JUUL pods.

586.   The Mississippi Subclass is defined as:

All persons who purchased, in Mississippi, a JUUL e-cigarette and/or JUUL pods

587.   The Missouri Subclass is defined as:

All persons who purchased, in Missouri, a JUUL e-cigarette and/or JUUL pods.

588.   The Montana Subclass is defined as:

All persons who purchased, in Montana, a JUUL e-cigarette and/or JUUL pods.

589.   The Nebraska Subclass is defined as:

All persons who purchased, in Nebraska, a JUUL e-cigarette and/or JUUL pods.

590.   The Nevada Subclass is defined as:

All persons who purchased, in Nevada, a JUUL e-cigarette and/or JUUL pods.

591.    The New Hampshire Subclass is defined as:

All persons who purchased, in New Hampshire, a JUUL e-cigarette and/or JUUL pods.

592.    The New Jersey Subclass is defined as:

All persons who purchased, in New Jersey, a JUUL e-cigarette and/or JUUL pods.

593.    The New Mexico Subclass is defined as:

All persons who purchased, in New Mexico, a JUUL e-cigarette and/or JUUL pods.

594.    The New York Subclass is defined as:

All persons who purchased, in New York, a JUUL e-cigarette and/or JUUL pods.

595.    The New York Direct Purchaser Subclass is defined as:

All persons who purchased, in New York, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

596.    The North Carolina Subclass is defined as:

All persons who purchased, in North Carolina, a JUUL e-cigarette and/or JUUL pods.

597.    The North Dakota Subclass is defined as:

All persons who purchased, in North Dakota, a JUUL e-cigarette and/or JUUL pods.

598.    The Ohio Subclass is defined as:

All persons who purchased, in Ohio, a JUUL e-cigarette and/or JUUL pods.

599.    The Ohio Direct Purchaser Subclass is defined as:

All persons who purchased, in Ohio, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

600.    The Oklahoma Subclass is defined as:

All persons who purchased, in Oklahoma, a JUUL e-cigarette and/or JUUL pods.

601.    The Oregon Subclass is defined as:

All persons who purchased, in Oregon, a JUUL e-cigarette and/or JUUL pods.

602.   The Oregon Direct Purchaser Subclass is defined as:

All persons who purchased, in Oregon, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

603.   The Pennsylvania Subclass is defined as:

All persons who purchased, in Pennsylvania, a JUUL e-cigarette and/or JUUL pods.

604.   The Rhode Island Subclass is defined as:

All persons who purchased, in Rhode Island, a JUUL e-cigarette and/or JUUL pods.

605.   The South Carolina Subclass is defined as:

All persons who purchased, in South Carolina, a JUUL e-cigarette and/or JUUL pods.

606.   The South Dakota Subclass is defined as:

All persons who purchased, in South Dakota, a JUUL e-cigarette and/or JUUL pods.

607.   The Tennessee Subclass is defined as:

All persons who purchased, in Tennessee, a JUUL e-cigarette and/or JUUL pods.

608.   The Tennessee Direct Purchaser Subclass is defined as:

All persons who purchased, in Tennessee, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

609.   The Texas Subclass is defined as:

All persons who purchased, in Texas, a JUUL e-cigarette and/or JUUL pods.

610.   The Utah Subclass is defined as:

All persons who purchased, in Utah, a JUUL e-cigarette and/or JUUL pods.

611.   The Vermont Subclass is defined as:

All persons who purchased, in Veront, a JUUL e-cigarette and/or JUUL pods.

612.    The Vermont Direct Purchaser Subclass is defined as:

All persons who purchased, in Vermont, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

613.    The Virginia Subclass is defined as:

All persons who purchased, in Virginia, a JUUL e-cigarette and/or JUUL pods.

614.    The Washington Subclass is defined as:

All persons who purchased, in Washington, a JUUL e-cigarette and/or JUUL pods.

615.    The Washington Direct Purchaser Subclass is defined as:

All persons who purchased, in Washington, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

616.    The West Virginia Subclass is defined as:

All persons who purchased, in West Virginia, a JUUL e-cigarette and/or JUUL pods.

617.    The Wisconsin Subclass is defined as:

All persons who purchased, in Wisconsin, a JUUL e-cigarette and/or JUUL pods.

618.    The Wisconsin Direct Purchaser Subclass is defined as:

All persons who purchased, in Wisconsin, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

619.    The Wyoming Subclass is defined as:

All persons who purchased, in Wyoming, a JUUL e-cigarette and/or JUUL pods.

## C.    Class Exclusions

620.    The following persons and entities are excluded from the proposed classes: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

1

### D.     Rule 23 Prerequisites

2      621.    Each of the proposed classes meets the requirements of Federal Rules of Civil

3    Procedure 23(a), (b)(2), (b)(3) and/or (c)(4).

4      622.    The members of each class are so numerous that joinder is impracticable. Each

5    class includes at least thousands of members. Members of the classes are widely dispersed

6    throughout the country and/or each respective state.

7      623.    Plaintiffs' claims are typical of the claims of all class members. Plaintiffs' claims

8    arise out of the same common course of conduct that gives rise to the claims of the other class

9    members. Plaintiffs and all class members were and will continue to be damaged by the same

10   wrongful conduct—*i.e.*, Defendants' scheme to engage in fraudulent and unfair business

11   practices regarding the marketing and sale of JUUL products, including the marketing of such

12   products to minors.

13     624.    Plaintiffs will fairly and adequately protect and represent the interests of the

14   classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the classes.

15     625.    Plaintiffs are represented by counsel who are experienced and competent in the

16   prosecution of class action litigation and have particular expertise with consumer class actions

17   and cases in the tobacco industry.

18     626.    Questions of law and fact common to the classes include:

19         a.    Whether the advertising for JUUL products was misleading,
               fraudulent, deceptive, unfair and/or unconscionable;

20

21         b.    Whether the targeting of minors in the marketing and sale of JUUL
               products was unfair and/or unconscionable;

22

23         c.    Whether Defendants have been unjustly enriched through the false,
               misleading and deceptive advertising of JUUL products and the
               marketing and sale of JUUL products to minors;

24

25         d.    Whether JUUL products were merchantable condition when sold,
               were defective when sold, and possessed the most basic degree of
               fitness for ordinary use;

26

27         e.    Whether Defendants' conduct violated the Magnuson-Moss
               Warranty Act, 15 U.S.C. §§ 2301, *et seq.*;

28

f.      Whether Defendants' conducted an enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*.;

g.      The amount of damages owed the classes;

h.      The appropriate measure of disgorgement; and

i.      The type and format of injunctive relief.

627.    Questions of law and fact common to members of each class will predominate over any questions that may affect only individual class members because Defendants have acted on grounds generally applicable to members of the classes.

628.    Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

629.    Class treatment is also manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this.

630.    Plaintiffs reserve the right to seek to certify common questions related to Defendants' knowledge, conduct, products, and duties.

## VII.    CAUSES OF ACTION

### A.      Causes of Action Brought on Behalf of the Nationwide Class and the California Subclass

631.    Plaintiffs bring each of the claims in this Section on behalf of the Nationwide Class and, in the alternative, on behalf of the California Class.

#### 1.      Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)

632.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

633.    This claim is brought against JLI and, for certain claims as noted below, all Defendants.

634.    JLI is a "person" under Cal. Bus. & Prof. Code § 17201.

635.    Plaintiffs and class members purchased JUUL products for personal purposes.

636.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

637.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

638.    Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

639.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

640.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

cigarettes, and other representations.

641.    JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

642.    JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

643.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter aßs the omitted facts.

644.    As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and

1   omissions.

2       645.   JLI's conduct was also unlawful in that it violated the following statutes:

3   Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*; the Magnuson-

4   Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*; Cal. Bus. & Prof. Code § 22963(a); and Cal.

5   Penal Code § 308(a)(1)(A).

6       646.   JLI and the Management Defendants engaged in fraudulent and deceptive

7   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

8   products were appropriate for minors, when in fact the products never should have been

9   marketed to minors and are especially harmful to minors due to the potent and addictive

10  nicotine doses, addictive qualities, and health risks.

11      647.   All Defendants engaged in conduct that is unfair and unconscionable because the

12  targeting of minors offends public policy (in particular Cal. Bus. & Prof. Code § 22963(a) and

13  Cal. Penal Code § 308(a)(1)(A)) is immoral, unethical, oppressive, outrageous, unscrupulous,

14  and substantially injurious; and has caused substantial harm that greatly outweighs any possible

15  utility from the conduct.

16      648.   As alleged above, all Defendants participated and/or facilitated the marketing of

17  JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

18  and others have continued the deceptive, misleading, unfair, and unconscionable practices that

19  Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

20  use of JUUL products by minors continues to rise.

21      649.   Defendants' conduct actually and proximately caused Plaintiffs and class

22  members to lose money or property. Absent Defendants' unfair and fraudulent conduct,

23  Plaintiffs and class members would have behaved differently and would not have purchased

24  JUUL products or would have paid less for them. Defendants' misrepresentations and omissions

25  induced Plaintiffs and class members to purchase JUUL products they would not otherwise have

26  purchased and enter into purchase contracts they would not otherwise have entered into. In

27  addition, class members who are minors are entitled to full repayment of the amounts they spent

28  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

1    restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court

2    may deem just or proper.

3            **2.    Violation of the California Consumer Legal Remedies Act (Cal. Civ.**

4                    **Code § 1750, *et seq*.)**

5    650.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

6    651.    This claim is brought against JLI.

7    652.    JLI is a "person" under Cal. Civ. Code § 1761.

8    653.    Plaintiffs and class members are "consumers" under Cal. Civ. Code § 1761 and

9    purchased JUUL products for personal purposes.

10   654.    JUUL products are "goods" under Cal. Civ. Code § 1761.

11   655.    Defendants created and implemented a scheme to create a market for e-cigarettes

12   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

13   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

14   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

15   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

16   addictiveness, and significant risks of substantial physical injury from using JUUL products.

17   656.    Advertisements and representations for JUUL products contained deceptive

18   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

19   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

20   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

21   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

22   decades, JLI used third parties and word of mouth to spread false and misleading information

23   about JUUL products and word of mouth to spread false and misleading information about

24   JUUL products.

25   657.    Advertisements and representations for JUUL products concealed and failed to

26   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

27   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

28   addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

658.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

659.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

660.    JLI's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

661.    JLI's conduct was likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

662.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

1    facts; because the facts would be material to reasonable consumers; because JLI actively

2    concealed them; because JLI intended for consumers to rely on the omissions in question;

3    because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

4    made partial representations concerning the same subject matter as the omitted facts.

5        663.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

6    purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.

7    Reasonable consumers would have been expected to have relied on the misrepresentations and

8    omissions.

9        664.   Defendants' conduct actually and proximately caused actual damages to

10   Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

11   class members would have behaved differently and would not have purchased JUUL products

12   or would have paid less for them. Defendants' misrepresentations and omissions induced

13   Plaintiffs and class members to purchase JUUL products they would not otherwise have

14   purchased and enter into purchase contracts they would not otherwise have entered into. In

15   addition, class members who are minors are entitled to full repayment of the amounts they spent

16   on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

17   actual damages, punitive damages, injunctive relief, reasonable attorneys' fees, and restitution,

18   as well as any other relief the Court may deem just or proper.

19       665.   Plaintiffs have complied or substantially complied with all applicable notice

20   requirements.

21       **3.      Violation of the California False Advertising Law (Cal. Bus. & Prof.**

22   **Code § 17500, *et seq*.)**

23       666.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

24       667.   This claim is brought against JLI.

25       668.   JUUL intended to directly and indirectly sell JUUL products.  JUUL induced

26   consumers to buy JUUL products and made and disseminated, and caused to be made and

27   disseminated, from California misrepresentations and omissions that were untrue and

28   misleading.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

669.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

670.    The misrepresentations and omissions were likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

671.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

672.    As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

673.    JUUL's conduct actually and proximately caused loss of money or property by Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase

1   contracts they would not otherwise have entered into. In addition, class members who are

2   minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs

3   seek—on behalf of themselves and each member of the class—restitution and injunctive relief,

4   as well as any other relief the Court may deem just or proper.

5            **4.**     **Common Law Fraud**

6   674.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

7   675.    This claim is brought against JLI.

8   676.    JUUL created and implemented a scheme to create a market for e-cigarettes and

9   substantially increase sales of JUUL through a pervasive pattern of false and misleading

10  statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

11  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

12  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

13  addictiveness, and significant risks of substantial physical injury from using JUUL products.

14  677.    Advertisements and representations for JUUL products contained deceptive

15  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

16  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

17  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

18  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

19  decades, JLI used third parties and word of mouth to spread false and misleading information

20  about JUUL products.

21  678.    Advertisements and representations for JUUL products concealed and failed to

22  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

23  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

24  addictive, posed significant risks of substantial physical injury resulting from the use of the

25  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

26  consumed through a pack of combustible cigarettes.

27  679.    The labels on JUUL products failed to disclose that the products posed

28  significant risks of substantial physical injury resulting from the use of the products. The labels

1    also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2        680.    The omissions were misleading and deceptive standing alone and were

3    particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

4    cigarettes and other representations.

5        681.    JLI's conduct was fraudulent and deceptive because its misrepresentations and

6    omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

7    including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

8    material to their purchasing decisions that JUUL's products (i) were not smoking cessation

9    devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

10   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

11   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

12   consumed through one JUUL pod exceeded the nicotine consumed through a pack of

13   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

14   Plaintiffs' and class members' decisions to purchase JUUL products.

15       682.    JLI owed Plaintiffs and class members a duty to disclose these facts because they

16   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

17   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

18   facts; because the facts would be material to reasonable consumers; because JUUL products

19   pose an unreasonable risk of substantial bodily injury; and because JLI made partial

20   representations concerning the same subject matter as the omitted facts.

21       683.    As set forth in the allegations concerning each Plaintiff in Appendix A, in

22   purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

23   and/or omissions.  Reasonable consumers would have been expected to have relied on the

24   misrepresentations and omissions.

25       684.    Defendants knew or should have known that their misrepresentations and/or

26   omissions were false and misleading, and intended for consumers to rely on such

27   misrepresentations and omissions.

28       685.    JUUL's conduct actually and proximately caused damages to Plaintiffs and class

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  members.  Absent JUUL's conduct, Plaintiffs and class members would have behaved
2  differently and would not have purchased JUUL products or would have paid less for them.
3  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase
4  JUUL products they would not otherwise have purchased and enter into purchase contracts they
5  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each
6  member of the class damages in an amount to be proven at trial, as well as any other relief the
7  Court may deem just or proper.

8          **5.     Breach of the Implied Warranty of Merchantability**

9  686.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10  687.    This claim is brought against JLI.

11  688.    JLI has at all times been a merchant with respect to the products which were sold
12  to Plaintiff and the class and was in the business of selling such products.

13  689.    Each JUUL product sold comes with an implied warranty that it will
14  merchantable and fit for the ordinary purpose for which it would be used.  Cal Comm. Code
15  § 2314.  JLI has breached its implied warranty of merchantability because its products were not
16  in merchantable condition when sold, were defective when sold, did not conform to the
17  promises and affirmations of fact made on the products' containers or labels, and/or do not
18  possess even the most basic degree of fitness for ordinary use.

19  690.    The ordinary intended purpose of JUUL products—and the purpose for which
20  they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's
21  products are not fit for that use—or any other use—because they (i) were not smoking cessation
22  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
23  potent nicotine-delivery mechanisms, (iv) were powerfully .addictive, and (v) posed
24  unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's
25  products are not fit for their ordinary, intended use as either cigarette replacement devices or
26  recreation smoking devices.

27  691.    Plaintiffs and each member of the class have had sufficient direct dealings with
28  either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

692.    Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

693.    Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

694.    JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### 6.    Unjust Enrichment

695.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

696.    This claim is brought against JLI and the Management Defendants.

697.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

698.    Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Cal. Bus. & Prof. Code § 22963(a) prohibits the marketing and sale of JUUL products to minors, and Cal. Penal Code § 308(a)(1)(A) makes doing so a criminal violation.

699.    Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

700.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

701.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

702.    Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

703.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

**B.    Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(c))**

704.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

705.    This claim is brought by Plaintiffs against Defendants JLI, Monsees, Bowen, Pritzker, Huh, Valani, and Altria (the "RICO Defendants") for actual damages, treble damages,

and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961, et seq. For ease of reference, Defendants JLI, Monsees, Bowen, Pritzker, Huh, and Valani are referred to below as the "Early Enterprise Defendants."

706.    At all relevant times, each RICO Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

707.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were and are injured in their business and/or property as a result of the RICO Defendants' wrongful conduct described herein.

708.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

709.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

710.    Each RICO Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

711.    Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

### 1.    Description of the Nicotine Market Expansion Enterprise

712.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

713.    Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

714.    The RICO Defendants formed an association-in-fact enterprise—the Nicotine Market Expansion Enterprise. The Nicotine Market Expansion Enterprise exists separately from

the otherwise legitimate business operations of JLI, Altria, or the investment companies with which Defendants Pritzker, Huh, and Valani are affiliated. Rather, the Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a more nefarious common purpose: maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market.

715.   The Early Enterprise Defendants and non-defendant Veratad Technologies LLC ("Veratad") formed the Nicotine Market Expansion Enterprise by at least 2015, when the Early Enterprise Defendants prepared to launch the JUUL e-cigarette and capture and grow a market of nicotine-addicted users that would serve as customers for life.

716.   As tobacco companies have long known, profitable growth requires a pipeline of "replacement smokers" or vapers. For that reason and others, Defendant Altria joined the Nicotine Market Expansion Enterprise in the Spring of 2017. The Early Enterprise Defendants, for their part, eagerly invited Altria into the fold—they needed allies and resources to further their Enterprise, and, despite their public statements to the contrary, sought to be a part of the tobacco industry.

717.   When Altria joined the Nicotine Market Expansion Enterprise, it shared the Early Enterprise Defendants' common purpose: maintaining and expanding the number of nicotine-addicted e-vapor users in order to ensure a steady and growing customer base. Among Altria's motivations for pursuing this common purpose was access to JLI's customer base that would serve as Altria's pipeline of "replacement smokers" or vapers.

718.   The Nicotine Market Expansion Enterprise involved a growing membership and changed its shape to fit its current needs, adding members when necessary and eliminating them when they became obsolete. From 2015 through 2017, the Enterprise consisted of the Early Enterprise Defendants and non-defendant Veratad. In the Spring of 2017, Defendant Altria joined the Nicotine Market Expansion Enterprise. Non-defendant member Veratad would leave the Enterprise sometime in 2018 when it stopped coordinating with Defendant JLI. Each Early

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Enterprise Defendant is liable for the predicate acts of the enterprise committed no later than its formation in 2015, and Defendant Altria is liable for the predicate acts of the enterprise committed no later than when it joined the Enterprise in Spring 2017.

719.     As described above, the Early Enterprise Defendants established an ongoing relationship through, among other connections, Defendants' Priztker, Huh, and Valani's investment in JLI; Defendants' Bowen, Monsees, Pritzker, Huh, and Valani's control of the JLI Board of Directors; the Early Enterprise Defendants' assumption of "final say" on all marketing for JLI products, including fraudulent advertising; and the Early Enterprise Defendants' coordination on ensuring broad access to JLI products, including underage access, with non-defendant Enterprise member Veratad. And the Early Enterprise Defendants and Altria established an ongoing relationship through, among other connections, Altria's equity investment in JLI, the many informal and formal agreements between these two Defendants and their coordinated activities in furtherance of the common purpose of the Nicotine Market Expansion Enterprise, and the overlap between JLI executives and leadership and Altria.

720.     The RICO Defendants formed the Nicotine Market Expansion Enterprise in order to engage in a collaborative scheme to defraud. As described above, the Nicotine Market Expansion Enterprise Defendants shared and acted on a common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market.

721.     The Nicotine Market Expansion Enterprise has been in existence for almost five years and continues to operate to this day. As described above, it has had sufficient longevity to pursue the Nicotine Market Expansion Enterprise's common purpose.

### 2.     Conduct of the Nicotine Market Expansion Enterprise

722.     "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

723.     As described above, each RICO Defendant participated in the operation or

management of the Nicotine Market Expansion Enterprise. Illustrative but non-exhaustive examples include the following:

**Early Leadership**

724.   As described in Sections IV.A, IV.B, and IV.C, Defendants Bowen and Monsees were the visionaries behind the Enterprise and would lead it in its early days.

**Fraudulent Marketing Scheme**

725.   As described in Sections IV.E.3, IV.E.4, and IV.E.7.a, JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani (through their "final say" on all of JLI's marketing efforts) caused false and misleading advertisements that omitted references to JUUL's nicotine content and potency to be transmitted via the mail and wires, including the Vaporized campaign.

**Youth Access Scheme**

726.   As described in Section IV.E.9, Defendant JLI (through its employees) coordinated with non-defendant member Veratad on behalf of the other Early Enterprise Defendants to expand youth access to JUUL products.

727.   As reflected in Section IV.E.9, Veratad was a key player in the Nicotine Market Expansion Enterprise. And while each member of the Enterprise was not involved in every scheme (Veratad, for example, did not transmit the advertisements or packaging containing misrepresentations regarding JLI's nicotine content), each worked in furtherance of the same common purpose and was aware of the other members' participation in the Enterprise. Moreover, each scheme was integral to the Enterprise's success in maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Veratad shared this common purpose, and its motivation for doing so was to maintain a lucrative client – one of several clients who relied on Veratad for intentionally ineffective age verification services.

**Coopting JLI's Board of Directors**

728.   As described in Section IV.E.7.b, Defendants Pritzker, Huh, and Valani took control of the JLI Board of Directors in October 2015, so they could use the Board as an

1    instrumentality to effectuate fraudulent schemes in furtherance of the Nicotine Market

2    Expansion Enterprise's common purpose. In doing so, leadership of the Enterprise transitioned

3    from Bowen and Monsees to Pritzker, Huh, and Valani.

4                    **Coordinating Activities of JLI and Altria**

5           729.    By August 2016, Defendants Pritzker, Huh, and Valani had ceded executive

6    leadership at JLI to a new CEO, Tyler Goldman. Thus, when these parties started to coordinate

7    with Altria, it was JLI (through its executives and employees – including Tyler Goldman and

8    his successors) and Altria (through its executives and employees) that primarily directed the

9    affairs of the Enterprise, although Defendants Bowen, Monsees, Pritzker, Huh, and Valani

10   remained critical to the success of the Enterprise's common purpose. Without their control of

11   the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI and

12   Altria, and Altria's investment in JLI, would not have been possible.

13          730.    As described in Sections IV.A and IV.F, the Early Enterprise Defendants and

14   Altria began to actively coordinate their activities in 2017 and each took actions that would

15   further the Enterprise's common purpose of maintaining and expanding the number of nicotine-

16   addicted e-cigarette users in order to ensure a steady and growing customer base, including by

17   maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market. For

18   example:

19          731.    As early as 2017, the Early Enterprise Defendants and Altria shared data and

20   strategy to support their common purpose, through a conduit, Avail Vapor.

21          732.    By 2018, Altria was taking actions to ensure JLI's products had access to prime

22   shelf space in retail locations.

23          733.    By 2018, Altria was distributing and marketing JLI's products to its wider base

24   of retailers.

25          734.    In December 2018, Altria decided to cash in on its role in the Nicotine Market

26   Expansion Enterprise by making a $12.8 billion equity investment in JLI, the largest equity

27   investment in United States history. This investment would give Altria three seats on the JLI

28   Board of Directors, and thus allow it to assert greater control over both JLI and the Nicotine

Market Expansion Enterprise, which used the instrumentalities of JLI to effectuate many of its fraudulent schemes.

### Nicotine Content Misrepresentation Scheme

735.    As described in Section IV.D, the Early Enterprise Defendants and Altria caused thousands, if not millions, of JUULpod packages to be distributed to consumers with false and misleading information regarding the JUUL pods' nicotine content. The Early Enterprise Defendants also caused the same false and misleading information to be distributed via JLI's website.

### Flavor Preservation Scheme

736.    As described in Sections IV.C.6 and IV.H.2, the RICO Defendants worked in concert to defraud the public and regulators in order to prevent regulation that would have impeded their plan to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Specifically, they worked to ensure the FDA allowed certain flavors, namely mint, to remain on the market.

### Cover-up Scheme

737.    The RICO Defendants were not only concerned with protecting flavors, however. In light of growing public scrutiny of JLI's role in the youth vaping crisis, these defendants continued their scheme to prevent a complete ban on JLI's product.

738.    As described in Sections IV.D.2 and IV.E.12, JLI maintained its website pages that provided false information about the addictive potential of its products and that denied that JLI marketed to youth, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani provided direct input as to the content of the JLI website and had "final say" over JLI's marketing messaging.

739.    As described in paragraphs Sections IV.D.4 and IV.E.12, JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani (through their "final say" on all of JLI's marketing efforts) caused false and misleading advertising to be distributed over television and the internet in order to give the impression that JLI's product was a smoking cessation device and that JLI never marketed to youth. Defendant Altria continued this scheme by transmitting the fraudulent

1  "Make the Switch" advertisements in packs of its combustible cigarettes.

2      740.   As described in Section IV.E.12, beginning in October 2018, both Altria and JLI

3  were transmitting false and misleading communications to the public and the government in an

4  attempt to stave off regulation.

5      741.   And no later than December 2018, Altria began providing even more services to

6  the Nicotine Market Expansion Enterprise, as described in Section IV.F.3.

7      742.   The pattern of racketeering activity by the RICO Defendants, described below,

8  provides further support that each RICO Defendant conducted or participated in the conduct of

9  the Nicotine Market Expansion Enterprise.

10          **3.      Pattern of Racketeering Activity**

11     743.   To carry out, or attempt to carry out, the objectives of the Nicotine Market

12  Expansion Enterprise, the RICO Defendants, each of whom is a person associated-in-fact with

13  the Enterprise, did knowingly conduct or participate in, directly or indirectly, the affairs of the

14  Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C.

15  §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in

16  violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

17     744.   Specifically, the RICO Defendants have committed, conspired to commit, and/or

18  aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e.,

19  violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

20     745.   The multiple acts of racketeering activity which the RICO Defendants

21  committed, or aided or abetted in the commission of, were related to each other, pose a threat of

22  continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

23     746.   The racketeering activity was made possible by the Enterprise's regular use of

24  the facilities, services, and employees of the members of the Enterprise.

25     747.   The RICO Defendants participated in the Nicotine Market Expansion Enterprise

26  by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign

27  commerce.

28     748.   The RICO Defendants used, directed the use of, and/or caused to be used,

CONSOLIDATED CLASS ACTION COMPLAINT
                                                       Case No. 19-md-02913-WHO

thousands of interstate mail and wire communications in service of the Enterprise's objectives through common misrepresentations, concealments, and material omissions.

749.    In devising and executing the objectives of the Nicotine Market Expansion Enterprise, the RICO Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public and regulators by (1) transmitting advertisements that fraudulently and deceptively omitted any reference to JUUL's nicotine content or potency (or any meaningful reference, where one was made); (2) causing false and misleading statements regarding the nicotine content of JUUL pods to be posted on the JLI website; (3) causing thousands, if not millions, of JUUL pod packages containing false and misleading statements regarding the nicotine content of JUUL pods to be transmitted via U.S. mail; (4) representing to consumers and the public-at-large that JUUL was created and designed as a smoking cessation device, and by misrepresenting the nicotine content and addictive potential of its products; (5) making fraudulent statements to the FDA to convince the FDA to allow certain flavors, namely mint, to remain on the market; and (6) making fraudulent statements to the public (including through advertising), the FDA, and Congress to stave off a total prohibition on JUUL cigarettes that was being contemplated in light of JLI's role in the youth vaping epidemic.

750.    For the purpose of furthering the Enterprise's common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by preserving and increasing JLI's market share, even at the expense of exposing and addicting children to nicotine, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the Enterprise's objectives.

751.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

> A. Mail Fraud: the Nicotine Market Expansion Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, fraudulent materials via U.S. mail or commercial interstate carriers for the purpose of deceiving the public, regulators, and Congress.
>
> B. Wire Fraud: The Nicotine Market Expansion Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted

and/or received, fraudulent materials by wire for the purpose of deceiving the public, regulators, and Congress.

752.   The Nicotine Market Expansion Enterprise falsely and misleadingly used the mails and wires in violation of 18 U.S.C. § 1341 and § 1343. Illustrative and non-exhaustive examples include the following:

| From | To | Date | Description |
|---|---|---|---|
| **Fraudulent Statements Omitting Reference to JUUL's Nicotine Content (see Sections IV.E.3, IV.E.4, and IV.E.7.a )** | | | |
| All Early Enterprise Defendants | Public (via television, internet, and mail) | 2015 | "Vaporized" Campaign, and other Advertising campaigns transmitted via the mails and wires which omitted any reference to JUUL's nicotine content. |
| **Fraudulent Statements that JUUL is a Cessation Device (see Section IV.D.4)** | | | |
| All Early Enterprise Defendants | Public (via internet – JLI Website) | April 25, 2018 (or earlier) to Present | "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." |
| Kevin Burns (former JLI CEO) | Public (via internet – JLI Website) | November 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." |
| All Early Enterprise Defendants | Public (via internet – JLI Website) | September 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." |

| Howard Willard (Altria CEO) | Public (via internet – Altria website) | December 20, 2018 | "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." |
|---|---|---|---|
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." |
| *Fraudulent Statements Regarding Nicotine Content in JUUL pods (see Section IV.D)* | | | |
| All Early Enterprise Defendants | Public (via internet – JLI website) | July 2, 2019 (or earlier) to Present | "Each 5% JUUL pod is roughly equivalent to one pack of cigarettes in nicotine delivery." |
| All Early Enterprise Defendants | Public (via internet – JLI website) | April 21, 2017 | "JUUL pod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." |
| All RICO Defendants | Public (via U.S. mail distribution of JUUL pod packaging) | 2015 to Present | JUUL pod packages (1) claiming a 5% nicotine strength; (2) stating that a JUUL pod is "approximately equivalent to about 1 pack of cigarettes." |
| *Fraudulent Statements to Prevent Regulation of mint Flavor (see Sections IV.C.6 and IV.H.2)* | | | |
| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)  November 12, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |

| Howard Willard (Altria CEO) | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
|---|---|---|---|
| JLI | FDA (via U.S. mail or electronic transmission) | November 5, 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. |
| **Fraudulent Statements to Prevent Ban on JUUL Products (see Section IV.E.12)** | | | |
| All Early Enterprise Defendants | Public (via Television) | January 2019 | $10 million "Make the Switch" advertising campaign for the purpose of deceiving the public and regulators that JLI was only targeting adult smokers with its advertising and product and that JUUL was a cessation product. |
| Altria | Public (via inserts in combustible cigarette packs) | December 2018 - Present | "Make the Switch" advertising campaign for the purpose of deceiving smokers that JUUL was a cessation product. |
| Ashely Gould, JLI Chief Administrative Officer | Public (via interview with CNBC, later posted on internet) | December 14, 2017 | "It's a really, really important issue. We don't want kids using our products." |
| JLI | Public (via internet - social media) | March 14, 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." |

| Kevin Burns (then-CEO of JLI) | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | JLI's Action Plan that fraudulently states: "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . Our intent was never to have youth use JUUL products." |
|---|---|---|---|
| Kevin Burns | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." |
| All Early Enterprise Defendants | Public (via internet - JLI website) | August 29, 2019 | "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." |
| James Monsees | Public (via statement to New York Times – later posted on internet) | August 27, 2019 | Monsees said selling JUUL products to youth was "antithetical to the company's mission." |
| JLI | Public (via statement to Los Angeles Times – later posted on internet) | September 24, 2019 | "We have never marketed to youth and we never will." |

| JLI (via counsel) | FDA (via U.S. mail or electronic transmission to Dr. Matthew Holman) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." and "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." |
| James Monsees | Congress (via U.S. mail or electronic transmission of written testimony) | July 25, 2019 | Written Testimony of J. Monsees provided to Congress, stating "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage use." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." |
| Howard Willard | Congress (via U.S. mail or electronic transmission of letter to Senator Durbin) | October 14, 2019 | "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." |

753.   The mail and wire transmissions described herein were made in furtherance of

the RICO Defendants' schemes and common course of conduct, thereby increasing or maintaining JLI's market share, resulting in corresponding high profits for each RICO Defendant.

754. As described above, the Nicotine Market Expansion Enterprise had a scheme to defraud the public and regulators in order to continue selling nicotine products to youth, and to protect their market share, by denying that JLI marketed to youth and claiming that JUUL was actually created and designed as a smoking cessation device or mitigated risk product.

755. The RICO Defendants used these mail and wire transmissions in furtherance of this scheme by transmitting deliberately false and misleading statements to the public and to government regulators.

756. The RICO Defendants had a specific intent to defraud regulators and the public. For example, as alleged above, the members of the Nicotine Market Expansion Enterprise made repeated and unequivocal statements through the wires and mails that they were not marketing to children and that their product was designed for adult smokers. As even the evidence pre-discovery shows, this is not true. The authors of these fraudulent statements are high level executives at each of JLI and Altria and who would reasonably be expected to have knowledge of their company's internal research, public positions, and long-term strategies. Because these high level executives made statements inconsistent with the internal knowledge and practice of the corporations, it would be absurd to believe that these highly ranked-representatives and agents of these corporations had no knowledge that their public statements were false and fraudulent. Similarly, the RICO Defendants caused to be transmitted through the wires and mails false and misleading statements regarding the nicotine content in JUUL pods which JLI's own internal data, and Altria's own pharmacokinetic studies, showed were false. Moreover, each of the Early Enterprise Defendants had "final say" over all marketing statements by JLI and thus caused such statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

757. The RICO Defendants intended the public and regulators to rely on these false transmissions and this scheme was therefore reasonably calculated to deceive persons of

1   ordinary prudence and comprehension.

2       758.    Both the public and government regulators did rely on the Nicotine Market

3   Expansion Enterprise's mail and wire fraud. For example, the regulators, including the FDA,

4   relied on the Nicotine Market Expansion Enterprise's statements that mint was not an appealing

5   flavor for nonsmokers in allowing mint JUUL pods to remain on the market and relied on the

6   Nicotine Market Expansion Enterprise's statements that it did not market to youth in allowing

7   the RICO Defendants to continue marketing and selling JUUL. Congress likewise relied on the

8   Enterprise's statements in not bringing legislation to recall or ban e-cigarettes, despite the calls

9   of members of both parties to do just that. And the public relied on statements (or absence

10  thereof) that were transmitted by the RICO Defendants regarding the nicotine content in and

11  potency of JUUL pods in deciding to purchase JUUL products.

12      759.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate

13  wire facilities have been deliberately hidden and cannot be alleged without access to the RICO

14  Defendants' books and records. However, Plaintiff has described the types of predicate acts of

15  mail and/or wire fraud, including the specific types of fraudulent statements upon which,

16  through the mail and wires, the Nicotine Market Expansion Enterprise engaged in fraudulent

17  activity in furtherance of its overlapping schemes.

18      760.    These were not isolated incidents, instead, the RICO Defendants' engaged in a

19  pattern of racketeering activity by committing thousands of predicate acts in a five year period

20  in the form of mail and wire fraud. That each RICO Defendant participated in a variety of

21  schemes involving thousands of predicate acts of mail and wire fraud establishes that such

22  fraudulent acts are part of the Enterprise's regular way of doing business. Moreover, Plaintiffs

23  expect to uncover even more coordinated, predicate acts of fraud as discovery in this case

24  continues.

25              **4.    Harm to Plaintiffs**

26      761.    "In order for a pattern of racketeering activity to be a cognizable cause of civil

27  RICO injury to a private plaintiff, one or more of the predicate acts must not only be the 'but

28  for' cause of the injury, but the proximate cause as well. A wrongful act is a proximate cause if

1    it is a substantial factor in the sequence of responsible causation. Plaintiffs must show a direct

2    relation between the injury asserted and the injurious conduct alleged." *Green Leaf Nursery v.*

3    *E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1307 (11th Cir. 2003) (internal quotation

4    marks and citations omitted). What matters, though, is not whether there is a direct relationship

5    between the plaintiff and defendant, but whether there is a 'sufficiently direct relationship'

6    between the defendant's wrongful conduct and the plaintiff's injury . . . .'" *Bridge*, 553 U.S. at

7    657 (2008)).

8           762.    Each Plaintiff and all members of the RICO Class were directly injured by the

9    RICO Defendants' conduct, and such injury would not have occurred but for the predicate acts

10   of the RICO Defendants. The combined effect of the RICO Defendants' fraudulent acts were:

11   (1) inducing Plaintiffs and the RICO Class members to purchase JUUL products that they

12   would not have purchased, or – in the alternative – to pay more for JUUL products than they

13   would have otherwise paid,  had they known that JUUL products were not cessation products or

14   if they had known about the intentional addictiveness of the nicotine levels in said products; (2)

15   lulling the FDA into allowing the continued sale of JLI's mint pods, which allowed Plaintiffs

16   and the RICO Class Members to purchase mint pods they would not have otherwise purchased;

17   and (3) lulling Congress and the FDA into allowing JUUL products to remain on the market,

18   which allowed Plaintiffs and the RICO Class Members to purchase JUUL products they would

19   not have purchased absent the RICO Defendants' schemes to preserve JLI's ill-gotten market

20   share.

21          763.    There are no intervening acts or parties that could interrupt the causal chain

22   between the RICO Defendants' mail and wire fraud and Plaintiffs' and the RICO Class

23   Members' injuries. The RICO Defendants, in furtherance of the Nicotine Market Expansion

24   Enterprise's common purpose, made false and misleading statements directly to the public. And

25   in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely

26   because the RICO Defendants deceived a third party into not taking action where the FDA's and

27   Congress's failure to regulate directly allowed Plaintiffs and the RICO Class Members to

28   purchase products that should not have been on the market.

764.    As to predicate acts occurring prior to March 10, 2016, Plaintiffs did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that the RICO Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, *inter alia*, the true nicotine content in and delivered by JUUL products, such information the RICO Defendants concealed and failed to truthfully disclose.

C.      **Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(d))**

765.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

766.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the members of the Nicotine Market Expansion Enterprise agreed to conspire and conspired to violate 18 U.S.C. § 1962(c), as described herein. The conspiracy is coterminous with the time period in which the Nicotine Expansion Market Enterprise has existed, beginning in 2015 and continuing to this day (with Defendant Altria joining the conspiracy in Spring 2017). The RICO Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise in furtherance of a common purpose, as detailed above in relation to the RICO Defendants' substantive violation of Section 1962(c). The acts in furtherance of the conspiracy attributable to the RICO Defendants include each of the predicate acts underlying the Nicotine Market Expansion Enterprise's violation of Section 1962(c), as described above. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the members of the Nicotine Market Expansion Enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, maintain or increase market share, and/or minimize losses for the Defendants and their named and unnamed co-conspirators throughout the illegal scheme and common course of conduct.

767.    Each Plaintiff and all members of the RICO Class were directly injured by the

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

RICO Defendants' conduct, and such injury would not have occurred but for the predicate acts of the RICO Defendants, which also constitute the acts taken by the RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d). The combined effect of the RICO Defendants' acts of mail and wire fraud in furtherance of their conspiracy were: (1) inducing Plaintiffs and the RICO Class members to purchase JUUL products that they would not have purchased, or—in the alternative—to pay more for JUUL products than they would have otherwise paid, had they known that JUUL products were not cessation products or if they had known about the intentional addictiveness of the nicotine levels in said products; (2) lulling the FDA into allowing the continued sale of JLI's mint pods, which allowed Plaintiffs and the RICO Class Members to purchase mint pods they would not have purchased; and (3) lulling Congress and the FDA into allowing JUUL products to remain on the market, which allowed Plaintiffs and the RICO Class Members to purchase JUUL products they would not have purchased absent the RICO Defendants' conspiracy to engage in a pattern of racketeering activity through a RICO Enterprise, the common purpose of which was maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by preserving and growing JLI's ill-gotten market share.

768.    There are no intervening acts or parties that could interrupt the causal chain between the RICO Defendants' mail and wire fraud acts in furtherance of their RICO conspiracy and Plaintiffs' and the RICO Class Members' injuries. The RICO Defendants, in furtherance of their conspiracy to form the Nicotine Market Expansion Enterprise and advance its common purpose, made false and misleading statements directly to the public. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed Plaintiffs and the RICO Class Members to purchase products that should not have been on the market.

769.    As to acts undertaken in furtherance of the conspiracy which occurred prior to March 10, 2016, Plaintiffs did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that the RICO

1    Defendants transmitted fraudulent statements via the mails and wires regarding the topics

2    described above including, inter alia, the true nicotine content in and delivered by JUUL

3    products, such information the RICO Defendants concealed and failed to truthfully disclose.

4            **D.      Violation of the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*)**

5            770.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

6            771.    This claim is brought against JLI on behalf of the members of the state

7    subclasses in Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, the

8    District of Columbia, Florida, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine,

9    Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska,

10   Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania,

11   Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and

12   Wyoming, and the state direct purchaser subclasses in Alabama, Georgia, Illinois, Kentucky,

13   New York, Ohio, Oregon, Tennessee, Vermont, Washington, and Wisconsin.

14           772.    Plaintiffs and members of the class are "consumers" within the meaning of 15

15   U.S.C. § 2301(3).

16           773.    JLI is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)

17   and (5), respectively.

18           774.    JUUL products are "consumer products" within the meaning of 15 U.S.C.

19   § 2301(1).

20           775.    Plaintiffs have met all requirements for pre-suit notice.

21           776.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is

22   damaged by the failure of a warrantor to comply with an implied warranty. The amount in

23   controversy of Plaintiffs' individual claims meets or exceeds $25.00 in value. In addition, the

24   amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs).

25           777.    JLI provided Plaintiffs and each member of the class with "implied warranties,"

26   including the implied warranty of merchantability, which is covered under 15 U.S.C. § 2301(7).

27           778.    Each JUUL product sold by JLI comes with an implied warranty that it will

28   merchantable and fit for the ordinary purpose for which it would be used. JLI has breached its

---

Page 220

implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

779.    The terms of these warranties became part of the basis of the bargain when Plaintiffs and each member of the class purchased JUUL products.

780.    Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JLI, on the one hand, and Plaintiffs and each member of the class, on the other hand.

781.    Further, Plaintiffs and each member of the class were third-party beneficiaries of JLI's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JLI's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

782.    Affording JLI a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or each JUUL product, JLI knew, or should have known that the products were not merchantable, but nonetheless failed to rectify the situation and/or disclose the defects. In addition, after over a year of litigation, JLI has not made any offer to cure. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs or members of the class resort to an informal dispute resolution procedure and/or afford JLI a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

783.    In addition, given the conduct described herein, any attempts by JLI, in its capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage of the defects in JUUL products is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defects is null and void.

784.    As a direct and proximate result of JLI's breach of the written and implied

warranties, Plaintiffs and each member of the class have suffered damages. Plaintiffs, individually and on behalf of the class, seek all damages permitted by law, including compensation for the cost of purchasing JUUL products, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

**E.    Causes of Action Brought on Behalf of the State Classes**

**1.    Alabama**

785.    Plaintiffs bring each of the following claims on behalf of the Alabama Subclass under Alabama law.

**a.    Violation of the Alabama Deceptive Trade Practices Act (Ala. Code § 8-19-1, *et seq.*)**

786.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

787.    This claim is brought against JLI, and for certain unconscionable conduct claims, all Defendants.

788.    Defendants are "persons" and Plaintiffs and class members are "consumers" under the statute. Ala. Code § 8-19-3.

789.    Plaintiffs and class members are consumers who purchased JUUL products for personal purposes.

790.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

791.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

792.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

793.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

794.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

795.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.  In addition, Ala. Code § 28-11-16 makes it unlawful for a retailer or manufacturer to advertise electronic nicotine delivery systems as tobacco cessations products and/or a healthier alternative to smoking.

796.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in any other unconscionable, false, misleading, or deceptive act or

1    practice in the conduct of trade or commerce.

2        797.   JLI's conduct was fraudulent and deceptive because the misrepresentations and

3    omissions had the capacity to deceive, and in fact did, deceive reasonable consumers, including

4    the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to

5    their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii)

6    were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-

7    delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of

8    substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

9    consumed through one JUUL pod exceeded the nicotine consumed through a pack of

10   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

11   Plaintiffs' and class members' decisions to purchase JUUL products.

12       798.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

13   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

14   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

15   facts; because the facts would be material to reasonable consumers; because JLI actively

16   concealed them; because JLI intended for consumers to rely on the omissions in question;

17   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

18   made partial representations concerning the same subject matter as the omitted facts.

19       799.   JLI and the Management Defendants engaged in fraudulent and deceptive

20   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

21   products were appropriate for minors, when in fact the products never should have been

22   marketed to minors and are especially harmful to minors due to the potent and addictive

23   nicotine doses, addictive qualities, and health risks.

24       800.   In addition, all Defendants engaged in conduct that is conduct is unfair and

25   unconscionable because the targeting of minors offends public policy (Ala. Code § 28-11-1 and

26   Ala. Code § 28-11-4); is immoral, unethical, oppressive, outrageous, unscrupulous, and

27   substantially injurious; and has caused substantial harm that greatly outweighs any possible

28   utility from the conduct.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

801.    As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

802.    Defendants' conduct actually and proximately caused actual monetary damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— injunctive relief, reasonable attorneys' fees, up to three times actual damages sustained by each such person, or any applicable statutory damages, whichever is greater, as well as any other relief the Court may deem just or proper.

803.    Plaintiffs have complied or substantially complied with all applicable notice requirements, or are otherwise excused from compliance because they do not maintain a place of business in and/ or does not keep assets within the state of Alabama.

### b.    Common Law Fraud

804.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

805.    This claim is brought against JLI.

806.    JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

807.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

808.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

809.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

810.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

811.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in

Plaintiffs' and class members' decisions to purchase JUUL products.

812.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

813.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

814.   JLI knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

815.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

816.   JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

817.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

818.     This claim is brought against JLI.

819.     JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

820.     Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   Ala. Code § 7-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

821.     The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

822.     Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

823.     Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

824.     Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

the Alabama Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

825.    JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

826.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

827.    This claim is brought against JLI and the Management Defendants.

828.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

829.    Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Ala. Code § 28-11-16 makes it unlawful for a retailer or manufacturer to advertise electronic nicotine delivery systems as

tobacco cessations products and/or a healthier alternative to smoking. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Ala. Code § 28-11-1 sets forth the intent of the Alabama legislature to "prohibit access to tobacco and tobacco products by minors." Ala. Code § 28-11-4 expresses the intent of Alabama legislature to "prevent[] the distribution of . . . alternative nicotine products to minors."

830.    Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

831.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

832.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

833.    Defendants wrongfully obfuscated the harm caused be their conduct. Thus, Plaintiffs and class members, who relied on Defendants' fraudulent representations, could not and did not know the effect that using JUUL products would have on their health.

834.    Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

835.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 2.    Alaska

836.    Plaintiffs bring each of the following claims on behalf of the Alaska Subclass under Alaska law.

### a.    Violation of the Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. § 45.50.471, *et seq.*)

837.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

838.    This claim is brought against JLI and, for certain unfair and/or unconscionable

1   conduct claims as noted below, all Defendants.

2       839.    Plaintiffs and class members are consumers who sought or acquired goods from

3   JUUL by purchase.

4       840.    Plaintiffs and class members purchased JUUL products for personal purposes.

5       841.    Defendants created and implemented a scheme to create a market for e-cigarettes

6   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

7   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

8   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

9   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

10  addictiveness, and significant risks of substantial physical injury from using JUUL products.

11      842.    Advertisements and representations for JUUL products contained deceptive

12  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

13  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

14  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

15  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

16  decades, JLI used third parties and word of mouth to spread false and misleading information

17  about JUUL products.

18      843.    Advertisements and representations for JUUL products concealed and failed to

19  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

20  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

21  addictive, posed significant risks of substantial physical injury resulting from the use of the

22  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

23  consumed through a pack of combustible cigarettes.

24      844.    The labels on JUUL products failed to disclose that the products posed

25  significant risks of substantial physical injury resulting from the use of the products. The labels

26  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

27      845.    The omissions were misleading and deceptive standing alone and were

28  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

cigarettes and other representations.

846.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

847.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) engaging in other conduct creating a likelihood of confusion or of misunderstanding and that misled, deceived, and/ or damaged a buyer in connection with the sale or advertisement of goods or services; and (e) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods.

848.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

849.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

850.    JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

851.    In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Alaska Stat. § 11.76.109); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

852.    As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

853.    Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the

amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, three times actual damages or $500, whichever is greater, as well as any other relief the Court may deem just or proper.

854.    Plaintiffs have complied or substantially complied with all applicable notice requirements, or are otherwise excused from compliance for this proceeding.

### b.    Common Law Fraud

855.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

856.    This claim is brought against JLI.

857.    JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

858.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

859.    Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

860.    The labels on JUUL products failed to disclose that the products posed

1   significant risks of substantial physical injury resulting from the use of the products. The labels
2   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3          861.   The omissions were misleading and deceptive standing alone and were
4   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
5   cigarettes and other representations.

6          862.   JLI's conduct was fraudulent and deceptive because its misrepresentations and
7   omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers
8   including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it
9   material to their purchasing decisions that JUUL's products (i) were not smoking cessation
10  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
11  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable
12  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine
13  consumed through one JUUL pod exceeded the nicotine consumed through a pack of
14  combustible cigarettes. Knowledge of these facts would have been a substantial factor in
15  Plaintiffs' and class members' decisions to purchase JUUL products.

16         863.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
17  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
18  other than Plaintiffs and class members), who had exclusive and superior knowledge of the
19  facts; because the facts would be material to reasonable consumers; because JUUL products
20  pose an unreasonable risk of substantial bodily injury; and because JLI made partial
21  representations concerning the same subject matter as the omitted facts.

22         864.   As set forth in the allegations concerning each Plaintiff in Appendix A, in
23  purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations
24  and/or omissions.  Reasonable consumers would have been expected to have relied on the
25  misrepresentations and omissions.

26         865.   JLI knew or should have known that its misrepresentations and/or omissions
27  were false and misleading, and intended for consumers to rely on such misrepresentations and
28  omissions.

1    866.    JLI knew that JUUL products were not safe or reasonable alternatives to

2  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

3  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

4  products.

5    867.    JUUL's conduct actually and proximately caused actual damages to Plaintiffs

6  and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

7  differently and would not have purchased JUUL products or would have paid less for them.

8  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

9  JUUL products they would not otherwise have purchased and enter into purchase contracts they

10  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

11  member of the class damages in an amount to be proven at trial, as well as any other relief the

12  Court may deem just or proper.

13              c.      **Breach of the Implied Warranty of Merchantability**

14    868.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

15    869.    This claim is brought against JLI.

16    870.    JUUL has at all times been a merchant with respect to the products which were

17  sold to Plaintiff and the class and was in the business of selling such products.

18    871.    Each JUUL product sold by JUUL comes with an implied warranty that it will

19  merchantable and fit for the ordinary purpose for which it would be used.    Alaska Stat.

20  § 45.02.314.  JUUL has breached its implied warranty of merchantability because its products

21  were not in merchantable condition when sold, were defective when sold, did not conform to the

22  promises and affirmations of fact made on the products' containers or labels, and/or do not

23  possess even the most basic degree of fitness for ordinary use.

24    872.    The ordinary intended purpose of JUUL's products—and the purpose for which

25  they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

26  products are not fit for that use—or any other use—because they (i) were not smoking cessation

27  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

28  potent  nicotine-delivery  mechanisms,  (iv)  were  powerfully  addictive,  and  (v) posed

1    unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

2    products are not fit for their ordinary, intended use as either cigarette replacement devices or

3    recreation smoking devices.

4          873.   Plaintiffs and each member of the class have had sufficient direct dealings with

5    either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

6    by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

7    each member of the class, on the other hand.

8          874.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

9    JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

10   sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the

11   intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

12   the express purpose an intent of being sold to consumers.

13         875.   Plaintiffs and the members of the class were injured as a direct and proximate

14   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

15   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

16   because, had they been aware of the unmerchantable condition of JUUL products, they would

17   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

18   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

19         876.   JUUL was provided notice of these issues by numerous complaints filed against

20   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

21   individual letters and communications sent by consumers before or within a reasonable amount

22   of time after they discovered or should have discovered that's JUUL product were defective and

23   unmerchantable.

24                          **d.    Unjust Enrichment**

25         877.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

26         878.   This claim is brought against JLI and the Management Defendants.

27         879.   Defendants created and implemented a scheme to create a market for e-cigarettes

28   and substantially increase sales of JUUL products through a pervasive pattern of false and

misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

880.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Alaska Stat. § 11.76.109 prohibits the marketing and sale of JUUL products to minors.

881.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

882.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

883.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

884.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

885.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 3.   Arizona

886.   Plaintiffs bring each of the following claims on behalf of the Arizona Subclass under Arizona law.

### a.   Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. § 44-1521, *et seq.*)

887.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

888.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

889.   Plaintiffs and class members purchased JUUL products for personal purposes.

890.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

891.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

892.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

893.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

894.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

895.    JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

896.    JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency and capacity to convey misleading impressions to consumers, and in fact did, mislead reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

897.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question;

because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

898.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

899.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

900.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

901.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Ariz. Rev. Stat. § 13-3622(A)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

902.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

903.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, punitive damages, and actual damages, as well as any other relief the Court may deem just or proper.

### b.  Common Law Fraud

904.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

905.    This claim is brought against JLI.

906.    JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

907.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

908.    Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

909.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

910.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

911.    JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

912.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

913.    As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

914.    JLI knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

omissions.

915.    JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

916.    JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

917.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

918.    This claim is brought against JLI.

919.    JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

920.    Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Ariz. Rev. Stat. § 47-2314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

921.    The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

1   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed
2   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's
3   products are not fit for their ordinary, intended use as either cigarette replacement devices or
4   recreation smoking devices.

5       922.    Plaintiffs and each member of the class have had sufficient direct dealings with
6   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized
7   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and
8   each member of the class, on the other hand.

9       923.    Further, Plaintiffs and each member of the class were third-party beneficiaries of
10  JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and
11  sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the
12  intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with
13  the express purpose an intent of being sold to consumers.

14      924.    Plaintiffs and the members of the class were injured as a direct and proximate
15  result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of
16  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability
17  because, had they been aware of the unmerchantable condition of JUUL products, they would
18  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages
19  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

20      925.    JUUL was provided notice of these issues by numerous complaints filed against
21  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous
22  individual letters and communications sent by consumers before or within a reasonable amount
23  of time after they discovered or should have discovered that's JUUL product were defective and
24  unmerchantable.

### d.   Unjust Enrichment

26      926.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

27      927.    This claim is brought against JLI and the Management Defendants.

28      928.    Defendants created and implemented a scheme to create a market for e-cigarettes

and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

929.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Ariz. Rev. Stat. § 13-3622(A) prohibits the marketing and sale of JUUL products to minors.

930.   Defendants requested and received a measurable benefit at the expense of the Plaintiffs and class members in the form of payment for JUUL products.

931.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

932.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

933.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

934.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

4.      **Arkansas**

935.    Plaintiffs bring each of the following claims on behalf of the Arkansas Subclass under Arkansas law.

a.      **Violation of the Arkansas Deceptive Trade Practices Act (Ark. Code § 4-88-101, *et seq.*)**

936.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

937.    This claim is brought against JLI and, for certain unfairness or unconscionable conduct claims, all Defendants.

938.    Plaintiffs and class members purchased JUUL products for personal purposes.

939.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

940.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

941.    Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

942.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

943.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

944.    JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products violated public policy and affronted the sense of justice, decency, or reasonableness.

945.    JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) knowingly misrepresenting that JUUL products have characteristics, ingredients, uses, or benefits which they do not have; (b) knowingly misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) using or employing deception, fraud, or false pretense; (e) concealing, suppressing, or omitting material facts with the intent that other rely upon the concealment, suppression, or omission; and (f) engaging in other unconscionable, false or deceptive acts or practices in business commerce, or trade.

946.    JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to and had the capacity to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a

1    pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor
2    in Plaintiffs' and class members' decisions to purchase JUUL products.

3         947.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
4    were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
5    other than Plaintiffs and class members), who had exclusive and superior knowledge of the
6    facts; because the facts would be material to reasonable consumers; because JLI actively
7    concealed them; because JLI intended for consumers to rely on the omissions in question;
8    because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI
9    made partial representations concerning the same subject matter as the omitted facts.

10        948.   As set forth in the allegations concerning each Plaintiff in Appendix A, in
11   purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.
12   Reasonable consumers would have been expected to have relied on the misrepresentations and
13   omissions.

14        949.   Defendants knew or should have known that their misrepresentations and/or
15   omissions were false and misleading, and intended for consumers to rely on such
16   misrepresentations and omissions.

17        950.   JLI and the Management Defendants engaged in fraudulent and deceptive
18   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL
19   products were appropriate for minors, when in fact the products never should have been
20   marketed to minors and are especially harmful to minors due to the potent and addictive
21   nicotine doses, addictive qualities, and health risks.

22        951.   In addition, all Defendants engaged in unfair and unconscionable conduct
23   because the targeting of minors offends public policy (in particular Ark. Code § 5-27-227(a)(1))
24   and affronted the sense of justice, decency, or reasonableness.

25        952.   As alleged above, all Defendants participated and/or facilitated the marketing of
26   JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI
27   and others have continued the deceptive, misleading, unfair, and unconscionable practices that
28   Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

1    use of JUUL products by minors continues to rise.

2        953.    Defendants' conduct actually and proximately caused actual financial loss to

3    Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

4    class members would have behaved differently and would not have purchased JUUL products

5    or would have paid less for them. Defendants' misrepresentations and omissions induced

6    Plaintiffs and class members to purchase JUUL products they would not otherwise have

7    purchased and enter into purchase contracts they would not otherwise have entered into. In

8    addition, class members who are minors are entitled to full repayment of the amounts they spent

9    on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—to

10   recover their actual financial loss, reasonable attorneys' fees, and punitive damages, as well as

11   any other relief the Court may deem just or proper.

12                          **b.    Common Law Fraud**

13       954.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

14       955.    This claim is brought against JLI.

15       956.    JUUL created and implemented a scheme to create a market for e-cigarettes and

16   substantially increase sales of JUUL through a pervasive pattern of false and misleading

17   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

18   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

19   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

20   addictiveness, and significant risks of substantial physical injury from using JUUL products.

21       957.    Advertisements and representations for JUUL products contained deceptive

22   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

23   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

24   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

25   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

26   decades, JLI used third parties and word of mouth to spread false and misleading information

27   about JUUL products.

28       958.    Advertisements and representations for JUUL products concealed and failed to

1  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
2  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
3  addictive, posed significant risks of substantial physical injury resulting from the use of the
4  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
5  consumed through a pack of combustible cigarettes.

6      959.   The labels on JUUL products failed to disclose that the products posed
7  significant risks of substantial physical injury resulting from the use of the products. The labels
8  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

9      960.   The omissions were misleading and deceptive standing alone and were
10  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
11  cigarettes and other representations.

12      961.   JLI's conduct was fraudulent and deceptive because its misrepresentations and
13  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers
14  including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it
15  material to their purchasing decisions that JUUL's products (i) were not smoking cessation
16  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
17  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable
18  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine
19  consumed through one JUUL pod exceeded the nicotine consumed through a pack of
20  combustible cigarettes. Knowledge of these facts would have been a substantial factor in
21  Plaintiffs' and class members' decisions to purchase JUUL products.

22      962.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
23  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
24  other than Plaintiffs and class members), who had exclusive and superior knowledge of the
25  facts; because the facts would be material to reasonable consumers; because JUUL products
26  pose an unreasonable risk of substantial bodily injury; and because JLI made partial
27  representations concerning the same subject matter as the omitted facts.

28      963.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

964. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

965. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

966. JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

c.   **Breach of the Implied Warranty of Merchantability**

967. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

968. This claim is brought against JLI.

969. JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

970. Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   Ark. Code § 4-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not

1    possess even the most basic degree of fitness for ordinary use.

2        971.   The ordinary intended purpose of JUUL's products—and the purpose for which

3    they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

4    products are not fit for that use—or any other use—because they (i) were not smoking cessation

5    devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

6    potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

7    unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

8    products are not fit for their ordinary, intended use as either cigarette replacement devices or

9    recreation smoking devices.

10       972.   Plaintiffs and each member of the class have had sufficient direct dealings with

11   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

12   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

13   each member of the class, on the other hand.

14       973.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

15   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

16   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

17   intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

18   the express purpose an intent of being sold to consumers.

19       974.   Plaintiffs and the members of the class were injured as a direct and proximate

20   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

21   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

22   because, had they been aware of the unmerchantable condition of JUUL products, they would

23   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

24   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

25       975.   JUUL was provided notice of these issues by numerous complaints filed against

26   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

27   individual letters and communications sent by consumers before or within a reasonable amount

28   of time after they discovered or should have discovered that's JUUL product were defective and

unmerchantable.

### d.      Unjust Enrichment

976.      Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

977.      This claim is brought against JLI and the Management Defendants.

978.      Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

979.      Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Ark. Code § 5-27-227(a)(1) prohibits the marketing and sale of JUUL products to minors.

980.      Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

981.      Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

982.      There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

983.    Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

984.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 5.    Colorado

985.    Plaintiffs bring each of the following claims on behalf of the Colorado Subclass under Colorado law.

### a.    Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, *et seq.*)

986.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

987.    This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

988.    Plaintiffs and class members purchased JUUL products for personal purposes.

989.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

990.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

991.    Advertisements and representations for JUUL products concealed and failed to

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

992.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

993.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

994.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

995.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) knowingly or recklessly misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, while knowing or having should known that they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) failing to disclose material information concerning goods or services which was known at the time of an advertisement or sale and intended to induce a consumer to enter into a transaction; and (e) knowingly or recklessly engaging in other unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practices.

996.   JLI's conduct was fraudulent and deceptive because the misrepresentations and

omissions had the capacity or tendency to deceive, and in fact did, deceive reasonable consumers, including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

997.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

998.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading or otherwise exhibited reckless disregard for the truth, and intended for consumers to rely on such misrepresentations and omissions.

999.    JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1000.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Colo. Rev. Stat. §§ 18-13-121(1)(a) and 44-7-103); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible

1    utility from the conduct.

2        1001.  As alleged above, all Defendants participated and/or facilitated the marketing of

3    JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

4    and others have continued the deceptive, misleading, unfair, and unconscionable practices that

5    Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

6    use of JUUL products by minors continues to rise.

7        1002.  Defendants' conduct significantly impacts the public as actual or potential

8    consumers of Defendant's goods.

9        1003.  Defendants' conduct actually and proximately caused injury and actual damage

10   to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs

11   and class members would have behaved differently and would not have purchased JUUL

12   products or would have paid less for them. Defendants' misrepresentations and omissions

13   induced Plaintiffs and class members to purchase JUUL products they would not otherwise have

14   purchased and enter into purchase contracts they would not otherwise have entered into. In

15   addition, class members who are minors are entitled to full repayment of the amounts they spent

16   on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

17   three times actual damages or $500, whichever is greater, and reasonable attorneys' fees, as well

18   as any other relief the Court may deem just or proper.

19                    **b.    Common Law Fraud**

20       1004.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21       1005.  This claim is brought against JLI.

22       1006.  JUUL created and implemented a scheme to create a market for e-cigarettes and

23   substantially increase sales of JUUL through a pervasive pattern of false and misleading

24   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

25   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

26   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

27   addictiveness, and significant risks of substantial physical injury from using JUUL products.

28       1007.  Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1008.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1009.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1010.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1011.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1012.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1013.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1014.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1015.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1016.   JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.     Breach of the Implied Warranty of Merchantability

1017.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1018.   This claim is brought against JLI.

1019.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1020.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   Colo. Rev. Stat. § 4-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1021.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1022.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1023.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1024.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

1    because, had they been aware of the unmerchantable condition of JUUL products, they would

2    not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

3    in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

4        1025.   JUUL was provided notice of these issues by numerous complaints filed against

5    it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

6    individual letters and communications sent by consumers before or within a reasonable amount

7    of time after they discovered or should have discovered that's JUUL product were defective and

8    unmerchantable.

### d.    Unjust Enrichment

10        1026.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

11        1027.   This claim is brought against JLI and the Management Defendants.

12        1028.   Defendants created and implemented a scheme to create a market for e-cigarettes

13    and substantially increase sales of JUUL products through a pervasive pattern of false and

14    misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

15    safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

16    while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

17    doses, addictiveness, and significant risks of substantial physical injury from using JUUL

18    products.

19        1029.   Defendants were unjustly enriched as a result of their wrongful conduct,

20    including through the false and misleading advertisements and omissions regarding (i) whether

21    JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

22    alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

23    powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

24    the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

25    nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

26    enriched through their scheme of marketing their products to minors. Colo. Rev. Stat. §§ 18-13-

27    121(1)(a) and 44-7-103 prohibits the marketing and sale of JUUL products to minors.

28        1030.   Defendants requested and received a measurable benefit at the expense of

Plaintiffs and class members in the form of payment for JUUL products.

1031. Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1032. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1033. Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1034. Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 6. Connecticut

1035. Plaintiffs bring each of the following claims on behalf of the Connecticut Subclass under Connecticut law.

### a. Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq.*)

1036. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1037. This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1038. Defendants are "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a.

1039. Plaintiffs and class members purchased JUUL products for personal purposes.

1040. Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1041.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1042.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1043.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1044.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1045.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1046.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to

their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1047.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1048.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1049.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Conn. Gen. Stat. § 53-344b(b)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1050.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

use of JUUL products by minors continues to rise.

1051.  Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, attorney's fees, actual damages, and punitive damages, as well as any other relief the Court may deem just or proper.

### b.    Common Law Fraud

1052.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1053.  This claim is brought against JLI.

1054.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1055.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1056.  Advertisements and representations for JUUL products concealed and failed to

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1057.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1058.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1059.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1060.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1061.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1062. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1063. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1064. JUUL's conduct actually and proximately caused injury and harm to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

1065. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1066. This claim is brought against JLI.

1067. JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1068. Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   Conn. Gen. Stat. § 42a-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not

possess even the most basic degree of fitness for ordinary use.

1069.  The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1070.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1071.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1072.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1073.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and

1  unmerchantable.

2              **d.      Unjust Enrichment**

3       1074.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4       1075.   This claim is brought against JLI and the Management Defendants.

5       1076.   Defendants created and implemented a scheme to create a market for e-cigarettes

6  and substantially increase sales of JUUL products through a pervasive pattern of false and

7  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

8  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

9  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

10 doses, addictiveness, and significant risks of substantial physical injury from using JUUL

11 products.

12      1077.   Defendants were unjustly enriched as a result of their wrongful conduct,

13 including through the false and misleading advertisements and omissions regarding (i) whether

14 JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

15 alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

16 powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

17 the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

18 nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

19 enriched through their scheme of marketing their products to minors.  Conn. Gen. Stat. § 53-

20 344b(b) prohibits the marketing and sale of JUUL products to minors.

21      1078.   Defendants requested and received a measurable benefit at the expense of

22 Plaintiffs and class members in the form of payment for JUUL products.

23      1079.   Defendants appreciated, recognized, and chose to accept the monetary benefits

24 Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

25 expected result of Defendant acting in its pecuniary interest at the expense of its customers.

26      1080.   There is no justification for Defendants' enrichment. It would be inequitable,

27 unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

28 benefits were procured as a result of their wrongful conduct.

1081. Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1082. Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 7.   Delaware

1083. Plaintiffs bring each of the following claims on behalf of the Delaware Subclass under Delaware law.

### a.   Violation of the Delaware Consumer Fraud Act (Del. Code tit. 6 § 2511, *et seq.*)

1084. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1085. This claim is brought against JLI and, for certain claims as noted below, the Management Defendants.

1086. Plaintiffs and class members purchased JUUL products for personal purposes.

1087. JLI is a "person" as defined by Del. Code Ann. tit. 6, § 2511.

1088. JUUL products are "merchandise" as defined by Del. Code Ann. tit. 6, § 2511.

1089. Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1090. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information

about JUUL products.

1091.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1092.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1093.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1094.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1095.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question;

1    because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

2    made partial representations concerning the same subject matter as the omitted facts.

3        1096.   JLI and the Management Defendants engaged in fraudulent and deceptive

4    conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

5    products were appropriate for minors, when in fact the products never should have been

6    marketed to minors and are especially harmful to minors due to the potent and addictive

7    nicotine doses, addictive qualities, and health risks.

8        1097.   As alleged above, all Defendants participated and/or facilitated the marketing of

9    JUUL products to minors and took no action to curb the use of JUUL products by minors.

10   JUUL has continued the deceptive and misleading practices that Defendants implemented,

11   facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by

12   minors continues to rise.

13       1098.   Defendants' conduct actually and proximately caused an ascertainable loss and

14   damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct,

15   Plaintiffs and class members would have behaved differently and would not have purchased

16   JUUL products or would have paid less for them. Defendants' misrepresentations and omissions

17   induced Plaintiffs and class members to purchase JUUL products they would not otherwise have

18   purchased and enter into purchase contracts they would not otherwise have entered into. In

19   addition, class members who are minors are entitled to full repayment of the amounts they spent

20   on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

21   injunctive relief, actual damages, and punitive damages, as well as any other relief the Court

22   may deem just or proper.

23              **b.      Violation of the Delaware Deceptive Trade Practices Act (Del.**

24                      **Code tit. 6 § 2531, *et seq.*)**

25       1099.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

26       1100.   This claim is brought against JLI and, for certain claims as noted below, the

27   Management Defendants.

28       1101.   Plaintiffs and class members purchased JUUL products for personal purposes.

1    1102.   JLI is a "person" as defined by Del. Code Ann. tit. 6, §2531.

2    1103.   Defendants created and implemented a scheme to create a market for e-cigarettes

3  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

4  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

5  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

6  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

7  addictiveness, and significant risks of substantial physical injury from using JUUL products.

8    1104.   Advertisements and representations for JUUL products contained deceptive

9  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

10  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

11  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

12  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

13  decades, JLI used third parties and word of mouth to spread false and misleading information

14  about JUUL products.

15    1105.   Advertisements and representations for JUUL products concealed and failed to

16  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

17  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

18  addictive, posed significant risks of substantial physical injury resulting from the use of the

19  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

20  consumed through a pack of combustible cigarettes.

21    1106.   The labels on JUUL products failed to disclose that the products posed

22  significant risks of substantial physical injury resulting from the use of the products. The labels

23  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

24    1107.   The omissions were misleading and deceptive standing alone and were

25  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

26  cigarettes and other representations.

27    1108.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

28  unfair business practices: (a) misrepresenting that JUUL products have characteristics,

1    ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL
2    products are of a particular standard, quality, or grade, or that goods are of a particular style or
3    model, when they are not; (c) advertising goods or services with intent not to sell them as
4    advertised; and (d) engaging in other conduct which similarly creates a likelihood of confusion
5    or misunderstanding.

6       1109.  JLI's conduct was fraudulent and deceptive because the misrepresentations and
7    omissions at issue were likely to, and in fact did, create confusion or misunderstanding among
8    reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs,
9    would have found it material to their purchasing decisions that JUUL's products (i) were not
10   smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii)
11   were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed
12   unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi)
13   that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a
14   pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor
15   in Plaintiffs' and class members' decisions to purchase JUUL products.

16      1110.  JLI owed Plaintiffs and class members a duty to disclose these facts because they
17   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
18   other than Plaintiffs and class members), who had exclusive and superior knowledge of the
19   facts; because the facts would be material to reasonable consumers; because JLI actively
20   concealed them; because JLI intended for consumers to rely on the omissions in question;
21   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI
22   made partial representations concerning the same subject matter as the omitted facts.

23      1111.  JLI and the Management Defendants engaged in fraudulent and deceptive
24   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL
25   products were appropriate for minors, when in fact the products never should have been
26   marketed to minors and are especially harmful to minors due to the potent and addictive
27   nicotine doses, addictive qualities, and health risks.

28      1112.  Defendants' conduct actually and proximately caused actual damages to

---

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, actual damages, and/ or statutory damages that are treble the amount of actual damages, as well as any other relief the Court may deem just or proper.

### c.      Common Law Fraud

1113.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1114.  This claim is brought against JLI.

1115.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1116.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1117.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1118.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1119.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1120.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1121.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1122.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

1  and/or omissions.  Reasonable consumers would have been expected to have relied on the

2  misrepresentations and omissions.

3  1123.  Defendants knew or should have known that their misrepresentations and/or

4  omissions were false and misleading, and intended for consumers to rely on such

5  misrepresentations and omissions.

6  1124.  JLI knew that JUUL products were not safe or reasonable alternatives to

7  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

8  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

9  products.

10  1125.  JUUL's conduct actually and proximately caused actual damages to Plaintiffs

11  and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

12  differently and would not have purchased JUUL products or would have paid less for them.

13  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

14  JUUL products they would not otherwise have purchased and enter into purchase contracts they

15  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

16  member of the class damages in an amount to be proven at trial, as well as any other relief the

17  Court may deem just or proper.

18  **d.    Breach of the Implied Warranty of Merchantability**

19  1126.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

20  1127.  This claim is brought against JLI.

21  1128.  JUUL has at all times been a merchant with respect to the products which were

22  sold to Plaintiff and the class and was in the business of selling such products.

23  1129.  Each JUUL product sold by JUUL comes with an implied warranty that it will

24  merchantable and fit for the ordinary purpose for which it would be used.  Del. Code tit. 6, § 2-

25  314.  JUUL has breached its implied warranty of merchantability because its products were not

26  in merchantable condition when sold, were defective when sold, did not conform to the

27  promises and affirmations of fact made on the products' containers or labels, and/or do not

28  possess even the most basic degree of fitness for ordinary use.

1130.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1131.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1132.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1133.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1134.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

e.      **Unjust Enrichment**

1135.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1136.   This claim is brought against JLI and the Management Defendants.

1137.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1138.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  Del. Code tit. 11, §§ 1116(a) and 1118(a) prohibits the marketing and sale of JUUL products to minors.

1139.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1140.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1141.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1142.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

1   and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

2   with Defendant.

3   1143.   Plaintiffs plead this claim separately as well as in the alternative to their other

4   claims, as without such claims they would have no adequate legal remedy.

5   **8.   District of Columbia**

6   1144.   Plaintiffs bring each of the following claims on behalf of the District of

7   Columbia Subclass under District of Columbia law.

8   **a.   Violation of the D.C. Consumer Protection Procedures Act**

9   **(D.C. Code § 28-3901, *et seq.*)**

10   1145.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

11   1146.   This claim is brought against JLI and, for certain unfair and/or unconscionable

12   conduct claims as noted below, all Defendants.

13   1147.   Defendants are merchants under the statute who furnishes, makes available,

14   provides information about, or, directly or indirectly, solicits or offers for or effectuates, a leas,

15   lease or transfer of consumer goods or services.

16   1148.   Plaintiffs and class members are consumers who purchased JUUL products for

17   personal purposes.

18   1149.   Defendants created and implemented a scheme to create a market for e-cigarettes

19   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

20   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

21   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

22   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

23   addictiveness, and significant risks of substantial physical injury from using JUUL products.

24   1150.   Advertisements and representations for JUUL products contained deceptive

25   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

26   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

27   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

28   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1151.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1152.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1153.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1154.   JLI's conduct was unfair trade practice because (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1155.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, grade, style, or model, when they are not; (c) advertising or offering goods or services with intent not to sell them as advertised or offered; (d) misrepresenting a material fact which has a tendency to mislead; (e) failing to sate a material fact when such failure tends to mislead; and (f) representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

1156.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had a tendency to mislead, and in fact did, mislead reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1157.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1158.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1159.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1160.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular D.C. Code § 7-1721.02); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1161.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1162.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— injunctive relief, reasonable attorneys' fees, restitution, $1,500 per violation, and/ or statutory treble damages, whichever is greater, and punitive damages, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

1163.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1164.  This claim is brought against JLI.

1165.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1166.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

1    cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
2    not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
3    decades, JLI used third parties and word of mouth to spread false and misleading information
4    about JUUL products.

5        1167.   Advertisements and representations for JUUL products concealed and failed to
6    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
7    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
8    addictive, posed significant risks of substantial physical injury resulting from the use of the
9    products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
10   consumed through a pack of combustible cigarettes.

11       1168.   The labels on JUUL products failed to disclose that the products posed
12   significant risks of substantial physical injury resulting from the use of the products. The labels
13   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

14       1169.   The omissions were misleading and deceptive standing alone and were
15   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
16   cigarettes and other representations.

17       1170.   JLI's conduct was fraudulent and deceptive because its misrepresentations and
18   omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers
19   including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it
20   material to their purchasing decisions that JUUL's products (i) were not smoking cessation
21   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
22   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable
23   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine
24   consumed through one JUUL pod exceeded the nicotine consumed through a pack of
25   combustible cigarettes. Knowledge of these facts would have been a substantial factor in
26   Plaintiffs' and class members' decisions to purchase JUUL products.

27       1171.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
28   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1172. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1173. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1174. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1175. JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

1176. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1177. This claim is brought against JLI.

1178. JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1179.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  D.C. Code § 28:2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1180.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1181.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1182.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1183.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

1   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2       1184.   JUUL was provided notice of these issues by numerous complaints filed against

3   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

4   individual letters and communications sent by consumers before or within a reasonable amount

5   of time after they discovered or should have discovered that's JUUL product were defective and

6   unmerchantable.

7            **d.**       **Unjust Enrichment**

8       1185.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

9       1186.   This claim is brought against JLI and the Management Defendants.

10       1187.   Defendants created and implemented a scheme to create a market for e-cigarettes

11   and substantially increase sales of JUUL products through a pervasive pattern of false and

12   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

13   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

14   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

15   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

16   products.

17       1188.   Defendants were unjustly enriched as a result of their wrongful conduct,

18   including through the false and misleading advertisements and omissions regarding (i) whether

19   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

20   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

21   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

22   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

23   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

24   enriched through their scheme of marketing their products to minors.  D.C. Code § 7-1721.02

25   prohibits the marketing and sale of JUUL products to minors.

26       1189.   Defendants requested and received a measurable benefit at the expense of

27   Plaintiffs and class members in the form of payment for JUUL products.

28       1190.   Defendants appreciated, recognized, and chose to accept the monetary benefits

---

Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1191.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1192.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1193.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

**9.      Florida**

1194.   Plaintiffs bring each of the following claims on behalf of the Florida Subclass under Florida law.

**a.      Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*)**

1195.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1196.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1197.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1198.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products. JUUL made or disseminated misleading advertisements to the general public or to a portion of the general public.

1199.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1200.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1201.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1202.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1203.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1204.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their

purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1205.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1206.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1207.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1208.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Fla. Stat. § 877.112(2)-(3)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1209.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

1    and others have continued the deceptive, misleading, unfair, and unconscionable practices that

2    Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

3    use of JUUL products by minors continues to rise.

4    1210.  Defendants' conduct actually and proximately caused actual damages to

5    Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

6    class members would have behaved differently and would not have purchased JUUL products

7    or would have paid less for them. Defendants' misrepresentations and omissions induced

8    Plaintiffs and class members to purchase JUUL products they would not otherwise have

9    purchased and enter into purchase contracts they would not otherwise have entered into. In

10   addition, class members who are minors are entitled to full repayment of the amounts they spent

11   on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

12   injunctive relief, reasonable attorneys' fees, and actual damages, as well as any other relief the

13   Court may deem just or proper.

14                    **b.**      **Violation of the Florida False Advertising Law (Fla. Stat.**

15                              **§§ 817.06 and 817.41, *et seq.*)**

16   1211.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

17   1212.  This claim is brought against JLI and, for certain claims as noted below, the

18   Management Defendants.

19   1213.  Plaintiffs and class members purchased JUUL products for personal purposes.

20   1214.  Defendants created and implemented a scheme to create a market for e-cigarettes

21   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

22   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

23   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

24   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

25   addictiveness, and significant risks of substantial physical injury from using JUUL products.

26   1215.  Advertisements and representations for JUUL products contained deceptive

27   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

28   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1216.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1217. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1218. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1219.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1220.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1221. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1222. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1223. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1224. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, reasonable attorneys' fees, and punitive damages, as well as any other relief the Court may deem just or proper.

1

### c. Common Law Fraud

2     1225. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3     1226. This claim is brought against JLI.

4     1227. JUUL created and implemented a scheme to create a market for e-cigarettes and

5     substantially increase sales of JUUL through a pervasive pattern of false and misleading

6     statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

7     alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

8     misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

9     addictiveness, and significant risks of substantial physical injury from using JUUL products.

10    1228. Advertisements and representations for JUUL products contained deceptive

11    statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

12    to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

13    cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

14    not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

15    decades, JLI used third parties and word of mouth to spread false and misleading information

16    about JUUL products.

17    1229. Advertisements and representations for JUUL products concealed and failed to

18    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

19    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

20    addictive, posed significant risks of substantial physical injury resulting from the use of the

21    products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

22    consumed through a pack of combustible cigarettes.

23    1230. The labels on JUUL products failed to disclose that the products posed

24    significant risks of substantial physical injury resulting from the use of the products. The labels

25    also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

26    1231. The omissions were misleading and deceptive standing alone and were

27    particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

28    cigarettes and other representations.

1232.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1233.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1234.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1235.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1236.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1237.   JUUL's conduct actually and proximately caused detriment to Plaintiffs and

1    class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

2    differently and would not have purchased JUUL products or would have paid less for them.

3    JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

4    JUUL products they would not otherwise have purchased and enter into purchase contracts they

5    would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

6    member of the class damages in an amount to be proven at trial, as well as any other relief the

7    Court may deem just or proper.

8                    **d.    Breach of the Implied Warranty of Merchantability**

9        1238.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10       1239.   This claim is brought against JLI.

11       1240.   JUUL has at all times been a merchant with respect to the products which were

12   sold to Plaintiff and the class and was in the business of selling such products.

13       1241.   Each JUUL product sold by JUUL comes with an implied warranty that it will

14   merchantable and fit for the ordinary purpose for which it would be used. Fla. Stat. § 672.314.

15   JUUL has breached its implied warranty of merchantability because its products were not in

16   merchantable condition when sold, were defective when sold, did not conform to the promises

17   and affirmations of fact made on the products' containers or labels, and/or do not possess even

18   the most basic degree of fitness for ordinary use.

19       1242.   The ordinary intended purpose of JUUL's products—and the purpose for which

20   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's

21   products are not fit for that use—or any other use—because they (i) were not smoking cessation

22   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

23   potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed

24   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

25   products are not fit for their ordinary, intended use as either cigarette replacement devices or

26   recreation smoking devices.

27       1243.   Plaintiffs and each member of the class have had sufficient direct dealings with

28   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

---

1    by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

2    each member of the class, on the other hand.

3         1244.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

4    JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

5    sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

6    intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

7    the express purpose an intent of being sold to consumers.

8         1245.   Plaintiffs and the members of the class were injured as a direct and proximate

9    result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

10   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

11   because, had they been aware of the unmerchantable condition of JUUL products, they would

12   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

13   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14        1246.   JUUL was provided notice of these issues by numerous complaints filed against

15   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

16   individual letters and communications sent by consumers before or within a reasonable amount

17   of time after they discovered or should have discovered that's JUUL product were defective and

18   unmerchantable.

19                            **e.      Unjust Enrichment**

20        1247.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21        1248.   This claim is brought against JLI and the Management Defendants.

22        1249.   Defendants created and implemented a scheme to create a market for e-cigarettes

23   and substantially increase sales of JUUL products through a pervasive pattern of false and

24   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

25   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

26   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

27   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

28   products.

1250.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Fla. Stat. § 877.112(2)-(3) prohibits the marketing and sale of JUUL products to minors.

1251.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1252.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1253.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1254.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1255.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 10.   Georgia

1256.   Plaintiffs bring each of the following claims on behalf of the Georgia Subclass under Georgia law.

### a.   Violation of the Georgia Uniform Deceptive Trade Practices Act (Ga. Code § 10-1-370, *et seq.*)

1257.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1258.   This claim is brought against JLI and, for certain claims as noted below, the Management Defendants.

1259.   Plaintiffs and class members purchased JUUL products for personal purposes.

1260.   JLI is a "person" as defined by Ga. Code Ann. § 10-1-371.

1261.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1262.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1263.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1264.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1265.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

1   cigarettes and other representations.

2       1266.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

3   unfair business practices: (a) misrepresenting that JUUL products have characteristics,

4   ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

5   products are of a particular standard, quality, or grade, or that goods are of a particular style or

6   model, when they are not; (c) advertising goods or services with intent not to sell them as

7   advertised; and (d) engaging in other conduct which similarly creates a likelihood of confusion

8   or of misunderstanding.

9       1267.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

10  omissions at issue were likely to, and in fact did, confuse and mislead reasonable consumers

11  including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

12  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

13  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

14  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

15  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

16  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

17  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

18  Plaintiffs' and class members' decisions to purchase JUUL products.

19      1268.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

20  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

21  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

22  facts; because the facts would be material to reasonable consumers; because JLI actively

23  concealed them; because JLI intended for consumers to rely on the omissions in question;

24  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

25  made partial representations concerning the same subject matter as the omitted facts.

26      1269.  JLI and the Management Defendants engaged in fraudulent and deceptive

27  conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

28  products were appropriate for minors, when in fact the products never should have been

marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1270.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members, who are also likely to be damaged in the future on an ongoing basis in the future. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

**b.      Violation of the Georgia Fair Business Practices Act (Ga. Code § 10-1-390, *et seq.*)**

1271.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1272.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1273.   Plaintiffs and class members purchased JUUL products for personal purposes.

1274.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1275.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1276.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1277.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1278.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1279.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1280.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

1281.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency or capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1282.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1283.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1284.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1285.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive

nicotine doses, addictive qualities, and health risks.

1286.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Ga. Code § 16-12-171(a)(1)(A)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1287.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1288.  Defendants' conduct actually and proximately caused injury or damages to Plaintiffs and class members as a result of consumer acts or practices in violation of the statute. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, general damages and/ or statutory damages in the amount of three times actual damages, whichever is greater, and punitive damages, as well as any other relief the Court may deem just or proper.

1289.  Plaintiffs have complied or substantially complied with all applicable notice requirements, or are otherwise excused from compliance because Defendants do not maintain a place of business in and/ or does not keep assets within the state of Georgia.

### c.      Common Law Fraud

1290.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1291.   This claim is brought against JLI.

1292.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1293.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1294.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1295.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1296.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1297.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1298.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1299.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1300.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1301.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1302.   JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.    Breach of the Implied Warranty of Merchantability

1303.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1304.    This claim is brought against JLI.

1305.    JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1306.    Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Ga. Code § 11-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1307.    The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1308.    Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1309.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1310.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Georgia Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1311.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.    Unjust Enrichment

1312.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1313.   This claim is brought against JLI and the Management Defendants.

1314.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1315.   Defendants were unjustly enriched as a result of their wrongful conduct,

1    including through the false and misleading advertisements and omissions regarding (i) whether

2    JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

3    alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

4    powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

5    the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

6    nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

7    enriched through their scheme of marketing their products to minors.  Ga. Code § 16-12-

8    171(a)(1)(A) prohibits the marketing and sale of JUUL products to minors.

9        1316.   Defendants requested and received a measurable benefit at the expense of

10   Plaintiffs and class members in the form of payment for JUUL products.

11       1317.   Defendants appreciated, recognized, and chose to accept the monetary benefits

12   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

13   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

14       1318.   There is no justification for Defendants' enrichment. It would be inequitable,

15   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

16   benefits were procured as a result of their wrongful conduct.

17       1319.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

18   and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

19   with Defendant.

20       1320.   Plaintiffs plead this claim separately as well as in the alternative to their other

21   claims, as without such claims they would have no adequate legal remedy.

22           **11.    Hawaii**

23       1321.   Plaintiffs bring each of the following claims on behalf of the Hawaii Subclass

24   under Hawaii law

25           **a.    Violation of the Hawaii Unfair and Deceptive Trade Practices**

26                   **Act (Haw. Rev. Stat. § 480-1,** *et seq.***)**

27       1322.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

28       1323.   This claim is brought against JLI and, for certain unfair and/or unconscionable

1    conduct claims as noted below, all Defendants.

2        1324.   Plaintiffs and class members are consumers who purchased JUUL products for

3    personal purposes.

4        1325.   Defendants created and implemented a scheme to create a market for e-cigarettes

5    and substantially increase sales of JUUL through a pervasive pattern of false and misleading

6    statements and omissions. Defendants aimed to portray JUUL products as cool and safe

7    alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

8    misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

9    addictiveness, and significant risks of substantial physical injury from using JUUL products.

10       1326.   Advertisements and representations for JUUL products contained deceptive

11   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

12   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

13   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

14   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

15   decades, JLI used third parties and word of mouth to spread false and misleading information

16   about JUUL products.

17       1327.   Advertisements and representations for JUUL products concealed and failed to

18   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives

19   to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

20   addictive, posed significant risks of substantial physical injury resulting from the use of the

21   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

22   consumed through a pack of combustible cigarettes.

23       1328.   The labels on JUUL products failed to disclose that the products posed

24   significant risks of substantial physical injury resulting from the use of the products. The labels

25   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

26       1329.   The omissions were misleading and deceptive standing alone and were

27   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

28   cigarettes and other representations.

1330. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1331. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity or tendency to mislead or deceive, and in fact did, mislead or deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1332. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1333. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1334. In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Haw. Rev. Stat. §§ 712-

1258(1) and 245-17(a)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1335.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1336.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— injunctive relief, reasonable attorneys' fees, actual damages not less than $1,000 as provided by the statute and/ or statutory damages in the amount of threefold the damages sustained, whichever is greater, and punitive damages, as well as any other relief the Court may deem just or proper.

**b.    Violation of the Hawaii Uniform Deceptive Trade Practice Act (Haw. Rev. Stat. § 481A-1, *et seq.*)**

1337.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1338.  This claim is brought against JLI and, for certain claims as noted below, the Management Defendants.

1339.  Plaintiffs and class members purchased JUUL products for personal purposes.

1340.  JLI is a "person" as defined in Haw. Rev. Stat. § 481A-2.

1341.  Defendants created and implemented a scheme to create a market for e-cigarettes

and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1342.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1343.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1344.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1345.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1346.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or

model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding.

1347.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, confuse and mislead reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1348.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1349. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1350. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members, and Plaintiffs and class members are likely to be damaged on an ongoing basis and in the future. Absent Defendants' unfair and fraudulent conduct, Plaintiffs

and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— injunctive relief and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### c.    Common Law Fraud

1351.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1352.   This claim is brought against JLI.

1353.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1354.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1355.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1356.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1357.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1358.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1359.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1360.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1361.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1362.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1363.   JUUL's conduct actually and proximately caused detriment to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.      Breach of the Implied Warranty of Merchantability

1364.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1365.   This claim is brought against JLI.

1366.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1367.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Haw. Rev. Stat. § 490:2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1368.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1369.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1370.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1371.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1372.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.   Unjust Enrichment

1373.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

---

1374.   This claim is brought against JLI and the Management Defendants.

1375.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1376.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.   Haw. Rev. Stat. §§ 712-1258(1) and 245-17(a) prohibits the marketing and sale of JUUL products to minors.

1377.   Defendants requested and received a measurable benefit at the expense of the Plaintiffs and class members in the form of payment for JUUL products.

1378.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1379.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1380.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1381.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 12.   Idaho

1382.   Plaintiffs bring each of the following claims on behalf of the Idaho Subclass under Idaho law

#### a.   Violation of the Idaho Consumer Protection Act (Idaho Code § 48-601, *et seq.*)

1383.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1384.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1385.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

1386.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1387.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1388.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1389.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1390.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1391.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products offended public policy; was immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

1392.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) engaging in acts or practices which are otherwise misleading, false, or deceptive to a consumer; and (e) engaging in unconscionable methods, acts, or practices in the conduct of trade or commerce.

1393.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency or capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking

cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1394.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1395.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1396.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1397.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Idaho Code §§ 39-5705(1) and 39-5714(1)); is immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; took advantage of minor consumers that are not reasonably able to protect their interests; and has caused substantial harm that greatly outweighs any benefits associated with the conduct.

1398.   As alleged above, all Defendants participated and/or facilitated the marketing of

JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1399.   Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, actual damages, disgorgement, restitution, and/ or statutory damages in the amount of $1,000, whichever is greater, and punitive damages, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

1400.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1401.   This claim is brought against JLI.

1402.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1403.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1404.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1405.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1406.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1407.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1408.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1409.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1410.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1411.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1412.   JUUL's conduct actually and proximately caused injury to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

1413.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1414.   This claim is brought against JLI.

1415.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1416.   Each JUUL product sold by JUUL comes with an implied warranty that it will

merchantable and fit for the ordinary purpose for which it would be used. Idaho Code § 28-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1417. The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1418. Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1419. Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1420. Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1421.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

1422.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1423.   This claim is brought against JLI and the Management Defendants.

1424.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1425.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  Idaho Code §§ 39-5705(1) and 39-5714(1) prohibits the marketing and sale of JUUL products to minors.

1426.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1427.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1428.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1429.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1430.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

**13.   Illinois**

1431.   Plaintiffs bring each of the following claims on behalf of the Illinois Subclass under Illinois law

    **a.      Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. § 505/1, *et seq.*)**

1432.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1433.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1434.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

1435.   Defendants, Plaintiffs, and class members are "persons" under the statute.

1436.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1437.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1438.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1439.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1440.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1441.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1442.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as

1   advertised; and (d) engaging in other conduct which similarly creates a likelihood of confusion

2   or misunderstanding.

3       1443.   JLI's conduct was fraudulent and deceptive because the misrepresentations and

4   omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to

5   reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs,

6   would have found it material to their purchasing decisions that JUUL's products (i) were not

7   smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii)

8   were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed

9   unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi)

10  that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a

11  pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor

12  in Plaintiffs' and class members' decisions to purchase JUUL products.

13      1444.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

14  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

15  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

16  facts; because the facts would be material to reasonable consumers; because JLI actively

17  concealed them; because JLI intended for consumers to rely on the omissions in question;

18  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

19  made partial representations concerning the same subject matter as the omitted facts.

20      1445.   Defendants knew or should have known that their misrepresentations and/or

21  omissions were false and misleading, and intended for consumers to rely on such

22  misrepresentations and omissions.

23      1446.  JLI and the Management Defendants engaged in fraudulent and deceptive

24  conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

25  products were appropriate for minors, when in fact the products never should have been

26  marketed to minors and are especially harmful to minors due to the potent and addictive

27  nicotine doses, addictive qualities, and health risks.

28      1447.  In addition, all Defendants engaged in unfair and unconscionable conduct

because the targeting of minors offends public policy (in particular 720 Ill. Comp. Stat. § 675/1.5(b) and 675/1.5(b)(c)(2)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1448.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1449.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, actual economic damages, and punitive damages, as well as any other relief the Court may deem just or proper.

### b.   Common Law Fraud

1450.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1451.   This claim is brought against JLI.

1452.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1453. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1454. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1455. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1456. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1457. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in

Plaintiffs' and class members' decisions to purchase JUUL products.

1458. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1459. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1460. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1461. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1462. JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

1463. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1464.   This claim is brought against JLI.

1465.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1466.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  810 Ill. Comp. Stat. § 5/2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1467.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1468.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1469.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1470.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

the Illinois Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1471.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.      Unjust Enrichment

1472.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1473.   This claim is brought against JLI and the Management Defendants.

1474.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1475.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  720 Ill. Comp. Stat.

1    § 675/1(a) and 675/1(b)(2) prohibits the marketing and sale of JUUL products to minors.

2    1476.   Defendants requested and received a measurable benefit at the expense of

3    Plaintiffs and class members in the form of payment for JUUL products.

4    1477.   Defendants appreciated, recognized, and chose to accept the monetary benefits

5    Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

6    expected result of Defendant acting in its pecuniary interest at the expense of its customers.

7    1478.   There is no justification for Defendants' enrichment. It would be inequitable,

8    unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

9    benefits were procured as a result of their wrongful conduct.

10   1479.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

11   and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

12   with Defendant.

13   1480.   Plaintiffs plead this claim separately as well as in the alternative to their other

14   claims, as without such claims they would have no adequate legal remedy.

15                    **14.    Indiana**

16   1481.   Plaintiffs bring each of the following claims on behalf of the Indiana Subclass

17   under Indiana law.

18                    **a.       Violation of Indiana's Deceptive Consumer Sales Act (Ind.**

19                    **Code §§ 24-5-0.5-1, *et seq*).**

20   1482.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21   1483.   This claim is brought against JLI and, for certain unfair and/or unconscionable

22   conduct claims as noted below, all Defendants.

23   1484.   Defendants are "suppliers" as that term is defined in Indiana's Deceptive

24   Consumer Sales Act.  Defendants engaged in incurable deceptive acts as set forth herein.

25   1485.   Plaintiffs and class members are individual consumers who purchased JUUL

26   products for personal purposes.

27   1486.   Defendants created and implemented a scheme to create a market for e-cigarettes

28   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

---

statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1487.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1488.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1489.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1490.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1491.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

substantial harm that greatly outweighs any possible utility from the conduct.

1492.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, uses, or benefits they do not have, which JUUL knows or reasonably should know they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not, and JUUL knows or reasonably should know they are not; and (c) advertising goods or services with intent not to sell them as advertised.

1493.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1494.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1495.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and

1   omissions.

2        1496.  Defendants knew or should have known that their misrepresentations and/or

3   omissions were false and misleading, and intended for consumers to rely on such

4   misrepresentations and omissions.

5        1497. JLI and the Management Defendants engaged in fraudulent and deceptive

6   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

7   products were appropriate for minors, when in fact the products never should have been

8   marketed to minors and are especially harmful to minors due to the potent and addictive

9   nicotine doses, addictive qualities, and health risks.

10        1498.  In addition, all Defendants engaged in unfair and unconscionable conduct

11   because the targeting of minors offends public policy (*see, e.g.*, Ind. Code §§ 35-46-1-10(a); 35-

12   46-1-10.2(a);  7.1-7-5.5-1;  7.1-7-5.5-2); is immoral, unethical, oppressive, outrageous,

13   unscrupulous, and substantially injurious; and has caused substantial harm that greatly

14   outweighs any possible utility from the conduct.

15        1499.  As alleged above, all Defendants participated and/or facilitated the marketing of

16   JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

17   and others have continued the deceptive, misleading, unfair, and unconscionable practices that

18   Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

19   use of JUUL products by minors continues to rise.

20        1500.  Defendants' conduct was incurable because it was done as part of a scheme with

21   the intent to defraud, mislead, and engage in unfair business practices.

22        1501. Defendants' conduct actually and proximately caused actual damages to

23   Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

24   class members would have behaved differently and would not have purchased JUUL products

25   or would have paid less for them. Defendants' misrepresentations and omissions induced

26   Plaintiffs and class members to purchase JUUL products they would not otherwise have

27   purchased and enter into purchase contracts they would not otherwise have entered into. In

28   addition, class members who are minors are entitled to full repayment of the amounts they spent

on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages and/or statutory damages in the amount of $500, whichever is greater; punitive damages because Defendants' deceptive acts were willful; restitution; and attorney's fees; as well as any other relief the Court may deem just or proper.

1502.  Plaintiffs have complied or substantially complied with all applicable notice requirements.

### b.       Common Law Fraud

1503.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1504.  This claim is brought against JLI.

1505.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1506.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1507.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1508.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1509.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1510.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1511.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1512.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1513.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

misrepresentations and omissions.

1514.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1515.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

1516.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1517.  This claim is brought against JLI.

1518.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1519.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Ind. Code § 26-1-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1520.  The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1521.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1522.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1523.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1524.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.     Unjust Enrichment

1525.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1526.   This claim is brought against JLI and the Management Defendants.

1527.   Defendants created and implemented a scheme to create a market for e-cigarettes

and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1528.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Indiana law (*see* Ind. Code §§ 35-46-1-10(a); 35-46-1-10.2(a); 7.1-7-5.5-1; 7.1-7-5.5-2) prohibits the marketing and sale of JUUL products to minors.

1529.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1530.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1531.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1532.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1533.   Plaintiffs plead this claim separately as well as in the alternative to their other

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1    claims, as without such claims they would have no adequate legal remedy.

2              **15.    Iowa**

3        1534.    Plaintiffs bring each of the following claims on behalf of the Iowa Subclass

4    under Iowa law.

5              **a.       Violation of the Iowa Consumer Fraud Act (Iowa Code**

6              **§ 714H.1, *et seq.*)**

7        1535.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

8        1536.    This claim is brought against JLI and, for certain unfair and/or unconscionable

9    conduct claims as noted below, all Defendants.

10       1537.    Plaintiffs and class members purchased JUUL products for personal purposes.

11       1538.    Defendants are "persons" under the statute.

12       1539.    Defendants created and implemented a scheme to create a market for e-cigarettes

13   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

14   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

15   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

16   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

17   addictiveness, and significant risks of substantial physical injury from using JUUL products.

18       1540.    Advertisements and representations for JUUL products contained deceptive

19   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

20   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

21   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

22   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

23   decades, JLI used third parties and word of mouth to spread false and misleading information

24   about JUUL products.

25       1541.    Advertisements and representations for JUUL products concealed and failed to

26   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

27   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

28   addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1542. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1543. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1544. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1545. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive ordinary and/or reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1546. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively

concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1547.   JUUL knew or reasonably should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1548.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1549.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Iowa Code Ann. § 453A.2) is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1550.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1551.   Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each

1   member of the class—actual damages, statutory damages up to three times actual damages

2   because Defendants' conduct represented a willful and wanton disregard for the safety of

3   Plaintiffs, attorney's fees,  and equitable relief, as well as any other relief the Court may deem

4   just or proper.

5   **b.     Common Law Fraud**

6   1552.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

7   1553.  This claim is brought against JLI.

8   1554.  JUUL created and implemented a scheme to create a market for e-cigarettes and

9   substantially increase sales of JUUL through a pervasive pattern of false and misleading

10   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

11   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

12   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

13   addictiveness, and significant risks of substantial physical injury from using JUUL products.

14   1555.  Advertisements and representations for JUUL products contained deceptive

15   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

16   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

17   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

18   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

19   decades, JLI used third parties and word of mouth to spread false and misleading information

20   about JUUL products.

21   1556.  Advertisements and representations for JUUL products concealed and failed to

22   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

23   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

24   addictive, posed significant risks of substantial physical injury resulting from the use of the

25   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

26   consumed through a pack of combustible cigarettes.

27   1557.  The labels on JUUL products failed to disclose that the products posed

28   significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1558. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1559. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1560. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1561. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1562. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1563. JLI knew that JUUL products were not safe or reasonable alternatives to

1 combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
2 addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the
3 products.

4     1564.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class
5 members. Absent JUUL's conduct, Plaintiffs and class members would have behaved
6 differently and would not have purchased JUUL products or would have paid less for them.
7 JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase
8 JUUL products they would not otherwise have purchased and enter into purchase contracts they
9 would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each
10 member of the class, compensatory damages in an amount to be proven at trial and punitive
11 damages, as well as any other relief the Court may deem just or proper.

12         **c.**    **Breach of the Implied Warranty of Merchantability**

13     1565.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

14     1566.   This claim is brought against JLI.

15     1567.   JUUL has at all times been a merchant with respect to the products which were
16 sold to Plaintiff and the class and was in the business of selling such products.

17     1568.   Each JUUL product sold by JUUL comes with an implied warranty that it will
18 merchantable and fit for the ordinary purpose for which it would be used. *See* Iowa Code Ann.
19 § 554.2314.   JUUL has breached its implied warranty of merchantability because its products
20 were not in merchantable condition when sold, were defective when sold, did not conform to the
21 promises and affirmations of fact made on the products' containers or labels, and/or do not
22 possess even the most basic degree of fitness for ordinary use.

23     1569.   The ordinary intended purpose of JUUL's products—and the purpose for which
24 they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's
25 products are not fit for that use—or any other use—because they (i) were not smoking cessation
26 devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
27 potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed
28 unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1570.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1571.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1572.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1573.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.      Unjust Enrichment

1574.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1575.   This claim is brought against JLI and the Management Defendants.

1576.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1577.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Iowa law (Iowa Code Ann. § 453A.2) prohibits the marketing and sale of JUUL products to minors.

1578.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1579.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1580.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1581.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1582.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy

### 16.   Kansas

1583.   Plaintiffs bring each of the following claims on behalf of the Kansas Subclass

1    under Kansas law.

2           a.       **Violation of Kansas Consumer Protection Act (Kan. Stat.**

3                    **Ann. § 50-623, *et seq*.)**

4           1584.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

5           1585.   This claim is brought against JLI and, for certain unfair and/or unconscionable

6    conduct claims as noted below, all Defendants.

7           1586.   Defendants are "suppliers" as that term is defined in Kansas's Consumer

8    Protection Act.

9           1587.   Plaintiffs and class members are individuals who purchased JUUL products for

10   personal purposes.

11          1588.   Defendants created and implemented a scheme to create a market for e-cigarettes

12   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

13   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

14   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

15   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

16   addictiveness, and significant risks of substantial physical injury from using JUUL products.

17          1589.   Advertisements and representations for JUUL products contained deceptive

18   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

19   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

20   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

21   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

22   decades, JLI used third parties and word of mouth to spread false and misleading information

23   about JUUL products.

24          1590.   Advertisements and representations for JUUL products concealed and failed to

25   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

26   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

27   addictive, posed significant risks of substantial physical injury resulting from the use of the

28   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

consumed through a pack of combustible cigarettes.

1591.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1592.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1593.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1594.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have and (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; and (d) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact.

1595.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, were likely to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a

pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1596. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1597. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1598. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1599. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1600. In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Kan. Stat. Ann. § 79-3321); is immoral, unethical, oppressive, and unscrupulous; took advantage of minors' inability to reasonably protect their interests; and has caused substantial harm that greatly outweighs any benefits associated with the conduct.

1601. As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

1   and others have continued the deceptive, misleading, unfair, and unconscionable practices that

2   Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

3   use of JUUL products by minors continues to rise.

4        1602.   Defendants' conduct actually and proximately caused damage to Plaintiffs and

5   class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members

6   would have behaved differently and would not have purchased JUUL products or would have

7   paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class

8   members to purchase JUUL products they would not otherwise have purchased and enter into

9   purchase contracts they would not otherwise have entered into. In addition, class members who

10   are minors are entitled to full repayment of the amounts they spent on JUUL products.

11   Plaintiffs seek—on behalf of themselves and each member of the class—actual damages,

12   attorney's fees, and equitable relief, as well as any other relief the Court may deem just or

13   proper.

14                   **b.**       **Common Law Fraud**

15        1603.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

16        1604.   This claim is brought against JLI.

17        1605.   JUUL created and implemented a scheme to create a market for e-cigarettes and

18   substantially increase sales of JUUL through a pervasive pattern of false and misleading

19   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

20   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

21   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

22   addictiveness, and significant risks of substantial physical injury from using JUUL products.

23        1606.   Advertisements and representations for JUUL products contained deceptive

24   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

25   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

26   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

27   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

28   decades, JLI used third parties and word of mouth to spread false and misleading information

1    about JUUL products.

2        1607.   Advertisements and representations for JUUL products concealed and failed to

3    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

4    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5    addictive, posed significant risks of substantial physical injury resulting from the use of the

6    products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

7    consumed through a pack of combustible cigarettes.

8        1608.   The labels on JUUL products failed to disclose that the products posed

9    significant risks of substantial physical injury resulting from the use of the products. The labels

10   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

11       1609.   The omissions were misleading and deceptive standing alone and were

12   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

13   cigarettes and other representations.

14       1610.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

15   omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

16   including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

17   material to their purchasing decisions that JUUL's products (i) were not smoking cessation

18   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

19   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

20   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

21   consumed through one JUUL pod exceeded the nicotine consumed through a pack of

22   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

23   Plaintiffs' and class members' decisions to purchase JUUL products.

24       1611.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

25   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

26   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

27   facts; because the facts would be material to reasonable consumers; because JUUL products

28   pose an unreasonable risk of substantial bodily injury; and because JLI made partial

representations concerning the same subject matter as the omitted facts.

1612.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1613.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1614.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1615.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

1616.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1617.   This claim is brought against JLI.

1618.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1619.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   *See* Kan. Stat. Ann. § 84–2–314.  JUUL has breached its implied warranty of merchantability because its products

1   were not in merchantable condition when sold, were defective when sold, did not conform to the

2   promises and affirmations of fact made on the products' containers or labels, and/or do not

3   possess even the most basic degree of fitness for ordinary use.

4       1620.   The ordinary intended purpose of JUUL's products—and the purpose for which

5   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

6   products are not fit for that use—or any other use—because they (i) were not smoking cessation

7   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

8   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

9   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

10  products are not fit for their ordinary, intended use as either cigarette replacement devices or

11  recreation smoking devices.

12      1621.   Plaintiffs and each member of the class have had sufficient direct dealings with

13  either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

14  by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

15  each member of the class, on the other hand.

16      1622.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

17  JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

18  sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the

19  intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

20  the express purpose an intent of being sold to consumers.

21      1623.   Plaintiffs and the members of the class were injured as a direct and proximate

22  result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

23  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

24  because, had they been aware of the unmerchantable condition of JUUL products, they would

25  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

26  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

27      1624.   JUUL was provided notice of these issues by numerous complaints filed against

28  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

1625.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1626.   This claim is brought against JLI and the Management Defendants.

1627.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1628.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Kansas law (*see* Kan. Stat. Ann. § 79-3321(l)) prohibits the marketing and sale of JUUL products to minors

1629.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1630.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1631.   There is no justification for Defendants' enrichment. It would be inequitable,

1  unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

2  benefits were procured as a result of their wrongful conduct.

3     1632.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

4  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

5  with Defendant.

6     1633.   Plaintiffs plead this claim separately as well as in the alternative to their other

7  claims, as without such claims they would have no adequate legal remedy.

8          **17.   Kentucky**

9     1634.   Plaintiffs bring each of the following claims on behalf of the Kentucky Subclass

10  under Kentucky law.

11          **a.      Violation of Kentucky Consumer Protection Act (Ky. Rev.**

12          **Stat. Ann. § 367.110, *et seq*.)**

13     1635.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

14     1636.   This claim is brought against JLI and, for certain unfair and/or unconscionable

15  conduct claims as noted below, all Defendants.

16     1637.   Defendants are sellers of JUUL products.

17     1638.   Plaintiffs and class member are "persons" under the statute.

18     1639.   Plaintiffs and class members are individuals who purchased JUUL products for

19  personal purposes.

20     1640.   Plaintiffs and each member of the class have had direct dealings with either

21  JUUL via its website or its agents (including distributors, dealers, and sellers authorized by

22  JUUL). Further, Plaintiffs and each member of the class were third-party beneficiaries of

23  JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

24  sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

25  intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

26  the express purpose an intent of being sold to consumers.

27     1641.   Defendants created and implemented a scheme to create a market for e-cigarettes

28  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1642.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1643.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1644.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1645.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1646.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

1    substantial harm that greatly outweighs any possible utility from the conduct.

2        1647.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

3    omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

4    including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

5    material to their purchasing decisions that JUUL's products (i) were not smoking cessation

6    devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

7    potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

8    risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

9    consumed through one JUUL pod exceeded the nicotine consumed through a pack of

10   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

11   Plaintiffs' and class members' decisions to purchase JUUL products.

12       1648.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

13   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

14   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

15   facts; because the facts would be material to reasonable consumers; because JLI actively

16   concealed them; because JLI intended for consumers to rely on the omissions in question;

17   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

18   made partial representations concerning the same subject matter as the omitted facts.

19       1649.  JLI and the Management Defendants engaged in fraudulent and deceptive

20   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

21   products were appropriate for minors, when in fact the products never should have been

22   marketed to minors and are especially harmful to minors due to the potent and addictive

23   nicotine doses, addictive qualities, and health risks.

24       1650.  In addition, all Defendants engaged in unfair and unconscionable conduct

25   because the targeting of minors offends public policy (*see, e.g.*, Ky. Rev. Stat. Ann. §§ 438.310,

26   438.313); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially

27   injurious; and has caused substantial harm that greatly outweighs any possible utility from the

28   conduct.

1651.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1652.   Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, punitive damages, attorney's fees and costs, and equitable relief, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

1653.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1654.   This claim is brought against JLI.

1655.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1656.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

1   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
2   decades, JLI used third parties and word of mouth to spread false and misleading information
3   about JUUL products.

4       1657.  Advertisements and representations for JUUL products concealed and failed to
5   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
6   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
7   addictive, posed significant risks of substantial physical injury resulting from the use of the
8   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
9   consumed through a pack of combustible cigarettes.

10      1658.  The labels on JUUL products failed to disclose that the products posed
11  significant risks of substantial physical injury resulting from the use of the products. The labels
12  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

13      1659.  The omissions were misleading and deceptive standing alone and were
14  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
15  cigarettes and other representations.

16      1660.  JLI's conduct was fraudulent and deceptive because its misrepresentations and
17  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers
18  including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it
19  material to their purchasing decisions that JUUL's products (i) were not smoking cessation
20  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
21  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable
22  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine
23  consumed through one JUUL pod exceeded the nicotine consumed through a pack of
24  combustible cigarettes. Knowledge of these facts would have been a substantial factor in
25  Plaintiffs' and class members' decisions to purchase JUUL products.

26      1661.  JLI owed Plaintiffs and class members a duty to disclose these facts because they
27  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
28  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1662.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1663.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1664.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1665.  JUUL's conduct actually and proximately caused damage including an ascertainable loss of money or property to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

1666.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1667.  This claim is brought against JLI.

1668.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1669.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Ky. Rev. Stat. Ann. § 355.2-314.   JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1670.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1671.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1672.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1673.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Kentucky Direct Purchase Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have

1   paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any
2   other relief the Court may deem just or proper.

3   1674.   JUUL was provided notice of these issues by numerous complaints filed against
4   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous
5   individual letters and communications sent by consumers before or within a reasonable amount
6   of time after they discovered or should have discovered that's JUUL product were defective and
7   unmerchantable.

8                          **d.      Unjust Enrichment**

9   1675.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10  1676.   This claim is brought against JLI and the Management Defendants.

11  1677.   Defendants created and implemented a scheme to create a market for e-cigarettes
12  and substantially increase sales of JUUL products through a pervasive pattern of false and
13  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and
14  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,
15  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and
16  doses, addictiveness, and significant risks of substantial physical injury from using JUUL
17  products.

18  1678.   Defendants were unjustly enriched as a result of their wrongful conduct,
19  including through the false and misleading advertisements and omissions regarding (i) whether
20  JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable
21  alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were
22  powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from
23  the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the
24  nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly
25  enriched through their scheme of marketing their products to minors. Kentucky law (*see* Ky.
26  Rev. Stat. Ann. §§ 438.310, 438.313) prohibits the marketing and sale of JUUL products to
27  minors.

28  1679.   Defendants requested and received a measurable benefit at the expense of

1    Plaintiffs and class members in the form of payment for JUUL products.

2        1680.   Defendants appreciated, recognized, and chose to accept the monetary benefits

3    Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

4    expected result of Defendant acting in its pecuniary interest at the expense of its customers.

5        1681.   There is no justification for Defendants' enrichment. It would be inequitable,

6    unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

7    benefits were procured as a result of their wrongful conduct.

8        1682.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

9    and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

10   with Defendant.

11       1683.   Plaintiffs plead this claim separately as well as in the alternative to their other

12   claims, as without such claims they would have no adequate legal remedy.

13                       **18.    Louisiana**

14       1684.   Plaintiffs bring each of the following claims on behalf of the Louisiana Subclass

15   under Louisiana law.

16                   a.       **Violation of Louisiana Unfair Trade Practices and Consumer**

17                            **Protection Law (La. Rev. Stat. Ann. § 51:1401, *et seq.*)**

18       1685.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

19       1686.   This claim is brought against JLI and, for certain unfair and/or unconscionable

20   conduct claims as noted below, all Defendants.

21       1687.   Plaintiffs and class members are persons who purchased JUUL products for

22   personal purposes.

23       1688.   Defendants created and implemented a scheme to create a market for e-cigarettes

24   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

25   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

26   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

27   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

28   addictiveness, and significant risks of substantial physical injury from using JUUL products.

1689.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1690.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1691.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1692.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1693.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1694.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1695.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1696.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1697.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1698.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, La. Rev. Stat. Ann. §§ 14:91.8, 14:91.6(A)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1699.  As alleged above, all Defendants participated and/or facilitated the marketing of

JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1700.  Defendants' conduct actually and proximately caused an ascertainable loss of money or movable property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—three times damages because Defendants deceptive and fraudulent conduct was done knowingly, and reasonable attorneys' fees and costs, as well as any other relief the Court may deem just or proper.

### b.    Common Law Fraud

1701.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1702.  This claim is brought against JLI.

1703.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1704.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1705.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1706.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1707.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1708.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1709.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1710.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1711.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1712.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1713.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, compensatory damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

1714.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1715.  This claim is brought against JLI.

1716.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1717.  Each JUUL product sold by JUUL comes with an implied warranty that it will

merchantable and fit for the ordinary purpose for which it would be used. *See* LSA-C.C. Art. 2475. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1718.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1719.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1720.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1721.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1722.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

1723.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1724.   This claim is brought against JLI and the Management Defendants.

1725.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1726.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. The Louisiana Prevention of Youth Access to Tobacco Law and other statutes (*see* La. Rev. Stat. Ann. §§ 14:91.8 and 14:91.6) prohibit the marketing and sale of JUUL products to minors.

1727.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1728.   Defendants appreciated, recognized, and chose to accept the monetary benefits

Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1729. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1730. Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1731. Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 19. Maine

1732. Plaintiffs bring each of the following claims on behalf of the Maine Subclass under Maine law.

### a. Violation of Maine Unfair Trade Practices Act (5 M.R.S.A. § 205-A, *et seq.*)

1733. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1734. This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1735. Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

1736. Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1737. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1738.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1739.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1740.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1741.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1742.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, mislead reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery

mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1743.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1744.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1745.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1746.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, 22 M.R.S.A. § 1555-B (2)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1747.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that

Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1748.   Defendants' conduct actually and proximately caused the loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, restitution, attorney's fees and costs, and injunctive relief, as well as any other relief the Court may deem just or proper.

1749.   Plaintiffs have complied or substantially complied with all applicable notice requirements.

**b.     Violation of Maine Uniform Deceptive Trade Practices Act (10 M.R.S.A. § 1211, *et seq.*)**

1750.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1751.   This claim is brought against JLI and, for certain claims as noted below, the Management Defendants.

1752.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

1753.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1754.   Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1755.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1756.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1757.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1758.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in conduct which creates a likelihood of confusion or of misunderstanding.

1759.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their

purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1760.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1761.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1762.   Defendants' conduct actually and proximately caused damage to Plaintiffs and class members and is likely to cause damage in the future. Absent Defendants' deceptive and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, attorney's fees, and equitable

relief, as well as any other relief the Court may deem just or proper.

### c.     Common Law Fraud

1763.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1764.   This claim is brought against JLI.

1765.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1766.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1767.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1768.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1769.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

cigarettes and other representations.

1770.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1771.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1772.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1773.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1774.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1775.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### d.    Breach of the Implied Warranty of Merchantability

1776.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1777.   This claim is brought against JLI.

1778.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1779.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* 11 M.R.S.A. § 2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1780.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1781.   Plaintiffs and each member of the class have had sufficient direct dealings with

either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1782.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1783.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1784.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.      Unjust Enrichment

1785.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1786.   This claim is brought against JLI and the Management Defendants.

1787.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL

products.

1788.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Maine law (*see* 22 M.R.S.A. § 1555-B) prohibits the marketing and sale of JUUL products to minors.

1789.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1790.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1791.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1792.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1793.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 20.   Maryland

1794.   Plaintiffs bring each of the following claims on behalf of the Maryland Subclass under Maryland law.

a.     **Violation of Maryland Consumer Protection Act (Md. Code Ann. Com. Law § 13-101, *et seq.*)**

1795.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1796.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1797.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1798.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1799.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1800.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1801.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

1    also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2        1802.  The omissions were misleading and deceptive standing alone and were

3    particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

4    cigarettes and other representations.

5        1803.  JLI's conduct was unfair and unconscionable in that it included (i) the

6    manufacture and sale of products with a heightened propensity to cause addiction and physical

7    injuries and (ii) misrepresentations and omissions of material facts concerning the

8    characteristics and safety of JUUL products that offended public policy; were immoral,

9    unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

10   substantial harm that greatly outweighs any possible utility from the conduct.

11       1804.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

12   unfair business practices: (a) misrepresenting that JUUL products have characteristics,

13   ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

14   products are of a particular standard, quality, or grade, or that goods are of a particular style or

15   model, when they are not; (c) advertising goods or services with intent not to sell them as

16   advertised; (d) stating a material fact that deceives or tends to deceive; and (e) engaging in

17   deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment,

18   suppression, or omission of any material fact with the intent that a consumer rely on the same.

19       1805.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

20   omissions had the capacity, tendency and effect of deceiving or misleading reasonable

21   consumers; and in fact did, deceive and mislead reasonable consumers including the Plaintiffs.

22   Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing

23   decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable

24   alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms,

25   (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury

26   resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL

27   pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of

28   these facts would have been a substantial factor in Plaintiffs' and class members' decisions to

CONSOLIDATED CLASS ACTION COMPLAINT
                                         Case No. 19-md-02913-WHO

purchase JUUL products.

1806.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1807.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1808.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1809.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1810.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Md. Code Ann. Health Gen. § 24- 305(b); Md. Code Ann. Crim. Law §§ 10-107(b)(2), (c)(1)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1811.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that

Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1812.   Defendants' conduct actually and proximately caused injury and loss to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—damages and attorney's fees, as well as any other relief the Court may deem just or proper.

### b.   Common Law Fraud

1813.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1814.   This claim is brought against JLI.

1815.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1816.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1817.   Advertisements and representations for JUUL products concealed and failed to

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1818.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1819.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1820.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1821.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1822.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1823. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1824. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1825. JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.      Breach of the Implied Warranty of Merchantability

1826. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1827. This claim is brought against JLI.

1828. JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1829. Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* Md. Code Ann. Com. Law § 2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels,

1   and/or do not possess even the most basic degree of fitness for ordinary use.

2   1830.   The ordinary intended purpose of JUUL's products—and the purpose for which

3   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

4   products are not fit for that use—or any other use—because they (i) were not smoking cessation

5   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

6   potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed

7   unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's

8   products are not fit for their ordinary, intended use as either cigarette replacement devices or

9   recreation smoking devices.

10   1831.   Plaintiffs and each member of the class have had sufficient direct dealings with

11   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

12   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

13   each member of the class, on the other hand.

14   1832.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

15   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

16   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

17   intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

18   the express purpose an intent of being sold to consumers.

19   1833.   Plaintiffs and the members of the class were injured as a direct and proximate

20   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

21   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

22   because, had they been aware of the unmerchantable condition of JUUL products, they would

23   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

24   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

25   1834.   JUUL was provided notice of these issues by numerous complaints filed against

26   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

27   individual letters and communications sent by consumers before or within a reasonable amount

28   of time after they discovered or should have discovered that's JUUL product were defective and

1    unmerchantable.

2                    **d.    Unjust Enrichment**

3        1835.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4        1836.   This claim is brought against JLI and the Management Defendants.

5        1837.   Defendants created and implemented a scheme to create a market for e-cigarettes
6    and substantially increase sales of JUUL products through a pervasive pattern of false and
7    misleading statements and omissions. Defendants aimed to portray JUUL products as cool and
8    safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,
9    while misrepresenting or omitting key facts concerning JUUL products' nicotine content and
10   doses, addictiveness, and significant risks of substantial physical injury from using JUUL
11   products.

12       1838.   Defendants were unjustly enriched as a result of their wrongful conduct,
13   including through the false and misleading advertisements and omissions regarding (i) whether
14   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable
15   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were
16   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from
17   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the
18   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly
19   enriched through their scheme of marketing their products to minors. Maryland law (*see* Md.
20   Code Ann. Health Gen. § 24- 305(b); Md. Code Ann. Crim. Law §§ 10-107(b)(2), (c)(1))
21   prohibits the marketing and sale of JUUL products to minors.

22       1839.   Defendants requested and received a measurable benefit at the expense of
23   Plaintiffs and class members in the form of payment for JUUL products.

24       1840.   Defendants appreciated, recognized, and chose to accept the monetary benefits
25   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the
26   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

27       1841.   There is no justification for Defendants' enrichment. It would be inequitable,
28   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

1    benefits were procured as a result of their wrongful conduct.

2        1842.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

3    and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

4    with Defendant.

5        1843.   Plaintiffs plead this claim separately as well as in the alternative to their other

6    claims, as without such claims they would have no adequate legal remedy.

7                **21.   Massachusetts**

8        1844.   Plaintiffs bring each of the following claims on behalf of the Massachusetts

9    Subclass under Massachusetts law.

10                **a.       Violation of Massachusetts Regulation of Business Practice**

11                **and Consumer Protection Act (M.G.L.A. 93A, § 1,** *et seq.***)**

12       1845.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

13       1846.   This claim is brought against JLI and, for certain unfair and/or unconscionable

14   conduct claims as noted below, all Defendants.

15       1847.   Plaintiffs and class members are persons who purchased JUUL products for

16   personal purposes.

17       1848.   Defendants created and implemented a scheme to create a market for e-cigarettes

18   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

19   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

20   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

21   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

22   addictiveness, and significant risks of substantial physical injury from using JUUL products.

23       1849.   Advertisements and representations for JUUL products contained deceptive

24   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

25   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

26   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

27   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

28   decades, JLI used third parties and word of mouth to spread false and misleading information

1  about JUUL products.

2      1850.   Advertisements and representations for JUUL products concealed and failed to

3  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

4  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5  addictive, posed significant risks of substantial physical injury resulting from the use of the

6  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

7  consumed through a pack of combustible cigarettes.

8      1851.  The labels on JUUL products failed to disclose that the products posed

9  significant risks of substantial physical injury resulting from the use of the products. The labels

10  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

11      1852.  The omissions were misleading and deceptive standing alone and were

12  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

13  cigarettes and other representations.

14      1853.  JLI's conduct was unfair and unconscionable in that it included (i) the

15  manufacture and sale of products with a heightened propensity to cause addiction and physical

16  injuries and (ii) misrepresentations and omissions of material facts concerning the

17  characteristics and safety of JUUL products that offended public policy; were immoral,

18  unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

19  substantial harm that greatly outweighs any possible utility from the conduct.

20      1854.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

21  omissions had the capacity to, tendency to, and in fact did, deceive reasonable consumers

22  including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

23  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

24  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

25  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

26  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

27  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

28  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

Plaintiffs' and class members' decisions to purchase JUUL products.

1855.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1856.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1857.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1858.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, M.G.L.A. 270 § 6(b)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1859.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1860.   Defendants' conduct actually and proximately caused injury to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have

paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—actual damages; injunctive relief; attorney's fees and costs; and because Defendants' conduct was a willful and knowing violation, punitive damages; as well as any other relief the Court may deem just or proper.

1861.   Plaintiffs have complied or substantially complied with all applicable notice requirements, or are otherwise excused from compliance because Defendants do not maintain a place of business in and/ or do not keep assets within the state of Massachusetts.

### b.   Common Law Fraud

1862.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1863.   This claim is brought against JLI.

1864.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1865.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1866.   Advertisements and representations for JUUL products concealed and failed to

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1867.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1868.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1869.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1870.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1871.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1872.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1873.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1874.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

1875.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1876.   This claim is brought against JLI.

1877.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1878.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* M.G.L.A. 106 § 2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not

possess even the most basic degree of fitness for ordinary use.

1879.  The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1880.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1881.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1882.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1883.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and

1    unmerchantable.

2                    **d.    Unjust Enrichment**

3    1884.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4    1885.   This claim is brought against JLI and the Management Defendants.

5    1886.   Defendants created and implemented a scheme to create a market for e-cigarettes
6    and substantially increase sales of JUUL products through a pervasive pattern of false and
7    misleading statements and omissions. Defendants aimed to portray JUUL products as cool and
8    safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,
9    while misrepresenting or omitting key facts concerning JUUL products' nicotine content and
10   doses, addictiveness, and significant risks of substantial physical injury from using JUUL
11   products.

12   1887.   Defendants were unjustly enriched as a result of their wrongful conduct,
13   including through the false and misleading advertisements and omissions regarding (i) whether
14   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable
15   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were
16   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from
17   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the
18   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly
19   enriched through their scheme of marketing their products to minors. Massachusetts law (*see*
20   M.G.L.A. 270 § 6(b)) prohibits the marketing and sale of JUUL products to minors.

21   1888.   Defendants requested and received a measurable benefit at the expense of
22   Plaintiffs and class members in the form of payment for JUUL products.

23   1889.   Defendants appreciated, recognized, and chose to accept the monetary benefits
24   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the
25   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

26   1890.   There is no justification for Defendants' enrichment. It would be inequitable,
27   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the
28   benefits were procured as a result of their wrongful conduct.

1891.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1892.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 22.   Michigan

1893.   Plaintiffs bring each of the following claims on behalf of the Michigan Subclass under Michigan law.

### a.   Violation of Michigan Consumer Protection Act (M.C.L.A. § 445.901, *et seq.*)

1894.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1895.   This claim is brought against JLI.

1896.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1897.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1898.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1899.   Advertisements and representations for JUUL products concealed and failed to

---

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1900.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1901.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1902.   JUUL's prohibited fraudulent, deceptive, and unfair business practices conduct includes, but is not limited to the following: (a) representing that the goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have ; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; (e) making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and (f) failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1903.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily

injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1904.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1905.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1906.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1907.   Defendants' conduct actually and proximately caused Plaintiffs and class members to be injured and to sustain losses. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages and equitable relief, as well as any other relief the Court may deem just or proper.

b.      **Common Law Fraud**

1908.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1909.   This claim is brought against JLI.

1910.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1911.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1912.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1913.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1914.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1915.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1916.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1917.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1918.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1919.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1920.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class

1    members.  Absent JUUL's conduct, Plaintiffs and class members would have behaved

2    differently and would not have purchased JUUL products or would have paid less for them.

3    JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

4    JUUL products they would not otherwise have purchased and enter into purchase contracts they

5    would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each

6    member of the class, damages in an amount to be proven at trial and punitive damages, as well

7    as any other relief the Court may deem just or proper.

8                       **c.      Breach of the Implied Warranty of Merchantability**

9         1921.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10        1922.   This claim is brought against JLI.

11        1923.   JUUL has at all times been a merchant with respect to the products which were

12   sold to Plaintiff and the class and was in the business of selling such products.

13        1924.   Each JUUL product sold by JUUL comes with an implied warranty that it will

14   merchantable and fit for the ordinary purpose for which it would be used. *See* M.C.L.A.

15   § 440.2314. JUUL has breached its implied warranty of merchantability because its products

16   were not in merchantable condition when sold, were defective when sold, did not conform to the

17   promises and affirmations of fact made on the products' containers or labels, and/or do not

18   possess even the most basic degree of fitness for ordinary use.

19        1925.   The ordinary intended purpose of JUUL's products—and the purpose for which

20   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

21   products are not fit for that use—or any other use—because they (i) were not smoking cessation

22   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

23   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

24   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

25   products are not fit for their ordinary, intended use as either cigarette replacement devices or

26   recreation smoking devices.

27        1926.   Plaintiffs and each member of the class have had sufficient direct dealings with

28   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

1   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and
2   each member of the class, on the other hand.

3   1927.   Further, Plaintiffs and each member of the class were third-party beneficiaries of
4   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and
5   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the
6   intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with
7   the express purpose an intent of being sold to consumers.

8   1928.   Plaintiffs and the members of the class were injured as a direct and proximate
9   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of
10   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability
11   because, had they been aware of the unmerchantable condition of JUUL products, they would
12   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages
13   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14   1929.   JUUL was provided notice of these issues by numerous complaints filed against
15   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous
16   individual letters and communications sent by consumers before or within a reasonable amount
17   of time after they discovered or should have discovered that's JUUL product were defective and
18   unmerchantable.

19                    **d.   Unjust Enrichment**

20   1930.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21   1931.   This claim is brought against JLI and the Management Defendants.

22   1932.   Defendants created and implemented a scheme to create a market for e-cigarettes
23   and substantially increase sales of JUUL products through a pervasive pattern of false and
24   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and
25   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,
26   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and
27   doses, addictiveness, and significant risks of substantial physical injury from using JUUL
28   products.

CONSOLIDATED CLASS ACTION COMPLAINT
                                       Case No. 19-md-02913-WHO

1933.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  Michigan law (*see* M.C.L.A. § 722.641) prohibits the marketing and sale of JUUL products to minors.

1934.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1935.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1936.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1937.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1938.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 23.   Minnesota

1939.   Plaintiffs bring each of the following claims on behalf of the Minnesota Subclass under Minnesota law.

### a.   Violation of Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.69)

1940.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1941.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

1942.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1943.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1944.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1945.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1946.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1947.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

cigarettes and other representations.

1948.  JUUL engaged in acts, used, and employed, fraud, false pretenses, false promises, misrepresentations, misleading statements and deceptive practices. JUUL's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1949.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1950.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1951. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1952.  Defendants' conduct actually and proximately caused injury to Plaintiffs and

1   class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members

2   would have behaved differently and would not have purchased JUUL products or would have

3   paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class

4   members to purchase JUUL products they would not otherwise have purchased and enter into

5   purchase contracts they would not otherwise have entered into. In addition, class members who

6   are minors are entitled to full repayment of the amounts they spent on JUUL products.

7   Plaintiffs seek—on behalf of themselves and each member of the class—damages, attorney's

8   fees and costs, and injunctive relief; as well as any other relief the Court may deem just or

9   proper. *See* M.S.A. § 8.31. This cause of action will benefit the public by requiring JUUL to

10  permanently cease the deceptive sale and marketing of dangerous products to consumers in

11  Minnesota and throughout the country, and to require JUUL to cease, and take steps to prevent,

12  the marketing and sale of JUUL products to minors.

### b. Violation of Minnesota False Statement in Advertising Law (Minn. Stat. § 325F.67)

15  1953.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

16  1954.  This claim is brought against JLI and, for certain claims below, the Management

17  Defendants.

18  1955.  Plaintiffs and class members are individuals who purchased JUUL products for

19  personal purposes.

20  1956.  Defendants created and implemented a scheme to create a market for e-cigarettes

21  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

22  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

23  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

24  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

25  addictiveness, and significant risks of substantial physical injury from using JUUL products.

26  1957.  Advertisements and representations for JUUL products contained deceptive

27  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

28  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1958.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1959.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1960.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1961.  JUUL has made, published, disseminated, circulated and placed before the public, and caused to be made, published, disseminated, circulated and placed before the public advertisements of merchandise for use, consumption, purchase, and sale that contain material assertions, representations, and statements of fact that are untrue, deceptive, and misleading.

1962.  JUUL's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor

1   in Plaintiffs' and class members' decisions to purchase JUUL products.

2       1963.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

3   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

4   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

5   facts; because the facts would be material to reasonable consumers; because JLI actively

6   concealed them; because JLI intended for consumers to rely on the omissions in question;

7   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

8   made partial representations concerning the same subject matter as the omitted facts.

9       1964.   JLI knew or should have known that its misrepresentations and/or omissions

10  were false and misleading, and intended for consumers to rely on such misrepresentations and

11  omissions.

12      1965.   JLI and the Management Defendants engaged in fraudulent and deceptive

13  conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

14  products were appropriate for minors, when in fact the products never should have been

15  marketed to minors and are especially harmful to minors due to the potent and addictive

16  nicotine doses, addictive qualities, and health risks.

17      1966.   Defendants' conduct actually and proximately caused injury to Plaintiffs and

18  class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members

19  would have behaved differently and would not have purchased JUUL products or would have

20  paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class

21  members to purchase JUUL products they would not otherwise have purchased and enter into

22  purchase contracts they would not otherwise have entered into. In addition, class members who

23  are minors are entitled to full repayment of the amounts they spent on JUUL products.

24  Plaintiffs seek—on behalf of themselves and each member of the class—damages, attorney's

25  fees and costs, and injunctive relief; as well as any other relief the Court may deem just or

26  proper. *See* M.S.A. § 8.31. This cause of action will benefit the public by requiring JUUL to

27  permanently cease the deceptive sale and marketing of dangerous products to consumers in

28  Minnesota and throughout the country, and to require JUUL to cease, and take steps to prevent,

the marketing and sale of JUUL products to minors.

                 **c.**        **Violation of Minnesota Deceptive Trade Practices Act (Minn. Stat. § 325D.43, *et seq*.)**

1967.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1968.   This claim is brought against JLI.

1969.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1970.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1971.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1972.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1973.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1974. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1975. JUUL's conduct constituted the following prohibited fraudulent and deceptive business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in conduct that creates a likelihood of confusion or misunderstanding.

1976. JUUL's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1977. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1978. JUUL's conduct actually and proximately caused injury to Plaintiffs and class members and is likely to cause injury in the future. Absent Defendants' unfair and fraudulent

conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, attorney's fees and costs, and equitable relief; as well as any other relief the Court may deem just or proper.

### d.    Common Law Fraud

1979.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1980.   This claim is brought against JLI.

1981.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1982.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1983.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1984.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1985.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1986.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1987.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1988.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1989.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1990.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1991.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### e.    Breach of the Implied Warranty of Merchantability

1992.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1993.   This claim is brought against JLI.

1994.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1995.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Minn. Stat. § 336.2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1996.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1997.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1998.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1999.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2000.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### f.    Unjust Enrichment

2001.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2002.   This claim is brought against JLI and the Management Defendants.

2003.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2004.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Minnesota law (*see* Minn. Stat. §§ 609.685) prohibits the marketing and sale of JUUL products to minors.

2005.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2006.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2007.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2008.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2009.  Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy

### 24.   Mississippi

2010.  Plaintiffs bring each of the following claims on behalf of the Mississippi Subclass under Mississippi law.

**a.      Violation of Mississippi Consumer Protection Act (Miss. Code Ann. § 75-24-1, *et seq.*)**

2011.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2012.  This claim is brought against JLI.

2013.  Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

2014.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2015.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2016.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2017.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2018.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2019.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

2020.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to, had the tendency to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2021.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively

concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2022. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2023. Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—damages, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

2024. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2025. This claim is brought against JLI.

2026. JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2027. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

1    not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

2    decades, JLI used third parties and word of mouth to spread false and misleading information

3    about JUUL products.

4         2028.   Advertisements and representations for JUUL products concealed and failed to

5    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

6    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

7    addictive, posed significant risks of substantial physical injury resulting from the use of the

8    products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

9    consumed through a pack of combustible cigarettes.

10        2029.   The labels on JUUL products failed to disclose that the products posed

11   significant risks of substantial physical injury resulting from the use of the products. The labels

12   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

13        2030.   The omissions were misleading and deceptive standing alone and were

14   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

15   cigarettes and other representations.

16        2031.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

17   omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

18   including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

19   material to their purchasing decisions that JUUL's products (i) were not smoking cessation

20   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

21   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

22   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

23   consumed through one JUUL pod exceeded the nicotine consumed through a pack of

24   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

25   Plaintiffs' and class members' decisions to purchase JUUL products.

26        2032.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

27   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

28   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

1   facts; because the facts would be material to reasonable consumers; because JUUL products
2   pose an unreasonable risk of substantial bodily injury; and because JLI made partial
3   representations concerning the same subject matter as the omitted facts.

4   2033.  As set forth in the allegations concerning each Plaintiff in Appendix A, in
5   purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations
6   and/or omissions.  Reasonable consumers would have been expected to have relied on the
7   misrepresentations and omissions.

8   2034.  Defendants knew or should have known that their misrepresentations and/or
9   omissions were false and misleading, and intended for consumers to rely on such
10  misrepresentations and omissions.

11  2035.  JLI knew that JUUL products were not safe or reasonable alternatives to
12  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
13  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the
14  products.

15  2036.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class
16  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved
17  differently and would not have purchased JUUL products or would have paid less for them.
18  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase
19  JUUL products they would not otherwise have purchased and enter into purchase contracts they
20  would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each
21  member of the class, damages in an amount to be proven at trial and punitive damages, as well
22  as any other relief the Court may deem just or proper.

23                  **c.      Breach of the Implied Warranty of Merchantability**

24  2037.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

25  2038.  This claim is brought against JLI.

26  2039.  JUUL has at all times been a merchant with respect to the products which were
27  sold to Plaintiff and the class and was in the business of selling such products.

28  2040.  Each JUUL product sold by JUUL comes with an implied warranty that it will

1    merchantable and fit for the ordinary purpose for which it would be used.  *See* Miss. Code Ann.

2    § 75-2-314.  JUUL has breached its implied warranty of merchantability because its products

3    were not in merchantable condition when sold, were defective when sold, did not conform to the

4    promises and affirmations of fact made on the products' containers or labels, and/or do not

5    possess even the most basic degree of fitness for ordinary use.

6         2041.   The ordinary intended purpose of JUUL's products—and the purpose for which

7    they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

8    products are not fit for that use—or any other use—because they (i) were not smoking cessation

9    devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

10   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

11   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

12   products are not fit for their ordinary, intended use as either cigarette replacement devices or

13   recreation smoking devices.

14        2042.   Plaintiffs and each member of the class have had sufficient direct dealings with

15   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

16   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

17   each member of the class, on the other hand.

18        2043.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

19   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

20   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

21   intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

22   the express purpose an intent of being sold to consumers.

23        2044.   Plaintiffs and the members of the class were injured as a direct and proximate

24   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

25   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

26   because, had they been aware of the unmerchantable condition of JUUL products, they would

27   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

28   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2045.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

2046.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2047.   This claim is brought against JLI and the Management Defendants.

2048.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2049.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Mississippi law (*see* Miss. Code Ann. § 97-32-51(2)) prohibits the marketing and sale of JUUL products to minors.

2050.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2051.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2052.  There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2053.  Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2054.  Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 25.   Missouri

2055.  Plaintiffs bring each of the following claims on behalf of the Missouri Subclass under Missouri law.

### a.   Violation of Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*)

2056.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2057.  This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2058.  Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

2059.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2060.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2061.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2062.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2063.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2064.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2065.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity or tendency to mislead, deceive or cheat, and in fact did, mislead, deceive, and/or cheat reasonable consumers including the Plaintiffs.   In addition, the misrepresentations and omissions were the type that tend to create a false impression. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable

alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2066.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2067.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2068.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see* Mo. Rev. Stat. §§ 407.926 and 407.931); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2069.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1    2070.   Defendants' conduct actually and proximately caused an ascertainable loss of

2    money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent

3    conduct, Plaintiffs and class members would have behaved differently and would not have

4    purchased JUUL products or would have paid less for them. Defendants' misrepresentations and

5    omissions induced Plaintiffs and class members to purchase JUUL products they would not

6    otherwise have purchased and enter into purchase contracts they would not otherwise have

7    entered into. In addition, class members who are minors are entitled to full repayment of the

8    amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each

9    member of the class—actual damages, punitive damages, attorney's fees, and equitable relief; as

10   well as any other relief the Court may deem just or proper.

11                          **b.      Common Law Fraud**

12   2071.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

13   2072.   This claim is brought against JLI.

14   2073.   JUUL created and implemented a scheme to create a market for e-cigarettes and

15   substantially increase sales of JUUL through a pervasive pattern of false and misleading

16   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

17   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

18   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

19   addictiveness, and significant risks of substantial physical injury from using JUUL products.

20   2074.   Advertisements and representations for JUUL products contained deceptive

21   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

22   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

23   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

24   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

25   decades, JLI used third parties and word of mouth to spread false and misleading information

26   about JUUL products.

27   2075.   Advertisements and representations for JUUL products concealed and failed to

28   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2076. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2077. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2078. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2079. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2080. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

1   and/or omissions.   Reasonable consumers would have been expected to have relied on the

2   misrepresentations and omissions.

3       2081.   Defendants knew or should have known that their misrepresentations and/or

4   omissions were false and misleading, and intended for consumers to rely on such

5   misrepresentations and omissions.

6       2082.   JLI knew that JUUL products were not safe or reasonable alternatives to

7   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

8   addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

9   products.

10      2083.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class

11  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

12  differently and would not have purchased JUUL products or would have paid less for them.

13  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

14  JUUL products they would not otherwise have purchased and enter into purchase contracts they

15  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

16  member of the class, damages in an amount to be proven at trial and punitive damages, as well

17  as any other relief the Court may deem just or proper.

18              **c.    Breach of the Implied Warranty of Merchantability**

19      2084.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

20      2085.   This claim is brought against JLI.

21      2086.   JUUL has at all times been a merchant with respect to the products which were

22  sold to Plaintiff and the class and was in the business of selling such products.

23      2087.   Each JUUL product sold by JUUL comes with an implied warranty that it will

24  merchantable and fit for the ordinary purpose for which it would be used.  *See* Mo. Rev. Stat.

25  § 400.2-314.  JUUL has breached its implied warranty of merchantability because its products

26  were not in merchantable condition when sold, were defective when sold, did not conform to the

27  promises and affirmations of fact made on the products' containers or labels, and/or do not

28  possess even the most basic degree of fitness for ordinary use.

2088.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2089.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2090.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2091.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2092.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

1

### d.      Unjust Enrichment

2     2093.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3     2094.   This claim is brought against JLI and the Management Defendants.

4     2095.   Defendants created and implemented a scheme to create a market for e-cigarettes

5 and substantially increase sales of JUUL products through a pervasive pattern of false and

6 misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

7 safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

8 while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

9 doses, addictiveness, and significant risks of substantial physical injury from using JUUL

10 products.

11     2096.  Defendants were unjustly enriched as a result of their wrongful conduct,

12 including through the false and misleading advertisements and omissions regarding (i) whether

13 JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

14 alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

15 powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

16 the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

17 nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

18 enriched through their scheme of marketing their products to minors. Missouri law (*see* Mo.

19 Rev. Stat. §§ 407.926 and 407.931) prohibits the marketing and sale of JUUL products to

20 minors.

21     2097.   Defendants requested and received a measurable benefit at the expense of

22 Plaintiffs and class members in the form of payment for JUUL products.

23     2098.   Defendants appreciated, recognized, and chose to accept the monetary benefits

24 Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

25 expected result of Defendant acting in its pecuniary interest at the expense of its customers.

26     2099.   There is no justification for Defendants' enrichment. It would be inequitable,

27 unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

28 benefits were procured as a result of their wrongful conduct.

2100.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2101.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 26.   Montana

2102.   Plaintiffs bring each of the following claims on behalf of the Montana Subclass under Montana law.

#### a.   Violation of Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. § 30-14-101, *et seq.*)

2103.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2104.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2105.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

2106.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2107.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2108.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2109.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2110.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2111.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2112.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2113.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2114.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2115.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Mont. Code Ann. § 16-11-305); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2116.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2117.   Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the

amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, treble damages, and attorney's fees, as well as any other relief the Court may deem just or proper.

### b.        Common Law Fraud

2118.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2119.   This claim is brought against JLI.

2120.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2121.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2122.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2123.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2124. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2125. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2126. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2127. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2128. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2129. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2130.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

2131.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2132.   This claim is brought against JLI.

2133.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2134.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Mont. Code Ann. § 30-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2135.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or

recreation smoking devices.

2136.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2137.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2138.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2139.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.      Unjust Enrichment

2140.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2141.  This claim is brought against JLI and the Management Defendants.

2142.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2143.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Montana law (*see* Mont. Code Ann. § 16-11-305) prohibits the marketing and sale of JUUL products to minors.

2144.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2145.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2146.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2147.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2148.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 27.   Nebraska

2149.   Plaintiffs bring each of the following claims on behalf of the Nebraska Subclass under Nebraska law

1

2

###### a.      Violation of the Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-1601, *et seq*.)

3        2150.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4        2151.   This claim is brought against JLI and, for certain unfair and/or unconscionable

5    conduct claims as noted below, all Defendants.

6        2152.   Plaintiffs and class members and are persons who purchased JUUL products for

7    personal purposes.

8        2153.   Defendants created and implemented a scheme to create a market for e-cigarettes

9    and substantially increase sales of JUUL through a pervasive pattern of false and misleading

10   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

11   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

12   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

13   addictiveness, and significant risks of substantial physical injury from using JUUL products.

14       2154.   Advertisements and representations for JUUL products contained deceptive

15   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

16   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

17   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

18   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

19   decades, JLI used third parties and word of mouth to spread false and misleading information

20   about JUUL products.

21       2155.   Advertisements and representations for JUUL products concealed and failed to

22   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

23   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

24   addictive, posed significant risks of substantial physical injury resulting from the use of the

25   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

26   consumed through a pack of combustible cigarettes.

27       2156.   The labels on JUUL products failed to disclose that the products posed

28   significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2157.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2158.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2159.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers and had the tendency or capacity to mislead reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2160.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2161. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2162. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2163. In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Neb. Rev. Stat. §§ 28-1419; 28-1425); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2164. As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2165. Defendants' deceptive and unfair conduct has had a detrimental impact on the public interest

2166. Defendants' conduct actually and proximately caused loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

1  actual damages (as increased as the Court may deem fit), injunctive relief, and reasonable

2  attorneys' fees, as well as any other relief the Court may deem just or proper.

3  **b.   Violation of the Nebraska Uniform Deceptive Trade Practices**

4  **Act (Neb. Rev. Stat. §§ 87-301, *et seq.*)**

5  2167.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

6  2168.   This claim is brought against JLI.

7  2169.   Plaintiffs and class members are persons who purchased JUUL products for

8  personal purposes.

9  2170.   Defendants created and implemented a scheme to create a market for e-cigarettes

10  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

11  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

12  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

13  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

14  addictiveness, and significant risks of substantial physical injury from using JUUL products.

15  2171.   Advertisements and representations for JUUL products contained deceptive

16  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

17  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

18  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

19  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

20  decades, JLI used third parties and word of mouth to spread false and misleading information

21  about JUUL products.

22  2172.   Advertisements and representations for JUUL products concealed and failed to

23  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

24  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

25  addictive, posed significant risks of substantial physical injury resulting from the use of the

26  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

27  consumed through a pack of combustible cigarettes.

28  2173.   The labels on JUUL products failed to disclose that the products posed

significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2174.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2175.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) causing confusion or misunderstanding as to the effects a substance causes when ingested, inhaled, or otherwise introduced into the human body; and (e) making a deceptives and misleading representations, and omitting material information, about a substance and failing to identify the contents of the package or the nature of the substance contained inside the package.

2176.   JUUL's conduct had the capacity to and was likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2177.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively

concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2178.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2179.  JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members, and is likely to cause damage in the future. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— injunctive relief, as well as any other relief the Court may deem just or proper.  Plaintiffs are also entitled to reasonable attorneys' fees because JUUL willfully engaged in trade practices that are known to be deceptive.

### c.   Common Law Fraud

2180.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2181.  This claim is brought against JLI.

2182.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2183.  Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2184.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2185.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2186.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2187.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2188.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2189.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2190.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2191.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2192.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.      Breach of the Implied Warranty of Merchantability

2193.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2194.   This claim is brought against JLI.

2195.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2196.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Neb. U.C.C. § 2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2197.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2198.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2199.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2200.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

1   because, had they been aware of the unmerchantable condition of JUUL products, they would

2   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

3   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

4      2201.   JUUL was provided notice of these issues by numerous complaints filed against

5   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

6   individual letters and communications sent by consumers before or within a reasonable amount

7   of time after they discovered or should have discovered that's JUUL product were defective and

8   unmerchantable.

9                              **e.    Unjust Enrichment**

10     2202.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

11     2203.   This claim is brought against JLI and the Management Defendants.

12     2204.   Defendants created and implemented a scheme to create a market for e-cigarettes

13  and substantially increase sales of JUUL products through a pervasive pattern of false and

14  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

15  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

16  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

17  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

18  products.

19     2205.   Defendants were unjustly enriched as a result of their wrongful conduct,

20  including through the false and misleading advertisements and omissions regarding (i) whether

21  JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

22  alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

23  powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

24  the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

25  nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

26  enriched through their scheme of marketing their products to minors. Neb. Rev. Stat. §§ 28-

27  1419 and 28-1425 prohibit the marketing and sale of JUUL products to minors.

28     2206.   Defendants requested and received a measurable benefit at the expense of

1  Plaintiffs and class members in the form of payment for JUUL products.

2       2207.   Defendants appreciated, recognized, and chose to accept the monetary benefits

3  Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

4  expected result of Defendant acting in its pecuniary interest at the expense of its customers.

5       2208.   There is no justification for Defendants' enrichment. It would be inequitable,

6  unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

7  benefits were procured as a result of their wrongful conduct.

8       2209.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

9  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

10  with Defendant.

11      2210.   Plaintiffs plead this claim separately as well as in the alternative to their other

12  claims, as without such claims they would have no adequate legal remedy.

13                  **28.    Nevada**

14      2211.   Plaintiffs bring each of the following claims on behalf of the Nevada Subclass

15  under Nevada law.

16             **a.    Violation of the Nevada Deceptive Trade Practices Act (Nev.**

17             **Rev. Stat. §§ 598.0903, *et seq*.)**

18      2212.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

19      2213.   This claim is brought against JLI, and for certain claims below, the Management

20  Defendants.

21      2214.   Plaintiffs and class members purchased JUUL products for personal purposes.

22      2215.   Defendants created and implemented a scheme to create a market for e-cigarettes

23  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

24  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

25  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

26  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

27  addictiveness, and significant risks of substantial physical injury from using JUUL products.

28      2216.   Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2217.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2218.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2219.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2220.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) knowingly making other false representations in a transaction; and (e) failing to disclose a material fact in connection with the sale of goods or services.

2221.   JLI's conduct was likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation

1   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

2   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

3   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

4   consumed through one JUUL pod exceeded the nicotine consumed through a pack of

5   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

6   Plaintiffs' and class members' decisions to purchase JUUL products.

7          2222.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

8   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

9   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

10  facts; because the facts would be material to reasonable consumers; because JLI actively

11  concealed them; because JLI intended for consumers to rely on the omissions in question;

12  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

13  made partial representations concerning the same subject matter as the omitted facts.

14         2223.  JLI's conduct was unlawful because it violated state and federal statutes and

15  regulations relating to the sale of e-cigarettes, including the Racketeer Influenced and Corrupt

16  Organizations Act, 18 U.S.C. § 1961, *et seq.*; the Magnuson-Moss Warranty Act, 15 U.S.C.

17  §§ 2301, *et seq.*; and Nev. Rev. Stat. § 202.24935.

18         2224.  As set forth in the allegations concerning each Plaintiff in Appendix A, in

19  purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.

20  Reasonable consumers would have been expected to have relied on the misrepresentations and

21  omissions.

22         2225.  Defendants knew or should have known that their misrepresentations and/or

23  omissions were false and misleading, and intended for consumers to rely on such

24  misrepresentations and omissions.

25         2226.  JLI and the Management Defendants engaged in fraudulent and deceptive

26  conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

27  products were appropriate for minors, when in fact the products never should have been

28  marketed to minors and are especially harmful to minors due to the potent and addictive

1    nicotine doses, addictive qualities, and health risks.

2        2227. Defendants' conduct actually and proximately caused actual damages to

3    Plaintiffs and class members, who were victims of Defendants' unfair and fraudulent conduct.

4    Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have

5    behaved differently and would not have purchased JUUL products or would have paid less for

6    them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to

7    purchase JUUL products they would not otherwise have purchased and enter into purchase

8    contracts they would not otherwise have entered into. In addition, class members who are

9    minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs

10   seek—on behalf of themselves and each member of the class—actual damages, injunctive relief,

11   and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

12   Nev. Rev. Stat. § 41.600(1), (2)(e).

13                          **b.      Common Law Fraud**

14       2228.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

15       2229.  This claim is brought against JLI.

16       2230.  JUUL created and implemented a scheme to create a market for e-cigarettes and

17   substantially increase sales of JUUL through a pervasive pattern of false and misleading

18   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

19   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

20   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

21   addictiveness, and significant risks of substantial physical injury from using JUUL products.

22       2231.  Advertisements and representations for JUUL products contained deceptive

23   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

24   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

25   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

26   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

27   decades, JLI used third parties and word of mouth to spread false and misleading information

28   about JUUL products.

2232.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2233.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2234.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2235.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2236.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2237.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2238.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2239.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2240.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.     Breach of the Implied Warranty of Merchantability

2241.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2242.  This claim is brought against JLI.

2243.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2244.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Nev. Rev. Stat. Ann. § 104.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the

promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2245.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2246.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2247.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2248.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2249.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount

of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

2250.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2251.   This claim is brought against JLI and the Management Defendants.

2252.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2253.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Nev. Rev. Stat. § 202.24935 prohibits the marketing and sale of JUUL products to minors.

2254.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2255.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2256.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

benefits were procured as a result of their wrongful conduct.

2257.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2258.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 29.   New Hampshire

2259.   Plaintiffs bring each of the following claims on behalf of the New Hampshire Subclass under New Hampshire law

#### a.   Violation of the New Hampshire Regulation of Business Practices for Consumer Protection (N.H. Rev. Stat. §§ 358-A:1, *et seq.*)

2260.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2261.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2262.   The marketing and sale of JUUL products constitutes "trade" and "commerce" as defined by statute.  Defendants are "persons" as defined by the statute.

2263.   Plaintiffs and class members purchased JUUL products for personal purposes.

2264.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2265.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2266.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2267.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2268.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2269.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2270.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; or (c) advertising goods or services with intent not to sell them as advertised.

2271.   JLI's conduct was fraudulent and deceptive because the misrepresentations and

omissions created a likelihood of confusion or misunderstanding reasonable consumers, including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products. In addition, JUUL's fraudulent and deceptive conduct was of a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

2272. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2273. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2274. Defendants knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2275. In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular N.H. Rev. Stat. Ann.

§§ 126-K:4); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2276.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2277.   Defendants' conduct actually and proximately caused loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— threefold their actual damages and statutory damages in the amount of $1,000, whichever is greater, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

**b.      Common Law Fraud**

2278.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2279.   This claim is brought against JLI.

2280.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2281.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2282.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2283.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2284.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2285.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in

Plaintiffs' and class members' decisions to purchase JUUL products.

2286.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2287.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2288.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2289.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2290.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

2291.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1          2292.   This claim is brought against JLI.

2          2293.   JUUL has at all times been a merchant with respect to the products which were

3    sold to Plaintiff and the class and was in the business of selling such products.

4          2294.   Each JUUL product sold by JUUL comes with an implied warranty that it will

5    merchantable and fit for the ordinary purpose for which it would be used.   N.H. Rev. Stat.

6    § 382—A:2A-212.   JUUL has breached its implied warranty of merchantability because its

7    products were not in merchantable condition when sold, were defective when sold, did not

8    conform to the promises and affirmations of fact made on the products' containers or labels,

9    and/or do not possess even the most basic degree of fitness for ordinary use.

10         2295.   The ordinary intended purpose of JUUL's products—and the purpose for which

11   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.   JUUL's

12   products are not fit for that use—or any other use—because they (i) were not smoking cessation

13   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

14   potent   nicotine-delivery   mechanisms,   (iv) were   powerfully   addictive,   and   (v) posed

15   unreasonable   risks   of   substantial   bodily   injury.   Due   to   these   and   other   features,   JUUL's

16   products are not fit for their ordinary, intended use as either cigarette replacement devices or

17   recreation smoking devices.

18         2296.   Plaintiffs and each member of the class have had sufficient direct dealings with

19   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

20   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

21   each member of the class, on the other hand.

22         2297.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

23   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

24   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

25   intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

26   the express purpose an intent of being sold to consumers.

27         2298.   Plaintiffs and the members of the class were injured as a direct and proximate

28   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

1  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

2  because, had they been aware of the unmerchantable condition of JUUL products, they would

3  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

4  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

5      2299.  JUUL was provided notice of these issues by numerous complaints filed against

6  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

7  individual letters and communications sent by consumers before or within a reasonable amount

8  of time after they discovered or should have discovered that's JUUL product were defective and

9  unmerchantable.

### d.     Unjust Enrichment

11     2300.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

12     2301.  This claim is brought against JLI and the Management Defendants.

13     2302.  Defendants created and implemented a scheme to create a market for e-cigarettes

14  and substantially increase sales of JUUL products through a pervasive pattern of false and

15  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

16  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

17  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

18  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

19  products.

20     2303.  Defendants were unjustly enriched as a result of their wrongful conduct,

21  including through the false and misleading advertisements and omissions regarding (i) whether

22  JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

23  alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

24  powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

25  the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

26  nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

27  enriched through their scheme of marketing their products to minors. N.H. Rev. Stat. Ann.

28  § 126-K:4 prohibits the sale of JUUL products to minors.

2304.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2305.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2306.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2307.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2308.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 30.   New Jersey

2309.   Plaintiffs bring each of the following claims on behalf of the New Jersey Subclass under New Jersey law

#### a.   Common Law Fraud

2310.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2311.   This claim is brought against JLI.

2312.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2313.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

1   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

2   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

3   decades, JLI used third parties and word of mouth to spread false and misleading information

4   about JUUL products.

5       2314.   Advertisements and representations for JUUL products concealed and failed to

6   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

7   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

8   addictive, posed significant risks of substantial physical injury resulting from the use of the

9   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

10  consumed through a pack of combustible cigarettes.

11      2315.  The labels on JUUL products failed to disclose that the products posed

12  significant risks of substantial physical injury resulting from the use of the products. The labels

13  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

14      2316.  The omissions were misleading and deceptive standing alone and were

15  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

16  cigarettes and other representations.

17      2317.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

18  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

19  including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

20  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

21  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

22  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

23  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

24  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

25  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

26  Plaintiffs' and class members' decisions to purchase JUUL products.

27      2318.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

28  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

1    other than Plaintiffs and class members), who had exclusive and superior knowledge of the

2    facts; because the facts would be material to reasonable consumers; because JUUL products

3    pose an unreasonable risk of substantial bodily injury; and because JLI made partial

4    representations concerning the same subject matter as the omitted facts.

5        2319.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

6    purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

7    and/or omissions.   Reasonable consumers would have been expected to have relied on the

8    misrepresentations and omissions.

9        2320.   Defendants knew or should have known that their misrepresentations and/or

10   omissions were false and misleading, and intended for consumers to rely on such

11   misrepresentations and omissions.

12       2321.   JLI knew that JUUL products were not safe or reasonable alternatives to

13   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

14   addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

15   products.

16       2322.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

17   members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

18   differently and would not have purchased JUUL products or would have paid less for them.

19   JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

20   JUUL products they would not otherwise have purchased and enter into purchase contracts they

21   would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

22   member of the class damages in an amount to be proven at trial, as well as any other relief the

23   Court may deem just or proper.

24                          **b.    Breach of the Implied Warranty of Merchantability**

25       2323.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

26       2324.   This claim is brought against JLI.

27       2325.   JUUL has at all times been a merchant with respect to the products which were

28   sold to Plaintiff and the class and was in the business of selling such products.

2326.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   N.J. Stat. Ann. § 12A:2-314.   JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2327.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.   JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2328.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2329.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2330.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2       2331.   JUUL was provided notice of these issues by numerous complaints filed against

3   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

4   individual letters and communications sent by consumers before or within a reasonable amount

5   of time after they discovered or should have discovered that's JUUL product were defective and

6   unmerchantable.

### c.   Unjust Enrichment

8       2332.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

9       2333.   This claim is brought against JLI and the Management Defendants.

10      2334.   Defendants created and implemented a scheme to create a market for e-cigarettes

11   and substantially increase sales of JUUL products through a pervasive pattern of false and

12   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

13   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

14   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

15   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

16   products.

17      2335.   Defendants were unjustly enriched as a result of their wrongful conduct,

18   including through the false and misleading advertisements and omissions regarding (i) whether

19   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

20   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

21   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

22   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

23   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

24   enriched through their scheme of marketing their products to minors. N.J. Stat. §§ 2A:170-

25   51.4(a)(2) and 2C:33-13.1(a) prohibit the marketing and sale of JUUL products to minors.

26      2336.   Defendants requested and received a measurable benefit at the expense of

27   Plaintiffs and class members in the form of payment for JUUL products.

28      2337.   Defendants appreciated, recognized, and chose to accept the monetary benefits

1    Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

2    expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3        2338.   There is no justification for Defendants' enrichment. It would be inequitable,

4    unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

5    benefits were procured as a result of their wrongful conduct.

6        2339.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

7    and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

8    with Defendant.

9        2340.   Plaintiffs plead this claim separately as well as in the alternative to their other

10   claims, as without such claims they would have no adequate legal remedy.

11                **31.    New Mexico**

12       2341.   Plaintiffs bring each of the following claims on behalf of the New Mexico

13   Subclass under New Mexico law

14                **a.      Violation of the New Mexico Unfair Trade Practices Act**

15                         **(N.M. Stat. § 57-12-1)**

16       2342.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

17       2343.   This claim is brought against JLI and, for certain unfair and/or unconscionable

18   conduct claims as noted below, all Defendants.

19       2344.   Defendants are "persons" under the statute and the sale and marketing of JUUL

20   products is "trade" and "commerce."

21       2345.   Plaintiffs and class members purchased JUUL products for personal purposes.

22       2346.   Defendants created and implemented a scheme to create a market for e-cigarettes

23   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

24   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

25   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

26   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

27   addictiveness, and significant risks of substantial physical injury from using JUUL products.

28       2347.   Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2348.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2349.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2350.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2351.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products offended public policy; was immoral, unethical, oppressive, and unscrupulous; resulted in a gross disparity between the value received by the person and the price paid; and caused substantial harm that greatly outweighs any benefits associated with the conduct.  JUUL's acts took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and class members to a grossly unfair degree and to the detriment of Plaintiffs and class members.

2352.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; or (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not.

2353.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions may, tends to, or does deceive or mislead reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2354.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2355.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2356.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive

nicotine doses, addictive qualities, and health risks.

2357.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular N.M. Stat. Ann. §§ 30-49-3(A), (E)); is immoral, unethical, oppressive, and unscrupulous; resulted in a gross disparity between the value received by the person and the price paid; takes advantage of the lack of knowledge, ability, experience, or capacity of minors to a grossly unfair degree; and has caused substantial harm that greatly outweighs any benefits associated with the conduct.

2358.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise. Defendants' acts took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and class members to a grossly unfair degree and to the detriment of Plaintiffs and class members

2359.  Defendants' conduct actually and proximately caused loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—three times actual damages and/or statutory damages in the amount of $300, whichever is greater, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

2360.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2361.  This claim is brought against JLI.

2362.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2363.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2364.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2365.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2366.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2367.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2368.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2369.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2370.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2371.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2372.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

2373.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2374.   This claim is brought against JLI.

2375.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2376.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  N.M. Stat. Ann. § 55-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2377.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2378.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2379.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

1    JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and
2    sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the
3    intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with
4    the express purpose an intent of being sold to consumers.

5        2380.   Plaintiffs and the members of the class were injured as a direct and proximate
6    result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of
7    the class were damaged as a result of JUUL's breach of its implied warranty of merchantability
8    because, had they been aware of the unmerchantable condition of JUUL products, they would
9    not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages
10   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

11       2381.   JUUL was provided notice of these issues by numerous complaints filed against
12   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous
13   individual letters and communications sent by consumers before or within a reasonable amount
14   of time after they discovered or should have discovered that's JUUL product were defective and
15   unmerchantable.

16                              **d.     Unjust Enrichment**

17       2382.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

18       2383.   This claim is brought against JLI and the Management Defendants.

19       2384.   Defendants created and implemented a scheme to create a market for e-cigarettes
20   and substantially increase sales of JUUL products through a pervasive pattern of false and
21   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and
22   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,
23   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and
24   doses, addictiveness, and significant risks of substantial physical injury from using JUUL
25   products.

26       2385.  Defendants were unjustly enriched as a result of their wrongful conduct,
27   including through the false and misleading advertisements and omissions regarding (i) whether
28   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. N.M. Stat. Ann. §§ 30-493(A), (E); 30-49-8(A) prohibit the marketing and sale of JUUL products to minors.

2386.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2387.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2388.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2389.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2390.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 32.   New York

2391.   Plaintiffs bring each of the following claims on behalf of the New York Subclass under New York law

### a.   Violation of New York General Business Law § 349

2392.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2393.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

2394.   Plaintiffs and class members purchased JUUL products for personal purposes.

2395.   Defendants created and implemented a scheme to create a market for e-cigarettes

and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2396.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2397.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2398.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2399.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2400.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, mislead reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their

purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2401.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2402.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2403.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2404.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In

1    addition, class members who are minors are entitled to full repayment of the amounts they spent

2    on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

3    three times actual damages or statutory damages in the amount of $50, whichever is greater,

4    injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem

5    just or proper.

6                    **b.    Violation of New York General Business Law § 350**

7            2405.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

8            2406.   This claim is brought against JLI and, for certain claims below, the Management

9    Defendants.

10           2407.   Plaintiffs and class members purchased JUUL products for personal purposes.

11           2408.   Defendants created and implemented a scheme to create a market for e-cigarettes

12   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

13   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

14   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

15   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

16   addictiveness, and significant risks of substantial physical injury from using JUUL products.

17           2409.   Advertisements and representations for JUUL products contained deceptive

18   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

19   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

20   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

21   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

22   decades, JLI used third parties and word of mouth to spread false and misleading information

23   about JUUL products.

24           2410.   Advertisements and representations for JUUL products concealed and failed to

25   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

26   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

27   addictive, posed significant risks of substantial physical injury resulting from the use of the

28   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

consumed through a pack of combustible cigarettes.

2411.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2412.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2413.  JUUL's advertising in the conduct of its business was fraudulent and deceptive because the misrepresentations and omissions had the capacity, tendency, or effect of deceiving reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2414.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2415.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2416.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2417.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages or $500, whichever is greater; treble damages; injunctive relief; and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### c.    Common Law Fraud

2418.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2419.   This claim is brought against JLI.

2420.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2421.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2422.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2423.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2424.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2425.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2426.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2427.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2428.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2429.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2430.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

**d.      Breach of the Implied Warranty of Merchantability**

2431.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2432.  This claim is brought against JLI.

2433.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2434.  Each JUUL product sold by JUUL comes with an implied warranty that it will

merchantable and fit for the ordinary purpose for which it would be used. N.Y. U.C.C. Law § 2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2435. The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2436. Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2437. Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2438. Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the New York Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any

1    other relief the Court may deem just or proper.

2    2439.   JUUL was provided notice of these issues by numerous complaints filed against

3    it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

4    individual letters and communications sent by consumers before or within a reasonable amount

5    of time after they discovered or should have discovered that's JUUL product were defective and

6    unmerchantable.

7    e.    **Unjust Enrichment**

8    2440.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

9    2441.   This claim is brought against JLI and the Management Defendants.

10   2442.   Defendants created and implemented a scheme to create a market for e-cigarettes

11   and substantially increase sales of JUUL products through a pervasive pattern of false and

12   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

13   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

14   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

15   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

16   products.

17   2443.   Defendants were unjustly enriched as a result of their wrongful conduct,

18   including through the false and misleading advertisements and omissions regarding (i) whether

19   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

20   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

21   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

22   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

23   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

24   enriched through their scheme of marketing their products to minors. N.Y. Pub. Health Law

25   §§ 1399-cc(2), 1399-bb(4), and 1399-bb(5) prohibit the marketing and sale of JUUL products to

26   minors.

27   2444.   Defendants requested and received a measurable benefit at the expense of

28   Plaintiffs and class members in the form of payment for JUUL products.

2445.  Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2446.  There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2447.  Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2448.  Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 33.  North Carolina

2449.  Plaintiffs bring each of the following claims on behalf of the North Carolina Subclass under North Carolina law

#### a.  Violation of the North Carolina Unfair & Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, *et seq*.)

2450.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2451.  This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2452.  Plaintiffs and class members purchased JUUL products for personal purposes.

2453.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2454.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2455.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2456.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2457.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2458.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2459.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency or capacity to mislead or created the likelihood of deception of average consumers such as including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible

cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2460.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2461.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2462.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2463.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular N.C. Gen. Stat. § 14-313(b) and N.C. Gen. Stat. § 14-313(b2); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2464.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2465.   Defendants' conduct, alleged herein, was in and affected commerce since the conduct was part and parcel of Defendants' business activities related to the sale of JUUL products.

2466.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— three times damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

2467.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2468.   This claim is brought against JLI.

2469.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2470.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2471.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2472. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2473. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2474.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2475.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2476.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2477.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2478.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2479.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

2480.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2481.  This claim is brought against JLI.

2482.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2483.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  N.C. GEN. STAT. § 25-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2484.  The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2485.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2486.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2487.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

1    in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2        2488.   JUUL was provided notice of these issues by numerous complaints filed against

3    it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

4    individual letters and communications sent by consumers before or within a reasonable amount

5    of time after they discovered or should have discovered that's JUUL product were defective and

6    unmerchantable.

### d.    Unjust Enrichment

8        2489.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

9        2490.   This claim is brought against JLI and the Management Defendants.

10       2491.   Defendants created and implemented a scheme to create a market for e-cigarettes

11   and substantially increase sales of JUUL products through a pervasive pattern of false and

12   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

13   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

14   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

15   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

16   products.

17       2492.  Defendants were unjustly enriched as a result of their wrongful conduct,

18   including through the false and misleading advertisements and omissions regarding (i) whether

19   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

20   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

21   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

22   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

23   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

24   enriched through their scheme of marketing their products to minors. N.C. Gen. Stat. § 14-

25   313(b) and N.C. Gen. Stat. § 14-313(b2) prohibit the marketing and sale of JUUL products to

26   minors.

27       2493.   Defendants requested and received a measurable benefit at the expense of

28   Plaintiffs and class members in the form of payment for JUUL products.

2494.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2495.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2496.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2497.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 34.   North Dakota

2498.   Plaintiffs bring each of the following claims on behalf of the North Dakota Subclass under North Dakota law.

#### a.   Violation of North Dakota Consumer Fraud Act (N.D. Cent. Code § 51-15-01, *et seq.*)

2499.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2500.   This claim is brought against JLI, and for certain unfair and unconscionable conduct claims, all Defendants.

2501.   Plaintiffs and class members purchased JUUL products for personal purposes.

2502.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2503.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2504.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2505.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2506.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2507.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2508.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery

1    mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily

2    injury resulting from the use of the products, and (vi) that the nicotine consumed through one

3    JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

4    Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members'

5    decisions to purchase JUUL products.

6         2509.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

7    were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

8    other than Plaintiffs and class members), who had exclusive and superior knowledge of the

9    facts; because the facts would be material to reasonable consumers; because JLI actively

10   concealed them; because JLI intended for consumers to rely on the omissions in question;

11   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

12   made partial representations concerning the same subject matter as the omitted facts.

13        2510.   JLI and the Management Defendants engaged in fraudulent and deceptive

14   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

15   products were appropriate for minors, when in fact the products never should have been

16   marketed to minors and are especially harmful to minors due to the potent and addictive

17   nicotine doses, addictive qualities, and health risks.

18        2511.   In addition, all Defendants engaged in unfair and unconscionable conduct

19   because the targeting of minors offends public policy (in particular N.D. Cent. Code § 12.1-31-

20   03(1)(a)) is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially

21   injurious; and has caused substantial harm that greatly outweighs any possible utility from the

22   conduct.

23        2512.   As alleged above, all Defendants participated and/or facilitated the marketing of

24   JUUL products to minors and took no action to curb the use of JUUL products by minors.

25   JUUL has continued the unconscionable practices that Defendants implemented, facilitated,

26   and/or did not take adequate steps to end. As a result, the use of JUUL products by minors

27   continues to rise.

28        2513.   Defendants knew or should have known that their misrepresentations and/or

1   omissions were false and misleading, and intended for consumers to rely on such

2   misrepresentations and omissions.

3       2514.   Defendants' conduct actually and proximately caused actual damages to

4   Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

5   class members would have behaved differently and would not have purchased JUUL products

6   or would have paid less for them. Defendants' misrepresentations and omissions induced

7   Plaintiffs and class members to purchase JUUL products they would not otherwise have

8   purchased and enter into purchase contracts they would not otherwise have entered into. In

9   addition, class members who are minors are entitled to full repayment of the amounts they spent

10  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

11  three times actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other

12  relief the Court may deem just or proper.

13          **b.      Violation of North Dakota False Advertising Law (N.D. Cent.**

14              **Code § 51-12-08)**

15      2515.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

16      2516.   This claim is brought against JLI.

17      2517.   Plaintiffs and class members purchased JUUL products for personal purposes.

18      2518.   Defendants created and implemented a scheme to create a market for e-cigarettes

19  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

20  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

21  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

22  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

23  addictiveness, and significant risks of substantial physical injury from using JUUL products.

24      2519.   Advertisements and representations for JUUL products contained deceptive

25  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

26  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

27  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

28  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

1   decades, JLI used third parties and word of mouth to spread false and misleading information

2   about JUUL products.

3          2520.   Advertisements and representations for JUUL products concealed and failed to

4   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

5   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

6   addictive, posed significant risks of substantial physical injury resulting from the use of the

7   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

8   consumed through a pack of combustible cigarettes.

9          2521.   The labels on JUUL products failed to disclose that the products posed

10  significant risks of substantial physical injury resulting from the use of the products. The labels

11  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

12         2522.   The omissions were misleading and deceptive standing alone and were

13  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

14  cigarettes and other representations.

15         2523.   JUUL's conduct constituted the following prohibited practices: making or

16  disseminating or causing to be made or disseminated before the public in North Dakota, in any

17  newspaper or other publication, or any advertising device, or by public outcry or proclamation,

18  or in any other manner or means whatever, statements, concerning such real or personal

19  property or services, professional or otherwise or concerning any circumstance or matter of fact

20  connected with the proposed performance or disposition thereof, which is untrue or misleading.

21         2524.  JLI's conduct was likely to, and in fact did, deceive reasonable consumers

22  including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

23  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

24  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

25  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

26  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

27  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

28  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Plaintiffs' and class members' decisions to purchase JUUL products.

2525.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2526.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2527.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### c.   Common Law Fraud

2528.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2529.   This claim is brought against JLI.

2530.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2531.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2532.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2533.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2534.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2535.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2536.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2537.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2538.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2539.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2540.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1

#### d.      Breach of the Implied Warranty of Merchantability

2      2541.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3      2542.   This claim is brought against JLI.

4      2543.   JUUL has at all times been a merchant with respect to the products which were

5  sold to Plaintiff and the class and was in the business of selling such products.

6      2544.   Each JUUL product sold by JUUL comes with an implied warranty that it will

7  merchantable and fit for the ordinary purpose for which it would be used.  N.D. Cent. Code

8  § 41-02-32.  JUUL has breached its implied warranty of merchantability because its products

9  were not in merchantable condition when sold, were defective when sold, did not conform to the

10 promises and affirmations of fact made on the products' containers or labels, and/or do not

11 possess even the most basic degree of fitness for ordinary use.

12     2545.   The ordinary intended purpose of JUUL's products—and the purpose for which

13 they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

14 products are not fit for that use—or any other use—because they (i) were not smoking cessation

15 devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

16 potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed

17 unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's

18 products are not fit for their ordinary, intended use as either cigarette replacement devices or

19 recreation smoking devices.

20     2546.   Plaintiffs and each member of the class have had sufficient direct dealings with

21 either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

22 by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

23 each member of the class, on the other hand.

24     2547.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

25 JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

26 sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

27 intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

28 the express purpose an intent of being sold to consumers.

2548.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2549.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.   Unjust Enrichment

2550.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2551.   This claim is brought against JLI and the Management Defendants.

2552.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2553.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

1    enriched through their scheme of marketing their products to minors. N.D. Cent. Code § 12.1-

2    31-03(1)(a) prohibits the marketing and sale of JUUL products to minors.

3        2554.   Defendants requested and received a measurable benefit at the expense of

4    Plaintiffs and class members in the form of payment for JUUL products.

5        2555.   Defendants appreciated, recognized, and chose to accept the monetary benefits

6    Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

7    expected result of Defendant acting in its pecuniary interest at the expense of its customers.

8        2556.   There is no justification for Defendants' enrichment. It would be inequitable,

9    unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

10   benefits were procured as a result of their wrongful conduct.

11       2557.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

12   and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

13   with Defendant.

14       2558.   Plaintiffs plead this claim separately as well as in the alternative to their other

15   claims, as without such claims they would have no adequate legal remedy.

16                    **35.    Ohio**

17       2559.   Plaintiffs bring each of the following claims on behalf of the Ohio Subclass

18   under Ohio law

19               **a.       Violation of the Ohio Consumer Sales Practices Act (Ohio**

20                         **Rev. Code Ann. §§ 1345.01,** *et seq.***)**

21       2560.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

22       2561.   This claim is brought against JLI and, for certain unfair and/or unconscionable

23   conduct claims as noted below, all Defendants.

24       2562.   Plaintiffs and class members purchased JUUL products for personal purposes.

25       2563.   Defendants created and implemented a scheme to create a market for e-cigarettes

26   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

27   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

28   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

---

misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2564.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2565.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2566.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2567.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2568.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries; (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products; (iii) knowingly making a misleading statement of opinion on which Plaintiffs and class members were likely to rely to their detriment; and (iv) knowingly taking advantage of Plaintiffs' and class members' inability to protect their interests, due to their ignorance regarding the actual characteristics of JUUL products, offended public policy; was

1   immoral, unethical, oppressive, and unscrupulous; caused substantial harm that greatly
2   outweighs any benefits associated with the conduct; and is marked by injustice.

3       2569.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and
4   unfair business practices: (a) misrepresenting that JUUL products have characteristics,
5   ingredients, uses, benefits, or quantities, which they do not have; or (b) misrepresenting that
6   JUUL products are of a particular standard, quality, or grade, or that goods are of a particular
7   style or model, when they are not.

8       2570.   JLI's conduct was fraudulent and deceptive because the misrepresentations and
9   omissions had the tendency or capacity to mislead reasonable consumers including the
10  Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their
11  purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not
12  reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery
13  mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily
14  injury resulting from the use of the products, and (vi) that the nicotine consumed through one
15  JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.
16  Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members'
17  decisions to purchase JUUL products.

18      2571.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
19  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
20  other than Plaintiffs and class members), who had exclusive and superior knowledge of the
21  facts; because the facts would be material to reasonable consumers; because JLI actively
22  concealed them; because JLI intended for consumers to rely on the omissions in question;
23  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI
24  made partial representations concerning the same subject matter as the omitted facts.

25      2572.   Defendants knew or should have known that their misrepresentations and/or
26  omissions were false and misleading, and intended for consumers to rely on such
27  misrepresentations and omissions.

28      2573.   JLI and the Management Defendants engaged in fraudulent and deceptive

conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2574.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Ohio Rev. Code Ann. § 2927.02(B)(1)) is immoral, unethical, oppressive, and unscrupulous; has caused substantial harm that greatly outweighs any benefits associated with the conduct; is marked by injustice; and takes advantage of minors' inability to protect their own interests.

2575.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2576.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual economic damages and/or statutory damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

2577.  Defendants had notice that their conduct was in violation based on prior rules and/or case decisions, including litigation related to combustible cigarettes and subsequent settlement agreements, and Ohio Rev. Code Ann. § 2927.02(B)(1) and Ohio Administrative Code § 109:4-3-10 , which prohibit much of the conduct Defendants' engaged in with respect to

1    JUUL products.

2         **b.      Violation of the Ohio Deceptive Trade Practices Act (Ohio**

3              **Rev. Code §§ 4165.01 - .04)**

4    2578.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

5    2579.   This claim is brought against JLI.

6    2580.   Plaintiffs and class members purchased JUUL products for personal purposes.

7    2581.   Defendants created and implemented a scheme to create a market for e-cigarettes

8    and substantially increase sales of JUUL through a pervasive pattern of false and misleading

9    statements and omissions. Defendants aimed to portray JUUL products as cool and safe

10   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

11   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

12   addictiveness, and significant risks of substantial physical injury from using JUUL products.

13   2582.   Advertisements and representations for JUUL products contained deceptive

14   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

15   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

16   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

17   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

18   decades, JLI used third parties and word of mouth to spread false and misleading information

19   about JUUL products.

20   2583.   Advertisements and representations for JUUL products concealed and failed to

21   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

22   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

23   addictive, posed significant risks of substantial physical injury resulting from the use of the

24   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

25   consumed through a pack of combustible cigarettes.

26   2584.   The labels on JUUL products failed to disclose that the products posed

27   significant risks of substantial physical injury resulting from the use of the products. The labels

28   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2585. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2586. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

2587. JUUL's conduct had the tendency to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2588. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2589. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products

or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

<div align="center">

**c.     Common Law Fraud**

</div>

2590.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2591.   This claim is brought against JLI.

2592.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2593.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2594.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

consumed through a pack of combustible cigarettes.

2595.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2596.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2597.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2598.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2599.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2600.  Defendants knew or should have known that their misrepresentations and/or

1  omissions were false and misleading, and intended for consumers to rely on such

2  misrepresentations and omissions.

3  2601.  JLI knew that JUUL products were not safe or reasonable alternatives to

4  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

6  products.

7  2602.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class

8  members.  Absent JUUL's conduct, Plaintiffs and class members would have behaved

9  differently and would not have purchased JUUL products or would have paid less for them.

10 JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

11 JUUL products they would not otherwise have purchased and enter into purchase contracts they

12 would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

13 member of the class damages in an amount to be proven at trial, as well as any other relief the

14 Court may deem just or proper.

15              **d.    Breach of the Implied Warranty of Merchantability**

16 2603.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

17 2604.  This claim is brought against JLI.

18 2605.  JUUL has at all times been a merchant with respect to the products which were

19 sold to Plaintiff and the class and was in the business of selling such products.

20 2606.  Each JUUL product sold by JUUL comes with an implied warranty that it will

21 merchantable and fit for the ordinary purpose for which it would be used.  Ohio Rev. Code Ann.

22 § 1302.27.  JUUL has breached its implied warranty of merchantability because its products

23 were not in merchantable condition when sold, were defective when sold, did not conform to the

24 promises and affirmations of fact made on the products' containers or labels, and/or do not

25 possess even the most basic degree of fitness for ordinary use.

26 2607.  The ordinary intended purpose of JUUL's products—and the purpose for which

27 they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

28 products are not fit for that use—or any other use—because they (i) were not smoking cessation

devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2608.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2609.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2610.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Ohio Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2611.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.    Unjust Enrichment

2612.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2613.   This claim is brought against JLI and the Management Defendants.

2614.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2615.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Ohio Rev. Code Ann. § 2927.02(B)(1) prohibits the marketing and sale of JUUL products to minors.

2616.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2617.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2618.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2619.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2620.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 36.   Oklahoma

2621.   Plaintiffs bring each of the following claims on behalf of the Oklahoma Subclass under Oklahoma law

### a.   Violation of the Oklahoma Consumer Protection Act (Okla. Stat. tit. 15, §§ 751, *et seq.*)

2622.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2623.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2624.   Plaintiffs and class members purchased JUUL products for purposes that are personal, household, or business oriented.

2625.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2626.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2627.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2628. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2629. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2630. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2631. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

2632. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions have deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person, including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine

consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2633.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2634.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2635.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular 63 Okl. St. §§ 1-229.13, 1-229.26); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2636.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2637.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced

1   Plaintiffs and class members to purchase JUUL products they would not otherwise have
2   purchased and enter into purchase contracts they would not otherwise have entered into. In
3   addition, class members who are minors are entitled to full repayment of the amounts they spent
4   on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—
5   actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the
6   Court may deem just or proper.

7              **b.    Violation of the Oklahoma Deceptive Trade Practices Act**
8                      **(Okla. Stat. tit. 78, §§ 51, *et seq.*)**

9   2638.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10  2639.   This claim is brought against JLI.

11  2640.   Plaintiffs and class members purchased JUUL products for purposes that are
12  personal, household, or business oriented.

13  2641.   Defendants created and implemented a scheme to create a market for e-cigarettes
14  and substantially increase sales of JUUL through a pervasive pattern of false and misleading
15  statements and omissions. Defendants aimed to portray JUUL products as cool and safe
16  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
17  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
18  addictiveness, and significant risks of substantial physical injury from using JUUL products.

19  2642.   Advertisements and representations for JUUL products contained deceptive
20  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives
21  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible
22  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
23  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
24  decades, JLI used third parties and word of mouth to spread false and misleading information
25  about JUUL products.

26  2643.   Advertisements and representations for JUUL products concealed and failed to
27  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
28  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2644.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2645.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2646.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have and (b) misrepresenting that JUUL products are of a particular standard, or that goods are of a particular style or model, when they are not.

2647.  JUUL's conduct has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person, including the Plaintiffs.   Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2648.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively

concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2649. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### c.  Common Law Fraud

2650.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2651.  This claim is brought against JLI.

2652.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2653.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information

1    about JUUL products.

2        2654.   Advertisements and representations for JUUL products concealed and failed to

3    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

4    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5    addictive, posed significant risks of substantial physical injury resulting from the use of the

6    products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

7    consumed through a pack of combustible cigarettes.

8        2655.   The labels on JUUL products failed to disclose that the products posed

9    significant risks of substantial physical injury resulting from the use of the products. The labels

10   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

11       2656.   The omissions were misleading and deceptive standing alone and were

12   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

13   cigarettes and other representations.

14       2657.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

15   omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

16   including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

17   material to their purchasing decisions that JUUL's products (i) were not smoking cessation

18   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

19   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

20   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

21   consumed through one JUUL pod exceeded the nicotine consumed through a pack of

22   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

23   Plaintiffs' and class members' decisions to purchase JUUL products.

24       2658.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

25   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

26   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

27   facts; because the facts would be material to reasonable consumers; because JUUL products

28   pose an unreasonable risk of substantial bodily injury; and because JLI made partial

representations concerning the same subject matter as the omitted facts.

2659.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2660.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2661.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2662.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.    Breach of the Implied Warranty of Merchantability

2663.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2664.  This claim is brought against JLI.

2665.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2666.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Okla. Stat. tit. 12A §§ 2A-212.  JUUL has breached its implied warranty of merchantability because its products

were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2667.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2668.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2669.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2670.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2671.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

1 individual letters and communications sent by consumers before or within a reasonable amount

2 of time after they discovered or should have discovered that's JUUL product were defective and

3 unmerchantable.

4                 **e.**      **Unjust Enrichment**

5        2672.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

6        2673.  This claim is brought against JLI and the Management Defendants.

7        2674.  Defendants created and implemented a scheme to create a market for e-cigarettes

8 and substantially increase sales of JUUL products through a pervasive pattern of false and

9 misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

10 safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

11 while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

12 doses, addictiveness, and significant risks of substantial physical injury from using JUUL

13 products.

14        2675.  Defendants were unjustly enriched as a result of their wrongful conduct,

15 including through the false and misleading advertisements and omissions regarding (i) whether

16 JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

17 alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

18 powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

19 the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

20 nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

21 enriched through their scheme of marketing their products to minors. 63 Okl. St. §§ 1-229.13, 1-

22 229.26 prohibit the marketing, sale, and transfer of JUUL products to minors.

23        2676.  Defendants requested and received a measurable benefit at the expense of

24 Plaintiffs and class members in the form of payment for JUUL products.

25        2677.  Defendants appreciated, recognized, and chose to accept the monetary benefits

26 Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

27 expected result of Defendant acting in its pecuniary interest at the expense of its customers.

28        2678.  There is no justification for Defendants' enrichment. It would be inequitable,

1  unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

2  benefits were procured as a result of their wrongful conduct.

3     2679.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

4  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

5  with Defendant.

6     2680.   Plaintiffs plead this claim separately as well as in the alternative to their other

7  claims, as without such claims they would have no adequate legal remedy.

8         **37.   Oregon**

9     2681.   Plaintiffs bring each of the following claims on behalf of the Oregon Subclass

10  under Oregon law

11        **a.    Violation of the Oregon Unfair Trade Practices Act (Or. Rev.**

12            **Stat. §§ 646.605, *et seq*.)**

13     2682.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

14     2683.   This claim is brought against JLI.

15     2684.   Plaintiffs and class members purchased JUUL products for personal purposes.

16     2685.   Defendants created and implemented a scheme to create a market for e-cigarettes

17  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

18  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

19  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

20  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

21  addictiveness, and significant risks of substantial physical injury from using JUUL products.

22     2686.   Advertisements and representations for JUUL products contained deceptive

23  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

24  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

25  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

26  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

27  decades, JLI used third parties and word of mouth to spread false and misleading information

28  about JUUL products.

2687. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2688. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2689. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2690. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2691. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; and (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not.

2692. JUUL's conduct had a tendency to, was likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed

1    unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi)

2    that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a

3    pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor

4    in Plaintiffs' and class members' decisions to purchase JUUL products.

5         2693.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

6    were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

7    other than Plaintiffs and class members), who had exclusive and superior knowledge of the

8    facts; because the facts would be material to reasonable consumers; because JLI actively

9    concealed them; because JLI intended for consumers to rely on the omissions in question;

10   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

11   made partial representations concerning the same subject matter as the omitted facts.

12        2694.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

13   purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.

14   Reasonable consumers would have been expected to have relied on the misrepresentations and

15   omissions.

16        2695.   Defendants knew or should have known that their misrepresentations and/or

17   omissions were false and misleading, and intended for consumers to rely on such

18   misrepresentations and omissions.

19        2696.   In addition, all Defendants engaged in unfair and unconscionable conduct

20   because the targeting of minors offends public policy (in particular Or. Rev. Stat. Ann.

21   § 167.755(1)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially

22   injurious; and has caused substantial harm that greatly outweighs any possible utility from the

23   conduct.

24        2697.   As alleged above, all Defendants participated and/or facilitated the marketing of

25   JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

26   and others have continued the deceptive, misleading, unfair, and unconscionable practices that

27   Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

28   use of JUUL products by minors continues to rise.

2698.   Defendants' conduct actually and proximately caused loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages or statutory damages of $200, whichever is greater, injunctive relief, restitution, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### b.   Common Law Fraud

2699.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2700.   This claim is brought against JLI.

2701.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2702.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2703.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

1   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

2   addictive, posed significant risks of substantial physical injury resulting from the use of the

3   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

4   consumed through a pack of combustible cigarettes.

5      2704.   The labels on JUUL products failed to disclose that the products posed

6   significant risks of substantial physical injury resulting from the use of the products. The labels

7   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

8      2705.   The omissions were misleading and deceptive standing alone and were

9   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

10   cigarettes and other representations.

11      2706.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

12   omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

13   including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

14   material to their purchasing decisions that JUUL's products (i) were not smoking cessation

15   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

16   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

17   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

18   consumed through one JUUL pod exceeded the nicotine consumed through a pack of

19   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

20   Plaintiffs' and class members' decisions to purchase JUUL products.

21      2707.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

22   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

23   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

24   facts; because the facts would be material to reasonable consumers; because JUUL products

25   pose an unreasonable risk of substantial bodily injury; and because JLI made partial

26   representations concerning the same subject matter as the omitted facts.

27      2708.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

28   purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2709.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2710.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2711.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.  Breach of the Implied Warranty of Merchantability

2712.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2713.  This claim is brought against JLI.

2714.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2715.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  OR. Rev. Stat. Ann. § 72.3140.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2716.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2717.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2718.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2719.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Oregon Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2720.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and

1    unmerchantable.

2                         **d.      Unjust Enrichment**

3    2721.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4    2722.   This claim is brought against JLI and the Management Defendants.

5    2723.   Defendants created and implemented a scheme to create a market for e-cigarettes
6    and substantially increase sales of JUUL products through a pervasive pattern of false and
7    misleading statements and omissions. Defendants aimed to portray JUUL products as cool and
8    safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,
9    while misrepresenting or omitting key facts concerning JUUL products' nicotine content and
10   doses, addictiveness, and significant risks of substantial physical injury from using JUUL
11   products.

12   2724.   Defendants were unjustly enriched as a result of their wrongful conduct,
13   including through the false and misleading advertisements and omissions regarding (i) whether
14   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable
15   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were
16   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from
17   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the
18   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly
19   enriched through their scheme of marketing their products to minors. OR. Rev. Stat. Ann.
20   §§ 167.755(1) prohibits the marketing and sale of JUUL products to minors.

21   2725.   Defendants requested and received a measurable benefit at the expense of
22   Plaintiffs and class members in the form of payment for JUUL products.

23   2726.   Defendants appreciated, recognized, and chose to accept the monetary benefits
24   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the
25   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

26   2727.   There is no justification for Defendants' enrichment. It would be inequitable,
27   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the
28   benefits were procured as a result of their wrongful conduct.

2728.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2729.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 38.   Pennsylvania

2730.   Plaintiffs bring each of the following claims on behalf of the Pennsylvania Subclass under Pennsylvania law.

#### a.   Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. Ann. §§ 201-1, *et seq.*)

2731.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2732.   This claim is brought against JLI.

2733.   Plaintiffs and class members purchased JUUL products for personal purposes.

2734.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2735.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2736.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2737. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2738. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2739. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in fraudulent and deceptive conduct that creates a likelihood of confusion and misunderstanding.

2740. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and in fact did deceive, ordinary consumers, including the Plaintiffs. Ordinary consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2741.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2742.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2743.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2744.   Defendants' conduct actually and proximately caused loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— three times actual damages and/or statutory damages in the amount of $100, whichever is greater, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

1

### b.  Common Law Fraud

2

2745.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3

2746.  This claim is brought against JLI.

4

2747.  JUUL created and implemented a scheme to create a market for e-cigarettes and

5

substantially increase sales of JUUL through a pervasive pattern of false and misleading

6

statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

7

alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

8

misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

9

addictiveness, and significant risks of substantial physical injury from using JUUL products.

10

2748.  Advertisements and representations for JUUL products contained deceptive

11

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

12

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

13

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

14

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

15

decades, JLI used third parties and word of mouth to spread false and misleading information

16

about JUUL products.

17

2749.  Advertisements and representations for JUUL products concealed and failed to

18

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives

19

to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

20

addictive, posed significant risks of substantial physical injury resulting from the use of the

21

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

22

consumed through a pack of combustible cigarettes.

23

2750.  The labels on JUUL products failed to disclose that the products posed

24

significant risks of substantial physical injury resulting from the use of the products. The labels

25

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

26

2751.  The omissions were misleading and deceptive standing alone and were

27

particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

28

cigarettes and other representations.

2752.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2753.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2754.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2755.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2756.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2757.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

1  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved
2  differently and would not have purchased JUUL products or would have paid less for them.
3  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase
4  JUUL products they would not otherwise have purchased and enter into purchase contracts they
5  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each
6  member of the class damages in an amount to be proven at trial, as well as any other relief the
7  Court may deem just or proper.

8            **c.      Breach of the Implied Warranty of Merchantability**

9   2758.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10  2759.  This claim is brought against JLI.

11  2760.  JUUL has at all times been a merchant with respect to the products which were
12  sold to Plaintiff and the class and was in the business of selling such products.

13  2761.  Each JUUL product sold by JUUL comes with an implied warranty that it will
14  merchantable and fit for the ordinary purpose for which it would be used.  13 Pa. C.S.A. § 2314.
15  JUUL has breached its implied warranty of merchantability because its products were not in
16  merchantable condition when sold, were defective when sold, did not conform to the promises
17  and affirmations of fact made on the products' containers or labels, and/or do not possess even
18  the most basic degree of fitness for ordinary use.

19  2762.  The ordinary intended purpose of JUUL's products—and the purpose for which
20  they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's
21  products are not fit for that use—or any other use—because they (i) were not smoking cessation
22  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
23  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed
24  unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's
25  products are not fit for their ordinary, intended use as either cigarette replacement devices or
26  recreation smoking devices.

27  2763.  Plaintiffs and each member of the class have had sufficient direct dealings with
28  either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

1 by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and
2 each member of the class, on the other hand.

3     2764.   Further, Plaintiffs and each member of the class were third-party beneficiaries of
4 JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and
5 sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the
6 intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with
7 the express purpose an intent of being sold to consumers.

8     2765.   Plaintiffs and the members of the class were injured as a direct and proximate
9 result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of
10 the class were damaged as a result of JUUL's breach of its implied warranty of merchantability
11 because, had they been aware of the unmerchantable condition of JUUL products, they would
12 not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages
13 in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14     2766.   JUUL was provided notice of these issues by numerous complaints filed against
15 it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous
16 individual letters and communications sent by consumers before or within a reasonable amount
17 of time after they discovered or should have discovered that's JUUL product were defective and
18 unmerchantable.

### d.     Unjust Enrichment

20     2767.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21     2768.   This claim is brought against JLI and the Management Defendants.

22     2769.   Defendants created and implemented a scheme to create a market for e-cigarettes
23 and substantially increase sales of JUUL products through a pervasive pattern of false and
24 misleading statements and omissions. Defendants aimed to portray JUUL products as cool and
25 safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,
26 while misrepresenting or omitting key facts concerning JUUL products' nicotine content and
27 doses, addictiveness, and significant risks of substantial physical injury from using JUUL
28 products.

2770.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.

2771.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2772.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2773.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2774.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2775.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 39.   Rhode Island

2776.   Plaintiffs bring each of the following claims on behalf of the Rhode Island Subclass under Rhode Island law.

### a.   Violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (6 R.I. Gen. Laws §§ 13.1-1, *et seq.*)

2777.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2778.   This claim is brought against JLI and, for certain unfair and/or unconscionable

1    conduct claims as noted below, all Defendants.

2        2779.   Plaintiffs, class members, and Defendants are persons under Rhode Island's

3    Unfair Trade Practice and Consumer Protection Act.

4        2780.   Plaintiffs and class members purchased JUUL products for personal purposes.

5        2781.   Defendants created and implemented a scheme to create a market for e-cigarettes

6    and substantially increase sales of JUUL through a pervasive pattern of false and misleading

7    statements and omissions. Defendants aimed to portray JUUL products as cool and safe

8    alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

9    misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

10   addictiveness, and significant risks of substantial physical injury from using JUUL products.

11       2782.   Advertisements and representations for JUUL products contained deceptive

12   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

13   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

14   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

15   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

16   decades, JLI used third parties and word of mouth to spread false and misleading information

17   about JUUL products.

18       2783.   Advertisements and representations for JUUL products concealed and failed to

19   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

20   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

21   addictive, posed significant risks of substantial physical injury resulting from the use of the

22   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

23   consumed through a pack of combustible cigarettes.

24       2784.   The labels on JUUL products failed to disclose that the products posed

25   significant risks of substantial physical injury resulting from the use of the products. The labels

26   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

27       2785.   The omissions were misleading and deceptive standing alone and were

28   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

cigarettes and other representations.

2786.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2787.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

2788.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2789.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question;

1   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

2   made partial representations concerning the same subject matter as the omitted facts.

3       2790.   JLI and the Management Defendants engaged in fraudulent and deceptive

4   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

5   products were appropriate for minors, when in fact the products never should have been

6   marketed to minors and are especially harmful to minors due to the potent and addictive

7   nicotine doses, addictive qualities, and health risks.

8       2791.   In addition, all Defendants engaged in unfair and unconscionable conduct

9   because the targeting of minors offends public policy (in particular R.I. Gen. Laws §§ 11-9-13,

10  *et seq.*); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially

11  injurious; and has caused substantial harm that greatly outweighs any possible utility from the

12  conduct.

13      2792.   As alleged above, all Defendants participated and/or facilitated the marketing of

14  JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

15  and others have continued the deceptive, misleading, unfair, and unconscionable practices that

16  Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

17  use of JUUL products by minors continues to rise.

18      2793.   Defendants' conduct actually and proximately caused actual damages to

19  Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

20  class members would have behaved differently and would not have purchased JUUL products

21  or would have paid less for them. Defendants' misrepresentations and omissions induced

22  Plaintiffs and class members to purchase JUUL products they would not otherwise have

23  purchased and enter into purchase contracts they would not otherwise have entered into. In

24  addition, class members who are minors are entitled to full repayment of the amounts they spent

25  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

26  actual damages,  restitution, and/ or statutory damages in the amount of $200 per claim,

27  whichever is greater, as well as punitive damages, injunctive relief, attorney's fees, and any

28  other relief the Court may deem just or proper.

b.      **Common Law Fraud**

2794.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2795.   This claim is brought against JLI.

2796.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2797.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2798.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2799.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2800.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2801.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2802.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2803.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2804.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2805.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2806.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

1    members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

2    differently and would not have purchased JUUL products or would have paid less for them.

3    JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

4    JUUL products they would not otherwise have purchased and enter into purchase contracts they

5    would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

6    member of the class damages in an amount to be proven at trial, as well as any other relief the

7    Court may deem just or proper.

8                     **c.    Breach of the Implied Warranty of Merchantability**

9        2807.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10       2808.   This claim is brought against JLI.

11       2809.   JUUL has at all times been a merchant with respect to the products which were

12    sold to Plaintiff and the class and was in the business of selling such products.

13       2810.   Each JUUL product sold by JUUL comes with an implied warranty that it will

14    merchantable and fit for the ordinary purpose for which it would be used. *See* 6A R.I. Gen.

15    Laws § 2-314. JUUL has breached its implied warranty of merchantability because its products

16    were not in merchantable condition when sold, were defective when sold, did not conform to the

17    promises and affirmations of fact made on the products' containers or labels, and/or do not

18    possess even the most basic degree of fitness for ordinary use.

19       2811.   The ordinary intended purpose of JUUL's products—and the purpose for which

20    they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's

21    products are not fit for that use—or any other use—because they (i) were not smoking cessation

22    devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

23    potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

24    unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's

25    products are not fit for their ordinary, intended use as either cigarette replacement devices or

26    recreation smoking devices.

27       2812.   Plaintiffs and each member of the class have had sufficient direct dealings with

28    either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

---

1   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

2   each member of the class, on the other hand.

3       2813.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

4   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

5   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

6   intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

7   the express purpose an intent of being sold to consumers.

8       2814.   Plaintiffs and the members of the class were injured as a direct and proximate

9   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

10  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

11  because, had they been aware of the unmerchantable condition of JUUL products, they would

12  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

13  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14      2815.   JUUL was provided notice of these issues by numerous complaints filed against

15  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

16  individual letters and communications sent by consumers before or within a reasonable amount

17  of time after they discovered or should have discovered that's JUUL product were defective and

18  unmerchantable.

19              **d.       Unjust Enrichment**

20      2816.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21      2817.   This claim is brought against JLI and the Management Defendants.

22      2818.   Defendants created and implemented a scheme to create a market for e-cigarettes

23  and substantially increase sales of JUUL products through a pervasive pattern of false and

24  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

25  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

26  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

27  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

28  products.

2819.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. The General Laws of Rhode Island sections 11-9-13 prohibits the marketing and sale of JUUL products to minors.

2820.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2821.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2822.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2823.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2824.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 40.   South Carolina

2825.   Plaintiffs bring each of the following claims on behalf of the South Carolina Subclass under South Carolina law:

#### a.   Violation of the South Carolina Unfair Trade Practices Act
#### (S.C. Code Ann. §§ 39-5-10, *et seq.*)

2826.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2827.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2828.   Plaintiffs, class members, and Defendants are persons under South Carolina's Unfair Trade Practices Act.

2829.   Defendants engaged in trade or commerce directly or indirectly affecting the people of South Carolina by participating and furthering the advertising, offering for sale, selling, or distributing JUUL products.

2830.   Plaintiffs and class members purchased JUUL products for personal purposes.

2831.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2832.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2833.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2834.   The labels on JUUL products failed to disclose that the products posed

significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2835.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2836.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2837.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2838.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

2839.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2840.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular S.C. Code Ann. §§ 16-17-500, *et seq.*); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2841.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2842.   Defendants' conduct actually and proximately caused actual damages and loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—actual damages and treble damages, as well as restitution, attorney's fees and any other relief the Court may deem just or proper.

### b.      Common Law Fraud

2843.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2844.   This claim is brought against JLI.

2845.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2846.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2847.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2848.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2849.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2850.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2851.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2852.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2853.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2854.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2855.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.      Breach of the Implied Warranty of Merchantability

2856.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2857.   This claim is brought against JLI.

2858.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2859.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* S.C. Code Ann. § 36-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2860.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2861.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2862.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

1   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

2   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

3   intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

4   the express purpose an intent of being sold to consumers.

5       2863.  Plaintiffs and the members of the class were injured as a direct and proximate

6   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

7   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

8   because, had they been aware of the unmerchantable condition of JUUL products, they would

9   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

10  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

11      2864.  JUUL was provided notice of these issues by numerous complaints filed against

12  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

13  individual letters and communications sent by consumers before or within a reasonable amount

14  of time after they discovered or should have discovered that's JUUL product were defective and

15  unmerchantable.

16                          d.      **Unjust Enrichment**

17      2865.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

18      2866.  This claim is brought against JLI and the Management Defendants.

19      2867.  Defendants created and implemented a scheme to create a market for e-cigarettes

20  and substantially increase sales of JUUL products through a pervasive pattern of false and

21  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

22  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

23  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

24  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

25  products.

26      2868. Defendants were unjustly enriched as a result of their wrongful conduct,

27  including through the false and misleading advertisements and omissions regarding (i) whether

28  JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. S.C. Code Ann. §§ 16-17-500 & 16-17-502(A) prohibit the marketing and sale of JUUL products to minors.

2869.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2870.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2871.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2872.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2873.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

2874.

### 41.   South Dakota

2875.   Plaintiffs bring each of the following claims on behalf of the South Dakota Subclass under South Dakota law.

### a.   Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-1, *et seq.*)

2876.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2877.   This claim is brought against JLI and, for certain claims below, the Management

Defendants.

2878.   Plaintiffs, class members, and JUUL are persons under South Dakota's Deceptive Trade Practices and Consumer Protection Act.

2879.   JUUL engaged in trade or commerce directly or indirectly affecting the people of South Dakota by advertising, offering for sale, attempting to sell, selling, or distributing JUUL products.

2880.   Plaintiffs and class members purchased JUUL products for personal purposes.

2881.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2882.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2883.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2884.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

1    also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2         2885.   The omissions were misleading and deceptive standing alone and were
3    particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
4    cigarettes and other representations.

5         2886.   JUUL engaged in, used, and employed deceptive acts and practices, fraud, false
6    pretense, false promises, and misrepresentations and concealed, suppressed, and omitted
7    material information in connection with the sale of JUUL products.

8         2887.   JUUL's conduct had the capacity to, were likely to, and in fact did, deceive
9    reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs,
10   would have found it material to their purchasing decisions that JUUL's products (i) were not
11   smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii)
12   were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed
13   unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi)
14   that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a
15   pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor
16   in Plaintiffs' and class members' decisions to purchase JUUL products.

17        2888.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
18   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
19   other than Plaintiffs and class members), who had exclusive and superior knowledge of the
20   facts; because the facts would be material to reasonable consumers; because JLI actively
21   concealed them; because JLI intended for consumers to rely on the omissions in question;
22   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI
23   made partial representations concerning the same subject matter as the omitted facts.

24        2889.   As set forth in the allegations concerning each Plaintiff in Appendix A, in
25   purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.
26   Reasonable consumers would have been expected to have relied on the misrepresentations and
27   omissions.

28        2890.   Defendants knew or should have known that their misrepresentations and/or

omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2891.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2892.   JUUL's conduct actually and proximately caused actual damages and loss of money or property to Plaintiffs and class members. Absent JUUL's deceptive and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, as well as any other relief the Court may deem just or proper.

### b.   Common Law Fraud

2893.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2894.   This claim is brought against JLI.

2895.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2896.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2897.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2898.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2899.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2900.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2901.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2902.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2903.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2904.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2905.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

2906.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2907.  This claim is brought against JLI.

2908.  JUUL has at all times been a merchant with respect to the products which were

sold to Plaintiff and the class and was in the business of selling such products.

2909.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* S.D. Codified Laws § 57A-2-314.   JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2910.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2911.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2912.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2913.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would

1    not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

2    in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3    2914.   JUUL was provided notice of these issues by numerous complaints filed against

4    it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

5    individual letters and communications sent by consumers before or within a reasonable amount

6    of time after they discovered or should have discovered that's JUUL product were defective and

7    unmerchantable.

8    ### d.    Unjust Enrichment

9    2915.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10   2916.   This claim is brought against JLI and the Management Defendants.

11   2917.   Defendants created and implemented a scheme to create a market for e-cigarettes

12   and substantially increase sales of JUUL products through a pervasive pattern of false and

13   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

14   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

15   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

16   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

17   products.

18   2918.   Defendants were unjustly enriched as a result of their wrongful conduct,

19   including through the false and misleading advertisements and omissions regarding (i) whether

20   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

21   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

22   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

23   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

24   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

25   enriched through their scheme of marketing their products to minors. South Dakota Codified

26   Laws § 34-46-2 prohibits the marketing and sale of JUUL products to minors.

27   2919.   Defendants requested and received a measurable benefit at the expense of

28   Plaintiffs and class members in the form of payment for JUUL products.

---

2920.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2921.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2922.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2923.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 42.   Tennessee

2924.   Plaintiffs bring each of the following claims on behalf of the Tennessee Subclass under Tennessee law:

### a.   Violation of the Tennessee Consumer Protection Act (Tenn. Code Ann. §§ 47-18-101, *et seq.*)

2925.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2926.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2927.   Plaintiffs, class members, and Defendants are persons under Tennessee's Consumer Protection Act.

2928.   Plaintiffs and class members are natural persons who purchased JUUL products for personal purposes.

2929.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

addictiveness, and significant risks of substantial physical injury from using JUUL products.

2930.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2931.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2932.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2933.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2934.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2935.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics,

1   ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

2   products are of a particular standard, quality, or grade, or that goods are of a particular style or

3   model, when they are not; (c) advertising goods or services with intent not to sell them as

4   advertised; and (d) using statements or illustrations in advertisements that create a false

5   impression of the grade, quality, quantity, value, or usability of the goods or services offered.

6       2936.   JLI's conduct was fraudulent and deceptive because the misrepresentations and

7   omissions at issue were likely to or tend to, and in fact did, deceive reasonable consumers

8   including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

9   material to their purchasing decisions that JUUL's products (i) were not smoking cessation

10  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

11  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

12  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

13  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

14  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

15  Plaintiffs' and class members' decisions to purchase JUUL products.

16      2937.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

17  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

18  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

19  facts; because the facts would be material to reasonable consumers; because JLI actively

20  concealed them; because JLI intended for consumers to rely on the omissions in question;

21  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

22  made partial representations concerning the same subject matter as the omitted facts.

23      2938.  JLI and the Management Defendants engaged in fraudulent and deceptive

24  conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

25  products were appropriate for minors, when in fact the products never should have been

26  marketed to minors and are especially harmful to minors due to the potent and addictive

27  nicotine doses, addictive qualities, and health risks.

28      2939.  In addition, all Defendants engaged in unfair and unconscionable conduct

because the targeting of minors offends public policy (in particular Tenn. Code Ann. § 39-17-1504); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2940.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2941.   Defendants' conduct actually and proximately caused ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—actual damages and statutory treble damages, as well as injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b.    Common Law Intentional Misrepresentation

2942.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2943.   This claim is brought against JLI.

2944.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2945.   Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2946.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2947.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2948.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2949.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1    2950.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

2    were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

3    other than Plaintiffs and class members), who had exclusive and superior knowledge of the

4    facts; because the facts would be material to reasonable consumers; because JUUL products

5    pose an unreasonable risk of substantial bodily injury; and because JLI made partial

6    representations concerning the same subject matter as the omitted facts.

7    2951.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

8    purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

9    and/or omissions.  Reasonable consumers would have been expected to have relied on the

10   misrepresentations and omissions.

11   2952.   Defendants knew or should have known that their misrepresentations and/or

12   omissions were false and misleading, and intended for consumers to rely on such

13   misrepresentations and omissions.

14   2953.   JLI knew that JUUL products were not safe or reasonable alternatives to

15   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

16   addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

17   products.

18   2954.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

19   members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

20   differently and would not have purchased JUUL products or would have paid less for them.

21   JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

22   JUUL products they would not otherwise have purchased and enter into purchase contracts they

23   would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

24   member of the class damages in an amount to be proven at trial, as well as any other relief the

25   Court may deem just or proper.

26                  **c.    Breach of the Implied Warranty of Merchantability**

27   2955.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

28   2956.   This claim is brought against JLI.

2957.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2958.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Tenn. Code Ann. § 47-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2959.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2960.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2961.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2962.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Tennessee Direct Purchaser Subclass were damaged as a result of JUUL's breach of its

implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2963.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

2964.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2965.   This claim is brought against JLI and the Management Defendants.

2966.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2967.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Tennessee Code Annotated §§ 39-17-1504(a) and 39-17-1504(d) prohibit the marketing and sale of JUUL

products to minors.

2968.  Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2969.  Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2970.  There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2971.  Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2972.  Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 43.  Texas

2973.  Plaintiffs bring each of the following claims on behalf of the Texas Subclass under Texas law.

#### a.  Violation of the Texas Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

2974.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2975.  This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2976.  Plaintiffs, class members, and Defendants are persons under Texas's Deceptive Trade Practices-Consumer Protection Act.

2977.  Plaintiffs and class members are individuals who purchased JUUL products.

2978.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe

1   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

2   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

3   addictiveness, and significant risks of substantial physical injury from using JUUL products.

4       2979.  Advertisements and representations for JUUL products contained deceptive

5   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

6   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

7   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

8   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

9   decades, JLI used third parties and word of mouth to spread false and misleading information

10  about JUUL products.

11      2980.  Advertisements and representations for JUUL products concealed and failed to

12  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

13  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

14  addictive, posed significant risks of substantial physical injury resulting from the use of the

15  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

16  consumed through a pack of combustible cigarettes.

17      2981.  The labels on JUUL products failed to disclose that the products posed

18  significant risks of substantial physical injury resulting from the use of the products. The labels

19  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

20      2982.  The omissions were misleading and deceptive standing alone and were

21  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

22  cigarettes and other representations.

23      2983.  JLI's conduct was unfair and unconscionable in that it included (i) the

24  manufacture and sale of products with a heightened propensity to cause addiction and physical

25  injuries and (ii) misrepresentations and omissions of material facts concerning the

26  characteristics and safety of JUUL products that offended public policy; were immoral,

27  unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

28  substantial harm that greatly outweighs any possible utility from the conduct. JUUL's acts took

1  advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and class

2  members to a grossly unfair degree and to the detriment of Plaintiffs and class members.

3      2984.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

4  unfair business practices: (a) misrepresenting that JUUL products have characteristics,

5  ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

6  products are of a particular standard, quality, or grade, or that goods are of a particular style or

7  model, when they are not; (c) advertising goods or services with intent not to sell them as

8  advertised; and (d) failing to disclose information concerning JUUL products which was known

9  at the time of the JUUL's sale of the products, with the intention to induce the consumers into

10  transactions into which consumers would not have entered had the information been disclosed.

11      2985.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

12  omissions had the capacity and tendency to deceive, and in fact did, deceive reasonable

13  consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have

14  found it material to their purchasing decisions that JUUL's products (i) were not smoking

15  cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were

16  extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed

17  unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi)

18  that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a

19  pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor

20  in Plaintiffs' and class members' decisions to purchase JUUL products.

21      2986.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

22  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

23  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

24  facts; because the facts would be material to reasonable consumers; because JLI actively

25  concealed them; because JLI intended for consumers to rely on the omissions in question;

26  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

27  made partial representations concerning the same subject matter as the omitted facts.

28      2987.  As set forth in the allegations concerning each Plaintiff in Appendix A, in

purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2988.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2989.   In addition, all Defendants engaged in unconscionable conduct because the targeting of minors took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and class members to a grossly unfair degree and to the detriment of Plaintiffs and class members. In particular, Texas law seeks to protect minors from being the target of sales and marketing practices concerning JUUL products. Texas Health & Safety Code § 161.082, 161.087 and 161.452(c).

2990.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— economic damages, treble damages, and restitution, as well as injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

b.      **Common Law Fraud**

2991.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2992.   This claim is brought against JLI.

2993.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2994.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2995.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2996.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2997.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2998.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

1   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine
2   consumed through one JUUL pod exceeded the nicotine consumed through a pack of
3   combustible cigarettes. Knowledge of these facts would have been a substantial factor in
4   Plaintiffs' and class members' decisions to purchase JUUL products.

5   2999.  JLI owed Plaintiffs and class members a duty to disclose these facts because they
6   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
7   other than Plaintiffs and class members), who had exclusive and superior knowledge of the
8   facts; because the facts would be material to reasonable consumers; because JUUL products
9   pose an unreasonable risk of substantial bodily injury; and because JLI made partial
10  representations concerning the same subject matter as the omitted facts.

11  3000.  As set forth in the allegations concerning each Plaintiff in Appendix A, in
12  purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations
13  and/or omissions.  Reasonable consumers would have been expected to have relied on the
14  misrepresentations and omissions.

15  3001.  Defendants knew or should have known that their misrepresentations and/or
16  omissions were false and misleading, and intended for consumers to rely on such
17  misrepresentations and omissions.

18  3002.  JLI knew that JUUL products were not safe or reasonable alternatives to
19  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
20  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the
21  products.

22  3003.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class
23  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved
24  differently and would not have purchased JUUL products or would have paid less for them.
25  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase
26  JUUL products they would not otherwise have purchased and enter into purchase contracts they
27  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each
28  member of the class damages in an amount to be proven at trial, as well as any other relief the

1    Court may deem just or proper.

2                    **c.    Breach of the Implied Warranty of Merchantability**

3        3004.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4        3005.   This claim is brought against JLI.

5        3006.   JUUL has at all times been a merchant with respect to the products which were

6    sold to Plaintiff and the class and was in the business of selling such products.

7        3007.   Each JUUL product sold by JUUL comes with an implied warranty that it will

8    merchantable and fit for the ordinary purpose for which it would be used. *See* Tex. Bus. & Com.

9    Code § 2.314. JUUL has breached its implied warranty of merchantability because its products

10   were not in merchantable condition when sold, were defective when sold, did not conform to the

11   promises and affirmations of fact made on the products' containers or labels, and/or do not

12   possess even the most basic degree of fitness for ordinary use.

13       3008.   The ordinary intended purpose of JUUL's products—and the purpose for which

14   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

15   products are not fit for that use—or any other use—because they (i) were not smoking cessation

16   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

17   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

18   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

19   products are not fit for their ordinary, intended use as either cigarette replacement devices or

20   recreation smoking devices.

21       3009.   Plaintiffs and each member of the class have had sufficient direct dealings with

22   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

23   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

24   each member of the class, on the other hand.

25       3010.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

26   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

27   sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the

28   intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

the express purpose an intent of being sold to consumers.

3011.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3012.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.  Unjust Enrichment

3013.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3014.  This claim is brought against JLI and the Management Defendants.

3015.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3016. Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Texas Health & Safety Code § 161.082, 161.087 and 161.452(c) prohibit the marketing and sale of JUUL products to minors.

3017.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3018.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3019.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3020.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 44.   Utah

3021.   Plaintiffs bring each of the following claims on behalf of the Utah Subclass under Utah law:

#### a.   Violation of the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*)

3022.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3023.   This claim is brought against JLI.

3024.   Plaintiffs, class members, and Defendants are persons under Utah's Consumer Sales Practices Act.

3025.   Plaintiffs and class members purchased JUUL products in consumer transactions primarily for personal purposes.

3026.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe

alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3027.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3028.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3029.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3030.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3031.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have performance characteristics, uses, or benefits, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

3032.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3033.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3034.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3035.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

1   actual damages as well as restitution, injunctive relief, attorney's fees, and any other relief the

2   Court may deem just or proper.

3       3036.   Defendants had notice that its conduct was in violation of the law based on prior

4   rulings in sprawling, decades-long tobacco litigation and other notice they have received as a

5   result of lawsuits filed against them, and regulations promulgated under Utah Code §§ 13-11-1,

6   *et seq*., including, but not limited to, Utah Administrative Code R152-11-3(B)(1).

7       **b.      Violation of the Utah Truth in Advertising Law (Utah Code**

8           **Ann. §§ 13-11a-1, *et seq.*)**

9       3037.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10      3038.   This claim is brought against JLI.

11      3039.   Plaintiffs, class members, and Defendants are persons under Utah's Truth in

12  Advertising Law.

13      3040.   JLI is a supplier of JUUL products because it sells, assigns, offers, brokers, or

14  regularly solicits, engages in, or enforces sales of JUUL products.

15      3041.   Plaintiffs and class members purchased JUUL products for personal purposes.

16      3042.   Defendants created and implemented a scheme to create a market for e-cigarettes

17  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

18  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

19  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

20  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

21  addictiveness, and significant risks of substantial physical injury from using JUUL products.

22      3043.   Advertisements and representations for JUUL products contained deceptive

23  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

24  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

25  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

26  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

27  decades, JLI used third parties and word of mouth to spread false and misleading information

28  about JUUL products.

3044.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3045.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3046.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3047.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

3048.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to cause, and in fact did cause, a likelihood of confusion or misunderstanding.   Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3049.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3050.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3051.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3052.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' deceptive and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages or $2,000, whichever is greater, and statutory damages, as well as restitution, injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### c.        Common Law Fraud

3053.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3054.   This claim is brought against JLI.

3055.   JUUL created and implemented a scheme to create a market for e-cigarettes and

substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3056.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3057.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3058.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3059.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3060.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation

devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3061.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3062.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3063.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3064.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3065.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they

1   would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each
2   member of the class damages in an amount to be proven at trial, as well as any other relief the
3   Court may deem just or proper.

4   <div align="center">**d.      Breach of the Implied Warranty of Merchantability**</div>

5   3066.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

6   3067.   This claim is brought against JLI.

7   3068.   JUUL has at all times been a merchant with respect to the products which were
8   sold to Plaintiff and the class and was in the business of selling such products.

9   3069.   Each JUUL product sold by JUUL comes with an implied warranty that it will
10  merchantable and fit for the ordinary purpose for which it would be used. *See* Utah Code Ann.
11  § 70A-2-314. JUUL has breached its implied warranty of merchantability because its products
12  were not in merchantable condition when sold, were defective when sold, did not conform to the
13  promises and affirmations of fact made on the products' containers or labels, and/or do not
14  possess even the most basic degree of fitness for ordinary use.

15  3070.   The ordinary intended purpose of JUUL's products—and the purpose for which
16  they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's
17  products are not fit for that use—or any other use—because they (i) were not smoking cessation
18  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
19  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed
20  unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's
21  products are not fit for their ordinary, intended use as either cigarette replacement devices or
22  recreation smoking devices.

23  3071.   Plaintiffs and each member of the class have had sufficient direct dealings with
24  either JUUL via its website or its agents (including distributors, dealers, and sellers authorized
25  by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and
26  each member of the class, on the other hand.

27  3072.   Further, Plaintiffs and each member of the class were third-party beneficiaries of
28  JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3073.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3074.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.   Unjust Enrichment

3075.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3076.   This claim is brought against JLI and the Management Defendants.

3077.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3078.  Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Utah Code Annotated section 76-10-104 prohibits the marketing and sale of JUUL products to minors.

3079.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3080.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3081.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3082.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3083.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 45.   Vermont

3084.   Plaintiffs bring each of the following claims on behalf of the Vermont Subclass under Vermont law.

### a.   Violation of the Vermont Consumer Protection Act (Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*)

3085.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3086.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

3087.   Plaintiffs and class members purchased JUUL products not for resale in the ordinary course of their trade or business but for personal purposes.

3088.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3089.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3090.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3091.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3092.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3093.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the

characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

3094.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency or capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3095.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3096.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3097.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Vt. Stat. Ann. tit. 7 §§ 1003(a) & 1007(a)); is immoral, unethical, oppressive, outrageous, unscrupulous, and

substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

3098.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

3099.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual, treble, and punitive damages and restitution, as well as injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b.    Common Law Fraud

3100.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3101.   This claim is brought against JLI.

3102.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3103.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3104.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3105.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3106.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3107.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3108.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3109.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3110.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3111.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3112.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.      Breach of the Implied Warranty of Merchantability

3113.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3114.   This claim is brought against JLI.

3115.   JUUL has at all times been a merchant with respect to the products which were

1    sold to Plaintiff and the class and was in the business of selling such products.

2        3116.  Each JUUL product sold by JUUL comes with an implied warranty that it will

3    merchantable and fit for the ordinary purpose for which it would be used.  *See* Vt. Stat. Ann. tit.

4    9A § 2-314. JUUL has breached its implied warranty of merchantability because its products

5    were not in merchantable condition when sold, were defective when sold, did not conform to the

6    promises and affirmations of fact made on the products' containers or labels, and/or do not

7    possess even the most basic degree of fitness for ordinary use.

8        3117.   The ordinary intended purpose of JUUL's products—and the purpose for which

9    they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

10   products are not fit for that use—or any other use—because they (i) were not smoking cessation

11   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

12   potent   nicotine-delivery   mechanisms,   (iv) were   powerfully   addictive,   and   (v) posed

13   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

14   products are not fit for their ordinary, intended use as either cigarette replacement devices or

15   recreation smoking devices.

16       3118.   Plaintiffs and each member of the class have had sufficient direct dealings with

17   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

18   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

19   each member of the class, on the other hand.

20       3119.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

21   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

22   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

23   intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

24   the express purpose an intent of being sold to consumers.

25       3120.   Plaintiffs and the members of the class were injured as a direct and proximate

26   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

27   the Vermont Direct Purchaser Subclass were damaged as a result of JUUL's breach of its

28   implied warranty of merchantability because, had they been aware of the unmerchantable

1    condition of JUUL products, they would not have purchased JUUL products, or would have

2    paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any

3    other relief the Court may deem just or proper.

4        3121.   JUUL was provided notice of these issues by numerous complaints filed against

5    it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

6    individual letters and communications sent by consumers before or within a reasonable amount

7    of time after they discovered or should have discovered that's JUUL product were defective and

8    unmerchantable.

9                                    **d.    Unjust Enrichment**

10       3122.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

11       3123.   This claim is brought against JLI and the Management Defendants.

12       3124.   Defendants created and implemented a scheme to create a market for e-cigarettes

13   and substantially increase sales of JUUL products through a pervasive pattern of false and

14   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

15   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

16   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

17   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

18   products.

19       3125.  Defendants were unjustly enriched as a result of their wrongful conduct,

20   including through the false and misleading advertisements and omissions regarding (i) whether

21   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

22   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

23   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

24   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

25   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

26   enriched through their scheme of marketing their products to minors. Vermont Statutes

27   Annotated title 7 §§ 1003(a) and 1007(a) prohibit the marketing and sale of JUUL products to

28   minors.

3126.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3127.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3128.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3129.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3130.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 46.   Virginia

3131.   Plaintiffs bring each of the following claims on behalf of the Virginia Subclass under Virginia law.

#### a.   Violation of the Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, *et seq.*)

3132.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3133.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

3134.   Plaintiffs, class members, and JUUL are persons under Virginia's Consumer Protection Act.

3135.   Plaintiffs and class members purchased JUUL products in consumer transactions, *i.e.*, for personal purposes.

3136.   JUUL advertised, solicited, or engaged in consumer transactions to sell JUUL products, or is a manufacturer, distributor, or licensor that advertised, sold, or licensed JUUL products to be resold, leased, or sublicensed by other persons in consumer transactions.

3137.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3138.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3139.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3140.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3141.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3142.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

1  products are of a particular standard, quality, or grade, or that goods are of a particular style or

2  model, when they are not; and (c) advertising goods or services with intent not to sell them as

3  advertised.

4       3143.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

5  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers,

6  including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

7  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

8  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

9  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

10  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

11  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

12  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

13  Plaintiffs' and class members' decisions to purchase JUUL products.

14       3144.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

15  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

16  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

17  facts; because the facts would be material to reasonable consumers; because JLI actively

18  concealed them; because JLI intended for consumers to rely on the omissions in question;

19  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

20  made partial representations concerning the same subject matter as the omitted facts.

21       3145.  As set forth in the allegations concerning each Plaintiff in Appendix A, in

22  purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.

23  Reasonable consumers would have been expected to have relied on the misrepresentations and

24  omissions.

25       3146.  JLI and the Management Defendants engaged in fraudulent and deceptive

26  conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

27  products were appropriate for minors, when in fact the products never should have been

28  marketed to minors and are especially harmful to minors due to the potent and addictive

nicotine doses, addictive qualities, and health risks.

3147.   Defendants' conduct actually and proximately caused actual damages and loss to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages or $500 per violation, whichever is greater, and statutory damages for each willful violation in the amount of treble damages or $1,000, whichever is greater, as well as attorney's fees and any other relief the Court may deem just or proper.

### b.    Common Law Fraud

3148.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3149.   This claim is brought against JLI.

3150.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3151.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3152.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3153.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3154.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3155.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3156.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3157.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3158.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3159.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3160.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

3161.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3162.   This claim is brought against JLI.

3163.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

3164.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Va. Code Ann. § 8.2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the

1   promises and affirmations of fact made on the products' containers or labels, and/or do not

2   possess even the most basic degree of fitness for ordinary use.

3        3165.   The ordinary intended purpose of JUUL's products—and the purpose for which

4   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

5   products are not fit for that use—or any other use—because they (i) were not smoking cessation

6   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

7   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

8   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

9   products are not fit for their ordinary, intended use as either cigarette replacement devices or

10  recreation smoking devices.

11       3166.   Plaintiffs and each member of the class have had sufficient direct dealings with

12  either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

13  by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

14  each member of the class, on the other hand.

15       3167.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

16  JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

17  sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

18  intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

19  the express purpose an intent of being sold to consumers.

20       3168.   Plaintiffs and the members of the class were injured as a direct and proximate

21  result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

22  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

23  because, had they been aware of the unmerchantable condition of JUUL products, they would

24  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

25  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

26       3169.   JUUL was provided notice of these issues by numerous complaints filed against

27  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

28  individual letters and communications sent by consumers before or within a reasonable amount

1   of time after they discovered or should have discovered that's JUUL product were defective and

2   unmerchantable.

3   **d.   Unjust Enrichment**

4   3170.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

5   3171.   This claim is brought against JLI and the Management Defendants.

6   3172.   Defendants created and implemented a scheme to create a market for e-cigarettes

7   and substantially increase sales of JUUL products through a pervasive pattern of false and

8   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

9   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

10   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

11   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

12   products.

13   3173.   Defendants were unjustly enriched as a result of their wrongful conduct,

14   including through the false and misleading advertisements and omissions regarding (i) whether

15   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

16   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

17   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

18   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

19   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

20   enriched through their scheme of marketing their products to minors. Code of Virginia

21   Annotated section 18.2-371.2 prohibits the marketing and sale of JUUL products to minors, or

22   knowingly permitting the purchase of JUUL products by minors.

23   3174.   Defendants requested and received a measurable benefit at the expense of

24   Plaintiffs and class members in the form of payment for JUUL products.

25   3175.   Defendants appreciated, recognized, and chose to accept the monetary benefits

26   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

27   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

28   3176.   There is no justification for Defendants' enrichment. It would be inequitable,

unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3177.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3178.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 47.   Washington

3179.   Plaintiffs bring each of the following claims on behalf of the Washington Subclass under Washington law.

### a.   Violation of the Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010, *et seq.*)

3180.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3181.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

3182.   Plaintiffs, class members, and Defendants are each natural persons, corporations, trusts, unincorporated associations or partnerships, and are thus persons under Washington's Consumer Sales Practices Act.

3183.   Plaintiffs and class members purchased JUUL products for personal purposes.

3184.   Defendants engaged in trade or commerce directly or indirectly affecting the people of Washington by advertising, offering for sale, selling, or distributing JUUL products.

3185.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3186.   Defendants' unlawful acts and practices occurred in connection with their sales

of JUUL products, in commerce directly or indirectly affecting the people of the state of Washington.

3187. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3188. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3189. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3190. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3191. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

3192. JLI's conduct was fraudulent and deceptive because the misrepresentations and

omissions had the capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.  JUUL's conduct thus had the capacity to injure not just Plaintiffs but also other members of the public.

3193.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3194.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3195.  In addition, all Defendants engaged in unfair and unconscionable conduct that affects the public interest because the targeting of minors offends public policy (in particular Wash. Rev. Code Ann. §§ 70.155.005, *et seq.*, § 26.28.080 and § 70.345.090.); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

3196.  As alleged above, all Defendants participated and/or facilitated the marketing of

1   JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

2   and others have continued the deceptive, misleading, unfair, and unconscionable practices that

3   Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

4   use of JUUL products by minors continues to rise.

5       3197.  Defendants' conduct actually and proximately caused actual damages and loss of

6   money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent

7   conduct, Plaintiffs and class members would have behaved differently and would not have

8   purchased JUUL products or would have paid less for them. Defendants' misrepresentations and

9   omissions induced Plaintiffs and class members to purchase JUUL products they would not

10  otherwise have purchased and enter into purchase contracts they would not otherwise have

11  entered into. In addition, class members who are minors are entitled to full repayment of the

12  amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each

13  member of the class—actual damages and statutory treble damages up to $25,000 for each

14  violation, as well as injunctive relief, attorney's fees, and any other relief the Court may deem

15  just or proper.

### b.      Common Law Fraud

16

17      3198.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

18      3199.  This claim is brought against JLI.

19      3200.  JUUL created and implemented a scheme to create a market for e-cigarettes and

20  substantially increase sales of JUUL through a pervasive pattern of false and misleading

21  statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

22  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

23  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

24  addictiveness, and significant risks of substantial physical injury from using JUUL products.

25      3201.  Advertisements and representations for JUUL products contained deceptive

26  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

27  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

28  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3202.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3203.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3204.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3205.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3206.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

1  facts; because the facts would be material to reasonable consumers; because JUUL products
2  pose an unreasonable risk of substantial bodily injury; and because JLI made partial
3  representations concerning the same subject matter as the omitted facts.

4  3207.  As set forth in the allegations concerning each Plaintiff in Appendix A, in
5  purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations
6  and/or omissions.  Reasonable consumers would have been expected to have relied on the
7  misrepresentations and omissions.

8  3208.  Defendants knew or should have known that their misrepresentations and/or
9  omissions were false and misleading, and intended for consumers to rely on such
10  misrepresentations and omissions.

11  3209.  JLI knew that JUUL products were not safe or reasonable alternatives to
12  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
13  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the
14  products.

15  3210.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class
16  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved
17  differently and would not have purchased JUUL products or would have paid less for them.
18  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase
19  JUUL products they would not otherwise have purchased and enter into purchase contracts they
20  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each
21  member of the class damages in an amount to be proven at trial, as well as any other relief the
22  Court may deem just or proper.

23  **c.  Breach of the Implied Warranty of Merchantability**

24  3211.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

25  3212.  This claim is brought against JLI.

26  3213.  JUUL has at all times been a merchant with respect to the products which were
27  sold to Plaintiff and the class and was in the business of selling such products.

28  3214.  Each JUUL product sold by JUUL comes with an implied warranty that it will

merchantable and fit for the ordinary purpose for which it would be used. *See* Wash. Rev. Code § 62A-2.314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3215.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

3216.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3217.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3218.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Washington Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any

1   other relief the Court may deem just or proper.

2       3219.   JUUL was provided notice of these issues by numerous complaints filed against

3   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

4   individual letters and communications sent by consumers before or within a reasonable amount

5   of time after they discovered or should have discovered that's JUUL product were defective and

6   unmerchantable.

7             **d.**    **Unjust Enrichment**

8       3220.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

9       3221.   This claim is brought against JLI and the Management Defendants.

10       3222.   Defendants created and implemented a scheme to create a market for e-cigarettes

11   and substantially increase sales of JUUL products through a pervasive pattern of false and

12   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

13   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

14   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

15   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

16   products.

17       3223.   Defendants were unjustly enriched as a result of their wrongful conduct,

18   including through the false and misleading advertisements and omissions regarding (i) whether

19   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

20   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

21   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

22   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

23   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

24   enriched through their scheme of marketing their products to minors. Revised Code of

25   Washington § 26.28.080, § 70.345.090 and §§ 70.155.005, *et seq.*, prohibit the marketing and

26   sale of JUUL products to minors.

27       3224.   Defendants requested and received a measurable benefit at the expense of

28   Plaintiffs and class members in the form of payment for JUUL products.

3225.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3226.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3227.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3228.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 48.   West Virginia

3229.   Plaintiffs bring each of the following claims on behalf of the West Virginia Subclass under West Virginia law.

### a.   Violation of the West Virginia Consumer Credit and Protection Act (W. Va. Code §§ 46A-6-101, *et seq.*)

3230.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3231.   This claim is brought against JLI and, for certain claims, the Management Defendants.

3232.   JUUL engaged in trade or commerce directly or indirectly affecting the people of West Virginia by advertising, offering for sale, selling, or distributing JUUL products.

3233.   Plaintiffs and class members are natural persons who purchased JUUL products for personal purposes.

3234.

3235.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3236. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3237. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3238. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3239. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3240. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

3241. JLI's conduct was fraudulent and deceptive because the misrepresentations and

omissions caused a likelihood of confusion or misunderstanding, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3242.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3243. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3244.   JUUL's conduct actually and proximately caused ascertainable loss of money or property to Plaintiffs and class members. Absent JUUL's unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent

on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages or $200, whichever is greater, as well as restitution, injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b.   Common Law Fraud

3245.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3246.   This claim is brought against JLI.

3247.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3248.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3249.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3250.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3251.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3252.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3253.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3254.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3255.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3256.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3257.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper

### c.   Breach of the Implied Warranty of Merchantability

3258.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3259.   This claim is brought against JLI.

3260.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

3261.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* W. Va. Code § 46-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3262.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or

1    recreation smoking devices.

2        3263.   Plaintiffs and each member of the class have had sufficient direct dealings with

3    either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

4    by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

5    each member of the class, on the other hand.

6        3264.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

7    JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

8    sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

9    intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

10   the express purpose an intent of being sold to consumers.

11       3265.   Plaintiffs and the members of the class were injured as a direct and proximate

12   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

13   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

14   because, had they been aware of the unmerchantable condition of JUUL products, they would

15   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

16   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper

17       3266.   JUUL was provided notice of these issues by numerous complaints filed against

18   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

19   individual letters and communications sent by consumers before or within a reasonable amount

20   of time after they discovered or should have discovered that's JUUL product were defective and

21   unmerchantable.

22                         d.       **Unjust Enrichment**

23       3267.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

24       3268.   This claim is brought against JLI and the Management Defendants.

25       3269.   Defendants created and implemented a scheme to create a market for e-cigarettes

26   and substantially increase sales of JUUL products through a pervasive pattern of false and

27   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

28   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3270.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. West Virginia Code section 16-9A-2 prohibits the marketing and sale of JUUL products to minors.

3271.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3272.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3273.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3274.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3275.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 49.   Wisconsin

3276.   Plaintiffs bring each of the following claims on behalf of the Wisconsin Subclass under Wisconsin law.

a.       **Violation of the Wisconsin Deceptive Trade Practices Act**

**(Wis. Stat. § 100.18)**

3277.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3278.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

3279.   Plaintiffs and class members purchased JUUL products for personal purposes.

3280.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3281.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3282.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3283.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3284. The omissions were misleading and deceptive standing in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3285. JLI's conduct was misleading and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3286. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3287. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3288. JUUL's conduct actually and proximately caused pecuniary loss to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class

members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—actual damages for pecuniary loss as well as restitution, attorney's fees, and any other relief the Court may deem just or proper.

### b.      Common Law Fraud

3289.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3290.   This claim is brought against JLI.

3291.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3292.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3293.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3294.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3295.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3296.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3297.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3298.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3299.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such

misrepresentations and omissions.

3300.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3301.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper

### c.     Breach of the Implied Warranty of Merchantability

3302.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3303.   This claim is brought against JLI.

3304.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

3305.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* Wisc. Stat. § 402.314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3306.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

3307.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3308.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3309.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Wisconsin Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3310.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

3311.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3312.  This claim is brought against JLI and the Management Defendants.

3313.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3314.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Wisconsin Statutes section 134.66 prohibits the marketing and sale of JUUL products to minors.

3315.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3316.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3317.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3318.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3319.   Plaintiffs plead this claim separately as well as in the alternative to their other

claims, as without such claims they would have no adequate legal remedy.

### 50.    Wyoming

3320.   Plaintiffs bring each of the following claims on behalf of the Wyoming Subclass under Wyoming law

#### a.    Violation of the Wyoming Consumer Protection Act (Wyo. Stat. Ann. §§ 40-12-101, *et seq.*)

3321.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3322.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

3323.   Plaintiffs, class members, and Defendants are each natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, or other legal entities and are thus persons under Wyoming's Consumer Protection Act.

3324.   Plaintiffs and class members purchased JUUL products for personal purposes.

3325.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3326.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3327.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3328.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3329.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3330.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

3331.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have uses which they do not have; (b) misrepresenting that JUUL products are of a particular standard or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

3332.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily

injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3333.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3334.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3335.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3336.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3337.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Wyo. Stat. Ann. § 14-3-302); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

3338.   As alleged above, all Defendants participated and/or facilitated the marketing of

1   JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

2   and others have continued the deceptive, misleading, unfair, and unconscionable practices that

3   Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

4   use of JUUL products by minors continues to rise.

5        3339.   Defendants' conduct actually and proximately caused actual damages to

6   Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

7   class members would have behaved differently and would not have purchased JUUL products

8   or would have paid less for them. Defendants' misrepresentations and omissions induced

9   Plaintiffs and class members to purchase JUUL products they would not otherwise have

10  purchased and enter into purchase contracts they would not otherwise have entered into. In

11  addition, class members who are minors are entitled to full repayment of the amounts they spent

12  on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—

13  actual damages as well as restitution, attorney's fees, and any other relief the Court may deem

14  just or proper.

15                     **b.      Common Law Fraud**

16       3340.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

17       3341.   This claim is brought against JLI.

18       3342.   JUUL created and implemented a scheme to create a market for e-cigarettes and

19  substantially increase sales of JUUL through a pervasive pattern of false and misleading

20  statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

21  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

22  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

23  addictiveness, and significant risks of substantial physical injury from using JUUL products.

24       3343.   Advertisements and representations for JUUL products contained deceptive

25  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

26  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

27  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

28  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

1   decades, JLI used third parties and word of mouth to spread false and misleading information
2   about JUUL products.

3       3344.   Advertisements and representations for JUUL products concealed and failed to
4   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
5   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
6   addictive, posed significant risks of substantial physical injury resulting from the use of the
7   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
8   consumed through a pack of combustible cigarettes.

9       3345.   The labels on JUUL products failed to disclose that the products posed
10  significant risks of substantial physical injury resulting from the use of the products. The labels
11  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

12      3346.   The omissions were misleading and deceptive standing alone and were
13  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
14  cigarettes and other representations.

15      3347.   JLI's conduct was fraudulent and deceptive because its misrepresentations and
16  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers
17  including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it
18  material to their purchasing decisions that JUUL's products (i) were not smoking cessation
19  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
20  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable
21  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine
22  consumed through one JUUL pod exceeded the nicotine consumed through a pack of
23  combustible cigarettes. Knowledge of these facts would have been a substantial factor in
24  Plaintiffs' and class members' decisions to purchase JUUL products.

25      3348.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
26  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
27  other than Plaintiffs and class members), who had exclusive and superior knowledge of the
28  facts; because the facts would be material to reasonable consumers; because JUUL products

1  pose an unreasonable risk of substantial bodily injury; and because JLI made partial
2  representations concerning the same subject matter as the omitted facts.

3       3349.  As set forth in the allegations concerning each Plaintiff in Appendix A, in
4  purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations
5  and/or omissions. Reasonable consumers would have been expected to have relied on the
6  misrepresentations and omissions.

7       3350.  Defendants knew or should have known that their misrepresentations and/or
8  omissions were false and misleading, and intended for consumers to rely on such
9  misrepresentations and omissions.

10      3351.  JLI knew that JUUL products were not safe or reasonable alternatives to
11  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
12  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the
13  products.

14      3352.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class
15  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved
16  differently and would not have purchased JUUL products or would have paid less for them.
17  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase
18  JUUL products they would not otherwise have purchased and enter into purchase contracts they
19  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each
20  member of the class damages in an amount to be proven at trial, as well as any other relief the
21  Court may deem just or proper.

22              c.      **Breach of the Implied Warranty of Merchantability**

23      3353.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

24      3354.  This claim is brought against JLI.

25      3355.  JUUL has at all times been a merchant with respect to the products which were
26  sold to Plaintiff and the class and was in the business of selling such products.

27      3356.  Each JUUL product sold by JUUL comes with an implied warranty that it will
28  merchantable and fit for the ordinary purpose for which it would be used. *See* Wyo. Stat. Ann.

§ 34.1-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3357.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

3358.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3359.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3360.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper

3361.   JUUL was provided notice of these issues by numerous complaints filed against

it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

3362.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3363.   This claim is brought against JLI and the Management Defendants.

3364.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3365.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Wyoming Statutes Annotated section 14-3-302 prohibits the marketing and sale of JUUL products to minors.

3366.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3367.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3368.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3369.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant. Due to the sprawling, decades-long tobacco litigations and other notice they have received as a result of lawsuits filed against them, Defendants are reasonably notified that Plaintiffs and class members would expect compensation from Defendants' unjust enrichment stemming from their wrongful actions.

3370.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## VIII.   PRAYER FOR RELIEF

Plaintiff, on behalf of themselves and the proposed classes, respectfully demand that the Court:

A.      Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a) and (b)(3), direct that reasonable notice of this action be given to the classes, declare Plaintiffs as a named representatives of the classes, and declare that Plaintiffs' counsel be appointed as class counsel;

B.      Enter judgment against Defendants and in favor of Plaintiffs and the classes;

C.      Award damages (including statutory, punitive, and multiple damages as provided by law) and restitution to the classes in an amount to be determined at trial, plus interest in accordance with law;

D.      Order disgorgement from the Defendants;

E.      Award Plaintiffs and the classes their costs of suit, including reasonable attorneys' fees as provided by law; and

F.      Award such further and additional relief as is necessary to redress the harm caused by Defendants' unlawful conduct and as the Court may deem just and proper under the circumstances.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1    IX.    RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS

2          3371.  None of the causes of action asserted herein seeks damages or other relief as a

3    result of personal injuries allegedly attributable to Plaintiffs' and class members' use of JUUL

4    products. Such claims are governed by the personal injury Master Complaint and any additional

5    Short Form complaints that may be filed (or as otherwise agreed by the parties). The named

6    Plaintiffs in this complaint expressly reserve their right to seek damages or other relief for

7    personal injuries they may have suffered, regardless of whether those damages are sought

8    through causes of action alleged herein or otherwise.

9    X.    DEMAND FOR JURY TRIAL

10         3372.  Pursuant to Federal Rule of Civil Procedure38, Plaintiffs, on behalf of

11   themselves and the classes, demand a trial by jury on all issues to triable.

12

13   DATED:  March 10, 2020                          Respectfully Submitted,

14

15                                                   By: *Dena C. Sharp*

16                                                   Dena C. Sharp
                                                     **GIRARD SHARP LLP**
17                                                   601 California St., Suite 1400
                                                     San Francisco, CA 94108
18                                                   Telephone: (415) 981-4800

19                                                   By: *Sarah R. London*

20

21                                                   Sarah R. London
                                                     **LIEFF CABRASER HEIMANN &**
22                                                   **BERNSTEIN**
                                                     275 Battery Street, Fl. 29
23                                                   San Francisco, CA 94111
                                                     Telephone:  (415) 956-1000
24

25

26                                                   By: *Dean Kawamoto*

27                                                   Dean Kawamoto
                                                     **KELLER ROHRBACK L.L.P.**
28                                                   1201 Third Ave., Ste. 3200
                                                     Seattle, WA 98101

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Telephone:  (206) 623-1900

By: *Ellen Relkin*

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for the Plaintiffs*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2020, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

<div align="right">

/s/ *Sarah R. London*

</div>