*[Submitting Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 19-md-02913-WHO |
| THIS DOCUMENT RELATES TO: *ALL PERSONAL INJURY ACTIONS* | **PLAINTIFFS' CONSOLIDATED MASTER COMPLAINT (PERSONAL INJURY)** <br><br> **JURY TRIAL DEMANDED** |

Pursuant to anticipated Case Management Order No. 7 governing adoption of Master and Short Form Complaints (Personal Injury) ("CMO-7"), the undersigned attorneys for Plaintiffs and the Plaintiffs' Steering Committee ("PSC") hereby file this *Consolidated Master Complaint (Personal Injury)* (hereinafter "*PI Master Complaint*"). This *PI Master Complaint* is being filed as an administrative device[1] to set forth potential claims that individual Plaintiffs may assert against DEFENDANTS in this MDL Litigation against the following DEFENDANTS:

1.      JUUL LABS, INC., previously d/b/a as PAX LABS, INC. and PLOOM INC.;

2.      ALTRIA GROUP, INC.;

3.      PHILIP MORRIS USA, INC.;

---

[1] *See In re Propulsid Products Liab. Litig.*, 208 F.R.D. 133, 141 (E.D. La. 2002).

1          4.      ALTRIA CLIENT SERVICES LLC;

2          5.      ALTRIA GROUP DISTRIBUTION COMPANY;

3          6.      ALTRIA ENTERPRISES LLC;

4          7.      JAMES MONSEES;

5          8.      ADAM BOWEN;

6          9.      NICHOLAS PRITZKER;

7          10.     HOYOUNG HUH;

8          11.     RIAZ VALANI;

9          12.     MOTHER MURPHY'S LABS, INC.;

10         13.     ALTERNATIVE INGREDIENTS, INC.;

11         14.     TOBACCO TECHNOLOGY, INC.;

12         15.     eLIQUITECH, INC.;

13         16.     MCLANE COMPANY, INC.;

14         17.     EBY-BROWN COMPANY, LLC;

15         18.     CORE-MARK HOLDING COMPANY, INC.;

16         19.     CHEVRON CORPORATION;

17         20.     CIRCLE K STORES INC.;

18         21.     SPEEDWAY LLC;

19         22.     7-ELEVEN, INC.;

20         23.     WALMART;

21         24.     WALGREENS BOOTS ALLIANCE, INC.

22     (collectively referred to as "DEFENDANTS").

23          This *Master Complaint (Personal Injury)* is an administrative device and sets forth

24     questions of fact and law common to those claims subsumed within the context of this

25     multidistrict proceeding. Plaintiffs seek compensatory and punitive damages, monetary restitution

26     and all other available remedies as a result of injuries caused by DEFENDANTS' defective

27     products and wrongful conduct. Plaintiffs make the following allegations based upon their

28     personal knowledge and upon information and belief, as well as upon their attorneys'

investigative efforts regarding JUUL E-Cigarettes, which includes the JUUL E-Cigarette device (including all components) and JUUL Pods (including all components) which contain an E-Liquid (collectively referred to as "JUUL" or "JUUL Products").

This *Master Complaint (Personal Injury)* does not necessarily include all claims asserted in all of the transferred actions to this Court, nor is it intended to consolidate for any purpose the separate claims of the Plaintiffs herein. It is anticipated that individual plaintiffs may adopt this *Master Complaint (Personal Injury)* and the necessary causes of action herein through use of a separate *Short Form Complaint (Personal Injury).* Any separate facts and additional claims of individual Plaintiffs will be set forth in the *Short Form Complaint (Personal Injury)* filed by the respective Plaintiffs or their counsel. *This Master Complaint (Personal Injury)* does not constitute a waiver or dismissal of any actions or claims asserted in those individual actions, nor does any Plaintiff relinquish the right to move to amend their individual claims to seek any additional claims and/or to add additional parties as discovery proceeds and facts and other circumstances may warrant.

Plaintiffs plead all Claims and Causes of Action in this *Master Complaint (Personal Injury)* in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the laws of Plaintiffs' resident States or other States that are deemed to apply.

Plaintiffs, by and through counsel, hereby bring claims against DEFENDANTS, and allege as follows:

## I.     <u>INTRODUCTION</u>

The battle to end nicotine addiction and its associated diseases and death has consumed our nation's public health resources for more than half a century. After five decades of tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on the path to victory. By 2014, rates of smoking and nicotine addiction in this country were finally at an all-time low, particularly among teenagers. Until now. The United States, closer than ever to consigning the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic of historic proportions. The swift rise in a new generation of nicotine addicts has overwhelmed

parents, schools, and the medical community, drawing governmental intervention at nearly every level—but it's too little, too late.

This public health crisis is no accident. What had been lauded as progress in curbing cigarette use, JUUL LABS INC.'S (JLI) co-founders ADAM BOWEN and JAMES MONSEES viewed as opportunity.  Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, BOWEN, MONSEES, and investors in their company sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier.  To achieve that common purpose, they knew they would need to create and market a product that would make nicotine cool again, without any of the stigma associated with cigarettes. With help from their early investors and board members, who include NICOLAS PRITZKER, HUYOUNG HUH, and RIAZ VALANI (together, the "MANAGEMENT DEFENDANTS"), they succeeded in hooking millions of youth, intercepting millions of adults trying to overcome their nicotine addictions, and, of course, earning billions of dollars in profits.

Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant ALTRIA.  JLI was created in the image of the iconic American cigarette companies, which JLI founders praised for creating "the most successful consumer product of all time. . . . an amazing product."  The secret to that "amazing product"?  Nicotine, a chemical that has deleterious effects on the developing brains of youths, and is the fundamental reason that people persist in using tobacco products posing the risk of pulmonary injuries, cardiovascular disease and other serious, often fatal, conditions.  Through careful study of decades of cigarette industry documents, JLI knew that the key to developing and sustaining addiction was the amount and the efficiency of the nicotine delivery.

Three tactics were central to decades of cigarette industry market dominance: product design to maximize addiction; mass deception; and targeting of youth.  JLI and its co-conspirators adopted and mastered them all.  *First*, JLI and BOWEN designed JUUL products to create and sustain addiction, not break it.  JLI and BOWEN were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery.  Indeed,

- 4 -

JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what JLI and BOWEN designed was a starter product, not a cessation or cigarette replacement product.  JLI and BOWEN also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

*Second*, JLI, the MANAGEMENT DEFENDANTS and ALTRIA engaged in a campaign of deceit, through sophisticated mass media and social media communications, advertisements and otherwise, about the purpose and dangers of JUUL products.  JUUL products' packaging and advertising grossly understates the nicotine content in its products.   Advertising campaigns featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a normal part of a daily routine, and as safe as caffeine. In partnership with ALTRIA, JLI adopted a "Make the Switch" campaign to mislead consumers into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions.   JLI, the MANAGEMENT DEFENDANTS, and ALTRIA also concealed the results of studies that revealed that JUUL products were far more powerfully addictive than was disclosed.   JLI's deceptive marketing scheme was carried out across the country through broad distribution channels: veteran cigarette industry wholesalers, distributors and retailers ensured that JUUL products would become widely available to a new market of nicotine-newcomers, especially youth.  JLI and the MANAGEMENT DEFENDANTS joined with these veteran cigarette industry marketers to secure premium shelf space for vivid displays at convenience stores, like 7-11, and gas stations, including Chevron, that would lure e-cigarette users, young and old, who would become long-term customers. These marketing efforts have been resounding successes—when JUUL products were climbing in sales, most adults and youth believed that e-cigarettes did not contain nicotine at all.

*Third*, JLI and the MANAGEMENT DEFENDANTS, just like cigarette companies before them, targeted kids as their customer base.  One of JLI's ██████████ was the need to ██████████ ██████████ JUUL products were designed to appear slick and high-tech like a cool

gadget, including video-game-like features like "party mode." JLI offered kid-friendly flavors like mango and cool mint, and partnered with ALTRIA to create and preserve the market for mint-flavored products—all because Defendants knew that flavors get young people hooked. Under the guise of youth smoking prevention, JLI sent representatives directly to schools to study teenager e-cigarette preferences.

JLI and the MANAGEMENT DEFENDANTS reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for cigarettes because they cause young people to start smoking) with cutting-edge viral marketing campaigns and social media. They hired young models and advertised using bright, "fun" themes, including on media long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and educational tools to students in middle school and high school. JLI and the MANAGEMENT DEFENDANTS also employed young social-media "influencers" and celebrities popular with teenagers. When regulators and Congress caught onto JLI's relentless focus on children, JLI and the MANAGEMENT DEFENDANTS simply lied, even though they knew well that they had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful. JUUL products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018. The Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."

It should come as little surprise that JLI and the MANAGEMENT DEFENDANTS' misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company. Well before ALTRIA announced its investment in JUUL, the connections between the two companies ran deep. JLI and ALTRIA collaborated to grow the e-cigarette market and the number of users addicted to nicotine, including by sharing data and information and coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes. ALTRIA's investment in JLI is not merely a financial proposition, but a key element of

Defendants' plan to stave off regulation and keep their most potent and popular products on the market. JLI has benefitted from ALTRIA's expertise in designing and marketing addictive products, and in thwarting regulation.

There is no doubt about it—JLI, the MANAGEMENT DEFENDANTS, ALTRIA, and their co-Defendants have created this public health crisis.  At the heart of this disastrous epidemic are the concerted efforts of JLI, its co-conspirators, and all those in JUUL's supply and distribution chain to continuously expand their market share and profits by preying upon a vulnerable young population and deceiving the public about the true nature of the products they were selling. Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air. Worse, the flavors in JUUL products are themselves toxic and dangerous, and have never been adequately tested to ensure they are safe for inhalation. According to the most recent scientific literature, JUUL products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Yet JUUL products and advertising contain no health risk warnings at all. Many smokers, believing that JUUL would help them "make the switch," ended up only further trapped in their nicotine addiction.  Older adults who switch to JUUL are more susceptible to cardiovascular and pulmonary problems, and CDC data shows that older patients hospitalized due to vaping lung related conditions had much longer hospital stays than younger patients. And a generation of kids is now hooked, ensuring long-term survival of the nicotine industry because, today just as in the 1950s, 90% of smokers start as children.

Hundreds of individual and class actions have been filed in state and federal courts on behalf of the countless victims of JUUL's e-cigarettes. On August 10, 2019, the Judicial Panel on Multidistrict Litigation consolidated all such actions then pending for pretrial purposes in this Court.  *See In re Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, 396 F.Supp.3d 1366 (J.P.M.L. 2019).  On January 13, 2020, this Court directed the filing of Master Complaints on behalf of the Plaintiffs.  ECF No. 351.  Plaintiffs submit this Consolidated Master Complaint (Personal Injury) seeking compensatory, treble, and punitive damages, medical monitoring, and all such other relief arising from Plaintiffs' Personal Injuries as the Court deems

1    proper.

2
     **II.    THE PARTIES**
3
         **A.    PLAINTIFFS**
4
         1.    This *Master Complaint (Personal Injury)* is filed for all Plaintiffs and, if
5
     applicable, Plaintiffs' spouses ("CONSORTIUM PLAINTIFFS"), children, Decedents, Estates or
6
     Wards represented by Plaintiffs' counsel who file a *Short Form Complaint (Personal Injury)*. By
7
     operation of anticipated CMO-7, all allegations pleaded herein are deemed pleaded in any *Short
8
     Form Complaint (Personal Injury)*.
9
         2.    Plaintiffs suffered various personal injuries described herein as a direct and
10
     proximate result of their use of JUUL Products, as well as any other injuries set forth a *Short
11
     Form Complaint (Personal Injury)*.
12
         **B.    DEFENDANTS**
13
         **1)    THE JUUL DEFENDANTS**
14
         3.    Defendant JUUL LABS, INC. ("JLI") is a Delaware corporation, with its principal
15
     place of business in San Francisco, California. Ploom, Inc., a predecessor company to JLI, was
16
     incorporated in Delaware on March 12, 2007.  In 2015, Ploom, Inc. changed its name to PAX
17
     Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new
18
     subsidiary corporation with its old name, PAX Labs, Inc. That new subsidiary, PAX Labs, Inc.
19
     ("PAX"), was incorporated in Delaware on April 21, 2017 and has its principal place of business
20
     in San Francisco, California.
21
         4.    JLI, designs, manufactures, sells, markets, advertises, promotes and distributes
22
     JUUL e-cigarettes devices, JUUL Pods and accessories (collectively "JUUL or JUUL products").
23
     Prior to the formation of separate entities PAX Labs, Inc. and JLI in or around April 2017, JLI
24
     designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the
25
     name PAX Labs, Inc.
26
         5.    Together with its predecessors, JUUL Labs Inc. is referred to herein as "JLI."
27

28

1        6.      Defendant ALTRIA GROUP, INC., (AGI") is a Virginia corporation, with its

2   principal place of business in Richmond, Virginia. AGI is one of the world's largest producers

3   and marketers of tobacco products, manufacturing and selling "traditional" cigarettes for more

4   than a century. On December 20, 2018, AGI purchased a 35% stake in JLI. ALTRIA and JLI

5   executed a Services Agreement that provides that AGI through its subsidiaries, would assist JLI

6   in the selling, marketing, promoting, and distributing of JUUL, among other things.

7        7.      Defendant PHILIP MORRIS USA, INC. ("Philip Morris"), is a wholly-owned

8   subsidiary of AGI. Philip Morris is a Virginia corporation with its principal place of business in

9   Richmond, Virginia. Philip Morris is the largest cigarette company in the United States.

10  Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette

11  brand in the United States for over 40 years. Philip Morris performs direct marketing support

12  services for JLI under the Services Agreement to assist JLI in selling, marketing and promoting

13  JUUL. This has included, among other things, placing JUUL Product inserts in millions of packs

14  of L&M, Parliament, and Marlboro cigarettes and utilizing Philip Morris's extensive consumer

15  market database for targeted direct marketing purposes.

16        8.



10.     Defendant ALTRIA ENTERPRISES LLC ("AE") is a wholly-owned subsidiary of AGI. AE is a Virginia limited liability company with its principal place of business in Richmond, Virginia. AE is a party to the purchase agreement between AGI and JLI. AE purchased ALTRIA's stake in JLI on ALTRIA's behalf.

11.     AGI, Philip Morris, ACS, AGDC, and AE are referred jointly as the "ALTRIA DEFENDANTS" or "ALTRIA."

12.     Upon information and belief, the ALTRIA DEFENDANTS conducted meetings, interviews and inspections at the JLI facilities in San Francisco and engaged in frequent communications regarding JUUL with JLI in California and elsewhere prior to, during and subsequent to its stock purchase.

13.     JLI and the ALTRIA DEFENDANTS are referred to jointly in the causes of action below as the "JUUL DEFENDANTS."

### 2)     THE MANGEMENT DEFENDANTS

14.     JAMES MONSEES is a resident of the San Francisco Bay Area. In 2007, he co-founded Ploom with ADAM BOWEN. Mr. MONSEES served as Chief Executive Officer of JLI until October 2015. Since October 2015, Mr. MONSEES has been Chief Product Officer of JLI. At all relevant times, he has been a member of the Board of Directors of JLI or its predecessors.

15.     ADAM BOWEN is a resident of the San Francisco Bay Area. In 2007, he co-founded Ploom with Mr. MONSEES. At all relevant times, Mr. BOWEN has been Chief Technology Officer and a member of the Board of Directors of JLI or its predecessors.

16.     NICHOLAS PRITZKER is a resident of San Francisco, California, and a member of the PRITZKER family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. PRITZKER received a J.D. from the University of Chicago. He served as president of the Hyatt Hotels Corporation and was a member of its Board of Directors from 1980 to 2007. More recently, Mr. PRITZKER co-founded Tao Capital, an early investor in, among other companies, Tesla Motors and Uber. In 2007, he

invested in JLI.[2]

███████████████████████████████████████[3]
███████████████████████████████████████
███████████████████████████████████████[4]

17.     HOYOUNG HUH lives and works in the Silicon Valley area. Dr. HUH holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering. He has been CEO or a Board member of numerous biotechnology businesses, including Geron Corporation. Dr. HUH has been on the Board of Directors of JLI or its predecessors since at least June 2015. ████████████████████████████████

████████████████████████████████████████
██████████████[5]

18.     RIAZ VALANI lives near San Jose and is a general partner at Global Asset Capital, a San Francisco-based private equity investment firm. He has been on the Board of Directors of JLI or its predecessors since at least May 2011. ███████████████

████████████████████████████████████████
████████████████████████████████████████
████████████

19.     MONSEES, BOWEN, PRITZKER, HUH, and VALANI are referred to jointly as the "MANAGEMENT DEFENDANTS."

### 3)     THE E-LIQUID MANUFACTURING DEFENDANTS

20.     Defendant MOTHER MURPHY'S LABS, INC. ("MOTHER MURPHY'S") is a North Carolina corporation, with a principal place of business in Greensboro, North Carolina.

---

[2] Ainsley Harris, How JUUL went from a Stanford thesis to $16 billion startup, Fast Company (March 8, 2020 4:11PM PST), https://www.fastcompany.com/90263212/how-JUUL-went-from-a-stanford-thesis-to-16-billion-startup

[3] INREJUUL_00371187.

[4] INREJUUL_00327603.

[5] INREJUUL_00327603.

[6] Id.

Mother Murphy's is in the business of manufacturing and supplying E-Liquids and the ingredients and additives in E-Liquids including the E-Liquid in JUUL.

21.     Defendant ALTERNATIVE INGREDIENTS, INC. ("ALTERNATIVE") is a wholly owned subsidiary of Mother Murphy's. Alternative is a North Carolina corporation, having a principal place of business in Greensboro, North Carolina. Alternative is in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL.

22.     Defendant TOBACCO TECHNOLOGY, INC. ("TTI") is a Maryland corporation, with a principal place of business in Eldersburg, Maryland. TTI is in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL.

23.     Defendant ELIQUITECH, INC. ("ELIQUITECH") is a wholly-owned subsidiary of TTI. ELiquitech is a Maryland corporation, with a principal place of business in Eldersburg, Maryland. ELiquitech is in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL.

24.     Mother Murphy's, Alternative, TTI, and ELiquitech, are referred to jointly as the "E-LIQUID MANUFACTURING DEFENDANTS."

### 4)     <u>DISTRIBUTOR DEFENDANTS</u>

25.     Defendant MCLANE COMPANY, INC. ("MCLANE") is a Texas corporation with a principal place of business in Temple, Texas. McLane is a wholly owned subsidiary of Berkshire Hathaway.[7]

26.     Defendant EBY-BROWN COMPANY, LLC ("EBY-BROWN") is a Delaware limited liability company with a principal place of business in Naperville, Illinois. In 2019, Eby-Brown was acquired by Performance Food Group.

27.     Defendant CORE-MARK HOLDING COMPANY, INC. ("CORE-MARK") is a Delaware corporation. From 2015-2018, Core-Mark's principal place of business was San Francisco, California. As of 2019, Core-Mark's principal place of business is in Westlake, Texas.

---

[7] https://www.mclaneco.com/content/mclaneco/en/home.html.

28.     McLane, Eby-Brown and Core-Mark will be referred to jointly as the "DISTRIBUTOR DEFENDANTS."

### 5)     **RETAILER DEFENDANTS**

29.     Defendant CHEVRON CORPORATION ("CHEVRON") is a Delaware corporation with a principal place of business in San Ramon, California.

30.     Defendant CIRCLE K STORES INC. ("CIRCLE K") is a Texas corporation with a principal place of business in Tempe, Arizona. Circle K is a wholly owned subsidiary of Alimentation Couche-Tard Inc. based in Canada.

31.     Defendant SPEEDWAY LLC ("SPEEDWAY") is a Delaware Limited Liability Company with a principal place of business in Enon, OH. Speedway is a wholly owned subsidiary of Marathon Petroleum Corporation. In 2014, Speedway acquired all of Hess Corporation's retail operations and related assets.

32.     Defendant 7-ELEVEN, INC. ("7-ELEVEN") is a Texas corporation with a principal place of business in Dallas, Texas. 7-Eleven is a wholly owned subsidiary of Seven & i Holdings Company based in Japan.

33.     Defendant WALMART ("WALMART") is a Delaware corporation with a principal place of business in Bentonville, AR.

34.     Defendant WALGREENS BOOTS ALLIANCE, INC. ("WALGREENS") is a Delaware corporation with a principal place of business in Deerfield, Illinois. Walgreens Boots Alliance, Inc. is a holding company that owns Walgreens, Duane Reade, and other national and international pharmaceutical manufacturing, wholesale, and distribution companies. Walgreens purchased 1,932 Rite Aid locations in 2017.

35.     Chevron, Circle K, Speedway, 7-Eleven, Walmart, and Walgreens will be referred to collectively as the "RETAILER DEFENDANTS."

36.     The JUUL DEFENDANTS, the MANAGEMENT DEFENDANTS, the E-LIQUID MANUFACTURING DEFENDANTS, the DISTRIBUTOR DEFENDANTS and the RETAILER DEFENDANTS are jointly and collectively referred to as "DEFENDANTS."

III. **JURIDICTION AND VENUE**

37. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because complete diversity exists between Plaintiffs and DEFENDANTS.

38. The amount in controversy alleged by each of the respective individual Plaintiffs will exceed the sum or value of $75,000.

39. This Court has personal jurisdiction over the JLI and the MANAGEMENT DEFENDANTS because it has committed the acts complained of herein in this State and in this District.

40. Defendants have significant contacts with the Northern District of California such that they are subject to the personal jurisdiction of the Court.

41. This Court has personal jurisdiction over DEFENDANTS for the additional reason that they have engaged in substantial, systematic and continuous contacts with this State by, *inter alia*, regularly conducting and soliciting business in this State and this District, deriving substantial revenue from products and/or services provided to persons in this State and this District, and in some circumstance, from products and services provided from persons in this State.

42. DEFENDANTS have significant contacts in each States and Territories of the United States, such that personal jurisdiction would be proper in any of them.

43. A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the Northern District of California. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said District.

IV. **FACTUAL ALLEGATIONS**

   A. **Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time."**

44. JLI's co-founder JAMES MONSEES has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[8] In 1965, 42% of adults

---

[8] Kathleen Chaykowski, *Billionaires-to-be: Cigarette Breakers–JAMES MONSEES and Adam BOWEN Have Cornered the US E-Cigarette Market with Juul. Up Next: The World*, Forbes

1    smoked cigarettes. This statement, which ignores the fact that cigarettes have caused more deaths

2    than any other human invention, contained a kernel of truth.  When U.S. smoking rates peaked in

3    the mid-1960s, cigarettes were everywhere; people smoked on airplanes, in movie theatres, at the

4    office, and at sports games. Movie stars and sports heroes smoked. Cigarette advertising

5    wallpapered American life, glamorizing smoking as sophisticated, cool, and the thing to do.

6        45.    But in reality, of course, this "successful" product has long been the world's

7    leading cause of preventable death.

8        46.    Citing "some problems" inherent in the cigarette, MONSEES and JLI co-founder

9    ADAM BOWEN set out to "deliver[] solutions that refresh the magic and luxury of the tobacco

10   category."[9] MONSEES saw "a huge opportunity for products that speak directly to those

11   consumers who aren't perfectly aligned with traditional tobacco products."[10] Successfully

12   capitalizing on this opportunity would mean not only billions of dollars in short-term revenue but

13   lucrative acquisition by a cigarette industry power player.

14       47.    BOWEN and MONSEES capitalized on that opportunity by deliberately creating

15   an extremely potent nicotine product that looked nothing like cigarettes. But achieving

16   widespread adoption of their highly addictive product required resources and expertise beyond

17   those possessed by BOWEN, MONSEES or others at JLI.

18       48.    When it became clear that BOWEN and MONSEES could not achieve their vision

19   of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life

20   through JLI themselves, the MANAGEMENT DEFENDANTS planned a fundamental shift in

21   roles to allow PRITZKER, HUH, and VALANI to direct and take control of JLI and use it to

22   commit Defendants' most problematic acts.

23

24

25   India (Sept. 27, 2018, 3:10:35 PM IST),
     www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.
26   https://socialunderground.com/2015/01/pax-ploom-origins-future-james-MONSEES/.
     [9] Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*,
27   Solid Smack (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-
     tobacco-pods/.
28   [10] *Id.*

49.     Specifically, in October 2015, MONSEES stepped-down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, PRITZKER, HUH, and VALANI formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.

50.     Before installation of, TYLER GOLDMAN as JLI's new CEO in August 2016, Defendants PRITZKER, HUH, and VALANI used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[11] ████████████████████████████████
████████████████████████████████████████████████████████████[12]

51.     But the MANAGEMENT DEFENDANTS could not create a massive market for JUUL on their own; they needed an ally that knew the business. They turned to THE ALTRIA DEFENDANTS in the Spring of 2017. While Defendants JLI, BOWEN, MONSEES, HUH, and VALANI are relative newcomers to the tobacco industry, THE ALTRIA DEFENDANTS have been manufacturing and selling "combustible" cigarettes for more than a century. And Defendant PRITZKER, for his part, has been long familiar with the tobacco industry from his family's ownership of chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Notwithstanding their different histories, JLI and the MANAGEMENT DEFENDANTS, for their part, invited THE ALTRIA DEFENDANTS into the fold as an ally with ample resources to further expand the market of nicotine-addicted e-cigarette users and to keep litigation and regulation at bay. While JLI, MONSEES, and BOWEN publicly claimed to be out to "disrupt" the industry, they and the other privately negotiated and ultimately relinquished a 35% ownership stake in the company to a cigarette giant.

52.     Cigarette companies have long known that profitable growth requires a pipeline of "replacement" customers. ALTRIA, after decades of tobacco litigation and regulation, had little

---

[11] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

[12] INREJUUL_00278359.

1    ability to recruit new smokers in the ways that had driven PHILIP MORRIS' success through

2    most of the 1900s. In 2017, ALTRIA's combustible cigarette products were facing increasing

3    regulatory pressures. In late July 2017, ALTRIA's stock value plummeted shortly after the FDA

4    announced that it would reduce the amount of nicotine allowed in cigarettes with an eye toward

5    reaching non-addictive levels.[13] In late 2017, ALTRIA, and other major cigarette companies, also

6    finally complied with a consent decree from the 1990s tobacco litigation that required them to

7    issue corrective advertising statements that highlighted the addictiveness and health impacts of

8    smoking cigarettes.

9        53.    Due in large part to this litigation and regulation, cigarette use has been declining

10   in the United States in the last decade, especially among youth.[14] ALTRIA estimates that the

11   cigarette industry declined by 4% in 2017 and by 4.5% in 2018, and it predicted a continued 4%

12   to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.[15]

13   ALTRIA later adjusted the estimated rate of decline to 4% to 6%, to reflect efforts to increase the

14   legal age for cigarette smoking to 21.[16]

15       54.    ALTRIA's own efforts at marketing an e-cigarette product had, however, proven

16   largely unsuccessful. ALTRIA had launched the MarkTen product nationwide in 2014 with an

17   aggressive marketing campaign, eclipsing the advertising expenditures for the market leader at

18   that time, blu e-cigarettes.[17] Of the $88.1 million spent on e-cigarette advertising in 2014, nearly

19

20   [13] *See* Dan Caplinger, *ALTRIA Group in 2017: The Year in Review*, The Motley Fool (Dec. 18,
     2017), https://www.fool.com/investing/2017/12/18/ALTRIA-group-in-2017-the-year-in-

21   review.aspx.
     [14] *Current Cigarette Smoking Among Adults In the United States*, CDC,

22   https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (last
     visited February 10, 2020); *Youth and Tobacco Use*, CDC,

23   https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last
     visited February 10, 2020).

24   [15] *ALTRIA's Fourth-Quarter 2018 Earnings Conference Call*, ALTRIA (Jan. 31, 2019),

25   http://investor.ALTRIA.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=10012478
     77&iid=4087349.

26   [16] *ALTRIA Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Bus. (July 31, 2019),
     https://tobaccobusiness.com/ALTRIA-shares-slide-as-cigarette-sales-continue-to-decline/.

27   [17] Jennifer Cantrell et al., *Rapid increase in e-cigarette advertising spending as ALTRIA's
     MarkTen enters the marketplace*, Tobacco Control 25 (10) (2015),

28   http://dx.doi.org/10.1136/tobaccocontrol-2015-052532.

40% of that was ALTRIA's MarkTen campaign, at $35 million.[18] ALTRIA was clear in its intent to dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at the time of MarkTen's launch.[19] The original MarkTen was a "cigalike," designed to mimic the look and feel of a combustible cigarette. ALTRIA had also been acquiring small companies in the vaping industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."[20] In 2016, ALTRIA acquired a vape product called Cync, from Vape Forward.[21] Cync is a small vapor device that uses prefilled pods in a variety of flavors, similar to the JUUL.

55.     In February 2017, ALTRIA told investors at the 2017 Consumer Analyst Group of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made excellent progress toward its long-term aspiration of becoming a leader in e-vapor."[22] In his remarks, ALTRIA's current CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year. It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations." He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately $2.5 billion."[23]

---

[18] *Id.*

[19] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[20] Mike Esterl, *ALTRIA To Launch MarkTen E-Cigarette Nationally*, Wall St. J. (Feb. 19, 2014), https://www.wsj.com/articles/ALTRIA-to-launch-markten-e-cigarette-nationally-1392832378; Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth* at 12 (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

[21] Remarks by Jody Begley, 2017 ALTRIA Investor Day (Nov. 2, 2017), http://media.corporate-ir.net/media_files/IROL/80/80855/2017InvestorDay/Remarks_and_Reconciliations.pdf.

[22] Remarks by Marty Barrington, ALTRIA Group, Inc.'s (ALTRIA) Chairman, CEO and President, and other members of ALTRIA's senior management team 2017 Consumer Analyst Group of New York (CAGNY) (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349

[23] *Id.*

In 2017, ALTRIA's MarkTen e-cigarettes had a market share of only 13.7%, well behind JLI's growing market share of 40%.[24]  Thus, despite its public statements to the contrary, ALTRIA knew that it would not achieve its goal of dominating the e-cigarette market through its own commercially inferior products.

56.    With smoking on the decline, litigation and regulatory controls were ramping up and threatening ALTRIA's ability to attract new smokers, and ALTRIA's own e-cigarette product proving unsuccessful, ALTRIA's best bet for maintaining a market by increasing users addicted to nicotine was to partner with JLI (1) to maintain or increase the number of users hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first scheme.

57.    For those reasons and others, ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████[25] and Ploom's Advisory Committee included ALTRIA's former growth officer. In ALTRIA's words, the company followed "JUUL's journey rather closely" from its early beginnings.[26]

58.    According to Howard Willard, ALTRIA's CEO, ALTRIA first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" beginning in the Spring of 2017.[27] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████[28] By the Fall of 2017, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA had agreed to and had taken coordinated

---

[24] Richard Craver, *Vuse falls further behind Juul on e-cig sales*, Winston-Salem Journal (Dec. 14, 2017), https://www.journalnow.com/business/vuse-falls-further-behind-juul-on-e-cig-sales/article_ed14c6bc-5421-5806-9d32-bba0e8f86571.html.

[25] INREJUUL_00278740.

[26] Olivia Zaleski & Ellen Huet, *JLI Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.

[27] ALTRIA's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[28] INREJUUL_00349529.

1   actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to

2   ensure a steady and growing customer base.

3        59.   ███████████████████████████████████████████████████

4   ████████████████████[29] These confidential discussions with ALTRIA would have involved

5   key employees and officers of JLI, which would have included MONSEES, BOWEN,

6   PRITZKER, HUH, and/or VALANI. During this roughly 18-month period when PRITZKER,

7   HUH, VALANI and GOLDMAN started to coordinate with ALTRIA, it was JLI (through its

8   executives and employees – including GOLDMAN and his successors) and ALTRIA (through its

9   executives and employees) that primarily directed and conducted fraudulent acts designed to

10   grow the market of nicotine-addicted e-cigarette users, although BOWEN, MONSEES,

11   PRITZKER, HUH, and VALANI remained critical to the success of these efforts. Without their

12   control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between

13   JLI and ALTRIA, and ALTRIA's investment in JLI, would not have been possible.

14        60.   In December 2018, ALTRIA decided to take the next step in its coordination with

15   JLI and the MANAGEMENT DEFENDANTS by making a $12.8 billion equity investment in

16   JLI, the largest equity investment in United States history. This arrangement was profitable for

17   both companies, as well as MONSEES, BOWEN, PRITZKER, HUH, and VALANI. JLI

18   employees received $2 billion in bonuses, which, split among the Company's 1,500 employees,

19   was approximately $1.3 million per employee;[30] ALTRIA received millions of loyal teen

20   customers; and MONSEES, BOWEN, PRITZKER, HUH, and VALANI received untold sums of

21   money and saw the value of their shares in JLI skyrocket, allowing them to cash out via a special

22   dividend and bonus, as well as through stock sales that were not available to other of JLI's

23   minority shareholders.[31] In deciding to make a huge investment in JUUL, ALTRIA took into

---

[29] *Id.*

[30] Olivia Zaleski, *Juul Employees to Get $2 Billion Bonus in ALTRIA Deal*, BLOOMBERG (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-ALTRIA-deal.

[31] Tiffany Kary, *JLI Founders Sued for Self-Dealing Over ALTRIA's $12.8 Billion*, Bloomberg (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-dealing-over-ALTRIA-s-12-8-billion

account that the e-cigarette industry would see significant year-over-year growth in the near term, and that "JUUL continu[es] to be a growth driver for the e-vapor category."[32]

61.    This investment further intertwined JLI and the ALTRIA DEFENDANTS. According to the terms of its investment, ALTRIA may appoint one-third of JLI's board. And in October 2019, JLI's CEO resigned to be replaced by another career ALTRIA executive, K.C. Crosthwaite. The key employees within JUUL—including BOWEN, MONSEES, PRITZKER, HUH, and/or VALANI—would have been instrumental in bringing Crosthwaite on board at JLI. Crosthwaite had most recently served as the Vice President and Chief Growth Officer of ACS, overseeing the company's work to assist ALTRIA'S companies, including with digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Crosthwaite knows the cigarette industry's playbook all too well, having previously served as the president and CEO of PHILLIP MORRIS the Vice President and General Manager at Marlboro—the leading cigarette brand among youth, and the Vice President of Strategy and Business Development of at ACS.

62.    In addition, Joe Murillo, who headed regulatory affairs for ALTRIA, and served as President and General Manager of Nu Mark, LLC (ALTRIA's e-cigarette business), became JLI's chief regulatory officer in October 2019.

63.    Both before and after ALTRIA's investment, JLI, through its employees and officers, provided ALTRIA with critical information regarding the design and nicotine content of the JUUL product, the labeling of the JUUL product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor preferences, and regulatory strategies. ALTRIA, for its part, guided JLI and the MANAGEMENT DEFENDANTS in these areas and helped them devise and execute schemes to maintain and expand the e-cigarette market.

64.    JLI, the MANAGEMENT DEFENDANTS, and ALTRIA DEFENDANTS worked together to implement their shared goal of growing a new market in the image of the combustible

---

[32] ALTRIA's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

cigarette market through a multi-pronged strategy to: (1) create an highly addictive product that consumers would not associate with cigarettes and that would appeal to the lucrative youth market, (2) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit, (3) actively attract young users through targeted marketing, and (4) use a variety of tools to delay regulation of e-cigarettes, including false and deceptive statements to the public and regulators. As detailed more fully throughout this Complaint, each of the DEFENDANTS played a critical role—at times overlapping and varying over time—in each of these strategies.

**B.      Defendants' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction.**

**1)      Defendants Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction.**

65.     The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product. Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly addictive and the key ingredient that drives addiction to cigarettes. Nicotine's addictive properties are similar to heroin and cocaine.[33]

66.     Route of administration and speed of delivery are key to understanding nicotine's addictive potential. Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report on nicotine addiction, wrote: "After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration."[34]

67.     Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by smoking … results in high levels of nicotine in the central nervous system with little time for

---

[33] *See e.g.,* US Department of Health and Human Services. *Nicotine Addiction: A Report of the Surgeon General.* DHHS Publication Number (CDC) 88-8406, (1988).

[34] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 Handb. Exp. Pharmacol., 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.

development of tolerance. The result is a more intense pharmacologic action. The short-time interval between puffing and nicotine entering the brain also allows the smoker to titrate the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[35]

68.     Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

69.     Kids are particularly vulnerable to nicotine addiction, as DEFENDANTS know well. As described by the United States Surgeon General, "Tobacco use is a pediatric epidemic." Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[36]

70.     The above statements apply equally, if not more so, to e-cigarettes. Further, the Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[37] The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control, deficits in

---

[35] *Id.*

[36] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

[37] *Know The Risks: E-Cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.html.

attention and cognition, and mood disorders.[38] A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[39]

71.     In 2014, the United States Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease), lung diseases (chronic obstructive pulmonary disease (COPD) and lung cancer), cancer almost anywhere in the body, and birth defects.

72.     It took five decades of public health initiatives, government intervention, impact litigation, consumer education and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

73.     By 2014, the number of adults that reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.[40] By 2014, teen smoking also hit a record low.[41] In June 2014, the Centers for

---

[38] Menglu Yuan et al., *Nicotine and the Adolescent Brain*, 593 J. of Physiology 3397 (2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/; U.S Surgeon General and U.S. Centers for Disease Control & Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes and Young People* (2019), https://e-cigarettes.surgeongeneral.gov/.

[39] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function*, 2 Cold Spring Harbor Persp. Med. 12 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

[40] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, *Trends in Cigarette Smoking Among High School Students—United States*, 1991-2001, 51 MORBIDITY AND MORTALITY WEEKLY REPORT 409 (May 17, 2002), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5119a1.htm; Teresa W. Wang et al., *Tobacco Product Use Among Adults—United States, 2017*, 67 MORBIDITY AND MORTALITY WEEKLY REPORT 1225 (Nov. 9, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/pdfs/mm6744a2-H.pdf; US Department of Health and Human Services. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report

[41] Press Release, Centers for Disease Control and Prevention, *Cigarette smoking among U.S. high school students at lowest level in 22 years* (June 12, 2014),

1    Disease Control and Prevention ("CDC") reported that "in achieving a teen smoking rate of 15.7

2    percent, the United States has met its national Healthy People 2020 objective of reducing

3    adolescent cigarette use to 16 percent or less."

4        74.    The United States Surgeon General reported in 2014 that: "We are at a historic

5    moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens

6    than any other preventable cause. The good news is that we know which strategies work best. By

7    applying these strategies more fully and more aggressively, we can move closer to our goal of

8    making the next generation tobacco-free."[42]

9        75.    Where the public health community saw progress in curbing the use of cigarettes

10   and nicotine addiction, Defendants saw an opportunity.

11                    **2)    Following the Cigarette Industry Playbook, Defendants Sought to**
                           **Market a Product that would Create and Sustain Nicotine Addiction,**
12                         **but Without the Stigma Associated with Cigarettes**

13       76.    Seeking to build and dominate a new market for nicotine products without the

14   baggage of combustible cigarettes (i.e. well-established link to death and disease), JLI engineered

15   a cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of

16   consumer addiction than ever before. JLI marketed that highly-addictive device as healthy, safe,

17   cool and available in kid-friendly flavors.

18       77.    In doing so, JLI followed the cigarette industry's playbook. MONSEES admitted

19   that when creating JLI, he and BOWEN carefully studied the marketing strategies,

20   advertisements, and product design revealed in cigarette industry documents that were uncovered

21   through litigation and made public under the November 1998 Master Settlement Agreement

22   [hereinafter the Master Settlement Agreement] between the state Attorneys General of forty-six

23   states, five U.S. territories, the District of Columbia and the four largest cigarette manufacturers

24   in the United States. "[Cigarette industry documents] became a very intriguing space for us to

25   investigate because we had so much information that you wouldn't normally be able to get in

26

27   https://www.cdc.gov/media/releases/2014/p0612-YRBS.html
     [42] US Department of Health and Human Services. *LET'S MAKE THE NEXT GENERATION*
28   *TOBACCO-FREE: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking*
     *and Health,* https://www.hhs.gov/sites/default/files/consequences-smoking-consumer-guide.pdf

most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[43]

78.     In a thesis presentation BOWEN and MONSEES gave in 2004, MONSEES candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[44] JLI researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[45] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

79.     Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in way that would be easy to ingest—without the nausea, cough, or other aversive side effects that many new smokers experienced. In the 1970s, R.J. Reynolds scientists eventually found a solution: Combine the high-pH nicotine with a low-pH acid. The result was a neutralized compound referred to as nicotine salt. In a 1973 RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive. A young RJ Reynolds chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."[46] Pefetti published

---

[43] Gabriel Montoya, *Pax Labs: Origins with JAMES MONSEES*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-MONSEES/.

[44] Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, Tech Crunch (Feb. 27, 2019, 7:51 am PST), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/.

[45] *Id.*

[46] Thomas A. Perfetti, *Smoking Satisfaction and Tar/Nicotine Control* (Dec. 7, 1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-salts-investigation.pdf.

his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salts. As described herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

80.    JLI also engaged former cigarette industry researchers to consult on the design of their product. As MONSEES noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to ALTRIA's R&D facility, it's empty."[47] The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."[48]

81.    One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device (2) the JUUL pod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL" or "JUUL product"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUUL pods that contain liquid that includes nicotine, flavoring and other additives. Each JUUL pod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[49]

---

[47] David Pierce, *This Might Just Be the First Great E-Cig*, WIRED (Apr. 21, 2015, 8:00 AM), www.wired.com/2015/04/pax-juul-ecig/.

[48] *Id.*

[49] *E-cigarettes and vapor products*, King County, https://www.kingcounty.gov/depts/health/tobacco/data/e-cigarettes.aspx (last visited Mar. 8, 2020).

82.     JLI sells the JUUL pods in packs of four or two pods, and until recently, in a variety of enticing kid-friendly flavors. Many of the flavors have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brûlée. Figure 1 shows the JLI device and a JLI "Starter Kit" with four flavored JUUL pods:

**Figure 1**



83.     JLI attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[50]

84.     JLI even took this message to ninth graders: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[51]

---

[50] U.S. Food and Drug Administration Warning Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019

[51] *Id.*

1    85.    This was not just a rogue employee.



10

11    86.    JLI's mission was not to improve public health. Rather, JLI sought to introduce a

12    new generation of consumers to nicotine. JLI's business model was never about reducing

13    addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're

14    not trying to design a cessation product at all . . . anything about health is not on our mind."[55]

15    87.    JLI, BOWEN, and MONSEES achieved their vision. Pioneering a nicotine

16    delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-

17    cigarette system provided consumers with palatable access to high-concentrations of nicotine like

18    never before. Since the JUUL's launch in 2015, JLI has become the dominant e-cigarette

19    manufacturer in the United States. Its revenues grew by 700 percent in 2017 alone. By 2019, JLI

20    owned three-quarters of the e-cigarette market.[56]

21

22

23

---

[52] INREJUUL_00441986 (emphasis added).
[53] JLI00373324.
[54] JLI00373328 (emphasis added).
[55] Kevin Roose, Juul's Convenient Smoke Screen, N.Y. Times (Jan. 11, 2019),
https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html
[56] Dick Durbin et al., *Durbin & Senators to JUUL: You are More Interested in Profits Than Public Health*, Durbin Newsroom (Apr. 8, 2019),
https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-are-more-interested-in-profits-than-public-health.

3)   **Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company**

88.    JLI, along with the MANAGEMENT DEFENDANTS, worked-together to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

89.    That growing customer base was crucial to JLI's and the MANAGEMENT DEFENDANTS' long term objective—lucrative acquisition by another company. They recognized that JLI's product, with its potential to dominate the nicotine products market by hooking new users, would appeal to one segment of the economy in particular: the cigarette industry.

90.    JLI and the MANAGEMENT DEFENDANTS also recognized that their business goal—becoming part of the cigarette industry—was unlikely to endear them to the consumers that they needed to purchase their products. Years of anti-smoking campaigns have successfully stigmatized cigarette smoking. When MONSEES and BOWEN presented their thesis and product design to their classmates, they included a clip from a South Park episode showing the characters assembled at the Museum of Tolerance and shaming a smoker.[57]

91.    MONSEES and BOWEN needed to shape social norms such that the public attitude towards e-cigarettes would allow consumers to use their product without the stigma and self-consciousness smokers experienced. MONSEES and BOWEN saw a market opportunity in a generation of non-smoking consumers brought up on anti-smoking norms. In MONSEES' words, they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."[58]

92.    Part of this approach was consistently portraying JUUL as an enemy of the cigarette industry, with a publicly announced goal of eliminating the cigarette. In an interview,

---

[57] Gabriel Montoya, *Pax Labs: Origins with JAMES Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-MONSEES/.
[58] *Id.*; *see also,* INREJUUL  00064696 (█████████)
████████████████████████████████████████
████████████████████████████████████████
█████████ )

BOWEN asserted that he and MONSEES spent a lot of time talking about "the kind of typical thoughts of evil Big Tobacco companies like coming down and squashing you."[59] The "Mission Statement" on JLI's homepage proclaims:

> Our mission is to transition the world's billion adult smokers away from combustible cigarettes, eliminate their use, and combat underage usage of our products.
>
> We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire.[60]

In fact, JLI's Chief Administrative Officer has publicly stated that the goal behind JLI is "eliminating cigarettes."[61]

93.     This public message of eliminating cigarettes and challenging tobacco companies stands in direct contrast with JLI's actual business and investment strategy. From the beginning, BOWEN and MONSEES actively sought the investment and assistance of major cigarette companies. BOWEN and MONSEES' initial foray into the e-cigarette business, Ploom, launched its e-cigarette as the ModelOne in 2010, using pods of loose-leaf tobacco heated by butane. It did not catch on. Ploom only sold a few thousand devices. By then a company with a dozen employees, Ploom was faltering, in need of money, technological expertise, and marketing savvy.[62]

94.     Help came from Japan Tobacco International ("Japan Tobacco"), a division of Japan Tobacco Inc., the fourth-largest tobacco company in the world. In December 2011, Japan Tobacco and Ploom entered into a strategic agreement, which gave Japan Tobacco a minority stake in Ploom and made it a strategic partner. In a statement regarding the agreement, MONSEES said, "We are very pleased to partner with [Japan Tobacco] as their deep expertise,

---

[59] Alison Keeley, *Vice Made Nice? A high-tech alternative to cigarettes*, Stanford Magazine, https://stanfordmag.org/contents/vice-made-nice

[60] *Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values

[61] Ashley Gould, *JUUL Labs is committed to eliminating cigarettes,* Cal Matters, (March 18, 2019).

[62] David H. Freedman, *How do you Sell a Product When You Really Can't Say what it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-MONSEES-ploom-ecigarette-company-marketing-dilemma.html.

1  global distribution networks and capital resources will enable us to enter our next phase of growth

2  and capitalize on global expansion opportunities."[63] As BOWEN explained in an interview, "We

3  were still doing a lot of our own internal product development, but now we had access to floors of

4  scientists at [Japan Tobacco]."[64]

5          95.    According to internal documents,



6

7  [65]

8  [66]

9  In addition,

10

11

12  [67]

13          96.    JLI and the MANAGEMENT DEFENDANTS

14

15  [68] According to

16

17

18

19  [69] The end result of the process would

20  . [70]

21

[63] *Innovative Partnership for Ploom and Japan Tobacco International JTI to Take Minority Share in Ploom*, Japan Tobacco Int'l (Dec. 8, 2011), https://www.jti.com/sites/default/files/press-releases/documents/2011/innovative-partnership-for-ploom-and-japan-tobacco-international.pdf.

[64] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?*, Inc., https://www.inc.com/magazine/201405/david-freedman/james-MONSEES-ploom-ecigarette-company-marketing-dilemma.html.

[65] INREJUUL_00371423 ( ).

[66] INREJUUL_00371447.

[67] INREJUUL_00371458-INREJUUL_00371459.

[68] INREJUUL_0016386 ( ).

[69] *Id.*

[70] *Id.*

97. ███████████████████████████████████
███████████████████████████████████████████
█████████████████████[71]



98.     According to ███████████████████████████████████
█████████████████████████████████ █ █
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████[73]

99.     Consistent with ███████████████████████████
███████████████████████████████████████████

---

[71] INREJUUL_0016399.

[72] INREJUUL_0016400-INREJUUL_0016401.

[73] INREJUUL_0016404.



100.    The

---

[74] INREJUUL_00061757 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

[75] INREJUUL_00061833.

[REDACTED]

101.     This goal—acquisition by a major cigarette company—was a motive that the JLI and the MANAGEMENT DEFENDANTS would return to in making decisions about the manufacture and marketing of JUUL products. As an example, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED][76] BOWEN knew that to achieve the ultimate goal of acquisition, JLI and the MANAGEMENT DEFENDANTS would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

102.     JLI and the MANAGEMENT DEFENDANTS sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction of, its users; and, second, by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people whose addiction would last the longest and be the most profitable for the DEFENDANTS.

---

[76] INREJUUL_00294198.

C.    **JLI and BOWEN Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction.**

103.   JLI was well-aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity. One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."[77] It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers. Claude Teague of R.J. Reynolds titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market." In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[78] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." As seen below, JLI heeded Dr. Teague's advice.

1)    **JLI and BOWEN Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale.**

104.   As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users, who were primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

105.   E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a palatable form.[79] Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine.[80] When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates

---

[77] Internal Memo from T.L. Achey (Lorillard Tobacco Company) to Curtis Judge, Product Information, (August 1978).

[78] Internal Memo from Claude Teague (R.J. Reynolds), Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market, (Feb. 2, 1973).

[79] Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL and the High-nicotine Product Market*, 28 Tobacco Control 623 (2019).

[80] *Id.*

MASTER COMPLAINT (PERSONAL INJURY)
CASE NO. 19-MD-02913-WHO

the throat, and is perceived as harsh by the user.[81] This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit."[82] While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.

106.    Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day.[83] None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

107.    Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

### 2)    JLI's Initial Experiments Measured Non-Smokers "Buzz" Levels and Perceptions of Throat Harshness.

108.    JLI intentionally designed its product to minimize "throat hit" and maximize "buzz." ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

109.    In these early tests, ████████████████████████████████████████████████████████████████████████████████████████████████████[84] The aim was to develop a nicotine salt formulation that maximized buzz,

---

[81] *Id*.
[82] *Id*.
[83] *Id*.
[84] INREJUUL_00002903.

minimized harshness. "Employees tested new liquid-nicotine formulations on themselves or on strangers taking smoke breaks on the street. Sometimes, the mix packed too much punch – enough nicotine to make some testers' hands shake or send them to the bathroom to vomit . . . ."[85]

110.   The



[86]

112.   A later study by Anna K. Duell et al., which examined 4% benzoate solutions—the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit. The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley" flavor was 0.05 and in "Crème Brulee" was 0.07.[87] Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine. For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the

[85] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/

[86] INREJUUL_00002903.

[87] U.S. Patent No. 9,215, 895; Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 432 (Fig. 3).

total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84,[88] resulting in over 14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[89]

113.    Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youths. The cigarette industry has long recognized this; a published study of industry documents concluded that "product design changes which make cigarettes more palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."[90] The Duell study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[91]

114.    Reducing the harshness of nicotine also allows more frequent use of e-cigarettes, for longer periods of time, and masks the amount of nicotine being delivered. By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction. The Duell study further concluded that JLI's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health."[92]

**3)    JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes**

115.    In 2014, after [REDACTED][93] [REDACTED]

---

[88] Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431 (*hereinafter* "Duell Study").
[89] *Id.* at 431–34.
[90] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. Times (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html
[91] Duell Study at 433 (citing Willett, J. G., et al., *Recognition, use and perceptions of JUUL among youth and young adults*, Tobacco Control, 054273 (2018)).
[92] *Id.* at 431.
[93] INREJUUL_00350930.
[94] *Id.*

████ From these measurements, the scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood (Cmax) and total nicotine exposure (Area Under the Curve or AUC). JLI reported the results in U.S. Patent No. 9,215,895 (the '895 patent), for which JLI applied on October 10, 2014,[95] and which was granted in December 2015. The named inventors on the patent were ADAM BOWEN and Chenyue Xing.

████ Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin.[96] As a comparator, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes. The ████████████████████████████████████████████████████████████████████ ████████████████████████████[97]█████████████ ████████████████



117.   According to Table 1 in the patent, the Cmax (the maximum nicotine concentration in blood) for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was

[95] This application was a continuation of U.S. Patent Application No. 14/271,071, filed May 6, 2014, which claimed the benefit of U.S. Provisional Patent Application Serial No. 61/820,128, filed May 6, 2014, and U.S. Provisional Patent Application Serial No. 61/912,507, filed December 5, 2013.
[96] U.S. Patent No. 9,215,895 at 19:63-20:4.
[97] INREJUUL_00024437.

15.06 ng/mL, which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

118.    Describing these results, JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [i.e., JLI's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a combustible cigarette."[98] The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a combustible cigarette."[99]

119.    In other words, JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick"[100] that drives addiction and abuse.[101] Because "nicotine yield is strongly correlated with tobacco consumption,"[102] a JUUL pod with more nicotine will strongly correlate with higher rates of consumption of JUUL pods, generating more revenue for JUUL. For

---

[98] U.S. Patent No. 9,215, 895, at 7:51-55 (filed Dec. 22, 2015) (emphasis added).
[99] *Id.* at 7:63-8:4.
[100] Internal Memo from Frank G. Colby (R.J. Reynolds), *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market*, (Dec. 4, 1973).
[101] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease, A Report of the Surgeon General* at 181 (2010), https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf
[102] Martin J. Jarvis et al., *Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, 93 Nt'l Cancer Inst. 134 (Jan. 17, 2001), https://academic.oup.com/jnci/article/93/2/134/2906355

example, a historic cigarette industry study that looked at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[103] In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

120. ████████████████████████████████████████████████ ████████████████████████████████████████████████████[104] The Reilly study tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered 164 ± 41 micrograms of nicotine per 75 mL puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 μg/puff.[105] Correcting to account for the different puff sizes between these two studies, this suggests that, at 75 mL/puff, a Marlboro would deliver about 114-145 μg/puff. In other words, the Reilly study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

121. Additionally, depending on how the product is used, an e-cigarette with the 4% benzoate solution is capable of delivering doses that are materially higher ████████████ ████████. As a paper published by the European Union notes: "[A]n e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the time needed to smoke a combustible cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[106] With at least 59 mg/ml of nicotine in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/ml amount), a JUUL pod easily exceeds the nicotine dose of a combustible cigarette. Not surprisingly, the European Union has banned all e-

---

[103] Letter from Peggy Martin to Study Participants, *Resume of Results from Eight-Week Smoking Study*, UCSF Library, 1003285443-5443 (Sept. 10, 1971).
[104] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 Nicotine Tobacco Research 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584
[105] Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 Tobacco Control ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/
[106] E-Cigarettes, European Comm'n, https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited February 10, 2020) (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and other countries have considered similar regulations.[107]

122.  ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████:

████████████████████████████████████████████

123.  Given the concentration of nicotine in a JUUL pod, four to five milligrams of JUUL e-liquid contains about 200-250 micrograms (μg) of nicotine. As noted by ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███ [108]  In other words, JUUL's precisely calibrated nicotine delivery system was specifically engineered to aerosolize ██████████████████████████████████████████████

[107] Charis Girvalaki et al., *Discrepancies in Reported Versus Measured Nicotine Content of E-cigarette Refill Liquids Across Nine European Countries Before and After the Implementation of the EU Tobacco Products Directive*, 55 Eur. Respir. J. 1900941 (2020), https://doi.org/10.1183/13993003.00941-2019
[108] INREJUUL_00347306.

1 ██████████████████████████████████████████████████████

2 ██ [109]

3        124.    JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes

4 delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they

5 want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never

6 burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists

7 "didn't want to introduce a new product with stronger addictive power."[110] For this reason, "the

8 company's engineers explored features to stop users from ingesting too much of the drug, too

9 quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or

10 disabling the device when the dose of a drug such as nicotine exceeds a certain threshold."[111] For

11 example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number

12 of puffs[.]"[112] But upper management rejected the concerns that the scientists raised, and "[t]he

13 company never produced an e-cigarette that limited nicotine intake."[113]

14        125.    As another option, JLI could have limited the duration of each puff to prevent the

15 JUUL from delivering doses of nicotine exceeding those of a cigarette on a per-puff basis.

16 Instead, it ██████████████████████████ [114] ████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████████████ [115]

19        126.    Further warnings about the addictive power of the JUUL e-cigarette—and its

20 appeal to youths—came ████████████████████████████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24
_____

25 [109] *Id.*

[110] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5,
26 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

[111] *Id.*
27 [112] *Id.*

[113] *Id.*
28 [114] INREJUUL_00431693

[115] INREJUUL_00351218; INREJUUL_00351239.



127. ▮▮▮▮▮▮

128. ▮▮▮▮▮▮

129. ▮▮▮▮▮▮

130.    In late 2014, knowing the results of ▮▮▮▮▮▮ ▮▮▮▮▮▮ All JUUL formulations at launch used the same amount of nicotine and benzoic acid as did the formulation that resulted in the highest nicotine blood levels i▮▮▮▮▮▮ JUUL pods

[116] JLI00365905.
[117] *Id.* (emphasis added).
[118] JLI00365709.
[119] JLI00365176.
[120] INREJUUL_00058345.
[121] *Id.*
[122] JLI00364678.
[123] JLI00364487.

were foreseeably exceptionally addictive, particularly when used by persons without prior exposure to nicotine.

### 4) JLI and the MANAGEMENT DEFENDANTS Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted

131.   The JUUL e-cigarette launched in 2015. After the launch, JLI and the MANAGEMENT DEFENDANTS continued to collect information about the addictiveness of JUUL. This information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness.

132.   For example, ████████████████████████████████████ ████████████████████████ He wrote:





133.     Another example came just days later.

[125]

134.     Additionally,

[126] This is consistent with a central goal of the product's design: capturing "users with the first hit."[127]

135.     None of this information was a surprise, nor did it cause JLI or the MANAGEMENT DEFENDANTS to change JLI's products or marketing. In fact, they embraced it.

[128]

136.     The following year, JLI and the MANAGEMENT DEFENDANTS obtained even more evidence that the amount of nicotine in JUULpods was needlessly high.

---

[124] INREJUUL_00264888-INREJUUL_00264890.
[125] INREJUUL_00230416.
[126] INREJUUL_00434580-INREJUUL_00434590.
[127] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette.
[128] INREJUUL_00228928-INREJUUL_00228930.

[129] Similarly,

[130]

137.

[131]

138.

139.   At some point during the coordination between JLI, the MANAGEMENT DEFENDANTS, and ALTRIA, but no later than the due-diligence period for ALTRIA's investment in JLI, either JLI (through its employees) or one or more of Defendants BOWEN, MONSEES, PRITZKER, HUH, and VALANI

Nonetheless, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA have maintained and promoted the 5% JUUL pods as JLI's flagship offering of JUUL pods although they knew that                                          They pushed the 5% JUULpod because it hooked users faster and kept them addicted to nicotine.

141.

---

[129] INREJUUL_00260068.
[130] INREJUUL_00260065.
[131] INREJUUL_00244200.

### 5)   JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection

142.   Not only did JUUL contain high levels of nicotine that delivered a strong "buzz" from the first puff, JLI designed its product to look appealing to youth and non-smokers. In

[REDACTED]

[132]

143.   JLI's strategy to position a nicotine-delivery device as the cool thing to do is not new. Decades before, Dr. Teague from R.J. Reynolds observed: "pre-smokers" face "psychological pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance, while at the same time emphasizing 'doing one's own thing.'"[133] Again, JUUL followed the cigarette playbook verbatim.

144.   JLI knew that among its target audience, young people, cigarette smoking had become increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix.

145.   Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, a young user can, and do, use JUUL—in class or at home—without detection.

146.   The JUUL device is small and discrete. Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be charged in

---

[132] INREJUUL_00057291 et seq.

[133] Claude Teague, Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market, (internal RJR memo) (Feb. 2, 1973).

a computer's USB drive. This design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces, like schools.



147.   Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and high-tech, which made it appealing to youth. JLI co-founder BOWEN drew on his experience as a design engineer at Apple to make JUUL resonate with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[134] The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers. According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're

---

[134] *How JUUL Made Nicotine Go Viral*, Vox (Aug. 10, 2018),
https://www.youtube.com/watch?v=AFOpoKBUyok

like, we can use it, we're not going to have any trouble with it because you can trust it."[135] A 16-year-old agreed, explaining that "the tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products. And then this is another product. And it's just another product. Until you're addicted to nicotine."[136]

148.    JUUL's design also included an LED light, which allowed users to active "party mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors, so that the rainbow colors are visible while the person inhales from the JUUL device. "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors permanently. Party mode on the JUUL is described by users to be "like an Easter egg in a video game" and allows for "some cool tricks that are going to drive [] friends crazy." [137] This feature was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it even more appealing and "cool" to young users.



---

[135] *Id.*

[136] *Id.*

[137] Jon Hos, *Getting Your Juul Into Party Mode*, (Jul. 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode.

6)   **JLI and E-Liquid Manufacturing Defendants Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation.**

a.   **JLI Develops Flavored JUUL Products That Would Appeal to Youth**

149.   Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine.[138] A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[139]

150.   In June 2015, JUUL came to market in four flavors including tabaac (later renamed Tobacco), fruut (later renamed Fruit Medley), bruulé (later renamed Crème Brulee), and miint (later renamed mint).



151.   JUUL later offered other kid-friendly flavors, including cool mint, Cucumber, and mango.

---

[138] A Sept. 1972 Brown & Williamson internal memorandum titled "Youth Cigarette New Concepts," observed that "it's a well known fact that teenagers like sweet products." A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.

[139] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.




152.    In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[140] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors.

153.    The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors. A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[141]

154.    Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine.[142] Research has shown that adolescents

---

[140]Daniel J. DeNoon, *FDA Bans Flavored Cigarettes: Ban Includes Cigarettes With Clove, Candy, and Fruit Flavors*, WebMD (Sept. 22, 2009), https://www.webmd.com/smoking-cessation/news/20090922/fda-bans-flavored-cigarettes#2

[141] *See* Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 JAMA 1871 (2015). Another peer-reviewed study concluded that "Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their peers who have not used e-cigarettes, a new study has found."

[142] *See How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Chapter 4 (Centers for Disease Control and Prevention ed. 2010), https://www.ncbi.nlm.nih. gov/books/NBK53018/ #ch4.s92.

whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

155.    In a recent study, 74% of youth surveyed indicated that their first-use of a JUUL was of a flavored JUUL pod.[143]

156.    Research shows that when youth see advertisements for flavored e-cigarettes, they believe the advertisements and products are intended for them.[144]

157.    A significant majority of under-age users chose flavored e-cigarette products.[145] By at least ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮[146] Instead of taking corrective action or withdrawing the kid-friendly flavors, JLI capitalized on their popularity with kids.

158.    JLI asserts that it did not intend its flavors to appeal to underage consumers. After eleven Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Dick Durbin. JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.[147]

---

[143] Karma McKelvey et al., *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA Network Open e183535 (2018), https://doi:10.1001/jamanetworkopen.2018.3535.

[144] D.C. Petrescu, et al. *What is the Impact of E-Cigarette Adverts on Children's Perceptions of Tobacco Smoking? An Experimental Study*, 26 Tobacco Control 421 (2016); Julia C. Chen-Sankey, et al. *Perceived Ease of Flavored E-Cigarette Use and E-Cigarette Use Progression Among Youth Never Tobacco Users*, 14 PLoS ONE 1 (2019).

[145] Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States*, 2019, 322 JAMA, 2095 (2019), https://tinyurl.com/y3g75gmg ("Among current exclusive e-cigarette users, an estimated 72.2% . . . of high school students and 59.2% . . . of middle school students used flavored e-cigarettes. . . .").

[146] *See* INREJLI_00265068 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[147] https://www.politico.com/story/2018/12/08/juul-lobbying-washington-1052219

159.     A former JUUL manager, who spoke to *The New York Times* on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[148]

160.     JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUUL pods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUUL pods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

### b.     Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market

161.     While JLI and the MANAGEMENT DEFENDANTS were developing and marketing their flavored products to appeal to and recruit youth, ALTRIA, recognizing the value of those young "replacement smokers" committed itself to the cause. With the shared goal to grow the number of nicotine-addicted users, and as detailed further below, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA set out to do whatever was necessary to create and preserve the lucrative market for flavors. In order to maximize the value of its mint line of JUUL pods, JLI, with the support of the MANAGEMENT DEFENDANTS, chemically and socially engineered its mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences.

162.     In July 2013, Reynolds American Inc.[149] released the VUSE, the first-known cartridge-based nicotine salt e-cigarette to reach the domestic market.[150] ALTRIA entered the

---

[148] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[149] Reynolds is now a wholly owned subsidiary of British American Tobacco.

nicotine salt market one month later, with the MarkTen cig-a-like.[151] JLI would enter the market in June 2015.

163.     Though mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories,[152] Reynolds, ALTRIA and JLI had all introduced mint-flavored products within a year of each company's initial release. By mid-2014, Reynolds had added "Mint, Rich Mint, Spearmint, [and] Wintergreen" to its VUSE lineup.[153] By February 2015, ALTRIA's Nu Mark LLC, under the leadership of Joe Murillo (JLI's current regulatory head), released a Winter Mint flavor for MarkTen.

164.     Unlike Reynolds and ALTRIA, which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUUL pods.

165.     JLI's flavored JUUL pods were particularly popular with its underage users and, when mango was introduced, it was the underage user's flavor of choice.

166.     JLI, the MANAGEMENT DEFENDANTS, and ALTRIA recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors. So, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape regulation and preserve JLI's astronomical sales figures.

### i.     JLI Manipulates Chemistry of Mint JUUL pods

---

[150] *See* FAQs, RJR Vapor Co., LLC, http://www.vusevapor.com/faqs/product/ ("Since Vuse's launch in 2013, all of our closed systems available for sale nationally (i.e., Vuse Solo, Vuse Ciro, Vuse Vibe, and Vuse Alto) include nicotine salts.") (last visited Feb. 10, 2020).

[151] Additional Info, Nu Mark LLC, https://markten.com ("certain varieties" of MarkTen Original "contain acetic acid, benzoic acid, and lactic acid.")

[152] *See* M.B. Harrell et al., *Flavored e-cigarette use: Characterizing youth, young adult, and adult users*, 5 Preventive Medicine Reports, 33-40, § 3.3 (Mar. 2017), https://www.sciencedirect.com/science/article/pii/S2211335516301346.

[153] *See* Sen. Richard Durbin, et al., *Gateway to Addiction?* (April 14, 2014), *available at* https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf

167.    JLI also enhanced the nicotine impact of the mint flavor by adding excess nicotine to mint JUUL pods,[154] and by boosting mint's nicotine delivery profile through pH manipulation, thereby increasing nicotine impact.[155]

168.    One recent study found that JLI's mango had the lowest free-base content, making it the least harsh formula; and that mint had the highest free-base content (30% more free-base than mango), making mint the formula with the strongest nicotine impact:[156]



| | $C_{HA}/C_{Nic}$ | $\alpha_{fb}$ |
|---|---|---|
| Benzoic acid | | |
| JUUL 'Cool Mint' (5% nicotine) | 0.97* | 0.13 |
| JUUL 'Classic Menthol' (5% nicotine) | 0.98* | 0.13 |
| JUUL 'Crème Brûlée' (5% nicotine) | 0.97* | 0.12 |
| JUUL 'Fruit Medley' (5% nicotine) | 0.99* | 0.12 |
| JUUL 'Cool Cucumber' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Classic Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Virginia Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL "Mango" (5% nicotine) | 0.99* | 0.09 |
| JUUL "Virginia Tobacco' (3% nicotine) | 0.94* | 0.14 |
| JUUL 'Mint' (3% nicotine) | 1.04* | 0.11 |
| Averages for JUUL | 0.99±0.03 SD | 0.12±0.01 |

Anna K. Duell et al., Nicotine in tobacco product aerosols: 'It's déjà vu all over again'

169.    These findings evidence the JLI, the MANAGEMENT DEFENDANTS, and ALTRIA's plan to make the flavor whose lifespan they were working hard to preserve the most potent when it got into the hands of nonsmokers, including youth.

**ii.      JLI's youth surveillance programs confirmed that Mint JUUL pods are preferred by teens**

170.    In January 2018, Kevin Burns, JUUL's new CEO, deployed his experience as the former CEO of a yogurt company to begin developing JUUL's flavor portfolio.

---

[154] See Duell AK, et al. *Nicotine in tobacco product aerosols: 'It's déjà vu all over again'* Tob Control, 5 ((Dec. 17, 2019), *available at* https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/12/16/tobaccocontrol-2019-055275.full.pdf

[155] S.G. Burch et al., *Effect of pH on Nicotine Absorption and Side Effects Produced by Aerosolized Nicotine*, 6 J. Aerosol Med. 1, 45 (1993).

[156] *See* Duell, *supra* (Dec. 17, 2019).

171.   One part of this initiative included studying consumer reactions to flavor names. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[157]

172.   In April 2018, JLI received a document request from the FDA on April 24, 2018, seeking information about the design and marketing of JLI's products, among other things.[158]

173.   In response, JLI announced a commitment of $30 million to youth prevention efforts and began sending JLI representatives to schools to present what were essentially advertising campaigns for JUUL products. This conduct resulted in a *Warning Letter* from the FDA's Center for Tobacco Products to JLI in September 2019.[159]

174.   Under the ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

175.   ████████████████████████████████████████████████████████████████████████████████████[161]████████████████████████████████████████████████████████████████████████████████████[162]

---

[157] INREJUUL_00053206.

[158] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

[159] *Juul Labs, Inc. Warning Letter*, U.S. Food & Drug Admin. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019

[160] INREJUUL_00121627 (████████████████); INREJUUL_00124965 (████).

[161] *Id.*

[162] INREJUUL_00035325.

176. ███████████████████████████████████████████
███████████████████████████████████████████████████
██████████[163]████████████████[164]

177. ███████████████████████████████████████████
███████████████████████████████████████████████████
█████████[165]

178.   In other words, ███████████████████████████
███████████████████████████████████████████████████
███████████████████   This is unsurprising, as the "mint" flavor was designed not to taste like a Menthol cigarette. Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport" cigarette that "doesn't have that good peppermint taste like cool [M]int."[166]

179. ███████████████████████████████████████████
███████████████████████████████████████   According to Siddharth Breja, who was Senior Vice President for Global Finance at JLI, after JLI pulled most flavored pods from the market, then-CEO Kevin Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[167] And it was public knowledge that mint and menthol have a well-documented history of facilitating youth tobacco use, as Dr. Jonathan Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool

---

[163] INREJUUL_00124965.
[164] *Id.*
[165] INREJUUL_00035325.
[166] Reddit, *How does Classic Menthol compare to Cool Mint*, https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_cool_mint/ (last visited February 10, 2020).
[167] Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html

the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.[168]

180. ████████████████████████████████

181. With that knowledge and with no genuine interest in youth prevention, and as detailed below, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA committed to work to preserve mint as a flavor for as long as possible. Indeed, to further this goal, Defendants PRITZKER and VALANI poured additional money into JLI a mere two months later as part of a $600 million funding round.[169]

182. By keeping mint on the market long after other flavors were pulled, these Defendants continued to expand the number of addicted e-cigarette users.

      c.   **JLI and the E-Liquid Defendants Used Toxic Flavorings and Raw Ingredients in JUUL Pods Without Ensuring They Were Safe For Inhalation and Without Providing Warnings to Plaintiffs of the Potential Dangers.**

183. It is well-established that flavoring additives and raw ingredients used in JUUL e-liquids are known causes of lung injuries when inhaled in the workplace setting.[170]

---

[168] Examining Juul's Role in the Youth Nicotine Epidemic, Testimony of Jonathan Winickoff Before the U.S. House of Representatives Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy, ("Winickoff Testimony") at 3, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf.

[169] Crunchbase, *JLI Raises $650M Of Its $1.25B Mega-Round*, 2018-07-10 (Last Visited 2019-12-26) https://news.crunchbase.com/news/juul-raises-650m-of-its-1-25b-mega-round/

[170] *Flavorings-Related Lung Disease, Exposure To Flavoring Chemicals: What Are Flavorings?,* National Institute for Occupational Safety and Health (October 3, 2017),

184.   Safety and toxicity analyses in the context of flavored e-liquids have also been published in the medical and scientific literature.

185.   In 2016, Tierney, et al., performed an analysis of the ingredients in several popular flavors and brands of e-cigarettes. They found that the concentration of artificial flavor chemicals in e-cigarette fluids are sufficiently high for inhalation exposure by vaping to be of toxicological concern. Also, the researchers found that certain flavoring additives appeared to be popular across all brands such as vanillin, ethyl vanillin, maltol and ethyl maltol, benzaldehyde and benzyl alcohol, ethyl butyrate and ethyl acetate. A review of the JUUL master formulations and ingredient lists for flavored JUUL pods identify many of these same popular toxic ingredients studied by Tierney.[171]

186.   A 2018 study examined the effect of popular e-cigarette flavoring on cells. The authors found that cell exposure to diacetyl, cinnamaldehyde, acetoin, pentanedione, o-vanillin, maltol, and coumarin without nicotine caused cytotoxicity dose-dependently. Mixing a greater variety of flavors resulted in an even greater cytotoxicity and cell-free ROS levels compared to treatments with individual flavors.[172]

187.   Talih, et al. analyzed the characteristics and toxicant emissions of JUUL and found that JUUL aerosol contained numerous toxic carbonyl compounds including formaldehyde, acetaldehyde and acetone, all known carcinogens.[173]

188.   Omaiye, et al. performed an analysis of the ingredients in a number of chemical flavored JUUL pods and found that they were cytotoxic when exposed to human bronchial cells. The study found the following known harmful chemicals in the JUUL e-liquids including: 2-methoxyphenol;   2,3,5-Trimethylpyrazine;   2,5-dimethylpyrazine;   isopulegol;   ethyl   maltol;

https://www.cdc.gov/niosh/topics/flavorings/exposure.html

[171] Peyton A Tierney, et al., *Flavour chemicals in electronic cigarette fluids*, Tob Control, 25:e10-e15, Apr. 15, 2015.
[172] Thivanka Muthumalage, et al., *Inflammatory and Oxidative Responses Induced by Exposure to Commonly Used e-Cigarette Flavoring Chemicals and Flavored e-Liquids without Nicotine*, 8 Frontiers in Physiology 1130 (2018).
[173] Talih S, Salman R, El-Hage R, et al., *Characteristics and toxicant emissions of JUUL electronic cigarettes*, Tobacco Control 2019;28:678-680.

benzaldehyde; 4-terpineol; maltol; hydrocoumarin; vanillin; ethyl vanillin; phenoethyl alcohol; benzyl alcohol; p-Cymene; corylone; and pulegone. They also found the following irritant chemicals included: p-Anisaldehyde; eucalyptol; piperidone; piperonal; linalool; methyl anthranilate; beta-Damascone; benzaldehyde PG acetal; gamma-terpinene; ethyl anthranilate; alpha-terpineol; delta-decalactone; gamma-octalatone; 3-Hecen-1-ol; ethyl isovalerate; beta-undecalactone; hexyl acetate; acetylpurazine; ethyl hexacanoate; ethyl 2-methylbutanoate; and menthol. In addition, they found the following environmentally hazardous chemicals included: thymol, ally hexanoate, alpha-pinene, beta-pinene, and limonene.[174]

189.    Another study published in 2019 examined the artificial flavoring additives in e-liquids in JUUL pods. The authors concluded that the cumulated data suggested that artificial flavors induce oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells. Specifically, JUUL crème brulee and cool cucumber caused epithelial barrier dysfunction in 16-HBE cells. Moreover, all flavors damaged DNA upon exposure in monocytes. The findings included increased mitochondrial superoxide generation, IL-8 inflammatory cytokine response, IL-8 inflammatory cytokine response in monocytes, and OGE2 response in monocytes. All findings are a known cause of acute and chronic lung injuries, as well as other serious and significant injuries.[175]

190.    A number of other studies have examined the effects of exposure to inhaled flavoring additives in e-liquids and determined that inhalation of flavoring additives in e-cigarette aerosol carry a significant risk of toxicity and other injuries.[176]

---

[174] Esther E. Omaiye, et al., *High-Nicotine Electronic Cigarette Products: Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations*, Chem Res Toxicol, 32(6): 1058-69, June 17, 2019.

[175] Thivanka Muthumalage, et al., *E-cigarette flavored pods induce inflammation, epithelial barrier dysfunction, and DNA damage in lung epithelial cells and monocytes*, Scientific Reports, 9:19035 (Feb. 1, 2019).

[176] Jessica L. Fetterman, et al., *Flavorings in Tobacco Products Induce Endothelial Cell Dysfunction*, Arterioscler Thromb Vasc Biol (July 2018);  Isaac Sundar, et al., E-*cigarettes and flavorings induce inflammatory and prosenescence responses in oral epithelial cells and periodontal fibroblasts*, Oncotarget, 7(47): 77196-204 (Oct. 24, 2016); Hae-Ryung Park, et al., *Transcriptomic response of primary human airway epithelial cells to flavoring chemicals in electronic cigarettes*, Scientific Reports, 9:1400, (Feb. 1, 2019); Chad A. Lerner, et al., *Vapors Produced by Electronic Cigarettes and E-Juices with Flavorings Induce Toxicity,* Oxidative

191.    In addition, there is evidence that combining a number of flavoring additives into an e-liquid formulation can significantly increase toxicity.[177]

192.    Despite the body of evidence demonstrating a significant risk associated with the flavoring additives used in JUUL e-liquids, Defendants failed to warn consumers or the public, including Plaintiffs of this risk thereby recklessly disregarding the safety of the millions of JUUL users throughout the country, including millions of teenagers and young adults who were non-smokers.

193.    Upon information and belief, Defendant JLI entered into an agreement in California with Defendant MOTHER MURPHY'S and Defendant ALTERNATIVE in or around 2014 wherein in conjunction with JLI, MOTHER MURPHY'S and ALTERNATIVE designed, manufactured and supplied flavoring additives and the  flavored E-liquids pursuant to JLI directives and specifications derived from their patents for use in its JUUL pods. Upon information and belief, MOTHER MURPHY'S and ALTERNATIVE continue to design, manufacture and supply flavoring additives and flavored e-liquids to JLI for use in its JUUL pods presently.

194.    MOTHER MURPHY'S and ALTERNATIVE would use their own chemical additives and flavorings to formulate the e-liquids but "the overall manufacturing processes are unique to the JUUL system and the formulas and chemistries for the e-liquids for the JUUL system, are proprietary to JLI" as alleged in JLI's responses to Congress.[178]

---

Stress, and *Inflammatory Response in Lung Epithelial Cells and in Mouse Lung*, PLoS ONE, 10(2): e0116732, (Feb. 6, 2015); Michael S. Werley, et al., *Toxicological assessment of a prototype e-cigaret device and three flavor formulations: a 90-day inhalation study in rats,* Inhalation Toxicology, 28(1), 22-28, (Jan. 18, 2016); Wavreil FDM, Heggland SJ, *Cinnamon-flavored electronic cigarette liquids and aerosols induce oxidative stress in human osteoblast-like MG-63 cells*, Toxicology Reports (2019), doi: https://doi.org/10.1016/j.toxrep.2019.11.019; Behar, et al., *Analytical and toxicological evaluation of flavor chemicals in electronic cigarette refill fluids*, Scientific Reports, (May 29, 2018).

[177] Marescotti D, et al., *Systems toxicology assessment of a representative e-liquid formulation using human primary bronchial epithelial cells*, Toxicology Reports (2019), doi: https://doi.org/10.1016/j.toxrep.2019.11.016; Temperance R. Rowell, et al., *Electronic Cigarettes: Not All Good News? Flavored e-cigarette liquids reduce proliferation and viability in the CALU3 airway epithelial cell line*, Am. J. Physiol. Lung Cell Mol. Physiol., 313:L52-L66 (Apr. 14, 2017).

[178] "Responses of JUUL LABS INC. to Questions for the Record at the July 25, 2019 Hearing

195.    MOTHER MURPHY'S and ALTERNATIVE would report regularly to JLI as to the production processes and progress and took direction from JLI in California as to business directives, including phone calls, e-mails and regular forms of electronic communication coming from JLI in California.

196.    Upon information and belief, MOTHER MURPHY'S and ALTERNATIVE performed "one-third of the final nicotine production" for JUUL products that go into the e-liquid mix.[179]

197.    Defendant MOTHER MURPHY'S describes itself as "**an industry leader in flavor innovation.**" According to its website:

> MOTHER MURPHY'S is a food flavoring business, family-owned and operated since 1946. We ship food flavorings, flavor extracts and powered flavorings to over 30 different countries. We are very innovative, and our in-house chemists are always developing and seeking new flavor extracts and powdered flavorings to add to our library of already more than 60,000 flavors. In fact, we say **'if you can imagine it, we can create it'.**[180]

198.    Upon information and belief, MOTHER MURPHY'S is the parent company of ALTERNATIVE. ALTERNATIVE's website was taken down in the Fall of 2019 when news broke that a lawsuit had been filed by a former JLI employee alleging that ALTERNATIVE supplied over a million contaminated pods which JLI sold to users, including teenagers and young adults, with reckless disregard for consumer safety.[181]

199.    A snapshot of ALTERNATIVE's website from 2016 accessed through wayback.org internet archive, describes ALTERNATIVE as "Established in Greensboro, North Carolina, ALTERNATIVE Ingredients, Inc. was created to serve the relatively new Vaping Industry, also known as the Electronic Nicotine Delivery Systems (ENDS) industry. Our product

---

before the House Committee on Oversight and Record Examining JUUL's role in the Youth Nicotine Epidemic: Part II p. 6.

[179] *Id.* at 7.

[180] http://www.mothermurphys.com/

[181] *See Breja v. JUUL labs, Inc.*, NDCA 3:19-cv-07148.

offering include E-Flavor Concentrates, Nicotine Solutions and finished E-Liquids." It also states that:

> We emphasize that while we have sought to create a group of flavors compatible with the ENDS industry, to our knowledge, no independent studies have been conducted which document the safety of these flavors in a vaping environment or in e-cigarettes. We expect that these studies will be forthcoming, but until they are released, we make no representation or warranty as to the safety of these flavors when used in a vaping environment or in e-cigarettes.[182] (emphasis added).

However, no such warning was provided when the e-liquids were shipped and/or sold to millions of consumers throughout the United States. MOTHER MURPHY'S and ALTERNATIVE did not see to it that JLI provide the same reservation as to lack of safety tasting and lack of warranty as to the safety of the chemical flavoring additives to the consumers that they themselves cautioned about to their potential vaping industry customers.

200.    In conjunction with JLI, MOTHER MURPHY'S and ALTERNATIVE designed, manufactured, and supplied flavoring ingredients for JUUL e-liquids utilizing flavoring additives, which were never tested for safety risks associated with inhalation in e-cigarettes. Accordingly, JLI, MOTHER MURPHY'S and ALTERNATIVE's design, manufacture, and supply of JUUL e-liquids was done with reckless disregard for the safety of consumers including, Plaintiffs, and millions of teenagers, young adults and older adults who unknowingly inhaled e-liquids containing flavoring additives that were never tested to determine whether they were safe for use in this manner and for which Defendants knew, or should have known, carried a severe and significant inhalation risk to the lung and other organs. MOTHER MURPHY'S and ALTERNATIVE placed JUUL e-liquids into the stream of commerce with the full knowledge that it was unsafe for use in the manner for which it was intended. MOTHER MURPHY'S and ALTERNATIVE knew, or should have known, that the e-liquid it designed, and was manufacturing and supplying was an inherently dangerous and toxic product which could cause the personal injuries as described herein.

---

[182] https://web.archive.org/web/20160312122149/http://www.alternativeingredients.com/

201.

[183]

202.    Occupational safety protections pursuant to OSHA and state laws were needed to ensure that ALTERNATIVE and Mother Murphy's employees were protected from the fumes from these flavoring additives, nicotine and other chemicals; the very chemicals designed to be vaporized and then inhaled by consumers.

203.    Despite the knowledge of the inhalation risks, MOTHER MURPHY'S and ALTERNATIVE, manufactured e-liquids and placed the products into the stream of commerce for millions of people, including Plaintiffs, to inhale without warning of any risks caused by inhalation of the ingredients contained therein.

204.    Due to the continued blockbuster success and increased demand for JUUL, as well as anticipated global expansion, JLI entered into an agreement with the Maryland based corporations Defendant TTI and Defendant ELIQUITECH in or around 2017 wherein TTI and ELIQUITECH also manufactured and supplied flavoring additives and blended the flavored e-liquids in JLI's JUUL pods. Upon information and belief, TTI and ELIQUITECH continue to design, manufacture and supply flavoring additives and flavored e-liquids in conjunction with JLI for use in its JUUL pods presently.

205.

[184]

206.    In addition to MOTHER MURPHY'S and ALTERNATIVE, Defendants TTI and ELIQUITECH, based upon contractual relations with JLI in California, also used specifications

---

[183] INREJUUL_00338418-INREJUUL_00338422.

[184] *Id.* at p. 6.

created by JLI in San Francisco, and designed, manufactured and supplied flavoring ingredients and blended the JUUL e-liquids utilizing flavoring additives, which were never tested for safety risks associated with inhalation in e-cigarettes. TTI and ELIQUITECH placed JUUL e-liquids into the stream of commerce with the full knowledge that it was unsafe for use in the manner for which it was intended. TTI and ELIQUITECH knew, or should have known, that the e-liquid it was designing, manufacturing, and supplying in conjunction with JLI was an inherently dangerous and a toxic product which could cause the personal injuries as described herein.

207.   Neither TTI or ELIQUITECH had ever tested the products for safety risks associated with utilizing the material in e-liquids. In fact, TTI and ELIQUITECH were fully aware that the Safety Data Sheets prepared for each flavoring additive specifically stated that the ingredient carried inhalation health risks. Despite the knowledge of the inhalation risks, TTI and ELIQUITECH manufactured e-liquids utilizing these ingredients and placed the product into the stream of commerce for millions of people, including Plaintiffs, to inhale without warning of any risks caused by inhaling of the ingredients contained therein.

208.   The flavoring additives and raw ingredients manufactured and supplied by the E-LIQUID MANUFACTURERS and used in the JUUL e-liquid formulations as designed in conjunction with JLI are associated with severe and significant risks of acute and chronic lung injuries, cardiovascular injuries and seizures. The E-LIQUID MANUFACTURERS knew, or should have known of the risks and failed to warn Plaintiffs, and failed to ensure that its' contractual partner/customer JLI warned its consumers of the risks, in reckless disregard for human safety.

209.   The E-LIQUID MANUFACTURERS maintained substantial contacts with the state of California in that they entered into contracts originating in California with JLI to manufacture and supply goods to be shipped throughout the United States, including to California. Upon information and belief, said Defendants continue to maintain substantial contacts with the state of California as described herein. Moreover, E-LIQUID MANUFACTURERS regularly supplied and shipped raw ingredients, flavoring additives and batches of e-liquid to Defendant JLI's headquarters in San Francisco, California over a period of

many years. The products that were shipped were either used in the research and development of JUUL products and/or were sold to consumers. The E-LIQUID MANUFACTURERS made at least three or more sales within a one year prior for each year over the last five years, thus subjecting themselves to California Regulation 1595 (d). Further, they subjected themselves to California law by adhering to some extent to certain requirements of California Proposition 65.

210.  ████████████████████████████████████████

████████████████████████████████████████████████ thereby agreeing to avail themselves of the laws of the state of California and waiving any potential objection to jurisdiction.[185]

211.  Upon information and belief, Defendants TTI and ELIQUITECH also agreed to be governed by California law under the terms of the contract that was entered into with JLI, thereby agreeing to avail themselves of the laws of the state of California and waiving any potential objection to jurisdiction.

212.  The aforementioned E-LIQUID MANUFACTURERS were all manufacturers and suppliers of flavoring ingredients for JUUL E-liquids utilizing flavoring additives. The E-LIQUID MANUFACTURERS were negligent in that they failed to warn and failed to ensure its contractual partner JLI warned the consumers and users of the risks associated with inhaling their products contained in the JUUL e-liquid and thereby acted in reckless disregard for the safety of the public, consumer and users of JUUL including millions of teenagers, young and older adults. The E-LIQUID MANUFACTURERS were otherwise negligent and liable for the injuries sustained by Plaintiffs.

**D.**   **Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe**

213.  Having created a product designed to hook users to its nicotine, JLI had to mislead consumers into believing JUUL was something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and

---

[185] INREJUUL_00424193-INREJUUL_00424209.

the unprecedented risks of abuse and addiction JUUL poses. Defendants devised and knowingly carried out a material scheme to defraud consumers by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products, (b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party groups to spread false and misleading narratives about e-cigarettes, and JUUL in particular.

### a.   The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.

214.   Every 5% strength JUUL pod package represents that one pod is equivalent to one pack of cigarettes. This statement is deceptive, false and misleading. As JLI's regulatory head explained internally to former CEO Kevin Burns in 2018, each JUUL pod contains "roughly *twice the nicotine content* of a pack of cigarettes."

215.   In addition, and as JLI and the MANAGEMENT DEFENDANTS know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain 10–15 mg of nicotine per cigarette and each cigarette yields between 1.0 to 1.4 mg of nicotine, meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, have been found to deliver at least 82% of the nicotine contained in a JUUL pod to the user. JLI's own internal studies suggest a nicotine transfer efficiency rate of closer to 100%.

216.   Defendants also knew that that the use of benzoic acid and nicotine salts in JUUL pods affects pH and facilitates "absorption of nicotine across biological membranes."[186] JUUL's e-liquid formulation is highly addictive not only because it contains a high concentration of nicotine, but because it contains a particularly potent form of nicotine, i.e., nicotine salts. Defendants knew this, ███████████████████████████████████████ ████████████████████████████████████████████[187] And the ALTRIA DEFENDANTS

---

[186] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 Handb. Exp. Pharmacol., 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.
[187] INREJUUL_00278408.

were aware of the research showing the potency of nicotine salts from their many years in the tobacco business.

217. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████[188]██████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████[189]████████████████████████

████████████████████████████████████[190]

218. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██[191]

219. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[188] INREJUUL_00014159-INREJUUL_00014226.
[189] INREJUUL_00002526-INREJUUL_00002625.
[190] *Id.*
[191] *Id.*

1
2 [192]
3    220.
4 [193]
5
6    221.    JLI and the MANAGEMENT DEFENDANTS knew that
7
8
9
10
11
12    222.    In the United States, the unsupported extrapolations
13 which JLI posted on its website, shared with journalists,
14 sent to retailers, and distributed to third party promoters, showing that JUUL's 5% solution
15 achieved a pk profile just below that of a cigarette. For example, the following chart appeared on
16 the online publication TechCrunch:





[192] INREJUUL_00351717-INREJUUL_00351719.
[193] *Id.*

223.    Simultaneously, 

224.

---

[194] *See* JLI00363360.

[195] INREJUUL_00448896.

[196] INREJUUL_00016443-INREJUUL_00016507.

1

2

3

4

5

6

### 2)   JLI and the MANAGEMENT DEFENDANTS Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Was False and Misleading

225.   As set forth above, the statements in JLI advertisements and on JUUL pod packaging that each JUUL pod contains about as much nicotine as a pack of cigarettes are deceptive, false and misleading. Defendants knew this.

226.   JLI and the MANAGEMENT DEFENDANTS caused deceptive, false and misleading statements that a JUUL pod had an equivalent amount of nicotine as one pack of cigarettes to be distributed to consumers including Plaintiff. These Defendants have thus materially misrepresented the nicotine content of JUUL products to the consuming pubic including Plaintiffs.

227.   By no later than October 30, 2016 (and likely much earlier), the JLI Website – which, as discussed above, the MANAGEMENT DEFENDANTS on JLI's Board of Directors reviewed and approved – advertised that "[e]ach JUULpod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs."[197] The language on the website would later change, but still maintained the same fraudulent misrepresentation – i.e., that "[e]ach 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery."[198]

228.   As noted above, JLI and the MANAGEMENT DEFENDANTS directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUUL pods and their deceptive, misleading and fraudulent statements regarding JUUL's nicotine content. And although they knew that these statements, were untrue, JLI and the

---

[197] JUULpod, JUUL Labs, Inc. (Oct. 30, 2016), https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/.

[198] *What is Vaping?*, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/What-is-Vaping-How-to-Vape.

MANAGEMENT DEFENDANTS have made no effort to retract such statements or correct their lies.

229.   In addition to approving the JLI website, knowing that it contained deceptive, misleading and false statements, JLI (through its employees) and the MANAGEMENT DEFENDANTS also were directly responsible for the selling and distributing JUUL pod packaging that contained misrepresentations and omissions. [REDACTED]

[REDACTED][199]

230.   JUUL pod packages that DEFENDANTS sold and distributed stated that JUUL pods are "approximately equivalent to about 1 pack of cigarettes."[200] These statements, as well as the statements on the JLI website, are false and misleading.

231.   The statement on the JLI website, and in its marketing, promotions, advertisements and packaging, that each JUUL pod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is false and likely to deceive and mislead, because the actual amount of nicotine contained in a JUUL pod is as much as twice as high as that *in a pack of* cigarettes.

232.   ALTRIA greatly expanded the reach of this fraud by providing its retail and distribution might for JLI products, causing millions of JUUL pods sold and distributed with packaging stating that JUUL pods contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[201] JLI, the MANAGEMENT DEFENDANTS, and ALTRIA knew that these statements are false and misleading, but nevertheless utilized JUUL product packing, marketing and advertising to maintain their fraud.

233.   ALTRIA knew in 2017 that a JUUL pod delivered more nicotine than one pack of cigarettes. In 2017, ALTRIA launched its MarkTen Bold ENDS, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even

---

[199] INREJUUL_00278408.
[200] Juul Labs, Feb. 14, 2018, 10:35 a.m. Tweet,
https://twitter.com/JUULvapor/status/963844069519773698.
[201] *Id.*

though JLI was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, ALTRIA chose to bring a less potent 4% formulation to market.

234.    According to ALTRIAS' own pharmacokinetic testing as reflected in the below chart, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, ALTRIAS' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.



Figure 1: Presented at ALTRIA Group Inc.'s November 1, 2017 Investor Day Presentation.

MarkTen Bold 4%

235.    Based on its own internal knowledge, ALTRIA knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data it received from JLI, the ALTRIA DEFENDANTS' due diligence undoubtedly included a careful examination of JLI's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

236.    Thus, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA knew that the statement on JUUL pod packaging that each JUUL pod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead. Neither ALTRIA, nor JLI or the MANAGEMENT DEFENDANTS has made any effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL pods. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving consumers.

237. From JLI's pre-release announcements to this day, JLI has continuously represented that each pod is approximately equivalent to a pack of cigarettes. These claims, which JLI repeats widely in advertisements, press releases, and its web site, have been distributed *via* the wires and mails and disseminated by reputable and widely reliable sources that accepted those representations is true.[202]

238. Not only have JLI, MANAGEMENT DEFENDANTS and ALTRIA misrepresented or concealed the actual amount of nicotine consumed *via* JUUL pods, but they also did not effectively or fully inform users about the risks associated with the potent dose of nicotine delivered by its products. Despite making numerous revisions to JUUL packaging since 2015, the packaging did not include nicotine addiction warnings until JLI was forced to add them in August 2018. ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██[203]

---

[202] *See* Truth Initiative, *6 Important Facts about Juul* (last visited March 4, 2020), https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul; Erin Brodwin, *An e-cigarette with twice the nicotine of comparable devices is taking over highschools – and scientists are sounding the alarm,* Business Insider, (April 30, 2018, 12:03 pm), https://www.businessinsider.com/juul-e-cig-vaping-health-effects-2018-3; Caroline Kee, *Everything you need to know about the JUUL, including the health effects,* Buzzfeed News, (February 5, 2018, 5:51 pm), https://www.buzzfeednews.com/article/carolinekee/juul-ecigarette-vape-health-effects; Jan Hoffman, *The Price of Cool: A teenager, a juul and nicotine addiction,* New York Times, (November 16, 2018), https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html; Sarah Milov, *Like the tobacco industry, e-cigarette manufacturers are targeting children,* The Washington Post, (September 23, 2018, 6:00 a.m.), https://www.washingtonpost.com/outlook/2018/09/23/like-tobacco-industry-e-cigarette-manufacturers-are-targeting-children/; Washington State Department of Health, *What are vapor products?,* (Last Visited March 4, 2020), https://www.doh.wa.gov/YouandYourFamily/Tobacco/VaporProducts

[203] *See* INREJUUL 00444332 (█████████████████████). Note that ███████████ *see e.g.* INREJUUL 00021583 (████████████████████████).

239.   Moreover, the form of nicotine JUUL pods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume,[204] leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUUL pods in fact contain approximately the same nicotine as a solution that is 6% nicotine by volume.

240.   The "5% strength" statement in Defendants' marketing, advertisements and promotions misrepresents the most material feature of the JUUL product -- the nicotine content -- and has misled consumers to their detriment. Resellers, apparently assuming that "5% strength" means "50mg/mL" nicotine by volume, compound confusion among consumers by stating that JUUL pods contain "50 mg/mL," which they do not.[205]

241.   If JLI and the MANAGEMENT DEFENDANTS did not know when JLI released JUUL pods that the "5% strength" representation in Defendants' advertisements were misleading, they learned that there was widespread confusion about the JUUL pods' nicotine content. By 2017, studies revealed that smokers did not understand "5% strength," and some understood that phrase to mean 5% of a cigarette. ███████████████████[206] JLI, ALTRIA and the MANAGEMENT DEFENDANTS did nothing to stop or correct this confusion about the nicotine content.

---

[204] See, e.g., https://www.whitecloudelectroniccigarettes.com/blog/nicotine-measurements/; American E-Liquids Manufacturing Standards Association, *E-Liquids Manufacturing Standards*, § 1.05 (2017) (quantifying e-liquid nicotine content in terms of volume), https://www.aemsa.org/wp-content/uploads/2017/03/AEMSA-Standards-v2.3.3.pdf.

[205] *See*, e.g. Tracy Vapors, Starter Kits, http://web.archive.org/web/20190422143424/https://www.tracyvapors.com/collections/starter-kit; Lindsey Fox, *JUUL Vapor Review, Ecigarette Reviewed, (March 20, 2017)* https://ecigarettereviewed.com/juul-review ("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); Jason Artman, *JUUL E-Cigarette Review*, eCig One (Oct. 26, 2016), https://ecigone.com/e-cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); West Coast Vape Supply, http://web.archive.org/web/20190718190102/https://westcoastvapesupply.com/products/juul-starter-kit ("5% . . . 50 mg"); Vapor4Life, *How Much Nicotine is In a JUUL?* ("Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter)."), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/.

[206] INREJUUL_00123540.

242. The "5% strength" statement in Defendants' marketing, promotions and advertisements is also misleading. At least two independent studies testing multiple varieties of JUUL pods have likewise found significantly higher concentrations of nicotine than the 59 mg/mL JUUL's website represents, suggesting that the difference in the total nicotine content of a JUUL pod vs. a pack of combustible cigarettes could be even greater.

### 3)   Defendants Used Food and Coffee Themes to Give False Impression that JUUL Products Were Safe and Healthy

243. In late 2015, JLI and the MANAGEMENT DEFENDANTS employed a deceptive marketing scheme to downplay the harms of e-cigarettes with a food-based advertising campaign called "Save Room for JUUL." The campaign framed JUUL's addictive pods as "flavors" to be paired with foods.[207] JLI described its crème brûlée nicotine pods as "the perfect evening treat" that would allow users to "indulge in dessert without the spoon."[208] In one 2016 e-mail, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee." [209] JLI similarly promoted the Fruit Medley pods using images of ripe berries. JLI described its "cool" mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint."[210]

---

[207] Erin Brodwin, *$15 billion startup JUUL used 'relaxation, freedom, and sex appeal' to market its crème-brulee-flavored e-cigs on Twitter and Instagram but its success has come at a big cost*, Business Insider (Oct. 26, 2018), https://www.businessinsider.com/juul-e-cig-marketing-youtube-twitter-instagram-social-media-advertising-study-2018-10.








244.   Again, none of these advertisements disclosed that JUUL was addictive and unsafe.[211]

245.   In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.[212] JLI's

1    coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup

2    of coffee.

3          246.    JLI's reference to coffee is no mere marketing gimmick, it reflects the larger effort

4    to mislead customers into believing that JUUL is no more harmful than coffee; reinforcing the

5    false and dangerous concept if a substance is "not harmful," then addiction to that substance

6    cannot be harmful.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



247.   Defendants knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

### 4) The "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device.

248.     JLI, ALTRIA, and the MANAGEMENT DEFENDANTS recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus, JLI's staggering market share), was to mislead potential customers about the true nature of JUUL products. Defendants knew that if it became public that JUUL was designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash. Therefore, JLI (with the knowledge and support of the MANAGEMENT DEFENDANTS) and ALTRIA repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device, and falsely and misleadingly used the mails and wires to spread the subterfuge. JLI, the MANAGEMENT DEFENDANTS, and ALTRIA committed these deceptive, misleading and fraudulent acts intentionally and knowingly. In making these representations, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA intended that consumers, the public, and regulators rely on misrepresentations that JUUL products were designed to assist smoking cessation.

249.     The most blatant evidence of the cover-up scheme was the January 2019, $10 million "*Make the Switch*" television advertising campaign. This campaign, which was the continuation of JLI's web-based Switch campaign, was announced less than a month after ALTRIA announced its investment in JLI.

250.     The "*Make the Switch*" television ads featured former smokers aged 37 to 54 discussing "how JUUL helped them quit smoking."[213] According to JLI's Vice President of Marketing, the "*Make the Switch*" campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company."[214] These statements were false as JUUL was not intended to be a smoking cessation device. JLI, the

---

[213] Angelica LaVito, *JLI combats criticism with new TV ad campaign featuring adult smokers who quit after switching to e-cigarettes*, CNBC (Jan. 8, 2019), https://www.cnbc.com/2019/01/07/juul-highlights-smokers-switching-to-e-cigarettes-in-ad-campaign.html.
[214] *Id.*

MANAGEMENT DEFENDANTS, and ALTRIA committed acts of deceit and fraud when they caused the "*Make the Switch*" campaign to air on television with the fraudulent intent of deceiving and misleading the public, the United States Congress, and government regulators into believing that the company is and had been focused solely on targeting adult smokers. ALTRIA also committed acts of deceit and fraud when they caused tens of thousands, if not millions, of written versions of the *Make the Switch* campaign to be distributed with packages of its combustible cigarettes.

251.    DEFENDANTS continually sought to frame JUUL products as smoking cessation devices in their public statements on their and website. MONSEES explained during his testimony before Congress:

> ***The history of cessations products have extremely low efficacy. That is the problem we are trying to solve here.*** So, if we can give consumers an alternative and market it right next to other cigarettes, then we can actually make something work.
>
> [T]raditional nicotine replacement therapies, which are generally regarded as the gold standard for tools, right, for quitting, those are nicotine in a patch or a gum form, typically, and the efficacy rates on those hover just below about a 10 percent or so. JUUL-we ran a very large study of JUUL consumers, ex-smokers who had picked up JUUL, and looked at them, looked at their usage on a longitudinal basis, which is usually the way that we want to look at this, in a sophisticated fashion ... what we found was that after 90 days, 54 percent of those smokers had stopped smoking completely, for a minimum of 30 days already. And the most interesting part of this study is that if you follow it out further, to 180 days, that number continues to go up dramatically, and that is quite the opposite of what happens with traditional nicotine replacement therapies.[215]

---

[215] Testimony of JAMES Monsees, Co-founder and Chief Product Officer, JUUL Labs, Inc., Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, *Hearing on Examining JUUL 's Role in the Youth Nicotine Epidemic: Part* 2 (July 25, 2019), https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii.

252.    In response to a direct question about whether people buy JUUL to stop smoking, MONSEES candidly responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[216]

253.    Other illustrative and non-exhaustive examples include the following:

**Statements by Defendant JLI:**[217]

254.    "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by **eliminating cigarettes**. We envision a world where fewer adults use cigarettes, and **where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirel**y, should they so desire." (JLI Website, April 2018 (or earlier));[218]

255.    "JUUL Labs, which exists to **help adult smokers switch** off of combustible cigarettes." (JLI Website, September 19, 2019); and,[219]

256.    "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);[220]

**Statements by ALTRIA:**

257.    "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, **a world leader in switching adult smokers** . . . . We have long said that providing adult

---

[216] *Id.*

[217] Although these statements are attributed to Defendant JLI, JLI's Board of Directors had ███████████████████████, accordingly, Defendants BOWEN, MONSEES, PRITZKER, HUH, and VALANI are each directly responsible for the dissemination of these fraudulent statements.

[218] *Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values (last visited February 7, 2020).

[219] CONSUMER UPDATE: 9/19, JUUL Labs, Inc (Sept. 19, 2019), https://newsroom.juul.com/consumer-update-9-19/.

[220] JLI Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of then-CEO Kevin Burns).

smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (ALTRIA Website, December 20, 2018);[221] and,

258.    "We believe e-vapor products present an **important opportunity to adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18).[222]

259.    "We have long said that **providing adult smokers with superior, satisfying products with the potential to reduce harm** is the best way to achieve tobacco harm reduction. **Through Juul**, we are making the biggest investment in our history toward that goal." (ALTRIA Earning Call, December 20, 2018)

260.    "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also **support and even accelerate transition to noncombustible alternative products by adult smokers**." (ALTRIA Earning Call, January 31, 2019);

261.    We expect the **JUUL product features that have driven JUUL's success in switching adult smokers in the U.S.** to strongly appeal to international adult cigarette smokers. (ALTRIA Earning Call, January 31, 2019).

262.    DEFENDANTS knew at the time of making these statements that they were false, deceptive and misleading. JUUL does not have FDA approval as a cessation product.

263.    The *Switch* advertisements reinforced the impression left by the testimony of JLI's co-founder, clearly linking JUUL to cessation and quitting. For example:

---

[221] *ALTRIA Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BUSINESSWIRE (Dec. 20, 2018, 7:00 AM EST), https://www.businesswire.com/news/home/20181220005318/en/ALTRIA-12.8-Billion-Minority-Investment-JUUL-Accelerate.
[222] Letter from Howard A. Willard III, ALTRIA, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018).



264.     Representative Rashida Tlaib, upon presenting this ad to MONSEES, had the following exchange:

> **Rep. Tlaib:** After 30 lines, starting with "quit," the ad says "switch," followed by no further mentions of start smoking again. You were a smoker. Does this ad give a smoker hope that there might be a way to quit cigarettes for good?

> **Mr. MONSEES:** I think the intention of this ad is to make it very clear to consumers that there is an alternative, finally, to

combustible cigarettes. I am one of those people.[223]

265.    DEFENDANTS' tacit message in their *Switch* advertisements is switch because, unlike cigarettes, JUUL is harmless to your health.

266.    DEFENDANTS' false, deceptive and misleading *Switch* campaign suggests that smoking and JUULing are mutually exclusive and that purchasing a JUUL will "switch" a smoker to a non-smoker.

267.    DEFENDANTS know that a large number of smokers who use JUUL products do not end up switching but end up consuming cigarettes and JUUL.

268.    JLI has advertised cost-savings calculators as part of its *Switch* campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (*i.e.,* a pack a day smoker is presumed to consume one JUUL pod a day). DEFENDANTS know that the calculator is misleading because smokers who switch to JUUL typically increase their nicotine intake or end up consuming cigarettes and JUUL products, rendering the calculator misleading at best.

269.    JUUL labels and advertisements also marketed the product as an "alternative" to cigarettes:

---

[223] JAMES MONSEES, *Testimony of JAMES MONSEES before the U.S. House of Representatives Committee on Oversight and Reform and Consumer* ("MONSEES Testimony") at 3, U.S. HOUSE COMMITTEE ON OVERSIGHT & REFORM (July 31, 2019), https://www.c-span.org/video/?c4811191/user-clip-wasserman-grothman-tlaib-question-MONSEES at 12:33-13:04.



270.   Other advertisements similarly marketed the product as smoking "evolved":



271.   The goal of these advertisements was to convey the deceptive, misleading and false impression that JUUL products could help consumers quit smoking and break nicotine addiction in a way that was healthy and safe. But, as noted above, that was simply not the case. Defendants never disclose to consumers that JUUL e-cigarettes and JUUL pods are at least as addictive as, if not more addictive, than combustible cigarettes. And each of JLI, the MANAGEMENT DEFENDANTS, and ALTRIA received this data and were aware of this fact.

272.    In addition, the notion that JUUL products are designed only for existing cigarette smokers, and safer than combustible cigarettes is belied by JLI's own knowledge, marketing plan and intentions on several fronts. *First*, Defendants sought to grow a new group of consumers of nicotine products (e.g., "vapers"), not just to market to the shrinking number of existing cigarette smokers. *Second,* JLI and BOWEN designed the JUUL device to be easy to use for youth and others who have never smoked and to create and exacerbate nicotine addiction by encouraging ingestion of excessive amounts of nicotine. *Third,* as noted above, JLI's own internal testing revealed that JUUL products were often too intense for combustible cigarette smokers. Each of the MANAGEMENT DEFENDANTS knew this from their position on JLI's Board of Directors, and THE ALTRIA DEFENDANTS knew the same when it began to actively coordinate with JLI and the MANAGEMENT DEFENDANTS. Despite this knowledge, these Defendants made numerous deceptive, false and misleading public statements that JUUL was intended to be a cessation device.

273.    JUUL is not a product adults typically use to quit smoking. Researchers have found that as of 2018, only 7.9% of American adults had ever used USB shaped vape devices, like JUUL, and only 2% of adults currently used them.[224] And as mentioned above, youth were 16 times more likely to use the USB-shaped JUUL than adults.[225]

274.    213.    JLI's own marketing research indicated that the JUUL was not appropriate as a cessation device for adults. ███████████████████████████

---

[224] Kristy L Marynak et al., *Use and reasons for use of electronic vapour products shaped like USB flash drivers among a national sample of adults*, 28 Tobacco Control 685 (Nov. 2019), https://tobaccocontrol.bmj.com/content/28/6/685.
[225] D.M. Vallone et al., Prevalence and correlates of JLI use among a national sample of youth and young adults, Tobacco Control (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

1   

226

2

3   227

4

5   228

6   229

7   230

8       275.    The deceptive, misleading and fraudulent nature of the "*Make the Switch*"

9   campaign is evident when comparing the campaign's advertisements to JUUL's initial

10  advertising, as demonstrated below. The fact that these advertisements are for the same product

11  confirms that, notwithstanding the advice that JLI and ALTRIAS' received from their media

12  consultants, the Defendants never intended to target only adult smokers.

13
14
15     
16
17
18
19
20
21
22
23
24

25  _____

226 JLI00365905.

26  227 *Id.* (emphasis added).

27  228 JLI00365709.

    229 JLI00364678.

28  230 JLI00364487.



and



276.   DEFENDANTS ensured that JUUL was the *opposite* of a "tool[] to reduce or eliminate" nicotine consumption. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[231] As described above, JLI and BOWEN designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

277.   The *Switch* campaign also does not disclose or warn about the risks of using multiple tobacco products, "dual use" or that the JUUL is not a smoking cessation product. In addition to the heightened risks of addiction that tobacco product use poses, one recent study

---

[231] CDC et al., Nicotine Addiction: Past and Present, How Tobacco Smoke Causes Disease (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92.

found that persons who use e-cigarettes and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that e-cigarettes and cigarettes generate individually.[232]

278.   The FDA and other government regulators, enforcing existing laws addressing e-cigarettes,[233] publicly criticized the "*Make the Switch*" campaign and other efforts by DEFENDANTS to depict JUUL as a smoking cessation device. Section 911(b)(2)(A)(i) of the Federal Food, Drug, and Cosmetics Act (FDCA) (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than combustible cigarettes, or is otherwise 'safer' than combustible cigarettes, then the product becomes a "modified risk tobacco product."[234]

279.   In late 2019, and in response to the House of Representatives hearings in which JLI Executives testified, the FDA issued two warning letters to JLI detailing its concern that JLI was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products" within the meaning of the FDCA.[235]

280.   Then, in its September 9, 2019 letter to JLI, the FDA notified JLI that its advertising slogans such as "99% safer," "much safer," and "a safer alternative" than cigarettes was "particularly concerning because [those] statements were made directly to children in school."[236] The FDA concluded that in using advertising language that e-cigarettes were safer than cigarettes, JLI had violated Sections 902(8) and 911 by marketing JUUL products as "modified risk tobacco products" without prior approval.[237]

---

[232] Julie B Wang, et al., *Cigarette and E-Cigarette Dual use and Risk of Cardiopulmonary Symptoms in the Health eHeart Study*, 13 PLoS ONE 1 (2018).

[233] Section 911(b)(2)(A)(i) of the FDCA (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."

[235] U.S. Food and Drug Administration Warning Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019

[236] *Id.*

[237] *Id.*

281.    The September 9, 2019 letter also detailed the FDA's concerns with JLI's "*Switch*" marketing campaign. "[T]roubled by recent testimony" that JLI had given to the House Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, the FDA noted that JLI's *Switch* advertising campaign "may also convey that switching to JUUL is a safer alternative to cigarettes."[238]

282.    The FDA specifically highlighted the *Switch* campaign slogans which referenced smoking cigarettes, or attempts to quit smoking, followed by "*Make the Switch*." The FDA stated that JLI's campaign was in violation of multiple FDA regulations and the FDCA subsections, and that JLI's *Switch* campaign purported to tell the public that using e-cigarettes was an alternative to smoking, or a possible cessation tool.[239]

283.    On the same day, the FDA requested that JLI provide all documents related to its decision to market the Switch campaign to the Cheyenne River Sioux Tribe, in light of the testimony by JLI that it had taken a "public health" approach to Native American tribes, and had sought healthcare professionals to refer Native American smokers to JLI's Switching Program.[240]

284.



[241]

[242]

---

[238] U.S. Food and Drug Administration Center for Tobacco Products Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/media/130859/download

[239] *Id.*

[240] *Id.*

[241] Kevin McCauley, *Altria Taps Mercury For Tobacco Regulation Work*, O'Dwyer's (Jun. 4, 2018), https://www.odwyerpr.com/story/public/10754/2018-06-04/altria-taps-mercury-for-tobacco-regulation-work.html

[242] *See, e.g.,* INREJUUL_00262168; INREJUUL_00262226-INREJUUL_00262227.

**5)**    **JLI, ALTRIA, and Others in the E-Cigarette Industry Coordinated With Third-Party Groups To Mislead the Public About the Harms and Benefits of E-Cigarettes**

285.    Through a collective and parallel effort of funding, leadership, and board membership, JLI, ALTRIA and others in the e-cigarette industry leveraged third-parties, ranging from industry-funded non-governmental organizations to online blogs more accessible to youth, to mislead the public about the impacts of consuming e-cigarettes.

286.    An assortment of lobbyists, trade associations, and online publications have coordinated with the e-cigarette industry, including JLI and ALTRIA, to promote a consistent message that consuming e-cigarettes is not harmful, that nicotine is not harmful, and that the impacts of e-cigarettes are greatly exaggerated. These organizations receive funding from the e-cigarette industry, feature executives on those companies' boards of directors, and in return, promote industry products, industry views, or fund "independent" studies of their own that reach the same conclusions as e-cigarette industry-funded research.

### a.    The American Vaping Association

287.    The AVA is a pro-e-cigarette lobby group founded by Greg Conley, who notably publishes articles criticizing the CDC for its stance on restricting e-cigarette use.[243] Other executive members of the AVA possess business interests in e-cigarettes; for example, Treasurer David J. Danzak Jr. is associated with an e-cigarette business called Vaporine LLC.[244] Vice-President Antoinette Lanza is an owner of an exclusively e-cigarette shop in Hoboken, New Jersey called Smokeless Image.[245] Half of the AVA's functional expenses are for lobbying efforts.[246] It lists several sponsors, all of which are e-cigarette, e-liquid, or cigarette companies.[247]

---

[243] Jeff Stier, *The War on E-Cigarettes*, National Review (2011), https://www.nationalreview.com/2011/09/war-e-cigarettes-jeff-stier-gregory-conley/.
[244] Vaporine LLC's business information page, Buzzfile, http://www.buzzfile.com/business/Vapornine-LLC-904-372-3244 (last visited Mar. 4, 2020).
[245] Stacy Jones, *Tobacco regulators mull more oversight as e-cigarettes see increased popularity*, NJ.com (Updated Mar. 30, 2019; Posted July 08, 2013), https://www.nj.com/business/2013/07/tobacco_regulators_mull_more_o.html
[246] Form 990, American Vaping Association Inc.'s Return of Organization Exempt from Income Tax, 2018, irs.com, https://apps.irs.gov/pub/epostcard/cor/464203951_201812_990O_2019122716980021.pdf (last visited Mar. 4, 2020).
[247] AVA Sponsors page, American Vaping Association, https://vaping.org/about-us/ava-

288.     Conley has a prolific social media presence and frequently appears on television and radio to tout the benefits of consuming e-cigarettes and dispute negative news. The AVA website lists "studies" which are uniformly authored by noted industry-funded or industry-friendly authors, such as Polosa and Shahab.[248] AVA lists CASAA, Not Blowing Smoke, and the VTA, all established fronts for the e-cigarette industry, as "Resources."

289.     The AVA receives its funding from sponsors, who are organized into tiers such as Platinum, Gold, Silver, Bronze, and Green.[249] Current advertised sponsors include e-cigarette distributors and retailers such as E-Cigarette Empire, and VaporBeast.[250] Prior sponsors are a who's who of e-cigarette retailers. In 2016, Platinum sponsors included AltSmoke and Vapor Kings, while Gold sponsors included the now defunct Smokeless Image.[251]

290.     On social media, the AVA regularly downplays the risks of consuming e-cigarettes, criticizes negative coverage as myths or exaggerations, and lauds efforts to curb any regulation of the e-cigarette industry.[252]

291.     JLI actively sought out the AVA to promote JUUL. ███████████

████████████████████████████

                                                                                              [253]

292.     In 2018, JLI took advantage of its coordinated efforts with the AVA to downplay the risks associated with JUUL. ████████████

████████████████████████████

████████████████████████████

sponsors/ (last visited Mar. 4, 2020).

[248] Research Reports page, American Vaping Association, https://vaping.org/research-report/(last visited Mar. 4, 2020).

[249] AVA Sponsors page, American Vaping Association, https://vaping.org/about-us/ava-sponsors/ (last visited Mar. 4, 2020).

[250] Id.

[251] AVA Sponsors page, American Vaping Association, Wayback Machine – Internet Archive (Aug. 14, 2017), https://web.archive.org/web/20170814221226/http://vaping.org/about-us/ava-sponsors/.

[252] American Vaping Assn (@AVABoard), Twitter, https://twitter.com/AVABoard (last visited Mar. 4, 2020).

[253] INREJUUL_00278889

1  ██████████████████████████████ 254 ███

2  ████████████████████████████████████████

3  ████████████████████████████████ 255

4       293.    The AVA also coordinated with JLI on pro-e-cigarette research. In March 2018,

5  Conley facilitated a conversation between Dr. Konstantinos Farsalinos, a researcher at the

6  University of Patras, Greece, who regularly publishes e-cigarette industry-friendly articles, and

7  Gal Cohen, then Director of Scientific Affairs at JLI.[256]

8  ████████████████████████████████████████

9  ████████████████████████████████████████

10  ██████████████████████████ 257

11       294.  ███████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████████ 258

17         **b.**     **Vaping360**

18       295.    Vaping360 is a website dedicated to news regarding the e-cigarette industry. The

19  website boasts "40 million smokers and vaping enthusiasts reached since 2015." This entity has a

20  big social media presence and huge publication strategy.

21       296.    Vaping360's main message misleads the public about the health impacts of

22  consuming e-cigarettes. Vaping360 has published various articles, including "10 Lies and Myths

23  About Juuling Exposed."[259] This article, published in May 9, 2018, claimed, among other things,

---

[254] *See* INREJUUL_00173252 (███████████████).

[255] *Id.*

[256] Juul Labs, *JUUL Labs Presents Findings at the Global Forum on Nicotine 2018,* Cision PR Newswire (June 15, 2018, 08:30 ET) ( https://www.prnewswire.com/news-releases/juul-labs-presents-findings-at-the-global-forum-on-nicotine-2018-300666743.html.

[257] INREJUUL_00173252; INREJUUL_00278889

[258] *Id.*

[259] Jim McDonald, *10 Lies and Myths About Juuling Exposed*, Vaping 360 (May 9, 2018),

that JUUL was not as dangerous as smoking; JUUL did not cause cancer or "popcorn lung"; JUUL was not popular among teenagers, nor did it sell kid-friendly flavors or flavors aimed to entice young people; and the nicotine in JUUL is "a relatively mild drug, [and] may cause dependence."[260]

297.    Vaping360 regularly published articles praising, promoting, or downplaying the risks of JUUL, including, among others: "These Scientists Want to Kill Smokers' Hope (For Vaping)"; "UK Scientists to WHO: Your Vape Report Is Junk"; "One Free Pack JUUL Coupon Codes 2019"; and an article disparaging anti-smoking advocacy group Truth Initiative by claiming that "Truth Initiative Promo Encourages Risky Teen Behavior."[261]

298.    One of the main writers at Vaping360 is Jim McDonald who aggressively attacks any negative science as fake news. For example, McDonald frequently posts on social media platforms, including on Facebook and Twitter, but ALSO comments on others posts extensively disputing negative news about consuming e-cigarettes.[262]

299.    Vaping360 has taken funding from e-cigarette manufacturers, and in return coordinates with e-cigarette manufacturers to promote their products, while publishing favorable content. ████████████████████████████████████████████
████████████████████████████████████████████████████.

300.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████[263]

https://vaping360.com/lifestyle/juuling/
[260] Id.
[261] Jim McDonald, *Truth Initiative Promo Encourages Risky Teen Behavior*, Vaping 360 (Jan. 9, 2020), https://vaping360.com/vape-news/87705/truth-initiative-promo-encourages-risky-teen-behavior/
[262] Jim McDonald, *Mass. Senate Passes Worst Vaping Law in the Country*, Vaping 360 (Nov. 21, 2019), https://vaping360.com/vape-news/86852/mass-senate-passes-worst-vaping-law-in-the-country/; Jim McDonald, *Meet the Rich Moms Who Want to Ban Vaping,* Vaping 360 (Oct. 8, 2018), https://vaping360.com/vape-news/71696/meet-the-rich-moms-who-want-to-ban-vaping/
[263] INREJUUL_00143870.

301.

302.    In 2018, McDonald continued to write articles specifically praising JLI, such as "Coming Soon: A JUUL to Help You Quit JUULing" and "10 Lies and Myths About JUULing Exposed."[267] As of 2020, Vaping360 continues to offer discounts for JUUL products.[268]

### c.    Foundation for a Smoke-Free World

303.    The Foundation was founded in 2017, and presents itself as a public health organization, purportedly "advancing global progress in smoking cessation and harm reduction."[269] It is funded entirely by Philip Morris International, which in 2017 announced a $1 billion commitment to fund the Foundation.[270] The Foundation's 2018 Form 990 lists only one donor: PMI Global Services, Inc., or Philip Morris International, with a contribution of $80 million.[271]

304.    The Foundation is headed by Derek Yach, a noted advocate and promoter of e-cigarettes and consuming e-cigarettes.[272]

---

[264] *Id.*

[265] *Id.*

[266] INREJUUL_00139196.

[267] Jim McDonald, *Coming Soon: A JUUL to Help You Quit Juuling,* Vaping 360 (Sept. 7, 2018), https://vaping360.com/vape-news/70262/coming-soon-a-juul-to-help-you-quit-juuling/

[268] [One FREE Pack] JUUL Coupon Codes 2019, Vaping 360 (Aug. 24, 2018) https://vaping360.com/vape-coupons/juul-coupon-promo-code/.

[269] Home - Foundation for a Smoke-Free World, Foundation for a Smoke-Free World (2020), https://www.smokefreeworld.org/.

[270] David Meyer, *Philip Morris Pledges Almost $1 Billion to Anti-Smoking Fight* (2017), https://www.webcitation.org/6tjyBv4dA.

[271] Return of Private Foundation, (2018), https://web.archive.org/web/20190828104138/https://www.smokefreeworld.org/sites/default/files/uploads/documents/fsfw_2018_form_990-pf_public_inspection.pdf.

[272] David Yach, *Anti-smoking advocates should embrace e-cigarettes*, National Post (2015), https://nationalpost.com/opinion/derek-yach-anti-smoking-advocates-should-embrace-e-

305.    In 2018, the Foundation announced that it would support Centers of Excellence to conduct tobacco control research.[273] This tactic is a well-known tool of the cigarette industry, which has a history of funding "research" centers to promote industry-friendly views, such as the Center for Indoor Air Research, which promulgated industry-funded studies that sowed doubt about the addictiveness of nicotine, claimed that indoor air quality was unaffected by cigarette smoke and downplayed the harms of cigarettes broadly. Institutes such as the Center for Indoor Air Research were forced to dissolve as part of the Master Settlement Agreement in 1998.

306.    A 2017 report in *The Verge* detailed the e-cigarette industry's apparently coordinated efforts to use biased research to downplay the risks of consuming e-cigarettes.[274] For example, e-cigarette manufacturers routinely conduct studies focusing on the "good news" about e-cigarettes, *i.e.* they release less harmful aerosolized chemicals than combustible cigarettes, or that their aerosol lingers for less time indoors than combustible cigarettes.[275] Industry-funded authors then regularly cite to each other's studies in their own research.[276] On information and

---

cigarettes.

[273] Support Global Research, Foundation for a Smoke-Free World, Web.archive.org (2020), https://web.archive.org/web/20180531105105/https://www.smokefreeworld.org/our-areas-focus/support-global-research.

[274] Liza Gross, *Vaping companies are using the same old tricks as Big Tobacco The Verge* (2017), https://www.theverge.com/2017/11/16/16658358/vape-lobby-vaping-health-risks-nicotine-big-tobacco-marketing.

[275] *See, e.g.*, J Margham & K McAdam, *Chemical Composition of Aerosol from an E-Cigarette: A Quantitative Comparison with Cigarette Smoke*, PubMed NCBI Ncbi.nlm.nih.gov (2016), https://www.ncbi.nlm.nih.gov/pubmed/27641760.; Tanvir Walele, Jim Bush & Annelize Koch, *Evaluation of the safety profile of an electronic vapour product used for two years by smokers in a real-life setting*, PubMed NCBI Ncbi.nlm.nih.gov (2018), https://www.ncbi.nlm.nih.gov/pubmed/29248487; Dainius Martuzevicius, Tadas Prasauskas & Ari Setyan, *Characterization of the Spatial and Temporal Dispersion Differences Between Exhaled E-Cigarette Mist and Cigarette Smoke,* Fontemscience.com (2018), http://www.fontemscience.com/wp-content/uploads/2018/07/nty121.pdf.

[276] *See*, e.g., Gene Gillman, *Determining the impact of flavored e-liquids on aldehyde production during Vaping*, ScienceDirect (2019), https://www.sciencedirect.com/science/article/pii/S0273230020300143.; Colin Mendelsohn, *Legalising Vaping in Australia* (2019), https://pdfs.semanticscholar.org/3e13/8e46419913a29f8fc9ddad52ec771f73fa76.pdf.; Violeta Kaunelienė, *Impact of Using a Tobacco Heating System (THS) on Indoor Air Quality in a Nightclub*, Aaqr.org, http://www.aaqr.org/files/article/7967/1_AAQR-19-04-OA-0211_1961-1968.pdf; Maya Mitova, *Human chemical signature: Investigation on the influence of human presence and selected activities on concentrations of airborne con*stituents (2020),

belief, JLI and ALTRIA, among others in the e-cigarette industry, funnel their industry-funded studies to friendly pro-industry groups knowing that those entities will misrepresent the results as evidence that e-cigarettes are safe, or not harmful.

### d.    Vapor Technology Association

307.    The Vapor Technology Association (VTA) bills itself as a trade association and advocates for the e-cigarette industry. It was founded in January 2016, with the banner tagline on its website reading "VAPE IS HOPE."[277]

308.    In 2018, JLI, SMOK, VMR, Turning Point Brands, and Joyetech were all featured as "Platinum Members," a level of membership that required a $100,000 annual contribution. Thus, JLI paid VTA $100,000 in 2018 to become a Platinum Member, and in return, VTA offered JLI a board seat; invitations to lobbying strategy meetings; access to the FDA; other federal agencies; and members of Congress, and conference participation.[278]

309.    The VTA, like other lobbying and trade association groups in the industry, advocates for less regulation of e-cigarettes, and testifies in opposition to flavor bans.[279]

### e.    Retailer Lobbying

310.    Retailers have also taken to creating subsidiaries or wholly owned companies whose purpose is to produce quasi-journalistic content to promote consuming e-cigarettes, discredit health initiatives, and suggest that consuming e-cigarettes has no harmful health impacts. The best example of this is the website SoupWire, which publishes articles and editorials that promote consuming e-cigarettes and criticizes studies that look at negative impacts of consuming e-cigarettes.[280] For example, when JLI donated $7.5 million towards a study on the

---

https://www.sciencedirect.com/science/article/pii/S0269749119334268.
[277] Vape is Hope, Vapor Technology Association, Wayback Machine – Internet Archive (Feb. 25, 2016), https://web.archive.org/web/20160225154600/http://www.vaportechnology.org:80/
[278] Some of Our Members, Vapor Technology Association, Wayback Machine – Internet Archive (Nov. 28, 2018), https://web.archive.org/web/20181128162940/https://vaportechnology.org/membership/
[279] Vapor Technology Association, https://vaportechnology.org/ (last visited Mar. 4, 2020).
[280] Soupwire – *The Truth About Vaping*, https://soupwire.com/ (last visited Mar. 4, 2020).

impacts of consuming e-cigarettes on teens, a SoupWire report concluded that the study will likely find "nothing Earth-shattering."[281]

### 6) ALTRIA Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to Help JLI.

311. ALTRIAS' announcement that it intended to invest in JLI came less than two months after it told the FDA that ALTRIA "believe[s] that pod-based products significantly contribute to the rise in youth use of e-vapor products" and that it accordingly would be removing its own pod-based products from the market.[282] ALTRIA made the same representations to its investors.[283]

312. Although ALTRIA claimed its investment in JLI had an altruistic motive—"we believed the transaction would give ALTRIA an unprecedented opportunity to share our experience in underage tobacco prevention with JUUL to help address youth usage," ALTRIA recently confirmed that JLI has not even availed itself of that experience. In ALTRIAS' October 2019 letter to Senator Dick Durbin, ALTRIA CEO Howard Willard acknowledged that while ALTRIA "offered to JUUL services relating to underage prevention efforts," to date "JUUL has not accepted ALTRIA's offers of assistance in addressing underage vaping relating issues."[284] Willard has stated that the deal would allow ALTRIA to "work[] with JUUL to accelerate its mission."[285] but as ALTRIA knew, as reflected in its letter to the FDA just two months prior, that mission had resulted in usage throughout the youth market. ALTRIA'S admission that pod-based products contributed to underage use show that ALTRIA knew its investment in JLI would

---

[281] Jeff Hawkins, *JUUL Donates $7.5 Million to Teen Vaping Study*, Soupwire – The Truth About Vaping (July 2, 2019), https://soupwire.com/juul-donates-7-5-million-to-teen-vaping-study/

[282] Letter from Howard A. Willard III, ALTRIA, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018)

[283] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript, (October 25, 2018) https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx

[284] Letter from Howard A. Willard III to Senator Richard J. Durbin, (October 14, 2019) (emphasis added).

[285] *ALTRIA Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, Business*, Wire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/ALTRIA-12.8-Billion-Minority-Investment-JUUL-Accelerate.

"strengthen[] its financial profile and enhance[] future growth prospects" specifically because JLI dominated the youth market for e-cigarettes.[286]

313.    ALTRIA recognized JLI's market share dominance in the e-cigarette market as the path to ALTRIA's continued viability and profitability. In a January 31, 2019 earnings call, ALTRIA explained that "[w]hen you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders. We are excited about JUUL's domestic growth and international prospects and their potential impact on our investment."[287] JUUL's growth was, as ALTRIA well knew, due to the product's viral popularity among teens. Willard briefly acknowledged the youth vaping crisis, stating, "Briefly touching on the regulatory environment, the FDA and many others are concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue that we and others in the industry must continue to address aggressively and promptly.[288]

314.    ALTRIA's representations that it intended to help JUUL curb the prevalence of underage use was false and misleading. As discussed below, ALTRIA coordinated with JUUL to capture and maintain the youth market.

**E.    Defendants Targeted the Youth Market**

315.    Having created a product, like combustible cigarettes, that sought to get users addicted to nicotine, and while taking steps to ensure that consumers and regulators did not appreciate the true nicotine content or potential harm from using JUULs, to successfully sink their high-tech nicotine hook into American consumers, JLI, BOWEN, and MONSEES needed investors willing to adopt the tactics of the cigarette industry as their own. They found those investors in PRITZKER, HUH, and VALANI.

---

[286] Press Release, *Altria Makes $12.8 Billion Minority Investment In Juul To Accelerate Harm Reduction And Drive Growth*, Altria (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm.
[287] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018. (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx
[288] *Id.*

316.    Under the leadership of the MANAGEMENT DEFENDANTS, JLI marketed to nicotine to kids. JLI and the MANAGEMENT DEFENDANTS deployed a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages to ensure their uptake and distribution among young consumers. JLI and the MANAGEMENT DEFENDANTS' campaign was wildly successful—burying their hook into kids and initiating a public health crisis.

### 1)    JLI Emulated the Marketing of Cigarette Companies

317.    As DEFENDANTS knew, nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.[289] The overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation."[290]

318.    Struggling to define their own identities, teenagers are particularly vulnerable to image-heavy advertisements that psychologically cue them on the "right" way to look and behave amongst peers.[291] Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation.[292]

319.    For decades, cigarette companies spun smoking as signifier of adulthood. This turned smoking into a way for teenagers to project independence and enhance their image among their peers.[293]

320.    Youth marketing was critical to the success of cigarette companies. In the 1950s, PHILIP MORRIS—now JUUL's corporate affiliate—intentionally marketed cigarettes to young people as a pool from which to "replace smokers" to ensure the economic future of the cigarette industry.[294]

---

[289] *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet*, Surgeon Gen., https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth-tobacco-use-factsheet/index.html (last visited Dec. 9, 2019).
[290] *USA v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006) (J. Kessler).
[291] *Id.* at 578.
[292] *Id.* at 570, 590.
[293] *Id.* at 1072.
[294] *U.S. v. Philip Morris*, No. 99- 2496 (D.D.C. Aug. 17, 2006), ECF No. 5750 (Amended Final

321.   PHILIP MORRIS'S documents set out their youth strategy, explaining: "Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens".[295]

322.   It wasn't just PHILIP MORRIS. The strategy of hooking kids was an open secret in the cigarette industry.[296]

323.   As detailed below, JLI and the MANAGEMENT DEFENDANTS sought to emulate this approach. Indeed, MONSEES admitted to using historical cigarette ads to inform JLI's own advertising campaign.[297]

324.   The emulation is obvious. A side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.[298]

---

Opinion, at 972.

[295] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

[296] C.A. Tucker, *Marketing Plans Presentation to RJRI B of D* at 2, U.C.S.F. Truth Tobacco Industry Documents (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091. (RJ Reynolds executive explaining that the "young adult . . . market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years.").

[297] Matthew Perone and Richard Lardner, AP News, *Juul exec: Never intended electronic cigarette for teens* (July 26, 2019), https://apnews.com/4b615e5fc9a042498c619d674ed0dc33; Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees

[298] *See* Appendix A, Ads 9-50.





325.    JLI and the MANAGEMENT DEFENDANTS deployed this same strategy, but adapted it to modern advertising tactics.

> **2)    JLI and the MANAGEMENT DEFENDANTS Intentionally Marketed JUUL to Young People**

326.    The risk that children would use a new e-cigarette product was well-known and well-publicized in the months leading up to the launch of the JUUL e-cigarette. For example, in

April 2015, the CDC published the results from its 2014 National Youth Tobacco Survey.[299] The CDC found that "[i]n 2014, e-cigarettes were the most commonly used tobacco product among middle (3.9%) and high (13.4%) school students."[300] Moreover, "[b]etween 2011 and 2014, statistically significant increases were observed among these students for current use of both e-cigarettes and hookahs (p<0.05), while decreases were observed for current use of more traditional products, such as cigarettes and cigars, resulting in no change in overall tobacco use."[301] The CDC blamed e-cigarette marketing, the use of "a mixture of 'sex, free samples, [and] flavors' — the same things that were originally found to be problematic with cigarette ads."[302]

327.    Seeking to enter this nascent youth market for e-cigarettes, from its inception, JLI intentionally targeted youth. In March 2015, MANAGEMENT DEFENDANTS supervised the advertising campaigns that would accompany the launch of JUUL.

328.    Consistent with MONSEES' position that he has no "qualms" with marketing to people that were not yet addicted to nicotine,[303]

329.

[304]

[305]

---

[299]  Centers for Disease Control and Prevention, *Tobacco Use Among Middle and High School Students — United States, 2011–2014*, Morbidity and Mortality Weekly Report (MMWR) 64(14); 381-385 (April 17, 2015), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a3.htm.

[300] *Id.*

[301] *Id.*

[302] Jacob Kastrenakes, *More teens are vaping instead of smoking,* The Verge (Apr. 16, 2015), https://www.theverge.com/2015/4/16/8429639/teen-ecigarette-use-triples-vaping-beats-smoking

[303] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc.,.https://www.inc.com/magazine/201405/david-freedman/james-MONSEES-ploom-ecigarette-company-marketing-dilemma.html.

[304] INREJUUL_00441209.

[305] INREJUUL_00057298-INREJUUL_00057487.



[306] Put differently, their target consumer was an adolescent.

330.    JLI professedly wanted kids to think JUUL was cool.

[307]

[308]

[309] For example,

[310]

[311]

[312]

331.    This focus on                continued up to and after launch.

[313]

[314]

---

[306] INREJUUL_00057298-INREJUUL_00057487.
[307] INREJUUL_00057289.
[308] INREJUUL_00057293.
[309] INREJUUL_00057293.
[310] INREJUUL_00057293.
[311] INREJUUL_00057293.
[312] INREJUUL 00441325-INREJUUL_00441326.
[313] JLI00218598.
[314] JLI00206206.
[315] JLI00222528.

1   █████[316]██████████████[317]████████████████

2   ████████████████████████████████████████████

3   ████████████████████████████████████████████

4   █████[318]

5   332.   JLI identified ███████████████████████

6   ████████████████████████████████████████████

7   █████████████████████████████████[319]

8   333.   With this goal in mind, ████████████████

9   ████████████████████████████[320]████████████

10  ████████████████████████████████████████████

11  █████████[321]

12  334.   In short order, the phrase "it's cool to JUUL" became an anthem among kids while

13  youth e-cigarette use skyrocketed.

14           **3)   JLI Advertising Exploited Young People's Psychological**
                  **Vulnerabilities**

15

16  335.   Informed by decades of tobacco marketing, JLI ran a consistent, simple message:

17  JUUL is used by young, popular, attractive, and stylish people.

18  336.   This was not the only marketing scheme JLI could have adopted. JLI had other

19  options. In 2014, JLI engaged a Calgary-based advertising agency, Cult Collective Ltd. ("Cult"),

20  to complete a "diagnostic" evaluation of the JUUL brand and to make recommendations

21  regarding the best advertising strategy to market the JUUL e-cigarette.

22  337.   In keeping with typical e-cigarette marketing, which messaged to existing smokers

23  looking to quit, Cult recommended that JUUL position its e-cigarette technology as the focus of

24  its advertisements. Cult presented JUUL with exemplar advertisements that used images of a

25  [316] JLI00461564.
    [317] JLI00235965.

26  [318] JLI00514343 ███████████████████████████████ .

27  INREJUUL_00161703-INREJUUL_00161715
    [320] *Id.*

28  [321] INREJUUL_00277080-INREJUUL_00277104

boom box and a joy stick, juxtaposed against the JUUL e-cigarette, with the tag line: "Everything changes. JUUL the evoluultion of smoking."



338.   This campaign expressly invokes combustible cigarettes and positions the JUUL as a technological upgrade for the modern smoker.

339.   JLI rejected this approach.

340.   Instead, in June of 2015, JLI launched the "Vaporized" advertising campaign.[322] The express mission ████████████████████████████████████████████

[323]

341.   Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models, bold colors, and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool."[324]

342.   The targeting of young consumers was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teen than mature adults."[325]

---

[322] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.

[323] INREJUUL_00057291-INREJUUL_00057295.

[324] *See* Appendix A, Advertisement 1 (example of targeting of young people).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    343.   In the months leading up to the launch of JUUL e-cigarettes,

17    ████████████████████████████████████████████████ [326]

18    ████████████████████████████████████████████████

19    ████[327]████████████████████████████████████████

20    ████████████████████████████████████████████████

21    ████████████████████████████[328] The MANAGEMENT DEFENDANTS

22    knew that the ads targeted the young, but "Juul's board of directors signed off on the company's

23    launch plans[.]"[329] In addition, "MONSEES, who was CEO at the time, personally reviewed

[325] Jackler, *JUUL Advertising (2015-2018)* at 7.
[326] INREJUUL_00371285.
[327] INREJUUL_00371314.
[328] INREJUUL_00174387.
[329] Ainsley Harris, *How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?,* Fast Company (Nov. 19, 2018),

images from the billboard photo shoot while it was in session."[330] A senior manager later told the *New York Times* that "he and others in the company were well aware" that the marketing campaign "could appeal to" teenagers.[331]

344.    As part of the Vaporized campaign, JLI advertised on a 12-panel display over Times Square.[332] Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement.



345.    ████████████████████████████████████████████████████████████████████████████████[333]

346.    In fact, JLI's Vaporized campaign was so effective that it gained national attention on an October 15th, 2015 episode of Late Night with Stephen Colbert, who ridiculed the notion that the young, dancing models were consistent with a target market of adult smokers. As Colbert joked after viewing the close-up video of young models dancing in place, "[y]eah! There is

---

https://www.fastcompany.com/90262821/how-juul-founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018

[330] *Id.*

[331] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[332] *See* Appendix A, image 14; *see also* https://inrejuul.myportfolio.com (also available at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_ mt068.php) (last accessed January 25, 2019) (additional images and videos).

[333] INREJUUL_00093933-INREJUUL_00093934

something about vaping that just makes me want to dance in a way that doesn't require much lung strength. . . . And it's not just ads featuring hip young triangles that appeal to the youths. . . . There is no reason to worry about the long-term effects of vaping, because e-cigarettes are so new that their long-term effects are still unknown.[334]

347.    The Vaporized campaign was not limited to the Times Square billboards however. The ads were also placed in nationally-distributed magazines, and the videos were displayed on screens at the top of point-of-sale JUUL kiosks provided by JUUL to retailers across the country.

348.    To the extent that the Vaporized advertisements disclosed that JUUL contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, cigarette advertisements, are required to display a health warning in high contrast black and white, covering 20% of the image.

349.    Likewise, JLI's social media ads did not disclose any health risks of using JUUL until May of 2018, when they were required to warn of addiction. But even then, JUUL placed these warnings in areas that were only viewable if the social media user clicked on the "full version" of the JLI post, which is not how teens typically engage with social media advertising.[335] Notably, on Twitter, a social media platform that is geared towards reading text, and on Facebook, where some users do read text, JLI typically did not include the disclaimer in its advertisements at all.[336]

### 4)    JLI Pushed the Vaporized Campaign Into Youth Targeted Channels

#### a.    JLI Placed Its Vaporized Ads on Youth Oriented Websites and Media

350.    JLI engaged programmatic media buyers to place advertisements on websites attractive to children, adolescents in middle school and high school, and underage college students. These advertisements, which included the images of models from the Vaporized campaign, began appearing on websites as early as June 2015. The chosen websites included:

---

[334] https://www.youtube.com/watch?v=PMtGca_7leM
[335] *See* Appendix A, Advertisement 3.
[336] *See* Appendix A, Advertisement 65; *see also* Juul Image Galleries (2015-2018) SRITA Collection, https://inrejuul.myportfolio.com/twitter-1.

nickjr.com (the website for a children's television network run by Nickelodeon Group); the Cartoon Network's website at cartoonnetwork.com; allfreekidscrafts.com; hellokids.com; and kidsgameheroes.com.

351.   A picture of the homepage of nickjr.com is below:



352.   JLI also purchased banner advertisements on websites providing games targeted to younger girls,[337] educational websites for middle school and high school students,[338] and other teen-targeted websites.[339]

353.   JLI knew what it was doing. I ███████████████████████████



███[340] Nevertheless, JLI continued to push its campaign on websites with young demographics.

---

[337] The sites included dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlgames.com, and girlsgogames.com.

[338] *E.g.,* coolmath-games.com. JUUL also purchased advertisements on basic-mathematics.com, coolmath.com, math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, and purplemath.com.

[339] *E.g.,* teen.com, seventeen.com, justjaredjr.com, and hireteen.com. JUUL purchased advertisements on websites for high school students hoping to attend college such as collegeconfidential.com and collegeview.com.

[340] INREJUUL_00082179-INREJUUL_00082185

354.    JLI promoted the Vaporized campaign on Facebook, Instagram, and Twitter.

355.    JLI could have employed age-gating on its social media accounts to prevent underage consumers from viewing its Vaporized advertisements, but chose not to do so.

356.    The Vaporized campaign included the largest e-cigarette smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year.

357.    JLI promoted Vaporized through Vice Magazine, which bills itself as the "#1 youth media brand" in the world.[341]



358.    By 2016, an estimated 20.5 million U.S. middle and high school students were exposed to advertisements for e-cigarettes, including JUUL.[342]

**b.    JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience**

359.    JLI used ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████[343] Influencers are prized sources of brand promotion on social media networks.

---

[341] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9;

[342] Kristy Marynak et al., *Exposure to Electronic Cigarette Advertising Among Middle and High School Students – United States, 2014-2016*, CDC: Morbidty and Mortality Weekly Report (Mar. 16, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a3.htm.

[343] *See* INREJUUL_00091138 (██████████████████████████████████

360.   Like its Vaporized campaign, ████████████████████
████████████████████████████████████████████████████████
████████[344] In keeping with this strategy, JLI targeted influencers that were young and popular with adolescents. One influencer JLI targeted was Tavi Gevinson, who was nineteen years old in the summer of 2015. The year before, *Rolling Stone* magazine described Gevinson as "possibly the most influential 18-year-old in America."[345]

361.   JLI contracted with Grit to enlist influencers by sending them free JUUL e-cigarettes. Grit provided free JUULs to Luka Sabbat, known as the "the Internet's Coolest Teenager,"[346] who was 17 years old during the summer of 2015.

362.   ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████[347]

363.   JLI encouraged its distributors, wholesalers, and other resellers—either explicitly or implicitly— to hire affiliates and influencers to promote JLI's brand and products. Even if not paid directly by JLI, these Influencers profited from the promotion of JUUL products either because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-compatible products.

364.   For example, one YouTube user Donnysmokes (Donny Karle, age twenty-one) created a JUUL promotional video in 2017 that garnered roughly 52,000 views, many of which were from users under the age of eighteen.[348] Since that time, Karle has made a series of videos,

████████████████████████████████████████████████████████
████████████████████████████████████████████ .
INREJUUL_00057293
[345] Alex Morris, *Tavi Gevinson: A Power Teen's New Direction*, Rolling Stone (Aug. 14, 2014, 3:57 PM), https://www.rollingstone.com/culture/culture-features/tavi-gevinson-a-power-teens-new-direction-232286/.
[346] Alexis Barnett, *Who Is Luka Sabbat? Meet the Internet's Coolest Teenager*, Complex (Aug. 17, 2015), https://www.complex.com/style/luka-sabbat-interview-on-youth-kanye-west-and-fashion.
[347] *See*, INREJUUL_00091141 ████████████████████████████
████████████████████████████████████████████ ).
Robert K. Jackler, *The Role of the Company in the Juul Teen Epidemic*, Testimony for the

including one titled "How to HIDE & HIT Your JUUL at SCHOOL WITHOUT Getting CAUGHT."[349] Karle has admitted to earning approximately $1200 a month from unspecified sources simply from posting videos of himself consuming e-cigarettes, especially of JUUL products online.[350]

365.    At least one JLI sales representative sent DonnySmokes a private message thanking him for promoting JUUL products on social media. Similarly, JUUL repeatedly thanked and encouraged the owner of the @JUULnation Instagram account for his posting of youth-oriented JUUL content on Instagram.

366.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[351] JLI's affiliates promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter and routinely failed to disclose that they were being paid to promote JUUL products.

367.    As with much of the marketing strategy for JUUL, the practices described above are prohibited by the Master Settlement Agreement.

c.    **JLI Used Viral Marketing Techniques Known to Reach Young People**

368.    JLI deployed "viral marketing" techniques to great success. Viral marketing is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[352] Viral marketing effectively converts customers into salespeople, who, by sharing

---

House Subcommittee on Economic and Consumer Policy (Jul. 24, 2019), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf
[349] *Id.*
[350] Allie Conti, *This 21-year-old is Making Thousands a Month Vaping on YouTube* (Feb. 5, 2018 9:30 AM), https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month¬vaping-on-youtube .
[351] INREJUUL_00113437-INREJUUL_00113441
[352] N. Deepa et al., *Viral Marketing as an On-Line Marketing Medium*, IOSR J. of Bus. And Management 18, http://www.iosrjournals.org/iosr-jbm/papers/ncibppte-volume-2/1115.pdf; P. R. Datta, D. N. Chowdhury & B.R. Chakraborty, *Viral Marketing: New Form of Word-of-Mouth Through Internet*, 3 The Business Review 69 (2005).

their use of a product (on social media or otherwise), repeat a company's representations and endorse the product within their network. The success of viral marketing depends on peer-to-peer transmission. Hence, a successful viral marketing campaign looks like a series of unrelated, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaigns.

369.    Social media platforms are the most effective way to launch viral marketing campaigns among young people. As of May 2018, among teenagers, 95% reported use of a smart phone, 85% use YouTube, 72% use Instagram, and 45% reported being online "constantly."[353]

370.    A key feature of JLI's viral marketing campaign was inviting user-generated content. This strategy revolves around prompting social media followers to provide their own JUUL-related content—e.g. post a selfie in your favorite place to use JUUL. The response provided by a user is then typically distributed—by the social media platform employed—into the user's personal network. In this way, brands can infiltrate online communities with personalized content that promotes their product (e.g. a picture of a friend using a JUUL e-cigarette at the beach). Within a few months of the JLI's commercial release in June 2015, a former JLI executive reportedly told the *New York Times* that JLI "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[354]

371.    To drive consumer participation in its ad campaign, JLI peppered its advertising and social media posts with hashtags, including those referencing JLI and consuming e-cigarettes (e.g., #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc. ██████

████████████████████████████████████████████████████████

---

[353] Monica Anderson And Jingjing Jiang, *Teens, Social Media & Technology 2018: Appendix A: Detailed Tables* (May 31, 2018), https://www.pewresearch.org/internet/2018/05/31/teens-technology-appendix-a-detailed-tables/

[354] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

1

2 355

3



372.    JUUL users began taking photos of themselves using JUUL devices and putting them on social media with the hashtag #juul. They were creating JUUL content that looked and felt like real JUUL ads: featuring young people having fun and using JUUL. The flavor-based hashtag campaigns #MangoMonday and #coolmint generated hundreds of thousands of user-generated posts.

373.    JLI could have stepped in and attempted to stop the use of its trademark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL." It could have sought to shut down infringing accounts such as @doit4juul and @JUULgirls. It did not do so.

**5)    JLI Targeted Youth Retail Locations**

374.    Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to point of sale tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed.

---

355 INREJUUL_00093294

375.   For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales. JLI knows that nicotine naïve young people frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL increased the likelihood that these people would purchase its product.

376.   JLI marketed its products extensively in convenience stores, employing video and product displays with bright colors and young adults using and displaying the JUUL device. The retail marketing worked and by late-2017 JUUL became the most popular e-cigarette sold in convenience stores according to Nielsen data.[356]

377.   Like all in-store cigarette advertising, JLI's point of sale materials played a major role in driving youth addiction. JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the JUUL store locator and offering discounts. And JLI actively encouraged its retailers to leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

378.   Before its launch in 2015, JLI and Cult Collective developed packaging and in-store displays that looked similar to iPhone packaging, which JLI knew would resonate with young people and further JLI's campaign to be the "the iPhone of e-cigarettes."

379.   [357]

---

[356]Campaign for Tobacco-Free Kids, *JUUL and Youth: Rising E-Cigarette Popularity*, Kansas Department of Health and Environment (July 6, 2018), http://www.kdheks.gov/tobacco/download/Campaign_for_tobacco-free_kids_rising_popularity_of_e-cigarettes.pdf
[357] INREJUUL_00370796-INREJUUL_00370806.





### 6)   **JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Consumers Hooked**

380.   JLI also sponsored at least twenty-five live social events for its products in California, Florida, New York and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, or was addictive.[358] Instead, the invitations traded on PAX Lab, Inc.'s reputation as a manufacturer of marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties.[359] Photographs from these events indicate that they drew a youthful crowd. Product promotion through sponsored events was a long-standing practice for cigarette companies, but is now prohibited.





---

[358] *See* Appendix A, Advertisements 78-81.
[359] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21      381.    At these live social events, JLI gave attendees free JUUL "Starter Kits," which

22 contain a JUUL device and 4 JUUL pods of various flavors. JLI gave away samples at music

23 events without age restrictions, including Outside Lands in San Francisco's Golden Gate Park.

24      382.    Giving away free samples is prohibited conduct for a cigarette company under the

25 Master Settlement Agreement.

26
27
28

383.   JLI also held sampling events in stores. █████████████
████████████████████████████████████████████████████████████[360] Documents
obtained by the New York Attorney General show that JLI recruited young "brand ambassadors"
to staff these events and required a dress code that included skinny jeans, high-top sneakers or
booties, and an iPhone in a JUUL-branded case.[361]



384.   Though JLI publicly acknowledged in October 2017 that it is unlawful to
distribute free samples of its products at live events,[362] it continued to reach out to new users by
offering samples, sometimes at $1 "demo events." Like so many of JLI's initiatives, promotions
of this kind are prohibited for cigarette companies by the Master Settlement Agreement.[363]

---

[360] INREJUUL_00160394

[361] Jake Offenhartz, *Juul Hooked Teens Through Sick Parties and Hip Ambassadors, NY AG Says*, Gothamist (Nov. 19, 2019 2:02 PM), https://gothamist.com/news/juul-hooked-teens-through-sick-parties-and-hip-ambassadors-ny-ag-says; Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

[362] *See* Nik Davis (@bigbabynik), Twitter (Nov. 17, 2017 1:11 PM), https://twitter.com/JLIvapor/status/931630885887266816; Robert K. Jackler, The Role of the Company in the Juul Teen Epidemic, Testimony for the House Subcommittee on Economic and Consumer Policy (Jul. 24, 2019), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

[363] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf. at 6.

385.    The effect—and purpose—of JLI's Vaporized giveaways was to flood major cities with products that would hook thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JLI's message to their friends via word of mouth and social media.

386.    According to BeCore, one of the firms responsible for designing and implementing JLI's live events, JLI distributed the nicotine-equivalent of approximately 500,000 packs of cigarettes at all twenty-five events.[364] And this was just to get people started.

**7)    The MANAGEMENT DEFENDANTS' Direction And Participation In The Youth Marketing Schemes**

**a.    The MANAGEMENT DEFENDANTS, And In Particular BOWEN, MONSEES, PRITZKER, HUH, And VALANI, Oversaw The Youth Marketing Scheme**

387.    The MANAGEMENT DEFENDANTS were well aware that JUUL branding was oriented toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine.

[365]

After launch, executives and directors discussed whether to rein in the advertising to teenagers.

---

[364] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf. at 9

[365] Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, House of Representatives, 116th Cong. 70 (2019) (statement of JAMES MONSEES, CPO, JLI Labs).

[366] JLI00206239.



389.    But some company leaders, including HUH, opposed any actions to curb youth sales. Youth sales were a large potential source of revenue.[372] As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people had no problem with 500 percent year-over-year growth."[373] And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.[374]

---

[367] JLI00214617.
[368] *Id.*
[369] *Id.*
[370] *Id.*
[371] *Id.*
[372] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM GMT), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[373] *Id.*
[374] *Id.*

390.   In October 2015, JUUL leadership resolved the debate in favor of selling to teens. ███████████████████████████████████████████████████████████ ███████████████████ JLI pressed ahead with its youth-oriented Vaporized ad campaign through early 2016.[375]

391.   The company also implemented the Board's decision in October 2015 to target and sell to minors in many other ways. For example, ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ Pax Labs, Inc. modified the age verification system so that 92% of users were able to pass the age gate.[379] By changing the age verification process so that users were more likely to pass— ████████████████████████████████████████████ ███████████████████████████████████—Pax Labs, Inc. deliberately chose to continue selling to underage purchasers.

392.   In July 2015, Asseily suggested "a cheeky campaign that asks existing smokers to return their unused cigarette packets (or other vaping products) to us in return for a discount on JUUL" because that would "send the only message that's needed: JUUL is a superior alternative to conventional smoking and mediocre vaping products."[380] But JLI did not run this campaign then and in fact did not begin focusing its advertising on switching from combustible cigarettes until 2018.[381]

---

[375] The Vaporized advertising campaign continued at least into early 2016. Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 7.
[376] INREJUUL_00276445.
[377] Native attachment to INREJUUL_00078494.
[378] JLI00068428.
[379] Kate Horowitz's LinkedIn profile (Last visited March, 9, 2020), https://www.linkedin.com/in/k8horowitz
[380] JLI00214617.
[381] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*,

393.    By March 2016, however, JLI employees internally recognized that its efforts to market to children were too obvious. ████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████[382]████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████[383]█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████[385]██████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████[386] Around this time, Pax Labs, Inc. reoriented its JUUL advertising from the explicitly youth-oriented Vaporized campaign to a more subtle approach to appeal to the young. The advertising's key themes continued to include pleasure/relaxation, socialization/romance, and flavors[387]—all of which still appealed to teenagers.

394.    The MANAGEMENT DEFENDANTS continued to direct and approve misleading marketing campaigns long after launch. For example, JLI deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns and ads cross-promoting mango and mint. Through their positions on the JLI Board of Directors, the MANAGEMENT DEFENDANTS were directly responsible for this marketing, as they had "final say" over all of

---

Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 16.
[382] INREJUUL_00178377.
[383] INREJUUL_00061469.
[384] INREJUUL_00178379.
[385] INREJUUL_00178384.
[386] INREJUUL_00061274.
[387] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 9.

1   JLI's marketing activities.[388] In other words, JLI and the MANAGEMENT DEFENDANTS

2   controlled the messaging around JUUL products.

3        395.   Notably, none of JLI's early advertisements, including those of the "Vaporized"

4   campaign and others targeted to youths, disclosed that JUUL contains high amounts of nicotine;

5   indeed, those advertisements did not advertise JUUL's nicotine content whatsoever.

6        396.   Likewise, none of JLI's advertisements, including those of the "Vaporized"

7   campaign and others targeted to youths, disclosed the health risks from consuming JUUL

8   products.

9        397.   JLI and the MANAGEMENT DEFENDANTS knew of course that JUUL

10  contained an ultra-high concentration of nicotine, and that ultra-high concentration of nicotine

11  was designed to addict. They also knew that e-cigarette products, including JUUL, would expose

12  users to increased health risks, including risks to their lungs and cardiovascular system. Despite

13  that knowledge, JLI and the MANAGEMENT DEFENDANTS took affirmative actions, the

14  natural consequence of which was the approval and transmission of these false and misleading

15  advertisements that did not include a disclosure of JUUL's high nicotine content and

16  concentration, nor any health risks at all.

17        **b.    PRITZKER, HUH, And VALANI Were Able to Direct and
            Participate in the Youth Marketing Because They Seized
18          Control of the JLI Board of Directors**

19        398.   Although BOWEN and MONSEES were the visionaries behind JLI and the most

20  hands-on in its early stages, by the time JLI was pushing its marketing campaigns in early-to-mid-

21  2015, JLI (through the individuals running the company), BOWEN, MONSEES, PRITZKER,

22  HUH, and VALANI were each intimately involved in the planning and execution of activities.

23        399.   For example, ███████████████████████████

24  ████████████████████████████████████████████

25

26

_____

[388] Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the
27   Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform,
     House of Representatives, 116th Cong. 70 (2019) (statement of JAMES MONSEES, CPO, JLI
28   Labs).

1   ▮▮▮▮▮▮▮▮▮[389] A legitimate business enterprise would typically ramp up,

2   rather than shut down, press outreach at the very time the company is supposed to be building

3   awareness for its recently launched product.

4       400.    But the MANAGEMENT DEFENDANTS at this point were taking actions that

5   went beyond the regular and legitimate business operations of JLI. At the same time JLI stopped

6   traditional press engagement, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮.[390]

10      401.    And at the same time the MANAGEMENT DEFENDANTS had approved the

11  early JLI marketing campaigns that were intentionally targeting youth, the MANAGEMENT

12  DEFENDANTS were planning a fundamental shift in roles to allow PRITZKER, HUH, and

13  VALANI to take charge of the instrumentalities of JLI, including its employees and resources.

14      402.    Specifically, in October 2015, MONSEES stepped down from his role as Chief

15  Executive Officer of JLI (to become Chief Product Officer) and, in his stead, PRITZKER, HUH,

16  and VALANI formed an Executive Committee of the JLI Board of Directors that would take

17  charge of fraudulently marketing JUUL products, including to youth. The MANAGEMENT

18  DEFENDANTS, and in particular HUH, wanted to continue their fraudulent marketing, knowing

19  that these ads were also targeted to youth, "argu[ing] that the company couldn't be blamed for

20  youth nicotine addiction."[391]

21      403.    JLI's organizational charts later reflected the executive committee in the place of a

22  CEO. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[392]▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[393]

---

[389] INREJUUL_00056077.

[390] *Id.*

[391] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/

[392] *See* INREJUUL_00016456 (▮▮▮▮▮▮).

[393] INREJUUL_00278332 (▮▮▮▮▮▮▮▮); INREJUUL_00061420 (▮▮▮▮▮▮).



404.     Board minutes also illustrate the direct control of the company and all the critical decisions [redacted]

[redacted] [394] [redacted]

[redacted] [395] [redacted]

[redacted]

[redacted] ,"[396] Additionally, the Board [redacted] [397] As these minutes illustrate, [redacted] .

[394] *See* INREJUUL_00278406 *et seq.* ([redacted]); INREJUUL_00278410 *et seq.* (September 24, 2015).
[395] *See* INREJUUL_00278404 *et seq.* ([redacted]); INREJUUL_00278402 *et seq.* ([redacted]).
[3] INREJUUL_00278405 ([redacted]).
[397] *Id.*

405.   Similarly, ██████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████████"398

406.   Over the next year, until the installation of a new CEO in August 2016, Defendants PRITZKER, HUH, and VALANI used ████████████████████████████████ to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."399 ██████████████████████████████████
████████████████████████████████████400Despite any potential internal misgivings about their fraudulent conduct, notably, none of MANAGEMENT DEFENDANTS terminated their relationship with JLI during this time period.

**8)    JLI and the MANAGEMENT DEFENDANTS Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products**

**a.    JLI's Strategy Worked**

407.   The MANAGEMENT DEFENDANTS knew that the JUUL marketing campaigns they directed and approved were successful in targeting youth. As Reuters has reported, "the first signs that JUUL had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where they could buy more JUULs, along with the cartridge-like disposable 'pods' that contain the liquid nicotine."401 A former senior manager told the *New York Times* that "[s]ome people bought more JLI kits on the company's website than they could individually use—sometimes 10 or more devices." He added that "[f]irst, they just knew it was being bought for resale," but later "when

---

398 INREJUUL_00061856.
399 Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.
400 INREJUUL_00278359.
401 Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM GMT), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

they saw the social media, in fall and winter of 2015, they suspected it was teens."[402] BOWEN

admitted that "he was aware early on of the risks e-cigarettes posed to teenagers[.]"[403]

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████[404] It was common knowledge within JLI that JUULs were being sold to

children.

408.   After the Vaporized campaign, retail stores began selling out of JUUL products

and JLI had a difficult time trying to meet demand coming from its online ordering platform.

409.   Furthermore, it was obvious to those outside the company that JLI was selling

JUUL products to children. In June 2015, reporting on the "Vaporized" campaign that

accompanied the JUUL launch, AdAge reported that John Schachter, director of state

communications for Campaign for Tobacco-Free Kids, "expressed concern about the JUUL

campaign because of the youth of the men and women depicted in the campaign, especially when

adjoined with the design" and added that there had been "obvious trends that appeal to

adolescents in e-cigarette campaigns[.]"[405] Robert Jackler, a Stanford physician who investigated

JLI's launch campaign, concluded that "JLI's launch campaign was patently youth-oriented."[406]

JUUL's commercials' attempts to appeal to teenagers were so obvious that, by October 2015,

Stephen Colbert ran a satirical segment on it that noted, among other things: "And it's not just ads

---

[402] Matt Richtel and Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[403] *Id.*
[404] INREJUUL_00339938 (emphasis added).
[405] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.
[406] Erin Brodwin, *See how Juul turned teens into influencers and threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cig company,* Business Insider (Nov 26, 2018, 6:07 AM), https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11

featuring hip young triangles that appeal to the youths; so do vape flavors like cotton candy, gummi bear, and skittles."[407]

410.    Moreover, the MANAGEMENT DEFENDANTS knew that kids were marketing JLI products on social media, and some even sought to take advantage of that to build the JLI brand. For example, ███████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████[408]████████████████████████

████████████████████████████████████████████████[409]

### b.    JLI Closely Tracked Its Progress in Reaching Young Customers through Social Media and Online Marketing

411.    Tracking the behaviors and preferences of youth that are under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products. Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers.

412.    As early as 1953, PHILIP MORRIS was gathering survey data on the smoking habits of "a cross section of men and women 15 years of age and over."[410] Commenting on these data, George Weissman, then-Vice President of PHILIP MORRIS, observed that "we have our greatest strength in the 15-24 age group."[411]

413.    Traditional approaches to youth tracking (e.g., interviews conducted face-to-face or over the telephone) were limited, however, in that they often failed to capture data from certain subsets of the target market. As a PHILIP MORRIS employee noted in a June 12, 1970 memorandum, Marlboro smokers were "among the types of young people our survey misses of necessity (on campus college students, those in the military and those under 18 years of age)."[412]

---

[407]The Late Show with Stephen Colbert, YOUTUBE (Oct. 7, 2015),
https://www.youtube.com/watch?v=PMtGca_7leM. The "triangles" ad was a JUUL ad; the listed flavors were not, but JUUL also had flavors that appealed to children
[408] JLI00382271.
[409] JLI00382271.
[410] Philip Morris Vice President for Research and Development, Why One Smokes, First Draft, 1969, Autumn (Minnesota Trial)
[411] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 581 (D.D.C. 2006).
[412] *Id*. at 1007.

414.    However, modern technology has removed many of the hurdles that made youth tracking difficult in decades past. With e-mail, social media and online forums, JLI can track and JLI has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL products.

415.    Using the tools available to them, JLI would have known that its viral marketing program was a resounding success, and in particular with young people.

416.    Between 2015 and 2017, JUUL-related posts on Twitter increased quadratically, which is the exact result to be expected from an effective viral marketing campaign.[413] Its growth on Instagram was likely even more rapid.

417.    A 2018 study of JLI's sales and presence on social media platforms found that JLI grew nearly 700%, yet spent "no recorded money" in the first half of 2017 on major advertising channels, and spent only $20,000 on business-to-business advertising.[414] Despite JLI's apparently minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.[415]

418.    On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.[416]

419.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the authors to question whether JLI was paying for positive reviews and JUUL-related social media content.

---

[413] Brittany Emelle, et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.
[414] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, TOBACCO CONTROL (May 31, 2018), http://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-0543 82.
[415] *Id.*
[416] *Id.*

420.    The lead author of the study concluded that JLI was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.[417]

421.    A separate study of e-cigarette advertising on mobile devices, where young people spend most of their day consuming media, found that 74% of total advertising impressions were for JUUL products.[418]

422.    A 2019 study found that as much as half of JUUL's Twitter followers were aged thirteen to seventeen.[419]

423.    A 2019 study characterizing JUUL-related Instagram posts between March and May 2018 found that among nearly 15,000 relevant posts from over 5,000 unique Instagram accounts, more than half were related to youth or youth lifestyle.[420]

424.    Some Twitter users have reported what appear to be JUUL bots.[421] Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content.[422]

425.    By April 2018, searching "JUUL" on YouTube yielded 137,000 videos with forty-three videos having over 100,000 views.[423] Of these, a huge number were plainly related to

---

[417] Laura Kelley, *JUUL Sales Among Young People Fueled by Social Media, Says Study*, The Washington Times (June 4, 2018), https://www.washingtontimes.com/news/2018/jun/4/juul-sales¬among-young-people-fueled-by-social-media/

[418] Brittany Emelle, et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.

[419] Steven Reinberg, *Study: Half of Juul's Twitter followers are teens, young adults*, United Press International HealthDay News, (May 20, 219, 5:31 PM) https://www.upi.com/Health_News/2019/05/20/Study-Half-of-Juuls-Twitter-followers-are-teens-young-adults/1981558384957/

[420] Lauren Czaplicki et al*., Characterizing JUUL-related posts on Instagram*, (August 1, 2019), https://tobaccocontrol.bmj.com/content/early/2019/07/30/tobaccocontrol-2018-054824

[421] One example of what appear to be JUUL bots in action on Twitter is available at: https://twitter.com/search?q=juul%20bot&src=typd.

[422] Hennrythejuul (@hennrythejuul), Twitter, (March 4, 2020, 9:35 am) https://twitter.com/hennrythejuul.

[423] Divya Ramamurthi et al.,, *JUUL and Other Stealth Vaporizers: Hiding the Habit from Parents and Teachers, Tobacco Control 2019,* https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/6/610.full.pdf

1  underage use, including: 1,730 videos on "hiding JUUL in school," 789 on "JUUL in school

2  bathroom," 992 on "hiding JUUL at home," and 241 on "hiding JUUL in Sharpie."[424]

3      426.   In 2018, JLI was internally collecting hundreds of social media posts—directed at

4  JLI—informing them of their wild popularity with young people and in many cases requesting

5  that they do something to stop it.[425]

6          **9)**    **JLI Coordinates with Veratad Technologies To Expand Youth Access**
              **to JUUL Products**

7

8      427.   At the same time JLI and the MANAGEMENT DEFENDANTS were taking

9  coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in

10  order to ensure a steady and growing customer base through unlawful marketing and distribution

11  activities, they were coordinating with an outside entity – Veratad Technologies LLC – to get

12  JUULs into the hands of the largest number of consumers possible.

13      428.   JLI's website, including its online store, was pivotal to these efforts.



14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  ---

[424] *Id.*
[425] Complaint at 60, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019).

[REDACTED]

[REDACTED]

[REDACTED] [426]

429.   JLI coordinated with Veratad to provide age verification services for its website from 2015 to 2018. Veratad has also provided age verification services to other e-cigarette sellers, including Lorillard[427] [REDACTED] [428] Consistent with the claim on Veratad's website that "*You can create your own verification rules,*" the company encouraged sellers like JLI to set the desired compliance level for age verification. As a member of a major e-cigarette trade organization, Veratad also offered insight into what competitors were doing, and offered to "guide your setup to follow industry best practices for age verification."

430.   Though it is illegal to sell and ship e-cigarettes to minors under both state and federal law, JLI and Veratad designed and implemented an age verification system designed to maximize the number of prospective purchasers who "pass" the process rather than to minimize the number of underage sales.[429] As a result of these intentionally permissive age verification practices, JLI and Veratad used online payment systems and the mails to ship tens of millions of dollars of JUUL pods to unverified customers, many of whom were minors.

431.   From June 2015 through the end of 2018, the age verification process on JLI's website typically prompted prospective purchasers to submit their name, address, and date of birth, which JLI forwarded to Veratad. Veratad then attempted to match all or some limited part of the consumer's information to a person of the minimum legal sales age in its database. If Veratad was able to locate a sufficient match of the prospective purchaser to a person of the minimum legal sales age in its database, then it would return a "pass" result to JLI. If Veratad was unable to make such a match, Veratad returned a "fail" result to JLI.

---

[426] INREJUUL_00329660
[427] Sen. Richard Durbin, et al., *Gateway to Addiction?* (April 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf
[428] INREJUUL_00174362.
[429] Complaint at 165, People v. JUUL, et al. CRT REPORTER, (Super. Ct. of Cal. 2019)

432.   If Veratad returned a "fail" result to JLI, rather than decline the prospective purchaser, JLI would prompt the person to enter an "alternate" address. If Veratad still could not find a match based on this alternate address, JLI would prompt the consumer to enter the last four digits of his or her social security number.

433.   If Veratad, supplied with the last four digits of a consumer's social security number, still could not match the consumer to a person of the minimum legal sales age in its database, JLI would prompt the consumer to upload an image or photograph of his or her driver's license or another governmental identification document. A JLI employee would then conduct a personal review of the image and decide whether the consumer was of the minimum legal sales age.

434.   Crucially, Veratad's age verification system was purposefully flexible, so JLI and Veratad could work together to decide just how closely a prospective purchaser's personal information had to match records in Veratad's database in order to "pass" the age verification process. JLI and Veratad could also set, or modify, the applicable minimum legal sales age to be used for verification.

435.   By the fall of 2015, JLI and Veratad knew that bulk purchases were being made for resale on JLI's website by minors and for resale to minors.[430] Nevertheless, ██████████ ████████████████████████████████████████████████████ [431] JLI repeatedly sought, and Veratad repeatedly recommended and directed, changes to the age verification process so that more prospective JUUL purchasers would "pass." Both did so in an effort to increase direct sales of JLI's e-cigarettes without regard to whether its less stringent age verification process would permit more underage consumers to purchase them.

436.   Between June 2015 and August 2017 (and perhaps even through early 2018), JLI and Veratad tailored the age verification system to "pass" prospective purchasers even if certain

---

[430] Matt Richtel and Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html
[431] INREJUUL_00276489-INREJUUL_00276490.

portions of the purchaser's personal information – e.g., the purchaser's street address or date of birth – did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.[432]

437.   Similarly, between June 2015 and August 2017, JLI and Veratad tailored the system to "pass" a prospective purchaser under certain circumstances even when the prospective purchaser's year of birth did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.

438.   JLI and Veratad sought to increase "pass" rates by modifying the age verification system to allow users multiple opportunities to change their personal information if a match was not initially found in an appropriate government database. A Veratad Performance Report from August 5, 2017 shows that, for 1,963 consumers Veratad recorded 3,794 transactions – an average of 1.93 attempts per consumer.[433] Only 966 consumers – less than half – passed age verification on the first attempt.[434] By allowing consumers to alter their personal information and attempt age verification up to three times, JLI was able to increase its database match pass rate from 49.2% to 61.2%.[435]

439.

---

[432] A January 29, 2018 e-mail exchange between Tom Canfarotta, Director of Strategic Accounts & Client Quality Services at Veratad, and Annie Kennedy, JUUL's Compliance Manager, reveals this to have been the case. Kennedy asked Canfarotta why a particular customer had "passed via the address step (public record check)…but we've since learned that is not a correct address—so we're curious as to how it passed." In response, Canfarotta wrote, "Your current rule set does not require a full address match." He went on to explain that approval of the customer was not an anomaly or a mistake; instead, Veratad's age verification system was working exactly the way it was designed.

[433] Id.

[434] Id.

[435] Id.

1 

2 [436]

3 

4 

5 

6      441.

7 [437] Customer

8 service representatives would go so far as to alter identifying information for them; a Slack chat

9 among customer service representatives confirmed that representatives were authorized to "adjust

10 the street address, apartment number, or zip code" associated with shipment.[438]

11      442.   The age verification procedures designed by JLI and Veratad have allowed

12 hundreds of thousands of e-cigarette products to be sold and/or delivered to fictitious individuals

13 at fictitious addresses.[439] Many of these improper sales may have been made to underage

14 purchasers or to resellers who sold the products to underage consumers on the grey market.[440]

15      443.   By divorcing the address from the other customer data in the age verification

16 process, JLI and Veratad allowed consumers to request that tobacco products be sent to locations

17 other than their permanent legal residences.[441] For example, JUUL sent thousands of orders to

18 commercial high rises and office parks.[442] It is unlikely these orders would have been approved

19 had JUUL and Veratad required that addresses provided by users match information in an

20 appropriate government database and followed the requirement that the shipping address and

21 billing address be the same.[443]

22

23

24

25 [436] INREJUUL_00184119.

   [437] INREJUUL_00215324-INREJUUL_00215325.

26 [438] Complaint at 169, *People v. JUUL, et al.* CRT REPORTER, (Super. Ct. of Cal. 2019).

   [439] Complaint at 138, *People v. JUUL, et al.* CRT REPORTER, (Super. Ct. of Cal. 2019).

27 [440] *Id.*

   [441] Complaint at 146, *People v. JUUL, et al.* CRT REPORTER, (Super. Ct. of Cal. 2019).

28 [442] Complaint at 147, *People v. JUUL, et al.* CRT REPORTER, (Super. Ct. of Cal. 2019).

   [443] *Id.*

444.    The failure of the JLI/Veratad age verification procedure was intentional.[444] And despite JLI and Veratad's concerted effort to enable the sale of federally regulated tobacco products to minors, ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████[445]███████

███████████████████████████████████████████[446]

███    In August 2017, JLI responded to public scrutiny by publicly stating that it would increase the purchase age on its website to 21+ by August 23, 2017. ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

446.    Further underscoring their common purpose of growing the e-cigarette market, even if that meant selling to youth, JLI and Veratad did not require that the year of birth and last four digits of the social security number match exactly the information corresponding to a person of the minimum legal sales age in Veratad's database until August 2018.

447.    ████████████████████████████████████████████

███████████████████████████████████████████████████

448.    Not only did JLI and Veratad's efforts result in more sales to minors, it also allowed JLI to build a marketing e-mail list that included minors—a data set that would prove highly valuable to ALTRIA.

449.    In the summer of 2017, JLI engaged a company called Tower Data to determine the ages of the persons associated with e-mail addresses on its e-mail marketing list. According to this analysis, approximately 269,000 e-mail addresses on JLI's e-mail marketing list were not

---

[444] Complaint at 173, *People v. JUUL, et al.* CRT REPORTER, (Super. Ct. of Cal. 2019)
[445] INREJUUL00178123-24.
[446] INREJUUL_00264882-84.

1   associated with a record of an individual who had "passed" JLI's age verification process.[447]

2   Additionally, approximately 40,000 e-mail addresses on JLI's e-mail marketing list were

3   associated with records of individuals who had "failed" JLI's own age verification process.[448]

4   Tower Data informed JLI that 83% of the approximately 420,000 e-mail addresses on JLI's

5   marketing list could not be matched with the record of an individual at least eighteen years of

6   age.[449]

7       450.    Despite knowing that their marketing list included minors, JLI continued to use

8   that marketing list to sell JUUL products, and then shared that list with ALTRIA to use for its

9   marketing purposes.

10      451.    JLI and the MANAGEMENT DEFENDANTS knew, however, that it was not

11  enough to disseminate advertisements and marketing materials that promote JLI to youth or to

12  open online sales to youth, while omitting mention of JUUL's nicotine content and manipulated

13  potency. To truly expand the nicotine market, they needed to deceive those purchasing a JUUL

14  device and JUULpods as to how much nicotine they were actually consuming. And, through

15  PRITZKER, HUH, and VALANI's control of JLI's Board of Directors, they did just that.

16      **10)    JLI Engaged in a Sham "Youth Prevention" Campaign**

17      452.    By April 2017, JLI had determined that the publicity around its marketing to

18  children was a problem. ████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ███████████████████████████[450]███████████████████████████████

21  ███████████[451] While ostensibly aimed at reducing youth sales, JLI's youth prevention program

22  actually served to increase, not reduce, sales to children.

---

23  [447] Complaint at 121, Commonwealth of Massachusetts v. JUUL, et al., No. 20-00402 (Filed

24  Super. Ct. of Mass. February 12, 2020) https://www.mass.gov/doc/juul-complaint/download;
    Janice Tan logo, *E-cigarette firm JUUL sued for using programmatic buying to target*

25  *adolescents* (Feb. 14, 2020), https://www.marketing-interactive.com/e-cigarette-firm-juul-sued-
    for-using-programmatic-buying-to-target-adolescents

26  [448] *Id.*

27  [449] *Id.*
    [450] INREJUUL_00264878; *see also* INREJUUL_00265042 (████████████████████

28  ████████████████████).
        *See, e.g.,* INREJUUL_00211242.

453.　█████████████████████████████████

██████[452] JLI paid schools for access to their students during school time, in summer school, and during a Saturday School Program that was billed as "an alternative to 'traditional discipline' for children caught using e-cigarettes in school."[453] JLI created the curriculum for these programs, and, like the "Think Don't Smoke" campaign by PHILIP MORRIS, which "insidiously encourage[d] kids to use tobacco and become addicted Philip Morris customers[,]"[454] JLI's programs were shams intended to encourage youth vaping, not curb it. According to testimony before Congress, during at least one presentation, "[n]o parents or teachers were in the room, and JUUL's messaging was that the product was 'totally safe.' The presenter even demonstrated to the kids how to use a JUUL."[455] Furthermore, JLI "provided the children snacks" and "collect[ed] student information from the sessions."[456]

454.　The problems with JLI's youth prevention programs were widespread. According to outside analyses, "the JUUL Curriculum is not portraying the harmful details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use."[457] Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL products as among the potentially harmful products to avoid.[458] As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs]

---

[452] INREJUUL_00173409.

[453] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf

[454] William V. Corr, *American Legacy Foundation Study Shows Philip Morris 'Think Don't Smoke' Youth Anti-Smoking Campaign is a Sham*, Campaign for Tobacco Free Kids (May 29, 2002), https://www.tobaccofreekids.org/press-releases/id_0499

[455] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf

[456] *Id.*

[457] Victoria Albert, *Juul Prevention Program Didn't School Kids on Dangers, Expert Says: SMOKE AND MIRRORS. JUUL—which made up 68 percent of the e-cigarette market as of mid-June—seems to have taken a page from the playbook of Big Tobacco*, The Daily Beast (Oct. 19, 2018), https://www.thedailybeast.com/juul-prevention-program-didnt-school-kids-on-dangers-expert-says

[458] *Id.*

1  to be a vaping device, but they don't call it that. So when you say to a young person, 'Vapes or e-

2  cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"[459]

3      455.  ███████████████████████████████████████████████

4  █████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████

6  ██████ ██████████████████████████████████████████████

7  █████████████████████████████████████████████████████

8  █████████████████████████████████████████████████████

9  ███████████████████████████████████[460]█████████████

10 ██████████████████████████[461]██████████████████████

11 █████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████

13 █████████████[462]███████████████████████████████████

14 ████████████████████████████████████████[463] The paper

15 concluded that "the Philip Morris campaign had a counterproductive influence."[464]

16     456.  JLI also bought access to teenagers at programs outside of school. For example,

17 █████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████

19 █████████████████████████████████████████████████████

20 █████████████████████████████████████████████████████

21 █████████████████████[465] Similarly, ████████████████

22 ███████████████████████████████████[466]█████████████

23 _____

24 [459] *Id.*
   [460] INREJUUL_00197608.

25 [461] INREJUUL_00197607.
   [462] INREJUUL_00196624.

26 [463] INREJUUL_00265202.
   [464] Matthew C. Farrelly, et al., *Getting to the Truth: Evaluating National Tobacco Counter*

27 *marketing Campaigns*, Am. J. Public Health 92(6): 901–907 (June, 2002),
   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1447480/

28 [465] JLI-HOR-00002181 – 00002182.
   [466] INREJUUL_00194247; Invoice to JUUL Labs from The Freedom & Democracy Schools,

[REDACTED][467][REDACTED] JLI paid nearly 70% of the cost of hiring eight teachers, eight instructional aides, and three other support personnel for the program.[468]

457. [REDACTED]

[REDACTED]

[REDACTED][470] Eventually, JLI ended this version of the youth prevention program, but the damage had been done: following the playbook of the tobacco industry, JLI had hooked more kids on nicotine.

458. The Board was intimately involved in these "youth prevention" activities. For example, [REDACTED]

[REDACTED]

[REDACTED][471]

**11)** <u>**The FDA Warned JUUL and Others That Their Conduct is Unlawful**</u>

459. Throughout 2018, the FDA put JLI and others in the e-cigarette industry on notice that their practices of marketing to minors needed to stop. It issued a series of *Warnings Letters* and enforcement actions:

460. On February 24, 2018, the FDA sent a letter to JLI expressing concern about the popularity of its products among youth and demanding that JLI produce documents regarding its marketing practices.[472]

---

Inc. for $134,000 dated June 21, 2018,
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00003711.pdf
[467] INREJUUL_0019428.
[468] *The Freedom & Democracy Schools, Inc. Proposal to JUUL Labs for Funding the Healthy Life Adventures Summer Pilot* (June 9, 2018),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00002789_Redacted.pdf
[469] INREJUUL_00194646.
[470] INREJUUL_00194646.
[471] JLI00151300.
[472] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Apr. 24, 2018),
https://www.fda.gov/media/112339/download.

461.    In April 2018, the FDA conducted an undercover enforcement effort, which resulted in fifty-six warning letters issued to online retailers, and six civil money complaints to retail establishments, all of which were related to the illegal sale of e-cigarettes to minors.[473] Manufacturers such as JLI were also sent letters requesting documents regarding their marketing and sales methods.[474]

462.    In May 2018, the FDA again issued more warning letters to manufacturers, distributors, and retailers of e-liquids for labeling and advertising violations; these labels and advertisements targeted children and resembled children's food items such as candy or cookies.[475]

463.    In September 2018, the FDA engaged in several other regulatory enforcement actions, issuing over 1300 warning letters and civil money complaints to e-cigarette and e-liquid retailers and distributors.[476]

464.    On September 12, 2018, the FDA sent letters to JLI and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[477] The FDA additionally requested manufacturers to enhance their compliance monitoring mechanisms, implement stricter age verification methods, and limit quantities and volume of e-cigarette products that could be purchased at a time.[478]

465.    Finally, in October 2018, the FDA raided JLI's headquarters and seized more than a thousand documents relating to JLI's sales and marketing practices.[479] Since then, the FDA, the

---

[473] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. Food & Drug Admin. (Jan. 2020), https://www.fda.gov/media/133880/download

[474] *Id.*

[475] *Id.*

[476] *Id.*

[477] *Letter from US FDA to Kevin Burns*, U.S. Food & Drug Admin. (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[478] Press Release, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access: Warning letters and civil money penalty complaints to retailers are largest coordinated enforcement effort in agency history; FDA requests manufacturers provide plan for mitigating youth sales within 60 days; warns it may restrict flavored e-cigarettes to*, US Food & Drug Administration (Sept. 11, 2018), https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more

[479] Laurie McGinley, *FDA Seizes Juul E-Cigarette Documents in Surprise Inspection of*

Federal Trade Commission, multiple state attorneys general and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into JLI's role in the youth vaping epidemic and whether JLI's marketing practices purposefully targeted youth.

466.    Siddharth Breja, who was senior vice president for global finance at Juul Labs, "claims that after the F.D.A. raided Juul headquarters in October 2018, seeking internal documents, Mr. Burns instructed Mr. Breja and other executives not to put anything relating to regulatory or safety issues in writing, so that the F.D.A. could not get them in the future."[480]

### 12)    In Response to Regulatory Scrutiny, Defendants Misled the Public, Regulators, and Congress that JLI Did Not Target Youth

467.    To shield their youth-driven success from scrutiny, ALTRIA, JLI, and the MANAGEMENT DEFENDANTS' had a long-running strategy to feign ignorance over JLI and the MANAGEMENT DEFENDANTS' youth marketing efforts and youth access to JLI's products. They were well aware that JLI's conduct in targeting underage users was reprehensible and unlawful, and that if it became widely known that this was how JLI obtained its massive market share, there would be public outcry and calls for stricter regulation or a ban on JLI's products. Given the increasing public and regulatory scrutiny of JLI's market share and marketing tactics, a dis-information campaign was urgently needed to protect the Defendants' bottom line. For this reason, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA hid JLI's conduct by vociferously denying that JLI had marketed to and targeted youth and instead claiming to engage in youth prevention. Defendants continued to make these statements while and after actively and successfully trying to market to and recruit youth non-smokers. These false statements were designed to protect JLI's market share, and ALTRIAS' investment, by concealing JLI's misconduct.

---

*Headquarters*, Wash. Post (Oct. 2, 2018),
https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documentssurprise-inspection-headquarters/.
[480] Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html

468.    For example, after 11 Senators sent a letter to JUUL questioning its marketing approach and kid-friendly e-cigarette flavors like fruit medley, creme brulee and mango, JLI visited Capitol Hill and told senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Sen. Dick Durbin (D-Ill.). JLI's statements to Congress—which parallel similar protests of innocence by tobacco company executives—were false.

469.    JLI also engaged in wire fraud when it made public statements seeking to disavow the notion that it had targeted and sought to addict teens:

470.    "It's a really, really important issue. **We don't want kids using our products**." (CNBC Interview of JLI's Chief Administrative Officer, December 14, 2017);[481]

471.    "We market our products responsibly, following strict guidelines to have material directly **exclusively toward adult smokers and never to youth audiences**." (JLI Social Media Post, March 14, 2018);[482]

472.    "Of course, we understand that **parents and lawmakers are concerned about underage use of JUUL. As are we**. We can't restate this enough. As an independent company that is not big tobacco, we are driven by our mission and commitment to adult smokers." (JLI CEO Kevin Burns Letter to JUUL Community on Reddit, July 18, 2018);[483]

473.    "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on

---

[481] Angelica LaVito, *Nearly one-quarter of teens are using pot*, CNBC (Dec. 14, 2017), https://www.cnbc.com/2017/12/13/marijuana-and-nicotine-vaping-popular-among-teens-according-to-study.html (Interview with Ashely Gould, JUUL Chief Administrative Officer).

[482] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (citing a JUUL social media post from March 14, 2018).

[483] *A Letter to the JUUL Community from CEO Kevin Burns* (July 18, 2018), Reddit, https://www.reddit.com/r/juul/comments/8zvlbh/a_letter_to_the_juul_community_from_ceo_kevin/

nicotine. . . . **Our intent was never to have youth use JUUL products**." (JLI Website, November 12, 2018);[484]

474.     "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);[485]

475.     "First of all, I'd tell them that I'm sorry that their child's using the product. **It's not intended for them**. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." (CNBC Interview of JLI CEO, July 13, 2019);[486]

476.     "We have **no higher priority than to prevent youth usage of our products** which is why we have taken aggressive, industry leading actions to combat youth usage." (JLI Website, August 29, 2019);[487]

477.     JAMES MONSEES, one of the company's co-founders, said **selling JUUL products to youth was "antithetical to the company's mission."** (JAMES MONSEES' Statement to New York Times, August 27, 2019);[488]

478.     "**We have never marketed to youth and we never will**." (JLI Statement to Los Angeles Times, September 24, 2019);[489] and,

---

[484] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of Ken Burns, former CEO of JUUL).

[485] Juul Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of then-CEO Kevin Burns)

[486] Angelica LaVito, *As JLI grapples with teen vaping 'epidemic,' CEO tells parent 'I'm sorry'*, CNBC (July 13, 2019), https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html.

[487] *Our Actions to Combat Underage Use*, JUUL Labs, Inc. (Aug. 29, 2019), https://newsroom.juul.com/ouractions-to-combat-underage-use/ (JUUL statement in response to lawsuits).

[488] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[489] Michael Hiltzik, *Column: Studies show how JLI exploited social media to get teens to start vaping*, L.A. Times (Sept. 24, 2019), https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens (statement made on behalf of JUUL).

479.   "As scientists, product designers and engineers, we believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. **Our goal is to maximize the positive and reduce the negative.**" (JLI Website, March 6, 2020).[490]

480.   As the JLI Board of Directors had "final say" over all of JLI's marketing efforts, these statements regarding JLI's marketing efforts can be imputed to the MANAGEMENT DEFENDANTS, who were therefore directly responsible for the messaging over the marketing of JUUL products.

481.   However, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA realized that attempting to shift public opinion through fraudulent statements was not enough to achieve their goal of staving off regulation. To accomplish this goal, they would also need to deceive the FDA and Congress. And so they set out to do just that through statements and testimony by JLI representatives. These include, but are not limited to, the following:

**Statements by JLI to the FDA:**

482.   "JUUL was not designed for youth, **nor has any marketing or research effort since the product's inception been targeted to youth.**" (Letter to FDA, June 15, 2018).[491]

483.   "With this response, the Company hopes FDA comes to appreciate why the product was developed and **how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers.**" (Letter to FDA, June 15, 2018).[492]

**Statements by ALTRIA to the FDA:**

484.   "**[W]e do not believe we have a current issue with youth access** to or use of our pod-based products, we do not want to risk contributing to the issue." (Letter from ALTRIA CEO to FDA Commissioner Scott Gottlieb, October 25, 2018).[493]

---

[490] *Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values (last visited March 6, 2020).

[491] Letter from JUUL's Counsel at Sidley Austin to Dr. Matthew Holman, FDA at 2 (June 15, 2018).

[492] *Id.* at 3.

[493] Letter from ALTRIA CEO Howard Willard to Dr. Scott Gottlieb, FDA at 2 (October 25, 2018).

485.    "We believe e-vapor products present an important opportunity to **adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18)

***Statements by JLI to Congress:***

486.    "**We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products**. . . .That is a serious problem. Our company has no higher priority than combatting underage use." (Testimony of JAMES MONSEES, July 25, 2019).[494]

487.    "Our product is **intended to help smokers stop smoking combustible cigarettes**." (Ashley Gould, JLI Chief Administrative Officer, Testimony before House Committee on Oversight and Reform, July 25, 2019).[495]

488.

***Statements by ALTRIA to Congress:***

489.    "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and **had quickly become a very compelling product among adult vapers**. We decided to pursue an economic interest in JUUL, believing that an investment would **significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products** and strengthen our competitive position with regards to potentially reduced risk products." (Letter from ALTRIA CEO to Senator Durbin, October 14, 2019).[496]

490.    Each of the foregoing statements constitutes an act of wire fraud. JLI, MONSEES, and ALTRIA made these statements, knowing they would be transmitted via wire, with the intent to deceive the public, the FDA, and Congress as to the DEFENDANTS' true intentions of hooking underage users.

---

[494] Examining JUUL's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the House Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy at 1 (July 25, 2019), https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-MONSEESJ-20190725.pdf (testimony of JUUL Founder JAMES MONSEES).
[495] Ashley Gould, *Testimony of Ashley Gould: Hearing on E-Cigarettes and Teen Usage, Day 2* at 01:53:25, U.S. House Committee on Oversight & Reform (July 25, 2019), https://www.c-span.org/video/?462992-1/hearing-cigarettes-teen-usage-day-2&start=6431.
[496] ALTRIA'S October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

491.    Their disinformation scheme was successful. While certain groups such as the American Medical Association were calling for a "sweeping ban on vaping products,"[497] no such ban has been implemented to date. Accordingly, JLI's highly addictive products remain on the market and available to underage users.

**F.    JLI Partnered with Veteran Cigarette Industry Distributors and Retailers to Spread and Amplify their Deceptive Messages and Place JUUL Products within Reach of Millions of Customers, Including Kids and Non-Smokers.**

492.    Through the false and deceptive viral marketing campaign, described above, JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS had built a successful product, largely on the back of improperly marketing to youth and by creating a false impression that that JUUL products were "safer" than cigarettes.

493.    After achieving early success, JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS knew that to take its profits to the next level and dramatically expand the market for JUUL products, it needed to access a broader distribution channel, namely marketing and selling its products in the thousands of chain convenience stores throughout the United States. Indeed, a single contract to market and sell through a convenience store chain could result in JUUL being sold in thousands of stores to millions of customers.

494.    Not only had JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS emulated the cigarette industry in its marketing, but they also sought to recreate the cigarette industry's distribution machine to push that marketing to a far wider swath of consumers than JLI itself could reach. That distribution machine included the major retail convenience stores ("Chain Convenience Stores"). It also included the cigarette industry distributors who had been the powerful middlemen between the cigarette industry and the Chain Convenience Stores in the cigarette market for decades.

495.    While the cigarette industry distributors largely operated behind the scenes of cigarette manufacturing giants like PHILLIP MORRIS (ALTRIA) and R.J. Reynolds, they too are

---

[497] Karen Zraick, *A.M.A. Urges Ban on Vaping Products as JLI is Sued by More States*, N.Y. Times (Nov. 19, 2019), https://www.nytimes.com/2019/11/19/health/juul-lawsuit-ny-california.html.

1   giants in the cigarette industry who have played a significant role in the decades of massive

2   cigarette sales in America.

3         496.   For example, the cigarette industry Distributors Defendant MCLANE is a wholly

4   owned subsidiary of Berkshire Hathaway[498] with an annual revenue of approximately $50

5   billion.[499]  MCLANE provides wholesale distribution services in all 50 states to customers that

6   include convenience stores, discount retailers, wholesale clubs, drug stores, military bases, quick

7   service restaurants and casual dining restaurants. MCLANE maintains a dominant market share

8   within the convenience store industry and serves most of the national convenience store chains,

9   providing products to approximately 50,000 retail locations nationwide.[500] MCLANE has served

10  as one of the largest tobacco distributors in the United States for the cigarette industry giants such

11  as ALTRIA and R.J. Reynolds.[501, 502] MCLANE is the largest wholesale distributor for ALTRIA,

12  accounting for approximately 27%, 26% and 25% of ALTRIAS' consolidated net revenues for

13  the years ended December 31, 2018, 2017 and 2016, respectively.

14        497.   Similarly, CORE-MARK is one of the largest wholesale distributors to the

15  convenience retail industry in North America, providing sales, marketing, distribution and

16  logistics services to approximately 43,000 customer locations across the United States ("U.S.")

17  and Canada.[503] CORE-MARK posted an annual revenue of over $16 billion in 2018.[504]

18        498.   EBY BROWN is the largest privately-owned tobacco, candy and convenience

19  store distributor in the United States. The company services over 14,500 convenience stores

20  around the United States, including the Speedway convenience store chain.

21        499.   The DISTRIBUTOR DEFENDANTS were necessary partners to elevate the JUUL

22  market and ensure that the JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS

---

23  [498] https://www.mclaneco.com/content/mclaneco/en/home.html.

24  [499] https://www.berkshirehathaway.com/2018ar/2018ar.pdf.
   [500] Berkshire Hathaway 10-K at K-18.

25  [501] "The largest customer of PM USA, USSTC, Middleton and Nat Sherman, MCLANE

26  COMPANY, Inc., accounted for approximately 27%, 26% and 25% of ALTRIA's consolidated net revenues for the years ended December 31, 2018, 2017 and 2016, respectively."
   http://www.snl.com/Cache/c396883765.html

27  [502] Reynolds America, 2016 Inc. 10-K, https://seekingalpha.com/filing/2987262
   [503] CORE-MARK 2018 10-K at 1.

28  [504] CORE-MARK 2018 10-K, at 3.

false and deceptive marketing campaign had a wide reach. Indeed, from years of partnering with the cigarette industry and their existing relationships with the Chain Convenience Stores, the cigarette industry distributors already had the existing infrastructure to widely push JUUL products to a massive audience serviced by their existing customers.

500.   Securing a partnership with the cigarette industry distributors, including the DISTIBUTOR DEFENDANTS, would be a major coup for the JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS.

MASTER COMPLAINT (PERSONAL INJURY)
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6
7
8
9
10
11
12

13    501.    Not only were the cigarette industry's distributors valuable to JUUL
14  DEFENDANTS and the MANAGEMENT DEFENDANTS but JUUL was valuable to the
15  DISTIBUTOR DEENDANTS AND RETAILER DEFENDANTS.

16    502.    Like the cigarette manufacturers, cigarette industry distributors including the
17  DISTIBUTOR DEENDANTS were losing profit over the decline in cigarette sales following the
18  efforts to combat cigarette industry's prior illegal marketing campaigns.

19    503.    By the time JUUL launched in 2015, cigarette consumption had been steadily
20  declining for over a decade. Based on data compiled from the U.S. Department of Agriculture -
21  Economic Research Service and provided by the Tobacco Merchants Association ("TMA"), total
22  cigarette consumption in the U.S. declined from 351 billion cigarettes in 2008 to 249 billion
23  cigarettes in 2017, or a compounded annual decline of approximately 3.4%.[505] An entire industry
24  including the cigarette industry distributors had depended on lucrative cigarette sales for decades.

25
26
27
28  [505] CORE-MARK 10-K at 2.

504.    The entire cigarette industry was hurting. Indeed, as announced in CORE-MARK's 2018 Annual Report, a slow-down in tobacco sales was affecting the major tobacco distributors' bottom line.[506]

505.    Capitalizing on the void left by a slow-down in cigarette sales, JLI approached the cigarette industry distributors, including MCLANE, CORE-MARK and EBY BROWN, and convinced them that one of the ways to plug their financial hole was to join JLI in growing the JUUL market.

506.    This could be accomplished by plugging the JUUL Products into the cigarette industry marketing and distribution model that had been so successful for decades.

507.    The proposal was attractive to the cigarette industry distributors as they could use JUUL to assuage investors that the void created by declining cigarette sales could be filled. For example, in 2018, CORE-MARK assured investors that "a greater decline in total cigarette consumption has been partially offset by consumption of alternative nicotine products and [OTHER TOBACCO PRODUCTS (OTP)]."[507] CORE-MARK detailed how selling e-cigarettes would fill a financial void for the company for years to come stating that "[a]lthough we anticipate overall cigarette consumption will continue to decline, we expect to offset these declines through continued growth in our non-cigarette categories including alternative nicotine products and OTP, market share expansion and incremental gross profit from cigarette manufacturer price increases."[508]

508.    A collaboration with JLI was lucrative, because margins for JUUL exceeded cigarette profit margins. This was not only true for retailers, but also for the cigarette industry distributors:

---

[506] CORE-MARK 2018 10-K at 1 ("The rate of growth in our net sales was lower than what we experienced the last several years due primarily to an acceleration of the decline of cigarette carton sales as well as fewer significant retail chains bidding their business in 2018.").
[507] CORE-MARK 10-K at 4.
[508] CORE-MARK 10-K at 4.

509.    Plugging the hole left by declining cigarette sales and reaping the profits attainable through JUUL's margins was only possible, however, if the cigarette industry distributors were able to activate their distribution juggernaut to convince their Chain Convenience Store trade partners to widely market and sell JUUL products. In short, the entire supply chain had to commit to the deceptive marketing and sales campaign that JLI had started.

510.    Starting in 2016, each of the cigarette industry distributors, including DISTIBUTOR DEENDANTS committed to joining with JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS to elevate the JUUL market. That was accomplished by JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS and the Cigarette Industry Distributors by pushing JUUL DEFENDANTS' and the MANAGEMENT DEFENDANTS' dangerous products which were designed for and aimed at youth to its Chain Convenience Store partners, and through them to the ultimate customers. It was accomplished by ensuring that JUUL DEFENDANTS' and the MANAGEMENT DEFENDANTS' false deceptive and dangerous marketing campaign was pushed to the Chain Convenience Stores and from there to a wide swath of convenience store customers across the United States.

511.    By at least 2017, the cigarette industry distributors and some of the largest convenience store distributors in the United States 

---
[509] INREJUUL_00048257
[510] INREJUUL_000120877

513.   Indeed,   the   cigarette   industry   distributors,   including   DISTIBUTOR DEENDANTS, became an essential piece of the supply chain to push products to millions of customers around the United States, including to youth customers and illegally to minors.

514.   Even though the cigarette industry distributors knew that the JUUL vaping Products contained nicotine, from at least 2016 to 2018, the DISTRIBUTOR DEFENDANTS, the RETAILER DEFENDANTS, JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS worked to sell JUUL products that neither disclosed the products' nicotine content, nor any of its risks.

515.   The DISTRIBUTOR DEFENDANTS, the RETAILER DEFENDANTS, JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS knowingly pushed a product designed for a youth market to a massive consumer audience that should never have been marketed and sold to youth. They did so through devising and coordinating a campaign that

1  would ensure JUUL DEFENDANTS' and the MANAGING DEFENDANTS' false and deceptive

2  marketing campaign reached millions of customers across America.

3       516.    To launch this campaign on a massive scale, ████████████████████

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ██████████████████████ This campaign employed the messages, the images and the deceptive

8  content of the JUUL DEFENDANTS and the MANAGING DEFENDANTS original fraudulent

9  marketing campaign, but deployed it to a much wider audience.

10      517.    Upon information and belief, high level representatives of the DISTRIBUTOR

11  DEFENDANTS, the RETAILER DEFENDANTS, met with the JUUL DEFENDANTS and the

12  MANAGEMENT DEFENDANTS at different times with JLI officers and or management

13  employees at the JLI headquarters in San Francisco, California to further these business

14  transactions.

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18

19

20

21

22

23

24

25

26

27

28

[511] INREJUUL_00032571.
[512] INREJUUL_00120885.



519.    JUUL DEFENDANTS and the MANAGEMENT DEFENDANTS provided the

DISTRIBUTOR   DEFENDANTS,

520.



521.   By [redacted] they were able to achieve results that the JUUL DEFENDANTS and MANAGEMENT DEFENDANTS alone could not. Indeed, by 2016, the false and deceptive marketing campaign was reaching customers in thousands of Chain Convenience Stores across the country.

---

[513] INREJUUL_000120877.
[514] *Id.*

523.    All of this was done at the expense of safety. Indeed, as this Complaint details, DEFENDANTS took a dangerous product targeted at youth and launched a massive campaign to widely distribute this product without regard to the dangers it would pose to America's youth and without regard to the fact that such a campaign would undo decades of progress that had been made in smoking cessation and public health.

524.    As outlined above, other critical participants in the push to elevate the JUUL market included the Chain Convenience Stores including RETAILER DEFENDANTS.

525.    By at least 2016, Chain Convenience Stores, including the following companies, were recruited to grow the JUUL market:

        a.      SPEEDWAY LLC;

        b.      7-ELEVEN INC.;

        c.      CIRCLE K STORES INC.; and,

        d.      CHEVRON CORPORATION;

[515] INREJUUL_00120628

527. Chain Convenience Stores including the RETAILER DEFENDANTS were an important part of the chain of sales because those stores are where high-volume sales can be generated and wide-spread product awareness could be generated:



1938165.2

MASTER COMPLAINT (PERSONAL INJURY)
CASE NO. 19-MD-02913-WHO



As further described above,

530.    Indeed, by 2018, JUUL DEFENDANTS and MANAGEMENT DEFENDANTS and MCLANE

531.    Once JUUL DEFENDANTS and MANAGEMENT DEFENDANTS and the Cigarette Industry Distributors including the DISTRIBUTOR DEFENDANTS enlisted the Chain Convenience Stores including the RETAILER DEFENDANTS, the Chain Convenience Stores

---

[516] INREJUUL_000120866.
[517] INREJUUL_00083368

including the RETAILER DEFENDANTS jointly helped to grow the JUUL market through coordinated co-marketing systems. ██████████████ As depicted by ████████████████████████████████████████████████████████████████████████

██████████████████ detailing a coordinated marketing campaign to grow the market and increase sales:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



535.    JUUL   DEFENDANTS    and    MANAGEMENT    DEFENDANTS    and    the
RETAILER DEFENDANTS jointly issued print and digital advertising containing the false
marketing messages aimed at youth and downplaying the risks of JUUL Products. Often
advertising contained both the JUUL logo and also the logos of the participating retail chain
convenience stores:

[518]INREJUUL_00031012.

1

2

3

4

5

6

7

8

9



10      536.   JUUL   DEFENDANTS   and   MANAGEMENT   DEFENDANTS   and   the

11 RETAILER DEFENDANTS jointly issued print and digital advertising containing the false

12 marketing messages aimed at youth and downplaying the risks of JUUL Products as compared to

13 cigarettes. Often advertising contained both the JUUL logo and also the logos of the participating

14 retail chain convenience stores:

15      537.   JUUL DEFENDANTS and MANAGEMENT DEFENDANTS than ran these joint

16 advertisements in media markets around the country. ███████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████

20

21

22

23

24

25

26

27

28

538.     Those joint marketing campaigns were run to drive both customers from retail stores to JLI's website, but also from social media and email advertising to the Chain Convenience Stores including RETAILER DEFENDANTS' stores:

539.    JLI and the RETAILER DEFENDANTS also ran joint promotions designed to drive sales and grow the market for JUUL products:

540.

███████████████████████████████████ stores around the country including in their stores in California.

541. ████████████████████████████████ to push the JLI product to their customers, including to youth and minors.

542. Often ████████████████████████████ ████████████████████████ products to push the Chain Convenience Stores, including the RETAILER DEFENDANTS, to drive repeat JUUL customers, including youth.

543. Instead of taking a conservative approach and ensuring JUUL DEFENDANTS' and MANAGEMENT DEFENDANTS' dangerous nicotine products didn't fall into the wrong hands of minors and youth, a system was created whose sole incentives were to push product with no controls on who that product would be pushed to. JUUL DEFENDANTS and

1   MANAGEMENT DEFENDANTS ████████████████████████

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████

5   ██████████ Upon information and belief, none of these programs emphasized the dangers

6   associated with JUUL products, instructed that they should not be marketed and sold or youth or

7   trained Chain Store staff to ensure that the Products should not be sold to minors.

8       544.   The   RETAILER   DEFENDANTS   and   JUUL   DEFENDANTS   and

9   MANAGEMENT DEFENDANTS conducted a joint marketing campaign that included product

10  placement, distributing product materials in stores and conducting in store events to promote

11  JUUL products, all of which distributed the deceptive and false messages which had built JLI's

12  early success.

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16

17

18      **a.**   **CHEVRON**

19      546.   JLI designated CHEVRON as a key C-Store (convenience store), which JLI

20  defined as one of the four primary distribution channels for distributing JLI's products in the

21  United States.

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████

25

26

27  [519] INREJUUL-0031012.

28  [520] *Id.*
    [521] CUSA_JUUL_20190613-0000308.

1    548.   CHEVRON collaborated with JLI to co-market JUUL products by pushing JLI's

2  false and deceptive marketing campaign to its convenience store customers, including in hundreds

3  of their stores in California.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    553.   JLI's  internal  documents  show

22

23

24

25

26    [522] INREJUUL_00438924.
       [523] INREJUUL_00203728.
27    [524] CUSA_JUUL_20190613-0000317.
       [525] INREJUUL_00438924.
28    [526] CUSA_JUUL_20190613-0000559.
       [527] CUSA_JUUL_20190613-0000506.

554.    CHEVRON was a willing partner in the JUUL DEFENDANTS' and MANAGEMENT DEFENDANTS' campaign to target youth, which lacked any meaningful process for preventing sales to minors since the onset of their joint campaign.

555.    From August 2016 through January 30, 2020, the FDA cited CHEVRON at least 240 times for selling e-cigarette products to minors in violation of the TCA; 53 of which involved sale of a JUUL product. In response to these violations, the FDA has issued multiple warning letters and civil monetary penalties for recurrent violations to multiple CHEVRON locations. For example, the FDA issued at least sixteen (16) warning letters to different CHEVRON locations in California.

### b.    CIRCLE K

556.    CIRCLE K has thousands of stores located throughout the United States, including many retail locations in California.

- 175 -

557.   CIRCLE K, like CHEVRON, was also designated by JUUL DEFENDANTS and MANAGEMENT DEFENDANTS as a key "C-Store" and therefore, one of the four primary distribution channels in which JUUL is distributed in the United States.

CIRCLE K was one of the earliest retailers of JUUL products. As early as June 2014, JLI targeted CIRCLE K to promote its new products and by May/June 2015, JUUL products were distributed by CIRCLE K in Indiana, Ohio, Pennsylvania, New York, Illinois and California.

560.   CIRCLE K was a willing partner in the JUUL DEFENDANTS and MANAGEMENT DEFENDANTS' campaign to target youth, which lacked any meaningful process for preventing sales to minors.

561.   Indeed, from October 2016 through January 31, 2020, the FDA cited CIRCLE K at least 499 times for selling e-cigarette products to minors in violation of the TCA; 96 of which involved sale of a JUUL product. In response to these violations, the FDA has issued multiple warning letters and civil monetary penalties for recurrent violations to multiple CIRCLE K locations.

c.   **SPEEDWAY**

SPEEDWAY operates the second largest chain of company-owned and operated retail gasoline and convenience stores in the United States, with approximately 2,770 convenience stores in 22 states, including retail locations in California.

---

[528] INREJUUL_00030892.
[529] INREJUUL_00085172.
[530] INREJUUL_00084929.
[531] INREJUUL_00203728.

1 [redacted]

2 [redacted]

3 [redacted]

4 [redacted]

5 [redacted]

6 [redacted]

7 [redacted]

8 [redacted]

9 [redacted]

10   566.   SPEEDWAY and CIRCLE K collaborated with JUUL DEFENDANTS and

11 MANAGEMENT DEFENDANTS to co-market JUUL products by pushing JUUL's false and

12 deceptive marketing campaign on its convenience store customers and particularly, minors,

13 including in hundreds of their stores throughout California.

14 [redacted]

15 [redacted]

16 [redacted]

17 [redacted]

18 [redacted]

19   569.   SPEEDWAY was a willing partner in the JUUL DEFENDANTS, and

20 MANAGEMENT DEFENDANTS' campaign to target youth, which (among other things) lacked

21 any meaningful process for preventing sales to minors beginning with the onset of their joint

22 campaign.

23   570.   From November 2016 through January 31, 2020, the FDA cited SPEEDWAY at

24 least 188 times by for selling e-cigarette products to minors in violation of the TCA; 35 of which

25

---

26 [532] INREJUUL_00438924.

27 [533] INREJUUL_00080744-747.
[534] INREJUUL_00030764.

28 [535] INREJUUL_00084929.
[536] INREJUUL_00070136.

involved sale of a JUUL product. In response to these violations, the FDA has issued warning letters and civil monetary penalties for recurrent violations to multiple SPEEDWAY locations.

### d.    **7-ELEVEN**

571.   7-ELEVEN has thousands of stores located throughout the United States, including retail locations in California.

---

[537] INREJUUL_00063625.
[538] INREJUUL_00084929.
[539] INREJUUL_00033425; INREJUUL_00203728.
[540] INREJUUL_00381738.
[541] INREJUUL_00435931; INREJUUL_00446081.

577.   7-ELEVEN collaborated with JUUL DEFENDANTS and MANAGEMENT DEFENDANTS to co-market JUUL products by pushing JUUL DEFENDANTS' and MANAGEMENT DEFENDANTS' false and deceptive marketing campaign to its convenience store customers and minors, including in hundreds of their stores in California.

578.   7-ELEVEN was a willing partner in the campaign to target youth, which lacked any meaningful process for preventing sales to minors.

579.   From August 2016 through January 31, 2020, the FDA cited 7-ELEVEN at least 659 times for selling e-cigarette products to minors in violation of the TCA; 156 of which involved sale of a JUUL product. In response to these violations, the FDA has issued warning letters or civil monetary penalties for recurrent violations to multiple 7-ELEVEN locations. For example, warning letters were issued to at least twelve different 7-ELEVEN stores located in California, five of which sold a JUUL product to a minor.

### e.   **WALMART**

WALMART has thousands of stores located throughout the United States, including many retail locations in California.

581.   WALMART sold JUUL products through September 2018 in its retail locations and on WALMART.com and collaborated with JUUL DEFENDANTS and MANAGEMENT DEFENDANTS to co-market JUUL products by pushing JUUL DEFENDANTS and MANAGEMENT DEFENDANTS' false and deceptive marketing campaign on its customers and particularly, minors, including in hundreds of their stores throughout California.

582.   WALMART was a willing partner in the campaign to target youth, which lacked any meaningful process for preventing sales to minors beginning with the onset of their joint campaign. Upon information and belief,

---

542 INREJUUL_00343240.
543 INREJUUL_00211437.

583.    From October 2016 through January 31, 2020, the FDA cited WALMART at least 199 times by for selling e-cigarette products to minors in violation of the TCA. In response to these violations, the FDA has issued warning letters and civil monetary penalties for recurrent violations to multiple WALMART locations.

### f.   **WALGREENS**

584.    WALGREENS has thousands of stores located throughout the United States, including retail locations in California.



586.

WALGREENS collaborated with JUUL DEFENDANTS and MANAGEMENT DEFENDANTS to co-market JUUL products by pushing JUUL DEFENDANTS' and MANAGEMENT DEFENDANTS' false and deceptive marketing campaign on its customers, including minors, in hundreds of their stores in California.

587.    WALGREENS was a willing partner in the JUUL DEFENDANTS' and MANAGEMENT DEFENDANTS' campaign to target youth, which (among other things) lacked any meaningful process for preventing sales to minors beginning with the onset of the campaign.

588.    From August 2016 through January 31, 2020, the FDA cited WALGREENS at least 376 times by for selling e-cigarette products to minors in violation of the TCA. In response to these violations, the FDA has issued warning letters and civil monetary penalties for recurrent violations to multiple WALGREENS locations. For example, warning letters were issued to at least three different WALGREENS locations in California.

589.    The citations received by the above described RETAILER DEFENDANTS represent the tip of the iceberg of actual violations. The FDA cannot be present at all of the tens of thousands of stores for every transaction, and the citations are just for those observed during

---

[544] INREJUUL_00299281.
[545] INREJUUL_00442275.

1   isolated inspections and or following reports of violations by bystanders or whistleblowers. The

2   FDA states it "has monitored retailer compliance with tobacco laws since 2010 via the Tobacco

3   Retailer Compliance Check Inspection Program. Of the more than 87,460 retailer inspections

4   where violations were observed since FDA inspections began in 2010, about 93 percent were for

5   selling tobacco products to minors. That's why the FDA needs your help to ensure retailers

6   nationwide are following federal tobacco laws. You can report a potential tobacco product

7   violation to the FDA in just minutes."[546]

8   **G.   ALTRIA Provided Services to JLI to Expand JUUL Sales and Maintain**
    **JUUL's Position as the Dominant E-Cigarette**

9

10  **1)   Before ALTRIA'S Investment in JLI, ALTRIA and JLI Exchanged**
    **Market Information Pertaining to Key Decisions**

11  590.   In October 2017, JLI and Avail Vapor ("Avail"), a chain of more than 100 high-

12  end vape stores,[547] ███████████████████████████████████████████[548]

13  591.   On November 2, 2017, ALTRIA announced that it had acquired a minority interest

14  in Avail.[549] ALTRIA's comments to investors highlighted that the investment allowed ALTRIA

15  access to Avail's "extensive data around adult vaper purchasing patterns," and "full-service

16  analytical science laboratory," located in ALTRIA's hometown of Richmond, Virginia.[550]

17  592.   On November 21, 2017—three weeks after ALTRIA announced its investment in

18  Avail—JLI and Avail entered into a distribution agreement, which has been renewed twice—once

19  in November 19, 2018 and again on January 8, 2019.[551]

---

[546] *Help the FDA Prevent Kids from Using Tobacco*, US Food & Drug Administration
(04/23/2018), https://www.fda.gov/consumers/consumer-updates/help-fda-prevent-kids-using-
tobacco
[547] *About Us,* Avail Vapor, https://www.availvapor.com/about-us (last visited February 10,
2020).
[548] INREJUUL_00066273
[549] Rich Duprey, *Is ALTRIA Trying to Corner the E-Cig Market?*, The Motley Fool (Jan. 7,
2018), https://www.fool.com/investing/2018/01/07/is-ALTRIA-trying-to-corner-the-e-cig-
market.aspx; Lauren Thomas, *ALTRIA shares plunge after FDA releases road map to curb*
*tobacco-related deaths*, CNBC (July 28, 2017), https://www.cnbc.com/2017/07/28/ALTRIA-
shares-fall-after-fda-releases-roadmap-to-curb-tobacco-related-deaths-.html.
[550] *Experience ALTRIA* (Investor Day Presentation), ALTRIA (Nov. 1, 2017),
http://investor.ALTRIA.com/Cache/1001243382.PDF.
[551] Responses of JUUL Labs, Inc. to Questions for the Record - July 25, 2019 Hearing Before
House Committee on Oversight and Reform, 28 (January 12, 2020) ("House Oversight January

593.    Through its investment in Avail, ALTRIA had access to sales data for JUUL products long before the companies exchanged diligence in connection with ALTRIA's investment in JLI. Although JLI represented to Congress that "[JLI's] data [from Avail] was not available to ALTRIA,"[552] statements in a ALTRIA's 2019 letter to Congress suggest otherwise.

594.    In that letter, ALTRIA admitted that it possessed JUUL sales data that corresponds to the very same time period in which JLI began selling its products at Avail stores, starting in late 2017.[553] That sales data showed that JLI was dominating the e-cigarette market during this time period.[554] By November 2017, JLI had sold one million units of its blockbuster product, boasting 621% growth in year-to-year sales and capturing 32% of e-cigarette sales tracked by Nielsen.[555] Sales of ALTRIA's own e-cigarettes, on the other hand, trailed behind both the JUUL and British American Tobacco's Vuse. ALTRIA sought to grow JLI's market dominance and young customer base. JLI, in the regulatory crosshairs, needed ALTRIA's experience and its influence in Washington.

595.    ALTRIA recognized that JLI had, against the backdrop of steadily declining cigarette sales, created the right product to addict a new generation to nicotine. JLI faced existential threats, however, from regulatory and congressional scrutiny, and public outrage over the growing vaping epidemic.

596.    JLI, ALTRIA, and the MANAGEMENT DEFENDANTS thus began to coordinate their activities in 2017 through Avail Vapor. This back-channel, and the information it provided ALTRIA, allowed ALTRIA to take actions to benefit itself, JLI, and the MANAGEMENT DEFENDANTS without drawing the scrutiny of the public and regulators that they knew would inevitably follow a formal announcement of a partnership between JLI and ALTRIA.

---

2020 Response").
[552] *Id.*
[553] Letter from Howard A. Willard III to Senator Richard J. Durbin, 6 (October 14, 2019) (emphasis added).
[554] ALTRIA's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019). (emphasis added).
[555] Melia Robinson, *How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year,* Business Insider (Nov. 21, 2017), https://www.businessinsider.com/juul-e-cigarette-one-million-units-sold-2017-11

1

2)    **JLI, the MANAGEMENT DEFENDANTS and ALTRIA Coordinated to Market JUUL in Highly-Visible Retail Locations**

597.    JLI, the MANAGEMENT DEFENDANTS, and ALTRIA's coordination continued in other ways throughout 2018 as they prepared for ALTRIA'S investment in JLI.

598.    A key aspect of this early coordination was ALTRIA's acquisition of shelf-space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products. By acquiring shelf space, ALTRIA took steps to ensure that JUUL products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.[556]

599.    ALTRIA's own relatively unsuccessful e-cigarette products did not warrant the investment. ALTRIA spent approximately $100 million in 2018 to secure shelf-space at retailers for e- cigarette products—purportedly for the MarkTen e-cigarette that ALTRIA stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small scale in only 25,000 stores,[557] as compared to its 2014 launch of the original MarkTen in 60,000 stores in the first month in the western United States alone.[558] Yet ALTRIA's payments for shelf space were a mixture of "cash and display fixtures in exchange for a commitment that its e-cigarettes would occupy prime shelf space for at least two years."[559]

600.    In reality, ALTRIA spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JLI's massive, ill-gotten market share. It has since been reported that ALTRIA "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction JUUL created, but because a non-compete was a "part of its deal with J[LI]."[560]

---

[556] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 161, 164 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html..
[557] Sheila Kaplan, *ALTRIA to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, N.Y. Times (Oct. 25, 2018), https://www.nytimes.com/2018/10/25/health/ALTRIA-vaping-ecigarettes.html.
[558] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Storew News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.
[559] Jennifer Maloney & John McKinnon, *ALTRIA-JLI Deal Is Stuck in Antitrust Review*, Wall St. J. (Jan. 17, 2020), https://www.wsj.com/articles/ALTRIA-juul-deal-is-stuck-in-antitrust-review-11579257002.
[560] *Id.*

601.     When ALTRIA later announced its $12.8 billion investment in JLI, part of the agreement between the two companies was that ALTRIA would provide JLI with this premium shelf space.[561]

602.     ALTRIA's purchase of shelf space in 2018 shows how ALTRIA, JLI, and the MANAGEMENT DEFENDANTS were coordinating even before ALTRIA announced its investment in JLI. ALTRIA's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them -- retail establishments.[562]

### 3)     ALTRIA Contributes to the Success of JLI's and the MANAGEMENT DEFENDANTS' Scheme Through a Range of Coordinated Activities

603.     While JLI and ALTRIA remain separate corporate entities in name, following its equity investment in JLI, ALTRIA and JLI forged even greater significant, systemic links – *i.e.*, shared leadership, contractual relationships, financial ties, and continuing coordination of activities.

604.     In 2019, two key ALTRIA executives became JLI's CEO and head of regulatory affairs, respectively.

605.     K.C. Crosthwaite, who was president of ALTRIA Client Services when the company carried out a study that would later be used by ALTRIA to shield JUUL's mint pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was ALTRIA's chief growth officer.

606.     Joe Murillo, who launched the MarkTen line at ALTRIA and more recently headed regulatory affairs for ALTRIA, is now JLI's chief regulatory officer.[563]   A 24-year career

---

[561] *Id.*

[562] Laura Bach, *Where Do Youth Get Their E-Cigarettes?*, Campaign for Tobacco Free Kids (Dec. 3, 2019), https://www.tobaccofreekids.org/assets/factsheets/0403.pdf.

[563] Jennifer Maloney, *JLI Hires Another Top Altria Executive*, Wall St. J. (Oct. 1, 2019), *available at* https://www.wsj.com/articles/juul-hires-another-top-altriaexecutive-11569971306.

ALTRIA executive, Murillo previously ran ALTRIA's e-cigarette business, Nu Mark, "before ALTRIA pulled its e-cigarettes off the market as part of its deal with J[UUL]."[564]

607.   In addition to its effective takeover of JLI, ALTRIA provides services to JLI in furtherance of their common goal of expanding the number of nicotine-addicted e-cigarette users, in the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs."[565] These services include, among other things:

a.   "Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services."

b.   "Making available [ALTRIA's] previously contracted shelf space with certain retailers," thus allowing JUUL products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth.

c.   "Executing direct mail and email campaigns and related activities. .."

d.   "Leveraging ALTRIA's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that ALTRIA calls upon."

e.   "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."[566]

608.   ALTIRA also worked with JLI to cross-market JUUL and Marlboro cigarettes. For example, ALTRIA offered coupons for JUUL starter kits inside packs of Marlboro cigarettes.[567]

---

[564] *Id.*
[565] ALTRIA's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III at 11 (2019).
[566] *Id.* at 13.
[567] Reddit, *Points for us!* https://www.reddit.com/r/juul/comments/d50jku/points_for_us/. (last visited March 8, 2020).



609.    ALTRIA's investment in JLI was not only a financial contribution; rather, it was an important aspect of JLI, ALTRIA, and the MANAGEMENT DEFENDANTS' plan to continue growing the user base, stave off regulation, and keep JLI's most potent and popular products on the market and available to kids and the public at large. ALTRIA is and was working to actively help expand sales of JLI's products. ALTRIA's investment brings legal and regulatory benefits to JLI, by helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure.

610.    ALTRIA also brings lobbying muscle to the table, which has played an important role in JLI, ALTRIA, and the MANAGEMENT DEFENDANTS' scheme of staving off regulation by preventing new federal or state legislation targeting JUUL or the e-cigarette category more broadly. ALTRIA "has a potent lobbying network in Washington [D.C.] and around the country."[568] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where ALTRIA ends and JLI begins."[569] While an ALTRIA spokesman has denied that there was any contractual services agreement for lobbying between JLI and ALTRIA, he admitted that he did not know what informal advice and conversations ALTRIA has had with JLI about lobbying efforts. Since

---

[568] Shelia Kaplan, *In Washington, JLI Vows to Curb Youth Vaping. Its Lobbying in States Runs Counter to That Pledge.*, N.Y. Times (Apr. 28, 2019),
https://www.nytimes.com/2019/04/28/health/juul-lobbying-statesecigarettes.html.
[569] *Id.*

JLI, the MANAGEMENT DEFENDANTS, and ALTRIA joined forces, JLI's spending on lobbying has risen significantly. JLI spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.[570]

611.    In addition, ALTRIA's arrangement with JLI greatly expands JLI's retail footprint. While JUUL products have typically been sold in 90,000 U.S. retail outlets, ALTRIA reaches 230,000 U.S. outlets. ALTRIA also brings its logistics and distribution experience (although, after increasing public scrutiny, ALTRIA announced on January 30, 2020 that it would limit its support to regulatory efforts beginning in March 2020[571]). And importantly, as noted above, ALTRIA gives JLI access to shelf space that it had obtained under fraudulent pretenses. This is not just any shelf space; it is space near ALTRIA's blockbuster Marlboro cigarettes and other premium products and retail displays. The arrangement allows JLI's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

612.    ALTRIA decided to make a significant investment in JLI to further cash in on its efforts to maintain and expand the number of nicotine-addicted e-vapor users in order to ensure a steady and growing customer base, which ultimately benefits ALTRIA by ensuring a new generation of customers for its products. In fact, when announcing its investment, ALTRIA explained that its investment in JLI "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JLI expand its reach and efficiency."[572] ALTRIA has helped JLI maintain, and expand its market share—a market share that, based on ALTRIA's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth vaping.

---

[570] Center for Responsive Politics, Client Profile: JUUL Labs, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2019&id=D000070920 (last visited February 6, 2020).

[571] Nathan Bomey, *Marlboro maker ALTRIA distances itself from vaping giant JLI amid legal scrutiny*, USA Today (Jan. 31, 2020), https://www.usatoday.com/story/money/2020/01/31/juul-ALTRIA-distances-itself-e-cigarette-maker-amid-scrutiny/4618993002/.

[572] *ALTRIA Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BUSINESSWIRE (Dec. 20, 2018, 7:00 AM EST), https://www.businesswire.com/news/home/20181220005318/en/ALTRIA-12.8-Billion-Minority-Investment-JUUL-Accelerate.

1

2

**H.** **JLI, ALTRIA, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis**

3

613.   Defendants' tactics have misled the public regarding the addictiveness and safety

4

of e-cigarettes generally, and JUUL products specifically, resulting in an epidemic of e-cigarette

5

use among youth in particular.

6

614.   Defendants' advertising and third-party strategy, as discussed above, ensured that

7

everyone from adults to young children, would believe JUULing was a cool, fun, and safe

8

activity.

9

615.   To this day, JLI has not fully disclosed the health risks associated with its

10

products, has not recalled or modified its products despite the known risks, and continues to foster

11

a public health crisis, placing millions of people in harm's way.

12

**1)** **Defendants' Caused Consumers to be Misled into Believing that JUUL was Safe and Healthy**

13

14

616.   In 2016, the National Institute on Drug Abuse issued findings regarding "Teens

15

and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring,

rather than nicotine.[573]

16

17

617.   Two years later, despite the ongoing efforts of public health advocates, a 2018

18

study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained

unaware that JUUL products contain nicotine.[574]

19

20

618.   Further, the study found that respondents using e-cigarettes were less likely to

21

report that e-cigarettes were harmful to their health, that people can get addicted to e-cigarettes, or

that smoke from others' e-cigarettes was harmful.[575]

22

23

619.   Similarly, in 2018, a literature review (of seventy-two articles) published in the

24

*International Journal of Environmental Research and Public Health* found that e-cigarettes were

25

26

[573] Teens and E-cigarettes, National Institute on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/teens-e-cigarettes (last visited Mar. 4, 2020).

27

[574] Jeffrey G. Willett et al., *Recognition, Use and Perceptions of Juul Among Youth and Young Adults,* 28 Tobacco Control 054273 (2019).

28

[575] *Id.*

perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy in comparison to combustible cigarettes.[576] Further, researchers found that specific flavors (including dessert and fruit flavors) were perceived to be less harmful than tobacco flavors among adult and youth e-cigarette users.[577] In addition, researchers found that youth e-cigarette users perceived e-cigarettes as safe to use and fashionable.[578]

620.    In 2019, a study published in *Pediatrics* found that 40% of participants reported using nicotine-free e-cigarette products, when in fact the products they were using contained significant levels of nicotine.[579]

621.    In 2019, a study published in the *British Medical Journal Open* systematically reviewed all peer-reviewed scientific literature published on e-cigarette perceptions through March 2018 (including fifty-one articles).[580] Researchers found consistent evidence showing that flavors attract both youth and young adults to use e-cigarettes.[581] In addition, among this same group, fruit and dessert flavors decrease the perception that e-cigarettes are harmful, while increasing the willingness to try e-cigarettes.[582]

## 2)    Use of JUUL by Minors Has Skyrocketed

622.    On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent e-cigarette use from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."[583]

---

[576] *Id.*

[577] Kim A. G. J. Romijnders et al., *Perceptions and Reasons Regarding E-Cigarette Use Among Users and Non-Users: A Narrative Literature Review*, 15(6) Int'l J. of Envtl. Research & Public Health 1190 (2018), https://doi: 10.3390/ijerph15061190.

[578] *Id.*

[579] Rachel Boykan et al., *Self-Reported Use of Tobacco, E-Cigarettes, and Marijuana versus Urinary Biomarkers*, 143 Pediatrics (2019), https://doi.org/10.1542/peds.2018-3531.

[580] Meernik, et al, Impact of Non-Menthol Flavours in E-Cigarettes on Perceptions and Use: An Updated Systematic Review, *BMJ Open*, 9:e031598 (2019), available at https://bmjopen.bmj.com/content/9/10/e031598.

[581] *Id.*

[582] *Id.*

[583] *National Adolescent Drug Trends in 2018*, University of Michigan Institute for Social

623.    The percentage of 12th grade students who reported consuming nicotine almost doubled between 2017 and 2018, rising from 11% to 20.9%.[584] This increase was "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade."

624.    By 2018 approximately 3.6 million middle and high school students were consuming e-cigarettes regularly,[585] and one in five 12th graders reported used an e-cigarette containing nicotine in the last 30 days.[586] As of late 2019, 5 million students reported active use of e-cigarettes, with 27.5% of high school students and 10.5% of middle school students using them within the last thirty days and with most youth reporting JLI as their usual brand.[587]



625.    The Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[588] Then FDA Commissioner Dr. Gottlieb described the increase in e-cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for

---

Research (Dec. 17, 2018), http://monitoringthefuture.org/pressreleases/18drugpr.pdf.
[584]  News Release, *Teens Using Vaping Devices in Record Numbers* (Dec. 17, 2018) https://www.nih.gov/news-events/news-releases/teens-using-vaping-devices-record-numbers
[585] *See* Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have no Clear Path to Quitting*, N.Y. Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.
[586] *Id.*
[587] National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey; Karen Cullen, et al.,*e-Cigarette Use Among Youth in the United States*, 2019. *JAMA.* 2019;322(21):2095–2103. https://jamanetwork.com/journals/jama/article-abstract/2755265
[588]  Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

an "epidemic" of nicotine use among teenagers.[589] The rapid—indeed infectious—adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products."[590] CDC Director Robert Redfield agreed, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."[591] Then-Commissioner Gottlieb identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."[592]

626.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."[593] The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."

627.    The JUUL youth addiction epidemic spread rapidly across high schools in the United States. JUUL surged in popularity, largely through social media networks, and created

---

[589] *FDA Launches New, Comprehensive Campaign to Warn Kids About the Dangers of E-Cigarette Use as Part of Agency's Youth Tobacco Prevention Plan, Amid Evidence of Sharply Rising Use Among Kids* (Sept. 18, 2018), https://www.fda.gov/NewsEvents/Newsroom/ PressAnnouncements/ucm620788.htm.

[590] Caitlin Owens, *FDA unveils its vaping crackdown, Axios* (Nov. 15, 2018), https://www.axios.com/fda-youth-vaping-crackdown-juul-1542288105-095b5376-49cc-421c-9c95-6bb42be579a9.html

[591] Amir Vera, *Texas Governor Signs Law Increasing the Age to Buy Tobacco Products to 21*, CNN (June 8, 2019), https://www-m.cnn.com/2019/06/08/health/texas-new-tobacco-law/index.html#:~:targetText=Supporters%20say%20increasing%20the%20minimum,go%20into%20effect%20September%201.?r=https%3A%2F%2Fwww.google.com%2F.

[592] Press Release, *FDA Unveils New Steps to Protect Youth by Preventing Access to Flavored Tobacco Products, Announces Plans to Ban Menthol in Cigarettes and Cigar,* US Food and Drug Administration (Nov. 15, 2018), https://www.fda.gov/tobacco-products/ctp-newsroom/fda-unveils-new-steps-protect-youth-preventing-access-flavored-tobacco-products-announces-plans-ban

[593] Surgeon General's Advisory on E-cigarette Use Among Youth, (2018), https://e-cigarettes. surgeongeneral. gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among¬youth-2018.pdf.

patterns of youth usage, illegal youth transactions, and addiction, that are consistent with this account from *Reddit* in 2017:

> Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say 'can I put my pod in ur juul?' and are in there every block. I myself spent about 180$ on mango pods and bought out a store, and sold these pods for 10$ a pod, making myself an absolutely massive profit in literally 9 days. Given because I'm 18 with a car and that's the tobacco age around here, I always get offers to get pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make i[t] their own, every day you can find the pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.[594]

628.    In response to the post above, several others reported similar experiences:

a.    "[T]his is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is."[595]

b.    "Same thing at my school. JUUL fiend is a term too."[596]

c.    "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are."[597]

d.    "[S]ame [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once, and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is."[598]

---

[594] *What's Juul in School*, https://www.reddit.com/r/juul/comments/61is7i/whats_juul_in_school/ (last visited Dec. 19, 2018).
[595] *Id.*
[596] *Id.*
[597] *Id.*
[598] *Id.*

e.    "[T]he same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now."[599]

f.    "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a pod man?'"[600]

g.    "It's the same at my school and just about every other school in Colorado."[601]

h.    "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic'."[602]

i.    "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one."[603].

j.    "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping."[604]

k.    "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul. It's a craze. I love it, I've made an insane amount of money. It's something that has swept through our age group and has truly taken over. And it happened almost overnight."[605]

629.   The following graph illustrates JLI's responsibility for the nationwide youth e-cigarette epidemic. While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth. Through that same timeframe, youth e-cigarette rates nearly doubled from more than 11.% in 2017 to more than 20% in 2018. Through October 5, 2019 (the last date for which data was available), rates of youth e-cigarette use continued to increase, tracking the growth of JUUL.

---

[599] *Id.*

[600] *Id.*

[601] *Id.*

[602] *Id.* (citing *Juuls Now Rule the School as Students Frenzy Over E-cig* (Oct. 5, 2016), https://imgur.com/a/BKepw).

[603] *Id.*

[604] *Id.*

[605] *Id.* (emphasis added).



630.    The unique features of the JUUL e-cigarette—high nicotine delivery, low harshness, and easy-to-conceal design—have caused patterns of addiction with no historical precedent. It is not uncommon for fifteen-year-old students, even those who live at home with their parents, to consume two or more JUUL pods a day.

**I.      JUUL Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products**

**1)      E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI**

631.    One of the main reasons e-cigarettes like JUUL were so appealing from an investment and business development perspective is that, unlike combustible cigarettes, e-cigarettes were relatively unregulated. This regulatory void was not an accident; the cigarette industry, and then the e-cigarette industry, spent significant resources blocking, frustrating, and delaying government action. A 1996 article in the *Yale Law & Policy Review* detailed how

---

[606] The area graph depicts e-cigarette unit sale volumes in retail outlets tracked by Nielsen by manufacturer and month from 2013 through October 5, 2019; the line graph depicts national high school and middle school e-cigarette past-30-day usage rates as percentages from 2013 through 2019, with each data point representing a year. *See* Nielsen: Tobacco All Channel Data; National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey. *See also* Complaint, *Commonwealth of Penn. v. Juul Labs, Inc.*, Case ID 200200962.

1    cigarette companies vehemently opposed the FDA mid-1990s rules on tobacco products, using

2    lawsuits, notice-and-comment, and arguments related to the FDA's jurisdiction to delay or undo

3    any regulatory efforts.[607]

4        632.    In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control

5    Act (TCA). The TCA amended the Federal Food, Drug, and Cosmetic Act to allow the FDA to

6    regulate tobacco products.

7        633.    Although the TCA granted the FDA immediate authority to regulate combustible

8    cigarettes, it did not give the FDA explicit authority over all types of tobacco products—including

9    those that had not yet been invented or were not yet popular. To "deem" a product for regulation,

10   the FDA must issue a "deeming rule" that specifically designates a tobacco product, such as e-

11   cigarettes, as falling within the purview of the FDA's authority under the TCA.

12       634.    The TCA also mandated that all "new" tobacco products (i.e., any product not on

13   the market as of February 15, 2007) undergo a premarket authorization process before they could

14   be sold in the United States.

15       635.    Four years later, on April 25, 2014, the FDA finally issued a proposed rule

16   deeming e-cigarettes for regulation under the Tobacco Act ("2014 Proposed Rule").

17       636.    Once issued, the e-cigarette industry, together with its newfound allies, parent

18   companies, and investors—the cigarette industry and pro-e-cigarette lobbyists—set to work to

19   dilute the rule's effectiveness. For example, in comments to the 2014 Proposed Rule, companies

20   such as Johnson Creek Enterprises (one of the first e-liquid manufacturers) stated that the "FDA

21   [] blatantly ignored evidence that our products improve people's lives."[608]

22       637.    The *New York Times* reported that ALTRIA was leading the effort to dilute,

23   diminish, or remove e-cigarette regulations. Notwithstanding ALTRIA's professed concern about

24   flavors attracting youth customers, ALTRIA submitted comments in August 2014 in response to

---

[607] Melvin Davis, Developments in Policy: The FDA's Tobacco Regulations Digitalcommons.law.yale.edu (1996), https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=1321&context=ylpr

[608] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, Nytimes.com (2020), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-ALTRIA.html.

the proposed rule opposing the regulation of flavors. ALTRIA asserted that restrictions could result in more illicit sales, and that adults also liked fruity and sweet e-cigarette flavors.[609]

638.    In 2015, ALTRIA lobbied Capitol Hill with its own draft legislation to eliminate the new requirement that most e-cigarettes already on sale in the United States be evaluated retroactively to determine if they are "appropriate for the protection of public health." In effect, ALTRIA lobbied to "grandfather" all existing e-cigarette brands, including JUUL, into a lax regulatory regime. That proposed legislation was endorsed by R.J. Reynolds. ALTRIA delivered its proposal, entitled "F.D.A. Deeming Clarification Act of 2015," to Representative Tom Cole of Oklahoma, who introduced the bill two weeks later using ALTRIA's draft verbatim.[610] Seventy other representatives signed on to ALTRIA's legislation.[611]

639.    The e-cigarette industry, along with the intertwined cigarette industry, was able to leverage support among Members of Congress such as Representative Cole and Representative Sanford Bishop of Georgia, who advocated for cigarette industry interests and opposed retroactive evaluation of e-cigarette products. Both Cole and Bishop echoed a common cigarette and e-cigarette industry refrain, that any regulations proposed by the FDA would bankrupt small businesses, even though the overwhelming majority of e-cigarettes were manufactured and distributed by large cigarette companies.

640.    Representatives Cole and Bishop received some of the largest cigarette industry contributions of any member of the U.S. House of Representatives, with Representative Bishop receiving $13,000 from ALTRIA, and Representative Cole $10,000 from ALTRIA in the 2015-2016 cycle.[612]

---

[609] ALTRIA Client Services Inc., Comment Letter on Proposed Rule Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act at 47-48 (August 8, 2014), https://www.ALTRIA.com/-/media/Project/ALTRIA/ALTRIA/about-ALTRIA/federal-regulation-of-tobacco/regulatory-filings/documents/ALCS-NuMark-Comments-FDA-2014-N-0189.pdf.

[610] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, Nytimes.com (2020), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-ALTRIA.html.

[611] *Id.*

[612] *Id.*; The Politics, Rep. Tom Cole - Oklahoma District 04 OpenSecrets (2017), https://www.opensecrets.org/members-of-congress/contributors?cid=N00025726&cycle=2016.

641.    By thwarting and delaying regulation, or by ensuring what regulation did pass was laced with industry-friendly components, the e-cigarette industry, including Defendants, hobbled the FDA—and by extension—Congress's efforts to regulate e-cigarettes. Simultaneously, the e-cigarette industry continued to market their products to youth, and it coordinated to sow doubt and confusion about the addictiveness and health impacts of e-cigarettes.

642.    Even after the FDA issued its final deeming rule in 2016, e-cigarette industry lobbying continued to pay dividends to companies like JLI. In 2017, when Dr. Scott Gottlieb took over as the FDA Commissioner, one of his first major acts was to grant e-cigarette companies a four-year extension to comply with the deeming rule, even as data indicated sharp increases in teen e-cigarette use.[613] Gottlieb had previously served on the board of Kure, a chain of e-cigarette lounges in the United States.[614]

643.    The four-year extension was celebrated by e-cigarette lobbyists. Greg Conley, president of the American Vaping Association (AVA), stated that but for the extension, "over 99 percent of vaper products available on the market today would be banned next year."[615] Despite the minimal research publicly available on the health effect of e-cigarettes, Ray Story, who had since become commissioner of the Tobacco Vapor Electronic Cigarette Association, lauded the decision: "Absolutely, it's a good thing . . . [w]hen you look at harm reduction, it's a no brainer."[616]

### 2)    JLI, the MANAGEMENT DEFENDANTS, and ALTRIA Successfully Shielded the Popular Mint Flavor from Regulation.

644.    JLI, the MANAGEMENT DEFENDANTS, and ALTRIA had a two-fold plan for staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on the

---

[613] Katie Thomas & Sheila Kaplan, *E-Cigarettes Went Unchecked in 10 Years of Federal Inaction,* NY Times.com (2019), https://www.nytimes.com/2019/10/14/health/vaping-e-cigarettes-fda.html (last visited Mar 4, 2020).
[614] Zeke Faux & Dune Lawrence, *Vaping Venture Poses Potential Conflict for Trump's FDA Nominee, Bloomberg* (2017), https://www.bloomberg.com/news/articles/2017-04-19/vaping-venture-poses-potential-conflict-for-trump-s-fda-nominee.
[615] Sheila Kaplan, *F.D.A. Delays Rules That Would Have Limited E-Cigarettes on Market* NY Times (2017), https://www.nytimes.com/2017/07/28/health/electronic-cigarette-tobacco-nicotine-fda.html.
[616] *Id.*

1  market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of

2  JLI's role in the youth vaping epidemic. These schemes involved acts of mail and wire fraud,

3  with the intent to deceive the FDA, Congress, and the public at large.

4       645.    First, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA publicly defended

5  mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated

6  that mint users are not former menthol smokers. Second, by fighting to keep mint as the last

7  flavor on the market, the cigarette industry could continue to appeal to non-smokers, including

8  youth. JLI and the MANAGEMENT DEFENDANTS coordinated with ALTRIA to pursue a

9  fraudulent scheme to convince the FDA into leaving the mint flavor on the market, sacrificing

10  other flavors in the process.

11       646.    On August 2, 2018, JLI met with the FDA to discuss a proposed youth-behavioral

12  study regarding the prevalence of use, perceptions of use, and intentions to use JUUL and other

13  tobacco products among adolescents aged 13-17 years (the "Youth Prevalence Study").[617]

14       647.    On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study

15  to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had

16  ever used a JUUL, and that only 0.8% of youth had used a JUUL in the last 30 days. ████████

17  ████████████████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████.[618] Specifically, the study found that 47%

19  of youth who reported use of a JUUL device in the last 30-days professed to using mango most

20  often, with only about 12% reporting the same for mint.

21       648.    JLI's study was a sham. JLI, the MANAGEMENT DEFENDANTS, and ALTRIA

22  knew their reported data was inconsistent ████████████████████████████████████████

23  ████████████████████████ JLI's report featured responses to a carefully selected survey question—

24  which *single* flavor youth used most often?—that obscured the widespread use of mint JUULpods

25  among youth.

26

27  [617] Letter from Joanna Engelke, JUUL Labs, Inc., to David Portnoy, Ph.D., M.P.H., FDA Center

28  for Tobacco Products (Sept. 12, 2018).
  [618] *Id.* at 3.

649.    Ironically, just a few days after JLI submitted the misleading Youth Prevalence Study to the FDA, the National Youth Tobacco Survey was released. Revealing the depths of the deception of JLI's Youth Prevalence Study, which found that only 1.5% of youth were current users of e-cigarettes, the National Youth Tobacco Survey found that 20.8% of high school student were current users (*i.e.*, consumed e-cigarettes within the last 30 days).

650.    The Youth Prevalence Study that JLI submitted to the FDA, either via U.S. mail or by electronic transmission, was false and misleading. JLI, the MANAGEMENT DEFENDANTS, and ALTRIA knew as much. Indeed, they counted on it.

651.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to ALTRIA, JLI and other e-cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[619]

652.    As evidenced by ALTRIA's recent admission that negotiations with JLI were ongoing in late 2017,[620] ALTRIA and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, allow JLI to continue marketing mint JUUL pods.[621]

653.    DEFENDANTS' plan centered on efforts to deceive the FDA that (1) mint was more akin to Tobacco and Menthol than other flavors; and (2) kids did not prefer mint.

654.    JLI took the first step in this coordinated effort to deceive the FDA. In response to then-Commissioner Gottlieb's September 25, 2018 letter, JLI prepared an "Action Plan," which it presented to the FDA at an October 16, 2018 meeting, and presented to the public on November 12, 2018. The substance of JLI's presentation to the FDA and its public-facing Action Plan were largely identical.[622]

---

[619] Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 25, 2018); Letter from Scott Gottlieb, M.D. to ALTRIA Group Inc. (Sept. 25, 2018)

[620] ALTRIA's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[621] *See United States v. Jones* (9th Cir. 1983) 712 F.2d 1316, 1320-1321 ("It is enough that the mails be used as part of a 'lulling' scheme by reassuring the victim that all is well and discouraging him from investigating and uncovering the fraud.").

[622] JUUL did not include in its Action Plan a proposal for Bluetooth or wifi equipped devices that was included in JLI's October presentation.

1 ███████████[623]██████████████████████████████████████

2 ████████████████████

3      655.    But this statement was not true. ████████████████████

4 ████████████████████████████[624] In JLI's Action

5 Plan, then-CEO Burns stated that only products that "mirror what is currently available for

6 combustible cigarettes – tobacco and menthol-based products (menthol and mint pods) – will be

7 sold to retail stores."[625]

8      656.    In both JLI's October 2018 presentation to the FDA and JLI's Action Plan that

9 was shared with the public, JLI and its CEO fraudulently characterized mint as a non-flavored

10 cigarette product, akin to tobacco and menthol cigarettes, suggesting that it was a product for

11 adult smokers. The image below was included in both the public-facing Action Plan and JLI's

12 presentation to the FDA.



23      657.    JLI knew that non-smoking youth liked mint as much as any flavor.

26 [623] JUUL Labs, Inc. *FDA Presentation*, 2 (Oct. 16, 2018) INREJUUL_00182989;
27 https://newsroom.juul.com/author/greg/page/3/.
[624] *Id.*
28 [625] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-
labs-action-plan/.

658. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████ [626] Indeed, ████████████████████████████████████████████
████████████████████████████████████████ [627] a ████████████████
████████████████████████████ [628]

659.    Most importantly, JLI knew that mint was the most popular JUUL pod. Though other flavors might draw new customers, JLI's most addictive "flavor" predictably became its most popular.

660.    The characterization of mint as an adult tobacco product was also fraudulent because JLI ████████████████████████████████ that teens viewed mint as favorably as mango, which implies that mango and mint were fungible goods for JLI's underage users. ██████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████ As alleged in a Whistleblower Complaint, JLI's then-CEO told his employees: "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."[629]

661.    On October 25, 2018, less than ten days after JLI presented its fraudulent, misleading Action Plan to the FDA, ALTRIA's CEO Howard Willard submitted a letter in response to the FDA's call to combat the youth epidemic. Willard's letter was a clear indication of ALTRIA's willingness to continue the fraudulent scheme and deception of the FDA. While Willard's letter confirmed that ALTRIA understood that JLI's conduct and product was addicting many children to nicotine, this letter repeated the misleading statement that mint was a "traditional tobacco flavor" despite ALTRIA and JLI knowing it was no such thing. Willard then claimed that the youth epidemic was caused, in part, by "flavors that go beyond traditional

---

[626] INREJUUL_00265069.

[627] INREJUUL_00079307-INREJUUL_00079409, at 395.

[628] *Id.*

[629] Angelica LaVito, *Former JLI executive sues over retaliation, claims company knowingly sold tainted nicotine pods*, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/former-juul-executive-sues-over-retaliation-claims-company-knowingly-sold-tainted-pods.html.

tobacco flavors"—which, according to JLI and ALTRIA, did not include mint—and announced that ALTRIA would discontinue all MarkTen flavors except for "traditional tobacco, menthol and mint flavors." Willard asserted that these three flavors were essential for transitioning smokers. But Willard, and ALTRIA, knew this was not true.[630]

662.    That same day—October 25, 2018—ALTRIA continued its deception on an earnings call with investors. ALTRIA fraudulently described its decision to remove its pod-based products from the market as one intended to address the dramatic increase in youth e-cigarette use, while it was only weeks away from publicly announcing its 35% stake in JLI:

> We recently met with Commissioner Gottlieb to discuss steps that could be taken to address underage access and use. Consistent with our discussion with the FDA and because we believe in the long-term promise of e-vapor products and harm reduction, we're taking immediate action to address this complex situation.
>
> First, Nu Mark will remove from the market MarkTen Elite and Apex by MarkTen pod-based products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Second, for our remaining MarkTen and Green Smoke cig-a-like products, Nu Mark will sell only tobacco, menthol and mint varieties. Nu Mark will discontinue the sale of all other flavor variants of our cig-a-like products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Although we don't believe we have a current issue with youth access or use of our e-vapor products, we are taking this action, because we don't want to risk contributing to the issue.
>
> After removing Nu Mark's pod-based products and cig-a-like flavor variants, approximately 80% of Nu Mark's e-vapor volume in the third quarter of 2018 will remain on the market. [631]

663.    Willard reiterated that "pod-based products and flavored products" were behind the increase in youth use of e-cigarettes:

> I mean, I think the way we thought about this was that we believe e-vapor has a lot of opportunity to convert adult cigarette smokers in

---

[630] ALTRIA's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).
[631] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript
MO earnings call for the period ending September 30, 2018 (Oct. 25, 2018),
https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx

the short, medium and long-term, but clearly, this significant increase in youth usage of the products puts that at risk and we think rapid and significant action is necessary. And I think as we looked at the data that is available in some of the remarks from the FDA, I think we concluded that the driver of the recent increase we think is pod-based products and flavored products and so we thought that the two actions that we took addressed the drivers of the increased youth usage here in the short run.[632]

664.     Willard emphasized that ALTRIA's withdrawal of its own pod-based products was intended to address youth use: "[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward." He later said: "And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue."[633] As noted above, however, it has since been reported that ALTRIA "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction that JLI created, but because a non-compete clause was a "part of its deal with J[UUL]."[634]

665.     Thus, while ALTRIA publicly announced that it would pull its pod-based products to combat youth usage, and publicly seemed to support removal of youth-friendly flavors, its defense of mint as a tobacco-analog was actually part of the scheme to protect the profits associated with JLI's mint JUUL pods, one of JLI's strongest products with the highest nicotine content and highest popularity among non-smokers and youth.

666.     In support of his arguments to the FDA that mint was a flavor for adult smokers, Willard cited to a study that ALTRIA had conducted and presented at a conference that JLI attended.[635] But Willard did *not* disclose that ALTRIA's "study" was merely a "quasi-

---

[632] *Id.*

[633] *Id.*

[634] *Id.*

[635] Jessica Parker Zdinak, Ph.D., ALTRIA CLIENT SERVICES, *E-vapor Product Appeal Among Tobacco Users and Non-users and the Role of Flavor in Tobacco Harm Reduction*, 72nd Tobacco Science Research Conference, (September 18, 2018), https://sciences.ALTRIA.com/library/media/Project/ALTRIA/Sciences/library/conferences/2018%20TSRC%20J%20Zdniak%20Presentation.pdf.

experimental online survey" and not a true scientific study.[636] Notably, JLI's current CEO, K.C. Crosthwaite, was the President and Chief Growth Officer of ALTRIA Client Services, which conducted ALTRIA's mint "study" in Spring 2017, the same time that the MANAGEMENT DEFENDANTS and ALTRIA began their "confidential discussions."[637] Willard did not disclose that this study was contradicted by the "youth prevention" data provided by JLI during its acquisition due-diligence showing that mint was popular among teens.

667.    Through these letters, ALTRIA sought to prevent the FDA—which was actively considering regulating flavors[638]—from banning JLI's mint JUUL pods.

668.    Acting in concert, JLI and ALTRIA committed acts of mail or wire fraud when (1) JLI transmitted its Action Plan to the FDA and the public; and (2) ALTRIA transmitted Willard's letter to the FDA.

669.    At the heart of these acts of fraud was Defendants' characterization of mint as a tobacco product that was targeted to adult smokers. This characterization was fraudulent because Defendants knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products. ALTRIA supported this plan and helped execute it. Together, these actions by JLI and ALTRIA ensured that mint would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-vapor users in order to ensure a steady and growing customer base.

670.    The deceptive scheme worked—the FDA did not protest JLI and ALTRIA's plan. And on December 20, 2018, one month after JLI announced its Action Plan to keep selling mint, ALTRIA made a $12.8 billion equity investment in JLI.

671.    By February of 2019, the FDA became aware that it had been deceived by JLI and ALTRIA. On February 6, 2019, then-FDA commissioner Gottlieb wrote JLI and ALTRIA demanding in-person meetings, excoriating ALTRIA for its "newly announced plans with JUUL

---

[636] *Id.*

[637] ALTRIA's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[638] Alex Lardieri, *FDA Considers Ban on E-Cigarette Flavors Amid 'Epidemic' Use By Teens*, U.S. News & World Report (Sept. 12, 2018), https://www.usnews.com/news/health-care-news/articles/2018-09-12/fda-considers-ban-on-e-cigarette-flavors-amid-epidemic-use-by-teens.

[that] *contradict the commitments you made to the FDA*" in a prior meeting and Willard's October 25, 2018 letter to the FDA.[639] Gottlieb's letter to JLI alleged that JLI's conduct was "inconsistent with its previous representations to the FDA."[640]

672.   The FDA demanded ALTRIA be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Then-Commissioner Gottlieb told ALTRIA that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any alleged steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

673.   JLI and ALTRIA met with Gottlieb in March 2019 in a meeting the then-Commissioner described as "difficult."[641] Gottlieb "did not come away with any evidence that public health concerns drove ALTRIA's decision to invest in JLI, and instead sa[id] it looks like a business decision." According to reporting by the NEW YORK TIMES, Gottlieb angrily criticized JLI's lobbying of Congress and the White House, stating:

> We have taken your meetings, returned your calls and I had personally met with you more times than I met with any other regulated company, and yet you still tried to go around us to the Hill and White House and undermine our public health efforts. I was trying to curb the illegal use by kids of your product and you are fighting me on it."[642]

674.   But just a week after the "difficult" meeting with JLI and ALTRIA, Gottlieb posted a statement about the FDA's new e-cigarette policy, proposing to ban all flavors *except* "tobacco-, mint- and menthol-flavored products."[643] He cited the strong support of President

---

[639] Letter from Scott Gottlieb to Howard Willard, ALTRIA (February 6, 2019).

[640] Letter from Scott Gottlieb to Kevin Burns, JUUL Labs, Inc. (February 6, 2019).

[641] Kate Rooney & Angelica LaVito, *ALTRIA Shares Fall After FDA's Gottlieb Describes 'Difficult' Meeting on Juul*, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/ALTRIA-shares-fall-after-fdas-gottlieb-describes-difficultmeeting-on-juul.html.

[642] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

[643] Statement from FDA Commissioner Scott Gottlieb, M.D., on advancing new policies aimed at preventing youth access to, and appeal of, flavored tobacco products, including e-cigarettes

---

Trump (whose administration JLI had aggressively lobbied[644]), and also cited "recent evidence indicat[ing] that mint- and menthol-flavored ENDS products are preferred more by adults than minors."[645] Just a few weeks later, Gottlieb resigned from his position as commissioner of the FDA.

675.    The scheme had succeeded in saving mint JUUL pods, as well as defendants' bottom-lines. JLI's sale of mint JUUL pods rose from one third of its sales in September 2018 to approximately two thirds in February 2019. JLI's 2019 revenues were estimated to be between $2.36 billion and $3.4 billion, and mint JUUL pods accounted for approximately 75% of JLI's total 2019 sales. And because mint remained on the market until JLI withdrew it in November 2019 in the face of growing scrutiny,[646] thousands, if not millions, of underage JUUL users suffered the consequences.

676.    As former New York City Mayor Mike Bloomberg stated: "JUUL's decision to keep mint- and menthol-flavored e-cigarettes on the shelves is a page right out of the tobacco industry's playbook."[647]

677.    JLI continues to sell menthol-flavored products.[648]

---

and cigars (Mar. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-advancing-new-policies-aimed-preventing-youth-access.

[644] Evan Sully and Ben Brody, *JLI Spent Record $1.2 Million Lobbying as Regulators Stepped Up*, Washington Post (Oct. 22, 2019), https://www.washingtonpost.com/business/on-small-business/juul-spent-record-12-million-lobbying-as-regulators-stepped-up/2019/10/22/2a0dbc52-f4de-11e9-b2d2-1f37c9d82dbb_story.html.

[645] Statement from FDA Commissioner Scott Gottlieb, M.D., on advancing new policies aimed at preventing youth access to, and appeal of, flavored tobacco products, including e-cigarettes and cigars (Mar. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-advancing-new-policies-aimed-preventing-youth-access.

[646] Ellen Huet, *JLI Pulls Mint-Flavor Vaping Products, but Menthol Remains*, Bloomberg (Nov. 7, 2019), https://www.bloomberg.com/news/articles/2019-11-07/juul-stops-selling-mint-flavored-vaping-products.

[647] Allison Aubrey, *Juul Suspends Sales Of Flavored Vapes And Signs Settlement To Stop Marketing To Youth,* NPR (Oct. 17, 2019), https://www.npr.org/sections/health-shots/2019/10/17/771098368/juul-suspends-sales-of-flavored-vapes-and-signs-settlement-to-stop-marketing-to-#:~:text=

[648] Sheila Kaplan, *Juul Ends E-Cigarette Sales of Mint-Flavored Pods*, N.Y. Times (Nov. 7, 2019), https://www.nytimes.com/2019/11/07/health/vaping-juul-mint-flavors.html.

3)      **In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic**

678.    In 2017, the FDA announced that it would be taking steps to regulate e-cigarette devices such as JUUL. In late 2017, the FDA initiated its investigation of e-cigarette companies' advertising and sales practices. But, as noted above, the FDA's 2017 Compliance Policy issued a four-year extension for compliance with the 2016 deeming rule, apparently to "balance between regulation and encouraging development of innovative tobacco products that may be less harmful than cigarettes."[649] In March 2018, the 2017 Compliance Policy was challenged by the American Academy of Pediatrics, along with other public health organizations concerned that a compliance extension for the e-cigarette industry would allow more e-cigarette products into the market and continue to addict thousands of youth.[650]

679.    In March 2019, the FDA drafted guidance that modified the 2017 Compliance Policy, but it did not go into full effect. However, on May 15, 2019, the lawsuit filed by the American Academy of Pediatrics was successful—the U.S. District Court for the District of Maryland vacated the 2017 Compliance Policy, and directed the FDA to "require that premarket authorization applications for all new deemed products ("new" referred to any product launched after February 15, 2007 and thus would include JUUL) be submitted within ten months, by May 2020.[651]

680.    In January 2020, the FDA issued: Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization: Guidance for Industry (2020 FDA Guidance), directed at the e-cigarette industry, which detailed the FDA's plan to prioritize enforcement of regulations prohibiting the sale of flavored e-cigarette products and prohibiting the targeting of youth and minors.[652] The 2020 FDA Guidance focused on flavored e-cigarettes that appeal to children, including fruit and mint:

---

[649] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. Food & Drug Admin. (Jan. 2020), https://www.fda.gov/media/133880/download
[650] *Id.*
[651] *Id.*; *Am.Academy of Pediatrics, et al. v. Food and Drug Admin. et al.*, 379 F. Supp. 3d 461, 496 (D. Md. 2019).
[652] *Id.*

1
2

"[C]ompanies that do not cease manufacture, distribution and sale of unauthorized flavored cartridge-based e-cigarettes . . . within 30 days risk FDA enforcement actions."[653]

3
4

### 4) The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done

5
6
7
8
9
10
11
12
13

681.    By the time the FDA acted, youth consumption of e-cigarettes had already reached an all-time high, and the e-cigarette industry's presence on social media became an unstoppable force. The 2020 FDA Guidance acknowledges that two of the largest 2019 surveys of youth cigarette use found that e-cigarette use had reached the highest levels ever recorded.[654] By December 2019, there were over 2,500 reported cases of e-cigarette related hospitalization for lung injury, including over fifty confirmed deaths.[655] Despite the FDA's efforts between 2017 and 2019, youth consumption of e-cigarettes doubled among middle and high school students over the same period.[656] In 2019, the total number of middle and high school students reporting current use of e-cigarettes surpassed five million for the first time in history.[657]

14
15
16
17
18
19

682.    JLI's presence on social media has persisted, even without further initiation by JLI—the hallmark of a successful viral marketing campaign. When the "#juul" hashtag was first used on social media, it was a series of thirteen tweets on Twitter. By the time JLI announced it would shut down its Instagram account, "#juul" had featured in over 250,000 posts on Instagram. A study by Stanford University found that in the eight months after JLI ceased all promotional postings, community posting accelerated, to nearly half a million posts. Whereas before JLI

20
21
22
23
24
25
26
27
28

[653] *FDA Finalizes Enforcement Policy on Unauthorized Flavored Cartridge-Based E-Cigarettes That Appeal to Children, Including Fruit and Mint*, FDA News Release (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

[654] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. Food & Drug Admin. (Jan. 2020), https://www.fda.gov/media/133880/download

[655] Karen A. Cullen et al., E-cigarette Use Among Youth in the United States, 2019, 322 JAMA, 2095 (2019).

[656] Karen A. Cullen, *et al.*, *e-Cigarette Use Among Youth in the United States, 2019*, JAMA. 2019; 322(21): 2095-2103. doi:10.1001/jama.2019.18387 (Nov. 5, 2019), https://jamanetwork.com/journals/jama/article-abstract/2755265.

[657] *Id.*

exited Instagram, "#juul" appeared on average in 315 posts per day, that number tripled to 1084 posts per day after JLI shut its Instagram account down.[658]

683.    The FDA's anti-e-cigarette campaign on social media was aimed at youth and middle and high school students. The campaign used the slogan "The Real Cost" to educate youth on social media platforms about the health impacts of e-cigarette consumption—the real cost of using e-cigarettes. A recent study from the University of California Berkeley found that since September 2018, when the FDA's social media campaign began, the hashtag "#TheRealCost" was used about fifty times per month on Instagram. By comparison, e-cigarette related hashtags were used as many as 10,000 times more often. Despite the FDA's social media intervention, the number of e-cigarette related posts, and the median number of likes (a strong metric of viewer engagement) the posts received, increased three-fold and six-fold, respectively.[659]

684.    In short, by the time the FDA reacted to the epidemic created by Defendants, millions of youth were addicted to e-cigarettes and nicotine, and were sharing e-cigarette related posts on social media on their own.

## J.    **JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries**

### 1)    **JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries**

685.    The use of e-cigarettes, including JUUL, cause significant lung toxicity[660] and have been implicated in multiple severe pathological lung injuries.

686.    Recent studies have demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[661]

---

[658] Robert K. Jackler et al., *Rapid Growth of JUUL Hashtags After the Company Ceased Social Media Promotion*, Stanford Research Into the Impact of Tobacco Advertising (July 22, 2019), http://tobacco.stanford.edu/tobacco_main/publications/Hashtag_JUUL_Project_7-22-19F.pdf

[659] Julia Vassey, *#Vape: Measuring E-cigarette Influence on Instagram With Deep Learning and Text Analysis*, 4 Frontiers in Commc'n 75 (2019), https://www.frontiersin.org/articles/10.3389/fcomm.2019.00075/full

[660] Lauren F. Chun et al., *Pulmonary Toxicity of E-cigarettes*, 313 Am. J. Physio. Lung Cell Mol. Physiol L193 (May 18, 2017), https://www.ncbi.nlm.nih.gov/pubmed/28522559.

[661] Thivanka Muthumalage, et al., *E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes*, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.

687.     Lung epithelial cells are the first-line of defense and provide barrier protection from toxic inhalants. Epithelial barrier dysfunction can allow toxic inhalants access to systemic circulation by which they can interact with other tissues to generate fibrosis. In addition, the impaired barrier function allows greater passage of inhaled chemicals into the body, increasing inflammation both locally in the lungs and systemically. This can lead to acute and chronic lung injury as well as exposure to, and increased susceptibility to, respiratory infections in users of e-cigarettes, including JUUL.[662] [663]

688.     Research has also demonstrated that ultrafine metal particles from heating devices have been found in e-cigarette aerosol, and in e-cigarette user's lungs.[664]

689.     In addition, exposure to JUUL aerosol has shown to significantly impair endothelial function comparable to impairment of endothelial function caused by use of combustible cigarettes.[665]

690.     It is well-established that endothelial dysfunction and injury from direct toxic effects of inhalants such as cigarette smoke, cause lung injuries such as chronic obstructive pulmonary disease (COPD), emphysema, asthma and chronic bronchitis.[666]

691.     Recent epidemiological and toxicological studies detected links between asthma frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.[667]

---

[662] Laura E. Crotty Alexander et al. *Chronic Inhalation of E-cigarette Vapor Containing Nicotine Disrupts Airway Barrier Function and Induces Systemic Inflammation and Multiorgan Fibrosis in Mice*, 314 Am. J. Physiol. Regul. Comp. Physiol. R834 (2018), https://journals.physiology.org/doi/full/10.1152/ajpregu.00270.2017.

[663] Pieter S. Hiemstra et al., *The Innate Immune Function of Airway Epithelial Cells in Inflammatory Lung Disease*, 45 Eur. Respir. J. 1150 (2015), https://erj.ersjournals.com/content/45/4/1150.

[664] Alessandra Caporale et al., *Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI*, 293 Radiology 97 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31429679.

[665] Poonam Rao et al., *Juul and Combusted Cigarettes Comparably Impair Endothelial Function*, 6 Tob. Regul. Sci. 30 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6953758/.

[666] Francesca Polverino et al. *COPD as an Endothelial Disorder: Endothelial Injury Linking Lesions in the Lungs and Other Organs?* 8 Pulm. Circ. 2045894018758528 (2018), https://www.ncbi.nlm.nih.gov/pubmed/29468936.

[667] Phillip W. Clapp and Ilona Jaspers, *Electronic Cigarettes: Their Constituents and Potential*

692.   A study published in December 2019, found that among individuals who never smoked combustible cigarettes, current e-cigarette use was associated with 75% higher odds of chronic bronchitis, emphysema, and COPD compared to those who never used e-cigarettes.[668]

693.   Moreover, the flavoring compounds used in e-cigarettes such as JUUL, include numerous chemicals known to be toxins if inhaled, such as diacetyl, acetyl propionyl, and benzaldehyde. These chemicals are linked to serious lung disease.[669] Further details as to the chemical alphabet soup of comprising the JUUL liquid are set forth above regarding the flavoring/JUUL liquid manufacturers. A multitude of published case reports have linked e-cigarette use, including JUUL, to a variety of acute inhalational lung injuries such as lipoid pneumonia, bronchiolitis obliterans (popcorn lung), alveolar hemorrhage, eosinophilic pneumonia, hypersensitivity pneumonitis, chemical pneumonitis and collapsed lungs, among others.

694.   In 2012, the first article was published in the medical literature describing respiratory illness occurring as a result of e-cigarettes. McCauley et al. reported on the case of a 42-year-old woman admitted with a seven-month history of dyspnea, cough, and fevers, for which she had been given multiple courses of antibiotics after presenting to the emergency department, without improvement. Coinciding with the onset of symptoms the patient had begun using e-cigarettes. Chest imaging revealed "new multifocal bilateral opacities" and "extensive bilateral upper- and lower-lobe patchy ground glass pulmonary opacities in a 'crazy paving' pattern." All other testing, including immunological, was unremarkable. The patient was

*Links to Asthma*, 79 Curr Allergy Asthma Rep. 17 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28983782.

[668] Albert D. Osei, et al., *Association Between E-Cigarette Use and Chronic Obstructive Pulmonary Disease by Smoking Status: Behavioral Risk Factor Surveillance System 2016 and 2017*, 132 Am. J. Prev. Med. 949 (2019), https://www.ncbi.nlm.nih.gov/pubmed/30853474.

[669] Centers for Disease Control & Prevention, *Flavorings-Related Lung Disease* (Oct. 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/default.html; Won Hee Lee *et al.*, *Modeling Cardiovascular Risks of E-Cigarettes with Human-Induced Pluripotent Stem Cell-Derived Endothelial Cells.* 73 J. Am. College of Cardiology 2722 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31146818; Sheila Kaplan & Matt Richtel, *Mysterious Vaping Illness That's 'Becoming an Epidemic,'* N.Y. Times (Aug. 31, 2019), https://www.nytimes.com/2019/08/31/health/vaping-marijuana-ecigarettes-sickness.html?auth=login-email&login=email.

diagnosed with lipoid pneumonia, a "primarily chronic inflammatory reaction secondary to the presence of lipid substances in the lungs, with subsequent uptake by alveolar macrophages and accumulation in the interstitium." The authors also hypothesized the source of lipoid pneumonia was e-cigarette use, due to "glycerin-based oils found in e-cigarette nicotine vapor" added to "make the visual smoke when the solution is vaporized."[670]

695.    Thota et al., published another report of respiratory illness associated with e-cigarette use in 2014. This report described a 20-year-old previously healthy U.S. active-duty male sailor who presented with a three-day history of "persistent cough, shortness of breath, and facial flushing" which began an hour after using an e-cigarette device. The patient had no history of exposure to pulmonary irritants and had experienced worsening of symptoms when using e-cigarettes again en route to the emergency department. Tachycardia and tachypnea were noted in his initial workup. Chest imaging found "subtle diffuse patchy reticulonodular opacities" and "predominantly diffuse ground-glass opacities involving the upper and middle lobes of the lungs more than lower lobes." The patient was administered antibiotics for presumed diagnosis of community-acquired pneumonia, but absence of microorganism infection upon bronchoscopy evaluation, nor indeed any other infectious etiology determined from subsequent testing, led to a diagnosis of acute eosinophilic pneumonia. The patient was given prednisone and discharged after five days in the hospital, with improvement of his symptoms and significant resolution of lung opacity.[671]

696.    In 2015, Atkins and Drescher reported a case of acute inhalational lung injury with ENDS with, importantly, positive rechallenge and dechallenge, significant indicators of an exposure being a causative effect for an outcome. A 60-year-old man with a history of cigar smoking was admitted with weakness, chills, and cough, which was treated with antibiotics and the patient discharged, and within three days he felt better. However, a month later the patient

---

[670] Lindsay McCauley et al., *An Unexpected Consequence of Electronic Cigarette Use*. 141 Chest 1110 (2012).
[671] Darshan Thota & Emi Latham, *Case Report of Electronic Cigarettes Possibly Associated with Eosinophilic Pneumonitis in a Previously Healthy Active-duty Sailor*. 47 J. Emerg. Med. 15 (2014).

presented again with similar symptoms as well as a fever and hypoxemia, with "bilateral upper lung zone crackles and bilateral upper lobe predominant ground glass infiltrate on chest CT." The patient revealed before each emergency room admittance he had used e-cigarettes. The patient was diagnosed with "suspected acute hypersensitivity pneumonitis, related to ENDS" and had no further episodes with cessation of ENDS use. Repeat chest CT at three months post-diagnosis revealed normal pulmonary function.[672]

697.    Another case of lipoid pneumonia was reported in 2015 by Modi et al., who saw a 31-year-old woman admitted to the hospital for dyspnea and cough. Chest imaging found "bilateral air space opacities" and "diffuse ground-glass opacities with interlobular septal thickening consistent with 'crazy paving' pattern" and, despite antibiotic administration, the patient "became increasingly hypoxic and was intubated due to concerns of acute respiratory distress syndrome." Bronchoalveolar lavage demonstrated "reactive pneumocytes and alveolar macrophages with positive staining (Oil-Red-O) for lipid content." Thus, the patient was started on IV steroids and diagnosed with lipoid pneumonia, given the close temporality of her recent initiation of e-cigarettes three months prior to her onset of symptoms. The patient rapidly improved with steroids and cessation of use of e-cigarettes.[673]

698.    In 2015, Moore et al., published a case report describing bilateral pneumonia and pleural effusions associated with e-cigarette use.[674]

699.    In 2016, another case report recognizing a link between e-cigarettes and respiratory illness was published by Mantilla et al., who reported a case of a 27-year-old otherwise healthy man who was admitted to the hospital with dyspnea, cough, fever, and hemoptysis after increasing use of e-cigarettes for seven months prior to presentation, initiated in an effort to decrease his combustible tobacco dependence. Chest imaging revealed "diffuse, military nodular pattern" with "innumerable pulmonary nodules." The patient worsened and

---

[672] Graham Atkins & Frank Drescher, *Acute Inhalational Lung Injury Related to the Use of Electronic Nicotine Delivery System (ENDS),* 148 Chest 83A (2015).
[673] Sujal Modi et al., *Acute Lipoid Pneumonia Secondary to E-Cigarettes Use: An Unlikely Replacement for Cigarettes*, 148 Chest 382A (2015).
[674] Kendall Moore et al., *Bilateral Pneumonia and Pleural Effusions Subsequent to Electronic Cigarette Use*, 3 Open Journal of Emergency Medicine 18 (2015).

1    required intubation and mechanical ventilator support in spite of absence of any notable findings

2    on microorganism workup, "making infectious etiology for his pneumonia very unlikely." Lung

3    biopsy demonstrated bronchiolitis obliterans organizing pneumonia, which was treated with

4    methylprednisolone.[675]

5        700.    Additional published case reports and case series were published since 2016 noting

6    serious and significant acute lung injuries associated with vaping or e-cigarette use. Despite the

7    increasing reports in the published medical literature and the widespread use of JUUL among

8    teenagers, JLI did not take any steps to warn the public and consumers of the risks of JUUL

9    products. Instead it continued to aggressively market the product as safe and promoted it

10   extensively in various media forms including on social media outlets and via influencers.

11       701.    Over the summer of 2019, healthcare providers started to note an influx of acute

12   respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes. This

13   prompted a Center for Disease Control ("CDC") investigation of an outbreak of vaping associated

14   lung injuries. The reported injuries mirrored the injuries that had been reported in the medical

15   literature since 2012.

16       702.    In October 2019, the CDC, recognizing the seriousness of the vaping epidemic,

17   issued treatment guidelines to assist doctors in clinical practice including a protocol for inquiring

18   about vaping or e-cigarette history of use. The CDC defined a new recognized medical condition

19   referred to as E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI).

20       703.    Researchers noted that the recent proliferation of vaping-related cases, known as

21   EVALI, demonstrated a heterogeneous collection of pneumonitis patterns that include acute

22   eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and

23   acute respiratory distress syndrome (ARDS), diffuse alveolar hemorrhage, hypersensitivity

24   pneumonitis, and the rare giant-cell interstitial pneumonitis. It was stated that, though the precise

25   manifestations of the respiratory injury may be diverse, there were clues to the precipitants that

26   warrant attention. About 80% of the persons who vaped and became ill reported having used both

27
     [675] Ronnie D. Mantilla et al., *Vapor Lung: Bronchiolitis Obliterans Organizing Pneumonia
28   (BOOP) in Patient with E-Cigarette Use*, 193 Am. J. of Respiratory and Critical Care Med.
     A6513 (2016).

nicotine products and tetrahydrocannabinol (THC) or cannabidiol (CBD) products. Active infection (which would include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit. It was suggested that mixing of multiple ingredients with primary compounds and potential contaminants may result in in vitro (or even in vivo) production of new agents that may be toxic.[676]

704.    Further, a recent publication in 2020 noted that there were almost 2000 cases of EVALI at the time it was written. The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak but there may be more than one cause and therefore, everyone should refrain from using any e-cigarette or vaping products.[677]

705.    Another publication in January 2020 noted that there were a number of patients who were diagnosed with EVALI, reported the use of nicotine only e-cigarettes and had negative drugs screens for THC or CBD. The authors concluded that EVALI was also associated with nicotine only products and a different causative agent might be implicated in those cases.[678]

706.    Also in January 2020, Lu, et al. reported a teenager who developed acute fibrinous organizing pneumonia (AFOP) after using JUUL as well as other e-cigarettes. AFOP presents with diffuse ground glass infiltrates and intra-alveolar fibrin balls. Subpleural sparing and pneumomediastinum described elsewhere in vaping associated lung injury were also seen. The authors noted that this patient's presentation fit with existing literature, but his young age, choice of e-cigarette, and lung pathology were considered unique. The images characterized AFOP, a newly evolving rare lung pathology within the field of pulmonology, which is now associated with e-cigarette use.[679]

---

[676] David C. Christiani, *Vaping-Induced Injury*, 68 New England J. Med. 787 (2019).

[677] Sascha Ellington et al., *Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use-Associated Lung Injury—United States, August 2019–January 2020,* 69 Morbidity and Mortality Weekly Rep. 44 (2020).

[678] Isaac Ghinai et al., *Characteristics of Persons Who Report Using Only Nicotine-Containing Products Among Interviewed Patients with E-cigarette, or Vaping, Product Use-Associated Lung Injury - Illinois, August-December 2019*, 69 Morbidity and Mortality Weekly Rep. 84 (2020).

[679] Monica A. Lu et al., *Vaping-related Lung Injury in an Adolescent.* 201 American J. of Respiratory & Critical Care Med. 481(2020).

707.    In addition, multiple reports have been published in the medical literature of acute alveolar hemorrhage caused by e-cigarette use.[680] Diffuse alveolar hemorrhage (DAH) is a life-threatening disorder which refers to bleeding that originates in the pulmonary microvasculature. It often results in acute respiratory failure.[681]

708.    Hypersensitivity pneumonitis is a disease of the lungs in which the lungs become inflamed as a result of an allergic reaction to inhaled dust, fungus, molds or chemicals. Hypersensitivity pneumonitis has been linked to the use of e-cigarettes, such as JUUL, since 2015.[682]

709.    In 2018, Sommerfield, et al, published the first reported case of hypersensitivity pneumonitis and acute respiratory distress syndrome (ARDS) as a risk of e-cigarette use in an adolescent.[683] ARDS is a buildup of fluid in the alveoli, the tiny air sacs in the lungs. This results in less oxygen travelling to organs, which is very dangerous and can result in severe life-threatening injuries, including death. ARDS can occur as a result of indirect or direct trauma to the lung.

710.    The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation and death.

711.    Recent case reports have also linked spontaneous pneumothorax (lung collapse) to vaping and use of e-cigarettes.[684] [685]

---

[680] Michael Agustin et al., *Diffuse Alveolar Hemorrhage Induced by Vaping*, 7 Case Rep. Pulmonol. 9724530 (2018); Peter J. Edmonds et al., *Vaping-induced Diffuse Alveolar Hemorrhage*, 29 Respiratory Med. Case Reports 100996 (2020).

[681] Brandi R. Newsome & Juan E. Morales, *Diffuse Alveolar Hemorrhage*, 104 Southern Med. J. 269 (2011).

[682] Graham Atkins et al., *Acute Inhalational Lung Injury Related to the Use of Electronic Nicotine Delivery Systems (ENDS)*, 148 Chest 83A (2015).

[683] Casey G. Sommerfield et al., *Hypersensitivity Pneumonitis and Acute Respiratory Distress Syndrome From E-Cigarette Use*, 141 Pediatrics e20163927 (2018).

[684] Alex Bonilla et al., *Recurrent Spontaneous Pneumothoraces and Vaping in an 18-year-old Man: A Case Report and Review of the Literature*, 13 J. of Med. Case Reports 283 (2019), https://doi.org/10.1186/s13256-019-2215-4.

[685] Munish Sharma et al. *A Case Report of Secondary Spontaneous Pneumothorax Induced by Vape*, 11 Cureus e6067 (2019), https://doi:10.7759/cureus.6067.

712.    While understandably the focus of concern over vaping is the addiction of a new generation of youth, there is certainly ample concern for older individuals as well.  As noted by an article written by the American Associated for Retired Persons (AARP) entitled Vaping Dangers for Older Adults:  What to know about recent lung illnesses and deaths,  "Most vaping patients were under 35 but a new CDC report shows adults older than 50 are getting hit hard: Among 342 people with vaping illness, 69 percent of those over age 50 were admitted to hospital intensive-care units compared with 38 to 56 percent of younger adults and teens; **older adults were more likely to need breathing tubes and spent nearly 15 days in the hospital, compared with six to seven days for younger people**." (Emphasis added).[686]

713.    In short, older adults, especially those who were smokers are at increased risk of lung and other complications due to their baseline higher risk status, making them more vulnerable to the adverse health effects of vaping.  Accordingly, as quoted by AARP, Brian King, Deputy Director for Research Translation of the Office on Smoking and Health at the Centers for Disease Control and Prevention (CDC) stated, "Everyone, including older adults, should refrain from using all e-cigarettes and vape products."[687]

714.    It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, acute respiratory distress syndrome (ARDS), asthma, emphysema and COPD. Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL. In fact, JLI downplayed any risk associated with the inhalation of JUUL aerosol and continued to overtly promote JUUL as safe.

---

[686] Sari Harrar, Vaping Dangers for Older Adults: What to know about recent lung illnesses and deaths, AARP (Oct. 17, 2019), https://www.aarp.org/health/conditions-treatments/info-2019/vaping-e-cigarettes-illnesses-deaths.html
[687] Id.

715.    It is notable, however, that in August 2019, JLI CEO Kevin Burns admitted that the long term health effects of JUUL are unknown.[688] The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety and warrants an award of punitive damages.

### 2)    JUUL Products Cause Cardiovascular Injuries

716.    In addition to severe lung injuries and addiction, JUUL products cause significant and severe risks of cardiovascular injuries. Studies have shown that use of e-cigarettes such as JUUL increase the risk of strokes and heart attacks.[689]

717.    Research has demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which also increases the risk of for strokes and heart attacks.[690] Further, scientists have found that e-cigarettes cause oxidative stress, which leads to vascular disease and damage, known risk factors for cardiovascular injuries.[691]

718.    Recent biological and epidemiologic studies found that significant associations exist between e-cigarette use and myocardial infarctions (heart attacks), which appear to be dose-

---

[688] CBS Interview JLI CEO, Kevin Burns (August 29, 2019).

[689] *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries,* American Stroke Association News Release*, Abstract 9, Session A2 (Jan. 30, 2019), https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries; Mohindar R. Vindhyal et al., *Impact on Cardiovascular Outcomes Among E-cigarette Users: A Review From National Health Interview Surveys,* 73 J. of the Am. College of Cardiology Suppl. 2 (2019), www.onlinejacc.org/content/73/9_Supplement_2/11.; Paul M. Ndunda & Tabitha M. Muutu, *Electronic Cigarette Use is Associated with a Higher Risk of Stroke,* 50 Int'l Stroke Conference 2019 Oral Abstracts: Community/Risk Factors, Suppl. 1, Abst. 9, www.ahajournals.org/doi/10.1161/str.50.suppl_1.9.

[690] Charalambos Vlachopoulos et al., *Electronic Cigarette Smoking Increases Aortic Stiffness and Blood Pressure in Young Smokers*, 67 J. Am. Coll. Cardiol. (2016).

[691] Dennis Thompson, *Vaping May Hurt the Lining of Your Blood Vessels*, WebMD HealthDay Reporter (May 28, 2019), www.webmd.com/mental-health/addiction/news/20190528/vaping-may-hurt-the-lining-of-your-blood-vessels#1; JUUL e-cigarettes and JUUL pods deliver dangerous toxins and carcinogens to users. The ingredients in JUUL pods include glycerol, propylene glycol, nicotine, benzoic acid, and flavoring chemicals, www.juul.com/learn/pods.

dependent. Biological investigations support this association, whereby a prothrombotic phenotype may develop after exposure to nicotine-containing e-cigarette vapors.[692]

719.    Rader, et al., found that chronic e-cigarette users demonstrated substantially impaired coronary microvascular endothelial function, even more pronounced than that seen in chronic tobacco cigarette users. These findings also suggested that chronic e-cigarette use leads to measurable and persistent adverse vascular effects that are not directly related to nicotine.[693]

720.    Alzahrani, et al., found that daily e-cigarette use was associated with an increased risk of myocardial infarction.[694]

721.    A systematic review of the literature found that acute mainstream exposure to aerosol from JUUL, or from previous generation e-cigarettes using free-base nicotine, impaired vascular function comparably to combusted cigarette smoke and delivered considerably more nicotine to the blood on a per puff basis.[695]

722.    The overarching conclusion from dozens of studies published in the past 8 years is that use of e-cigarettes, including JUUL, increases the risk of cardiovascular injury which can lead to strokes, heart attacks and death.

723.    JLI never warned the public or consumers of the serious and significant risk of cardiovascular injuries associated with its products.

### 3)    JUUL Products Cause and Contribute to Seizure(s)

724.    On April 3, 2019 the FDA Center for Tobacco Products issued a Special Announcement notifying the public of an increase in reports of tobacco-related seizures, specifically relating to an increase in e-cigarette use, particularly among youth.[696]

---

[692] Giuseppe Lippi & Emmanuel J. Favaloro, *An Update on Biological and Clinical Associations Between E-Cigarettes and Myocardial Infarction*, Semin. Thromb. Hemost. (2019), https//:doi 10.1055/s-0039-3402451.

[693] Florian Rader et al., E-Cigarette Use and Subclinical Cardiac Effects, medRxiv (preprint) https//:doi:https://doi.org/10.1101/2020.01.16.20017780 (2020).

[694] Talal Alzahrani et al., *Association Between Electronic Cigarette Use and Myocardial Infarction*, 55 Am. J. Preventive Med. 455 (2018).

[695] Nicholas Buchanan et al. *Cardiovascular Risk of Electronic Cigarettes: A Review of Preclinical and Clinical Studies,* 116 Cardiovascular Research 40 (2019).

[696] *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. Food & Drug Administration (April 10, 2019), https://www.fda.gov/tobacco-

725.     The FDA is currently investigating the direct connection between e-cigarette use in young people and increased risk of seizures, and requested that physicians and members of the public report any similar incidents.[697]

726.     Additionally, FDA Commissioner Scott Gottlieb, M.D. and the Principal Deputy

727.     Commissioner Amy Abernethy M.D., PhD issued a joint statement addressing the FDA's ongoing scientific investigation of seizures following e-cigarette use as a potential safety issue in youth and young adults. The statement flags seizures following e-cigarette use as a source of concern for the FDA, adding that in addition to the 35 reported cases from 2010 to early 2019, the FDA "recognize[s] that not all of the cases may be reported" due to their voluntary nature.[698]

728.     Symptomatic nicotine toxicity is a consequence of excessive vaping.[699] As the FDA acknowledges in their statement, "seizures or convulsions are known potential side effects of nicotine poisoning."[700]

729.     It is well-documented that nicotine poisoning can cause seizures, including ingestion of e-cigarette fluid.[701] Nicotine-induced seizure has long been considered a possible side effect of long-term nicotine exposure.[702]

730.     Nicotine has proconvulsive actions and, when overdosed, induces convulsive seizures both in humans and animals.[703] JUUL's high nicotine content and addictive nature cause JUUL users to be highly susceptible to seizures.

products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.

[697] Id.

[698] Scott Gottlieb & Amy Abernethy, *Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's Ongoing Scientific Investigation of Potential Safety Issue Related to Seizures Reported Following E-cigarette Use, Particularly in Youth and Young Adults* (April 3, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-and-principal-deputy-commissioner-amy-abernethy-md-phd.

[699] Adrienne Hughes et al., *An Epidemiologic and Clinical Description of E-cigarette Toxicity*, 57 Clin. Toxicol. 287 (2018), https://doi: 10.1080/15563650.2018.1510503.

[700] Gottlieb, *Statement from FDA Commissioner Scott Gottlieb, M.D.*

[701] Gerdinique C. Maessen et al., *Nicotine Intoxication by E-cigarette Liquids: A Study of Case Reports, Pathophysiology*, 58 Clinical Toxicology 1 (2020), https://www.tandfonline.com/doi/full/10.1080/15563650.2019.1636994.

[702] Lucinda L. Miner et al., *The Effect of Chronic Nicotine Treatment on Nicotine-induced Seizures,* 52 Psychopharmacology 52 (2018), https://doi.org/10.1007/BF00212766.

731.   As indicated in the FDA's announcement, reports of minor and young adult seizures following e-cigarette use have increased. At the time of the initial announcement in April 2019, 35 cases of seizures following e-cigarette use had been reported. As of August 7, 2019, the agency had received 127 reports of seizure or other neurological symptoms, such as fainting or tremors that occurred after vaping between 2010 and 2019 representing an increase of 92 cases since April 3, 2019.[704]

732.   According to the Tobacco Product Problem Reports issued by the FDA, now a total of 187 events of seizures or grand mal seizures mentioning e-cigarette, or other vaping device have been reported thereby representing a greater recognition of this growing problem.[705]

733.   Moreover, it has been suggested that the use of e-cigarettes has been associated with an exacerbation of seizures in individuals who are predisposed.[706]

734.   Seizures following e-cigarette use are a significant cause for concern due to the unnecessarily high levels of nicotine delivered, by design, via JUUL. As described herein, JLI intentionally designed its products to deliver a higher amount of nicotine, particularly targeting young people, and then failed to warn of the subsequent risks. JUUL devices were deliberately designed to deliver higher concentrations of nicotine per puff as compared to cigarettes, creating the risk for addiction as well as the risk of seizure due to potentially toxic levels of nicotine exposure.

735.   JLI never warned the public or consumers of the risk of seizures associated with the use of e-cigarettes including JUUL.

---

[703] Higor Iha et al. *Nicotine Elicits Convulsive Seizures by Activating Amygdalar Neurons*, 8 Frontiers in Pharmacology 57 (2017).

[704] *FDA in Brief: FDA Encourages Continued Submission of Reports Related to Seizures Following E-cigarette Use as Part of Agency's Ongoing Scientific Investigation of Potential Safety Issue*, U.S. Food & Drug Administration (Aug. 7, 2019), https://www.fda.gov/news-events/fda-brief/fda-brief-fda-encourages-continued-submission-reports-related-seizures-following-e-cigarette-use.

[705] *Tobacco Product Problem Reports,* U.S. Food & Drug Administration (Nov. 1, 2019), https://www.fda.gov/tobacco-products/tobacco-science-research/tobacco-product-problem-reports#2019-reports.

[706] Jessica D. Wharton et al. *Increased Seizure Frequency Temporally Related to Vaping: Where There's Vapor, There's Seizures?* 104 Pediatric Neurology 66 (2020).

4) **Animal Studies Demonstrate Carcinogenic Potential of JUUL**

736.     In 2017, Canistro, et al. found that e-cigarettes induce toxicological effects that can raise the risk of cancer.[707]

737.     Similarly, a 2018 study measured the DNA damage induced by nitrosamines in the organs (lung, bladder, and heart) of mice subjected to e-cigarette vapor. They concluded that e-cigarette vapor induces DNA damage in all three organs and reduces DNA-repair functions and proteins in mouse lungs. They further found that nicotine-derived nitrosamine ketone can induce the same effects and enhance mutational susceptibility and tumorigenic transformation of cultured human bronchial epithelial and urothelial cells (leading them to believe that vaping could contribute to heart disease and lung and bladder cancer in humans).[708]

738.     In 2019, Tang, et al. found that exposure to e-cigarette vapor, induced lung adenocarcinoma and bladder urothelial hyperplasia in mice.[709]

739.     In 2020, researchers found that both vapers and smokers showed significant loss of DNA methylation in LINE-1 repeat elements in comparison to controls. The methylation levels of LINE-1 repeats were not significantly different between vapers and smokers. Because repetitive DNA elements comprise almost 50% of the human genome and account for more than one third of genome wide DNA methylation, it is largely thought that the global loss of methylation that is observed in cancer is primarily due to hypomethylation at repetitive elements. The observation that vapers have significant loss of methylation in LINE-1 repeat elements has important implications. Additionally, the finding that vapers and smokers have similar reductions in LINE-1 methylation levels is consistent with previous studies by others who have shown significantly reduced levels of LINE-1 methylation in smokers, environmentally or occupationally exposed individuals to carcinogens, as well as in cells treated in vitro with cigarette smoke condensate or

[707] Donatella Canistro et al., *E-cigarettes Induce Toxicological Effects That Can Raise the Cancer Risk*, 7 Scientific Reports (2017).
[708] Hyun-Wook Lee et al., *E-cigarette Smoke Damages DNA and Reduces Repair Activity in Mouse Heart, Lung, and Bladder as well as in Human Lung and Bladder Cells*, 115 PNAS E1560 (2018).
[709] Moon-shong Tang, et al., *Electronic-cigarette Smoke Induces Lung Adenocarcinoma and Bladder Urothelial Hyperplasia in Mice*, 116 PNAS 21727 (2019).

select tobacco smoke carcinogens. Together, those studies demonstrated the utility of LINE-1 hypomethylation as an informative biomarker of exposure as well as effect for known or suspected carcinogens.[710]

740.     It is evident that there is a potential association between e-cigarettes, including JUUL, and cancer. Sadly, as time goes on it is expected that the population of JUUL users will develop cancers caused and or contributed to by vaping the JUUL toxic stew of chemicals they inhaled. Long term epidemiological studies will likely reveal an increased risk of cancer among this generation of youth who were unwitting targets of JLI in complete and utter reckless disregard for their safety.

## V.     CAUSES OF ACTION

### CAUSE OF ACTION I
### STRICT LIABILITY - DESIGN DEFECT

741.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

742.     Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

743.     At all relevant times, the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiffs consumed.

744.     JUUL Products were designed and intended to be used as a method of ingesting nicotine and the other vaporized constituents of JUUL's e-liquid solution.

---

[710] Andrew W. Caliri et al. *Hypomethylation of LINE-1 Repeat Elements and Global Loss of DNA Hydroxmyethylation in Vapers and Smokers,* 5 Epigenetics 1 (2020), https//:doi. 10.1080/15592294.2020.1724401.

745.    JUUL Products were sold in a defective condition that is unreasonably dangerous and unsafe to the consumer because the JUUL DEFENDANTS and MANAGEMENT DEFENDANTS failed to adequately warn about the risk of nicotine addiction and entirely failed to warn of the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects.

746.    JUUL Products as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons including the high delivery of nicotine, the inclusion of a multitude of other harmful ingredients, the likelihood of nicotine addiction and the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects.

747.    The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS defectively designed JUUL to specifically appeal to minors and young adults, who were particularly unable to appreciate the risks posed by JUUL.

748.    The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS effectively designed JUUL with a pharmacokinetic profile engineered to create risks of abuse and addiction (that exceeded that of a cigarette) in that JUUL delivered more nicotine than cigarettes.

749.    The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS defectively designed JUUL Products that are inherently dangerous because they included features making the product attractive and more palatable to youth and non-smokers. These features include but are not limited to "party mode" lights; in youth appealing colors and flavors, a sleek virtually smoke free design capable of escaping detection by adults and school authorities. In addition, the JUUL DEFENDANTS and MANAGEMENT DEFENDANTS increased the ease of inhaleability of JUUL and the level of nicotine that is absorbed by users making the product even more addictive and dangerous.

750.    The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS in conjunction with the E-LIQUID MANUFACTURING DEFENDANTS defectively designed JUUL Pods in youth appealing colors and flavors that are unsafe to inhale because the e-Liquid is dangerous and hazardous and includes constituent flavoring additives and other chemicals that carry a significant

risk of toxicity and injuries that the E-LIQUID MANUFACTURING DEFENDANTS failed to test as to the safety of the solutions they manufactured and sold for use in JUUL.

751.    JUUL Products do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. JUUL Products contain and deliver more nicotine than is represented, are delivered by heat vaporization inhaled into the body, and contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

752.    The risks inherent in the design of JUUL Products significantly outweigh any benefits of such design.

753.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products that delivered less nicotine per puff, used less potent and addictive forms of nicotine (without reduction of the "throat hit"), reduced repeated exposure to toxic chemicals that do not pose substantial health risks to users while still delivering sufficient levels of nicotine to preexisting cigarette smokers. The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS could also have designed the products in a way in which they would not be as appealing to minors and non-smokers by designing the device with a throat hit and only designing non-flavored E-Liquids.

754.    The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine far in excess of a cigarette on a per puff basis and could have designed the device to shut off for a period of time if excessive puffs were taken too close in time.

755.    The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's identity and age verification, restricting those underage from using the JUUL Product, or other similar technology, or youth restricting features.

756.   The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS failed to design the product with an expiration or best if "used by" date, resulting in the potential for the products' chemical properties to change in a deleterious manner.

757.   Plaintiffs used JUUL Products as intended or in reasonably foreseeable ways. The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS specifically intended for minors to use its products, and were aware that minors were doing so.

758.   Plaintiffs' injuries, physical, emotional and economic, were reasonably foreseeable to the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS at the time of the products' design, manufacture, distribution, and sale.

759.   JUUL Products were defective and unreasonably dangerous when they left the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS' possession. The defects continued to exist through the products' sale to and use by consumers, including Plaintiffs, who used the products without any substantial change in the products' condition.

760.   Plaintiffs were injured as a direct and proximate result of JUUL's defective design as described herein. The defective design of JUUL Products was a substantial factor in causing Plaintiffs' harms.

761.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION II**
**STRICT LIABILITY - FAILURE TO WARN**

762.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

763.    Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

764.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiffs consumed.

765.    JUUL Products are sold in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn about the risk of nicotine addiction and failing to warn entirely of the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein.

766.    DEFENDANTS were aware that JUUL Products posed risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

767.    JUUL Products are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers including Plaintiffs, in JUUL's labeling, packaging and through the marketing, promotion and advertising of JUUL including that:

a.    prior to November 2017 that JUUL Products contained nicotine;

b.    the amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes, and not as "approximately equivalent to a pack of cigarettes" as represented;

c.    JUUL Products cause, maintain, or aggravate nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, *i.e.,* compulsive behavior can result in, and that this danger was even greater for minors;

d.    JUUL Products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein;

e.    the representations about the actual nicotine content did not conform to the pharmacokinetics of JUUL use and the products' cigarette equivalence;

f.    JUUL was an e-cigarette intended not intended for persons under age 26;

g.    JUUL delivered more nicotine than cigarettes;

h.    JUUL's pharmacokinetic profile had been engineered to create risks of abuse and addiction that exceeded that of a cigarette;

i.    JUUL can be life-threatening and carries the risk of lung injuries, seizure, strokes, heart attacks and cardiovascular injuries, behavioral, cognitive and mental health injuries among other harmful effects;

j.    which and when medical symptoms warranted medical care; and,

k.    how many JUUL Pods are safe to consume in a day.

768.    Through its aggressive social media campaign, and in other mass marketing efforts the JUUL DEFENDANTS and MANAGEMENT DEFENDANTS circumvented the post-August 2018 requirement to warn of nicotine addiction by deputizing teenagers and young adults as social media influencers who failed to warn of nicotine addiction and of all the other injuries as set forth above.

769.    The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS affirmatively encouraged new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

770.    The E-LIQUID MANUFACTURING DEFENDANTS warn their own employees through "Material Safety Data Sheets" of the risk of severe lung damage when handling or breathing in the chemicals used in the JUUL Pods; however, upon information and belief these Defendants failed to provide any comparable warning to JLI to include with its label, packaging or advertisements.

771.    The E-LIQUID MANUFACTURING DEFENDANTS acknowledged no studies had been conducted to evaluate the safety of the flavoring additives and other E-Liquids chemicals when vaporized and inhaled as e-cigarettes and that these untested ingredients were

1    contained within JUUL pods; however, no such warnings of the lack of safety studies was

2    provided to millions of consumers throughout the United States.

3         772.    The failure of the DEFENDANTS to adequately warn about its defective products

4    and to misleadingly advertise through conventional and social media avenues created a danger of

5    injuries described herein that were reasonably foreseeable at the time of labeling, design,

6    manufacture, distribution, and sale of JUUL devices and JUUL Pods.

7         773.    Ordinary consumers would not have recognized the potential risks of JUUL

8    Products when used in a manner reasonably foreseeable to DEFENDANTS.

9         774.    DEFENDANTS are strictly liable for the sale of defective JUUL Products that

10   contained inadequate warnings.

11        775.    Plaintiffs could not have averted injury through the exercise of reasonable care for

12   reasons including DEFENDANTS' concealment of the true risks posed by JUUL Products.

13        776.    The defects in JUUL Products, including the lack of adequate warnings and

14   instructions, existed at the time the products left the DEFENDANTS' possession and continued to

15   exist through the products' sale to and use by consumers, including Plaintiffs. JUUL Products

16   were used without substantial change in their condition from the time of their manufacture or

17   sale.

18        777.    At all relevant times, DEFENDANTS could have provided adequate warnings and

19   instructions to prevent the harms and injuries set forth herein, such as providing full and accurate

20   information about the products in advertising, at point of sale, and on the product labels.

21        778.    Plaintiffs were injured as a direct and proximate result of DEFENDANTS' failure

22   to warn and instruct because they would not have used or purchased JUUL Products had they

23   received adequate warnings and instructions that they could be harmed by higher-than-perceived

24   nicotine exposure, develop an addiction, be exposed to a panoply of harmful chemical additives

25   in the flavorings and suffer other negative health consequences including but not limited to life

26   threatening lung injuries, cardiovascular injuries, seizure behavioral, cognitive and mental health

27   injuries.

28

779.   JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising was a substantial contributing factor in causing the harm to Plaintiffs.

780.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CAUSE OF ACTION III
## STRICT LIABILITY - MANUFACTURING DEFECT

781.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

782.   Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this cause of action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

783.   At all relevant times, the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiffs consumed.

784.   The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS contracted with the E-LIQUID MANUFACTURING DEFENDANTS to supply, manufacture, process and blend the E- liquids and flavoring following a "menu."

785.   Employees of the E-LIQUID MANUFACTURING DEFENDANTS were inadequately trained and supervised, resulting in widely variable products with different concentrations of nicotine, some highly excessive and beyond the specifications.

786.   Upon   information   and   belief,   the   E-LIQUID   MANUFACTURING DEFENDANTS supplied contaminated contents that were inserted in Pods which JLI sold to users, including teenagers and young adults, with reckless disregard for consumer safety.711

787.   When   JUUL   Products   left   the   control   of   the   JUUL   DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS, they were expected to, and did reach Plaintiffs without substantial change from the condition in which it left DEFENDANTS' control.

788.   Plaintiffs used JUUL Products in substantially the same condition that they were in when they left the control of the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID   MANUFACTURING   DEFENDANTS   and   any   changes   or   modifications   were foreseeable by these Defendants.

789.   Plaintiffs used JUUL Products in a manner intended and/or foreseeable to the JUUL   DEFENDANTS,   MANAGEMENT   DEFENDANTS,   and   E-LIQUID MANUFACTURING DEFENDANTS.

790.   JUUL   Products   contained   manufacturing   defects   when   they   left   the   JUUL DEFENDANTS',   MANAGEMENT   DEFENDANTS',   and   E-LIQUID   MANUFACTURING DEFENDANTS' control and were placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

791.   Without limitation, examples of the JUUL DEFENDANTS', MANAGEMENT DEFENDANTS',   and   E-LIQUID   MANUFACTURING   DEFENDANTS'   inadequate manufacturing, assembling, inspecting and packaging practices include:

   a.   Failure to follow Good Manufacturing Practices ("GMPs");

   b.   Failure to adequately inspect/test JUUL Products during the manufacturing process;

   c.   Failure to ensure that instruments used to prepare E-Liquids for JUUL Pods were   properly   cleaned   and   sterilized   to   ensure   there   was   no   cross contamination between products;

---

711 See Complaint filed in *Breha v. Juul Labs, Inc.,* No. 3:19-cv-7148 (N.D.Cal.) (ECF No. 1).

d.   Failure to implement procedures that would measure and confirm the amount of nicotine in each JUUL pod;

e.   Failure to timely establish procedures or practices to prevent JUUL Products from being contaminated on the production line or elsewhere at production facilities; and,

f.   Failure to have sanitary conditions and protocol at the facilities to avoid contamination.

792.   Plaintiffs were injured as a direct and proximate result of the manufacturing, assembling, processing, blending, inspecting and packaging defects of JUUL Products as described herein.

793.   The defective manufacturing, assembling, inspecting and packaging of JUUL Products was a substantial factor in causing Plaintiffs' harms.

794.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION IV**
**PRODUCTS LIABILITY - NEGLIGENT DESIGN**

795.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

796.   Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

797.   At all relevant times, the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, processed, blended, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiffs consumed.

798.    JUUL Products were designed and intended to be used as a method of ingesting nicotine and the other vaporized constituents of JUUL's nicotine solution.

799.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL Products was dangerous, harmful and injurious when used by Plaintiffs in a reasonably foreseeable manner, particularly with minors and young adults.

800.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

801.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

802.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care in the design of JUUL Products because the products delivered a high amount of nicotine, included other harmful ingredients, and had the likelihood of causing nicotine addiction and the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular, behavioral, cognitive and mental health injuries, among other harmful effects.

803.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care in the design of JUUL Products by negligently designing JUUL with a pharmacokinetic profile engineered to create risks of abuse and addiction that equaled or exceeded that of a cigarette and delivered more nicotine than cigarettes.

804.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care in the

design of JUUL Products by negligently designing JUUL Products to specifically appeal to minors, who were particularly unable to appreciate the risks posed by JUUL. These features include but are not limited to "party mode" lights; in youth appealing colors and flavors, a sleek virtually smoke free design capable of escaping detection by adults and school authorities. In addition, the JUUL DEFENDANTS and MANAGEMENT DEFENDANTS increased the ease of inhaleability of JUUL and the level of nicotine that is absorbed by users making the product even more addictive and dangerous.

805.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care in the design of JUUL Products because they designed JUUL Pods in youth appealing colors and flavors that are unsafe to inhale because the e-Liquid is dangerous and hazardous and includes constituent flavoring additives and other chemicals that carry a significant risk of toxicity and other injuries that the E-LIQUID MANUFACTURING DEFENDANTS failed to test as to the safety of the solutions they manufactured and sold for use in JUUL.

806.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to designing products that delivered less nicotine per puff, used less potent and addictive forms of nicotine (without reduction of the "throat hit"), reduced repeated exposure to toxic chemicals that do not pose substantial health risks to users while still delivering sufficient levels of nicotine to preexisting cigarette smokers.

807.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less appealing to minors and non-smokers including but not limited to designing the device with a throat hit and only designing non-flavored E-Liquids.

808.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care by

1 | failing to use cost effective, reasonably feasible alternative designs that could have limited the

2 | duration of each puff to prevent the JUUL from delivering doses of nicotine far in excess of a

3 | cigarette on a per puff basis and could have designed the device to shut off for a period of time if

4 | excessive puffs were taken too close in time.

5 |      809.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID

6 | MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care by in

7 | choosing to not include an expiration or best if "used by" date, resulting in the potential for the

8 | products' chemical properties to change in a deleterious manner.

9 |      810.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID

10 | MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care by

11 | failing to use cost effective, reasonably feasible alternative designs utilizing technology to enable

12 | user-level access restrictions so that use was tied to a user's identity and age verification,

13 | restricting those that are underage from using the JUUL Product, or other similar technology, or

14 | youth restricting features.

15 |      811.    A reasonable company under the same or similar circumstances would have

16 | designed a safer product.

17 |      812.    Plaintiffs were harmed directly and proximately by the JUUL DEFENDANTS',

18 | MANAGEMENT DEFENDANTS', and E-LIQUID MANUFACTURING DEFENDANTS'

19 | failure to use reasonable care in the design of JUUL Products. Such harm includes significant

20 | exposure to toxic substances, which can cause or contribute to significant physical injuries;

21 | nicotine addiction; emotional, psychiatric, psychological and economic harm.

22 |      813.    The design of JUUL Products was a substantial factor in causing Plaintiffs' harms.

23 |      814.    Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and

24 | punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to

25 | allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs

26 | of suit, attorneys' fees, and all such other relief as the Court deems proper.

27 | **CAUSE OF ACTION V**
**PRODUCTS LIABIITY –NEGLIGENT FAILURE TO WARN**

28 |

815.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

816.    Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

817.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiffs consumed.

818.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL Products was dangerous, harmful and injurious when used by Plaintiffs in a reasonably foreseeable manner, particularly with minors and young adults.

819.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

820.    The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, that JUUL Products posed risks including the risks of addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

821.   The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of JUUL Products.

822.   The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in JUUL's labeling and packaging and through marketing, promoting and advertising of JUUL including that:

a.   prior to November 2017 that JUUL Products contained nicotine;

b.   the amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes, and not as "approximately equivalent to a pack of cigarettes" as represented;

c.   JUUL Products cause, maintain, or aggravate nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, *i.e.,* compulsive behavior can result in, and that this danger was even greater for minors;

d.   JUUL Products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein;

e.   the representations about the actual nicotine content did not conform to the pharmacokinetics of JUUL use and the products' cigarette equivalence;

f.   JUUL was an e-cigarette intended not intended for persons under age 26;

g.   JUUL delivered more nicotine than cigarettes;

h.   JUUL's pharmacokinetic profile had been engineered to create risks of abuse and addiction that exceeded that of a cigarette;

i.   JUUL can be life-threatening and carries the risk of lung injuries, seizure, strokes, heart attacks and cardiovascular injuries, behavioral, cognitive and mental health injuries among other harmful effects;

j.   which and when medical symptoms warranted medical care;

k.   how many JUUL Pods are safe to consume in a day;

l.   urging customers to keep puffing even if they found the vapor harsh; and

m.   JUUL products were comprised of many chemical additives and artificial flavors that are known to cause injury to exposed workers in factories.

823.   Through its aggressive social media campaign, and in other mass marketing efforts the JUUL DEFENDANTS and MANAGEMENT DEFENDANTS circumvented the post-August 2018 requirement to warn of nicotine addiction by deputizing teenagers and young adults as social media influencers who failed to warn of nicotine addiction and of all the other injuries as set forth above.

824.   The E-LIQUID MANUFACTURING DEFENDANTS warn their own employees through "Material Safety Data Sheets" of the risk of severe lung damage when handling or breathing in the chemicals used in the JUUL Pods; however, upon information and belief these Defendants failed to provide any comparable warning to JLI to include with its label, packaging or advertisements.

825.   The E-LIQUID MANUFACTURING DEFENDANTS acknowledged no studies had been conducted to evaluate the safety of flavoring additives and flavored E-Liquids with e-cigarettes and that these untested ingredients were contained within JUUL pods; however, no such warnings of the lack of safety studies was provided to millions of consumers throughout the United States.

826.   The failure of the DEFENDANTS to adequately warn about its defective products and to misleadingly advertise through conventional and social media avenues created a danger of injuries described herein that were reasonably foreseeable at the time of labeling, design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

827.   The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS were negligent in affirmatively encouraging new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

828.   At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sale, and on the product labels.

829.     A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

830.     Plaintiffs were injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because they would not have used or purchased JUUL Products had they received adequate warnings and instructions that they could be harmed by higher-than-perceived nicotine exposure, develop an addiction, be exposed to a panoply of harmful chemical additives in the flavorings and suffer other negative health consequences including but not limited to life threatening lung injuries, strokes, heart attacks, cardiovascular injuries, seizure, behavioral, cognitive and mental health injuries.

831.     JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising was a substantial contributing factor in causing the harm to Plaintiffs.

832.     Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CAUSE OF ACTION VI
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

833.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

834.     Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

835.     At all relevant times, the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiffs consumed.

836.  The JUUL DEFENDANTS, MANAGING DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS had a duty to use exercise reasonable care, in the manufacturing, assembling, inspecting and packaging of JUUL Products.

837.  The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL Products carelessly manufactured, assembled, inspected and packaged was dangerous, harmful and injurious when used by Plaintiffs in a reasonably foreseeable manner.

838.  The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of JUUL products improperly manufactured assembled, inspected and packaged.

839.  The JUUL DEFENDANTS and MANAGER DEFENDANTS contracted with the E-LIQUID MANUFACTURING DEFENDANTS to supply, manufacture, process and blend the E- liquids and flavoring following specifications in a "menu."

840.  Employees of the E-LIQUID MANUFACTURING DEFENDANTS were inadequately trained and supervised, resulting in widely variable products with different concentrations of nicotine, some highly excessive and beyond the specifications.

841.  Without limitation, examples of the JUUL DEFENDANTS', MANAGEMENT DEFENDANTS', and E-LIQUID MANUFACTURING DEFENDANTS' breached their duty to exercise reasonable care in manufacturing, assembling, inspecting and packaging by their:

   a.    Failure to follow Good Manufacturing Practices ("GMPs");

   b.    Failure to adequately inspect/test JUUL Products during the manufacturing process;

   c.    Failure to ensure that instruments used to prepare E-Liquids for JUUL Pods were properly cleaned and sterilized to ensure there was no cross contamination between products;

   d.    Failure to implement procedures that would measure and confirm the amount of nicotine in each JUUL pod:

   e.    Failure to timely establish procedures or practices to prevent JUUL Products from being contaminated on the production line or elsewhere at production facilities; and,

f.     Failure to have sanitary conditions and protocol at the facilities to avoid contamination.

842.   A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

843.   Plaintiffs were injured as a direct and proximate result of JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS failure to use reasonable care in the manufacturing, assembling, inspecting and packaging of JUUL Products as described herein.

844.   The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS negligent manufacturing, assembling, inspecting and packaging of JUUL Products was a substantial factor in causing Plaintiffs' harms.

845.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION VII**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

846.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

847.   Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

848.   At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

849.    JUUL Products were the types of products that could endanger others if negligently made or promoted.

850.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing and/or selling JUUL to avoid causing harm to those that consumed JUUL Products.

851.    DEFENDANTS knew, or should have known the exercise of reasonable care, the risks to consumers of JUUL, a powerfully addictive and dangerous nicotine-delivery device.

852.    DEFENDANTS knew, or should have known the exercise of reasonable care, that minors and young people would be attracted to these products.

853.    DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL Products was dangerous, harmful and injurious when used by Plaintiffs in a reasonably foreseeable manner, particularly with minors and young adults.

854.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

855.    DEFENDANTS knew or, by the exercise of reasonable care, should have known, that JUUL Products posed risks including the risks of addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

856.    DEFENDANTS knew or should have known that JUUL Products needed to be researched, designed, manufactured, assembled, inspected, tested packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold properly, without defects and with due care to avoid needlessly causing harm.

857.   DEFENDANTS knew or should have known that its JUUL Products could cause serious risk of harm, particularly to young persons and minors.

858.   DEFENDANTS knew or should have known that adults who were encouraged to cease smoking by using JUUL as a cessation device were individuals with greater preexisting cardiovascular and other health risk factors who were at enhanced risk of harm by utilizing the misleadingly labeled JUUL Pods which misrepresented the nicotine content and failed to warn of the other chemicals' content and risks.

859.   The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS were grossly negligent in affirmatively encouraging new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

860.   DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiffs, thereby causing Plaintiffs to suffer harm.

861.   The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

    a.    Failure to perform adequate testing of the JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, respiratory, pulmonary and immune systems, and other related medical conditions, as well as its effect on mental health;

    b.    Failure to warn consumers that JUUL Products had not been adequately tested or researched prior to marketing to ensure safety;

    c.    Failure to take reasonable care in the design of JUUL Products;

    d.    Failure to use reasonable care in the production of JUUL Products;

    e.    Failure to use reasonable care in the manufacture of JUUL Products;

    f.    Failure to use reasonable care in the assembly of JUUL Products;

    g.    Failure of DISTRIBUTOR DEFENDANTS to use reasonable care in supplying and distributing JUUL's products;

    h.    Failure to use reasonable care in advertising, promoting, and marketing JUUL Products;

i.  Failure to use reasonable care in the sale of JUUL Products without adequate warnings; use of flavors and design to appeal to minors and young people, in that the products smell good, look cool and are easy to conceal from parents and teachers;

j.  Use of a design that maximizes nicotine delivery while minimizing "harshness," thereby easily creating and sustaining addiction;

k.  Failure to utilize proper materials, ingredients, additives and components in the design of JUUL Products to ensure they would not deliver unsafe doses of nicotine and cause other injuries from inhalation of other hazardous chemicals;

l.  Failure to inspect JUUL Products for them to operate properly and avoid delivering unsafe levels of nicotine and causing the injuries described herein;

m.  Failure to reasonably and properly test and properly analyze the testing of JUUL Products under reasonably foreseeable circumstances;

n.  Failure to warn consumers about the dangers associated with use of JUUL Products, in that it was unsafe, significantly increases blood pressure, causes vascular and pulmonary damage, causes seizures, carries risks of stroke, heart attacks, and pulmonary and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition;

o.  Failure to warn consumers of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained with JUUL Products;

p.  Failure to warn consumers of the actual nicotine content, JUUL Products' cigarette equivalence and the pharmacokinetics of JUUL use;

q.  Misleadingly stating the amount of nicotine in JUUL Pods is "approximately equivalent to a pack of cigarettes", when the amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes;

r.  Failure to provide any instructions regarding a safe amount of JUUL Pods to consume in a day;

s.  Failure to take necessary steps to modify JUUL Products to avoid delivering high doses of nicotine and repeatedly exposing them to toxic chemicals;

t.  Failure of RETAILER DEFENDANTS to verify the age of consumers purchasing JUUL Products;

u.  Failure to recall JUUL Products;

v.  Shipping JUUL Products to retail locations with actual or constructive knowledge that retailers were not utilizing age verification procedures resulting in unlawful sales to minors; and,

w.      all other failures, acts and omissions set forth herein.

862.    DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiffs.

863.    DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiffs, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiffs.

864.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try JUUL Products and quickly become addicted to JUUL Products, resulting in teenagers and young adults developing lifelong addictions. After placing unnecessarily massive amounts of nicotine into their products, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

865.    Plaintiffs were injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes nicotine addiction with its behavioral and emotional sequelae, seizures, acute and chronic respiratory injuries, cardiovascular injuries, addiction, and significant exposure to toxic substances, which may cause or contribute to additional disease.

866.    DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiffs' harms.

867.    Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CAUSE OF ACTION VIII
## NEGLIGENT FAILURE TO RECALL/ RETROFIT

868.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

869.     Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

870.     At all relevant times, the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

871.     The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew or reasonably should have known that JUUL Products were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner, particularly with minors and young adults.

872.     The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS knew that its flavors had attracted young people and non-smokers, yet instead of withdrawing flavored JUUL Pods, these Pods remained available for purchase online until October 2019 and JUUL continued to offer mint-flavored JUUL Pods until November 2019. However, to date, menthol-flavored JUUL Pods are still available for purchase online and in retail stores which are still regularly consumed by minors and young adults suffering from addiction.

873.     Additionally, JUUL DEFENDANTS, MANAGEMENT DEFENDANTS, and E-LIQUID MANUFACTURING DEFENDANTS were aware of growing reports of E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI) and other injuries related to vaping, yet continue to sell JUUL Products.

874. The JUUL DEFENDANTS and MANAGEMENT DEFENDANTS could have retrofitted the JUUL devices with a kill switch or locking component.

875. Despite the JUUL DEFENDANTS', MANAGEMENT DEFENDANTS', and E-LIQUID MANUFACTURING DEFENDANTS' knowledge and awareness of defects in JUUL Products causing injuries to Plaintiffs, these DEFENDANTS failed to retrofit their products and delayed withdrawal of flavored JUUL Pods from the market.

876. JUUL DEFENDANTS', MANAGEMENT DEFENDANTS', and E-LIQUID MANUFACTURING DEFENDANTS' continue to market and sell JUUL Products without adequate warnings to advise consumers of these dangers.

877. A reasonable company under the same or similar circumstances would have recalled or retrofitted the products and/or provided revised warnings.

878. The JUUL DEFENDANTS', MANAGEMENT DEFENDANTS', and E-LIQUID MANUFACTURING DEFENDANTS' negligent failure to recall and/or retrofit JUUL Products was a substantial factor in causing Plaintiffs' harms.

879. Plaintiffs were injured as a direct and proximate result of these DEFENDANTS' negligent failure to recall and/or retrofit JUUL Products as described herein. Such harm includes seizures, stroke, heart attack, acute and chronic respiratory injuries, cardiovascular injuries, addiction, behavioral, cognitive and mental health and significant exposure to toxic substances, which may cause or contribute to additional disease.

880. Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### CAUSE OF ACTION IX
### NEGLIGENT MISREPRESENTATION

881. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

882.    Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

883.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

884.    DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiffs to make accurate and truthful representations regarding JUUL Products, DEFENDANTS breached their duty, thereby causing Plaintiffs to suffer harm.

885.    DEFENDANTS represented to Plaintiffs via the media, advertising, website, social media, packaging, and promotions, among other misrepresentations described herein that:

     a.     JUUL Products were safe, were safer than cigarettes and were not harmful;

     b.     That one JUUL pod is "approximately equivalent to about 1 pack of cigarettes;"

     c.     An inaccurate and misleading portrayal of JUUL Pods nicotine content; and,

     d.     That the flavored mango, cool cucumber and crème brulee were naturally flavored derived from such foods instead of labelling them as artificially flavored as they would be required to under food labelling rules.

886.    These representations were false. JUUL is unsafe for anyone under age 26, especially minors as well as older users. The amount of nicotine consumed from one JUUL pod is actually equivalent to the amount of nicotine consumed through at least two packs of combustible cigarettes, and not one pack as represented.

887.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

888.   DEFENDANTS had a duty to accurately provide this information to Plaintiffs. In concealing this information from Plaintiffs, DEFENDANTS breached their duty. DEFENDANTS also gained financially from, and as a result of their breach.

889.   DEFENDANTS intended for Plaintiff to rely on these representations.

890.   Each of these misrepresentations were material at the time they were made. In particular, each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase or consume JUUL Products.

891.   DEFENDANTS have yet to disclose correct these misrepresentations about JUUL Products.

892.   Plaintiffs reasonably relied on these representations and were harmed as described herein. Plaintiffs' reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiffs' harms. Had DEFENDANTS told Plaintiffs the truth about the safety and composition of JUUL's products, Plaintiffs would not have consumed or purchased them.

893.   DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich DEFENDANTS.

894.   Plaintiffs were injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding JUUL Products as described herein. Such harm includes seizures, acute and chronic respiratory injuries, stroke, heart attack, other cardiovascular injuries, addiction, behavioral, cognitive and mental health injuries and significant exposure to toxic substances, which may cause or contribute to additional disease.

895.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION X**
**FRAUD**

896.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

897.    Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

898.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, processed, blended, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

899.    DEFENDANTS created and implemented a plan to generate a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. DEFENDANTS' plan was intended to portray JUUL Products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, based in part on food flavors while misrepresenting or omitting key facts concerns JUUL nicotine content, addictiveness, flavoring content and safety.

900.    DEFENDANTS' marketing, promotions and advertisements contained deceptive statements that JUUL e-cigarettes were reasonable alternatives to combustible cigarettes and that they contained nicotine "approximately equivalent to a pack of cigarettes", when in fact the amount of nicotine in a JUUL pod is as much as twice as high as that in a pack of cigarettes, higher than what DEFENDANTS represented.

901.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that JUUL e-cigarettes were not reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and posed significant risks of substantial physical injury resulting from the use of the products.

902.    The labels and packaging of the JUUL Products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels and packaging also falsely stated that JUUL Products contained nicotine levels higher than

1  "approximately equivalent to a pack of cigarettes", and that they were reasonable alternatives to

2  combustible cigarettes.

3         903.    The omissions were misleading and deceptive standing alone and were particularly

4  deceptive in light of JUUL marketing, promotions and advertising its products as reasonable

5  alternatives to cigarettes.

6         904.    DEFENDANTS'  conduct  was  fraudulent  and  deceptive  because  their

7  misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive

8  reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs,

9  would have found it material to their purchasing decisions that JUUL's products: (i) were not a

10  reasonable alternative to cigarettes, (ii) were extremely potent nicotine-delivery mechanisms, (iii)

11  contained nicotine levels higher than "approximately equivalent to a pack of cigarettes," (iii) were

12  flavored with artificial flavors, and (iv) posed unreasonable risks of substantial bodily injury

13  including addiction resulting from the use of the products. Knowledge of these facts would have

14  been a substantial factor in Plaintiffs' decisions to purchase and consume JUUL Products.

15         905.    Additionally, consumers including teenagers and are accustomed to seeing food

16  products labelled with the term "artificial flavors" when the flavoring is not natural. 21 CFR

17  Section 101.22, Subpart B--Specific Food Labeling Requirements governs food for human

18  consumption and expressly requires that if a product's label makes a prominent representation

19  with respect to a primary recognizable flavor, then that flavor is deemed to be a "characterizing

20  flavor" and must be declared on the principle display panel (PDP). If the product contains any

21  artificial flavor that simulates, resembles, or reinforces the characterizing flavor, the name of the

22  food on the PDP must be accompanied by the name of the characterizing flavor with the words

23  "artificial" or "artificially flavored."

24         906.    While JUUL pods were not regulated as food, the use of food flavors in the

25  marketing and packaging of these products was misleading. Marketing "Crème Brulee" JUUL

26  with a picture next to coffee, suggesting it was a sweet dessert-like product (without the calories),

27  and without referencing the fact the flavoring contained many artificial flavors and chemicals,

28  misleadingly suggested to the consumer that the flavors were indeed natural. Similarly, the

cucumber product did not contain cucumber and all of the flavorings were replete with artificial flavorings and chemicals.

907.    DEFENDANTS owed Plaintiffs a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be materials to reasonable consumers; because JUUL's products pose an unreasonable risk of substantial bodily injury; and because JUUL made partial representations concerning the same subject matter as the omitted facts.

908.    Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on JUUL's misrepresentations and omissions.

909.    DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

910.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiffs' harms. Plaintiffs were injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

911.    Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION XI**
**FRAUDULENT CONCEALMENT**

912.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

913.    Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

914.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

915.    DEFENDANTS had a duty to disclose material facts about JUUL Products to Plaintiffs.

916.    DEFENDANTS fraudulently and deceptively marketed JUUL Products to Plaintiffs as safe, healthful, or not harmful, when DEFENDANTS knew it to be untrue.

917.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with e-cigarettes generally, including promoting the "Make the Switch" campaign which suggests to the average consumer that unlike cigarettes, JUUL is harmless to one's health. DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of e-cigarettes, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers buying JUUL Products, and to avoid regulation or legislative efforts to control sales.

918.    DEFENDANTS fraudulently and deceptively concealed that JUUL Products can cause physical injuries such as seizures, acute and chronic respiratory injuries, heart attacks, strokes and other cardiovascular injuries, addiction, behavioral, cognitive and mental health injuries and significant exposure to toxic substances, which may cause or contribute to additional disease.

919.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested JUUL and the E-Liquids to assess its safety before placing it on the market and promoting it to young people and older adults.

920.    DEFENDANTS fraudulently and deceptively concealed JUUL was powerfully addictive and that its design inherently demanded dependency.

921.    DEFENDANTS further failed to disclose to Plaintiffs that JUUL is designed to create and sustain an addiction to nicotine. DEFENDANTS also manipulated the formulations of JUUL devices and JUUL Pods in ways that could and would impact their potency and addictiveness, and DEFENDANTS did so without notifying Plaintiffs. DEFENDANTS actively concealed the nicotine content and nicotine potency of JUUL Products.

922.    DEFENDANTS fraudulently concealed to users the amount of nicotine consumed by using JUUL. As previously explained, DEFENDANTS claim that one JUUL Pod is "approximately equivalent to about 1 pack of cigarettes," but that is false and misleading. The amount of nicotine consumed from one JUUL pod is actually equivalent to the amount of nicotine consumed through at least two packs of combustible cigarettes.

923.    DEFENDANTS fraudulently represented that the mango, cool cucumber and crème brulee were food derived when instead they were based upon artificial flavors.

924.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase or consume JUUL Products.

925.    Plaintiffs did not know of the facts that DEFENDANTS concealed.

926.    DEFENDANTS intended to deceive Plaintiffs and the public by concealing these facts.

927.    DEFENDANTS had a duty to accurately provide this information to Plaintiffs. In concealing this information from Plaintiffs, DEFENDANTS breached their duty. DEFENDANTS also gained financially from, and as a result of their breach.

928.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiffs, through packaging, advertising, retail outlets, on its website, and on social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about JUUL Products.

929.    Plaintiffs relied to their detriment on DEFENDANTS' fraudulent omissions. Had Plaintiffs been adequately informed of the material facts concealed from them regarding the

safety of JUUL, and not intentionally deceived by DEFENDANTS, they would not have purchased or used JUUL Products.

930.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiffs' harms as described herein, including: seizures, acute and chronic respiratory injuries, cardiovascular injuries, addiction, and significant exposure to toxic substances, which may cause or contribute to additional disease. Plaintiffs were injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

931.    Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CAUSE OF ACTION XII
## CONSPIRACY TO COMMIT FRAUD

932.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

933.    Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiffs' respective States.

934.    This claim is brought by Plaintiffs against the JUUL DEFENDANTS, MONSEES, BOWEN, PRITZKER, HUH, VALANI ("CONSPIRACY DEFENDANTS"). For ease of reference, Defendants JLI, MONSEES, BOWEN, PRITZKER, HUH, and VALANI are referred to below as the "EARLY CONSPIRACY DEFENDANTS."

935.    All CONSPIRACY DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiffs. Specifically, the CONSPIRACY DEFENDANTS worked in concert to maintain and expand the number of nicotine-addicted e-cigarette users to ensure a steady and growing customer base. This included protecting and expanding JLI's

1    massive, ill-gotten, share of the e-cigarette market. For ease of reference, this conspiracy is

2    referred to below as the "Nicotine Market Expansion Conspiracy" or "the Conspiracy."

3        936.    The CONSPIRACY DEFENDANTS sought to accomplish this objective by (1)

4    designing a product that delivered nicotine in a manner and in doses that were intended to addict

5    or exacerbate the nicotine addiction of its users; (2) marketing, advertising, promoting and

6    misbranding that potent product to consumers, including the vulnerable youth market; and (3)

7    defrauding regulators and the public to advance their interests.

8        937.    Plaintiffs' addiction to nicotine was a primary object of the Conspiracy.

9    CONSPIRACY DEFENDANTS orchestrated efforts with a unity of purpose to addict this new

10   generation of teenagers and young adults to nicotine by way of unlawful conduct in marketing,

11   promoting, manufacturing, designing, and selling JUUL products that substantially contributed to

12   the Plaintiffs' injuries as alleged herein.

13       938.    DEFENDANTS further conspired with one another by setting out to entice and

14   lure new users of tobacco as a wrongful, unlawful and tortious means to make a profit.

15       939.    Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

16           **1)    Description of the Nicotine Market Expansion Conspiracy**

17       940.    The Nicotine Market Expansion Conspiracy exists separately from the otherwise

18   legitimate business operations of THE JUUL DEFENDANTS, or the investment companies with

19   which Defendants PRITZKER, HUH, and VALANI are affiliated.

20       941.    The EARLY CONSPIRACY DEFENDANTS formed the Nicotine Market

21   Expansion Conspiracy by at least 2015, when they prepared to launch the JUUL e-cigarette and

22   capture and grow a market of nicotine-addicted users that would serve as customers for life.

23       942.    As tobacco companies have long known, profitable growth requires a pipeline of

24   "replacement smokers" or e-cigarette users. For that reason and others, ALTRIA joined the

25   Nicotine Market Expansion Conspiracy in the Spring of 2017. The EARLY CONSPIRACY

26   DEFENDANTS, for their part, eagerly invited ALTRIA into the fold—they needed allies and

27   resources to further their Conspiracy, and, despite their public statements to the contrary, sought

28   to be a part of the tobacco industry.

943.    When ALTRIA joined the Nicotine Market Expansion Conspiracy, it shared the EARLY CONSPIRACY DEFENDANTS' common purpose: maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Among ALTRIA'S motivations for pursuing this common purpose was access to JLI's customer base that would serve as ALTRIA'S pipeline of "replacement smokers" or e-cigarette users.

944.    The Nicotine Market Expansion Conspiracy involved a growing membership and changed its shape to fit its needs, adding members when necessary and eliminating them when they became obsolete. From 2015 through 2017, the Conspiracy consisted of the EARLY CONSPIRACY DEFENDANTS and non-defendant Veratad Technologies LLC. In the Spring of 2017, ALTRIA joined the Nicotine Market Expansion Conspiracy. Non-defendant member Veratad would leave the Conspiracy sometime in 2018 when it stopped coordinating with JLI. Each EARLY CONSPIRACY DEFENDANT is liable for the predicate acts of the Conspiracy committed no later than its formation in 2015, and ALTRIA is liable for the predicate acts of the Conspiracy committed no later than when it joined the Conspiracy in Spring 2017.

945.    As described above, the EARLY CONSPIRACY DEFENDANTS established an ongoing relationship through, among other connections, Defendants' PRIZTKER, HUH, and VALANI'S investment in JLI; Defendants' BOWEN, MONSEES, PRITZKER, HUH, AND VALANI'S control of the JLI Board of Directors; the EARLY CONSPIRACY DEFENDANTS' assumption of "final say" on all marketing for JLI products, including fraudulent advertising; and the EARLY CONSPIRACY DEFENDANTS' coordination on ensuring broad access to JLI products, including underage access, with non-defendant Conspiracy member Veratad. And the EARLY CONSPIRACY DEFENDANTS and ALTRIA established an ongoing relationship through, among other connections, ALTRIA's equity investment in JLI, the many informal and formal agreements between these two defendants and their coordinated activities in furtherance of the common purpose of the Nicotine Market Expansion Conspiracy, and the overlap between JLI Executives, leadership, and ALTRIA.

946.     The CONSPIRACY DEFENDANTS formed the Nicotine Market Expansion Conspiracy to engage in a collaborative scheme to defraud and injure. As described above, the Nicotine Market Expansion CONSPIRACY DEFENDANTS shared and acted on a common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market.

947.     The Nicotine Market Expansion Conspiracy has been in existence for almost five years and continues to operate to this day.

### 2)     Conduct of the Nicotine Market Expansion Conspiracy

948.     As described above, each CONSPIRACY DEFENDANT participated in the operation or management of the Nicotine Market Expansion Conspiracy. Illustrative but non-exhaustive examples include the following:

#### i.     EARLY Leadership

949.     As described in sections IV (A)-(D), Defendants BOWEN and MONSEES were the visionaries behind the Conspiracy and would lead it in its EARLY days.

#### ii.     Fraudulent Marketing Scheme

950.     As described in sections IV (D)-(F), JLI, and Defendants BOWEN, MONSEES, PRITZKER, HUH, and VALANI (through their "final say" on all of JLI's marketing efforts) caused false and misleading advertisements that omitted any references to JUUL's nicotine content to be transmitted, including the Vaporized campaign.

#### iii.     Youth Access Scheme

951.     As described in section IV (E), Defendant JLI (through its employees) coordinated with non-defendant member Veratad on behalf of the other EARLY CONSPIRACY DEFENDANTS to expand youth access to JUUL products.

952.     As reflected in section IV (E), Veratad was a key player in the Nicotine Market Expansion Conspiracy. And while each member of the Conspiracy was not involved in every scheme (Veratad, for example, did not transmit the advertisements or packaging containing misrepresentations regarding JLI's nicotine content), each worked in furtherance of the same

common purpose and was aware of the other members' participation in the Conspiracy. Moreover, each scheme was integral to the Conspiracy's success in maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Veratad shared this common purpose, and its motivation for doing so was to maintain a lucrative client – one of several clients who relied on Veratad for intentionally ineffective age verification services.

### iv.   Co-opting JLI's Board of Directors

953.   As described in section IV (E), Defendants PRITZKER, HUH, and VALANI took control of the JLI Board of Directors in October 2015, so they could use the Board as an instrumentality to effectuate fraudulent schemes in furtherance of the Nicotine Market Expansion Conspiracy 's common purpose. In doing so, leadership of the Conspiracy transitioned from BOWEN and MONSEES to PRITZKER, HUH, and VALANI.

### v.   Coordinating Activities of JLI and ALTRIA

954.   By August 2016, Defendants PRITZKER, HUH, and VALANI had ceded executive leadership at JLI to a new CEO, GOLDMAN. Thus, when these parties started to coordinate with ALTRIA , it was JLI (through its executives and employees – including GOLDMAN and his successors) and ALTRIA (through its executives and employees) that primarily directed the affairs of the Conspiracy, although Defendants BOWEN, MONSEES, PRITZKER, HUH, and VALANI remained critical to the success of the Conspiracy's common purpose. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI and ALTRIA, and ALTRIA's investment in JLI, would not have been possible.

955.   As described in sections IV (F)-(I), the EARLY CONSPIRACY DEFENDANTS and ALTRIA began to actively coordinate their activities in 2017 and each took actions that would further the Conspiracy's common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market. For example:

a.   As EARLY as 2017, the EARLY CONSPIRACY DEFENDANTS and ALTRIA shared data and strategy to support their common purpose, through a conduit, Avail Vapor.

b.   By 2018, ALTRIA was taking actions to ensure JLI's products had access to prime shelf space in retail locations.

c.   By 2018, ALTRIA was distributing and marketing JLI's products to its wider base of retailers.

d.   In December 2018, ALTRIA decided to cash in on its role in the Nicotine Market Expansion Conspiracy by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This investment would give ALTRIA three seats on the JLI Board of Directors, and thus allow it to assert greater control over both JLI and the Nicotine Market Expansion Conspiracy, which used the instrumentalities of JLI to effectuate many of its fraudulent schemes.

### vi.   Nicotine Content Misrepresentation Scheme

956.   As described in sections IV (F)-(I), the EARLY CONSPIRACY DEFENDANTS and ALTRIA caused thousands, if not millions, of JUUL pod packages to be distributed to consumers with false and misleading information regarding the JUUL pods' nicotine content. The EARLY CONSPIRACY DEFENDANTS also caused the same false and misleading information to be distributed via JLI's website.

### vii.   Nicotine Content Misrepresentation Scheme

957.   As described in sections IV (F)-(I), the EARLY CONSPIRACY DEFENDANTS and ALTRIA worked in concert to defraud the public and regulators in order to prevent regulation that would have impeded their plan to: maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Specifically, they worked to ensure the FDA allowed certain flavors, namely mint, to remain on the market.

### viii.   Cover-up Scheme

958.   The CONSPIRACY DEFENDANTS were not only concerned with protecting flavors, however. In light of growing public scrutiny of JLI's role in the youth vaping crisis, these defendants continued their scheme to prevent a complete ban on JUUL products.

959.   As described in sections IV (F)-(I), JLI provided false information on its website pages about the addictive potential of its products and denied that JLI marketed to youth, and

1    Defendants BOWEN, MONSEES, PRITZKER, HUH, and VALANI provided direct input as to

2    the content of the JLI website and had "final say" over JLI's marketing messaging.

3         960.    As described in sections IV (D)-(E), JLI, and Defendants BOWEN, MONSEES,

4    PRITZKER, HUH, and VALANI (through their "final say" on all of JLI's marketing efforts)

5    caused deceptive, false and misleading marketing, promotions and advertising to be distributed

6    over television, radio and the internet and through other mass media channels in order to give the

7    impression that JLI's product was a smoking cessation device and that JLI never marketed to

8    youth. As described in sections IV (D)-(F), Defendant ALTRIA continued this scheme by

9    transmitting the fraudulent "Make the Switch" advertisements in packs of its combustible

10   cigarettes.

11        961.    As described in sections IV (H)-(I), beginning in October 2018, both ALTRIA and

12   JLI were transmitting deceptive, false and misleading communications to the public and the

13   government in an attempt to stave off regulation.

14        962.    And no later than December 2018, ALTRIA began providing even more services

15   to the Nicotine Market Expansion Conspiracy, as described in sections IV (G)-(H).

16             **3)      Pattern of Fraud in Furtherance of the Conspiracy**

17        963.    The CONSPIRACY DEFENDANTS advanced the Conspiracy's objectives

18   through common deceptions, fraud, misrepresentations, concealments, and material omissions.

19        964.    In devising and executing the objectives of the Nicotine Market Expansion

20   Conspiracy, the CONSPIRACY DEFENDANTS devised and knowingly carried out material

21   schemes and/or artifices to defraud the public, including Plaintiffs, and regulators by (1)

22   transmitting marketing, promotional materials and advertisements that fraudulently and

23   deceptively omitted any reference to JUUL's nicotine content (or any meaningful reference,

24   where one was made); (2) causing false and misleading statements regarding the nicotine content

25   of JUUL pods to be posted on the JLI website; (3) causing thousands, if not millions, of JUUL

26   pod packages containing false and misleading statements regarding the nicotine content of JUUL

27   pods to be transmitted; (4) representing to consumers, including Plaintiffs, and the public-at-large

28   that JUUL was created and designed as a smoking cessation device, and by misrepresenting the

nicotine content and addictive potential of its products; (5) making fraudulent statements to the FDA to convince the FDA to allow certain flavors, namely mint, to remain on the market; and (6) making fraudulent statements to the public (including through advertising), the FDA, and Congress to stave off a total prohibition on JUUL that was being contemplated in light of JLI's role in the youth vaping epidemic.

965.    Illustrative and non-exhaustive examples include the following:

| From | To | Date | Description |
|------|-----|------|-------------|
| **Fraudulent Statements Omitting Reference to JUUL's Nicotine Content (see sec. IV(E)(3)-(4)** | | | |
| All EARLY CONSPIRACY DEFENDANTS | Public (via television, internet, and mail) | 2015 | "Vaporized" Campaign |
| **Fraudulent Statements that JUUL is a Cessation Device (see sec. IV(D)(4))** | | | |
| All EARLY CONSPIRACY DEFENDANTS | Public (via internet – JLI Website) | April 25, 2018 (or earlier) to Present | "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." |
| Kevin Burns (former JLI CEO) | Public (via internet – JLI Website) | November 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." |
| All EARLY CONSPIRACY DEFENDANTS | Public (via internet – JLI Website) | September 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." |
| Howard Willard | Public (via | December 20, | "We are taking significant |

| (ALTRIA CEO) | internet – ALTRIA website) | 2018 | action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." |
| Howard Willard | FDA | October 25, 2018 | "We believe e-cigarette products present an important opportunity to adult smokers to switch from combustible cigarettes." |
| **Fraudulent Statements Regarding Nicotine Content in JUUL pods** (see sec. IV(D)(2)) | | | |
| All EARLY CONSPIRACY DEFENDANTS | Public (via internet – JLI website) | July 2, 2019 (or earlier) to Present | "Each 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery." |
| All EARLY CONSPIRACY DEFENDANTS | Public (via internet – JLI website) | April 21, 2017 | "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." |
| All CONSPIRACY DEFENDANTS | Public | 2015 to Present | JUULpod packages (1) claiming a 5% nicotine strength; (2) stating that a JUULpod is "approximately equivalent to about 1 pack of cigarettes." |
| **Fraudulent Youth Prevention Study** (see sec. IV(I)(2)) | | | |
| JLI | FDA (via U.S. mail or electronic transmission) | November 5, 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. |

| **Fraudulent Statements to Prevent Regulation of Mint Flavor (¶¶ x)** | | | |
|---|---|---|---|
| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| Howard Willard (ALTRIA CEO) | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| **Fraudulent Statements to Prevent Ban on JUUL Products (see sec. IV(G)-(I))** | | | |
| All EARLY CONSPIRACY DEFENDANTS | Public (via Television) | January 2019 | $10 million "Make the Switch" advertising campaign for the purpose of deceiving the public and regulators that JLI was only targeting adult smokers with its advertising and product and that JUUL was a cessation product. |
| ALTRIA | Public (via inserts in combustible cigarette packs) | March 2019 | "Make the Switch" advertising campaign for the purpose of deceiving smokers that JUUL was a cessation product. |
| Ashely Gould, JLI Chief Administrative Officer | Public (via interview with CNBC, later posted on internet) | December 14, 2017 | "It's a really, really important issue. We don't want kids using our products." |
| JLI | Public (via internet - social media) | March 14, 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." |

| Kevin Burns (then-CEO of JLI) | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA) November 12, 2018 (Public) | JLI's Action Plan that fraudulently states: "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . Our intent was never to have youth use JUUL products." |
| --- | --- | --- | --- |
| Kevin Burns | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." |
| All EARLY CONSPIRACY DEFENDANTS | Public (via internet - JLI website) | August 29, 2019 | "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." |
| MONSEES | Public (via statement to New York Times – later posted on internet) | August 27, 2019 | MONSEES said selling JUUL products to youth was "antithetical to the company's mission." |
| JLI | Public (via statement to Los Angeles Times – later posted on internet) | September 24, 2019 | "We have never marketed to youth and we never will." |

| JLI (via counsel) | FDA (via U.S. mail or electronic transmission to Dr. Matthew Holman) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." and "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." |
|---|---|---|---|
| MONSEES | Congress (via U.S. mail or electronic transmission of written testimony) | July 25, 2019 | Written Testimony of J. Monsees provided to Congress, stating "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage use." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." |
| Howard Willard | Congress (via U.S. mail or electronic transmission of letter to Senator Durbin) | October 14, 2019 | "In late 2017 and into EARLY 2018, we saw that the previously flat e-cigarette category had begun to grow rapidly. JUUL was responsible for much of the category growth and **had quickly become a very compelling product among adult vapers**. We decided to pursue an economic interest in JUUL, believing that an investment would **significantly improve** |

| | | | **our ability to bring adult smokers a leading portfolio of non-combustible products** and strengthen our competitive position with regards to potentially reduced risk products." |
|---|---|---|---|

966.     As described above, the Nicotine Market Expansion Conspiracy had a scheme to defraud the public and regulators in order to continue selling nicotine products to youth, and to protect their market share, by denying that JLI marketed to youth and claiming that JUUL was actually created and designed as a smoking cessation device or mitigated risk product.

967.     The CONSPIRACY DEFENDANTS had a specific intent to defraud regulators and the public. For example, as alleged above, the members of the Nicotine Market Expansion Conspiracy made repeated and unequivocal statements that they were not marketing to children and that their product was designed for adult smokers. As even the evidence pre-discovery shows, this is not true. The authors of these fraudulent statements are high level executives at each of the Defendant companies who would reasonably be expected to have knowledge of the company's internal research, public positions, and long term strategies. Because these high level executives made statements inconsistent with the internal knowledge and practice of the corporations, it would be absurd to believe that these highly ranked-representatives and agents of these corporations had no knowledge that their public statements were false and fraudulent. The CONSPIRACY DEFENDANTS intended the public and regulators to rely on these false transmissions and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

968.     The public and government regulators relied on the Nicotine Market Expansion Conspiracy's fraudulent misstatements. For example, the regulators, including the FDA, relied on the Nicotine Market Expansion Conspiracy's statements that mint was not a popular flavor in allowing mint JUULpods to remain on the market and relied on the Nicotine Market Expansion Conspiracy 's statements that it did not market to youth in allowing the CONSPIRACY

DEFENDANTS to continue marketing and selling JUUL. Congress likewise relied on the Conspiracy's statements in not bringing legislation to recall or ban e-cigarettes, despite the calls of members of both parties to do just that. And the public relied on statements that were transmitted by the CONSPIRACY DEFENDANTS regarding the nicotine content in JUULpods in deciding to purchase JUUL products.

### 4)    Harm and Injuries to Plaintiffs

969.    Each Plaintiff was injured—as set forth herein—by the Conspiracy and such injury would not have occurred but for the predicate acts of the CONSPIRACY DEFENDANTS. The combined effect of the CONSPIRACY DEFENDANTS' fraudulent acts were: (1) inducing Plaintiffs to purchase JUUL products that they would not have purchased had they known that JUUL products were not cessation products or if they had known of the addictive and toxic nicotine in said products; (2) lulling the FDA into allowing the continued sale of JLI's mint pods, which allowed Plaintiffs to purchase mint pods they would not have purchased; and (3) lulling Congress and the FDA into allowing JUUL products to remain on the market, which allowed Plaintiffs to purchase JUUL products they would not have purchased absent the CONSPIRACY DEFENDANTS' schemes to preserve JLI's ill-gotten market share.

970.    DEFENDANTS' conduct violated numerous states' laws and constituted a conspiracy to harm Plaintiffs. Plaintiffs bring a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

971.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiffs were injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

972.    Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### CAUSE OF ACTION XIII
### UNJUST ENRICHMENT

973.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

974.    Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

975.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

976.    DEFENDANTS created and implemented a plan to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. DEFENDANTS' plan was intended to portray JUUL Products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerns JUUL nicotine content, addictiveness, and safety.

977.    DEFENDANTS were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions and advertisements that included the following non-exhaustive list of omissions regarding: (i) whether JUUL Products are reasonable alternatives to cigarettes, (ii) were extremely potent nicotine-delivery mechanisms, (iii) contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and (iv) posed unreasonable risks of substantial bodily injury resulting from the use of the products. DEFENDANTS were also unjustly enriched through their scheme of marketing, distributing and selling their products to minors in violation of 21 C.F.R. § 1140.14.

978.    DEFENDANTS requested and received a measurable benefit at the expense of Plaintiffs in the form of payment for JUUL Products.

979.     DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto DEFENDANTS at the Plaintiffs' detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its customers.

980.     There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

981.     DEFENDANTS wrongfully obfuscated the harm caused be their conduct. Thus, Plaintiffs, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using JUUL Products would have on Plaintiffs' health.

982.     Plaintiffs are entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long tobacco litigations and other notice they have received as a result of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiffs would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

983.     Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION XIV**
**VIOLATION OF UNFAIR TRADE**
**PRACTICES/CONSUMER PROTECTION LAW**

984.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

985.     Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including

the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

986.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

987.    Certain Plaintiffs herein will bring a cause of action for consumer fraud and/or unfair and deceptive trade practices under applicable state law.

988.    DEFENDANTS are on notice that such claims may be asserted by those Plaintiffs.

989.    Plaintiffs purchased and/or used a JUUL PRODUCTS and/or JUUL PODS and suffered injuries as a result of DEFENDANTS' actions in violation of these consumer protection laws.

990.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased or used a JUUL PRODUCTS and/or JUUL PODS resulting in the monetary and physical injuries as alleged herein.

991.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include but are not limited to the following:

a.    representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b.    advertising goods or service with the intent not to sell them as advertised; and

c.    engaging in fraudulent or deceptive conduct that creates a likelihood of confusion.

992.    Plaintiffs were injured by DEFENDANTS' unlawful conduct, which was intended to through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying JUUL Products as cool and safe alternatives to combustible cigarettes while misrepresenting or omitting concerns about their nicotine content, addictiveness, and safety.

993. DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiffs constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

> a. Ala. Ala. Code §§ 8-19-1 et seq.;
>
> b. Alaska Stat. §§ 45.50.471 et seq.;
>
> c. Ariz. Rev. Stat. Ann. §§ 44-1522 et seq.;
>
> d. Cal. Civ. Code §§ 1770 et seq.
>
> e. Cal. Bus. & Prof. Code §§ 17200 et seq.;
>
> f. Colo. Rev. Stat. §§ 6-1-105 et seq.;
>
> g. Conn. Gen. Stat. §§ 42-110a et seq.;
>
> h. Del. Code Ann. tit. 6, §§ 2511 et seq., §§ 2531 et seq.;
>
> i. D.C. Code Ann. §§ 28-3901 et seq.;
>
> j. Fla. Stat. Ann. §§ 501.201 et seq.;
>
> k. O.C.G.A. §§ 10-1-372 et seq.;
>
> l. Haw. Rev. Stat. §§ 481A-1 et seq.;
>
> m. Id. Code Ann. §§ 48-601 et seq.;
>
> n. Ill. Comp. Stat. Ann. ch. 815, 505-1 et seq.;
>
> o. Ind. Code Ann. §§ 24-5-0.5-1 et seq.;
>
> p. Iowa Code Ann. §§ 714.16 et seq.;
>
> q. Kan. Stat. Ann. §§ 50-623, et seq.;
>
> r. Ky. Rev. Stat. Ann. §§ 367.110 et seq.;
>
> s. La. Rev. Stat. Ann. §§ 51:1401 et seq.;
>
> t. Me. Rev. Stat. Ann. tit. 5, §§ 205A et seq.;

u.      Md. Code Ann., Com. Law §§ 13-101 et seq.;

v.      Mass. Gen. Laws Ann. Ch. 93A et seq.;

w.      Mich. Comp. Laws §§ 445.901 et seq.;

x.      Minn. Stat. §§ 325D.43, et seq. §§ 325F.67 et seq., §§ 325F.69;

y.      Miss. Code Ann. §§ 75-24-3 et seq.;

z.      Mo. Ann. Stat. §§ 407.010 et seq.;

aa.     Mont. Code Ann. §§ 30-14-101 et seq

bb.     Neb. Rev. Stat. §§ 59-1601 et seq.;

cc.     Nev. Rev. Stat. §§ 598.0903 et seq.;

dd.     N.H. Rev. Stat. Ann. §§ 358-A:1 et seq.;

ee.     N.J. Stat. Ann. §§ 56:8-2 et seq.;

ff.     N.M. Stat. Ann. §§ 57-12-1 et seq.;

gg.     N.Y. Gen. Bus. Law §§ 349 et seq., §§ 350-e et seq.;

hh.     N.C. Gen. Stat. §§ 75-1.1 et seq.;

ii.     N.D. Cent. Code §§ 51-12-01 et seq., §§ 51-15-01 et seq.;

jj.     Ohio Rev. Code Ann. §§ 1345.01 et seq.;

kk.     Okla. Stat. tit. 15 §§ 751 et seq.;

ll.     Or. Rev. Stat. §§ 646.605 et seq.;

mm.     73 Pa. Stat. §§ 201-1 et seq.;

nn.     R.I. Gen. Laws. §§ 6-13.1-1 et seq.;

oo.     S.C. Code Ann. §§ 39-5-10 et seq.;

pp.     S.D. Codified Laws §§ 37-24-1 et seq.;

qq.     Tenn. Code Ann. §§ 47-18-101 et seq.;

rr.     Tex. Bus. & Com. Code Ann. §§17.41 et seq.;

ss.     Utah Code Ann. §§ 13-11-1 et seq.;

tt.     Vt. Stat. Ann. tit. 9, §§ 2451 et seq.;

uu.    Va. Code Ann. §§ 59.1-196 et seq.;

vv.    Wash. Rev. Code. §§ 19.86.010 et seq.;

ww.    W. Va. Code §§ 46A-6-101 et seq.;

xx.    Wis. Stat. Ann. §§ 100.20 et seq.; and

yy.    Wyo. Stat. Ann. §§ 40-12-101 et seq.

994.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, manufacturers, advertisers, marketers, promoters and sellers of JUUL Products, who are subject to liability under such legislation from fraudulent, unfair, deceptive, and unconscionable consumer sales practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were put on notice more than 30 days before this filing and failed to take any action to cure their actions or omissions.

995.    Plaintiffs relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to purchase and use JUUL Products.

996.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiffs have sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

997.    Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION XV**
**BREACH OF EXPRESS WARRANTY**

998.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

999.    Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including

the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

1000.   At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

1001.   DEFENDANTS violated numerous states' laws for breach of express warranties and certain Plaintiffs herein will bring a cause of action for breach of express warranty under applicable State common law.

1002.   DEFENDANTS expressly warranted through public statements, press releases advertisements, marketing materials and descriptions that JUUL Pods and JUUL Products were safe for their intended use and that they were a safer alternative to traditional combustible cigarettes.

1003.   DEFENDANTS expressly warranted to Plaintiffs through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, point-of-sale marketing and advertising, and its packaging materials that "JUUL pod contains ~.7 ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes."

1004.   DEFENDANTS expressly warranted to Plaintiffs through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, point-of-sale marketing and advertising and its packaging materials that "JUUL pod contains ~.7 ml with 3% nicotine by weight."

1005.   DEFENDANTS also expressly warranted that JUUL Pods are "5% Strength" as stated on the front of JUUL's product packaging and that one JUUL pod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials including point-of-sale marketing and advertising.

1006.   DEFENDANTS expressly warranted that JUUL use causes less, or at least no more, nicotine to enter the bloodstream than a cigarette and that one JUUL pod is equivalent to "1

pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials, including , point-of-sale marketing and advertising.

1007.   These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiffs, thereby creating express warranties that JUUL Products would conform to JUUL's affirmations of fact, representations, promises, and descriptions.

1008.   As described herein, JUUL Pods actually contain more nicotine than as advertised, and JUUL delivers more nicotine per puff than a combustible cigarette and JUUL Pods contain significantly more nicotine than one pack of cigarettes.

1009.   These express communications contained misrepresentations and failed to warn of the serious and known risks of JUUL Products as alleged herein.

1010.   When DEFENDANTS made these express warranties, they knew the intended purposes of the JUUL Products and warranted the product to be, in all respects, safe and proper for such purposes.

1011.   DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The JUUL Products sold by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately packaged, labeled, promoted and/or fit for the ordinary purposes for which they were intended.

1012.   All of the aforementioned written materials are known to DEFENDANTS and in their possession, and it is Plaintiffs' belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

1013.   DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiffs' harms.

1014.   As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiffs suffered serious economic and physical injuries and/or sequelae thereto as alleged herein.

1015.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to

allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CAUSE OF ACTION XVI
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

1016.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

1017.   Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

1018.   At all relevant times, the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS and RETAILER DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

1019.   The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS and RETAILER DEFENDANTS at all times were merchants with respect to JUUL Products sold to Plaintiffs and were in the business of selling such products.

1020.   Each JUUL Product sold comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

1021.   The ordinary intended purposes of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes or a smoking cessation device. For example, the "Make the Switch" campaign reinforces the impression that JUUL is linked to cessation and quitting and that JUUL is less harmful to one's health.

1022.   JUUL's products are not fit for that use—or any other use—because they are an unreasonably potent nicotine-delivery mechanism, contain nicotine levels higher than "approximately equivalent to a pack of cigarettes" in contrast to their warranties, and pose

significant risks of substantial physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, JUUL Products worsen or aggravate users' underlying nicotine addiction. Furthermore, by worsening users' addiction, JUUL Products have served as a gateway to increased cigarette use.

1023.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices and JUUL Products are in fact defective and fail to conform to JUUL's implied warranties.

1024.  JUUL DEFENDANTS', MANAGEMENT DEFENDANTS' and RETAILER DEFENDANTS' breach of their implied warranties violated numerous statutes, including but not limited to:

      a.     Ala. Code §§ 7-2-314 et seq.;

      b.     Alaska Stat. §§ 45.02.314 et seq.;

      c.     Ariz. Rev. Stat. Ann. §§ 47-2314 et seq.;

      d.     Ark. Code Ann. §§ 4-2-314 et seq.;

      e.     Cal. Com. Code §§ 2314 et seq.;

      f.     Colo. Rev. Stat. §§ 4-2-314 et seq.;

      g.     Conn. Gen. Stat. Ann. §§ 42a-2-314 et seq.;

      h.     Del. Code Ann. tit. 6, §§ 2-314 et seq.;

      i.     D.C. Code Ann. §§ 28:2-314 et seq.;

      j.     Fla. Stat. Ann. §§ 672.314 et seq.;

      k.     O.C.G.A. §§ 11-2-314 et seq.;

      l.     Haw. Rev. Stat. §§ 490:2-314 et seq.;

      m.     Id. Code §§ 28-2-314 et seq.;

      n.     Ill. Comp. Stat. Ann. Ch. 810, 5/2-314 et seq.;

      o.     Indiana Code Ann. §§ 26-1-2-314 et seq.;

      p.     Iowa Code Ann. §§ 554.2314 et seq.;

      q.     Kan. Stat. Ann. §§ 84-2-314 et seq.;

      r.     Ky. Rev. Stat. Ann. §§ 355.2-314 et seq.;

s.     La. Civ. Code Ann. art. 2520 et seq.;

t.     Me. Rev. Stat. Ann. tit. 11, §§ 2-314 et seq.;

u.     Md. Code Ann., Com. Law §§ 2-314 et seq.;

v.     Mass. Gen. Laws Ann. Ch. 106, §§ 2-314 et seq.;

w.     Mich. Comp. Laws Ann. §§ 440.2314 et seq.;

x.     Minn. Stat. Ann. §§ 336.2-314 et seq.;

y.     Miss. Code Ann. §§ 75-2-314 et seq.;

z.     Mo. Rev. Stat. §§ 400.2-314 et seq.;

aa.    Mont. Code Ann. §§ 30-2-314 et seq.;

bb.    Neb. Rev. Stat. §§ 2-314 et seq.;

cc.    Nev. Rev. Stat. §§ 104.2314 et seq.;

dd.    N.H. Rev. Stat. Ann. §§ 382-A:2-314 et seq.;

ee.    N.J. Stat. Ann. §§ 12A:2-314 et seq.;

ff.    N.M. Stat. Ann. § 55-2-314 et seq.;

gg.    N.Y. U.C.C. Law §§ 2-314 et seq.;

hh.    N.C. Gen. Stat. Ann. §§ 25-2-314 et seq.;

ii.    N.D. Cent. Code §§ 41-02-31 et seq.;

jj.    Ohio Rev. Code Ann. §§ 1302.27 et seq.;

kk.    Okl. Stat. tit. 12A, §§ 2-314 et seq.;

ll.    Or. Rev. Stat. §§ 72.3140 et seq.;

mm.    13 Pa. Stat. Ann. §§ 2314 et seq.;

nn.    R.I. Gen. Laws §§ 6A-2-314 et seq.;

oo.    S.C. Code Ann. §§ 36-2-314 et seq.;

pp.    S.D. Codified Laws §§ 57A-2-314 et seq.;

qq.    Tenn. Code Ann. §§ 47-2-314 et seq.;

rr.    Tex. Bus. & Com. Code §§ 2.314 et seq.;

ss.    Utah Code Ann. §§ 70A-2-314 et seq.;

tt.    Va. Code Ann. §§ 8.2-314 et seq.;

1    uu.    Vt. Stat. Ann. tit. 9A, §§ 2-314 et seq.;

2    vv.    Wash. Rev. Code §§ 62A.2-314 et seq.;

3    ww.    W. Va. Code §§ 46-2-314 et seq.;

4    xx.    Wis. Stat. Ann. §§ 402.314 et seq.; and

5    yy.    Wyo. Stat. Ann. §§ 34.1-2-314 et seq.

1025.  The JUUL DEFENDANTS, MANAGEMENT DEFENDANTS and RETAILER DEFENDANTS have breached JUUL's implied warranty of merchantability because JUUL Products were not in merchantable condition when sold, were defective when sold, and do not possess even the most basic degree of fitness for ordinary use.

1026.  Despite having received notice of these defects, the JUUL DEFENDANTS, MANAGEMENT DEFENDANTS and RETAILER DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

1027.  Plaintiffs have had sufficient direct dealings with the JUUL DEFENDANTS and/or MANAGEMENT DEFENDANTS via its website or the RETAILER DEFENDANTS as its agents authorized to sell and distribute JUUL Products and to establish privity of contract between JUUL.

1028.  Further, Plaintiffs were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL Products to consumers. Specifically, Plaintiffs are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1029.  Plaintiffs would not have used or purchased JUUL Products, or would not have purchased the products on the same terms, had they known the facts these Defendants failed to disclose.

1030.  DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiffs' harms.

1031.  Plaintiffs were injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiffs have been harmed by DEFENDANTS' failure

to deliver merchantable products in the form of higher-than-perceived nicotine exposure, addiction, and other negative health consequences.

1032.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION XVII**
**<u>WRONGFUL DEATH</u>**

1033.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

1034.   Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

1035.   This Cause of Action applies to Plaintiffs bringing their actions as duly-appointed representatives of Plaintiff Decedents' Estates pursuant to laws of various States.

1036.   As a direct and proximate result of the conduct of DEFENDANTS and the defective nature of JUUL as outlined above, Plaintiff Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, emotional distress, loss of capacity of the enjoyment of life, a shortened life expectancy, expenses for hospitalizations and other medical and nursing treatments, loss of earnings, loss of ability to earn, funeral expenses, and death.

1037.   As a direct and proximate cause of the conduct of DEFENDANTS and the defective nature of JUUL as outlined above, Plaintiff Decedents' beneficiaries have incurred hospital, nursing, medical, and estate administration expenses resulting from Plaintiff Decedents' injuries and deaths, and have suffered and will continue to suffer mental and physical anguish.

1038.   DEFENDANTS' conduct, as described above, was willful, wanton, reckless, malicious, fraudulent, oppressive, extreme and outrageous, and displayed an entire want of care

and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their patients, and warrants an award of punitive damages.

1039.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION XVIII**
**SURVIVAL ACTION**

1040.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

1041.   Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

1042.   This Cause of Action applies to Plaintiffs bringing their actions as duly-appointed representatives of Plaintiff Decedents' Estates pursuant to laws of various States.

1043.   As a direct and proximate result of the conduct of DEFENDANTS and the defective nature of JUUL as outlined above, Plaintiff Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, emotional distress, loss of capacity of the enjoyment of life, a shortened life expectancy, expenses for hospitalizations and other medical and nursing treatments, loss of earnings, loss of ability to earn, funeral expenses, and death.

1044.   As a direct and proximate cause of the conduct of DEFENDANTS and the defective nature of JUUL as outlined above, Plaintiff Decedents' beneficiaries have incurred hospital, nursing, medical, and estate administration expenses resulting from Plaintiff Decedents' injuries and deaths, and have suffered and will continue to suffer mental and physical anguish.

1045.   DEFENDANTS' conduct, as described above, was willful, wanton, reckless, malicious, fraudulent, oppressive, extreme and outrageous, and displayed an entire want of care

and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their patients, and warrants an award of punitive damages.

1046.  Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION XIX**
**LOSS OF CONSORTIUM**

1047.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

1048.  Plaintiffs plead all Causes of Action of this Master Complaint (Personal Injury) in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiffs' resident States. Plaintiffs plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiffs' respective States.

1049.  The spouses of the primary Plaintiffs in this litigation, who live and cohabit with the primary Plaintiffs in this litigation, are the "CONSORTIUM PLAINTIFFS."

1050.  As a direct and proximate result of the conduct of DEFENDANTS and the defective nature of JUUL as outlined above, the CONSORTIUM PLAINTIFFS have necessarily paid and/or have become liable to pay, and will continue to pay and/or continue to be liable to pay, for medical aid, medical treatment, and medications of the primary Plaintiffs in this litigation.

1051.  As a direct and proximate result of the conduct of DEFENDANTS and the defective nature of JUUL outlined above, the CONSORTIUM PLAINTIFFS have been caused and will continue to be caused the loss of their spouses' consortium, companionship, services, society, love, and comforts, and their martial association has been altered, and, accordingly, the CONSORTIUM PLAINTIFFS have been caused great mental anguish and emotional distress

1052.  DEFENDANTS' conduct, as described above, was willful, wanton, reckless, malicious, fraudulent, oppressive, extreme and outrageous, and displayed an entire want of care

1    and a conscious and depraved indifference to the consequences of their conduct, including to the

2    health, safety, and welfare of Plaintiffs, and warrants an award of punitive damages.

3         1053.   Plaintiffs demand judgment against DEFENDANTS for compensatory, treble, and

4    punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

5    the Court deems proper.

6    **VI.     TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS**

7         1054.   Through the exercise of reasonable diligence, Plaintiffs did not and could not have

8    discovered that JUUL Products caused their injuries and/or sequelae thereto because, at the time

9    of these injuries and/or sequelae thereto, the cause was unknown to Plaintiffs.

10        1055.   Plaintiffs did not suspect and had no reason to suspect JUUL Products caused their

11   injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing

12   of this action.

13        1056.   In addition, DEFENDANTS' fraudulent concealment has tolled the running of any

14   statute of limitations. Through their affirmative misrepresentations and omissions,

15   DEFENDANTS actively concealed from Plaintiffs the risks associated with the defects of JUUL

16   Products and that these products caused their injuries and/or sequelae thereto. Through their

17   ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual

18   tortious and fraudulent acts.

19        1057.   As a result of DEFENDANTS' fraudulent concealment, Plaintiffs were unaware

20   and could not have reasonably known or learned through reasonable diligence that they had been

21   exposed to the defects and risks alleged herein and that those defects and risks were the direct and

22   proximate result of DEFENDANTS' acts and omissions.

23   **VII.    PRAYER FOR RELIEF**

24        Plaintiffs demand judgment against DEFENDANTS to the full extent of the law,

25   including but not limited to:

26        1.      judgment for Plaintiffs and against DEFENDANTS;

27        2.      damages to compensate Plaintiffs for injuries sustained as a result of the use of

28   JUUL including but not limited to physical pain and suffering, mental anguish, loss of enjoyment

1   of life, emotional distress, expenses for hospitalizations and medical treatments, other economic

2   harm that includes but is not limited to lost earnings and loss of earning capacity;

3       3.      where alleged, damages to compensate CONSORTIUM PLAINTIFFS for loss of

4   consortium, companionship, services, society, love, and comforts, and alteration their martial

5   association, and mental anguish and emotional distress;

6       4.      where alleged all damages available for wrongful death and survival;

7       5.      exemplary, treble, and/or punitive damages in an amount in excess of the

8   jurisdictional limits;

9       6.      attorneys' fees;

10      7.      experts' fees;

11      8.      costs of litigation;

12      9.      pre-judgment and post-judgment interest at the lawful rate;

13      10.     a trial by jury on all issues of the case;

14      11.     medical monitoring costs or programs; and,

15      11.     any other relief as this court may deem equitable and just, or that may be available.

16

17      By: */s/ Sarah R. London*
        Sarah R. London
18      **LIEFF CABRASER HEIMANN & BERNSTEIN**
        275 Battery Street, Fl. 29
19      San Francisco, CA 94111
        Telephone: (415) 956-1000
20

21      By: */s/ Dena Sharp*
        Dena C. Sharp
22      **GIRARD SHARP LLP**
        601 California St., Suite 1400
23      San Francisco, CA 94108
        Telephone: (415) 981-4800
24

25      By: */s/ Dean Kawamoto*
        Dean Kawamoto
26      **KELLER ROHRBACK L.L.P.**
        1201 Third Ave., Ste. 3200
27      Seattle, WA 98101
        Telephone: (206) 623-1900
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Ellen Relkin*
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2020, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

/s/ <i>Sarah R. London</i>