# APPENDIX A

## A. Shayla Aceti

1.      Plaintiff Shayla Aceti is a resident of Eugene, Oregon.

2.      Aceti first used JUUL products in July 2019 when a friend purchased a JUUL device and offered her the opportunity to try it. She was twenty-eight years old. After this initial exposure, Aceti ordered a JUUL starter kit from JUUL's website. Aceti was unaware that JUUL products contained substantial amounts of nicotine and their use posed a risk of addiction. Aceti would not have tried JUUL if she knew it delivered more nicotine to the bloodstream than cigarettes.

3.      Aceti recalls promotional displays at local gas stations and convenience stores.

4.      Aceti recalls, in 2019, in-store displays in front of the cashiers' counters and next to the lighters, prominently exhibiting JUUL products. They were, or were substantially similar to, the following:



5.      Aceti further recalls in-store displays featuring a bevy of JUUL accessories, such as JUUL pod flavor varieties, a USB charging dock, and JUUL devices with fresh

1

new color schemes, on display since 2019. They were, or were substantially similar to, the following:



6.      After her initial starter kit, Aceti purchased her JUUL products online. She recalls viewing advertisements on social media platforms such as Instagram and Snapchat. Aceti specially recalls viewing imagery identical or substantially similar to that below on Snapchat in 2019.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



7.      Aceti also received promotional emails, including that below, from JUUL in early 2019 and 2020.



8.      While using JUUL products, Aceti consumed roughly one-half of a JUUL pod each day. As a frequent consumer of JUUL products, Aceti experienced constant throat

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

pain and disruptive coughing fits. She further reports a greater vulnerability to illness and infection while using JUUL, despite her usual resilience to such ailments. These developments worried Aceti; she began to reconsider her JUUL habits. As of early 2020, Aceti has successfully curbed her JUUL use. All respiratory issues and immuno-vulnerabilities disappeared within two weeks of her cessation of JUUL use. In retrospect, Aceti wishes JUUL was more forthright about the high nicotine content in their products, as well as the health and addiction risks of engaging in their use.

9.      None of the advertisements, in-store promotions, or labels Aceti saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Aceti would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**B. Jose Gale Aliaga**[1]

10.     Jose Gale Aliaga is a 24-year-old resident of Virginia.

11.     Aliaga started using JUUL products in 2015 after hearing a radio commercial on station DC101, seeing advertisements in gas stations, and he also saw JUUL content on social media including Facebook, and received promotional emails from JUUL.

---

[1] Plaintiff Jose Angullo legally changed his name to Jose Gale Aliaga, pursuant to a November 29, 2018 court order issued by the Circuit Court of Fairfax, Virginia.

12.     Aliaga bought JUUL to see what it was because the marketing made it seem like a safer alternative to smoking and did not contain any warnings. He specifically saw this ad:



13.     Prior to using JUUL, Aliaga used to smoke between 10-20 cigarettes per day.

14.     He now purchases JUUL at $17/per pack at the 7-11 convenience stores and smokes one JUUL pod per day, and sometimes more.

15.     Aliaga noticed the 5% strength label on the JUUL pod and thought it meant it was 5% of the nicotine of a regular cigarette.

16.     Aliaga saw these displays in stores before using the product:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



17.     Aliaga prefers to use the Mango flavor, which is more palatable. He saw specific ads related to Mango that downplayed or omitted the harms of exposure to nicotine or warned of the content of nicotine in JUUL, including the following online and on Twitter and Instagram:







18.     Aliaga has received promotional emails and online content from JUUL, none of which contained warnings explaining that JUUL pods contain and delivered more nicotine than a pack of cigarettes.

19.     None of the advertisements, in-store promotions, or labels Aliaga saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

20.      Instead, Aliaga has become addicted to JUUL. Aliaga smokes JUUL within 5 minutes of waking up. JUUL is stuck on his mind more than cigarettes ever were and he feels completely addicted.

21.      Aliaga coughs every day and has a persistent cough that never goes away.

22.      Aliaga would never have purchased JUUL products if he had known the true nature of nicotine content and delivery, including that content in relation to a pack of cigarettes. Aliaga would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

23.      Aliaga is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**C.  Nicholas Allen**

24.      Plaintiff Nicholas Allen is a 40-year-old resident of Herriman, Utah.

25.      Allen had been smoking from one half to one full pack of cigarettes each day prior to quitting in 2013 in favor of other vaping products. He first began using JUUL products in 2018.

26.      Based on various advertisements of JUUL's products that he saw and relied on, Allen purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

27.     Allen saw numerous advertisements and promotional marketing materials for JUUL. After clicking on an article about JUUL products on Facebook, Allen's social media began to fill with further advertisements for JUUL products, which led him to the JUUL website. On social media, Allen was exposed to ads that concealed JUUL's nicotine content, including specifically the following:



28.     Allen interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements

or labels Allen saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is of capable delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

29.     Shortly after beginning to use JUUL pods in 2018, Allen began to feel like he was "back smoking cigarettes again." He began coughing more frequently and suffered from decreased lung capacity.

30.     Furthermore, Allen became addicted to JUUL pods, consuming between one half and one entire JUUL pod per day.

31.     Allen turned to his JUUL pod on a daily basis within one minute of waking and felt his nicotine addiction had worsened rather than improved once he began consuming JUUL pods.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

32.     Allen purchased JUUL pods at local convenience stores where he was further exposed to attractive and misleading advertisements and marketing displays, including specifically the following:





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

33.    Allen was allured by JUUL's variety of flavors. He especially preferred the Mango flavor, for which he saw advertisements on social media and in person. He believed JUUL pods were available in more appealing flavors than were other vaping products.

34.    Allen has become more addicted to JUUL pods than he ever was to cigarettes. He spent an average of $65 per week on JUUL products.

35.    Allen now smokes Vuse e-cigarettes in place of JUUL e-cigarettes.

36.    Allen would not have purchased JUUL pods if JUUL had accurately conveyed the true potency of the device's nicotine content.

37.    Had Allen known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Allen is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**D. Addison Altizer**

38.    Addison Altizer is a 23-year-old resident of Bluffton, South Carolina.

39.    Altizer had been smoking less than 10 cigarettes per day before using JUUL products. He began using JUUL in 2017.

40.    Based on various advertisements of JUUL's products that he saw and relied on, Altizer purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

41.     Altizer saw advertisements on social media and point of sale displays that led him to believe that JUUL was a smoking-cessation tool. On Instagram, Altizer saw the following promotional posts:



42.     Altizer saw ads that emphasized exotic flavors and encouraged Plaintiff to switch to JUUL from cigarettes. These ads did not accurately display the strength of the nicotine in JUUL products or refer to the delivery system that results in nicotine entering the bloodstream faster and at higher levels than cigarettes or other e-cigarettes. At point of sale displays, Altizer saw the following ads:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

43.     Altizer's preferred JUUL pod flavor had been Mango. After JUUL
discontinued the flavor, Altizer has switched to the Virginia Tobacco flavored JUUL pods.

44.     Altizer interpreted the ads he had seen as indicating that JUUL was not only
safer than cigarettes, but capable of helping him stop smoking. None of the advertisements,
in-store promotions, or labels Altizer saw adequately disclosed the nature or addiction risks
of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that
the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the
JUUL is capable of delivering nicotine more rapidly and in greater quantities than a
cigarette, or that use of JUUL products poses significant health risks.

45.     Altizer believed that the 5% nicotine label on JUUL pod packaging
indicated that JUUL pods contained significantly less nicotine than a pack of cigarettes.

46.     Altizer has become addicted to JUUL pods. He consumes between half of a
JUUL pod and one JUUL pod a day and begins using his JUUL within five minutes of
waking. He feels that JUUL pods are "for sure" on his mind more than cigarettes.

47.     Altizter often misplaced his JUUL and needed to purchase new devices. At one point, Altizer owned 7 JUUL devices at the same time.

48.     Plaintiff Altizer believed the JUUL would help him quit smoking cigarettes. The advertisements he saw did not reveal that JUUL pods deliver a higher concentration of nicotine than cigarettes and e-cigarettes or that they deliver nicotine to the bloodstream more quickly.

> Had Altizer known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and Case No. 19-md-02913-WHO

49.     , risks of addiction, and other health risks. Altizer is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**E.  Gary Bagley**

50.     Gary Bagley is a 51-year-old resident of Pocatello, Idaho.

51.     Bagley had been consuming between one and one-and-a-half packs of cigarettes per day before he began using JUUL in February 2017.

52.     Bagley's nicotine addiction interfered with his career as a paramedical examiner. His patients often complained of his smoking habits, such as a strong cigarette smell during home visits. As a result, Bagley decided to quit smoking.

53.     Bagley previously had attempted, unsuccessfully, to quit smoking cigarettes using nicotine patches, before starting on JUUL.

54.     Bagley became aware of JUUL through colleagues who vaped as well as through point-of-sale advertisements that misrepresented the product as an alternative to cigarettes or a smoking cessation tool.

55.     Based on various advertisements of JUUL's products that he saw and relied on, Bagley purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

56.     During his initial exposure to JUUL's advertising, JUUL packaging did not display a nicotine warning. Such ads included specifically the following:





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

57.     Bagley's preferred JUUL pod flavor is 5% Virginia Tobacco.

58.     Bagley saw the different JUUL strengths like different steps of the nicotine patch. Thus, he began with 5% pods over 3% pods because he felt that 5% pods would more effectively mitigate his initial withdrawal systems from almost 28 years of smoking.

59.     Although Bagley knew that 5% JUUL pods contained more nicotine than 3% JUUL pods, he was not aware that JUUL pods delivered more nicotine into the bloodstream than cigarettes, and that they delivered nicotine more quickly.

60.     Bagley interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements, in-store promotions, or labels Bagley saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

61.     Bagley became aware of JUUL's higher nicotine content approximately 6 months after beginning JUUL use.

62.     Bagley developed an addiction to JUUL pods. Bagley feels that JUUL pods are on his mind as much as smoking cigarettes was. He uses his JUUL within five minutes of waking. He consumes between half and one full JUUL pod per day.

63.     Bagley believes that the withdrawal symptoms he experiences from JUUL are stronger than those he experienced while using traditional cigarettes.

Had Bagley known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the ni Case No. 19-md-02913-WHO

64.    content and dosage, risks of addiction, and other health risks. Bagley is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**F.  Mary Baker, on behalf of her son, B.C., a minor**

65.    Plaintiff Mary Baker and B.C. are residents of Huntington, West Virginia.

66.    Baker's son, B. C., is currently 17 years old and used a JUUL for the first time in 2016 at the age of 14.

67.    B.C. learned about JUUL from his friends at school and by viewing JUUL advertisements online. The advertisements he recalls viewing included the following images from JUUL's infamous "Vaporized" campaign:



68.    Before he had ever taken a puff from a JUUL, B.C. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including advertisements featuring JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit." Among the POS materials that B.C. recalls seeing were the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

69.     On platforms such as Instagram, B.C. was exposed to a steady stream of images that focused on the sweet and fruity flavors of JUUL pods and promoted JUUL as a tasty treat but failed to disclose that it was also a potent addictive drug. Among the online "flavor" advertisements that B.C. recalls were the following:

 

70.     None of the advertisements, in-store promotions, or labels B.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of

19

JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's advertisements, in-store promotions and labels materially impacted B.C.'s assessment of, and eventual decision to use, JUUL products.

71.    The viral spread of JUUL-promotional content reached B.C. and B.C.'s social network, including classmates, leading to an increase in uptake of JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, B.C. would not have been exposed to, and would not have used, JUUL products.

72.    When one of B.C.'s friends offered him his first puff of a JUUL, B.C. accepted. Shortly thereafter, he started buying JUUL products of his own.

73.    Once B.C. had a JUUL of his own, he quickly became addicted to nicotine.

74.    Although well below the minimum legal age to purchase JUUL products, B.C. was nevertheless able to purchase JUUL products from local stores and classmates.

75.    B.C. was still below the legal age to purchase JUUL products when he obtained warranty service for his JUUL device from the JUUL website in 2018.

76.    Like many other students, B.C. has used his JUUL at school. Due to this in-school JUUL use, B.C. was suspended from school three times in 2017 and two more times in 2018.

77.    Baker has sought assistance for B.C.'s nicotine addiction but, to date, B.C. is still addicted.

78.    B.C. currently consumes one JUUL pod a day. He takes his first puff of JUUL within 5 minutes of waking up.

79.     B.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks JUUL posed.

### G.  Tommy Benham

80.     Plaintiff Tommy Benham is a resident of Michigan.

81.     Benham, who is 20 years old, purchased a JUUL starter kit at the age of 18. He was a smoker prior to his purchase. Benham decided to try JUUL products based on advertising that he saw in posters, magazines, and Facebook depicting JUUL e-cigarettes as a safe, less addictive alternative to smoking cigarettes. He was smoking a pack of cigarettes a day at the time and thought that the JUUL would help him quit smoking by weaning him from cigarettes. He also found the variety of flavors appealing and was attracted to the eye-catching colors and bold fonts used in the JUUL ads.

82.     Among the JUUL ads that Benham saw were numerous ads placed on Facebook as part of JUUL's "Switch" campaign. These included testimonial ads touting the switch to JUUL as an improvement over cigarette smoking. For example, Benham recalls seeing the ads below on Facebook:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





83.    These ads led Benham to believe that using JUUL products would decrease his appetite for nicotine.

---

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

84.     Benham also recalls seeing a number of "Smoking Evolved" ads, including

the ads below:



85.     Benham liked the sleek, high tech look of the device and the bright colors of

the JUUL pods. The tag line "Smoking Evolved" led Benham to believe that the JUUL pod

had been designed to avoid unhealthy side effects and be less addictive than traditional

cigarettes.

86.     Benham saw numerous JUUL ads on Facebook touting the various JUUL

pod flavors, including limited edition flavors such as Mango (before it became a

"permanent" flavor), Menthol, and Cool Cucumber. For example, Benham recalls seeing

the ads below on Facebook:







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



87.     The variety of flavors was a major factor in his use of JUUL, and he tried essentially every new flavor that came out. JUUL's use of invitations to comment on "which flavor is your favorite" was also engaging to Benham, who commented on the various flavors in response to those ads. Benham also saw ads framing JUUL pod flavors

as something to be paired with foods, such as ads with "featured chef" pairings of JUUL

pod flavors with recipes. For example, Benham believes he saw the ad below:



88.     Benham also saw numerous ads on Facebook that touted limited edition

JUUL e-cigarettes in new colors such as Navy and Gold. For example, Benham recalls

seeing the ads below:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



89.     Benham purchased these limited-edition e-cigarettes because he felt they had more pizazz than a standard black JUUL e-cigarette.

90.     Benham also saw JUUL ads leveraging the fact that JUUL e-cigarettes would avoid "smelling like an ashtray."

91.     Among the ads discussed above that Benham saw were ads using discounts to promote new styles of e-cigarettes and JUUL pod flavors. He sometime purchased JUUL products at least in part in response to seeing these discounts. For example, Benham believes he saw the discount ad below:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



92.     Benham also saw JUUL ads on Facebook with celebrity images, such as a 2016 ad showing Orlando Bloom and Katy Perry sharing a JUUL e-cigarette. Benham perceived these images as glamorizing JUUL products and making them seem trendy.

93.     None of the advertisements, in-store promotions, or labels Benham saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

94.     Although Benham thought JUUL would help him quit smoking, he has found it even more addictive than cigarettes, to the point where he is addicted to JUUL pods and now even tobacco is an inadequate substitute. Benham now finds that he has to interrupt his routine throughout the day to vape with his JUUL, and that he is consuming at least eight JUUL pod packs per week. Benham favors Cool Mint flavored JUUL pods.

95.    Benham would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**H.  Mindy Boyd, on behalf of her daughter, E.B., a minor**

96.    Plaintiff Mindy Boyd and her daughter, E.B., are residents of Kearney, Missouri.

97.    Boyd's daughter, E.B., is currently 16 years old and started using JUUL's products in 2017 when she was only 14 years old.

98.    E.B. never tried smoking cigarettes before using JUUL's products.

99.    E.B. learned about JUUL at school from her friends and by viewing advertisements and promotions online through social media. E.B. recalls in particular seeing ads on social media in 2017 promoting JUUL's products, which specifically included the following:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

100.    Despite her underage status, E.B. was able to purchase JUUL pods from QuickTrip and Casey's stores where she lives in Missouri. She recalls seeing in-store displays essentially identical to the following, which were designed to be easily accessible and eye-catching:







101.    E.B. was also drawn to JUUL's products by the candy-like flavors and, as with many underage users, she preferred the mint variety. Below is the type of promotional image shown below that she specifically recalls viewing:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

102.    None of the advertisements, in-store promotions, or labels E.B. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

103.    E.B. is now addicted to JUUL and has to start vaping within 5 minutes of waking each morning, eventually consuming more than a full JUUL pod each day.

104.    The addiction has cost E.B. and her family money and other losses. E.B. spends roughly half of her paychecks on JUUL every week and estimates altogether spending at least $2,100 per year on JUUL's products given she vapes at least one pod per day (which equates to at least $6,300 over three years).

105.    Boyd has noticed as well that E.B. gets sick more often and has experienced substantial personality changes. E.B. is uncharacteristically irritable and suffers from frequent headaches, which are symptoms of nicotine addiction and withdrawal.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

106.    E.B. has tried to stop using JUUL on numerous occasions, but always becomes anxious when not vaping and has never been able to quit for long.

107.    Boyd struggles with E.B.'s addiction and inability to quit using as well, leading to constant arguments between them and worries about what physical effects E.B.'s exposure to nicotine at such a young age will have.

108.    E.B. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. The availability of candy-like flavors played a role as well in getting her to start using JUUL products.

### I.    Kaahuakamehuanui Brun

109.    Plaintiff Kaahuakamehuanui Brun is a 27-year-old resident of Makaweli, Hawaii.

110.    Brun purchased his first JUUL e-cigarette in the early part of 2018 at a 7-Eleven in Makaweli, Hawaii. He was twenty-five years old.

111.    Brun visited the JUUL website in every year from 2016 to 2020 and saw advertisements there. He also saw JUUL-related social media content, including JUUL advertisements, on Facebook, Instagram, and Snapchat. He does not recall seeing warnings related to addiction or nicotine in any of these advertisements.

112.    Based on the advertisements that he saw, Brun believed that JUULs were safer and less addictive than cigarettes and hoped to use JUULs to reduce his nicotine intake. He believed that the 5% strength representation on the JUUL packs meant that they were 5% as strong as cigarettes. He would not have tried JUUL if he knew it delivered

more nicotine to the bloodstream than cigarettes or if he knew that it could cause respiratory illnesses and other health complications.

113.    After his initial purchase, Brun continued to purchase pods at the local 7-Eleven.

114.    Before starting JUUL, Brun smoked between 10 and 20 cigarettes per day. While using JUUL products, Brun used one to two JUUL pods per day.

115.    While using JUUL, Brun found that vaping was more on his mind than smoking ever had been. He first used his JUUL device within 5-30 minutes of waking up.

116.    While using JUUL products, Brun experienced shortness of breath and asthma-like symptoms, including difficulty breathing when he first wakes up. He also experienced an increased frequency of respiratory illnesses, coughing, migraine headaches, pain in his chest and the back of his shoulders, and diarrhea.

117.    In November 2019, Brun sought medical treatment as a result of these medical issues and was told that he has a lung-related problem.

118.    Brun tried to quit JUUL, but he was unable to stop vaping. He recently switched to another, cheaper vaping device. He is still addicted to nicotine and vapes frequently.

119.    None of the advertisements, in-store promotions, or labels Brun saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Brun would not have purchased or started using JUUL's products if he had

been adequately warned about the nicotine content and dosage, risks of addiction, and other

health risks.

**J.   Nikki Buchanan, on behalf of her son, C.S.B., a minor**

120.   Plaintiff Nikki Buchanan and her son, C.S.B., are residents of Calhoun,

Georgia.

121.   C.S.B. is 16 years old now. He started using JUUL's products in 2018 when

he was 14 years old and is now addicted.

122.   C.S.B. had never tried smoking cigarettes before using JUUL's products.

123.   Before he started vaping, C.S.B. recalls seeing dozens of ads in late 2017 on

Instagram, Facebook, and Twitter promoting JUUL's products without any clear warnings

about nicotine or addiction, specifically including the following:



124.   Relying on those ads, C.S.B. thought it would not be harmful to use JUUL's

products and was not aware of a risk that he could become addicted.

125.   None of the advertisements, in-store promotions, or labels C.S.B.

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was

engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of

delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

126.    Instead, many of the ads he saw portrayed JUUL as a desirable product that was a status symbol or a harmless lifestyle choice like having a cup of coffee:







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO




127.   C.S.B. also started vaping JUUL's products as well because of the Mango flavor in particular. He recalls that being popular in his school and promoted in advertisements that he, as a minor, found particularly appealing, such as the following ads that he saw, which did not contain any warning of the dangers:







128.     C.S.B. was in transition from middle school to high school and was working out with the football team. The older high school kids were using JUUL products and doing so made C.S.B. feel like an adult.

129.     When C.S.B. started vaping with his friends, he found he was able to purchase JUUL pods himself at a grocery store near where he lived in Georgia and from classmates who purchased elsewhere. He recalls seeing posters and displays essentially identical to the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





130. C.S.B. is now addicted and has to start vaping within 5 minutes of waking each morning, ultimately consuming between half a JUUL pod to a full pod each day.

131. C.S.B.'s use of JUUL products has caused substantial problems for him and his family. Buchanan notes her son became more aggressive and gets angry when cannot use JUUL and started hiding things from his parents to be able to vape. He was also caught vaping at school and kicked off the football team as well. C.S.B. had been caught using JUUL in school 3 times and was warned that another such infraction would result in

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

expulsion. Due to his severe addiction and inability to stop JUULing, C.S.B. was withdrawn from school and is now being home schooled.

132.    The resulting changes in C.S.B.'s behavior and addiction to JUUL's products has caused Buchanan to spend more than $3,000 in counseling fees and will continue to cost her family more in the future dealing with C.S.B.'s addiction.

133.    C.S.B. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**K.  Cortney Burch, on behalf of her son, C.B., a minor**

134.    Plaintiff Cortney Burch and her son, C.B., are residents of Denham Springs, Louisiana.

135.    C.B. is 14 years old. He first learned about JUUL's products at school and saw them promoted on social media, then started using JUUL's products in 2019 and is now addicted.

136.    C.B. never tried smoking cigarettes before using JUUL's products.

137.    C.B. was able to purchase JUUL pods from classmates, stores, and even from JUUL's website. The posters and displays he recalls seeing offered substantial discounts to get started and always were made to be attractive and trendy looking, including some essentially identical to the following:









138.    None of the advertisements, in-store promotions, or labels C.B.

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

139.    C.B.'s interest in JUUL was significantly increased as well by the availability of candy-like flavors such as Cool Mint, his favorite.

140.    C.B. is now addicted and has to start vaping within 5 minutes of waking up each morning, ultimately consuming between half a JUUL pod to a full pod each day. C.B.'s use of JUUL products has negatively affected his physical stamina and caused depression. C.B. was an athlete and his use of JUUL has harmed his ability to keep-up with his peers in sports.

141.    C.B. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**L.  Thomas Carcone, on behalf of his son, N.C., a minor**

142.    Plaintiff Thomas Carcone and N.C. are residents of Utica, New York.

143.    Thomas Carcone's son, N.C., is currently 17 years old. N.C. began using JUUL's products in 2015, when he was 14 years old, after hearing about them at school and seeing displays in store.

144.    The displays used bold colors and were set up in standalone cases to be enticing and easily accessible and were essentially identical to the following:

 



145.    None of the advertisements, in-store promotions, or labels N.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

146.    Based on his understanding that the products did not contain nicotine and were not addictive, N.C. began purchasing JUUL pods from a local vaping store in his area and soon was consuming several JUUL pods each week.

147.    In the meantime, his classmates and others adopted JUUL's advertising of the products as cool, trendy, and designed for young people, and often promoted the

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

products themselves by posting on social media or sharing viral images and posts using the

"#JUUL" hashtag that N.C. saw. That reinforced the perception of N.C. that the products

were essentially harmless. N.C. specifically recalls seeing at various times the following

images promoting use and abuse of JUUL's products by youth:









148.    N.C. became addicted to JUUL's products. Currently he consumes between

two and five JUUL pods a week, now preferring the Tobacco and Menthol flavors along

with Mango.

149.    The addiction to JUUL's product has cost N.C. significant money spent on

JUUL pods every week since 2015 to supply his addiction. N.C. has tried to stop using

JUUL products with his father's encouragement but is unable to go long without JUULing. When he does not use JUUL's products N.C. becomes angry, irritable, and anxious, which has affected his relationship with his father and made N.C. lose all interest in sports or any activity except for JUULing.

150.    N.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**M. Elizabeth Carroll, on behalf of her son, T.A.C., a minor**

151.    Plaintiff Elizabeth Carroll and T.A.C. are residents of Bristol, Virginia.

152.    Carroll's son T.A.C. first used JUUL in 2016 at the age of 16. He decided to use JUUL products primarily as a result of peer pressure. T.A.C., like many of his peers, had been exposed to JUUL marketing materials via various channels, including social media platforms. Carroll recalls that T.A.C. told her he was unaware JUUL products contained nicotine when he first began use.

153.    JUUL was quite popular amongst T.A.C.'s age group and played a major role in the social ecosystem at his school. He would purchase JUUL products from classmates. Carroll also suspects that T.A.C. was able to purchase JUUL products from a local convenience store, due to lax enforcement of age verification for the purchase of nicotine products.

154.    Like many adolescents, T.A.C. frequently uses social media platforms such as Twitter, Instagram, and Snapchat. T.A.C. recalls JUUL-related content appearing during use of each platform.

155.    T.A.C. remembers a tweet from 2018 promoting JUUL's Crème Brulee

flavored JUUL pods. The tweet was, or was substantially similar to, the following:



156.    T.A.C. saw an Instagram post, like the one below, in 2017, advertising the

Mango flavored JUUL pod, with a stylish close-up of the colorful accessory.



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

157.    T.A.C. and his peers would frequently post and re-post JUUL content onto their social media accounts. One such form of content included Snapchat photos and videos of their JUUL use. T.A.C. and his peers would mimic and emulate certain vaping styles and tricks seen on more popular social media accounts.

158.    T.A.C. also encountered JUUL promotional material when at gas stations, including outside-of-store displays featuring a variety of JUUL pod flavors. Each flavor had its own distinct illustration and color palette. T.A.C. favorite flavor, Cool Mint, sat in the center of the bottom row. The display was, or was substantially similar to, the following:



159.    T.A.C. also saw gas station displays advertising JUUL availability directly beneath the price of gasoline. This display was, or was substantially similar to, the

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

following:



160.    T.A.C. further saw in-store displays of readily available JUUL products.

The display was, or was substantially similar to, the following:



161.    T.A.C. and his family have endured material and emotional hardship due to

T.A.C.'s JUUL addiction, which persists to this day. At present, T.A.C. consumes over

one-and-a-half JUUL pods each day. Upon waking in the morning, T.A.C. immediately

uses his JUUL device. His attempts to cease use have thus far been unsuccessful, and often

result in harm to both himself and others. Carroll reports T.A.C. suffers physical

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

withdrawal symptoms, in addition to extreme irritability and aggression. She reports various instances of physical damage to their at-home property resulting from psychological withdrawal symptoms.

162.    None of the advertisements, in-store promotions, or labels T.A.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. T.A.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**N. Kisha Chandler, on behalf of her son, D.C., a minor**

163.    Plaintiff Kisha Chandler and D.C. are residents of Williston Park, New York.

164.    Prior to using a JUUL for the first time in August 2017, at the age of 15, Chandler's son D.C. had viewed increasing amounts of JUUL-related content on various social media platforms. For example, D.C. recalls viewing advertisements identical or substantially similar to the following images on Instagram:



 

  

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO










CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

165.    D.C. had also viewed seen online JUUL advertisements promoting JUUL

flavors identical or substantially similar to the following:






166.    Before D.C. tried JUUL, he had also seen point-of-sale ("POS")

promotional materials for JUUL devices and products, including signs and displays. These

promotional materials featured images of JUUL's multicolored fruit-flavored pods. D.C.

did not see any warnings or disclosures in these POS materials about JUUL's nicotine

levels or the risks JUUL posed. The representations and omissions in JUUL's in-store

promotions materially impacted D.C.'s assessment of, and eventual decision to use, JUUL

products. D.C. remembers viewing promotional materials in and around Williston Park,

New York when he began purchasing JUUL products in 2017, identical or substantially

similar to the following images:






CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



167.    None of the advertisements, in-store promotions, or labels D.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

168.    When D.C. was offered a Mango flavored JUUL by one of his many high school friends who had taken up JUUL use, he had never smoked a cigarette before or used any other tobacco product. D.C. succumbed to peer pressure and decided to try JUUL because everything he had seen had led him to believe that JUUL was fun, harmless, and "cool."

169.    D.C. enjoyed the "buzzed" feeling he received from the JUUL's powerful nicotine hit, and he quickly became addicted to nicotine. D.C. and his friends obtained their JUUL pods from nearby gas stations and a small local deli. Initially, the gas stations and deli sold JUUL products directly to D.C. and his friends. Thereafter, D.C. and his friends would approach adults and ask them to purchase JUUL pods for them.

170.    When Chandler caught her son with JUUL pods in his bedroom, D.C. told her JUUL was safe and nicotine-free; he told his mother that JUUL pods only contained water vapor. D.C. would not have started using JUUL if he knew it contained nicotine. Additionally, D.C. would not have used a Tobacco or Menthol flavored JUUL pod because he associates both of those flavors with cigarettes, which he knew to avoid.

171.    Chandler does not provide D.C. with cash; instead, if D.C. needs to purchase something, D.C. uses apps on his phone, which are linked to Chandler's bank accounts. Thus, in order to obtain JUUL pods, D.C. would trade food for JUUL pods (i.e. "I'll give you $20 worth of Wendy's for JUUL pods).

172.    Even though Chandler has confiscated numerous JUUL devices and JUUL pods from her son, D.C. has continued to find ways to obtain JUUL products. At his peak consumption, D.C. was consuming two to three JUUL pods a day.

173.    D.C.'s JUUL use has taken a significant toll on his physical and psychological health. Since D.C. started using JUUL, he has developed a chronic cough. Chandler also believes D.C.'s JUUL use has increased his anxiety levels.

174.    Chandler fears D.C. will be unable to quit using JUUL. D.C. has expressed to his mother that he wants to stop using JUUL, but he cannot due to the severity of his addiction.

175.    D.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**O.  Tyler Cobb**

176.    Plaintiff Tyler Cobb is an 18-year old who resides in Troy, Missouri.

---

177.    Cobb began using JUUL's products in 2016, when he was 15 years old and still in high school, after hearing about them from friends and based on various advertisements he saw online and in gas stations.

178.    Cobb never smoked before using JUUL's products, but he has since become addicted to nicotine and vapes on a daily basis.

179.    Prior to first purchasing JUUL's products in 2016, Cobb saw them advertised in in-store displays and posters on windows, specifically including the following that are essentially identical to those he recalls viewing:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO














180.   None of the advertisements, in-store promotions, or labels Cobb

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL

products poses significant health risks. Nor did they indicate that JUUL was an age-

restricted product.

181.    The advertisements and promotions Cobb viewed cause him to begin

purchasing JUUL pods in 2016 from his friends and gas station displays, at a cost of around

$10.00-$15.00 each.

182.    He was attracted to JUUL's products as well because of the way they tasted.

Cobb tried virtually all flavors except for the Tobacco varieties and preferred Mango, but

now has to buy the Cool Mint flavor since he is not aware of Mango being sold in his area

any longer. He recalls seeing the following promotional images pushing the various

flavors:






CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

183.    Cobb became addicted to vaping. Now he needs the nicotine in JUUL pods within the first 30 minutes of waking each day and usually ends up consuming between half a pod and one full pod per day. Some days it is up to as much as two full pods.

184.    Cobb would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**P.  Kimberly Christianson**

185.    Plaintiff Kimberly Christianson is a 39-year-old resident of Coral Springs, Florida.

186.    She began JUULing in approximately November 2015 at the age of 35.

187.    Christianson first learned about JUUL from an ad she had seen at the Tobacco Outlet where she and her husband normally bought cigarettes. It was advertised to try JUUL for $1.00. She bought four or five JUUL devices at $1.00 each.

188.    Like many other smokers, Christianson began using JUUL because she was initially attracted to the flavors, which were much more appealing than the taste of cigarettes. In addition, she believed that JUULing would help her cut back on her cigarette use and eventually quit, saving both her money and her health.

189.    Prior to using JUUL, Christianson had been smoking combustible cigarettes for approximately 15 years.

190.    Christianson had frequently seen JUUL ads in the Tobacco Outlet where she and her husband purchased cigarettes.

191.    She understood from the ads and in-store promotions she saw for JUUL, that it was a healthier alternative to smoking, and believed it to be safer and less addictive than cigarettes.

192.    Christianson specifically saw these in-store signs and promotions:







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 



193.   She also saw these ads:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



194.    Christianson became addicted to JUULpods.

195.    She found JUULing to be on her mind more that smoking.  Her preferred

flavors were Crème Brulee and Fruit Medley.

196.    At the height of her addiction, Christianson was using her JUUL within five

minutes of waking and smoked between 1 and 2 JUULpods per day.

197.    Christianson no longer uses JUUL; she returned to smoking combustible

cigarettes in mid-2019 in order to quit JUUL.

198.    Before trying JUUL, Christianson smoked less than 10 cigarettes a day,

occasionally smoking up to a half pack per day.

199.    Now, she smokes at least a pack per day -- more than twice as much as she

smoked before trying JUUL.

200.    JUULing is still on her mind, even after quitting.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

201.    None of the advertisements, point-of-sale displays, or labels Christianson saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

202.    Christianson would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, risks of addiction, and other health risks. She also would not have used JUUL's products if they did not come in appealing flavors.

**Q.  Bradley Colgate**

203.    Plaintiff Bradley Colgate is a resident of La Jolla, California.

204.    In 2017, Colgate purchased a JUUL e-cigarette and JUUL pods at the age of 24 in an effort to curtail his nicotine addiction and quit smoking. He had smoked Marlboros for approximately seven years and hated being a smoker.

205.    In the summer and fall of 2017, Colgate started seeing JUUL ads across social media. He typically used Instagram and Facebook and recalls seeing many JUUL ads on both platforms. In particular, he remembers seeing a series of Instagram posts that included testimonials from people who had switched from cigarettes to JUUL. When logging into Instagram, he would see "Instagram sponsored stories," which were short one-minute video advertisements, and often, he'd be presented with a JUUL-sponsored story that was in the form of a testimonial. These testimonials typically involved people describing how JUUL helped them quit smoking cigarettes. While he did not watch the

videos, he often observed the brief caption that appeared beneath the video, which typically



encouraged him to "switch" from cigarettes to JUUL. While the precise testimonials that

Colgate saw are no longer available online, Colgate recalls seeing testimonials that looked

similar to the advertisement below:

206.    In particular, he recalled seeing in these testimonials phrases that described



JUUL as an "alternative" to cigarettes, which he understood to mean not unhealthy and less addictive. Colgate also recalls seeing advertisements on both Instagram and Facebook that simply contained the word "SWITCH," including the advertisement below:

207.    Around that same time, he also began seeing advertisements in stores. He noticed how large the store advertisements were, and was surprised to see the ads on display not just at smoke shops, but at convenience stores and gas stations, such as 7-Eleven. He also noticed that these stores displayed JUUL on the counter, instead of behind it with the other cigarettes.

208.    Before Colgate purchased JUUL for the first time, he saw other JUUL advertisements on Facebook and Instagram. In particular, he recalls seeing the below Instagram advertisements:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

209.    He also recalls seeing Facebook ads in September 2017 for a "Device Kit"
and another on or around October 4, 2017 that encouraged him to "[c]ustomise a plan that
fits your lifestyle." Those ads are depicted below:







210.    He believed that JUUL would make it easier to stop being a smoker.

211.    On the basis of JUUL's advertising campaign, including the ads described in
the previous paragraph, Colgate decided to purchase JUUL in or around October 2017.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

212.    None of the advertisements, in-store promotions, or labels Colgate saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

213.    Rather than weaning Colgate off of nicotine, the intense dosage of nicotine delivered by the JUUL products resulted in an addiction to JUUL pods, an increased nicotine addiction, and an increased consumption of nicotine and JUUL products by Colgate. Colgate found JUUL so addictive that he did not subscribe to JUUL's pod service, as he was concerned that by having so many pods in the house, he would smoke more than his typical pod a day due to its addictive nature. Moreover, not only has the increased nicotine made JUUL harder to quit than regular cigarettes, but because of the way in which JUUL relentlessly continued to advertise to him on social media, Colgate has found quitting JUUL to be even more difficult than quitting cigarettes due to the fact that he is continuously reminded of it.

214.    Colgate would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**R.  Anjie Comer, on behalf of her son, Q.C., a minor**

215.    Plaintiff Anjie Comer and Q.C. are residents of Fort Worth, Texas.

216.    Comer's son Q.C. began using JUUL around March 2018 at the age of 16.

217.    Before Q.C. even tried JUUL, he viewed point-of-sale ("POS") promotional

materials for JUUL devices and products, including signs and displays. These promotional



materials featured images of JUUL's multicolored fruit-flavored pods. Q.C. did not see any

warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks

JUUL posed. The representations and omissions in JUUL's in-store promotions materially

impacted Q.C.'s assessment of, and eventual decision to use, JUUL products. For example,

Q.C. viewed promotional material for JUUL products at local gas stations in and around

Fort Worth, Texas in 2018 that was, or was substantially similar to, the following:











CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



218.    When Q.C. was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product; he decided to try a JUUL because the fruit flavors sounded intriguing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. Q.C. had seen advertisements for JUUL on social media and was led to believe JUUL did not contain any nicotine. For example, Q.C. viewed advertisements that made him believe JUUL products were youth-friendly after viewing promotional JUUL material that was, or was substantially similar to, the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

219.    Peer pressure and JUUL's narcotic effect of nicotine led Q.C. to use his friend's JUUL repeatedly over the course of the next few weeks. Using JUUL became a social activity that Q.C. regularly engaged in with his friends during and after school.

220.    Comer has noticed that since her son began using JUUL, it has made him experience severe mood swings.

221.    Had Q.C. known the risks of using a JUUL, he would not have used a JUUL. None of the advertisements, in-store promotions, or labels Cobb saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. Additionally, Q.C. would not have used a Tobacco or Menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

### S.   Lisa Commitante, on behalf of her daughter, A.U., a minor

222.    Plaintiff Lisa Commitante and A.U. are residents of New York.

223.    Commitante's daughter A.U. began JUULing at the age of 14, after purchasing a JUUL and JUUL pods at a smoke shop. She recalls seeing displays and signs there essentially identical to the following:

 

224.    A.U. was attracted to the fruit flavors produced by the JUUL pods, and did

not realize that they contained nicotine. The images from JUUL promoting flavors that she

saw specifically included the following:

 

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









225.     None of the advertisements, in-store promotions, or labels A.U. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

226.     She subsequently began consuming JUUL pods, enticed by the fact that it looked cool and her friends were vaping JUUL products. A.U. became addicted to JUUL pods.

227.     She used the JUUL frequently until her mother found and confiscated it.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

228.    A.U. would not have purchased the JUUL starter kit if she had known it contained nicotine or been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**T.  Timothy Critzer**

229.    Plaintiff Timothy Critzer is a resident of Apex, North Carolina.

230.    Critzer used JUUL right around its launch in 2015. He had been a regular smoker for over fifteen years prior and had used other e-cigarette brands in the past. As a smoker, he typically went through around one pack of cigarettes each day. He initially began using JUUL products with the hope they would help end his addiction to nicotine. In-store and online advertisements failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use. Indeed, Critzer believed that one JUUL pod contained substantially less nicotine than a pack of cigarettes. He would not have purchased JUUL products had he known they delivered more nicotine to the bloodstream than cigarettes.

231.    When purchasing JUUL products in-person, Critzer will visit the local Circle K convenience store. He reports, upon arrival, that various in-store advertisements will further induce him to purchase JUUL products. These advertisements often succeed, even when Critzer has not initially intended to purchase JUUL products during his visit. He does not remember seeing any accompanying nicotine content warnings, or notices regarding JUUL's addictive nature.

232.    Critzer recalls, since 2017, a display situated in front of the cashier's counter and next to the lighters, prominently exhibiting JUUL products. It was, or was substantially similar to, the following:



233.    Critzer also recalls seeing outside-of-store display, prominently featuring a variety of JUUL pod flavors. Each had its own distinct illustration and color palette. Critzer's favorite, Classic Tobacco, sat to the far right in the top row. The display from 2017 was, or was substantially similar to, the following:



234.    Critzer sees JUUL-related promotional content online as well. Critzer constantly sees advertisements for JUUL on Facebook. He recalls one identical or substantially similar to that below appearing multiple summers since 2015.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



235.    Critzer similarly recalls seeing a Facebook post that was, or was

substantially similar to, the following.



236.    Critzer also receives promotional emails from JUUL. He remembers the

slogan "Smoking Evolved" and various discounts and sales associated with sharing JUUL

content across the internet. The emails he received looked like:



237.     As a result of the inundation of promotional materials and his worsening

nicotine addiction, Critzer's JUUL use has become a constant preoccupation. JUUL is on

his mind more than cigarettes ever were. He typically consumes between one-and-a-half

and two JUUL pods each day, in addition to his usual pack of cigarettes. That represents a

150%-200% increase in Critzer's nicotine consumption since he began using JUUL. Critzer

feels generally powerless to reduce his nicotine consumption. Moreover, he experiences

frequent throat pain and soreness as a result of his JUUL use; he rarely, if ever, experienced

such problems when solely smoking cigarettes.

238.    None of the advertisements, in-store promotions, or labels Critzer saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Critzer would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**U. Mary Deaton, on behalf of her granddaughter, M.E.D., a minor.**

239.    Plaintiff Mary Deaton and M.E.D. are residents of Oxford, Mississippi.

240.    Deaton's granddaughter M.E.D. is currently 15 years old. She started using JUUL's products in 2017 when she was only 13 years old.

241.    M.E.D. never tried smoking cigarettes before using JUUL's products.

242.    M.E.D. learned about JUUL at school from her friends and by viewing advertisements online and through social media. The advertisements she viewed promoted JUUL as cool and trendy, or even "essential," and includes the following ads she specifically recalls seeing:







243.    The kids at M.E.D.'s school adopted this view of the products as trendy and often promoted JUUL's products themselves by posting about them on social media or sharing viral images and posts of others using the "#JUUL" hashtag. M.E.D. specifically recalls seeing the following images promoting use and abuse by young persons that were widely shared, which JUUL did nothing to address or counteract:

















CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

244.    Advertisements from JUUL pushing candy-like flavors were particularly enticing to M.E.D. and her friends, and she recalls seeing the following images and advertisements in particular that played up the perception of JUUL products as a treat:



245.    None of the advertisements, in-store promotions, or labels M.E.D. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

246.    All the advertisements and social media influence from JUUL and its products caused M.E.D. to begin vaping with her friends. Despite her youth, she was able to purchase JUUL pods from convenience stores and vape shops around the area where she lives in Mississippi. The in-store displays also failed to inform her of the risks of JUUL's

products, and were presented in attractive and colorful ways that looked essentially identical to the following:

 

247.    M.E.D. became addicted to JUUL pods. Currently, she has to start vaping within the first 30 minutes of each day and consumes between one-half and a full pod each day. The flavor which she prefers, like many of her underage friends, is Cool Mint.

248.    The addiction to JUUL's product has cost M.E.D. and her family significant money that is spent on JUUL pods every week to feed her addiction.

249.    M.E.D. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**V.  Michael James Deeter**

250.    Plaintiff Michael James Deeter is a resident of Tucson, Arizona.

251.    Deeter is currently 18 years old. He started using JUUL products in 2015 when he was just 13.

252.    Deeter had experimented with other tobacco products before he tried JUUL, but he was not a habitual nicotine user.

253.    Before using a JUUL for the first time, Deeter had seen and relied upon

point-of-sale promotional materials for JUUL devices and products, including the signs and displays pictured below. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit."

 

254.    None of the signs, product displays, or product labels Deeter saw adequately disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, that use of JUUL products pose significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions of JUUL's in-store promotions materially impacted D.C.'s assessment of, and eventual decision to use, JUUL products.

255.    Soon after he started JUULing in 2015, Deeter became addicted to nicotine.

256.    Although Deeter was, until recently, below the legal age to purchase tobacco products in Arizona, he has always been able to acquire JUUL products through classmates or his local Circle K convenience store.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

257.    Deeter actively uses Instagram, Snapchat, and YouTube where he is exposed to JUUL-related content from other adolescents and from JUUL-related accounts. Deeter has also posted his own JUUL-related content to social media.

258.    Other parents have informed Deeter's mother that they have seen JUUL-themed Snapchat posts posted by Deeter as well as videos of Deeter smoking JUULs.

259.    Deeter consumes at least one JUUL pod every two days. He takes his first puff of JUUL within 30 minutes of waking up every morning. His preferred flavor is Mint.

260.    Deeter would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, risk of addiction, and other health risks JUUL poses. He also would not have used JUUL's products if they did not come in sweet and fruity flavors.

### W. Katherine Dentler

261.    Plaintiff Katherine Dentler is a resident of Aloha, Oregon.

262.    Before using JUUL for the first time in Summer 2016 at the age of 39, Dentler regularly smoked combustible cigarettes. At that point, she had been a smoker for over twenty-five years, and typically smoked around a pack of cigarettes daily. She began using JUUL products with the hope they would help end her nicotine addiction. In fact, she first heard of the JUUL brand from a television commercial touting its efficacy as a cigarette replacement. The commercial characterized JUUL products as inherently safe and failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use. Dentler would not have bought JUUL products had she known they delivered more nicotine to the bloodstream than

cigarettes. Indeed, upon her initial purchase, she believed that one JUUL pod only

contained a negligible amount of nicotine.

263.    Dentler purchased JUUL products from different variety stores, a local Plaid

Pantry, and a 7-Eleven gas station. At these stores, she recalls promotional displays that

were, or were substantially similar to, the following:

a.   An in-store display at a single-owner smoke shop called Cold Beer Cheap

Smokes, since early 2017. Situated in front of the cashier's counter and next

to the lighters, this display prominently exhibits JUUL products.



b.   An in-store display at Plaid Pantry, from 2017, prominently exhibiting

various JUUL pod flavors, each with its own distinct color palette.



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

c.  An in-store display at a Chevron gas station, from 2017, featuring JUUL

accessories, such as JUUL pod flavor varieties and a USB charging dock.



264.  Dentler once saw a promotional poster at a local 7-Eleven, prominently

advertising a sale: two JUUL pods for thirty dollars. The sale was appealing; Dentler

typically paid twenty dollars for each JUUL pod.



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

265.     Dentler frequently saw advertisements for JUUL products in magazines she perused. These advertisements often highlighted JUUL's high-tech design and futuristic aesthetic. She recalls the slogan "Smoking Evolved" displayed along with promotional imagery. She remembers an in-magazine advertisement, similar to the following, appearing many times since 2016:



266.     JUUL-related advertisements and promotions began to percolate through Dentler's digital life as well. As a result of the inundation of promotional materials and her worsening nicotine addiction, Dentler's JUUL use became a constant preoccupation. JUUL was on her mind more than cigarettes ever were.

267.     Dentler saw advertisements for JUUL on Facebook, identical or substantially similar to the one below, each summer since 2016.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



268.    Dentler recalls the imagery paired with the below Facebook post, though is unsure if she saw it on Facebook, or elsewhere on the internet. Dentler recalls sharing such imagery online after beginning use of JUUL in 2016.



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

269.    Dentler also received promotional emails from JUUL. She recalls repetition of the aforementioned "Smoking Evolved" slogan and various discounts and sales associated with sharing JUUL content across the internet. The emails she received looked similar to:



270.    Dentler attempted to reduce her JUUL use in early 2018, as she began to understand the potency of JUUL's nicotine delivery mechanism. As a result, she experienced severe withdrawal symptoms. Physical symptoms included hot flashes, cold sweats, and gastrointestinal issues. Dentler also suffered psychological withdrawal effects

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

such as mood swings, crying fits, and acute irritability with occasional outbursts of anger. She had no idea that her JUUL use had propelled her nicotine addiction to such a level that attempts to reduce use would result in withdrawal symptoms such as these. This newfound understanding frightened her; despite the hardships of withdrawal, she persisted in her efforts and successfully reduced her JUUL use to a negligible level by March 2018. She quit tobacco products altogether in September 2019. Far from aiding in this process, Dentler's JUUL use only intensified and prolonged an already daunting challenge.

271.    None of the advertisements, in-store promotions, or labels Dentler saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks.

272.    Dentler would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

## X.  Michael Diemert

273.    Plaintiff Michael Diemert is a 42-year-old resident of Fargo, North Dakota.

274.    Diemert had been consuming between half a pack and one full pack of cigarettes per day before he began using JUUL in 2017.

275.    Based on various advertisements of JUUL's products that he saw and relied on, Diemert purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

276.    Diemert saw signs and posters for JUUL in stores as well as advertisements

and promotions on social media that indicated JUUL could be used to help quit other

nicotine products like cigarettes.

277.    On social media, Diemert saw the following ads specifically:





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

278.    In person at vendors of JUUL products, Diemert saw ads that concealed JUUL's nicotine content and misrepresented the product as an alternative to cigarettes or a smoking cessation tool. Such ads included specifically the following:





279.    Diemert interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements, in-store promotions, or labels Diemert saw adequately disclosed the nature

or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

280.    Diemert developed an addiction to JUUL pods. Diemert now consumes between one and two full JUUL pods per day, though he has on occasion consumed as many as four in one day.

281.    Diemert feels that JUUL pods are on his mind more than smoking cigarettes was. He uses his JUUL within five minutes of waking and even uses it if he awakes at night to use the bathroom.

282.    Diemert feels embarrassed to use his JUUL in front of his twelve-year old son but is addicted to the extent that he cannot refrain from using JUUL pods long enough to avoid such exposure.

283.    Since beginning to use JUUL pods, Diemert has begun coughing frequently and has suffered periodontal disease as a result of his JUUL use. He has tried and been unable to quit using JUUL pods and believes that rehabilitation services will be necessary to overcome his addiction.

284.    Had Diemert known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Diemert is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

### Y.  Joseph DiGiacinto, on behalf of his sons, M.D. and C.D., minors

285.    Plaintiff Joseph DiGiacinto ("Digiacinto"), M.D., and C.D. are residents of Cotati, California.

286.    DiGiacinto's sons M.D. and C.D. are 17 years old and 16 years old, respectively.

287.    Before M.D. started using JUUL in 2015, neither he, nor C.D., had ever smoked. As M.D. told C.D. the night before he used JUUL for the first time, his friends were peer pressuring him to start JUULing because "everyone was doing it" at M.D.'s school.

288.    Shortly after M.D. started JUULing, he, like many of his classmates, became addicted to nicotine.

289.    Before M.D. and C.D. had ever tried a JUUL, they had seen point-of-sale ("POS") promotional materials for JUUL devices and products, including the specific signs and displays pictured below. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Device Kit" or "Starter Kit." The representations and omissions in JUUL's in-store promotions materially impacted M.D. and C.D.'s assessment of, and eventual decision to use, JUUL products.

 

290.    Mirroring the behavior of his big brother, C.D. started using JUUL as well, and eventually bought a JUUL device from a classmate who had a spare for sale.

291.    The viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use reached C.D. and M.D.'s social network, including classmates, leading to an increase in uptake of JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, C.D. would not have been exposed to, and would not have used, JUUL products. Among the viral JUUL-related posts C.D. and M.D. saw were the following:

 

292.    M.D. and C.D. are both active on Instagram and Facebook. Among the

JUUL promotions that M.D. and C.D. saw was the following Instagram post dated October

3, 2017:



293.    Also, on Instagram, M.D. and C.D. were also exposed to a significant

amount of JUUL promotional content from third parties, including the Instagram accounts

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

@Doit4JUUL and @JUULNation. These accounts led M.D. and C.D. to believe that JUUL use was "cool," safe, and appropriate for minors. The accounts also encouraged the unlawful purchase and use of JUUL products by youth. On YouTube, M.D. and C.D. saw numerous JUUL-themed videos from Donny Smokes and Supreme Patty. On Snapchat, C.D. saw JUUL-themed content from EonSmoke and OG Nick, and even his own friends. This content was overtly youth-oriented and promoted nicotine abuse, downplayed or normalized addiction risks, encouraged JUUL use in school, provided guidance on how to conceal a JUUL, created the impression that JUUL use was more common than it was, and that JUULing was the "cool" thing to do. These accounts also sold JUUL products directly through Instagram and promoted websites that sold JUUL products with inadequate age verification procedures, if any at all. C.D. did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote JUUL use to adolescents and profit from their addiction. Had M.D. or C.D. known that they were being targeted by vendors of JUUL products, or that JUUL's own viral marketing had promoted and facilitated these accounts, M.D. and C.D. would have rejected offers to use a JUUL or would have made efforts to stop using JUUL sooner than they did.

294.    Although C.D. was, and is, under 18 years of age, he was able to continually acquire and use JUUL products through M.D. and other older high school students, and thus maintain his addiction to nicotine. DiGiacinto does not know where M.D. buys JUUL products.

295.    Though C.D. is a minor, he has been receiving a steady stream of promotional e-mails from JUUL for months.

296.    C.D.'s Instagram and Snapchat streams are bombarded with advertisements for JUUL products and JUUL-related products, many of which use the hashtag #juul. Among the promotions C.D. has seen are those pictured below:



297.    None of the advertisements, in-store promotions or JUUL labels M.D. and C.D. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's advertising and POS promotions materially impacted M.D. and C.D.'s assessment of the flavored JUULs they eventually decided to try.

298.    DiGiacinto has enlisted the aid of school administrators and his family doctor in efforts to halt C.D. and M.D.'s nicotine addiction. He has also attempted to keep C.D. and M.D. from associating with friends who use JUUL. None of these efforts have been successful.

100

299.    Neither M.D. nor C.D. would not have purchased or started using JUUL's products if they had been adequately warned about the nicotine content, risk of addiction, and other health risks JUUL posed.

## Z.  Rachelle Dollinger, on behalf of her son, K.S., a minor

300.    Plaintiff Rachelle Dollinger and K.S. are residents of Brownsburg, Indiana.

301.    Dollinger's son, K.S., is currently 15 years old. He started using JUUL products in 2017 when he was only 13.

302.    K.S. had never smoked or used other tobacco products before he started using JUUL.

303.    K.S. learned about JUUL from his friends at school and by viewing JUUL promotions online and through social media. The promotions he recalls viewing included the following images from JUUL's "Vaporized" campaign:



304.    Before he had ever tried JUUL, K.S. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs touting JUUL's simplicity, ads featuring JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit." Among the POS materials that K.S. recalls seeing

were the following:

 

305.   K.S. was exposed to a steady stream of images that promoted JUUL as a tasty treat or a lifestyle essential but failed to disclose that JUUL was also a potent addictive drug. Among the JUUL social media promotions that K.S. saw and relied upon were the following:

    a.   Instagram posts:

 

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

b.      Facebook posts from July 10, December 1 and December 28 of 2017 and January 18, 2018:





306.    None of the advertisements, in-store promotions, or labels that K.S. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was

engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's advertisements, in-store promotions, and labels materially impacted K.S.'s assessment of the fruit-flavored JUUL he would later be offered.

307.    In 2017, K.S. tried JUUL for the first time when he took a puff from his friend's JUUL device. At the time, K.S. and his friend were both 13-year-olds in the eighth grade.

308.    When Dollinger found out that K.S. was using JUUL products, she confronted K.S., who told her that JUUL was harmless and did not contain nicotine. K.S. claimed that he had reviewed JUUL's website, and told Dollinger that if she also reviewed JUUL's website, she would see for herself that JUUL was safe.

309.    Although K.S. is well below the minimum legal age to buy tobacco products, he is nevertheless able to purchase JUUL products from the local Speedway gas station.

310.    Dollinger recently found approximately 30 empty JUUL pods while cleaning K.S.'s room. K.S. claimed that there are videos on YouTube that explain how to refill empty pods.

311.    At 15 years of age, K.S. is addicted to JUUL pods. According to Dollinger, he has a "meltdown" if he is not able to JUUL.

312.    K.S. would not have purchased or started using JUUL products if he had been adequately warned about the nicotine content, risk of addiction, and other health risks

JUUL poses. He also would not have used JUUL products if they did not come in sweet and fruity flavors.

### AA.        Michael Doughty

313.    Plaintiff Michael Doughty is a 45-year-old resident of Tucson, Arizona.

314.    Doughty began using JUUL in 2018. Before using JUUL, Doughty had been smoking about one full pack of cigarettes per day.

315.    Based on various advertisements of JUUL's products that he saw and relied on, Doughty purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

316.    Doughty saw JUUL advertisements when he went to purchase cigarettes. Doughty saw various advertisements and promotional displays that represented JUUL's nicotine content as relatively low. At point of sale displays, he was exposed to the following specific advertisements:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



317.    Doughty interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements, in-store promotions, or labels Doughty saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

318.    Doughty believed that the "5% nicotine" listed on many JUUL products represented a small percentage compared to typical vaping products and cigarettes. Because there were no warnings on the display or elsewhere, Doughty believed that using JUUL would assist him in quitting smoking cigarettes, and in weaning off of nicotine entirely.

319.    Doughty continues to smoke cigarettes but is now additionally addicted to JUUL pods.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

320.     Doughty came to realize that since beginning to use JUUL, his daily nicotine consumption has tripled rather than gradually decreasing to zero as he had expected.

321.     Doughty spends $15 for a 4-pack of JUUL pods and consumes two to three pods per day.

322.     Doughty is more addicted to JUUL pods than he ever was to cigarettes. Using his JUUL is more frequently on his mind and he consumes more nicotine through JUUL per day than he ever had through cigarettes.

323.     Three months after beginning to use JUUL, Doughty suffered from a minor heart attack, but was still unable to quit JUUL. In addition, Doughty has suffered a severe upper respiratory tract infection and episodes of nicotine poisoning. He has also been diagnosed with depression since starting JUUL use.

324.     The JUUL advertisements that Doughty saw did not represent that the nicotine salts in JUUL pods constituted a different nicotine delivery system than present in cigarettes or other e-cigarettes.

325.     Doughty would not have purchased JUUL pods if he knew they delivered more nicotine into the bloodstream than cigarettes and that they delivered nicotine more quickly.

326.     Had Doughty known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Doughty is still interested in products that would help him

stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

### BB.      Nicole Dramis on behalf of her son, J.D., a minor

327.    Plaintiff Nicole Dramis and J.D. are residents of Miller Place, New York.

328.    Dramis' son J.D. began using JUUL in November 2017, at the age of 14. Prior to this, J.D. did not smoke cigarettes or use other tobacco products.

329.    Before using JUUL for the first time, J.D. had seen numerous JUUL advertisements online, which promoted JUUL pod flavors and depicted fashionably dressed young people striking playful poses with JUUL devices in hand.

330.    For example, J.D. recalls viewing online promotional material in 2017 that was, or was substantially similar to, the following, showcasing JUUL's bright, dessert- and fruit-flavored products:





331.    Before J.D. even tried JUUL, he also viewed point-of-sale ("POS")

promotional materials for JUUL devices and products, including signs and displays. These

promotional materials featured images of JUUL's multicolored fruit-flavored pods. J.D. did

not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or

the risks JUUL posed. The representations and omissions in JUUL's in-store promotions

materially impacted J.D.'s assessment of, and eventual decision to use, JUUL products. For

instance, J.D. remembers viewing advertisements that were, or were substantially similar

to, the following in and around Miller Place, New York when he started purchasing JUUL

pods in November 2017:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






332.    None of the advertisements, in-store promotions, or labels J.D. saw

adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of

nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. J.D. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

333.    Based on the promotional material J.D. viewed, when offered a JUUL by a friend at school, J.D. accepted because he was interested in trying the fruit flavors. J.D. believed that JUUL pods did not contain nicotine but were simply "fruit-flavored juice."

334.    JUUL's use of fruit-based flavors, fruit-based flavor names and fruit-based advertising images was a substantial factor in J.D.'s decision to use and continue using a JUUL. JUUL's fruit-based promotions misled J.D. about the nature of JUUL's product and distorted the risks JUUL products posed. J.D. would not have started using JUUL if he knew it contained nicotine. Additionally, J.D. would not have used Virginia Tobacco or Classic Menthol flavored JUUL pods, since he associates both of those flavors with cigarettes, which he knew to avoid.

335.    Peer pressure was also a significant contributing factor in J.D.'s decision to use and continue using a JUUL. J.D. has conveyed to Dramis that everyone at his high school was using JUUL, and he did not want to be the "odd man out."

336.    J.D. and his friends have purchased JUUL pods from older students at school and at vape shops in the area.

337.    At his peak level of consumption, J.D. was consuming up to three JUUL pods per day; he began using JUUL within five minutes of waking up in the morning and continued using JUUL throughout the day. J.D. enjoys using JUUL because it gives him a

high and makes him feel good.

338.    J.D. began using JUUL regularly at school; he would leave class and take extended visits to the bathroom to use JUUL. Because of this, Dramis has received phone calls from J.D.'s teachers informing her of her son's absence from class.

339.    Dramis states J.D.'s JUUL use has had significant psychological and social effects on her son. Dramis says J.D. becomes very nasty and irritated when he cannot consume JUUL due to his severe addiction to nicotine.

340.    For a time period, J.D. concealed his JUUL use from Dramis. During this time, J.D. would lock himself in his room and sleep all day because this was the only way he could get through the day without using JUUL products. J.D. sank into a severe depression. Dramis took J.D. to see several therapists to better understand what was going on with her son. Through therapy, Dramis and J.D. discovered J.D.'s JUUL use and nicotine withdrawals were to blame for his depressive state.

341.    Socially, Dramis says her son has always been a nice, respectful child. However, since using JUUL, J.D. has started hanging out with a different crowd and veers the other way. J.D. has made friends with older kids that have easier access to JUUL.

342.    Dramis has made many efforts to get her son to stop using JUUL. Dramis has grounded J.D., taken away his spending money, and banned him from hanging out with "bad influences." Dramis would like to send her son to a rehabilitation program in order to treat his addiction to nicotine and put a stop to his JUUL use.

343.    Recently, J.D. has also made several unsuccessful attempts to quit using JUUL. J.D. has reached out to the addiction counselor at his school. Because J.D. is under the age of 18, it is illegal to give him nicotine patches or Chantix. Both Dramis and J.D. are

desperately trying to break J.D.'s severe addiction to nicotine and JUUL products.

**CC.**     **Robert Dyer, on behalf of his son, B.D., a minor.**

344.    Plaintiff Robert Dyer and B.D. are residents of Nauvoo, Alabama.

345.    Dyer's son B.D. began using JUUL in October 2015 at the age of 15, shortly after the device's launch in June of the same year. Online advertisements sold him on the safety of the product, along with the social status he could achieve through its use. B.D. purchased his initial JUUL products from classmates, many of whom were then of legal age to purchase them. Later, B.D. would purchase JUUL products from local stores with lax enforcement of legal age requirements. Dyer also suspects that B.D. used fake accounts in order to purchase JUUL products directly from the JUUL website.

346.    Prior to using JUUL, B.D. had never used tobacco products. Today, he uses JUUL daily and has done so for over four years.

347.    When he first began using JUUL products, B.D. was unaware of their addictive potential; Dyer recalls a conversation where his son expressed his belief that JUUL had to be safe because it was different than cigarettes. JUUL's marketing campaigns reinforced such beliefs. B.D. does not recall any nicotine content warnings on the various advertisements he saw online. Since he started using JUUL, B.D. has on occasion tried other e-cigarettes, but always ends up circling back to JUUL, which has a more rapid nicotine delivery mechanism than most other e-cigarette brands.

348.    B.D. recalls seeing JUUL-related content and imagery on many of the websites he frequented as an adolescent, including popular social media platforms.

349. B.D. saw an image online advertising the eight different JUUL pod flavor varieties available to consumers, that was, or was substantially similar to, the following. B.D. recalls this image from 2017 through 2018:



350. B.D. recalls imagery, substantially similar or identical to that below, advertising the immensely popular Mango JUUL pod flavor. He recalls this image from 2018.



351. B.D. also encountered JUUL promotional material when at local convenience stores.

352.    B.D. recalls an in-store display, from 2017, in front of cashier's counter, prominently exhibiting JUUL products. The display was next to the lighters and practically impossible to miss. The display was, or was substantially similar to, the following:



353.    B.D. recalls an outside-of-store display featuring a variety of JUUL pod flavors. Each flavor has its own distinct illustration and color palette. B.D.'s favorite flavor, Cool Mint, sits center-stage in the bottom row. The display was, or was substantially similar to, the following:



354.     None of the advertisements, in-store promotions, or labels B.D. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

355.     B.D. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**DD.     John Scott Emidy**

356.     Plaintiff John Scott Emidy is a 24-year old who resides in Cordova, Tennessee.

357.     Emidy was not a regular smoker prior to his introduction to JUUL's products. He occasionally would smoke a cigar (or "cigarillo") in social settings but was not addicted to nicotine by any means. After he started using JUUL's products, Emidy became completely addicted to nicotine and now, as a result, also smokes cigarettes.

358.     Emidy began using JUUL's products in 2018 based on various advertisements and "memes" he saw online, including Reddit posts and other sites, as well as advertisements and displays he saw in person at gas stations.

359.     Specifically, prior to purchasing JUUL's products, Emidy saw posters and displays set up at gas stations that he frequented in Tennessee, including some essentially identical to the following:




360.    Emidy also saw viral images and videos on social media that pushed JUUL products as cool or edgy for young persons like himself, including the following specific images he recalls being widely shared in connection with the "#JUUL" hashtag at the time, which JUUL did nothing to address or correct:





361.    None of the advertisements, in-store promotions, or labels Emidy saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver

nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

362.    Emidy instead developed an addiction to JUUL pods. The advertisements caused Emidy to begin purchasing JUUL pods because they were interesting to him, spawned funny memes and posts, and made it fun, so he started purchasing JUUL pods from "Kangaroo" gas stations near where he lives at a cost of around $10.00 each, and he would vape one to two pods a day on average. After becoming addicted, Emidy found he needed nicotine each day and so he progressed to smoking cigarettes as well, as a result of using JUUL's products.

363.    In addition to the money that Emidy has lost and continues to lose as a result of the addiction to nicotine caused by JUUL's products, he now also has heart problems that did not exist before.

364.    Emidy would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### EE.    Joan Eubanks

365.    Plaintiff Joan Eubanks is a resident of Tucson, Arizona.

366.    Before using JUUL for the first time in January 2016 at the age of fifty-three, Eubanks regularly smoked combustible cigarettes. She had been a smoker for ten years and would typically smoke less than half a pack of cigarettes each day. She initially began using JUUL products with the hope they would help end her addiction to nicotine. Promotional emails and in-store displays failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its

use. She would not have purchased JUUL products if she had known they delivered more nicotine to the bloodstream than cigarettes.

367.   Eubanks received many promotional emails from JUUL since she began purchasing JUUL products in January 2016. These emails included, among many others, the following:

a.   Eubanks received an email with the below imagery on January 1st, 2016. She recalls the slogan "Smoking Evolved" and various discounts and sales associated with sharing JUUL content across the internet.



b.   On February 12th, 2016, Eubanks received the following email.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



c.   Eubanks further recalls the below imagery in an email she received on

March 27th, 2018. å



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

368.     Eubanks also recalls the following promotional display at her local Walgreens. She saw the display each time she visited this Walgreens location from July 20th, 2018, up through December 2019, when it was removed. It was, or was substantially similar to, the following:



369.     Eubanks currently consumes around one-half of a JUUL pod each day. She now suffers from constant chest heaviness and congestion, in addition to a periodic severe cough. Her addiction to nicotine has only intensified and she now feels entirely powerless to stop her JUUL use. JUUL is on her mind more than cigarettes ever were.

370.     None of the advertisements, in-store promotions, or labels Eubanks saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

371.     Eubanks would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**FF.Brooke Forgetta**

372.     Plaintiff Brooke Forgetta is a 27-year-old resident of Tewksbury, Massachusetts.

373.     Forgetta had been smoking between one half and one full pack of cigarettes per day before she began using JUUL products in 2018.

374.     Based on various advertisements of JUUL's products that she saw and relied on, Forgetta purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

375.     At point of sale displays, she was exposed to the following specific advertisement:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

376.     Forgetta saw various advertisements and promotional displays that represented JUUL as more socially acceptable than cigarettes. On Facebook, she was exposed to the following specific advertisement:



377.     Forgetta also saw promotional materials on other social media, including Instagram and Snapchat, and through radio advertisements.

378.     Forgetta believed that the statement that JUUL contains "5% nicotine" in JUUL's advertisements meant that JUUL pods contain five percent the nicotine content of cigarettes. Forgetta felt persuaded to use JUUL products by other advertisements representing that the JUUL was designed as a smoking-cessation device.

123

379.     Forgetta interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Forgetta saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

380.     Forgetta has not quit cigarettes but is now also addicted to JUUL pods. She consumes one to two full pods per day, often costing her more than $50 per week.

381.     Since beginning to use JUUL pods, Forgetta has become anxious and agitated. She feels regular pain in her chest and lungs. When a JUUL is inaccessible, her anger and anxiety become more pronounced, and she compensates by smoking even more cigarettes.

382.     Forgetta is also suffering from hyperthyroidism as a result of her JUUL use.

383.     Had Forgetta known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Forgetta is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

**GG.     Janine Franklin, on behalf of her daughter, J.F., a minor**

384.     Plaintiff Janine Franklin and J.F. are residents of Centennial, Colorado.

385.    Franklin's daughter, J.F., is currently 17 years old and started using JUUL products in 2017 when she was only 15 years old.

386.    J.F. had never smoked cigarettes or tried any other tobacco product before using JUUL.

387.    J.F. first became aware of JUUL in September 2017 when, during her sophomore year at Denver Academy, the vaping epidemic swept through her school. Suddenly, it seemed that about 80% of J.F.'s classmates were JUULing.

388.    Around the same time, J.F. saw JUUL advertising at convenience stores and gas stations near her home, including the following point-of-sale promotions:




389.    J.F. also saw advertisements from JUUL promoting its fruit- and dessert-flavored JUUL pods. She recalls seeing the following images in particular:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

390.    None of the advertisements or in-store promotions that J.F. saw adequately

disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine

in, or delivered by, JUUL's products, that JUUL was engineered to deliver nicotine rapidly

and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in

greater quantities than a cigarette, or that use of JUUL products poses significant health

risks. Nor did they indicate that JUUL was an age-restricted product. The representations

and omissions of JUUL's advertisements and in-store promotions materially impacted

J.F.'s assessment of, and eventual decision to use, JUUL products.

391.    Unaware that JUUL products contained nicotine and hoping to be "more

part of the crowd," J.F. took a few puffs of a friend's JUUL in a school bathroom. She

enjoyed the buzz, the flavor, and the feeling of social acceptance that JUULing provided.

392.    J.F.'s boyfriend, who was two years older than J.F., had his own JUUL

device. He let J.F. and her best friend "hit" his JUUL several times, assuring them that

JUUL products did not contain nicotine. By mid-November 2017, J.F., decided that she

wanted a JUUL device of her own, so she purchased a JUUL Starter Pack from an

eighteen-year-old senior in her high school.

393.    Once she had a JUUL of her own, J.F. became addicted to JUUL pods. She found that she was JUULing all the time, particularly with her best friend. She also noticed that she was fitting in with more people in her school's ever-growing community of JUUL users.

394.    With steady JUUL use, J.F.'s addiction to nicotine worsened. She discovered that she needed to JUUL even when she was alone. J.F. practiced "ghosting" (i.e., using breath control techniques to JUUL without producing noticeable vapor) so she could JUUL undetected at home, in school, in the car with her parents, etc. Her JUUL pod consumption quickly escalated from 3-4 pods per week to 2-3 pods per day.

395.    JUUL proved to be a "gateway" drug for J.F. Although she had never tried a tobacco product before the events described here, JUUL opened the door to her experimentation with marijuana.

396.    To afford the JUUL pods she needed to satisfy her addiction to nicotine, J.F. started to sell her personal possessions. Although she was below the legal age to purchase tobacco products, she, like many of her classmates, was nevertheless able to purchase JUUL pods from the Family Cigarette Grocery Store on Colfax Avenue in Denver.

397.    In February 2018, J.F. realized that JUULing was causing her numerous physical and psychological problems. Her hair was thinning, and she became anxious whenever she didn't have her JUUL with her. J.F. tried to quit vaping and even sold her JUUL, but she quickly succumbed to her addiction and bought another vaping device, a Suorin Air, a few days later. When her Suorin broke, a friend gave her another JUUL.

398.    In April of 2018, Franklin discovered that J.F was vaping and threatened to take away J.F.'s vaping equipment. J.F.'s reaction to the confrontation was so intense that

her parents took her to the Children's Hospital Emergency Department. At Children's Hospital, it was recommended that J.F. be admitted for inpatient care and J.F. was transferred by ambulance to the Denver Springs addiction treatment facility in Meridian, Colorado. J.F. was hospitalized at Denver Springs for approximately 10 days. She was then discharged into a partial hospitalization program for roughly another 10 days, followed by approximately 2 weeks in an intensive outpatient program.

399.    While she was hospitalized, J.F. begged to go home so she could get access to her JUUL. According to J.F., she "never felt that terrible in [her] life."

400.    J.F. was prescribed various versions of the drug Wellbutrin to combat her addiction, but to no good effect. She had a bad reaction to at least one version of Wellbutrin, and none of the medications she was prescribed helped with her addiction to nicotine.

401.    Franklin withdrew J.F. from Denver Academy and enrolled her in Girls Athletic Leadership School ("GALS") in the hope that a change of setting would help her make a new start. Unfortunately, when J.F. returned home, she began vaping again, which led to her mother cutting all of J.F.'s contact to her longtime best friend.

402.    Once at GALS, J.F. found that she had not escaped the JUUL epidemic. J.F. estimates that 60-70% of students at GALS vape.

403.    J.F. is still addicted to nicotine. She continues to receive routine counseling treatment and is largely nicotine-free though she has relapsed on numerous occasions.

404.    J.F. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other

health risks. She also would not have used JUUL's products if they did not come in the
candy-like flavors.

**HH.      Isaac Gant**

405.    Plaintiff Isaac Gant is a 23-year old who resides in Overland Park, Kansas.

406.    Gant began using JUUL's products in 2015, while he was 18 years old and
still in high school, after hearing about them from friends and based on various
advertisements he saw online and in gas stations.

407.    Gant was not a regular smoker prior to his introduction to JUUL's products.
He occasionally would smoke a "Black & Mild" cigar in social settings but was not
addicted to nicotine. As a result of using JUUL, Gant is now completely addicted to
nicotine.

408.    Prior to first purchasing JUUL's products in 2015, Gant saw them promoted
in social media popular with his peers, trending with hashtags like "#JUUL." The images
and advertisements were appealing because they featured bold coloring, displayed
attractive and youthful models, and depicted people laughing and having fun, such as the
following he specifically recalls viewing in that time frame:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO













131




409.    Gant also saw posters and displays set up at gas stations he frequented in

Kansas, including some essentially identical to the following:




410.    None of the advertisements, in-store promotions, or labels Gant saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

411.    The advertisements and promotions he viewed caused Gant to begin purchasing JUUL pods in 2015 from gas station displays primarily, at a cost of around $10.00-$15.00 each. He enjoyed them because of the way they tasted, preferring the Cucumber, Mango, and Fruit Medley flavors in particular.

412.    Eventually, Gant became addicted to JUUL pods and he now needs the nicotine in JUUL pods within the first 30-60 minutes of waking each day. Usually, he ends up consuming between half a pod and one full pod each day. Some days, it is up to as much as two full pods.

413.    In addition to the money Gant has lost and continues to lose as a result of his addiction, he has suffered respiratory problems, bouts of anxiety, and coughing fits, not to mention the compulsion to take frequent breaks from his work and everyday life to curb the nicotine cravings he now has.

414.    Gant would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

## II. Bruce Gibson, on behalf of his son, K.G., a minor

415.    Plaintiff Bruce Gibson and K.G. are residents of Centennial, Colorado.

416.    Gibson's son K.G. began using JUUL in 2016 at the age of fourteen. Gibson and his wife have since taken hundreds of JUUL pods from K.G., most of them already empty.

417.    K.G. spends between $75 and $100 each month on JUUL pods.

418.    Due to peer pressure, K.G. first purchased JUUL products from Amazon. Upon learning this, Gibson reached out to Amazon regarding their age verification process. Amazon directed Gibson to contact JUUL, who told Gibson that their only age verification process operated via the credit card used to make the purchase. Gibson reports that K.G. and his peers would create "bogus accounts" using parents' or guardians' credit card information. K.G. also purchases JUUL products from a local convenience store with lax legal-age enforcement procedures.

419.    At this local convenience store, K.G. recalls promotional material, identical or substantially similar to that below, propagating since JUUL's introduction in 2015:

   a.   K.G. recalls an in-store display since 2016, in front of the cashiers' counters, prominently exhibiting JUUL products. The display was next to the lighters and practically impossible to miss.



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

    b.  K.G. recalls an in-store display of readily available JUUL products, appearing in 2016, with an image of a hip and attractive model directly above.



420.    Upon his initial use of JUUL products, K.G. preferred fruit flavored JUUL pods.

421.    K.G. is now addicted to JUUL pods. K.G. desires to curb his JUUL use, but the potency of his nicotine to addiction has rendered him totally powerless in his efforts to do so. He has faced disciplinary action at school resulting from his compulsive JUUL use. Moreover, after finding an empty JUUL pod in K.G.'s backpack, the school decided to contact local police, per their tobacco policy. This resulted in a citation, court appearance, and mandatory community service. K.G.'s JUUL use and resultant nicotine addiction has thus led to severe academic and legal repercussions.

422.    K.G. has seen two counselors to address his JUUL use and compulsions, and their underlying causes, although thus far to minimal effect. Gibson reports that their family has spent thousands of dollars on these counseling efforts. K.G. continues to

regularly use JUUL products.

423.    None of the advertisements, in-store promotions, or labels K.G. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

424.    K.G. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**JJ. Corey Graves**

425.    Plaintiff Corey Graves is a 42-year-old resident of Hot Springs, Arkansas.

426.    Graves smoked between one and two packs of cigarettes per day prior to using JUUL.

427.    Based on various advertisements of JUUL's products that he saw and relied on, Graves purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

428.    Graves saw JUUL advertisements on Instagram and Twitter. Graves believed Instagram and Twitter advertisements such as the following implied that JUUL e-cigarettes were safer than traditional cigarettes:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







429.     Graves interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements, in-store promotions, or labels Graves saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

430.     Graves intended on using JUUL to end his nicotine addiction. Instead, he developed an addiction to JUUL pods, and he began to regularly vape between one and two JUUL pods per day and used his JUUL within five minutes of waking.

431.    Graves believes that JUUL use was "absolutely" on his mind more than cigarette use.

432.    Graves now uses other vaping devices and nicotine salts in place of his JUUL e-cigarette.

433.    Had Graves known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Graves is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

### KK.    Lee-Ann Gregory

434.    Lee-Ann Gregory is a 49-year-old resident of South Royalton, Vermont.

435.    Gregory had been consuming between approximately 10 to 20 cigarettes per day before she began using JUUL in 2015.

436.    Gregory became aware of JUUL through point-of-sale displays and advertisements on her Sling TV streaming service.

437.    Gregory had been attempting to quit smoking through other e-cigarettes, such as MarkTen devices.

438.    Based on various advertisements of JUUL's products that she saw and relied on, Gregory purchased a JUUL to help her quit smoking and as a healthy alternative to smoking.

439.    While using JUUL, Gregory saw point-of-sale display and Facebooks advertisements that depicted JUUL e-cigarettes as a smoking-cessation device. Gregory was exposed to the following advertisements:

 



440.    Gregory interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Gregory saw adequately disclosed the nature

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

441.    Gregory believed that JUUL would help end her nicotine addiction. Instead, she became addicted to JUUL.

442.    Gregory travels out-of-state to purchase JUUL pods at a Sunoco gas station in West Levanon, New Hampshire.

443.    Gregory recalls seeing the 5% strength label on JUUL packaging. She is unsure what the percentage measures.

444.    Gregory's preferred flavor is Virginia Tobacco JUUL pods because they are the closest in taste to Pall Mall cigarettes, which she still regularly smokes.

445.    In addition to her JUUL use, Gregory smokes between 10 and 20 cigarettes on work days and more than 20 cigarettes on her days off from work.

446.    Had Gregory known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. She would never have tried or purchased JUUL pods had JUUL's advertising and labeling conveyed the truth about JUUL's nicotine content and delivery, and the nature of its impact on his health as described herein. Gregory is still interested in products that would help her stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

LL.      **Dylan Healey**

447.    Plaintiff Dylan Healey is a 23-year-old who resides in Huntington, West Virginia.

448.    He began smoking cigarettes at about age 10 or 11. He typically smoked less than half a pack a day.

449.    He first began using JUUL products at age 19, around February 2016. He learned about JUUL from advertisements on television and in gas stations. He decided to start using JUUL because he believed that it was a safer alternative to smoking and a means to quit smoking. Based on the advertisements he had seen, he believed that JUUL was safer and less addictive than cigarettes.

450.    He primarily purchased JUUL products at the convenience stores Circle K and Sheetz. He typically paid between $14 and $16 for a pack of JUUL pods. He saw advertisements at the checkout counter at these stores.

451.    He also saw advertisements on Facebook and YouTube.

452.    He recalls seeing the following or substantially similar advertisements, labels, and social media posts:






**Image 4**                                                    **Image**




**Image 6**

**Image 7**                                    **Image**







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



**Image 14**

**Image 14**

**Image 15**

**Image 12**



**Image 17**

**Image 15**

# Image 17

**Image 18**

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



# Image 18

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





# Image 21

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



**Image 23**          **Image 24**



**Image 24**

**Image 26**          **Image 27**

**Image 26**          **Image 27**

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

**Image 28**

**Image 29**





Image 2

Image 3





Image 5

Image 6







Image 8

Image 9









## Image 13
### Image 10





## Image 1



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO













CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



453.    When he began JUULing, his preferred flavors were Tobacco and Crème Brulee.

454.    He increased his nicotine consumption significantly when JUULing. He typically consumed between one and two JUUL pods per day. The most he consumed in a single day was between two and three pods.

455.    When he was JUULing, he first used his JUUL within 5 minutes of waking. JUULing was on his mind more than cigarettes ever were.

456.    He tried to quit JUUL four times, but he was successful only on the fourth try.

457.    He has returned to smoking cigarettes and now smokes less than half a pack a day.

458.    He experiences headaches and respiratory/lung problems that he believes are related to his JUUL use.

459.    None of the advertisements, in-store promotions, or labels Healey saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

460.    Healey would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### MM.    Jordan Heitmann

461.    Plaintiff Jordan Heitmann is a 20-year old who resides in Sullivan, Missouri.

462.    Heitmann began using JUUL's products in 2016, when he was 17 years old and still in high school, after hearing about them from friends and based on various advertisements he saw online and in gas stations.

463.    Heitmann never smoked before using JUUL's products, but he has since become addicted to nicotine and now smokes cigarettes and chews tobacco along with vaping on a daily basis.

464.    Prior to first purchasing JUUL's products in 2016, Heitmann saw them promoted in social media and other online sites popular with his peers, such as YouTube,




166

Facebook, and in pop-up ads that made them seem trendy, including specifically the following that he recalls:



465.    Heitmann also saw posters and displays set up at gas stations he frequented in Missouri, including some essentially identical to the following:

 

466.    None of the advertisements, in-store promotions, or labels Heitmann saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL

products poses significant health risks. Nor did they indicate that JUUL was an age-

restricted product.

467.    The advertisements and promotions Heitmann viewed cause him to begin

purchasing JUUL pods in 2016 from his friends and gas station displays, at a cost of around

$10.00-$15.00 each.

468.    He enjoyed vaping also because of the way JUUL's products tasted,

preferring the Mint, Cucumber, and Mango flavors. In particular, he saw multiple ads

promoting the Mango flavor without clearly disclosing its nicotine content or addiction

warnings:

 

469.    Eventually Heitmann became addicted to JUUL pods. Now he needs the

nicotine in JUUL pods within the first hour of waking each day and usually ends up

consuming between half a pod and one full pod per day. Some days it is up to as much as

two full pods. On the occasions when he does not have his JUUL device or he runs out of

pods, Heitmann resorts to other sources of nicotine, such as chewing tobacco, smoking Marlboro cigarettes, or using other vaping devices.

470.     In addition to the money Heitmann has lost and continues to lose as a result of his addiction, he has suffered physical and mental changes, including substantial weight loss. He also now suffers from breathing problems, lack of attention, and irritability.

471.     Heitmann would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**NN.    Madison Hellman**

472.     Plaintiff Madison Hellman ("Hellman") is a resident of New Hope, Pennsylvania but lived in Robbinsville, New Jersey until July 2018. Hellman's initial purchases and JUUL use took place in and around Robbinsville, New Jersey.

473.     Hellman is currently 19 years old. She started using JUUL products in March of 2017 when she was just 16.

474.     Hellman was not a smoker or user of nicotine products before she tried JUUL.

475.     Hellman learned about JUUL from her older brother, who started using JUUL in 2016, and from JUUL point-of-sale promotions.

476.     Before using a JUUL for the first time, Hellman saw and relied on JUUL signs and product displays in local gas stations, including the promotions pictured below.

 

477.    None of the signs, product displays, or product labels Hellman saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products pose significant health risks. Nor did they indicate that JUUL was an age-restricted product.

478.    Hellman tried JUUL for the first time when her brother let her take a puff from his JUUL device. Hellman liked the way JUUL tasted and the nicotine buzz it provided.

479.    Because many of her friends and her brother's friends were JUULing, Hellman felt social pressure to follow the crowd. As a result of this combination of factors, Hellman became a habitual JUUL user and quickly developed an addiction to nicotine.

480.    Hellman and her friends were active on social media, where Hellman saw posts from her friends and her brother's friends that encouraged adolescent use of JUUL products and promoted using JUUL products at school. This online content

reinforced Hellman's belief that JUUL was a harmless product made for teenagers. Hellman even posted pictures of herself using JUUL, mimicking what she had seen other kids doing on social media.

481.    All of Hellman's friends in New Jersey were JUUL users. Although many of them were below the legal age to purchase JUUL products, they easily purchased JUUL pods from local gas stations and other students at Hellman's school.

482.    Now 19 years old, Hellman's spending on JUUL pods and JUUL devices has totaled at least $2000, some of which she earned herself and some of which her mother provided through gifts of money, not realizing that she was funding Hellman's addiction.

483.    Hellman's mother, Jennifer Hellman, has spent in excess of $7,000 in her efforts to help Hellman with behavioral issues that appeared when she began JUULing.

484.    In 2018, Hellman's family moved to Pennsylvania seeking a new start, only to find that JUUL abuse was just as common in Hellman's new high school.

485.    Hellman's mother had taught her and her brother that smoking was dangerous, but she did not know to warn them about JUUL until it was too late. Similarly, schools had educated Hellman and her brother about tobacco though the DARE program, but never addressed JUUL use.

486.    Hellman has tried repeatedly to quit using JUUL but has been unable to do so.

487.    Hellman's current consumption of nicotine is consistent and frequent. Her nicotine addiction is currently so severe that, when she cannot access JUUL, she turns to combustible cigarettes.

488.     Hellman would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, risk of addiction, and other health risks JUUL poses. She also would not have used JUUL's products if they did not come in sweet and fruity flavors.

**OO.     John Hollis**

489.     Plaintiff John Hollis is a 67-year-old resident of Sellersberg, Indiana.

490.     Hollis had been consuming nearly a full pack of cigarettes per day prior to using JUUL products. Hollis began using JUUL products in 2018.

491.     Based on various advertisements of JUUL's products that he saw and relied on, Hollis purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

492.     Hollis saw advertisements and promotions at gas stations where he purchased JUUL products that highlighted flavors and switching away from cigarette use while concealing JUUL's addictiveness, including specifically the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

493.    These advertisements display various flavors and use enticing color schemes while failing to adequately warn about JUULs addictiveness and potential adverse health consequences.

494.    Hollis interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements, in-store promotions, or labels Hollis saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

495.    Hollis has become addicted to JUUL pods. He consumes nearly a full pod per day and has consumed as many as three in a single day on previous occasions. He begins using his JUUL daily within half an hour of waking and feels strongly that he is more addicted to JUUL pods than he ever was to cigarettes.

496.    Hollis continues to use cigarettes daily.

497.    Hollis coughs more since using JUUL than he ever had due to cigarettes. He has also suffered from a general decline in health since beginning to use JUUL pods.

498.    Had Hollis known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Hollis is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**PP. Coleman Holnicker**

499.     Plaintiff Coleman Holniker is a 28-year old who resides in Seattle, Washington. He was previously a resident of Timonium, Maryland, when he purchased and began using JUUL.

500.     Holniker had been smoking between one half and one full pack of cigarettes per day before using JUUL products. He began using JUUL pods in 2018.

501.     Based on various advertisements of JUUL's products that he saw and relied on, Holniker purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

502.     Holniker saw advertisements on social media and point of sale displays that led him to believe the JUUL was a smoking-cessation tool. At sale displays, Holniker saw the following specific ad:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

503.    On Facebook, Holniker was exposed to the following specific ads:



504.    These ads emphasized exotic flavors and encouraged Holniker to switch to JUUL from cigarettes. Holniker interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements, in-store promotions, or labels Holniker saw adequately disclosed the nature

or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

505.    In 2018, Holniker first visited the JUUL website. Despite not signing up for a subscription, he began receiving multiple promotional emails from JUUL after registering his device on JUUL's website.

506.    Holniker has become addicted to JUUL pods. He consumes about two pods every day and begins using his JUUL within five minutes of waking. He feels that JUUL pods are "absolutely" on his mind more than cigarettes, and that the JUUL has become "another addiction."

507.    Holniker continues to smoke cigarettes.

508.    Holniker suffers from asthma. Prior to using JUUL, Holniker had moderate asthma attacks. After he started using JUUL, his attacks were more frequent.

509.    Since beginning to use JUUL, Holniker uses his inhaler with greater frequency to control his breathing and was once hospitalized because he could not breathe. JUUL also causes his heart to race and has intensified his coughing. Despite these symptoms, Holniker has been unable to quit JUUL pods.

510.    Holniker believed the JUUL would help him quit smoking cigarettes. The advertisements he saw did not reveal that JUUL pods deliver a higher concentration of nicotine than cigarettes and e-cigarettes or that they deliver nicotine to the bloodstream more quickly.

511.    Had Holniker known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Holniker is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**QQ.     Jenika Ingram**

512.    Plaintiff Jenika Ingram is a resident of Louisville, Mississippi.

513.    Before using JUUL for the first time in 2016, at the age of 34, Ingram was an e-cigarette user, having stopped smoking combustible cigarettes in 2012. Prior to that, she had been a smoker for roughly ten years.

514.    Ingram typically purchased her e-cigarettes from local convenience stores and gas stations, such as Murphy USA. Shortly after JUUL's introduction in 2015, Mississippi vendors began to carry JUUL products, and often displayed prominent promotional imagery both inside and outside of shops. Such promotional imagery failed to disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use.

515.    Among the promotional imagery displayed at Ingram's typical e-cigarette vendors:

a.    In-store display, in front of the cashier's counter and next to the lighters, prominently exhibiting JUUL products. It was, or was substantially similar

to, the following:



b.  Outside-of-store display, prominently featuring a variety of JUUL pod

flavors. Each flavor has its own distinct illustration and color palette.

Ingram's favorite, Classic Menthol, sits to the far left in the top row. The

display was, or was substantially similar to, the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

c.  Gas-station display, advertising JUUL availability directly beneath the price
of gasoline. This display was, or was substantially similar to, the following:



516.  When Ingram first encountered JUUL advertisements, she was struck by the
flashy imagery and prominent arrangements, compared to other cigarette and e-cigarette
products. For a long-time smoker such as Ingram, cigarette and e-cigarette vendors were
institutions, of sorts, in her life. When these locations began to feature JUUL
advertisements, Ingram felt a sense of trust in their judgement. She did not research JUUL
products further after seeing the displays, since they exhibited no warnings as to JUUL's
exceptionally high nicotine concentration, nor the risk of further addiction. She began to
purchase JUUL products soon after being exposed to the in-store advertisements.

517.  By the time JUUL products began to be sold in Mississippi in 2016, Ingram
had been an e-cigarette user for around four years. Having successfully quit cigarettes, she
now hoped to eliminate her nicotine consumption altogether. Indeed, she initially
purchased JUUL products under the impression they would facilitate her transition away
from nicotine products. She would not have purchased JUUL products had she known they
delivered more nicotine to the bloodstream than cigarettes or other e-cigarettes.

518.    At the peak of her use, in or around Fall 2016, Ingram would consume more than two JUUL pods each day. The 5% strength label suggested to her that JUUL contained substantially less nicotine than cigarettes or other e-cigarettes. Ingram did not know that a single JUUL pod delivered more nicotine to the bloodstream than an entire pack of cigarettes. As a matter of fact, assuming an average consumption rate of two JUUL pods per day, Ingram consumed over four times as much nicotine when using JUUL as she had when smoking cigarettes. As a smoker, she had rarely, if ever, gone through more than half a pack a day. As a JUUL user, Ingram once went through three JUUL pods in a single day.

519.    After using JUUL for some time, Ingram began to receive promotional emails, such as the one below. It was hard enough to avoid JUUL branding in her material life; JUUL had now encroached upon her digital life as well. JUUL was now on her mind more than cigarettes ever were, sending messages that were, or were substantially similar to, the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



520.    In 2017, health complications, arising from her cigarette and e-cigarette use, forced Ingram to stop using JUUL and other nicotine products. Far from aiding in this process, Ingram's JUUL use only intensified an already daunting challenge. Ingram had experienced no respiratory problems prior to her JUUL use. She now receives Social Security disability benefits due to breathing complications, and she has a recent growth on the right side of her neck, which she also understands to have resulted from her cigarette and e-cigarette use.

521.    None of the advertisements, in-store promotions, or labels Ingram saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver

nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Ingram would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

RR.     **Adam Jenkins, on behalf of his son, M.R.J., a minor**

522.     Plaintiff Adam Jenkins and M.R.J. are residents of Oxford, Mississippi.

523.     Jenkins's son, M.R.J., is currently 15 years old and started using JUUL's products in 2018 when he was only 13 years old.

524.     M.R.J. never tried smoking cigarettes before using JUUL's products.

525.     M.R.J. learned about JUUL at school from his friends and by viewing advertisements online and through social media. The advertisements he recalls viewing in particular include the following image:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

526.    The kids at M.R.J.'s school picked up on JUUL's advertising and often

promoted JUUL's products themselves by posting about the products on social media or

sharing viral images and posts in connection with the #JUUL hashtag. M.R.J. specifically

remembers seeing the following images geared towards kids:





527.    Advertisements from JUUL pushing candy-like flavors were also seen by

M.R.J., and he recalls seeing the following images in particular.





528.   All the JUUL advertisements and social media influence caused M.R.J. to begin vaping and, despite being underage, he was able to purchase JUUL pods from convenience stores and vape shops in Oxford, Mississippi, as well as from classmates who were able to obtain the products. The posters and in-store displays also failed to adequately inform him of the specific content of JUUL's products or that they delivered more nicotine than cigarettes, and were presented in attractive ways that looked essentially identical to the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

529.     None of the advertisements, in-store promotions, or labels M.R.J. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in greater quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

530.     M.R.J. became addicted to JUUL pods. Currently he has to start vaping within 30 minutes of rising in the morning and consumes a little less than half a JUUL pod per day. His preferred flavors are Mint, Crème Brulee, Mango, and Fruit Medley.

531.     The addiction to JUUL's product has cost M.R.J. and his family significant amounts of money spent on purchasing JUUL pods to date.

532.     M.R.J. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in the

185

candy-like flavors.

**SS.  Adam Jenkins, on behalf of his daughter, D.L.J., a minor**

533.     Plaintiff Adam Jenkins and D.L.J. are residents of Oxford, Mississippi.

534.     Jenkins's daughter, D.L.J., is currently 17 years old and started using

JUUL's products in 2018 when she was only 15 years old.

535.     D.L.J. never tried smoking cigarettes before using JUUL's products.

536.     D.L.J. learned about JUUL at school from her friends and by viewing

advertisements online and through social media. The advertisements she recalls viewing in

particular include the following:



537.     The kids at D.L.J.'s school picked up on JUUL's advertising and often

promoted JUUL's products themselves by posting about the products on social media or

sharing viral images and posts in connection with the "#JUUL" hashtag. D.L.J. specifically

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

remembers seeing the following images promoting use of JUUL's products by young persons:

 

 

538.    Advertisements from JUUL pushing candy-like flavors were also seen by D.L.J., and she recalls seeing the following images in particular:



187



539.    All the JUUL advertisements and social media influence caused D.L.J. to begin vaping and, despite being underage, she was able to purchase JUUL pods from convenience stores and vape shops in Oxford, Mississippi, as well as from classmates who were able to obtain the products. The posters and in-store displays she saw looked essentially identical to the following:





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






540.    None of the advertisements, in-store promotions, or labels D.L.J. saw

adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of

nicotine in JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and

in greater quantities, or that the JUUL is capable of delivering nicotine more rapidly and in

greater quantities than a cigarette, or that use of JUUL products poses significant health

risks. Nor did they indicate that JUUL was an age-restricted product.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

541.     D.L.J. became addicted to JUUL pods. Currently she has to start vaping within 5 minutes of rising in the morning and consumes between one-half and a full pod each day. Her preferred flavors are Mint, Menthol, and Mango.

542.     The addiction to JUUL's product has cost D.L.J. and her family significant amounts of money spent on purchasing JUUL pods to date.

543.     D. L J. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. She also would not have used JUUL's products if they did not come in the candy-like flavors.

**TT.      Edgar Kalenkevich**

544.     Plaintiff Edgar Kalenkevich is a resident of Brooklyn, New York. He started using JUUL products in 2015 at the age of 25.

545.     Before he started using JUUL, Kalenkevich was a non-smoker. He had tried cigarettes in the past but found them disgusting and rough on his throat.

546.     Kalenkevich recalls that the JUUL brand seemed to appear out of nowhere in New York City in the summer of 2015. Suddenly, all his friends seemed to have JUUL devices and some of his friends spoke of attending events where free JUUL products were distributed.

547.     Although he had not yet used a JUUL, Kalenkevich had seen advertisements from JUUL's "Vaporized" campaign. These colorful ads featured fashionably dressed young people striking playful poses reminiscent of pop music idols, either with JUUL in hand or next to an enlarged image of a JUUL device. Among the Vaporized ads Kalenkevich saw and relied upon were the ones pictured below:





548.     Kalenkevich also remembers seeing JUUL advertisements on his mobile phone in 2015. None of the JUUL-related content Kalenkevich saw on his phone indicated that the JUUL contained nicotine, could deliver more nicotine than cigarettes, or posed at least the same risks of addiction as cigarettes.

549.     Prior to using a JUUL, Kalenkevich had also seen point-of-sale promotional materials for JUUL devices and products, including the signs and displays pictured below:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







550.   None of the advertisements, in-store promotions, or labels Kalenkevich saw adequately disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly

192

and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Instead, he saw claims that JUUL offered "intensely satisfying vapor" and promotions for fruit- and dessert-flavored pods. These representations and omissions in JUUL's in store promotions materially impacted Kalenkevich's assessment of dessert-flavored JUUL he would later be offered.

551.    Kalenkevich had his first JUUL experience when his friend offered him a puff in a movie theater in the summer of 2015. Kalenkevich enjoyed the Crème Brulee flavor and the feeling it gave him. Although he knew smoking to be dangerous and addictive, he thought that JUUL would not be dangerous, in part because of the colorful pods and the sweet, candy-like flavors. Kalenkevich would not have used a tobacco- or menthol-flavored JUUL.

552.    JUUL's use of food-based names, food-based advertising images, and food-based flavors was a substantial contributing factor in Kalenkevich's decision to start using and continue using a JUUL. JUUL's food-based promotions misled Kalenkevich about the nature of JUUL's products and distorted the risks JUUL's products posed. But for JUUL's flavorings and flavor-based promotions, Kalenkevich would not have started using a JUUL or would not have continued using a JUUL.

553.    JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content. When Kalenkevich's friends began posting or re-posting social media content related to JUUL, Kalenkevich started following some of the JUUL-related accounts, including @JUULnation and @doit4juul. Through these, and other, accounts Kalenkevich saw numerous JUUL-related posts featuring popular cartoon characters, teenagers using JUUL devices, teens combining

JUUL with cigarettes, and JUUL as an essential—indeed irresistible—element of teenage life. By glamorizing the JUUL use of people even younger than Kalenkevich, this social media content caused Kalenkevich to misperceive the nature and risks of JUUL products.

554.    Kalenkevich visited JUUL's website in 2015 and 2016 and began receiving promotional emails from JUUL. Nothing in those emails disclosed that JUUL contained at least 59 mg/mL nicotine or that the JUUL could deliver more nicotine per puff than a cigarette.

555.    Kalenkevich's JUUL use caused him to become addicted to nicotine. Though cigarettes had disgusted him in the past, his addiction to nicotine was so intense that he started smoking when he did not have access to JUUL. Like many non-smokers who are introduced to nicotine through JUUL, Kalenkevich became a user of multiple tobacco products.

556.    Though Kalenkevich has tried many approaches to quitting nicotine, including the use of transdermal nicotine patches, he remains hooked. He takes his first puff of JUUL within 5 minutes of waking up and he consumes more than half of a JUUL pod every day along with at least half a pack of cigarettes.

557.    Kalenkevich would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, risk of addiction, and other health risks.

UU.    **Pamela Keen**

558.    Plaintiff Pamela Keen is a resident of Crowley, Texas.

559.    Keen began using JUUL products in September 2017.

560.    Keen first learned about JUUL from her stepson. She later saw JUUL

advertisements at Racetrac stores and decided to buy a JUUL device because of the

appealing, exotic flavors. Keen would not have purchased a JUUL device if JUUL had not

promoted flavored JUUL pods, such as Mango and Crème Brulée.

561.    Keen frequently purchased JUUL products from Racetrac stores throughout

Texas. Keen recalls viewing promotional materials for JUUL in Racetrac stores in Crowley

and throughout Texas in 2017 that were, or were substantially similar to, the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



562.    Keen also viewed JUUL advertising material on Facebook in 2017. Keen

viewed advertisements promoting Mango JUUL pods that were, or were substantially

similar to, the following:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



563.    At the height of Keen's JUUL use, she consumed at least one JUUL pod every three days.

564.    Prior to using JUUL, Keen smoked about 10 to 20 cigarettes a day. Keen continued to smoke cigarettes while using JUUL, as her addiction to nicotine intensified.

565.    Keen stopped using JUUL in September 2018. But she now smokes over 20 cigarettes a day, as she is more addicted to nicotine than before she started using JUUL products.

566.    Keen's JUUL use has exacerbated her asthma and resulted in respiratory infections.

567.    None of the advertisements or labels Keen saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

568.     Keen would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**VV.      Janis Kelly, on behalf of her son, C.J.W., a minor**

569.     Plaintiff Janis Kelly and C.J.W. are residents of Rock Valley, Iowa.

570.     Kelly's son, C.J.W., is currently 17 years old and started using JUUL's products in 2018 at 16 years old.

571.     C.J.W. never tried smoking cigarettes before using JUUL's products.

572.     C.J.W. learned about JUUL at school from his friends and by viewing advertisements online and through social media. On Twitter, C.J.W. saw the following specific advertisement:



573.     C.J.W. recalls seeing user-generated JUUL content on social media that used the #JUUL hashtag. C.J.W. specifically remembers seeing the following images geared towards kids:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

574.    C.J.W. also saw advertisements from JUUL pushing candy-like flavors. He recalls seeing the following image in particular:



575.    None of the advertisements or labels C.J.W. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

576.   All of the JUUL advertisements and social media influence caused C.J.W. to begin vaping and, despite being underage, he was able to purchase JUUL pods from classmates who were able to obtain the products.

577.   C.J.W. became addicted to JUUL pods. Currently he has to start vaping within 30 to 60 minutes of rising in the morning and consumes between half a JUUL pod and a full JUUL pod per day. His preferred flavors are Mint, Cucumber, and Mango. Additionally, C.J.W. uses LEAP vaping devices.

578.   C.J.W's addiction has been a burden on his personal life. For instance, he was suspended from school wrestling matches and tournaments for character misconduct after school officials discovered JUUL pods in his locker.

579.   C.J.W. suffered from severe lack of appetite as a result of his JUUL use and addiction to nicotine. He later developed pancreatitis. His physician cited his low body weight as a cause. C.J.W. regularly visits a gastroenterologist to evaluate his weight.

580.   C.J.W. also developed a large lesion in his mouth on the inside of his left cheek as a result of using JUUL. Kelly had to take his son to an oral surgeon to have the lesion evaluated.

581.   The addiction to JUUL's product has also cost C.J.W. and his family significant amounts of money spent on purchasing JUUL pods to date.

582.   Kelly attempted to wean her son off of JUUL by purchasing him nicotine gum for a period of approximately 4 months in 2019. However, C.J.W was not able to quit his JUUL use.

583.   C.J.W. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other

health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.

**WW.** **Shannon Kinnard**

584.    Plaintiff Shannon Kinnard is a 37-year-old resident of Albuquerque, New Mexico.

585.    Kinnard smoked between half of a pack to a full pack of cigarettes per day prior to using JUUL.

586.    Based on various advertisements of JUUL's products that she saw and relied on, Kinnard purchased a JUUL to help her quit smoking and as a healthy alternative to smoking. Kinnard encountered radio as well as Twitter and Facebook ads that depicted JUUL e-cigarettes as a smoking-cessation device, such as the following specific advertisements:



587.    Kinnard interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Kinnard saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

588.     Kinnard instead developed an addiction to JUUL pods. Kinnard regularly used JUUL within an hour of waking and consumed between half of a JUUL pod and one JUUL pod per day.

589.     Kinnard experienced high blood pressure while using JUUL. Kinard had suffered pregnancy complications as a result of her JUUL use.

590.     Upon learning of JUUL's harmful effects, Kinnard has subsequently stopped JUULing, but only by going back to smoking combustible cigarettes and other vaping devices.

591.     Had Kinard known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Kinnard is still interested in products that would help her stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

## XX.     Taggart Knutson

592.     Plaintiff Taggart Knutson is an 18-year-old resident of Olalla, Washington.

593.     Knutson began using JUUL socially with his friends at age 17.

594.     Prior to using JUUL, Knutson smoked approximately 2 to 3 cigarettes per day.

595.     Knutson has seen JUUL ads on social media and the radio, including these Facebook ads and similar ads:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



596.    Knutson believed that JUUL contained less harmful chemicals than traditional cigarettes. He also did not have a clear understanding of the 5% strength label on JUUL pod packaging.

597.    Knutson purchased JUUL pods through his friends as a minor. He began purchasing JUUL pods himself from local gas stations once he turned 18 years old.

598.    None of the advertisements, point-of-sale displays, or labels Knutson saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

599.    Knutson became addicted to JUUL pods. At the height of his addiction, Knutson was using his JUUL within 5 minutes of waking and smoked between 1 and 2

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

JUUL pods per day. His preferred flavor was Mango. Using JUUL was on Knutson's mind more than using cigarettes

600.    Knutson has suffered coughing and lung irritation from his JUUL use. Additionally, his tinnitus intensifies when he uses JUUL. Knutson has sought treatment from ear, nose, and throat specialists for these issues.

601.    Knutson would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in candy-like flavors

**YY.    Tyler Krauel**

602.    Plaintiff Tyler Krauel is a 20-year old who resides in St. Pete Beach, Florida.

603.    Prior to using JUUL's products for the first time in 2015, Krauel never smoked or used any nicotine-containing products. After starting to use JUUL, however, he also began smoking up to 10 cigarettes a day.

604.    While still in high school, he was first introduced to JUUL by friends talking about how amazing the flavors were and by seeing JUUL's online ads in 2015-2016, including on Instagram, Facebook, and YouTube. Some of the ads and promotions he recalls seeing include:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

 

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO








605.    Those promotions made it seem to Krauel that using JUUL's products was

harmless and the "cool" new thing to do. The advertisements failed to warn of addiction

and, if they did, failed to make it bold and noticeable to a viewer. Certainly, none of the

advertisements warned Krauel that JUUL's products delivered more nicotine into the blood

stream than cigarettes and did so more efficiently.

606.   In addition to JUUL's advertisements, Krauel saw user-generated content on social media that was shared with the "#JUUL" hashtag promoting use and abuse of JUUL by young persons using memes or images of others vaping, such as the following that Krauel specifically recalls:







607.   Relying on the advertisements and believing JUUL's products were widely accepted and trendy, Krauel bought a device and eventually started purchasing JUUL pods himself from various convenience stores and smoke shops in his area. The in-store signs,

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

displays, and advertisements Krauel recalls viewing include some essentially identical to the following:










608.    None of the advertisements, in-store promotions, or labels Krauel saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

609.    Krauel paid anywhere from $20.00 to $25.00 for JUUL pods. His favorite flavors were Mango and Fruit Medley, but he later switched to Mint. The flavors were a big factor in Krauel using JUUL's products.

610.    Krauel became addicted to JUUL pods and felt a need for it within five minutes of waking each morning. He typically would go on to consume between one and two JUUL pods each day. Krauel struggled to quit using JUUL and was finally successful in late 2019.

611.    In addition to the money spent on JUUL's products, Krauel has experienced health problems that did not exist before. He has asthma, is fatigued easily, and gets stomach aches when JUULing.

612.    Krauel would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He also would not have started using if there had not been candy-like flavors available.

### ZZ.      David Kugler

613.    Plaintiff David Kugler is a resident of Illinois.

614.    Kugler is 19 years old.

615.    Kugler is addicted to JUUL; he started in the summer of 2016 at age 15. He had tried a cigarette before.

616. JUUL seemed trendy or cool and "everyone was doing it" so he tried too.

617. Kugler has seen JUUL ads on social media, Instagram, at gas stations, and smoke shops during the class period, including this ad and similar ads:



618. None of the advertisements, in-store promotions, or labels Kugler saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

619. Kugler first tried JUUL at a party and one of his classmates offered him a JUUL device and JUUL pod that was "Cool Mint" flavor. Kugler did know what nicotine was and had not tried nicotine before that point. There were no warnings on the device or pod.

620. If Kugler had known how addictive JUUL was or how it worked, he definitely would not have tried it. At peak use in 2017, Kugler was smoking a pack of pods or $20-$25 per week.

621.     Kugler was consistently struggling with addiction and withdrawal to JUUL, and it hurt his relationship with his parents.

622.     Kugler prefers flavored JUUL pods, including Mango. Kugler avoids Tobacco or Menthol JUUL pods.

623.     Kugler would never have used JUUL had it not been for the flavors.

624.     Kugler had seen JUUL's packaging and advertisements in gas stations and on social media.

625.     Kugler saw online ads for JUUL skins and saw @juulnation on Instagram. When Mango first came out, he saw a lot of social media promotion over new appealing flavors. He had seen many memes such as people inhaling multiple JUULs at once. He had seen many online memes.

626.     Kugler saw a photo of Baker Mayfield, the NFL quarterback, posted with a JUUL device.

627.     Kugler purchased JUUL from a classmate who purchased pods in bulk on the JUUL website. He also purchased JUUL pods through gas stations and smoke shops and through the help of some of his classmates who looked older.

628.     Kugler suffered a serious bout of non-contagious pneumonia. He also lost 11lbs. He visited his physician, who attributed Kugler's rapid weight loss to his nicotine addiction.

629.     Kugler's nicotine addiction has contributed to his slower athletic performance and has now diminished his opportunities to play college soccer.

630.     Kugler received help from a counselor and was eventually able to recover from his addiction in the summer of 2017. This program cost approximately $2,000.

631.     Kugler would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He would never have used JUUL had it not been for flavors and marketing that made him believe JUUL was safe.

**AAA.     Tracie Kugler, on behalf of her son, Z.K, a minor**

632.     Kugler and Z.K. are residents of Illinois.

633.     Z.K., Kugler's son, is 17 years old.

634.     Z.K. is addicted to JUUL. Z.K. started at age 14 in 2017.

635.     Z.K. had never tried a cigarette before trying JUUL.

636.     Z.K. saw JUUL ads on Facebook advertising JUUL's newest flavor, Mango. He specifically saw this ad in early 2017 before he started smoking JUUL:



637.     When Z.K. first tried JUUL, it was clear to him that he only liked flavored JUUL pods, including Mango.

638.    Z.K. avoids Tobacco and Menthol JUUL pods, finding them "disgusting."

639.    Z.K. became addicted to JUUL in 2017 and was caught using JUUL at school multiple times in the past several years.

640.    Z.K. purchased JUUL pods on a regular basis through other people who obtained them from gas stations, online, or retailers.

641.    Z.K. had seen JUUL's packaging and advertisements in gas stations and on social media. He did see the 5% nicotine strength as well.

642.    None of the advertisements, in-store promotions, or labels Z.K. saw, including the ones below, adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

643.    Z.K. was caught using JUUL three times in school. He performed poorly in school due to his addiction and had to be put in a drug rehab program mandated by the school.

644.    Z.K. was also caught using JUUL in a summer school program, after which he was placed in an out-patient rehab facility in Illinois that cost at least $4,000 and therapy that cost $160 per session with approximately 25 visits. Z.K. continued to use JUUL through the program due to his addiction.

645.    Z.K.'s mood changed significantly, and his nicotine addiction has contributed to anxiety and depression.

646.    Z.K.'s addiction has contributed to negative impacts on his health, and conflicts with parents and others. Z.K. has been diagnosed with Adjustment Disorder, Anxiety, Nicotine Use Disorder, Severe, Unspecified Depressive Disorder, and Generalized Anxiety Disorder.

647.    Due to his nicotine addiction, Z.K. spent the summer of 2019 at an intensive camp in Colorado for recovering young people. He spent a total of 82 days in the program. The cost of various associated tests and transportation for Z.K. and family members cost Kugler approximately $70,000.

648.    Z.K. is currently attending a boarding school in Utah designed for young people in recovery where he will remain until he begins his senior year of high school. Z.K. entered the boarding school in August of 2019 and plans to leave in May of 2020. Kugler pays $13,000 per month for Z.K. to attend this boarding school.

649.    Z.K. would never have used JUUL had it not been for the flavors. He never would have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**BBB.     Kacie Ann Lagun (née Durham)**

650.    Plaintiff Kacie Ann Lagun (née Durham) is a resident of Pennsylvania who began JUULing in 2016 at the age of 23.

651.    Lagun is a U.S. Army veteran and health sciences student.

652.    Based on various advertisements of JUUL's products that she saw and relied on, Lagun purchased a JUUL to help her quit smoking and as a healthy alternative to smoking.

653.    Lagun saw JUUL advertisements when she went to purchase cigarettes. These ads included discounts and advertised to "switch" to JUUL, as well as the slogan "smoking evolved." She also saw point of sale displays for JUUL, presenting a variety of



flavors, each with its own bright primary color. She further remembers seeing discount

offers, and specifically sought out shops that offered such discounts. Ads that she

remembers seeing include those shown below:

  



654.    Friends forwarded links to JUUL's website to Lagun on Facebook, touting

JUUL as a safe alternative to smoking, and telling her to "switch to JUUL." On

Defendant's web site, she saw the JUUL as a sleek, portable device with a variety of

appealing flavors, particularly Mint. The devices were advertised using bright, primary

colors in ads such as the one below:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



655.    Lagun also saw multiple advertisements from JUUL's Vaporized!

Campaign in magazines. As with JUUL's website, she thought the colorful ads were very

attractive, and made JUUL look like a fun, youthful activity. Among the Vaporized! Ads

that Lagun remembers seeing in magazines are those below:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






656.    None of the advertisements, in-store promotions, or labels Lagun saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

657.    Lagun instead developed an addiction to JUUL pods and found herself vaping 2-3 JUUL pods per day. She has subsequently stopped JUULing, but only by going back to smoking combustible cigarettes.

658.     Had Lagun known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Lagun is still interested in products that would help her stop smoking, and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

### CCC.     David Langan

659.     Plaintiff David Langan is a resident of Massachusetts.

660.     Langan, who is now 24 years old, bought his first JUUL from a friend. Langan had been smoking 4-5 years before he purchased his first JUUL and had unsuccessfully tried to quit a few times. He particularly wanted to quit smoking because he had a child on the way, and did not want to smoke around his pregnant wife or infant.

661.     He felt like he had almost quit cigarettes when a friend introduced him to JUUL pods in or about March 2017. Shortly afterwards, he purchased his JUUL.

662.     Langan had seen ads from JUUL's "Switch" campaign prior to his purchase. He also remembers seeing the slogan "Smoking Evolved." The following are specific advertisements he recalls seeing:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



663.    Langan remembers JUUL coming out of nowhere, and suddenly being

everywhere, both in social media ads, gas station/point of sale ads and displays, and being

used by friends, as well as many high school students in his neighborhood. He remembers

JUUL advertising being so widespread it became part of the subconscious backdrop of his

everyday life. The types of gas station/point of sale ads and displays he recalls were

essentially identical to the following:









CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

664.    At the time of his early JUUL purchases, Langan was active on Instagram and Facebook. He viewed Instagram "Switch" clips where JUUL users talked about their experiences switching to JUUL. Some of the other "switch" ads he saw promoted on social media included the following:



665.    Langan's first store purchase of JUUL pods was a pack of the Cool Mint flavored pods, which was triggered by a poster advertising the Cool Mint flavor at his local gas station. Langan saw advertising materials describing the fruity and menthol flavors of JUUL pods, which influenced his purchase. Langan favors Menthol JUUL pods, and has also purchased Mango-flavored and Cool Mint JUUL pods that were advertised. Some of the flavor-themed advertisements he specifically recalls viewing include the following:







666.    Langan also received ads promoting JUUL from his local smoke shop, in the form of text messages.

667.    None of the advertisements, in-store promotions, or labels Langan saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

668.    Subsequently, he found that his nicotine addition increased significantly and he became addicted to JUUL pods. When Langan lost his first JUUL, he could not go

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

without one, so he bought a replacement. Langan also found that if he did not have a

working JUUL on him, he felt compelled to ask for cigarettes from smokers around him.

669.    Langan would not have purchased or started using JUUL's products if he

had been adequately warned about the nicotine content and dosage, risks of addiction, and

other health risks.

### DDD.    Lucas Lawless

670.    Lucas Lawless is an 18-year-old resident of Whitewater, Montana.

671.    Lawless began using JUUL in 2019 at age 17.

672.    Based on various advertisements of JUUL's products that he saw and relied

on, Moore purchased a JUUL as a safe alternative to smoking as well as to help manage his

anxiety. He saw point-of-sale displays and social media advertisements such as the

following:

 

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



673.    Lawless interpreted the ads he had seen as indicating that JUUL was safer than cigarettes. None of the advertisements, in-store promotions, or labels Lawless saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

674.    Lawless developed an addiction to JUUL pods. He consumes less than half of a JUUL pod per day, totaling approximately 2 to 3 JUUL pods per week.

675.    JUUL is frequently on Lawless's mind. He often plans his day around his next opportunity to vape and he begins consuming JUUL pods within 5 minutes after waking each day.

676.    Lawless's preferred JUUL pod flavor is Virginia Tobacco. He typically purchases 5% strength JUUL pods from the West Side Gas stations in Malta, Montana. He

225

also occasionally uses honey-flavored cartridges on Blu devices and alternative tobacco flavors on Vuse Alto devices.

677.    Lawless experiences weakness in his chest and increased coughing as a result of his JUUL use.

678.    Had Lawless known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Lawless is interested in products that would help him stop using nicotine and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**EEE.    Veronica Lesher**

679.    Plaintiff Veronica Lesher is a 54-year-old resident of Deptford, New Jersey.

680.    Lesher had been smoking about one pack of cigarettes per day prior to using JUUL. She began using JUUL pods in 2018.

681.    Based on various advertisements of JUUL's products that she saw and relied on, Lesher purchased a JUUL to help her quit smoking and as a healthy alternative to smoking.

682.    Lesher saw JUUL advertisements when she went to purchase cigarettes. Lesher saw advertisements for JUUL promoting its capacity to help wean cigarette-smokers off of their addiction. These advertisements and marketing displays concealed JUUL pods' true nicotine content and delivery system.

683.   Lesher also saw ads on Facebook that promoted JUUL's Mango and Cool Mint flavors while failing to disclosure nicotine content, including specifically the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

684.    On other social media platforms, Lesher saw content promoting JUUL featuring attractive, youthful models while omitting information as to nicotine content or addictiveness, including specifically the following:

 

685.    Lesher interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Lesher saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

686.    Lesher consumed between one and two JUUL pods per day, amounting to an expense of more than $40 every week.

687.    Lesher became addicted to JUUL pods. She would resume using her JUUL each day promptly after waking and spent more time thinking about her JUUL than about cigarettes.

688.    Lesher's numerous health issues drove her to try to quit her JUUL. Since beginning to use JUUL, Lesher suffered an upper respiratory infection and was diagnosed with asthma. She also struggles with depression, since starting with JUUL.

689.    Lesher quit her JUUL due to these effects, but she is still addicted to nicotine and now smokes around a full pack of cigarettes per day, more than before she began using a JUUL.

690.    Had Lesher known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Lesher is still interested in products that would help her stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

**FFF.    Randi Lines**

691.    Plaintiff Randi Lines is a current resident of North Mancato, Minnesota.

692.    Before using JUUL for the first time in 2017 at the age of 58, Lines regularly smoked combustible cigarettes. She began smoking cigarettes over forty years prior, at the age of fifteen. She initially used JUUL at the behest of her son, who wanted her to stop smoking. Lines herself recognized the benefits of quitting smoking and purchased JUUL products because she thought they would help her, over the long-term, end her addiction to nicotine.

693.    Based on the online and television advertisements she saw, Lines believed

JUUL to be safer and contain less nicotine than cigarettes. She recalls JUUL

advertisements, substantially similar or identical to that below, proliferating throughout

Facebook in particular. This particular image features the eight different JUUL pod flavor

varieties available to consumers. Lines's favorite flavor, Classic Menthol, sits to the far

right.



694.    These online advertisements directed her towards JUUL's website, which

contained misleading information regarding the health and addiction risks posed by JUUL

use. She frequently purchased JUUL products from their website via the online

marketplace throughout 2017.

695.    Lines also purchased JUUL products at local variety stores and smoke

shops. She recalls in-store displays, substantially similar or identical to that below, near the

cashier's counters at shops she frequented, prominently exhibiting JUUL products since

mid-2017. The displays were next to the lighters and practically impossible to miss, and

were, or were substantially similar to, the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



696.    When using JUUL, Lines would consume well over two JUUL pods each

day. Lines did not know that a single JUUL pod delivered more nicotine to the bloodstream

than an entire pack of cigarettes. None of the advertisements she saw online, or the

information she read on JUUL's website, indicated that JUUL contained exceptionally high

concentrations of nicotine or that JUUL products posed a risk of addiction. She used her

JUUL device each morning immediately upon waking. She has since transitioned back to

cigarettes, citing issues of expense and throat irritants. She now smokes well over two

packs of cigarettes each day.

697.   None of the advertisements, in-store promotions, or labels Lines saw

adequately disclosed the nature or addiction risks of JUUL's products, the actual amount

of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine

rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and

in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

Lines would not have purchased or started using JUUL's products if she had been

adequately warned about the nicotine content and dosage, risks of addiction, and other

health risks.

GGG.     **Jeanine Manning on behalf of her son, M.C., a minor**

698.    Plaintiff Jeanine Manning and M.C. are residents of Walpole,

Massachusetts.

699.    Manning's son, M.C., is currently 17 years old and started using JUUL

products in 2015 when he was only 12 years old.

700.    M.C. had never smoked cigarettes or used any other type of tobacco

products before using JUUL.

701.    M.C. learned about JUUL from friends at school and by exposure to

advertisements from JUUL's youth-oriented "Vaporized" campaign, including the images

below:





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

702.    The kids at M.C.'s school were aware of JUUL's advertising and often

promoted JUUL's products themselves by posting about the products on social media or

sharing viral images and posts along with the #JUUL hashtag. M.C. recalls seeing the

following youth-targeted posts:



703.    Prior to using a JUUL, M.C. had also seen point-of-sale promotional

materials for JUUL devices and fruit- and dessert-flavored JUUL pods. Among the point-

of-sale promotions M.C. saw and relied upon were those pictured below:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



704.    Because JUUL engaged in extensive advertising on youth-oriented social media platforms, M.C. was exposed to a steady stream of JUUL ads that presented JUUL as a tasty treat but failed to disclose that JUUL was also a potent addictive drug. JUUL's use of food-based names, food-based advertising images, and food-based flavors played a substantial contributing factor to M.C.'s decision to start using and continue using JUUL. JUUL's food-based promotions misled M.C. about the nature of JUUL's product and distorted the risks JUUL products posed. But for JUUL's flavorings and flavor-based promotions, M.C. would not have used a JUUL or would not have continued using a JUUL. Two of the flavor-focused ads that M.C. saw and relied upon are pictured below:




705.    None of the advertisements, in-store promotions, or labels M.C.

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that JUUL was

engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of

delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of

JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-

restricted product. The representations and omissions in JUUL's advertisements, in-store

promotions and labels materially impacted M.C.'s assessment of the JUUL he would later

be offered by a friend at school.

706.    Though he was not a smoker, when M.C.'s classmate offered him his first

puff of a JUUL, M.C. accepted it because he thought it would be safe and harmless. Soon

thereafter, M.C. became addicted to JUUL pods.

707.    M.C. did not know that JUUL aerosol contains nicotine and presents a risk

of addiction. To this day, though he is addicted to nicotine, M.C. thinks that JUUL use is

"ok" and "safe."

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

708.    JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached M.C. and M.C.'s social network and were intended to promote the JUUL brand and products to youth. But for JUUL's social media advertising, M.C. would not have been exposed to, and would not have used, JUUL products.

709.    Among the JUUL social media promotions that M.C. saw and relied upon were the following:

   a.   Instagram post-dated portraying a JUUL device and pods alongside
        sunglasses, a wallet, earbuds, thermos and portable speaker:



   b.   Instagram post dated October 3, 2017 promoting JUUL flavors:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



710.    M.C. and his friends are active on Instagram and Snapchat and follow a number of JUUL-promoting accounts. Through these accounts, M.C. has seen content that encourages teenage JUUL use by depicting teens using JUUL, depicting "cool" cultural icons using JUUL and making light of teen dependence on JUUL. M.C. and his friends now post videos of themselves JUULing on Snapchat that are similar to the videos and images they see on Instagram.

711.    M.C. and his friends purchase JUUL products through classmates when they cannot purchase them through stores or online. Manning knows that M.C. has at least once purchased JUUL products online using a Visa gift card that he purchased with cash. But Manning does not know if M.C. bought them from JUUL or from a JUUL reseller. More recently, M.C. admitted to having purchased a JUUL device and 20 pods from a stranger he met on Snapchat.

712.    Like many of his friends and classmates, M.C. supports his JUUL addiction by selling JUUL pods to classmates at a markup.

713.    To date, Manning has confiscated at least 5 JUUL devices from M.C. Each time she does so, M.C. becomes extremely irritable, belligerent and verbally abusive due to nicotine withdrawal. Since he started using JUUL, M.C.'s health and performance in school have suffered, with M.C. being more withdrawn and moody than he was before he became addicted to nicotine.

714.    M.C.'s physician has not been able to help MC break his addiction. MC now sees a counselor because Manning found that he was vaping marijuana oil through his JUUL device. To date, Manning has spent in excess of $1,150 on interventions to address M.C.'s JUUL addiction, but without success.

715.    M.C. currently consumes at least 1 fruit-flavored JUUL pod (either Fruit Medley or Mango) per day.

716.    M.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, risk of addiction, and other health risks.

**HHH.    David Masessa**

717.    Plaintiff David Masessa resides in Virginia Beach, Virginia. Masessa previously lived in Chatham, New Jersey, and his purchase and use of JUUL occurred in New Jersey.

718.    In 2015, Masessa began using JUUL products in an effort to cease smoking cigarettes and wean himself from nicotine consumption. He had been smoking between one half pack and a full pack of cigarettes per day. He believed the JUUL pods would quench

his desire for nicotine, allow him to stop smoking and using e-cigarettes, and allow him to

cease consuming all nicotine products altogether.

719.    Prior to consuming JUUL pods, Masessa was exposed to and did see JUUL

advertising, promotional and marketing materials in various online publications (such as

Wired, Verge, and Engadget), which caused him to believe that JUUL products would

allow him to wean himself off of cigarettes and nicotine products. These materials

sometimes included the word "Vaporized" and always featured attractive, youthful-looking

models including specifically the following:



720.    Prior to consuming JUUL pods, he visited the JUUL website in June 2015,

where he saw claims and representations about the product. He relied on those claims and

representations when he then purchased the JUUL starter kit from the JUUL website. Such

claims include the following graph:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

721.    At around this time, Masessa also saw posts on JUUL's Facebook page, including the following ad:



722.    After June 2015 when Masessa purchased the JUUL started kit, he visited or came across additional posts from JUUL's Facebook page, including a post that pictured a JUUL Creme Brulee-flavored pod next to a real crème brulee with the words "this JUUL pod lets you indulge in dessert without the spoon," and a post with the word "SWITCH" in large letters across the face of the post along with the words "JUUL was designed with smokers in mind. Have you made the switch?"

723.    After June 2015, Massesa also saw advertisements on social media for rooftop JUUL parties in Brooklyn and Manhattan, which further enticed him to begin using and to continue to use JUUL products. He saw the following ad and several others that were similar:



724.    He saw JUUL's representation of "5% strength" on JUUL packaging and believed that this meant the product contained 5% nicotine.

725.    After June 2015, he also saw JUUL's representation that one JUUL pod is equivalent to one pack of cigarettes and believed this to mean that one JUUL pod has a nicotine content equivalent to one pack of cigarettes.

726.    He also saw JUUL's representation that JUUL products were an "alternative for adult smokers" and believed this to mean that JUUL products were a smoking-cessation device that was a healthier alternative to cigarettes. Although he ultimately reduced, but did not cease, his consumption of cigarettes, he became addicted to JUUL pods, which increased his anxiety and desire for nicotine. He experienced strong withdrawal symptoms when he did not use JUUL.

727.    He relied on these representations in deciding to use JUUL and in continuing to use JUUL.

728.    From the JUUL marketing materials and representations that Masessa saw, he did not know that the JUUL contained 59mg/mL nicotine (6%); that the JUUL could deliver more nicotine per puff than a cigarette; or that the nicotine delivered by the JUUL entered the bloodstream faster than a cigarette. He believed that the nicotine salts in the JUUL broke down in the blood over a longer period of time than nicotine inhaled through a cigarette, and that this was supposed to reduce his desire for nicotine.

729.   Masessa purchased JUUL products at convenience stores and local smoke shops near where he lives. At those stores and in other locations, he saw JUUL advertisements and in-store signs, promotional materials, sales and discount information, and poster-sized enlargements of the product packaging. He saw several displays including the following display, none of which warned him of the truth of JUUL's nicotine content and delivery:



730.   Masessa has tried all of the JUUL flavors. He had seen JUUL advertisements touting all of the flavors it offered before trying those flavors, including advertisements that pictured real fruit next to the corresponding JUUL flavor, such as ripe mangoes next to a picture of the Mango-flavored JUUL pod, Creme Brulee-flavored JUUL pods next to a cup of coffee as if those pods were a sweet dessert, and sliced cucumber next to the Cool Cucumber-flavored JUUL pod. His favorite flavor is Creme Brulee because it causes him the least amount of irritation and inflammation of his throat and mouth.

731.   Masessa on average consumed four to six JUUL pods every week.

732.   Since starting to consume JUUL pods, Masessa became addicted to the nicotine salts they contain. Indeed, JUULing was on his mind more than smoking cigarettes

was, and not having a JUUL nearby caused him anxiety. Rather than weaning Masessa off of cigarettes and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

733.    None of the advertisements, in-store promotions, or labels Masessa saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

734.    Masessa would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He would not have purchased had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself. Masessa is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

### III. Noah Matarazzo

735.    Plaintiff Noah Matarazzo is a Maine resident.

736.    Matarazzo began using JUUL in 2017 as a result of online fanfare and peer pressure from his classmates.

737.     Matarazzo typically purchased JUUL products from classmates of legal age to purchase them, or occasionally from local convenience stores with lax age-requirement enforcement. Prior to using JUUL, Matarazzo had never used tobacco products. By mid-2019, Matarazzo had spent thousands of dollars on JUUL products.

738.     When he first began using JUUL products, Matarazzo was unaware of their addictive potential. He recalls peers passing their own JUULs around school bathrooms and using JUUL for the first time in that exact scenario. In these instances, Matarazzo would only try JUUL if it was flavored. He would not have used JUUL products if they were only available in basic flavors such as Classic Tobacco or Classic Menthol. He first purchased a starter pack with fruit flavored JUUL pods from a peer.

739.     Matarazzo's nicotine addiction quickly grew out of control. By 2018, he consumed two JUUL pods each day.

740.     Like many adolescents, Matarazzo used social media. He followed the account @juulnation across various platforms. He recalls his friends constantly posting Snapchat stories of them using JUUL and attempting "vape tricks." On YouTube, he watched videos of prolific JUUL user DonnySmokes.

741.     Matarazzo also encountered JUUL promotional material when at gas stations and local convenience stores.

742.     Matarazzo recalls an in-store display, since 2017, in front of the cashier's counter, prominently exhibiting JUUL products. The display is next to the lighters and practically impossible to miss. The display was, or was substantially similar to, the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



743.    Matarazzo also recalls an in-store display of readily available JUUL products, with an image of a hip and attractive model directly above. The display was, or was substantially similar to, the following:



744.    Matarazzo recalls an image substantially similar or identical to that below, with the "Smoking Evolved" slogan:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



745.    Matarazzo endured serious withdrawal symptoms, including distorted vision, upon attempts to discontinue his JUUL use. He also suffered emotional instability and physical exhaustion. He eventually attempted to curb his nicotine addiction via nicotine gum and lozenges.

746.    Although Matarazzo has not used tobacco products for the last two or three months, he continues to struggle with nicotine addiction.

747.    None of the advertisements, in-store promotions, or labels Matarazzo saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. Matarazzo would not have purchased or started using JUUL's products if he had been

adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### JJJ.      John McFaull

748.    Plaintiff John McFaull is a 26-year old who resides in Lexington, Kentucky.

749.    McFaull began using JUUL's products in February 2018 after seeing advertisements through social media, online, and hearing about them from a friend.

750.    At the time, McFaull was "dipping" chewing tobacco on a daily basis.

751.    Based on the advertising, McFaul believed JUUL's products to be a safer alternative that he could use to wean himself off of the nicotine in chewing tobacco.

752.    Specifically, prior to first purchasing JUUL's products, McFaull recalls having seen the following advertisements, among others:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



753.    None of the advertisements, in-store promotions, or labels McFaull

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL

products poses significant health risks.

754.    Rather, based on the advertising of JUUL as an "alternative" for smokers

and packaging of the products that stated "5% strength" as depicted below, McFaull



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

believed JUUL's products contained significantly less nicotine than cigarettes or chewing

tobacco:



755.   McFaull purchased JUUL pods from gas stations, online retailers,

convenience stores, and other distributors for between $18.00 to $20.00 for a four-pack of

JUUL pods, often getting them from displays essentially identical to the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

756.    Rather than weaning himself off nicotine, the advertising caused McFaull to become addicted to JUUL's products and he now needs to start vaping within 30 minutes after waking up each day. On average, he ends up consuming between one to two JUUL pods per day, which is costly and significantly more nicotine than he was getting when dipping chewing tobacco.

757.    McFaul's favorite flavors of JUUL pods were always Cool Mint and Mango, but he is so addicted now that, even though those flavors are no longer available in his area, he has turned to purchasing the Classic Menthol flavor. He recalls seeing the following specific ads of these flavors:



758.    McFaull would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**KKK.      Ron Minas**

759.    Plaintiff Ron Minas is a resident of Lebanon, Connecticut.

760.    Minas began using JUUL products in January 2018 at the age of 36. Minas first learned about JUUL from his brother. He later saw JUUL advertisements online and decided to buy a JUUL device. He hoped that the JUUL would help him stop smoking and break his addiction to nicotine.

761.    Before purchasing JUUL in January 2018, Minas visited JUUL website. Minas also began to receive promotional emails from JUUL, substantially similar or identical to:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



762.

763.    Minas also viewed JUUL advertising material on Facebook. Minas viewed advertisements promoting Mango JUUL pods substantially similar or identical to:





764.    Neither JUUL's website nor JUUL's promotional material disclosed JUUL easily delivers nicotine to the bloodstream faster than a cigarette. Minas would not have purchased JUUL products if he knew that they delivered more nicotine to the bloodstream than cigarettes.

765.    Minas first purchased Mango-flavored JUUL pods. Minas would not have purchased Classic Tobacco- or Classic Menthol-flavored JUUL pods.

766.    JUUL has only worsened Minas' nicotine addiction, as he can consume JUUL anywhere; the JUUL device is constantly in his hand. Prior to using JUUL, Minas

smoked approximately ten cigarettes a day. Now, Minas consumes at least one JUUL pod per day, often more. That represents at least a doubling of Minas's daily nicotine intake.

767. Minas says he has tried to stop using JUUL, but he cannot kick his nicotine addiction. Minas has tried to use a nicotine patch and received treatment at the V.A., as he is a veteran, but he just cannot shake it. Minas says it is even more difficult to quit JUUL versus cigarettes because it is an attractive product; the JUUL tastes good and does not emit any foul odors.

768. Since Minas began purchasing JUUL products in January 2018, he has also purchased JUUL products from local vape shops in Lebanon, Connecticut and the surrounding area. Various promotional materials have displayed JUUL products substantially similar or identical to:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



769.    None of the advertisements, in-store promotions, or labels Minas saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

770.    Minas would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**LLL.     D'Angelo Moore**

771.    Plaintiff D'Angelo Moore is a 20-year-old resident of Fairbanks, Alaska.

772.    Moore began using JUUL in 2018 at age 18. Moore began using JUUL to relieve stress from his time in the U.S. Army.

773.   Based on various advertisements of JUUL's products that he saw and relied on, as well as the recommendations of his local smoke shop employees, Moore purchased a JUUL to help manage his stress. He saw point-of-sale displays such as the following:





774.   Moore interpreted the ads he had seen indicating that JUUL was safer than cigarettes. None of the advertisements, in-store promotions or labels Moore saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in

or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, or that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

775.    Moore developed an addiction to JUUL pods. At his peak usage, Moore was consuming between half of a JUUL pod and one JUUL pod a day. JUUL pods were on his mind more than cigarettes, and he would begin consuming JUUL pods within 5 minutes after waking each day.

776.    Moore's preferred JUUL pod flavors were Classic Menthol, Cool Mint, Mango and Fruit Medley. He typically purchased 5% strength JUUL pods from a Holiday gas station in Fairbanks. He did not have a clear understanding of the 5% strength label on JUUL pod packaging.

777.    Moore stopped using JUUL in favor of ZYN nicotine pouches after experiencing breathing difficulties and throat infections as a result of his JUUL use.

778.    Had Moore known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Moore is still interested in products that would help him stop using nicotine and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**MMM.    Shirley Moses on behalf of her daughter, K.S.C., a minor**

779.    Plaintiff Shirley Moses and K.S.C. are residents of West Jordan, Utah.

780.    Moses' daughter K.S.C. first used JUUL in her early adolescence, as early on as JUUL's initial launch in 2015, when K.S.C. was 14 years old. K.S.C. is currently 16 years old.

781.    Prior to using JUUL, K.S.C. had never used tobacco products.

782.    K.S.C. began using JUUL as a result of peer pressure and would typically purchase JUUL products from classmates.

783.    Moses believes that while K.S.C. likely knew of JUUL's nicotine content when first using the product, K.S.C. was far too young to understand its addictive potential. Moses is a smoker, and her husband is a former smoker. Her husband stopped smoking at the behest of K.S.C., who abhors cigarettes and tried to force her mother to quit as well. Moses says that K.S.C. would never have used JUUL products if she understood that they posed an addiction risk similar to, or greater than, that of cigarettes.

784.    Both Moses and K.S.C. believe that K.S.C. is currently addicted to nicotine. K.S.C. now consumes between one-half and one full JUUL pod each day. Upon waking up in the morning, K.S.C. will typically use her JUUL before even getting out of bed. She prefers fruit-flavor JUUL pods to all others.

785.    Like many adolescents, K.S.C. is an avid social media user. Her primary platform is Instagram. K.S.C. recalls JUUL-related content frequently populating her Instagram feed.

786.    K.S.C. recalls seeing an Instagram post, substantially similar or identical to the one below, advertising Mango flavored JUUL pods, featuring a stylish close-up of the colorful accessory.



787.     K.S.C. also recalls seeing an Instagram post featuring model, fashion icon, and soccer star Florencia Galarza posing with a JUUL similar to the one below. Though not posted by the official JUUL Instagram account, the official account did comment approvingly. JUUL later featured this image in their #Vaporized campaign.



788.     K.S.C. saw these images from 2016 through 2019.

789.     Once addicted to nicotine, the very sight of JUUL-related content on social media prompted K.S.C. to reach for her JUUL. Even now, with most youth-oriented content scrubbed from social platforms, K.S.C. still encounters difficulties. Anti-JUUL public service warnings, for instance, still incite within her an urge to use JUUL.

790.   K.S.C. also frequently encountered and continues to encounter JUUL promotional material when at gas stations with friends and family, starting in 2016. Imagery such as that below was, and still is, quite common.

791.   For instance, K.S.C. encountered outside-of-store displays such as the one below, prominently featuring a variety of JUUL pod flavors. Each flavor had its own distinct illustration and color palette. Fruit flavors feature prominently in the bottom row. The display was substantially similar or identical to:



792.   K.S.C. also encountered in-store displays of readily available JUUL products such as the one below, with an image of a hip and attractive model. The display was substantially similar or identical to:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



793.    K.S.C. has endured serious withdrawal symptoms upon attempts to discontinue her JUUL use. Her existing anxiety will often flare up, along with depressive tendencies. Physically, she will suffer from insomnia and, during extreme episodes, begin to foam at the mouth until her nicotine craving is satisfied.

794.    None of the advertisements, in-store promotions, or labels K.S.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

795.    K.S.C. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**NNN.    Jill Nelson on behalf of her daughter L.B., a minor**

796.    Plaintiff Jill Nelson and L.B. are residents of San Diego, California.

797.    Nelson's daughter L.B. is currently 16 years old and started using JUUL in 2016, shortly after her 13th birthday.

798.    L.B. had never smoked or used other tobacco products before trying JUUL.

799.    L.B. learned about JUUL from her friends at school and through JUUL's point-of-sale materials, which L.B. saw in stores near her home. These materials featured JUUL's flavored pods and "Starter Kit" and made JUUL seem like a fun, harmless product. Among the materials that L.B. saw and relied upon were the following:

 

800.    None of the materials or product labels L.B. saw adequately disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's promotions materially impacted L.B.'s assessment of the fruit-flavored JUUL she would later be offered.

801.    L.B. was introduced to JUUL products by her friends at school when she was in the eighth grade. The JUUL device bears no warning labels about nicotine or

content, and L.B.'s friends did not warn of her of the risks of JUUL use. Had L.B. known, or understood, the risks JUUL posed, she would never have used it.

802.    The fruit flavoring in the JUUL product L.B.'s friends offered her led L.B. to believe that JUUL was safe. She did not know she was ingesting nicotine from a nicotine delivery system that delivered as much—or more—nicotine than a cigarette. She knew not to smoke but did not understand the risks of ingesting nicotine from JUUL. L.B. would not have tried a JUUL but for the flavored pods.

803.    Through her use of her friends' JUULs, L.B. became addicted to nicotine and eventually purchased a JUUL of her own from an unknown source.

804.    L.B. has reported to J. Nelson that JUUL use is common at her high school, where older students sell individual pods to younger students for profit.

805.    L.B. told J. Nelson that the local gas stations readily sell JUUL pods to minors and that one young gas station employee even trades JUUL pods for fast food that children bring him.

806.    On at least one occasion, Nelson knows of L.B. purchasing JUUL pods from eBay.

807.    In October 2017, L.B. also obtained a device directly from JUUL through the company's warranty department.

808.    L.B. also received promotional emails from JUUL, starting no later than October 2017.

809.    Nelson is unsure how much L.B. uses her JUUL but she constantly finds the orange and green caps of Mango and Cool Mint JUUL pods in L.B.'s room. Nelson has

talked to L.B.'s doctor and other medical providers. None of them are trained, or equipped, to treat adolescents with severe addictions to nicotine caused by JUUL products.

810.    Since the filing of the First Amended Complaint in *Colgate*, L.B. has been subject to disciplinary actions at school for truancy relating to JUUL usage and was put in a court-ordered program called Diversion as a result.

811.    In October of 2018, Nelson took away L.B.'s smartphone for disciplinary reasons. In doing so, she also removed L.B.'s access to her network of friends who are also addicted to JUUL. L.B.'s anger and panic caused her to flee the house and L.B. was apprehended for erratic behavior in public and held by the police for 72 hours.

812.    When the police released L.B., Nelson and L.B.'s father put L.B. in a 45-day inpatient treatment program.

813.    The day after she returned from treatment, L.B. acquired another JUUL.

814.    Because of her extended absence from school, L.B. was unable to complete her freshman year of high school with her classmates. In an attempt to salvage her freshman year, she transferred to an alternative school.

815.    In October 2019, L.B. began a 3-month stay at a juvenile detention center. Upon being released, she immediately resumed her use of nicotine.

816.    L.B. now uses other high-nicotine products in addition to JUUL.

817.    L.B. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, risk of addiction, and other health risks.

**OOO.**    **William Nelson**

818.    Plaintiff William Nelson is a 40-year old resident of Shreveport, Louisiana.

819.    Nelson began using JUUL products approximately five years ago shortly after they came out, in 2015. At that time, he had been smoking since he was 19 years old, at a rate of about 10-20 cigarettes a day, and was looking for a way to end his addiction to cigarettes, both for himself, and to avoid exposing his children and others to second-hand smoke.

820.    The way that the JUUL e-cigarettes were advertised in displays gave him the impression that they were a better or safer alternative to tobacco cigarettes and could help him end his addition to nicotine. He recalls seeing displays in gas stations that promoted the product without providing a warning that they contained nicotine, which were essentially identical to the following:

 

821.    Nelson also saw colorful ads from JUUL's Vaporized! Campaign, showing healthy, young models posing with the JUUL in a manner that made it seem like a safe, fun lifestyle choice, including the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











822.    None of the advertisements, in-store promotions, or labels W. Nelson saw

adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of

nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver

nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine

266

more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses

significant health risks. He did see representations that a single JUUL pod was the

equivalent of a pack of cigarettes.

823.    Based on JUUL's advertisements and displays, Nelson purchased the JUUL

device in 2015 and began regularly buying pods from displays at the gas stations he

frequented in his area, vaping anywhere from half a pod to two full JUUL pods each day.

824.    Nelson does not remember the specific prices he paid for his JUUL

products, but does recall in particular comparing the price of JUUL pods to a pack of

cigarettes and believing the JUUL products were cheaper overall. He remembers seeing ads

that promoted discounted purchases for starter kits, and that discussed JUUL as a cheaper

alternative to smoking over the long-term.

825.    Nelson's preferred flavor became Classic Menthol, and he recalls later on

seeing additional advertisements, such as the following:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

826.    Still nothing in those later advertisements disclosed that JUUL's e-cigarettes delivered nicotine into the blood stream more efficiently and at higher levels than traditional cigarettes. To the contrary, the catchphrase "smoking evolved" reinforced and contributed to his understanding that JUUL's products were supposed to be a safer alternative to regular cigarettes. In practice, he found the opposite true, with his overall consumption of nicotine harder to regulate, not only because the nicotine delivery was more intense, but also because it was impossible to determine when he had vaped an amount of nicotine equivalent to a single cigarette.

827.    In addition to the money spent on JUUL's products, Nelson found they ultimately did not help him manage or lower his nicotine intake or addiction at all. Instead he had become addicted to JUUL pods and had the urge to start vaping a pod within 30 minutes of arising each morning and, contrary to his expectations based on JUUL's advertising, he also continued to have cravings for, and smoked, traditional tobacco cigarettes at the rate of 10-20 per day in addition to using JUUL's products, increasing his overall nicotine consumption.

828.    Nelson would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. The only reason he tried the JUUL products in the first place was because he believed, based on the advertisements, that they could help him end his nicotine addiction.

**PPP.        Ashley Noble, on behalf of her daughter, S.G., a minor**

829.    Plaintiff Ashley Noble and S.G. are residents of Ocean Springs, Mississippi.

830.    Noble's daughter S.G. is currently 16 years old and started using JUUL products in 2017 when she was only 14.

831.    S.G. had experimented with other e-cigarettes before using JUUL products, but she had never smoked. Nor did she understand that JUUL presents a risk of nicotine addiction.

832.    Prior to using JUUL, S.G. had seen the point-of-sale signs and displays pictured below:

    

833.    None of the in-store promotions or product labels S.G. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions of JUUL's in-store promotions materially impacted S.G.'s assessment of the fruit-flavored JUUL she would later be offered by a friend at school.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

834.     In 2017, JUULing became very popular at S.G.'s high school. When S.G. took a puff of her friend's fruit-flavored JUUL, S.G. found that she liked the flavor and the fact that it gave her a far stronger "buzz" than the 1.8% nicotine ENDS she had tried before.

835.     JUUL's use of flavors played a substantial contributing factor in S.G.'s decision to take up and continue using a JUUL. But for JUUL's dessert- and fruit-based nicotine flavors, and JUUL's promotion of those flavors, S.G. would not have used JUUL.

836.     Though S.G. had used ENDS in the past, JUUL was much stronger than she expected it to be. Once she started JUULing regularly, S.G. quickly became addicted to nicotine, consuming up to 2 JUUL pods a day in either Cool Mint or Mango flavor.

837.     Because S.G. had used ENDS before using a JUUL, she read and understood JUUL's labeling statement of "5% strength" to mean 5% nicotine by volume. S.G. did not know that JUUL contained at least 5.9% nicotine—more than three times the potency of the solution she had used before—or that JUUL's Cool Mint pods had been found to contain up to 9.4% nicotine. JUUL's misleading labels also made it difficult for S.G. to find alternative ENDS to JUUL or understand what lower potency products might exist.

838.     Social media drove the popularity of JUUL at S.G.'s high school. Both before and after taking up JUUL use, S.G. saw a significant amount of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors with JUUL products, distorted and omitted the risks of JUUL use, and omitted or downplayed the nature and risks of JUUL use. These promotions including reached S.G. and S.G.'s social network, including classmates, leading to an increase in uptake on JUUL products

and widespread misperceptions about the nature and risks of JUUL products. S.G. has seen

viral media content that normalizes the role of JUUL in teen life by, among other things,

portraying teens using JUUL, portraying teens dressed in JUUL-themed costumes,

depicting JUUL as an element of a "high school starter pack" and giving humorous

treatment to teen dependence on JUUL products. But for JUUL's viral marketing activity,

S.G. would not have been exposed to and would not have used a JUUL. Among the social

media posts S.G. saw were the images below:

 

839.    S.G. is very active on Instagram where she followed the account

"@Doit4Juul" and "@JUULnation." S.G. routinely saw images of

adolescents her age using JUUL products and believed that JUULing was the cool thing to

do and would help her fit in with her peers.

840.    On SnapChat, S.G. has seen content from the JUUL influencers

DonnySmokes and Supreme Patty. S.G. and her friends and classmates mimic the

mannerisms and techniques they observe copying the tricks and content. In effect, they are

imitating within their social circles the activity they see on "DoIt4Juul," and similar social

271

media counts. Through Snapchat, S.G. can also readily purchase JUUL pods from classmates or other peers.

841.    Since she started JUULing, S.G. has developed behavioral problems linked to her nicotine addiction, including stealing money to buy JUUL products and skipping classes so she could use JUUL in the school bathroom. As S.G.'s nicotine addiction caused her to fall further and further behind in her studies, S.G. eventually dropped out of school. She is currently in a voluntary program where he hopes to obtain her GED.

842.    Noble has purchased urine cotinine screens, nicotine patches, and nicotine gum as part of her efforts to understand and assist S.G. with her addiction. In addition to trying to help S.G. wean herself off nicotine, Noble has sought professional treatment but to no avail. Noble recently took away S.G.'s JUUL. The resulting nicotine withdrawal prompted S.G. to begin smoking cigarettes, which she could access more easily than a new JUUL.

843.    S.G. currently consumes at least one Creme Brulee JUUL pod a day and smokes cigarettes when she cannot use a JUUL.

844.    S.G. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, risk of addiction, and other health risks. She also would not have used JUUL's products if they did not come in the candy-like flavors.

**QQQ.    Atoyia Orders, on behalf of her son, D.O., a minor**

845.    Plaintiff Atoyia Orders and D.O. are residents of London, Ohio.

846.    Orders' son D.O. began using JUUL around June 2016, at the age of 16.

847.    When D.O. was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product; he decided to try a JUUL because the Cool Mint flavor sounded appealing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school.

848.    D.O. had seen many advertisements for JUUL on social media and was led to believe JUUL did not contain any nicotine. For example, D.O. specifically recalls online advertising material substantially similar or identical to the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



849.   Before D.O. even tried JUUL, he also viewed point-of-sale promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. D.O. did not see any warnings or disclosures in these materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted D.O.'s assessment of, and eventual decision to use, JUUL products. For example, D.O. recalls seeing JUUL products prominently displayed in front of cashier counters in and around London, Ohio, since he began using JUUL products in June 2016, substantially similar or identical to:



850. D.O. has told Orders that smoking JUUL was "smooth and easy" and eased his anxiety.

851. Shortly after trying his friend's JUUL at school, D.O. purchased a JUUL "starter pack" from a local gas station and consumed all the JUUL pods contained therein.

852. D.O. has become addicted to JUUL pods. D.O. now consumes two or three JUUL pods each day.

853. D.O. attempted to quit using JUUL. However, because he was highly addicted to nicotine, D.O. turned to cigarettes. Now, D.O. uses JUUL and cigarettes.

854. Orders says D.O.'s JUUL use has had significant physical, psychological, financial, and social effects on her son.

855. Physically, D.O. has his JUUL in hand "24/7" and becomes very fidgety and irritated when he cannot use JUUL. D.O. has been hospitalized twice for issues with his lungs and breathing since he started using JUUL. D.O. has also lost a significant amount of weight since he started using JUUL.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

856.    Psychologically, D.O. has also struggled since he started using JUUL. He has experienced severe depression and attempted to commit suicide twice since he started using JUUL.

857.    Financially, D.O.'s JUUL use consumes a large portion of his budget, as he spends a significant amount of money on JUUL pods each week. D.O. now works to finance his nicotine addiction, but before he started working, he would steal money from his mother in order to purchase JUUL pods.

858.    Socially, Orders says her son now hangs out with the "wrong crowd," as he spends most of his time with friends that also use JUUL incessantly.

859.    None of the advertisements, in-store promotions, or labels D.O. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

860.    D.O. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**RRR.    Ann Parker, on behalf of her daughter, S.P., a minor**

861.    Plaintiff Ann Parker and S.P. are residents of Oak Creek, Wisconsin.

862.    Parker's daughter is currently 16 years old and started using JUUL's products in 2018 at 14 years old.

863.    S.P. learned about JUUL from her older brother and friends as well as by viewing advertisements online and through social media. S.P. saw the following specific advertisements:





864.    S.P. recalls seeing user-generated JUUL content on social media that used the #JUUL hashtag. S.P. specifically remembers seeing the following images geared towards kids:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

865.    S.P. also saw advertisements from JUUL pushing candy-like flavors. She

recalls seeing the following image in particular:



866.    None of the advertisements or labels S.P. saw adequately disclosed the

nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered

by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great

quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater

quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor

did they indicate that JUUL was an age-restricted product.

867.    All of the JUUL advertisements and social media influence caused S.P. to begin vaping and, despite being underage, she was able to purchase JUUL pods from friends who were able to obtain the products.

868.    S.P. became addicted to JUUL pods. She consumes approximately between 10 to 15 JUUL pods per week. Her preferred flavors are Cool Mint and Mango JUUL pods.

869.    S.P.'s addiction has been a burden on her relationship with her family. Parker has had numerous arguments with her daughter over S.P.'s JUUL addiction.

870.    S.P. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. She also would not have used JUUL's products if they did not come in the candy-like flavors.

**SSS.    Vickie Perry, on behalf of her daughter, L.P., a minor**

871.    Plaintiff Vickie Perry and L.P. are residents of Milton, Vermont.

872.    Perry's daughter L.P. began using JUUL in early 2018 at age 16 as a result of online fanfare and the device's popularity amongst her peer group. L.P. bought her JUUL products from classmates who were of legal age to purchase them from authorized retailers. Prior to using JUUL, L.P. had smoked perhaps a handful of cigarettes in her life. She proceeded to use JUUL on a near-daily basis for the next two years.

873.    When she first began using JUUL products, L.P. was unaware of their addictive potential. Since she bought JUUL products from classmates, who would remove the product from its packaging prior to resale, L.P. never saw any nicotine warning on the JUUL packaging. Nor does she recall such warnings on the advertisements proliferating across various social media platforms, or the promotional displays at local gas stations.

Although L.P. managed to kick her JUUL addiction around the start of 2020, for two years she would consume upwards of one-half of a JUUL pod each day. Her favorite flavor was Mango.

874.    Like many adolescents, L.P. is an avid user of social media platforms. She frequents Instagram, Facebook, and Snapchat. L.P. remembers viewing JUUL-related content on each platform. Much of the JUUL content L.P. was exposed to preceded her initial JUUL use. Rather than reinforce existing use patterns, JUUL marketing material primed L.P. for later use. They sought to imbed the brand in potential buyers' psyches and allow social forces to operate at their own speed. After all, due to the device's highly addictive nature, buyers need only try JUUL products a handful of times before JUUL can count on them to provide a reliable future income stream.

875.    L.P. saw a Facebook post, substantially similar or identical to the one below, advertising a JUUL "Starter Kit" with the popular Mango JUUL pod flavor. Indeed, Mango quickly became L.P.'s preferred JUUL pod flavor.



876.    L.P. recalls an Instagram post from 2017, like the one below, advertising the Mango-flavored JUUL pod, with a stylish close-up of the colorful accessory.



877.    L.P. remembers a tweet promoting JUUL's Creme Brulee flavored JUUL pods. The tweet was substantially similar or identical to:



878.    L.P. also saw an Instagram post featuring model, fashion icon, and soccer star Florencia Galarza posing with a JUUL similar to the one below. Though not posted by the official JUUL Instagram account, the official account did comment approvingly. JUUL later featured this image in their #Vaporized campaign, which L.P. also recalls viewing online. The post and online imagery were substantially similar or identical to:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



879.    L.P. also encountered JUUL promotional material when at gas stations.

880.    L.P. recalls in-store displays since 2017, in front of the cashiers' counters, prominently exhibiting JUUL products. The displays were next to the lighters and practically impossible to miss. The displays were substantially similar or identical to:



881.    L.P. also remembers seeing an outside-of-store display similar to the one below, featuring a variety of JUUL pod flavors. Each flavor had its own distinct illustration and color palette. L.P.'s favorite flavor, Mango, sits to the far left in the bottom row. The display was substantially similar or identical to:



882.    L.P. recalls seeing an in-store display of readily available JUUL products, with an image of a hip and attractive model, similar to the one below. The display was from 2017 and was substantially similar or identical to:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

883.    L.P. and her family endured hardship as a result of her JUUL addiction and struggle still to pick up the pieces. While using JUUL, L.P. developed asthma and began to contend with other upper respiratory difficulties. Her existing anxiety and depression worsened to a considerable degree. She could not reconcile JUUL's place in her life as both a major social tool and a source of significant physical and psychological distress.

884.    L.P.'s attempts to stop her JUUL use resulted in irritability and frequent anger outbursts. Her school performance rapidly declined, as the severity of her nicotine addiction intensified beyond her control. Eventually, she dropped out, unable to manage the myriad pressures of her daily life.

885.    As of early 2020, L.P. no longer uses JUUL, but will bear the scars of this ordeal for years to come.

886.    None of the advertisements, in-store promotions, or labels L.P. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

887.    L.P. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

## TTT.    Jessica Pierre

888.    Plaintiff Jessica Pierre is a resident of Norwich, Connecticut.

889.    Pierre began using JUUL products after receiving a coupon in the mail for a free starter-pack in Spring 2018. She was 34 years old. When she received this coupon, Pierre was unaware that JUUL products contained substantial amounts of nicotine and that their use posed a risk of addiction. Pierre would not have purchased JUUL products if she knew that they delivered more nicotine to the bloodstream than cigarettes.

890.    Pierre typically purchased her JUUL products from a local corner store, and recalls various promotional materials displayed in-store before and during her use of JUUL.

891.    Pierre recalls, since early 2018, a display in front of the cashier's counter and next to the lighters, prominently exhibiting JUUL products. It looked substantially similar or identical to:



892.    Pierre also recalls an in-store display, from 2018, featuring JUUL accessories, such as JUUL pod flavor varieties and a USB charging dock. It looked substantially similar or identical to:



893.    Pierre frequently saw advertisements for JUUL products in magazines she perused. These advertisements often highlighted JUUL's high-tech design and futuristic aesthetic. She recalls the slogan "Smoking Evolved" displayed along with promotional imagery. She remembers an in-magazine advertisement from early 2018 more-or-less identical to the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

894.    Pierre recalls viewing a Facebook post substantially similar or identical to that below on her newsfeed in 2018.



895.    Pierre also recalls receiving an email around February 2019 with the below imagery.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



896.    As a JUUL user, Pierre consumed around one-half a JUUL pod each day. By late 2019, she had successfully curbed her JUUL use.

897.    None of the advertisements, in-store promotions, or labels Pierre saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

898. Pierre would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### UUU. Erin Puente

899. Plaintiff Erin Puente is a 35-year-old resident of Grand Island, Nebraska.

900. Puente had been smoking about half a pack of cigarettes per day prior to starting JUUL.

901. Based on various advertisements of JUUL's products that she saw and relied on, Puente purchased a JUUL in 2018 to help her quit smoking and as a healthy alternative to smoking.

902. At point of sale displays, Puente saw ads that drew attention to JUUL's enticing flavors while disregarding nicotine content and addictiveness, including specifically the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



903.    On social media outlets including Facebook, Puente saw JUUL-related

content, such as the following image:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

904.    In 2018, Puente visited the JUUL website to register her device for a warranty. She then began receiving promotional emails from JUUL despite never subscribing to receive any.

905.    In late 2018 and early 2019, Puente saw ads that proclaimed JUUL's nicotine content to be "5%."

906.    Puente interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Puente saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

907.    Puente has quit cigarettes. But now, she is highly addicted to JUUL pods. She consumes between one and two pods each day, which costs her about $40 per week.

908.    Puente now suffers from a dry throat and other throat issues. She has also been diagnosed with several ear infections for which she required antibiotics. Her doctor informed her these problems were either caused by or aggravated by her JUUL use.

909.    Puente developed bronchitis as a result of her JUUL use.

910.    Had Puente known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Puente is still interested in products that would help her

stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

**VVV.     Lacretia Pulce on behalf of her daughter, K.P., a minor**

911.    Plaintiff Lacretia Pulce and K.P. are residents of Columbia, Tennessee.

912.    Pulce's daughter K.P. began using JUUL in late 2017 at the age of 16, primarily as a result of peer pressure. K.P., like many of her peers, had been exposed to JUUL marketing materials via various channels, including social media platforms. By 2017, JUUL products were quite popular amongst K.P.'s age group and were part of the social ecosystem at her school. K.P. wanted to fit in. She purchased her first JUUL from classmates and continued to buy JUUL products from peers going forward.

913.    Prior to using JUUL, K.P. had never used tobacco products. She now uses other tobacco products, such as cigars and cigarettes, on an infrequent basis.

914.    When she first began using JUUL products, K.P. was unaware of their nicotine content, or the risk of addiction posed by their use.

915.    Both Pulce and K.P. believe that K.P. is currently addicted to nicotine. She uses her JUUL as soon as she wakes up each morning, and will typically consume at least two, perhaps even three, JUUL pods each day. Her favorite flavors are Classic Menthol, Cool Mint, and Cool Cucumber.

916.    Like many adolescents, K.P. frequently uses social media. Her primary platforms are Instagram and Twitter. K.P. recalls JUUL-related content appearing during her use of both platforms:

917.    Shortly after her initial exposure to JUUL, K.P. recalls an Instagram post near-identical to the tweet below.



918.    K.P. saw an image substantially similar or identical to the one below on her friend's Twitter feed in summer 2018. Promotional imagery of a lush mango mixed with sleek product and packaging aesthetic. This image has high youth appeal, particularly in conjunction with the sweet flavoring.



919.    K.P. also saw JUUL advertisements at local gas stations. She recalls seeing

an image substantially similar or identical to the one below, in early 2018, that promoted

the Cool Cucumber flavor, now K.P.'s favorite JUUL pod flavor:



920.    K.P. experiences strong withdrawal if she attempts to go even a short time

without using her JUUL. Sadness and depression are common after just several hours

without use. As a result, K.P. uses JUUL constantly, thereby exerting pressure on her own

friends and family. Pulce notes that other members of their household use JUUL with

considerable frequency.

921.    Pulce estimates expenditures of roughly $80 each week on JUUL products,

buying pods not only for K.P., but also her mother, uncle, and brother. She believes her

family's use created a sort of vicious, reciprocal cycle, where it became ever more difficult

for one member to quit as others continually picked up the habit.

922.    None of the advertisements, in-store promotions, or labels K.P. saw

adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of

nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. K.P. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

WWW.    **Kylie Renfro**

923.    Kylie Renfro is a 34-year-old resident of Iola, Kansas.

924.    Renfro had been consuming between approximately 25 cigarettes per day before she began using JUUL in 2017.

925.    Renfro became aware of JUUL as an assistant manager at a convenience store that carried the product.

926.    Based on various advertisements of JUUL's products that she saw and relied on, Renfro purchased a JUUL to help her quit smoking and as a healthy alternative to smoking.

927. Renfro saw JUUL advertisements when she went to purchase cigarettes. Renfro was exposed to the following advertisements that highlighted JUUL's promotional deals and affordability when compared to other tobacco products:



928. Renfro was also exposed to promotions on social media that indicated JUUL could be used to help quit cigarettes such as the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

929.     When Plaintiff Renfro later discovered that her 14-year-old son had been using JUUL in 2017, she decided to use it herself as a smoking-cessation tool rather than dispose of the confiscated device.

930.     Renfro interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Renfro saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

931.     Renfro believed that JUUL would help end her nicotine addiction and would be less aggravating to her asthmatic lungs than traditional cigarettes.

932.     Renfro's preferred JUUL pod flavor was Virginia Tobacco.

933.     Renfro correlated JUUL's nicotine labeling to traditional cigarettes. She believed that smoking a 5% JUUL pod was a similar experience to smoking a full-flavored cigarette while 3% JUUL pods were more akin to light cigarettes. She was aware that a JUUL pod contained approximately as much nicotine as a pack of cigarettes.

934.     Smoking traditional cigarettes were still on Renfro's mind while she switched to Virginia Tobacco JUUL pods. When using fruit-flavored pods, however, Renfro craved JUUL more than traditional cigarettes.

935.     Renfro developed an addiction to JUUL pods, and found herself using her JUUL within 5 minutes of waking and regularly consumed one to two pods per day.

936.    Renfro stopped smoking JUUL in late 2018 and reverted to traditional cigarettes. She now smokes more cigarettes per day than before starting JUUL, at approximately 35 to 40 cigarettes per day.

937.    Renfro believes that her asthma is worse than prior to starting JUUL. Had Renfro known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. She would never have tried or purchased JUUL pods had JUUL's advertising and labeling conveyed the truth about JUUL's nicotine content and delivery, and the nature of its impact on his health as described herein. Renfro is still interested in products that would help her stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised

**XXX.    Charleen Richey, on behalf of her son, T.Y., a minor**

938.    Plaintiff Charleen Richey and T.Y. are residents of Albuquerque, New Mexico.

939.    Richey's son T.Y. is currently 16 years old. He started using JUUL's products in 2017 when he was 14 years old.

940.    T.Y. never tried smoking cigarettes before using JUUL's products.

941.    T.Y. learned about JUUL at school from his friends and by viewing advertisements online and through social media. The advertisements he viewed promoted use of JUUL's products as trendy and offering various flavors as if they were treats, including the following ads he specifically recalls seeing:















942.   T.Y.'s friends at school adopted JUUL's promotion of the products as trendy and often posted about them on social media or by sharing viral images and posts of others with the "#JUUL" hashtag. T.Y. specifically remembers seeing the following images widely shared online that promoted the use and abuse of JUUL's products by underage persons, which JUUL did nothing to stop or counteract:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO













CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

943.    Despite his youth, T.Y. was able to purchase JUUL pods from classmates

and in stores. The displays he saw were always presented in attractive and colorful ways,

often with enticing discounts, that looked essentially identical to the following:







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



944.    None of the advertisements, in-store promotions, or labels T.Y. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

945.    As a result, T.Y. did not think he could get addicted. He came to really enjoy the Cool Mint and Mango flavors in particular.

946.    T.Y. became addicted to using JUUL pods. He would feel the need to start vaping right after waking each morning and regularly consumed more than one JUUL pod each day.

947.    The addiction to JUUL's product cost T.Y. and his family hundreds of dollars that T.Y. secretively spent on JUUL pods. He would ask his father for money each morning before school, telling him it was for food or an activity, but really just collecting it and saving until having enough to buy more JUUL products each week.

948.    Richey currently has been able to force T.Y. to stop vaping, but fears he has suffered irreversible health problems and feels that his addiction continues even though not

using, putting T.Y. at higher risk and temptation of using again once he leaves her control and even advancing on to other products like cigarettes.

949.    T. Y. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**YYY.    Jack Thomas Roberts, administrator of the estate of Jack Roberts, deceased**

950.    Plaintiff Jack Thomas Roberts is a resident of Lexington, Kentucky and the administrator of the estate of his son, Jack Roberts, a plaintiff in the *Colgate* action who passed away in 2019. By a Suggestion of Death filed on February 12, 2020, (ECF 368-2), Mr. Roberts requested that the Court substitute him for Jack as a plaintiff in the current action.

951.    Roberts used a JUUL for the first in November 2017 at the age of 17. Before he took his first puff of JUUL aerosol, Roberts had seen numerous JUUL displays, signs and promotions in local gas stations touting JUUL as a simple and satisfying "alternative" for smokers and offering discounts on the JUUL "Starter Kit." Among the in-store signs and promotions Jack saw and relied upon were the following:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



952.     Roberts was exposed to a steady stream of images that promoted JUUL as a

tasty treat but didn't mention that JUUL was also a potent addictive drug. JUUL's use of

food-based flavors, food-based flavor names and food-based advertising images was a

substantial contributing factor in Jack's decision to use and continue using JUUL. Among

the online "flavor" advertisements that Jack saw and relied upon were the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

Roberts also saw JUUL-related viral images and posts on social media, many of which incorporated the #Juul hashtag. The viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUULing reached Jack and his social network, including his classmates, leading to increased JUUL use and widespread misperceptions about the nature and risks of JUUL products:







953.    None of the advertisements, social media posts, in-store promotions, or labels Roberts saw adequately disclosed the nature or addiction risks of JUUL products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's advertisements, in-store promotions and labels materially impacted Roberts' assessment of the flavored JUUL he would later be offered.

954.    When Roberts was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product. He decided to try JUUL because the Cool Mint flavor sounded appealing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. Roberts would not have used a Virginia Tobacco or Classic Menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

955.    The combination of peer pressure and JUUL's nicotine buzz led Roberts to "hit" his friend's JUUL repeatedly over the course of the next few weeks. Deciding that he wanted to try different flavors, Roberts bought his own JUUL "Starter Kit" through an 18-year-old classmate. Roberts promptly consumed the Fruit Medley, Creme Brulee and Cool Mint pods included in the Starter Kit, but gave away the Virginia Tobacco pod, which held no interest for him. After finishing his Starter Kit, Roberts bought a box of Mango JUUL pods from a classmate and continued purchasing Mango pods from that point forward.

956.     When Roberts sent in the registration card for the JUUL device in his Starter Kit, JUUL began sending Roberts promotional emails, including an invitation to combat federal efforts to regulate ENDS flavors by writing the FDA to report how JUUL's flavors played an important role in Roberts' journey as a smoker. The email also contained a survey inviting Roberts to list which JUUL flavors he had used.

957.     Roberts quickly developed a pod-a-day nicotine addiction, which cost about $40 a week to maintain. In an attempt to save money, Roberts purchased bottles of nicotine salt e-liquid from a local store, which he used to refill empty JUUL pods. Relying on JUUL's labeling, Roberts purchased bottles of 5% nicotine salt e-liquid to refill his empty JUUL pods. Because JUUL pods contain at least 5.9% nicotine, the third-party e-liquids Roberts purchased were not potent enough to satisfy his addiction, leading Roberts to discard the bottle and purchase Defendant's premium-priced JUUL pods to get the fix he needed.

958.     Once he turned 18, Roberts, like many other JUUL-addicted seniors in his high school, supported his addiction by legally purchasing packages of JUUL pods at local gas stations and reselling the pods to younger students at a markup. Though Roberts came to deeply regret this decision, he justified it at the time as "helping out" younger classmates in the same way that older classmates had "helped" him before he turned 18.

959.     On social media, Roberts continued to see a significant amount of JUUL promotion from third parties, some of which include Instagram accounts by: @Doit4JUUL, @JUUL_break, @JUULwraps, @Juulzi.co, @DonnyK17, and @SupremePatty. Many of the posts from these accounts promoted or included JUUL's name and hashtags that JUUL promoted, including #juul, #juulvapor, and #juulnation. On Snapchat and YouTube,

Roberts followed or saw content from Donny Smokes, including the JUUL Challenge, and other "tricks" that Roberts and his friends mimicked.

960.    Roberts did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors whose aim was to promote JUUL use to adolescents and profit off of their addiction. Had Roberts known the truth, he would have rejected offers to use a JUUL or would have attempted to stop using a JUUL far sooner than he did.

961.    JUUL's viral marketing campaign ensnared Roberts, who shared his own JUUL-themed "promposal" in the spring of 2018. Had Roberts known that his creation of JUUL-related content was the result of JUUL's efforts to turn young JUUL users into unpaid youth advertisers for JUUL's products, Roberts would not have posted the content or would not have consented to being used to promote JUUL to other adolescents.



962.    In or around the summer of 2018, Roberts joined "JUUL Talk." An "exclusive insights community" developed by Defendant, JUUL Talk's welcome email warned that any information shared by JUUL Talk was "confidential (subject to the non-disclosure agreement) and not to be shared with others."

963.    Within days of joining, Roberts received his first JUUL Talk survey invitation, which was purportedly designed to help JUUL "design activities and experiences that are relevant and valuable to you."

964.    On November 20, 2018, after JUUL announced that it would remove flavored JUUL pods from gas stations, JUUL Talk sent Roberts the first of three separate

emails he would receive, urging him to complete a survey detailing how the removal of Mango and other flavored JUUL pods from gas stations would impact him.

965.    Had Roberts known the truth about JUUL or its marketing activities, he would not have joined JUUL Talk or submitted any other information about himself to JUUL.

966.    As a freshman in college, Roberts was consuming at least one JUUL pod a day. He slept with his JUUL next to him on a nightstand and began using his JUUL as soon as he woke up each morning. He was unable to quit or taper down to less potent e-liquids than the JUUL. His JUUL addiction had cost him thousands of dollars since he started using JUUL products in 2017.

967.    To control the costs of his spiraling nicotine addiction, Roberts began smoking cigarettes by early 2019 and smoked at least 10 cigarettes a day, which represented a significant reduction in his daily nicotine intake from JUUL use.

968.    Tragically, Roberts became involved in other addictive substances after JUUL introduced him to nicotine and, weeks after submitting a declaration in opposition to JUUL's motion to compel him into arbitration, took his own life.

969.    Roberts would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### ZZZ.    Angel Rowan

970.    Plaintiff Angel Rowan is a resident of Red Wing, Minnesota.

971.    Rowan is currently 18 years old and used JUUL for the first time in 2017 when she was 16.

972.    Before trying JUUL, Rowan had never smoked a cigarette or use other

tobacco products.

973.    Rowan learned about JUUL from her friends at school and through JUUL's

point-of-sale materials, which Rowan saw in stores near her family's home. These

materials featured JUUL's flavored pods, "Device Kit" and "Starter Kit" and made JUUL

seem like harmless fun. Among the materials that Rowan saw and relied upon were the

following:




.




974.    None of the POS materials or product labels Rowan saw adequately

disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in

320

or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's promotions and labels materially impacted Rowan's assessment of the JUUL she would later be offered.

975.    Rowan had her first JUUL experience when offered a puff from a friend's JUUL device. Shortly thereafter, Rowan purchased a JUUL of her own.

976.    Even though Rowan started JUULing when she was below the minimum legal age to buy tobacco products, she was nevertheless able to buy JUUL products from her friends and classmates.

977.    Once she had her own JUUL, Rowan quickly became addicted to nicotine.

978.    Although Rowan had never smoked before trying JUUL, she now smokes cigarettes to satisfy her nicotine addiction when she does not have access to JUUL.

979.    Rowan consumes one JUUL pod every 2 or 3 days. She takes her first puff of JUUL within 5 minutes of waking up.

980.    Rowan would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, risk of addiction, and other health risks.

**AAAA.    Tonya Rowan on behalf of her son, W.T., a minor**

981.    Plaintiff Tonya Rowan and W.T. are residents of Red Wing, Minnesota.

982.    Rowan's son W.T. is currently 17 years old and used a JUUL for the first time in 2016 when he was only 13.

983.    Before trying JUUL, W.T. had never smoked a cigarette or used other

tobacco products.

984.    W.T. learned about JUUL from his friends at school and through JUUL's

point-of-sale materials, which W.T. saw in stores near his family's home. These materials

featured JUUL's flavored pods and "Starter Kit" and made JUUL seem cool and harmless.

Among the materials that W.T. saw and relied upon were the following:







985.    None of the materials or product labels W.T. saw adequately disclosed the

322

nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's POS promotions and labels materially impacted W.T.'s assessment of the JUUL he would later be offered.

986.    In 2016, when W.T.'s friend offered him his first puff of JUUL, W.T. accepted. Shortly thereafter, W.T. purchased a JUUL of his own and quickly became addicted to nicotine.

987.    Even though W.T and is still below the minimum legal age to buy tobacco products, he has always been able to buy JUUL products from his friends and classmates.

988.    Although W.T. had never smoked before trying JUUL, he now smokes cigarettes to satisfy his nicotine addiction when he does not have access to JUUL.

989.    W.T.'s mother reports that, without nicotine, W.T. becomes "crazy and ornery."

990.    W.T. currently consumes one JUUL pod per day. He takes his first puff of JUUL within 5 minutes of waking up.

991.    W.T. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, risk of addiction, and other health risks.

**BBBB.    Nomaan Sabahat**

992.    Plaintiff Nomaan Sabahat is a 24-year-old resident of Newark, Delaware.

993.    She began JUULing in early 2017 at the age of 21.

994.    Sabahat first learned about JUUL from an ad she saw online on Snapchat.

995.    Like many other younger people, Sabahat began using JUUL because JUULing was popular among her peers.

996.    Prior to using JUUL, Sabahat did not smoke.

997.    Sabahat had seen JUUL ads on social media and in gas stations and convenience stores. She understood from the ads and in-store promotions she saw for JUUL, that it was a healthier alternative to smoking, and believed it to be safer and less addictive than cigarettes.

998.    While she saw the "5% strength" label, she had no idea what it meant.

999.    Sabahat specifically saw these in-store promotions:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1000.   She specifically saw these social media ads:





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

1001.   Sabahat became addicted to JUUL pods.

1002.   At the height of her addiction, Sabahat was using her JUUL within 5 minutes of waking and smoked between one-half and one full JUUL pod per day. Her preferred flavors were Mango and Fruit Medley.

1003.   Within three months of starting JUUL, Sabahat noticed a marked decline in her short-term memory and her ability to focus her thoughts.

1004.   Sabahat no longer uses JUUL, but her short-term memory and focus problems persist.

1005.   None of the advertisements, point-of-sale displays, or labels Sabahat saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1006.   Sabahat would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and

other health risks. She also would not have used JUUL's products if they did not come in candy-like flavors.

**CCCC.    Andrea Saldana, on behalf of her daughter, Le.S., a minor**

1007.   Plaintiff Andrea Saldana and Le.S. are residents of Prairie Grove, Arkansas.

1008.   A. Saldana's daughter, Le.S., is currently 15 years old. Le.S. became aware of JUUL from friends at school and started using JUUL's products in 2018 when she was only 14 years old.

1009.   Le.S. is now addicted to JUUL pods.

1010.   Le.S. had never tried smoking cigarettes before using JUUL's products.

1011.   Before she started vaping, Le.S. recalls seeing ads on social media promoting JUUL's products without any clear warnings of the risk that she could so easily become addicted. She believed vaping was trendy, safer than smoking cigarettes, and primarily intended for inhaling flavorful tastes. The advertisements she recalls include the following:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1012.   None of the advertisements or labels Le.S. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1013.   Le.S. also started vaping JUUL's products because of the flavors available. Her favorites are Cool Mint and Creme Brulee, as promoted by JUUL in bold images such as the following that Le.S. specifically recalls:

 

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1014.   Le.S. was able to purchase JUUL pods from her classmates and others, spending approximately $15.00-$20.00 per week.

1015.   Le.S. wants to quit vaping but is addicted. She has to start vaping within 5-30 minutes of waking each morning, ultimately consuming approximately one-half of a JUUL pod each day (four per week).

1016.   There are costs from Le.S.'s addiction beyond the money spent on JUUL pods as well. A. Saldana reports her daughter has behavioral issues if she cannot vape and that her asthma is worse. A. Saldana also had to incur extra dental costs related an in infection that occurred after having Le.S.'s wisdom teeth removed, which was due to vaping. Le.S. has also been suffering from nose bleeds since she's become a JUUL user.

1017.   Le.S. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**DDDD.   Lacey Saldana**

1018.   Plaintiff Lacey Saldana and is a resident of Prairie Grove, Arkansas.

1019.   L. Saldana, is 18 years old. She became aware of JUUL from friends and started using JUUL's products in 2018 when she was 16 years old and is now addicted.

1020.   L. Saldana had never tried smoking cigarettes before using JUUL's products.

1021.   Before she started vaping, L. Saldana recalls seeing ads on social media promoting JUUL's products. She does not recall seeing any warnings of the risk that she could become addicted. She believed vaping was trendy, safer than smoking cigarettes, and

primarily intended for inhaling flavorful tastes. The advertisements she recalls include the following:







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1022.   None of the advertisements or labels L. Saldana saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1023.   L. Saldana also started vaping JUUL's products because of the flavors available. She started with Cool Mint but came to prefer Mango and Fruit Medley as well. Those were popular among her peers and promoted in bold images designed to draw their attention, such as the following that La.S. specifically recalls:







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1024.   L. Saldana was able to purchase JUUL pods from her classmates and online through JUUL's website by using her school email account, as well as through Amazon (which still identified JUUL as the seller).

1025.   L. Saldana wants to quit vaping but is addicted. She has to start vaping within 5-30 minutes of waking each morning, ultimately consuming between one and one-and-a-half JUUL pods each day.

1026.   The addiction has cost L. Saldana and her family money. L. Saldana currently spends half her paycheck from working on JUUL pods—approximately $50-$60 a week—and has taken money from her mother's purse before to buy JUUL pods.

1027.   L. Saldana's mother Andrea Saldana has found her daughter's behavior changes as well if she runs out of JUUL pods. She becomes irritable and argumentative. L. Saldana reports she is unable to run or play softball any longer either.

1028.   L. Saldana would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**EEEE.     Dylan Selfridge**

1029.   Plaintiff Dylan Selfridge is a resident of Butler, Pennsylvania.

1030.   Selfridge is currently 18 years old and started using JUUL products in 2018 when he was 16.

1031.   Selfridge had never tried smoking cigarettes before using JUUL products.

1032.   Selfridge became aware of JUUL through his friends at school and by exposure to advertisements from JUUL's youth-oriented "Vaporized" campaign, including the ads reproduced below. These ads presented JUUL as a sleek gadget used by stylish, young, "cool" people. Noticeably absent from the Vaporized ads was any mention of nicotine or addiction risk.





1033.   Selfridge was exposed to a steady stream of images that promoted JUUL as a tasty treat but didn't mention that JUUL was also a potent addictive drug. JUUL's use of food-based flavors, food-based flavor names and food-based advertising images was a substantial contributing factor in Selfridge's decision to use and continue using a JUUL. Among the online "flavor" advertisements that Selfridge recalls were the following:







1034.   Selfridge also saw JUUL-related viral images and posts on social media, many of which incorporated the #Juul hashtag. The viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUULing reached Selfridge and Selfridge's social network, including his classmates, leading to increased JUUL use and widespread misperceptions about the nature and risks of JUUL products.

1035.   Selfridge and his friends followed many of the popular JUUL accounts on Instagram. Among the posts Selfridge saw were those that encouraged, among other things, consuming massive quantities of JUUL vapor, using multiple JUUL devices at the same time and using JUUL in conjunction with combustible cigarettes.

1036.   Selfridge has posted social media content about JUUL, mimicking the JUUL-related content he has seen on other accounts.

1037.   But for JUUL's social media advertising and the viral spread of JUUL-related content, Selfridge would not have been exposed to and would not have used a JUUL. Selfridge specifically remembers seeing the following youth-targeted messages:



1038.   Selfridge was exposed to a steady stream of images that promoted JUUL as a tasty treat but didn't mention that JUUL was also a potent addictive drug. JUUL's use of food-based flavors, food-based flavor names and food-based advertising images was a substantial contributing factor in Selfridge's decision to use and continue using a JUUL. Among the online "flavor" advertisements that Selfridge recalls were the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

 

1039.   Prior to using a JUUL, Selfridge had also seen point-of-sale materials for

JUUL devices and products, including the signs and displays pictured below:

 

1040.   None of the advertisements, social media posts, in-store promotions, or labels Selfridge saw adequately disclosed the nature or addiction risks of JUUL products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's POS advertisements, in-store promotions and labels materially impacted Selfridge's assessment of the fruit-flavored JUUL he would later be offered.

1041.   When offered a JUUL by a friend, Selfridge accepted because he was interested in trying the fruit flavors. JUUL's food-based promotions misled Selfridge about the nature of JUUL's product and distorted the risks JUUL products posed. Were it not for JUUL's flavorings and flavor-based promotions, Selfridge would not have used a JUUL or would not have continued using a JUUL.

1042.   Selfridge liked the sweet flavor of the first JUUL product he tried and he continued to take puffs of his friends' JUULs until before eventually purchasing his own.

1043.   After purchasing his own JUUL device, Selfridge quickly became addicted to JUUL pods. Selfridge's JUUL consumption soon increased to 4 JUUL pods a day.

1044.   Reasoning that he would not be able to smoke the equivalent of 4 JUUL pods a day in combustible tobacco products, Selfridge tried to switch from JUUL to cigarettes.

1045.   Selfridge still consumes more than 1 JUUL pod a day, in addition to at least half a pack of cigarettes. He takes his first puff of JUUL within 5 minutes of waking up. His favorite JUUL pod flavor is Cool Cucumber.

1046.   Selfridge would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**FFFF.    Kelli Scott**

1047.   Plaintiff Kelli Scott is a 43-year-old resident of Las Vegas, Nevada.

1048.   Scott had never smoked cigarettes before she began using JUUL in Fall, 2016.

1049.   Scott started using JUUL socially with friends at work who were using it to quit smoking. She began using JUUL, because she believed the product contained no nicotine, and was an alternative to traditional tobacco/ nicotine products.

1050.   Scott purchased JUUL because she liked the flavors and thought it was not harmful like cigarettes. She noticed that people were permitted to use JUUL indoors, so she thought it was completely safe.

1051.   On social media, Scott saw the following ads specifically:



1052.   Scott also saw ads that concealed JUUL's nicotine content and misrepresented the product as an alternative to cigarettes or a smoking cessation tool. Such ads included specifically the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

1053.   Scott interpreted the ads she had seen as indicating that JUUL was safer than

cigarettes and contained no nicotine. None of the advertisements or labels Scott

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL

products poses significant health risks.

1054.   Scott quickly became addicted to JUUL pods and was no longer just

JUULing socially.

1055.   At the height of her addiction, Scott was regularly consuming between 1-2

pods per day. Scott recalls that JUULing was on her mind a lot. She would typically use her

JUUL within 30 minutes of waking and continue using it throughout the day until bedtime.

1056.   Scott would regularly spend between $40.00 - $50.00 per week on JUUL.

She typically bought her pods at Wal-Mart, where they sold as a 3-pack for $20.00 plus tax.

1057.   Scott's adult daughter also uses JUUL. Scott sees her daughter is not honest with her about how many pods she consumes weekly. Scott is worried for her daughter's health, as she knows how quickly she herself escalated to almost two pods per day.

1058.   Had Scott known JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### GGGG.   Kevin Singer

1059.   Plaintiff Kevin Singer is a 22-year-old resident of Bingham, Maine.

1060.   Singer began smoking cigarettes at about age 16. When he was 17 years old, he started using JUUL as an alternative to cigarettes. Based on advertisements that he had seen, he believed that JUUL was less addictive and safer than cigarettes.

1061.   He purchased his JUUL pods at retail establishments. He typically paid $22 for a four-pack of pods. While at these retail establishments, he saw point-of-sale advertisements substantially similar to the following:







1062.   He also remembers seeing JUUL advertisements on Facebook.

1063.   When he smoked cigarettes, he typically smoked about a pack every two days. When JUULing, he typically consumes between half a pod and a full pod per day. He has consumed as many as two full pods in a day. His preferred flavors are Mint and Crème Brulee.

1064.   He purchased JUUL products because he thought that they would help him end his addiction to nicotine. But while he was using JUUL, he began using JUUL within five minutes of waking up each day, and JUULing was on his mind more than cigarettes ever were.

1065.   He tried to quit using JUUL three times, and he was successful only on the third try. He no longer uses nicotine products. But he still has breathing problems that he believes are related to his JUUL use.

1066.   None of the advertisements, in-store promotions, or labels Singer saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1067.   Singer would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### HHHH.   Anthony Smith

1068.   Plaintiff Anthony Smith is a resident of Cashmere, Washington.

1069.   Smith obtained his first JUUL e-cigarette and JUUL pods in an effort to curtail his nicotine addiction and quit smoking.

1070.   In early 2015, Smith was 17 and he began seeing JUUL advertised via Twitter and Instagram. In particular, he remembers seeing the below advertisement on Twitter:



He recalls that many of the ads had images of young people—young enough to be in high school—who often looked like his friends, and they appeared to be having fun, vaping and enjoying a hip, cool activity.

1071.   Smith also recalls seeing an ad on Instagram that was highly similar to the one below:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1072.   In particular, Smith recalls a young, blond woman that reminded him of a good friend of his, except that the ad he recalls seeing did not include a disclaimer about the nicotine content. It was Smith's typical habit to scroll through images on Instagram quickly, and he rarely paused to open posts to read any content, thus had any such disclaimers been there, he would not have seen it. Because of the model's similarity to his good friend, that ad in particular piqued his curiosity about JUUL. He also began noticing JUUL's ads for their flavored pods, which also made him interested.

1073.   Shortly after reviewing the advertisement with the blond woman, Smith visited a Circle K. He saw a large advertisement there for a JUUL starter pack, which included the device and four different flavored pods. The advertisement was similar to the one below:



However, he did not see any warning that the product contained nicotine, or that one pod contained more nicotine than a pack of cigarette. He reasoned that a starter pack would allow him to try several flavors for a lower price, so he decided to try it. The starter pack was purchased for approximately $29.

1074.   None of the advertisements, in-store promotions, or labels Smith saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1075.   Smith began using the product, noticed that he would get a quick nicotine buzz that was more intense than cigarettes, but he attributed that to the fact that it was a vapor instead of a smoke. Rather than weaning Smith off of nicotine, the intense dosage of

nicotine delivered by the JUUL products resulted in an addiction to JUUL products and an increased nicotine addiction, and an increased consumption of nicotine and JUUL products, upping his consumption of one JUUL pod per day. The fact that the Cool Mint flavor of the JUUL pods is pleasant has also played a role in his continued use of JUUL products.

1076.   At the age of 18, Smith switched to use exclusively of JUUL pods as a source of nicotine. Until approximately the spring of 2018, Smith had consumed JUUL pods on a daily basis for over three years, and found it far more addictive than traditional cigarettes, to the point where he spent several years unable to make it through a day without JUULing. At times, he would try to quit, but found it difficult due to the fact that the advertising was continually being delivered to him via social media. At one point, he did quit, and then he saw the below ad for a new Mango-flavored pod, which caused him to purchase more pods and begin using JUUL again.



1077.   Smith would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### IIII.    Savannah Smith

1078.   Plaintiff Savannah Smith is a 20-year old who resides near Atlanta, Georgia.

1079.   Prior to using JUUL's products for the first time in 2017, Smith had been a regular smoker since she was 15 years old, using less than 10 cigarettes per day.

1080.   In 2017, while still in high school, she was first introduced to JUUL by a younger classmate who was using the product. Smith had seen JUUL advertisements and promotions online and through social media before then which gave her the perception that JUUL's products were a safer alternative to cigarettes and could help her quit. Some of the ads she recalls having seen in particular include the following:






CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO




1081.   None of the advertisements, in-store promotions, or labels Smith saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1082.   In addition to JUUL's advertisements, Smith saw user-generated content on social media that was shared with the "#JUUL" hashtag which promoted use and abuse of JUUL by young persons using memes or images of others vaping, such as the following that Smith specifically recalls:





CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1083.   Thinking that JUUL' s products were widely accepted and could help wean her off of cigarettes, she began purchasing them from various convenience stores and vape shops (Shell, QuikTrip, Cloud 9, Bees Smoke Shop, Valuer, BP, RaceTrac, and others in her area specifically). The in-store signs, displays, and advertisements Smith recalls viewing include some essentially identical to the following:







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1084.   Smith paid anywhere from $13.00 to $25.00 for JUUL pods with her favorite flavor always being Mango, before switching to Cool Mint. The flavors also were a big factor in Smith using JUUL's products.

1085.   Rather than help Smith break her addiction to nicotine, JUUL's products increased the addiction. Smith became addicted to JUUL pods. While she was a JUUL user, she felt a need to start vaping within five minutes of waking each morning (which is stronger than the need she ever felt for cigarettes) and frequently consumed 1-2 JUUL pods per day. Even when she tried to quit using JUUL, she continued to feel the need to consume, and did consume, between one and two JUUL pods a week.

1086.   In October 2019, Smith successfully quit using JUUL, but she has had to continue to use other nicotine products.

1087.   In addition to the money spent on JUUL products, since she started vaping Smith has experienced health problems. She has a persistent cough, and a skin condition was aggravated from increased nicotine use.

1088.   Smith would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. She also would not have used JUUL's products if they did not come in the candy-like flavors.

**JJJJ.**      **Laura Staller**

1089.   Plaintiff Laura Staller lives in Germantown, Wisconsin.

1090.   Staller began using JUUL in September of 2017.

1091.   Based on various advertisements of JUUL's products that she saw and relied on, Staller purchased a JUUL to help her quit smoking and as a healthy alternative to smoking. Around that time and before she started she saw the following in-store display, among others:



1092.   Staller believed there would be less nicotine in JUUL than in cigarettes, because she thought the "5% strength" on the label indicated that the amount of nicotine content of JUUL pods was significantly less than a pack of cigarettes.

1093.   Before she started, she saw in-store displays and advertisements that indicated the strength but failed to include any warning, including these displays:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1094. Staller also heard advertisements about JUUL on the radio station 97.3FM and saw ads on gas stations, none of which warned her of JUUL' s dangerous levels of nicotine or potential harms it could cause.

1095. Staller went on JUUL's website when she first started looking into it. The website indicated that it was a better alternative to smoking and would help her quit smoking.

1096. Staller interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Staller saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1097. Staller instead developed an addiction to JUUL pods. Staller uses one and one half JUUL pods a day which is at least equivalent to more than a pack and a half of

cigarettes a day. When she was using cigarettes, she was using less than a pack a day. So she is now consuming much more nicotine because of JUUL.

1098.   Staller has had unusual fainting spells since using JUUL and has noticed that her ability to take deep breaths and her endurance has decreased since using JUUL. She has had to wear a heart monitor for 48 hours. The only thing in her lifestyle that has changed has been her use of JUUL.

1099.   Staller had developed non-contagious pneumonia and pleurisy as a result of her JUUL use.

1100.   Staller's use of JUUL seems to be affecting her respiratory health worse than when she was smoking.

1101.   Staller uses the Mango JUUL pods, which feel easier to breathe in than a cigarette. She started with the Virginia Tobacco flavor and didn't like it.

1102.   Staller has not been able to quit and it has been over one and a half years. She was hoping to quit in 2018, but she is addicted.

1103.   Had Staller known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Staller is still interested in products that would help her stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

## KKKK.   Kristy Strattard

1104.   Plaintiff Kristy Strattard is a 41-year old who resides in Rome, Georgia.

1105.   In 2018, Strattard had been smoking cigarettes for five or six years, up to a

pack a day, when she first took notice of the advertisements and displays for JUUL

products in her local gas stations. The JUUL products and their displays were more easily

accessible than cigarettes and more attractive to look at, and included displays essentially

identical to the one below:



1106.   Strattard became interested in JUUL's products because she wanted to quit

smoking and nicotine in general. She was told good things as well by her daughter who was

familiar with JUUL since it was prevalent in her high school.

1107.   The posters and signage she saw in and around where JUUL products were

being sold in Georgia reinforced the idea that the products could help her quit nicotine

altogether. Specifically, she recalls seeing the following advertisements promoting JUUL's

product as "smoking evolved," including others, which indicated to her that JUUL's e-

cigarettes were safer than regular cigarettes. An example of the ad she remembers seeing is

below:



1108.   Strattard accordingly signed up on the JUUL website to receive more information about the products.

1109.   In response to the request for information, JUUL sent Strattard coupons in the mail that encouraged her to start purchasing and using JUUL by giving substantial discounts.

1110.   None of the advertisements, in-store promotions, or labels Strattard saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1111.   In 2018, relying on the signs, displays, promotions, and discounts she received and saw, Strattard first purchased a JUUL e-cigarette and began buying four-packs of JUUL pods at a Circle K gas station nearby her home, which she recalls typically cost her about $19.99 each.

1112.   Strattard thereafter became addicted to JUUL and regularly consumed one JUUL pod per day, on average, with her favorite flavors being Classic Menthol and Creme Brulee as depicted in, among others, the following type of advertisement designed to promote the flavors that she saw and relied on:



1113.   Rather than weaning Strattard off of her nicotine addiction, she found the JUUL pods to be so addictive that, within five minutes of waking up each morning, she immediately needed to use her JUUL e-cigarette. Further, when not at work, Strattard regularly consumed upwards of three JUUL pods in a single day—which is substantially more nicotine than in the pack of cigarettes she had been smoking prior to her use of JUUL.

1114.   Strattard would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**LLLL.     Rodney Sykes**

1115.   Plaintiff Rodney Sykes is a 55-year-old resident of Jefferson City, Missouri.

1116.   Sykes smoked between one to two packs of cigarettes per day prior to using JUUL e-cigarettes.

1117.   Based on various advertisements of JUUL's products that he saw and relied on, Sykes purchased a JUUL to help him quit smoking and as a healthy alternative to smoking. Sykes was looking to quit smoking because of a recent surgery. He began using JUUL e-cigarettes to end his nicotine addiction on or about June of 2017.

1118.   Sykes saw JUUL advertisements when he went to purchase cigarettes. At point of sale displays, Sykes was exposed to the following advertisements that highlighted JUUL's promotional deals and affordability next to other tobacco products.






CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1119.   Sykes also encountered the following specific advertisements, whose vibrant color pallets and youthful models lead him to believe that JUUL was safer than traditional tobacco products.





1120.   Sykes interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements,

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

in-store promotions, or labels Sykes saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1121.   Sykes instead developed an addiction to JUUL pods. Sykes regularly used his JUUL e-cigarette within five minutes of waking and consumed between one to two JUUL pods a day.

1122.   Upon learning of JUUL's harmful effects, Sykes has subsequently stopped JUULing, but only by going back to smoking combustible cigarettes.

1123.   Had Sykes known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Sykes is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**MMMM.  Treyton Bailey-Thomseth**

1124.   Plaintiff Treyton Bailey-Thomseth resides in Minneapolis, Minnesota.

1125.   Bailey-Thomseth is currently 18 years old. He started using JUUL products in 2017 when he was just 15.

1126.   Before Bailey-Thomseth had ever tried JUUL, he was already aware of JUUL through advertisements from JUUL's Vaporized campaign, JUUL's point-of-sale materials and JUUL's online promotions. Among the Vaporized ads Bailey-Thomseth saw

and relied on were the ones pictured below:





      1127.   Bailey-Thomseth also saw point-of-sale materials in stores that promoted

JUUL flavors and offered discounts on the JUUL "Device Kit" and "Starter Kit." Among

the POS materials Bailey-Thomseth recalls seeing were the following:

 

1128.   Bailey-Thomseth had also seen online JUUL advertisements promoting

JUUL flavors. Among the flavor-themed ads Bailey-Thomseth saw were the following:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

1129.   None of the advertisements, in-store promotions, or labels Bailey-Thomseth saw adequately disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. These representations and omissions in JUUL's advertisements, in-store promotions, and labels materially impacted Bailey-Thomseth's eventual decision to try JUUL products.

1130.   In the time leading up to his first JUUL experience, Bailey-Thomseth saw increasing amounts of JUUL-related content on the social media platforms Instagram and Snapchat. This content, which often featured young people performing "tricks" with exhaled JUUL vapor, led Bailey-Thomseth to believe that using JUUL was a "cool" activity that would improve his social status.

1131.   When one of Bailey-Thomseth's friends offered him a JUUL, he accepted.

He enjoyed the "buzzed" feeling he received from the JUUL's powerful nicotine aerosol. He does not recall which flavor he tried first, but he knows it was not Virginia Tobacco. Bailey-Thomseth would not have tried JUUL if it were only available in Virginia Tobacco flavor.

1132.   Shortly after he started using JUUL, Bailey-Thomseth became addicted to nicotine.

1133.   Although he had never used drugs before he started JUULing, Bailey-Thomseth began experimenting with marijuana. He continued to use marijuana until late 2018.

1134.   Despite being below the minimum legal age to purchase JUUL products in Minnesota, Bailey-Thomseth has always been able to buy JUUL products from local stores.

1135.   Bailey-Thomseth gets money to pay for JUUL products by selling items for cash. He also resells JUUL products to finance his own habit.

1136.   Bailey-Thomseth has, from time to time, refilled his JUUL pods with e-liquid from other manufacturers. However, most commercial e-liquid contains far less nicotine than the e-liquid in JUUL pods and thus fails to satisfy Bailey-Thomseth's nicotine addiction. Therefore, Bailey-Thomseth continues to use JUUL pods with their original JUUL-manufactured e-liquid.

1137.   The online social media content that Bailey-Thomseth has seen, and continues to see, online normalizes teen JUUL use by, for example, presenting the JUUL device alongside earbuds, cellphones and other common items that comprise a "high school starter pack."

1138.   Bailey-Thomseth's nicotine addiction has had a severe impact on his

psychological wellbeing. Since becoming addicted to JUUL, Bailey-Thomseth has suffered suicidal ideations, depression, severe anxiety, and social isolation.

1139.   Bailey-Thomseth spent 5 months in an outpatient addiction program that cost several thousand dollars. The program proved ineffective and Bailey-Thomseth is still addicted to nicotine.

1140.   Bailey-Thomseth currently consumes more than 1 JUUL pod per day. He starts JUULing within 5 minutes of waking up.

1141.   Bailey-Thomseth would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks JUUL posed.

### NNNN.   Charles Tippe

1142.   Plaintiff Charles Tippe is a resident of Providence, Rhode Island.

1143.   Before using JUUL for the first time in February 2017 at the age of 53, Tippe regularly smoked combustible cigarettes. He had been a smoker for over five years and would typically go through between half a pack and one pack of cigarettes each day. He initially began using JUUL products with the hope they would help end his addiction to nicotine. Billboards and online advertisements failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use. Indeed, Tippe believed that one JUUL pod contained substantially less nicotine than a pack of cigarettes. He would not have bought JUUL products had he known they delivered more nicotine to the bloodstream than cigarettes.

1144.   Tippe purchased JUUL products from a couple of different variety stores near where he lived. At these stores, he recalls promotional displays  substantially similar

or identical to those below since early 2017.

    a.  In-store display, since early 2017, in front of the cashier's counter exhibiting

various JUUL pod flavors, each with its own distinct color palette,

substantially similar or identical to:



    b.  In-store display featuring a bevy of JUUL accessories, such as JUUL pod

flavor varieties, a USB charging dock, and JUUL devices with fresh new

color schemes. Began appearing in early 2017. It looked substantially

similar or identical to:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1145.   Both prior to and during his use of JUUL products, from early 2017 through 2019, Tippe saw advertisements for JUUL on Facebook, substantially similar or identical to the one below.



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1146.   Tippe did not know that a single JUUL pod delivered more nicotine to the bloodstream than an entire pack of cigarettes. When using JUUL, Tippe would consume over two JUUL pods each day. As a smoker, he had rarely, if ever, gone through more than one pack a day. Thus, Tippe consumed at least twice as much nicotine when using JUUL as he had when smoking cigarettes. As a JUUL user, Tippe once went through three JUUL pods in a single day. Tippe's JUUL use was a constant preoccupation; he thought about JUUL more than he ever had cigarettes, and this fact caused Tippe significant stress and anxiety. He would use his JUUL immediately upon waking each morning.

1147.   Tippe began experiencing respiratory issues while using JUUL products, chief among them excess mucus in his throat. He also alleges constant throat itching and coughing, neither of which occurred when he smoked cigarettes, in addition to strong headaches he believes stemmed from JUUL's high nicotine content and concentration. Moreover, these problems largely subsided when Tippe stopped using JUUL products and returned to smoking cigarettes. He now smokes around one full pack of cigarettes daily, a higher rate of consumption than before his JUUL use.

1148.   None of the advertisements, in-store promotions, or labels Tippe saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1149.   Tippe would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other

health risks.

    **OOOO.**   **Michael Viscomi**

    1150.   Plaintiff Michael Viscomi resides in Bethlehem, Pennsylvania.

    1151.   In 2014, Viscomi smoked a pack of cigarettes each day, which he started to reduce to a few cigarettes each day. Prior to March 2018, he had reduced his cigarette consumption down to several cigarettes per day through the use of alternative products, such as nicotine gum, chewing tobacco and non-JUUL vaping products.

    1152.   On March 1, 2018, Viscomi switched from smoking cigarettes to consuming JUUL pods in an attempt to quit smoking cigarettes completely and wean himself off of his nicotine addiction. At that time, Viscomi believed that one JUUL pod would supply him with the same quantity of nicotine as one pack of cigarettes.

    1153.   Prior to consuming JUUL pods, Viscomi was exposed to and did see JUUL advertising, promotional and marketing materials, particularly in the form of JUUL Instagram posts featuring young, attractive people using the product. He specifically followed @SupremePatty on Instagram. He also visited the JUUL website and thereafter regularly and consistently received JUUL emails. Specifically, he saw the following image and other similar ads:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1154.   Some of these social media posts show abuse of JUUL and encourage youth to smoke JUUL, or multiple JUULs at once, including these posts that Viscomi saw during the class period:

 

1155.   Prior to consuming JUUL pods, Viscomi was not aware of the actual amount or potency of nicotine that JUUL products would deliver into his body or that the product was developed to maximize the effects on him of the nicotine it contained. He did see JUUL's representation of "5% strength" on its packaging and thought that meant 5% nicotine content. He also saw JUUL's statement that a JUUL pod is equivalent to a pack of cigarettes and understood that to mean "equivalent nicotine content." He also saw JUUL's representation that "1 JUUL POD = 1 pack of cigarettes" and "alternative for adult smokers" and believed those to mean that JUUL is a less addictive alternative to cigarettes.

1156.   After March 1, 2018, Viscomi continued to be exposed to and saw JUUL advertising, promotional and marketing materials in the form of JUUL Instagram posts and radio advertisements.

1157.   Since that time, Viscomi began consuming JUUL consistently and constantly at a rate of at least one JUUL pod each day or taken approximately 200 hits

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

from his JUUL device each day. He has consumed every flavor JUUL offers, including

purchasing and consuming a JUUL starter kit, which contains all the flavors offered.

1158.   Based on the JUUL marketing, advertising and promotional materials to

which he was exposed, Viscomi was not aware that JUUL could deliver more nicotine per

puff than a cigarette, or that the nicotine delivered by the JUUL entered the bloodstream

faster than a cigarette

1159.   None of the advertisements, in-store promotions, or labels Viscomi

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL

products poses significant health risks.

1160.   In fact, the JUUL marketing Viscomi saw contained no warnings, either on

JUUL's website, in-store displays, or on the packaging itself, including the following ads

which Viscomi saw during the class period, among many others:



1161.   Since starting to consume JUUL pods, Viscomi has become addicted to the

Cool Mint JUUL pods and the nicotine salts they contain, an addiction he considers worse

than his previous addiction to cigarettes. Indeed, using JUUL products is on his mind

more than smoking cigarettes was. Rather than weaning Viscomi off of cigarettes and

nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased

nicotine addiction, an increased consumption of nicotine, and an increase in the number of

JUUL products he consumed.

1162.   Viscomi purchases his JUUL products at gas stations, Wawa and Sheetz at

an approximate price of $23 per pack of four pods.

1163.   Viscomi would not have purchased JUUL products had he known that the

nicotine salts in JUUL pods were highly addictive and more potent and addictive than the

traditional cigarettes from which he was attempting to wean himself. He would not have

purchased or started using JUUL's products if he had been adequately warned about the

nicotine content and dosage, risks of addiction, and other health risks. Viscomi is still

interested in products that would help him stop smoking and would be willing to purchase

a vape product such as JUUL ENDS in the future if he could trust the product to work as

advertised.

**PPPP.     Tanya Viti on behalf of her daughter, O.V., a minor**

1164.   Plaintiff Tanya Viti and O.V. are residents of Chestnut Hill, Massachusetts.

1165.   Viti's daughter O.V. first started using JUUL in September 2017 at the age

of 12, while in sixth grade.

1166.   O.V. actively uses Instagram, Snapchat, and YouTube where she is exposed

to JUUL-related content from other adolescents and from JUUL-related accounts.

1167.   On Instagram, O.V. saw a significant amount of JUUL promotional content

from @JUULvapor and third parties, including the Instagram accounts @Doit4JUUL and

@SupremePatty. On YouTube and Snapchat, O.V. saw numerous JUUL-themed videos

from EonSmoke and Supreme Patty. This content was overtly youth-oriented

and encouraged JUUL use, depicting JUULing as the "cool" thing to do. O.V. also viewed

promotional material created by JUUL, including advertisements substantially similar or

identical to this image from JUUL's Facebook page:



1168.   O.V. did not know that much of the content she saw was being created,

distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote

JUUL use to adolescents and profit from their addiction.

1169.   Before O.V. even tried JUUL, she also viewed point-of-sale promotional

materials for JUUL devices and products, including signs and displays. These promotional

materials featured images of JUUL's multicolored, flavored pods. O.V. did not see any

warnings or disclosures in these materials about JUUL's nicotine levels or the risks JUUL

posed. The representations and omissions in JUUL's in-store promotions materially

impacted O.V.'s assessment of, and eventual decision to use, JUUL products. O.V.

specifically recalls viewing advertisements in and around Chestnut Hill in September 2017

substantially similar or identical to:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO




1170.   None of the advertisements, in-store promotions, or labels O.V.

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL

products poses significant health risks. Nor did they indicate that JUUL was an age-

restricted product. O.V. would not have purchased or started using JUUL's products if she

had been adequately warned about the nicotine content and dosage, risks of addiction, and

other health risks.

1171.   After discovering JUUL on social media and in stores, O.V. sought out

friends in neighboring towns that were already using JUUL. When O.V. started using

JUUL, she had no idea the product contained nicotine. When Viti confronted her daughter

377

about her JUUL use, O.V. told her mother JUUL pods were "flavored juice," which is what she was led to believe based on the advertisements she had viewed. Even after Viti informed her daughter that JUUL contained nicotine, O.V. chose to follow her perception of JUUL, cultivated from an overload of advertisements, versus the advice of her mother.

1172.   After trying JUUL with friends, O.V. quickly became addicted to nicotine and started using JUUL regularly. Once O.V. entered seventh grade, JUUL use had become rampant in her school. O.V. told her mother that kids in her school would hide JUUL devices in their shoes and try to use them while in class; it was considered "cool" to be able to smoke JUUL in class and get away with it. According to O.V., there are very few students in her school that do not use JUUL.

1173.   O.V. and her friends regularly posted photographs of themselves with JUUL on social media. In October 2018, O.V. was suspended from school after her and a friend posted an image of themselves "JUULing" in the bathroom on social media.

1174.   While in seventh grade, O.V. admitted to her mother she was addicted to nicotine. Viti has found jars of liquid nicotine and other forms of nicotine in O.V.'s bedroom since she started using JUUL products.

1175.   O.V. has suffered academically due to her JUUL use. In addition multiple suspensions from school, O.V. went from being an "A-student" to receiving all "F"s.

1176.   O.V. has also experienced severe physical, financial, psychological, and social repercussions from her JUUL use and severe nicotine addiction.

1177.   Physically, O.V. now experiences acute headaches and stomach aches and becomes visibly irritated and fidgety when she cannot consume nicotine.

1178.   Financially, O.V.'s JUUL use has had a significant impact on her parents.

O.V. has stolen large quantities of money from her parents to purchase JUUL products. O.V.'s parents have also expended significant amounts of money on therapy and treatment to address O.V.'s addiction to nicotine and JUUL products.

1179.   Psychologically and socially, O.V. has struggled tremendously since using JUUL products. Viti has placed O.V. in a therapeutic residential school that provides comprehensive treatment to address O.V.'s addiction to JUUL products and related behavioral issues.

1180.   O.V. is not permitted to have JUUL products at the therapeutic residential school she now attends. But O.V. has indicated to Viti she plans to continue using JUUL products when she leaves because it makes her "feel good." O.V. shows no understanding of the impact using JUUL products and a severe addiction to nicotine can have on her health.

QQQQ.   **Nicholas Vogel, on behalf of his son, E.V., a minor**

1181.   Plaintiff Nicholas Vogel and E.V. are residents of Ponchatoula, Louisiana.

1182.   Vogel's son, E.V., is presently 16 years old and began using JUUL pods in August 2018 when he was only 15 years old.

1183.   E.V. had never tried a cigarette before trying JUUL's products.

1184.   Prior to using a JUUL, E.V. saw several JUUL ads on social media advertising JUUL before being introduced to JUUL by friends and classmates at school.

1185.   None of the advertisements or labels E.V. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater

quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1186.   E.V. specifically recalls seeing these ads:





1187.   After using his friends' JUULs, E.V. began purchasing JUUL pods from an 18-year-old acquaintance. E.V. purchased JUUL pods on a regular basis through other people who obtained the pods from gas stations and convenience stores near his high school.

1188.   Because E.V. always purchased his JUUL pods "loose" from other kids at school, he never saw the 3% or 5% strength label on JUUL's packaging.

1189.   E.V. became addicted to JUUL pods. E.V. would regularly use his JUUL before he arrived at school in the morning and was smoking almost a pod a day at the height of his addiction. He was spending upwards of $25.00 per week on JUULing. E.V.'s

preferred JUUL pod flavors are Mango and Virginia Tobacco.

1190.   Vogel forbade E.V. from using JUUL, and E.V. was caught several times using JUUL afterward. He was punished each time, but, owing to his addiction, he always went back to using his JUUL.

1191.   Vogel worries about his son's health. He grew up with parents who smoked and therefore never touched a tobacco product in his life.

1192.   Vogel is himself a cardiac nurse. He knows the dangers of nicotine and how addictive it is. He worries about the possible long-term impacts of JUUL use on his son's health.

1193.   Vogel has never had difficulty speaking to his son about lifestyle choices and consequences, but that changed with E.V.'s JUUL use.

1194.   Vogel has lost trust with E.V. because E.V continued to lie about his JUUL use.

1195.   Because of their disagreements concerning E.V.'s JUUL use, E.V. also feels his relationship with his parents has significantly changed.

1196.   E.V. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.

**RRRR.   John Warren**

1197.   Plaintiff John Warren is a 19-year-old resident of Smithfield, North Carolina who began JUULing in Summer 2017 at the age of 17.

1198.   Warren first learned about JUUL from other students his high school.

1199.   He had never smoked prior to using JUUL.

1200.   Warren would purchase his JUUL pods from a friend. Once he turned 18, he purchased his own JUUL pods.

1201.   Warren understood from the ads, signs and in-store promotions he saw for JUUL, that it was a healthier alternative to smoking.

1202.   Warren specifically saw these in-store promotions and social media ads:







CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1203.   None of the advertisements, point-of-sale displays, or labels Warren saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1204.   Warren became addicted to JUUL pods. At the height of his addiction, Warren was using his JUUL within 5 minutes of waking and smoked between 1 and 2 JUUL pods per day. His preferred flavors were Cool Mint and Mango.

1205.   Despite no longer using JUUL, Warren has seen a decline in his sports performance. He now tires easily and has developed a frequent cough as a result of his JUUL use.

1206.   Warren would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

other health risks. He also would not have used JUUL's products if they did not come in candy-like flavors.

**SSSS.    Ryan Watkins**

1207.    Plaintiff Ryan Watkins is a 32-year-old resident of East Liverpool, Ohio.

1208.    Watkins first began using JUUL products in March 2017, when he was twenty-nine years old.

1209.    Watkins had been smoking about one full pack of cigarettes per day prior to using JUUL products.

1210.    Watkins first learned about JUUL products from advertisements on Facebook and in magazines.

1211.    Based on the advertisements of JUUL's products that he saw and relied on, Plaintiff Watkins believed that JUUL would aid him in quitting cigarettes and nicotine altogether, which is why he purchased JUUL products for the first time.

1212.    Watkins also relied on advertisements that represented JUUL as a healthy alternative to cigarettes.

1213.    Watkins was exposed to advertisements on social media and through point of sale displays in stores and gas stations that sold JUUL products, including the following specific ads:






1214.   None of these representations clearly displayed JUUL's true nicotine content or delivery system.

1215.   Watkins believed the "5% strength" label on JUUL products indicated that the products contained a very low nicotine level in comparison to cigarettes or e-cigarettes.

1216.   Watkins interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the

385

advertisements, in-store promotions, or labels Watkins saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1217.   Watkins was never made aware through advertisements or promotions that JUUL pods actually contained 59 mg/mL nicotine (6%), or that a JUUL pod delivers more nicotine to the body than a pack of cigarettes, or that JUUL pods deliver nicotine more quickly into the bloodstream than cigarettes or e-cigarettes.

1218.   Watkins, a cigarette smoker for eight years prior to consuming JUUL products, feels consuming JUUL pods is on his mind more than smoking cigarettes ever had been.

1219.   Watkins became addicted to JUUL pods, smoking between one half and one full JUUL pod a day. He uses JUUL products each day typically within five to thirty minutes after waking.

1220.   Since beginning to use JUUL pods, Watkins has begun to suffer extreme anxiety, which he never had before. Watkins had a severe anxiety attack that resulted in a two-day hospitalization. Because he lacked health insurance at the time, he was left with $35,000 in medical bills. Due to his newly developed anxiety, he had to see a psychologist, and was temporarily on blood pressure and anxiety medications.

1221.   Had Watkins known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of

addiction, and other health risks. Watkins is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

**TTTT.    Chloe Ann Weber**

1222.   Chloe Ann Weber is a 19-year-old resident of Lawton, Oklahoma.

1223.   Prior to using JUUL, Weber smoked less than 10 cigarettes a day.

1224.   Weber began using JUUL as an alternative to cigarettes as well socially with her friends at age 16.

1225.   Weber has seen JUUL ads on social media and gas station displays. On Instagram, Weber saw the following advertisements:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





1226.   Based on various advertisements of JUUL's products that she saw and relied on, Weber purchased a JUUL to help end her nicotine addiction. She saw point-of-sale displays such as the following:

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1227.   Weber interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Weber saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1228.   Weber developed an addiction to JUUL pods in addition to her existing addiction to cigarettes. At her peak usage, Weber was consuming more than two JUUL pods a day. She has since reduced her consumption to approximately one JUUL pod a day. JUUL pods are on her mind more than cigarettes, and she begins consuming JUUL pods within 5 minutes of waking each day.

1229.   Weber developed an addiction to JUUL pods in addition to her existing addiction to cigarettes. At her peak usage, Weber was consuming more than two JUUL

pods a day. She has since reduced her consumption to approximately one JUUL pod a day. JUUL pods are on her mind more than cigarettes, and she begins consuming JUUL pods within 5 minutes of waking each day.

1230.   Weber suffers from coughing fits and a weakened immune system as a result of her JUUL use.

1231.   Had Weber known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Weber is still interested in products that would help her stop using nicotine and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

**UUUU.      Joe Weibel, on behalf of his son, S.W., a minor**

1232.   Plaintiff Joe Weibel and S.W. are residents of Chadwicks, New York.

1233.   S.W. began using JUUL in 2018 at the age of 14.

1234.   Before S.W. even tried JUUL, he viewed point-of-sale promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. S.W. did not see any warnings or disclosures in these materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted S.W.'s assessment of, and eventual decision to use, JUUL products. For example, S.W. viewed promotional material in and around Chadwicks, New York in 2018 substantially similar or identical to:






CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1235.   None of the advertisements, in-store promotions, or labels S.W.

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL

products poses significant health risks. Nor did they indicate that JUUL was an age-

restricted product. S.W. would not have purchased or started using JUUL's products if he

had been adequately warned about the nicotine content and dosage, risks of addiction, and

other health risks.

1236.   S.W. did not understand the risks JUUL pods posed when he tried them for

the first time. JUUL use is rampant in S.W.'s town and high school. S.W. has told Weibel

that his basketball team even uses JUUL in the locker room, which his coaches cannot

detect because JUUL products release no odor or visible smoke.

1237.   Older students at S.W.'s high school sell individual pods to younger students

for profit. S.W.'s older sister has even encouraged S.W. to start selling JUUL pods.

1238.   Even though Weibel has forbidden S.W. from using JUUL products, Weibel believes he continues to sneak JUUL.

1239.   When S.W. started using JUUL, he believed that JUUL products were safe and non-addictive.

1240.   S.W. would not have started using JUUL if he knew it contained nicotine. Additionally, S.W. would not have used a tobacco- or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

**VVVV.    Natasha Welch, on behalf of her son, J.W., a minor**

1241.   Plaintiff Natasha Welch and J.W. are residents of Vilonia, Arkansas.

1242.   Welch's son, J.W., is currently 15 years old. He became aware of JUUL from friends at school and started using JUUL's products in December 2018 when he was just 14 years old, and now he is addicted to JUUL.

1243.   J.W. had never tried smoking cigarettes before using JUUL's products.

1244.   When he started vaping, J.W. did not understand that JUUL's products were harmful. He thought it was fun after seeing ads and promotional messaging from JUUL on social media and other sites that made it appear trendy, modern, healthy, and cool. Some of the advertisements he specifically recalls seeing include:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO














394

 

1245.   Other kids at J.W.'s school picked up on JUUL's advertising and often promoted JUUL's products themselves by posting about them on social media or sharing viral images and posts in connection with the "#JUUL" hashtag. J.W. specifically remembers seeing the following images promoting use of JUUL's products by young persons, which JUUL did nothing to stop or counteract:

  

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

   

  

  

1246.   None of the advertisements or labels J.W. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1247.   Relying on the advertisements, J.W. started purchased JUUL pods from classmates, spending his entire weekly allowance of $20.00 on obtaining JUUL products every week. J.W. has spent approximately $3,500 to $4,000 on JUUL products since December 2018. Like many other youths addicted to JUUL's products, the flavor which attracted him to it was Cool Mint.

1248.   Welch was not aware her son was vaping after he started because the device was so easily concealable. She noticed a distinct change in his personality though and later discovered he was vaping at least four JUUL pods every week. She took measures to get him to stop, but it became clear to her J.W. was addicted to the nicotine. He displayed uncharacteristic behaviors associated with withdrawal when he was unable to vape, such as becoming angry, physically aggressive, irritable, and anxious. He also experienced a loss of appetite and significant weight loss.

1249.   J.W. became addicted to JUUL pods. J.W. now has to start vaping within an hour of waking up each morning. J.W. vaped used about 1-2 pods a day from December 2018 until July 2019. Since October 2019, J.W. started vaping again and uses about 3 pods a week.

1250.   J.W. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**WWWW. Kyle Wells**

1251.   Plaintiff Kyle Wells is a 34-year-old resident of Owasso, Oklahoma.

1252.   Wells had been smoking about half a pack of cigarettes per day prior to starting JUUL.

---

1253.   Based on various advertisements of JUUL's products that he saw and relied on, Wells purchased a JUUL to help him quit smoking and as a healthy alternative to smoking. He saw advertisements for JUUL on the internet that led him to the JUUL website, from which he purchased a starter kit in 2017.

1254.   He also saw ads featuring vibrant colors and displayed youthful models exhibiting positive and fun attitudes around JUUL products, including specifically the following:





1255.   Wells also saw misleading advertisements that omitted information about JUUL's potent nicotine formulation at point of sale displays at gas stations and

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

convenience stores where he typically purchased JUUL pods, including specifically the following:



1256.   Wells interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements or labels Wells saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1257.   Wells has quit cigarettes, but he has become addicted to JUUL pods and other nicotine-vaping products that he had never tried before using JUUL. Now, he consumes between one and two full JUUL pods per day as well as other nicotine-salts products, including "Pod Juice."

1258.   Wells is more intensely addicted to JUUL pods than he ever was to

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

cigarettes. He begins using his JUUL each day immediately upon waking and even takes

his JUUL to bed. Wells never smoked cigarettes inside his house but began using his JUUL

inside almost as soon as he first purchased it.

1259.   Wells suffers from shortness of breath and increasing breathing difficulties

as a result of his JUUL use. In addition, he suffers from rheumatoid arthritis and finds that

JUUL irritates his inflammation.

1260.   Had Wells known that JUUL pods were more addictive than cigarettes, he

would not have purchased them. He would not have purchased or started using JUUL's

products if he had been adequately warned about the nicotine content and dosage, risks of

addiction, and other health risks. Wells is still interested in products that would help him

stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the

future if he could trust the product to work as advertised.

### XXXX.   Janece Wilhelm

1261.   Plaintiff Janece Wilhelm is a resident of Casper, Wyoming.

1262.   Before using JUUL for the first time in September 2017 at the age of 38,

Wilhelm regularly smoked combustible cigarettes. At that point, she had been an on-and-

off smoker over fifteen years and typically smoked half-a-pack of cigarettes each day. She

began using JUUL products at the suggestion of her son; both believed JUUL would help

end her addiction to nicotine. They had seen television commercials touting its efficacy as a

cigarette replacement. Commercials characterized JUUL products as inherently safe and

failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery

mechanism, or the resultant addiction risk posed by its use. Wilhelm would not have

bought JUUL products had she known they delivered more nicotine to the bloodstream

than cigarettes.

1263.   Wilhelm recalls seeing advertisements in local gas stations and convenience stores.

1264.   Wilhelm recalls displays situated in front of the cashier's counter and next to the lighters, since 2017, prominently exhibiting JUUL products. They look substantially similar or identical to:



1265.   Wilhelm also recalls seeing in-store displays featuring a bevy of JUUL accessories, such as JUUL pod flavor varieties, a USB charging dock, and JUUL devices with fresh new color schemes, on display since 2017. They look substantially similar or identical to:



1266.   Wilhelm typically consumes between one to two JUUL pods each day. Wilhelm did not know that a single JUUL pod delivered more nicotine to the bloodstream than an entire pack of cigarettes when she began use. Wilhelm consumes at least three times as much nicotine as a JUUL user as she had when smoking cigarettes. As a smoker, she had rarely, if ever, gone through more than half a pack a day. As a JUUL user, Wilhelm once went through two JUUL pods in a single day. She uses JUUL's auto-ship membership program to receive fifteen JUUL pod 4-packs each month.

1267.   None of the advertisements, in-store promotions, or labels Wilhelm saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1268.   Wilhelm would not have purchased or started using JUUL's products if she

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### YYYY.    Janece Wilhelm on behalf of her son. D.L., a minor

1269.   Plaintiff Janece Wilhelm and D.L. are residents of Casper, Wyoming.

1270.   D.L. began using JUUL products in March 2017 at the age of sixteen. Like many of his peers, D.L. had been exposed to JUUL marketing materials via various channels, including online and on social media platforms.

1271.   D.L. saw an image online advertising the eight different JUUL pod flavor varieties available to consumers, substantially similar or identical to the one below. D.L saw this image in 2017 and early 2018:



1272.   D.L. recalls imagery from 2017 and early 2018, substantially similar or identical to that below, advertising the immensely popular Mango JUUL pod flavor.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1273.   D.L. recalls imagery from 2017 and early 2018, substantially similar or

identical to that below, advertising one of his favorite JUUL pod flavors: Creme Brulee.



1274.   D.L. also encountered JUUL promotional material when at local

convenience stores.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1275.   D.L. recalls an in-store display from early 2017, in front of cashier's counter, prominently exhibiting JUUL products. The display is next to the lighters and practically impossible to miss. The display was substantially similar or identical to:



1276.   D.L. has seen an in-store display of readily available JUUL products, with an image of a hip and attractive model directly above, since early 2017. The display is substantially similar or identical to:



1277.   D.L. recalls a gas-station display in Denver, Colorado, in July 2019,

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

advertising JUUL availability directly beneath the price of gasoline. This display was substantially similar or identical to:



1278.   D.L. has grown totally dependent on JUUL products for his day-to-day functioning. Wilhelm reports that his use is akin to an infant's desire for a pacifier; D.L. will panic without his JUUL and must constantly either have it or know that it is in close proximity. Due to the severe withdrawal effects inherent to nicotine addiction, D.L. has not tried to curb his JUUL use. Among their family, JUUL use has created conflict. D.L.'s father does not approve of D.L.'s JUUL use, although D.L. is largely powerless to stop, lest he endure the serious symptoms of withdrawal. Presently, D.L. consumes over one-and-a-half JUUL pods each day.

1279.   None of the advertisements, in-store promotions, or labels D.L. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1280.   D.L. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**ZZZZ.**   **Tonya Williams-Walker on behalf of her son, M.W., a minor**

1281.   Plaintiff Tonya Williams-Walker and M.W. are residents of Laurel, Maryland.

1282.   Williams-Walker's son M.W. was first exposed to the JUUL brand in 2017 at the age of 14 and began using JUUL later that year as a result of peer pressure. JUUL use was rampant throughout his high school, as well as Laurel as a whole. Prior to using JUUL, M.W. had never smoked a cigarette or used any other tobacco product in his life. Yet within two years of using JUUL for the first time, M.W. developed a nicotine addiction so severe, he required admission to a medical facility for a supervised nicotine detoxification.

1283.   M.W. first used JUUL while at a summer camp with his peers in 2017. Several of M.W.'s campmates planned to slip away from camp to purchase JUUL products from a nearby gas station, and pressured M.W. to participate. They knew the gas station sold JUUL products because they saw a promotional display, substantially similar or identical to the one below, when passing by. The display advertised JUUL's availability alongside the price of gasoline.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1284.   M.W. had seen JUUL-related promotional materials at gas stations and other convenience stores before his initial use of JUUL at the summer camp and continued to take note of these advertisements as his nicotine addiction developed. He recalls specifically the images below.

1285.   M.W. recalls in-store displays, since 2017, in front of cashiers' counters, prominently exhibiting JUUL products. The displays are situated next to the lighters and practically impossible to miss. The displays are substantially similar or identical to:



1286.   M.W. also recalls an in-store display, from 2018, of offered JUUL products, with an image of a hip and attractive model directly above. The display was substantially similar or identical to:



1287.   None of the advertisements or promotional materials M.W. had been exposed to prior to his summer camp adequately disclosed the hazards of JUUL use. He does not recall seeing any warnings about JUUL's high nicotine content or addictive nature. Knowledge of either factor would have led him to reject pressure from his peers to try JUUL at his summer camp. He first tried the Creme Brulee flavor, which later became his preferred JUUL pod flavor. M.W. reports he would not have tried JUUL if it were only available in tobacco and nicotine flavors. Creme Brulee and other sweet-flavored JUUL pod variety downplayed the hazards of JUUL use, and their severity. Further, due to JUUL's nicotine salt formula, M.W. found JUUL vapor easy to inhale and JUUL products easy to use multiple times in quick succession.

1288.   M.W. continued his use of JUUL products following his experimentation at his summer camp. He purchased JUUL products and accessories from classmates at school, where there existed a dynamic resale market for all things JUUL-related.

1289.   M.W. recalls seeing many online advertisements for JUUL products during his use.

1290.   M.W. saw an image online advertising the eight JUUL pod flavor varieties available to consumers, substantially similar or identical to that below. M.W.'s favorite flavor, Creme Brulee, sits fourth over from the left.



1291.   M.W. recalls imagery, substantially similar or identical to that below, advertising his favorite JUUL pod flavor: Creme Brulee.



1292.   M.W. also recalls seeing an Instagram post featuring model, fashion icon, and soccer star Florencia Galarza posing with a JUUL similar to the one below. Though not posted by the official JUUL Instagram account, the official account did comment approvingly. JUUL later featured this image in their #Vaporized campaign, which M.W.

410

also recalls viewing online. The post and imagery were, or were substantially similar to, the

following:



1293.   M.W. has suffered material and emotional distress resulting from his JUUL

use and consequent addiction. He has developed a chronic cough and chest congestion, as

well as various respiratory infections, which have negatively impacted his athletic ability

and prospects for college sports recruitment. Moreover, the declines in mental health

stemming from his nicotine dependence have harmed his academic standing; when

addicted to JUUL, M.W. brought home failing grades for the first time. In addition, M.W.

has faced disciplinary action, suffered interpersonal difficulties, and endured financial

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

hardship due to his dependence on JUUL products.

1294.   None of the advertisements, in-store promotions, or labels M.W. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1295.   M.W. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

### AAAAA.   Jeremy Worden

1296.   Plaintiff Jeremy Worden is a 21-year-old resident of Hookseet, New Hampshire who began JUULing in Fall 2016 at the age of 18.

1297.   Worden first learned about JUUL in college from a fellow resident in his dormitory.

1298.   Prior to using JUUL, Worden smoked less than a half pack of cigarettes per day, having only begun smoking cigarettes the summer immediately before entering college.

1299.   Worden had seen JUUL ads on TV, social media, and in gas stations and convenience stores.

1300.   Worden understood from the ads and in-store promotions he saw for JUUL, that it was a healthier alternative to smoking. He purchased JUUL believing that it would help him quit smoking. He understood the "5% strength" label to mean 5% of the amount

of nicotine contained in cigarette.

1301.   Worden specifically saw these in-store promotions and social media ads:

 

 

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

1302.   None of the advertisements, point-of-sale displays, or labels Worden saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1303.   Worden became addicted to JUUL pods. At the height of his addiction, Worden was using his JUUL within 5 minutes of waking and smoked between 1 and 2 JUUL pods per day. His preferred flavors were Creme Brulee and Cool Mint. Using JUUL was on Worden's mind more than using cigarettes.

1304.   Worden no longer uses JUUL, but still experiences shortness of breath and a persistent cough as a result of his JUUL use.

1305.   Worden would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

other health risks. He also would not have used JUUL's products if they did not come in candy-like flavors.

### BBBBB.   Hunter Wren

1306.   Plaintiff Hunter Wren is a 19-year-old resident of Fountain, Colorado.

1307.   Wren began using JUUL in 2016, at age 16, after seeing advertisements on Instagram and hearing about JUUL from his friends. At that time, Wren was smoking less than half a pack of cigarettes per day.

1308.   Based on various advertisements of JUUL's products that he saw and relied on, Wren purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

1309.   Wren saw advertisements representing that JUUL was a smoking-cessation device at points of sale and on television, radio, and social media. These ads became prevalent on his social media feeds. On Twitter, he saw the following specific ad:



CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1310.   On Instagram and Snapchat, Wren saw other content promoting JUUL use while concealing the associated adverse health effects and addiction including specifically the following:




1311.   None of the advertisements or labels Wren saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1312.   Wren tried JUUL only because he hoped it would enable him to end his nicotine addiction. Wren interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements or labels Wren saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in JUUL's products, that the JUUL was engineered to deliver more nicotine more rapidly and in greater quantities than a cigarette,

or that use of JUUL products poses significant health risks.

1313.   Wren developed an addiction to JUUL pods. At his peak usage, Wren was consuming close to two JUUL pods per day. JUUL pods were on his mind more than cigarettes, and he would begin consuming JUUL pods promptly after waking each day.

1314.   Wren is still addicted to JUUL pod and uses about one to one and a half pods per day despite the severe health consequences he's suffered from JUUL use.

1315.   Previously a competitive swimmer, Wren began experiencing breathing issues similar to those presented among asthmatics. In one incident, he went to the emergency room after experiencing tunnel-vision and vomiting after a swim. His doctor found his JUUL use contributed to these problems. Wren has also begun seeing a therapist.

1316.   Along with severe headaches Wren has developed Postural Orthostatic Tachycardia Syndrome (POTS), a heart rhythm problem.

1317.   Though Wren has quit smoking cigarettes, he has failed to quit JUUL despite trying. When he stops consuming JUUL pods, he experiences severe withdrawal symptoms such as anxiety and depression and returns to JUUL. These symptoms have been present even while Wren utilized genuine smoking-cessation tools, such as nicotine patches.

1318.   Had Wren known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Wren is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

### CCCCC.   Barbara Yannucci, on behalf of her son, J.Y., a minor

1319.   Plaintiff Barbara Yannucci and J.Y. are residents of Port St. Lucie, Florida.

1320.   Yanucci's son J.Y. is presently 17 years old and began using JUUL pods at the age of 15 because he thought it was fun.

1321.   Prior to using a JUUL, J.Y. had also seen point-of-sale promotional materials for JUUL devices and products, including signs and displays. J.Y. did not see any warnings or disclosures in these materials about the existence or amount of nicotine in a JUUL or the risks nicotine posed. Instead, he saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions in JUUL's in-store promotions materially impacted J.Y. assessment of the JUUL he would later try. J.Y. saw the following specific displays:




CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1322.   On social media, J.Y. saw other content promoting JUUL use among teens such as the following:

 

1323.   When he first tried a JUUL, J.Y., as a minor, could not appreciate the dangers posed by the nicotine and other chemicals contained in the JUUL, and was not aware how much nicotine a JUUL contained or that the JUUL had specifically been developed to maximize the addictive effects of the nicotine it contained and to put extremely high doses of nicotine into the bloodstream.

1324.   J.Y. states that many of his friends in high school were consuming JUUL products at the time he began using JUUL and continue to do so. JUUL products were and still are popular, ubiquitous and easy to obtain.

1325.   J.Y., a minor, has himself purchased JUUL products at a Wawa convenience store.

1326.   J.Y. now considers himself addicted to JUUL pods and has consumed JUUL pods up to 12 times per day. His favorite flavor is Cool Mint. His craving for nicotine has increased while using the JUUL pods, and he now uses vaping devices that deliver even

more nicotine than JUUL.

1327.   None of the advertisements, in-store promotions, or labels J.Y. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1328.   J.Y. initially concealed his use of JUUL from his mother Yannucci, who, after learning that JUUL products contain nicotine and appreciating the dangers of nicotine, has done and continues to do everything in her power to get her son to quit using JUUL products. She has not been successful to date.

1329.   J.Y. would not have purchased or started using JUUL's products if he had been adequately warned about the risks of addiction and other health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.

**DDDDD.   Wolfgang Ziegenhagen, on behalf of his son, H.Z., a minor**

1330.   Plaintiff Wolfgang Ziegenhagen and H.Z. are residents of Guilford, Connecticut.

1331.   Ziegenhagen's son, H.Z., is currently 17 years old and started using JUUL's products in Summer 2017 when he was only 14 years old.

1332.   H.Z. is presently an in-patient at the Hazelton Betty Ford Center in Plymouth, Minnesota for treatment of his nicotine addiction.

1333.   H.Z. had never tried a cigarette before trying JUUL and had never used any

other tobacco products before using JUUL.

1334.   Like many other teens, H.Z. began using JUUL socially through and with friends at school but became addicted to JUUL pods. His two preferred JUUL pod flavors were Fruit Medley and Cool Mint.

1335.   H.Z. did not know that JUUL contained nicotine when he first started using JUUL.

1336.   H.Z. would have never tried JUUL if he had known that it contained nicotine.

1337.   Because he always purchased JUUL pods "loose" from other kids at school, H.Z. never saw JUUL packaging, and thus never saw the 3% or 5% strength labels. Ziegenhagen recalls that his son always kept his supply of JUUL pods loose in bags.

1338.   It is only now while in treatment at Hazelton Betty Ford, that H.Z. is beginning to admit, and come to terms with, his addiction to JUUL.

1339.   H.Z. has received formal diagnoses of Nicotine Use Disorder and Unspecified Anxiety Disorder from his JUUL use. H.Z. would begin his day using JUUL within an hour of waking and was using half a pod per day on average, sometimes more, at the time he entered in-patient treatment.

1340.   Ziegenhagen worries about his son. H.Z. has started vaping marijuana, in addition to JUULing, to "cope." He has been diagnosed with Cannabis Disorder and is being further evaluated to determine if he is suffering from Major Depressive Disorder and/or Substance Induced Mood Disorder.

1341.   H.Z.'s addiction has been devastating not only for him, but for his parents and siblings as well.

1342.   The family has seen H.Z.'s behavior change dramatically over the past few years since he started using JUUL. Before JUUL, H.Z. was a leader in sports, did very well academically, and was very social. Now, H.Z.'s interest in sports and school has declined and he went from socially JUULing with other kids to using JUUL alone and all the time.

1343.   Mr. and Mrs. Ziegenhagen had H.Z. in therapy with at least three different substance abuse and behavioral health professionals trying to help their son. H.Z. began therapy when he was 15.

1344.   After two years and no success in breaking H.Z.'s addiction to JUUL, the Ziegenhagens resorted to placing H.Z. in the teen residential program at Hazelton Betty Ford Clinic in Minnesota.

1345.   Because H.Z. is in an intensive in-patient treatment for his JUUL addiction, he is not permitted social media use and cannot therefore assert here which images he may have seen on Instagram, Facebook or Snapchat, the three social media platforms H.Z. principally uses. Upon being released from treatment, H.Z. may be cautioned to further avoid such social media advertising and images, as they could trigger a relapse for a young person newly in recovery such as H.Z.

1346.   However, Ziegenhagen is certain that H.Z. was aware of the JUUL "culture" among young people and its lure on social media. He and his wife ultimately saw a video clip their son had created of himself JUULing and which H.Z. later posted on Instagram.

1347.   Currently, between therapy and residential treatment, Mr. and Mrs. Ziegenhagen have spent approximately $60,000 helping their son end his nicotine addiction and treating the problems that have come with it.

1348.   Mr. and Mrs. Ziegenhagen have also recently been made aware that H.Z.

will have to transition into a 5-day per week out-patient program once he is permitted to return to the family. He also will likely have to finish high school at an expensive special residential private school for recovering young people after that.

1349.   H.Z. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.

CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO