1

2     *[Submitting Counsel on Signature Page]*

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT
9                       NORTHERN DISTRICT OF CALIFORNIA
                           SAN FRANCISCO DIVISION
10

| | |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 19-md-2913-WHO |
| THIS DOCUMENT RELATES TO: *Tucson Unified School District v. JUUL Labs, Inc., et al.* | **PLAINTIFF'S AMENDED COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE .............................................................................5

III.    PARTIES ................................................................................................................6

IV.     GENERAL FACTUAL ALLEGATIONS.............................................................10

     A.      Each Defendant Was Instrumental in Seeking to Develop and Market the
           Blockbuster Sequel to Combustible Cigarettes, the "Most Successful
           Consumer Product of All Time."..................................................................10

     B.      Defendants' Strategy Was to Create a Nicotine Product That Would
           Maximize Profits Through Addiction...........................................................18

           1.      Defendants Understood that the "Magic" Behind Cigarettes'
                   Stratospheric Commercial Success Was Nicotine Addiction. .............18

           2.      Following the Cigarette Industry Playbook, Defendants Sought to
                   Market a Product that would Create and Sustain Nicotine
                   Addiction, but Without the Stigma Associated with Cigarettes. .........22

           3.      Defendants Sought to Position JLI for Acquisition by a Major
                   Cigarette Company. ...........................................................................28

     C.      JLI and Bowen Designed a Nicotine Delivery Device Intended to Create
           and Sustain Addiction, Particularly Among Young People............................35

           1.      JLI and Bowen Made Highly Addictive E-Cigarettes Easy for
                   Young People and Non-Smokers' to Inhale. ......................................35

            2.      JLI's Initial Experiments Measured Non-Smokers "Buzz" Levels
                   and Perceptions of Throat Harshness..................................................36

            3.      JUULs Rapidly Deliver Substantially Higher Doses of Nicotine
                   than Cigarettes. .................................................................................39

            4.      JLI and the Management Defendants Knew That JUUL was
                   Unnecessarily Addictive Because It Delivered More Nicotine
                   Than Smokers Needed or Wanted. ......................................................46

            5.      JUUL's Design Did Not Look Like a Cigarette, Making it
                   Attractive to Non-Smokers and Easy for Young People to Use
                   Without Detection.............................................................................48

            6.      JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors
                   Without Ensuring the Flavoring Additives Were Safe for
                   Inhalation. ........................................................................................53

a.   JLI Develops Flavored JUUL Products That Would
Appeal to Youth...................................................................53

b.   Defendants Developed and Promoted the Mint Flavor and
Sought to Preserve its Market. ................................................60

(i)   JLI Manipulates Chemistry of Mint JUUL Pods. ........61

(ii)   JLI's Youth Surveillance Programs Confirmed
that Mint JUUL Pods are Preferred by Teens.............62

D.   Defendants Developed and Implemented a Marketing Scheme to Mislead
the Public, Including Youth, into Believing that JUUL Products
Contained Less Nicotine Than They Actually Do and Were Healthy and
Safe. .......................................................................................................65

1.   The Defendants Knowingly Made False and Misleading
Statements and Omissions Concerning JUUL's Nicotine Content......65

2.   JLI, the Management Defendants, and Altria Transmitted,
Promoted and Utilized Statements Concerning JUUL's Nicotine
Content that They Knew Were False and Misleading. .......................72

3.   Defendants Used Food and Coffee Themes to Give the False
Impression that JUUL Products Were Safe and Healthy....................76

4.   JLI's "Make the Switch" Campaign Intentionally Misled and
Deceived Users to Believe that JUUL Is a Cessation Device.............80

5.   JLI, Altria, and Others in the E-Cigarette Industry Coordinated
with Third-Party Groups to Mislead the Public, Including Minors,
About the Harms and Benefits of E-Cigarettes...................................93

a.   The American Vaping Association ..........................................93

b.   Vaping360...............................................................................96

c.   Foundation for a Smoke-Free World ......................................98

d.   Vapor Technology Association................................................99

e.   Retailer Lobbying .................................................................100

6.   Altria Falsely Stated That It Intended to Lend Its Expertise in
"Underage Prevention" Issues to JLI. ..............................................100

E.   Defendants Targeted the Youth Market.........................................................102

1.   JLI Emulated the Marketing of Cigarette Companies. .....................102

2.     The Management Defendants Intentionally Marketed JUUL to
       Young People........................................................................................105

3.     JLI Advertising Exploited Young People's Psychological
       Vulnerabilities....................................................................................108

4.     JLI Pushed the Vaporized Campaign Into Youth Targeted
       Channels..............................................................................................113

       a.     JLI Placed Its Vaporized Ads on Youth Oriented
              Websites and Media...............................................................113

       b.     JLI Used Influencers and Affiliates to Amplify Its
              Message to a Teenage Audience.............................................115

       c.     JLI Used Viral Marketing Techniques Known to Reach
              Young People..........................................................................119

5.     JLI Targeted Youth Retail Locations..................................................122

6.     JLI Hosted Parties to Create a Youthful Brand and Gave Away
       Free Products to Get New Consumers Hooked. ................................124

7.     The Management Defendants' Direction and Participation in the
       Youth Marketing Schemes..................................................................128

       a.     The Management Defendants, and in particular Bowen,
              Monsees, Pritzker, Huh, and Valani, oversaw the youth
              marketing scheme...................................................................128

       b.     Pritzker, Huh, and Valani Were Able to Direct and
              Participate in the Youth Marketing Because They Seized
              Control of the JLI Board of Directors....................................133

8.     JLI and the Management Defendants Knew Their Efforts Were
       Wildly Successful in Building a Youth Market and Took
       Coordinated Action to Ensure That Youth Could Purchase JUUL
       Products...............................................................................................136

       a.     JLI's Strategy Worked. ..........................................................136

       b.     JLI Closely Tracked Its Progress in Reaching Young
              Customers through Social Media and Online Marketing. .....138

9.     JLI Coordinated with Veratad Technologies To Expand Youth
       Access to JUUL Products. .................................................................141

10.    JLI Engaged in a Sham "Youth Prevention" Campaign....................152

11.    The FDA Warned JLI and Others That Their Conduct is
       Unlawful. ............................................................................................155

12. In Response to Regulatory Scrutiny, Defendants Misled the Public, Regulators, and Congress that JLI Did Not Target Youth.....157

F. Altria Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette. .............................163

1. Before Altria's Investment in JLI, Altria and JLI Exchanged Market Information Pertaining to Key Decisions.............................163

2. JLI, the Management Defendants and Altria Coordinated to Market JUUL in Highly-Visible Retail Locations.............................165

3. Altria Contributes to the Success of JLI's and the Management Defendants' Scheme Through a Range of Coordinated Activities....166

G. JLI, Altria, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis. .............................170

1. Defendants' Scheme Caused Youth to be Misled into Believing that JUUL was Safe and Healthy.............................170

2. Use of JUUL by Minors Has Skyrocketed. .............................172

H. JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products.............................178

1. E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI.............................178

2. JLI, the Management Defendants, and Altria Defendants Successfully Shielded the Popular Mint Flavor from Regulation. ....181

3. In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic. .............................191

4. The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done. .............................192

V. GOVERNMENT ENTITY FACTUAL ALLEGATIONS .............................194

A. E-cigarette Use in Schools .............................194

B. Impact of the Youth E-Cigarette Crisis on Plaintiff Tucson Unified ............205

C. No Federal Agency Action, Including by the FDA, Can Provide the Relief Plaintiff Seeks Here.............................212

VI. CAUSES OF ACTION .............................213

COUNT ONE — VIOLATIONS OF ARIZONA PUBLIC NUISANCE LAW ................... 213

COUNT TWO — VIOLATIONS OF THE RACKETEER INFLUENCED AND
      CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961(C) ................... 218

    A.    Description of the Nicotine Market Expansion Enterprise ........................... 219

    B.    Conduct of the Nicotine Market Expansion Enterprise ................................ 221

    C.    Pattern of Racketeering Activity ................................................................ 225

    D.    Plaintiff Has Been Damaged by the Nicotine Market Expansion
           Enterprise Defendants' RICO Violations ....................................... 241

COUNT THREE — VIOLATIONS OF THE RACKETEER INFLUENCED AND
      CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(D) ................. 243

COUNT FOUR — NEGLIGENCE ........................................................................ 246

COUNT FIVE — GROSS NEGLIGENCE .............................................................. 251

PRAYER FOR RELIEF ...................................................................................... 256

JURY TRIAL DEMANDED ................................................................................ 257

# I.    INTRODUCTION

1.    The battle to end nicotine addiction and its associated diseases and death has consumed our nation's public health resources for more than half a century. After five decades of tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on the path to victory. By 2014, rates of smoking and nicotine addiction in this country were finally at an all-time low, particularly among teenagers. Until now. The United States, closer than ever to consigning the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic of historic proportions.

2.    JUUL products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018. In 2019, more than five million middle and high school students reported current use of e-cigarettes, including more than one in every four high schoolers. Consistent with this national trend, youth e-cigarette consumption rates in Tucson Unified School District ("Tucson Unified" or "Plaintiff") continue to climb. According to the 2018 Arizona Youth Survey, nearly 48% of teens in Pima County, Arizona, have used a vape or e-cigarette device. The Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks." The swift rise in a new generation of nicotine addicts has overwhelmed parents, schools, and the medical community (including county public health departments) on the front lines dealing with this crisis, drawing governmental intervention at nearly every level—but it's too little, too late.

3.    This public health crisis is no accident. What had been lauded as progress in curbing cigarette use, JUUL Labs Inc.'s (JLI) co-founders Adam Bowen and James Monsees viewed as opportunity. Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier. To achieve that common purpose, they knew they would need to create and market a product that would make nicotine cool again, without any of the stigma associated with cigarettes. With help from their early investors and board members, who

include Nicolas Pritzker, Huyoung Huh, and Riaz Valani (together, the "Management Defendants"), they succeeded in hooking millions of youth, and, of course, earning billions of dollars in profits.

4.      Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant Altria. JLI was created in the image of the iconic American cigarette companies, which JLI founders praised for creating "the most successful consumer product of all time. . . . an amazing product." The secret to that "amazing product"? Nicotine, a chemical that has deleterious effects on developing young brains, is the fundamental reason that people persist in using tobacco products even though they can cause pulmonary injuries, cardiovascular disease and other serious, often fatal, conditions. Through careful study of decades of cigarette industry documents, JLI knew that the key to developing and sustaining addiction was the amount and the efficiency of the nicotine delivery.

5.      Three tactics were central to decades of cigarette industry market dominance: product design to maximize addiction; mass deception; and targeting of youth. JLI and its co-conspirators adopted and mastered them all. *First*, JLI and Bowen designed JUUL products to create and sustain addiction, not break it. JLI and Bowen were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what JLI and Bowen designed was a starter product designed for youth, not a cessation or cigarette replacement product. JLI and Bowen also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

6.      *Second*, JLI and the Management Defendants, just like cigarette companies before them, targeted kids as their customer base. One of JLI's ███████ was the need to ███████████

███████ JUUL products were designed to appear slick and high-tech like a cool gadget, including

video-game-like features like "party mode." JLI offered kid-friendly flavors like mango and cool mint and partnered with Altria to create and preserve the market for mint-flavored products—all because Defendants knew that flavors get young people hooked. Under the guise of youth smoking prevention, JLI sent representatives directly to schools to study teenager e-cigarette preferences.

7.      *Third*, JLI, the Management Defendants and Altria engaged in a campaign of deceit, through sophisticated mass media and social media communications, advertisements and otherwise, about the purpose and dangers of JUUL products. JUUL products' packaging and advertising grossly understates the nicotine content in its products. Advertising campaigns featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a normal part of a daily routine, and as safe as caffeine. In partnership with Altria, JLI adopted a "Make the Switch" campaign to mislead the public into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions. JLI, the Management Defendants, and Altria also concealed the results of studies that revealed that JUUL products were far more powerfully addictive than was disclosed. JLI's deceptive marketing scheme was carried out across the country through broad distribution channels: veteran cigarette industry wholesalers, distributors and retailers ensured that JUUL products would become widely available to a new market of nicotine-newcomers, especially youth. JLI and the Management Defendants joined with these veteran cigarette industry marketers to secure premium shelf space for vivid displays at convenience stores, like 7-11, and gas stations, including Chevron, that would lure e-cigarette users, particularly young people, who would become long-term customers. These marketing efforts have been resounding successes—when JUUL products were climbing in sales, most youth—and their parents—believed that e-cigarettes did not contain nicotine at all.

8.      JLI and the Management Defendants reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for cigarettes because they cause young people to start smoking) with cutting-edge viral marketing campaigns and social media. They hired young models and advertised using bright, "fun" themes, including on media

long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and educational tools to students in middle school and high school. JLI and the Management Defendants also employed young social media "influencers" and celebrities popular with teenagers. When the public, regulators, and Congress caught onto JLI's relentless focus on children, JLI and the Management Defendants simply lied, even though they knew well that they had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful.

9.      It should come as little surprise that JLI and the Management Defendants' misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company. In December 2018, Altria paid $12.8 billion to acquire a 35% stake in JLI. But even well before Altria announced its investment in JLI, the connections between the two companies ran deep. JLI and Altria collaborated to grow the e-cigarette market and the number of users addicted to nicotine, including by sharing data and information and coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes. Altria's investment in JLI is not merely a financial proposition, but a key element of Defendants' plan to stave off regulation and public outcry and keep their most potent and popular products on the market. JLI has benefitted from Altria's expertise in designing and marketing addictive products, and in thwarting regulation.

10.      There is no doubt about it—JLI, the Management Defendants, Altria, and their co-Defendants have created this youth public health crisis. At the heart of this disastrous epidemic are the concerted efforts of JLI, its co-conspirators, and all those in JUUL's supply and distribution chain to continuously expand their market share and profits by preying upon a vulnerable young population and deceiving the public about the true nature of the products they were selling. Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air. Worse, the flavors in JUUL products are themselves toxic and dangerous, and have never been

adequately tested to ensure they are safe for inhalation. According to the most recent scientific literature, JUUL products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Yet JUUL products and advertising contain no health risk warnings at all. And a generation of kids is now hooked, ensuring long-term survival of the nicotine industry because, today just as in the 1950s, 90% of smokers start as children.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's racketeering claim arises under the laws of the United States, 18 U.S.C. § 1961 *et seq.*, and pursuant to 28 U.S.C. § 1332(a) because: (i) the amount in controversy exceeds $75,000, exclusive of interests and costs, and (ii) the plaintiff and defendants are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.    The Court has personal jurisdiction over Defendants because they do business in the District of Arizona and have sufficient minimum contacts with the District. Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, and sale of the products at issue in this lawsuit in Arizona, and by retaining the profits and proceeds from these activities, to render the exercise of jurisdiction by this Court permissible under Arizona law and the U.S. Constitution. The Court also has personal jurisdiction over JLI, the Management Defendants, and Altria under 18 U.S.C. § 1965, because at least one of these Defendants has sufficient minimum contacts with the District.

13.    Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391 (b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

### III.    PARTIES

**Plaintiff**

14.    Plaintiff Tucson Unified has been serving the Tucson community since 1867.  Tucson Unified includes 89 schools serving over 44,000 students.  Tucson Unified's mission includes ensuring its students receive an engaging, rigorous and comprehensive education.  Plaintiff's administrative offices are located on East Tenth Street in Tucson, Pima County, Arizona.

**JUUL Labs, Inc.**

15.    Defendant JUUL Labs, Inc. ("JLI") is a Delaware corporation, having its principal place of business in San Francisco, California. Ploom, Inc., a predecessor company to JLI, was incorporated in Delaware on March 12, 2007. In 2015, Ploom, Inc. changed its name to PAX Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name, PAX Labs, Inc. That new subsidiary, PAX Labs, Inc. ("PAX"), was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

16.    JUUL, designs, manufactures, sells, markets, advertises, promotes and distributes JUUL e-cigarette devices, JUUL pods and accessories (collectively "JUUL" or "JUUL products"). Prior to the formation of separate entities PAX Labs, Inc. and JLI in or around April 2017, JUUL designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the name PAX Labs, Inc.

17.    Together with its predecessors, JUUL Labs, Inc is referred to herein as "JLI."

**Altria Defendants**

18.    Defendant Altria Group Inc, (together with its wholly owned subsidiaries and their predecessors, "Altria" or the "Altria Defendants") is a Virginia corporation, having its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco products, manufacturing and selling combustible cigarettes for more than a century.

19.     On December 20, 2018, Altria purchased a 35% stake in JLI. Altria and JLI executed a Services Agreement that provides that Altria, through its subsidiaries, Philip Morris, Altria Client Services LLC, and Altria Group Distribution Company, would assist JLI in the selling, marketing, promoting, and distributing of JUUL, among other things.

20.     Defendant Altria Client Services LLC ("Altria Client Services" or "ACS") is a Virginia limited liability company with its principal place of business in Richmond, Virginia. Altria Client Services provides Altria Group, Inc. and its companies with services in many areas including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Pursuant to Altria's Relationship Agreement with JLI, Altria Client Services assists JLI in the sale, marketing, promotion and distribution of JUUL products.[1] Such services include database support, direct marketing support, and premarket product application support.[2] On September 25, 2019, the former senior vice president and chief growth officer of Altria Client Services, K.C. Crosthwaite, became the new chief executive officer of JLI.

21.     Defendant Altria Group Distribution Company ("AGDC") is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Richmond, Virginia. Altria Group Distribution Company provides sales, distribution and consumer engagement services to Altria's tobacco companies. Altria Group Distribution Company ████████████ ████████████████████████████████████████████ Altria Group Distribution Company ████████████████████████████████████████████ ████████████████████████████

---

[1] Altria Group, Inc., *Relationship Agreement by and among JUUL Labs, Inc., Altria Group, Inc., and Altria Enterprises LLC* ("Relationship Agreement") (Form 8-K), Ex. 2.2 (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex22.htm.
[2] *Id.*

22.     Defendant Altria Enterprises LLC ("Altria Enterprises") is a wholly owned subsidiary of Altria Group, Inc. Altria Enterprises is a Virginia limited liability company with its principal place of business in Richmond, Virginia. Altria Enterprises is a party to the purchase agreement between Altria Group, Inc. and JLI. Altria Enterprises purchased Altria's stake in JLI on Altria's behalf. Collectively, Altria Group, Inc. and its subsidiaries named above will be referred to herein as "Altria." Upon information and belief, Altria conducted meetings, interviews and inspections at the JLI facilities in San Francisco and engaged in frequent communications regarding JUUL with JLI in California and elsewhere prior to, during, and subsequent to its stock purchase.

**Management Defendants**

23.     Defendant James Monsees is a resident of the San Francisco Bay area, California. In 2007, he co-founded Ploom with Defendant Bowen. He served as Chief Executive Officer of JLI until October 2015. Since October 2015, he has been Chief Product Officer of JLI. At all relevant times, he has been a member of the Board of Directors of JLI until he stepped down in March 2020.

24.     Defendant Adam Bowen is a resident of the San Francisco Bay area, California. In 2007, he co-founded Ploom with Defendant Monsees. At all relevant times, he has been Chief Technology Officer and a member of the Board of Directors of JLI.

25.     Defendant Nicholas Pritzker is a resident of San Francisco, California, and a member of the Pritzker family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Pritzker received a J.D. from the University of Chicago. He served as president of the Hyatt Hotels Corporation and was a member of its Board of Directors from 1980 to 2007. More recently, he co-founded Tao Capital, an early investor in, among other companies, Tesla Motors and Uber. In 2007, he invested in JLI.[3] ▮▮▮▮▮▮▮▮▮

---

[3] Ainsley Harris, *How JUUL went from a Stanford thesis to $16 billion startup*, Fast Co. (Mar. 8, 2020), https://www.fastcompany.com/90263212/how-JUUL-went-from-a-stanford-thesis-to-16-billion-startup.

█████████████████████ ██ ████████████████████

████████████████████████████████████████████

██████████████████████.[5]

26.     Defendant Hoyoung Huh lives and works in the Silicon Valley area, California. He holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering. He has been CEO or a Board member of numerous biotechnology businesses, including Geron Corporation. Huh has been on the Board of Directors of JLI since at least June 2015. ████████

████████████████████████████████████████

████████████████████.[6]

27.     Defendant Riaz Valani lives near San Jose, California and is a general partner at Global Asset Capital, a San Francisco-based private equity investment firm. He has been on the Board of Directors of JLI since at least May 2011.[7]███████████████████████

████████████████████████████████████████

█████████████████.[8]

28.     Defendants Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "Management Defendants."

29.     Defendants JLI, the Altria Defendants, Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "RICO Defendants."

---

[4] INREJUUL_00371187.
[5] INREJUUL_00327603.
[6] *Id.*
[7] Ploom, Inc., Notice of Exempt Offering of Securities (Form D) (May 5, 2011), https://www.sec.gov/Archives/edgar/data/1520049/000152004911000001/xslFormDX01/primary_doc.xml.
[8] INREJUUL_00327603.

## IV.   GENERAL FACTUAL ALLEGATIONS

**A.   Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time."**

30.   JLI's co-founder James Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[9] This statement, which ignores the fact that cigarettes have caused more deaths than any other human invention, contained a kernel of truth. When U.S. smoking rates peaked in the mid-1960s, 42% of adults smoked cigarettes. Cigarettes were everywhere; people smoked on airplanes, in movie theatres, at the office, and at sports games. Movie stars and sports heroes smoked. Cigarette advertising wallpapered American life, glamorizing smoking as sophisticated, cool, and the thing to do.

31.   But in reality, of course, this "successful" product has long been the world's leading cause of preventable death.

32.   Years of anti-smoking campaigns, including work by local government public health departments and school-based anti-tobacco programs, have made great strides towards de-normalizing cigarette smoking. But where public health officials and schools saw progress, others saw an opportunity.

33.   Citing "some problems" inherent in the cigarette, Monsees and JLI co-founder Adam Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[10] Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[11] Successfully capitalizing on this opportunity would mean not only billions of dollars in short-term revenue but lucrative acquisition by a cigarette industry power player.

---

[9] Kathleen Chaykowski, *Billionaires-to-be: Cigarette Breakers–James Monsees and Adam Bowen Have Cornered the US E-Cigarette Market with Juul. Up Next: The World*, FORBES INDIA (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.

[10] Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*, SOLID SMACK (Apr. 23, 2014), www.solidsmack.com/design/ploom-modeltwo-slick-design-tobacco-pods.

[11] *Id.*

34.     Bowen and Monsees took the first major step toward realizing their vision by deliberately creating an extremely potent nicotine product that looked nothing like a cigarette. But achieving widespread adoption of their highly addictive product required resources and expertise beyond those possessed by Bowen, Monsees or others at JLI.

35.     When it became clear that Bowen and Monsees could not themselves achieve their vision of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life, the Management Defendants planned a fundamental shift in roles to allow Pritzker, Huh, and Valani to direct and take control of JLI and use it to commit the Defendants' unlawful acts.

36.     Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Huh, and Valani formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.

37.     Prior to the installation of Tyler Goldman as JLI's new CEO in August 2016, Defendants Pritzker, Huh, and Valani used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public, and specifically to minors. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[12] ███████████████████████████████████ ████████████████████████████████████."[13]

38.     But the Management Defendants knew that their desire to create a massive new market for JUUL on their own would be aided if they could convert Altria, an experienced cigarette company with a history of marketing to youth and covering it up, into an ally. They turned to Altria in the Spring of 2017. While Defendants JLI, Bowen, Monsees, Huh, and Valani are relative newcomers to the tobacco industry, Altria has been manufacturing and selling "combustible" cigarettes for more than a

---

[12] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 23, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.
[13] INREJUUL_00278359.

century. And Defendant Pritzker, for his part, has been long familiar with the tobacco industry from his family's ownership of chewing-tobacco giant, Conwood, before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Notwithstanding their different histories, JLI and the Management Defendants, for their part, invited Altria into the fold as an ally with ample resources to further expand the market of nicotine-addicted e-cigarette users and to keep litigation and regulation at bay. While JLI, Monsees, and Bowen publicly claimed to be out to "disrupt" the industry, they and the other Management Defendants privately negotiated and ultimately relinquished a 35% ownership stake in the company to a cigarette giant.

39.     Cigarette companies have long known that profitable growth requires a pipeline of "replacement" customers. Altria, after decades of tobacco litigation and regulation, had little ability to recruit new smokers in the ways that had driven Philip Morris's success through most of the 1900s. In 2017, Altria's combustible cigarette products were facing increasing regulatory pressures. In late July 2017, Altria's stock value plummeted shortly after the FDA announced that it would reduce the amount of nicotine allowed in cigarettes with an eye toward reaching non-addictive levels.[14] In late 2017, Altria, and other major cigarette companies, also finally complied with a consent decree from the 1990s tobacco litigation that required them to issue corrective advertising statements that highlighted the addictiveness and health impacts of smoking cigarettes.[15]

40.     Due in large part to this litigation and regulation, cigarette use has been declining in the United States in the last decade, especially among youth.[16] Altria estimates that the cigarette industry

---

[14] *See* Dan Caplinger, *Altria Group in 2017: The Year in Review*, THE MOTLEY FOOL (Dec. 18, 2017), https://www.fool.com/investing/2017/12/18/altria-group-in-2017-the-year-in-review.aspx.

[15] Chuck Stanley, *Tobacco Cos. Settle Long-Running Health Warning Dispute*, LAW360 (Apr. 25, 2018, https://www.law360.com/articles/1037281/tobacco-cos-settle-long-running-health-warning-dispute.

[16] *Current Cigarette Smoking Among Adults In the United States*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (last visited May 5, 2020); *Youth and Tobacco Use*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last visited May 5, 2020).

declined by 4% in 2017 and by 4.5% in 2018, and it predicted a continued 4% to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.[17] Altria later adjusted the estimated rate of decline to 4% to 6%, to reflect efforts to increase the legal age for cigarette smoking to 21.[18]

41.     Altria had undertaken its own efforts at marketing an e-cigarette product. Altria had launched the MarkTen product nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for the market leader at that time, blu e-cigarettes.[19] Of the $88.1 million spent on e-cigarette advertising in 2014, nearly 40% of that was Altria's MarkTen campaign, at $35 million.[20]

42.     Altria was clear in its intent to dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at the time of MarkTen's launch.[21] The original MarkTen was a "cigalike," designed to mimic the look and feel of a combustible cigarette.

43.     Altria had also been acquiring small companies in the e-cigarette industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."[22] In 2016, Altria acquired a product

---

[17] *Altria's Fourth-Quarter 2018 Earnings Conference Call*, Altria (Jan. 31, 2019), http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.

[18] *Altria Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Bus. (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.

[19] Jennifer Cantrell et al., *Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace*, 25 Tobacco Control e125 (10) (2015), http://dx.doi.org/10.1136/tobaccocontrol-2015-052532.

[20] *Id.*

[21] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, CONVENIENCE STORE NEWS (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[22] Mike Esterl, *Altria To Launch MarkTen E-Cigarette Nationally*, WALL ST. J. (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378; Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth* at 12 (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

called Cync, from Vape Forward.[23] Cync is a small e-cigarette device that uses prefilled pods in a variety of flavors, similar to the JUUL.

44.     In February 2017, Altria told investors at the 2017 Consumer Analyst Group of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made excellent progress toward its long-term aspiration of becoming a leader in e-vapor."[24] In his remarks, Altria's current CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year. It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations." He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately $2.5 billion."[25] In 2017, Altria's MarkTen e-cigarettes had a market share of only 13.7%, well behind JLI's growing market share of 40%.[26] Thus, despite its public statements to the contrary, Altria knew the popularity of JUUL stood in the way of Altria becoming the dominant force in the e-cigarette market.

45.     With smoking on the decline, litigation and regulatory controls were ramping up and threatening Altria's ability to attract new smokers, and JUUL outperforming Altria's products in the market, Altria's best bet for maintaining its sales by increasing the number of users, and especially minors, addicted to nicotine was to partner with JLI (1) to maintain or increase the number of users, and especially minors, hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first scheme.

---

[23] Remarks by Jody Begley, 2017 Altria Investor Day (Nov. 2, 2017), http://media.corporate-ir.net/media_files/IROL/80/80855/2017InvestorDay/Remarks_and_Reconciliations.pdf.

[24] Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, CEO and President, and other members of Altria's senior management team 2017 Consumer Analyst Group of New York (CAGNY), (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.

[25] *Id.*

[26] Richard Craver, *Vuse falls further behind Juul on e-cig sales*, WINSTON-SALEM JOURNAL (Dec. 14, 2017), https://www.journalnow.com/business/vuse-falls-further-behind-juul-on-e-cig-sales/article_ed14c6bc-5421-5806-9d32-bba0e8f86571.html.

46.     For those reasons and others, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[27] and Ploom's advisory committee included Altria's former growth officer. In Altria's words, the company followed "JUUL's journey rather closely" from its early beginnings.[28]

47.     According to Howard Willard, Altria's CEO, Altria first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" beginning in the Spring of 2017.[29] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[30]

48.     ████████████████████████████████████████████████████████████████████████████████████████ ████████[31] Pritzker and Valani, together with Burns, were the lead negotiators on the Altria deal. On July 30, 2018, in advance of a meeting between the lead negotiators from JLI and Altria, Pritzker emailed Howard Willard an opening term sheet for discussions, and made clear that an end to competition from Altria's e-cigarette products was a key term of any deal. On August 1, 2018, the companies' negotiators met at the Park Hyatt Hotel in Washington, D.C., to discuss terms. Pritzker, Valani, and Burns attended for JLI. Willard and Billy Gifford, Altria's CFO, attended for Altria. By the Fall of 2017, JLI, the Management Defendants, and Altria had agreed to and had taken coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

---

[27] INREJUUL_00278740.
[28] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, BLOOMBERG (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.
[29] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).
[30] INREJUUL_00349529.
[31] *Id.*

49.     ████████████████████████████ it was JLI (through its executives and employees—including Tyler Goldman and his successors) and Altria (through its executives and employees) that primarily directed and conducted fraudulent acts designed to grow the market of youth nicotine-addicted e-cigarette users, although Bowen, Monsees, Pritzker, Huh, and Valani remained critical to the success of these efforts. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI and Altria, and Altria's investment in JLI, would not have been possible.

50.     In December 2018, Altria decided to take the next step in its coordination with JLI and the Management Defendants by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This arrangement was profitable for both companies, as well as Defendants Monsees, Bowen, Prtizker, Huh, and Valani. JLI employees received $2 billion in bonuses, which, split among the Company's 1,500 employees, was approximately $1.3 million per employee,[32] and Altria received millions of loyal teen customers. In deciding to make a huge investment in JUUL, Altria took into account that the e-cigarette industry would see significant year-over-year growth in the near term, and that "JUUL continu[es] to be a growth driver for the e-vapor category."[33]

51.     In July 2018, JLI's valuation was approximately $15 billion.[34] But, in December 2018, Altria's investment of $12.8 billion for a 35% stake in the company reflected a valuation of approximately $38 billion—more than two and a half times the valuation just five months earlier. Defendants Monsees, Bowen, Pritzker, Huh, and Valani thus saw the value of their investments in JLI

---

[32] Olivia Zaleski, *Juul Employees to Get $2 Billion Bonus in Altria Deal*, BLOOMBERG (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-altria-deal.

[33] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[34] Rachel Becker, *Why Is Juul Worth $16 Billion? It's More Like a Cigarette Than You Think*, THE VERGE (Jul. 3, 2018), https://www.theverge.com/2018/7/3/17529442/juul-vapes-nicotine-electronic-cigarettes-addiction-funding.

skyrocket as a result of the Altria agreement, allowing them to cash out via a special dividend and bonus, as well as through stock sales that were not available to other of JLI's minority shareholders.[35]

52.     This investment further intertwined JLI and Altria. According to the terms of its investment, Altria may appoint one third of JLI's board. And in October 2019, JLI's CEO resigned to be replaced by another career Altria executive, K.C. Crosthwaite. The key JLI negotiators of the Altria deal (including Pritzker and Valani), and other officers and directors including Bowen, Monsees, and Huh, would have been instrumental in bringing Crosthwaithe on board at JLI. Crosthwaite had most recently served as the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work to assist Altria's companies, including with digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Crosthwaite knows the cigarette industry's playbook all too well, having previously served as the president and CEO of Phillip Morris USA, the vice president and general manager at Marlboro—the leading cigarette brand among youth—and the vice president of strategy and business development of at Altria Client Services LLC.

53.     In addition, Joe Murillo, who headed regulatory affairs for Altria, and served as President and General Manager of Nu Mark, LLC (Altria's e-cigarette business), became JLI's chief regulatory officer in October 2019.

54.     Both before and after Altria's investment, JLI, through its employees and officers, provided Altria with critical information regarding the design and nicotine content of the JUUL product, the labeling of the JUUL product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor preferences, and regulatory strategies. Altria, for its part, guided JLI and the Management Defendants in these areas and helped them devise and execute schemes to maintain and expand the e-cigarette market.

---

[35] Tiffany Kary, *JUUL Founders Sued for Self-Dealing Over Altria's $12.8 Billion*, Bloomberg (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-dealing-over-altria-s-12-8-billion.

55.     JLI, the Management Defendants, and Altria worked together to implement their shared goal of growing a new market in the image of the combustible cigarette market through a multi-pronged strategy to: (1) create a highly addictive product that users would not associate with cigarettes and that would appeal to the lucrative youth market; (2) deceive the public, and especially young people, into thinking the product was a fun and safe alternative to cigarettes that would help smokers quit; (3) actively attract young users through targeted marketing, and (4) use a variety of tools, including false and deceptive statements to the public and regulators, to delay regulation of e-cigarettes. As detailed more fully throughout this Amended Complaint, each of the Defendants played a critical role—at times overlapping and varying over time—in each of these strategies.

**B.     Defendants' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction.**

**1.     Defendants Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction.**

56.     The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product. Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly addictive and the key ingredient that drives addiction to cigarettes. Nicotine's addictive properties are similar to heroin and cocaine.[36]

57.     Route of administration and speed of delivery are key to understanding nicotine's addictive potential. Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report on nicotine addiction, wrote: "After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during

---

[36] *See e.g.,* U.S. Dep't of Health and Human Servs., *Nicotine Addiction: A Report of the Surgeon General*, DHHS Publication Number (CDC) 88-8406, (1988).

smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration."[37]

58.     Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by smoking … results in high levels of nicotine in the central nervous system with little time for development of tolerance. The result is a more intense pharmacologic action. The short time interval between puffing and nicotine entering the brain also allows the smoker to titrate the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[38]

59.     Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

60.     Kids are particularly vulnerable to nicotine addiction, as Defendants know well. As described by the United States Surgeon General, "Tobacco use is a pediatric epidemic."[39] Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[40]

---

[37] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 HANDB. EXP. PHARMACOL. 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.
[38] *Id.*
[39] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* ("*2012 Surgeon General Report*") at 539, U.S. Dep't Health & Human Servs. (2012), https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf.
[40] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

61.     The above statements apply equally, if not more so, to e-cigarettes. Further, the Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[41] The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control, deficits in attention and cognition, and mood disorders.[42] A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[43]

62.     In 2014, the United States Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease), lung diseases (chronic obstructive pulmonary disease (COPD) and lung cancer), cancer almost anywhere in the body, and birth defects.[44]

---

[41] *Know The Risks: E-Cigarettes & Young People* (2019), https://e-cigarettes.surgeongeneral.gov/knowtherisks.html.

[42] Menglu Yuan et al., *Nicotine and the Adolescent Brain*, 593 J. OF PHYSIOLOGY 3397 (2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/; U.S. Surgeon General and U.S. Centers for Disease Control & Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes and Young People* (2019), https://e-cigarettes.surgeongeneral.gov/.

[43] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function*, 2 COLD SPRING HARBOR PERSP. MED. 12 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

[44] U.S. Dep't of Health and Human Servs. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.

63.     It took five decades of public health initiatives, government intervention, impact litigation, consumer education, and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

64.     By 2014, the number of adults that reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.[45] By 2014, teen smoking also hit a record low.[46] In June 2014, the Centers for Disease Control and Prevention ("CDC") reported that "in achieving a teen smoking rate of 15.7 percent, the United States has met its national Healthy People 2020 objective of reducing adolescent cigarette use to 16 percent or less."

65.     The United States Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free."[47]

66.     Where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, Defendants saw an opportunity.

---

[45] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, *Trends in Cigarette Smoking Among High School Students—United States*, 1991-2001, 51 MORBIDITY & MORTALITY WKLY. REP. 409 (May 17, 2002), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5119a1.htm; Teresa W. Wang et al., *Tobacco Product Use Among Adults—United States, 2017*, 67 MORBIDITY & MORTALITY WKLY. REP. 1225 (Nov. 9, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/pdfs/mm6744a2-H.pdf; U.S. Dep't of Health and Human Servs. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.

[46] Press Release, Centers for Disease Control and Prevention, *Cigarette smoking among U.S. high school students at lowest level in 22 years* (June 12, 2014), https://www.cdc.gov/media/releases/2014/p0612-YRBS.html.

[47] U.S. Dep't of Health and Human Servs. *LET'S MAKE THE NEXT GENERATION TOBACCO-FREE: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking and Health* (2014), https://www.hhs.gov/sites/default/files/consequences-smoking-consumer-guide.pdf.

2. **Following the Cigarette Industry Playbook, Defendants Sought to Market a Product that would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes.**

67.    Seeking to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (i.e. well-established link to death and disease), JLI engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of consumer addiction than ever before. JLI marketed that highly-addictive device as healthy, safe, cool, and available in kid-friendly flavors.

68.    In doing so, JLI followed the cigarette industry's playbook. Monsees admitted that when creating JLI, he and Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement between the state Attorneys General of forty-six states, five U.S. territories, the District of Columbia and the four largest cigarette manufacturers in the United States. "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[48]

69.    In a thesis presentation Bowen and Monsees gave in 2004, Monsees candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[49] JLI researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[50] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control

---

[48] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

[49] Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, TECH CRUNCH (Feb. 27, 2019), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/.

[50] *Id.*

efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

70.     Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in a way that would be easy to ingest—without the nausea, cough, or other aversive side effects that many new smokers experienced. In the 1970s, R.J. Reynolds scientists eventually found a solution: Combine the high-pH nicotine with a low-pH acid. The result was a neutralized compound referred to as nicotine salt. In a 1973 RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive. A young RJ Reynolds chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."[51] Pefetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salts. As described in herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

71.     JLI also engaged former cigarette industry researchers to consult on the design of their product. As Monsees noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies

---

[51] Thomas A. Perfetti, *Smoking Satisfaction and Tar/Nicotine Control* (Dec. 7, 1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-salts-investigation.pdf.

anymore. If you go to Altria's R&D facility, it's empty."[52] The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."[53]

72.     One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device (2) the JUUL pod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUUL pods that contain liquid that includes nicotine, flavoring and other additives. Each JUUL pod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[54]

---

[52] David Pierce, *This Might Just Be the First Great E-Cig*, WIRED (Apr. 21, 2015),
   www.wired.com/2015/04/pax-juul-ecig/.
[53] *Id.*
[54] JUUL Labs, Inc., (as of April 8, 2018),
   https://web.archive.org/web/20180408102252/www.juullabs.com/..



73.     JLI sells the JUUL pods in packs of four or two pods, and until recently, in a variety of enticing flavors. Many of the flavors have no combustible cigarette analog, including "cool" cucumber, fruit medley, "cool" mint, and crème brûlée. Figure 1 shows the JLI device and a JLI "Starter Kit" with four flavored JUUL pods:

**Figure 1**



74.     JLI attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[55]

75.     JLI even took this message to ninth graders: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[56]

---

[55] Letter from U.S. Food & Drug Admin. to Kevin Burns, CEO of JUUL Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.
[56] *Id*.

76.     This was not just a rogue employee. Internal messaging around JUUL, crafted by the executives, emphasized that JUUL was safer than smoking. In a █████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████[57] ███████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████[58] ███████████████████████████████████████ ████████████████████████████████[59] The consistency of the wording in these presentations more than a year apart shows that this was standard company language.

77.     JLI's mission was not to improve public health. Rather, JLI sought to introduce a new generation of consumers, and especially young people, to nicotine. JLI's business model was never about reducing addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[60]

78.     JLI, Bowen, and Monsees achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided users with palatable access to high-concentrations of nicotine like never before. Since the JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700 percent in 2017 alone. By 2019, JLI owned three-quarters of the e-cigarette market.[61]

---

[57] INREJUUL_00441986 (emphasis added).
[58] JLI00373324.
[59] JLI00373328 (emphasis added).
[60] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. TIMES (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.
[61] Dick Durbin et al., *Durbin & Senators to JUUL: You are More Interested in Profits Than Public Health*, Durbin Newsroom (Apr. 8, 2019)*, https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-are-more-interested-in-profits-than-public-health.

**3.     Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company.**

79.     JLI, along with the Management Defendants, worked together to maintain and expand the number of nicotine-addicted e-cigarette users, including young people in particular, in order to ensure a steady and growing customer base.

80.     That growing customer base was crucial to JLI's and the Management Defendants' long term objective—lucrative acquisition by another company. They recognized that JLI's product, with its potential to dominate the nicotine products market by hooking new users, would appeal to one segment of the economy in particular: the cigarette industry.

81.     JLI and the Management Defendants also recognized that their business goal—becoming part of the cigarette industry—was unlikely to endear them to the consumers that they needed to purchase their products. Years of anti-smoking campaigns have successfully stigmatized cigarette smoking. When Monsees and Bowen presented their thesis and product design to their classmates, they included a clip from a South Park episode showing the characters assembled at the Museum of Tolerance and shaming a smoker.[62]

82.     Monsees and Bowen needed to shape social norms such that the public attitude towards e-cigarettes would allow people to use their product without the stigma and self-consciousness smokers experienced. Monsees and Bowen saw a market opportunity in a generation of non-smoking young people brought up on anti-smoking norms. In Monsees' words, they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."[63]

83.     Part of this approach was consistently portraying JUUL as an enemy of the cigarette industry, with a publicly announced goal of eliminating the cigarette. In an interview, Bowen asserted

---

[62] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

[63] *Id.*; *see also,* INREJUUL 00064696 ████████████████████

that he and Monsees spent a lot of time talking about "the kind of typical thoughts of evil Big Tobacco companies like coming down and squashing you."[64] The "Mission Statement" on JLI's homepage proclaims:

> Our mission is to transition the world's billion adult smokers away from combustible cigarettes, eliminate their use, and combat underage usage of our products.
>
> We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire.[65]

84.     In fact, JLI's Chief Administrative Officer has publicly stated that the goal behind JLI is "eliminating cigarettes."[66]

85.     This public message of eliminating cigarettes and challenging tobacco companies stands in direct contrast with JLI's actual business and investment strategy, which involved replicating in JUUL's new market the tobacco companies' historical success in the youth market for cigarettes. From the beginning, Bowen and Monsees actively sought the investment and assistance of major cigarette companies. Bowen and Monsees' initial foray into the e-cigarette business, Ploom, launched its e-cigarette as the ModelOne in 2010, using pods of loose-leaf tobacco heated by butane. It did not catch on. Ploom only sold a few thousand devices. By then a company with a dozen employees, Ploom was faltering, in need of money, technological expertise, and marketing savvy.[67]

86.     Help came from Japan Tobacco International ("Japan Tobacco"), a division of Japan Tobacco Inc., the fourth-largest tobacco company in the world. In December 2011, Japan Tobacco and Ploom entered into a strategic agreement, which gave Japan Tobacco a minority stake in Ploom and made it a strategic partner. In a statement regarding the agreement, Monsees said, "We are very

---

[64] Alison Keeley, *Vice Made Nice? A high-tech alternative to cigarettes*, STANFORD MAGAZINE (2012), https://stanfordmag.org/contents/vice-made-nice.

[65] JUUL Labs, *Our Mission* (2019), https://www.juul.com/mission-values.

[66] Ashley Gould, *JUUL Labs is committed to eliminating cigarettes,* CAL MATTERS (March 18, 2019), https://calmatters.org/commentary/e-cigarette/.

[67] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?*, Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html

pleased to partner with [Japan Tobacco] as their deep expertise, global distribution networks and capital resources will enable us to enter our next phase of growth and capitalize on global expansion opportunities."[68] As Bowen explained in an interview, "We were still doing a lot of our own internal product development, but now we had access to floors of scientists at [Japan Tobacco]."[69]

87.   According to internal documents, ██████████████████████████████████████ ████████████████████████████████████████████████████████████"[70] ████████████████████████████████████████████████████████████████ ████████████████████████████████████[71] In addition, ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████[72]

88.   JLI and the Management Defendants ████████████████████████████ ████████████████████████████████████████████████████████████ ████[73] According to ██████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████"[74] The end result

---

[68] *Innovative P'ship for Ploom and Japan Tobacco Int'l JTI to Take Minority Share in Ploom*, JAPAN TOBACCO INT'L (Dec. 8, 2011), https://www.jti.com/sites/default/files/press-releases/documents/2011/innovative-partnership-for-ploom-and-japan-tobacco-international.pdf.

[69] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* INC. MAGAZINE (2014), https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html.

[70] INREJUUL_00371423 ████████████████████████).

[71] INREJUUL_00371447.

[72] INREJUUL_00371458-INREJUUL_00371459.

[73] INREJUUL_00016386 ████████████████████).

[74] *Id*.

of the process would be ██████████████████████████

████████████████████".[75]

89.   █████████████████████████████

████████████████████████████████████



.[76]

90.   According to Stifel, ██████████████████████████

████████████████████████████[77]

████████████████████████████████

████████████████████████████████

[75] *Id.*
[76] INREJUUL_0016399.
[77] INREJUUL_0016400-INREJUUL_0016401.



91.   Consistent with

.78

92.   The

.80

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

93.     This goal—acquisition by a major cigarette company—was a motive that the JLI and the Management Defendants would return to in making decisions about the manufacture and marketing of JUUL products. As an example, ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████[81] Bowen knew that to achieve the ultimate goal of acquisition, JLI and the Management Defendants would have to grow the market share of nicotine-addicted e-cigarette users, including youth in particular, regardless of the human cost.

94.     JLI and the Management Defendants sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction, especially among young people; and, second, by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people, in particular, whose addiction would last the longest and be the most profitable for the Defendants.

---

[81] INREJUUL_00294198.

95.     These schemes were an overwhelming success. By the close of 2017, according to Nielsen data, JLI had surpassed its competitors in capturing 32.9% of the e-cigarette market, with British American Tobacco at 27.4% and Altria at 15.2%.[82] The total e-cigarette market expanded 40% to $1.16 billion.[83]

96.     In 2018, JLI's gross profit margins were 70%[84] and it represented 76.1% of the national e-cigarette market.[85] In a complaint it filed in November 2018 against 24 vape companies for alleged patent infringement, JLI asserted that it was "now responsible for over 95% of the growth in the ENDS pod refill market in the United States" and included the following chart:[86]

**Appendix 5: U.S. ENDS Pod Market Retail Unit Sales Growth 2018**

4-Week Unit Sales by End Date

| | Nielsen | | | IRI | | |
|---|---|---|---|---|---|---|
| | Apr 21 | Sep 8 | Share of Growth | Apr 22 | Sep 9 | Share of Growth |
| Total Market | 36,002,645 | 55,773,039 | 100% | 29,546,883 | 50,793,955 | 100% |
| Juul | 22,618,886 | 41,501,172 | 95.5% | 14,964,158 | 35,166,120 | 95.1% |
| Vuse | 6,385,922 | 6,172,595 | -1.1% | 7,204,900 | 7,409,312 | 1.0% |
| MarkTen | 3,677,300 | 4,240,285 | 2.8% | 2,904,168 | 3,230,237 | 1.5% |
| Logic | 1,785,167 | 2,018,023 | 1.2% | 1,928,841 | 1,876,006 | -0.2% |
| Blu | 1,062,360 | 1,461,127 | 2.0% | 1,305,209 | 1,937,225 | 3.0% |
| Other | 473,010 | 379,837 | -0.5% | 1,239,607 | 1,175,055 | -0.3% |

[82] Ari Levy, *E-cigarette maker Juul is raising $150 million after spinning out of vaping company*, CNBC (Dec. 20, 2017), https://www.cnbc.com/2017/12/19/juul-labs-raising-150-million-in-debt-after-spinning-out-of-pax.html.

[83] *Id.*

[84] Dan Primack, *Scoop: The Numbers Behind Juul's Investor Appeal*, AXIOS (July 2, 2018), https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html.

[85] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market* at 2, STAN. RES. INTO THE IMPACT OF TOBACCO ADVERT. (2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[86] Verified Complaint Under Section 337 of the Tariff Act of 1930 at 6, *In the Matter of Certain Cartridges for Elec. Nicotine Delivery Sys. & Components Thereof*, Investigation No. 337-TA-1141 (USITC Nov. 19, 2018).

97.     JLI shattered previous records for reaching decacorn status, reaching valuation of over $10 billion in a matter of months—four times faster than Facebook.[87] This all came just three years after its product launch.

**C.     JLI and Bowen Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction, Particularly Among Young People.**

98.     JLI was well-aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity. One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."[88] It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers. Claude Teague of R.J. Reynolds titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market." In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[89] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." As seen below, JLI heeded Dr. Teague's advice.

**1.     JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers' to Inhale.**

99.     As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users, who were primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

---

[87] Zack Guzman, *Juul Surpasses Facebook As Fastest Startup to Reach Decacorn Status*, YAHOO! FIN. (Oct. 9, 2018), https://finance.yahoo.com/news/juul-surpasses-facebook-fastest-startup-reach-decacorn-status-153728892.html.

[88] Internal Memo from T.L. Achey, Lorillard Tobacco Company, to Curtis Judge, Product Information (August 1978).

[89] Internal Memo from Claude Teague, R.J. Reynolds, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market* (Feb. 2, 1973).

100.     E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a palatable form.[90] Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine.[91] When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user.[92] This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit."[93] While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.

101.     Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day.[94] None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

102.     Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

## 2.     JLI's Initial Experiments Measured Non-Smokers "Buzz" Levels and Perceptions of Throat Harshness.

103.     JLI intentionally designed its product to minimize "throat hit" and maximize "buzz."

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[90] Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL and the High-nicotine Product Market*, 28 TOBACCO CONTROL 623 (2019).
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*

1

2

104.    In these early tests, ████████████████████████████

████████████████████████████████████

████████[95] The aim was to develop a nicotine salt formulation that maximized buzz, minimized

harshness. "Employees tested new liquid-nicotine formulations on themselves or on strangers taking

smoke breaks on the street. Sometimes, the mix packed too much punch – enough nicotine to make

some testers' hands shake or send them to the bathroom to vomit . . . ."[96]

105.    The ████████████████████████████

████████████████████████████████████

████████████████████████████████.[97]

████████████████████████████████████

106.    ████████████████████████

████████████████████████████████████

████████████

---

[95] INREJUUL_00002903.
[96] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[97] INREJUUL_00002903.

107.    A later study by Anna K. Duell et al., which examined 4% benzoate solutions—the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit. The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley" flavor was 0.05 and in "Crème Brulee" was 0.07.[98] Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine. For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84,[99] resulting in over 14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[100]

108.    Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youth. The cigarette industry has long recognized this; a published study of industry documents concluded that "product design changes which make cigarettes more palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."[101] The Duell study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[102]

109.    Reducing the harshness of nicotine also allows more frequent use of e-cigarettes, for longer periods of time, and masks the amount of nicotine being delivered. By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction. The Duell study further concluded that JLI's

---

[98] U.S. Patent No. 9,215, 895; Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 432 (Fig. 3).

[99] Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431 (*hereinafter* "Duell Study").

[100] *Id.* at 431–34.

[101] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. TIMES (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.

[102] Duell Study at 433 (citing J. G. Willett, et al., *Recognition, use and perceptions of JUUL among youth and young adults*, TOBACCO CONTROL 054273 (2018)).

creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health."[103]

### 3. JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes.

110.    In 2014, ███████████████████████████████████████████████████████

███████████████████████████████████████[104]███████████████████████████████████████

███████████████ ████████ [105]███████████████████████████████████████████████████. From these measurements, the scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood (Cmax) and total nicotine exposure (Area Under the Curve or AUC). JLI reported the results in U.S. Patent No. 9,215,895 (the '895 patent), for which JLI applied on October 10, 2014,[106] and which was granted in December 2015. The named inventors on the patent were Adam Bowen and Chenyue Xing

111.    Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin.[107] As a comparator, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes. ████████████████

███████████████████████████████████████████████████████████████████████████

███████████████[108]███████████████████████████████████████████████████████

---

[103] *Id.* at 431.
[104] INREJUUL_00350930.
[105] *Id.*
[106] This application was a continuation of U.S. Patent Application No. 14/271,071 (filed May 6, 2014), which claimed the benefit of U.S. Provisional Patent Application Serial No. 61/820,128, (filed May 6, 2014), and U.S. Provisional Patent Application Serial No. 61/912,507 (filed December 5, 2013).
[107] U.S. Patent No. 9,215,895, at 19:63-20:4 (filed Dec. 22, 2015).
[108] INREJUUL_00024437.



112.    According to Table 1 in the patent, the Cmax (the maximum nicotine concentration in blood) for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL, which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

113.    Describing these results, JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [i.e., JLI's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette."[109] The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than

---

[109] U.S. Patent No. 9,215, 895, at 7:51-55 (filed Dec. 22, 2015) (emphasis added).

nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."[110]

114.    In other words, JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick"[111] that drives addiction and abuse, including among youth.[112] Because "nicotine yield is strongly correlated with tobacco consumption,"[113] a JUUL pod with more nicotine will strongly correlate with higher rates of consumption of JUUL pods, generating more revenue for JUUL. For example, a historic cigarette industry study that looked at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[114] In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

115.    ████████████████████████████████████████████████████████
████████████████████████████████████████[115] The Reilly study tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per 75 mL puff. By comparison, a 2014 study using larger 100 mL puffs

---

[110] *Id.* at 7:63-8:4.

[111] Internal Memo from Frank G. Colby, R.J. Reynolds, *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market* (Dec. 4, 1973).

[112] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease, A Report of the Surgeon General* at 181 (2010), https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf

[113] Martin J. Jarvis et al., *Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, 93 NT'L CANCER INST. 134 (Jan. 17, 2001), https://academic.oup.com/jnci/article/93/2/134/2906355

[114] Letter from Peggy Martin to Study Participants, *Resume of Results from Eight-Week Smoking Study*, UCSF Library, 1003285443-5443 (Sept. 10, 1971).

[115] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 NICOTINE TOBACCO RESEARCH 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584.

found that a Marlboro cigarette delivered 152-193 μg/puff.[116] Correcting to account for the different puff sizes between these two studies, this suggests that, at 75 mL/puff, a Marlboro would deliver about 114-145 μg/puff. In other words, the Reilly study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

116.    Additionally, depending on how the product is used, an e-cigarette with the 4% benzoate solution is capable of delivering doses that are materially higher ███████████████ █████  As a paper published by the European Union notes: "[A]n e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[117] With at least 59 mg/ml of nicotine in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/ml amount), a JUUL pod easily exceeds the nicotine dose of a combustible cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and other countries have considered similar regulations.[118]

117.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████[119]

---

[116] Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 TOBACCO CONTROL ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

[117] E-Cigarettes, European Comm'n, https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

[118] Charis Girvalaki et al., *Discrepancies in Reported Versus Measured Nicotine Content of E-cigarette Refill Liquids Across Nine European Countries Before and After the Implementation of the EU Tobacco Products Directive*, 55 EUR. RESPIR. J. 1900941 (2020), https://doi.org/10.1183/13993003.00941-2019.

[119] INREJUUL_00442040-INREJUUL_00442080; INREJUUL_00442064.

118.    Given the concentration of nicotine in a JUUL pod, four to five milligrams of JUUL e-liquid contains about 200-250 micrograms (µg) of nicotine. ████████████████████

████████████████████

████████████████████

████████████████████.[120] In other words, JUUL's precisely calibrated nicotine delivery system was specifically engineered to aerosolize ████████████████

████████████████████

████████████████.[121]

119.    JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists "didn't want to

---

[120] INREJUUL_00347306.
[121] *Id.*

introduce a new product with stronger addictive power."[122] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold."[123] For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]"[124] But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."[125]

120.    As another option, JLI could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine exceeding those of a cigarette on a per-puff basis. Instead, it

██████████████████████████████████████████.[126]█████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████.[127]

121.    Further warnings about the addictive power of the JUUL e-cigarette—and its appeal to youths—came ██████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████,[128] ████████████████████████████████

████████████████████████████████████████████

---

[122] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] INREJUUL_00431693.
[127] INREJUUL_00351218; INREJUUL_00351239.
[128] JLI00365905.

1  ████████████████████████████████████████████████

2  ████ [129]

3  122.  █████████████████████████████████████████

4  ██████████████████████████████████████████████████

5  ██████████████████████████████████████████████████

6  ██████████████████████████████████████████████████

7  ████████████████████████████████ [130]

8  123.  ██████████████████████████████████████████████

9  ████████████████████ [131] ███████████████████████

10  █████████████████████████████████████████████████

11  ████ [132] ███████████████████████████████████████

12  ████████████████████ "[133]

13  124.  ██████████████████████████████████████████

14  ██████████████ ███████ [134] █████████████████ [135]

15  125.  In late 2014, knowing the results ████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████ All JUUL formulations at

18  launch used the same amount of nicotine and benzoic acid as did the formulation that resulted in the

19  highest nicotine blood levels ███████████████. JUUL pods were foreseeably exceptionally

20  addictive, particularly when used by persons without prior exposure to nicotine.

[129] *Id.* (emphasis added).
[130] JLI00365709.
[131] JLI00365176.
[132] INREJUUL_00058345.
[133] *Id.*
[134] JLI00364678.
[135] JLI00364487.



**4.      JLI and the Management Defendants Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted.**

126.    The JUUL e-cigarette launched in 2015. After the launch, JLI and the Management Defendants continued to collect information about the addictiveness of JUUL. This information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness, especially among youth.

127.    For example, ████████████████████████████████████████ ███████████████████████████. He wrote:



---

128.    Another example came just days later. On ███████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████[137]

129.    Additionally, ████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████[138] This is

consistent with a central goal of the product's design: capturing "users with the first hit."[139]

130.    None of this information was a surprise, nor did it cause JLI or the Management

Defendants to change JLI's products or marketing. In fact, they embraced █████████████

██████████████████████████████████████████████████████

████████████████████████████████████[140]

131.    The following year, JLI and the Management Defendants obtained even more evidence

that the amount of nicotine in JUULpods was needlessly high. ████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████ Similarly,

██████████████████████████████████████████████████████████████

██████████████████████[142]

---

[137] INREJUUL_00230416.

[138] INREJUUL_00434580-INREJUUL_00434590.

[139] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette.

[140] INREJUUL_00228928-INREJUUL_00228930.

[141] INREJUUL_00260068.

[142] INREJUUL_00260065.

132. 

[143]

133.

[144]

134.

[145]

135.

[146]

136.

5.    **JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection.**

137.    Not only did JUUL contain high levels of nicotine that delivered a strong "buzz" from the first puff, JLI designed its product to look appealing to youth and non-smokers. In

---

[143] INREJUUL_00244200.
[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.*

1

2

3

4                                                                                                          148

5

6

7        138.    JLI's strategy to position a nicotine-delivery device as the cool thing to do is not new.

8  Decades before, Dr. Teague from R.J. Reynolds observed: "pre-smokers" face "psychological

9  pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow

10  be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance,

11  while at the same time emphasizing 'doing one's own thing.'"[149] Again, JUUL followed the cigarette

12  playbook verbatim.

13        139.    JLI knew that among its target audience, young people, cigarette smoking had become

14  increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement,

15  totally different from the image of addicted cigarette smokers huddling outside their workplaces in the

16  cold to get their nicotine fix.

17        140.    Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a

18  reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does

19  not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly,

20  allowing for concealed use. As a result, young users can, and do, use JUUL—in class or at home—

21  without detection.

22        141.    The JUUL device is also designed to be small and discrete. Fully assembled, the device

23  is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be

24  charged in a computer's USB drive. This design allows the device to be concealed in plain sight,

---

[148] INREJUUL_00057291 *et seq*.
[149] Internal RJR Memo, Claude Teague, *Research Planning Memorandum on Some Thoughts About
New Brands of Cigarettes for the Youth Market*, (Feb. 2, 1973).

camouflaged as a thumb-drive, for use in public spaces, like schools and even charged in school computers. JLI has been so successful in emulating harmless technology that its small, rectangular devices are often mistaken for—or passed off as—flash drives. According to one high school senior, "that's what people tell the teachers a lot, too, if you charge it in class, they'll just say it's my flash drive."[150].





142.    The ability to conceal a JUUL is part of the appeal for adolescents. The devices are small and slim, so they fit easily in a closed hand or a pocket. The ease and simplicity of use—there is nothing to light or unwrap, not even an on-off switch—also make it possible to covertly use a JUUL behind a turned back, which has become a trend in many schools. As a police officer told reporters,

JUUL use is "incredibly prevalent in schools," including both high schools and middle schools, and that it is hard to catch kids in the act of using JUUL because the device does not produce a large vapor cloud. As the officer explained, students will "just take a little hit or puff off them and then can hold the vapor in their mouth for a little while . . . There's minimal vapor. They'll also just blow into their sleeve or into their hoodie."[151] Finding new ways to hide the ever-concealable JUUL has spawned products designed just for that purpose, such as apparel that allows the wearer to use the device while it is concealed in the drawstring of a hoodie or the strap of a backpack.[152]

143.    Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and high-tech, which made it appealing to youth. JLI co-founder Bowen drew on his experience as a design engineer at Apple Inc. ("Apple") to make JUUL resonate with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[153] The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers. According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it."[154] A 16-year-old agreed, explaining that "the tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products. And then this is another product. And it's just another product. Until you're addicted to nicotine."[155]

---

[151] *Juuling at School*, KOMO News (2019), https://komonews.com/news/healthworks/dangerous-teen-trend-juuling-at-school.
[152] Evie Blad, *'Juuling' and Teenagers: 3 Things Principals and Teachers Need to Know*, EDUC. WK. (July 18, 2018), https://www.edweek.org/ew/articles/2018/07/18/juuling-and-teenagers-3-things-principals-and.html.
[153] *How JUUL Made Nicotine Go Viral*, VOX (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok.
[154] *Id.*
[155] *Id.*

144.     JUUL's design also included an LED light, which allowed users to active "party mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors, so that the rainbow colors are visible while the person inhales from the JUUL device. "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors permanently. Party mode on the JUUL is described by users to be "like an Easter egg in a video game" and allows for "some cool tricks that are going to drive [] friends crazy."[156] This feature was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it even more appealing and "cool" to young users.



145.     According to Dr. David Kessler, a former Commissioner of the FDA and current Professor of Pediatrics at the University of California, San Francisco, JUUL's "fundamental design appears to ease young people into using these e-cigarettes and ultimately, addiction."[157] Dr. Kessler emphasized the reduced harshness of JUUL's nicotine salt formulation, the high nicotine content,

---

[156] Jon Hos, *Getting Your Juul Into Party Mode*, VAPE DRIVE (Jul. 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode.

[157] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. TIMES (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.

discreet vapor cloud, and use of flavors as design features that appeal to youth.[158] On April 24, 2018, the FDA sent JLI a letter, based on the FDA's concern "about the popularity of JUUL products among youth" and stated that this popularity may be related to "the product design."[159] As a result, the FDA requested documents related to product design, including its "shape or form," "nicotine salt formulation" and "nicotine concentration/content," "flavors," and "features such as: appearance, or lack thereof, or plume . . . [and] USB port rechargeability."

### 6. JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation.

#### a. JLI Develops Flavored JUUL Products That Would Appeal to Youth.

146.    Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine. A 1972 Brown & Williamson memorandum: *Youth Cigarette – New Concepts*, specifically noted the "well known fact that teenagers like sweet products."[160] A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers" candy company to determine which flavors enjoyed the widest appeal among youth.[161]

147.    Altria's subsidiary U.S. Smokeless Tobacco Company (formerly called United States Tobacco Company) described the initiation of new customers through flavored products as "the graduation theory":

> New users of smokeless tobacco—attracted to the product for a variety of reasons—are most likely to begin with products that are milder tasting, more flavored, and/or easier

---

[158] *Id.*

[159] Letter from Matthew R. Holman, Director of the Office of Science at the Center for Tobacco Products, to Ziad Rouag, Vice President of Regulatory & Clinical Affairs, JUUL Labs, Inc. (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

[160] Marketing Innovations, Inc., *Brown & Williamson Tobacco Corp. Project Report: Youth Cigarette—New Concepts*, U.C.S.F. Truth Tobacco Indus. Documents (Sept. 1972), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=hzpd0040.

[161] *Flavored Tobacco FAQs*, Students Working Against Tobacco, http://swatflorida.com/uploads/fightresource/Flavored%20Tobacco%20Industry%20Quotes%20and%20Facts.pdf (citing Sedgefield Idea Sessions 790606-790607 (June 8, 1979), Bates No. 81513681/3691) (last visited Mar. 27. 2020).

to control in the mouth. After a period of time, there is a natural progression of product switching to brands that are more full-bodied, less flavored, have more concentrated "tobacco taste" than the entry brand.[162]

148.    A sales manager who worked at U.S. Tobacco in the 1980s told the Wall Street Journal that "They talked about graduation all the time—in sales meetings, memos and manuals for the college program. It was a mantra."[163]

149.    A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[164]

150.    In June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint).



151.    JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.

---

[162] G.N. Connolly, *The marketing of nicotine addiction by one oral snuff manufacturer*, 4 TOBACCO CONTROL 73-79 (1995), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1759392/pdf/v004p00073.pdf.
[163] Alix Freedman, *Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'* WALL ST. J. (Oct. 26, 1994), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=mlch0185.
[164] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. TIMES (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

 

152.     In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[165] In agreement, former FDA Commissioner Dr. Margaret Hamburg declared that "flavored cigarettes are a gateway for many children and young adults to become regular smokers."[166] A 2017 study of the cigarette flavor ban found that the ban was effective in lowering both the number of smokers and the amount smoked by smokers, though it was associated with an increased use of menthol cigarettes (the only flavor still available).[167]

153.     In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of e-cigarettes" because these products are "so appealing" to children."[168]

---

[165] Daniel J. DeNoon, *FDA Bans Flavored Cigarettes: Ban Includes Cigarettes With Clove, Candy, and Fruit Flavors*, WebMD (Sept. 22, 2009), https://www.webmd.com/smoking-cessation/news/20090922/fda-bans-flavored-cigarettes#2.

[166] *Id.*

[167] Charles J. Courtemanche et al., *Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use*, AM. J. OF PREVENTIVE MED. 52(5):e139 - e146 (May 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5401634/pdf/nihms842675.pdf; M.B. Harrell et al., *Flavored e-cigarette use: Characterizing youth, young adult, and adult users*, 5 PREV. MED REP. 33–40 (Nov. 11, 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5121224/pdf/main.pdf.

[168] U.S. Food & Drug Admin*., FDA Finalizes Enforcement Policy on Unauthorized Flavored Cartridge-Based E-cigarettes that Appeal to Children, Including Mint* (Jan. 22, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

154.    The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors. According to the Surgeon General, 85% of adolescents who use e-cigarettes use flavored varieties.[169] Studies also show that flavors motivate e-cigarette initiation among youth,[170] and that youth are much more likely to use flavored tobacco products than adults are.[171] Flavored e-cigarettes play a large role in the youth vaping epidemic. As mentioned above, flavors motivate e-cigarette initiation among youth and youth are much more likely to use flavored tobacco products than adults.[172] According to the FDA, 96% of twelve to seventeen-year-olds who recently begun using e-cigarettes reported using a flavored e-cigarette the first time they tried the product.[173] Flavors work to attract youth. A survey of teenagers between the ages of thirteen to seventeen from 2014-2015 showed that this age group was six times more interested in trying e-cigarettes in fruity flavors than they were in trying e-cigarettes with only tobacco flavor.[174]

155.    Research confirms that flavored products—no matter what the tobacco product—appeal to youth and young adults. According to the *2012 Surgeon General Report*, "Much of the growing popularity of small cigars and smokeless tobacco is among younger adult consumers (aged <30 years)

---

[169] *E-Cigarette Use Among Youth and Young Adults*, U.S. Dep't of Health & Human Servs. (2016), https://www.ctclearinghouse.org/Customer-Content/www/topics/2444-E-Cigarette-Use-Among-Youth-And-Young-Adults.pdf (last visited Mar. 27, 2020).

[170] Karl Paul, *Flavored Vapes Lure Teens Into Smoking and Nicotine Addiction, Study Shows*, MARKETWATCH (Feb. 26, 2019), https://www.marketwatch.com/story/flavored-vapes-lure-teens-into-smoking-and-nicotine-addiction-study-shows-2019-02-25.

[171] A.C. Villanti et al., *Flavored Tobacco Product Use in Youth and Adults: Findings From the First Wave of the PATH Study*, 53 AM. J. OF PREVENTATIVE MED. 139 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28318902.

[172] *See E-Cigarette Use Among Youth and Young Adults*, *supra* note 169; Paul, *supra* note 170; Villanti, *supra* note 171.

[173] *Modifications to Compliance Policy for Certain Deemed Tobacco Products*, FDA (Mar. 2019), https://www.fda.gov/media/121384/download.

[174] J.K. Pepper et al., *Adolescents' interest in trying flavored e-cigarettes*, 25 TOBACCO CONTROL ii62 (Sept. 15, 2016), https://tobaccocontrol.bmj.com/content/25/Suppl_2/ii62.

and appears to be linked to the marketing of flavored tobacco products that, like cigarettes, might be expected to be attractive to youth."[175]

156.     A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[176]

157.     Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction, especially among minors, by making it easier and more pleasant to ingest nicotine.[177] Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

158.     In a recent study, 74% of youth surveyed indicated that their first use of a JUUL was of a flavored JUUL pod.[178]

159.     Research shows that when youth see advertisements for flavored e-cigarettes, they believe the advertisements and products are intended for them.[179]

---

[175] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* ("*2012 Surgeon General Report*") at 539, U.S. Dep't Health & Human Servs. (2012), https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf.

[176] *See* Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 JAMA 1871 (2015). Another peer-reviewed study concluded that young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their peers who have not used e-cigarettes. *See* Brian A. Primack, et al. *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, 131 AM. J. MED. 443.e1 (2018).

[177] *See* U.S. Dep't of Health & Human Servs., *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Chapter 4 (Centers for Disease Control and Prevention ed. 2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/ #ch4.s92.

[178] Karma McKelvey et al., *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA NETWORK OPEN e183535 (2018), https://doi:10.1001/jamanetworkopen.2018.3535.

[179] D.C. Petrescu, et al., *What is the Impact of E-Cigarette Adverts on Children's Perceptions of Tobacco Smoking? An Experimental Study*, 26 TOBACCO CONTROL 421 (2016); Julia C. Chen-Sankey et al., *Perceived Ease of Flavored E-Cigarette Use and E-Cigarette Use Progression Among Youth Never Tobacco Users*, 14 PLOS ONE 1 (2019).

160.     Flavors like mint and menthol are attractive to youth. According to Robin Koval, CEO and president of Truth Initiative, mint and menthol are among the most popular flavors for youth and that "[w]e also know, as does the tobacco industry, that menthol has been and continues to be the starter flavor of choice for young cigarette users."[180] According to the FDA, "younger populations have the highest rate of smoking menthol cigarettes" and "menthol in cigarettes is likely associated with increased initiation and progression to regular [] cigarette smoking."[181]

161.     A significant majority of under-age users chose flavored e-cigarette products.[182] By at least ███████████████████████████████████████████████████████████████████.[183] Instead of taking corrective action or withdrawing the kid friendly flavors, JLI capitalized on their popularity with kids and continued to promote JUUL's flavors. In a social media post from August 2017, for example, JLI tweeted "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste."[184] In another August 2017 tweet, JLI compared JUUL to dessert: "Do you brulée? RT [re-tweet] if you enjoy dessert without the spoon with our Creme Brulee #JUULpods."[185]

---

[180] *Id.*

[181] *Preliminary Scientific Evaluation of the Possible Public Health Effects of Menthol Versus Nonmenthol Cigarettes* at 5, FDA, https://www.fda.gov/media/86497/download (last visited Mar. 28, 2020).

[182] Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States*, 322 JAMA 2095 (2019), https://tinyurl.com/y3g75gmg ("Among current exclusive e-cigarette users, an estimated 72.2% . . . of high school students and 59.2% . . . of middle school students used flavored e-cigarettes. . . .").

[183] *See* INREJLI_00265068 ████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████).

[184] JUUL Labs, Inc. (@JUULvapor), Twitter (Aug. 4, 2017), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_39.jpg.

[185] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.



162.    JLI asserts that it did not intend its flavors to appeal to underage consumers. After eleven Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Richard Durbin.[186] JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

163.    A former JUUL manager, who spoke to The New York Times on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use— sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the

---

[186] Lorraine Woellert & Sarah Owermohle, *Juul Tries to Make Friends in Washington as Regulators Circle,* POLITICO (Dec. 28, 2018), https://www.politico.com/story/2018/12/08/juul-lobbying-washington-1052219.

former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[187]

164.    By positioning JUUL pods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUUL pods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

### b.    Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market.

165.    While JLI and the Management Defendants were developing and marketing their flavored products to appeal to and recruit youth customers, Altria, recognizing the value of those young "replacement smokers" committed itself to the cause. With the shared goal to grow the number of nicotine-addicted users, including youth in particular, and as detailed further herein, JLI, the Management Defendants, and Altria set out to do whatever was necessary to create and preserve the lucrative market for flavors. In order to maximize the value of its mint line of JUULpods, JLI, with the support of the Management Defendants, chemically and socially engineered its mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

166.    In July 2013, Reynolds American Inc.[188] released the Vuse, the first-known cartridge-based nicotine salt e-cigarette to reach the domestic market.[189] Altria entered the nicotine salt market one month later, with the MarkTen cig-a-like.[190] JLI would enter the market in June 2015.

---

[187] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. TIMES (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[188] Reynolds is now a wholly owned subsidiary of British American Tobacco.
[189] See FAQs, RJR Vapor Co., LLC, http://www.vusevapor.com/faqs/product/ ("Since Vuse's launch in 2013, all of our closed systems available for sale nationally (i.e., Vuse Solo, Vuse Ciro, Vuse Vibe, and Vuse Alto) include nicotine salts.").
[190] Additional Info, Nu Mark LLC, https://markten.com ("certain varieties" of MarkTen Original "contain … acetic acid, benzoic acid, and lactic acid.").

167.    Though mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories,[191] Reynolds, Altria and JLI had all introduced mint-flavored products within a year of each company's initial release. By mid-2014, Reynolds had added "Mint, Rich Mint, Spearmint, [and] Wintergreen" to its Vuse lineup.[192] By February 2015, Altria's Nu Mark LLC, under the leadership of Joe Murillo (JLI's current regulatory head), released a Winter Mint flavor for MarkTen.

168.    Unlike Reynolds and Altria, which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUULpods.

169.    JLI's flavored JUULpods were particularly popular with its underage users and, when mango was introduced, it was the underage user's flavor of choice.

170.    JLI, the Management Defendants, and Altria recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors. So, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape regulation and preserve JLI's astronomical sales figures.

(i)    **JLI Manipulates Chemistry of Mint JUUL Pods.**

171.    One recent study found that JLI's mango had the lowest free-base content, making it the least harsh formula; and that mint had the highest free-base content (30% more free-base than mango), making mint the formula with the strongest nicotine impact:[193]

---

[191] *See* M.B. Harrell et al., *Flavored e-cigarette use: Characterizing youth, young adult, and adult users*, 5 PREVENTIVE MEDICINE REPS. 33-40, § 3.3 (Mar. 2017), https://www.sciencedirect.com/science/article/pii/S2211335516301346.

[192] *See* Sen. Richard Durbin, et al., *Gateway to Addiction?* (April 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

[193] See Duell AK, et al. *Nicotine in tobacco product aerosols: "It's déjà vu all over Again*," 5 TOBACCO CONTROL (Dec. 17, 2019), https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/12/16/tobaccocontrol-2019-055275.full.pdf.

**Anna K. Duell et al., Nicotine in tobacco product aerosols: 'It's déjà vu all over again'**



| | $C_{Nic}/C_{Nic}$ | $\alpha_{fb}$ |
|---|---|---|
| Benzoic acid | | |
| JUUL 'Cool Mint' (5% nicotine) | 0.97* | 0.13 |
| JUUL 'Classic Menthol' (5% nicotine) | 0.98* | 0.13 |
| JUUL 'Crème Brûlée' (5% nicotine) | 0.97* | 0.12 |
| JUUL 'Fruit Medley' (5% nicotine) | 0.99* | 0.12 |
| JUUL 'Cool Cucumber' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Classic Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Virginia Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL "Mango" (5% nicotine) | 0.99* | 0.09 |
| JUUL "Virginia Tobacco" (3% nicotine) | 0.94* | 0.14 |
| JUUL 'Mint' (3% nicotine) | 1.04* | 0.11 |
| Averages for JUUL | 0.99±0.03 SD | 0.12±0.01 |

172.    These findings evidence JLI, the Management Defendants, and the Altria Defendants' plan to make the flavor whose lifespan they were working hard to preserve the most potent when it got into the hands of nonsmokers, including youth.

> **(ii)    JLI's Youth Surveillance Programs Confirmed that Mint JUUL Pods are Preferred by Teens.**

173.    In January 2018, Kevin Burns, JLI's new CEO, deployed his experience as the former CEO of a yogurt company to begin developing JUUL's flavor portfolio.

174.    One part of this initiative included studying reactions to flavor names. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.[194]

175.    In April 2018, JLI received a document request from the FDA on April 24, 2018, seeking information about the design and marketing of JLI's products, among other things.[195]

176.    In response, JLI announced a commitment of $30 million to youth prevention efforts and began sending JLI representatives to schools to present what were essentially advertising

---

[194] INREJUUL_00053172.

[195] Matthew Holman, U.S. Food & Drug Admin., to Ziad Rouag, Juul Labs, Inc., *Letter from Director of Office of Science, Center for Tobacco Products* (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

campaigns for JUUL products. This conduct resulted in a Warning Letter from the FDA's Center for Tobacco Products to JLI in September 2019.[196]

177. ███████████████████████████████████████

████████████████████[197]█████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

178. ███████████████████████████████████████

████████████████[198]█████████████████████████

███████████████████████████████████████[199]

179. ███████████████████████████████████████

██████████████████████████████████████████

████████[200]██████████████████[201]

180. ███████████████████████████████████████

████████████████████████████████████████████

██████[202]

181.   In other words, █████████████████████████████

████████████████████████████████████████████████

█████████████████████ This is unsurprising, as the "Mint" flavor was designed not to taste like

---

[196] Letter from U.S. Food & Drug Admin. to Kevin Burns, CEO of Juul Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.
[197] INREJUUL_00121627 ████████████); INREJUUL_00124965 (████).
[198] *Id.*
[199] INREJUUL_00035325.
[200] INREJUUL_00124965.
[201] *Id.*
[202] INREJUUL_00035325.

a Menthol cigarette. Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport"

cigarette that "doesn't have that good peppermint taste like [C]ool [M]int."[203]

182. ████████████████████████████████████████████████████████

████████████████████████████████████████ According to Siddharth Breja, who was

senior vice president for global finance at JLI, after JLI pulled most flavored pods, including mango,

from the market in a purported attempt to reduce youth usage of JUUL, then-CEO Kevin Burns said

that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[204]

183. And it was public knowledge that mint and menthol have a well-documented history of

facilitating youth tobacco use, as Dr. Jonathan Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From
> candy canes to toothpaste, children are introduced to mint flavor from a young age. Not
> only do children enjoy mint, but it has special properties that make it an especially
> dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the
> harshness of nicotine, and make it easier for children to start using and continue using
> tobacco products. The impact of mint and menthol flavors on increasing youth tobacco
> addiction is well documented.[205]

184. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

---

[203] Reddit, *How does Classic Menthol compare to Cool Mint*,
https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_cool_mi
nt/.

[204] Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. TIMES (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html.

[205] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. 3 (2019) (statement of Jonathan P. Winickoff, American Academy of Pediatrics),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20
AAP%20Testimony.pdf.

185.    With that knowledge and with no genuine interest in youth prevention, and as detailed below, JLI, the Management Defendants, and Altria committed to work to preserve mint as a flavor for as long as possible. Indeed, to further this goal, Defendants Pritzker and Valani poured additional money into JLI a mere two months later as part of a $600 million funding round.[206]

186.    By keeping mint on the market long after other flavors were pulled, these Defendants continued to expand the number of addicted e-cigarette users, including youth in particular.

**D.    Defendants Developed and Implemented a Marketing Scheme to Mislead the Public, Including Youth, into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe.**

187.    Having created a product designed to hook users to its nicotine, JLI had to mislead consumers, including youth in particular, into believing JUUL was something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL poses. Defendants devised and knowingly carried out a material scheme to defraud and addict consumers, including youth in particular, by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products, (b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party-groups to spread false and misleading narratives about e-cigarettes, and JUUL in particular.

**1.    The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.**

188.    As part of their strategy to market to youth and nonsmokers, JLI and the Management Defendants also did not effectively inform users that JUUL products contain nicotine. ███████ ██████████████████████████████████████████████████ JLI did not include nicotine warnings until forced to do so in August 2018.[207]

---

[206] Alex Wilheim & Jason D. Rowley, *JUUL Raises $650M Of Its $1.25B Mega-Round,* CRUNCHBASE (Jul. 10, 2018), https://news.crunchbase.com/news/juul-raises-650m-of-its-1-25b-mega-round/.
[207] *See* INREJUUL_00444332 (█████████████████████████████████████████████████████████████, *see e.g.,*

189.    Moreover, many of JUUL's advertisements, particularly prior to November 2017, also did not mention that JUUL contained nicotine. In the first year after JUUL's launch, not one of JLI's 171 promotional emails said anything about the nicotine content in JUUL products.[208] For example, in a July 11, 2015 email, JLI advertised its promotional events with the text, "Music, Art, & JUUL. What could be better? Stop by and be gifted a free starter kit."[209] This email did not mention that JUULpods contain nicotine, nor did it say that JUUL or the free starter kits were intended for adults only.

190.    Similarly, none of JLI's 2,691 tweets between June 2015 and October 6, 2017 mentioned that JUUL contained nicotine.[210] For example:

a.    On August 7, 2015, JLI tweeted, "Need tix for @cinespia 8/15? We got you. Follow us and tweet #JUULallnight and our faves will get a pair of tix!"[211] This tweet did not mention that JUUL contained nicotine.

b.    On July 28, 2017, JLI tweeted an image of a Mango JUULpod next to mangos captioned "#ICYMI: Mango is now in Auto-ship! Get the #JUULpod flavor you love delivered & save 15%. Sign up today."[212] This tweet did not mention that JUUL contained nicotine.

c.    On August 4, 2017, JLI tweeted "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste," captioned "A new month means you can stock up on as many as 15 #JUULpod packs. Shop now."[213] This tweet did not mention that JUUL contained nicotine.

---

INREJUUL  00021583-586 at 583 ██████████████████████████████ ███████████ ).

[20]   Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 25 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[209]  *Check out our JUUL events this Summer*, JUUL (hello@juulvapor.com) (July 11, 2015), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/email/large/email_2.jpg.

[210]  Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 25 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[211]  JUUL Labs, Inc. (@JUULvapor), Twitter (Aug. 7, 2015), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_18.jpg.

[212]  JUUL Labs, Inc. (@JUULvapor), Twitter (July 28, 2017), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_38.jpg.

[213]  JUUL Labs, Inc. (@JUULvapor), Twitter (Aug. 4, 2017), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_39.jpg.

d.     On August 28, 2017, JLI tweeted "Do you brulée? RT [re-tweet] if you enjoy dessert without the spoon with our Creme Brulee #JUULpods."[214] This tweet did not mention that JUUL contained nicotine.

191.    Even after Defendants added a nicotine warning to JUUL products, they continued to mislead youth and the public about the amount of nictoine in a JUULpod. Every 5% strength JUUL pod package represents that one pod is equivalent to one pack of cigarettes. This statement is deceptive, false and misleading. ███████████████████████████████

███████████████████████████████████████████████████████████████."[215]

192.    In addition, and as JLI and the Management Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain 10–15 mg of nicotine per cigarette[216] and each cigarette yields between 1.0 to 1.4 mg of nicotine,[217] meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, have been found to deliver at least 82% of the nicotine contained in a JUUL pod to the user.[218] ████████████████████████████████

█████.[219]

---

[214] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.
[215] INREJUUL_00279931.
[216] Neal L Benowitz & Jack E Henningfield, *Reducing the nicotine content to make cigarettes less addictive*, 22 TOBACCO CONTROL Supp. 1, i14-17 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3632983/.
[217] Lynn T. Kozlowski & Janine L. Pilliteri, *Compensation for Nicotine by Smokers of Lower Yield Cigarettes*, 7 SMOKING AND TOBACCO CONTROL MONOGRAPH 161, 164 (1983), https://cancercontrol.cancer.gov/brp/tcrb/monographs/7/m7_12.pdf.
[218] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 NICOTINE TOBACCO RESEARCH 1274 (2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584 (about 82%, for averages of 164 µg per puff).
[219] See, e.g., INREJUUL_00023597 ██████████████████████████████ ██.

1    193.   Defendants also knew that the use of benzoic acid and nicotine salts in JUUL pods

2  affects pH and facilitates "absorption of nicotine across biological membranes."[220] JUUL's e-liquid

3  formulation is highly addictive not only because it contains a high concentration of nicotine, but

4  because it contains a particularly potent form of nicotine, i.e., nicotine salts. ████████████████

5  ██████████████████████████████████████████████████████████████████████████

6  ████████████████████████████

7  ██████████████████"[221] And the Altria Defendants were aware of the research showing the potency

8  of nicotine salts from their many years in the tobacco business.

9    194.   JLI and Defendant Bowen, ████████████████████████████████████████

10  ████████████████████████████████ sought to engineer test results that differed from

11  those results and were more consistent with JLI's deceptive messaging. ████████████████

12  ████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████████████

16  ████████████████████████████[222] ████████████████████████████████████

17  ██████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████████████████████

19  ████████████████   As Defendants JLI and Bowen knew, this difference is critical. ████████

20  ██████████████████████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████[223]███████████████

23  ██████████████████████████████████████████████████████████

24  ████████████████████████████████[224]

25

[220] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 HANDB.
   EXP. PHARMACOL. 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/
[221] INREJUUL_00278408.
[222] INREJUUL_00014159-INREJUUL_00014226.
[223] INREJUUL_00002526-INREJUUL_00002625.
[224] *Id*.

195.   ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████.[225]

196.   ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████████████████.[226]

197.   ███████████████████████████

███████████████.[227]   ███████████████████████

███████████████████████████████

198.   JLI and the Management Defendants knew that ███████████████████

████████████████████████████████████

████████████████████████████████████████ to market

JUUL as providing a nicotine experience on par with a cigarette, even though they designed JUUL to

ensure that was not true. In reality, there were never any measured test results in accord with JLI's

marketing to distributors, retailers, and the public at large.

199.   In the United States, the unsupported extrapolations from what ████████████████

████████ were used to create charts, which JLI posted on its website, shared with journalists, sent to

retailers, and distributed to third party promoters, showing that JUUL's 5% solution achieved a pk

[225] *Id.*
[226] INREJUUL_00351717-INREJUUL_00351719.
[227] *Id.*

profile just below that of a cigarette. For example, the following chart appeared on the online

publication TechCrunch:[228]



200. 

[229]                                                    [230]

[228] Ryan Lawler, *Vaporization Startup Pax Labs Introduces Juul, Its Next-Gen-E-Cigarette*, TECH CRUNCH (Apr. 21, 2015), https://techcrunch.com/2015/04/21/pax-juul/.
[229] *See* JLI00363360.
[230] INREJUUL_00448896.

1

2

3

4

5

6

7

8

9

10

11

[REDACTED]

12    201.    These misrepresentations to the public were not accidental, nor were they the work of a

13    rogue employee. [REDACTED]

14    [REDACTED]

15    [REDACTED]

16    [REDACTED] "231 [REDACTED]

17    [REDACTED]

18    [REDACTED]

19    [REDACTED] Thus, Defendants Bowen, Monsees, Pritzker,

20    and Valani were privy to both [REDACTED]. And they *knew* that the data JLI (then

21    Ploom) was pushing on the public was false and misleading, but none made any efforts to correct or

22    withdraw those false and misleading statements. Aside from submitting the testing protocol and [REDACTED]

23    [REDACTED] with the '895 patent, JLI, Bowen, Monsees, Prtizker, and Valani otherwise

24    ignored the [REDACTED] and omitted it from public discussion of JUUL's nicotine delivery.

25

26

27

28

---

231 INREJUUL_00016443-INREJUUL_00016507.

2.     **JLI, the Management Defendants, and Altria Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Were False and Misleading.**

202.     As set forth above, the statements in JLI advertisements and on JUUL pod packaging that each JUUL pod contains about as much nicotine as a pack of cigarettes are deceptive, false and misleading. Defendants knew this.

203.     JLI and the Management Defendants caused deceptive, false and misleading statements that a JUUL pod had an equivalent amount of nicotine as one pack of cigarettes to be distributed via the wires and mails. These Defendants have thus materially misrepresented the nicotine content of JUUL products to the consuming public including Plaintiffs, through acts of mail and wire fraud.

204.     By no later than October 30, 2016 (and likely earlier), the JLI Website—which, as discussed above, the Management Defendants on JLI's Board of Directors reviewed and approved—advertised that "[e]ach JUULpod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs."[232] The language on the website would later change, but still maintained the same fraudulent misrepresentation—i.e., that "[e]ach 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery."[233]

205.     As noted above, JLI and the Management Defendants directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUUL pods and deceptive, misleading and fraudulent statements regarding JUUL's nicotine content. And although they knew that these statements, which they caused to be transmitted over the wires and mails, were untrue, JLI and the Management Defendants have made no effort to retract such statements or correct their lies.

---

[232] JUULpod, JUUL Labs, Inc. (Oct. 30, 2016),
https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/.
[233] What is Vaping?, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/What-is-Vaping-How-to-Vape.

206.   In addition to approving the JLI website, knowing that it contained deceptive, misleading and false statements, JLI (through its employees) and the Management Defendants also were directly responsible for the interstate transport, *via* U.S. mail, of JUULpod packaging contained misrepresentations and omissions. ███████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████[234]

207.   JUUL pod packages that were sent *via* U.S. mail stated that a single JUUL pod is "approximately equivalent to about 1 pack of cigarettes."[235] These statements, as well as the statements on the JLI website, are false and misleading.

208.   The statement on the JLI website, and in its advertisements and packaging, that each JUUL pod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is false and likely to deceive and mislead, because the actual amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes.

209.   The Altria Defendants greatly expanded the reach of this fraud by providing their retail and distribution might for JLI products, causing millions of JUUL pods to be sent via U.S. mail with packaging stating that JUUL pods contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[236] JLI, the Management Defendants, and the Altria Defendants knew that these statements were false and misleading, but nevertheless utilized JUUL product packing, marketing and advertising to maintain their fraud.

210.   The Altria Defendants knew in 2017 that a JUUL pod delivered more nicotine than one pack of cigarettes. In 2017, the Altria Defendants launched its MarkTen Bold e-cigarette, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially

---

[234] INREJUUL_00278408.
[235] Juul Labs, Inc., Twitter, (Feb. 14, 2018),
  https://twitter.com/JUULvapor/status/963844069519773698.
[236] *Id.*

offered. Even though JUUL was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, the Altria Defendants chose to bring a less potent 4% formulation to market.

211.     According to the Altria Defendants own pharmacokinetic testing as reflected in the chart below, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, the Altria Defendants' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.



**Figure 2: Presented at Altria Group Inc.'s November 1, 2017 Investor Day Presentation.
MarkTen Bold 4%**

212.     Based on its own internal knowledge, the Altria Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data they received from JLI, the Altria Defendants' due diligence undoubtedly included a careful examination of JLI's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

213.     Thus, JLI, the Management Defendants, and the Altria Defendants knew that the statement on JUUL pod packaging that each JUUL pod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead users, including youth. Neither the Altria Defendants nor JLI or the Management Defendants have made any

effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL pods. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving consumers.

214.    From JUUL's pre-release announcements to this day, JLI has continuously represented that each pod is approximately equivalent to a pack of cigarettes. These claims, which JLI repeats widely in advertisements, press releases, and its website, have been distributed *via* the wires and mails and disseminated by reputable and widely reliable sources that accepted those representations as true.[237]

215.    Moreover, the form of nicotine JUUL pods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume,[238] leading users to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUUL pods in fact contain approximately the same nicotine as a solution that is 6% nicotine by volume.

216.    The "5% strength" statement in Defendants' advertisements misrepresents the most material feature of the JUUL product—the nicotine content—and has misled young people to their detriment. Resellers, apparently assuming that "5% strength" means "50mg/ml" nicotine by volume,

---

[237] *See* Truth Initiative, *6 Important Facts about Juul*, https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul; Erin Brodwin, *An e-cigarette with twice the nicotine of comparable devices is taking over High Schools – and scientists are sounding the alarm,* BUSINESS INSIDER (Apr. 30, 2018), https://www.businessinsider.com/juul-e-cig-vaping-health-effects-2018-3*;* Caroline Kee, *Everything you need to know about the JUUL, including the health effects,* BUZZFEED NEWS (Feb. 5, 2018), https://www.buzzfeednews.com/article/carolinekee/juul-ecigarette-vape-health-effects; Jan Hoffman, *The Price of Cool: A teenager, a juul and nicotine addiction,* NEW YORK TIMES, (November 16, 2018), https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html; Sarah Milov, *Like the tobacco industry, e-cigarette manufacturers are targeting children,* THE WASHINGTON POST, (Sept. 23, 2018) https://www.washingtonpost.com/outlook/2018/09/23/like-tobacco-industry-e-cigarette-manufacturers-are-targeting-children/; Washington State Dep't of Health, *What are vapor products?,* https://www.doh.wa.gov/YouandYourFamily/Tobacco/VaporProducts.

[238] See, e.g., American E-Liquids Manufacturing Standards Association, *E-Liquids Manufacturing Standards*, § 1.05 (2017), https://www.aemsa.org/wp-content/uploads/2017/03/AEMSA-Standards-v2.3.3.pdf, (quantifying e-liquid nicotine content in terms of volume).

compound confusion among young people by stating that JUUL pods contain "50 mg/ml," which they do not.[239]

217.    If JLI and the Management Defendants did not know when JLI released JUUL pods that the "5% strength" representation in Defendants' advertisements was misleading, they learned that there was widespread confusion about the JUUL pods' nicotine content. By 2017, studies revealed that users did not understand "5% strength," and some understood that phrase to mean 5% of a cigarette. ███████ ██████████████████████████████████████,[240] JLI and the Management Defendants (and later the Altria Defendants) did nothing to stop or correct this confusion about the nicotine content.

218.    The "5% strength" statement in Defendants' advertisements is also misleading. At least two independent studies testing multiple varieties of JUUL pods have likewise found significantly higher concentrations of nicotine than the 59 mg/mL JUUL's website represents, suggesting that the difference in the total nicotine content of a JUUL pod vs. a pack of combustible cigarettes could be even greater.[241]

### 3.    Defendants Used Food and Coffee Themes to Give the False Impression that JUUL Products Were Safe and Healthy.

219.    In late 2015, JLI and the Management Defendants employed a deceptive marketing scheme to downplay the harms of e-cigarettes with a food-based advertising campaign called "Save

---

[239] See, e.g. Tracy Vapors, Starter Kit, http://web.archive.org/web/20190422143424/https://www.tracyvapors.com/collections/starter-kit; Lindsey Fox, *JUUL Vapor Review, E-cigarette Reviewed,* (Mar. 20, 2017), https://ecigarettereviewed.com/juul-review ("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); Jason Artman, *JUUL E-Cigarette Review*, eCig One (Oct. 26, 2016) https://ecigone.com/e¬cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); West Coast Vape Supply, Juul Starter Kit (July 18, 2019), http://web.archive.org/web/20190718190102/https://westcoastvapesupply.com/products/juul-starter-kit ("5% . . . 50 mg"); Vapor4Life, *How Much Nicotine is In a JUUL?* (Aug. 24, 2018), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/ ("Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter.").

[240] INREJUUL_00123540.

[241] *See* J.F. Pankow et al., *Benzene formation in electronic cigarettes*, 12 PLoS ONE 1 (2017); *see also* Anna K. Duell, et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 431-34 (2018).

Room for JUUL." The campaign framed JUUL's addictive pods as "flavors" to be paired with foods.[242] JLI described its Crème Brûlée nicotine pods as "the perfect evening treat" that would allow users to "indulge in dessert without the spoon."[243] In one 2016 email, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."[244] JLI similarly promoted the fruit medley pods using images of ripe berries.[245] JLI described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint."[246]






---

[242] Erin Brodwin, *$15 billion startup JUUL used 'relaxation, freedom, and sex appeal' to market its crème-brulee-flavored e-cigs on Twitter and Instagram—but its success has come at a big cost*, BUSINESS INSIDER (Oct. 26, 2018), https://www.businessinsider.com/juul-e-cig-marketing-youtube-twitter-instagram-social-media-advertising-study-2018-10.

[243] Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/flavors/large/flavor_3.jpg.

[244] Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/flavors/large/flavor_34.jpg.

[245] Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/flavors/large/flavor_6.jpg.

[246] Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/flavors/large/flavor_15.jpg.



220.   Again, none of these advertisements disclosed that JUUL was addictive and unsafe.

221.   In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.[247] JLI's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.

222.   JLI's reference to coffee is no mere marketing gimmick, it reflects the larger effort to mislead customers, including young people in particular, into believing that JUUL is no more harmful than coffee, reinforcing the false and dangerous concept that if a substance is "not harmful," then addiction to that substance cannot be harmful.

---

[247]   Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st659.php&token1=fm _pods_img36083.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Ins tagram.

















223.    Defendants knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

### 4.    JLI's "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device.

224.    JLI, the Altria Defendants, and the Management Defendants recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus JLI's staggering market share), was to mislead potential customers about the true nature of JUUL products. Defendants knew that if it became public that JUUL was designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash. Therefore, JLI (with the knowledge and support of the Management Defendants) and the Altria Defendants repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device, and falsely and misleadingly used the mails and wires to spread the subterfuge. JLI, the Management Defendants, and the Altria Defendants committed these deceptive, misleading and fraudulent acts intentionally and knowingly. In making these representations, JLI, the Management Defendants, and the Altria Defendants intended that consumers, the public, and regulators rely on misrepresentations that JUUL products were designed to assist smoking cessation.

225.    The most blatant evidence of the cover-up scheme was the January 2019, $10 million "*Make the Switch*" television advertising campaign. This campaign, which was a continuation of JLI's

web-based Switch campaign, was announced less than a month after the Altria Defendants announced Altria's investment in JLI.

226.    The "*Make the Switch*" television ads featured former smokers aged 37 to 54 discussing "how JUUL helped them quit smoking."[248] According to JLI's Vice President of Marketing, the "*Make the Switch*" campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company."[249]

227.    These statements were false as JUUL was not intended to be a smoking cessation device.

228.    JLI and the Management Defendants committed acts of wire fraud when they caused the "Make the Switch" campaign to air on television with the fraudulent intent of deceiving and misleading the public, the United States Congress, and government regulators into believing that JLI is and had been focused solely on targeting adult smokers. The Altria Defendants also committed acts of mail fraud when they caused tens of thousands, if not millions, of written versions of the *Make the Switch* campaign to be distributed with packages of Altria's combustible cigarettes.

229.    The "*Make the Switch*" campaign was fraudulent and was made to protect, maintain, and expand the tremendous market share gained by hooking kids on nicotine by convincing regulators and the public that JUUL was only ever intended as an alternative to smoking for existing adult smokers and JLI's marketing was never aimed at youth.

230.    Defendants continually sought to frame JUUL products as smoking cessation devices in their public statements and on their website. Defendant Monsees explained during his testimony before Congress:

---

[248] Angelica LaVito, *JLI combats criticism with new TV ad campaign featuring adult smokers who quit after switching to e-cigarettes*, CNBC (Jan. 8, 2019), https://www.cnbc.com/2019/01/07/juul-highlights-smokers-switching-to-e-cigarettes-in-ad-campaign.html.
[249] *Id.*

*The history of cessations products have extremely low efficacy. That is the problem we are trying to solve here.* So, if we can give consumers an alternative and market it right next to other cigarettes, then we can actually make something work.

[T]raditional nicotine replacement therapies, which are generally regarded as the gold standard for tools, right, for quitting, those are nicotine in a patch or a gum form, typically, and the efficacy rates on those hover just below about a 10 percent or so. JUUL-we ran a very large study of JUUL consumers, ex-smokers who had picked up JUUL, and looked at them, looked at their usage on a longitudinal basis, which is usually the way that we want to look at this, in a sophisticated fashion ... what we found was that after 90 days, 54 percent of those smokers had stopped smoking completely, for a minimum of 30 days already. And the most interesting part of this study is that if you follow it out further, to 180 days, that number continues to go up dramatically, and that is quite the opposite of what happens with traditional nicotine replacement therapies.[250]

231.    In response to a direct question about whether people buy JUUL to stop smoking, Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[251]

232.    Other illustrative and non-exhaustive examples include the following:

**Statements by Defendant JLI:**[252]

- "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by **eliminating cigarettes**. We envision a world where fewer adults use cigarettes, and **where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely**, should they so desire." (JLI Website, April 2018 (or earlier));[253]

- "JUUL Labs, which exists to **help adult smokers switch** off of combustible cigarettes." (JLI Website, September 19, 2019);[254] and,

---

[250] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii.

[251] *Id.*

[252] Although these statements are attributed to Defendant JLI, JLI's Board of Directors had ███████████████, accordingly, Defendants Bowen, Monsees, Pritzker, Huh, and Valani are each directly responsible for the transmission of these fraudulent statements.

[253] *Our Mission*, JUUL Labs, Inc. (2019), https://www.juul.com/mission-values.

[254] CONSUMER UPDATE: 9/19, JUUL Labs, Inc. (Sept. 19, 2019), https://newsroom.juul.com/consumer-update-9-19/.

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018).[255]

**Statements by the Altria Defendants:**

- "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, **a world leader in switching adult smokers** . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Altria Website, December 20, 2018);[256]

- "We believe e-vapor products present an **important opportunity to adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18);[257]

- "We have long said that **providing adult smokers with superior, satisfying products with the potential to reduce harm** is the best way to achieve tobacco harm reduction. **Through Juul**, we are making the biggest investment in our history toward that goal." (Altria Press Release, Dec. 20, 2018);[258]

- "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also **support and even accelerate transition to noncombustible alternative products by adult smokers**." (Altria Earning Call, January 31, 2019);[259] and,

- We expect the **JUUL product features that have driven JUUL's success in switching adult smokers in the U.S.** to strongly appeal to international adult cigarette smokers. (Altria Earning Call, January 31, 2019).[260]

---

[255] JLI Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of then-CEO Kevin Burns).

[256] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BUSINESSWIRE (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate

[257] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, at 2 (Oct. 25, 2018).

[258] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, (Dec. 20. 2018), BUSINESS WIRE, https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[259] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018, (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.

[260] *Id.*

233.    Defendants knew at the time of making these statements that they were false, deceptive and misleading. JUUL does not have FDA approval as a cessation product.

234.    The *Switch* advertisements reinforced the impression left by the testimony of JLI's co-founder, clearly linking JUUL to cessation and quitting. For example:



235.    Representative Rashida Tlaib, upon presenting this ad to Monsees, had the following exchange:

**Rep. Tlaib:** After 30 lines, starting with "quit," the ad says "switch," followed by no further mentions of start smoking again. You were a smoker. Does this ad give a smoker hope that there might be a way to quit cigarettes for good?

**Mr. Monsees:** I think the intention of this ad is to make it very clear to consumers that there is an alternative, finally, to combustible cigarettes. I am one of those people.[261]

236.    Defendants' tacit message in their *Switch* advertisements is: switch because, unlike cigarettes, JUUL is harmless to your health.

237.    Defendants' false, deceptive and misleading *Switch* campaign suggests that JUUL is designed to "switch" adult smokers off cigarettes rather than to addict youth to nicotine.

238.    Defendants know that a large number of smokers who use JUUL products do not end up switching but end up consuming cigarettes and JUUL.

239.    Moreover, Defendants know that, by design, a large number of their customers are youth and that JUUL was never designed to be a cessation device.

240.    JLI has advertised cost-savings calculators as part of its *Switch* campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (*i.e.,* a pack a day smoker is presumed to consume one JUUL pod a day). Defendants know that the calculator is misleading because smokers who switch to JUUL frequently increase their nicotine intake.

241.    JUUL labels and advertisements also marketed the product as an "alternative" to cigarettes:

---

[261] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., at 12:33-13:04.



242.     Other advertisements similarly marketed the product as smoking "evolved":



243.     One goal of these advertisements was to convey the deceptive, misleading and false impression that JUUL products could help people quit smoking and break nicotine addiction in a way that was healthy and safe. But, as noted above, that was simply not the case. Defendants never disclosed to the public that JUUL e-cigarettes and JUUL pods are at least as, if not more, addictive than combustible cigarettes. And each of JLI, the Management Defendants, and the Altria Defendants received data to this effect, as discussed above, and were aware of this fact.

244.     In addition, the notions that JUUL products are designed only for existing cigarette smokers, and safer than combustible cigarettes are belied by JLI's own knowledge, marketing plan and intentions on several fronts. *First*, Defendants sought to grow a new group of users of nicotine

products (e.g., "vapers"), including young people in particular, not just to market to the shrinking number of existing cigarette smokers. *Second,* JLI and Bowen designed the JUUL device to be easy to use for youth and others who have never smoked and to create and exacerbate nicotine addiction among those groups by encouraging ingestion of excessive amounts of nicotine. *Third,* as noted above, JLI's own internal testing revealed that JUUL products were often more potent than combustible cigarette smokers prefer. Each of the Management Defendants knew this from his position on JLI's Board of Directors, and the Altria Defendants knew the same when they began to actively coordinate with JLI and the Management Defendants. Despite this knowledge, these Defendants made numerous deceptive, false and misleading public statements that JUUL was intended to be a cessation device.

245.    JUUL is not a product adults typically use to quit smoking. Researchers have found that as of 2018, only 7.9% of American adults had ever used USB shaped e-cigarettes, like JUUL, and only 2% of adults currently used them.[262] By contrast, a recent study found that 15 to 17-year-olds are *sixteen times* more likely to use JUUL products than 25 to 34-year-olds.[263]

246.    JLI's own marketing research indicated that JUUL was not appropriate as a cessation device for adults. ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████[264]
████████████████████████████████████████████████████

---

[262] Kristy L. Marynak et al., *Use and reasons for use of electronic vapour products shaped like USB flash drivers among a national sample of adults*, 28 TOBACCO CONTROL 685 (Nov. 2019), https://tobaccocontrol.bmj.com/content/28/6/685.

[263] D.M. Vallone et al., Prevalence and correlates of JLI use among a national sample of youth and young adults, TOBACCO CONTROL (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

[264] JLI00365905.

1  ██████████████████████████████████████ 265 ██████████████████████

2  ████████████████████████████████████████████████████

3  ██████████████████████████████ ,,266 ████████████████████████

4  ████████████████████████████████████████ ████ 267

5  ██████████████████████████ 268

6  .

247.    The deceptive, misleading and fraudulent nature of the "*Make the Switch*" campaign is

evident when comparing the campaign's advertisements to JUUL's initial advertising, as demonstrated

below. The fact that these advertisements are for the same product confirms that, notwithstanding the

advice JLI and the Altria Defendants received from their media consultants, the Defendants never

intended to target only adult smokers.




---

265 *Id.* (emphasis added).
266 JLI00365709.
267 JLI00364678.
268 JLI00364487.

  

And



248.    Defendants ensured that JUUL was the *opposite* of a "tool[] to reduce or eliminate" nicotine consumption. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[269] As described above, JLI and Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

249.    The *Switch* campaign also does not disclose or warn about the risks of using multiple tobacco products, "dual use" or that the JUUL is not a smoking cessation product. In addition to the

_____

[269] U.S. Dep't of Health & Human Servs., Nicotine Addiction: Past and Present, How Tobacco Smoke Causes Disease (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92.

heightened risks of addiction that multiple tobacco product use poses, one recent study found that persons who use e-cigarettes and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that e-cigarettes and cigarettes generate individually.[270]

250.    The FDA and other government regulators, enforcing existing laws addressing e-cigarettes,[271] publicly criticized the "*Make the Switch*" campaign and other efforts by Defendants to depict JUUL as a smoking cessation device. Section 911(b)(2)(A)(i) of the Federal Food, Drug, and Cosmetics Act (FDCA) (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."[272]

251.    In late 2019, and in response to the House of Representatives hearings in which JLI executives testified, the FDA issued two warning letters to JLI detailing its concern that JLI was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products" within the meaning of the FDCA.[273]

252.    Then, in its September 9, 2019 letter to JLI, the FDA notified JLI that its advertising slogans such as "99% safer," "much safer," and "a safer alternative" than cigarettes was "particularly concerning because [those] statements were made directly to children in school."[274] The FDA concluded that in using advertising language that e-cigarettes were safer than cigarettes, JLI had

---

[270] Julie B. Wang et al., *Cigarette and E-Cigarette Dual use and Risk of Cardiopulmonary Symptoms in the Health eHeart Study*, 13 PLoS ONE 1 (2018).

[271] Section 911(b)(2)(A)(i) of the FDCA (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."

[272] *Id.*

[273] Letter from U.S. Food and Drug Admin. to Kevin Burns, CEO of JUUL Labs, Inc., (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[274] *Id.*

violated Sections 902(8) and 911 by marketing JUUL products as "modified risk tobacco products" without prior approval.[275]

253.    The September 9, 2019 letter also detailed the FDA's concerns with JLI's "*Switch*" marketing campaign. "[T]roubled by recent testimony" that JLI had given to the House Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, the FDA noted that JLI's *Switch* advertising campaign "may also convey that switching to JUUL is a safer alternative to cigarettes."[276]

254.    The FDA specifically highlighted the *Switch* campaign slogans which referenced smoking cigarettes, or attempts to quit smoking, followed by "*Make the Switch.*" The FDA stated that JLI's campaign was in violation of multiple FDA regulations and the FDCA subsections, and that JLI's *Switch* campaign purported to tell the public that using e-cigarettes was an alternative to smoking, or a possible cessation tool.[277]

255.    On the same day, the FDA requested that JLI provide all documents related to its decision to market the Switch campaign to the Cheyenne River Sioux Tribe, in light of the testimony by JLI that it had taken a "public health" approach to Native American tribes, and had sought healthcare professionals to refer Native American smokers to JLI's Switching Program.[278]

256.    ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[275] *Id.*

[276] Letter from U.S. Food and Drug Admin. Ctr. for Tobacco Prods. to JUUL Labs, Inc. (Sept. 9, 2019).

[277] *Id.*

[278] *Id.*



257.

258.

259.

This campaign was *"Make the Switch."*

279 Kevin McCauley, *Altria Taps Mercury For Tobacco Regulation Work*, O'DWYER'S (Jun. 4, 2018), https://www.odwyerpr.com/story/public/10754/2018-06-04/altria-taps-mercury-for-tobacco-regulation-work.html.
280 *See, e.g.,* INREJUUL_00262168; INREJUUL_00262226-INREJUUL_00262227.
281 *See* INREJUUL_00262168; *see also* Kate Zernike, *'I Can't Stop': Schools Struggle With Vaping Explosion*, N.Y. Times (Apr. 2, 2018), https://www.nytimes.com/2018/04/02/health/vaping-ecigarettes-addiction-teen.html.
282 INREJUUL_00262168.
283 INREJUUL_00262226-227.
284 *See* INREJUUL_00066530-539

28  *See* INREJUUL_00074841; *see also* INREJUUL_00074842-844 at 842.

5. **JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public, Including Minors, About the Harms and Benefits of E-Cigarettes.**

260.    Through a collective and parallel effort of funding, leadership, and board membership, JLI, the Altria Defendants and others in the e-cigarette industry leveraged third-parties, ranging from industry-funded non-governmental organizations to online blogs more accessible to youth**,** to mislead the public about the impacts of consuming e-cigarettes.

261.    An assortment of lobbyists, trade associations, and online publications have coordinated with the e-cigarette industry, including JLI and the Altria Defendants, to promote a consistent message that consuming e-cigarettes is not harmful, that nicotine is not harmful, and that the impacts of e-cigarettes are greatly exaggerated. These organizations receive funding from the e-cigarette industry, feature executives on those companies' boards of directors, and in return, promote industry products, industry views, or fund "independent" studies of their own that reach the same conclusions as e-cigarette industry-funded research.

a.    **The American Vaping Association**

262.    The American Vaping Association ("AVA") is a pro-e-cigarette lobby group founded by Greg Conley, who notably publishes articles criticizing the CDC for its stance on restricting e-cigarette use.[286] Other executive members of the AVA possess business interests in e-cigarettes; for example, Treasurer David J. Danzak Jr. is associated with an e-cigarette business called Vapornine LLC.[287] Vice-President Antoinette Lanza is an owner of an exclusively e-cigarette shop in Hoboken,

---

[286] Jeff Stier & George Conley, *The War on E-Cigarettes*, NATIONAL REVIEW (Sept. 19, 2011), https://www.nationalreview.com/2011/09/war-e-cigarettes-jeff-stier-gregory-conley/.

[287] Vapornine LLC, BUZZFILE, http://www.buzzfile.com/business/Vapornine-LLC-904-372-3244 (business information page).

New Jersey called Smokeless Image.[288] Half of the AVA's functional expenses are for lobbying efforts.[289] It lists several sponsors, all of which are e-cigarette, e-liquid, or cigarette companies.[290]

263.    Conley has a prolific social media presence and frequently appears on television and radio to tout the benefits of consuming e-cigarettes and dispute negative news. The AVA website lists "studies" which are uniformly authored by noted industry-funded or industry-friendly authors, such as Polosa and Shahab.[291] AVA lists CASAA, Not Blowing Smoke, and the VTA, all established fronts for the e-cigarette industry, as "Resources."

264.    The AVA receives its funding from sponsors, who are organized into tiers such as Platinum, Gold, Silver, Bronze, and Green.[292] Current advertised sponsors include e-cigarette distributors and retailers such as E-Cigarette Empire, and VaporBeast.[293] Prior sponsors are a who's who of e-cigarette retailers. In 2016, Platinum sponsors included AltSmoke and Vapor Kings, while Gold sponsors included the now defunct Smokeless Image.[294]

265.    On social media, the AVA regularly downplays the risks of consuming e-cigarettes, criticizes negative coverage as myths or exaggerations, and lauds efforts to curb any regulation of the e-cigarette industry.[295]

266.    JLI actively sought out the AVA to promote JUUL. ███████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████[296]

---

[288] Stacy Jones, *Tobacco regulators mull more oversight as e-cigarettes see increased popularity*, NJ.com (Mar. 30, 2019), https://www.nj.com/business/2013/07/tobacco_regulators_mull_more_o.html.
[289] Form 990, American Vaping Association Inc.'s Return of Organization Exempt from Income Tax ( 2018), https://apps.irs.gov/pub/epostcard/cor/464203951_201812_990O_2019122716980021.pdf.
[290] AVA Sponsors, American Vaping Association, https://vaping.org/about-us/ava-sponsors/.
[291] Research Reports, American Vaping Association, https://vaping.org/research-report/.
[292] AVA Sponsors, American Vaping Association, https://vaping.org/about-us/ava-sponsors/.
[293] *Id.*
[294] AVA Sponsors, American Vaping Association, Wayback Machine – Internet Archive (Aug. 14, 2017), https://web.archive.org/web/20170814221226/http://vaping.org/about-us/ava-sponsors/.
[295] American Vaping Association (@AVABoard), Twitter, https://twitter.com/AVABoard.

94

267.    In 2018, JLI took advantage of its coordinated efforts with the AVA to downplay the

risks associated with JUUL. █████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████.[297] ███████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████[298]

268.    The AVA also coordinated with JLI on pro-e-cigarette research. In March 2018, Conley

facilitated a conversation between Dr. Konstantinos Farsalinos, a researcher at the University of Patras,

Greece, who regularly publishes e-cigarette industry-friendly articles, and Gal Cohen, then Director of

Scientific Affairs at JLI.[299] █████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████,[300]

269.    ███████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[296] INREJUUL_00278889.
[297] *See* INREJUUL_00173252 (████████████).
[298] *Id.*
[299] Juul Labs, Inc., *JUUL Labs Presents Findings at the Global Forum on Nicotine 2018,* Cision PR Newswire (June 15, 2018) , https://www.prnewswire.com/news-releases/juul-labs-presents-findings-at-the-global-forum-on-nicotine-2018-300666743.html.
[300] INREJUUL_0034128.

1

2 ███████████████████████████████████████████ [301].

3         **b.**     **Vaping360**

4      270.    Vaping360 is a website dedicated to news regarding the e-cigarette industry. The

5

6 website boasts "40 million smokers and vaping enthusiasts reached since 2015." This entity has a big

7 social media presence and huge publication strategy.

8      271.    Vaping360's main message misleads the public about the health impacts of consuming

9

10 e-cigarettes. Vaping360 has published various articles, including "10 Lies and Myths About Juuling

Exposed."[302] This article, published in May 9, 2018, claimed, among other things, that JUUL was not

11

12 as dangerous as smoking; JUUL did not cause cancer or "popcorn lung"; JUUL was not popular

among teenagers, nor did JLI sell kid-friendly flavors or flavors aimed to entice young people; and the

13

14 nicotine in JUUL is "a relatively mild drug, [and] may cause dependence."[303]

15      272.    Vaping360 regularly published articles praising, promoting, or downplaying the risks of

16

JUUL, including, among others: "These Scientists Want to Kill Smokers' Hope (For Vaping)"; "UK

17

Scientists to WHO: Your Vape Report Is Junk"; "One Free Pack JUUL Coupon Codes 2019"; and an

18

19 article disparaging anti-smoking advocacy group Truth Initiative by claiming that "Truth Initiative

Promo Encourages Risky Teen Behavior."[304]

20

21      273.    One of the main writers at Vaping360 is Jim McDonald who aggressively attacks any

22 negative science as fake news. For example, McDonald frequently posts on social media platforms,

23

24

25 ───────────────────

[301] *Id.*

26 [302] Jim McDonald, *10 Lies and Myths About Juuling Exposed*, Vaping 360 (May 9, 2018),
https://vaping360.com/lifestyle/juuling/.

27 [303] *Id.*

[304] Jim McDonald, *Truth Initiative Promo Encourages Risky Teen Behavior*, Vaping 360 (Jan. 9,
2020), https://vaping360.com/vape-news/87705/truth-initiative-promo-encourages-risky-teen-

28 behavior/.

including on Facebook and Twitter, but also comments on others posts extensively disputing negative news about consuming e-cigarettes.[305]

274.    Vaping360 has taken funding from e-cigarette manufacturers, and in return coordinates with e-cigarette manufacturers to promote their products, while publishing favorable content.

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

275.    ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

. [306] ██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[307]████████████████████████████

████████████████████████████████████████████████████████████████████████[308]

276.    ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████[309]

277.    In 2018, McDonald continued to write articles specifically praising JLI, such as "Coming Soon: A JUUL to Help You Quit JUULing" and "10 Lies and Myths About JUULing Exposed."[310] As of 2020, Vaping360 continues to offer discounts for JUUL products.[311]

---

[305] Jim McDonald, *Mass. Senate Passes Worst Vaping Law in the Countr*, Vaping 360 (Nov. 21, 2019), https://vaping360.com/vape-news/86852/mass-senate-passes-worst-vaping-law-in-the-country/; Jim McDonald, *Meet the Rich Moms Who Want to Ban Vaping,* Vaping 360 (Oct. 8, 2018), https://vaping360.com/vape-news/71696/meet-the-rich-moms-who-want-to-ban-vaping/.
[306] INREJUUL_00143870.
[307] *Id*.
[308] *Id*.
[309] INREJUUL_00139196.
[310] Jim McDonald, *Coming Soon: A JUUL to Help You Quit Juuling,* Vaping 360 (Sept. 7, 2018), https://vaping360.com/vape-news/70262/coming-soon-a-juul-to-help-you-quit-juuling/.
[311] [One FREE Pack] JUUL Coupon Codes 2019, Vaping 360 (Aug. 24, 2018) https://vaping360.com/vape-coupons/juul-coupon-promo-code/.

### c.      Foundation for a Smoke-Free World

278.     The Foundation was founded in 2017, and presents itself as a public health organization, purportedly "advancing global progress in smoking cessation and harm reduction."[312] It is funded entirely by Philip Morris International, which in 2017 announced a $1 billion commitment to fund the Foundation.[313] The Foundation's 2018 Form 990 lists only one donor: PMI Global Services, Inc., or Philip Morris International, with a contribution of $80 million.[314]

279.     The Foundation is headed by Derek Yach, a noted advocate and promoter of e-cigarettes and consuming e-cigarettes.[315]

280.     In 2018, the Foundation announced that it would support Centers of Excellence to conduct tobacco control research.[316] This tactic is a well-known tool of the cigarette industry, which has a history of funding "research" centers to promote industry-friendly views, such as the Center for Indoor Air Research, which promulgated industry-funded studies that sowed doubt about the addictiveness of nicotine, claimed that indoor air quality was unaffected by cigarette smoke and downplayed the harms of cigarettes broadly. Institutes such as the Center for Indoor Air Research were forced to dissolve as part of the Master Settlement Agreement in 1998.

---

[312] Foundation for a Smoke-Free World (2020), https://www.smokefreeworld.org/.

[313] David Meyer, *Philip Morris Pledges Almost $1 Billion to Anti-Smoking Fight*, FORTUNE (Sept. 13, 2017), https://www.webcitation.org/6tjyBv4dA.

[314] Return of Private Foundation, Foundation for a Smoke-Free World (2018), https://web.archive.org/web/20190828104138/https://www.smokefreeworld.org/sites/default/files/uploads/documents/fsfw_2018_form_990-pf_public_inspection.pdf.

[315] *Derek Yach: Anti-smoking advocates should embrace e-cigarettes*, NATIONAL POST (Aug. 26, 2015), https://nationalpost.com/opinion/derek-yach-anti-smoking-advocates-should-embrace-e-cigarettes.

[316] Support Global Research, Foundation for a Smoke-Free World (May 31, 2018), https://web.archive.org/web/20180531105105/https://www.smokefreeworld.org/our-areas-focus/support-global-research.

281.    A 2017 report in The Verge detailed the e-cigarette industry's apparently coordinated efforts to use biased research to downplay the risks of consuming e-cigarettes.[317] For example, e-cigarette manufacturers routinely conduct studies focusing on the "good news" about e-cigarettes, *i.e.* they release less harmful aerosolized chemicals than combustible cigarettes, or that their aerosol lingers for less time indoors than combustible cigarettes.[318] Industry-funded authors then regularly cite to each other's studies in their own research.[319] On information and belief, JLI and Altria, among others in the e-cigarette industry, funnel their industry-funded studies to friendly pro-industry groups knowing that those entities will misrepresent the results as evidence that e-cigarettes are safe, or not harmful.

### d.    Vapor Technology Association

282.    The Vapor Technology Association (VTA) bills itself as a trade association and advocates for the e-cigarette industry. It was founded in January 2016, with the banner tagline on its website reading "VAPE IS HOPE."[320]

283.    In 2018, JLI, SMOK, VMR, Turning Point Brands, and Joyetech were all featured as "Platinum Members," a level of membership that required a $100,000 annual contribution. Thus, JLI

---

[317] Liza Gross, *Vaping companies are using the same old tricks as Big Tobacco*, THE VERGE (Nov. 16, 2017), https://www.theverge.com/2017/11/16/16658358/vape-lobby-vaping-health-risks-nicotine-big-tobacco-marketing.

[318] *See, e.g.*, J. Margham, et al., *Chemical Composition of Aerosol from an E-Cigarette: A Quantitative Comparison with Cigarette Smoke*, 29 CHEM. RES. TOXICOL. 1662 (2016); Tanvir Walele et al., *Evaluation of the safety profile of an electronic vapour product used for two years by smokers in a real-life setting*, 92 REG. TOXICOL. PHARMACOL. 226 (2018); D. Martuzevicius, et al., *Characterization of the Spatial and Temporal Dispersion Differences Between Exhaled E-Cigarette Mist and Cigarette Smoke*, 21 NICOTINE & TOBACCO RES. 1371 (2019).

[319] *See, e.g.*, Gene Gillman et al., *Determining the impact of flavored e-liquids on aldehyde production during Vaping*, 112 REG. TOXICOL. PHARMACOL. 1 (2020); Colin Mendelsohn & Alex Wodak, *Legalising Vaping in Australia,* The McKell Institute (March 2019), https://pdfs.semanticscholar.org/3e13/8e46419913a29f8fc9ddad52ec771f73fa76.pdf; Violeta Kaunelienė et al., *Impact of Using a Tobacco Heating System (THS) on Indoor Air Quality in a Nightclub*, 19 AEROSOL AND AIR QUAL. RES. 1961 (2019); Maya Mitova et al., *Human chemical signature: Investigation on the influence of human presence and selected activities on concentrations of airborne constituents*, 257 ENV'TL POLLUTION 1 (2020).

[320] Vape is Hope, Vapor Technology Association (Feb. 25, 2016), https://web.archive.org/web/20160225154600/http://www.vaportechnology.org:80/.

paid VTA $100,000 in 2018 to become a Platinum Member, and in return, VTA offered JLI a board seat; invitations to lobbying strategy meetings; access to the FDA, other federal agencies, and members of Congress; and conference participation.[321]

284.   The VTA, like other lobbying and trade association groups in the industry, advocates for less regulation of e-cigarettes, and testifies in opposition to flavor bans.[322]

### e.   Retailer Lobbying

285.   Retailers have also taken to creating subsidiaries or wholly owned companies whose purpose is to produce quasi-journalistic content to promote consuming e-cigarettes, discredit health initiatives, and suggest that consuming e-cigarettes has no harmful health impacts. The best example of this is the website SoupWire, which publishes articles and editorials that promote consuming e-cigarettes and criticizes studies that look at the negative impacts of consuming e-cigarettes.[323] For example, when JLI donated $7.5 million towards a study on the impacts of consuming e-cigarettes on teens, a SoupWire report concluded that the study will likely find "nothing Earth-shattering."[324]

### 6.   Altria Falsely Stated That It Intended to Lend Its Expertise in "Underage Prevention" Issues to JLI.

286.   Altria's announcement that it intended to invest in JLI came less than two months after it told the FDA that Altria "believe[s] that pod-based products significantly contribute to the rise in youth use of e-vapor products" and that it accordingly would be removing its own pod-based products from the market.[325] Altria made the same representations to its investors.[326]

287.   Although Altria claimed its investment in JLI had an altruistic motive—"When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to

---

[321] Some of Our Members, Vapor Technology Association (Nov. 28, 2018), https://web.archive.org/web/20181128162940/https://vaportechnology.org/membership/.
[322] Vapor Technology Association, https://vaportechnology.org/.
[323] Soupwire – The Truth About Vaping, https://soupwire.com/.
[324] Jeff Hawkins, *JUUL Donates $7.5 Million to Teen Vaping Study*, Soupwire – The Truth About Vaping (July 2, 2019), https://soupwire.com/juul-donates-7-5-million-to-teen-vaping-study/.
[325] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018).
[326] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript, (October 25, 2018).

directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders," Altria recently confirmed that JLI has not even availed itself of that experience.[327] In Altria's October 2019 letter to Senator Dick Durbin, Altria CEO Howard Willard acknowledged that while Altria "offered to JUUL services relating to underage prevention efforts," to date "JUUL has not accepted Altria's offers of assistance in addressing underage vaping relating issues."[328] Willard has stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."[329] but as Altria knew, as reflected in its letter to the FDA just two months prior, that mission involved had resulted in usage throughout the youth market. Altria's admission that pod-based products contributed to underage use show that Altria knew its investment in JLI would "strengthen[] its financial profile and enhance[] future growth prospects" specifically because JLI dominated the youth market for e-cigarettes.[330]

288.    Altria recognized JLI's market share dominance in the e-cigarette market as the path to Altria's continued viability and profitability. In a January 31, 2019 earnings call, Altria explained that "[w]hen you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders. We are excited about JUUL's domestic growth and international prospects and their potential impact on our investment."[331] JUUL's growth was, as Altria well knew, due to the product's viral popularity among teens. Willard briefly acknowledged the

---

[327] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018, (Jan. 31, 2019).

[328] Letter from Howard A. Willard III to Senator Richard J. Durbin (October 14, 2019) (emphasis added).

[329] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, BUSINESS WIRE (Dec. 20, 2018, 7:00 AM EST), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[330] Id.

[331] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018 (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.

youth e-cigarette use crisis, stating, "Briefly touching on the regulatory environment, the FDA and many others are concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue that we and others in the industry must continue to address aggressively and promptly.[332]

289.    Altria's representations that it intended to help JUUL curb the prevalence of underage use was false and misleading. As discussed below, Altria coordinated with JUUL to capture and maintain the youth market.

**E.    Defendants Targeted the Youth Market.**

290.    Having created a product, like combustible cigarettes, that sought to get users addicted to nicotine, and while taking steps to ensure that users and regulators did not appreciate the true nicotine content or potential harm from using JUULs, to successfully sink their high-tech nicotine hook into American consumers, JLI, Bowen, and Monsees needed investors willing to adopt the tactics of the cigarette industry as their own. They found those investors in Pritzker, Huh, and Valani.

291.    Under the leadership of the Management Defendants, JLI marketed nicotine to kids. JLI and the Management Defendants deployed a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages to ensure their uptake and distribution among young consumers. JLI and the Management Defendants' campaign was wildly successful—burying their hook into kids and initiating a public health crisis.

**1.    JLI Emulated the Marketing of Cigarette Companies.**

292.    As Defendants know, nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.[333]

---

[332] *Id.*

[333] U.S. Dep't Health & Human Servs., *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet*, https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth-tobacco-use-factsheet/index.html.

The overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation."[334]

293.    Struggling to define their own identities, teenagers are particularly vulnerable to image-heavy advertisements that psychologically cue them on the "right" way to look and behave amongst peers.[335] Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation.[336]

294.    For decades, cigarette companies spun smoking as a signifier of adulthood. This turned smoking into a way for teenagers to project independence and enhance their image among their peers.[337]

295.    Youth marketing was critical to the success of cigarette companies. In the 1950s, Philip Morris—now JUUL's corporate affiliate—intentionally marketed cigarettes to young people as a pool from which to "replace smokers" to ensure the economic future of the cigarette industry.[338]

296.    Philip Morris's documents set out their youth strategy, explaining: "Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens".[339]

297.    It wasn't just Philip Morris. The strategy of hooking kids was an open secret in the cigarette industry.[340]

---

[334] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006) (J. Kessler).
[335] *Id.* at 578.
[336] *Id.* at 570, 590.
[337] *Id.* at 1072.
[338] *United States. v. Philip Morris*, No. 99-2496 (D.D.C. Aug. 17, 2006), ECF No. 5750 at 972 (Amended Final Opinion).
[339] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.
[340] C.A. Tucker, *Marketing Plans Presentation to RJRI B of D* at 2, U.C.S.F. Truth Tobacco Industry Documents (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (RJ Reynolds executive explaining that the "young adult . . . market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years.").

298.     As detailed below, JLI and the Management Defendants sought to emulate this approach. Indeed, Monsees admitted to using historical cigarette ads to inform JLI's own advertising campaign.[341]

299.     The emulation is obvious. A side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.[342]



[341] Matthew Perone & Richard Lardner, *Juul exec: Never intended electronic cigarette for teens*, AP News (July 26, 2019), https://apnews.com/4b615e5fc9a042498c619d674ed0dc33; Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees (last visited Apr. 3, 2020).

[342] *See* Appendix A, Ads 9-50.

300.    JLI and the Management Defendants deployed this same strategy but adapted it to modern advertising tactics.

### 2.    The Management Defendants Intentionally Marketed JUUL to Young People.

301.    The risk that children would use a new e-cigarette product was well known and well publicized in the months leading up to the launch of the JUUL e-cigarette. For example, in April 2015, the CDC published the results from its 2014 National Youth Tobacco Survey.[343] The CDC found that "[i]n 2014, e-cigarettes were the most commonly used tobacco product among middle (3.9%) and high (13.4%) school students."[344] Moreover, "[b]etween 2011 and 2014, statistically significant increases were observed among these students for current use of both e-cigarettes and hookahs (p<0.05), while decreases were observed for current use of more traditional products, such as cigarettes and cigars, resulting in no change in overall tobacco use."[345] The CDC blamed e-cigarette marketing, the use of "a

---

[343] Centers for Disease Control and Prevention, *Tobacco Use Among Middle and High School Students — United States, 2011–2014*, Morbidity and Mortality Weekly Report (MMWR) 64(14);381-385 (Apr. 17, 2015), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a3.htm.
[344] *Id.*
[345] *Id.*

mixture of 'sex, free samples, [and] flavors'—the same things that were originally found to be problematic with cigarette ads."[346]

302.    Seeking to enter this nascent youth market for e-cigarettes, JLI intentionally targeted youth from its inception. In March 2015, Management Defendants supervised the advertising campaigns that would accompany the launch of JUUL.

303.    Consistent with Monsees' position that he has no "qualms" with marketing to people that were not yet addicted to nicotine,[347] ███████████████████████████████████████

███████████████████████████████████████████████████████████

██████████[348]

304.    ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████[349]████████████████████████████

█████████████████████████████████████████████████████

██████████[350] Put differently, their target consumer was an adolescent.

305.    JLI professedly wanted kids to think JUUL was cool. ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████.[351] ██████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

---

[346] Jacob Kastrenakes, *More teens are vaping instead of smoking,* THE VERGE (Apr. 16, 2015), https://www.theverge.com/2015/4/16/8429639/teen-ecigarette-use-triples-vaping-beats-smoking.
[347] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html (last visited Apr. 4, 2020).
[348] INREJUUL_00441209.
[349] INREJUUL_00057298-INREJUUL_00057487.
[350] INREJUUL_00057298-INREJUUL_00057487.
[351] INREJUUL_00057289.



[352] ██████████ [353] For example, ████████████████████████████████████████████████████████████████

[354] ██████████████████████████████████████████████████████

[356] █████████████

    306.   This focus on ████████ continued up to and after launch. █████████

[357] ████████████████████████████████████

[358] ████████████████████████████████████

[359] ████████████████████████████

[360] ████ [361] ████████████████████

[362] ████████████████

---

[352] INREJUUL_00057293.
[353] *Id.*
[354] *Id.*
[355] *Id.*
[356] INREJUUL 00441325-INREJUUL_00441326.
[357] JLI00218598.
[358] JLI00206206.
[359] JLI00222528.
[360] JLI00461564.
[361] JLI00235965.
[362] JLI00514343

307.  JLI identified ███████████████████████████
███████████████████████████████████████████████
██████████████████████████████[363].

308.  With this goal in mind, █████████████████████████
███████████████████████████[364]██████████████████████
██████████████████████████████████████████[365]

309.  In short order, the phrase "it's cool to JUUL" became an anthem among kids while youth e-cigarette use skyrocketed.

**3.  JLI Advertising Exploited Young People's Psychological Vulnerabilities.**

310.  Informed by decades of tobacco marketing, JLI ran a consistent, simple message: JUUL is used by young, popular, attractive, and stylish people.

311.  This was not the only marketing scheme JLI could have adopted. JLI had other options. In 2014, JLI engaged a Calgary-based advertising agency, Cult Collective, to complete a "diagnostic" evaluation of the JUUL brand and to make recommendations regarding the best advertising strategy to market the JUUL e-cigarette.

312.  In keeping with typical e-cigarette marketing, which messaged to existing smokers looking to quit, Cult Collective recommended that JUUL position its e-cigarette technology as the focus of its advertisements. Cult Collective presented JUUL with exemplar advertisements that used images of a boom box and a joy stick, juxtaposed against the JUUL e-cigarette, with the tag line: "Everything changes. JUUL the evoluution of smoking."

---

[363] INREJUUL_00161703-INREJUUL_00161715.
[364] *Id.*
[365] INREJUUL_00277080-INREJUUL_00277104.



313.   This campaign expressly invokes combustible cigarettes and positions the JUUL as a technological upgrade for the modern smoker.

314.   JLI rejected this approach.

315.   Instead, in June of 2015, JLI launched the "Vaporized" advertising campaign.[366] The express mission ███████████████████████████████████████████████████

316.   Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models, bold colors, and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool."[368]

317.   The targeting of young consumers was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teen than mature adults."[369]

---

[366] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.

[367] INREJUUL_00057291-INREJUUL_00057295.

[368] *See* Appendix A, Advertisement 1 (example of targeting of young people).

[369] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University),

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

318.    In the months leading up to the launch of JUUL e-cigarettes, ███████████

███████████████████████████████████ 370 ████████████████████

██████████████████████████████████ 371 . ███████████████

███████████████████████████████████████

███████████████████████████████████

█████████ ” 372 The Management Defendants knew that the ads targeted youth, but "Juul's board of

directors signed off on the company's launch plans[.]" 373 In addition, "Monsees, who was CEO at the

time, personally reviewed images from the billboard photo shoot while it was in session." 374 A senior

manager later told the New York Times that "he and others in the company were well aware" that the

marketing campaign "could appeal to" teenagers. 375

319.    As part of the Vaporized campaign, JLI advertised on a 12-panel display over Times

Square. 376 Billboard advertising of cigarettes has for years been unlawful under the Master Settlement

Agreement.

---

370 INREJUUL_00371285.

371 INREJUUL_00371314.

372 INREJUUL_00174387.

373 Ainsley Harris, *How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?*, Fast Company (Nov. 19, 2018), https://www.fastcompany.com/90262821/how-juul-founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018.

374 *Id.*

375 Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

376 *See* Appendix A, image 14; *see also* https://inrejuul.myportfolio.com (also available at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_ mt068.php) (last visited April 3, 2020) (additional images and videos).



320.    ████████████████████████████████████████████████

████████████.[377]

321.    In fact, JLI's Vaporized campaign was so effective that it gained national attention on an October 15, 2015 episode of Late Night with Stephen Colbert, who ridiculed the notion that the young, dancing models were consistent with a target market of adult smokers. As Colbert joked after viewing the close-up video of young models dancing in place, "[y]eah! There is something about vaping that just makes me want to dance in a way that doesn't require much lung strength. . . . And it's not just ads featuring hip young triangles that appeal to the youths. . . . There is no reason to worry about the long-term effects of vaping, because e-cigarettes are so new that their long-term effects are still unknown."[378]

---

[377] INREJUUL_00093933-INREJUUL_00093934.
[378] *The Late Show With Stephen Colbert*: *Vaping is So Hot Right Now*, YouTube (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM.

322.    The Vaporized campaign was not limited to the Times Square billboards however. The ads were also placed in nationally-distributed magazines, and the videos were displayed on screens at the top of point-of-sale JUUL kiosks provided by JUUL to retailers across the country.

323.    To the extent that the Vaporized advertisements disclosed that JUUL contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, cigarette advertisements, are required to display a health warning in high contrast black and white, covering 20% of the image.

324.    Likewise, JLI's social media ads did not disclose any health risks of using JUUL until May of 2018, when they were required to warn of addiction. But even then, JUUL placed these warnings in areas that were only viewable if the social media user clicked on the "full version" of the JLI post, which is not how teens typically engage with social media advertising.[379] Notably, on Twitter, a social media platform that is geared towards reading text, and on Facebook, where some users do read text, JLI typically did not include the disclaimer in its advertisements at all.[380]

### 4.    JLI Pushed the Vaporized Campaign Into Youth Targeted Channels.

#### a.    JLI Placed Its Vaporized Ads on Youth Oriented Websites and Media.

325.    JLI engaged programmatic media buyers to place advertisements on websites attractive to children, adolescents in middle school and high school, and underage college students. These advertisements, which included the images of models from the Vaporized campaign, began appearing on websites as early as June 2015. The chosen websites included: nickjr.com (the website for a children's television network run by Nickelodeon Group); the Cartoon Network's website at cartoonnetwork.com; allfreekidscrafts.com; hellokids.com; and kidsgameheroes.com.

326.    A picture of the homepage of nickjr.com is below

---

[379] *See* Appendix A, Advertisement 3.
[380] *See* Appendix A, Advertisement 65; *see also* Juul Image Galleries (2015-2018) SRITA Collection, https://inrejuul.myportfolio.com/twitter-1 (last visited Apr. 3, 2020).



327.    JLI also purchased banner advertisements on websites providing games targeted to younger girls,[381] educational websites for middle school and high school students,[382] and other teen-targeted websites.[383]

328.    JLI knew what it was doing. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[384] Nevertheless, JLI continued to push its campaign on websites with young demographics.

329.    JLI promoted the Vaporized campaign on Facebook, Instagram, and Twitter.

330.    JLI could have employed age-gating on its social media accounts to prevent underage consumers from viewing its Vaporized advertisements, but chose not to do so.

---

[381] The sites included dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlgames.com, and girlsgogames.com.

[382] *E.g.,* coolmath-games.com. JUUL also purchased advertisements on basic-mathematics.com, coolmath.com, math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, and purplemath.com.

[383] *E.g.*, teen.com, seventeen.com, justjaredjr.com, and hireteen.com. JUUL purchased advertisements on websites for high school students hoping to attend college such as collegeconfidential.com and collegeview.com.

[384] INREJUUL_00082179-INREJUUL_00082185.

331.    The Vaporized campaign included the largest e-cigarette smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year.

332.    JLI promoted Vaporized through Vice Magazine, which bills itself as the "#1 youth media brand" in the world.[385]



333.    By 2016, an estimated 20.5 million U.S. middle and high school students were exposed to advertisements for e-cigarettes, including JUUL.[386]

**b.      JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience.**

334.    JLI used ███████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████.[387] Influencers are prized sources of brand promotion on social media networks.

[385] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.
[386] Kristy Marynak et al., *Exposure to Electronic Cigarette Advertising Among Middle and High School Students – United States, 2014-2016*, CDC: Morbidity and Mortality Weekly Report (Mar. 16, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a3.htm.
[387] *See* INREJUUL_00091138 (███████████████████████████████████████████ .

335.    Like its Vaporized campaign, █████████████████████████████

████████████████████████████████████████████████████████████████████

████,"[388] In keeping with this strategy, JLI targeted influencers that were young and popular with

adolescents. One influencer JLI targeted was Tavi Gevinson, who was nineteen years old in the

summer of 2015. The year before, Rolling Stone magazine described Gevinson as "possibly the most

influential 18-year-old in America."[389]

336.    JLI contracted with Grit to enlist influencers by sending them free JUUL e-cigarettes.

Documents obtained pursuant to a Congressional investigation show that in July 2015, JLI's contract

with Grit was for services that included "Influencer Relations," in which Grit agreed to provide two

"Social Buzzmakers" for six events within a four-week period, with each Social Buzzmaker having a

minimum of 30,000 followers and be active on at least two social media channels, such as Instagram,

Twitter, or Facebook. The contract provided that JLI would determine or approve the timing of the

Buzzmakers' posts. In addition, JLI engaged Grit to "develop influencer engagement efforts to

establish a network of creatives to leverage as loyalists for Juul/Pax brand activations."[390]

337.    Grit provided free JUULs to Luka Sabbat, known as the "the Internet's Coolest

Teenager,"[391] who was 17 years old during the summer of 2015.

338.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████.[392]

---

[388] INREJUUL_00057293.

[389] Alex Morris, *Tavi Gevinson: A Power Teen's New Direction*, Rolling Stone (Aug. 14, 2014),
https://www.rollingstone.com/culture/culture-features/tavi-gevinson-a-power-teens-new-direction-232286/.

[390] Kenrick Cai, *Juul Funded High Schools, Recruited Social Media Influencers To Reach Youth, House Panel Charges*, Forbes (July 25, 2019),
https://www.forbes.com/sites/kenrickcai/2019/07/25/juul-high-schools-influencers-reach-youth-house-investigation/#57735a4a33e2.  *See* JLI-HOR-00042050-052 at 050.

[391] Alexis Barnett, *Who Is Luka Sabbat? Meet the Internet's Coolest Teenager*, Complex (Aug. 17, 2015), https://www.complex.com/style/luka-sabbat-interview-on-youth-kanye-west-and-fashion.

339.     JLI paid these social media influencers to post photos of themselves with JUUL devices and to use the hashtags that it was cultivating.[393] One such influencer was Christina Zayas, whom JLI paid $1,000 for just one blog post and one Instagram post in the fall of 2017.



340.     JLI encouraged its distributors, wholesalers, and other resellers—either explicitly or implicitly—to hire affiliates and influencers to promote JLI's brand and products. Even if not paid directly by JLI, these influencers profited from the promotion of JUUL products either because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-compatible products.

341.     For example, one YouTube user Donnysmokes (Donny Karle, age twenty-one) created a JUUL promotional video in 2017 that garnered roughly 52,000 views, many of which were from users under the age of eighteen.[394] Since that time, Karle has made a series of videos, including videos titled "How to hide your JUUL from your parents" and "How to HIDE & HIT Your JUUL at

---

[392] *See*, INREJUUL  00091141 ( ██████████████████████████████
████████████████████████████████████ )

[394] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

SCHOOL WITHOUT Getting CAUGHT."[395] Karle has admitted to earning approximately $1200 a

month from unspecified sources simply from posting videos of himself consuming e-cigarettes,

especially of JUUL products online.[396]



How to hide your JUUL from your parents
DonnySmokes · 31K views · 3 months ago
9:32



How To HIDE & HIT Your JUUL at SCHOOL WITHOUT Getting CAUGHT
DonnySmokes · 98K views · 1 month ago
14:33

342.    Karle also created a YouTube sensation called the "JUUL Challenge," which is a play

on the viral "Ice Bucket Challenge." In the JUUL Challenge, the goal is to suck down as much nicotine

as possible within a predetermined amount of time. The JUUL Challenge, which promotes nicotine

abuse and adolescent use of JUUL products, went viral like the Ice Bucket Challenge it mimicked.

Soon, youth across the country were posting their own JUUL Challenge videos, a practice that

continues to this day on YouTube, Instagram, Snapchat and other social media platforms. In one recent

JUUL Challenge on YouTube, which has received nearly 500,000 views, the two teenagers filming

themselves discussing the hundreds of thousands of views their prior JUUL Challenge received and

comment upon the "virality" of their JUUL Challenge content.[397]

343.    JLI knowingly sought and accepted the benefits of viral marketing and user-generated

content. For example, JLI was aware of Karle's videos and his young followers. A sales representative

---

[395] *Id.*

[396] Allie Conti, *This 21-year-old is Making Thousands a Month Vaping on YouTube*, Vice (Feb. 5, 2018), https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month¬vaping-on-youtube.

[397] Nate420, JUUL Challenge (Apr. 22, 2018), https://youtu.be/gnM8hqW_2oo (last visited Mar. 30, 2020).

at JLI sent Karle a direct message on Twitter stating, "Thanks for the Juul plugs.  There ya go.  An actual JUUL employee thanking you."[398]

344.    JLI also recruited "affiliates" to help its viral marketing ████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████.[399] JLI's affiliates promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter and routinely failed to disclose that they were being paid to promote JUUL products.

345.    JLI's "affiliate program" recruited those who authored favorable reviews of its products by providing such reviewers with a 20% discount of purchases of JUUL products.[400] It even recruited JUUL users to act as part of their marketing team by asking users to "refer a friend and get a discount."[401]

346.    As with much of the marketing strategy for JUUL, the practices described above are prohibited by the Master Settlement Agreement.

       **c.**    **JLI Used Viral Marketing Techniques Known to Reach Young People.**

347.    JLI deployed "viral marketing" techniques to great success. Viral marketing is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[402] Viral marketing effectively converts customers into salespeople, who, by sharing their use of a product (on

---

[398] Karle000009-011 at 009 (undated Twitter direct messages exchange).
[399] INREJUUL_00113437-INREJUUL_00113441.
[400] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.
[401] *Id.* at 9.
[402] N. Deepa et al., *Viral Marketing as an On-Line Marketing Medium*, IOSR J. of Bus. & Mgmt. 18, (last visited Apr. 3, 2020); P. R. Datta et al., *Viral Marketing: New Form of Word-of-Mouth Through Internet*, 3 The Bus. Rev. 69 (2005).

social media or otherwise), repeat a company's representations and endorse the product within their network. The success of viral marketing depends on peer-to-peer transmission. Hence, a successful viral marketing campaign looks like a series of unrelated, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaigns.

348.



403

349.    Social media platforms are the most effective way to launch viral marketing campaigns among young people. As of May 2018, among teenagers, 95% reported use of a smart phone, 85% use YouTube, 72% use Instagram, and 45% reported being online "constantly."[404]

350.    A key feature of JLI's viral marketing campaign was inviting user-generated content. This strategy revolves around prompting social media followers to provide their own JUUL-related content—*e.g.*, post a selfie in your favorite place to use JUUL. The response provided by a user is then typically distributed—by the social media platform employed—into the user's personal network. In this way, brands can infiltrate online communities with personalized content that promotes their product (*e.g.* a picture of a friend using a JUUL e-cigarette).[405]

---

[403] INREJUUL_00349529-560 at 541.
[404] Monica Anderson & Jingjing Jiang, *Teens, Social Media & Technology 2018: Appendix A: Detailed Tables*, Pew Research Center (May 31, 2018),
https://www.pewresearch.org/internet/2018/05/31/teens-technology-appendix-a-detailed-tables/.
[405] *The Rise in the Use of Juul Among Young People: The Power of Design and Social Media Marketing*, Campaign for Tobacco Free Kids,
https://www.tobaccofreekids.org/assets/images/content/JUUL_Presentation.pdf.



351.    Within a few months of the JLI's commercial release in June 2015, a former JLI executive reportedly told the New York Times that JLI "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[406]

352.    To drive consumer participation in its ad campaign, JLI peppered its advertising and social media posts with hashtags, including those referencing JLI and consuming e-cigarettes (*e.g.*, #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc. ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████"[407]

---

[406] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[407] INREJUUL_00093294.

353.    JLI's hashtags attracted an enormous community of youthful posts on a wide array of subjects. According to Dr. Jackler, #Juul contains literally thousands of juvenile postings, and numerous Instagram hashtags contain the JUUL brand name.[408]

354.    Just as JLI intended, JUUL users began taking photos of themselves using JUUL devices and putting them on social media with the hashtag #juul. They were creating JUUL content that looked and felt like real JUUL ads: featuring young people having fun and using JUUL. The flavor-based hashtag campaigns #MangoMonday and #coolmint generated hundreds of thousands of user-generated posts. JLI could have stepped in and attempted to stop the use of its trademark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL." It could have sought to shut down infringing accounts such as @doit4juul and @JUULgirls. It did not do so.

**5.     JLI Targeted Youth Retail Locations.**

355.    Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to point of sale tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed.

356.    For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales. JLI knows that nicotine-naïve young people frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL increased the likelihood that these people would purchase its product.

357.    JLI marketed its products extensively in convenience stores, employing video and product displays with bright colors and young adults using and displaying the JUUL device. The retail

marketing worked and, by late 2017, JUUL became the most popular e-cigarette sold in convenience stores according to Nielsen data.[409]

358.    Like all in-store cigarette advertising, JLI's point–of–sale materials played a major role in driving youth addiction. JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the JUUL store locator and offering discounts. And JLI actively encouraged its retailers to leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

359.    Before JUUL's launch in 2015, JLI and Cult Collective developed packaging and in-store displays that looked similar to iPhone packaging, which JLI knew would resonate with young people and further JLI's campaign to be the "the iPhone of e-cigarettes."

360.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████[410]

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[409] Laura Bach, *JUUL and Youth: Rising E-Cigarette Popularity*, Campaign for Tobacco-Free Kids (July 6, 2018), https://www.tobaccofreekids.org/assets/factsheets/0394.pdf.
[410] INREJUUL_00370796-INREJUUL_00370806, 805.

### 6.   JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Consumers Hooked.

361.   JLI also sponsored at least twenty-five live social events for its products in California, Florida, New York, and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, or was addictive.[411] Instead, the invitations traded on PAX Lab, Inc.'s (PAX) reputation as a manufacturer of marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties.[412] Photographs from these events indicate that they drew a youthful crowd. Product promotion through sponsored events was a long-standing practice for cigarette companies, but is now prohibited.

 





362.   At these live social events, JLI gave attendees free JUUL "Starter Kits," which contain a JUUL device and 4 JUUL pods of various flavors. JLI gave away samples at music events without age restrictions, including Outside Lands in San Francisco's Golden Gate Park, and other events aimed at a youthful audience, such as the annual Cinespia "Movies All Night Slumber Party" in Los Angeles. These events, in addition to providing youthful crowds for handing out samples, were opportunities for JLI to cultivate its brand image as youthful, hip, and trendy—but had nothing to do with smoking

cessation. For example, on August 7, 2015, JLI tweeted, "Need tix for @cinespia 8/15? We got you. Follow us and tweet #JUULallnight and our faves will get a pair of tix!"[413]

363.    Giving away free samples is prohibited conduct for a cigarette company under the Master Settlement Agreement.

364.    As part of the Vaporized campaign, JLI also emulated trendy pop-up restaurants and stores by using a shipping container "pop-up JUUL bar" at festivals and events in the Los Angeles and New York City metro areas. The firm BeCore designed and created the container for JLI, and managed it as a mobile JUUL product sampling lounge.[414]



Juul's container bar

[415]

365.    JLI also held sampling events in stores. ███████████████████████
████████████████████████████████████████████.[416] Documents obtained by the New York Attorney General show that JLI recruited young "brand ambassadors" to staff these

---

[413] JUUL Labs, Inc. (@JUULvapor), Twitter (Aug. 7, 2015), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_18.jpg.

[414] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 9 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[415] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.

[416] INREJUUL_00160394.

events and required a dress code that included skinny jeans, high-top sneakers or booties, and an

iPhone in a JUUL-branded case.[417]




366.     JLI also engaged PUSH Agency, LLC ("PUSH"), a promotional model and event

staffing agency, to provide models and brand ambassadors to hand out coupons in trendy areas of New

York City popular with young people. ████████████████

████████████████████████████████

████████████████████████████████

████████████.[418]

367.     Though JLI publicly acknowledged in October 2017 that it is unlawful to distribute free

samples of its products at live events,[419] it continued to reach out to new users by offering samples,

---

[417] Jake Offenhartz, *Juul Hooked Teens Through Sick Parties and Hip Ambassadors, NY AG Says*,
  Gothamist (Nov. 19, 2019 2:02 PM), https://gothamist.com/news/juul-hooked-teens-through-sick-
  parties-and-hip-ambassadors-ny-ag-says; Kathleen Chaykowski, *The Disturbing Focus of Juul's
  Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM),
  https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-
  marketing-campaigns/#3da1e11b14f9.
[418] INREJUUL_00158794-803 at 794.
[419] *See* Nik Davis (@bigbabynik), Twitter (Nov. 17, 2017 1:11 PM),
  https://twitter.com/JLIvapor/status/931630885887266816; Robert K. Jackler, The Role of the
  Company in the Juul Teen Epidemic, Testimony for the House Subcommittee on Economic and
  Consumer Policy (Jul. 24, 2019),

sometimes at $1 "demo events." Like so many of JLI's initiatives, promotions of this kind are prohibited for cigarette companies by the Master Settlement Agreement.

368.     The effect—and purpose—of JLI's Vaporized giveaways was to flood major cities with products that would hook thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JLI's message to their friends via word of mouth and social media.

369.     According to BeCore, one of the firms responsible for designing and implementing JLI's live events, JLI distributed the nicotine-equivalent of approximately 500,000 packs of cigarettes at all twenty-five events.[420] And this was just to get people started.

**7.     The Management Defendants' Direction and Participation in the Youth Marketing Schemes**

**a.     The Management Defendants, and in particular Bowen, Monsees, Pritzker, Huh, and Valani, oversaw the youth marketing scheme.**

370.     The Management Defendants were well aware that JUUL branding was oriented toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine. The Management Defendants directed and approved JUUL branding to be oriented toward teenagers. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████[421]████████████████████

████████████████████████

371.     After launch, executives and directors discussed whether to rein in the advertising to teenagers. ████████████████████████████████████████

---

https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

[420] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 9 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[421] *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the Comm. on Oversight & Reform, H.R.*, 116th Cong. 70 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.).



372.     But some company leaders, including Huh, opposed any actions to curb youth sales. Youth sales were a large potential source of revenue.[428] As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people had no problem with

---

[422] JLI00206239.
[423] JLI00214617.
[424] *Id.*
[425] *Id.*
[426] *Id.*
[427] *Id.*
[428] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

500 percent year-over-year growth."[429] And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.[430]

373. In October 2015, JLI leadership resolved the debate in favor of selling to teens. ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[431]

374. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████[432]█████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████[433]████████████████████████████████████████████████████████

███████████████████,[434] Pax Labs modified the age verification system so that 92% of users were able to pass the age gate.[435] By changing the age verification process so that users were more likely to pass—████████████████████████████████████████████—Pax Labs deliberately chose to continue selling to underage purchasers.

375. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[429] *Id.*
[430] *Id.*
[431] The Vaporized advertising campaign continued at least into early 2016. Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 7 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[432] INREJUUL_00276445.
[433] Native attachment to INREJUUL_00078494.
[434] JLI00068428.
[435] Kate Horowitz's LinkedIn profile, https://www.linkedin.com/in/k8horowitz (last visited Apr. 22, 2020) (stating that while serving as an Ecommerce Product Manager at PAX Labs, Inc. from July 2015 to May 2016, she "increased success rate of age verification by 25%, up from 74% to 92%").

█████████████████████████████████████████████████████████

███████████████████████████████████[436] But JLI did not run this campaign then and in

fact did not begin focusing its advertising on switching from combustible cigarettes until 2018.[437]

376.    By March 2016, however, JLI employees internally recognized that JLI's efforts to

market to children were too obvious. ███████████████████████████████████████████

█████████████████████████████████████████████

███████████████[438] ███████████████████████████████████████

██████████████████████████████████████████████████████,,[439]

███████████████████████████████████████████████████████████

████████████████████[440]████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████[441]████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████[442] Around this time, Pax Labs reoriented its JUUL advertising from the explicitly

youth-oriented Vaporized campaign to a more subtle approach to appeal to the young. The

advertising's key themes continued to include pleasure/relaxation, socialization/romance, and

---

[436] JLI00214617.
[437] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford
  Research Into the Impact of Tobacco Advertising (Jan. 31, 2019),
  http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 16.
[438] INREJUUL_00178377.
[439] INREJUUL_00061469.
[440] INREJUUL_00178379.
[441] INREJUUL_00178384.
[442] INREJUUL_00061274.

flavors[443]—all of which still appealed to teenagers, as was made clear in the previous litigation against the cigarette industry.

377.     The Management Defendants continued to direct and approve misleading marketing campaigns long after launch. For example, JLI deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns, and ads cross-promoting mango and mint. Through their positions on the JLI Board of Directors, the Management Defendants were directly responsible for this marketing, as they had "final say" over all of JLI's marketing activities.[444] In other words, JLI and the Management Defendants controlled the messaging around JUUL products.

378.     Notably, none of JLI's early advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed that JUUL contains high amounts of nicotine; indeed, many of those advertisements did not advertise JUUL's nicotine content whatsoever.

379.     Likewise, none of JLI's advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed the health risks from consuming JUUL products.

380.     JLI and the Management Defendants knew of course that JUUL contained an ultra-high concentration of nicotine, and that ultra-high concentration of nicotine was designed to addict. They also knew that e-cigarette products, including JUUL, would expose users to increased health risks, including risks to their lungs and cardiovascular system. Despite that knowledge, JLI and the Management Defendants took affirmative actions, the natural consequence of which was the approval and transmission of these false and misleading advertisements that did not include a disclosure of JUUL's high nicotine content and concentration, nor any health risks at all.

---

[443] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf at 9.

[444] *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the Comm. on Oversight & Reform, H.R*, 116th Cong. 70 (2019) (statement of James Monsees, CPO, JLI Labs).

### b. Pritzker, Huh, and Valani Were Able to Direct and Participate in the Youth Marketing Because They Seized Control of the JLI Board of Directors.

381. Although Defendants Bowen and Monsees were the visionaries behind JLI and the most hands-on in its early stages, by the time JLI was pushing its marketing campaigns in early-to mid-2015, JLI (through the individuals running the company), Bowen, Monsees, Pritzker, Huh, and Valani were each intimately involved in the planning and execution of activities.

382. For example, ███████████████████████████████████
███████████████████████████████████████████████████
█████,"445 ██████████████████████████████████████████
███████████████████████████████████████████████████
███████

383. But the Management Defendants at this point were taking actions that went beyond the regular and legitimate business operations of JLI. At the same time ███████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████.446

384. And at the same time the Management Defendants had approved the early JLI marketing campaigns that were intentionally targeting youth, the Management Defendants were planning a fundamental shift in roles to allow Defendants Pritzker, Huh, and Valani to take charge of the instrumentalities of JLI, including its employees and resources.

385. Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Huh, and Valani formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth. The Management Defendants, and in particular Huh, wanted to

---

445 INREJUUL_00056077 [Confidential].
446 *Id.*

continue their fraudulent marketing, knowing that these ads were also targeted to youth, "argu[ing] that the company couldn't be blamed for youth nicotine addiction[.]"[447]

386.    JLI's organizational charts later reflected the executive committee in the place of a CEO. [448]

387.    [449]

388.    [450]

---

[447] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[448] *See* INREJUUL_00016456 ▮▮▮▮).
[449] INREJUUL_00278332 ▮▮▮▮▮▮▮; INREJUUL_00061420 ▮▮▮▮▮▮
[450] *See* INREJUUL_00278406 *et seq.* (▮▮▮▮▮); INREJUUL_00278410 *et seq.* (▮▮▮▮▮).

1   ███████. [451] Also, ████████████████████████████

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████

6   █████████████████████████████████████ [452]

7   Additionally, ██████████████████████████████████

8   █████████," [453] ████████████████████████████

9   ███████████

10   389.   Similarly, ████████████████████████████

11   █████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   █████████████████████████ [454]

15   390.   Over the next year, until the installation of a new CEO in August 2016, Defendants

16   Pritzker, Huh, and Valani used their newly formed Executive Committee to expand the number of

17   addicted e-cigarette users through fraudulent advertising and representations to the public. They

18   cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the

19   company." [455] ████████████████████████████████████

20   ███████████ [456] Despite any potential internal misgivings about their fraudulent conduct, notably, none

21   of Management Defendants terminated their relationship with JLI during this time period.

---

[451] *See* INREJUUL_00278404 *et seq.* █████████████); INREJUUL_00278402 *et seq.* (████████
███).

[45] INREJUUL_00278405 ████████████

[453] *Id.*

[454] INREJUUL_00061856.

[455] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

[456] INREJUUL_00278359.

8.      **JLI and the Management Defendants Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products.**

a.      **JLI's Strategy Worked.**

391.    The Management Defendants knew that the JUUL marketing campaigns they directed and approved were successful in targeting youth. As Reuters has reported, "the first signs that JUUL had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where they could buy more JUULs, along with the cartridge-like disposable 'pods' that contain the liquid nicotine."[457] A former senior manager told the New York Times that "[s]ome people bought more JLI kits on the company's website than they could individually use—sometimes 10 or more devices." He added that "[f]irst, they just knew it was being bought for resale," but later "when they saw the social media, in fall and winter of 2015, they suspected it was teens."[458] Adam Bowen admitted that "he was aware early on of the risks e-cigarettes posed to teenagers[.]"[459]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ "[460] It was common knowledge within JLI that JUULs were being sold to children.

392.    After the Vaporized campaign, retail stores began selling out of JUUL products, and JLI had a difficult time trying to meet demand coming from its online ordering platform.

---

[457] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[458] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[459] *Id.*
[460] INREJUUL_00339938 (emphasis added).

393.     Furthermore, it was obvious to those outside the company that JLI was selling JUUL products to children. In June 2015, reporting on the "Vaporized" campaign that accompanied the JUUL launch, AdAge reported that John Schachter, director of state communications for Campaign for Tobacco-Free Kids, "expressed concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design" and added that there had been "obvious trends that appeal to adolescents in e-cigarette campaigns[.]"[461] Robert Jackler, a Stanford physician who investigated JLI's launch campaign, concluded that "JLI's launch campaign was patently youth-oriented."[462] JLI's commercials' attempts to appeal to teenagers were so obvious that, by October 2015, Stephen Colbert ran a satirical segment on it that noted, among other things: "And it's not just ads featuring hip young triangles that appeal to the youths; so do vape flavors like cotton candy, gummi bear, and skittles."[463]

394.     Moreover, the Management Defendants knew that kids were marketing JLI products on social media, and some even sought to take advantage of that to build the JLI brand. For example, ███

██████████████████████████████████████████████████

███████████████████████████████████████████████

█████████,"[464] ████████████████████████████

████████████,"[465]

---

[461] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.

[462] Erin Brodwin, *See how Juul turned teens into influencers and threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cig company,* Bus. Insider (Nov 26, 2018), https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11.

[463] *The Late Show with Stephen Colbert*: *Vaping is So Hot Right Now*, YOUTUBE (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM. The "triangles" ad was a JUUL ad; the listed flavors were not, but JUUL also had flavors that appealed to children.

[464] JLI00382271.

[465] *Id*.

### b.   JLI Closely Tracked Its Progress in Reaching Young Customers through Social Media and Online Marketing.

395.   Tracking the behaviors and preferences of youth that are under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products. Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers.

396.   As early as 1953, Philip Morris was gathering survey data on the smoking habits of "a cross section of men and women 15 years of age and over."[466] Commenting on these data, George Weissman, then-Vice President of Philip Morris, observed that "we have our greatest strength in the 15-24 age group."[467]

397.   Traditional approaches to youth tracking (*e.g.*, interviews conducted face-to-face or over the telephone) were limited, however, in that they often failed to capture data from certain subsets of the target market. As a Philip Morris employee noted in a June 12, 1970 memorandum, Marlboro smokers were "among the types of young people our survey misses of necessity (on campus college students, those in the military and those under 18 years of age)."[468]

398.   However, modern technology has removed many of the hurdles that made youth tracking difficult in decades past. With e-mail, social media and online forums, JLI can track, and has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL products.

399.   Using the tools available to it, JLI would have known that its viral marketing program was a resounding success, and in particular with young people.

---

[466] Philip Morris Vice President for Research and Development, Why One Smokes, First Draft, 1969, Autumn (Minnesota Trial).
[467] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 581 (D.D.C. 2006).
[468] *Id*.

400.    Between 2015 and 2017, JUUL-related posts on Twitter increased quadratically, which is the exact result to be expected from an effective viral marketing campaign.[469] Its growth on Instagram was likely even more rapid.

401.    A 2018 study of JLI's sales and presence on social media platforms found that JLI grew nearly 700%, yet spent "no recorded money" in the first half of 2017 on major advertising channels, and spent only $20,000 on business-to-business advertising.[470] Despite JLI's apparently minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.[471]

402.    On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.[472]

403.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the authors to question whether JLI was paying for positive reviews and JUUL-related social media content.

404.    The lead author of the study concluded that JLI was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.[473]

405.    Similarly, an account named @JUULnation was established on Instagram and posted tips on how to conceal JUUL devices in school supplies. The account also ridiculed efforts to combat

---

[469] *See* Brittany Emelle, et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.

[470] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, TOBACCO CONTROL (May 31, 2018), https://tobaccocontrol.bmj.com/content/28/2/146.full.

[471] *Id.*

[472] *Id.*

[473] Laura Kelly, *JUUL Sales Among Young People Fueled by Social Media, Says Study*, The Wash. Times (June 4, 2018), https://www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/.

JUUL use in schools, promoted videos of JUUL influencers, and promoted videos like the "JUUL Challenge," in which users inhale as much JUUL nicotine vapor as possible in a fixed period of time. JLI repeatedly used the hashtag "#JUULnation" on posts on its own Instagram account, for example when advertising its "Cool Mint" JUULpods, ▮▮▮▮▮▮▮, or party mode.[474]

406.    A separate study of e-cigarette advertising on mobile devices, where young people spend most of their day consuming media, found that 74% of total advertising impressions were for JUUL products.[475]

407.    A 2019 study found that as much as half of JUUL's Twitter followers were aged thirteen to seventeen.[476]

408.    A 2019 study characterizing JUUL-related Instagram posts between March and May 2018 found that among nearly 15,000 relevant posts from over 5,000 unique Instagram accounts, more than half were related to youth or youth lifestyle.[477]

409.    Some Twitter users have reported what appear to be JUUL bots.[478] Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content.[479]

410.    By April 2018, searching "JUUL" on YouTube yielded 137,000 videos with forty-three videos having over 100,000 views.[480] Of these, a huge number were plainly related to underage use,

---

[474] JLI00682401-484 at 428, 444, 451; *see also* Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/instagram/large/ig_11.jpg; Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/instagram/large/ig_12.jpg.

[475] *See* Brittany Emelle et al., *Mobile Marketing of Electronic Cigarettes in the U.S.*, Truth Iniative (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.

[476] Steven Reinberg, *Study: Half of Juul's Twitter followers are teens, young adults*, HealthDay News, (May 20, 2019) https://www.upi.com/Health_News/2019/05/20/Study-Half-of-Juuls-Twitter-followers-are-teens-young-adults/1981558384957/.

[477] Lauren Czaplicki et al., *Characterising JUUL-related posts on Instagram*, Truth Initiative (Aug. 1, 2019), https://tobaccocontrol.bmj.com/content/early/2019/07/30/tobaccocontrol-2018-054824.

[478] One example of what appear to be JUUL bots in action on Twitter is available at: https://twitter.com/search?q=juul%20bot&src=typd (last visited Apr. 4, 2020).

[479] Hennrythejuul (@hennrythejuul), Twitter (Mar. 4, 2020, 9:35 am) https://twitter.com/hennrythejuul.

including: 1,730 videos on "hiding JUUL in school," 789 on "JUUL in school bathroom," 992 on "hiding JUUL at home," and 241 on "hiding JUUL in Sharpie."[481]

411.   In 2018, JLI was internally collecting hundreds of social media posts—directed at JLI—informing it of JUUL's wild popularity with young people and in many cases requesting that JLI do something to stop it.[482]

### 9.   JLI Coordinated with Veratad Technologies To Expand Youth Access to JUUL Products.

412.   At the same time JLI and the Management Defendants were taking coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base through unlawful marketing and distribution activities, they were coordinating with an outside entity—Veratad Technologies LLC—to get JUULs into the hands of the largest number of consumers possible.

413.   JLI's website, including its online store, was pivotal to these efforts. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████.[483]

---

[480] Divya Ramamurthi et al., *JUUL and Other Stealth Vaporizers: Hiding the Habit from Parents and Teachers, Tobacco Control 2019,* Stanford Univ. (Sept. 15, 2018), https://www.ncbi.nlm.nih.gov/pubmed/30219794.
[481] *Id.*
[482] Complaint at 60, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.
[483] INREJUUL_00329660.

414.    JLI coordinated with Veratad to provide age verification services for its website from 2015 to 2018. Veratad has also provided age verification services to other e-cigarette sellers, including Lorillard[484] ███████.[485] Consistent with the claim on Veratad's website that "*You can create your own verification rules*," the company encouraged sellers like JLI to set the desired compliance level for age verification. As a member of a major e-cigarette trade organization, Veratad also offered insight into what competitors were doing, and offered to "guide your setup to follow industry best practices for age verification."

415.    Though it is illegal to sell and ship e-cigarettes to minors under both state and federal law, JLI and Veratad designed and implemented an age verification system designed to maximize the number of prospective purchasers who "pass" the process rather than to minimize the number of underage sales.[486] As a result of these intentionally permissive age verification practices, JLI and

---

[484] Staff of Sen. Richard Durbin et al., 113th Cong., *Gateway to Addiction?* (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.
[485] INREJUUL_00174362.
[486] Complaint at 165, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.

Veratad used online payment systems and the US mails to ship tens of millions of dollars of JUULpods to unverified customers, many of whom were minors.

416.    From June 2015 through the end of 2018, the age verification process on JLI's website typically prompted prospective purchasers to submit their name, address, and date of birth, which JLI forwarded to Veratad. Veratad then attempted to match all or some limited part of the consumer's information to a person of the minimum legal sales age in its database. If Veratad was able to locate a sufficient match of the prospective purchaser to a person of the minimum legal sales age in its database, then it would return a "pass" result to JLI. If Veratad was unable to make such a match, Veratad returned a "fail" result to JLI.

417.    If Veratad returned a "fail" result to JLI, rather than decline the prospective purchaser, JLI would prompt the person to enter an "alternate" address. If Veratad still could not find a match based on this alternate address, JLI would prompt the consumer to enter the last four digits of his or her social security number.

418.    If Veratad, supplied with the last four digits of a consumer's social security number, still could not match the consumer to a person of the minimum legal sales age in its database, JLI would prompt the consumer to upload an image or photograph of his or her driver's license or another governmental identification document. A JLI employee would then conduct a personal review of the image and decide whether the consumer was of the minimum legal sales age.

419.    Crucially, Veratad's age verification system was purposefully flexible, so JLI and Veratad could work together to decide just how closely a prospective purchaser's personal information had to match records in Veratad's database in order to "pass" the age verification process. JLI and Veratad could also set, or modify, the applicable minimum legal sales age to be used for verification.

1    420.    By the fall of 2015, JLI and Veratad knew that bulk purchases were being made for

2  resale on JLI's website by minors and for resale to minors.[487] For example, ██████████████

3  ████████████████████████████████████████████████████████████████████[488] ██████

4  ████████████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████"[489] ████

8  ████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████[490]

10  ████████████████████████████████."[491]

11    421.    Veratad also knew or should have known that JUUL products were being widely used

12  by minors. Veratad also knew that some underage users were able to purchase JUUL through JLI's

13

14  website using the age verification parameters that were in place. ████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████[492] ████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████."[493]

21

22

23

[487] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[488] INREJUUL_00300253-258 at 257.
[489] *Id.* at 256.
[490] *Id.*
[491] *Id.* at 253.
[492] INREJUUL_00209176-180 at 176.
[493] *Id.*

422.     Nevertheless, ███████████████████████████████████████████
████████████████████████████ ,"[494] JLI repeatedly sought, and Veratad repeatedly

recommended and directed, changes to the age verification process so that more prospective JUUL

purchasers would "pass." Both did so in an effort to increase direct sales of JLI's e-cigarettes without

regard to whether it's less stringent age verification process would permit more underage consumers to

purchase them.

423.     Between June 2015 and August 2017 (and perhaps even through early 2018), JLI and

Veratad tailored the age verification system to "pass" prospective purchasers even if certain portions of

the purchaser's personal information—*e.g.*, the purchaser's street address or date of birth—did not

match the information corresponding to a person of the minimum legal sales age in Veratad's

database.[495]

424.     Similarly, between June 2015 and August 2017, JLI and Veratad tailored the system to

"pass" a prospective purchaser under certain circumstances even when the prospective purchaser's

year of birth did not match the information corresponding to a person of the minimum legal sales age

in Veratad's database.

425.     JLI and Veratad sought to increase "pass" rates by modifying the age verification

system to allow users multiple opportunities to change their personal information if a match was not

initially found in an appropriate government database. A Veratad Performance Report from August 5,

2017 shows that, for 1,963 consumers Veratad recorded 3,794 transactions—an average of 1.93

---

[494] INREJUUL_00276489-INREJUUL_00276490.
[495] Complaint at 43, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019),
https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf. A January 29, 2018 email
exchange between Tom Canfarotta, Director of Strategic Accounts & Client Quality Services at
Veratad, and Annie Kennedy, JUUL's Compliance Manager, reveals this to have been the case.
Kennedy asked Canfarotta why a particular customer had "passed via the address step (public record
check)…but we've since learned that is not a correct address—so we're curious as to how it passed."
In response, Canfarotta wrote, "Your current rule set does not require a full address match." He went
on to explain that approval of the customer was not an anomaly or a mistake; instead, Veratad's age
verification system was working exactly the way it was designed.

attempts per consumer.[496] Only 966 consumers—less than half—passed age verification on the first

attempt.[497] By allowing consumers to alter their personal information and attempt age verification up

to three times, JLI was able to increase its database match pass rate from 49.2% to 61.2%.[498]

426. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████.[499]

427. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

428. ████████████████████████████████████████████████

██████████████████████████████████████[500] Customer service representatives

would go so far as to alter identifying information for them; a Slack chat among customer service

representatives confirmed that representatives were authorized to "adjust the street address, apartment

number, or zip code" associated with shipment.[501]

429.    The age verification procedures designed by JLI and Veratad have allowed hundreds of

thousands of e-cigarette products to be sold and/or delivered to fictitious individuals at fictitious

addresses.[502] Many of these improper sales may have been made to underage purchasers or to resellers

who sold the products to underage consumers on the grey market.[503]

---

[496] *Id.*
[497] *Id.*
[498] *Id.*
[499] INREJUUL_00184119.
[500] INREJUUL_00215324-INREJUUL_00215325.
[501] Complaint at 168, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019),
   https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.
[502] *Id.* at 138.
[503] *Id.*

430.    By divorcing the address from the other customer data in the age verification process, JLI and Veratad allowed consumers to request that tobacco products be sent to locations other than their permanent legal residences.[504] For example, JLI sent thousands of orders to commercial high rises and office parks.[505] It is unlikely these orders would have been approved had JLI and Veratad required that addresses provided by users match information in an appropriate government database and followed the requirement that the shipping address and billing address be the same.[506]

431.    The failure of the JLI/Veratad age verification procedure was intentional.[507] And despite JLI and Veratad's concerted effort to enable the sale of federally regulated tobacco products to minors,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████[508]████████████████████████████

████████████████████████████████████.[509] Similarly, a JLI spokesperson told a reporter at a New York newspaper, *ANMY*, that JLI uses "industry-leading ID match and age verification technology to ensure that customers" are over twenty-one years of age and that the "information is verified against multiple databases."[510]

---

[504] *Id.* at 146
[505] *Id.* at 147.
[506] *Id.*
[507] *Id.* at 173.
[508] INREJUUL00178123-24. INREJUUL00178123-24 ███████████████████████
████████████████████████████████████████████████████.
[50] INREJUUL_00264882-84.
[510] Alison Fox, *'Juul' e-cigarettes require stronger FDA regulation, Schmuer Says*, AMNY, (Oct. 15, 2017), https://www.amny.com/news/juul-e-cigarette-fda-regulation-1-14485385/.

432.     In August 2017, JLI responded to public scrutiny by publicly stating that it would increase the purchase age on its website to 21+ by August 23, 2017. █████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████





                                                    PLAINTIFF'S AMENDED
                                                                                                   COMPLAINT

433.    Further underscoring their common purpose of growing the e-cigarette market, even if that meant selling to youth, JLI and Veratad did not require that the year of birth and last four digits of the social security number match exactly the information corresponding to a person of the minimum legal sales age in Veratad's database until August 2018.

434.    ███████████████████████████████████████

████████████████████████████████████████████████████████████

435.    Despite JLI's knowledge that it had been coordinating with Veratad to ensure minors could purchase JUUL products online, JLI continued to make false and fraudulent statements about the strength of its age verification system. For example, on June 5, 2018, JLI tweeted about its relationship with Veratad, claiming that "We've partnered with Veratad Technologies to complete a public records search, only reporting back whether or not you are 21 years of age or older."[511] In addition, on November 13, 2018, JLI and the Managements Defendants caused a post to appear on JLI's website stating that JLI was "Restricting Flavors to Adults 21+ On Our Secure Website" and that JLI's age-verification system was "an already industry-leading online sales system that is restricted to 21+ and utilizes third party verification."[512] A video accompanying this message stated "At JUUL labs we're committed to leading the industry in online age verification security to ensure that our products don't end up in the hands of underage users" and included an image of a computer with a chain wrapped around it and locked in place.[513] These statements were fraudulent because JLI and the Management Defendants were and had been coordinating with Veratad to ensure that their age verification system did not actually prevent youth from purchasing JUUL products.

---

[511] JUUL Labs, Inc. (@JUULvapor), Twitter (June 5, 2018), https://twitter.com/juulvapor/status/1004055352692752386.
[512] *JUUL Labs Action Plan* ("November 2018 Action Plan"), JUUL Labs, Inc. (Nov. 12, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (last visited Apr. 30, 2020).
[513] *Id.*

436.     Not only did JLI and Veratad's efforts result in more sales to minors, it also allowed JLI to build a marketing email list that included minors—a data set that would prove highly valuable to Altria.

437.     In the summer of 2017, JLI engaged a company called Tower Data to determine the ages of the persons associated with email addresses on its email marketing list. According to this analysis, approximately 269,000 email addresses on JLI's email marketing list were not associated with a record of an individual who had "passed" JLI's age verification process.[514] Additionally, approximately 40,000 email addresses on JLI's email marketing list were associated with records of individuals who had "failed" JLI's own age verification process.[515] Tower Data informed JLI that 83% of the approximately 420,000 email addresses on JLI's marketing list could not be matched with the record of an individual at least eighteen years of age.[516]

438.     Despite knowing that their marketing list included minors, JLI continued to use that marketing list to sell JUUL products, and then shared that list with Altria to use for its marketing purposes.

439.     JLI and the Management Defendants knew, however, that it was not enough to disseminate advertisements and marketing materials that promote JLI to youth or to open online sales to youth, while omitting mention of JUUL's nicotine content and manipulated potency. To truly expand the nicotine market, they needed to deceive those purchasing a JUUL device and JUULpods as to how much nicotine they were actually consuming. And, through Defendants Pritzker, Huh, and Valani's control of JLI's Board of Directors, they did just that.

---

[514] Complaint at 121, *Commonwealth of Massachusetts v. Juul, et al.*, No. 20-00402 (Super. Ct. of Mass. Feb. 12, 2020) https://www.mass.gov/doc/juul-complaint/download; Janice Tan, *E-cigarette firm JUUL sued for using programmatic buying to target adolescents*, Marketing (Feb. 14, 2020), https://www.marketing-interactive.com/e-cigarette-firm-juul-sued-for-using-programmatic-buying-to-target-adolescents.
[515] *Id.*
[516] *Id.*

### 10.    JLI Engaged in a Sham "Youth Prevention" Campaign.

440.    By April 2017, JLI had determined that the publicity around its marketing to children was a problem. ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

████████████████████████████,,[517] ████████████████████████████████████████

████████,,[518] While ostensibly aimed at reducing youth sales, JLI's youth prevention program actually served to increase, not reduce, sales to children.

441.    ████████████████████████████████████████████████████████████████

██████.[519] JLI paid schools for access to their students during school time, in summer school, and during a Saturday School Program that was billed as "an alternative to 'traditional discipline' for children caught using e-cigarettes in school."[520] JLI created the curriculum for these programs, and, like the "Think Don't Smoke" campaign by Philip Morris, which "insidiously encourage[d] kids to use tobacco and become addicted Philip Morris customers[,]"[521] JLI's programs were shams intended to encourage youth e-cigarette use, not curb it. According to testimony before Congress, during at least one presentation, "[n]o parents or teachers were in the room, and JUUL's messaging was that the product was 'totally safe.' The presenter even demonstrated to the kids how to use a JUUL."[522] Furthermore, JLI "provided the children snacks" and "collect[ed] student information from the sessions."[523]

---

[517] INREJUUL_00264878; *see also* INREJUUL_00265042 ████████████████████
████████).
[518] *See, e.g.*, INREJUUL_00211242.
[519] INREJUUL_00173409.
[520] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019).
[521] William V. Corr, *American Legacy Foundation Study Shows Philip Morris 'Think Don't Smoke' Youth Anti-Smoking Campaign is a Sham*, Campaign for Tobacco Free Kids (May 29, 2002), https://www.tobaccofreekids.org/press-releases/id_0499.
[522] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019).
[523] *Id.*

442. The problems with JLI's youth prevention programs were widespread. According to outside analyses, "the JUUL Curriculum is not portraying the harmful details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use."[524] Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL products as among the potentially harmful products to avoid.[525] As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs] to be a vaping device, but they don't call it that. So when you say to a young person, 'Vapes or e-cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"[526]

443. Internal emails confirm both that JLI employees knew about the similarities of JLI's "youth prevention program" to the earlier pretextual antismoking campaigns by the cigarette industry and that JLI management at the highest levels was personally involved in these efforts. ███████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████[527]█████

████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████[529]█████████

██████████████████████████████████████████

_____

[524] Victoria Albert, *Juul Prevention Program Didn't School Kids on Dangers, Expert Says: SMOKE AND MIRRORS. JUUL—which made up 68 percent of the e-cigarette market as of mid-June—seems to have taken a page from the playbook of Big Tobacco*, The Daily Beast (Oct. 19, 2018), https://www.thedailybeast.com/juul-prevention-program-didnt-school-kids-on-dangers-expert-says.
[525] *Id.*
[526] *Id.*
[527] INREJUUL_00197608.
[528] INREJUUL_00197607.
[529] INREJUUL_00196624.

1      █████████."[530] The paper concluded that "the Philip Morris campaign had a counterproductive

2      influence."[531]

3            444.     JLI also bought access to teenagers at programs outside of school. For example, ██



9      █████.[532] Similarly, ███████████████████████████

10     ████████████.[533] ███████████████████[534]

11     ██████████████████████. JLI paid nearly 70% of the cost of

12     hiring eight teachers, eight instructional aides, and three other support personnel for the program.[535]

13

14            445.     █████████████████████████████

15     ████████████████.[536] █████████████████

16     ███████████████████████[537] Eventually,

17     JLI ended this version of the youth prevention program, but the damage had been done: following the

18     playbook of the tobacco industry, JLI had hooked more kids on nicotine.

---

[530] INREJUUL_00265202.

[531] Matthew C. Farrelly et al*., Getting to the Truth: Evaluating National Tobacco Countermarketing Campaigns*, 92 Am. J. Public Health 901 (2002).

[532] JLI-HOR-00002181–00002182.

[533] INREJUUL_00194247; Invoice to JUUL Labs from The Freedom & Democracy Schools, Inc. for $134,000, (June 21, 2018), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00003711.pdf.

[534] INREJUUL_0019428.

[535] The Freedom & Democracy Schools, Inc., *Proposal to JUUL Labs for Funding the Healthy Life Adventures Summer Pilot* (June 9, 2018), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00002789_Redacted.pdf.

[536] INREJUUL_00194646.

[537] INREJUUL_00194646.

446.     The Board was intimately involved in these "youth prevention" activities. For example,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████[538]

**11.     The FDA Warned JLI and Others That Their Conduct is Unlawful.**

447.     Throughout 2018, the FDA put JLI and others in the e-cigarette industry on notice that

their practices of marketing to minors needed to stop. It issued a series of warnings letters and

enforcement actions:

448.     On February 24, 2018, the FDA sent a letter to JLI expressing concern about the

popularity of its products among youth and demanding that JLI produce documents regarding its

marketing practices.[539]

449.     In April 2018, the FDA conducted an undercover enforcement effort, which resulted in

fifty-six warning letters issued to online retailers, and six civil money complaints to retail

establishments, all of which were related to the illegal sale of e-cigarettes to minors.[540] Manufacturers

such as JLI were also sent letters requesting documents regarding their marketing and sales methods.[541]

450.     In May 2018, the FDA again issued more warning letters to manufacturers, distributors,

and retailers of e-liquids for labeling and advertising violations; these labels and advertisements

targeted children and resembled children's food items such as candy or cookies.[542]

451.     In September 2018, the FDA engaged in several other regulatory enforcement actions,

issuing over 1300 warning letters and civil money complaints to e-cigarette and e-liquid retailers and

distributors.[543]

---

[538] JLI00151300.
[539] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. FDA (Apr. 24, 2018), https://www.fda.gov/media/112339/download.
[540] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.
[541] *Id.*
[542] *Id.*

452.    On September 12, 2018, the FDA sent letters to JLI and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[544] The FDA additionally requested manufacturers to enhance their compliance monitoring mechanisms, implement stricter age verification methods, and limit quantities and volume of e-cigarette products that could be purchased at a time.[545]

453.    Finally, in October 2018, the FDA raided JLI's headquarters and seized more than a thousand documents relating to JLI's sales and marketing practices.[546] Since then, the FDA, the Federal Trade Commission, multiple state attorneys general and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into JLI's role in the youth e-cigarette epidemic and whether JLI's marketing practices purposefully targeted youth.

454.    Siddharth Breja, who was senior vice president for global finance at JLI, "claims that after the F.D.A. raided Juul headquarters in October 2018, seeking internal documents, Mr. Burns instructed Mr. Breja and other executives not to put anything relating to regulatory or safety issues in writing, so that the F.D.A. could not get them in the future."[547]

[543] *Id.*

[544] *Letter from US FDA to Kevin Burns*, U.S. FDA (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[545] Press Release, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access*, US FDA (Sept. 11, 2018), https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-of-youth-e-cigarette-use-including-historic-action-against-more.

[546] Laurie McGinley, *FDA Seizes Juul E-Cigarette Documents in Surprise Inspection of Headquarters*, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters/.

[547] Sheila Kaplan & Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html.

1
2

**12.     In Response to Regulatory Scrutiny, Defendants Misled the Public, Regulators, and Congress that JLI Did Not Target Youth.**

3

455.     To shield their youth-driven success from scrutiny, Altria, JLI, and the Management

4

Defendants' had a long-running strategy to feign ignorance over JLI and the Management Defendants'

5

youth marketing efforts and youth access to JLI's products. They were well aware that JLI's conduct in

6

targeting underage users was reprehensible and unlawful, and that if it became widely known that this

7

was how JLI obtained its massive market share, there would be a public outcry and calls for stricter

8

regulation or a ban on JLI's products. Given the increasing public and regulatory scrutiny of JLI's

9

market share and marketing tactics, a dis-information campaign was urgently needed to protect

10

Defendants' bottom line. For this reason, JLI, the Management Defendants, and Altria all hid JLI's

11

conduct by vociferously denying that JLI had marketed to and targeted youth and instead falsely

12

claimed that JLI engaged in youth prevention. Defendants continued to make these statements while

13

and after actively and successfully trying to market to and recruit youth non-smokers. These false

14

statements were designed to protect JLI's market share, and Altria's investment, by concealing JLI's

15
16

misconduct.

17

456.     For example, after eleven senators sent a letter to JLI questioning its marketing

18

approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and Mango, JLI visited

19

Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize

20

youth were using its products, according to a staffer for Senator Richard Durbin (D-Ill.). JLI's

21

statements to Congress—which parallel similar protests of innocence by tobacco company

22
23

executives—were false.

24

457.     JLI also engaged in wire fraud when it made public statements seeking to disavow the

25

notion that it had targeted and sought to addict teens:

26
27
28

                                                                       PLAINTIFF'S AMENDED
COMPLAINT

- "It's a really, really important issue. **We don't want kids using our products**." (CNBC Interview of JLI's Chief Administrative Officer, December 14, 2017);[548]

- "We market our products responsibly, following strict guidelines to have material directly **exclusively toward adult smokers and never to youth audiences**." (JLI Social Media Post, March 14, 2018);[549]

- "Our company's mission is to eliminate cigarettes and **help the more than one billion smokers worldwide switch to a better alternative**," said JUUL Labs Chief Executive Officer Kevin Burns. "We are already seeing success in our efforts to enable adult smokers to transition away from cigarettes and believe our products have the potential over the long-term to contribute meaningfully to public health in the U.S. and around the world. At the same time, we are committed to deterring young people, as well as adults who do not currently smoke, from using our products. **We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL**." (JLI Press Release, April 25, 2018);[550]

- "Our objective is to provide the 38 million American adult smokers with **meaningful alternatives to cigarettes while also ensuring that individuals who are not already smokers, particularly young people, are not attracted to nicotine products such as JUUL**," said JUUL Labs Chief Administrative Officer Ashley Gould, who heads the company's regulatory, scientific and youth education and prevention programs. "We want to be a leader in seeking solutions, and are actively engaged with, and listening to, community leaders, educators and lawmakers on how best to effectively keep young people away from JUUL." (JLI Press Release, April 25, 2018);[551]

- "Of course, we understand that **parents and lawmakers are concerned about underage use of JUUL. As are we**. We can't restate this enough. As an independent company that is not big tobacco, we are driven by our mission and commitment to adult smokers." (JLI CEO Kevin Burns Letter to JUUL Community on Reddit, July 18, 2018);[552]

- "We welcome the opportunity to work with the Massachusetts Attorney General because, **we too, are committed to preventing underage use of JUUL**. We utilize stringent online tools to block attempts by those under the age of 21 from purchasing our products, including unique ID match and age verification technology. Furthermore,

---

[548] Angelica LaVito, *Nearly one-quarter of teens are using pot*, CNBC (Dec. 14, 2017), https://www.cnbc.com/2017/12/13/marijuana-and-nicotine-vaping-popular-among-teens-according-to-study.html (Interview with Ashely Gould, JUUL Chief Administrative Officer) (emphasis added).

[549] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 15 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (citing a JUUL social media post from March 14, 2018) (emphasis added).

[550] JUUL Labs, Inc., *JUUL Labs Announces Comprehensive Strategy to Combat Underage Use*, MarketWatch (Apr. 25, 2018), https://www.marketwatch.com/press-release/juul-labs-announces-comprehensive-strategy-to-combat-underage-use-2018-04-25 (emphasis added).

[551] *Id* (emphasis added).

[552] *A Letter to the JUUL Community from CEO Kevin Burns*, Reddit (July 18, 2018), https://www.reddit.com/r/juul/comments/8zvlbh/a_letter_to_the_juul_community_from_ceo_kevin/ (emphasis added).

we have never marketed to anyone underage. Like many Silicon Valley technology startups, our growth is not the result of marketing but rather a superior product disrupting an archaic industry. When adult smokers find an effective alternative to cigarettes, they tell other adult smokers. That's how we've gained 70% of the market share. . . Our ecommerce platform utilizes unique ID match and age verification technology to make sure minors are not able to access and purchase our products online." (Statement from Matt David, JLI Chief Communications Officer, July 24, 2018);[553]

- "**We did not create JUUL to undermine years of effective tobacco control, and we do not want to see a new generation of smokers**. . . . We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. . . .We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers."." (JLI's website as of July 26, 2018);[554]

- "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . **Our intent was never to have youth use JUUL products**." (JLI Website, November 12, 2018);[555]

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);[556]

- "Any underage consumers using this product are absolutely a negative for our business. We don't want them. **We will never market to them. We never have.**" (James Monsees, quoted in *Forbes*, November 16, 2018);[557]

- "First of all, I'd tell them that I'm sorry that their child's using the product. **It's not intended for them**. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms

---

[553] *Statement Regarding The Press Conference Held By The Massachusetts Attorney General*, JUUL Labs, Inc. (July 24, 2018), https://newsroom.juul.com/statement-regarding-the-press-conference-held-by-the-massachusetts-attorney-general/ (emphasis added).

[554] *Our Responsibility*, JUUL Labs, Inc. (July 26, 2018), https://web.archive.org/web/20180726021743/https://www.juul.com/our-responsibility (last visited Mar. 29, 2020) (emphasis added).

[555] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of Ken Burns, former CEO of JUUL) (emphasis added).

[556] *Id.* (emphasis added).

[557] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9 (emphasis added) (statement of James Monsees).

of what the challenges they're going through." (CNBC Interview of JLI CEO, July 13, 2019);[558]

- "We have **no higher priority than to prevent youth usage of our products** which is why we have taken aggressive, industry leading actions to combat youth usage." (JLI Website, August 29, 2019);[559]

- James Monsees, one of the company's co-founders, said **selling JUUL products to youth was "antithetical to the company's mission."**(James Monsees' Statement to New York Times, August 27, 2019);[560]

- Adam Bowen, one of the company's co-founders, said he was aware early on of the risks e-cigarettes posed to teenagers, and the **company had tried to make JUUL "as adult-oriented as possible**."(Adam Bowen's Statement to the New York Times, August 27, 2019);[561]

- "**We have never marketed to youth and we never will**."(JLI Statement to Los Angeles Times, September 24, 2019);[562]

- "I have long believed in a future where adult smokers overwhelmingly choose alternative products like JUUL. **That has been this company's mission since it was founded,** and it has taken great strides in that direction." (JLI's CEO K.C. Crosthwaite, September 25, 2019);[563]

- "As scientists, product designers and engineers, we believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. **Our goal is to maximize the positive and reduce the negative.**" (JLI Website, March 6, 2020);[564] and

- "**JUUL was designed with adult smokers in mind.**" (JLI Website, last visited March 29, 2020).[565]

---

[558] Angelica LaVito, *As JLI grapples with teen vaping 'epidemic,' CEO tells parent 'I'm sorry'*, CNBC (July 13, 2019), https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html (emphasis added).

[559] *Our Actions to Combat Underage Use*, JUUL Labs, Inc. (Aug. 29, 2019), https://newsroom.juul.com/our-actions-to-combat-underage-use/ (JUUL statement in response to lawsuits) (emphasis added).

[560] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html (emphasis added).

[561] *Id* (emphasis added).

[562] Michael Hiltzik, *Column: Studies show how JLI exploited social media to get teens to start vaping*, L.A. Times (Sept. 24, 2019), https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens (statement made on behalf of JUUL) (emphasis added).

[563] Juul Labs Names New Leadership, Outlines Changes to Policy and Marketing Efforts, JUUL Labs, Inc. (Sept. 25, 2019), https://newsroom.juul.com/juul-labs-names-new-leadership-outlines-changes-to-policy-and-marketing-efforts/ (emphasis added) (statement by K.C. Crosthwaite).

[564] *Our Mission*, JUUL LABS, INC. (2019), https://www.juul.com/mission-values (last visited Apr. 4, 2020) (emphasis added).

[565] JUUL Labs, Inc., https://www.juul.com/ (last visited Mar. 29, 2020) (emphasis added).

458.     As the JLI Board of Directors had "final say" over all of JLI's marketing efforts, these statements regarding JLI's marketing efforts can be imputed to the Management Defendants, who were therefore directly responsible for the messaging over the marketing of JUUL products.

459.     Altria also engaged in wire fraud when it made public statements seeking to disavow the notion that JLI had targeted and sought to addict teens:

- "Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. **As JUUL previously said, 'Our intent was never to have youth use JUUL products.'**" (Altria News Release, December 20, 2018).[566]

460.     However, JLI, the Management Defendants, and Altria realized that attempting to shift public opinion through fraudulent statements was not enough to achieve their goal of staving off regulation. To accomplish this goal, they would also need to deceive the FDA and Congress. And so they set out to do just that through statements and testimony by JLI representatives. These include, but are not limited to, the following:

**Statements by JLI to the FDA:**

- "JUUL was not designed for youth, **nor has any marketing or research effort since the product's inception been targeted to youth**." (Letter to FDA, June 15, 2018).[567]
- "With this response, the Company hopes FDA comes to appreciate why the product was developed and **how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers**." (Letter to FDA, June 15, 2018).[568]

**Statements by Altria to the FDA:**

- "**[W]e do not believe we have a current issue with youth access** to or use of our pod-based products, we do not want to risk contributing to the issue." (Letter from Altria CEO to FDA Commissioner Scott Gottlieb, October 25, 2018).[569]

---

[566] Altria Group, Inc., *Altria Makes $12.8 Billion Minority Investment to Accelerate Harm Reduction and Drive Growth* ("Altria Minority Investment") (Form 8-K), Ex. 99.1 (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm (emphasis added).

[567] Letter from JUUL's Counsel at Sidley Austin to Dr. Matthew Holman, FDA at 2 (June 15, 2018) (emphasis added).

[568] *Id.* at 3 (emphasis added).

[569] Letter from Altria CEO Howard Willard to Dr. Scott Gottlieb, FDA at 2 (Oct. 25, 2018) (emphasis added).

- "We believe e-vapor products present an important opportunity to **adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18)[570]

**Statements by JLI to Congress:**

- "**We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products**. . . .That is a serious problem. Our company has no higher priority than combatting underage use." (Testimony of James Monsees, July 25, 2019).[571]

- "Our product is **intended to help smokers stop smoking combustible cigarettes**." (Ashley Gould, JLI Chief Administrative Officer, Testimony before House Committee on Oversight and Reform, July 25, 2019).[572]

**Statements by Altria to Congress:**

- "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and **had quickly become a very compelling product among adult vapers**. We decided to pursue an economic interest in JUUL, believing that an investment would **significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products** and strengthen our competitive position with regards to potentially reduced risk products." (Letter from Altria CEO to Senator Durbin, October 14, 2019).[573]

461.   Each of the foregoing statements constitutes an act of wire fraud. JLI, Monsees, and Altria made these statements, knowing they would be transmitted via wire, with the intent to deceive the public, the FDA, and Congress as to Defendants' true intentions of hooking underage users.

462.   Their disinformation scheme was successful. While certain groups such as the American Medical Association were calling for a "sweeping ban on vaping products,"[574] no such ban

---

[570] *Id.* At 1 (emphasis added).

[571] *Examining JUUL's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. 1 (2019), https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-MonseesJ-20190725.pdf (emphasis added) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.).

[572] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Ashley Gould, Chief Administrative Officer, JUUL Labs, Inc. ), https://www.c-span.org/video/?462992-1/hearing-cigarettes-teen-usage-day-2&start=6431 at 01:53:25 (emphasis added).

[573] Letter from Howard A. Willard III, Altria to Senator Richard J. Durbin, 6 (October 14, 2019) (emphasis added).

[574] Karen Zraick, *A.M.A. Urges Ban on Vaping Products as JLI is Sued by More States*, N.Y. TIMES (Nov. 19, 2019), https://www.nytimes.com/2019/11/19/health/juul-lawsuit-ny-california.html.

has been implemented to date. Accordingly, JLI's highly addictive products remain on the market and available to underage users.

**F.      Altria Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette.**

      **1.      Before Altria's Investment in JLI, Altria and JLI Exchanged Market Information Pertaining to Key Decisions.**

463.      ████████████████ JLI and Avail Vapor ("Avail"), a chain of more than 100 high-end vape stores,[575] ████████████████████████████████████.[576]

464.      On November 2, 2017, Altria announced that it had acquired a minority interest in Avail.[577] Altria's comments to investors highlighted that the investment allowed Altria access to Avail's "extensive data around adult vaper purchasing patterns," and "full-service analytical science laboratory," located in Altria's hometown of Richmond, Virginia.[578]

465.      On November 21, 2017—three weeks after Altria announced its investment in Avail—JLI and Avail entered into a distribution agreement, which has been renewed twice—once in November 19, 2018 and again on January 8, 2019.[579]

466.      Through its investment in Avail, Altria had access to sales data for JUUL products long before the companies exchanged diligence in connection with Altria's investment in JLI. Although JLI

---

[575] *About Us,* Avail Vapor, https://www.availvapor.com/about-us (last visited Apr. 4, 2020).
[576] INREJUUL_00066273.
[577] Rich Duprey, *Is Altria Trying to Corner the E-Cig Market?*, THE MOTLEY FOOL (Jan. 7, 2018), https://www.fool.com/investing/2018/01/07/is-altria-trying-to-corner-the-e-cig-market.aspx; Lauren Thomas, *Altria shares plunge after FDA releases road map to curb tobacco-related deaths*, CNBC (July 28, 2017), https://www.cnbc.com/2017/07/28/altria-shares-fall-after-fda-releases-roadmap-to-curb-tobacco-related-deaths-.html.
[578] Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, CEO and President, and other members of ALTRIA's senior management team, 2017 Consumer Analyst Group of New York (CAGNY) Conference (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.
[579] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. 28 (2019) (Responses of JUUL Labs, Inc. to Questions for the Record).

represented to Congress that "[JLI's] data [from Avail] was not available to Altria,"[580] statements in Altria's October 2019 letter to Congress suggest otherwise.

467.    In that letter, Altria admitted that it possessed JUUL sales data that corresponds to the very same time period in which JLI began selling its products at Avail stores, starting in late 2017.[581] That sales data showed that JLI was dominating the e-cigarette market during this time period.[582] By November 2017, JLI had sold one million units of its blockbuster product, boasting 621% growth in year-to-year sales and capturing 32% of e-cigarette sales tracked by Nielsen.[583] Sales of Altria's own e-cigarettes, on the other hand, trailed behind both the JUUL and British American Tobacco's Vuse. Altria sought to grow JLI's market dominance and young customer base. JLI, in the regulatory crosshairs, needed Altria's experience and its influence in Washington.

468.    Altria recognized that JLI had, against the backdrop of steadily declining cigarette sales, created the right product to addict a new generation to nicotine. JLI faced existential threats, however, from regulatory and congressional scrutiny, and public outrage over the growing youth e-cigarette epidemic.

469.    JLI, Altria, and the Management Defendants thus began to coordinate their activities in 2017 through Avail Vapor. This back-channel, and the information it provided Altria, allowed Altria to take actions to benefit itself, JLI, and the Management Defendants without drawing the scrutiny of the public and regulators that they knew would inevitably follow a formal announcement of a partnership between JLI and Altria.

---

[580] *Id.*

[581] Letter from Howard A. Willard III, Altria to Senator Richard J. Durbin, 6 (October 14, 2019) (emphasis added).

[582] *Id.*

[583] Melia Robinson, *How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year,* Bus. Insider (Nov. 21, 2017), https://www.businessinsider.com/juul-e-cigarette-one-million-units-sold-2017-11.

1
2

### 2. JLI, the Management Defendants and Altria Coordinated to Market JUUL in Highly-Visible Retail Locations.

3
4

470.    JLI, the Management Defendants, and Altria's coordination continued in other ways throughout 2018 as they prepared for Altria's equity investment in JLI.

5
6
7
8
9
10

471.    A key aspect of this early coordination was Altria's acquisition of shelf-space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products. By acquiring shelf space, Altria took steps to ensure that JUUL products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.[584]

11
12
13
14
15
16
17
18
19

472.    Altria's investment was not for its own e-cigarette products. Altria spent approximately $100 million in 2018 to secure shelf-space at retailers for e-cigarette products—purportedly for the MarkTen e-cigarette that Altria stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small scale in only 25,000 stores.[585] By comparison, the 2014 launch of the original MarkTen resulted in product placement in 60,000 stores in the first month in the western United States alone.[586] Yet Altria's payments for shelf space were a mixture of "cash and display fixtures in exchange for a commitment that its e-cigarettes would occupy prime shelf space for at least two years."[587]

20
21

473.    In reality, Altria spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JLI's massive, ill-gotten market share. It has since been

22
23

---

24
25
[584] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General,* Centers for Disease Control & Prevention 161, 164 (2012), https://www.ncbi.nlm.nih.gov/books/NBK99237/.

26
[585] Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, N.Y. TIMES (Oct. 25, 2018), https://www.nytimes.com/2018/10/25/health/altria-vaping-ecigarettes.html.

[586] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, CONVENIENCE STORE NEWS (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

27
28
[587] Jennifer Maloney & John McKinnon, *Altria-JLI Deal Is Stuck in Antitrust Review*, WALL ST. J. (Jan. 17, 2020), https://www.wsj.com/articles/altria-juul-deal-is-stuck-in-antitrust-review-11579257002.

reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction JUUL created, but because a non-compete was a "part of its deal with J[LI]."[588]

474.    When Altria later announced its $12.8 billion investment in JLI, part of the agreement between the two companies was that Altria would provide JLI with this premium shelf space.[589]

475.    Altria's purchase of shelf space in 2018 and its subsequent provision of that space to JLI shows how Altria, JLI, and the Management Defendants were coordinating even before Altria announced its investment in JLI. Altria's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they most likely to buy them—retail establishments.[590]

### 3.    Altria Contributes to the Success of JLI's and the Management Defendants' Scheme Through a Range of Coordinated Activities.

476.    While JLI and Altria remain separate corporate entities in name, following its equity investment in JLI, Altria and JLI forged even greater significant, systemic links, *i.e.*, shared leadership, contractual relationships, financial ties, and continuing coordination of activities.

477.    In 2019, two key Altria executives became JLI's CEO and head of regulatory affairs, respectively.

478.    K.C. Crosthwaite, who was president of Altria Client Services when the company carried out a study that would later be used by Altria to shield JUUL's Mint pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was Altria's chief growth officer.

---

[588] *Id.*

[589] *Id.*

[590] Laura Bach, *Where Do Youth Get Their E-Cigarettes?*, Campaign for Tobacco Free Kids (Dec. 3, 2019), https://www.tobaccofreekids.org/assets/factsheets/0403.pdf.

479.     Joe Murillo, who launched the MarkTen line at Altria and more recently headed regulatory affairs for Altria, is now JLI's chief regulatory officer.[591] A 24-year career Altria executive, Murillo previously ran Altria's e-cigarette business, Nu Mark, "before Altria pulled its e-cigarettes off the market as part of its deal with J[UUL]."[592]

480.     In addition to its effective takeover of JUUL, Altria provides services to JLI in furtherance of their common goal of expanding the number of nicotine-addicted e-cigarette users, in the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs."[593] These services include, among other things:

> "Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services;"

> "Making available [Altria's] previously contracted shelf space with certain retailers," thus allowing JUUL products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth;

> "Executing direct mail and email campaigns and related activities. . . .;"

> "Leveraging Altria's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon;" and

> "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."[594]

481.     Altria also worked with JLI to cross-market JUUL and Marlboro cigarettes. For example, Altria offered coupons for JUUL starter kits inside packs of Marlboro cigarettes:[595]

---

[591] Jennifer Maloney, *JLI Hires Another Top Altria Executive*, Wall St. J. (Oct. 1, 2019), https://www.wsj.com/articles/juul-hires-another-top-altria-executive-11569971306.
[592] *Id.*
[593] Letter from Howard Willard III, Altria Senator Durbin, et. al., at 11 (Oct. 14, 2019).
[594] *Id.* at 13.
[595] *Points for us!*, Reddit (Sept. 16, 2019), (depicting an image of a Marlboro carton with a JUUL starter kit coupon inside).



482.     Altria's investment in JLI was not only a financial contribution; rather, it was an important aspect of JLI, Altria, and the Management Defendants' plan to continue growing the user base, stave off regulation, and keep JLI's most potent and popular products on the market and available to kids and the public at large. Altria is and was working to actively help expand sales of JLI's products. Altria's investment brings legal and regulatory benefits to JLI, by helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure.

483.     Altria also brings lobbying muscle to the table, which has played an important role in JLI, Altria, and the Management Defendants' scheme of staving off regulation by preventing new federal or state legislation targeting JUUL or the e-cigarette category more broadly. Altria "has a potent lobbying network in Washington [D.C.] and around the country."[596] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where Altria ends and JLI begins."[597] While an Altria spokesman has denied that there was any contractual services agreement for lobbying between JLI and Altria, he

---

[596] Shelia Kaplan, *In Washington, JLI Vows to Curb Youth Vaping. Its Lobbying in States Runs Counter to That Pledge.*, N.Y. Times (Apr. 28, 2019), https://www.nytimes.com/2019/04/28/health/juul-lobbying-states-ecigarettes.html.
[597] *Id.*

admitted that he did not know what informal advice and conversations Altria has had with JLI about lobbying efforts. Since JLI, the Management Defendants, and Altria joined forces, JLI's spending on lobbying has risen significantly. JLI spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.[598]

484.    In addition, Altria's arrangement with JLI greatly expands JLI's retail footprint. While JUUL products have typically been sold in 90,000 U.S. retail outlets, Altria reaches 230,000 U.S. outlets. Altria also brings its logistics and distribution experience (although, after increasing public scrutiny, Altria announced on January 30, 2020 that it would limit its support to regulatory efforts beginning in March 2020[599]). And importantly, as noted above, Altria gives JLI access to shelf space that it had obtained under fraudulent pretenses. This is not just any shelf space; it is space near Altria's blockbuster Marlboro cigarettes, and other premium products and retail displays. The arrangement allows JLI's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

485.    Altria decided to make a significant investment in JLI to further its efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, which ultimately benefits Altria by ensuring a new generation of customers for its products. In fact, when announcing its investment, Altria explained that its investment in JLI "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JLI expand its reach and efficiency."[600] Altria has helped JLI maintain and expand its market share—a market share that, based on Altria's own October 25, 2018 letter to the FDA, it

[598] *Client Profile: JUUL Labs*, Center for Responsive Politics, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2019&id=D000070920 (last visited Apr. 4, 2020).

[599] Nathan Bomey, *Marlboro maker Altria distances itself from vaping giant JLI amid legal scrutiny*, USA Today (Jan. 31, 2020), https://www.usatoday.com/story/money/2020/01/31/juul-altria-distances-itself-e-cigarette-maker-amid-scrutiny/4618993002/.

[600] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

believes was gained by employing marketing and advertising practices that contributed to youth e-cigarette use.

**G.     JLI, Altria, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis.**

486.     Defendants' tactics have misled the public regarding the addictiveness and safety of e-cigarettes generally, and JUUL products specifically, resulting in an epidemic of e-cigarette use among youth in particular.

487.     Defendants' advertising and third-party strategy, as discussed above, ensured that everyone from adults to young children, would believe JUULing was a cool, fun, and safe activity.

488.     To this day, JLI has not fully disclosed the health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of people in harm's way.

**1.     Defendants' Scheme Caused Youth to be Misled into Believing that JUUL was Safe and Healthy.**

489.     In 2016, the National Institute on Drug Abuse issued findings regarding "Teens and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring, rather than nicotine.[601]

490.     Two years later, despite the ongoing efforts of public health advocates, a 2018 study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained unaware that JUUL products contain nicotine.[602] Further, the study found that respondents using e-cigarettes were less likely to report that e-cigarettes were harmful to their health, that people can get addicted to e-cigarettes, or that smoke from others' e-cigarettes was harmful.[603]

---

[601] *Teens and E-cigarettes*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/teens-e-cigarettes (last visited May 5, 2020).
[602] Jeffrey G. Willett et al. *Recognition, Use and Perceptions of Juul Among Youth and Young Adults,* 28 TOBACCO CONTROL 054273 (2019).
[603] *Id.*

491.    Similarly, in 2018, a literature review of seventy-two articles published in the *International Journal of Environmental Research and Public Health* found that e-cigarettes were perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes.[604] Further, researchers found that specific flavors (including dessert and fruit flavors) were perceived to be less harmful than tobacco flavors among adult and youth e-cigarette users.[605] In addition, researchers found that youth e-cigarette users perceived e-cigarettes as safe to use and fashionable.[606]

492.    In 2019, a study published in Pediatrics found that 40% of participants reported using nicotine-free e-cigarette products, when in fact the products they were using contained significant levels of nicotine.[607]

493.    In 2019, a study published in the *British Medical Journal Open* systematically reviewed all peer-reviewed scientific literature published on e-cigarette perceptions through March 2018 which included fifty-one articles.[608] Researchers found consistent evidence showing that flavors attract both youth and young adults to use e-cigarettes.[609] In addition, among this same group, fruit and dessert flavors decrease the perception that e-cigarettes are harmful, while increasing the willingness to try e-cigarettes.[610]

---

[604] *Id.*

[605] Kim A. G. J. Romijnders et al., *Perceptions and Reasons Regarding E-Cigarette Use Among Users and Non-Users: A Narrative Literature Review*, 15 INT'L J. OF ENVTL. RESEARCH & PUBLIC HEALTH 1190 (2018), https://doi: 10.3390/ijerph15061190.

[606] *Id.*

[607] Rachel Boykan et al., *Self-Reported Use of Tobacco, E-Cigarettes, and Marijuana versus Urinary Biomarkers*, 143 PEDIATRICS (2019), https://doi.org/10.1542/peds.2018-3531.

[608] Clare Meernik, et al, *Impact of Non-Menthol Flavours in E-Cigarettes on Perceptions and Use: An Updated Systematic Review*, BMJ Open, 9:e031598 (2019), https://bmjopen.bmj.com/content/9/10/e031598.

[609] *Id.*

[610] *Id.*

1

2.     **Use of JUUL by Minors Has Skyrocketed.**

2

494.     On December 28, 2018, the University of Michigan's National Adolescent Drug Trends

3

for 2018 reported that increases in adolescent e-cigarette use from 2017 to 2018 were the "largest ever

4

recorded in the past 43 years for any adolescent substance use outcome in the U.S."[611]

5

495.     The percentage of 12th grade students who reported consuming nicotine almost doubled

6

between 2017 and 2018, rising from 11% to 20.9%.[612] This increase was "twice as large as the

7

previous record for largest-ever increase among past 30-day outcomes in 12th grade."

8

496.     By 2018 approximately 3.6 million middle and high school students were consuming e-

9

cigarettes regularly,[613] and one in five 12th graders reported used an e-cigarette containing nicotine in

10

the last 30 days.[614] As of late 2019, 5 million students reported active use of e-cigarettes, with 27.5%

11

of high school students and 10.5% of middle school students using them within the last thirty days and

12

with most youth reporting JUUL as their usual brand.[615]

13

14

15



16

17

18

19

20

21

22

23

[611] *National Adolescent Drug Trends in 2018*, Univ. of Mich. Inst. for Social Research (Dec. 17, 2018), http://monitoringthefuture.org/pressreleases/18drugpr.pdf.

24

[612] News Release, *Teens Using Vaping Devices in Record Numbers*, Nat'l Insts. of Health (Dec. 17, 2018) https://www.nih.gov/news-events/news-releases/teens-using-vaping-devices-record-numbers.

25

[613] *See* Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have no Clear Path to Quitting*, N.Y.

26

Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.

[614] *Id.*

27

[615] National Youth Tobacco Survey, U.S. FDA (2019); Karen Cullen et al., *e-Cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019), https://jamanetwork.com/journals/jama/fullarticle/2755265.

28

497.    The Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[616] Then FDA Commissioner Dr. Gottlieb described the increase in e-cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for an "epidemic" of nicotine use among teenagers.[617] The rapid—indeed infectious—adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products."[618] CDC Director Robert Redfield agreed, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."[619] Then-Commissioner Gottlieb identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."[620]

498.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."[621] The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of

---

[616] Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

[617] News Release, *FDA Launches New, Comprehensive Campaign to Warn Kids About the Dangers of E-Cigarette Use as Part of Agency's Youth Tobacco Prevention Plan, Amid Evidence of Sharply Rising Use Among Kids,* U.S. FDA (Sept. 18, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm.

[618] *Id.*

[619] Amir Vera, *Texas Governor Signs Law Increasing the Age to Buy Tobacco Products to 21*, CNN (June 8, 2019), https://www-m.cnn.com/2019/06/08/health/texas-new-tobacco-law/index.html.

[620] *Id.*

[621] Jerome Adams. *Surgeon General's Advisory on E-cigarette Use Among Youth* at 1. CDC (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."[622]

499.    Kids are consuming so much nicotine that they are experiencing symptoms of nicotine toxicity, including headaches, nausea, sweating, and dizziness, and they have even coined a term for it: "nic sick." As one high school student explained to *CBS News*, it "kinda seems like a really bad flu, like, just out of nowhere. Your face goes pale, you start throwing up and stuff, and you just feel horrible."[623]

500.    The JUUL youth addiction epidemic spread rapidly across high schools in the United States. JUUL surged in popularity, largely through social media networks, and created patterns of youth usage, illegal youth transactions, and addiction, that are consistent with this account from Reddit in 2017:

> Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say 'can I put my pod in ur juul?' and are in there every block. I myself spent about 180$ on mango pods and bought out a store, and sold these pods for 10$ a pod, making myself an absolutely massive profit in literally 9 days. Given because I'm 18 with a car and that's the tobacco age around here, I always get offers to get pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make i[t] their own, every day you can find the pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.[624]

In response to the post above, several others reported similar experiences:

---

[622] *Id.* a 2.

[623] *High school students say about 20% of their peers are vaping, some as young as 8th grade*, CBS News (Aug. 30, 2019), https://www.cbsnews.com/news/high-school-students-say-about-20-of-their-peers-are-vaping-some-as-young-as-8th-grade/.

[624] *What's Juul in School*, https://www.reddit.com/r/juul/comments/61is7i/whats_juul_in_school/ (last visited Apr. 4, 2020).

a.  "[T]his is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is."[625]

b.  "Same thing at my school. JUUL fiend is a term too."[626]

c.  "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are."[627]

d.  "[S]ame [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once, and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is."[628]

e.  "[T]he same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now."[629]

f.  "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a pod man?'"[630]

g.  "It's the same at my school and just about every other school in Colorado."[631]

h.  "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic.'"[632]

i.  "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one."[633].

j.  "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping."[634]

---

[625] *Id.*
[626] *Id.*
[627] *Id.*
[628] *Id.*
[629] *Id.*
[630] *Id.*
[631] *Id.*
[632] *Id.* (citing *Juuls Now Rule the School as Students Frenzy Over E-cig* (Oct. 5, 2016), https://imgur.com/a/BKepw).
[633] *Id.*
[634] *Id.*

k.   "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul. It's a craze. I love it, I've made an insane amount of money. It's something that has swept through our age group and has truly taken over. And it happened almost overnight."[635]

501.    The following graph illustrates JLI's responsibility for the nationwide youth e-cigarette epidemic. While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth. Through that same timeframe, youth e-cigarette rates nearly doubled from more than 11% in 2017 to more than 20% in 2018. Through October 5, 2019 (the last date for which data was available), rates of youth e-cigarette use continued to increase, tracking the growth of JUUL.



[636]

502.    The unique features of the JUUL e-cigarette—high nicotine delivery, low harshness, and easy-to-conceal design—have caused patterns of addiction with no historical precedent. It is not

---

[635] *Id.* (emphasis added).

[636] The area graph depicts e-cigarette unit sale volumes in retail outlets tracked by Nielsen by manufacturer and month from 2013 through October 5, 2019; the line graph depicts national high school and middle school e-cigarette past-30-day usage rates as percentages from 2013 through 2019, with each data point representing a year. *See* Nielsen: Tobacco All Channel Data; National Youth Tobacco Survey (2019); *see also* Complaint at 2 (Figure 1), *Commonwealth of Penn. v. Juul Labs, Inc.*, (Ct. Common Pleas, Feb. 10, 2020).

uncommon for fifteen-year-old students, even those who live at home with their parents, to consume two or more JUUL pods a day.

503.    The downwards trend in youth smoking that public health departments and school anti-tobacco programs worked so hard to create has completely reversed. In 2018, more than one in four high school students in the United States reported using a tobacco product in the past thirty days, a dramatic increase from just one year before.[637] But there was no increase in the use of cigarettes, cigars, or hookahs during that same time period.[638] There was only increased use in a single tobacco product: e-cigarettes. While use of all other tobacco products continued to decrease as it had been for decades, e-cigarette use increased 78% in just one year.[639] This drastic reversal caused the CDC to describe youth e-cigarette use as an "epidemic."[640]

---

[637] *Progress Erased: Youth Tobacco Use Increased During 2017-2018*, CDC (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.

[638] *Tobacco Use By Youth Is Rising: E-Cigarettes are the Main Reason*, CDC (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.

[639] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes, FDA (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access.

[640] Jerome Adams, *Surgeon General's Advisory on E-cigarette Use Among Youth*, CDC (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

1
2
3
4
5
6
7
8
9
10
11
12



13

**H.    JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products.**

14

    **1.    E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that
Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI.**

15
16

    504.    One of the main reasons e-cigarettes like JUUL were so appealing from an investment

17

and business development perspective is that, unlike combustible cigarettes, e-cigarettes were

18

relatively unregulated. This regulatory void was not an accident; the cigarette industry, and then the e-

19

cigarette industry, spent significant resources blocking, frustrating, and delaying government action. A

20

1996 article in the *Yale Law & Policy Review* detailed how cigarette companies vehemently opposed

21

the FDA mid-1990s rules on tobacco products, using lawsuits, notice-and-comment, and arguments

22

related to the FDA's jurisdiction to delay or undo any regulatory efforts.[641]

23

    505.    In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act

24

("TCA"). The TCA amended the Federal Food, Drug, and Cosmetic Act to allow the FDA to regulate

25
26

tobacco products.

27

28

---

[641] Melvin Davis, *Developments in Policy: The FDA's Tobacco Regulations* 15 Yale L. & Policy Rev.
  399 (1996).

506.    Although the TCA granted the FDA immediate authority to regulate combustible cigarettes, it did not give the FDA explicit authority over all types of tobacco products—including those that had not yet been invented or were not yet popular. To "deem" a product for regulation, the FDA must issue a "deeming rule" that specifically designates a tobacco product, such as e-cigarettes, as falling within the purview of the FDA's authority under the TCA.

507.    The TCA also mandated that all "new" tobacco products (*i.e.*, any product not on the market as of February 15, 2007) undergo a premarket authorization process before they could be sold in the United States.

508.    Four years later, on April 25, 2014, the FDA finally issued a proposed rule deeming e-cigarettes for regulation under the Tobacco Act ("2014 Proposed Rule").

509.    Once issued, the e-cigarette industry, together with its newfound allies, parent companies, and investors—the cigarette industry and pro-e-cigarette lobbyists—set to work to dilute the rule's effectiveness. For example, in comments to the 2014 Proposed Rule, companies such as Johnson Creek Enterprises (one of the first e-liquid manufacturers) stated that the "FDA [] blatantly ignored evidence that our products improve people's lives."[642]

510.    The *New York Times* reported that Altria was leading the effort to dilute, diminish, or remove e-cigarette regulations. Notwithstanding Altria's professed concern about flavors attracting youth customers, Altria submitted comments in August 2014 in response to the proposed rule opposing the regulation of flavors. Altria asserted that restrictions could result in more illicit sales, and that adults also liked fruity and sweet e-cigarette flavors.[643]

---

[642] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (Sept. 2, 2016), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.

[643] Altria Client Services Inc., Comment Letter on Proposed Rule Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act 47-48 (Aug. 8, 2014), https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/ALCS-NuMark-Comments-FDA-2014-N-0189.pdf.

511.    In 2015, Altria lobbied Capitol Hill with its own draft legislation to eliminate the new requirement that most e-cigarettes already on sale in the United States be evaluated retroactively to determine if they are "appropriate for the protection of public health." In effect, Altria lobbied to "grandfather" all existing e-cigarette brands, including JUUL, into a lax regulatory regime. That proposed legislation was endorsed by R.J. Reynolds. Altria delivered its proposal, entitled *F.D.A. Deeming Clarification Act of 2015*, to Representative Tom Cole of Oklahoma, who introduced the bill two weeks later using Altria's draft verbatim.[644] Seventy other representatives signed on to Altria's legislation.[645]

512.    The e-cigarette industry, along with the intertwined cigarette industry, was able to leverage support among Members of Congress such as Representative Cole and Representative Sanford Bishop of Georgia, who advocated for cigarette industry interests and opposed retroactive evaluation of e-cigarette products. Both Cole and Bishop echoed a common cigarette and e-cigarette industry refrain, that any regulations proposed by the FDA would bankrupt small businesses, even though the overwhelming majority of e-cigarettes were manufactured and distributed by large cigarette companies.

513.    Representatives Cole and Bishop received some of the largest cigarette industry contributions of any member of the U.S. House of Representatives, with Representative Bishop receiving $13,000 from Altria, and Representative Cole $10,000 from Altria in the 2015-2016 cycle.[646]

514.    By thwarting and delaying regulation, or by ensuring what regulation did pass was laced with industry-friendly components, the e-cigarette industry, including Defendants, hobbled the FDA—and by extension—Congress's efforts to regulate e-cigarettes. Simultaneously, the e-cigarette industry

---

[644] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (Sept. 2, 2016), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.
[645] *Id.*
[646] *Id.*; *Rep. Tom Cole - Oklahoma District 04, Contributors 2015-16*, OpenSecrets (2017), https://www.opensecrets.org/members-of-congress/contributors?cid=N00025726&cycle=2016.

continued to market their products to youth, and it coordinated to sow doubt and confusion about the addictiveness and health impacts of e-cigarettes.

515.    Even after the FDA issued its final deeming rule in 2016, e-cigarette industry lobbying continued to pay dividends to companies like JLI. In 2017, when Dr. Scott Gottlieb took over as the FDA Commissioner, one of his first major acts was to grant e-cigarette companies a four-year extension to comply with the deeming rule, even as data indicated sharp increases in teen e-cigarette use.[647] Gottlieb had previously served on the board of Kure, a chain of e-cigarette lounges in the United States, though he fully divested before taking the helm at the FDA.[648]

516.    The four-year extension was celebrated by e-cigarette lobbyists. Greg Conley, president of the American Vaping Association ("AVA"), stated that but for the extension, "over 99 percent of vaper products available on the market today would be banned next year."[649] Despite the minimal research publicly available on the health effect of e-cigarettes, Ray Story, who had since become commissioner of the Tobacco Vapor Electronic Cigarette Association, lauded the decision: "Absolutely, it's a good thing . . . [w]hen you look at harm reduction, it's a no brainer."[650]

## 2.    JLI, the Management Defendants, and Altria Defendants Successfully Shielded the Popular Mint Flavor from Regulation.

517.    JLI, the Management Defendants, and Altria Defendants had a two-fold plan for staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on the market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of JLI's role in the youth

---

[647] Katie Thomas & Sheila Kaplan, *E-Cigarettes Went Unchecked in 10 Years of Federal Inaction*, N.Y. Times (Oct. 14, 2019), https://www.nytimes.com/2019/10/14/health/vaping-e-cigarettes-fda.html.
[648] Zeke Faux et al., *Vaping Venture Poses Potential Conflict for Trump's FDA Nominee*, Bloomberg, (Apr. 19, 2017), https://www.bloomberg.com/news/articles/2017-04-19/vaping-venture-poses-potential-conflict-for-trump-s-fda-nominee.
[649] Sheila Kaplan, *F.D.A. Delays Rules That Would Have Limited E-Cigarettes on Market*, N.Y. Times (July 28, 2017), https://www.nytimes.com/2017/07/28/health/electronic-cigarette-tobacco-nicotine-fda.html.
[650] *Id*.

e-cigarette epidemic. These schemes involved acts of mail and wire fraud, with the intent to deceive the FDA, Congress, and the public at large.

518.    First, JLI, the Management Defendants, and Altria publicly defended mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated that mint users are not former menthol smokers. Second, by fighting to keep mint as the last flavor on the market, the cigarette industry could continue to appeal to non-smokers, including youth. JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to convince the FDA into leaving the mint flavor on the market, sacrificing other flavors in the process.

519.    On August 2, 2018, JLI met with the FDA to discuss a proposed youth-behavioral study regarding the prevalence of use, perceptions of use, and intentions to use JUUL and other tobacco products among adolescents aged 13-17 years (the "Youth Prevalence Study").[651]

520.    On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had ever used a JUUL, and that only 0.8% of youth had used a JUUL in the last 30 days. ███████████ ████████████████████████████████████████████████████████████ ████████████████████.[652] Specifically, the study found that 47% of youth who reported use of a JUUL device in the last 30-days professed to using mango most often, with only about 12% reporting the same for mint.

521.    JLI's study was a sham. JLI, the Management Defendants, and Altria knew their reported data was inconsistent ████████████████████████████████ ████████. JLI's report featured responses to a carefully selected survey question—which *single* flavor youth used most often?—that obscured the widespread use of mint JUUL pods among youth.

---

[651] Letter from Joanna Engelke, JUUL Labs, Inc., to David Portnoy, Ph.D., M.P.H., FDA Center for Tobacco Products (Nov. 5, 2018).
[652] *Id.* at 3.

522.    Ironically, just a few days after JLI submitted the misleading Youth Prevalence Study to the FDA, the National Youth Tobacco Survey was released. Revealing the depths of the deception of JLI's Youth Prevalence Study, which found that only 1.5% of youth were current users of e-cigarettes, the National Youth Tobacco Survey found that 20.8% of high school student were current users (*i.e.*, consumed e-cigarettes within the last 30 days).

523.    The Youth Prevalence Study that JLI submitted to the FDA, either via U.S. mail or by electronic transmission, was false and misleading. JLI, the Management Defendants, and Altria knew as much. Indeed, they counted on it.

524.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria, JLI and other e-cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[653]

525.    As evidenced by Altria's recent admission that negotiations with JLI were ongoing in late 2017,[654] Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, allow JLI to continue marketing mint JUUL pods.[655]

526.    Defendants' plan centered on efforts to deceive the FDA that (1) mint was more akin to Tobacco and Menthol than other flavors; and (2) kids did not prefer mint.

527.    JLI took the first step in this coordinated effort to deceive the FDA. In response to then-Commissioner Gottlieb's September 12, 2018 letter, JLI prepared an "Action Plan," which it presented to the FDA at an October 16, 2018 meeting, and presented to the public on November 12, 2018. The

---

[653] Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 12, 2018); Letter from Scott Gottlieb, M.D. to Altria Group Inc. (Sept. 12, 2018).
[654] Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).
[655] *See United States v. Jones*, 712 F.2d 1316, 1320-21 (9th Cir. 1983) ████████████████

1   substance of JLI's presentation to the FDA and its public-facing Action Plan were largely identical.[656]

2   ███████████████████████████████████████████,[657]  ██████████

3   ████████████████████████████████████████████████████████[658]

4        528.   But this statement was not true. ████████████████████

5   ████████████████████████████████████[659] In JLI's Action Plan, then-

6   CEO Burns stated that only products that "mirror what is currently available for combustible

7   cigarettes—tobacco and menthol-based products (menthol and mint pods)—will be sold to retail

8   stores."[660]

9        529.   In both JLI's October 2018 presentation to the FDA and JLI's Action Plan that was

10  shared with the public, JLI and its CEO fraudulently characterized mint as a non-flavored cigarette

11  product, akin to tobacco and menthol cigarettes, suggesting that it was a product for adult smokers.

12  The image below was included in both the public-facing Action Plan and JLI's presentation to the

13  FDA.

---

[656] JUUL did not include in its Action Plan a proposal for Bluetooth or Wi-Fi equipped devices that was included in JLI's October presentation.
[657] JUUL Labs, Inc. *FDA Presentation*, 2 ████████████████; INREJUUL_00182989.
[658] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/.
[659] *Id.*
[660] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/.



530.    JLI knew that non-smoking youth liked mint as much as any flavor.

531.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████[661]

Indeed, ███████████████████████████████████████████

███████████████████████████[662] ████████████████████

████████████████████[663]

532.    Most importantly, JLI knew that mint was the most popular JUUL pod. Though other

flavors might draw new customers, JLI's most addictive "flavor" predictably became its most popular.

533.    The characterization of mint as an adult tobacco product was also fraudulent because

JLI ███████████████████████████████████████

████████████████████████████████████

████████████████████████████████

███████████████████████████████r. As alleged in a

---

[661] INREJUUL_00265069.
[662] INREJUUL_00079307-INREJUUL_00079409, at 395.
[663] Id.

Whistleblower Complaint, JLI's then-CEO told his employees: "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."[664]

534.    On October 25, 2018, less than ten days after JLI presented its fraudulent, misleading Action Plan to the FDA, Altria's CEO Howard Willard submitted a letter in response to the FDA's call to combat the youth epidemic. Willard's letter was a clear indication of Altria's willingness to continue the fraudulent scheme and deception of the FDA. While Willard's letter confirmed that Altria understood that JLI's conduct and product was addicting many children to nicotine, this letter repeated the misleading statement that mint was a "traditional tobacco flavor" despite Altria and JLI knowing it was no such thing. Willard then claimed that the youth epidemic was caused, in part, by "flavors that go beyond traditional tobacco flavors"—which, according to JLI and Altria, did not include mint—and announced that Altria would discontinue all MarkTen flavors except for "traditional tobacco, menthol and mint flavors." Willard asserted that these three flavors were essential for transitioning smokers. But Willard, and Altria, knew this was not true.[665]

535.    That same day—October 25, 2018—Altria continued its deception on an earnings call with investors. Altria fraudulently described its decision to remove its pod-based products from the market as one intended to address the dramatic increase in youth e-cigarette use, while it was only weeks away from publicly announcing its 35% stake in JLI:

> We recently met with Commissioner Gottlieb to discuss steps that could be taken to address underage access and use. Consistent with our discussion with the FDA and because we believe in the long-term promise of e-vapor products and harm reduction, we're taking immediate action to address this complex situation.
>
> First, Nu Mark will remove from the market MarkTen Elite and Apex by MarkTen pod-based products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Second, for our remaining MarkTen and Green Smoke cig-a-like products, Nu Mark will sell only tobacco, menthol and mint varieties. Nu Mark will discontinue the sale of all other flavor variants of our cig-a-like products until

---

[664] Angelica LaVito, *Former JLI executive sues over retaliation, claims company knowingly sold tainted nicotine pods*, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/former-juul-executive-sues-over-retaliation-claims-company-knowingly-sold-tainted-pods.html.
[665] Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).

these products receive a market order from the FDA or the youth issue is otherwise addressed. Although we don't believe we have a current issue with youth access or use of our e-vapor products, we are taking this action, because we don't want to risk contributing to the issue.

After removing Nu Mark's pod-based products and cig-a-like flavor variants, approximately 80% of Nu Mark's e-vapor volume in the third quarter of 2018 will remain on the market. [666]

536.     Willard reiterated that "pod-based products and flavored products" were behind the increase in youth use of e-cigarettes:

I mean, I think the way we thought about this was that we believe e-vapor has a lot of opportunity to convert adult cigarette smokers in the short, medium and long-term, but clearly, this significant increase in youth usage of the products puts that at risk and we think rapid and significant action is necessary. And I think as we looked at the data that is available in some of the remarks from the FDA, I think we concluded that the driver of the recent increase we think is pod-based products and flavored products and so we thought that the two actions that we took addressed the drivers of the increased youth usage here in the short run.[667]

537.     Willard emphasized that Altria's withdrawal of its own pod-based products was intended to address youth use: "[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward." He later said: "And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue."[668] As noted above, however, it has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction that JLI created, but because a non-compete clause was a "part of its deal with J[LI]."[669]

538.     Thus, while Altria publicly announced that it would pull its pod-based products to combat youth usage, and publicly seemed to support removal of youth-friendly flavors, its defense of mint as a tobacco-analog was actually part of the scheme to protect the profits associated with JLI's

---

[666] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript MO earnings call for the period ending September 30, 2018 (Oct. 25, 2018).

[667] *Id.*

[668] *Id.*

[669] *Id.*

mint JUUL pods, one of JLI's strongest products with the highest nicotine content and highest popularity among non-smokers and youth.

539.    In support of his arguments to the FDA that mint was a flavor for adult smokers, Willard cited to a study that Altria had conducted and presented at a conference that JLI attended.[670] But Willard did *not* disclose that Altria's "study" was merely a "quasi-experimental online survey" and not a true scientific study.[671] Notably, JLI's current CEO, K.C. Crosthwaite, was the President and Chief Growth Officer of Altria Client Services, which conducted Altria's mint "study" in Spring 2017, the same time that the Management Defendants and Altria began their "confidential negotiations."[672] Willard did not disclose that this study was contradicted by the "youth prevention" data provided by JLI during its acquisition due-diligence showing that mint was popular among teens.

540.    Through these letters, Altria sought to prevent the FDA—which was actively considering regulating flavors[673]—from banning JLI's mint JUULpods.

541.    Acting in concert, JLI and Altria committed acts of mail or wire fraud when (1) JLI transmitted its Action Plan to the FDA and the public; and (2) Altria transmitted Willard's letter to the FDA.

542.    At the heart of these acts of fraud was Defendants' characterization of mint as a tobacco product that was targeted to adult smokers. This characterization was fraudulent because Defendants knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products. Altria supported this plan and helped execute it. Together, these actions by JLI and Altria ensured that mint

---

[670] Jessica Parker Zdinak, Ph.D., *E-vapor Product Appeal Among Tobacco Users and Non-users and the Role of Flavor in Tobacco Harm Reduction*, 72nd Tobacco Science Research Conference (Sept. 18, 2018), https://sciences.altria.com/library/-/media/Project/Altria/Sciences/library/conferences/2018%20TSRC%20J%20Zdniak%20Presentation.pdf.

[671] *Id.*

[672] Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).

[673] Alex Lardieri, *FDA Considers Ban on E-Cigarette Flavors Amid 'Epidemic' Use By Teens*, U.S. News & World Report (Sept. 12, 2018), https://www.usnews.com/news/health-care-news/articles/2018-09-12/fda-considers-ban-on-e-cigarette-flavors-amid-epidemic-use-by-teens.

would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

543.    The deceptive scheme worked—the FDA did not protest JLI and Altria's plan. And on December 20, 2018, one month after JLI announced its Action Plan to keep selling mint, Altria made a $12.8 billion equity investment in JLI.

544.    By February of 2019, the FDA became aware that it had been deceived by JLI and Altria. On February 6, 2019, then-FDA commissioner Gottlieb wrote JLI and Altria demanding in-person meetings, excoriating Altria for its "newly announced plans with JUUL [that] *contradict the commitments you made to the FDA*" in a prior meeting and Willard's October 25, 2018 letter to the FDA.[674] Gottlieb's letter to JLI alleged that JLI's conduct was "inconsistent with its previous representations to the FDA."[675]

545.    The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Then-Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any alleged steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

546.    JLI and Altria met with Gottlieb in March 2019 in a meeting the then-Commissioner described as "difficult."[676] Gottlieb "did not come away with any evidence that public health concerns drove Altria's decision to invest in JLI, and instead said it looked like a business decision. According to reporting by the *New York Times*, Gottlieb angrily criticized JLI's lobbying of Congress and the White House, stating:

---

[674] Letter from Scott Gottlieb, FDA to Howard Willard, Altria (Feb. 9, 2019).
[675] Letter from Scott Gottlieb, FDA to Kevin Burns, JUUL Labs, Inc. (Feb. 9, 2019).
[676] Kate Rooney & Angelica LaVito, *Altria Shares Fall After FDA's Gottlieb Describes 'Difficult' Meeting on Juul*, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html.

> We have taken your meetings, returned your calls and I had personally met with you more times than I met with any other regulated company, and yet you still tried to go around us to the Hill and White House and undermine our public health efforts. I was trying to curb the illegal use by kids of your product and you are fighting me on it.[677]

547.   But just a week after the "difficult" meeting with JLI and Altria, Gottlieb posted a statement about the FDA's new e-cigarette policy, proposing to ban all flavors *except* "tobacco-, mint- and menthol-flavored products."[678] He cited the strong support of President Trump (whose administration JLI had aggressively lobbied[679]), and also cited "recent evidence indicat[ing] that mint- and menthol-flavored ENDS products are preferred more by adults than minors."[680] Just a few weeks later, Gottlieb resigned from his position as commissioner of the FDA.

548.   The scheme had succeeded in saving mint JUUL pods, as well as each Defendant's bottom line. JLI's sale of mint JUUL pods rose from one third of its sales in September 2018 to approximately two thirds in February 2019. JLI's 2019 revenues were estimated to be between $2.36 billion and $3.4 billion, and mint JUUL pods accounted for approximately 75% of JLI's total 2019 sales. And because mint remained on the market until JLI withdrew it in November 2019 in the face of growing scrutiny,[681] thousands, if not millions, of underage JUUL users suffered the consequences.

---

[677] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. TIMES (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

[678] News Release, *Statement from FDA Commissioner Scott Gottlieb, M.D., on advancing new policies aimed at preventing youth access to, and appeal of, flavored tobacco products, including e-cigarettes and cigars*, U.S. FDA (Mar. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-advancing-new-policies-aimed-preventing-youth-access.

[679] Evan Sully & Ben Brody, *JLI Spent Record $1.2 Million Lobbying as Regulators Stepped Up*, BLOOMBERG (Oct. 22, 2019) https://www.bloomberg.com/news/articles/2019-10-22/juul-spent-record-1-2-million-lobbying-as-regulators-stepped-up.

[680] *Id.*

[681] Ellen Huet, *JLI Pulls Mint-Flavor Vaping Products, but Menthol Remains*, Bloomberg (Nov. 7, 2019), https://www.bloomberg.com/news/articles/2019-11-07/juul-stops-selling-mint-flavored-vaping-products.

549.     As former New York City Mayor Mike Bloomberg stated: "JUUL's decision to keep mint- and menthol-flavored e-cigarettes on the shelves is a page right out of the tobacco industry's playbook."[682]

550.     JLI continues to sell menthol-flavored products.[683]

**3.      In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic.**

551.     In 2017, the FDA announced that it would be taking steps to regulate e-cigarette devices such as JUUL. In late 2017, the FDA initiated its investigation of e-cigarette companies' advertising and sales practices. But, as noted above, the FDA's 2017 Compliance Policy issued a four-year extension for compliance with the 2016 deeming rule, apparently to "balance between regulation and encouraging development of innovative tobacco products that may be less harmful than cigarettes."[684] In March 2018, the 2017 Compliance Policy was challenged by the American Academy of Pediatrics, along with other public health organizations concerned that a compliance extension for the e-cigarette industry would allow more e-cigarette products into the market and continue to addict thousands of youth.[685]

552.     In March 2019, the FDA drafted guidance that modified the 2017 Compliance Policy, but it did not go into full effect. However, on May 15, 2019, the lawsuit filed by the American Academy of Pediatrics was successful—the U.S. District Court for the District of Maryland vacated the 2017 Compliance Policy, and directed the FDA to "require that premarket authorization

---

[682] *Id.*
[683] Sheila Kaplan, *Juul Halts Sales of Mint, Its Top-Selling e-Cigarette Flavor*, N.Y. Times (Nov. 7, 2019), https://www.nytimes.com/2019/11/07/health/vaping-juul-mint-flavors.html.
[684] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.
[685] *Id.*

applications for all new deemed products" ("new" referred to any product launched after February 15, 2007 and thus would include JUUL) be submitted within ten months, by May 2020.[686]

553.     In January 2020, the FDA issued: *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization: Guidance for Industry* ("2020 FDA Guidance"), directed at the e-cigarette industry, which detailed the FDA's plan to prioritize enforcement of regulations prohibiting the sale of flavored e-cigarette products and prohibiting the targeting of youth and minors.[687] The 2020 FDA Guidance focused on flavored e-cigarettes that appeal to children, including fruit and mint: "[C]ompanies that do not cease manufacture, distribution and sale of unauthorized flavored cartridge-based e-cigarettes . . . within 30 days risk FDA enforcement actions."[688]

### 4.     The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done.

554.     By the time the FDA acted, youth consumption of e-cigarettes had already reached an all-time high, and the e-cigarette industry's presence on social media became an unstoppable force. The 2020 FDA Guidance acknowledges that two of the largest 2019 surveys of youth cigarette use found that e-cigarette use had reached the highest levels ever recorded.[689] By December 2019, there were over 2,500 reported cases of e-cigarette related hospitalization for lung injury, including over fifty confirmed deaths.[690] Despite the FDA's efforts between 2017 and 2019, youth consumption of e-

---

[686] *Id.*; *Am. Academy of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 496 (D. Md. 2019).
[687] *Id.*
[688] News Release, *FDA Finalizes Enforcement Policy on Unauthorized Flavored Cartridge-Based E-Cigarettes That Appeal to Children, Including Fruit and Mint*, U.S. FDA (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.
[689] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.
[690] Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019) , https://jamanetwork.com/journals/jama/fullarticle/2755265.

cigarettes doubled among middle and high school students over the same period.[691] In 2019, the total number of middle and high school students reporting current use of e-cigarettes surpassed five million for the first time in history.[692]

555.   JLI's presence on social media has also persisted, even without further initiation by JLI—the hallmark of a successful viral marketing campaign. When the "#juul" hashtag was first used on social media, it was a series of thirteen tweets on Twitter. By the time JLI announced it would shut down its Instagram account, "#juul" had been featured in over 250,000 posts on Instagram. A study by Stanford University found that in the eight months after JLI ceased all promotional postings, community posting accelerated, to nearly half a million posts. Whereas before JLI exited Instagram, "#juul" appeared on average in 315 posts per day, that number tripled to 1084 posts per day after JLI shut down its Instagram account.[693]

556.   The FDA's anti-e-cigarette campaign on social media was aimed at youth and middle and high school students. The campaign used the slogan "The Real Cost" to educate youth on social media platforms about the health impacts of e-cigarette consumption—the real cost of using e-cigarettes. A recent study from the University of California Berkeley found that since September 2018, when the FDA's social media campaign began, the hashtag "#TheRealCost" was used about fifty times per month on Instagram. By comparison, e-cigarette related hashtags were used as many as 10,000 times more often. Despite the FDA's social media intervention, the number of e-cigarette related posts, and the median number of likes (a strong metric of viewer engagement) the posts received, increased three-fold and six-fold, respectively.[694]

---

[691] *Id.*

[692] *Id.*

[693] Robert K. Jackler et al., *Rapid Growth of JUUL Hashtags After the Company Ceased Social Media Promotion*, Stanford Research Into the Impact of Tobacco Advertising (July 22, 2019), http://tobacco.stanford.edu/tobacco_main/publications/Hashtag JUUL Project_7-22-19F.pdf.

[694] Julia Vassey, *#Vape: Measuring E-cigarette Influence on Instagram With Deep Learning and Text Analysis*, 4 Frontiers in Commc'n 75 (2020), https://www.frontiersin.org/articles/10.3389/fcomm.2019.00075/full.

557.    In short, by the time the FDA reacted to the epidemic created by Defendants, millions of youth were addicted to e-cigarettes and nicotine, and were sharing e-cigarette related posts on social media on their own.

## V.    GOVERNMENT ENTITY FACTUAL ALLEGATIONS

### A.    E-cigarette Use in Schools

558.    In addition to severe health consequences, widespread e-cigarette use, and particularly JUUL use, has placed severe burdens on society and schools in particular. It is not an overstatement to say that JUUL has changed the high school and even middle school experience of students across the nation. As one e-cigarette shop manager told KOMO News, "It's the new high school thing. Everyone's got the JUUL."[695]

559.    The JUUL youth addiction epidemic spread rapidly across high schools in the United States. JUUL surged in popularity, largely through social media networks, and created patterns of youth usage, illegal youth transactions, and addiction, that are consistent with the account from Reddit that described widespread JUUL use discussed above.

560.    E-cigarette use has completely changed school bathrooms—now known as "the Juul room."[696] As one high school student explained, "it's just a cloud."[697]

561.    As another high school student explained, "You can pull it out, you can have it anywhere. To smoke a cigarette you have to hit the bus stop. You want a Juul you hit the bathroom,

---

[695] *Juuling at School*, KOMO News (2019), https://komonews.com/news/healthworks/dangerous-teen-trend-juuling-at-school.

[696] Moriah Balingit, *In the 'Juul room': E-cigarettes spawn a form of teen addiction that worries doctors, parents and schools*, Wash. Post (July 26, 2019), https://www.washingtonpost.com/local/education/helpless-to-the-draw-of-nicotine-doctors-parents-and-schools-grapple-with-teens-addicted-to-e-cigarettes/2019/07/25/e1e8ac9c-830a-11e9-933d-7501070ee669_story.html.

[697] Greta Jochem, *Juuling in School: e-Cigarette Use Prevalent Among Local Youth*, Daily Hampshire Gazette (Nov. 13, 2018), https://www.gazettenet.com/Juuling-in-Schools-21439655.

it's easy."[698] He added that JLI "market[s] it as an alternative to cigarettes but really it's a bunch of kids who have never picked up a pack and they're starting their nicotine addiction there."[699] Students at another high school stated that classmates had "set off the fire alarm four times last year from vaping in the bathrooms [at school]," adding that it is commonplace to see students using e-cigarettes in school bathrooms or in the parking lot.[700]

562.    An April 20, 2018 article in *The Wall Street Journal* described the problems parents and schools are facing with the meteoric rise of nicotine use by America's youth:

> At Northern High School in Dillsburg, Pa., Principal Steve Lehman's locked safe, which once contained the occasional pack of confiscated cigarettes, is now filled with around 40 devices that look like flash drives.
>
> The device is called a Juul and it is a type of e-cigarette that delivers a powerful dose of nicotine, derived from tobacco, in a patented salt solution that smokers say closely mimics the feeling of inhaling cigarettes. It has become a coveted teen status symbol and a growing problem in high schools and middle schools, spreading with a speed that has taken teachers, parents and school administrators by surprise.
>
> *            *            *
>
> After two decades of declining teen cigarette use, "JUULing" is exploding. The JUUL liquid's 5% nicotine concentration is significantly higher than that of most other commercially available e-cigarettes. JUUL Labs Inc., maker of the device, says one liquid pod delivers nicotine comparable to that delivered by a pack of cigarettes, or 200 puffs—important for adult smokers trying to switch to an e-cigarette. It is also part of what attracts teens to the product, which some experts say is potentially as addictive as cigarettes and has schools and parents scrambling to get a grip on the problem.[701]

563.    This impact was only made worse by JLI intentionally targeting schools, as described above.

---

[698] Alison Grande, *'Juuling': Vaping device that looks like USB drive popular with teens*, KIRO 7 (Dec. 8, 2017), https://www.kiro7.com/news/local/juuling-vaping-device-that-looks-like-usb-drive-popular-with-teens/660965605/.

[699] *Id.*

[700] Manisha Jha, *'You need to stop vaping right now': Students and faculty react to Washington vape ban*, The Daily, U. of Wash. (Sept. 30, 2019), http://www.dailyuw.com/news/article_960d8692-e324-11e9-870c-9f9d571115d6.html.

[701] Anne Marie Chaker, *Schools and Parents Fight a Juul E-Cigarette Epidemic*, Wall St. J. (Apr. 4, 2018), https://www.wsj.com/articles/schools-parents-fight-a-juul-e-cigarette-epidemic-1522677246.

564.     Such rampant e-cigarette use has effectively added another category to teachers' and school administrators' job descriptions; many now receive special training to respond to the various problems that youth e-cigarette use presents, both in and out of the classroom. A national survey of middle schools and high schools found that 44.4% of schools have had to implement policies to address JUUL use.[702] Participants in the survey reported multiple barriers to enforcing these policies, including the discreet appearance of the product, difficulty pinpointing the vapor or scent, and the addictive nature of the product.

565.     Across the United States, schools have had to divert resources and administrators have had to go to extreme lengths to respond to the ever-growing number of students using e-cigarettes on school grounds, including in restrooms. According to the *Truth Initiative*, more than 40% of all teachers and administrators reported responding to the JUUL crisis through camera surveillance near the school's restroom; almost half (46%) reported camera surveillance elsewhere in the school; and 23% reported using assigned teachers for restroom surveillance.[703] Some schools have responded by removing bathroom doors or even shutting bathrooms down, and schools have banned flash drives to avoid any confusion between flash drives and JUUL. Schools have also paid thousands of dollars to install special monitors to detect e-cigarette use, which they say is a small price to pay compared to the plumbing repairs otherwise spent as a result of students flushing e-cigarette paraphernalia down toilets. Other school districts have sought state grant money to create new positions for tobacco prevention supervisors, who get phone alerts when e-cigarette smoke is detected in bathrooms.

---

[702] Barbara A. Schillo, PhD et al., *JUUL in School: Teacher and Administrator Awareness and Policies of E-Cigarettes and JUUL in U.S. Middle and High Schools*, Truth Initiative Vol. 21(1) Health Promotion Practice 20-24 (Sept. 18, 2019), https://journals.sagepub.com/doi/full/10.1177/1524839919868222?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dpubmed.

[703] *How are schools responding to JUUL and the youth e-cigarette epidemic?*, Truth Initiative (Jan. 18, 2019), https://truthinitiative.org/research-resources/emerging-tobacco-products/how-are-schools-responding-juul-and-youth-e-cigarette.

566.     Many schools have also shifted their disciplinary policies in order to effectively address the youth e-cigarette epidemic. Rather than immediately suspending students for a first offense, school districts have created anti-e-cigarette curricula which students are required to follow in sessions held outside of normal school hours, including on Saturdays. Teachers prepare lessons and study materials for these sessions with information on the marketing and health dangers of e-cigarettes—extra work which requires teachers to work atypical hours early in the mornings and on weekends. Some schools will increase their drug testing budget to include random nicotine tests for students before they join extracurricular activities. Under this drug-testing protocol, first offenders will undergo drug and alcohol educational programming; second and third offenders with be forced to sit out from extra-curricular activities and attend substance abuse counseling.

567.     A July 26, 2019 article in *The Washington Post* noted the measures some schools were taking to combat "JUULing" by students:

> Many schools are at a loss for how to deal with Juuls and other e-cigarettes.  Some educators report increases in the number of students being suspended after they're caught with e-cigarettes.

> Desperate school administrators have banned USB drives because they're indistinguishable from Juuls.  Others removed bathroom doors because teens were regularly gathering there to vape, and some have even started searching students.

> Jonathon Bryant, chief administrator of Lincoln Charter School in North Carolina, estimated that three-quarters of suspensions in the just-completed academic year were related to vaping, and some students were suspended more than once.[704]

568.     JUUL's prevalence in schools is not a coincidence; JLI actively sought to enter school campuses. ██████████████████████████████████████████

████████████[705]████████████████████████████████████████████[706].

---

[704] Moriah Balingit, *In the 'Juul room': E-cigarettes spawn a form of teen addiction that worries doctors, parents and schools*, Wash. Post (July 26, 2019), https://www.washingtonpost.com/local/education/helpless-to-the-draw-of-nicotine-doctors-parents-and-schools-grapple-with-teens-addicted-to-e-cigarettes/2019/07/25/e1e8ac9c-830a-11e9-933d-7501070ee669_story.html.
[705] *See, e.g.*, INREJUUL_00211242-243 at 242.

569.     As discussed above, the U.S. House Subcommittee on Economic and Consumer Policy ("Subcommittee") conducted a months-long investigation of JLI, including reviewing tens of thousands of internal documents, and concluded that JLI "deliberately targeted children in order to become the nation's largest seller of e-cigarettes."[707] The Subcommittee found that "(1) JUUL deployed a sophisticated program to enter schools and convey its messaging directly to teenage children; (2) JUUL also targeted teenagers and children, as young as eight years-old, in summer camps and public out-of-school programs; and (3) JUUL recruited thousands of online 'influencers' to market to teens."[708]

570.     According to the Subcommittee, JLI was willing to pay schools and organizations hundreds of thousands of dollars to have more direct access to kids. For example, JLI paid a Baltimore charter school organization $134,000 to start a summer camp to teach kids healthy lifestyles, for which JLI itself would provide the curriculum.[709] ███████████████████████"[710] JLI also offered schools $10,000 to talk to students on campus and gave the Police Activities League in Richmond, California, almost $90,000 to provide JLI's own e-cigarette education program, "Moving On," to teenage students suspended for using cigarettes. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[711]

571.     Community members testified before the Subcommittee as to the content of one of JLI's presentations in school. During JLI's presentation to students, "[n]o parents or teachers were in

---

[706] INREJUUL_00173409.
[707] *Memorandum*, U.S. House Subcommittee on Econ. & Consumer Policy (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[708] *Id.*
[709] *See* INREJUUL_00194247-251; *see also* JLI-HOR-00003711-712 (invoice to JLI from The Freedom & Democracy Schools, Inc. for $134,000 dated June 21, 2018).
[710] INREJUUL_0019427-251 at 428.
[711] JLI-HOR-00002180-184 at 181-182.

the room, and JUUL's messaging was that the product was 'totally safe.' The presenter even demonstrated to the kids how to use a JUUL."[712]

572.    In 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the "FDA would approve it any day," that JUUL was "totally safe," that JUUL was a "safer alternative than smoking cigarettes, and it would be better for the kid to use," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that . . . would happen very soon[.]"[713] "The presenter even demonstrated to the kids how to use a JUUL."[714]

573.    In the FDA's September 9, 2019 Warning Letter, which discussed this presentation to ninth graders, the agency noted its "concern is amplified by the epidemic rate of increase in youth use of ENDS products, including JUUL's products, and evidence that ENDS products contribute to youth use of, and addiction to, nicotine, to which youth are especially vulnerable."[715]

574.    The FDA's Center for Tobacco Products issued a separate letter to JUUL CEO Kevin Burns, requesting "documents and information from JUUL Labs, Inc. (JUUL) regarding JUUL's marketing, advertising, promotional, and educational campaigns, as well as certain product development activity."[716] The FDA also issued a news release on September 9, 2019, in which it chided JUUL for its role in the youth e-cigarette epidemic, noting "[s]ome of this youth use appears to

---

[712] Committee Staff, *Memorandum re: Supplemental Memo for Hearing on "Examining JUUL's Role in the Youth Nicotine Epidemic: Parts 1 & II* ("Supplemental Memo for Hearing") at 1, Subcommittee on Econ. & Consumer Policy (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.

[713] *Juul Labs, Inc. Warning Letter*, FDA (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[714] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019).

[715] *Id.*

[716] Letter from Mitchell Zeller, Director, Center for Tobacco Products, to Kevin Burns, CEO of JUUL Labs, Inc. at 1 (Sept. 9, 2019), https://www.fda.gov/media/130859/download.

have been a direct result of JUUL's ***product design and promotional activities*** and outreach efforts," in particular, its outreach efforts to students.[717]

575.   The Center for Tobacco Products letter requested documents and explanations on multiple topics, including, but not limited to:

> Ms. Meredith Berkman, Co-founder, Parents Against Vaping e-cigarettes (PAVe), testified that, "In California, a retired school superintendent was offering schools in his state and in Massachusetts money if they would implement the anti-JUUL curriculum that…a man named Bruce Harder was offering on JUUL's behalf."
>
> *        *        *
>
> On July 25, 2019, in response to questions from Chairman Krishnamoorthi about JUUL's program to pay schools $10,000 or more to use a JUUL "youth prevention" curriculum, Ms. Ashley Gould, Chief Administrative Officer, JUUL Labs, Inc., testified: "That is not currently the case. We ended that program in the fall of 2018," and that, "…there were six schools that received funding from JUUL to implement programming to prevent teen vaping…."
>
> In addition, in response to questions from Chairman Krishnamoorthi about internal JUUL correspondence in 2018 about setting up a booth at a school health fair, Ms. Gould testified that JUUL ended its youth prevention program.[718]

576.   JLI also sponsored a "Saturday School Program" in which students caught using e-cigarettes in school were presented with JLI-sponsored curriculum and snacks, and JLI "established the right to collect student information from the sessions."[719] A JLI spokesman said the company is no longer funding such programs.

577.   As mentioned above, the problems with JLI's youth prevention programs were widespread. According to outside analyses, "the JUUL Curriculum is not portraying the harmful

---

[717] *FDA warns JUUL Labs for marketing unauthorized modified risk tobacco products, including in outreach to youth,* FDA (Sept. 9, 2019), https://www.fda.gov/news-events/press-announcements/fda-warns-juul-labs-marketing-unauthorized-modified-risk-tobacco-products-including-outreach-youth (emphasis added)Letter from Center for Tobacco Products, to Kevin Burns, CEO of JUUL Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/media/130859/download.

[718] Letter from Mitchell Zeller, Director, Center for Tobacco Products, to Kevin Burns, CEO of JUUL Labs, Inc. at 2 (Sept. 9, 2019), https://www.fda.gov/media/130859/download.

[719] Committee Staff, *Memorandum re: Supplemental Memo for Hearing on "Examining JUUL's Role in the Youth Nicotine Epidemic: Parts 1 & II* ("Supplemental Memo for Hearing") at 2, Subcommittee on Econ. & Consumer Policy (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.

200                    PLAINTIFF'S AMENDED
COMPLAINT

details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use."[720] Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL products as among the potentially harmful products to avoid.[721] As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs] to be a vaping device, but they don't call it that. So when you say to a young person, 'Vapes or e-cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"[722]

578.    Internal emails confirm both that JLI employees knew about the similarities of JLI's "youth prevention program" to the earlier pretextual antismoking campaigns by the cigarette industry and that JLI management at the highest levels was personally involved in these efforts. ████

████████████████████████

████████████████████████

████████████████████████████

████"[723]████████████████

████[724]███████████████████

████████████████████████████

████████,[725]████████████████

████████████████████████████

---

[720] Victoria Albert, *Juul Prevention Program Didn't School Kids on Dangers, Expert Says: SMOKE AND MIRRORS. JUUL—which made up 68 percent of the e-cigarette market as of mid-June—seems to have taken a page from the playbook of Big Tobacco*, The Daily Beast (Oct. 19, 2018), https://www.thedailybeast.com/juul-prevention-program-didnt-school-kids-on-dangers-expert-says.
[721] *Id.*
[722] *Id.*
[723] INREJUUL_00197607-608 at 608.
[724] *Id.* at 607.
[725] INREJUUL_00196624-625.

██████████████ ."[726] The paper concluded that "the Philip Morris's ['youth prevention'] campaign had a counterproductive influence."[727]

579.    The Management Defendants were intimately involved in these "youth prevention" activities. For example, ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████ ,,[728]

580.    ███████████████████████████████████████ ████████████████████████████████████ .[729] Eventually, JLI ended this version of its youth prevention program, but the damage had been done: following the cigarette industry playbook, JLI had hooked more youth on nicotine.

581.    As the sales of JUUL continued to mushroom, it was readily apparent, and widely reported, that the rapid growth in sales was due to the surging popularity of e-cigarette use among teenagers. By March 2018, multiple national news outlets including *National Public Radio*, *USA Today*, and *Business Insider* reported youth were using JUUL with alarming frequency, posting about using JUUL in school restrooms on social media, and bragging about being able to use the device in the classroom due to JUUL's discreet design.

582.    One of the priorities for JLI, Altria, and the Management Defendants was therefore to control the messaging and narrative around youth e-cigarette use. Faced with an urgent, growing public health crisis, national media attention, and the ire of the public, the FDA and members of Congress, the Defendants realized that dis-information campaign was urgently needed to protect its bottom line. This campaign was the "*Make the Switch*" campaign discussed above.

---

[726] INREJUUL_00265202.
[727] Matthew C. Farrelly et al., *Getting to the Truth: Evaluating National Tobacco Countermarketing Campaigns*, 92 Am. J. Public Health 901 (2002), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=nxhb0024.
[728] JLI00151300.
[729] INREJUUL_00194646.

583.   The "*Make the Switch*" campaign was a cover-up, and its goal was to convince the public, including schools and public health departments, that JUUL had never marketed to youth and was instead intended to be a smoking cessation device. This campaign was false. As mentioned above, one of JLI's engineers admitted, "we're not trying to design a cessation product at all . . . anything about health is not on our mind."[730] And as described elsewhere herein, JLI and the Management Defendants directly targeted underage nonsmokers. Indeed, JLI did not mention the term "adult" or "adult smoker" on its Twitter feed until July 5, 2017. JLI, the Management Defendants, and Altria were all well aware that such users made up a significant percentage of JLI's customer base in 2018— in fact, they counted on this customer base to grow and preserve JUUL's market share—and that the statements they disseminated regarding "Make the Switch" from smoking being JLI's mission from the start were fraudulent, to the detriment of schools and public health departments.

584.   As JUUL sales skyrocketed in 2017 and 2018 and schools quickly became overwhelmed by this public health crisis, everyone from tobacco industry giants to e-cigarette start-ups launched their own products to take advantage of the illicit youth e-cigarette market Defendants created, using the key elements of JUUL's design: flavor pods, nicotine salts, and a tech-like appearance.

585.   The cigarette industry, which already marketed e-cigarettes, launched "JUULalike" versions of their products in 2018, in flavors such as Mango Apricot and Green Apple, and with nicotine salt formulations and higher nicotine content than their earlier e-cigarettes.[731]

---

[730] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. Times (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.
[731] Rachel Becker, *Juul's Nicotine Salts Are Dominating the Market – And Other Companies Want In*, The Verge (Nov. 21, 2018), https://www.theverge.com/2018/11/21/18105969/juul-vaping-nicotine-salts-electronic-cigarettes-myblu-vuse-markten; *blu Launches myblu E-Vapor Device*, CStore Decisions (Feb. 21, 2018), https://cstoredecisions.com/2018/02/21/blu-launches-myblu-e-vapor-device/; Angelica LaVito, *Juul's momentum slips as NJOY woos customers with dollar e-cigarettes*, CNBC (Aug. 20, 2019), https://www.cnbc.com/2019/08/20/juuls-momentum-slips-as-njoy-woos-customers-with-dollar-e-cigarettes.html.

586.     The launch of "JUULalike" products concerned Vince Willmore, Vice President of Communications for the Campaign for Tobacco-Free Kids. According to Willmore, "Juul is our biggest concern right as it is being widely used by kids across the country . . . [b]ut we are also concerned that the introduction of a growing number of Juul-like products could make the problem even worse."[732] Willmore was not the only one worried. Then FDA Commissioner Gottlieb expressed concern about products copying JUUL's features, stating that such products "closely resemble a USB flash drive, have high levels of nicotine and emissions that are hard to see. These characteristics may facilitate youth use, by making the products more attractive to children and teens."[733]

587.     Researchers from SRITA called it "a nicotine arms race," writing that "JUUL's success in the e-cigarette marketplace has spurred a variety of new pod-based products with exceptionally high nicotine."[734] "As of September 2018," the researchers wrote, "there were at least 39 JUUL knock off devices on the market"—none of which were sold prior to the introduction of JUUL.[735]

588.     The rapid proliferation of e-cigarette products in JUUL's wake and the speed with which the e-cigarette market evolves make it difficult to enact effective legislative and regulatory measures.

589.     The Secretary of HHS recognized, "The United States has never seen an epidemic of substance use arise as quickly as our current epidemic of youth use of e-cigarettes."[736] FDA

---

[732] Ben Tobin, *FDA targets e-cigarettes like Juul as teachers fear 'epidemic' use by students*, USA Today (Aug. 16, 2018), https://www.usatoday.com/story/money/2018/08/16/juul-labs-back-school-teachers-e-cigarettes/917531002/.

[733] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes, FDA (Apr. 23, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and-youth-tobacco-prevention?utm_campaign=04242018_Statement_Youth%20Tobacco%20Prevention&utm_medium=email&utm_source=Eloqua.

[734] Robert K. Jackler & Divya Ramamurthi, *Nicotine arms race: JUUL and the high-nicotine product market*. 28 Tobacco Control 623-28 (2019), https://tobaccocontrol.bmj.com/content/28/6/623.

[735] *Id.*

[736] U.S. Food & Drug Administration, *FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint* ("FDA News Release"),

Commissioner Stephen Hahn, M.D. added, "As we work to combat the troubling epidemic of youth e-cigarette use, the enforcement policy we're issuing today confirms our commitment to dramatically limit children's access to certain flavored e-cigarette products we know are so appealing to them—so-called cartridge-based products that are both easy to use and easily concealable."[737]

590.    Enterprising companies recognized loopholes in a policy aimed only at cartridge-based products and the opportunity to fill the demand for fruit-flavored nicotine created by JLI. Disposable e-cigarettes have become increasingly popular with youth due to the youth e-cigarette market Defendant JLI created. The use of disposable e-cigarettes is now "rampant" in schools, further intensifying this public health crisis.[738]

591.    For every company inspired by JLI to sell candy-flavored e-cigarette products that exits the market, more materialize to take its place, driven by the knowledge that there is a large market of nicotine-addicted youth eager for their products, a market created by JLI.

592.    The rise in disposable products demonstrates why additional measures are necessary to halt the spread of youth e-cigarette use.[739]

**B.    Impact of the Youth E-Cigarette Crisis on Plaintiff Tucson Unified**

593.    Plaintiff Tucson Unified School District has been serving the Tucson community since 1867.  Tucson Unified is the largest school district in Tucson, one of the largest in Arizona, and includes 89 schools serving over 44,000 students.  Tucson Unified's mission includes ensuring its students receive an engaging, rigorous and comprehensive education.  Plaintiff's administrative offices are located on East Tenth Street in Tucson, Pima County, Arizona.

---

FDA (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.
[737] *Id.*
[738] Sheila Kaplan, *Teens Find a Big Loophole in the New Flavored Vaping Ban*, N.Y. Times (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/vaping-flavors-disposable.html.
[739] *Press Release: Raising the Tobacco Age to 21 Won't Stop the Youth E-Cigarette Epidemic and Is Not a Substitute for Eliminating the Flavored Products that Lure Kids*, Tobacco Free Kids (Dec. 16, 2019), https://www.tobaccofreekids.org/press-releases/2019_12_16_tobacco21_flavor.

594.     Plaintiff has been hit hard by the youth e-cigarette epidemic. According to the 2018 Arizona Youth Survey, nearly 48% of teens in Pima County, Arizona, have used a vape or e-cigarette device.[740] According to Judith Gordon, Professor and Interim Associate Dean of Research at the University of Arizona's College of Nursing in Tucson: "It's definitely a crisis in the sense that we're creating a whole new generation of people who are going to be addicted to nicotine."[741]  The problem is so pervasive in Arizona that it has repeatedly made the news:

> Jan Vesely, superintendent of the Kyrene School District, asked middle school students in a focus group last year what their biggest concern was.  Their answer surprised her. It wasn't their friends or teachers.  The students told her how they would go all day without using the restroom, fearful they'd encounter other students vaping and worried they would be falsely accused and suspended from school.[742]

595.     Some school districts in Arizona have attempted to combat the problem in part with technology, like e-cigarette detectors, but most cannot afford the steep price tag.[743]

596.     Because of the extreme nature of the problem, the Arizona School Boards Association ("ASBA") in October, 2019, took the unusual step of unanimously passing a resolution declaring youth e-cigarette use to be an epidemic and supporting legal action by its member schools, including Plaintiff, in an attempt to curb and eliminate the problem.[744]

597.     Students in Plaintiff's schools have openly used e-cigarette devices in classrooms, causing disruption and diverting staff resources away from classroom instruction.  Other students, addicted to nicotine, have demonstrated anxious, distracted and acting out behaviors, causing disruption and diverting staff resources away from classroom instruction and requiring additional time

---

[740] Pima County, *The REAL DEAL on Vaping* (undated), https://webcms.pima.gov/cms/One.aspx?portalId=169&pageId=474763; Pima County School Superintendent's Office, *Pima County Takes on Youth Vaping Epidemic* (undated), http://www.schools.pima.gov/media/press-releases/pima-county-takes-on-teen-vaping-epidemic.

[741] Hailey Mensik, *As e-cigarette use climbs, schools address the problem with vape detectors and information* (March 11, 2019), https://arizonadailyindependent.com/2019/03/11/as-e-cigarette-use-climbs-schools-address-the-problem-with-vape-detectors-and-information/.

[742] *Id.*

[743] *Id.*

[744] ASBA, *ASBA Board of Directors Pass Vaping Resolution*, (Oct. 17, 2019), https://azsba.org/asba-connect-10-17-19/.

and attention for addicted students.  These problems are consistent with the rise in youth e-cigarette use throughout the State of Arizona and across the country.

598.    According to Plaintiff's Superintendent, Dr. Gabriel Trujillo, "vaping is problem number one.  In all of our high schools especially it, not unlike any high school around the nation, it's a pretty serious disruption that we deal with."[745]

599.    Plaintiff's school board members have echoed the urgency of the situation.  As one remarked:  "In every single school visit that I partake in, that's the number one thing principals are telling us is their discipline issue and there is so much time and resources, as you know, that is going towards this that we cannot afford."[746]

600.    Defendants' conduct has created a public health crisis in Plaintiff's schools and Plaintiff spent significant and unexpected levels of time and resources on addressing the pervasiveness of youth e-cigarette use.

601.    Smoking combustible cigarettes in public places has become increasingly socially unacceptable as a result of years of sustained anti-smoking efforts by public health advocates, but due to Defendants' actions and efforts to market e-cigarette use as a "safe" and "healthier" alternative to smoking and as a way to defy existing smoke-free regulations, e-cigarette use has become normalized and regarded as "cool" particularly among youth peer groups. This contributes to the false impression among Plaintiff's youth that using e-cigarettes is safe. To combat these norms and perceptions, Plaintiff has devoted time and resources to raise awareness and educate its stakeholders and community members about the dangers of youth e-cigarette use.

602.    The work that Plaintiff does to educate students and parents is particularly important, and necessary, as a result of the widespread misinformation about e-cigarette products. Many students

---

[745] Tucson Unified Governing Board, *October 16, 2019 Meeting Video*, http://govboard.tusd1.org/Meetings/Meeting-Video-2019/ctl/view/itemid/201126?returnurl=http://govboard.tusd1.org/Meetings/Meeting-Video-2019.
[746] *Id.*

in Plaintiff's schools have been deceived by Defendants' marketing and misinformation and are unaware of the true nature, health risks, and addictiveness of e-cigarette products. As a result of Defendants' advertising campaigns, some students in Plaintiff's schools believe that Defendants' products contain only flavoring, not nicotine. Additionally, both teens and their parents have been deceived into thinking e-cigarette use is harmless, and as a result of the low perception of harm, youth use e-cigarettes more frequently.

603.    Plaintiff has had to devote and divert staff resources to conduct staff training on e-cigarette use.  Plaintiff's teachers and administrators have had to become educated about Defendants' products and their dangers. One component of the necessary education has been simply recognizing the devices for what they are: due to the USB-mimicking design of JUUL and its copycats, many teachers do not recognize the e-cigarette devices when they see them.

604.    Plaintiff also has dedicated time at school to address the issue of e-cigarette use, time that could have otherwise been devoted to other important issues facing Plaintiff's students.

605.    In addition to working with students, Plaintiff's counselors and administrators also train the district's teachers and work to educate and engage with parents in Plaintiff's community. Plaintiff has had to devote and divert staff resources to deploying student, family and parent-teacher engagement regarding the dangers of e-cigarette products.

606.    Plaintiff has had to devote, divert and increase staff time associated with routing students to social workers to develop and convene support groups and prevention programming for suspended students.

607.    Plaintiff has had to expend, divert and increase resources for modifications to its health curriculum to address the risks and dangers posed by e-cigarette products.

608.    Discipline and suspensions related to incidents of e-cigarette use in Plaintiff's schools have increased at alarming rates and staff are required to spend increased time addressing discipline problems related to student e-cigarette use. Consequently, Plaintiff's school administrators and

teachers are having to address these issues during school hours, which interferes with curriculum and regular teaching time.  Plaintiff has had to devote and divert staff time and resources to intervening in student e-cigarette activities and coordinating necessary follow-up, devoting class time to discuss youth e-cigarette use with students.  Additionally, Plaintiff has had to devote and divert staff time and resources in confiscating product, taking teachers out of class to prepare witness statements, assist in investigations, and otherwise participate in the discipline and suspension of students.

609.     Relatedly, because e-cigarette use in bathrooms is pervasive at Plaintiff's schools, Plaintiff's staff has had to devote staff time and resources to monitoring the bathrooms, including regularly walking through them both during class and between classes.

610.     Not only have Defendants' e-cigarette products addicted a new generation to nicotine, Defendants are also creating a growing hazardous waste problem in Plaintiff's schools. Defendants' e-cigarette products contain chemicals that can be toxic or fatal if ingested in their concentrated forms,[747] as well as lithium-ion batteries,[748] which cannot be safely disposed of in the normal stream of trash. The e-cigarette epidemic has led to significant levels of hazardous waste from these e-cigarette products throughout Plaintiff's schools, either from youth improperly disposing of them by littering or throwing them in the trash or toilets, or because teachers and school staff must confiscate and store them. JLI contributed to the improper disposal of JUULpods by telling customers to throw JUULpods

---

[747] *See, e.g., How do I dispose of a JUULpod?*, JUUL Labs, Inc., https://support.juul.com/hc/en-us/articles/360023529793-How-do-I-dispose-of-a-JUULpod- (last visited Mar. 3, 2020) ("JUULpods should be recycled along with other e-waste."); American Acad. of Pediatrics, *Liquid Nicotine Used in E-Cigarettes Can Kill Children*, healthychildren.org, https://www.healthychildren.org/english/safety-prevention/at-home/pages/liquid-nicotine-used-in-e-cigarettes-can-kill-children.aspx (last visited Mar. 3, 2020).

[748] *See, e.g.,* JUUL Labs, Inc. (2020), https://support.juul.com/hc/en-us/articles/360023319614-What-kind-of-battery-is-in-the-device- (last visited Feb. 3, 2020) ("JUUL uses a lithium-ion polymer battery. All portable electronics containing lithium-ion batteries present rare, but potentially serious safety hazards."); JUUL Labs, Inc. (2020), https://support.juul.com/hc/en-us/articles/ 360023366194-How-do-I-dispose-of-a-JUUL-device- (last visited Mar. 13, 2020) ("Unlike other e-cigarettes, JUUL isn't disposable and should be treated as a consumer electronic device. Follow your city's local recommendations for disposing of a lithium-polymer rechargeable battery.").

away in the "regular trash" until at least April 27, 2019.[749] Due to the widespread nature of this problem, Plaintiff has struggled to determine how best to respond.

611.    Plaintiff has been taking important steps to combat the youth e-cigarette crisis, but it cannot fully address the existing widespread use of e-cigarette products and resulting nicotine addiction among youth. Because of the smoothness of nicotine salts contained in Defendants' e-cigarette products as well as Defendants' discreet device designs, many youth use their e-cigarette devices with high frequency throughout the day—with some kids taking a puff as often as every few minutes. Unlike a combustible cigarette with its telltale emissions of smoke and distinct smell, the JUUL device and "JUULalikes" allow kids to use e-cigarettes undetected behind closed doors and even behind their teachers' backs in the classroom. Such frequent use makes it much more likely that nicotine addiction will develop, particularly when coupled with the high nicotine content in JUULpods and copycat products. Youth e-cigarette use has therefore resulted in a higher incidence of addiction than that caused by youth smoking of combustible cigarettes.

612.    As the researchers conducting the national *Monitoring the Future* survey wrote in a letter to the *New England Journal of Medicine* in October 2019, current efforts are insufficient to address youth nicotine addiction from e-cigarette use:

> Current efforts by the vaping industry, government agencies, and schools have thus far proved insufficient to stop the rapid spread of nicotine vaping among adolescents. Of particular concern are the accompanying increases in the proportions of youth who are physically addicted to nicotine, an addiction that is very difficult to overcome once established. The substantial levels of daily vaping suggest the development of nicotine addiction. New efforts are needed to protect youth from using nicotine during adolescence, when the developing brain is particularly susceptible to permanent changes from nicotine use and when almost all nicotine addiction is established.[750]

---

[749] JUUL Labs, Inc.  (@JUULvapor), Twitter (Jul. 16, 2018), https://twitter.com/juulvapor/status/1018976775676792834?lang=en ("JUULpods can be thrown away in a regular trash receptacle"); *see also* JUULpod Basics, JUUL Labs, Inc (Apr. 27, 2019), https://web.archive.org/web/20190427023811/https://support.juul.com/home/learn/faqs/juulpod-basics ("How do I dispose of a JUULpod?" "JUULpods are closed systems and are not intended to be refilled. They can be thrown away in a regular trash can.").

[750] Miech, *supra* note 4.

613.     The lack of available nicotine-addiction treatment options for youth presents a challenge to communities across the country. The lack of treatment options for students within the Plaintiff's school district who are addicted to nicotine is a significant concern for Plaintiff, but such treatment options will be difficult to develop. The available FDA-approved tobacco cessation products are not intended for, and are not approved for, pediatric use. With additional resources, Plaintiff would support the development of additional, youth-appropriate cessation options that can meet the needs of its students. Plaintiff would also support the development of e-cigarette-specific cessation resources to address the ways in which e-cigarette cessation may differ from traditional smoking cessation. Development of such resources is a crucial step to combat the youth e-cigarette epidemic.

614.     With additional resources, Plaintiff would develop and implement a district-wide education and outreach campaign about e-cigarette use and its dangers in order to combat Defendants' marketing and the social pressures the youth e-cigarette epidemic has created. Carrying out such a campaign effectively and countering Defendants' extensive marketing will require significant funding as well as staff time. This education and outreach campaign must include developing prevention and education materials appropriate for middle school and even elementary school students, as the e-cigarette crisis continues to spread to even younger children. And critically, Plaintiff wants to establish more comprehensive parent education programs to broaden capacity for families to support their children who are struggling with e-cigarette use and addiction.

615.     In addition, Plaintiff would conduct more traditional outreach efforts such as media development and targeted marketing campaigns to support Plaintiff's prevention and education work. This would require significant expenditure of resources to ensure the message was spread widely enough to reach students and combat Defendants' extensive marketing and misinformation. In order to make the message resonate with youth, Plaintiff will have to work with youth to cultivate the most effective message.

616.    Funding is also needed to establish a peer mentorship and prevention program. Peer-to-peer messaging is crucial because it is necessary to change the social norms around e-cigarette use, just as previous efforts ultimately changed social norms around combustible cigarette smoking. Defendants have been adept at using peer-to-peer messaging to promote their addictive e-cigarette products to kids through the use of social media campaigns and paid influencers. Because young people are often most willing to listen to other young people, countering Defendants' conduct will require training and supporting youth to educate their peers.

617.    With sufficient funding, Plaintiff would also purchase e-cigarette detectors to install in its bathrooms and cameras for the hallways, in order to both reduce the amount of staff time devoted to patrolling the bathroom and ensure that students using e-cigarettes at school are identified and connected with resources to help them quit.  Where necessary, Plaintiff also would physically modify the design of certain areas of its property, such as restrooms, with alternative floorplans that have been demonstrated to reduce the ability of students to use contraband such as e-cigarette devices.

618.    Fully addressing the harms to Plaintiff caused by Defendants' conduct will require a comprehensive approach. Without the resources to fund measures such as those described herein, Plaintiff will continue to be harmed by the ongoing consequences of Defendants' conduct.

**C.    No Federal Agency Action, Including by the FDA, Can Provide the Relief Plaintiff Seeks Here.**

619.    The injuries Plaintiff has suffered and will continue to suffer cannot be addressed by agency or regulatory action. There are no rules the FDA could make or actions the agency could take that would provide Plaintiff the relief it seeks in this litigation.

620.    Even if e-cigarettes were entirely banned today or only used by adults, millions of youth, including Plaintiff's students, would remain addicted to nicotine.

621.    Regulatory action would do nothing to compensate Plaintiff for the money and resources it has already expended addressing the impacts of the youth e-cigarette epidemic and the

resources it will need in the future. Only this litigation has the ability to provide Plaintiff with the relief it seeks.

622.     Furthermore, the costs Plaintiff has incurred in responding to the public health crisis caused by youth e-cigarette and taking the actions described above are recoverable pursuant to the causes of actions raised by Plaintiff. Defendants' misconduct alleged herein is not a series of isolated incidents, but instead the result of a sophisticated and complex marketing scheme and related cover-up scheme that has caused a continuing, substantial, and long-term burden on the services provided by Plaintiff. In addition, the public nuisance created by Defendants and Plaintiff's requested relief in seeking abatement further compels Defendants to reimburse and compensate Plaintiff for the substantial resources it has expended and will need to continue to expend to address the youth e-cigarette epidemic.

## VI.     CAUSES OF ACTION

### COUNT ONE — VIOLATIONS OF ARIZONA PUBLIC NUISANCE LAW

623.     Plaintiff incorporates by reference all preceding paragraphs.

624.     Plaintiff brings this claim under Arizona public nuisance law as to all Defendants.

625.     Under Arizona law, a public nuisance is an unreasonable interference with a right common to the general public that affects a considerable number of people or an entire community or neighborhood.

626.     Plaintiff and its students have a right to be free from conduct that endangers their health and safety. Yet Defendants have engaged in conduct and omissions which unreasonably and injuriously interfered with the public health and safety in Plaintiff's community and created substantial and unreasonable annoyance, inconvenience, and injury to the public by their production, promotion, distribution, and marketing of e-cigarette products, including, but not limited to JUUL, for use by youth in Plaintiff's school district. Defendants' actions and omissions have substantially, unreasonably,

and injuriously interfered with Plaintiff's functions and operations and affected the public health, safety, and welfare of Plaintiff's community.

627.   Each Defendant has created or assisted in the creation of a condition that is injurious to the health and safety of Plaintiff and its students and interferes with the comfortable enjoyment of life and property of Plaintiff's community.

628.   Defendants' conduct has directly caused a severe disruption of the public health, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

629.   This harm to Plaintiff and the public is substantial, unreasonable, widespread, and ongoing. It outweighs any potential offsetting benefit of the Defendants' wrongful conduct because Defendants' conduct violates Arizona's public policy against marketing e-cigarette products to minors. This policy is expressed through statutes and regulations, including but not limited to:

   a.   A.R.S. § 13-3622(a), which prohibits the sale or furnishing of vapor products, instruments, or paraphernalia, to a minor; and

   b.   A.R.S. § 13-3622(b), which prohibits minors from buying, possessing, or knowingly accepting vapor products, instruments, or paraphernalia.

630.   Defendants' conduct violated these state laws and the public policy they enforce, including by:

   a.   Actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens;

   b.   Engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push e-cigarette products, and by selling e-cigarette products in flavors designed to appeal to youth;

   c.   Engaging in advertising modeled on cigarette ads and featuring youthful-appearing models and designing advertising in a patently youth-oriented fashion;

d.    Directing advertising to youth media outlets and media designed to appeal to children and youth, such as Instagram and other social media channels;

e.    Hosting youth-focused parties across the United States, at which free samples were dispensed and in which e-cigarette use was featured prominently across social media;

f.    Formulating e-cigarette products with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon e-cigarette products; and

g.    Promoting and assisting the growth of the e-cigarette product market and its availability with knowledge that e-cigarette products were being purchased and used by large numbers of youth.

631.    Defendants' conduct described in the preceding paragraph and throughout the Complaint also violated, and thereby created or maintained a public nuisance, the following state law:

a.    A.R.S. § 44-1521 *et seq*., which prohibits deceptive or unfair acts or practices, fraud, false pretenses, false promises, misrepresentations, or concealment, suppression or omission of material facts with an intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of merchandise.

632.    Defendants' conduct substantially and unreasonably interfered with public health, safety and the right to a public education in a safe and healthy environment.  In that regard, and in other ways discussed herein, the public nuisance created or maintained by Defendants was connected to Plaintiff's property, including but not limited to school buildings.

633.    The health and safety of the youth of Plaintiff's school district, including those who use, have used, or will use e-cigarette products, as well as those affected by others' use of e-cigarette products, are matters of substantial public interest and of legitimate concern to Plaintiff, as well as to Plaintiff's community.

634.    Defendants' conduct has affected and continues to affect a substantial number of people within Plaintiff's school district and is likely to continue causing significant harm.

635. But for Defendants' actions, e-cigarette products, including, but not limited to JUUL, used by youth would not be as widespread as they are today, and the youth e-cigarette public health crisis that currently exists as a result of Defendants' conduct would have been averted.

636. Defendants knew or should have known that their conduct would create a public nuisance. Defendants knew or reasonably should have known that their statements regarding the risks and benefits of e-cigarette use were false and misleading, that their marketing methods were designed to appeal to minors, and that their false and misleading statements, marketing to minors, and active efforts to increase the accessibility of e-cigarette products and grow JUUL's market share, or the market share of Defendants' products, were causing harm to youth and to municipalities, schools, and counties, including youth in Plaintiff's school district and to Plaintiff itself.

637. Thus, the public nuisance caused by Defendants was reasonably foreseeable, including the financial and economic losses incurred by Plaintiff.

638. Alternatively, Defendants' conduct was a substantial factor in bringing about the public nuisance even if a similar result would have occurred without it. By directly marketing to youth and continuing these marketing practices after it was evident that children were using JUUL products in large numbers and were specifically using these products in schools, JLI and the Management Defendants directly facilitated the spread of the youth e-cigarette crisis and the public nuisance affecting Plaintiff.

639. Altria, by investing billions of dollars in JLI and actively working to promote the sale and spread of JUUL products with the knowledge of JLI's practice of marketing JUUL products to youth and its failure to control youth access to JUUL products, directly facilitated the spread of the youth e-cigarette crisis and the public nuisance affecting Plaintiff.

640. Plaintiff has taken steps to address the harm caused by Defendants' conduct, including, but not limited to, those listed in Section V.B above.

641.    Fully abating the epidemic of youth e-cigarette use resulting from Defendants' conduct will require much more than these steps.

642.    As detailed herein, Plaintiff has suffered special damage different in kind or quality from that suffered by the public in common.  The damages suffered by Plaintiff have been greater in degree and different in kind than those suffered by the general public including, but not limited to, those arising from: expending, diverting and increasing staff time to confiscate product; expending, diverting and increasing staff time to communicate and engage with parents; expending, diverting and increasing the time that teachers must be out of class to prepare witness statements and assist in investigations; expending, diverting and increasing staff time associated with discipline and suspension of students; expending, diverting and increasing staff time associated with routing students to social workers to develop and convene support groups for suspended students; expending, diverting and increasing staff time associated with routing students to social workers to develop and conduct prevention programing; expending, diverting and increasing resources for modifications to the health curriculum; expending, diverting and increasing resources to make physical changes to schools and/or address property damage in schools.

643.    Plaintiff therefore requests all the relief to which it is entitled in its own right and relating to the special damage or injury it has suffered, and not in any representative or *parens patriae* capacity on behalf of students, including damages in an amount to be determined at trial and an order providing for the abatement of the public nuisance that Defendants have created or assisted in the creation of, and enjoining Defendants from future conduct contributing to the public nuisance described above.

644.    Defendants' conduct, as described above, was intended to cause injury and/or was motivated by spite or ill will and/or Defendants acted to serve their own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure the rights of others, including Plaintiff, and/or Defendants consciously pursued a course of conduct

knowing that it created a substantial risk of significant harm to others, including Plaintiff.  Defendants regularly risks the lives and health of consumers and users of its products with full knowledge of the dangers of its products.  Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff's students or Plaintiff.  Defendants' willful, knowing and reckless conduct therefore warrants an award of aggravated or punitive damages.

### COUNT TWO — VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961(C)

645.    Plaintiff incorporates by reference all preceding paragraphs.

646.    This claim is brought by Plaintiff against Defendants JLI, Monsees, Bowen, Pritzker, Huh, Valani, and Altria (the "RICO Defendants") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961, et seq. For ease of reference, Defendants JLI, Monsees, Bowen, Pritzker, Huh, and Valani are referred to below as the "Early Enterprise Defendants."

647.    At all relevant times, each RICO Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

648.    Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as they were and are injured in their business and/or property as a result of the RICO Defendants' wrongful conduct described herein.

649.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

650.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

651.     Each RICO Defendant conducted the affairs of an enterprise through a pattern of racketeering activity and conspired to do so, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

652.     Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

**A.     Description of the Nicotine Market Expansion Enterprise**

653.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

654.     Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. See Boyle v. United States, 556 U.S. 938, 946 (2009).

655.     The RICO Defendants formed an association-in-fact enterprise—the Nicotine Market Expansion Enterprise. The Nicotine Market Expansion Enterprise exists separately from the otherwise legitimate business operations of JLI, Altria, or the investment companies with which Defendants Pritzker, Huh, and Valani are affiliated. Rather, the Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a more nefarious common purpose: maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market.

656.     The Early Enterprise Defendants and non-defendant Veratad Technologies LLC ("Veratad") formed the Nicotine Market Expansion Enterprise by at least 2015, when the Early Enterprise Defendants prepared to launch the JUUL e-cigarette and capture and grow a market of nicotine-addicted users, including youth, that would serve as customers for life.

657.     As tobacco companies have long known, profitable growth requires a pipeline of "replacement smokers" or vapers. For that reason and others, Defendant Altria joined the Nicotine

Market Expansion Enterprise in the Spring of 2017. The Early Enterprise Defendants, for their part, eagerly invited Altria into the fold—they needed allies and resources to further their Enterprise, and, despite their public statements to the contrary, sought to be a part of the tobacco industry.

658.    When Altria joined the Nicotine Market Expansion Enterprise, it shared the Early Enterprise Defendants' common purpose: maintaining and expanding the number of nicotine-addicted e-vapor users in order to ensure a steady and growing customer base. Among Altria's motivations for pursuing this common purpose was access to JLI's customer base that would serve as Altria's pipeline of "replacement smokers" or vapers.

659.    The Nicotine Market Expansion Enterprise involved a growing membership and changed its shape to fit its current needs, adding members when necessary and eliminating them when they became obsolete. From 2015 through 2017, the Enterprise consisted of the Early Enterprise Defendants and non-defendant Veratad. In the Spring of 2017, Defendant Altria joined the Nicotine Market Expansion Enterprise. Non-defendant member Veratad would leave the Enterprise sometime in 2018 when it stopped coordinating with Defendant JLI. Each Early Enterprise Defendant is liable for the predicate acts of the enterprise committed no later than its formation in 2015, and Defendant Altria is liable for the predicate acts of the enterprise committed no later than when it joined the Enterprise in Spring 2017.

660.    As described above, the Early Enterprise Defendants established an ongoing relationship through, among other connections, Defendants' Priztker, Huh, and Valani's investment in JLI; Defendants' Bowen, Monsees, Pritzker, Huh, and Valani's control of the JLI Board of Directors; the Early Enterprise Defendants' assumption of "final say" on all marketing for JLI products, including fraudulent advertising; and the Early Enterprise Defendants' coordination on ensuring broad access to JLI products, including underage access, with non-defendant Enterprise member Veratad. And the Early Enterprise Defendants and Altria established an ongoing relationship through, among other connections, Altria's equity investment in JLI, the many informal and formal agreements between

these two Defendants and their coordinated activities in furtherance of the common purpose of the Nicotine Market Expansion Enterprise, and the overlap between JLI executives and leadership and Altria.

661.    The RICO Defendants formed the Nicotine Market Expansion Enterprise in order to engage in a collaborative scheme to defraud. As described above, the Nicotine Market Expansion Enterprise Defendants shared and acted on a common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market.

662.    The Nicotine Market Expansion Enterprise has been in existence for almost five years and continues to operate to this day. As described above, it has had sufficient longevity to pursue the Nicotine Market Expansion Enterprise's common purpose.

**B.    Conduct of the Nicotine Market Expansion Enterprise**

663.    "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

664.    As described above, each RICO Defendant participated in the operation or management of the Nicotine Market Expansion Enterprise. Illustrative but non-exhaustive examples include the following:

**Early Leadership**

665.    As described in Sections IV.A, IV.B, and IV.C, Defendants Bowen and Monsees were the visionaries behind the Enterprise and would lead it in its early days.

**Fraudulent Marketing Scheme**

666.    As described in Sections IV.E.3, IV.E.4, and IV.E.7.a, JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani (through their "final say" on all of JLI's marketing efforts) caused

false and misleading advertisements that omitted references to JUUL's nicotine content and potency to be transmitted via the mail and wires, including the Vaporized campaign.

**Youth Access Scheme**

667.    As described in Section IV.E.9, Defendant JLI (through its employees) coordinated with non-defendant member Veratad on behalf of the other Early Enterprise Defendants to expand youth access to JUUL products.

668.    As described in Section IV.E.9, Veratad was a key player in the Nicotine Market Expansion Enterprise. And while each member of the Enterprise was not involved in every scheme (Veratad, for example, did not transmit the advertisements or packaging containing misrepresentations regarding JLI's nicotine content), each worked in furtherance of the same common purpose and was aware of the other members' participation in the Enterprise. Moreover, each scheme was integral to the Enterprise's success in maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Veratad shared this common purpose, and its motivation for doing so was to maintain a lucrative client – one of several clients who relied on Veratad for intentionally ineffective age verification services. Veratad knew that JUUL products were being purchased online by youth and that youth were able to "pass" age verification, yet coordinated with JLI to reduce the requirements for purchasers to "pass" age verification.

**Coopting JLI's Board of Directors**

669.    As described in Section IV.E.7.b, Defendants Pritzker, Huh, and Valani took control of the JLI Board of Directors in October 2015, so they could use the Board as an instrumentality to effectuate fraudulent schemes in furtherance of the Nicotine Market Expansion Enterprise's common purpose. In doing so, leadership of the Enterprise transitioned from Bowen and Monsees to Pritzker, Huh, and Valani.

**Coordinating Activities of JLI and Altria**

670.    By August 2016, Defendants Pritzker, Huh, and Valani had ceded executive leadership at JLI to a new CEO, Tyler Goldman. Thus, when these parties started to coordinate with Altria, it was JLI (through its executives and employees—including Tyler Goldman and his successors) and Altria (through its executives and employees) that primarily directed the affairs of the Enterprise, although Defendants Bowen, Monsees, Pritzker, Huh, and Valani remained critical to the success of the Enterprise's common purpose. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI and Altria, and Altria's investment in JLI, would not have been possible.

671.    As described in Sections IV.A and IV.F, the Early Enterprise Defendants and Altria began to actively coordinate their activities in 2017 and each took actions that would further the Enterprise's common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market. For example, as alleged above:

672.    As early as 2017, the Early Enterprise Defendants and Altria shared data and strategy to support their common purpose, through a conduit, Avail Vapor.

673.    By 2018, Altria was taking actions to ensure JLI's products had access to prime shelf space in retail locations.

674.    By 2018, Altria was distributing and marketing JLI's products to its wider base of retailers.

675.    In December 2018, Altria decided to cash in on its role in the Nicotine Market Expansion Enterprise by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This investment would give Altria three seats on the JLI Board of Directors, and thus allow it to assert greater control over both JLI and the Nicotine Market Expansion Enterprise, which used the instrumentalities of JLI to effectuate many of its fraudulent schemes.

**Nicotine Content Misrepresentation Scheme**

676.     As described in Section IV.D, the Early Enterprise Defendants and Altria caused thousands, if not millions, of JUUL pod packages to be distributed to consumers with false and misleading information regarding the JUUL pods' nicotine content. The Early Enterprise Defendants also caused the same false and misleading information to be distributed via JLI's website.

**Flavor Preservation Scheme**

677.     As described in Sections IV.C.6 and IV.H.2, the RICO Defendants worked in concert to defraud the public and regulators in order to prevent regulation and public outrage that would have impeded their plan to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Specifically, they worked to ensure the FDA allowed certain flavors, namely mint, to remain on the market.

**Cover-up Scheme**

678.     The RICO Defendants were not only concerned with protecting flavors, however. In light of growing public scrutiny of JLI's role in the youth e-cigarette crisis, these defendants continued their scheme to prevent a complete ban on JLI's product due to regulatory action or public outcry.

679.     As described in Sections IV.D.2 and IV.E.12, JLI maintained its website pages that provided false information about the addictive potential of its products and denied that JLI marketed to youth, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani provided direct input as to the content of the JLI website and had "final say" over JLI's marketing messaging.

680.     As described in paragraphs Sections IV.D.4 and IV.E.12, JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani (through their "final say" on all of JLI's marketing efforts) caused false and misleading advertising to be distributed over television and the internet in order to give the impression that JLI's product was a smoking cessation device and that JLI never marketed to youth. Defendant Altria continued this scheme by transmitting the fraudulent "Make the Switch" advertisements in packs of its combustible cigarettes.

681. As described in Section IV.E.12, beginning in October 2018, both Altria and JLI were transmitting false and misleading communications to the public and the government in an attempt to stave off regulation and public outcry.

682. And no later than December 2018, Altria began providing even more services to the Nicotine Market Expansion Enterprise, as described in Section IV.F.3.

683. The pattern of racketeering activity by the RICO Defendants, described below, provides further support that each RICO Defendant conducted or participated in the conduct of the Nicotine Market Expansion Enterprise.

**C.     Pattern of Racketeering Activity**

684. To carry out, or attempt to carry out, the objectives of the Nicotine Market Expansion Enterprise, the RICO Defendants, each of whom is a person associated-in-fact with the Enterprise, did knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

685. Specifically, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341, 1343), within the past ten years.

686. The multiple acts of racketeering activity which the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

687. The racketeering activity was made possible by the Enterprise's regular use of the facilities, services, and employees of the members of the Enterprise.

688.    The RICO Defendants participated in the Nicotine Market Expansion Enterprise by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

689.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the Enterprise's objectives through common misrepresentations, concealments, and material omissions.

690.    In devising and executing the objectives of the Nicotine Market Expansion Enterprise, the RICO Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public and regulators by (1) transmitting advertisements that fraudulently and deceptively omitted any reference to JUUL's nicotine content or potency (or any meaningful reference, where one was made); (2) causing false and misleading statements regarding the nicotine content of JUUL pods to be posted on the JLI website; (3) causing thousands, if not millions, of JUUL pod packages containing false and misleading statements regarding the nicotine content of JUUL pods to be transmitted via U.S. mail; (4) representing to consumers and the public-at-large that JUUL was created and designed as a smoking cessation device, and by misrepresenting the nicotine content and addictive potential of its products; (5) making fraudulent statements to the FDA to convince the FDA to allow certain flavors, namely mint, to remain on the market; and (6) making fraudulent statements to the public (including through advertising), the FDA, and Congress to stave off a total prohibition on JUUL e-cigarettes that was being contemplated in light of JLI's role in the youth e-cigarette epidemic.

691.    For the purpose of furthering the Enterprise's common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by preserving and increasing JLI's market share, even at the expense of exposing and addicting children to nicotine, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the Enterprise's objectives.

692.    The RICO Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include, but are not limited to:

      a.    Mail Fraud: the Nicotine Market Expansion Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, fraudulent materials via U.S. mail or commercial interstate carriers for the purpose of deceiving the public, regulators, and Congress; and

      b.    Wire Fraud: the Nicotine Market Expansion Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, fraudulent materials by wire for the purpose of deceiving the public, regulators, and Congress.

693.    The Nicotine Market Expansion Enterprise falsely and misleadingly used the mails and wires in violation of 18 U.S.C. §§ 1341, 1343. Illustrative and non-exhaustive examples include the following:

| From | To | Date | Description |
|---|---|---|---|
| *Fraudulent Statements Omitting Reference to JUUL's Nicotine Content (see Sections IV.E.3, IV.E.4, and IV.E.7.a )* | | | |
| All Early Enterprise Defendants | Public (via television, internet, and mail) | 2015 | "Vaporized" Campaign, and other Advertising campaigns transmitted via the mails and wires which omitted any reference to JUUL's nicotine content. |
| JLI | Members of the public on JLI's email distribution list | June 2015 to April 7, 2016 | 171 promotional emails were sent to members of the public with no mention of JUUL nicotine content. For example, on July 11, 2015, JLI knowingly caused an email to be sent via the wires in interstate commerce from JUUL's email address to people who had signed up from JUUL emails, including youth. This email advertised JUUL's promotion events and said "Music, Art, & JUUL. What could be better? Stop by and be gifted a free starter kit." This email did not mention that JUUL contained nicotine nor that JUUL or the free starter kits were only for adults. |

| From | To | Date | Description |
|------|-----|------|-------------|
| **Fraudulent Statements Omitting Reference to JUUL's Nicotine Content (see Sections IV.E.3, IV.E.4, and IV.E.7.a )** | | | |
| JLI | Public (via internet – Twitter) | June 2015 to October 6, 2017 | JLI's Twitter feed, @JUULvapor, and its 2,691 tweets, did not contain a nicotine warning.  For example, on August 7, 2015, JLI knowingly caused a tweet to be posted on JLI's Twitter Feed, @JUULvapor, advertising the Cinespia "Movies All Night Slumber Party" and captioned it "Need tix for @cinespia 8/15? We got you. Follow us and tweet #JUULallnight and our faves will get a pair of tix!" This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |
| JLI | Public (via internet – Twitter) | July 28, 2017 | JLI knowingly caused a tweet to be posted on JLI's Twitter Feed, @JUULvapor, showing an image of a Mango JUULpod next to mangos, and captioned "#ICYMI: Mango is now in Auto-ship! Get the #JUULpod flavor you love delivered & save 15%. Sign up today." This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. On information and belief, due to the Early Enterprise Defendant's coordination with Veratad, mango JUULpods were actually shipped to youth. |

| From | To | Date | Description |
|------|----|----|-------------|
| *Fraudulent Statements Omitting Reference to JUUL's Nicotine Content (see Sections IV.E.3, IV.E.4, and IV.E.7.a )* | | | |
| JLI | Public (via internet – Twitter) | August 4, 2017 | JLI knowingly caused a tweet to be posted on JLI's Twitter Feed, @JUULvapor, promoting Mint JUULpods with an image stating "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste," captioned "A new month means you can stock up on as many as 15 #JUULpod packs. Shop now." This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. On information and belief, due to the Early Enterprise Defendant's coordination with Veratad, mint JUULpods were actually shipped to youth. |
| JLI | Public (via internet – Twitter) | August 28, 2017 | JLI knowingly caused a tweet to be posted on JLI's Twitter Feed, @JUULvapor, comparing JUULpods to dessert with an image and stating "Do you bruleé? RT if you enjoy dessert without a spoon with our Crème Brulee #JUULpods." This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. On information and belief, due to the Early Enterprise Defendant's coordination with Veratad, Crème Brulee JUULpods were actually shipped to youth. |

| From | To | Date | Description |
|------|-----|------|-------------|
| *Fraudulent Statements that the Coordination with Veratad was Designed to Reduce Youth Access (see Section IV.E.9)* | | | |
| JLI | Public (via internet – email to a member of the press) | October 15, 2017 | JLI knowingly caused a JLI spokeswoman to send an email to a newspaper in New York, ANMY, stating that JLI uses "industry-leading ID match and age verification technology to ensure that customers" are over 21 and that the "information is verified against multiple databases." This email was delivered via the wires in interstate commerce to a member of the press. The Early Enterprise Defendants intended this statement to be published to members of the public and it was in fact published to members of the public. This statement was false and fraudulent in furtherance of the Enterprise because the Early Enterprise Defendants were coordinating with Veratad to ensure that their age verification system did not actual prevent youth from purchasing JUUL. |
| JLI | Public ████████ ████ | October 17, 2016 | ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ This email was delivered via the wires in interstate commerce to a member of the press. The Early Enterprise Defendants intended this statement to be published to members of the public. This statement was false and fraudulent in |

| From | To | Date | Description |
|------|-----|------|-------------|
| *Fraudulent Statements that the Coordination with Veratad was Designed to Reduce Youth Access (see Section IV.E.9)* | | | |
| | | | furtherance of the Enterprise because the Early Enterprise Defendants were coordinating with Veratad to ensure that their age verification system did not actual prevent youth from purchasing JUUL. |
| JLI | Public (via internet – Twitter) | June 5, 2018 | JLI knowingly caused a tweet to be posted on JLI's Twitter Feed, @JUULvapor, stating "We've partnered with Veratad Technologies to complete a public records search, only reporting back whether or not you are 21 years of age or older." This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This statement was fraudulent because the Early Enterprise Defendants were coordinating with Veratad to ensure that their age verification system did not actual prevent youth from purchasing JUUL. |
| All Early Enterprise Defendants | Public (via JLI's website) | November 13, 2018 | JLI was "Restricting Flavors to Adults 21+ On Our Secure Website" and that JLI's age-verification system was "an already industry-leading online sales system that is restricted to 21+ and utilizes third party verification." A video accompanying this message stated "At JUUL labs we're committed to leading the industry in online age verification security to ensure that our products don't end up in the hands of underage users" and included an image of a computer with a chain wrapped around it and locked in place. This message was posted using |

| From | To | Date | Description |
|------|-----|------|-------------|
| **Fraudulent Statements that the Coordination with Veratad was Designed to Reduce Youth Access (see Section IV.E.9)** | | | |
| | | | the wires in interstate commerce on JLI's website and was directed to and seen by the public. These statements were fraudulent because the Early Enterprise Defendants were and had been coordinating with Veratad to ensure that their age verification system did not actual prevent youth from purchasing JUUL |

| From | To | Date | Description |
|------|-----|------|-------------|
| **Fraudulent Statements that JUUL is a Cessation Device (see Section IV.D.4)** | | | |
| JLI | Public (via internet – Twitter) | July 5, 2017 | The @JUULvapor Twitter account published a tweet stating "Here at JUUL we are focused on driving innovation to eliminate cigarettes, with the corporate goal of improving the lives of the world's one billion adult smokers." |
| All Early Enterprise Defendants | Public (via internet – JLI Website) | April 25, 2018 (or earlier) to Present | "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." |
| Kevin Burns (former JLI CEO) | Public (via internet – JLI Website) | November 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." |
| All Early Enterprise Defendants | Public (via internet – JLI Website) | September 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." |
| Howard Willard (Altria CEO) | Public (via internet – Altria website) | December 20, 2018 | "We are taking significant action to prepare for a |

| From | To | Date | Description |
|---|---|---|---|
| *Fraudulent Statements that JUUL is a Cessation Device (see Section IV.D.4)* | | | |
| | | | future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." |

| From | To | Date | Description |
|---|---|---|---|
| *Fraudulent Statements Regarding Nicotine Content in JUUL pods (see Section IV.D)* | | | |
| All Early Enterprise Defendants | Public (via internet – JLI website) | July 2, 2019 (or earlier) to Present | "Each 5% JUUL pod is roughly equivalent to one pack of cigarettes in nicotine delivery." |
| All Early Enterprise Defendants | Public (via internet – JLI website) | April 21, 2017 | "JUUL pod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." |
| All RICO Defendants | Public (via U.S. mail distribution of JUUL pod packaging) | 2015 to Present | JUUL pod packages (1) claiming a 5% nicotine strength; (2) stating that a JUUL pod is "approximately equivalent to about 1 pack of cigarettes." |

| From | To | Date | Description |
|---|---|---|---|
| *Fraudulent Statements to Prevent Regulation of Mint Flavor (see Sections IV.C.6 and IV.H.2)* | | | |
| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)

November 12, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult |

| From | To | Date | Description |
|------|-----|------|-------------|
| *Fraudulent Statements to Prevent Regulation of Mint Flavor (see Sections IV.C.6 and IV.H.2)* | | | |
| | | | smokers. |
| Howard Willard (Altria CEO) | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| JLI | FDA (via U.S. mail or electronic transmission) | November 5, 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. |

| From | To | Date | Description |
|------|-----|------|-------------|
| *Fraudulent Statements to Prevent Ban on JUUL Products or Overwhelming Public Outcry (see Section IV.E.12)* | | | |
| All Early Enterprise Defendants | Public (via Television) | January 2019 | $10 million "Make the Switch" advertising campaign for the purpose of deceiving the public and regulators that JLI was only targeting adult smokers with its advertising and product and that JUUL was a cessation product. |
| Altria | Public (via inserts in combustible cigarette packs) | December 2018 - Present | "Make the Switch" advertising campaign for the purpose of deceiving smokers that JUUL was a cessation product. |
| Ashely Gould, JLI Chief Administrative Officer | Public (via interview with CNBC, later posted on internet) | December 14, 2017 | "It's a really, really important issue. We don't want kids using our products." |
| JLI | Public (via internet -social media) | March 14, 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." |
| Kevin Burns (then-CEO of JLI) | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | JLI's Action Plan that fraudulently states: "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . Our intent was never to |

| From | To | Date | Description |
|------|-----|------|-------------|
| **Fraudulent Statements to Prevent Ban on JUUL Products or Overwhelming Public Outcry (see Section IV.E.12)** | | | |
| | | | have youth use JUUL products." |
| Kevin Burns | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." |
| All Early Enterprise Defendants | Public (via internet - JLI website) | August 29, 2019 | "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." |
| James Monsees | Public (via statement to New York Times – later posted on internet) | August 27, 2019 | Monsees said selling JUUL products to youth was "antithetical to the company's mission." |
| JLI | Public (via statement to Los Angeles Times – later posted on internet) | September 24, 2019 | "We have never marketed to youth and we never will." |
| JLI (via counsel) | FDA (via U.S. mail or electronic transmission to Dr. Matthew Holman) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." and "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." |
| James Monsees | Congress (via U.S. mail or electronic transmission of written testimony) | July 25, 2019 | Written Testimony of J. Monsees provided to Congress, stating "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our |

| From | To | Date | Description |
|------|-----|------|-------------|
| **Fraudulent Statements to Prevent Ban on JUUL Products or Overwhelming Public Outcry (see Section IV.E.12)** | | | |
| | | | company has no higher priority than combatting underage use." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." |
| Howard Willard | Congress (via U.S. mail or electronic transmission of letter to Senator Durbin) | October 14, 2019 | "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." |
| All Early Enterprise Defendants | Public ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |
| Kevin Burns, then-CEO of JLI | Public (via JLI's website) | April 25, 2018 | "Our company's mission is to eliminate cigarettes and help the more than one billion smokers worldwide switch to a better alternative . . . . We are already seeing success in our efforts to enable adult smokers to transition away from cigarettes and believe our products have the potential over the long-term to contribute meaningfully to public health in the U.S. and around the world. At the same time, we are committed to deterring young people, as well as |

| From | To | Date | Description |
|------|-----|------|-------------|
| *Fraudulent Statements to Prevent Ban on JUUL Products or Overwhelming Public Outcry (see Section IV.E.12)* | | | |
| | | | adults who do not currently smoke, from using our products. We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL." |
| Ashely Gould, JLI Chief Administrative Officer | Public (via JLI's website) | April 25, 2018 | "Our objective is to provide the 38 million American adult smokers with meaningful alternatives to cigarettes while also ensuring that individuals who are not already smokers, particularly young people, are not attracted to nicotine products such as JUUL . . . . We want to be a leader in seeking solutions, and are actively engaged with, and listening to, community leaders, educators and lawmakers on how best to effectively keep young people away from JUUL." |
| JLI | Public (via JLI's website) | July 24, 2018 | "We welcome the opportunity to work with the Massachusetts Attorney General because, we too, are committed to preventing underage use of JUUL. We utilize stringent online tools to block attempts by those under the age of 21 from purchasing our products, including unique ID match and age verification technology. Furthermore, we have never marketed to anyone underage. Like many Silicon Valley technology startups, our growth is not the result of marketing but rather a superior product disrupting an archaic industry. When adult smokers find an effective alternative to cigarettes, they tell other adult smokers. That's how we've gained 70% of the market share. . . . Our ecommerce platform utilizes unique ID match and age verification |

| From | To | Date | Description |
|------|-----|------|-------------|
| *Fraudulent Statements to Prevent Ban on JUUL Products or Overwhelming Public Outcry (see Section IV.E.12)* | | | |
| | | | technology to make sure minors are not able to access and purchase our products online." |
| JLI | Public (via JLI's website) | July 26, 2018 | "We did not create JUUL to undermine years of effective tobacco control, and we do not want to see a new generation of smokers. . . . We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. . . .We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers." |
| Adam Bowen | Public (via statement to New York Times – later posted on internet) | August 27, 2018 | Bowen said he was aware early on of the risks e-cigarettes posed to teenagers, and the company had tried to make the gadgets "as adult-oriented as possible," purposely choosing not to use cartoon characters or candy names for its flavors. |
| James Monsees | Public (via statement to *Forbes*, later published on internet) | November 16, 2018 | "Any underage consumers using this product are absolutely a negative for our business. We don't want them. We will never market to them. We never have." |
| Altria | Public (via internet) | December 20, 2018 | Statement published in Altria news release stating: "Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. As JUUL previously said, 'Our intent was never to have youth use JUUL products.'" |
| Altria | Public (via Earnings Call) | January 31, 2019 | "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor |

| From | To | Date | Description |
|------|-----|------|-------------|
| *Fraudulent Statements to Prevent Ban on JUUL Products or Overwhelming Public Outcry (see Section IV.E.12)* | | | |
| | | | category but to also support and even accelerate transition to noncombustible alternative products by adult smokers." |
| K.C. Crosthwaite, JLI's CEO | Public (via JLI's website) | September 25, 2019 | "I have long believed in a future where adult smokers overwhelmingly choose alternative products like JUUL. That has been this company's mission since it was founded, and it has taken great strides in that direction." |
| JLI | Public (via JLI's website) | March 29, 2020 | "JUUL was designed with adult smokers in mind." |

694.     The mail and wire transmissions described herein were made in furtherance of the RICO Defendants' schemes and common course of conduct, thereby increasing or maintaining JLI's market share, resulting in corresponding high profits for each RICO Defendant.

695.     As described above, the Nicotine Market Expansion Enterprise had a scheme to defraud the public and regulators in order to continue selling nicotine products to youth, and to protect their market share, by denying that JLI marketed to youth and claiming that JUUL was actually created and designed as a smoking cessation device or mitigated risk product.

696.     The RICO Defendants used these mail and wire transmissions in furtherance of this scheme by transmitting deliberately false and misleading statements to the public and to government regulators.

697.     The RICO Defendants had a specific intent to defraud regulators and the public. For example, as alleged above, the members of the Nicotine Market Expansion Enterprise made repeated and unequivocal statements through the wires and mails that they were not marketing to children and that their product was designed for adult smokers. As even the evidence pre-discovery shows, this is not true. The authors of these fraudulent statements are high level executives at JLI and Altria and who would reasonably be expected to have knowledge of their company's internal research, public

positions, and long-term strategies. Because these high level executives made statements inconsistent with the internal knowledge and practice of the corporations, it would be absurd to believe that these highly ranked representatives and agents of these corporations had no knowledge that their public statements were false and fraudulent. Similarly, the RICO Defendants caused to be transmitted through the wires and mails false and misleading statements regarding the nicotine content in JUUL pods which JLI's own internal data, and Altria's own pharmacokinetic studies, showed were false. Moreover, each of the Early Enterprise Defendants had "final say" over all marketing statements by JLI and thus caused such statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

698.    The RICO Defendants intended for the public and regulators to rely on these false transmissions and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

699.    Both the public and government regulators did rely on the Nicotine Market Expansion Enterprise's mail and wire fraud. For example, the regulators, including the FDA, relied on the Nicotine Market Expansion Enterprise's statements that mint was not an appealing flavor for nonsmokers in allowing mint JUUL pods to remain on the market and relied on the Nicotine Market Expansion Enterprise's statements that it did not market to youth in allowing the RICO Defendants to continue marketing and selling JUUL. Congress likewise relied on the Enterprise's statements in not bringing legislation to recall or ban e-cigarettes, despite the calls of members of both parties to do just that. And the public relied on statements (or absence thereof) that were transmitted by the RICO Defendants regarding the nicotine content in and potency of JUUL pods in deciding to purchase JUUL products and relied on statements denying JLI's past youth marketing in not creating a public outcry forcing these products to be removed from the market.

700.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the RICO Defendants'

books and records. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, the Nicotine Market Expansion Enterprise engaged in fraudulent activity in furtherance of its overlapping schemes.

701.     These were not isolated incidents, instead, the RICO Defendants engaged in a pattern of racketeering activity by committing thousands of predicate acts in a five-year period in the form of mail and wire fraud. That each RICO Defendant participated in a variety of schemes involving thousands of predicate acts of mail and wire fraud establishes that such fraudulent acts are part of the Enterprise's regular way of doing business. Moreover, Plaintiff expects to uncover even more coordinated, predicate acts of fraud as discovery in this case continues.

**D.     Plaintiff Has Been Damaged by the Nicotine Market Expansion Enterprise Defendants' RICO Violations**

702.     Plaintiff has been injured by the Nicotine Market Expansion Enterprise Defendants' conduct, and such injury would not have occurred but for the predicate acts of those defendants which also constitute the acts taken by the RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d). By working to preserve and expand the market of underage JUUL customers, fraudulently denying JLI's youth-focused marketing, and deceiving regulators and the public in order to allow JUUL products and mint-flavored JUULpods to remain on the market, the Nicotine Market Expansion Enterprise caused the expansion of an illicit e-cigarette market for youth in Plaintiff's schools and caused a large number of youth in Plaintiff's schools to become addicted to nicotine, thus forcing Plaintiff to expend time, money, and resources to address the epidemic Defendants created through their conduct. Indeed, the Nicotine Market Expansion Enterprise Defendants intentionally sought to reach into schools and deceive public health officials in order to continue growing JLI's youth customer base. The repeated fraudulent misstatements by the Nicotine Market Expansion

Enterprise Defendants denying that JLI marketed to youth have served to preserve JUUL's market share—a market share that is based upon children purchasing JLI's tobacco products.

703.    Plaintiff was a direct victim of Defendants' misconduct. The Nicotine Market Expansion Enterprise Defendants displayed a wanton disregard for public health and safety by intentionally addicting youth, including youth in Plaintiff's schools, to nicotine and then attempting to cover up their scheme in order to maintain and expand JUUL's market share. Defendants actively concealed that they marketed to youth in order to avoid public condemnation and to keep their products on the market and continue youth sales. This forced Plaintiff to shoulder the responsibility for this youth e-cigarette crisis created by Defendants' misconduct. The harm from the illicit youth e-cigarette market created by Defendants required Plaintiff to expend its limited financial and other resources to mitigate the health crisis of youth e-cigarette use. The expansion of this youth e-cigarette market was the goal of the Nicotine Market Expansion Enterprise and is critical to its success. Therefore, the harm suffered by Plaintiff because it must address and mitigate the youth e-cigarette crisis was directly foreseeable and, in fact, an intentional result of Defendants' misconduct.

704.    The creation and maintenance of this youth e-cigarette market directly harms Plaintiff by imposing costs on its business and property. Plaintiff's injuries were not solely the result of routine school district expenses. Instead, as a result of Defendants' misconduct, Plaintiff has been and will be forced to go far beyond what a school district might ordinarily be expected to pay to enforce the laws and to promote the general welfare in order to combat the youth e-cigarette crisis. This includes providing new programs and new services as a direct result and in direct response to Defendants' misconduct. As a result of the conduct of the Nicotine Market Expansion Enterprise Defendants, Plaintiff has incurred and will incur costs that far exceed the norm.

705.    There are no intervening acts or parties that could interrupt the causal chain between the Defendants' mail and wire fraud and Plaintiff's injuries. Defendants, in furtherance of the Nicotine Market Expansion Enterprise's common purpose, made false and misleading statements directly to the

public, including Plaintiff, its employees, and its students. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed youth in Plaintiff's community to purchase products that should not have been on the market and/or that should not have been marketed to minors.

706.    As to predicate acts occurring prior to October 7, 2015, Plaintiff did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, inter alia, the true nicotine content in and delivered by JUUL products, such information the Defendants concealed and failed to truthfully disclose.

707.    The Nicotine Market Expansion Enterprise's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Plaintiff is entitled to bring this action for three times its actual damages, as well as for injunctive/equitable relief, costs, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE — VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(D)**

708.    Plaintiff incorporates by reference all preceding paragraphs.

709.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the members of the Nicotine Market Expansion Enterprise agreed to conspire and conspired to violate 18 U.S.C. § 1962(c), as described herein. The conspiracy is coterminous with the time period in which the Nicotine Expansion Market Enterprise has existed, beginning in 2015 and continuing to this day (with Defendant Altria joining the conspiracy in Spring 2017). The RICO Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise

in furtherance of a common purpose, as detailed above in relation to the RICO Defendants' substantive violation of Section 1962(c). The acts in furtherance of the conspiracy attributable to the RICO Defendants include each of the predicate acts underlying the Nicotine Market Expansion Enterprise's violation of Section 1962(c), as described above. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Amended Complaint, have participated as co-conspirators with the members of the Nicotine Market Expansion Enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, maintain or increase market share, and/or minimize losses for the Defendants and their named and unnamed co-conspirators throughout the illegal scheme and common course of conduct.

710.    Plaintiff has been injured by the Nicotine Market Expansion Enterprise Defendants' conduct, and such injury would not have occurred but for the predicate acts of those defendants which also constitute the acts taken by the RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d). The combined effect of the RICO Defendants' acts of mail and wire fraud in furtherance of their conspiracy, including working to preserve and expand the market of underage JUUL customers, fraudulently denying JLI's youth-focused marketing, and deceiving regulators and the public in order to allow JUUL products and mint-flavored JUUL pods to remain on the market, was to cause e caused the expansion of an illicit e-cigarette market for youth in Plaintiff's schools and cause a large number of youth in Plaintiff's schools to become addicted to nicotine, thus forcing Plaintiff to expend time, money, and resources to address the epidemic Defendants created through their conduct. Indeed, the Nicotine Market Expansion Enterprise Defendants intentionally sought to reach into schools and deceive public health officials in order to continue growing JLI's youth customer base. The repeated fraudulent misstatements by the Nicotine Market Expansion Enterprise Defendants denying that JLI marketed to youth have served to preserve JUUL's market share—a market share that is based upon children purchasing JLI's tobacco products. The harm to Plaintiff would not have occurred absent the RICO Defendants' conspiracy to engage in a pattern of

racketeering activity through a RICO Enterprise, the common purpose of which was maintaining and expanding the number of nicotine-addicted e-cigarette users, and youth in particular, in order to ensure a steady and growing customer base, including by preserving and growing JLI's ill-gotten market share.

711.     Plaintiff was a direct victim of Defendants' misconduct. The Nicotine Market Expansion Enterprise Defendants' acts in furtherance of their RICO conspiracy displayed a wanton disregard for public health and safety by intentionally addicting youth, including youth in Plaintiff's schools, to nicotine and then attempting to cover up their scheme in order to maintain and expand JUUL's market share. Defendants actively concealed that they marketed to youth in order to avoid public condemnation and to keep their products on the market and continue youth sales. This forced Plaintiff to shoulder the responsibility for this youth e-cigarette crisis created by Defendants' misconduct. The harm from the illicit youth e-cigarette market created by Defendants required Plaintiff to expend its limited financial and other resources to mitigate the health crisis of youth e-cigarette. The expansion of this youth e-cigarette market was the goal of the Nicotine Market Expansion Enterprise and is critical to its success. Therefore, the harm suffered by Plaintiff because it must address and mitigate the youth e-cigarette crisis was directly foreseeable and, in fact, an intentional result of Defendants' misconduct.

712.     The creation and maintenance of this youth e-cigarette market, and Defendants actions in furtherance of their RICO conspiracy, directly harms Plaintiff by imposing costs on its business and property. Plaintiff's injuries were not solely the result of routine school district expenses. Instead, as a result of Defendants' misconduct, Plaintiff has been and will be forced to go far beyond what a school district might ordinarily be expected to pay to enforce the laws and to promote the general welfare in order to combat the youth e-cigarette crisis. This includes providing new programs and new services as a direct result and in direct response to Defendants' misconduct. As a result of the conduct of the

Nicotine Market Expansion Enterprise Defendants, Plaintiff has incurred and will incur costs that far exceed the norm.

713.    There are no intervening acts or parties that could interrupt the causal chain between the RICO Defendants' mail and wire fraud acts in furtherance of their RICO conspiracy and Plaintiff's injuries. The RICO Defendants, in furtherance of their conspiracy to form the Nicotine Market Expansion Enterprise and advance its common purpose, made false and misleading statements directly to the public, including Plaintiff, its employees, and its students. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed youth in Plaintiff's community to purchase products that should not have been on the market and/or that should not have been marketed to minors.

714.    As to predicate acts undertaken in furtherance of the conspiracy which occurred prior to October 7, 2015, Plaintiff did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that the RICO Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, inter alia, the true nicotine content in and delivered by JUUL products, such information the RICO Defendants concealed and failed to truthfully disclose.

715.    The Nicotine Market Expansion Enterprise's violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiff and Plaintiff is entitled to bring this action for three times its actual damages, as well as for injunctive/equitable relief, costs, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### COUNT FOUR — NEGLIGENCE

716.    Plaintiff incorporates by reference all preceding paragraphs.

717.     Defendants owed Plaintiff a duty to not expose Plaintiff to an unreasonable risk of harm, and to act with reasonable care as a reasonably careful person and/or company would act under the circumstances.

718.     At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of  Defendants' e-cigarette products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

719.     At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of their e-cigarette products.  Defendants' duty of care owed to consumers and the general public, including Plaintiff, included providing accurate, true, and correct information concerning the risks of using Defendants' products and appropriate, complete, and accurate warnings concerning the potential adverse effects of e-cigarette use and nicotine use and, in particular, JLI's patented nicotine salts and the chemical makeup of JUULpods liquids.

720.     At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Defendants' products and specifically, the health hazards posed by using JUULpods and other e-cigarette products and continued use of nicotine, particularly among adolescents.

721.     Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of Defendants' products by students could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to Plaintiff.

722.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Defendants' products were unaware of the risks and the magnitude of the risks associated with the use of Defendants' products including but not limited to the risks of continued nicotine use and nicotine addiction.

723.    As such, Defendants, by action and inaction, representation and omission, breached their duty of reasonable care, failed to exercise ordinary care, and failed to act as a reasonably careful person and/or company would act under the circumstances in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their e-cigarette products, in that Defendants manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, knew or had reason to know of the defects inherent in their products, knew or had reason to know that a consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

724.    Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendants have failed to do so.  Indeed, Defendants have wrongfully concealed information and have made false and/or misleading statements concerning the safety and/or use of Defendants' products and nicotine vaping.

725.    Defendants' negligence included:

a.    Researching, designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing, and/or selling their products, without thorough and adequate pre- and post-market testing;

b.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not their products were safe for their intended use;

c.    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of their products so as to avoid the risk of serious harm associated with the prevalent use of e-cigarettes and nicotine products;

d.      Designing and manufacturing their products to cause nicotine addiction, including by maximizing nicotine delivery while minimizing "throat hit" or "harshness";

e.      Failing to utilize proper materials, ingredients, additives and components in the design of their products to ensure they would not deliver unsafe doses of nicotine;

f.      Designing and manufacturing their products to appeal to minors and young people, including through the use of flavors and an easily concealable, tech-inspired design;

g.      Advertising, marketing, and promoting their products to minors, including through the use of viral social media campaigns;

h.      Failing to take steps to prevent their products from being sold to, distributed to, or used by minors;

i.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use their products;

j.      Affirmatively encouraging new JUUL users through an instructional starter pack insert to disregard any initial discomfort and to continue e-cigarette use by instructing users to "keep trying even if the JUUL feels too harsh," and telling them, "[d]on't give up, you'll find your perfect puff";

k.      Failing to disclose to, or warn, Plaintiff, users, consumers, and the general public of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained in Defendants' products;

l.      Misrepresenting to Plaintiff, users, consumers, and the general public the actual nicotine content of Defendants' products;

m.      Failing to disclose to Plaintiff, users, consumers, and the general public that Defendants' products deliver more nicotine than represented;

n.      Misrepresenting Defendants' products as non-addictive, less addictive, and/or safer nicotine delivery systems than traditional cigarettes;

o.      Representing that Defendants' products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

p.      Declining to make or propose any changes to the labeling or other promotional materials for Defendants' e-cigarette and nicotine products that would alert consumers and the general public, including minors in Plaintiffs' schools of the true risks of using Defendants' products;

q.   Advertising, marketing, and recommending Defendants' products while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with, or caused by, the use of Defendants' products;

r.   Continuing to disseminate information to consumers, which indicates or implies that Defendants' products are not unsafe for their intended use;

s.   Continuing the manufacture and sale of Defendants' products with knowledge that the products were unreasonably unsafe, addictive, and dangerous;

t.   Failing to recall Defendants' products; and

u.   Committing other failures, acts, and omissions set forth herein.

726.    Defendants knew and/or should have known that it was foreseeable that Plaintiff would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Defendants' products, particularly when Defendants' products were made and marketed so as to be attractive and addictive to youth who spend many hours each week on Plaintiff's property and under Plaintiff's supervision.

727.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of e-cigarette products including, but not limited to, JLI's patented JUULpods liquids, by Plaintiff's students.

728.    Defendants' negligence helped to and did produce, and  was  the  proximate  cause  of, the  injuries,  harm,  and economic losses that Plaintiff suffered, and will continue to suffer, and such injuries, harm and economic losses would not have happened without Defendants' negligence as described herein.

729.    E-cigarette use is the single most disruptive behavioral situation in Plaintiff's high schools and Plaintiff's injuries, harm and economic losses include, but are not limited to:

a.   Expending, diverting and increasing staff time to confiscate product;

b.   Expending, diverting and increasing staff time to communicate and engage with parents;

c.   Expending, diverting and increasing the time that teachers must be out of class to prepare witness statements and assist in investigations;

d.    Expending, diverting and increasing staff time associated with discipline and suspension of students;

e.    Expending, diverting and increasing staff time associated with routing students to social workers to develop and convene support groups for suspended students;

f.    Expending, diverting and increasing staff time associated with routing students to social workers to develop and conduct prevention programing;

g.    Expending, diverting and increasing resources for modifications to the health curriculum; and

h.    Expending, diverting and increasing resources to make physical changes to schools and/or address property damage in schools.

730.    Defendants' conduct, as described above, was intended to cause injury and/or was motivated by spite or ill will and/or Defendants acted to serve their own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure the rights of others, including Plaintiff, and/or Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, including Plaintiff.  Defendants regularly risks the lives and health of consumers and users of its products with full knowledge of the dangers of its products.  Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff's students or Plaintiff.  Defendants' willful, knowing and reckless conduct therefore warrants an award of aggravated or punitive damages.

**COUNT FIVE — GROSS NEGLIGENCE**

731.    Plaintiff incorporates by reference all preceding paragraphs.

732.    Defendants owed a duty of care to Plaintiff to conduct their business of manufacturing, promoting, marketing, and/or distributing e-cigarette products in compliance with applicable state law and in an appropriate manner.

733.    Specifically, Defendants had a duty and owed a duty to Plaintiff to exercise a degree of reasonable care including, but not limited to: ensuring that Defendants' marketing does not target minors; ensuring that Defendants' products including, but not limited to, JUUL e-cigarettes and

JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors; designing a product that will not addict youth or other users to nicotine; and adequately warning of any reasonably foreseeable adverse events with respect to using the product. Defendants designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed Defendants' products into the stream of commerce, and therefore owed a duty of reasonable care to those, including Plaintiff, who would be impacted by their use.

734.     Defendants' products were the types of products that could endanger others if negligently made, promoted, or distributed. Defendants knew the risks that young people would be attracted to their e-cigarette products and knew or should have known the importance of ensuring that the products were not sold and/or distributed to anyone under age 26, but especially to minors.

735.     Defendants knew or should have known that their marketing, distribution, and sales practices did not adequately safeguard minors from the sale and/or distribution of Defendants' products and, in fact, induced minors to purchase Defendants' products.

736.     Defendants were grossly negligent in designing, manufacturing, supplying, distributing, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, and/or labeling Defendants' products.

737.     As powerfully addictive and dangerous nicotine-delivery devices, Defendants knew or should have known that their e-cigarette products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied and distributed properly, without defects and with due care to avoid needlessly causing harm. Defendants knew or should have known that their products could cause serious risk of harm, particularly to young persons like students in Plaintiff's schools.

738.     Defendants engaged in willful and/or wanton conduct amounting to aggravated negligence in that they acted with reckless indifference to the results, or to the rights or safety of others

because Defendants knew, or a reasonable person or company in Defendants' position should have known, that Defendants' action and/or inaction created an unreasonable risk of harm, and the risk was so great that it was highly probable that harm would result.  Defendants' willful and wanton conduct, and aggravated negligence, caused Plaintiff to suffer harm.

739.    The willful and wanton conduct, and aggravated negligence of Defendants includes, but is not limited to, the following:

      a.    Researching, designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing, and/or selling their products, without thorough and adequate pre- and post-market testing;

      b.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not their products were safe for their intended use;

      c.    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of their products so as to avoid the risk of serious harm associated with the prevalent use of e-cigarettes and nicotine products;

      d.    Designing and manufacturing their products to cause nicotine addiction, including by maximizing nicotine delivery while minimizing "throat hit" or "harshness";

      e.    Failing to utilize proper materials, ingredients, additives and components in the design of their products to ensure they would not deliver unsafe doses of nicotine;

      f.    Designing and manufacturing their products to appeal to minors and young people, including through the use of flavors and an easily concealable, tech-inspired design;

      g.    Advertising, marketing, and promoting their products to minors, including through the use of viral social media campaigns;

      h.    Failing to take steps to prevent their products from being sold to, distributed to, or used by minors;

      i.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use their products;

      j.    Affirmatively encouraging new JUUL users through an instructional starter pack insert to disregard any initial discomfort and to continue e-cigarette use by instructing users to "keep trying even if the JUUL feels too harsh," and telling them, "[d]on't give up, you'll find your perfect puff";

k.   Failing to disclose to, or warn, Plaintiff, users, consumers, and the general public of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained in Defendants' products;

l.   Misrepresenting to Plaintiff, users, consumers, and the general public the actual nicotine content of Defendants' products;

m.   Failing to disclose to Plaintiff, users, consumers, and the general public that Defendants' products deliver more nicotine than represented;

n.   Misrepresenting Defendants' products as non-addictive, less addictive, and/or safer nicotine delivery systems than traditional cigarettes;

o.   Representing that Defendants' products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

p.   Declining to make or propose any changes to the labeling or other promotional materials for Defendants' e-cigarette and nicotine products that would alert consumers and the general public, including minors in Plaintiffs' schools of the true risks of using Defendants' products;

q.   Advertising, marketing, and recommending Defendants' products while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with, or caused by, the use of Defendants' products;

r.   Continuing to disseminate information to consumers, which indicates or implies that Defendants' products are not unsafe for their intended use;

s.   Continuing the manufacture and sale of Defendants' products with knowledge that the products were unreasonably unsafe, addictive, and dangerous;

t.   Failing to recall Defendants' products; and

u.   Committing other failures, acts, and omissions set forth herein.

740.   Defendants breached the duties they owed to Plaintiff and in doing so, were wholly unreasonable.  A responsible company, whose primary purpose is to help adult smokers, would not design a product to appeal to minors and nonsmokers nor market their products to minors and nonsmokers.  If they are aware of the dangers of smoking and nicotine ingestion enough to create a device to help people stop smoking, then they are aware of the dangers enough to know that it would be harmful for young people and nonsmokers to use.

741.    Defendants breached their duties through their false and misleading statements and omissions in the course of the manufacture, distribution, sale, and/or marketing of Defendants' e-cigarette products.

742.    As a foreseeable consequence of Defendants' breaches of their duties, Plaintiff suffered direct and consequential economic and other injuries as a result of dealing with the e-cigarette epidemic in Plaintiff's schools.

743.    E-cigarette use is the single most disruptive behavioral situation in Plaintiff's high schools and Plaintiff's injuries, harm and economic losses include, but are not limited to:

      a.    Expending, diverting and increasing staff time to confiscate product;

      b.    Expending, diverting and increasing staff time to communicate and engage with parents;

      c.    Expending, diverting and increasing the time that teachers must be out of class to prepare witness statements and assist in investigations;

      d.    Expending, diverting and increasing staff time associated with discipline and suspension of students;

      e.    Expending, diverting and increasing staff time associated with routing students to social workers to develop and convene support groups for suspended students;

      f.    Expending, diverting and increasing staff time associated with routing students to social workers to develop and conduct prevention programing;

      g.    Expending, diverting and increasing resources for modifications to the health curriculum; and

      h.    Expending, diverting and increasing resources to make physical changes to schools and/or address property damage in schools.

744.    Defendants' breaches of their duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute gross negligence, willful or wanton conduct, and aggravated negligence.

745.    Defendants' gross negligence, willful and wanton conduct and aggravated negligence was egregious, directed at the public generally, and involved a high degree of moral culpability.

746.     Defendants' conduct, as described above, was intended to cause injury and/or was motivated by spite or ill will and/or Defendants acted to serve their own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure the rights of others, including Plaintiff, and/or Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, including Plaintiff.  Defendants regularly risks the lives and health of consumers and users of its products with full knowledge of the dangers of its products.  Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff's students or Plaintiff.  Defendants' willful, knowing and reckless conduct therefore warrants an award of aggravated or punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

747.  Entering an Order that the conduct alleged herein constitutes a public nuisance under Arizona law;

748.  Entering an Order that Defendants are jointly and severally liable;

749.  Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

750.  Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

751.  Awarding equitable relief to fund prevention education and addiction treatment;

752.  Awarding actual and compensatory damages;

753.  Awarding punitive damages;

754.  Awarding statutory damages in the maximum amount permitted by law;

755.  Awarding reasonable attorneys' fees and costs of suit;

756.  Awarding pre-judgment and post-judgment interest; and

757.  Such other and further relief as the Court deems just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 8th day of May, 2020.

**WAGSTAFF & CARTMELL LLP**

*/s/ Thomas P. Cartmell*
Thomas P. Cartmell, (*pro hac vice*)
Jonathan P. Kieffer, (*pro hac vice*)
Tyler W. Hudson, (*pro hac vice*)
Wagstaff & Cartmell LLP
4740 Grand Avenue, Ste 300
Kansas City, MO  64112
Tel. (816) 701-1100
Fax (816) 531-2372
tcartmell@wcllp.com
jpkieffer@wcllp.com
thudson@wcllp.com

*/s/ José de Jesús Rivera*
José de Jesús Rivera
MILLER, PITT, FELDMAN & McANALLY, P.C.
2800 North Central Avenue, Ste. 840
Phoenix, AZ 85004-1069
(601) 266-5557; Fax (602) 266-2223
jrivera@mpfmlaw.com

*/s/ Kirk J. Goza*
Kirk J. Goza (*pro hac vice*)
Brad Honnold (*pro hac vice*)
Goza & Honnold LLC
9500 Nall Ave., Ste 400
Overland Park, KS 66207
Tel. (913) 451-3433
kgoza@gohonlaw.com
bhonnold@gohonlaw.com

*/s/ Andy D. Birchfield, Jr.*
Andy D. Birchfield, Jr. (*pro hac vice*)
Joseph G. VanZandt (*pro hac vice*)
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC

234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
***Attorneys for Plaintiff***
**TUCSON UNIFIED SCHOOL DISTRICT**