[Submitting Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 19-md-02913-WHO |
| THIS DOCUMENT RELATES TO: CLASS ACTIONS | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES ............................................................................................................. 5

        A.      Plaintiffs ................................................................................................... 5

        B.      Defendants ............................................................................................... 5

III.    JURISDICTION AND VENUE ......................................................................... 8

IV.     FACTUAL ALLEGATIONS ............................................................................. 9

        A.      Each Defendant Was Instrumental in Seeking to Develop and Market the
                Blockbuster Sequel to Combustible Cigarettes, the "Most Successful
                Consumer Product of All Time." ............................................................. 9

        B.      Defendants' Strategy Was to Create a Nicotine Product That Would Maximize
                Profits Through Addiction. ..................................................................... 17

                1.      Defendants Understood that the "Magic" Behind Cigarettes'
                        Stratospheric Commercial Success Was Nicotine Addiction. ............... 17

                2.      Following the Cigarette Industry Playbook, Defendants Sought to Market
                        a Product that would Create and Sustain Nicotine Addiction, but Without
                        the Stigma Associated with Cigarettes ................................................... 20

                3.      Defendants Sought to Position JLI for Acquisition by a Major Cigarette
                        Company. ................................................................................................ 26

        C.      JLI and Bowen Designed a Nicotine Delivery Device Intended to Create and
                Sustain Addiction. ................................................................................... 32

                1.      JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young
                        People and Non-Smokers to Inhale ........................................................ 32

                2.      JLI's Initial Experiments Measured Non-Smokers "Buzz" Levels and
                        Perceptions of Throat Harshness ........................................................... 33

                3.      JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than
                        Cigarettes. .............................................................................................. 36

                4.      JLI and the Management Defendants Knew That JUUL was
                        Unnecessarily Addictive Because It Delivered More Nicotine Than
                        Smokers Needed or Wanted .................................................................... 43

                5.      JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to
                        Non-Smokers and Easy for Young People to Use Without Detection. ... 45

i

6. JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation. .................. 49

 a. JIL Develops Flavored JUUL Products That Would Appeal to Youth.................................................................................... 49

 b. Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market. .................................................. 53

D. Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe.................................................. 58

1. The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content................................... 58

2. JLI, the Management Defendants, and Altria Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Was False and Misleading.................................................... 63

3. Defendants Used Food and Coffee Themes to Give False Impression that JUUL Products Were Safe and Healthy................................................. 68

4. JLI's "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device................................. 72

5. JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public About the Harms and Benefits of E-Cigarettes. ..................................................................... 83

6. Altria Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to JLI .......................................................... 90

E. Defendants Targeted the Youth Market................................................ 92

1. JLI Emulated the Marketing of Cigarette Companies. ............................ 93

2. The Management Defendants Intentionally Marketed JUUL to Young People........................................................................................ 95

3. JLI Advertising Exploited Young People's Psychological Vulnerabilities.98

4. JLI Pushed the Vaporized Campaign Into Youth Targeted Channels. ... 103

 a. JLI Placed Its Vaporized Ads on Youth Oriented Websites and Media. ................................................................................. 103

 b. JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience................................................................. 105

 c. JLI Used Viral Marketing Techniques Known to Reach Young People.................................................................................. 108

ii

5.      JLI Targeted Youth Retail Locations...................................................... 110

6.      JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Consumers Hooked. ............................................ 111

7.      The Management Defendants' Direction and Participation in the Youth Marketing Schemes...................................................................................... 114

        a.      The Management Defendants, and in particular Bowen, Monsees, Pritzker, Huh, and Valani, oversaw the youth marketing scheme.114

        b.      Pritzker, Huh, and Valani Were Able to Direct and Participate in the Youth Marketing Because They Seized Control of the JLI Board of Directors...................................................................... 119

8.      JLI and the Management Defendants Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products. ........................... 121

        a.      JLI's Strategy Worked. ............................................................. 122

        b.      JLI Closely Tracked Its Progress in Reaching Young Customers through Social Media and Online Marketing............................. 123

9.      JLI Coordinates with Veratad Technologies To Expand Youth Access to JUUL Products........................................................................................... 126

10.     JLI Engaged in a Sham "Youth Prevention" Campaign...................... 135

11.     The FDA Warned JUUL and Others That Their Conduct is Unlawful . 138

12.     In Response to Regulatory Scrutiny, Defendants Misled the Public, Regulators, and Congress that JLI Did Not Target Youth..................... 140

F.      Altria Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette. ................................................................. 144

        1.      Before Altria's Investment in JLI, Altria and JLI Exchanged Market Information Pertaining to Key Decisions. ............................................. 144

        2.      JLI, the Management Defendants and Altria Coordinated to Market JUUL in Highly-Visible Retail Locations ............................................. 146

        3.      Altria Contributes to the Success of JLI's and the Management Defendants' Scheme Through a Range of Coordinated Activities........ 147

G.      JLI, Altria, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis. ................................................................................................................ 151

        1.      Defendants' Scheme Caused Consumers to be Misled into Believing that JUUL was Safe and Healthy.......................................................... 151

iii

2.      Use of JUUL by Minors Has Skyrocketed ............................................ 153

H.    JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its
        Products.......................................................................................................... 158

        1.      E-Cigarette Manufacturers Successfully Blocked the Types of
                Regulations that Reduced Cigarette Sales, Creating the Perfect
                Opportunity for JLI. ............................................................................ 158

        2.      JLI, the Management Defendants, and Altria Defendants Successfully
                Shielded the Popular Mint Flavor from Regulation............................... 161

        3.      In Response to the Public Health Crisis Created by JUUL, the FDA
                Belatedly Tried to Slow the Epidemic. ................................................. 170

        4.      The Government's Efforts to Address the JUUL Crisis Were Too Late
                and the Damage Has Already Been Done............................................... 171

I.     JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological,
        and Other Bodily Injuries........................................................................... 173

        1.      JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries . 173

        2.      JUUL Products Cause Cardiovascular Injuries...................................... 179

        3.      JUUL Products Cause and Contribute to Seizure(s)............................... 180

        4.      Animal Studies Demonstrate Carcinogenic Potential of JUUL............. 182

V.    INTERSTATE AND INTRASTATE COMMERCE.................................................. 183

VI.   CLASS ACTION ALLEGATIONS............................................................................ 183

        A.    Nationwide Class ......................................................................................... 183

        B.    State Classes and Subclasses ...................................................................... 183

        C.    Class Exclusions .......................................................................................... 189

        D.    Rule 23 Prerequisites ................................................................................. 190

VII.  CAUSES OF ACTION ............................................................................................. 191

        A.    Causes of Action Brought on Behalf of the Nationwide Class and the
                California Subclass ...................................................................................... 191

        1.      Violation of the California Unfair Competition Law (Cal. Bus. & Prof.
                Code § 17200, *et seq.*)............................................................................. 191

iv

2.      Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*)................................................................. 195

3.      Violation of the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*)................................................................. 197

4.      Common Law Fraud ............................................................................. 199

5.      Breach of the Implied Warranty of Merchantability............................. 201

6.      Unjust Enrichment ................................................................................ 202

B.      Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(c))..................................................................... 204

1.      Description of the Nicotine Market Expansion Enterprise .................... 204

2.      Conduct of the Nicotine Market Expansion Enterprise ........................ 207

3.      Pattern of Racketeering Activity........................................................... 210

4.      Harm to Plaintiffs................................................................................. 218

C.      Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(d)).................................................................... 220

D.      Violation of the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*).. 222

E.      Causes of Action Brought on Behalf of the State Classes ................................ 224

1.      Alabama ................................................................................................ 224

        a.      Violation of the Alabama Deceptive Trade Practices Act (Ala. Code § 8-19-1, *et seq.*)................................................................. 224

        b.      Common Law Fraud ................................................................... 227

        c.      Breach of the Implied Warranty of Merchantability.................. 229

        d.      Unjust Enrichment ..................................................................... 231

2.      Alaska ................................................................................................... 232

        a.      Violation of the Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. § 45.50.471, *et seq.*) ..................... 232

        b.      Common Law Fraud ................................................................... 236

        c.      Breach of the Implied Warranty of Merchantability.................. 238

        d.      Unjust Enrichment ..................................................................... 239

3.      Arizona.................................................................................................. 240

a.    Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. § 44-1521, *et seq.*)................................................................. 241

b.    Common Law Fraud ........................................................... 244

c.    Breach of the Implied Warranty of Merchantability................. 246

d.    Unjust Enrichment .............................................................. 247

4.    Arkansas................................................................................... 248

a.    Violation of the Arkansas Deceptive Trade Practices Act (Ark. Code § 4-88-101, *et seq.*)................................................ 249

b.    Common Law Fraud ........................................................... 252

c.    Breach of the Implied Warranty of Merchantability................. 254

d.    Unjust Enrichment .............................................................. 256

5.    Colorado.................................................................................. 257

a.    Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, *et seq.*).............................................. 257

b.    Common Law Fraud ........................................................... 260

c.    Breach of the Implied Warranty of Merchantability................. 262

d.    Unjust Enrichment .............................................................. 264

6.    Connecticut ............................................................................. 265

a.    Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq.*)................................. 265

b.    Common Law Fraud ........................................................... 268

c.    Breach of the Implied Warranty of Merchantability................. 270

d.    Unjust Enrichment .............................................................. 272

7.    Delaware ................................................................................. 273

a.    Violation of the Delaware Consumer Fraud Act (Del. Code tit. 6 § 2511, *et seq.*)........................................................ 273

b.    Violation of the Delaware Deceptive Trade Practices Act (Del. Code tit. 6 § 2531, *et seq.*) ........................................ 275

c.    Common Law Fraud ........................................................... 278

d.    Breach of the Implied Warranty of Merchantability................. 280

e.    Unjust Enrichment .............................................................. 282

8.    District of Columbia ................................................................. 283

a.    Violation of the D.C. Consumer Protection Procedures Act (D.C. Code § 28-3901, *et seq.*) .......................................... 283

vi

|   |   | b. | Common Law Fraud | 286 |
|   |   | c. | Breach of the Implied Warranty of Merchantability | 288 |
|   |   | d. | Unjust Enrichment | 290 |
|   | 9. | Florida | | 291 |
|   |   | a. | Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*) | 291 |
|   |   | b. | Violation of the Florida False Advertising Law (Fla. Stat. §§ 817.06 and 817.41, *et seq.*) | 294 |
|   |   | c. | Common Law Fraud | 297 |
|   |   | d. | Breach of the Implied Warranty of Merchantability | 299 |
|   |   | e. | Unjust Enrichment | 300 |
|   | 10. | Georgia | | 301 |
|   |   | a. | Violation of the Georgia Uniform Deceptive Trade Practices Act (Ga. Code § 10-1-370, *et seq.*) | 301 |
|   |   | b. | Violation of the Georgia Fair Business Practices Act (Ga. Code § 10-1-390, *et seq.*) | 304 |
|   |   | c. | Common Law Fraud | 307 |
|   |   | d. | Breach of the Implied Warranty of Merchantability | 310 |
|   |   | e. | Unjust Enrichment | 311 |
|   | 11. | Hawaii | | 312 |
|   |   | a. | Violation of the Hawaii Unfair and Deceptive Trade Practices Act (Haw. Rev. Stat. § 480-1, *et seq.*) | 312 |
|   |   | b. | Violation of the Hawaii Uniform Deceptive Trade Practice Act (Haw. Rev. Stat. § 481A-1, *et seq.*) | 315 |
|   |   | c. | Common Law Fraud | 318 |
|   |   | d. | Breach of the Implied Warranty of Merchantability | 320 |
|   |   | e. | Unjust Enrichment | 321 |
|   | 12. | Idaho | | 323 |
|   |   | a. | Violation of the Idaho Consumer Protection Act (Idaho Code § 48-601, *et seq.*) | 323 |
|   |   | b. | Common Law Fraud | 326 |
|   |   | c. | Breach of the Implied Warranty of Merchantability | 328 |
|   |   | d. | Unjust Enrichment | 330 |
|   | 13. | Illinois | | 331 |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

|     |     | a. | Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. § 505/1, *et seq.*)................. 331 |
|     |     | b. | Common Law Fraud ........................................................ 334 |
|     |     | c. | Breach of the Implied Warranty of Merchantability................. 336 |
|     |     | d. | Unjust Enrichment .......................................................... 338 |
|     | 14. | Indiana.................................................................................. 339 |
|     |     | a. | Violation of Indiana's Deceptive Consumer Sales Act (Ind. Code §§ 24-5-0.5-1, *et seq*). .................................................... 339 |
|     |     | b. | Common Law Fraud ........................................................ 343 |
|     |     | c. | Breach of the Implied Warranty of Merchantability................. 345 |
|     |     | d. | Unjust Enrichment .......................................................... 346 |
|     | 15. | Iowa...................................................................................... 348 |
|     |     | a. | Violation of the Iowa Consumer Fraud Act (Iowa Code § 714H.1, *et seq.*) ....................................................................... 348 |
|     |     | b. | Common Law Fraud ........................................................ 351 |
|     |     | c. | Breach of the Implied Warranty of Merchantability................. 353 |
|     |     | d. | Unjust Enrichment .......................................................... 354 |
|     | 16. | Kansas................................................................................... 355 |
|     |     | a. | Violation of Kansas Consumer Protection Act (Kan. Stat. Ann. § 50-623, *et seq.*)......................................................... 356 |
|     |     | b. | Common Law Fraud ........................................................ 359 |
|     |     | c. | Breach of the Implied Warranty of Merchantability................. 361 |
|     |     | d. | Unjust Enrichment .......................................................... 363 |
|     | 17. | Kentucky ............................................................................... 364 |
|     |     | a. | Violation of Kentucky Consumer Protection Act (Ky. Rev. Stat. Ann. § 367.110, *et seq.*) ............................................... 364 |
|     |     | b. | Common Law Fraud ........................................................ 367 |
|     |     | c. | Breach of the Implied Warranty of Merchantability................. 369 |
|     |     | d. | Unjust Enrichment .......................................................... 371 |
|     | 18. | Louisiana ............................................................................... 372 |
|     |     | a. | Violation of Louisiana Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. § 51:1401, *et seq.*) ........... 372 |
|     |     | b. | Common Law Fraud ........................................................ 375 |
|     |     | c. | Breach of the Implied Warranty of Merchantability................. 377 |

viii

|  |  | d. | Unjust Enrichment ................................................................ 379 |
| 19. | | Maine ............................................................................................ 380 |
|  | a. | Violation of Maine Unfair Trade Practices Act (5 M.R.S.A. § 205-A, *et seq.*)................................................................ 380 |
|  | b. | Violation of Maine Uniform Deceptive Trade Practices Act (10 M.R.S.A. § 1211, *et seq.*)........................................... 383 |
|  | c. | Common Law Fraud ......................................................... 386 |
|  | d. | Breach of the Implied Warranty of Merchantability.......... 388 |
|  | e. | Unjust Enrichment ........................................................... 389 |
| 20. | | Maryland ...................................................................................... 390 |
|  | a. | Violation of Maryland Consumer Protection Act (Md. Code Ann. Com. Law § 13-101, *et seq.*)......................................... 391 |
|  | b. | Common Law Fraud ......................................................... 394 |
|  | c. | Breach of the Implied Warranty of Merchantability.......... 396 |
|  | d. | Unjust Enrichment ........................................................... 398 |
| 21. | | Massachusetts ............................................................................... 399 |
|  | a. | Violation of Massachusetts Regulation of Business Practice and Consumer Protection Act (M.G.L.A. 93A, § 1, *et seq.*) ............ 399 |
|  | b. | Common Law Fraud ......................................................... 402 |
|  | c. | Breach of the Implied Warranty of Merchantability.......... 404 |
|  | d. | Unjust Enrichment ........................................................... 406 |
| 22. | | Michigan ....................................................................................... 407 |
|  | a. | Violation of Michigan Consumer Protection Act (M.C.L.A. § 445.901, *et seq.*)......................................................... 407 |
|  | b. | Common Law Fraud ......................................................... 410 |
|  | c. | Breach of the Implied Warranty of Merchantability.......... 412 |
|  | d. | Unjust Enrichment ........................................................... 413 |
| 23. | | Minnesota ..................................................................................... 414 |
|  | a. | Violation of Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.69).............................................................. 414 |
|  | b. | Violation of Minnesota False Statement in Advertising Law (Minn. Stat. § 325F.67)..................................................... 417 |
|  | c. | Violation of Minnesota Deceptive Trade Practices Act (Minn. Stat. § 325D.43, *et seq.*)................................................ 420 |

ix

|  |  | d. | Common Law Fraud | 422 |
|  |  | e. | Breach of the Implied Warranty of Merchantability | 424 |
|  |  | f. | Unjust Enrichment | 425 |
|  | 24. | Mississippi | | 427 |
|  |  | a. | Violation of Mississippi Consumer Protection Act (Miss. Code Ann. § 75-24-1, *et seq.*) | 427 |
|  |  | b. | Common Law Fraud | 429 |
|  |  | c. | Breach of the Implied Warranty of Merchantability | 431 |
|  |  | d. | Unjust Enrichment | 433 |
|  | 25. | Missouri | | 434 |
|  |  | a. | Violation of Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*) | 434 |
|  |  | b. | Common Law Fraud | 437 |
|  |  | c. | Breach of the Implied Warranty of Merchantability | 439 |
|  |  | d. | Unjust Enrichment | 441 |
|  | 26. | Montana | | 442 |
|  |  | a. | Violation of Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. § 30-14-101, *et seq.*) | 442 |
|  |  | b. | Common Law Fraud | 445 |
|  |  | c. | Breach of the Implied Warranty of Merchantability | 447 |
|  |  | d. | Unjust Enrichment | 448 |
|  | 27. | Nebraska | | 449 |
|  |  | a. | Violation of the Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-1601, *et seq.*) | 450 |
|  |  | b. | Violation of the Nebraska Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. §§ 87-301, *et seq.*) | 453 |
|  |  | c. | Common Law Fraud | 455 |
|  |  | d. | Breach of the Implied Warranty of Merchantability | 457 |
|  |  | e. | Unjust Enrichment | 459 |
|  | 28. | Nevada | | 460 |
|  |  | a. | Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq.*) | 460 |
|  |  | b. | Common Law Fraud | 463 |
|  |  | c. | Breach of the Implied Warranty of Merchantability | 465 |

d.      Unjust Enrichment ................................................................. 467

29.      New Hampshire ................................................................................. 468

a.      Violation of the New Hampshire Regulation of Business Practices for Consumer Protection (N.H. Rev. Stat. §§ 358-A:1, *et seq.*) 468

b.      Common Law Fraud ............................................................... 471

c.      Breach of the Implied Warranty of Merchantability ................. 474

d.      Unjust Enrichment ................................................................. 475

30.      New Jersey ........................................................................................ 476

a.      Common Law Fraud ............................................................... 476

b.      Breach of the Implied Warranty of Merchantability ................. 478

c.      Unjust Enrichment ................................................................. 480

31.      New Mexico ....................................................................................... 481

a.      Violation of the New Mexico Unfair Trade Practices Act (N.M. Stat. § 57-12-1) ................................................................. 481

b.      Common Law Fraud ............................................................... 485

c.      Breach of the Implied Warranty of Merchantability ................. 487

d.      Unjust Enrichment ................................................................. 488

32.      New York .......................................................................................... 489

a.      Violation of New York General Business Law § 349 ............... 489

b.      Violation of New York General Business Law § 350 ............... 492

c.      Common Law Fraud ............................................................... 494

d.      Breach of the Implied Warranty of Merchantability ................. 496

e.      Unjust Enrichment ................................................................. 498

33.      North Carolina ................................................................................... 499

a.      Violation of the North Carolina Unfair & Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, *et seq.*).................... 499

b.      Common Law Fraud ............................................................... 502

c.      Breach of the Implied Warranty of Merchantability ................. 504

d.      Unjust Enrichment ................................................................. 506

34.      North Dakota ..................................................................................... 507

a.      Violation of North Dakota Consumer Fraud Act (N.D. Cent. Code § 51-15-01, *et seq.*) ................................................................. 507

b.      Violation of North Dakota False Advertising Law (N.D. Cent. Code § 51-12-08) ........................................................ 510

c.      Common Law Fraud ........................................................ 512

d.      Breach of the Implied Warranty of Merchantability ................. 515

e.      Unjust Enrichment ........................................................ 516

35.      Ohio ................................................................................ 517

a.      Violation of the Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §§ 1345.01, *et seq.*) ................................... 517

b.      Violation of the Ohio Deceptive Trade Practices Act (Ohio Rev. Code §§ 4165.01 - .04) ................................................ 521

c.      Common Law Fraud ........................................................ 523

d.      Breach of the Implied Warranty of Merchantability ................. 525

e.      Unjust Enrichment ........................................................ 527

36.      Oklahoma ....................................................................... 528

a.      Violation of the Oklahoma Consumer Protection Act (Okla. Stat. tit. 15, §§ 751, *et seq.*) ................................... 528

b.      Violation of the Oklahoma Deceptive Trade Practices Act (Okla. Stat. tit. 78, §§ 51, *et seq.*) ................................ 531

c.      Common Law Fraud ........................................................ 533

d.      Breach of the Implied Warranty of Merchantability ................. 535

e.      Unjust Enrichment ........................................................ 537

37.      Oregon ........................................................................... 538

a.      Violation of the Oregon Unfair Trade Practices Act (Or. Rev. Stat. §§ 646.605, *et seq.*) ................................... 538

b.      Common Law Fraud ........................................................ 541

c.      Breach of the Implied Warranty of Merchantability ................. 543

d.      Unjust Enrichment ........................................................ 545

38.      Pennsylvania .................................................................. 546

a.      Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. Ann. §§ 201-1, *et seq.*) 546

b.      Common Law Fraud ........................................................ 549

c.      Breach of the Implied Warranty of Merchantability ................. 551

d.      Unjust Enrichment ........................................................ 552

39.      Rhode Island .................................................................. 553

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

a.     Violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (6 R.I. Gen. Laws §§ 13.1-1, *et seq.*) 554

b.     Common Law Fraud ........................................................ 557

c.     Breach of the Implied Warranty of Merchantability.................. 559

d.     Unjust Enrichment ........................................................ 560

40.     South Carolina ................................................................ 561

      a.     Violation of the South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq.*) ........................................... 562

      b.     Common Law Fraud ........................................................ 565

      c.     Breach of the Implied Warranty of Merchantability.................. 567

      d.     Unjust Enrichment ........................................................ 568

41.     South Dakota ................................................................... 569

      a.     Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-1, *et seq.*) .......................................................................... 570

      b.     Common Law Fraud ........................................................ 572

      c.     Breach of the Implied Warranty of Merchantability.................. 575

      d.     Unjust Enrichment ........................................................ 576

42.     Tennessee ........................................................................ 577

      a.     Violation of the Tennessee Consumer Protection Act (Tenn. Code Ann. §§ 47-18-101, *et seq.*) .......................................... 577

      b.     Common Law Intentional Misrepresentation ........................... 580

      c.     Breach of the Implied Warranty of Merchantability.................. 583

      d.     Unjust Enrichment ........................................................ 584

43.     Texas .............................................................................. 585

      a.     Violation of the Texas Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)....... 585

      b.     Common Law Fraud ........................................................ 589

      c.     Breach of the Implied Warranty of Merchantability.................. 591

      d.     Unjust Enrichment ........................................................ 592

44.     Utah ............................................................................... 593

      a.     Violation of the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*) ............................................... 593

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

        b.      Violation of the Utah Truth in Advertising Law (Utah Code Ann. §§ 13-11a-1, *et seq.*).................................................................. 596

        c.      Common Law Fraud ...................................................... 599

        d.      Breach of the Implied Warranty of Merchantability................. 601

        e.      Unjust Enrichment ....................................................... 602

   45.     Vermont ............................................................................. 603

        a.      Violation of the Vermont Consumer Protection Act (Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*)........................................... 604

        b.      Common Law Fraud ...................................................... 606

        c.      Breach of the Implied Warranty of Merchantability................. 609

        d.      Unjust Enrichment ....................................................... 610

   46.     Virginia .............................................................................. 611

        a.      Violation of the Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, *et seq.*).................................................. 611

        b.      Common Law Fraud ...................................................... 614

        c.      Breach of the Implied Warranty of Merchantability................. 616

        d.      Unjust Enrichment ....................................................... 618

   47.     Washington ......................................................................... 619

        a.      Violation of the Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010, *et seq.*).................................. 619

        b.      Common Law Fraud ...................................................... 622

        c.      Breach of the Implied Warranty of Merchantability................. 625

        d.      Unjust Enrichment ....................................................... 626

   48.     West Virginia ...................................................................... 627

        a.      Violation of the West Virginia Consumer Credit and Protection Act (W. Va. Code §§ 46A-6-101, *et seq.*) ................. 627

        b.      Common Law Fraud ...................................................... 630

        c.      Breach of the Implied Warranty of Merchantability................. 632

        d.      Unjust Enrichment ....................................................... 634

   49.     Wisconsin ........................................................................... 635

        a.      Violation of the Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.18) ........................................................... 635

        b.      Common Law Fraud ...................................................... 637

        c.      Breach of the Implied Warranty of Merchantability................. 639

d.     Unjust Enrichment ..................................................... 641

50.     Wyoming................................................................. 642

a.     Violation of the Wyoming Consumer Protection Act (Wyo. Stat. Ann. §§ 40-12-101, *et seq.*) ........................................ 642

b.     Common Law Fraud ................................................... 645

c.     Breach of the Implied Warranty of Merchantability.................. 648

d.     Unjust Enrichment ..................................................... 649

VIII.     PRAYER FOR RELIEF ........................................................................ 650

IX.     RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS ........................... 651

X.     DEMAND FOR JURY TRIAL ................................................................. 651

## I.      INTRODUCTION

1.      The battle to end nicotine addiction and its associated diseases and death has consumed our nation's public health resources for more than half a century. After five decades of tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on the path to victory. By 2014, rates of smoking and nicotine addiction in this country were finally at an all-time low, particularly among teenagers. Until now.  The United States, closer than ever to consigning the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic of historic proportions. The swift rise in a new generation of nicotine addicts has overwhelmed parents, schools, and the medical community, drawing governmental intervention at nearly every level—but it's too little, too late.

2.      This public health crisis is no accident. What had been lauded as progress in curbing cigarette use, JUUL Labs Inc.'s (JLI) co-founders Adam Bowen and James Monsees viewed as opportunity.  Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier.  To achieve that common purpose, they knew they would need to create and market a product that would make nicotine cool again, without any of the stigma associated with cigarettes. With help from their early investors and board members, who include Nicolas Pritzker, Huyoung Huh, and Riaz Valani (together, the "Management Defendants"), they succeeded in hooking millions of youth, intercepting millions of adults trying to overcome their nicotine addictions, and, of course, earning billions of dollars in profits.

3.      Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant Altria.  JLI was created in the image of the iconic American cigarette companies, which JLI founders praised for creating "the most successful consumer product of all time. . . . an amazing product."  The secret to that "amazing product"?  Nicotine, a chemical that has deleterious effects on the developing brains of youths, and is the fundamental reason that people persist in using tobacco products posing the risk of pulmonary injuries, cardiovascular disease and other

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   serious, often fatal, conditions.   Through careful study of decades of cigarette industry

2   documents, JLI knew that the key to developing and sustaining addiction was the amount and

3   the efficiency of the nicotine delivery.

4          4.      Three tactics were central to decades of cigarette industry market dominance:

5   product design to maximize addiction; mass deception; and targeting of youth.   JLI and its co-

6   conspirators adopted and mastered them all.   *First*, JLI and Bowen designed JUUL products to

7   create and sustain addiction, not break it.   JLI and Bowen were the first to design an e-cigarette

8   that could compete with combustible cigarettes on the speed and strength of nicotine delivery.

9   Indeed, JUUL products use nicotine formulas and delivery methods much stronger than

10  combustible cigarettes, confirming that what JLI and Bowen designed was a starter product, not

11  a cessation or cigarette replacement product.   JLI and Bowen also innovated by making an e-

12  cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit,"

13  which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J.

14  Reynolds' chemist Claude Teague called new addicts, primarily young people.

15         5.      *Second*, JLI, the Management Defendants and Altria engaged in a campaign of

16  deceit, through sophisticated mass media and social media communications, advertisements and

17  otherwise, about the purpose and dangers of JUUL products.   JUUL products' packaging and

18  advertising grossly understates the nicotine content in its products.   Advertising campaigns

19  featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a

20  normal part of a daily routine, and as safe as caffeine. In partnership with Altria, JLI adopted a

21  "Make the Switch" campaign to mislead consumers into thinking that JLI products were benign

22  smoking cessation devices, even though JUUL was never designed to break addictions.   JLI, the

23  Management Defendants, and Altria also concealed the results of studies that revealed that

24  JUUL products were far more powerfully addictive than was disclosed.   JLI's deceptive

25  marketing scheme was carried out across the country through broad distribution channels:

26  veteran cigarette industry wholesalers, distributors and retailers ensured that JUUL products

27  would become widely available to a new market of nicotine-newcomers, especially youth.   JLI

28  and the Management Defendants joined with these veteran cigarette industry marketers to

secure premium shelf space for vivid displays at convenience stores, like 7-11, and gas stations, including Chevron, that would lure e-cigarette users, young and old, who would become long-term customers.  These marketing efforts have been resounding successes—when JUUL products were climbing in sales, most adults and youth believed that e-cigarettes did not contain nicotine at all.

6.    *Third*, JLI and the Management Defendants, just like cigarette companies before them, targeted kids as their customer base.  One of JLI's "key needs" was the need to "own the 'cool kid' equity."  JUUL products were designed to appear slick and high-tech like a cool gadget, including video-game-like features like "party mode."  JLI offered kid-friendly flavors like mango and cool mint, and partnered with Altria to create and preserve the market for mint-flavored products—all because Defendants knew that flavors get young people hooked.  Under the guise of youth smoking prevention, JLI sent representatives directly to schools to study teenager e-cigarette preferences.

7.    JLI and the Management Defendants reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for cigarettes because they cause young people to start smoking) with cutting-edge viral marketing campaigns and social media.  They hired young models and advertised using bright, "fun" themes, including on media long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and educational tools to students in middle school and high school.  JLI and the Management Defendants also employed young social-media "influencers" and celebrities popular with teenagers.  When regulators and Congress caught onto JLI's relentless focus on children, JLI and the Management Defendants simply lied, even though they knew well that they had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful.  JUUL products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018.  The Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."

8.      It should come as little surprise that JLI and the Management Defendants' misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company. In December 2018, Altria paid $12.8 billion to acquire a 35% stake in JLI. Altria's agreement to pull its competing e-cigarette product off the market was a non-negotiable condition of the deal demanded by JLI's lead negotiators (and Management Defendants) Nicholas Pritzker and Riaz Valani, as well as CEO Ken Burns. JUUL's market dominance was thus established, positioning Altria and JLI to share the profits. Defendants' conduct prompted the Federal Trade Commission to sue JLI and Altria on April 1, 2020 alleging violations of the antitrust laws and seeking to unwind the JLI/Altria transaction. But even well before Altria announced its investment in JLI, the connections between the two companies ran deep.  JLI and Altria collaborated to grow the e-cigarette market and the number of users addicted to nicotine, including by sharing data and information and coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes.  Altria's investment in JLI is not merely a financial proposition, but a key element of Defendants' plan to stave off regulation and keep their most potent and popular products on the market. JLI has benefitted from Altria's expertise in designing and marketing addictive products, and in thwarting regulation.

9.      There is no doubt about it—JLI, the Management Defendants, Altria, and their co-Defendants have created this public health crisis.  At the heart of this disastrous epidemic are the concerted efforts of JLI, its co-conspirators, and all those in JUUL's supply and distribution chain to continuously expand their market share and profits by preying upon a vulnerable young population and deceiving the public about the true nature of the products they were selling. Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air.   Worse, the flavors in JUUL products are themselves toxic and dangerous, and have never been adequately tested to ensure they are safe for inhalation. According to the most recent scientific literature, JUUL products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Yet JUUL products and advertising

contain no health risk warnings at all. Many smokers, believing that JUUL would help them "make the switch," ended up only further trapped in their nicotine addiction. Older adults who switch to JUUL are more susceptible to cardiovascular and pulmonary problems, and CDC data shows that older patients hospitalized due to vaping lung related conditions had much longer hospital stays than younger patients. And a generation of kids is now hooked, ensuring long-term survival of the nicotine industry because, today just as in the 1950s, 90% of smokers start as children.

10.     Hundreds of individual and class actions have been filed in state and federal courts on behalf of the countless victims of JUUL's e-cigarettes. On August 10, 2019, the Judicial Panel on Multidistrict Litigation consolidated all such actions then pending for pretrial purposes in this Court. *See In re Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, 396 F. Supp. 3d 1366 (J.P.M.L. 2019). On January 13, 2020, this Court directed the filing of Master Complaints on behalf of the Plaintiffs. ECF No. 351. Plaintiffs submit this Consolidated Class Action Complaint seeking compensatory and punitive damages, restitution, disgorgement, and other relief arising from the conduct alleged in this complaint.

## II.     PARTIES

### A.     Plaintiffs

11.     Allegations specific to each plaintiff are included in Appendix A.

### B.     Defendants

12.     Defendant JUUL Labs, Inc. ("JLI") is a Delaware corporation, having its principal place of business in San Francisco, California. Ploom, Inc., a predecessor company to JLI, was incorporated in Delaware on March 12, 2007. In 2015, Ploom, Inc. changed its name to PAX Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name, PAX Labs, Inc. That new subsidiary, PAX Labs, Inc. ("PAX"), was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

13.     JUUL, designs, manufactures, sells, markets, advertises, promotes and distributes JUUL e-cigarettes devices, JUUL pods and accessories (collectively "JUUL" or "JUUL

products"). Prior to the formation of separate entities PAX Labs, Inc. and JLI in or around April 2017, JUUL designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the name PAX Labs, Inc.

14.     Together with its predecessors, JUUL Labs, Inc is referred to herein as "JLI."

15.     Defendant ALTRIA GROUP, INC., (together with its wholly owned subsidiaries and their predecessors, "Altria" or the "Altria Defendants") is a Virginia corporation, having its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco products, manufacturing and selling combustible cigarettes for more than a century. Defendant Philip Morris USA, Inc. ("Philip Morris"), is a wholly-owned subsidiary of Altria. Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia. Philip Morris is engaged in the manufacture and sale of e-cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

16.     On December 20, 2018, Altria purchased a 35% stake in JLI. Altria and JLI executed a Services Agreement that provides that Altria, through its subsidiaries, Philip Morris, Altria Client Services LLC, and Altria Group Distribution Company, would assist JLI in the selling, marketing, promoting, and distributing of JUUL, among other things.

17.     Altria Client Services LLC ("ACS") performs services under the Services Agreement to assist JUUL in the sale, marketing, promotion and distribution of JUUL. Such services include database support, direct marketing support, premarket product application support,

18.     Altria Group Distribution Company ("AGDC") performs services under the Services Agreement to assist JUUL in the sale, marketing, promotion and distribution of JUUL. Such services include JUUL-distribution support, the removal by Altria Group Distribution Company of Nu Mark products (such as Green Smoke or MarkTen) and fixtures in retail stores and replacing them with JUUL products and fixtures, and sales support services.

19.     Defendant James Monsees is a resident of the San Francisco Bay Area. In 2007,

he co-founded Ploom with Adam Bowen. He served as Chief Executive Officer of JLI until October 2015. Since October 2015, he has been Chief Product Officer of JLI. At all relevant times, he has been a member of the Board of Directors of JLI.

20.     Defendant Adam Bowen is a resident of the San Francisco Bay Area. In 2007, he co-founded Ploom with Monsees. At all relevant times, he has been Chief Technology Officer and a member of the Board of Directors of JLI.

21.     Defendant Nicholas Pritzker is a resident of San Francisco, California, and a member of the Pritzker family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Pritzker received a J.D. from the University of Chicago. He served as president of the Hyatt Hotels Corporation and was a member of its Board of Directors from 1980 to 2007. More recently, he co-founded Tao Capital, an early investor in, among other companies, Tesla Motors and Uber. In 2007, he invested in JLI.[1] He has been on the Board of Directors of JLI since at least June 2014.[2] At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. As of November 2017, he controlled two Board seats (the second of which was occupied by Hoyoung Huh, discussed next).[3]

22.     Defendant Hoyoung Huh lives and works in the Silicon Valley area. He holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering. He has been CEO or a Board member of numerous biotechnology businesses, including Geron Corporation. Huh has been on the Board of Directors of JLI since at least June 2015. At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. As of November 2017, he served as Pritzker's second seat on the Board.[4]

23.     Defendant Riaz Valani lives near San Jose and is a general partner at Global

---

[1] Ainsley Harris, How JUUL Went From a Stanford Thesis to $16 Billion Startup, FAST COMPANY (Nov.19, 2018), https://www.fastcompany.com/90263212/how-JUUL-went-from-a-stanford-thesis-to-16-billion-startup.

[2] INREJUUL_00371187

[3] INREJUUL_00327603.

[4] Id.

Asset Capital, a San Francisco-based private equity investment firm. He has been on the Board of Directors of JLI since at least May 2011.[5] At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. As of November 2017, he controlled two Board seats, the second of which was occupied by Zach Frankel.[6]

24. Defendants Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "Management Defendants."

25. Defendants JLI, the Altria Defendants, Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "RICO Defendants."

III. **JURISDICTION AND VENUE**

26. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists.

27. Defendants JUUL and the Altria Defendants have significant contacts in each States and Territories of the United States, such that personal jurisdiction would be proper in any of them. Defendants Monsees, Bowen, Pritzker, Huh, and Valani reside within the Northern District of California and are subject to the general jurisdiction of this Court.

28. A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in and/or emanated from this District. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said District.

---

[5] Ploom, Inc., Notice of Exempt Offering of Securities (Form D) (May, 5 2011), https://www.sec.gov/Archives/edgar/data/1520049/000152004911000001/xslFormDX01/primary_doc.xml.
[6] INREJUUL_00327603.

IV.    FACTUAL ALLEGATIONS

A.    Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time."

29.    JLI's co-founder James Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[7] This statement, which ignores the fact that cigarettes have caused more deaths than any other human invention, contained a kernel of truth. When U.S. smoking rates peaked in the mid-1960s, 42% of adults smoked cigarettes. Cigarettes were everywhere; people smoked on airplanes, in movie theatres, at the office, and at sports games. Movie stars and sports heroes smoked. Cigarette advertising wallpapered American life, glamorizing smoking as sophisticated, cool, and the thing to do.

30.    But in reality, of course, this "successful" product has long been the world's leading cause of preventable death.

31.    Citing "some problems" inherent in the cigarette, Monsees and JLI co-founder Adam Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[8] Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[9] Successfully capitalizing on this opportunity would mean not only billions of dollars in short-term revenue but lucrative acquisition by a cigarette industry power player.

32.    Bowen and Monsees took the first major step toward realizing their vision by deliberately creating an extremely potent nicotine product that looked nothing like a cigarette. But achieving widespread adoption of their highly addictive product required resources and

---

[7] Kathleen Chaykowski, *Billionaires-to-be: Cigarette Breakers–James Monsees and Adam Bowen Have Cornered the US E-Cigarette Market with Juul. Up Next: The World*, FORBES INDIA (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.

[8] Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*, SOLID SMACK (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods.

[9] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

expertise beyond those posessed by Bowen, Monsees or others at JLI.

33.     When it became clear that Bowen and Monsees could not achieve vision of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life through JLI by themselves, the Management Defendants planned a fundamental shift in roles to allow Pritzker, Huh, and Valani to direct and take control of JLI and use it to commit the Defendants' unlawful acts.

34.     Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Huh, and Valani formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.

35.     Prior to the installation of Tyler Goldman as JLI's new CEO in August 2016, Defendants Pritzker, Huh, and Valani used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[10] Once their leadership was secure, defendants Huh, Pritzker, and Valani pressed for even "more aggressive rollout and [marketing]."[11]

36.     But the Management Defendants knew that their desire to create and monpolize a massive new market for JUUL on their own would be aided if they could convert Altria, a competitor, into an ally. They began that effort in the Spring of 2017. While Defendants JLI, Bowen, Monsees, Huh, and Valani are relative newcomers to the tobacco industry, Altria has been manufacturing and selling "combustible" cigarettes for more than a century. And Defendant Pritzker, for his part, has been long familiar with the tobacco industry from his family's ownership of chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Notwithstanding their different histories, JLI and the Management Defendants, for their part, invited Altria into the fold as an ally with ample

---

[10] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. TIMES (Nov. 23, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.
[11] INREJUUL_00278359.

resources to further expand the market of nicotine-addicted e-cigarette users and to keep litigation and regulation at bay. While JLI, Monsees, and Bowen publicly claimed to be out to "disrupt" the industry, they and the other Management Defendants privately negotiated and ultimately relinquished a 35% ownership stake in the company to a cigarette giant.

37.     Cigarette companies have long known that profitable growth requires a pipeline of "replacement" customers. Altria, after decades of tobacco litigation and regulation, had little ability to recruit new smokers in the ways that had driven Philip Morris's success through most of the 1900s. In 2017, Altria's combustible cigarette products were facing increasing regulatory pressures. In late July 2017, Altria's stock value plummeted shortly after the FDA announced that it would reduce the amount of nicotine allowed in cigarettes with an eye toward reaching non-addictive levels.[12] In late 2017, Altria, and other major cigarette companies, also finally complied with a consent decree from the 1990s tobacco litigation that required them to issue corrective advertising statements that highlighted the addictiveness and health impacts of smoking cigarettes.[13]

38.     Due in large part to this litigation and regulation, cigarette use has been declining in the United States in the last decade, especially among youth.[14] Altria estimates that the cigarette industry declined by 4% in 2017 and by 4.5% in 2018, and it predicted a continued 4% to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.[15] Altria later adjusted the estimated rate of decline to 4% to 6%, to reflect efforts to increase the

---

[12] *See* Dan Caplinger, *Altria Group in 2017: The Year in Review*, The Motley Fool (Dec. 18, 2017), https://www.fool.com/investing/2017/12/18/altria-group-in-2017-the-year-in-review.aspx.

[13] https://www.law360.com/articles/1037281/tobacco-cos-settle-long-running-health-warning-dispute

[14] *Current Cigarette Smoking Among Adults In the United States*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (last visited February 10, 2020); *Youth and Tobacco Use*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last visited February 10, 2020).

[15] *Altria's Fourth-Quarter 2018 Earnings Conference Call*, Altria (Jan. 31, 2019), http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

legal age for cigarette smoking to 21.[16]

39.    Altria had undertaken its own efforts at marketing an e-cigarette product. Altria had launched the MarkTen product nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for the market leader at that time, blu e-cigarettes.[17] Of the $88.1 million spent on e-cigarette advertising in 2014, nearly 40% of that was Altria's MarkTen campaign, at $35 million.[18] Altria was clear in its intent to dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at the time of MarkTen's launch.[19] The original MarkTen was a "cigalike," designed to mimic the look and feel of a combustible cigarette. Altria had also been acquiring small companies in the vaping industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."[20] In 2016, Altria acquired a vape product called Cync, from Vape Forward.[21] Cync is a small vapor device that uses prefilled pods in a variety of flavors, similar to the JUUL.

40.    In February 2017, Altria told investors at the 2017 Consumer Analyst Group of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made

---

[16] *Altria Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Bus. (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.

[17] Jennifer Cantrell et al., *Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace*, Tobacco Control 25 (10) (2015), http://dx.doi.org/10.1136/tobaccocontrol-2015-052532.

[18] *Id*.

[19] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[20] Mike Esterl, *Altria To Launch MarkTen E-Cigarette Nationally*, Wall St. J. (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378; Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth* at 12 (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

[21] Remarks by Jody Begley, 2017 Altria Investor Day (Nov. 2, 2017), http://media.corporate-ir.net/media_files/IROL/80/80855/2017InvestorDay/Remarks_and_Reconciliations.pdf.

excellent progress toward its long-term aspiration of becoming a leader in e-vapor."[22] In his remarks, Altria's current CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year. It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations." He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately $2.5 billion."[23] In 2017, Altria's MarkTen e-cigarettes had a market share of only 13.7%, well behind JLI's growing market share of 40%.[24] Thus, despite its public statements to the contrary, Altria knew the popularity of JUUL stood in the way of Altria becoming the dominant force in the e-cigarette market.

41.     With smoking on the decline, litigation and regulatory controls were ramping up and threatening Altria's ability to attract new smokers, and JUUL outperforming Altria's products in the market, Altria's best bet for maintaining its sales by increasing users addicted to nicotine was to partner with JLI (1) to maintain or increase the number of users hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first scheme.

42.     For those reasons and others, Altria began coordinating with JLI and the Management Defendants in the Spring of 2017. Before then, Altria and JLI were members of at least one industry group that shared information and coordinated public statements regarding vaping,[25] and Ploom's advisory committee included Altria's former growth officer. In Altria's words, the company followed "JUUL's journey rather closely" from its early beginnings.[26]

---

[22] Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, CEO and President, and other members of Altria's senior management team 2017 Consumer Analyst Group of New York (CAGNY), (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.

[23] *Id.*

[24] Richard Craver, *Vuse falls further behind Juul on e-cig sales*, Winston-Salem Journal (Dec. 14, 2017), https://www.journalnow.com/business/vuse-falls-further-behind-juul-on-e-cig-sales/article_ed14c6bc-5421-5806-9d32-bba0e8f86571.html.

[25] INREJUUL_00278740.

[26] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019),

43.     According to Howard Willard, Altria's CEO, Altria first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" beginning in the Spring of 2017.[27] JLI's pitch deck to investors at the time boasted that "Viral Marketing Wins," and that JUUL's super potent nicotine formulation was "cornering" the consumables market with the highest customer retention rate of any e-cigarette.[28] JLI and Altria's "confidential discussions" occurred "over a period of approximately 18 months."[29] Pritzker and Valani, together with Burns, were the lead negotiators on the Altria deal. On July 30, 2018, in advance of a meeting between the lead negotiators from JLI and Altria, Pritzker emailed Howard Willard an opening term sheet for discussions, and made clear that an end to competition from Altria's e-cigarette products was a key term of any deal. On August 1, 2018, the companies' negotiators met at the Park Hyatt Hotel in Washington, D.C., to discuss terms. Pritzker, Valani, and Burns attended for JLI. Willard and Billy Gifford, Altria's CFO, attended for Altria. By the Fall of 2017, JLI, the Management Defendants, and Altria had agreed to and had taken coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

44.     During the roughly 18-month negotiating period, it was JLI (through its executives and employees—including Tyler Goldman and his successors) and Altria (through its executives and employees) that primarily directed and conducted fraudulent acts designed to grow the market of nicotine-addicted e-cigarette users, although Bowen, Monsees, Pritzker, Huh, and Valani remained critical to the success of these efforts. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI and Altria, and Altria's investment in JLI, would not have been possible.

45.     In December 2018, Altria decided to take the next step in its coordination with JLI and the Management Defendants by making a $12.8 billion equity investment in JLI, the

---

https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.

[27] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[28] INREJUUL_00349529.

[29] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

largest equity investment in United States history. This arrangement was profitable for both companies, as well as Defendants Monsees, Bowen, Prtizker, Huh, and Valani. JLI employees received $2 billion in bonuses, which, split among the Company's 1,500 employees, was approximately $1.3 million per employee,[30] and Altria received millions of loyal teen customers. In deciding to make a huge investment in JUUL, Altria took into account that the e-cigarette industry would see significant year-over-year growth in the near term, and that "JUUL continu[es] to be a growth driver for the e-vapor category."[31]

46.      In July 2018, JLI's valuation was approximately $15 billion.[32] But, in December 2018, Altria's investment of $12.8 billion for a 35% stake in the company reflected a valuation of approximately $38 billion—more than two and a half times the valuation just five months earlier. Defendants Monsees, Bowen, Pritzker, Huh, and Valani thus saw the value of their investments in JLI skyrocket as a result of the Altria agreement, allowing them to cash out via a special dividend and bonus, as well as through stock sales that were not available to other of JLI's minority shareholders.[33] This investment further intertwined JLI and the Altria. According to the terms of its investment, Altria may appoint one third of JLI's board. And in October 2019, JLI's CEO resigned to be replaced by another career Altria executive, K.C. Crosthwaite. The key JLI negotiators of the Altria deal (including Pritzker and Valani), and other officers and directors including Bowen, Monsees, and Huh, would have been instrumental in bringing Crosthwaithe on board at JLI. Crosthwaite had most recently served as the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work to assist Altria's companies, including with digital marketing, packaging design & innovation, product

---

[30] Olivia Zaleski, *Juul Employees to Get $2 Billion Bonus in Altria Deal*, BLOOMBERG (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-altria-deal.

[31] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[32] https://www.theverge.com/2018/7/3/17529442/juul-vapes-nicotine-electronic-cigarettes-addiction-funding

[33] Tiffany Kary, *JUUL Founders Sued for Self-Dealing Over Altria's $12.8 Billion*, Bloomberg (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-dealing-over-altria-s-12-8-billion.

1    development, and safety, health, and environmental affairs. Crosthwaite knows the cigarette

2    industry's playbook all too well, having previously served as the president and CEO of Phillip

3    Morris USA, the vice president and general manager at Marlboro—the leading cigarette brand

4    among youth, and the vice president of strategy and business development of at Altria Client

5    Services LLC.

6    47.    In addition, Joe Murillo, who headed regulatory affairs for Altria, and served as

7    President and General Manager of Nu Mark, LLC (Altria's e-cigarette business), became JLI's

8    chief regulatory officer in October 2019.

9    48.    Both before and after Altria's investment, JLI, through its employees and

10   officers, provided Altria with critical information regarding the design and nicotine content of

11   the JUUL product, the labeling of the JUUL product, and related topics including advertising,

12   retail distribution, online sales, age verification procedures, information on underage user's

13   flavor preferences, and regulatory strategies. Altria, for its part, guided JLI and the Management

14   Defendants in these areas and helped them devise and execute schemes to maintain and expand

15   the e-cigarette market.

16   49.    JLI, the Management Defendants, and Altria worked together to implement their

17   shared goal of growing a new market in the image of the combustible cigarette market through a

18   multi-pronged strategy to: (1) create an highly addictive product that consumers would not

19   associate with cigarettes and that would appeal to the lucrative youth market, (2) deceive the

20   public into thinking the product was a fun and safe alternative to cigarettes that would also help

21   smokers quit, (3) actively attract young users through targeted marketing, and (4) use a variety

22   of tools, including false and deceptive statements to the public and regulators, to delay

23   regulation of e-cigarettes. As detailed more fully throughout this Complaint, each of the

24   Defendants played a critical role—at times overlapping and varying over time—in each of these

25   strategies.

26

27

28

**B.    Defendants' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction.**

    **1.    Defendants Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction.**

50.    The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product. Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly addictive and the key ingredient that drives addiction to cigarettes. Nicotine's addictive properties are similar to heroin and cocaine.[34]

51.    Route of administration and speed of delivery are key to understanding nicotine's addictive potential. Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report on nicotine addiction, wrote: "After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration."[35]

52.    Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by smoking … results in high levels of nicotine in the central nervous system with little time for development of tolerance. The result is a more intense pharmacologic action. The short time interval between puffing and nicotine entering the brain also allows the smoker to titrate the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[36]

53.    Nicotine fosters addiction through the brain's "reward" pathway. Both a

---

[34] *See e.g.,* U.S. Dep't of Health and Human Servs., *Nicotine Addiction: A Report of the Surgeon General*, DHHS Publication Number (CDC) 88-8406, (1988).

[35] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 HANDB. EXP. PHARMACOL. 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/

[36] *Id.*

stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

54.     Kids are particularly vulnerable to nicotine addiction, as Defendants know well. As described by the United States Surgeon General, "Tobacco use is a pediatric epidemic." Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[37]

55.     The above statements apply equally, if not more so, to e-cigarettes. Further, the Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses— are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[38] The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control, deficits in attention and cognition, and mood disorders.[39] A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses

---

[37] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

[38] *Know The Risks: E-Cigarettes & Young People* (2019), https://e-cigarettes.surgeongeneral.gov/ knowtherisks.html.

[39] Menglu Yuan et al., *Nicotine and the Adolescent Brain*, 593 J. OF PHYSIOLOGY 3397 (2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/; U.S. Surgeon General and U.S. Centers for Disease Control & Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes and Young People* (2019), https://e-cigarettes.surgeongeneral.gov/.

a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[40]

56.     In 2014, the United States Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease), lung diseases (chronic obstructive pulmonary disease (COPD) and lung cancer), cancer almost anywhere in the body, and birth defects.[41]

57.     It took five decades of public health initiatives, government intervention, impact litigation, consumer education and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

58.     By 2014, the number of adults that reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.[42] By 2014, teen smoking also hit a record low.[43] In June 2014, the Centers for

---

[40] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function*, 2 COLD SPRING HARBOR PERSP. MED. 12 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

[41] U.S. Dep't of Health and Human Servs. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.

[42] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, *Trends in Cigarette Smoking Among High School Students—United States*, 1991-2001, 51 MORBIDITY & MORTALITY WKLY. REP. 409 (May 17, 2002), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5119a1.htm; Teresa W. Wang et al., *Tobacco Product Use Among Adults—United States, 2017*, 67 MORBIDITY & MORTALITY WKLY. REP. 1225 (Nov. 9, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/pdfs/mm6744a2-H.pdf; U.S. Dep't of Health and Human Servs. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.

[43] Press Release, Centers for Disease Control and Prevention, *Cigarette smoking among U.S. high school students at lowest level in 22 years* (June 12, 2014), https://www.cdc.gov/media/releases/2014/p0612-YRBS.html.

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1    Disease Control and Prevention ("CDC") reported that "in achieving a teen smoking rate of 15.7

2    percent, the United States has met its national Healthy People 2020 objective of reducing

3    adolescent cigarette use to 16 percent or less."

4         59.    The United States Surgeon General reported in 2014 that: "We are at a historic

5    moment in our fight to end the epidemic of tobacco use that continues to kill more of our

6    citizens than any other preventable cause. The good news is that we know which strategies work

7    best. By applying these strategies more fully and more aggressively, we can move closer to our

8    goal of making the next generation tobacco-free."[44]

9         60.    Where the public health community saw progress in curbing the use of cigarettes

10   and nicotine addiction, Defendants saw an opportunity.

**2.    Following the Cigarette Industry Playbook, Defendants Sought to Market a Product that would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes**

14        61.    Seeking to build and dominate a new market for nicotine products without the

15   baggage of combustible cigarettes (i.e. well-established link to death and disease), JLI

16   engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling

17   higher levels of consumer addiction than ever before. JLI marketed that highly-addictive device

18   as healthy, safe, cool and available in kid-friendly flavors.

19        62.    In doing so, JLI followed the cigarette industry's playbook. Monsees admitted

20   that when creating JLI, he and Bowen carefully studied the marketing strategies,

21   advertisements, and product design revealed in cigarette industry documents that were

22   uncovered through litigation and made public under the November 1998 Master Settlement

23   Agreement between the state Attorneys General of forty-six states, five U.S. territories, the

24   District of Columbia and the four largest cigarette manufacturers in the United States.

25   "[Cigarette industry documents] became a very intriguing space for us to investigate because we

---

[44] U.S. Dep't of Health and Human Servs. *Let's Make the Next Generation Tobacco-Free: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking and Health* (2014), https://www.hhs.gov/sites/default/files/consequences-smoking-consumer-guide.pdf

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                         Case No. 19-md-02913-WHO

had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[45]

63.     In a thesis presentation Bowen and Monsees gave in 2004, Monsees candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[46] JLI researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[47] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

64.     Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in way that would be easy to ingest—without the nausea, cough, or other aversive side effects that many new smokers experienced. In the 1970s, R.J. Reynolds scientists eventually found a solution: Combine the high-pH nicotine with a low-pH acid. The result was a neutralized compound referred to as nicotine salt. In a 1973 RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive. A young RJ Reynolds chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve

---

[45] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

[46] Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, TECH CRUNCH (Feb. 27, 2019), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/.

[47] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                       Case No. 19-md-02913-WHO

into a liquid, and heated them in pursuit of the "maximum release of nicotine."[48] Pefetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salts. As described in herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

65.     JLI also engaged former cigarette industry researchers to consult on the design of their product. As Monsees noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty."[49] The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."[50]

66.     One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device (2) the JUUL pod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUUL pods that contain liquid that includes nicotine, flavoring and other additives. Each JUUL pod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting of nicotine, benzoic

---

[48] Thomas A. Perfetti, *Smoking Satisfaction and Tar/Nicotine Control* (Dec. 7, 1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-salts-investigation.pdf.

[49] David Pierce, *This Might Just Be the First Great E-Cig*, WIRED (Apr. 21, 2015), www.wired.com/2015/04/pax-juul-ecig/.

[50] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

acid, glycerin, and propylene glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[51]



67.     JLI sells the JUUL pods in packs of four or two pods, and until recently, in a variety of enticing flavors. Many of the flavors have no combustible cigarette analog, including "cool" cucumber, fruit medley, "cool" mint, and crème brûlée. Figure 1 shows the JLI device and a JLI "Starter Kit" with four flavored JUUL pods:

---

[51] King County & Seattle Public Health, *E-cigarettes and Vapor Products* (Dec. 30, 2019), https://www.kingcounty.gov/depts/health/tobacco/data/e-cigarettes.aspx.

**Figure 1**



68.     JLI attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[52]

69.     JLI even took this message to ninth graders: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[53]

---

[52] Letter from U.S. Food & Drug Admin. to Kevin Burns, CEO of Juul Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[53] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                                Case No. 19-md-02913-WHO

70.     This was not just a rogue employee. Internal messaging around JUUL, crafted by the executives, emphasized that JUUL was safer than smoking. In a "Marketing Update" presentation dated March 26, 2015, a message from then-Chief Marketing Officer Scott Dunlap stated that "[v]aporization technology is fundamentally disruptive, because it is *safer*, faster, more effective and less intrusive than alternatives."[54] More than a year later, on April 28, 2016, Tim Danaher sent Tyler Goldman a slide deck aimed at investors which he said that "James [Monsees] owns" and "will pull / update the relevant slides."[55] The deck claimed that "PAX Labs' new delivery system is faster, *safer*, more effective and less intrusive than[,]" among other options, "[s]moking[.]"[56] The consistency of the wording in these presentations more than a year apart shows that this was standard company language.

71.     JLI's mission was not to improve public health. Rather, JLI sought to introduce a new generation of consumers to nicotine. JLI's business model was never about reducing addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[57]

72.     JLI, Bowen, and Monsees achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided consumers with palatable access to high-concentrations of nicotine like never before. Since the JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700 percent in 2017 alone. By 2019, JLI owned three-quarters of the e-cigarette market.[58]

---

[54] INREJUUL_00441986 (emphasis added).

[55] JLI00373324.

[56] JLI00373328 (emphasis added).

[57] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. TIMES (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.

[58] Dick Durbin et al., *Durbin & Senators to JUUL: You are More Interested in Profits Than Public Health*, Durbin Newsroom (Apr. 8, 2019), https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-are-more-interested-in-profits-than-public-health.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

### 3. Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company.

73. JLI, along with the Management Defendants, worked together to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

74. That growing customer base was crucial to JLI's and the Management Defendants' long term objective—lucrative acquisition by another company. They recognized that JLI's product, with its potential to dominate the nicotine products market by hooking new users, would appeal to one segment of the economy in particular: the cigarette industry.

75. JLI and the Management Defendants also recognized that their business goal—becoming part of the cigarette industry—was unlikely to endear them to the consumers that they needed to purchase their products. Years of anti-smoking campaigns have successfully stigmatized cigarette smoking. When Monsees and Bowen presented their thesis and product design to their classmates, they included a clip from a South Park episode showing the characters assembled at the Museum of Tolerance and shaming a smoker.[59]

76. Monsees and Bowen needed to shape social norms such that the public attitude towards e-cigarettes would allow consumers to use their product without the stigma and self-consciousness smokers experienced. Monsees and Bowen saw a market opportunity in a generation of non-smoking consumers brought up on anti-smoking norms. In Monsees' words, they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."[60]

77. Part of this approach was consistently portraying JUUL as an enemy of the cigarette industry, with a publicly announced goal of eliminating the cigarette. In an interview,

---

[59] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

[60] *Id.*; *see also,* INREJUUL_00064696 (May 28, 2015) (Slides describing JUUL's market overview and positioning as a "tech lifestyle product with a nicotine experience that satisfies, JUUL will appeal to regular ecig users and wealthy, tech savvy smokers – a significant portion of the market.")

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Bowen asserted that he and Monsees spent a lot of time talking about "the kind of typical thoughts of evil Big Tobacco companies like coming down and squashing you."[61] The "Mission Statement" on JLI's homepage proclaims:

> Our mission is to transition the world's billion adult smokers away from combustible cigarettes, eliminate their use, and combat underage usage of our products.
>
> We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire.[62]

In fact, JLI's Chief Administrative Officer has publicly stated that the goal behind JLI is "eliminating cigarettes."[63]

78.     This public message of eliminating cigarettes and challenging tobacco companies stands in direct contrast with JLI's actual business and investment strategy, which involved replicating in JUUL's new market the tobacco companies' historical success in the market for cigarettes. From the beginning, Bowen and Monsees actively sought the investment and assistance of major cigarette companies. Bowen and Monsees' initial foray into the e-cigarette business, Ploom, launched its e-cigarette as the ModelOne in 2010, using pods of loose-leaf tobacco heated by butane. It did not catch on. Ploom only sold a few thousand devices. By then a company with a dozen employees, Ploom was faltering, in need of money, technological expertise, and marketing savvy.[64]

79.     Help came from Japan Tobacco International ("Japan Tobacco"), a division of Japan Tobacco Inc., the fourth-largest tobacco company in the world. In December 2011, Japan Tobacco and Ploom entered into a strategic agreement, which gave Japan Tobacco a minority

---

[61] Alison Keeley, *Vice Made Nice? A High-tech Alternative to Cigarettes*, STANFORD MAGAZINE (2012), https://stanfordmag.org/contents/vice-made-nice.

[62] JUUL Labs, *Our Mission* (2019), https://www.juul.com/mission-values.

[63] Ashley Gould, *JUUL Labs is Committed to Eliminating Cigarettes,* CAL MATTERS (March 18, 2019)*,* https://calmatters.org/commentary/e-cigarette/.

[64] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                    Case No. 19-md-02913-WHO

stake in Ploom and made it a strategic partner. In a statement regarding the agreement, Monsees said, "We are very pleased to partner with [Japan Tobacco] as their deep expertise, global distribution networks and capital resources will enable us to enter our next phase of growth and capitalize on global expansion opportunities."[65] As Bowen explained in an interview, "We were still doing a lot of our own internal product development, but now we had access to floors of scientists at [Japan Tobacco]."[66]

80.     According to internal documents, JLI (then known as Pax) entered into a "strategic partnership" with Japan Tobacco after it "evaluated all major tobacco industry companies."[67] When JLI was getting ready to launch JUUL, its business plan called for a "massive distribution for JUUL," to "be distributed by the four largest US tobacco distributors."[68] In addition, in 2015, JLI counted among its advisors Charles Blixt, the former general counsel of Reynold American, Chris Skillin, former director of corporate business development at Altria Group, Bryan Stockdale, the former SVP/President & CEO of R.J. Reynolds / American Snuff Company, and Chris Coggins, a toxicologist at Reynolds for 20 years.[69]

81.     JLI and the Management Defendants even retained the Investment Bank Stifel to help JLI "establish strong international partnerships with leading tobacco companies ("LT") to accelerate JUUL."[70] According to Stifel, "JUUL could be a multi-billion opportunity to LT [leading tobacco companies] over time," and Stifel offered to manage a process that: "Identified the best Partner(s) for JUUL"; "Best positions JUUL to each Partner"; "Creates a catalyst for

[65] *Innovative P'ship for Ploom and Japan Tobacco Int'l JTI to Take Minority Share in Ploom*, JAPAN TOBACCO INT'L (Dec. 8, 2011), https://www.jti.com/sites/default/files/press-releases/documents/2011/innovative-partnership-for-ploom-and-japan-tobacco-international.pdf.

[66] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?*, INC. MAGAZINE (2014), https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html.

[67] INREJUUL_00371423 (Pax Labs company overview, Feb. 2015).

[68] INREJUUL_00371447.

[69] INREJUUL_00371458-INREJUUL_00371459.

[70] INREJUUL_00016386 (Stifel Presentation, Aug. 2015).

[leading tobacco company] decision making"; and "drives strong economic value and terms through competition."[71] The end result of the process would be an exclusive agreement with the cigarette industry that would "maximize JUUL Growth Trajectory":[72]

82.     Stifel's presentation to the JLI Board of Directors, which included each of the Management Defendants, also emphasized both the stagnant and declining cigarette market, and the sharply growing e-cigarette market:[73]



83.     According to Stifel, "[s]ince 2013 [leading tobacco companies] have aggressively but unprofitably entered the vape category . . . with products that are not compelling."[74] Stifel's conclusion was that in light of the leading cigarette companies' failures to develop an appealing e-cigarette product: "JUUL Presents a Prime Opportunity for [leading tobacco companies] to Compete with [vaporizers, tanks and mods] in Form Factor and

---

[71] *Id.*

[72] *Id.*

[73] INREJUUL_0016399.

[74] INREJUUL_0016400-INREJUUL_0016401.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  Dominate the E-cig Experience Through Retail Channels that Leverage its Distribution

2  Strengths."[75]

3       84.     Consistent with Stifel's presentation, and the profits it was forecasting, a draft

4  December 7, 2015 presentation to the board of directors included as a "management committee

5  recommendation" that JLI position itself for "strategic alternatives (including licensing or

6  sale)":[76]



85.     The presentation also made clear that the "strategic alternative" for JLI

envisioned by management was its acquisition by a large cigarette company:[77]

---

[75] INREJUUL_0016404.

[76] INREJUUL_00061757 (board meeting presentation, Dec. 7, 2015).

[77] INREJUUL_00061833.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                          Case No. 19-md-02913-WHO

## JUUL sale considerations



| Recent transactions | Description | Est. LTM multiple |
|---|---|---|
| Tobacco | • $600m BAT // TDR<br>• $350m JTI // Logic<br>• $5bn JT // Natural Spirits<br>• $130m Altria // GS<br>• £30m Victory // VIP<br>• $135m Lorillard // blu | • 3.4x<br>• 5.8x<br>• 34x<br>• 3.3x<br>• 1.5x<br>• 4.5x |
| Non-SAAS consumer tech | • $3.2bn Google // Nest<br>• $555m Google // Dropcam<br>• $2.4bn Canon // Axis<br>• $34m Logitech // UE<br>• $100-150m Intel // Basis | • 28x (10x fwd)<br>• 18x (~9x fwd)<br>• 4.1x<br>• TBD<br>• TBD |

Tobacco multiples: ~3-6x
Non-SAAS consumer tech: 4-10x [TBC]

Other considerations

• **Big tobacco unfamiliarity buying tech IP** - may be difficult to achieve a technology-based acquisition multiple

• **Declining ecig category** - JUUL growth may drive additional interest

• **Significant big tobacco consolidation underway** - potentially limits further M&A appetite

• PLI may generate **significant non-financial benefits from JUUL sale** - singular focus on cannabis

86.    This goal—acquisition by a major cigarette company—was a motive that the JLI and the Management Defendants would return to in making decisions about the manufacture and marketing of JUUL products. As an example, in a 2016 email exchange with JLI employees regarding potential partnerships with e-cigarette juice manufacturers, Defendant Bowen reminded the employees that "big tobacco is used to paying high multiples for brands and market share."[78] Bowen knew that to achieve the ultimate goal of acquisition, JLI and the Management Defendants would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

87.    JLI and the Management Defendants sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction of, its users; and, second, by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people whose addiction would last the longest and be the most profitable for the Defendants.

---

[78] INREJUUL_00294198.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                          Case No. 19-md-02913-WHO

C.      **JLI and Bowen Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction.**

88.     JLI was well-aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity. One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."[79] It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers. Claude Teague of R.J. Reynolds titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market." In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[80] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." As seen below, JLI heeded Dr. Teague's advice.

1.      **JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale.**

89.     As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users, who were primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

90.     E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in

---

[79] Internal Memo from T.L. Achey, Lorillard Tobacco Company, to Curtis Judge, Product Information (August 1978).

[80] Internal Memo from Claude Teague, R.J. Reynolds, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market* (Feb. 2, 1973).

a palatable form.[81] Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine.[82] When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user.[83] This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit."[84] While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.

91.    Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day.[85] None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

92.    Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

### 2.    JLI's Initial Experiments Measured Non-Smokers "Buzz" Levels and Perceptions of Throat Harshness

93.    JLI intentionally designed its product to mimimize "throat hit" and maximize "buzz." JLI's first known testing of JUUL-related products occurred in 2013, when it conducted "buzz" experiments included non-smoker participants, and measured "buzz" and throat harshness. JLI officers and directors Adam Bowen, Ari Atkins, and Gal Cohen served as the initial subjects in the "buzz" experiments. These early tests were performed with the assistance of Thomas Perfetti, the same RJR chemist who had studied nicotine salt decades ago to help

---

[81] Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL and the High-nicotine Product Market*, 28 TOBACCO CONTROL 623 (2019).

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                     Case No. 19-md-02913-WHO

RJR palatably deliver more nicotine.

94.     In these early tests, JLI's goal was to develop a "buzz-effective e-cig formulation," which would principally turn on "effectiveness (buzz, harshness)," followed by shelf life and patentability.[86] The aim was to develop a nicotine salt formulation that maximized buzz, minimized harshness. "Employees tested new liquid-nicotine formulations on themselves or on strangers taking smoke breaks on the street. Sometimes, the mix packed too much punch – enough nicotine to make some testers' hands shake or send them to the bathroom to vomit . . . ."[87]

95.     The "buzz" experiments, which used heart rate as a qualitative measurement for buzz, showed that Bowen tested a 4% benzoate (nicotine salt) solution, which caused his resting heart rate to increase by about 70% in under 2 minutes, far exceeding all other formulations JLI was considering:[88]



96.     Because they personally vaped these formulations, Bowen, Cohen, and Atkins knew that the 4% benzoate solution delivered a strong buzz that matched or exceeded a cigarette but had minimal throat hit.

---

[86] INREJUUL_00002903.

[87] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

[88] INREJUUL_00002903.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                        Case No. 19-md-02913-WHO

97.     A later study by Anna K. Duell et al., which examined 4% benzoate solutions—the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit. The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley" flavor was 0.05 and in "Crème Brulee" was 0.07.[89] Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine. For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84,[90] resulting in over 14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[91]

98.     Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youths. The cigarette industry has long recognized this; a published study of industry documents concluded that "product design changes which make cigarettes more palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."[92] The Duell study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[93]

99.     Reducing the harshness of nicotine also allows more frequent use of e-cigarettes, for longer periods of time, and masks the amount of nicotine being delivered. By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction. The Duell study further concluded that

---

[89] U.S. Patent No. 9,215, 895; Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 432 (Fig. 3).

[90] Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431 (*hereinafter* "Duell Study").

[91] *Id.* at 431–34.

[92] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. TIMES (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.

[93] Duell Study at 433 (citing J.G. Willett, et al., *Recognition, Use and Perceptions of JUUL Among Youth and Young Adults*, TOBACCO CONTROL 054273 (2018)).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

JLI's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health."[94]

### 3.    JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes.

100.    In 2014, after the "buzz" experiments, JLI engineers ran a pilot pharmacokinetic study in New Zealand, called the Phase 0 Clinical Study.[95] The participants in the study—Adam Bowen, Gal Cohen, and Ari Atkins[96]—had their blood drawn while vaping prototype JUUL aerosols. From these measurements, the scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood (Cmax) and total nicotine exposure (Area Under the Curve or AUC). JLI reported the results in U.S. Patent No. 9,215,895 (the '895 patent), for which JLI applied on October 10, 2014,[97] and which was granted in December 2015. The named inventors on the patent were Adam Bowen and Chenyue Xing

101.    Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin.[98] As a comparator, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes. The Phase 0 study also tested a 2% benzoate formulation, which had a similar Cmax as a Pall Mall cigarette, and a variety of other formulations.[99] The following graph shows the pharmacokinetic results of the Phase 0 study:

---

[94] *Id*. at 431.

[95] INREJUUL_00350930.

[96] *Id*.

[97] This application was a continuation of U.S. Patent Application  No. 14/271,071 (filed May 6, 2014), which claimed the benefit of U.S. Provisional Patent Application Serial No. 61/820,128, (filed May 6, 2014), and U.S. Provisional Patent Application Serial No. 61/912,507 (filed December 5, 2013).

[98] U.S. Patent No. 9,215,895, at 19:63-20:4 (filed Dec. 22, 2015).

[99] INREJUUL_00024437.



102.    According to Table 1 in the patent, the Cmax (the maximum nicotine concentration in blood) for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL, which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

103.    Describing these results, JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [i.e., JLI's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette."[100] The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."[101]

---

[100] U.S. Patent No. 9,215, 895, at 7:51-55 (filed Dec. 22, 2015) (emphasis added).

[101] *Id.* at 7:63-8:4.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

104.    In other words, JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick"[102] that drives addiction and abuse.[103] Because "nicotine yield is strongly correlated with tobacco consumption,"[104] a JUUL pod with more nicotine will strongly correlate with higher rates of consumption of JUUL pods, generating more revenue for JUUL. For example, a historic cigarette industry study that looked at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[105] In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

105.    Another study corroborates the key result of the Phase 0 study that the 4% benzoate solution delivers more nicotine than a combustible cigarette.[106] The Reilly study tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per 75 mL puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 μg/puff.[107] Correcting to account for the different puff sizes between these two studies, this suggests that, at 75 mL/puff,

---

[102] Internal Memo from Frank G. Colby, R.J. Reynolds, *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market* (Dec. 4, 1973).

[103] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." U.S. Dep't of Health & Human Servs., *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease, A Report of the Surgeon General* at 181 (2010), https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf.

[104] Martin J. Jarvis et al., *Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, 93 NT'L CANCER INST. 134 (Jan. 17, 2001), https://academic.oup.com/jnci/article/93/2/134/2906355

[105] Letter from Peggy Martin to Study Participants, *Resume of Results from Eight-Week Smoking Study*, UCSF Library, 1003285443-5443 (Sept. 10, 1971).

[106] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 NICOTINE TOBACCO RESEARCH 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584.

[107] Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 TOBACCO CONTROL ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  a Marlboro would deliver about 114-145 μg/puff. In other words, the Reilly study suggests that

2  JUUL delivers more nicotine per puff than a Marlboro cigarette.

3      106.    Additionally, depending on how the product is used, an e-cigarette with the 4%

4  benzoate solution is capable of delivering doses that are materially higher than those seen in the

5  Phase 0 study. As a paper published by the European Union notes: "[A]n e-cigarette with a

6  concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the

7  time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg

8  of nicotine)."[108] With at least 59 mg/ml of nicotine in a salt form that increases the rate and

9  efficiency of uptake (and even with a lower mg/ml amount), a JUUL pod easily exceeds the

10  nicotine dose of a combustible cigarette. Not surprisingly, the European Union has banned all e-

11  cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and other

12  countries have considered similar regulations.[109]

13      107.    Around 2014, JLI engineers designed the JUUL vaping device, which also was

14  designed for addictiveness. On average, the JUUL was engineered to deliver between four to

15  five milligrams of aerosol per puff, which is an unusually massive puff[110]:

---

[108] E-Cigarettes, European Comm'n,
https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf  (citing United
Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

[109] Charis Girvalaki et al., *Discrepancies in Reported Versus Measured Nicotine Content of E-cigarette Refill Liquids Across Nine European Countries Before and After the Implementation of the EU Tobacco Products Directive*, 55 EUR. RESPIR. J. 1900941 (2020),
https://doi.org/10.1183/13993003.00941-2019.

[110] INREJUUL_00442040-INREJUUL_00442080; INREJUUL_00442064

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    108.    Given the concentration of nicotine in a JUUL pod, four to five milligrams of

16  JUUL e-liquid contains about 200-250 micrograms (μg) of nicotine. As noted by Dan Myers, a

17  JLI scientist, in an internal 2018 email to Adam Bowen and Ziad Rouag, a regulatory employee

18  at JLI at the time, "much more nicotine than 150 per puff could be problematic" because,

19  according to Myers, cigarettes deliver between around 100-150 μg of nicotine per puff.[111] In

20  other words, JUUL's precisely calibrated nicotine delivery system was specifically engineered

21  to aerosolize up to 2.5 times as much nicotine per puff as a cigarette. Myers also noted that

22  "Adam put in his recommendation of ~4mg/puff as the target" for a pharmacokinetic study.[112]

23    109.    JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes

24  delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they

25  want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never

26  burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists

27

28

---

[111] INREJUUL_00347306.

[112] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                    Case No. 19-md-02913-WHO

"didn't want to introduce a new product with stronger addictive power."[113] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold."[114] For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]"[115] But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."[116]

110.    As another option, JLI could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine exceeding those of a cigarette on a per-puff basis. Instead, it programmed the device to emit puffs for up to six seconds.[117] JUUL knew from the Phase 0 pharmacokinetic study in 2014 and the CH-1702 pharmaokinetic study in 2017 that puffs of three seconds generate pharmacokinetic profiles matching that of a cigarette.[118]

111.    Further warnings about the addictive power of the JUUL e-cigarette—and its appeal to youths—came from consumer research that Ploom commissioned in 2014. Ploom hired the consumer research firm Tragon to do research with prototypes of the JUUL e-cigarette. On September 30, 2014, Lauren Collinsworth, a consumer researcher at Tragon, emailed Chelsea Kania, a marketing employee at Ploom, with some of the preliminary results from the studies. She stated that the testing showed that "the younger group is open to trying something new and liked J1 [the JUUL prototype] for being smart, new, techy, etc."[119] Ms. Collinsworth added that "the qualitative information suggests J1 could fit into the e-cig or vapor category for the younger group. The qualitative findings suggested *this product isn't going to fit*

---

[113] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[114] *Id*.
[115] *Id*.
[116] Id.
[117] INREJUUL_00431693
[118] INREJUUL_00351218; INREJUUL_00351239.
[119] JLI00365905.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1     *as well with consumers who are looking to cut back on the cigarette intake.*"[120]

2          112.    On October 1, 2014, Ms. Collinsworth followed up with additional comments.

3 She stated that "[t]he delivery was almost too much for some smokers, especially those used to

4 regular e-cigarettes. When they approached the product like they would a Blu or other

5 inexpensive e-cig, they were floored by the delivery and didn't really know how to control

6 it."[121]

7          113.    Survey responses showed that the least important product attribute for the adult

8 smokers and non-smokers in that group was "buzz."[122] Comments from the study's subjects

9 included "overwhelming when I first inhaled," "too much for me," "it was too strong," and "it

10 caught me off-guard."[123] Comments on the device's style said JUUL "might manage to make

11 smoking cool again"; others "thought it was a data storage device."[124]

12          114.    The final results from this consumer research were distributed to upper

13 management, including to then-CEO James Monsees[125] and then-Chief Marketing Officer

14 Richard Mumby.[126]

15          115.    In late 2014, knowing the results of the buzz tests, the Phase 0 study and the

16 consumer research, JLI executives, including Bowen, selected the 4% benzoate formulation to

17 serve as the model for all formulations to be used in the JUUL product to be released in 2015.

18 All JUUL formulations at launch used the same amount of nicotine and benzoic acid as did the

19 formulation that resulted in the highest nicotine blood levels in the Phase 0 study. JUUL pods

20 were foreseeably exceptionally addictive, particularly when used by persons without prior

21 exposure to nicotine.

22

23

24    [120] *Id.* (emphasis added).

25    [121] JLI00365709.

26    [122] JLI00365176.

   [123] INREJUUL_00058345.

27    [124] *Id.*

   [125] JLI00364678.

28    [126] JLI00364487.

         AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1

2

3

    **4.**      **JLI and the Management Defendants Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted.**

4

5

6

7

116.    The JUUL e-cigarette launched in 2015. After the launch, JLI and the Management Defendants continued to collect information about the addictiveness of JUUL. This information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness.

8

9

117.    For example, on April 22, 2017, an e-cigarette retailer emailed Gal Cohen expressing concern about the addictiveness of JLI's products. He wrote:

10

11

I am very concerned about the JLI products. People's addiction behavior
is SEVERE with this JLI device. I don't think I can justify carrying this anymore.

12

13

14

15

16

17

18

19

The Brooklyn store is run by someone else and he still wants to carry it. I am not really happy about this. It was a simple product for users who do not want to fill tanks and change atomizers and it was easy to sell, but I really don't feel good about selling it. I know we talked about this back a few years ago before we were carrying the product, but I am curious to know what is in the liquid. I know the nicotine salts are added but I would like to know what else is in it. Do you guys have a GCMS or ingredient listing for the liquid? Are there other additives? I want to feel more comfortable so I can keep carrying these, but **I have seen what it is doing to people and I am very uncomfortable with it**. Last year when the news came to me and wanted me to help them with the story that teens were using JLI I shut that story down by telling them it wasn't true. It is true.. kids are getting hooked on this thing and they don't even understand half the time that it has nicotine in it! Little kids.. like 14 and 15 year olds. They try to come in my shop and we tell them it is 21 and over and get them out... but it is REALLY bad!

20

21

22

23

I have kids calling and trying to order using delivery services as well. We will only allow pickup and delivery for regular customers whose ID we have already checked... but they TRY and that worries me.. because the smoke shops and bodegas are NOT checking that the person they are picking up for is old enough to buy the product.

24

25

I agree that it is certainly less hazardous than smoking... **but to intentionally increase the addictiveness of nicotine seems really irresponsible and makes me feel like Big Tobacco pushing people onto a really addictive product.** I just don't think that it is necessary and I don't feel good about it.

26

27

Anyway... if there is any info you have that might make me feel better about selling it let me know... or if you could send me ingredient listing (I know Pax

28

applied for the patent on the liquid with the nicotine salts so it should be ok to share now?) I would appreciate it.[127]

118.    Another example came just days later. On April 28, 2017, JLI held a science meeting discussing the scientific information in JLI's possession with outside scientists. Notes from the meeting state that "concern was raised that because the nicotine update [sic] is slightly faster the data could be interpreted as feeding an addiction faster. Given the current climate with addictions to OxyContin how the data is presented needs to be considered carefully."[128]

119.    Additionally, Dan Myers wrote to Adam Bowen in October 2017 that "single puff data from Juul suggests that a small number of puffs, at the beginning of the pod's lifetime, may contain 2-3X" the levels of nicotine in the puffs from the rest of the pod, "i.e., 200-300 [$\mu$]g/puff."[129] This is consistent with a central goal of the product's design: capturing "users with the first hit."[130]

120.    None of this information was a surprise, nor did it cause JLI or the Management Defendants to change JLI's products or marketing. In fact, they embraced it. On November 3, 2017, Steven Hong, JLI's Director of Consumer Insights, described JUUL's "design and chemical formulation (fast acting nic salts)" as JLI's "ace in the hole" over the competition.[131]

121.    The following year, JLI and the Management Defendants obtained even more evidence that the amount of nicotine in JUULpods was needlessly high. By no later than May of 2018, JLI had completed Phase I of "Project Bears," a JLI study of smoker and vaper nicotine strength preferences. The results showed that "[a]cross the smoker segments, product liking is very similar[,]" and the "heaviest smokers (21+ cigs) like 1.7% more than higher strengths" such as 3% and 5%.[132] Similarly, "for those who evaluated the 5% pod, when given the choice

---

[127] INREJUUL_00264888-INREJUUL_00264890.

[128] INREJUUL_00230416.

[129] INREJUUL_00434580-INREJUUL_00434590.

[130] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette.

[131] INREJUUL_00228928-INREJUUL_00228930.

[132] INREJUUL_00260068.

1    of lower level pod strengths, at least half would choose a lower strength pods."[133]

2    122.    The same tests also showed that, contrary to JLI's expectations, smokers did not

3    increase their use of the 1.7% formulation relative to the 5% formulation in order to achieve

4    nicotine satisfaction. "Smoking volume does seem to be a driver of vaping volume, but this does

5    not vary much by strength within a given smoker type."[134]

6    123.    Thus, Project Bears revealed that 5% JUULpods delivered more nicotine than

7    necessary to satisfy cigarette smokers, even those characterized as "heavy" smokers.[135]

8    124.    At some point during the coordination between JLI, the Management

9    Defendants, and Altria, but no later than the due-diligence period for Altria's investment in JLI,

10   either JLI (through its employees) or one or more of Defendants Bowen, Monsees, Pritzker,

11   Huh, and Valani provided Altria with a copy of the Project Bears findings.[136]

12   125.    Nonetheless, JLI, the Management Defendants, and Altria have maintained and

13   promoted the 5% JUULpods as JLI's flagship offering of JUULpods although they knew that

14   even current smokers prefer a *lower* nicotine content. They pushed the 5% JUULpod because it

15   hooked users faster and kept them addicted to nicotine.[137]

16   126.    In addition to Project Bears, JLI and the Management Defendants (and

17   potentially Altria) were aware of other internal studies that established that its 5% JUUL pod

18   product would not be a successful cessation tool, as it was not attractive to an audience looking

19   to reduce cigarette consumption.[138]

20              **5.    JUUL's Design Did Not Look Like a Cigarette, Making it**

21                  **Attractive to Non-Smokers and Easy for Young People to Use**

22                  **Without Detection.**

23   127.    Not only did JUUL contain high levels of nictoine that delivered a strong "buzz"

24

25   [133] INREJUUL_00260065.

26   [134] INREJUUL_00244200.

     [135] *Id.*

27   [136] *Id.*

     [137] *Id.*

28   [138] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                              Case No. 19-md-02913-WHO

from the first puff, JLI designed its product to look appealing to youth and non-smokers. In January 2015, six months before JUUL's launch, JLI's Marketing Director, Sarah Richardson, identified "key needs" for JUUL's PR strategy, including "Establish premium positioning to entice the "masses" to follow the trend setters; own the "early adopter" /"cool kid" equity as we build out volume", and highlighted that "JUUL deliberately doesn't resemble e-cigs or cigalikes" that are "awkward" and "douche-y".[139] Instead, JUUL is "elegant" and "cool".

128.    JLI's strategy to position a nicotine-delivery device as the cool thing to do is not new. Decades before, Dr. Teague from R.J. Reynolds observed: "pre-smokers" face "psychological pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance, while at the same time emphasizing 'doing one's own thing.'"[140] Again, JUUL followed the cigarette playbook verbatim.

129.    JLI knew that among its target audience, young people, cigarette smoking had become increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix.

130.    Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, a young users can, and do, use JUUL—in class or at home—without detection.

131.    The JUUL device is small and discrete. Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be charged in a computer's USB drive. This design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces, like schools.

---

[139] INREJUUL_00057291 et seq.

[140] Internal RJR Memo, Claude Teague, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market,* (Feb. 2, 1973).





132.   Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and high-tech, which made it appealing to youth. JLI co-founder Bowen drew on his experience as a design engineer at Apple to make JUUL resonate with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[141] The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers. According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you

_____

[141] *How JUUL Made Nicotine Go Viral*, Vox (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok.

can trust it."[142] A 16-year-old agreed, explaining that "the tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products. And then this is another product. And it's just another product. Until you're addicted to nicotine."[143]

133.    JUUL's design also included an LED light, which allowed users to active "party mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors, so that the rainbow colors are visible while the person inhales from the JUUL device. "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors permanently. Party mode on the JUUL is described by users to be "like an Easter egg in a video game" and allows for "some cool tricks that are going to drive [] friends crazy."[144] This feature was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it even more appealing and "cool" to young users.



---

[142] *Id.*

[143] *Id.*

[144] Jon Hos, *Getting Your Juul Into Party Mode*, (Jul. 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

**6.      JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation.**

**a.      JIL Develops Flavored JUUL Products That Would Appeal to Youth.**

134.     Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine.[145] A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[146]

135.     In June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint).




---

[145] A Sept. 1972 Brown & Williamson internal memorandum titled "Youth Cigarette New Concepts," observed that "it's a well known fact that teenagers like sweet products." A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.

[146] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. TIMES (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

136.   JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.

 

137.   In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[147] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of e-cigarettes" because these products are "so appealing" to children."[148]

138.   The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors. A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes

---

[147] Daniel J. DeNoon, *FDA Bans Flavored Cigarettes: Ban Includes Cigarettes With Clove, Candy, and Fruit Flavors*, WebMD (Sept. 22, 2009), https://www.webmd.com/smoking-cessation/news/20090922/fda-bans-flavored-cigarettes#2.

[148] U.S. Food & Drug Admin*., FDA Finalizes Enforcement Policy on Unauthorized  Flavored Cartridge-Based E-cigarettes that Appeal  to Children, Including Mint* (Jan. 22, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

"because they come in flavors I like."[149]

139.    Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine.[150] Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

140.    In a recent study, 74% of youth surveyed indicated that their first use of a JUUL was of a flavored JUUL pod.[151]

141.    Research shows that when youth see advertisements for flavored e-cigarettes, they believe the advertisements and products are A significant majority of under-age users chose flavored e-cigarette products.[152] By at least early 2017, JLI knew that its flavors had attracted young people and non-smokers in droves.[153] Instead of taking corrective action or withdrawing the kid friendlyintended for them.[154]

---

[149] *See* Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 JAMA 1871 (2015). Another peer-reviewed study concluded that young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their peers who have not used e-cigarettes. *See* Brian A. Primack, et al. *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, 131 AM. J. MED. 443.e1 (2018).

[150] *See* U.S. Dep't of Health & Human Servs., *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Chapter 4 (Centers for Disease Control and Prevention ed. 2010), https://www.ncbi.nlm.nih. gov/books/NBK53018/ #ch4.s92.

[151] Karma McKelvey et al., *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA NETWORK OPEN e183535 (2018), https:// doi:10.1001/jamanetworkopen.2018.3535.

[152] Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States*, 322 JAMA 2095 (2019), https://tinyurl.com/y3g75gmg ("Among current exclusive e-cigarette users, an estimated 72.2% . . . of high school students and 59.2% . . . of middle school students used flavored e-cigarettes. . . .").

[153] *See* INREJLI_00265068 (Feb. 13, 2017 internal JLI email string: ". . . [f]lavors are important for retention – especially when you consider the switching effectiveness of JLI. Would we still have these people as customers if we didn't offer fruit or dessert flavors? Hard to say on this alone, but if we removed our highest quality flavors (mint or mango), we would surely risk churn.")

[154] D.C. Petrescu, et al., *What is the Impact of E-Cigarette Adverts on Children's Perceptions of Tobacco Smoking? An Experimental Study*, 26 TOBACCO CONTROL 421 (2016); Julia C. Chen-

142.   flavors, JLI capitalized on their popularity with kids.

143.   JLI asserts that it did not intend its flavors to appeal to underage consumers. After eleven Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Dick Durbin[155]. JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

144.   A former JUUL manager, who spoke to The New York Times on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[156]

145.   JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUUL pods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUUL pods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

---

Sankey et al., *Perceived Ease of Flavored E-Cigarette Use and E-Cigarette Use Progression Among Youth Never Tobacco Users*, 14 PLoS ONE 1 (2019).

[155] Lorraine Woellert & Sarah Owermohle, *Juul Tries to Make Friends in Washington as Regulators Circle,* POLITICO (Dec. 28, 2018), https://www.politico.com/story/2018/12/08/juul-lobbying-washington-1052219.

[156] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. TIMES (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1

2

          **b.**       **Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market.**

3

4

5

6

7

8

9

10

11

      146.    While JLI and the Management Defendants were developing and marketing their flavored products to appeal to and recruit youth, Altria, recognizing the value of those young "replacement smokers" committed itself to the cause. With the shared goal to grow the number of nicotine-addicted users, and as detailed further herein, JLI, the Management Defendants, and Altria set out to do whatever was necessary to create and preserve the lucrative market for flavors. In order to maximize the value of its mint line of JUULpods, JLI, with the support of the Management Defendants, chemically and socially engineered its mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

12

13

14

15

      147.    In July 2013, Reynolds American Inc.[157] released the Vuse, the first-known cartridge-based nicotine salt e-cigaretteto reach the domestic market.[158] Altria entered the nicotine salt market one month later, with the MarkTen cig-a-like.[159] JLI would enter the market in June 2015.

16

17

18

19

20

      148.    Though mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories,[160] Reynolds, Altria and JLI had all introduced mint-flavored products within a year of each company's initial release. By mid-2014, Reynolds had added "Mint, Rich Mint, Spearmint, [and] Wintergreen" to its Vuse lineup.[161] By February 2015, Altria's Nu Mark LLC, under the leadership of Joe Murillo (JLI's current regulatory

21

---

22

[157] Reynolds is now a wholly owned subsidiary of British American Tobacco.

23

[158] See FAQs, RJR Vapor Co., LLC, http://www.vusevapor.com/faqs/product/ ("Since Vuse's launch in 2013, all of our closed systems available for sale nationally (i.e., Vuse Solo, Vuse Ciro, Vuse Vibe, and Vuse Alto) include nicotine salts.").

24

25

[159] Additional Info, Nu Mark LLC, https://markten.com ("certain varieties" of MarkTen Original "contain … acetic acid, benzoic acid, and lactic acid.").

26

[160] *See* M.B. Harrell et al., *Flavored E-cigarette Use: Characterizing Youth, Young Adult, and Adult Users*, 5 PREVENTIVE MEDICINE REPS. 33-40, § 3.3 (Mar. 2017), https://www.sciencedirect.com/science/article/pii/S2211335516301346.

27

28

[161] *See* Sen. Richard Durbin, et al., *Gateway to Addiction?* (April 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

---

               AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

head), released a Winter Mint flavor for MarkTen.

149.    Unlike Reynolds and Altria, which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUULpods.

150.    JLI's flavored JUULpods were particularly popular with its underage users and, when mango was introduced, it was the underage user's flavor of choice.

151.    JLI, the Management Defendants, and Altria recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors. So, they sought to solidify the market presence of a "substitute" youth-friendly flavor— mint—which might escape regulation and preserve JLI's astronomical sales figures.

### i.    JLI Manipulates Chemistry of Mint JUUL Pods.

152.    One recent study found that JLI's mango had the lowest free-base content, making it the least harsh formula; and that mint had the highest free-base content (30% more free-base than mango), making mint the formula with the strongest nicotine impact:[162]

| | $C_{HA}/C_{Nic}$ | $\alpha_{fb}$ |
|---|---|---|
| **Benzoic acid** | | |
| JUUL 'Cool Mint' (5% nicotine) | 0.97* | 0.13 |
| JUUL 'Classic Menthol' (5% nicotine) | 0.98* | 0.13 |
| JUUL 'Crème Brûlée' (5% nicotine) | 0.97* | 0.12 |
| JUUL 'Fruit Medley' (5% nicotine) | 0.99* | 0.12 |
| JUUL 'Cool Cucumber' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Classic Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Virginia Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL "Mango" (5% nicotine) | 0.99* | 0.09 |
| JUUL "Virginia Tobacco" (3% nicotine) | 0.94* | 0.14 |
| JUUL 'Mint' (3% nicotine) | 1.04* | 0.11 |
| Averages for JUUL | 0.99±0.03 SD | 0.12±0.01 |

Anna K. Duell et al., Nicotine in tobacco product aerosols: 'It's déjà vu all over again'

153.    These findings evidence JLI, the Management Defendants, and the Altria Defendants' plan to make the flavor whose lifespan they were working hard to preserve the

---

[162] See Duell AK, et al. *Nicotine in Tobacco Product Aerosols: "It's Déjà vu All Over Again*," 5 TOBACCO CONTROL (Dec. 17, 2019), https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/12/16/tobaccocontrol-2019-055275.full.pdf.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                                           Case No. 19-md-02913-WHO

most potent when it got into the hands of nonsmokers, including youth.

ii.     **JLI's Youth Surveillance Programs Confirmed that**

**Mint JUUL Pods are Preferred by Teens.**

154.    In January 2018, Kevin Burns,  JLI's new CEO, deployed his experience as the former CEO of a yogurt company to begin developing JUUL's flavor portfolio.

155.    One part of this initiative included studying consumer reactions to flavor names. By February 2018, McKinsey & Company had provided a roadmap to JLI's Consumer Insights department, which included multiple flavor studies including a flavor "likability" tests, which was carried out under JUUL's marketing and commercial department.[163]

156.    In April 2018, JLI received a document request from the FDA on April 24, 2018, seeking information about the design and marketing of JLI's products, among other things.[164]

157.    In response, JLI announced a commitment of $30 million to youth prevention efforts and began sending JLI representatives to schools to present what were essentially advertising campaigns for JUUL products. This conduct resulted in a Warning Letter from the FDA's Center for Tobacco Products to JLI in September 2019.[165]

158.    Under the guise of this youth prevention program, *JLI directly studied 13- to 17-year-old teens' e-cigarette flavor preferences*.[166] These studies, undertaken at a time when JLI and Altria were coordinating their activities, asked teens to rank a variety of e-cigarette flavors in terms of appeal, and included the names of current JUUL flavors, JUUL flavors under development, and flavors offered by JLI's competitors. Though they were not made public, through document requests, two such studies have been identified from April 2018.

159.    The first study, carried out by McKinsey & Company, generated over 1,000

---

[163] INREJUUL_00053172.

[164] Matthew Holman, U.S. Food & Drug Admin., to Ziad Rouag, Juul Labs, Inc., *Letter from Director of Office of Science, Center for Tobacco Products* (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

[165] Letter from U.S. Food & Drug Admin. to Kevin Burns, CEO of Juul Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[166] INREJUUL_00121627 (preliminary slides); INREJUUL_00124965 (data).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

responses from teens aged 13 to 17 years old.[167] The second study, conducted by DB Research, appears to have gathered data from a focus group of 16 kids in Bethesda, Maryland, and Baltimore, Maryland.[168]

160.    Both studies found that teens' co-favorite JUUL flavors were mango and mint, and that teens found only one third-party flavor more desirable than mango and mint: "Cotton Candy" (McKinsey)[169] and "Fruit Loops" (DB Research).[170]

161.    Though the McKinsey study did not survey teens' preference for menthol, the DB Research study did and found that while 28% of teens found menthol appealing, 72% of teens liked mint.[171]

162.    In other words, these surveys showed that teens respond to mint the way they respond to their favorite candy flavors and respond to Menthol the way they respond to traditional tobacco flavors typically disfavored by youth. This is unsurprising, as the "Mint" flavor was designed not to taste like a Menthol cigarette. Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport" cigarette that "doesn't have that good peppermint taste like [C]ool [M]int."[172]

163.    Because of these and other studies, JLI, the Management Defendants, and the Altria Defendants knew that mint is an attractive flavor for kids. According to Siddharth Breja, who was senior vice president for global finance at JLI, after JLI pulled most flavored pods, including mango, from the market in an claimed attempt to reduce youth usage of JUUL, then-CEO Kevin Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't

---

[167] *Id.*

[168] INREJUUL_00035325.

[169] INREJUUL_00124965.

[170] *Id.*

[171] INREJUUL_00035325.

[172] Reddit, *How does Classic Menthol Compare to Cool Mint*, https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_cool_mint/.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

find mango they buy mint."[173] And it was public knowledge that mint and menthol have a well-documented history of facilitating youth tobacco use, as Dr. Jonathan Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.[174]

164.    If the purpose of these youth prevention studies was to "better understand how different flavor profiles appeal to different age groups to inform youth prevention," as the McKinsey slides presenting that study's findings indicate, the lesson for JLI, the Management Defendants, and the Altria Defendants was that teens like mint as much or more than any other JUUL flavor, including mango, fruit medley, crème brulee, cucumber, and more than a dozen other candy-like flavors produced by third-parties for use with the JUUL device.

165.    With that knowledge and with no genuine interest in youth prevention, and as detailed below, JLI, the Management Defendants, and Altria committed to work to preserve mint as a flavor for as long as possible. Indeed, to further this goal, Defendants Pritzker and Valani poured additional money into JLI a mere two months later as part of a $600 million funding round.[175]

166.    By keeping mint on the market long after other flavors were pulled, these Defendants continued to expand the number of addicted e-cigarette users.

---

[173] Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. TIMES (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html.

[174] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. 3 (2019) (statement of Jonathan P. Winickoff, American Academy of Pediatrics). , https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf.

[175] Alex Wilheim & Jason D. Rowley, *JUUL Raises $650M Of Its $1.25B Mega-Round*, CRUNCHBASE (Jul. 10, 2018), https://news.crunchbase.com/news/juul-raises-650m-of-its-1-25b-mega-round/.

**D.** **Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe.**

167.    Having created a product designed to hook users to its nicotine, JLI had to mislead consumers into believing JUUL was something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecendented risks of abuse and addiction JUUL poses. Defendants devised and knowingly carried out a material scheme to defraud consumers by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products, (b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party groups to spread false and misleading narratives about e-cigarettes, and JUUL in particular.

**1.** **The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.**

168.    Every 5% strength JUUL pod package represents that one pod is equivalent to one pack of cigarettes. This statement is deceptive, false and misleading. As JLI's regulatory head explained internally to former CEO Kevin Burns in 2018, each JUUL pod contains "roughly *twice the nicotine content* of a pack of cigarettes."[176]

169.    In addition, and as JLI and the Management Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain 10–15 mg of nicotine per cigarette[177] and each cigarette yields between 1.0 to 1.4 mg of nicotine,[178] meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, have been found to deliver

---

[176] INREJUUL_00279931.

[177] Neal L Benowitz & Jack E Henningfield, *Reducing the Nicotine Content to Make Cigarettes less addictive*, 22 TOBACCO CONTROL Supp. 1, i14-17 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3632983/.

[178] Lynn T. Kozlowski & Janine L. Pilliteri, *Compensation for Nicotine by Smokers of Lower Yield Cigarettes*, 7 SMOKING AND TOBACCO CONTROL MONOGRAPH 161, 164 (1983), https://cancercontrol.cancer.gov/brp/tcrb/monographs/7/m7_12.pdf

at least 82% of the nicotine contained in a JUUL pod to the user.[179] JLI's own internal studies

suggest a nicotine transfer efficiency rate of closer to 100%.[180]

170.    Defendants also knew that the use of benzoic acid and nicotine salts in JUUL

pods affects pH and facilitates "absorption of nicotine across biological membranes."[181] JUUL's

e-liquid formulation is highly addictive not only because it contains a high concentration of

nicotine, but because it contains a particularly potent form of nicotine, i.e., nicotine salts.

Defendants knew this, as Adam Bowen advised the Board of Directors at an October 2015

Board meeting on JLI's "nicotine salts patent application."[182] And the Altria Defendants were

aware of the research showing the potency of nicotine salts from their many years in the tobacco

business.

171.    JLI and Defendant Bowen, knowing that the Phase 0 results illustrated that the

nicotine content was greater than they wanted to represent, sought to engineer test results that

differed from those results and were more consistent with JLI's deceptive messaging. In May

2014, within weeks of the Phase 0 study, JLI and Defendant Bowen carried out a second

pharmacokinetics study in New Zealand. This study was called the CH-1401, or the "Phase 1"

study. This study again examined the effects of inhaling aerosol from various 2% nicotine

solutions: nicotine benzoate (blend A), nicotine malate (blend B), and free-base nicotine (blend

C).[183] In a further departure from the Phase 0 study, which used experienced e-cigarette users,

the Phase 1 study used subjects that had not previously ingested aerosolized nicotine vapor, and

who had certainly never ingested aerosolized nicotine vapor from nicotine salts. As Defendants

JLI and Bowen knew, this difference is critical. Just as first-time smokers would not inhale as

---

[179] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 NICOTINE TOBACCO RESEARCH 1274 (2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584 (about 82%, for averages of 164 µg per puff).

[180] See, e.g., INREJUUL_00023597 (finding 94% nicotine transfer efficiency with 4% benzoate formula).

[181] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 HANDB.EXP.PHARMACOL. 29(2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/

[182] INREJUUL_00278408.

[183] INREJUUL_00014159-INREJUUL_00014226.

much cigarette smoke as regular smokers, inexperienced (or "learning") e-cigarette users will not inhale vapor at a rate that maximizes nicotine delivery.[184] JLI's decision to omit participatnts with previous e-cigarette experience from the criteria for inclusion in CH-1401 resulted in artificially deflated Cmax results.[185]

172.   The Cmax recorded in the Phase 1 study was approximately a third of that achieved by smoking a cigarette. Specifically, e-cigarette users recorded a Cmax of approximately 12.87 ng/ml, compared with the 31.47 ng/ml Cmax resulting from smoking a Pall Mall.[186]

173.   In possession of the results from both the Phase 0 and Phase 1 studies, JLI nevertheless decided to launch a 5% nicotine salt solution as its commercial product. An internal memo explained JLI's reasoning as follows: "[s]ince the Cmax of the [2%] nicotine salt was about 1/3 that of cigarettes, we chose a concentration of 5% for our commercial product (JUUL), which should provide a Tmax and Cmax consistent with a cigarette."[187]

174.   Instead of testing a 5% solution, JLI *estimated* the Cmax result of a 5% nicotine solution using a model.[188] But the Phase 0 data showed that a 4% benzoic acid / 5% nicotine solution would have a higher Cmax and AUC than those of a cigarette, not one that was equal.

175.   JLI and the Management Defendants knew that JLI's studies indicated that their 5% solution product was more potent and more addictive than a typical cigarette. But JLI and the Management Defendants then used their unsupported extrapolation of their flawed studies to market JUUL as providing a nicotine experience on par with a cigarette, even though they designed JUUL to ensure that was not true. In reality, there were never any measured test results in accord with JLI's marketing to distributors, retailers, and the public at large.

176.   In the United States, the unsupported extrapolations from what appears to be the Phase 1 study were used to create charts, which JLI posted on its website, shared with

---

[184] INREJUUL_00002526-INREJUUL_00002625.

[185] *Id*.

[186] *Id*.

[187] INREJUUL_00351717-INREJUUL_00351719.

[188] *Id*.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

journalists, sent to retailers, and distributed to third party promoters, showing that JUUL's 5% solution achieved a pk profile just below that of a cigarette. For example, the following chart appeared on the online publication TechCrunch:[189]



177.   Simultaneously, while providing extrapolated data to the public, Phase 1 was used as the basis for representations to retailers that a *2% solution* achieved a pk profile equalling that of a cigarette. In a pitch deck dated March 25, 2015, and labeled as being intended for the convenience store distributor Core-Mark, JLI presented interim[190] Phase 1 data showing this equivalence:[191]

---

[189] Ryan Lawler, *Vaporization Startup Pax Labs Introduces Juul, Its Next-Gen-E-Cigarette*, TECH CRUNCH (Apr. 21, 2015), https://techcrunch.com/2015/04/21/pax-juul/.
[190] *See* JLI00363360.
[191] INREJUUL_00448896.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                                Case No. 19-md-02913-WHO

178.     These misrepresentations to the public were not accidental, nor were they the work of a rogue employee. In a June 2014 Ploom Board meeting in London, the Ploom executives' presentation to the Board, which at that time included Defendants Bowen, Monsees, Pritzker, and Valani, explained the differences between the Phase 0 and Phase 1 results as "due to averaging across more subjects with variability in puffing behavior."[192] Their explanation did not note that "variability in puffing behaviour" was partly a result of the fact that participants in the Phase 0 study were experienced e-cigarette users whereas the participants in the Phase 1 study were not. Thus, Defendants Bowen, Monsees, Pritzker, and Valani were privy to both the Phase 0 and Phase 1 results. And they *knew* that the data JLI (then Ploom) was pushing on the public was false and misleading, but none made any efforts to correct or withdraw those false and misleading statements.  Aside from submitting the testing protocol and results of the Phase 0 study with the '895 patent, JLI, Bowen, Monsees, Prtizker, and Valani otherwise ignored the Phase 0 study and omitted it from public discussion of JUUL's nicotine delivery.

---

[192] INREJUUL_00016443-INREJUUL_00016507.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

2.     **JLI, the Management Defendants, and Altria Transmitted,**
**Promoted and Utilized Statements Concerning JUUL's Nicotine**
**Content that They Knew Was False and Misleading.**

179.    As set forth above, the statements in JLI advertisements and on JUUL pod packaging that each JUUL pod contains about as much nicotine as a pack of cigarettes are deceptive, false and misleading. Defendants knew this.

180.    JLI and the Management Defendants caused deceptive, false and misleading statements that a JUUL pod had an equivalent amount of nicotine as one pack of cigarettes to be distributed via the wires and mails. These Defendants have thus materially misrepresented the nicotine content of JUUL products to the consuming public including Plaintiffs, through acts of mail and wire fraud.

181.    By no later than October 30, 2016 (and likely earlier), the JLI Website—which, as discussed above, the Management Defendants on JLI's Board of Directors reviewed and approved—advertised that "[e]ach JUULpod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs."[193] The language on the website would later change, but still maintained the same fraudulent misrepresentation—i.e., that "[e]ach 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery."[194]

182.    As noted above, JLI and the Management Defendants directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUUL pods and deceptive, misleading and fraudulent statements regarding JUUL's nicotine content. And although they knew that these statements, which they caused to be transmitted over the wires and mails, were untrue, JLI and the Management Defendants have made no effort to retract such statements or correct their lies.

183.    In addition to approving the JLI website, knowing that it contained deceptive,

---

[193] JUULpod, JUUL Labs, Inc. (Oct. 30, 2016),
https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/
[194] What is Vaping?, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/What-is-Vaping-How-to-Vape

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

misleading and false statements, JLI (through its employees) and the Management Defendants also were directly responsible for the interstate transport, *via* U.S. mail, of JUULpod packaging contained misrepresentations and omissions. At the same Board Meeting where Defendants Pritzker, Huh, and Valani were installed as the Executive Committee, the Board directed JLI's management on, among other things, "the need to rely on distributors and the challenges in reaching customers otherwise."[195]

184.    JUUL pod packages that were sent *via* U.S. mail stated that a single Juul pod is "approximately equivalent to about 1 pack of cigarettes."[196] These statements, as well as the statements on the JLI website, are false and misleading.

185.    The statement on the JLI website, and in its advertisements and packaging, that each JUUL pod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is false and likely to deceive and mislead, because the actual amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes

186.    The Altria Defendants greatly expanded the reach of this fraud by providing its retail and distribution might for JLI products, causing millions of JUUL pods to be sent via U.S. mail with packaging stating that JUUL pods contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[197] JLI, the Management Defendants, and the Altria Defendants knew that these statements were false and misleading, but nevertheless utilized JUUL product packing, marketing and advertising to maintain their fraud.

187.    The Altria Defendants knew in 2017 that a JUUL pod delivered more nicotine than one pack of cigarettes. In 2017, the Altria Defendants launched its MarkTen Bold e-cigarette, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JUUL was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, the Altria Defendants chose to

---

[195] INREJUUL_00278408.

[196] Juul Labs, Inc., Twitter, (Feb. 14, 2018), https://twitter.com/JUULvapor/status/963844069519773698,

[197] *Id*.

bring a less potent 4% formulation to market.

188.    According to the Altria Defendants own pharmacokinetic testing as reflected in the chart below, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, the Altria Defendants' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.



Figure 1: Presented at Altria Group Inc.'s November 1, 2017 Investor Day Presentation. MarkTen Bold 4%

189.    Based on its own internal knowledge, the Altria Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data it received from JLI, the Altria Defendants' due diligence undoubtedly included a careful examination of JLI's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

190.    Thus, JLI, the Management Defendants, and the Altria Defendants knew that the statement on JUUL pod packaging that each JUUL pod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead. Neither the Altria Defendants nor JLI or the Management Defendants have made any effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL pods. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving consumers.

191.    From JUUL's pre-release announcements to this day, JLI has continuously represented that each pod is approximately equivalent to a pack of cigarettes. These claims, which JLI repeats widely in advertisements, press releases, and its web site, have been distributed *via* the wires and mails and disseminated by reputable and widely reliable sources that accepted those representations as true.[198]

192.    Not only have JLI and the Management Defendants misrepresented or concealed the actual amount of nicotine consumed *via* JUUL pods, but they also did not effectively or fully inform users about the risks associated with the potent dose of nicotine delivered by JLI's products. Despite going through numerous revisions since 2015, the JUUL packaging did not include nicotine addiction warnings until JLI was forced to add them in August 2018. The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUUL pods away from children and pets, but contained no warnings specifically about the known effects, or unknown long-term effects, of nicotine or consuming e-cigarettes/inhaling nicotine salts.[199]

193.    Moreover, the form of nicotine JUUL pods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard

---

[198] *See* Truth Initiative, *6 Important Facts about Juul*, https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul; Erin Brodwin, *An E-cigarette with Twice the Nicotine of Comparable Devices is Taking over High Schools – and Scientists are Sounding the Alarm,* BUSINESS INSIDER (Apr. 30, 2018), https://www.businessinsider.com/juul-e-cig-vaping-health-effects-2018-3*;* Caroline Kee, *Everything you Need to Know About the JUUL, Including the Health Effects,* BUZZFEED NEWS (Feb. 5, 2018), https://www.buzzfeednews.com/article/carolinekee/juul-ecigarette-vape-health-effects; Jan Hoffman, *The Price of Cool: A Teenager, a Juul and Nicotine Addiction,* NEW YORK TIMES, (November 16, 2018), https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html; Sarah Milov, *Like the Tobacco Industry, E-cigarette Manufacturers are Targeting Children,* THE WASHINGTON POST, (Sept. 23, 2018) https://www.washingtonpost.com/outlook/2018/09/23/like-tobacco-industry-e-cigarette-manufacturers-are-targeting-children/; Washington State Dep't of Health, *What are Vapor Products?,* https://www.doh.wa.gov/YouandYourFamily/Tobacco/VaporProducts.

[199] *See* INREJUUL_00444332 (2015 image of JLI packaging). Note that JLI packaging originally included such warnings about nicotine, but were apparently removed during various rounds of revisions, *see e.g.* INREJUUL_00021583 (2014 image of JLI packaging containing handwritten revisions of the original language.).

of reporting concentration by volume,[200] leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUUL pods in fact contain approximately the same nicotine as a solution that is 6% nicotine by volume.

194.    The "5% strength" statement in Defendants' advertisements misrepresents the most material feature of the JUUL product—the nicotine content—and has misled consumers to their detriment. Resellers, apparently  assuming that "5% strength" means "50mg/ml" nicotine by volume, compound confusion among consumers by stating that JUUL pods contain "50 mg/ml," which they do not.[201]

195.    If JLI and the Management Defendants did not know when JLI released JUUL pods that the "5% strength" representation in Defendants' advertisements was misleading, they learned that there was widespread confusion about the JUUL pods' nicotine content. By 2017, studies revealed that smokers did not understand "5% strength," and some understood that phrase to mean 5% of a cigarette. Though this was identified as a "pain point" for new users,[202] JLI and the Management Defendants (and later the Altria Defendants) did nothing to stop or correct this confusion about the nicotine content.

196.    The "5% strength" statement in Defendants' advertisements is also misleading.

---

[200] See, e.g., American E-Liquids Manufacturing Standards Association, *E-Liquids Manufacturing Standards*, § 1.05 (2017), https://www.aemsa.org/wp-content/uploads/2017/03/AEMSA-Standards-v2.3.3.pdf, (quantifying e-liquid nicotine content in terms of volume).

[201] See, e.g. Tracy Vapors, Starter Kit, http://web.archive.org/web/20190422143424/https://www.tracyvapors.com/collections/starter-kit; Lindsey Fox, *JUUL Vapor Review, E-cigarette Reviewed,* (Mar. 20, 2017), https://ecigarettereviewed.com/juul-review ("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); Jason Artman, *JUUL E-Cigarette Review*, eCig One (Oct. 26, 2016) https://ecigone.com/e¬cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); West Coast Vape Supply, Juul Starter Kit (July 18, 2019), http://web.archive.org/web/20190718190102/https://westcoastvapesupply.com/products/juul-starter-kit ("5% . . . 50 mg"); Vapor4Life*, How Much Nicotine is In a JUUL?* (Aug. 24, 2018), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/. "Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter."

[202] INREJUUL_00123540.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                    Case No. 19-md-02913-WHO

1    At least two independent studies testing multiple varieties of JUUL pods have likewise found

2    significantly higher concentrations of nicotine than the 59 mg/mL JUUL's website represents,

3    suggesting that the difference in the total nicotine content of a JUUL pod vs. a pack of

4    combustilble cigarettes could be even greater.[203]

5              **3.    Defendants Used Food and Coffee Themes to Give False**

6                     **Impression that JUUL Products Were Safe and Healthy.**

7              197.   In late 2015, JLI and the Management Defendants employed a deceptive

8    marketing scheme to downplay the harms of e-cigarettes with a food-based advertising

9    campaign called "Save Room for JUUL." The campaign framed JUUL's addictive pods as

10   "flavors" to be paired with foods.[204] JLI described its Crème Brûlée nicotine pods as "the

11   perfect evening treat" that would allow users to "indulge in dessert without the spoon."[205]  In

12   one 2016 email, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's

13   highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."[206] JLI similarly promoted

14   the fruit medley pods using images of ripe berries. JLI described its "Cool" Mint pods as having

15   a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The

16   August Heat With Cool Mint."[207]

17

18

---

19   [203] *See* J.F. Pankow et al., *Benzene Formation in Electronic Cigarettes*, 12 PLoS ONE 1
     (2017); *See also* Anna K. Duell, et al., *Free-Base Nicotine Determination in Electronic*

20   *Cigarette Liquids by 1H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 431-34 (2018).

     [204] Erin Brodwin, *$15 Billion Startup JUUL Used 'Relaxation, Freedom, and Sex Appeal' to

21   Market its Crème-brulee-flavored E-cigs on Twitter and Instagram—but its Success has Come

22   at a Big Cost*, BUSINESS INSIDER (Oct. 26, 2018), https://www.businessinsider.com/juul-e-cig-
     marketing-youtube-twitter-instagram-social-media-advertising-study-2018-10.

23   [205] Stanford University, *Research into the Impact of Tobacco Advertising*,
     http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&toke

24   n1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subthem

25   e_name=Flavors

     [206] Stanford University, *Research into the Impact of Tobacco Advertising*,

26   http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&toke
     n1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subthem

27   e_name=Flavors

     [207] Stanford University, *Research into the Impact of Tobacco Advertising*,

28   http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&toke

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21








22

198.    Again, none of these advertisements disclosed that JUUL was addictive and

23
unsafe.

24

199.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to

25
coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the

26
27
28

n1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subthem
e_name=Flavors

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

picture.[208] JLI's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.

200.     JLI's reference to coffee is no mere marketing gimmick, it reflects the larger effort to mislead customers into believing that JUUL is no more harmful than coffee, reinforcing the false and dangerous concept if a substance is "not harmful," then addiction to that substance cannot be harmful.

---

[208] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO



201.   Defendants knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

1
2

### 4.    JLI's "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device.

3      202.    JLI, the Altria Defendants, and the Management Defendants recognized that one

4 of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and

5 thus JLI's staggering market share), was to mislead potential customers about the true nature of

6 JUUL products. Defendants knew that if it became public that JUUL was designed as a way to

7 introduce nicotine to youth and otherwise hook new users with its potent nicotine content and

8 delivery, it would not survive the public and regulatory backlash. Therefore, JLI (with the

9 knowledge and support of the Management Defendants) and the Altria Defendants repeatedly

10 made false and misleading statements to the public that JUUL was created and designed as a

11 smoking cessation device, and falsely and misleadingly used the mails and wires to spread the

12 subterfuge. JLI, the Management Defendants, and the Altria Defendants committed these

13 deceptive, misleading and fraudulent acts intentionally and knowingly. In making these

14 representations, JLI, the Management Defendants, and the Altria Defendants intended that

15 consumers, the public, and regulators rely on misrepresentations that JUUL products were

16 designed to assist smoking cessation.

17      203.    The most blatant evidence of the cover-up scheme was the January 2019, $10

18 million "*Make the Switch*" television advertising campaign. This campaign, which was the

19 continuation of JLI's web-based Switch campaign, was announced less than a month after the

20 Altria Defendants announced Altria's investment in JLI.

21      204.    The "*Make the Switch*" television ads featured former smokers aged 37 to 54

22 discussing "how JUUL helped them quit smoking."[209] According to JLI's Vice President of

23 Marketing, the "*Make the Switch*" campaign was "an honest, straight down the middle of the

24 fairway, very clear communication about what we're trying to do as a company."[210] These

25

26 [209] Angelica LaVito, *JLI Combats Criticism with New TV Ad Campaign Featuring Adult Smokers Who Quit after Switching to E-cigarettes*, CNBC (Jan. 8, 2019),

27 https://www.cnbc.com/2019/01/07/juul-highlights-smokers-switching-to-e-cigarettes-in-ad-campaign.html.

28 [210] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

statements were false as JUUL was not intended to be a smoking cessation device. JLI and the Management Defendants committed acts of wire fraud when they caused the "Make the Switch" campaign to air on television with the fraudulent intent of deceiving and misleading the public, the United States Congress, and government regulators into believing that JLI is and had been focused solely on targeting adult smokers. The Altria Defendants also committed acts of mail fraud when they caused tens of thousands, if not millions, of written versions of the *Make the Switch* campaign to be distributed with packages of Altria's combustible cigarettes.

205.    Defendants continually sought to frame JUUL products as smoking cessation devices in their public statements and on their website. Defendant Monsees explained during his testimony before Congress:

> ***The history of cessations products have extremely low efficacy. That is the problem we are trying to solve here.*** So, if we can give consumers an alternative and market it right next to other cigarettes, then we can actually make something work.
>
> [T]raditional nicotine replacement therapies, which are generally regarded as the gold standard for tools, right, for quitting, those are nicotine in a patch or a gum form, typically, and the efficacy rates on those hover just below about a 10 percent or so. JUUL-we ran a very large study of JUUL consumers, ex-smokers who had picked up JUUL, and looked at them, looked at their usage on a longitudinal basis, which is usually the way that we want to look at this, in a sophisticated fashion ... what we found was that after 90 days, 54 percent of those smokers had stopped smoking completely, for a minimum of 30 days already. And the most interesting part of this study is that if you follow it out further, to 180 days, that number continues to go up dramatically, and that is quite the opposite of what happens with traditional nicotine replacement therapies.[211]

206.    In response to a direct question about whether people buy JUUL to stop smoking, Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[212]

207.    Other illustrative and non-exhaustive examples include the following:

---

[211] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii.

[212] *Id.*

***Statements by Defendant JLI:*** [213]

- "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by **eliminating cigarettes**. We envision a world where fewer adults use cigarettes, and **where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirel**y, should they so desire." (JLI Website, April 2018 (or earlier)); [214]

- "JUUL Labs, which exists to **help adult smokers switch** off of combustible cigarettes." (JLI Website, September 19, 2019); and, [215]

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018); [216]

***Statements by the Altria Defendants:***

- "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, **a world leader in switching adult smokers** . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Altria Website, December 20, 2018); [217] and,

- "We believe e-vapor products present an **important opportunity to adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18). [218]

---

[213] Although these statements are attributed to Defendant JLI, JLI's Board of Directors had "final say" over marketing messaging and, accordingly, Defendants Bowen, Monsees, Pritzker, Huh, and Valani are each directly responsible for the transmission of these fraudulent statements.

[214] *Our Mission*, JUUL Labs, Inc. (2019), https://www.juul.com/mission-values.

[215] CONSUMER UPDATE: 9/19, JUUL Labs, Inc. (Sept. 19, 2019), https://newsroom.juul.com/consumer-update-9-19/.

[216] JLI Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of then-CEO Kevin Burns).

[217] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BUSINESSWIRE (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate

[218] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, at 2 (Oct. 25, 2018).

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

- "We have long said that **providing adult smokers with superior, satisfying products with the potential to reduce harm** is the best way to achieve tobacco harm reduction. **Through Juul**, we are making the biggest investment in our history toward that goal."[219]

- "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also **support and even accelerate transition to noncombustible alternative products by adult smokers.**" (Altria Earning Call, January 31, 2019)[220]

- We expect the **JUUL product features that have driven JUUL's success in switching adult smokers in the U.S.** to strongly appeal to international adult cigarette smokers. (Altria Earning Call, January 31, 2019)[221]

208.   Defendants knew at the time of making these statements that they were false, deceptive and misleading. JUUL does not have FDA approval as a cessation product.

209.   The *Switch* advertisements reinforced the impression left by the testimony of JLI's co-founder, clearly linking JUUL to cessation and quitting. For example:

---

[219] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, (Dec. 20. 2018), BUSINESS WIRE, https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[220] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018,  (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.

[221] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

210.     Representative Rashida Tlaib, upon presenting this ad to Monsees, had the following exchange:

> **Rep. Tlaib:** After 30 lines, starting with "quit," the ad says "switch," followed by no further mentions of start smoking again. You were a smoker. Does this ad give a smoker hope that there might be a way to quit cigarettes for good?
>
> **Mr. Monsees:** I think the intention of this ad is to make it very clear to consumers that there is an alternative, finally, to combustible cigarettes. I am one of those people.[222]

---

[222] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://www.c-

211.    Defendants' tacit message in their *Switch* advertisements is: switch because, unlike cigarettes, JUUL is harmless to your health.

212.    Defendants' false, deceptive and misleading *Switch* campaign suggests that purchasing a JUUL will "switch" a smoker to a non-smoker.

213.    [Omimtted]

214.    JLI has advertised cost-savings calculators as part of its *Switch* campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (*i.e.*, a pack a day smoker is presumed to consume one JUUL pod a day). Defendants know that the calculator is misleading because smokers who switch to JUUL frequently increase their nicotine intake.

215.    JUUL labels and advertisements also marketed the product as an "alternative" to cigarettes:



216.    Other advertisements similarly marketed the product as smoking "evolved":

span.org/video/?c4811191/user-clip-wasserman-grothman-tlaib-question-monsees at 12:33-13:04.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO



217.   The goal of these advertisements was to convey the deceptive, misleading and false impression that JUUL products could help consumers quit smoking and break nicotine addiction in a way that was healthy and safe. But, as noted above, that was simply not the case. Defendants never disclosed to consumers that JUUL e-cigarettes and JUUL pods are at least as, if not more, addictive than combustible cigarettes. And each of JLI, the Management Defendants, and the Altria Defendants received data to this effect, as discussed above, and were aware of this fact.

218.   In addition, the notions that JUUL products are designed only for existing cigarette smokers, and safer than combustible cigarettes are belied by JLI's own knowledge, marketing plan and intentions on several fronts. *First*, Defendants sought to grow a new group of consumers of nicotine products (e.g., "vapers"), not just to market to the shrinking number of existing cigarette smokers. *Second,* JLI and Bowen designed the JUUL device to be easy to use for youth and others who have never smoked and to create and exacerbate nicotine addiction by encouraging ingestion of excessive amounts of nicotine. *Third,* as noted above, JLI's own internal testing revealed that JUUL products were often more potent than combustible cigarette smokers prefer. Each of the Management Defendants knew this from his position on JLI's Board of Directors, and the Altria Defendants knew the same when they began to actively coordinate with JLI and the Management Defendants. Despite this knowledge, these Defendants made numerous deceptive, false and misleading public statements that JUUL was intended to be a cessation device.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

219.    JUUL is not a product adults typically use to quit smoking. Researchers have found that as of 2018, only 7.9% of American adults had ever used USB shaped vape devices, like JUUL, and only 2% of adults currently used them.[223] And as mentioned above, youth were 16 times more likely to use the USB-shaped JUUL than adults.[224]

220.    JLI's own marketing research indicated that the JUUL was not appropriate as a cessation device for adults. In 2014, JLI when it was called Ploom hired the consumer research firm Tragon to do research with prototypes of the JUUL e-cigarette. On September 30, 2014, Lauren Collinsworth, a consumer researcher at Tragon, e-mailed Chelsea Kania, a marketing employee at Ploom, with some of the preliminary results from the studies. She stated that the testing showed that "the younger group is open to trying something new and liked J1 [the JUUL prototype] for being smart, new, techy, etc." [225] Ms. Collinsworth added that "The qualitative findings suggested *this product isn't going to fit as well with consumers who are looking to cut back on the cigarette intake*."[226] On October 1, 2014, Ms. Collinsworth followed up with additional comments. She stated that "[t]he delivery was almost too much for some smokers, especially those used to regular e-cigarettes."[227] The final results from this consumer research were distributed to upper management, including to then-CEO James Monsees[228] and then-Chief Marketing Officer Richard Mumby.[229]

221.    The deceptive, misleading and fraudulent nature of the "*Make the Switch*" campaign is evident when comparing the campaign's advertisements to JUUL's initial advertising, as demonstrated below. The fact that these advertisements are for the same product

---

[223] Kristy L. Marynak et al., *Use and Reasons for Use of Electronic Vapour Products Shaped like USB Flash Drivers Among a National Sample of Adults*, 28 TOBACCO CONTROL 685 (Nov. 2019), https://tobaccocontrol.bmj.com/content/28/6/685.

[224] D.M. Vallone et al., Prevalence and Correlates of JLI Use Among a National Sample of Youth and Young Adults, TOBACCO CONTROL (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

[225] JLI00365905.

[226] *Id.* (emphasis added).

[227] JLI00365709.

[228] JLI00364678.

[229] JLI00364487.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

confirms that, notwithstanding the advice JLI and the Altria Defendants received from their media consultants, the Defendants never intended to target only adult smokers.







And



AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

222.     Defendants ensured that JUUL was the *opposite* of a "tool[] to reduce or eliminate" nicotine consumption. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[230] As described above, JLI and Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

223.     The *Switch* campaign also does not disclose or warn about the risks of using multiple tobacco products, "dual use" or that the JUUL is not a smoking cessation product. In addition to the heightened risks of addiction that multiple tobacco product use poses, one recent study found that persons who use e-cigarettes and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that e-cigarettes and cigarettes generate individually.[231]

224.     The FDA and other government regulators, enforcing existing laws addressing e-cigarettes,[232] publicly criticized the "*Make the Switch*" campaign and other efforts by Defendants to depict JUUL as a smoking cessation device. Section 911(b)(2)(A)(i) of the Federal Food, Drug, and Cosmetics Act (FDCA) (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."[233]

---

[230] U.S. Dep't of Health & Human Servs.,  Nicotine Addiction: Past and Present, How Tobacco Smoke Causes Disease (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92

[231] Julie B. Wang  et al., *Cigarette and E-Cigarette Dual use and Risk of Cardiopulmonary Symptoms in the Health eHeart Study*, 13 PLoS ONE 1 (2018).

[232] Section 911(b)(2)(A)(i) of the FDCA (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."

[233] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

225.    In late 2019, and in response to the House of Representatives hearings in which JLI executives testified, the FDA issued two warning letters to JLI detailing its concern that JLI was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products" within the meaning of the FDCA.[234]

226.    Then, in its September 9, 2019 letter to JLI, the FDA notified JLI that its advertising slogans such as "99% safer," "much safer," and "a safer alternative" than cigarettes was "particularly concerning because [those] statements were made directly to children in school."[235] The FDA concluded that in using advertising language that e-cigarettes were safer than cigarettes, JLI had violated Sections 902(8) and 911 by marketing JUUL products as "modified risk tobacco products" without prior approval.[236]

227.    The September 9, 2019 letter also detailed the FDA's concerns with JLI's "*Switch*" marketing campaign. "[T]roubled by recent testimony" that JLI had given to the House Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, the FDA noted that JLI's *Switch* advertising campaign "may also convey that switching to JUUL is a safer alternative to cigarettes."[237]

228.    The FDA specifically highlighted the *Switch* campaign slogans which referenced smoking cigarettes, or attempts to quit smoking, followed by "*Make the Switch.*" The FDA stated that JLI's campaign was in violation of multiple FDA regulations and the FDCA subsections, and that JLI's *Switch* campaign purported to tell the public that using e-cigarettes was an alternative to smoking, or a possible cessation tool.[238]

229.    On the same day, the FDA requested that JLI provide all documents related to its decision to market the Switch campaign to the Cheyenne River Sioux Tribe, in light of the

---

[234] Letter from U.S. Food and Drug Admin. to Kevin Burns, CEO of JUUL Labs, Inc., (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[235] *Id.*

[236] *Id.*

[237] Letter from U.S. Food and Drug Admin. Ctr. for Tobacco Prods. to JUUL Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/media/130859/download.

[238] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

testimony by JLI that it had taken a "public health" approach to Native American tribes, and had sought healthcare professionals to refer Native American smokers to JLI's Switching Program.[239]

230.    Perhaps unsurprisingly, the *Make the Switch* campaign was spearheaded by a marketing firm with long-standing ties to the cigarette industry. In particular, it was led by a subsidiary of Omnicom Group, Inc., one of the "Big Four" advertising holding companies dominating marketing and communications worldwide since the 1990s, second only to WPP. Omnicom is the parent company of Mercury Public Affairs which, by at least April 2018, counted both Altria and JLI as its clients. Mercury lobbied for Altria on tobacco regulations,[240] and helped JLI push back against negative press coverage of youth usage of its products.[241]

### 5.    JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public About the Harms and Benefits of E-Cigarettes.

231.    Through a collective and parallel effort of funding, leadership, and board membership, JLI, the Altria Defendants and others in the e-cigarette industry leveraged third-parties, ranging from industry-funded non-governmental organizations to online blogs more accessible to youth**,** to mislead the public about the impacts of consuming e-cigarettes.

232.    An assortment of lobbyists, trade associations, and online publications have coordinated with the e-cigarette industry, including JLI and the Altria Defendants, to promote a consistent message that consuming e-cigarettes is not harmful, that nicotine is not harmful, and that the impacts of e-cigarettes are greatly exaggerated. These organizations receive funding from the e-cigarette industry, feature executives on those companies's boards of directors, and in return, promote industry products, industry views, or fund "independent" studies of their own that reach the same conclusions as e-cigarette industry-funded research.

---

[239] *Id.*

[240]   Kevin McCauley*, Altria Taps Mercury For Tobacco Regulation Work*, O'DWYER'S (Jun. 4, 2018), https://www.odwyerpr.com/story/public/10754/2018-06-04/altria-taps-mercury-for-tobacco-regulation-work.html.

[241] *See, e.g.,* INREJUUL_00262168; INREJUUL_00262226-INREJUUL_00262227.

1

### a)   The American Vaping Association

2      233.    The American Vaping Association ("AVA") is a pro-e-cigarette lobby group

3   founded by Greg Conley, who notably publishes articles criticizing the CDC for its stance on

4   restricting e-cigarette use.[242] Other executive members of the AVA possess business interests in

5   e-cigarettes; for example, Treasurer David J. Danzak Jr. is associated with an e-cigarette

6   business called Vapornine LLC.[243] Vice-President Antoinette Lanza is an owner of an

7   exclusively e-cigarette shop in Hoboken, New Jersey called Smokeless Image.[244] Half of the

8   AVA's functional expenses are for lobbying efforts.[245] It lists several sponsors, all of which are

9   e-cigarette, e-liquid, or cigarette companies.[246]

10      234.    Conley has a prolific social media presence and frequently appears on television

11   and radio to tout the benefits of consuming e-cigarettes and dispute negative news. The AVA

12   website lists "studies" which are uniformly authored by noted industry-funded or industry-

13   friendly authors, such as Polosa and Shahab.[247] AVA lists CASAA, Not Blowing Smoke, and

14   the VTA, all established fronts for the e-cigarette industry, as "Resources."

15      235.    The AVA receives its funding from sponsors, who are organized into tiers such

16   as Platinum, Gold, Silver, Bronze, and Green.[248] Current advertised sponsors include e-cigarette

17   distributors and retailers such as E-Cigarette Empire, and VaporBeast.[249] Prior sponsors are a

18   who's who of e-cigarette retailers. In 2016, Platinum sponsors included AltSmoke and Vapor

19

20   [242] Jeff Stier & George Conley, *The War on E-Cigarettes*, NATIONAL REVIEW (Sept. 19, 2011),
     https://www.nationalreview.com/2011/09/war-e-cigarettes-jeff-stier-gregory-conley/.

21   [243] Vapornine LLC, BUZZFILE, http://www.buzzfile.com/business/Vapornine-LLC-904-372-
22   3244 (business information page).

23   [244] Stacy Jones, *Tobacco Regulators Mull More Oversight as E-cigarettes See Increased
     Popularity*, NJ.com (Mar. 30, 2019),
24   https://www.nj.com/business/2013/07/tobacco_regulators_mull_more_o.html.

25   [245] Form 990, American Vaping Association Inc.'s Return of Organization Exempt from
     Income Tax ( 2018),
26   https://apps.irs.gov/pub/epostcard/cor/464203951_201812_990O_2019122716980021.pdf.

     [246] AVA Sponsors, American Vaping Association, https://vaping.org/about-us/ava-sponsors/.
27   [247] Research Reports, American Vaping Association, https://vaping.org/research-report/.
     [248] AVA Sponsors, American Vaping Association, https://vaping.org/about-us/ava-sponsors/ .
28   [249] *Id*.

1    Kings, while Gold sponsors included the now defunct Smokeless Image.[250]

2          236.   On social media, the AVA regularly downplays the risks of consuming e-

3    cigarettes, criticizes negative coverage as myths or exaggerations, and lauds efforts to curb any

4    regulation of the e-cigarette industry.[251]

5          237.   JLI actively sought out the AVA to promote JUUL. In January 2016, e-mails

6    between employees at JLI (then known as PAX) discussed a "list of thought leaders [JLI] can

7    tap for stories for JUUL" which included Conley at the AVA and Satel.[252]

8          238.   In 2018, JLI took advantage of its coordinated efforts with the AVA to downplay

9    the risks associated with JUUL. In an e-mail exchange between Christine Castro of JLI and a

10   "Stratcomms" internal mailing list, Castro lamented a "testy conversation" with a USA Today

11   reporter who pointed out that JLI's marketing and advertising appeared to feature and target

12   minors and teenagers.[253] Castro noted that "I hit back at [the reporter] very aggressively but we

13   can expect the usual B.S. Greg Conley is being allowed to write a 300-word rebuttal. I will

14   email him and copy you Ashley [JLI employee] just so we can stay coordinated."[254]

15         239.   The AVA also coordinated with JLI on pro-e-cigarette research. In March 2018,

16   Conley facilitated a conversation between Dr. Konstantinos Farsalinos, a researcher at the

17   University of Patras, Greece, who regularly publishes e-cigarette industry-friendly articles, and

18   Gal Cohen, then Director of Scientific Affairs at JLI.[255] In the e-mail, Conley asks Farsalinos to

19   send Cohen "some info on your flavor study" to which Farsalinos responds by sending Conley

20   and Cohen an attachment: "USA FLAVORS SURVEY.pptx" and the note: "[A]ttached is a

---

[250] AVA Sponsors, American Vaping Association, Wayback Machine – Internet Archive (Aug. 14, 2017), https://web.archive.org/web/20170814221226/http://vaping.org/about-us/ava-sponsors/.

[251] American Vaping Association (@AVABoard), Twitter, https://twitter.com/AVABoard.

[252] INREJUUL_00278889

[253] *See* INREJUUL_00173252 (Apr. 4, 2018 email).

[254] *Id*.

[255] Juul Labs, Inc*., JUUL Labs Presents Findings at the Global Forum on Nicotine 2018,* Cision PR Newswire (June 15, 2018) , https://www.prnewswire.com/news-releases/juul-labs-presents-findings-at-the-global-forum-on-nicotine-2018-300666743.html.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                         Case No. 19-md-02913-WHO

powerpoint presentation about the study we proposed."[256]

240.   The proposed study was a survey aimed at determining what flavors different demographic groups preferred as e-cigarette flavors, which flavors they use frequently, and which flavors they used when they first started consuming e-cigarettes. While the study was purportedly to determine the impact of e-cigarette flavors on e-cigarette and smoking behavior, the data obtained from such a study would have allowed JLI to understand which flavors were not only the most popular, but which flavors were most popular by demographic.[257]

### b)   Vaping360

241.   Vaping360 is a website dedicated to news regarding the e-cigarette industry. The website boasts "40 million smokers and vaping enthusiasts reached since 2015." This entity has a big social media presence and huge publication strategy.

242.   Vaping360's main message misleads the public about the health impacts of consuming e-cigarettes. Vaping360 has published various articles, including "10 Lies and Myths About Juuling Exposed."[258] This article, published in May 9, 2018, claimed, among other things, that JUUL was not as dangerous as smoking; JUUL did not cause cancer or "popcorn lung"; JUUL was not popular among teenagers, nor did JLI sell kid-friendly flavors or flavors aimed to entice young people; and the nicotine in JUUL is "a relatively mild drug, [and] may cause dependence."[259]

243.   Vaping360 regularly published articles praising, promoting, or downplaying the risks of JUUL, including, among others: "These Scientists Want to Kill Smokers' Hope (For Vaping)"; "UK Scientists to WHO: Your Vape Report Is Junk"; "One Free Pack JUUL Coupon Codes 2019"; and an article disparaging anti-smoking advocacy group Truth Initiative by

---

[256] INREJUUL_0034128.

[257] *Id.*

[258] Jim McDonald, *10 Lies and Myths About Juuling Exposed*, Vaping 360 (May 9, 2018), https://vaping360.com/lifestyle/juuling/.

[259] *Id.*

claiming that "Truth Initiative Promo Encourages Risky Teen Behavior."[260]

244.    One of the main writers at Vaping360 is Jim McDonald who aggressively attacks any negative science as fake news. For example, McDonald frequently posts on social media platforms, including on Facebook and Twitter, but also comments on others posts extensively disputing negative news about consuming e-cigarettes.[261]

245.    Vaping360 has taken funding from e-cigarette manufacturers, and in return coordinates with e-cigarette manufacturers to promote their products, while publishing favorable content. Vaping360 was paid by JLI for advertising, and was given kickbacks (referred to as commission) for every coupon used for JUUL that originated from Vaping 360's website.

246.    In March 2017, JLI (then PAX) communicated with Chris Kendell and others at Vaping360 to discuss promoting JLI's products with a 15% discount coupon on Vaping360's website.[262] JLI representative Andy Martin also noted that JLI "figured out the commission issue," and expressed excitement at JLI's new mango flavor JUUL pod.[263] They also discussed a Facebook advertising link whereby Vaping360 could offer similar discounts for JLI products on social media.[264]

247.    In November 2017, Martin of JLI and Rawad Nassif of Vaping360 discussed a meeting agenda, with topics such as "new affiliate commission terms," "JLI funnelling [sic] project," and "exploring further opportunities."[265]

---

[260] Jim McDonald, *Truth Initiative Promo Encourages Risky Teen Behavior*, Vaping 360 (Jan. 9, 2020), https://vaping360.com/vape-news/87705/truth-initiative-promo-encourages-risky-teen-behavior/.

[261] Jim McDonald, *Mass. Senate Passes Worst Vaping Law in the Countr*, Vaping 360 (Nov. 21, 2019)*,* https://vaping360.com/vape-news/86852/mass-senate-passes-worst-vaping-law-in-the-country/; Jim McDonald, *Meet the Rich Moms Who Want to Ban Vaping,* Vaping 360 (Oct. 8, 2018), https://vaping360.com/vape-news/71696/meet-the-rich-moms-who-want-to-ban-vaping/.

[262] INREJUUL_00143870.

[263] *Id.*

[264] *Id.*

[265] INREJUUL_00139196

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

248.   In 2018, McDonald continued to write articles specifically praising JLI, such as "Coming Soon: A JUUL to Help You Quit JUULing" and "10 Lies and Myths About JUULing Exposed."[266] As of 2020, Vaping360 continues to offer discounts for JUUL products.[267]

c)   **Foundation for a Smoke-Free World**

249.   The Foundation was founded in 2017, and presents itself as a public health organization, purportedly "advancing global progress in smoking cessation and harm reduction."[268] It is funded entirely by Philip Morris International, which in 2017 announced a $1 billion commitment to fund the Foundation.[269] The Foundation's 2018 Form 990 lists only one donor: PMI Global Services, Inc., or Philip Morris International, with a contribution of $80 million.[270]

250.   The Foundation is headed by Derek Yach, a noted advocate and promoter of e-cigarettes and consuming e-cigarettes.[271]

251.   In 2018, the Foundation announced that it would support Centers of Excellence to conduct tobacco control research.[272] This tactic is a well-known tool of the cigarette industry, which has a history of funding "research" centers to promote industry-friendly views, such as the Center for Indoor Air Research, which promulgated industry-funded studies that sowed doubt about the addictiveness of nicotine, claimed that indoor air quality was unaffected by

---

[266] Jim McDonald, *Coming Soon: A JUUL to Help You Quit Juuling,* Vaping 360 (Sept. 7, 2018), https://vaping360.com/vape-news/70262/coming-soon-a-juul-to-help-you-quit-juuling/.

[267] [One FREE Pack] JUUL Coupon Codes 2019, Vaping 360 (Aug. 24, 2018) https://vaping360.com/vape-coupons/juul-coupon-promo-code/.

[268] Foundation for a Smoke-Free World (2020), https://www.smokefreeworld.org/.

[269] David Meyer, *Philip Morris Pledges Almost $1 Billion to Anti-Smoking Fight*, FORTUNE (Sept. 13, 2017), https://www.webcitation.org/6tjyBv4dA.

[270] Return of Private Foundation, Foundation for a Smoke-Free World (2018), https://web.archive.org/web/20190828104138/https://www.smokefreeworld.org/sites/default/files/uploads/documents/fsfw_2018_form_990-pf_public_inspection.pdf.

[271] *Derek Yach: Anti-smoking Advocates Should Embrace E-cigarettes*, NATIONAL POST (Aug. 26, 2015), https://nationalpost.com/opinion/derek-yach-anti-smoking-advocates-should-embrace-e-cigarettes.

[272] Support Global Research, Foundation for a Smoke-Free World (May 31, 2018), https://web.archive.org/web/20180531105105/https://www.smokefreeworld.org/our-areas-focus/support-global-research.

cigarette smoke and downplayed the harms of cigarettes broadly. Institutes such as the Center for Indoor Air Research were forced to dissolve as part of the Master Settlement Agreement in 1998.

252.    A 2017 report in The Verge detailed the e-cigarette industry's apparently coordinated efforts to use biased research to downplay the risks of consuming e-cigarettes.[273] For example, e-cigarette manufacturers routinely conduct studies focusing on the "good news" about e-cigarettes, *i.e.* they release less harmful aerosolized chemicals than combustible cigarettes, or that their aerosol lingers for less time indoors than combustible cigarettes.[274] Industry-funded authors then regularly cite to each other's studies in their own research.[275] On information and belief, JLI and Altria, among others in the e-cigarette industry, funnel their industry-funded studies to friendly pro-industry groups knowing that those entities will misrepresent the results as evidence that e-cigarettes are safe, or not harmful.

d)    **Vapor Technology Association**

253.    The Vapor Technology Association (VTA) bills itself as a trade association and advocates for the e-cigarette industry. It was founded in January 2016, with the banner tagline

---

[273] Liza Gross, *Vaping Companies are Using the Same Old Tricks as Big Tobacco*, THE VERGE (Nov. 16, 2017), https://www.theverge.com/2017/11/16/16658358/vape-lobby-vaping-health-risks-nicotine-big-tobacco-marketing.

[274] *See, e.g.*, J. Margham, et al., *Chemical Composition of Aerosol from an E-Cigarette: A Quantitative Comparison with Cigarette Smoke*, 29 CHEM. RES. TOXICOL. 1662 (2016); Tanvir Walele et al., *Evaluation of the Safety Profile of an Electronic Vapour Product Used for Two Years by Smokers in a Real-life Setting*, 92 REG. TOXICOL. PHARMACOL. 226 (2018); D. Martuzevicius, et al., *Characterization of the Spatial and Temporal Dispersion Differences Between Exhaled E-Cigarette Mist and Cigarette Smoke*, 21 NICOTINE & TOBACCO RES. 1371 (2019).

[275] *See, e.g.*, Gene Gillman et al., *Determining the Impact of Flavored E-liquids on Aldehyde Production During Vaping*, 112 REG. TOXICOL. PHARMACOL. 1 (2020); Colin Mendelsohn & Alex Wodak, *Legalising Vaping in Australia*, The McKell Institute (March 2019), https://pdfs.semanticscholar.org/3e13/8e46419913a29f8fc9ddad52ec771f73fa76.pdf; Violeta Kaunelienė et al., *Impact of Using a Tobacco Heating System (THS) on Indoor Air Quality in a Nightclub*, 19 AEROSOL AND AIR QUAL. RES. 1961 (2019); Maya Mitova et al., *Human Chemical Signature: Investigation on the Influence of Human Presence and Selected Activities on Concentrations of Airborne Constituents*, 257 ENV'TL POLLUTION 1 (2020).

on its website reading "VAPE IS HOPE."[276]

254.    In 2018, JLI, SMOK, VMR, Turning Point Brands, and Joyetech were all featured as "Platinum Members," a level of memebership that required a $100,000 annual contribution. Thus, JLI paid VTA $100,000 in 2018 to become a Platinum Member, and in return, VTA offered JLI a board seat; invitations to lobbying strategy meetings; access to the FDA, other federal agencies, and members of Congress; and conference participation.[277]

255.    The VTA, like other lobbying and trade association groups in the industry, advocates for less regulation of e-cigarettes, and testifies in opposition to flavor bans.[278]

### f)    Retailer Lobbying

256.    Retailers have also taken to creating subsidiaries or wholly owned companies whose purpose is to produce quasi-journalistic content to promote consuming e-cigarettes, discredit health initiatives, and suggest that consuming e-cigarettes has no harmful health impacts. The best example of this is the website SoupWire, which publishes articles and editorials that promote consuming e-cigarettes and criticizes studies that look at the negative impacts of consuming e-cigarettes.[279] For example, when JLI donated $7.5 million towards a study on the impacts of consuming e-cigarettes on teens, a SoupWire report concluded that the study will likely find "nothing Earth-shattering."[280]

### 6.    Altria Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to JLI

257.    Altria's announcement that it intended to invest in JLI came less than two months after it told the FDA that Altria "believe[s] that pod-based products significantly

---

[276] Vape is Hope, Vapor Technology Association (Feb. 25, 2016),
https://web.archive.org/web/20160225154600/http://www.vaportechnology.org:80/

[277] Some of Our Members, Vapor Technology Association  (Nov. 28, 2018),
https://web.archive.org/web/20181128162940/https://vaportechnology.org/membership/

[278] Vapor Technology Association, https://vaportechnology.org/.

[279] Soupwire – The Truth About Vaping, https://soupwire.com/.

[280] Jeff Hawkins, *JUUL Donates $7.5 Million to Teen Vaping Study*, Soupwire – The Truth About Vaping (July 2, 2019), https://soupwire.com/juul-donates-7-5-million-to-teen-vaping-study/

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

contribute to the rise in youth use of e-vapor products" and that it accordingly would be removing its own pod-based products from the market.[281] Altria made the same representations to its investors.[282]

258.    Although Altria claimed its investment in JLI had an altruistic motive—" When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders," Altria recently confirmed that JLI has not even availed itself of that experience.[283] In Altria's October 2019 letter to Senator Dick Durbin, Altria CEO Howard Willard acknowledged that while Altria "offered to JUUL services relating to underage prevention efforts," to date "JUUL has not accepted Altria's offers of assistance in addressing underage vaping relating issues."[284] Willard has stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."[285] but as Altria knew, as reflected in its letter to the FDA just two months prior, that mission involved had resulted in usage throughout the youth market. Altira's admission that pod-based products contributed to underage use show that Altria knew its investment in JLI would "strengthen[] its financial profile and enhance[] future growth prospects" specifically because JLI dominated the youth market for e-cigarettes.[286]

---

[281] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018)
[282] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript, (October 25, 2018) https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx
[283] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018. (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx
[284] Letter from Howard A. Willard III to Senator Richard J. Durbin (October 14, 2019) (emphasis added).
[285] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, Business Wire (Dec. 20, 2018, 7:00 AM EST), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.
[286] Press Release, *Altria Makes $12.8 Billion Minority Investment In Juul To Accelerate Harm Reduction And Drive Growth*, Altria (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

259.    Altria recognized JLI's market share dominance in the e-cigarette market as the path to Altria's continued viability and profitability. In a January 31, 2019 earnings call, Altria explained that "[w]hen you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders. We are excited about JUUL's domestic growth and international prospects and their potential impact on our investment."[287] JUUL's growth was, as Altria well knew, due to the product's viral popularity among teens. Willard briefly acknowledged the youth vaping crisis, stating, "Briefly touching on the regulatory environment, the FDA and many others are concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue that we and others in the industry must continue to address aggressively and promptly.[288]

260.    Altria's representations that it intended to help JUUL curb the prevalence of underage use was false and misleading. As discussed below, Altria coordinated with JUUL to capture and maintain the youth market.

### E.    Defendants Targeted the Youth Market

261.    Having created a product, like combustible cigarettes, that sought to get users addicted to nicotine, and while taking steps to ensure that consumers and regulators did not appreciate the true nicotine content or potential harm from using JUULs, to successfully sink their high-tech nicotine hook into American consumers, JLI, Bowen, and Monsees needed investors willing to adopt the tactics of the cigarette industry as their own. They found those investors in Pritzker, Huh, and Valani.

262.    Under the leadership of the Management Defendants, JLI marketed nicotine to kids. JLI and the Management Defendants deployed a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages to ensure their uptake

---

[287] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018 (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.
[288] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

and distribution among young consumers. JLI and the Management Defendants' campaign was wildly successful—burying their hook into kids and initiating a public health crisis.

### 1.    JLI Emulated the Marketing of Cigarette Companies.

263.    As Defendants know, nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.[289] The overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation."[290]

264.    Struggling to define their own identities, teenagers are particularly vulnerable to image-heavy advertisements that psychologically cue them on the "right" way to look and behave amongst peers.[291] Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation.[292]

265.    For decades, cigarette companies spun smoking as signifier of adulthood. This turned smoking into a way for teenagers to project independence and enhance their image among their peers.[293]

266.    Youth marketing was critical to the success of cigarette companies. In the 1950s, Philip Morris—now JUUL's corporate affiliate—intentionally marketed cigarettes to young people as a pool from which to "replace smokers" to ensure the economic future of the cigarette industry.[294]

267.    Philip Morris's documents set out their youth strategy, explaining: "Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers

---

[289] U.S. Dep't Health & Human Servs., *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet*, https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth-tobacco-use-factsheet/index.html.

[290] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006) (J. Kessler).

[291] *Id.* at 578.

[292] *Id.* at 570, 590

[293] *Id.* at 1072.

[294] *United States. v. Philip Morris*, No. 99- 2496 (D.D.C. Aug. 17, 2006), ECF No. 5750 at 972 (Amended Final Opinion).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

first begin to smoke while still in their teens".[295]

268.    It wasn't just Philip Morris. The strategy of hooking kids was an open secret in the cigarette industry.[296]

269.    As detailed below, JLI and the Management Defendants sought to emulate this approach. Indeed, Monsees admitted to using historical cigarette ads to inform JLI's own advertising campaign.[297]

270.    The emulation is obvious. A side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.[298]

---

[295] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

[296] C.A. Tucker, *Marketing Plans Presentation to RJRI B of D* at 2, U.C.S.F. Truth Tobacco Industry Documents (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (RJ Reynolds executive explaining that the "young adult . . . market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years.").

[297] Matthew Perone & Richard Lardner, *Juul exec: Never intended electronic cigarette for teens*, AP News (July 26, 2019), https://apnews.com/4b615e5fc9a042498c619d674ed0dc33; Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees (last visited Apr. 3, 2020).

[298] *See* Appendix B, Ads 9-50.





271.    JLI and the Management Defendants deployed this same strategy, but adapted it to modern advertising tactics.

**2.      The Management Defendants Intentionally Marketed JUUL to Young People.**

272.    The risk that children would use a new e-cigarette product was well known and well publicized in the months leading up to the launch of the JUUL e-cigarette. For example, in

April 2015, the CDC published the results from its 2014 National Youth Tobacco Survey.[299] The CDC found that "[i]n 2014, e-cigarettes were the most commonly used tobacco product among middle (3.9%) and high (13.4%) school students."[300] Moreover, "[b]etween 2011 and 2014, statistically significant increases were observed among these students for current use of both e-cigarettes and hookahs (p<0.05), while decreases were observed for current use of more traditional products, such as cigarettes and cigars, resulting in no change in overall tobacco use."[301] The CDC blamed e-cigarette marketing, the use of "a mixture of 'sex, free samples, [and] flavors'the same things that were originally found to be problematic with cigarette ads."[302]

273.   Seeking to enter this nascent youth market for e-cigarettes, JLI intentionally targeted youth from its inception. In March 2015, Management Defendants supervised the advertising campaigns that would accompany the launch of JUUL.

274.   Consistent with Monsees' position that he has no "qualms" with marketing to people that were not yet addicted to nicotine,[303] JLI's marketing strategy targeted people that were "flavor-seeking, social 'vapers,'" and those who "have very limited experience with traditional tobacco cigarettes."[304]

275.   JLI's first major marketing hire, Cult Collective Ltd. ("Cult Collective"), presented a pitch deck to JLI in late 2014, which defined the "target consumer" as a person "within a life stage or mindset where they are defining their own identity."[305] The study

---

[299] Centers for Disease Control and Prevention, *Tobacco Use Among Middle and High School Students — United States, 2011–2014*, Morbidity and Mortality Weekly Report (MMWR) 64(14);381-385 (Apr. 17, 2015), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a3.htm.

[300] *Id*.

[301] *Id*.

[302] Jacob Kastrenakes, *More teens are vaping instead of smoking,* The Verge (Apr. 16, 2015), https://www.theverge.com/2015/4/16/8429639/teen-ecigarette-use-triples-vaping-beats-smoking.

[303] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html (last visited Apr. 4, 2020).

[304] INREJUUL_00441209.

[305] INREJUUL_00057298-INREJUUL_00057487.

1   described the "modern vaper" as "trendy, sophisticated image managers seeking to balance their

2   desire for originality against acceptance."[306] Put differently, their target consumer was an

3   adolescent.

4   276.   JLI professedly wanted kids to think JUUL was cool. In an email dated January

5   29, 2015, Sarah Richardson—then Director of Communications—sent a document dated

6   December 31, 2014, to Dima Martirosyan, Director of Digital Marketing, who forwarded it to

7   Rafael Burde, Director of Ecommerce.[307] The document stated that "[m]ost e-cigarettes to date

8   are unsatisfying and seem 'douche-y'. The JUUL product delivers nicotine far more effectively,

9   and the product design is elegant and cool. We need to tell this story in a credible fashion

10  through press, influencers and social media."[308] The document repeatedly referred to Pax Labs's

11  plan to target the "cool kids[.]"[309] For example, it described as one of the "Key needs" to

12  "Establish premium positioning to entice the 'masses' to follow the trend setters; own the 'early

13  adopter' / 'cool kid' equity as we build out volume[.]"[310] The document noted that "the voices

14  of influencers can build strong demand."[311] Messaging to media similarly focused on "coolness"

15  and the message that "JUUL singlehandedly made e-cigarettes cool."[312]

16  277.   This focus on "cool kids" continued up to and after launch. On May 18, 2015,

17  Kate Morgan, field marketing manager, emailed Richard Mumby, Chief Marketing Officer, and

18  a variety of other marketing employees about "Some Music Options for JUUL Party" and noted

19  that one of the options was a pair who were both "cool kids."[313] On June 7, 2015, Rafael Burde

20  emailed Scott Dunlap, then Chief Operating Officer, stating that the JUUL launch party "was a

21  resounding success (at least in my mind) in terms of winning over the cool kids . . . ."[314] Pax

22

23  [306] INREJUUL_00057298-INREJUUL_00057487.

24  [307] INREJUUL_00057289.

     [308] INREJUUL_00057293.

25  [309] Id.

26  [310] Id.

     [311] Id.

27  [312] INREJUUL_00441325-INREJUUL_00441326.

     [313] JLI00218598.

28  [314] JLI00206206.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                               Case No. 19-md-02913-WHO

Labs employees used similar wording regarding interest in targeting "cool kids" in an email from Sarah Richardson on August 12, 2015,[315] and emails from Ashley Marand on September 15, 2015,[316] and October 21, 2015.[317] The consistency of the language around this target demographic confirms that marketing to "cool kids" was a company policy set by the executives and the Board, particularly because, before selling the Ploom assets to JTI, James Monsees said similar things about Ploom.[318]

278.    JLI identified its competitor in this space as cigarette companies, complaining that "cigarettes continue to own the 'cool' equity," and identifying a "key pillar to go-to-market" as "win[ning] with the 'cool crowd'" away from cigarettes.[319]

279.    With this goal in mind, JLI hired the Grit Creative Group ("Grit"), which billed itself as an agency whose marketing appealed to "cool kids."[320] Grit helped JLI to "use external audiences to communicate nuanced messages around early adoption 'coolness' and product performance."[321]

280.    In short order, the phrase "it's cool to JUUL" became an anthem among kids while youth e-cigarette use skyrocketed.

### 3.    JLI Advertising Exploited Young People's Psychological Vulnerabilities.

281.    Informed by decades of tobacco marketing, JLI ran a consistent, simple message: JUUL is used by young, popular, attractive, and stylish people.

282.    This was not the only marketing scheme JLI could have adopted. JLI had other options. In 2014, JLI engaged a Calgary-based advertising agency, Cult Collective, to complete a "diagnostic" evaluation of the JUUL brand and to make recommendations regarding the best

---

[315] JLI00222528.

[316] JLI00461564.

[317] JLI00235965.

[318] JLI00514343 (describing Ploom as "providing optionality for distribution growth and consumer outreach to a younger, opinion leading audience").

[319] INREJUUL_00161703-INREJUUL_00161715.

[320] *Id.*

[321] INREJUUL_00277080-INREJUUL_00277104.

advertising strategy to market the JUUL e-cigarette.

283.    In keeping with typical e-cigarette marketing, which messaged to existing smokers looking to quit, Cult Collective recommended that JUUL position its e-cigarette technology as the focus of its advertisements. Cult Collective presented JUUL with exemplar advertisements that used images of a boom box and a joy stick, juxtaposed against the JUUL e-cigarette, with the tag line: "Everything changes. JUUL the evoluution of smoking."



284.    This campaign expressly invokes combustible cigarettes and positions the JUUL as a technological upgrade for the modern smoker.

285.    JLI rejected this approach.

286.    Instead, in June of 2015, JLI launched the "Vaporized" advertising campaign.[322] The express mission of the Vaporized campaign was to "own the 'early adopter'/'cool kid' equity."[323]

287.    Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models, bold colors, and highlighted themes of sexual

---

[322] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.
[323] INREJUUL_00057291-INREJUUL_00057295.

attractiveness, thinness, independence, rebelliousness and being "cool."[324]

288.    The targeting of young consumers was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teen than mature adults."[325]



[324] *See* Appendix B, Advertisement 1 (example of targeting of young people).

[325] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

1
2
3
4
5
6
7
8
9



10      289.    In the months leading up to the launch of JUUL e-cigarettes, Pax Labs

11  executives and directors discussed how to market the new product. On March 23, 2015,[326] there

12  was a meeting of the Board of Directors where the upcoming advertising campaign was

13  discussed.[327] According to Chelsea Kania, then Brand Manager at Pax Labs, at this meeting,

14  "there was some commentary at the youthfulness of the models[,]" but "nobody disliked them"

15  and "everybody agreed they are pretty 'effective[.]'"[328] The Management Defendants knew that

16  the ads targeted youth, but "Juul's board of directors signed off on the company's launch

17  plans[.]"[329] In addition, "Monsees, who was CEO at the time, personally reviewed images from

18  the billboard photo shoot while it was in session."[330] A senior manager later told the New York

19  Times that "he and others in the company were well aware" that the marketing campaign "could

20
21
22

23  [326] INREJUUL_00371285.
    [327] INREJUUL_00371314.
24  [328] INREJUUL_00174387.

25  [329] Ainsley Harris, *How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also*
26  *hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?,* Fast Company (Nov. 19, 2018),
27  https://www.fastcompany.com/90262821/how-juul-founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018.
28  [330] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                                     Case No. 19-md-02913-WHO

1   appeal to" teenagers.[331]

2   290.   As part of the Vaporized campaign, JLI advertised on a 12-panel display over

3   Times Square.[332] Billboard advertising of cigarettes has for years been unlawful under the

4   Master Settlement Agreement.



291.   These ads, which ran for nearly a month, generated an estimated 1.5 million

impressions per day.[333]

292.   In fact, JLI's Vaporized campaign was so effective that it gained national

attention on an October 15th, 2015 episode of Late Night with Stephen Colbert, who ridiculed

the notion that the young, dancing models were consistent with a target market of adult

smokers. As Colbert joked after viewing the close-up video of young models dancing in place,

"[y]eah! There is something about vaping that just makes me want to dance in a way that

[331] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[332] *See* Appendix B, image 14; *see also* https://inrejuul.myportfolio.com (also available at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_ mt068.php) (last visited April 3, 2020) (additional images and videos).

[333] INREJUUL_00093933-INREJUUL_00093934.

doesn't require much lung strength. . . . And it's not just ads featuring hip young triangles that appeal to the youths. . . . There is no reason to worry about the long-term effects of vaping, because e-cigarettes are so new that their long-term effects are still unknown."[334]

293.   The Vaporized campaign was not limited to the Times Square billboards however.  The ads were also placed in nationally-distributed magazines, and the videos were displayed on screens at the top of point-of-sale JUUL kiosks provided by JUUL to retailers across the country.

294.   To the extent that the Vaporized advertisements disclosed that JUUL contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, cigarette advertisements, are required to display a health warning in high contrast black and white, covering 20% of the image.

295.   Likewise, JLI's social media ads did not disclose any health risks of using JUUL until May of 2018, when they were required to warn of addiction. But even then, JUUL placed these warnings in areas that were only viewable if the social media user clicked on the "full version" of the JLI post, which is not how teens typically engage with social media advertising.[335] Notably, on Twitter, a social media platform that is geared towards reading text, and on Facebook, where some users do read text, JLI typically did not include the disclaimer in its advertisements at all.[336]

### 4.   JLI Pushed the Vaporized Campaign Into Youth Targeted Channels.

#### a.   JLI Placed Its Vaporized Ads on Youth Oriented Websites and Media.

296.   JLI engaged programmatic media buyers to place advertisements on websites attractive to children, adolescents in middle school and high school, and underage college

---

[334] *The Late Show With Stephen Colbert*: *Vaping is So Hot Right Now*, YouTube (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM.

[335] *Se* Appendix B, Advertisement 3.

[336] *See* Appendix B, Advertisement 65; *see also* Juul Image Galleries (2015-2018) SRITA Collection, https://inrejuul.myportfolio.com/twitter-1 (last visited Apr. 3, 2020).

students. These advertisements, which included the images of models from the Vaporized campaign, began appearing on websites as early as June 2015. The chosen websites included: nickjr.com (the website for a children's television network run by Nickelodeon Group); the Cartoon Network's website at cartoonnetwork.com; allfreekidscrafts.com; hellokids.com; and kidsgameheroes.com.

297.    A picture of the homepage of nickjr.com is below:



298.    JLI also purchased banner advertisements on websites providing games targeted to younger girls,[337] educational websites for middle school and high school students,[338] and other teen-targeted websites.[339]

299.    JLI knew what it was doing. In May 2015, Chelsea Kania contacted Cult Collective to raise concerns about advertising on younghollywood.com. Kania explained that the website's demographics are "age 12-34 . . . and *weighing the % who could actually afford JUUL against the risk we'd run being flagged for advertising on that site* – I don't think we

---

[337] The sites included dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlgames.com, and girlsgogames.com.

[338] *E.g.,* coolmath-games.com. JUUL also purchased advertisements on basic-mathematics.com, coolmath.com, math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, and purplemath.com.

[339] *E.g.*, teen.com, seventeen.com, justjaredjr.com, and hireteen.com. JUUL purchased advertisements on websites for high school students hoping to attend college such as collegeconfidential.com and collegeview.com.

should do it."[340] Nevertheless, JLI continued to push its campaign on websites with young demographics.

300.    JLI promoted the Vaporized campaign on Facebook, Instagram, and Twitter.

301.    JLI could have employed age-gating on its social media accounts to prevent underage consumers from viewing its Vaporized advertisements, but chose not to do so.

302.    The Vaporized campaign included the largest e-cigarette smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year.

303.    JLI promoted Vaporized through Vice Magazine, which bills itself as the "#1 youth media brand" in the world.[341]



304.    By 2016, an estimated 20.5 million U.S. middle and high school students were exposed to advertisements for e-cigarettes, including JUUL.[342]

**b.      JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience.**

305.    JLI used "influencers" to push their product to young people. Influencers are

---

[340] INREJUUL_00082179-INREJUUL_00082185.

[341] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

[342] Kristy Marynak et al., *Exposure to Electronic Cigarette Advertising Among Middle and High School Students – United States, 2014-2016*, CDC: Morbidity and Mortality Weekly Report (Mar. 16, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a3.htm.

"high-social net worth" individuals who have developed large social media followings—*i.e.*, the "cool kids" of the social media world.[343] Influencers are prized sources of brand promotion on social media networks.

306.   Like its Vaporized campaign, JLI's influencer strategy was youth-focused, with the stated aim of "show[ing] that the tastemakers, cool kids and early adopters who consume tobacco use JUUL."[344] In keeping with this strategy, JLI targeted influencers that were young and popular with adolescents. One influencer JLI targeted was Tavi Gevinson, who was nineteen years old in the summer of 2015. The year before, Rolling Stone magazine described Gevinson as "possibly the most influential 18-year-old in America."[345]

307.   JLI contracted with Grit to enlist influencers by sending them free JUUL e-cigarettes. Grit provided free JUULs to Luka Sabbat, known as the "the Internet's Coolest Teenager,"[346] who was 17 years old during the summer of 2015.

308.   Grit targeted celebrities with large numbers of underage fans, including Miley Cyrus, former star of "Hannah Montana," a series that aired for four seasons on the Disney Channel and won eight Teen Choice Awards.[347]

309.   JLI encouraged its distributors, wholesalers, and other resellers—either explicitly or implicitly— to hire affiliates and influencers to promote JLI's brand and products. Even if not paid directly by JLI, these influencers profited from the promotion of JUUL products either because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-

---

[343] *See* INREJUUL_00091138 (Aug. 26, 2015 "JLI Influencer Program" defining an influencer as "individuals who have strong influence over their audience. We are aiming for influencers in popular culture with large audiences in various sectors such as music, movies, social, pop media, etc.").

[344] INREJUUL_00057293.

[345] Alex Morris, *Tavi Gevinson: A Power Teen's New Direction*, Rolling Stone (Aug. 14, 2014), https://www.rollingstone.com/culture/culture-features/tavi-gevinson-a-power-teens-new-direction-232286/.

[346] Alexis Barnett, *Who Is Luka Sabbat? Meet the Internet's Coolest Teenager*, Complex (Aug. 17, 2015), https://www.complex.com/style/luka-sabbat-interview-on-youth-kanye-west-and-fashion.

[347] *See*, INREJUUL_00091141 (Aug. 26, 2015 "JLI Influencer Seeding Chart" provided by Grit listing various celebrities and influencers, including Miley Cyrus.).

compatible products.

310.    For example, one YouTube user Donnysmokes (Donny Karle, age twenty-one) created a JUUL promotional video in 2017 that garnered roughly 52,000 views, many of which were from users under the age of eighteen.[348] Since that time, Karle has made a series of videos, including one titled "How to HIDE & HIT Your JUUL at SCHOOL WITHOUT Getting CAUGHT."[349] Karle has admitted to earning approximately $1200 a month from unspecified sources simply from posting videos of himself consuming e-cigarettes, especially of JUUL products online.[350]

311.    At least one JLI sales representative sent DonnySmokes a private message thanking him for promoting JUUL products on social media. Similarly, JUUL repeatedly thanked and encouraged the owner of the @JUULnation Instagram account for his posting of youth-oriented JUUL content on Instagram.

312.    In or around 2017, JLI began using a company called Impact Radius for the management of JLI's affiliate program. Impact Radius's affiliate application stated that JLI "auto-approve[d]" applications and did not ask for or confirm the affiliate's age.[351] JLI's affiliates promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter and routinely failed to disclose that they were being paid to promote JUUL products.

313.    As with much of the marketing strategy for JUUL, the practices described above are prohibited by the Master Settlement Agreement.

---

[348] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

[349] *Id.*

[350] Allie Conti, *This 21-year-old is Making Thousands a Month Vaping on YouTube*, Vice (Feb. 5, 2018), https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month¬vaping-on-youtube.

[351] INREJUUL_00113437-INREJUUL_00113441.

### c. JLI Used Viral Marketing Techniques Known to Reach Young People.

314.    JLI deployed "viral marketing" techniques to great success. Viral marketing is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[352] Viral marketing effectively converts customers into salespeople, who, by sharing their use of a product (on social media or otherwise), repeat a company's representations and endorse the product within their network. The success of viral marketing depends on peer-to-peer transmission. Hence, a successful viral marketing campaign looks like a series of unrelated, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaigns.

315.    Social media platforms are the most effective way to launch viral marketing campaigns among young people. As of May 2018, among teenagers, 95% reported use of a smart phone, 85% use YouTube, 72% use Instagram, and 45% reported being online "constantly."[353]

316.    A key feature of JLI's viral marketing campaign was inviting user-generated content. This strategy revolves around prompting social media followers to provide their own JUUL-related content—e.g., post a selfie in your favorite place to use JUUL. The response provided by a user is then typically distributed—by the social media platform employed—into the user's personal network. In this way, brands can infiltrate online communities with personalized content that promotes their product (e.g. a picture of a friend using a JUUL e-cigarette at the beach). Within a few months of the JLI's commercial release in June 2015, a

---

[352] N. Deepa et al., *Viral Marketing as an On-Line Marketing Medium*, IOSR J. of Bus. & Mgmt. 18, http://www.iosrjournals.org/iosr-jbm/papers/ncibppte-volume-2/1115.pdf (last visited Apr. 3, 2020); P. R. Datta et al., *Viral Marketing: New Form of Word-of-Mouth Through Internet*, 3 The Bus. Rev. 69 (2005).

[353] Monica Anderson & Jingjing Jiang, *Teens, Social Media & Technology 2018: Appendix A: Detailed Tables*, Pew Research Center (May 31, 2018), https://www.pewresearch.org/internet/2018/05/31/teens-technology-appendix-a-detailed-tables/.

former JLI executive reportedly told the New York Times that JLI "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[354]

317.    To drive consumer participation in its ad campaign, JLI peppered its advertising and social media posts with hashtags, including those referencing JLI and consuming e-cigarettes (e.g., #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc. JLI's hashtag marketing went beyond passive posts to being "very proactive to find and reach out to people who are (or might be) interested in JUUL. This means searching hashtags to engage, using widely used hashtags, paying close attention to our followers, being responsive to posts, etc."[355]



318.    JUUL users began taking photos of themselves using JUUL devices and putting them on social media with the hashtag #juul. They were creating JUUL content that looked and felt like real JUUL ads: featuring young people having fun and using JUUL. The flavor-based hashtag campaigns #MangoMonday and #coolmint generated hundreds of thousands of user-

---

[354] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[355] INREJUUL_00093294.

generated posts.

319.    JLI could have stepped in and attempted to stop the use of its trademark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL." It could have sought to shut down infringing accounts such as @doit4juul and @JUULgirls. It did not do so.

### 5.    JLI Targeted Youth Retail Locations.

320.    Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to point of sale tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed.

321.    For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales. JLI knows that nicotine-naïve young people frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL increased the likelihood that these people would purchase its product.

322.    JLI marketed its products extensively in convenience stores, employing video and product displays with bright colors and young adults using and displaying the JUUL device. The retail marketing worked and, by late 2017, JUUL became the most popular e-cigarette sold in convenience stores according to Nielsen data.[356]

323.    Like all in-store cigarette advertising, JLI's point–of–sale materials played a major role in driving youth addiction. JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the JUUL store locator and offering discounts. And JLI actively encouraged its retailers to leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

---

[356] Laura Bach, *JUUL and Youth: Rising E-Cigarette Popularity*, Campaign for Tobacco-Free Kids (July 6, 2018), http://www.kdheks.gov/tobacco/download/Campaign_for_tobacco-free_kids_rising_popularity_of_e-cigarettes.pdf.

324. Before JUUL's launch in 2015, JLI and Cult Collective developed packaging and in-store displays that looked similar to iPhone packaging, which JLI knew would resonate with young people and further JLI's campaign to be the "the iPhone of e-cigarettes."

325. As a 2015 marketing plan shows, JLI's in-store promotional content "stands out" from competing tobacco products by conveying that the "JUUL brand is colorful, approachable, and fun—core elements of trade support assets."[357]



### 6. JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Consumers Hooked.

326. JLI also sponsored at least twenty-five live social events for its products in California, Florida, New York, and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, or was addictive.[358] Instead, the invitations traded on PAX Lab, Inc.'s (PAX) reputation as a manufacturer of marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties.[359] Photographs from these events indicate that they drew a youthful crowd. Product promotion through sponsored events was a long-standing practice for cigarette companies, but is now prohibited.

---

[357] INREJUUL_00370796-INREJUUL_00370806, 805.
[358] *See* Appendix B, Advertisements 78-81.
[359] *Id.*








AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

327.   At these live social events, JLI gave attendees free JUUL "Starter Kits," which contain a JUUL device and 4 JUUL pods of various flavors. JLI gave away samples at music events without age restrictions, including Outside Lands in San Francisco's Golden Gate Park.

328.   Giving away free samples is prohibited conduct for a cigarette company under the Master Settlement Agreement.

329.   JLI also held sampling events in stores. By September 2015, JLI was on schedule to host sampling events in more than 5,000 stores in twenty cities in twelve states.[360] Documents obtained by the New York Attorney General show that JLI recruited young "brand ambassadors" to staff these events and required a dress code that included skinny jeans, high-top sneakers or booties, and an iPhone in a JUUL-branded case.[361]



330.   Though JLI publicly acknowledged in October 2017 that it is unlawful to distribute free samples of its products at live events,[362] it continued to reach out to new users by

---

[360] INREJUUL_00160394.

[361] Jake Offenhartz, *Juul Hooked Teens Through Sick Parties and Hip Ambassadors, NY AG Says*, Gothamist (Nov. 19, 2019), https://gothamist.com/news/juul-hooked-teens-through-sick-parties-and-hip-ambassadors-ny-ag-says; Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

[362] *See* Nik Davis (@bigbabynik), Twitter (Nov. 17, 2017 1:11 PM), https://twitter.com/JLIvapor/status/931630885887266816; *The Role of the Company in the Juul Teen Epidemic, Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong.

offering samples, sometimes at $1 "demo events." Like so many of JLI's initiatives, promotions of this kind are prohibited for cigarette companies by the Master Settlement Agreement.

331.     The effect—and purpose—of JLI's Vaporized giveaways was to flood major cities with products that would hook thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JLI's message to their friends via word of mouth and social media.

332.     According to BeCore, one of the firms responsible for designing and implementing JLI's live events, JLI distributed the nicotine-equivalent of approximately 500,000 packs of cigarettes at all twenty-five events.[363] And this was just to get people started.

### 7.     The Management Defendants' Direction and Participation in the Youth Marketing Schemes.

#### a.     The Management Defendants, and in particular Bowen, Monsees, Pritzker, Huh, and Valani, oversaw the youth marketing scheme.

333.     The Management Defendants were well aware that JUUL branding was oriented toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine. The Management Defendants directed and approved JUUL branding to be oriented toward teenagers. The Management Defendants directed and participated in each marketing campaign pushing the JUUL e-cigarette, as they had "final say" over all marketing campaigns (including the Vaporized campaign and the other formal and informal marketing efforts described above),[364] and Monsees provided specific direction on the content of the website to JLI employees.

---

(2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

[363] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 9 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[364] *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the Comm. on Oversight & Reform, H.R.*, 116th Cong. 70 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.).

334.     After launch, executives and directors discussed whether to rein in the advertising to teenagers. According to Scott Dunlap, then Chief Operating Officer, in June 2015, Nicholas Pritzker commented that the branding "feels too young[.]"[365] In early July 2015, Nicholas Pritzker, Riaz Valani, and Alexander Asseily "spoke[] at length on the JUUL approach[,]" and Asseily also "spoke to James [Monsees] at length" on the same topic.[366] Asseily followed up with a lengthy email to Valani and Pritzker, which he also sent to Richard Mumby. He began by noting that "our fears around tobacco / nicotine are not going away. We will continue to have plenty of agitation if we don't come to terms with the fact that these substances are almost irretrievably connected to the shittiest companies and practices in the history of business."[367] He stated that "an approach needs to be taken that actively, if implicitly, distances us from [Big Tobacco]: what we say, the way we sell, the way we run the company, what we emphasi[z]e, who we hire, etc."[368] Referring to JLI's strategy to use the same marketing techniques as major tobacco companies used to market to youths, Asseily added that "[t]he trouble with just doing 'what the others do' is that we'll end up as Nick [Pritzker] rightly points out in the same ethical barrel as them, something none of us want no matter the payoff (I think)."[369] He continued that "the world is transparent and increasingly intolerant of bullshit. It's not about faking it - it's about doing it correctly....which could mean **not doing a lot of things we thought we would do like putting young people in our poster ads or drafting in the wake of big players in the market**."[370]

335.     But some company leaders, including Huh, opposed any actions to curb youth sales. Youth sales were a large potential source of revenue.[371] As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people

---

[365] JLI00206239.

[366] JLI00214617.

[367] *Id.*

[368] *Id.*

[369] *Id.*

[370] *Id.*

[371] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                            Case No. 19-md-02913-WHO

had no problem with 500 percent year-over-year growth."[372] And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.[373]

336.    In October 2015, JLI leadership resolved the debate in favor of selling to teens. Even though the directors and executives of JLI knew—and explicitly stated—that what they were doing was wrong, JLI pressed ahead with its youth-oriented Vaporized ad campaign through early 2016.[374]

337.    The company also implemented the Board's decision in October 2015 to target and sell to minors in many other ways. For example, in early October 2015, sales and marketing employees of Pax Labs noted that only 74% of users were able to pass the age gate on the website, "which is a steep decline in sales for us."[375] In mid-January 2016, a similar group of employees estimated that about 11% of those reaching the JUUL Purchase Confirmation Page on Pax Labs's own website were under 18 years old.[376] But, rather than strengthen JUUL's age verification system, Pax Labs worked to weaken it. In February 2016,[377] Pax Labs modified the age verification system so that 92% of users were able to pass the age gate.[378] By changing the age verification process so that users were more likely to pass—while knowing that some minors had already been able to pass before the change—Pax Labs deliberately chose to continue selling to underage purchasers.

338.    In July 2015, Asseily suggested "a cheeky campaign that asks existing smokers to return their unused cigarette packets (or other vaping products) to us in return for a discount

---

[372] *Id.*

[373] *Id.*

[374] The Vaporized advertising campaign continued at least into early 2016. Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 7 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[375] INREJUUL_00276445.

[376] Native attachment to INREJUUL_00078494.

[377] JLI00068428.

[378] Kate Horowitz's LinkedIn profile, https://www.linkedin.com/in/k8horowitz (last visited Mar. 9, 2020).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   on JUUL" because that would "send the only message that's needed: JUUL is a superior

2   alternative to conventional smoking and mediocre vaping products."[379] But JLI did not run this

3   campaign then and in fact did not begin focusing its advertising on switching from combustible

4   cigarettes until 2018.[380]

5          339.    By March 2016, however, JLI employees internally recognized that JLI's efforts

6   to market to children were too obvious. On March 2, 2016, Richard Mumby, the Chief

7   Marketing Officer, sent a document related to JLI's branding to Hoyoung Huh and a number of

8   other marketing employees of JLI.[381] According to Mumby, he was sending the document

9   because Hoyoung Huh "indicated that [he] would review [JLI's] brand and collateral

10  positioning on behalf of the board."[382] The attached document noted that "[t]he models that we

11  used for the #Vaporized campaign appeared to be too youthful for many consumers (and the

12  media)[.]"[383] Under a header that listed as one of JLI's "Objectives" to "Be Different & Have

13  Integrity[,]" the document stated that "[w]e need to be sensitive to the subjectivity of

14  youthfulness by positioning the brand to be mature and relatable."[384] On March 11, 2016,

15  Mumby sent another version of this document to Hoyoung Huh and Zach Frankel, who was an

16  observer on the Board and would later become a director, and Mumby thanked them "for the

17  support on this."[385] Around this time, Pax Labs reoriented its JUUL advertising from the

18  explicitly youth-oriented Vaporized campaign to a more subtle approach to appeal to the young.

19  The advertising's key themes continued to include pleasure/relaxation, socialization/romance,

20

21

22

23  [379] JLI00214617.

24  [380] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*,
    Stanford Research Into the Impact of Tobacco Advertising 16 (Jan. 31, 2019),

25  http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
    [381] INREJUUL_00178377.

26  [382] INREJUUL_00061469.

27  [383] INREJUUL_00178379.
    [384] INREJUUL_00178384.

28  [385] INREJUUL_00061274.

and flavors[386]—all of which still appealed to teenagers.

340.    The Management Defendants continued to direct and approve misleading marketing campaigns long after launch. For example, JLI deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns, and ads cross-promoting mango and mint. Through their positions on the JLI Board of Directors, the Management Defendants were directly responsible for this marketing, as they had "final say" over all of JLI's marketing activities.[387] In other words, JLI and the Management Defendants controlled the messaging around JUUL products.

341.    Notably, none of JLI's early advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed that JUUL contains high amounts of nicotine; indeed, many of those advertisements did not advertise JUUL's nicotine content whatsoever.

342.    Likewise, none of JLI's advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed the health risks from consuming JUUL products.

343.    JLI and the Management Defendants knew of course that JUUL contained an ultra-high concentration of nicotine, and that ultra-high concentration of nicotine was designed to addict. They also knew that e-cigarette products, including JUUL, would expose users to increased health risks, including risks to their lungs and cardiovascular system. Despite that knowledge, JLI and the Management Defendants took affirmative actions, the natural consequence of which was the approval and transmission of these false and misleading advertisements that did not include a disclosure of JUUL's high nicotine content and concentration, nor any health risks at all.

---

[386] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 9 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[387] *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the Comm. on Oversight & Reform, H.R*, 116th Cong. 70 (2019) (statement of James Monsees, CPO, JLI Labs).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                Case No. 19-md-02913-WHO

1

2

3

        **b.**      **Pritzker, Huh, and Valani Were Able to Direct and Participate in the Youth Marketing Because They Seized Control of the JLI Board of Directors.**

4

344. Although Defendants Bowen and Monsees were the visionaries behind JLI and

5

the most hands-on in its early stages, by the time JLI was pushing its marketing campaigns in

6

early-to mid-2015, JLI (through the individuals running the company), Bowen, Monsees,

7

Pritzker, Huh, and Valani were each intimately involved in the planning and execution of

8

activities.

9

345. For example, JLI stopped interacting with the press in the summer of 2015 while

10

its Board of Directors, led by Bowen, Monsees, Pritzker, Huh, and Valani, was finalizing a

11

"messaging framework."[388] A legitimate business enterprise would typically ramp up, rather

12

than shut down, press outreach at the very time the company is supposed to be building

13

awareness for its recently launched product.

14

346. But the Management Defendants at this point were taking actions that went

15

beyond the regular and legitimate business operations of JLI. At the same time JLI stopped

16

traditional press engagement, the Board of Directors was directing and monitoring the launch

17

plans that they had set in motion – including the launch of sponsored content on social media in

18

July 2015 (which content did not include any warnings about JUUL's nicotine content or health

19

risks).[389]

20

347. And at the same time the Management Defendants had approved the early JLI

21

marketing campaigns that were intentionally targeting youth, the Management Defendants were

22

planning a fundamental shift in roles to allow Defendants Pritzker, Huh, and Valani to take

23

charge of the instrumentalities of JLI, including its employees and resources.

24

348. Specifically, in October 2015, Monsees stepped down from his role as Chief

25

Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Huh, and

26

Valani formed an Executive Committee of the JLI Board of Directors that would take charge of

27

28

---

[388] INREJUUL_00056077 [Confidential].

[389] *Id.*

Page 119

1    fraudulently marketing JUUL products, including to youth. The Management Defendants, and

2    in particular Huh, wanted to continue their fraudulent marketing, knowing that these ads were

3    also targeted to youth, "argu[ing] that the company couldn't be blamed for youth nicotine

4    addiction[.]"[390]

5          349.    JLI's organizational charts later reflected the executive committee in the place of

6    a CEO. Before late 2015, the company's organizational charts showed the CEO at the head of

7    the company, reporting to the Board.[391]

8          350.    After Monsees was removed as CEO, the executive committee appeared in the

9    place of the CEO.[392]



351.    Board minutes also illustrate the direct control of the company and all the critical

decisions about how to market JLI by the Executive Committee. Until late October 2015,

Monsees ran Board meetings.[393] In late October 2015 and thereafter, however, Huh began

---

[390] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

[391] *See* INREJUUL_00016456 (July 9, 2014).

[392] INREJUUL_00278332 (Dec. 7, 2015); INREJUUL_00061420 (Apr.21, 2016).

[393] *See* INREJUUL_00278406 *et seq.* (Oct. 5, 2015); INREJUUL_00278410 *et seq.* (Sept. 24, 2015).

running Board meetings.[394] Also, the late October minutes report that the "Board discussed . . . the additional responsibilities that would be assigned to Bryan White" (who was a Vice President of Engineering and Product Design at the time), and furthermore that "[a] discussion followed regarding who Bryan should report to, and it was agreed that the executive committee that had been formed since the last Board meeting, consisting of Messrs. Huh, Pritzker and Valani, would address this issue."[395] Additionally, the Board "discussed how these new roles and responsibilities would be communicated internally."[396] As these minutes illustrate, the Executive Committee was acting as the CEO of the company at this time.

352.    Similarly, in December 2015, at Board of Directors/Executive Committee meeting, it was decided that "Hoyoung [Huh] will make decisions on behalf of the BOD [Board of Directors] Exec[utive] Comm[ittee]" and "3-4 days/week Nick [Pritzker] and/or Hoyoung [Huh] will be in the office" to "help us manage our people[.]"[397]

353.    Over the next year, until the installation of a new CEO in August 2016, Defendants Pritzker, Huh, and Valani used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[398] Defendants Huh, Pritzker, and Valani wanted even "more aggressive rollout and [marketing]."[399] Despite any potential internal misgivings about their fraudulent conduct, notably, none of Management Defendants terminated their relationship with JLI during this time period.

### 8.    JLI and the Management Defendants Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took

---

[394] *See* INREJUUL_00278404 *et seq.* (October 26, 2015); INREJUUL_00278402 *et seq.* (Nov. 10, 2015).

[395] INREJUUL_00278405 (Oct. 26, 2015).

[396] *Id.*

[397] INREJUUL_00061856.

[398] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

[399] INREJUUL_00278359.

1

**Coordinated Action to Ensure That Youth Could Purchase JUUL**

2

**Products.**

3

a.    **JLI's Strategy Worked.**

4       354.    The Management Defendants knew that the JUUL marketing campaigns they

5 directed and approved were successful in targeting youth. As Reuters has reported, "the first

6 signs that JUUL had a strong appeal to young people came almost immediately after the sleek

7 device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where

8 they could buy more JUULs, along with the cartridge-like disposable 'pods' that contain the

9 liquid nicotine."[400] A former senior manager told the New York Times that "[s]ome people

10 bought more JLI kits on the company's website than they could individually use—sometimes 10

11 or more devices." He added that "[f]irst, they just knew it was being bought for resale," but later

12 "when they saw the social media, in fall and winter of 2015, they suspected it was teens."[401]

13 Adam Bowen admitted that "he was aware early on of the risks e-cigarettes posed to

14 teenagers[.]"[402] On January 5, 2016, Gal Cohen forwarded a presentation dated December 16,

15 2015, which asked the question: "If *large numbers of youth are initiating tobacco use with*

16 *flavored e-cigarettes*, but adults [*sic*] smokers may benefit from completely switching to an e-

17 cigarette, what should the market look like?"[403] It was common knowledge within JLI that

18 JUULs were being sold to children.

19       355.    After the Vaporized campaign, retail stores began selling out of JUUL products,

20 and JLI had a difficult time trying to meet demand coming from its online ordering platform.

21       356.    Furthermore, it was obvious to those outside the company that JLI was selling

22 JUUL products to children. In June 2015, reporting on the "Vaporized" campaign that

23

24   [400] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5,
25   2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

26   [401] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether*
27   *Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018),
     https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
28   [402] *Id*.
     [403] INREJUUL_00339938 (emphasis added).

accompanied the JUUL launch, AdAge reported that John Schachter, director of state communications for Campaign for Tobacco-Free Kids, "expressed concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design" and added that there had been "obvious trends that appeal to adolescents in e-cigarette campaigns[.]"[404] Robert Jackler, a Stanford physician who investigated JLI's launch campaign, concluded that "JLI's launch campaign was patently youth-oriented."[405] JLI's commercials' attempts to appeal to teenagers were so obvious that, by October 2015, Stephen Colbert ran a satirical segment on it that noted, among other things: "And it's not just ads featuring hip young triangles that appeal to the youths; so do vape flavors like cotton candy, gummi bear, and skittles."[406]

357.    Moreover, the Management Defendants knew that kids were marketing JLI products on social media, and some even sought to take advantage of that to build the JLI brand. For example, on July 16, 2016, Adam Bowen emailed Tyler Goldman about social media posts by children about JUUL e-cigarettes, stating, "I'm astounded by this 'ad campaign' that apparently some rich east coast boarding school kids are putting on."[407] Bowen added that "Riaz [Valani] was thinking maybe we can leverage user generated content."[408]

### b.    JLI Closely Tracked Its Progress in Reaching Young Customers through Social Media and Online Marketing

358.    Tracking the behaviours and preferences of youth that are under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco

---

[404] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.

[405] Erin Brodwin, *See how Juul turned teens into influencers and threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cig company,* Bus. Insider (Nov 26, 2018), https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11.

[406] *The Late Show with Stephen Colbert*: *Vaping is So Hot Right Now*, YouTube (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM. The "triangles" ad was a JUUL ad; the listed flavors were not, but JUUL also had flavors that appealed to children.

[407] JLI00382271.

[408] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

products. Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers.

359.    As early as 1953, Philip Morris was gathering survey data on the smoking habits of "a cross section of men and women 15 years of age and over."[409] Commenting on these data, George Weissman, then-Vice President of Philip Morris, observed that "we have our greatest strength in the 15-24 age group."[410]

360.    Traditional approaches to youth tracking (e.g., interviews conducted face-to-face or over the telephone) were limited, however, in that they often failed to capture data from certain subsets of the target market. As a Philip Morris employee noted in a June 12, 1970 memorandum, Marlboro smokers were "among the types of young people our survey misses of necessity (on campus college students, those in the military and those under 18 years of age)."[411]

361.    However, modern technology has removed many of the hurdles that made youth tracking difficult in decades past. With e-mail, social media and online forums, JLI can track, and has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL products.

362.    Using the tools available to it, JLI would have known that its viral marketing program was a resounding success, and in particular with young people.

363.    Between 2015 and 2017, JUUL-related posts on Twitter increased quadratically, which is the exact result to be expected from an effective viral marketing campaign.[412] Its growth on Instagram was likely even more rapid.

364.    A 2018 study of JLI's sales and presence on social media platforms found that JLI grew nearly 700%, yet spent "no recorded money" in the first half of 2017 on major

---

[409] Philip Morris Vice President for Research and Development, *Why One Smokes*, First Draft, 1969, Autumn (Minnesota Trial)

[410] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 581 (D.D.C. 2006).

[411] *Id.*

[412] *See* Brittany Emelle, et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* (May 2017), https://www.slideshare.net/YThorg/mobile-marketing-of-electronic-cigarettes.

advertising channels, and spent only $20,000 on business-to-business advertising.[413] Despite JLI's apparently minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.[414]

365.    On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.[415]

366.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the authors to question whether JLI was paying for positive reviews and JUUL-related social media content.

367.    The lead author of the study concluded that JLI was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.[416]

368.    A separate study of e-cigarette advertising on mobile devices, where young people spend most of their day consuming media, found that 74% of total advertising impressions were for JUUL products.[417]

369.    A 2019 study found that as much as half of JUUL's Twitter followers were aged

---

[413] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tobacco Control (May 31, 2018), https://tobaccocontrol.bmj.com/content/28/2/146.full.

[414] *Id.*

[415] *Id.*

[416] Laura Kelly, *JUUL Sales Among Young People Fueled by Social Media, Says Study*, The Wash. Times (June 4, 2018), https://www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/.

[417] *See* Brittany Emelle et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* Truth Iniative (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                              Case No. 19-md-02913-WHO

thirteen to seventeen.[418]

370.    A 2019 study characterizing JUUL-related Instagram posts between March and May 2018 found that among nearly 15,000 relevant posts from over 5,000 unique Instagram accounts, more than half were related to youth or youth lifestyle.[419]

371.    Some Twitter users have reported what appear to be JUUL bots.[420] Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content.[421]

372.    By April 2018, searching "JUUL" on YouTube yielded 137,000 videos with forty-three videos having over 100,000 views.[422] Of these, a huge number were plainly related to underage use, including: 1,730 videos on "hiding JUUL in school," 789 on "JUUL in school bathroom," 992 on "hiding JUUL at home," and 241 on "hiding JUUL in Sharpie."[423]

373.    In 2018, JLI was internally collecting hundreds of social media posts—directed at JLI—informing it of JUUL's wild popularity with young people and in many cases requesting that JLI do something to stop it.[424]

**9.    JLI Coordinates with Veratad Technologies To Expand Youth Access to JUUL Products.**

374.    At the same time JLI and the Management Defendants were taking coordinated

---

[418] Steven Reinberg, *Study: Half of Juul's Twitter followers are teens, young adults*,  HealthDay News, (May 20, 2019) https://www.upi.com/Health_News/2019/05/20/Study-Half-of-Juuls-Twitter-followers-are-teens-young-adults/1981558384957/.

[419] Lauren Czaplicki et al.*, Characterising JUUL-related posts on Instagram*, Truth Initiative (Aug. 1, 2019), https://tobaccocontrol.bmj.com/content/early/2019/07/30/tobaccocontrol-2018-054824.

[420] One example of what appear to be JUUL bots in action on Twitter is available at: https://twitter.com/search?q=juul%20bot&src=typd (last visited Apr. 4, 2020).

[421] Hennrythejuul (@hennrythejuul), Twitter (Mar. 4, 2020, 9:35 am) https://twitter.com/hennrythejuul.

[422] Divya Ramamurthi et al., *JUUL and Other Stealth Vaporizers: Hiding the Habit from Parents and Teachers, Tobacco Control 2019,* Stanford Univ. (Sept. 15, 2018), https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/6/610.full.pdf.

[423] *Id.*

[424] Complaint at 60, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to

2   ensure a steady and growing customer base through unlawful marketing and distribution

3   activities, they were coordinating with an outside entity—Veratad Technologies LLC—to get

4   JUULs into the hands of the largest number of consumers possible.

5       375.   JLI's website, including its online store, was pivotal to these efforts. Early

6   marketing documents show that JLI planned a "consumer journey" that started with a consumer

7   being exposed to misleading JUUL marketing in stores, where JLI's "fun" and "approachable"

8   in-store marketing would lead consumers to JLI's website for additional misrepresentations and

9   omissions about JUUL products, an email subscription sign-up, and purchases through JLI's

10  ecommerce platform:[425]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

INREJUUL_00329660

    376.   JLI coordinated with Veratad to provide age verification services for its website

from 2015 to 2018. Veratad has also provided age verification services to other e-cigarette

---

[425] INREJUUL_00329660

sellers, including Lorillard[426] and Altria.[427] Consistent with the claim on Veratad's website that "*You can create your own verification rules*," the company encouraged sellers like JLI to set the desired compliance level for age verification. As a member of a major e-cigarette trade organization, Veratad also offered insight into what competitors were doing, and offered to "guide your setup to follow industry best practices for age verification."

377.    Though it is illegal to sell and ship e-cigarettes to minors under both state and federal law, JLI and Veratad designed and implemented an age verification system designed to maximize the number of prospective purchasers who "pass" the process rather than to minimize the number of underage sales.[428] As a result of these intentionally permissive age verification practices, JLI and Veratad used online payment systems and the US mails to ship tens of millions of dollars of JUULpods to unverified customers, many of whom were minors.

378.    From June 2015 through the end of 2018, the age verification process on JLI's website typically prompted prospective purchasers to submit their name, address, and date of birth, which JLI forwarded to Veratad. Veratad then attempted to match all or some limited part of the consumer's information to a person of the minimum legal sales age in its database. If Veratad was able to locate a sufficient match of the prospective purchaser to a person of the minimum legal sales age in its database, then it would return a "pass" result to JLI. If Veratad was unable to make such a match, Veratad returned a "fail" result to JLI.

379.    If Veratad returned a "fail" result to JLI, rather than decline the prospective purchaser, JLI would prompt the person to enter an "alternate" address. If Veratad still could not find a match based on this alternate address, JLI would prompt the consumer to enter the last four digits of his or her social security number.

380.    If Veratad, supplied with the last four digits of a consumer's social security

---

[426] Staff of Sen. Richard Durbin et al., 113th Cong., *Gateway to Addiction?* (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

[427] INREJUUL_00174362.

[428] Complaint at 165, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

number, still could not match the consumer to a person of the minimum legal sales age in its database, JLI would prompt the consumer to upload an image or photograph of his or her driver's license or another governmental identification document. A JLI employee would then conduct a personal review of the image and decide whether the consumer was of the minimum legal sales age.

381.   Crucially, Veratad's age verification system was purposefully flexible, so JLI and Veratad could work together to decide just how closely a prospective purchaser's personal information had to match records in Veratad's database in order to "pass" the age verification process. JLI and Veratad could also set, or modify, the applicable minimum legal sales age to be used for verification.

382.   By the fall of 2015, JLI and Veratad knew that bulk purchases were being made for resale on JLI's website by minors and for resale to minors.[429] Nevertheless, the two companies worked together to find ways to "bump up [JLI's] rate of people who get through age verification."[430] JLI repeatedly sought, and Veratad repeatedly recommended and directed, changes to the age verification process so that more prospective JUUL purchasers would "pass." Both did so in an effort to increase direct sales of JLI's e-cigarettes without regard to whether its less stringent age verification process would permit more underage consumers to purchase them.

383.   Between June 2015 and August 2017 (and perhaps even through early 2018), JLI and Veratad tailored the age verification system to "pass" prospective purchasers even if certain portions of the purchaser's personal information—e.g., the purchaser's street address or date of birth—did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.[431]

---

[429] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[430] INREJUUL_00276489-INREJUUL_00276490
[431] Complaint at 43, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=. A January 29,

384.    Similarly, between June 2015 and August 2017, JLI and Veratad tailored the system to "pass" a prospective purchaser under certain circumstances even when the prospective purchaser's year of birth did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.

385.    JLI and Veratad sought to increase "pass" rates by modifying the age verification system to allow users multiple opportunities to change their personal information if a match was not initially found in an appropriate government database. A Veratad Performance Report from August 5, 2017 shows that, for 1,963 consumers Veratad recorded 3,794 transactions—an average of 1.93 attempts per consumer.[432] Only 966 consumers—less than half—passed age verification on the first attempt.[433] By allowing consumers to alter their personal information and attempt age verification up to three times, JLI was able to increase its database match pass rate from 49.2% to 61.2%.[434]

386.    By design, these lax requirements ensured underage consumers could "pass" JLI's age verification process and purchase JUUL e-cigarettes directly from JLI's website by using their parent's name, home address, and an approximate date of birth. JLI was aware of this fact, as evidenced by the multiple complaints it received from parents who alleged their children did just that.[435]

387.    JLI directed and approved the system it had implemented with Veratad that caused accounts with "bad info" to be "AV approved" but, as a Senior Business Systems Manager at JLI commented, "if [v]eratad passed it [then] it's not on us."

---

2018 email exchange between Tom Canfarotta, Director of Strategic Accounts & Client Quality Services at Veratad, and Annie Kennedy, JUUL's Compliance Manager, reveals this to have been the case. Kennedy asked Canfarotta why a particular customer had "passed via the address step (public record check)…but we've since learned that is not a correct address—so we're curious as to how it passed." In response, Canfarotta wrote, "Your current rule set does not require a full address match." He went on to explain that approval of the customer was not an anomaly or a mistake; instead, Veratad's age verification system was working exactly the way it was designed.

[432] *Id.*

[433] *Id.*

[434] *Id.*

[435] INREJUUL_00184119.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

388.    JLI customer service representatives even encouraged those who failed age verification to "make multiple accounts in order to pass AV [age verification]."[436] Customer service representatives would go so far as to alter identifying information for them; a Slack chat among customer service representatives confirmed that representatives were authorized to "adjust the street address, apartment number, or zip code" associated with shipment.[437]

389.    The age verification procedures designed by JLI and Veratad have allowed hundreds of thousands of e-cigarette products to be sold and/or delivered to fictitious individuals at fictitious addresses.[438] Many of these improper sales may have been made to underage purchasers or to resellers who sold the products to underage consumers on the grey market.[439]

390.    By divorcing the address from the other customer data in the age verification process, JLI and Veratad allowed consumers to request that tobacco products be sent to locations other than their permanent legal residences.[440] For example, JUUL sent thousands of orders to commercial high rises and office parks.[441] It is unlikely these orders would have been approved had JUUL and Veratad required that addresses provided by users match information in an appropriate government database and followed the requirement that the shipping address and billing address be the same.[442]

391.    The failure of the JLI/Veratad age verification procedure was intentional.[443] And despite JLI and Veratad's concerted effort to enable the sale of federally regulated tobacco products to minors, JLI nevertheless publicly touted Veratad as the "gold standard" of age verification services. For example, JLI told a reporter with CBS that "[t]here is an extensive age

---

[436] INREJUUL_00215324-INREJUUL_00215325.

[437] Complaint at 168, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=..

[438] *Id.* at 138.

[439] *Id.*

[440] *Id.* at 146

[441] *Id.* at 147.

[442] *Id.*

[443] *Id.* at 173.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

verification process in place to purchase JUUL online" and that JLI "work[s] with Veratad Technologies, the state-of-the-art, gold-standard for age verification."[444] JLI later planned on sending this same, canned false language to a student journalist at Georgetown University.[445]

392.    In August 2017, JLI responded to public scrutiny by publicly stating that it would increase the purchase age on its website to 21+ by August 23, 2017. In the weeks leading up to that date, it emailed the approximately 500,000 or more potential customers to report that customers who signed up for JLI's "auto-ship" subscription service before August 23, 2017 would not have to prove that they were 21+ for as long as they maintained the subscription to receive JUULpods. As a result of this scheme, JLI's subscription gains more than offset any losses from the site's heightened age verification requirements.

---

[444] INREJUUL00178123-24.
[445] INREJUUL_00264882-84.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO



393.    Further underscoring their common purpose of growing the e-cigarette market, even if that meant selling to youth, JLI and Veratad did not require that the year of birth and last four digits of the social security number match exactly the information corresponding to a person of the minimum legal sales age in Veratad's database until August 2018.

394.    Tellingly, after JLI and Veratad implemented industry-standard age verification practices, JLI boasted to the FDA that approval rate for sales on its website had dropped to 27%.

395.    Not only did JLI and Veratad's efforts result in more sales to minors, it also allowed JLI to build a marketing email list that included minors—a data set that would prove highly valuable to Altria.

396.    In the summer of 2017, JLI engaged a company called Tower Data to determine the ages of the persons associated with email addresses on its email marketing list. According to this analysis, approximately 269,000 email addresses on JLI's email marketing list were not associated with a record of an individual who had "passed" JLI's age verification process.[446] Additionally, approximately 40,000 email addresses on JLI's email marketing list were associated with records of individuals who had "failed" JLI's own age verification process.[447] Tower Data informed JLI that 83% of the approximately 420,000 email addresses on JLI's marketing list could not be matched with the record of an individual at least eighteen years of age.[448]

397.    Despite knowing that their marketing list included minors, JLI continued to use that marketing list to sell JUUL products, and then shared that list with Altria to use for its marketing purposes.

398.    JLI and the Management Defendants knew, however, that it was not enough to disseminate advertisements and marketing materials that promote JLI to youth or to open online

---

[446] Complaint at 121, *Commonwealth of Massachusetts v. JUUL, et al.*, No. 20-00402 (Super. Ct. of Mass. Feb. 12, 2020) https://www.mass.gov/doc/juul-complaint/download; Janice Tan, *E-cigarette firm JUUL sued for using programmatic buying to target adolescents*, Marketing (Feb. 14, 2020), https://www.marketing-interactive.com/e-cigarette-firm-juul-sued-for-using-programmatic-buying-to-target-adolescents,
[447] *Id.*
[448] *Id.*

sales to youth, while omitting mention of JUUL's nicotine content and manipulated potency. To truly expand the nicotine market, they needed to deceive those purchasing a JUUL device and JUULpods as to how much nicotine they were actually consuming. And, through Pritzker, Huh, and Valani's control of JLI's Board of Directors, they did just that.

### 10.    JLI Engaged in a Sham "Youth Prevention" Campaign

399.    By April 2017, JLI had determined that the publicity around its marketing to children was a problem. Ashley Gould, the company's General Counsel and Chief Regulatory and Communications Officer, thus sought to "hire a crisis communication firm to help manage the youth interest JUUL has received[.]"[449] By June 2017, JLI began developing a "youth prevention program[.]"[450] While ostensibly aimed at reducing youth sales, JLI's youth prevention program actually served to increase, not reduce, sales to children.

400.    By December 2017, JLI's youth prevention program included extensive work with schools.[451] JLI paid schools for access to their students during school time, in summer school, and during a Saturday School Program that was billed as "an alternative to 'traditional discipline' for children caught using e-cigarettes in school."[452] JLI created the curriculum for these programs, and, like the "Think Don't Smoke" campaign by Philip Morris, which "insidiously encourage[d] kids to use tobacco and become addicted Philip Morris customers[,]"[453] JLI's programs were shams intended to encourage youth vaping, not curb it. According to testimony before Congress, during at least one presentation, "[n]o parents or teachers were in the room, and JUUL's messaging was that the product was 'totally safe.' The

---

[449] INREJUUL_00264878; *see also* INREJUUL_00265042 (retaining Sard Verbinnen, a strategic communications firm).

[450] *See, e.g.*, INREJUUL_00211242.

[451] INREJUUL_00173409.

[452] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.

[453] William V. Corr, *American Legacy Foundation Study Shows Philip Morris 'Think Don't Smoke' Youth Anti-Smoking Campaign is a Sham*, Campaign for Tobacco Free Kids (May 29, 2002), https://www.tobaccofreekids.org/press-releases/id_0499.

presenter even demonstrated to the kids how to use a JUUL."[454] Furthermore, JLI "provided the children snacks" and "collect[ed] student information from the sessions."[455]

401.   The problems with JLI's youth prevention programs were widespread. According to outside analyses, "the JUUL Curriculum is not portraying the harmful details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use."[456] Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL products as among the potentially harmful products to avoid.[457] As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs] to be a vaping device, but they don't call it that. So when you say to a young person, 'Vapes or e-cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"[458]

402.   Internal emails confirm both that JLI employees knew about the similarities of JLI's "youth prevention program" to the earlier pretextual antismoking campaigns by the cigarette industry and that JLI management at the highest levels was personally involved in these efforts. In April 2018, Julie Henderson, the Youth Prevention Director, emailed school officials about "the optics of us attending a student health fair" because of "how much our efforts seem to duplicate those of big tobacco (Philip Morris attended fairs and carnivals where they distributed various branded items under the guise of 'youth prevention')."[459] She later wrote that she would "confirm our participation w[ith] Ashley & Kevin"[460]—an apparent reference to Kevin Burns, at the time the CEO of JLI, who would later personally approve JLI's

---

[454] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.

[455] *Id.*

[456] Victoria Albert, *Juul Prevention Program Didn't School Kids on Dangers, Expert Says*, The Daily Beast (Oct. 19, 2018), https://www.thedailybeast.com/juul-prevention-program-didnt-school-kids-on-dangers-expert-says.

[457] *Id.*

[458] *Id.*

[459] INREJUUL_00197608.

[460] INREJUUL_00197607.

involvement in school programs. In May 2018, Julie Henderson spoke with former members of Philip Morris's "youth education" team,[461] and Ashley Gould received and forwarded what was described as "the paper that ended the Think Don't Smoke campaign undertaken by Philip Morris."[462] The paper concluded that "the Philip Morris campaign had a counterproductive influence."[463]

403.    JLI also bought access to teenagers at programs outside of school. For example, JLI paid $89,000 to the Police Activities League of Richmond, California, so that all youth in the Richmond Diversion Program—which targeted "youth, aged 12-17, who face suspension from school for using e-cigarettes and/or marijuana" and "juveniles who have committed misdemeanor (lesser category) offenses"—would "participate in the JUUL labs developed program, Moving Beyond" for as long as ten weeks.[464] Similarly, JUUL paid $134,000 to set up a summer program for 80 students from a charter school in Baltimore, Maryland.[465] Participants were "recruited from grades 3 through 12"[466] and worked closely with teachers to develop personal health plans. JLI paid nearly 70% of the cost of hiring eight teachers, eight instructional aides, and three other support personnel for the program.[467]

404.    JLI was aware that these out-of-school programs were, in the words of Julie Henderson, "eerily similar" to the tactics of the tobacco industry.[468] In June 2018, Ms. Henderson described "current executive concerns & discussion re: discontinuing our work

---

[461] INREJUUL_00196624.

[462] INREJUUL_00265202.

[463] Matthew C. Farrelly et al., *Getting to the Truth: Evaluating National Tobacco Countermarketing Campaigns*, 92 Am. J. Public Health 901 (2002).

[464] JLI-HOR-00002181 – 00002182.

[465] INREJUUL_00194247; Invoice to JUUL Labs from The Freedom & Democracy Schools, Inc. for $134,000, dated June 21, 2018, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00003711.pdf.

[466] INREJUUL_0019428.

[467] The Freedom & Democracy Schools, Inc., *Proposal to JUUL Labs for Funding the Healthy Life Adventures Summer Pilot* (June 9, 2018), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00002789_Redacted.pdf.

[468] INREJUUL_00194646.

w[ith] schools[.]"[469] Eventually, JLI ended this version of the youth prevention program, but the damage had been done: following the playbook of the tobacco industry, JLI had hooked more kids on nicotine.

405.    The Board was intimately involved in these "youth prevention" activities. For example, in April 2018, Riaz Valani and Nicholas Pritzker edited a youth prevention press release, noting that they "don't want to get these small items wrong" and "think it's critical to get this right."[470]

### 11.    The FDA Warned JUUL and Others That Their Conduct is Unlawful

406.    Throughout 2018, the FDA put JLI and others in the e-cigarette industry on notice that their practices of marketing to minors needed to stop. It issued a series of warnings letters and enforcement actions:

407.    On February 24, 2018, the FDA sent a letter to JLI expressing concern about the popularity of its products among youth and demanding that JLI produce documents regarding its marketing practices.[471]

408.    In April 2018, the FDA conducted an undercover enforcement effort, which resulted in fifty-six warning letters issued to online retailers, and six civil money complaints to retail establishments, all of which were related to the illegal sale of e-cigarettes to minors.[472] Manufacturers such as JLI were also sent letters requesting documents regarding their marketing and sales methods.[473]

409.    In May 2018, the FDA again issued more warning letters to manufacturers,

---

[469] INREJUUL_00194646.

[470] JLI00151300.

[471] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. FDA (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

[472] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.

[473] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

distributors, and retailers of e-liquids for labeling and advertising violations; these labels and advertisements targeted children and resembled children's food items such as candy or cookies.[474]

- In September 2018, the FDA engaged in several other regulatory enforcement actions, issuing over 1300 warning letters and civil money complaints to e-cigarette and e-liquid retailers and distributors.[475]

- On September 12, 2018, the FDA sent letters to JLI and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[476] The FDA additionally requested manufacturers to enhance their compliance monitoring mechanisms, implement stricter age verification methods, and limit quantities and volume of e-cigarette products that could be purchased at a time.[477]

410.    Finally, in October 2018, the FDA raided JLI's headquarters and seized more than a thousand documents relating to JLI's sales and marketing practices.[478] Since then, the FDA, the Federal Trade Commission, multiple state attorneys general and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into JLI's role in the youth vaping epidemic and whether JLI's marketing practices purposefully targeted youth.

411.    Siddharth Breja, who was senior vice president for global finance at Juul Labs,

---

[474] *Id.*

[475] *Id.*

[476] *Letter from US FDA to Kevin Burns*, U.S. FDA (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[477] Press Release, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access*, US FDA (Sept. 11, 2018), https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more.

[478] Laurie McGinley, *FDA Seizes Juul E-Cigarette Documents in Surprise Inspection of Headquarters*, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters/.

1   "claims that after the F.D.A. raided Juul headquarters in October 2018, seeking internal
2   documents, Mr. Burns instructed Mr. Breja and other executives not to put anything relating to
3   regulatory or safety issues in writing, so that the F.D.A. could not get them in the future."[479]

4                    **12.    In Response to Regulatory Scrutiny, Defendants Misled the Public,**
5                            **Regulators, and Congress that JLI Did Not Target Youth**

6          412.    To shield their youth-driven success from scrutiny, Altria, JLI, and the
7   Management Defendants' had a long-running strategy to feign ignorance over JLI and the
8   Management Defendants' youth marketing efforts and youth access to JLI's products. They
9   were well aware that JLI's conduct in targeting underage users was reprehensible and unlawful,
10  and that if it became widely known that this was how JLI obtained its massive market share,
11  there would be a public outcry and calls for stricter regulation or a ban on JLI's products. Given
12  the increasing public and regulatory scrutiny of JLI's market share and marketing tactics, a dis-
13  information campaign was urgently needed to protect the Defendants' bottom line. For this
14  reason, JLI, the Management Defendants, and Altria all hid JLI's conduct by vociferously
15  denying that JLI had marketed to and targeted youth and instead falsely claimed that JLI
16  engaged in youth prevention. Defendants continued to make these statements while and after
17  actively and successfully trying to market to and recruit youth non-smokers. These false
18  statements were designed to protect JLI's market share, and Altria's investment, by concealing
19  JLI's misconduct.

20         413.    For example, after 11 senators sent a letter to JLI questioning its marketing
21  approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and mango, JLI
22  visited Capitol Hill and told senators that it never intended its products to appeal to kids and did
23  not realize youth were using its products, according to a staffer for Sen. Dick Durbin (D-Ill.).
24  JLI's statements to Congress—which parallel similar protests of innocence by tobacco company
25  executives—were false.

26

27  ─────────────────────
    [479] Sheila Kaplan & Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former
28  Executive Say*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-
    pods-contaminated.html.

414.    JLI also engaged in wire fraud when it made public statements seeking to disavow the notion that it had targeted and sought to addict teens:

- "It's a really, really important issue. **We don't want kids using our products**." (CNBC Interview of JLI's Chief Administrative Officer, December 14, 2017)[480]

- "We market our products responsibly, following strict guidelines to have material directly **exclusively toward adult smokers and never to youth audiences**." (JLI Social Media Post, March 14, 2018)[481]

- "Of course, we understand that **parents and lawmakers are concerned about underage use of JUUL. As are we**. We can't restate this enough. As an independent company that is not big tobacco, we are driven by our mission and commitment to adult smokers." (JLI CEO Kevin Burns Letter to JUUL Community on Reddit, July 18, 2018)[482]

- "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . **Our intent was never to have youth use JUUL products**." (JLI Website, November 12, 2018)[483]

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018)[484]

- "First of all, I'd tell them that I'm sorry that their child's using the product. **It's not intended for them**. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." (CNBC Interview of JLI CEO, July 13, 2019)[485]

---

[480] Angelica LaVito, *Nearly one-quarter of teens are using pot*, CNBC (Dec. 14, 2017), https://www.cnbc.com/2017/12/13/marijuana-and-nicotine-vaping-popular-among-teens-according-to-study.html (Interview with Ashely Gould, JUUL Chief Administrative Officer) (emphasis added).

[481] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 15 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (citing a JUUL social media post from March 14, 2018) (emphasis added).

[482] *A Letter to the JUUL Community from CEO Kevin Burns*, Reddit (July 18, 2018), https://www.reddit.com/r/juul/comments/8zvlbh/a_letter_to_the_juul_community_from_ceo_kevin/ (emphasis added).

[483] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of Ken Burns, former CEO of JUUL) (emphasis added).

[484] *Id*. (emphasis added).

[485] Angelica LaVito, *As JLI grapples with teen vaping 'epidemic,' CEO tells parent 'I'm sorry'*, CNBC (July 13, 2019), https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html (emphasis added).

- "We have **no higher priority than to prevent youth usage of our products** which is why we have taken aggressive, industry leading actions to combat youth usage." (JLI Website, August 29, 2019)[486]

- James Monsees, one of the company's co-founders, said **selling JUUL products to youth was "antithetical to the company's mission."**(James Monsees' Statement to New York Times, August 27, 2019)[487]

- "**We have never marketed to youth and we never will**."(JLI Statement to Los Angeles Times, September 24, 2019) [488]

- "As scientists, product designers and engineers, we believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. **Our goal is to maximize the positive and reduce the negative.**" (JLI Website, March 6, 2020)[489]

415.    As the JLI Board of Directors had "final say" over all of JLI's marketing efforts, these statements regarding JLI's marketing efforts can be imputed to the Management Defendants, who were therefore directly responsible for the messaging over the marketing of JUUL products.

416.    However, JLI, the Management Defendants, and Altria realized that attempting to shift public opinion through fraudulent statements was not enough to achieve their goal of staving off regulation. To accomplish this goal, they would also need to deceive the FDA and Congress. And so they set out to do just that through statements and testimony by JLI representatives. These include, but are not limited to, the following:

***Statements by JLI to the FDA:***

- "JUUL was not designed for youth, **nor has any marketing or research effort since the product's inception been targeted to youth**." (Letter to FDA, June 15, 2018).[490]

---

[486] *Our Actions to Combat Underage Use*, JUUL Labs, Inc. (Aug. 29, 2019), https://newsroom.juul.com/our-actions-to-combat-underage-use/ (JUUL statement in response to lawsuits) (emphasis added).

[487] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html (emphasis added).

[488] Michael Hiltzik, *Column: Studies show how JLI exploited social media to get teens to start vaping*, L.A. Times (Sept. 24, 2019), https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens (statement made on behalf of JUUL) (emphasis added).

[489] *Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values (last visited Apr. 4, 2020) (emphasis added).

[490] Letter from JUUL's Counsel at Sidley Austin to Dr. Matthew Holman, FDA at 2 (June 15, 2018) (emphasis added).

- "With this response, the Company hopes FDA comes to appreciate why the product was developed and **how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers**." (Letter to FDA, June 15, 2018).[491]

*Statements by Altria to the FDA:*

- "**[W]e do not believe we have a current issue with youth access** to or use of our pod-based products, we do not want to risk contributing to the issue." (Letter from Altria CEO to FDA Commissioner Scott Gottlieb, October 25, 2018).[492]
- "We believe e-vapor products present an important opportunity to **adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18)

*Statements by JLI to Congress***:**

- "**We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products**. . . .That is a serious problem. Our company has no higher priority than combatting underage use." (Testimony of James Monsees, July 25, 2019).[493]
- "Our product is **intended to help smokers stop smoking combustible cigarettes**." (Ashley Gould, JLI Chief Administrative Officer, Testimony before House Committee on Oversight and Reform, July 25, 2019).[494]

*Statements by Altria to Congress:*

- "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and **had quickly become a very compelling product among adult vapers**. We decided to pursue an economic interest in JUUL, believing that an investment would **significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products** and strengthen our competitive position with regards to potentially reduced risk products." (Letter from Altria CEO to Senator Durbin, October 14, 2019).[495]

---

[491] *Id.* at 3 (emphasis added).

[492] Letter from Altria CEO Howard Willard to Dr. Scott Gottlieb, FDA at 2 (October 25, 2018) (emphasis added).

[493] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. 1 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-MONSEESJ-20190725.pdf.

[494] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Ashley Gould, Chief Administrative Officer, JUUL Labs, Inc. )., https://www.c-span.org/video/?462992-1/hearing-cigarettes-teen-usage-day-2&start=6431 at 01:53:25 (emphasis added).

[495] Letter from Howard A. Willard III, Altria to Senator Richard J. Durbin, 6 (October 14, 2019) (emphasis added).

417.    Each of the foregoing statements constitutes an act of wire fraud. JLI, Monsees, and Altria made these statements, knowing they would be transmitted via wire, with the intent to deceive the public, the FDA, and Congress as to the Defendants' true intentions of hooking underage users.

418.    Their disinformation scheme was successful. While certain groups such as the American Medical Association were calling for a "sweeping ban on vaping products,"[496] no such ban has been implemented to date. Accordingly, JLI's highly addictive products remain on the market and available to underage users.

### F.    Altria Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette.

#### 1.    Before Altria's Investment in JLI, Altria and JLI Exchanged Market Information Pertaining to Key Decisions.

419.    In October 2017, JLI and Avail Vapor ("Avail"), a chain of more than 100 high-end vape stores,[497] negotiated the first purchase order for Avail stores to sell JUUL products.[498]

420.    On November 2, 2017, Altria announced that it had acquired a minority interest in Avail.[499] Altria's comments to investors highlighted that the investment allowed Altria access to Avail's "extensive data around adult vaper purchasing patterns," and "full-service analytical science laboratory," located in Altria's hometown of Richmond, Virginia.[500]

---

[496] Karen Zraick, *A.M.A. Urges Ban on Vaping Products as JLI is Sued by More States*, N.Y. Times (Nov. 19, 2019), https://www.nytimes.com/2019/11/19/health/juul-lawsuit-ny-california.html.

[497] *About Us,* Avail Vapor, https://www.availvapor.com/about-us (last visited Apr. 4, 2020).

[498] INREJUUL_00066273.

[499] Rich Duprey, *Is Altria Trying to Corner the E-Cig Market?*, The Motley Fool (Jan. 7, 2018), https://www.fool.com/investing/2018/01/07/is-altria-trying-to-corner-the-e-cig-market.aspx; Lauren Thomas, *Altria shares plunge after FDA releases road map to curb tobacco-related deaths*, CNBC (July 28, 2017), https://www.cnbc.com/2017/07/28/altria-shares-fall-after-fda-releases-roadmap-to-curb-tobacco-related-deaths-.html.

[500] Remarks by Marty Barrington, ALTRIA Group, Inc.'s (ALTRIA) Chairman, CEO and President, and other members of ALTRIA's senior management team, 2017 Consumer Analyst Group of New York (CAGNY) Conference (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                          Case No. 19-md-02913-WHO

421.    On November 21, 2017—three weeks after Altria announced its investment in Avail—JLI and Avail entered into a distribution agreement, which has been renewed twice—once in November 19, 2018 and again on January 8, 2019.[501]

422.    Through its investment in Avail, Altria had access to sales data for JUUL products long before the companies exchanged diligence in connection with Altria's investment in JLI. Although JLI represented to Congress that "[JLI's] data [from Avail] was not available to Altria,"[502] statements in Altria's October 2019 letter to Congress suggest otherwise.

423.    In that letter, Altria admitted that it possessed JUUL sales data that corresponds to the very same time period in which JLI began selling its products at Avail stores, starting in late 2017.[503] That sales data showed that JLI was dominating the e-cigarette market during this time period.[504] By November 2017, JLI had sold one million units of its blockbuster product, boasting 621% growth in year-to-year sales and capturing 32% of e-cigarette sales tracked by Nielsen.[505] Sales of Altria's own e-cigarettes, on the other hand, trailed behind both the JUUL and British American Tobacco's Vuse. Altria sought to grow JLI's market dominance and young customer base. JLI, in the regulatory crosshairs, needed Altria's experience and its influence in Washington.

424.    Altria recognized that JLI had, against the backdrop of steadily declining cigarette sales, created the right product to addict a new generation to nicotine. JLI faced existential threats, however, from regulatory and congressional scrutiny, and public outrage over the growing vaping epidemic.

---

06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.

[501] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. 28 (2019) (Responses of JUUL Labs, Inc. to Questions for the Record).

[502] *Id.*

[503] Letter from Howard A. Willard III, Altria to Senator Richard J. Durbin, 6 (October 14, 2019) (emphasis added).

[504] *Id.*

[505] Melia Robinson, *How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year,* Bus. Insider (Nov. 21, 2017), https://www.businessinsider.com/juul-e-cigarette-one-million-units-sold-2017-11.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                            Case No. 19-md-02913-WHO

425.    JLI, Altria, and the Management Defendants thus began to coordinate their activities in 2017 through Avail Vapor. This back-channel, and the information it provided Altria, allowed Altria to take actions to benefit itself, JLI, and the Management Defendants without drawing the scrutiny of the public and regulators that they knew would inevitably follow a formal announcement of a partnership between JLI and Altria.

### 2.    JLI, the Management Defendants and Altria Coordinated to Market JUUL in Highly-Visible Retail Locations

426.    JLI, the Management Defendants, and Altria's coordination continued in other ways throughout 2018 as they prepared for Altria's equity investment in JLI.

427.    A key aspect of this early coordination was Altria's acquisition of shelf-space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products. By acquiring shelf space, Altria took steps to ensure that JUUL products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.[506]

428.    Altria's investment was not for its own e-cigarette products. Altria spent approximately $100 million in 2018 to secure shelf-space at retailers for e-cigarette products—purportedly for the MarkTen e-cigarette that Altria stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small scale in only 25,000 stores.[507]   By comparison, the 2014 launch of the original MarkTen resulted in product placement in 60,000 stores in the first month in the western United States alone.[508] Yet Altria's payments for shelf space were a mixture of "cash and display fixtures in exchange for a commitment that its e-

---

[506] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General,* Centers for Disease Control & Prevention 161, 164 (2012), https://www.ncbi.nlm.nih.gov/books/NBK99237/.

[507] Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, N.Y. Times (Oct. 25, 2018), https://www.nytimes.com/2018/10/25/health/altria-vaping-ecigarettes.html

[508] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

cigarettes would occupy prime shelf space for at least two years."[509]

429.    In reality, Altria spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JLI's massive, ill-gotten market share. It has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction JUUL created, but because a non-compete was a "part of its deal with J[LI]."[510]

430.    When Altria later announced its $12.8 billion investment in JLI, part of the agreement between the two companies was that Altria would provide JLI with this premium shelf space.[511]

431.    Altria's purchase of shelf space in 2018 and its subsequent provision of that space to JLI shows how Altria, JLI, and the Management Defendants were coordinating even before Altria announced its investment in JLI.  Altria's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them—retail establishments.[512]

### 3.    Altria Contributes to the Success of JLI's and the Management Defendants' Scheme Through a Range of Coordinated Activities

432.    While JLI and Altria remain separate corporate entities in name, following its equity investment in JLI, Altria and JLI forged even greater significant, systemic links, *i.e.*, shared leadership, contractual relationships, financial ties, and continuing coordination of activities.

433.    In 2019, two key Altria executives became JLI's CEO and head of regulatory

---

[509] Jennifer Maloney & John McKinnon, *Altria-JLI Deal Is Stuck in Antitrust Review*, Wall St. J. (Jan. 17, 2020), https://www.wsj.com/articles/altria-juul-deal-is-stuck-in-antitrust-review-11579257002.

[510] *Id.*

[511] *Id.*

[512] Laura Bach, *Where Do Youth Get Their E-Cigarettes?*, Campaign for Tobacco Free Kids (Dec. 3, 2019), https://www.tobaccofreekids.org/assets/factsheets/0403.pdf.

affairs, respectively.

434.   K.C. Crosthwaite, who was president of Altria Client Services when the company carried out a study that would later be used by Altria to shield JUUL's mint pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was Altria's chief growth officer.

435.   Joe Murillo, who launched the MarkTen line at Altria and more recently headed regulatory affairs for Altria, is now JLI's chief regulatory officer.[513] A 24-year career Altria executive, Murillo previously ran Altria's e-cigarette business, Nu Mark, "before Altria pulled its e-cigarettes off the market as part of its deal with J[UUL]."[514]

436.   In addition to its effective takeover of JUUL, Altria provides services to JLI in furtherance of their common goal of expanding the number of nicotine-addicted e-cigarette users, in the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs."[515] These services include, among other things:

    a.    "Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services."

    b.    "Making available [Altria's] previously contracted shelf space with certain retailers," thus allowing JUUL products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth.

    c.    "Executing direct mail and email campaigns and related activities. . . ."

    d.    "Leveraging Altria's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon."

    e.    "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."[516]

---

[513] Jennifer Maloney, *JLI Hires Another Top Altria Executive*, Wall St. J. (Oct. 1, 2019), https://www.wsj.com/articles/juul-hires-another-top-altria-executive-11569971306.
[514] *Id.*
[515] Letter from Howard Willard III, Altria Senator Durbin, et. al., at 11 (Oct. 14, 2019).
[516] *Id.* at 13.

1    437.    Altria also worked with JLI to cross-market JUUL and Marlboro cigarettes. For

2 example, Altria offered coupons for JUUL starter kits inside packs of Marlboro cigarettes.[517]



12    438.    Altria's investment in JLI was not only a financial contribution; rather, it was an

13 important aspect of JLI, Altria, and the Management Defendants' plan to continue growing the

14 user base, stave off regulation, and keep JLI's most potent and popular products on the market

15 and available to kids and the public at large. Altria is and was working to actively help expand

16 sales of JLI's products. Altria's investment brings legal and regulatory benefits to JLI, by

17 helping with patent infringement battles and consumer health claims and helping to navigate the

18 regulatory waters and FDA pressure.

19    439.    Altria also brings lobbying muscle to the table, which has played an important

20 role in JLI, Altria, and the Management Defendants' scheme of staving off regulation by

21 preventing new federal or state legislation targeting JUUL or the e-cigarette category more

22 broadly. Altria "has a potent lobbying network in Washington [D.C.] and around the

23 country."[518] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has

24

25  _____

26 [517] *Points for us!*, Reddit (Sept. 16, 2019),
https://www.reddit.com/r/juul/comments/d50jku/points_for_us/ (depicting an image of a
Marlboro carton with a JUUL starter kit coupon inside).

27 [518] Shelia Kaplan, *In Washington, JLI Vows to Curb Youth Vaping. Its Lobbying in States Runs
Counter to That Pledge.*, N.Y. Times (Apr. 28, 2019),

28 https://www.nytimes.com/2019/04/28/health/juul-lobbying-states-ecigarettes.html.

been involved in many state lobbying battles, said, "It's hard to say where Altria ends and JLI begins."[519] While an Altria spokesman has denied that there was any contractual services agreement for lobbying between JLI and Altria, he admitted that he did not know what informal advice and conversations Altria has had with JLI about lobbying efforts. Since JLI, the Management Defendants, and Altria joined forces, JLI's spending on lobbying has risen significantly. JLI spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.[520]

440.    In addition, Altria's arrangement with JLI greatly expands JLI's retail footprint. While JUUL products have typically been sold in 90,000 U.S. retail outlets, Altria reaches 230,000 U.S. outlets. Altria also brings its logistics and distribution experience (although, after increasing public scrutiny, Altria announced on January 30, 2020 that it would limit its support to regulatory efforts beginning in March 2020[521]). And importantly, as noted above, Altria gives JLI access to shelf space that it had obtained under fraudulent pretenses. This is not just any shelf space; it is space near Altria's blockbuster Marlboro cigarettes, and other premium products and retail displays. The arrangement allows JLI's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

441.    Altria decided to make a significant investment in JLI to further its efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, which ultimately benefits Altria by ensuring a new generation of customers for its products. In fact, when announcing its investment, Altria explained that its investment in JLI "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JLI expand its reach and

---

[519] *Id.*

[520] *Client Profile: JUUL Labs*, Center for Responsive Politics, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2019&id=D000070920 (last visited Apr. 4, 2020).

[521] Nathan Bomey, *Marlboro maker Altria distances itself from vaping giant JLI amid legal scrutiny*, USA Today (Jan. 31, 2020), https://www.usatoday.com/story/money/2020/01/31/juul-altria-distances-itself-e-cigarette-maker-amid-scrutiny/4618993002/.

efficiency."[522] Altria has helped JLI maintain and expand its market share—a market share that, based on Altria's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth e-cigarette use.

**G.      JLI, Altria, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis.**

442.    Defendants' tactics have misled the public regarding the addictiveness and safety of e-cigarettes generally, and JUUL products specifically, resulting in an epidemic of e-cigarette use among youth in particular.

443.    Defendants' advertising and third-party strategy, as discussed above, ensured that everyone from adults to young children, would believe JUULing was a cool, fun, and safe activity.

444.    To this day, JLI has not fully disclosed the health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of people in harm's way.

**1.      Defendants' Scheme Caused Consumers to be Misled into Believing that JUUL was Safe and Healthy.**

445.    In 2016, the National Institute on Drug Abuse issued findings regarding "Teens and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring, rather than nicotine.[523]

446.    Two years later, despite the ongoing efforts of public health advocates, a 2018 study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained

---

[522] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[523] *Teens and E-cigarettes*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/teens-e-cigarettes (last visited Apr. 4, 2020).

unaware that JUUL products contain nicotine.[524] Further, the study found that respondents using e-cigarettes were less likely to report that e-cigarettes were harmful to their health, that people can get addicted to e-cigarettes, or that smoke from others' e-cigarettes was harmful.[525]

447.    Similarly, in 2018, a literature review of seventy-two articles published in the International Journal of Environmental Research and Public Health found that e-cigarettes were perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes.[526] Further, researchers found that specific flavors (including dessert and fruit flavors) were perceived to be less harmful than tobacco flavors among adult and youth e-cigarette users.[527] In addition, researchers found that youth e-cigarette users perceived e-cigarettes as safe to use and fashionable.[528]

448.    In 2019, a study published in Pediatrics found that 40% of participants reported using nicotine-free e-cigarette products, when in fact the products they were using contained significant levels of nicotine.[529]

449.    In 2019, a study published in the British Medical Journal Open systematically reviewed all peer-reviewed scientific literature published on e-cigarette perceptions through March 2018 which included fifty-one articles.[530] Researchers found consistent evidence showing that flavors attract both youth and young adults to use e-cigarettes.[531] In addition,

---

[524] Jeffrey G. Willett et al. *Recognition, Use and Perceptions of Juul Among Youth and Young Adults,* 28 Tobacco Control 054273 (2019).

[525] *Id.*

[526] *Id.*

[527] Kim A. G. J. Romijnders et al., *Perceptions and Reasons Regarding E-Cigarette Use Among Users and Non-Users: A Narrative Literature Review*, 15 Int'l J. of Envtl. Research & Public Health 1190 (2018), https://doi: 10.3390/ijerph15061190.

[528] *Id.*

[529] Rachel Boykan et al., *Self-Reported Use of Tobacco, E-Cigarettes, and Marijuana versus Urinary Biomarkers*, 143 Pediatrics (2019), https://doi.org/10.1542/peds.2018-3531.

[530] Meernik, et al, *Impact of Non-Menthol Flavours in E-Cigarettes on Perceptions and Use: An Updated Systematic Review*, *BMJ Open*, 9:e031598 (2019), https://bmjopen.bmj.com/content/9/10/e031598.

[531] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

among this same group, fruit and dessert flavors decrease the perception that e-cigarettes are harmful, while increasing the willingness to try e-cigarettes.[532]

### 2. Use of JUUL by Minors Has Skyrocketed

450.   On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent e-cigarette use from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."[533]

451.   The percentage of 12th grade students who reported consuming nicotine almost doubled between 2017 and 2018, rising from 11% to 20.9%.[534] This increase was "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade."

452.   By 2018 approximately 3.6 million middle and high school students were consuming e-cigarettes regularly,[535] and one in five 12th graders reported used an e-cigarette containing nicotine in the last 30 days.[536] As of late 2019, 5 million students reported active use of e-cigarettes, with 27.5% of high school students and 10.5% of middle school students using them within the last thirty days and with most youth reporting JUUL as their usual brand.[537]

---

[532] *Id.*

[533] *National Adolescent Drug Trends in 2018*, Univ. of Mich. Inst. for Social Research (Dec. 17, 2018), http://monitoringthefuture.org/pressreleases/18drugpr.pdf.

[534] News Release, *Teens Using Vaping Devices in Record Numbers*, Nat'l Insts. of Health (Dec. 17, 2018) https://www.nih.gov/news-events/news-releases/teens-using-vaping-devices-record-numbers.

[535] *See* Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have no Clear Path to Quitting*, N.Y. Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.

[536] *Id.*

[537] National Youth Tobacco Survey, U.S. FDA (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey; Karen Cullen et al., *e-Cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019).



453.    The Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[538] Then FDA Commissioner Dr. Gottlieb described the increase in e-cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for an "epidemic" of nicotine use among teenagers.[539] The rapid—indeed infectious—adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products."[540] CDC Director Robert Redfield agreed, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."[541] Then-Commissioner Gottlieb identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."[542]

454.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr.

[538] Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

[539] News Release, *FDA Launches New, Comprehensive Campaign to Warn Kids About the Dangers of E-Cigarette Use as Part of Agency's Youth Tobacco Prevention Plan, Amid Evidence of Sharply Rising Use Among Kids,* U.S. FDA (Sept. 18, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm.

[540] *Id.*

[541] Amir Vera, *Texas Governor Signs Law Increasing the Age to Buy Tobacco Products to 21*, CNN (June 8, 2019), https://www-m.cnn.com/2019/06/08/health/texas-new-tobacco-law/index.html.

[542] *Id.*

Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."[543] The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."

455.    The JUUL youth addiction epidemic spread rapidly across high schools in the United States. JUUL surged in popularity, largely through social media networks, and created patterns of youth usage, illegal youth transactions, and addiction, that are consistent with this account from Reddit in 2017:

> Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say 'can I put my pod in ur juul?' and are in there every block. I myself spent about 180$ on mango pods and bought out a store, and sold these pods for 10$ a pod, making myself an absolutely massive profit in literally 9 days. Given because I'm 18 with a car and that's the tobacco age around here, I always get offers to get pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make i[t] their own, every day you can find the pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.[544]

456.    In response to the post above, several others reported similar experiences:

> a.      "[T]his is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is."[545]
>
> b.      "Same thing at my school. JUUL fiend is a term too."[546]

---

[543] Surgeon General's Advisory on E-cigarette Use Among Youth (2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[544] *What's Juul in School*, https://www.reddit.com/r/juul/comments/61is7i/whats_juul_in_school/ (last visited Apr.. 4, 2020).

[545] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

c.     "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are."[547]

d.     "[S]ame [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once, and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is."[548]

e.     "[T]he same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now."[549]

f.     "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a pod man?'"[550]

g.     "It's the same at my school and just about every other school in Colorado."[551]

h.     "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic.'"[552]

i.     "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one."[553].

j.     "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping."[554]

k.     "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you

---

[546] *Id.*

[547] *Id.*

[548] *Id.*

[549] *Id.*

[550] *Id.*

[551] *Id.*

[552] *Id.* (citing *Juuls Now Rule the School as Students Frenzy Over E-cig* (Oct. 5, 2016), https://imgur.com/a/BKepw).

[553] *Id.*

[554] *Id.*

1
2
3
4

have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul. It's a craze. I love it, I've made an insane amount of money. It's something that has swept through our age group and has truly taken over. And it happened almost overnight."[555]

5
6
7
8
9
10

457.    The following graph illustrates JLI's responsibility for the nationwide youth e-cigarette epidemic. While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth. Through that same timeframe, youth e-cigarette rates nearly doubled from more than 11% in 2017 to more than 20% in 2018. Through October 5, 2019 (the last date for which data was available), rates of youth e-cigarette use continued to increase, tracking the growth of JUUL.

11
12
13
14
15
16
17
18
19
20
21



[556]

22
23

458.    The unique features of the JUUL e-cigarette—high nicotine delivery, low harshness, and easy-to-conceal design—have caused patterns of addiction with no historical

24

___

[555] *Id.* (emphasis added).

25
26
27
28

[556] The area graph depicts e-cigarette unit sale volumes in retail outlets tracked by Nielsen by manufacturer and month from 2013 through October 5, 2019; the line graph depicts national high school and middle school e-cigarette past-30-day usage rates as percentages from 2013 through 2019, with each data point representing a year. *See* Nielsen: Tobacco All Channel Data; National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey; *see also* Compl. at 2 (Figure 1), *Commonwealth of Penn. v. Juul Labs, Inc.*, (Ct. Common Pleas, Feb. 10, 2020).

1  precedent. It is not uncommon for fifteen-year-old students, even those who live at home with

2  their parents, to consume two or more JUUL pods a day.

3  **H.   JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its**

4  **Products**

5  **1.   E-Cigarette Manufacturers Successfully Blocked the Types of**

6  **Regulations that Reduced Cigarette Sales, Creating the Perfect**

7  **Opportunity for JLI.**

8  459.   One of the main reasons e-cigarettes like JUUL were so appealing from an

9  investment and business development perspective is that, unlike combustible cigarettes, e-

10  cigarettes were relatively unregulated. This regulatory void was not an accident; the cigarette

11  industry, and then the e-cigarette industry, spent significant resources blocking, frustrating, and

12  delaying government action. A 1996 article in the *Yale Law & Policy Review* detailed how

13  cigarette companies vehemently opposed the FDA mid-1990s rules on tobacco products, using

14  lawsuits, notice-and-comment, and arguments related to the FDA's jurisdiction to delay or undo

15  any regulatory efforts.[557]

16  460.   In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control

17  Act (TCA). The TCA amended the Federal Food, Drug, and Cosmetic Act to allow the FDA to

18  regulate tobacco products.

19  461.   Although the TCA granted the FDA immediate authority to regulate combustible

20  cigarettes, it did not give the FDA explicit authority over all types of tobacco products—

21  including those that had not yet been invented or were not yet popular. To "deem" a product for

22  regulation, the FDA must issue a "deeming rule" that specifically designates a tobacco product,

23  such as e-cigarettes, as falling within the purview of the FDA's authority under the TCA.

24  462.   The TCA also mandated that all "new" tobacco products (i.e., any product not on

25  the market as of February 15, 2007) undergo a premarket authorization process before they

26  could be sold in the United States.

27

28  _____
[557] Melvin Davis, *Developments in Policy: The FDA's Tobacco Regulations*, 15 Yale L. &
Policy Rev. 399 (1996).

463.     Four years later, on April 25, 2014, the FDA finally issued a proposed rule deeming e-cigarettes for regulation under the Tobacco Act ("2014 Proposed Rule").

464.     Once issued, the e-cigarette industry, together with its newfound allies, parent companies, and investors—the cigarette industry and pro-e-cigarette lobbyists—set to work to dilute the rule's effectiveness. For example, in comments to the 2014 Proposed Rule, companies such as Johnson Creek Enterprises (one of the first e-liquid manufacturers) stated that the "FDA [] blatantly ignored evidence that our products improve people's lives."[558]

465.     The New York Times reported that Altria was leading the effort to dilute, diminish, or remove e-cigarette regulations. Notwithstanding Altria's professed concern about flavors attracting youth customers, Altria submitted comments in August 2014 in response to the proposed rule opposing the regulation of flavors. Altria asserted that restrictions could result in more illicit sales, and that adults also liked fruity and sweet e-cigarette flavors.[559]

466.     In 2015, Altria lobbied Capitol Hill with its own draft legislation to eliminate the new requirement that most e-cigarettes already on sale in the United States be evaluated retroactively to determine if they are "appropriate for the protection of public health." In effect, Altria lobbied to "grandfather" all existing e-cigarette brands, including JUUL, into a lax regulatory regime. That proposed legislation was endorsed by R.J. Reynolds. Altria delivered its proposal, entitled "F.D.A. Deeming Clarification Act of 2015," to Representative Tom Cole of Oklahoma, who introduced the bill two weeks later using Altria's draft verbatim.[560] Seventy other representatives signed on to Altria's legislation.[561]

---

[558] Eric Lipton, *A Lobbyist Wrote the Bill.Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (Sept. 2, 2016), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.

[559] Altria Client Services Inc., Comment Letter on Proposed Rule Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act 47-48 (Aug. 8, 2014), https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/ALCS-NuMark-Comments-FDA-2014-N-0189.pdf.

[560] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (Sept. 2, 2016), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.

[561] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

467.    The e-cigarette industry, along with the intertwined cigarette industry, was able to leverage support among Members of Congress such as Representative Cole and Representative Sanford Bishop of Georgia, who advocated for cigarette industry interests and opposed retroactive evaluation of e-cigarette products. Both Cole and Bishop echoed a common cigarette and e-cigarette industry refrain, that any regulations proposed by the FDA would bankrupt small businesses, even though the overwhelming majority of e-cigarettes were manufactured and distributed by large cigarette companies.

468.    Representatives Cole and Bishop received some of the largest cigarette industry contributions of any member of the U.S. House of Representatives, with Representative Bishop receiving $13,000 from Altria, and Representative Cole $10,000 from Altria in the 2015-2016 cycle.[562]

469.    By thwarting and delaying regulation, or by ensuring what regulation did pass was laced with industry-friendly components, the e-cigarette industry, including Defendants, hobbled the FDA—and by extension—Congress's efforts to regulate e-cigarettes. Simultaneously, the e-cigarette industry continued to market their products to youth, and it coordinated to sow doubt and confusion about the addictiveness and health impacts of e-cigarettes.

470.    Even after the FDA issued its final deeming rule in 2016, e-cigarette industry lobbying continued to pay dividends to companies like JLI. In 2017, when Dr. Scott Gottlieb took over as the FDA Commissioner, one of his first major acts was to grant e-cigarette companies a four-year extension to comply with the deeming rule, even as data indicated sharp increases in teen e-cigarette use.[563] Gottlieb had previously served on the board of Kure, a chain of e-cigarette lounges in the United States, though he fully divested before taking the helm at

---

[562] *Id.*; *Rep. Tom Cole - Oklahoma District 04, Contributors 2015-16*, OpenSecrets (2017), https://www.opensecrets.org/members-of-congress/contributors?cid=N00025726&cycle=2016.

[563] Katie Thomas & Sheila Kaplan, *E-Cigarettes Went Unchecked in 10 Years of Federal Inaction*, N.Y. Times (Oct. 14, 2019), https://www.nytimes.com/2019/10/14/health/vaping-e-cigarettes-fda.html.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1  the FDA.[564]

2      471.    The four-year extension was celebrated by e-cigarette lobbyists. Greg Conley,

3  president of the American Vaping Association (AVA), stated that but for the extension, "over

4  99 percent of vaper products available on the market today would be banned next year."[565]

5  Despite the minimal research publicly available on the health effect of e-cigarettes, Ray Story,

6  who had since become commissioner of the Tobacco Vapor Electronic Cigarette Association,

7  lauded the decision: "Absolutely, it's a good thing . . . [w]hen you look at harm reduction, it's a

8  no brainer."[566]

9      **2.    JLI, the Management Defendants, and Altria Defendants**

10      **Successfully Shielded the Popular Mint Flavor from Regulation.**

11      472.    JLI, the Management Defendants, and Altria Defendants had a two-fold plan for

12  staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on

13  the market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of

14  JLI's role in the youth vaping epidemic. These schemes involved acts of mail and wire fraud,

15  with the intent to deceive the FDA, Congress, and the public at large.

16      473.    First, JLI, the Management Defendants, and Altria publicly defended mint

17  flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated that

18  mint users are not former menthol smokers. Second, by fighting to keep mint as the last flavor

19  on the market, the cigarette industry could continue to appeal to non-smokers, including youth.

20  JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to

21  convince the FDA into leaving the mint flavor on the market, sacrificing other flavors in the

22  process.

23      474.    On August 2, 2018, JLI met with the FDA to discuss a proposed youth-

24

25  [564] Zeke Faux et al., *Vaping Venture Poses Potential Conflict for Trump's FDA Nominee*,
    Bloomberg, (Apr. 19, 2017), https://www.bloomberg.com/news/articles/2017-04-19/vaping-

26  venture-poses-potential-conflict-for-trump-s-fda-nominee.

27  [565] Sheila Kaplan, *F.D.A. Delays Rules That Would Have Limited E-Cigarettes on Market*,
    N.Y. Times (July 28, 2017), https://www.nytimes.com/2017/07/28/health/electronic-cigarette-

28  tobacco-nicotine-fda.html.
    [566] *Id*.

1   behavioral study regarding the prevalence of use, perceptions of use, and intentions to use

2   JUUL and other tobacco products among adolescents aged 13-17 years (the "Youth Prevalence

3   Study").[567]

4       475.    On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study

5   to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had

6   ever used a JUUL, and that only 0.8% of youth had used a JUUL in the last 30 days. And in

7   stark contrast to the McKinsey and DB Research studies discussed above, the Youth Prevalence

8   Study suggested that mango was four times as popular as mint.[568] Specifically, the study found

9   that 47% of youth who reported use of a JUUL device in the last 30-days professed to using

10  mango most often, with only about 12% reporting the same for mint.

11      476.    JLI's study was a sham. JLI, the Management Defendants, and Altria knew their

12  reported data was inconsistent with the McKinsey and DB Research studies conducted just a

13  few months earlier. JLI's report featured responses to a carefully selected survey question—

14  which *single* flavor youth used most often?—that obscured the widespread use of mint JUUL

15  pods among youth.

16      477.    Ironically, just a few days after JLI submitted the misleading Youth Prevalence

17  Study to the FDA, the National Youth Tobacco Survey was released. Revealing the depths of

18  the deception of JLI's Youth Prevalence Study, which found that only 1.5% of youth were

19  current users of e-cigarettes, the National Youth Tobacco Survey found that 20.8% of high

20  school student were current users (*i.e.*, consumed e-cigarettes within the last 30 days).

21      478.    The Youth Prevalence Study that JLI submitted to the FDA, either via U.S. mail

22  or by electronic transmission, was false and misleading. JLI, the Management Defendants, and

23  Altria knew as much. Indeed, they counted on it.

24      479.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner

25  Scott Gottlieb sent letters to Altria, JLI and other e-cigarette manufacturers, requesting a

---

[567] Letter from Joanna Engelke, JUUL Labs, Inc., to David Portnoy, Ph.D., M.P.H., FDA
Center for Tobacco Products (Nov. 5, 2018).
[568] *Id.* at 3.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                        Case No. 19-md-02913-WHO

1   "detailed plan, including specific timeframes, to address and mitigate widespread use by

2   minors."[569]

3       480.    As evidenced by Altria's recent admission that negotiations with JLI were

4   ongoing in late 2017,[570] Altria and JLI's responses to the FDA reflect a coordinated effort to

5   mislead the FDA with the intention that regulators, in reliance on their statements, allow JLI to

6   continue marketing mint JUUL pods.[571]

7       481.    Defendants' plan centered on efforts to deceive the FDA that (1) mint was more

8   akin to Tobacco and Menthol than other flavors; and (2) kids did not prefer mint.

9       482.    JLI took the first step in this coordinated effort to deceive the FDA. In response

10  to then-Commissioner Gottlieb's September 12, 2018 letter, JLI prepared an "Action Plan,"

11  which it presented to the FDA at an October 16, 2018 meeting, and presented to the public on

12  November 12, 2018. The substance of JLI's presentation to the FDA and its public-facing

13  Action Plan were largely identical.[572] JLI purported to "share a common goal- preventing youth

14  from initiating on nicotine."[573] As part of this plan, JLI stated that it would be "stopping

15  flavored JUUL pod sales to all 90,000+ retail stores."

16      483.    But this statement was not true. JLI was continuing retail sales of its mint JUUL

17  pods, which JLI categorized as a non-flavored "tobacco and menthol product."[574] In JLI's

18  Action Plan, then-CEO Burns stated that only products that "mirror what is currently available

19  for combustible cigarettes—tobacco and menthol-based products (menthol and mint pods)—

20

21

22

---

23  [569] Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 12, 2018); Letter from Scott
    Gottlieb, M.D. to Altria Group Inc. (Sept. 12, 2018).

24  [570] Letter from Howard Willard III, Altria to Senator Durbin, et. al. ( Oct. 14, 2019).

25  [571] *See United States v. Jones*, 712 F.2d 1316, 1320-21 (9th Cir. 1983) ("It is enough that the
    mails be used as part of a 'lulling' scheme by reassuring the victim that all is well and

26  discouraging him from investigating and uncovering the fraud.").

27  [572] JUUL did not include in its Action Plan a proposal for Bluetooth or Wi-Fi equipped devices
    that was included in JLI's October presentation.

28  [573] JUUL Labs, Inc. *FDA Presentation*, 2 (Oct. 16, 2018); INREJUUL_00182989.
    [574] *Id.*

1   will be sold to retail stores."[575]

2   484.   In both JLI's October 2018 presentation to the FDA and JLI's Action Plan that

3   was shared with the public, JLI and its CEO fraudulently characterized mint as a non-flavored

4   cigarette product, akin to tobacco and menthol cigarettes, suggesting that it was a product for

5   adult smokers. The image below was included in both the public-facing Action Plan and JLI's

6   presentation to the FDA.



485.   JLI knew that non-smoking youth liked mint as much as any flavor.

486.   Numerous internal studies had informed JLI that mint's success was "not

because it's a menthol/a familiar tobacco flavor but because it is the best JUUL flavor profile on

multiple levels."[576] Indeed, despite JLI's attempts to explicitly link mint to menthol, JLI knew

there was "No Implied Relationship Between Mint & Menthol,"[577] and "menthol smokers are

not the only driver behind the popularity of mint flavored JUULpods."[578]

487.   Most importantly, JLI knew that mint was the most popular JUUL pod. Though

other flavors might draw new customers, JLI's most addictive "flavor" predictably became its

---

[575] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/.
[576] INREJUUL_00265069.
[577] INREJUUL_00079307-INREJUUL_00079409, at 395.
[578] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

most popular.

488.    The characterization of mint as an adult tobacco product was also fraudulent because JLI *knew first hand* from the McKinsey and DB Research studies that teens viewed mint as favorably as mango, which implies that mango and mint were fungible goods for JLI's underage users. The McKinsey and DB Research studies also showed that youth preferred mint over the more stereotypically youth-oriented flavors like fruit medley, crème brule, and cucumber. As alleged in a Whistlerblower Complaint, JLI's then-CEO told his employees: "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."[579]

489.    On October 25, 2018, less than ten days after JLI presented its fraudulent, misleading Action Plan to the FDA, Altria's CEO Howard Willard submitted a letter in response to the FDA's call to combat the youth epidemic. Willard's letter was a clear indication of Altria's willingness to continue the fraudulent scheme and deception of the FDA. While Willard's letter confirmed that Altria understood that JLI's conduct and product was addicting many children to nicotine, this letter repeated the misleading statement that mint was a "traditional tobacco flavor" despite Altria and JLI knowing it was no such thing. Willard then claimed that the youth epidemic was caused, in part, by "flavors that go beyond traditional tobacco flavors"—which, according to JLI and Altria, did not include mint—and announced that Altria would discontinue all MarkTen flavors except for "traditional tobacco, menthol and mint flavors." Willard asserted that these three flavors were essential for transitioning smokers. But Willard, and Altria, knew this was not true.[580]

490.    That same day—October 25, 2018—Altria continued its deception on an earnings call with investors. Altria fraudulently described its decision to remove its pod-based products from the market as one intended to address the dramatic increase in youth e-cigarette use, while it was only weeks away from publicly announcing its 35% stake in JLI:

We recently met with Commissioner Gottlieb to discuss steps that could be taken

---

[579] Angelica LaVito, *Former JLI executive sues over retaliation, claims company knowingly sold tainted nicotine pods*, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/former-juul-executive-sues-over-retaliation-claims-company-knowingly-sold-tainted-pods.html.
[580] Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                    Case No. 19-md-02913-WHO

to address underage access and use. Consistent with our discussion with the FDA and because we believe in the long-term promise of e-vapor products and harm reduction, we're taking immediate action to address this complex situation.

First, Nu Mark will remove from the market MarkTen Elite and Apex by MarkTen pod-based products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Second, for our remaining MarkTen and Green Smoke cig-a-like products, Nu Mark will sell only tobacco, menthol and mint varieties. Nu Mark will discontinue the sale of all other flavor variants of our cig-a-like products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Although we don't believe we have a current issue with youth access or use of our e-vapor products, we are taking this action, because we don't want to risk contributing to the issue.

After removing Nu Mark's pod-based products and cig-a-like flavor variants, approximately 80% of Nu Mark's e-vapor volume in the third quarter of 2018 will remain on the market.[581]

491.  Willard reiterated that "pod-based products and flavored products" were behind the increase in youth use of e-cigarettes:

I mean, I think the way we thought about this was that we believe e-vapor has a lot of opportunity to convert adult cigarette smokers in the short, medium and long-term, but clearly, this significant increase in youth usage of the products puts that at risk and we think rapid and significant action is necessary. And I think as we looked at the data that is available in some of the remarks from the FDA, I think we concluded that the driver of the recent increase we think is pod-based products and flavored products and so we thought that the two actions that we took addressed the drivers of the increased youth usage here in the short run.[582]

492.  Willard emphasized that Altria's withdrawal of its own pod-based products was intended to address youth use: "[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward." He later said: "And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue."[583] As noted above, however,

---

[581] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript MO earnings call for the period ending September 30, 2018 (Oct. 25, 2018), https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx.

[582] *Id*.

[583] *Id*.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

it has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction that JLI created, but because a non-compete clause was a "part of its deal with J[LI]."[584]

493.    Thus, while Altria publicly announced that it would pull its pod-based products to combat youth usage, and publicly seemed to support removal of youth-friendly flavors, its defense of mint as a tobacco-analog was actually part of the scheme to protect the profits associated with JLI's mint JUUL pods, one of JLI's strongest products with the highest nicotine content and highest popularity among non-smokers and youth.

494.    In support of his arguments to the FDA that mint was a flavor for adult smokers, Willard cited to a study that Altria had conducted and presented at a conference that JLI attended.[585] But Willard did *not* disclose that Altria's "study" was merely a "quasi-experimental online survey" and not a true scientific study.[586] Notably, JLI's current CEO, K.C. Crosthwaite, was the President and Chief Growth Officer of Altria Client Services, which conducted Altria's mint "study" in Spring 2017, the same time that the Management Defendants and Altria began their "confidential negotiations."[587] Willard did not disclose that this study was contradicted by the "youth prevention" data provided by JLI during its acquisition due-diligence showing that mint was popular among teens.

495.    Through these letters, Altria sought to prevent the FDA—which was actively considering regulating flavors[588]—from banning JLI's mint JUULpods.

496.    Acting in concert, JLI and Altria committed acts of mail or wire fraud when (1)

---

[584] *Id.*

[585] Jessica Parker Zdinak, Ph.D., *E-vapor Product Appeal Among Tobacco Users and Non-users and the Role of Flavor in Tobacco Harm Reduction*, 72nd Tobacco Science Research Conference (Sept. 18, 2018), https://sciences.altria.com/library/-/media/Project/Altria/Sciences/library/conferences/2018%20TSRC%20J%20Zdniak%20Presentation.pdf.

[586] *Id.*

[587] Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).

[588] Alex Lardieri, *FDA Considers Ban on E-Cigarette Flavors Amid 'Epidemic' Use By Teens*, U.S. News & World Report (Sept. 12, 2018), https://www.usnews.com/news/health-care-news/articles/2018-09-12/fda-considers-ban-on-e-cigarette-flavors-amid-epidemic-use-by-teens.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

JLI transmitted its Action Plan to the FDA and the public; and (2) Altria transmitted Willard's letter to the FDA.

497.   At the heart of these acts of fraud was Defendants' characterization of mint as a tobacco product that was targeted to adult smokers. This characterization was fraudulent because Defendants knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products. Altria supported this plan and helped execute it. Together, these actions by JLI and Altria ensured that mint would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

498.   The deceptive scheme worked—the FDA did not protest JLI and Altria's plan. And on December 20, 2018, one month after JLI announced its Action Plan to keep selling mint, Altria made a $12.8 billion equity investment in JLI.

499.   By February of 2019, the FDA became aware that it had been deceived by JLI and Altria. On February 6, 2019, then-FDA commissioner Gottlieb wrote JLI and Altria demanding in-person meetings, excoriating Altria for its "newly announced plans with JUUL [that] *contradict the commitments you made to the FDA*" in a prior meeting and Willard's October 25, 2018 letter to the FDA.[589] Gottlieb's letter to JLI alleged that JLI's conduct was "inconsistent with its previous representations to the FDA."[590]

500.   The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Then-Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any alleged steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

501.   JLI and Altria met with Gottlieb in March 2019 in a meeting the then-

---

[589] Letter from Scott Gottlieb, FDA to Howard Willard, Altria (Feb. 9, 2019).
[590] Letter from Scott Gottlieb, FDA to Kevin Burns, JUUL Labs, Inc. (Feb. 9, 2019).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

Commissioner described as "difficult."[591] Gottlieb "did not come away with any evidence that public health concerns drove Altria's decision to invest in JLI, and instead said it looked like a business decision. According to reporting by the New York Times, Gottlieb angrily criticized JLI's lobbying of Congress and the White House, stating:

> We have taken your meetings, returned your calls and I had personally met with you more times than I met with any other regulated company, and yet you still tried to go around us to the Hill and White House and undermine our public health efforts. I was trying to curb the illegal use by kids of your product and you are fighting me on it.[592]

502.    But just a week after the "difficult" meeting with JLI and Altria, Gottlieb posted a statement about the FDA's new e-cigarette policy, proposing to ban all flavors *except* "tobacco-, mint- and menthol-flavored products."[593] He cited the strong support of President Trump (whose administration JLI had aggressively lobbied[594]), and also cited "recent evidence indicat[ing] that mint- and menthol-flavored ENDS products are preferred more by adults than minors."[595] Just a few weeks later, Gottlieb resigned from his position as commissioner of the FDA.

503.    The scheme had succeeded in saving mint JUUL pods, as well as each Defendant's bottom line. JLI's sale of mint JUUL pods rose from one third of its sales in September 2018 to approximately two thirds in February 2019. JLI's 2019 revenues were

---

[591] Kate Rooney & Angelica LaVito, *Altria Shares Fall After FDA's Gottlieb Describes 'Difficult' Meeting on Juul*, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html.

[592] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

[593] News Release, *Statement from FDA Commissioner Scott Gottlieb, M.D., on advancing new policies aimed at preventing youth access to, and appeal of, flavored tobacco products, including e-cigarettes and cigars*, U.S. FDA (Mar. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-advancing-new-policies-aimed-preventing-youth-access.

[594] Evan Sully & Ben Brody, *JLI Spent Record $1.2 Million Lobbying as Regulators Stepped Up*, Wash. Post (Oct. 22, 2019), https://www.washingtonpost.com/business/on-small-business/juul-spent-record-12-million-lobbying-as-regulators-stepped-up/2019/10/22/2a0dbc52-f4de-11e9-b2d2-1f37c9d82dbb_story.html.

[595] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

estimated to be between $2.36 billion and $3.4 billion, and mint JUUL pods accounted for approximately 75% of JLI's total 2019 sales. And because mint remained on the market until JLI withdrew it in November 2019 in the face of growing scrutiny,[596] thousands, if not millions, of underage JUUL users suffered the consequences.

504.    As former New York City Mayor Mike Bloomberg stated: "JUUL's decision to keep mint- and menthol-flavored e-cigarettes on the shelves is a page right out of the tobacco industry's playbook."[597]

505.    JLI continues to sell menthol-flavored products.[598]

### 3.    In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic.

506.    In 2017, the FDA announced that it would be taking steps to regulate e-cigarette devices such as JUUL. In late 2017, the FDA initiated its investigation of e-cigarette companies' advertising and sales practices. But, as noted above, the FDA's 2017 Compliance Policy issued a four-year extension for compliance with the 2016 deeming rule, apparently to "balance between regulation and encouraging development of innovative tobacco products that may be less harmful than cigarettes."[599] In March 2018, the 2017 Compliance Policy was challenged by the American Academy of Pediatrics, along with other public health organizations concerned that a compliance extension for the e-cigarette industry would allow more e-cigarette products into the market and continue to addict thousands of youth.[600]

507.    In March 2019, the FDA drafted guidance that modified the 2017 Compliance Policy, but it did not go into full effect. However, on May 15, 2019, the lawsuit filed by the

---

[596] Ellen Huet, *JLI Pulls Mint-Flavor Vaping Products, but Menthol Remains*, Bloomberg (Nov. 7, 2019),  https://www.bloomberg.com/news/articles/2019-11-07/juul-stops-selling-mint-flavored-vaping-products.

[597] *Id.*

[598] Sheila Kaplan, *Juul Halts Sales of Mint, Its Top-Selling e-Cigarette Flavor*, N.Y. Times (Nov. 7, 2019), https://www.nytimes.com/2019/11/07/health/vaping-juul-mint-flavors.html.

[599] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.

[600] *Id.*

American Academy of Pediatrics was successful—the U.S. District Court for the District of Maryland vacated the 2017 Compliance Policy, and directed the FDA to "require that premarket authorization applications for all new deemed products" ("new" referred to any product launched after February 15, 2007 and thus would include JUUL) be submitted within ten months, by May 2020.[601]

508.    In January 2020, the FDA issued: Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization: Guidance for Industry (2020 FDA Guidance), directed at the e-cigarette industry, which detailed the FDA's plan to prioritize enforcement of regulations prohibiting the sale of flavored e-cigarette products and prohibiting the targeting of youth and minors.[602] The 2020 FDA Guidance focused on flavored e-cigarettes that appeal to children, including fruit and mint: "[C]ompanies that do not cease manufacture, distribution and sale of unauthorized flavored cartridge-based e-cigarettes . . . within 30 days risk FDA enforcement actions."[603]

### 4.    The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done

509.    By the time the FDA acted, youth consumption of e-cigarettes had already reached an all-time high, and the e-cigarette industry's presence on social media became an unstoppable force. The 2020 FDA Guidance acknowledges that two of the largest 2019 surveys of youth cigarette use found that e-cigarette use had reached the highest levels ever recorded.[604] By December 2019, there were over 2,500 reported cases of e-cigarette related hospitalization

---

[601] *Id.*; *Am. Academy of Pediatrics v. FDA* , 379 F. Supp. 3d 461, 496 (D. Md. 2019).

[602] *Id.*

[603] News Release, *FDA Finalizes Enforcement Policy on Unauthorized Flavored Cartridge-Based E-Cigarettes That Appeal to Children, Including Fruit and Mint*, U.S. FDA (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

[604] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.

for lung injury, including over fifty confirmed deaths.[605] Despite the FDA's efforts between 2017 and 2019, youth consumption of e-cigarettes doubled among middle and high school students over the same period.[606] In 2019, the total number of middle and high school students reporting current use of e-cigarettes surpassed five million for the first time in history.[607]

510.   JLI's presence on social media has also persisted, even without further initiation by JLI—the hallmark of a successful viral marketing campaign. When the "#juul" hashtag was first used on social media, it was a series of thirteen tweets on Twitter. By the time JLI announced it would shut down its Instagram account, "#juul" had been featured in over 250,000 posts on Instagram. A study by Stanford University found that in the eight months after JLI ceased all promotional postings, community posting accelerated, to nearly half a million posts. Whereas before JLI exited Instagram, "#juul" appeared on average in 315 posts per day, that number tripled to 1084 posts per day after JLI shut down its Instagram account.[608]

511.   The FDA's anti-e-cigarette campaign on social media was aimed at youth and middle and high school students. The campaign used the slogan "The Real Cost" to educate youth on social media platforms about the health impacts of e-cigarette consumption—the real cost of using e-cigarettes. A recent study from the University of California Berkeley found that since September 2018, when the FDA's social media campaign began, the hashtag "#TheRealCost" was used about fifty times per month on Instagram. By comparison, e-cigarette related hashtags were used as many as 10,000 times more often. Despite the FDA's social media intervention, the number of e-cigarette related posts, and the median number of likes (a strong metric of viewer engagement) the posts received, increased three-fold and six-fold,

---

[605] Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019).

[606] *Id*.

[607] *Id*.

[608] Robert K. Jackler et al., *Rapid Growth of JUUL Hashtags After the Company Ceased Social Media Promotion*, Stanford Research Into the Impact of Tobacco Advertising (July 22, 2019), http://tobacco.stanford.edu/tobacco_main/publications/Hashtag JUUL Project_7-22-19F.pdf.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

respectively.[609]

512.   In short, by the time the FDA reacted to the epidemic created by Defendants, millions of youth were addicted to e-cigarettes and nicotine, and were sharing e-cigarette related posts on social media on their own.

## I.   JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries

### 1.   JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries

513.   The use of e-cigarettes, including JUUL, cause significant lung toxicity[610] and have been implicated in multiple severe pathological lung injuries.

514.   Recent studies have demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[611] An impaired epithelial barrier function allows greater passage of inhaled chemicals into the body, increasing inflammation both locally in the lungs and systemically. This can lead to acute and chronic lung injury as well as exposure to, and increased susceptibility to, respiratory infections in users of e-cigarettes, including JUUL.[612]

515.   Research has also demonstrated that ultrafine metal particles from heating

---

[609] Julia Vassey, *#Vape: Measuring E-cigarette Influence on Instagram With Deep Learning and Text Analysis*, 4 Frontiers in Commc'n 75 (2020),https://www.frontiersin.org/articles/10.3389/fcomm.2019.00075/full.

[610] Lauren F. Chun et al., *Pulmonary Toxicity of E-cigarettes*, 313 Am. J. Physio. Lung Cell Mol. Physiol. L193 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28522559.

[611] Thivanka Muthumalage et al., *E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes*, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.

[612] Laura E. Crotty Alexander et al., *Chronic Inhalation of E-cigarette Vapor Containing Nicotine Disrupts Airway Barrier Function and Induces Systemic Inflammation and Multiorgan Fibrosis in Mice*, 314 Am. J. Physiol. Regul. Comp. Physiol. R834 (2018), https://journals.physiology.org/doi/full/10.1152/ajpregu.00270.2017; Pieter S. Hiemstra et al., *The Innate Immune Function of Airway Epithelial Cells in Inflammatory Lung Disease*, 45 Eur. Respir. J. 1150 (2015), https://erj.ersjournals.com/content/45/4/1150.

---

1    devices have been found in e-cigarette aerosol, and in e-cigarette user's lungs.[613]

2    516.   In addition, exposure to JUUL aerosol has been shown to significantly impair

3    endothelial function comparable to impairment of endothelial function caused by use of

4    combustible cigarettes.[614]

5    517.   It is well-established that endothelial dysfunction and injury from direct toxic

6    effects of inhalants such as cigarette smoke, can cause lung injuries such as chronic obstructive

7    pulmonary disease (COPD), emphysema, asthma and chronic bronchitis.[615]

8    518.   Recent epidemiological and toxicological studies detected links between asthma

9    frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the

10   same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.[616]

11   519.   A study published in December 2019, found that among individuals who never

12   smoked combustible cigarettes, current e-cigarette use was associated with 75% higher odds of

13   chronic bronchitis, emphysema, and COPD compared to those who never used e-cigarettes.[617]

14   520.   In addition, the flavoring compounds used in e-cigarettes such as JUUL, include

15   numerous chemicals known to be toxins if inhaled, such as diacetyl, acetyl propionyl, and

16   benzaldehyde. These chemicals are linked to serious lung disease.[618]

---

[613] Alessandra Caporale et al., *Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI*, 293 Radiology 97 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31429679.

[614] Poonam Rao et al., *Juul and Combusted Cigarettes Comparably Impair Endothelial Function*, 6 Tob. Regul. Sci. 30 (2020),https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6953758/.

[615] Francesca Polverino et al. *COPD as an Endothelial Disorder: Endothelial Injury Linking Lesions in the Lungs and Other Organs?*, 8 Pulm. Circ. 1 (2018), https://www.ncbi.nlm.nih.gov/pubmed/29468936.

[616] Phillip W. Clapp and Ilona Jaspers, *Electronic Cigarettes: Their Constituents and Potential Links to Asthma*, 79 Curr Allergy Asthma Rep. 17 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28983782.

[617] Albert D. Osei et al., *Association Between E-Cigarette Use and Chronic Obstructive Pulmonary Disease by Smoking Status: Behavioral Risk Factor Surveillance System 2016 and 2017*, 132 Am. J. Prev. Med. 949 (2019),https://www.ncbi.nlm.nih.gov/pubmed/30853474.

[618] Centers for Disease Control & Prevention, *Flavorings-Related Lung Disease* (Oct. 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/default.html; Won Hee Lee et al., *Modeling Cardiovascular Risks of E-Cigarettes with Human-Induced Pluripotent Stem Cell-Derived Endothelial Cells.* 73 J. Am. College of Cardiology 2722 (2019),

521.    A multitude of published case reports have linked e-cigarette use, including JUUL, to a variety of acute inhalational lung injuries such as lipoid pneumonia, bronchiolitis obliterans (popcorn lung), alveolar hemorrhage, eosinophilic pneumonia, hypersensitivity pneumonitis, chemical pneumonitis and collapsed lungs, among others.

522.    In 2012, one article reported on the case of a 42-year-old woman admitted with a seven-month history of dyspnea, cough, and fevers that began when the patient had begun using e-cigarettes. The authors hypothesized the source of lipoid pneumonia was e-cigarette use, due to "glycerin-based oils found in e-cigarette nicotine vapor" added to "make the visual smoke when the solution is vaporized."[619]

523.    A 2014 report described a 20-year-old previously healthy U.S. active-duty male sailor who presented with a three-day history of "persistent cough, shortness of breath, and facial flushing" which began an hour after using an e-cigarette device. The patient was diagnosed with acute eosinophilic pneumonia. The patient was given prednisone and discharged after five days in the hospital, with improvement of his symptoms and significant resolution of lung opacity.[620]

524.    In 2015, Atkins and Drescher reported the case of a 60-year-old man admitted repeatedly with weakness, chills, cough, a fever, and hypoxemia, with "bilateral upper lung zone crackles." The patient revealed before each emergency room admittance he had used e-cigarettes and was was diagnosed with "suspected acute hypersensitivity pneumonitis, related to ENDS" and had no further episodes with cessation of e-cigarette use.

525.    In another case in 2015, a 31-year-old woman was admitted to the hospital for dyspnea and cough. The patient "became increasingly hypoxic and was intubated due to

---

https://www.ncbi.nlm.nih.gov/pubmed/31146818; Sheila Kaplan & Matt Richtel, *Mysterious Vaping Illness That's 'Becoming an Epidemic,'* N.Y. Times (Aug. 31, 2019), https://www.nytimes.com/2019/08/31/health/vaping-marijuana-ecigarettes-sickness.html.

[619] Lindsay McCauley et al., *An Unexpected Consequence of Electronic Cigarette Use*, 141 Chest 1110 (2012).

[620] Darshan Thota & Emi Latham, *Case Report of Electronic Cigarettes Possibly Associated with Eosinophilic Pneumonitis in a Previously Healthy Active-duty Sailor*, 47 J. Emerg. Med. 15 (2014).

concerns of acute respiratory distress syndrome." The patient was started on IV steroids and diagnosed with lipoid pneumonia, given the close temporality of her recent initiation of e-cigarettes three months prior to her onset of symptoms. The patient rapidly improved with steroids and cessation of use of e-cigarettes.[621] A different published a case report in 2015 describes bilateral pneumonia and pleural effusions associated with e-cigarette use.[622]

526.   In 2016, another case report described the case of a 27-year-old otherwise healthy man who was admitted to the hospital with dyspnea, cough, fever, and hemoptysis after increasing use of e-cigarettes for seven months prior to presentation, initiated in an effort to decrease his combustible tobacco dependence. The patient worsened and required intubation and mechanical ventilator support. There were no notable findings on microorganism workup, "making infectious etiology for his pneumonia very unlikely.".[623]

527.   Also in January 2020, another article reported on a teenager who developed acute fibrinous organizing pneumonia (AFOP) after using JUUL as well as other vaping products. AFOP presents with diffuse ground glass infiltrates and intra-alveolar fibrin balls. Subpleural sparing and pneumomediastinum described elsewhere in vaping associated lung injury were also seen. The authors noted that this patient's presentation fit with existing literature, but his young age, choice of e-cigarette, and lung pathology were considered unique. The images characterized AFOP, a newly evolving rare lung pathology, which is now associated with vaping.[624]

528.   Additional published case reports and case series were published since 2016 noting serious and significant acute lung injuries associated with vaping or e-cigarette use. Despite the increasing reports in the published medical literature and the widespread use of

---

[621] Sujal Modi et al., *Acute Lipoid Pneumonia Secondary to E-Cigarettes Use: An Unlikely Replacement for Cigarettes*, 148 Chest 382 (2015).
[622] Kendall Moore et al., *Bilateral Pneumonia and Pleural Effusions Subsequent to Electronic Cigarette Use*, 3 Open J. of Emergency Med. 18 (2015).
[623] Ronnie D. Mantilla et al., *Vapor Lung: Bronchiolitis Obliterans Organizing Pneumonia (BOOP) in Patient with E-Cigarette Use*, 193 Am. J. of Respiratory & Critical Care Med. A6513 (2016).
[624] Monica A. Lu et al., *Vaping-related Lung Injury in an Adolescent*, 201 Am. J. of Respiratory & Critical Care Med. 481(2020).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

JUUL among teenagers, JLI did not take any steps to warn the public and consumers of the risks of JUUL products.

529.   Over the summer of 2019, healthcare providers started to note an influx of acute respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes. This prompted a Center for Disease Control ("CDC") investigation of an outbreak of vaping associated lung injuries. The reported injuries mirrored the injuries that had been reported in the medical literature since 2012. In October 2019, the CDC issued treatment guidelines to assist doctors in clinical practice. The CDC defined a new recognized medical condition referred to as E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI).

530.   Researchers noted that the recent proliferation of vaping-related cases, known as EVALI, demonstrated a heterogeneous collection of pneumonitis patterns that include acute eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and acute respiratory distress syndrome (ARDS), diffuse alveolar hemorrhage, hypersensitivity pneumonitis, and the rare giant-cell interstitial pneumonitis. Active infection (which would include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit.[625]

531.   Further, a recent publication in 2020 noted that there were almost 2000 cases of EVALI at the time it was written. The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak but there may be more than one cause and therefore, everyone should refrain from using any e-cigarette or vaping products.[626]

532.   Another publication in January 2020 noted that there were a number of patients who were diagnosed with EVALI who reported the use of nicotine only e-cigarettes. The authors concluded that EVALI was also associated with nicotine only products.[627]

---

[625] David C. Christiani, *Vaping-Induced Injury*, 68 New England J. Med. 787 (2019).

[626] Sascha Ellington et al., *Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use-Associated Lung Injury—United States, August 2019–January 2020,* 69 Morbidity & Mortality Weekly Rep. 44 (2020).

[627] Isaac Ghinai et al., *Characteristics of Persons Who Report Using Only Nicotine-Containing Products Among Interviewed Patients with E-cigarette, or Vaping, Product Use-Associated*

533.    In addition, multiple reports have been published in the medical literature of acute alveolar hemorrhage caused by e-cigarette use.[628] Diffuse alveolar hemorrhage (DAH) is a life-threatening disorder which refers to bleeding that originates in the pulmonary microvasculature. It often results in acute respiratory failure.[629] Hypersensitivity pneumonitis has been linked to the use of e-cigarettes, such as JUUL, since 2015.[630] In 2018, researchers published the first reported case of hypersensitivity pneumonitis and acute respiratory distress syndrome (ARDS) as a risk of e-cigarette use in an adolescent.[631] Recent case reports have also linked spontaneous pneumothorax (lung collapse) to vaping and use of e-cigarettes.[632, 633]

534.    The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation and death.

535.    It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, acute respiratory distress syndrome (ARDS), asthma, emphysema and COPD. Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL.

*Lung Injury - Illinois, August-December 2019*, 69 Morbidity & Mortality Weekly Rep. 84 (2020).

[628] Michael Agustin et al., *Diffuse Alveolar Hemorrhage Induced by Vaping*, 2018 Case Rep. Pulmonol. 1 (2018); Peter J. Edmonds et al., *Vaping-induced Diffuse Alveolar Hemorrhage*, 29 Respiratory Med. Case Reports 1 (2020).

[629] Brandi R. Newsome & Juan E. Morales, *Diffuse Alveolar Hemorrhage*, 104 Southern Med. J. 269 (2011).

[630] Graham Atkins et al., *Acute Inhalational Lung Injury Related to the Use of Electronic Nicotine Delivery Systems (ENDS)*, 148 Chest 83A (2015).

[631] Casey G. Sommerfield et al., *Hypersensitivity Pneumonitis and Acute Respiratory Distress Syndrome From E-Cigarette Use*, 141 Pediatrics 1 (2018).

[632] Alex Bonilla et al., *Recurrent Spontaneous Pneumothoraces and Vaping in an 18-year-old Man: A Case Report and Review of the Literature*, 13 J. of Med. Case Reports 283 (2019), https://doi.org/10.1186/s13256-019-2215-4.

[633] Munish Sharma et al., *A Case Report of Secondary Spontaneous Pneumothorax Induced by Vape*, 11 Cureus e6067 (2019), https://www.cureus.com/articles/24542-a-case-report-of-secondary-spontaneous-pneumothorax-induced-by-vape.

536.    The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety.

### 2.    JUUL Products Cause Cardiovascular Injuries

537.    In addition to severe lung injuries and addiction, JUUL products cause significant and severe risks of cardiovascular injuries. Studies have shown that use of e-cigarettes such as JUUL increase the risk of strokes and heart attacks. [634]

538.    Research has demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which also increases the risk of strokes and heart attacks.[635] Further, scientists have found that e-cigarettes cause oxidative stress, which leads to vascular disease and damage, known risk factors for cardiovascular injuries.[636]

539.    Biological and epidemiologic studies have found that significant associations exist between e-cigarette use and myocardial infarctions (heart attacks), which appear to be dose-dependent. Biological investigations support this association, whereby a prothrombotic phenotype may develop after exposure to nicotine-containing e-cigarette vapors.[637]

---

[634] News Release, *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries,* Am. Stroke Ass'n , Abstract 9, Session A2 (Jan. 30, 2019), https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries; Mohindar R. Vindhyal et al., *Impact on Cardiovascular Outcomes Among E-cigarette Users: A Review From National Health Interview Surveys,* 73 J. of the Am. College of Cardiology Suppl. 2 (2019), www.onlinejacc.org/content/73/9_Supplement_2/11.; Paul M. Ndunda & Tabitha M. Muutu, *Electronic Cigarette Use is Associated with a Higher Risk of Stroke,* 50 Int'l Stroke Conference 2019 Oral Abstracts: Community/Risk Factors, Suppl. 1, Abst. 9, www.ahajournals.org/doi/10.1161/str.50.suppl_1.9.

[635] Charalambos Vlachopoulos et al., *Electronic Cigarette Smoking Increases Aortic Stiffness and Blood Pressure in Young Smokers,* 67 J. Am. Coll. Cardiol. (2016).

[636] Dennis Thompson, *Vaping May Hurt the Lining of Your Blood Vessels*, WebMD HealthDay Reporter (May 28, 2019), www.webmd.com/mental-health/addiction/news/20190528/vaping-may-hurt-the-lining-of-your-blood-vessels#1; JUUL e-cigarettes and JUUL pods deliver dangerous toxins and carcinogens to users. The ingredients in JUUL pods include glycerol, propylene glycol, nicotine, benzoic acid, and flavoring chemicals. *See What Are JUULpods?*, www.juul.com/learn/pods (last visited Apr. 4, 2020).

[637] Giuseppe Lippi & Emmanuel J. Favaloro, *An Update on Biological and Clinical Associations Between E-Cigarettes and Myocardial Infarction*, Semin. Thromb. Hemost. (2019), https//:doi.org/10.1055/s-0039-3402451.

540.     Researcher Floridan Rader and others found that chronic e-cigarette users demonstrated substantially impaired coronary microvascular endothelial function, even more pronounced than that seen in chronic tobacco cigarette users. These findings also suggested that chronic e-cigarette use leads to measurable and persistent adverse vascular effects that are not directly related to nicotine.[638]

541.     Talal Alzahrani found that daily e-cigarette use was associated with an increased risk of myocardial infarction.[639]

542.     A systematic review of the literature found that acute mainstream exposure to aerosol from JUUL, or from previous generations of e-cigarettes using free-base nicotine, impaired vascular function comparably to combusted cigarette smoke and delivered considerably more nicotine to the blood on a per puff basis.[640]

543.     The overarching conclusion from dozens of studies published in the past 8 years is that use of e-cigarettes, including JUUL, increases the risk of cardiovascular injury which can lead to strokes, heart attacks and death. JLI never warned the public or consumers of the serious and significant risk of cardiovascular injuries associated with its products.

### 3.     JUUL Products Cause and Contribute to Seizure(s)

544.     On April 3, 2019 the FDA Center for Tobacco Products issued a Special Announcement notifying the public of an increase in reports of tobacco-related seizures, specifically relating to an increase in e-cigarette use, particularly among youth.[641]

545.     Additionally, FDA Commissioner Gottlieb and the Principal Deputy Commissioner Amy Abernethy issued a joint statement addressing the FDA's ongoing scientific

---

[638] Florian Rader et al., *E-Cigarette Use and Subclinical Cardiac Effects*, medRxiv (preprint) (2020), https://www.medrxiv.org/content/10.1101/2020.01.16.20017780v1 .

[639] Talal Alzahrani et al., *Association Between Electronic Cigarette Use and Myocardial Infarction*, 55 Am. J. Preventive Med. 455 (2018).

[640] Nicholas Buchanan et al. *Cardiovascular Risk of Electronic Cigarettes: A Review of Preclinical and Clinical Studies,* 116 Cardiovascular Research 40 (2019).

[641] News Release, *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. FDA (Apr. 10, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.

1   investigation of seizures following e-cigarette use as a potential safety issue in youth and young

2   adults. The statement identifies seizures following e-cigarette use as a source of concern for the

3   FDA, adding that in addition to the 35 reported cases from 2010 to early 2019, the FDA

4   "recognize[s] that not all of the cases may be reported" due to their voluntary nature.[642]

5   546.   Symptomatic nicotine toxicity is a consequence of excessive vaping.[643] As the

6   FDA acknowledges in their statement, "seizures or convulsions are known potential side effects

7   of nicotine toxicity."[644] It is well-documented that nicotine poisoning can cause seizures,

8   including ingestion of e-cigarette fluid.[645] Nicotine-induced seizure has long been considered a

9   possible side effect of long-term nicotine exposure.[646] JUUL's high nicotine content and

10  addictive nature cause JUUL users to be highly susceptible to seizures. Moreover, it has been

11  suggested that the use of e-cigarettes has been associated with an exacerbation of seizures in

12  individuals who are predisposed.[647]

13  547.   Seizures following e-cigarette use are a significant cause for concern due to the

14  unnecessarily high levels of nicotine delivered, by design, via JUUL. As described herein, JLI

15  intentionally designed its products to deliver a higher amount of nicotine, particularly targeting

16

17

18  [642] News Release, *Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's Ongoing Scientific Investigation of Potential Safety Issue Related to Seizures Reported Following E-cigarette Use, Particularly in Youth and Young Adults*, U.S. FDA (Apr. 3, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-and-principal-deputy-commissioner-amy-abernethy-md-phd.

19

20

21  [643] Adrienne Hughes et al., *An Epidemiologic and Clinical Description of E-cigarette Toxicity*, 57 Clin. Toxicol. 287 (2018), https://doi: 10.1080/15563650.2018.1510503.

22

23  [644] News Release, *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. FDA (Apr. 10, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.

24

25  [645] Gerdinique C. Maessen et al., *Nicotine Intoxication by E-cigarette Liquids: A Study of Case Reports, Pathophysiology*, 58 Clinical Toxicology 1 (2020), https://www.tandfonline.com/doi/full/10.1080/15563650.2019.1636994.

26

27  [646] Lucinda L. Miner et al., *The Effect of Chronic Nicotine Treatment on Nicotine-induced Seizures,* 95 Psychopharmacology 52 (1988), https://doi.org/10.1007/BF00212766.

28  [647] Jessica D. Wharton et al., *Increased Seizure Frequency Temporally Related to Vaping: Where There's Vapor, There's Seizures?*, 104 Pediatric Neurology 66 (2020).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

young people, and then failed to warn of the subsequent risks. JUUL devices were deliberately designed to deliver higher concentrations of nicotine per puff as compared to cigarettes, creating the risk for addiction as well as the risk of seizure due to potentially toxic levels of nicotine exposure.

548.    JLI never warned the public or consumers of the risk of seizures associated with the use of e-cigarettes including JUUL.

### 4.    Animal Studies Demonstrate Carcinogenic Potential of JUUL

549.    Several studies conducted on animals show a significant likelihood that JUUL could cause cancer for users.

550.    In 2017, a report by Donatella Canistro and others found that e-cigarettes induce toxicological effects that can raise the risk of cancer.[648] Similarly, a 2018 study measured the DNA damage induced by nitrosamines in the organs (lung, bladder, and heart) of mice subjected to e-cigarette vapor and concluded that e-cigarette vapor induces DNA damage in all three organs and reduces DNA-repair functions and proteins in mouse lungs. They further found that nicotine-derived nitrosamine ketone can induce the same effects and enhance mutational susceptibility and tumorigenic transformation of cultured human bronchial epithelial and urothelial cells (leading them to believe that vaping could contribute to heart disease and lung and bladder cancer in humans).[649] And in 2019, a report by Moon-shong Tang and others found that exposure to e-cigarette vapor, induced lung adenocarcinoma and bladder urothelial hyperplasia in mice.[650]

551.    There is a likely association between e-cigarettes, including JUUL, and cancer. Long term epidemiological studies will likely reveal an increased risk of cancer among this generation of youth who were unwitting targets of JLI in complete and utter reckless disregard

---

[648] Donatella Canistro et al., *E-cigarettes Induce Toxicological Effects That Can Raise the Cancer Risk*, 7 Sci. Reports 1 (2017).

[649] Hyun-Wook Lee et al., *E-cigarette Smoke Damages DNA and Reduces Repair Activity in Mouse Heart, Lung, and Bladder as well as in Human Lung and Bladder Cells*, 115 PNAS E1560 (2017).

[650] Moon-shong Tang, et al., *Electronic-cigarette Smoke Induces Lung Adenocarcinoma and Bladder Urothelial Hyperplasia in Mice*, 116 PNAS 21727 (2019).

for their safety.

## V.   INTERSTATE AND INTRASTATE COMMERCE

552.   Defendants' conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

553.   At all material times, Defendants participated in the manufacture, marketing, promotion, distribution, and sale substantial amounts of JUUL products in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States

554.   Defendants' conduct also had substantial intrastate effects in that, among other things, JUUL products were advertised and sold in each state and the District of Columbia. At least thousands of individuals in each state and the District of Columbia were impacted by Defendants' fraudulent, deceptive, and unfair conduct. As alleged below, absent Defendants' unlawful conduct, Plaintiffs and class members within each state and the District of Columbia would not have purchased JUUL products or would have paid less for them.

## VI.   CLASS ACTION ALLEGATIONS

555.   Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of classes defined as follows:

### A.   Nationwide Class

556.   The Nationwide Class is defined as:

> All persons who purchased, in the United States, a JUUL e-cigarette and/or JUUL pods.

### B.   State Classes and Subclasses

557.   As an alternative or in addition to the Nationwide Class, Plaintiffs allege a separate class for each State and the District of Columbia based upon the applicable laws set forth in the alternate state law counts. Each class is defined as follows for the claims asserted under a particular jurisdiction's law:

558.   The Alabama Subclass is defined as:

> All persons who purchased, in Alabama, a JUUL e-cigarette and/or JUUL pods.

559.    The Alabama Direct Purchaser Subclass is defined as:

All persons who purchased, in Alabama, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

560.    The Alaska Subclass is defined as:

All persons who purchased, in Alaska, a JUUL e-cigarette and/or JUUL pods.

561.    The Arizona Subclass is defined as:

All persons who purchased, in Arizona, a JUUL e-cigarette and/or JUUL pods.

562.    The Arkansas Subclass is defined as:

All persons who purchased, in Arkansas, a JUUL e-cigarette and/or JUUL pods.

563.    The California Subclass is defined as:

All persons who purchased, in California, a JUUL e-cigarette and/or JUUL pods.

564.    The Colorado Subclass is defined as:

All persons who purchased, in Colorado, a JUUL e-cigarette and/or JUUL pods.

565.    The Connecticut Subclass is defined as:

All persons who purchased, in Connecticut, a JUUL e-cigarette and/or JUUL pods.

566.    The Delaware Subclass is defined as:

All persons who purchased, in Delaware, a JUUL e-cigarette and/or JUUL pods.

567.    The District of Columbia Subclass is defined as:

All persons who purchased, in District of Columbia, a JUUL e-cigarette and/or JUUL pods.

568.    The Florida Subclass is defined as:

All persons who purchased, in Florida, a JUUL e-cigarette and/or JUUL pods.

569.    The Georgia Subclass is defined as:

All persons who purchased, in Georgia, a JUUL e-cigarette and/or JUUL pods.

570.   The Georgia Direct Purchaser Subclass is defined as:

All persons who purchased, in Georgia, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

571.   The Hawaii Subclass is defined as:

All persons who purchased, in Hawaii, a JUUL e-cigarette and/or JUUL pods.

572.   The Idaho Subclass is defined as:

All persons who purchased, in Idaho, a JUUL e-cigarette and/or JUUL pods.

573.   The Illinois Subclass is defined as:

All persons who purchased, in Illinois, a JUUL e-cigarette and/or JUUL pods.

574.   The Illinois Direct Purchaser Subclass is defined as:

All persons who purchased, in Illinois, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

575.   The Indiana Subclass is defined as:

All persons who purchased, in Indiana, a JUUL e-cigarette and/or JUUL pods.

576.   The Iowa Subclass is defined as:

All persons who purchased, in Iowa, a JUUL e-cigarette and/or JUUL pods.

577.   The Kansas Subclass is defined as:

All persons who purchased, in Kansas, a JUUL e-cigarette and/or JUUL pods.

578.   The Kentucky Subclass is defined as:

All persons who purchased, in Kentucky, a JUUL e-cigarette and/or JUUL pods.

579.   The Kentucky Direct Purchaser Subclass is defined as:

All persons who purchased, in Kentucky, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

580.    The Louisiana Subclass is defined as:

All persons who purchased, in Louisiana, a JUUL e-cigarette and/or JUUL pods.

581.    The Maine Subclass is defined as:

All persons who purchased, in Maine, a JUUL e-cigarette and/or JUUL pods.

582.    The Maryland Subclass is defined as:

All persons who purchased, in Maryland, a JUUL e-cigarette and/or JUUL pods.

583.    The Massachusetts Subclass is defined as:

All persons who purchased, in Massachusetts, a JUUL e-cigarette and/or JUUL pods.

584.    The Michigan Subclass is defined as:

All persons who purchased, in Michigan, a JUUL e-cigarette and/or JUUL pods.

585.    The Minnesota Subclass is defined as:

All persons who purchased, in Minnesota, a JUUL e-cigarette and/or JUUL pods.

586.    The Mississippi Subclass is defined as:

All persons who purchased, in Mississippi, a JUUL e-cigarette and/or JUUL pods

587.    The Missouri Subclass is defined as:

All persons who purchased, in Missouri, a JUUL e-cigarette and/or JUUL pods.

588.    The Montana Subclass is defined as:

All persons who purchased, in Montana, a JUUL e-cigarette and/or JUUL pods.

589.    The Nebraska Subclass is defined as:

All persons who purchased, in Nebraska, a JUUL e-cigarette and/or JUUL pods.

590.    The Nevada Subclass is defined as:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

All persons who purchased, in Nevada, a JUUL e-cigarette and/or JUUL pods.

591.   The New Hampshire Subclass is defined as:

All persons who purchased, in New Hampshire, a JUUL e-cigarette and/or JUUL pods.

592.   The New Jersey Subclass is defined as:

All persons who purchased, in New Jersey, a JUUL e-cigarette and/or JUUL pods.

593.   The New Mexico Subclass is defined as:

All persons who purchased, in New Mexico, a JUUL e-cigarette and/or JUUL pods.

594.   The New York Subclass is defined as:

All persons who purchased, in New York, a JUUL e-cigarette and/or JUUL pods.

595.   The New York Direct Purchaser Subclass is defined as:

All persons who purchased, in New York, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

596.   The North Carolina Subclass is defined as:

All persons who purchased, in North Carolina, a JUUL e-cigarette and/or JUUL pods.

597.   The North Dakota Subclass is defined as:

All persons who purchased, in North Dakota, a JUUL e-cigarette and/or JUUL pods.

598.   The Ohio Subclass is defined as:

All persons who purchased, in Ohio, a JUUL e-cigarette and/or JUUL pods.

599.   The Ohio Direct Purchaser Subclass is defined as:

All persons who purchased, in Ohio, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

600.   The Oklahoma Subclass is defined as:

All persons who purchased, in Oklahoma, a JUUL e-cigarette and/or JUUL pods.

601.    The Oregon Subclass is defined as:

All persons who purchased, in Oregon, a JUUL e-cigarette and/or JUUL pods.

602.    The Oregon Direct Purchaser Subclass is defined as:

All persons who purchased, in Oregon, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

603.    The Pennsylvania Subclass is defined as:

All persons who purchased, in Pennsylvania, a JUUL e-cigarette and/or JUUL pods.

604.    The Rhode Island Subclass is defined as:

All persons who purchased, in Rhode Island, a JUUL e-cigarette and/or JUUL pods.

605.    The South Carolina Subclass is defined as:

All persons who purchased, in South Carolina, a JUUL e-cigarette and/or JUUL pods.

606.    The South Dakota Subclass is defined as:

All persons who purchased, in South Dakota, a JUUL e-cigarette and/or JUUL pods.

607.    The Tennessee Subclass is defined as:

All persons who purchased, in Tennessee, a JUUL e-cigarette and/or JUUL pods.

608.    The Tennessee Direct Purchaser Subclass is defined as:

All persons who purchased, in Tennessee, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

609.    The Texas Subclass is defined as:

All persons who purchased, in Texas, a JUUL e-cigarette and/or JUUL pods.

610.    The Utah Subclass is defined as:

All persons who purchased, in Utah, a JUUL e-cigarette and/or JUUL pods.

611.    The Vermont Subclass is defined as:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

All persons who purchased, in Veront, a JUUL e-cigarette and/or JUUL pods.

612.   The Vermont Direct Purchaser Subclass is defined as:

All persons who purchased, in Vermont, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

613.   The Virginia Subclass is defined as:

All persons who purchased, in Virginia, a JUUL e-cigarette and/or JUUL pods.

614.   The Washington Subclass is defined as:

All persons who purchased, in Washington, a JUUL e-cigarette and/or JUUL pods.

615.   The Washington Direct Purchaser Subclass is defined as:

All persons who purchased, in Washington, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

616.   The West Virginia Subclass is defined as:

All persons who purchased, in West Virginia, a JUUL e-cigarette and/or JUUL pods.

617.   The Wisconsin Subclass is defined as:

All persons who purchased, in Wisconsin, a JUUL e-cigarette and/or JUUL pods.

618.   The Wisconsin Direct Purchaser Subclass is defined as:

All persons who purchased, in Wisconsin, a JUUL e-cigarette and/or JUUL pods directly from JUUL.

619.   The Wyoming Subclass is defined as:

All persons who purchased, in Wyoming, a JUUL e-cigarette and/or JUUL pods.

**C.   Class Exclusions**

620.   The following persons and entities are excluded from the proposed classes: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated

court staff assigned to this case.

### D.    Rule 23 Prerequisites

621.    Each of the proposed classes meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4).

622.    The members of each class are so numerous that joinder is impracticable. Each class includes at least thousands of members. Members of the classes are widely dispersed throughout the country and/or each respective state.

623.    Plaintiffs' claims are typical of the claims of all class members. Plaintiffs' claims arise out of the same common course of conduct that gives rise to the claims of the other class members. Plaintiffs and all class members were and will continue to be damaged by the same wrongful conduct—*i.e.*, Defendants' scheme to engage in fraudulent and unfair business practices regarding the marketing and sale of JUUL products, including the marketing of such products to minors.

624.    Plaintiffs will fairly and adequately protect and represent the interests of the classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the classes.

625.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with consumer class actions and cases in the tobacco industry.

626.    Questions of law and fact common to the classes include:

a.    Whether the advertising for JUUL products was misleading, fraudulent, deceptive, unfair and/or unconscionable;

b.    Whether the targeting of minors in the marketing and sale of JUUL products was unfair and/or unconscionable;

c.    Whether Defendants have been unjustly enriched through the false, misleading and deceptive advertising of JUUL products and the marketing and sale of JUUL products to minors;

d.    Whether JUUL products were merchantable condition when sold, were defective when sold, and possessed the most basic degree of fitness for ordinary use;

e.    Whether Defendants' conduct violated the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*;

f.      Whether Defendants' conducted an enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*;

g.      The amount of damages owed the classes;

h.      The appropriate measure of disgorgement; and

i.      The type and format of injunctive relief.

627.    Questions of law and fact common to members of each class will predominate over any questions that may affect only individual class members because Defendants have acted on grounds generally applicable to members of the classes.

628.    Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

629.    Class treatment is also manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this.

630.    Plaintiffs reserve the right to seek to certify common questions related to Defendants' knowledge, conduct, products, and duties.

## VII.   CAUSES OF ACTION

### A.     Violations of California Law Brought on Behalf of the Nationwide Class and the California Subclass

631.    Except as otherwise noted, Plaintiffs bring each of the claims in this Section on behalf of the Nationwide Class and, in the alternative, on behalf of the California Class.

#### 1.     Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) (Sales and Marketing Practices)

632.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

633.    This claim is brought against JLI and, for certain claims as noted below, all Defendants.

634.    JLI is a "person" under Cal. Bus. & Prof. Code § 17201.

635.    Plaintiffs and class members purchased JUUL products for personal purposes.

636.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

637.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

638.    Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

639.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

640.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1    cigarettes, and other representations.

2    641.   JLI's conduct was unfair and unconscionable in that it included (i) the

3    manufacture and sale of products with a heightened propensity to cause addiction and physical

4    injuries and (ii) misrepresentations and omissions of material facts concerning the

5    characteristics and safety of JUUL products that offended public policy; were immoral,

6    unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

7    substantial harm that greatly outweighs any possible utility from the conduct.

8    642.   JLI's conduct was fraudulent and deceptive because the misrepresentations and

9    omissions at issue were likely to, and in fact did, deceive reasonable consumers, including the

10   Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their

11   purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not

12   reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery

13   mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily

14   injury resulting from the use of the products, and (vi) that the nicotine consumed through one

15   JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes, and (vi)

16   that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a

17   pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor

18   in Plaintiffs' and class members' decisions to purchase JUUL products.

19   643.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

20   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

21   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

22   facts; because the facts would be material to reasonable consumers; because JLI actively

23   concealed them; because JLI intended for consumers to rely on the omissions in question;

24   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

25   made partial representations concerning the same subject matter aßs the omitted facts.

26   644.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

27   purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.

28   Reasonable consumers would have been expected to have relied on the misrepresentations and

1   omissions.

2      645.    JLI's conduct was also unlawful in that it violated the following statutes:

3   Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*; the Magnuson-

4   Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*; Cal. Bus. & Prof. Code § 22963(a); and Cal.

5   Penal Code § 308(a)(1)(A).

6      646.    JLI and the Management Defendants engaged in fraudulent and deceptive

7   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

8   products were appropriate for minors, when in fact the products never should have been

9   marketed to minors and are especially harmful to minors due to the potent and addictive

10  nicotine doses, addictive qualities, and health risks.

11     647.    All Defendants engaged in conduct that is unfair and unconscionable because the

12  targeting of minors offends public policy (in particular Cal. Bus. & Prof. Code § 22963(a) and

13  Cal. Penal Code § 308(a)(1)(A)) is immoral, unethical, oppressive, outrageous, unscrupulous,

14  and substantially injurious; and has caused substantial harm that greatly outweighs any possible

15  utility from the conduct.

16     648.    As alleged above, all Defendants participated and/or facilitated the marketing of

17  JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

18  and others have continued the deceptive, misleading, unfair, and unconscionable practices that

19  Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

20  use of JUUL products by minors continues to rise.

21     649.    Defendants' conduct actually and proximately caused Plaintiffs and class

22  members to lose money or property. Absent Defendants' unfair and fraudulent conduct,

23  Plaintiffs and class members would have behaved differently and would not have purchased

24  JUUL products or would have paid less for them. Defendants' misrepresentations and omissions

25  induced Plaintiffs and class members to purchase JUUL products they would not otherwise have

26  purchased and enter into purchase contracts they would not otherwise have entered into. In

27  addition, class members who are minors are entitled to full repayment of the amounts they spent

28  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

1   restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court

2   may deem just or proper.

3           **2.      Violation of the California Consumer Legal Remedies Act (Cal. Civ.**

4                   **Code § 1750, *et seq.*)**

5       650.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

6       651.    This claim is brought against JLI.

7       652.    JLI is a "person" under Cal. Civ. Code § 1761.

8       653.    Plaintiffs and class members are "consumers" under Cal. Civ. Code § 1761 and

9   purchased JUUL products for personal purposes.

10      654.    JUUL products are "goods" under Cal. Civ. Code § 1761.

11      655.    Defendants created and implemented a scheme to create a market for e-cigarettes

12  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

13  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

14  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

15  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

16  addictiveness, and significant risks of substantial physical injury from using JUUL products.

17      656.    Advertisements and representations for JUUL products contained deceptive

18  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

19  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

20  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

21  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

22  decades, JLI used third parties and word of mouth to spread false and misleading information

23  about JUUL products and word of mouth to spread false and misleading information about

24  JUUL products.

25      657.    Advertisements and representations for JUUL products concealed and failed to

26  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

27  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

28  addictive, posed significant risks of substantial physical injury resulting from the use of the

---

Page 195                                     AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                          Case No. 19-md-02913-WHO

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

658.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

659.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

660.    JLI's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

661.    JLI's conduct was likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

662.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

663.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

664.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, punitive damages, injunctive relief, reasonable attorneys' fees, and restitution, as well as any other relief the Court may deem just or proper.

665.   Plaintiffs have complied or substantially complied with all applicable notice requirements.

**3.      Violation of the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq*.)**

666.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

667.   This claim is brought against JLI.

668.   JUUL intended to directly and indirectly sell JUUL products.  JUUL induced consumers to buy JUUL products and made and disseminated, and caused to be made and disseminated, from California misrepresentations and omissions that were untrue and misleading.

669.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

670.    The misrepresentations and omissions were likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

671.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

672.    As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

673.    JUUL's conduct actually and proximately caused loss of money or property by Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase

contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—restitution and injunctive relief, as well as any other relief the Court may deem just or proper.

### 4. Common Law Fraud

674. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

675. This claim is brought against JLI.

676. JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

677. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

678. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

679. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

680. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

681. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

682. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

683. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

684. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

685. JUUL's conduct actually and proximately caused damages to Plaintiffs and class

1   members.   Absent   JUUL's   conduct,   Plaintiffs   and   class   members   would   have   behaved

2   differently and would not have purchased JUUL products or would have paid less for them.

3   JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

4   JUUL products they would not otherwise have purchased and enter into purchase contracts they

5   would  not  otherwise  have  entered  into.  Plaintiffs  seek—on  behalf  of  themselves  and  each

6   member of the class damages in an amount to be proven at trial, as well as any other relief the

7   Court may deem just or proper.

8          **5.      Breach of the Implied Warranty of Merchantability**

9          686.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10         687.    This claim is brought against JLI.

11         688.    JLI has at all times been a merchant with respect to the products which were sold

12   to Plaintiff and the class and was in the business of selling such products.

13         689.    Each  JUUL  product  sold  comes  with  an  implied  warranty  that  it  will

14   merchantable and fit for the ordinary purpose for which it would be used.  Cal Comm. Code

15   § 2314.  JLI has breached its implied warranty of merchantability because its products were not

16   in  merchantable  condition  when  sold,  were  defective  when  sold,  did  not  conform  to  the

17   promises and affirmations of fact made on the products' containers or labels, and/or do not

18   possess even the most basic degree of fitness for ordinary use.

19         690.    The  ordinary  intended  purpose  of  JUUL  products—and  the  purpose  for  which

20   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

21   products are not fit for that use—or any other use—because they (i) were not smoking cessation

22   devices,  (ii)  were  not  reasonable  alternatives  to  combustible  cigarettes,  (iii)  were  extremely

23   potent  nicotine-delivery  mechanisms,  (iv)  were  powerfully  .addictive,  and  (v)  posed

24   unreasonable  risks  of  substantial  bodily  injury.   Due  to  these  and  other  features,  JUUL's

25   products are not fit for their ordinary, intended use as either cigarette replacement devices or

26   recreation smoking devices.

27         691.    Plaintiffs and each member of the class have had sufficient direct dealings with

28   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

1   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

2   each member of the class, on the other hand.

3   692.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

4   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

5   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

6   intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

7   the express purpose an intent of being sold to consumers.

8   693.   Plaintiffs and the members of the class were injured as a direct and proximate

9   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

10  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

11  because, had they been aware of the unmerchantable condition of JUUL products, they would

12  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

13  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14  694.   JUUL was provided notice of these issues by numerous complaints filed against

15  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

16  individual letters and communications sent by consumers before or within a reasonable amount

17  of time after they discovered or should have discovered that's JUUL product were defective and

18  unmerchantable.

19                      **6.   Unjust Enrichment**

20  695.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21  696.   This claim is brought against JLI and the Management Defendants.

22  697.   Defendants created and implemented a scheme to create a market for e-cigarettes

23  and substantially increase sales of JUUL products through a pervasive pattern of false and

24  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

25  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

26  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

27  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

28  products.

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                    Case No. 19-md-02913-WHO

698.     Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Cal. Bus. & Prof. Code § 22963(a) prohibits the marketing and sale of JUUL products to minors, and Cal. Penal Code § 308(a)(1)(A) makes doing so a criminal violation.

699.     Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

700.     Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

701.     There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

702.     Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

703.     Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

B.      **Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO")[651]**

1.      **Violation of 18 U.S.C. § 1962(c)**

704.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

705.   This claim is brought by Plaintiffs against Defendants JLI, Monsees, Bowen, Pritzker, Huh, Valani, and Altria (the "RICO Defendants") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961, et seq. For ease of reference, Defendants JLI, Monsees, Bowen, Pritzker, Huh, and Valani are referred to below as the "Early Enterprise Defendants."

706.   At all relevant times, each RICO Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

707.   Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were and are injured in their business and/or property as a result of the RICO Defendants' wrongful conduct described herein.

708.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

709.   Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

710.   Each RICO Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

711.   Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

a.      **Description of the Nicotine Market Expansion Enterprise**

712.   RICO defines an enterprise as "any individual, partnership, corporation,

---

[651] Plaintiffs bring both of the claims in this Section on behalf of the Nationwide Class.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

713. Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

714. The RICO Defendants formed an association-in-fact enterprise—the Nicotine Market Expansion Enterprise. The Nicotine Market Expansion Enterprise exists separately from the otherwise legitimate business operations of JLI, Altria, or the investment companies with which Defendants Pritzker, Huh, and Valani are affiliated. Rather, the Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a more nefarious common purpose: maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market.

715. The Early Enterprise Defendants and non-defendant Veratad Technologies LLC ("Veratad") formed the Nicotine Market Expansion Enterprise by at least 2015, when the Early Enterprise Defendants prepared to launch the JUUL e-cigarette and capture and grow a market of nicotine-addicted users that would serve as customers for life.

716. As tobacco companies have long known, profitable growth requires a pipeline of "replacement smokers" or vapers. For that reason and others, Defendant Altria joined the Nicotine Market Expansion Enterprise in the Spring of 2017. The Early Enterprise Defendants, for their part, eagerly invited Altria into the fold—they needed allies and resources to further their Enterprise, and, despite their public statements to the contrary, sought to be a part of the tobacco industry.

717. When Altria joined the Nicotine Market Expansion Enterprise, it shared the Early Enterprise Defendants' common purpose: maintaining and expanding the number of nicotine-addicted e-vapor users in order to ensure a steady and growing customer base. Among

Altria's motivations for pursuing this common purpose was access to JLI's customer base that would serve as Altria's pipeline of "replacement smokers" or vapers.

718.    The Nicotine Market Expansion Enterprise involved a growing membership and changed its shape to fit its current needs, adding members when necessary and eliminating them when they became obsolete. From 2015 through 2017, the Enterprise consisted of the Early Enterprise Defendants and non-defendant Veratad. In the Spring of 2017, Defendant Altria joined the Nicotine Market Expansion Enterprise.  Non-defendant member Veratad would leave the Enterprise sometime in 2018 when it stopped coordinating with Defendant JLI. Each Early Enterprise Defendant is liable for the predicate acts of the enterprise committed no later than its formation in 2015, and Defendant Altria is liable for the predicate acts of the enterprise committed no later than when it joined the Enterprise in Spring 2017.

719.    As described above, the Early Enterprise Defendants established an ongoing relationship through, among other connections, Defendants' Priztker, Huh, and Valani's investment in JLI; Defendants' Bowen, Monsees, Pritzker, Huh, and Valani's control of the JLI Board of Directors; the Early Enterprise Defendants' assumption of "final say" on all marketing for JLI products, including fraudulent advertising; and the Early Enterprise Defendants' coordination on ensuring broad access to JLI products, including underage access, with non-defendant Enterprise member Veratad. And the Early Enterprise Defendants and Altria established an ongoing relationship through, among other connections, Altria's equity investment in JLI, the many informal and formal agreements between these two Defendants and their coordinated activities in furtherance of the common purpose of the Nicotine Market Expansion Enterprise, and the overlap between JLI executives and leadership and Altria.

720.    The RICO Defendants formed the Nicotine Market Expansion Enterprise in order to engage in a collaborative scheme to defraud. As described above, the Nicotine Market Expansion Enterprise Defendants shared and acted on a common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market.

721.    The Nicotine Market Expansion Enterprise has been in existence for almost five years and continues to operate to this day. As described above, it has had sufficient longevity to pursue the Nicotine Market Expansion Enterprise's common purpose.

### b.    Conduct of the Nicotine Market Expansion Enterprise

722.    "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

723.    As described above, each RICO Defendant participated in the operation or management of the Nicotine Market Expansion Enterprise. Illustrative but non-exhaustive examples include the following:

**Early Leadership**

724.    As described in Sections IV.A, IV.B, and IV.C, Defendants Bowen and Monsees were the visionaries behind the Enterprise and would lead it in its early days.

**Fraudulent Marketing Scheme**

725.    As described in Sections IV.E.3, IV.E.4, and IV.E.7.a, JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani (through their "final say" on all of JLI's marketing efforts) caused false and misleading advertisements that omitted references to JUUL's nicotine content and potency to be transmitted via the mail and wires, including the Vaporized campaign.

**Youth Access Scheme**

726.    As described in Section IV.E.9, Defendant JLI (through its employees) coordinated with non-defendant member Veratad on behalf of the other Early Enterprise Defendants to expand youth access to JUUL products.

727.    As reflected in Section IV.E.9, Veratad was a key player in the Nicotine Market Expansion Enterprise. And while each member of the Enterprise was not involved in every scheme (Veratad, for example, did not transmit the advertisements or packaging containing misrepresentations regarding JLI's nicotine content), each worked in furtherance of the same common purpose and was aware of the other members' participation in the Enterprise.

Moreover, each scheme was integral to the Enterprise's success in maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Veratad shared this common purpose, and its motivation for doing so was to maintain a lucrative client – one of several clients who relied on Veratad for intentionally ineffective age verification services.

### Coopting JLI's Board of Directors

728.    As described in Section IV.E.7.b, Defendants Pritzker, Huh, and Valani took control of the JLI Board of Directors in October 2015, so they could use the Board as an instrumentality to effectuate fraudulent schemes in furtherance of the Nicotine Market Expansion Enterprise's common purpose. In doing so, leadership of the Enterprise transitioned from Bowen and Monsees to Pritzker, Huh, and Valani.

### Coordinating Activities of JLI and Altria

729.    By August 2016, Defendants Pritzker, Huh, and Valani had ceded executive leadership at JLI to a new CEO, Tyler Goldman. Thus, when these parties started to coordinate with Altria, it was JLI (through its executives and employees – including Tyler Goldman and his successors) and Altria (through its executives and employees) that primarily directed the affairs of the Enterprise, although Defendants Bowen, Monsees, Pritzker, Huh, and Valani remained critical to the success of the Enterprise's common purpose. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI and Altria, and Altria's investment in JLI, would not have been possible.

730.    As described in Sections IV.A and IV.F, the Early Enterprise Defendants and Altria began to actively coordinate their activities in 2017 and each took actions that would further the Enterprise's common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market. For example:

731.    As early as 2017, the Early Enterprise Defendants and Altria shared data and strategy to support their common purpose, through a conduit, Avail Vapor.

732.     By 2018, Altria was taking actions to ensure JLI's products had access to prime shelf space in retail locations.

733.     By 2018, Altria was distributing and marketing JLI's products to its wider base of retailers.

734.     In December 2018, Altria decided to cash in on its role in the Nicotine Market Expansion Enterprise by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This investment would give Altria three seats on the JLI Board of Directors, and thus allow it to assert greater control over both JLI and the Nicotine Market Expansion Enterprise, which used the instrumentalities of JLI to effectuate many of its fraudulent schemes.

**Nicotine Content Misrepresentation Scheme**

735.     As described in Section IV.D, the Early Enterprise Defendants and Altria caused thousands, if not millions, of JUULpod packages to be distributed to consumers with false and misleading information regarding the JUUL pods' nicotine content. The Early Enterprise Defendants also caused the same false and misleading information to be distributed via JLI's website.

**Flavor Preservation Scheme**

736.     As described in Sections IV.C.6 and IV.H.2, the RICO Defendants worked in concert to defraud the public and regulators in order to prevent regulation that would have impeded their plan to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Specifically, they worked to ensure the FDA allowed certain flavors, namely mint, to remain on the market.

**Cover-up Scheme**

737.     The RICO Defendants were not only concerned with protecting flavors, however. In light of growing public scrutiny of JLI's role in the youth vaping crisis, these defendants continued their scheme to prevent a complete ban on JLI's product.

738.     As described in Sections IV.D.2 and IV.E.12, JLI maintained its website pages that provided false information about the addictive potential of its products and that denied that

JLI marketed to youth, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani provided direct input as to the content of the JLI website and had "final say" over JLI's marketing messaging.

739.     As described in paragraphs Sections IV.D.4 and IV.E.12, JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani (through their "final say" on all of JLI's marketing efforts) caused false and misleading advertising to be distributed over television and the internet in order to give the impression that JLI's product was a smoking cessation device and that JLI never marketed to youth. Defendant Altria continued this scheme by transmitting the fraudulent "Make the Switch" advertisements in packs of its combustible cigarettes.

740.     As described in Section IV.E.12, beginning in October 2018, both Altria and JLI were transmitting false and misleading communications to the public and the government in an attempt to stave off regulation.

741.     And no later than December 2018, Altria began providing even more services to the Nicotine Market Expansion Enterprise, as described in Section IV.F.3.

742.     The pattern of racketeering activity by the RICO Defendants, described below, provides further support that each RICO Defendant conducted or participated in the conduct of the Nicotine Market Expansion Enterprise.

### c.     Pattern of Racketeering Activity

743.     To carry out, or attempt to carry out, the objectives of the Nicotine Market Expansion Enterprise, the RICO Defendants, each of whom is a person associated-in-fact with the Enterprise, did knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

744.     Specifically, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

745.     The multiple acts of racketeering activity which the RICO Defendants

committed, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

746.   The racketeering activity was made possible by the Enterprise's regular use of the facilities, services, and employees of the members of the Enterprise.

747.   The RICO Defendants participated in the Nicotine Market Expansion Enterprise by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

748.   The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the Enterprise's objectives through common misrepresentations, concealments, and material omissions.

749.   In devising and executing the objectives of the Nicotine Market Expansion Enterprise, the RICO Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public and regulators by (1) transmitting advertisements that fraudulently and deceptively omitted any reference to JUUL's nicotine content or potency (or any meaningful reference, where one was made); (2) causing false and misleading statements regarding the nicotine content of JUUL pods to be posted on the JLI website; (3) causing thousands, if not millions, of JUUL pod packages containing false and misleading statements regarding the nicotine content of JUUL pods to be transmitted via U.S. mail; (4) representing to consumers and the public-at-large that JUUL was created and designed as a smoking cessation device, and by misrepresenting the nicotine content and addictive potential of its products; (5) making fraudulent statements to the FDA to convince the FDA to allow certain flavors, namely mint, to remain on the market; and (6) making fraudulent statements to the public (including through advertising), the FDA, and Congress to stave off a total prohibition on JUUL cigarettes that was being contemplated in light of JLI's role in the youth vaping epidemic.

750.   For the purpose of furthering the Enterprise's common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by preserving and increasing JLI's market share, even at the expense of exposing and addicting children to nicotine, the RICO Defendants committed these

racketeering acts, which number in the thousands, intentionally and knowingly with the specific

intent to advance the Enterprise's objectives.

751.   The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1))

include, but are not limited to:

    A.  Mail Fraud: the Nicotine Market Expansion Enterprise violated 18 U.S.C.
       § 1341 by sending or receiving, or by causing to be sent and/or received,
       fraudulent materials via U.S. mail or commercial interstate carriers for the
       purpose of deceiving the public, regulators, and Congress.

    B.  Wire Fraud: The Nicotine Market Expansion Enterprise violated 18 U.S.C.
       § 1343 by transmitting and/or receiving, or by causing to be transmitted
       and/or received, fraudulent materials by wire for the purpose of deceiving the
       public, regulators, and Congress.

752.   The Nicotine Market Expansion Enterprise falsely and misleadingly used the

mails and wires in violation of 18 U.S.C. § 1341 and § 1343. Illustrative and non-exhaustive

examples include the following:

| From | To | Date | Description |
|---|---|---|---|
| **_Fraudulent Statements Omitting Reference to JUUL's Nicotine Content (see Sections IV.E.3, IV.E.4, and IV.E.7.a)_** | | | |
| All Early Enterprise Defendants | Public (via television, internet, and mail) | 2015 | "Vaporized" Campaign, and other Advertising campaigns transmitted via the mails and wires which omitted any reference to JUUL's nicotine content. |
| **_Fraudulent Statements that JUUL is a Cessation Device (see Section IV.D.4)_** | | | |
| All Early Enterprise Defendants | Public (via internet – JLI Website) | April 25, 2018 (or earlier) to Present | "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." |

| Kevin Burns (former JLI CEO) | Public (via internet – JLI Website) | November 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." |
|---|---|---|---|
| All Early Enterprise Defendants | Public (via internet – JLI Website) | September 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." |
| Howard Willard (Altria CEO) | Public (via internet – Altria website) | December 20, 2018 | "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." |
| **_Fraudulent Statements Regarding Nicotine Content in JUUL pods (see Section IV.D)_** | | | |
| All Early Enterprise Defendants | Public (via internet – JLI website) | July 2, 2019 (or earlier) to Present | "Each 5% JUUL pod is roughly equivalent to one pack of cigarettes in nicotine delivery." |
| All Early Enterprise Defendants | Public (via internet – JLI website) | April 21, 2017 | "JUUL pod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." |
| All RICO Defendants | Public (via U.S. mail distribution of JUUL pod packaging) | 2015 to Present | JUUL pod packages (1) claiming a 5% nicotine strength; (2) stating that a JUUL pod is "approximately equivalent to about 1 pack of cigarettes." |

| **Fraudulent Statements to Prevent Regulation of mint Flavor** (see Sections IV.C.6 and IV.H.2) | | | |
|---|---|---|---|
| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA) <br><br> November 12, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| Howard Willard (Altria CEO) | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| JLI | FDA (via U.S. mail or electronic transmission) | November 5, 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. |
| **Fraudulent Statements to Prevent Ban on JUUL Products** (see Sections IV.D.4 and IV.E.12) | | | |
| All Early Enterprise Defendants | Public (via Television) | January 2019 | $10 million "Make the Switch" advertising campaign for the purpose of deceiving the public and regulators that JLI was only targeting adult smokers with its advertising and product and that JUUL was a cessation product. |
| Altria | Public (via inserts in combustible cigarette packs) | December 2018 - Present | "Make the Switch" advertising campaign for the purpose of deceiving smokers that JUUL was a cessation product. |
| Ashely Gould, JLI Chief Administrative Officer | Public (via interview with CNBC, later posted on internet) | December 14, 2017 | "It's a really, really important issue. We don't want kids using our products." |

| JLI | Public (via internet - social media) | March 14, 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." |
|---|---|---|---|
| Kevin Burns (then-CEO of JLI) | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | JLI's Action Plan that fraudulently states: "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . Our intent was never to have youth use JUUL products." |
| Kevin Burns | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." |
| All Early Enterprise Defendants | Public (via internet - JLI website) | August 29, 2019 | "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." |
| James Monsees | Public (via statement to New York Times – later posted on internet) | August 27, 2019 | Monsees said selling JUUL products to youth was "antithetical to the company's mission." |
| JLI | Public (via statement to Los Angeles Times – later posted on internet) | September 24, 2019 | "We have never marketed to youth and we never will." |

| JLI (via counsel) | FDA (via U.S. mail or electronic transmission to Dr. Matthew Holman) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." and "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." |
|---|---|---|---|
| James Monsees | Congress (via U.S. mail or electronic transmission of written testimony) | July 25, 2019 | Written Testimony of J. Monsees provided to Congress, stating "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage use." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." |
| Howard Willard | Congress (via U.S. mail or electronic transmission of letter to Senator Durbin) | October 14, 2019 | "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." |

753.   The mail and wire transmissions described herein were made in furtherance of

the RICO Defendants' schemes and common course of conduct, thereby increasing or maintaining JLI's market share, resulting in corresponding high profits for each RICO Defendant.

754.    As described above, the Nicotine Market Expansion Enterprise had a scheme to defraud the public and regulators in order to continue selling nicotine products to youth, and to protect their market share, by denying that JLI marketed to youth and claiming that JUUL was actually created and designed as a smoking cessation device or mitigated risk product.

755.    The RICO Defendants used these mail and wire transmissions in furtherance of this scheme by transmitting deliberately false and misleading statements to the public and to government regulators.

756.    The RICO Defendants had a specific intent to defraud regulators and the public. For example, as alleged above, the members of the Nicotine Market Expansion Enterprise made repeated and unequivocal statements through the wires and mails that they were not marketing to children and that their product was designed for adult smokers. As even the evidence pre-discovery shows, this is not true. The authors of these fraudulent statements are high level executives at each of JLI and Altria and who would reasonably be expected to have knowledge of their company's internal research, public positions, and long-term strategies. Because these high level executives made statements inconsistent with the internal knowledge and practice of the corporations, it would be absurd to believe that these highly ranked-representatives and agents of these corporations had no knowledge that their public statements were false and fraudulent. Similarly, the RICO Defendants caused to be transmitted through the wires and mails false and misleading statements regarding the nicotine content in JUUL pods which JLI's own internal data, and Altria's own pharmacokinetic studies, showed were false. Moreover, each of the Early Enterprise Defendants had "final say" over all marketing statements by JLI and thus caused such statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

757.    The RICO Defendants intended the public and regulators to rely on these false transmissions and this scheme was therefore reasonably calculated to deceive persons of

1   ordinary prudence and comprehension.

2       758.    Both the public and government regulators did rely on the Nicotine Market

3   Expansion Enterprise's mail and wire fraud. For example, the regulators, including the FDA,

4   relied on the Nicotine Market Expansion Enterprise's statements that mint was not an appealing

5   flavor for nonsmokers in allowing mint JUUL pods to remain on the market and relied on the

6   Nicotine Market Expansion Enterprise's statements that it did not market to youth in allowing

7   the RICO Defendants to continue marketing and selling JUUL. Congress likewise relied on the

8   Enterprise's statements in not bringing legislation to recall or ban e-cigarettes, despite the calls

9   of members of both parties to do just that. And the public relied on statements (or absence

10  thereof) that were transmitted by the RICO Defendants regarding the nicotine content in and

11  potency of JUUL pods in deciding to purchase JUUL products.

12      759.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate

13  wire facilities have been deliberately hidden and cannot be alleged without access to the RICO

14  Defendants' books and records. However, Plaintiff has described the types of predicate acts of

15  mail and/or wire fraud, including the specific types of fraudulent statements upon which,

16  through the mail and wires, the Nicotine Market Expansion Enterprise engaged in fraudulent

17  activity in furtherance of its overlapping schemes.

18      760.    These were not isolated incidents, instead, the RICO Defendants' engaged in a

19  pattern of racketeering activity by committing thousands of predicate acts in a five year period

20  in the form of mail and wire fraud. That each RICO Defendant participated in a variety of

21  schemes involving thousands of predicate acts of mail and wire fraud establishes that such

22  fraudulent acts are part of the Enterprise's regular way of doing business. Moreover, Plaintiffs

23  expect to uncover even more coordinated, predicate acts of fraud as discovery in this case

24  continues.

25                      **d.    Harm to Plaintiffs**

26      761.    "In order for a pattern of racketeering activity to be a cognizable cause of civil

27  RICO injury to a private plaintiff, one or more of the predicate acts must not only be the 'but

28  for' cause of the injury, but the proximate cause as well. A wrongful act is a proximate cause if

it is a substantial factor in the sequence of responsible causation. Plaintiffs must show a direct relation between the injury asserted and the injurious conduct alleged." *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1307 (11th Cir. 2003) (internal quotation marks and citations omitted). What matters, though, is not whether there is a direct relationship between the plaintiff and defendant, but whether there is a 'sufficiently direct relationship' between the defendant's wrongful conduct and the plaintiff's injury . . . .'" *Bridge*, 553 U.S. at 657 (2008)).

762.   Each Plaintiff and all members of the RICO Class were directly injured by the RICO Defendants' conduct, and such injury would not have occurred but for the predicate acts of the RICO Defendants. The combined effect of the RICO Defendants' fraudulent acts were: (1) inducing Plaintiffs and the RICO Class members to purchase JUUL products that they would not have purchased, or – in the alternative – to pay more for JUUL products than they would have otherwise paid,  had they known that JUUL products were not cessation products or if they had known about the intentional addictiveness of the nicotine levels in said products; (2) lulling the FDA into allowing the continued sale of JLI's mint pods, which allowed Plaintiffs and the RICO Class Members to purchase mint pods they would not have otherwise purchased; and (3) lulling Congress and the FDA into allowing JUUL products to remain on the market, which allowed Plaintiffs and the RICO Class Members to purchase JUUL products they would not have purchased absent the RICO Defendants' schemes to preserve JLI's ill-gotten market share.

763.   There are no intervening acts or parties that could interrupt the causal chain between the RICO Defendants' mail and wire fraud and Plaintiffs' and the RICO Class Members' injuries. The RICO Defendants, in furtherance of the Nicotine Market Expansion Enterprise's common purpose, made false and misleading statements directly to the public. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed Plaintiffs and the RICO Class Members to purchase products that should not have been on the market.

764.    As to predicate acts occurring prior to March 10, 2016, Plaintiffs did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that the RICO Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, *inter alia*, the true nicotine content in and delivered by JUUL products, such information the RICO Defendants concealed and failed to truthfully disclose.

### 2.    Violations of 18 U.S.C. § 1962(d)

765.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

766.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the members of the Nicotine Market Expansion Enterprise agreed to conspire and conspired to violate 18 U.S.C. § 1962(c), as described herein. The conspiracy is coterminous with the time period in which the Nicotine Expansion Market Enterprise has existed, beginning in 2015 and continuing to this day (with Defendant Altria joining the conspiracy in Spring 2017). The RICO Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise in furtherance of a common purpose, as detailed above in relation to the RICO Defendants' substantive violation of Section 1962(c). The acts in furtherance of the conspiracy attributable to the RICO Defendants include each of the predicate acts underlying the Nicotine Market Expansion Enterprise's violation of Section 1962(c), as described above. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the members of the Nicotine Market Expansion Enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, maintain or increase market share, and/or minimize losses for the Defendants and their named and unnamed co-conspirators throughout the illegal scheme and common course of conduct.

767.    Each Plaintiff and all members of the RICO Class were directly injured by the RICO Defendants' conduct, and such injury would not have occurred but for the predicate acts

of the RICO Defendants, which also constitute the acts taken by the RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d). The combined effect of the RICO Defendants' acts of mail and wire fraud in furtherance of their conspiracy were: (1) inducing Plaintiffs and the RICO Class members to purchase JUUL products that they would not have purchased, or—in the alternative—to pay more for JUUL products than they would have otherwise paid, had they known that JUUL products were not cessation products or if they had known about the intentional addictiveness of the nicotine levels in said products; (2) lulling the FDA into allowing the continued sale of JLI's mint pods, which allowed Plaintiffs and the RICO Class Members to purchase mint pods they would not have purchased; and (3) lulling Congress and the FDA into allowing JUUL products to remain on the market, which allowed Plaintiffs and the RICO Class Members to purchase JUUL products they would not have purchased absent the RICO Defendants' conspiracy to engage in a pattern of racketeering activity through a RICO Enterprise, the common purpose of which was maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by preserving and growing JLI's ill-gotten market share.

768.    There are no intervening acts or parties that could interrupt the causal chain between the RICO Defendants' mail and wire fraud acts in furtherance of their RICO conspiracy and Plaintiffs' and the RICO Class Members' injuries. The RICO Defendants, in furtherance of their conspiracy to form the Nicotine Market Expansion Enterprise and advance its common purpose, made false and misleading statements directly to the public. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed Plaintiffs and the RICO Class Members to purchase products that should not have been on the market.

769.    As to acts undertaken in furtherance of the conspiracy which occurred prior to March 10, 2016, Plaintiffs did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that the RICO Defendants transmitted fraudulent statements via the mails and wires regarding the topics

1    described above including, inter alia, the true nicotine content in and delivered by JUUL

2    products, such information the RICO Defendants concealed and failed to truthfully disclose.

3    **C.    Violation of the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301,** *et seq.***)**

4    770.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

5    771.    This claim is brought against JLI on behalf of the members of the state

6    subclasses in Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, the

7    District of Columbia, Florida, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine,

8    Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska,

9    Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania,

10   Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and

11   Wyoming, and the state direct purchaser subclasses in Alabama, Georgia, Illinois, Kentucky,

12   New York, Ohio, Oregon, Tennessee, Vermont, Washington, and Wisconsin.

13   772.    Plaintiffs and members of the class are "consumers" within the meaning of 15

14   U.S.C. § 2301(3).

15   773.    JLI is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)

16   and (5), respectively.

17   774.    JUUL products are "consumer products" within the meaning of 15 U.S.C.

18   § 2301(1).

19   775.    Plaintiffs have met all requirements for pre-suit notice.

20   776.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is

21   damaged by the failure of a warrantor to comply with an implied warranty. The amount in

22   controversy of Plaintiffs' individual claims meets or exceeds $25.00 in value. In addition, the

23   amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs).

24   777.    JLI provided Plaintiffs and each member of the class with "implied warranties,"

25   including the implied warranty of merchantability, which is covered under 15 U.S.C. § 2301(7).

26   778.    Each JUUL product sold by JLI comes with an implied warranty that it will

27   merchantable and fit for the ordinary purpose for which it would be used.  JLI has breached its

28   implied warranty of merchantability because its products were not in merchantable condition

when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

779.   The terms of these warranties became part of the basis of the bargain when Plaintiffs and each member of the class purchased JUUL products.

780.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JLI, on the one hand, and Plaintiffs and each member of the class, on the other hand.

781.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JLI's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JLI's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

782.   Affording JLI a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or each JUUL product, JLI knew, or should have known that the products were not merchantable, but nonetheless failed to rectify the situation and/or disclose the defects. In addition, after over a year of litigation, JLI has not made any offer to cure. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs or members of the class resort to an informal dispute resolution procedure and/or afford JLI a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

783.   In addition, given the conduct described herein, any attempts by JLI, in its capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage of the defects in JUUL products is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defects is null and void.

784.   As a direct and proximate result of JLI's breach of the written and implied warranties, Plaintiffs and each member of the class have suffered damages. Plaintiffs,

individually and on behalf of the class, seek all damages permitted by law, including compensation for the cost of purchasing JUUL products, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

### D.    Causes of Action Brought on Behalf of the State Classes

#### 1.    Alabama

785.    Plaintiffs bring each of the following claims on behalf of the Alabama Subclass under Alabama law.

##### a.    Violation of the Alabama Deceptive Trade Practices Act (Ala. Code § 8-19-1, *et seq.*)

786.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

787.    This claim is brought against JLI, and for certain unconscionable conduct claims, all Defendants.

788.    Defendants are "persons" and Plaintiffs and class members are "consumers" under the statute. Ala. Code § 8-19-3.

789.    Plaintiffs and class members are consumers who purchased JUUL products for personal purposes.

790.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

791.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information

1  about JUUL products.

2      792.   Advertisements and representations for JUUL products concealed and failed to

3  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

4  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5  addictive, posed significant risks of substantial physical injury resulting from the use of the

6  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

7  consumed through a pack of combustible cigarettes.

8      793.   The labels on JUUL products failed to disclose that the products posed

9  significant risks of substantial physical injury resulting from the use of the products. The labels

10 also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

11     794.   The omissions were misleading and deceptive standing alone and were

12 particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

13 cigarettes and other representations.

14     795.   JLI's conduct was unfair and unconscionable in that it included (i) the

15 manufacture and sale of products with a heightened propensity to cause addiction and physical

16 injuries and (ii) misrepresentations and omissions of material facts concerning the

17 characteristics and safety of JUUL products that offended public policy; were immoral,

18 unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

19 substantial harm that greatly outweighs any possible utility from the conduct.  In addition, Ala.

20 Code § 28-11-16 makes it unlawful for a retailer or manufacturer to advertise electronic nicotine

21 delivery systems as tobacco cessations products and/or a healthier alternative to smoking.

22     796.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

23 unfair business practices: (a) misrepresenting that JUUL products have characteristics,

24 ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

25 products are of a particular standard, quality, or grade, or that goods are of a particular style or

26 model, when they are not; (c) advertising goods or services with intent not to sell them as

27 advertised; and (d) engaging in any other unconscionable, false, misleading, or deceptive act or

28 practice in the conduct of trade or commerce.

797.    JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

798.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

799.    JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

800.    In addition, all Defendants engaged in conduct that is conduct is unfair and unconscionable because the targeting of minors offends public policy (Ala. Code § 28-11-1 and Ala. Code § 28-11-4); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

801.    As alleged above, all Defendants participated and/or facilitated the marketing of

1  JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

2  and others have continued the deceptive, misleading, unfair, and unconscionable practices that

3  Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

4  use of JUUL products by minors continues to rise.

5      802.    Defendants' conduct actually and proximately caused actual monetary damages

6  to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs

7  and class members would have behaved differently and would not have purchased JUUL

8  products or would have paid less for them. Defendants' misrepresentations and omissions

9  induced Plaintiffs and class members to purchase JUUL products they would not otherwise have

10 purchased and enter into purchase contracts they would not otherwise have entered into. In

11 addition, class members who are minors are entitled to full repayment of the amounts they spent

12 on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

13 injunctive relief, reasonable attorneys' fees, up to three times actual damages sustained by each

14 such person, or any applicable statutory damages, whichever is greater, as well as any other

15 relief the Court may deem just or proper.

16     803.    Plaintiffs have complied or substantially complied with all applicable notice

17 requirements, or are otherwise excused from compliance because they do not maintain a place

18 of business in and/ or does not keep assets within the state of Alabama.

19                    **b.      Common Law Fraud**

20     804.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21     805.    This claim is brought against JLI.

22     806.    JUUL created and implemented a scheme to create a market for e-cigarettes and

23 substantially increase sales of JUUL through a pervasive pattern of false and misleading

24 statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

25 alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

26 misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

27 addictiveness, and significant risks of substantial physical injury from using JUUL products.

28     807.    Advertisements and representations for JUUL products contained deceptive

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                        Case No. 19-md-02913-WHO

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

808.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

809.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

810.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

811.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

812.     JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

813.     As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

814.     JLI knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

815.     JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

816.     JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.     Breach of the Implied Warranty of Merchantability

817.     Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

818.     This claim is brought against JLI.

819.    JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

820.    Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   Ala. Code § 7-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

821.    The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

822.    Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

823.    Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

824.    Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Alabama Direct Purchaser Subclass were damaged as a result of JUUL's breach of its

1  implied warranty of merchantability because, had they been aware of the unmerchantable

2  condition of JUUL products, they would not have purchased JUUL products, or would have

3  paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any

4  other relief the Court may deem just or proper.

5  825.   JUUL was provided notice of these issues by numerous complaints filed against

6  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

7  individual letters and communications sent by consumers before or within a reasonable amount

8  of time after they discovered or should have discovered that's JUUL product were defective and

9  unmerchantable.

10  ### d.   Unjust Enrichment

11  826.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

12  827.   This claim is brought against JLI and the Management Defendants.

13  828.   Defendants created and implemented a scheme to create a market for e-cigarettes

14  and substantially increase sales of JUUL products through a pervasive pattern of false and

15  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

16  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

17  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

18  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

19  products.

20  829.   Defendants were unjustly enriched as a result of their wrongful conduct,

21  including through the false and misleading advertisements and omissions regarding (i) whether

22  JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

23  alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

24  powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

25  the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

26  nicotine consumed through a pack of combustible cigarettes. Ala. Code § 28-11-16 makes it

27  unlawful for a retailer or manufacturer to advertise electronic nicotine delivery systems as

28  tobacco cessations products and/or a healthier alternative to smoking. Defendants were also

unjustly enriched through their scheme of marketing their products to minors.  Ala. Code § 28-11-1 sets forth the intent of the Alabama legislature to "prohibit access to tobacco and tobacco products by minors." Ala. Code § 28-11-4 expresses the intent of Alabama legislature to "prevent[] the distribution of . . . alternative nicotine products to minors."

830.    Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

831.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

832.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

833.    Defendants wrongfully obfuscated the harm caused be their conduct. Thus, Plaintiffs and class members, who relied on Defendants' fraudulent representations, could not and did not know the effect that using JUUL products would have on their health.

834.    Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

835.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## 2.    Alaska

836.    Plaintiffs bring each of the following claims on behalf of the Alaska Subclass under Alaska law.

### a.    Violation of the Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. § 45.50.471, *et seq.*)

837.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

838.    This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

839.   Plaintiffs and class members are consumers who sought or acquired goods from JUUL by purchase.

840.   Plaintiffs and class members purchased JUUL products for personal purposes.

841.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

842.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

843.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

844.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

845.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

846.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

847.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) engaging in other conduct creating a likelihood of confusion or of misunderstanding and that misled, deceived, and/ or damaged a buyer in connection with the sale or advertisement of goods or services; and (e) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods.

848.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

849.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

850.    JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

851.    In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Alaska Stat. § 11.76.109); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

852.    As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

853.    Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each

member of the class—injunctive relief, reasonable attorneys' fees, three times actual damages or $500, whichever is greater, as well as any other relief the Court may deem just or proper.

854.    Plaintiffs have complied or substantially complied with all applicable notice requirements, or are otherwise excused from compliance for this proceeding.

### b.    Common Law Fraud

855.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

856.    This claim is brought against JLI.

857.    JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

858.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

859.    Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

860.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

861.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

862.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

863.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

864.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

865.   JLI knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

866.   JLI knew that JUUL products were not safe or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

867.    JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

868.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

869.    This claim is brought against JLI.

870.    JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

871.    Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.    Alaska Stat. § 45.02.314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

872.    The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

873.    Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

874.    Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

875.    Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

876.    JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

877.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

878.    This claim is brought against JLI and the Management Defendants.

879.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

880.     Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Alaska Stat. § 11.76.109 prohibits the marketing and sale of JUUL products to minors.

881.     Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

882.     Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

883.     There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

884.     Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

885.     Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 3.     Arizona

886.     Plaintiffs bring each of the following claims on behalf of the Arizona Subclass

1    under Arizona law.

2        a.    **Violation of the Arizona Consumer Fraud Act (Ariz. Rev.**

3        **Stat. § 44-1521, *et seq.*)**

4        887.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

5        888.    This claim is brought against JLI and, for certain unfair and/or unconscionable

6    conduct claims as noted below, all Defendants.

7        889.    Plaintiffs and class members purchased JUUL products for personal purposes.

8        890.    Defendants created and implemented a scheme to create a market for e-cigarettes

9    and substantially increase sales of JUUL through a pervasive pattern of false and misleading

10   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

11   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

12   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

13   addictiveness, and significant risks of substantial physical injury from using JUUL products.

14       891.    Advertisements and representations for JUUL products contained deceptive

15   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

16   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

17   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

18   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

19   decades, JLI used third parties and word of mouth to spread false and misleading information

20   about JUUL products.

21       892.    Advertisements and representations for JUUL products concealed and failed to

22   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

23   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

24   addictive, posed significant risks of substantial physical injury resulting from the use of the

25   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

26   consumed through a pack of combustible cigarettes.

27       893.    The labels on JUUL products failed to disclose that the products posed

28   significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

894.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

895.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

896.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency and capacity to convey misleading impressions to consumers, and in fact did, mislead reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

897.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

898.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

899.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

900.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

901.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Ariz. Rev. Stat. § 13-3622(A)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

902.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

903.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In

1    addition, class members who are minors are entitled to full repayment of the amounts they spent

2    on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

3    injunctive relief, reasonable attorneys' fees, punitive damages, and actual damages, as well as

4    any other relief the Court may deem just or proper.

5                           **b.    Common Law Fraud**

6        904.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

7        905.    This claim is brought against JLI.

8        906.    JUUL created and implemented a scheme to create a market for e-cigarettes and

9    substantially increase sales of JUUL through a pervasive pattern of false and misleading

10   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

11   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

12   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

13   addictiveness, and significant risks of substantial physical injury from using JUUL products.

14       907.    Advertisements and representations for JUUL products contained deceptive

15   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

16   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

17   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

18   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

19   decades, JLI used third parties and word of mouth to spread false and misleading information

20   about JUUL products.

21       908.    Advertisements and representations for JUUL products concealed and failed to

22   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

23   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

24   addictive, posed significant risks of substantial physical injury resulting from the use of the

25   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

26   consumed through a pack of combustible cigarettes.

27       909.    The labels on JUUL products failed to disclose that the products posed

28   significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

910.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

911.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

912.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

913.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

914.   JLI knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

915.   JLI knew that JUUL products were not safe or reasonable alternatives to

1  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

2  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

3  products.

4      916.    JUUL's conduct actually and proximately caused damage to Plaintiffs and class

5  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

6  differently and would not have purchased JUUL products or would have paid less for them.

7  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

8  JUUL products they would not otherwise have purchased and enter into purchase contracts they

9  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

10  member of the class damages in an amount to be proven at trial, as well as any other relief the

11  Court may deem just or proper.

12              **c.    Breach of the Implied Warranty of Merchantability**

13      917.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

14      918.    This claim is brought against JLI.

15      919.    JUUL has at all times been a merchant with respect to the products which were

16  sold to Plaintiff and the class and was in the business of selling such products.

17      920.    Each JUUL product sold by JUUL comes with an implied warranty that it will

18  merchantable and fit for the ordinary purpose for which it would be used.   Ariz. Rev. Stat. § 47-

19  2314.  JUUL has breached its implied warranty of merchantability because its products were not

20  in merchantable condition when sold, were defective when sold, did not conform to the

21  promises and affirmations of fact made on the products' containers or labels, and/or do not

22  possess even the most basic degree of fitness for ordinary use.

23      921.    The ordinary intended purpose of JUUL's products—and the purpose for which

24  they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

25  products are not fit for that use—or any other use—because they (i) were not smoking cessation

26  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

27  potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed

28  unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's

products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

922. Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

923. Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

924. Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

925. JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

926. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

927. This claim is brought against JLI and the Management Defendants.

928. Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

929.    Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Ariz. Rev. Stat. § 13-3622(A) prohibits the marketing and sale of JUUL products to minors.

930.    Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

931.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

932.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

933.    Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

934.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 4.    Arkansas

935.    Plaintiffs bring each of the following claims on behalf of the Arkansas Subclass

under Arkansas law.

              **a.**       **Violation of the Arkansas Deceptive Trade Practices Act (Ark. Code § 4-88-101,** *et seq.***)**

936.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

937.    This claim is brought against JLI and, for certain unfairness or unconscionable conduct claims, all Defendants.

938.    Plaintiffs and class members purchased JUUL products for personal purposes.

939.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

940.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

941.    Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

942.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

943.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

944.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products violated public policy and affronted the sense of justice, decency, or reasonableness.

945.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) knowingly misrepresenting that JUUL products have characteristics, ingredients, uses, or benefits which they do not have; (b) knowingly misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) using or employing deception, fraud, or false pretense; (e) concealing, suppressing, or omitting material facts with the intent that other rely upon the concealment, suppression, or omission; and (f) engaging in other unconscionable, false or deceptive acts or practices in business commerce, or trade.

946.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to and had the capacity to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

947.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

948.    As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

949.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

950.    JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

951.    In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Ark. Code § 5-27-227(a)(1)) and affronted the sense of justice, decency, or reasonableness.

952.    As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

953.    Defendants' conduct actually and proximately caused actual financial loss to

1    Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

2    class members would have behaved differently and would not have purchased JUUL products

3    or would have paid less for them. Defendants' misrepresentations and omissions induced

4    Plaintiffs and class members to purchase JUUL products they would not otherwise have

5    purchased and enter into purchase contracts they would not otherwise have entered into. In

6    addition, class members who are minors are entitled to full repayment of the amounts they spent

7    on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—to

8    recover their actual financial loss, reasonable attorneys' fees, and punitive damages, as well as

9    any other relief the Court may deem just or proper.

10                        **b.      Common Law Fraud**

11        954.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

12        955.    This claim is brought against JLI.

13        956.    JUUL created and implemented a scheme to create a market for e-cigarettes and

14   substantially increase sales of JUUL through a pervasive pattern of false and misleading

15   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

16   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

17   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

18   addictiveness, and significant risks of substantial physical injury from using JUUL products.

19        957.    Advertisements and representations for JUUL products contained deceptive

20   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

21   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

22   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

23   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

24   decades, JLI used third parties and word of mouth to spread false and misleading information

25   about JUUL products.

26        958.    Advertisements and representations for JUUL products concealed and failed to

27   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

28   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                              Case No. 19-md-02913-WHO

addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

959.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

960.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

961.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

962.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

963.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the

misrepresentations and omissions.

964.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

965.    JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

966.    JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

967.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

968.    This claim is brought against JLI.

969.    JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

970.    Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   Ark. Code § 4-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

971.    The ordinary intended purpose of JUUL's products—and the purpose for which

they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

972.    Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

973.    Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

974.    Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

975.    JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

1

#### d.    Unjust Enrichment

2    976.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3    977.    This claim is brought against JLI and the Management Defendants.

4    978.    Defendants created and implemented a scheme to create a market for e-cigarettes

5    and substantially increase sales of JUUL products through a pervasive pattern of false and

6    misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

7    safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

8    while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

9    doses, addictiveness, and significant risks of substantial physical injury from using JUUL

10    products.

11    979.    Defendants were unjustly enriched as a result of their wrongful conduct,

12    including through the false and misleading advertisements and omissions regarding (i) whether

13    JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

14    alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

15    powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

16    the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

17    nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

18    enriched through their scheme of marketing their products to minors. Ark. Code § 5-27-

19    227(a)(1) prohibits the marketing and sale of JUUL products to minors.

20    980.    Defendants requested and received a measurable benefit at the expense of

21    Plaintiffs and class members in the form of payment for JUUL products.

22    981.    Defendants appreciated, recognized, and chose to accept the monetary benefits

23    Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

24    expected result of Defendant acting in its pecuniary interest at the expense of its customers.

25    982.    There is no justification for Defendants' enrichment. It would be inequitable,

26    unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

27    benefits were procured as a result of their wrongful conduct.

28    983.    Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

1    and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

2    with Defendant.

3         984.    Plaintiffs plead this claim separately as well as in the alternative to their other

4    claims, as without such claims they would have no adequate legal remedy.

5              **5.    Colorado**

6         985.    Plaintiffs bring each of the following claims on behalf of the Colorado Subclass

7    under Colorado law.

8              **a.    Violation of the Colorado Consumer Protection Act (Colo.**

9              **Rev. Stat. § 6-1-101, *et seq.*)**

10        986.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

11        987.    This claim is brought against JLI and, for certain unfair and/or unconscionable

12   conduct claims as noted below, all Defendants.

13        988.    Plaintiffs and class members purchased JUUL products for personal purposes.

14        989.    Defendants created and implemented a scheme to create a market for e-cigarettes

15   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

16   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

17   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

18   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

19   addictiveness, and significant risks of substantial physical injury from using JUUL products.

20        990.    Advertisements and representations for JUUL products contained deceptive

21   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

22   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

23   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

24   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

25   decades, JLI used third parties and word of mouth to spread false and misleading information

26   about JUUL products.

27        991.    Advertisements and representations for JUUL products concealed and failed to

28   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                 Case No. 19-md-02913-WHO

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

992. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

993. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

994. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

995. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) knowingly or recklessly misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, while knowing or having should known that they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) failing to disclose material information concerning goods or services which was known at the time of an advertisement or sale and intended to induce a consumer to enter into a transaction; and (e) knowingly or recklessly engaging in other unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practices.

996. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity or tendency to deceive, and in fact did, deceive reasonable

consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

997.    JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

998.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading or otherwise exhibited reckless disregard for the truth, and intended for consumers to rely on such misrepresentations and omissions.

999.    JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1000. In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Colo. Rev. Stat. §§ 18-13-121(1)(a) and 44-7-103); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1001.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1002.  Defendants' conduct significantly impacts the public as actual or potential consumers of Defendant's goods.

1003.  Defendants' conduct actually and proximately caused injury and actual damage to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—three times actual damages or $500, whichever is greater, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### b.    Common Law Fraud

1004.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1005.  This claim is brought against JLI.

1006.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1007.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1008.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1009.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1010.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1011.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1012.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1013.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1014.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1015.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1016.  JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.      Breach of the Implied Warranty of Merchantability

1017.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1018.  This claim is brought against JLI.

1019.  JUUL has at all times been a merchant with respect to the products which were

sold to Plaintiff and the class and was in the business of selling such products.

1020.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Colo. Rev. Stat. § 4-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1021.  The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1022.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1023.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1024.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would

not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1025.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

1026.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1027.   This claim is brought against JLI and the Management Defendants.

1028.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1029.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Colo. Rev. Stat. §§ 18-13-121(1)(a) and 44-7-103 prohibits the marketing and sale of JUUL products to minors.

1030.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1031.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1032.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1033.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1034.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 6.   Connecticut

1035.   Plaintiffs bring each of the following claims on behalf of the Connecticut Subclass under Connecticut law.

### a.   Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq.*)

1036.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1037.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1038.   Defendants are "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a.

1039.   Plaintiffs and class members purchased JUUL products for personal purposes.

1040.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1041.   Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1042.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1043.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1044.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1045.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1046.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii)

were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1047.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1048.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1049.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Conn. Gen. Stat. § 53-344b(b)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1050.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1051.   Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, attorney's fees, actual damages, and punitive damages, as well as any other relief the Court may deem just or proper.

### b.   Common Law Fraud

1052.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1053.   This claim is brought against JLI.

1054.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1055.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1056.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1057.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1058.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1059.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1060.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1061.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

1   and/or omissions.   Reasonable consumers would have been expected to have relied on the

2   misrepresentations and omissions.

3       1062.   Defendants knew or should have known that their misrepresentations and/or

4   omissions were false and misleading, and intended for consumers to rely on such

5   misrepresentations and omissions.

6       1063.   JLI knew that JUUL products were not safe or reasonable alternatives to

7   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

8   addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

9   products.

10      1064.   JUUL's conduct actually and proximately caused injury and harm to Plaintiffs

11  and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

12  differently and would not have purchased JUUL products or would have paid less for them.

13  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

14  JUUL products they would not otherwise have purchased and enter into purchase contracts they

15  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

16  member of the class damages in an amount to be proven at trial, as well as any other relief the

17  Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

19      1065.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

20      1066.   This claim is brought against JLI.

21      1067.   JUUL has at all times been a merchant with respect to the products which were

22  sold to Plaintiff and the class and was in the business of selling such products.

23      1068.   Each JUUL product sold by JUUL comes with an implied warranty that it will

24  merchantable and fit for the ordinary purpose for which it would be used.   Conn. Gen. Stat.

25  § 42a-2-314.   JUUL has breached its implied warranty of merchantability because its products

26  were not in merchantable condition when sold, were defective when sold, did not conform to the

27  promises and affirmations of fact made on the products' containers or labels, and/or do not

28  possess even the most basic degree of fitness for ordinary use.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                    Case No. 19-md-02913-WHO

1069.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1070.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1071.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1072.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1073.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

#### d.     Unjust Enrichment

1074.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1075.   This claim is brought against JLI and the Management Defendants.

1076.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1077.  Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  Conn. Gen. Stat. § 53-344b(b) prohibits the marketing and sale of JUUL products to minors.

1078.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1079.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1080.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1081.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

1    and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

2    with Defendant.

3        1082.   Plaintiffs plead this claim separately as well as in the alternative to their other

4    claims, as without such claims they would have no adequate legal remedy.

5            **7.    Delaware**

6        1083.   Plaintiffs bring each of the following claims on behalf of the Delaware Subclass

7    under Delaware law.

8            a.    **Violation of the Delaware Consumer Fraud Act (Del. Code tit.**

9                **6 § 2511, *et seq.*)**

10       1084.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

11       1085.   This claim is brought against JLI and, for certain claims as noted below, the

12   Management Defendants.

13       1086.   Plaintiffs and class members purchased JUUL products for personal purposes.

14       1087.   JLI is a "person" as defined by Del. Code Ann. tit. 6, § 2511.

15       1088.   JUUL products are "merchandise" as defined by Del. Code Ann. tit. 6, § 2511.

16       1089.   Defendants created and implemented a scheme to create a market for e-cigarettes

17   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

18   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

19   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

20   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

21   addictiveness, and significant risks of substantial physical injury from using JUUL products.

22       1090.   Advertisements and representations for JUUL products contained deceptive

23   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

24   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

25   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

26   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

27   decades, JLI used third parties and word of mouth to spread false and misleading information

28   about JUUL products.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                              Case No. 19-md-02913-WHO

1091.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1092.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1093.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1094.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1095.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

made partial representations concerning the same subject matter as the omitted facts.

1096.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1097.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JUUL has continued the deceptive and misleading practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1098.   Defendants' conduct actually and proximately caused an ascertainable loss and damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— injunctive relief, actual damages, and punitive damages, as well as any other relief the Court may deem just or proper.

**b.**      **Violation of the Delaware Deceptive Trade Practices Act (Del. Code tit. 6 § 2531, *et seq.*)**

1099.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1100.   This claim is brought against JLI and, for certain claims as noted below, the Management Defendants.

1101.   Plaintiffs and class members purchased JUUL products for personal purposes.

1102.   JLI is a "person" as defined by Del. Code Ann. tit. 6, §2531.

1103.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1104.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1105.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1106.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1107.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1108.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

1109.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, create confusion or misunderstanding among reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1110.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1111.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1112.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

1  class members would have behaved differently and would not have purchased JUUL products

2  or would have paid less for them. Defendants' misrepresentations and omissions induced

3  Plaintiffs and class members to purchase JUUL products they would not otherwise have

4  purchased and enter into purchase contracts they would not otherwise have entered into. In

5  addition, class members who are minors are entitled to full repayment of the amounts they spent

6  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

7  injunctive relief, reasonable attorneys' fees, actual damages, and/ or statutory damages that are

8  treble the amount of actual damages, as well as any other relief the Court may deem just or

9  proper.

### c.   Common Law Fraud

11  1113.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

12  1114.  This claim is brought against JLI.

13  1115.  JUUL created and implemented a scheme to create a market for e-cigarettes and

14  substantially increase sales of JUUL through a pervasive pattern of false and misleading

15  statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

16  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

17  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

18  addictiveness, and significant risks of substantial physical injury from using JUUL products.

19  1116.  Advertisements and representations for JUUL products contained deceptive

20  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

21  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

22  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

23  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

24  decades, JLI used third parties and word of mouth to spread false and misleading information

25  about JUUL products.

26  1117.  Advertisements and representations for JUUL products concealed and failed to

27  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

28  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1118.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1119.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1120.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1121.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1122.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the

misrepresentations and omissions.

1123.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1124.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1125.   JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.      Breach of the Implied Warranty of Merchantability

1126.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1127.   This claim is brought against JLI.

1128.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1129.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Del. Code tit. 6, § 2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1130.   The ordinary intended purpose of JUUL's products—and the purpose for which

they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1131.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1132.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1133.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1134.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.    Unjust Enrichment

1135.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1136.    This claim is brought against JLI and the Management Defendants.

1137.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1138.    Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  Del. Code tit. 11, §§ 1116(a) and 1118(a) prohibits the marketing and sale of JUUL products to minors.

1139.    Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1140.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1141.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1142.    Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1143.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 8.   District of Columbia

1144.   Plaintiffs bring each of the following claims on behalf of the District of Columbia Subclass under District of Columbia law.

### a.   Violation of the D.C. Consumer Protection Procedures Act (D.C. Code § 28-3901, *et seq.*)

1145.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1146.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1147.   Defendants are merchants under the statute who furnishes, makes available, provides information about, or, directly or indirectly, solicits or offers for or effectuates, a leas, lease or transfer of consumer goods or services.

1148.   Plaintiffs and class members are consumers who purchased JUUL products for personal purposes.

1149.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1150.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1151.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1152.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1153.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1154.   JLI's conduct was unfair trade practice because (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1155.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, grade, style, or model, when they are not; (c) advertising or offering goods or services with intent not to sell them as advertised or offered; (d) misrepresenting a material fact which has a tendency to mislead; (e) failing to sate a material fact when such failure tends to mislead; and (f) representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

1156.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had a tendency to mislead, and in fact did, mislead reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1157.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1158.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1159.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1160.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular D.C. Code § 7-1721.02); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1161.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1162.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, restitution, $1,500 per violation, and/ or statutory treble damages, whichever is greater, and punitive damages, as well as any other relief the Court may deem just or proper.

### b.  Common Law Fraud

1163.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1164.  This claim is brought against JLI.

1165.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1166.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1167.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1168.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1169.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1170.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1171.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1172. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1173. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1174. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1175. JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.      Breach of the Implied Warranty of Merchantability

1176. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1177. This claim is brought against JLI.

1178. JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1179.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  D.C. Code § 28:2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1180.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1181.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1182.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1183.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

1    in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2        1184.   JUUL was provided notice of these issues by numerous complaints filed against

3    it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

4    individual letters and communications sent by consumers before or within a reasonable amount

5    of time after they discovered or should have discovered that's JUUL product were defective and

6    unmerchantable.

### d.    Unjust Enrichment

8        1185.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

9        1186.   This claim is brought against JLI and the Management Defendants.

10        1187.   Defendants created and implemented a scheme to create a market for e-cigarettes

11    and substantially increase sales of JUUL products through a pervasive pattern of false and

12    misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

13    safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

14    while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

15    doses, addictiveness, and significant risks of substantial physical injury from using JUUL

16    products.

17        1188.   Defendants were unjustly enriched as a result of their wrongful conduct,

18    including through the false and misleading advertisements and omissions regarding (i) whether

19    JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

20    alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

21    powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

22    the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

23    nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

24    enriched through their scheme of marketing their products to minors.  D.C. Code § 7-1721.02

25    prohibits the marketing and sale of JUUL products to minors.

26        1189.   Defendants requested and received a measurable benefit at the expense of

27    Plaintiffs and class members in the form of payment for JUUL products.

28        1190.   Defendants appreciated, recognized, and chose to accept the monetary benefits

Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1191.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1192.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1193.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 9.      Florida

1194.   Plaintiffs bring each of the following claims on behalf of the Florida Subclass under Florida law.

### a.      Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*)

1195.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1196.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1197.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1198.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products. JUUL made or disseminated misleading advertisements to the general public or to a portion of the general public.

1199. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1200. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1201. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1202. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1203. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1204. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their

purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1205.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1206.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1207.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1208.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Fla. Stat. § 877.112(2)-(3)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1209.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

1   and others have continued the deceptive, misleading, unfair, and unconscionable practices that

2   Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

3   use of JUUL products by minors continues to rise.

4      1210.   Defendants' conduct actually and proximately caused actual damages to

5   Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

6   class members would have behaved differently and would not have purchased JUUL products

7   or would have paid less for them. Defendants' misrepresentations and omissions induced

8   Plaintiffs and class members to purchase JUUL products they would not otherwise have

9   purchased and enter into purchase contracts they would not otherwise have entered into. In

10  addition, class members who are minors are entitled to full repayment of the amounts they spent

11  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

12  injunctive relief, reasonable attorneys' fees, and actual damages, as well as any other relief the

13  Court may deem just or proper.

14           **b.**     **Violation of the Florida False Advertising Law (Fla. Stat.**

15                 **§§ 817.06 and 817.41, *et seq.*)**

16     1211.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

17     1212.   This claim is brought against JLI and, for certain claims as noted below, the

18  Management Defendants.

19     1213.   Plaintiffs and class members purchased JUUL products for personal purposes.

20     1214.   Defendants created and implemented a scheme to create a market for e-cigarettes

21  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

22  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

23  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

24  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

25  addictiveness, and significant risks of substantial physical injury from using JUUL products.

26     1215.   Advertisements and representations for JUUL products contained deceptive

27  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

28  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

1   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

2   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

3   decades, JLI used third parties and word of mouth to spread false and misleading information

4   about JUUL products.

5       1216.   Advertisements and representations for JUUL products concealed and failed to

6   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

7   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

8   addictive, posed significant risks of substantial physical injury resulting from the use of the

9   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

10   consumed through a pack of combustible cigarettes.

11       1217. The labels on JUUL products failed to disclose that the products posed

12   significant risks of substantial physical injury resulting from the use of the products. The labels

13   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

14       1218. The omissions were misleading and deceptive standing alone and were

15   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

16   cigarettes and other representations.

17       1219.   JLI's conduct was fraudulent and deceptive because the misrepresentations and

18   omissions at issue were likely to, and in fact did, deceive reasonable consumers including the

19   Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their

20   purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not

21   reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery

22   mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily

23   injury resulting from the use of the products, and (vi) that the nicotine consumed through one

24   JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

25   Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members'

26   decisions to purchase JUUL products.

27       1220.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

28   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1221. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1222. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1223. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1224. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, reasonable attorneys' fees, and punitive damages, as well as any other relief the Court may deem just or proper.

1

### c.    Common Law Fraud

2    1225.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3    1226.   This claim is brought against JLI.

4    1227.   JUUL created and implemented a scheme to create a market for e-cigarettes and

5    substantially increase sales of JUUL through a pervasive pattern of false and misleading

6    statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

7    alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

8    misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

9    addictiveness, and significant risks of substantial physical injury from using JUUL products.

10    1228.   Advertisements and representations for JUUL products contained deceptive

11    statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

12    to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

13    cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

14    not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

15    decades, JLI used third parties and word of mouth to spread false and misleading information

16    about JUUL products.

17    1229.   Advertisements and representations for JUUL products concealed and failed to

18    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives

19    to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

20    addictive, posed significant risks of substantial physical injury resulting from the use of the

21    products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

22    consumed through a pack of combustible cigarettes.

23    1230.   The labels on JUUL products failed to disclose that the products posed

24    significant risks of substantial physical injury resulting from the use of the products. The labels

25    also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

26    1231.   The omissions were misleading and deceptive standing alone and were

27    particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

28    cigarettes and other representations.

1232. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1233. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1234. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1235. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1236. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1237. JUUL's conduct actually and proximately caused detriment to Plaintiffs and

1  class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

2  differently and would not have purchased JUUL products or would have paid less for them.

3  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

4  JUUL products they would not otherwise have purchased and enter into purchase contracts they

5  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

6  member of the class damages in an amount to be proven at trial, as well as any other relief the

7  Court may deem just or proper.

### d.    Breach of the Implied Warranty of Merchantability

9    1238.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10   1239.   This claim is brought against JLI.

11   1240.   JUUL has at all times been a merchant with respect to the products which were

12  sold to Plaintiff and the class and was in the business of selling such products.

13   1241.   Each JUUL product sold by JUUL comes with an implied warranty that it will

14  merchantable and fit for the ordinary purpose for which it would be used. Fla. Stat. § 672.314.

15  JUUL has breached its implied warranty of merchantability because its products were not in

16  merchantable condition when sold, were defective when sold, did not conform to the promises

17  and affirmations of fact made on the products' containers or labels, and/or do not possess even

18  the most basic degree of fitness for ordinary use.

19   1242.   The ordinary intended purpose of JUUL's products—and the purpose for which

20  they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

21  products are not fit for that use—or any other use—because they (i) were not smoking cessation

22  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

23  potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed

24  unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's

25  products are not fit for their ordinary, intended use as either cigarette replacement devices or

26  recreation smoking devices.

27   1243.   Plaintiffs and each member of the class have had sufficient direct dealings with

28  either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

1   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

2   each member of the class, on the other hand.

3       1244.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

4   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

5   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

6   intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

7   the express purpose an intent of being sold to consumers.

8       1245.   Plaintiffs and the members of the class were injured as a direct and proximate

9   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

10  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

11  because, had they been aware of the unmerchantable condition of JUUL products, they would

12  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

13  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14      1246.   JUUL was provided notice of these issues by numerous complaints filed against

15  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

16  individual letters and communications sent by consumers before or within a reasonable amount

17  of time after they discovered or should have discovered that's JUUL product were defective and

18  unmerchantable.

19                              **e.     Unjust Enrichment**

20      1247.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21      1248.   This claim is brought against JLI and the Management Defendants.

22      1249.   Defendants created and implemented a scheme to create a market for e-cigarettes

23  and substantially increase sales of JUUL products through a pervasive pattern of false and

24  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

25  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

26  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

27  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

28  products.

1250.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Fla. Stat. § 877.112(2)-(3) prohibits the marketing and sale of JUUL products to minors.

1251.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1252.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1253.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1254.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1255.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 10.   Georgia

1256.   Plaintiffs bring each of the following claims on behalf of the Georgia Subclass under Georgia law.

#### a.   Violation of the Georgia Uniform Deceptive Trade Practices Act (Ga. Code § 10-1-370, *et seq.*)

1257.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1258.   This claim is brought against JLI and, for certain claims as noted below, the Management Defendants.

1259.   Plaintiffs and class members purchased JUUL products for personal purposes.

1260.   JLI is a "person" as defined by Ga. Code Ann. § 10-1-371.

1261.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1262.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1263.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1264.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1265.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

cigarettes and other representations.

1266. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding.

1267. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, confuse and mislead reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1268. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1269. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been

marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1270.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members, who are also likely to be damaged in the future on an ongoing basis in the future. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

**b.      Violation of the Georgia Fair Business Practices Act (Ga. Code § 10-1-390, *et seq.*)**

1271.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1272.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1273.   Plaintiffs and class members purchased JUUL products for personal purposes.

1274.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1275.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

1   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
2   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
3   decades, JLI used third parties and word of mouth to spread false and misleading information
4   about JUUL products.

5       1276.  Advertisements and representations for JUUL products concealed and failed to
6   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
7   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
8   addictive, posed significant risks of substantial physical injury resulting from the use of the
9   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
10  consumed through a pack of combustible cigarettes.

11      1277. The labels on JUUL products failed to disclose that the products posed
12  significant risks of substantial physical injury resulting from the use of the products. The labels
13  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

14      1278. The omissions were misleading and deceptive standing alone and were
15  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
16  cigarettes and other representations.

17      1279. JLI's conduct was unfair and unconscionable in that it included (i) the
18  manufacture and sale of products with a heightened propensity to cause addiction and physical
19  injuries and (ii) misrepresentations and omissions of material facts concerning the
20  characteristics and safety of JUUL products that offended public policy; were immoral,
21  unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused
22  substantial harm that greatly outweighs any possible utility from the conduct.

23      1280.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and
24  unfair business practices: (a) misrepresenting that JUUL products have characteristics,
25  ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL
26  products are of a particular standard, quality, or grade, or that goods are of a particular style or
27  model, when they are not; and (c) advertising goods or services with intent not to sell them as
28  advertised.

1281.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency or capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1282.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1283.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1284.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1285.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive

nicotine doses, addictive qualities, and health risks.

1286.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Ga. Code § 16-12-171(a)(1)(A)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1287.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1288.  Defendants' conduct actually and proximately caused injury or damages to Plaintiffs and class members as a result of consumer acts or practices in violation of the statute. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, general damages and/ or statutory damages in the amount of three times actual damages, whichever is greater, and punitive damages, as well as any other relief the Court may deem just or proper.

1289.  Plaintiffs have complied or substantially complied with all applicable notice requirements, or are otherwise excused from compliance because Defendants do not maintain a place of business in and/ or does not keep assets within the state of Georgia.

### c.    Common Law Fraud

1290.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1    1291.  This claim is brought against JLI.

2    1292.  JUUL created and implemented a scheme to create a market for e-cigarettes and

3  substantially increase sales of JUUL through a pervasive pattern of false and misleading

4  statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

5  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

6  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

7  addictiveness, and significant risks of substantial physical injury from using JUUL products.

8    1293.  Advertisements and representations for JUUL products contained deceptive

9  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

10  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

11  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

12  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

13  decades, JLI used third parties and word of mouth to spread false and misleading information

14  about JUUL products.

15    1294.  Advertisements and representations for JUUL products concealed and failed to

16  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

17  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

18  addictive, posed significant risks of substantial physical injury resulting from the use of the

19  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

20  consumed through a pack of combustible cigarettes.

21    1295.  The labels on JUUL products failed to disclose that the products posed

22  significant risks of substantial physical injury resulting from the use of the products. The labels

23  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

24    1296.  The omissions were misleading and deceptive standing alone and were

25  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

26  cigarettes and other representations.

27    1297.  JLI's conduct was fraudulent and deceptive because its misrepresentations and

28  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1298.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1299.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1300.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1301.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1302.   JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them.

JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.   Breach of the Implied Warranty of Merchantability

1303.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1304.   This claim is brought against JLI.

1305.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1306.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Ga. Code § 11-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1307.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1308.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1309.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1310.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Georgia Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1311.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.      Unjust Enrichment

1312.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1313.   This claim is brought against JLI and the Management Defendants.

1314.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1315.   Defendants were unjustly enriched as a result of their wrongful conduct,

including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  Ga. Code § 16-12-171(a)(1)(A) prohibits the marketing and sale of JUUL products to minors.

1316.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1317.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1318.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1319.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1320.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 11.    Hawaii

1321.   Plaintiffs bring each of the following claims on behalf of the Hawaii Subclass under Hawaii law.

### a.    Violation of the Hawaii Unfair and Deceptive Trade Practices Act (Haw. Rev. Stat. § 480-1, *et seq.*)

1322.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1323.   This claim is brought against JLI and, for certain unfair and/or unconscionable

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

conduct claims as noted below, all Defendants.

1324.  Plaintiffs and class members are consumers who purchased JUUL products for personal purposes.

1325.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1326.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1327.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1328.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1329.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1330.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1331.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity or tendency to mislead or deceive, and in fact did, mislead or deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1332.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1333.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1334.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Haw. Rev. Stat. §§ 712-

1258(1) and 245-17(a)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1335.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1336.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— injunctive relief, reasonable attorneys' fees, actual damages not less than $1,000 as provided by the statute and/ or statutory damages in the amount of threefold the damages sustained, whichever is greater, and punitive damages, as well as any other relief the Court may deem just or proper.

**b.**     **Violation of the Hawaii Uniform Deceptive Trade Practice Act (Haw. Rev. Stat. § 481A-1,** *et seq.***)**

1337.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1338.  This claim is brought against JLI and, for certain claims as noted below, the Management Defendants.

1339.  Plaintiffs and class members purchased JUUL products for personal purposes.

1340.  JLI is a "person" as defined in Haw. Rev. Stat. § 481A-2.

1341.  Defendants created and implemented a scheme to create a market for e-cigarettes

and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1342.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1343.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1344.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1345.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1346.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or

1   model, when they are not; (c) advertising goods or services with intent not to sell them as

2   advertised; and (d) engaging in other conduct which similarly creates a likelihood of confusion

3   or of misunderstanding.

4       1347.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

5   omissions at issue were likely to, and in fact did, confuse and mislead reasonable consumers

6   including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

7   material to their purchasing decisions that JUUL's products (i) were not smoking cessation

8   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

9   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

10  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

11  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

12  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

13  Plaintiffs' and class members' decisions to purchase JUUL products.

14      1348.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

15  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

16  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

17  facts; because the facts would be material to reasonable consumers; because JLI actively

18  concealed them; because JLI intended for consumers to rely on the omissions in question;

19  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

20  made partial representations concerning the same subject matter as the omitted facts.

21      1349.  JLI and the Management Defendants engaged in fraudulent and deceptive

22  conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

23  products were appropriate for minors, when in fact the products never should have been

24  marketed to minors and are especially harmful to minors due to the potent and addictive

25  nicotine doses, addictive qualities, and health risks.

26      1350.  Defendants' conduct actually and proximately caused actual damages to

27  Plaintiffs and class members, and Plaintiffs and class members are likely to be damaged on an

28  ongoing basis and in the future. Absent Defendants' unfair and fraudulent conduct, Plaintiffs

1    and class members would have behaved differently and would not have purchased JUUL

2    products or would have paid less for them. Defendants' misrepresentations and omissions

3    induced Plaintiffs and class members to purchase JUUL products they would not otherwise have

4    purchased and enter into purchase contracts they would not otherwise have entered into. In

5    addition, class members who are minors are entitled to full repayment of the amounts they spent

6    on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

7    injunctive relief and reasonable attorneys' fees, as well as any other relief the Court may deem

8    just or proper.

9                              **c.    Common Law Fraud**

10         1351.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

11         1352.   This claim is brought against JLI.

12         1353.   JUUL created and implemented a scheme to create a market for e-cigarettes and

13    substantially increase sales of JUUL through a pervasive pattern of false and misleading

14    statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

15    alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

16    misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

17    addictiveness, and significant risks of substantial physical injury from using JUUL products.

18         1354.   Advertisements and representations for JUUL products contained deceptive

19    statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

20    to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

21    cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

22    not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

23    decades, JLI used third parties and word of mouth to spread false and misleading information

24    about JUUL products.

25         1355.   Advertisements and representations for JUUL products concealed and failed to

26    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

27    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

28    addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1356.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1357.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1358.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1359.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1360.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1361.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1362.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1363.   JUUL's conduct actually and proximately caused detriment to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.      Breach of the Implied Warranty of Merchantability

1364.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1365.   This claim is brought against JLI.

1366.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1367.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Haw. Rev. Stat. § 490:2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1368.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

1  products are not fit for that use—or any other use—because they (i) were not smoking cessation

2  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

3  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

4  unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's

5  products are not fit for their ordinary, intended use as either cigarette replacement devices or

6  recreation smoking devices.

7       1369.   Plaintiffs and each member of the class have had sufficient direct dealings with

8  either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

9  by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

10  each member of the class, on the other hand.

11       1370.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

12  JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

13  sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

14  intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

15  the express purpose an intent of being sold to consumers.

16       1371.   Plaintiffs and the members of the class were injured as a direct and proximate

17  result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

18  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

19  because, had they been aware of the unmerchantable condition of JUUL products, they would

20  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

21  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

22       1372.   JUUL was provided notice of these issues by numerous complaints filed against

23  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

24  individual letters and communications sent by consumers before or within a reasonable amount

25  of time after they discovered or should have discovered that's JUUL product were defective and

26  unmerchantable.

### e.   Unjust Enrichment

28       1373.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                   Case No. 19-md-02913-WHO

1374.   This claim is brought against JLI and the Management Defendants.

1375.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1376.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.   Haw. Rev. Stat. §§ 712-1258(1) and 245-17(a) prohibits the marketing and sale of JUUL products to minors.

1377.   Defendants requested and received a measurable benefit at the expense of the Plaintiffs and class members in the form of payment for JUUL products.

1378.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1379.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1380.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1381.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 12.   Idaho

1382.   Plaintiffs bring each of the following claims on behalf of the Idaho Subclass under Idaho law.

### a.   Violation of the Idaho Consumer Protection Act (Idaho Code § 48-601, *et seq.*)

1383.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1384.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1385.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

1386.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1387.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1388.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1389.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1390.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1391.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products offended public policy; was immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

1392.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) engaging in acts or practices which are otherwise misleading, false, or deceptive to a consumer; and (e) engaging in unconscionable methods, acts, or practices in the conduct of trade or commerce.

1393.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency or capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking

cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1394.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1395.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1396.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1397.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Idaho Code §§ 39-5705(1) and 39-5714(1)); is immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; took advantage of minor consumers that are not reasonably able to protect their interests; and has caused substantial harm that greatly outweighs any benefits associated with the conduct.

1398.   As alleged above, all Defendants participated and/or facilitated the marketing of

JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1399.  Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, actual damages, disgorgement, restitution, and/ or statutory damages in the amount of $1,000, whichever is greater, and punitive damages, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

1400.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1401.  This claim is brought against JLI.

1402.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1403.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1404.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1405.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1406.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1407.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1408.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1409.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1410.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1411.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1412.   JUUL's conduct actually and proximately caused injury to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.     Breach of the Implied Warranty of Merchantability

1413.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1414.   This claim is brought against JLI.

1415.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1416.   Each JUUL product sold by JUUL comes with an implied warranty that it will

merchantable and fit for the ordinary purpose for which it would be used. Idaho Code § 28-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1417.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1418.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1419.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1420.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1421.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

1422.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1423.   This claim is brought against JLI and the Management Defendants.

1424.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1425.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  Idaho Code §§ 39-5705(1) and 39-5714(1) prohibits the marketing and sale of JUUL products to minors.

1426.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1427.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

1  expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2  1428.   There is no justification for Defendants' enrichment. It would be inequitable,

3  unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

4  benefits were procured as a result of their wrongful conduct.

5  1429.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

6  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

7  with Defendant.

8  1430.   Plaintiffs plead this claim separately as well as in the alternative to their other

9  claims, as without such claims they would have no adequate legal remedy.

10  **13.   Illinois**

11  1431.   Plaintiffs bring each of the following claims on behalf of the Illinois Subclass

12  under Illinois law.

13  a.   **Violation of the Illinois Consumer Fraud and Deceptive**

14  **Business Practices Act (815 Ill. Comp. Stat. § 505/1, *et seq.*)**

15  1432.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

16  1433.   This claim is brought against JLI and, for certain unfair and/or unconscionable

17  conduct claims as noted below, all Defendants.

18  1434.   Plaintiffs and class members are persons who purchased JUUL products for

19  personal purposes.

20  1435.   Defendants, Plaintiffs, and class members are "persons" under the statute.

21  1436.   Defendants created and implemented a scheme to create a market for e-cigarettes

22  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

23  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

24  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

25  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

26  addictiveness, and significant risks of substantial physical injury from using JUUL products.

27  1437.   Advertisements and representations for JUUL products contained deceptive

28  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1438.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1439.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1440.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1441.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1442.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as

advertised; and (d) engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

1443.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1444.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1445.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1446.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1447.   In addition, all Defendants engaged in unfair and unconscionable conduct

because the targeting of minors offends public policy (in particular 720 Ill. Comp. Stat. § 675/1.5(b) and 675/1.5(b)(c)(2)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1448.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1449.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, reasonable attorneys' fees, actual economic damages, and punitive damages, as well as any other relief the Court may deem just or proper.

### b.   Common Law Fraud

1450.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1451.  This claim is brought against JLI.

1452.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1453.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1454.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1455.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1456.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1457.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in

1    Plaintiffs' and class members' decisions to purchase JUUL products.

2        1458.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

3    were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

4    other than Plaintiffs and class members), who had exclusive and superior knowledge of the

5    facts; because the facts would be material to reasonable consumers; because JUUL products

6    pose an unreasonable risk of substantial bodily injury; and because JLI made partial

7    representations concerning the same subject matter as the omitted facts.

8        1459.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

9    purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

10   and/or omissions.   Reasonable consumers would have been expected to have relied on the

11   misrepresentations and omissions.

12       1460.   Defendants knew or should have known that their misrepresentations and/or

13   omissions were false and misleading, and intended for consumers to rely on such

14   misrepresentations and omissions.

15       1461.   JLI knew that JUUL products were not safe or reasonable alternatives to

16   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

17   addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

18   products.

19       1462.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

20   members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

21   differently and would not have purchased JUUL products or would have paid less for them.

22   JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

23   JUUL products they would not otherwise have purchased and enter into purchase contracts they

24   would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

25   member of the class damages in an amount to be proven at trial, as well as any other relief the

26   Court may deem just or proper.

27           c.      **Breach of the Implied Warranty of Merchantability**

28       1463.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1464.   This claim is brought against JLI.

1465.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1466.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  810 Ill. Comp. Stat. § 5/2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1467.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1468.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1469.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1470.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

the Illinois Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1471.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.     Unjust Enrichment

1472.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1473.   This claim is brought against JLI and the Management Defendants.

1474.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1475.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  720 Ill. Comp. Stat.

§ 675/1(a) and 675/1(b)(2) prohibits the marketing and sale of JUUL products to minors.

1476.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1477.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1478.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1479.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1480.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 14.   Indiana

1481.   Plaintiffs bring each of the following claims on behalf of the Indiana Subclass under Indiana law.

### a.   Violation of Indiana's Deceptive Consumer Sales Act (Ind. Code §§ 24-5-0.5-1, *et seq*).

1482.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1483.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1484.   Defendants are "suppliers" as that term is defined in Indiana's Deceptive Consumer Sales Act.  Defendants engaged in incurable deceptive acts as set forth herein.

1485.   Plaintiffs and class members are individual consumers who purchased JUUL products for personal purposes.

1486.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading

statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1487.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1488.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1489.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1490.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1491.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

substantial harm that greatly outweighs any possible utility from the conduct.

1492.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, uses, or benefits they do not have, which JUUL knows or reasonably should know they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not, and JUUL knows or reasonably should know they are not; and (c) advertising goods or services with intent not to sell them as advertised.

1493.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1494.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1495. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and

omissions.

1496.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1497. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1498.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Ind. Code §§ 35-46-1-10(a); 35-46-1-10.2(a);  7.1-7-5.5-1;  7.1-7-5.5-2); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1499.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1500.   Defendants' conduct was incurable because it was done as part of a scheme with the intent to defraud, mislead, and engage in unfair business practices.

1501. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent

on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages and/or statutory damages in the amount of $500, whichever is greater; punitive damages because Defendants' deceptive acts were willful; restitution; and attorney's fees; as well as any other relief the Court may deem just or proper.

1502.  Plaintiffs have complied or substantially complied with all applicable notice requirements.

### b.      Common Law Fraud

1503.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1504.  This claim is brought against JLI.

1505.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1506.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1507.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1508. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1509. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1510. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1511. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1512. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1513. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such

misrepresentations and omissions.

1514.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1515.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

1516.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1517.   This claim is brought against JLI.

1518.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1519.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Ind. Code § 26-1-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1520.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1521.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1522.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1523.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1524.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.      Unjust Enrichment

1525.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1526.   This claim is brought against JLI and the Management Defendants.

1527.   Defendants created and implemented a scheme to create a market for e-cigarettes

and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1528.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Indiana law (*see* Ind. Code §§ 35-46-1-10(a); 35-46-1-10.2(a); 7.1-7-5.5-1; 7.1-7-5.5-2) prohibits the marketing and sale of JUUL products to minors.

1529.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1530.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1531.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1532.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1533.   Plaintiffs plead this claim separately as well as in the alternative to their other

claims, as without such claims they would have no adequate legal remedy.

### 15.   Iowa

1534.   Plaintiffs bring each of the following claims on behalf of the Iowa Subclass under Iowa law.

### a.   Violation of the Iowa Consumer Fraud Act (Iowa Code § 714H.1, *et seq.*)

1535.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1536.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1537.   Plaintiffs and class members purchased JUUL products for personal purposes.

1538.   Defendants are "persons" under the statute.

1539.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1540.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1541.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1542.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1543.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1544.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1545.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive ordinary and/or reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1546.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively

concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1547.   JUUL knew or reasonably should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1548.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1549.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Iowa Code Ann. § 453A.2) is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1550.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1551.   Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each

1  member of the class—actual damages, statutory damages up to three times actual damages
2  because Defendants' conduct represented a willful and wanton disregard for the safety of
3  Plaintiffs, attorney's fees,  and equitable relief, as well as any other relief the Court may deem
4  just or proper.

### b.      Common Law Fraud

6  1552.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

7  1553.   This claim is brought against JLI.

8  1554.   JUUL created and implemented a scheme to create a market for e-cigarettes and
9  substantially increase sales of JUUL through a pervasive pattern of false and misleading
10 statements and omissions. JUUL's plan was to portray JUUL products as cool and safe
11 alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
12 misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
13 addictiveness, and significant risks of substantial physical injury from using JUUL products.

14 1555.   Advertisements and representations for JUUL products contained deceptive
15 statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives
16 to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible
17 cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
18 not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
19 decades, JLI used third parties and word of mouth to spread false and misleading information
20 about JUUL products.

21 1556.   Advertisements and representations for JUUL products concealed and failed to
22 disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
23 combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
24 addictive, posed significant risks of substantial physical injury resulting from the use of the
25 products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
26 consumed through a pack of combustible cigarettes.

27 1557.   The labels on JUUL products failed to disclose that the products posed
28 significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1558.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1559.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1560.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1561.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1562.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1563.  JLI knew that JUUL products were not safe or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1564.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, compensatory damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

1565.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1566.   This claim is brought against JLI.

1567.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1568.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* Iowa Code Ann. § 554.2314.   JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1569.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's

products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1570.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1571.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1572.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1573.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

1574.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1575.   This claim is brought against JLI and the Management Defendants.

1576.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1577.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Iowa law (Iowa Code Ann. § 453A.2) prohibits the marketing and sale of JUUL products to minors.

1578.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1579.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1580.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1581.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1582.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 16.   Kansas

1583.   Plaintiffs bring each of the following claims on behalf of the Kansas Subclass

under Kansas law.

a.     **Violation of Kansas Consumer Protection Act (Kan. Stat. Ann. § 50-623, *et seq.*)**

1584.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1585.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1586.   Defendants are "suppliers" as that term is defined in Kansas's Consumer Protection Act.

1587.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1588.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1589.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1590.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

consumed through a pack of combustible cigarettes.

1591.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1592.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1593.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1594.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have and (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; and (d) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact.

1595.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, were likely to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a

pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1596.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1597.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1598.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1599.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1600.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Kan. Stat. Ann. § 79-3321); is immoral, unethical, oppressive, and unscrupulous; took advantage of minors' inability to reasonably protect their interests; and has caused substantial harm that greatly outweighs any benefits associated with the conduct.

1601.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

1    and others have continued the deceptive, misleading, unfair, and unconscionable practices that
2    Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the
3    use of JUUL products by minors continues to rise.

4        1602.   Defendants' conduct actually and proximately caused damage to Plaintiffs and
5    class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members
6    would have behaved differently and would not have purchased JUUL products or would have
7    paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class
8    members to purchase JUUL products they would not otherwise have purchased and enter into
9    purchase contracts they would not otherwise have entered into. In addition, class members who
10   are minors are entitled to full repayment of the amounts they spent on JUUL products.
11   Plaintiffs seek—on behalf of themselves and each member of the class—actual damages,
12   attorney's fees, and equitable relief, as well as any other relief the Court may deem just or
13   proper.

14                                **b.    Common Law Fraud**

15       1603.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

16       1604.   This claim is brought against JLI.

17       1605.   JUUL created and implemented a scheme to create a market for e-cigarettes and
18   substantially increase sales of JUUL through a pervasive pattern of false and misleading
19   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe
20   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
21   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
22   addictiveness, and significant risks of substantial physical injury from using JUUL products.

23       1606.   Advertisements and representations for JUUL products contained deceptive
24   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives
25   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible
26   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
27   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
28   decades, JLI used third parties and word of mouth to spread false and misleading information

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                          Case No. 19-md-02913-WHO

1   about JUUL products.

2   1607.   Advertisements and representations for JUUL products concealed and failed to

3   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

4   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5   addictive, posed significant risks of substantial physical injury resulting from the use of the

6   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

7   consumed through a pack of combustible cigarettes.

8   1608.   The labels on JUUL products failed to disclose that the products posed

9   significant risks of substantial physical injury resulting from the use of the products. The labels

10   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

11   1609.   The omissions were misleading and deceptive standing alone and were

12   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

13   cigarettes and other representations.

14   1610.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

15   omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

16   including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

17   material to their purchasing decisions that JUUL's products (i) were not smoking cessation

18   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

19   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

20   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

21   consumed through one JUUL pod exceeded the nicotine consumed through a pack of

22   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

23   Plaintiffs' and class members' decisions to purchase JUUL products.

24   1611.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

25   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

26   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

27   facts; because the facts would be material to reasonable consumers; because JUUL products

28   pose an unreasonable risk of substantial bodily injury; and because JLI made partial

representations concerning the same subject matter as the omitted facts.

1612.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1613.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1614.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1615.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

1616.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1617.   This claim is brought against JLI.

1618.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1619.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   *See* Kan. Stat. Ann. § 84–2–314.  JUUL has breached its implied warranty of merchantability because its products

were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1620.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1621.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1622.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1623.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1624.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

1625.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1626.    This claim is brought against JLI and the Management Defendants.

1627.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1628.    Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Kansas law (*see* Kan. Stat. Ann. § 79-3321(l)) prohibits the marketing and sale of JUUL products to minors

1629.    Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1630.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1631.    There is no justification for Defendants' enrichment. It would be inequitable,

1    unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

2    benefits were procured as a result of their wrongful conduct.

3        1632.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

4    and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

5    with Defendant.

6        1633.   Plaintiffs plead this claim separately as well as in the alternative to their other

7    claims, as without such claims they would have no adequate legal remedy.

8            **17.    Kentucky**

9        1634.   Plaintiffs bring each of the following claims on behalf of the Kentucky Subclass

10   under Kentucky law.

11           **a.        Violation of Kentucky Consumer Protection Act (Ky. Rev.**

12               **Stat. Ann. § 367.110, *et seq*.)**

13       1635.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

14       1636.   This claim is brought against JLI and, for certain unfair and/or unconscionable

15   conduct claims as noted below, all Defendants.

16       1637.   Defendants are sellers of JUUL products.

17       1638.   Plaintiffs and class member are "persons" under the statute.

18       1639.   Plaintiffs and class members are individuals who purchased JUUL products for

19   personal purposes.

20       1640.   Plaintiffs and each member of the class have had direct dealings with either

21   JUUL via its website or its agents (including distributors, dealers, and sellers authorized by

22   JUUL). Further, Plaintiffs and each member of the class were third-party beneficiaries of

23   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

24   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

25   intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

26   the express purpose an intent of being sold to consumers.

27       1641.   Defendants created and implemented a scheme to create a market for e-cigarettes

28   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1642.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1643.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1644.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1645.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1646.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

substantial harm that greatly outweighs any possible utility from the conduct.

1647. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1648. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1649. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1650. In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Ky. Rev. Stat. Ann. §§ 438.310, 438.313); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1651.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1652.   Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, punitive damages, attorney's fees and costs, and equitable relief, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

1653.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1654.   This claim is brought against JLI.

1655.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1656.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1657.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1658.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1659.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1660.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1661.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1662. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1663. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1664. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1665. JUUL's conduct actually and proximately caused damage including an ascertainable loss of money or property to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

1666. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1667. This claim is brought against JLI.

1668. JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1669. Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* Ky. Rev. Stat. Ann. § 355.2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1670. The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1671. Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1672. Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1673. Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Kentucky Direct Purchase Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have

paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1674.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

1675.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1676.   This claim is brought against JLI and the Management Defendants.

1677.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1678.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Kentucky law (*see* Ky. Rev. Stat. Ann. §§ 438.310, 438.313) prohibits the marketing and sale of JUUL products to minors.

1679.   Defendants requested and received a measurable benefit at the expense of

Plaintiffs and class members in the form of payment for JUUL products.

1680.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1681.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1682.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1683.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 18.   Louisiana

1684.   Plaintiffs bring each of the following claims on behalf of the Louisiana Subclass under Louisiana law.

### a.   Violation of Louisiana Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. § 51:1401, *et seq.*)

1685.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1686.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1687.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

1688.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1689.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1690.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1691.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1692.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1693.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1694.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1695.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1696.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1697.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1698.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, La. Rev. Stat. Ann. §§ 14:91.8, 14:91.6(A)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1699.   As alleged above, all Defendants participated and/or facilitated the marketing of

JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1700.   Defendants' conduct actually and proximately caused an ascertainable loss of money or movable property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—three times damages because Defendants deceptive and fraudulent conduct was done knowingly, and reasonable attorneys' fees and costs, as well as any other relief the Court may deem just or proper.

### b.    Common Law Fraud

1701.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1702.   This claim is brought against JLI.

1703.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1704.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

1   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

2   decades, JLI used third parties and word of mouth to spread false and misleading information

3   about JUUL products.

4       1705.   Advertisements and representations for JUUL products concealed and failed to

5   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

6   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

7   addictive, posed significant risks of substantial physical injury resulting from the use of the

8   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

9   consumed through a pack of combustible cigarettes.

10      1706.   The labels on JUUL products failed to disclose that the products posed

11  significant risks of substantial physical injury resulting from the use of the products. The labels

12  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

13      1707.   The omissions were misleading and deceptive standing alone and were

14  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

15  cigarettes and other representations.

16      1708.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

17  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

18  including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

19  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

20  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

21  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

22  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

23  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

24  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

25  Plaintiffs' and class members' decisions to purchase JUUL products.

26      1709.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

27  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

28  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1710.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1711.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1712.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1713.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, compensatory damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

1714.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1715.  This claim is brought against JLI.

1716.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1717.  Each JUUL product sold by JUUL comes with an implied warranty that it will

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

merchantable and fit for the ordinary purpose for which it would be used. *See* LSA-C.C. Art. 2475. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1718.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1719.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1720.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1721.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1722.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

1723.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1724.   This claim is brought against JLI and the Management Defendants.

1725.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1726.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. The Louisiana Prevention of Youth Access to Tobacco Law and other statutes (*see* La. Rev. Stat. Ann. §§ 14:91.8 and 14:91.6) prohibit the marketing and sale of JUUL products to minors.

1727.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1728.   Defendants appreciated, recognized, and chose to accept the monetary benefits

1  Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the
2  expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3      1729.  There is no justification for Defendants' enrichment. It would be inequitable,
4  unconscionable, and unjust for Defendants to be permitted to retain these benefits because the
5  benefits were procured as a result of their wrongful conduct.

6      1730.  Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained
7  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing
8  with Defendant.

9      1731.  Plaintiffs plead this claim separately as well as in the alternative to their other
10  claims, as without such claims they would have no adequate legal remedy.

11          **19.   Maine**

12      1732.  Plaintiffs bring each of the following claims on behalf of the Maine Subclass
13  under Maine law.

14          a.      **Violation of Maine Unfair Trade Practices Act (5 M.R.S.A.**
15                  **§ 205-A,** *et seq.***)**

16      1733.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

17      1734.  This claim is brought against JLI and, for certain unfair and/or unconscionable
18  conduct claims as noted below, all Defendants.

19      1735.  Plaintiffs and class members are persons who purchased JUUL products for
20  personal purposes.

21      1736.  Defendants created and implemented a scheme to create a market for e-cigarettes
22  and substantially increase sales of JUUL through a pervasive pattern of false and misleading
23  statements and omissions. Defendants aimed to portray JUUL products as cool and safe
24  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
25  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
26  addictiveness, and significant risks of substantial physical injury from using JUUL products.

27      1737.  Advertisements and representations for JUUL products contained deceptive
28  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1738. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1739. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1740. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1741. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1742. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, mislead reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery

mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1743.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1744.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1745.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1746.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, 22 M.R.S.A. § 1555-B (2)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1747.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that

Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1748.   Defendants' conduct actually and proximately caused the loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, restitution, attorney's fees and costs, and injunctive relief, as well as any other relief the Court may deem just or proper.

1749.   Plaintiffs have complied or substantially complied with all applicable notice requirements.

## b.   Violation of Maine Uniform Deceptive Trade Practices Act (10 M.R.S.A. § 1211, *et seq.*)

1750.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1751.   This claim is brought against JLI and, for certain claims as noted below, the Management Defendants.

1752.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

1753.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1754.   Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1755.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1756.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1757.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1758.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in conduct which creates a likelihood of confusion or of misunderstanding.

1759.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their

purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1760.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1761.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1762.   Defendants' conduct actually and proximately caused damage to Plaintiffs and class members and is likely to cause damage in the future. Absent Defendants' deceptive and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, attorney's fees, and equitable

1   relief, as well as any other relief the Court may deem just or proper.

2                    **c.    Common Law Fraud**

3       1763.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4       1764.   This claim is brought against JLI.

5       1765.   JUUL created and implemented a scheme to create a market for e-cigarettes and
substantially increase sales of JUUL through a pervasive pattern of false and misleading
statements and omissions. JUUL's plan was to portray JUUL products as cool and safe
alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
addictiveness, and significant risks of substantial physical injury from using JUUL products.

11      1766.   Advertisements and representations for JUUL products contained deceptive
statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives
to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible
cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
decades, JLI used third parties and word of mouth to spread false and misleading information
about JUUL products.

18      1767.   Advertisements and representations for JUUL products concealed and failed to
disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
addictive, posed significant risks of substantial physical injury resulting from the use of the
products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
consumed through a pack of combustible cigarettes.

24      1768.   The labels on JUUL products failed to disclose that the products posed
significant risks of substantial physical injury resulting from the use of the products. The labels
also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

27      1769.   The omissions were misleading and deceptive standing alone and were
particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

cigarettes and other representations.

1770.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1771.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1772.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1773.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1774.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1775.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### d.   Breach of the Implied Warranty of Merchantability

1776.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1777.   This claim is brought against JLI.

1778.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1779.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* 11 M.R.S.A. § 2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1780.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1781.   Plaintiffs and each member of the class have had sufficient direct dealings with

either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1782.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1783.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1784.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.        Unjust Enrichment

1785.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1786.   This claim is brought against JLI and the Management Defendants.

1787.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL

products.

1788.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Maine law (*see* 22 M.R.S.A. § 1555-B) prohibits the marketing and sale of JUUL products to minors.

1789.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1790.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1791.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1792.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1793.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 20.   Maryland

1794.   Plaintiffs bring each of the following claims on behalf of the Maryland Subclass under Maryland law.

a.     **Violation of Maryland Consumer Protection Act (Md. Code Ann. Com. Law § 13-101, *et seq*.)**

1795.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1796.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1797.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1798.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1799.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1800.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1801.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1802. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1803. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1804. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) stating a material fact that deceives or tends to deceive; and (e) engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same.

1805. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity, tendency and effect of deceiving or misleading reasonable consumers; and in fact did, deceive and mislead reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to

purchase JUUL products.

1806.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1807.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1808.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1809.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1810.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Md. Code Ann. Health Gen. § 24- 305(b); Md. Code Ann. Crim. Law §§ 10-107(b)(2), (c)(1)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1811.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that

Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1812.   Defendants' conduct actually and proximately caused injury and loss to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—damages and attorney's fees, as well as any other relief the Court may deem just or proper.

### b.   Common Law Fraud

1813.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1814.   This claim is brought against JLI.

1815.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1816.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1817.   Advertisements and representations for JUUL products concealed and failed to

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1818.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1819.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1820.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1821.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1822.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1823.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1824.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1825.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

1826.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1827.  This claim is brought against JLI.

1828.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1829.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Md. Code Ann. Com. Law § 2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels,

and/or do not possess even the most basic degree of fitness for ordinary use.

1830.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1831.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1832.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1833.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1834.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and

unmerchantable.

### d.     Unjust Enrichment

1835.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1836.   This claim is brought against JLI and the Management Defendants.

1837.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1838.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Maryland law (*see* Md. Code Ann. Health Gen. § 24- 305(b); Md. Code Ann. Crim. Law §§ 10-107(b)(2), (c)(1)) prohibits the marketing and sale of JUUL products to minors.

1839.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1840.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1841.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

benefits were procured as a result of their wrongful conduct.

1842.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1843.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 21.   Massachusetts

1844.   Plaintiffs bring each of the following claims on behalf of the Massachusetts Subclass under Massachusetts law.

### a.   Violation of Massachusetts Regulation of Business Practice and Consumer Protection Act (M.G.L.A. 93A, § 1, *et seq.*)

1845.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1846.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

1847.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

1848.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1849.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information

about JUUL products.

1850.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1851. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1852. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1853. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

1854. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in

Plaintiffs' and class members' decisions to purchase JUUL products.

1855.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1856.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1857.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1858.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, M.G.L.A. 270 § 6(b)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

1859.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

1860.   Defendants' conduct actually and proximately caused injury to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have

paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—actual damages; injunctive relief; attorney's fees and costs; and because Defendants' conduct was a willful and knowing violation, punitive damages; as well as any other relief the Court may deem just or proper.

1861.   Plaintiffs have complied or substantially complied with all applicable notice requirements, or are otherwise excused from compliance because Defendants do not maintain a place of business in and/ or do not keep assets within the state of Massachusetts.

### b.   Common Law Fraud

1862.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1863.   This claim is brought against JLI.

1864.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1865.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1866.   Advertisements and representations for JUUL products concealed and failed to

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1867.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1868.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1869.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1870.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1871.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1872.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1873.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1874.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.      Breach of the Implied Warranty of Merchantability

1875.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1876.  This claim is brought against JLI.

1877.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1878.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* M.G.L.A. 106 § 2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not

possess even the most basic degree of fitness for ordinary use.

1879.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1880.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1881.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1882.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1883.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and

1    unmerchantable.

2                              **d.      Unjust Enrichment**

3        1884.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4        1885.   This claim is brought against JLI and the Management Defendants.

5        1886.   Defendants created and implemented a scheme to create a market for e-cigarettes

6    and substantially increase sales of JUUL products through a pervasive pattern of false and

7    misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

8    safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

9    while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

10   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

11   products.

12       1887.   Defendants were unjustly enriched as a result of their wrongful conduct,

13   including through the false and misleading advertisements and omissions regarding (i) whether

14   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

15   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

16   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

17   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

18   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

19   enriched through their scheme of marketing their products to minors. Massachusetts law (*see*

20   M.G.L.A. 270 § 6(b)) prohibits the marketing and sale of JUUL products to minors.

21       1888.   Defendants requested and received a measurable benefit at the expense of

22   Plaintiffs and class members in the form of payment for JUUL products.

23       1889.   Defendants appreciated, recognized, and chose to accept the monetary benefits

24   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

25   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

26       1890.   There is no justification for Defendants' enrichment. It would be inequitable,

27   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

28   benefits were procured as a result of their wrongful conduct.

1891.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1892.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 22.   Michigan

1893.   Plaintiffs bring each of the following claims on behalf of the Michigan Subclass under Michigan law.

### a.   Violation of Michigan Consumer Protection Act (M.C.L.A. § 445.901, *et seq.*)

1894.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1895.   This claim is brought against JLI.

1896.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1897.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1898.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1899.   Advertisements and representations for JUUL products concealed and failed to

disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1900.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1901.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1902.   JUUL's prohibited fraudulent, deceptive, and unfair business practices conduct includes, but is not limited to the following: (a) representing that the goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have ; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; (e) making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and (f) failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1903.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily

injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1904.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1905.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1906.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1907.   Defendants' conduct actually and proximately caused Plaintiffs and class members to be injured and to sustain losses. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages and equitable relief, as well as any other relief the Court may deem just or proper.

### b.    Common Law Fraud

1908.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1909.   This claim is brought against JLI.

1910.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1911.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1912.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1913.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1914.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1915.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1916.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1917.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1918.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1919.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1920.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class

members.  Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.     Breach of the Implied Warranty of Merchantability

1921.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1922.   This claim is brought against JLI.

1923.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1924.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* M.C.L.A. § 440.2314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1925.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1926.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

1  by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

2  each member of the class, on the other hand.

3      1927.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

4  JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

5  sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

6  intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with

7  the express purpose an intent of being sold to consumers.

8      1928.   Plaintiffs and the members of the class were injured as a direct and proximate

9  result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

10  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

11  because, had they been aware of the unmerchantable condition of JUUL products, they would

12  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

13  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14      1929.   JUUL was provided notice of these issues by numerous complaints filed against

15  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

16  individual letters and communications sent by consumers before or within a reasonable amount

17  of time after they discovered or should have discovered that's JUUL product were defective and

18  unmerchantable.

19                          **d.      Unjust Enrichment**

20      1930.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21      1931.   This claim is brought against JLI and the Management Defendants.

22      1932.   Defendants created and implemented a scheme to create a market for e-cigarettes

23  and substantially increase sales of JUUL products through a pervasive pattern of false and

24  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

25  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

26  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

27  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

28  products.

1933.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors.  Michigan law (*see* M.C.L.A. § 722.641) prohibits the marketing and sale of JUUL products to minors.

1934.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

1935.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

1936.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1937.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

1938.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 23.   Minnesota

1939.   Plaintiffs bring each of the following claims on behalf of the Minnesota Subclass under Minnesota law.

### a.   Violation of Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.69)

1940.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1941.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

1942.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1943.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1944.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1945.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1946.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1947.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

cigarettes and other representations.

1948.   JUUL engaged in acts, used, and employed, fraud, false pretenses, false promises, misrepresentations, misleading statements and deceptive practices. JUUL's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1949.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1950.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1951.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1952.   Defendants' conduct actually and proximately caused injury to Plaintiffs and

class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—damages, attorney's fees and costs, and injunctive relief; as well as any other relief the Court may deem just or proper. *See* M.S.A. § 8.31. This cause of action will benefit the public by requiring JUUL to permanently cease the deceptive sale and marketing of dangerous products to consumers in Minnesota and throughout the country, and to require JUUL to cease, and take steps to prevent, the marketing and sale of JUUL products to minors.

### b.   Violation of Minnesota False Statement in Advertising Law (Minn. Stat. § 325F.67)

1953.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1954.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

1955.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

1956.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1957.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1958.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1959.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1960.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1961.   JUUL has made, published, disseminated, circulated and placed before the public, and caused to be made, published, disseminated, circulated and placed before the public advertisements of merchandise for use, consumption, purchase, and sale that contain material assertions, representations, and statements of fact that are untrue, deceptive, and misleading.

1962.   JUUL's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor

in Plaintiffs' and class members' decisions to purchase JUUL products.

1963.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1964.  JLI knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1965.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

1966.  Defendants' conduct actually and proximately caused injury to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—damages, attorney's fees and costs, and injunctive relief; as well as any other relief the Court may deem just or proper. *See* M.S.A. § 8.31. This cause of action will benefit the public by requiring JUUL to permanently cease the deceptive sale and marketing of dangerous products to consumers in Minnesota and throughout the country, and to require JUUL to cease, and take steps to prevent,

1  the marketing and sale of JUUL products to minors.

2  **c.      Violation of Minnesota Deceptive Trade Practices Act (Minn.**

3  **Stat. § 325D.43, *et seq.*)**

4  1967.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

5  1968.   This claim is brought against JLI.

6  1969.   Plaintiffs and class members are individuals who purchased JUUL products for

7  personal purposes.

8  1970.   Defendants created and implemented a scheme to create a market for e-cigarettes

9  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

10  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

11  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

12  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

13  addictiveness, and significant risks of substantial physical injury from using JUUL products.

14  1971.   Advertisements and representations for JUUL products contained deceptive

15  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

16  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

17  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

18  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

19  decades, JLI used third parties and word of mouth to spread false and misleading information

20  about JUUL products.

21  1972.   Advertisements and representations for JUUL products concealed and failed to

22  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

23  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

24  addictive, posed significant risks of substantial physical injury resulting from the use of the

25  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

26  consumed through a pack of combustible cigarettes.

27  1973.   The labels on JUUL products failed to disclose that the products posed

28  significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1974. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1975. JUUL's conduct constituted the following prohibited fraudulent and deceptive business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in conduct that creates a likelihood of confusion or misunderstanding.

1976. JUUL's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1977. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1978. JUUL's conduct actually and proximately caused injury to Plaintiffs and class members and is likely to cause injury in the future. Absent Defendants' unfair and fraudulent

conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—injunctive relief, attorney's fees and costs, and equitable relief; as well as any other relief the Court may deem just or proper.

### d.     Common Law Fraud

1979.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1980.  This claim is brought against JLI.

1981.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

1982.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

1983.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

1984.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

1985.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

1986.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

1987.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

1988.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

1989.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

1990.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1991.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members.  Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into.  Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### e.   Breach of the Implied Warranty of Merchantability

1992.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

1993.   This claim is brought against JLI.

1994.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

1995.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Minn. Stat. § 336.2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

1996.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

1997.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

1998.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1999.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2000.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

## f.    Unjust Enrichment

2001.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2002.   This claim is brought against JLI and the Management Defendants.

2003.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2004.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Minnesota law (*see* Minn. Stat. §§ 609.685) prohibits the marketing and sale of JUUL products to minors.

2005.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2006.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2007.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2008.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2009.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 24.   Mississippi

2010.   Plaintiffs bring each of the following claims on behalf of the Mississippi Subclass under Mississippi law.

### a.   Violation of Mississippi Consumer Protection Act (Miss. Code Ann. § 75-24-1, *et seq.*)

2011.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2012.   This claim is brought against JLI.

2013.   Plaintiffs and class members are individuals who purchased JUUL products for personal purposes.

2014.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2015.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2016.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the

products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2017.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2018.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2019.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

2020.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to, had the tendency to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2021.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively

1    concealed them; because JLI intended for consumers to rely on the omissions in question;

2    because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

3    made partial representations concerning the same subject matter as the omitted facts.

4        2022.   Defendants knew or should have known that their misrepresentations and/or

5    omissions were false and misleading, and intended for consumers to rely on such

6    misrepresentations and omissions.

7        2023.   Defendants' conduct actually and proximately caused an ascertainable loss of

8    money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent

9    conduct, Plaintiffs and class members would have behaved differently and would not have

10   purchased JUUL products or would have paid less for them. Defendants' misrepresentations and

11   omissions induced Plaintiffs and class members to purchase JUUL products they would not

12   otherwise have purchased and enter into purchase contracts they would not otherwise have

13   entered into. In addition, class members who are minors are entitled to full repayment of the

14   amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each

15   member of the class—damages, as well as any other relief the Court may deem just or proper.

16                          **b.      Common Law Fraud**

17       2024.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

18       2025.   This claim is brought against JLI.

19       2026.   JUUL created and implemented a scheme to create a market for e-cigarettes and

20   substantially increase sales of JUUL through a pervasive pattern of false and misleading

21   statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

22   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

23   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

24   addictiveness, and significant risks of substantial physical injury from using JUUL products.

25       2027.   Advertisements and representations for JUUL products contained deceptive

26   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

27   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

28   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2028.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2029.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2030.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2031.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2032.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2033.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2034.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2035.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2036.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek, on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

2037.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2038.  This claim is brought against JLI.

2039.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2040.  Each JUUL product sold by JUUL comes with an implied warranty that it will

merchantable and fit for the ordinary purpose for which it would be used. *See* Miss. Code Ann. § 75-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2041. The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2042. Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2043. Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2044. Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2045.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

2046.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2047.   This claim is brought against JLI and the Management Defendants.

2048.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2049.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Mississippi law (*see* Miss. Code Ann. § 97-32-51(2)) prohibits the marketing and sale of JUUL products to minors.

2050.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2051.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

1  expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2  2052.  There is no justification for Defendants' enrichment. It would be inequitable,

3  unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

4  benefits were procured as a result of their wrongful conduct.

5  2053.  Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

6  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

7  with Defendant.

8  2054.  Plaintiffs plead this claim separately as well as in the alternative to their other

9  claims, as without such claims they would have no adequate legal remedy.

10  **25.   Missouri**

11  2055.  Plaintiffs bring each of the following claims on behalf of the Missouri Subclass

12  under Missouri law.

13  **a.     Violation of the Missouri Merchandising Practices Act (Mo.**

14  **Rev. Stat. § 407.010, *et seq*.)**

15  2056.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

16  2057.  This claim is brought against JLI and, for certain unfair and/or unconscionable

17  conduct claims as noted below, all Defendants.

18  2058.  Plaintiffs and class members are persons who purchased JUUL products for

19  personal purposes.

20  2059.  Defendants created and implemented a scheme to create a market for e-cigarettes

21  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

22  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

23  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

24  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

25  addictiveness, and significant risks of substantial physical injury from using JUUL products.

26  2060.  Advertisements and representations for JUUL products contained deceptive

27  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

28  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2061.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2062. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2063. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2064. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2065. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity or tendency to mislead, deceive or cheat, and in fact did, mislead, deceive, and/or cheat reasonable consumers including the Plaintiffs.  In addition, the misrepresentations and omissions were the type that tend to create a false impression. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable

alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2066.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2067.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2068.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see* Mo. Rev. Stat. §§ 407.926 and 407.931); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2069.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2070.  Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, punitive damages, attorney's fees, and equitable relief; as well as any other relief the Court may deem just or proper.

### b.    Common Law Fraud

2071.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2072.  This claim is brought against JLI.

2073.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2074.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2075.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

1   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

2   addictive, posed significant risks of substantial physical injury resulting from the use of the

3   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

4   consumed through a pack of combustible cigarettes.

5   2076.  The labels on JUUL products failed to disclose that the products posed

6   significant risks of substantial physical injury resulting from the use of the products. The labels

7   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

8   2077.  The omissions were misleading and deceptive standing alone and were

9   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

10  cigarettes and other representations.

11  2078.  JLI's conduct was fraudulent and deceptive because its misrepresentations and

12  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

13  including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

14  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

15  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

16  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

17  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

18  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

19  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

20  Plaintiffs' and class members' decisions to purchase JUUL products.

21  2079.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

22  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

23  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

24  facts; because the facts would be material to reasonable consumers; because JUUL products

25  pose an unreasonable risk of substantial bodily injury; and because JLI made partial

26  representations concerning the same subject matter as the omitted facts.

27  2080.  As set forth in the allegations concerning each Plaintiff in Appendix A, in

28  purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2081.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2082.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2083.  JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

2084.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2085.  This claim is brought against JLI.

2086.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2087.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Mo. Rev. Stat. § 400.2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2088.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.   JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2089.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2090.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2091.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2092.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

1

#### d.     Unjust Enrichment

2    2093.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3    2094.   This claim is brought against JLI and the Management Defendants.

4    2095.   Defendants created and implemented a scheme to create a market for e-cigarettes

5    and substantially increase sales of JUUL products through a pervasive pattern of false and

6    misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

7    safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

8    while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

9    doses, addictiveness, and significant risks of substantial physical injury from using JUUL

10   products.

11   2096.   Defendants were unjustly enriched as a result of their wrongful conduct,

12   including through the false and misleading advertisements and omissions regarding (i) whether

13   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

14   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

15   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

16   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

17   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

18   enriched through their scheme of marketing their products to minors. Missouri law (*see* Mo.

19   Rev. Stat. §§ 407.926 and 407.931) prohibits the marketing and sale of JUUL products to

20   minors.

21   2097.   Defendants requested and received a measurable benefit at the expense of

22   Plaintiffs and class members in the form of payment for JUUL products.

23   2098.   Defendants appreciated, recognized, and chose to accept the monetary benefits

24   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

25   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

26   2099.   There is no justification for Defendants' enrichment. It would be inequitable,

27   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

28   benefits were procured as a result of their wrongful conduct.

2100.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2101.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 26.   Montana

2102.   Plaintiffs bring each of the following claims on behalf of the Montana Subclass under Montana law.

### a.   Violation of the Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. § 30-14-101, *et seq.*)

2103.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2104.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2105.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

2106.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2107.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information

1    about JUUL products.

2        2108.  Advertisements and representations for JUUL products concealed and failed to

3    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

4    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5    addictive, posed significant risks of substantial physical injury resulting from the use of the

6    products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

7    consumed through a pack of combustible cigarettes.

8        2109.  The labels on JUUL products failed to disclose that the products posed

9    significant risks of substantial physical injury resulting from the use of the products. The labels

10   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

11       2110.  The omissions were misleading and deceptive standing alone and were

12   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

13   cigarettes and other representations.

14       2111.  JLI's conduct was unfair and unconscionable in that it included (i) the

15   manufacture and sale of products with a heightened propensity to cause addiction and physical

16   injuries and (ii) misrepresentations and omissions of material facts concerning the

17   characteristics and safety of JUUL products that offended public policy; were immoral,

18   unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

19   substantial harm that greatly outweighs any possible utility from the conduct.

20       2112.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

21   omissions at issue were likely to, and in fact did, deceive reasonable consumers including the

22   Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their

23   purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not

24   reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery

25   mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily

26   injury resulting from the use of the products, and (vi) that the nicotine consumed through one

27   JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

28   Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members'

decisions to purchase JUUL products.

2113.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2114.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2115.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (*see, e.g.*, Mont. Code Ann. § 16-11-305); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2116.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2117.   Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have

entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, treble damages, and attorney's fees, as well as any other relief the Court may deem just or proper.

### b.    Common Law Fraud

2118.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2119.    This claim is brought against JLI.

2120.    JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2121.    Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2122.    Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2123.    The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2124. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2125. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2126. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2127. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2128. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2129. JLI knew that JUUL products were not safe or reasonable alternatives to

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2130.   JUUL's conduct actually and proximately caused damage to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class, damages in an amount to be proven at trial and punitive damages, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

2131.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2132.   This claim is brought against JLI.

2133.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2134.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Mont. Code Ann. § 30-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2135.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2136.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2137.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2138.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2139.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

2140.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2141.   This claim is brought against JLI and the Management Defendants.

2142.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2143.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Montana law (*see* Mont. Code Ann. § 16-11-305) prohibits the marketing and sale of JUUL products to minors.

2144.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2145.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2146.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2147.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2148.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 27.   Nebraska

2149.   Plaintiffs bring each of the following claims on behalf of the Nebraska Subclass

under Nebraska law.

a.     **Violation of the Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-1601, *et seq*.)**

2150.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2151.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2152.   Plaintiffs and class members and are persons who purchased JUUL products for personal purposes.

2153.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2154.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2155.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2156.   The labels on JUUL products failed to disclose that the products posed

significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2157.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2158.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2159.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers and had the tendency or capacity to mislead reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2160.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

made partial representations concerning the same subject matter as the omitted facts.

2161.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2162.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2163.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Neb. Rev. Stat. §§ 28-1419; 28-1425); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2164.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2165.   Defendants' deceptive and unfair conduct has had a detrimental impact on the public interest

2166.   Defendants' conduct actually and proximately caused loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent

on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—actual damages (as increased as the Court may deem fit), injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

**b.      Violation of the Nebraska Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. §§ 87-301, *et seq.*)**

2167.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2168.   This claim is brought against JLI.

2169.   Plaintiffs and class members are persons who purchased JUUL products for personal purposes.

2170.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2171.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2172.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2173. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2174. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2175. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) causing confusion or misunderstanding as to the effects a substance causes when ingested, inhaled, or otherwise introduced into the human body; and (e) making a deceptives and misleading representations, and omitting material information, about a substance and failing to identify the contents of the package or the nature of the substance contained inside the package.

2176. JUUL's conduct had the capacity to and was likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2177. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2178.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2179.   JUUL's conduct actually and proximately caused actual damages to Plaintiffs and class members, and is likely to cause damage in the future. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— injunctive relief, as well as any other relief the Court may deem just or proper.  Plaintiffs are also entitled to reasonable attorneys' fees because JUUL willfully engaged in trade practices that are known to be deceptive.

### c.    Common Law Fraud

2180.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2181.   This claim is brought against JLI.

2182.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2183.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2184.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2185.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2186.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2187.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in

1    Plaintiffs' and class members' decisions to purchase JUUL products.

2        2188.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

3    were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

4    other than Plaintiffs and class members), who had exclusive and superior knowledge of the

5    facts; because the facts would be material to reasonable consumers; because JUUL products

6    pose an unreasonable risk of substantial bodily injury; and because JLI made partial

7    representations concerning the same subject matter as the omitted facts.

8        2189.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

9    purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

10   and/or omissions.  Reasonable consumers would have been expected to have relied on the

11   misrepresentations and omissions.

12       2190.   Defendants knew or should have known that their misrepresentations and/or

13   omissions were false and misleading, and intended for consumers to rely on such

14   misrepresentations and omissions.

15       2191.   JLI knew that JUUL products were not safe or reasonable alternatives to

16   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

17   addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

18   products.

19       2192.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

20   members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

21   differently and would not have purchased JUUL products or would have paid less for them.

22   JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

23   JUUL products they would not otherwise have purchased and enter into purchase contracts they

24   would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

25   member of the class damages in an amount to be proven at trial, as well as any other relief the

26   Court may deem just or proper.

27              **d.    Breach of the Implied Warranty of Merchantability**

28       2193.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2194.   This claim is brought against JLI.

2195.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2196.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Neb. U.C.C. § 2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2197.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2198.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2199.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2200.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2201.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.      Unjust Enrichment

2202.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2203.   This claim is brought against JLI and the Management Defendants.

2204.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2205.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Neb. Rev. Stat. §§ 28-1419 and 28-1425 prohibit the marketing and sale of JUUL products to minors.

2206.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2207.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2208.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2209.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2210.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 28.   Nevada

2211.   Plaintiffs bring each of the following claims on behalf of the Nevada Subclass under Nevada law.

#### a.   Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq.*)

2212.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2213.   This claim is brought against JLI, and for certain claims below, the Management Defendants.

2214.   Plaintiffs and class members purchased JUUL products for personal purposes.

2215.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2216. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2217. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2218. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2219. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2220. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; (d) knowingly making other false representations in a transaction; and (e) failing to disclose a material fact in connection with the sale of goods or services.

2221. JLI's conduct was likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2222.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2223.   JLI's conduct was unlawful because it violated state and federal statutes and regulations relating to the sale of e-cigarettes, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*; the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*; and Nev. Rev. Stat. § 202.24935.

2224.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2225.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2226.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been

marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2227. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members, who were victims of Defendants' unfair and fraudulent conduct. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper. Nev. Rev. Stat. § 41.600(1), (2)(e).

### b.      Common Law Fraud

2228.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2229.   This claim is brought against JLI.

2230.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2231.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information

about JUUL products.

2232.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2233.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2234.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2235.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2236.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial

representations concerning the same subject matter as the omitted facts.

2237.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2238.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2239.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2240.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.     Breach of the Implied Warranty of Merchantability

2241.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2242.   This claim is brought against JLI.

2243.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2244.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Nev. Rev. Stat. Ann. § 104.  JUUL has breached its implied warranty of merchantability because its products were

not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2245.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2246.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2247.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2248.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2249.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

1   individual letters and communications sent by consumers before or within a reasonable amount

2   of time after they discovered or should have discovered that's JUUL product were defective and

3   unmerchantable.

### d.   Unjust Enrichment

4

5   2250.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

6   2251.   This claim is brought against JLI and the Management Defendants.

7   2252.   Defendants created and implemented a scheme to create a market for e-cigarettes

8   and substantially increase sales of JUUL products through a pervasive pattern of false and

9   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

10  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

11  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

12  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

13  products.

14  2253.   Defendants were unjustly enriched as a result of their wrongful conduct,

15  including through the false and misleading advertisements and omissions regarding (i) whether

16  JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

17  alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

18  powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

19  the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

20  nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

21  enriched through their scheme of marketing their products to minors. Nev. Rev. Stat.

22  § 202.24935 prohibits the marketing and sale of JUUL products to minors.

23  2254.   Defendants requested and received a measurable benefit at the expense of

24  Plaintiffs and class members in the form of payment for JUUL products.

25  2255.   Defendants appreciated, recognized, and chose to accept the monetary benefits

26  Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

27  expected result of Defendant acting in its pecuniary interest at the expense of its customers.

28  2256.   There is no justification for Defendants' enrichment. It would be inequitable,

unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2257.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2258.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 29.   New Hampshire

2259.   Plaintiffs bring each of the following claims on behalf of the New Hampshire Subclass under New Hampshire law.

### a.   Violation of the New Hampshire Regulation of Business Practices for Consumer Protection (N.H. Rev. Stat. §§ 358-A:1, *et seq.*)

2260.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2261.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2262.   The marketing and sale of JUUL products constitutes "trade" and "commerce" as defined by statute.  Defendants are "persons" as defined by the statute.

2263.   Plaintiffs and class members purchased JUUL products for personal purposes.

2264.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2265.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

1  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

2  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

3  decades, JLI used third parties and word of mouth to spread false and misleading information

4  about JUUL products.

5     2266.  Advertisements and representations for JUUL products concealed and failed to

6  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

7  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

8  addictive, posed significant risks of substantial physical injury resulting from the use of the

9  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

10  consumed through a pack of combustible cigarettes.

11     2267.  The labels on JUUL products failed to disclose that the products posed

12  significant risks of substantial physical injury resulting from the use of the products. The labels

13  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

14     2268.  The omissions were misleading and deceptive standing alone and were

15  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

16  cigarettes and other representations.

17     2269.  JLI's conduct was unfair and unconscionable in that it included (i) the

18  manufacture and sale of products with a heightened propensity to cause addiction and physical

19  injuries and (ii) misrepresentations and omissions of material facts concerning the

20  characteristics and safety of JUUL products that offended public policy; were immoral,

21  unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused

22  substantial harm that greatly outweighs any possible utility from the conduct.

23     2270.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

24  unfair business practices: (a) misrepresenting that JUUL products have characteristics,

25  ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

26  products are of a particular standard, quality, or grade, or that goods are of a particular style or

27  model, when they are not; or (c) advertising goods or services with intent not to sell them as

28  advertised.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

2271.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions created a likelihood of confusion or misunderstanding reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.  Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.  In addition, JUUL's fraudulent and deceptive conduct was of a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

2272.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2273.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2274.  Defendants knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2275.  In addition, all Defendants engaged in unfair and unconscionable conduct

1  because the targeting of minors offends public policy (in particular N.H. Rev. Stat. Ann.

2  §§ 126-K:4); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially

3  injurious; and has caused substantial harm that greatly outweighs any possible utility from the

4  conduct.

5      2276.  As alleged above, all Defendants participated and/or facilitated the marketing of

6  JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

7  and others have continued the deceptive, misleading, unfair, and unconscionable practices that

8  Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the

9  use of JUUL products by minors continues to rise.

10     2277.  Defendants' conduct actually and proximately caused loss of money or property

11  to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs

12  and class members would have behaved differently and would not have purchased JUUL

13  products or would have paid less for them. Defendants' misrepresentations and omissions

14  induced Plaintiffs and class members to purchase JUUL products they would not otherwise have

15  purchased and enter into purchase contracts they would not otherwise have entered into. In

16  addition, class members who are minors are entitled to full repayment of the amounts they spent

17  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

18  threefold their actual damages and statutory damages in the amount of $1,000, whichever is

19  greater, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court

20  may deem just or proper.

21              **b.    Common Law Fraud**

22     2278.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

23     2279.  This claim is brought against JLI.

24     2280.  JUUL created and implemented a scheme to create a market for e-cigarettes and

25  substantially increase sales of JUUL through a pervasive pattern of false and misleading

26  statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

27  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

28  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

addictiveness, and significant risks of substantial physical injury from using JUUL products.

2281.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2282.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2283.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2284.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2285.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of

combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2286.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2287.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2288.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2289.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2290.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

1

### c.   Breach of the Implied Warranty of Merchantability

2    2291.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3    2292.   This claim is brought against JLI.

4    2293.   JUUL has at all times been a merchant with respect to the products which were

5    sold to Plaintiff and the class and was in the business of selling such products.

6    2294.   Each JUUL product sold by JUUL comes with an implied warranty that it will

7    merchantable and fit for the ordinary purpose for which it would be used.   N.H. Rev. Stat.

8    § 382—A:2A-212.   JUUL has breached its implied warranty of merchantability because its

9    products were not in merchantable condition when sold, were defective when sold, did not

10   conform to the promises and affirmations of fact made on the products' containers or labels,

11   and/or do not possess even the most basic degree of fitness for ordinary use.

12   2295.   The ordinary intended purpose of JUUL's products—and the purpose for which

13   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.   JUUL's

14   products are not fit for that use—or any other use—because they (i) were not smoking cessation

15   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

16   potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed

17   unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's

18   products are not fit for their ordinary, intended use as either cigarette replacement devices or

19   recreation smoking devices.

20   2296.   Plaintiffs and each member of the class have had sufficient direct dealings with

21   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

22   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

23   each member of the class, on the other hand.

24   2297.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

25   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

26   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

27   intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

28   the express purpose an intent of being sold to consumers.

2298.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2299.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

2300.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2301.   This claim is brought against JLI and the Management Defendants.

2302.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2303.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

enriched through their scheme of marketing their products to minors. N.H. Rev. Stat. Ann. § 126-K:4 prohibits the sale of JUUL products to minors.

2304.  Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2305.  Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2306.  There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2307.  Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2308.  Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 30.   New Jersey

2309.  Plaintiffs bring each of the following claims on behalf of the New Jersey Subclass under New Jersey law.

### a.   Common Law Fraud

2310.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2311.  This claim is brought against JLI.

2312.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2313.  Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2314.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2315.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2316.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2317.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2318.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2319.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2320.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2321.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2322.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

**b.      Breach of the Implied Warranty of Merchantability**

2323.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2324.   This claim is brought against JLI.

2325.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2326.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   N.J. Stat. Ann. § 12A:2-314.   JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2327.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.   JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2328.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2329.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2330.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2331.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### c.    Unjust Enrichment

2332.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2333.   This claim is brought against JLI and the Management Defendants.

2334.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2335.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. N.J. Stat. §§ 2A:170-51.4(a)(2) and 2C:33-13.1(a) prohibit the marketing and sale of JUUL products to minors.

2336.   Defendants requested and received a measurable benefit at the expense of

1    Plaintiffs and class members in the form of payment for JUUL products.

2    2337.   Defendants appreciated, recognized, and chose to accept the monetary benefits

3    Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

4    expected result of Defendant acting in its pecuniary interest at the expense of its customers.

5    2338.   There is no justification for Defendants' enrichment. It would be inequitable,

6    unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

7    benefits were procured as a result of their wrongful conduct.

8    2339.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

9    and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

10   with Defendant.

11   2340.   Plaintiffs plead this claim separately as well as in the alternative to their other

12   claims, as without such claims they would have no adequate legal remedy.

13                          **31.   New Mexico**

14   2341.   Plaintiffs bring each of the following claims on behalf of the New Mexico

15   Subclass under New Mexico law.

16                  **a.        Violation of the New Mexico Unfair Trade Practices Act**

17                              **(N.M. Stat. § 57-12-1)**

18   2342.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

19   2343.   This claim is brought against JLI and, for certain unfair and/or unconscionable

20   conduct claims as noted below, all Defendants.

21   2344.   Defendants are "persons" under the statute and the sale and marketing of JUUL

22   products is "trade" and "commerce."

23   2345.   Plaintiffs and class members purchased JUUL products for personal purposes.

24   2346.   Defendants created and implemented a scheme to create a market for e-cigarettes

25   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

26   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

27   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

28   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

addictiveness, and significant risks of substantial physical injury from using JUUL products.

2347. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2348. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2349. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2350. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2351. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products offended public policy; was immoral, unethical, oppressive, and unscrupulous; resulted in a gross disparity between the value received by the person and the price paid; and caused substantial harm that greatly outweighs any benefits associated with the conduct. JUUL's acts took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and class members to a grossly unfair degree and to the

detriment of Plaintiffs and class members.

2352. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; or (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not.

2353. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions may, tends to, or does deceive or mislead reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2354. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2355. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2356. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2357. In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular N.M. Stat. Ann. §§ 30-49-3(A), (E)); is immoral, unethical, oppressive, and unscrupulous; resulted in a gross disparity between the value received by the person and the price paid; takes advantage of the lack of knowledge, ability, experience, or capacity of minors to a grossly unfair degree; and has caused substantial harm that greatly outweighs any benefits associated with the conduct.

2358. As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise. Defendants' acts took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and class members to a grossly unfair degree and to the detriment of Plaintiffs and class members

2359. Defendants' conduct actually and proximately caused loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—three times actual damages and/or statutory damages in the amount of $300, whichever is greater, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

b.      **Common Law Fraud**

2360.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2361.   This claim is brought against JLI.

2362.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2363.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2364.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2365.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2366.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2367.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2368.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2369.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2370.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2371.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2372.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

1    members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

2    differently and would not have purchased JUUL products or would have paid less for them.

3    JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

4    JUUL products they would not otherwise have purchased and enter into purchase contracts they

5    would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

6    member of the class damages in an amount to be proven at trial, as well as any other relief the

7    Court may deem just or proper.

8             **c.    Breach of the Implied Warranty of Merchantability**

9    2373.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10   2374.   This claim is brought against JLI.

11   2375.   JUUL has at all times been a merchant with respect to the products which were

12   sold to Plaintiff and the class and was in the business of selling such products.

13   2376.   Each JUUL product sold by JUUL comes with an implied warranty that it will

14   merchantable and fit for the ordinary purpose for which it would be used. N.M. Stat. Ann. § 55-

15   2-314.  JUUL has breached its implied warranty of merchantability because its products were

16   not in merchantable condition when sold, were defective when sold, did not conform to the

17   promises and affirmations of fact made on the products' containers or labels, and/or do not

18   possess even the most basic degree of fitness for ordinary use.

19   2377.   The ordinary intended purpose of JUUL's products—and the purpose for which

20   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's

21   products are not fit for that use—or any other use—because they (i) were not smoking cessation

22   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

23   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

24   unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's

25   products are not fit for their ordinary, intended use as either cigarette replacement devices or

26   recreation smoking devices.

27   2378.   Plaintiffs and each member of the class have had sufficient direct dealings with

28   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

1   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

2   each member of the class, on the other hand.

3       2379.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

4   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

5   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

6   intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

7   the express purpose an intent of being sold to consumers.

8       2380.   Plaintiffs and the members of the class were injured as a direct and proximate

9   result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

10   the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

11   because, had they been aware of the unmerchantable condition of JUUL products, they would

12   not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

13   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14       2381.   JUUL was provided notice of these issues by numerous complaints filed against

15   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

16   individual letters and communications sent by consumers before or within a reasonable amount

17   of time after they discovered or should have discovered that's JUUL product were defective and

18   unmerchantable.

19              **d.    Unjust Enrichment**

20       2382.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21       2383.   This claim is brought against JLI and the Management Defendants.

22       2384.   Defendants created and implemented a scheme to create a market for e-cigarettes

23   and substantially increase sales of JUUL products through a pervasive pattern of false and

24   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

25   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

26   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

27   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

28   products.

2385. Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. N.M. Stat. Ann. §§ 30-493(A), (E); 30-49-8(A) prohibit the marketing and sale of JUUL products to minors.

2386. Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2387. Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2388. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2389. Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2390. Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 32.   New York

2391. Plaintiffs bring each of the following claims on behalf of the New York Subclass under New York law.

### a.   Violation of New York General Business Law § 349

2392. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2393. This claim is brought against JLI and, for certain claims below, the Management

Defendants.

2394.   Plaintiffs and class members purchased JUUL products for personal purposes.

2395.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2396.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2397.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2398.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2399.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2400.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, mislead reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2401.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2402.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2403.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2404.  Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products

or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—three times actual damages or statutory damages in the amount of $50, whichever is greater, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### b.     Violation of New York General Business Law § 350

2405.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2406.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

2407.   Plaintiffs and class members purchased JUUL products for personal purposes.

2408.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2409.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2410.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

1  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
2  addictive, posed significant risks of substantial physical injury resulting from the use of the
3  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
4  consumed through a pack of combustible cigarettes.

5       2411.  The labels on JUUL products failed to disclose that the products posed
6  significant risks of substantial physical injury resulting from the use of the products. The labels
7  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

8       2412.  The omissions were misleading and deceptive standing alone and were
9  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
10 cigarettes and other representations.

11      2413.  JUUL's advertising in the conduct of its business was fraudulent and deceptive
12 because the misrepresentations and omissions had the capacity, tendency, or effect of deceiving
13 reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs,
14 would have found it material to their purchasing decisions that JUUL's products (i) were not
15 smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii)
16 were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed
17 unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi)
18 that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a
19 pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor
20 in Plaintiffs' and class members' decisions to purchase JUUL products.

21      2414.  JLI owed Plaintiffs and class members a duty to disclose these facts because they
22 were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
23 other than Plaintiffs and class members), who had exclusive and superior knowledge of the
24 facts; because the facts would be material to reasonable consumers; because JLI actively
25 concealed them; because JLI intended for consumers to rely on the omissions in question;
26 because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI
27 made partial representations concerning the same subject matter as the omitted facts.

28      2415.  As set forth in the allegations concerning each Plaintiff in Appendix A, in

purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2416. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2417. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages or $500, whichever is greater; treble damages; injunctive relief; and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### c.      Common Law Fraud

2418.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2419.   This claim is brought against JLI.

2420.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2421.   Advertisements and representations for JUUL products contained deceptive

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2422.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2423. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2424. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2425. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2426.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2427.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2428.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2429.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2430.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.      Breach of the Implied Warranty of Merchantability

2431.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2432.   This claim is brought against JLI.

2433.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2434.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  N.Y. U.C.C. Law § 2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2435.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2436.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2437.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2438.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the New York Direct Purchaser Subclass were damaged as a result of JUUL's breach of its

1   implied warranty of merchantability because, had they been aware of the unmerchantable
2   condition of JUUL products, they would not have purchased JUUL products, or would have
3   paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any
4   other relief the Court may deem just or proper.

5     2439.   JUUL was provided notice of these issues by numerous complaints filed against
6   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous
7   individual letters and communications sent by consumers before or within a reasonable amount
8   of time after they discovered or should have discovered that's JUUL product were defective and
9   unmerchantable.

### e.  Unjust Enrichment

10

11     2440.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

12     2441.   This claim is brought against JLI and the Management Defendants.

13     2442.   Defendants created and implemented a scheme to create a market for e-cigarettes
14   and substantially increase sales of JUUL products through a pervasive pattern of false and
15   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and
16   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,
17   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and
18   doses, addictiveness, and significant risks of substantial physical injury from using JUUL
19   products.

20     2443.   Defendants were unjustly enriched as a result of their wrongful conduct,
21   including through the false and misleading advertisements and omissions regarding (i) whether
22   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable
23   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were
24   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from
25   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the
26   nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly
27   enriched through their scheme of marketing their products to minors. N.Y. Pub. Health Law
28   §§ 1399-cc(2), 1399-bb(4), and 1399-bb(5) prohibit the marketing and sale of JUUL products to

minors.

2444.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2445.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2446.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2447.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2448.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 33.   North Carolina

2449.   Plaintiffs bring each of the following claims on behalf of the North Carolina Subclass under North Carolina law.

### a.   Violation of the North Carolina Unfair & Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, *et seq.*)

2450.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2451.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2452.   Plaintiffs and class members purchased JUUL products for personal purposes.

2453.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

addictiveness, and significant risks of substantial physical injury from using JUUL products.

2454.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2455.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2456.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2457.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2458.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2459.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency or capacity to mislead or created the likelihood of deception of

average consumers such as including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2460.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2461.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2462.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2463.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular N.C. Gen. Stat. § 14-313(b) and N.C. Gen. Stat. § 14-313(b2); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible

utility from the conduct.

2464.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2465.   Defendants' conduct, alleged herein, was in and affected commerce since the conduct was part and parcel of Defendants' business activities related to the sale of JUUL products.

2466.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class— three times damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

2467.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2468.   This claim is brought against JLI.

2469.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2470.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2471.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2472.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2473.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2474.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in

1  Plaintiffs' and class members' decisions to purchase JUUL products.

2      2475.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

3  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

4  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

5  facts; because the facts would be material to reasonable consumers; because JUUL products

6  pose an unreasonable risk of substantial bodily injury; and because JLI made partial

7  representations concerning the same subject matter as the omitted facts.

8      2476.  As set forth in the allegations concerning each Plaintiff in Appendix A, in

9  purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

10  and/or omissions.  Reasonable consumers would have been expected to have relied on the

11  misrepresentations and omissions.

12      2477.  Defendants knew or should have known that their misrepresentations and/or

13  omissions were false and misleading, and intended for consumers to rely on such

14  misrepresentations and omissions.

15      2478.  JLI knew that JUUL products were not safe or reasonable alternatives to

16  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

17  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

18  products.

19      2479.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class

20  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

21  differently and would not have purchased JUUL products or would have paid less for them.

22  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

23  JUUL products they would not otherwise have purchased and enter into purchase contracts they

24  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

25  member of the class damages in an amount to be proven at trial, as well as any other relief the

26  Court may deem just or proper.

27              **c.**    **Breach of the Implied Warranty of Merchantability**

28      2480.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2481.   This claim is brought against JLI.

2482.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2483.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  N.C. GEN. STAT. § 25-2-314.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2484.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2485.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2486.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2487.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2488.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

2489.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2490.   This claim is brought against JLI and the Management Defendants.

2491.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2492.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. N.C. Gen. Stat. § 14-313(b) and N.C. Gen. Stat. § 14-313(b2) prohibit the marketing and sale of JUUL products to

minors.

2493.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2494.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2495.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2496.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2497.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 34.   North Dakota

2498.   Plaintiffs bring each of the following claims on behalf of the North Dakota Subclass under North Dakota law.

### a.   Violation of North Dakota Consumer Fraud Act (N.D. Cent. Code § 51-15-01, *et seq.*)

2499.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2500.   This claim is brought against JLI, and for certain unfair and unconscionable conduct claims, all Defendants.

2501.   Plaintiffs and class members purchased JUUL products for personal purposes.

2502.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

addictiveness, and significant risks of substantial physical injury from using JUUL products.

2503.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2504.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2505.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2506.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2507.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2508.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers, including the

Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2509.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2510.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2511.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular N.D. Cent. Code § 12.1-31-03(1)(a)) is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2512.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JUUL has continued the unconscionable practices that Defendants implemented, facilitated,

1   and/or did not take adequate steps to end. As a result, the use of JUUL products by minors

2   continues to rise.

3       2513.   Defendants knew or should have known that their misrepresentations and/or

4   omissions were false and misleading, and intended for consumers to rely on such

5   misrepresentations and omissions.

6       2514.   Defendants' conduct actually and proximately caused actual damages to

7   Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

8   class members would have behaved differently and would not have purchased JUUL products

9   or would have paid less for them. Defendants' misrepresentations and omissions induced

10  Plaintiffs and class members to purchase JUUL products they would not otherwise have

11  purchased and enter into purchase contracts they would not otherwise have entered into. In

12  addition, class members who are minors are entitled to full repayment of the amounts they spent

13  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

14  three times actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other

15  relief the Court may deem just or proper.

16          **b.**      **Violation of North Dakota False Advertising Law (N.D. Cent.**

17                  **Code § 51-12-08)**

18      2515.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

19      2516.   This claim is brought against JLI.

20      2517.   Plaintiffs and class members purchased JUUL products for personal purposes.

21      2518.   Defendants created and implemented a scheme to create a market for e-cigarettes

22  and substantially increase sales of JUUL through a pervasive pattern of false and misleading

23  statements and omissions. Defendants aimed to portray JUUL products as cool and safe

24  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

25  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

26  addictiveness, and significant risks of substantial physical injury from using JUUL products.

27      2519.   Advertisements and representations for JUUL products contained deceptive

28  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2520.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2521.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2522.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2523.  JUUL's conduct constituted the following prohibited practices: making or disseminating or causing to be made or disseminated before the public in North Dakota, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, statements, concerning such real or personal property or services, professional or otherwise or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading.

2524.  JLI's conduct was likely to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

1  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine
2  consumed through one JUUL pod exceeded the nicotine consumed through a pack of
3  combustible cigarettes. Knowledge of these facts would have been a substantial factor in
4  Plaintiffs' and class members' decisions to purchase JUUL products.

5      2525.  JLI owed Plaintiffs and class members a duty to disclose these facts because they
6  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
7  other than Plaintiffs and class members), who had exclusive and superior knowledge of the
8  facts; because the facts would be material to reasonable consumers; because JLI actively
9  concealed them; because JLI intended for consumers to rely on the omissions in question;
10  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI
11  made partial representations concerning the same subject matter as the omitted facts.

12      2526.  Defendants knew or should have known that their misrepresentations and/or
13  omissions were false and misleading, and intended for consumers to rely on such
14  misrepresentations and omissions.

15      2527.  Defendants' conduct actually and proximately caused actual damages to
16  Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and
17  class members would have behaved differently and would not have purchased JUUL products
18  or would have paid less for them. Defendants' misrepresentations and omissions induced
19  Plaintiffs and class members to purchase JUUL products they would not otherwise have
20  purchased and enter into purchase contracts they would not otherwise have entered into. In
21  addition, class members who are minors are entitled to full repayment of the amounts they spent
22  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—
23  injunctive relief and reasonable attorneys' fees, as well as any other relief the Court may deem
24  just or proper.

### c.    Common Law Fraud

26      2528.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

27      2529.  This claim is brought against JLI.

28      2530.  JUUL created and implemented a scheme to create a market for e-cigarettes and

substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2531. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2532. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2533. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2534. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2535. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation

devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2536.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2537.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2538.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2539.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2540.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they

would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.      Breach of the Implied Warranty of Merchantability

2541.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2542.   This claim is brought against JLI.

2543.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2544.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   N.D. Cent. Code § 41-02-32.   JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2545.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.   JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2546.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2547.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2548.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2549.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.      Unjust Enrichment

2550.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2551.   This claim is brought against JLI and the Management Defendants.

2552.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2553. Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. N.D. Cent. Code § 12.1-31-03(1)(a) prohibits the marketing and sale of JUUL products to minors.

2554.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2555.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2556.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2557.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2558.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 35.   Ohio

2559.   Plaintiffs bring each of the following claims on behalf of the Ohio Subclass under Ohio law.

### a.   Violation of the Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §§ 1345.01, *et seq.*)

2560.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2561.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2562.   Plaintiffs and class members purchased JUUL products for personal purposes.

2563.   Defendants created and implemented a scheme to create a market for e-cigarettes

and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2564.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2565.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2566.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2567.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2568.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries; (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products; (iii) knowingly making a misleading statement of opinion on

1    which Plaintiffs and class members were likely to rely to their detriment; and (iv) knowingly

2    taking advantage of Plaintiffs' and class members' inability to protect their interests, due to their

3    ignorance regarding the actual characteristics of JUUL products, offended public policy; was

4    immoral, unethical, oppressive, and unscrupulous; caused substantial harm that greatly

5    outweighs any benefits associated with the conduct; and is marked by injustice.

6        2569.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

7    unfair business practices: (a) misrepresenting that JUUL products have characteristics,

8    ingredients, uses, benefits, or quantities, which they do not have; or (b) misrepresenting that

9    JUUL products are of a particular standard, quality, or grade, or that goods are of a particular

10   style or model, when they are not.

11       2570.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

12   omissions had the tendency or capacity to mislead reasonable consumers including the

13   Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their

14   purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not

15   reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery

16   mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily

17   injury resulting from the use of the products, and (vi) that the nicotine consumed through one

18   JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

19   Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members'

20   decisions to purchase JUUL products.

21       2571.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

22   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

23   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

24   facts; because the facts would be material to reasonable consumers; because JLI actively

25   concealed them; because JLI intended for consumers to rely on the omissions in question;

26   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

27   made partial representations concerning the same subject matter as the omitted facts.

28       2572.  Defendants knew or should have known that their misrepresentations and/or

omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2573. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2574. In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Ohio Rev. Code Ann. § 2927.02(B)(1)) is immoral, unethical, oppressive, and unscrupulous; has caused substantial harm that greatly outweighs any benefits associated with the conduct; is marked by injustice; and takes advantage of minors' inability to protect their own interests.

2575. As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2576. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—actual economic damages and/or statutory damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

2577. Defendants had notice that their conduct was in violation based on prior rules

and/or case decisions, including litigation related to combustible cigarettes and subsequent settlement agreements, and Ohio Rev. Code Ann. § 2927.02(B)(1) and Ohio Administrative Code § 109:4-3-10 , which prohibit much of the conduct Defendants' engaged in with respect to JUUL products.

### b.   Violation of the Ohio Deceptive Trade Practices Act (Ohio Rev. Code §§ 4165.01 - .04)

2578.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2579.   This claim is brought against JLI.

2580.   Plaintiffs and class members purchased JUUL products for personal purposes.

2581.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2582.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2583.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2584. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2585. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2586. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

2587. JUUL's conduct had the tendency to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2588. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2589.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### c.    Common Law Fraud

2590.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2591.   This claim is brought against JLI.

2592.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2593.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2594.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2595.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2596.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2597.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2598.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2599.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2600.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2601.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2602.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.   Breach of the Implied Warranty of Merchantability

2603.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2604.  This claim is brought against JLI.

2605.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2606.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Ohio Rev. Code Ann. § 1302.27.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2607.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2608.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2609.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2610.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Ohio Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2611.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and

unmerchantable.

### e.    Unjust Enrichment

2612.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2613.   This claim is brought against JLI and the Management Defendants.

2614.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2615.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Ohio Rev. Code Ann. § 2927.02(B)(1) prohibits the marketing and sale of JUUL products to minors.

2616.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2617.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2618.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2619.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2620.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 36.   Oklahoma

2621.   Plaintiffs bring each of the following claims on behalf of the Oklahoma Subclass under Oklahoma law.

### a.   Violation of the Oklahoma Consumer Protection Act (Okla. Stat. tit. 15, §§ 751, *et seq.*)

2622.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2623.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2624.   Plaintiffs and class members purchased JUUL products for purposes that are personal, household, or business oriented.

2625.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2626.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2627.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2628.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2629.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2630.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2631.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

2632.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions have deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person, including the Plaintiffs.   Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible

cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2633.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2634.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2635.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular 63 Okl. St. §§ 1-229.13, 1-229.26); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2636.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2637.   Defendants' conduct actually and proximately caused actual damages to

Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### b.    Violation of the Oklahoma Deceptive Trade Practices Act
### (Okla. Stat. tit. 78, §§ 51, *et seq.*)

2638.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2639.   This claim is brought against JLI.

2640.   Plaintiffs and class members purchased JUUL products for purposes that are personal, household, or business oriented.

2641.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2642.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2643.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2644.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2645.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2646.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have and (b) misrepresenting that JUUL products are of a particular standard, or that goods are of a particular style or model, when they are not.

2647.   JUUL's conduct has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person, including the Plaintiffs.   Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2648.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

1   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

2   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

3   facts; because the facts would be material to reasonable consumers; because JLI actively

4   concealed them; because JLI intended for consumers to rely on the omissions in question;

5   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

6   made partial representations concerning the same subject matter as the omitted facts.

7       2649.   Defendants' conduct actually and proximately caused actual damages to

8   Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

9   class members would have behaved differently and would not have purchased JUUL products

10  or would have paid less for them. Defendants' misrepresentations and omissions induced

11  Plaintiffs and class members to purchase JUUL products they would not otherwise have

12  purchased and enter into purchase contracts they would not otherwise have entered into. In

13  addition, class members who are minors are entitled to full repayment of the amounts they spent

14  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

15  actual damages, injunctive relief, and reasonable attorneys' fees, as well as any other relief the

16  Court may deem just or proper.

17                              **c.      Common Law Fraud**

18      2650.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

19      2651.   This claim is brought against JLI.

20      2652.   JUUL created and implemented a scheme to create a market for e-cigarettes and

21  substantially increase sales of JUUL through a pervasive pattern of false and misleading

22  statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

23  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

24  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

25  addictiveness, and significant risks of substantial physical injury from using JUUL products.

26      2653.   Advertisements and representations for JUUL products contained deceptive

27  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

28  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

1 cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
2 not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
3 decades, JLI used third parties and word of mouth to spread false and misleading information
4 about JUUL products.

5    2654.   Advertisements and representations for JUUL products concealed and failed to
6 disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to
7 combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully
8 addictive, posed significant risks of substantial physical injury resulting from the use of the
9 products, and that the nicotine consumed through one JUUL pod exceeded the nicotine
10 consumed through a pack of combustible cigarettes.

11    2655.   The labels on JUUL products failed to disclose that the products posed
12 significant risks of substantial physical injury resulting from the use of the products. The labels
13 also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

14    2656.   The omissions were misleading and deceptive standing alone and were
15 particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to
16 cigarettes and other representations.

17    2657.   JLI's conduct was fraudulent and deceptive because its misrepresentations and
18 omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers
19 including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it
20 material to their purchasing decisions that JUUL's products (i) were not smoking cessation
21 devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely
22 potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable
23 risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine
24 consumed through one JUUL pod exceeded the nicotine consumed through a pack of
25 combustible cigarettes. Knowledge of these facts would have been a substantial factor in
26 Plaintiffs' and class members' decisions to purchase JUUL products.

27    2658.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
28 were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2659.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2660.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2661.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2662.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### d.      Breach of the Implied Warranty of Merchantability

2663.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2664.   This claim is brought against JLI.

2665.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2666.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  Okla. Stat. tit. 12A §§ 2A-212.  JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2667.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2668.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2669.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2670.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

1   in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2       2671.   JUUL was provided notice of these issues by numerous complaints filed against

3   it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

4   individual letters and communications sent by consumers before or within a reasonable amount

5   of time after they discovered or should have discovered that's JUUL product were defective and

6   unmerchantable.

7                               e.      **Unjust Enrichment**

8       2672.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

9       2673.   This claim is brought against JLI and the Management Defendants.

10      2674.   Defendants created and implemented a scheme to create a market for e-cigarettes

11  and substantially increase sales of JUUL products through a pervasive pattern of false and

12  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

13  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

14  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

15  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

16  products.

17      2675.   Defendants were unjustly enriched as a result of their wrongful conduct,

18  including through the false and misleading advertisements and omissions regarding (i) whether

19  JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

20  alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

21  powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

22  the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

23  nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

24  enriched through their scheme of marketing their products to minors. 63 Okl. St. §§ 1-229.13, 1-

25  229.26 prohibit the marketing, sale, and transfer of JUUL products to minors.

26      2676.   Defendants requested and received a measurable benefit at the expense of

27  Plaintiffs and class members in the form of payment for JUUL products.

28      2677.   Defendants appreciated, recognized, and chose to accept the monetary benefits

1  Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the
2  expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3      2678.   There is no justification for Defendants' enrichment. It would be inequitable,
4  unconscionable, and unjust for Defendants to be permitted to retain these benefits because the
5  benefits were procured as a result of their wrongful conduct.

6      2679.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained
7  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing
8  with Defendant.

9      2680.   Plaintiffs plead this claim separately as well as in the alternative to their other
10 claims, as without such claims they would have no adequate legal remedy.

11                    **37.    Oregon**

12     2681.   Plaintiffs bring each of the following claims on behalf of the Oregon Subclass
13 under Oregon law.

14              **a.    Violation of the Oregon Unfair Trade Practices Act (Or. Rev.**
15                      **Stat. §§ 646.605, *et seq*.)**

16     2682.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

17     2683.   This claim is brought against JLI.

18     2684.   Plaintiffs and class members purchased JUUL products for personal purposes.

19     2685.   Defendants created and implemented a scheme to create a market for e-cigarettes
20 and substantially increase sales of JUUL through a pervasive pattern of false and misleading
21 statements and omissions. Defendants aimed to portray JUUL products as cool and safe
22 alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
23 misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
24 addictiveness, and significant risks of substantial physical injury from using JUUL products.

25     2686.   Advertisements and representations for JUUL products contained deceptive
26 statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives
27 to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible
28 cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2687.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2688.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2689.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2690.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2691.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; and (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not.

2692.   JUUL's conduct had a tendency to, was likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs,

would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2693.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2694.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2695.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2696.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Or. Rev. Stat. Ann. § 167.755(1)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2697.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI

1    and others have continued the deceptive, misleading, unfair, and unconscionable practices that
2    Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the
3    use of JUUL products by minors continues to rise.

4        2698.   Defendants' conduct actually and proximately caused loss of money or property
5    to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs
6    and class members would have behaved differently and would not have purchased JUUL
7    products or would have paid less for them. Defendants' misrepresentations and omissions
8    induced Plaintiffs and class members to purchase JUUL products they would not otherwise have
9    purchased and enter into purchase contracts they would not otherwise have entered into. In
10    addition, class members who are minors are entitled to full repayment of the amounts they spent
11    on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—
12    actual damages or statutory damages of $200, whichever is greater, injunctive relief, restitution,
13    and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

14                          **b.      Common Law Fraud**

15        2699.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

16        2700.   This claim is brought against JLI.

17        2701.   JUUL created and implemented a scheme to create a market for e-cigarettes and
18    substantially increase sales of JUUL through a pervasive pattern of false and misleading
19    statements and omissions. JUUL's plan was to portray JUUL products as cool and safe
20    alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
21    misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
22    addictiveness, and significant risks of substantial physical injury from using JUUL products.

23        2702.   Advertisements and representations for JUUL products contained deceptive
24    statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives
25    to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible
26    cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
27    not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
28    decades, JLI used third parties and word of mouth to spread false and misleading information

1  about JUUL products.

2      2703.   Advertisements and representations for JUUL products concealed and failed to

3  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

4  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5  addictive, posed significant risks of substantial physical injury resulting from the use of the

6  products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

7  consumed through a pack of combustible cigarettes.

8      2704.  The labels on JUUL products failed to disclose that the products posed

9  significant risks of substantial physical injury resulting from the use of the products. The labels

10  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

11      2705.  The omissions were misleading and deceptive standing alone and were

12  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

13  cigarettes and other representations.

14      2706.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

15  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

16  including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

17  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

18  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

19  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

20  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

21  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

22  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

23  Plaintiffs' and class members' decisions to purchase JUUL products.

24      2707.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

25  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

26  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

27  facts; because the facts would be material to reasonable consumers; because JUUL products

28  pose an unreasonable risk of substantial bodily injury; and because JLI made partial

representations concerning the same subject matter as the omitted facts.

2708. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2709. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2710. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2711. JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

2712. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2713. This claim is brought against JLI.

2714. JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2715. Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. OR. Rev. Stat. Ann. § 72.3140. JUUL has breached its implied warranty of merchantability because its products

were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2716. The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2717. Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2718. Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2719. Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Oregon Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2720. JUUL was provided notice of these issues by numerous complaints filed against

it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.     Unjust Enrichment

2721.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2722.    This claim is brought against JLI and the Management Defendants.

2723.    Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2724.    Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. OR. Rev. Stat. Ann. §§ 167.755(1) prohibits the marketing and sale of JUUL products to minors.

2725.    Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2726.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2727. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2728. Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2729. Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 38.   Pennsylvania

2730. Plaintiffs bring each of the following claims on behalf of the Pennsylvania Subclass under Pennsylvania law.

### a.   Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. Ann. §§ 201-1, *et seq.*)

2731. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2732. This claim is brought against JLI.

2733. Plaintiffs and class members purchased JUUL products for personal purposes.

2734. Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2735. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information

about JUUL products.

2736.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2737. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2738. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2739.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in fraudulent and deceptive conduct that creates a likelihood of confusion and misunderstanding.

2740.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and in fact did deceive, ordinary consumers, including the Plaintiffs. Ordinary consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL

pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2741.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2742.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2743.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2744.   Defendants' conduct actually and proximately caused loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— three times actual damages and/or statutory damages in the amount of $100, whichever is

greater, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

### b. Common Law Fraud

2745.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2746.   This claim is brought against JLI.

2747.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2748.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2749.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2750.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2751.   The omissions were misleading and deceptive standing alone and were

particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2752. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2753. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2754. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2755. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2756. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

1    products.

2    2757.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

3    members.  Absent JUUL's conduct, Plaintiffs and class members would have behaved

4    differently and would not have purchased JUUL products or would have paid less for them.

5    JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

6    JUUL products they would not otherwise have purchased and enter into purchase contracts they

7    would not otherwise have entered into.  Plaintiffs seek—on behalf of themselves and each

8    member of the class damages in an amount to be proven at trial, as well as any other relief the

9    Court may deem just or proper.

10                    **c.        Breach of the Implied Warranty of Merchantability**

11   2758.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

12   2759.   This claim is brought against JLI.

13   2760.   JUUL has at all times been a merchant with respect to the products which were

14   sold to Plaintiff and the class and was in the business of selling such products.

15   2761.   Each JUUL product sold by JUUL comes with an implied warranty that it will

16   merchantable and fit for the ordinary purpose for which it would be used.  13 Pa. C.S.A. § 2314.

17   JUUL has breached its implied warranty of merchantability because its products were not in

18   merchantable condition when sold, were defective when sold, did not conform to the promises

19   and affirmations of fact made on the products' containers or labels, and/or do not possess even

20   the most basic degree of fitness for ordinary use.

21   2762.   The ordinary intended purpose of JUUL's products—and the purpose for which

22   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

23   products are not fit for that use—or any other use—because they (i) were not smoking cessation

24   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

25   potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed

26   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

27   products are not fit for their ordinary, intended use as either cigarette replacement devices or

28   recreation smoking devices.

2763.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2764.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2765.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2766.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

2767.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2768.   This claim is brought against JLI and the Management Defendants.

2769.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

1    doses, addictiveness, and significant risks of substantial physical injury from using JUUL

2    products.

3        2770.   Defendants were unjustly enriched as a result of their wrongful conduct,

4    including through the false and misleading advertisements and omissions regarding (i) whether

5    JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

6    alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

7    powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

8    the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

9    nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

10   enriched through their scheme of marketing their products to minors.

11       2771.   Defendants requested and received a measurable benefit at the expense of

12   Plaintiffs and class members in the form of payment for JUUL products.

13       2772.   Defendants appreciated, recognized, and chose to accept the monetary benefits

14   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

15   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

16       2773.   There is no justification for Defendants' enrichment. It would be inequitable,

17   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

18   benefits were procured as a result of their wrongful conduct.

19       2774.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

20   and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

21   with Defendant.

22       2775.   Plaintiffs plead this claim separately as well as in the alternative to their other

23   claims, as without such claims they would have no adequate legal remedy.

24            **39.    Rhode Island**

25       2776.   Plaintiffs bring each of the following claims on behalf of the Rhode Island

26   Subclass under Rhode Island law.

27

28

1

2

### a.   Violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (6 R.I. Gen. Laws §§ 13.1-1, *et seq.*)

3      2777.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4      2778.   This claim is brought against JLI and, for certain unfair and/or unconscionable

5   conduct claims as noted below, all Defendants.

6      2779.   Plaintiffs, class members, and Defendants are persons under Rhode Island's

7   Unfair Trade Practice and Consumer Protection Act.

8      2780.   Plaintiffs and class members purchased JUUL products for personal purposes.

9      2781.   Defendants created and implemented a scheme to create a market for e-cigarettes

10   and substantially increase sales of JUUL through a pervasive pattern of false and misleading

11   statements and omissions. Defendants aimed to portray JUUL products as cool and safe

12   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

13   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

14   addictiveness, and significant risks of substantial physical injury from using JUUL products.

15      2782.   Advertisements and representations for JUUL products contained deceptive

16   statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

17   to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible

18   cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or

19   not harmful. Like the tobacco companies that marketed combustible cigarettes in previous

20   decades, JLI used third parties and word of mouth to spread false and misleading information

21   about JUUL products.

22      2783.   Advertisements and representations for JUUL products concealed and failed to

23   disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

24   combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

25   addictive, posed significant risks of substantial physical injury resulting from the use of the

26   products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

27   consumed through a pack of combustible cigarettes.

28      2784.   The labels on JUUL products failed to disclose that the products posed

significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2785. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2786. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2787. JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

2788. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2789. JLI owed Plaintiffs and class members a duty to disclose these facts because they

were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2790.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2791.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular R.I. Gen. Laws §§ 11-9-13, *et seq.*); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2792.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2793.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent

on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, restitution, and/ or statutory damages in the amount of $200 per claim, whichever is greater, as well as punitive damages, injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b. Common Law Fraud

2794. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2795. This claim is brought against JLI.

2796. JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2797. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2798. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2799. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2800.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2801.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2802.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2803.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2804.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2805.   JLI knew that JUUL products were not safe or reasonable alternatives to

1    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

2    addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

3    products.

4    2806.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

5    members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

6    differently and would not have purchased JUUL products or would have paid less for them.

7    JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

8    JUUL products they would not otherwise have purchased and enter into purchase contracts they

9    would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

10   member of the class damages in an amount to be proven at trial, as well as any other relief the

11   Court may deem just or proper.

12              **c.      Breach of the Implied Warranty of Merchantability**

13   2807.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

14   2808.   This claim is brought against JLI.

15   2809.   JUUL has at all times been a merchant with respect to the products which were

16   sold to Plaintiff and the class and was in the business of selling such products.

17   2810.   Each JUUL product sold by JUUL comes with an implied warranty that it will

18   merchantable and fit for the ordinary purpose for which it would be used. *See* 6A R.I. Gen.

19   Laws § 2-314. JUUL has breached its implied warranty of merchantability because its products

20   were not in merchantable condition when sold, were defective when sold, did not conform to the

21   promises and affirmations of fact made on the products' containers or labels, and/or do not

22   possess even the most basic degree of fitness for ordinary use.

23   2811.   The ordinary intended purpose of JUUL's products—and the purpose for which

24   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's

25   products are not fit for that use—or any other use—because they (i) were not smoking cessation

26   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

27   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

28   unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's

1   products are not fit for their ordinary, intended use as either cigarette replacement devices or

2   recreation smoking devices.

3       2812.   Plaintiffs and each member of the class have had sufficient direct dealings with

4   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

5   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

6   each member of the class, on the other hand.

7       2813.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

8   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

9   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

10  intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

11  the express purpose an intent of being sold to consumers.

12      2814.   Plaintiffs and the members of the class were injured as a direct and proximate

13  result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

14  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

15  because, had they been aware of the unmerchantable condition of JUUL products, they would

16  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

17  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

18      2815.   JUUL was provided notice of these issues by numerous complaints filed against

19  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

20  individual letters and communications sent by consumers before or within a reasonable amount

21  of time after they discovered or should have discovered that's JUUL product were defective and

22  unmerchantable.

23          **d.**   **Unjust Enrichment**

24      2816.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

25      2817.   This claim is brought against JLI and the Management Defendants.

26      2818.   Defendants created and implemented a scheme to create a market for e-cigarettes

27  and substantially increase sales of JUUL products through a pervasive pattern of false and

28  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2819.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. The General Laws of Rhode Island sections 11-9-13 prohibits the marketing and sale of JUUL products to minors.

2820.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2821.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2822.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2823.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2824.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 40.   South Carolina

2825.   Plaintiffs bring each of the following claims on behalf of the South Carolina

Subclass under South Carolina law.

**a.      Violation of the South Carolina Unfair Trade Practices Act**

**(S.C. Code Ann. §§ 39-5-10, *et seq.*)**

2826.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2827.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2828.   Plaintiffs, class members, and Defendants are persons under South Carolina's Unfair Trade Practices Act.

2829.   Defendants engaged in trade or commerce directly or indirectly affecting the people of South Carolina by participating and furthering the advertising, offering for sale, selling, or distributing JUUL products.

2830.   Plaintiffs and class members purchased JUUL products for personal purposes.

2831.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2832.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2833.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2834. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2835. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2836. JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2837. JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2838. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2839.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2840.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular S.C. Code Ann. §§ 16-17-500, *et seq.*); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2841.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2842.   Defendants' conduct actually and proximately caused actual damages and loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.   Plaintiffs seek—on behalf of themselves and each member of the class—actual damages and treble damages, as well as restitution, attorney's fees

and any other relief the Court may deem just or proper.

**b.   Common Law Fraud**

2843.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2844.   This claim is brought against JLI.

2845.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2846.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2847.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2848.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2849.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

cigarettes and other representations.

2850. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2851. JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2852. As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2853. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2854. JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2855.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.   Breach of the Implied Warranty of Merchantability

2856.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2857.   This claim is brought against JLI.

2858.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2859.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* S.C. Code Ann. § 36-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2860.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2861.   Plaintiffs and each member of the class have had sufficient direct dealings with

either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2862.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2863.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2864.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.      Unjust Enrichment

2865.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2866.   This claim is brought against JLI and the Management Defendants.

2867.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

products.

2868.  Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. S.C. Code Ann. §§ 16-17-500 & 16-17-502(A) prohibit the marketing and sale of JUUL products to minors.

2869.  Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2870.  Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2871.  There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2872.  Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2873.  Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

2874.  [Intentionally Omitted]

### 41.   South Dakota

2875.  Plaintiffs bring each of the following claims on behalf of the South Dakota Subclass under South Dakota law.

a.      **Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-1, *et seq.*)**

2876.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2877.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

2878.   Plaintiffs, class members, and JUUL are persons under South Dakota's Deceptive Trade Practices and Consumer Protection Act.

2879.   JUUL engaged in trade or commerce directly or indirectly affecting the people of South Dakota by advertising, offering for sale, attempting to sell, selling, or distributing JUUL products.

2880.   Plaintiffs and class members purchased JUUL products for personal purposes.

2881.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2882.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2883.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2884.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2885.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2886.   JUUL engaged in, used, and employed deceptive acts and practices, fraud, false pretense, false promises, and misrepresentations and concealed, suppressed, and omitted material information in connection with the sale of JUUL products.

2887.   JUUL's conduct had the capacity to, were likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2888.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2889.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2890.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2891.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2892.  JUUL's conduct actually and proximately caused actual damages and loss of money or property to Plaintiffs and class members. Absent JUUL's deceptive and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages, as well as any other relief the Court may deem just or proper.

### b.      Common Law Fraud

2893.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2894.  This claim is brought against JLI.

2895.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2896.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2897.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2898.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2899.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2900.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2901.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2902.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2903.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2904.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2905.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the

1    Court may deem just or proper.

2        **c.**   **Breach of the Implied Warranty of Merchantability**

3      2906. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4      2907. This claim is brought against JLI.

5      2908. JUUL has at all times been a merchant with respect to the products which were

6    sold to Plaintiff and the class and was in the business of selling such products.

7      2909. Each JUUL product sold by JUUL comes with an implied warranty that it will

8    merchantable and fit for the ordinary purpose for which it would be used. *See* S.D. Codified

9    Laws § 57A-2-314. JUUL has breached its implied warranty of merchantability because its

10   products were not in merchantable condition when sold, were defective when sold, did not

11   conform to the promises and affirmations of fact made on the products' containers or labels,

12   and/or do not possess even the most basic degree of fitness for ordinary use.

13     2910. The ordinary intended purpose of JUUL's products—and the purpose for which

14   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's

15   products are not fit for that use—or any other use—because they (i) were not smoking cessation

16   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

17   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

18   unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's

19   products are not fit for their ordinary, intended use as either cigarette replacement devices or

20   recreation smoking devices.

21     2911. Plaintiffs and each member of the class have had sufficient direct dealings with

22   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

23   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

24   each member of the class, on the other hand.

25     2912. Further, Plaintiffs and each member of the class were third-party beneficiaries of

26   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

27   sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the

28   intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with

1    the express purpose an intent of being sold to consumers.

2        2913.  Plaintiffs and the members of the class were injured as a direct and proximate

3    result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

4    the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

5    because, had they been aware of the unmerchantable condition of JUUL products, they would

6    not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

7    in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

8        2914.  JUUL was provided notice of these issues by numerous complaints filed against

9    it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

10   individual letters and communications sent by consumers before or within a reasonable amount

11   of time after they discovered or should have discovered that's JUUL product were defective and

12   unmerchantable.

### d.    Unjust Enrichment

13

14       2915.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

15       2916.  This claim is brought against JLI and the Management Defendants.

16       2917.  Defendants created and implemented a scheme to create a market for e-cigarettes

17   and substantially increase sales of JUUL products through a pervasive pattern of false and

18   misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

19   safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

20   while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

21   doses, addictiveness, and significant risks of substantial physical injury from using JUUL

22   products.

23       2918.  Defendants were unjustly enriched as a result of their wrongful conduct,

24   including through the false and misleading advertisements and omissions regarding (i) whether

25   JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

26   alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

27   powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

28   the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the

nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. South Dakota Codified Laws § 34-46-2 prohibits the marketing and sale of JUUL products to minors.

2919.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2920.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2921.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2922.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2923.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 42.   Tennessee

2924.   Plaintiffs bring each of the following claims on behalf of the Tennessee Subclass under Tennessee law.

**a.   Violation of the Tennessee Consumer Protection Act (Tenn. Code Ann. §§ 47-18-101, *et seq.*)**

2925.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2926.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2927.   Plaintiffs, class members, and Defendants are persons under Tennessee's Consumer Protection Act.

2928.   Plaintiffs and class members are natural persons who purchased JUUL products for personal purposes.

2929.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2930.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2931.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2932.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2933.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2934.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the

characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

2935.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) using statements or illustrations in advertisements that create a false impression of the grade, quality, quantity, value, or usability of the goods or services offered.

2936.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to or tend to, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2937.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2938.   JLI and the Management Defendants engaged in fraudulent and deceptive

conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

2939.  In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Tenn. Code Ann. § 39-17-1504); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

2940.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

2941.  Defendants' conduct actually and proximately caused ascertainable loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages and statutory treble damages, as well as injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b.    Common Law Intentional Misrepresentation

2942.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2943.  This claim is brought against JLI.

2944.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading

statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2945.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2946.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2947.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2948.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2949.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2950.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2951.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2952.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2953.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

2954.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

2955.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2956.   This claim is brought against JLI.

2957.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

2958.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Tenn. Code Ann. § 47-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

2959.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

2960.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

2961.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

2962.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Tennessee Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

2963.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

2964.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2965.   This claim is brought against JLI and the Management Defendants.

2966.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2967.  Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were

powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Tennessee Code Annotated §§ 39-17-1504(a) and 39-17-1504(d) prohibit the marketing and sale of JUUL products to minors.

2968.  Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

2969.  Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

2970.  There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

2971.  Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

2972.  Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 43.   Texas

2973.  Plaintiffs bring each of the following claims on behalf of the Texas Subclass under Texas law.

#### a.   Violation of the Texas Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

2974.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2975.  This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

2976.  Plaintiffs, class members, and Defendants are persons under Texas's Deceptive

Trade Practices-Consumer Protection Act.

2977.   Plaintiffs and class members are individuals who purchased JUUL products.

2978.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2979.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2980.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2981.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2982.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2983.   JLI's conduct was unfair and unconscionable in that it included (i) the

manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct. JUUL's acts took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and class members to a grossly unfair degree and to the detriment of Plaintiffs and class members.

2984.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) failing to disclose information concerning JUUL products which was known at the time of the JUUL's sale of the products, with the intention to induce the consumers into transactions into which consumers would not have entered had the information been disclosed.

2985.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity and tendency to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2986.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the

facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

2987.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

2988.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

2989.   In addition, all Defendants engaged in unconscionable conduct because the targeting of minors took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and class members to a grossly unfair degree and to the detriment of Plaintiffs and class members. In particular, Texas law seeks to protect minors from being the target of sales and marketing practices concerning JUUL products. Texas Health & Safety Code § 161.082, 161.087 and 161.452(c).

2990.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— economic damages, treble damages, and restitution, as well as injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b.   Common Law Fraud

2991.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

2992.   This claim is brought against JLI.

2993.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

2994.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

2995.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

2996.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2997.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

2998.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

2999.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3000.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3001.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3002.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3003.   JUUL's conduct actually and proximately caused damages  to Plaintiffs and class

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1   members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

2   differently and would not have purchased JUUL products or would have paid less for them.

3   JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

4   JUUL products they would not otherwise have purchased and enter into purchase contracts they

5   would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

6   member of the class damages in an amount to be proven at trial, as well as any other relief the

7   Court may deem just or proper.

8               **c.      Breach of the Implied Warranty of Merchantability**

9       3004.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

10      3005.   This claim is brought against JLI.

11      3006.   JUUL has at all times been a merchant with respect to the products which were

12   sold to Plaintiff and the class and was in the business of selling such products.

13      3007.   Each JUUL product sold by JUUL comes with an implied warranty that it will

14   merchantable and fit for the ordinary purpose for which it would be used. *See* Tex. Bus. & Com.

15   Code § 2.314. JUUL has breached its implied warranty of merchantability because its products

16   were not in merchantable condition when sold, were defective when sold, did not conform to the

17   promises and affirmations of fact made on the products' containers or labels, and/or do not

18   possess even the most basic degree of fitness for ordinary use.

19      3008.   The ordinary intended purpose of JUUL's products—and the purpose for which

20   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's

21   products are not fit for that use—or any other use—because they (i) were not smoking cessation

22   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

23   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed

24   unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's

25   products are not fit for their ordinary, intended use as either cigarette replacement devices or

26   recreation smoking devices.

27      3009.   Plaintiffs and each member of the class have had sufficient direct dealings with

28   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

1  by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

2  each member of the class, on the other hand.

3      3010.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

4  JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

5  sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

6  intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

7  the express purpose an intent of being sold to consumers.

8      3011.   Plaintiffs and the members of the class were injured as a direct and proximate

9  result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

10  the class were damaged as a result of JUUL's breach of its implied warranty of merchantability

11  because, had they been aware of the unmerchantable condition of JUUL products, they would

12  not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages

13  in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

14      3012.   JUUL was provided notice of these issues by numerous complaints filed against

15  it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous

16  individual letters and communications sent by consumers before or within a reasonable amount

17  of time after they discovered or should have discovered that's JUUL product were defective and

18  unmerchantable.

19                              **d.      Unjust Enrichment**

20      3013.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21      3014.   This claim is brought against JLI and the Management Defendants.

22      3015.   Defendants created and implemented a scheme to create a market for e-cigarettes

23  and substantially increase sales of JUUL products through a pervasive pattern of false and

24  misleading statements and omissions. Defendants aimed to portray JUUL products as cool and

25  safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors,

26  while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

27  doses, addictiveness, and significant risks of substantial physical injury from using JUUL

28  products.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

3016.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Texas Health & Safety Code § 161.082, 161.087 and 161.452(c) prohibit the marketing and sale of JUUL products to minors.

3017.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3018.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3019.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3020.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 44.   Utah

3021.   Plaintiffs bring each of the following claims on behalf of the Utah Subclass under Utah law.

### a.   Violation of the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*)

3022.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3023.   This claim is brought against JLI.

3024.   Plaintiffs, class members, and Defendants are persons under Utah's Consumer

Sales Practices Act.

3025.   Plaintiffs and class members purchased JUUL products in consumer transactions primarily for personal purposes.

3026.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3027.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3028.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3029.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3030.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3031.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have performance characteristics, uses, or benefits, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

3032.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers, including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3033.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3034.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3035.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

1   class members would have behaved differently and would not have purchased JUUL products
2   or would have paid less for them. Defendants' misrepresentations and omissions induced
3   Plaintiffs and class members to purchase JUUL products they would not otherwise have
4   purchased and enter into purchase contracts they would not otherwise have entered into. In
5   addition, class members who are minors are entitled to full repayment of the amounts they spent
6   on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—
7   actual damages as well as restitution, injunctive relief, attorney's fees, and any other relief the
8   Court may deem just or proper.

9   3036.   Defendants had notice that its conduct was in violation of the law based on prior
10   rulings in sprawling, decades-long tobacco litigation and other notice they have received as a
11   result of lawsuits filed against them, and regulations promulgated under Utah Code §§ 13-11-1,
12   *et seq*., including, but not limited to, Utah Administrative Code R152-11-3(B)(1).

13               **b.      Violation of the Utah Truth in Advertising Law (Utah Code**
14                        **Ann. §§ 13-11a-1, *et seq.*)**

15   3037.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

16   3038.   This claim is brought against JLI.

17   3039.   Plaintiffs, class members, and Defendants are persons under Utah's Truth in
18   Advertising Law.

19   3040.   JLI is a supplier of JUUL products because it sells, assigns, offers, brokers, or
20   regularly solicits, engages in, or enforces sales of JUUL products.

21   3041.   Plaintiffs and class members purchased JUUL products for personal purposes.

22   3042.   Defendants created and implemented a scheme to create a market for e-cigarettes
23   and substantially increase sales of JUUL through a pervasive pattern of false and misleading
24   statements and omissions. Defendants aimed to portray JUUL products as cool and safe
25   alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
26   misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
27   addictiveness, and significant risks of substantial physical injury from using JUUL products.

28   3043.   Advertisements and representations for JUUL products contained deceptive

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                                              Case No. 19-md-02913-WHO

statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3044.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3045.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3046.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3047.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

3048.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to cause, and in fact did cause, a likelihood of confusion or misunderstanding.   Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation

devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3049.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3050.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3051.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3052.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' deceptive and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

actual damages or $2,000, whichever is greater, and statutory damages, as well as restitution, injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### c.    Common Law Fraud

3053.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3054.   This claim is brought against JLI.

3055.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3056.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3057.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3058.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3059.   The omissions were misleading and deceptive standing alone and were

particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3060.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3061.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3062.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3063.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3064.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

1   products.

2   3065.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

3   members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

4   differently and would not have purchased JUUL products or would have paid less for them.

5   JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

6   JUUL products they would not otherwise have purchased and enter into purchase contracts they

7   would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

8   member of the class damages in an amount to be proven at trial, as well as any other relief the

9   Court may deem just or proper.

10            **d.        Breach of the Implied Warranty of Merchantability**

11   3066.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

12   3067.   This claim is brought against JLI.

13   3068.   JUUL has at all times been a merchant with respect to the products which were

14   sold to Plaintiff and the class and was in the business of selling such products.

15   3069.   Each JUUL product sold by JUUL comes with an implied warranty that it will

16   merchantable and fit for the ordinary purpose for which it would be used. *See* Utah Code Ann.

17   § 70A-2-314. JUUL has breached its implied warranty of merchantability because its products

18   were not in merchantable condition when sold, were defective when sold, did not conform to the

19   promises and affirmations of fact made on the products' containers or labels, and/or do not

20   possess even the most basic degree of fitness for ordinary use.

21   3070.   The ordinary intended purpose of JUUL's products—and the purpose for which

22   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's

23   products are not fit for that use—or any other use—because they (i) were not smoking cessation

24   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

25   potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed

26   unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's

27   products are not fit for their ordinary, intended use as either cigarette replacement devices or

28   recreation smoking devices.

---

3071.  Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3072.  Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3073.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3074.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### e.    Unjust Enrichment

3075.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3076.  This claim is brought against JLI and the Management Defendants.

3077.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and

doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3078.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Utah Code Annotated section 76-10-104 prohibits the marketing and sale of JUUL products to minors.

3079.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3080.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3081.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3082.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3083.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 45.   Vermont

3084.   Plaintiffs bring each of the following claims on behalf of the Vermont Subclass under Vermont law.

a.       **Violation of the Vermont Consumer Protection Act (Vt. Stat. Ann. tit. 9 §§ 2451,** *et seq.***)**

3085.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3086.   This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

3087.   Plaintiffs and class members purchased JUUL products not for resale in the ordinary course of their trade or business but for personal purposes.

3088.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3089.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3090.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3091.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3092.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3093.  JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

3094.  JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the tendency or capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3095.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3096.  JLI and the Management Defendants engaged in fraudulent and deceptive

conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3097.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Vt. Stat. Ann. tit. 7 §§ 1003(a) & 1007(a)); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

3098.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

3099.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class— actual, treble, and punitive damages and restitution, as well as injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b.      Common Law Fraud

3100.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3101.   This claim is brought against JLI.

3102.   JUUL created and implemented a scheme to create a market for e-cigarettes and

substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3103. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3104. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3105. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3106. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3107. JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation

devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3108.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3109.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3110.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3111.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3112.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they

would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c.    Breach of the Implied Warranty of Merchantability

3113.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3114.   This claim is brought against JLI.

3115.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

3116.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.  *See* Vt. Stat. Ann. tit. 9A § 2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3117.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent  nicotine-delivery  mechanisms,  (iv) were  powerfully  addictive,  and  (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

3118.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3119.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

sale of JUUL products to consumers.    Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3120.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Vermont Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3121.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

3122.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3123.   This claim is brought against JLI and the Management Defendants.

3124.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3125.  Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable

alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Vermont Statutes Annotated title 7 §§ 1003(a) and 1007(a) prohibit the marketing and sale of JUUL products to minors.

3126.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3127.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3128.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3129.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3130.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 46.   Virginia

3131.   Plaintiffs bring each of the following claims on behalf of the Virginia Subclass under Virginia law.

#### a.   Violation of the Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, *et seq.*)

3132.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3133.   This claim is brought against JLI and, for certain claims below, the Management Defendants.

3134.   Plaintiffs, class members, and JUUL are persons under Virginia's Consumer Protection Act.

3135.   Plaintiffs and class members purchased JUUL products in consumer transactions, *i.e.*, for personal purposes.

3136.   JUUL advertised, solicited, or engaged in consumer transactions to sell JUUL products, or is a manufacturer, distributor, or licensor that advertised, sold, or licensed JUUL products to be resold, leased, or sublicensed by other persons in consumer transactions.

3137.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3138.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3139.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3140.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels

1  also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

2  3141.  The omissions were misleading and deceptive standing alone and were

3  particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

4  cigarettes and other representations.

5  3142.  JUUL's conduct constituted the following prohibited fraudulent, deceptive, and

6  unfair business practices: (a) misrepresenting that JUUL products have characteristics,

7  ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL

8  products are of a particular standard, quality, or grade, or that goods are of a particular style or

9  model, when they are not; and (c) advertising goods or services with intent not to sell them as

10  advertised.

11  3143.  JLI's conduct was fraudulent and deceptive because the misrepresentations and

12  omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers,

13  including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it

14  material to their purchasing decisions that JUUL's products (i) were not smoking cessation

15  devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

16  potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

17  risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

18  consumed through one JUUL pod exceeded the nicotine consumed through a pack of

19  combustible cigarettes. Knowledge of these facts would have been a substantial factor in

20  Plaintiffs' and class members' decisions to purchase JUUL products.

21  3144.  JLI owed Plaintiffs and class members a duty to disclose these facts because they

22  were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

23  other than Plaintiffs and class members), who had exclusive and superior knowledge of the

24  facts; because the facts would be material to reasonable consumers; because JLI actively

25  concealed them; because JLI intended for consumers to rely on the omissions in question;

26  because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI

27  made partial representations concerning the same subject matter as the omitted facts.

28  3145.  As set forth in the allegations concerning each Plaintiff in Appendix A, in

1   purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.

2   Reasonable consumers would have been expected to have relied on the misrepresentations and

3   omissions.

4       3146.   JLI and the Management Defendants engaged in fraudulent and deceptive

5   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

6   products were appropriate for minors, when in fact the products never should have been

7   marketed to minors and are especially harmful to minors due to the potent and addictive

8   nicotine doses, addictive qualities, and health risks.

9       3147.   Defendants' conduct actually and proximately caused actual damages and loss to

10  Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and

11  class members would have behaved differently and would not have purchased JUUL products

12  or would have paid less for them. Defendants' misrepresentations and omissions induced

13  Plaintiffs and class members to purchase JUUL products they would not otherwise have

14  purchased and enter into purchase contracts they would not otherwise have entered into. In

15  addition, class members who are minors are entitled to full repayment of the amounts they spent

16  on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—

17  actual damages or $500 per violation, whichever is greater, and statutory damages for each

18  willful violation in the amount of treble damages or $1,000, whichever is greater, as well as

19  attorney's fees and any other relief the Court may deem just or proper.

20  **b.      Common Law Fraud**

21      3148.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

22      3149.   This claim is brought against JLI.

23      3150.   JUUL created and implemented a scheme to create a market for e-cigarettes and

24  substantially increase sales of JUUL through a pervasive pattern of false and misleading

25  statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

26  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

27  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,

28  addictiveness, and significant risks of substantial physical injury from using JUUL products.

3151.  Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3152.  Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3153.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3154.  The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3155.  JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in

1   Plaintiffs' and class members' decisions to purchase JUUL products.

2       3156.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

3   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

4   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

5   facts; because the facts would be material to reasonable consumers; because JUUL products

6   pose an unreasonable risk of substantial bodily injury; and because JLI made partial

7   representations concerning the same subject matter as the omitted facts.

8       3157.   As set forth in the allegations concerning each Plaintiff in Appendix A, in

9   purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

10  and/or omissions.   Reasonable consumers would have been expected to have relied on the

11  misrepresentations and omissions.

12      3158.   Defendants knew or should have known that their misrepresentations and/or

13  omissions were false and misleading, and intended for consumers to rely on such

14  misrepresentations and omissions.

15      3159.   JLI knew that JUUL products were not safe or reasonable alternatives to

16  combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

17  addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the

18  products.

19      3160.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class

20  members. Absent JUUL's conduct, Plaintiffs and class members would have behaved

21  differently and would not have purchased JUUL products or would have paid less for them.

22  JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase

23  JUUL products they would not otherwise have purchased and enter into purchase contracts they

24  would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each

25  member of the class damages in an amount to be proven at trial, as well as any other relief the

26  Court may deem just or proper.

27          **c.**     **Breach of the Implied Warranty of Merchantability**

28      3161.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3162.   This claim is brought against JLI.

3163.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

3164.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   *See* Va. Code Ann. § 8.2-314.   JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3165.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.   JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

3166.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3167.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3168.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of

the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3169.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.   Unjust Enrichment

3170.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3171.   This claim is brought against JLI and the Management Defendants.

3172.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3173.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Code of Virginia Annotated section 18.2-371.2 prohibits the marketing and sale of JUUL products to minors, or

1   knowingly permitting the purchase of JUUL products by minors.

2       3174.   Defendants requested and received a measurable benefit at the expense of

3   Plaintiffs and class members in the form of payment for JUUL products.

4       3175.   Defendants appreciated, recognized, and chose to accept the monetary benefits

5   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the

6   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

7       3176.   There is no justification for Defendants' enrichment. It would be inequitable,

8   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the

9   benefits were procured as a result of their wrongful conduct.

10      3177.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

11  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing

12  with Defendant.

13      3178.   Plaintiffs plead this claim separately as well as in the alternative to their other

14  claims, as without such claims they would have no adequate legal remedy.

15              **47.   Washington**

16      3179.   Plaintiffs bring each of the following claims on behalf of the Washington

17  Subclass under Washington law.

18              **a.   Violation of the Washington Consumer Protection Act (Wash.**

19                     **Rev. Code §§ 19.86.010, *et seq.*)**

20      3180.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

21      3181.   This claim is brought against JLI and, for certain unfair and/or unconscionable

22  conduct claims as noted below, all Defendants.

23      3182.   Plaintiffs, class members, and Defendants are each natural persons, corporations,

24  trusts, unincorporated associations or partnerships, and are thus persons under Washington's

25  Consumer Sales Practices Act.

26      3183.   Plaintiffs and class members purchased JUUL products for personal purposes.

27      3184.   Defendants engaged in trade or commerce directly or indirectly affecting the

28  people of Washington by advertising, offering for sale, selling, or distributing JUUL products.

3185.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3186.   Defendants' unlawful acts and practices occurred in connection with their sales of JUUL products, in commerce directly or indirectly affecting the people of the state of Washington.

3187.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3188.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3189.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3190.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3191.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

3192.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.  JUUL's conduct thus had the capacity to injure not just Plaintiffs but also other members of the public.

3193.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3194.   JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive

nicotine doses, addictive qualities, and health risks.

3195.  In addition, all Defendants engaged in unfair and unconscionable conduct that affects the public interest because the targeting of minors offends public policy (in particular Wash. Rev. Code Ann. §§ 70.155.005, *et seq.*, § 26.28.080 and § 70.345.090.); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

3196.  As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

3197.  Defendants' conduct actually and proximately caused actual damages and loss of money or property to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages and statutory treble damages up to $25,000 for each violation, as well as injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b.    Common Law Fraud

3198.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3199.  This claim is brought against JLI.

3200.  JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe

alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3201.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3202.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3203.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3204.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3205.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3206.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3207.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3208.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3209.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3210.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the

1    Court may deem just or proper.

2              **c.      Breach of the Implied Warranty of Merchantability**

3        3211.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

4        3212.   This claim is brought against JLI.

5        3213.   JUUL has at all times been a merchant with respect to the products which were

6    sold to Plaintiff and the class and was in the business of selling such products.

7        3214.   Each JUUL product sold by JUUL comes with an implied warranty that it will

8    merchantable and fit for the ordinary purpose for which it would be used. *See* Wash. Rev. Code

9    § 62A-2.314.   JUUL has breached its implied warranty of merchantability because its products

10   were not in merchantable condition when sold, were defective when sold, did not conform to the

11   promises and affirmations of fact made on the products' containers or labels, and/or do not

12   possess even the most basic degree of fitness for ordinary use.

13       3215.   The ordinary intended purpose of JUUL's products—and the purpose for which

14   they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.   JUUL's

15   products are not fit for that use—or any other use—because they (i) were not smoking cessation

16   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

17   potent   nicotine-delivery   mechanisms,   (iv) were   powerfully   addictive,   and   (v) posed

18   unreasonable risks of substantial bodily injury.   Due to these and other features, JUUL's

19   products are not fit for their ordinary, intended use as either cigarette replacement devices or

20   recreation smoking devices.

21       3216.   Plaintiffs and each member of the class have had sufficient direct dealings with

22   either JUUL via its website or its agents (including distributors, dealers, and sellers authorized

23   by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and

24   each member of the class, on the other hand.

25       3217.   Further, Plaintiffs and each member of the class were third-party beneficiaries of

26   JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and

27   sale of JUUL products to consumers.   Specifically, Plaintiffs and class members are the

28   intended beneficiaries of JUUL's implied warranties.   JUUL's products are manufactured with

the express purpose an intent of being sold to consumers.

3218.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Washington Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3219.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.      Unjust Enrichment

3220.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3221.  This claim is brought against JLI and the Management Defendants.

3222.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3223.  Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from

the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Revised Code of Washington § 26.28.080, § 70.345.090 and §§ 70.155.005, *et seq.*, prohibit the marketing and sale of JUUL products to minors.

3224.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3225.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3226.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3227.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3228.   Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 48.   West Virginia

3229.   Plaintiffs bring each of the following claims on behalf of the West Virginia Subclass under West Virginia law.

#### a.   Violation of the West Virginia Consumer Credit and Protection Act (W. Va. Code §§ 46A-6-101, *et seq.*)

3230.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3231.   This claim is brought against JLI and, for certain claims, the Management Defendants.

3232.   JUUL engaged in trade or commerce directly or indirectly affecting the people of West Virginia by advertising, offering for sale, selling, or distributing JUUL products.

3233. Plaintiffs and class members are natural persons who purchased JUUL products for personal purposes.

3234. [Intentionally Omitted]

3235. Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3236. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3237. Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3238. The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3239. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3240.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have characteristics, ingredients, uses, benefits, or quantities, which they do not have; (b) misrepresenting that JUUL products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods or services with intent not to sell them as advertised.

3241.   JLI's conduct was fraudulent and deceptive because the misrepresentations and omissions caused a likelihood of confusion or misunderstanding, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3242.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3243. JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3244.   JUUL's conduct actually and proximately caused ascertainable loss of money or property to Plaintiffs and class members. Absent JUUL's unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products.  Plaintiffs seek—on behalf of themselves and each member of the class—actual damages or $200, whichever is greater, as well as restitution, injunctive relief, attorney's fees, and any other relief the Court may deem just or proper.

### b.    Common Law Fraud

3245.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3246.   This claim is brought against JLI.

3247.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3248.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3249.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3250.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3251.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3252.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3253.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3254.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations

and/or omissions.   Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3255.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3256.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3257.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper

### c.    Breach of the Implied Warranty of Merchantability

3258.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3259.   This claim is brought against JLI.

3260.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

3261.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used.   *See* W. Va. Code § 46-2-314.   JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3262.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes.  JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury.  Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

3263.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3264.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers.  Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties.  JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3265.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper

3266.   JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

#### d.     Unjust Enrichment

3267.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3268.   This claim is brought against JLI and the Management Defendants.

3269.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3270.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. West Virginia Code section 16-9A-2 prohibits the marketing and sale of JUUL products to minors.

3271.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3272.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

3273.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3274.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained

1   and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing
2   with Defendant.

3       3275.   Plaintiffs plead this claim separately as well as in the alternative to their other
4   claims, as without such claims they would have no adequate legal remedy.

5       **49.   Wisconsin**

6       3276.   Plaintiffs bring each of the following claims on behalf of the Wisconsin Subclass
7   under Wisconsin law.

8       **a.   Violation of the Wisconsin Deceptive Trade Practices Act**
9           **(Wis. Stat. § 100.18)**

10      3277.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

11      3278.   This claim is brought against JLI and, for certain claims below, the Management
12  Defendants.

13      3279.   Plaintiffs and class members purchased JUUL products for personal purposes.

14      3280.   Defendants created and implemented a scheme to create a market for e-cigarettes
15  and substantially increase sales of JUUL through a pervasive pattern of false and misleading
16  statements and omissions. Defendants aimed to portray JUUL products as cool and safe
17  alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while
18  misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses,
19  addictiveness, and significant risks of substantial physical injury from using JUUL products.

20      3281.   Advertisements and representations for JUUL products contained deceptive
21  statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives
22  to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible
23  cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or
24  not harmful. Like the tobacco companies that marketed combustible cigarettes in previous
25  decades, JLI used third parties and word of mouth to spread false and misleading information
26  about JUUL products.

27      3282.   Advertisements and representations for JUUL products concealed and failed to
28  disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3283.  The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3284.  The omissions were misleading and deceptive standing in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3285.  JLI's conduct was misleading and deceptive because the misrepresentations and omissions had the capacity to deceive, and in fact did, deceive reasonable consumers including the Plaintiffs.  Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3286.  JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JLI actively concealed them; because JLI intended for consumers to rely on the omissions in question; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3287.  JLI and the Management Defendants engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL

products were appropriate for minors, when in fact the products never should have been marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3288.   JUUL's conduct actually and proximately caused pecuniary loss to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class—actual damages for pecuniary loss as well as restitution, attorney's fees, and any other relief the Court may deem just or proper.

### b.        Common Law Fraud

3289.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3290.   This claim is brought against JLI.

3291.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3292.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information

1    about JUUL products.

2          3293.   Advertisements and representations for JUUL products concealed and failed to

3    disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to

4    combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully

5    addictive, posed significant risks of substantial physical injury resulting from the use of the

6    products, and that the nicotine consumed through one JUUL pod exceeded the nicotine

7    consumed through a pack of combustible cigarettes.

8          3294.   The labels on JUUL products failed to disclose that the products posed

9    significant risks of substantial physical injury resulting from the use of the products. The labels

10   also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

11         3295.   The omissions were misleading and deceptive standing alone and were

12   particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to

13   cigarettes and other representations.

14         3296.   JLI's conduct was fraudulent and deceptive because its misrepresentations and

15   omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers

16   including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it

17   material to their purchasing decisions that JUUL's products (i) were not smoking cessation

18   devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely

19   potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable

20   risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

21   consumed through one JUUL pod exceeded the nicotine consumed through a pack of

22   combustible cigarettes. Knowledge of these facts would have been a substantial factor in

23   Plaintiffs' and class members' decisions to purchase JUUL products.

24         3297.   JLI owed Plaintiffs and class members a duty to disclose these facts because they

25   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties

26   other than Plaintiffs and class members), who had exclusive and superior knowledge of the

27   facts; because the facts would be material to reasonable consumers; because JUUL products

28   pose an unreasonable risk of substantial bodily injury; and because JLI made partial

representations concerning the same subject matter as the omitted facts.

3298.  As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3299.  Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3300.  JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3301.  JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper

### c.    Breach of the Implied Warranty of Merchantability

3302.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3303.  This claim is brought against JLI.

3304.  JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

3305.  Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* Wisc. Stat. § 402.314. JUUL has breached its implied warranty of merchantability because its products

were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3306.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

3307.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3308.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3309.   Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the Wisconsin Direct Purchaser Subclass were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

3310.   JUUL was provided notice of these issues by numerous complaints filed against

it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

3311.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3312.   This claim is brought against JLI and the Management Defendants.

3313.   Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3314.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly enriched through their scheme of marketing their products to minors. Wisconsin Statutes section 134.66 prohibits the marketing and sale of JUUL products to minors.

3315.   Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for JUUL products.

3316.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of its customers.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

3317. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

3318. Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendant.

3319. Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### 50. Wyoming

3320. Plaintiffs bring each of the following claims on behalf of the Wyoming Subclass under Wyoming law.

### a. Violation of the Wyoming Consumer Protection Act (Wyo. Stat. Ann. §§ 40-12-101, *et seq.*)

3321. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3322. This claim is brought against JLI and, for certain unfair and/or unconscionable conduct claims as noted below, all Defendants.

3323. Plaintiffs, class members, and Defendants are each natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, or other legal entities and are thus persons under Wyoming's Consumer Protection Act.

3324. Plaintiffs and class members purchased JUUL products for personal purposes.

3325. Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3326. Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives

to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3327.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3328.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3329.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3330.   JLI's conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of JUUL products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

3331.   JUUL's conduct constituted the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that JUUL products have uses which they do not have; (b) misrepresenting that JUUL products are of a particular standard or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) misrepresenting that the subject of a transaction has

1   been supplied in accordance with a previous representation when it has not.

2   3332.   JLI's conduct was fraudulent and deceptive because the misrepresentations and
3   omissions at issue were likely to, and in fact did, deceive reasonable consumers including the
4   Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their
5   purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not
6   reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery
7   mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily
8   injury resulting from the use of the products, and (vi) that the nicotine consumed through one
9   JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.
10   Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members'
11   decisions to purchase JUUL products.

12   3333.   JLI owed Plaintiffs and class members a duty to disclose these facts because they
13   were known and/or accessible exclusively to Defendants (and potentially other unnamed parties
14   other than Plaintiffs and class members), who had exclusive and superior knowledge of the
15   facts; because the facts would be material to reasonable consumers; because JLI actively
16   concealed them; because JLI intended for consumers to rely on the omissions in question;
17   because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI
18   made partial representations concerning the same subject matter as the omitted facts.

19   3334.   As set forth in the allegations concerning each Plaintiff in Appendix A, in
20   purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions.
21   Reasonable consumers would have been expected to have relied on the misrepresentations and
22   omissions.

23   3335.   Defendants knew or should have known that their misrepresentations and/or
24   omissions were false and misleading, and intended for consumers to rely on such
25   misrepresentations and omissions.

26   3336.   JLI and the Management Defendants engaged in fraudulent and deceptive
27   conduct by devising and executing a scheme to deceptively and misleadingly convey that JUUL
28   products were appropriate for minors, when in fact the products never should have been

marketed to minors and are especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities, and health risks.

3337.   In addition, all Defendants engaged in unfair and unconscionable conduct because the targeting of minors offends public policy (in particular Wyo. Stat. Ann. § 14-3-302); is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

3338.   As alleged above, all Defendants participated and/or facilitated the marketing of JUUL products to minors and took no action to curb the use of JUUL products by minors. JLI and others have continued the deceptive, misleading, unfair, and unconscionable practices that Defendants implemented, facilitated, and/or did not take adequate steps to end. As a result, the use of JUUL products by minors continues to rise.

3339.   Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. In addition, class members who are minors are entitled to full repayment of the amounts they spent on JUUL products. Plaintiffs seek—on behalf of themselves and each member of the class— actual damages as well as restitution, attorney's fees, and any other relief the Court may deem just or proper.

### b.      Common Law Fraud

3340.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3341.   This claim is brought against JLI.

3342.   JUUL created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. JUUL's plan was to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while

misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3343.   Advertisements and representations for JUUL products contained deceptive statements that JUUL e-cigarettes were smoking cessation devices and reasonable alternatives to combustible cigarettes, and that a pod of JUUL was equivalent to one pack of combustible cigarettes. The advertisements and JLI's public statements portrayed JUUL products as safe or not harmful. Like the tobacco companies that marketed combustible cigarettes in previous decades, JLI used third parties and word of mouth to spread false and misleading information about JUUL products.

3344.   Advertisements and representations for JUUL products concealed and failed to disclose that JUUL e-cigarettes were not smoking cessation devices or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed significant risks of substantial physical injury resulting from the use of the products, and that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes.

3345.   The labels on JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels also falsely stated that JUUL products were reasonable alternatives to combustible cigarettes.

3346.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JLI's advertising of its products as reasonable alternatives to cigarettes and other representations.

3347.   JLI's conduct was fraudulent and deceptive because its misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that JUUL's products (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine

consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase JUUL products.

3348.   JLI owed Plaintiffs and class members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Plaintiffs and class members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JLI made partial representations concerning the same subject matter as the omitted facts.

3349.   As set forth in the allegations concerning each Plaintiff in Appendix A, in purchasing JUUL products, Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

3350.   Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

3351.   JLI knew that JUUL products were not safe or reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, were powerfully addictive, posed unreasonable risks of substantial bodily injury resulting from the use of the products.

3352.   JUUL's conduct actually and proximately caused damages to Plaintiffs and class members. Absent JUUL's conduct, Plaintiffs and class members would have behaved differently and would not have purchased JUUL products or would have paid less for them. JUUL's misrepresentations and omissions induced Plaintiffs and class members to purchase JUUL products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into. Plaintiffs seek—on behalf of themselves and each member of the class damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper.

### c. Breach of the Implied Warranty of Merchantability

3353.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3354.   This claim is brought against JLI.

3355.   JUUL has at all times been a merchant with respect to the products which were sold to Plaintiff and the class and was in the business of selling such products.

3356.   Each JUUL product sold by JUUL comes with an implied warranty that it will merchantable and fit for the ordinary purpose for which it would be used. *See* Wyo. Stat. Ann. § 34.1-2-314. JUUL has breached its implied warranty of merchantability because its products were not in merchantable condition when sold, were defective when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

3357.   The ordinary intended purpose of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes. JUUL's products are not fit for that use—or any other use—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices.

3358.   Plaintiffs and each member of the class have had sufficient direct dealings with either JUUL via its website or its agents (including distributors, dealers, and sellers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the class, on the other hand.

3359.   Further, Plaintiffs and each member of the class were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

3360.  Plaintiffs and the members of the class were injured as a direct and proximate result of JUUL's breach of its implied warranties of merchantability. Plaintiffs and members of the class were damaged as a result of JUUL's breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of JUUL products, they would not have purchased JUUL products, or would have paid less for them. Plaintiffs seek damages in an amount to be proven at trial, as well as any other relief the Court may deem just or proper

3361.  JUUL was provided notice of these issues by numerous complaints filed against it, including the complaints in *In re: JUUL Labs, Inc. Product Litigation*, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have discovered that's JUUL product were defective and unmerchantable.

### d.    Unjust Enrichment

3362.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

3363.  This claim is brought against JLI and the Management Defendants.

3364.  Defendants created and implemented a scheme to create a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning JUUL products' nicotine content and doses, addictiveness, and significant risks of substantial physical injury from using JUUL products.

3365.  Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding (i) whether JUUL products were smoking cessation devices, (ii) whether JUUL products are reasonable alternatives to cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, (v) posed unreasonable risks of substantial bodily injury resulting from the use of the products, and (vi) that the nicotine consumed through one JUUL pod exceeded the nicotine consumed through a pack of combustible cigarettes. Defendants were also unjustly

1   enriched through their scheme of marketing their products to minors. Wyoming Statutes
2   Annotated section 14-3-302 prohibits the marketing and sale of JUUL products to minors.

3      3366.   Defendants requested and received a measurable benefit at the expense of
4   Plaintiffs and class members in the form of payment for JUUL products.

5      3367.   Defendants appreciated, recognized, and chose to accept the monetary benefits
6   Plaintiffs conferred onto Defendants at the Plaintiffs' detriment. These benefits were the
7   expected result of Defendant acting in its pecuniary interest at the expense of its customers.

8      3368.   There is no justification for Defendants' enrichment. It would be inequitable,
9   unconscionable, and unjust for Defendants to be permitted to retain these benefits because the
10  benefits were procured as a result of their wrongful conduct.

11     3369.   Plaintiffs are entitled to restitution of the benefits Defendant unjustly retained
12  and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing
13  with Defendant. Due to the sprawling, decades-long tobacco litigations and other notice they
14  have received as a result of lawsuits filed against them, Defendants are reasonably notified that
15  Plaintiffs and class members would expect compensation from Defendants' unjust enrichment
16  stemming from their wrongful actions.

17     3370.   Plaintiffs plead this claim separately as well as in the alternative to their other
18  claims, as without such claims they would have no adequate legal remedy.

19  **VIII.   PRAYER FOR RELIEF**

20     Plaintiff, on behalf of themselves and the proposed classes, respectfully demand that the
21  Court:

22     A.      Determine that this action may be maintained as a class action pursuant to Fed.
23  R. Civ. P. Rule 23(a) and (b)(3), direct that reasonable notice of this action be given to the
24  classes, declare Plaintiffs as a named representatives of the classes, and declare that Plaintiffs'
25  counsel be appointed as class counsel;

26     B.      Enter judgment against Defendants and in favor of Plaintiffs and the classes;

27     C.      Award damages (including statutory, punitive, and multiple damages as
28  provided by law) and restitution to the classes in an amount to be determined at trial, plus

interest in accordance with law;

        D.      Order disgorgement from the Defendants;

        E.      Award Plaintiffs and the classes their costs of suit, including reasonable attorneys' fees as provided by law; and

        F.      Award such further and additional relief as is necessary to redress the harm caused by Defendants' unlawful conduct and as the Court may deem just and proper under the circumstances.

## IX.    RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS

        3371.  None of the causes of action asserted herein seeks damages or other relief as a result of personal injuries allegedly attributable to Plaintiffs' and class members' use of JUUL products. Such claims are governed by the personal injury Master Complaint and any additional Short Form complaints that may be filed (or as otherwise agreed by the parties). The named Plaintiffs in this complaint expressly reserve their right to seek damages or other relief for personal injuries they may have suffered, regardless of whether those damages are sought through causes of action alleged herein or otherwise.

## X.    DEMAND FOR JURY TRIAL

        3372. Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the classes, demand a trial by jury on all issues to triable.

 DATED:  June 18, 2020              Respectfully Submitted,

                                         By: *Dena C. Sharp*

                                       Dena C. Sharp
                                       **GIRARD SHARP LLP**
                                       601 California St., Suite 1400
                                       San Francisco, CA 94108
                                       Telephone: (415) 981-4800

By: *Sarah R. London*

Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone:  (415) 956-1000


By: *Dean Kawamoto*

Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone:  (206) 623-1900


By: *Ellen Relkin*

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for the Plaintiffs*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 19-md-02913-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 18, 2020, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

/s/ *Sarah R. London*