UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In Re: Juul Labs, Inc., Marketing, Sales
Practices, and Products Liability Litigation

Case No.  19-md-02913-WHO

**ORDER ON SUBSTANTIVE MOTIONS
TO DISMISS**

Dkt. Nos.: 626, 627, 628, 629, 632, 645,
647, 649, 738, 740, 748, 750, 751, 752/778,
754, 771, 772, 773/779.

Currently before me is the "first wave" of motions to dismiss in this massive multidistrict litigation, attacking claims asserted in the Amended Consolidated Class Action Complaint ("CAC"), the Amended Master Complaint (Personal Injury) ("PIC"), and in seven of the Government Entity Complaints ("PECs" or "Three Village/TVC").  The main moving defendants are JUUL Labs, Inc. ("JLI"), the Altria group of defendants[1] ("Altria"), and the current and former JLI founders and directors ("Officer and Director Defendants").[2]  These sets of defendants are named in all three sets of operative complaints.  Other defendants who are named only in the PIC are the Retailer defendants,[3] the Distributor defendants,[4] and the E-Liquid defendants.[5]  These

[1] Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services LLC, Altria Group Distribution Company, and Altria Enterprises LLC, collectively "Altria."

[2] James Monsees, Adam Bowen, Nicholas Pritzker, Hoyoung Huh, and Riaz Valani, collectively "Officer and Director Defendants," and "Other Director Defendants" when referring solely to Huh, Pritzker, and Valani.

[3] Chevron Corporation, Circle K. Stores Inc., Speedway LLC, 7-Eleven, Inc., Walmart, and Walgreens Boots Alliance, Inc., collectively "Retailers."

[4] McLane Company, Inc., Eby-Brown Company, LLC, and Core-Mark Holding Company, Inc., collectively "Distributors."

[5] Mother Murphy's Labs, Inc., Alternative Ingredients, Inc., Tobacco Technology, Inc., and eLiquitech, Inc., collectively "E-Liquid Defendants."

United States District Court
Northern District of California

1   defendants have either joined or filed their own motions tracking the main moving defendants'

2   motions, and some have reserved rights to file motions to dismiss in the next round.

3        The aim of this first round of motions to dismiss is to address potentially cross-cutting

4   issues.  The following motions have been filed and argued:

5   • JLI and the Retailer defendants' motions to dismiss or stay given the Food and Drug

6        Administration's primary jurisdiction over JLI's products;

7   • JLI and the Retailer defendants' motions to dismiss claims as preempted by federal law;

8   • Defendants' motions to dismiss the federal Racketeer Influenced and Corrupt

9        Organizations Act ("RICO") claims asserted in the CAC and PECs;

10  • Defendants' motions to dismiss the California law claims asserted in the CAC;[6] and

11  • Defendants' motions to dismiss the public entity claims asserted in seven of the PECs.

12       In the main, plaintiffs' claims may proceed.  We are at the pleading stage, where plaintiffs'

13  allegations are taken as true and reasonable inferences from those allegations are drawn in their

14  favor.  In large part, plaintiffs' claims are plausibly supported and state claims upon which relief

15  can be granted.  It would not be efficient to stay this case based on primary jurisdiction, given the

16  uncertainty of when and how the FDA might address any related issues, and until it does so,

17  preemption is not appropriate except regarding specific and narrow statements on product labels as

18  I previously determined in *Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178 (N.D. Cal. 2018)

19  and *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 745 (N.D. Cal. 2019).

20       That said, I am granting some defendants' motions in a few respects, with leave to amend.

21  Allegations concerning the distinctiveness of the RICO enterprise from the general business of

22  JLI, and the role of Veratad in supporting the enterprise, are currently insufficient.  More specific

23  allegations are needed for the RICO claims against Altria, and for all of the claims asserted against

24  directors Pritzker, Huh, and Valani.  Plaintiffs will have 20 days from the date of this Order to

25  amend any of the claims dismissed.

26  

27  [6] The Other Director Defendants – Huh, Valani, and Pritzker – also move to dismiss various state
    law claims.  Other than with respect to the specific state law claims implicated by the PECs

28  challenged on this round of motions to dismiss, I do not reach whether plaintiffs have adequately
    asserted their claims against any set of defendants under the laws of other states.

United States District Court
Northern District of California

# TABLE OF CONTENTS

**BACKGROUND**

I.   Class Complaint ............................................................................................. 6

II.   Master Personal Injury Complaint ................................................................ 7

III.   Government Entity Complaints ..................................................................... 8

I.   Motions to Stay or Dismiss Based on Primary Jurisdiction ....................... 10

  A.   Legal Standard .................................................................................. 11

  B.   Primary Jurisdiction ......................................................................... 12

    1.   Efficiency of a Stay ................................................................ 12

    2.   Delay from a Stay .................................................................. 16

    3.   Other Factors .......................................................................... 17

II.   Motions to Dismiss Based on Preemption .................................................. 18

  A.   Legal Standard .................................................................................. 19

    1.   Preemption .............................................................................. 19

    2.   Statutory Scheme .................................................................... 20

  B.   Express Preemption .......................................................................... 22

    1.   Product Liability ..................................................................... 22

    2.   Product Design/Standards Claims ........................................... 23

    3.   Packaging and Labelling Claims ............................................ 23

    4.   Advertising Claims ................................................................. 27

    5.   Modified-Risk Claims ............................................................ 28

    6.   Retailer-Specific Preemption ................................................. 29

  C.   Implied Preemption .......................................................................... 30

III.   Motions to Dismiss RICO Claims ............................................................. 33

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A.    Legal Standards ................................................................................................. 33

B.    RICO Allegations .............................................................................................. 35

   1.    CAC ........................................................................................................ 35

   2.    Public Entity Complaints ....................................................................... 38

C.    Enterprise .......................................................................................................... 38

D.    Conducted Affairs of Enterprise ...................................................................... 46

   1.    Bowen ..................................................................................................... 47

   2.    Monsees .................................................................................................. 51

   3.    Other Director Defendants ..................................................................... 52

   4.    Altria ...................................................................................................... 55

E.    Predicate Acts and Pattern of Racketeering ..................................................... 57

   1.    Scheme to Defraud ................................................................................. 58

   2.    Intent ...................................................................................................... 59

   3.    Predicate Acts ........................................................................................ 60

   4.    Pattern .................................................................................................... 66

F.    Proximate Cause and Injury to Money or Property........................................... 67

   1.    CAC ........................................................................................................ 67

   2.    PECs........................................................................................................ 70

   3.    Altria ...................................................................................................... 74

G.    Conspiracy ........................................................................................................ 74

IV.    Motions to Dismiss UCL/California claims................................................................ 75

A.    Common Law Fraud – California Plaintiffs ...................................................... 77

   1.    Affirmative Misrepresentations and Justifiable Reliance ...................... 77

United States District Court
Northern District of California

United States District Court
Northern District of California

2.     Omissions and Justifiable Reliance ................................................................. 80

3.     Damages ........................................................................................................... 85

B.    Breach of Implied Warranty – California Plaintiffs ................................................ 85

1.     Privity with JLI ............................................................................................... 85

2.     Non-Merchantability and Causation ............................................................... 86

C.    UCL/FAL .................................................................................................................. 87

1.     Stating a UCL Claim ....................................................................................... 87

2.     Standing ........................................................................................................... 95

3.     Relief ............................................................................................................... 96

D.    CLRA ........................................................................................................................ 99

E.    Unjust Enrichment ................................................................................................. 100

F.    Other Claims/Subject Matter Jurisdiction for Putative Subclass Claims ........................... 101

G.    Personal Jurisdiction over the Other Director Defendants ............................................. 102

V.   Motions to Dismiss Government Bellwether Complaints ....................................................... 103

A.    Municipal Cost Recovery Rule .............................................................................. 103

B.    Public Nuisance ..................................................................................................... 106

1.     JLI ................................................................................................................. 107

2.     Altria ............................................................................................................. 113

3.     Officer and Director Defendants ................................................................... 115

C.    Negligence .............................................................................................................. 119

1.     JLI ................................................................................................................. 119

2.     Altria ............................................................................................................. 129

3.     Officer and Director Defendants ................................................................... 130

5

D.    Proximate Causation ................................................................................ 132

   1.    JLI ................................................................................................ 132

   2.    Altria ........................................................................................... 135

E.    Statutory Consumer Protection ............................................................... 135

   1.    New York Consumer Protection Law ......................................... 136

   2.    Florida Consumer Protection Law .............................................. 143

F.    Personal Jurisdiction ............................................................................... 146

   1.    Specific Jurisdiction ................................................................... 147

**BACKGROUND**

**I.    CLASS COMPLAINT**

The Amended Consolidated Class Action Complaint is the operative pleading for the consumer class action allegations in this case.  Dkt. No. 679 ("CAC").  In the CAC, the plaintiffs allege hundreds of pages facts regarding JLI's and the Officer and Director Defendants' intent to create and market a "blockbuster sequel" to combustible cigarettes.  Their product, the JUUL e-cigarette device, was a new entry into the existing electronic nicotine delivery systems ("ENDS") market.  According to plaintiffs, the product was intentionally designed to avoid the "stigma" surrounding combustible cigarettes and capture not only existing combustible cigarette smokers and smokeless tobacco users who were addicted to nicotine, but also vastly expand the market by capturing and addicting individuals – specifically including youth users – who had not previously used tobacco or ENDS products.  JLI and the Officer and Director Defendants allegedly achieved this by creating a highly addictive product that produced high "buzz" levels with lower throat harshness and discomfort than prior tobacco or existing ENDS products. Eventually with the assistance of Altria, JLI and the Officer and Director Defendants are alleged to have achieved not only market dominance in the ENDS market but also to have expanded the pipeline of new nicotine addicts through their three-pronged approach: (i) product design to maximize addiction;

(ii) mass deception; and (iii) targeting of youth.

Based on these themes, the CAC asserts the following causes of action on behalf of the "nationwide" class as well as the "California Subclass": (1) Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.); (2) Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.); (3) Violation of the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, et seq.); (4) Common Law Fraud; (5) Breach of the Implied Warranty of Merchantability; and (6) Unjust Enrichment.  The CAC also states on behalf of the nationwide class: (7) Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(c)); (8) Conspiracy to Violate RICO (18 U.S.C. § 1962(d)); and (9) Violation of the Magnuson-Moss Warranty Act (15 U.S.C. § 2301, et seq.).

The CAC also alleges specific violations of state law for subclasses of consumers in the other 49 states and the District of Columbia arising under those jurisdictions' consumer protection statutes, as well as common law claims of fraud, breach of the warranty of merchantability, and unjust enrichment.  CAC ¶¶ 224-649.

## II.    MASTER PERSONAL INJURY COMPLAINT

The Amended Consolidated Master Complaint (Personal Injury) plus the Court-approved Short Form Complaint are the operative pleadings for the personal injury cases.  Dkt. Nos. 677 (PIC), 405 (SFC).  The essential facts with respect to JLI, Altria, and the Officer and Director Defendants' conduct are materially similar to those alleged in the CAC.  There are also additional allegations regarding the "prominent role" the Distributor and Retailer Defendants played in the "false and deceptive marketing campaign" and fraudulent scheme created by JLI and the Officer and Director Defendants (and eventually Altria) to expand the market of nicotine-addicted individuals through joint promotion campaigns targeting youth, failing to take adequate precautions to prevent youth use, and selling products that "neither disclosed the products' nicotine content, nor any of its risks."  PIC ¶¶ 5, 526-527, 532-534, 543, 557-601.  Plaintiffs allege that the E-Liquid Defendants manufactured and supplied "the ingredients and additives in E-Liquids including the E-Liquid" in the JUUL products.  *Id*. ¶¶ 31-35.  The E-Liquid Defendants and JLI allegedly "enticed" newcomers to nicotine with "kid-friendly" flavors without ensuring

that the additives were safe for inhalation.  PIC ¶¶ 162-173, 196-225, 757.

Plaintiffs plead nineteen causes of action in the PIC: (1) Strict Liability – Design Defect, PIC ¶¶ 755-775; (2) Strict Liability – Failure to Warn, ¶¶ 776-794; (3) Strict Liability – Manufacturing Defect, ¶¶ 795-808; (4) Products Liability – Negligent Design, ¶¶ 809-828; (5) Products Liability – Negligent Failure to Warn, ¶¶ 829-846; (6) Product Liability – Negligent Manufacturing, ¶¶ 847-859; (7) Negligence and/or Gross Negligence, ¶¶ 860-881; (8) Negligent Failure to Recall/Retrofit, ¶¶ 882-894; (9) Negligent Misrepresentation, ¶¶ 895-909; (10) Fraud, ¶¶ 910-925; (11) Fraudulent Concealment, ¶¶ 926-945; (12) Conspiracy to Commit Fraud, ¶¶ 946-987; (13) Unjust Enrichment, ¶¶ 988-998; (14) Violation of Unfair Trade Practices/ Consumer Protection Law under identified state laws, ¶¶ 999-1012; (15) Breach of Express Warranty, ¶¶ 1013-1030; (16) Breach of an Implied Warranty of Merchantability, ¶¶ 1031-1047; (17) Wrongful Death, ¶¶ 1048-1054; (18) Survival Action, ¶¶ 1055-1061; and (19) Loss of Consortium, ¶¶ 1062-1068.[7]

There are a number of additional defendants identified in the underlying personal injury complaints and SFCs.[8]  Those defendants have not moved in this first round of motions to dismiss; their defenses and right to move to dismiss are expressly preserved for determination at a later date.

## III.   GOVERNMENT ENTITY COMPLAINTS

There are seven cases filed by government entities that, by agreement of the parties, are being tested during this first round of motions to dismiss.  Those cases are *County of Santa Cruz v. JUUL Labs, Inc*., No. 20-cv-02261 (N.D. Cal.) ("Santa Cruz"), and seven school districts (collectively the "school districts"): *Central Bucks School District, Bucks County v. JUUL Labs, Inc.*, No. 19-cv-08023 (N.D. Cal.) ("Central Bucks"); *The School Board of Escambia County,*

---

[7] By stipulation, plaintiffs and the Retailer and Distributor Defendants agreed that the PIC and the SFCs did not plead the following claims against the Retailer and Distributor Defendants: (i) Cause of Action IV (Products Liability – Negligent Design); (ii) Cause of Action VI (Products Liability – Negligent Manufacturing); and (iii) Cause of Action XII (Conspiracy to Commit Fraud).  Dkt. No. 875.

[8] As of the parties' October 16, 2020 Case Management Statement, there were 82 defendants named across the cases in the MDL.  Dkt. No. 1055.

*Florida v. JUUL Labs, Inc*., No. 20-cv-00459 (N.D. Cal.) ("Escambia"); *The Livermore Valley Joint Unified School District v. JUUL Labs, Inc*., No. 19-cv-08176 (N.D. Cal.) ("Livermore Valley"); *The School Board of Broward County, Florida v. JUUL Labs, Inc*., No. 19-cv-08289 (N.D. Cal.) ("Broward"); *Three Village Central School District v. JUUL Labs, Inc*., No. 19-cv-07028 (N.D. Cal.) (Three Village" or "TVC"); and *Tucson Unified School District v. JUUL Labs, Inc*., No. 19-cv-07335 (N.D. Cal.) ("Tucson") (collectively PECs).

The same or materially similar allegations are made in each of the operative complaints. JLI and other defendants generally refer to the factual allegations in the *Three Village Complaint* (TVC), in addition to challenging some of the bellwether claims under specific state laws relevant to specific entities. The government entities allege that "JLI, the Management Defendants, and Altria worked together to implement their shared goal of growing a new market in the image of the combustible cigarette market through a multipronged strategy to: (1) create a highly addictive product that users would not associate with cigarettes and that would appeal to the lucrative youth market; (2) deceive the public, and especially young people, into thinking the product was a fun and safe alternative to cigarettes that would help smokers quit; (3) actively attract young users through targeted marketing, and (4) use a variety of tools, including false and deceptive statements to the public and regulators, to delay regulation of e-cigarettes." TVC ¶ 55. Each of the defendants "played a critical role—at times overlapping and varying over time—in each of these strategies." *Id.*

As a result of the youth e-cigarette crisis created by this misconduct, school districts and local governments were compelled to respond. The school districts spent significant and unexpected levels of time and resources to address the pervasiveness of youth e-cigarette use and had to divert resources and deploy new ones to combat the problem. *See* TVC ¶¶ 597–604 (educate about the dangers of youth e-cigarette use, including staff training and new counseling services); *id.* ¶¶ 605–06 (costs associated with discipline and suspensions related to incidents of e-cigarette use in schools, including additional legal expenses in connection with disciplinary hearings and costs for home-tutoring services to suspended students at risk of falling behind academically); *id.* ¶ 607 (monitoring bathrooms for pervasive e-cigarette use as well as installing

United States District Court
Northern District of California

1   e-cigarette detectors, additional cameras and anti-vaping signs around the property); *id.* ¶ 608 (loss

2   of personnel hours of school staff who had to direct time and activity towards discipline,

3   education, and health care attention associated with e-cigarette use); *id.* ¶ 609 (costs associated

4   with safely disposing of hazardous waste contained in JUUL products).

5        Local governments also seek to recover costs that they incurred when responding to the

6   youth e-cigarette crisis.  *See* Santa Cruz ¶¶ 601–622 (public health staff spent significant time and

7   resources addressing youth e-cigarette use, including educational campaigns and buying ads to

8   combat defendants' misinformation); *id.* ¶¶ 610, 615 (responding to schools who requested

9   assistance in dealing with increased youth e-cigarette use, including time and resources from local

10  police departments; increased need for disciplinary alternatives, including trained addiction

11  specialists, counselors, and social workers, as well as developing effective cessation methods

12  targeted at youth); *id.* ¶¶ 612–13 (dealing with hazardous waste disposal in the county's landfills).

13       Based on these allegations, the seven government entity complaints at issue allege the

14  following causes of action: (1) violations of RICO (18 U.S.C. § 1962(c)); (2) conspiracy to violate

15  RICO (18 U.S.C. § 1962(d)); (3) public nuisance under Arizona, California, Florida, New York

16  and Pennsylvania law; and (4) negligence and gross negligence under the same state laws.  Three

17  Village, Broward and Escambia also allege violations of the New York and Florida consumer

18  protection statutes.

19       Together, these government entity complaints seek abatement, injunctive relief, equitable

20  relief to fund prevention education and addiction treatment, actual and compensatory damages,

21  punitive damages,[9] statutory damages, attorneys' fees and costs, and pre- and post-judgment

22  interest.

23                              **DISCUSSION**

24  **I.   MOTIONS TO STAY OR DISMISS BASED ON PRIMARY JURISDICTION**

25       JLI moves to stay all proceedings in this MDL pending the Food and Drug Administration

26

27  ───────────────
    [9] Santa Cruz County concedes to dismissal of its standalone punitive damages claim because it is
28  not a distinct cause of action under California law, but maintains its request for punitive damages
    in its prayer for relief.  Dkt. No. 817 at 48 n.20.

                                    10

("FDA") ruling on JLI's recently filed premarket tobacco application ("PMTA") for its electronic

nicotine delivery system ("ENDS") product.  Dkt. No. 626.[10]  Pursuant to its authority under the

Family Smoking Prevention and Tobacco Control Act of 2009 ("TCA", 21 U.S.C. § 387 et seq.),

the FDA will review JLI's PMTA and determine whether JLI may continue to sell its products in

the United States, and if so how, with approved designs (*e.g.*, nicotine yields, ingredients, and

flavorings) and marketing strategies (*e.g.*, product labels, disclosures/warnings, and sales

strategies).  JLI asserts that because it filed its PMTA at the end of July 2020, the FDA must

complete its review of JLI's PMTA by September 9, 2021.[11]  It argues that efficiency weighs in

favor of staying these proceedings so that the FDA can determine the technical matters that are

squarely within its areas of expertise, such as the CAC and PEC claims that JLI's product was and

is defective, that JLI breached its duty to warn consumers, and that JLI engaged in false and

misleading advertising.

   Plaintiffs argue that efficiency and fairness weigh strongly against a stay where the FDA's

"forward-looking" process will not consider or resolve the actual claims for damages, restitution,

and abatement sought here under the claims of the CAC, PIC, and PECs.  They dispute the length

of time the FDA will take to determine JLI's PMTA and related issues.  And they also contend

that any overlap between issues in these proceedings and the going-forward issues that the FDA

will resolve is speculative, but manageable if the need arises.

### A.  Legal Standard

   "The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a

---

[10] JLI filed its PMTA with the FDA on July 29, 2020, following the completion of the briefing on these motions.  Dkt. No. 910 at 8 n.6.  The Retailer Defendants separately move to dismiss the state law claims asserted against them in the PIC under the primary jurisdiction doctrine.  They argue that because FDA will set standards for the design and marketing of JLI's products within its area of technical expertise, the attempts by the PIC to enforce potentially different standards should be rejected.  Dkt. No. 750.  The arguments raised by the Retailer Defendants are identical to, and rise and fall with, the arguments raised by JLI.

[11] This deadline is shorter than that initially contemplated by the FDA and results in part from a challenge to delayed enforcement by pediatric physician and anti-tobacco groups.  *See Am. Academy of Pediatrics v. FDA*, 399 F. Supp. 3d 479, 481 (D. Md. 2019).  Subsequent to that decision, in January 2020, the FDA finalized its Enforcement Guidance imposing the current deadlines.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   complaint without prejudice pending the resolution of an issue within the special competence of

2   an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).

3   The doctrine is a "prudential" one, "under which a court determines that an otherwise cognizable

4   claim implicates technical and policy questions that should be addressed in the first instance by the

5   agency with regulatory authority over the relevant industry rather than by the judicial branch." *Id.*

6   (citing *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir.2002)).

7       However, "[n]ot every case that implicates the expertise of federal agencies warrants

8   invocation of primary jurisdiction. Rather, the doctrine is reserved for a 'limited set of

9   circumstances' that 'requires resolution of an issue of first impression, or of a particularly

10   complicated issue that Congress has committed to a regulatory agency.'" *Astiana v. Hain Celestial

11   Group, Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (quoting *Clark*, 523 F.3d at 1114).

12       To determine whether to defer to an agency, the Ninth Circuit has traditionally examined

13   the factors set forth in *General Dynamics*, and found that the doctrine applies in cases where there

14   is: "(1) [a] need to resolve an issue that (2) has been placed by Congress within the jurisdiction of

15   an administrative body having regulatory authority (3) pursuant to a statute that subjects an

16   industry or activity to a comprehensive regulatory authority that (4) requires expertise or

17   uniformity in administration." *Syntek*, 307 F.3d at 781 (citing *U.S. v. Gen. Dynamics Corp.*, 828

18   F.2d 1356, 1362 (9th Cir. 1987)).  "[C]ourts must also consider whether invoking primary

19   jurisdiction would needlessly delay the resolution of claims," and under Ninth Circuit precedent,

20   "'efficiency' is the 'deciding factor' in whether to invoke primary jurisdiction." *Astiana*, 784 F.3d

21   at 760 (quoting *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1165 (9th Cir.2007)).

22       **B.     Primary Jurisdiction**

23           **1.     Efficiency of a Stay**

24       The primary dispute between the parties is whether the FDA's resolution of JLI's PMTA –

25   drawing on the FDA's significant expertise in regulating nicotine containing products and related

26   marketing/advertising – will impact the claims asserted in this MDL enough so that efficiency

27   weighs significantly in favor of a stay.  I conclude that efficiency weighs against a stay.

28       The FDA's consideration of the design and marketing of JLI's products as described in the

12

United States District Court
Northern District of California

1   undisclosed PMTA will be forward-looking, based on JLI's proposals for the design and

2   marketing of approved products.  While JLI contends that the PMTA will include products that

3   have been on the market since 2016, plaintiffs contend that the design of JLI's products and

4   marketing materials submitted in the undisclosed PMTA for the FDA's review and approval

5   might, instead, be focused on "next generation" products that differ substantially from products

6   that were sold and injured the plaintiffs in these proceedings.  In addition, plaintiffs note that JLI

7   has voluntarily ceased much of the conduct that plaintiffs' challenge – including sales of the

8   flavored JUUL pods and the youth and tribal marketing initiatives – and therefore the FDA's

9   review may not touch upon the bulk of the conduct alleged here.

10          Without disclosure of the actual PMTA submitted by JLI, I am unable to verify the

11   assertions about what is actually before the FDA concerning JLI's products and suggested

12   labelling and marketing and what past JLI conduct (marketing or design elements) the FDA will

13   consider.  For purposes of this motion, I assume that the FDA will review some significant portion

14   of the design and marketing elements that underlie plaintiffs' claims.  That assumption does not

15   support a stay.

16          The heart of plaintiffs' claims concerns JLI's past conduct that centers on intentional youth

17   marketing or negligent knowledge but encouragement of youth use of its products, alleged

18   conduct that JLI has voluntarily ceased or reduced.[12]  The design allegations – sleek, discrete

19   devices designed with intent to appeal to youth – are relevant to plaintiffs' claims  about

20   defendants' intent to capture *new* nicotine users, but are not at the center of plaintiffs' claims.

21   Closer to the line are plaintiffs' allegations regarding failures to warn or omissions about the

22   amount of nicotine delivered as well as "smoother" delivery, leading to known or expected

23   overuse.  The FDA will undoubtedly consider these design and delivery elements in determining

24

25   [12] For example, the FDA has committed itself to prioritizing premarket review and enforcement
26   aimed at ENDS manufacturers who fail to take "adequate" measures to prevent minors' access to
     ENDS or whose marketing is "likely to promote" use by minors.  Future enforcement actions and
27   determinations by the FDA may well be relevant to proceedings in this MDL regarding JLI's past
     acts or even possibly to future sales and marketing efforts by JLI, but what may happen and when
28   with respect to enforcement as to unknown ENDS' manufacturers or distributors would not appear
     to have a central impact of the claims and defenses across the actions in this MDL.

what products JLI may sell going forward and with what labels and disclosures or warnings.  But it is not clear that the FDA will address the central part of these claims – the past marketing, the past disclosures, and the past sales of flavored pods.

Plaintiffs also point out, and defendants do not really dispute, that the FDA's ruling on the PMTA will not resolve the various personal injury claims and false, misleading, and unfair advertising claims based on JLI's and other defendants' conduct up to now.  The FDA will determine on a going-forward basis whether, and if so how, JLI's product may be sold, with respect to nicotine delivery, labeling and warnings.  It will not determine whether JLI's and the other defendants' past conduct (much of which has now allegedly ceased) – the allegations of intentional or negligent youth and tribal marketing, the misleading marketing, and the failure to disclose nicotine uptake of existing and prior product versions that are at the center of this MDL-- was illegal and caused plaintiffs' injury.

The myriad of legal issues and fact questions contained within this MDL, as well as the significant allegations based on conduct that JLI has admittedly or apparently ceased (and therefore will not be subject to FDA review in JLIs' PMTA), differentiate this MDL from the Ninth Circuit and Northern District of California cases relied on by defendants where stays or dismissals in favor of primary jurisdiction were appropriate.  The issues in this MDL proceeding are nowhere near as narrow or limited as in those cases, where the issue under agency consideration would directly impact the central claims.  *See, e.g., Kane v. Chobani*, LLC, 645 Fed. Appx. 593, 594 (9th Cir. 2016)(unpublished) (determining that primary jurisdiction was appropriate for state law deception and mislabeling claims based on use of "natural" and "evaporated cane juice" that were made in alleged violation of FDA regulations); *Astiana v. Hain Celestial Group, Inc*., 783 F.3d 753, 761 (9th Cir. 2015) (primary jurisdiction appropriately invoked where FDA actively determining "what chemical compounds may be advertised as natural on cosmetic product labels"); *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008) (primary jurisdiction of FCC over question of whether a VoIP provider qualifies as a "telecommunications carrier" under Telecommunications Act of 1996); *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc*., 307 F.3d 775, 782 (9th Cir. 2002) ("Referral under the doctrine

of primary jurisdiction is therefore appropriate for the Register of Copyrights to determine to what extent administrative cancellation remedies are available to third parties who seek registration cancellation."); *MCI Commun. Corp. v. Am. Tel. & Tel. Co.*, 496 F.2d 214, 222 (3d Cir. 1974) (primary jurisdiction appropriate where agency needed to determine in first instance technologically complex question of whether specific conduct was required by federal telecommunications law); *Colette v. CV Scis., Inc.*, 2020 WL 2739861, at *1 (C.D. Cal. May 22, 2020) (staying case where the "crux of this lawsuit is Plaintiffs' allegations that Defendant's products are illegal under the Federal Food, Drug, and Cosmetic Act of 1938" as mislabeled as dietary supplements, an issue under active FDA consideration); *Glass v. Glob. Widget*, LLC, 2020 WL 3174688, at *1–2 (E.D. Cal. June 15, 2020) (staying CBD-related claims concerning the quantities of CBD in products and regarding representations regarding legality of sales); *Grimm v. APN, Inc.*, 2018 WL 4793088, at *2 (C.D. Cal. Jan. 8, 2018) (staying because "issue of the use of the term 'natural' in pet food labeling is within the" agency's expertise); *Swearingen v. Amazon Preservation Partners, Inc.*, 13-CV-04402-WHO, 2014 WL 3934000, at *2 (N.D. Cal. Aug. 11, 2014) (approving short stay of false advertising claims based on use of "evaporated cane juice" where FDA was finalizing draft guidance on meaning of that specific term); *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 935 (N.D. Cal. 2015) (staying for primary jurisdiction where FDA was determining and case rested on "safety of the ingredient, not whether a reasonable consumer would be misled" by advertising with respect to that ingredient).

The FDA's analysis of JLI's PMTA will likely touch upon going-forward issues such as the injunctive and equitable relief to which plaintiffs may be entitled with respect to labelling, warnings, and the marketing and advertising of any products that are allowed to remain on the market. But I can address their impact when the FDA's decisions on the JLI PMTA become final. Similarly, I will address the preemptive effect of the FDA's decisions on JLI's PMTA or other rulings regarding how ENDS may be designed, labelled, or marketed, if and when they occur. That theoretical future possibility is not a sufficient reason to stay these proceedings.

Resolution of the PMTA will not be irrelevant to the determination of some of the issues in this MDL and could well impact the scope of going-forward relief sought by plaintiffs. But the

United States District Court
Northern District of California

unclear scope of and likely limited relevance of the FDA's actions, and the uncertainty of when the FDA will act, does not weigh strongly in favor of staying these large and complex proceedings that can and should move forward efficiently.

### 2.     Delay from a Stay

Plaintiffs argue that delaying the three tracks of cases in this MDL pending the FDA's resolution of the PMTA will cause an unnecessary delay in the resolution of the hundreds if not eventually thousands of cases that are part of the MDL.  They contend that while JLI has now filed its PMTA, it has already caused significant delay by initially intentionally avoiding FDA guidance (taking the position that the FDA did not have jurisdiction over its products under the TCA) and by opposing any expedited review of its products by the FDA when Congress included ENDS within the TCA.  JLI disputes the allegations of intentional delay and asserts that its prior acts are irrelevant now that its PMTA has been filed and the FDA is under deadlines to act.

Plaintiffs contest the firmness of those deadlines, noting the FDA's limited resources in light of the demands resulting from the COVID-19 pandemic and the number of PMTAs that it now has under review.  These factors make it probable that the FDA will need to seek additional time to consider the hundreds of now-pending PMTAs from JLI and others.[13]  Plaintiffs add that even since a court ordered the FDA to adhere to specific deadlines for processing PMTAs, manufacturers have sought and the court or the FDA has granted further extensions to the deadlines because of the limited agency resources.  Plaintiffs contend, therefore, that further extensions are highly likely while JLI asserts that any further delays or extensions are purely speculative.

At a minimum, a delay of *at least* twelve months is at stake.  There is a significant risk of a longer delay given the demands on the FDA.  Whatever action it takes on JLI's PMTA, the FDA will not affect, much less resolve, the bulk of plaintiffs' liability theories based on JLI's and the

---

[13] Plaintiffs assert that since 2014, the FDA has approved only 14 PMTAs and that as of June 29, 2020, the FDA had received 205 PMTAs in 2020 alone.  PJ Oppo. at 17.  Plaintiffs also point to the FDA's handling of a PMTA from Marlboro Heatsticks, that was submitted in May 2017 and not decided by the FDA until more than two years later, despite the FDA having far fewer PMTAs pending for ENDS during that time.  *Id* at 17-18.

1    other defendants' past conduct.  There is no reason to impose such a lengthy delay.  It is more

2    efficient to proceed to address and potentially narrow the claims and issues in these proceedings.

3              **3.       Other Factors**

4              The other factors do not strongly weigh one way or the other.  As noted, there are

5    significant claims in these proceedings that will need to be resolved irrespective of what the FDA

6    determines.  JLI is correct that the FDA has a high level of expertise in regulating tobacco and

7    nicotine containing products, although its responsibility for and expertise with respect to ENDS is

8    relatively new and developing.  But the technical and policy questions that will be addressed by

9    the FDA do not supplant the legal and fact-based issues to be resolved by me or a trier of fact.  For

10   example, was JLI's and the other defendants' marketing unfairly and illegally targeted to youth

11   and tribes?  Did the level of nicotine found in the products (or their possible if not encouraged

12   method of use) cause significant health impacts on the personal injury plaintiffs?  Those sorts of

13   questions are squarely within the expertise of courts and juries to answer.

14             JLI is also correct that a comprehensive federal approach to the design and marketing of

15   ENDS is undoubtedly in the public interest.  However, whether the FDA's regulation of ENDS

16   generally and JLI's products specifically will be uniform and touch upon some significant portion

17   of the issues raised in this case is uncertain.  In the end, what the FDA regulates and mandates

18   regarding the design for any permitted JLI products or what labels and other marketing will be

19   allowed might impact some claims, but likely will not be determinative of the vast majority of

20   them.  Such issues can be addressed if and when they actually arise.[14]

21             JLI's motion to stay and the Retailer Defendants' motion to dismiss based on primary

22   jurisdiction are DENIED.[15]

23   _____

24   [14] For this reason, the Retailer Defendants' argument that plaintiffs are asking this Court to "create
     a new or different standard regarding the labeling and marketing of JUUL products" is not well
25   taken.  Dkt. No. 878.  The primary question for liability with respect to Retailer Defendants, for
     past marketing for JLI products created or used by Retailer Defendants, is unlikely to be impacted
26   by the FDA's forward-looking determinations.  If there is any impact, I can consider it when it
     occurs.

27   [15] Portions of plaintiffs' opposition were filed under seal because JLI had designated information
     confidential.  Dkt. Nos. 754, 853.  JLI only seeks to maintain under seal Exhibits C-F, asserting
28   that compelling justifications exist to seal these documents containing "confidential and

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.    MOTIONS TO DISMISS BASED ON PREEMPTION

Absent a stay or dismissal under the primary jurisdiction doctrine, JLI and the Retailers also move to dismiss because plaintiffs' state law claims are preempted by the Family Smoking Prevention and Tobacco Control Act of 2009 (TCA) that gave the FDA broad authority to regulate all tobacco products, including the "deemed" ENDS products at issue in these proceedings.

I considered similar arguments in the *Colgate v. JUUL Labs, Inc.* class action that was pending before the inception of this MDL.  *See Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178 (N.D. Cal. 2018) (*Colgate I*); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 745 (N.D. Cal. 2019) (*Colgate II*).  I addressed the express preemption of plaintiffs' false advertising and related consumer protection claims.  Considering the scope of the false advertising and related claims alleged, I concluded that most of plaintiffs' state law claims were not preempted, except for a narrow set of claims based on allegations that "the product label fail[s] to disclose the greater potency and addictiveness of JUUL's benzoic acid and nicotine salt formulation."  *Colgate I*, 345 F. Supp. 3d at 1189.  The preempted claims were related to statements on the labels of the products and not more generally to "advertising" of the products.  *Id*. at 1190 (concluding the exception clause at 21 U.S.C § 387p(2)(B), "expressly excepts advertisements from preemption and no aspect of plaintiffs' claims based on an allegedly misleading or fraudulent advertising is preempted by the TCA, including the issue of warning consumers about the potency and addictiveness of JUUL's benzoic acid and nicotine salt formulation.").  I concluded that false advertising and related claims "based on the allegation that JUUL mislabels the dosage of nicotine on its pods at 5% when the dosage of nicotine is higher than 5%" were not preempted.  *Id*. at 1189.  In *Colgate II*,  I concluded that point-of-sale advertising did not constitute preempted "labelling."  *Colgate II*, 402 F. Supp. 3d at 745.

---

competitively sensitive business information, including proprietary business strategy and scientific research pertaining to JLI's upcoming premarket tobacco product application ('PMTA') as well as confidential disclosures made to potential investors regarding JLI's market strategy, research and technology, and financial data." Dkt. No. 853 ¶ 6 ("The information contained in these exhibits is neither public nor known to JLI's competitors, and its public release in connection with Plaintiffs' opposition brief would permit JLI's competitors to unfairly compete with it in the PMTA process and elsewhere in the marketplace.").  The request to seal those exhibits at this juncture is GRANTED.

In the current motions, JLI and the Retailer defendants contend that preemption should be extended because the *Colgate* orders were made with "less extensive briefing" and considered "less expansive claims" than those asserted in the MDL proceedings.  That is true, but there are two main reasons why the end result regarding preemption is essentially the same as in *Colgate*.

First, the only relevant area where the FDA has in fact spoken – and where any state law might seek to impose duties "different from, or in addition to" those imposed by the FDA – is the limited nicotine warning required by 21 C.F.R. § 1143.3.  Claims that seek to impose labelling requirements different from or in addition to nicotine addictiveness warnings regarding only nicotine *and* addiction are preempted.  Once the FDA rules on JLI's PMTA or if the FDA issues other rules and regulations with respect to ENDS more generally there may be new preemption issues that I need to address.  But it would be speculative and premature to attempt to foresee those arguments at this juncture.

Second, an issue only touched upon in passing in *Colgate II* is the TCA's express savings clause that expressly preserves state law products liability claims.  That express savings clause (21 U.S.C. § 387p(b)) *preserves* the majority of the claims in the PIC and potentially other claims asserted in the CAC or PECs that sound in product liability under applicable state law.  Whether or not some subset of those otherwise saved claims may nonetheless be impliedly preempted in light of the FDA's eventual actions is a relevant but not yet ripe issue for consideration.

As explained below, the vast majority of plaintiffs' claims may proceed now.  No claims other than the false and misleading claims based on failure to disclose nicotine addictiveness on labels of JLI's products are preempted.

### A.     Legal Standard

#### 1.     Preemption

Under the Supremacy Clause "[i]f federal law 'imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law," "the federal law takes precedence and the state law is preempted."' *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (quoting *Murphy v. National Collegiate Athletic Assn.*, 138 S. Ct. 1461, 1480 (2018)).  "In all cases, the federal restrictions or rights that are said to conflict with state law must

stem from either the Constitution itself or a valid statute enacted by Congress." *Garcia*, 140 S. Ct. at 801.  That preemption may either be express or implied.  *Id*.

Express preemption is found where Congress "enact[s] a clear statement to that effect." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig*., 959 F.3d 1201, 1211 (9th Cir. 2020).  "Congress may also preempt state law implicitly," but implied preemption will only be found where there is sufficient evidence of Congressional intent to preempt that overcomes the "high threshold" of the strong presumption against preemption of state law.  *Id*.  That implied preemption may be found only where Congress' intent was to occupy the "field" of regulating the subject matter or where state law "conflicts" with the federal regulatory scheme, and compliance with both is impossible or raises an obstacle to the regulatory objective of Congress.  *Id*. at 1212.

### 2.      Statutory Scheme

The Family Smoking Prevention and Tobacco Control Act of 2009 (TCA, 21 U.S.C. § 387 et seq.) provides the Food and Drug Administration with comprehensive regulatory powers over "tobacco products."  Relevant here, the FDA in 2016 "deemed" ENDS like JLI's products to be "tobacco products" subject to its regulation.  81 Fed. Reg. 28973 (2016).  However, despite the comprehensive regulatory powers given to the FDA, the TCA and its implementing regulations carve out areas where state actions (and related claims arising under state law) are expressly permitted.  The statutory and regulatory provisions at issue on this motion follow.

"A tobacco product shall be deemed to be misbranded" if "its labeling is false or misleading in any particular," 21 U.S.C § 387c(a)(1), or "if, in the case of any tobacco product distributed or offered for sale in any State (A) its advertising is false or misleading in any particular."  *Id*., (a)(7)(A).

21 U.S.C. § 387p is titled "Preservation of State and local authority" and provides:

(a)(2) Preemption of certain State and local requirements

(A) In general

No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any

United States District Court
Northern District of California

20

> requirement under the provisions of this subchapter relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.
>
> (B) Exception
>
> Subparagraph (A) does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products....
>
> (b) Rule of construction regarding product liability
>
> No provision of this subchapter relating to a tobacco product shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State.

21 U.S.C. § 387p.

21 C.F.R. § 1143.3, is titled "Required warning statement regarding addictiveness of nicotine" and provides that "packages" of "covered" products must contain a specific warning:

> "WARNING: This product contains nicotine. Nicotine is an addictive chemical."

21 C.F.R. § 1143.3(a)(1).  The regulations impose specific location and formatting requirements for the warning on the packages.  A "safe harbor" provision is provided for retailers specifying:

> (3) A retailer of any tobacco product covered by paragraphs (a)(1) and (2) of this section will not be in violation of this section for packaging that:
>
> (i) Contains a health warning;
>
> (ii) Is supplied to the retailer by the tobacco product manufacturer, importer, or distributor, who has the required state, local, or Alcohol and Tobacco Tax and Trade Bureau (TTB)-issued license or permit, if applicable, and
>
> (iii) Is not altered by the retailer in a way that is material to the requirements of this section.

*Id*., § 1143.3(a)(3).  For "Advertisements," under paragraph (b), "it is unlawful" for any manufacturer, distributor, or retailer "to advertise or cause to be advertised" "any tobacco product unless each advertisement bears the required warning statement specified in paragraph (a)(1) of this section."  *Id*., §1143.3(b)(1).  Paragraph (b), like (a), imposes specific location and formatting requirements for the required "nicotine addiction" warning on advertisements.  The section

1    explained that "paragraph (b) applies to a retailer only if that retailer is responsible for or directs

2    the health warning required under the paragraph. However, this paragraph does not relieve a

3    retailer of liability if the retailer displays, in a location open to the public, an advertisement that

4    does not contain a health warning or contains a health warning that has been altered by the retailer

5    in a way that is material to the requirements of this section." *Id*., §1143.3(b)(3).

6         **B.    Express Preemption**

7              **1.    Product Liability**

8         Defendants argue that under § 387p(a)(2)(A) "nearly all" of plaintiffs' state-law claims are

9    expressly preempted.  Their apparent but not explicitly identified carve out extends presumably to

10   "saved" product liability claims that defendants and plaintiffs agree are not expressly preempted

11   under the savings clause in 21 U.S.C. § 387p(b).  JLI Preempt Mot. [Dkt. No. 627] at 1, 17-18;

12   Oppo. JLI Preempt at 5.[16]  Both sides also agree that what constitutes a "saved" product liability

13   claim is determined under the applicable state law.  JLI Preempt Mot. at 17; Oppo. JLI Preempt at

14   7.

15        Neither side, however, provides helpful or specific analysis to assist me in drawing those

16   lines.  Defendants generally stick with "nearly all" of plaintiffs' claims are not true product

17   liability claims, for example because the claims in the PIC are "generic claims" untethered to any

18   particular state's laws.  In response, plaintiffs assert that "all or most of their claims" sound in

19   product liability and more specifically that each of the 19 claims in the PIC are product liability

20   claims by simple virtue of being alleged in the PIC.

21        Defendants contend more specifically that any claim in the PIC seeking "economic

22   damages for alleged misrepresentations" cannot be considered a product liability claim.  PIC ¶ 997

23   (Unjust Enrichment), ¶ 1011 (Violation of Unfair Trade Practices/Consumer Protection Laws), ¶

24   1029 (Breach of Warranty), ¶ 1044 (Breach of Implied Warranty).  Plaintiffs do not directly

25   address whether some of the claims in the PIC are true product liability claims under various state

26   laws, but insist instead that because the "PIC" as a whole asserts personal injury the claims are

27

28   ───────────────
     [16] Defendants contend that product liability claims falling with the savings clause are nonetheless
     impliedly preempted.  That argument is discussed below.

United States District Court
Northern District of California

immune from preemption.  That is an unhelpful response.  Plaintiffs also argue that "to the extent the Court's preemption determination turns on application of the product-liability savings clause, the prudent approach is to apply that ruling in the context of bellwethers." Oppo. JLI Preempt. at 8.  In the end, both sides agree that this issue – sorting out which claims are product liability claims – is better handled at the bellwether stage or a different, later date.

Another difficult question is whether "failure to warn" claims that are product liability claims are nonetheless subject to preemption to the extent that they touch upon JLI's past or future failures to disclose the FDA's now-approved nicotine addiction warning in 21 C.F.R. § 1143.3. The legal question is how to reconcile a strong preemption provision with an equally strong savings clause.  As discussed below, I conclude that despite the strong savings clause, normal principles of implied preemption may still preclude specific product liability claims.  What those are or might be will be decided as the individual cases and state law PI claims are tested.

### 2.    Product Design/Standards Claims

Defendants argue that plaintiffs' non-product liability claims are expressly preempted. Design and product standards (*e.g.*, nicotine yields, components, ingredients, additives, and properties of tobacco products) are committed to the authority of the FDA; the CAC, PIC, and the PECs assert broad claims challenging both product design features (*e.g.,* smooth delivery of nicotine and sleek easily concealable design) and standards (*e.g.*, dosage of nicotine and flavored products) of JLI's products.  But that argument fails because the FDA has not yet proscribed any actual design or product standards for ENDS.  Without the existence of any defined "standards", there can be no supposed preemption of state law standards that are "different from or in addition to" the federal ones.  *See, e.g., GoodCat, LLC v. Cook*, 202 F. Supp. 3d 896, 912 (S.D. Ind. 2016) ("the clause does not operate unless the FDA regulates the adulteration of tobacco products"). Express preemption does not bar any of plaintiffs' claims touching on design and standards at this point.

### 3.    Packaging and Labelling Claims

In the *Colgate* Orders I concluded that labeling claims – both based on the presence or absence of false and misleading disclosures about nicotine addiction and failure to warn theories –

23

1    were preempted to the extent that they implicated the nicotine addiction warning specifically

2    approved and required by the FDA under 21 C.F.R. § 1143.3.  *See Colgate I.,* 345 F. Supp. 3d at

3    1189; *Colgate II*, 402 F. Supp. 3d at 752 ("failure to warn claims [based] on a lack of labelling"

4    were preempted").  I also concluded that the preempted claims were limited to disclosures or lack

5    of disclosures on the product labels themselves and did not extend to "advertising" more

6    generally.  *Colgate I*, 345 F. Supp. 3d at 1190.  Both sides take some issue with the boundaries or

7    substance of those prior conclusions.

8         Defendants argue that numerous claims in all three sets of operative complaints (CAC,

9    PIC, and PECs) allege that JLI "failed to warn" about alleged risks of nicotine addiction and

10   physical harm and that JLI advertised JUUL products are "reasonable alternatives" to combustible

11   cigarettes when they were not.  Defendants contend that these claims are preempted because they

12   "would impose" additional or different requirements under state law related to "misbranding" and

13   "labelling" that are within the exclusive control of the FDA under section 387p(a)(2)(A).

14   However, the only misbranding or labelling requirement that the FDA has adopted for ENDS *is*

15   the "minimum" nicotine addiction warning under 21 C.F.R. § 1143.3(a)(1).

16        I cannot determine what might be "different from or in addition to" any particular

17   standards that the FDA might adopt in the future.  I do not agree with defendants' implicit

18   argument that the states are wholly without authority with respect to ENDS and that state laws

19   may not impose *any* requirements on labelling.  That is contrary to the "exception" clause in 21

20   U.S.C. § 387p(a)(2)(B) (preserving state "requirements relating to the sale, distribution,

21   possession, information reporting to the State, exposure to, access to, the advertising and

22   promotion of, or use of, tobacco products").  It is akin to "field" preemption, which plaintiffs

23   persuasively point out is not contemplated by the text, history, and precedent under and in light of

24   the Congressional amendments to and extension of the Federal Food Drug, and Cosmetic Act

25   (FDCA) through the TCA.  As explained in the *Colgate* orders, claims that JLI falsely or

26   misleadingly mislabeled the dosage of nicotine on its labels were not preempted by Congress

27   committing the "authority" to the FDA to regulate labelling as it sees fit.  *See also Altria Group,*

28   *Inc. v. Good*, 555 U.S. 70, 81 (2008) (claims asserting a "duty not to deceive" in labelling based in

United States District Court
Northern District of California

24

state common-law rule not preempted by Federal Cigarette Labeling and Advertising Act (FCLAA)).

Defendants ask me to depart from *Colgate* and conclude that under on *Nat'l Meat Ass'n v. Harris*, 132 S. Ct. 965, 970 (2012), the broad "which is different from, or in addition to" preemptive language with respect to labelling means that no labelling claims can be asserted. They argue that any theoretical requirement imposed under state law would be different from or in addition to the labeling required by the FDA. But the only requirement in place is the self-described "minimum" nicotine warning.[17] A theoretical warning or disclosure that might be required under state common law on a wholly different topic (for example, regarding the amount of recommended use given a particular device's delivery method) is not different from or in addition to any existing FDA labelling requirement on that specific topic.

Therefore, plaintiffs are correct that omissions of "deadly safety defects" that they contend should have been made under state law duties are not expressly preempted, other than any related to the minimum nicotine addiction warning from the labels of the JUUL products. If and when the FDA issues additional labelling requirements, this argument can be reassessed.[18]

I agree with defendants that labelling claims based on nicotine addiction are preempted, as found in the *Colgate* orders. Plaintiffs dispute whether that analysis extends to the "failure to warn" product liability claims asserted in the PIC. Given the savings clause "preserving" state authority over claims that are not expressly preempted, the issue becomes one of implied, not

---

[17] In *Harris* the Court's decision was informed by the agency's issuing "extensive regulations to govern the inspection of animals and meat, as well as other aspects of slaughterhouses' operations and facilities" and employing "9,000 inspectors, veterinarians, and investigators to implement its inspection regime and enforce its humane-handling requirements." *Harris*, 565 U.S. at 456. Therefore, that plaintiffs' members could have theoretically complied with the *additional* but not conflicting requirements required under California's law did not save it from preemption. Here, though the FDA has been given extensive authority to potentially regulate extensively, the FDA's regulations regarding ENDS are nowhere near as extensive or detailed as the regime in *Harris*.

[18] I recognize that in the court in *In re Fontem US, Inc.*, SACV1501026JVSRAOX, 2016 WL 6520142, at *4 (C.D. Cal. Nov. 1, 2016), *order clarified sub nom. In re Fontem US, Inc. Consumer Class Action Litig.*, 2017 WL 10402988 (C.D. Cal. Mar. 8, 2017 – itself relying on *Nat'l Meat Ass'n v. Harris*, 132 S. Ct. 965, 970 (2012) – found that section 387p(a)(1)(A)'s language swept broadly and would preempt *any* state-label requirement that was not identical to the federal requirement. In my opinion, the scope of any specific preemptive effect is better considered when and if the FDA actually issues standards.

United States District Court
Northern District of California

express, preemption and is addressed below.

Defendants do not persuade me that claims that JUUL labels included statements that were "false and misleading" (other than the discussed nicotine addiction warnings) are expressly preempted.  I find instructive the Ninth Circuit's food and cosmetic labelling cases interpreting similar preemptive language, like "different from," "in addition to," or "not identical with," from the relevant federal regulations.  Those cases conclude that where plaintiffs were not asking defendant to "modify or enhance any aspect of its [] labels that are required by federal law," claims regarding false and misleading labels were not preempted.  *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 758 (9th Cir. 2015); *see also Ebner v. Fresh, Inc.*, 838 F.3d 958, 964 - 965 (9th Cir. 2016) (the claim based on the "omission of supplemental statements is not expressly and affirmatively permitted by law").[19]

Relatedly, I disagree with defendants' attempt to revisit and reverse the conclusions in the *Colgate* orders concerning whether claims regarding false and misleading "labeling" are not expressly preempted because "misbranding" is defined as including, among other acts, if a product label "is false or misleading in any particular." 21 U.S.C § 387c(a)(1).  Misbranding *is* broadly included in Section 387p's preemption provision ("No State . . . may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to . . . misbranding").  But as noted above, numerous Ninth Circuit decisions have recognized that "different from, or in addition to" does not preclude liability for label statements that are "false and misleading" when that same or substantially similar conduct is likewise prohibited under the federal law at issue.  Absent the FDA's actions defining or proscribing specific "misbranding" on JLI's products, there is nothing

---

[19] In Reply, defendants contend that California's "likely to deceive" standard under consumer protection laws cannot be identical to the "false or misleading" standard under the TCA but cite no persuasive authority explaining why that is so.   Preempt Reply at 6 (citing *Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 36 (2d Cir. 2020) (plaintiffs' theory that "compliance with one part of the FDCA and its regulations counterintuitively results in a violation of another part of the FDCA" preempted because "to avoid liability under Plaintiffs' theory" defendant "must make an additional disclosure on its packaging" not required by federal law)).

further to address at this juncture.[20]

Finally, the answer to whether disclosures regarding a product on a "website" constitutes labelling – discussed by the parties in footnotes – would seem to be straight-forward. The statute defined "labeling" to mean "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321m. Defendants do not explain how website text can under any possible circumstance "accompany" the product at issue. Although in *Lanovaz v. Twinings N.A., Inc.*, C-12-02646-RMW, 2014 WL 46822, at *6 n.5 (N.D. Cal. Jan. 6, 2014), the Hon. Ronald Whyte noted that "the parties do not seem to dispute that FDA labeling rules should apply to the content on [the] website under section 201(m)," he then cited at least two district court decision that questioned whether or concluded that websites did not constitute labeling.

### 4.   Advertising Claims

Relatedly, defendants argue that all false and misleading advertising claims in the three sets of operative complaints are preempted because the preemptive "different from, or in addition to" language of the express preemption provision includes "misbranding" and misbranding is defined in part as when "in the case of any tobacco product distributed or offered for sale in any State (A) its advertising is false or misleading in any particular," 21 U.S.C § 387c(a)(7)(A).

I rejected that argument in *Colgate I. See* 345 F. Supp. 3d at 1190 (the "exception clause expressly excepts advertisements from preemption"); *see also Natl. Ass'n of Tobacco Outlets, Inc. v. City of Providence, R.I.*, 731 F.3d 71, 82 (1st Cir. 2013) (under the Family Smoking Prevention and Tobacco Control Act, "the savings clause, overrides the standards preemption but allows only regulations 'relating to' the sale of tobacco products"). It unduly expands the concept of misbranding, one aspect of which may be advertising with respect to products sold in states. It

---

[20] Nor will I revisit my prior conclusion in *Colgate* that plaintiffs' misstated nicotine content labeling claims are not preempted. In Reply, defendants focus on section 387c(a)(2)'s definition of misbranding as failure to disclose "an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count." Defendants skim over the obvious difference between a required disclosure of the "quantity of a package's contents" as applied to a package containing X ounces of product or 20 items of product and disclosure of the nicotine content of an ENDS product.

United States District Court
Northern District of California

also ignores the "exception" clause of 21 U.S.C. § 387p(a)(2)(B) that preserves state requirements regarding the "exposure to, access to, the advertising and promotion of, or use of, tobacco products." *Id*. The notion that section 387p(a)(2)(A)'s reference to misbranding – itself defined elsewhere as including false and misleading advertising – is somehow more specific than the following very specific "exception" clause that expressly preserves "advertising", is not well-taken. The concepts of "advertising and promotion" are readily understood, while the term "misbranding" is more of a regulatory term of art. But that does not support defendants' argument that (a)(2)(A) is more specific and (a)(2)(B) more general. The explicit "exception" is more *specific* even though it uses readily understood terms to define the powers reserved to the states.

If the FDA eventually issues a regulation or standard saying, "if product X is advertised as Y, that is misbranded and illegal under the TCA," the FDA could – presumably – take action like forcing the misbranded product from the market. But even if the FDA acted in that matter and identified a particular JLI or other ENDS advertisement as false and misleading and misbranded, that would not automatically wipe out a state law "false and misleading" claim that was identical to and perfectly consistent with the FDA's interpretation.

The parties' dispute over the implications flowing from the amendments the TCA made to the Federal Cigarette Labeling and Advertising Act (FCLAA) is interesting but, as plaintiffs note, the FDA's Deeming Rule itself recognized that each statute has to be considered given its own terms. 81 Fed. Reg. at 28, 989 ("For example, the FCLAA and CSTHEA provisions expressly preempt State and local regulation of the content of cigarette and smokeless product advertisements, while section 916(a)(2)(B) of the FD&C Act exempts State and local advertising restrictions from preemption."). The FCLAA amendments concern preemption of state "statutes" and "regulations" on content (but not regulations governing the time, place, and manner of advertisements), and those provisions do not help inform the interpretation of the express saving of state law "claims" on which plaintiffs rest most heavily for the claims asserted in the PIC.

### 5.    Modified-Risk Claims

Defendants argue that because plaintiffs repeatedly claim that JLI misrepresented its products as "less harmful" than combustible cigarettes, plaintiffs are alleging that JLI's products

United States District Court
Northern District of California

were "modified risk" tobacco products.  Because advertising and labeling for modified risk tobacco products must be pre-approved by the FDA, any state law claims based on those products are preempted.  JLI Preempt at 12.  But plaintiffs expressly disclaim any intent to characterize their claims as based on arguments that JLI's products were "modified-risk products" subject to separate FDA requirements. Oppo. JLI Preempt at 18-19.

I agree with plaintiffs.  The mere fact that defendants allegedly misleadingly portrayed their products as something they were not does not bring the claims (or, in fact, the products) under the separate modified-risk regulations.

### 6.      Retailer-Specific Preemption

The Retailer Defendants, like the other defendants, join in the preemption arguments made by JLI.  Those are addressed above.  They separately argue that the claims against them – related to their conduct advertising, promoting, and selling JUUL products – are preempted under 21 C.F.R. §§ 1143.3(a)(3) and (b)(3).  Specifically, the Retailers[21] argue for themselves only that plaintiffs' (i) misrepresentation and failure to warn claims regarding nicotine content and potential harm from JUUL products claims, (ii) strict liability claims for "defective products that contained inadequate warnings" claims, and (iii) failure to provide adequate warnings and instructions to prevent harm to plaintiffs, are all also preempted given the "safe harbor" provisions in section 1143.3(a)(3).  That provision provides that a retailer "will not be in violation of this section for packaging that" "(i) Contains a health warning; (ii) Is supplied to the retailer by the tobacco product manufacturer, importer, or distributor, . . . . and (iii) Is not altered by the retailer in a way that is material to the requirements of this section."  Retailers argue that in light of this provision they cannot be liable for any inclusion or omission of any health warning on a product's packaging unless the warning was specifically required by the FDA and they altered it.

The Retailers also point out – with respect to the broader concepts of "misbranding" and "advertising" – that the FDA mandated that the nicotine addiction warning be carried on "packaging *and advertising*" for the newly deemed ENDS (81 Fed. Reg. at 28,988) and that

---

[21] The Retailers are named defendants only in the PIC.

United States District Court
Northern District of California

subsection (b) of section 1143.3 contains similarly very detailed requirements (font, placement, and formatting) for the required nicotine addiction warning on "advertisements."  Because under (b)(3) the FDA provided another "safe harbor" for advertisements, the Retailers contend that they can only be liable if they were responsible for "directing" a mandated FDA health warning and failed to do so or (if the manufacturer was responsible for directing the health warning) they display an advertisement without a mandated health warning or one with a "materially" altered health warning.

Plaintiffs respond, as above, that none of their claims is expressly or impliedly preempted because state law product liability claims are expressly saved under the TCA, and because only product liability claims are asserted in the PIC against the Retailers and other defendants.

The Retailer-specific arguments under Section 1143.3 are derivative from the only FDA mandated warning currently imposed on ENDS under that section, the nicotine-addiction warning discussed in *Colgate I*.  As noted above, plaintiffs' claims (generally, across all three sets of complaints) regarding failures to disclose or misleading disclosures on labels regarding *other* topics are not preempted absent further action by the FDA.  More broadly, advertising is expressly exempted from the TCA's express preemption clause despite defendants' rejected attempt to bring all advertising-based claims within the distinct "misbranding" arena.

The Retailer Defendants' motion to dismiss based on express preemption is DENIED.

### C.     Implied Preemption

Defendants also argue that *all* of the claims within this MDL – even the product liability claims falling within the savings cause – are impliedly preempted under "conflict" preemption principles.  They contend that because plaintiffs' claims *may* seek to impose liability and standards of conduct on defendants that *may* conflict, undermine, or otherwise interfere with the standards and regulatory actions the FDA *may* issue and take in the future, the claims are preempted.  But this puts the cart well before the horse.

I assume for purposes of this motion that implied preemption principles could apply to preempt a specific product liability claim notwithstanding the express savings clause if the FDA issues a regulation or standard that directly conflicts with state law-based personal injury claims

either because of a set of extensive regulations and standards or because compliance would be impossible.  Plaintiffs are correct that it is appropriate to "begin our search for implied preemptive intent by observing the [statute's] express preemption clause creates a 'reasonable inference' that Congress did not intend to preempt state and local laws that do not fall within the clause's scope." *Atay v. County of Maui*, 842 F.3d 688, 704 (9th Cir. 2016).  But "the inclusion of either a saving clause or an express preemption clause within a statutory scheme does not foreclose the application of ordinary implied preemption principles."  *Natl. Fedn. of the Blind v. United Airlines Inc.*, 813 F.3d 718, 731 (9th Cir. 2016); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, 959 F.3d 1201, 1213–14 (9th Cir. 2020) ("though a saving clause raises the inference that Congress did not intend to preempt state law, the existence of a saving clause does not 'foreclose or limit the operation of ordinary pre-emption principles' . . . . We may not interpret a saving clause as preserving a state law that would so conflict and interfere with a federal enactment that it would defeat the federal law's purpose or essentially nullify it; rather, such a state law is preempted under ordinary preemption principles.") (internal citations omitted).  Therefore, I disagree with plaintiffs that the existence of a clear and strong savings clause precludes defendants from showing that specific otherwise-saved products liability claims may be preempted under traditional conflict preemption principles.

However, this analysis depends on (1) whether and how the FDA exercises what both sides recognize as its broad regulatory authority and (2) whether it does so in a manner that will create a conflict so that (i) a specific goal of the FDA would be frustrated by allowing specific state law claims to proceed or (ii) the FDA issues a specific regulation or standard that would be impossible for defendants to comply with in light of particular product liability claims asserted by plaintiffs. Other than with respect to the nicotine-addiction warning addressed above, there is no evidence that either of these scenarios will occur, much less when they might occur.  It is true that the FDA could take actions that impact the strength of some of plaintiffs' claims or even conflict-preempt them.  If and when that potential conflict arises, I can address it.  Absent the FDA's issuance of those standards under the TCA, I cannot assess conflict preemption now.  No one knows how broadly or narrowly the FDA will regulate ENDS generally or JLI's products specifically, other

31

1    than regarding the standards that already apply to JLI's products like the nicotine addiction

2    warning addressed above.

3         This posture is unlike the main authority on which JLI relies, *Geier v. Am. Honda Motor

4    *Co., Inc*., 529 U.S. 861, 874–75 (2000), because the federal standard here is not final.  The federal

5    standard at issue in *Geier* – the passive restraint standard issued by the Secretary of the

6    Department of Transportation that expressly gave car manufacturers a number of different passive

7    restraints they could use – was final.  Despite the presence of a savings clause that generally

8    preserved state law product liability claims, the Supreme Court determined that implied, conflict

9    preemption prevented a specific product liability claim.  The Court agreed that allowing a state

10   law products liability action based on the failure of a manufacturer to adopt one of the allowed

11   (but not required) passive restraint standards (use of air bags) "conflicts with the objectives of" the

12   federal standard to allow a mix of restraints and if allowed would stand as an "obstacle to the

13   variety and mix of devices that the federal regulation sought." *Geier*, 529 U.S. at 866, 881.[22]

14        Given that field preemption is clearly not contemplated by the structure of the TCA – the

15   statute expressly preempts only "different or identical too" standards, except advertising and other

16   laws governing sales and promotion, and includes a strong, express saving clause preserving state

17   law product liability claims – defendants' arguments that allowing state law claims generally

18   "frustrates" federal objectives is not well-taken.[23]  If the FDA later imposes methods (standards

19   and regulations) on ENDS generally or JLI products specifically that would be frustrated by

20   allowing state law claims to proceed or if specific state law claims create an impossibility conflict

21   with those not-yet-issued federal standards or regulations, this issue will be reconsidered.

22        Finally, the nicotine addiction warning that *has* been promulgated might conflict-preempt

23

24   _____

25   [22] Defendants also argue that to the extent any of plaintiffs' claims are based on a "fraud on the
     FDA" theory – in other words that JLI misled the FDA in some manner – those too are impliedly
     preempted under *Buckman Co. v. Plaintiffs' Leg. Comm*., 531 U.S. 341, 348 (2001).  JLI Preempt

26   at 19.  Plaintiffs in opposition argue that they have not pleaded any claims that are actionable
     based solely on a "fraud on the FDA" basis and clarify that the allegedly fraudulent

27   misrepresentations made to the FDA are simply part of the broader scheme to defraud alleged.
     Oppo. JLI Preempt at 21.

28   [23] Defendants do not assert field preemption.  Preempt Reply at 13 n.7.

United States District Court
Northern District of California

an otherwise saved product liability claim if the specific relief sought by a personal injury plaintiff (or the PIC) would require JLI to make a different or additional disclosure on that specific topic *and* it would either frustrate Congressional intent or it would be impossible to comply with both the FDA standard and a standard imposed as a matter of state product liability law.  As neither side has fully briefed this narrow issue, I will address it when the state law product liability claims or bellwether plaintiffs' claims are tested.

Defendants' motions to dismiss based on preemption are DENIED.

### III.   MOTIONS TO DISMISS RICO CLAIMS

Defendants JLI, Altria, and the Officer and Director Defendants move to dismiss the RICO claims asserted against each of them in both the CAC and the PECs.

### A.   Legal Standards

To state a RICO claim, plaintiffs must plausibly allege that each defendant acted, directly or indirectly, in (1) the conduct, (2) of an enterprise that affects interstate commerce, (3) through a pattern, (4) of racketeering activity.  *Eclectic Props. E., LLC v. Marcus & Millichap Co*., 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)).  Plaintiffs must connect the alleged racketeering activity with the conduct of an "enterprise" that affects interstate or foreign commerce. 18 U.S.C. § 1962(c).  Here, plaintiffs allege defendants were part of an associated-in-fact enterprise (AIF).  *See* 18 U.S.C. § 1961(4). To plead an AIF enterprise, plaintiffs must plausibly allege the following  three elements: (1) a common purpose, (2) a structure or organization, and (3) longevity necessary to accomplish the purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

"In order to 'participate, directly or indirectly, in the conduct of [an] enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (quoting 18 U.S.C. § 1962(c)).  This requirement does not limit RICO liability "to those with primary responsibility for the enterprise's affairs," nor does it require a participant to exercise "significant control over or within an enterprise." *Id*. at 179 & n.4 (emphasis omitted). But "some part in directing the enterprise's affairs is required," *id*. at 179, and "[s]imply performing services for the enterprise," or failing to stop illegal activity, is not sufficient. *Walter v. Drayson*, 538 F.3d

1244, 1248-49 (9th Cir. 2008).

RICO defines "racketeering activity" as any of the predicate acts listed in 18 U.S.C. § 1961(1). Those acts include mail and wire fraud, which are the acts plaintiffs claim defendants committed, agreed to, or supported other defendants committing. Mail and wire fraud are identical offenses except for the particular method used to disseminate the fraud. *Eclectic Props.*, 751 F.3d at 997. The elements are (1) a scheme to defraud, (2) the use of the mails or wires to further that scheme, and (3) the specific intent to defraud. *Id.* The "scheme to defraud" element requires "an affirmative, material misrepresentation." *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) (quoting *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986)). But the misrepresentation does not need to be made through the mails or wires; rather, the use of the mails or wires only needs to be "a step in the plot." *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2004) (internal quotation marks omitted). The misrepresentation also does not need to be made to the RICO plaintiff, but instead may be made to a third-party. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) (bidder on public tax liens had standing to assert RICO claim against a competing bidder who made misrepresentations to the auctioneer, which deprived plaintiff of other bids; "a plaintiff asserting a RICO claim predicated on mail fraud need not show ... that it relied on the defendant's alleged misrepresentations").

The "scheme to defraud" element of mail and wire fraud is "treated like conspiracy in several respects." *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (quoting *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)). As a result, each member of the scheme does not need to make a separate misrepresentation. *Id.*

A "pattern of racketeering activity" requires the commission of at least two predicate acts within a ten-year period. 18 U.S.C. § 1961(5). "Evidence of multiple schemes is not required ... and, indeed, proof of a single scheme can be sufficient so long as the predicate acts involved are not isolated or sporadic." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989)).

RICO's injury standard requires the plaintiff to plead "a harm to a specific business or property interest," which is "a categorical inquiry typically determined by reference to state law."

United States District Court
Northern District of California

34

*Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (*en banc*).  Not only must a RICO plaintiff

adequately plead an injury to a specific business or property interest, but the injury must also be

"tangible" or "concrete." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008);

*Diaz*, 420 F.3d at 900.  An out-of-pocket loss satisfies this requirement.  In *Canyon County*, for

example, the court noted that "[i]n the ordinary context of a commercial transaction, a consumer

who has been overcharged can claim an injury to her property, based on a wrongful deprivation of

her money." 519 F.3d at 976.

     A plaintiff asserting a private cause of action for a RICO violation must also satisfy a

causation requirement: the plaintiff must plausibly allege at the pleading stage that the RICO

violation was a "but for" cause and proximate cause of its asserted injuries. *Canyon Cty.*, 519 F.3d

at 981. "When a court evaluates a RICO claim for proximate causation, the central question it

must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel*

*Supply Corp.*, 547 U.S. 451, 461 (2006). Three non-exhaustive factors are considered: "(1)

whether there are more direct victims of the alleged wrongful conduct who can be counted on to

vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the

amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether

the courts will have to adopt complicated rules apportioning damages to obviate the risk of

multiple recoveries." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002) (relying on

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).

     "[A] RICO conspiracy under § 1962(d) requires only that the defendant was 'aware of the

essential nature and scope of the enterprise and intended to participate in it.'" *United States v.*

*Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *United States v. Fernandez*, 388 F.3d

1199, 1230 (9th Cir. 2004)).

    **B.**    **RICO Allegations**

       **1.**    **CAC**

     Plaintiffs assert claims arising under the Racketeer Influenced and Corrupt Organizations

Act ("RICO") (18 U.S.C. §§ 1962(c), (d)) against defendants JLI, the Altria Defendants, Monsees,

Bowen, Pritzker, Huh, and Valani.  CAC ¶ 705. Plaintiffs allege that the RICO Defendants formed

an "association-in-fact enterprise—the Nicotine Market Expansion Enterprise," which exists separately from the otherwise legitimate business operations of JLI, Altria, or the investment companies with which the Other Director Defendants are affiliated. *Id.* ¶ 714.  The RICO defendants are alleged to have "created and maintained systematic links for a more nefarious common purpose: maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market." *Id.*  The Enterprise went beyond "business as normal" according to plaintiffs because its purpose – and the purpose of each of the defendants – was according to plaintiffs to addict many more people and especially minors to nicotine. *Id.*

Those efforts to expand the market of nicotine-addicted e-cigarette users, including youth, included the following Enterprise acts: (1) developing a product with an undisclosed and heightened ability to smoothly deliver and addict nicotine users and running it through purposely reengineered tests to obscure nicotine content and delivery, *see, e.g.,* CAC ¶¶ 115, 125, 168, 179; (2) distributing advertisements that omitted references to or misrepresented the nicotine content in JUUL products and developing marketing campaigns that intentionally targeted youths, *see, e.g.,* CAC ¶¶ 286-304, 341-43, 752; (3) coordinating with Altria to distribute misleading statements to the FDA fraudulently characterizing mint (a flavor offered by both JLI and Altria) as a non-flavored tobacco and menthol product, claiming that it was a product for adult smokers, *see, e.g.,* CAC ¶¶ 472-505, 752; (4) sharing data between JLI and Altria to allow the Enterprise members to align on strategy for growing the e-cigarette market, *see, e.g.,* CAC ¶ 42-44, 48, 124, 397, 419-25; (5) formalizing the partnership between JLI and Altria through an equity investment, *see, e.g.*, CAC ¶¶ 42-46; (6) coordinating with non-defendant co-conspirator Veratad on means of defeating age-verification processes, *see, e.g.*, CAC ¶¶ 374-95; (7) transmitting to the FDA a fraudulent youth prevalence study addressing both tobacco products generally and JUUL products that misrepresented the popularity of the Mint flavor among kids and vastly understated the percentage of youth using e-cigarettes, *see, e.g.*, CAC ¶ 474-78, 752; (8) coordinating with Altria to distribute the fraudulent and misleading "Make the Switch" advertisements, *see, e.g.*, CAC ¶¶ 202-04, 752;

and (9) coordinating with Altria on lobbying efforts to "prevent[] new federal or state legislation targeting JUUL or the e-cigarette category more broadly." CAC ¶ 439.

Plaintiffs allege that "Early Enterprise Defendants" JLI, Monsees, Bowen, Pritzker, Huh, and Valani "formed the Nicotine Market Expansion Enterprise by at least 2015" with non-defendant co-conspirator Veratad Technologies LLC when these defendants "prepared to launch the JUUL e-cigarette and capture and grow a market of nicotine-addicted users that would serve as customers for life." *Id*. ¶ 715.  The Early Enterprise Defendants are alleged to have developed a product that gave a quicker buzz and a more palatable yet higher dosage of nicotine to consumers after manipulating studies and deceiving the consumers and the public regarding the highly addictive nature of the JUUL product.  *Id*. ¶¶ 32, 74, 88-116, 168-175, 175-199.

Plaintiffs contend that the Early Enterprise Defendants knew that the most impressionable and profitable user base would be youth users, and so Bowen, Monsees, Pritzker, Huh, Valani, and JLI devised and implemented a marketing plan to target youth, including the "Vaporized" campaign and other youth-oriented campaigns. *Id*. ¶¶ 333-353.  Once the JUUL product hit the market, these defendants hired Veratad, which is alleged to have coordinated with the Enterprise defendants to "to get JUULs into the hands of the largest number of consumers possible." CAC ¶ 374.  Plaintiffs claim that Veratad provided JLI with "age verification services" for purchases made through JLI's  website from 2015 to 2018, and that Veratad provided age verification services to other e-cigarette sellers, including Lorillard and Altria.  *Id*. ¶ 376.  Plaintiffs contend that "JLI and Veratad designed and implemented an age verification system designed to maximize the number of prospective purchasers who 'pass' the process rather than to minimize the number of underage sales.  As a result of these intentionally permissive age verification practices, JLI and Veratad used online payment systems and the US mails to ship tens of millions of dollars of JUUL pods to unverified customers, many of whom were minors."  *Id*. ¶ 377.  "Veratad's age verification system was purposefully flexible, so JLI and Veratad could work together to decide just how closely a prospective purchaser's personal information had to match records in Veratad's database in order to "pass" the age verification process; JLI and Veratad worked together to "bump up" the number or purchasers who could pass the flexible age verification process,

1    including by "divorcing" an address verification step. *Id*. ¶¶ 381 – 386, 390.

2         Plaintiffs contend that "[i]n the Spring of 2017, Defendant Altria joined the Nicotine

3    Market Expansion Enterprise.  Non-defendant member Veratad would leave the Enterprise

4    sometime in 2018 when it stopped coordinating with Defendant JLI.  Each Early Enterprise

5    Defendant is liable for the predicate acts of the enterprise committed no later than its formation in

6    2015, and Defendant Altria is liable for the predicate acts of the enterprise committed no later than

7    when it joined the Enterprise in Spring 2017." *Id*. ¶ 718.

8                    **2.    Public Entity Complaints**

9         The factual allegations and bases of purported RICO liability in the PECs are materially

10   similar to those in the CAC, with additional allegations regarding injury from defendants' alleged

11   conduct specifically targeting youth and schools.  *See, e.g*., TVC ¶¶ 176, 441, 445, 701.  There are,

12   however, significant differences with respect to the government entities' allegations regarding the

13   types of injuries and damages caused.  The PECs allege that the youth e-cigarette epidemic caused

14   by defendants' actions forced them expend "limited financial and other resources to mitigate the

15   health crisis of youth e-cigarette use," by "providing new programs and new services as a direct

16   result and in direct response to Defendants' misconduct."  TVC ¶¶ 701-703; *see also*  TVC ¶ 597

17   (generally allege that plaintiffs were "forced to divert resources and deploy new ones to combat

18   the problem of teen e-cigarette use"); TVC ¶ 605 ("incurred additional legal expenses in

19   connection with disciplinary hearings"); TVC ¶ 607 (purchased and installed e-cigarette detectors,

20   cameras and anti-vaping signs around school district property); TVC ¶ 609 (property damage

21   caused by growing hazardous waste problem, "either from youth improperly disposing of [the

22   products] by littering or throwing them in the trash or toilets, or because teachers and school staff

23   must confiscate and store them").

24       **C.    Enterprise**

25       An associated in fact enterprise has three elements: (1) a common purpose, (2) a structure

26   or organization, and (3) longevity necessary to accomplish the purpose.  *Boyle v. United States*,

27   556 U.S. 938, 946 (2009).  Plaintiffs in the CAC and PECs allege, generally, that the common

28   purpose of the RICO Nicotine Market Expansion Enterprise was to increase the number of

United States District Court
Northern District of California

38

nicotine addicted consumers and to target the youth market to create a new generation of nicotine addicts. The common purpose element of an associated-in-fact enterprise is different from (but related to) the pattern of predicate acts (discussed below). The "common purpose" does not itself have to be fraudulent. *See, e.g., Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) ("Defendants had the common purpose of increasing the number of people using Microsoft's Internet Service, and doing so by fraudulent means.").[24] And an "associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise," and can be made up of parts of an otherwise legitimate business entity. *Odom*, 486 F.3d at 551. However, an enterprise "is not simply the same 'person' referred to by a different name," and RICO liability "depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 163 (2001).

Plaintiffs allege that the associated-in-fact Nicotine Market Expansion Enterprise began in 2015 and expanded in Spring 2017 to include Altria. Plaintiffs contend that the Enterprise existed separately from the otherwise legitimate business operations of JLI, Altria, and the investment companies with which the Other Director Defendants are affiliated because it was focused on the illegitimate and undisclosed (to the public and regulators) goals of creating new nicotine addicts and targeting youth. CAC ¶¶ 714, 727. Plaintiffs state, generally, that the Enterprise achieved its common purpose through the co-conspirators' actions in deceiving consumers, regulators, and the general public about the nature of the product (the potency of nicotine delivery and potential for fostering addiction) and its intent (falsely or unduly portraying it as a smoking cessation product when the Enterprise intended to capture new nicotine addicts and denying its true intent to target

---

[24] As the *Odem* court noted: "'The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other.'" *Id*. at 549 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

youth and create new nicotine addicts).  CAC ¶¶ 735-737.  Plaintiffs allege that these acts lulled public officials into delaying or deferring regulation of the JUUL products, in full or in part, and deceived consumers about the purpose and impact of JUUL's products in order to protect defendants' sales, profits, and secure the Enterprise's long-term goal of creating more nicotine addicts.

Defendants argue, generally, that plaintiffs' allegations regarding common purpose and the existence of an "organization" separate from JLI itself are fatally deficient.  They do not really challenge the common purpose element of the Enterprise, the alleged scheme to defraud.  They do contest the adequacy of allegations regarding each individual participant's intent or agreement with that purpose, which I address later.  But their main defense to the existence of the AIF Enterprise is that plaintiffs have not alleged facts showing that the Nicotine Market Expansion Enterprise is really anything other than JLI (and JLI combined with Altria) or that conduct of the participants is anything more than the fulfillment of their duties owed to JLI as officers, directors, service providers, and investors.  Cases recognize that where the individual constituents of an asserted enterprise are alleged only to have conducted the "regular" business" of the corporate entity or business in their own interests, those allegations are insufficient to support a RICO enterprise.

Defendants characterize all of the alleged conduct of the Enterprise as "regular" business of JLI (even if fraudulent, as plaintiffs allege but defendants contest) and not the separate and distinct conduct of a "Nicotine Market Expansion Enterprise."  They note that the alleged goals of the Enterprise are essentially aligned with JLI's goals; expanded sales of JUUL products and capture of ENDS market share.[25]  Even if the conduct was fraudulent, that does not transform it into distinct "enterprise" conduct actionable under RICO.  *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011) (where "plaintiffs merely allege that the Defendants are associated in a manner directly related to their own primary business activities" and alleged "no more than that

---

[25] Defendants dispute the veracity of plaintiffs' allegations that their true goals were to capture new users, particularly youth users.

1    Defendants' primary business activity . . . was conducted fraudulently," that was "insufficient to

2    state a claim under § 1962(c)"); *In re Jamster Mktg. Litig.*, 05CV0819 JM (CAB), 2009 WL

3    1456632, at *5 (S.D. Cal. May 22, 2009) (concluding "[w]ithout the adjectives, the allegations

4    allege conduct consistent with ordinary business conduct and an ordinary business purpose," and

5    dismissing RICO claim despite alleging "an overarching common purpose to engage in fraudulent

6    conduct" because they failed "to identify specific allegations in support of the common purpose.");

7    *Shaw v. Nissan N.A., Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) (recognizing that courts

8    "have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO

9    enterprises") (internal quotation omitted).  Defendants argue that the same is true after Altria made

10   its first investment in JLI in December 2018 because there are no allegations that the investment

11   was for purposes *other* than ordinary commercial purposes shared by JLI and Altria.

12        Plaintiffs respond, first, that these general attacks raise questions of fact that are not

13   appropriately determined on a motion to dismiss.  Oppo. JLI/Altria RICO at 23-24; *see, e.g. Bias*

14   *v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 942 (N.D. Cal. 2013) ("Wells Fargo's challenge that

15   its actions were simply 'normal business dealings' without the existence of an enterprise or any

16   'common purpose' is fact-determinative and cannot be resolved at this juncture.").[26]  However,

17   plaintiffs need to assert *plausible* allegations to support the existence of this AIF "Nicotine Market

18   Expansion Enterprise" separate and apart from the regular business of JLI.  The current allegations

19   in the CAC often allege that JLI *itself* (including specifically those broadly in charge, like the CEO

20   who eventually replaced Monsees and who is not alleged to be part of the AIF Enterprise) had the

21   purpose of growing the nicotine market and even doing so by targeting youth.  Those broad and

22   undifferentiated allegations make it difficult to plausibly allege the existence of a separate AIF

23   Enterprise.

24   _____

25   [26] In *Bias*, plaintiffs alleged that Wells Fargo set up a specific intra-corporate division to enact the
     Enterprise scheme with outside vendors to charge "marked-up" and illegal fees related to its home

26   mortgage services.  The court concluded that allegations regarding the existence of the intra-
     corporate division within Wells Fargo and "its creation of fictitious invoices to substantiate fees,

27   Wells Fargo's reliance on those invoices to justify the marked-up fees, and Wells Fargo's payment
     of lesser amounts—independent of the invoices—directly to third-party vendors and brokers

28   satisfy the distinctiveness requirement."  *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 941
     (N.D. Cal. 2013).  Plaintiffs do not allege any distinct division within JLI here.

Plaintiffs also attempt to distinguish *Shaw* and *Jamster* by contending that the allegations in the CAC demonstrate that defendants were not engaged in routine business activities but instead in a "collaborative scheme to defraud" such as the one outlined in *In re: Takata Airbag Products Liab. Litig*., 2015 WL 9987659 (S.D. Fla. Dec. 2, 2015).  In *Takata*, however, plaintiffs alleged the existence of numerous communications showing that "Takata, the Vehicle Manufacturer Defendants, and dealerships" demonstrated "a collaborative scheme to defraud consumers" that was "distinct from the conduct of any individual defendant." *Id*. at *1.  Plaintiffs plausibly alleged that the defendants acting together "as an enterprise, knew of a defect in the Takata airbag, knew that Takata had concealed the defect, and defrauded consumers by selling and servicing vehicles for more money than consumers would have paid had the vehicle not contained a defective airbag." *Id*.  There was obvious "other conduct of the defendant" in *Takata* that was not associated with the alleged AIF enterprise.  That is missing here.  Plaintiffs need to plausibly allege more in support of the distinct AIF Enterprise.[27]

Relatedly, JLI and the Officer and Director Defendants argue that they could not have formed a separate, distinct enterprise because JLI's officers, directors, and employees are categorically not "distinct" from JLI for purposes of RICO.  *See, e.g., Living Designs, Inc. v. E.I. Dupont de Nemours and Co*., 431 F.3d 353, 361 (9th Cir. 2005) ("To be sure, if the 'enterprise' consisted only of DuPont and its employees, the pleading would fail for lack of distinctiveness.'" (citing *Cedric Kushner*, 533 U.S. at 164)); *In re: Gen. Motors LLC Ignition Switch Litig*., 14-MC-2543 (JMF), 2016 WL 3920353, at *12 (S.D.N.Y. July 15, 2016). ("A corporation carrying out its own activities (even fraudulent ones) only through its agents and employees does not constitute an enterprise.").  JLI and the Officer and Director Defendants, therefore, argue that the existence of a

---

[27] Plaintiffs' other cases are inapposite or otherwise do not support their effort to allege the distinctiveness of the AIF Enterprise or drawing lines between what they allege were the separate acts of the Enterprise and the regular acts of JLI.  *See, e.g., Asis Internet Services v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 941–42 (N.D. Cal. 2009 (addressing whether "falsity or deception" must be narrowed to common-law fraud in CAN–SPAM Act); *United Energy Trading, LLC v. P. Gas & Electric Co*., 200 F. Supp. 3d 1012, 1023 (N.D. Cal. 2016 (addressing Sherman Act intent); *Bunnett & Co., Inc. v. Gearheart*, 17-CV-01475-RS, 2018 WL 1070298, at *1 (N.D. Cal. Feb. 27, 2018) (alleging RICO scheme made up of affiliated *and* unaffiliated entities to "establish and exert control over a new distribution channel for the supply and sale of dairy cow nutritional supplements").

United States District Court
Northern District of California

United States District Court
Northern District of California

properly pleaded Enterprise depends on Veratad and Altria being part of it.

Plaintiffs respond that an AIF enterprise does not need to have a particular structure or fixed roles for the participants, Oppo. JLI/Altria RICO at 12-14, but they miss defendants' point. To constitute an AIF enterprise, the presence of some third-party, separate and apart from the company and its officers and employees, is necessary.  Defendants persuasively argue that plaintiffs have failed to plausibly allege the involvement of third-party Veratad in the Enterprise. They contend that the allegations regarding the role of Veratad is categorically insufficient because plaintiffs' own allegations confirm that JLI hired Veratad to provide the same age-verification services that Veratad provided to other ENDS sellers.  CAC ¶ 375, TVC ¶ 414.  They also argue that plaintiffs' allegations establish only that Veratad was acting in its own interests – not part of any Enterprise – and the allegations prove that JLI hired Veratad to serve JLI's general corporate interests, not the interests of the theoretically separate AIF Enterprise.  As such, defendants assert that the allegations regarding Veratad cannot prop up the existence of an AIF Enterprise.  *See, e.g., In re Countrywide Fin. Corp. Mortg.-Backed Securities Litig.*, 2012 WL 10731957, at *9 (C.D. Cal. June 29, 2012) (dismissing RICO claim where plaintiffs only "identified exactly the type of arms-length business transaction, with each party pursuing its own independent economic interests, that does not constitute a RICO enterprise"); *Chagby v. Target Corp.*, 2008 WL 5686105, at *3 (C.D. Cal. Oct. 27, 2008), *aff'd*, 358 Fed. Appx. 805 (9th Cir. 2009) (unpublished) (dismissing where "plaintiff alleges no facts that could lead someone to believe that Defendants' relationship with its advertising agency was anything more than a typical client of the advertising agency"); *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *11 (C.D. Cal. July 13, 2015) ("RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client."); *but see City of New York v. Gordon*, 155 F. Supp. 3d 411, 423 (S.D.N.Y. 2015) (upholding a RICO verdict where an enterprise member formed an uncontested association-in-fact enterprise with one smoke shop to deliver contraband cigarettes, in part because that member handled deliveries for other smoke shops and, therefore, was more than a passive party to the substantive conduct alleged).

Plaintiffs respond that they have "extensive" allegations regarding how Veratad worked

43

with JLI to get around and minimize the impact of age verification requirements and changed processes to increase the numbers of prospective purchasers who "passed."  CAC ¶¶ 377, 382, 385.  But plaintiffs do not allege facts showing that Veratad undertook *those* efforts as part of a joint "scheme to defraud" to mislead regulators and the public or to specifically to grow the market of nicotine-addict as services *in aid of* the "Nicotine Market Expansion Enterprise" as opposed simply securing higher returns for JLI, which was in both Veratad's and JLI's general economic interests.

That is why plaintiffs' reliance on *City of New York v. Gordon*, 155 F. Supp. 3d 411, 423 (S.D.N.Y. 2015) is not useful.  There, the fact that the third-party participant in an admitted AIF enterprise was hired by defendants *and* others to deliver contraband cigarettes, did not undermine the RICO claim as the conduct was in all circumstances illicit.  Here, plaintiffs attempt to allege an Enterprise distinct from the "otherwise legitimate business operations of JLI, Altria, or the investment companies with which Defendants Pritzker, Huh, and Valani are affiliated," CAC ¶ 714, but fail to connect Veratad and indeed much of the alleged Enterprise participants' conduct to anything other than JLI and Altria's normal business.  Plaintiffs have not adequately alleged plausible facts that Veratad joined, was part of, and provided services for, the *separate* Nicotine Market Expansion Enterprise.

As for the subsequent "Altria period," defendants argue that the allegations establish only that Altria and JLI were acting in their joint corporate interests, not as a distinct Enterprise. Defendants point out that Altria and JLI were purported competitors from Spring 2017 to December 20, 2018, and the only alleged coordination during that time was that Altria had apparent access to JLI's sales data in 2017 that plaintiffs allege was secured through a third party, Avail Vapor.  CAC ¶¶ 419-423, 731; TVC ¶¶ 463-467, 671.  The allegation is that both JLI and Altria used Avail Vapor as a conduit for their confidential negotiations about joining forces.

Defendants contend that this attenuated connection cannot establish an "association-in-fact" enterprise with Altria.  *See Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1090-91 (N.D. Cal. 2006) (dismissing RICO claim where all "that is alleged is that defendants entered into these agreements with numerous third-parties—who notably are unnamed in the complaint—and

44

United States District Court
Northern District of California

through the information gained from these agreements, committed their fraudulent acts.  Plaintiffs make no allegations that defendants and these unnamed third parties worked in concert to engage in the alleged racketeering activities or to distribute its proceeds.").  Plaintiffs respond that they allege Altria and JLI were not true competitors during this time frame, given JLI's dominance, and that Altria and JLI were in fact engaged in secret negotiations to join forces, undercutting the "competition" argument.  But the presence of limited data in Altria's possession regarding JLI's sales data in 2017 is a thin reed to rest a claim that Altria and JLI were part of an association in fact prior to Altria's formal investment.

Plaintiffs also point to their allegations (taken as true for purposes of motion to dismiss) that Altria secured shelf-space that it intended *for JUUL* products (with knowledge of JLI's youth-targeting through marketing and product displays) and that Altria joined with JLI to attempt to keep mint-flavored products on the market (knowing that mint pods were a main driver of youth use and JLI sales generally).  CAC ¶¶ 427-429, 472-489.  These allegations do not support distinctiveness or that Altria's conduct was intended to support the Enterprise as opposed to the general business of JLI which, as plaintiffs plausibly allege, Altria worked to support in advance of the culmination of its investment in December 2018.

The significance of the amount of Altria's investment as of December 2018 (35%) is likewise contested.  Plaintiffs contend that high percentage of Altria's investment is significant in and of itself and supports the inference that Altria joined the Enterprise in order to grow the number of nicotine addicts and create a new pipeline for profits.  Defendants counter that the size of the investment strengthens *their* argument that Altria invested for its own economic interests, and not to join an already existing Enterprise.  *See, e.g., In re Countrywide*, 2012 WL 10731957, at *8 (where "parties that enter commercial relationships 'for their own gain or benefit' do not constitute an 'enterprise,'"); *Toyota*, 826 F. Supp. 2d at 1202-03. ("[T]he SAC alleges no more than that Defendants' primary business activity—the design, manufacture, and sale or lease of Toyota vehicles—was conducted fraudulently.").

In short, plaintiffs have not plausibly alleged the existence of a distinct Enterprise, separate and apart from the general business of JLI.  There is too little to plausibly allege that

Veratad and Altria specifically joined that distinct Enterprise, as opposed to going into business with JLI to support the general business of JLI for their mutual benefit.

### D.    Conducted Affairs of Enterprise

Each defendant also challenges the pleadings regarding the alleged roles and conduct in support of the Enterprise.  Two lines of authority are implicated by defendants' challenges.

Rule 9(b) applies to the fraudulent conduct relevant to both the common purpose of the Enterprise and the underlying predicate acts discussed below, and requires a heightened showing of the circumstance of fraudulent acts, including "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Schreiber Distribg. Co. v. Serv-Well Furniture Co., Inc*., 806 F.2d 1393, 1401 (9th Cir. 1986).  Particularly relevant here, Rule 9(b) "does not allow a complaint to merely lump multiple defendants together" but requires plaintiffs to "differentiate" their allegations to "inform" each defendant separately of the allegations particular to that defendant's alleged participation in the fraud.  *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007).  "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'"  *Id*. (quoting *Moore v. Kayport Package Express, Inc*., 885 F.2d 531, 541 (9th Cir.1989)).

On the merits, "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs.  Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  "Numerous courts have held that *Reves* is satisfied by evidence that lower-rung members of an enterprise implemented decisions directed by those higher up the ladder in the enterprise or committed racketeering acts which furthered the basic goals of the enterprise at the direction of other members of the enterprise."  U.*S. v. Philip Morris USA, Inc*. (*Philip Morris I*), 449 F. Supp. 2d 1, 876 (D.D.C. 2006)  A defendant can satisfy this "conduct" element by simply "coordinating and

46

causing the public dissemination of false, misleading or deceptive statements" in support of the RICO conspiracy. *Id*. at 877.

### 1.     Bowen

Bowen argues that he must be dismissed from the RICO claims because nowhere in the CAC or PECs is he alleged to have personally committed any fraud and there are no facts alleged regarding his agreement to join the Enterprise or how he personally managed or operated the Enterprise. He claims that the facts alleged show only that he was furthering the regular business of JLI.

Plaintiffs identify the following allegations regarding Bowen's role and conduct in the Enterprise: "JLI and Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts," including by altering or re-engineering his own studies concerning nicotine content to mask the true content and impact in the products he developed. CAC ¶¶ 100-115, 171, 222. Bowen discussed those engineered test results (the Phase 1 results), and how they differed from the Phase 0 results, with defendants Monsees, Pritzker, and Valani. *Id*. ¶ 178. Bowen was personally involved in approving the fraudulent advertisements and other "public-facing" statements attributed generally to the "Early Enterprise Defendants" because, as defendant Monsees testified to Congress that he, Bowen, Pritzker, Huh, and Valani had "final say" over marketing campaigns. *Id*. ¶ 333. It was through this "final say" that plaintiffs claim that Bowen conducted the affairs of the enterprise and is jointly responsible for acts of mail and wire fraud attributed to the "Early Enterprise Defendants" in paragraph 752 of the CAC, including the early Vaporized campaign, which omitted any reference to JUUL's highly addictive nicotine content. *Id*. ¶ 752. Plaintiffs assert that Bowen is responsible for these fraudulent advertisements because he was "directing and monitoring the launch plans [the JLI Board] had set in motion," *id*. ¶ 346, and that he suggested affirmatively leveraging youth user generated content to further expand youth addiction. *Id*. ¶ 357. Finally, plaintiffs say that his involvement, through the JLI Board of Directors, was critical to the coordination with Altria and its ultimate investment in JLI. *Id*. ¶ 44.

Bowen responds that the only specific facts alleged regarding him concern his co-founding

of JLI and his work designing and testing the product and performing related acts as part of his "legitimate" performance of his job as CTO.  He also points out that none of the instances of alleged mail or wire fraud identified in the CAC is directly attributed to him. Instead, the bulk of those advertisements and website marketing materials are identified as "from" "All Early Enterprise Defendants." Finally, he notes that there are no allegations that connect him to Veratad.

Plaintiffs argue that the lack of specific connections between any defendant and Veratad is not itself significant under established caselaw recognizing that "it is not necessary to prove 'that every member of the enterprise participated in or knew about all its activities.'" *Philip Morris I*, 449 F. Supp. 2d at 868 (quoting *United States v. Cagnina*, 697 F.2d 915, 922 (11th Cir.1983)). Plaintiffs contend that their very generalized allegations regarding "control" by the Officer and Director Defendants support the inference that some of them were responsible and directly knowledgeable about Veratad's conduct in support of the Enterprise.  In their opposition, plaintiffs reference additional evidence they have secured to support that inference.  As noted, the allegations regarding Veratad are currently insufficient.  If plaintiffs amend, they can allege what their "discovery map" has shown with respect to connections between Veratad and Bowen or the other Officers and Directors who are alleged part of the Enterprise.

Bowen's other persuasive point is an argument raised by all of the Officer and Director Defendants; that attributing the advertisements and marketing to "All Early Enterprise Defendants" is impermissible group pleading prohibited by *Swartz, supra.*  Plaintiffs contend that generalized attribution is of no legal moment because other express acts that contributed to and set in motion the deception are sufficiently alleged with respect to Bowen, such as his development of the product and re-engineering of tests.

I agree that those independent allegations identifying Bowen's role and personal conduct at the initial design and engineering of the JUUL product and then the subsequent development and rollout of the JUUL product are sufficient *as to him* for RICO conduct.  That said, I agree with Bowen that the lack allegations regarding his and any of the other Officer and Director Defendants' roles with Veratad – addressed above – is problematic and needs further support.  I also agree with Bowen and the other Officer and Director Defendants that their alleged "final say"

over marketing, an allegation that is repeatedly used throughout the CAC and the PECs, is generally insufficient.

Plaintiffs repeatedly allege that the Officer and Director Defendants, both as a group and individually, committed acts cognizable as RICO conduct and by the UCL (as well as the other consumer protection statutes addressed below with respect to the Government Entity Complaints) because these defendants had "final say" over advertising and marketing as part of their role on JLI's Board or on the Board's Executive Committee. *See, e.g.,* CAC ¶ 333. Bowen's and the other Officer and Director Defendants' challenge to this allegation as impermissible "group" pleading is not particularly persuasive. *See, e.g., U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) ("There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct.").

But the "final say" allegation is insufficient for other reasons. First, the only citation in the CAC that gives any factual support to this allegation is a reference to Monsees' July 25, 2019 statement before Congress. *See, e.g.*, CAC ¶ 333 (citing to Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the Comm. on Oversight & Reform, H.R., 116th Cong. 70 (2019)). In their opposition to the motion to dismiss the RICO claims, plaintiffs quote the following exchange from that testimony:

> Q: Who has the final say, I guess, on what the company is doing now, operationally, related to marketing?
>
> Mr. Monsees. You know, it is a combination between Kevin Burns, our CEO, and then our board, of which I am a member.

Oppo. JLI/Altria RICO at 16 n.15. On its face, that statement concerns only who was responsible for marketing as of July 2019.[28] Second, plaintiffs do not expressly allege that the marketing

---

[28] As this testimony was cited in plaintiffs' CAC and this excerpt was quoted by plaintiffs themselves in their opposition, it is subject to judicial notice under the doctrine of incorporation. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

Defendants and plaintiffs ask me to take judicial notice of various documents and facts. In Dkt. No. 630, JLI asks me to take judicial notice of: (i) orders from other cases; (ii) FDA statements and press releases; (iii) JLI news and press releases; (iv) research journal and educational

United States District Court
Northern District of California

United States District Court
Northern District of California

plans, steps, or initiatives that plaintiffs allege were key to further the RICO Enterprise (and that

separately constitute consumer protection act violations, discussed below) were presented for

Board approval and that the Officer and Director Defendants voted as a bloc to approve them and

had sufficient numerical control or other influence over the Board to ensure their effectuation.

Without identification of specific acts taken by the Officer and Director Defendants on the Board

(or perhaps a plausibly supported allegation that marketing was controlled through the Board) and

the defendants' actual, numerical control of the Board, the very general "final say" allegation is

insufficient as a hook for conduct of the Enterprise.

Turning back to Bowen specifically, there are sufficient allegations about his role in

conducting the RICO Enterprise other than the "final say" and Board control allegations.  Given

his role in the company as a founder and officer and given the more specific allegations about his

direct involvement and control over the design, testing, and initial rollout of the JUUL product

identified above, the conduct element has been adequately alleged as to Bowen.

---

publications; (v) articles from various media and news outlets.  Those requests are partially opposed by plaintiffs.  The request is granted as to the orders from other cases, and granted for the existence of the FDA and news statements as well as the journal and educational publications, but does not extend to notice of the truth of the facts in those statements and publications.

In Dkt. No. 633, Altria asks me to take judicial notice of letters from Altria's CEO to Congress and FDA and a copy of an Altria marketing initiative under doctrine of incorporation.  That request is GRANTED, but not for truth of statements contained therein.  Altria also requests judicial notice of: (i) two Altria SEC filings; (ii) filings from the *Colgate* case; and of (iii) an FDA press release.  Judicial notice will be taken of the court filings and judicial notice will be taken of the existence of the SEC and FDA documents, but not for the truth of or meaning of disputed facts and statements therein.

In Dkt. No. 648, Monsees asks me to take judicial notice of the facts that he resigned from JLI on March 12, 2020, and is no longer an employee, officer, director, or adviser of the company.  These facts do not appear to be disputed by plaintiffs, but given plaintiffs' clarification regarding injunctive relief, the request is DENIED.

In Dkt. Nos. 739 & 880, Altria asks me to take judicial notice of: (i) a document summarizing PFS data from MDL Centrality; (ii) an FDA press release; (iii) and the complaint in the *Colgate* case.  The request is granted as to the *Colgate* pleading, and granted as to the FDA press release (as to its existence, not the truth of the facts therein), but DENIED as to the PFS data summarized from MDL Centrality.

In Dkt. No. 759, plaintiffs ask me to take judicial notice of one statement on JLI's website regarding mailing of JUUL products.  The request is DENIED.  In Dkt. No. 760, plaintiffs ask me to take judicial notice of facts regarding the FDA's handling and processing of PMTAs.  That unopposed request is GRANTED.

### 2.   Monsees

Plaintiffs allege that Monsees was a co-founder of the Enterprise and instrumental in the scheme to expand the market of nicotine-addicted e-cigarette users beyond those "who aren't perfectly aligned with traditional tobacco products." CAC ¶ 31.  He is alleged to have studied cigarette industry marketing strategies and "personally reviewed" the photographs used in the allegedly fraudulent advertisements accompanying JUUL's launch.  *Id*. ¶¶ 62, 289.  He purportedly "provided specific direction on the content of the website to JLI employees" that plaintiffs contend included false, misleading, and deceptive statements. *Id*. ¶ 333.  He personally spread the allegedly fraudulent messages that JUULs are a cessation product and that JLI did not target youth. *Id*. ¶¶ 205-06, 210, 414, 416.  And, as part of the Enterprise, he is alleged to be jointly responsible for the "multiple" acts of mail and wire fraud attributed to the Early Enterprise Defendants.  *Id*. ¶ 752.  While plaintiffs admit that Monsees ceded control of the JLI Board of Directors to Defendants Pritzker, Huh, and Valani in 2015, they contend that Monsees did so only to "allow those individuals to further co-opt the resources of JLI and take the Enterprise further than he could," (*id*. ¶¶ 347-48), but his continued involvement with Bowen on the Board was "critical" to the unlawful coordination with Altria and its ultimate investment in JLI that directly benefitted Monsees, Bowen, Pritzker, Huh, and Valani. *Id*. ¶¶ 44-45.

Monsees argues these allegations fail to adequately allege his sufficient "direction or control" over the Enterprise and, instead, simply allege acts by Monsees that were taken as part of the "ordinary" business operations of JLI.  All of this activity, according to Monsees, is the normal activity of a CEO and then Director of a company and not separate, distinct efforts on behalf of a RICO Enterprise.  Drilling down on his "personal" involvement, Monsees notes that plaintiffs allege that persons other than Monsees "led" or directed some of the Enterprise acts alleged by plaintiffs (CAC ¶¶ 34, 728-729), which defeats the vaguer allegations about Monsees's direction or control after October 2015.  CAC ¶ 729.  Finally, he notes that there are no specific facts alleged regarding his involvement prior to October 2015 other than his general status as a co-founder and CEO.

Putting aside the group allegations that Monsees as part of the Board had "final say" over

United States District Court
Northern District of California

marketing (that, as noted above, are impermissibly vague and insufficient), there are sufficient allegations concerning specific acts in which Monsees engaged that show sufficient RICO conduct.  Those include, along with Bowen, the intentional design of the product, the intent to copy the tactics of tobacco, and his personal direction and approval of specific marketing campaigns and more generally misleading content on JLI's website.[29]

### 3.      Other Director Defendants

Huh, Valani, and Pritzker also argue that the allegations are not sufficient as to them.[30] Plaintiffs assert that, through their control of the JLI Board of Directors, these three Other Director Defendants worked with Bowen and Monsees to "finaliz[e] a 'messaging framework'" at the time JLI launched JUUL. CAC ¶¶ 345-346.  But, as noted above, the allegation regarding control of the Board is insufficiently alleged.  Similarly, plaintiffs also state that each Other Director Defendant was involved in approving the fraudulent advertisements and other public-facing statements attributed generally to the "Early Enterprise Defendants," given the "final say" allegation, but that too is insufficiently alleged.

Plaintiffs' repeated blanket assertion that the "Board of Directors" generally and Huh, Valani, and Pritzker (along with Bowen and Monsees) through their "control" of the Board of Directors had "final say" over JLI's marketing materials does not establish the requisite individual "direction or control" to pin liability for marketing acts or even specific marketing campaigns of

---

[29] Monsees also argues that two of the public statements attributed to him (and alleged as predicate acts of mail or wire fraud) are not actionable as a matter of law. Bowen argues his testimony before Congress on behalf of JLI (*id*. ¶ 205) is protected by the *Noerr-Pennington* doctrine and his statement to the *New York Times* on behalf of JLI is protected opinion or non-actionable puffery. *Id*. ¶ 752.  Those arguments will be addressed below but are not necessary to sustain the RICO conduct element as to Monsees.

[30] Huh is alleged to have been on the Board of Directors of JLI "since at least June 2015.  At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. As of November 2017, he served as Pritzker's second seat on the Board."  CAC ¶ 22. Valani is alleged to have been on "the Board of Directors of JLI since at least May 2011.  At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors.  As of November 2017, he controlled two Board seats."  *Id*. ¶ 23.  Pritzker is alleged to "have been on the Board of Directors of JLI since at least June 2014 and from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors.  As of November 2017, he controlled two Board seats (the second of which was occupied by Hoyoung Huh."  *Id*. ¶ 21.

52

United States District Court
Northern District of California

JLI on *each* member of the Board of Directors or any of the defendants in their individual capacity as Board members. *See, e.g.*, CAC ¶¶ 207 n. 213, 333 n. 364, 415.[31]  Nor can the generalized reference to the "Board's decision" in October 2015 to resolve the alleged internal JLI debate to specifically target teens (allegedly supported by Huh and unnamed others) support individual acts despite the concern expressed by Pritzker and others.  CAC ¶¶ 334-336.  There is no allegation of a Board vote or other *action* identified.  Nor do plaintiffs identify any specific items proposed by the defendant Directors together or by one specific Director and then approved through their numeric or other control over the full Board.

Plaintiffs also contend that the three Directors' roles in the Enterprise went beyond the early fraud accompanying JUUL's launch because they "orchestrated a take-over" of the JLI Board in October 2015, acting in concert with Bowen and Monsees, to install themselves as the Executive Committee of the JLI Board of Directors. *Id.* ¶¶ 347-48; *see also id.* ¶ 34 ("October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Huh, and Valani formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.")  In those roles, plaintiffs allege that Pritzker, Huh, and Valani pushed for "even 'more aggressive rollout and [marketing].'" *Id.* ¶ 353; *see also id.* ¶ 348 (alleging that Defendant Huh in particular supported continuing the fraudulent youth marketing).

The most specific allegations regarding conduct of the Executive Committee are:  when Monsees stepped down in October 2015, the Executive Committee of Huh, Valani, and Pritzker is alleged to have "taken over the power of the CEO."  CAC ¶¶ 349, 350.  Plaintiffs rely on a very few examples of Board minutes to "illustrate" that starting in late 2015, the Executive Committee exercised "direct control" over the company: (a) Huh ran board meetings, (b) the Executive Committee was to decide on reporting structure for a particular VP, (c) Huh was to make decisions on behalf of the Executive Committee, and Pritzker or Huh would be in office to "help manage

---

[31] As noted, the admitted factual support for the "final say" allegation is Monsees' July 2019 statement to Congress, where in he indicated that the Board and others were *currently* responsible for marketing.  *See, e.g.*, CAC ¶333 n. 364.

people." *Id*. ¶¶ 351, 352.  Plaintiffs then allege that over the next year, "until the installation of a new CEO in August 2016," Pritzker, Huh, and Valani used the Executive Committee "to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by 'dismiss[ing] other senior leaders and effectively tak[ing] over the company,'" and they committed to even "more aggressive rollout and [marketing]." *Id*. ¶ 353.

These generalized allegations are insufficient to connect each Other Director Defendant to conduct of the separate AIF Enterprise, as opposed to general acts to run or direct JLI.  This dovetails with the concept of distinctiveness discussed above.  There is weight to the Other Director Defendants' argument that plaintiffs are simply trying to hold them liable for acts taken in their capacity as corporate directors, which is impermissible.  *See, e.g., Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 843 (9th Cir. 1992) ("Under California law, which the parties do not dispute applies to this claim, directors and officers of a corporation do not incur personal liability for the torts of the corporation 'unless they participate in the wrong or authorize or direct that it be done.'" (quoting *United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.*, 1 Cal.3d 586 (1970)).  The Other Director Defendants can be held liable only if they personally participated, authorized, or directed specific fraudulent acts or under RICO conducted or directed specific acts of the distinct Enterprise separate and apart from routine business conducted by the Directors as a consequence of their positions on the Board.  Those sorts of acts have not been adequately alleged.  *See, e.g., Ferrari v. Mercedes-Benz USA, LLC*, 15-CV-04379-YGR, 2016 WL 7188030, at *4 (N.D. Cal. Dec. 12, 2016) ("the allegations of the SAC might state a simple claim for fraud or unfair business practices by their respective companies, but they do not allege that the individual defendants participated in a pattern of racketeering acts by a RICO enterprise.").

Plaintiffs assert that their allegations are sufficient to establish each of the Other Director Defendants' personal roles in the conduct of the Enterprise and that they are not trying to hold them liable simply because they were directors on JLI's Board but because each is alleged to have "coordinat[ed] and caus[ed] the public dissemination of false, misleading or deceptive statements" in support of the RICO conspiracy. *Philip Morris I*, 449 F. Supp. 2d at 877.  However, plaintiffs

1   need to allege more in support of distinctiveness of the RICO enterprise generally, as well as more

2   specifics regarding these three Other Director Defendants, to tie them to allegations that they

3   specifically conducted the affairs of that distinct Enterprise.  So far, plaintiffs have failed to do

4   so.[32]

5   ### 4.   Altria

6       Altria contends that plaintiffs fail to allege sufficient plausible facts regarding Altria's role

7   in the Enterprise during Spring 2017 through December 2018, noting first that no facts are alleged

8   concerning any agreement by Altria to join the "existing" Enterprise framework or the role any

9   Altria party undertook during this period exclusively for that Enterprise.  The only allegations

10  from this time period are that Altria and JLI had "confidential discussions" and that some JLI sales

11  data was shared through Avail Vapor (CAC ¶ 423).  Altria contends that those allegations are

12  insufficient under Rule 9(b) because they are fatally speculative and conclusory and fully

13  consistent with parties laying the groundwork for its legitimate 35% investment.

14      Altria dismisses other allegations identified by plaintiffs in their RICO opposition brief,

15  one stemming from the pre-December 2018 period and the others from the post-December 2018

16  period, that it: (1) fraudulently acquired "shelf space" on behalf of the Enterprise, *id*. ¶ 427-31,

17  440; (2) executed "direct mail and email campaigns and related activities" for JUUL products, *id*.

18  ¶ 436; (3) leveraged "Altria's field sales force" to promote JUUL products to a broader footprint

19  than JLI would have been able to reach independently, *id*. ¶¶ 436, 440; and (4) engaged in

20  lobbying efforts with the FDA to ensure more people, including nonsmokers and youth, could gain

21  access to and become addicted to JUUL.  *Id*. ¶ 439.

22      Altria disputes the significance of the "shelf space" allegation, noting that plaintiffs

23  elsewhere in the CAC allege that the purchase was for Altria's own products that were still on the

24  market in 2018 (although its own pod-based product was withdrawn in October 2018).  *Compare*

25  CAC ¶ 427 *with* ¶ 428.  It then contends that the remaining allegations are simply activities that

26  plaintiffs admit one or more of the undifferentiated Altria-defendant companies and their

27

28  [32] With respect to conduct of the Enterprise, JLI similarly reasserts its persuasive argument
    regarding the failure of plaintiffs to adequately allege a distinct Enterprise.

employees undertook for "contractual compensation," an allegation that supports only an inference that both entities were acting in their normal business interests.  *See, e.g., Gardner v. Starkist Co*., 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019) (plaintiffs "failed to plausibly allege facts that show StarKist and RICO Co-Conspirators committed acts towards this alleged common purpose. Simply characterizing routine commercial dealing as a RICO enterprise is not enough.").

Plaintiffs respond that, taking the inferences in their favor, their pre-December 2018 allegations (the shelf space, Altria's possession of JLI sales data from 2017, and Altria's efforts to keep mint on the market to benefit JLI) establish non-routine coordination between Altria and JLI in the pre-December 2018 period.  They also argue that the services contract, under which Altria was reimbursed for the services its employees provided to JLI, provided only a "veneer of legitimacy" for Altria's coordinated fraudulent conduct with JLI.  Oppo. JLI/Altria RICO at 27. These are thin reeds on which to allege that Altria actively joined an existing RICO Enterprise and then "conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs."  *Cedric Kushner*, 533 U.S. at 161; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig*., MDL 2672 CRB (JSC), 2017 WL 4890594, at *16 (N.D. Cal. Oct. 30, 2017) ("But 'some part in directing the enterprise's affairs is required,' [*Reves*, 507 U.S. at 179], and '[s]imply performing services for the enterprise,' or failing to stop illegal activity, is not sufficient. *Walter v. Drayson*, 538 F.3d 1244, 1248-49 (9th Cir. 2008).").  Plaintiffs need to allege more.

Finally, Altria contends that plaintiffs do not sufficiently identify which of the four *different* Altria defendants named in the operative complaints but lumped together as "Altria" in the complaints was responsible for the specific Enterprise acts identified.  This, according to Altria, is impermissible group pleading not permissible under Rule 9(b).  Plaintiffs respond that they are not yet in a position to know which Altria defendant engaged in what specific actions, given the complex nature of Altria's corporate structure.  *See, e.g., In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig*., 295 F. Supp. 3d 927, 990 (N.D. Cal. 2018) ("at this early stage in the proceedings, Plaintiffs have essentially been forced to lump the Bosch companies because the Bosch Defendants have chosen to operate a specific way, grouping

United States District Court
Northern District of California

1    business sectors by function (instead of location)”).  But those “complex structure” allegations are

2    not included in the CAC.

3        On amendment, plaintiffs shall add allegations regarding Altria’s conduct in support of the

4    allegedly distinct Enterprise (as opposed to conduct which, even if coordinated with JLI, was

5    simply in furtherance of its own economic and JLI’s ordinary business interests).  Plaintiffs shall

6    also identify which Altria defendant undertook what specific Enterprise conduct or explain why

7    they cannot be more specific at this juncture.

8        E.    **Predicate Acts and Pattern of Racketeering**

9        Plaintiffs allege that the defendants engaged in predicate acts of mail and wire fraud in

10   violation of 18 U.S.C. §§ 1341 and 1343 through communications meant to defraud “regulators

11   and the public” as to both the impact of JLI’s products (delivery, nicotine dosages, flavors) and

12   their coordinated intent to market to youth and to create a pipeline of new, nicotine addicts.  *See,*

13   *e.g.,* CAC ¶¶ 735-737, 749-752, 756.[33]  The specific acts of mail and wire fraud are identified in

14   Paragraph 752 of the CAC with a chart listing “from, to, date, and description” for each alleged

15   fraudulent statement.  There, spanning five pages, plaintiffs identify various packaging statements,

16   advertisements, marketing materials, JLI website statements, Altria website statements,

17   correspondence with regulators, testimony to Congress, and statements to print, television and

18   social media that plaintiffs contend were fraudulent.  The “from” identified for each of the

19   statements identifies them as being made by “All Early Enterprise Defendants” (mostly

20   advertisement and marketing materials); “All RICO Defendants” (mostly packaging statements);

21   statements by “JLI” or its former CEOs (Monsees or Burns) or Chief Administrative Officer

22   (Ashely Gould); and statements by Howard Willard (Altria CEO).  *Id.* ¶ 752.  Some of these

23   statements are also described at other places in the CAC.  *See* CAC ¶¶ 416-417 (Altria’s October

24   25, 2018 and October 14, 2019 letters sent respectively to the FDA Commissioner and Senator

25   Durbin); CAC ¶¶ 749, 752 (Altria’s helping JLI distribute JUUL product with deceptive

26

27   [33] As noted above, mail and wire fraud “are identical except for the particular method used to
     disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B)
28   the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud.”
     *Eclectic Properties*, 751 F.3d at 997.

1    packaging, Altria attaching "Make the Switch" advertisements to packages of cigarettes).

2          These statements are all alleged to be part of the scheme: (1) misrepresenting the nicotine

3    content, nicotine delivery profile, and risks of JUUL products; (2) misrepresenting to the public

4    that JUUL was a smoking cessation tool; and, (3) using third-party groups to spread false and

5    misleading narratives about e-cigarettes, and JUUL in particular, in order to grow the market for

6    nicotine users, particularly among youth.  CAC ¶ 167; *see also id.* ¶¶ 725-27, 735-40.

7          Defendants argue generally that the predicate wire and mail fraud acts are not pleaded with

8    sufficient particularity or are otherwise insufficient.

9                    **1.      Scheme to Defraud**

10         Defendants raise a number of challenges to the alleged scheme to defraud.  Many of them

11   are variants on a theme addressed before, that defendants' acts were not fraudulent but were

12   regular business acts meant to ensure that JLI's products could remain on the market and would

13   have successful sales.  But the issue of the distinctness of an Enterprise from an otherwise

14   legitimate corporate organization is significantly different from the question of whether plaintiffs

15   have adequately alleged a "scheme to defraud."  Alleged fraudulent conduct does not create a

16   RICO enterprise.  But that a distinct RICO enterprise is not supported by various fraud-based

17   allegations does not, conversely, mean that those acts are not plausibly alleged to be fraudulent.

18         Separately, Bowen argues that allegations that defendants were generally undertaking

19   conduct in order to increase market share and sell "legal goods" cannot constitute a scheme to

20   defraud plaintiffs of property.  *See, e.g., Bitton v. Gencor Nutrientes, Inc.*, 654 Fed. Appx. 358,

21   363 (9th Cir. 2016) (unpublished) (where plaintiffs failed to allege defendants knew "results of the

22   study were altered or that any Defendant knew that the study was either falsified or unreliable"

23   allegations were insufficient to reasonably infer "that the conduct at issue—the purchase,

24   marketing, and sale of legal goods by legitimate businesses— 'is plausibly part of a fraudulent

25   scheme.'").  Of course, the sale of JUUL products by itself is not the crux of the scheme to

26   defraud.  It is instead the intentional design and related fraudulent misrepresentations or omissions

27   regarding its intentional addictiveness and method of nicotine delivery, combined with the intent,

28   contrary to public statements, to grow the market for nicotine-addicted individuals (particularly

youth who did not use traditional tobacco products).  This has been adequately alleged.

Plaintiffs have adequately alleged a scheme to defraud using mails and wires to conduct and further that fraudulent scheme.

### 2.      Intent

An element of both the wire and mail fraud predicate act claims is the "specific intent to defraud."  *Eclectic Properties*, 751 F.3d at 997.  The intent to defraud need not be shown for each alleged use of the mails or wires as long as there is evidence that the use of mails or wires was done to further the overarching scheme to defraud.  *See, e.g., U.S. v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003) (reaffirming that under the mail fraud statute the government is not required to prove any particular false statement was made, and there are "alternative routes" including "proof of a scheme to defraud that may or may not involve any specific false statements").  As explained in *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig*., 295 F. Supp. 3d 927, 977 (N.D. Cal. 2018), "[i]ntent to defraud may be inferred 'by examining the scheme itself.'"  *Id*. at 977 (quoting *Eclectic Props*., 751 F.3d at 997).  Given the well-pleaded allegations that defendants knowingly participated in an inherently fraudulent scheme (to falsify emissions), "intent to defraud easily follows."  *Id*.

JLI and Altria do not contest intent, but Bowen, Monsees, and the Other Director Defendants do.  For the same reasons that sufficient acts in support of conducting an enterprise have been alleged for Bowen and Monsees, as well as the existence of a scheme to defraud that stems in part from express acts and representations taken by Bowen and Monsees, the showing of intent is satisfied for both of them.[34]  As noted, neither of those elements has been shown with respect to Huh, Valani, and Pritzker; facts plausibly showing intent are for related reasons insufficiently alleged as to each of them.

---

[34] Monsees complains that plaintiffs have failed to allege that *he* sought to secure, through his allegedly fraudulent statements to Congress and the *New York Times*, money or property from Congress or the *New York Times*.  He misses the point.  The clear target of the alleged fraud alleged are end-consumers, from whom (as discussed below) money and property were taken.

United States District Court
Northern District of California

### 3.      Predicate Acts

#### a.      Puffery or Opinion

A number of the defendants – in particular Bowen and Monsees – argue that predicate acts of mail or wire fraud cannot be based on public statements that amount in their view to opinion or puffery.  For example, Monsees argues his August 2019 response to questions from the *New York Times* on behalf of JLI – that selling JUUL products to youth was "antithetical to the company's mission" and which plaintiffs claim was a fraudulent statement – is protected opinion or non-actionable puffery.  CAC ¶¶  414, 752.

The trier of fact may determine what the true mission of the company or the distinct Enterprise within the company was, given defendants' oft-repeated statements that JUUL is a smoking cessation device contrasted with its alleged intentional youth targeting to grow the market of nicotine-addicted users.  The cases relied on by defendants are inapposite.  *See, e.g*., *Eclectic Properties E., LLC v. Marcus & Millichap Co*., 751 F.3d 990, 1000 (9th Cir. 2014) (finding statements by defendants "about the relative security of the investments constitute 'puffing' or related expressions of opinion that are common in sales and not actionable as fraud."); *Retail Wholesale & Dept. Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co*., 845 F.3d 1268, 1276 (9th Cir. 2017) (plaintiffs could not base securities claim based on "inherently aspirational" code of conduct).

Similarly, defendants' argument that a scheme to defraud and fraud-based predicate acts cannot be based on statements made to others (like media outlets or government officials) is not persuasive.  The Supreme Court in *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 642 (2008), determined that a showing of first-party reliance is not required under the mail or wire fraud statutes.  The Ninth Circuit's recent decision *in U.S. v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020), does not alter that conclusion because *Miller* simply reiterated that "a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions."  Here the intended victims, as consistently alleged, are the end consumers.

### b.     *Noerr-Pennington* and Petitioning Activity

Plaintiffs also expressly rely on statements various defendants made at different times to Congress and regulators at the FDA.  CAC ¶¶ 416,417.  Defendants claim that these statements cannot, as a matter of law, be actionable frauds because they are petitioning conduct protected under the *Noerr-Pennington* doctrine.  This "doctrine derives from the First Amendment's guarantee of 'the right of the people ... to petition the Government for a redress of grievances.' U.S. Const. amend. I."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

Under the *Noerr–Pennington* doctrine, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa*, 437 F.3d at 929.  Defendants rely on *Sosa*, where the Ninth Circuit determined that plaintiff's lawsuit, which sought to impose RICO liability on DIRECTV for sending prelitigation demand letters, would "quite plainly burden DIRECTV's ability to settle legal claims short of filing a lawsuit" and therefore implicated the *Noerr-Pennington* doctrine directly.  *Id*. at 932.[35]

Plaintiffs dispute the impact of *Noerr-Pennington*, arguing that the statements to Congress and the FDA were intentionally false statements that fall within *Noerr-Pennington's* "sham" exception.  *See Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009) (noting that the *Sosa* court "suggested that the question of whether there would be absolute immunity for conduct including intentional misrepresentations or fraud should be analyzed under the sham exception"); *see also Clipper Exxpress v. Rocky Mt. Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982) ("It is unquestionably true, as defendants assert, that *Noerr-Pennington* confers antitrust immunity for conduct genuinely intended to influence governmental action. Whether something is a genuine effort to influence governmental action, or a mere sham, is a question of fact.").

---

[35] In *Sosa*, the Ninth Circuit sought to "determine whether Sosa's RICO lawsuit burdens DIRECTV's petitioning activities. If it does, we must examine the precise petitioning conduct DIRECTV engaged in to determine whether the burden identified may be imposed consistently with the Constitution. If there is a substantial question that it may not, we must determine whether RICO or the RICO predicate acts Sosa alleges clearly provide for liability for the conduct at issue. If a reasonable construction of RICO or the predicate act statutes exists that avoids the burden, we will adopt that construction."  437 F.3d at 932.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Whether or not an otherwise non-actionable statement falls within the sham exception is generally a question of fact not appropriate for resolution on a motion to dismiss.  Plaintiffs concede that JLI and Altria genuinely sought to influence the government through these statements (to defer regulation and allow them to keep JLI's mint pods on the market), even if the information they used to achieve those ends was fraudulent.  It is unclear whether the sham exception stretches to cover this scenario.  That said, even if the representations to Congress and the FDA are not actionable as predicate acts, they are nonetheless evidence of the alleged overall scheme to defraud. *See In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) (*Noerr-Pennington* provides immunity from liability for simply petitioning government, but doctrine does not foreclose use of communications to government as evidence, *e.g.*, of knowledge, intent, state of mind).

Relatedly, defendants argue that plaintiffs' "lulling" of regulators theory – that JLI and Altria pretended to be concerned about youth-use but in reality were attempting to placate the FDA and postpone FDA action while maintaining JUUL on the market generally and mint as a flavored-youth-preferred pod specifically – is untenable under a recent Supreme Court decision, *Kelly v. U.S.*, 140 S. Ct. 1565 (2020).  In *Kelly*, the Court considered a wire fraud conviction, noting that 18 U.S.C. § 1343 makes it a crime to "to effect (with the use of the wires) 'any scheme or artifice to defraud, *or for obtaining money or property* by means of false or fraudulent pretenses, representations, or promises.'" U.S.C. § 1343 (emphasis added).  The Court held that because the purpose of the scheme at issue was to punish a local elected official (for failing to endorse the Governor) and was carried out through the means of restricting access to commuter lanes by directing the Port Authority to do so, a wire fraud claim could not be asserted because defendants did not attempt to "obtain the Port Authority's money or property." *Id*. at 1568-69 (no cognizable injury where the only harm was "realignment of the toll lanes was an exercise of regulatory power—something this Court has already held fails to meet the statutes' property requirement. And the [extra toll taker's] labor was just the incidental cost of that regulation, rather

than itself an object of the officials' scheme.").[36]

Here, however, the scheme was to secure the money and property of the end consumers, in particular the new and youth users who were not previously addicted to nicotine. Defendants did so by allegedly lulling Congressional legislators and the regulators at the FDA into inaction, or more limited action, to allow their products to remain on the market. *Kelly* does not foreclose the plaintiffs' RICO claim.

Defendants likewise rely on *Buckman Co. v. Plaintiffs' Leg. Comm.*, 531 U.S. 341, 353 (2001) to argue that "fraud on the agency" cannot be a predicate wire or mail fraud act. In *Buckman*, however, the question was preemption of a claim based on a duty created "solely" by virtue of the FDCA disclosure requirements. That is not the basis of the mail or wire fraud claims here. There is no claim that the allegedly fraudulent statements made to the government officials were specifically *required* by Congress or the FDA. Indeed, the statements were voluntarily made by the speakers with an alleged aim to deter or defer government action, placate the public, and preserve JLI's ability to continue to sell mint pods and continue to grow the youth market (contrary to its disclosed intent).[37] *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 995 (N.D. Cal. 2018) (distinguishing *Buckman* where "the gravamen of the affirmative misrepresentation claims is that Defendants deceived consumers. Thus, the fraud claims here do not arise 'solely by virtue of' noncompliance with FAA emissions rules; they arise out of the alleged deceit practiced on consumers by Defendants."); *Ferrari v. Nat. Partners, Inc.*, 15-CV-04787-LHK, 2016 WL 4440242, at *5 (N.D. Cal. Aug. 23, 2016) (allowing fraud on the FDA-type claims to proceed and recognizing "*Buckman* addresses federal preemption of claims, not of individual allegations."). *Buckman*

---

[36] The regulatory power issue discussed in *Kelly* referred to the holding in *Cleveland v. United States*, 531 U.S. 12 (2000) where the Court held that defendant's scheme "to influence, to his own benefit, Louisiana's issuance of gaming licenses" was aimed at depriving the State of property by altering its licensing decisions and that was an "intangible right" of allocation, exclusion, and control and not a cognizable "property interest." *Id.* at 26; *see also Kelly*, 140 S. Ct. at 1572.

[37] As the Ninth Circuit recognized, the claims in *Buckman* also failed because there was "clear evidence" that Congress intended that the relevant act to be enforced exclusively by the Federal Government. As noted above in the preemption discussion, that is clearly not the case with the TCA. *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1040 (9th Cir. 2015).

United States District Court
Northern District of California

United States District Court
Northern District of California

likewise does not bar plaintiffs' RICO claim.  *See also McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1040–41 (9th Cir. 2015) (claims were barred "fraud-on-the-FDA claims" under *Buckman* where the "failure-to-warn claims McClellan alleged did not arise solely by virtue of the MDA.  Further, there is no suggestion that Congress intended to displace traditional tort law by making all policing of medical labels and warnings the exclusive province of the FDA.").

### c.    Acts Committed by Enterprise or by Co-Conspirators Individually

Defendants argue, generally, that plaintiffs have failed to show that each of them committed at least two predicate acts of mail or wire fraud, but that is not the standard.  Instead, plaintiffs need only allege that each defendant was "(1) a knowing participant in a scheme to defraud, (2) that [defendant] participated in the scheme with the intent to defraud, and (3) that a co-schemer's acts of mail and wire fraud occurred during [defendant's] participation in the scheme and were within the scope of the scheme."  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 4890594, at *13 (N.D. Cal. Oct. 30, 2017) (relying on *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002)); *see also In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 979 (N.D. Cal. 2018) ("When the predicate acts are acts of mail or wire fraud, however, the Ninth Circuit has held that 'knowing participants in the scheme are legally liable for their co-schemers use of the mails or wires'" and requiring only plausibly supported facts "that each Defendant was a knowing participant in the scheme to defraud.");  *Dufour v. BE LLC*, C 09-03770 CRB, 2010 WL 2560409, at *11 (N.D. Cal. June 22, 2010) ("[I]t is not necessary that all named defendants themselves used the wires. . . . Therefore, it is not necessary for [defendant] to have sent any messages himself; it is sufficient that he knew of the scheme and participated in it.").

Bowen.   Bowen argues that because there are no particularized allegations that he committed any particular act of mail or wire fraud, much less that he participated in the marketing or commercial messaging of the JUUL products other than the unsupported allegation that Bowen had, along with Monsees and the Other Director Defendants, "final say" over marketing materials,

United States District Court
Northern District of California

1    he must be dismissed from the RICO claim.  CAC ¶¶ 207 n. 212, 340, 415, 719.  But, as noted

2    above, Bowen misstates the applicable standard.  Plaintiffs have plausibly alleged that Bowen was

3    a knowing participant in the scheme to defraud.

4        Monsees.  Monsees also points out that plaintiffs specifically identify only two statements

5    from him as predicate Enterprise acts.  The first was the written testimony submitted to Congress

6    in July 2019, where Monsees stated that JLI never wanted to capture non-nicotine addicted or

7    youth users, which Monsees argues is protected under the *Noerr-Pennington* doctrine.  CAC ¶

8    752.  I addressed that argument earlier.[38]  He also argues that because the aim of this statement is

9    to influence Congress, and not to obtain money or property from the government, it cannot

10   constitute mail or wire fraud.  That argument, too, is rejected above.  The second alleged statement

11   is his August 2019 statement to the *New York Times* that selling to youth was "antithetical" to

12   JLI's mission.  CAC ¶ 752.  Monsees argues that it is protected opinion and "objectively true"

13   given JLI's mission statement expressing its intent to "combat underage usage of our products."

14   CAC ¶ 77.  These arguments were likewise addressed above and at most raise disputes of fact not

15   appropriate for resolution now.[39]

16       Other Director Defendants.  The Other Director Defendants point out that there are no

17   allegations that any of them directly engaged in any of the predicate acts or had knowledge of

18   others doing so.  Again, that is not the standard.  But because plaintiffs have failed (at this

19   juncture) to plausibly allege facts showing that the Other Director Defendants were knowing

20   participants in the scheme to defraud and that they personally participated in the scheme with the

21   intent to defraud, the RICO claim has not been adequately alleged against each of them.

22       Altria.  Altria separately contends that predicate acts of mail fraud cannot be based on

23

24   _____

[38] Monsees also contends that no RICO-cognizable harm could have flowed from the
25   Congressional testimony because lulling Congress into inaction on JLI's products is too remote a
     theory of causation and is impermissibly contingent on Congress inaction.  Proximate cause is
26   addressed below.

27   [39] In footnotes, Monsees argues the Congressional testimony and statements to the *New York
     Time*s are not alleged to have been material to the scheme to defraud.  Monsees MTD at 11 n.11,
28   12 at n.12.  Plaintiffs do, however, allege that these were material statements and materiality is
     not appropriately determined at this juncture.

Altria shipping JLI products that allegedly contained misleading and fraudulent statements because Altria did not use the "mails" but used freight delivery services. That simply raises a dispute of fact that is not appropriately resolved on a motion to dismiss.

JLI. Finally, JLI contends that the predicate acts from 2015 fall outside RICO's statute of limitations. That argument depends on whether the "injury discovery rule" tolls the statute of limitations and can be addressed on summary judgment.

### 4. Pattern

A RICO pattern consisting of different acts by the Enterprise is shown where the acts are "related" and extend over a "substantial" period of time. *Howard v. Am. Online Inc*., 208 F.3d 741, 750 (9th Cir. 2000).

#### a. Relatedness

Various defendants argue that the specific isolated acts with which they are charged are too distinct, separated by too much time, or otherwise not sufficiently related to other acts to be part of the requisite "pattern." So, for example, Monsees challenges the relatedness of his alleged specific predicate acts to the pattern of Enterprise acts as a whole. But even if Monsees's acts were made through different channels and made to different audiences (comments to Congress, regulators, the news media, or the public), the goal of the scheme to defraud as consistently alleged by plaintiffs remains plausibly the same: to lull the public and government into false beliefs about the JUUL product and defendants' intent while defendants worked (contrary to those public statements) to increase nicotine addiction and specifically target the youth market.

#### b. Continuity

Plaintiffs contend that: (i) by identifying predicate wire and mail fraud acts over a course of five years, they have alleged "closed-ended" continuity; and (ii) by alleging that some of the misrepresentations continue to this day, they have likewise alleged "open-ended" continuity. *See Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1526-27 (9th Cir. 1995). Monsees challenges the showing of both closed-ended and open-ended continuity by focusing exclusively on the two predicate acts he is alleged to have personally committed (to Congress and the *New York Times*). He points out that those two acts do not span a "substantial" period of time (generally recognized at 12 months

1    or more) but were committed within approximately one month.  However, those two acts are part

2    of the larger context of Enterprise acts that extend over a five-year period.  Sufficient continuity

3    has been alleged.

### F.    Proximate Cause and Injury to Money or Property

5        Defendants contest whether plaintiffs in the CAC and PECs have alleged sufficient

6    proximate causation under the heightened RICO standard, which bars "'suits for alleged harm that

7    is 'too remote' from the defendant's unlawful conduct'" and instead demands some "'direct

8    relation between the injury asserted and the injurious conduct alleged.'" *Painters and Allied*

9    *Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1248–49

10   (9th Cir. 2019) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133

11   and *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).  However, plaintiffs "are not

12   required to show that each individual predicate act caused them an injury, but rather that the

13   pattern of racketeering activity did."  *Just Film, Inc. v. Merchant Services, Inc.*, C 10-1993 CW,

14   2012 WL 6087210, at *12 (N.D. Cal. Dec. 6, 2012).

15       Plaintiffs generally allege that the purpose of the Enterprise was  "maintaining and

16   expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and

17   growing customer base, including by … addicting children to nicotine." CAC ¶ 750.  In

18   furtherance of the Enterprise's common purpose, defendants "made false and misleading

19   statements directly to the public," leading them to purchase JUUL. CAC ¶ 763.  As such, plaintiffs

20   contend that they are the direct victims of defendants' alleged fraudulent scheme. *See, e.g.,*

21   *Painters*, 943 F.3d at 1251 (finding proximate cause based on allegations that defendants actively

22   concealed the risk of a product to sell more to unsuspecting persons and increase revenue and that

23   plaintiffs would not have purchased the product but for the deception).

### 1.    CAC

#### a.    Directness

26       JLI and Altria argue, first, that the alleged deception to regulators cannot support "direct"

27   proximate causation because any harm to plaintiffs from those statements resulted from the

28   intervening acts or inaction of the regulators, not the Enterprise.  JLI RICO Mot. at 12-13; *see also*

United States District Court
Northern District of California

United States District Court
Northern District of California

Altria RICO/UCL MTD (Dkt. No. 632) at 37-38 (asserting that Altria's only pre-investment conduct is the mint comments to regulators that cannot support the "direct" causation required under RICO because it impacted (theoretically) only the acts of the third-party regulators). Defendants' comments to the regulators (in hopes of inaction) are only one part of the scheme alleged. Plaintiffs also identify statements made directly to the public through marketing materials, website materials, media statements, and press releases.

In addition, the line of cases on which defendants rely – rejecting proximate causation where the RICO conduct alleged most directly impacted the government – do not control here. *See, e.g.*, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) (alleged injury to the business caused by competitor unlawfully selling products free of sales tax and submitting fraudulent sales tax returns was not sufficiently direct to show proximate cause because it was the government's loss of sales tax that was primary and direct injury); *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866 (9th Cir. 2010) (purchasers of tax shelters could not show RICO proximate cause based on allegations that defendants engaged in scheme to defraud United States of tax revenue through fraudulent tax shelters).[40] Here, the aim of the scheme and those who most directly suffered the harm plaintiffs allege, for purposes of the CAC allegations, were the end consumers of JLI's products.

Closer to the posture of this case is *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 967 (N.D. Cal. 2018). In *Ecodiesel,* the plaintiffs alleged that defendants concealed that they had installed devices that reduced the effectiveness of the promised and government-regulated emissions levels and based their RICO claim, in part, on a scheme to defraud the agencies that regulated emissions. *Id*. at 965. The Hon. Edward M. Chen persuasively distinguished *Anza* and *Rezner* (where government entities, not the

---

[40] *See also Halpin v. Crist*, 405 Fed. Appx. 403, 406 (11th Cir. 2010) (unpublished) (dismissing RICO claim for lack of proximate causation where State of Florida was the intended target of the fraudulent scheme (bribes related to provision of services in prisons) and prisoner-plaintiffs' injuries (payment of higher prices) was "not directly caused by the acts of racketeering" bribes); *Callahan v. A.E.V., Inc*., 182 F.3d 237, 261 (3d Cir. 1999) (proximate cause lacking based on scheme involving false submissions to state liquor control board, because the board and the state "more generally were the direct victims of the defendants' actions; the plaintiffs' losses are at most derivative of any injuries to the [board's] regulatory mission").

United States District Court
Northern District of California

plaintiffs, were more directly damaged by the loss of tax monies, *not* the plaintiffs), because in *Ecodiesel* the "alleged 'fraud on the regulators' plausibly led directly to Plaintiffs' economic injury. By deceiving regulators, Defendants were able to sell Class Vehicles that emitted NOx at levels up to 20 times legal limits and that contained one or more defeat devices. This deceit plausibly caused Plaintiffs to overpay for the defective Class Vehicles by an amount directly attributable to the alleged wrongful conduct of the Defendants." *Id*. Here too (for purposes of the CAC), the end consumers are the ones injured by defendants' false representations to federal regulators and others. *See also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig*., MDL 2672 CRB (JSC), 2017 WL 4890594, at *9 (N.D. Cal. Oct. 30, 2017) ("What matters, though, is not whether there is a direct relationship between the plaintiff and defendant, but whether there is a 'sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury.'") (quoting *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 657 (2008)).

That some of the predicate acts or fraudulent statements were made to regulators did not break the causal chain for purposes of RICO.

### b.      Benefit of Bargain

In the CAC, plaintiffs allege that defendants' conduct caused "the RICO Class members to purchase JUUL products that they would not have purchased, or—in the alternative—to pay more for JUUL products than they would have otherwise paid." CAC ¶ 762; *see also, e.g*., CAC, App. A ¶¶ 9, 22, 37, 48, 63, 79, 95, 108, 119. This lost money, plaintiffs argue, is cognizable "lost money or property" under RICO. *See, e.g., Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd*., 943 F.3d 1243, 1247 (9th Cir. 2019) (plaintiffs sought "to recover economic damages under RICO for the payments they made to purchase Actos under the assumption that it was a safe drug, which they allege they would not have purchased had they known that Actos" was not safe).

While JLI contests whether these "expectation" or "benefit-of-the-bargain" damages are a cognizable RICO injury, in the Ninth Circuit and this District they are. *Canyon County v. Syngenta Seeds, Inc*., 519 F.3d 969, 976 (9th Cir. 2008) ("a consumer who has been overcharged

69

can claim an injury to her property, based on a wrongful deprivation of her money"); *In re*

*Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d

927, 960 (N.D. Cal. 2018) ("when a plaintiff alleges that he or she overpaid for a good or service

because of anticompetitive or deceptive conduct, the Supreme Court's decision in *Reiter* and the

Ninth Circuit's decision in *Canyon County* support that such an injury is one to 'property,' not

merely 'expectation interests.'").[41]

### 2.    PECs

In the PECs, Three Village and the other public entities generally allege that "Defendants

intentionally sought to reach into schools . . . to continue growing JLI's youth customer base,"

TVC ¶ 701, and "intentionally addict[ed] . . . youth in [Three Village]'s schools." TVC ¶ 702.

Defendants' conduct "required [Three Village] to expend its limited financial and other resources

to mitigate the health crisis of youth e-cigarette use" in Three Village schools, TVC ¶ 702, forcing

Three Village to: conduct staff training on e-cigarette use, TVC ¶ 599; hold assemblies to educate

students and parents on the dangers of e-cigarette use, TVC ¶ 600; modify its health curricula to

focus on the dangers of e-cigarette use, TVC ¶ 601; hire a new student assistant counselor, TVC ¶

603; pay the costs of tutoring services for suspended students, including transportation, TVC ¶

606; purchase e-cigarette detectors and surveillance cameras, TVC ¶ 607; and purchase anti-e-

cigarette signage for school property. TVC ¶ 607.

Defendants raise separate proximate cause arguments with respect to the damages alleged

in the PECs.  First, they argue that the proximate cause between the government entities' damages

and the defendants' acts is not "direct" enough because the claims rely on the intervening

consumers' conduct.  For example, in *Oregon Laborers-Employers Health & Welfare Tr. Fund v.*

*Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999), the Ninth Circuit found too indirect a health

care trust funds' RICO claim and attempt to recover damages for smoking-related costs of health

---

[41] JLI relies heavily on *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) and *In re General Motors LLC Ignition Switch Litigation*, No. 14–md–2543 JMF, 2016 WL 3920353 (S.D.N.Y. July 15, 2016), both of which were rejected as contrary to circuit precedent (and for *McLaughlin* also persuasively distinguished) in both *Ecodiesel*, 295 F. Supp. 3d at 960 and *In re Volkswagen "Clean Diesel" Mktg., Sales, Practices, and Products Liab. Litig.*, 349 F. Supp. 3d 881, 905 (N.D. Cal. 2018).

United States District Court
Northern District of California

care for its insureds.  The Ninth Circuit found those damages "too remote" from defendants'

alleged conduct (efforts to conceal the scientific evidence about smoking risks and prevent

measures to curb smoking).  *Id.* at 961-62.  The Ninth Circuit explained that "all of plaintiffs'

claims rely on alleged injury to smokers-without any injury to smokers, plaintiffs would not have

incurred the additional expenses in paying for the medical expenses of those smokers. Thus, there

is no 'direct' link between the alleged misconduct of defendants and the alleged damage to

plaintiffs."[42] *See also Assn. of Washington Pub. Hosp. Districts v. Philip Morris Inc.*, 241 F.3d

696, 702 (9th Cir. 2001) ("All other Courts of Appeals that have addressed the issue have agreed

that union trust funds lack standing to bring antitrust and RICO claims against the tobacco

industry to recover their increased expenditures for treating tobacco-related illnesses.").

Defendants contend that the PEC damages are like the health care trust funds', wholly

dependent on actual damages suffered by *users* of JLI's products and, therefore, too remote to

satisfy proximate cause and establish standing.  However, while the public entities' damages

would not have been incurred but for defendants' scheme to defraud and create a youth market as

alleged, significant distinctions between the PEC allegations and the health care trust fund cases

make that line of authority inapposite.  The most significant of those distinctions is that the

damages incurred by end-users are wholly distinct from the damages incurred by the PECs.  Even

if the consumers in the end are unable to prove any benefit of the bargain damages or if some

personal injury plaintiffs are unable to prove causation between use of JUUL and their injuries,

that would not undercut the damages sought by the PECs, such as the costs of hiring and training

staff to address e-cigarette use, development of programs and materials to address e-cigarette use,

costs of tutoring and other services for students who were disciplined for e-cigarette use, physical

alterations to their properties to address and deter further e-cigarette use, and disposal of the

---

[42] The court went onto weigh the three *Holmes* factors, specifically considering "(1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries" (*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002)), and found each of those factors weighed against the trust funds' standing.  *Id.* at 964.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    hazardous waste resulting from e-cigarette use.  An additional distinction is that the PECs contain

2    numerous allegations that defendants intentionally targeted school-aged youth and schools (*see,*

3    *e.g.,* TVC ¶¶ 176, 441, 445) and that conduct created and/or perpetuated some of the government

4    entities' harms.  None of the *Holmes* factors, *see supra*, weigh against the PECs' showing of

5    proximate cause and standing.

6            Second, defendants argue that the damages each of the PEC's seek are not recoverable as a

7    matter of law under *Canyon County v. Syngenta Seeds, Inc*., 519 F.3d 969, 975 (9th Cir. 2008).  In

8    that case, the County alleged that it was damaged by having to spend millions of dollars on health

9    care and criminal justice services for the illegal immigrants who have been employed by the

10   defendants in violation of federal law.  The Ninth Circuit held that was insufficient "injury to" the

11   County's property noting first, that the law "commonly distinguishes between the status of a

12   governmental entity acting to enforce the laws or promote the general welfare and that of a

13   governmental entity acting as a consumer or other type of market participant."  *Id*. at 976.

14   Providing health care and criminal justice services were necessary to "enforce the laws or promote

15   the public well-being" and normal governmental acts that did not constitute injury to its property

16   cognizable under RICO.

17           Plaintiffs contend that the expenditures here – wholly new or expanded services

18   necessitated solely by the crisis of youth use of JUUL products – were "extraordinary" and not the

19   sort of typical and expected government expenditures at issue in *Canyon County*.  This distinction

20   was accepted by Judge Polster in *In re Natl. Prescription Opiate Litig*., 1:17-MD-2804, 2018 WL

21   6628898, at *10 (N.D. Ohio Dec. 19, 2018) (distinguishing *Canyon County* given "the scope and

22   magnitude of the opioid crisis—the illicit drug market and attendant human suffering—allegedly

23   created by Defendants have forced Plaintiffs to go far beyond what a governmental entity might

24   ordinarily be expected to pay to enforce the laws or promote the general welfare. Plaintiffs have

25   been forced to expend vast sums of money far exceeding their budgets to attempt to combat the

26   opioid epidemic.").

27           A recent decision from the Hon. Charles R. Breyer in this District rejected that distinction

28   and instead concluded that *Canyon City* established a bright line rule and that government entities

United States District Court
Northern District of California

1  may never recover for government expenditures when acting to enforce the laws or promote the

2  general welfare, even if those expenditures are the result of a "man-made crisis" unexpected in

3  magnitude and of a scope far beyond typical government expenditures.  *City and County of San*

4  *Francisco v. Purdue Pharma*, 3:18-CV-07591-CRB, 2020 WL 5816488, at *19 (N.D. Cal. Sept.

5  30, 2020).  If I were to follow that decision, a large segment of the PEC damages under RICO

6  would be cut away.

7  However, the PECs here also allege that they have suffered damage directly to their

8  physical property and that suffices to confer standing.  For example, Three Village alleges that

9  hazardous products have been wrongfully disposed of as regular waste in Three Village schools

10  and littered on Three Village property, and that Three Village has had to make physical

11  modifications to its property by installing e-cigarette detectors, cameras, and anti-vaping signs

12  around its property. TVC ¶¶ 607, 609.  The disposal of hazardous waste is similar to an alleged

13  property injury that Judge Breyer rejected as too indirectly caused to satisfy proximate cause in

14  *City and County of San Francisco v. Purdue Pharma*, 2020 WL 5816488 * 24.  In that case,

15  however, there were many more interim links between the defendants' conduct (sale and creation

16  of illegal secondary market for opioids) and the plaintiff's alleged harm (disposal of needles used

17  to inject crushed opioids) than exist here.  *Id*. at *24 ("physicians (Link 1), pharmacists (Link 2),

18  and patients (Link 3) who then illegally misuse opioids, improperly discard the needles, and thus

19  damage city-owned property and businesses (the harm)").  The allegations in this case are that

20  defendants not only intentionally targeted youth but also conducted programs on school grounds.

21  Unlike in the *Purdue Pharma* case, there are no issues with interim links of physicians and

22  pharmacists (although the youth users had to buy from others or circumvent age-checking

23  requirements – conduct which plaintiffs allege defendants *intended* to occur) and the use of the

24  products was as intended.

25  At this juncture, the allegations regarding injury to the PECs' properties suffice for PEC

26  standing under RICO.  The potential damages available to them (if plaintiffs are otherwise able to

27  plausibly allege a RICO claim) are better determined on a full, evidentiary record.

28

United States District Court
Northern District of California

### 3.     Altria

Altria separately argues that plaintiffs fail to adequately allege reliance, and therefore, proximate causation and sufficient injury against it, because at least 34 of the 107 putative class representatives began purchasing JUUL products before Spring 2017, the earliest the Altria defendants were alleged to have engaged in the RICO Enterprise, and almost all began using JUUL products before Altria's first investment in JLI in December 2018.  Dkt. No. 632 at 36 (noting that only 3 class representatives allege they started using JUUL products in 2019).

This argument fails because the Supreme Court in *Bridge*[43] clarified that individual reliance is not necessary for mail and wire fraud and because liability under RICO is purposefully "joint and "several"[44] this argument fails.  At this juncture, however, it is unnecessary to reach or resolve this issue because as long as there is standing for some plaintiffs, that is sufficient.  As Altria is alleged to have joined the RICO conspiracy under section 1962(d), if plaintiffs are able to plausibly allege and prove the other elements of their RICO claim, Altria may be liable for conduct throughout the whole Enterprise.[45]

### G.     Conspiracy

Finally, each defendant argues that because plaintiffs have failed to allege a substantive violation of RICO, the RICO conspiracy claim fails as a matter of law.  At this juncture, that is correct, but plaintiffs are given leave to amend to attempt to plausibly allege the underlying RICO claim.

Each of the Officer and Director defendants also argues that the RICO conspiracy claims are not sufficiently stated because plaintiffs allege no facts plausibly demonstrating that each defendant agreed with specific others to commit the fraudulent acts or that he intended to commit them himself.  These arguments are largely derivative of the "we were only acting in JLI's or our

---

[43] *Bridge*, 553 U.S. at 642.

[44] "Holding RICO conspirators jointly and severally liable for the acts of their co-conspirators reflects the notion that the damage wrought by the conspiracy 'is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002) (quoting *Investor Prot. Corp. v. Vigman*, 908 F.2d 1461, 1468 (9th Cir.1990)).

[45] Altria also reiterates the *Noerr-Pennington* and *Buckman* arguments discussed above.

own business interests" discussed above.  Because I am giving plaintiffs leave to amend to plausibly allege a distinct RICO Enterprise, the role of Veratad (and its specific connection to members of the Enterprise), and conduct in support of that Enterprise by the Other Director Defendants and Altria, there is no need to reach these separate arguments.

For the foregoing reasons, each of the defendants' motions to dismiss the RICO claims is GRANTED.  Plaintiffs are given leave to amend the deficiencies identified.

## IV.  MOTIONS TO DISMISS UCL/CALIFORNIA CLAIMS

Defendants move to dismiss the fraud, consumer protection, implied-warranty, and unjust enrichment claims asserted in the CAC on behalf of the subclass of California consumers represented by Bradley Colgate and minors C.D. and L.B. (collectively, California plaintiffs).[46] In Appendix A to the CAC, plaintiffs identify "[a]llegations specific to each plaintiff."  CAC ¶ 11. These plaintiffs allege that in "purchasing JUUL products, the Plaintiffs relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions."  *Id.* ¶¶ 644, 663 (plaintiffs relied), 672, 683 (plaintiffs justifiably relied); *see also* ¶¶ 813, 864, 898, 913, 948, 963, 1013, 1061, 1122, 1158, 1172, 1222, 1234, 1283, 1299, 1360, 1409, etc. (same).

Colgate had been a combustible cigarette smoker for at least seven years before he first purchased JUUL products in or around October 2017, having seen social media advertisements and "sponsored stories" encouraging the switch to JUUL from combustible cigarettes, advertisements characterizing JUUL as an "alternative" to cigarettes (which he understood meant not unhealthy and less addictive than cigarettes), and advertisements describing kits customized to his lifestyle.  He also started seeing JUUL product displays in retail establishments, noting that JUUL products were often located on instead of behind counters with cigarettes. *See generally* CAC App'x ¶¶ 203-214.  He specifically alleges: "None of the advertisements, in-store promotions, or labels Colgate saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was

---

[46] In their opposition, plaintiffs dismiss the claims of M.D.  Oppo. to JLI/Altria CA (Dkt. No. 758) at 1 n.1.

United States District Court
Northern District of California

engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks."  *Id*. ¶ 212.

C.D. is 16 years old and alleges that before he had used JUUL he had seen point of sale (POS) materials that "featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL" kits.  "The representations and omissions in JUUL's in-store promotions materially impacted . . . C.D.'s assessment of, and eventual decision to use, JUUL products."  Following his older brother's use, C.D. started using JUUL and bought a JUUL device from a classmate who had a spare for sale.  C.D. alleged that but for JUUL's social media advertising, he would not have been exposed to, and would not have used, JUUL products.  He describes some of the JUUL social media posts he saw, and also social media posts by third-parties (showing that JUUL was a "cool" thing to do) and sites advertising JUUL products without or with inadequate age verification.  He states that he did not know that the content he saw was being created, distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote JUUL use to adolescents and profit from their addiction.  He also alleges that he has been receiving a steady stream of promotional e-mails from JUUL for months and that his Instagram and Snapchat streams are "bombarded" with advertisements for JUUL products.  Finally, he alleges that none "of the advertisements, in-store promotions or JUUL labels . . . C.D. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age- restricted product. The representations and omissions in JUUL's advertising and POS promotions materially impacted . . . C.D.'s assessment of the flavored JUULs [he] eventually decided to try."  CAC Appx. A ¶¶ 285-299.

L.B. alleges that she is currently 16 years old and started using JUUL in 2016, shortly after her 13th birthday.  She learned about JUUL from her friends at school and through JUUL's point-of-sale materials, which she saw in stores near her home, that showed JUUL's flavored pods and

76

United States District Court
Northern District of California

"Starter Kit" and made JUUL seem like a fun, harmless product.  She alleged that none of the materials and advertisements she saw "adequately disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's promotions materially impacted L.B.'s assessment of the fruit-flavored JUUL she would later be offered."  She states that the "fruit flavoring in the JUUL product L.B.'s friends offered her led L.B. to believe that JUUL was safe. She did not know she was ingesting nicotine from a nicotine delivery system that delivered as much-or more-nicotine than a cigarette. She knew not to smoke but did not understand the risks of ingesting nicotine from JUUL.  L.B. would not have tried a JUUL but for the flavored pods."  L.B. obtained her pods from friends and E-Bay, and a device from JLI's warranty department.  CAC Appx. A ¶¶ 796-817.

### A.   Common Law Fraud – California Plaintiffs

#### 1.   Affirmative Misrepresentations and Justifiable Reliance

JLI argues that the California plaintiffs have failed to sufficiently identify the specific affirmative representations on which they justifiably relied as required for common law fraud and that any representations currently identified are not actionable.  Plaintiffs respond that the specific deceptive and misleading statements seen by the California plaintiffs specifically included that JUUL products were smoking cessation devices, were reasonable alternatives to cigarettes, and that a pod of JUUL was equivalent to one pack of cigarettes.  CAC ¶¶ 677, 679.

As an initial matter, JLI challenges the adequacy of the identification of the actual representations on which they claim each California plaintiffs relied.  The advertisements and marketing materials that each California plaintiff saw (or were similar to the types of advertisements and marketing materials each of them saw) are identified for each in the CAC, Appendix A.  However, C.D. and L.B. do not clearly specify what text in those or similar advertisements and marketing materials they contend are express affirmative representations.  As plaintiffs will be given leave to amend to rectify some problems with their current allegations (*see*

77

*supra*), on amendment plaintiffs shall clarify whether C.D. and L.B. are alleging express

misrepresentations and, if so, identify them with more specificity.[47]

As to Colgate, JLI argues that advertisements that "vaguely" encourage people to "switch"

to JUUL or that describe JUUL products as an "alternative" to cigarettes  cannot constitute false

representations because they are too vague, too subjective, or puffery and, therefore, not

actionable as a matter of law.[48]  This issue was briefly addressed in *Colgate II*.  There, in a

footnote, I provided the following guidance:

> JUUL's use of common advertising practices and its ads that follow
> the predominant marketing aesthetic of the last few years ("bright"
> colors, "clean lines," "minimal text," "eye-catching graphics,") would
> not by itself constitute any sort of misrepresentation. Also, claims
> based on themes and vague terms in JUUL's advertising are, as JUUL
> argues, nothing more than non-actionable puffery.  *In re Fontem*,
> 2016 WL 11503066, at *9 (C.D.Cal. Apr. 22, 2016) ("Courts enter
> dangerous territory when they consider representations actionable
> based not on what they actually say, but on what plaintiffs claim
> defendants seem to be stating. This goes beyond viewing the
> allegations in the light most favorable to the plaintiff.").

*Colgate II*, 402 F. Supp. 3d at 748.  I did not rule on the use of specific phrases in JLI's marketing

materials.  Nor did I rule out the relevance of the overall features of an advertisement (including

its use bright or eye-catching colors) to the context of whether an advertisement, when considered

in whole, is misleading or false.  Instead, I warned plaintiffs that design elements would not "by

themselves" constitute an actionable misrepresentation.[49]

Turning to puffery, this is not a product comparison case where plaintiffs criticize JLI for

---

[47] To be clear, the minor plaintiffs may use "representative" advertisements in order to specify what affirmative misrepresentations they recall having seen.  The actual advertisement or marketing material a particular plaintiff saw does not (for obvious reasons) need to be reproduced *but* the specific or materially similar words or text that form the basis of their affirmative misrepresentation claim should be identified.

[48] JLI does not address the one pod equals one pack of cigarettes allegation that I previously found stated a misrepresentation claim. *Colgate II*, 402 F. Supp. 3d at 748 ("plaintiffs have sufficiently stated an omission claim and an affirmative misrepresentation with regards to JUUL's claim that one pod has as much nicotine as a pack of cigarettes").

[49] The court in *In re Fontem US, Inc. Consumer Class Action Litig.*, 2016 WL 11503066, at *9 (C.D. Cal. Apr. 22, 2016) considered whether plaintiffs had alleged sufficient facts to support the inference that "No Tobacco Smoke, Only Vapor" could imply "healthfulness or even harmlessness."  It rejected that assertion given the specific context of where and how that phrase appeared on that product's label. *Id*. at *9.

portraying JUUL as a "better" ENDS or "the best" ENDS or an ENDS that delivers "smoother"

nicotine as compared to other ENDS. *Cf. Southland Sod Farms v. Stover Seed Co.*, 108 F.3d

1134, 1145 (9th Cir. 1997) ("superiority claims that are vague or highly subjective often amount to

nonactionable puffery").[50]  As alleged, the specific "switch" and "alternative" claims must be

considered in the context of the advertisements and materials where they appear.  Considering

them there, for present purposes, the inference that the comparison specifically and quantifiably

means – when considered in context of the advertisements as a whole – that JUUL was a healthier

or less harmful alternative to combustible cigarettes is adequately alleged. *See, e.g., Shank v.

Presidio Brands, Inc.*, 17-CV-00232-DMR, 2018 WL 510169, at *9 (N.D. Cal. Jan. 23, 2018)

(where allegation concerned representation that products contained "only naturally derived

ingredients," when considered with other statements and use of imagery on packaging actionable

and not mere puffery since a consumer "could interpret Presidio's statements as a definitive

representation that its [products] contain only naturally derived ingredients, and do not contain

synthetic ingredients.").

For similar reasons, JLI is incorrect that Colgate cannot, as a matter of law, allege

justifiable reliance because no reasonable reader could agree with his inference that

advertisements encouraging him to switch to the alternative JUUL product from traditional

tobacco products could not support a reasonable inference that JUUL was attempting to convince

consumers its product was healthier or less harmful.  *Atari Corp. v. Ernst & Whinney*, 981 F.2d

1025, 1031 (9th Cir. 1992) (affirming summary judgment determination that plaintiff "possessed

facts demonstrating that the representations upon which it claims to have relied were 'patently and

---

[50] Nor is this the type of case discussed in *Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210, 234 (N.D. Cal. 2019), discussing puffery assertions of product superiority such as improved durability, high performance, state of the art, long life, etc.  This is a case where the allegation is despite being advertised as an alternative for a switch from cigarettes, JUUL is not measurably safer and may be a measurably worse or measurably more dangerous product.  While various cases have held that the term "health" untethered to specific or measurable attributes may not state a claim, that is not this case.  Discovery and expert opinions in these proceedings will concern whether ENDS generally or JUUL specifically have different (the same, better, or worse) health impacts compared to combustible cigarettes across different metrics.

obviously false.'").[51]  It is also incorrect to argue that Colgate could not have justifiably relied on the "alternative" representations because, as a long-term smoker, he knew or should have known that nicotine is bad for you.  This is likewise a question to be addressed after discovery on a motion for summary judgment record or at trial.  *See also Colgate II*, 402 F. Supp. 3d at 748 ("It is also irrelevant that certain plaintiffs were smokers before using JUUL. Being a smoker of combustible cigarettes would not impart knowledge that JUUL's liquid nicotine formulation might be twice as potent.").

Finally, JLI argues that C.D. and L.B. fail to allege specific facts showing actual reliance on defendants' advertisements and marketing materials when they instead relied on peer pressure. This argument, like the one raised as to Colgate, should be made after discovery and on an evidentiary record.  That peer use is one aspect of these minors' allegations of how and maybe why they started using JUUL does not defeat reliance because they also attest to the advertising and marketing materials on which they relied.  Whether those materials were part of the "immediate cause" of their initial or continued use can be tested on an evidentiary record.  *See City Sols., Inc. v. Clear Channel Commun.*, 365 F.3d 835, 840 (9th Cir. 2004) ("Because of the highly subjective nature of a causation analysis, the Supreme Court of California has instructed that the question whether a party detrimentally relied on the misrepresentation of another party is properly left to a jury.").

### 2.      Omissions and Justifiable Reliance

JLI challenges the plaintiffs' fraudulent omissions claims by noting the lack of a transaction between each of the California plaintiffs and JUUL and arguing that they fail to allege justifiable reliance.[52]  JLI argues plaintiffs' fraud claim cannot be based on omissions because,

---

[51] In so concluding, I do not rely on the "reasonable consumer" standard applicable under the statutory claims.

[52] Generally, a duty to disclose arises under California law: "(1) when there is a known defect in a consumer product and there are safety concerns associated with the product's use; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts."  *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958–59 (N.D. Cal. 2014).  Plaintiffs here rely on all but the "active concealment" theory.  Oppo. JLI/Altria CA at 11.

given the lack of a transactional relationship between JLI and any of the California plaintiffs

(where none are alleged to have purchased directly from JLI), there could be no duty to disclose.

*See Deteresa v. Am. Broad. Companies, Inc.*, 121 F.3d 460, 467 (9th Cir. 1997) (explaining that

no general duty to disclose arises without a transaction between the parties or the existence of a

special relationship creating a duty).[53]  It points out that neither Colgate nor C.D. allege facts

regarding where or how they purchased JUUL products.  L.B.'s only connection with JLI was

receipt of a device from JLI's warranty department, but there is no allegation money changed

hands between L.B. and JLI and absent transfer of money JLI argues there is no sufficient

transaction.  *See, e.g., Dreifort v. DJO Glob. Inc.*, 2019 WL 5578240, at *5 (S.D. Cal. Oct. 28,

2019) ("If Plaintiff purchased the boot himself, he has insufficiently plead the details of that

transaction. . . . Plaintiff has inadequately plead the existence of a transaction between him and

DJO that would give rise to DJO's duty to disclose.").

       This challenge fails.  Where the allegedly undisclosed defect creates a risk of bodily injury,

"a manufacturer has a duty to disclose a defect that poses an unreasonable safety risk even if that

manufacturer did not have a transactional relationship with the" end user.  *Hamm v. Mercedes-Benz USA, LLC*, 5:16-CV-03370-EJD, 2019 WL 4751911, at *4 (N.D. Cal. Sept. 30, 2019); *see also Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 897 (N.D. Cal. 2015 (rejecting the

requirement of a transaction, as "where, as here, Plaintiffs allege a safety defect that a reasonable

consumer would find material.").  Here, plaintiffs adequately allege defects that create an

unreasonable risk to their personal safety, even if they disclaim (in the CAC) claims based on their

personal injuries as opposed to their economic loss.[54]

-------------------------------------------------------------

[53] In *Colgate II*, I found that "plaintiffs sufficiently plead that JUUL has materially omitted the difference between the pharmacokinetic effects of its nicotine solution as compared to combustible cigarettes." *Colgate II*, 402 F. Supp. 3d at 746.  This theory is arguably not at issue on this motion because JLI contends none of the California plaintiffs' claims to have saw or relied on this representation.

[54] Contrary to JLI's assertions, a plaintiff proceeding under a safety-based omissions theory need not plead personal injury.  Instead, she must allege a threat of physical injury or safety concerns. *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 836 (Cal. App. 2d Dist. 2006), as modified (Nov. 8, 2006); *see also Bryde v. Gen. Motors, LLC*, 16-CV-02421-WHO, 2016 WL 6804584, at *13 (N.D. Cal. Nov. 17, 2016) (fraudulent omission safety claim sufficiently alleged even where injury was "out-of-pocket expenses").  The cases JLI cites in reply

United States District Court
Northern District of California

United States District Court
Northern District of California

1    As a fallback to its transaction argument, JLI contends that it was not under a duty to

2 disclose because the allegedly omitted information was not within its exclusive knowledge but

3 was publicly available to plaintiffs through studies and news articles demonstrating the dangers of

4 ENDS generally (for example linking ENDS use to lung injuries and a CDC report addressing the

5 addictive properties of ENDS) and JLI in particular (noting the CAC cites a publicly-available

6 study disclosing that JUUL delivers "more nicotine per puff than a Marlboro cigarette").  CAC ¶

7 105.  *See, e.g., In re NJOY, Inc. Consumer Class Action Litig.*, 2015 WL 12732461, at *16 (C.D.

8 Cal. May 27, 2015) (plaintiffs could not rely on a 2009 FDA study regarding toxins in e-cigarettes

9 because "the study was publicly available for three years or more" and defendants, therefore, did

10 not have exclusive knowledge of those facts at the time of plaintiffs' purchases); *Andren v. Alere,*

11 *Inc.*, 207 F. Supp. 3d 1133, 1143 (S.D. Cal. 2016) (plaintiffs' allegations re specific product defect

12 undermined by citation to publicly available studies and FDA warning letter and FDA recall

13 notices regarding *same* defect).  JLI asserts that the omissions-based claim fails given this publicly

14 available information and the failure of plaintiffs to allege specifically what material information

15 JLI had within its exclusive knowledge.

16    However, plaintiffs plausibly allege that JLI had exclusive and superior knowledge of

17 specific and undisclosed or not adequately disclosed information, including the results from the

18 Phase 0 study (showing heightened nicotine delivery, CAC ¶¶ 100-103) at the same time that it

19 was marketing its products without that disclosure, and likewise falsely stating on its packages that

20 a pod was "equivalent" in terms of nicotine to a pack of cigarettes.  Plaintiffs contend that

21 information on the market about ENDS generally and JUUL specifically was not specific enough

22 about the method of nicotine delivery and potency of JUUL; it mostly concerned the known

23 dangers of nicotine and its addictiveness.  Because the disclosures identified by JLI did not

24 disclose the specific heightened nicotine delivery and potential for heightened addictiveness of

25 _____

26 – all from the Central District and all concerning the same product – do not persuade me to depart
from the well-recognized "safety" exception for omissions-based fraud claims.  *See, e.g., Marrujo*

27 *v. Coloplast Corp.*, 2020 WL 3791637, at *6 (S.D. Cal. July 7, 2020) (relying solely on *Deteresa*
and no subsequent caselaw); *Cruz v. Johnson and Johnson, Inc.*, 2018 WL 7017981, at *3 (C.D.

28 Cal. Dec. 10, 2018) (same); *Westgate v. Coloplast Corp.*, 2018 WL 6380746, at *3 (C.D. Cal.
Sept. 6, 2018) (same).

United States District Court
Northern District of California

1  JUUL, the "exclusive knowledge" prong has been adequately alleged.  *Compare In re MyFord*

2  *Touch Consumer Litig*., 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014) ("Even if the public—and

3  therefore Plaintiffs—were aware of some problems with MFT, that does not establish that either

4  the public or Plaintiffs knew or should have known of the severity of the problems, including the

5  fact that the problems could not be fixed (as alleged by Plaintiffs)."); *with In re NJOY, Inc.*

6  *Consumer Class Action Litig*., 2015 WL 12732461 at *16 (plaintiffs could not argue defendants

7  had exclusive knowledge of the presence of carcinogens in product because FDA report disclosed

8  that specific information); *Wolph v. Acer Am. Corp*., C 09-01314 JSW, 2009 WL 2969467, at *4

9  (N.D. Cal. Sept. 14, 2009) ("Plaintiffs have not alleged any information known by Acer"

10  regarding publicly disclosed computer operating system requirements, "that was unavailable to the

11  public.").

12       The allegations of exclusive or superior knowledge and what JLI contends was publicly

13  disclosed and available to consumers are materially different from the allegations considered by

14  the Hon. James Donato in *Harris v. R.J. Reynolds Vapor Co*., 15-CV-04075-JD, 2017 WL

15  3617061, at *2 (N.D. Cal. Aug. 23, 2017).  There, plaintiffs broadly alleged that defendants failed

16  to disclose that ENDS had risks or were comparable in those risks to traditional tobacco products.

17  But because plaintiffs had cited numerous studies and reports broadly disclosing risks with ENDS

18  (and defendant itself "expressly disclosed to consumers that VUSE products are tobacco products,

19  and that 'no tobacco product is safe or without risk'"), plaintiffs' omissions-based fraud claim was

20  self-defeating.  Here, plaintiffs assert that the only source that specifically addressed the

21  addictiveness of JUUL – which both sides agree is different in design and delivery than other

22  ENDS – was published in August 2019, well after the California plaintiffs had started their JUUL

23  use.  CAC ¶ 105 & n.106.

24       JLI contends that this narrow category of JUUL-specific information – the design and

25  potency of JUUL – was in fact publicly disclosed in its patent application.  Plaintiffs acknowledge

26  and expressly allege that the results of the Phase 0 study were disclosed in the ´895 Patent (CAC

27  ¶¶ 101-102).  But this does not defeat the omissions-claim.  Disclosure to an agency and arguably

28  the public in the complex prose of a patent disclosure does not translate to a disclosure that any of

1    the California plaintiffs (much less a reasonable consumer) could reasonably be expected to read,

2    let alone comprehend.  *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales*

3    *Practices, and Products Liab. Litig*., 754 F. Supp. 2d 1145, 1192 (C.D. Cal. 2010) ("While Toyota

4    shared some information regarding [the defect] with NHTSA and eventually with consumers,

5    Toyota remained in a superior position of knowledge. While prospective customers could have

6    been tipped off to the possibility of [the defect manifesting] by researching past complaints filed

7    with NHTSA, many customers would not have performed such a search, nor would they be

8    expected to.").

9        Under the third asserted theory, JLI contends that plaintiffs have not identified any "partial

10   disclosures" other than the puffery of the "switch" and "alternative" marketing materials identified

11   by Colgate that could trigger a responsibility to disclose omitted information.[55]  But, as noted

12   above, the switch and alternative statements may, in context, be actionable and not mere puffery or

13   opinion.  Plaintiffs have also alleged that the "one pod is equivalent to a pack of cigarettes" in

14   terms of nicotine delivery can also be misleading given JUUL's otherwise not publicly

15   acknowledged different and more potent delivery method.[56]

16       As to reliance for omissions-based claims, if the withheld information was material

17   reliance is presumed.  *See, e.g*., *Daniel v. Ford Motor Co*., 806 F.3d 1217, 1225 (9th Cir. 2015)

18   ("That one would have behaved differently can be presumed, or at least inferred, when the

19   omission is material" and "[a]lleged defects that create 'unreasonable safety risks' are considered

20   material").  The allegedly withheld information at issue satisfies the materiality hurdle as a matter

21   of pleading.  The particular significance of withheld information to named plaintiffs is a highly

22   fact-based analysis typically resolved based on an evidentiary record.  *See, e.g., City Sols., Inc.,*

23   365 F.3d at 840.

24

25   [55] C.D. and L.B. have been given leave to amend to specify the text and messages they saw and

26   relied on in support of their fraud claims, including partial representations.

27   [56] Where actionable omissions or partial representation claims have been adequately alleged, there
     is no need to demonstrate a direct transaction between the manufacturer/seller and the end user,

28   especially where a safety defect is at issue.  *See, e.g., Reniger v. Hyundai Motor Am*., 122 F. Supp.
     3d 888, 897 (N.D. Cal. 2015).

United States District Court
Northern District of California

84

United States District Court
Northern District of California

### 3.      Damages

JLI argues that the fraud claims must be dismissed because none of the California plaintiffs alleges damages from the misrepresentations with sufficient specificity, offering only identical and conclusory allegations about their harm (at most, disclaiming nicotine addiction personal injury claims, CAC ¶ 3371) and providing no quantity or measure of resulting damages.  It cites no caselaw requiring – at the pleading stage – a detailed disclosure of damages.  Plausible allegations of damages are required and are made for each of the California plaintiffs.  Damages may be tested after expert and fact discovery is adduced.[57]

Dismissal with leave to amend for C.D. and L.B.'s affirmative misrepresentations claim is GRANTED.  JLI's motion to dismiss the California fraud claims is otherwise DENIED.

### B.      Breach of Implied Warranty – California Plaintiffs

Plaintiffs assert two theories under their breach of implied warranty of merchantability claim asserted only against JLI.  First, the products do not conform to statements made on their labels.  Second, they are not merchantable for the purpose for which they are sold and are not fit for ordinary use. CAC ¶ 689.

### 1.      Privity with JLI

JLI moves to dismiss the implied warranty claim, arguing that because none of the California plaintiffs purchased from JLI, none can establish privity.  Plaintiffs do not contest that privity is typically required but insist that two exceptions apply, the third-party beneficiary exception and the "foodstuff" exception.

As my more recent decisions have recognized, the third-party beneficiary exception has been accepted by California Courts of Appeal.  *See Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 854 (N.D. Cal. 2018) (collecting cases).  Under that exception, plaintiffs contend and defendants do not contest that Colgate was an intended purchaser and did purchase JUUL products, even if through retailers and not directly from JLI.  The real dispute is over the minors, C.D. and L.B., whom JLI argues cannot be intended third-party beneficiaries since minors were not legally

---

[57] This "unquantified damages" argument also fails as to plaintiffs' implied warranty and CLRA claim.  Restitution, available under the UCL and FAL, is addressed below.

entitled to purchase JUUL.  JLI relies on express contract cases that, understandably, hold that whether a party is an intended beneficiary turns on the terms of the contact and the parties' intent as expressed in the written contract.  *See, e.g., Balsam v. Tucows Inc*., 627 F.3d 1158, 1161 (9th Cir. 2010) (express contract).  How that line of cases applies to an implied breach claim arising in the typical consumer-context (where manufacturers sell to retailers who sell to consumers) is unclear.  Absent apposite caselaw, I will not dismiss C.D. and L.B.'s implied warranty of merchantability claim on this ground.[58]

### 2.     Non-Merchantability and Causation

JLI asserts that plaintiffs' claim under both of their theories of breach fails because (1) plaintiffs fail to allege that they relied on the "container or label" of the JUUL products and (2) plaintiffs cannot plausibly allege that the JUUL products are not fit for their ordinary purpose (as a safer alternative to cigarettes) because that theory is based on plaintiffs' subjective expectations of use.  Under the first theory, the parties dispute whether reliance is required for an implied warranty of merchantability claim (as opposed to other variants of warranty claims).  *Compare* CA Oppo. at 19 (citing CACI 1231); *with* JLI CA Reply at 9 (citing two C.D. Cal. cases dismissing implied warranty claims where plaintiffs did not allege they saw particular statements).  However, the CACI instruction identified by plaintiffs does not include within its scope a theory *based* on statements made on a product's container or label.  Absent other persuasive authority, I conclude that plaintiffs must identify the specific statements on the label or container that they saw and that would breach the implied warranty in order to proceed under this theory.  Plaintiffs may attempt to plead those facts on amendment.

I have already considered the second theory and found it adequately pleaded.  See *Colgate II*, 402 F. Supp. 3d at 757 (finding that "the allegations about the pharmacokinetics of JUUL's

---

[58] Because the implied warranty claims survive the privity challenge, I need not reach whether the second asserted exception, the "foodstuffs" exception, applies to ENDS.  I note that one judge in this District has declined to extend the exception to tobacco products.  *Xavier v. Philip Morris USA Inc*., No. C 10–02067 WHA, 787 F. Supp. 2d 1075, 1084 (N.D. Cal. 2011) ("No blanket rule has been articulated to cover all products intended for human consumption, and the rationale underlying the exceptions for foodstuffs, pharmaceuticals, and pesticides has not been extended to cigarettes. A good public policy argument likely lies for such an extension, but, it is up to the California courts—not federal courts sitting in diversity—to make it.").

United States District Court
Northern District of California

formulation sufficiently allege that JUUL's products do not 'possess even the most basic degree of fitness for ordinary use.'").  I need not revisit this argument again based on materially similar allegations asserted in the CAC.

**C.      UCL/FAL**

Unlike common law fraud and breach of the implied warranty – claims that were asserted only against JLI – each of the moving defendants is named as a defendant under plaintiffs' UCL and FAL claims.  Each asserts slightly different arguments in addition to joining each other's arguments.

**1.      Stating a UCL Claim**

**a.      JLI**

JLI argues that the California plaintiffs have failed to state a claim under any of the three disjunctive prongs of the UCL.  They contend that no fraud-prong claim has been alleged because plaintiffs failed to adequately allege common-law fraud.  That argument was rejected above.  JLI contends that plaintiffs cannot state a claim under the unlawful prong because: (a) plaintiffs' have failed to plead and cannot plead their RICO claim; (b) the Magnuson-Moss Warranty Act (MMWA) claim fails for the same reason as the implied warranty claim; (c) plaintiffs have failed to allege a Stake Act Claim under Cal.  Bus. & Prof. Code § 22963 (imposing liability for sale of tobacco to people under 21 through mail or delivery service) as C.D. and L.B. did not allege use of mails to purchase tobacco; and (d) plaintiffs cannot state a claim under Cal. Penal Code § 308 (imposing liability for tobacco sales to a minor) because Colgate is an adult, L.B. never bought a device (although she received one from warranty department), and C.D. does not allege that he ever purchased anything from JLI.  However, the implied warranty claim survives as to Colgate at a minimum and, according to JLI, the MMWA claim is coextensive with the implied warranty claim and survives as well.  At this juncture, and without more fulsome briefing on the other statutes plaintiffs allege also support their illegal-prong claim, I need not go further.

Finally, JLI argues that plaintiffs have failed to allege an unfair prong claim under the balancing test.  Given how the California claims currently stand, because the fraud and illegal prongs have been adequately alleged, I need not separately address the unfairness prong as to JLI

United States District Court
Northern District of California

this stage. I would note, however, that L.B. and C.D. have both adequately alleged that they saw youth-targeted marketing (either allegedly from or sponsored by JLI, although as discussed below they not have not adequately identified the specific representations within those materials that they relied on) that would be sufficient to allege harm due to JLI's actionable unfair conduct of targeting minors. *See Colgate II*, 402 F. Supp. 3d at 760.

### b.    Altria

Plaintiffs confirm that they are asserting only an unfairness-prong claim under the UCL against Altria based on Altria's conduct related to youth marketing (the phrase preferred by Altria) or youth targeting (the phrase preferred by plaintiffs). CA/UCL Oppo. at 28-31. Altria contends, however, that plaintiffs fail to allege sufficient facts under Rule 9(b) plausibly showing that Altria actually engaged in the unfair conduct of youth marketing or targeting. Dkt. No. 632 at 18.

As an initial matter, the parties dispute whether Rule 9(b) applies to the unfairness claims asserted against Altria based solely on youth marketing conduct. Plaintiffs point out that "youth marketing" does not necessarily "sound in" fraud or deception. That may be true in cases where a party expressly engaged in unfair youth marketing. However, as discussed in more detail below, plaintiffs' most specific allegations about Altria's youth-targeting conduct sound in deception because the allegations are that Altria coordinated and supported JLI's continued targeting of youth – *contrary* to its public statements – by lobbying the FDA to preserve mint as a flavor (knowing that mint was favored by youth and drove youth sales) and by purchasing shelf space (with the intent it would be used by JLI) to favorably display JUUL products next to its popular and/or youth-favored tobacco products. That conduct sounds in deception.[59]

As the second, more substantive matter, Altria contends that the 157 paragraphs describing the defendants' youth marketing conduct barely mention Altria and nowhere allege that Altria marketed, advertised, or promoted JUUL products directly to youth. According to Altria's review of the CAC, the only marketing Altria is alleged to have undertaken for JUUL products was in

---

[59] If plaintiffs amend to allege specific acts of youth marketing expressly directed by Altria employees under their contracts with JLI to youth, that might not "sound in deception" and may not need to satisfy Rule 9(b).

packets of PM USA cigarettes mailed to adult smokers, advertising them to "make the switch." CAC ¶¶ 203-204.  Therefore, under either the unfair conduct balancing test or the tethering test to (used to determine whether acts constitute unfair conduct under the UCL), Altria contends that the allegations at to its conduct are fatally insufficient.

I disagree.  In addition to the preserving mint, shelf-space, and make the switch allegations, there are allegations regarding Altria's direct conduct and own acts that plaintiffs allege directly support an inference of unfair youth-targeting.  *See, e.g.,* CAC ¶¶ 395, 397 (alleging that JLI provided Altria a marketing list including minors); ¶ 412 (Altria publicly "feigned ignorance" over JUUL's youth marketing intents and acts); ¶¶ 416, 417 (Altria's statements to the FDA and Congress).[60]

Plaintiffs characterize the totality of the allegations regarding Altria's own conduct as a significant part of the coordinated (starting in 2017) "scheme of youth targeting" given Altria's knowledge of JLI's youth marketing through the joint relationship with Avail Vapor and its agreement to secure the shelf space, preserve mint, and then (after December 2018) provide services to JLI in order to preserve or grow youth use of JLI's products.  *See* CAC ¶¶ 419-422, 425, 427-432, 432-441, 473, 489-495.[61]  These allegations regarding conduct over which Altria had direct control are sufficient, at this stage, to sustain the unfair-prong UCL claim against Altria.[62]

### c.    Officers and Directors

Each of the Officer and Director Defendants moves to dismiss the UCL claim because he cannot be personally liable merely due to his status as either co-founder, officer, or member of the

---

[60] Altria does not contest that "youth marketing" would satisfy both the balancing and tethering tests, a conclusion I reached in *Colgate II*, 402 F. Supp. 3d at 760.

[61] As noted above, while the allegations regarding Altria's statements to Congress and the FDA may not be independently actionable under the *Noerr-Pennington* doctrine, they are evidence regarding Altria's more broadly alleged unfair conduct.

[62] This is not inconsistent with the conclusion above that plaintiffs fail to identify plausible facts in support of Altria's agreement to join the already-established Enterprise and fail to allege facts showing Altria's acts were performed in support of the alleged, distinct Enterprise as opposed to Altria and JLI's consistent general business interests which (under the UCL) conceivably include acts of unfair youth-targeting.

United States District Court
Northern District of California

1    Board of Directors of JLI and plaintiffs fail to allege sufficient facts regarding his personal

2    participation or "unbridled control" over the alleged UCL acts.  Dkt. No. 751.

3         Bowen, Monsees, and the three Other Director Defendants rely on the discussion of the

4    boundaries of UCL liability in *Emery v. Visa Internat. Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (Cal.

5    App. 3d Dist. 2002), where the court reminded "plaintiff that his unfair practices claim under

6    section 17200 cannot be predicated on vicarious liability" and "[a] defendant's liability must be

7    based on his personal 'participation in the unlawful practices' and 'unbridled control' over the

8    practices that are found to violate section 17200 or 17500."  *Id.* at 960; *see also People v. Toomey*,

9    203 Cal. Rptr. 642, 651 (Cal. Ct. App. 1984) (defendant aided and abetted a business's unlawful

10   conduct because he "orchestrated all aspects of" and "had unbridled control over the practices

11   which were found [to be unlawful].").  This limiting principle is significant, according to the

12   Officer and Director Defendants, because the UCL's purpose is to punish acts of unfair

13   competition by the corporate entities who engage in that competition, not the individual officers

14   and directors who simply approved a corporate entity's activities.  *See O'Connor v. Uber Techs.,*

15   *Inc.*, C-13-3826 EMC, 2013 WL 6354534, at *18 (N.D. Cal. Dec. 5, 2013) (dismissing UCL claim

16   against corporate officers with leave to add allegations that directors "'actively and directly

17   participate[d] in [any] unfair business practice[s],'" because simply "[i]dentifying their roles in the

18   corporation and alleging that they were 'responsible' for pay practices and employment policies

19   does not make it plausible that they were personally liable, any more so than it would make any

20   officer responsible for the torts allegedly committed by their corporation.  California law does not

21   impose liability on corporate officers merely for their role in the corporation, but only for

22   wrongful acts in which they have been personally involved." (quoting *Bradstreet v. Wong*, 161

23   Cal. App. 4th 1440, 1458 (2008)); *see also Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058,

24   1069 (9th Cir. 2016) (holding CEO personally liable because he "admitted that, during the

25   promotion, he controlled and directed Power's actions" and "admitted that the promotion was his

26   idea").

27         Plaintiffs respond that they do not seek to hold any of the Officer or Director Defendants

28   liable merely for their roles as corporate officers or directors or under a theory of vicarious

United States District Court
Northern District of California

liability, but instead allege that they are liable for their personal acts.  Plaintiffs rely on established

caselaw holding that corporate officers and directors may be liable (notwithstanding the

protections provided by the corporate form) for torts or other acts that they specifically authorized

or directed.  *See Frances T. v. Village Green Owners Assn.*, 42 Cal.3d 490, 503 (1986) ("It is well

settled that corporate directors cannot be held vicariously liable for the corporation's torts in which

they do not participate. Their liability, if any, stems from their own tortious conduct, not from

their status as directors or officers of the enterprise. . .  Directors are jointly liable with the

corporation and may be joined as defendants if they personally directed or participated in the

tortious conduct."); *see also Fitbit, Inc. v. Laguna 2, LLC*, 17-CV-00079-EMC, 2017 WL

8294274, at *2 (N.D. Cal. Apr. 26, 2017) (liability against a CEO actionable under UCL when

"predicated on his direction of and participation in the alleged trademark infringement and unfair

competition," where CEO defendant personally vouched for legitimacy of goods sold); *In re*

*Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d

927, 988 (N.D. Cal. 2018) (denying motion to dismiss consumer fraud claims alleged against a

specific corporate officer who was alleged to have personally "approved of, or ratified, the use of

the 'EcoDiesel' logo on the Class Vehicles, and with knowledge of the emissions problem.");

*POM Wonderful LLC v. Purely Juice, Inc.*, 362 Fed. Appx. 577, 581 (9th Cir. 2009)(unpublished)

("The record shows [president of the company] knew of the test results . . ., was personally

involved in making decisions for Purely Juice in response to the results, and had the "final word"

on Purely Juice's business decisions.").

The primary dispute between the parties comes down to whether under the UCL plaintiffs

can merely allege "individual participation" in the unfair business acts asserted under the UCL

(which they have) or whether they *also* need to plead plausible facts showing that each defendant

exercised "unbridled control" over (and hence bear personally responsibility for) each of the UCL

acts.  However stated, the through line of the cases on which both sides rely is that liability can lie

against an officer or director who either personally commits a tort or, relevant here, personally

commits the alleged UCL act or was sufficiently responsible for the commission of that act

through his personal direction or action that he may be held personally liable.

91

United States District Court
Northern District of California

1    Monsees and Bowen are alleged to have personally committed or directed acts that are

2    sufficient under the UCL.  *See, e.g.*, CAC ¶¶ 4, 63, 76, 132, 218 (Bowen and Monsees

3    intentionally designed a more addictive and youth-oriented product);¶¶ 78, 79 (Monsees and

4    Bowen expressed their intent to "disrupt" traditional tobacco and assist traditional tobacco addicts,

5    but courted the investment and expertise of "big tobacco"); ¶¶ 108, 115, 171, 178 (Bowen

6    intentionally designing and re-engineering tests); ¶ 414 (Monsees allegedly fraudulent August

7    2019 statement to the *New York Times* that selling JUUL products to youth was "antithetical to the

8    company's mission.").

9    It is a closer question, however, whether the Other Director Defendants (Huh, Valani, and

10   Pritzker) have.  As noted above with respect to RICO, plaintiffs' repeated blanket assertion that

11   the "Board of Directors" generally and Huh, Valani, and Pritzker (along with Bowen and

12   Monsees) through their "control" of the Board of Directors had "final say" over JLI's marketing

13   materials, by itself, does not establish the requisite individual "direction or control" to pin liability

14   for marketing acts or even specific marketing campaigns of JLI on *each* member of the Board of

15   Directors or any of the defendants in their individual capacity as Board members.  *See, e.g.*, CAC

16   ¶¶ 207 n. 213, 333 n. 364, 415.[63]

17   Nor is the generalized reference to the "Board's decision" in October 2015 to resolve the

18   alleged internal JLI debate about youth use (given concern over the issue expressed by Pritzker

19   and others) and to specifically target teens (allegedly supported by Huh and unnamed others)

20   enough to support individual liability.  CAC ¶¶ 334-336.  There is no allegation of a Board vote or

21   other *action* identified.  The plaintiffs do not identify any specific matters put forward by the

22   defendant Directors together or individually that were approved through their direct control over

23   the full Board.  Nor do the "Executive Committee" allegations support the UCL claim.  Huh,

24   Valani, and Pritzker formed an Executive Committee of the Board in October 2015 and, as

25   Monsees had stepped down as CEO, Pritzker, Huh, and Valani took charge of JLI until a

26

27   ──────────────
     [63] As noted, the only factual support for the "final say" allegation is a reference to Monsees' July
28   2019 statement to Congress, where in he indicated that the Board and others were currently
     responsible for marketing materials.  *See, e.g.*, CAC ¶333 n. 364.

United States District Court
Northern District of California

replacement CEO was appointed in August 2016. However, the specific allegations regarding the Executive Committee's conduct during this time are merely that Huh ran meetings, the Executive Committee made reporting structure decisions, it helped "manage people," and the three were committed to an even "more aggressive" rollout. CAC ¶¶ 349-353.

These generalized allegations are insufficient to connect each Other Director Defendant to the direction or control of any unfair *acts* or youth-targeted marketing *acts*. Plaintiffs identify a few internal comments made by the Other Director Defendants that (taking inference in favor of plaintiffs) show their general awareness of and "expressed" concern about the issue of youth-targeting. But there are no factual allegations of specific *conduct* of youth-targeting committed by, at the direction of, or even with the specific knowledge of the Other Director Defendants during this time frame. *See, e.g.*, CAC ¶ 334 (Pritzker commenting that branding "feels too young"); ¶ 339 (Huh being aware of efforts to "mature" the brand advertising to minimize risk of youth targeting); ¶ 405 ("The Board was intimately involved in these 'youth prevention' activities. For example, in April 2018, Riaz Valani and Nicholas Pritzker edited a youth prevention press release, noting that they "don't want to get these small items wrong" and "think it's critical to get this right."). The one comment that comes closest is Bowen's alleged assertion that Valani was interested in "leveraging" user generated content, but there is no allegation in the CAC that it was the "youth" content or that Valani personally leveraged youth-content or directed anyone else to do so. *Id*. ¶ 357.[64]

In sum, the generalized allegations of "control" do not amount to plausibly alleged facts

---

[64] The generalized allegations here against the Other Director Defendants are not akin to the more specific and narrow allegations in *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig*., 295 F. Supp. 3d 927 (N.D. Cal. 2018). There, plaintiffs alleged that a CEO specifically "approved of, or ratified, the use of the 'EcoDiesel' logo on the Class Vehicles, and with knowledge of the emissions problem." *Id*. at 988-989. Even though plaintiffs state that the Executive Committee functioned as the CEO of JLI from late 2015 through mid-2016, as noted above plaintiffs do not identify specific acts or conduct approved by the Executive Committee that could constitute UCL acts during that time. *POM Wonderful LLC v. Purely Juice, Inc.*, 362 Fed. Appx. 577 (9th Cir. 2009) (unpublished) is similarly inapposite considering the allegations against the Other Direct Defendants here. *Id*. at 581 (defendant "was 'in control' of Purely Juice given his position as president and principal shareholder, his direct involvement in the manufacturing and marketing process, and his involvement in the selection of concentrate suppliers.").

showing direction or control or an adequate allegation of commission of UCL acts or acts in support of youth-targeting by either the full Board or the Executive Committee with respect to the Other Director Defendants.  More specific allegations are needed to plausibly allege UCL conduct through: (i) specific acts taken by the Executive Committee when the three Other Director Defendants were in control; or (ii) specific acts taken by the Board that the three Other Director Defendants alone or in conjunction with Bowen and Monsees proposed, directed, and secured approval of, *along with* allegations that, by virtue of the number of Board members, the group of three or five were able to and did "direct or control" the Board's approval.[65]

More specific allegations are made against some of the Other Director Defendants regarding their efforts to negotiate and consummate the investment by Altria.  *See, e.g.,* CAC ¶ 43 (Pritzker and Valani, together with then-CEO were the lead negotiators on the Altria deal); ¶ 46 (in October 2019 Pritzker and Valani, "and other officers and directors including Bowen, Monsees, and Huh," would have been instrumental in bringing Crosthwaithe on board at JLI" from Altria).  It does not appear that plaintiffs are alleging that the acts of seeking the investment by Altria *by themselves* are alleged unfair acts under the UCL, but even if they were an independent basis, there are no allegations that these Other Direct Defendants directed or otherwise had sufficient control over the eventual deal.[66]

---

[65] I recognize that plaintiffs make one other more specific allegation regarding the allegedly concealed heightened nicotine delivery of JUUL, that in a June 2014 board meeting of Ploom (a predecessor to JLI), "Pritzker, and Valani were privy to both the Phase 0 and Phase 1 results.  And they knew that the data JLI (then Ploom) was pushing on the public was false and misleading, but none made any efforts to correct or withdraw those false and misleading statements."  CAC ¶ 178.  There is a debate between the parties over what inferences attendees like Pritzker and Valani could have drawn from the presentation, but there is no support for the allegation that these two Other Director Defendants "selectively utilized" the results to direct or control JLI's "withholding" information regarding JUUL's nicotine delivery.  Oppo. to Officer and Director MTD at 9 n.5.

[66] Plaintiffs' reliance on *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1385 (Cal. App. 2d Dist. 2000), *as modified on denial of reh'g* (Apr. 7, 2000), is a little perplexing.  There, the Court found ample evidence "from which a trier of fact could reasonably infer defendants, in anticipation of enormous corporate and personal profit, knowingly invested at a bargain price in a corporation whose sole business assets consisted of stolen confidential information and processes, and subsequently controlled the entity which was engaging in unlawful conduct."  *Id.* at 1385.  Here, however, plaintiffs are attempting to section off part of JLI's operation as the RICO Enterprise (and the cause of presumably most if not all of the UCL acts) from the other presumably legitimate operations of JLI.  If the acts by any of the Officer and Director defendants in securing the Altria investment are alleged to be actionable under the UCL, further allegations are necessary

94

The Other Director Defendants' motion to dismiss the UCL claims against them is GRANTED with leave to amend.

### 2.    Standing

#### a.    JLI

JLI contends that California minor plaintiff L.B. lacks standing to pursue the UCL and FAL claims against JLI because L.B. fails to allege that she bought any JUUL products.  Plaintiffs argue that L.B. sufficiently alleges that she purchased product from one "unknown source" and one "from eBay" according to her mother, who brings the claim on L.B.'s behalf.  CAC Appx. A ¶ 803, 806.  JLI claims these assertions are "implausible" and insufficient.  Not so; L.B. has standing.

#### b.    Altria

Separately, Altria argues that the California plaintiffs have failed to allege standing under the UCL against it because they fail to allege any facts showing how they were harmed as a result of Altria's separate conduct.  Altria complains that many of the allegations in the CAC assert conduct against an unspecific group of "defendants" generally, and even as to "Altria" plaintiffs fail to identify the specific acts for which the different Altria entities (among the four separately named as defendants) were responsible.  Plaintiffs do not address this issue.  As noted above, plaintiffs are given leave to amend additional details as to which Altria entity performed what acts or to allege why they cannot do so.

More substantively, Altria argues that because each of the California plaintiffs started using JUUL products before Altria's first involvement with JLI in December 2018 – and indeed Colgate has filed a suit against JLI based on false and misleading and youth targeting allegations *prior* to that date – none of the California plaintiffs can argue that anything Altria did caused them harm.  In response, plaintiffs clarify that only C.D. and L.B. bring this claim and argue that Altria's unfair conduct contributed to their use of JUUL even if it was not responsible for the inception of their use of the product.  Those allegations and facts in support are not contained in

to follow and support that distinction.

United States District Court
Northern District of California

1    the CAC with respect to C.D. or L.B., but presumably can be easily rectified on amendment.

2                    **3.      Relief**

3          Each of the moving defendants bring separate but related arguments why the UCL claim

4    fails due to the plaintiffs' failure to allege cognizable theories of equitable relief.

5                    **a.      JLI**

6          JLI argues that claims for equitable relief under the UCL (and the FAL) fail because

7    plaintiffs have not shown that they have inadequate remedies at law.  It relies on the Ninth

8    Circuit's recent decision in *Sonner v. Premier Nutrition Corp.*, 962 F.3d 1072, 1081 (9th Cir.

9    2020), *opinion amended and superseded on denial of reh'g*, 971 F.3d 834 (9th Cir. 2020) ("*Sonner*

10   must establish that she lacks an adequate remedy at law before securing equitable restitution for

11   past harm under the UCL and CLRA.").  The facts of *Sonner* – where the plaintiff on the eve of

12   trial sought to secure a bench trial under the UCL by foregoing CLRA damages claims that had to

13   be tried to a jury – are inapposite considering the allegations and the posture of the CAC.

14   However, as limited amendments are already being required to the CAC, plaintiffs are given leave

15   to amend to expressly allege that their remedies at law are inadequate and to support their claim to

16   equitable restitution under the UCL and FAL.[67]

17         Assuming that hurdle is cleared (as it seems likely to be given the allegations regarding

18   unfair conduct are not otherwise coextensive with plaintiffs' legal claims and given the

19   preliminary stage of these proceedings), JLI also argues that plaintiffs are not entitled to restitution

20   from JLI because they failed to allege that JLI profited from any transaction with any California

21   plaintiff and restitution only extends to "money or property that was once in the possession of that

22

23   ─────────────────────

24   [67] I acknowledge the recent decision by the Hon. Edward J. Davila in *In re MacBook Keyboard
     Litig.*, 5:18-CV-02813-EJD, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020).  Dkt. No. 1071.
25   In that decision, plaintiffs' claim for equitable relief under the UCL was dismissed because
     adequate damages were available against the one defendant based on a recognition that "Courts
26   generally hold that monetary damages are an adequate remedy for claims based on an alleged
     product defect."  The posture of this case is significantly different from that in *In re MacBook
     Keyboard Litig.*  For example, damage claims are asserted primarily against JLI, but the UCL
27   and equitable relief claims are asserted against JLI *and* the other defendants from whom damages may
     not be recoverable.  That counsels against outright dismissal of the equitable relief claims as
28   inadequate at this juncture.  However, as noted, plaintiffs are given leave to amend to explain why
     their damages at law might be inadequate.

                                        96

person" or "money or property in which he or she has a vested interest." *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1149 (2003).  JLI does not dispute that indirect purchasers – like many of the users of JUUL who purchased from retail establishments or from resellers and not directly from JLI – may nonetheless seek restitution under the UCL; that is an established point of law.  *See, e.g., Cabebe v. Nissan of N.A., Inc*., 18-CV-00144-WHO, 2018 WL 5617732, at *5 (N.D. Cal. Oct. 26, 2018).  Plaintiffs simply need to allege that JLI obtained money (or property) and that plaintiffs lost money or property as a result of defendants' unfair practices.  *Id*.

Plaintiffs do so here.  *See, e.g*., CAC ¶ 649.  Given the allegations regarding the diverse supply chains of JUUL products in the CAC, plaintiffs' allegation regarding lost money and JLI's profiting from its initial sales are plausible and sufficient to allege entitlement to UCL restitution.  *See, e.g., Shersher v. Super. Ct*., 154 Cal. App. 4th 1491, 1498, 1500 (Cal. App. 2d Dist. 2007) ("plaintiff and the putative class members clearly had an ownership interest in the restitutionary relief sought because they purchased Microsoft's product" albeit through a retailer and rejecting defendant's argument that "plaintiff allegedly lost any ownership interest in his money once he used it to purchase Microsoft's product from a retailer.").  How the many JUUL supply chains worked and how much if any of plaintiffs' money spent to purchase JUUL products constitutes appropriate restitution can only be determined following fact and expert discovery and on a full evidentiary record.

### b.  Altria

Altria asserts, first, that the California plaintiffs do not have standing to seek restitution from Altria because they started using JUUL products before Altria's conduct occurred.  However, plaintiffs plausibly allege that Altria's conduct contributed to the youth targeting, and may (on amendment) allege that Altria's conduct more narrowly contributed to C.D. and L.B.'s continued use of JUUL.  If those allegations are included on amendment, causation – whether specific plaintiffs were harmed in some part "as a result of" Altria's conduct – is  more appropriately determined on a full evidentiary record.

Altria also argues that it cannot be liable for restitution as Altria did not receive any funds

United States District Court
Northern District of California

United States District Court
Northern District of California

1    these plaintiffs spent on JLI products.  That sort of direct tracing of specific funds is not required

2    under the UCL, as discussed above.  If Altria is alleged to have received money traceable to its

3    general unfair conduct that impacted C.D. and L.B., that is sufficient.

4          Plaintiffs rely on *Troyk v. Farmers Group, Inc*., 171 Cal. App. 4th 1305, 1340 (Cal. App.

5    4th Dist. 2009).  There, the unfair conduct (charging fees) was carried out by a wholly owned

6    subsidiary.  The court concluded that to the extent the parent entity "earned profits from those

7    service charge payments, its net worth increased and the value of" the parent entity's "stock

8    investment in the subsidiary likewise increased" and sufficient benefit flowed to the parent that

9    could constitute potential restitution.

10          Altria contends that *Troyk* is inapposite because the trial court relied (on a full summary

11   judgment record) not just on the wholly-owned subsidiary/parent relationship (which it argues is

12   not comparable to a 35% minority interest) but also on facts suggesting the parent controlled the

13   subsidiary and the acts were of a single "enterprise."  *Id*. at 1340-41.  That the showing in *Troyk*

14   was based on a summary judgment record (including evidence not only of parental profit from the

15   unfair act but also direction, control, and coordination), demonstrates that whether restitution is

16   warranted under a particular fact pattern should be determined on a full evidentiary record at

17   summary judgment record or post-trial.

18                          c.      **Officers and Directors**

19          The Officer and Director Defendants make a number of arguments that restitution is

20   generally unavailable and more specifically that restitutionary or injunctive relief against each of

21   them is inappropriate.

22          The argument that plaintiffs are not entitled to restitution because plaintiffs do not allege

23   that they purchased anything from JLI directly or a "source likely to convey funds" to JLI is

24   unpersuasive, as discussed earlier.  *See, e.g.,* Dkt. No. 751.  The Officer and Director Defendants

25   more persuasively argue that restitution is not warranted because there are no allegations that any

26   of them personally obtained any money that is traceable or the result of the unfair practices

27   alleged.  Plaintiffs respond by pointing to the well-established case law discussed above that

28   allows courts to consider restitution despite the indirect nature of the payments received by

98

United States District Court
Northern District of California

defendants as a result of their UCL conduct.  *See, e.g., People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1563 (Cal. App. 4th Dist. 2014) (evidence showed two owners of closely held company drained money from the corporation and, as such, court could "exercise its equitable discretion to conclude USHA, Sarpas, and Nazarzai acted as a single enterprise for the purpose of ordering restitution under the UCL and the FAL.").  None of plaintiffs' cases, however, stretch the concept of "indirect benefit" to Officers and Directors of large corporations as opposed to closely held ones.  I have serious concerns whether restitution could be appropriate against these Officer and Director Defendants given the size of JLI, the number of officers and directors on its board, and that some aspect of JLI's business was legitimate.  Relatedly, each of the Officer and Director Defendants challenge whether injunctive relief is arguably available given his role as merely one of many Officers of JLI or one of many directors on the board of a large corporate entity.[68]  In opposition, plaintiffs do not address or explain how injunctive relief is appropriate against an officer or director of a corporate entity, much less against a subset of officers or directors.

In the end, if plaintiffs are able to amend to state UCL claims against the Other Director Defendants, I will determine how far my "broad discretion" to award restitution or injunctive relief may stretch and what restitution should be awarded or conduct be enjoined.  That is more appropriately addressed on a full evidentiary record, based on evidence regarding exactly how the Officer and Director Defendants were compensated and as a result of what guarantees, metrics or other compensation structures were in place.

JLI, Altria, Monsees, and Bowen's motions to dismiss the California and UCL claims are DENIED.  The Other Director Defendants' motions to dismiss are granted with respect to the UCL claims and with leave to amend.  Plaintiffs are also given leave to amend to allege why their remedies at law are inadequate and why they need to preserve their requests for equitable relief.

### D.     CLRA

JLI moves to dismiss the CLRA claim for failure to file the required affidavit under Cal.

---

[68] In their opposition to the Officer and Director Defendants' motions plaintiffs clarify they do not seek injunctive relief against Huh or Monsees who are no longer associated with JLI or Altria. Oppo. to Officer and Directors at 17 n.7.

Civ. Code § 1780(d), failure to allege a specific "transaction" (none of the California plaintiffs allege a direct purchase from JLI), and failure to allege sufficient allegations of acts of deceit and cognizable damages under the CLRA. The first and third issues are easily resolved. Plaintiffs are given leave to amend to include the venue affidavit required by section 1780(d). The analysis of the acts of deceit and damages largely overlaps with plaintiffs' allegations on their common-law fraud claims, which survive.

As to the transaction required under section 1770(a),[69] "the CLRA does not require a direct transaction between plaintiffs and defendants." *Johnson v. Nissan N.A., Inc.*, 272 F. Supp. 3d 1168, 1183 (N.D. Cal. 2017). Notwithstanding this authority, JLI contends that at least an indirect transaction is required "such as through an authorized retailer." JLI CA Reply at 13. That argument is not supported. *See, e.g., McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 186 (Cal. App. 3d Dist. 2010) (noting "a cause of action under the CLRA may be established independent of any contractual relationship between the parties," and allowing CLRA claims based on purchases from retailers as well as "purchases from [manufacturer], from home builders, or from individuals selling their homes.").

JLI's motion to dismiss the CLRA claim is DENIED, except plaintiffs are given leave to amend to include the venue affidavit.

### E.     Unjust Enrichment

Defendants argue that the unjust enrichment claim under California law fails because there is no separate stand-alone unjust enrichment cause of action and plaintiffs have failed to plausibly plead facts showing that unjust enrichment is an appropriate remedy against specific defendants. On the first point, unjust enrichment may proceed as a stand-alone cause of action under California law if "it states a claim for relief as an independent cause of action or as a quasi-contract claim for restitution. To allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's

---

[69] "The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful . . . ." Cal. Civ. Code § 1770(a).

United States District Court
Northern District of California

1    expense." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016); *see also*

2    *Snarr v. Cento Fine Foods Inc.*, 19-CV-02627-HSG, 2019 WL 7050149, at *8 (N.D. Cal. Dec. 23,

3    2019) (allowing plaintiffs' stand-alone unjust enrichment claim to proceed based on false

4    advertising allegations).  Plaintiffs have adequately alleged their unjust enrichment claim against

5    (at least) JLI.  CAC ¶ 699 ("Defendants requested and received a measurable benefit at the

6    expense of Plaintiffs and class members in the form of payment for JUUL products"), ¶ 701 ("It

7    would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these

8    benefits because the benefits were procured as a result of their wrongful conduct.").

9        The Officer and Director Defendants argue that even if this claim can be stated as a

10   separate claim, it must be dismissed because there no facts alleged supporting an unjust

11   enrichment claim against *them*.  Dkt. No. 748. As with the UCL restitution issue, if any of the

12   claims asserted against the Officer and Director Defendants survive (as a matter of pleading or

13   thereafter), what enrichment defendants received as a result of illegal or unfair conduct and

14   whether it would be unjust for them to keep it is better determined on a full record showing the

15   payment each Officer and Director Defendant received from JLI as a result of what guarantees,

16   metrics, or other compensation structures.

17       **F.    Other Claims/Subject Matter Jurisdiction for Putative Subclass Claims**

18       JLI and Altria also move to dismiss the CAC causes of action asserted on behalf of 25

19   putative subclasses and the related claims of 58 class representatives for lack of subject matter

20   jurisdiction.  JLI MTD (Dkt. No. 629); Altria MTD (Dkt. No. 632) at 39.  As I indicated in the

21   Tentative Opinions (Dkt. No. 977), I will not reach this issue now.  If the parties cannot resolve it

22   through a meet and confer process, or through plaintiffs' limited amendment to the CAC otherwise

23   required by this Order, the subject matter jurisdiction arguments may be raised by separate motion.

24       Similarly, I will not reach the arguments raised by the Other Director Defendants on

25   whether the CAC fails to allege facts supporting either the consumer protection or unjust

26   enrichment claims against them under other state laws.  Dkt. No. 748.  To the extent that these

27   issues are not resolved by the limited amendments to the CAC (and plaintiffs may, if they choose,

28   amend the allegations on these other state law claims in conjunction with the limited leave to

United States District Court
Northern District of California

101

amend granted herein), the parties shall propose a briefing schedule to resolve the separate

challenges, ensuring that these arguments concerning each state are sufficiently raised and argued

in a brief rather than through *a chart* attached to a brief.

### G.    Personal Jurisdiction over the Other Director Defendants

The Other Director Defendants question whether this court has personal jurisdiction over

each of them with respect to the California claims for cases filed in this jurisdiction pursuant to the

Direct Filed Order or for cases filed in other jurisdictions and transferred here by the Judicial

Panel.

Huh argues generally that the CAC fails to allege sufficient facts establishing specific

jurisdiction over him in California for the California claims under consideration.  Dkt. No. 748.

As noted above, the UCL claims against Huh are dismissed with leave to amend.  Assuming that

plaintiffs are able to amend to allege the UCL claim against him based on his own alleged actions

or directions to others to act in violation of the UCL, specific jurisdiction over Huh would likely

be satisfied.  Huh's personal acts necessarily occurred when he served on JLI's board in

California.  That is sufficient.

The Other Director Defendants also argue that the CAC fails to allege sufficient facts to

establish specific jurisdiction against them "outside" of California for cases that originated (or

absent the Direct Filed Order would have originated) in non-California courts.  They contend that I

need to determine whether there are sufficient "acts" taken by each Other Director Defendant

connected to each non-California jurisdiction where an underlying action was or would have been

filed, despite the transfer to or direct-filing of cases in this court, and despite the California claims

based on their acts taken in California or acts taken through a corporate entity based in California.

In particular, these defendants contend that because the CAC fails to allege that the Other Director

Defendants had control over any state-specific advertising, it fails to establish personal jurisdiction

for the other jurisdictions.

As the UCL claim has not yet been plausibly alleged against the Other Director

Defendants, for now I will not reach this argument with respect to UCL claims asserted in the

underlying complaints filed in or that would have been filed in jurisdictions outside of California.

Assuming plaintiffs can amend to state the UCL claim against Huh, Valani, and Pritzker, the jurisdictional analysis would follow what is set out below with respect to the government entity complaints.

## V.      MOTIONS TO DISMISS GOVERNMENT BELLWETHER COMPLAINTS

JLI, Altria, and the Officer and Director Defendants separately move to dismiss the claims asserted against each of them in the PECs.  I resolved the RICO claims above.  I now address the remaining claims, including public nuisance, negligence, gross negligence and violations of New York and Florida consumer protection statutes.  I also discuss the Officer and Director Defendants' additional motion to dismiss for lack of personal jurisdiction.

### A.      Municipal Cost Recovery Rule

JLI argues that the monetary damages the government entities seek for both their nuisance and negligence-based claims are not cognizable because the municipal cost recovery rule bars them from recovering the cost of providing educational or other public community services to their constituents.[70]  The rule, sometimes called the "free public services doctrine," is a common-law doctrine holding that "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service."  *City of Flagstaff v. Atchison, Topeka & Santa Fe*, 719 F.2d 322, 323 (9th Cir. 1983).  The Ninth Circuit in *Flagstaff* observed, however, that "[r]ecovery has . . . been allowed where the acts of a private party create a public nuisance which the government seeks to abate."  719 F.2d at 324.

Decisions from the opioid multidistrict litigation before the Northern District of Ohio are instructive.  There, multiple tribes and counties alleged misconduct by opioid manufacturers, distributors, and pharmacies that created and maintained an opioid epidemic.  They sought "damages attributable to Defendants' misconduct, including the costs of emergency, law enforcement, and criminal justice services," as well as "the expenses incurred in responding to the opioid epidemic" that were "the consequence of long-term, continuing misconduct by the

_____

[70] It is unclear whether school districts are considered municipalities for purposes of applying this rule.  For purposes of evaluating JLI's argument, I assume that the rule covers school districts.

United States District Court
Northern District of California

Defendants." *In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*, 2019 WL
2468267, at *8 (N.D. Ohio Apr. 1, 2019), *report and recommendation adopted in part, rejected in
part,* 2019 WL 3737023 (N.D. Ohio Jun. 13, 2019); *see also In re Nat'l Prescription Opiate Litig.
– Summit County*, 2018 WL 4895856, at *10 (N.D. Ohio Oct. 5, 2018), *report and
recommendation adopted in part, rejected in part,* 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018).

Judge Polster determined that the municipal cost recovery rule did not bar the tribes' and
counties' claims, noting, "The current trend among state court judges' ruling in opioid-related
cases around the country is that the municipal cost recovery rule does not apply when, as alleged
here, an ongoing and persistent course of intentional misconduct creates an unprecedented, man-
made crisis that a governmental entity plaintiff could not have reasonably anticipated as part of its
normal operating budget for municipal, county, or in this case, tribal services." 2019 WL
3737023, at *1.

Cases considering negligence and nuisance public entity claims asserted against firearm
manufacturers recognize similar distinctions and decline to apply the rule. In *Cincinnati v. Beretta
U.S.A. Corp.*, the Ohio Supreme Court allowed the city of Cincinnati to recover governmental
costs flowing from the gun manufacturers' ongoing conduct of marketing, distributing, and selling
firearms in a manner that created an illegal secondary market for firearms. 95 Ohio St.3d 416, 428
(2002). "Unlike the train derailment that occurred in the *Flagstaff* case, which was a single,
discrete incident requiring a single emergency response," the court found that misconduct alleged
by Cincinnati was "ongoing and persistent," and that the "continuing nature of the misconduct
may justify the recoupment of such governmental costs." *Id.* It also noted that the distinction
between single, discrete incidents and ongoing or persistent conduct is consistent with the public
nuisance exception expressly recognized in *Flagstaff*, "that recovery by a government entity is
allowed 'where the acts of a private party create a public nuisance which the government seeks to
abate.'" *Id.* (quoting *Flagstaff*, 719 F.2d at 324).

JLI points to a case from the Illinois Supreme Court that declined to follow this analysis.
*City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 430 (2004) ("We agree with defendants
that when the need for emergency services in response to an alleged nuisance is ongoing, the

United States District Court
Northern District of California

104

1    municipal cost recovery rule is stronger, not weaker, because the legislature is better able to

2    consider need for cost-recovery legislation than in cases of sudden disaster.").  This single case is

3    unpersuasive in light of the numerous courts that have allowed these public entity claims to

4    proceed where private individuals' intentional misconduct created the sort of ongoing and

5    persistent man-made crisis that could not have been reasonably anticipated.  As plaintiffs correctly

6    point out, authority in each of the five states of the seven complaints being tested here have

7    recognized the "private party created" public nuisance exception from *Flagstaff*, and some of them

8    have also found that the municipal cost recovery rule does not apply to the kind of ongoing and

9    persistent misconduct alleged here.

10        For instance, in the opioid litigation in New York, multiple counties alleged that

11   defendants' deceptive marketing campaign fueled an opioid crisis, "causing them to spend

12   millions of dollars in payments for opioid prescriptions for employees and Medicaid

13   beneficiaries," and "forced them to pay the costs of implementing opioid treatment programs for

14   residents, purchasing prescriptions of naloxone to treat prescription opioid overdoses, combating

15   opioid-related criminal activities, and other such expenses arising from the crisis." *In re Opioid*

16   *Litigation*, 2018 WL 3115102, at *2 (N.Y. Sup. Ct. Jun. 18, 2018).  The court found that "a review

17   of the current state law revealed no case law supporting the manufacturer defendants' contention

18   that such rule bars recovery for municipal expenses incurred, not by reason of an accident or an

19   emergency situation necessitating 'the normal provision of police, fire and emergency services,'"

20   but to "remedy public harm caused by an intentional, persistent course of deceptive conduct." *Id.*

21   at *10 (quoting *Flagstaff*, 719 F.2d at 324).  It held that the municipal cost recovery doctrine did

22   not bar the New York counties' claims, and that concluding otherwise "would distort the doctrine

23   beyond recognition." *Id.*; *see also In re Nat'l Prescription Opiate Litig. – Broward County*, 2020

24   WL 1986589, at *6 (N.D. Ohio Apr. 27, 2020) (similarly concluding that "the Florida Supreme

25   Court would find the Municipal Cost Recovery Rule inapplicable to the present case").

26        The government entities plausibly allege damages that are not a result of a single discrete

27   incident that a government entity can reasonably expect to incur; rather, they allege damages as a

28   result of an ongoing and persistent deceptive marketing campaign and intentional targeting of

United States District Court
Northern District of California

youth that led to expenses that municipalities and school boards could not have reasonably anticipated to incur. JLI's misconduct allegedly forced school districts to devote and divert resources to address the youth e-cigarette crisis and incur costs related to counseling, training, educating, or disciplining students, as well as increased costs for physical modifications to schools and disposing of hazardous waste. *See* TVC ¶¶ 597–609. Santa Cruz County and its public health departments also incurred unexpected expenses arising from the crisis, including education and prevention campaigns and the development of youth-tailored cessation programs. *See* Santa Cruz ¶¶ 601–22.

The municipal cost recovery rule does not bar the claims of the seven government entities whose complaints are being tested on these motions from recovering the monetary damages they seek for their public nuisance and negligence claims. JLI's motion to dismiss on this basis is DENIED.[71]

### B.     Public Nuisance

The government entities allege that defendants have created a public nuisance by producing, promoting, distributing, and marketing JUUL products for underage use in their school districts and counties in violation of each state's public nuisance law. JLI moves to dismiss the claims on grounds that the government entities should not be allowed to expand public nuisance law beyond its traditional boundaries and into product liability. It also attacks the sufficiency of the allegations regarding interference with a public right, control over the nuisance-causing instrumentality, and special injury. Altria and the Officer and Director Defendants move to dismiss the claims for failure to adequately plead their role in creating and maintaining the alleged nuisance.

---

[71] I note that even if the doctrine prevented the government entities from recovering damages incurred to combat the alleged youth e-cigarette crisis, "it would entail only a limit on the scope of damages that the [government entities] might recover" and not mandate dismissal of their entire public nuisance or negligence claims. *See Camden Cty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 265 (D.N.J. 2000), *aff'd,* 273 F.3d 536 (3d Cir. 2001) ("Plaintiff's request for injunctive and equitable relief would be unaffected by this doctrine.").

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.    JLI

#### a.    Product Liability Limitation

As an initial matter, JLI argues that the public nuisance claims should be dismissed because they are essentially product liability claims for economic damages under the guise of nuisance law.  It contends that public nuisance law should not be applied here because other product-based torts, like negligent misrepresentation, are better suited to address the government entities' allegations.

Contrary to JLI's assertions, "while Plaintiff's nuisance theory concerns a product, it does not sound in products liability."  *In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*, 2019 WL 2468267, at *29.  The allegations here do not concern the JUUL product itself, but rather the alleged consequence of JLI's conduct.  Put differently, the public nuisance claims are premised on JLI's aggressive promotion of JUUL to teens and efforts to create and maintain an e-cigarette market based on youth sales, not on any alleged defect in JUUL products.  This is not, as JLI contends, an attempt to stretch nuisance law to allow claims against manufacturers of allegedly dangerous products or based on failures to warn in the marketing of those products.  The public nuisance claims alleged here are not as novel as JLI characterizes them to be; similar claims have been alleged in numerous opioid and gun manufacturer cases.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*, , 2019 WL 2468267, at *29 (drawing distinction between a product liability claim alleging a negligence theory and claim alleging a non-product liability theory of negligence); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1210–14 (9th Cir. 2003) (concluding that "[c]ontrary to the dissent's mis-characterization of this case as a products liability suit, this is an action that alleges negligence and public nuisance claims; it does not allege that the guns in question were defectively designed or manufactured or that the defendants failed to affix an adequate warning on the guns"; rather, the public nuisance claim "rest[ed] on the defendants' actions in creating an illegal secondary market for guns," conduct that plaintiffs alleged "unreasonably interfered with public safety and health").

JLI asserts that the government entities have not shown that the relevant states (Arizona, California, Florida, Pennsylvania, and New York) recognize these kinds of public nuisance claims.

United States District Court
Northern District of California

As discussed above, California plaintiffs have been allowed to bring public nuisance claims against product manufacturers and distributors as long as their claims are not premised on product liability theories. *See Ileto*, 349 F.3d at 1214.[72] The Pennsylvania and Florida decisions that JLI cites "are based on the alleged facts that differ materially" from those alleged here. *See In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*, 2019 WL 2468267, at *29 (distinguishing *City of Philadelphia v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 910–11 (E.D. Pa. 2000), *aff'd*, 277 F.3d 415 (3d Cir. 2002) and *Penelas v. Arms Tech., Inc.*, No. 99-1941 CA-06, 1999 WL 1204353, at *4 (Fla. Cir. Ct. Dec. 13, 1999), *aff'd*, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001)).

JLI cites *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91 (N.Y. App. Div. 2003) as an example of a New York court dismissing public nuisance claims that were improperly disguised product liability claims. The allegations in that case also differ from the ones here. *See Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 389–91 (E.D.N.Y. 2004) (allowing public nuisance claim against gun industry whose marketing and sales led to illegal secondary gun market; analogizing to Ninth Circuit's reasoning *Ileto* and distinguishing *Spitzer* on grounds that it dismissed public nuisance claims because of intervening acts of criminals using guns "but specifically not[ed] facts which, if alleged, might be sufficient to state a cause of action for public nuisance against members of the firearms industry").

JLI points out that no Arizona court has recognized a nuisance cause of action against a

---

[72] JLI's argument that I should not follow the Ninth Circuit's decision in *Ileto* is unconvincing. The two California Court of Appeal decisions it cites only differentiated the facts at issue in *Ileto*; they did not outright reject its reasoning. In *In re Firearm Cases*, 126 Cal. App. 4th 959, 990 (2005), the court noted that the Ninth Circuit in *Ileto* was reviewing the grant of a motion under Rule 12(b)(6), whereas "[t]his case had progressed beyond the pleadings stage." It also distinguished *Ileto* on grounds that the "negligence and nuisance theories advanced *Ileto* were based on two contentions: (1) the defendants negligently created an illegal secondary market for guns by selling more guns than legal purchasers can buy; and (2) the defendants thereby developed distribution channels they knew would regularly provide guns to criminals." *Id.* It concluded that "[e]ven if [it] were to accept the *Ileto* court's interpretation of what our Supreme Court may decide when faced with this issue, the conclusions in that case (aside from the need to show causation) are not applicable here, where there is no evidence of either of the contentions underlying the causes of actions in *Illeto*." *Id.*

Similarly, the California Court of Appeal in *City of Modesto Redevelopment Agency v. Superior Court* did not reject *Ileto*, but distinguished it. 119 Cal. App. 4th 28, 39 n.8 (Jun. 28, 2004) ("In any event, the theory in those cases was *not* that the products were defective or that the defendants failed to warn of their dangers.") (emphasis added).

108

United States District Court
Northern District of California

manufacturer of a consumer product based on sale, marketing, or distribution of that product. That is not reason enough to conclude that Arizona courts would not recognize the kind of public nuisance claims alleged here. *See In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*, 2019 WL 2468267, at *29 (rejecting similar argument that no Oklahoma Supreme Court precedent has affirmed the viability of the kind of public nuisance claim alleged based on the case law discussed above).

The government entities' public nuisance claims do not stretch into product liability law. JLI's motion to dismiss on this ground is DENIED.

### b.  Interference With A Public Right

A public nuisance is generally defined as "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B (1979). This formulation of public nuisance has been adopted by courts in Arizona, New York, and Pennsylvania; Florida and California courts have applied similar principles.[73] Conduct that may constitute an "unreasonable interference with a right common to the general public" includes conduct "that involves a significant interference with the public health." Restatement (Second) of Torts § 821B. Public nuisance law in each of the jurisdictions at issue here prohibits conduct that interferes with public health.[74]

---

[73] *See Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Arizona*, 148 Ariz. 1, 4 (1985) (quoting section 821B for the definition of a public nuisance); *Wheeler v. Lebanon Valley Auto Racing Corp.*, 755 N.Y.S.2d 763 (2003) (same in New York); *Machipongo Land & Coal Co. v. Com.*, 569 Pa. 3, 40 (2002) (same in Pennsylvania); *People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1104 (1997) (comparing section 821B definition to California common law and Cal. Civ. Code § 3479); *Thompson v. State*, 392 So.2d 1317, 1318 (Fla. 1981) (defining a public nuisance as a violation of public rights or an inconvenience to the public generally).

[74] *See Citizens for Odor Nuisance Abatement v. City of San Diego*, 8 Cal. App. 5th 350, 358 (2017) (defining nuisance as including "[a]nything which is injurious to health . . . or is indecent or offensive to the senses" and noting that "public nuisances at common law are offenses against, or interferences with, the exercise of rights common to the public, such as public health") (quoting Cal. Civ. Code § 3479); *Flo-Sun, Inc. v. Kirk*, 783 So.2d 1029, 1036 (Fla. 2001) ("[A] public nuisance may be classified as something that causes 'any annoyance to the community or harm to public health.'") (citation omitted); *Com. ex rel. Preate v. Danny's New Adam & Eve Bookstore*, 155 Pa. Cmwlth. 281, 285 (1993) ("One set of circumstances which support a conclusion that an interference with a public right is unreasonable is whether the conduct in question poses a significant threat to the public health.") (citation omitted); *Armory Park Neighborhood Ass'n*, 148 Ariz. at 10 ("[C]onduct which unreasonably and significantly interferes with the public health, safety, peace, comfort or convenience is a public nuisance within the concept of tort law."); *532*

The government entities sufficiently allege that JLI substantially interfered with public health, impacting their school districts and communities.[75]  JLI misconstrues these allegations as flowing through the individual right to be free from alleged defective products or alleged deceptive marketing.  A New York court in an opioids case rejected the same argument:

> As for the manufacturer defendants' claim that the plaintiffs have failed to plead substantial interference with a public right, it suffices to note the defendants' failure to establish why public health is not a right common to the general public, nor why such continuing, deceptive conduct as alleged would not amount to interference; it can scarcely be disputed, moreover, that the conduct at the heart of this litigation, alleged to have created or contributed to a crisis of epidemic proportions, has affected a considerable number of persons.

*In re Opioid Litigation*, 2018 WL 3115102, at *22 (internal quotation marks and citation omitted).

JLI further mischaracterizes the allegations here as simply a "tallying" of alleged individual injuries based on a significant number of people in the school districts or communities being affected in a similar way.  The government entity complaints adequately describe a public health crisis of youth e-cigarette use and wholesale addiction of kids to nicotine.  I must accept these factual allegations as true at this stage.

JLI's motion to dismiss the public nuisance claims for failure to plead an interference with a public right is DENIED.

### c.    Control Over Instrumentality

JLI argues that the government entity complaints from Arizona, Florida, New York, and Pennsylvania fail because there is no allegation that JLI controlled the instrumentality that caused the nuisance.  A review of the case law reveals that control is a required element for public nuisance claims in Pennsylvania and Florida.  The parties' briefs do not address whether the same

---

*Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001) ("A public nuisance exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons.").

[75] JLI points out that the government entities allege interferences with "public health, safety and the right to a public education,"  TVC ¶ 631, but in their opposition, the government entities only focus on the interference with public health and safety.   Oppo. to JLI & Altria  Motions to Dismiss [Dkt. No. 817]11–14.

United States District Court
Northern District of California

is true in New York and Arizona.  But assuming that control is a requirement in New York and Arizona, plaintiffs have sufficiently alleged it for each of the four jurisdictions.[76]

JLI's contention that the government entities have not alleged that it controlled the JUUL product as of the time the alleged nuisance occurred, as discussed above, "rest[s] upon a false premise that the instrumentality of the nuisance is the [JUUL product itself]."  *In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*, 2019 WL 2468267, at *30.  The government entity complaints include plausible allegations that JLI had control over the conduct that created and maintained the youth e-cigarette crisis, such as directly and intentionally marketing to youth, distributing free samples to young audiences, presenting misleading information to students in schools, and preserving the availability of the popular mint flavor while ostensibly removing "kid-friendly" flavors from the market.  These allegations match the type of public nuisance allegations that have proceeded past the pleadings stage in cases addressing opioids and firearms.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig. – West Boca Medical Center*, 2020 WL 1669655, at *18 (N.D. Ohio Apr. 3, 2020) ("Defendants had control over the instrumentality of the nuisance by virtue of their control over their own opioid marketing, distribution, or dispensing practices."); *Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d at 420 ("[I]t is not fatal to appellant's public nuisance claim that appellees did not control the actual firearms at the moment that harm occurred," where complaint alleged that appellees "created a nuisance through their ongoing conduct of marketing, distributing, and selling firearms in a manner that facilitated their flow into the illegal market"; thus the City alleged that the manufacturers "control the creation and supply of this illegal, secondary market for firearms, not the actual use of the firearms that cause injury").

At the pleading stage, I accept plaintiffs' allegations regarding JLI's level of control.  *In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*, 2019 WL 2468267, at *30.

---

[76] There is no control requirement under California public nuisance law.  The California Court of Appeal has clearly found that "[l]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant *created or assisted in the creation of the nuisance*." *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 109 (2017) (internal quotation marks and citation omitted) (emphasis in original).

1  ("Whether a defendant had a requisite level of control raises questions of fact inappropriate for

2  resolution on a motion to dismiss.").  JLI's motion to dismiss the public nuisance claims for

3  failure to plead control over the instrumentality is DENIED.

### d.      Special Injury

5      A plaintiff cannot recover pecuniary losses resulting from a public nuisance unless it has

6  suffered damages "different [in] kind from that suffered by the general public."  Restatement

7  (Second) of Torts § 821C.  If the pecuniary loss "is common to an entire community and the

8  plaintiff suffers it only in a greater degree than others, it is not a different kind of harm and the

9  plaintiff cannot recover for the invasion of the public right."  *Id.*  JLI argues that the government

10  entities' public nuisance claims fail for the independent reason that they have not alleged an injury

11  that is cognizable through a public nuisance claim for damages.

12      The school districts provide sufficient detail in their complaints about the kinds of harms

13  caused by JLI's conduct that is unique to schools and different in kind from that suffered by the

14  general public in their community.  *See* TVC ¶¶ 597–608 (to combat widespread youth vaping, the

15  school districts had to take numerous actions, such as diverting limited resources to combat the

16  problem, creating resources and education materials, installing e-cigarette detectors and cameras

17  to discourage and detect e-cigarette use, and managing hazardous waste problem due to improper

18  disposal of e-cigarette devices and pods on school grounds).  They adequately allege that JLI's

19  conduct—including a targeted marketing campaign on social media, flavored products such as

20  mango and mint, and other actions targeting school-age youth—created and maintained an illicit

21  youth market of school-age youth addicted to nicotine, causing extreme disruption in classrooms

22  and unique harm to schools that is different in kind than the community at large.

23      Similar allegations have passed the pleadings stage in opioid cases.  *See, e.g.*, *In re Nat'l*

24  *Prescription Opiate Litig. – West Boca*, 2020 WL 1669655, at *17 (hospital plausibly pleaded

25  concrete economic losses differing in kind from the generalized injury to health suffered by the

26  general public, including "increased operational costs" to train hospital staff, provide diagnostic

27  tools to identify "pill-seekers", and hire additional personnel to help them keep their opioids

28  secure).

United States District Court
Northern District of California

Santa Cruz County also sufficiently pleads a special injury for its non-representative public nuisance claim.[77]  It alleges that it plays a unique role as the entity required to protect the public health of its community, a responsibility not shared by the general public or even other unspecified agencies, and therefore conduct that impacts the public health of the County injures the County in a different way from the general public within the County.  *See* Santa Cruz ¶¶ 602–13 (public health staff spent significant time and resources addressing youth e-cigarette use, including developing and disseminating educational campaigns).  These factual allegations, taken as true, provide at least some basis for special injury that allows Santa Cruz County's non-representative public nuisance claim to survive the pleadings stage.  JLI does not provide any authority to support the broad assertion that claims brought by a county are by definition incapable of being special injuries.

JLI's motion to dismiss the public nuisance claims for failure to plead a special injury is DENIED.

### 2.    Altria

Altria separately contends that the government entities fail to allege sufficient facts regarding the role that it played in creating or maintaining the alleged nuisance.  I disagree.  Drawing inferences in their favor, the government entity complaints include allegations that make Altria's participation plausible.

The government entities claim that JLI benefitted from Altria's expertise in designing and marketing addictive products, and in thwarting regulation.  TVC ¶ 9.  Although Altria argues that its involvement with JLI began in December 2018, with its official investment in JLI, the complaints allege that the companies began coordinating their marketing efforts to expand the youth vaping marketing as early as Spring 2017 by sharing information and coordinating public

---

[77] JLI concedes that Santa Cruz County is statutorily authorized to bring a representative public nuisance claim without showing special injury, and therefore challenges only the non-representative claim.  *See* Santa Cruz ¶¶ 627–47 (Count One representative public nuisance claim brought on behalf of the People of the State of California); *id.* ¶¶ 648–69 (Count Two non-representative public nuisance claim).

United States District Court
Northern District of California

marketing activities.  *Id.* ¶¶ 9, 46–48, 54.[78]

A key aspect of this early coordination was Altria's acquisition of shelf space in 2018 "that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products."  *Id.* ¶ 471.  This ensured that, "even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them—retail establishments."  *Id.* ¶ 475.

Altria also utilized its lobbying muscle to maintain the youth vaping market.  Both before and after gaining a share of JLI, the government entities allege that Altria used its lobbying power to keep mint, a popular flavor with youth, on the market for as long as possible.  *Id.* ¶¶ 519–50.  Following investment in JLI, two key Altria executives became JLI's CEO and head of regulatory affairs and Altria agreed to assist JLI with "direct marketing; sales, distribution, and fixture services; and regulatory affairs" and committed to applying "its logistics and distribution experience to help JLI expand its reach and efficiency."  *Id.* ¶¶ 482, 487.

In addition, the government entities allege that Altria actively participated in the misleading "Make the Switch" campaign, even though it knew that JUUL was not a product used mostly by adults to switch but, rather, was a product widely used by youth and nicotine naïve individuals.  *Id.* ¶ 245.  The campaign allegedly sought to convince the public that JUUL products were never marketed to youth and were instead intended as smoking cessation devices, a cover-up that allowed the youth e-cigarette crisis to continue and grow.  *Id.* ¶¶ 582–92, 621.

These allegations, considered together, plausibly allege that Altria engaged in conduct which created, maintained and/or contributed to the purported nuisance.[79]  Altria's attempt to

---

[78] Altria requests judicial notice of Plaintiff Facts Sheets (PFSs) submitted by individual plaintiffs in this litigation to show that most individuals allege that they began using JUUL products before December 2018, when Altria purchased a 35% stake in JLI.  Dkt. No. 739, Ex. 1.  As noted above, Altria's request for judicial notice is DENIED.  Even if I considered this exhibit, it would not alter my analysis.  The PFSs are relevant only to individual plaintiffs asserting personal injury claims and are irrelevant as to the government entity plaintiffs.  The government entities' claims are based on harms the entities experienced as a result of the public health crisis of escalating youth e-cigarette use and are not derivative of harms to these individual plaintiffs.

[79] This conclusion is not in conflict with the conclusion that the RICO claim has not been

1    factually dispute these allegations is inappropriate at the pleading stage.

2         Altria's motion to dismiss the public nuisance claims is DENIED.

3              **3.    Officer and Director Defendants**

4         The Officer and Director Defendants move to dismiss the public nuisance claims against

5    them on grounds that the government entities have failed to allege their roles in creating and

6    maintaining the public nuisance of the youth vaping epidemic.  The government entities respond

7    that the allegations are sufficient to establish each of the Officer and Director Defendants'

8    personal roles in the conduct, not by virtue of their status as JLI officers or directors, but because

9    each of them authorized, directed, or participated in creating and maintaining the public nuisance.

10        "A corporate officer or director is, in general, personally liable for all torts which he

11   authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the

12   corporation and not on his own behalf."  *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d

13   1001, 1021 (9th Cir. 1985) (citation omitted); *State of New York v. Shore Realty Corp.*, 759 F.2d

14   1032, 1053 (2d Cir. 1985 (holding an individual defendant personally liable for public nuisance

15   without piercing the corporate veil).  The government entities cite multiple examples that show

16   that each state at issue on these motions has applied a similar individual liability theory[80] and has

17   recognized individual liability for a public nuisance tort in particular.[81]

18   _____

19   adequately pleaded against Altria.  Allegations of Altria's coordination with JLI and its own acts
     undertaken to support JLI's continued sales to youth are sufficient for the nuisance, negligence,
20   and consumer protection claims, but those allegations do not – without more – plausibly support
     that Altria joined an existing Enterprise that was distinct from JLI's regular business and
21   undertook conduct in support of that distinct Enterprise.

22   [80] *See Marlyn Nutraceuticals, Inc. v. Improvita Health Prods.*, 663 F. Supp. 2d 841, 847 (D. Ariz.
     2009); *Frances T. v. Vill. Green Owners Ass'n*, 42 Cal.3d 490, 508 (1986); *White v. Wal-Mart
23   Stores, Inc.*, 918 So.2d 357, 358 (Fla. Dist. Ct. App. 2005); *Kopec v. Hempstead Gardens, Inc.*,
     696 N.Y.S.2d 53, 55 (N.Y. App. Div. 1999); *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 621–22
24   (1983).

25   [81] *See Bischofshausen, Vasbinder, & Luckie v. D.W. Jaquays Min. & Equip. Contractors Co.*, 145
     Ariz. 204, 211 (Ct. App. 1985) (denying summary judgment on individual liability of corporate
26   officers for negligence and nuisance claims because fact issues remain "as to the extent of the
     [individual defendants'] involvement with the torts"); *People v. Pac. Landmark, LLC*, 129 Cal.
27   App. 4th 1203, 1216 (2005) (applying this rule to affirm a preliminary injunction against a
     corporate officer "because of his personal involvement in allowing the nuisance to persist");
28   *Kopec*, 696 N.Y.S.2d at 55 (affirming denial of motion for summary judgment on nuisance claim
     under New York law because "[c]orporate officers may be held personally liable for torts

                                              115

United States District Court
Northern District of California

Before turning to the sufficiency of the allegations, I address the legal argument raised by some of the Officer and Director Defendants. They argue that although corporate officers can be held personally liable for torts, there is no reason to believe that state courts would expand public nuisance where abatement is impossible, given that an individual officer has no authority to take action either on behalf of the corporation without the consent the board of directors or when an individual officer is no longer employed by the corporation.

The jurisdictions at issue here generally follow the Restatement (Second) of Torts § 821B's definition of public nuisance. The Restatement specifies that a person who substantially participates in creating a nuisance condition remains subject to liability "even though he is no longer in a position to abate the condition and stop the harm." Restatement (Second) of Torts § 834 comment e, at 150–51. Relying on this reasoning, the court in *Commonwealth v. Purdue Pharma, L.P.*, 2019 WL 5495716, at *4 (Mass. Super. Oct. 8, 2019) rejected the argument of an individual director of a pharmaceutical company that the public nuisance claims against him should fail because he had "long since left [the company]." The court found that "although [it] need not determine on a motion to dismiss precisely what relief the Commonwealth would be entitled to receive, [it] would note that an abatement order in a public nuisance case could include a requirement that the defendants expend the money necessary to abate the nuisance." *Id.* at *5.

That is precisely the relief the government entities seek here – equitable relief to fund prevention education and addiction treatment. If liable, individual Officer and Director

---

committed in the performance of their corporate duties"); *Kaites v. Com. of Pa., Dep't of Envtl. Res.*, 108 Pa. Cmwlth. 267, 276 (1987) (holding corporate officers may be personally liable but finding "lack of sufficient evidence demonstrating that [individual defendant] has contributed, by personal actions of neglect or misconduct, to the existing nuisance at the Bear Run complex").

Although the government entities were unable to point to a Florida case that has squarely recognized individual liability for public nuisance, the case law suggests that Florida law is similar to that in other jurisdictions that have allowed it. *See White*, 918 So.2d at 358 (plaintiff sufficiently stated a negligence claim against store manager individually, where the complaint "allege[d] more than mere technical or vicarious fault—it allege[d] that [the store manager] was directly responsible for carrying out certain responsibilities; that he negligently failed to do so; and that, as a result, [plaintiff] was injured"). Some cases suggest that under certain circumstances, individuals can be sued for public nuisance. *See, e.g., Health Clubs, Inc. v. State ex rel. Eagan*, 377 So.2d 28, 30 (Fla. Dist. Ct. App. 1979) (discussing final judgment against operators of health club to abate a public nuisance); *Health Clubs of Jacksonville, Inc. v. State ex rel. Austin*, 381 So.2d 1174 (Fla. Dist. Ct. App. 1980) (same).

United States District Court
Northern District of California

Defendants would contribute to the abatement fund, which would be used to support various measures to address the youth vaping epidemic. An abatement fund is "not a 'thinly-disguised' damages award", but rather an equitable remedy designed to eliminate the nuisance. *See People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 132 (2017) ("An abatement order is an equitable remedy, while damages are a legal remedy" and "[a]n equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff."). Therefore, even if the government entities cannot seek injunctive relief from the Officer and Director Defendants, they can seek equitable relief in the form of an abatement fund.

The factual allegations concerning Monsees and Bowen's conduct are sufficient at this stage. The government entity complaints allege that Monsees played a key role in directing JLI's youth marketing, leading to the public health crisis at issue. Monsees admitted that he and Bowen "carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation," describing how these companies marketed cigarettes to youth. TVC ¶¶ 68, 298–99. Monsees knew well before launch that JUUL would be attractive to youth, because in October 2014, he received results from a study of a JUUL prototype that revealed that although JUUL was "too much" for smokers, "the younger group" liked JUUL, and JUUL "might manage to make smoking cool again." *Id.* ¶¶ 121–24.

In particular, Monsees set the focus on marketing to the "cool kids" and "personally reviewed images" from JLI's "Vaporized" campaign. *Id.* ¶¶ 306, 318. "'[H]e and other in the company were well aware' that the marketing campaign 'could appeal to' teenagers." *Id.* ¶ 318 (quoting *New York Times* article). He also "provided specific direction on the content of the website to JLI employees." *Id.* ¶ 370. In early July 2015, he spoke to Alexander Asseily, a JLI Director, "at length" about JLI's marketing approach, but JLI continued to market its products to youth for years to come. *Id.* at ¶ 371.

The government entity complaints allege that Bowen played a large role in developing and designing the JUUL product to appeal to young users and sustain their addiction to nicotine. TVC ¶¶ 5, 98–125. He helped create a product that had features attractive to youth that was also easy to use. He personally participated in "buzz" experiments and products tests, and worked to

United States District Court
Northern District of California

"minimize 'throat hit' and maximize 'buzz'" of JUUL e-cigarettes, recognizing that "[d]ramatically reducing the throat hit is not necessary for a product that is aimed at smokers," but "very effectively appeals to nonsmokers, especially youth." *Id.* ¶¶ 103–110. He also participated in studies that revealed the high amount of nicotine in prototype JUUL products and helped designed the product "to deliver nicotine in larger amounts and at a faster rate than even cigarettes." *Id.* ¶¶ 110–125, 248.

The allegations against Pritzker, Valani, and Huh, however, are not as detailed and are not sufficient. The government entities allege that Pritzker, Valani, and Huh formed an Executive Committee in October 2015 and took "charge of fraudulently marketing JUUL products, including to youth." *Id.* ¶ 385. Pritzker admitted that JUUL's branding "feels too young" and discussed the JUUL approach "at length" with Valani and Board member Asseily in July 2015. *Id.* ¶ 371. Asseily also sent Pritzker and Valani a follow-up email expressing his concerns about the JUUL marketing strategies. *Id.* The PECs allege that "[e]ven though the directors and executives of JLI knew—and explicitly stated—that what they were doing was wrong, JLI pressed ahead with its youth-oriented Vaporized ad campaign through early 2016." *Id.* ¶ 373.

The government entities also allege that Pritzker, Huh, and Valani through their position on the JLI Board of Directors were responsible for continuing to market flavors to youth, particularly mint, because they had "final say" over all of JLI's marketing activities and effectively "controlled the messaging around JUUL products." *Id.* ¶¶ 185–86, 377. But as noted above, the "final say" and "control" allegations are not sufficient for the claims asserted against the Other Director Defendants for the claims in the CAC and are not sufficient for the nuisance claim under the PEC.

The other allegations similarly do not establish that Pritzker, Huh, and Valani authorized, directed, or participated in conduct that contributed to the youth e-cigarette crisis. While the government entities allege that the Other Director Defendants knew about the youth-targeting marketing, they do not specifically allege conduct in which the Other Director Defendants personally directed, controlled, or participated. Vague allegations about exercising "final say" over marketing decisions do not suffice without any specificity concerning what those decisions

United States District Court
Northern District of California

1   were and how they were connected to youth-targeting in particular.

2        The allegations in the government entity complaints are sufficient to satisfy the

3   requirements under Rule 12(b)(6) that Monsees and Bowen personally participated in wrongdoing

4   that created and maintained the nuisance.  The allegations are insufficient regarding the roles

5   Pritzker, Huh, and Valani played.  Accordingly, Monsees and Bowens' motions to dismiss the

6   public nuisance claims are DENIED.  Huh, Valani, and Pritzker's motion to dismiss the public

7   nuisance claims is GRANTED with leave to amend.

8        **C.   Negligence**

9        The school districts bring claims for negligence and gross negligence.  JLI challenges the

10  duty element and argues that the economic loss doctrine also bars the school districts from seeking

11  recovery.  Altria and the Officer and Director Directors challenge the sufficiency of the allegations

12  with respect to duty and breach.[82]

13       **1.   JLI**

14       **a.   Duty**

15       Duty is an "obligation, recognized by law, which requires the defendant to conform to a

16  particular standard of conduct in order to protect others against unreasonable risks of harm."  *Delci*

17  *v. Gutierrez Trucking Co.*, 229 Ariz. 333, 335 (Ct. App. 2012) (citation omitted).  In each of the

18  relevant jurisdictions, public policy factors govern whether a defendant owes a duty of care.  Some

19  jurisdictions give more weight to the foreseeability of harm than others.  I address  duty  under

20  each jurisdiction in turn.

21  _____

22  [82] I briefly address the gross negligence claims here.  JLI does not challenge the sufficiency of the
    gross negligence claims, but argues that some of the gross negligence claims should be dismissed
23  because California and Pennsylvania law do not permit standalone gross negligence claims
    separate from negligence claims.  Altria raises the same argument as to the remaining gross
24  negligence claims under Arizona, Florida and New York law, and also challenges the sufficiency
    of the school districts' allegations.

25  A review of the case law reveals that at least some courts in the relevant jurisdictions consider
26  gross negligence as a degree of negligence and not a separate cause of action.  The gross
    negligence claims are therefore deemed subsumed in the school districts' negligence claims.  To
27  the extent that Altria challenges the sufficiency of the school districts' gross negligence
    allegations, whether Altria's conduct "constituted an extreme departure from the ordinary standard
28  of conduct" and "were a cause of [the school districts'] injuries" are "questions of fact" not
    resolved at this stage.  *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1088 (2011).

1    In California, courts consider the following factors in determining whether a defendant

2    owes a duty of care:

> (1) the extent to which the transaction was intended to affect the
> plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree
> of certainty that the plaintiff suffered injury, (4) the closeness of the
> connection between the defendant's conduct and the injury suffered,
> (5) the moral blame attached to the defendant's conduct and (6) the
> policy of preventing future harm.

6    *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 804 (1979) (citing *Biakanja v. Irving*, 49 Cal.2d 647, 650

7    (1958)) (hereinafter the "*Biakanja* factors")).   "[F]oreseeability of the risk is a primary

8    consideration in establishing the element of duty."   *Id.* at 806 (citation omitted).

9    The school districts allege that JLI created a product that had features to intentionally

10   appeal to young users (*e.g.*, flavors and easily disguisable), marketed it directly to youth using

11   social media, young attractive models, websites and networks frequented by teens, and even

12   marketed it directly in school through deceptive "education programs" that taught students how to

13   use JUUL and told them it was safe.   *See, e.g.*, TVC ¶¶ 74–75, 111–18, 143-51, 161, 219–23, 303–

14   05, 315–19, 325–27, 336–43, 361–62, 441–45.   This alleged conduct hooked millions of teenagers

15   onto vaping with an addictive product that is easily concealed in schools, and foreseeably caused a

16   multitude of problems for the school districts, including, but not limited to, the need to devote

17   substantial staff time to addressing the crisis, financial costs from new equipment to detect e-

18   cigarette use, and handling hazardous waste on school grounds.   *Id.* at ¶¶ 597–609.

19   These allegations sufficiently plead that JLI's actions in marketing JUUL directly to teens

20   placed the school districts in the "foreseeable zone of risk."   Applying the *Biakanja* factors, the

21   school districts adequately allege that: (1) JLI's scheme was intended to "affect" school children,

22   which necessarily caused harm on school district property; (2) the harm was foreseeable, as

23   discussed above; (3) the certainty of their injuries must be accepted as true at this stage; (4) there

24   is a close connection between JLI's conduct that created the youth vaping market and the harms

25   suffered by the school districts; (5) there is strong "moral blame" attached to JLI's conduct in

26   targeting school children with a dangerous product; and (6) there is also a strong policy in favor of

27   preventing future harm and curbing teen vaping.   *See Ileto*, 349 F.3d at 1197 (policy factors

28   weighed in favor of imposed legal duty on gun manufacturer, where shooting victims sufficiently

United States District Court
Northern District of California

120

United States District Court
Northern District of California

1    alleged that manufacturer created an illegal secondary market for guns that exposed them to an

2    unreasonable risk of harm through the reasonably foreseeable conduct of a prohibited purchaser).

3            In Florida, "[t]he touchstone for determining whether a duty exists is foreseeability."

4    *Sewell v. Racetrac Petroleum, Inc.*, 245 So.3d 822, 825 (Fla. Dist. Ct. App. 2017) (internal

5    quotation marks and citation omitted).  Where a person's conduct is such that it creates a

6    "'foreseeable zone of risk' posing a general threat of harm to others, a legal duty will ordinarily be

7    recognized to ensure that the underlying threatening conduct is carried out reasonably."  *Id.*

8    The Florida Supreme Court has identified four sources that help determine whether a duty arises.

9    As relevant here, the school districts rely on the "general facts of the case" as the source for JLI's

10   common-law duty.  *McCain v. Fla. Power Corp.*, 593 So.2d 500, 503 n.2 (Fla. 1992)

11           The school districts' allegations here are analogous to the foreseeable harms at issue in the

12   opioid multidistrict litigation.  For example, West Boca Medical Center brought claims as a non-

13   user of a product that suffered substantial harms due to a public health crisis caused by the

14   defendants in the form of treating patients with minimal or no compensation and additional

15   operational costs to combat the crisis.  *See In re Nat'l Prescription Opiate Litig. – West Boca*

16   *Medical Center*, 2020 WL 1669655, at *4–5.  It asserted that "its injuries were within the

17   'foreseeable zone of risk' created by Defendants' manufacturing, distributing, and dispensing

18   activities, because: (a) if not conducted with a requisite level of care, these activities could (and, in

19   fact, did) foreseeably allow opioids to be diverted in large quantities into West Boca's service

20   area; (b) this diversion could (and, in fact, did) foreseeably lead to widespread injury to people's

21   health, creating a public health crisis; and (c) hospitals are necessarily and foreseeably on the

22   "front lines" of any and all health crises."  *Id.* at *28.

23           Applying Florida law and accepting the allegations as true at the motion to dismiss stage,

24   Judge Polster concluded that West Boca sufficiently pleaded a duty of care because its "asserted

25   injuries plausibly fall within the foreseeable zone of risk created by Defendants' manufacturing,

26   distributing, and dispensing activities related to opioid drugs."  *Id.*; *see also In re Nat'l*

27   *Prescription Opiate Litig. – Broward County*, 2020 WL 1986589, at *9 (concluding Broward

28   County sufficiently alleged a claim of common law negligence under Florida law for the same

reasons stated in *West Boca*, where the County alleged that the opioid crisis forced it to incur substantial costs in order to protect the health and welfare of its community); *In re Nat'l Prescription Opiate Litig. – Summit County*, 2018 WL 6628898, at *18; *id.* at *19 ("It is also foreseeable that local governments will be responsible for combatting the creation of that [black] market and mitigating its effects.")

The school districts' allegations are sufficient under Florida law for the same reasons. They have plausibly alleged injuries that were within the "foreseeable zone of risk" created by JLI's conduct. Its youth-targeted marketing created a surge in youth e-cigarette use, particularly in schools where the product was easily disguisable, and the rampant use foreseeably led to widespread injury to schools that are foreseeably on the "front lines" of the crisis.

In Pennsylvania, "[t]he determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 553 (2000). Here, the need for prevention of youth vaping is unquestionable and social utility weighs in favor of imposing a duty on JLI to exercise reasonable care in promotion of its product. The school districts have not only alleged that their harm was foreseeable, but also targeted. These factors outweigh the concerns against imposing a duty.

Although foreseeability is not an essential factor in finding duty under Arizona and New York law, the public policy factors weigh in favor of finding duty in those states as well. *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (N.Y. 2001) ("Foreseeability, alone, does not define duty – it merely determines the scope of the duty once it is determined to exist."); *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 564 (2018) ("[F]oreseeability is not a factor to be considered by courts when making determinations of duty.").

In New York, courts "fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public

122

policies affecting the expansion or limitation of new channels of liability." *Hamilton*, 96 N.Y.2d at 232.  In *Hamilton*, the court found that a gun manufacturer that simply supplied a product had no duty to victims of gun violence.  *Id.* at 240.  JLI argues that the school districts' claims fail for the same reason set forth in *Hamilton* because JLI did not control over the student consumers who caused their injuries.

*Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 399 (E.D.N.Y. 2004), another case applying New York law, demonstrates why JLI's reliance on *Hamilton* is misplaced and why the school districts have sufficiently pleaded a duty that comports with public policy.  There, the court explained that *Hamilton* "was, in part, predicated on the inability in that case to determine whether a high incidence of traces was attributable to irresponsible conduct on the part of certain members of the gun industry."  *Id.* at 400.  By contrast, the plaintiff in *Johnson* plausibly pleaded that gun manufacturers played a disproportionate role in supplying the illegal gun-trafficking market and "state[d] facts that establish a duty on the part of gun companies to exercise reasonable care in the marketing and sales of their product."  *Id.*  The duty did not depend on controlling the actions of third parties that misused guns, but rather on the gun manufacturers' business practices.

The same logic applies here.  Contrary to JLI's mischaracterization of the allegations, the school districts do not simply contend that JLI manufactured a dangerous product that caused them downstream harm.  Rather, they allege that JLI's lack of reasonable care in the marketing and sales of JUUL created an illicit youth market and the heavy promotion of JUUL to teen users caused the school districts reasonably predictable harm.[83]  This supports finding a duty under New

---

[83] JLI's contention that the negligence claims must be dismissed for failure to allege a "special relationship" is based on a similar mischaracterization of the case; the government entities are not seeking to impose a duty on JLI to control the actions of third parties, but rather a duty to use reasonable care in its own marketing and sales of JUUL products.  *See Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St. 3d 416, 417 (2002), where the city alleged that defendants marketed and distributed their firearms in such a way as to "ensure the widespread accessibility of the firearms to prohibited users" thereby fostering criminal misuse and an illegal aftermarket.  The Ohio Supreme Court held that the "special relationship rule [was] not determinative" because the city was not alleging a duty to control third persons.  *Id.* at 422.  Instead, "the issue [was] whether appellees are themselves negligent by manufacturing, marketing, and distributing firearms in a way that creates an illegal firearms market that results in a foreseeable injury."  *Id.*; *see also In re Nat'l Prescription Opiate Litig. – Summit County*,  2018 WL 4895856, at *37 (N.D. Ohio Oct. 5, 2018), *report and recommendation adopted in part, rejected in part,*  2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ("Plaintiffs' do not assert a duty to prevent the actions of third persons, but

United States District Court
Northern District of California

1    York law.

2        In Arizona, duties are created either by "special relationships or relationships created by

3    public policy." *Quiroz*, 243 Ariz. At 565.  The primary source for identifying a duty based on

4    public policy is based on Arizona state statutes.  *Id.* at 566; *see, e.g.*, *Brannigan v. Raybuck*, 136

5    Ariz. 513, 516–17 (1983) (statutes barring minors from consuming alcohol create a duty

6    prohibiting liquor licensees from furnishing alcohol to minors).  The school districts allege that

7    JLI's conduct violates Arizona's public policy against marketing e-cigarette products to minors.

8    Tucson ¶ 629 (citing A.R.S. § 13-3622(a), which prohibits the sale or furnishing of vapor

9    products, instruments, or paraphernalia, to a minor, and A.R.S. § 13-3622(b), which prohibits

10   minors from buying, possessing, or knowingly accepting vapor products, instruments, or

11   paraphernalia).

12       The school districts sufficiently plead that JLI violated the policy interests behind these

13   Arizona statutes by marketing an addictive product to school-age children, leading to an epidemic

14   of youth vaping and corresponding harms to schools.  JLI does not convincingly refute these

15   public policy considerations.

16       Altogether, the school districts do not seek to impose a duty on JLI as members of the

17   general public.  Their specific allegations answer JLI's concerns about limitless or unbounded

18   liability.  The factors considered above and ordinary principles of tort law such as proximate

19   causation discussed below "are fully adequate to limit recovery without the drastic consequence of

20   an absolute rule which bars recovery in all such cases." *J'Aire*, 24 Cal. 3d at 808.  The policy

21   considerations "place a limit on recovery by focusing judicial attention on the foreseeability of the

22   injury and the nexus between the defendant's conduct and the plaintiff's injury." *Id.*  As Judge

23   Polster emphasized in finding that West Boca sufficiently pleaded a duty of care owed by the

24   opioid manufactures, "[a]t this stage in the case, a complaint need only set forth a plausible claim

25   for relief and should not be dismissed unless it is clear that *no relief* could be granted under any set

26

27   _____

28   rather a duty owed by Defendants to Plaintiffs to use reasonable care in, for example, marketing, monitoring, reporting, and selling their opioids.  The wrongful conduct alleged is that of Defendants, and not of third persons.").

United States District Court
Northern District of California

of facts that could be proved consistent with the allegations."  2020 WL 1669655, at *28 (citations omitted) (emphasis added).

The school districts adequately allege that JLI owed them a duty of care under Arizona, California, Florida, Pennsylvania, and New York law because their harms were foreseeable and public policy supports imposing a duty.  JLI's motion to dismiss the negligence claims on this basis is DENIED.

### b.      Economic Loss Doctrine

JLI argues that the economic loss doctrine in all states but Arizona require dismissal of the school districts' negligence claims because they seek economic losses without plausible allegations of physical injury or property damage.  The school districts contend that their losses are not "purely economic" because they have also suffered physical property damage in the form of hazardous waste, removal of bathroom doors, and other alterations to school property.  JLI responds that even if hazardous disposal of JUUL pods qualified as property damage, that would be the limit of the school districts' negligence claims.

The gravamen of the school districts' complaints clearly involves economic losses—for example, the alleged need to spend money on additional instruction, counseling, student discipline, and monitoring—and these economic losses do not flow from their alleged physical or property damage.  The question, then, is whether the economic loss doctrine in Florida, New York, Pennsylvania, and California would bar their negligence claims regarding these economic losses untethered to physical or property damage.

Florida and New York courts only apply the economic loss doctrine in cases involving contracts or product liability, which are not claims alleged by the Florida and New York government entity plaintiffs.  *See Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So.3d 399, 407 (Fla. 2013) ("[W]e we now take this final step and hold that the economic loss rule applies only in the products liability context."); *In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102, at *27 (N.Y. Sup. Ct. Jun. 18, 2018) (economic loss doctrine did not bar New York counties from recovering expense incurred in combatting opioid crisis because they did not assert a "cause of action against the manufacturer defendants for breach of

1    contract or an alleged defect in the product produced by said defendants"). The school districts'

2    negligence claims are therefore not barred by the economic loss doctrine in Florida and New York.

3        The doctrine is less straightforward in Pennsylvania and California. Pennsylvania courts

4    follow a "'reasoned approach' to applying the economic loss doctrine that 'turns on the

5    determination of the source of the duty plaintiff claims the defendant owed.'" *Dittman v. UPMC*,

6    649 Pa. 496, 525 (2018) (quoting *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa.

7    454, 483 (2005)). The economic loss doctrine "is concerned with two main factors: foreseeability

8    and limitation of liability." *Azur v. Chase Bank, USA, Nat. Ass'n*, 601 F.3d 212, 222 (3d Cir.

9    2010).

10       In *Dittman*, university medical center employees sued the university for negligence when

11   their personal and financial information was accessed and stolen from the university's computer

12   systems. The Pennsylvania Supreme Court found that the case "involve[ed] application of an

13   existing duty to a novel factual scenario" and held that the employees plausibly pleaded a

14   common-law duty in those circumstances. 649 Pa. at 513–14. It rejected the university's

15   interpretation of Pennsylvania's economic loss doctrine, finding that "those cases do not stand for

16   the proposition that the economic loss doctrine, as applied in Pennsylvania, precludes *all*

17   negligence claims seeking solely economic damages." *Id.* at 525 (emphasis added).

18       Although the employees' claim did not squarely fit in the "negligent misrepresentation"

19   exception to the economic loss doctrine previously delineated by the court, it found that negligent

20   misrepresentation is simply "one among many tort claims in Pennsylvania for which the economic

21   loss doctrine does not act as a bar for recovery of purely economic losses." *Id.* at 526 (citing *Bilt-*

22   *Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 479 (2005)). Because the

23   employees plausibly pleaded that the university breached its common-law duty to act with

24   reasonable care, and that duty "exist[ed] independently from any contractual obligations between

25   the parties, the economic loss doctrine [did] not bar [e]mployees' claim." *Id.* at 528.

26       The analysis in *Dittman* indicates that Pennsylvania courts would not bar the school

27   districts' negligence claim. As discussed above, the school districts plausibly plead a common-

28   law duty that arises independently from any contractual obligations, and finding a duty comports

United States District Court
Northern District of California

United States District Court
Northern District of California

1    with foreseeability and public policy factors.

2         There is no bright-line rule barring all negligence claims for purely economic losses in

3    California either.  Instead, the economic loss doctrine is part of the "duty" analysis and "[d]eciding

4    whether to impose a duty of care turns on a careful consideration of the sum total of the policy

5    considerations at play, not a mere tallying of some finite, one-size-fits-all set of factors."  *S.*

6    *California Gas Leak Cases*, 7 Cal. 5th 391, 401 (2019).

7         JLI heavily relies on the *Gas Leak Cases* to foreclose the school districts' negligence

8    claims in California under the economic loss doctrine.  In that case, residents in a Los Angeles

9    suburb were forced to relocate due to a leak at a major natural gas storage facility, and the local

10   economy was devastated as a result.  *Id.* at 395–96.  Business entities in the area sued for

11   economic losses resulting from the loss of business previously generated by the relocated

12   residents.  *Id.* at 396.  The California Supreme Court rejected the plaintiffs' contention that the gas

13   company had a tort duty to guard against purely economic losses.  *Id.* 403–08.  It noted that courts

14   across the country, "[c]oncerned about line-drawing problems and potentially overwhelming

15   liability," have "rejected recovery for purely economic losses stemming from man-made

16   calamity."  *Id.* at 403; *see, e.g.*, *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96

17   N.Y.2d 280, 290 (2001) (declining to hold "that a landowner owes a duty to protect an entire

18   urban neighborhood against purely economic losses," where business entities sought

19   compensation for the income they lost from tower collapse in midtown Manhattan).  "Based on

20   concerns about limitless liability and unending litigation," the court concluded that plaintiffs'

21   negligence claim for pure economic losses was barred.  *Gas Leak Cases*, 7 Cal. 5th 391 at 403.

22        The circumstances in that case, involving a massive environmental disaster, are materially

23   different from the school districts' claims here.  The school districts are not simply incidental

24   victims; they plausibly plead that they were uniquely targeted by JLI's misconduct, who took its

25   marketing scheme directly into schools.  As discussed above, they sufficiently allege a common-

26   law duty that comports with the *Biakanja* factors considered by California courts and involves

27   "more than mere foreseeability."  *Gas Leak Cases*, 7 Cal. 5th at 401.  Giving them their day in

28   court does not run into same unlimited liability concerns at issue in the *Gas Leak Cases*.  *Id.* at

127

407–08 (distinguishing cases with "weak or absent" concerns about unlimited liability and finding "in this case, as in the mine run of man-made disaster cases, those rationales apply with full force").

At the hearing on these motions, JLI drew a distinction between the "contracting" and "non-contracting strangers" line of cases within the economic loss doctrine and argued that the "non-contracting strangers" line of cases in Pennsylvania and California bar the school districts' negligence claims. But the "non-contracting strangers" line of cases is not as broad as JLI paints it to be, nor is it applicable here.

One basis for applying the "stranger rule" to bar negligence claims for pure economic harm is the concept that tortious acts causing pure economic harm are traditionally dealt with under the rules of specific or named economic torts that were developed to address particular kinds of economic harm cases. Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts, Chapter 48 § 608 (2d ed.). In an ordinary negligence action, the "stranger rule" may bar pure economic loss "that results solely because of negligence to another person." *Id.* However, the treatise JLI relies on for the "stranger rule" states that "under some circumstances, a defendant may owe a tort duty to persons with whom the defendant has no contract, and when that occurs, he is of course subject to liability for breach of that duty." Those are the circumstances here.

There is no issue of a specific economic tort, like interference with a contract, that could better redress the school districts' alleged harm. Nor is this a situation where the school districts are "strangers" claiming economic harm based on JLI's negligence towards other people. Instead, the school districts plausibly plead that JLI directly owed them a common-law duty given the foreseeability and public policy considerations. Dobbs § 608 (cautioning that "it may be important to recognize that relationships of the parties may be neither clear-cut, direct-contract relationships nor total stranger relationships"); *id.* § 612 (cautioning that "a measured and careful delineation of the stranger rules and careful attention to the exceptions and other limitations is especially desirable"). The rationale behind the "non-contracting strangers" cases "involve concerns about unpredictable and limitless liabilities," *id.* § 608, which are not at play in this case, or, at the very least, are not enough to warrant dismissal of the school districts' claims at the

1   pleadings stage.[84]

2          JLI's motion to dismiss the school districts' negligence claims based on the economic loss

3   doctrine is DENIED.

4                      **2.    Altria**

5          The same considerations regarding foreseeability and public policy discussed above apply

6   to Altria as well.  It contends that it could not have assumed a duty or breached a duty to the

7   school districts because it did not market the product until it gained a 35% share of JLI in

8   December 2018, and because it did not design, research, or manufacture the product at any time.

9          This argument ignores allegations that the government entities offer to explain how Altria

10  helped to expand and maintain JLI's youth vaping market by, for example, acquiring shelf space

11  to make room for JUUL in stores.  TVC ¶ 472; *see also id.* ¶¶ 524–43 (Altria used its lobbying

12  power to maintain "mint" as an available JUUL flavor while knowing that mint was a popular

13  favor among teens); *id.* ¶¶ 46–47, 51 (Altria aligned its interests with JLI as early as Spring 2017

14  and worked together on expanding the youth e-cigarette market, long before Altria officially

15  purchased 35% of JLI for $12.8 in December 2018); *id.* ¶¶ 224–27, 555 (Altria collaborated on the

16  "cover-up" "Make the Switch" campaign to portray JUUL as a smoking cessation device for adult

17  smokers and divert public attention from Altria's and JLI's true motive to maintain the valuable

18  youth market).

19         As it did for the public nuisance claim, Altria's attempt to dispute these factual allegations

20  is inappropriate at the pleading stage.  Read together, these allegations plausibly allege that Altria

21  placed the school districts in the "foreseeable zone of risk" by aiding JLI's marketing and public

22  relations efforts and, thereby, increasing the availability of JUUL products pods for youth,

23

24  [84] The treatise also identifies *Excavation Techs., Inc. v. Columbia Gas Co. of Pennsylvania*, 604
    Pa. 50 (2009) as the "leading non-contracting case."  Dobbs § 608.  In that case, a contractor that

25  sustained purely economic loss as a result of utility company's failure to properly mark location of
    underground gas lines could not bring a negligent misrepresentation claim because "public policy

26  weigh[ed] against imposing liability."  *Excavation*, 604 Pa. at 57.  Therefore, the "stranger"
    economic loss rule was not applied categorically, but rather in light of public policy concerns.  *See*

27  *also Dittman*, 649 Pa. at 526 ("[T]he *Excavation Technologies* Court did not hold that the
    economic loss doctrine barred Excavation Technologies' claim.  Rather, it held that Excavation

28  Technologies failed to state a viable claim for negligent misrepresentation under Section 552 of
    the Restatement in the first instance.").

United States District Court
Northern District of California

1    including to the school districts' students.  JLI may have created the JUUL product, but the school

2    districts plausibly allege that Altria helped to deliver it to more children from 2017 on, leaving

3    them to bear the consequences a youth e-cigarette epidemic.  *See In re Opioid Litigation*, No.

4    4000002017, 2018 WL 4827862, at *16 (N.Y. Sup. Ct. July 17, 2018) (having determined that the

5    allegations in New York counties' complaint "are sufficient to state a negligence cause of action

6    against the manufacturer defendants, [their] claims of concerted action suffice to state a basis to

7    support the existence of yet another breach of duty by the distributor defendants").  The public

8    policy factors that govern the duty inquiry support concluding that Altria owed a duty to the

9    school districts.

10       Additionally, the government entities sufficiently allege that Altria breached its duty of

11   care by failing to act reasonably.  They allege that Altria was fully aware of the problem of youth

12   vaping created by JLI and its flavored pods yet pressed on to expand JUUL sales.  Whether such

13   conduct comports with a reasonable standard of care is an issue of fact not appropriate for

14   determination on a motion to dismiss.  *See, e.g.*, *Gipson v. Kasey*, 214 Ariz. 141, 143 (2007)

15   (describing the breach issue as "an issue of fact that turns on the specifics of the individual case");

16   *L.A. Fitness Int'l, LLC v. Mayer*, 980 So.2d 550, 557 (Fla. Dist. Ct. App. 2008) ("[W]hether a

17   defendant exercised reasonable care under a given set of facts is generally an issue for the jury to

18   decide.").

19       On balance, given the allegations regarding Altria's involvement in helping JLI protect and

20   expand the youth e-cigarette market, the school districts plausibly plead that Altria owed them a

21   duty of care and that it breached that duty.  Altria's motion to dismiss the negligence claims is

22   DENIED.

### 3.    Officer and Director Defendants

24       Each Officer and Director Defendant argues that he owed no duty to the school districts,

25   and some argue that the allegations of breach are also insufficient.  For similar reasons discussed

26   above, the school districts' allegations about personal participation and the laws of each relevant

27   state support the negligence claims against Monsees and Bowen, but not Pritzker, Huh, and

28   Valani.

United States District Court
Northern District of California

As with public nuisance, the school districts contend that corporate officers and directors may be liable in negligence where they "authorized, directed or participated in the allegedly tortious conduct." *Frances T.*, 42 Cal.3d at 508.[85]  They plausibly allege that Monsees and Bowen's actions created an illicit market for a product and marketed that product to a group that regularly convenes on the school districts' property, such that it foreseeably caused substantial harm to them.  Their personal participation put the school districts in the foreseeable zone of risk, and the policy factors in the relevant states weigh in favor of finding a duty given the allegations in the government entity complaints.

The school districts also adequately allege breach.  They contend that Monsees and Bowen knew the harmful effects of nicotine on youth, the unparalleled potency of JUUL products, and that youth were buying JUUL products in droves.  TVC ¶¶ 126–36; 391–411.  Nonetheless, they coordinated efforts to greatly expand JUUL products' reach.  As discussed above, the school districts sufficiently describe what Monsees and Bowen did, in terms of marketing and/or product development, to target youth.  Whether such conduct comports with a reasonable standard of care is an issue of fact not appropriate for determination on a motion to dismiss.

Although the school districts plausibly allege that Pritzker, Huh, and Valani, also knew about the youth-targeted marketing, they have not alleged enough to establish what negligent acts each did, whether individually or collectively, to create or support the youth e-cigarette crisis.  At the hearing, the school districts emphasized that they do not seek to hold the entire Board of Directors liable for misconduct, but they fail to explain why these three Directors in particular should be part of the case.

Monsees and Bowen's motions to dismiss the negligence claims are DENIED.  Pritzker, Huh, and Valani's motion to dismiss the negligence claim is GRANTED with leave to amend.

---

[85] Pritzker, Valani, Huh, and Monsees rely on *U.S. Liability Insurance Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 595 (1970), for the proposition that California courts have long refused to allow negligence actions seeking economic damages against officers and directors.  But, "recent California law demonstrate[s] a shift away from *Haidinger-Hayes* and that an employee, working within the scope of their employment, could be held liable in tort for pecuniary losses."  *Nasrawi v. Buck Consultants, LLC*, 776 F. Supp. 2d 1166, 1177 (E.D. Cal. 2011) (citing *Bear Valley Family v. Bank Midwest, N.A.*, 2010 WL 3369600, at *4 (E.D. Cal. Mar. 8, 2011)).

United States District Court
Northern District of California

**D.      Proximate Causation**

JLI and Altria challenge the government entities' public nuisance and negligence claims for failure to allege a sufficiently close connection between their conduct and the alleged harms to show proximate causation.  The parties evaluate proximate causation based on a "substantial factor" analysis and agree that the analysis is the same for both negligence and public nuisance. Dkt. No. 740 at 28–29 (arguing "[p]roximate causation generally requires that the defendant's acts substantially brings about the plaintiff's injury" and that the government entities' injuries are "too attenuated"); Dkt. No. 817 at 46 (arguing proximate causation is sufficiently alleged because "Defendants were each a substantial factor in causing them harm").

It appears that some courts conduct the substantial factor analysis in evaluating factual causation, not proximate or legal causation.  *See People v. ConAgra Grocery Products Co.*, 17 Cal. App. 5th 51, 101 (2017) ("The parties agree that the causation element of a public nuisance cause of action is satisfied if the conduct of a defendant is a substantial factor in bringing about the result.") (citation omitted); *id.* at 104 ("[P]roximate cause is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.") (internal quotation marks and citation omitted); *but see Eckroth v. Pennsylvania Elec., Inc.*, 12 A.3d 422, 428 (Pa. Super. 2010) ("Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm.")  But regardless of the correct label for the analysis, the dispute here primarily focuses on whether the government entities' injuries are too attenuated or remote from the alleged conduct to plausibly plead proximate cause for their negligence and public nuisance claims.[86]

**1.      JLI**

JLI contends that the government entities' injuries are too attenuated because their injuries

---

[86] To the extent that defendants argue that factual causation is also lacking for the public nuisance claims, the government entities point out that "[t]he substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical," and that a defendant play "at least 'a minor' role in creating the nuisance that now exists." *ConAgra*, 17 Cal. App. 5th at 102; Dkt. No. 817 at 23 n.9 (citing cases from each of the five jurisdictions that apply a similar standard).  As discussed above, the government entities sufficiently plead how each of the defendants, except for the three Other Directors, contributed to the youth e-cigarette epidemic.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  derive from students' addiction to nicotine and runs through several links in a chain that include at

2  least two intervening events (adult purchasers or retailers who gave JUUL to students and students

3  who deliberately used them at school).  This contention is based on a mischaracterization of the

4  claims as sounding in product liability.[87]

5       The government entities do not seek to recover costs expended by students or any other

6  third party.  Nor do they seek compensation for any damages or personal injuries suffered by

7  students who used JUUL.  Rather, they allege injuries as a result of a public health crisis in their

8  school districts and communities that JLI created and sustained through its negligent and nuisance-

9  causing conduct, *i.e.*, by developing a product with features that appeal to youth and then directly

10  targeting youth with its marketing.  The government entities suffered direct harm in combatting

11  the crisis through multiple forms of costs and damages.  TVC ¶¶ 597–609.  The injuries caused by

12  JLI were not only foreseeable, they were an intended consequence of JLI's conduct.  *Id.* ¶¶ 77, 94,

13  583.  Even if, as JLI contends, students deliberately using JUUL products at schools were

14  intervening acts to the government entities' injuries, those intervening acts were reasonably

15  foreseeable given JLI's alleged youth-targeting conduct and do not undermine proximate cause.

16       JLI cites distinguishable cases brought by hospitals seeking damages for unreimbursed

17  medical expenses related to tobacco use.  *See Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228

18  F.3d 429, 435 (3d Cir. 2000); *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.*, 241 F.3d

19  696 (9th Cir. 2001).  Judge Polster's discussion of these cases in the opioid multidistrict litigation

20  is instructive.  Although he was skeptical that West Boca Medical Center would be able to recover

21  "unreimbursed charges for treatment of patients with opioid conditions," as those were similar to

22  the attenuated damages sought in *Allegheny* and *Ass'n of Wash. Pub. Hosp. Dists.*, he found that

23  those cases were ultimately distinguishable because West Boca "presented sufficient factual

24  allegations that at least some of their asserted injuries are a foreseeable result of the Defendants'

25  purported failures that allegedly created the opioid crisis," including [i]ncreased operational costs

26

27  _____

   [87] Monsees and Bowen incorporate JLI's argument that proximate causation is not met because of
28  intervening events.  Dkt. No. 772 at 16; Dkt. No. 779 at 11.  Their argument fails for the same
   reasons stated above.

for: (a) providing more and more-complicated care to opioid addicts, and (b) dealing with "pill seekers." *In re Nat'l Prescription Opiate Litig. – West Boca Medical Center*, 2020 WL 1669655, at *8.

The government entities allege similar injuries in the form of operational costs that were directly borne by them, not passed on by any intermediate party. *In re Nat'l Prescription Opiate Litig. – Summit County*, 2018 WL 6628898, at *5 (county sufficiently alleged proximate causation for RICO claims, where they alleged that they were forced to expend substantial and unexpected resources "to attempt to stop the flow of the excess opioids into local communities and to bear the costs associated with cleaning them up"); *In re Opioid Litigation*, 2018 WL 3115102, at *26– 27 (New York counties "adequately pled[ed] that the alleged breach of the manufacturer defendants' duty [] was a proximate cause of their injuries," where they alleged spent "extraordinary amounts [] to combat the opioid crisis allegedly caused by the deceptive marketing campaign"); *see also id.* at *21 (finding defendants' argument regarding lack of proximate causation for public nuisance claim was also unpersuasive).

JLI's proximate causation argument is insufficient to warrant dismissal at this stage. *See id.* at *27 ("Generally, issues of proximate cause are for the fact finder to resolve."). The government entities plausibly allege a reasonably close causal connection between the alleged conduct (which created the youth e-cigarette epidemic) and the resulting injury (in combatting the youth e-cigarette epidemic).

Even if the more stringent RICO proximate causation standard were not satisfied, which it is *see supra*, the government entities' state law claims still survive. *City and County Of San Francisco, v. Purdue Pharma. L.P.*, 2020 WL 5816488, at *42 (N.D. Cal. 2020) ("Unlike RICO, courts place great emphasis on 'foreseeability of harm' in determining whether a public nuisance claim sufficiently alleges proximate cause."); *Sheperd v. Am. Honda Motor Co. Inc.*, 822 F. Supp. 625, 633 n.1 (N.D. Cal. 1993) (noting that even if RICO claims are dismissed, parties "remain free to pursue common law or statutory state law claims."); *see also City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *6 (W.D. Wash. Sept. 25, 2017) (finding proximate causation was sufficiently pleaded for negligence claim because the alleged injury was foreseeable and finding

United States District Court
Northern District of California

*Ass'n of Wash. Pub. Hosp. Dists.* inapposite as it "applied a proximate cause standard from RICO law" and although it "appears to have applied the same standard to a state law negligence claim, no Washington state court has subsequently applied this standard to tort or [state consumer protection] claims"). JLI's motion to dismiss on this basis is DENIED.

### 2.      Altria

Altria's proximate causation argument similarly misconstrues the gravamen of the case and attempts to litigate the merits of the government entities' claims. As discussed above, the government entity complaints sufficiently describe Altria's participation in sustaining and worsening the youth e-cigarette epidemic. Altria's attempt to rewrite the allegations by insisting that its alleged misconduct is narrow in both time and scope raise factual disputes that cannot be resolved on a motion to dismiss. For now, the government entity complaints sufficiently allege that Altria's conduct was a proximate cause in maintaining the public health crisis of youth e-cigarette use, resulting in numerous harms to the school districts and local governments. Altria's motion to dismiss for failure to plead proximate causation is DENIED.

### E.      Statutory Consumer Protection

Some of the school districts bring additional statutory consumer protection claims. Three Village brings claims under New York's consumer protection statute, sections 349 and 350 of the New York General Business Law ("GBL"), and Broward and Escambia bring claims under Florida's consumer protection statute, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). It is clear that both the New York and Florida consumer protection statutes allow non-consumers to bring claims. *In re Nat'l Prescription Opiate Litig. – West Boca Medical Center*, 2020 WL 1669655, at *20 ("This Court chooses to follow the majority of recent opinions from Florida's District Courts of Appeal concluding that, 'in amending the Act, the legislature intended to give non-consumers standing.'") (collecting cases); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 205 (2004) (the New York consumer protection statute does not limit recovery only to consumers, rather "any person who has been injured by reason of any violation of this section may bring an action").

The parties dispute whether I should apply Rule 9(b)'s heightened standard for pleadings

135

1   claims sounding in fraud or the more permissive pleading standards of Rule 8(a) to the New York

2   and Florida statutory consumer protection claims.  New York courts do not apply the Rule 9(b)

3   standard to GBL claims and Florida courts are split as to whether it applies to FDUTPA claims.

4   *See Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 957 (C.D. Cal. 2012) (citing cases).

5   But I am bound to apply Ninth Circuit precedent, which requires claims based on fraudulent

6   conduct to be pleading with particularity.  *See id.* (following *Kearns v. Ford Motor Co.*, 567 F.3d

7   1120, 1125 (9th Cir. 2009) and applying Rule 9(b) to GBL and FDUTPA claims).  As discussed

8   below, Three Village, Broward, and Escambia have sufficiently pleaded with particularity for

9   certain defendants but not others.

### 1. New York Consumer Protection Law

11       Section 349 of New York General Business Law makes unlawful "[d]eceptive acts or

12   practices in the conduct of any business, trade or commerce or in the furnishing of any service in

13   this state." N.Y. Gen. Bus. Law § 349(a).  Section 350 prohibits "[f]alse advertising in the

14   conduct of any business." N.Y. Gen. Bus. Law § 350.  To state a claim for deceptive practices

15   under either section, a plaintiff must show: (1) that the act, practice or advertisement was

16   consumer-oriented; (2) that the act, practice or advertisement was misleading in a material respect,

17   and (3) that the plaintiff was injured as a result of the deceptive practice, act or advertisement.

18   *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 524–25 (S.D.N.Y. 2003).  The standard for

19   assessing claims under Sections 349 and 350 are essentially the same.  *Cline v. TouchTunes Music*

20   *Corp.*, 211 F. Supp. 3d 628, 635 (S.D.N.Y. 2016).

21       JLI argues that Three Village fails to allege actual damages for its GBL claim.  Altria and

22   the Officer and Director Defendants contend that Three Village fails to allege that they engaged in

23   a deceptive act in violation of statute.

### a. JLI

25       When analyzing whether a plaintiff has standing to commence a private action pursuant to

26   subsection 349(h), the New York Court of Appeals has confined its analysis to determining the

27   nature of the alleged injury and whether it is sufficiently connected to the asserted unlawful

28   conduct.  *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 622–24 (2009); *Blue*

United States District Court
Northern District of California

*Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 206–08 (2004).  In this regard, the court has stated that plaintiffs "must . . . plead that they have suffered actual injury caused by a materially misleading or deceptive act or practice."  *Smokes-Spirits*, 12 N.Y.3d at 623. Recognizing that the statute only permits recovery by one injured "by reason of" a deceptive business practice, the court has refused to "presume an intent to include recovery for derivative injuries within the scope of the statute in the absence of a clear indication of such intent from the Legislature."  *Blue Cross*, 3 N.Y.3d at 207.  The court has made it clear that "allegations of indirect or derivative injuries will not suffice."  *Smokes-Spirits*, 12 N.Y.3d at 623.

In *Blue Cross*, plaintiff was one of several healthcare plans that commenced an action against tobacco companies alleging that they engaged in deceptive practices that misled the public regarding the harmful effects of smoking.  3 N.Y.3d at 203.  The health plan sought to recover from the tobacco companies the cost of services that it had provided to plan subscribers as a result of those subscribers being harmed by the effects of smoking.  *Id.*  The New York Court of Appeals concluded that the health plan had "no standing to bring [the] action under General Business Law [section] 349 because its claims [were] too remote."  *Id.* at 208.

Four years later, in *Smokes-Spirits*, the City of New York sued out-of-state entities and persons engaged in the business of selling cigarettes over the internet.  12 N.Y.3d at 618.  The City alleged that defendants' websites misrepresented that their internet cigarette sales were tax free, and that their customers did not have to pay cigarette taxes.  *Id.* at 620.  The City claimed that it was injured by defendants' deceptive acts "in an undetermined amount of unpaid cigarette taxes."  *Id.*  The New York Court of Appeals concluded that the City lacked standing to assert an action premised on violations of section 349 because the City's claimed injury was "just as indirect as the insurer's was in *Blue Cross*."  *Id.* at 622.

In both *Smokes-Spirits* and *Blue Cross*, the court reached its conclusion based on the finding that the injuries alleged by each of the plaintiffs were "entirely derivative of injuries . . . suffered by misled consumers."  12 N.Y.3d at 622; 3 N.Y.3d at 207.  The rule derived from these cases is as follows: a plaintiff lacks standing to bring an action pursuant to General Business Law section 349(h) when the claimed loss "arises solely as a result of injuries sustained by another

party." *Blue Cross*, 3 N.Y.3d at 207.

Three Village's complaint includes numerous examples of direct pecuniary harm sustained in combating the youth vaping epidemic allegedly created by JLI's conduct.  These alleged injuries do not rely upon injuries sustained by any other individual, such as the damages or injuries suffered by student users of JUUL.  The alleged injuries were incurred in fulfilling independent duties as educators and caretakers.  Three Village claims that it was compelled to respond to the crisis by, for instance, diverting limited resources, devising educational campaigns, spending funds on monitoring systems, and incurring costs to alter the health curriculum.  *See* TVC ¶¶ 597–609.

Similar allegations of actual damages were found sufficient by the court in *In re Opioid Litigation*, 2018 WL 3115100, at *6.  In that case, multiple New York counties identified "forms of direct pecuniary harm incurred by the counties that correlate with the growth of the opioid epidemic."  *Id.*  The complaint listed, among others, "direct financial losses the counties allegedly incurred in having to increase their expenditures on social services, drug addiction treatment and diversion programs, additional policing and criminal justice costs, as well as expenditures associated with the purchase of [opioid overdose reversal drug] and the implementation of programs to train the public and public personnel in its use."  *Id.*  The court found the alleged harms were not "derivative in nature, as such harm was directly incurred by the counties because they bore independent duties, whether as municipalities constitutionally and statutorily mandated to protect the welfare, safety, and public health of their citizens or as self-funded health and workers' compensation insurance providers, to make the expenditures necessary to meet such obligations."  *Id.*

Drawing inferences in Three Village's favor, the complaint sufficiently alleges actual damages that directly flow from responding to the youth vaping epidemic created by JLI's deceptive conduct.  These independent injuries are unlike the derivative injuries at issue in *Blue Cross* and *Smokes-Spirits*.  The health care plan's injuries in *Blue Cross* were derivative because had the plan subscribers not suffered smoking illnesses due to their consumption of the product, then the plans would not have incurred costs in reimbursing their medical expenses.  New York

United States District Court
Northern District of California

City's damages in *Smokes-Spirits* were dependent on the deceived consumers' purchase of the product because "had the allegedly deceived consumers not been improperly induced to purchase defendants' cigarettes then the City would have no claim to lost tax revenues." By contrast, Three Village is not seeking to recoup the costs incurred by JUUL users, nor are its injuries solely dependent on any transaction between JLI and JUUL users.

In reply, JLI argues that if the students had not been deceived into using JUUL products, then Three Village would not have to incur any of the alleged costs in responding to the students' rampant use of JUUL products. This argument is unconvincing. The deception of the students is a harm that occurred independent of the harm suffered by Three Village. *See M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 217–18 (E.D.N.Y. 2010) (distinguishing *Blue Cross* and *Smokes-Spirits* and finding vehicle repair shop had standing to bring GBL claims because "not only was the customer the victim of a deceptive practice, but Mid Island also suffered a loss of business or other injury" that was not derivative because it was not "solely as a result of injuries sustained by another party"). JLI's motion to dismiss Three Village's GBL claim is DENIED.

### b.    Altria

Altria moves to dismiss the GBL claim on grounds that Three Village fails to identify what it did that was deceptive. In response, Three Village points to two particular sets of allegations: (i) Altria assisted in the deceptive "Make the Switch" ad campaign; and (ii) deceived regulators to ensure that mint JUUL pods remained on the market. TVC ¶¶ 224–259, 470–503, 517–50.

Altria attempts to litigate the merits of Three Village's GBL claims by arguing that these actions were not in fact deceptive and did not contribute to the underage e-cigarette crisis. It argues that its dissemination of JUUL's "Make the Switch" advertisements was not a deceptive act because the statement that JUUL products are "alternatives" to cigarettes is undeniably true. This misses the point. Three Village is not arguing that the campaign was deceptive because JUUL products are not actually alternatives to cigarettes, but rather that the campaign was a misleading "cover-up" to convince the public that JUUL was always aimed at adult smokers and never marketed to youth, which in turn allowed the youth e-cigarette crisis to continue to grow. TVC ¶¶ 582–592, 621.

139

United States District Court
Northern District of California

1    Altria's challenge to the second set of allegations regarding mint is also unpersuasive.  As

2    stated earlier, it is plausible that Altria was trying to convince the FDA to allow mint-based

3    products to remain on the market, knowing its popularity among young users.  TVC ¶¶ 518–550

4    (describing how JLI coordinated with Altria to pursue a fraudulent scheme to convince the FDA

5    into leaving the mint flavor on the market).[88]

6    Whether Altria's conduct was actually deceptive is a merits question that will not be

7    resolved at the pleadings stage.  *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 566 (S.D.N.Y.

8    2016).[89]  At this juncture, Three Village has adequately identified the actions by Altria that were

9    plausibly deceptive.  *See, e.g., In re Opioid Litigation*, 2018 WL 4827862, at *8 (New York

---

[88] Altria also argues that the letters to FDA and Congress are not actionable for the same reasons set forth in their separate motion to dismiss to class action complaint  [Dkt. No. 632] at 21-22.  As noted above, even if these statements are not independently actionable, they are evidence supporting a scheme to defraud.

[89] Altria does not challenge whether the alleged acts were consumer-oriented (first element of a GBL claim), but rather whether the alleged acts were deceptive (second element of a GBL claim). It cites to *Kantrowitz v. Allstate Indem. Co.*, 853 N.Y.S.2d 151, 152 (N.Y. App. Div. 2008) as an example of claims that were dismissed because the second element was not met where "plaintiff failed to allege that the defendants engaged in deceptive acts or practices."  However, the full quote from the case reveals that the court dismissed the claim for failure to allege the first element, consumer-oriented conduct: "With respect to the fourth cause of action to recover treble damages against the appellant pursuant to General Business Law [section] 349, the plaintiff failed to allege that the defendants engaged in deceptive acts or practices *that had a broad impact on consumers at large*." *Kantrowitz*, 853 N.Y.S.2d at 152 (emphasis added).  *Kantrowitz* relied on *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308 (1995), which explains that "parties claiming the benefit of [section 349] must, at the threshold, charge conduct that is *consumer oriented*" and "[i]f a plaintiff meets this threshold, its prima facie case may then be established by proving that defendant is engaging in an act or practice that is deceptive in a material way and that plaintiff has been injured by it."  *Id.* at 320 (citation omitted) (emphasis added).  Therefore, *Kantrowitz* did not dismiss claims solely because plaintiff failed to allege deceptive acts, as Altria insinuates, but because plaintiff failed to allege deceptive acts that were consumer-oriented.  Plaintiffs in *Cont'l Ins. Co.* did not meet that threshold requirement because the defendant insurance company's "acts in selling this policy and handling the claim under it do not constitute consumer-oriented conduct."  87 N.Y.2d at 321.  *Kantrowitz* and *Cont'l Ins. Co.* are not in contradiction with numerous other courts that have found that whether an act is deceptive is a factual question that must be decided beyond  the pleadings stage.

Altria's other citations are also unconvincing because those cases were concerned with whether a certain label was plausibly misleading.  *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 183 (E.D.N.Y. 2018), *aff'd sub nom. Axon v. Florida's Nat. Growers, Inc.*, 813 F. App'x 701 (2d Cir. 2020) (recognizing the question of whether a reasonable consumer would be deceived by a "natural" label is not typically resolved at the pleadings stage but dismissing GBL claims because it was "not plausible to allege that a reasonable consumer would interpret the brand label "Florida's Natural" as meaning that the product contains no traces of glyphosate"); *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241, 247 (S.D.N.Y. 2019) (similar).

counties' sufficiently pleaded GBL claim against distributor defendants by alleging that "the distributor defendants, acting in concert with the manufacturer defendants, made and disseminated statements . . .that misrepresented the risks of opioid addiction and falsely portrayed prescription opioids as a preferred treatment option for chronic pain"). Altria's motion to dismiss Three Village's GBL claim is DENIED.

### c.    Officer and Director Defendants

The Officer and Director Defendants argue that they cannot be held personally liable under the GBL. New York courts have found individual defendants liable under GBL if the plaintiff has either sufficiently alleged the individual defendants' participation in the alleged misconduct or has alleged sufficient facts to pierce the corporate veil. *See Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 526 (S.D.N.Y. 2015). Because Three Village focuses on the former, the relevant inquiry is whether it has sufficiently alleged the Officer and Director Defendants' individual participation in the alleged misconduct.

"[A] corporate officer who participates in the commission of a tort may be held individually liable, regardless of whether the officer acted on behalf of the corporation in the course of official duties and regardless of whether the corporate veil is pierced." *Reynolds*, 136 F. Supp. 3d at 526. In *Reynolds*, plaintiff sued a medical alert device company and two individual defendants, the president and vice president of the company, alleging that they engaged in deceptive practices to induce customers to buy their products in violation of the New York consumer protection law. *Id.* at 508. The court dismissed the GBL claims against the two individual defendants. *Id.* at 521, 527. It found that the allegations that president and vice president of company controlled day-to-day operations, and were aware of, or should have been aware of, the improper business practices were conclusory and insufficient to establish individual participation. *Id.* at 526. It noted that "[i]n cases where courts have found individual defendants to have participated in the misrepresentations at issue, the complaints specifically alleged personal participation, rather than mere awareness or control." *Id.* at 526 (citing cases).

One of the cases *Reynolds* discussed was *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 690 (S.D.N.Y. 2015), where plaintiffs alleged that a debt-buying company, a law firm, and

associated individuals orchestrated a scheme to fraudulently obtain and enforce consumer debt judgments.  The court denied the individual defendants' motion to dismiss, finding that plaintiffs "sufficiently pleaded the individual Defendants' personal participation in deceptive business practices prohibited by the GBL," by alleging, among other things, that they personally signed and submitted fraudulent affidavits in pursuit of consumer debt actions and harassed consumers with legally improper interrogatories and notices.  *Id.* at 701.

Three Village's allegations against Bowens and Monsees are more aligned with the specificity in *Mayfield* than *Reynolds*.  It alleges more than mere knowledge or control by offering multiple examples about Monsees' and Bowen's personal and direct participation in the deceptive scheme at issue.  For instance, it alleges that: Monsees and Bowen carefully studied the marketing strategies of the cigarette industry and developed the deceptive youth-focused marketing campaign for JUUL (TVC ¶¶ 68, 370–80); Monsees "personally reviewed images" from the "Vaporized" campaign and provided "specific direction on the content of the website (*id.* ¶¶ 318, 370); Bowen designed a highly addictive product that appealed to young users (*id.* ¶¶ 103–10; 143, 244); Bowen engineered test results consistent with the deceptive messaging (*id.* ¶¶ 194 – 201); and both had input and control over specific advertising, including flavor-driven and viral social media advertising, despite knowledge about the health risks and high nicotine concentration designed to addict (*id.* ¶¶ 377–80).

These factual allegations are sufficient at the pleadings stage to establish Monsees and Bowen's personal liability under the GBL.[90]  Their motions to dismiss Three Village's GBL claim are DENIED.

However, as discussed above, the allegations concerning Pritzker, Huh, and Valani are insufficient.  New York courts require more than "mere awareness or control" to establish individual participation.  *Reynolds*, 136 F. Supp. 3d at 526; *Steven Madden, Ltd. v. Jasmin Larian, LLC*, 2019 WL 294767, at *6 (S.D.N.Y. 2019) (granting dismissal of GBL claim because party's

United States District Court
Northern District of California

---

[90] Monsees raises the same arguments as JLI regarding cognizable damages under GBL.  This argument is rejected for the same reasons addressed above.  Three Village sufficiently alleges that it incurred non-derivative actual damage due to the deceptive scheme.

"conclusory and vague allegations in the Counterclaims, which frequently refer to the Counterclaim Defendants collectively, fail to describe Madden's specific role in the purported infringement."). The Other Director Defendants' motions to dismiss Three Village's GBL claim are GRANTED with leave to amend.

### 2. Florida Consumer Protection Law

Broward and Escambia allege claims under the FDUTPA, Florida's consumer protection law. Broward ¶¶ 716-722; Escambia ¶¶ 703-709. The FDUTPA is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §§ 501.202(2) and 501.204. A successful claim for damages under FDUTPA contains three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages. *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016). The Florida legislature specifically provided that the FDUTPA "shall be construed liberally." Fla. Stat. § 501.202(2); *see also State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1307 (S.D. Fla. 2018) ("when considering whether a defendant's actions support a finding of 'unfair methods of competition, unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce,' courts have regarded the concept as 'extremely broad'").

The arguments against the FDUTPA claims are similar to those raised as the GBL claims discussed above. JLI argues that Broward and Escambia fail to allege actual damages. Altria and the Officer and Director Defendants argue that Broward and Escambia fail to allege that they engaged in a deceptive act.

### a. JLI

Proof of actual damages in necessary to sustain a FDUTPA claim. "Actual damages are limited to compensatory damages; consequential damages are not available under the Act." *In re Nat'l Prescription Opiate Litig. – West Boca Medical Center*, 2020 WL 1669655, at *25 (citing *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 824–25 (Fla. Dist. Ct. App. 2010)). In addition, the FDUTPA affords civil private causes of action for equitable relief in the form of a

United States District Court
Northern District of California

declaratory judgment or an injunction.  *Id.* (citing *Nazario v. Prof'l Account Servs., Inc.*, No. 216CV772FTM99MRM, 2017 WL 1179917, at *4 (M.D. Fla. Mar. 30, 2017)).

JLI argues that Broward and Escambia have not adequately alleged a claim for damages under the FDUTPA because they: (i) do not allege that they were party to any transaction by which they were harmed; and (ii) do not seek to recover the difference in price between what they paid for JUUL products and what they received (which has been recognized as actual damages under FDUTPA).  First, as clarified in the beginning of this section, "[a] plaintiff need not be party to any consumer transaction to bring a FDUTPA claim."  *In re Nat'l Prescription Opiate Litig. – West Boca Medical Center*, 2020 WL 1669655, at *20 (analyzing Florida law).  Second, as Judge Polster explained when rejecting a similar argument, the difference in market value of a product or service is not the only type of actual damages cognizable under FDUTPA.  *Id.* at *25.  The amounts necessary "to compensate adequately an injured party for losses sustained as the result of a defendant's wrongful or negligent action" are also "easily recognized as actual damages."  *Id.* (quoting *Diamond v. Porsche Cars N. Am., Inc.*, No. 06-10592, 2012 WL 6837916, at *4-5 (Cir. Ct. Fla. Sept. 28, 2012)).  This is precisely the kind of damages Broward and Escambia seek to recover here.

The alleged damages here are similar to those asserted by Broward County in the opioid case that Judge Polster found sufficient in *In re Nat'l Prescription Opiate Litig. – Broward County*, 2020 WL 1986589, at *9.  There, Broward County asserted thirteen categories of costs incurred as a result of the opioid epidemic, including costs associated with emergency response. costs for providing mental-health counseling, costs associated with law enforcement and public safety relating to the opioid epidemic, costs associated with increased burden on judicial systems, and losses caused by the decrease in funding available for public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic.  *Id.* Here, in responding to the youth e-cigarette crisis created by JLI's misconduct, not only did Broward and Escambia have to divert their limited resources to combat the problem of e-cigarette use among students, but they also incurred costs in, among other things, purchasing e-cigarette-detection devices and cameras, paying for in-school and afterschool programs, and altering the

United States District Court
Northern District of California

1   health curriculum.  *See* Broward ¶¶ 603–13; Escambia ¶¶ 598–604.  These costs do not depend

2   upon any particular student's damages or injuries; they flow from the independent losses caused

3   by alleged deceptive conduct.

4       JLI's motion to dismiss Broward's and Escambia's FDUTPA claims is DENIED.

5   **b.   Altria**

6       Altria argues that Broward and Escambia fail to identify what it did that was deceptive

7   under the Florida consumer protection statutes.  This argument is unconvincing for the same

8   reasons stated above concerning the GBL claim.  *See* Broward ¶¶ 521–54 (Altria coordinated with

9   JLI to deceive regulators to ensure that mint JUUL pods remained on the market); Escambia ¶¶

10   517–50 (same); Broward ¶¶ 226 –61 (Altria assisted in the deceptive "Make the Switch" ad

11   campaign); Escambia ¶¶ 224–59 (same).  Altria's attempt to litigate the merits of these allegations

12   is inappropriate at this stage.  *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics &*

13   *Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017) ("Whether [specific] conduct

14   constitutes as unfair or deceptive trade practice [under FDUTPA] is a question of fact for the jury

15   to determine.") (citation omitted).  Altria's motion to dismiss the FDUTPA claim is DENIED.

16   **c.   Officer and Director Defendants**

17       The Officer and Director Defendants argue that Broward and Escambia do not allege that

18   they personally participated in any violation of the FDUTPA.  In order to proceed against an

19   individual for a violation of FDUTPA, a plaintiff must allege that the individual was a "direct

20   participant" in the dealings.  *Aboujaoude v. Poinciana Dev. Co. II*, 509 F. Supp. 2d 1266, 1277

21   (S.D. Fla. 2007); *Rollins, Inc. v. Heller*, 454 So.2d 580, 582 (Fla. Dist. Ct. App. 1984) (it is

22   unnecessary to pierce the corporate veil because individual defendant was a direct participant in

23   the dealings).

24       Broward and Escambia offer the same allegations about Monsees and Bowen's individual

25   participation in the alleged misconduct as Three Village; these allegations are sufficient for the

26   same reasons discussed above.  They are unlike the conclusory allegations Florida courts have

27   found insufficient to plead individual liability under FDUTPA.  *See, e.g.*, *Aboujaoude*, 509 F.

28   Supp. 2d at 1277 (plaintiffs "made general allegations against [the president of the company]" and

145

1    "[did] not specify his individual actions and how they constitute a violation of FDUTPA").

2         But, like Three Village, Broward and Escambia fail to sufficiently describe how Pritzker,

3    Huh, and Valani were "direct participant[s]" in the alleged misconduct.  *SIG, Inc. v. AT & T*

4    *Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1195 (S.D. Fla. 2013) (dismissing individual claims

5    because complaint included a single conclusory allegation that individual defendants "participated

6    directly in the violations").

7         Monsees and Bowen's motions to dismiss the FDTPA claims are DENIED.  Pritzker, Huh,

8    and Valani's motion to dismiss is GRANTED with leave to amend.

9         **F.      Personal Jurisdiction**

10        The Officer and Director Defendants move to dismiss complaints filed outside of their

11   respective home states for lack of personal jurisdiction.  In MDL actions such as this one, the court

12   is entitled to exercise personal jurisdiction over each defendant only to the same degree that the

13   original transferor court could have.  *In re Dynamic Random Access Memory (Dram)*, No. C 02-

14   1486 PJH, 2005 WL 2988715, at *2 (N.D. Cal. Nov. 7, 2005).  Accordingly, I must evaluate the

15   nature of the Officer and Director Defendants contacts in the relevant forum states with regard to

16   the long-arm statutes of those states.  Since Arizona, California, Florida, New York, and

17   Pennsylvania all have long-arm statutes that authorize the exercise of personal jurisdiction to the

18   fullest extent authorized by constitutional due process, personal jurisdiction is to be assessed with

19   regards to federal due process.  "And since federal law accordingly controls, this court will look to

20   its own circuit as the source for federal law."  *Id.* (citation omitted).

21        The plaintiff bears the burden of demonstrating that the court has jurisdiction.  *Harris*

22   *Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128–29 (9th Cir. 2003).

23   However, the plaintiff must make "only a prima facie showing of jurisdictional facts to withstand

24   the motion to dismiss."  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  For the purposes

25   of deciding whether a prima facie showing has been made, "the court resolves all disputed facts in

26   favor of the plaintiff."  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).

27        Due process is determined under either a general or specific jurisdiction analysis.  Bowen,

28   Monsees, Pritzker, and Valani concede that they are subject to general jurisdiction in California,

but claim that they are not subject to personal jurisdiction in any of the cases filed outside of California: Central Bucks (Pennsylvania); Escambia (Florida); Broward (Florida); Three Village (New York); and Tucson (Arizona).  Huh concedes that he is subject to general jurisdiction in Florida, where he currently resides, but claims that he is not subject to personal jurisdiction in any of the cases filed outside of Florida: Central Bucks (Pennsylvania); Santa Cruz (California); Livermore Valley (California); Three Village (New York); and Tucson (Arizona).

The government entities argue that there is specific personal jurisdiction over each of their claims, and alternatively that there is pendent personal jurisdiction.  As such, the relevant inquiry is whether they have made, or can make, a factual showing that warrants the exercise of specific personal jurisdiction under the standards espoused by the Ninth Circuit.

## 1.    Specific Jurisdiction

Specific jurisdiction arises when a defendant's specific contacts with the forum give rise to the claim in question.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984).  "A court exercises specific jurisdiction where the cause of action arises out of or has a substantial connection to the defendant's contacts with the forum."  *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002).  The Ninth Circuit employs a three-part test to determine whether there is specific jurisdiction over a defendant:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

The plaintiff bears the burden of satisfying the first two prongs of the test.  *Id.* at 802.  If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state.  *Id.*  If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable.  *Id.*

United States District Court
Northern District of California

147

### a.    Purposeful Direction

To determine whether a defendant's acts have had the requisite effects, courts assess whether the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Levi Strauss & Co. v. J. Barbour & Sons Ltd.*, No. 3:18-CV-03540-WHO, 2019 WL 1117533, at *4 (N.D. Cal. Mar. 11, 2019). As the Ninth Circuit has explained, "purposeful availment is satisfied even by a defendant whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state." *Schwarzenegger*, 374 F.3d at 803 (internal quotation and citation omitted).

The government entities allege that Monsees, Bowen, Pritzker, Huh, and Valani developed the marketing strategy to target teens and then pushed for aggressive implementation of that strategy nationwide. *See, e.g.*, TVC ¶¶ 1-3, 35–38, 44, 95–96, 156, 501–02. Those defendants allegedly directed and intended their actions at each of the forum states and nationwide.

The marketing strategy included control over messaging, particularly on JLI's website. TVC ¶ 678. The website directly offers JUUL products for sale throughout the United States, and JUUL products are directly shipped to online purchasers throughout the United States, including in the forum states. *See id.* ¶¶ 204–08, 413–39. The age-verification function on the JUUL website requires users to identify their state of residence. *Id.* ¶¶ 418 (government identification required), 432 (describing auto-ship function). The website includes a "store locator" feature that allows users to find JUUL retails throughout the country. *Id.* ¶ 358. The marketing strategy also relied heavily on social media posting, which actively sends messages to JUUL social media followers throughout the United States, as well as in-person events and presentations throughout the country. *Id.* ¶¶ 343, 361–69, 394, 441, 444, 569–72.

The Officer and Director Defendants' alleged authorization of and participation in tortious conduct, namely the youth-targeted conduct, can create jurisdictional contacts with respect to themselves as individuals:

> If acts taken by a corporate officer subjects the officer to personal liability (i.e., the corporate officer authorized, directed or participated in tortious conduct), and those acts create contact with the forum state, such acts are not only acts of the corporation but also acts of the individual, and may be considered contacts of the individual for

148

purposes of determining whether long-arm jurisdiction may be exercised over the individual.

*Chunghwa Telecom Glob., Inc. v. Medcom, LLC*, No. 5:13-CV-02104-HRL, 2016 WL 5815831, at *6 (N.D. Cal. Oct. 5, 2016) (citation omitted); *see also Quiksilver, Inc. v. Quick Sports Int'l B.V.*, 2005 WL 8157305, at *5 (C.D. Cal. May 11, 2005) (where defendants were directly involved product marketing, it would be it would be "erroneous" to grant a motion to dismiss on jurisdiction grounds); *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520–23 & n.10 (9th Cir. 1989) (finding "mere association with a corporation that causes injury in the forum state" is not enough to exercise jurisdiction over an individual employee, but individuals can be liable when they are the "guiding spirit" or "central figure" in the wrongful conduct, and exercising jurisdiction over individual defendant shareholders). [91]

As noted above, the government entities have sufficiently alleged Bowen and Monsees' role in the alleged youth-targeted misconduct. These allegations regarding Bowen and Monsees' involvement in the development and implementation of the challenged nationwide marketing campaign and its intended effects in the forum states satisfy the first prong of the jurisdictional analysis.

The allegations about Pritzker, Huh, and Valani's involvement are insufficient. But

_____

[91] Bowen argues that the "corporate shield" doctrine or the "fiduciary shield" doctrine prevents personal jurisdiction over him outside of California. As the government entities correctly point out, the laws of all the states at issue here do not apply these doctrines when the employee developed, implemented and/or supervised the wrongful conduct at issue that was intended to cause harm in the foreign state. *See, e.g., Calder v. Jones*, 465 U.S. 783, 790 (1984) (finding jurisdiction over non-resident defendants where they were "primary participants in an alleged wrongdoing intentionally directed at a California resident"); *In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig.*, No. ML 12-2317 CAS JEMX, 2012 WL 6062047, at *5–6 (C.D. Cal. Dec. 3, 2012) (rejecting application of fiduciary shield doctrine under Florida long-arm statute where employee was one of the key participants in the allegedly fraudulent national marketing campaign); *FFR SE, LLC v. Sanborn*, No. CIV.A. 14-5439, 2015 WL 3970923, at *6 & n.10 (E.D. Pa. Jun. 30, 2015) (corporate shield not applicable to company's president and owner who was a "key player in the corporate structure") (citation omitted); *Belabbas v. Inova Software Inc.*, No. 16 CIV. 7379 (LGS), 2017 WL 3669512, at *3 (S.D.N.Y. Aug. 24, 2017) (explaining that corporate shield doctrine does not exist under New York law which "does not distinguish actions taken in a defendant's personal capacity from actions taken in his 'corporate' capacity" because N.Y. C.P.L.R. 302 "confers jurisdiction over individual corporate officers who supervise and control an infringing activity") (citation omitted); *Scott v. Kemp*, 248 Ariz. 380, 387 (Ct. App. 2020) (finding fiduciary shield doctrine inconsistent with Arizona long-arm statute and instead looking at the actions undertaken by the defendant directed at the forum).

United States District Court
Northern District of California

United States District Court
Northern District of California

assuming the government entities are able to add sufficient allegations on amendment, the first prong would also be satisfied as to them. *See, e.g.*, *Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 5617817, at *8 (Mass. Super. Oct. 8, 2019) (concluding "the exercise of jurisdiction against the individual defendants on the facts alleged is reasonable and foreseeable," where plaintiffs alleged that "the individual defendants, who held positions of control over [the pharmaceutical company's] activities, reasonably were aware that [the company] had sales operations based in Massachusetts" and also alleged that each of the individual defendants either "tacitly or explicitly approved sending tailored marketing materials to Massachusetts doctors" or knowingly engaged in other conduct aimed at Massachusetts that is alleged to be unfair and deceptive).

### b.    Claims Arise Out Of Contacts

Claims "arise out of" forum-related contacts when those contacts are the "but for" cause of a plaintiff's claims. Thus, courts ask whether the plaintiff would have been injured "but for" the conduct directed at the forum state. *See Levi Strauss*, 2019 WL 1117533, at *6 (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998)).

The government entities allege that "but for" the Officer and Director Defendants' efforts to develop and maintain a nationwide youth nicotine market—by creating the product to appeal to youth, by marketing that product to youth nationally (including in the forum states), by establishing a nationwide distribution network, by establishing a website that offered JUUL for sale nationwide, and by taking orders and shipping products nationwide (including in the forum states)—they would not have been injured. The second prong of the jurisdictional analysis is satisfied, at least as to Monsees and Bowen, because the claims directly arise out of and relate to their forum-related contacts.

### c.    Reasonableness

With the first two factors established, the burden shifts to the Officer and Director Defendants to present a "compelling case" establishing that the exercise of jurisdiction over them is unreasonable. *Levi Strauss*, 2019 WL 1117533, at *4 (citation omitted). The factors to be considered in determining reasonableness include: "(1) the extent of the defendant's purposeful

United States District Court
Northern District of California

1    interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the

2    extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in

3    adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the

4    importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the

5    existence of an alternative forum." *Levi Strauss*, 2019 WL 1117533, at *4 n. 4 (citing *In re W.*

6    *States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 745 (9th Cir. 2013)).

7         The Officer and Director Defendants have not satisfied their burden of making a

8    "compelling case" for denying jurisdiction.  As discussed above, the government entities have

9    sufficiently alleged that each defendant, except the three Other Director Defendants, purposefully

10   availed themselves to the forums at issue.  The forum states therefore have a significant interest in

11   remediating the youth e-cigarette crisis created by the alleged misconduct.  On the other hand, the

12   Officer and Director Defendants make no particularized argument that litigating cases outside of

13   their home states would pose a hardship or other burden on them.  Exercising personal jurisdiction

14   in these circumstances comports with fair play and substantial justice.

15        Monsees and Bowen's motions to dismiss for lack of personal jurisdiction are DENIED.

16   The Other Directors' motion is GRANTED with leave to amend.[92]

17

18                                    **CONCLUSION**

19        The motions to dismiss or stay under the primary jurisdiction doctrine are DENIED.  Dkt.

20   Nos. 626, 750.

21        The motions to dismiss based on federal preemption are DENIED.  Dkt. Nos. 627, 750

22        The motions to dismiss the RICO claims are GRANTED and with leave to amend.  Dkt.

23   Nos. 628, 632, 645, 647.

24        The motions to dismiss the California claims are GRANTED in part and with leave to

25   amend.  Dkt. Nos. 629, 632, 748, 751, 752/778.

26        The motions to dismiss the Government Entity Complaints are GRANTED in part and

27

28   [92] The government entities' alternative pendent jurisdiction argument fails due, as explained
     above, to the insufficient RICO allegations as to which leave to amend has been granted.

1    with leave to amend.  Dkt. Nos. 738, 740, 771, 772, 773/779.

2            **IT IS SO ORDERED.**

3    Dated: October 23, 2020



William H. Orrick
United States District Judge