# APPENDIX A – Plaintiff Allegations[1]

## TABLE OF CONTENTS

1.   Shayla Aceti ................................................................................................. 4

2.   Shurjo Ali ..................................................................................................... 7

3.   Addison Altizer .......................................................................................... 15

4.   Mary Baker, on behalf of her son, B.C., a minor ...................................... 20

5.   Spyncer Baker ............................................................................................ 23

6.   Tommy Benham .......................................................................................... 31

7.   Mindy Boyd, on behalf of her daughter, E.B., a minor ............................ 40

8.   Kaahuakamehuanui Brun ........................................................................... 43

9.   Nikki Buchanan, on behalf of her son, C.S.B., a minor ............................ 44

10.  Meredith Caddell ....................................................................................... 50

11.  Thomas Carcone, on behalf of his son, N.C., a minor .............................. 61

12.  Alex Casas ................................................................................................. 64

13.  Kisha Chandler, on behalf of her son, D.C., a minor ................................ 69

14.  Ronald Claytor ........................................................................................... 74

15.  Tyler Cobb ................................................................................................. 78

16.  Bradley Colgate .......................................................................................... 81

17.  Anjie Comer, on behalf of her son, Q.C., a minor .................................... 87

18.  Lisa Commitante, on behalf of her daughter, A.U., a minor .................... 91

19.  Timothy Critzer .......................................................................................... 93

20.  Mary Deaton, on behalf of her granddaughter, M.E.D., a minor. ........... 97

21.  Michael James Deeter .............................................................................. 101

22.  Katherine Dentler ..................................................................................... 103

23.  Joseph DiGiacinto, on behalf of his son, C.D., a minor. ........................ 109

24.  Rachelle Dollinger, on behalf of her son, K.S., a minor ......................... 114

25.  Nicole Dramis on behalf of her son, J.D., a minor ................................. 118

---

[1] The advertisements included herein are either the specific advertisements each plaintiff saw or substantially similar representations of such advertisements.

26.    Robert Dyer, on behalf of his son, B.D., a minor. ................................. 123

27.    John Scott Emidy ................................................................. 126

28.    Joan Eubanks ..................................................................... 128

29.    Patience Evans ................................................................... 132

30.    Clark Fish........................................................................ 139

31.    Janine Franklin, on behalf of her daughter, J.F., a minor .................... 145

32.    Larry Fox ........................................................................ 149

33.    Isaac Gant ....................................................................... 154

34.    Bruce Gibson, on behalf of his son, K.G., a minor............................. 159

35.    Carlee Goldston .................................................................. 161

36.    Lauren Gregg ..................................................................... 168

37.    Dylan Healey ..................................................................... 178

38.    Jordan Heitmann .................................................................. 203

39.    Madison Hellman................................................................... 206

40.    John Hollis ...................................................................... 208

41.    Coleman Holnicker ................................................................ 212

42.    Jenika Ingram..................................................................... 216

43.    Chris Ippoliti .................................................................... 221

44.    Adam Jenkins, on behalf of his son, M.R.J., a minor .......................... 231

45.    Adam Jenkins, on behalf of his daughter, D.L.J., a minor ..................... 235

46.    Pamela Keen ...................................................................... 238

47.    Janis Kelly, on behalf of her son, C.J.W., a minor .......................... 242

48.    Shannon Kinnard .................................................................. 245

49.    Tyler Krauel...................................................................... 248

50.    Tracie Kugler, on behalf of her son, Z.K, a minor ........................... 253

51.    Kacie Ann Lagun (née Durham)...................................................... 256

52.    David Langan...................................................................... 261

53.    Lucas Lawless .................................................................... 265

54.    Randi Lines ...................................................................... 268

55.    Thane Lore ....................................................................... 270

56.    Jeanine Manning on behalf of her son, M.C., a minor ......................... 275

57.    Noah Matarazzo.................................................................... 281

2

58.    John McFaull ................................................................................ 284

59.    Emilio Mendoza ........................................................................... 288

60.    Ron Minas ..................................................................................... 302

61.    D'Angelo Moore ........................................................................... 306

62.    Shirley Moses on behalf of her daughter, K.S.C., a minor .................................. 308

63.    Matthew Murphy ........................................................................... 312

64.    Jill Nelson on behalf of her daughter L.B., a minor ............................................. 318

65.    William Nelson ............................................................................. 323

66.    Atoyia Orders, on behalf of her son, D.O., a minor ............................................ 327

67.    Ann Parker, on behalf of her daughter, S.P., a minor .......................................... 336

68.    Vickie Perry, on behalf of her daughter, L.P., a minor ........................................ 339

69.    Alexander Pierce ........................................................................... 345

70.    Jessica Pierre ................................................................................ 350

71.    Erin Puente .................................................................................. 354

72.    Lacretia Pulce on behalf of her daughter, K.P., a minor .................................... 358

73.    Kristof Rest .................................................................................. 361

74.    Charleen Richey, on behalf of her son, T.Y., a minor ........................................ 374

75.    Jack Thomas Roberts, administrator of the estate of Jack Roberts, deceased ....... 380

76.    Andrea Saldana, on behalf of her daughter, Le.S., a minor .................................. 386

77.    Lacey Saldana ............................................................................... 389

78.    Dylan Selfridge ............................................................................. 393

79.    Kevin Singer ................................................................................ 399

80.    Anthony Smith .............................................................................. 401

81.    Derrick Smith ............................................................................... 405

82.    Savannah Smith ............................................................................. 416

83.    Kristy Strattard ............................................................................. 420

84.    Daniel Tarrats .............................................................................. 423

85.    Treyton Bailey-Thomseth ................................................................. 430

86.    Charles Tippe ............................................................................... 435

87.    Johnson Truong ............................................................................. 438

88.    Michael Viscomi ........................................................................... 447

89.    Tanya Viti on behalf of her daughter, O.V., a minor .......................................... 450

90.    Nicholas Vogel, on behalf of his son, E.V., a minor ............................................ 454

91.    Joe Weibel, on behalf of his son, S.W., a minor.................................................... 456

92.    Natasha Welch, on behalf of her son, J.W., a minor ............................................ 459

93.    Janece Wilhelm.................................................................................................... 464

94.    Janece Wilhelm on behalf of her son. D.L., a minor ............................................ 466

95.    Tonya Williams-Walker on behalf of her son, M.W., a minor............................. 470

96.    Jeremy Worden .................................................................................................... 475

97.    Barbara Yannucci, on behalf of her son, J.Y., a minor......................................... 477

98.    Aiden Young........................................................................................................ 480

99.    Jerry Yut ............................................................................................................. 487

100.   Wolfgang Ziegenhagen, on behalf of his son, H.Z., a minor................................ 490

## 1.    **Shayla Aceti**

1.    Plaintiff Shayla Aceti is a resident of Eugene, Oregon.

2.    Aceti first used JUUL products in July 2019 when a friend purchased a JUUL device and offered her the opportunity to try it. She was twenty-eight years old. After this initial exposure, Aceti ordered a JUUL starter kit from JUUL's website. Aceti was unaware that JUUL products contained substantial amounts of nicotine and their use posed a risk of addiction. Aceti would not have tried JUUL if she knew it delivered more nicotine to the bloodstream than cigarettes.

3.    Aceti recalls promotional displays at local gas stations and convenience stores.

4.    Aceti recalls, in 2019, in-store displays in front of the cashiers' counters and next to the lighters, prominently exhibiting JUUL products. They were, or were substantially similar to, the following:



5.      Aceti further recalls in-store displays featuring a bevy of JUUL accessories, such as JUUL pod flavor varieties, a USB charging dock, and JUUL devices with fresh new color schemes, on display since 2019. They were, or were substantially similar to, the following:



6.      After her initial starter kit, Aceti purchased her JUUL products online from JUUL and other retailers. She recalls viewing advertisements on social media platforms

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

such as Instagram and Snapchat. Aceti specially recalls viewing imagery identical or substantially similar to that below on Snapchat in 2019.



7.      Aceti also received promotional emails, including that below, from JUUL in early 2019 and 2020.



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

8.      While using JUUL products, Aceti consumed roughly one-half of a JUUL pod each day. As a frequent consumer of JUUL products, Aceti experienced constant throat pain and disruptive coughing fits. She further reports a greater vulnerability to illness and infection while using JUUL, despite her usual resilience to such ailments. These developments worried Aceti; she began to reconsider her JUUL habits. As of early 2020, Aceti has successfully curbed her JUUL use. All respiratory issues and immuno-vulnerabilities disappeared within two weeks of her cessation of JUUL use. In retrospect, Aceti wishes JUUL was more forthright about the high nicotine content in their products, as well as the health and addiction risks of engaging in their use.

9.      None of the advertisements, in-store promotions, or labels Aceti saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Aceti would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**2.      <u>Shurjo Ali</u>**

10.      Plaintiff Shurjo Ali is a 24-year old who resides in Piano, Texas.

11.      Ali began using JUUL's products in September 2018 after seeing advertisements at gas stations and hearing about JUUL from friends. Ali also frequently saw promotions for JUUL on social media from both JUUL and people in hissocial network. JUUL was popular among Ali's friends and classmates, which made JUUL appear to be cool and safe.

12.      Before he started using JUUL, Ali had never used nicotine.

13.      Prior to first purchasing JUUL's products, Ali recalls having seen the following advertisements, among others:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





14.     Prior to purchasing JUUL, Ali viewed the product's label.

15.     Ali purchased JUUL pods from gas stations, convenience stores, and other distributors. Ali saw in-store promotions for JUUL that were substantially similar to the below:







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO













16.     Based on the advertising of JUUL as an "alternative" for smokers, "smoking evolved", and that consumers should "switch" to JUUL from cigarettes, Ali believed JUUL's products were safe, healthy, not highly addictive, and a safer and less-

addictive alternative to cigarettes. Ali was interested in trying the product to determine whether he should recommend the product to his father, to help him quit cigarettes.

17.     Ali began using and purchasing JUUL at the age of 21. Ali was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Ali's favorite flavors are Mango, Fruit, and Crème. These factors caused Ali to believe that JUUL was safe and appropriate for him to use. The primary reason he started using JUUL was because of advertisements and only a small part of the reason was the fact that it was popular among his peers.

18.     He also saw user-generated content like the following:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

19.    None of the advertisements, in-store promotions, or labels Ali saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

20.    Ali would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**3.    Addison Altizer**

21.    Addison Altizer is a 24-year-old resident of Bluffton, South Carolina.

22.    Altizer had been smoking less than 10 cigarettes per day before using JUUL products. He began using JUUL in 2017.

23.    Based on various advertisements of JUUL's products that he saw and relied on, Altizer purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

24.     Altizer saw JUUL advertisements on social media and point-of-sale displays containing statements that JUUL is an "alternative" to cigarettes. These ads were very influential in his decision to purchase JUUL. On Instagram, Altizer saw the following promotional posts:





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

25.     Altizer saw JUUL advertisements containing statements that JUUL is "smoking evolved". These ads were very influential in his decision to purchase JUUL. On Instagram, Altizer saw the following promotional post:



26.     Altizer saw JUUL advertisements urging smokers to "switch" from cigarettes to JUUL. These ads were the most important factor in his decision to purchase JUUL. On Instagram, Altizer saw the following promotional post:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



27.      Altizer saw ads that emphasized exotic flavors and encouraged Plaintiff to switch to JUUL from cigarettes. These ads did not accurately display the strength of the nicotine in JUUL products or refer to the delivery system that results in nicotine entering the bloodstream faster and at higher levels than cigarettes or other e-cigarettes. At point of sale displays, Altizer saw the following ads:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

28.     Altizer's preferred JUUL pod flavor had been Mango. After JUUL discontinued the flavor, Altizer has switched to the Virginia Tobacco flavored JUUL pods.

29.     Altizer interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements, in-store promotions, or labels Altizer saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

30.     Altizer believed that the 5% nicotine label on JUUL pod packaging indicated that JUUL pods contained significantly less nicotine than a pack of cigarettes.

31.     While using JUUL, Altizer does not recall seeing the phrase, "a JUUL pod is equal to a pack of cigarettes," on advertisements or labels for JUUL products.

32.     Altizer has become addicted to JUUL pods. He consumes between half of a JUUL pod and one JUUL pod a day and begins using his JUUL within five minutes of waking. He feels that JUUL pods are "for sure" on his mind more than cigarettes.

33.     Altizer often misplaced his JUUL and needed to purchase new devices. At one point, Altizer owned 7 JUUL devices at the same time.

34.     Altizer personally made purchases of JUUL products from brick-and-mortar stores, including Walmart, Enmark, Kroger, Chevron Gas Station, Parker's Kitchen, Hilton Head Vapes, and Pirate's Cove Vapor Lounge.

35.     Plaintiff Altizer believed that JUUL would help him quit smoking cigarettes. The advertisements he saw did not reveal that JUUL pods deliver a higher concentration of nicotine than cigarettes and e-cigarettes or that they deliver nicotine to the bloodstream more quickly.

36.    Had Altizer known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and risks of addiction, and other health risks. Altizer is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

4.    **Mary Baker, on behalf of her son, B.C., a minor**

37.    Plaintiff Mary Baker and B.C. are residents of Huntington, West Virginia.

38.    Baker's son, B. C., is currently 17 years old and used a JUUL for the first time in 2016 at the age of 14.

39.    B.C. learned about JUUL from his friends at school and by viewing JUUL advertisements online. The advertisements he recalls viewing included the following images from JUUL's infamous "Vaporized" campaign:



40.    Before he had ever taken a puff from a JUUL, B.C. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including advertisements featuring JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit." Among the POS materials that B.C. recalls seeing were the following:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

41.     On platforms such as Instagram, B.C. was exposed to a steady stream of images that focused on the sweet and fruity flavors of JUUL pods and promoted JUUL as a tasty treat but failed to disclose that it was also a potent addictive drug. Among the online "flavor" advertisements that B.C. recalls were the following:

 

42.     None of the advertisements, in-store promotions, or labels B.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-

restricted product. The representations and omissions in JUUL's advertisements, in-store promotions and labels materially impacted B.C.'s assessment of, and eventual decision to use, JUUL products.

43.     The viral spread of JUUL-promotional content reached B.C. and B.C.'s social network, including classmates, leading to an increase in uptake of JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, B.C. would not have been exposed to, and would not have used, JUUL products.

44.     When one of B.C.'s friends offered him his first puff of a JUUL, B.C. accepted. Shortly thereafter, he started buying JUUL products of his own.

45.     Once B.C. had a JUUL of his own, he quickly became addicted to nicotine.

46.     Although well below the minimum legal age to purchase JUUL products, B.C. was nevertheless able to purchase JUUL products from local stores and classmates.

47.     B.C. was still below the legal age to purchase JUUL products when he obtained warranty service for his JUUL device from the JUUL website in 2018.

48.     Like many other students, B.C. has used his JUUL at school. Due to this in-school JUUL use, B.C. was suspended from school three times in 2017 and two more times in 2018.

49.     Baker has sought assistance for B.C.'s nicotine addiction but, to date, B.C. is still addicted.

50.     B.C. currently consumes one JUUL pod a day. He takes his first puff of JUUL within 5 minutes of waking up.

51.     B.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks JUUL posed.

**5.**     **Spyncer Baker**

52.     Plaintiff Spyncer Baker is a 19-year old who resides in Tulsa, Oklahoma.

53.     Baker began using JUUL's products in September 2018 after seeing advertisements at gas stations, hearing ads on the radio, and hearing about JUUL through friends. JUUL was popular among Baker's friends and classmates, which made JUUL appear to be cool and safe.

54.     Before trying JUUL, Baker never used nicotine.

55.     Prior to first purchasing JUUL's products, Baker recalls having seen the following advertisements, among others:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

56.     Based on the advertising of JUUL as an "alternative" for smokers, smoking evolved", or that consumers should "switch" to JUUL from cigarettes, Baker believed JUUL's products were safe, healthy, and were a safer and less-addictive alternative to cigarettes.

57.     Prior to purchasing JUUL, Baker viewed the product's label.

58.     Baker purchased JUUL pods from gas stations and other distributors. Baker saw in-store promotions for JUUL that were substantially similar to the below:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

59.     Baker began using and purchasing JUUL at the age of 17. Baker was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Baker's favorite flavors are Mint, Mango, and Fruit. These factors caused Baker to believe that JUUL was safe, even though he was underage. Baker recalls seeing ads like the following that attracted him to JUUL:









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



60.     None of the advertisements, in-store promotions, or labels Baker saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

61.     Baker would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**6.     Tommy Benham**

62.     Plaintiff Tommy Benham is a resident of Michigan.

63.     Benham, who is 20 years old, purchased a JUUL starter kit at the age of 18. He was a smoker prior to his purchase. Benham decided to try JUUL products based on advertising that he saw in posters, magazines, and Facebook depicting JUUL e-cigarettes as a safe, less addictive alternative to smoking cigarettes. He was smoking a pack of cigarettes a day at the time and thought that the JUUL would help him quit smoking by weaning him from cigarettes. He also found the variety of flavors appealing and was attracted to the eye-catching colors and bold fonts used in the JUUL ads.

64.     Among the JUUL ads that Benham saw were numerous ads placed on Facebook as part of JUUL's "Switch" campaign. These included testimonial ads touting the switch to JUUL as an improvement over cigarette smoking. For example, Benham recalls seeing the ads below on Facebook:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



65.     These ads led Benham to believe that using JUUL products would decrease his appetite for nicotine.

66.     Benham also recalls seeing a number of "Smoking Evolved" ads, including the ads below:





67.      Benham liked the sleek, high tech look of the device and the bright colors of the JUUL pods. The tag line "Smoking Evolved" led Benham to believe that the JUUL pod had been designed to avoid unhealthy side effects and be less addictive than traditional cigarettes.

68.      Benham saw numerous JUUL ads on Facebook touting the various JUUL pod flavors, including limited edition flavors such as Mango (before it became a "permanent" flavor), Menthol, and Cool Cucumber. For example, Benham recalls seeing the ads below on Facebook:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



69.     The variety of flavors was a major factor in his use of JUUL, and he tried essentially every new flavor that came out. JUUL's use of invitations to comment on "which flavor is your favorite" was also engaging to Benham, who commented on the

various flavors in response to those ads. Benham also saw ads framing JUUL pod flavors as something to be paired with foods, such as ads with "featured chef" pairings of JUUL pod flavors with recipes. For example, Benham believes he saw the ad below:



70.    Benham also saw numerous ads on Facebook that touted limited edition JUUL e-cigarettes in new colors such as Navy and Gold. For example, Benham recalls seeing the ads below:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



71.    Benham purchased these limited-edition e-cigarettes because he felt they had more pizazz than a standard black JUUL e-cigarette.

72.    Benham also saw JUUL ads leveraging the fact that JUUL e-cigarettes would avoid "smelling like an ashtray."

73.    Among the ads discussed above that Benham saw were ads using discounts to promote new styles of e-cigarettes and JUUL pod flavors. He sometime purchased JUUL products at least in part in response to seeing these discounts. For example, Benham believes he saw the discount ad below:



74.     Benham also saw JUUL ads on Facebook with celebrity images, such as a 2016 ad showing Orlando Bloom and Katy Perry sharing a JUUL e-cigarette. Benham perceived these images as glamorizing JUUL products and making them seem trendy.

75.     Benham purchased JUUL from Walmart and local smoke and vape shops.

76.     None of the advertisements, in-store promotions, or labels Benham saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

77.     Although Benham thought JUUL would help him quit smoking, he has found it even more addictive than cigarettes, to the point where he is addicted to JUUL pods and now even tobacco is an inadequate substitute. Benham now finds that he has to interrupt his routine throughout the day to vape with his JUUL, and that he is consuming at least eight JUUL pod packs per week. Benham favors Cool Mint flavored JUUL pods.

78.     Benham would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**7.     Mindy Boyd, on behalf of her daughter, E.B., a minor**

79.     Plaintiff Mindy Boyd and her daughter, E.B., are residents of Kearney, Missouri.

80.     Boyd's daughter, E.B., is currently 16 years old and started using JUUL's products in 2017 when she was only 14 years old.

81.     E.B. never tried smoking cigarettes before using JUUL's products.

82.     E.B. learned about JUUL at school from her friends and by viewing advertisements and promotions online through social media. E.B. recalls in particular seeing ads on social media in 2017 promoting JUUL's products, which included advertisements substantially similar to the following:

 

83.     Despite her underage status, E.B. was able to purchase JUUL pods from

QuickTrip and Casey's stores where she lives in Missouri. She recalls seeing in-store

displays essentially identical to the following, which were designed to be easily accessible

and eye-catching:

 

 

84.     E.B. was also drawn to JUUL's products by the candy-like flavors and, as

with many underage users, she preferred the mint variety. Below is the type of

promotional image shown below that she recalls viewing:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO




85.     None of the advertisements, in-store promotions, or labels E.B. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

86.     E.B. is now addicted to JUUL and has to start vaping within 5 minutes of waking each morning, eventually consuming more than a full JUUL pod each day.

87.     The addiction has cost E.B. and her family money and other losses. E.B. spends roughly half of her paychecks on JUUL every week and estimates altogether spending at least $2,100 per year on JUUL's products given she vapes at least one pod per day (which equates to at least $6,300 over three years).

88.     Boyd has noticed as well that E.B. gets sick more often and has experienced substantial personality changes. E.B. is uncharacteristically irritable and suffers from frequent headaches, which are symptoms of nicotine addiction and withdrawal.

89.     E.B. has tried to stop using JUUL on numerous occasions, but always becomes anxious when not vaping and has never been able to quit for long.

90.     Boyd struggles with E.B.'s addiction and inability to quit using as well, leading to constant arguments between them and worries about what physical effects E.B.'s exposure to nicotine at such a young age will have.

91.     E.B. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. The availability of candy-like flavors played a role as well in getting her to start using JUUL products.

**8.     Kaahuakamehuanui Brun**

92.     Plaintiff Kaahuakamehuanui Brun is a 27-year-old resident of Makaweli, Hawaii.

93.     Brun purchased his first JUUL e-cigarette in the early part of 2018 at a 7-Eleven in Makaweli, Hawaii. He was twenty-five years old.

94.     Brun visited the JUUL website in every year from 2016 to 2020 and saw advertisements there. He also saw JUUL-related social media content, including JUUL advertisements, on Facebook, Instagram, and Snapchat. He does not recall seeing warnings related to addiction or nicotine in any of these advertisements.

95.     Based on the advertisements that he saw, Brun believed that JUULs were safer and less addictive than cigarettes and hoped to use JUULs to reduce his nicotine intake. He believed that the 5% strength representation on the JUUL packs meant that they were 5% as strong as cigarettes. He would not have tried JUUL if he knew it delivered more nicotine to the bloodstream than cigarettes or if he knew that it could cause respiratory illnesses and other health complications.

96.     After his initial purchase, Brun continued to purchase pods at the local 7-Eleven.

97.     Before starting JUUL, Brun smoked between 10 and 20 cigarettes per day. While using JUUL products, Brun used one to two JUUL pods per day.

98.     While using JUUL, Brun found that vaping was more on his mind than smoking ever had been. He first used his JUUL device within 5-30 minutes of waking up.

99.     While using JUUL products, Brun experienced shortness of breath and asthma-like symptoms, including difficulty breathing when he first wakes up. He also experienced an increased frequency of respiratory illnesses, coughing, migraine headaches, pain in his chest and the back of his shoulders, and diarrhea.

100.    In November 2019, Brun sought medical treatment as a result of these medical issues and was told that he has a lung-related problem.

101.    Brun tried to quit JUUL, but he was unable to stop vaping. He recently switched to another, cheaper vaping device. He is still addicted to nicotine and vapes frequently.

102.    None of the advertisements, in-store promotions, or labels Brun saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Brun would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**9.     Nikki Buchanan, on behalf of her son, C.S.B., a minor**

103.    Plaintiff Nikki Buchanan and her son, C.S.B., are residents of Calhoun, Georgia.

104.    C.S.B. is 16 years old now. He started using JUUL's products in 2018 when he was 14 years old and is now addicted.

105.    C.S.B. had never tried smoking cigarettes before using JUUL's products.

106.    Before he started vaping, C.S.B. recalls seeing dozens of ads in late 2017 on Instagram, Facebook, and Twitter promoting JUUL's products without any clear warnings about nicotine or addiction, including advertisements substantially similar to the following:



107.    Relying on those ads, C.S.B. thought it would not be harmful to use JUUL's products and was not aware of a risk that he could become addicted.

108.    None of the advertisements, in-store promotions, or labels C.S.B. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

109.    Instead, many of the ads he saw portrayed JUUL as a desirable product that was a status symbol or a harmless lifestyle choice like having a cup of coffee:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

 




110.    C.S.B. also started vaping JUUL's products as well because of the Mango flavor in particular. He recalls that being popular in his school and promoted in advertisements that he, as a minor, found particularly appealing, such as the following ads that he saw, which did not contain any warning of the dangers:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







111.     C.S.B. was in transition from middle school to high school and was working out with the football team. The older high school kids were using JUUL products and doing so made C.S.B. feel like an adult.

112.     When C.S.B. started vaping with his friends, he found he was able to purchase JUUL pods himself at a grocery store near where he lived in Georgia and from classmates who purchased elsewhere. He recalls seeing posters and displays essentially identical to the following:





113.    C.S.B. is now addicted and has to start vaping within 5 minutes of waking each morning, ultimately consuming between half a JUUL pod to a full pod each day.

114.    C.S.B.'s use of JUUL products has caused substantial problems for him and his family. Buchanan notes her son became more aggressive and gets angry when cannot use JUUL and started hiding things from his parents to be able to vape. He was also caught vaping at school and kicked off the football team as well. C.S.B. had been caught using JUUL in school 3 times and was warned that another such infraction would result in

expulsion. Due to his severe addiction and inability to stop JUULing, C.S.B. was withdrawn from school and is now being home schooled.

115.    The resulting changes in C.S.B.'s behavior and addiction to JUUL's products has caused Buchanan to spend more than $3,000 in counseling fees and will continue to cost her family more in the future dealing with C.S.B.'s addiction.

116.    C.S.B. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**10.    <u>Meredith Caddell</u>**

117.    Plaintiff Meredith Caddell is a 24-year old who resides in Banks, Alabama.

118.    Caddell began using JUUL's products in January, 2017 after seeing advertisements through social media and hearing about it from friends. Caddell frequently saw promotions for JUUL on social media from both JUUL and people in her social network. JUUL was popular among Caddell's friends and classmates, which made JUUL appear to be cool and safe. After starting JUUL, she observed more JUUL ads on TV, the radio, at gas stations, online, and social media. These ads encouraged and increased her JUUL use.

119.    Before trying JUUL, she used a vape called Kanger Tech from September 2013 until January 2017.

120.    Prior to first purchasing JUUL's products, Caddell recalls having seen the following advertisements, among others:



























SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







121.    Based on the advertising of JUUL as an "alternative" for smokers, JUUL's

"make the switch" campaign, and other JUUL advertising, Caddell believed JUUL's products were safe, healthy, not highly addictive, had significantly less nicotine than cigarettes, and were a safer and less-addictive alternative to cigarettes.

122.    Caddell also say advertisement like the following that used the #JUUL hashtag:








SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

123.    Caddell purchased JUUL pods from gas stations and convenience stores.

Caddell saw in-store promotions for JUUL that were substantially similar to the below:

 

 







124.     Rather than helping to reduce Caddell's nicotine consumption, Caddell became addicted to JUUL's products and vapes and increased her nicotine intake substantially. From January 2017 until December 2017, she used a half a pod per day. From January 2018 until August 2019, she used 3 to 4 JUUL pods every day.

125.     Caddell began using and purchasing JUUL at the age of 20. Caddell was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and

58

the variety of flavors it came in. Caddell's favorite flavors are mango, mint, and cucumber. She was attracted to JUUL's sleek and discrete design. She and her friends were able to use the product without having to step outside, and could use it on busses during trips. These factors caused Caddell to believe that JUUL was safe and appropriate for her to use, even though she was underage. Caddell recalls seeing the following ads that attracted her to JUUL:







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO








SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

126. None of the advertisements, in-store promotions, or labels Caddell saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

127. Caddell would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**11.      Thomas Carcone, on behalf of his son, N.C., a minor**

128. Plaintiff Thomas Carcone and N.C. are residents of Utica, New York.

129. Thomas Carcone's son, N.C., is currently 17 years old. N.C. began using JUUL's products in 2015, when he was 14 years old, after hearing about them at school and seeing displays in store.

130. The displays used bold colors and were set up in standalone cases to be enticing and easily accessible and were essentially identical to the following:






131.    None of the advertisements, in-store promotions, or labels N.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

132.    Based on his understanding that the products did not contain nicotine and were not addictive, N.C. began purchasing JUUL pods from a local vaping store in his area and soon was consuming several JUUL pods each week.

133.    In the meantime, his classmates and others adopted JUUL's advertising of the products as cool, trendy, and designed for young people, and often promoted the products themselves by posting on social media or sharing viral images and posts using

the "#JUUL" hashtag that N.C. saw. That reinforced the perception of N.C. that the products were essentially harmless. N.C. recalls seeing at various times the following images promoting use and abuse of JUUL's products by youth:









134.    N.C. became addicted to JUUL's products. Currently he consumes between two and five JUUL pods a week, now preferring the Tobacco and Menthol flavors along with Mango.

135.    The addiction to JUUL's product has cost N.C. significant money spent on JUUL pods every week since 2015 to supply his addiction. N.C. has tried to stop using JUUL products with his father's encouragement but is unable to go long without JUULing.

When he does not use JUUL's products N.C. becomes angry, irritable, and anxious, which has affected his relationship with his father and made N.C. lose all interest in sports or any activity except for JUULing.

136.    N.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**12.    Alex Casas**

137.    Plaintiff Alex Casas is a 20-year old who resides in Lincoln, Nebraska.

138.    Casas began using JUUL's products in November 2016 after seeing advertisements on TV, at gas stations, and heard about it through friends. Casas also frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Casas' friends and classmates, which made JUUL appear to be cool and safe.

139.    Before trying JUUL, Casas had never used nicotine.

140.    Prior to purchasing JUUL, Casas viewed the product's label and saw, among other things, statements that JUUL was an "alternative" to smoking.

141.    Prior to first purchasing JUUL's products, Casas recalls having seen the following advertisements, among others:



Posted: 4/30/2018 7:01 PM UTC

**JUUL** We asked Brandon why he made the #SwitchToJUUL and this is what he told us. See more testimonials from #JUUL users at juul.com/community and share your #SwitchToJUUL stories with us. .

WARNING: This product contains nicotine. Nicotine is an addictive chemical. #JUUL #JUULvapor

710 users like this



142.    Based on advertisement he saw calling JUUL as an "alternative" for smokers, "smoking evolved", that "a JUULpod is equal to a pack of cigarettes", and that consumers should "switch" to JUUL from cigarettes, Casas believed JUUL's products were safe, healthy, not highly addictive, and a safer and less-addictive alternative to cigarettes.

143.    Casas purchased JUUL pods from gas stations, online retailers, convenience stores, and other distributors. Casas saw in-store promotions for JUUL that were substantially similar to the below:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







144.     Casas began using and purchasing JUUL at the age of 15. Casas was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. The device's odorless and discrete design attracted him, because the product could easily be hidden. These factors caused Casas to believe that JUUL was safe and appropriate for him to use, even though he was underage.

145.     Cases also saw user-generated content like the following:

 

146.     None of the advertisements, in-store promotions, or labels Casas saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

147.     Casas would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

13.     **Kisha Chandler, on behalf of her son, D.C., a minor**

148.    Plaintiff Kisha Chandler and D.C. are residents of Williston Park, New York.

149.    Prior to using a JUUL for the first time in August 2017, at the age of 15, Chandler's son D.C. had viewed increasing amounts of JUUL-related content on various social media platforms. For example, D.C. recalls viewing advertisements identical or substantially similar to the following images on Instagram:







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

150.    D.C. had also viewed seen online JUUL advertisements promoting JUUL

flavors identical or substantially similar to the following:






151.    Before D.C. tried JUUL, he had also seen point-of-sale ("POS")

promotional materials for JUUL devices and products, including signs and displays. These

promotional materials featured images of JUUL's multicolored fruit-flavored pods. D.C.

did not see any warnings or disclosures in these POS materials about JUUL's nicotine

levels or the risks JUUL posed. The representations and omissions in JUUL's in-store

promotions materially impacted D.C.'s assessment of, and eventual decision to use, JUUL

products. D.C. remembers viewing promotional materials in and around Williston Park,

New York when he began purchasing JUUL products in 2017, identical or substantially

similar to the following images:






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



152.    None of the advertisements, in-store promotions, or labels D.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

153.    When D.C. was offered a Mango flavored JUUL by one of his many high school friends who had taken up JUUL use, he had never smoked a cigarette before or used any other tobacco product. D.C. succumbed to peer pressure and decided to try JUUL because everything he had seen had led him to believe that JUUL was fun, harmless, and "cool."

154.    D.C. enjoyed the "buzzed" feeling he received from the JUUL's powerful nicotine hit, and he quickly became addicted to nicotine. D.C. and his friends obtained their JUUL pods from nearby gas stations and a small local deli. The gas stations and deli sold JUUL products directly to D.C. and his friends.

155.    When Chandler caught her son with JUUL pods in his bedroom, D.C. told her JUUL was safe and nicotine-free; he told his mother that JUUL pods only contained

water vapor. D.C. would not have started using JUUL if he knew it contained nicotine. Additionally, D.C. would not have used a Tobacco or Menthol flavored JUUL pod because he associates both of those flavors with cigarettes, which he knew to avoid.

156.    Chandler does not provide D.C. with cash; instead, if D.C. needs to purchase something, D.C. uses apps on his phone, which are linked to Chandler's bank accounts. Thus, in order to obtain JUUL pods, D.C. would trade food for JUUL pods (i.e. "I'll give you $20 worth of Wendy's for JUUL pods).

157.    Even though Chandler has confiscated numerous JUUL devices and JUUL pods from her son, D.C. has continued to find ways to obtain JUUL products. At his peak consumption, D.C. was consuming two to three JUUL pods a day.

158.    D.C.'s JUUL use has taken a significant toll on his physical and psychological health. Since D.C. started using JUUL, he has developed a chronic cough. Chandler also believes D.C.'s JUUL use has increased his anxiety levels.

159.    Chandler fears D.C. will be unable to quit using JUUL. D.C. has expressed to his mother that he wants to stop using JUUL, but he cannot due to the severity of his addiction.

160.    D.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**14.    Ronald Claytor**

161.    Plaintiff Ronald Claytor is a 19-year old who resides in Petersburg, Virginia.

162.    Claytor began using JUUL's products in September 2018 after seeing advertisements through TV, at gas stations, and hearing about JUUL through friends. Claytor also frequently saw promotions for JUUL on social media from both JUUL and

people in his social network. JUUL was popular among Claytor's friends and classmates, which made JUUL appear to be cool and safe.

163.     Before starting JUUL, Claytor had never tried nicotine.

164.     Prior to purchasing JUUL, Claytor viewed the product's label.

165.     Claytor purchased JUUL pods from Murphy USA at 423 Oakville Road, Appomattox, Virginia 24522. Claytor saw in-store promotions for JUUL that were substantially similar to the below:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



166.     Based on the advertising of JUUL as an "alternative" for smokers, "smoking evolved", and that consumers should "switch" to JUUL from cigarettes, Claytor believed JUUL's products were safe, healthy, were not addictive, and were a safer alternative to cigarettes.

167.     Claytor began using and purchasing JUUL at the age of 17. Claytor was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. These factors caused Claytor to believe that JUUL was safe, even though she was underage.

168.     None of the advertisements, in-store promotions, or labels Claytor saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

169.     Claytor would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**15.     Tyler Cobb**

170.     Plaintiff Tyler Cobb is an 18-year old who resides in Troy, Missouri.

171.     Cobb began using JUUL's products in 2016, when he was 15 years old and still in high school, after hearing about them from friends and based on various advertisements he saw online and in gas stations.

172.     Cobb never smoked before using JUUL's products, but he has since become addicted to nicotine and vapes on a daily basis.

173.     Prior to first purchasing JUUL's products in 2016, Cobb saw them advertised in in-store displays and posters on windows, including the following that are essentially identical to those he recalls viewing:

   

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



174.    None of the advertisements, in-store promotions, or labels Cobb saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

175.    The advertisements and promotions Cobb viewed caused him to begin purchasing JUUL pods in 2016 from his friends and gas station displays.

176.    He was attracted to JUUL's products as well because of the way they tasted. Cobb tried virtually all flavors except for the Tobacco varieties and preferred Mango, but now has to buy the Cool Mint flavor since he is not aware of Mango being sold in his area any longer. He recalls seeing the following promotional images pushing the various flavors:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







177.   Cobb became addicted to vaping. Now he needs the nicotine in JUUL pods within the first 30 minutes of waking each day and usually ends up consuming between half a pod and one full pod per day. Some days it is up to as much as two full pods.

178.   Cobb would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**16.   Bradley Colgate**

179.   Plaintiff Bradley Colgate is a resident of La Jolla, California.

180.     In 2017, Colgate purchased a JUUL e-cigarette and JUUL pods at the age of 24 in an effort to curtail his nicotine addiction and quit smoking. He had smoked Marlboros for approximately seven years and hated being a smoker.

181.     In the summer and fall of 2017, Colgate started seeing JUUL ads across social media. He typically used Instagram and Facebook and recalls seeing many JUUL ads on both platforms. In particular, he remembers seeing a series of Instagram posts that included testimonials from people who had switched from cigarettes to JUUL. When logging into Instagram, he would see "Instagram sponsored stories," which were short one-minute video advertisements, and often, he'd be presented with a JUUL-sponsored story that was in the form of a testimonial. These testimonials typically involved people describing how JUUL helped them quit smoking cigarettes. While he did not watch the videos, he often observed the brief caption that appeared beneath the video, which typically encouraged him to "switch" from cigarettes to JUUL. While the precise testimonials that Colgate saw are no longer available online, Colgate recalls seeing testimonials that looked similar to the advertisement below:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

182.    In particular, he recalled seeing in these testimonials phrases that described JUUL as an "alternative" to cigarettes, which he understood to mean not unhealthy and less addictive. Colgate also recalls seeing advertisements on both Instagram and Facebook that simply contained the word "SWITCH," including the advertisement below:



183.    Around that same time, he also began seeing advertisements in stores. He noticed how large the store advertisements were, and was surprised to see the ads on display not just at smoke shops, but at convenience stores and gas stations, such as 7-Eleven. He also noticed that these stores displayed JUUL on the counter, instead of behind it with the other cigarettes.

184.    Before Colgate purchased JUUL for the first time, he saw other JUUL advertisements on Facebook and Instagram. In particular, he recalls seeing the below Instagram advertisements:








SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

185.    He also recalls seeing Facebook ads in September 2017 for a "Device Kit" and another on or around October 4, 2017 that encouraged him to "[c]ustomise a plan that fits your lifestyle." Those ads are depicted below:





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

186.    He believed that JUUL would make it easier to stop being a smoker.

187.    On the basis of JUUL's advertising campaign, including the ads described in the previous paragraph, Colgate decided to begin purchasing JUUL in or around October 2017.  He has purchased JUUL from numerous local gas stations and liquor stores, including 7-Elevens, ARCO and Chevron gas stations, Dick's Liquor, Funky Monkey, Keg-N-Bottle, Liquor Box, M Mart, Sheetz, Smoke and Stacks, Sweet Dreams, and Syrah Spirit & Wine Parlor.

188.    None of the advertisements, in-store promotions, or labels Colgate saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

189.    Rather than weaning Colgate off of nicotine, the intense dosage of nicotine delivered by the JUUL products resulted in an addiction to JUUL pods, an increased nicotine addiction, and an increased consumption of nicotine and JUUL products by Colgate. Colgate found JUUL so addictive that he did not subscribe to JUUL's pod service, as he was concerned that by having so many pods in the house, he would smoke more than his typical pod a day due to its addictive nature. Moreover, not only has the increased nicotine made JUUL harder to quit than regular cigarettes, but because of the way in which JUUL relentlessly continued to advertise to him on social media, Colgate has found quitting JUUL to be even more difficult than quitting cigarettes due to the fact that he is continuously reminded of it.

190.    Colgate would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

17.     **Anjie Comer, on behalf of her son, Q.C., a minor**

191.    Plaintiff Anjie Comer and Q.C. are residents of Fort Worth, Texas.

192.    Comer's son Q.C. began using JUUL around March 2018 at the age of 16.

193.    Before Q.C. even tried JUUL, he viewed point-of-sale ("POS")

promotional materials for JUUL devices and products, including signs and displays. These

promotional materials featured images of JUUL's multicolored fruit-flavored pods. Q.C.

did not see any warnings or disclosures in these POS materials about JUUL's nicotine

levels or the risks JUUL posed. The representations and omissions in JUUL's in-store

promotions materially impacted Q.C.'s assessment of, and eventual decision to use, JUUL

products. For example, Q.C. viewed promotional material for JUUL products at local gas

stations in and around Fort Worth, Texas in 2018 that was, or was substantially similar to,

the following:











SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



194.    When Q.C. was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product; he decided to try a JUUL because the fruit flavors sounded intriguing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. Q.C. had seen advertisements for JUUL on social media and was led to believe JUUL did not contain any nicotine. For example. Q.C. viewed advertisements that made him believe JUUL products were youth-friendly after viewing promotional JUUL material that was, or was substantially similar to, the following:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



195.    JUUL's narcotic effect of nicotine led Q.C. to use his friend's JUUL repeatedly over the course of the next few weeks. Using JUUL became a social activity that Q.C. regularly engaged in with his friends during and after school. Q.C. purchased JUUL from a local QuikTrip store.

196.    Comer has noticed that since her son began using JUUL, it has made him experience severe mood swings.

197.    Had Q.C. known the risks of using a JUUL, he would not have used a JUUL. None of the advertisements, in-store promotions, or labels Cobb saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. Additionally, Q.C. would not have used a Tobacco or Menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

18.    **Lisa Commitante, on behalf of her daughter, A.U., a minor**

198.    Plaintiff Lisa Commitante and A.U. are residents of New York.

199.    Commitante's daughter A.U. began JUULing at the age of 14, after purchasing a JUUL and JUUL pods at a smoke shop in Brooklyn, NY. She recalls seeing displays and signs there essentially identical to the following:




200.    A.U. was attracted to the fruit flavors produced by the JUUL pods, and did not realize that they contained nicotine. The images from JUUL promoting flavors that she saw included the following:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









201.     None of the advertisements, in-store promotions, or labels A.U. saw adequately disclosed the nature or addiction risks of JUUL's products, the presence of nicotine, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

202.     She subsequently began consuming JUUL pods, enticed by the fact that it looked cool and her friends were vaping JUUL products. A.U. became addicted to JUUL pods.

203.     She used the JUUL frequently until her mother found and confiscated it.

204.    A.U. would not have purchased the JUUL starter kit if she had known it contained nicotine or been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**19.    Timothy Critzer**

205.    Plaintiff Timothy Critzer is a resident of Apex, North Carolina.

206.    Critzer used JUUL right around its launch in 2015. He had been a regular smoker for over fifteen years prior and had used other e-cigarette brands in the past. As a smoker, he typically went through around one pack of cigarettes each day. He initially began using JUUL products with the hope they would help end his addiction to nicotine. In-store and online advertisements failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use. Indeed, Critzer believed that one JUUL pod contained substantially less nicotine than a pack of cigarettes. He would not have purchased JUUL products had he known they delivered more nicotine to the bloodstream than cigarettes.

207.    When purchasing JUUL products in-person, Critzer will visit the local Circle K convenience store. He reports, upon arrival, that various in-store advertisements will further induce him to purchase JUUL products. These advertisements often succeed, even when Critzer has not initially intended to purchase JUUL products during his visit. He does not remember seeing any accompanying nicotine content warnings, or notices regarding JUUL's addictive nature.

208.    Critzer recalls, since 2017, a display situated in front of the cashier's counter and next to the lighters, prominently exhibiting JUUL products. It was, or was substantially similar to, the following:



209.    Critzer also recalls seeing outside-of-store display, prominently featuring a variety of JUUL pod flavors. Each had its own distinct illustration and color palette. Critzer's favorite, Classic Tobacco, sat to the far right in the top row. The display from 2017 was, or was substantially similar to, the following:



210.    Critzer sees JUUL-related promotional content online as well. Critzer constantly sees advertisements for JUUL on Facebook. He recalls one identical or substantially similar to that below appearing multiple summers since 2015.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



211.    Critzer similarly recalls seeing a Facebook post that was, or was substantially similar to, the following.



212.    Critzer also receives promotional emails from JUUL. He remembers the slogan "Smoking Evolved" and various discounts and sales associated with sharing JUUL content across the internet. The emails he received looked like:



213.    As a result of the inundation of promotional materials and his worsening nicotine addiction, Critzer's JUUL use has become a constant preoccupation. JUUL is on his mind more than cigarettes ever were. He typically consumes between one-and-a-half and two JUUL pods each day, in addition to his usual pack of cigarettes. That represents a 150%-200% increase in Critzer's nicotine consumption since he began using JUUL. Critzer feels generally powerless to reduce his nicotine consumption. Moreover, he experiences frequent throat pain and soreness as a result of his JUUL use; he rarely, if ever, experienced such problems when solely smoking cigarettes.

214.     None of the advertisements, in-store promotions, or labels Critzer saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Critzer would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**20.     <u>Mary Deaton, on behalf of her granddaughter, M.E.D., a minor.</u>**

215.     Plaintiff Mary Deaton and M.E.D. are residents of Oxford, Mississippi.

216.     Deaton's granddaughter M.E.D. is currently 15 years old. She started using JUUL's products in 2017 when she was only 13 years old.

217.     M.E.D. never tried smoking cigarettes before using JUUL's products.

218.     M.E.D. learned about JUUL at school from her friends and by viewing advertisements online and through social media. The advertisements she viewed promoted JUUL as cool and trendy, or even "essential," and includes the following ads she recalls seeing:







219.     The kids at M.E.D.'s school adopted this view of the products as trendy and often promoted JUUL's products themselves by posting about them on social media or sharing viral images and posts of others using the "#JUUL" hashtag. M.E.D. recalls seeing the following images promoting use and abuse by young persons that were widely shared, which JUUL did nothing to address or counteract:












SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

220.    Advertisements from JUUL pushing candy-like flavors were particularly enticing to M.E.D. and her friends, and she recalls seeing the following images and advertisements in particular that played up the perception of JUUL products as a treat:



221.    None of the advertisements, in-store promotions, or labels M.E.D. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

222.    All the advertisements and social media influence from JUUL and its products caused M.E.D. to begin vaping with her friends. Despite her youth, she was able to purchase JUUL pods from convenience stores and vape shops around the area where she lives in Mississippi. The in-store displays also failed to inform her of the risks of

JUUL's products, and were presented in attractive and colorful ways that looked essentially identical to the following:

 

223.    M.E.D. became addicted to JUUL pods. Currently, she has to start vaping within the first 30 minutes of each day and consumes between one-half and a full pod each day. The flavor which she prefers, like many of her underage friends, is Cool Mint.

224.    The addiction to JUUL's product has cost M.E.D. and her family significant money that is spent on JUUL pods every week to feed her addiction.

225.    M.E.D. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**21.    Michael James Deeter**

226.    Plaintiff Michael James Deeter is a resident of Tucson, Arizona.

227.    Deeter is currently 18 years old. He started using JUUL products in 2015 when he was just 13.

228.    Deeter had experimented with other tobacco products before he tried JUUL, but he was not a habitual nicotine user.

229.     Before using a JUUL for the first time, Deeter had seen and relied upon point-of-sale promotional materials for JUUL devices and products, including the signs and displays pictured below. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit."

 

230.     None of the signs, product displays, or product labels Deeter saw adequately disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, that use of JUUL products pose significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions of JUUL's in-store promotions materially impacted D.C.'s assessment of, and eventual decision to use, JUUL products.

231.     Soon after he started JUULing in 2015, Deeter became addicted to nicotine.

232.     Although Deeter was, until recently, below the legal age to purchase tobacco products in Arizona, he has always been able to acquire JUUL products through his local Circle K convenience store.

233.    Deeter actively uses Instagram, Snapchat, and YouTube where he is exposed to JUUL-related content from other adolescents and from JUUL-related accounts. Deeter has also posted his own JUUL-related content to social media.

234.    Other parents have informed Deeter's mother that they have seen JUUL-themed Snapchat posts posted by Deeter as well as videos of Deeter smoking JUULs.

235.    Deeter consumes at least one JUUL pod every two days. He takes his first puff of JUUL within 30 minutes of waking up every morning. His preferred flavor is Mint.

236.    Deeter would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risk of addiction, and other health risks JUUL poses. He also would not have used JUUL's products if they did not come in sweet and fruity flavors.

**22.    Katherine Dentler**

237.    Plaintiff Katherine Dentler is a resident of Aloha, Oregon.

238.    Before using JUUL for the first time in Summer 2016 at the age of 39, Dentler regularly smoked combustible cigarettes. At that point, she had been a smoker for over twenty-five years, and typically smoked around a pack of cigarettes daily. She began using JUUL products with the hope they would help end her nicotine addiction. In fact, she first heard of the JUUL brand from a television commercial touting its efficacy as a cigarette replacement. The commercial characterized JUUL products as inherently safe and failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use. Dentler would not have bought JUUL products had she known they delivered more nicotine to the bloodstream than cigarettes. Indeed, upon her initial purchase, she believed that one JUUL pod only contained a negligible amount of nicotine.

239.    Dentler purchased JUUL products from different variety stores, a local
Plaid Pantry, and a 7-Eleven gas station. At these stores, she recalls promotional displays
that were, or were substantially similar to, the following:

240.    An in-store display at a single-owner smoke shop called Cold Beer Cheap
Smokes, since early 2017. Situated in front of the cashier's counter and next to the
lighters, this display prominently exhibits JUUL products.



241.    An in-store display at Plaid Pantry, from 2017, prominently exhibiting
various JUUL pod flavors, each with its own distinct color palette.



242.    An in-store display at a Chevron gas station, from 2017, featuring JUUL
accessories, such as JUUL pod flavor varieties and a USB charging dock.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



243.    Dentler once saw a promotional poster at a local 7-Eleven, prominently advertising a sale: two JUUL pods for thirty dollars. The sale was appealing; Dentler typically paid twenty dollars for each JUUL pod.



244.    Dentler frequently saw advertisements for JUUL products in magazines she perused. These advertisements often highlighted JUUL's high-tech design and futuristic aesthetic. She recalls the slogan "Smoking Evolved" displayed along with promotional

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

imagery. She remembers an in-magazine advertisement, similar to the following, appearing many times since 2016:



245.    JUUL-related advertisements and promotions began to percolate through Dentler's digital life as well. As a result of the inundation of promotional materials and her worsening nicotine addiction, Dentler's JUUL use became a constant preoccupation. JUUL was on her mind more than cigarettes ever were.

246.   Dentler saw advertisements for JUUL on Facebook, identical or substantially similar to the one below, each summer since 2016.



247.   Dentler recalls the imagery paired with the below Facebook post, though is unsure if she saw it on Facebook, or elsewhere on the internet. Dentler recalls sharing such imagery online after beginning use of JUUL in 2016.



248.    Dentler also received promotional emails from JUUL. She recalls repetition of the aforementioned "Smoking Evolved" slogan and various discounts and sales associated with sharing JUUL content across the internet. The emails she received looked similar to:



249.    Dentler attempted to reduce her JUUL use in early 2018, as she began to understand the potency of JUUL's nicotine delivery mechanism. As a result, she experienced severe withdrawal symptoms. Physical symptoms included hot flashes, cold sweats, and gastrointestinal issues. Dentler also suffered psychological withdrawal effects such as mood swings, crying fits, and acute irritability with occasional outbursts of anger.

She had no idea that her JUUL use had propelled her nicotine addiction to such a level that attempts to reduce use would result in withdrawal symptoms such as these. This newfound understanding frightened her; despite the hardships of withdrawal, she persisted in her efforts and successfully reduced her JUUL use to a negligible level by March 2018. She quit tobacco products altogether in September 2019. Far from aiding in this process, Dentler's JUUL use only intensified and prolonged an already daunting challenge.

250.    None of the advertisements, in-store promotions, or labels Dentler saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks.

251.    Dentler would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

23.    **Joseph DiGiacinto, on behalf of his son, C.D., a minor.**

252.    Plaintiff Joseph DiGiacinto ("Digiacinto") and his son C.D. are residents of Cotati, California.

253.    C.D. is 16 years old.

254.    Before C.D. started using JUUL in 2015, he had never smoked.

255.    Before C.D. had ever tried a JUUL, he had seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays substantially similar to those pictured below. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Device Kit" or "Starter Kit." C.D., like most youth, found the depiction of the sweet and fruity JUUL pods in JUUL's POS advertisement particularly appealing.  To C.D., this advertisement conveyed that JUUL was a harmless treat and gave C.D. no

reason to believe that JUUL actually contained a highly addictive drug.  The representations and omissions in JUUL's in-store promotions materially impacted C.D.'s assessment of, and eventual decision to use, JUUL products.

 

256.     None of the advertisements, in-store promotions or JUUL labels C.D. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's advertising and POS promotions materially impacted C.D.'s assessment of the flavored JUULs he eventually decided to try and purchase.

257.     In June 2016, C.D. started using JUUL products, and eventually bought a JUUL device from a classmate who had a spare for sale. C.D. has also purchased from Al Sahara Smoke Shop.

258.     The viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL

use, and misled youth about the nature and risks of JUUL use reached C.D.'s social
network, including classmates, leading to an increase in uptake of JUUL products and
widespread misperceptions about the nature and risks of JUUL products. But for JUUL's
social media advertising, C.D. would not have been exposed to, and would not have used,
JUUL products. Among the viral JUUL-related posts C.D. saw were the following:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

259.    C.D. is active on Instagram and Facebook. Among the JUUL promotions that C.D. saw was the following Instagram post promoting JUUL flavors, including youth favorites Mango and Cool Mint,dated October 3, 2017:



260.    While he was using JUUL, C.D. continued to be exposed to JUUL advertising on social media, including the Instagram post below.  This Instagram post, which presented JUUL's Cool Cucumber pods as an experience similar to a day on a secluded tropical beach, again conveyed to C.D. that JUUL is a harmless indulgence that presented no health-related concerns.  C.D. became a regular user of Cool Cucumber JUUL pods.



261.   Also, on Instagram, C.D. was exposed to a significant amount of JUUL promotional content from third parties, including the Instagram accounts @Doit4JUUL and @JUULNation. These accounts led C.D. to believe that JUUL use was "cool," safe, and appropriate for minors. The accounts also encouraged the unlawful purchase and use of JUUL products by youth. On YouTube, C.D. saw numerous JUUL-themed videos from Donny Smokes and Supreme Patty. On Snapchat, C.D. saw JUUL-themed content from EonSmoke and OG Nick, and even his own friends. This content was overtly youth-oriented and promoted nicotine abuse, downplayed or normalized addiction risks, encouraged JUUL use in school, provided guidance on how to conceal a JUUL, created the impression that JUUL use was more common than it was, and that JUULing was the "cool" thing to do. These accounts also sold JUUL products directly through Instagram and promoted websites that sold JUUL products with inadequate age verification procedures, if any at all. C.D. did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote JUUL use to adolescents and profit from their addiction. Had C.D. known that he was being targeted by vendors of JUUL products, or that JUUL's own viral marketing had promoted and facilitated these accounts, C.D. would have rejected offers to use a JUUL or would have made efforts to stop using JUUL sooner than he did.

262.   Though C.D. is a minor, he has been receiving a steady stream of promotional e-mails from JUUL for months.

263.   C.D.'s Instagram and Snapchat streams are bombarded with advertisements for JUUL products and JUUL-related products, many of which use the hashtag #juul. Among the promotions C.D. has seen are those pictured below:



264.    DiGiacinto has enlisted the aid of school administrators and his family doctor in efforts to halt C.D.'s nicotine addiction. He has also attempted to keep C.D from associating with friends who use JUUL. None of these efforts have been successful.

265.    C.D. would not have purchased or started using JUUL's products were it not for JUUL's youth directed advertising and if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risk of addiction, and other health risks JUUL posed.

**24.    Rachelle Dollinger, on behalf of her son, K.S., a minor**

266.    Plaintiff Rachelle Dollinger and K.S. are residents of Brownsburg, Indiana.

267.    Dollinger's son, K.S., is currently 15 years old. He started using JUUL products in 2017 when he was only 13.

268.    K.S. had never smoked or used other tobacco products before he started using JUUL.

269.    K.S. learned about JUUL from his friends at school and by viewing JUUL promotions online and through social media. The promotions he recalls viewing included the following images from JUUL's "Vaporized" campaign:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

270.    Before he had ever tried JUUL, K.S. had also seen point-of-sale ("POS")
promotional materials for JUUL devices and products, including signs touting JUUL's

 

simplicity, ads featuring JUUL's multicolored fruit- and dessert-flavored pods and offers
of discounts on the JUUL "Starter Kit." Among the POS materials that K.S. recalls seeing
were the following:

271.    K.S. was exposed to a steady stream of images that promoted JUUL as a
tasty treat or a lifestyle essential but failed to disclose that JUUL was also a potent

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

addictive drug. Among the JUUL social media promotions that K.S. saw and relied upon were the following:

272.    Instagram posts:




273.    Facebook posts from July 10, December 1 and December 28 of 2017 and January 18, 2018:





274.    None of the advertisements, in-store promotions, or labels that K.S.
saw adequately disclosed the nature or addiction risks of JUUL's products, the actual
amount of nicotine in or delivered by JUUL's products, that the JUUL was
engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of
delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of
JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-
restricted product. The representations and omissions in JUUL's advertisements, in-store
promotions, and labels materially impacted K.S.'s assessment of the fruit-flavored JUUL
he would later be offered.

275.    In 2017, K.S. tried JUUL for the first time when he took a puff from his
friend's JUUL device. At the time, K.S. and his friend were both 13-year-olds in the eighth
grade.

276.    When Dollinger found out that K.S. was using JUUL products, she
confronted K.S., who told her that JUUL was harmless and did not contain nicotine. K.S.

claimed that he had reviewed JUUL's website, and told Dollinger that if she also reviewed JUUL's website, she would see for herself that JUUL was safe.

277.    Although K.S. is well below the minimum legal age to buy tobacco products, he is nevertheless able to purchase JUUL products from the local Speedway gas station.

278.    Dollinger recently found approximately 30 empty JUUL pods while cleaning K.S.'s room. K.S. claimed that there are videos on YouTube that explain how to refill empty pods.

279.    At 15 years of age, K.S. is addicted to JUUL pods. According to Dollinger, he has a "meltdown" if he is not able to JUUL.

280.    K.S. would not have purchased or started using JUUL products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risk of addiction, and other health risks JUUL poses. He also would not have used JUUL products if they did not come in sweet and fruity flavors.

**25.    Nicole Dramis on behalf of her son, J.D., a minor**

281.    Plaintiff Nicole Dramis and J.D. are residents of Miller Place, New York.

282.    Dramis' son J.D. began using JUUL in November 2017, at the age of 14. Prior to this, J.D. did not smoke cigarettes or use other tobacco products.

283.    Before using JUUL for the first time, J.D. had seen numerous JUUL advertisements online, which promoted JUUL pod flavors and depicted fashionably dressed young people striking playful poses with JUUL devices in hand.

284.    For example, J.D. recalls viewing online promotional material in 2017 that was, or was substantially similar to, the following, showcasing JUUL's bright, dessert- and fruit-flavored products:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





285.     Before J.D. even tried JUUL, he also viewed point-of-sale ("POS")

promotional materials for JUUL devices and products, including signs and displays. These

promotional materials featured images of JUUL's multicolored fruit-flavored pods. J.D.

did not see any warnings or disclosures in these POS materials about JUUL's nicotine

levels or the risks JUUL posed. The representations and omissions in JUUL's in-store

promotions materially impacted J.D.'s assessment of, and eventual decision to use, JUUL

products. For instance, J.D. remembers viewing advertisements that were, or were substantially similar to, the following in and around Miller Place, New York when he started purchasing JUUL pods in November 2017:






286.    None of the advertisements, in-store promotions, or labels J.D. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. J.D. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

287.    Based on the promotional material J.D. viewed, when offered a JUUL by a friend at school, J.D. accepted because he was interested in trying the fruit flavors. J.D. believed that JUUL pods did not contain nicotine but were simply "fruit-flavored juice."

288.    JUUL's use of fruit-based flavors, fruit-based flavor names and fruit-based advertising images was a substantial factor in J.D.'s decision to use and continue using a JUUL. JUUL's fruit-based promotions misled J.D. about the nature of JUUL's product and distorted the risks JUUL products posed. J.D. would not have started using JUUL if he knew it contained nicotine. Additionally, J.D. would not have used Virginia Tobacco or Classic Menthol flavored JUUL pods, since he associates both of those flavors with cigarettes, which he knew to avoid.

289.    Peer pressure was also a significant contributing factor in J.D.'s decision to use and continue using a JUUL. J.D. has conveyed to Dramis that everyone at his high school was using JUUL, and he did not want to be the "odd man out."

290.    J.D. and his friends have purchased JUUL pods from vape shops in the area.

291.    At his peak level of consumption, J.D. was consuming up to three JUUL pods per day; he began using JUUL within five minutes of waking up in the morning and

continued using JUUL throughout the day. J.D. enjoys using JUUL because it gives him a high and makes him feel good.

292. J.D. began using JUUL regularly at school; he would leave class and take extended visits to the bathroom to use JUUL. Because of this, Dramis has received phone calls from J.D.'s teachers informing her of her son's absence from class.

293. Dramis states J.D.'s JUUL use has had significant psychological and social effects on her son. Dramis says J.D. becomes very nasty and irritated when he cannot consume JUUL due to his severe addiction to nicotine.

294. For a time period, J.D. concealed his JUUL use from Dramis. During this time, J.D. would lock himself in his room and sleep all day because this was the only way he could get through the day without using JUUL products. J.D. sank into a severe depression. Dramis took J.D. to see several therapists to better understand what was going on with her son. Through therapy, Dramis and J.D. discovered J.D.'s JUUL use and nicotine withdrawals were to blame for his depressive state.

295. Socially, Dramis says her son has always been a nice, respectful child. However, since using JUUL, J.D. has started hanging out with a different crowd and veers the other way. J.D. has made friends with older kids that have easier access to JUUL.

296. Dramis has made many efforts to get her son to stop using JUUL. Dramis has grounded J.D., taken away his spending money, and banned him from hanging out with "bad influences." Dramis would like to send her son to a rehabilitation program in order to treat his addiction to nicotine and put a stop to his JUUL use.

297. Recently, J.D. has also made several unsuccessful attempts to quit using JUUL. J.D. has reached out to the addiction counselor at his school. Because J.D. is under the age of 18, it is illegal to give him nicotine patches or Chantix. Both Dramis and J.D. are desperately trying to break J.D.'s severe addiction to nicotine and JUUL products.

26.     **Robert Dyer, on behalf of his son, B.D., a minor.**

298.     Plaintiff Robert Dyer and B.D. are residents of Nauvoo, Alabama.

299.     Dyer's son B.D. began using JUUL in October 2015 at the age of 15, shortly after the device's launch in June of the same year. Online advertisements sold him on the safety of the product, along with the social status he could achieve through its use. B.D. purchased his initial JUUL products from classmates, many of whom were then of legal age to purchase them. Later, B.D. would purchase JUUL products from local stores with lax enforcement of legal age requirements. Dyer also suspects that B.D. used fake accounts in order to purchase JUUL products directly from the JUUL website.

300.     Prior to using JUUL, B.D. had never used tobacco products. Today, he uses JUUL daily and has done so for over four years.

301.     When he first began using JUUL products, B.D. was unaware of their addictive potential; Dyer recalls a conversation where his son expressed his belief that JUUL had to be safe because it was different than cigarettes. JUUL's marketing campaigns reinforced such beliefs. B.D. does not recall any nicotine content warnings on the various advertisements he saw online. Since he started using JUUL, B.D. has on occasion tried other e-cigarettes, but always ends up circling back to JUUL, which has a more rapid nicotine delivery mechanism than most other e-cigarette brands.

302.     B.D. recalls seeing JUUL-related content and imagery on many of the websites he frequented as an adolescent, including popular social media platforms.

303.     B.D. saw an image online advertising the eight different JUUL pod flavor varieties available to consumers, that was, or was substantially similar to, the following. B.D. recalls this image from 2017 through 2018:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



304.   B.D. recalls imagery, substantially similar or identical to that below, advertising the immensely popular Mango JUUL pod flavor. He recalls this image from 2018.



305.   B.D. also encountered JUUL promotional material when at local convenience stores.

306.   B.D. recalls an in-store display, from 2017, in front of cashier's counter, prominently exhibiting JUUL products. The display was next to the lighters and practically impossible to miss. The display was, or was substantially similar to, the following:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



307.    B.D. recalls an outside-of-store display featuring a variety of JUUL pod flavors. Each flavor has its own distinct illustration and color palette. B.D.'s favorite flavor, Cool Mint, sits center-stage in the bottom row. The display was, or was substantially similar to, the following:



308.    None of the advertisements, in-store promotions, or labels B.D. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver

nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

309.    B.D. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**27.    John Scott Emidy**

310.    Plaintiff John Scott Emidy is a 24-year old who resides in Cordova, Tennessee.

311.    Emidy was not a regular smoker prior to his introduction to JUUL's products. He occasionally would smoke a cigar (or "cigarillo") in social settings but was not addicted to nicotine by any means. After he started using JUUL's products, Emidy became completely addicted to nicotine and now, as a result, also smokes cigarettes.

312.    Emidy began using JUUL's products in 2018 based on various advertisements and "memes" he saw online, including Reddit posts and other sites, as well as advertisements and displays he saw in person at gas stations.

313.    Prior to purchasing JUUL's products, Emidy saw posters and displays set up at gas stations that he frequented in Tennessee, including some essentially identical to the following:




314.    Emidy also saw viral images and videos on social media that pushed JUUL products as cool or edgy for young persons like himself, including the following images he recalls being widely shared in connection with the "#JUUL" hashtag at the time, which JUUL did nothing to address or correct:





315.    None of the advertisements, in-store promotions, or labels Emidy saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver

nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

316.    Emidy instead developed an addiction to JUUL pods. The advertisements caused Emidy to begin purchasing JUUL pods because they were interesting to him, spawned funny memes and posts, and made it fun, so he started purchasing JUUL pods from "Kangaroo" gas stations near where he lives, and he would vape one to two pods a day on average. After becoming addicted, Emidy found he needed nicotine each day and so he progressed to smoking cigarettes as well, as a result of using JUUL's products.

317.    In addition to the money that Emidy has lost and continues to lose as a result of the addiction to nicotine caused by JUUL's products, he now also has heart problems that did not exist before.

318.    Emidy would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**28.    Joan Eubanks**

319.    Plaintiff Joan Eubanks is a resident of Tucson, Arizona.

320.    Before using JUUL for the first time in January 2016 at the age of fifty-three, Eubanks regularly smoked combustible cigarettes. She had been a smoker for ten years and would typically smoke less than half a pack of cigarettes each day. She initially began using JUUL products with the hope they would help end her addiction to nicotine. Promotional emails and in-store displays failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use. She would not have purchased JUUL products if she had known they delivered more nicotine to the bloodstream than cigarettes.

321.    Eubanks received many promotional emails from JUUL since she began purchasing JUUL products in January 2016. These emails included, among many others, the following.

322.    Eubanks received an email with the below imagery on January 1st, 2016. She recalls the slogan "Smoking Evolved" and various discounts and sales associated with sharing JUUL content across the internet.



323.    On February 12th, 2016, Eubanks received the following email.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



324.   Eubanks further recalls the below imagery in an email she received on March 27th, 2018. å



325.   Eubanks also recalls the following promotional display at her local Walgreens (where she purchased JUUL). She saw the display each time she visited this Walgreens location from July 20th, 2018, up through December 2019, when it was removed. It was, or was substantially similar to, the following:



326.   Eubanks currently consumes around one-half of a JUUL pod each day. She now suffers from constant chest heaviness and congestion, in addition to a periodic severe cough. Her addiction to nicotine has only intensified and she now feels entirely powerless to stop her JUUL use. JUUL is on her mind more than cigarettes ever were.

327.   None of the advertisements, in-store promotions, or labels Eubanks saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

328.     Eubanks would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**29.    Patience Evans**

329.     Plaintiff Patience Evans is an 18-year old who resides in Charleston, West Virginia.

330.     Evans began using JUUL's products in September 2017 after seeing advertisements through social media, online, and hearing about them through a friend. Evans recalls seeing numerous advertisements and influencers on social media promoting JUUL products. Evans frequently saw promotions for JUUL on social media from both JUUL and people in her social network. JUUL was popular among Evans' friends and classmates, which to Evans made JUUL appear to be cool and safe.

331.     Evans began using and purchasing JUUL's products at the age of 14 after Evans and a friend shared a JUUL device in her high school bathroom. At that time, Evans was 14 and did not believe the JUUL product would be addictive. Evans was attracted to JUUL and used the products for the first time because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. These advertisements were displayed on various social media platforms that Evans used.

332.     Prior to using JUUL's products, Evans had never used any nicotine delivery products product and did not know she would become addicted to nicotine products after using JUUL's products.

333.     Prior to purchasing JUUL, Evans viewed the product's label and saw, among other things, statements that JUUL was an "alternative" to smoking.

334.     Based on the advertising of JUUL and her understanding of the products, Evans believed JUUL's products were safe, healthy, and not highly addictive. Additionally,

numerous friends at school were also using JUUL's products which made the products appear to be safe to Evans.

335.    Evans and her classmates adopted JUUL's advertising of the products as cool, trendy, and designed for young people. Evans often saw the products promoted on social media by friends and using the hashtag "#JUUL." This reinforced the perception that JUUL's products were cool and fun. Evans recalls seeing at various times the following images promoting use and abuse of JUUL's products by youth:









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO













SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











336.    Evans purchased JUUL products and pods from gas stations, convenience stores, friends at school, and other distributors such as tobacco shops. Evans continues to purchase JUUL products through these channels today. Evans' favorite JUUL pod flavor was Mango and Fruit Medley. Now Evans purchases Menthol flavored pods for daily consumption. These fruit flavors factors caused Evans to believe that JUUL was safe, even though she was underage. Evans recalls seeing the following ads and in-store displays that that attracted her to JUUL:






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



337.   Evans is addicted to JUUL's products and has been for approximately three years. Evans vapes daily, taking her first puff as soon as he wakes up in the morning. Evans consumes about one JUUL pod per day and suffers from withdrawal-like symptoms, including anger and irritation, when she does not have sufficient nicotine.

338.   None of the advertisements, in-store promotions, or labels that Evans saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

339.   Evans would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**30.   Clark Fish**

340.   Plaintiff Clark Fish is a 20-year old who resides in Nicholasville, Kentucky.

341.   Fish began using JUUL's products in September 2017 after seeing advertisements at gas stations about hearing about JUUL from friends. Fish also frequently saw promotions for JUUL on social media from both JUUL and people in his social

network. JUUL was popular among Fish's friends and classmates, which made JUUL appear to be cool and safe.

342.    Before using JUUL, Fish had only every tried his friends SMOK vape on one occasion in April 2017.

343.    Fish recalls having seen the following advertisements, among others:





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

344.     Based on the advertising of JUUL, Fish believed JUUL's products were safe, healthy, not addictive, and a safer alternative to cigarettes. He was very attracted to the flavors, and did not know JUUL was addictive.

345.     Prior to purchasing JUUL, Fish viewed the product's label and saw, among other things, statements that JUUL was an "alternative" to smoking and had as much nicotine as a package of cigarettes.

346.     Fish purchased JUUL pods from gas stations, including Circle K, located at 100 Bellerive Blvd, Nicholasville, KY 40356, and Valero, located at 1000 S. Main Street, Nicholasville, KY 40356, and other distributors. Fish saw in-store promotions for JUUL that were substantially similar to the below:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






347.    Fish began using and purchasing JUUL at the age of 17. Fish was attracted

to JUUL because of, among other things, the youthful-looking persons in its

advertisements, that it was advertised as a cool part of a fun lifestyle, its stylish design,

and the variety of flavors it came in. Fish's favorite flavors are Mango, Mint, and Fruit

Medley. These factors caused Fish to believe that JUUL was safe, even though she was underage.

348.    None of the advertisements, in-store promotions, or labels Fish saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

349.    Fish would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**31.    <u>Janine Franklin, on behalf of her daughter, J.F., a minor</u>**

350.    Plaintiff Janine Franklin and J.F. are residents of Centennial, Colorado.

351.    Franklin's daughter, J.F., is currently 17 years old and started using JUUL products in 2017 when she was only 15 years old.

352.    J.F. had never smoked cigarettes or tried any other tobacco product before using JUUL.

353.    J.F. first became aware of JUUL in September 2017 when, during her sophomore year at Denver Academy, the vaping epidemic swept through her school. Suddenly, it seemed that about 80% of J.F.'s classmates were JUULing.

354.    Around the same time, J.F. saw JUUL advertising at convenience stores and gas stations near her home, including the following point-of-sale promotions:




355.    J.F. also saw advertisements from JUUL promoting its fruit- and dessert-flavored JUUL pods. She recalls seeing the following images in particular:




356.    None of the advertisements or in-store promotions that J.F. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in, or delivered by, JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in

146

greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions of JUUL's advertisements and in-store promotions materially impacted J.F.'s assessment of, and eventual decision to use, JUUL products.

357.    Unaware that JUUL products contained nicotine and hoping to be "more part of the crowd," J.F. took a few puffs of a friend's JUUL in a school bathroom. She enjoyed the buzz, the flavor, and the feeling of social acceptance that JUULing provided.

358.    J.F.'s boyfriend, who was two years older than J.F., had his own JUUL device. He let J.F. and her best friend "hit" his JUUL several times, assuring them that JUUL products did not contain nicotine. By mid-November 2017, J.F., decided that she wanted a JUUL device of her own, so she purchased a JUUL Starter Pack from an eighteen-year-old senior in her high school.

359.    Once she had a JUUL of her own, J.F. became addicted to JUUL pods. She found that she was JUULing all the time, particularly with her best friend. She also noticed that she was fitting in with more people in her school's ever-growing community of JUUL users.

360.    With steady JUUL use, J.F.'s addiction to nicotine worsened. She discovered that she needed to JUUL even when she was alone. J.F. practiced "ghosting" (i.e., using breath control techniques to JUUL without producing noticeable vapor) so she could JUUL undetected at home, in school, in the car with her parents, etc. Her JUUL pod consumption quickly escalated from 3-4 pods per week to 2-3 pods per day.

361.    To afford the JUUL pods she needed to satisfy her addiction to nicotine, J.F. started to sell her personal possessions. Although she was below the legal age to purchase tobacco products, she, like many of her classmates, was nevertheless able to purchase JUUL pods from the Family Cigarette Grocery Store on Colfax Avenue in Denver.

362.    In February 2018, J.F. realized that JUULing was causing her numerous physical and psychological problems. Her hair was thinning, and she became anxious whenever she didn't have her JUUL with her. J.F. tried to quit vaping and even sold her JUUL, but she quickly succumbed to her addiction and bought another vaping device, a Suorin Air, a few days later. When her Suorin broke, a friend gave her another JUUL.

363.    In April of 2018, Franklin discovered that J.F was vaping and threatened to take away J.F.'s vaping equipment. J.F.'s reaction to the confrontation was so intense that her parents took her to the Children's Hospital Emergency Department. At Children's Hospital, it was recommended that J.F. be admitted for inpatient care and J.F. was transferred by ambulance to the Denver Springs addiction treatment facility in Meridian, Colorado. J.F. was hospitalized at Denver Springs for approximately 10 days. She was then discharged into a partial hospitalization program for roughly another 10 days, followed by approximately 2 weeks in an intensive outpatient program.

364.    While she was hospitalized, J.F. begged to go home so she could get access to her JUUL. According to J.F., she "never felt that terrible in [her] life."

365.    J.F. was prescribed various versions of the drug Wellbutrin to combat her addiction, but to no good effect. She had a bad reaction to at least one version of Wellbutrin, and none of the medications she was prescribed helped with her addiction to nicotine.

366.    Franklin withdrew J.F. from Denver Academy and enrolled her in Girls Athletic Leadership School ("GALS") in the hope that a change of setting would help her make a new start. Unfortunately, when J.F. returned home, she began vaping again, which led to her mother cutting all of J.F.'s contact to her longtime best friend.

367.    Once at GALS, J.F. found that she had not escaped the JUUL epidemic. J.F. estimates that 60-70% of students at GALS vape.

368.    J.F. is still addicted to nicotine. She continues to receive routine counseling treatment and is largely nicotine-free though she has relapsed on numerous occasions.

369.    J.F. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. She also would not have used JUUL's products if they did not come in the candy-like flavors.

**32.    Larry Fox**

370.    Plaintiff Larry Fox is a 17-year old who resides in Bonner Springs, Kansas.

371.    Fox began using JUUL's products in September 2017 after seeing advertisements through social media, online, and hearing about it from friends. Fox frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Fox's friends and classmates, which made JUUL appear to be cool and safe.

372.    Fox never used or tried nicotine before starting with JUUL.

373.    Prior to first purchasing JUUL's products, Fox recalls having seen the following advertisements, among others:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



374.    Based on the advertising of JUUL, Fox believed JUUL's products were safe, healthy, and thought the product merely contained water vapor. He and his friends were unaware that the product contained nicotine or any other chemical additives. Because of JUUL's advertising, Fox did not consider JUUL comparable to cigarettes, and was unaware of any health risks associated with JUULing.

375.    Prior to purchasing JUUL, Fox viewed the product's label.

376.    Fox purchased JUUL pods from a gas station, QuikTrip, located near his home, and other distributors. The location he purchased from is 389 N 130th St, Bonner Springs, Kansas 66013. Fox saw in-store promotions for JUUL that were substantially similar to the below:

 

377.    Fox began using and purchasing JUUL at the age of 14. Fox was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Fox's favorite flavor is mango. Fox and his friends believed the product merely produced water vapor without any added chemicals, let alone a drug like nicotine. His beliefs were based on ads that showed young people having fun with the product and that failed to make any health warnings. These factors caused Fox to believe that JUUL was safe and appropriate for him to use, even though he was underage. Fox recalls seeing the following ads (or substantially similar ones) that attracted him to JUUL:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



378.    None of the advertisements, in-store promotions, or labels Fox saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

379.    Larry Fox's father, David Fox, is a respiratory therapist. David and Larry have been long opposed to the cigarette smoking habit Larry Fox's grandfather maintains. Fox would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Larry Fox was unable to quit using JUUL until August 2019, after his father read him the nicotine and chemical ingredients that were finally added to the product label, and explained that JUUL is "the same thing as Grandpa's cigarettes."

**33.    Isaac Gant**

380.    Plaintiff Isaac Gant is a 23-year old who resides in Overland Park, Kansas.

381.    Gant began using JUUL's products in 2015, while he was 18 years old and still in high school, after hearing about them from friends and based on various advertisements he saw online and in gas stations.

382.    Gant was not a regular smoker prior to his introduction to JUUL's products. He occasionally would smoke a "Black & Mild" cigar in social settings but was not addicted to nicotine. As a result of using JUUL, Gant is now completely addicted to nicotine.

383.    Prior to first purchasing JUUL's products in 2015, Gant saw them promoted in social media popular with his peers, trending with hashtags like "#JUUL." The images and advertisements were appealing because they featured bold coloring, displayed attractive and youthful models, and depicted people laughing and having fun, such as the following he recalls viewing in that time frame:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



















SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





384.    Gant also saw posters and displays set up at gas stations he frequented in Kansas, including some essentially identical to the following:





385.    None of the advertisements, in-store promotions, or labels Gant saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

386.    The advertisements and promotions he viewed caused Gant to begin purchasing JUUL pods in 2015 from gas station displays primarily, at a cost of around $10.00-$15.00 each. He enjoyed them because of the way they tasted, preferring the Cucumber, Mango, and Fruit Medley flavors in particular.

387.    Eventually, Gant became addicted to JUUL pods and he now needs the nicotine in JUUL pods within the first 30-60 minutes of waking each day. Usually, he ends up consuming between half a pod and one full pod each day. Some days, it is up to as much as two full pods.

388.    In addition to the money Gant has lost and continues to lose as a result of his addiction, he has suffered respiratory problems, bouts of anxiety, and coughing fits, not to mention the compulsion to take frequent breaks from his work and everyday life to curb the nicotine cravings he now has.

389.    Gant would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**34.     Bruce Gibson, on behalf of his son, K.G., a minor**

390.    Plaintiff Bruce Gibson and K.G. are residents of Centennial, Colorado.

391.    Gibson's son K.G. began using JUUL in 2016 at the age of fourteen. Gibson and his wife have since taken hundreds of JUUL pods from K.G., most of them already empty.

392.    K.G. spends between $75 and $100 each month on JUUL pods.

393.    K.G. first purchased JUUL products from Amazon. Upon learning this, Gibson reached out to Amazon regarding their age verification process. Amazon directed Gibson to contact JUUL, who told Gibson that their only age verification process operated via the credit card used to make the purchase. K.G. also purchases JUUL products from a local convenience store with lax legal-age enforcement procedures.

394.    At this local convenience store, K.G. recalls promotional material, identical or substantially similar to that below, propagating since JUUL's introduction in 2015:

395.    K.G. recalls an in-store display since 2016, in front of the cashiers' counters, prominently exhibiting JUUL products. The display was next to the lighters and practically impossible to miss.



396.    K.G. recalls an in-store display of readily available JUUL products, appearing in 2016, with an image of a hip and attractive model directly above.



397.    Upon his initial use of JUUL products, K.G. preferred fruit flavored JUUL pods.

398.    K.G. is now addicted to JUUL pods. K.G. desires to curb his JUUL use, but the potency of his nicotine to addiction has rendered him totally powerless in his efforts to do so. He has faced disciplinary action at school resulting from his compulsive JUUL use. Moreover, after finding an empty JUUL pod in K.G.'s backpack, the school decided to contact local police, per their tobacco policy. This resulted in a citation, court appearance, and mandatory community service. K.G.'s JUUL use and resultant nicotine addiction has thus led to severe academic and legal repercussions.

399.    K.G. has seen two counselors to address his JUUL use and compulsions, and their underlying causes, although thus far to minimal effect. Gibson reports that their family has spent thousands of dollars on these counseling efforts. K.G. continues to regularly use JUUL products.

400.    None of the advertisements, in-store promotions, or labels K.G. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

401.    K.G. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**35.    <u>Carlee Goldston</u>**

402.    Plaintiff Carlee Goldston is a 20-year old who resides in Elizabeth City, North Carolina.

403.    Goldston began using JUUL's products in March 2017 after seeing advertisements at gas stations and hearing about it through friends. After she starting using JUUL, Goldston frequently saw TV ads and promotions for JUUL on social media from

both JUUL and people in her social network. JUUL was popular among Goldston's friends and classmates, which made JUUL appear to be cool and safe.

404.    Before using JUUL, Goldston had only ever used a SMOK several times when offered it by a friend in 2016. Otherwise, she had never used nicotine products.

405.    Prior to purchasing JUUL, Goldston viewed the product's label and saw, among other things, statements that JUUL was an "alternative" to smoking. She also Goldston recalls having seen the following advertisements, among others:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



406.    Based on advertising of JUUL as an "alternative" for smokers that she saw, Goldston believed JUUL's products were safe, healthy, not highly addictive, had significantly less nicotine than cigarettes, and would be a safer and less-addictive alternative to cigarettes.

407.    Goldston purchased JUUL pods from gas stations, including Hand-Dee Hugo's at 1012 Halstead Blvd., Elizabeth City, North Carolina 27909, and Discount Tobacco at 900 W. Ehringhaus Street, Suite E, Elizabeth City, North Carolina 27909, and other distributors. Goldston saw in-store promotions for JUUL that were substantially similar to the below:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

408.     Rather than helping to prevent or reduce Goldston's nicotine consumption,

409.     Goldston became addicted to JUUL's products and vapes. From March 2017 until the present, she has used one pod per day on average, and has even used as much as three pods in a single day.

410.     Goldston began using and purchasing JUUL at the age of 17. Goldston was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Goldston's favorite flavors are Mint and Mango. The device became very popular among her friends in part because it was compact and easy to hide. These factors caused Goldston to believe that JUUL was safe, even though she was underage.

411.     He also recalls seeing posts like the following on social media and other places:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



412.    None of the advertisements, in-store promotions, or labels Goldston saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

413.    Goldston would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**36.    Lauren Gregg**

414.    Plaintiff Lauren Gregg is a 19-year-old who resides in Salisbury Mills, New York.

415.    Gregg began using JUUL's products in September 2017 after seeing advertisements through TV and hearing about it from friends. Gregg frequently saw promotions for JUUL on social media from both JUUL and people in her social network. JUUL was popular among Gregg's friends and classmates, which made JUUL appear to be cool and safe. After starting JUUL, she also regularly saw gas station ads.

416.   Prior to using JUUL, Gregg had never smoked cigarettes or used any other nicotine products.

417.   Gregg saw signs and displays like the below:




418.   She is also active on social media, and saw the following advertisements:

a.   Instagram



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





b.  Twitter



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

c.   Facebook



419.    She also saw posts like the below on her social media that used a #JUUL hashtag:







420.   Many of the advertisements Gregg saw focused on the JUUL flavors:

 

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



421.   Based on the advertising of JUUL as an "alternative" for smokers and "smoking evolved", Gregg believed JUUL's products were safe, healthy, not highly addictive, and were a safer and less-addictive alternative to cigarettes.

422.   Prior to purchasing JUUL, Gregg viewed the product's label.

423.   Gregg purchased JUUL from retail locations in Chester, New York and New Windsor, New York beginning in October 2017 through January 2020. She also purchased JUUL online from the JUUL website using her own email address.

424.   Gregg began using and purchasing JUUL at the age of 15. Gregg was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Her favorite flavors are Mango and Cucumber. These factors caused Gregg to believe that JUUL was safe and appropriate for her to use, even though she was underage. JUUL's marketing was the primary reason Gregg started JUUL and popularity among her peers was a much smaller consideration.

425.    None of the advertisements, in-store promotions, or labels Gregg saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

426.    Gregg would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**37.    Dylan Healey**

427.    Plaintiff Dylan Healey is a 23-year-old who resides in Huntington, West Virginia.

428.    He began smoking cigarettes at about age 10 or 11. He typically smoked less than half a pack a day.

429.    Healey first began using JUUL products at age 19, around February 2016. He learned about JUUL from advertisements on television and in gas stations. He decided to start using JUUL because he believed that it was a safer alternative to smoking and a means to quit smoking. Based on the advertisements he had seen, he believed that JUUL was safer and less addictive than cigarettes.

430.    He primarily purchased JUUL products at the convenience stores Circle K and Sheetz. He typically paid between $14 and $16 for a pack of JUUL pods. He saw advertisements at the checkout counter at these stores.

431.    He also saw advertisements on Facebook and YouTube.

432.    He recalls seeing the following or substantially similar advertisements, labels, and social media posts:






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO










SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO














SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO























SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



433.    When Healey began JUULing, his preferred flavors were Tobacco and Crème Brulee.

434.    He increased his nicotine consumption significantly when JUULing. He typically consumed between one and two JUUL pods per day. The most he consumed in a single day was between two and three pods.

435.    When he was JUULing, he first used his JUUL within 5 minutes of waking. JUULing was on his mind more than cigarettes ever were.

436.    He tried to quit JUUL four times, but he was successful only on the fourth try.

437.    He has returned to smoking cigarettes and now smokes less than half a pack a day.

438.    He experiences headaches and respiratory/lung problems that he believes are related to his JUUL use.

439.    None of the advertisements, in-store promotions, or labels Healey saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL
products poses significant health risks.

440.    Healey would not have purchased or started using JUUL's products if he
had been adequately warned about the nicotine content, that it delivered even more
nicotine than cigarettes, risks of addiction, and other health risks.

**38.    Jordan Heitmann**

441.    Plaintiff Jordan Heitmann is a 20-year old who resides in Sullivan,
Missouri.

442.    Heitmann began using JUUL's products in 2016, when he was 17 years old
and still in high school, after hearing about them from friends and based on various
advertisements he saw online and in gas stations.

443.    Heitmann never smoked before using JUUL's products, but he has since
become addicted to nicotine and now smokes cigarettes and chews tobacco along with
vaping on a daily basis.

444.    Prior to first purchasing JUUL's products in 2016, Heitmann saw them
promoted in social media and other online sites popular with his peers, such as YouTube,
Facebook, and in pop-up ads that made them seem trendy, including the following that he
recalls:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



445.   Heitmann also saw posters and displays set up at gas stations he frequented in Missouri, including some essentially identical to the following:

   

446.   None of the advertisements, in-store promotions, or labels Heitmann saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

447.    The advertisements and promotions Heitmann viewed cause him to begin purchasing JUUL pods in 2016 from his friends and gas station displays.

448.    He enjoyed vaping also because of the way JUUL's products tasted, preferring the Mint, Cucumber, and Mango flavors. In particular, he saw multiple ads promoting the Mango flavor without clearly disclosing its nicotine content or addiction warnings:

 

449.    Eventually Heitmann became addicted to JUUL pods. Now he needs the nicotine in JUUL pods within the first hour of waking each day and usually ends up consuming between half a pod and one full pod per day. Some days it is up to as much as two full pods. On the occasions when he does not have his JUUL device or he runs out of pods, Heitmann resorts to other sources of nicotine, such as chewing tobacco, smoking Marlboro cigarettes, or using other vaping devices.

450.    In addition to the money Heitmann has lost and continues to lose as a result of his addiction, he has suffered physical and mental changes, including substantial weight loss. He also now suffers from breathing problems, lack of attention, and irritability.

451.   Heitmann would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**39.   <u>Madison Hellman</u>**

452.   Plaintiff Madison Hellman ("Hellman") is a resident of New Hope, Pennsylvania but lived in Robbinsville, New Jersey until July 2018. Hellman's initial purchases and JUUL use took place in and around Robbinsville, New Jersey.

453.   Hellman is currently 19 years old. She started using JUUL products in March of 2017 when she was just 16.

454.   Hellman was not a smoker or user of nicotine products before she tried JUUL.

455.   Hellman learned about JUUL from her older brother, who started using JUUL in 2016, and from JUUL point-of-sale promotions.

456.   Before using a JUUL for the first time, Hellman saw and relied on JUUL signs and product displays in local gas stations, including the promotions pictured below.




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

457.     None of the signs, product displays, or product labels Hellman saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products pose significant health risks. Nor did they indicate that JUUL was an age-restricted product.

458.     Hellman tried JUUL for the first time when her brother let her take a puff from his JUUL device. Hellman liked the way JUUL tasted and the nicotine buzz it provided.

459.     Because many of her friends and her brother's friends were JUULing, Hellman felt social pressure to follow the crowd. As a result of this combination of factors, Hellman became a habitual JUUL user and quickly developed an addiction to nicotine.

460.     Hellman and her friends were active on social media, where Hellman saw posts from her friends and her brother's friends that encouraged adolescent use of JUUL products and promoted using JUUL products at school. This online content reinforced Hellman's belief that JUUL was a harmless product made for teenagers. Hellman even posted pictures of herself using JUUL, mimicking what she had seen other kids doing on social media.

461.     All of Hellman's friends in New Jersey were JUUL users. Although many of them were below the legal age to purchase JUUL products, they easily purchased JUUL pods from local gas stations and other students at Hellman's school.

462.     Now 19 years old, Hellman's spending on JUUL pods and JUUL devices has totaled at least $2000, some of which she earned herself and some of which her mother provided through gifts of money, not realizing that she was funding Hellman's addiction.

463.    Hellman's mother, Jennifer Hellman, has spent in excess of $7,000 in her efforts to help Hellman with behavioral issues that appeared when she began JUULing.

464.    In 2018, Hellman's family moved to Pennsylvania seeking a new start, only to find that JUUL abuse was just as common in Hellman's new high school.

465.    Hellman's mother had taught her and her brother that smoking was dangerous, but she did not know to warn them about JUUL until it was too late. Similarly, schools had educated Hellman and her brother about tobacco though the DARE program, but never addressed JUUL use.

466.    Hellman has tried repeatedly to quit using JUUL but has been unable to do so.

467.    Hellman's current consumption of nicotine is consistent and frequent. Her nicotine addiction is currently so severe that, when she cannot access JUUL, she turns to combustible cigarettes.

468.    Hellman would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risk of addiction, and other health risks JUUL poses. She also would not have used JUUL's products if they did not come in sweet and fruity flavors.

**40.    John Hollis**

469.    Plaintiff John Hollis is a 69-year-old resident of Sellersberg, Indiana.

470.    Hollis had been consuming nearly a full pack of cigarettes per day prior to using JUUL products. Hollis began using JUUL products in 2018.

471.    Based on various advertisements of JUUL's products that he saw and relied on, Hollis purchased a JUUL to help him quit smoking and as a healthy alternative to smoking.

472.    Hollis saw JUUL advertisements on social media and point of sale displays containing statements that JUUL is an "alternative" to cigarettes. These ads were very influential in his decision to purchase JUUL products. At sale displays, Hollis saw the following ad:



473.    Hollis saw JUUL advertisements containing statements that JUUL is "smoking evolved." These ads were influential in his decision to purchase JUUL products. At sale displays, Hollis saw the following ad:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



474.    Hollis saw JUUL advertisements containing statements that cigarette smokers should "switch" from cigarettes to JUUL. These ads were the most important factor in his decision to purchase JUUL products. At sale displays, Hollis saw the following ad:



475.    Hollis saw advertisements and promotions at gas stations where he purchased JUUL products that highlighted flavors and switching away from cigarette use while concealing JUUL's addictiveness, including the following:



476.    These advertisements display various flavors and use enticing color schemes while failing to adequately warn about JUULs addictiveness and potential adverse health consequences.

477.    Hollis interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him stop smoking. None of the advertisements, in-store promotions, or labels Hollis saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

478.    Hollis personally made purchases of JUUL products from brick-and-mortar stores, including Shell gas station, Clarksville Peddler's Mall and Smoke Shop.

479.    Hollis has become addicted to JUUL pods. He consumes nearly a full pod per day and has consumed as many as three in a single day on previous occasions. He

begins using his JUUL daily within half an hour of waking and feels strongly that he is more addicted to JUUL pods than he ever was to cigarettes.

480.    Hollis continues to use cigarettes daily.

481.    Hollis coughs more since using JUUL than he ever had due to cigarettes. He has also suffered from a general decline in health since beginning to use JUUL pods.

482.    Had Hollis known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Hollis is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**41.    Coleman Holnicker**

483.    Plaintiff Coleman Holnicker is a 29-year old, who resides in Seattle, Washington.  He was previous a resident of Timonium, Maryland, when he purchased and began using JUUL.

484.    Holnicker had been smoking between one half and one full pack of cigarettes per day before using JUUL products. He began using JUUL pods in 2018.

485.    Based on various advertisements of JUUL's products that he saw and relied on, Holnicker purchased a JUUL device to help him quit smoking and as a healthy alternative to smoking.

486.    Holnicker saw JUUL advertisements on social media and point-of-sale displays containing statements that JUUL is an "alternative" to cigarettes. These ads were very influential in his decision to purchase JUUL. At sale displays, Holnicker saw the following ad:



487.    On Facebook, Holnicker was exposed to the following ads:





488.    These ads emphasized exotic flavors and encouraged Holnicker to switch to JUUL from cigarettes. Holnicker interpreted the ads he had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping him to stop smoking.  None of the advertisements, in-store promotions, or labels Holnicker saw adequately disclosed the nature or addition risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

489.    Holnicker personally purchased JUUL products from brick-and-mortar retail stores, including: 7-Eleven, Towson, MD; 7-Eleven, Portland, OR; RiteAid, Timonium, MD; RiteAid, Baltimore, MD; Plaid Pantry, Portland, OR; and Amaan Petro,

Inc., Portland, OR. He also purchased JUUL products directly from JUUL Labs, Inc., online.

490.     In 2018, Holnicker visited the JUUL website. Despite no signing up for a subscription, he began first receiving multiple promotional emails from JUUL after registering his device on JUUL's website.

491.     Holnicker has become addicted to JUUL pods.  He consumes about two pods every day and begins using his JUUL within five minutes of waking. He feels that JUUL pods are "absolutely" on his mind more than cigarettes, and that the JUUL had become "another addiction."

492.     Holnicker continues to smoke cigarettes.

493.     Holnicker suffers from asthma. Prior to using JUUL, Holnicker had moderate asthma attacks. After he started using JUUL, his attacks were more frequent.

494.     Since beginning to use JUUL, Holnicker uses his inhaler with greater frequency to control his breathing and was once hospitalized because he could not breathe. JUUL also causes his heart to race and has intensified his coughing. Despite these symptoms, Holnicker has been unable to quit JUUL pods.

495.     Holnicker believed the JUUL would help him quit smoking cigarettes. The advertisements he saw did not reveal that JUUL pods deliver a higher concentration of nicotine than cigarettes and e-cigarettes or that they deliver nicotine to the bloodstream more quickly.

496.     Prior to consuming JUUL pods, Holnicker was not aware of the actual amount or potency of nicotine that JUUL products would deliver into his body or that the product was developed to maximize the effects on him or the nicotine it contained. He did see JUUL's product label on its packaging and the representation there of "5% strength" and thought that it meant 5% nicotine content. He also saw JUUL's statement that a JUUL pod is equivalent to a pack of cigarettes and understood that to mean "equivalent nicotine

content." He also saw JUUL's representation that "1 JUUL POD = 1 pack of cigarettes" and an "alternative for adult smokers" and believed those to mean that JUUL is a less addictive alternative to cigarettes.

497.    Had Holnicker known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Holnicker is interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**42.    Jenika Ingram**

498.    Plaintiff Jenika Ingram is a resident of Louisville, Mississippi.

499.    Before using JUUL for the first time in 2016, at the age of 34, Ingram was an e-cigarette user, having stopped smoking combustible cigarettes in 2012. Prior to that, she had been a smoker for roughly ten years.

500.    Ingram typically purchased her e-cigarettes from local convenience stores and gas stations, such as Murphy USA. Shortly after JUUL's introduction in 2015, Mississippi vendors began to carry JUUL products, and often displayed prominent promotional imagery both inside and outside of shops. Such promotional imagery failed to disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

501.    Among the promotional imagery displayed at Ingram's typical e-cigarette vendors:



502.    In-store display, in front of the cashier's counter and next to the lighters, prominently exhibited JUUL products.

503.    Outside-of-store display, prominently featuring a variety of JUUL pod flavors. Each flavor has its own distinct illustration and color palette. Ingram's favorite, Classic Menthol, sits to the far left in the top row. The display was, or was substantially similar to, the following:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



504.   Gas-station display, advertising JUUL availability directly beneath the price of gasoline. This display was, or was substantially similar to, the following:



505.   When Ingram first encountered JUUL advertisements, she was struck by the flashy imagery and prominent arrangements, compared to other cigarette and e-

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

cigarette products. For a long-time smoker such as Ingram, cigarette and e-cigarette vendors were institutions, of sorts, in her life. When these locations began to feature JUUL advertisements, Ingram felt a sense of trust in their judgement. She did not research JUUL products further after seeing the displays, since they exhibited no warnings as to JUUL's exceptionally high nicotine concentration, nor the risk of further addiction. She began to purchase JUUL products soon after being exposed to the in-store advertisements.

506.    By the time JUUL products began to be sold in Mississippi in 2016, Ingram had been an e-cigarette user for around four years. Having successfully quit cigarettes, she now hoped to eliminate her nicotine consumption altogether. Indeed, she initially purchased JUUL products under the impression they would facilitate her transition away from nicotine products. She would not have purchased JUUL products had she known they delivered more nicotine to the bloodstream than cigarettes or other e-cigarettes.

507.    At the peak of her use, in or around Fall 2016, Ingram would consume more than two JUUL pods each day. The 5% strength label suggested to her that JUUL contained substantially less nicotine than cigarettes or other e-cigarettes. Ingram did not know that a single JUUL pod delivered more nicotine to the bloodstream than an entire pack of cigarettes. As a matter of fact, assuming an average consumption rate of two JUUL pods per day, Ingram consumed over four times as much nicotine when using JUUL as she had when smoking cigarettes. As a smoker, she had rarely, if ever, gone through more than half a pack a day. As a JUUL user, Ingram once went through three JUUL pods in a single day.

508.    After using JUUL for some time, Ingram began to receive promotional emails, such as the one below. It was hard enough to avoid JUUL branding in her material life; JUUL had now encroached upon her digital life as well. JUUL was now on her mind more than cigarettes ever were, sending messages that were, or were substantially similar to, the following:



509.    In 2017, health complications, arising from her cigarette and e-cigarette use, forced Ingram to stop using JUUL and other nicotine products. Far from aiding in this process, Ingram's JUUL use only intensified an already daunting challenge. Ingram had experienced no respiratory problems prior to her JUUL use. She now receives Social Security disability benefits due to breathing complications, and she has a recent growth on the right side of her neck, which she also understands to have resulted from her cigarette and e-cigarette use.

510.    None of the advertisements, in-store promotions, or labels Ingram saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine

more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Ingram would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**43.**   **Chris Ippoliti**

511.   Plaintiff Chris Ippoliti is a 21-year old who resides in Marlton, New Jersey.

512.   Ippoliti began using JUUL's products in January 2017 after seeing advertisements through social media, at gas stations, and hearing about it through friends. Ippoliti frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Ippoliti's friends and classmates, which made JUUL appear to be cool and safe.

513.   Ippoliti never used nicotine before trying JUUL.

514.   Prior to first purchasing JUUL's products, Ippoliti recalls having seen the following advertisements, among others:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





515. Based on the advertising of JUUL, Ippoliti believed JUUL's products were

safe, harmless, and not addictive. Although he had heard from a friend that the JUUL was

"addictive," he thought his friend was describing its appealing flavor and desirability. He was not aware the product contained nicotine. He did not realize that addiction and other health harms were associated with JUUL until he experienced the effects himself.

516.    Prior to purchasing JUUL, Ippoliti viewed the product's label.

517.    Ippoliti purchased JUUL pods from a gas station, Exxon Mobile, at 1823 Marlton Pike East, Cherry Hill, New Jersey 08003. Ippoliti saw in-store promotions for JUUL that were substantially similar to the below:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

518.    Rather than reducing Ippoliti's nicotine consumption or preventing him from trying cigarettes, Ippoliti became addicted to JUUL's products and vapes. From January 2017 until September 2019, Ippoliti used 1 to 2 JUULpods per day. JUUL also led him to use a Box Mod Vape daily from Febuary 2017 until April 2018.

519.    Ippoliti began using and purchasing JUUL at the age of 17. Ippoliti was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Ippoliti was particularly attracted to ads promoting the mango flavor. These factors caused Ippoliti to believe that JUUL was safe, even though he was underage. Ippoliti recalls seeing the following ads that attracted him to JUUL:



229








520.    None of the advertisements, in-store promotions, or labels Ippoliti

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

521.    Ippoliti would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**44.    Adam Jenkins, on behalf of his son, M.R.J., a minor**

522.    Plaintiff Adam Jenkins and M.R.J. are residents of Oxford, Mississippi.

523.    Jenkins's son, M.R.J., is currently 15 years old and started using JUUL's products in 2018 when he was only 13 years old.

524.    M.R.J. never tried smoking cigarettes before using JUUL's products.

525.    M.R.J. learned about JUUL at school from his friends and by viewing advertisements online and through social media. The advertisements he recalls viewing in particular include the following image:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

526.    The kids at M.R.J.'s school picked up on JUUL's advertising and often promoted JUUL's products themselves by posting about the products on social media or sharing viral images and posts in connection with the #JUUL hashtag. M.R.J. remembers seeing the following images geared towards kids:




527.    Advertisements from JUUL pushing candy-like flavors were also seen by M.R.J., and he recalls seeing the following images in particular.





528.    All the JUUL advertisements and social media influence caused M.R.J. to begin vaping and, despite being underage, he was able to purchase JUUL pods from convenience stores and vape shops in Oxford, Mississippi, as well as from classmates who were able to obtain the products. The posters and in-store displays also failed to adequately inform him of the content of JUUL's products or that they delivered more nicotine than cigarettes, and were presented in attractive ways that looked essentially identical to the following:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

529.   None of the advertisements, in-store promotions, or labels M.R.J. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in greater quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

530.   M.R.J. became addicted to JUUL pods. Currently he has to start vaping within 30 minutes of rising in the morning and consumes a little less than half a JUUL pod per day. His preferred flavors are Mint, Crème Brulee, Mango, and Fruit Medley.

531.   The addiction to JUUL's product has cost M.R.J. and his family significant amounts of money spent on purchasing JUUL pods to date.

532.   M.R.J. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.

45.     **Adam Jenkins, on behalf of his daughter, D.L.J., a minor**

533.    Plaintiff Adam Jenkins and D.L.J. are residents of Oxford, Mississippi.

534.    Jenkins's daughter, D.L.J., is currently 17 years old and started using JUUL's products in 2018 when she was only 15 years old.

535.    D.L.J. never tried smoking cigarettes before using JUUL's products.

536.    D.L.J. learned about JUUL at school from her friends and by viewing advertisements online and through social media. The advertisements she recalls viewing in particular include the following:



537.    The kids at D.L.J.'s school picked up on JUUL's advertising and often promoted JUUL's products themselves by posting about the products on social media or sharing viral images and posts in connection with the "#JUUL" hashtag. D.L.J. remembers seeing the following images promoting use of JUUL's products by young persons:






538.    Advertisements from JUUL pushing candy-like flavors were also seen by

D.L.J., and she recalls seeing the following images in particular:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

539.    All the JUUL advertisements and social media influence caused D.L.J. to begin vaping and, despite being underage, she was able to purchase JUUL pods from convenience stores and vape shops in Oxford, Mississippi, as well as from classmates who were able to obtain the products. The posters and in-store displays she saw looked essentially identical to the following:



          

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

540.    None of the advertisements, in-store promotions, or labels D.L.J. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in greater quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

541.    D.L.J. became addicted to JUUL pods. Currently she has to start vaping within 5 minutes of rising in the morning and consumes between one-half and a full pod each day. Her preferred flavors are Mint, Menthol, and Mango.

542.    The addiction to JUUL's product has cost D.L.J. and her family significant amounts of money spent on purchasing JUUL pods to date.

543.    D. L J. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. She also would not have used JUUL's products if they did not come in the candy-like flavors.

**46.    <u>Pamela Keen</u>**

544.    Plaintiff Pamela Keen is a resident of Crowley, Texas.

545.    Keen began using JUUL products in September 2017.

546.    Keen first learned about JUUL from her stepson. She later saw JUUL advertisements at Racetrac stores and decided to buy a JUUL device because of the appealing, exotic flavors. Keen would not have purchased a JUUL device if JUUL had not promoted flavored JUUL pods, such as Mango and Crème Brulée.

547.    Keen frequently purchased JUUL products from Racetrac stores throughout Texas. Keen recalls viewing promotional materials for JUUL in Racetrac stores in Crowley and throughout Texas in 2017 that were, or were substantially similar to, the following:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



548.     Keen also viewed JUUL advertising material on Facebook in 2017. Keen viewed advertisements promoting Mango JUUL pods that were, or were substantially similar to, the following:






549. At the height of Keen's JUUL use, she consumed at least one JUUL pod every three days.

550. Prior to using JUUL, Keen smoked about 10 to 20 cigarettes a day. Keen continued to smoke cigarettes while using JUUL, as her addiction to nicotine intensified.

551. Keen stopped using JUUL in September 2018. But she now smokes over 20 cigarettes a day, as she is more addicted to nicotine than before she started using JUUL products.

552. Keen's JUUL use has exacerbated her asthma and resulted in respiratory infections.

553. None of the advertisements or labels Keen saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

554. Keen would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

47.     **Janis Kelly, on behalf of her son, C.J.W., a minor**

555.    Plaintiff Janis Kelly and C.J.W. are residents of Rock Valley, Iowa.

556.    Kelly's son, C.J.W., is currently 18 years old and started using JUUL's products in 2018 at 16 years old.

557.    C.J.W. never tried smoking cigarettes before using JUUL's products.

558.    C.J.W. learned about JUUL at school from his friends and by viewing advertisements online and through social media. On Twitter, C.J.W. saw the following advertisement:



559.    C.J.W. recalls seeing user-generated JUUL content on social media that used the #JUUL hashtag. C.J.W. remembers seeing the following images geared towards kids:

 

560.    C.J.W. also saw advertisements from JUUL pushing candy-like flavors. He recalls seeing the following image in particular:



561.    The JUUL advertising that C.J.W. saw was very influential in his decision to purchase JUUL products because he thought JUUL products were "cool" after he saw the JUUL advertising. Specifically, JUUL advertising and marketing on official JUUL social media posts (Twitter, Instagram, Facebook, etc.) and in-store displays and signs influenced him to purchase JUUL products, especially JUUL ads containing youthful looking models and depictions of JUUL-flavored pods.

562.    None of the advertisements or labels C.J.W. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered

243

by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

563.    All of the JUUL advertisements and social media influence caused C.J.W. to begin vaping and, despite being underage, he was able to purchase JUUL pods from classmates who were able to obtain the products. He also directly purchased JUUL products himself for his own personal use from retail establishments, including JJ's Valley Mart and Casey's General Store.

564.    C.J.W. became addicted to JUUL pods. Currently he has to start vaping within 30 to 60 minutes of rising in the morning and consumes between half a JUUL pod and a full JUUL pod per day. His preferred flavors are Mint, Cucumber, and Mango. Additionally, C.J.W. uses LEAP vaping devices.

565.    C.J.W's addiction has been a burden on his personal life. For instance, he was suspended from school wrestling matches and tournaments for character misconduct after school officials discovered JUUL pods in his locker.

566.    C.J.W. suffered from severe lack of appetite as a result of his JUUL use and addiction to nicotine. He later developed pancreatitis. His physician cited his low body weight as a cause. C.J.W. regularly visits a gastroenterologist to evaluate his weight.

567.    C.J.W. also developed a large lesion in his mouth on the inside of his left cheek as a result of using JUUL. Kelly had to take his son to an oral surgeon to have the lesion evaluated.

568.    The addiction to JUUL's product has also cost C.J.W. and his family significant amounts of money spent on purchasing JUUL pods to date.

569.     Kelly attempted to wean her son off of JUUL by purchasing him nicotine gum for a period of approximately 4 months in 2019. However, C.J.W was not able to quit his JUUL use.

570.     C.J.W. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.

**48.     <u>Shannon Kinnard</u>**

571.     Plaintiff Shannon Kinnard is a 37-year-old resident of Albuquerque, New Mexico.

572.     Kinnard smoked between half of a pack to a full pack of cigarettes per day prior to using JUUL.

573.     Based on various advertisements of JUUL's products that she saw and relied on, Kinnard purchased a JUUL to help her quit smoking and as a healthy alternative to smoking. Kinnard encountered radio as well as Twitter and Facebook ads and point-of-sale displays that depicted JUUL e-cigarettes as a smoking-cessation device, such as the following advertisements:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



574.    The JUUL advertisements she saw containing statements that JUUL is an "alternative" to cigarettes were the most important factor in her decision to purchase JUUL productions.



575.     The JUUl advertisements she saw containing statements that cigarette smokers should "switch" from cigarettes to JUUL, as forth above, were very influential in her decision to purchase JUUL productions.

576.     Kinnard saw JUUL advertisements containing statements that JUUL is "smoking evolved."  These ads were very influential in her decision to purchase JUUL products.  At sale displays, Hollis saw the following ad:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

577.     Kinnard interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Kinnard saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

578.     Kinnard instead developed an addiction to JUUL pods. Kinnard regularly used JUUL within an hour of waking and consumed between half of a JUUL pod and one JUUL pod per day.

579.     Kinnard personally made purchases of JUUL products from brick-and-mortar stores, including Walgreens, Circle K gas station, Tobacco Town, and 7-Eleven.

580.     Kinnard experienced high blood pressure while using JUUL. Kinard had suffered pregnancy complications as a result of her JUUL use.

581.     Upon learning of JUUL's harmful effects, Kinnard has subsequently stopped JUULing, but only by going back to smoking combustible cigarettes and other vaping devices.

582.     Had Kinard known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Kinnard is still interested in products that would help her stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

**49.     Tyler Krauel**

583.     Plaintiff Tyler Krauel is a 20-year old who resides in St. Pete Beach, Florida.

584.    Prior to using JUUL's products for the first time in 2015, Krauel never smoked or used any nicotine-containing products. After starting to use JUUL, however, he also began smoking up to 10 cigarettes a day.

585.    While still in high school, he was first introduced to JUUL by friends talking about how amazing the flavors were and by seeing JUUL's online ads in 2015-2016, including on Instagram, Facebook, and YouTube. Some of the ads and promotions he recalls seeing include:

 

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO








586.    Those promotions made it seem to Krauel that using JUUL's products was harmless and the "cool" new thing to do. The advertisements failed to warn of addiction and, if they did, failed to make it bold and noticeable to a viewer. Certainly, none of the advertisements warned Krauel that JUUL's products delivered more nicotine into the blood stream than cigarettes and did so more efficiently.

587.    In addition to JUUL's advertisements, Krauel saw user-generated content on social media that was shared with the "#JUUL" hashtag promoting use and abuse of JUUL by young persons using memes or images of others vaping, such as the following that Krauel recalls:







588.    Relying on the advertisements and believing JUUL's products were widely accepted and trendy, Krauel bought a device and eventually started purchasing JUUL pods himself from various convenience stores and smoke shops in his area (including Farm Stores). The in-store signs, displays, and advertisements Krauel recalls viewing include some essentially identical to the following:

251

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO










589.    None of the advertisements, in-store promotions, or labels Krauel saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

590.    Krauel paid anywhere from $20.00 to $25.00 for JUUL pods. His favorite flavors were Mango and Fruit Medley, but he later switched to Mint. The flavors were a big factor in Krauel using JUUL's products.

591.    Krauel became addicted to JUUL pods and felt a need for it within five minutes of waking each morning. He typically would go on to consume between one and two JUUL pods each day. Krauel struggled to quit using JUUL and was finally successful in late 2019.

592.    In addition to the money spent on JUUL's products, Krauel has experienced health problems that did not exist before. He has asthma, is fatigued easily, and gets stomach aches when JUULing.

593.    Krauel would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. He also would not have started using if there had not been candy-like flavors available.

**50.    Tracie Kugler, on behalf of her son, Z.K, a minor**

594.    Kugler and Z.K. are residents of Illinois.

595.    Z.K., Kugler's son, is 17 years old.

596.    Z.K. is addicted to JUUL. Z.K. started at age 14 in 2017.

597.    Z.K. had never tried a cigarette before trying JUUL.

598.    JUUL's marketing campaigns, including official JUUL social media posts and Celebrity/Influencer endorsements, were very influential in Z.K.'s decision to purchase JUUL, especially ads containing youthful looking models, depictions of social events/parties, depictions of JUUL flavored pods, and depictions of JUUL's party mode.

599.    Z.K. saw JUUL ads on Facebook advertising JUUL's newest flavor, Mango. He saw this ad in early 2017 before he started smoking JUUL:



600.    When Z.K. first tried JUUL, it was clear to him that he only liked flavored JUUL pods, including Mango.

601.    Z.K. avoids Tobacco and Menthol JUUL pods, finding them "disgusting."

602.    Z.K. became addicted to JUUL in 2017 and was caught using JUUL at school multiple times in the past several years.

603.    Z.K. purchased JUUL pods on a regular basis through other people who obtained them from gas stations, online, or retailers.

604.    Z.K. personally purchased JUUL products from brick-and-mortar smoke shops, including True Discount Smoke Shop and Smoke Shop Guys, as well as directly from JUUL Labs Inc., online.

605.    Z.K. had seen JUUL's packaging and advertisements in gas stations and on social media. He did see the 5% nicotine strength as well.

606.    None of the advertisements, in-store promotions, or labels Z.K. saw, including the ones below, adequately disclosed the nature or addiction risks of JUUL's

products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.



607.    Z.K. was caught using JUUL three times in school. He performed poorly in school due to his addiction and had to be put in a drug rehab program mandated by the school.

608.    Z.K. was also caught using JUUL in a summer school program, after which he was placed in an out-patient rehab facility in Illinois that cost at least $4,000 and therapy that cost $160 per session with approximately 25 visits. Z.K. continued to use JUUL through the program due to his addiction.

609.    Z.K.'s mood changed significantly, and his nicotine addiction has contributed to anxiety and depression.

610.    Z.K.'s addiction has contributed to negative impacts on his health, and conflicts with parents and others. Z.K. has been diagnosed with Adjustment Disorder, Anxiety, Nicotine Use Disorder, Severe, Unspecified Depressive Disorder, and Generalized Anxiety Disorder.

611.    Due to his nicotine addiction, Z.K. spent the summer of 2019 at an intensive camp in Colorado for recovering young people. He spent a total of 82 days in the program. The cost of various associated tests and transportation for Z.K. and family members cost Kugler approximately $70,000.

612.    Z.K. is currently attending a boarding school in Utah designed for young people in recovery where he will remain until he begins his senior year of high school. Z.K. entered the boarding school in August of 2019 and plans to leave in May of 2020. Kugler pays $13,000 per month for Z.K. to attend this boarding school.

613.    Z.K. would never have used JUUL had it not been for the flavors. He never would have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**51.    Kacie Ann Lagun (née Durham)**

614.    Plaintiff Kacie Ann Lagun (née Durham) is a resident of Pennsylvania who began JUULing in 2016 at the age of 23.

615.    Lagun is a U.S. Army veteran and health sciences student.

616.    Based on various advertisements of JUUL's products that she saw and relied on, Lagun purchased a JUUL at a store in Pennsylvania to help her quit smoking and as a healthy alternative to smoking.

617. Lagun saw JUUL advertisements when she went to purchase cigarettes. These ads included discounts and advertised to "switch" to JUUL, as well as the slogan "smoking evolved." She also saw point of sale displays for JUUL, presenting a variety of flavors, each with its own bright primary color. She further remembers seeing discount offers, and sought out shops that offered such discounts. Ads that she remembers seeing include those shown below:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

  



618.   Friends forwarded links to JUUL's website to Lagun on Facebook, touting JUUL as a safe alternative to smoking, and telling her to "switch to JUUL." On Defendant's web site, she saw the JUUL as a sleek, portable device with a variety of appealing flavors, particularly Mint. The devices were advertised using bright, primary colors in ads such as the one below:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



619.    Lagun also saw multiple advertisements from JUUL's Vaporized! Campaign in magazines. As with JUUL's website, she thought the colorful ads were very attractive, and made JUUL look like a fun, youthful activity. Among the Vaporized! Ads that Lagun remembers seeing in magazines are those below:







620.    None of the advertisements, in-store promotions, or labels Lagun

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL

products poses significant health risks.

621.    Lagun instead developed an addiction to JUUL pods and found herself

vaping 2-3 JUUL pods per day. She has subsequently stopped JUULing, but only by going

back to smoking combustible cigarettes.

622.    Had Lagun known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. Lagun is still interested in products that would help her stop smoking, and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

**52.    <u>David Langan</u>**

623.    Plaintiff David Langan is a resident of Massachusetts.

624.    Langan, who is now 24 years old, bought his first JUUL from a friend. Langan had been smoking 4-5 years before he purchased his first JUUL and had unsuccessfully tried to quit a few times. He particularly wanted to quit smoking because he had a child on the way, and did not want to smoke around his pregnant wife or infant.

625.    He felt like he had almost quit cigarettes when a friend introduced him to JUUL pods in or about March 2017. Shortly afterwards, he purchased his JUUL.

626.    Langan had seen ads from JUUL's "Switch" campaign prior to his purchase.  He also remembers seeing the slogan "Smoking Evolved." The following are advertisements he recalls seeing:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



627.    Langan remembers JUUL coming out of nowhere, and suddenly being everywhere, both in social media ads, gas station/point of sale ads and displays, and being used by friends, as well as many high school students in his neighborhood. He remembers JUUL advertising being so widespread it became part of the subconscious backdrop of his everyday life. The types of gas station/point of sale ads and displays he recalls were essentially identical to the following:





 

628. At the time of his early JUUL purchases, Langan was active on Instagram and Facebook. He viewed Instagram "Switch" clips where JUUL users talked about their experiences switching to JUUL. Some of the other "switch" ads he saw promoted on social media included the following:



629. Langan's first store purchase of JUUL pods was a pack of the Cool Mint flavored pods, which was triggered by a poster advertising the Cool Mint flavor at his local gas station. Langan saw advertising materials describing the fruity and menthol

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

flavors of JUUL pods, which influenced his purchase. Langan favors Menthol JUUL pods, and has also purchased Mango-flavored and Cool Mint JUUL pods that were advertised. Some of the flavor-themed advertisements he recalls viewing include the following:











630.    Langan also received ads promoting JUUL from his local smoke shop, in the form of text messages.

631.    None of the advertisements, in-store promotions, or labels Langan saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

632.    Subsequently, he found that his nicotine addition increased significantly and he became addicted to JUUL pods. When Langan lost his first JUUL, he could not go without one, so he bought a replacement. Langan also found that if he did not have a working JUUL on him, he felt compelled to ask for cigarettes from smokers around him.

633.    Langan would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**53.    Lucas Lawless**

634.    Lucas Lawless is an 18-year-old resident of Whitewater, Montana.

635.    Lawless began using JUUL in 2019 at age 17.

636.    Based on various advertisements of JUUL's products that he saw and relied on, Lawless purchased a JUUL as a safe alternative to smoking as well as to help manage his anxiety. He saw point-of-sale displays and social media advertisements such as the following:






637.    Lawless interpreted the ads he had seen as indicating that JUUL was safer than cigarettes, and made him much mor likely to use JUUL than cigarettes.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

638.     A big motivation for Lawless to begin using JUUL was the young and cool way in which JUUL advertisements portrayed the product. Lawless found that social media influencers were using JUUL particularly appealing, and he liked the fact that people in the advertisements looked like him.

639.     Before buying JUUL, Lawless saw the product label.  Friends and other people had told him that a JUULpod was the same as a pack of cigarettes.

640.     None of the advertisements, in-store promotions, or labels Lawless saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

641.     Lawless developed an addiction to JUUL pods. He consumes less than half of a JUUL pod per day, totaling approximately 2 to 3 JUUL pods per week.

642.     JUUL is frequently on Lawless's mind. He often plans his day around his next opportunity to vape and he begins consuming JUUL pods within 5 minutes after waking each day.

643.     Lawless's preferred JUUL pod flavor is Virginia Tobacco. He typically purchases 5% strength JUUL pods from gas stations and other stores throughout the state.

644.     Lawless experiences weakness in his chest and increased coughing as a result of his JUUL use.

645.     Had Lawless known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. Lawless is

267

interested in products that would help him stop using nicotine and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**54.    Randi Lines**

646.    Plaintiff Randi Lines is a current resident of North Mancato, Minnesota.

647.    Before using JUUL for the first time in 2017 at the age of 58, Lines regularly smoked combustible cigarettes. She began smoking cigarettes over forty years prior, at the age of fifteen. She initially used JUUL at the behest of her son, who wanted her to stop smoking. Lines herself recognized the benefits of quitting smoking and purchased JUUL products because she thought they would help her, over the long-term, end her addiction to nicotine.

648.    Based on the online and television advertisements she saw, Lines believed JUUL to be safer and contain less nicotine than cigarettes. She recalls JUUL advertisements, substantially similar or identical to that below, proliferating throughout Facebook in particular. This particular image features the eight different JUUL pod flavor varieties available to consumers. Lines's favorite flavor, Classic Menthol, sits to the far right.





649. These online advertisements directed her towards JUUL's website, which contained misleading information regarding the health and addiction risks posed by JUUL use. She frequently purchased JUUL products from their website via the online marketplace throughout 2017.

650. Lines also purchased JUUL products at local variety stores and smoke shops. She recalls in-store displays, substantially similar or identical to that below, near the cashier's counters at shops she frequented, prominently exhibiting JUUL products since mid-2017. The displays were next to the lighters and practically impossible to miss, and were, or were substantially similar to, the following:



651. When using JUUL, Lines would consume well over two JUUL pods each day. Lines did not know that a single JUUL pod delivered more nicotine to the bloodstream than an entire pack of cigarettes. None of the advertisements she saw online, or the information she read on JUUL's website, indicated that JUUL contained exceptionally high concentrations of nicotine or that JUUL products posed a risk of addiction. She used her JUUL device each morning immediately upon waking. She has since transitioned back to cigarettes, citing issues of expense and throat irritants. She now smokes well over two packs of cigarettes each day.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

652.     None of the advertisements, in-store promotions, or labels Lines saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Lines would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**55.    Thane Lore**

653.     Plaintiff Thane Lore is a 18-year old who resides in Deadwood, South Dakota.

654.     Lore began using JUUL's products in June 2018 after seeing advertisements at gas stations and hearing about it through friends. JUUL was popular among Lore's friends and classmates, which made JUUL appear to be cool and safe.

655.     Lore had never tried nicotine before using JUUL.

656.    Prior to first purchasing JUUL's products, Lore recalls having seen the

following advertisements, among others:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

657.     Based on the advertising of JUUL as an "alternative" for smokers, "smoking evolved", and that consumers should "switch" to JUUL from cigarettes, Lore believed JUUL's products were safe, healthy, not highly addictive, and were a safer and less-addictive alternative to cigarettes.

658.     Prior to purchasing JUUL, Lore viewed the product's label.

659.     Lore purchased JUUL pods from gas stations, including Yesway at 3275 Cambell St Rapid City, South Dakota 57701, and other distributors. Lore saw in-store promotions for JUUL that were substantially similar to the below:





274

660.    Lore began using and purchasing JUUL at the age of 16. Lore was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. These factors caused Lore to believe that JUUL was safe and appropriate for him to use, even though he was underage. Lore believes that JUUL's marketing was the primary reason he starting using JUUL.

661.    None of the advertisements, in-store promotions, or labels Lore saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

662.    Lore would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Lore regrets ever using JUUL and has since participated in school programs to discourage the use of JUUL and vapes among high school students.

**56.     <u>Jeanine Manning on behalf of her son, M.C., a minor</u>**

663.    Plaintiff Jeanine Manning and M.C. are residents of Walpole, Massachusetts.

664.    Manning's son, M.C., is currently 17 years old and started using JUUL products in 2015 when he was only 12 years old.

665.    M.C. had never smoked cigarettes or used any other type of tobacco products before using JUUL.

666.    M.C. learned about JUUL from friends at school and by exposure to advertisements from JUUL's youth-oriented "Vaporized" campaign, including the images below:





667.    The kids at M.C.'s school were aware of JUUL's advertising and often promoted JUUL's products themselves by posting about the products on social media or sharing viral images and posts along with the #JUUL hashtag. M.C. recalls seeing the following youth-targeted posts:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO




668.    Prior to using a JUUL, M.C. had also seen point-of-sale promotional materials for JUUL devices and fruit- and dessert-flavored JUUL pods. Among the point-of-sale promotions M.C. saw and relied upon were those pictured below:



669.    Because JUUL engaged in extensive advertising on youth-oriented social media platforms, M.C. was exposed to a steady stream of JUUL ads that presented JUUL as a tasty treat but failed to disclose that JUUL was also a potent addictive drug. JUUL's use of food-based names, food-based advertising images, and food-based flavors played a

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

substantial contributing factor to M.C.'s decision to start using and continue using JUUL. JUUL's food-based promotions misled M.C. about the nature of JUUL's product and distorted the risks JUUL products posed. But for JUUL's flavorings and flavor-based promotions, M.C. would not have used a JUUL or would not have continued using a JUUL. Two of the flavor-focused ads that M.C. saw and relied upon are pictured below:



670.     None of the advertisements, in-store promotions, or labels M.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's advertisements, in-store promotions and labels materially impacted M.C.'s assessment of the JUUL he would later be offered by a friend at school.

671.     Though he was not a smoker, when M.C.'s classmate offered him his first puff of a JUUL, M.C. accepted it because he thought it would be safe and harmless. Soon thereafter, M.C. became addicted to JUUL pods.

672.   M.C. did not know that JUUL aerosol contains nicotine and presents a risk of addiction. To this day, though he is addicted to nicotine, M.C. thinks that JUUL use is "ok" and "safe."

673.   JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached M.C. and M.C.'s social network and were intended to promote the JUUL brand and products to youth. But for JUUL's social media advertising, M.C. would not have been exposed to, and would not have used, JUUL products.

674.   Among the JUUL social media promotions that M.C. saw and relied upon were the following:

675.   Instagram post-dated portraying a JUUL device and pods alongside sunglasses, a wallet, earbuds, thermos and portable speaker:



676.   Instagram post dated October 3, 2017 promoting JUUL flavors:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



677.    M.C. and his friends are active on Instagram and Snapchat and follow a number of JUUL-promoting accounts. Through these accounts, M.C. has seen content that encourages teenage JUUL use by depicting teens using JUUL, depicting "cool" cultural icons using JUUL and making light of teen dependence on JUUL. M.C. and his friends now post videos of themselves JUULing on Snapchat that are similar to the videos and images they see on Instagram.

678.    M.C. and his friends purchase JUUL products through classmates when they cannot purchase them through stores or online (which M.C. has done). Manning knows that M.C. has at least once purchased JUUL products online using a Visa gift card that he purchased with cash. But Manning does not know if M.C. bought them from JUUL or from a JUUL reseller.

679.    Like many of his friends and classmates, M.C. supports his JUUL addiction by selling JUUL pods to classmates at a markup.

680.    To date, Manning has confiscated at least 5 JUUL devices from M.C. Each time she does so, M.C. becomes extremely irritable, belligerent and verbally abusive due

to nicotine withdrawal. Since he started using JUUL, M.C.'s health and performance in school have suffered, with M.C. being more withdrawn and moody than he was before he became addicted to nicotine.

681.    M.C.'s physician has not been able to help MC break his addiction. MC now sees a counselor because Manning found that he was vaping marijuana oil through his JUUL device. To date, Manning has spent in excess of $1,150 on interventions to address M.C.'s JUUL addiction, but without success.

682.    M.C. currently consumes at least 1 fruit-flavored JUUL pod (either Fruit Medley or Mango) per day.

683.    M.C. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risk of addiction, and other health risks.

**57.    Noah Matarazzo**

684.    Plaintiff Noah Matarazzo is a Maine resident.

685.    Matarazzo began using JUUL in 2017 as a result of online fanfare and peer pressure from his classmates.

686.    Matarazzo typically purchased JUUL products from classmates of legal age to purchase them, or occasionally from local convenience stores with lax age-requirement enforcement. Prior to using JUUL, Matarazzo had never used tobacco products. By mid-2019, Matarazzo had spent thousands of dollars on JUUL products.

687.    When he first began using JUUL products, Matarazzo was unaware of their addictive potential. He recalls peers passing their own JUULs around school bathrooms and using JUUL for the first time in that exact scenario. In these instances, Matarazzo would only try JUUL if it was flavored. He would not have used JUUL products if they were only available in basic flavors such as Classic Tobacco or Classic Menthol. He first purchased a starter pack with fruit flavored JUUL pods from a peer.

688.    Matarazzo's nicotine addiction quickly grew out of control. By 2018, he consumed two JUUL pods each day.

689.    Like many adolescents, Matarazzo used social media. He followed the account @juulnation across various platforms. He recalls his friends constantly posting Snapchat stories of them using JUUL and attempting "vape tricks." On YouTube, he watched videos of prolific JUUL user DonnySmokes.

690.    Matarazzo also encountered JUUL promotional material when at gas stations and local convenience stores.

691.    Matarazzo recalls an in-store display, since 2017, in front of the cashier's counter, prominently exhibiting JUUL products. The display is next to the lighters and practically impossible to miss. The display was, or was substantially similar to, the following:



692.    Matarazzo also recalls an in-store display of readily available JUUL products, with an image of a hip and attractive model directly above. The display was, or was substantially similar to, the following:



693.    Matarazzo recalls an image substantially similar or identical to that below, with the "Smoking Evolved" slogan:



694.    Matarazzo endured serious withdrawal symptoms, including distorted vision, upon attempts to discontinue his JUUL use. He also suffered emotional instability

and physical exhaustion. He eventually attempted to curb his nicotine addiction via nicotine gum and lozenges.

695.    Although Matarazzo has not used tobacco products for the last two or three months, he continues to struggle with nicotine addiction.

696.    None of the advertisements, in-store promotions, or labels Matarazzo saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. Matarazzo would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**58.    John McFaull**

697.    Plaintiff John McFaull is a 26-year old who resides in Lexington, Kentucky.

698.    McFaull began using JUUL's products in February 2018 after seeing advertisements through social media, online, and hearing about them from a friend.

699.    At the time, McFaull was "dipping" chewing tobacco on a daily basis.

700.    Based on the advertising, McFaul believed JUUL's products to be a safer alternative that he could use to wean himself off of the nicotine in chewing tobacco.

701.    Prior to first purchasing JUUL's products, McFaull recalls having seen the following advertisements, among others:







702.    None of the advertisements, in-store promotions, or labels McFaull saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

703.     Rather, based on the advertising of JUUL as an "alternative" for smokers and packaging of the products that stated "5% strength" as depicted below, McFaull believed JUUL's products contained very little nicotine and amounts that were significantly less than what were in cigarettes or chewing tobacco:

 

704.     McFaull purchased JUUL pods from JUUL's website, gas stations, online retailers, convenience stores, and other distributors for between $18.00 to $20.00 for a four-pack of JUUL pods, often getting them from displays essentially identical to the following:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO




705.    Rather than weaning himself off nicotine, the advertising caused McFaull to become addicted to JUUL's products and he now needs to start vaping within 30 minutes after waking up each day. On average, he ends up consuming between one to two JUUL pods per day, which is costly and significantly more nicotine than he was getting when dipping chewing tobacco.

706.    McFaul's favorite flavors of JUUL pods were always Cool Mint and Mango, but he is so addicted now that, even though those flavors are no longer available in his area, he has turned to purchasing the Classic Menthol flavor. He recalls seeing the following ads of these flavors:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

707.   McFaull would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**59.   Emilio Mendoza**

708.   Plaintiff Emilio Mendoza is a 16-year old who resides in Reno, Nevada.

709.   Mendoza began using JUUL's products in June 2018 after seeing advertisements through social media, at gas stations, and hearing about JUUL through friends. Mendoza frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Mendoza's friends and classmates, which made JUUL appear to be cool and safe.

710.   Mendoza has never used any other form of nicotine before or after starting JUUL.

711.   Mendoza recalls having seen the following advertisements, among others:







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO




















SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





294







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

712.   Based on the advertising of JUUL as an "alternative" for smokers, "smoking evolved", and that consumers should "switch" to JUUL from cigarettes, Mendoza believed JUUL's products were safe, healthy, not highly addictive, and were a safer and less-addictive alternative to cigarettes.

713.   Prior to purchasing JUUL, Mendoza viewed the product's label and saw, among other things, statements that JUUL was an "alternative" to smoking.

714.   Mendoza purchased JUUL pods from JUUL's website, gas stations, and other distributors. Mendoza saw in-store promotions for JUUL that were substantially similar to the below:






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

715.   Mendoza also saw user-generated image s similar to the below:







716.   Mendoza began using and purchasing JUUL at the age of 13. Mendoza was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and

301

the variety of flavors it came in. Mendoza's favorite flavor is Mint. These factors caused Mendoza to believe that JUUL was safe, even though she was underage.

717.    None of the advertisements, in-store promotions, or labels Mendoza saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

718.    Mendoza would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**60.    <u>Ron Minas</u>**

719.    Plaintiff Ron Minas is a resident of Lebanon, Connecticut.

720.    Minas began using JUUL products in January 2018 at the age of 36. Minas first learned about JUUL from his brother. He later saw JUUL advertisements online and decided to buy a JUUL device. He hoped that the JUUL would help him stop smoking and break his addiction to nicotine.

721.    Before purchasing JUUL in January 2018, Minas visited JUUL website. Minas also began to receive promotional emails from JUUL, substantially similar or identical to:



722.   Minas also viewed JUUL advertising material on Facebook. Minas viewed advertisements promoting Mango JUUL pods substantially similar or identical to:





723.    Neither JUUL's website nor JUUL's promotional material disclosed JUUL easily delivers nicotine to the bloodstream faster than a cigarette. Minas would not have purchased JUUL products if he knew that they delivered more nicotine to the bloodstream than cigarettes.

724.    Minas first purchased Mango-flavored JUUL pods. Minas would not have purchased Classic Tobacco- or Classic Menthol-flavored JUUL pods.

725.    JUUL has only worsened Minas' nicotine addiction, as he can consume JUUL anywhere; the JUUL device is constantly in his hand. Prior to using JUUL, Minas smoked approximately ten cigarettes a day. Now, Minas consumes at least one JUUL pod per day, often more. That represents at least a doubling of Minas's daily nicotine intake.

726.    Minas says he has tried to stop using JUUL, but he cannot kick his nicotine addiction. Minas has tried to use a nicotine patch and received treatment at the V.A., as he is a veteran, but he just cannot shake it. Minas says it is even more difficult to quit JUUL versus cigarettes because it is an attractive product; the JUUL tastes good and does not emit any foul odors.

727.    Since Minas began purchasing JUUL products in January 2018, he has also purchased JUUL products from local vape shops in Lebanon, Connecticut and the surrounding area. Various promotional materials have displayed JUUL products substantially similar or identical to:





728.    None of the advertisements, in-store promotions, or labels Minas saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

729.    Minas would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**61.    D'Angelo Moore**

730.    Plaintiff D'Angelo Moore is a 20-year-old resident of Fairbanks, Alaska.

731.    Moore began using JUUL in 2018 at age 18. Moore began using JUUL to relieve stress from his time in the U.S. Army.

732.    Based on various advertisements of JUUL's products that he saw and relied on, as well as the recommendations of his local smoke shop employees, Moore purchased a JUUL to help manage his stress. He saw point-of-sale displays such as the following:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



733.    He also saw advertisements and the product label touting JUUL as an "alternative" to traditional cigarettes, which played a large factor in him deciding to start using and purchasing JUUL.  In particular, Moore recalls hearing a radio advertisement. The speaker in the ad was a former smoking talking about how JUUL was a better option than cigarettes.  The person in the ad said JUUL "changed my life."

734.    Moore interpreted the ads he had seen indicating that JUUL was safer than cigarettes.

735.    Prior to starting JUUL, Moore saw a personalized Facebook advertisement that said that one JUULpod was equivalent to a pack of cigarettes.

736.    None of the advertisements, in-store promotions or labels Moore saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, or that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

737.     Moore started using JUUL as a minor, and how JUUL was marketed—as young and cool—played a major role in his decision to start using JUUL. In particular, Moore recalls seeing Facebook ads showing young people using and glorifying JUUL.

738.     Moore developed an addiction to JUUL pods. At his peak usage, Moore was consuming between half of a JUUL pod and one JUUL pod a day. JUUL pods were on his mind more than cigarettes, and he would begin consuming JUUL pods within 5 minutes after waking each day.

739.     Moore's preferred JUUL pod flavors were Classic Menthol, Cool Mint, Mango and Fruit Medley. He typically purchased 5% strength JUUL pods from a Holiday gas station in Fairbanks. He did not have a clear understanding of the 5% strength label on JUUL pod packaging.

740.     As a minor, Moore purchased JUUL from Suzy's Smoke and Gifts.

741.     Had Moore known that JUUL pods were more addictive than cigarettes, he would not have purchased them. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. Moore is still interested in products that would help him stop using nicotine.

**62.     <u>Shirley Moses on behalf of her daughter, K.S.C., a minor</u>**

742.     Plaintiff Shirley Moses and K.S.C. are residents of West Jordan, Utah.

743.     Moses' daughter K.S.C. first used JUUL in her early adolescence, as early on as JUUL's initial launch in 2015, when K.S.C. was 14 years old. K.S.C. is currently 16 years old.

744.     Prior to using JUUL, K.S.C. had never used tobacco products.

745.     K.S.C. would typically purchase JUUL products from classmates.

746.     Moses believes that while K.S.C. likely knew of JUUL's nicotine content when first using the product, K.S.C. was far too young to understand its addictive

potential. Moses is a smoker, and her husband is a former smoker. Her husband stopped smoking at the behest of K.S.C., who abhors cigarettes and tried to force her mother to quit as well. Moses says that K.S.C. would never have used JUUL products if she understood that they posed an addiction risk similar to, or greater than, that of cigarettes.

747.    Both Moses and K.S.C. believe that K.S.C. is currently addicted to nicotine. K.S.C. now consumes between one-half and one full JUUL pod each day. Upon waking up in the morning, K.S.C. will typically use her JUUL before even getting out of bed. She prefers fruit-flavor JUUL pods to all others.

748.    Like many adolescents, K.S.C. is an avid social media user. Her primary platform is Instagram. K.S.C. recalls JUUL-related content frequently populating her Instagram feed.

749.    K.S.C. recalls seeing an Instagram post, substantially similar or identical to the one below, advertising Mango flavored JUUL pods, featuring a stylish close-up of the colorful accessory.



750.    K.S.C. also recalls seeing an Instagram post featuring model, fashion icon, and soccer star Florencia Galarza posing with a JUUL similar to the one below. Though not posted by the official JUUL Instagram account, the official account did comment approvingly. JUUL later featured this image in their #Vaporized campaign.



751.    K.S.C. saw these images from 2016 through 2019.

752.    Once addicted to nicotine, the very sight of JUUL-related content on social media prompted K.S.C. to reach for her JUUL. Even now, with most youth-oriented content scrubbed from social platforms, K.S.C. still encounters difficulties. Anti-JUUL public service warnings, for instance, still incite within her an urge to use JUUL.

753.    K.S.C. also frequently encountered and continues to encounter JUUL promotional material when at gas stations with friends and family, starting in 2016. Imagery such as that below was, and still is, quite common.

754.    For instance, K.S.C. encountered outside-of-store displays such as the one below, prominently featuring a variety of JUUL pod flavors. Each flavor had its own distinct illustration and color palette. Fruit flavors feature prominently in the bottom row. The display was substantially similar or identical to:



755.    K.S.C. also encountered in-store displays of readily available JUUL products such as the one below, with an image of a hip and attractive model. The display was substantially similar or identical to:



756.    K.S.C. has endured serious withdrawal symptoms upon attempts to discontinue her JUUL use. Her existing anxiety will often flare up, along with depressive tendencies. Physically, she will suffer from insomnia and, during extreme episodes, begin to foam at the mouth until her nicotine craving is satisfied.

757.    None of the advertisements, in-store promotions, or labels K.S.C. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

758.    K.S.C. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

## 63.   **Matthew Murphy**

759.    Plaintiff Matthew Murphy is a 21-year old who resides in Reading, Massachusetts.

760.    Mr. Murphy began using JUUL's products in June, 2016 after seeing advertisements and retail displays.  Mr. Murphy also frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was very popular among Mr. Murphy's friends and classmates, which, combined with its advertising and presence in social media, made JUUL appear to be cool and safe to Mr. Murphy.

761.    Prior to his use of Juul, Mr. Murphy had not regularly used any nicotine products.

762.    Prior to first purchasing JUUL's products, Mr. Murphy recalls having seen the following advertisements, among others:





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



763.    Mr. Murphy personally purchased JUUL pods from gas stations, convenience stores, and other retail distributors. Mr. Murphy saw in-store promotions for JUUL that were substantially similar to the below:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





764.    Mr. Murphy began using and purchasing JUUL at the age of 17. Mr.

Murphy was attracted to JUUL because of, among other, its stylish design, and the variety

of flavors it came in. Mr. Murphy's favorite flavor was Cool Mint. Mr. Murphy would not

have regularly used Juul were it not for the flavors what appealed to him when he was a

teen.  Mr. Murphy recalls seeing the following ads that attracted him to JUUL:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO








765.    None of the advertisements, in-store promotions, or labels Mr. Murphy saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

766.    Mr. Murphy would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**64.    Jill Nelson on behalf of her daughter L.B., a minor**

767.    Plaintiff Jill Nelson and L.B. are residents of San Diego, California.

768.    Nelson's daughter L.B. is currently 17 years old and started using JUUL in 2016, shortly after her 13th birthday.

769.    L.B. had never smoked or used other tobacco products before trying JUUL.

770.    L.B. learned about JUUL from her friends at school and through JUUL's point-of-sale materials, which L.B. saw in stores near her home. These materials featured JUUL's flavored pods and "Starter Kit" and made JUUL seem like a fun, harmless product.

771.    L.B.  had no interest in tobacco-flavored products, but she was drawn to the sweet and fruity JUULpod flavors depicted in JUUL's POS displays.  These displays conveyed to L.B. that JUUL was a tasty indulgence that, much like candy, was appropriate for teen use and presented no threat to her health or wellbeing.  L.B. was exposed to "Starter Kit" posters including the first one below, which led her to believe JUUL was a product for "starters" like her, and POS displays of JUUL products like second one pictured below, which looked like and described candy-like products without any warnings or nicotine disclosures.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

772.   L.B. also saw displays substantially similar to the below:

 

773.   None of the materials or product labels L.B. saw adequately disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The misrepresentations and omissions in JUUL's promotions materially impacted L.B.'s assessment of the fruit-flavored JUUL she would later be offered.

774.   L.B. also saw the advertisement below from JUUL's Vaporized campaign. This splashy advertisement featured JUUL's bright-colored flavored JUULpods and conveyed to L.B. that JUUL was a fun lifestyle product.  The advertisement's tag line, "Smoking Evolved," in the absence of any health warnings or nicotine disclosures, conveyed to L.B. that JUUL products were better and safer than regular cigarettes.



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

775.    L.B. was introduced to JUUL products by her friends at school when she was in the seventh grade. The JUUL device bears no warning labels about nicotine or content, or safety warnings.

776.    The fruit flavoring in the JUUL product L.B.'s friends offered her led L.B. to believe that JUUL was safe. She did not know she was ingesting nicotine from a nicotine delivery system that delivered as much—or more—nicotine than a cigarette. She knew not to smoke but did not understand the risks of ingesting nicotine from JUUL. L.B. would not have tried a JUUL but for the flavored pods.

777.    Through her use of JUUL, L.B. became addicted to nicotine and eventually purchased JUUL of her own. L.B. has purchased JUUL products from Shell and Arco gas stations, and a local 7-11.

778.    On one occasion, L.B. purchased JUULpods through ebay from a JUUL distributor. On March 29, 2018, L.B. ordered a pack of JUULpods through ebay from a seller named cmmcapital. Neither ebay nor the seller made any attempt to verify Lauren's age at any time. A few days later, Nelson intercepted the JUUL Starter Kit Lauren had ordered through ebay. The materials inside the package, and the return address on the packaging, indicated that the seller was Craze Vapor / ETX Distribution, a Texas company that is an official distributor of JUUL products.

779.    In October 2017, L.B. also obtained a device directly from JUUL through the company's warranty department. Following her transaction with JLI, L.B. began receiving promotional emails from starting. These emails were a part of JUUL's youth marketing scheme and directly appealed to the themes that had drawn Lauren to use JUUL: flavors, popularity, and fashion.

780.   Some of the emails and images JLI sent L.B. include messages like "tell a friend" and "find your favorite flavor," and did not include warnings or disclosures about JUUL's risks or nicotine content. Examples of emails L.B. received and relied upon from JLI are detailed in the chart below and image to the right.



| | |
|---|---|
| 5, 2017 | Save $20 on a Starter Kit |
| | |
| 11, 2017 | Need It Before Thanksgiving |
| 14, 2017 | Pack The Essentials |
| | |
| 11, 2017 | Be Ready for Holidays |
| 5, 2018 | Enjoy a JUUL Moment |

*...re 1 - October 16, 2017 email from JLI to L.B., "Make Mango Monday"*

781.   Nelson is unsure how much L.B. uses her JUUL but she constantly finds the orange and green caps of Mango and Cool Mint JUUL pods in L.B.'s room. Nelson has talked to L.B.'s doctor and other medical providers. None of them are trained, or equipped, to treat adolescents with severe addictions to nicotine caused by JUUL products.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

782. L.B. has been subject to disciplinary actions at school for truancy relating to JUUL usage and was put in a court-ordered program called Diversion as a result.

783. In October of 2018, Nelson took away L.B.'s smartphone for disciplinary reasons. In doing so, she also removed L.B.'s access to her network of friends who are also addicted to JUUL. L.B.'s anger and panic caused her to flee the house and L.B. was apprehended for erratic behavior in public and held by the police for 72 hours.

784. When the police released L.B., Nelson and L.B.'s father put L.B. in a 45-day inpatient treatment program.

785. The day after she returned from treatment, L.B. acquired another JUUL.

786. Because of her extended absence from school, L.B. was unable to complete her freshman year of high school with her classmates. In an attempt to salvage her freshman year, she transferred to an alternative school.

787. In October 2019, L.B. began a 3-month stay at a juvenile detention center. Upon being released, she immediately resumed her use of nicotine.

788. L.B. now uses other high-nicotine products in addition to JUUL.

789. L.B. would not have purchased or started using JUUL's products if she had not been exposed to JUUL's youth targeted advertising and had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risk of addiction, and other health risks.

**65.**   **William Nelson**

790. Plaintiff William Nelson is a 40-year old resident of Shreveport, Louisiana.

791. Nelson began using JUUL products approximately five years ago shortly after they came out, in 2015. At that time, he had been smoking since he was 19 years old, at a rate of about 10-20 cigarettes a day, and was looking for a way to end his addiction to cigarettes, both for himself, and to avoid exposing his children and others to second-hand smoke.

792.     The way that the JUUL e-cigarettes were advertised in displays gave him the impression that they were a better or safer alternative to tobacco cigarettes and could help him end his addiction to nicotine. He recalls seeing displays in gas stations that promoted the product without providing a visible warning that they contained nicotine, which were essentially identical to the following:

 

793.     Nelson also saw colorful ads from JUUL's Vaporized! Campaign, showing healthy, young models posing with the JUUL in a manner that made it seem like a safe, fun lifestyle choice, including the following:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







794.   None of the advertisements, in-store promotions, or labels W. Nelson saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. He did see representations that a single JUUL pod was the equivalent of a pack of cigarettes.

795.   Based on JUUL's advertisements and displays, Nelson purchased the JUUL device in 2015 and began regularly buying pods from displays at the gas stations he frequented in his area, vaping anywhere from half a pod to two full JUUL pods each day.

796.   Nelson does not remember the prices he paid for his JUUL products, but does recall in particular comparing the price of JUUL pods to a pack of cigarettes and

believing the JUUL products were cheaper overall. He remembers seeing ads that promoted discounted purchases for starter kits, and that discussed JUUL as a cheaper alternative to smoking over the long-term.

797.    Nelson's preferred flavor became Classic Menthol, and he recalls later on seeing additional advertisements, such as the following:




798.    Still nothing in those later advertisements disclosed that JUUL's e-cigarettes delivered nicotine into the blood stream more efficiently and at higher levels than traditional cigarettes. To the contrary, the catchphrase "smoking evolved" reinforced and contributed to his understanding that JUUL's products were supposed to be a safer alternative to regular cigarettes. In practice, he found the opposite true, with his overall consumption of nicotine harder to regulate, not only because the nicotine delivery was more intense, but also because it was impossible to determine when he had vaped an amount of nicotine equivalent to a single cigarette.

799.    In addition to the money spent on JUUL's products, Nelson found they ultimately did not help him manage or lower his nicotine intake or addiction at all. Instead he had become addicted to JUUL pods and had the urge to start vaping a pod within 30

326

minutes of arising each morning and, contrary to his expectations based on JUUL's advertising, he also continued to have cravings for, and smoked, traditional tobacco cigarettes at the rate of 10-20 per day in addition to using JUUL's products, increasing his overall nicotine consumption.

800.   Nelson would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. The only reason he tried the JUUL products in the first place was because he believed, based on the advertisements, that they could help him end his nicotine addiction.

**66.   Atoyia Orders, on behalf of her son, D.O., a minor**

801.   Plaintiff Atoyia Orders and D.O. are residents of London, Ohio.

802.   Orders' son D.O. began using JUUL around June 2016, at the age of 16.

803.   When D.O. was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product; he decided to try a JUUL because the Cool Mint flavor sounded appealing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school.

804.   D.O. had seen many advertisements for JUUL on social media and was led to believe JUUL did not contain any nicotine. For example, D.O. recalls online advertising material substantially similar or identical to the following:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO















805.    Before D.O. even tried JUUL, he also viewed point-of-sale promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. D.O. did not see any warnings or disclosures in these materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted D.O.'s assessment of, and eventual decision to use, JUUL products. For example, D.O. recalls seeing JUUL products prominently displayed in front of cashier counters in and around London, Ohio, since he began using JUUL products in June 2016, substantially similar or identical to:



806.    D.O. has told Orders that smoking JUUL was "smooth and easy" and eased his anxiety.

807.    Shortly after trying his friend's JUUL at school, D.O. purchased a JUUL "starter pack" from a local gas station and consumed all the JUUL pods contained therein.

808.    D.O. has become addicted to JUUL pods. D.O. now consumes two or three JUUL pods each day.

809.    D.O. attempted to quit using JUUL. However, because he was highly addicted to nicotine, D.O. turned to cigarettes. Now, D.O. uses JUUL and cigarettes.

810.    Orders says D.O.'s JUUL use has had significant physical, psychological, financial, and social effects on her son.

811.    Physically, D.O. has his JUUL in hand "24/7" and becomes very fidgety and irritated when he cannot use JUUL. D.O. has been hospitalized twice for issues with his lungs and breathing since he started using JUUL. D.O. has also lost a significant amount of weight since he started using JUUL.

812.    Psychologically, D.O. has also struggled since he started using JUUL. He has experienced severe depression and attempted to commit suicide twice since he started using JUUL.

813.    Financially, D.O.'s JUUL use consumes a large portion of his budget, as he spends a significant amount of money on JUUL pods each week. D.O. now works to finance his nicotine addiction, but before he started working, he would steal money from his mother in order to purchase JUUL pods.

814.    Socially, Orders says her son now hangs out with the "wrong crowd," as he spends most of his time with friends that also use JUUL incessantly.

815.    None of the advertisements, in-store promotions, or labels D.O. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

816.    D.O. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**67.    Ann Parker, on behalf of her daughter, S.P., a minor**

817.    Plaintiff Ann Parker and S.P. are residents of Oak Creek, Wisconsin.

818.    Parker's daughter is currently 16 years old and started using JUUL's products in 2018 at 14 years old, when she was a freshman in high school.

819.    S.P. learned about JUUL from her older brother and friends as well as by viewing advertisements online and through social media. S.P. saw the following advertisements:





820.    S.P. recalls seeing user-generated JUUL content on social media that used the #JUUL hashtag. S.P. remembers seeing the following images geared towards kids:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

821.    S.P. also saw advertisements from JUUL pushing candy-like flavors. She recalls seeing the following image in particular:



822.    None of the advertisements or labels S.P. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

823.    All of the JUUL advertisements and social media influence caused S.P. to begin vaping and, despite being underage, she was able to purchase JUUL pods from friends who were able to obtain the products.

824.    S.P. viewed the label on JUUL pods.

825.    S.P. became addicted to JUUL pods. She consumes approximately between 10 to 15 JUUL pods per week. Her preferred flavors are Cool Mint and Mango JUUL pods.

826.    S.P.'s addiction has been a burden on her relationship with her family. Parker has had numerous arguments with her daughter over S.P.'s JUUL addiction.

827.    S.P. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. She also would not have used JUUL's products if they did not come in the candy-like flavors.

**68.    Vickie Perry, on behalf of her daughter, L.P., a minor**

828.    Plaintiff Vickie Perry and L.P. are residents of Milton, Vermont.

829.    Perry's daughter L.P. began using JUUL in early 2018 at age 16 as a result of online fanfare and the device's popularity amongst her peer group. L.P. bought her JUUL products from classmates who were of legal age to purchase them from authorized retailers. Prior to using JUUL, L.P. had smoked perhaps a handful of cigarettes in her life. She proceeded to use JUUL on a near-daily basis for the next two years.

830.    When she first began using JUUL products, L.P. was unaware of their addictive potential. She does she recall nicotine warnings on the advertisements proliferating across various social media platforms, or the promotional displays at local gas stations. Although L.P. managed to kick her JUUL addiction around the start of 2020, for two years she would consume upwards of one-half of a JUUL pod each day. Her favorite flavor was Mango.

831.     Like many adolescents, L.P. is an avid user of social media platforms. She frequents Instagram, Facebook, and Snapchat. L.P. remembers viewing JUUL-related content on each platform. Much of the JUUL content L.P. was exposed to preceded her initial JUUL use. Rather than reinforce existing use patterns, JUUL marketing material primed L.P. for later use. They sought to imbed the brand in potential buyers' psyches and allow social forces to operate at their own speed. After all, due to the device's highly addictive nature, buyers need only try JUUL products a handful of times before JUUL can count on them to provide a reliable future income stream.

832.     L.P. saw a Facebook post, substantially similar or identical to the one below, advertising a JUUL "Starter Kit" with the popular Mango JUUL pod flavor. Indeed, Mango quickly became L.P.'s preferred JUUL pod flavor.



833.     L.P. recalls an Instagram post from 2017, like the one below, advertising the Mango-flavored JUUL pod, with a stylish close-up of the colorful accessory.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



834.   L.P. remembers a tweet promoting JUUL's Creme Brulee flavored JUUL pods. The tweet was substantially similar or identical to:



835.   L.P. also saw an Instagram post featuring model, fashion icon, and soccer star Florencia Galarza posing with a JUUL similar to the one below. Though not posted by the official JUUL Instagram account, the official account did comment approvingly. JUUL later featured this image in their #Vaporized campaign, which L.P. also recalls viewing online. The post and online imagery were substantially similar or identical to:



836.   L.P. also encountered JUUL promotional material when at gas stations.

837.   L.P. recalls in-store displays since 2017, in front of the cashiers' counters, prominently exhibiting JUUL products. The displays were next to the lighters and practically impossible to miss. The displays were substantially similar or identical to:



838.    L.P. also remembers seeing an outside-of-store display similar to the one below, featuring a variety of JUUL pod flavors. Each flavor had its own distinct illustration and color palette. L.P.'s favorite flavor, Mango, sits to the far left in the bottom row. The display was substantially similar or identical to:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

839.    L.P. recalls seeing an in-store display of readily available JUUL products, with an image of a hip and attractive model, similar to the one below. The display was from 2017 and was substantially similar or identical to:



840.    L.P. and her family endured hardship as a result of her JUUL addiction and struggle still to pick up the pieces. While using JUUL, L.P. developed asthma and began to contend with other upper respiratory difficulties. Her existing anxiety and depression worsened to a considerable degree. She could not reconcile JUUL's place in her life as both a major social tool and a source of significant physical and psychological distress.

841.    L.P.'s attempts to stop her JUUL use resulted in irritability and frequent anger outbursts. Her school performance rapidly declined, as the severity of her nicotine addiction intensified beyond her control. Eventually, she dropped out, unable to manage the myriad pressures of her daily life.

842.    As of early 2020, L.P. no longer uses JUUL, but will bear the scars of this ordeal for years to come.

843.    None of the advertisements, in-store promotions, or labels L.P. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver

nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

844.    L.P. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**69.    Alexander Pierce**

845.    Plaintiff Alexander Pierce is a 26-year old who resides in Hermitage, Tennessee.

846.    Pierce began using JUUL's products in October 2015 after seeing advertisements through TV, social media, at gas stations, and heard about JUUL from a JUUL representative who gave him free JUUL product at a bar. Pierce frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Pierce's friends and classmates, which made JUUL appear to be cool and safe.

847.    Pierce had never tried nicotine before he starting using JUUL.

848.   Pierce recalls having seen the following advertisements, among others:







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











849.     Based on the advertising of JUUL as an "alternative" for smokers, "smoking evolved", and that consumers should "switch" to JUUL from cigarettes, Pierce believed JUUL's products were safe, healthy, not highly addictive, and a safer and less-addictive alternative to cigarettes. Pierce has now learned from personal experience that these assertions are untrue, has suffered health harms from JUUL, and he wishes he had never started using JUUL.

850.     Prior to purchasing JUUL, Pierce viewed the product's label and saw, among other things, statements that JUUL was an "alternative" to smoking. This made him believe JUL was safe and made him want to try it.

851.     Pierce purchased JUUL pods from gas stations, convenience stores, and other distributors.

852.     Pierce began using and purchasing JUUL at the age of 21. Pierce was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. These factors caused Pierce to believe that JUUL was safe and appropriate for him to use.

853.     None of the advertisements, in-store promotions, or labels Pierce saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

854.    Pierce would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**70.    Jessica Pierre**

855.    Plaintiff Jessica Pierre is a resident of Norwich, Connecticut.

856.    Pierre began using JUUL products after receiving a coupon in the mail for a free starter-pack in Spring 2018. She was 34 years old. When she received this coupon, Pierre was unaware that JUUL products contained substantial amounts of nicotine and that their use posed a risk of addiction. Pierre would not have purchased JUUL products if she knew that they delivered more nicotine to the bloodstream than cigarettes.

857.    Pierre typically purchased her JUUL products from a local corner store, and recalls various promotional materials displayed in-store before and during her use of JUUL.

858.    Pierre recalls, since early 2018, a display in front of the cashier's counter and next to the lighters, prominently exhibiting JUUL products. It looked substantially similar or identical to:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

859.    Pierre also recalls an in-store display, from 2018, featuring JUUL accessories, such as JUUL pod flavor varieties and a USB charging dock. It looked substantially similar or identical to:



860.    Pierre frequently saw advertisements for JUUL products in magazines she perused. These advertisements often highlighted JUUL's high-tech design and futuristic aesthetic. She recalls the slogan "Smoking Evolved" displayed along with promotional imagery. She remembers an in-magazine advertisement from early 2018 more-or-less identical to the following:



861.    Pierre recalls viewing a Facebook post substantially similar or identical to that below on her newsfeed in 2018.



862.    Pierre also recalls receiving an email around February 2019 with the below imagery.



863.    As a JUUL user, Pierre consumed around one-half a JUUL pod each day. By late 2019, she had successfully curbed her JUUL use.

864.    None of the advertisements, in-store promotions, or labels Pierre saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine

more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

865.    Pierre would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**71.    <u>Erin Puente</u>**

866.    Plaintiff Erin Puente is a 35-year-old resident of Grand Island, Nebraska.

867.    Puente had been smoking about half a pack of cigarettes per day prior to starting JUUL.

868.    Based on various advertisements of JUUL's products that she saw and relied on, Puente purchased a JUUL in 2018 to help her quit smoking and as a healthy alternative to smoking.

869.    At point of sale displays, Puente saw ads that drew attention to JUUL's enticing flavors while disregarding nicotine content and addictiveness, including the following:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



870.    On social media outlets including Facebook, Puente saw JUUL-related

content, such as the following image:



871.    In 2018, Puente visited the JUUL website to register her device for a warranty. She then began receiving promotional emails from JUUL despite never subscribing to receive any.

872.    In late 2018 and early 2019, Puente saw ads that proclaimed JUUL's nicotine content to be "5%."

873.    Puente saw JUUL ads containing statements that JUUL is an "alternative" to cigarettes and that a smoker should "switch" from cigarettes to JUUL products, ads that she considers the most important factor in her decision to use JUUL products. She also saw JUUL ads containing statements that JUUL is "smoking evolved", which she considers very influential in her decision to purchase JUUL products. The ads she saw are set forth directly below:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



874.    Puente interpreted the ads she had seen as indicating that JUUL was not only safer than cigarettes, but capable of helping her stop smoking. None of the advertisements, in-store promotions, or labels Puente saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

875.    Puente has quit cigarettes. But now, she is highly addicted to JUUL pods. She consumes between one and two pods each day, which costs her about $40 per week.

876.    She purchased JUUL products herself for her own consumption at Conoco gas station and Pump and Pantry.

877.    Puente now suffers from a dry throat and other throat issues. She has also been diagnosed with several ear infections for which she required antibiotics. Her doctor informed her these problems were either caused by or aggravated by her JUUL use.

878.    Puente developed bronchitis as a result of her JUUL use.

879.    Had Puente known that JUUL pods were more addictive than cigarettes, she would not have purchased them. She would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Puente is still interested in products that would help her stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if she could trust the product to work as advertised.

**72.    Lacretia Pulce on behalf of her daughter, K.P., a minor**

880.    Plaintiff Lacretia Pulce and K.P. are residents of Columbia, Tennessee.

881.    Pulce's daughter K.P. began using JUUL in late 2017 at the age of 16, primarily as a result of peer pressure. K.P., like many of her peers, had been exposed to JUUL marketing materials via various channels, including social media platforms. By 2017, JUUL products were quite popular amongst K.P.'s age group and were part of the social ecosystem at her school. K.P. wanted to fit in. She purchased her first JUUL from classmates and continued to buy JUUL products from peers going forward.

882.    Prior to using JUUL, K.P. had never used tobacco products. She now uses other tobacco products, such as cigars and cigarettes, on an infrequent basis.

883.    When she first began using JUUL products, K.P. was unaware of their nicotine content, or the risk of addiction posed by their use.

884.    Both Pulce and K.P. believe that K.P. is currently addicted to nicotine. She uses her JUUL as soon as she wakes up each morning, and will typically consume at least

two, perhaps even three, JUUL pods each day. Her favorite flavors are Classic Menthol, Cool Mint, and Cool Cucumber.

885.    Like many adolescents, K.P. frequently uses social media. Her primary platforms are Instagram and Twitter. K.P. recalls JUUL-related content appearing during her use of both platforms:

886.    Shortly after her initial exposure to JUUL, K.P. recalls an Instagram post near-identical to the tweet below.



887.    K.P. saw an image substantially similar or identical to the one below on her friend's Twitter feed in summer 2018. Promotional imagery of a lush mango mixed with sleek product and packaging aesthetic. This image has high youth appeal, particularly in conjunction with the sweet flavoring.



888.    K.P. also saw JUUL advertisements at local gas stations. She recalls seeing an image substantially similar or identical to the one below, in early 2018, that promoted the Cool Cucumber flavor, now K.P.'s favorite JUUL pod flavor:



889.    K.P. experiences strong withdrawal if she attempts to go even a short time without using her JUUL. Sadness and depression are common after just several hours without use. As a result, K.P. uses JUUL constantly, thereby exerting pressure on her own

friends and family. Pulce notes that other members of their household use JUUL with considerable frequency.

890.    Pulce estimates expenditures of roughly $80 each week on JUUL products, buying pods not only for K.P., but also her mother, uncle, and brother. She believes her family's use created a sort of vicious, reciprocal cycle, where it became ever more difficult for one member to quit as others continually picked up the habit.

891.    None of the advertisements, in-store promotions, or labels K.P. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. K.P. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**73.    Kristof Rest**

892.    Plaintiff Kristof Rest is a 27-year old who resides in Miami, Florida.

893.    Rest began using JUUL's products in January 2017 after seeing advertisements on social media and in person.

894.    Rest had very infrequently smoked cigarettes before using JUUL.

895.    Rest recalls having seen the following advertisements, among others:

---





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







Juul

"I'm constantly encouraging people to use this and not smoke your cigarettes." Learn more about Lauren's #SwitchToJUUL story and share your own with us at http://JUUL.com/community

(Post) May 16, 2018 9:13



Juul

"You walk into a meeting and you just smoked a cigarette, everyone knows you just smoked a cigarette." - Carl on one of the reasons he made the #SwitchToJUUL. Learn more at http://juul.com/community

(Post) May 23, 2018 11:30

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





896.    Based on the advertising of JUUL as an "alternative" for smokers, "smoking evolved," or that consumers should "switch" to JUUL from cigarettes, Rest believed JUUL's products were safe and healthy, were not highly addictive, and was a safer and less-addictive alternative to cigarettes. The fact that JUUL was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in also made Rest believe that it JUUL was safe to use.

897.    Prior to purchasing JUUL, Rest viewed the product's label and saw, among other things, statements that JUUL was an "alternative" to smoking.

898.   Rest purchased JUUL pods from JUUL's website and local smoke shops, including Vapor Shark and Vape N Smoke Shop. Rest saw in-store promotions for JUUL that were substantially similar to the below:






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



899.    Rest became addicted to JUUL's products and uses slightly less than one pod per day.

900.    None of the advertisements, in-store promotions, or labels Rest saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

901.    Rest would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**74.    Charleen Richey, on behalf of her son, T.Y., a minor**

902.    Plaintiff Charleen Richey and T.Y. are residents of Albuquerque, New Mexico.

903.    Richey's son T.Y. is currently 16 years old. He started using JUUL's products in 2017 when he was 14 years old.

904.    T.Y. never tried smoking cigarettes before using JUUL's products.

905.    T.Y. learned about JUUL at school from his friends and by viewing advertisements online and through social media. The advertisements he viewed promoted use of JUUL's products as trendy and offering various flavors as if they were treats, including the following ads he recalls seeing:





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









906.    T.Y.'s friends at school adopted JUUL's promotion of the products as

trendy and often posted about them on social media or by sharing viral images and posts

of others with the "#JUUL" hashtag. T.Y. remembers seeing the following images widely

shared online that promoted the use and abuse of JUUL's products by underage persons, which JUUL did nothing to stop or counteract:









 

 

907.     Despite his youth, T.Y. was able to purchase JUUL pods from classmates and in stores such as 7-Eleven, Alon, and Giant. The displays he saw were always presented in attractive and colorful ways, often with enticing discounts, that looked essentially identical to the following:










SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

908.     None of the advertisements, in-store promotions, or labels T.Y. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

909.     As a result, T.Y. did not think he could get addicted. He came to really enjoy the Cool Mint and Mango flavors in particular. T.Y. would not have wanted to try JUUL if it was only available in Menthol or Tobacco flavors.

910.     T.Y. became addicted to using JUUL pods. In fact, one of the reasons T.Y. decided to try JUUL was that he was under the impression that it was not as dangerous as smoking. He would feel the need to start vaping right after waking each morning and regularly consumed more than one JUUL pod each day.

911.     The addiction to JUUL's product cost T.Y. and his family hundreds of dollars that T.Y. secretively spent on JUUL pods. He would ask his father for money each morning before school, telling him it was for food or an activity, but really just collecting it and saving until having enough to buy more JUUL products each week.

912.     Richey currently has been able to force T.Y. to stop vaping, but fears he has suffered irreversible health problems and feels that his addiction continues even though not using, putting T.Y. at higher risk and temptation of using again once he leaves her control and even advancing on to other products like cigarettes.

913.     T. Y. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**75.**     <u>Jack Thomas Roberts, administrator of the estate of Jack Roberts, deceased</u>

914.    Plaintiff Jack Thomas Roberts is a resident of Lexington, Kentucky and the administrator of the estate of his son, Jack Roberts, a plaintiff in the Colgate action who passed away in 2019. By a Suggestion of Death filed on February 12, 2020, (ECF 368-2), Mr. Roberts requested that the Court substitute him for Jack as a plaintiff in the current action.

915.    Roberts used a JUUL for the first in November 2017 at the age of 17. Before he took his first puff of JUUL aerosol, Roberts had seen numerous JUUL displays, signs and promotions in local gas stations touting JUUL as a simple and satisfying "alternative" for smokers and offering discounts on the JUUL "Starter Kit." Among the in-store signs and promotions Jack saw and relied upon were the following:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



916.    Roberts was exposed to a steady stream of images that promoted JUUL as a tasty treat but didn't mention that JUUL was also a potent addictive drug. JUUL's use of food-based flavors, food-based flavor names and food-based advertising images was a substantial contributing factor in Jack's decision to use and continue using JUUL. Among the online "flavor" advertisements that Jack saw and relied upon were the following:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



917.    Roberts also saw JUUL-related viral images and posts on social media, many of which incorporated the #Juul hashtag. The viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUULing reached Jack and his social network, including his classmates, leading to increased JUUL use and widespread misperceptions about the nature and risks of JUUL products:




918.    None of the advertisements, social media posts, in-store promotions, or labels Roberts saw adequately disclosed the nature or addiction risks of JUUL products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of

JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's advertisements, in-store promotions and labels materially impacted Roberts' assessment of the flavored JUUL he would later be offered.

919.    When Roberts was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product. He decided to try JUUL because the Cool Mint flavor sounded appealing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. Roberts would not have used a Virginia Tobacco or Classic Menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

920.    Deciding that he wanted to try different flavors, Roberts bought his own JUUL "Starter Kit" through an 18-year-old classmate. Roberts promptly consumed the Fruit Medley, Creme Brulee and Cool Mint pods included in the Starter Kit, but gave away the Virginia Tobacco pod, which held no interest for him. After finishing his Starter Kit, Roberts bought a box of Mango JUUL pods from a classmate and continued purchasing Mango pods from that point forward.

921.    When Roberts sent in the registration card for the JUUL device in his Starter Kit, JUUL began sending Roberts promotional emails, including an invitation to combat federal efforts to regulate ENDS flavors by writing the FDA to report how JUUL's flavors played an important role in Roberts' journey as a smoker. The email also contained a survey inviting Roberts to list which JUUL flavors he had used.

922.    Roberts quickly developed a pod-a-day nicotine addiction, which cost about $40 a week to maintain.

923.    On social media, Roberts continued to see a significant amount of JUUL promotion from third parties, some of which include Instagram accounts by: @Doit4JUUL, @JUUL_break, @JUULwraps, @Juulzi.co, @DonnyK17, and

@SupremePatty. Many of the posts from these accounts promoted or included JUUL's name and hashtags that JUUL promoted, including #juul, #juulvapor, and #juulnation. On Snapchat and YouTube, Roberts followed or saw content from Donny Smokes, including the JUUL Challenge, and other "tricks" that Roberts and his friends mimicked.

924.   Roberts did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors whose aim was to promote JUUL use to adolescents and profit off of their addiction. Had Roberts known the truth, he would have rejected offers to use a JUUL or would have attempted to stop using a JUUL far sooner than he did.

925.   JUUL's viral marketing campaign ensnared Roberts, who shared his own JUUL-themed "promposal" in the spring of 2018. Had Roberts known that his creation of JUUL-related content was the result of JUUL's efforts to turn young JUUL users into unpaid youth advertisers for JUUL's products, Roberts would not have posted the content or would not have consented to being used to promote JUUL to other adolescents.



926.    In or around the summer of 2018, Roberts joined "JUUL Talk." An "exclusive insights community" developed by Defendant, JUUL Talk's welcome email warned that any information shared by JUUL Talk was "confidential (subject to the non-disclosure agreement) and not to be shared with others."

927.    Within days of joining, Roberts received his first JUUL Talk survey invitation, which was purportedly designed to help JUUL "design activities and experiences that are relevant and valuable to you."

928.    On November 20, 2018, after JUUL announced that it would remove flavored JUUL pods from gas stations, JUUL Talk sent Roberts the first of three separate emails he would receive, urging him to complete a survey detailing how the removal of Mango and other flavored JUUL pods from gas stations would impact him.

929.     Had Roberts known the truth about JUUL or its marketing activities, he would not have joined JUUL Talk or submitted any other information about himself to JUUL.

930.     As a freshman in college, Roberts was consuming at least one JUUL pod a day. He slept with his JUUL next to him on a nightstand and began using his JUUL as soon as he woke up each morning. He was unable to quit or taper down to less potent e-liquids than the JUUL. His JUUL addiction had cost him thousands of dollars since he started using JUUL products in 2017.

931.     To control the costs of his spiraling nicotine addiction, Roberts began smoking cigarettes by early 2019 and smoked at least 10 cigarettes a day, which represented a significant reduction in his daily nicotine intake from JUUL use.

932.     Tragically, Roberts became involved in other addictive substances after JUUL introduced him to nicotine and, weeks after submitting a declaration in opposition to JUUL's motion to compel him into arbitration, took his own life.

933.     Roberts would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**76.     <u>Andrea Saldana, on behalf of her daughter, Le.S., a minor</u>**

934.     Plaintiff Andrea Saldana and Le.S. are residents of Prairie Grove, Arkansas.

935.     A. Saldana's daughter, Le.S., is currently 15 years old. Le.S. became aware of JUUL from friends at school and started using JUUL's products in 2018 when she was only 14 years old.

936.     Le.S. is now addicted to JUUL pods.

937.     Le.S. had never tried smoking cigarettes before using JUUL's products.

938.     Before she started vaping, Le.S. recalls seeing ads on social media promoting JUUL's products without any clear warnings of the risk that she could so easily

become addicted. She believed vaping was trendy, safer than smoking cigarettes, and primarily intended for inhaling flavorful tastes. The advertisements she recalls include the following:









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



939.    None of the advertisements or labels Le.S. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

940.    Le.S. also started vaping JUUL's products because of the flavors available. Her favorites are Cool Mint and Creme Brulee, as promoted by JUUL in bold images such as the following that Le.S. recalls:

 

941.    Le.S. was able to purchase JUUL pods from her classmates and others, spending approximately $15.00-$20.00 per week.

942.    Le.S. wants to quit vaping but is addicted. She has to start vaping within 5-30 minutes of waking each morning, ultimately consuming approximately one-half of a JUUL pod each day (four per week).

943.    There are costs from Le.S.'s addiction beyond the money spent on JUUL pods as well. A. Saldana reports her daughter has behavioral issues if she cannot vape and that her asthma is worse. A. Saldana also had to incur extra dental costs related an in infection that occurred after having Le.S.'s wisdom teeth removed, which was due to vaping. Le.S. has also been suffering from nose bleeds since she's become a JUUL user.

944.    Le.S. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**77.    Lacey Saldana**

945.    Plaintiff Lacey Saldana and is a resident of Prairie Grove, Arkansas.

946.    L. Saldana, is 18 years old. She became aware of JUUL from friends and started using JUUL's products in 2018 when she was 16 years old and is now addicted.

947.    L. Saldana had never tried smoking cigarettes before using JUUL's products.

948.    Before she started vaping, L. Saldana recalls seeing ads on social media promoting JUUL's products. She does not recall seeing any warnings of the risk that she could become addicted. She believed vaping was trendy, safer than smoking cigarettes, and primarily intended for inhaling flavorful tastes. The advertisements she recalls include the following:

 

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO











SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

949.    None of the advertisements or labels L. Saldana saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

950.    L. Saldana also started vaping JUUL's products because of the flavors available. She started with Cool Mint but came to prefer Mango and Fruit Medley as well. Those were popular among her peers and promoted in bold images designed to draw their attention, such as the following that La.S. recalls:

 

 

951.    L. Saldana was able to purchase JUUL pods from her classmates and online through JUUL's website by using her school email account, as well as through Amazon (which still identified JUUL as the seller).

952.     L. Saldana wants to quit vaping but is addicted. She has to start vaping within 5-30 minutes of waking each morning, ultimately consuming between one and one-and-a-half JUUL pods each day.

953.     The addiction has cost L. Saldana and her family money. L. Saldana currently spends half her paycheck from working on JUUL pods—approximately $50-$60 a week—and has taken money from her mother's purse before to buy JUUL pods.

954.     L. Saldana's mother Andrea Saldana has found her daughter's behavior changes as well if she runs out of JUUL pods. She becomes irritable and argumentative. L. Saldana reports she is unable to run or play softball any longer either.

955.     L. Saldana would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**78.   Dylan Selfridge**

956.     Plaintiff Dylan Selfridge is a resident of Butler, Pennsylvania.

957.     Selfridge is currently 18 years old and started using JUUL products in 2018 when he was 16.

958.     Selfridge had never tried smoking cigarettes before using JUUL products.

959.     Selfridge became aware of JUUL through his friends at school and by exposure to advertisements from JUUL's youth-oriented "Vaporized" campaign, including the ads reproduced below. These ads presented JUUL as a sleek gadget used by stylish,



young, "cool" people. Noticeably absent from the Vaporized ads was any mention of nicotine or addiction risk.



960.   Selfridge was exposed to a steady stream of images that promoted JUUL as a tasty treat but didn't mention that JUUL was also a potent addictive drug. JUUL's use of food-based flavors, food-based flavor names and food-based advertising images was a substantial contributing factor in Selfridge's decision to use and continue using a JUUL. Among the online "flavor" advertisements that Selfridge recalls were the following:

 

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

961.    Selfridge also saw JUUL-related viral images and posts on social media, many of which incorporated the #Juul hashtag. The viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUULing reached Selfridge and Selfridge's social network, including his classmates, leading to increased JUUL use and widespread misperceptions about the nature and risks of JUUL products.

962.    Selfridge and his friends followed many of the popular JUUL accounts on Instagram. Among the posts Selfridge saw were those that encouraged, among other things, consuming massive quantities of JUUL vapor, using multiple JUUL devices at the same time and using JUUL in conjunction with combustible cigarettes.

963.    Selfridge has posted social media content about JUUL, mimicking the JUUL-related content he has seen on other accounts.

964.    But for JUUL's social media advertising and the viral spread of JUUL-related content, Selfridge would not have been exposed to and would not have used a JUUL. Selfridge remembers seeing the following youth-targeted messages:






965.    Selfridge was exposed to a steady stream of images that promoted JUUL as a tasty treat but didn't mention that JUUL was also a potent addictive drug. JUUL's use of food-based flavors, food-based flavor names and food-based advertising images was a substantial contributing factor in Selfridge's decision to use and continue using a JUUL. Among the online "flavor" advertisements that Selfridge recalls were the following:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







966.    Prior to using a JUUL, Selfridge had also seen point-of-sale materials for JUUL devices and products, including the signs and displays pictured below:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

967.    None of the advertisements, social media posts, in-store promotions, or labels Selfridge saw adequately disclosed the nature or addiction risks of JUUL products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. The representations and omissions in JUUL's POS advertisements, in-store promotions and labels materially impacted Selfridge's assessment of the fruit-flavored JUUL he would later be offered.

968.    When offered a JUUL by a friend, Selfridge accepted because he was interested in trying the fruit flavors. JUUL's food-based promotions misled Selfridge about the nature of JUUL's product and distorted the risks JUUL products posed. Were it not for JUUL's flavorings and flavor-based promotions, Selfridge would not have used a JUUL or would not have continued using a JUUL.

969.    Selfridge liked the sweet flavor of the first JUUL product he tried and he continued to take puffs of his friends' JUULs until before eventually purchasing his own.

970.     After purchasing his own JUUL device, Selfridge quickly became addicted to JUUL pods. Selfridge's JUUL consumption soon increased to 4 JUUL pods a day. He purchased JUUL from a Sheetz.

971.     Reasoning that he would not be able to smoke the equivalent of 4 JUUL pods a day in combustible tobacco products, Selfridge tried to switch from JUUL to cigarettes.

972.     Selfridge still consumes more than 1 JUUL pod a day, in addition to at least half a pack of cigarettes. He takes his first puff of JUUL within 5 minutes of waking up. His favorite JUUL pod flavor is Cool Cucumber.

973.     Selfridge would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**79.     Kevin Singer**

974.     Plaintiff Kevin Singer is a 22-year-old resident of Bingham, Maine.

975.     Singer began smoking cigarettes at about age 16. When he was 17 years old, he started using JUUL as an alternative to cigarettes. Based on advertisements that he had seen, he believed that JUUL was less addictive and safer than cigarettes.

976.     He purchased his JUUL pods at retail establishments, including Cumberland Farm and Circle K. He typically paid $22 for a four-pack of pods. While at these retail establishments, he saw point-of-sale advertisements substantially similar to the following:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO






977.    He also remembers seeing JUUL advertisements on Facebook.

978.    When he smoked cigarettes, he typically smoked about a pack every two days. When JUULing, he typically consumes between half a pod and a full pod per day. He has consumed as many as two full pods in a day. His preferred flavors are Mint and Crème Brulee.

979.    He purchased JUUL products because he thought that they would help him end his addiction to nicotine. But while he was using JUUL, he began using JUUL within five minutes of waking up each day, and JUULing was on his mind more than cigarettes ever were.

980.    Part of Singer's decision to start using JUUL was that it was marketed as a cool and young product.

981.    Prior to using JUUL, Singer saw the product label.

982.    He tried to quit using JUUL three times, and he was successful only on the third try. He no longer uses nicotine products. But he still has breathing problems that he believes are related to his JUUL use.

983.    None of the advertisements, in-store promotions, or labels Singer saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

984.    Singer would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**80.    <u>Anthony Smith</u>**

985.    Plaintiff Anthony Smith is a resident of Cashmere, Washington.

986.    Smith obtained his first JUUL e-cigarette and JUUL pods in an effort to curtail his nicotine addiction and quit smoking.

987.    In early 2015, Smith was 17 and he began seeing JUUL advertised via Twitter and Instagram. In particular, he remembers seeing the below advertisement on Twitter:

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



He recalls that many of the ads had images of young people—young enough to be in high school—who often looked like his friends, and they appeared to be having fun, vaping and enjoying a hip, cool activity.

988.    Smith also recalls seeing an ad on Instagram that was highly similar to the one below:



989.    In particular, Smith recalls a young, blond woman that reminded him of a good friend of his, except that the ad he recalls seeing did not include a disclaimer about the nicotine content. It was Smith's typical habit to scroll through images on Instagram quickly, and he rarely paused to open posts to read any content, thus had any such disclaimers been there, he would not have seen it. Because of the model's similarity to his good friend, that ad in particular piqued his curiosity about JUUL. He also began noticing JUUL's ads for their flavored pods, which also made him interested.

990.    Shortly after reviewing the advertisement with the blond woman, Smith visited a Circle K. He saw a large advertisement there for a JUUL starter pack, which included the device and four different flavored pods. The advertisement was similar to the one below:



403

991.    However, he did not see any warning that the product contained nicotine, or that one pod contained more nicotine than a pack of cigarette. He reasoned that a starter pack would allow him to try several flavors for a lower price, so he decided to try it. The starter pack was purchased for approximately $29.

992.    None of the advertisements, in-store promotions, or labels Smith saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

993.    Smith began using the product, noticed that he would get a quick nicotine buzz that was more intense than cigarettes, but he attributed that to the fact that it was a vapor instead of a smoke. Rather than weaning Smith off of nicotine, the intense dosage of nicotine delivered by the JUUL products resulted in an addiction to JUUL products and an increased nicotine addiction, and an increased consumption of nicotine and JUUL products, upping his consumption of one JUUL pod per day. The fact that the Cool Mint flavor of the JUUL pods is pleasant has also played a role in his continued use of JUUL products.

994.    At the age of 18, Smith switched to use exclusively of JUUL pods as a source of nicotine. Until approximately the spring of 2018, Smith had consumed JUUL pods on a daily basis for over three years, and found it far more addictive than traditional cigarettes, to the point where he spent several years unable to make it through a day without JUULing. At times, he would try to quit, but found it difficult due to the fact that the advertising was continually being delivered to him via social media. At one point, he did quit, and then he saw the below ad for a new Mango-flavored pod, which caused him to purchase more pods and begin using JUUL again.



995.    Smith would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**81.    <u>Derrick Smith</u>**

996.    Plaintiff Derrick Smith is a 22-year old who resides in Olympia, Washington.

997.    Smith began using JUUL's products in August 2015 after seeing advertisements through social media, at gas stations, and hearing about JUUL through friends. Smith frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Smith's friends and classmates, which made JUUL appear to be cool and safe.

998.    Smith had never tried nicotine before he tried JUUL.

999.   Prior to first purchasing JUUL's products, Smith recalls having seen the following advertisements, among others:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1000.   Based on the advertising of JUUL, Smith believed JUUL's products were safe, healthy, not addictive, did not contain nicotine, and were a safer alternative to cigarettes.

1001.   Prior to purchasing JUUL, Smith viewed the product's label.

1002.   Smith purchased JUUL pods from JUUL's website, gas stations, online
retailers, convenience stores, and other distributors. Smith saw in-store promotions for
JUUL that were substantially similar to the below:






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







1003.    Smith began using and purchasing JUUL at the age of 16. Smith was

attracted to JUUL because of, among other things, the youthful-looking persons in its

advertisements, that was advertised as a cool part of a fun lifestyle, its stylish and discrete

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

design, and the variety of flavors it came in. Some of Smith's favorite flavors are Mint,

Mango, and Cucumber. These factors caused Smith to believe that JUUL was safe, even

though she was underage. Smith recalls seeing the following ads:












SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1004.   Smith also saw user-generated post like the below:







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

1005.   None of the advertisements, in-store promotions, or labels Smith saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1006.   Smith would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**82.   <u>Savannah Smith</u>**

1007.   Plaintiff Savannah Smith is a 20-year old who resides near Atlanta, Georgia.

1008.   Prior to using JUUL's products for the first time in 2017, Smith had been a regular smoker since she was 15 years old, using less than 10 cigarettes per day.

1009.   In 2017, while still in high school, she was first introduced to JUUL by a younger classmate who was using the product. Smith had seen JUUL advertisements and promotions online and through social media before then which gave her the perception that JUUL's products were a safer alternative to cigarettes and could help her quit. Some of the ads she recalls having seen in particular include the following:













1010.   None of the advertisements, in-store promotions, or labels Smith

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1011.   In addition to JUUL's advertisements, Smith saw user-generated content on social media that was shared with the "#JUUL" hashtag which promoted use and abuse of JUUL by young persons using memes or images of others vaping, such as the following that Smith recalls:








SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO




1012.   Thinking that JUUL's products were widely accepted and could help wean her off of cigarettes, she began purchasing them from various convenience stores and vape shops (Shell, QuikTrip, Cloud 9, Bees Smoke Shop, Valuer, BP, RaceTrac, and others in her area). The in-store signs, displays, and advertisements Smith recalls viewing include some essentially identical to the following:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1013.   Smith paid anywhere from $13.00 to $25.00 for JUUL pods with her favorite flavor always being Mango, before switching to Cool Mint. The flavors also were a big factor in Smith using JUUL's products.

1014.   Rather than help Smith break her addiction to nicotine, JUUL's products increased the addiction. Smith became addicted to JUUL pods. While she was a JUUL user, she felt a need to start vaping within five minutes of waking each morning (which is stronger than the need she ever felt for cigarettes) and frequently consumed 1-2 JUUL pods per day. Even when she tried to quit using JUUL, she continued to feel the need to consume, and did consume, between one and two JUUL pods a week.

1015.   In October 2019, Smith successfully quit using JUUL, but she has had to continue to use other nicotine products.

1016.   In addition to the money spent on JUUL products, since she started vaping Smith has experienced health problems. She has a persistent cough, and a skin condition was aggravated from increased nicotine use.

1017.   Smith would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. She also would not have used JUUL's products if they did not come in the candy-like flavors.

**83.   Kristy Strattard**

1018.   Plaintiff Kristy Strattard is a 41-year old who resides in Rome, Georgia.

1019.   In 2018, Strattard had been smoking cigarettes for five or six years, up to a pack a day, when she first took notice of the advertisements and displays for JUUL products in her local gas stations. The JUUL products and their displays were more easily

accessible than cigarettes and more attractive to look at, and included displays essentially identical to the one below:



1020.   Strattard became interested in JUUL's products because she wanted to quit smoking and nicotine in general. She was told good things as well by her daughter who was familiar with JUUL since it was prevalent in her high school.

1021.   The posters and signage she saw in and around where JUUL products were being sold in Georgia reinforced the idea that the products could help her quit nicotine altogether. She recalls seeing the following advertisements promoting JUUL's product as "smoking evolved," including others, which indicated to her that JUUL's e-cigarettes were safer than regular cigarettes. An example of the ad she remembers seeing is below:



1022.   Strattard accordingly signed up on the JUUL website to receive more information about the products.

1023.   In response to the request for information, JUUL sent Strattard coupons in the mail that encouraged her to start purchasing and using JUUL by giving substantial discounts.

1024.   None of the advertisements, in-store promotions, or labels Strattard saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1025.   In 2018, relying on the signs, displays, promotions, and discounts she received and saw, Strattard first purchased a JUUL e-cigarette and began buying four-packs of JUUL pods at a Circle K gas station nearby her home, which she recalls typically cost her about $19.99 each.

1026.   Strattard thereafter became addicted to JUUL and regularly consumed one JUUL pod per day, on average, with her favorite flavors being Classic Menthol and Creme

Brulee as depicted in, among others, the following type of advertisement designed to promote the flavors that she saw and relied on:



1027.   Rather than weaning Strattard off of her nicotine addiction, she found the JUUL pods to be so addictive that, within five minutes of waking up each morning, she immediately needed to use her JUUL e-cigarette. Further, when not at work, Strattard regularly consumed upwards of three JUUL pods in a single day—which is substantially more nicotine than in the pack of cigarettes she had been smoking prior to her use of JUUL.

1028.   Strattard would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**84.    Daniel Tarrats**

1029.   Plaintiff Daniel Tarrats is a 22-year old who resides in Minneapolis, Minnesota.

1030.   Tarrats began using JUUL's products in Summer 2016 after seeing advertisements through social media, at gas stations, and hearing about it from friends.

Tarrats frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Tarrats' friends and classmates, which made JUUL appear to be cool and safe.

1031.   Tarrats never tried nicotine before he starting using JUUL.

1032.   Prior to first purchasing JUUL's products, Tarrats recalls having seen the following advertisements, among others:












SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





1033.   Based on the advertising of JUUL as "FDA approved" and "the first FDA approved vape," an "alternative" for smokers, "smoking evolved", and that consumers should "switch" to JUUL from cigarettes, Tarrats believed JUUL's products were safe, healthy, were not highly addictive and he was not aware that JUUL contain nicotine until after he became addicted.

1034.   When he first purchased JUUL, the product label did not indicate that JUUL contain nicotine or was addictive. After he was addicted, Tarrats viewed the

product's label and saw, among other things, statements that JUUL was an "alternative" to smoking, and contained "5% nicotine." This statement is unclear and unusual to Tarrats, because he since learned that most vapes indicate their nicotine level in milligrams.

1035.   Tarrats purchased JUUL pods from gas stations, convenience stores, and other distributors, including Puff City at 521 US Highway 206 NJ, Newton, NJ 07860 and the Holiday Gas Station at 12024 Champlin Drive, Champline, MN 55316-2378. Tarrats saw in-store promotions for JUUL that were substantially similar to the below:

 




1036.   Tarrats began using and purchasing JUUL at the age of 18. Tarrats was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Tarrats' favorite flavor is Mango. It was not until all flavors were banned in his state besides Tobacco flavors that Tarrats was able to quit. Some advertisements that he found particularly enticing were those showcasing the Mango flavor, young men using JUUL surrounded by attractive young women, ads showing JUUL product deals and discounts, and ads that associated JUUL with youthful partying and entertainment. Many of his peers, including the individual from whom he got his first JUUL, believed that JUUL merely contained "salt-based liquid" without nicotine. Throughout his entire town, he was not aware of one young person who did not at least occasionally use JUUL. These factors caused Tarrats to believe that JUUL was safe and

appropriate for him, even though he was underage. Tarrats recalls seeing the following ads that attracted him to JUUL:











SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1037.   None of the advertisements, in-store promotions, or labels Tarrats saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Tarrats was not aware of health risks associated with JUUL until he began to experience chronic chest pains and coughing.

1038.   Tarrats would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**85.    Treyton Bailey-Thomseth**

1039.   Plaintiff Treyton Bailey-Thomseth resides in Minneapolis, Minnesota.

1040.   Bailey-Thomseth is currently 18 years old. He started using JUUL products in 2017 when he was just 15.

1041.   Before Bailey-Thomseth had ever tried JUUL, he was already aware of JUUL through advertisements from JUUL's Vaporized campaign, JUUL's point-of-sale materials and JUUL's online promotions. Among the Vaporized ads Bailey-Thomseth saw and relied on were the ones pictured below:



1042.   Bailey-Thomseth also saw point-of-sale materials in stores that promoted

JUUL flavors and offered discounts on the JUUL "Device Kit" and "Starter Kit." Among

the POS materials Bailey-Thomseth recalls seeing were the following:

 

1043.   Bailey-Thomseth had also seen online JUUL advertisements promoting

JUUL flavors. Among the flavor-themed ads Bailey-Thomseth saw were the following:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

 

1044.   None of the advertisements, in-store promotions, or labels Bailey-Thomseth saw adequately disclosed the nature or addiction risk of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that JUUL was engineered to deliver nicotine rapidly and in great quantities, that JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. These representations and omissions in JUUL's advertisements, in-store promotions, and labels materially impacted Bailey-Thomseth's eventual decision to try JUUL products.

1045.   In the time leading up to his first JUUL experience, Bailey-Thomseth saw increasing amounts of JUUL-related content on the social media platforms Instagram and Snapchat. This content, which often featured young people performing "tricks" with exhaled JUUL vapor, led Bailey-Thomseth to believe that using JUUL was a "cool" activity that would improve his social status.

1046.   When one of Bailey-Thomseth's friends offered him a JUUL, he accepted. He enjoyed the "buzzed" feeling he received from the JUUL's powerful nicotine aerosol. He does not recall which flavor he tried first, but he knows it was not Virginia Tobacco.

Bailey-Thomseth would not have tried JUUL if it were only available in Virginia Tobacco flavor.

1047.   Shortly after he started using JUUL, Bailey-Thomseth became addicted to nicotine.

1048.   Although he had never used drugs before he started JUULing, Bailey-Thomseth began experimenting with marijuana. He continued to use marijuana until late 2018.

1049.   Despite being below the minimum legal age to purchase JUUL products in Minnesota, Bailey-Thomseth has always been able to buy JUUL products from local stores.

1050.   Bailey-Thomseth gets money to pay for JUUL products by selling items for cash. He also resells JUUL products to finance his own habit.

1051.   Bailey-Thomseth has, from time to time, refilled his JUUL pods with e-liquid from other manufacturers. However, most commercial e-liquid contains far less nicotine than the e-liquid in JUUL pods and thus fails to satisfy Bailey-Thomseth's nicotine addiction. Therefore, Bailey-Thomseth continues to use JUUL pods with their original JUUL-manufactured e-liquid.

1052.   The online social media content that Bailey-Thomseth has seen, and continues to see, online normalizes teen JUUL use by, for example, presenting the JUUL device alongside earbuds, cellphones and other common items that comprise a "high school starter pack."

1053.   Bailey-Thomseth's nicotine addiction has had a severe impact on his psychological wellbeing. Since becoming addicted to JUUL, Bailey-Thomseth has suffered suicidal ideations, depression, severe anxiety, and social isolation.

1054.   Bailey-Thomseth spent 5 months in an outpatient addiction program that cost several thousand dollars. The program proved ineffective and Bailey-Thomseth is still addicted to nicotine.

1055.   Bailey-Thomseth currently consumes more than 1 JUUL pod per day. He starts JUULing within 5 minutes of waking up.

1056.   Bailey-Thomseth would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks JUUL posed.

**86.**   **Charles Tippe**

1057.   Plaintiff Charles Tippe is a resident of Providence, Rhode Island.

1058.   Before using JUUL for the first time in February 2017 at the age of 53, Tippe regularly smoked combustible cigarettes. He had been a smoker for over five years and would typically go through between half a pack and one pack of cigarettes each day. He initially began using JUUL products with the hope they would help end his addiction to nicotine. Billboards and online advertisements failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use. Indeed, Tippe believed that one JUUL pod contained substantially less nicotine than a pack of cigarettes. He would not have bought JUUL products had he known they delivered more nicotine to the bloodstream than cigarettes.

1059.   Tippe purchased JUUL products from a couple of different variety stores near where he lived. At these stores, he recalls promotional displays  substantially similar or identical to those below since early 2017.

1060.   In-store display, since early 2017, in front of the cashier's counter exhibiting various JUUL pod flavors, each with its own distinct color palette, substantially similar or identical to:



1061.   In-store display featuring a bevy of JUUL accessories, such as JUUL pod flavor varieties, a USB charging dock, and JUUL devices with fresh new color schemes. Began appearing in early 2017. It looked substantially similar or identical to:



1062.   Both prior to and during his use of JUUL products, from early 2017 through 2019, Tippe saw advertisements for JUUL on Facebook, substantially similar or identical to the one below.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1063.   Tippe did not know that a single JUUL pod delivered more nicotine to the bloodstream than an entire pack of cigarettes. When using JUUL, Tippe would consume over two JUUL pods each day. As a smoker, he had rarely, if ever, gone through more than one pack a day. Thus, Tippe consumed at least twice as much nicotine when using JUUL as he had when smoking cigarettes. As a JUUL user, Tippe once went through three JUUL pods in a single day. Tippe's JUUL use was a constant preoccupation; he thought about JUUL more than he ever had cigarettes, and this fact caused Tippe significant stress and anxiety. He would use his JUUL immediately upon waking each morning.

1064.   Tippe began experiencing respiratory issues while using JUUL products, chief among them excess mucus in his throat. He also alleges constant throat itching and coughing, neither of which occurred when he smoked cigarettes, in addition to strong headaches he believes stemmed from JUUL's high nicotine content and concentration. Moreover, these problems largely subsided when Tippe stopped using JUUL products and

returned to smoking cigarettes. He now smokes around one full pack of cigarettes daily, a higher rate of consumption than before his JUUL use.

1065.   None of the advertisements, in-store promotions, or labels Tippe saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1066.   Tippe would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**87.   <u>Johnson Truong</u>**

1067.   Plaintiff Johnson Truong is a 22-year old who resides in Florissant, Missouri.

1068.   Truong began using JUUL's products in late 2015 after seeing advertisements through social media, at gas stations, and seeing JUUL used at parties and among friends. Truong frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Truong's friends and classmates, which made JUUL appear to be cool and safe.

1069.   Before using JUUL, Truong had only used cigarettes once or twice a month at parties, starting in 2014.

1070.   Prior to first purchasing JUUL's products, Truong recalls having seen the following advertisements, among others:





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







441



1071.   Based on the advertising of JUUL as an "alternative" for smokers, "smoking evolved", that JUUL was going to "end cigarettes and disrupt the tobacco industry," that consumers should "switch" to JUUL from cigarettes, Truong believed JUUL's products were safe, healthy, and not highly addictive.

1072.   Prior to purchasing JUUL, Truong viewed the product's label.

1073.   Truong purchased JUUL pods from gas stations, including a Circle K at 602 North Main Street, O'Fallon, Missouri 63366, and other distributors. Truong saw in-store promotions for JUUL that were substantially similar to the below:









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1074.   Truong began using and purchasing JUUL at the age of 17. Truong was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Truong asserts that seeing advertisements was the major reason why he started and continued using JUUL. He was very attracted to advertisements showing JUUL flavors, its discrete design, and how social media ads made the product appear popular, cool and futuristic. These factors caused Truong to believe that JUUL was safe and appropriate for him to use, even though he was underage.

1075.   None of the advertisements, in-store promotions, or labels Truong saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1076.   Truong would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

## 88.   Michael Viscomi

1077.   Plaintiff Michael Viscomi resides in Bethlehem, Pennsylvania.

1078.   In 2014, Viscomi smoked a pack of cigarettes each day, which he started to reduce to a few cigarettes each day. Prior to March 2018, he had reduced his cigarette consumption down to several cigarettes per day through the use of alternative products, such as nicotine gum, chewing tobacco and non-JUUL vaping products.

1079.   On March 1, 2018, Viscomi switched from smoking cigarettes to consuming JUUL pods in an attempt to quit smoking cigarettes completely and wean himself off of his nicotine addiction. At that time, Viscomi believed that one JUUL pod would supply him with the same quantity of nicotine as one pack of cigarettes.

1080.   Prior to consuming JUUL pods, Viscomi was exposed to and did see JUUL advertising, promotional and marketing materials, particularly in the form of JUUL Instagram posts featuring young, attractive people using the product. He followed @SupremePatty on Instagram. He also visited the JUUL website and thereafter regularly and consistently received JUUL emails. He saw the following image and other similar ads:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1081.   Some of these social media posts show abuse of JUUL and encourage youth to smoke JUUL, or multiple JUULs at once, including these posts that Viscomi saw during the class period:




1082.   Viscomi saw JUUL advertisements on social media and point-of-sale displays containing statements that JUUL is an "alternative" to cigarettes and that a cigarette smoker should "switch" from cigarettes to JUUL. These ads were influential in his decision to purchase JUUL products.

1083.   Prior to consuming JUUL pods, Viscomi was not aware of the actual amount or potency of nicotine that JUUL products would deliver into his body or that the product was developed to maximize the effects on him of the nicotine it contained. He did see JUUL's representation of "5% strength" on its packaging and thought that meant 5% nicotine content. He also saw JUUL's statement that a JUUL pod is equivalent to a pack of cigarettes and understood that to mean "equivalent nicotine content." He also saw JUUL's representation that "1 JUUL POD = 1 pack of cigarettes" and an "alternative for adult smokers" and believed those to mean that JUUL is a less addictive alternative to cigarettes.

1084.   After March 1, 2018, Viscomi continued to be exposed to and saw JUUL advertising, promotional and marketing materials in the form of JUUL Instagram posts and radio advertisements.

1085.   Since that time, Viscomi began consuming JUUL consistently and constantly at a rate of at least one JUUL pod each day or taken approximately 200 hits from his JUUL device each day. He has consumed every flavor JUUL offers, including purchasing and consuming a JUUL starter kit, which contains all the flavors offered.

1086.   Based on the JUUL marketing, advertising and promotional materials to which he was exposed, Viscomi was not aware that JUUL could deliver more nicotine per puff than a cigarette, or that the nicotine delivered by the JUUL entered the bloodstream faster than a cigarette

1087.   None of the advertisements, in-store promotions, or labels Viscomi saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1088.   In fact, the JUUL marketing Viscomi saw contained no warnings, either on JUUL's website, in-store displays, or on the packaging itself, including the following ads which Viscomi saw during the class period, among many others:

 

1089.   Since starting to consume JUUL pods, Viscomi has become addicted to the Cool Mint JUUL pods and the nicotine salts they contain, an addiction he considers worse than his previous addiction to cigarettes. Indeed, using JUUL products is on his mind more than smoking cigarettes was. Rather than weaning Viscomi off of cigarettes and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine

449

addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

1090.   Viscomi purchases his JUUL products at gas stations, Wawa and Sheetz, at an approximate price of $23 per pack of four pods.

1091.   Viscomi would not have purchased JUUL products had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself. He would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. Viscomi is still interested in products that would help him stop smoking and would be willing to purchase a vape product such as JUUL ENDS in the future if he could trust the product to work as advertised.

**89.    Tanya Viti on behalf of her daughter, O.V., a minor**

1092.   Plaintiff Tanya Viti and O.V. are residents of Chestnut Hill, Massachusetts.

1093.   Viti's daughter O.V. first started using JUUL in September 2017 at the age of 12, while in sixth grade.

1094.   O.V. actively uses Instagram, Snapchat, and YouTube where she is exposed to JUUL-related content from other adolescents and from JUUL-related accounts.

1095.   On Instagram, O.V. saw a significant amount of JUUL promotional content from @JUULvapor and third parties, including the Instagram accounts @Doit4JUUL and @SupremePatty. On YouTube and Snapchat, O.V. saw numerous JUUL-themed videos from EonSmoke and Supreme Patty. This content was overtly youth-oriented and encouraged JUUL use, depicting JUULing as the "cool" thing to do. O.V. also viewed promotional material created by JUUL, including advertisements substantially similar or identical to this image from JUUL's Facebook page:



1096.   O.V. did not know that much of the content she saw was being created, distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote JUUL use to adolescents and profit from their addiction.

1097.   Before O.V. even tried JUUL, she also viewed point-of-sale promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored, flavored pods. O.V. did not see any warnings or disclosures in these materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted O.V.'s assessment of, and eventual decision to use, JUUL products. O.V. recalls viewing advertisements in and around Chestnut Hill in September 2017 substantially similar or identical to:

 

1098.   None of the advertisements, in-store promotions, or labels O.V.
saw adequately disclosed the nature or addiction risks of JUUL's products, the actual
amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to
deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering
nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL
products poses significant health risks. Nor did they indicate that JUUL was an age-
restricted product. O.V. would not have purchased or started using JUUL's products if she
had been adequately warned about the nicotine content, that it delivered even more
nicotine than cigarettes, risks of addiction, and other health risks.

1099.   After discovering JUUL on social media and in stores, O.V. sought out
friends in neighboring towns that were already using JUUL. When O.V. started using
JUUL, she had no idea the product contained nicotine. When Viti confronted her daughter
about her JUUL use, O.V. told her mother JUUL pods were "flavored juice," which is

what she was led to believe based on the advertisements she had viewed. Even after Viti informed her daughter that JUUL contained nicotine, O.V. chose to follow her perception of JUUL, cultivated from an overload of advertisements, versus the advice of her mother.

1100.   After trying JUUL with friends, O.V. quickly became addicted to nicotine and started using JUUL regularly. Once O.V. entered seventh grade, JUUL use had become rampant in her school. O.V. told her mother that kids in her school would hide JUUL devices in their shoes and try to use them while in class; it was considered "cool" to be able to smoke JUUL in class and get away with it. According to O.V., there are very few students in her school that do not use JUUL.

1101.   O.V. and her friends regularly posted photographs of themselves with JUUL on social media. In October 2018, O.V. was suspended from school after her and a friend posted an image of themselves "JUULing" in the bathroom on social media.

1102.   While in seventh grade, O.V. admitted to her mother she was addicted to nicotine. Viti has found jars of liquid nicotine and other forms of nicotine in O.V.'s bedroom since she started using JUUL products.

1103.   O.V. has suffered academically due to her JUUL use. In addition multiple suspensions from school, O.V. went from being an "A-student" to receiving all "F"s.

1104.   O.V. has also experienced severe physical, financial, psychological, and social repercussions from her JUUL use and severe nicotine addiction.

1105.   Physically, O.V. now experiences acute headaches and stomach aches and becomes visibly irritated and fidgety when she cannot consume nicotine.

1106.   Financially, O.V.'s JUUL use has had a significant impact on her parents. O.V. has stolen large quantities of money from her parents to purchase JUUL products. O.V.'s parents have also expended significant amounts of money on therapy and treatment to address O.V.'s addiction to nicotine and JUUL products.

1107.   Psychologically and socially, O.V. has struggled tremendously since using JUUL products. Viti has placed O.V. in a therapeutic residential school that provides comprehensive treatment to address O.V.'s addiction to JUUL products and related behavioral issues.

1108.   O.V. is not permitted to have JUUL products at the therapeutic residential school she now attends. But O.V. has indicated to Viti she plans to continue using JUUL products when she leaves because it makes her "feel good." O.V. shows no understanding of the impact using JUUL products and a severe addiction to nicotine can have on her health.

**90.   Nicholas Vogel, on behalf of his son, E.V., a minor**

1109.   Plaintiff Nicholas Vogel and E.V. are residents of Ponchatoula, Louisiana.

1110.   Vogel's son, E.V., is presently 16 years old and began using JUUL pods in August 2018 when he was only 15 years old.

1111.   E.V. had never tried a cigarette before trying JUUL's products.

1112.   Prior to using a JUUL, E.V. saw several JUUL ads on social media advertising JUUL before being introduced to JUUL by friends and classmates at school.

1113.   JUUL's marketing campaigns, including official JUUL social media posts and Celebrity/Influencer endorsements, were influential in E.V.'s decision to purchase JUUL products, especially JUUL ads and marketing materials that included youthful looking models, depictions of social events/parties, and depictions of JUUL flavored pods, which appeals to E.V.

1114.   None of the advertisements or labels E.V. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater

quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1115.   E.V. recalls seeing these ads:





1116.   After using his friends' JUULs, E.V. began purchasing JUUL pods from an 18-year-old acquaintance. E.V. purchased JUUL pods on a regular basis through other people who obtained the pods from gas stations and convenience stores near his high school.

1117.   E.V. became addicted to JUUL pods. E.V. would regularly use his JUUL before he arrived at school in the morning and was smoking almost a pod a day at the height of his addiction. He was spending upwards of $25.00 per week on JUULing. E.V.'s preferred JUUL pod flavors are Mango and Virginia Tobacco.

1118.   Vogel forbade E.V. from using JUUL, and E.V. was caught several times using JUUL afterward. He was punished each time, but, owing to his addiction, he always went back to using his JUUL.

1119.   Vogel worries about his son's health. He grew up with parents who smoked and therefore never touched a tobacco product in his life.

1120.   Vogel is himself a cardiac nurse. He knows the dangers of nicotine and how addictive it is. He worries about the possible long-term impacts of JUUL use on his son's health.

1121.   Vogel has never had difficulty speaking to his son about lifestyle choices and consequences, but that changed with E.V.'s JUUL use.

1122.   Vogel has lost trust with E.V. because E.V continued to lie about his JUUL use.

1123.   Because of their disagreements concerning E.V.'s JUUL use, E.V. also feels his relationship with his parents has significantly changed.

1124.   E.V. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.

**91.    Joe Weibel, on behalf of his son, S.W., a minor**

1125.   Plaintiff Joe Weibel and S.W. are residents of Chadwicks, New York.

1126.   S.W. began using JUUL in 2018 at the age of 14.

1127.   Before S.W. even tried JUUL, he viewed point-of-sale promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. S.W. did not see any warnings or disclosures in these materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially

impacted S.W.'s assessment of, and eventual decision to use, JUUL products. For example, S.W. viewed promotional material in and around Chadwicks, New York in 2018 substantially similar or identical to:







SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1128.   None of the advertisements, in-store promotions, or labels S.W. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product. S.W. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

1129.   S.W. did not understand the risks JUUL pods posed when he tried them for the first time. JUUL use is rampant in S.W.'s town and high school. S.W. has told Weibel that his basketball team even uses JUUL in the locker room, which his coaches cannot detect because JUUL products release no odor or visible smoke.

1130.   Older students at S.W.'s high school sell individual pods to younger students. S.W. has also purchased from Cliff's.

1131.   Even though Weibel has forbidden S.W. from using JUUL products, Weibel believes he continues to sneak JUUL.

1132.   When S.W. started using JUUL, he believed that JUUL products were safe and non-addictive.

1133.   S.W. would not have started using JUUL if he knew it contained nicotine. Additionally, S.W. would not have used a tobacco- or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

**92.     <u>Natasha Welch, on behalf of her son, J.W., a minor</u>**

1134.   Plaintiff Natasha Welch and J.W. are residents of Vilonia, Arkansas.

1135.   Welch's son, J.W., is currently 15 years old. He became aware of JUUL from friends at school and started using JUUL's products in December 2018 when he was just 14 years old, and now he is addicted to JUUL.

1136.   J.W. had never tried smoking cigarettes before using JUUL's products.

1137.   When he started vaping, J.W. did not understand that JUUL's products were harmful. He thought it was fun after seeing ads and promotional messaging from JUUL on social media and other sites that made it appear trendy, modern, healthy, and cool. Some of the advertisements he recalls seeing include:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO










SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1138.   Other kids at J.W.'s school picked up on JUUL's advertising and often promoted JUUL's products themselves by posting about them on social media or sharing viral images and posts in connection with the "#JUUL" hashtag. J.W. remembers seeing the following images promoting use of JUUL's products by young persons, which JUUL did nothing to stop or counteract:

















SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1139.   None of the advertisements or labels J.W. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1140.   Relying on the advertisements, J.W. started purchased JUUL pods from classmates, spending his entire weekly allowance of $20.00 on obtaining JUUL products every week. J.W. has spent approximately $3,500 to $4,000 on JUUL products since December 2018. Like many other youths addicted to JUUL's products, the flavor which attracted him to it was Cool Mint.

1141.   Welch was not aware her son was vaping after he started because the device was so easily concealable. She noticed a distinct change in his personality though and later discovered he was vaping at least four JUUL pods every week. She took measures to get him to stop, but it became clear to her J.W. was addicted to the nicotine. He displayed uncharacteristic behaviors associated with withdrawal when he was unable to vape, such as becoming angry, physically aggressive, irritable, and anxious. He also experienced a loss of appetite and significant weight loss.

1142.   J.W. became addicted to JUUL pods. J.W. now has to start vaping within an hour of waking up each morning. J.W. vaped used about 1-2 pods a day from December 2018 until July 2019. Since October 2019, J.W. started vaping again and uses about 3 pods a week.

1143.   J.W. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**93.**     **Janece Wilhelm**

1144.   Plaintiff Janece Wilhelm is a resident of Casper, Wyoming.

1145.   Before using JUUL for the first time in September 2017 at the age of 38, Wilhelm regularly smoked combustible cigarettes. At that point, she had been an on-and-off smoker over fifteen years and typically smoked half-a-pack of cigarettes each day. She began using JUUL products at the suggestion of her son; both believed JUUL would help end her addiction to nicotine. They had seen television commercials touting its efficacy as a cigarette replacement. Commercials characterized JUUL products as inherently safe and failed to adequately disclose JUUL's rapid and high-concentration nicotine delivery mechanism, or the resultant addiction risk posed by its use. Wilhelm would not have bought JUUL products had she known they delivered more nicotine to the bloodstream than cigarettes.

1146.   Wilhelm recalls seeing advertisements in local gas stations and convenience stores.

1147.   Wilhelm recalls displays situated in front of the cashier's counter and next to the lighters, since 2017, prominently exhibiting JUUL products. They look substantially similar or identical to:



1148.   Wilhelm also recalls seeing in-store displays featuring a bevy of JUUL accessories, such as JUUL pod flavor varieties, a USB charging dock, and JUUL devices

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

with fresh new color schemes, on display since 2017. They look substantially similar or identical to:



1149.   Wilhelm typically consumes between one to two JUUL pods each day. Wilhelm did not know that a single JUUL pod delivered more nicotine to the bloodstream than an entire pack of cigarettes when she began use. Wilhelm consumes at least three times as much nicotine as a JUUL user as she had when smoking cigarettes. As a smoker, she had rarely, if ever, gone through more than half a pack a day. As a JUUL user, Wilhelm once went through two JUUL pods in a single day. She uses JUUL's auto-ship membership program to receive fifteen JUUL pod 4-packs each month. She has also purchased from gas stations and liquor stores.

1150.   None of the advertisements, in-store promotions, or labels Wilhelm saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine

more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1151.   Wilhelm would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**94.     Janece Wilhelm on behalf of her son. D.L., a minor**

1152.   Plaintiff Janece Wilhelm and D.L. are residents of Casper, Wyoming.

1153.   D.L. began using JUUL products in March 2017 at the age of sixteen. Like many of his peers, D.L. had been exposed to JUUL marketing materials via various channels, including online and on social media platforms.

1154.   D.L. saw an image online advertising the eight different JUUL pod flavor varieties available to consumers, substantially similar or identical to the one below. D.L saw this image in 2017 and early 2018:



1155.   D.L. recalls imagery from 2017 and early 2018, substantially similar or identical to that below, advertising the immensely popular Mango JUUL pod flavor.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1156.   D.L. recalls imagery from 2017 and early 2018, substantially similar or identical to that below, advertising one of his favorite JUUL pod flavors: Creme Brulee.



1157.   D.L. also encountered JUUL promotional material when at local convenience stores.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1158.   D.L. recalls an in-store display from early 2017, in front of cashier's counter, prominently exhibiting JUUL products. The display is next to the lighters and practically impossible to miss. The display was substantially similar or identical to:



1159.   D.L. has seen an in-store display of readily available JUUL products, with an image of a hip and attractive model directly above, since early 2017. The display is substantially similar or identical to:



1160.   D.L. recalls a gas-station display in Denver, Colorado, in July 2019, advertising JUUL availability directly beneath the price of gasoline. This display was substantially similar or identical to:



1161.   D.L. has grown totally dependent on JUUL products for his day-to-day functioning. Wilhelm reports that his use is akin to an infant's desire for a pacifier; D.L. will panic without his JUUL and must constantly either have it or know that it is in close proximity. Due to the severe withdrawal effects inherent to nicotine addiction, D.L. has not tried to curb his JUUL use. Among their family, JUUL use has created conflict. D.L.'s father does not approve of D.L.'s JUUL use, although D.L. is largely powerless to stop, lest he endure the serious symptoms of withdrawal. Presently, D.L. consumes over one-and-a-half JUUL pods each day.

1162.   D.L. has purchased JUUL from eBay.

1163.   None of the advertisements, in-store promotions, or labels D.L. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1164.   D.L. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**95.   Tonya Williams-Walker on behalf of her son, M.W., a minor**

1165.   Plaintiff Tonya Williams-Walker and M.W. are residents of Laurel, Maryland.

1166.   Williams-Walker's son M.W. was first exposed to the JUUL brand in 2017 at the age of 14 and began using JUUL later that year as a result of peer pressure. JUUL use was rampant throughout his high school, as well as Laurel as a whole. Prior to using JUUL, M.W. had never smoked a cigarette or used any other tobacco product in his life. Yet within two years of using JUUL for the first time, M.W. developed a nicotine addiction so severe, he required admission to a medical facility for a supervised nicotine detoxification.

1167.   M.W. first used JUUL while at a summer camp with his peers in 2017. Several of M.W.'s campmates planned to slip away from camp to purchase JUUL products from a nearby gas station, and pressured M.W. to participate. They knew the gas station sold JUUL products because they saw a promotional display, substantially similar or identical to the one below, when passing by. The display advertised JUUL's availability alongside the price of gasoline.



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1168.   M.W. had seen JUUL-related promotional materials at gas stations and other convenience stores before his initial use of JUUL at the summer camp and continued to take note of these advertisements as his nicotine addiction developed. He recalls the images below.

1169.   M.W. recalls in-store displays, since 2017, in front of cashiers' counters, prominently exhibiting JUUL products. The displays are situated next to the lighters and practically impossible to miss. The displays are substantially similar or identical to:



1170.   M.W. also recalls an in-store display, from 2018, of offered JUUL products, with an image of a hip and attractive model directly above. The display was substantially similar or identical to:



1171.   None of the advertisements or promotional materials M.W. had been exposed to prior to his summer camp adequately disclosed the hazards of JUUL use. He does not recall seeing any warnings about JUUL's high nicotine content or addictive nature. Knowledge of either factor would have led him to reject pressure from his peers to try JUUL at his summer camp. He first tried the Creme Brulee flavor, which later became his preferred JUUL pod flavor. M.W. reports he would not have tried JUUL if it were only available in tobacco and nicotine flavors. Creme Brulee and other sweet-flavored JUUL pod variety downplayed the hazards of JUUL use, and their severity. Further, due to JUUL's nicotine salt formula, M.W. found JUUL vapor easy to inhale and JUUL products easy to use multiple times in quick succession.

1172.   M.W. continued his use of JUUL products following his experimentation at his summer camp. He purchased JUUL products and accessories from classmates at school, where there existed a resale market for all things JUUL-related. M.W. has also purchased through non-JUUL websites.

1173.   M.W. recalls seeing many online advertisements for JUUL products during his use.

1174.   M.W. saw an image online advertising the eight JUUL pod flavor varieties available to consumers, substantially similar or identical to that below. M.W.'s favorite flavor, Creme Brulee, sits fourth over from the left.



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1175.   M.W. recalls imagery, substantially similar or identical to that below, advertising his favorite JUUL pod flavor: Creme Brulee.



1176.   M.W. also recalls seeing an Instagram post featuring model, fashion icon, and soccer star Florencia Galarza posing with a JUUL similar to the one below. Though not posted by the official JUUL Instagram account, the official account did comment approvingly. JUUL later featured this image in their #Vaporized campaign, which M.W. also recalls viewing online. The post and imagery were, or were substantially similar to, the following:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1177.   M.W. has suffered material and emotional distress resulting from his JUUL use and consequent addiction. He has developed a chronic cough and chest congestion, as well as various respiratory infections, which have negatively impacted his athletic ability and prospects for college sports recruitment. Moreover, the declines in mental health stemming from his nicotine dependence have harmed his academic standing; when addicted to JUUL, M.W. brought home failing grades for the first time. In addition, M.W. has faced disciplinary action, suffered interpersonal difficulties, and endured financial hardship due to his dependence on JUUL products.

1178.   None of the advertisements, in-store promotions, or labels M.W. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1179.   M.W. would not have purchased or started using JUUL's products if she had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks.

**96.**   **Jeremy Worden**

1180.   Plaintiff Jeremy Worden is a 21-year-old resident of Hooksett, New Hampshire who began JUULing in Fall 2016 at the age of 18.

1181.   Worden first learned about JUUL in college from a fellow resident in his dormitory.

1182.   Prior to using JUUL, Worden smoked less than a half pack of cigarettes per day, having only begun smoking cigarettes the summer immediately before entering college.

1183.   Worden had seen JUUL ads on TV, social media, and in gas stations and convenience stores.

1184.   Worden understood from the ads and in-store promotions he saw for JUUL, that it was a healthier alternative to smoking. He purchased JUUL believing that it would help him quit smoking. He understood the "5% strength" label to mean 5% of the amount of nicotine contained in cigarette.

1185.   Worden saw these in-store promotions and social media ads:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO







1186.   Prior to using JUUL, Worden also saw the product label.

1187.   Worden purchased JUUL directly from JUUL's website and from various retail stores, including Campus Convenience, Irving Oil, Engen, and Sammy's Market.

1188.   None of the advertisements, point-of-sale displays, or labels Worden saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine

more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1189.   Worden became addicted to JUUL pods. At the height of his addiction, Worden was using his JUUL within 5 minutes of waking and smoked between 1 and 2 JUUL pods per day. His preferred flavors were Creme Brulee and Cool Mint. Using JUUL was on Worden's mind more than using cigarettes.

1190.   Worden no longer uses JUUL, but still experiences shortness of breath and a persistent cough as a result of his JUUL use.

1191.   Worden would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content, that it delivered even more nicotine than cigarettes, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in candy-like flavors.

**97.   Barbara Yannucci, on behalf of her son, J.Y., a minor**

1192.   Plaintiff Barbara Yannucci and J.Y. are residents of Port St. Lucie, Florida.

1193.   Yanucci's son J.Y. is presently 18 years old and began using JUUL pods at the age of 15 because he thought it was fun.

1194.   Prior to using a JUUL, J.Y. had also seen point-of-sale promotional materials for JUUL devices and products, including signs and displays. J.Y. did not see any warnings or disclosures in these materials about the existence or amount of nicotine in a JUUL or the risks nicotine posed. Instead, he saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions in JUUL's in-store promotions materially impacted J.Y. assessment of the JUUL he would later try. J.Y. saw the following displays:

 

1195.   On social media, J.Y. saw other content promoting JUUL use among teens such as the following:

 

1196.   When he first tried a JUUL, J.Y., as a minor, could not appreciate the dangers posed by the nicotine and other chemicals contained in the JUUL, and was not aware how much nicotine a JUUL contained or that the JUUL had been developed to

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

maximize the addictive effects of the nicotine it contained and to put extremely high doses of nicotine into the bloodstream.

1197.   J.Y. states that many of his friends in high school were consuming JUUL products at the time he began using JUUL and continue to do so. JUUL products were and still are popular, ubiquitous and easy to obtain.

1198.   J.Y., a minor, has himself purchased JUUL products at a Wawa convenience store.

1199.   J.Y. now considers himself addicted to JUUL pods and has consumed JUUL pods up to 12 times per day. His favorite flavor is Cool Mint. His craving for nicotine has increased while using the JUUL pods, and he now uses vaping devices that deliver even more nicotine than JUUL.

1200.   None of the advertisements, in-store promotions, or labels J.Y. saw adequately disclosed the nature or addiction risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that JUUL was an age-restricted product.

1201.   J.Y. initially concealed his use of JUUL from his mother Yannucci, who, after learning that JUUL products contain nicotine and appreciating the dangers of nicotine, has done and continues to do everything in her power to get her son to quit using JUUL products. She has not been successful to date.

1202.   J.Y. would not have purchased or started using JUUL's products if he had been adequately warned about the risks of addiction and other health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.

98.     **Aiden Young**

1203.   Plaintiff Aiden Young is a 16-year old who resides in Modesto, California.

1204.   Young began using JUUL's products in April 2019 after witnessing advertisements through TV, radio, social media at gas stations, and hearing about it through friends. Young frequently saw promotions for JUUL on social media from both JUUL and people in his social network. JUUL was popular among Young's friends and classmates, which made JUUL appear to be cool and safe.

1205.   Young had never used nicotine before trying JUUL products.

1206.   Young recalls having seen the following advertisements, among others:









**JUULpods**
Available in 8 flavors.



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

1207.   Based on the advertising of JUUL, Young believed JUUL's products were safe, healthy, not addictive, and were a safer and less-addictive alternative to cigarettes.

1208.   Young purchased JUUL pods from smoke shops through friends. Young saw in-store promotions for JUUL that were substantially similar to the below:






SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO









1209.   Young began using and purchasing JUUL at the age of 14. Young was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and in particular the variety of flavors it came in. These factors caused Young to believe that JUUL was safe and appropriate for him to use, even though he was underage, and were the primary reasons he started using JUUL.

1210.   Young also saw user-generated content like the below:






1211.   None of the advertisements, in-store promotions, or labels Young

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1212.   Young would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

## 99.   <u>Jerry Yut</u>

1213.   Plaintiff Jerry Yut is a 22-year old who resides in Portland, Oregon.

1214.   Yut began using JUUL's products in June 2015 after seeing advertisements in gas stations.

1215.   Before starting JUUL, he had only tried cigarettes a few times before and did not enjoy them.

1216.   Yut recalls having seen the advertisements stating that JUUL was an "alternative" for smokers, "smoking evolved", and that consumers should "switch" to JUUL from cigarettes. Yut believed JUUL's products were safe, healthy, not highly addictive, and were a safer and less-addictive alternative to cigarettes.

1217.   Prior to purchasing JUUL, Yut viewed the product's label.

1218.   Yut purchased JUUL pods from gas stations, convenience stores, and other distributors. Yut saw in-store promotions for JUUL that were substantially similar to the below:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO



1219.   Rather than helping to prevent or reduce Yut's nicotine consumption, Yut became addicted to JUUL's products and vapes and has used around one pod per day since he started.

1220.   Yut began using and purchasing JUUL at the age of 16. Yut was attracted to JUUL because of, among other things, the youthful-looking persons in its advertisements, that was advertised as a cool part of a fun lifestyle, its stylish design, and the variety of flavors it came in. Yut asserts that JUUL advertisement was by far the most significant reason he started JUULing, while popularity among peers played only a very small role.



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

These factors caused Yut to believe that JUUL was safe, even though he was underage. Yut

recalls seeing the following ads that attracted him to JUUL:

1221.   Yut also recalls seeing user-made images of JUUL similar to the following:






1222.   None of the advertisements, in-store promotions, or labels Yut

saw adequately disclosed the nature or addiction risks of JUUL's products, the actual

amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to

deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - APPENDIX A
Case No. 19-md-02913-WHO

nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks.

1223.   Yut would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

**100.   Wolfgang Ziegenhagen, on behalf of his son, H.Z., a minor**

1224.    Plaintiff Wolfgang Ziegenhagen and H.Z. are residents of Guilford, Connecticut.

1225.   Ziegenhagen's son, H.Z., is currently 17 years old and started using JUUL's products in Summer 2017 when he was only 14 years old.

1226.   H.Z. is presently an in-patient at the Hazelton Betty Ford Center in Plymouth, Minnesota for treatment of his nicotine addiction.

1227.   H.Z. had never tried a cigarette before trying JUUL and had never used any other tobacco products before using JUUL.

1228.   Like many other teens, H.Z. began using JUUL socially through and with friends at school but became addicted to JUUL pods. His two preferred JUUL pod flavors were Fruit Medley and Cool Mint.

1229.   H.Z. did not know that JUUL contained nicotine when he first started using JUUL.

1230.   H.Z. would have never tried JUUL if he had known that it contained nicotine.

1231.   H.Z. purchased JUUL pods "loose" from other kids at school and in retail stores, including Krauszers in Guilford, CT. Ziegenhagen recalls that his son always kept his supply of JUUL pods loose in bags.

1232.   It is only now while in treatment at Hazelton Betty Ford, that H.Z. is beginning to admit, and come to terms with, his addiction to JUUL.

1233.   H.Z. has received formal diagnoses of Nicotine Use Disorder and Unspecified Anxiety Disorder from his JUUL use. H.Z. would begin his day using JUUL within an hour of waking and was using half a pod per day on average, sometimes more, at the time he entered in-patient treatment.

1234.   Ziegenhagen worries about his son. H.Z. has started vaping marijuana, in addition to JUULing, to "cope." He has been diagnosed with Cannabis Disorder and is being further evaluated to determine if he is suffering from Major Depressive Disorder and/or Substance Induced Mood Disorder.

1235.   H.Z.'s addiction has been devastating not only for him, but for his parents and siblings as well.

1236.   The family has seen H.Z.'s behavior change dramatically over the past few years since he started using JUUL. Before JUUL, H.Z. was a leader in sports, did very well academically, and was very social. Now, H.Z.'s interest in sports and school has declined and he went from socially JUULing with other kids to using JUUL alone and all the time.

1237.   Mr. and Mrs. Ziegenhagen had H.Z. in therapy with at least three different substance abuse and behavioral health professionals trying to help their son. H.Z. began therapy when he was 15.

1238.   After two years and no success in breaking H.Z.'s addiction to JUUL, the Ziegenhagens resorted to placing H.Z. in the teen residential program at Hazelton Betty Ford Clinic in Minnesota.

1239.   Because H.Z. is in an intensive in-patient treatment for his JUUL addiction, he is not permitted social media use and cannot therefore assert here which images used in JUUL marketing and advertising he may have seen on Instagram, Facebook or Snapchat, the three social media platforms H.Z. principally uses. Of the JUUL advertising images he had seen in the past on social media, those that depicted JUUL flavored pods appealed to

him. Upon being released from treatment, H.Z. may be cautioned to further avoid such social media advertising and images, as they could trigger a relapse for a young person newly in recovery such as H.Z.

1240.   However, Ziegenhagen is certain that H.Z. was aware of the JUUL "culture" among young people and its lure on social media. He and his wife ultimately saw a video clip their son had created of himself JUULing and which H.Z. later posted on Instagram.

1241.   Currently, between therapy and residential treatment, Mr. and Mrs. Ziegenhagen have spent approximately $60,000 helping their son end his nicotine addiction and treating the problems that have come with it.

1242.   Mr. and Mrs. Ziegenhagen have also recently been made aware that H.Z. will have to transition into a 5-day per week out-patient program once he is permitted to return to the family. He also will likely have to finish high school at an expensive special residential private school for recovering young people after that.

1243.   H.Z. would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks. He also would not have used JUUL's products if they did not come in the candy-like flavors.