[Submitting Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

This Document Relates to:
CLASS ACTION AND PUBLIC ENTITY CASES

Case No. 19–md–02913–WHO

**PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS BY DEFENDANTS BOWEN, MONSEES, HUH, PRITZKER, VALANI, AND THE ALTRIA DEFENDANTS**

Judge: Hon. William H. Orrick
Date: March 26, 2021
Time: 9:00 a.m.
Ctrm.: 2

## TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. The Individual Defendants And The Early Days Of The JLI Enterprise ..... 2

1. Bowen and Monsees intentionally designed an addictive product ..... 2

2. The Other Director Defendants used JLI to expand Bowen's and Monsees's vision ..... 3

3. The Individual Defendants undertook a fraudulent marketing scheme to mislead the public about the addictive product JLI was selling. ..... 4

4. The Other Director Defendants exploited their role at JLI to expand JLI's youth market. ..... 6

B. Altria's Resources And Influence Ensure The JLI Enterprise Expands And Can Pursue Additional Fraudulent Schemes. ..... 7

1. Altria joins the ongoing JLI Enterprise ..... 7

2. Altria, Bowen, Monsees, Pritzker, Huh, and Valani took steps in furtherance of the nicotine content misrepresentation scheme ..... 10

3. Altria, Pritzker, and Valani undertook actions in furtherance of the flavor preservation scheme ..... 11

4. The cover–up scheme ..... 12

III. LEGAL STANDARD ..... 14

IV. ARGUMENT ..... 15

A. Plaintiffs Have Plausibly Alleged Viable RICO Claims ..... 15

1. Plaintiffs have plausibly alleged the existence of the JLI Enterprise ..... 15

a. Plaintiffs have plausibly alleged a RICO enterprise ..... 15

b. JLI is "distinct" from the RICO Defendants ..... 16

c. JLI was the vehicle for the RICO Defendants' fraudulent scheme ..... 18

2. Plaintiffs have plausibly alleged that every RICO Defendant conducted the affairs of JLI through a pattern of racketeering activity ..... 20

a. Bowen and Monsees conducted the affairs of the Enterprise through a pattern of racketeering activity. ..... 22

b. The Other Director Defendants conducted the affairs of the enterprise through a pattern of racketeering activity ..... 25

(i) The Other Director Defendants controlled JLI and played a role in each of the Enterprise's fraudulent schemes ..... 26

(ii) The Other Director Defendants intended to and did engage in a scheme to defraud, through a pattern of racketeering activity ..... 30

**TABLE OF CONTENTS**
**(continued)**

**Page**


c. Altria conducted the affairs of the Enterprise through a pattern of racketeering activity, including building on JLI's fraudulent schemes to hook youth and non–smokers .................. 30

(i) Altria was not merely engaged in routine corporate activities .................. 32

(ii) Altria was not just a service provider, but instead exercised control over JLI through JLI's Board and played a critical role in the fraudulent schemes .................. 33

(iii) Altria intended to and did engage in a scheme to defraud, through a pattern of racketeering activity .................. 36

d. The Other Director Defendants' Rule 9(b) arguments lack merit .................. 37

3. The Government Entity Plaintiffs sufficiently allege RICO injury and causation, as this Court has already held .................. 38

4. Plaintiffs Have Plausibly Alleged a Viable Section 1962(d) Conspiracy Claim .................. 40

B. California Plaintiffs Adequately Allege UCL and Unjust Enrichment Claims Against the Other Director Defendants .................. 41

1. California Plaintiffs have stated UCL claims against the Other Director Defendants .................. 41

2. California Plaintiffs have stated unjust enrichment claims against the Other Director Defendants .................. 42

C. The Government Entity Plaintiffs have adequately alleged that the Other Director Defendants personally participated in tortious conduct in violation of state law .................. 43

1. The Government Entity Plaintiffs have stated public nuisance claims against the Other Director Defendants .................. 43

2. The Government Entity Plaintiffs have stated negligence claims against the Other Director Defendants .................. 45

3. The Government Entity Plaintiffs have stated statutory consumer protection claims against the Other Director Defendants .................. 46

D. The Court Has Personal Jurisdiction Over the Claims of All Government Entity and Class Plaintiffs .................. 46

V. CONCLUSION .................. 50

## TABLE OF AUTHORITIES

**Page**

### CASES

*Aboujaoude v. Poinciana Dev. Co. II*, 509 F. Supp. 2d 1266 (S.D. Fla. 2007) .... 46

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174 (9th Cir. 2004) .... 49

*Alves v. Player's Edge, Inc.*, *No. 05–1654 WQH (CAB)*, 2006 WL 8455520 (S.D. Cal. July 19, 2006) .... 50

*Ass'n for L.A. Deputy Sheriffs v. Cty. of L.A.*, 648 F.3d 986 (9th Cir. 2011) .... 14

*Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993) .... 19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .... 14

*Boyle v. United States*, 556 U.S. 938 (2009) .... 15, 16

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) .... 15, 24

*Buckman Co. v. Plaintiffs' Leg. Comm.*, 531 U.S. 341 (2001) .... 21

*Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Inv., Inc.*, 788 F.2d 535 (9th Cir. 1986) .... 49

*Cabebe v. Nissan of N.A., Inc.*, 18–CV–00144–WHO, 2018 WL 5617732 (N.D. Cal. Oct. 26, 2018) .... 42

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) .... 18, 19, 30

*Cellco P'ship v. Hope*, No. CV11–0432–PHX–DGC, 2012 WL 260032 (D. Ariz. Jan. 30, 2012), *on reconsideration in part*, No. CV11–0432 PHX DGC, 2012 WL 715309 (D. Ariz. Mar. 6, 2012) .... 29, 30

*Chunghwa Telecom Glob., Inc. v. Medcom, LLC*, No. 5:13–CV–02104–HRL, 2016 WL 5815831 (N.D. Cal. Oct. 5, 2016) .... 48

*Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996) .... 41

*Cty. & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 3:18–CV–07591–CRB, 2020 WL 5816488 (N.D. Cal. Sept. 30, 2020) .... 39

*Davis v. Mutual Life Ins. Co.*, 6 F.3d 367 (6th Cir. 1993) .... 17

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) .... 19, 32

*Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774 (N.D. Cal. 2016) .... 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*ESG Capital Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016)........................................................................................ 43

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)............................................................................................... 15, 22

*Ileto v. Glock Inc.*,
349 F.3d 1191 (9th Cir. 2003)........................................................................................ 44

*In re Chrysler–Dodge–Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ........................................................................... 30

*In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*,
2019 WL 2468267 (N.D. Ohio Apr. 1, 2019), *report and recommendation adopted in part, rejected in part*, 2019 WL 3737023 (N.D. Ohio Jun. 13, 2019)............................................. 44

*In re Packaged Seafood Prods Antitrust Litig.*,
338 F. Supp. 3d 1118 (S.D. Cal. 2018)..................................................................... 49, 50

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*,
MDL 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) (relying on *Stapleton*, 293 F.3d at 1117) ................................................................................... 24, 29, 40

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
336 F. Supp. 3d 1256 (D. Kan. 2018) ........................................................................... 19

*Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*,
46 F.3d 258 (3d Cir. 1995)................................................................................ 17, 18, 28

*Just Film, Inc. v. Merchant Services, Inc.*,
C 10–1993 CW, 2012 WL 6087210 (N.D. Cal. Dec. 6, 2012)........................................ 39

*Kelly v. U.S.*,
140. S. Ct. 1565 (2020)................................................................................................. 21

*Kelmar v. Bank of Am. Corp.*,
No. CV–12–6826–PSG, 2012 WL 12850425 (C.D. Cal. Oct. 26, 2012), *aff'd*, 599 F. App'x 806 (9th Cir. 2015)..................................................................................................... 20

*Marshall & Ilsley Tr. Co. v. Pate*,
819 F.2d 806 (7th Cir. 1987).......................................................................................... 39

*Mavrix Photo, Inc. v. Brand Technologies, Inc.*,
647 F.3d 1218 (9th Cir. 2011)........................................................................................ 48

*Mayfield v. Asta Funding, Inc.*,
95 F. Supp. 3d 685 (S.D.N.Y. 2015).............................................................................. 46

*MCM Partners, Inc. v. Andrews–Bartlett & Associates, Inc.*,
62 F.3d 967 (7th Cir. 1995)............................................................................................ 35

*Menzies v. Seyfarth Shaw LLP*,
197 F. Supp. 3d 1076 (N.D. Ill. 2016) ........................................................................... 18

*Microsoft Corp. v. Gulfcoast Software Sols., LLC*,
2016 WL 4543231 (W.D. Wash. Jan. 4, 2016)............................................................... 49

*Moran v. Bromma*,
675 F. App'x 641 (9th Cir. 2017) .................................................................................. 17

**TABLE OF AUTHORITIES**
**(continued)**


**Page**

*Nat'l Org. for Women v. Scheidler*, 510 U.S. 249 (1994) ... 16

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) ... 37

*Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768 (9th Cir. 2002) ... 41

*OMNEL v. Tanner*, 2013 WL 3357886 (Cal. Ct. App. July 3, 2013) ... 46

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243 (9th Cir. 2019) ... 15

*Phillips v. Apple, Inc.*, 2016 WL 5846992 (N.D. Cal. Oct. 6, 2016) ... 42

*Quicksilver, Inc. v. Quick Sports International B.V.*, No. SACV 03–1548 DOC (ANx), 2005 WL 8157305 (C.D. Cal. May 11, 2005) ... 48

*Reves v. Ernst & Young*, 507 U.S. at 170 (1993) ... passim

*Salinas v. U.S.*, 522 U.S. 52 (1997) ... 40

*Sanford v. MemberWorks, Inc.*, 625 F.3d 550 (9th Cir. 2010) ... 37

*Schreiber Distrib. Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393 (9th Cir. 1986) ... 21

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) ... 48

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ... 15

*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992) ... 17, 18

*Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046 (C.D. Cal. 2016) ... 15

*State, Dept. of Health v. The Mill*, 887 P.2d 993 (Colo. 1994) ... 44

*Stewart v. American Ass'n of Physician Specialists, Inc.*, 2014 WL 2011799 (C.D. Cal. May 15, 2014) ... 49

*Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001 (9th Cir. 1985) ... 44

*U.S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 877 (D.D.C. 2006) ... 20, 36

*United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984 (9th Cir. 2011) ... 14

*United States v. Bohonus*, 628 F.2d 1167 (9th Cir. 1980) ... 21

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. Green*,
745 F.2d 1205 (9th Cir. 1984) ........ 21

*United States v. Hernandez*,
No. CR–14–0120 EMC, 2015 WL 4498084 (N.D. Cal. July 23, 2015) ........ 40

*United States v. Rone*,
598 F.2d 564 (9th Cir. 1979) ........ 17, 22

*United States v. Stapleton*,
293 F.3d 1111 (9th Cir. 2002) ........ 24, 29

*United States v. Turkette*,
452 U.S. 576 (1981) ........ 16, 17, 22

*Vess v. Ciba–Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ........ 14, 38

*Walter v. Drayson*,
538 F.3d 1244 (9th Cir. 2008) ........ 20, 35

*Yasukochi v. Bank of Am., N.A.*,
2016 WL 4508220 (S.D. Cal. Apr. 27, 2016) ........ 42

**STATUTES**

18 U.S.C. § 1961(4) ........ 15

18 U.S.C. § 1962(c) ........ 20

18 U.S.C. § 1964(c) ........ 15

18 U.S.C. § 1965(b) ........ 49

Calif. Bus. & Prof. Code § 22958(a) ........ 22

Fla. Stat. § 877.112(2) ........ 22

N.Y. Public Health Law § 1399–cc(3) ........ 22

**RULES**

Fed. R. Civ. P. 9 ........ 14

## I. INTRODUCTION

In its order on the first wave of motions to dismiss, the Court identified two deficiencies in the class and government entity pleadings: (1) failure to establish a RICO enterprise that operated separate from Juul Labs, Inc. ("JLI") itself; and (2) a lack of sufficiently particularized allegations of misconduct on the part of defendants Pritzker, Huh, and Valani ("Other Director Defendants"[1]) and the Altria Defendants.[2] Although the Court determined that Plaintiffs adequately pleaded most of the elements of RICO, UCL, and common law claims against these defendants, the Court found these two deficiencies fatal to those claims (with minor implications for personal jurisdiction), and granted leave to amend.[3]

Supported not only by enhanced allegations, but also by revelations from ongoing discovery, the amended complaints solve the problems the Court identified. *First*, rather than pleading an association–in–fact enterprise that included JLI as a participant, Plaintiffs now plead that JLI itself *was* the RICO enterprise, operated for fraudulent purposes by defendants. It is well–established that a corporation with legitimate business activities can also be used as a vehicle through which bad actors commit acts of racketeering. Having made that distinction, the amended complaints plausibly identify wrongful acts separate and apart from any legitimate business activities.

*Second*, the amended complaints include new, and more detailed allegations, about the specific acts of misconduct committed by the Other Director Defendants and the Altria Defendants. For example, the amended complaints provide specific examples of the Other Director Defendants' involvement in key decisions regarding the unlawful conduct, exactly how the Other Director Defendants controlled the JLI's Board, and the illegal acts taken by the Board

---

[1] Although Huh, Pritzker, and Valani refer to themselves as the "Non–Management Defendants," plaintiffs have adopted the "Other Director Defendants" terminology used by the Court in its motion to dismiss order.

[2] Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services LLC, and Altria Group Distribution Company are referred to herein collectively as "the Altria Defendants" or "Altria."

[3] The Court also dismissed without prejudice one theory of the class plaintiffs' implied warranty claims and their UCL claims against Altria for lack of standing. As set forth in the parties' stipulation, ECF 1352, class plaintiffs do not at this time challenge those portions of the Court's order.

as a result of that control. Similarly, the amended complaint shows how Altria worked with Pritzker and Valani to direct JLI and further the fraudulent schemes.

The new and expanded allegations respond directly to the Court's concerns, and support Plaintiffs' RICO, UCL, and common law claims. The Court should deny the defendants' motions to dismiss.

## II. FACTUAL BACKGROUND

Plaintiffs' amended complaints describe the ways in which Defendants Bowen, Monsees, Pritzker, Huh, and Valani (the "Individual Defendants") coopted and controlled JLI and used it to engage in a pattern of racketeering activity (the JLI Enterprise) as they launched and marketed the JUUL e–cigarette, and how Altria began to participate in the JLI Enterprise by Spring 2017. The RICO Defendants[4] pursued a series of fraudulent schemes through the JLI Enterprise, including: targeting youth, misrepresenting and omitting to consumers of all ages what JLI was really selling and to whom (including, specifically, misrepresentations and omissions regarding the nicotine potency of JUUL products), and seeking to delay or prevent public outcry and regulation that would impede the exponential growth of JUUL's massive youth market share. They worked in concert to effectuate these schemes by causing or personally committing numerous acts of mail and wire fraud.

### A. The Individual Defendants And The Early Days Of The JLI Enterprise

#### 1. Bowen and Monsees intentionally designed an addictive product

Bowen and Monsees were the visionaries behind JUUL, led JLI in its infancy to develop a highly addictive product, and formed the JLI Enterprise with the aim of creating a growing base of loyal users, including an illicit youth market of nicotine users.[5] Second Amended Consolidated Class Action Complaint[6] ("SAC") ¶¶ 35, 870. Bowen and Monsees followed the same tactics that

---

[4] The "RICO Defendants" are Defendants Bowen, Monsees, Pritzker, Huh, and Valani, and the Altria Defendants.

[5] At the time, JLI was known as Ploom, Inc., a predecessor company. In 2015, Ploom, Inc. changed its name to PAX Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name, PAX Labs, Inc. For ease of reference, Plaintiffs will only refer to the primary entity as "JLI."

[6] Plaintiffs will cite the Second Amended Class Action Complaint as the exemplar complaint, except when discussing issues specific to the Government Entity Plaintiffs, in which case they

*Footnote continued on next page*

the cigarette industry has used for decades: selling to kids and lying to adults about their products. *Id*. In the nascent stages of the JLI Enterprise, Bowen and others within JLI developed JUUL, an extremely potent nicotine delivery device that looked nothing like a cigarette; the goal was to create a highly addictive product that seemed harmless and was appealing to youth. *Id.* ¶¶ 71–82, 873–74. Under Bowen's leadership, JLI conducted early studies and confirmed that their nicotine benzoate formulation delivered large doses of nicotine to the blood stream much faster than a cigarette, which significantly amplified JUUL's "buzz"—and the risks of abuse and addiction. *Id.* ¶¶ 101–128. But Bowen and others within JLI at the time (in consultation with Monsees, Pritzker, and Valani) manipulated the results of those studies, falsely portrayed JUUL as having a milder pharmacokinetic profile than a cigarette, and forged ahead with an even more potent "5%" formulation that is more addictive, and delivers more nicotine, than a cigarette—all without a cigarette's harsh "throat hit." *Id*. Having developed JUUL to provide consumers with palatable access to high concentrations of nicotine like never before, the JLI Enterprise sought to deceive consumers and the public regarding the highly addictive nature of the JUUL product and how it compared to cigarettes.

Bowen and Monsees focused not only on the design of the highly addictive product, but also how best to market it to their target audience—kids and other non–smokers. Monsees admitted that, when creating JLI, he and Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public in 1998. *Id.* ¶¶ 72, 871. That marketing admittedly sought to appeal to kids in order to recruit new smokers and was banned as a result of government lawsuits.

### 2. <u>The Other Director Defendants used JLI to expand Bowen's and Monsees's vision</u>

The Other Director Defendants controlled a majority of the seats on JLI's Board of Directors throughout the events underlying this suit. JLI's Board had a maximum of seven seats. *Id.* ¶ 360. Monsees and Bowen each occupied a seat; Pritzker and Valani controlled two seats

---

*Footnote continued from previous page*
will cite the Three Village School District Second Amended Complaint ("TVC"). All of the cited allegations regarding the Defendants' conduct appear in all of the amended complaints.

each; and the seventh seat, appointed by a majority of the Board, was occupied by Huh. *Id.* ¶¶ 24–26; 360–367.

Board decisions were made by majority vote. *Id.* ¶¶ 366–67. Thus, Pritzker, Valani, and Huh, holding five Board seats between them, had the ability to control the outcome of all decisions of the seven–seat Board. And at all relevant times, even before Huh joined and after he resigned from the Board, Pritzker and Valani controlled a majority of the JLI Board, so they had an effective "veto" over any decisions made by the Board. *Id.*; ¶¶ 420, 424 (in 2017, Altria, preparing for a meeting with JLI, noted that their research showed "Valani and Pritzker control majority of voting power and 44% economic interests").

The Other Director Defendants used their control of JLI to take charge of marketing JUUL products, and particularly targeting youth; growing JUUL's market share to best position JLI for acquisition by a tobacco company seeking teenage customers; and selecting Pritzker and Valani to lead the negotiations with Altria and bring Altria into the Enterprise. *Id.* ¶¶ 38–42.

#### 3. <u>The Individual Defendants undertook a fraudulent marketing scheme to mislead the public about the addictive product JLI was selling.</u>

Defendants Bowen, Monsees, Pritzker, Huh, and Valani directed and caused JLI to make false and misleading advertisements that also omitted references to JUUL's nicotine potency and health risks to be transmitted via the mail and wires, including the youth–targeted Vaporized campaign. *Id.* ¶¶ 368–77, 897. Pritzker, Valani, and Huh were more involved and exercised more control over the operations of JLI than is usual for corporate directors. For example, in June 2015, the Other Director Defendants gave detailed feedback on the Vaporized marketing campaign, which led then–COO Scott Dunlap to comment that "[o]ur board members are more involved than most." *Id.* ¶ 368. Pritzker, Valani, and Huh were involved at such a granular level that Dunlap worried that "the board [will] try and write copy" for branding materials. *Id.*[7] JLI's Board also met far more frequently than is typical, with weekly Board calls in addition to monthly meetings. *Id.* ¶ 369.

---

[7] Dunlap's efforts to wrestle control over marketing from Pritzker, Valani, and Huh failed—he was the first person fired when their Executive Committee began to clean house. *Id.* ¶ 368.

As early as 2014, Pritzker participated in planning discussions with Monsees and Valani about how to get their addictive product in the hands of as many consumers as possible, including youth. *Id.* ¶¶ 372, 898. In January 2015, Monsees, Bowen, Valani, and Pritzker met as part of the Board of Directors—then comprising of only Pritzker, Valani, Bowen, Monsees, and Hank Handelsman (in Valani's second seat)—to discuss JLI's marketing. *Id.* ¶ 373. The entire marketing strategy for JUUL, including reliance on influencers and a planned partnership with the # 1 youth media magazine, *Vice*, was presented to the Board at this meeting for approval before its launch. *Id.* Also in January 2015, Monsees, Bowen, Pritzker, and Valani discussed how to market JUUL and the product's nicotine content. *Id.* ¶ 372. They dictated specific goals for the company's messaging and gave "direction…on [the board's] comfort level with" the way nicotine was addressed in JLI's marketing, including dictating specific language that was or was not acceptable. *Id.* ¶¶ 372–74.

In March 2015, the Board—controlled by Pritzker and Valani—received information that "Influencer Marketing has begun" and approved specific marketing materials used in JUUL's launch. *Id.* ¶¶ 375–76. The Board reviewed Vaporized marketing images and made "some commentary at the youthfulness of the models[,]" but "nobody disliked them" and "everybody agreed they are pretty 'effective[.]'" *Id.* Bowen, Monsees, Pritzker, and Valani knew that the ads targeted youth but nonetheless "[JLI]'s board of directors signed off on the company's launch plans[.]" *Id.* ¶¶ 316, 376. In addition, Monsees personally reviewed the photographs that were used in the youth–oriented advertisements that accompanied JUUL's launch. *Id.* ¶¶ 316, 900.

Huh began joining the Board's weekly calls starting in May 2015, before he formally took a seat on the Board in June. *Id.* ¶ 369. In the months following JUUL's June 2015 launch, the youth appeal of JUUL's marketing became a "common conversation" at the weekly Board calls. *Id.* ¶ 369. At a Board meeting, Monsees, Bowen, Pritzker, Valani, and Huh discussed both the youthful focus of JUUL's branding and "the Company's approach to advertising and marketing and portrayal of the product, which led to a discussion of the Company's longer term strategy led by Mr. Monsees." *Id.* ¶ 378.

In short, Bowen, Monsees, Pritzker, and Valani—who controlled JLI's Board at the

time— reviewed and approved the *Vaporized* campaign, including its omission of any reference to nicotine content. *Id.* ¶ 377. And they, along with Huh, ensured that campaign continued past JUUL's launch. *Id.* ¶ 379.

### 4. **The Other Director Defendants exploited their role at JLI to expand JLI's youth market.**

Inside the company, the confirmation that JUUL had a strong appeal to young people came almost immediately after JUUL's launch. *Id.* ¶ 379. Early signs of teenage use kicked off an internal debate within JLI's Board, where some Board members argued for immediate action to curb youth sales. *Id.* ¶¶ 379–80. But the Other Director Defendants rejected those proposed changes, knowing that their nicotine product would be much more profitable if it captured the youth market and arguing "the company couldn't be blamed for youth nicotine addiction." *Id.* ¶¶ 379, 381. Although JLI's highly sanitized Board minutes do not reflect whether this debate was put to a vote, Pritzker, Valani, and Huh decided and ensured that JLI would continue pursuing the youth market. *Id.* ¶ 382. During this time, JLI took the unusual step of ceasing interactions with the press while the Board (controlled by Bowen, Monsees, and the Other Director Defendants) finalized a "messaging framework" and directed and monitored the plans they set in motion, including the launch of sponsored social media content in July 2015. *Id.* ¶ 391.

In October 2015, Monsees stepped down as CEO of JLI and the Other Director Defendants appointed themselves as an Executive Committee to run JLI in the place of a CEO and provide a "consistent and focused direction to the company" and "usher in the next phase of growth for the business." *Id.* ¶¶ 382, 395. Huh became the Executive Chairman and Pritzker became the Co–Chairman. *Id.* ¶ 395. Exerting their control, the Other Director Defendants directed the continuation of marketing that they knew was actively targeting youth, effectively took over JLI, and cleaned house by dismissing dissenting voices in management. *Id.* ¶¶ 39, 382. Keeping the company's youth marketing on track was critical to and consistent with the Other Director Defendants' overall goal of accelerating JLI's growth and expanding its customer base and profits—regardless of the human cost. *Id.* ¶ 395.

As the Executive Committee, the Other Director Defendants were intimately involved in

the company's business operations. JLI's organizational charts reflected the Executive Committee in the place of a CEO; senior executives at JLI began reporting directly to the Committee; and Huh was empowered to "make decisions on behalf of the [Board of Directors] Exec[utive] Comm[ittee]." *Id.* ¶¶ 397–400. Huh and Pritzker even began coming into the office several days a week to "help us manage our people." *Id.* ¶ 400. Huh reviewed and approved changes to JLI's "brand and collateral positioning on behalf of the board" in March 2016. *Id.* ¶ 385. Around this time, JUULs branding shifted from the explicitly youth–oriented *Vaporized* campaign to a more subtle approach to appealing to youth. This new campaign included themes that previous litigation against the cigarette industry and Altria and Philip Morris, in particular, proved were effective in increasing youth sales. *Id.* And for years, JLI continued to offer flavors it knew appealed to teens, like mint, mango, fruit medley, and crème brulee. *Id*. ¶¶ 152–53, 162–63.

Although JLI hired a new CEO in August 2016, the Other Director Defendants continued to exercise control over and direct the affairs of JLI. *See, e.g.*, *id.* ¶ 408 (JLI's media plan put on hold in 2017 because the Board—then controlled by Pritzker, Valani, and Huh—did not approve); ¶ 409 (Valani supervised plans to sell JUUL devices in vending machines, asking for early design images and constructs); ¶ 410 (Pritzker dictated specific changes to the content on JUUL's corporate website in May 2017); ¶ 412 (in October 2017, Pritzker rejected a specific marketing campaign proposal, noting that he "didn't like" it); ¶ 413 (Pritzker personally involved in customer service issues); ¶ 429 (Valani proposed JLI find ways to "leverage user generated content" on social media in July 2016). Pritzker and Valani also closely controlled JLI's public relations and media strategies, dictating JLI's messaging in response to negative press and requesting a "week–by–week progress" report. *Id.* ¶ 414.

### B. <u>Altria's Resources And Influence Ensure The JLI Enterprise Expands And Can Pursue Additional Fraudulent Schemes.</u>

#### 1. <u>Altria joins the ongoing JLI Enterprise</u>

Bowen, Monsees, Pritzker, Huh, and Valani knew that the way to maximize their personal profit from their unlawful acts was to use their control of JLI to position the company for acquisition. *Id.* ¶ 41. In particular, they knew that their desire to create and monetize a massive

new market for JUUL would be aided if they could convert Altria, an experienced cigarette company with a history of marketing to youth and covering it up, into an ally and eventual purchaser. *Id.* ¶ 43. They began that effort in the Spring of 2017, dispatching Pritzker and Valani to engage in back–channel negotiations with Altria. *Id.* ¶¶ 43, 52–53.

Altria, for its part, needed to replenish its shrinking customer base of combustible cigarette smokers, as it had little ability to recruit new smokers in the ways that had driven Philip Morris' success through most of the 1900s due to the Master Settlement Agreement and other litigation against and regulation of the cigarette industry. *Id.* ¶ 44. Simultaneously, it was struggling to achieve this goal through middling sales of its own e–cigarette product. Altria was carefully studying JUUL, including examining JUUL's market share, design, and flavor names. *Id.* ¶ 48. JUUL's popularity with youth and non–smokers was public knowledge and widely reported. *Id.* ¶ 239, 517. Altria also directly received data that confirmed that JUUL was popular with youth. On January 3, 2018, Avail Vapor, LLC ("Avail") shared JUUL sales data with Altria, showing that the vast majority of JUUL purchasers at Avail stores were 18 or 19 years old. *Id.* ¶ 518. James Xu at Avail also repeatedly warned Altria executives of the youth appeal of JUUL. *Id.* ¶ 519. In addition, Altria requested and received information from JLI regarding JUUL's "underage product appeal" and "underage use." *Id.* ¶ 530.

Recognizing that JUUL was popular with youth, Altria told Pritzker and Valani that they were all aligned on a "strategic vision as to how to grow the JUUL business rapidly." *Id.* ¶ 517. Wanting to ensure JLI continued to appeal to and retain new nicotine users, including youth, Altria worked with Defendants Pritzker and Valani to direct JLI to maintain and expand JUUL's market share and sales.

Altria's leadership met with Pritzker and Valani, often privately, throughout 2017 and 2018. These were not typical arms–length interactions. Altria viewed Valani as a potential "back–channel" and emails between Defendant Pritzker and Altria suggest that these communications were not always "in [their] capacity as directors." *Id.* ¶¶ 518, 519. While Pritzker and Valani were pushing for "high value," they told Altria that JLI "does not need capital." *Id.* ¶ 513. Instead, in exchange for giving Monsees, Bowen, Pritzker, Valani, and Huh billions of dollars in the form of

equity payouts, Altria sought to purchase a majority share in JLI and "control generally the JUUL business." *Id.* ¶ 517.[8] In other words, Pritzker and Valani sought a massive payday for themselves and were not looking out for the interests of JLI as a corporation. JLI did "not need" the massive capital infusion that Altria's investment would ultimately provide. It was the investors—Pritzker, Valani, Huh, Bowen, and Monsees—who stood to benefit. *Id.* ¶ 513. And each one of them was handsomely rewarded. In December 2018, Altria formalized its relationship with JLI's leadership by making a $12.8 billion equity investment in JLI through Altria Group and its wholly–owned subsidiary, Altria Enterprises—the largest equity investment in United States history. *Id.* ¶ 548. The arrangement was profitable for both Altria as well as the Individual Defendants. Each of the Individual Defendants received millions or billions of dollars. *Id.* In turn, Altria and its subsidiaries received millions of loyal teen customers, customers Altria was no longer able to get through the sale of its own cigarette products. *Id.*

But Altria's direct participation in the JLI Enterprise occurred well before its investment, as it worked to ensure that JUUL would remain on the market and available to youth in the face of growing public and regulatory scrutiny. In 2018, when negotiations with Pritzker and Valani were already well underway, Altria spent $100 million to acquire prime shelf space at retailers for at least two years, purportedly for its own e–cigarette product that Altria planned on discontinuing that same year. *Id.* ¶ 544. Altria later provided this retail shelf space to JLI, ensuring that JUUL was placed next to Altria's Marlboro cigarettes—the most iconic, popular brand of cigarettes among underage users. *Id.* ¶¶ 545–47. By August 2018, Altria was preparing a "Youth vaping prevention plan" for JLI which would never actually result in youth vaping prevention. *Id.* ¶ 522. And by October 2018, Altria directly engaged in mail or wire fraud in support of the JLI Enterprise by transmitting a letter to the FDA which sought to deceive the regulator and prevent the FDA from banning JUUL's popular mint JUUL pods. *Id.* ¶¶ 533, 638–646, 892. Following its December 2018 investment and attendant pay–off of the Individual Defendants, Altria also directly distributed fraudulent statements that JLI was a cessation device, *id.* ¶¶ 532–34, 583–84,

---

[8] While Altria ultimately made a 35% investment in JLI, internal documents reveal that its goal to "influence" and "guide" JLI remained the same. *See, e.g.* SAC at ¶¶ 526, 554, 587, 589.

943, that JLI did not target youth, *id.* ¶¶ 494, and that the nicotine in a single JUUL pod was equivalent to a pack of cigarettes, *id.* ¶¶ 205, 920.

Moreover, to further bolster its influence and control of the JLI Enterprise, Altria worked with Pritzker and Valani to install two key Altria executives into leadership positions at JLI: former Vice President of Altria Client Services and President of Philip Morris USA, K.C. Crosthwaite as CEO of JLI and former Senior Vice President of Regulatory Affairs of Altria Client Services and President and General Manager of Altria's e–cigarette business, Nu Mark LLC, Joe Murillo as head of JLI's regulatory operations. *Id.* ¶¶ 552–569.

**2. <u>Altria, Bowen, Monsees, Pritzker, Huh, and Valani took steps in furtherance of the nicotine content misrepresentation scheme</u>**

Prior to, during, and following Altria's negotiations and ultimate investment in JLI, the RICO Defendants directed the distribution to consumers of millions of JUUL pod packages that deceptively equated the nicotine content of one JUUL pod as equivalent to one pack of cigarettes, even as they knew a JUUL pod delivered substantially more nicotine than a standard pack of combustible cigarettes. *Id.* ¶¶ 198–215, 916. Bowen, Monsees, and the Other Director Defendants also caused the same false and misleading information to be distributed via JLI's website. *Id.* ¶¶ 201–202, 210, 913.

Each of the RICO Defendants was a knowing participant in this scheme. Bowen participated in studies regarding the nicotine content of JUUL pods, including by altering or re–engineering his own studies concerning nicotine content to mask the true nicotine content and impact in the products he developed. *Id.* ¶¶ 113–116, 122–28, 190–97, 914. Monsees, Pritzker, and Valani had personal knowledge about JUUL product nicotine content and potency through direct communications with Bowen regarding the results of his various tests of JUUL products' nicotine content. *Id.* ¶¶ 197, 915. Altria knew in 2017 that a JUUL pod delivered more nicotine than one pack of cigarettes, both from its own e–cigarette product and from its own pharmacokinetic testing of JUUL (likely conducted by Altria Client Services). *Id.* ¶¶ 206–07.

Bowen also directed, on May 4, 2018, that Ashley Gould convey to the Washington Post that JLI's studies "support that nic strength and pack equivalence holds true," even though he

knew this statement was false. *Id.* ¶ 917. On May 10, 2018, the Washington Post published an article, quoting a JUUL spokesperson extensively and stating that JUUL "contains about the same amount of nicotine as a pack of cigarettes"—the exact false statement Bowen instructed Gould to convey to the Post. *Id.*[9]

With the approval and consent of Altria Group and under the management of Altria Client Services (the "Provider Manager" for the contracts), Altria Group Distribution Company ("AGDC") also distributed millions of JUUL pod packages to stores across the country. *Id.* ¶¶ 205, 920. These packages included the false and misleading information regarding JUUL pods' nicotine content.

### 3. Altria, Pritzker, and Valani undertook actions in furtherance of the flavor preservation scheme

Altria, Pritzker, and Valani also worked in concert to defraud the public and deceive regulators to prevent regulation that would have impeded their plan to keep selling to children. Specifically, they worked to ensure that JUUL's mint flavor would remain on the market even after other flavors were banned or removed in response to public scrutiny into the appeal of flavors to kids. This plan was coordinated through Avail, a company partially owned by Altria. Through Avail, the RICO Defendants obtained evidence that confirmed that mint was so popular with non–smoking teenagers that, even if mint was the only JUUL flavor available, JLI would remain a multi–billion dollar enterprise. *Id.* ¶¶ 536–39, 923. Other studies conducted by JLI, and shared with Altria, confirmed the data received through Avail. *Id.* ¶¶ 172–82, 624–25.

Weeks before Altria's equity investment in December 2018, the regulatory pressure ramped up significantly. On September 25, 2018, then–FDA Commissioner Scott Gottlieb sent letters to Altria, JLI, and other e–cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors." *Id.* ¶¶ 628, 925.

In response, Altria and JLI (controlled by the Individual Defendants) engaged in a deceptive campaign to lull the FDA into not regulating mint JUUL pods, conveying that mint was

[9] Defendant Monsees also played a key role in continuing this fraudulent scheme. By no later than July 2018, Monsees required that JLI employees obtain his personal approval for the artwork on all JUUL pod packaging. *Id.*¶¶ 201, 919.

simply a traditional cigarette flavor designed to help adult smokers switch, rather than a flavor that appealed primarily to youth. *Id.* ¶¶ 621–38, 924. On October 25, 2018, Altria Group sent a letter to the FDA portraying mint as a traditional tobacco flavor. *Id.* ¶¶ 638, 927. The same day it sent the letter to the FDA, Altria shared this letter with Pritzker and Valani. *Id.* ¶¶ 646, 927. JLI, at the direction of Altria, Pritzker and Valani, subsequently sent a similar letter and false youth study, fraudulently claiming that mint was a traditional tobacco flavor and was not attractive to kids. *Id.* ¶ 927. The goal was to prevent a ban on mint JUUL pods, and the scheme was successful—mint JUUL pods were available on the market until November 2019. *Id.* ¶¶ 648–54. Sales of mint skyrocketed, accounting for approximately 75% of JLI's total 2019 sales, and Altria directly helped promote mint via a "market blitz" for JUUL products in 2019, distributing order forms to stores that were skewed towards mint, and having a senior executive communicate with JLI's then–CEO, Kevin Burns, about fixing "inventory constraints" involving mint 5% JUUL pods. *Id.* ¶¶ 576–78, 654. Thousands, if not millions, of underage JUUL users suffered the consequences. *Id.* ¶ 654.

**4. <u>The cover–up scheme</u>**

The RICO Defendants were not only concerned with protecting flavors. In light of growing public scrutiny of JLI's role in the youth vaping crisis, these Defendants continued their scheme to prevent a complete ban on JLI's product or overwhelming public outcry by portraying JUUL as a smoking cessation device and denying that the company ever marketed to youth.

Each of the RICO Defendants knew that JUUL had marketed to youth. *See, e.g.*, *id.* ¶¶ 376–85, 426–29, 932 (Bowen), *id.* ¶¶ 376–85, 426–29, 933 (Monsees), *id.* ¶¶ 376–85, 426–29, 935–36 (Pritzker, Valani, and Huh), *id.* ¶¶ 517–19, 530 (Altria). Yet Monsees, Bowen, Pritzker, Valani, and Altria took actions on behalf of the JLI Enterprise to defraud the public and regulators about the JLI Enterprise's actions and true intentions. In 2018, when public concern grew about youth vaping, Valani directed JLI's strategy in responding to such concerns. Valani directed a strategy of distraction and misinformation, attacking and undermining studies linking the JLI Enterprise with the youth vaping crisis and misdirecting the focus on youth smokers who allegedly had switched to JUUL—a misinformation campaign designed to stave off regulation or

the ban of JUUL products. *Id.* ¶¶ 414, 936.

Also in 2018, Pritzker and Valani were heavily involved in planning sham "youth prevention" activities, whereby JLI would put on seminars for school children that ostensibly were designed to prevent youth vaping, but which actually told school children that vaping was safe and even taught children how to use the product. *Id.* ¶¶ 482, 937. Pritzker and Valani also approved a press release in response to U.S. Senators' inquiry, which falsely detailed JLI's alleged youth vaping prevention efforts, *id.* ¶¶ 416, 938; edited and revised press releases about JLI's youth prevention activities and steps JLI purportedly was taking to prevent youth sales, *id.* ¶¶ 482, 939; and approved then–CEO Kevin Burn's op–ed in the Washington Post claiming that JLI did not want to sell to youth and was only targeting adult smokers. *Id.* ¶¶ 418, 939. Monsees also repeated this lie to both congress and the press. *Id.* ¶¶ 491, 494, 947–48. As did Altria. *Id.* ¶ 493–94. And Bowen also pushed this lie through the press. *Id.* ¶ 491.

To complement their youth marketing denials, the RICO Defendants ensured that JLI portrayed JUUL as a cessation device. For example, Pritzker and Valani saw in advance, and Valani approved, the fraudulent "Make the Switch" advertising campaign, which featured former smokers aged 37 to 54 discussing how JUUL helped them quit smoking, and Valani selected which videos should be aired as part of the campaign. *Id.* ¶¶ 534, 941–42. Altria Group's subsidiaries Philip Morris USA and AGDC continued his scheme by transmitting the fraudulent "Make the Switch" advertisements in packs of its combustible cigarettes. *Id.* ¶¶ 532–34, 583–84, 943. Altria Client Services did the same by e–mailing and mailing out hundreds of thousands of "Make the Switch" advertisements, with the approval and consent of Altria Group. *Id.* Monsees, for his part, conveyed this cessation lie to Congress and to the public. *Id.* ¶¶ 225–29, 944–45.

In support of this scheme, Altria's October 2018 letter to the FDA claimed that Altria was committed to youth smoking prevention and was pulling its e–cigarette from the market because "pod–based products significantly contribute to the rise in youth use of e–vapor products." *Id.* ¶ 280. In reality, Altria was working with Pritzker and Valani to invest in (with the goal of ultimately purchasing outright) the largest maker of pod–based products on the market, and the one with the largest share of new youth nicotine users. Altria withdrew its MarkTen line of e–

cigarettes from the market not out of concern for the epidemic of youth nicotine addiction, but because it was a "part of its deal" with JLI, which went public just two months later, in December 2018. *Id.* ¶ 638–41.

Participating in the JLI Enterprise, the RICO Defendants engaged in these fraudulent schemes through predicate acts of mail and wire fraud, only some of which are described above. The SAC includes a chart of some of the Enterprise's acts of mail and wire fraud. *Id.* ¶ 959. The sections cross–referenced in the chart detail how the RICO Defendants directly approved certain fraudulent statements or set into motion a scheme to defraud that reasonably led to such fraudulent statements being transmitted via the mail and wires.

## III. LEGAL STANDARD

When ruling on a motion to dismiss, the Court accepts all complaint allegations as true, considers them as a whole, and draws all reasonable inferences in Plaintiffs' favor. *Ass'n for L.A. Deputy Sheriffs v. Cty. of L.A.*, 648 F.3d 986, 991 (9th Cir. 2011). For non–fraud based claims, Plaintiffs need only set forth enough facts as are necessary to state facially plausible claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Under Rule 9(b), fraud allegations must "be specific enough to give defendants notice of the particular misconduct…so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation omitted). Not all elements must be pleaded with particularity; "other facts may be pleaded generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011); *see* Fed. R. Civ. P. 9 (providing that "intent, knowledge, and other conditions of a person's mind may be alleged generally."). Rule 9(b) is "relaxed" when "the defendant must necessarily possess full information concerning the facts of the controversy" or "when the facts lie more in" its knowledge. *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 790 (N.D. Cal. 2016) (quotation omitted).

## IV. ARGUMENT

### A. Plaintiffs Have Plausibly Alleged Viable RICO Claims

#### 1. Plaintiffs have plausibly alleged the existence of the JLI Enterprise

RICO provides a civil remedy for persons injured in their business or property "by reason of" a pattern of racketeering activity (which, here, means acts of mail and wire fraud). 18 U.S.C. § 1964(c). RICO applies "the same way" in criminal and civil cases. Rather than being disfavored, as Defendants' briefs suggest, "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes[.]" *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985); *see also Boyle v. United States*, 556 U.S. 938, 944 (2009) (same and collecting cases).

The Supreme Court has repeatedly rejected the view that RICO only applies to the mafia or criminal organizations. *Sedima*, 473 U.S. at 498–500; *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248–49 (1989). Although the RICO statute was enacted to combat organized crime, "it has become a tool for everyday fraud cases brought against respected and legitimate enterprises." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019) (internal quotations omitted). Congress deliberately "drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways." *H.J. Inc.*, 492 U.S. at 248–49. "The upshot is that RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).

##### a. Plaintiffs have plausibly alleged a RICO enterprise

The RICO statute defines an enterprise as "any individual, partnership, **corporation**, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Thus, the statute provides for two types of RICO enterprises: (1) "legal entities" used as vehicles through which bad actors commit acts of racketeering; and (2) several corporate entities or individuals "associated in fact." *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1053 (C.D. Cal. 2016) (quoting *United States v.*

*Turkette*, 452 U.S. 576, 581–82 (1981)); *see also Boyle v. United States*, 556 U.S. 938, 946 (2009).

Plaintiffs allege that the RICO Defendants used JLI as a vehicle to engage in an unlawful scheme to defraud. SAC at ¶¶ 857–66. Defendants cite no case in which a corporation failed to qualify as an "enterprise" under the statute. Instead, they offer the unsupported argument that, because plaintiffs allege JLI was a bad actor, it could not also be the RICO enterprise. *See, e.g.*, Altria Br., Dkt. No. 1223, at 1. But that is not the law. The enterprise need not be "the victim of [racketeering] activity." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249 (1994). Instead, the RICO enterprise is, as here with JLI, the "vehicle through which the unlawful pattern of racketeering activity is committed." *Id.*[10] Thus, the SAC alleges the existence of two distinct persons or entities: (1) "persons" who are the RICO defendants that carry out the pattern of racketeering activity (Bowen, Monsees, Pritzker, Valani, Huh, and Altria); and (2) an "enterprise," JLI, that is distinct from those persons, and through which the RICO Defendants' racketeering activity is committed. SAC at ¶¶ 857–59, 865–66.

**b. <u>JLI is "distinct" from the RICO Defendants</u>**

The amended complaints solve the problem that the Court identified in its prior Order. The Court concluded that "plaintiffs have not plausibly alleged the existence of a **distinct** Enterprise, separate and apart from the general business of JLI." Order on Substantive Motions to Dismiss, ECF No. 1084 ("Order") at 45 (emphasis added). Distinctness is no longer an issue, however, as Plaintiffs now allege a corporate, rather than association–in–fact ("AIF"), enterprise. Plaintiffs allege that the RICO Defendants used JLI itself as the vehicle for their fraudulent schemes to increase sales through deception, including but not limited to making false representations about JUUL's nicotine content, and creating and growing an illicit market for selling JUUL products to underage users. *See* SAC at ¶ 865; *see also* § IV.A.2. This Court has already held that the Plaintiffs sufficiently alleged a scheme to defraud with those aims and results. Order at 58–59.

[10] *Reves v. Ernst & Young*, 507 U.S. at 170, 182 (1993) ("Congress consistently referred to subsection (c) as prohibiting the *operation* of an enterprise through a pattern of racketeering activity[.]").

Even if JLI has some legitimate business activities, it still can function as a RICO Enterprise. The RICO statute applies equally to legitimate and illegitimate businesses. *Turkette*, 452 U.S. at 501; *see also United States v. Rone*, 598 F.2d 564, 568 (9th Cir. 1979) (holding that "Congress gave the term enterprise a very broad meaning" and that "the Act clearly encompasses not only legitimate businesses but also enterprises which are from their inception organized for illicit purposes" (quotations omitted)). "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 581–82.

Circuit courts have consistently held that "when officers and/or employees operate and manage a legitimate corporation and use it to conduct, through interstate commerce, a pattern of racketeering activity, those defendant persons are properly liable under § 1962(c)." *See, e.g.*, *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 269 (3d Cir. 1995) (recognizing that the corporate entity is distinct from the officer, director, or outside influencers who use the company as a vehicle to engage in a fraudulent scheme). The Ninth Circuit recognized this principle in *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992), holding that the distinctness problem arises only when the corporation is the named defendant but does not exist when individual officers are the defendants/persons and the corporation is the enterprise. *Id.* at 1534; *see also Moran v. Bromma*, 675 F. App'x 641, 645 (9th Cir. 2017); *Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 377–78 (6th Cir. 1993).

Far from playing a "shell game," or using "sleight of hand" that "flies in the face of basic RICO jurisprudence," *see* Altria Br. at 1, Plaintiffs have revised their legal theory in light of newly uncovered allegations and the Court's order. RICO actions routinely involve defendants using a corporate enterprise as a vehicle for a fraudulent scheme that deprives its victims of business or property. For example, in *Jaguar Cars*, the Third Circuit expressly rejected the notion that "allowing a § 1962(c) action against officers conducting a pattern of racketeering activity through a corporate enterprise yields an 'absurd result.'" *Jaguar Cars*, 46 F.3d at 268. In fact, this result "accords with binding Supreme Court precedent" and "is supported by the interpretation adopted by all other circuits that have addressed the question." *Id.* Tellingly, no Defendant cites a

single corporate enterprise case holding otherwise.

c. **JLI was the vehicle for the RICO Defendants' fraudulent scheme**

Plaintiffs allege that the RICO Defendants used JLI as a tool through which they made billions of dollars from JUUL e–cigarette products through fraudulent schemes, including by misrepresenting the nicotine content of the product and by creating, expanding, and maintaining an illicit youth market. *See* Order at 58–59. Specifically, and as this Court has already recognized, Plaintiffs sufficiently alleged that RICO Defendants and JLI participated in fraudulent schemes by: "(1) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products; (2) misrepresenting to the public that JUUL was a smoking cessation tool; and, (3) using third–party groups to spread false and misleading narratives about e–cigarettes, and JUUL in particular, in order to grow the market for nicotine users, particularly among youth." Order at 58. As the Court noted, the mere sale of JLI products is not the scheme to defraud. The scheme is "the intentional design and related fraudulent misrepresentations or omissions regarding its intentional addictiveness and method of nicotine delivery, combined with the intent, contrary to public statements, to grow the market for nicotine–addicted individuals (particularly youth who did not use traditional tobacco products)." *Id.* at 58–59.

Though Defendants describe their participation in these schemes to defraud as merely conducting the "ordinary" or "regular" business of JLI,[11] the law recognizes a distinction between legitimate business activity and the operation of a fraudulent scheme. *See, e.g.*, *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1094-95 (N.D. Ill. 2016). And the Individual Defendants' status as directors does not insulate them from liability. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (holding that company's sole owner could be the "person" and the company could be the "enterprise" for RICO purposes).[12] Nor does Altria's

[11] *See* Other Direct Defendant ("ODD") Br., Dkt. No. 1222, at 16; Altria Br., Dkt. No. 1223, at 8, 17; Bowen Br., Dkt. No. 1229, at 1–2.

[12] *See also, e.g.*, *Sever*, 978 F.2d at 1534 ("[T]he inability of a corporation to operate except through its officers is not an impediment to section 1962(c) suits. That fact poses a problem only when the corporation is the named defendant—when it is both the 'person' and the 'enterprise.'"); *Jaguar Cars*, 46 F.3d at 269 ("[W]hen officers and/or employees operate and manage a legitimate

*Footnote continued on next page*

lack of official status within JLI preclude liability. *See Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) ("RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." (citation omitted); *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) ("Of course, 'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself." (emphasis in original)).

The Second Circuit's decision *DeFalco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001), is instructive. In *DeFalco*, the RICO enterprise was the town of Delaware, New York. The town was the instrument for racketeering activity by individuals and corporations who used the town to conduct a fraudulent scheme for profit. *Id.* at 307. Like the RICO Defendants with respect to JLI, some RICO defendants in *DeFalco* had formal positions with the town, such as town supervisor Williams Dirie; while others had no formal position but heavily influenced the town's affairs, such as contractor John Bernas. *Id.* at 294. These and other defendants required the plaintiff developer to hire certain people, perform certain tasks, and provide access to his property to gain the necessary permits and approvals for his project, thereby enriching those involved in the scheme. *Id.* at 306–09. Based on these allegations, the court held that "the Town of Delaware was a 'passive instrument' through which the defendants wielded power for their personal benefit and, accordingly, was a RICO enterprise." *Id.* at 309. Even though the town had legitimate functions, it also operated as a RICO enterprise due to the fraudulent scheme administered using the town government as a tool. *Id.* at 306–09. So too here. Even if JLI had some legitimate functions, the RICO Defendants also operated it as a RICO Enterprise, using JLI to administer their fraudulent schemes and carry out their pattern of racketeering activity.

---

*Footnote continued from previous page*
corporation, and use it to conduct, through interstate commerce, a pattern of racketeering activity, those defendant persons are properly liable under § 1962(c)."); *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1327 (D. Kan. 2018) (citing *Cedric Kushner*, 533 U.S. at 163, and holding that plaintiffs sufficiently alleged that CEO of defendant corporation was "person" who conducted enterprise's affairs).

**2. Plaintiffs have plausibly alleged that every RICO Defendant conducted the affairs of JLI through a pattern of racketeering activity**

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise…to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.…" 18 U.S.C. § 1962(c). To conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs, "one must have some part in directing those affairs." *Reves*, 507 U.S. at 179. RICO "liability is not limited to those with primary responsibility, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise.…" *Id.*

Courts look to various considerations in applying the test, including, "whether the defendant occupied a position in the chain of command through which the affairs of the enterprise are conducted, whether the defendant knowingly implemented the decisions of upper management, and whether the defendant's participation was vital to the mission's success." *Kelmar v. Bank of Am. Corp.*, No. CV–12–6826–PSG, 2012 WL 12850425, at *7 (C.D. Cal. Oct. 26, 2012), *aff'd*, 599 F. App'x 806 (9th Cir. 2015) (quotation marks and ellipsis omitted); *see also Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008) (considering the same factors). And, as this Court has held, "[a] defendant can satisfy this 'conduct' element by simply 'coordinating and causing the dissemination of false, misleading or deceptive statements' in support of the RICO conspiracy." Order at 46–47 (quoting *U.S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 877 (D.D.C. 2006)).

Citing this Court's prior ruling, Defendants assert that Plaintiffs have failed to allege that Defendants conducted the affairs of a RICO enterprise. Not so. *First*, the Court's prior ruling addressed whether the Defendants conducted the affairs of an AIF Enterprise. Order at 45. As to the Other Director Defendants, for instance, the Court held that Plaintiffs had failed to "tie them to allegations that they specifically conducted the affairs **of that distinct Enterprise**." *Id.* at 55 (emphasis added). This Court has not addressed whether the RICO Defendants conducted the affairs of the JLI Enterprise through a pattern of racketeering activity. As set forth below, they all did. *Second*, the Court directed Plaintiffs to "add allegations regarding Altria's conduct in

support of the allegedly distinct Enterprise," as opposed to conduct in support of Altria's or JLI's "ordinary business interests." *Id.* at 57. Plaintiffs have added numerous new allegations as to Altria, and as to the Other Director Defendants, showing how they all conducted the affairs of JLI through fraudulent schemes. Those allegations are summarized below. *See* § IV.A.2b.–c.

Plaintiffs also allege that the RICO Defendants engaged in mail and wire fraud, as defined by 18 U.S.C. sections 1341 and 1343, both through JLI and individually. Mail and wire fraud constitute racketeering acts under the RICO statute. The mail and wire fraud statutes are nearly identical and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud. *Schreiber Distrib. Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1399 (9th Cir. 1986). If a plaintiff shows "the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension," then "by examining the scheme itself," the court may infer a defendant's specific intent to defraud. *See, e.g.*, *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984) (internal quotation marks omitted) (quoting *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980)). In other words, Plaintiffs may show intent by alleging a plausible fraudulent scheme. *See* Order at 59.

This Court previously held that Plaintiffs sufficiently alleged a pattern of racketeering activity. Specifically, the Court rejected Defendants' argument that their "acts were not fraudulent but were regular business acts," because "the sale of JUUL products by itself is not the crux of the scheme to defraud." Order at 58.[13] Rather, Defendants' fraudulent scheme was "the intentional design and related fraudulent misrepresentations or omissions regarding [JUUL's] intentional addictiveness and method of nicotine delivery, combined with the intent, contrary to public statements, to grow the market for nicotine–addicted individuals (particularly youth who did not use traditional tobacco products)." *Id.* at 58–59. The Court thus held that "Plaintiffs have

[13] In addition to the analysis described above, the Court rejected Defendants' arguments that the predicate acts were unactionable puffery or opinion, *id*. at 60; that the predicate acts constituted petitioning conduct protected under the Noerr–Pennington doctrine, *id*. at 61–62; that the "lulling" of regulators theory was untenable under *Kelly v. U.S.*, 140. S. Ct. 1565 (2020), Order at 62–63; and that "fraud on the agency" cannot be a predicate act of mail or wire fraud under *Buckman Co. v. Plaintiffs' Leg. Comm.*, 531 U.S. 341 (2001), Order at 63–64.

adequately alleged a scheme to defraud using mails and wires to conduct and further that fraudulent scheme." *Id.* at 59.

This Court should similarly reject Defendants' claims that they were merely conducting the "regular" or "ordinary" business of JLI. Racketeering "may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J.*, 492 U.S. at 242. This is true even when "the predicates themselves" are part of the regular way of doing business for an ongoing entity such as a…legitimate business." *Id*. As this Court has already recognized, JLI was at the center of a fraudulent scheme to enhance sales by providing false information about nicotine content, and by developing an illicit youth market through product development, marketing, and lobbying. Order, at 58–59. Selling nicotine products to children is illegal in every U.S. state and territory. *See, e.g.*, Calif. Bus. & Prof. Code § 22958(a); Fla. Stat. § 877.112(2); N.Y. Public Health Law § 1399–cc(3). Thus, one of two things is necessarily true: Either (1) JLI's "routine" business involves providing false information to customers and marketing nicotine to minors, in which case the entire business is an illegal enterprise; or (2) as in *DeFalco*, JLI has some legitimate activity, but it also served as the vehicle for fraudulent schemes designed to expand the nicotine market (and, in particular, the youth market) and enhance profits for its founders, directors, and investors. Either way, the illegal activity run through JLI creates liability for the Defendants who conducted the affairs of JLI as a RICO enterprise through a pattern of racketeering activity. *Turkette*, 452 U.S. at 501; *Rone*, 598 F.2d at 568 (holding that illegal schemes run through legitimate businesses and wholly illegitimate business both constitute RICO enterprises).

The issue here, then, becomes whether each RICO Defendant conducted the affairs of JLI through a pattern of racketeering activity. They did.

#### a. <u>Bowen and Monsees conducted the affairs of the Enterprise through a pattern of racketeering activity.</u>

This Court has already recognized that Bowen and Monsees conducted the affairs of JLI through a pattern of racketeering activity, and Bowen's latest brief gives this Court no reason to depart from that determination. The Court previously held that "[g]iven [Bowen's] role in the

company as a founder and officer and given the more specific allegations about his direct involvement and control over the design, testing, and initial rollout of the JUUL product identified above, the conduct element has been adequately alleged as to Bowen." Order at 50. Next, the Court concluded that Plaintiffs had sufficiently alleged that Monsees conducted the affairs of the Enterprise, based on "the intentional design of the product, the intent to copy the tactics of tobacco, and his personal direction and approval of specific marketing campaigns and more generally misleading content on JLI's website." *Id.* at 52. The Court referred to their conduct as "RICO conduct," *id.* at 48, 52, and concluded that the Plaintiffs had sufficiently alleged their intent to engage in a scheme to defraud. *Id.* at 59. The same allegations that led to these conclusions are repeated in the SAC, buttressed by many additional allegations, describing how Bowen and Monsees developed JUUL to be a highly addictive product that was attractive to teens; developed JLI's deceptive marketing plans that focused on children; and worked with Altria and the Other Director Defendants to deceive regulators into keeping as many JUUL products on the shelves as possible—among other actions. *See, e.g.*, SAC at ¶¶ 2–4, 40–43, 71–76, 81–82, 101–39, 145–47, 190–94, 198–202, 225–29, 284–85, 313–14, 370–77, 386–88, 426–29, 491–95, 548–49, 869–83.

Bowen, joined by Monsees, asks this Court to "consider again the legal adequacy of the alleged racketeering acts." Bowen Br., Dkt. No. 1229, at 3 n.4. Bowen claims that the Court "can consider" this issue again because the Plaintiffs are now alleging that JLI is the enterprise, rather than alleging an association–in–fact enterprise. *Id.* But Bowen has not provided **any** rationale as to why the change in the focus of the enterprise affects the validity of the Court's prior decision. Plaintiffs allege that Bowen (and the other RICO Defendants) violated RICO by conducting racketeering activity through JLI. The *Reves* standard clearly supports this conclusion, given that Bowen and Monsees co–founded the company that became JLI, Monsees was CEO of JLI until October 2015, Bowen has at all relevant times been the Chief Technology Officer of JLI, and both were Board members from the inception of JLI until at least March 2020. SAC at ¶¶ 22–23. And, as this Court has already recognized, each was intimately involved in the RICO Defendants' fraudulent schemes. *See* Section II. Therefore, Bowen and Monsees undoubtedly had "some part

in directing [the] affairs" of JLI. *See Reves*, 507 U.S. at 179.

In addition to re–litigating issues already decided, Bowen largely raises factual issues that go beyond the pleadings. Bowen argues that certain Plaintiffs did not rely on any purportedly false statements, Bowen Br. at 6–7, but reliance is not a necessary element of a RICO claim. Order at 74 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 642 (2008)). Bowen also repeats the argument that the false statements alleged were mere "puffery." Bowen Br. at 8. This Court already rejected that argument, noting that it was the jury's role to determine "what the true mission of the company or the distinct Enterprise within the company was." Order at 60.

Bowen also misconstrues the law in arguing that he cannot be indicted for a co–conspirator's statement, citing *United States v. Stapleton*, 293 F.3d 1111 (9th Cir. 2002).[14] As this Court recognized, *Stapleton* held that it was immaterial whether each RICO defendant had personally committed two acts of mail or wire fraud; it was only necessary that each defendant knowingly participate in the scheme to defraud, with the requisite intent, and that some member of the scheme commit mail or wire fraud. *Id.* at 64 (citing *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 4890594, at *13 (N.D. Cal. Oct. 30, 2017) (relying on *Stapleton*, 293 F.3d at 1117)). Here, Bowen directed the affairs of the Enterprise, had the requisite intent to defraud, and participated in the scheme to defraud including through mail and wire fraud, which is all that the law requires. *Stapleton*, 293 F.3d at 1117.

Similarly, it is immaterial to the existence of the JLI Enterprise, or to Bowen's involvement with it, whether certain fraudulent statements could be attributed to Bowen. Bowen Br. at 10–11. *See Stapleton*, 293 F.3d at 1117. Again, this Court's decision that Bowen conducted the affairs of the Enterprise through a pattern of racketeering activity was not based merely on affirmative statements he made. It was based on allegations that Bowen was heavily involved in the "design, testing, and initial rollout of the JUUL product." Order at 50.

[14] Moreover, Bowen ignores Plaintiffs' allegation that he directed a false statement regarding JUUL pods' nicotine content be made to the Washington Post. *See* SAC ¶ 917.

**b. <u>The Other Director Defendants conducted the affairs of the enterprise through a pattern of racketeering activity</u>**

In its Order, the Court noted that what was needed to "hook [the Other Director Defendants] for conduct of the Enterprise" were allegations of "defendants' actual, numerical control of the Board" and (1) "identification of specific acts taken by the Officer and Director Defendants on the Board" *or* (2) "a plausibly supported allegation that marketing was controlled through the Board." Order at 50. For similar reasons, the Court found that Plaintiffs' allegations were insufficient to show intent to defraud, as is required to establish the pattern of racketeering activity elements as to the Other Director Defendants. *Id.* at 59, 65.[15] The Court provided leave to amend to address these issues.

Plaintiffs heeded the Court's directive. As laid out below, Plaintiffs have plausibly alleged that the Other Director Defendants conducted the affairs of the JLI Enterprise through a pattern of racketeering activity by controlling JLI through the Board and the Executive Committee and by steering JLI's efforts to create and expand an illicit youth market to broaden sales through a series of fraudulent schemes.

The Other Director Defendants contend that there are no allegations of specific false statements by them. ODD Br. at 16. But the Supreme Court in *Bridge* clarified that "the indictable act under § 1341 [the mail fraud statute] is not the fraudulent misrepresentation, but rather the use of the mails with the purpose of executing or attempting to execute a scheme to defraud." *Bridge*, 553 U.S. at 652 ("The gravamen of the offense is the scheme to defraud[.]"). This Court has already concluded that specific false statements identified by Plaintiffs are part of a plausibly alleged scheme to defraud and that Plaintiffs need not allege that each Defendant committed at least two predicate acts of mail or wire fraud. Order at 57–58, 54. The Other Director Defendants also contend that the Second Amended Complaint fails to allege specific allegations about their personal actions beyond ordinary Board functions. ODD Br. at 16–17. In fact, they assert that

---

[15] The Court also rejected the argument raised by each Defendant that "plaintiffs have failed to show that each of them committed at least two predicate acts of mail or wire fraud" because "that is not the standard." *Id.* at 64. The Court held that, because Plaintiffs had adequately alleged that Defendants Bowen, Monsees, JLI, and Altria were "knowing participants in the scheme to defraud," they were liable for their co–schemers predicate acts. *Id.* at 64–66.

plaintiffs have not pointed to a single Board vote that was made in furtherance of wrongdoing by the company. *Id.* at 2. All of these arguments miss the mark given the expanded and detailed allegations in the amended complaints showing that these three individuals controlled JLI, including by their absolute numerical control of the Board of Directors, and had direct involvement in the youth marketing and other alleged schemes to defraud, which schemes caused the various acts of mail and wire fraud alleged in the amended complaints.

**(i) <u>The Other Director Defendants controlled JLI and played a role in each of the Enterprise's fraudulent schemes</u>**

As described in Section II.A, above, the Other Director Defendants exercised significant control over JLI and were involved in each of the JLI Enterprise's fraudulent schemes.

By virtue of their involvement in the fraudulent marketing scheme, the Other Director Defendants conducted the affairs of the JLI Enterprise by causing the acts of mail and wire fraud that comprised the early marketing campaigns, including Vaporized, which targeted youth and omitted any reference to nicotine content:

> The Other Director Defendants controlled a majority of the seats on JLI's Board throughout the events underlying this suit. SAC at ¶¶ 24–26; 360–67. They then used their control of JLI to take charge of marketing JUUL products, focusing on youth. *Id.* at ¶¶ 38–42. For example, before JUUL's launch, Pritzker and Valani led Board discussions about how to market JUUL and the product's nicotine content. *Id.* at ¶ 372.
>
> They dictated specific goals for the company's messaging and gave "direction…on [the Board's] comfort level with" the way nicotine was addressed in JLI's marketing, including dictating specific language. *Id.* at ¶¶ 372–74. Before JUUL's launch in early 2015, the Board reviewed and approved marketing materials for JUUL's launch, despite the obvious youth appeal and lack of nicotine warning. *Id.* at ¶¶ 361, 373–77.
>
> After JUUL's launch, the Board discussed the youthful focus of JUUL's branding and early signs of teen use. *Id.* ¶ 378–80. While some at the company wanted to take "immediate action to curb youth sales," Huh, Pritzker, and Valani disagreed, claiming "the company couldn't be blamed for youth nicotine addiction." *Id.* ¶ 379.
>
> Although JLI's sanitized Board minutes do not indicate whether a formal vote was taken, Pritzker, Valani, and Huh decided and ensured in October 2015 that JLI would continue pursuing the youth market. *Id.* at ¶ 382. Monsees stepped down as CEO of JLI,

> and the Other Director Defendants appointed themselves as an Executive Committee to run JLI in the place of a CEO. *Id.* Huh served as the Executive Chairman and Pritzker as Co–Chairman. *Id.*
>
> Chief Marketing Officer Richard Mumby acknowledged that the Other Director Defendants' direction and control would help JLI grow through its "sales strategy and integrating sales/marketing better." *Id.* at ¶ 396. Plaintiffs allege that JLI's "sales strategy," as orchestrated by the Other Director Defendants, was the fraudulent scheme to market and sell JUUL products to children. *See, e.g.*, *id.* at ¶¶ 380–82. While acting as Executive Chairman, in March 2016, Huh approved changes to JLI's "brand and collateral positioning on behalf of the board." *Id.* ¶ 385.

By virtue of their involvement in the nicotine content misrepresentation scheme, the Other Director Defendants conducted the affairs of the Enterprise by causing these acts of mail and wire fraud to occur:

> The Other Director Defendants were aware that JLI was misrepresenting the nicotine content of its JUUL pods (a scheme spearheaded by Bowen), yet directed and approved the distribution of thousands of JUUL pods with packaging containing these nicotine content misrepresentations. *See id.* ¶¶ 197, 198–215, 915–16.
>
> They also reviewed and approved marketing materials, including the JLI website, which transmitted these same fraudulent statements. *See, e.g., id.* ¶¶ 201–202, 210, 410, 913.

By virtue of their involvement in the flavor preservation scheme, Pritzker and Valani conducted the affairs of the Enterprise by causing JLI's and Altria's mail and wire fraud statements to the FDA and the public:

> Pritzker and Valani were working to bring Altria into the Enterprise. Pritzker and Valani led secret back–channel negotiations with Altria. *See id.* ¶¶ 43, 52–53, 517–19. Influenced by the promise of a multi–billion dollar payout, Pritzker and Valani worked with Altria and others within JLI to preserve the youth market by crafting a narrative for the public and regulators that would preserve JLI's ability to market the kid–favored mint JUUL pods. *See id.* ¶¶ 621–38, 648–54, 924.
>
> This scheme led to both Altria and JLI transmitting false statements to the FDA and the public, and ultimately deceiving the FDA that mint JUUL pods were a traditional tobacco flavor used to switch adult smokers rather than a flavor specifically designed to recruit youth users to the product. *Id.* ¶ 927.

Finally, by virtue of their involvement in the cover–up scheme, Pritzker and Valani

conducted the affairs of the Enterprise by causing JLI's and Altria's mail and wire fraud statements regarding cessation and youth usage of JUUL products:

> Pritzker and Valani were instrumental in the cover–up scheme. Valani directed JLI's response to public scrutiny over youth vaping. SAC ¶ 414, 936. He pushed a misinformation campaign designed to debunk studies regarding youth usage of JUUL. *Id.* Pritzker and Valani worked to push a sham youth prevention campaign, and approved public statements regarding JLI's youth prevention efforts. *Id.* ¶¶ 416, 418, 482, 937, 939.
>
> Pritzker and Valani also approved, and Valani personally selected the videos for, the fraudulent "Make the Switch" advertising campaign which suggested that JUUL was a cessation device targeted to adult smokers and never to kids. *Id.* ¶ 416–17.

Given these expanded and detailed allegations, Plaintiffs have plausibly alleged that the Other Director Defendants took specific actions to perpetuate the fraudulent schemes run through JLI and were deeply involved in operating JLI to a far greater degree than an ordinary corporate director. As their own COO put it, JLI's Board members, and especially Pritzker, Valani, and Huh, were "more involved than most." *Id.* ¶ 368. This Court previously held that there was "weight to the Other Director Defendants' argument that plaintiffs are simply trying to hold them liable for acts taken in their capacity as corporate directors, which is impermissible." Order at 54. But Plaintiffs' allegations now detail how these individuals used their power in controlling the Board to personally direct and approve many aspects of the company's fraudulent marketing schemes, to cause false statements to be made on behalf of JLI, and to work with Altria to keep the mint flavor on the market, to the Other Director Defendants' substantial financial benefit, as outlined above.

Importantly, Plaintiffs need not establish that these directors were conducting the affairs of an enterprise distinct from JLI. *See Jaguar Cars*, 46 F.3d at 269. When evaluating the previous allegations, the Court held that "plaintiffs need to allege more in support of distinctiveness of the RICO enterprise generally, as well as more specifics regarding these three Other Director Defendants, to tie them to allegations that they specifically conducted the affairs of that distinct Enterprise." Order at 54–55. Now, Plaintiffs have shown that the Other Director Defendants operated, managed and controlled JLI, and the amended complaints tie these individuals directly

to the fraudulent schemes, showing a clear intent to defraud. In fact, the fraudulent marketing scheme was the whole motivation for Huh, Pritzker, and Valani taking control of JLI through the Executive Committee and running the day–to–day operations of JLI, beginning in October 2015. *See* SAC at ¶¶ 380–82.

In renewing their motions to dismiss, the Other Director Defendants do not apply the *Reves* test or cite to analogous cases. As noted, the central question under *Reves* is whether the Other Director Defendants had "some part in directing [the Enterprise's] affairs." *Reves*, 507 U.S. at 179. "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility …." *Id.* There should be little doubt that these directors who controlled JLI throughout the years at issue had, at least, "some part in directing" JLI's affairs. Again, Plaintiffs allege that the Other Director Defendants gained full control of JLI in October 2015 (and had absolute control over the Board of Directors well before that) and directed the company's marketing strategy from that point forward. As this Court has already held that there was a scheme to defraud that involved the use of the mail and wires, Order at 57–67, the only question is whether the Other Director Defendants participated in or conducted that scheme to defraud. *Id.* at 64 (citing *In re Volkswagen*, 2017 WL 4890594, at *13; *Stapleton*, 293 F.3d at 1117). Plaintiffs allegations show that they did.

For example, other Courts in the Ninth Circuit have found that participating in meetings discussing actions essential to the scheme can satisfy the *Reves* test. *See Cellco P'ship v. Hope*, No. CV11–0432–PHX–DGC, 2012 WL 260032, at *9 (D. Ariz. Jan. 30, 2012), *on reconsideration in part*, No. CV11–0432 PHX DGC, 2012 WL 715309 (D. Ariz. Mar. 6, 2012). In *Cellco*, mobile phone giant Verizon alleged that certain third parties had fraudulently obtained access to Verizon's networks and were taking actions detrimental to Verizon's customers. *Id.* at *1. Adjudicating a motion to dismiss, the court assessed the roles of four individuals, applying the *Reves* test. *Id.* at *8–9. The court noted that three of them were in a meeting to discuss setting up the silo companies used in the scheme and concealing their actions from Verizon and were also involved in discussions regarding the creation of cloaking software. *Id.* The court then held "that a jury could reasonably conclude from the facts alleged that [those three individuals], through

their participation in meetings discussing actions essential to the operation of Defendant' scheme, played '*some* part in directing the enterprise's affairs.'" *Id.*

The allegations against the Other Director Defendants go far beyond alleging that they participated in two planning meetings, as outlined above. Pritzker, Valani, and Huh controlled JLI and supervised and directed its operations over a period of years in which JLI massively increased its sales through fraudulent marketing that misrepresented the product's nicotine content and targeted children. *See* Order at 58–59.

**(ii) <u>The Other Director Defendants intended to and did engage in a scheme to defraud, through a pattern of racketeering activity</u>**

These same allegations show that the Other Director Defendants participated in these schemes with intent, and thereby participated in a pattern of racketeering activity. The Court has previously held that Plaintiffs have plausibly alleged a scheme to defraud, including "intentional design and related fraudulent misrepresentations or omissions regarding its intentional addictiveness and method of nicotine delivery, combined with the intent, contrary to public statements, to grow the market for nicotine–addicted individuals (particularly youth who did not use traditional tobacco products)." Order at 58–59. Plaintiffs' allegations now show how the Other Director Defendants knowingly participated in this inherently fraudulent scheme. "[I]ntent to defraud easily follows." Order at 59 (quoting *In re Chrysler–Dodge–Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig*., 295 F. Supp. 3d 927, 977 (N.D. Cal. 2018)).

**c. <u>Altria conducted the affairs of the Enterprise through a pattern of racketeering activity, including building on JLI's fraudulent schemes to hook youth and non–smokers</u>**

The Court instructed Plaintiffs to allege facts establishing "that Altria actively joined an existing RICO Enterprise and then 'conducted or participated in the conduct of the "enterprise's affairs," not just their own affairs.'" Order at 56 (quoting *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 161). Plaintiffs have done so. Altria knew that JUUL was marketed to youth and was addicting a new generation to nicotine. *See, e.g.*, SAC ¶¶ 48, 239, 499, 517–19, 530. But instead of seeing a public health crisis, Altria saw an opportunity to find new customers and replace its pipeline of tobacco users. *Id.* ¶¶ 44, 50, 510. To take full advantage of this opportunity, Altria

played a critical role in directing JLI's affairs, both directly and indirectly, with a goal of keeping JUUL on the market and maintaining and expanding an illicit e–cigarette youth market.

From the start, Altria admitted internally that it sought to control JLI. Altria negotiated a deal with Pritzker and Valani that resulted in Pritzker and Valani receiving hundreds of millions of dollars. In return for this massive pay–day (which Altria calls an "investment," even though the vast majority of the invested funds went to other investors and not the company), Altria was able to direct JLI's affairs, as demonstrated by its involvement in the fraudulent schemes described below. Altria was able to conduct the affairs of the Enterprise and execute the fraudulent schemes through back–channel coordination with Pritzker and Valani, JLI's most influential Board members (and until Altria, its largest investors), by installing its own executives into leadership positions at JLI, and by directly committing innumerous acts of mail and wire fraud. And contrary to Altria's assertion that there are no allegations of "secret or de facto control of JLI's board of directors by the Altria Defendants," Altria Br., Dkt. No. 1223, at 2, this is precisely what Plaintiffs are alleging. By promising a massive payout to JLI's most powerful directors and officers and installing its own executives into leadership roles at JLI, Altria had the power to participate in the direction and control of the JLI Enterprise and used that power to carry out the Enterprise's fraudulent schemes.

Altria contends that it could not have directed JLI because "JLI is and was 'directed' by its board of directors," and Altria has never been a director, officer, employee, or voting shareholder of JLI. Altria Br. at 10. While Plaintiffs agree that all Director Defendants also played a role in directing the enterprise, *Reves* "does not limit RICO liability 'to those with primary responsibility for the enterprise's affairs,' nor does it require a participant to exercise 'significant control over or within an enterprise.'" Order at 33 (quoting *Reves*, 507 U.S. at 179 & n.4). Instead, the defendant merely must play "some part" in directing the enterprise's affairs. *Id.* Contrary to Altria's suggestion that "outsiders" should not be held liable under § 1962(c), Altria Br. at 10–11, the Supreme Court held that "'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 185 (emphasis in

original); *see also DeFalco*, 244 F.3d at 310–12 (holding that Bernas, an outside contractor who had no formal position with the town of Delaware, could be held liable for conducting the affairs of the enterprise due to his conduct influencing the town). Altria's actions meet this standard.

**(i) Altria was not merely engaged in routine corporate activities**

Altria's actions were not routine corporate activities. Altria's actions were not driven by typical market considerations, but by a desire to regain a prized group of customers that, due to court order and regulatory action, it could no longer market to by itself: teenagers. *See* Section II.B.1. And, as explained below, Altria pursued this goal by directly participating in a variety of fraudulent schemes effectuated through the JLI Enterprise. As this Court previously held, it does not matter if the fraudulent acts were part of "regular business," or if defendants only sought to "increase market share and sell 'legal goods'." *See* Order at 58 (rejecting Defendants arguments on these points and explaining: "that a distinct RICO enterprise is not supported by various fraud–based allegations does not, conversely, mean that those acts are not plausibly alleged to be fraudulent"). Altria participated in the conduct of the enterprise's affairs through a pattern of fraudulent racketeering acts; that is all that is required for RICO liability to attach.

As detailed above, despite its knowledge that JUUL was popular with youth and was creating a public health crisis, Altria told Defendants Pritzker and Valani that they were all aligned on a "strategic vision as to how to grow the JUUL business rapidly." SAC at ¶ 517. To achieve this goal, Altria worked with Defendants Pritzker and Valani to help direct JLI to maintain and expand JUUL's youth market share and sales. Altria's leadership met with Defendants Pritzker and Valani, often privately, throughout 2017 and 2018. *See id.* at ¶¶ 507–27. As discussed above, these were not typical arms–length communications. Altria viewed Defendant Valani as a potential "back–channel," and e–mails between Pritzker and Altria suggest that these communications were not always "in [their] capacity as directors." *Id.* at ¶¶ 518–19. While Defendants Pritzker and Valani were pushing for "high value," they told Altria that JLI "does not need capital." *Id.* at ¶ 513. Instead, in exchange for giving the Director Defendants millions of dollars in equity payouts, Altria wanted to "control generally the JUUL business" through either a majority stake in JUUL or exercise its control by "influenc[ing]" and "guid[ing]"

JLI's Board. *See, e.g. id.*at ¶¶ 517, 526, 555, 587, 589. Thus, by negotiating a deal that primarily financially benefitted the Individual Defendants, with vast sums of money flowing directly to Defendants Pritzker, Valani and Huh, Altria positioned itself to influence JLI leadership and conduct the affairs of the Enterprise, and did so through its close involvement in the Enterprise's various fraudulent schemes.

**(ii) <u>Altria was not just a service provider, but instead exercised control over JLI through JLI's Board and played a critical role in the fraudulent schemes</u>**

Altria was far more than a service provider to JLI. Altria's actions were critical to the fraudulent schemes, including keeping JUUL on the market and maintaining and expanding the youth e–cigarette crisis. As described in Section II.B.1, above, Altria provided JLI's leadership with instruction and direction to help the RICO schemes succeed. Plaintiffs allege that Altria planned to direct JLI's affairs by "guid[ing]" and "influen[cing]" JLI's Board, and that it turned those plans into actions at private meetings with the controlling members of JLI's Board, Defendants Pritzker and Valani, and by installing its own executives into JLI's leadership. SAC at 526, 555.

First, Altria's goal, both before and after its investment, was to "influence" and "guide" JLI. For example, before the investment, K.C. Crosthwaite told Altria's Board of Directors that a "strategic investment in JUUL" would give Altria "[s]ignificant ownership and influence in the U.S. e–vapor leader." *Id.* at ¶ 526. After the investment, Crosthwaite confirmed Altria's goal remained to "ensur[e] JUUL maintains long–term leadership in global E–vapor by leveraging Altria's best–in–class infrastructure and *providing guidance through board participation*." *Id.* at ¶ 555 (emphasis added). Internal documents show that Altria did not consider itself a mere non–voting minority investor or service provider. Instead, it viewed itself as JLI's "valued partner" and wanted to ensure it could "guide [JLI's] strategic direction through board engagement," including "providing strategic advice and expertise," and "collaborate on youth vaping." *Id.* at ¶ 587. Other Altria documents confirm that it wanted to be "viewed as more than a vendor but as a strategic partner in supporting JUUL's mission," and confirm Altria's plan to control JLI through "strategic guidance" and "board influence." *Id.* at ¶¶ 587, 589. One method Altria used to

direct JLI was to appoint a senior Altria executive, K.C. Crosthwaite, as an observer to JLI's Board. *Id.* at ¶ 555. JLI's Board members regularly communicated with Crosthwaite and that "the Board valued his perspective on JLI's business"—in other words, it valued Altria's perspective on JLI's business. *Id.* at ¶ 559. This shared vision allowed Altria to conduct the affairs of the JLI Enterprise, as demonstrated through its close involvement in the Enterprise's various fraudulent schemes.

Second, Altria was able to conduct the affairs of the Enterprise by virtue of its influence over JLI's Board, gained through private meetings with Defendants Pritzker and Valani that continued after the investment. For example, Crosthwaite met with Defendants Pritzker and Valani, with the approval of Howard Willard, on January 31, 2019. SAC at ¶ 556. In June 2019, Willard met "separately" with Defendants Pritzker and Valani. *Id.* at ¶ 560. Altria provided direction regarding running the of JLI to JLI's leadership. For instance, in July 2019, Willard met with Defendants Pritzker and Valani, and JLI's then–CEO Kevin Burns, about "youth vaping prevention," evaluating JLI's plan and giving them direction by telling them to "[k]eep working on it, but do not make a big announcement at this time." *Id.* at ¶ 561.

Third, with the help of Willard, Pritzker, and Valani, Altria exercised direct control of JLI by installing Crosthwaite, a career Altria–executive, as JLI's CEO, and Joe Murillo as JLI's Chief Regulatory Officer. SAC at ¶ 552. From April through September of 2019, Willard and Crosthwaite worked with Pritzker and Valani to ensure that Crosthwaite would take over as CEO. *Id.* at ¶¶ 552–69. For example, Willard and Crosthwaite both told Defendants Pritzker and Valani that JLI would "benefit from a new direction." Willard also said that "JLI could benefit from Mr. Crosthwaite's leadership," and that "Mr. Crosthwaite's unique experience would make him a strong leader for JLI." *Id.* at ¶¶ 558, 562, 565. While still at Altria, Crosthwaite also suggested bringing on another Altria executive to help "guide" (i.e. control) JLI, specifically Murillo. *Id.* at ¶ 565. Soon thereafter, JLI's Board, including Defendants Pritzker, Valani, Bowen, and Monsees, agreed to make Crosthwaite the CEO of JLI, thereby adding him to JLI's Board. *Id.* at ¶ 568. Crosthwaite then directed JLI to hire Joe Murillo to control JLI's regulatory operations. *Id.*

Fourth, Altria's involvement was "vital to the achievement of the enterprise's primary

goal," given its long history and experience with marketing to youth and non–smokers and covering it up. *See Walter*, 538 F.3d at 1249 (noting that whether a defendant was vital to the enterprise's primary goal is a relevant factor in determining whether the defendant conducted the affairs of the Enterprise) (quoting *MCM Partners, Inc. v. Andrews–Bartlett & Associates, Inc*., 62 F.3d 967, 979 (7th Cir. 1995)); *see also* SAC at ¶ 510. Altria used its experience and control to help JLI weather a public approval and regulatory storm to keep JUUL pods generally, and the mint flavor specifically, on the market.

As this Court has already recognized, Altria "secured shelf–space that it intended for JUUL products (with knowledge of JLI's youth–targeting through marketing and product displays)"; that Altria joined with JLI to attempt to keep mint–flavored products on the market (knowing that mint pods were a main driver of youth use and JLI sales generally)"; and that "Altria actively participated in the misleading 'Make the Switch' campaign ... [which] sought to convince the public that JUUL products were never marketed to youth and were instead intended as smoking cessation devices, a cover–up that allowed the youth e–cigarette crisis to continue to grow." Order at 45, 114. In this way, Altria played a critical role in the success of the fraudulent schemes.

For example, even before paying off the Individual Defendants through its "investment" in JLI, Altria was a key player in the RICO Enterprise. Altria, in anticipation of its investment, advanced the flavor preservation scheme with an eye towards preserving JLI's massive youth market share. *See* Section II.B.3. Altria knew early on that mint JUUL pods were appealing to kids. *Id.* So, when the FDA increased its scrutiny of e–cigarette flavors, Altria worked with Pritzker and Valani to deceive the FDA and the public that mint was a traditional tobacco flavor and not one favored by kids. *Id.* It committed mail or wire fraud when it transmitted a letter to the FDA conveying this lie (such letter Altria subsequently shared with Pritzker and Valani so that JLI could also perpetuate the lie), which succeeded in deceiving the FDA into allowing mint JUUL pods to remain on the market. *Id.* This effort succeeded, and the results were astounding. Altria took its own pod–based products off the market and focused on promoting JUUL, including mint JUUL products. SAC ¶¶ 576–78, 638–41, 654. In 2019, mint JUUL pods

accounted for 75% of JLI's sales. *Id*. at ¶ 654. By virtue of its involvement in the flavor preservation scheme, Altria conducted the affairs of the Enterprise by directly committing acts of mail or wire fraud, and by causing JLI to commit the same.

Altria also was a key player in the nicotine content misrepresentation scheme. *See* Section II.B.2. Altria knew that the nicotine content representations on JUUL pod packaging were fraudulent, yet it nonetheless distributed thousands, if not millions, of JUUL pod packaging containing fraudulent misrepresentations following its investment in JLI. *Id.* By virtue of its involvement in the nicotine content misrepresentation scheme, Altria conducted the affairs of the Enterprise by directly committing acts of mail fraud.

Altria also played an integral role in the cover–up scheme. *See* Section II.B.4. Altria misrepresented to the FDA that it was pulling pod–based products off the market due to concerns over youth vaping, yet at the same time actively coordinating with Pritzker and Valani to invest in the largest purveyor of pod–based products in the market. *Id.* Altria also distributed the fraudulent *Make the Switch* advertisements in packs of its combustible cigarettes, and emailed and mailed out the fraudulent *Make the Switch* advertisements to hundreds of thousands of customers on its mailing lists. *Id.* By virtue of its involvement in the cover–up scheme, Altria conducted the affairs of the Enterprise by directly committing acts of mail and wire fraud. That is enough to satisfy the RICO conduct element. *See* Order at 46–47 ("A defendant can satisfy this 'conduct' element by simply 'coordinating and causing the dissemination of false, misleading or deceptive statements' in support of the RICO conspiracy." (quoting *U.S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 877)).

**(iii) <u>Altria intended to and did engage in a scheme to defraud, through a pattern of racketeering activity</u>**

The Court previously held that Plaintiffs had alleged a scheme to defraud, and noted that Altria did not contest the "intent" element. Order at 58–59.[16] The Court also identified several

[16] Altria now contends that it did and does contest intent. Altria Br. at 25 n.19. Regardless, this Court should conclude that Altria had an intent to defraud given the allegations about Altria's conduct and the scheme to defraud, as it previously found for Defendants Monsees and Bowen. *See* Order at 59.

statements by Altria and its CEO, Willard, as among the predicate acts that showed a pattern of racketeering activity. *Id.* at 57–58. The Court also wrote that JLI's and Altria's statements to Congress and the FDA were "evidence of the alleged overall scheme to defraud." *Id.* at 62. As the Court recognized, the scheme alleged "was to secure the money and property of the end consumers, in particular the new and youth users who were not previously addicted to nicotine. Defendants did so by allegedly lulling Congressional legislators and the regulators at the FDA into inaction, or more limited action, to allow their products to remain on the market." *Id.* at 63. Altria's actions were central to that scheme.

Thus, the Court should find, as it previously did for Bowen and Monsees, that allegations regarding Altria's "sufficient acts in support of conducting an enterprise," and "the existence of a scheme to defraud that stems in part from express acts and representations taken by" Altria, are sufficient to show that Altria was a knowing participant in a scheme to defraud through predicate acts of racketeering — i.e., Altria engaged in a pattern of racketeering.

#### d. <u>The Other Director Defendants' Rule 9(b) arguments lack merit</u>

The Other Director Defendants raise a Rule 9(b) challenge to the SAC. "Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud…, a party must state with particularity the circumstances constituting fraud," while "[m]alice, intent, knowledge, and other conditions of a person's mind may be averred generally." Consequently, "[t]he only aspects of wire [or mail] fraud that require particularized allegations are the factual circumstances of the fraud itself." *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557–58 (9th Cir. 2010).

The Other Director Defendants identify only two allegations that purportedly do not comport with Rule 9(b): (1) that Board minutes are "sanitized" and thus do not reflect the Other Director Defendants directing fraudulent schemes, ODD Br. at 5 (quoting SAC ¶ 382); and (2) that the Other Director Defendants caused acts of mail and wire fraud "to be made through their control of JLI." *Id.* at 16. Both arguments are unavailing. First, as to the "sanitized" Board minutes, Plaintiffs did not allege that the sanitizing of Board Minutes was itself fraudulent

conduct; thus, this allegation need not meet the requirements of Rule 9(b). Rather, Plaintiffs simply offered this allegation to explain why the underlying fraudulent conduct—which is alleged in great detail throughout the SAC—is not reflected in the minutes. As to the second Rule 9(b) challenge, the Other Director Defendants cherry–pick a quote—that the Other Director Defendants caused certain fraudulent statements "to be made through their control of JLI"—from the RICO count and present it without any context. *Id.* at 16 (quoting SAC ¶ 958). The next paragraph in the count explains "[t]he sections cross–referenced in the chart detail how the RICO Defendants caused such mailings or transmissions to be made." SAC ¶ 960.

To the extent the Rule 9(b) challenge could be read to broadly cover the entire SAC, it fails because Plaintiffs—as demonstrated herein—have pleaded allegations "specific enough to give defendants notice of the particular misconduct…so that they can defend against the charge." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation omitted). In fact, the Other Director Defendants raise specific challenges and defenses to the allegations in their brief—allegations that were apparently specific enough that the Other Director Defendants do "not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106. And the Court has already held that plaintiffs sufficiently alleged the who, where, when, and what of the fraud; the only question is whether the Other Director Defendants' participation in that fraud.

### 3. <u>The Government Entity Plaintiffs sufficiently allege RICO injury and causation, as this Court has already held</u>

Altria asks this Court to revisit its prior rulings concluding that the Government Entity Plaintiffs properly alleged RICO injury and proximate causation. Altria Br. at 24–25. But this Court correctly interpreted RICO case law on proximate cause and the requirement to show injury to business or property. Order at 70–74 (concluding that the Government Entity Plaintiffs have standing to bring a RICO claim because they properly alleged injury to business or property caused "by reason of" the Defendants' RICO violations). Altria's brief fails to raise any cases that the Court did not previously consider. Instead, Altria contends that the Court's reasoning in the prior order does not apply to a RICO claim against Altria. *Id.* at 24.

Altria's argument fails both legally and factually and contradicts this Court's well–

considered decision. Order at 70–74. First, Altria focuses on its own conduct, as opposed to assessing whether the scheme to defraud caused the Plaintiffs' RICO injury. *See id.* at 24–25. As this Court held, Plaintiffs "are not required to show that each individual predicate act caused them an injury, but rather that the pattern of racketeering activity did." Order at 67 (quoting *Just Film, Inc. v. Merchant Services, Inc.*, C 10–1993 CW, 2012 WL 6087210, at *12 (N.D. Cal. Dec. 6, 2012)); *see also Marshall & Ilsley Tr. Co. v. Pate*, 819 F.2d 806, 809 (7th Cir. 1987) (holding that a plaintiff need only prove "an injury directly resulting from some or all of the activities comprising the [RICO] violation"). In the opioid order Altria cites, the court assessed causation as to the defendants generally—it did not assess each defendant's conduct individually, as Altria suggests. *See Cty. & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 3:18–CV–07591–CRB, 2020 WL 5816488, at *26–27 (N.D. Cal. Sept. 30, 2020).

Altria's argument also fails factually. Essentially, Altria contends that the SAC fails to allege that Altria engaged in a fraudulent scheme that injured the Government Entity Plaintiffs on their property. Altria Br. at 24–25. Altria focuses on only one aspect of this Court's prior Order—discussing programs that JLI conducted on school grounds—and then contends that Plaintiffs have to show that Altria caused harm on school grounds. *Id.* But this Court also discussed the PEC's allegations that they suffered damage directly to their physical property due to hazardous waste, as well as the school districts' need to make physical modifications on school property to address extensive JUUL use—steps that were necessary because the fraudulent schemes kept youth–friendly JUUL products on the market. Order at 73; *see also* TVC at ¶¶ 726–28.

These harms relate directly to Altria's conduct. As noted above, Plaintiffs allege that Altria worked with JLI to develop a false justification for keeping mint–flavored JUUL pods on the market. TVC at ¶¶ 174–86, 544–53, 634–68. This effort succeeded, and the results were astounding. In 2019, JLI gained an estimated $2.36 billion to $3.4 billion in revenue, and mint JUUL pods accounted for **75%** of JLI's sales. *Id.* at ¶ 667. Mint was an extremely popular flavor with children. *Id.* at ¶¶ 166–71. Thus, by keeping mint–flavored JUUL pods on the market, Altria contributed to at least thousands, and maybe millions, of children using mint pods in 2019. *Id.* at ¶ 667. Therefore, even if the Government Entity Plaintiffs must connect Altria's specific conduct

to the physical harms on their property to establish causation, their complaints make that connection. JLI sold more product to youth because of Altria's action, and that product caused injuries on school property. SAC at ¶¶ 174–84, 544–51, 634–63.

But again, the law does not require such a connection. The question is whether Plaintiffs can show "that the pattern of racketeering activity" caused them injury, not whether a particular Defendant did so. Order at 67. This Court, therefore, should reaffirm its conclusion that Plaintiffs have sufficiently alleged proximate causation and RICO injury as to all RICO Defendants, including Altria. *Id.* at 70–74.

### 4. Plaintiffs Have Plausibly Alleged a Viable Section 1962(d) Conspiracy Claim

Bowen and the Other Director Defendants each raise cursory challenges to Plaintiffs' allegations of a RICO conspiracy arguing, in essence, that because Plaintiffs have not pleaded facts to establish a violation of Section 1962(c), they cannot establish a violation of Section 1962(d). *See* ECF 1222 at 19; ECF 1229 at 11. But, as set forth above, Plaintiffs have sufficiently alleged facts establishing each element of a Section 1962(c) violation as to each Defendant. This is enough to establish a violation of a conspiracy claim under Section 1962(d) and to establish liability as to each RICO Defendant for the conduct throughout the whole Enterprise. *See In re Volkswagen*, 2017 WL 4890594, at *17 ("The same allegations that demonstrate Bosch's participation in the enterprise support the…conspiracy claim."); *see also* Order at 74 ("As Altria is alleged to have joined the RICO conspiracy under section 1962(d), if plaintiffs are able to plausibly allege and prove the other elements of their RICO claim, Altria may be liable for conduct throughout the whole Enterprise.").[17]

---

[17] Moreover, Defendants' argument is incorrect as a matter of law. Even if a Defendant cannot be held liable under Section 1962(c), the Defendant may still be found to have violated the conspiracy provision because Section 1962(d) requires only an agreement—not an overt or specific act. *See Salinas v. U.S.*, 522 U.S. 52, 63–64 (1997) ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."); *see also United States v. Hernandez*, No. CR–14–0120 EMC, 2015 WL 4498084, at *5 (N.D. Cal. July 23, 2015) ("[P]roof of an agreement the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering) is sufficient to establish a violation of section 1962(d)." (citation omitted)).

Finally, the Other Director Defendants insist that Plaintiffs have alleged "no fact supporting any claim that any [Other Director Defendant] entered into an agreement or conspiracy to commit racketeering with awareness of the conspiracy's essential nature." ECF 1222 at 19.[18] But no formalized agreement is required. Plaintiffs have met their burden by alleging sufficient facts to infer the existence of a scheme violating RICO. *See Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775 (9th Cir. 2002) ("The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved.").

### B. California Plaintiffs Adequately Allege UCL and Unjust Enrichment Claims Against the Other Director Defendants

#### 1. California Plaintiffs have stated UCL claims against the Other Director Defendants

This Court's prior Order held that, with respect to the Other Director Defendants, "[m]ore specific allegations are needed to plausibly allege UCL conduct." Order at 94. Specifically, the Court suggested that more specific allegations were needed concerning: "(i) specific acts taken by the Executive Committee when the three Other Director Defendants were in control; or (ii) specific acts taken by the Board that the three Other Director Defendants alone or in conjunction with Bowen and Monsees proposed, directed, and secured approval of, *along with* allegations that, by virtue of the number of Board members, the group of three or five were able to and did "direct or control" the Board's approval." *Id*. For the same reasons that the Other Director Defendants' arguments as to their RICO conduct fail, their contention with respect to UCL conduct that allegations of "'specific acts' are absent from the SAC" should be rejected. ODD Br. at 20.[19] In light of the new and substantial allegations, for the same reasons that the

---

[18] The Court noted this argument is "largely derivative of" the RICO conduct argument and did not address it because Plaintiffs were provided leave to amend. Order at 74. Because Plaintiffs' additional allegations address the concerns raised by the court as to the RICO conduct element, those allegations too cure any shortcoming in Plaintiffs' Section 1962(d) conspiracy claim.

[19] The Other Director Defendants devote only a single paragraph to their argument that California Plaintiffs' have not stated as UCL claim against then and, aside from the Court's Order, have cited no cases concerning the applicable legal standard. A corporate officer or director is "personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996).

Court permitted UCL claims against Bowen and Monsees to proceed, it should also let California Plaintiffs pursue their claims against the Other Director Defendants.

The Other Director Defendants' additional argument that they are not subject to restitution is likewise unavailing. ODD Br. at 20–21. First, they cite to the Court's stated concerns about whether restitution will ultimately be available against them. ODD Br. at 20. But they ignore that the Court held that the issue is "more appropriately addressed on a full evidentiary record, based on evidence regarding exactly how the Officer and Director Defendants were compensated and as a result of what guarantees, metrics or other compensation structures were in place." Order at 99. In addition, as discussed above, plaintiffs allege that the Other Director Defendants fraudulently marketed the product and participated in the targeting of youth as a means of positioning JLI for acquisition and the ultimately made millions or billions of dollars as a culmination of those efforts. Second, the Other Director Defendants assert in a footnote that restitution is unavailable from them because the money they received came from Altria (via its investment in JLI) and not Plaintiffs. ODD Br. at 20 n.18. The Court already rejected this argument, as "Plaintiffs simply need to allege that [the defendant] obtained money (or property) and that plaintiffs lost money or property as a result of defendants' unfair practices." Order at 97 (citing *Cabebe v. Nissan of N.A., Inc.*, 18–CV–00144–WHO, 2018 WL 5617732, at *5 (N.D. Cal. Oct. 26, 2018) (used car buyers could seek restitution from car manufacturers even though they paid no funds directly or indirectly to manufacturers)). Even if the Court were to agree that the California Plaintiffs do not presently plead sufficient facts to sustain a UCL claim for restitution, discovery is ongoing and there is no basis to dismiss the claim with prejudice as the Other Director Defendants request. The court in *Yasukochi v. Bank of Am., N.A.*, 2016 WL 4508220, at *7 (S.D. Cal. Apr. 27, 2016) dismissed a UCL claim without prejudice, as did Judge Koh in *Phillips v. Apple, Inc.*, 2016 WL 5846992, at *11 (N.D. Cal. Oct. 6, 2016) because it was possible for the plaintiffs to plead additional facts, as it is here.

### 2. <u>California Plaintiffs have stated unjust enrichment claims against the Other Director Defendants</u>

The Other Director Defendants claim that California Plaintiffs' unjust enrichment claims

should be dismissed if their UCL claims are dismissed. ODD Br. at 21. In support of their argument, the Other Director Defendants cite *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) for the proposition that unjust enrichment is "construe[d]…as a quasi–contract claim seeking restitution." *Id.* (internal quotation omitted). But the omitted part of that quotation states that an unjust enrichment claim can be an "independent cause of action." *ESG Capital*, 828 F.3d at 1038. The Other Director Defendants have not addressed the elements of an unjust enrichment claim, which differ from those of a UCL claim. Plaintiffs have alleged the necessary elements: that the Other Director Defendants were enriched by their conduct, and that such enrichment was unjust due to their role in the wrongful and fraudulent marketing of JUUL products.[20]

### C. The Government Entity Plaintiffs have adequately alleged that the Other Director Defendants personally participated in tortious conduct in violation of state law

This Court has already recognized that the Government Entity Plaintiffs have stated viable public nuisance, negligence, and statutory consumer protection claims under New York and Florida law against JLI, the Altria Defendants, Bowen, and Monsees. Order at 103–146. The only remaining issue before the Court is whether the Government Entity Plaintiffs have now alleged sufficient facts to show personal participation in these torts by the Other Director Defendants, Pritzker, Valani, and Huh. For the reasons discussed above in the RICO and UCL context, they have.

#### 1. The Government Entity Plaintiffs have stated public nuisance claims against the Other Director Defendants

As this Court recognized in its prior Order, "[a] corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." Order at 115 (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir.

[20] The Other Director Defendants also assert that California Plaintiffs are not entitled to restitution under their unjust enrichment claims. ODD Br. at 21. Even if that were correct, California Plaintiffs have also sought nonrestitutionary disgorgement. SAC ¶ 853 (alleging that Defendants should not be allowed to retain the benefits they received as a result of their conduct), p.709 (requesting that the Court order disgorgement, separate from the request for restitution).

1985) (citation omitted)). This Court has already found that individuals can be liable for public nuisance and the Other Director Defendants do not raise any new arguments to the contrary.[21] Instead, the gravamen of their motion is that Plaintiffs have not alleged they did anything to contribute to the nuisance. But this ignores the new allegations in Plaintiffs' complaints.

Plaintiffs have alleged that Pritzker, Valani, and Huh each personally participated in the conduct that contributed to the public health crisis of youth e–cigarette use, as described above. For example:

> Pritzker and Valani discussed JLI's marketing plan, including the goal to win the "cool crowd," using influencers, social media, and the partnership with the #1 youth media magazine, Vice, at a Board meeting in January 2015, and approved JLI's patently youth–oriented Vaporized marketing campaign at a March 2015 Board meeting (TVC ¶¶ 382, 384–387);
>
> Pritzker, Valani, and Huh were "more involved than most," and discussed the youthful focus of JUUL's branding in the summer of 2015 and "the Company's approach to advertising and marketing and portrayal of the product, which led to a discussion of the Company's longer term strategy" but choose to permit JLI's youth marketing to continue, opposing actions to curb youth sales and arguing that the company could not be blamed for youth nicotine addiction; (TVC ¶¶ 377–378, 388, 390–391);

[21] The Other Director Defendants' attempt to relitigate this Court's prior ruling on public nuisance by citing to a Colorado trial court decision is both irrelevant and unpersuasive. First, Colorado is not one of the states before the Court on this motion. More fundamentally, the state trial court's decision is directly contrary to this Court's prior ruling, and the overwhelming weight of public nuisance decisions. While agreeing that Colorado law follows the Restatement (Second) of Torts § 821B, the state trial court concluded that JLI's conduct did not interfere with a public right, directly contradictory to the plain text of the Restatement, abundant case law, and this Court's prior order stating that conduct "that involves a significant interference with the public health" is an "unreasonable interference with a right common to the general public." Order at 109 (quoting Restatement (Second) of Torts §821B and citing cases from all five jurisdictions confirming that an unreasonable interference with public health constitutes a public nuisance); *see also State, Dept. of Health v. The Mill*, 887 P.2d 993, 1002 (Colo. 1994) ("A public nuisance is the doing or failure to do something that injuriously affects the safety, health, or morals of the public or works some substantial annoyance, inconvenience, or injury to the public."). The trial court also characterized the case against JLI as a "product liability claim," whereas this Court has recognized that "[t]he allegations here do not concern the JUUL product itself, but rather the alleged consequence of JLI's conduct." Order at 107. Finally, the trial court held that, as a general matter, "product–based dangers to public health" are not "remedial in public nuisance." In doing so, the trial court simply ignored the overwhelming majority of cases in a variety of contexts reaching the opposite conclusion and permitting product–based public nuisance claims. *See id.*; *see also, e.g.*, *In re Nat'l Prescription Opiate Litig. – Muscogee (Creek) Nation*, 2019 WL 2468267, at *8 (N.D. Ohio Apr. 1, 2019), *report and recommendation adopted in part, rejected in part*, 2019 WL 3737023 (N.D. Ohio Jun. 13, 2019); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1210–14 (9th Cir. 2003)). Plaintiffs respectfully submit that this decision is unlikely to be followed by Colorado appellate courts.

Pritzker directed specific changes to JLI's website, was involved with managing JLI's influencers, directed a specific response to a teacher concerned with youth JUUL use, reviewed and approved misinformation about JLI's commitment to youth prevention, and was referred to as "a driving force in building the [JLI] business" (TVC ¶¶ 378, 419–423, 427);

Valani was directly involved in JLI's misinformation campaign to convince the public that JLI was not targeting youth, including coming up with a detailed public relations messaging strategy in response to a study linking teen e–cigarette use to an increased likelihood of trying cigarettes, redlining JLI's representations about its attempts to prevent underage use, and approving certain advertisements (and not others) (TVC ¶¶ 423–427);

Huh reviewed JLI's brand and collateral position on behalf of the Board and approved specific branding changes, including retaining brand recognition and bright colors, opting for a youthful approach without the express youth targeting that was drawing unwanted scrutiny, was in charge of making decisions on behalf of the BOD Executive Committee as Executive Chairman, and at the December 2015 Board meeting, delivered his "Vision for the company," including more aggressive rollout and marketing (TVC ¶¶ 394, 404–405, 408–414); and

Pritzker and Valani played a critical role in bringing in Altria to assist and invest in JLI, which allowed it to expand mint JUUL sales, spread disinformation about JUUL's true purpose, and help JLI fight regulatory and public scrutiny (TVC ¶¶ 428–434);

In short, Plaintiffs have provided more detailed allegations showing how Pritzker, Valani, and Huh each took action to contribute to the youth e–cigarette public health crisis. While ongoing discovery will no doubt reveal additional actions these Defendants took, these allegations are sufficient to plausibly allege that each of the Other Director Defendants personally contributed to this public nuisance.

### 2. **<u>The Government Entity Plaintiffs have stated negligence claims against the Other Director Defendants</u>**

The Government Entity Plaintiffs' allegations are sufficient to show the negligent actions the Other Director Defendants took to create and support the youth e–cigarette crisis. As discussed above, these Defendants took on key roles in planning and approving JLI's marketing, spreading disinformation about JLI's youth targeting, and actively opposed and worked against proposals to curb youth sales. This personal participation subjects them to liability for their

actions.

The Other Director Defendants attempt to relitigate this Court's prior ruling on the motion to dismiss, arguing that corporate directors cannot be liable for negligence involving economic loss as a matter of law. But the Other Director Defendants cited this same unpublished case last summer and used it to make this same argument. *See* ODD Br. filed July 1, 2020 (arguing that "corporate directors 'are not personally liable for economic damages caused by any negligent acts' they 'commit[] in the course and scope of [their] corporate duties.'" (citing *OMNEL v. Tanner*, 2013 WL 3357886, at *6 (Cal. Ct. App. July 3, 2013)); ODD Reply filed August 17, 2020 (same). This Court already rejected this argument once and there is no reason to revisit that decision. Order at 131 & n.85.

#### 3. The Government Entity Plaintiffs have stated statutory consumer protection claims against the Other Director Defendants

The Government Entity Plaintiffs' allegations are also sufficient to state claims under the statutory consumer protection laws of New York and Florida against the Other Director Defendants. As described above, Three Village School District has now alleged not just awareness and control, but personal and direct participation by each of the Other Director Defendants in the deceptive scheme at issue. *See Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 690 (S.D.N.Y. 2015). Similarly, Escambia and Broward County School Districts have alleged how the Other Director Defendants were "direct participant[s]" in the dealings at issue in this case. *See Aboujaoude v. Poinciana Dev. Co. II*, 509 F. Supp. 2d 1266, 1277 (S.D. Fla. 2007).

### D. The Court Has Personal Jurisdiction Over the Claims of All Government Entity and Class Plaintiffs

Defendants Pritzker and Valani argue that the Court lacks personal jurisdiction over them for actions "outside" California (*i.e.* where the plaintiff's transferor jurisdiction is not California). ODD Br. at 23–24. But the class bellwether plaintiffs, as well as government entity plaintiffs Broward, Livermore, and Santa Cruz, originally brought suit in California or have designated the Northern District of California as their transferor court.[22] Thus, there is no dispute that the Court

[22] *See* Case No. 3:18–cv–02499–WHO (N.D. Cal.) (Colgate, DiGiacinto, and Nelson); 3:19–cv–

*Footnote continued on next page*

has personal jurisdiction over Pritzker and Valani with respect to the claims brought by the class bellwether plaintiffs, Broward, Livermore, or Santa Cruz. And while Huh contends that the Court lacks personal jurisdiction over him for actions outside Florida, as the Court previously recognized, "Huh's personal acts necessarily occurred when he served on JLI's Board in California. That is sufficient [to establish specific jurisdiction]." Order at 102. Thus, because each of the class bellwether plaintiffs, Broward, Livermore, and Santa Cruz filed suit in this District (and Gregg will designate it as her transferor court), the Court has personal jurisdiction over Huh, Pritzker, and Valani for the claims brought by those plaintiffs. *See* ECF 977 ("As for the California claims, specific jurisdiction is adequately alleged against each Director Defendant.").

As a threshold matter, there is no need at this time for the Court to reach the claims of plaintiffs who are not a part of the bellwether proceedings, as the Other Director Defendants request. The Other Director Defendants have made only a blanket, single–page argument that purportedly applies to every jurisdiction in play in this MDL. ODD Br. at 23–24. Personal jurisdiction over the claims of all 100 class representatives deserves fuller briefing than the Other Direct Defendants have offered, and the Court should decline to resolve these issues through truncated briefing, just as it previously did when the Other Director Defendants sought to shotgun litigate issues under the laws of every jurisdiction as part of a single motion. *See* Order at 101–02; ECF 977 (directing the parties to propose a "separate briefing schedule" for jurisdictional issues related to non–California plaintiffs).

In any event, if the Court is inclined to reach non–bellwether claims now, the Court should find that it has personal jurisdiction over the Other Director Defendants for any actions that originated in California for the reasons discussed above.[23] And with respect to the plaintiffs outside of California (including non–California class representatives, and government entity plaintiffs Central Bucks, Escambia, Three Village, and Tucson), the Other Director Defendants

---

*Footnote continued from previous page*
05838–WHO (N.D. Cal.) (Krauel); 3:19–cv–08289–WHO (N.D. Cal.) (Broward); 3:19–cv–08176–WHO (N.D. Cal.) (Livermore); and 5:20–cv–02261–WHO (N.D. Cal.) (Santa Cruz). Plaintiff Gregg is in the process of filing her underlying complaint, and will designate the Northern District of California as her transferor forum.

[23] Class representatives that have not previously filed individual, underlying complaints are in the process of doing so and will designate their transferor forum in such complaints.

argue that the Court only has personal jurisdiction over a "primary participant in the wrongdoing intentionally directed at the forum." ODD Br. at 24 (quotation omitted).[24] In other words, they appear to argue that a higher level of participation is needed for personal jurisdiction than is needed for a finding of liability. The Other Director Defendants' motion should be denied.

"The Ninth Circuit employs a three–part test to determine whether there is specific jurisdiction over a defendant." Order at 147 (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). In its prior order, the Court held that because plaintiffs had sufficiently alleged Bowen and Monsees' role in the alleged misconduct, the first two prongs—that the defendant purposefully directed his activities to the forum and whether the claims arise out of those contacts—were satisfied as to those defendants. Order at 148–50. Among other things, the Court noted that the marketing strategy for JUUL (in which the Other Director Defendants are alleged to have played a key role) was intended to reach purchasers throughout the United States. *Id.*; *see Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1231 (9th Cir. 2011) ("where, as here, a website with national viewership and scope appeals to, and profits from, an audience in a particular state, the site's operators can be said to have 'expressly aimed' at that state"). The Court also held that:

> If acts taken by a corporate officer subjects the officer to personal liability (i.e., the corporate officer authorized, directed or participated in tortious conduct), and those acts create contact with the forum state, such acts are not only acts of the corporation but also acts of the individual, and may be considered contacts of the individual for purposes of determining whether long–arm jurisdiction may be exercised over the individual.

Order at 148–49 (quoting *Chunghwa Telecom Glob., Inc. v. Medcom, LLC*, No. 5:13–CV–02104–HRL, 2016 WL 5815831, at *6 (N.D. Cal. Oct. 5, 2016); *see also Quicksilver, Inc. v. Quick Sports International B.V.*, No. SACV 03–1548 DOC (ANx), 2005 WL 8157305, at *5 (C.D. Cal. May 11, 2005) (where defendants were directly involved product marketing, it would be it would be "erroneous" to grant a motion to dismiss on jurisdiction grounds).

The same analysis also applies to the Other Director Defendants: because plaintiffs state

[24] Dr. Huh also concedes that the Court would have personal jurisdiction over him for the claims brought by Escambia. None of the class representatives' transferor court is Florida.

claims against them based on their personal participation in nationwide sales and marketing, the first two prongs of the personal jurisdiction test are met for each jurisdiction. No heightened showing is required. The Other Director Defendants' cases are inapposite. In *Stewart v. American Ass'n of Physician Specialists, Inc.*, the court did not hold that there was a higher level of "participation" needed for personal jurisdiction than for liability; the court found jurisdiction lacking because there were no allegation of personal participation at all. 2014 WL 2011799, at *6–7 (C.D. Cal. May 15, 2014); *see also Microsoft Corp. v. Gulfcoast Software Sols., LLC*, 2016 WL 4543231, at *5 (W.D. Wash. Jan. 4, 2016) (role of individual defendant insufficiently alleged). With respect to the third prong of the personal jurisdiction test, the Other Director Defendants have not asserted that the exercise of jurisdiction would be unreasonable. Order at 151.

In the alternative, if the court upholds plaintiffs' RICO claims, then the Court may exercise pendent personal jurisdiction over the Other Director Defendants.

> [A] court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction.

*In re Packaged Seafood Prods Antitrust Litig.*, 338 F. Supp. 3d 1118, 1172 (S.D. Cal. 2018) (citations omitted). Courts may exercise pendent personal jurisdiction where doing so "would best serve the motivating policies delineated by the Ninth Circuit; these include 'judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties.'" *Id.* at 1773 (quoting *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004)).

"Congress provided for service of process upon RICO defendants residing outside the federal court's district when it is shown that 'the ends of justice' require it." *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir. 1986) (quoting 18 U.S.C. § 1965(b)). Personal jurisdiction under section 1965(b) exists when "(1) the Court has personal jurisdiction over at least one of the participants in the action; (2) there is no other district in which a court will have personal jurisdiction over the alleged co–conspirators; and (3) the facts show a single nationwide RICO conspiracy exists." *Alves v.*

*Player's Edge, Inc., No. 05–1654 WQH (CAB)*, 2006 WL 8455520, at *8 (S.D. Cal. July 19, 2006). While Huh consents to general jurisdiction only in Florida courts, Pritzker and Valani argue that courts outside of California cannot exercise general or specific jurisdiction over them. If the Court does not reject these arguments, then the first two prongs of the section 1965(b) analysis will have been met: the Court would have jurisdiction over Pritzker and Valani, but no court would have jurisdiction over all the RICO defendants. Lastly, as set forth above, plaintiffs have sufficiently alleged a RICO claim. Because the Court has jurisdiction over the Other Director Defendants with respect to plaintiffs' federal RICO claims, it may also exercise pendent personal jurisdiction over all of plaintiffs' state law claims. *See Packaged Seafood*, 338 F. Supp. 3d at 1172 ("Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction.").

## V. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated: February 3, 2021

Respectfully submitted,

By: */s/ Sarah R. London*
Sarah R. London
LIEFF CABRASER HEIMANN & BERNSTEIN
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956–1000
slondon@lchb.com

By: */s/ Dena C. Sharp*
Dena C. Sharp
GIRARD SHARP LLP
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981–4800
dsharp@girardsharp.com

By: */s/ Dean Kawamoto*
Dean Kawamoto
KELLER ROHRBACK L.L.P.
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623–1900
dkawamoto@kellerrohrback.com

By: */s/ Ellen Relkin*
Ellen Relkin
WEITZ & LUXENBERG
700 Broadway
New York, NY 10003
Telephone: (212) 558–5500
erelkin@weitzlux.com

Co–Lead Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: /s/ *Sarah R. London*
Sarah R. London