# EXHIBIT H

**From:** Riaz Valani
**Sent:** Thursday, July 20, 2017 9:31 PM
**To:** Gifford, William F. Jr (ALG)
**Subject:** Re: Introduction

Billy,
That works well - I'll confirm venue. Looking forward to meeting.
Riaz

> On Jul 18, 2017, at 20:15, Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com> wrote:
>
> Riaz,
>
> Thanks for getting back to me. Hope all is going well. If still available, Friday the 28th works well, as we have our second quarter earnings call on the 27th. I would suggest mid-morning (10:30) if that works for you guys. Let me know if that works and where you would like to meet in New York. Thanks.
>
> Best regards,
>
> Billy
>
> -----Original Message-----
> From: Riaz Valani [mailto:RValani@gacapital.com]
> Sent: Thursday, July 13, 2017 1:27 PM
> To: Gifford, William F. Jr (ALG)
> Cc: Nick Pritzker; Isaac Pritzker; Zach Frankel
> Subject: Re: Introduction
>
> Billy,
> Thanks much. I'm in Europe the next 2 weeks but am planning to be in New York along with Nick, Zach, and Isaac on the 27/28th of this month.
> Perhaps we could all get together there then, if workable for you?
> Best,
> Riaz
>
> On 12/07/2017, 13:43, "Gifford, William F. Jr (ALG)"
> <William.F.Gifford@altria.com> wrote:
>
>> Riaz,
>>
>> Hope you enjoyed your break last week. I was just checking in to see
>> if you have any available dates for us to meet you and the management
>> team on the west coast.
>>
>> Best regards,
>>
>> Billy
>>

>> -----Original Message-----
>> From: Riaz Valani [mailto:RValani@gacapital.com]
>> Sent: Tuesday, June 06, 2017 7:04 AM
>> To: Dinyar Devitre
>> Cc: Gifford, William F. Jr (ALG)
>> Subject: Re: Introduction
>>
>> Dinny,
>> Thanks so much.
>>
>> Billy,
>> Pleasure to meet you. Do you have any plans to be on the west coast
>> late June or July?
>>
>> Best,
>> Riaz
>>
>>> On Jun 5, 2017, at 20:38, Dinyar Devitre <Dinyar@Devitre.net> wrote:
>>>
>>> Hi Riaz,
>>>
>>> Further to our conversation, this will introduce you to Billy
>>> Gifford, CFO Altria Group Inc.
>>>
>>> I hope that the two of you can connect.
>>>
>>> Best wishes,
>>>
>>> Dinny
>>>
>>> Sent from my iPad
>

# EXHIBIT I

**From:** Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com>
**Sent:** Monday, July 31, 2017 9:00 PM
**To:** Riaz Valani
**Cc:** Isaac Pritzker;Zach Frankel;nick@taocap.com
**Subject:** RE: <no subject>

**Follow Up Flag:** Flag for follow up
**Flag Status:** Flagged

Dear Riaz,

Thank you guys for your time. We enjoyed meeting you guys and the conversation as well. I will get with Howard and send a couple of dates for you guys to choose from to further the discussion.

Best regards,

Billy

---

**From:** Riaz Valani [mailto:RValani@gacapital.com]
**Sent:** Monday, July 31, 2017 1:18 PM
**To:** Gifford, William F. Jr (ALG)
**Cc:** Isaac Pritzker; Zach Frankel; nick@taocap.com
**Subject:** <no subject>

Dear Billy,

Thank you again for your time on Friday - we very much enjoyed meeting you both.

It was very interesting to get your perspective on the industry, the future of reduced risk products, and your thoughts on possible collaboration between ourselves.

As a next step, I wanted to connect you with my fellow director Nick Pritzker. We were hoping to find a mutually convenient time to continue our discussion, and are happy to come to Richmond.

Please convey our warm regards to Howard, as I do not have his email address.

Best,

Riaz

# EXHIBIT J

**From:** Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com>
**Sent:** Wednesday, August 30, 2017 2:24 PM
**To:** Nicholas J. Pritzker;Gifford, William F. Jr (ALG)
**Cc:** Isaac Pritzker;Zach Frankel;Riaz Valani
**Subject:** RE: Thanks!

Thank you for a great discussion and we look forward to reconnecting in Mid-September.

-----Original Message-----
From: Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
Sent: Tuesday, August 29, 2017 3:16 PM
To: Gifford, William F. Jr (ALG); Willard, Howard A. (ALG)
Cc: Isaac Pritzker; Zach Frankel; Riaz Valani
Subject: Thanks!

Billy/Howard: thanks so much for your time Friday: it was a fascinating conversation, and we look forward to continuing as planned.
Best, nick

Sent from my iPad

# EXHIBIT K

| | |
|---|---|
| **Subject:** | 11:00am PT / 2:00pm ET: Altria Conf. call w/ Howard & Billy (Nick/Isaac/Riaz/Zach) |
| **Location:** | Dial-in details enclosed |
| **Start:** | Tue 10/3/2017 6:00 PM |
| **End:** | Tue 10/3/2017 7:00 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Organizer:** | Gifford, William F. Jr (ALG) |

Please see below Dial-in and access code.

Dial-in 1-650-479-3207

Access code: 735 619 453

# EXHIBIT L

**From:** Lobosco-Seibert, Providence M. "Enza" (ALG) <Providence.M.Lobosco-Seibert@altria.com> on behalf of Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com>
**Sent:** Thursday, October 5, 2017 8:27 PM
**To:** Nicholas J. Pritzker
**Cc:** Willard, Howard A. (ALG); Zach Frankel; Riaz Valani; Isaac Pritzker; Gifford, William F. Jr (ALG)
**Subject:** RE: Meeting

Hello Mr. Pritzker,

This is to confirm the meeting with Billy and Howard on November 9th in NY. Please advise a time that works for all of you and I will coordinate travel.

Thank you.
Enza

---

**From:** Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
**Sent:** Thursday, October 05, 2017 3:04 PM
**To:** Gifford, William F. Jr (ALG)
**Cc:** Willard, Howard A. (ALG); Zach Frankel; Riaz Valani; Isaac Pritzker
**Subject:** Re: Meeting

Billy: thanks for the fast response. How about Thursday Nov 9 in NY, maybe at the Park Hyatt? We will have just had a board meeting and will be armed with current information. We will keep your list in mind and will share what we can with you when we are together.
Best wishes,
Nick

Sent from my iPad

On Oct 5, 2017, at 8:15 AM, Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com> wrote:

> Nick,
>
> We appreciate the dates; however, those two days happen to be when we are having our investor day conference this year. We will be unavailable both days. We are available on Nov. 3rd or any day the week following Nov 6th- 10th. Let me know if any of those days could possibly work for you guys.
>
> Additionally, the areas of questions we referred to on our previous phone conversations would be as follows:
>
> Financials (Historical and future plans)
> Regulatory assessment
> Manufacturing capacity and Production Forecast

Internal Capability assessment (R&D and management)
Product/technology pipeline
Intellectual property portfolio

I realize the depth of conversation is dependent on how comfortable you guys will be sharing information in these areas.

We look forward to hearing if any of the dates above work. We can do it in New York or San Francisco.

Best regards,

Billy

---

**From:** Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
**Sent:** Wednesday, October 04, 2017 7:12 PM
**To:** Willard, Howard A. (ALG); Zach Frankel; Gifford, William F. Jr (ALG); Riaz Valani; Isaac Pritzker
**Subject:** Meeting

Billy/Howard: We can all be in NY on Nov. 1st or 2nd if either of those days might work for you to get together.
Please let us know if that is convenient, and what the best times would be for you.
Best, nick

Sent from my iPad

# EXHIBIT T

NewsRoom

1/31/19 FD (Fair Disclosure) Wire 14:00:00

FD (Fair Disclosure) Wire
Copyright (c) 2019 Thomson Financial and ASC LLC

January 31, 2019

# Q4 2018 Altria Group Inc Earnings Call - Final

Presentation

OPERATOR: Good day, and welcome to the Altria Group 2018 Fourth Quarter and Full Year Earnings Conference Call. Today's call is scheduled to last about 1 hour, including remarks by Altria's management and a question-and-answer session. (Operator Instructions) I would now like to turn the call over to Ms. Paige Magness, Vice President of Communications for Altria Client Services. Please go ahead, ma'am.

PAIGE MAGNESS, VP OF COMMUNICATIONS - ALTRIA CLIENT SERVICES, ALTRIA GROUP, INC.: Good morning. Thank you for joining us. We're here this morning with Howard Willard, Altria's CEO; and Billy Gifford, our CFO, to discuss Altria's 2018 business results and provide a deeper dive on the JUUL opportunity and Cronos.

Earlier today, we issued a press release providing these results, which is available on our website at altria.com and through the Altria Investor App.

During our call today, unless otherwise stated, we're comparing results to the same period in 2017. Our remarks contain forward-looking and cautionary statements and projections of future results. Please review the forward-looking and cautionary statements section at the end of today's earnings release for various factors that could cause actual results to differ materially from projections. Future dividend payments and share repurchases remain subject to the discretion of Altria's board. The timing of share repurchases depends on marketplace conditions and other factors. Altria reports its financial results in accordance with U.S. Generally Accepted Accounting Principles. Today's call will contain various operating results on both a reported and adjusted basis. Adjusted results exclude special items that affect the comparability of reported results. Descriptions of these non-GAAP financial measures and reconciliations are included in today's earnings release.

With that, I'll turn the call to Howard.

HOWARD A. WILLARD, CHAIRMAN, CEO, COO & EXECUTIVE VP, ALTRIA GROUP, INC.: Thanks, Paige, and good morning, everyone. This morning, I'll focus on addressing key questions we've been getting, including our outlook for cigarette volumes, our strategic investments in JUUL and Cronos and the current regulatory environment. I'll also review our guidance for 2019. Billy will then briefly highlight our 2018 performance. We've included some slides to accompany some of my remarks.

Altria closed out 2018 with excellent full year adjusted diluted EPS growth of 17.7%. And we continue to reward shareholders by returning $5.4 billion in cash through dividends. PM USA stabilized Marlboro and strengthened our combustible business. We also took proactive steps that we believe uniquely position us for long-term success. Altria enters 2019 with an evolved business platform that includes our strong core tobacco businesses and new strategic investments with tremendous potential for growth.

First, our operating companies continue to give us the industry-leading portfolio in the U.S. through Marlboro, Black & Mild, Copenhagen and hopefully soon, iQOS. But now beyond these brands, our investments in JUUL as well as Cronos, once closed, give us exposure to new growth opportunities, while also further diversifying our future income streams.

The decision to pursue these investments stems from a desire to enhance Altria's long-term earnings and dividend growth, while also making progress on our harm-reduction aspiration to help adult consumers switch from combustible cigarettes to noncombustible alternatives. We believe that JUUL and Cronos present unique opportunities to meaningfully participate in fast-growing adjacent categories.

Before offering additional detail on the investments themselves, let's discuss the dynamics affecting U.S. cigarette category volumes and our outlook. The U.S. cigarette category is large and resilient and has absorbed many shocks over time. And despite significant e-vapor acceleration in 2018, the U.S. cigarette category volume decline rate accelerated only modestly from the recent long-term decline rate of 3% to 4%. Let's look at the last 2 years for some context. In 2017, we estimated that U.S. cigarette industry volume declined by 4%, which reflects the impact of a disruptive $2 per pack California state excise tax increase in the second quarter and initial signs of the e-vapor category returning to growth during the second half of the year. In 2018, record growth in e-vapor of approximately 35% and higher gas prices accelerated U.S. cigarette industry volume declines outside the 3% to 4% range to a decline of 4.5%.

Given the significant interest in cigarette category fundamentals, let me provide perspective on the specific drivers of the decline rate and our outlook for 2019. We previously cited a secular decline rate within a 2% to 3% range. This rate includes smokers who reduce their consumption, those who stop using tobacco products and smokers moving to other tobacco categories.

In 2018, we estimate that the secular decline rate was elevated due to increased movement by adult smokers across categories, which historically accounted for about 1 percentage point of the 2% to 3% secular rate. This acceleration is largely attributable to e-vapor category growth, especially in light of the decline in the smokeless category in 2018. In total in 2018, we believe e-vapor represented the vast majority of the 1 percentage point component plus an additional 3/10. Of course, other factors also affect the decline rate. In 2018, we believe macroeconomic factors, specifically gas prices, accounted for about 0.5 percentage point additional headwind on cigarette volumes. We believe the price elasticity component of the decline rate remains consistent with our long-term estimate of negative 0.3.

Looking forward, we'll continue to closely monitor the various factors at play. We watch, for example, excise taxes at both the federal and state level, gas prices, economic conditions affecting the adult tobacco consumer, like housing starts, unemployment rates and consumer confidence, and the regulatory environment. We also know that over half of adult smokers are looking for alternatives. With the recent e-vapor growth, almost entirely driven by JUUL in 2018, and more alternative tobacco products available in the marketplace, we expect the 2019 U.S. cigarette industry volume decline rate to be in a range of 3.5% to 5%. This range is wider range, covers a potential for higher levels of adult smoker trial of and conversion to noncombustible products similar to 2018. For 2019 through 2023, our estimate for average annual U.S. cigarette industry volume declines is 4% to 5%.

Let's now move to our recently announced strategic investments, starting with JUUL. Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also support and even accelerate transition to noncombustible alternative products by adult smokers. The JUUL investment provides Altria with a significant stake in the largest and fastest-growing e-vapor company with a highly talented management team, successful end-market products, a strong innovation pipeline and significant international opportunity. When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders.

We are excited about JUUL's domestic growth and international prospects and their potential impact on our investment. JUUL's 2018 growth was quite remarkable. JUUL had net revenues in excess of $1 billion in 2018, up from approximately $200 million in 2017. JUUL overwhelmingly reaccelerated the U.S. e-vapor category growth rate, growing JUUL's volume by nearly 600%

to over 450 million refill kit pods. We estimate JUUL represents over 30% of the overall e-vapor category across open and close systems and all trade classes. After e-vapor growth plateaued from 2015 to 2017, rapid growth was reignited in 2018, and we expect U.S. e-vapor volume to grow at a compounded annual rate of 15% to 20% through 2023.

As a reminder, Altria's share of JUUL's international e-vapor income would be 100% incremental to Altria. We believe the global e-vapor and heat-not-burn segments, with estimated sales of roughly $23 billion in 2018, have substantial room to grow. JUUL currently operates in 8 countries with plans for additional expansion this year. We expect the JUUL product features that have driven JUUL's success in switching adult smokers in the U.S. to strongly appeal to international adult cigarette smokers. And JUUL has designed

[Audio Gap]

in international markets to meet applicable regulatory requirements and also had significant new innovations in its pipeline.

Though still early days, some information from recent launch markets shows rapid growth and helps affirm our assumptions that JUUL's product development and commercialization capabilities can solve for different regulatory restrictions and adult consumer preferences.

Let's look at 2 examples. First, in Canada, while distribution is limited, JUUL reports that retail takeaway grew to more than 60% dollar share in stores selling their products after only 3 months in retail. JUUL is also seeing encouraging performance where they have achieved distribution in Europe. For example, in the Sainsbury chain in the U.K., JUUL tells us that it recently became the #1 e-vapor brand in the chain, with the dollar share in excess of 23% in less than 12 weeks after launch. And just to remind you, the U.K. operates under the Tobacco Products Directive adopted by many EU countries, which limits the nicotine concentration level. Ultimately, we expect the international revenue and income opportunity to end up being as large as or larger than the U.S. opportunity.

Our 35% investment was based on a deep strategic, operational and financial analysis of JUUL and the marketplace. Clearly, we look at this opportunity over the long term, but for context, let us provide a view 5 years out. Some of our independently developed key assumptions over the next 5 years that informed that analysis include: a U.S. e-vapor category that grows volume between 15% to 20% annually; JUUL continuing to be the primary growth driver for the e-vapor category; attractive JUUL operating margins that achieve current cigarette-like margins due to the benefits of increasing scale and automation in the supply chain; international revenues that equal domestic revenues by 2023; and international margins that approach current international cigarette margins.

Under our assumptions, our investment in JUUL would generate an after-tax return exceeding our weighted average cost of capital in 2023. Additionally, with 5-year e-vapor category volume growth in the range of 15% to 20% annually, we would expect the U.S. cigarette category volume decline rate to be consistent with the decline rate estimate of 4% to 5%. I'll remind you that in 2018 with e-vapor category volume growth of 35%, the cigarette category decline rate was 4.5%, including 0.5 of a percent headwind from gas prices.

Combined with the earnings and cash generation engine of our core tobacco business, we believe this investment in JUUL will support consistent returns over the long term by providing Altria with a significant stake in the fastest-growing -- in the fast-growing e-vapor category.

Briefly touching on the regulatory environment. The FDA and many others are concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue that we and others in the industry must continue to address aggressively and promptly. We understand that the long-term opportunity of tobacco harm reduction is threatened by continued underage use. JUUL has already taken significant action to address these concerns. Today, it remains the only e-vapor company to have stopped shipping flavored products other than tobacco, menthol and mint to retail. These shipments stopped on November 13. JUUL

has taken additional steps to enhance its online age verification processes for sales on its website to adult tobacco consumers 21 years of age or older as well as developing a restricted distribution system for retailers. JUUL has also halted all promotional use of U.S. social media platforms and will continue to monitor and remove inappropriate material from third-party accounts. And JUUL is developing new technologies to further restrict youth access.

We know more can and must be done. That's why we are engaged in unprecedented efforts at the federal and state level to raise the minimum legal age to purchase all tobacco products to 21. We believe it is the single most important step we can take today, and we'll be stepping up our efforts in the coming months. Already this year, we are supporting legislation raising the legal age in both Washington state and Virginia, and we continue to engage nationwide in this effort.

We recognize that some of these actions may impact the short-term growth of the e-vapor category. We also know that preserving the long-term opportunity of harm reduction for adults is critical. We remain committed to being part of the solution to this issue.

Harm reduction remains central to our view of the future for the tobacco industry. In addition to the significant opportunity presented by e-vapor, we remain very excited about the prospects for heat-not-burn in the U.S. It is now approaching 2 years since PMI submitted the iQOS PMTA, and we are fully prepared to commercialize iQOS in the U.S. We remain fully committed to the success of iQOS in the U.S. and are excited to deploy our robust commercialization plans. PM USA is establishing brick-and-mortar stores, including locations in multiple cities within the first year of launch. They've already hired personnel to support prelaunch activities and are collaborating with key partners to best position iQOS at retail.

Let's now turn to Cronos. While the transaction is subject to customary closing conditions and expected to close in the first half of 2019, Altria's agreement to acquire a 45% stake in Cronos with a warrant to achieve majority ownership will create a new growth opportunity in an adjacent category poised for rapid growth. It complements our strong core tobacco businesses and expands our income opportunity beyond the U.S.

After years of evaluating adjacent opportunities, the cannabis category is quite attractive and delivers on some key considerations, including accretion to our long-term financial performance and synergy with Altria's capabilities, allowing our combined resources to accelerate Cronos' growth.

While a range of estimates exist, a recent third-party report projects the 10-year global cannabis revenue opportunity to be in a range of $40 billion under a similar legal landscape to today to more than $250 billion assuming a fully legal market worldwide. We believe the growth opportunities are significant and will extend across the globe as cannabis markets open.

Selecting the right partner in this category was critical, and we've done just that. Cronos' strong management team has built unique capabilities to compete globally across the medicinal, recreational and nutraceutical categories. Our investment will allow Cronos to more quickly expand its global footprint and production capacity. We also expect it to accelerate the execution of its strategic initiatives, including investments in cannabinoid innovation and developing differentiated products and brands across medicinal and recreational categories. We look forward to helping Cronos realize its significant growth potential.

In summary, 2018 was a transformative year for Altria. We are pleased with the performance of our core tobacco businesses, as PM USA stabilized Marlboro through its equity investments. We made strategic investments in rapidly growing category that we believe strengthen our long-term financial profile, enhance our growth prospects and better position the company to deliver long-term value to shareholders through earnings growth and dividends. And of course, we had significant earnings growth and increased our dividend twice. We look forward to sharing more with you at CAGNY in a few weeks.

Turning to 2019 guidance, we expect to deliver full year 2019 adjusted diluted earnings per share of $4.15 to $4.27. This range represents a growth rate of 4% to 7% from a 2018 adjusted diluted EPS base of $3.99. Our guidance reflects our expectation for a higher full year adjusted effective tax rate, primarily resulting from lower dividends from AB InBev. It also includes increased interest expense from the debt incurred related to the Cronos and JUUL transactions, although we expect that expense to be

mostly offset by savings from our previously announced cost reduction program. Our plans also take into account increased investments related to PM USA's lead market plans for iQOS, once authorized by the FDA. And lastly, our guidance assumes little to no earnings or cash contributions from the Cronos and JUUL investments.

In the first quarter, we'll have the increased interest expense without the full benefits of our cost reduction program and 1 fewer shipping day in the smokeable segment. Therefore, we expect the growth to come in the last 3 quarters of the year.

We have a proven track record of delivering against our objectives, and we maintain our long-term financial goals to grow adjusted diluted EPS at an average annual rate of 7% to 9% and to maintain a dividend payout ratio target of approximately 80% of adjusted diluted EPS.

I'll now turn it over to Billy to provide more detail on our 2018 results.

WILLIAM F. GIFFORD, VICE CHAIRMAN, CFO & EXECUTIVE VP, ALTRIA GROUP, INC.: Thanks, Howard, and good morning, everyone. Although we had been busy securing these investments over the past few months, we continue to compete vigorously in the cigarette and smokeless tobacco categories, which still deliver substantially all of our earnings. We're quite pleased with the performance of our core tobacco businesses in 2018, and believe the equity investments we made using the benefits of the corporate tax reform set them up to deliver strong income growth in 2019 and beyond.

Here are some highlights. In the smokeable products segment, our strategy remains unchanged to maximize income, while maintaining momentum on Marlboro over time. We saw a slight decline in adjusted operating company's income for this segment, primarily driven by lower volume and higher cost, including additional investments. Those included brand equity investments behind product expansions, innovative packaging and a digital loyalty program that allowed PM USA to successfully stabilize Marlboro.

Following softness in 2017, Marlboro's full year 2018 cigarette retail share of 43.1% was unchanged compared to its fourth quarter 2017 share. As we discussed in the third quarter, we believe keeping Marlboro strong and relevant is important to the long-term profit maximization in cigarettes. This may mean that Marlboro retail share varies up or down quarter-to-quarter as we continue to balance momentum behind the brand and profitability.

Building off the success of Points West, Marlboro's limited-time rewards program in Texas, PM USA launched Marlboro rewards nationally this month, with the goal of increasing its digital leadership, brand engagement and Marlboro's already strong brand equity and loyalty. Within the first 10 days of the program, 700,000 adult smokers, 21 plus, enrolled and entered nearly 1.5 million pack codes. In the super-premium Tobacco and Water segment, Nat Sherman continued to deliver against its plan, and we're pleased with its performance following the regional expansion of Nat's across the Western U.S. in 2018.

In the fourth quarter, Nat's had a 0.3 share in the cigarette category in states selling the product. The team continues to evaluate further expansion opportunities, which we will share at the appropriate time.

In noncombustible products, our businesses invested in the regulatory sciences to support the MRTP following for Copenhagen Snuff, and our commercialization plans for the iQOS lead market. These are important steps on our journey towards tobacco harm reduction. USSTC will present the science supporting its application to the Tobacco Products Scientific Advisory Committee next week, and we look forward to engaging with the FDA on this application.

In the Smokeless Products segment, USSTC generated adjusted operating income growth of 7.5% in 2018, despite slowing category volumes. We continue to believe that smokeless industry volume is being affected by higher pricing and adult consumer movement among tobacco products, including e-vapor and other innovative products. USSTC has exciting plans for its portfolio in 2019. USSTC announced its plans to expand Skoal Long Cut cool Spearmint nationally. This offering provides adult dippers a flavorful experience and furthers USSTC's strong position in the mint and wintergreen segment. In the second quarter,

Copenhagen will open its first retail location in Nashville, Tennessee. The store will sell Copenhagen products and provide a unique opportunity to directly engagement with adult tobacco consumers 21-plus.

Turning to our alcohol assets. Ste. Michelle's adjusted OCI decreased significantly in the fourth quarter, so let me provide some additional information on these results. Results were negatively impacted by higher investments in marketing and sales, lower volume and inventory adjustments. As we've discussed previously, the growth rate in the premium wine category has slowed, and Ste. Michelle worked closely with its major distributors to reduce trade inventories.

In beer, adjusted earnings from our equity investment in AB InBev were $200 million in the fourth quarter, which reflects Altria's share of AB InBev's third quarter results. In the short time we've held an interest in AB InBev, there has been volatility in its earnings, resulting from the mark-to-market adjustments for hedging of share-based payment programs. A decrease in AB InBev's share price, as occurred last year, results in losses on these hedges, which are reflected in our underlying results. For the full year 2018, Altria's share of these losses was $128 million.

I'd like to provide some insight on the cost reduction program that we announced last month. To offset most of the interest expense associated with the debt incurred to finance the JUUL and Cronos investments, in the fourth quarter, we announced a cost reduction program expected to deliver approximately $575 million in annualized cost savings by the end of 2019. The savings from this program will ramp up through the year. This program includes third-party spending reductions across the business, such as professional and consulting services, information technology and product research and regulatory investments. The program also includes workforce reductions of approximately 900 people, particularly within our support services.

With that, we'll wrap up and Howard and I will be happy to take your questions. While the calls are being compiled, I remind you that today's earning release and our non-GAAP reconciliations are available on altria.com. We have also posted today's slides and our usual quarterly metrics, which include pricing, inventory and other housekeeping items. On that page, we've add quarterly shipping days and PM USA's menthol share to provide additional color around that part of our business.

With that, I'll open up the question-and-answer period. Operator, do we have any questions?

Questions and Answers

OPERATOR: (Operator Instructions) Our first question comes from Steve Powers of Deutsche Bank.

STEPHEN ROBERT R. POWERS, RESEARCH ANALYST, DEUTSCHE BANK AG, RESEARCH DIVISION: So, Howard or Billy, I guess, my first question is just how secure you see your fiscal '19 volume outlook in cigarettes to be? And maybe to help with that, I was just wondering if you're able to decompose some of the volume drivers that you provided as it relates to the fourth quarter, that down 5%. It was worse than the full year run rate. So I'm just wondering what the contribution from maybe macro-elasticity factors, the next -- which I'm assuming includes excise taxes as well as manufacture pricing and the cross category movement would have been in the fourth quarter. And then, I guess, more importantly, looking to '19, where do you see, within the context of those drivers, the potential improvement coming from?

HOWARD A. WILLARD: Yes, Steve, I think, if I understand your question correctly, if you look at, as we progressed through the year, we did have 2 SET increases. One was in Oklahoma and the other was in Kentucky. And so that had an effect because that was represented about 5% of cigarette industry volume. So as you progress through the year, of course, you have the initial drop for the price shock and then it returns to elasticity as you move through time. I would say as we move to this year, right now gas prices are a tailwind to the overall adult cigarette consumer as we experience gas prices drop. Last year, they were up 13% year-over-year, and we've seen them drop as we progress into the first part of this year, so we should see that impact through time.

STEPHEN ROBERT R. POWERS: Okay. So the big driver of incremental potential improvement '19 versus '18 is really your gas price outlook?

HOWARD A. WILLARD: That and the overall macroeconomic tailwinds that the consumer is experiencing.

STEPHEN ROBERT R. POWERS: Okay. Great. And I need to run the math, but with 15% to 20% category growth in e-vapor, the negative 4% to negative 5% category declines you call out in core combustible going forward, I'm assuming some positive contribution from iQOS and heat-not-burn in your outlook. I guess, my question is, as you look forward 5 years from now, are you expecting market-wide nicotine consumption to be higher or lower in the U.S. versus now? And maybe by what magnitude? And I guess, within that, there's an implied question about what the expected interplay between e-vapor and heat-not-burn maybe with smokeless?

WILLIAM F. GIFFORD: Yes. I think with regard to your question, our primary focus has been on estimating by individual category, and we provided that information to you. I think with regard to heat-not-burn, I think it's clearly going to have an impact going forward on cigarettes and likely e-vapor. But I think that we have not really included that in our calculations, and we're really waiting until we get some experience in the marketplace this year and certainly we can make adjustments to any of our estimates. But certainly, we believe that when we do get approval from the FDA to put iQOS through the market, it is an additional driver of growth in the noncombustible tobacco product segment.

STEPHEN ROBERT R. POWERS: Okay. Great. And if I could do one more, it's related to JUUL and I clearly thank you for the insight you provided in your slides and on the call today with respect to JUUL. But, I guess, kind of 3 following questions now that you've opened up on JUUL, I find myself a little bit greedy for more. So just based on your conversations with JUUL management recognizing that they are independent and private, I guess, as we go forward, what level of incremental disclosure do you expect you'll be able to share over time, whether in a few weeks at CAGNY or just in general? Question number one. And I guess, within that, related to that, 2 follow ons. The first one is, your fiscal '19 guidance assumes 0 -- effectively 0 EPS and cash contribution from Cronos and JUUL. And I guess, is that a firm estimate of breakeven or are you simply excluding JUUL and Cronos from guidance? Another way to ask that question is, given -- are you able to absorb volatility in Cronos, JUUL contributions within the 4% to 7% range? Or does that create risk of pushing you outside the range? And then lastly, sorry, the 5-year kind of breakeven return rate -- economic return that you called out on JUUL based on your expectations, is that -- what are you assuming in terms of like cash coming back to? Is that a theoretical return or is that actual -- do you expect to receive cash in the form of dividends from JUUL, so that you're cash breakeven over that 5-year time frame? Sorry for all the questions.

HOWARD A. WILLARD: Well, you're going to make us work hard this morning, aren't you? I'll take a crack at them, and if I miss something, I'm sure Billy will jump in. So with regard to the disclosure, as you pointed out, given the time since the closing, we put together significantly more information and shared it today. And obviously, as we get further questions, we'll look at -- we'll look for opportunities to share more relevant information with investors. And the other thing I would reference is that we expect at some point in the future, probably later this year, we will be accounting for the JUUL investment following antitrust approval using the equity income approach. And when we do that, there will be more disclosure in our SEC documents. So that's, I think, something to look forward to, and we do expect antitrust approval during this year. The second thing is, with regard to our statement about 2019 income, I think that what that really reflects is that with regard to JUUL, we're kind of waiting before it gets reflected in our income based on the equity income method. So we thought on the side of conservatism that it made sense to not guess as to the timing of antitrust approval. And then the second thing I would say is on Cronos, obviously, they are a publicly traded company, and so you have access to what their current income is and their income today is modest. The investment is really designed to rapidly accelerate their growth rate. And so we don't expect it to be a material contribution in 2019. With regard to the guidance range of 4% to 7%, that is designed, as it's always been in the past, to be a wide enough range to take into account the variety of changes that could occur. And that could reflect changes in our core business with regard to JUUL or with regard to Cronos. So it's designed to reflect our best all-in estimate of what could happen during the year.

Then you asked a question about the 5-year breakeven. And I think the way we calculated that, it was really taking the equity income we expect in 5 years, tax affecting it and then dividing it by the overall investment in JUUL. So it is an equity income

return, not a cash return, although, obviously, by that point, given the significant level of income, we would expect to have some dividends as well.

WILLIAM F. GIFFORD: The only thing I would add, Steve, I think it's important to remember under both JUUL or Cronos, as a business is growing in phases, significant opportunity to expand outside of the U.S. with huge growth potential, that reinvestments in the business for a period of time is appropriate.

HOWARD A. WILLARD: Yes, that's absolutely right. And I think we agree with the other JUUL investors that its growth prospects are so strong that now is the time to invest in -- and ultimately driving top line growth.

OPERATOR: Our next question comes from Pamela Kaufman with Morgan Stanley.

PAMELA KAUFMAN, SENIOR ANALYST, MORGAN STANLEY, RESEARCH DIVISION: I was just hoping to get a sense for how you're thinking about JUUL's midterm growth outlook, just given that the company is removing flavors from retail channels. And then what the impact is on the economics of the investment, if the category grows faster than 15% to 20%? Why is 15% to 20%, I guess, the right forecast, and what assumptions feed into that?

HOWARD A. WILLARD: Sure. I think with regard to the midterm forecast, one of the reasons why we selected a 5-year period to estimate the growth rate of the e-vapor category and JUUL is a significant driver of that growth is, I think, there is a bit of uncertainty as to whether or not there'll be a slowdown in growth in the next year or 2 as the industry works together with the FDA to drive down youth usage. And so I think that is to be determined. But I think even taking into account the fact that there could be some impact in the short run, I think we're confident in the long-term growth rate that we forecasted. It may just be that there's slower growth early on and more rapid growth later on. I think with regard to the significant action JUUL took in removing their flavors from retail, I do expect that, that is going to have some impact on their overall growth rate this year, but I think we also believe that adults will continue to buy the other flavored products at mainstream retail stores. And of course, with heightened age verification, those other flavors are available to adults on the JUUL website. So we still think they have pretty good growth prospects for this year even with those actions. I think we're pretty comfortable with our forecast of 15% to 20% compound annual growth rate over 5 years. And certainly with that level of growth, we believe the investment in JUUL is additive in a significant way to our income growth. If your question is, if it grows faster, is it still additive to our income growth? And I think that it could certainly grow faster than 20% and still be additive based on our estimates. I suppose there is some dramatically higher growth rate that, that may not be the case, but we're pretty comfortable that under a whole range of scenarios that financially this is a good thing for our income growth.

PAMELA KAUFMAN: And then just with respect to JUUL's international opportunity, how do you think about the impact of some of the differences in the regulatory backdrop, just given the nicotine caps in international markets and then just lower barriers to entry for competitors in the category relative to the U.S.?

HOWARD A. WILLARD: Sure. I think that when you look at various international markets, there are different regulatory requirements that have to be navigated. And frankly, there are different consumer expectations, given differences between the cigarettes in those markets that are purchased by adult vapor consumers over there compared to the U.S. So both of those things need to be navigated successfully in order to have a similar level of success internationally to what JUUL has had in the U.S. We are highly confident that JUUL has the technical capability, the current products and the products in the pipeline to navigate those differences and have strong success overseas. So I think frankly that there certainly is some work to be done there, but I think that they are already well on their way to having done that, and I think that we're encouraged by the products they have in their pipeline.

OPERATOR: Our next question is from Vivien Azer with Cowen.

VIVIEN NICOLE AZER, MD AND SENIOR RESEARCH ANALYST, COWEN AND COMPANY, LLC, RESEARCH DIVISION: So my first question is for you, Billy. You called out like the favorable macro backdrop in terms of your comfort around the 3.5% to 5% decline for 2019. I have a hard time reconciling that with the pretty consistent down trading that we're seeing at the low end of the category, where deep discount is consistently gaining share at the expense of discount. So can you help me reconcile that? That's my first question.

WILLIAM F. GIFFORD: Sure, it's a great question, Vivien. I think if you think about the economic recovery, it's a bit uneven, so it's a bit lumpy. So those consumers that were engaged in the branded discount, as we've increased the margins and profitability of our brand specifically, you can see some down trading that takes place because you can even think of the adult tobacco consumer with uneven economic recovery. Those at the lower end haven't recovered to the same extent as those at the higher end of the category. And so that's where you're seeing that churn within the discount category as the branded discount brands are taking increased profitability and margin.

VIVIEN NICOLE AZER: And you don't think that there is a risk over time that, that starts to kind of bleed up into the branded premium segment?

WILLIAM F. GIFFORD: Yes, based on our consumer research, Vivien, that we -- because of that and even we keep an eye on that group of consumers at that lower end to make sure that we feel comfortable with where we're at. We feel very strong with the premium segment. I think that's reminiscent, you can see with the flatness of the overall discount category and just churn within. So we don't see any signs at this point that would point to it moving up to the premium segment.

HOWARD A. WILLARD: Vivien, I'd refer you to the last couple of years. What has really happened is, you've had, particularly over the last year, a pretty nice performance by the premium brands, including Marlboro, but you had -- and you had a flat overall discount category from a market share perspective, but there's been significant movement from branded discount products to deep discount products. And of course, there's certainly market action that could be taken to try and address that, but given the nice margins that we have on L&M, I think that we're comfortable with the current trends in the marketplace.

VIVIEN NICOLE AZER: Okay, that's fair. My second question is around kind of the longer-term outlook for cigarette industry volume declines of 4% to 5%. It certainly makes sense that if you're expecting a deceleration in e-cig, it shouldn't be like incrementally that much worse for the cigarette category. That being said, I am curious to hear your thoughts around dual use within that e-cigarette revenue pool because if you've got JUUL users today that ultimately migrate to single-category use on the e-cigarette side, that would suggest that there would be some incremental degradation on cigarettes, if I'm thinking about it right. So I'd love to hear your thoughts on that.

HOWARD A. WILLARD: Yes, I think you have to consider, take 2018 as a guide, you had very substantial growth in e-vapor volume. And it was both people converting completely from cigarettes to e-vapor as well as a substantial amount of dual use as people tried e-vapor, in many cases JUUL, and are deciding whether to continue to dual use or convert completely. So I think that 2018 was a pretty active year for e-vapor category growth. And of course, as we know, the decline rate in cigarette category was only 4.5% and that was elevated 0.5 percentage point for -- by increase in gas prices. So I think it shows you that the cigarette category decline rate is pretty persistent and it can withstand a fair amount of growth from e-vapor. So we continue to be very comfortable with our forecasted decline rate of the cigarette category over the next 5 years of 4% to 5%.

WILLIAM F. GIFFORD: Yes, I think it's important to remember, Vivien, in the base 3% to 4%, that was historical, there was always 1% of that, that was included in secular decline of consumers doing exactly what you're saying, either replacing certain occasions or converting completely, as Howard mentioned. So that's, if you will, already in the 3% to 4% that was in the historical run.

OPERATOR: Our next question is from Chris Growe with Stifel.

CHRISTOPHER ROBERT GROWE, MD & ANALYST, STIFEL, NICOLAUS & COMPANY, INCORPORATED, RESEARCH DIVISION: Just to follow on Vivien's question there, see -- you've mentioned this 1 percentage point drag on volume from moving across categories, and I think you said it was around 1.4% drag on that category from e-vapor in 2018. That category, vapor is also pulling from smokeless tobacco as an example, I'm just curious how much of an overall volume effect it might have had on your business, like how much did it pull from smokeable, I think you defined that as well as smokeless, I think we're seeing some effect on that category as well?

WILLIAM F. GIFFORD: Yes, we don't have an exact number for you, but that's something that we'll provide in the future. But you're right, I think you also had dual usage between smokeless and the e-vapor category. And so you're right that, that is also pulling some of those consumers because the e-vapor experience was closer to what they were transitioning from, being an inherent pipe product versus a smokeless product.

HOWARD A. WILLARD: Chris, I'd also say on smokeless you've got 2 things going on, which is I do think you have some consumers that were smokeless users that are moving into e-vapor. Probably the bigger impact on the smokeless growth rate is that in the past, a lot of cigarette smokers were using smokeless as an alternative product, and I think a fair number of them have now said, "Boy, with the presence of JUUL in the marketplace, I've got a closer experience to my cigarette than smokeless that's attractive to me." So I think that has also contributed to the decline in the growth rate of smokeless.

CHRISTOPHER ROBERT GROWE: Okay. And as you think about your outlook for the -- through 2023, do you assume like e-cigarette starts to see excise taxes implemented? Is that a factor in that model? And then would you just assume, from a high-level, that JUUL grows in line with the category over that time?

HOWARD A. WILLARD: Yes. I think we're comfortable with that growth rate over a variety of excise tax assumptions. But I would tell you that I believe that it's a reasonable assumption to believe that you'll get some incremental excise taxes on e-vapor. But then it will not be a significant acceleration of what's happened over the last few years. And I think that the argument that's been made at the state level about the fact that given the potential for harm reduction that's offered by e-vapor, that, that is not a place where significant excise tax increases should be put in place. I think that's been fairly persuasive and I would expect it to continue to be. I think you had a second question. Remind me of it.

CHRISTOPHER ROBERT GROWE: And then just if JUUL would grow in line with the category, would that be your operating assumption in that 5-year model?

HOWARD A. WILLARD: Yes, I think our assumption is that the JUUL is going to grow faster in the category. I mean, if you look at 2018, JUUL growth represented more than the growth in the category, and I think that it's probably likely that it may moderate from being the whole growth of the category going forward, but we would expect it to be growing at a much more rapid rate than the other brands in the category.

OPERATOR: Our next question is from Michael Lavery with Piper Jaffray.

MICHAEL SCOTT LAVERY, PRINCIPAL & SENIOR RESEARCH ANALYST, PIPER JAFFRAY COMPANIES, RESEARCH DIVISION: On your decomposition on Slide 6, you show a modest deceleration in your projected or estimated impact from elasticity. But it looks like your pricing has actually accelerated in '18 versus '17. How do you reconcile that?

WILLIAM F. GIFFORD: Yes, I think when you look at that, Michael, you got to take into all -- the consideration of all factors. So you got to take in the total change to the consumers. So you have SET differentials that you'd annualize then across time. So that price elasticity is not just manufacturer list price, it's increase in list price to the consumer.

MICHAEL SCOTT LAVERY: Okay, that's helpful. And on iQOS, can you just specify what it is that you are assuming in guidance? Would it be right to think you're not accounting on any revenues until you get approval, but that there's some costs you are factoring in, and then would there be incremental spending if the revenues come? How should we think about that?

HOWARD A. WILLARD: We are optimistic and hopeful that iQOS is going to get approved fairly soon, and so we've got a full rollout of iQOS included in our guidance.

MICHAEL SCOTT LAVERY: Okay, that's great. And you -- so you did also mention both a lead market, but also stores in multiple cities, which sounds a little bit broader and faster and maybe a bigger launch than you've hinted at in the past. Have you expanded your plans? And you also said when you were reading through that slide related to it, you said that you are establishing stores. Are you doing that now ahead of approval? And how should we think about what your -- how you're positioned relative to that?

HOWARD A. WILLARD: You were listening carefully. Yes, I think -- I don't know that it's a change in our plans, but our belief is that iQOS is going to be quite a success, and that after the lead market we'll be moving quickly to other markets. And what we have learned as we've been focused on as to gaining access to and establishing retail locations is that it's not something you can do overnight. And so we've made the decision that it's worth the incremental investment in order to line up those locations in multiple markets in advance. And obviously, as time for the approval of iQOS drags on, it does cause us to incur a little bit of incremental expense. But we think the upside from commercializing iQOS is big enough that we want to be fully ready the minute we get FDA approval.

MICHAEL SCOTT LAVERY: Yes. And so you mentioned the Copenhagen store in Nashville. Is that one you would be able to quickly repurpose as a dual brand outlet, or would you want to separate those for brand identity and marketing purposes?

WILLIAM F. GIFFORD: I think that's something we'll consider long-term, Michael. I think the opportunity in Nashville is that's the home of the manufacturing base. And so we think it affords our consumer a great opportunity to engage with the brand and be right there where we're manufacturing the products. So we're really focused currently on the engagement with those adult dippers right there where the product is made.

MICHAEL SCOTT LAVERY: Okay, that's helpful. One real quick last one. You gave the share gains in the U.K. and Canada for JUUL. Is that also driving category growth or is it primarily market share momentum?

HOWARD A. WILLARD: I don't know that I have a good answer to that. I could speculate, but I will not.

OPERATOR: Your next question is from Judy Hong with Goldman Sachs.

JUDY EUNJOO HONG, MD, SENIOR ANALYST & CO-HEAD OF THE GIR ASIAN PROFESSIONALS NETWORK, GOLDMAN SACHS GROUP INC., RESEARCH DIVISION: One is just a quick clarification, the category volume for e-vapor that you laid out on Slide #8, is that equivalized volume to cigarette tax or what is the -- kind of how should we think about that relative to the cigarette volume?

WILLIAM F. GIFFORD: Yes, I think, Judy, that chart is trying to equivalize across open systems and closed. So if you think about it, that's the number of pods that are in the marketplace. If you think about the equivalization to total cigarettes, you have to think about what's the pod equivalent of a cigarette. And so a pod equivalent to a cigarette, we would estimated to be around 1 pod per pack of cigarettes.

JUDY EUNJOO HONG: So basically if you -- so JUUL at 0.5 million pods would be equivalent to roughly like 6% or 7% of the total cigarette volume equivalent?

WILLIAM F. GIFFORD: Yes, that would be the case.

JUDY EUNJOO HONG: Okay. So the total e-vapor category today is about 15% to 20% of the total cigarette equivalent volume in your estimate, just based on this math?

WILLIAM F. GIFFORD: That's correct, Judy.

JUDY EUNJOO HONG: Okay. So I guess, that seems like it's a pretty big number in the context of the cigarette category. And I guess, I'm still a little bit confused as to why it's not having a much bigger impact on the total cigarette volume, if the size of the e-vapor category is already 15% of the total.

WILLIAM F. GIFFORD: Yes. I think you have to think about it, Judy, is -- a base of that has been in place for quite a while. So if you think about the initial start, because we are including open systems in this overall equivalization, open systems have been in place going back a number of years. And I think that the point I was trying to raise is, it's important to remember within the cigarette category, the historical decline rate at 3% to 4% included 1% that was moving to other tobacco categories. And so part of the historical decline already assumed that there were going to be consumers progressing from cigarettes to other tobacco categories.

JUDY EUNJOO HONG: Got it. Okay. Anyway and then just going back to the international opportunity for JUUL, I mean, it sounds like based on the -- the assumptions would imply that your revenue for international market from JUUL is going to be a pretty sizable number at a margin that's also pretty attractive. So given some of the experience that we've seen, where we've seen some bumps along the way for iQOS and other players that have launched in markets outside the U.S., I guess, I'm just still wondering what gives you the confidence about sort of the big revenue contribution and margin contribution in 5 years?

HOWARD A. WILLARD: Yes. I mean, Judy, I think the way I would frame that is, I acknowledge that there've been a number of products, particularly in the e-vapor category, that have had some success and then that success has fizzled and so certainly that is something you have to be sensitive to. But I have to point out that JUUL's growth and success in the U.S. market last year was unique and first of its kind compared to other tobacco product successes both in the U.S. and overseas. I mean, the growth rate was dramatic, it represented the entire growth of e-vapor for the year, and it dramatically reaccelerated the growth of e-vapor. So I think the reason that we have confidence that it's going to have more success in overseas markets over the next 5 years than some of the other products that have been introduced over there is because it's had such dramatic success in the U.S. last year.

JUDY EUNJOO HONG: Got it. Okay. And then my last question just, Billy, when you think about Q1 combustible or smokeable volume, am I right in thinking that if you layer in the 1 less shipping day and then I think you're lapping a pretty big inventory level a year ago. So volume sounds like it could be down double digits in Q1, is that sort of in the ballpark?

WILLIAM F. GIFFORD: So, Judy, we're careful not to guide to the quarter level on volume. But I think you're thinking about trade inventories; that was a big component in the first quarter of last year, so it's important to pick that up. So you're exactly right from that standpoint, that it's important to consider how trade inventories were moving last year versus your expectations for this year.

OPERATOR: Our next question is from Bonnie Herzog with Wells Fargo.

BONNIE LEE HERZOG, MD AND SENIOR BEVERAGE & TOBACCO ANALYST, WELLS FARGO SECURITIES, LLC, RESEARCH DIVISION: I had a question on your EPS growth guidance. You guys now see a wide range in 2019, but you stated back in December that you expected your EPS growth to be slightly below your long-term 7% to 9% growth algorithm. So just wanted to understand what changed, or are you guys just being prudent with the wide range? And then I wanted to confirm your guidance assumes no buybacks this year, but just kind of wondering if there's a chance that could change or maybe what needs to happen to get you back in the market to buy back your stock?

HOWARD A. WILLARD: So I'll answer the first part of your question, and then I'll turn it over to Billy. The short answer on December versus today is nothing changed. We viewed 4% to 7% guidance as slightly below the 7% to 9% long-term trend. And you are right that it is a 3 percentage point wide range, but I think that we think it's prudent, given some of the increased volatility we've seen in our income in large part driven by volatility in the Anheuser-Busch InBev income stream, that in order to give the investment community the right confidence in our guidance that a bit of a wider range is prudent and appropriate.

WILLIAM F. GIFFORD: And as far as share buyback, Bonnie, remember we had about 350 million, I think it was 345 million to be exact, as we ended last year on the current program. And we expect to complete that by midyear, that is unchanged. And then we'll assess the situation and come forward if anything is appropriate after that.

BONNIE LEE HERZOG: Okay. And then I had a question on Marlboro. You guys successfully stabilized Marlboro share in 2018. So as we look forward, do you believe it's realistic that Marlboro could take share in a shrinking volume pool, especially given your new Marlboro rewards program? And then I also wanted to ask about the coupon inserts for JUUL and Marlboro packs. Can you guys help us understand the strategy with those? And how we should think about cannibalization of Marlboro versus maybe the opportunity to take share from competitive cig brands?

HOWARD A. WILLARD: Sure. I think with regard to Marlboro, you're right, we did stabilize it this year, and we think it's got very strong momentum and that, that will continue into this year. But I also think you have to consider the fact that our objective in the smokeable segment is to maximize income. And so I think you will see us balancing our desire to maximize income against the momentum of Marlboro, and we did that this year and I think we'll continue to do it. So I think with regard to your question about putting JUUL inserts on our cigarette packs, I would first of all say that I think the vast majority of the support that we will provide to JUUL is really going to be brand agnostic or company agnostic with regard to how it helps JUUL source volume. So if you think about them putting JUUL into much better display space at retail and having higher visibility, or you think about them potentially gaining access to some of our other services, I think, most of those services are not going to have a greater impact on our brands than they would on our competitors' brands. I think you could -- particularly with the onserts, obviously, we can only put onserts on our packs; they don't go on competitors' packs. And so theoretically, I guess, it could result in a bit more volume coming out of Marlboro. But I think that, that is unlikely to be the case. And I say that for really 2 reasons. I think there's already very high awareness amongst all cigarette -- adult cigarette smokers and, frankly, all Marlboro smokers about the availability of JUUL. So I think that a lot of that awareness has already been established. I wouldn't expect a big incremental uptick from those onserts. And then secondly, I would point out that I think JUUL tends to get more of its growth from the 21- to 29-year-old cigarette smoker than it does from the 30-plus cigarette smoker. And if you think about it, I think, as we've communicated in the past, Marlboro's share of those 21- to 29-year-old smokers is about equal to its overall share. But there are several other cigarette brands that are overdeveloped amongst 21- to 29-year-olds, such as Newport, Camel or Natural American Spirit that, frankly, might actually give up more volume on a relative basis than Marlboro.

BONNIE LEE HERZOG: Okay, that's really helpful. And then my final question for you guys is about the FDA. Just I was hoping you guys could give us some color from your perspective on the FDA's recent commentary surrounding harsher e-cig regulation. Was it a surprise to you that they are now putting threats out there, especially after your investment in JUUL? And then wondering if you've spoken to them recently? And you know what's your sense of how they're thinking about your ownership stake in JUUL as well as some of the initiatives JUUL's working on to help reduce youth e-cig use?

HOWARD A. WILLARD: Sure. I don't think we've been surprised at FDA's concern about youth usage of e-vapor products. I think, as you know, both JUUL and Altria, we were in talking to them in November. They had a high level of concern then. We shared that concern, and we've been interacting back and forth with the agency on the actions we're taking to try and reduce the levels of youth usage of e-vapor products. And frankly, I think their concern and their focus on the industry taking significant steps to drive down youth usage is appropriate and justified. And I think that we agree with JUUL that we need to take significant action. I think JUUL has already taken significant action, but we also agree that more must be done. And so I think that our view is that it's important to drive down youth usage in order to preserve this opportunity for adult cigarette smokers to be able

to switch to a very compelling noncombustible product, and I think we will ultimately achieve both. I think we'll drive down youth usage and still make this available to adult cigarette smokers as an alternative. And I just think we have some work to do and we're fully prepared to engage on that.

OPERATOR: Our next question comes from Adam Spielman with Citi.

ADAM JUSTIN SPIELMAN, MD AND EUROPEAN TOBACCO AND BEVERAGE ANALYST, CITIGROUP INC, RESEARCH DIVISION: First of all, can I say thank you for providing so much more data than usual. It really is appreciated, so thank you for that. I have 2 quick questions, I think they're quick. So if I take what you've said about the impact basically with growth of JUUL -- this is Slide 8, and equate that to cigarettes, it looks like the JUUL has grown about 0.4 billion units, which equates essentially to a 4% market share growth, and that's true for the whole e-cigarettes or e-vapor category. And yet you've also said that the impact of the growth of e-vapor on cigarettes is about 1.3%, 1.4%. So is there a right way of thinking about it, where basically 2/3 of vapor growth is incremental? Is that how we should think about it? And, I guess, if that is the right way of thinking about it, where is that increment coming from? Do you think it's mostly coming from people in their 20s or what? So that's one question.

HOWARD A. WILLARD: Okay. I'm not sure I'm tracking with -- exactly with your math, but let me try and answer the question in a more general way, which is you're right about the impact that we think it's having on the cigarette category. But beyond the impact that it's having on the cigarette category, we think it's also sourcing, as we said earlier, from the smokeless category, probably from the cigar category as well. And we also think that with all the trial that's going on, part of their volume is coming from increased youth educations by a variety of adult tobacco consumers and that may settle out over time. I think that given the increased availability of the product, I think you'll have a lot of people that are trying it, while still using their existing tobacco product, and I think over time they're going to make a decision and they'll either switch completely to JUUL. But I think you have some of that in the 2018 numbers as well.

ADAM JUSTIN SPIELMAN: Fine. I mean, just -- I mean, I am not sure how relevant it is, but math is. Basically, there was 400 incremental million pods of JUUL sold in 2018 and that equates to roughly 4% of the cigarette market, if 1 pod is 1 pack of cigarettes. But that's -- so that's how I think about it. But the second question is really coming back to this question about the onserts and the inserts on your packs. I mean, can you confirm that JUUL will be able to put or maybe deny that they'll be able to have coupons, so there might be, I'm making this up here, but let's say, $5 off advertise to somebody who buys a pack of Marlboro. So that's -- is that right that they'll be able to coupon this whether it's just market raise awareness?

WILLIAM F. GIFFORD: Yes, Adam, I think you're thinking about it right. I think it's important to remember what Howard said. If our Marlboro consumers -- so take it the one person that receives that in their pack, if they have a decision to switch, they would have switched anyway. And so we would want them to switch to the JUUL product, which we have an investment in, versus searching for other alternative products out there. So the awareness is already high. If the individual is making the decision to switch, we want them to switch to JUUL.

ADAM JUSTIN SPIELMAN: Fine. Okay. And -- so then sort of, is that something you sort of been able to sort of validate with focus groups or is that -- because for me, it's sort of quite a thing that you're potentially offering your smokers, let's say, $5 off to start JUUL?

HOWARD A. WILLARD: Yes, I mean, you are right that essentially we are cross promoting, which is a fairly common thing, and I think you may be thinking about the fact that we have a 35% economic interest in JUUL and we have a 100% economic interest in our cigarette business. And so that may be what's causing you to be surprised we would be willing to do this. I think I would frame it with a couple of thoughts. First of all, we think that even with the impact that JUUL could have on the overall volume growth and potential profit growth from our cigarette business going forward, even if it does impact it, we think when you take the sum of our cigarette profitability growth and you combine it with the economic contribution from JUUL over the next 5 years, we think that's a net positive to us. And it's a net positive even if there's a bit more growth in JUUL coming from

our brands than from the competitors. So that's the first reason. The second reason is, if you look at it, we were -- frankly, I've been with the company 26 years. Almost my entire career, we have believed that our business would be better in the long term if we could offer harm reduced products that would represent attractive alternatives to our adult cigarette smokers to switch. And we have invested billions of dollars in it and lots of effort. And ultimately until December this year, we really didn't have the product portfolio to fully achieve our harm reduction aspiration. And the opportunity to invest in JUUL, I think, really makes that harm reduction aspiration a reality. And if you look at it, we've got iQOS in the heat-not-burn category, the #1 product in brand in that category; we've got Copenhagen and Skoal in the oral tobacco products category; and we had a hole in the e-vapor category and we've now filled that with our 35% economic interest in JUUL. So I think that we are finally going to be able to achieve our harm reduction aspiration. And I think we can do that over the next 10 years and still deliver our long-term 7% to 9% EPS growth algorithm and give 80% of that adjusted EPS back to shareholders in the form of dividends. And I think our ability to achieve both harm reduction and secure our long-term financial performance was enhanced by the investment in JUUL.

ADAM JUSTIN SPIELMAN: Can I just very quickly ask, again, have you actually done focus groups and have found out what might happen if you put coupons or other material in your cigarettes?

HOWARD A. WILLARD: We've done a variety of work to understand the interaction between cigarette smokers and JUUL. I don't know that we've done anything specifically to what you're referencing, but we think we have a pretty firm understanding of what the interaction between the 2 categories is.

OPERATOR: Our last question is from Nik Modi with RBC Capital Markets.

SUNIL HARSHAD MODI, MD OF TOBACCO, HOUSEHOLD PRODUCTS AND BEVERAGES, RBC CAPITAL MARKETS, LLC, RESEARCH DIVISION: I'll try to make this quick because I know we're going a little long here. Howard, you've -- obviously, a lot of decisions have been made, lot of portfolio transformation. I am just curious whether wine business fits into that kind of your vision of the future of Altria? The second question is just on the pricing. I mean, very, very strong, at least, where we were looking, or maybe you can provide some context around that. Was that the loyalty program kind of making you a little bit more efficient in terms of promo spend? And then the third is just on Cronos. Is this a kind of a platform strategy, meaning you'll look to get into all types of products, or is this going to be really just focused on your existing categories?

HOWARD A. WILLARD: Sure. I think with regard to wine, I don't know that there's a real change there. I think that we have long said that we very much like the wine business, and we are committed to returning it to strong income growth. But we've also said that it's not core like the rest of our tobacco businesses are. And that's been the case for quite some time, and there hasn't been a change there. So we remain committed to running that business well. It has had a bit of a downturn over the last 2 years, but we're confident that the employees their have strategies in place to turn that around. With regard to Cronos, I think that you shouldn't assume that our existing product portfolio at Cronos is where we're going to stop. I think that both we and Cronos think there are opportunities really across the world in a variety of product categories, both recreational and medicinal, that would involve them entering new product forms and developing new products and new product brands. I think it's early days there, and we have really not restricted our thinking with regard to that. I think I'll hand over to Billy, the question on cigarette pricing.

WILLIAM F. GIFFORD: Yes, Nik, I would point you to -- on pricing, it's the process of data analytics that we've enhanced here that allows us to be more efficient and effective the way we think about the total value equation. It's specifically the promotional piece that we run at retail. So that drives the overall price realization up through time.

OPERATOR: Thank you. At this time, I would like to turn the call back over to Ms. Paige Magness for closing comments.

PAIGE MAGNESS: Thank you all for joining our call this morning. If you have any follow-up questions, please call us at investor relations. Thank you.

OPERATOR: Thank you. This concludes today's conference call. You may now disconnect.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2019 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2019 ASC LLC (www.ascllc.net) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or ASC's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and ASC so long as they provide conspicuous attribution to Thomson Financial and ASC as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]

**---- Index References ----**

Company: ANHEUSER BUSCH INBEV SA; ALTRIA GROUP INC; CITIGROUP INC; COWEN AND COMPANY LLC; CRONOS GROUP INC; DEUTSCHE BANK AG; GOLDMAN SACHS GROUP INC (THE); JUUL LABS INC; MORGAN STANLEY; PIPER JAFFRAY COMPANIES; RBC CAPITAL MARKETS LLC; J SAINSBURY PLC; STIFEL NICOLAUS AND CO INC; THOMSON REUTERS CORP

News Subject: (Business Management (1BU42); Corporate Events (1CR05); Drug Addiction (1DR84); Earnings Calls (1EA37); Health & Family (1HE30); Market Share (1MA91); Meeting Announcements (1ME17); Sales & Marketing (1MA51); Smoking (1SM71))

Industry: (Cigarettes (1CI04); Consumer Products & Services (1CO62); Press Releases (1PR19); Tobacco (1TO65))

Region: (Americas (1AM92); Central Europe (1CE50); Denmark (1DE14); Europe (1EU83); Eurozone Countries (1EU86); Germany (1GE16); North America (1NO39); Northern Europe (1NO01); Scandinavia (1SC27); Tennessee (1TE37); U.S. Southeast Region (1SO88); USA (1US73); Western Europe (1WE41))

Language: EN

Other Indexing: (ASC LLC; WELLS FARGO SECURITIES LLC; altria client services) (William F. Gifford; William Gifford; Michael Lavery; Vivien Azer; ADAM JUSTIN SPIELMAN; Michelle; Adam Spielman; BONNIE LEE HERZOG; Paige Magness; VIVIEN NICOLE AZER; Pamela Kaufman; William F. Gifford; William Gifford; Howard A. Willard; Howard Willard; HOWARD WILLARD; MICHAEL SCOTT LAVERY; Robert J. Powers; Robert Powers; Chris Growe; Judy Hong; CHRISTOPHER ROBERT GROWE; SUNIL HARSHAD MODI; Bonnie Herzog; Steve Powers; STEPHEN ROBERT; JUDY EUNJOO HONG)

Word Count: 11493

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT X

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-02913-WHO |
| This Document Relates to: ALL ACTIONS. | |

**THIRD AMENDED NOTICE OF PLAINTIFFS' FIRST ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF THE ALTRIA DEFENDANTS (REGARDING SELECT TOPICS THE TRANSACTION BETWEEN ALTRIA AND JLI) – NOTICE D**

ISSUING PARTY: Plaintiffs

PRODUCING PARTY: The Altria Defendants as defined on Schedule A

TO: Altria Group, Inc. and its Attorneys of Record

DATE: May 3, 2021 at 9:00 a.m. PST

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30, and *In Re: Juul Labs, Inc., Marketing, Sales Practices, And Products Liability Litigation*, Case No. 19-md-02913-WHO, Case Management Order Numbers 10 and 11 (CMO Nos. 10 and 11), Plaintiffs, by and through the undersigned counsel, intend to depose the Altria Defendants as defined in Schedule A via remote audio-video conference on the mutually agreed upon date indicated above between the parties via a remote platform meeting provided by Golkow Litigation Services. This deposition will continue across consecutive days until complete, and will be limited to approximately four (4) hours

daily to accommodate the witness' medical limitations.

The remote deposition will be coordinated by Golkow Litigation Services, with a business address of 1650 Market St, Suite 5150, Philadelphia, PA 19103. A link and any necessary credentials will be provided at least three days in advance of the deposition. The deposition will be conducted using teleconference and/or video conference technology, without a court reporter being physically present with the witness, consistent with CMO No. 11 and all existing governmental and court orders relating to COVID-19 and consistent with best practices recommended by the CDC to prevent the spread of COVID-19.

The Altria Defendants are directed to designate a person or persons to testify on its behalf on the matters listed in Schedule A attached to this Notice of Deposition and to produce the documents identified on Schedule B.

The deposition will be recorded stenographically and on videotape.

Dated: March 15, 2021

By: *<u>/s/ Sarah R. London</u>*
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: *<u>/s/ Dena Sharp</u>*
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: *<u>/s/ Dean Kawamoto</u>*
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: *<u>/s/ Ellen Relkin</u>*
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway

New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

**<u>SCHEDULE A</u>**

**<u>Definitions</u>**

1. **Altria Group** refers to Altria Group, Inc.

2. **Altria Defendants** collectively refers to Altria Group, Inc., Philip Morris USA Inc., Altria Enterprises LLC, Altria Client Services LLC and Altria Group Distribution Company.

3. **JLI** refers to JUUL Labs, Inc. (specifically including its predecessors Pax Labs, Inc., and Ploom, Inc.).

4. **Management Defendants** refers to James Monsees, Adam Bowen, Nicholas Pritzker, Hoyung Huh and Riaz Valani.

5. **Defendants** refers, respectively and collectively, to JLI, the Altria Defendants and the Management Defendants.

6. **ENDS** means electronic nicotine delivery system, including components and parts, but not related accessories.

7. **JUUL** refers as broadly as possible to any and every JUUL ENDS, including JUUL Pods and e-liquids, and it refers both to all finished products and design prototypes or models of JUUL.

8. **The Transaction** refers to the December 20, 2018, transaction involving on or more of the Altria Defendants' stock purchase agreement with JLI, pursuant to which Altria purchased for an aggregate price of $12.8 billion dollars shares of JLI stock resulting in a beneficial ownership interest in JLI.

9. **Due diligence** or **diligence activity** refers as broadly as possible to any investigation, appraisal, audit, assessment, review or exercise of care, whether formal or informal, related in whole or in part to The Transaction.

10. **Agreement** always includes any and all modifications, revisions or amendments.

11. The terms **or** and **and** should be construed disjunctively or conjunctively so as to give the broadest possible effect to a request.

12. The terms **you** and **your** refers to the **Altria Defendants**.

**Topics**

Pursuant to Federal Rule of Civil Procedure 30(b)(6), you shall be prepared to testify regarding the following subjects:

1. To the extent such information is relevant or necessary to a full understanding of, or inquiry into, the other Topics in this Notice:[1]

   a. Your current and historical corporate/organizational structure, including departments, functions, divisions, subdivisions, and teams; and,

   b. the identities and responsibilities of Your personnel, senior managers, directors, or subcontractors.

2. Any assessment or analysis, whether formal or informal, performed by You (or a third party on your behalf) both prior to and after the Transaction related to:

   a. JUUL's appeal to youth/underage users;

   b. JLI's marketing, advertising and promotion of JUUL, including use of social and digital media. [2]

3. The details and substance of communications by and between You, JLI (including through any intermediaries or third parties) and/or the Management Defendants about a potential business/investment relationship by and between JLI and Altria, including but not limited to those communications leading to the Transaction and the details, terms, conditions of the Transaction and how they have changed and been implemented over time, including how and when the first such

---

[1] For the sake of clarity and to assist Altria in the preparation of its designated witness or witnesses:

Topic 1 is limited to inquiry by Plaintiffs' counsel about the identity and responsibilities of various departments and personnel that were involved at any time in some capacity relating to the other Topics in this Notice. In short, Topic 1 is included to safeguard against any objection that this Notice fails to alert Altria and its designated witnesses that Plaintiffs intend to ask routine "who, what, and when" questions that arise naturally in the course of deposing Your representatives about the Topics in this Notice. Plaintiffs include this Topic with the expectation that the routine sorts of questions encompassed by the Topic would arise organically in questioning witnesses on the remaining Topics in the Notice and those witnesses would likely have responsive information given their designation as Your corporate representative for this Notice. In other words, any witness who You designate to testify about the Topics in this Notice is expected to be familiar with—and likely already would be familiar with—Your historical/corporate organizational structure related to that witness's Topic.

[2] Topic 2(a-b) was previously Topic 5(b,d) in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

communications occurred. [3]

4. The details of the results of any diligence activity performed by You (or any of Your predecessors or related companies and agents, including any third party), related to the Transaction and when such diligence activity was performed and when results were received. [4]

5. The details of the Transaction or any Agreement related to Your right to appoint or to influence the appointment of members of JLI's Board of Directors. [5]

6. Your motivation and the reasons why You entered into the Transaction, including the identity of the persons who made the decision to enter into the Transaction. [6]

7. The reasons why You removed MarkTen line of ENDS from the market and discontinued your ENDS business, including the identity of the persons involved in making the decision. [7]

8. The details and substance of communications regarding JLI and JUUL (including demographic data regarding JUUL users) by and between You and anyone on Your behalf with Avail Vapor, prior to the Transaction. [8]

9. Information or data about JLI and JUUL including demographics of JUUL users, exchanged by and between You, or anyone on Your behalf and Avail Vapor, prior to the Transaction[9].

---

[3] Topic 3 was previously Topic 8A in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[4] Topic 4 was previously Topic 7B in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[5] Topic 6 was previously Topic 15 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[6] Topic 7 was previously Topic 16 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[7] Topic 8 was previously Topic 17 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[8] Topic 9 was previously Topic 19 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[9] Topic 10 was previously Topic 20 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

Case 3:19-md-02913-WHO Document 1563 Filed 03/12/21 Page 7 of 36

**SCHEDULE B**

1. The witnesses' *curriculum vitae.*
2. Documents relied on by the witnesses in preparing to testify about the Topics set forth in Schedule A.
3. Documents evidencing, referring, or relating to each Topic in Schedule A.
4. At least 10 days in advance of the deposition, identify and produce to juulmdlplaintiffdiscovery@kellerrohrback.com all documents reviewed, considered, or relied upon in preparation for this deposition, as well as any summaries or demonstratives a witness will request to use at a deposition. If the documents have already been produced, please email a list of bates numbers to juulmdlplaintiffdiscovery@kellerrohrback.com.

Dated: March 15, 2021

By: */s/ Sarah R. London*
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: */s/ Dena Sharp*
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: */s/ Dean Kawamoto*
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: */s/ Ellen Relkin*
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway

Case 3:19-md-02913-WHO Document 1563 Filed 03/12/21 Page 8 of 36

New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

Case 3:19-md-02913-WHO Document 1615-3 Filed 03/15/21 Page 9 of 36

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2021, a true and correct copy of the foregoing *THIRD AMENDED NOTICE OF PLAINTIFFS' FIRST ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF THE ALTRIA DEFENDANTS (REGARDING SELECT TOPICS THE TRANSACTION BETWEEN ALTRIA AND JLI) – NOTICE D* was served via electronic mail upon the following:

Gregory P. Stone
Bethany Woodard Kristovich
Jeremy K Beecher
**MUNGER TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: 213-683-9100
Facsimile: 213-687-3702
gregory.stone@mto.com
Bethany.Kristovich@mto.com
jeremy.beecher@mto.com

Renee D. Smith
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: 312-862-2310
Facsimile: 312-862-2200
renee.smith@kirkland.com

Mike Brock
Peter A. Farrell
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-879-5000
mike.brock@kirkland.com
pfarrell@kirkland.com

David Horowitz
**KIRKLAND & ELLIS LLP**
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: 213-680-8400
david.horowitz@kirkland.com

David M. Bernick
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
dbernick@paulweiss.com

*Attorneys for Defendant JUUL Labs, Inc.*

John C. Massaro
Jason A. Ross
David E. Kouba
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
john.massaro@arnoldporter.com
Jason.ross@arnoldporter.com
David.Kouba@arnoldporter.com

Lauren S. Wulfe
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: 213-243-4000
Facsimile: 213-243-4199
lauren.wulfe@arnoldporter.com

*Attorneys for Defendants Altria Group, Inc. and Philip Morris USA Inc.*

James Thompson
James N. Kramer
**ORRICK HERRINGTON & SUTCLIFFE LLP**
The Orrick Building
405 Howard Street
San Francisco CA 94105
Telephone: 415.773.5923
Facsimile: 415.601.5488
jthompson@orrick.com
jkramer@orrick.com

*Attorneys for Defendant James Monsees*

Eugene Illovsky
Martha Boersch
Matthew Dirkes
**BOERSCH & ILLOVSKY LLP**
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Telephone: (415) 500-6643
eugene@boersch-illovsky.com
martha@boersch-illovsky.com
matt@boersch-illovsky.com

*Attorneys for Defendant Adam Bowen*

Michael J. Guzman
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
Sumner Square, 1615 M St., N.W., Suite 400

Washington, DC 20036
Telephone: (202) 326-7910
mguzman@kellogghansen.com

Karl Belgum
**NIXON PEABODY LLP**
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111
Telephone: (415) 984-8409
kbelgum@nixonpeabody.com

*Attorneys for Defendants Nicholas Pritzker, Riaz Valani, and Hoyoung Huh*

James E. Sell
Mitchell B. Malachowski
TYSON & MENDES, LLP
523 4th Street, Suite 100
San Rafael, CA 94901
Telephone: (628) 253-5070
Fax: (415) 785-3165
jsell@tysonmendes.com
mmalachowski@tysonmendes.com

*Attorneys for Defendants Mother Murphy's Labs, Inc., and Alternative Ingredients, Inc.*

Robert A. Scher
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016
Telephone: (212)338-3405
rscher@foley.com

*Attorney for Defendants Tobacco Technology, Inc., and Eliquitech, Inc.*

Michael L. O'Donnell
James E. Hooper
Marissa Ronk
**WHEELER TRIGG O'DONNELL LLP**
370 17th Street, Ste. 4500
Denver, CO 80202
Telephone: (303) 244-1850
Odonnell@wtotrial.com
hooper@wtotrial.com
Ronk@wtotrial.com

*Attorneys for Defendant McLane Company, Inc.*

Christopher J. Esbrook
David F. Pustilnik
Michael S. Kozlowski
**ESBROOK LAW LLC**

77 W. Wacker, Suite 4500
Chicago, IL 60601
Telephone: (312) 319-7681
christopher.esbrook@esbrooklaw.com
david.pustilnik@esbrooklaw.com
michael.kozlowski@esbrooklaw.com

*Attorneys for Defendants Eby-Brown Company, LLC, Circle K Stores, 7-Eleven, Inc., Speedway, LLC, and Walgreens Boots Alliance, Inc.*

David R. Singh
Bambo Obaro
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065
Telephone: (650) 802-3083
david.singh@weil.com
bambo.obaro@weil.com

*Attorneys for Defendants Core-Mark Holding Company, Inc.*

Charles C. Correll, Jr.
Matthew J. Blaschke
Alessandra M. Givens
**KING & SPALDING LLP**
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
ccorrell@kslaw.com
mblaschke@kslaw.com
agivens@kslaw.com

*Attorneys for Defendant Chevron Corporation*

Donald F. Zimmer, Jr.
Quyen L. Ta
Jennifer T. Stewart
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
fzimmer@kslaw.com
qta@kslaw.com
jstewart@kslaw.com

*Attorneys for Defendant Walmart*

By: /s/ Sarah R. London
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: /s/ Dena Sharp
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: /s/ Dean Kawamoto
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: /s/ Ellen Relkin
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>*All matters* | CASE NO. 19-md-02913-WHO<br><br>**CASE MANAGEMENT ORDER NO. 10: DEPOSITION PROTOCOL ORDER**<br><br>HONORABLE JUDGE WILLIAM H. ORRICK |

This Order, agreed to after extensive negotiations and with the agreement of counsel, governs the conduct of depositions of fact witnesses on issues of general applicability to the litigation (as opposed to solely case-specific witnesses). This Order applies to all such depositions in the MDL and JCCP Proceedings ("Lead Actions") and those actions involving the same or similar subject matter as the MDL pending in other state and federal courts that adopt the Joint Coordination Order[1] ("Coordinated Actions"). The purpose of this Order is to gain the highest degree of efficiencies in the taking of fact witness depositions. At no time has it been, nor will it be, the intention of the Court or the parties that judges in any of the participating jurisdictions delegate their duties to any other judicial officer.

## 1. General Provisions

Counsel and all parties (both represented and *pro se*) shall comply with this Order, and to the extent consistent with this Order, with the applicable Rules of Civil Procedure and the Local Rules of the presiding court. Unless specifically modified herein, nothing in this Order shall be construed to abrogate the Rules of Civil Procedure or the Local Rules.

[1] Case Management Order No. 9: Joint Coordination Order ("Joint Coordination Order").

Conduct of all participants in depositions shall be in accordance with the Northern District of California Professional Guidelines and the customs and practices expected of lawyers and witnesses appearing before the presiding court in their home jurisdictions, including as if each was appearing personally before the Courts at the time of the depositions. Counsel shall not at any time conduct themselves in a manner not becoming of an officer of the court and not in full compliance with the civil rules of practice and all other orders of the Courts. Neither counsel nor witnesses shall, at any time, engage in inappropriate conduct that impedes, delays, or frustrates the examination of the witness. All counsel and deponents must be treated with civility and respect.

**2. Scope**

This Order shall apply to: (i) all fact depositions of witnesses who are currently or were formerly employees, agents, or contractors of Defendants; and (ii) all third-party witnesses, other than third-party witnesses who are relevant only to the claims of a particular plaintiff, i.e., case-specific witnesses (together, "Common Witnesses"). For the avoidance of doubt, this Order shall not apply to: (i) fact depositions of any Plaintiff, their representatives, employees, family members, personal acquaintances, healthcare providers, and all other case-specific fact witnesses; and (ii) expert depositions.

**3. Coordination of Depositions**

The protocols in this Order supplement the Joint Coordination Order. If the deposition protocols in this Order are deemed to conflict with any provisions in the Joint Coordination Order, the protocols in this Order shall control.

The parties, the Courts in the Lead Actions, and the Courts in the Coordinated Actions wish to minimize the expense and inconvenience of this litigation by minimizing the depositions of any Common Witness. Accordingly, as a general rule, a witness may be deposed once within the time limits set forth in this Order. Such deposition shall be noticed in the Lead Actions and shall be deemed to be cross-noticed in the Coordinated Actions as long as the Coordinated Action: (1) has adopted the Coordination Order and (2) receives notice of the deposition as described in Section 5. Depositions shall be noticed according to the Federal Rules of Civil Procedure. A witness may be deposed once in total across all Lead and Coordinated Actions and, following the deposition, shall not be re-deposed in a Lead or Coordinated

Action unless otherwise agreed by the parties or authorized by an order of Court upon a showing of good cause by the party seeking the additional deposition.

Plaintiffs' Counsel in the Lead Actions shall take reasonable efforts and engage in good faith efforts to coordinate with each other before serving deposition notices and with respect to which depositions to notice.

Depositions, in addition to those being taken in the Lead Actions, may also be taken in Coordinated Actions, but only upon leave of the Court in which the Coordinated Action is pending, obtained on noticed motion for good cause shown, including why the discovery sought could not have been obtained in coordinated discovery in the Lead Actions. Coordinated Action Plaintiffs' Liaison Counsel[2] and JLI Counsel in a Coordinated Action in which any such motion is filed shall promptly notify the MDL Court and Plaintiffs' Lead Counsel in the Lead Actions of such filing and provide a copy of the motion. If a deposition in a Coordinated Action has been cross-noticed by the Lead Actions, then parties in the Coordinated Action may not take a subsequent deposition of that witness except for good cause shown.

If the Lead Action Plaintiffs, or Defendants and their respective Counsel in any Coordinated Action have received at least 21 days' notice of a deposition in either of the Lead Actions or any Coordinated Action (or if (a) the parties agree in writing that such notice is not necessary or (b) upon order of the MDL Court, a deposition is permitted to be taken with fewer than 21 days' notice), such deposition may be used in the Lead Actions and each Coordinated Action for all purposes prescribed in Fed. R. Civ. P. 32, California Code of Civil Procedure 2025.620, et seq. or corresponding rule of civil procedure in a Coordination Action, or as otherwise permitted by the Federal, California, or Coordinated Action's state's Rules of Evidence, by or against any party including parties later added and parties in cases subsequently filed in, removed to, or transferred to this Court as part of this litigation, without regard to whether any Lead Actions' Plaintiffs' Counsel or any Defendants' Counsel or any counsel representing plaintiffs or defendants in any Coordinated Action attended or examined the witness at the noticed deposition.

Fed. R. Civ. P. 6(a) shall govern the computation of time periods set forth in this Order.

---

[2] *See* Joint Coordination Order.

**4. Length and Scope**

The following rules shall apply to depositions noticed pursuant to this Protocol (absent an agreement of the parties or further order of the Court on a showing of good cause):

(a) There may be two days of questioning by the Lead Actions—the first day will be limited to seven hours on the record and the second day will be limited to five hours on the record, exclusive of redirect examination as provided below if necessary.

(b) Any Counsel from a Coordinated Action who is designated as an examiner shall be permitted a reasonable amount of time to question the deponent (up to two hours combined for all Coordinated Actions that shall occur immediately following the examination by the Lead Actions), and shall be permitted to make objections during examination by other counsel, subject to the below provisions regarding objections and in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the Orders of the MDL Court, and in accordance with the terms and procedures set forth in subparts (i) through (iii) below providing the following:

(i) the Court in which the Coordinated Action is pending has adopted the Discovery Orders or has entered a Protective Order, ESI Order, Deposition Protocol Order or other discovery order substantially similar to the Discovery Orders;

(ii) Plaintiffs' Counsel from the Coordinated Action shall make best efforts to ask questions that are non-duplicative of questions already asked at the deposition, however, nothing shall prevent Plaintiffs' Counsel from a Coordinated Action to probe further into issues already covered during the questioning of Noticing Party; and

(iii) participation of Plaintiffs' Counsel from the Coordinated Actions shall be arranged so as not to delay discovery or other proceedings as scheduled in the Lead Actions.

(c) After questioning by the Lead and Coordinated Actions, the party defending the deposition ("Defending Party") may elect to ask follow up questions of the deponent for up to two hours. If Defending Party elects to question the deponent, then the Plaintiffs in the Lead and Coordinated Actions shall be entitled to an equal amount of time to perform redirect examination (up to two hours total). Absent

agreement of the parties or order by a Lead Action Court for good cause shown, no further examination will be permitted by any party after redirect examination.

(d) Depositions shall begin at 9:00 a.m. absent agreement of the parties.

(e) Absent agreement of the parties, the days of questioning will take place on consecutive business days to the extent possible.

(f) No speaking objections or other actions that unnecessarily delay depositions will be permitted, and will result in additional time being added to the deposition for the questioning party.

Counsel in the Lead Actions shall confer before the deposition concerning allocation of time to question the witness and collaborate to avoid needless duplication (i.e., asking the same questions). In the event that the deposition involves a translator requested by the witness, the maximum length of the deposition shall be increased as is reasonably necessary by up to 50% and the parties shall negotiate a reasonable allocation of the translator costs. Absent agreement otherwise, the parties should set aside two days for each Common Witness to account for sufficient time on the record in accordance with this Order. The parties are encouraged to make full and efficient use of each deposition day so as not to waste valuable time and incur unnecessary expenses. Not every witness will require an examination that lasts as long as the presumptive time limits set forth above, and no party will be prevented from using a deposition merely because it did not continue into a subsequent day. To the extent the parties can anticipate a witness will take less time, they will attempt to agree to lesser time limits and, for planning purposes, will provide other deposition attendees with advance notice of any agreement to lessen the examination time. This procedure may be particularly useful in the event that more than one deposition is scheduled on a given day.

**5. Scheduling, Logistics, and Service of Notices**

Cooperation in Scheduling. Lead Counsel for the MDL Plaintiffs, or their designee, Lead Counsel for the JCCP Plaintiffs, or their designee, Counsel for the Defendants, and Counsel for the deponent, if applicable, shall cooperate on selecting a mutually convenient date, time, and location for each deposition. Unless otherwise agreed by the parties or ordered by either the MDL or JCCP Court, depositions shall not be taken on Saturdays, Sundays, or federal or state court holidays.

Plaintiffs' Counsel in the Lead Actions must make best efforts to coordinate their deposition dates with each other, including providing three days written notice of proposed deposition dates to persons designated by the other Lead Action to schedule depositions before issuing the notice. If the non-noticing Lead Action does not object to the date within three days, the deposition may be noticed for that date.

Location. In the absence of agreement, a deposition may take place within (a) the county in which the deponent resides or (b) the county in which the deponent is employed.

Content of Notice. Each deposition notice subject to this Order shall comply with Fed. R. Civ. P. 30(b) or California Code of Civil § 2025.220, absent agreement of the parties or Court order. Depositions subject to this Order noticed in the Coordinated Actions shall be noticed and conducted pursuant to rules of the relevant jurisdiction and with this Order. The deposition notice shall include the name, address, and telephone number of an attorney point of contact designated by the party noticing the deposition, as well as the date, time, and location of the deposition. Any notice for the deposition of a corporate or organizational representative under Fed. R. Civ. P. 30(b)(6) or California Code of Civil Procedure § 2025.230 shall describe with reasonable particularity the matters for examination. This Order in its entirety shall be attached to any subpoena or deposition notice that pertains to a third-party witness covered by its terms. The notice shall clearly state whether the deposition will be videotaped in addition to being recorded by stenographic means.

Adequacy of Notice. After counsel, through consultation, have arrived on a date and location for a deposition, the Noticing Party shall serve an amended Notice reflecting the agreed upon date and location. Witnesses subpoenaed to produce documents shall be served with the document subpoena at least thirty calendar days before a scheduled deposition.

Costs. The Noticing Party shall be responsible for retaining and paying for a court reporter and videographer.

Service Manner and Timing. Notices for Depositions in the Lead Actions and Coordinated Actions shall be served by e-mail or other electronic means on Lead Actions' Co-Lead Counsel, State/Federal Liaison Counsel, and Counsel for the Defendants. Each Plaintiffs' Liaison Counsel in a Coordinated Action, or his or her designee, shall be responsible for distributing such documents to other counsel for

plaintiffs in their Coordinated Action. Notices served in accordance with this paragraph shall be deemed cross-noticed in the Coordinated Actions as long as the Coordinated Action: (1) has adopted the Coordination Order and (2) receives notice of the deposition as described above.

To allow for planning, preparation, and coordination between the Lead Actions and the Coordinated Actions, depositions must be noticed at least 21 days before they are scheduled to occur. Expedited depositions may be scheduled by agreement of the parties in writing or as ordered by the MDL or JCCP Courts, or a Court in a Coordinated Action, and in which event the time limitations for notice shall be lessened, as well as the time limitation for production of any documents sought by third-party subpoena in conjunction with said deposition.

Challenges to the Notice. Any party or witness receiving notice of a deposition that contends is not permitted by the terms of this Order shall have five business days from receipt of the notice within which to serve the noticing party with a written objection to the deposition.

Disputes. In accordance with this Order, all disputes regarding any matters arising under this Order, whether pertaining to a deposition in the Lead Actions or any Common Witness deposition in a Coordinated Action, shall be resolved pursuant to Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). In the event of such an objection, the deposition shall not go forward unless (a) the parties and the deponent reach an agreement in writing to resolve the objection or (b) the noticing party applies for and receives an order pursuant to the Section 7 of the Stipulated Joint Coordination Order granting leave to take the deposition. Before filing a discovery motion pursuant to Section 7 of the Stipulated Joint Coordination Order, the parties must first attempt to resolve the dispute in good faith.

**6. Means of Recording Depositions**

A certified court reporter shall stenographically record all deposition proceedings and testimony and provide a "real time" transcription feed to devices such as video monitors and computers at the deposition venue. A party seeking to transmit "real time" transcription feeds to computers not located at the deposition venue may do so at their own expense by making a request to the court reporting service five business days before the deposition; that party will ensure that any remote viewing is in compliance

with all applicable Protective Orders. The court reporter shall administer the oath or affirmation to the deponent. The written transcript prepared by the court reporter shall constitute the official record of the deposition for purposes of Fed. R. Civ. P. 30's requirements concerning filing, retention, certification, and the like. The Lead Actions can choose their own reporting service for depositions that they notice. All videotaped depositions shall be accompanied by a simultaneous audiotape recording and be stenographically recorded by a court reporter as provided in the previous paragraph. As noted above, the stenographically prepared transcript shall constitute the official record of the deposition.

Where the party wishing to videotape the proceeding did not notice the deposition, a request to videotape the deposition shall be submitted in writing to the Lead Actions Counsel, Counsel for the Defendants, and Plaintiffs' State/Federal Liaison Counsel, no later than seven days before the date on which the deposition is scheduled to occur. The party wishing to videotape the deposition, if not originally noticed as such, shall be responsible for arranging and paying for the videotaping and providing a copy to Lead Actions Counsel.

Services or products offered or provided by the operator of the videotape equipment must be offered to counsel for all parties, regardless of which party is financing the videotaping of the deposition. Further, any video operator is subject to the orders of this Court whether the deposition was noticed or cross-noticed in the MDL or JCCP Proceedings or in a Coordinated Action, including but not limited to the Confidentiality Order and Joint Coordination Order. The video operator shall be given a copy of all applicable orders at least five days before the deposition.

The operator of the videotape recording equipment is subject to the provisions of Fed. R. Civ. P. 28(c). At the start of the deposition, the operator shall swear or affirm to record the proceedings fairly and accurately.

Each witness, attorney, and other person attending the deposition (in person or telephonically) shall be identified on the record at the commencement of the deposition, however, a consulting expert who has signed the applicable protective order and is attending the deposition telephonically need not be identified on the record. The videotape recording shall include the court reporter administering the oath

or affirmation to the witness. Thereafter, the deponent and, if necessary, exhibits and any demonstratives will be videotaped.

The deposition will be conducted in a manner to replicate, to the extent feasible, the presentation of evidence at trial. Unless physically incapacitated, the deponent shall be seated at a table except when reviewing or presenting demonstrative materials for which a change in position is needed. To the extent practicable, the deposition will be conducted with the witness seated in front of a solid background with only such lighting as is required for accurate video recording. Lighting, camera angle, lens setting, and field of view will be changed only as might be reasonably necessary to record accurately the natural body movements of the deponent or to portray exhibits and materials used during the deposition. Sound levels will be altered only as necessary to record satisfactorily the voices of counsel and the deponent. The witness shall appear in ordinary business attire (as opposed to, for instance, a lab coat) and without objects such as a bible, medical equipment, or props.

Video recording will be suspended during all "off the record" discussions and the video operator shall note such suspensions.

The videotape operator shall use recording equipment with an appropriate timer and, unless otherwise agreed to by the parties, shall prepare and provide counsel with a log, cross-referenced with timestamps, that identifies the portion of the recording at which examination by different counsel begins and ends, when exhibits are used, and when there is any interruption of continuous tape recording, whether for recess, "off the record" discussions by counsel, mechanical failure, or other interruption.

The video operator shall maintain custody of the original video medium in its original condition, without editing in any fashion. No part of the video or audio record shall be released or made available to the public unless authorized by an order of the MDL or JCCP Court.

The parties shall meet and confer to determine whether an agreement can be reached to limit the number of independent court reporting and videography firms involved in recording the deposition proceedings covered by this Order and to develop a cost-sharing agreement between the various parties or party groups for the associated fees, including the cost of the facilities where depositions are conducted.

**7. Remote Participation via Telephone, Internet, or Video Streaming**

If requested at least ten days before a deposition, telephone facilities shall be provided so that parties wishing to participate in the deposition by telephone may do so at their own expense. By indicating in a deposition notice that it wishes to examine a witness over the telephone, a party shall be deemed to have moved for such an order under Fed. R. Civ. P. 30(b)(4). Unless an objection is filed and served within five days after such notice is received, the Court shall be deemed to have granted the motion. Other parties may examine the deponent telephonically or in person. However, all persons present in the location with the deponent shall be identified on the deposition record and shall not by word, sign, or other means coach or suggest answers to the deponent and shall act in accordance with applicable federal rules of civil procedure and professional conduct governing interaction with the deponent. In addition, the court reporter stenographically recording the deposition shall be located in the same room as the deponent.

Technical difficulties with telephonic participation shall not constitute grounds for postponing the deposition or for rendering inadmissible a deposition that otherwise would be admissible in evidence. If technical problems with the telephonic facilities create disruptions in the deposition, counsel attending a deposition in person may discontinue telephonic participation for such periods of time as necessary.

A party may request, at their own expense, to make the live deposition proceedings available to locations that are remote from the deposition venue through the use of video streaming over secure and encrypted Internet connections and to allow for remote real-time participation by interested counsel, such as through the use of a private group chat system that enables remote counsel to collaborate with their on on-site colleagues. A party seeking these services shall make a request to the court reporting service five business days before the deposition. The viewing of or participation in any deposition via the Internet is expressly subject to the [MDL Protective Order, Doc. 308 and JCCP CMO No. 3], or a substantially similar order in a Coordinated Action. The party participating remotely is responsible for providing his or her own Internet connection and shall not re-record the deposition by video or audio means.

**8. Appearances and Examination**

Unless otherwise agreed to by the parties or ordered under Fed. R. Civ. P. 26(c) and subject to the terms of the [Protective Order, Doc. #308 and JCCP CMO No. 3], depositions may be attended only by

the parties, the deponent, the deponent's attorney, attorneys of record in the MDL and JCCP Proceedings, attorneys of record in the Coordinated Actions, in-house counsel and corporate representatives, court reporters, videographers, and any person who is assisting in the litigation and whose presence is reasonably required by the aforementioned counsel of record who is bound by any applicable Protective Order (such as a consulting expert).

Upon motion, and for good cause shown, the MDL Court may permit attendance by a person who does not fall within any of the categories above.

For there to be adequate deposition space, counsel intending to attend a deposition noticed in the Lead Actions, or in a Coordinated Action, should advise all parties, including counsel for the Noticing Party, of their intention to attend in person at least two business days before the deposition.

Unnecessary attendance by counsel is discouraged and may not be compensated in any fee application to a court. Counsel who have only a marginal or slight interest in a noticed deposition or who expect their interests to be adequately protected by other counsel should not attend the deposition.

Lead Counsel for the Lead Actions shall designate up to two attorneys to serve as the examiners of each deponent on behalf of the Lead Actions. Given deposition time limits and in the interest of efficiency, the Court strongly encourages Plaintiffs' Counsel from the Coordinated Actions to designate one attorney to serve as the examiner of each deponent on behalf of all Plaintiffs in the Coordinated Actions. If Plaintiffs in the Coordinated Actions are unable to agree on that examiner for a given deponent, Lead Counsel for the MDL Plaintiffs and Lead Counsel for JCCP Plaintiffs shall assist in attempting to reach such an agreement. For those depositions where an agreement is not reached, Plaintiffs' Counsel shall diligently work together to ensure that questioning on behalf of Plaintiffs in the Lead Actions and in the Coordinated Actions proceeds in the most efficient manner possible.

One counsel representing each Defendant shall be permitted to examine deponents. Each Lead Actions Defendant should designate one attorney to conduct the principal examination of each deponent. Examination by other counsel for the Lead Actions Defendants shall make best efforts to ask questions that are non-duplicative of questions already asked at the deposition. Notwithstanding the number of

examiners, the time limits set forth above shall still apply. Counsel should cooperate so examinations by multiple attorneys do not result in a deposition exceeding the allotted time.

The parties shall meet and confer to develop supplemental protocols for (a) allotting examination time to various parties or party groups and (b) determining order of examination of a witness.

Counsel representing parties in the Lead Actions shall be entitled to attend the deposition of any witness whose deposition is taken in a Coordinated Action. The Plaintiffs in all Coordinated Actions shall designate one counsel to examine the witness. One counsel representing the MDL Plaintiffs, one counsel representing the JCCP Plaintiffs, and one counsel representing both the MDL and JCCP Defendants shall each be permitted to ask questions and make objections during examination by other counsel.

**9. Objections**

Unless otherwise specified, an objection by a single defendant shall be deemed an objection by all defendants; similarly, an objection by a single plaintiff shall be deemed an objection by all plaintiffs unless otherwise specified. However, unless otherwise specified, (a) an instruction not to answer by one defendant shall not be deemed an instruction not to answer by all defendants and (b) an instruction not to answer by one plaintiff shall not be deemed an instruction not to answer by all plaintiffs.

The only objections allowed during the deposition are those for the following bases: form of the question, privilege (the nature and grounds for which must be stated succinctly on the record), or a limitation imposed by court order. All objections, except as to form, privilege, or a limitation imposed by a court order, shall be preserved for ruling by the MDL Court, JCCP Court, or the Court in the Coordinated Action at trial or other use of the deposition.

Counsel shall comply with Fed. R. Civ. P. 30(c)(2) and the Northern District of California Guidelines on Professional Conduct concerning objections at a deposition. Counsel shall not engage in colloquy in objecting to a question or responding to an objection. Any objections to an examiner's questions shall be made in a concise manner, and counsel shall not suggest an answer to the witness. The phrases "objection as to form," or similar language are sufficient and shall preserve all objections as to form and foundation until a party seeks to use a deposition. However, to determine whether there is a need to cure a defect in a question, counsel conducting the examination may ask the attorney lodging the

form or foundation objection to identify the specific defect. The response shall be stated succinctly and shall be limited to the legal grounds for the form objection (e.g., "lacks foundation" rather than "the witness didn't work in that department and couldn't possibly know the answer"). Counsel shall refrain from all comments that could be perceived as instructive to a witness, such as "you can answer if you understand the question" or "you can answer if you know."

**10. Additional Provisions Relating to Corporate Witnesses**

The party producing a corporate witness pursuant to Rule 30(b)(6) and/or California Code of Civil Procedure § 2025.230 shall disclose the identity of that witness no later than 10 days before the deposition.

**11. Use of Exhibits and Documents During the Deposition**

Provided that plaintiffs notify the defendants at least 60 days in advance of the intended deposition of any present or former company employee of a Defendant whose custodial file has not been produced in its entirety, that Defendant will conduct a good-faith, reasonable search using search terms or other reasonable methods, and based on that search produce non-privileged, custodial file documents responsive to outstanding discovery requests at least 30 days in advance of the noticed deposition date. The Defendant will be obligated to produce only previously non-produced portions of the custodial file responsive to outstanding discovery requests if the Defendant's prior production included metadata identifying the deponent as a custodian of the previously produced custodial file documents. The scope of discovery related to custodial files will be determined at least 45 days before the deposition, subject to prior orders of the Court; applicable rules of civil procedure; agreements of the parties regarding the sequence, timing, and methods of discovery, including document production; and, if necessary, court order resolving any dispute regarding the scope of production. Unless the Parties agree or a court orders otherswise, the Defendant shall have at least 30 days to produced non-privileged responseive documents following determination of the scope of discovery, but no later than 30 days before the deposition is noticed. The custodial file of that employee shall be produced 30 days in advance of the scheduled deposition to the address specified by plaintiffs' counsel. If 100 or fewer pages are produced between 14 and 29 days prior to the scheduled deposition, the deposition shall proceed as scheduled. Any documents produced fewer than 14 days prior to the scheduled deposition must be delivered to the primary examiner,

if one has been designated by plaintiffs' counsel. If a primary examiner has not been designated, the documents shall be produced to the same address to which the previous documents were produced. The parties shall meet and confer regarding the impact, if any, of this production on the scheduled deposition. If the parties cannot agree, the matter shall be referred to the Courts for resolution pursuant to the protocol for Discovery Dispute Resolution set forth in Section 7 of the Joint Coordination Order.

Third-party witnesses subpoenaed to produce documents at a deposition shall be served with the document subpoena at least 30 days before a scheduled deposition, absent written agreement by the parties, time constraints due to orders by the Lead Actions' Court, or a shorter period authorized by the Lead Actions' Court. The requested documents shall be produced at least 14 days before the date noticed for the deposition. Any documents produced fewer than 14 days prior to the scheduled deposition must be delivered to the primary examiner, if one has been designated by plaintiffs' counsel. If a primary examiner has not been designated, the documents shall be produced to the same address to which the previous documents were produced. The parties shall meet and confer regarding the impact, if any, of this production on the scheduled deposition. If the parties cannot agree, the matter shall be referred to the Courts for resolution pursuant to the protocol for Discovery Dispute Resolution set forth in Section 7 of the Joint Coordination Order.

During the deposition, copies of documents about which counsel plan to examine the deponent shall be provided to counsel for the deponent and counsel for the other party participants. As a general rule, hard copies of the documents should be made available to the deponent, the deponent's attorney, and the principal examiners of the deponent. The documents may be provided to other attendees on electronic media such as USB drives or through a secure file sharing service. To the extent possible, all exhibits should have printed Bates or other document control numbers affixed before distribution, which shall remain constant throughout the litigation.

Counsel shall use best efforts to mark exhibits sequentially during each deposition and across depositions, consistent with Northern District of California Local Rule 30-2. All documents marked as exhibits will be attached to the original transcript and will be retained with the original transcript. The

court reporter for each deposition will include in each deposition transcript a list of the exhibits referenced in the deposition.

Objections to the relevance or admissibility of documents used as deposition exhibits are not waived, and are reserved for later ruling by the MDL or JCCP Court or the court in a Coordinated Action.

**12. Examination Concerning Confidential Information**

If a deponent is questioned about any document or exhibit stamped Confidential or Highly Confidential or the Information contained therein, persons to whom disclosure is not authorized under the Protective Order of this Court will be excluded from the deposition for that portion of the examination. Any portion of a deposition transcript containing Confidential Information or Highly Confidential Information shall be sealed so as not to waive confidentiality.

**13. Disputes During or Relating to Depositions**

All disputes regarding any matters arising under this Order, whether pertaining to a deposition in the Lead Actions or any Common Witness deposition in a Coordinated Action, shall be resolved pursuant to Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). Nothing in this Order shall deny counsel the right to suspend a deposition pursuant to Fed. R. Civ. P. 30(d)(3) and seek relief as set forth in Section 7 of the Stipulated Joint Coordination Order.

**14. Transcript and Time to Review Transcript**

Unless waived by the deponent, the deposition transcript shall be submitted to the deponent for correction and signature, and shall be corrected and signed within 45 days after the official transcript of the Court Report is made available to counsel for the party defending the deposition. This time period shall not be extended, absent good cause shown. Corrections to a deposition shall be listed on an errata sheet signed by the deponent and the court reporter shall serve copies of the errata sheet on all parties purchasing the transcript. Should the deponent fail to submit corrections within 45 days, the transcript will be presumed accurate, and all parties shall have the right to use the copy sent to the deponent as if it were final and signed with no corrections needed.

Counsel representing any party in the MDL or JCCP Proceeding or any Coordinated Action may obtain directly from the court reporter, at the requesting counsel's own expense, a transcript of any

deposition taken in the Lead Actions or in any other Coordinated Action, unless stated otherwise in this Order. The transcript of any deposition taken in the Lead Actions or a Coordinated Action shall not be used or disseminated except in accordance with the terms of this Order and the MDL Court's discovery orders.

**15. Use and Admissibility of Depositions**

Under the conditions prescribed in FED. R. CIV. P. 32(a) (1)- (4) CAL. C.C.P. § 2025.620; or as otherwise permitted by the Federal and California Rules of Evidence or the rules in the presiding jurisdiction, depositions taken in accordance with this order may be used against any party (including parties later added and parties in cases subsequently filed in any state court covered by this order, cases filed in, removed to or transferred to the federal court which is covered by this order; all of which are part of this litigation) who:

(a) was present or represented at the deposition; or

(b) had reasonable notice thereof; or

(c) within 30 days after the deposition is taken or within 45 days after becoming a party in one of the Lead or Coordinated Actions fails to show just cause why such deposition should not be used against such party.

This order does not address trial preservation depositions. Nor does it address the timing of any such trial preservation deposition. Such determinations shall be made in each coordinated proceeding.

**IT IS SO ORDERED.**

**DATE: May 20, 2020**



Hon. William H. Orrick
United States District Court Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>ALL ACTIONS | Case No. 19-md-02913-WHO<br><br>**CASE MANAGEMENT ORDER NO. 11: RE REMOTE DEPOSITIONS** |

The COVID-19 global pandemic has affected virtually every aspect of American society, including civil litigation in this Court and across the federal system. Governmental authorities have responded to this public health emergency by imposing travel restrictions, "stay at home" directives, and other social distancing measures designed to slow the communal spread of the disease. While the Parties may prefer to conduct in-person depositions in this litigation, social distancing restrictions and personal and public health concerns may sometimes preclude this option. Pursuant to Fed. R. Civ. P. 30(b)(4), this Court issues the following protocol to govern depositions where all, or most of the participants, including the court reporter and videographer, are attending remotely ("Remote Deposition").

1. Subject to all of the conditions below, depositions for cases filed in *In Re Juul Labs, Inc., Marketing, Sales Practices, And Products Liability Litigation*, Case No. 2:19-md-02913, may be noticed to take place remotely via video or internet video conference technology.

2. The protocols in this Order supplement Case Management Order No. 10 Deposition Protocol (Dkt. 573) and Case Management Order No. 9 Joint Coordination Order

(Dkt. 572). If the deposition protocols in this Order are deemed to conflict with any provisions in the Joint Coordination Order or Deposition Protocol, the protocols in this Order shall control.

3. The protocols in this Order shall apply to depositions of fact witnesses, including those taken pursuant to the Deposition Protocol, and supplement that Order. For the avoidance of doubt, this Order shall not apply to expert depositions. Protocols for remote depositions not covered by this Order will be set forth in future order(s).

4. Any Remote Deposition taken pursuant to this Court's Orders must comply with the requirements in Fed. R. Civ. P. 30(b)(5). This includes the requirements that, (1) "[u]nless the parties stipulate otherwise, a deposition must be conducted before an officer appointed or designated under Rule 28," and (2) that officer must administer the oath or affirmation to the deponent. A Remote Deposition taken pursuant to this Case Management Order will be deemed to have been taken before an appropriate officer despite the court reporter not being in the same physical location as the witness—as long as the court reporter attends the deposition by the same remote means as the other participants and is able to hear and communicate with other attendees. To the extent permitted by the law of the state in which the witness is located, the witness may be sworn in remotely with the same effect as an oath administered in person.

5. The deposition notice for any Remote Deposition pursuant to Fed. R. Civ. P. 30 must list the location(s) (city and state) from where the witness, the court reporter, and the videographer will attend.

6. All deposition notices must identify the company that will host and record the Remote Deposition (the "Remote Deposition Vendor") and contain a general description of how those attending may access the remote connection being utilized (e.g., GoToMeeting, Zoom, WebEx). The party noticing the deposition must provide the witness and all other attendees with detailed instructions regarding how to participate in the Remote Deposition at least three business days before the deposition—and will use best efforts to provide the detailed instructions at least five business days before the deposition. The noticing party shall bear the costs of the Remote Deposition Vendor, except that if another party objects to the technology proposed by the

noticing party, and the noticing party is amenable to use another technology proposed by the objecting party, the objecting party shall bear the costs of the technology proposed.

7. To host a Remote Deposition, a Remote Deposition Vendor must have implemented adequate security measures to ensure the confidentiality of the Remote Deposition (e.g., video and audio feeds, exhibits). These security measures include using tools such as a "virtual waiting room" that allows the court reporter to admit only individuals authorized to attend the deposition.

8. At least 24 hours before the Remote Deposition is scheduled to start, noticing counsel, defending counsel, the witness, and the Remote Deposition Vendor must conduct a test of the system, equipment, and internet connection that will be used to conduct the Remote Deposition (the "Remote Deposition Technology"). If a witness noticed for a Videoconference Deposition does not have a webcam-equipped tablet, desktop or laptop computer that can be used during the deposition, counsel defending the deposition must provide the deponent with an agreed-upon tablet, desktop, or laptop computer containing the audio, webcam, and Wi-Fi connectivity needed to participate in the deposition. If a witness noticed for a Videoconference Deposition is not being defended by counsel for any Party to this action, the Parties will confer regarding a reasonable method for providing the deponent with an agreed-upon tablet, desktop, or laptop computer containing the audio, webcam, and Wi-Fi connectivity needed to participate in the deposition.

9. At the time of the deposition, the witness must advise the court reporter of his or her physical location. The witness should endeavor to participate in the deposition from a quiet, well-lit, indoor location, while seated in front of a neutral background, and facing the camera being used to record the witness. Only the witness's counsel and in-house counsel is/are permitted to be in the same location as the witness during remote testimony, if the witness consents and such attendance is consistent with social distancing restrictions. Unless otherwise stipulated by the noticing party and counsel for the witness, the deponent participating in a Remote Deposition must participate through video conference (or other remote means capable of producing audio-video transmission), as opposed to telephone or other audio-only means, so that

the officer and noticing party may properly identify and observe the witness throughout the deposition.

10. If counsel for the witness attends the deposition in person, that counsel shall also log into the Remote Deposition, so that all participants can see and hear the counsel for the witness at all times that the deposition is being conducted on the record. Both counsel and the witness shall also comply with any government law, regulation or guidance regarding public health and safety during the COVID-19 pandemic.

11. To avoid any potential disruptions of a Remote Deposition, those attending must enable “do not disturb” settings for applications not in use, including but not limited to, Skype, instant messaging, and/or e-mail notifications. While on the record, the witness must put away and not look at devices other than the device(s) being used for the Remote Deposition. While on the record, there shall be no other programs displaying images on the witness’s screen other than the agreed-upon Remote Deposition platform and any exhibits that have been marked for the deposition. The Court recognizes that the microphones for certain attendees (such as the witness, the court reporter, the attorney taking the deposition, and the attorney defending the deposition) must remain on when the deposition is on the record. Other attendees should mute microphones when not speaking. The participating attorneys may be visible to all other participants during the deposition.

12. Each witness, attorney, or other person attending the deposition, either remotely or in-person, shall be identified on the record by name and physical location at the beginning of the deposition (except for consulting experts). Any individual participating remotely should not do so in a public space. Participants should ensure that they are acting in compliance with the governing protective order. After the deponent has been sworn, the deponent must confirm that he or she has either powered down or, at a minimum, temporarily disabled the listening function on any Google Home, Amazon Echo, or any other known “listening devices” placed within listening distance of the deponent.

13. A videographer employed by the Remote Deposition Vendor will record the witness’s deposition testimony, by the best technological means available, including remote video

capture/recording. The video recording of the deposition may only be suspended during the deposition upon stipulation by counsel conducting and defending the deposition. With the exception of the videographer and the court reporter, the deposition may not otherwise be recorded electronically without the consent of the Parties. The videographer must only record (1) the audio and video of the witness's testimony; (2) the video of any documents being displayed or annotated for the witness during the deposition; (3) the audio of the attorney actively questioning the witness; and (4) audio of the defending attorney not actively questioning the witness (or any other attorney making an objection on the record).

14. Acceptable Exhibit Formats: During the deposition, full and complete copies of deposition exhibits must be provided to the witness and counsel who are attending the deposition. Deposition exhibits may be made available in physical (hardcopy) form or via the Remote Deposition Technology, file sharing software, or other electronic means.

15. Electronic Exhibits: Exhibits provided electronically shall be accessible such that the deponent and counsel may review the entire exhibit on their own computers or devices, without reliance on the noticing attorney's "share screen." In the case of electronic exhibits, a witness may be required to use a keyboard, mouse, or other similar means to open and/or advance the pages of an exhibit. In such instances, access to a full copy of the deposition exhibit electronically via iPad, tablet, laptop, or other devices, will be deemed to equate to hardcopy access. The fact that a witness was provided with only an electronic copy of an exhibit will be an insufficient basis, by itself, to object to the admissibility of that exhibit at trial.

16. Hardcopy Exhibits: Notwithstanding the foregoing and only if agreed in writing by the participants in a particular deposition, all documents any attorney expects to use as exhibits at a deposition that exceed 100 pages shall be sent to the witness in advance of the deposition in hard copy form. In addition, the Parties agree to work in good faith to reach agreements regarding the provision of hard copy exhibits to a deponent for whom electronic-only versions are particularly problematic. To the extent hardcopy exhibits are provided to the deponent, the package containing the documents shall be sealed, and the witness shall unseal it only when asked to do so on the record at the deposition.

17. While the deposition is on the record, no person aside from the attorney conducting the examination is permitted to communicate with the witness directly or indirectly by any means not recorded in the same manner as the deposition itself (e.g., no private messages, text messages or emails). However, the witness's counsel may communicate with the witness in person, telephonically, or by other electronic means during breaks (including, but not limited to, by means of the use of remote connection software), consistent with Federal Rule of Civil Procedure 30(c)(1). To the extent that the Remote Deposition Vendor's technology includes a "chat" feature or similar capabilities, the noticing party shall ensure that the Remote Deposition Vendor either: (a) disables the feature or (b) implements settings (if available) that require all communications to be seen by all Participants. Nothing in this provision is to be read as prohibiting otherwise appropriate communications among participants and/or attendees by other means.

18. During breaks in the deposition, the Parties may use the breakout room feature provided by the Remote Deposition Vendor, which simulates a live breakout room through videoconference. Conversations in the breakout rooms shall not be recorded. The breakout rooms shall be established by the Remote Deposition Vendor prior to the deposition and controlled by the Remote Deposition Vendor.

19. Technical difficulties, including but not limited to pauses, lags, and/or interruptions in Internet connection shall be addressed as they would be in any in-person deposition. The Parties shall go off the record and attempt to resolve the issue. Technical difficulties will not result in waiver of objections by any party. If any pauses, lags, and/or disruptions are persistent or prolonged, the Parties should: (1) extend the Remote Deposition by an amount of time equal to the duration of the pause, lag, and/or disruption, provided that the additional time is less than an hour; or (2) consider rescheduling the Remote Deposition for a later date, if the additional time required is an hour or more.

20. Any Remote Depositions conducted in accordance with these protocols may be admitted at trial with the same effect and pursuant to the same evidentiary rules as one recorded in-person. The "Confidential" or "Highly Confidential" designation of all or portions of Remote

Depositions will be governed by the provisions MDL Protective Order and the Deposition Protocol (ECF Nos. 308, 573).

21. The Parties acknowledge that Remote Depositions may take longer to complete than an in-person deposition due to logistical challenges beyond anyone's control, and because it may take time for everyone to adjust to the technology. While the Parties will endeavor in good faith to comply with the time limits set forth in the Deposition Protocol, there may be circumstances under which depositions may need to exceed those limits. The Parties will be respectful and collaborative under these circumstances and will make good faith efforts to make reasonable accommodations to allow all Parties adequate additional time to conduct a fair examination. Nothing in this Order prevents a Party from moving for a protective order under Fed. R. Civ. P. 26(c) to require that a given individual deposition proceed in person. However, where a Remote Deposition has been requested by the deponent, the court reporter, or an attorney, an in-person deposition may not be conducted without leave of the court, pursuant to the procedures laid out in Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). Further, nothing in this Order precludes counsel for a witness from being in the same room as the witness, if the witness consents and such attendance is consistent with social distancing restrictions.

SO ORDERED, on this 21st day of August, 2020.



Judge William H. Orrick
UNITED STATES DISTRICT JUDGE

# EXHIBIT Y

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-02913-WHO |
| This Document Relates to:<br>ALL ACTIONS. | |

**NOTICE OF PLAINTIFFS' ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF THE ALTRIA DEFENDANTS REGARDING THE RELATIONSHIP BETWEEN ALTRIA AND JLI (NOTICE E)**

ISSUING PARTY: Plaintiffs

PRODUCING PARTY: The Altria Defendants as defined on Schedule A

TO: Altria Group, Inc. and its Attorneys of Record:

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30, and *In Re: Juul Labs, Inc., Marketing, Sales Practices, And Products Liability Litigation*, Case No. 19-md-02913-WHO, Case Management Order Numbers 10 and 11 (CMO Nos. 10 and 11), Plaintiffs, by and through the undersigned counsel, intend to depose the Altria Defendants as defined in Schedule A via remote audio-video conference on a date to be mutually agreed upon between the parties via Golkow Litigation Services.

The remote deposition will be coordinated by Golkow Litigation Services, with a business address of 1650 Market Street, Suite 5150, Philadelphia, PA 19103. A link and any necessary

credentials will be provided at least three days in advance of the deposition. The deposition will be conducted using teleconference and/or video conference technology, without a court reporter being physically present with the witness, consistent with CMO No. 11 and all existing governmental and court orders relating to COVID-19 and consistent with best practices recommended by the CDC to prevent the spread of COVID-19. This deposition is being taken for the purpose of discovery, for use at trial, or such other purposes as are permitted under the Rules. The deposition will be recorded by stenographic means and by audio and video.

The Altria Defendants are directed to designate a person or persons to testify on its behalf on the matters listed in Schedule A attached to this Notice of Deposition and to produce the documents identified on Schedule B.

The deposition will be recorded stenographically and on videotape.

Dated: March 15, 2021

By: */s/ Sarah R. London*
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: */s/ Dena Sharp*
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: */s/ Dean Kawamoto*
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: */s/ Ellen Relkin*
Ellen Relkin
**WEITZ & LUXENBERG**

700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

Case 3:19-md-02913-WHO Document 1615-4 Filed 03/12/21 Page 4 of 36

## SCHEDULE A

## Definitions

1. **Altria Group** refers to Altria Group, Inc.

2. **Altria Defendants** collectively refers to Altria Group, Inc., Philip Morris USA Inc., Altria Enterprises LLC, Altria Client Services LLC and Altria Group Distribution Company.

3. **JLI** refers to JUUL Labs, Inc. (specifically including its predecessors Pax Labs, Inc., and Ploom, Inc.).

4. **Management Defendants** refers to James Monsees, Adam Bowen, Nicholas Pritzker, Hoyung Huh and Riaz Valani.

5. **Defendants** refers, respectively and collectively, to JLI, the Altria Defendants and the Management Defendants.

6. **ENDS** means electronic nicotine delivery system, including components and parts, but not related accessories.

7. **JUUL** refers as broadly as possible to any and every JUUL ENDS, including JUUL Pods and e-liquids, and it refers both to all finished products and design prototypes or models of JUUL.

8. **The Transaction** refers to the December 20, 2018, transaction involving on or more of the Altria Defendants' stock purchase agreement with JLI, pursuant to which Altria purchased for an aggregate price of $12.8 billion dollars shares of JLI stock resulting in a beneficial ownership interest in JLI.

9. **Agreement** always includes any and all modifications, revisions or amendments.

10. The terms **or** and **and** should be construed disjunctively or conjunctively so as to give the broadest possible effect to a request.

11. The terms **you** and **your** refers to the **Altria Defendants**.

Case 3:19-cv-02913-WHO Document 1615-1 Filed 04/15/21 Page 5 of 36

**Topics**

Pursuant to Federal Rule of Civil Procedure 30(b)(6), you shall be prepared to testify regarding the following subjects:

1. To the extent such information is relevant or necessary to a full understanding of, or inquiry into, the other Topics in this Notice:[1]

   a. Your current and historical corporate/organizational structure, including departments, functions, divisions, subdivisions, and teams; and,

   b. the identities and responsibilities of Your personnel, senior managers, directors, or subcontractors.

2. The details and substance of any advice, guidance, recommendations, plans, strategies, or other communications provided by you to JLI and/or the Management Defendants relating to JUUL and relating to any or all of the following, before or after the Transaction:

   a. design;

   b. research;

   c. development;

   d. testing;

   e. manufacturing;

   f. marketing;

   g. advertising;

   h. distribution;

---

[1] For the sake of clarity and to assist Altria in the preparation of its designated witness or witnesses:

Topic 1 is limited to inquiry by Plaintiffs' counsel about the identity and responsibilities of various departments and personnel that were involved at any time in some capacity relating to the other Topics in this Notice. In short, Topic 1 is included to safeguard against any objection that this Notice fails to alert Altria and its designated witnesses that Plaintiffs intend to ask routine "who, what, and when" questions that arise naturally in the course of deposing Your representatives about the Topics in this Notice. Plaintiffs include this Topic with the expectation that the routine sorts of questions encompassed by the Topic would arise organically in questioning witnesses on the remaining Topics in the Notice and those witnesses would likely have responsive information given their designation as Your corporate representative for this Notice. In other words, any witness who You designate to testify about the Topics in this Notice is expected to be familiar with—and likely already would be familiar with—Your historical/corporate organizational structure related to that witness's Topic.

i. sale;

j. youth prevention;

k. corporate management;

l. lobbying; and,

m. regulatory compliance.

4. The details and substance of any communications between you, JLI, and/or the Management Defendants relating to K.C. Crosthwaite assuming a leadership position within JLI.

5. The details and substance of any communications between you, JLI, and/or the Management Defendants relating to Joe Murillo assuming a leadership position within JLI.

6. The knowledge, understanding, writings, in internal business communications or public statements by Atria and their operating companies regarding their knowledge of nicotine, nicotine addiction, the role nicotine plays in continued smoking, internal Company statement related thereto and public statement related to same. This includes statements made by entities speaking for or on behalf of Altria or their operating companies publicly or in internal business records.

7. The details and substance of any communications, recommendations, guidance or assistance provided by Altria regarding JLI removing certain flavors from the market and the reasons for such recommendations and actions.

8. The details and decision making and reasons for the language included in drafts and the final version of Howard Willard's letter to the FDA on October 25, 2018, including any communications with JLI about the content, substance, or strategy underlying this letter.

Case 3:19-md-02913-WHO Document 1613-4 Filed 04/12/21 Page 7 of 36

**SCHEDULE B**

1. The witnesses' *curriculum vitae.*
2. Documents relied on by the witnesses in preparing to testify about the Topics set forth in Schedule A.
3. Documents evidencing, referring, or relating to each Topic in Schedule A.
4. At least 10 days in advance of the deposition, identify and produce to juulmdlplaintiffdiscovery@kellerrohrback.com all documents reviewed, considered, or relied upon in preparation for this deposition, as well as any summaries or demonstratives a witness will request to use at a deposition. If the documents have already been produced, please email a list of bates numbers to juulmdlplaintiffdiscovery@kellerrohrback.com.

Dated: March 15, 2021

By: */s/ Sarah R. London*

Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: */s/ Dena Sharp*

Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: */s/ Dean Kawamoto*

Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

Case 3:19-md-02913-WHO Document 1615 Filed 04/12/21 Page 8 of 36

By: <u>*/s/ Ellen Relkin*</u>

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

Case 3:19-md-02913-WHO Document 1613-4 Filed 03/12/21 Page 9 of 36

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2021, a true and correct copy of the foregoing *NOTICE OF PLAINTIFFS' ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF THE ALTRIA DEFENDANTS REGARDING THE RELATIONSHIP BETWEEN ALTRIA AND JLI (NOTICE E)* was served via electronic mail upon the following:

Gregory P. Stone
Bethany Woodard Kristovich
Jeremy K Beecher
**MUNGER TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: 213-683-9100
Facsimile: 213-687-3702
gregory.stone@mto.com
Bethany.Kristovich@mto.com
jeremy.beecher@mto.com

Renee D. Smith
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: 312-862-2310
Facsimile: 312-862-2200
renee.smith@kirkland.com

Mike Brock
Peter A. Farrell
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-879-5000
mike.brock@kirkland.com
pfarrell@kirkland.com

David Horowitz
**KIRKLAND & ELLIS LLP**
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: 213-680-8400
david.horowitz@kirkland.com

David M. Bernick
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990

dbernick@paulweiss.com

*Attorneys for Defendant JUUL Labs, Inc.*
John C. Massaro
Jason A. Ross
David E. Kouba
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
john.massaro@arnoldporter.com
Jason.ross@arnoldporter.com
David.Kouba@arnoldporter.com

Lauren S. Wulfe
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: 213-243-4000
Facsimile: 213-243-4199
lauren.wulfe@arnoldporter.com

*Attorneys for Defendants Altria Group, Inc. and Philip Morris USA Inc.*

James Thompson
James N. Kramer
**ORRICK HERRINGTON & SUTCLIFFE LLP**
The Orrick Building
405 Howard Street
San Francisco CA 94105
Telephone: 415.773.5923
Facsimile: 415.601.5488
jthompson@orrick.com
jkramer@orrick.com

*Attorneys for Defendant James Monsees*

Eugene Illovsky
Martha Boersch
Matthew Dirkes
**BOERSCH & ILLOVSKY LLP**
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Telephone: (415) 500-6643
eugene@boersch-illovsky.com
martha@boersch-illovsky.com
matt@boersch-illovsky.com

*Attorneys for Defendant Adam Bowen*

Michael J. Guzman

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
Sumner Square, 1615 M St., N.W., Suite 400
Washington, DC 20036
Telephone: (202) 326-7910
mguzman@kellogghansen.com

Karl Belgum
**NIXON PEABODY LLP**
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111
Telephone: (415) 984-8409
kbelgum@nixonpeabody.com

*Attorneys for Defendants Nicholas Pritzker, Riaz Valani, and Hoyoung Huh*

James E. Sell
Mitchell B. Malachowski
TYSON & MENDES, LLP
523 4th Street, Suite 100
San Rafael, CA 94901
Telephone: (628) 253-5070
Fax: (415) 785-3165
jsell@tysonmendes.com
mmalachowski@tysonmendes.com

*Attorneys for Defendants Mother Murphy's Labs, Inc., and Alternative Ingredients, Inc.*

Robert A. Scher
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016
Telephone: (212)338-3405
rscher@foley.com

*Attorney for Defendants Tobacco Technology, Inc., and Eliquitech, Inc.*

Michael L. O'Donnell
James E. Hooper
Marissa Ronk
**WHEELER TRIGG O'DONNELL LLP**
370 17th Street, Ste. 4500
Denver, CO 80202
Telephone: (303) 244-1850
Odonnell@wtotrial.com
hooper@wtotrial.com
Ronk@wtotrial.com

*Attorneys for Defendant McLane Company, Inc.*

Christopher J. Esbrook
David F. Pustilnik
Michael S. Kozlowski

**ESBROOK LAW LLC**
77 W. Wacker, Suite 4500
Chicago, IL 60601
Telephone: (312) 319-7681
christopher.esbrook@esbrooklaw.com
david.pustilnik@esbrooklaw.com
michael.kozlowski@esbrooklaw.com

*Attorneys for Defendants Eby-Brown Company, LLC, Circle K Stores, 7-Eleven, Inc., Speedway, LLC, and Walgreens Boots Alliance, Inc.*

David R. Singh
Bambo Obaro
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065
Telephone: (650) 802-3083
david.singh@weil.com
bambo.obaro@weil.com

*Attorneys for Defendants Core-Mark Holding Company, Inc.*

Charles C. Correll, Jr.
Matthew J. Blaschke
Alessandra M. Givens
**KING & SPALDING LLP**
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
ccorrell@kslaw.com
mblaschke@kslaw.com
agivens@kslaw.com

*Attorneys for Defendant Chevron Corporation*

Donald F. Zimmer, Jr.
Quyen L. Ta
Jennifer T. Stewart
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
fzimmer@kslaw.com
qta@kslaw.com
jstewart@kslaw.com

*Attorneys for Defendant Walmart*

Case 3:19-md-02913-WHO Document 1536-4 Filed 04/15/21 Page 13 of 16

By: */s/ Sarah R. London*
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: */s/ Dena Sharp*
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: */s/ Dean Kawamoto*
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: */s/ Ellen Relkin*
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: JUUL LABS INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

This Document Relates to:

*All matters*

CASE NO. 19-md-02913-WHO

**CASE MANAGEMENT ORDER NO. 10: DEPOSITION PROTOCOL ORDER**

HONORABLE JUDGE WILLIAM H. ORRICK

This Order, agreed to after extensive negotiations and with the agreement of counsel, governs the conduct of depositions of fact witnesses on issues of general applicability to the litigation (as opposed to solely case-specific witnesses). This Order applies to all such depositions in the MDL and JCCP Proceedings ("Lead Actions") and those actions involving the same or similar subject matter as the MDL pending in other state and federal courts that adopt the Joint Coordination Order[1] ("Coordinated Actions"). The purpose of this Order is to gain the highest degree of efficiencies in the taking of fact witness depositions. At no time has it been, nor will it be, the intention of the Court or the parties that judges in any of the participating jurisdictions delegate their duties to any other judicial officer.

## 1. General Provisions

Counsel and all parties (both represented and *pro se*) shall comply with this Order, and to the extent consistent with this Order, with the applicable Rules of Civil Procedure and the Local Rules of the presiding court. Unless specifically modified herein, nothing in this Order shall be construed to abrogate the Rules of Civil Procedure or the Local Rules.

[1] Case Management Order No. 9: Joint Coordination Order ("Joint Coordination Order").

Conduct of all participants in depositions shall be in accordance with the Northern District of California Professional Guidelines and the customs and practices expected of lawyers and witnesses appearing before the presiding court in their home jurisdictions, including as if each was appearing personally before the Courts at the time of the depositions. Counsel shall not at any time conduct themselves in a manner not becoming of an officer of the court and not in full compliance with the civil rules of practice and all other orders of the Courts. Neither counsel nor witnesses shall, at any time, engage in inappropriate conduct that impedes, delays, or frustrates the examination of the witness. All counsel and deponents must be treated with civility and respect.

**2. Scope**

This Order shall apply to: (i) all fact depositions of witnesses who are currently or were formerly employees, agents, or contractors of Defendants; and (ii) all third-party witnesses, other than third-party witnesses who are relevant only to the claims of a particular plaintiff, i.e., case-specific witnesses (together, "Common Witnesses"). For the avoidance of doubt, this Order shall not apply to: (i) fact depositions of any Plaintiff, their representatives, employees, family members, personal acquaintances, healthcare providers, and all other case-specific fact witnesses; and (ii) expert depositions.

**3. Coordination of Depositions**

The protocols in this Order supplement the Joint Coordination Order. If the deposition protocols in this Order are deemed to conflict with any provisions in the Joint Coordination Order, the protocols in this Order shall control.

The parties, the Courts in the Lead Actions, and the Courts in the Coordinated Actions wish to minimize the expense and inconvenience of this litigation by minimizing the depositions of any Common Witness. Accordingly, as a general rule, a witness may be deposed once within the time limits set forth in this Order. Such deposition shall be noticed in the Lead Actions and shall be deemed to be cross-noticed in the Coordinated Actions as long as the Coordinated Action: (1) has adopted the Coordination Order and (2) receives notice of the deposition as described in Section 5. Depositions shall be noticed according to the Federal Rules of Civil Procedure. A witness may be deposed once in total across all Lead and Coordinated Actions and, following the deposition, shall not be re-deposed in a Lead or Coordinated

Action unless otherwise agreed by the parties or authorized by an order of Court upon a showing of good cause by the party seeking the additional deposition.

Plaintiffs' Counsel in the Lead Actions shall take reasonable efforts and engage in good faith efforts to coordinate with each other before serving deposition notices and with respect to which depositions to notice.

Depositions, in addition to those being taken in the Lead Actions, may also be taken in Coordinated Actions, but only upon leave of the Court in which the Coordinated Action is pending, obtained on noticed motion for good cause shown, including why the discovery sought could not have been obtained in coordinated discovery in the Lead Actions. Coordinated Action Plaintiffs' Liaison Counsel[2] and JLI Counsel in a Coordinated Action in which any such motion is filed shall promptly notify the MDL Court and Plaintiffs' Lead Counsel in the Lead Actions of such filing and provide a copy of the motion. If a deposition in a Coordinated Action has been cross-noticed by the Lead Actions, then parties in the Coordinated Action may not take a subsequent deposition of that witness except for good cause shown.

If the Lead Action Plaintiffs, or Defendants and their respective Counsel in any Coordinated Action have received at least 21 days' notice of a deposition in either of the Lead Actions or any Coordinated Action (or if (a) the parties agree in writing that such notice is not necessary or (b) upon order of the MDL Court, a deposition is permitted to be taken with fewer than 21 days' notice), such deposition may be used in the Lead Actions and each Coordinated Action for all purposes prescribed in Fed. R. Civ. P. 32, California Code of Civil Procedure 2025.620, et seq. or corresponding rule of civil procedure in a Coordination Action, or as otherwise permitted by the Federal, California, or Coordinated Action's state's Rules of Evidence, by or against any party including parties later added and parties in cases subsequently filed in, removed to, or transferred to this Court as part of this litigation, without regard to whether any Lead Actions' Plaintiffs' Counsel or any Defendants' Counsel or any counsel representing plaintiffs or defendants in any Coordinated Action attended or examined the witness at the noticed deposition.

Fed. R. Civ. P. 6(a) shall govern the computation of time periods set forth in this Order.

---

[2] *See* Joint Coordination Order.

**4. Length and Scope**

The following rules shall apply to depositions noticed pursuant to this Protocol (absent an agreement of the parties or further order of the Court on a showing of good cause):

(a) There may be two days of questioning by the Lead Actions—the first day will be limited to seven hours on the record and the second day will be limited to five hours on the record, exclusive of redirect examination as provided below if necessary.

(b) Any Counsel from a Coordinated Action who is designated as an examiner shall be permitted a reasonable amount of time to question the deponent (up to two hours combined for all Coordinated Actions that shall occur immediately following the examination by the Lead Actions), and shall be permitted to make objections during examination by other counsel, subject to the below provisions regarding objections and in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the Orders of the MDL Court, and in accordance with the terms and procedures set forth in subparts (i) through (iii) below providing the following:

(i) the Court in which the Coordinated Action is pending has adopted the Discovery Orders or has entered a Protective Order, ESI Order, Deposition Protocol Order or other discovery order substantially similar to the Discovery Orders;

(ii) Plaintiffs' Counsel from the Coordinated Action shall make best efforts to ask questions that are non-duplicative of questions already asked at the deposition, however, nothing shall prevent Plaintiffs' Counsel from a Coordinated Action to probe further into issues already covered during the questioning of Noticing Party; and

(iii) participation of Plaintiffs' Counsel from the Coordinated Actions shall be arranged so as not to delay discovery or other proceedings as scheduled in the Lead Actions.

(c) After questioning by the Lead and Coordinated Actions, the party defending the deposition ("Defending Party") may elect to ask follow up questions of the deponent for up to two hours. If Defending Party elects to question the deponent, then the Plaintiffs in the Lead and Coordinated Actions shall be entitled to an equal amount of time to perform redirect examination (up to two hours total). Absent

agreement of the parties or order by a Lead Action Court for good cause shown, no further examination will be permitted by any party after redirect examination.

(d) Depositions shall begin at 9:00 a.m. absent agreement of the parties.

(e) Absent agreement of the parties, the days of questioning will take place on consecutive business days to the extent possible.

(f) No speaking objections or other actions that unnecessarily delay depositions will be permitted, and will result in additional time being added to the deposition for the questioning party.

Counsel in the Lead Actions shall confer before the deposition concerning allocation of time to question the witness and collaborate to avoid needless duplication (i.e., asking the same questions). In the event that the deposition involves a translator requested by the witness, the maximum length of the deposition shall be increased as is reasonably necessary by up to 50% and the parties shall negotiate a reasonable allocation of the translator costs. Absent agreement otherwise, the parties should set aside two days for each Common Witness to account for sufficient time on the record in accordance with this Order. The parties are encouraged to make full and efficient use of each deposition day so as not to waste valuable time and incur unnecessary expenses. Not every witness will require an examination that lasts as long as the presumptive time limits set forth above, and no party will be prevented from using a deposition merely because it did not continue into a subsequent day. To the extent the parties can anticipate a witness will take less time, they will attempt to agree to lesser time limits and, for planning purposes, will provide other deposition attendees with advance notice of any agreement to lessen the examination time. This procedure may be particularly useful in the event that more than one deposition is scheduled on a given day.

**5. Scheduling, Logistics, and Service of Notices**

Cooperation in Scheduling. Lead Counsel for the MDL Plaintiffs, or their designee, Lead Counsel for the JCCP Plaintiffs, or their designee, Counsel for the Defendants, and Counsel for the deponent, if applicable, shall cooperate on selecting a mutually convenient date, time, and location for each deposition. Unless otherwise agreed by the parties or ordered by either the MDL or JCCP Court, depositions shall not be taken on Saturdays, Sundays, or federal or state court holidays.

Plaintiffs' Counsel in the Lead Actions must make best efforts to coordinate their deposition dates with each other, including providing three days written notice of proposed deposition dates to persons designated by the other Lead Action to schedule depositions before issuing the notice. If the non-noticing Lead Action does not object to the date within three days, the deposition may be noticed for that date.

Location. In the absence of agreement, a deposition may take place within (a) the county in which the deponent resides or (b) the county in which the deponent is employed.

Content of Notice. Each deposition notice subject to this Order shall comply with Fed. R. Civ. P. 30(b) or California Code of Civil § 2025.220, absent agreement of the parties or Court order. Depositions subject to this Order noticed in the Coordinated Actions shall be noticed and conducted pursuant to rules of the relevant jurisdiction and with this Order. The deposition notice shall include the name, address, and telephone number of an attorney point of contact designated by the party noticing the deposition, as well as the date, time, and location of the deposition. Any notice for the deposition of a corporate or organizational representative under Fed. R. Civ. P. 30(b)(6) or California Code of Civil Procedure § 2025.230 shall describe with reasonable particularity the matters for examination. This Order in its entirety shall be attached to any subpoena or deposition notice that pertains to a third-party witness covered by its terms. The notice shall clearly state whether the deposition will be videotaped in addition to being recorded by stenographic means.

Adequacy of Notice. After counsel, through consultation, have arrived on a date and location for a deposition, the Noticing Party shall serve an amended Notice reflecting the agreed upon date and location. Witnesses subpoenaed to produce documents shall be served with the document subpoena at least thirty calendar days before a scheduled deposition.

Costs. The Noticing Party shall be responsible for retaining and paying for a court reporter and videographer.

Service Manner and Timing. Notices for Depositions in the Lead Actions and Coordinated Actions shall be served by e-mail or other electronic means on Lead Actions' Co-Lead Counsel, State/Federal Liaison Counsel, and Counsel for the Defendants. Each Plaintiffs' Liaison Counsel in a Coordinated Action, or his or her designee, shall be responsible for distributing such documents to other counsel for

plaintiffs in their Coordinated Action. Notices served in accordance with this paragraph shall be deemed cross-noticed in the Coordinated Actions as long as the Coordinated Action: (1) has adopted the Coordination Order and (2) receives notice of the deposition as described above.

To allow for planning, preparation, and coordination between the Lead Actions and the Coordinated Actions, depositions must be noticed at least 21 days before they are scheduled to occur. Expedited depositions may be scheduled by agreement of the parties in writing or as ordered by the MDL or JCCP Courts, or a Court in a Coordinated Action, and in which event the time limitations for notice shall be lessened, as well as the time limitation for production of any documents sought by third-party subpoena in conjunction with said deposition.

Challenges to the Notice. Any party or witness receiving notice of a deposition that contends is not permitted by the terms of this Order shall have five business days from receipt of the notice within which to serve the noticing party with a written objection to the deposition.

Disputes. In accordance with this Order, all disputes regarding any matters arising under this Order, whether pertaining to a deposition in the Lead Actions or any Common Witness deposition in a Coordinated Action, shall be resolved pursuant to Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). In the event of such an objection, the deposition shall not go forward unless (a) the parties and the deponent reach an agreement in writing to resolve the objection or (b) the noticing party applies for and receives an order pursuant to the Section 7 of the Stipulated Joint Coordination Order granting leave to take the deposition. Before filing a discovery motion pursuant to Section 7 of the Stipulated Joint Coordination Order, the parties must first attempt to resolve the dispute in good faith.

**6. Means of Recording Depositions**

A certified court reporter shall stenographically record all deposition proceedings and testimony and provide a "real time" transcription feed to devices such as video monitors and computers at the deposition venue. A party seeking to transmit "real time" transcription feeds to computers not located at the deposition venue may do so at their own expense by making a request to the court reporting service five business days before the deposition; that party will ensure that any remote viewing is in compliance

with all applicable Protective Orders. The court reporter shall administer the oath or affirmation to the deponent. The written transcript prepared by the court reporter shall constitute the official record of the deposition for purposes of Fed. R. Civ. P. 30's requirements concerning filing, retention, certification, and the like. The Lead Actions can choose their own reporting service for depositions that they notice. All videotaped depositions shall be accompanied by a simultaneous audiotape recording and be stenographically recorded by a court reporter as provided in the previous paragraph. As noted above, the stenographically prepared transcript shall constitute the official record of the deposition.

Where the party wishing to videotape the proceeding did not notice the deposition, a request to videotape the deposition shall be submitted in writing to the Lead Actions Counsel, Counsel for the Defendants, and Plaintiffs' State/Federal Liaison Counsel, no later than seven days before the date on which the deposition is scheduled to occur. The party wishing to videotape the deposition, if not originally noticed as such, shall be responsible for arranging and paying for the videotaping and providing a copy to Lead Actions Counsel.

Services or products offered or provided by the operator of the videotape equipment must be offered to counsel for all parties, regardless of which party is financing the videotaping of the deposition. Further, any video operator is subject to the orders of this Court whether the deposition was noticed or cross-noticed in the MDL or JCCP Proceedings or in a Coordinated Action, including but not limited to the Confidentiality Order and Joint Coordination Order. The video operator shall be given a copy of all applicable orders at least five days before the deposition.

The operator of the videotape recording equipment is subject to the provisions of Fed. R. Civ. P. 28(c). At the start of the deposition, the operator shall swear or affirm to record the proceedings fairly and accurately.

Each witness, attorney, and other person attending the deposition (in person or telephonically) shall be identified on the record at the commencement of the deposition, however, a consulting expert who has signed the applicable protective order and is attending the deposition telephonically need not be identified on the record. The videotape recording shall include the court reporter administering the oath

or affirmation to the witness. Thereafter, the deponent and, if necessary, exhibits and any demonstratives will be videotaped.

The deposition will be conducted in a manner to replicate, to the extent feasible, the presentation of evidence at trial. Unless physically incapacitated, the deponent shall be seated at a table except when reviewing or presenting demonstrative materials for which a change in position is needed. To the extent practicable, the deposition will be conducted with the witness seated in front of a solid background with only such lighting as is required for accurate video recording. Lighting, camera angle, lens setting, and field of view will be changed only as might be reasonably necessary to record accurately the natural body movements of the deponent or to portray exhibits and materials used during the deposition. Sound levels will be altered only as necessary to record satisfactorily the voices of counsel and the deponent. The witness shall appear in ordinary business attire (as opposed to, for instance, a lab coat) and without objects such as a bible, medical equipment, or props.

Video recording will be suspended during all "off the record" discussions and the video operator shall note such suspensions.

The videotape operator shall use recording equipment with an appropriate timer and, unless otherwise agreed to by the parties, shall prepare and provide counsel with a log, cross-referenced with timestamps, that identifies the portion of the recording at which examination by different counsel begins and ends, when exhibits are used, and when there is any interruption of continuous tape recording, whether for recess, "off the record" discussions by counsel, mechanical failure, or other interruption.

The video operator shall maintain custody of the original video medium in its original condition, without editing in any fashion. No part of the video or audio record shall be released or made available to the public unless authorized by an order of the MDL or JCCP Court.

The parties shall meet and confer to determine whether an agreement can be reached to limit the number of independent court reporting and videography firms involved in recording the deposition proceedings covered by this Order and to develop a cost-sharing agreement between the various parties or party groups for the associated fees, including the cost of the facilities where depositions are conducted.

**7. Remote Participation via Telephone, Internet, or Video Streaming**

If requested at least ten days before a deposition, telephone facilities shall be provided so that parties wishing to participate in the deposition by telephone may do so at their own expense. By indicating in a deposition notice that it wishes to examine a witness over the telephone, a party shall be deemed to have moved for such an order under Fed. R. Civ. P. 30(b)(4). Unless an objection is filed and served within five days after such notice is received, the Court shall be deemed to have granted the motion. Other parties may examine the deponent telephonically or in person. However, all persons present in the location with the deponent shall be identified on the deposition record and shall not by word, sign, or other means coach or suggest answers to the deponent and shall act in accordance with applicable federal rules of civil procedure and professional conduct governing interaction with the deponent. In addition, the court reporter stenographically recording the deposition shall be located in the same room as the deponent.

Technical difficulties with telephonic participation shall not constitute grounds for postponing the deposition or for rendering inadmissible a deposition that otherwise would be admissible in evidence. If technical problems with the telephonic facilities create disruptions in the deposition, counsel attending a deposition in person may discontinue telephonic participation for such periods of time as necessary.

A party may request, at their own expense, to make the live deposition proceedings available to locations that are remote from the deposition venue through the use of video streaming over secure and encrypted Internet connections and to allow for remote real-time participation by interested counsel, such as through the use of a private group chat system that enables remote counsel to collaborate with their on on-site colleagues. A party seeking these services shall make a request to the court reporting service five business days before the deposition. The viewing of or participation in any deposition via the Internet is expressly subject to the [MDL Protective Order, Doc. 308 and JCCP CMO No. 3], or a substantially similar order in a Coordinated Action. The party participating remotely is responsible for providing his or her own Internet connection and shall not re-record the deposition by video or audio means.

**8. Appearances and Examination**

Unless otherwise agreed to by the parties or ordered under Fed. R. Civ. P. 26(c) and subject to the terms of the [Protective Order, Doc. #308 and JCCP CMO No. 3], depositions may be attended only by

the parties, the deponent, the deponent's attorney, attorneys of record in the MDL and JCCP Proceedings, attorneys of record in the Coordinated Actions, in-house counsel and corporate representatives, court reporters, videographers, and any person who is assisting in the litigation and whose presence is reasonably required by the aforementioned counsel of record who is bound by any applicable Protective Order (such as a consulting expert).

Upon motion, and for good cause shown, the MDL Court may permit attendance by a person who does not fall within any of the categories above.

For there to be adequate deposition space, counsel intending to attend a deposition noticed in the Lead Actions, or in a Coordinated Action, should advise all parties, including counsel for the Noticing Party, of their intention to attend in person at least two business days before the deposition.

Unnecessary attendance by counsel is discouraged and may not be compensated in any fee application to a court. Counsel who have only a marginal or slight interest in a noticed deposition or who expect their interests to be adequately protected by other counsel should not attend the deposition.

Lead Counsel for the Lead Actions shall designate up to two attorneys to serve as the examiners of each deponent on behalf of the Lead Actions. Given deposition time limits and in the interest of efficiency, the Court strongly encourages Plaintiffs' Counsel from the Coordinated Actions to designate one attorney to serve as the examiner of each deponent on behalf of all Plaintiffs in the Coordinated Actions. If Plaintiffs in the Coordinated Actions are unable to agree on that examiner for a given deponent, Lead Counsel for the MDL Plaintiffs and Lead Counsel for JCCP Plaintiffs shall assist in attempting to reach such an agreement. For those depositions where an agreement is not reached, Plaintiffs' Counsel shall diligently work together to ensure that questioning on behalf of Plaintiffs in the Lead Actions and in the Coordinated Actions proceeds in the most efficient manner possible.

One counsel representing each Defendant shall be permitted to examine deponents. Each Lead Actions Defendant should designate one attorney to conduct the principal examination of each deponent. Examination by other counsel for the Lead Actions Defendants shall make best efforts to ask questions that are non-duplicative of questions already asked at the deposition. Notwithstanding the number of

examiners, the time limits set forth above shall still apply. Counsel should cooperate so examinations by multiple attorneys do not result in a deposition exceeding the allotted time.

The parties shall meet and confer to develop supplemental protocols for (a) allotting examination time to various parties or party groups and (b) determining order of examination of a witness.

Counsel representing parties in the Lead Actions shall be entitled to attend the deposition of any witness whose deposition is taken in a Coordinated Action. The Plaintiffs in all Coordinated Actions shall designate one counsel to examine the witness. One counsel representing the MDL Plaintiffs, one counsel representing the JCCP Plaintiffs, and one counsel representing both the MDL and JCCP Defendants shall each be permitted to ask questions and make objections during examination by other counsel.

**9. Objections**

Unless otherwise specified, an objection by a single defendant shall be deemed an objection by all defendants; similarly, an objection by a single plaintiff shall be deemed an objection by all plaintiffs unless otherwise specified. However, unless otherwise specified, (a) an instruction not to answer by one defendant shall not be deemed an instruction not to answer by all defendants and (b) an instruction not to answer by one plaintiff shall not be deemed an instruction not to answer by all plaintiffs.

The only objections allowed during the deposition are those for the following bases: form of the question, privilege (the nature and grounds for which must be stated succinctly on the record), or a limitation imposed by court order. All objections, except as to form, privilege, or a limitation imposed by a court order, shall be preserved for ruling by the MDL Court, JCCP Court, or the Court in the Coordinated Action at trial or other use of the deposition.

Counsel shall comply with Fed. R. Civ. P. 30(c)(2) and the Northern District of California Guidelines on Professional Conduct concerning objections at a deposition. Counsel shall not engage in colloquy in objecting to a question or responding to an objection. Any objections to an examiner's questions shall be made in a concise manner, and counsel shall not suggest an answer to the witness. The phrases "objection as to form," or similar language are sufficient and shall preserve all objections as to form and foundation until a party seeks to use a deposition. However, to determine whether there is a need to cure a defect in a question, counsel conducting the examination may ask the attorney lodging the

form or foundation objection to identify the specific defect. The response shall be stated succinctly and shall be limited to the legal grounds for the form objection (e.g., “lacks foundation” rather than “the witness didn’t work in that department and couldn’t possibly know the answer”). Counsel shall refrain from all comments that could be perceived as instructive to a witness, such as “you can answer if you understand the question” or “you can answer if you know.”

**10. Additional Provisions Relating to Corporate Witnesses**

The party producing a corporate witness pursuant to Rule 30(b)(6) and/or California Code of Civil Procedure § 2025.230 shall disclose the identity of that witness no later than 10 days before the deposition.

**11. Use of Exhibits and Documents During the Deposition**

Provided that plaintiffs notify the defendants at least 60 days in advance of the intended deposition of any present or former company employee of a Defendant whose custodial file has not been produced in its entirety, that Defendant will conduct a good-faith, reasonable search using search terms or other reasonable methods, and based on that search produce non-privileged, custodial file documents responsive to outstanding discovery requests at least 30 days in advance of the noticed deposition date. The Defendant will be obligated to produce only previously non-produced portions of the custodial file responsive to outstanding discovery requests if the Defendant’s prior production included metadata identifying the deponent as a custodian of the previously produced custodial file documents. The scope of discovery related to custodial files will be determined at least 45 days before the deposition, subject to prior orders of the Court; applicable rules of civil procedure; agreements of the parties regarding the sequence, timing, and methods of discovery, including document production; and, if necessary, court order resolving any dispute regarding the scope of production. Unless the Parties agree or a court orders otherswise, the Defendant shall have at least 30 days to produced non-privileged responseive documents following determination of the scope of discovery, but no later than 30 days before the deposition is noticed. The custodial file of that employee shall be produced 30 days in advance of the scheduled deposition to the address specified by plaintiffs’ counsel. If 100 or fewer pages are produced between 14 and 29 days prior to the scheduled deposition, the deposition shall proceed as scheduled. Any documents produced fewer than 14 days prior to the scheduled deposition must be delivered to the primary examiner,

if one has been designated by plaintiffs' counsel. If a primary examiner has not been designated, the documents shall be produced to the same address to which the previous documents were produced. The parties shall meet and confer regarding the impact, if any, of this production on the scheduled deposition. If the parties cannot agree, the matter shall be referred to the Courts for resolution pursuant to the protocol for Discovery Dispute Resolution set forth in Section 7 of the Joint Coordination Order.

Third-party witnesses subpoenaed to produce documents at a deposition shall be served with the document subpoena at least 30 days before a scheduled deposition, absent written agreement by the parties, time constraints due to orders by the Lead Actions' Court, or a shorter period authorized by the Lead Actions' Court. The requested documents shall be produced at least 14 days before the date noticed for the deposition. Any documents produced fewer than 14 days prior to the scheduled deposition must be delivered to the primary examiner, if one has been designated by plaintiffs' counsel. If a primary examiner has not been designated, the documents shall be produced to the same address to which the previous documents were produced. The parties shall meet and confer regarding the impact, if any, of this production on the scheduled deposition. If the parties cannot agree, the matter shall be referred to the Courts for resolution pursuant to the protocol for Discovery Dispute Resolution set forth in Section 7 of the Joint Coordination Order.

During the deposition, copies of documents about which counsel plan to examine the deponent shall be provided to counsel for the deponent and counsel for the other party participants. As a general rule, hard copies of the documents should be made available to the deponent, the deponent's attorney, and the principal examiners of the deponent. The documents may be provided to other attendees on electronic media such as USB drives or through a secure file sharing service. To the extent possible, all exhibits should have printed Bates or other document control numbers affixed before distribution, which shall remain constant throughout the litigation.

Counsel shall use best efforts to mark exhibits sequentially during each deposition and across depositions, consistent with Northern District of California Local Rule 30-2. All documents marked as exhibits will be attached to the original transcript and will be retained with the original transcript. The

court reporter for each deposition will include in each deposition transcript a list of the exhibits referenced in the deposition.

Objections to the relevance or admissibility of documents used as deposition exhibits are not waived, and are reserved for later ruling by the MDL or JCCP Court or the court in a Coordinated Action.

**12. Examination Concerning Confidential Information**

If a deponent is questioned about any document or exhibit stamped Confidential or Highly Confidential or the Information contained therein, persons to whom disclosure is not authorized under the Protective Order of this Court will be excluded from the deposition for that portion of the examination. Any portion of a deposition transcript containing Confidential Information or Highly Confidential Information shall be sealed so as not to waive confidentiality.

**13. Disputes During or Relating to Depositions**

All disputes regarding any matters arising under this Order, whether pertaining to a deposition in the Lead Actions or any Common Witness deposition in a Coordinated Action, shall be resolved pursuant to Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). Nothing in this Order shall deny counsel the right to suspend a deposition pursuant to Fed. R. Civ. P. 30(d)(3) and seek relief as set forth in Section 7 of the Stipulated Joint Coordination Order.

**14. Transcript and Time to Review Transcript**

Unless waived by the deponent, the deposition transcript shall be submitted to the deponent for correction and signature, and shall be corrected and signed within 45 days after the official transcript of the Court Report is made available to counsel for the party defending the deposition. This time period shall not be extended, absent good cause shown. Corrections to a deposition shall be listed on an errata sheet signed by the deponent and the court reporter shall serve copies of the errata sheet on all parties purchasing the transcript. Should the deponent fail to submit corrections within 45 days, the transcript will be presumed accurate, and all parties shall have the right to use the copy sent to the deponent as if it were final and signed with no corrections needed.

Counsel representing any party in the MDL or JCCP Proceeding or any Coordinated Action may obtain directly from the court reporter, at the requesting counsel's own expense, a transcript of any

deposition taken in the Lead Actions or in any other Coordinated Action, unless stated otherwise in this Order. The transcript of any deposition taken in the Lead Actions or a Coordinated Action shall not be used or disseminated except in accordance with the terms of this Order and the MDL Court's discovery orders.

**15. Use and Admissibility of Depositions**

Under the conditions prescribed in FED. R. CIV. P. 32(a) (1)- (4) CAL. C.C.P. § 2025.620; or as otherwise permitted by the Federal and California Rules of Evidence or the rules in the presiding jurisdiction, depositions taken in accordance with this order may be used against any party (including parties later added and parties in cases subsequently filed in any state court covered by this order, cases filed in, removed to or transferred to the federal court which is covered by this order; all of which are part of this litigation) who:

(a) was present or represented at the deposition; or

(b) had reasonable notice thereof; or

(c) within 30 days after the deposition is taken or within 45 days after becoming a party in one of the Lead or Coordinated Actions fails to show just cause why such deposition should not be used against such party.

This order does not address trial preservation depositions. Nor does it address the timing of any such trial preservation deposition. Such determinations shall be made in each coordinated proceeding.

**IT IS SO ORDERED.**

**DATE: May 20, 2020**



Hon. William H. Orrick
United States District Court Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>ALL ACTIONS | Case No. 19-md-02913-WHO<br><br>**CASE MANAGEMENT ORDER NO. 11: RE REMOTE DEPOSITIONS** |

The COVID-19 global pandemic has affected virtually every aspect of American society, including civil litigation in this Court and across the federal system. Governmental authorities have responded to this public health emergency by imposing travel restrictions, "stay at home" directives, and other social distancing measures designed to slow the communal spread of the disease. While the Parties may prefer to conduct in-person depositions in this litigation, social distancing restrictions and personal and public health concerns may sometimes preclude this option. Pursuant to Fed. R. Civ. P. 30(b)(4), this Court issues the following protocol to govern depositions where all, or most of the participants, including the court reporter and videographer, are attending remotely ("Remote Deposition").

1. Subject to all of the conditions below, depositions for cases filed in *In Re Juul Labs, Inc., Marketing, Sales Practices, And Products Liability Litigation*, Case No. 2:19-md-02913, may be noticed to take place remotely via video or internet video conference technology.

2. The protocols in this Order supplement Case Management Order No. 10 Deposition Protocol (Dkt. 573) and Case Management Order No. 9 Joint Coordination Order

(Dkt. 572). If the deposition protocols in this Order are deemed to conflict with any provisions in the Joint Coordination Order or Deposition Protocol, the protocols in this Order shall control.

3. The protocols in this Order shall apply to depositions of fact witnesses, including those taken pursuant to the Deposition Protocol, and supplement that Order. For the avoidance of doubt, this Order shall not apply to expert depositions. Protocols for remote depositions not covered by this Order will be set forth in future order(s).

4. Any Remote Deposition taken pursuant to this Court's Orders must comply with the requirements in Fed. R. Civ. P. 30(b)(5). This includes the requirements that, (1) "[u]nless the parties stipulate otherwise, a deposition must be conducted before an officer appointed or designated under Rule 28," and (2) that officer must administer the oath or affirmation to the deponent. A Remote Deposition taken pursuant to this Case Management Order will be deemed to have been taken before an appropriate officer despite the court reporter not being in the same physical location as the witness—as long as the court reporter attends the deposition by the same remote means as the other participants and is able to hear and communicate with other attendees. To the extent permitted by the law of the state in which the witness is located, the witness may be sworn in remotely with the same effect as an oath administered in person.

5. The deposition notice for any Remote Deposition pursuant to Fed. R. Civ. P. 30 must list the location(s) (city and state) from where the witness, the court reporter, and the videographer will attend.

6. All deposition notices must identify the company that will host and record the Remote Deposition (the "Remote Deposition Vendor") and contain a general description of how those attending may access the remote connection being utilized (e.g., GoToMeeting, Zoom, WebEx). The party noticing the deposition must provide the witness and all other attendees with detailed instructions regarding how to participate in the Remote Deposition at least three business days before the deposition—and will use best efforts to provide the detailed instructions at least five business days before the deposition. The noticing party shall bear the costs of the Remote Deposition Vendor, except that if another party objects to the technology proposed by the

noticing party, and the noticing party is amenable to use another technology proposed by the objecting party, the objecting party shall bear the costs of the technology proposed.

7. To host a Remote Deposition, a Remote Deposition Vendor must have implemented adequate security measures to ensure the confidentiality of the Remote Deposition (e.g., video and audio feeds, exhibits). These security measures include using tools such as a "virtual waiting room" that allows the court reporter to admit only individuals authorized to attend the deposition.

8. At least 24 hours before the Remote Deposition is scheduled to start, noticing counsel, defending counsel, the witness, and the Remote Deposition Vendor must conduct a test of the system, equipment, and internet connection that will be used to conduct the Remote Deposition (the "Remote Deposition Technology"). If a witness noticed for a Videoconference Deposition does not have a webcam-equipped tablet, desktop or laptop computer that can be used during the deposition, counsel defending the deposition must provide the deponent with an agreed-upon tablet, desktop, or laptop computer containing the audio, webcam, and Wi-Fi connectivity needed to participate in the deposition. If a witness noticed for a Videoconference Deposition is not being defended by counsel for any Party to this action, the Parties will confer regarding a reasonable method for providing the deponent with an agreed-upon tablet, desktop, or laptop computer containing the audio, webcam, and Wi-Fi connectivity needed to participate in the deposition.

9. At the time of the deposition, the witness must advise the court reporter of his or her physical location. The witness should endeavor to participate in the deposition from a quiet, well-lit, indoor location, while seated in front of a neutral background, and facing the camera being used to record the witness. Only the witness's counsel and in-house counsel is/are permitted to be in the same location as the witness during remote testimony, if the witness consents and such attendance is consistent with social distancing restrictions. Unless otherwise stipulated by the noticing party and counsel for the witness, the deponent participating in a Remote Deposition must participate through video conference (or other remote means capable of producing audio-video transmission), as opposed to telephone or other audio-only means, so that

the officer and noticing party may properly identify and observe the witness throughout the deposition.

10. If counsel for the witness attends the deposition in person, that counsel shall also log into the Remote Deposition, so that all participants can see and hear the counsel for the witness at all times that the deposition is being conducted on the record. Both counsel and the witness shall also comply with any government law, regulation or guidance regarding public health and safety during the COVID-19 pandemic.

11. To avoid any potential disruptions of a Remote Deposition, those attending must enable "do not disturb" settings for applications not in use, including but not limited to, Skype, instant messaging, and/or e-mail notifications. While on the record, the witness must put away and not look at devices other than the device(s) being used for the Remote Deposition. While on the record, there shall be no other programs displaying images on the witness's screen other than the agreed-upon Remote Deposition platform and any exhibits that have been marked for the deposition. The Court recognizes that the microphones for certain attendees (such as the witness, the court reporter, the attorney taking the deposition, and the attorney defending the deposition) must remain on when the deposition is on the record. Other attendees should mute microphones when not speaking. The participating attorneys may be visible to all other participants during the deposition.

12. Each witness, attorney, or other person attending the deposition, either remotely or in-person, shall be identified on the record by name and physical location at the beginning of the deposition (except for consulting experts). Any individual participating remotely should not do so in a public space. Participants should ensure that they are acting in compliance with the governing protective order. After the deponent has been sworn, the deponent must confirm that he or she has either powered down or, at a minimum, temporarily disabled the listening function on any Google Home, Amazon Echo, or any other known "listening devices" placed within listening distance of the deponent.

13. A videographer employed by the Remote Deposition Vendor will record the witness's deposition testimony, by the best technological means available, including remote video

capture/recording. The video recording of the deposition may only be suspended during the deposition upon stipulation by counsel conducting and defending the deposition. With the exception of the videographer and the court reporter, the deposition may not otherwise be recorded electronically without the consent of the Parties. The videographer must only record (1) the audio and video of the witness's testimony; (2) the video of any documents being displayed or annotated for the witness during the deposition; (3) the audio of the attorney actively questioning the witness; and (4) audio of the defending attorney not actively questioning the witness (or any other attorney making an objection on the record).

14. Acceptable Exhibit Formats: During the deposition, full and complete copies of deposition exhibits must be provided to the witness and counsel who are attending the deposition. Deposition exhibits may be made available in physical (hardcopy) form or via the Remote Deposition Technology, file sharing software, or other electronic means.

15. Electronic Exhibits: Exhibits provided electronically shall be accessible such that the deponent and counsel may review the entire exhibit on their own computers or devices, without reliance on the noticing attorney's "share screen." In the case of electronic exhibits, a witness may be required to use a keyboard, mouse, or other similar means to open and/or advance the pages of an exhibit. In such instances, access to a full copy of the deposition exhibit electronically via iPad, tablet, laptop, or other devices, will be deemed to equate to hardcopy access. The fact that a witness was provided with only an electronic copy of an exhibit will be an insufficient basis, by itself, to object to the admissibility of that exhibit at trial.

16. Hardcopy Exhibits: Notwithstanding the foregoing and only if agreed in writing by the participants in a particular deposition, all documents any attorney expects to use as exhibits at a deposition that exceed 100 pages shall be sent to the witness in advance of the deposition in hard copy form. In addition, the Parties agree to work in good faith to reach agreements regarding the provision of hard copy exhibits to a deponent for whom electronic-only versions are particularly problematic. To the extent hardcopy exhibits are provided to the deponent, the package containing the documents shall be sealed, and the witness shall unseal it only when asked to do so on the record at the deposition.

17. While the deposition is on the record, no person aside from the attorney conducting the examination is permitted to communicate with the witness directly or indirectly by any means not recorded in the same manner as the deposition itself (e.g., no private messages, text messages or emails). However, the witness's counsel may communicate with the witness in person, telephonically, or by other electronic means during breaks (including, but not limited to, by means of the use of remote connection software), consistent with Federal Rule of Civil Procedure 30(c)(1). To the extent that the Remote Deposition Vendor's technology includes a "chat" feature or similar capabilities, the noticing party shall ensure that the Remote Deposition Vendor either: (a) disables the feature or (b) implements settings (if available) that require all communications to be seen by all Participants. Nothing in this provision is to be read as prohibiting otherwise appropriate communications among participants and/or attendees by other means.

18. During breaks in the deposition, the Parties may use the breakout room feature provided by the Remote Deposition Vendor, which simulates a live breakout room through videoconference. Conversations in the breakout rooms shall not be recorded. The breakout rooms shall be established by the Remote Deposition Vendor prior to the deposition and controlled by the Remote Deposition Vendor.

19. Technical difficulties, including but not limited to pauses, lags, and/or interruptions in Internet connection shall be addressed as they would be in any in-person deposition. The Parties shall go off the record and attempt to resolve the issue. Technical difficulties will not result in waiver of objections by any party. If any pauses, lags, and/or disruptions are persistent or prolonged, the Parties should: (1) extend the Remote Deposition by an amount of time equal to the duration of the pause, lag, and/or disruption, provided that the additional time is less than an hour; or (2) consider rescheduling the Remote Deposition for a later date, if the additional time required is an hour or more.

20. Any Remote Depositions conducted in accordance with these protocols may be admitted at trial with the same effect and pursuant to the same evidentiary rules as one recorded in-person. The "Confidential" or "Highly Confidential" designation of all or portions of Remote

Depositions will be governed by the provisions MDL Protective Order and the Deposition Protocol (ECF Nos. 308, 573).

21. The Parties acknowledge that Remote Depositions may take longer to complete than an in-person deposition due to logistical challenges beyond anyone's control, and because it may take time for everyone to adjust to the technology. While the Parties will endeavor in good faith to comply with the time limits set forth in the Deposition Protocol, there may be circumstances under which depositions may need to exceed those limits. The Parties will be respectful and collaborative under these circumstances and will make good faith efforts to make reasonable accommodations to allow all Parties adequate additional time to conduct a fair examination. Nothing in this Order prevents a Party from moving for a protective order under Fed. R. Civ. P. 26(c) to require that a given individual deposition proceed in person. However, where a Remote Deposition has been requested by the deponent, the court reporter, or an attorney, an in-person deposition may not be conducted without leave of the court, pursuant to the procedures laid out in Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). Further, nothing in this Order precludes counsel for a witness from being in the same room as the witness, if the witness consents and such attendance is consistent with social distancing restrictions.

SO ORDERED, on this 21st day of August, 2020.

Judge William H. Orrick
UNITED STATES DISTRICT JUDGE