1

2

3

4                         UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    In Re: Juul Labs, Inc., Marketing, Sales          Case No.  19-md-02913-WHO
     Practices, and Products Liability Litigation
8                                                      **ORDER ON SECOND ROUND OF
                                                       MOTIONS TO DISMISS**
9
                                                       Re: Dkt. Nos. 1222, 1223, 1225, 1229,
10                                                     1397

11

12          Defendants in this multidistrict litigation are JUUL Labs, Inc. ("JLI"), the Altria group of

13   defendants ("Altria"), and the current and former JLI founders and directors ("Founder and

14   Director Defendants").[1]  Before me is their "second wave" of motions to dismiss claims asserted

15   in the Second Amended Consolidated Class Action Complaint ("SACAC") and in seven of the

16   Second Amended Public Entity Complaints ("SAPECs" or "Three Village/TVAC").

17          Plaintiffs assert a plausible theory to maintain their federal Racketeer Influenced and

18   Corrupt Organizations Act ("RICO") claims against Altria and the Founder and Director

19   Defendants.  That company and those persons allegedly conducted acts of mail and wire fraud in

20   connection with five related fraudulent schemes run through JLI as the RICO Enterprise.  The

21   schemes to defraud had the goals of growing the market of nicotine-addicts, most specifically

22   youth addicts, to ensure a new pipeline for Altria and to enrich the Founder and Director

23   Defendants.

24          With added allegations about Pritzker, Huh, and Valani's ("Other Director Defendants")

25   _____

26   [1] Defendants Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services LLC, Altria
     Group Distribution Company, and Altria Enterprises LLC, are referred to collectively as "Altria."
27   Defendants James Monsees, Adam Bowen, Nicholas Pritzker, Hoyoung Huh, and Riaz Valani, are
     referred to collectively as "Founder and Director Defendants" and as "Other Director Defendants"
28   or "ODD" when referring solely to Huh, Pritzker, and Valani.  Monsees joins Altria, Bowen, and
     the Other Director Defendants' motions to dismiss.  [Dkt. No. 1230].

United States District Court
Northern District of California

numerical control of the Board, knowledge about JUUL's youth appeal and the growth of underage users, significant involvement in marketing decisions, and unusually active roles in management and decisions from which they profited billions of dollars, plaintiffs sufficiently allege the Other Director Defendants' personal participation to maintain the RICO and state law claims asserted against them.  Personal jurisdiction is also proper given the Other Director Defendants' personal participation and their forum-related contacts as directors of a San Francisco-based company.  It appears that personal jurisdiction would exist for the same reasons in all cases, but I will restrict this result to the challenged complaints.

Finally, as noted in the Case Management Conference following the hearing on these motions, plaintiffs intended to file complaints on behalf of the 57 class representatives who had not yet filed a complaint with class action claims, mooting in large part JLI's motion to dismiss or strike those class representative claims for lack of subject matter jurisdiction.  However, the class action claims asserted under the laws of Delaware, the District of Columbia, Idaho and North Dakota will be dismissed without prejudice given the lack of any class representative who resides in those jurisdictions or otherwise confers subject matter jurisdiction over those claims.

For these reasons, the motions to dismiss are DENIED, except the class action claims arising under the laws of Delaware, the District of Columbia, Idaho, and North Dakota are DISMISSED without prejudice.

## BACKGROUND

In an order dated October 23, 2020 (October 2020 Order [Dkt. No. 1084]), I dismissed the substantive and conspiracy RICO claims against all defendants, finding that:

- (i) plaintiffs had not plausibly alleged the existence of an associated-in-fact distinct RICO Enterprise, separate and apart from the general business of JLI (*id*. at 38–46);

- (ii) plaintiffs had not plausibly alleged facts that Altria and third-party Veratad specifically joined that distinct Enterprise, as opposed to going into business with JLI to support the general business of JLI for their mutual benefit (*id*.);

- (iii) allegations that the Founder and Director Defendants had "final say" over advertising and marketing as part of their role on JLI's Board or on the Board's Executive Committee

were insufficient, although additional allegations about Bowen and Monsees' direct control

and involvement over the design, testing, marketing and initial rollout of the JUUL product

were sufficient to maintain their conduct in the RICO Enterprise (*id.* at 49–55)

- (iv) plaintiffs' allegations regarding Altria's efforts to secure shelf space for JUUL

    products, maintain flavored products on the market, and provide distribution and marketing

    services for JLI, were not sufficient to plausibly allege Atria was engaged in conduct

    directing or otherwise supporting the distinct Enterprise as opposed to Altria performing

    services in its own interest (*id*. at 55–56);

- and (v) plaintiffs failed to allege sufficient acts taken by Other Director Defendants

    showing an intent to engage in a scheme to defraud.  *Id*. at 58–59, 65.

Plaintiffs filed their Second Amended Consolidated Class Action Complaint (SACAC

[Dkt. Nos. 1135, 1249-2]) on November 30, 2020 and the government entities filed their Second

Amended Public Entity Complaints (SAPECs or Three Village/TVAC) on November 24, 2020.[2]

In those amended pleadings, plaintiffs put forward a new theory of RICO Enterprise and

additional allegations regarding the conduct of Altria, the Founder Defendants (Monsees and

Bowen), and the Other Director Defendants (Valani, Pritzker, and Huh).  With respect to the

RICO claim, plaintiffs now contend that JLI *is* the RICO Enterprise and that defendants "Pritzker,

Huh, Valani, Bowen, and Monsees controlled the JLI Enterprise—that is, they used JLI as the

_____

[2] The Tucson Unified School District − Arizona, No. 3:19-cv-07335-WHO [Dkt. No. 26]; County of Santa Cruz − California, No. 3:20-cv-02261-WHO [Dkt. No. 30]; The Livermore Valley Joint Unified School District − California, No. 3:19-cv-08176-WHO [Dkt. No. 22]; The School District of Escambia County − Florida, No. 3:20-cv-00459-WHO [Dkt. No. 37] ("Escambia"); The School Board of Broward County − Florida, No. 3:19-cv-08289-WHO [Dkt. No. 21] ("Broward"); Three Village Central School District − New York, No. 3:19-cv-07028-WHO [Dkt. No. 26] ("Three Village" or "TVAC"); and Central Bucks School District Bucks County − Pennsylvania, No. 3:19-cv-08023-WHO [Dkt. No. 21].

The same or materially similar allegations are made in each of the operative SAPECs.  Defendants generally refer to the factual allegations and legal claims asserted in the Three Village Amended Complaint (TVAC), but also challenge some of the state-specific claims raised by the government entities.

The factual allegations and bases of purported RICO liability in the SAPECs are materially similar to those in the SACAC, except for the allegations regarding the types of injuries and damages caused to the government entities.  Citations are to the SACAC, unless otherwise noted.

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1  vehicle through which an unlawful pattern of racketeering activity was committed—through their

2  roles as officers and directors of JLI."  SACAC ¶¶ 864–66.  Under this RICO theory, JLI cannot

3  be liable and only Monsees, Bowen, Pritzker, Huh, Valani, and Altria (the "RICO defendants") are

4  possibly liable.

5        Plaintiffs allege that the RICO defendants—through their control of JLI—engaged in the

6  following five schemes to defraud involving the use or wires and mail:  (i) the Fraudulent

7  Marketing Scheme, where defendants Bowen, Monsees, Pritzker, Huh, and Valani (Founder and

8  Other Director Defendants) directed and caused JLI to make false and misleading advertisements

9  that omitted references to JUUL's nicotine content and potency to be transmitted via the mail and

10 wires, including the Vaporized campaign, *id.* ¶¶ 897–909; (ii) the Youth Access Scheme, where

11 the Founder and Other Director Defendants "who controlled JLI acted individually and in concert

12 to expand youth access to JUUL products through schemes to mislead customers about the

13 products," *id.* ¶¶ 910–912; (iii) the Nicotine Content Misrepresentation Scheme, where the

14 Founders and Other Director Defendants and Altria (RICO defendants) "caused thousands, if not

15 millions, of JUUL pod packages to be distributed to consumers with false and misleading

16 information regarding the JUUL pods' nicotine content," *id.* ¶¶ 913–921; (iv) the Flavor

17 Preservation Scheme, where the RICO defendants "worked in concert to defraud the public and

18 deceive regulators to prevent regulation that would have impeded their plan to keep selling to

19 children" and "to ensure that the FDA allowed JUUL's mint flavor to remain on the market," *id.*

20 ¶¶ 922–929; and (v) the Cover-up Scheme, where "in light of growing public scrutiny of JLI's role

21 in the youth vaping crisis" the RICO defendants "continued their scheme to prevent a complete

22 ban on JLI's product by portraying JUUL as a smoking cessation device and denying that the

23 company ever marketed to youth."  *Id.* ¶¶ 930–950.

24        Plaintiffs allege that the RICO defendants "devised and knowingly carried out material

25 schemes and/or artifices to defraud the public and deceive regulators" by:

26        (1) transmitting advertisements that fraudulently and deceptively
        omitted any reference to JUUL's nicotine content or potency (or
27      any meaningful reference, where one was made); (2) causing false and
        misleading statements regarding the nicotine content of JUUL pods
28      to be posted on the JLI website; (3) causing thousands, if not millions,

4

> of JUUL pod packages containing false and misleading statements regarding the nicotine content of JUUL pods to be transmitted via U.S. mail; (4) representing to consumers and the public at-large that JUUL was created and designed as a smoking cessation device; (5) misrepresenting the nicotine content and addictive potential of its products; (6) making fraudulent statements to the FDA to persuade the FDA to allow mint flavored JUUL pods to remain on the market; and (7) making fraudulent statements to the public (including through advertising), the FDA, and Congress to prevent prohibition of JUUL cigarettes, as was being contemplated in light of JLI's role in the youth vaping epidemic.

*Id.* ¶ 955. Illustrative examples of the fraudulent statements conveyed through the mails and wires by, at the direction of, or under the control of the RICO defendants are identified in paragraph 959 of the SACAC and paragraph 868 of the TVAC. As before, a few of the identified statements at issue are attributed to a specific RICO defendant (Monsees and Bowen). The rest are attributed to JLI or Altria Client services generally, or to others employed by JLI or an Altria entity.

The allegations regarding the Founder Defendants (Monsees and Bowen) and the Enterprise are largely the same as in the prior Complaint (and that I found were adequate in the October 2020 Order). Plaintiffs provide more details in their allegations regarding Monsees and Bowen's roles in creating, testing, and then misrepresenting the addictiveness and nicotine levels delivered by the JUUL product with the specific aim of targeting youth. SACAC ¶¶ 870–883.

Plaintiffs again allege that the Founder Defendants and the Other Director Defendants (Pritzker, Valani, and Huh), through their roles as officers and directors, were able to "control the resources and instrumentalities of JLI and use that control to perpetrate" the fraudulent schemes identified above. *Id.* ¶ 865. Plaintiffs provided new allegations regarding the Other Director Defendants' numeric and collective control of the JLI Board during different phases of the Enterprise, from 2007 through their consolidation of power during the 2015-2017 "Executive Committee" period when they ran the company and including the Altria investment in December 2018. *Id.* ¶¶ 360–367, 886–888.[3]

Plaintiffs assert that "[a]s early as November 2014, Monsees, Pritzker, and Valani discussed 'the addiction issue' with JUUL" and worked on defining a strategy for how to frame

---

[3] Valani controlled two of the Board's seats through his investment in JLI. *Id.* ¶¶ 26, 360.

and market their product.  *Id.* ¶ 372.  For example, in January 2015, JLI's Board of Directors—then comprising of Monsees, Bowen, Pritzker, Valani, and Hank Handelsman (in Valani's second seat)—"met and discussed JLI's marketing," including the goal to win the "cool crowd," using influencers, social media, and the "planned partnership with the #1 youth media magazine, Vice." *Id.* ¶ 373.  Also in January 2015, Monsees, Bowen, Pritzker, and Valani discussed how to market JUUL's nicotine content, prompting JLI's Marketing Director and Scientific Affairs Director to seek "clarif[ication] in a follow-up meeting with [Bowen]" regarding "'direction from the board on their comfort level'" with the way nicotine was addressed in JLI's marketing.  *Id.* ¶ 374 (quoting email exchange).  Because Pritzker and Valani "controlled three of the five Board seats at that time," they had "veto power over the launch plans which included [] youthful advertising with no representations of nicotine content, yet they approved the marketing to go forward."  *Id.* ¶ 377.

By the summer of 2015, Huh and Alexander Asseily joined the Board.  *Id.* ¶ 363.  At that time, the Board had seven members: Monsees, Bowen, Valani, Pritzker, Handelsman, Huh, and Asseily.  *Id.*  Handelsman continued to occupy Valani's second seat.  *Id.*  Plaintiffs state that Pritzker, Valani, and Huh were more involved and exercised more control over the operations of JLI than is usual for corporate directors, and "also met far more frequently than is typical, with weekly Board calls in addition to monthly meetings."  *Id.* ¶ 369.  For example, in June 2015, the Other Director Defendants gave detailed feedback on the Vaporized marketing campaign, which led then–Chief Operating Officer Scott Dunlap to comment that "[o]ur board members are more involved than most."  *Id.* ¶ 368.  Pritzker, Valani, and Huh were involved at such a granular level that Dunlap worried that "the board [will] try and write copy" for branding materials.  *Id.*; *see also id.* ("Dunlap's efforts to wrestle control over marketing from Pritzker, Valani, and Huh failed—he was the first person fired when their Executive Committee began to clean house, as discussed below.").

In the months following JUUL's June 2015 launch, plaintiffs allege that the youth appeal of JUUL's marketing became a "common conversation" at the weekly Board calls.  *Id.* ¶¶ 363, 369.  "[E]arly signs of teenage use kicked off an internal debate," and while some company leaders argued for immediate action to curb youth sales, Huh, Pritzker, and Valani "argued the

United States District Court
Northern District of California

company couldn't be blamed for youth nicotine addiction[.]" *Id.* ¶ 379 (quoting Chris Kirkham, Juul Disregarded Early Evidence it was Hooking Teens, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.).  In October 2015, the debate was resolved in favor of selling to teens.  JLI's "highly sanitized" Board minutes do not reflect whether this debate was put to a vote, but plaintiffs contend that Huh, Pritzker, and Valani were the driving forces behind the decision and "pressed ahead with JUUL's youth-oriented Vaporized ad campaign through early 2016." *Id.* ¶ 382; *see also id.* (explaining that Valani's second board seat, occupied by Handelsman, would have given them a majority if a vote was necessary, regardless of Bowen's vote).

When Monsees stepped down as CEO in October 2015, the Other Director Defendants appointed themselves as an Executive Committee, "taking direct control of the company and marking critical decisions about how to market JUUL." *Id.* ¶¶ 394, 399.  Plaintiffs assert that the Executive Committee "had the final say over all day-to-day operations of the JLI business.  Huh, as Chairman, and Pritzker, as Co-Chairman of JLI, were involved in the management of the company on a weekly basis." *Id.* ¶ 886.  Huh was empowered to "make decisions on behalf of the [Board of Directors] Exec[utive] Comm[ittee]" and approved changes to JLI's "brand and collateral positioning on behalf of the board." *Id.* ¶¶ 385, 397–400.  "By December 2015, for example, the Executive Committee gave Pritzker and Huh supervisory responsibility for JLI employees.  Valani, for his part, was also an active Board member, involved in the management of the company on a weekly basis.  Dating back to 2011, Valani was a regular presence in JLI's offices, appearing in person at JLI's offices 'a couple times a week.'" *Id.* ¶¶ 400, 886.

Over the next year, until the installation of a new CEO in August 2016, the Other Director Defendants used their newly formed Executive Committee "to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public," to "over[i]de other board members' arguments that JLI's youth oriented marketing campaign should be abandoned or scaled back," to "direct[] the continuation of the marketing campaign that they knew was actively targeting youth," and to "clean[] house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company." *Id.* ¶¶ 39, 406, 886.  "On October 6, 2015, the day

7

after Pritzker, Valani, and Huh ousted Monsees as CEO and rejected suggestions to abandon the current youth-oriented marketing, Richard Mumby acknowledged in an email to Huh, Pritzker, and Valani that their seizing power would facilitate JUUL's growth" through its "sales strategy and integrating sales/marketing better." *Id.* ¶ 396. Plaintiffs contend that JLI's "sales strategy," as orchestrated by the Other Director Defendants, was the fraudulent scheme to market and sell JUUL products to children. *See, e.g.*, *id.* ¶¶ 380–82. Once their leadership was secure, the Other Director Defendants pressed for even "more aggressive rollout and [marketing]." *Id.* ¶ 401.

Even when JLI hired a new CEO in August 2016, plaintiffs assert that the Other Director Defendants' Executive Committee did not appear to have been dissolved as they continued to exercise control over and direct JLI's affairs. *Id.* ¶ 407; *see e.g.*, *id.* ¶ 408 (JLI's media plan put on hold in 2017 because the Board—then controlled by Pritzker, Valani, and Huh—did not approve); *id.* ¶ 412 (the Board reviewed sample marketing campaign materials in October 2017 and Pritzker rejected a specific proposal, noting that he "didn't like" the slogan); *id.* ¶ 416 (Valani edited a press release about JUUL's "Comprehensive Strategy to Prevent Underage Use" and sent his redline to the CEO); *id.* (CEO sought approval from Valani and Pritzker on a specific advertising campaign; Valani approved only certain videos).

Altria allegedly joined and contributed to the RICO Enterprise prior to finalizing its investment in December 2018 "by sharing data and information and coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes." *Id.* ¶ 8. Plaintiffs state that Altria's investment in JLI "was not merely a financial proposition, but a key element of Defendants' plan to stave off regulation and public outcry and keep their most potent and popular products on the market." *Id.* Altria and Altria Client Services specifically began conspiring with Pritzker and Valani to "direct the affairs of JLI as early as Spring 2017." *Id.* ¶ 865. They conspired to achieve the best financial outcome for Pritzker and Valani personally, and for Altria as an entity. *Id.* ¶ 891.

Altria supported the "nicotine content misrepresentation scheme" (along with the Founder and Director Defendants) by "caus[ing] thousands, if not millions, of JUUL pod packages to be distributed to consumers with false and misleading information regarding the JUUL pods' nicotine

United States District Court
Northern District of California

content." *Id*. ¶¶ 913, 920.  It also supported the "flavor preservation scheme" by "working together [with JLI] on flavor strategy as early as September 2017" when JLI met with "representatives of Altria Client Services to plan a strategy for responding to the FDA's proposed regulation of flavors in e-cigarettes.  This plan would be coordinated through Avail Vapor, LLC, a company partially owned by Altria."  *Id*. ¶ 923.  Altria also allegedly made statements in October 2018 in coordination with JLI in order to preserve "mint" as a flavor on the market and to help JLI deliver thousands of mint-flavored pods in 2019.  *Id*. ¶¶ 6, 892, 926–28.

Altria then participated in the alleged "cover up scheme" when Altria and JLI adopted the "'Make the Switch' campaign to mislead consumers into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions."  *Id*. ¶ 5.  Altria worked with JLI and the Founder and Director Defendants to conceal "the results of studies that revealed that JUUL products were far more powerfully addictive than was disclosed" to stave off regulation of the JUUL product.  *Id*. ¶¶ 5, 8, 943, 949.

On this second round of motions, Altria again moves to dismiss the RICO claims asserted against the Altria-entities, challenging the sufficiency of the revised RICO enterprise allegations and Altria's alleged role in and control of the Enterprise, as well as the sufficiency of the government entities' allegations regarding RICO injury and causation.  Altria Mot. [Dkt. No. 1223].[4]  Bowen moves to dismiss, arguing that the RICO Enterprise, predicate act, and conspiracy allegations are fatally deficient.  Bowen Mot. [Dkt. No. 1229].  The Other Director Defendants move to dismiss all claims based on plaintiffs' failure to allege facts showing that these three "personally participated" in any wrongdoing, that a RICO Enterprise exists, and that they knowingly joined and conducted affairs of that RICO Enterprise.  ODD Mot. [Dkt. No. 1222].

---

[4] As directed, plaintiffs provided some additional allegations regarding the roles in the fraudulent schemes performed by different Altria defendants.  *See, e.g.*, SACAC ¶¶ 15–21.  On this round of motions, the Altria entities do not argue that plaintiffs have failed to adequately differentiate between the Altria entities, but preserves their prior objections.  Altria Mot. at 4 n.4.

Altria also moved to dismiss the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), unfairness claims asserted against it in the SACAC, but pursuant to the parties' stipulation, plaintiffs voluntarily dismissed the UCL claim against Altria.  [Dkt. No 1352].

1    They also move to dismiss the state law claims because the SACAC fails to allege UCL and unjust

2    enrichment claims against them and the SAPECs fail to allege public nuisance, negligence, and

3    consumer protection claims against them.  *Id.*  They separately argue that there is no personal

4    jurisdiction over Pritzker and Valani for non-California actions and no personal jurisdiction over

5    Huh for non-Florida actions.  *Id.*  Finally, JLI (on behalf of itself and the other defendants) moves

6    to dismiss or strike with prejudice the claims of 27 state subclasses and 57 putative class

7    representatives for lack of subject-matter jurisdiction.  JLI Mot. [Dkt. No. 1397].[5]

                                   **DISCUSSION**[6]

8

9    **I.     ADEQUACY OF AMENDED RICO ALLEGATIONS**

10          **A.     Enterprise Allegations**

11          In the October 2020 Order, I recognized that plaintiffs' then-existing allegations failed to

12   "plausibly allege[] the existence of a distinct Enterprise, separate and apart from the general

13   business of JLI," and that there was "too little to plausibly allege that Veratad and Altria

14   specifically joined that distinct Enterprise, as opposed to going into business with JLI to support

15   the general business of JLI for their mutual benefit."  October 2020 Order at 44–45.  Plaintiffs

16   assert that they have cured those deficiencies by designating JLI as the Enterprise through which

17   the RICO defendants—Monsees, Bowen, Pritzker, Valani, Huh, and the Altria entities—carried

18   out their pattern of fraudulent RICO activity.[7]  *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529,

19   1534 (9th Cir. 1992) ("[T]he inability of a corporation to operate except through its officers is not

20

21   _____

      [5] JLI moved to dismiss plaintiffs' Breach of Implied Warranty Claim under Cal. Com. Code §
22   2314(2)(f) asserted only against JLI.  [Dkt. No. 1225].  Pursuant to the parties' stipulation,
      plaintiffs voluntarily dismissed that claim, leaving only a breach claim under Cal. Com. Code §
23   2314(2)(c) that JLI does not challenge on this round of motions.  [Dkt. No. 1352].

24   [6] The October 2020 Order sets forth the legal standards applicable to this motion.  I will not repeat
      them here.

25   [7] By naming JLI as the enterprise and not as a RICO defendant, plaintiffs avoid the distinctness
26   problem that created a hurdle on the last round of motions.  *See Cedric Kushner Promotions, Ltd.
      v. King*, 533 U.S. 158, 164 (2001) (finding the individual corporate defendant was a "person"
27   distinct from the corporation "enterprise" and subject to liability under RICO; finding no
      distinctiveness problem in a "claim that a corporate employee is the 'person' and the corporation
      is the 'enterprise'" as opposed to a "claim that a corporation was the 'person' and the corporation,
28   together with all its employees and agents, were the 'enterprise'").

United States District Court
Northern District of California

an impediment to section 1962(c) suits. That fact poses a problem only when the corporation is the named defendant—when it is both the "person" and the 'enterprise.' In this case, however, Sever named the several individual officers as defendants/persons, and APC as the enterprise. Therefore, he has satisfied this allegation requirement.").

For this theory, plaintiffs rely on *DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001), where the plaintiff alleged that specific public officials, private individuals, and corporations used a town as a RICO enterprise to carry out their illegal activity (including illegally impeding plaintiff's development). The Second Circuit concluded that the jury was able to determine that the:

> separate and distinct assortment of public officials, private individuals and corporations who used their political power to influence the Town of Delaware's exercise of governmental authority over the plaintiffs' development. From the evidence adduced at trial, there was sufficient evidence from which a reasonable jury could conclude that the named defendants were separate, culpable parties and that the alleged enterprise, the Town of Delaware, was the "passive instrument or victim of [their] racketeering activity."

*Id.* at 307 (quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)).

Defendants contend that plaintiffs cannot allege that JLI is a RICO Enterprise—a company unwittingly used as a vehicle for fraudulent schemes by the RICO defendants—while at the same time alleging fraud-based state law claims against JLI. Altria Mot. at 7–10; Bowen Mot. at 1–2; ODD Mot. at 17–19. Given plaintiffs' numerous claims against JLI itself, defendants argue that plaintiffs' reliance on *DeFalco* is misplaced. They place particular emphasis on the Second Circuit's recognition that the jury "could have reasonably found that the Town of Delaware was a 'passive instrument' through which the defendants wielded power for their personal benefit and, accordingly, was a RICO enterprise." *DeFalco*, 244 F.3d at 309. They argue that given plaintiffs' state law claims against the corporation, JLI could not be a mere "passive instrument" and victim because of its express involvement in illegal activities.

Plaintiffs respond that JLI's direct role in fraudulent activities (as alleged in their state law claims) does not preclude a finding that JLI was also the RICO Enterprise through which the RICO defendants operated. They point to their extensive allegations describing how the RICO

United States District Court
Northern District of California

defendants conducted the alleged RICO schemes to grow the youth market and nicotine addiction market generally in order to enrich themselves (acting primarily in their own self-interests and not primarily in JLI's interests) by soliciting through "back channels" and then consummating the Altria investment.  SACAC ¶¶ 43, 52–53, 55, 510, 513, 517–19.  That deal made the individual RICO defendants collectively billions of dollars and gave Altria a firm footing to ensure future sales to nicotine addicts through JLI and its own traditional product lines, in particular to the now-expanded youth market.  *Id.* ¶¶ 50, 510, 513, 517, 548.  As plaintiffs note, numerous cases have accepted that "corporate officers/employees, . . . may properly be held liable as persons managing the affairs of their corporation as an enterprise through a pattern of racketeering activity."  *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc*., 46 F.3d 258, 261 (3d Cir. 1995).[8]

Defendants rely on *Fitzgerald v. Chrysler Corp*., 116 F.3d 225 (7th Cir. 1997).  There, the Seventh Circuit rejected a RICO theory where Chrysler was only "a large, reputable manufacturer deal[ing] with its dealers and other agents in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental, differing not at all from what it would be if these agents were the employees of a totally integrated enterprise, the manufacturer plus its dealers and other agents (or any subset of the members of the corporate family) do not constitute an enterprise within the meaning of the statute."  *Id*. at 228.  In this case, however, plaintiffs are not alleging that the corporation conspired with its dealers or other distant "agents" to conduct the RICO Enterprise.

Neither *DeFalco* nor *Fitzgerald* answers the question posed here.  Whether the facts of this case eventually align with the "prototypical RICO case" where a "person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person" by "channeling his criminal activities through the enterprise," or the

---

[8] In *Healthguard of Lancaster, Inc. v. Gartenberg*, CIV.A. 02-2611, 2004 WL 632722, at *7 (E.D. Pa. Mar. 5, 2004), relied on by Altria, the court explained that the *Jaguar Cars* opinion affirmed "that the distinctiveness requirement was satisfied when officers and employees of the corporation operate and manage a legitimate corporation and use it to conduct a pattern of racketeering activity" where, as here, "the enterprise and the defendants" are not identical.

1    "step away from the prototypical case" where "the criminal uses the acquired enterprise to engage

2    in some criminal activities but for the most part is content to allow it to continue to conduct its

3    normal, lawful business—and many of the employees of the business may be unaware that it is

4    controlled and being used by a criminal," or reaches too far beyond either of those scenarios, is

5    better determined on a full factual record.  *See Fitzgerald*, 116 F.3d at 227.[9]

6            Plaintiffs' more detailed allegations regarding the RICO defendants' achievement of the

7    goals that were primarily sought to advance their self-interests, and not necessarily or primarily to

8    advance JLI's interests, are adequate to support the plausibility of the theory that JLI was the

9    separate RICO Enterprise.  Absent apposite caselaw, at this juncture plaintiffs can treat JLI as the

10   RICO Enterprise despite its own fraudulent conduct.  At summary judgment, that issue as well as

11   whether the RICO defendants were operating merely in the "ordinary course" of JLI's business or

12   were pursuing separate Enterprise goals through JLI may be revisited.

13           **B.      Altria's RICO Conduct**

14           Altria's motion argues that the SACAC still fails to allege facts showing that it plausibly

15   joined the individual RICO defendants in the then-existing RICO Enterprise and that it thereafter

16   "directed" the RICO Enterprise.  As noted above, in the SACAC plaintiffs allege that Altria

17   "joined" the Enterprise prior to December 2018 by "sharing data and information and coordinating

18   marketing activities, including acquisition of key shelf space next to top-selling Marlboro

19   cigarettes."  SACAC ¶¶ 5, 8, 543.  These allegations are consistent with but more detailed than the

20

21   ---
     [9] In *Ferrari v. Mercedes-Benz USA, LLC*, 15-CV-04379-YGR, 2016 WL 7188030, at *4 (N.D.

22   Cal. Dec. 12, 2016), the court dismissed the RICO enterprise allegations against directors because
     "distinct from their simply being officers of the alleged enterprise at the time, the SAC does not

23   allege with specificity the predicate acts of wire fraud and mail fraud, or specifics about how [the
     Directors] participated in that conduct."  That was the deficiency in the last round of motions that,

24   as discussed below, plaintiffs have rectified.  Nor is this still a case where the corporation (JLI) is
     a RICO defendant.  Therefore, defendants' line of cases rejecting RICO allegations where "the

25   defendant 'person' is a corporation and is alleged to have engaged in an enterprise with its
     officers, employees, and agents" is not persuasive.  *See, e.g., Ray v. Spirit Airlines, Inc*., 836 F.3d

26   1340, 1356 (11th Cir. 2016).  Nor are the cases discussing the sufficiency of the "distinctiveness"
     allegations necessary to allege an associated-in-fact RICO Enterprise.  *See, e.g., D.M. Robinson

27   Chiropractic, S.C. v. Encompass Ins. Co. of Am*., 10 C 8159, 2013 WL 1286696, at *9 (N.D. Ill.
     Mar. 28, 2013) ("[T]he shared goal of financial profit, by each party conducting its own business,

28   does not qualify as a 'common purpose' under RICO" to adequately identify "an organization with
     a common purpose separate from the predicate acts themselves.").

United States District Court
Northern District of California

1   allegations in the prior Consolidated Class Action Complaint.  More significantly, plaintiffs now

2   shore up their allegations that Altria's December 2018 investment in JLI "was not merely a

3   financial proposition, but a key element of Defendants' plan to stave off regulation and public

4   outcry and keep their most potent and popular products on the market."  SACAC ¶¶ 8, 44, 50, 510.

5   Plaintiffs contend that Altria and Altria Client Services specifically began conspiring with

6   defendants Pritzker and Valani to "direct the affairs of JLI as early as Spring 2017," working

7   through back channels to achieve the best financial outcome for Pritzker and Valani personally

8   and for Altria as an entity (including access to and continued growth of the now-expanded youth

9   market and control of JLI).  *Id.* ¶¶ 507–527, 555, 587, 589, 865, 891.

10          Plaintiffs also assert that Altria specifically joined and helped direct three of the fraudulent

11  schemes being carried out by the RICO Enterprise: the "nicotine content misrepresentation"

12  scheme, by causing "thousands, if not millions, of JUUL pod packages to be distributed to

13  consumers with false and misleading information regarding the JUUL pods' nicotine content," *id.*

14  ¶¶ 913, 920; the "flavor preservation" scheme, when the RICO defendants with representatives of

15  Altria Client Services planned a strategy for responding to the FDA's proposed regulation of

16  flavors in e-cigarettes and coordinated (through Avail Vapor, LLC) to keep the mint flavor on the

17  market, *id.* ¶¶ 6, 892, 923, 926–928; and the "cover up" scheme, when Altria and the other RICO

18  defendants adopted the "'Make the Switch' campaign to mislead consumers into thinking that JLI

19  products were benign smoking cessation devices, even though JUUL was never designed to break

20  addictions." *Id.* ¶¶ 5, 59.  Altria achieved that control by working with the other RICO defendants

21  both before and after December 2018, but especially after the December 2018 investment that

22  gave Altria sufficient influence to direct the Board to conceal "the results of studies that revealed

23  that JUUL products were far more powerfully addictive than was disclosed" and to stave off

24  regulation of the JUUL product.  *Id.* ¶¶ 5, 8, 943, 949.  Finally, plaintiffs have added facts to

25  support their allegation that Altria, once it finalized its December 2018 investment, was not a mere

26  service provider to JLI but instead a "strategic partner" that had significant influence if not direct

27  control over the Board and management of JLI.  *Id.* ¶¶ 552–569, 587, 589.

28          These more detailed allegations clear the plausibility threshold to show that Altria joined

United States District Court
Northern District of California

14

the alleged Enterprise and played "some part" in directing and controlling it.  While Altria

characterizes its motives for the JLI acquisition and its provision of its "best-in-class"

infrastructure" and other services to JLI as "routine" and not independently fraudulent or

otherwise in knowing support of the RICO schemes, and disputes the context and gloss plaintiffs

place on some of the communications from Altria executives,[10] the allegations are plausible and

may be tested at summary judgment or trial.  Similarly, if, and more particularly when, Altria

joined the Enterprise is likewise better tested on a full evidentiary record.[11]

### C.    Bowen's RICO Conduct and Pattern of Predicate Acts

Bowen separately argues that the allegations of his "conduct" of the Enterprise are

insufficient because at most they show that he acted in support of his own interest, as opposed to

the interests of the Enterprise.  However, as noted in the October 2020 Order, the allegations

regarding Bowen's participation, at least in the design and misrepresentation of JUUL as a

particularly addictive product, were sufficient to show his own RICO conduct.  That plaintiffs

identify JLI as the Enterprise itself does not change that outcome.  October 2020 Order at 50.

In addition, as discussed below, in the SACAC plaintiffs have provided more specifics and

more weight to their allegations that JLI's Board—throughout the time when Bowen was a

member—was intimately and unusually involved in the day-to-day operations of JLI, including

during the initial rollout of the product and the marketing campaigns.  *See, e.g.*, SACAC ¶¶ 316,

---

[10] For example, whether Altria's communications with the FDA support plaintiffs' theory (that Altria wanted to appear to be concerned about youth vaping by agreeing that pod-based products like JUUL were contributing to that epidemic, but its ulterior motive was to preserve mint on the market so that sales would be unhindered when the JLI investment was cemented) or Altria's theory (that its communications show its concern over pod-based products and youth vaping and its intent to compete with its non-pod-based products) cannot be resolved at this juncture.  The same is true for the parties' disputes about the context and meaning of the negotiation documents, as well as the roles and influence of Altria executives Crosthwaite and Murillo with respect to JLI's Board and management.

[11] Altria also requests that I "re-visit whether the public entities allege RICO injury and proximate causation against [them]."  Altria Mot. at 24.    The SAPECs allege that they have suffered damage directly to their physical property and, as I held before, "that suffices to confer standing."  October 2020 Order at 73; *see, e.g.*, TVAC ¶¶ 726–28  (alleging that hazardous products have been wrongfully disposed of as regular waste in the Three Village schools and littered on Three Village property, and that Three Village has to make physical modifications to its property by installing e-cigarette detectors, cameras, and anti-vaping signs around its property).  I will not revisit this argument.

United States District Court
Northern District of California

372–373, 376-379, 391.   The SACAC also offers more details tying the acts of Bowen (and the Other Director Defendants) to the Enterprise's aim at securing a huge payout that was primarily in their interest and not as much in JLI's interest.  *Id*. ¶¶ 41, 513, 517.  That is sufficient for Bowen with respect to RICO conduct, especially considering the reframing of the RICO Enterprise from one associated-in-fact to JLI being the Enterprise.  Whether the allegedly fraudulent schemes identified by plaintiffs and Bowen's conduct in support is simply evidence of Bowen conducting the routine affairs expected from a founder and the Chief Technology Officer of JLI *or* of his racketeering acts in support of a RICO enterprise is better determined on a full evidentiary record.

Somewhat separately, Bowen argues that the SACAC does not allege sufficient facts showing that he conducted the affairs of the Enterprise through a pattern of racketeering activity. He believes that would require allegations that he personally committed a series or criminal acts through JLI.  He is mistaken.

Plaintiffs are not required to show that each RICO defendant including Bowen *personally* committed at least two acts of mail or wire fraud to establish a pattern of racketeering.  As noted in the October 2020 Order, it is only necessary that plaintiffs allege that each defendant knowingly participated in the scheme to defraud, with the requisite intent, and that some member or members of the Enterprise commit at least two acts of  mail or wire fraud.  October 2020 Order at 64 (relying on *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) & *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig*., MDL 2672 CRB (JSC), 2017 WL 4890594, at *13 (N.D. Cal. Oct. 30, 2017)).  That showing has been made for Bowen, given his alleged extensive involvement in the fraudulent schemes conducted by the Enterprise and the pattern of fraudulent acts discussed in the October 2020 Order.[12]

---

[12] Despite the conclusions reached in the October 2020 Order, Bowen spends a significant portion of his motion challenging plaintiffs' showing of predicate acts of mail and wire fraud by arguing the identified statements: (i) are not material; (ii) are statements not specifically made by the RICO defendants; (iii) are protected statements of opinion; (iv) are statements not made in furtherance of the identified RICO schemes; (v) are not actionable omissions given Bowen's lack of duty to the recipients; and (vi) as too vague to be actionable.  Bowen Mot. at 3–11.  I will not revisit or address arguments multiple times unless I have granted leave for reconsideration after an appropriately filed noticed motion.

United States District Court
Northern District of California

### D.      Other Director Defendants' RICO Conduct

The Other Director Defendants again move to dismiss, arguing that the allegations still do not adequately allege that they conducted the affairs of the Enterprise or knowingly participated in a scheme to defraud.  They assert that plaintiffs have not identified a single actionable Board vote on youth marketing or anything else at issue in this case.  ODD Mot. at 5.  Their prior pleading did not contain an "allegation of a Board vote or other *action* identified," nor did it "identify any specific items proposed by the defendant Directors together or by one specific Director and then approved through their numeric or other control over the full Board."  October 2020 Order at 53 (emphasis supplied).  "Without identification of specific acts taken by the [Founder and Director Defendants] on the Board (or perhaps a plausibly supported allegation that marketing was controlled through the Board) and the defendants' actual, numerical control of the Board, the very general 'final say' allegation" that plaintiffs offered before were "insufficient as a hook for conduct of the Enterprise."  *Id.* at 50.

Failure to allege a Board vote does not doom plaintiffs' claims.[13]  As detailed above, the SACAC adds sufficient allegations regarding the Other Director Defendants' *actions*, including their actual and numerical control of the Board in conjunction with plausibly supported allegations that significant marketing decisions were run through the Board and that the Board was more involved in the direct management of JLI than is typical.

Plaintiffs state that the Other Director Defendants controlled a majority of the seats on JLI's Board throughout the events underlying this suit and that they then used their control of JLI to take charge of marketing JUUL products.  *See* SACAC ¶¶ 24–26, 38–42, 360–406.  For example, before JUUL's launch, Pritzker and Valani led Board discussions about how to market JUUL and the product's nicotine content, dictating specific goals for the company's messaging, giving "direction . . . on [the Board's] comfort level with" the way nicotine was addressed in JLI's

---

[13] The Other Director Defendants argue that plaintiffs cannot excuse their failure to allege any specific action by the Board by calling the Board minutes "highly sanitized," a conclusory allegation that they contend does not comport with Rule 9(b).  ODD Mot. at 5 (quoting SACAC ¶ 382).  Plaintiffs respond that the allegation need not meet the requirements of Rule 9(b) because they do not allege that the sanitizing of Board Minutes was itself fraudulent conduct.  Rather, they offered the allegation to explain why the underlying fraudulent conduct is not reflected in the minutes.

marketing, including dictating specific language, and reviewing and approving marketing materials for JUUL's launch, despite the obvious youth appeal and lack of nicotine warning. *Id.* ¶¶ 361, 372–77. After JUUL's launch, the youth appeal of JUUL's marketing became a "common conversation" at the weekly Board meetings (now including Huh). *Id.* ¶¶ 363, 369. While some at the company wanted to take "immediate action to curb youth sales," Huh, Pritzker, and Valani disagreed, claiming that "the company couldn't be blamed for youth nicotine addiction." *Id.* ¶ 379 (quoting Chris Kirkham, Juul Disregarded Early Evidence it was Hooking Teens, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.).[14] When Monsees stepped down as CEO, the Other Director Defendants appointed themselves as an Executive Committee to run JLI in place of a CEO, using their direction and control to help JLI grow through its sales strategy, including a scheme to market and sell JUUL products to children. *Id.* ¶¶ 380–82, 396.

Plaintiffs also describe the Other Director Defendants' involvement in each of the alleged schemes: the "fraudulent marketing" and "youth access" schemes, by using their control of the Board to take charge of the affairs of the JLI Enterprise, controlling aspects of JLI's marketing and branding that included obvious youth appeal and lack of nicotine warning, and dismissing efforts to "curb youth sales," *id.* ¶¶ 38–42, 372–80, 897–912; the "nicotine misrepresentation" scheme, by directing and approving the distribution of thousands of JUUL pods with packaging containing nicotine content misrepresentations and other marketing materials, including JLI's website, which transmitted the same fraudulent statements, *id.* ¶¶ 197–215, 913–16; the "flavor preservation" scheme, by bringing Altria into the Enterprise through back-channel negotiations and working with Altria to preserve the mint JUUL pods on the market, *id.* ¶¶ 52–53, 621–38, 648–54, 924; and the "cover-up" scheme, by directing JLI's response to public scrutiny over youth vaping, including efforts to debunk studies regarding youth usage of JUUL and to push a sham youth prevention

---

[14] The Other Director Defendants point out that the entire quote from the article reads: "They argued the company couldn't be blamed for youth nicotine addiction *because it did not intentionally advertise or sell to teens*, said the manager, who had direct knowledge of the internal discussions." ODD Mot. at 12 (emphasis added). Whether the second part of that statement is accurate with respect to the efforts of the Director Defendants, however, is in dispute. What is not in dispute is that the company at various points claimed it did not intentionally market to youth.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   campaign, and by directing the content for the cover-up "Make the Switch" campaign. *Id.* ¶¶ 414–

2   418, 936–39.

3          The Other Director Defendants argue that many of the allegations plaintiffs offer are not

4   specifically tied to youth marketing and amount to nothing more than "routine business conducted

5   by the Directors as a consequence of their positions on the Board."  ODD Mot. at 12 (quoting

6   October 2020 Order at 54).  For example, they argue that the document plaintiffs cite for the

7   assertion that Pritzker, Valani, and Huh pressed for even "more aggressive rollout and

8   [marketing]" relates to a cannabis strategy that was never pursued.  SACAC ¶ 401; ODD Mot. at 7

9   n.7.  Similarly, the allegation that Pritzker and Valani gave direction on which slogan and video to

10   use relates solely to the "Make the Switch" campaign that occurred well-after plaintiffs allege the

11   Other Director Defendants used JLI to target youth.  SACAC ¶¶ 412, 216; ODD Mot. at 10, 12.

12   While these allegations may not directly relate to youth marketing, they plausibly support the

13   assertion that marketing was controlled or to some extent directed through the Board under the

14   direction of the defendant Board members.  This assertion, in conjunction with allegations that the

15   Other Director Defendants numerically controlled the Board and, at the very least, had knowledge

16   of the youthful appeal of JUUL marketing materials and the growth of youth sales, plausibly

17   establishes the Other Director Defendants' personal participation in wrongdoing.

18          Further assertions show how the Other Director Defendants were more involved and

19   exercised more control over the operations of JLI than is usual for corporate directors.  *See, e.g.*,

20   SACAC ¶ 400 (Pritzker and Huh were "in the office" to "help manage [] people"); *id.* ¶¶ 402–405

21   ("Monsees[] deferred heavily to Huh as the decisionmaker during [the Executive Committee]

22   period," including responding to potential investors); *id.* ¶ 409 (Valani supervised plans to sell

23   JUUL devices in vending machines, asking for early design images and constructs); *id.* ¶¶ 410–11

24   (Pritzker dictated specific changes to the content on JUUL's corporate website and evaluated

25   potential names for JUUL's parent company, ensuring that if the new name were to appear on any

26   packaging, the JUUL brand name would still be the most prominent); ¶ 413 (Pritzker was

27   personally involved in customer service issues); *id.* ¶ 414 (Pritzker and Valani closely controlled

28   JLI's public relations and media, including directing a "specific and personal response" to an

1   email from a teacher addressing youth use in schools and providing a  "detailed messaging

2   strategy and action items to respond to [] negative press").

3        While the Other Director Defendants contest the context and meaning of some of the

4   documents plaintiffs rely on to show the control and direction of JLI by these  Board members

5   (either individually or though the Executive Committee), as well as the alleged "unusually high"

6   level of Board member participation in the day-to-day management of JLI (particularly with

7   respect to marketing), those disputes cannot be resolved at this juncture.  The Other Director

8   Defendants also argue that plaintiffs simply repeat allegations that I previously found "insufficient

9   to connect each Other Director Defendant to the direction or control of any unfair acts or youth-

10  targeted marketing acts," including allegations that they helped "manage people," made comments

11  about the youthfulness of JLI's branding, and pushed for "more aggressive rollout."  ODD Mot. at

12  7 (quoting October 2020 Order at 93) (ruling on UCL claims).  But plaintiffs offer more

13  allegations and details than before, including about the unusually active roles the Other Director

14  Defendants played and the control they seized in those roles, all of which cumulatively supports

15  the assertion that these defendants  controlled and directed aspects of youth-targeted marketing.

16  Contrary to the Other Director Defendants' contention, these allegations are not conclusory simply

17  because plaintiffs have not cited to a specific Board vote formally approving youth-targeted

18  marketing.

19       Finally, the Other Director Defendants repeat their argument from the last round of

20  motions that all that has been alleged is that they have acted in the corporate interest of JLI and not

21  in any separate interest of the RICO Enterprise.  But plaintiffs have added allegations regarding

22  the efforts of the Founder and Director Defendants to primarily enrich themselves through the

23  Altria deal (negotiated in part through "back channels") and not primarily to enrich JLI.  SACAC

24  ¶¶ 498, 513, 517–519, 548–549.  At this stage, that is sufficient.

25        In sum, the allegations in the SACAC regarding the Other Director Defendants' RICO

26  conduct are plausible.

27       **E.      Conspiracy**

28       Bowen and the Other Director Defendants also challenge the adequacy of the RICO

20

conspiracy allegations. Their argument is based on plaintiffs' inability to allege their substantive

RICO claim. I have rejected that argument and so the defendants' challenge to the RICO

conspiracy claim likewise fails. *See, e.g., Howard v. Am. Online Inc*., 208 F.3d 741, 751 (9th Cir.

2000) ("To establish a violation of section 1962(d), Plaintiffs must allege either an agreement that

is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a

violation of two predicate offenses.").

Altria, Bowen, and the Other Director Defendants' motions to dismiss the RICO claims are

DENIED.

## II.      STATE LAW CLAIMS

The Other Director Defendants move to dismiss the UCL and unjust enrichment claims in

the SACAC and the public nuisance, negligence, and consumer protection claims in the SAPECs.

The personal participation allegations discussed above are sufficient to pin liability on the Other

Director Defendants for these claims too. Their remaining arguments have either been resolved by

the October 2020 Order or are premature at this stage.

### A.      Consumer Claims

#### 1.      UCL

The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair,

or (3) fraudulent. Cal. Bus. & Prof. Code § 17200. Each "prong" of the UCL provides a separate

and distinct theory of liability. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th

Cir. 2007). Plaintiffs assert causes of action against the Other Director Defendants under the

unfair and fraudulent prongs. SACAC ¶¶ 797–98.

"[L]iability can lie against an officer or director who either personally commits a tort or,

relevant here, personally commits the alleged UCL act or was sufficiently responsible for the

commission of that act through his personal direction or action that he may be held personally

liable." October 2020 Order at 91. Plaintiffs' UCL claim against the Other Director Defendants

was previously dismissed because "[m]ore specific allegations [were] needed to plausibly allege

UCL conduct." October 2020 Order at 94. As discussed above, plaintiffs have added sufficient

allegations about the level of direction and control (including numerical control of the Board) that

United States District Court
Northern District of California

1    each Other Director Defendant had.  These allegations, coupled with assertions that each Other

2    Director Defendant knew about JUUL's youth appeal and the growth of underage users, are

3    sufficient to establish their personal participation, direction, or control over the alleged UCL acts.

4          The Other Director Defendants separately argue that the UCL claim fails because plaintiffs

5    do not allege cognizable theories of equitable relief.  ODD Mot. at 20.  They contend that they are

6    not subject to restitution because such a remedy "requires both that money or property have been

7    lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other."

8    *Phillips v. Apple Inc.*, 725 F. App'x 496, 498 (9th Cir. 2018) (quoting *Kwikset Corp. v. Superior

9    Ct.*, 51 Cal. 4th 310, 336 (2011)).  They raised that argument before, and while I had "serious

10   concerns whether restitution could be appropriate against these [Founder] and Director

11   Defendants," I found that "if plaintiffs are able to amend to state UCL claims against the Other

12   Director Defendants," the restitution issue would be "more appropriately addressed on a full

13   evidentiary record, based on evidence regarding exactly how the [Founder] and Director

14   Defendants were compensated and as a result of what guarantees, metrics or other compensation

15   structures were in place."  October 2020 Order at 99.

16         Plaintiffs add allegations explaining how the Other Director Defendants positioned JLI for

17   acquisition by Altria and the millions or billions of dollars they ultimately made as a culmination

18   of those efforts.  *See* SACAC ¶¶ 41–42, 548.  The Other Director Defendants argue that those

19   funds came from Altria, not plaintiffs, and so cannot support a claim for restitution.  ODD Mot. at

20   20 n.18.  As noted in the October 2020 Order, plaintiffs "simply need to allege that [defendants]

21   obtained money (or property) and that plaintiffs lost money or property as a result of defendants'

22   unfair practices."  October 2020 Order at 97 (citing *Cabebe v. Nissan of N. Am., Inc.*, No. 18-CV-

23   00144-WHO, 2018 WL 5617732, at *5 (N.D. Cal. Oct. 26, 2018)).  Plaintiffs have done that here,

24   at least for pleading purposes.  It is unclear how far the caselaw stretches the concept of "indirect

25   benefit" to officers and directors of large corporations as opposed to closely held ones, but, as I

26   held before, "I will determine how far my 'broad discretion' to award restitution . . . may stretch

27   and what restitution should be awarded" on a full evidentiary record.  October 2020 Order at 99.

28

United States District Court
Northern District of California

### 2.       Unjust Enrichment

The Other Director Defendants similarly move to dismiss the unjust enrichment claim on grounds that plaintiffs fail to plead entitlement to restitution.  ODD Mot. at 21.  As with the UCL restitution issue, "what enrichment defendants received as a result of illegal or unfair conduct and whether it would be unjust for them to keep it is better determined on a full record showing the payment each [Founder] and Director Defendant received from JLI as a result of what guarantees, metrics, or other compensation structures."  October 2020 Order at 101.[15]

The Other Director Defendants' motion to dismiss the UCL and unjust enrichment claims in the SACAC is DENIED.

### B.       Government Entity Claims

### 1.       Public Nuisance

"A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf."  October 2020 Order at 115 (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985)); *see id.* at 115 n. 80–81 (each state at issue on these motions has applied a similar individual liability theory and has recognized individual liability for a public nuisance tort in particular).  The Other Director Defendants move to dismiss the public nuisance claims for failure to allege "their roles in creating and maintaining the public nuisance of the youth vaping epidemic."  ODD Mot. at 21 (quoting October 2020 Order at 115).

The government entities have fixed this deficiency in the SAPECs, which largely resemble the SACAC allegations discussed above.  They plausibly plead how each Other Director Defendant played a key role in directing JLI's youth marketing, leading to the public health crisis at issue.  The SAPECs add sufficient allegations regarding the Other Director Defendants' actual and numerical control of the Board and plausibly support the assertion that they managed the day-

---

[15] Plaintiffs point out that they also seek nonrestitutionary disgorgement.  *See* SACAC ¶ 853, Prayer for Relief ¶ D.  The Other Director Defendants question whether I would have authority to grant a *nonrestitutionary* remedy on a theory that is synonymous with *restitution*.  ODD Reply [Dkt. No. 1463] at 18 n.25.  This issue has not been properly raised or argued by parties and I will not decide it now given that plaintiffs have sufficiently alleged entitlement to restitution.

United States District Court
Northern District of California

1    to-day operations of JLI, particularly with respect to marketing.  *See, e.g.*, TVAC ¶¶ 28–30, 39–

2    43, 369–415.

3          Despite my prior ruling on the matter, the Other Director Defendants attempt to relitigate

4    whether the government entities' public nuisance claims are essentially product liability claims

5    under the guise of nuisance law and whether they have sufficiently alleged interference with a

6    public right.  ODD Mot. at 44 n.21.  They cite a recent decision by a Colorado state court

7    dismissing the State of Colorado's public nuisance claim against JLI and holding that the sale of

8    JUUL products cannot constitute a public nuisance under Colorado law.  *See id.*, Ex. B (Order at

9    8, *Colorado v. JUUL Labs, Inc.*, No. 20-CV-32283 (D. Ct. Colo. Dec. 14, 2020)).  Nothing in that

10   decision leads me to revisit my prior ruling that the government entities' public nuisance claims do

11   not sound in product liability law, particularly in light of the extensive case law cited in my Order.

12   *See* October 2020 Order at 107–10; *see, e.g.*, *In re Nat'l Prescription Opiate Litig. – Muscogee

13   (Creek) Nation*, 2019 WL 2468267, at *29 (N.D. Ohio Apr. 1, 2019), *report and recommendation

14   adopted in part, rejected in part,* 2019 WL 3737023 (N.D. Ohio Jun. 13, 2019) ("These

15   allegations make clear that the claimed nuisance is the alleged consequence of the Defendants'

16   conduct and not the opioid product itself."); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1210–14 (9th Cir.

17   2003) (finding the complaint "does not allege that the guns in question were defectively designed

18   or manufactured or that the defendants failed to affix an adequate warning on the guns"; rather, the

19   public nuisance claim "rest[ed] on the defendants' actions in creating an illegal secondary market

20   for guns," conduct that plaintiffs alleged "unreasonably interfered with public safety and health").

21              **2.    Negligence**

22         The school districts (not Santa Cruz County) bring claims for negligence and gross

23   negligence.  As with public nuisance, the school districts contend that corporate officers and

24   directors may be liable in negligence where they "authorized, directed or participated in the

25   allegedly tortious conduct."  October 2020 Order at 131 (quoting *Frances T. v. Vill. Green Owners

26   Assn.*, 42 Cal. 3d 490, 508 (1986)).

27         I previously dismissed negligence claims against the Other Director Defendants because

28   "[a]lthough the school districts plausibly allege[d] that Pritzker, Huh, and Valani, also knew about

United States District Court
Northern District of California

24

1    the youth-targeted marketing, they [did] not allege[] enough to establish what negligent acts each

2    did, whether individually or collectively, to create or support the youth e-cigarette crisis."  October

3    2020 Order at 131.  The added personal participation allegations in the SAPECs now plausibly

4    support the theory that the Other Director Defendants' actions put them in the foreseeable zone of

5    risk.  The policy factors in the relevant states also weigh in favor of finding a duty based on these

6    allegations.

7         The Other Director Defendants separately argue that the negligence claims fail as a matter

8    of law because plaintiffs improperly seek economic damages from corporate directors.  ODD Mot.

9    at 22 (citing *U.S. Liability Insurance Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 595 (1970)).[16]  I

10   previously rejected this argument because "recent California law demonstrate[s] a shift away from

11   *Haidinger-Hayes* and that an employee, working within the scope of their employment, could be

12   held liable in tort for pecuniary losses."  October 2020 Order at 131 n.85 (quoting *Nasrawi v. Buck*

13   *Consultants, LLC*, 776 F. Supp. 2d 1166, 1177 (E.D. Cal. 2011)).  The Other Director Defendants

14   now cite  a 2013 (unpublished) California state court opinion that they argue reaffirmed

15   *Haidinger–Hayes* and held that corporate directors are "not personally liable for economic

16   damages caused by any negligent acts" they "commit[] in the course and scope of [their] corporate

17   duties."  *OMNEL v. Tanner*, No. C070907, 2013 WL 3357886, at *6 (Cal. Ct. App. Jul. 3, 2013).

18        This single citation is unpersuasive.  In *Nasrawi*, the court initially found that the corporate

19   defendant "could not be held liable for action taken within the course and scope of his

20   employment where those acts are alleged to have caused only economic injury."  *Nasrawi*, 776 F.

21   Supp. 2d at 1176–77.  But it later determined that "recent California law demonstrated a shift

22   away from *Haidinger–Hayes* and that an employee, working within the scope of their

23   employment, could be held liable in tort for pecuniary losses."  *Id.* at 1176 (citing *Bear Valley*

24   *Fam. v. Bank Midwest, N.A.*, No. ED CV 10-905, 2010 WL 3369600, at *4 (C.D. Cal. Aug. 23,

25   2010) and finding it "persuasive authority given the review and application of related Ninth

26

27   [16] As noted in the October 2020 Order, the school districts' losses are not "purely economic" because they have also suffered physical property damage in the form of hazardous waste,

28   removal of bathroom doors, and other alterations to school property, although "[t]he gravamen of the school districts' complaints clearly involves economic losses."  October 2020 Order at 125.

1    Circuit and California law").  As another recent example, *EduMoz, LLC v. Republic of*

2    *Mozambique*, No. CV1302309MMMCWX, 2015 WL 13697385 (C.D. Cal. Apr. 20, 2015)

3    similarly rejected the individual defendants' argument that the economic loss doctrine barred

4    negligence claims asserted against them.  The court clarified that the "*Haidinger-Hayes* Court did

5    not hold that a plaintiff had to suffer personal injury or property damage . . . to sue the officer in

6    tort"; rather "[i]t held that '[l]iability imposed upon agents for active participation in tortious acts

7    of the principal ha[s] been *mostly* restricted to cases involving physical injury, not pecuniary harm,

8    to third persons.'"  *Id.* at 10 n.83 (quoting *Haidinger-Hayes*, 1 Cal.3d at 595 (emphasis added)).

9    ### 3.    Statutory Consumer Protection

10       Some of the school districts bring additional statutory consumer protection claims.  Three

11   Village brings claims under New York's consumer protection statute, sections 349 and 350 of the

12   New York General Business Law ("GBL"), and Broward and Escambia bring claims under

13   Florida's consumer protection statute, the Florida Deceptive and Unfair Trade Practices Act

14   ("FDUTPA").  The Other Director Defendants move to dismiss these claims for failure to allege

15   their personal participation in wrongdoing.  ODD Mot. at 23.

16       These claims involve the same sufficient personal participation allegations discussed

17   above.  These allegations go beyond "mere awareness of control" and establish that the Other

18   Director Defendants were "direct participant[s]" in violative acts.  *See Reynolds v. Lifewatch, Inc.*,

19   136 F. Supp. 3d 503, 526 (S.D.N.Y. 2015); *Aboujaoude v. Poinciana Dev. Co. II*, 509 F. Supp. 2d

20   1266, 1277 (S.D. Fla. 2007).

21       The Other Director Defendants' motion to dismiss the public nuisance, negligence, GBL

22   and FDUTPA claims is DENIED.

23   ## III.    PERSONAL JURISDICTION

24       Pritzker and Valani move to dismiss the non-California actions against them, asserting that

25   there is no personal jurisdiction over them for any action or claim arising outside of California.

26   ODD Mot. at 23–24.  Similarly, Huh moves to dismiss all non-Florida actions asserted against

27   him, arguing that there is no personal jurisdiction over him for any action or claim arising outside

28   of Florida.  *Id.*

United States District Court
Northern District of California

1    The Ninth Circuit employs a three-part test to determine whether there is specific

2    jurisdiction over a defendant: (i) the non-resident defendant must purposefully direct his activities

3    to the forum; (ii) the claim must be one which arises out of or relates to the defendant's forum-

4    related activities; and (iii) the exercise of jurisdiction must comport with fair play and substantial

5    justice, *i.e.*, it must be reasonable.  October 2020 Order at 147 (citing *Schwarzenegger v. Fred*

6    *Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).

7        I previously found that the personal participation allegations against the Other Director

8    Defendants were insufficient, "[b]ut assuming the government entities are able to add sufficient

9    allegations on amendment, the first prong would also be satisfied as to them."  October 2020

10   Order at 149–50.  The Other Director Defendants argue that the personal participation allegations

11   remain insufficient because, to support the exercise of personal jurisdiction, plaintiffs must show

12   that each director was a "primary participant[]" in the wrongdoing intentionally directed at the

13   forum.  ODD Mot. at 24.

14       The caselaw the Other Director Defendants cite is distinguishable.  Those cases did not

15   offer the kind of personal participation allegations that plaintiffs now state in their amended

16   complaints and which I find sufficient for personal jurisdiction purposes.  *See, e.g.*, *Stewart v. Am.*

17   *Ass'n of Physician Specialists, Inc.*, No. 5:13-CV-01670-ODW, 2014 WL 2011799, at *7–8 (C.D.

18   Cal. May 15, 2014) (no personal jurisdiction where the complaint generally referred to conduct of

19   the entire Board of Directors but failed to allege "sufficient facts to demonstrate [] personal

20   participation" by individual directors); *Microsoft Corp. v. Gulfcoast Software Sols., LLC*, No.

21   C14-1851RSM, 2016 WL 4543231, at *5 (W.D. Wash. Jan. 4, 2016) (purposeful direction prong

22   not satisfied where plaintiff "generally contend[ed] that [individual defendant] 'managed,

23   supervised and controlled every aspect of his company's actions in relation to this case'").

24       The second prong of the jurisdictional analysis is satisfied because the claims directly arise

25   out of and relate to the Other Director Defendants' forum-related contacts.  With the first two

26   factors established, the burden shifts to the Other Director Defendants to present a "compelling

27   case" establishing that the exercise of jurisdiction over them is unreasonable.  *Levi Strauss & Co.*

28   *v. J. Barbour & Sons Ltd.*, No. 3:18-CV-03540-WHO, 2019 WL 1117533, at *4 (N.D. Cal. Mar.

United States District Court
Northern District of California

27

11, 2019) (citation omitted).  As before, the Other Director Defendants "make no particularized argument that litigating cases outside of their home states would pose a hardship or other burden on them."  October 2020 Order at 150.

The Other Directors' motion to dismiss for lack of personal jurisdiction is DENIED.  It appears that personal jurisdiction would exist for the same reasons in all cases, but at this stage I will restrict my personal jurisdiction ruling to the challenged complaints.[17]

## IV.    DEFENDANTS' MOTION TO DISMISS OR STRIKE SUB-CLASS CLAIMS

JLI on behalf of all defendants moves to strike or dismiss with prejudice the claims of 27 state subclasses and 57 putative class representatives from the SACAC for lack of subject-matter jurisdiction because the 57 state sub-class representatives had not, as of the date of JLI's motion, filed "underlying" separate complaints asserting claims under their particular state's laws and because there are no class representatives who reside in four jurisdictions (Delaware, the District of Columbia, Idaho, and North Dakota).  Defendants note that plaintiffs stipulated that they would file the underlying complaints by February 2, 2021.  *See* Stipulation and [Proposed] Order to Extend Deadlines Regarding the Filing of Individual Underlying Class Action Complaints and Motions to Dismiss Subclass Claims and Claims of Proposed Class Representatives for Lack of Subject-Matter Jurisdiction [Dkt. No. 1218].  I entered that stipulation on January 4, 2021.  [Dkt. No. 1219].[18]

In response, plaintiffs explain that while they disagree that they are required to file underlying complaints for each set of state laws at issue, they agreed to do so in the December stipulation [Dkt. No. 1218] to avoid further motion practice.  However, in January they informed defendants that they would likely not be able to meet the February 2, 2021 deadline given the parties' continued disagreement over whether the underlying complaints could be direct filed in this District.  That issue was not resolved until January 22, 2021.  *See* Declaration of Dena Sharp

---

[17] Plaintiffs alternatively argue that pendent personal jurisdiction is also available based on the sufficient RICO allegations.  I need not reach that issue given my ruling above.

[18] When this issue was raised on the prior round of motions to dismiss, I declined to address it and directed the parties to meet and confer in an attempt to agree to a process to resolve the issue by agreement or by separate motion.  October 2020 Order at 101.

United States District Court
Northern District of California

[Dkt. No. 1481-1] ¶ 5.  At that juncture plaintiffs did not have sufficient time to draft and file the underlying complaints, but defendants were unwilling to provide another extension and proceeded with this motion to dismiss.  *Id.* ¶¶ 6–7.  With respect to the separate issue of the lack of class representatives who reside in Delaware, the District of Columbia, Idaho, and North Dakota, plaintiffs contend that there is no need to dismiss those state law claims now, as representativeness can be determined on class certification under Rule 23 and need not be determined on motions to dismiss.

Not satisfied by plaintiffs' commitment, made in their opposition, to file the underlying complaints within days, defendants argue that plaintiffs' intent to file underlying complaints is too little too late (given the stipulation and Order) and contend that these claims should be dismissed because of plaintiffs' unreasonable delay.  Defendants also assert that they have been prejudiced because to determine the strength of plaintiffs' claims and venue choices, the defendants need to know where each class representative's case would have been filed but for the Direct Filing Order and that information has been and is still missing for the 57 cases at issue.  JLI Reply on Jurisdiction [Dkt. No. 1557] at 4.

At the hearing on these motions and confirmed in the Minute Order following that hearing [Dkt. No. 1617], I accepted plaintiffs' representations that they would file the missing underlying 57 complaints on behalf of the class representatives and ordered them do to so by April 1, 2021. That resolves that issue.

I agree with defendants that the class claims asserted under the laws of Delaware, the District of Columbia, Idaho, and North Dakota can and should be dismissed at this juncture. Plaintiffs ask me to wait, relying on the Ninth Circuit's decision in *Melendres v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015), where the court recommended the "class certification approach" of deferring until class certification the issue of class representatives' ability to represent the claims of absent class members.  But that case was addressing a different question; namely, the ability of named plaintiffs to represent absent class members who were subjected to different types of unconstitutional searches.

A number of my colleagues have expressly addressed and declined to follow *Melendres*

and rejected at the motion to dismiss stage absent class member claims arising under state laws where no class member resided or was harmed.  *See, e.g.*, *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 19-MD-02918-MMC, 2020 WL 6270948, at *3 (N.D. Cal. Oct. 23, 2020) (dismissing state law claims that lacked a class representative for lack of standing at motion to dismiss stage; distinguishing *Melendres*); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 909 (N.D. Cal. 2019) (JSW) (same); *In re Glumetza Antitrust Litig.*, C 19-05822 WHA, 2020 WL 1066934, at *10 (N.D. Cal. Mar. 5, 2020) (same); *but see Staley v. Gilead Sciences, Inc.*, 446 F. Supp. 3d 578, 622 (N.D. Cal. 2020) (EMC) (applying *Melendres* and deferring standing until class certification); *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Products Liability Litigation*, 295 F. Supp. 3d 927 (N.D. Cal. 2018) (EMC) (same).  I have also dismissed class claims for lack of subject-matter jurisdiction in other cases where there was admittedly no class representative with standing to raise those state law claims.  *See, e.g.*, *Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1175–76 (N.D. Cal. 2017) (addressing class representative standing for non-California claims at motion to dismiss stage).

I look at this question on a case by case basis.  I might feel differently if plaintiffs lacked sufficient time or resources to locate suitable class representatives.  But that is not the case here, where the initial class action was filed more than three years ago, the MDL was formed more than 18 months ago, and there are scores of talented, experienced plaintiffs' counsel.  There is no reason to delay ruling now where there are no class representatives for three states and the District of Columbia.

## CONCLUSION

The motions to dismiss are DENIED, except that the class claims asserted under the laws of Delaware, the District of Columbia, Idaho, and North Dakota are DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

Dated: April 13, 2021

William H. Orrick
United States District Judge