1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8

9

10                     UNITED STATES DISTRICT COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12                       SAN FRANCISCO DIVISION

13

14   IN RE JUUL LABS, INC., MARKETING,        Case No. 19-md-02913-WHO
     SALES PRACTICES, AND PRODUCTS
15   LIABILITY LITIGATION                     **PLAINTIFFS' MOTION FOR CLASS
                                              CERTIFICATION**
16   ─────────────────────────────
                                              **Judge:    Hon. William H. Orrick**
17   This Document Relates to:                **Date:     September 24, 2021**
     CLASS ACTIONS                            **Time:     TBD**
18                                            **Ctrm.:    2**

19

20

21

22              **PROVISIONALLY FILED UNDER SEAL**

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... iii

GLOSSARY OF KEY TERMS ...................................................................................... xi

SUMMARY OF CLAIMS AND CLASSES .................................................................. xii

NOTICE OF MOTION AND MOTION ....................................................................... xiii

I.      INTRODUCTION ............................................................................................... 1

II.     CLASS PLAINTIFFS' ALLEGATIONS ........................................................... 2

        A.      Defendants' Conduct............................................................................... 2

        B.      Plaintiffs' Claims .................................................................................... 4

        C.      The Proposed Classes.............................................................................. 5

III.    ARGUMENT ...................................................................................................... 6

        A.      Legal Standard ........................................................................................ 6

        B.      The Classes Satisfy Rule 23(a) .............................................................. 7

                1.      Numerosity.................................................................................... 7

                2.      Commonality................................................................................. 7

                3.      Typicality...................................................................................... 9

                4.      Adequacy ...................................................................................... 9

        C.      The Classes Satisfy Rule 23(b)(3)........................................................ 11

                1.      Common Issues Predominate for Each of Plaintiffs' Claims.................... 11

                        a.      Nationwide RICO Claim................................................. 12

                                1.      Enterprise and Predicate Acts ........................... 13

                                2.      Injury ................................................................. 13

                                3.      Causation........................................................... 18

                        b.      California Fraud Claims: UCL, CLRA, and FAL Claims ........... 19

                                1.      Consumer Deception and Materiality ............... 19

                                2.      Reliance.............................................................. 22

                                3.      Damages............................................................. 28

                        c.      California Common Law Fraud Claim ........................... 31

                        d.      California UCL Unfair Conduct: Youth Marketing.................... 32

                                1.      Unfairness. ......................................................... 32

                                2.      Causation............................................................ 34

                                3.      Damages.............................................................. 35

e.     California Unjust Enrichment .......................................................... 37

f.     California Implied Warranty of Merchantability and
Magnuson-Moss Warranty Act Claims......................................... 39

2.     A Class Action Is the Superior Method of Adjudicating the Claims
of the Proposed Classes................................................................. 41

D.     The Classes Are Based on Objective Criteria and Are Ascertainable .................. 42

E.     The Denial of Class Certification in Other Nicotine Product Cases Does
Not Compel a Similar Result in This Case ............................................................ 42

F.     In the Alternative, the Court Can Certify Plaintiffs' Claims Under Rule
23(c)(4)................................................................................................................... 45

IV.     CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Akootchook v. U.S.*
  271 F.3d 1160 (9th Cir. 2001) ................................................................. 10

*Alger v. FCA US LLC*
  334 F.R.D. 415 (E.D. Cal. 2020) ............................................................. 10

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*
  568 U.S. 455 (2013) ........................................................................... 6, 30

*Andren v. Alere, Inc.*
  2017 WL 6509550 (S.D. Cal. Dec. 20, 2017) .......................................... 10

*Beck-Ellman v. Kaz USA, Inc.*
  283 F.R.D. 558 (S.D. Cal. 2012) ............................................................. 37

*Bellinghausen v. Tractor Supply Co.*
  303 F.R.D. 611 (N.D. Cal. 2014) ............................................................. 40

*Benedict v. Hewlett-Packard Co.*
  314 F.R.D. 457 (N.D. Cal. 2016) ............................................................. 10

*Blackie v. Barrack*
  524 F.2d 891 (9th Cir. 1975) ................................................................... 30

*Bradach v. Pharmavite, LLC*
  735 F. App'x 251 (9th Cir. 2018) ............................................................. 22

*Brazil v. Dole Packaged Foods, LLC*
  660 F. App'x 531 (9th Cir. 2016) ............................................................. 14

*Brickman v. Fitbit, Inc.*
  2017 WL 5569827 (N.D. Ca. Nov. 20, 2017) .......................................... 31

*Bridge v. Phoenix Bond & Indem. Co.*
  553 U.S. 639 (2008) ......................................................................... 13, 18

*Briseno v. ConAgra Foods, Inc.*
  844 F.3d 1121 (9th Cir. 2017) ................................................................. 41

*Broomfield v. Craft Brew Alliance, Inc.*
  2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ............................. 16, 19, 31

*Cameron v. Tomes*
  990 F.2d 14 (1st Cir. 1993) ..................................................................... 10

*Clay v. Cytosport, Inc.*
  2016 WL 6082314 (C.D. Cal. Oct. 18, 2016) ............................................. 5

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Cleary v. Philip Morris USA, Inc.*
4
   265 F.R.D. 289 (N.D. Ill. 2010) ............................................................................ 42

*Clemens v. DaimlerChrysler Corp.*
5
   534 F.3d 1017 (9th Cir. 2008) ............................................................................. 39

6

*Colgan v. Leatherman Tool Group, Inc.*
7
   135 Cal.App. 4th 663 (2006) ............................................................................... 35

8

*Colgate v. Juul Labs, Inc.*
   402 F. Supp. 3d 728 (N.D. Cal. 2019) ............................................................. 33, 39

9

*Comcast Corp. v. Behrend*
10
   569 U.S. 27 (2013) .............................................................................................. 35

11

*Cottrell v. AT&T Inc.*
   2020 WL 4818606 (N.D. Cal. Aug. 19, 2020) ..................................................... 37

12

*Craft v. Philip Morris Co.*
13
   190 S.W.3d 368 (Mo. Ct. App. 2005) .................................................................. 43

14

*Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*
   984 F.3d 595 (8th Cir. 2020) ........................................................................... 8, 18
15

16

*Daniel v. Ford Motor Co.*
   806 F.3d 1217 (9th Cir. 2015) ............................................................................. 21

17

*Ebner v. Fresh, Inc.*
18
   838 F.3d 958 (9th Cir. 2016) ............................................................................... 22

19

*Edwards v. First Am. Corp.*
   798 F.3d 1172 (9th Cir. 2015) ............................................................................... 7

20

*Ehret v. Uber Techs., Inc.*
21
   148 F. Supp. 3d 884 (N.D. Cal. 2015) ................................................................. 23

22

*Ellis v. Costco Wholesale Corp.*
   657 F.3d 970 (9th Cir. 2011) ......................................................................... 6, 7, 9

23

*Ellsworth v. U.S. Bank, N.A.*
24
   2014 WL 2734953 (N.D. Cal. June 13, 2014) ...................................................... 37

25

*Farar v. Bayer AG*
   2017 WL 5952876 (N.D. Cal. Nov. 15, 2017) .................................................. 7, 42

26

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*
27
   326 F.R.D. 592 (N.D. Cal. 2018) ............................................................. 20, 22, 44

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Fletcher v. Sec. Pac. Nat'l Bank*
   23 Cal. 3d 442 (1979) ........................................................................... 34

*FTC v. Commerce Planet, Inc.*
   815 F.3d 593 (9th Cir. 2016) ................................................................ 29

*Grace v. Apple, Inc.*
   328 F.R.D. 320 (N.D. Cal. 2018) ............................................... 32, 33, 35

*Guido v. L'Oreal, USA, Inc.*
   2013 WL 3353857 (C.D. Cal. July 1, 2013) ............................... 29, 39, 40

*Hadley v. Kellogg Sales Co.*
   2019 WL 3804661 (N.D. Cal. Aug. 13, 2019) ...................................... 20

*Hadley v. Kellogg Sales Co.*
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) ........................................ passim

*Hanlon v. Chrysler Corp.*
   150 F.3d 1011 (9th Cir. 1998) ........................................................ 7, 9, 11

*Hemi Group, LLC v. City of New York, N.Y.*
   559 U.S. 1 (2010) ............................................................................. 18, 19

*Hinojos v. Kohl's Corp.*
   718 F.3d 1098 (9th Cir. 2013) .............................................................. 19

*In re Adobe Sys. Privacy Litig.*
   66 F. Supp. 3d 1197 (N.D. Cal. 2014) ............................................... 8, 32

*In re Apple AT&T iPad Unlimited Data Plan Litig.*
   2012 WL 2428248 (N.D. Cal. June 26, 2012) ...................................... 27

*In re Arris Cable Modem Consumer Litig.*
   327 F.R.D. 334 (N.D. Cal. 2018) ......................................................... 22

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg, Sales Pracs., and Prods. Liab. Litig.*
   295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................... 15, 18, 43, 44

*In re Facebook, Inc. Internet Tracking Litig.*
   956 F.3d 589 (9th Cir. 2020) ............................................................... 37

*In re JUUL Labs, Inc. Mktg., Sales Pracs., and Prods. Liab. Litig.*
   2020 WL 6271173 (N.D. Cal. Oct. 23, 2020) .................................. passim

*In re JUUL Labs, Inc. Mktg., Sales Pracs., and Prods. Liab. Litig.*
   396 F. Supp. 3d 1366 (J.P.M.L. 2019) ................................................. 41

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Lidoderm Antitrust Litig.*
2017 WL 679367 (N.D. Cal. Feb. 21, 2017)...............................................42

*In re Light Cigarettes Marketing Sales Practices Litigation*
271 F.R.D. 402 (D. Me. 2010) ...................................................................42

*In re Mercedes-Benz Tele Aid Contract Litig.*
257 F.R.D. 46 (D.N.J. 2009) ......................................................................38

*In re Myford Touch Consumer Litig.*
2016 WL 7734558 (N.D. Cal. Sept. 14, 2016)..........................................40

*In re NJOY, Inc. Consumer Class Action Litig.*
120 F. Supp. 3d 1050 (C.D. Cal. 2015).........................................24, 27, 44

*In re Steroid Hormone Prod. Cases*
181 Cal. App. 4th 145 (Cal. Ct. App. 2010) ........................17, 32, 34, 36

*In re Tobacco II Cases*
207 P.3d 20 (Cal. 2009) .............................................................................34

*In re Tobacco II Cases*
240 Cal. App. 4th 779 (Cal. Ct. App. 2015) ............................................44

*In re Tobacco II Cases*
46 Cal. 4th 298 (Cal. 2009) ...........................................23, 27, 32, 35

*In re Vioxx Class Cases*
180 Cal. App. 4th 116 (Cal. Ct. App. 2009) ............................................36

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*
349 F. Supp. 3d 881 (N.D. Cal 2018) .......................................................44

*In Re: MacBook Keyboard Litigation*
2021 WL 1250378 (N.D. Cal. Mar. 8, 2021) .............................13, 16, 23

*Johnson v. General Mills, Inc.*
275 F.R.D. 282 (C.D.Cal.2011) ................................................................28

*Just Film, Inc. v. Buono*
847 F.3d 1108 (9th Cir. 2017).......................................................12, 13, 15

*Klay v. Humana, Inc.*
382 F.3d 1241 (11th Cir. 2004)..................................................................13

*Krommenhick v. Post Foods*
334 F.R.D. 552 (N.D. Cal. 2020) .........................................................passim

**TABLE OF AUTHORITIES**
(continued)

Page

*Kumar v. Salov N. Am. Corp.*
   2016 WL 3844334 (N.D. Cal. July 15, 2016) .......................................................... 26

*Kurtz v. Kimberly-Clark Corp.*
   321 F.R.D. 482 (E.D.N.Y. 2017) ............................................................................. 43

*Lambert v. Nutraceutical Corp.*
   2015 WL 12655392 (C.D. Cal. June 24, 2015) ........................................................ 36

*Larson v. Trans Union, LLC*
   2015 WL 3945052 (N.D. Cal. June 26, 2015) ........................................................... 9

*Lavie v. Procter & Gamble Co.*
   105 Cal. App. 4th 496 (2003) ............................................................................ 19, 29

*Lectrodryer v. SeoulBank*
   77 Cal. App. 4th 723 (Cal. Ct. App. 2000) ............................................................. 37

*Leyva v. Medline Indus. Inc.*
   716 F.3d 510 (9th Cir. 2013) ............................................................................. 18, 35

*Lozano v. AT&T Wireless Servs.*
   504 F.3d 718 (9th Cir. 2007) ................................................................................... 32

*Makaeff v. Trump Univ., LLC*
   2014 WL 688164 (S.D. Cal. Feb. 21, 2014) ........................................................... 25

*Makaeff v. Trump Univ., LLC*
   309 F.R.D. 631 (S.D. Cal. 2015) ............................................................................ 35

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*
   256 F.R.D. 586 (N.D. Ill. 2009) .............................................................................. 10

*Mangini v. R.J. Reynolds Tobacco Co.*
   22 Cal. App. 4th 628 (Cal. Ct. App. 1993) ............................................................. 32

*Marsh v. First Bank of Del.*
   2014 WL 554553 (N.D. Cal. Feb. 7, 2014) ............................................................... 7

*Mass. Mut. Life Ins. Co. v. Superior Court*
   97 Cal. App. 4th 1282 (2002) .................................................................................. 34

*Mazza v. Am. Honda Motor Co., Inc.*
   666 F.3d 581 (9th Cir. 2012) ................................................................................... 14

*McLaughlin v. Am. Tobacco Co.*
   522 F.3d 215 (2d Cir. 2008) .................................................................................... 43

**TABLE OF AUTHORITIES**
**(continued)**

Page

*McReynolds v. Merril Lynch, Pierce, Fenner & Smith, Inc.*
    672 F.3d 482 (7th Cir. 2012) ....................................................................... 45

*Miller v. Fuhu, Inc.*
    2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) ............................................... 31

*Morgan v. AT&T Wireless Servs., Inc.*
    177 Cal. App. 4th 1235 (Cal. Ct. App. 2009) ............................................. 26

*Newton v. Am. Debt Servs.*
    2015 WL 3614197 (N.D. Cal. June 9, 2015) ........................................ 32, 33

*Ortega v. Nat. Balance, Inc.*
    300 F.R.D. 422 (C.D. Cal. 2014) ................................................................ 36

*People v. First Federal Credit Corp.*
    104 Cal. App. 4th 721 (Cal. Ct. App. 2002) ............................................... 29

*Pettit v. Procter & Gamble Co.*
    2017 WL 3310692 (N.D. Cal. Aug. 3, 2017) .............................................. 20

*Phillips v. Philip Morris Companies, Inc.*
    298 F.R.D. 355 (N.D. Ohio Feb. 28, 2014) ................................................ 42

*Ruiz Torres v. Mercer Canyons Inc.*
    835 F.3d 1125 (9th Cir. 2016) .................................................................... 26

*S.M. Wilson & Co. v. Smith Intern, Inc.*
    587 F.2d 1363 (9th Cir. 1978) .................................................................... 40

*Schumacher v. Tyson Fresh Meats, Inc.*
    221 F.R.D. 605 (D.S.D. 2004) .................................................................... 38

*Sevidal v. Target Corp.*
    189 Cal. App. 4th 905 (Cal. Ct. App. 2010) ............................................... 34

*Sloan v. Gen. Motors LLC*
    2020 WL 1955643 (N.D. Cal. Apr. 23, 2020) ............................................ 23

*Stearns v. Ticketmaster Corp.*
    655 F.3d 1013 (9th Cir. 2011) .............................................................. 23, 34

*Tait v. BSH Home Appliances Corp.*
    289 F.R.D. 466 (C.D. Cal. 2012) ...................................................... 20, 23, 39

*Torres v. Mercer Canyons Inc.*
    835 F.3d 1125 (9th Cir. 2016) .................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

Page

*Torres v. S.G.E. Mgmt., LLC*
   838 F.3d 629 (5th Cir. 2016).................................................................. 18, 19

*Tourgeman v. Collins Fin. Servs.*
   2011 WL 5025152 (S.D. Cal. Oct. 21, 2011)..................................... 34, 35

*Treviso v. Nat'l Football League*
   2020 WL 7021357 (N.D. Ohio Nov. 30, 2020) ........................................ 40

*True Health Chiropractic, Inc. v. McKesson Corp.*
   896 F.3d 923 (9th Cir. 2018).................................................................... 41

Tyson Foods, Inc. v. Bouaphakeo
   577 U.S. 442 (2016) ................................................................................. 11

*Valentino v. Carter-Wallace, Inc.*
   97 F.3d 1227 (9th Cir. 1996).................................................................... 40

*Walker v. Life Ins. Co. of the Sw.*
   953 F.3d 624 (9th Cir. 2020)......................................................... 12, 22, 23

*Wal-Mart Stores, Inc., v. Dukes*
   564 U.S. 338 (2011) ................................................................................... 7

*Williams v. Gerber Prods. Co.*
   552 F.3d 934 (9th Cir. 2008).................................................................... 19

*Williams v. Mohawk Indus., Inc.*
   568 F.3d 1350 (11th Cir. 2009)................................................................ 13

*Zakaria v. Gerber Prods. Co.*
   2016 WL 6662723 (C.D. Cal. Mar. 23, 2016) ........................................ 39

*Zeiger v. WellPet LLC*
   304 F. Supp. 3d 837 (N.D. Cal. 2018) .................................................... 40

*Zeiger v. Wellpet, LLC*
   2021 WL 756109 (N.D. Cal. Feb. 26, 2021)................................... passim

**STATUTES**

15 U.S.C. § 2301 .................................................................................. xi, xii

18 U.S.C. § 1341 ....................................................................................... 13

18 U.S.C. § 1343 ....................................................................................... 13

18 U.S.C. § 1962 .................................................................................. xi, xii

18 U.S.C. § 1964 ....................................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page

42 U.S.C.A. § 300x-26 ........................................................................................ 17

Cal Com. Code § 2314 ........................................................................................ 39

Cal. Bus. & Prof. Code § 17200 ............................................................. xi, xii, 32

Cal. Bus. & Prof. Code § 17203 ................................................................. 31, 34

Cal. Bus. & Prof. Code § 17205 ......................................................................... 29

Cal. Bus. & Prof. Code § 17500 ................................................................... xi, xii

Cal. Bus. & Prof. Code § 22963 ........................................................... 17, 33, 36

Cal. Civ. Code § 1750 ................................................................................. xi, xii

**OTHER AUTHORITIES**

2 W. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2012) ................... 11

7AA C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005) ..... 11

Restatement (Second) of Judgment § 26(1)(b) .................................................. 10

**RULES**

Fed. R. Civ. P. 23 ..................................................................................... passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# GLOSSARY OF KEY TERMS

| Term | Definition |
|------|------------|
| Altria | Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services LLC, and Altria Group Distribution Company |
| C.D. | Joseph DiGiacinto on behalf of C.D. |
| California Plaintiffs | Bradley Colgate; Joseph DiGiacinto on behalf of C.D.; and Jill Nelson on behalf of L.B. |
| CLRA | California Consumer Legal Remedies Act (Cal. Civ. Code § 1750) |
| Colgate | Plaintiff Bradley Colgate |
| Defendants | Altria; JUUL Labs, Inc.; Adam Bowen; James Monsees; Nicholas Pritzker; Riaz Valani, and Huyoung Huh |
| FAL | California False Advertising Law (Cal. Bus. & Prof. Code § 17500) |
| Gregg | Plaintiff Lauren Gregg |
| Individual Defendants | Adam Bowen, James Monsees, Nicholas Pritzker, Riaz Valani, and Huyoung Huh |
| JUUL products | JUUL starter kits (2 or 4 JUULpods, JUUL device, and JUUL charger), JUUL basic kits (JUUL device and charger), JUULpods, and JUUL devices |
| Krauel | Plaintiff Tyler Krauel |
| L.B. | Jill Nelson on behalf of L.B. |
| Mag-Moss | Magnuson-Moss Warranty Act (15 U.S.C. § 2301) |
| Plaintiffs | Bradley Colgate, Joseph DiGiacinto on behalf of C.D., Lauren Gregg, Tyler Krauel, and Jill Nelson on behalf of L.B. |
| RICO | Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962) |
| UCL | California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) |

## SUMMARY OF CLAIMS AND CLASSES

On behalf of the nationwide and California classes, Plaintiffs assert three primary theories of relief: (1) the marketing of JUUL was unlawfully *deceptive*, (2) JUUL was unlawfully marketed to *youth*, and (3) JUUL products are not fit for ordinary use. Plaintiffs seek to certify four classes: (1) a Nationwide Class, (2) a California Class, (3) a Nationwide Youth Class, and (4) a California Youth Class. Plaintiffs' claims and the classes they seek to certify are summarized as follows:

| Theory of Relief | Classes | Legal Claims |
|---|---|---|
| Deceptive Marketing | Nationwide Class | Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962) ("RICO") |
| | California Class | California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) ("UCL"), California Consumer Legal Remedies Act (Cal. Civ. Code § 1750) ("CLRA"), California False Advertising Law (Cal. Bus. & Prof. Code § 17500) ("FAL"), Common Law Fraud, Unjust Enrichment |
| Youth Marketing | Nationwide Youth Class | Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962) ("RICO") |
| | California Youth Class | California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) ("UCL"), Unjust Enrichment |
| Not Fit for Ordinary Use | California Class | Implied Warranty of Merchantability, Magnuson-Moss Warranty Act (15 U.S.C. § 2301) ("Mag-Moss") |

**NOTICE OF MOTION AND MOTION**

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on September 24, 2021, at a time convenient for the Court, before the Honorable William H. Orrick, plaintiffs Bradley Colgate, Joseph DiGiacinto on behalf of C.D., Jill Nelson on behalf of L.B. ("California Plaintiffs"), Lauren Gregg, and Tyler Krauel (together with the California Plaintiffs, "Plaintiffs") will and do hereby move the Court, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), for an order certifying the following classes with the indicated class representatives::

- **Nationwide Class** (All Plaintiffs): All persons who purchased, in the United States, a JUUL product.

- **Nationwide Youth Class** (C.D., Krauel, and L.B): All persons who purchased, in the United States, a JUUL product and were under the age of eighteen at the time of purchase.

- **California Class**: (Colgate, C.D. and L.B.) All persons who purchased, in California, a JUUL product.

- **California Youth Class** (C.D. and L.B.): All persons who purchased, in California, a JUUL product and were under the age of eighteen at the time of purchase.

The claims Plaintiffs seek to certify are identified in the Summary of Claims and Classes set forth above.

Each of the classes is limited to individuals who purchased their JUUL products from brick and mortar or online retailers, and damages, restitution and disgorgement amounts are similarly based on retailer purchases and prices. The proposed classes exclude any individuals who purchased JUUL products only secondarily from non-retailers (*i.e.* from a friend). In addition, excluded from the proposed classes are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

Plaintiffs will also move the Court to appoint them as class representatives (for the classes specified above) and to appoint Sarah London, Dena Sharp, Dean Kawamoto and Ellen Relkin as

Co-Lead Class Counsel, with the Plaintiffs' Steering Committee continuing to work for the benefit of the class alongside, and under the direction of, Co-Lead Class Counsel.

This motion is based upon this Notice of Motion and Motion; the incorporated Memorandum of Law; the Expert Declarations of Professor John Chandler, Dr. Anthony Pratkanis, Dr. Sherry Emery, Dr. Alan Shihadeh, and Dr. Hal Singer; the Declaration of Dena C. Sharp and its exhibits; and any argument that may be presented to the Court.

1   I.      **INTRODUCTION**

2          Defendant JUUL Labs, Inc. ("JLI") is the corporate entity that manufactures, markets, and

3   sells JUUL e-cigarette products. Since its inception, JLI has been operated and managed by other

4   Defendants in this action: co-founders Adam Bowen and James Monsees; key investors and

5   controlling directors Nichols Pritzker, Riaz Valani, and Huyoung Huh (the "Individual

6   Defendants"); and Altria, which has bolstered JLI's operations through its decades of experience

7   selling cigarettes and helped to fraudulently maintain the market for JUUL products. Unfortunately

8   for consumers, Defendants have misled JUUL purchasers about the nature of JUUL products.

9   Defendants promoted JUUL as a fun, cool and marketed JUUL products[1] as a safe "alternatives"

10  to cigarettes that delivered the same amount of nicotine (or less). By design, the marketing of JUUL

11  products through both statements and omissions led consumers to believe that they were buying

12  and using a safe product designed for smokers that posed no greater risk of addiction than did

13  combustible cigarettes. But the truth is that JUUL products are not safe, and they deliver nicotine

14  in a form and manner that poses greater risks of addiction than combustible cigarettes. And to make

15  matters worse, Defendants directed their fraudulent marketing to the most vulnerable segment of

16  society—youth—in ways that were intended to (and did) appeal to underage users, employing the

17  same tactics that cigarette manufacturers have been banned from using for over a decade.

18         Plaintiffs' claims are appropriate for classwide resolution because the key legal question of

19  Defendants' liability turns on their conduct, not the conduct or experiences of individual class

20  members. For example, Plaintiffs' claims under the Racketeer Influenced and Corrupt

21  Organizations Act require the existence of a RICO enterprise and a scheme to defraud, proof of

22  which does not turn on any individual consumer's experiences. Plaintiffs' California consumer

23  fraud claims turn on whether Defendant's representations were deceptive and material to a

24  reasonable consumer, an objective standard that presents a common, not individualized, question.

25  Aggregate damages, restitution, and disgorgement will be calculated using common evidence.

26  Common issues lie at the heart of the class's claims.

27  ---
    [1] "JUUL products" as used in this motion includes JUUL starter kits, JUUL basic kits, JUULpods,
28  and JUUL devices. Plaintiffs do not seek relief related to class members' purchases of JUUL
    accessories, such as device chargers.

Resolving Plaintiffs' economic loss claims through a class action is vastly superior to individual litigations.[2] The individual value of class members' economic loss claims—the amount they overpaid for JUUL products—is unlikely to provide sufficient motivation for the filing of costly and time-consuming individual lawsuits. On the other hand, JUUL is responsible for an epidemic of e-cigarette use—and nicotine addiction—particularly among minors, and it is critical that Defendants be held accountable to the millions of JUUL purchasers injured as a result of their conduct. Plaintiffs respectfully request that the Court grant their motion for class certification.

## II.    CLASS PLAINTIFFS' ALLEGATIONS

### A.    Defendants' Conduct

Decades of regulation and litigation against cigarette companies had by 2014 driven smoking and nicotine addiction rates in this country to an all-time low. Second Amended Consolidated Class Action Complaint ("SCAC"), ECF 1135, ¶ 1. Seeking to capitalize on the lax regulation of e-cigarettes, Bowen and Monsees sought to develop a product in the image of cigarettes, which they described as "the most successful consumer product of all time. . . . an amazing product." *Id.*, ¶¶ 2-3. Recognizing the significant money-making potential of a new (highly addictive) nicotine product, Pritzker, Valani, and Huh invested huge sums in JLI and took control of its strategy and marketing. *Id.*

JUUL's initial marketing was youth focused: the company's stated goal was to build "cool kid equity" (Sharp Decl., Ex. 5 at 5), JUULpods came in flavors kids like (such as mango), advertisements in the "Vaporized" campaign was a "lifestyle" campaign that relied on very young looking, hip models in youthful and often sexually suggestive poses, the company engaged "influencers" popular among a younger audience, and one of the primary means of marketing was social media (an inherently youth-centric advertising medium). This strategy was not new; JUUL copied the marketing that cigarette companies had successfully used for decades to hook kids on

---

[2] The SCAC only seeks recovery of economic losses related to purchases of JUUL products. Plaintiffs and class members have separately pursued their claims for personal injuries through the process established by the Court. *See* ECF 1125 at 3 ("A particular plaintiff's class claims and personal injury claims may be severed and pursued through each track. . . . Plaintiffs have already excluded personal injury damages from the scope of the class action track, limiting the monetary relief they seek in the CAC to economic loss.").

smoking. *Id*., Ex. 6 at 27 ("JUUL's principal advertising themes . . . are closely aligned with that of traditional tobacco advertising."). While cigarette companies have been banned for more than a decade from using such marketing techniques (for example, selling flavored cigarettes), Defendants exploited the lax regulatory environment for e-cigarettes. Defendants knew that by targeting the "cool kids" early on, other kids would soon follow, and the popularity of JUUL would expand through viral marketing. A social media study commissioned by a JUUL investor in 2018 (and shared with JUUL employees and defendant Valani) proclaimed that "Juul Owns Teens" and concluded that the "trendy teen / young adults / Millenials who's [sic] use starts with Juul rather than cigarettes" group was "by far the largest" of all JUUL users. *Id*., Ex. 7 at 5, 23.

After it became clear to the public that JUUL was driving a youth vaping epidemic, the company attempted to shift gears and market JUUL as an "alternative for adult smokers." But this was also misleading: JUUL was engineered to deliver nicotine more effectively than cigarettes and to foster and maintain addiction. Pre-release product testing showed that JUUL's nicotine delivery was "too much for some smokers" and that, as compared to the "younger group," JUUL "isn't going to fit as well with consumers who are looking to cut back on the cigarette intake." Sharp Decl., Ex. 8 at 1, 4. The claim that a JUULpod contains the same amount of nicotine as a pack of cigarettes is also misleading. Plaintiffs allege that while JUUL marketing has sometimes included an assortment of partial warnings; the warnings did not put consumers on notice of the products' highly addictive formulation, the full extent of physical injuries that can result from using the product, the harmful chemicals in the e-liquid formulation, or that JUUL has made no attempt to study the long-term effects of using JUUL.

Defendants' marketing tactics worked. Within a few short years JUUL had become the dominant e-cigarette product on the market, claiming over 70% of the market by late 2018. Sharp Decl., Ex. 9 at 8. The rise in JUUL sales was a direct result of the product's design and social media marketing. As JUUL's social media marketing increased, so did sales. According to one study, "the growth trend in JUUL tweets noticeably tracks well the growth in JUUL retail sales; the two data series were highly correlated, with a correlation coefficient of 0.968" and that "the number of tweets alone accounted for 93% of variation in JUUL sales in retail stores." *Id*., Ex. 10 at 3. While

Defendants cashed in on the success of their fraudulent marketing to the tune of millions and billions of dollars each, the toll on JUUL purchasers and society overall has been devastating. In September 2018, FDA Commissioner Scott Gottlieb officially declared that there is an "epidemic of youth use" of e-cigarettes. *Id.*, Ex. 11. According to a November 2019 study titled "e-Cigarette Use Among Youth in the United States," over 27% of high school students had used JUUL within the past 30 days. *Id.*, Ex. 12 at 1. The article concluded that "the results of this survey are particularly concerning given relatively high exposure to nicotine through the use of nicotine salt–based e-cigarette products such as JUUL, which was the most commonly reported brand among youth using e-cigarettes in 2019." *Id.* at 7; *see also* SCAC, ¶ 605 (chart showing the correlation between in e-cigarette use by minors and JUUL sales).

## B.   Plaintiffs' Claims

While the SCAC asserts claims under federal law and the law of forty-seven states,[3] only Plaintiffs' federal law claims and California Plaintiffs' California state law "bellwether" claims are at issue in this motion. *See* ECF 1488, Ex. 1 (Case/Trial Schedule). Plaintiffs' claims involve three core allegations: that Defendants deceptively marketed JUUL products, that Defendants marketed JUUL products to minors, and that JUUL products failed to conform to their implied warranties. *See* Summary of Claims and Classes.

First, as to the deceptive marketing claims, Plaintiffs' RICO claim and California Plaintiffs' UCL, CLRA, FAL, common law fraud, and unjust enrichment claims each allege that Defendants engaged in a fraudulent scheme to deceive JUUL purchasers regarding the potency, addictiveness, and safety of JUUL products. SCAC, ¶¶ 787-88. JUUL marketing and labels misleadingly state that JUUL is an alternative to combustible cigarettes and a JUULpod contains the same amount of nicotine as a package of cigarettes. *Id.*, ¶ 790. The same marketing and labels deceptively failed to disclose material information: that JUUL e-cigarettes were not smoking cessation devices, were not reasonable alternatives to combustible cigarettes, were extremely potent nicotine delivery mechanisms, were highly addictive (both on their own and as compared to combustible cigarettes),

---

[3] While the SCAC includes claims brought under the laws of Delaware, the District of Columbia, Idaho, and North Dakota, those claims have been dismissed without prejudice. ECF 1694 at 30.

and posed significant risks of substantial physical injury. SCAC, ¶ 789. In light of the Court's preemption rulings, California Plaintiffs do not assert labeling claims based on nicotine *addiction* but do assert misleading labeling regarding nicotine *dosage* as well as that the product labels failed to disclose that JUUL products posed significant risks of physical injury resulting from their use. *Id.*, ¶ 790. *See In re JUUL Labs, Inc. Mktg., Sales Pracs., and Prods. Liab. Litig.*, 2020 WL 6271173, at *13-15 (N.D. Cal. Oct. 23, 2020) ("*MTD Order*") (discussing the different scope of preemption for labeling and advertising claims).

Second, as to the youth-oriented marketing claims, Plaintiffs' RICO claim alleges that a key component of Defendants' unlawful scheme was to create and maintain a market for JUUL products among minors.  California Plaintiffs allege that JLI and the Individual Defendants' youth-focused product design and marketing also violates the unfair prong of the UCL and has resulted in Defendants' unjust enrichment.

Third, California Plaintiffs' breach of implied warranty and Mag-Moss claims allege that JUUL products are not, and have not been since their initial launch, fit for their ordinary use as a reasonable nicotine delivery systems, electronic cigarettes, or cigarette replacements.

## C.    The Proposed Classes

Plaintiffs seek certification of the following classes[4] of purchasers of JUUL products, with the indicated class representatives:

- **Nationwide Class** (All Plaintiffs): All persons who purchased, in the United States, a JUUL product.

- **Nationwide Youth Class (**C.D., Krauel, and L.B): All persons who purchased, in the United States, a JUUL product and were under the age of eighteen at the time of purchase.

- **California Class**: (Colgate, C.D. and L.B.) All persons who purchased, in California, a JUUL product.

---

[4] While the SCAC does not specifically include youth subclasses, there is no ambiguity that certain claims (or portions of claims) were brought specifically with respect to youth and there is no bar to proposing amended class definitions as part of class certification. *See Clay v. Cytosport, Inc.*, 2016 WL 6082314, at *3 (C.D. Cal. Oct. 18, 2016) (court in not "bound by the class definition provided in the complaint" and noting that plaintiff may narrow, but not expand, the class definitions in the complaint).

- **California Youth Class** (C.D. and L.B.): All persons who purchased, in California, a JUUL product and were under the age of eighteen at the time of purchase.

The claims for which certification is sought are identified in the Summary of Claims and Classes.

Each of the classes is limited to individuals who purchased their JUUL products from brick and mortar or online retailers, and damages, restitution and disgorgement amounts are similarly based on retailer purchases and prices. The proposed classes do not include any individuals who purchased JUUL products only secondarily from non-retailers (*i.e.* from a friend). In addition, excluded from the proposed classes are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

## III.   ARGUMENT

### A.   Legal Standard

To certify a class, Plaintiffs must meet "each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). Rule 23(a) requires plaintiffs to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

At the class certification stage, Plaintiffs need not establish that they will succeed on the merits at trial, as Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). Instead, courts are "merely to decide a suitable method of adjudicating the case and should not 'turn

class certification into a mini-trial' on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (quoting *Ellis*, 657 F.3d at 983 n.8). The possibility that Plaintiffs may not prove their allegations is an insufficient reason "for declining to certify a class which apparently satisfies Rule 23." *Marsh v. First Bank of Del.*, 2014 WL 554553, at *4 (N.D. Cal. Feb. 7, 2014).

As shown below, Plaintiffs meet each of the Rule 23(a) requirements. And because the elements of each of their claims will be proven through evidence that is common to the class, certification is appropriate for each of their claims under Rule 23(b)(3).

### B.   The Classes Satisfy Rule 23(a)

#### 1.   Numerosity

JUUL is the best-selling e-cigarette product on the market, and the number of purchasers in the class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Courts generally find numerosity satisfied if the class includes forty or more members." *Krommenhick v. Post Foods*, 334 F.R.D. 552, 562, n.2 (N.D. Cal. 2020). Here, Dr. Singer's survey alone included several thousand JUUL purchasers (Singer Rpt., ¶ 25) and sales of JUUL products exceeded $2.8 billion in 2019. *See Zeiger v. Wellpet, LLC*, 2021 WL 756109, at *25 (N.D. Cal. Feb. 26, 2021) ("based on the prices of the units at issue, it is certain that numerous people—far more than 40—would be included in the class").

#### 2.   Commonality

Each of Plaintiffs' claims also satisfies the requirement that there be "questions of law or fact common to the class." Fed R. Civ. P. 23(a)(2). The commonality requirement has "'been construed permissively' and '[a]ll questions of fact and law need not be common to satisfy the rule.'" *Ellis*, 657 F.3d at 981 (alteration in original) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). "Even a single common question will do" when it is "apt to drive the resolution of the litigation." *Farar v. Bayer AG*, 2017 WL 5952876, at *5 (N.D. Cal. Nov. 15, 2017) (quoting *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 350, 359 (2011)). Each of Plaintiffs' claims involves common questions whose common answers will drive resolution of the claims.

***RICO Claim***: Plaintiffs' RICO claim turns on common issues, such as the existence of an enterprise and whether Defendants engaged in a scheme to defraud. *See Custom Hair Designs by*

*Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 601-02 (8th Cir. 2020) (identifying the existence of a "scheme to defraud" as a common issue).

**Statutory Fraud Claims (UCL FAL, and CLRA) Claims**: Courts frequently analyze these claims together for purposes of class certification. California Plaintiffs' statutory fraud claims will involve numerous common issues such as whether reasonable consumers would likely have been deceived and would have found the misrepresented or omitted information material, as well as whether plaintiffs are entitled to a presumption of reliance. *See Wellpet*, 2021 WL 756109, at *25 ("whether reasonable consumers would be misled by the actionable Wellness Statements and omissions" was a common question); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1093 (N.D. Cal. 2018) (common questions included "whether the challenged health statements are unlawful, unfair, deceptive, or misleading").

**Common Law Fraud Claim:** Like the California statutory claims, the gravamen of this claim is whether Defendants' statements and omissions were deceptive, an issue that can be addressed on a class-wide basis. Given the materiality of Defendants' false statements, the Court will also decide whether reliance can be presumed, yet another issue common to the class.

**Unfair Conduct Claim**: Proving Defendants' liability will involve numerous common questions, chief among them whether Defendants' conduct qualifies as "unfair" under the UCL, *i.e.* whether the conduct violates public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *See In re Adobe Sys. Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014) (stating tests for unfair conduct claims).

**Unjust Enrichment Claim**: California Plaintiffs' unjust enrichment claim includes common questions such as whether JLI and Individual Defendants received benefits through their fraudulent and youth-focused marketing, whether the retention of those benefits would be unjust, and whether the benefits JLI and Individual Defendants received were at the expense of class members.

**Implied Warranty Claim**: The primary issue for an implied warranty claim is a common one: whether JUUL products are fit for their ordinary use.

### 3.    Typicality

"The test for typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Ellis*, 657 F.3d at 984. The test is "permissive" and only requires that the plaintiffs' claims are "reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1021.

Each of Plaintiffs' three core liability and injury claims are "reasonably co-extensive" with those of absent class members. *See Post Foods*, 334 F.R.D. at 562 (typicality satisfied where plaintiffs and "each class member paid a premium" for the products at issue); *Hadley*, 324 F. Supp. 3d at 1118 (same). All Plaintiffs allege that Defendants misled JUUL purchasers and C.D., L.B., and Krauel allege that Defendants engaged in a fraudulent scheme and unfair conduct to market JUUL products to minors. Those theories of liability and injury are the same for plaintiffs and members of the classes.  Plaintiffs' allegation that JUUL products are not fit for their ordinary use is based on the design of JUUL products. It is thus the same for California Plaintiffs and members of the California Class.

### 4.    Adequacy

Plaintiffs are adequate class representatives where: (1) neither named plaintiffs nor their counsel have any conflicts of interest with other class members; and (2) the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Ellis*, 657 F.3d at 985. The adequacy requirement aims "to ensure that the interests of the named representatives align with those of the rest of the class." *Larson v. Trans Union, LLC*, 2015 WL 3945052, at *11 (N.D. Cal. June 26, 2015).

Each Plaintiff has the same goal as members of the proposed classes (*i.e.*, holding Defendants accountable for their deceptive and youth-focused marketing). Plaintiffs' interests are aligned with, and not in conflict with, those of the class members. Plaintiffs have fulfilled their duties as class representatives, vigorously prosecuted the case to date, and will continue to do so. *See* Sharp Decl., ¶¶ 3-8. Each of the Plaintiffs has dedicated substantial time and effort to this

litigation by reviewing pleadings; responding to discovery; searching for, collecting, and producing documents; and preparing to sit for depositions, among other things. *Id.*

In earlier briefing, Defendants suggested that Plaintiffs' decision to seek class resolution of claims for economic injury while leaving any personal-injury claims to individual adjudication creates an adequacy problem. *See* ECF 1124 at 5 n.9. It does not.[5] Because Rule 23 permits aggregation only of claims that are common among the class, it is standard, and raises no adequacy concerns, for class members to pursue individualized claims separately. *E.g.*, *Alger v. FCA US LLC*, 334 F.R.D. 415, 425 (E.D. Cal. 2020) (rejecting adequacy challenge on this basis); *Andren v. Alere, Inc.*, 2017 WL 6509550, at *8 (S.D. Cal. Dec. 20, 2017) (same). *Cf. Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 473 (N.D. Cal. 2016) (finding adequacy satisfied even where, unlike here, the named plaintiff "additionally [brought] individual claims" on behalf of himself "where there is no evidence that the individual claims will impair his ability to represent the interests of the class.").

Defendants' concern that a class judgment will lack preclusive effect is unwarranted. First, because of the restrictions of Rule 23, courts recognize that "the doctrine of claim splitting," under which a party "cannot avoid the effects of res judicata by splitting her cause of action into separate grounds of recovery, . . . generally does not apply to class actions." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 597 (N.D. Ill. 2009); *see also, e.g.*, *Cameron v. Tomes*, 990 F.2d 14, 17 (1st Cir. 1993) ("[A] class action judgment . . . binds the class members as to matters actually litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action."); Restatement (Second) of Judgment § 26(1)(b) (an exception to claim splitting arises where "plaintiff was unable to . . . seek a certain remedy or form of relief in the first action because of . . . restrictions on [courts'] authority to entertain . . . demands for multiple remedies or forms of relief in a single action"). If "all class members had to bring their own individual claims in addition to the common class claims, it would destroy the efficiency of having class actions."

---

[5] The separate prosecution of economic loss and personal injury claims also does not raise typicality concerns because "none of Plaintiff's claims require Plaintiff to prove that he or any other class member was physically harmed as a result of [Defendants'] alleged misconduct," and thus any issues related plaintiffs' personal injuries "are irrelevant to the resolution of any claims in the instant case." *Hadley*, 324 F. Supp. 3d at 1120.

1    *Akootchook v. U.S.*, 271 F.3d 1160, 1164-65 (9th Cir. 2001) (individualized claims were not subject

2    to res judicata based on the outcome of the class case).[6]

3         With respect to the adequacy of class counsel, courts consider: "(i) the work counsel has

4    done in identifying or investigating potential claims in the action; (ii) counsel's experience in

5    handling class actions, other complex litigation, and claims of the types of claims asserted in the

6    action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will

7    commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Each consideration weighs in favor

8    of a finding of the adequacy of proposed class counsel. On December 20, 2019, the Court appointed

9    Sarah London, Dena Sharp, Dean Kawamoto, and Ellen Relkin to serve as Co-Lead Counsel for

10   the MDL, as well as a group of highly qualified lawyers to serve on the Plaintiffs' Steering

11   Committee (PSC) and as liaison for government entity plaintiffs and the related state court actions.

12   ECF 341 at 1-2. Since that time, Co-Lead Counsel, with the support of the PSC, have worked

13   diligently and collaboratively to advance the interests of the proposed classes by, among other

14   things, preparing detailed complaints, opposing motions to dismiss and other pretrial motions,

15   pursuing discovery against Defendants and third parties, retaining leading experts in the relevant

16   fields, and preparing this action for trial. *See* Sharp Decl. ¶¶ 9-10; ECFs 299, 1084, & 1125 (orders

17   in favor of plaintiffs on key pretrial issues).

18        **C.       The Classes Satisfy Rule 23(b)(3)**

19             **1.       Common Issues Predominate for Each of Plaintiffs' Claims**

20        "When 'one or more of the central issues in the action are common to the class and can be

21   said to predominate, the action may be considered proper under Rule 23(b)(3) even though other

22   important matters will have to be tried separately, such as . . . some affirmative defenses peculiar

23   to some individual class members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54

24   (2016) (quoting 7AA C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1778, at

25   123–24 (3d ed. 2005)). The predominance inquiry is thus a holistic one that "asks whether the

26   common, aggregation-enabling, issues in the case are more prevalent or important than the non-

27   [6] In addition, claim preclusion does not apply where the "court in the first action has expressly
     reserved the plaintiff's right to maintain the second action." Restatement § 6(1)(b); *see also Alger*,

28   334 F.R.D. at 425 (same); *Andren*, 2017 WL 6509550, at *8 (same).

common, aggregation-defeating, individual issues." *Id*. at 453 (citing 2 W. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2012)); *see also Hanlon*, 150 F.3d at 1022 ("there is clear justification for handling the dispute on a representative rather than on an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication"). "[M]ore important questions apt to drive the resolution of the litigation are given more weight . . . over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).

Common questions—whether Defendants formed an unlawful RICO enterprise, whether JUUL marketing was likely to mislead a reasonable consumer, whether the misrepresentations and omissions were material to a reasonable consumer, whether JUUL product design and marketing targeted youth, whether JUUL products are fit for ordinary use, and whether certain Defendants have been unjustly enriched—will drive the resolution of the class claims. *See Wellpet*, 2021 WL 756109, at *26 (common questions "central" to the litigation, such as "whether the statements and omissions would be material to a reasonable consumer," predominated over individual issues). Issues of consumer deception, materiality, and unfairness are judged by objective standards, and will thus be proven or disproven using common evidence. *See Post Foods*, 334 F.R.D. at 564, 565, 575 (discussing the objective nature of the key inquires under the UCL, CLRA, and FAL). The existence of a RICO enterprise, the merchantability of JUUL products, and the extent to which JLI and the Other Director Defendants were unjustly enriched are also common questions because they turn on the nature of JUUL products and defendants' conduct. And for each claim, Plaintiffs have proposed a sufficiently reliable damages model.

In short, the key issues in the litigation are common to the class and the predominance requirement is met.

a.      Nationwide RICO Claim

Any "assessment of predominance begins, of course, with the elements of the underlying cause of action." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) (quotation omitted). To prevail on their RICO claim, the plaintiffs will have to prove that Defendants engaged

in the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (quotation omitted). Each element is susceptible to common proof.

### 1.    *Enterprise and Predicate Acts*

The first four elements of Plaintiffs' RICO claim—the conduct of the enterprise through a pattern of racketeering activity—all focus on the Defendants' conduct, not the circumstances of individual class members, and thus present purely common issues. The first issue, whether Defendants formed a RICO enterprise, poses a single common issue: either an enterprise exists, or it does not. The other elements will also ask common questions, namely whether RICO Defendants, "having devised or intending to devise any scheme or artifice to defraud," used the mail and wires "for the purpose of executing such scheme or artifice or attempting so to do." 18 U.S.C. §§ 1341, 1343. And Plaintiffs will have to further establish that Defendants engaged in a pattern of such fraud. Thus, whether Defendants were "part of an enterprise operating an alleged scheme to defraud class members can be resolved on a classwide basis." *Just Film*, 847 F.3d at 1116 n.3. It is for this reason that courts have recognized that RICO claims "are often susceptible to common proof"— because "the existence of a national conspiracy" is "the very gravamen of the RICO claims." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1257 (11th Cir. 2004)); *see Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) ("The gravamen of the offense [of mail fraud] is the scheme to defraud."). In such circumstances, it "would be folly to force each [class member] to prove the nucleus of the alleged fraud again and again." *In re First Alliance Mortg Co.*, 471 F.3d 977, 991 (9th Cir. 2006).

### 2.    *Injury*

The fifth element of Plaintiffs claim requires Plaintiffs to show they have been "injured in [their] business or property by reason of" (18 U.S.C. § 1964(c)) by the RICO Defendants' scheme. It has two components, both which are susceptible to common proof: injury and causation.

With respect to injury for the Nationwide Class, Plaintiffs will show that the misleading marketing carried out by the enterprise caused purchasers to overpay for their JUUL products through a choice-based conjoint analysis conducted by economist Dr. Hal Singer. "Choice-based

conjoint ('CBC') analysis is a well-recognized economic method used to study and quantify consumer preferences." *In Re: MacBook Keyboard Litigation*, 2021 WL 1250378, at *5 (N.D. Cal. Mar. 8, 2021) (certifying class based on Dr. Singer's conjoint method); *see also Post Foods*, 334 F.R.D. at 575 ("[C]onjoint surveys and analyses have been accepted against *Comcast* and *Daubert* challenges by numerous courts in consumer protection cases challenging false or misleading labels."). In a conjoint survey, participants go through a series of choice tasks in which they are presented with variations of a product (*i.e.*, different prices or labels) and asked to pick which one they would purchase (or whether they would not purchase any one of the choices). Singer Rpt., ¶¶ 18, 30. The responses are then analyzed to isolate the economic value (also known as the price premium) that consumers place on certain attributes. *Id*. *See Hadley*, 324 F. Supp. 3d at 1104 ("It is well-established that the 'price premium attributable to' an alleged misrepresentation on product labeling or packaging is a valid measure of damages in a mislabeling case . . . .") (quoting *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534 (9th Cir. 2016)).

Importantly, a conjoint analysis takes into account responses from all participants, including those who may not place less economic value on a particular product attribute. It therefore does not measure the price premium that any particular consumer might place on a given attribute, but instead measures the overall price premium the market assigns to that attribute. Singer Rpt., ¶ 41. A conjoint survey estimates how much lower the market price would have been had consumers been given accurate information (*i.e.*, not have been deceived) about the product attribute at issue. *Id.*, ¶¶ 28-29. The result would be a lower retail price for *all* purchasers, regardless of the extent to which any given individual purchasers might have differed in the value he or she placed on the attribute at issue. As a result, the conjoint analysis estimates a single price premium paid (and thus injury suffered) by all purchasers of the product. *Id.*, ¶ 41. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595 (9th Cir. 2012) ("[t]o the extent that class members were relieved of their money by [Defendant's] deceptive conduct . . . they have suffered an 'injury in fact'" even "without individualized proof of deception, reliance, or injury").

Dr. Singer's conjoint analysis provides a sound methodology for estimating the market-wide price premium attributable to the JUUL product characteristics that plaintiffs allege were

misrepresented or omitted in JUUL product marketing and packaging. Singer Rpt., ¶¶ 28-29.[7] First, Plaintiffs allege that Defendants' fraudulent scheme conveyed that JUUL products were less addictive than combustible cigarettes, and omitted material information to the contrary. The conjoint analysis demonstrates that, had consumers been informed that JUUL products' propensity to create and maintain addiction was greater than that of combustible cigarettes, the market price would have decreased significantly. *Id.*, ¶ 41 (37.6% decline). Second, Plaintiffs allege that JUUL marketing deceptively conveyed that JUUL products were safe and failed to disclose facts the contrary. The conjoint analysis again demonstrates that, had consumers been better informed of the health risks posed by JUUL products, the market price would have decreased significantly. *Id.* (24.9% decline). To the extent that JUUL advertisements and labels may have also contained truthful and non-misleading statements that Plaintiffs do not challenge, there is no requirement that conjoint have separately isolated and tested the impact of these statement on consumers' purchasing decisions. *See Post Foods*, 334 F.R.D. at 575 (rejecting defendants' criticism of plaintiffs for not "isolat[ing]" and test[ing] the Challenged Statements separate and apart from the value of the unchallenged or truthful statements"). Nor is there any requirement that the conjoint account for competing products or other "possible influences" on consumer behavior. *Id*. at 576, 580.

The conjoint analysis thus sufficiently measures the "harm caused by the predicate acts constituting the illegal pattern." *Just Film*, 847 F.3d at 1120. All class members, in other words, paid a "premium they would not have paid had Defendants disclosed the [omitted information]." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg, Sales Pracs., and Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 970 (N.D. Cal. 2018). While the precise nature and scope of the misrepresentations and omissions will be determined by the jury, Dr. Singer's analysis demonstrates that classwide proof can be used to determine a price premium that is "directly attributable to [Plaintiffs'] legal theory of the harm." *Just Film*, 847 F.3d at 1121-22. As a result, common questions exist and predominate for the injury prong of Plaintiffs' RICO claim.

---

[7] To the extent Defendants challenge the existence of such misrepresentations and omissions, or whether consumers would have relied on them, those arguments would "go to the weight, not the admissibility" conjoint survey. *Post Foods*, 334 F.R.D. at 582.

The fact that consumers of nicotine products pay price premiums based on what information is provided (or not provided) about the products is not a novel concept. Numerous studies have shown a direct connection between the represented safety and addictiveness of nicotine products, and consumers' willingness to pay for them. One such study conducted in 2016, like Dr. Singer's analysis, considered products' flavor, nicotine content, health warnings, and price. Singer Rpt, ¶ 21. A 2021 analysis concluded that the most significant attributes for e-cigarette consumers were flavor, product messaging, and nicotine levels. *Id.*, ¶ 22. In other words, Dr. Singer's methodology is well-grounded and frequently utilized in the field of consumer research for nicotine products.

In addition to estimating the price premiums attributable to certain product features, Dr. Singer's analysis also sufficiently accounts for 'supply-side' factors; *i.e.,* JLI's ability and/or willingness to supply the same amount of product at a lower price point. Courts have held that a conjoint sufficiently accounts for supply-side factors "when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period." *Hadley*, 324 F. Supp. 3d at 1105-06 (collecting cases). Dr. Singer's analysis includes both features. The conjoint survey used actual prices charged during the class period. Singer Rpt., ¶ 32, 41. And Dr. Singer's willingness to pay and aggregate damages analysis "held the supply fixed." *Broomfield v. Craft Brew Alliance, Inc.*, 2018 WL 4952519, at *10 (N.D. Cal. Sept. 25, 2018); *see* Singer Rpt., ¶ 44. Dr. Singer explained that it would be "clearly economically feasible" for JLI to supply the same amount in the but-for world, at the same cost. Singer Rpt., ¶ 44. There is thus no basis to assume that had JUUL products been adequately labeled and marketed, JUUL's *ability* to supply its products would have been diminished. Although not necessary under *Hadley*, *Broomfield*, and other cases, Dr. Singer also performed an additional supply-side analysis that "allows for the possibility that JUUL could have reduced the supply" of JUUL products in the but-for world, in order to further increase its but-for profit. Singer Rpt., ¶ 45. To do so, Dr. Singer employed "standard economics" to determine how a profit-maximizing company like JUUL would have responded to decreases in demand (and price) had the challenged conduct been eliminated. *Id.*, ¶ 46; *see MacBook*, 2021 WL 1250378, at *6 (finding Dr. Singer's

supply-side methodology sufficient). To calculate aggregate damages for the Nationwide Class, Dr. Singer determined the total sales for JUUL products sold through 2019 (the date through which sales data was produced) by multiplying the quantities of each type of JUUL product sold by each product's retail price. *Id.*, ¶ 41. He then applied the percentage price premium to the total sales to obtain a preliminary aggregate damages figure. *Id.* Even under Dr. Singer's conservative analysis, preliminary aggregate damages exceed $950 million dollars. *Id.*, ¶ 50.

Dr. Singer also provided a model for estimating classwide damages for the Nationwide Youth Class. Plaintiffs allege that Defendants' conduct created an expansive market for JUUL products among minors, to whom tobacco sales are illegal. *E.g.* Cal. Bus. & Prof. Code § 22963(a) (prohibiting the "sale, distribution, or nonsale distribution of tobacco products directly or indirectly to any person under 21 years of age"); *see also* 42 U.S.C.A. § 300x-26 (allowing  funding only to states that prohibit sales of tobacco products to anyone under 21 years of age (18 years of age prior to a 2019 amendment). Because the transactions themselves were unlawful and strongly prohibited by public policy, the appropriate measure of damages for Defendants' youth marketing is the full amount of purchases made by minors. *See In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 155 (Cal. Ct. App. 2010) (approving full refund where plaintiff alleged "he bought an illegal product he would not have [otherwise] bought"). Dr. Singer's proposed methodology therefore estimates the number and value of purchases made by minors at retail locations, and it uses common evidence to do so. The first step of the methodology is to estimate the total number of electronic cigarette users under 18 years of age, relying on data reported by the U.S. Food & Drug Administration and Centers for Disease Control through its annual National Youth Tobacco Survey ("NYTS"). Singer Rpt., ¶ 60. Next, the proposed methodology would implement a survey targeting users between 18 and 23 years of age who used e-cigarettes before they turned 18 years old. *Id.*, ¶ 62. The survey would estimate the proportion of total electronic cigarette users under 18 who used JUUL (as opposed to other brands), the proportion of those individuals who made their own purchases from brick and mortar stores or online retailers, and the purchasers' average consumption of JUUL. *Id.* The methodology would use those results to estimate, on a yearly basis, the total number of JUUL products purchased by underage users from brick and mortar stores or online.

That purchase volume can then be multiplied by the retail prices for JUUL products. *Id.*, ¶¶ 62, 67-68. The methodology to calculate aggregate damages will therefore rely on evidence common to the class: data from the NYTS, survey results, and retail prices for JUUL products. *Id.*, ¶¶ 59-65.

There is no need to determine the extent to which each individual RICO Defendant is liable for the aggregate damages amount because "liability under RICO is 'joint' and 'several'." *MTD Order*, 2020 WL 6271173, at *43. And while the damages owed to class member will vary, differences in the amount of damages are irrelevant at class certification. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013) (holding that the district court abused its discretion in finding that individualized issues of damages precluded class certification). The determination of classwide damages therefore presents common, not individualized, issues.

### 3.  *Causation*

With respect to causation, "plaintiff[s] asserting a RICO claim predicated on mail fraud need not show, either as an element of [their] claim or as a prerequisite to establishing proximate causation, that [they] relied on the defendant's alleged misrepresentations." *Bridge*, 553 U.S. at 661; *see also Ecodiesel*, 295 F. Supp. 3d at 970 ("reliance is not a necessary element of a RICO claim").[8] They need only show that they were injured "by reason of" the scheme, which includes both but-for and proximate causation. *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010). If a plaintiff, "[a]s a result of [the] fraud," lost money that "they otherwise would [not] have," the fraud is a but-for cause of the injury. *Bridge*, 553 U.S. at 649. And if the injury is also the "direct and foreseeable consequence" of the fraud, *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 640 (5th Cir. 2016) (en banc), and "the conduct directly causing the harm" is the same as "the conduct giving rise to the fraud," the fraud is the proximate cause of the injury. *Hemi Group*, 559 U.S. at 11. "[T]his understanding of the causation requirement for fraud-based RICO claims—that such claims, unlike most common law fraud claims, do not require proof of first-party reliance—largely dooms [any] attempt to identify individual issues of causation sufficient to preclude a finding of predominance." *Torres*, 838 F.3d at 638; *see also Custom Hair Designs*, 984 F.3d at 602.

---

[8] Even if reliance we required, as the Fifth Circuit recognized in *Torres v. S.G.E.*, circuits "have permitted inferences of reliance when it follows logically from the nature of the scheme." 838 F.3d at 641-43.

As discussed above, Defendants' scheme injured class members in that class members paid more for JUUL products than they would have absent Defendants' fraudulent conduct, and minors purchased products they were not legally permitted to purchase. Both theories of harm are directly attributable to Defendants' scheme, and "there can be no question that [class members] are both the direct and foreseeable victims of the alleged fraud," so the scheme proximately "caused [their] financial losses." *Torres*, 838 F.3d at 640. And for every class member, "the conduct directly causing the harm" is the same as that "giving rise to the fraud," *Hemi Group*, 559 U.S. at 11. So "[t]he facts necessary to prove that the [RICO] Defendants operated a fraudulent [] scheme will also suffice to show under *Bridge* that the fraud caused the Plaintiffs' injuries." *Torres*, 838 F.3d at 641. For this reason, certification of Plaintiffs' RICO claim is appropriate.

### b.   California Fraud Claims: UCL, CLRA, and FAL Claims

California Plaintiffs' statutory fraud claims—brought under the UCL, CLRA, and FAL— involve overlapping legal and factual questions and courts therefore "often analyze the three statutes together" at class certification. *Hadley*, 324 F. Supp. 3d at 1089; *see also Broomfield*, 2018 WL 4952519, at *10 ("For the purpose of class certification, Plaintiffs' CLRA, UCL, and FAL claims are "materially indistinguishable and thus can be analyzed together.") (quotation omitted). Because the elements of the claims focus primarily on Defendants' conduct, turn on objective standards for liability, and do not present individualized questions of reliance or injury, they are well-suited to classwide resolution.

### 1.   *Consumer Deception and Materiality*

Under the UCL, CLRA, and FAL, the issues of whether a defendant's conduct is deceptive and whether the misrepresented or omitted information is material are quintessentially common questions. A misrepresentation or omission is deceptive if it "has a capacity, likelihood or tendency to deceive or confuse the public," which is an "objective test [that] focuses on the reasonable consumer." *Hadley*, 324 F. Supp. 3d at 1095 (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008), and *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506–07 (Cal. Ct. App. 2003)) (quotation omitted). Similarly, a statement or omission is material if "a reasonable consumer would attach importance to it *or* if the maker of the representations knows or has reason

to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (quotation omitted). "[B]ecause deception and materiality under the FAL, CLRA, and UCL are objective questions, they are 'ideal for class certification because they will not require the court to investigate class members' individual interaction with the [challenged] product[s].'" *Hadley*, 324 F. Supp. 3d at 1115 (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012)); *see also Wellpet*, 2021 WL 756109, at *27 ("The inquiry under California law is based on what a reasonable consumer would believe," which is an issue "to be resolved at trial."); *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 326 F.R.D. 592, 613 (N.D. Cal. 2018) ("As a general rule, materiality may be established by common proof because materiality is judged according to an objective standard, and so the alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all [consumers] composing the class.") (quotations omitted).

The objective nature of the deception and materiality inquiries has two important implications. First, extrinsic evidence, such as expert reports or consumer surveys, is not necessary to prove that the public is likely to be deceived under the FAL, CLRA, or UCL. *Post Foods*, 334 F.R.D. at 565 (citing *Hadley*, 324 F. Supp. 3d at 1115). In fact, "failure to provide sufficient evidence of deception and materiality . . . has no bearing on whether common questions will predominate over individual questions. . . . [W]hether the challenged [] statements were misleading and material must be evaluated according to an objective 'reasonable consumer' standard." *Hadley*, 324 F. Supp. 3d at 1115. Second, a plaintiff "has no burden to establish that there is a uniform understanding among putative class members as to the meaning of" the challenged marketing, "or that all or nearly all of [the class members] shared any specific belief." *Pettit v. Procter & Gamble Co.*, 2017 WL 3310692, at *3 (N.D. Cal. Aug. 3, 2017). The objective nature of the inquiries thus means that common issues inherently predominate.

Plaintiffs have nonetheless provided ample record evidence supporting the conclusion that the challenged misrepresentations and omissions were likely to deceive and were material to a reasonable consumer. Plaintiffs' expert, Dr. Anthony Pratkanis, has analyzed JUUL marketing based on his decades of experience studying the science of social influence and consumer

perceptions, and has also reviewed internal JUUL documents. *See Post Foods*, 334 F.R.D. at 579 (plaintiffs' expert offered opinions on, among other things, whether the challenged statements "conveyed" a health message); *see also Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at *24 (N.D. Cal. Aug. 13, 2019) (rejecting *Daubert* challenge to expert that relied on his marketing experience) (collecting cases). According to Dr. Pratkanis, JUUL's key marketing strategy was to convey that it was a technologically innovative product for young adults and, later, for adult smokers. Pratkanis Rpt. at 6. The result of those efforts, and the imagery used in JUUL marketing materials, was that reasonable consumers would conclude JUUL products were safe and not engineered to be dangerously addictive. *Id*. at 6, 22-40. And the partial warnings used in advertisements and on product labels would not have sufficiently informed reasonable consumers about the addictiveness and dangers of JUUL products. *Id*. at 6, 11, 46-50.

With respect to materiality, under California law, a misrepresentation or omission is material where safety is involved. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("Alleged defects that create 'unreasonable safety risks' are considered material."). As a result, a presumption of materiality arises based on California Plaintiffs' allegations that JUUL marketing misled consumers into incorrectly believing that JUUL products were safe, failed to disclose information that the products were not safe, and was likely to deceive consumers regarding the nicotine potency and addictive nature of JUUL products.

Though Plaintiffs are entitled to a presumption of materiality, there is also substantial evidence that a reasonable consumer would find the challenged misrepresentations and omissions material. First, JLI's internal documents demonstrate that consumers placed significant weight on the health effects of JUUL products. *See* Pratkanis Rpt. at 14 (discussing JLI documents). For example, a December 2017 marketing overview and survey showed four of the top product claims that would be most important to consumers involved health or addictiveness messaging. Sharp Decl., Ex. 13 at 16-17. The fact that the product labels consistently compared the nicotine content of JUULpods with combustible cigarettes demonstrates that Defendants believed nicotine levels (especially in comparison to combustible cigarettes) were a valuable consideration for consumers.

*See Post Foods*, 334 F.R.D. at 566 (with respect to materiality, the jury could weigh "evidence of why [the defendant] decided to use the statements and how to place them on the Products").

Second, Dr. Pratkanis has explained that "healthy, safer, and no or less risk nicotine/tobacco products are important and material in consumers' decision-making." Pratkanis Rpt. at 14. *See Post Foods*, 334 F.R.D. at 563 (in support of class certification, plaintiffs offered expert testimony concerning how the defendant "used the Challenged Statements to drive sales and market shares" and that "consumer interest" in the subject matter of the statements was "extremely relevant"). Another one of Plaintiffs' experts, Dr. Sherry Emery, has explained that addictiveness and safety were key drivers for the combustible cigarette industry, and that consumer perceptions (and purchasing behavior) changed significantly when the truth about combustible cigarettes became widely known and their marketing practices ended. Emery Rpt. at 9. As with consumer deception, the record on materiality provided by the California Plaintiffs is more than sufficient to support certification. The plaintiffs in *Post Foods*, for example, relied on an expert who offered opinions on whether health messaging is material to consumers, whether consumers rely on health messaging in their purchasing decisions, and whether the disclosure of omitted information would have impacted consumer behavior. 334 F.R.D. at 579. Similar expert opinions, Defendants' own documents, the results of the conjoint surveys, and common sense all support a finding of materiality here, and all are common to the class.

### 2.   *Reliance*

In fraud cases brought under the UCL, CLRA, and FAL, absent class members "are not required to prove their individual reliance on the allegedly misleading statements. Instead, the standard in actions under both the CLRA and UCL is whether 'members of the public are likely to be deceived.'" *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364–65 (N.D. Cal. 2018) (citing *Bradach v. Pharmavite, LLC*, 735 F. App'x 251, 254 (9th Cir. 2018), and *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)); s*ee also Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) ("named plaintiffs, but not absent ones, must show proof of 'actual reliance' at the certification stage"). As a result, "[t]he relevant analysis under California law does not consider whether each class member saw and relied on the [fraudulent statements] and in what combination."

*Post Foods*, 334 F.R.D. at 563-64 (citing *Hadley*, 324 F. Supp. 3d at 1095 (the question is how an objective "reasonable consumer" would react to a statement, and not whether individual class members saw or were deceived by statements")); *Fitzhenry-Russell*, 326 F.R.D. at 612 ("Each statute allows plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation material.").

Instead, under California law, the relevant inquiry is "whether the [fraudulent statements] were used consistently through the Class Period, supporting an inference of classwide exposure." *Post Foods*, 334 F.R.D. at 564. In *In re Tobacco II Cases*, the California Supreme Court explained that even a named plaintiff "is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements" where the alleged fraud occurred as part of an "extensive" marketing campaign. 46 Cal. 4th 298, 328 (Cal. 2009). Where the fraud is part of an extensive and widespread marketing effort and the challenged misrepresentations and omissions are material to a reasonable consumer, "reliance is presumed." *Sloan v. Gen. Motors LLC*, 2020 WL 1955643, at *43 (N.D. Cal. Apr. 23, 2020) (collecting cases and rejecting defendant's argument that "evidence that materiality and reliance would vary from consumer to consumer" makes a presumption of reliance improper); *see also Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 902 (N.D. Cal. 2015) ("reliance . . . can be established on a class-wide basis by materiality"). The Ninth Circuit has "repeatedly relied on *Tobacco II* in recognizing 'what amounts to a conclusive presumption' of reliance in UCL cases." *Walker*, 953 F.3d at 630 (citing *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 n.13 (9th Cir. 2011)). As discussed below, the challenged misrepresentations and omissions were pervasive throughout the class.

***Misrepresentations and Omissions on JUUL Labels Warrant a Presumption of Reliance***: "Where, as here, there is evidence that the representation was consistently made on a product's label, the only question is whether it was objectively material to a reasonable consumer." *Post Foods*, 334 F.R.D. at 565 (collecting cases); *Ehret*, 148 F. Supp. 3d at 895 (in a mislabeling case, "exposure on a classwide basis may be deemed sufficient."). Similarly, where "[p]laintiffs' theory is that Defendant's *omissions* violated the UCL, FAL, and CLRA and that partial representations *on the product itself* are misleading," no individualized issues exist concerning classwide exposure.

1 *Tait*, 289 F.R.D. at 482; *see also MacBook*, 2021 WL 1250378, at *13 (in an omission case, a

2 plaintiff "may establish the required elements of reliance, causation, and damages by satisfying a

3 'reasonable person' standard").

4       California Plaintiffs allege multiple deceptive statements on JUUL product labels that were

5 made consistently throughout the class period. First, since the initial launch of JUUL, the labels

6 have stated that that one JUULpod is "equivalent to about 1 pack of cigarettes" (later changed to

7 "approximately equivalent to about 1 pack of cigarettes). Second, the statement that JUUL is an

8 "alternative for adult smokers" was later added to the packaging. Pratkanis Rpt. at 46. Plaintiffs

9 allege that both of these statements were likely to deceive a reasonable consumer into believing

10 that JUUL products would not be more addictive than combustible cigarettes. The fact that there

11 were variations in the packaging over time is irrelevant. *See Wellpet*, 2021 WL 756109, at *27

12 ("Even if the packaging varied considerably, it would be irrelevant if WellPet" had a duty to

13 disclose omitted information.).

14       With respect to omissions, although the JUUL product labels stated that the products had

15 nicotine (although, until 2018 only in small font on the back of the package), prior to 2018 the

16 labels did not state that nicotine was addictive. Pratkanis Rpt. at 46. And at no point did the product

17 labels disclose that JUUL products used a unique formulation and design that was highly effective

18 at creating and maintaining addiction. *Id*. at 47. Similarly, while the back of the labels contained a

19 California Proposition 65 and other warnings, the label never disclosed that using JUUL products

20 poses a significant risk of cardiovascular and lung injury and disease, as well as seizures, or

21 contained harmful chemicals like propylene glycol and glycerin. *Id*. Because all JUUL product

22 labels omitted material information concerning nicotine potency, addictiveness, and safety, a

23 classwide presumption of reliance arises. *See Wellpet*, 2021 WL 756109, at *27-29 (certifying

24 product-specific classes despite variations in packaging); *In re NJOY, Inc. Consumer Class Action

25 Litig.*, 120 F. Supp. 3d 1050, 1105 (C.D. Cal. 2015) (presumption of reliance existed where

26 "plaintiffs allege that the packaging [of e-cigarettes] consistently omitted reference to ingredients

27 such as propylene glycol and glycerin, or consistently failed to disclose health-related risks").

28

*Misrepresentations and Omissions in JUUL Advertisements Warrant a Presumption of Reliance*: A classwide presumption of reliance is also warranted with respect to California Plaintiffs' claims that JUUL marketing (aside from the product labels) contained deceptive statements and omissions because (1) JUUL branding and marketing was pervasive and JUUL purchasers were exposed to Defendants' messaging and (2) the messaging, although using different imagery and wording, conveyed consistent messages about JUUL products that would be likely to deceive reasonable consumers in similar ways.

With respect to classwide exposure, Plaintiffs' experts have provided detailed analyses of the effectiveness and pervasiveness of the sophisticated JUUL marketing campaign. John Chandler, a Clinical Professor of Marketing at the University of Montana and former Research Director at Microsoft Advertising, conducted a thorough assessment of the various JUUL marketing campaigns. Chandler Rpt. at 30-111. Earlier marketing efforts were more targeted and designed to create "buzz" and excitement among a young audience, and allowed JUUL to "lay the foundation for their future success." *Id*. at 31. Over time JUUL marketing expanded substantially, provoking criticism from the FDA. *Id*. Defendants not only used social media to maximize the reach of JUUL marketing but they also used a wide range of marketing techniques (point-of-sale displays, influencers, print, billboards, TV, radio, display advertising, and others) to ensure that JUUL messaging was dispersed through as many channels as possible and as widely as possible. *Id*. at 30-113. The extensive use of social media and the viral nature of the medium allowed JUUL marketing to easily reach a wide-range of consumers and likely JUUL purchasers, making it much more efficient and effective than traditional print and TV advertising alone. *Id*. at 7-9 (discussing the advantages of social media). The effect was hundreds of millions or billions of impressions (*i.e.* the number of times an advertisement appears in front of a person) per year. *Id*. at 113-14. The fact that the "multi-media promotional campaign was uniform, highly orchestrated, concentrated and focused on its intended audience," *Makaeff v. Trump Univ., LLC*, 2014 WL 688164, at *13 (S.D. Cal. Feb. 21, 2014), confers that the marketing of JUUL to purchasers was pervasive.

Professor Chandler ultimately concludes that JUUL marketing would have reached all or nearly all media consumers in the United States. *Id*. at 114. Because JUUL targets its marketing to

nicotine users and, more specifically, likely JUUL purchasers, the pervasiveness among those groups would be even greater. *Id*. According to Dr. Chandler's analysis, it would have been "almost impossible" for a JUUL purchaser not to have been exposed to JUUL marketing. *Id*. at 115. The pervasiveness of JUUL's marketing is corroborated by the fact that as JUUL's marketing volume grew, so did its sales volume. Plaintiffs' expert Dr. Sherry Emery, Senior Fellow at the University of Chicago, who currently studies the impact of media marketing on the sales of e-cigarettes for the Centers for Disease Control and Prevention (CDC), has studied the relationship between JUUL-related tweets and sales volume from 2015 and 2017, and concluded that there is a 97% correlation between the two. Emery Rpt. at 20-21. Twitter activity alone accounted for 93% of sales using a regression analysis (*id*.) and Twitter was just a portion of JUUL's overall marketing strategy (*see* Chandler Rpt. at 112-13). Those findings strongly support Dr. Chandler's conclusion that JUUL marketing was very effective at targeting likely purchasers. Dr. Chandler's analyses, especially when bolstered by Dr. Emery's analysis and opinions, strongly support the conclusion that JUUL marketing was sufficiently pervasive to warrant a classwide presumption of reliance.

Given the widespread pervasiveness of the messaging for JUUL products, along with evidence suggesting that JUUL marketing was driving purchasing behavior, a presumption of classwide exposure and reliance is appropriate. *See id*. (nature of marketing made it "highly likely" that class members were exposed); *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1258 (Cal. Ct. App. 2009) (plaintiff not required to plead specific advertisements where the "advertising campaign . . . [took] place over many months, in several different media"). There is no requirement that plaintiffs prove that *every* class member was actually exposed to a misleading advertisement before a class can be certified. *See Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("even a well-defined class may inevitably contain some individuals who have suffered no harm as a result of defendant's unlawful conduct"); *Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *9 (N.D. Cal. July 15, 2016) (arguments concerning whether consumers actually saw the challenged statements goes the common question of whether a "reasonable consumer" would have been misled). This is particularly true where, as here, all class members paid an inflated price premium.

The fact that the marketing of JUUL products involved different advertisements is also no impediment to certification. As the Ninth Circuit has explained, "[t]he class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims." *First Alliance*, 471 F.3d at 992; *see also NJOY*, 120 F. Supp. 3d at 1106 (same). "[I]n *Tobacco II*, the California Supreme Court held that 'where . . . a plaintiff alleges exposure to a long-term advertising campaign . . . some degree of variation or imprecision with respect to specific statements is allowed." *In re Apple AT&T iPad Unlimited Data Plan Litig.*, 2012 WL 2428248, at *7 (N.D. Cal. June 26, 2012) (citation omitted) (quoting *Tobacco II*, 46 Cal. 4th at 328). Instead of fixating on whether the representations were identical, the focus is the "underlying scheme" which "transcends the specific details of" the communications to class members and reject a "talismanic rule" that defeats class certification "unless [the] representations are all but identical." *First Alliance*, 471 F.3d at 991.

Dr. Pratkanis's report establishes that JUUL's advertising had the kind of unifying "underlying scheme" likely to convey similar messages to a reasonable consumer, rendering minor variations in specific ads irrelevant for purposes of class certification. Dr. Pratkanis identified the "Unique Selling Proposition" (USP) for JUUL products as "a tech lifestyle product that satisfies," which is intended to create an impression of health and safety, including by comparison to unsafe products like cigarettes. Pratkanis Rpt. at 6, 8-11. While the USP was originally developed in the context of the *Vaporized* marketing campaign, it was also the basis for subsequent campaigns such as *Make the Switch*, which "leverages the JUUL unique selling proposition of 'tech lifestyle' to make health and safety claims in a manner similar to the *Vaporized* and other campaigns." *Id*. at 26-30, 34-43. Although they do so in somewhat different ways, the campaigns and advertisements for JUUL products all convey to a reasonable consumer the central message that JUUL products are safe and would not be more addictive than combustible cigarettes. *Id*. at 6, 8-11, 14. Variations in the manner in which JUUL marketing has conveyed its central themes (including omissions) reinforces the core marketing messages and increases the effectiveness of the advertising. *Id*. at 14-17.

Where, as here, advertisements convey a consistent message, differences in wording or imagery do not preclude certification. In *NJOY*, for example, the advertisements contained a variety of statements, "such as 'finally smokers have a real alternative,' 'cigarettes you've met your match,' and other slogans such as 'Resolution Solution' and 'Everything you like about cigarettes without the things you don't.'" 120 F. Supp. 3d at 1106. The court held that where advertisements "were materially misleading, and conveyed a safety message, the fact that they were worded differently does not preclude a finding that materiality can be proved on a classwide basis." *Id*; *see also Johnson v. General Mills, Inc.*, 275 F.R.D. 282, 288–89 (C.D.Cal.2011) ("General Mills' argument is unpersuasive that individual issues predominate because purchasers of YoPlus have been exposed to different mixes of packages and advertisements . . . the common issue that predominates is whether General Mills' packaging and marketing communicated a persistent and material message that YoPlus promotes digestive health.").

In addition, with respect to California Plaintiffs' omission claims, there are no significant variations in the information omitted from JUUL marketing. Regardless of form, content, or media through which advertisements were distributed, JUUL marketing failed to disclose the highly addictive nature of JUUL products and the serious health risks they pose. Pratkanis Rpt. at 46-50.

In any event, any complexity created by variations among the advertisements distributed to the class "does not mean predominance is undermined. . . . These arguments [] show only that plaintiffs have a complex case to prove." *Post Foods*, 334 F.R.D. at 566; *see id*. at 560, 563 (rejecting defendant's argument that "consideration of each combination of labels and recipes," 45 different statements that appeared on 31 different products, created individualized issues). Given the common nature of the other elements of California Plaintiffs' statutory fraud claims, variations among classwide advertisements do not present individualized issues that would overwhelm common ones.

3.    *Damages*

As with Plaintiffs' RICO claim, California Plaintiffs will establish classwide injury, restitution (for the UCL and FAL claims), and damages (for the CLRA claim) for the California Class through Dr. Singer's conjoint analysis, discussed above. Conjoint analyses are regularly used

in consumer fraud cases. *Hadley*, 324 F. Supp. 3d at 1103 (finding conjoint analysis sufficient). And a price premium theory of recovery is also readily accepted in such cases. *See Wellpet*, 2021 WL 756109, at *11 ("price premiums attributable to alleged misrepresentations have been accepted, as a general matter, as valid measures for damages in [UCL, FAL, and CLRA cases"); *Hadley*, 324 F. Supp. 3d at 1104 ("It is well-established that the 'price premium attributable to' an alleged misrepresentation on product labeling or packaging is a valid measure of damages in a mislabeling case under the FAL, CLRA, and UCL."); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *11 (C.D. Cal. July 1, 2013) ("One method of quantifying the amount of restitution to be awarded is computing the effect of unlawful conduct on the market price of a product purchased by the class").

There is no need to separately calculate the amount of restitution owed by JLI and each of the Individual Defendants for their violations of the UCL.[9] Under California law, "parties may be held jointly and severally liable for unfair competition and for making false and misleading statements." *People v. First Federal Credit Corp.*, 104 Cal. App. 4th 721, 734 (Cal. Ct. App. 2002) (upholding joint and several liability against corporation and corporate officer under the UCL and FAL). The UCL does not displace such common law remedies. *See* Cal. Bus. & Prof. Code § 17205 ("the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state"). Further, "[b]ecause joint and several liability is permissible, restitution awards need not be limited to the funds each defendant personally received from the wrongful conduct." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 601 (9th Cir. 2016). Instead, "Defendants held jointly and severally liable for payment of restitution are liable for the unjust gains the defendants *collectively* received, even if that amount exceeds (as it usually will) what any one defendant pocketed from the unlawful scheme." *Id.*[10] In addition, imposition of joint and several liability would be consistent with California Plaintiffs' theory of

___

[9] The Individual Defendants are defendants for Plaintiffs' UCL claims, but not their CLRA claims, and thus liable for restitution under the UCL but not damages under the CLRA.

[10] Although the Ninth Circuit was describing restitution under the FTC Act, not the UCL, it is still persuasive authority. "[T]he Unfair Business Practices Act is one 'of the so-called 'little FTC Acts' of the 1930's . . . . Because of this relationship between the [UCL] and the Federal Trade Commission Act, judicial interpretations of the federal act have persuasive force." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 505-06 (2003).

1  liability for the Individual Defendants—that as individuals and a collective group, they personally

2  participated in and directed the fraudulent conduct.

3  　　Even if restitution were required to be calculated separately for each of the Individual

4  Defendants, plaintiffs have proposed such an analysis.[11] Plaintiffs allege that the Individual

5  Defendants sought to "position[] JLI for acquisition by Altria and the millions or billions of dollars

6  they ultimately made as a culmination of those efforts." ECF 1694, Order on Second Round of

7  Motions to Dismiss, at 22. When Altria purchased 35% of JLI, its valuation was tied to the ability

8  of JUUL products to generate sales (Sharp Decl., Ex. 14 (discussing importance of JUUL sales in

9  Altria valuation model) and the payments received by the Individual Defendants were based on the

10  size of Altria's investment (*id.*, Ex. 15 at 1 ("participants receive cash distribution" based on vested

11  and unvested "units")). Dr. Singer's conjoint analysis, in turn, uses the price premium to determine

12  the percentage of sales attributable to the challenged conduct. Singer Rpt., ¶ 41. In other words, the

13  premium charged for JUUL products increased sales, which increased the value of JLI, which in

14  turn increased the payments to the Individual Defendants. Restitution for the Individual

15  Defendants' participation in the fraudulent marketing of JUUL products can therefore be calculated

16  by reference to the percentage increase in sales (based on the price premium). While the Individual

17  Defendants may dispute the reliability or legal sufficiency of this approach, at the merits stage it

18  will "prevail or fail in unison. In no event will the individual circumstances of particular class

19  members bear on the inquiry." *Amgen*, 568 U.S. at 460.

20  　　Plaintiffs' proposed restitution analysis reflects both the financial benefit realized by the

21  Individual Defendants and, by calculating restitution based on price premium, the loss suffered by

22  class members. *See Post Foods*, 334 F.R.D. at 577 (noting that the calculation of restitution must

23  have "some connection to the amount of *actual* loss to actual class members"). Most important for

24  class certification purposes, however, is the fact that the calculation of restitution to be paid by each

25  Defendant would focus on the common question of how much Defendants gained through the

---

[11] As the Court has recognized, the entitlement to, and amount of restitution is best determined on
a full evidentiary record. ECF 1694, Order on Second Round of Motions to Dismiss, at 22. Discovery
concerning the Individual Defendants is ongoing, and Plaintiffs provide the proposed restitution
calculation methodology for illustrative purposes but reserve their right to present an alternative
methodology at the merits phase.

26

27

28

fraudulent marketing of JUUL products. And how much restitution is owed to each class member "is invariably an individual question and does not defeat class action treatment." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).

c.   California Common Law Fraud Claim

"Under California law, to state a claim for common law fraud and fraudulent misrepresentation, a party must plead facts alleging five elements: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) the speaker's knowledge of falsity (scienter); (3) the intent to defraud or to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Broomfield*, 2018 WL 4952519, at *12. Common questions will predominate with respect to consideration of these factors. The elements of scienter and intent focus exclusively on Defendants' conduct, and therefore present issues common to the class. And as noted above, the existence of misrepresentations and omissions in JUUL marketing will also be common to the class. The classwide damages will be calculated using the same conjoint methodology described above.

The need to demonstrate reasonable and actual reliance does not preclude a finding of predominance. Because the question of whether reliance is reasonable turns on whether the misrepresentation or omission is material, that element is "common to the class." *Broomfield*, 2018 WL 4952519, at *13. Similarly, the actual reliance element will not present individual issues that would preclude certification of California Plaintiffs' common law fraud claim. First, regardless of issues related to actual reliance, "[t]he California common law claims are also good candidates for class treatment in that they focus in significant part on the falsity of the defendant's statements, and the defendant's knowledge of falsity or assertion of a falsehood without reasonable grounds." *Brickman v. Fitbit, Inc.*, 2017 WL 5569827, at *6 (N.D. Ca. Nov. 20, 2017) (citing *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173-74 (Cal. 2003)). Second, "the issue of materiality will have a direct impact on [the actual reliance analysis], and thus [the issue of actual reliance] alone is not enough to defeat predominance." *Broomfield*, 2018 WL 4952519, at *13; *Miller v. Fuhu, Inc.*, 2015 WL 7776794, at *16 (C.D. Cal. Dec. 1, 2015) (for common law fraud claim, "reliance can be presumed if the misrepresentation was material").

d.    California UCL Unfair Conduct: Youth Marketing

As to restitution under the unfair prong of the UCL, Plaintiffs and the Class must show only that Defendants committed unfair acts and that the money to be restored "may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203; *see also id.* § 17200 (defining "unfair competition" to encompass "unfair" business acts or practices). This results in essentially three elements: (1) unfair conduct; (2) likelihood of causation; and (3) amount of restitution. Each element is necessarily common and predominates because it "focus[es] on the defendant's conduct." *Tobacco II*, 46 Cal. 4th at 312; *see also Newton v. Am. Debt Servs.*, 2015 WL 3614197, at *10 (N.D. Cal. June 9, 2015) ("Because no individualized inquiries seem required under the unfair prong, Rule 23(b)(3)'s predominance element is satisfied. Even if some individual inquiry were required, it is clear here that commonality predominates."); *Grace v. Apple, Inc.*, 328 F.R.D. 320, 335 (N.D. Cal. 2018) ("[C]ommon questions are especially likely to predominate because this case centers almost exclusively on Apple's conduct, namely causing the FaceTime Break, as opposed to class members' individual experiences."); *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 155 ("Martinez's UCL claim presents two predominate issues . . . both of which are common to the class: (1) whether GNC's sale of androstenediol products was unlawful; and if so, (2) the amount of money GNC 'may have . . . acquired by means of' those sales").

1.    *Unfairness.*

California law has two different tests to evaluate whether a practice is "unfair," either one of which is sufficient to establish a UCL violation, and both of which are common to all class members. *See In re Adobe*, 66 F. Supp. 3d at 1226 (articulating the possible tests defining "unfair"); *see also Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 736 (9th Cir. 2007) (holding that the two tests "are not mutually exclusive"). A practice is unfair under the "tethering test" if it violates a public policy "tethered to specific constitutional, statutory, or regulatory provisions." *In re Adobe*, 66 F. Supp. 3d at 1226. A practice is unfair under the "balancing" test if it is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and its harmfulness outweighs its utility. *Id.* Plaintiffs will establish on a class-wide basis that Defendants' conduct in designing and marketing a nicotine product in a way that appeals to youth is unfair under either test.

Whether Defendants' conduct is unfair under the tethering test is necessarily a common question, as it focuses solely on whether that conduct violates California's strong public "policy of keeping children from starting on the road to tobacco addiction." *Mangini v. R.J. Reynolds Tobacco Co.*, 22 Cal. App. 4th 628, 641 (Cal. Ct. App. 1993). That policy is specifically "tethered to state laws prohibiting the sale of e-cigarettes to minors." *Colgate v. Juul Labs, Inc.*, 402 F. Supp. 3d 728, 760 (N.D. Cal. 2019); *see also* Cal. Bus. & Prof. Code § 22963(a) (prohibiting the sale and distribution of tobacco products, including e-cigarettes). JUUL's conduct either violated this strong, statutorily-tethered public policy, or it did not—regardless, the answer will be the same for all class members. *See Newton*, 2015 WL 3614197, at *10 (certifying UCL unfairness claims because the "'unfair' conduct appears uniform across all class members—either Newton will be able to show that Defendants structured their affairs to charge excessive prorating fees, or not").

Whether JUUL's conduct is unfair under the balancing test is similarly a common question. As to the first part of the test, either JUUL's conduct is immoral, unethical, oppressive, or unscrupulous, or it is not. Also, as to the "balancing" portion of the test, "the Court may make one uniform determination of whether the utility of the conduct outweighed the harm to class members" in the aggregate which requires "no individualized inquiries." *Newton*, 2015 WL 3614197, at *10; *see also Grace*, 328 F.R.D. at 335 ("[C]ommon questions predominate because this case stems from Apple's uniform and simultaneous creation of the FaceTime Break, which affected all class members at the same time and in the same way.").

Although it is unnecessary for the Court to make an unfairness determination at this stage of the case, common evidence will be used to prove unfairness under both tests. The essence of the unfairness is Defendants' design and marketing of JUUL products in a way that was likely to appeal to minors and to induce them to purchase and use JUUL products. Several features of the design were attractive to youth and made them likely to purchase and use the product, including the dessert-like flavors; the nicotine salts that reduced throat irritation; the pharmacokinetics that delivered an immediate nicotine buzz; the light-up party mode; the concealability of the device as a USB thumb drive; and the sleek modern design that was unlike previous ENDS, which were either bulky or looked like cigarettes. Emery Rpt. at 9-12. When it came to marketing, JUUL copied

many tactics straight from the playbook of Big Tobacco; tactics that courts have previously deemed as unfair targeting of underage users. *Id.* at 3, 6-9, 12; Pratkanis Rpt. at 6 (JUUL messaging "was driven home to the consumer using a variety of effective social influence tactics reminiscent of traditional tobacco marketing).

### 2.   *Causation*

The UCL allows a court to order the restitution of any money that "may have been acquired" as a result of an unfair, unlawful, or deceptive practice. Cal. Bus. & Prof. Code § 17203. "[T]his standard focuses on the defendant's conduct and is substantially less stringent than a reliance or 'but for' causation test." *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 924 (Cal. Ct. App. 2010); *see also Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442, 451 (1979) ("Defendant's reading of the statute overlooks the true breadth of the section. Section 17535 authorizes restitution not only of any money which has been acquired by means of an illegal practice, but further, permits an order of restitution of any money which a trial court finds 'may have been acquired by means of any . . . [illegal] practice.'"). And, critically for class certification purposes, no "individualized proof of injury or causation is required to impose restitution liability against the defendant in favor of absent class members," which means this issue is necessarily common. *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 154; *see also Stearns*, 655 F.3d at 1020 (class relief under the UCL is available "without individualized proof of deception, reliance and injury"); *Tourgeman v. Collins Fin. Servs.*, 2011 WL 5025152, at *17 (S.D. Cal. Oct. 21, 2011) ("Because individual inquiry into causation is not necessary, common issues would predominate on the UCL claim.").

If class members were exposed to the unfair conduct, then "the 'money or property' of the entire class of purchasers 'may have been acquired by means of an unfair practice, thus entitling them to restitution for their loss." *In re Tobacco II Cases*, 207 P.3d 20, 37 (Cal. 2009); *see also Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292 (2002) (classwide showing of causation is sufficient if it is as to "most of the class. The fact a defendant may be able to defeat causation as to a few individual class members does not transform the common question into a multitude of individual ones"); *In re Steroid Hormone Prods. Cases*, 181 Cal. App. 4th at 156-57 (holding that defendant could not defeat class certification even though it ultimately "might be able

1    to show that some class members would have bought the products even if they had known they

2    were unlawful to sell or possess without a prescription").

3         Here, JUUL's unfair conduct included pervasive youth-directed marketing including

4    domination of social media youth spaces. As discussed above, Dr. Chandler's analysis shows that

5    all or nearly all JUUL users would have been exposed to JUUL product messaging. Chandler Rpt.

6    at 114-15.  And the exposure to JUUL marketing would have been even more pronounced among

7    minors. Dr. Emery's report specifically focuses on the effects of JUUL marketing on youth, and

8    she explains that the primary marketing methods for JUUL—*e.g.*, social media and influencers—

9    were particularly likely to be utilized by JUUL, further supporting the notion that youth would have

10   been exposed to JUUL's marketing. Emery Rpt. at 13-29; *see Tobacco II*, 46 Cal. 4th at 327

11   (referencing "saturation advertising targeting adolescents" as a basis for liability even when

12   plaintiffs could not point to specific misrepresentations that they had heard or relied on). Dr. Emery

13   cites numerous articles and studies concluding that since the introduction of JUUL and its youth-

14   focused marketing, e-cigarette use among minors has skyrocketed. Emery Rpt. at 12-13. The unfair

15   conduct also included the product design itself, to which, by definition, all class members were

16   "necessarily exposed." *See Tourgeman*, 2011 WL 5025152, at *17 ("[C]lass members necessarily

17   were exposed to the misrepresentation because, by definition, they received a collection letter or

18   lawsuit stating that AIB as the original creditor for the loan.").

19                              3.      *Damages.*

20        To satisfy predominance as to damages on a cause of action, "the plaintiff bears the burden

21   of providing a damages model showing that 'damages are susceptible of measurement across the

22   entire class'" and that the model measures "'only those damages attributable to' the plaintiff's

23   theory of liability.'" *Grace*, 328 F.R.D. at 337 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27,

24   35 (2013)). The fact that the amount of damages will be different for each class member, which is

25   "invariably an individual question . . . does not defeat class action treatment." *Leyva v. Medline

26   Indus., Inc.,* 716 F.3d 510, 514 (9th Cir. 2013). Restitution under the UCL "must be of a measurable

27   amount to restore to the plaintiff what has been acquired by violations of the statutes, and that

28   measurable amount must be supported by evidence." *Colgan v. Leatherman Tool Group, Inc.,* 135

Cal.App. 4th 663, 698 (2006). Plaintiff's damages model for the California Youth Class provides for a full refund, which fits the theory of liability and is capable of measurement across the class.

A full refund damages model is appropriate in only a few limited circumstances, one of which is where the underlying sale is illegal. *Makaeff v. Trump Univ., LLC*, 309 F.R.D. 631, 639 (S.D. Cal. 2015). So, although in some damages models plaintiffs must account for the value of the product they received, permitting such "an offset" when the underlying transaction is illegal "would legitimize the illegal sale." *Id.* Also, plaintiffs must account for a product's value when their theory of liability puts at issue the valuation of the product, such as with a claim that a misrepresentation caused the plaintiffs to pay more for a product than it was worth. *See id.* at 637 & 639 (distinguishing mislabeling cases that disapprove of full-refund models because in those cases "plaintiffs put valuation at issue by alleging that due to the alleged misrepresentations they paid more for [the products] than [they were] worth]").

As to the claims asserted on behalf of the California Youth Classes, Plaintiffs' theory is not that Defendants caused Plaintiffs to pay more for the JUUL products than they were worth, but that JUUL induced Plaintiffs into illegal transactions *that never should never have occurred in the first place*. Cal. Bus. & Prof. Code § 22963(a) (prohibiting the sale and distribution of tobacco products, including e-cigarettes). Accordingly, a full refund damages model is appropriate and fits Plaintiffs' theory of liability. *See In re Steroid Hormone Prod. Cases,* 181 Cal. App. 4th at 156-57 (approving full refund); *Ortega v. Nat. Balance, Inc.*, 300 F.R.D. 422, 430 (C.D. Cal. 2014) (allowing plaintiffs to "recover their full purchase price" because the product "was illegal"); *Lambert v. Nutraceutical Corp.*, 2015 WL 12655392, at *3 (C.D. Cal. June 24, 2015)  ("Plaintiff's full refund damage model is consistent with his liability theory that Cobra is ineffective and illegal.").

The *In re Steroid Hormone Products* case is instructive and directly on point. There the plaintiff sought to certify a class of consumers to pursue, among other things, a claim under the unlawfulness prong of the UCL that "GNC sold products containing androstenediol [a controlled substance] without requiring a prescription." 181 Cal. App. 4th at 150. Plaintiffs sought a full refund of the purchase price of the products on the theory that the transactions were illegal, and they therefore would not have purchased the products absent GNC's unlawful conduct. *Id.* at 156-

157. GNC argued that a full refund did not adequately account for the "value" of the products, and that the decision in *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (Cal. Ct. App. 2009), required the damages model to do so. *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 159. The Court rejected the argument and held the class should be certified, reasoning that "with regard to the UCL claim, unlike the allegations in *Vioxx*, where the plaintiffs put valuation at issue by alleging that due to the alleged misrepresentations they paid more for a medication than it was worth, in this case Martinez does not put valuation at issue when he alleges that he bought a product that was illegal to sell or possess." *Id.* at 160. The same holds true here.

Using the same analysis discussed above with respect to the RICO claims of the Nationwide Youth Class (*see* Part III.C.1.a.2), full refund damages are also capable of measurement across the California Youth Class. Although not necessary due to the availability of joint and several liability under the UCL, California Plaintiffs can also separately calculate restitution amounts for the Individual Defendants. Dr. Singer's analysis can be used to estimate the number of sales attributable minors. *Id.*, ¶¶ 61-65, 67-68. And, as discussed above in the context of damages for California Plaintiffs' fraud claims, increases in sales also increased the value of JLI, which in turn increased the amount the Individual Defendants received. *See* Part III.C.1.b.3. This approach to calculating individual restitution amounts appropriately reflects the amounts received by the Individual Defendants while being tied to the harm suffered by the California Youth Class.

e.     California Unjust Enrichment

Unjust enrichment requires the "receipt of a benefit and the unjust retention of the benefit at the expense of another." *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *27 (N.D. Cal. June 13, 2014) (quoting *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (Cal. Ct. App. 2000)). The Ninth Circuit has recently clarified that "'California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss,' and 'regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.'" *Cottrell v. AT&T Inc.*, 2020 WL 4818606, at *4 (N.D. Cal. Aug. 19, 2020) (quoting *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599–600 (9th Cir.

2020)). Because the elements of unjust enrichment focus primarily on the defendant's conduct, courts have recognized that unjust enrichment claims are well suited to certification. *See Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 568 (S.D. Cal. 2012) ("[U]njust enrichment claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members."); *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 72 (D.N.J. 2009) (finding that certification of the plaintiffs' unjust enrichment claim was appropriate because "virtually all of the legal and factual issues which will be adjudicated at trial are common to the class"); *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 612 (D.S.D. 2004) (holding that unjust enrichment claims are well suited to certification because their "very nature . . . requires a focus on the gains of the defendants, not the losses of the plaintiffs").

California Plaintiffs allege that the Defendants received benefits—sales revenues in the case of JLI, and dividend and other payments in the case of the Individual Defendants—at the expense of class members, who paid more than they would have as a result of Defendants' unjust fraudulent marketing and targeting of minors. Whether Defendants received benefits, whether those benefits were received at the expense of class members (including the extent to which the payments received by the Individual Defendants were the result of the success of Defendants' conduct), and whether the retention of those benefits would be unjust are all common issues capable of classwide resolution. Because those common issues will drive resolution of California Plaintiffs' unjust enrichment claims, certification is appropriate.

The amount of disgorgement owed by JLI and the Individual Defendants is purely a function of how much money each Defendant received, does not vary from class member to class member, and is an inherently common issue. For JLI, Dr. Singer's conjoint analysis can be used to determine the disgorgement amount attributable to the deceptive marketing of JUUL products by applying the price premium percentage to JLI's net revenues for JUUL products. Singer Rpt., ¶ 43. With respect to marketing to minors, Dr. Singer's youth damages methodology can be used to determine disgorgement by multiplying the number of minor purchases by JLI's per-product net revenues (as opposed to retail prices, which was used by Dr. Singer to determine damages for the youth marketing claims). *Id*. ¶ 70. For the Individual Defendants, disgorgement attributable to deceptive

marketing of JUUL products can be measured using the same analysis used above with respect to California Plaintiffs' statutory fraud claims. *See* Part III.C.1.b.3. With respect to marketing to minors, the percentage of JUUL sales attributable to the use of JUUL products by minors (calculated using Dr. Singer's methodology for estimating the volume of JUUL sales attributable to minor purchases) can be applied to each Individual Defendant's respective payments. Each of these methods relies on common evidence and presents common issues.

f.   California Implied Warranty of Merchantability and Magnuson-Moss Warranty Act Claims

A seller breaches the implied warranty of merchantability where its products are not "fit for the ordinary purposes for which such goods are used." Cal. Com. Code § 2314(2)(c); *see also Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) ("the claims under the Magnuson–Moss Act stand or fall with his express and implied warranty claims under state law"). A plaintiff's damages for a breach of the implied warranty of merchantability are "the monetary equivalent to the benefit of his bargain." *Guido*, 2013 WL 3353857, at *14 (quoting *S.M. Wilson & Co. v. Smith Intern, Inc.*, 587 F.2d 1363, 1375 (9th Cir. 1978)) (accepting a damages model based on the "true market value" of the product at issue). The analysis focuses on the condition of the product at the time it was sold and whether it was sold as warranted, rather than how it was subsequently used, and in this case, the Court has found that "the allegations about the pharmacokinetics of JUUL's formulation sufficiently allege that JUUL's products do not possess even the most basic degree of fitness for ordinary use." *MTD Order*, 2020 WL 6271173, at *50 (quoting *Colgate*, 402 F. Supp. 3d at 757).

"An implied warranty claim requires an objective standard" and is "'therefore susceptible to common proof. Courts routinely certify implied warranty classes for this reason.'" *Zakaria v. Gerber Prods. Co.*, 2016 WL 6662723, at *13 (C.D. Cal. Mar. 23, 2016) (quotations and alterations omitted) (quoting *Tait*, 289 F.R.D. at 485). Here, no matter how the Court ultimately decides to evaluate the "ordinary purpose" for JUUL products the question of whether JUUL products are fit as sold for that use will be resolved through common evidence and analysis. As California Plaintiffs' expert Alan Shihadeh (an engineer specializing in tobacco products) explains, the

analysis of whether JUUL products are fit for any ordinary use will focus on the design of JUUL products as they were sold, and specifically whether their design fosters nicotine abuse and addiction. Shihadeh Rpt. at 2. Specifically, the abuse liability analysis will center on how the design of the product impacts "the form of nicotine delivered, the speed and quantity of nicotine delivered, and other features . . . ." *Id*. at 2, 5. As one example, the extent to which JUUL products are engineered to create a nicotine spike upon use—*i.e.*, an initial rapid rise in nicotine levels in the brain—directly correlates to its potential for abuse. *Id*., at 13. Other examples include the the addition of benzoic acid and the ratio of glycerol to propylene glycol. *Id*., at 7, 10, 11. Each of these attributes is inherent to JUUL the condition of JUUL products when they were sold throughout the class period and does not vary by individual consumer. *Id*., at 2, 7, 12-14. *See Guido*, 2013 WL 3353857, at *13 (certifying implied warranty claim because, at merits phase of the litigation, plaintiffs' ability to present "common proof about the nature of" the product was sufficient); *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *25 (N.D. Cal. Sept. 14, 2016) (certifying implied warranty claim based on evidence that each product had materially similar defects). With respect to damages, Dr. Singer's conjoint-based damages model measures the benefit of the bargain, *i.e.*, what consumer paid for JUUL products versus the value of what the class actually received, and relies on common evidence.

There are likewise no individualized issues concerning whether class members are in privity with JLI. As this Court noted in denying JLI's motion to dismiss, recent decisions have recognized that "the third-party beneficiary exception has been accepted by California Courts of Appeal." *MTD Order*, 2020 WL 6271173, at *49 (citing *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 854 (N.D. Cal. 2018) (collecting cases)).[12] All members of the class would either be in privity with JLI (because they purchased directly) or fit within the third-party beneficiary privity exception. There are thus no individualized issues related to privity. *See Treviso v. Nat'l Football League*, 2020 WL 7021357, at *5 (N.D. Ohio Nov. 30, 2020) (certifying class including third-party beneficiaries as

---

[12] The Court declined to reach the issue of whether the "foodstuffs" privity exception also applies. *MTD Order*, 2020 WL 6271173, at *49 n.58. California Plaintiffs reserve their right to argue that such an exception applies. Because the exception focuses on the type of product at issue and not the type of purchaser, its applicability would not raise any individualized issues.

well as direct purchasers).

## 2. A Class Action Is the Superior Method of Adjudicating the Claims of the Proposed Classes

Classwide adjudication is also the superior method of resolving class members' claims. "A class action is a superior means of adjudicating a dispute '[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency.'" *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 618 (N.D. Cal. 2014) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)). Courts examine four factors in making this determination: "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). All four factors support class certification of Plaintiffs' claims.

While individuals with personal injury claims may be motivated to file individual personal injury suits, the same is not true with respect to claims for economic losses. No plaintiffs have expressed a desire to individually litigate their economic loss claims; in fact, plaintiffs sought to litigate their economic loss claims as class actions instead of through their separate personal injury complaints. *See* ECF 1123. And given the substantial overlap between all class members' claims, it is highly desirable to concentrate economic loss claims in a single proceeding. *See In re JUUL Labs, Inc. Mktg., Sales Pracs., and Prods. Liab. Litig.*, 396 F. Supp. 3d 1366, 1367 (J.P.M.L. 2019) (centralizing all class actions in this Court). Nor are there manageability problems that would overwhelm the substantial efficiencies gained through class litigation given that the common nature of the central issues in the litigation. *See Post Foods*, 334 F.R.D. at 566 (complexity of advertising and labeling did not defeat certification). This is particularly true in light of the "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015)). To demonstrate how this case can be

tried effectively and efficiently in a single proceeding (including legal claims before the jury and equitable claims before the Court), Plaintiffs have provided trial plan. Sharp Decl., Ex. 21.

### D. The Classes Are Based on Objective Criteria and Are Ascertainable

In the Ninth Circuit, "there is no free-standing requirement above and beyond the requirements specifically articulated in Rule 23" that a class be "ascertainable" or that identification of class member be "administratively feasible." *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018); *see also Briseno*, 844 F.3d at 1133 ("the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification"). To the extent there is any form of an "ascertainability" requirement in the Ninth Circuit, it considers only whether the class definition is "based on objective criteria that allow potential class members to determine whether they are included in the class." *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *25 (N.D. Cal. Feb. 21, 2017); *Farar v. Bayer AG*, 2017 WL 5952876, at *13-14 (focusing on whether a class definition "identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover"). The proposed classes are based on objective criteria: whether the individual purchased a JUUL product at retail and (for the Nationwide Youth Class and the California Youth Class) how old the individual was at the time of purchase. No further "ascertainability" showing is required.

### E. The Denial of Class Certification in Other Nicotine Product Cases Does Not Compel a Similar Result in This Case

Plaintiffs recognize that in a number of decisions, courts have denied class certification in cases involving the marketing and sales of light cigarettes. Those cases are, however, distinguishable as they involved different theories of harm and recovery.

In the typical light cigarette case, such as *In re Light Cigarettes Marketing Sales Practices Litigation*, the plaintiffs' theory of injury was that, while defendants marketed light cigarettes as containing less nicotine than traditional cigarettes, light cigarette users would not realize these benefits because they would "compensate," *i.e.* they would smoke more light cigarettes to receive as much nicotine and tar as they would smoking traditional cigarettes. 271 F.R.D. 402, 410 & n.9

(D. Me. 2010). In *Light Cigarettes*, the court declined to certify the class on predominance grounds because the extent to which class members did or did not compensate—and were thus injured under plaintiffs' theory—was an individualized inquiry. *Id*. at 416. *See also Phillips v. Philip Morris Companies, Inc.*, 298 F.R.D. 355, 365 (N.D. Ohio Feb. 28, 2014) (denying certification because of variations in compensation). In addition, the plaintiffs in *Light Cigarettes* had "not specified resultant damages suffered by all California Class members." *Id*. at 417; *see also Cleary v. Philip Morris USA, Inc.*, 265 F.R.D. 289, 292-93 (N.D. Ill. 2010) (plaintiff failed to "address how he or any other class member will prove that they suffered detriment" and had "effectively forfeited" any arguments as to typicality).

By contrast to the claims in the light cigarette cases, Plaintiffs' alleged injury here—an elevated market price that every class member paid—does not depend on each individual class member's smoking habits. Instead, the harm occurs when the purchase is made and the overcharge is paid, and is unaffected by class members' later use of JUUL. *See Craft v. Philip Morris Co.*, 190 S.W.3d 368, 382, 383 (Mo. Ct. App. 2005) (certifying class of light cigarette purchasers because plaintiffs' allegations "go[] to the condition of the product" and that "predominance of the common issues is not defeated" even if there are individual issues related to injury damages). And through a price premium model, Plaintiffs have shown how class members suffered the type of quintessential economic losses that are recoverable under RICO and California law. While the court in *Light Cigarettes* also concluded that class members were exposed to disparate information (*id*.), in this case Plaintiffs have explained that, despite variations in the statements and warnings in JUUL marketing, a reasonable consumer would take away the same core messages from JUUL marketing and that certain alleged addiction and safety risks were never disclosed. Pratkanis Rpt. at 6, 15-16, 26-27, 32, 34, 40-41 46-50.

The light cigarette decisions also often relied on outdated or inapplicable controlling law or lacked certain factual showings that Plaintiffs have made in this case. In *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 220 (2d Cir. 2008), plaintiffs brought a RICO claim alleging that they were deceived "into believing that 'light' cigarettes ('Lights') were healthier than 'full-flavored' cigarettes." The Second Circuit reversed class certification because, in large part, the record showed

that plaintiffs could not show reliance on common basis. *Id*. at 222-24. As noted above, the holding in *McLaughlin* is no longer good law in light of the Supreme Court's holding in *Bridge* that reliance is not a requirement under RICO. Nor is it applicable to statutory claims like those at issue here that do not require actual reliance by all class members and focus on objective, reasonable consumers. *See Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 549 (E.D.N.Y. 2017) (distinguishing *McLaughlin*). In addition, while *McLaughlin* concluded that overcharges are not cognizable damages under RICO, decisions from the Ninth Circuit have concluded otherwise. *See MTD Order*, 2020 WL 6271173, at \*40 n.41 (*McLaughlin* has been "rejected as contrary to circuit precedent" and "persuasively distinguished" (citing *EcoDiesel*, 295 F. Supp. 3d at 960, and *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 349 F. Supp. 3d 881, 905 (N.D. Cal 2018)). Lastly, in *McLaughlin*, the plaintiffs' theory of recovery depended on the value of a hypothetical "healthy cigarette," which was too speculative. 522 F.3d at 229.  "In *McLaughlin* . . . there was no actual overpayment because the plaintiffs in those cases did not pay more than the fair market value of the items they purchased. The same cannot be said here. Plaintiffs allege that they paid a premium for" JUUL products. *EcoDiesel*, 295 F. Supp. 3d at 961. 

In *NJOY*, 120 F. Supp. 3d 1050, the court denied certification for reasons that are not applicable here. First, plaintiffs did not demonstrate classwide exposure for their misrepresentation claims because the marketing in *NJOY* was not sufficiently pervasive, as it included only sporadic print and radio advertisements over the course of a year and television advertisements for 193 days (mostly in Los Angeles only). *Id*. at 1108-09. Here, in contrast, Professor Chandler provides a detailed explanation of the pervasive marketing for JUUL, and sales of JUUL are highly correlated to those marketing efforts. *See* Chandler Rpt. at 83; Emery Rpt. at 20-21. No similar evidence was offered in *NJOY*. In addition, the *NJOY* court concluded that exposure was not an issue with respect to plaintiffs' labeling claims, *id*. at 1105 ("As respects the omissions claims based on product packaging, there is no question that *Mazza* is not controlling and is distinguishable."), and the same holds true here. Second, the *NJOY* court rejected the proposed conjoint analysis because it "completely ignores" supply-side factors. *Id*. at 1120. Here, Dr. Singer has sufficiently accounted for supply-side factors by using actual market prices and quantities, *Hadley*, 324 F. Supp. 3d at

1105-06, and through widely accepted economic techniques. Singer Rpt., ¶¶ 44-57. *See Fitzhenry-Russell*, 326 F.R.D. at 606 ("the conjoint survey here may be distinguished [from *NJOY*] on the same basis because Dr. Dennis's conjoint survey does consider supply-side factors").

Lastly, in *In re Tobacco II Cases*, after the California Supreme Court vacated the lower court's decertification of the class, the plaintiffs lost a bench trial, in large part because the Court rejected their conjoint survey. 240 Cal. App. 4th 779, 786, 788 (Cal. Ct. App. 2015). That decision is inapposite to this motion, which focuses on whether a conjoint constitutes classwide proof and not whether the factfinder should credit the results of the survey at trial. While the trial court in *Tobacco II* rejected the use of a conjoint analysis in that case to measure restitution under the UCL, decisions from this District have regularly approved of conjoint analyses for such purposes. *E.g.*, *Hadley*, 324 F. Supp. 3d at 1113 ("the price premium attributable to an alleged misrepresentation on product packaging is a valid measure of damages in the affirmative misrepresentation context under the FAL, CLRA, and UCL").

**F.      In the Alternative, the Court Can Certify Plaintiffs' Claims Under Rule 23(c)(4)**

Rule 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Even if the Court determines that the presence of individualized issues in certain aspects of the case may preclude certification of the classes under Rule 23(b)(3), certification under Rule 23(c)(4) of the many indisputably common issues will substantially advance the resolution of class members' claims. Doing so would avoid separate trials simply to "determine whether the challenged practices were unlawful." *McReynolds v. Merril Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012).

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed classes, appoint Sarah London, Dena Sharp, Dean Kawamoto, and Ellen Relkin as Co-Lead Class Counsel for the classes under Rule 23(g), and appoint Plaintiffs as class representatives.

Dated: April 28, 2021

Respectfully submitted,


By: /s/ Sarah R. London

Sarah R. London
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
slondon@lchb.com


By: /s/ Dena C. Sharp

Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
dsharp@girardsharp.com


By: /s/ Dean Kawamoto

Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
dkawamoto@kellerrohrback.com


By: /s/ Ellen Relkin

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
erelkin@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record. I also caused a copy of the under-seal documents to be served via electronic mail on defense counsel.

By: /s/ *Dena C. Sharp*
Dena C. Sharp

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 19-MD-02913-WHO