# EXHIBIT B

April 12, 2021

*Via ECF*
The Honorable Jacqueline Scott Corley
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102

RE: *In re Juul Labs, Inc., Mktg. Sales Prac. & Prods. Liab. Litig.*
Case No.: 3:19-md-2913

Dear Judge Corley:

Pursuant to Case Management Order No. 6 (ECF No. 357), Defendants Altria Group, Inc., Philip Morris USA Inc., Altria Client Services LLC, Altria Group Distribution Company, and Altria Enterprises LLC (collectively, "Altria") and Plaintiffs (together, the "Parties") submit this Joint Letter Brief to address whether the Court should preclude the deposition of Altria Group Inc.'s ("Altria") Chief Executive Officer, William ("Billy") F. Gifford. After efforts to meet and confer were unsuccessful, they agreed to a simultaneous exchange of five-page statements of their respective positions on this issue followed shortly thereafter by the filing of this joint submission. The Parties' respective positions for the Court's consideration are set forth below.

## Plaintiffs' Position

### I. Billy Gifford Played a Principal Role in Altria's $12.8 Billion Investment in and Partnership with Juul Labs, Inc. and the Director Defendants and Has Personal Knowledge of Altria's Operations and Business Strategy Regarding Expansion of the Nicotine Market, Issues Central to Plaintiffs' Claims.

Plaintiffs allege that Altria, by at least the Spring of 2017 and continuing to the present, collaborated with, directed, and controlled both JUUL Labs, Inc. ("JLI") and the Director Defendants with the aim of maximizing at all costs the market for nicotine generally, and JUUL e-cigarette products specifically. Through discovery, Plaintiffs are gathering evidence to test their contentions, which Altria vigorously deny, including:

- Altria knew before negotiations ever began that JLI's products were dangerous, and that its business growth required aggressive targeting of youth;

- Altria had the means, motive, and opportunity to influence and direct JLI and the Director Defendants: immense financial leverage over the Director Defendants (the means); its own ability to target future smokers hobbled by litigation and regulatory pressure (the motive); and 18 months of confidential back-channel negotiations with the Director Defendants (the opportunity);

- During this period where Altria was supposedly innocently exploring potential minority investment, it took significant active steps to support JLI's business, including: removing its own competing product from the market; ensuring that the FDA would not take action against the mint products key to enticing youth; acquiring shelf space earmarked for JUUL; and designing fraudulent messaging for JUUL;

- Once Altria formally invested $12.8 billion in JLI in December 2018, (a decision made despite the FDA's raid of JLI's headquarters and data establishing that JLI had caused a youth epidemic), it continued to actively control JLI, notwithstanding its official status as a "minority" investor; and

- Under the guise of reducing harm to its core customers (combustible cigarette smokers), Altria provided services to dramatically expand sales of Juul products—particularly the mint products attractive to youth—and to facilitate fraud, including distributing "Make the Switch" advertisements and nicotine content statements that it knew were fraudulent.

Plaintiffs seek to depose Billy Gifford, who served as one of the main Altria negotiators of the JLI investment and personally played a key role in nearly every facet of the initiation, investigation, resuscitation, execution, and public justification of the deal. Numerous Altria representatives (including 30(b)(6) witnesses) have identified Gifford as one of Altria's principal decision-makers and negotiators in the JLI-Altria transaction. *See, e.g.*, Brian Blaylock (Altria 30(b)(6)) Dep. Tr., Vol. I, at 47:8–19 ("**Exhibit A**") ("Q. Who were the principal negotiators for Altria…for this transaction?...THE WITNESS: My understanding [is] the principal negotiators were Howard Willard and Billy Gifford..."); Willard Dep. Tr., at 264:2–10 ("**Exhibit B**") ("Q. ...If you can describe who from Altria was involved in negotiations with Pax and then -- which became Juul... A. On the Altria side, the people that were involved tended to be myself, Murray Garnick, and Billy Gifford, and K.C. Crosthwaite."); *id.* at 264:13–265:1 ("Q. Can you just go through each of those folks and just describe for me your understanding of what role they played in the transaction? A... Billy Gifford is vice chairman and chief financial officer. And so he was involved looking at particularly the financial aspects of the deal, but he's also deeply experienced in the tobacco category.").

Documents reviewed to date further confirm Gifford's essential, personal role in the advancement of the investment, including attending key meetings with JLI investors to dangle substantial financial incentives and negotiating terms. For example, on July 28 or 29, 2017, Gifford (then Vice Chairman and CFO of Altria) and Howard Willard (then CEO of Altria) met with JLI executives and investors, including Tyler Goldman, Zach Frankel, and Defendants Valani and Pritzker to discuss a potential minority investment. Meeting minutes indicate that Gifford and/or Willard offered that with such a partnership, "altria could help with: 1. Access to distribution and sales team 2. FDA + regulatory engagement as well as whole gov't affairs org [and] 3. Expertise in brand building and maintenance." Further, Altria "Would invest at 'EXCESS OF TOBACCO MULTIPLES'" and "Provide Access to other Altria Resources" including "Distribution across 150k doors that matter." In the meantime, Altria pushed JLI to

"develop … very good digital reach." Valani followed up on this meeting with an email on July 31, 2017 connecting Gifford with Defendant Pritzker, "convey[ing] our warm regards to Howard," and offering to "come to Richmond" in order "to continue our discussion." *Bagley* First Am. Compl. at ¶ 549;[1] *see also* 8/9/2018 Email from Gifford to Willard, Riaz Valani ("Valani"), and Kevin Burns ("**Exhibit D**") (Gifford providing redline edits for the purchase agreement between JLI and Altria). Gifford also internally championed the deal, including by presenting to Altria's stakeholders the benefits of pursuing JLI. *See, e.g.,* 10/11/2018 Draft Script for October Townhall Presentation by Gifford and Willard ("**Exhibit E**"); May 2018 Board of Directors Presentation by Gifford ("**Exhibit F**") (presentation by Gifford on the rapid growth of JUUL, the benefits of a deal between JLI and Altria, a preliminary valuation of JLI, and mitigation of certain regulatory risks).[2]

Beyond his close, personal involvement with the JLI deal, Gifford has been part of the Altria enterprise for more than 27 years. In that time, Gifford has held multiple senior positions.[3] In these roles, Gifford has become intimately familiar with and directed Altria's operations and business strategy central to the issues in this MDL, specifically Altria's efforts to maximize its core cigarette business while hedging against future losses through investment in nicotine products that appeal to young people. He has spoken frequently to analysts and investors and authored internal communications and documents on these topics. *See e.g.*, Altria 2018 Fourth Quarter Earnings Call, SEC (Jan. 31, 2019) ("**Exhibit T**").

In short, Plaintiffs do not seek to depose Gifford merely because he is CEO, or some high-level executive. Gifford is a key fact witness because he was a principal negotiator who facilitated the JLI deal, and because he has unique personal knowledge of the core issues in this MDL—Altria's drive to expand the nicotine market by any means necessary. No other witness can testify to Mr. Gifford's recollection of key events or explain his statements or actions.

## II. The Apex Doctrine Does Not Shield Gifford from Deposition as He Has Unique Knowledge of and Personal Involvement with Altria's Efforts to Collaborate With, Control, and Direct JLI and the Director Defendants.

It is well-established that "a party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied". *In re Chase Bank USA, N.A. Check Loan Cont. Litig.*, No. 3:09-MD-2032 MMC JSC, 2011 WL 5248158, at *1 (N.D. Cal. Nov. 3, 2011) (internal quotation marks and citation omitted). A witness's status as "'a busy, high-ranking executive' is not itself sufficient to justify a protective order." *Hardin v. Wal–Mart Stores, Inc.*, No. 08-CV-0617, 2011 WL 6758857 *2 (E.D. Cal. Dec.22, 2011).

---

[1] The *Bagley* complaint is filed in redacted form at Doc. 7 in case number 3:20-cv-3770 and MDL Doc. 1419-2 (Exhibit A-6) and under seal at MDL Doc. 1420 (Exhibit B-6).

[2] There are myriad emails between Gifford and JLI that demonstrate Gifford's indispensable role in solidifying the transaction and detail the specific decisions he made to finalize and promote the deal. *See* Exhibits C, G-S (Gifford arranging and engaging in meetings, collaborations, strategy, signed agreements, due diligence and other core activities related to Juul products).

[3] *See Altria: Our Leadership*, https://web.archive.org/web/20190312094316/http://www.altria.com/About-Altria/Our-Leadership/Pages/Billy-Gifford.aspx (last visited Apr. 2, 2021).

When a party seeks protect "a high-level executive" from testifying (a so-called 'apex' deposition), courts may limit the discovery after considering "(1) whether the deponent has unique firsthand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Haggarty v. Wells Fargo Bank, N.A.*, No. 10-2416 CRB JSC, 2012 WL 3939320, at *1 (N.D. Cal. Aug. 24, 2012) (citing *In re Google Litig.*, No. C 08-03172, 2011 WL 4985279 at *2). Courts routinely permit depositions of high-level executives, including CEOs, where, as here, those executives have unique, first-hand knowledge of facts that are relevant to the case. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, Ltd, 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition.").[4]

**a. Gifford's unique and personal knowledge and hands-on involvement justify his deposition.**

*Apple, Inc. v. Samsung Elecs. Co.* is instructive. In that case, Apple brought a patent infringement case against Samsung. 282 F.R.D. at 261–62. During discovery, Apple moved to compel Samsung to produce witnesses for deposition, including Samsung's CEO, Choi. *Id.* Samsung moved for a protective order, citing the apex doctrine. *Id.* at 262. The court denied the motion, explaining, "Choi's position as CEO of Samsung Electronics Company does not automatically shield his deposition. In *In re Google*, [the Northern District of California] ordered the limited depositions of the defendant's CEO after the plaintiff showed that he had unique knowledge of facts that could not be secured by other less intrusive means of discovery." *Id.* at 264. The court specifically noted that in *In re Google*, the CEO "was one of a few employees at Google[] at the time of [certain] negotiations" and that "he had direct knowledge of the patent search industry." *Id.* at 265 (citing *In re Google*, 2011 WL 4985279, at *1). Applying those same principles, the *Apple* court explained, "[i]n light of the evidence proffered by Apple that Choi was at the head of a strategic shift in Samsung's design mentality at precisely the time that certain accused products were being developed, the court is similarly persuaded that Choi may have engaged in the type of hands-on action which demonstrates the unique personal knowledge required to compel a deposition of a CEO." 282 F.R.D. at 265 (internal citations omitted). Just like Samsung's CEO, Gifford was engaged in "hands-on action which demonstrates . . . unique personal knowledge" at precisely the same time that JLI and Altria were engaged in negotiations.

That Plaintiffs have deposed or will depose others who attended the same meetings as Gifford or who were parties to communications with Gifford does not render his testimony

[4] *See also, e.g.*, *Powertech Tech., Inc. v. Tessera, Inc.*, No. C 11-6121, 2013 WL 3884254, at *1 (N.D. Cal. July 26, 2013) (same); *Anderson v. Cty. of Contra Costa*, No. 15-CV-01673, 2017 WL 930315, at *3 (N.D. Cal. Mar. 9, 2017) ("The apex doctrine does not protect high-ranking officials from all depositions."); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, No. 05-CV-1018, 2011 WL 1304587, *2 (S.D. Cal. Apr. 6, 2011) ("[CEOs] and other apex-type executives are certainly not beyond the reach of the litigation process . . . the Northern District of California recently ordered Steve Jobs, the CEO of Apple Inc. and arguably the apex of all apexes, to sit for deposition . . . *no* CEO is *ipso facto* immune from deposition in the Court's mind.").

"repetitive" or not unique. *See Updateme, Inc. v. Axel Springer SE*, 2018 WL 5734670, at *1-2 (N.D. Cal. Oct. 31, 2018) (rejecting defendant's argument that a deposition of its executive was repetitive because plaintiffs had already deposed another senior executive who attended the same meetings as both executives appeared to be centrally involved in the meetings and projects that plaintiffs were concerned with and thus "may have unique first-hand, non-repetitive knowledge.").[5] As in *Updateme, Inc.*, deposing Gifford is not "repetitive" because the evidence suggests he had direct involvement in the negotiations and setting company strategy to expand the market for Juul products. Further, Gifford authored or edited many key documents and presentations regarding the investment and corporate strategy during the relevant period, and Gifford's testimony is necessary to explain them and put them in their proper context. Moreover, the negotiations and meetings in question took place several years ago, and it is imperative to collect the recollections of multiple participants, especially when certain participants' recollections have faded or might not be credible. *See* Ex. B, Willard Dep. Tr., at 267:1–268:22 (stating he does not remember the July 28, 2017 meeting with Gifford and JLI senior management, who was there, or what was discussed); 297:22–307:1 (discussing documents used in preparation for the October 2018 Altria town hall meeting regarding JLI's youth prevention efforts at which Gifford attended and presented; Willard "think[s] that there was dialogue between Juul and Altria about how to more effectively drive down youth e-vapor use", but "do[esn't] remember ... specific document[s]"); *see also id.* at 453:4–24 (referring to a Board of Directors meeting that Gifford likely attended: "Q. Can you remember talking to the board of directors on October 5th, Mr. Willard? A... I don't -- I don't remember the specific date of any call. Q. Did you tell the board of directors in this early October time period "We are going to recommend the FDA take -- require all pod products to be taken off the market until PMTAs are obtained"? A. I don't remember whether that was a discussion I had with the board of directors. Q. You were also going to tell Commissioner Gottlieb that pod-based products were causing the epidemic of youth e-cigarette use. Did you tell the board of directors that? A. I told you I don't remember the details of the discussion with the board of directors.").

**b. There are no less intrusive means to adequately obtain the discovery needed.**

There are no less intrusive means to discover Gifford's recollection of the critical events leading up to the JLI transaction relevant to Plaintiffs' claims, or his explanation for the documents he authored or comments he made. Plaintiffs have or will have exhausted other means by the time Gifford's deposition is taken, per this Court's instructions in *Symantec Corp. v. Acronis, Inc.*, 2013 WL 12184286, at *2 (N.D. Cal. Oct. 10, 2013). To date, Plaintiffs have served four sets of interrogatories and six sets of document requests on Altria, and have deposed approximately 18 JLI and Altria witnesses, including three 30(b)(6) witnesses from Altria on 10 topics related to the transaction with JLI. While evidence gathered through these other means of discovery (including Gifford's testimony in the FTC's enforcement action) undoubtedly will allow Plaintiffs to narrow the scope of Gifford's deposition to avoid truly repetitive testimony, it does not and cannot supplant his deposition testimony.

[5] *Compare Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. 05-4374, 2007 WL 205067 (N.D. Cal. Jan. 25, 2007) (CEO had no first-hand knowledge of events and would testify solely based on documents that pre-dated his arrival).

For example, the questions posed to Gifford during the FTC deposition were tailored toward the FTC's goals of protecting marketplace competition and preventing market monopolization. Notably absent from Gifford's FTC deposition were any questions pertaining to Altria's knowledge of JLI's marketing targeted to youth, JUUL products propensity to create and sustain addiction, or the "e-cigarette epidemic." The FTC is concerned with the implications of Altria's investment for competition in the marketplace, not protecting JUUL users' health, remedying fraud on the public, or ameliorating the youth vaping epidemic. Given the differences in scope and purpose of the FTC deposition, it is not a sufficient substitute for taking Gifford's deposition in the MDL. In any event, any overlap between the FTC deposition and Plaintiffs' deposition could justify, at most, limiting the inquiry into those topic areas, not precluding the deposition altogether. *See, e.g.*, *WebSideStory, Inc. v. NetRatings, Inc.*, No. 06-408, 2007 WL 1120567, at *2 (S.D. Cal. Apr. 6, 2007) (It is "very unusual…for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances.").

Even if Altria would permit several hundred interrogatories with subparts and follow-up questions to supplement the FTC testimony, the exercise would not only be unduly cumbersome, but would shield from the jury and Plaintiffs the opportunity to examine Gifford's credibility—a key question in assessing Altria's motives for its interactions with JLI's investors and seismic investment in a company known to have created a youth nicotine addiction crisis. Given the breadth and depth of Mr. Gifford's personal knowledge of the key issues in this litigation, and the serious public health issues at stake, Plaintiffs intend to proceed with a deposition consistent with the limitations set out in the agreed-upon CMO No. 10. In a case of this magnitude, it is hardly unexpected or inappropriate to expect Gifford to sit for two days of deposition. To accommodate his schedule, however, Plaintiffs would be willing to schedule the second day at a more convenient time, if two consecutive days is too burdensome on the witness.

**<u>Altria's Position</u>**

The Altria Defendants respectfully oppose Plaintiffs' effort to depose Altria's CEO William F. Gifford. As CEO, Mr. Gifford is subject to the "apex deposition" doctrine, which protects certain executives from unnecessary depositions. Under the apex doctrine, a party seeking to depose a CEO first must demonstrate that: (1) the CEO has unique first-hand, non-repetitive knowledge of the key facts at issue, and (2) the party has exhausted other methods of obtaining the information. Plaintiffs cannot show either to be true.[6]

---

[6] Altria's concerns that Plaintiffs will abuse the deposition device are not hypothetical. Altria's witnesses have endured irrelevant and abusive questioning by counsel for Plaintiffs from the Schlesinger Law Offices. At the deposition of Dr. William Gardner, an Altria principal scientist who joined the company in 2001, Plaintiffs' counsel Jonathan R. Gdanski asked the witness if he had "spoken to [his] children about JUUL." Gardner Dep. 369-70 (Ex. U). Mr. Gdanski later questioned Dr. Gardner for what amounted to 25 transcript pages about company documents from the 1970s—a time period that predated Dr. Gardner's employment at Altria by decades. *See id.* 416:17–441:5. Mr. Gardner repeatedly told Mr. Gdanski he had no knowledge of those documents. *See id.* 425-26. Mr. Gdanski, however, proceeded to conduct unnecessary and irrelevant questioning, which largely consisted of Mr. Gdanski reading the documents into the record. *See, e.g.*, *id.* 422-26, 432-35. Plaintiffs' counsel have pursued similar lines of questioning at depositions of other Altria witnesses, including Howard Willard and Jason Flora, *see* Willard Dep. 349-50, 387-89, 393 (Ex. V); Flora Dep. 55-56, 215-27 (Ex. W).

Indeed, Plaintiffs have not explained with sufficient precision what specific information they believe to be within the unique possession of Mr. Gifford. Nor can they, given the voluminous discovery the Altria Defendants have produced and continue to provide on every subject about which they might question Mr. Gifford. Among other things, the Altria Defendants have searched and produced responsive documents from Mr. Gifford's custodial files and provided his testimony from the FTC's enforcement action against Altria and JLI. Plaintiffs also have deposed current and former Altria executives already, including Howard A. Willard III, Altria's CEO during Altria's negotiations with and investment in JLI, and Plaintiffs have indicated that they intend to depose many more current and former Altria officers and employees. Accordingly, even if Plaintiffs had identified information that Mr. Gifford might possess that Plaintiffs do not currently possess, they plainly have not yet exhausted less intrusive methods for seeking that information. This is precisely the type of situation that warrants the apex deposition doctrine's protections.[7]

## ARGUMENT

### I. The Apex Doctrine Protects High Level Executives from Unnecessary Depositions

"When a party seeks the deposition of a high-level executive (an 'apex' deposition), courts have 'observed that such discovery creates a tremendous potential for abuse or harassment.'" *Finisar Corp. v. Nistica, Inc.*, 2015 WL 3988132, at *1-2 (N.D. Cal. June 30, 2015) (Corley, J.); *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) (noting that "[v]irtually every court" has observed this). Courts therefore "protect high level corporate officers from depositions . . . where the officer's testimony would be repetitive." *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, 2014 WL 1340674, at *2 (N.D. Cal. Apr. 3, 2014) (Corley, J.) (quotation marks omitted).

Under the apex doctrine, a party seeking to depose a high-level executive must establish two things. *First*, that party must show that "the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case." *Id.* (quoting *In re Google Litig.,* WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011). *Second*, "the party seeking the deposition" must show that it "has exhausted other less intrusive discovery methods." *Id.* (quoting *In re Google Litig.,* 2011 WL 4985279, at *2). Although these showings are not "absolute requirement[s]," they guide the Court's discretion, *Finisar*, 2015 WL 3988132, at *2, and the party seeking the deposition bears the burden of showing a need for the deposition, *see Celerity*, 2007 WL 205067, at *3-4 (denying apex deposition for failure to show uniqueness or exhaustion and explaining that "half-hearted" pursuit of alternative discovery is insufficient).

Moreover, "[e]ven when an executive does have personal knowledge about the case, the court still may fashion a remedy which reduces the burden on the executive." *Schmidt v. Levi Strauss & Co.*, 2006 WL 8459745, at *2 (N.D. Cal. May 31, 2006) (citation omitted).

---

[7] If the Court were to conclude—either now or at a later date—that Plaintiffs have met their burden under the apex doctrine with respect to Mr. Gifford, the Court should limit any deposition to only those specific topics that Plaintiffs can show to be within his unique knowledge and as to which the information known by Mr. Gifford is unobtainable through other means.

## II. Plaintiffs Have Not Demonstrated that Mr. Gifford Has Unique Knowledge

Mr. Gifford currently serves as Altria's CEO and as such is the highest-ranking executive at the company. Mr. Gifford is therefore protected by the apex doctrine, and, before Plaintiffs can force his deposition, they must show that he has "unique" and "non-repetitive" information concerning issues in this litigation that cannot be obtained elsewhere. *Circle Click*, 2014 WL 1340674, at *2. Plaintiffs cannot meet this burden.

Plaintiffs already have extensive discovery from the Altria Defendants. The Altria Defendants have produced over 6.4 million of pages of documents and communications, and Plaintiffs already have deposed several Altria officers and employees, each for two days at a time, including Altria's former CEO Howard A. Willard III. [8] Notably, Mr. Willard—and not Mr. Gifford—was Altria's CEO at the time of Altria's December 20, 2018 investment in JLI and the period preceding and following that investment. The Altria Defendants also have provided discovery from Mr. Gifford. This includes responsive, non-privileged documents from Mr. Gifford's custodial files (produced on January 13, 2021) and transcripts of the two depositions given by Mr. Gifford in the FTC's action against Altria and JLI.[9]

Plaintiffs also intend to depose many more current and former Altria executives and employees.[10] Plaintiffs also have not completed their Rule 30(b)(6) deposition of Altria, including the issues identified in Notice D and Notice E, which are expansive and overlap with any subject Mr. Gifford would cover, including most of the subjects that Plaintiffs' submission outlines as purportedly necessitating Mr. Gifford's deposition. *See* Pls. Notice of Rule 30(b)(6) Dep., Notice D (Mar. 15, 2021) (Ex. X); Pls. Notice of Rule 30(b)(6) Dep., Notice E (Mar. 15, 2021) (Ex. Y).

Despite this completed discovery, and that which remains, Plaintiffs claim they need Mr. Gifford's deposition to question him about Altria's negotiations with JLI, the due diligence process for the investment, and public statements Mr. Gifford issued concerning the deal. Plaintiffs have not shown—and cannot show—that Mr. Gifford has non-repetitive information on these subjects. Plaintiffs, for example, mention Mr. Gifford's name in only 10 of the 3,710 paragraphs in their class action complaint, referencing meetings and communications between

[8] To date, the following officers and employees of Altria have been deposed under Rule 30(b)(6) and/or Rule 30(b)(1): Howard Willard (January 12-13, 2021), William Gardner (February 16-17, 2021), Jason Flora (February 18-19, 2021), Kaitlin Longest (March 2-3, 2021); Brian Blaylock (March 16-17, 2021). These depositions have gone two full days and covered the subject matter in question extensively.

[9] Courts have concluded that the apex doctrine does not apply to actions brought by the FTC. *See FTC v. Bisaro*, 2010 WL 4910268, at *6 (explaining FTC's position), *report and recommendation adopted* 757 F. Supp. 2d 1, 9 (D.D.C. 2010).

[10] Plaintiffs have requested depositions of the following current and former officers and employees of Altria: Pascal Fernandez, Brian Blaylock, Murray Garnick, Jennifer Hunter, Matt Melvin, Steven Schroder, John Miller, David Wise, Nicole Baumstark, Brian Daviduke, Richard Jupe, Dinyar Devitre, Paige Magness, Matthew Romyak, Joe Murillo and KC Crosthwaite. Additional Altria employees also will be deposed as part of Altria's deposition under Federal Rule 30(b)(6).

Altria and JLI before the December 2018 investment.[11] Plaintiffs likewise cite certain emails or meetings including Mr. Gifford, but these communications and meetings did not involve Mr. Gifford alone. To the contrary, they frequently included Mr. Willard, who already has been deposed, as well as individuals from JLI who will be deposed. *See, e.g.*, SAC ¶ 55 (meeting also attended by Willard, Burns, Pritzker, Valani); *id.* ¶ 512 (meeting also attended by Willard, Pritzker, Valani). Many times they included additional individuals from Altria who will be deposed in the coming months. *See, e.g.*, SAC ¶¶ 527 (describing meeting that also included Willard and Devitre); *id*. ¶ 528 (describing call that also included Garnick and Crosthwaite). These and other individuals also possess information concerning negotiations and due diligence more generally, as well as any other subjects about which Plaintiffs would question Mr. Gifford. Moreover, Plaintiffs have correspondence and documents related to all of these subjects as well, including materials in Mr. Gifford's custodial files, and testimony on these subjects provided in the FTC case two months ago. Plaintiffs cannot show that Mr. Gifford has unique information about an issue in the litigation. *See, e.g.*, *Celerity*, 2007 WL 205067, at *4-5 (finding bare allegation that apex executive has unique relevant knowledge insufficient and instead requiring "evidentiary showing"). Plaintiffs' case, *Updateme Inc. v. Axel Springer SE*, cited *supra*, is inapposite. 2018 WL 5734670, at *2 (N.D. Cal. Oct. 31, 2018). The court there held the testimony would be non-repetitive because the witness's own acts and own motives were centrally relevant to plaintiff's claims. *See id.* Plaintiffs' other case, *Apple Inc. v. Samsung Elecs. Co., Ltd*, supports Altria. 282 F.R.D. 259, 264–65 (N.D. Cal. 2012). There, Apple showed that it needed to depose Samsung's CEO because his knowledge was in fact "unique." *See id.* 264-65 & n.30.

Indeed, it remains unclear what specific information Plaintiffs believe Mr. Gifford would provide that they do not already have. Plaintiffs have not identified any specific email, document, or other communication about which they need to ask Mr. Gifford. They have not pinpointed any statement, decision, or action by Mr. Gifford about which they need his testimony. And they have not identified any other relevant information that Mr. Gifford would possess to the exclusion of anyone else that cannot be obtained through other means. Plaintiffs suggest that Mr. Gifford's deposition may be necessary because Mr. Willard could not recall certain information during his deposition. *See supra*. But it is impossible to determine from plaintiffs' submissions to date—as necessary to overcome the apex doctrine—whether the information is relevant to the issues here, whether other witnesses can provide that information, whether that information is available in documents, and whether Mr. Gifford can provide that information if it is in fact relevant and unavailable elsewhere. Plaintiffs' own submission confirms this point—they refer to subjects addressed by other discovery and depositions, including the Rule 30(b)(6) depositions they have noticed, and emails and meetings including other individuals who have been or will be deposed. *See supra*.

Nor can Plaintiffs avoid the apex doctrine by arguing, as they alluded to during efforts to meet and confer and allude here, that Mr. Gifford alone can speak to his personal motivations and thoughts during negotiations. Allowing parties to circumvent the apex doctrine on this basis would create an exception that swallows the rule, because one can always argue that a person's

[11] *See* Second Am. Class Action Compl. ("SAC") ¶¶ 55, 511-12, 514, 523, 525, 527-28, 553, 557.

thoughts are unique. Indeed, Plaintiffs' argument that "[n]o other witness can testify to Mr. Gifford's recollection of key events or explain his statements or actions," *supra*, could be made with respect to any potential witness. Courts thus limit the circumstances in which an individual's motivations and thoughts can be offered to avoid the apex doctrine to those in which the apex witness is personally alleged to have acted with bad motives. *See, e.g.*, *Givens v. Newsom*, 2021 WL 65878, at *5 (E.D. Cal. Jan. 7, 2021) (rejecting claim that proposed apex witness should be required to testify as to his motives because plaintiffs' claims did not turn on apex witness's motives); *Coleman v. Schwarzenegger*, 2008 WL 4300437, at *4 (E.D. Cal. Sept. 15, 2008) (similar). Plaintiffs' Complaints do not allege that *Mr. Gifford* himself was acting with bad motives. In fact, their allegations do not concern Mr. Gifford's motivations or thoughts at all; they concern the intentions of Altria Group, Inc. Plaintiffs fail to show discovery on that subject is relevant and unavailable elsewhere.

Plaintiffs' failure to identify information within Mr. Gifford's exclusive possession alone precludes his deposition under the apex doctrine.

## III. Plaintiffs Have Not Exhausted Less Intrusive Means of Discovery

The Court also should deny Plaintiffs' efforts to compel Mr. Gifford's deposition because, given the depositions yet to occur and ongoing discovery, Plaintiffs have not "exhausted other less intrusive discovery methods." *Circle Click*, 2014 WL 1340674, at *2. Indeed, courts regularly bar apex depositions unless "interrogatories and depositions of other employees, have been exhausted without success." *Symantec Corp. v. Acronis, Inc.*, 2013 WL 12184286, at *2 (N.D. Cal. Oct. 10, 2013) (Corley, J.); *see Finisar*, 2015 WL 3988132, at *2 (parties should typically pursue interrogatories in lieu of apex deposition).

In *Circle Click*, for example, the court barred an apex deposition because the party seeking the deposition could obtain the same information "with far less burdensome discovery methods, such as interrogatories." 2014 WL 1340674, at *2. In *Haggarty v. Wells Fargo Bank, N.A.*, the court permitted a limited apex deposition but only after a showing by the party seeking the deposition that it had "deposed the three lower-level employees [the opposing party] identified as having identical information" and had "persuaded the Court that these deponents did not definitively answer [the propounding party's] questions." 2012 WL 3939320, at *2 (N.D. Cal. Aug. 24, 2012) (Corley, J.). And in *In re Chase Bank USA, N.A. Check Loan Contract Litig.*, the court permitted an apex deposition because the propounding party had "already taken the depositions of other lower level employees involved" and the information the party sought was "specific and unique." 2011 WL 5248158, at *1 (N.D. Cal. Nov. 3, 2011) (Corley, J.).

This case law applies here. Plaintiffs have yet to depose numerous witnesses likely to have information on any subjects about which Mr. Gifford would testify. Plaintiffs therefore have not exhausted less intrusive methods of obtaining discovery than deposing Mr. Gifford. At a minimum, therefore, Plaintiffs should be required to await the outcome of the remaining discovery before requesting that the Court order the deposition of Mr. Gifford to occur.

There is no need to inquire as to Plaintiffs' motivations in seeking this deposition. Whatever the motives, the Court should deny their request and enter an order precluding Mr. Gifford's deposition. If need be, that decision can always be revisited later if Plaintiffs believe they can show at a future date that Mr. Gifford has unique knowledge and they have exhausted other means of obtaining it. *See Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979). It is clear they currently have not made—and cannot make—that showing.

Respectfully submitted,

/s/ Dean Kawamoto
/s/ Dena Sharp
/s/ Sarah London
/s/ Ellen Relkin

*Co-Lead Counsel for Plaintiffs*

*/s/ John C. Massaro*
*/s/ Jason A. Ross*

*Counsel for the Altria Defendants*

cc: MDL Counsel of Record (via ECF)

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: )
)
JUUL LABS, INC. MARKETING, ) CASE NO.
SALES PRACTICES AND PRODUCTS ) 19-md-2913-WHO
LIABILITY LITIGATION )
)
This Document Relates to: )
ALL ACTIONS. )
)
___________________________ )

— — —

Tuesday, March 16, 2021

— — —

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

— — —

Remote Video-Recorded Oral Rule 30(b)(6) Deposition of Altria Defendants, by BRIAN BLAYLOCK, held at the location of the witness, commencing at 11:01 a.m. Central on the above date, before Karen K. Kidwell, Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

the valuation underlying that was $38 billion for Juul; is that right?

MS. O'CONNOR: Object to form.

THE WITNESS: That's correct.

BY MS. SONEJI:

Q. Okay. All right. So . . . We can get rid of -- we can get rid of this document.

Who were the principal negotiators for Altria --

MS. O'CONNOR: Object to form. Outside --

BY MS. SONEJI:

Q. -- for -- for this transaction?

MS. O'CONNOR: Sorry.

Object to form. Outside the scope.

THE WITNESS: My understanding, the principal negotiators were Howard Willard and Billy Gifford, and I believe that Murray Garnick and K.C. Crosthwaite also had some interactions.

BY MS. SONEJI:

Q. Do you know, when was the first conversation between Altria and Juul about this transaction?

A. I don't recall the specific date of -- of that first meeting. I know we had outreached to Juul

# EXHIBIT B

Deposition Transcript

Case Number: 19-md-02913-WHO
Date: January 13th, 2021

In the matter of:

# In re: Juul Labs, Inc. Marketing, Sales & Practices, And Products Liability Litigation

## Howard Willard - Vol. II

CERTIFIED COPY

Reported by:
Sudny Gallardo
CSR No. 14023

Steno
Official Reporters

1100 Glendon Ave.
Suite 1850
Los Angeles, CA 90024
concierge@steno.com
(310) 573-8380

Page 263

A. Right. I think -- I think certainly there was some contact in early 2017. I don't know if there was any engagement earlier than that. There could have been, but I'm -- I'm not certain about that.
Q. Were you aware of any interactions between anyone at Philip Morris International and Juul, which was then Pax Labs before early 2017?
A. I don't remember any contact between the two of them in that time frame.
Q. And before early 2017, are you aware of any industry groups in which anyone from Altria and anyone from Pax Labs were collaborating or working together?
A. Not that I remember.
Q. And were you aware of any communications between anyone at Altria and anyone at Pax Labs regarding an FDA action related to e-cigarettes?
A. What time period?
Q. Before early 2017.
A. No, not that I am aware of.
Q. Were you aware of any communications or correspondence between anyone at Altria and anyone at Pax Labs regarding flavors of nicotine products before early 2017?

Page 264

A. Not that I remember, no.
Q. All right. So I just want to set the scene a little bit about who was involved in the negotiations over the deal. If you can describe who from Altria was involved in negotiations with Pax and then -- which became Juul, and what your understanding of their roles were.
A. On the -- on the Altria side, the people that were involved tended to be myself, Murray Garnick, and Billy Gifford, and K.C. Crosthwaite. And there were a series of other people that supported within the company.
Q. Can you just go through each of those folks and just describe for me your understanding of what role they played in the transaction?
A. Well, K.C. Crosthwaite, his involvement was primarily when he was overseeing the strategy and business development group, so he was supporting the senior leaders that were working on the deal he was working with the investment banker, and his department was doing a lot of the analysis.
Billy Gifford is vice chairman and chief financial officer. And so he was involved looking at particularly the financial aspects of the deal, but he's also deeply experienced in the tobacco

Page 265

category.
Murray Garnick is our general counsel, and so he was playing the general counsel role. And early in the process, I was the chief operating officer, and later on I was the chief executive officer. And I was involved really from a strategic perspective.
Q. And Mr. Crosthwaite, he was overseeing the business development group until when? Do you recall when he moved to becoming something else?
A. His responsibilities went beyond just strategy and business development, but I think he left his role in September of 2019.
Q. Okay. So Mr. Crosthwaite's title changed at some point, but his responsibilities with respect to this negotiation didn't really change; is that right?
A. Oh, are you talking about a title change --
Q. At Altria?
A. -- at Altria?
Q. Yes.
A. Yes, I think -- I have to be honest with you, he -- he probably had a couple of title changes. During this time there was a fair amount of movement in senior management. I don't remember

Page 266

the sequence of titles that he held, but -- but he was involved particularly in the back half of the negotiation.
Q. Now, who from Pax/Juul was involved in negotiations?
A. The primary people that were involved in the negotiation were Nick Pritzker and Riaz Valani, who were investors and board members. And on occasion also Kevin Burns, who was CEO. And they had a team of people that supported them.
Q. And between Nick and Riaz Valani, did you have any sense of any differentiation between their roles in the negotiation?
A. No, I don't think so. I think they both played an equal role in the negotiations.
Q. And one -- was one or the other of them more of your primary contact?
A. I don't think so. They tended to both participate similarly.
Q. Now, at some point you met with Juul representatives from Pax. When was that? Do you recall, the first time?
A. Yeah, I don't remember exactly when, but I think it was in the area of the second quarter of 2017.

Page 267

Q. So according to some records I've seen, it appears to be July 28th, 2017, there was a meeting between you and Mr. Gifford and some of the senior management at Pax.
Does that sound about right to you?
A. Yeah, that could very well be the case.
Q. And that would have been shortly after the FDA's announcement we discussed yesterday, around extending the deadline for the PMTA and the nicotine ceiling.
Does that help frame up a little bit in terms of time frame?
A. Right, I think that lines up.
Q. Okay. And that meeting took place in California?
A. I'd have to say I don't remember.
Q. Do you recall who was at that meeting?
A. I do not.
Q. Do you recall anyone else at the meeting besides yourself?
A. I don't remember specifically who was at that meeting from each side.
Q. Now, did this meeting take place after there was already a confidentiality agreement between Pax and Altria?

Page 268

A. No, I don't know. I know that we eventually did have a confidentiality agreement that went in place. I don't know whether there were early discussions of a general nature that happened before that was signed or -- or whether that took place before we had that meeting.
Q. Was it your practice to take any notes during meetings you had with any representatives from Pax or --
A. Typically, yeah. I am not a big note taker, but typically we had discussions. Sometimes there would be presentation materials, but sometimes there was, sometimes there wasn't.
Q. Do you recall whether there were any presentation materials for this first meeting you had?
A. I don't recall.
Q. During that meeting, did you discuss with representatives from Pax about the concerns of over use -- usage of their products?
A. I don't remember whether that was discussed in that -- in that specific meeting.
Q. And do you recall whether you provided some information to the representatives of Pax about Altria's youth prevention efforts?

Page 269

A. I know that we had discussion with them about that. I don't know whether it happened in that specific meeting.
Q. And when you say you recall having those discussions with them, do you recall generally the time frame that you had conversations with representatives from Pax about youth prevention efforts at Altria, giving them your experience that we discussed yesterday?
A. Yeah, I don't -- I don't recall at which specific meetings that -- that occurred.
Q. Do you recall whether those discussions occurred before or after the transaction in December of 2018?
A. Oh, I think before the transaction in 2018. We had had discussions about our youth smoking prevention capabilities and the critical importance of addressing that issue for Juul and for any player in the industry.
Q. Let's focus on the time frame before December of 2018. What was your sense of response from the representatives from Pax regarding your communications to them about implementing strong youth prevention measures?
A. Yeah, I think that they -- they were in

Page 270

full agreement that addressing the youth issue and taking actions to contribute the driving down youth usage of e-vapor products was critically important. And they were particularly interested in our perspective on how success had been achieved in the cigarette category. And -- and they were committed to taking actions at -- at their company, and certainly put in place a significant number of programs and actions to help drive down youth vapor rates.
Q. So fair to say that Pax, and then Juul, they were receptive and heard and followed up on the counsel that you had given about youth prevention?
A. I think -- I think they did. I think we didn't always agree on the right path forward, but I think they listened and they responded. And, of course, they weren't just hearing it from us. There was a loud chorus of people that were concerned about increasing rates of youth vaping, and they were getting a lot of general feedback about what Juul should do and a lot of feedback about what FDA should do to address this important issue.
Q. At some point during negotiations, I think you -- you mentioned -- strike that.
You said, I think, Mr. Burns was

Page 295

THE WITNESS: Yeah. I -- I have to say that I don't believe that in the way I have been using the term that it is at all misleading. And the FDA, I think, is on record. And I'd have to look at their documents to see how they describe a consumer moving from one category to the other. I might be surprised if they don't describe it as switching products, but the FDA is on record as -- I think it was in an announcement in 2017 as adopting the strategy to more proactively encourage consumers to move down the continuum of harm of tobacco products and switch from cigarette smoking, which is widely believed to be the most harmful tobacco product, to -- to switch to other products. And I think that that's -- that's been a discussion that's been going on for years and years.
BY MS. LONDON:
Q. Now, the warning letter that Juul received, that was in 2019, two years after the announcement you are referring to. Does that change at all your perspective about whether the FDA at this point considered the "Make the switch" campaign to, in fact, be a misleading way to talk about Juul?
MR. LEVANDER: Objection as to form.
THE WITNESS: Yeah, I think -- I think you

Page 296

were raising whether the FDA would have been concerned with the way I have been using the term "switch." I don't think so. But now you are back to a warning letter that -- that FDA sent to Juul. And I am assuming that Juul and FDA had significant dialogue regarding FDA's concern. That's typically the way these things happen. And I don't know how -- how the outcome of that dialogue came out. But typically, a warning letter is an opportunity to share a lot more information and -- and have a lot of discussion to try and resolve FDA's concern.
BY MS. LONDON:
Q. You are aware that Congress also expressed concern about "Make the Switch" being misleading to consumers?
MS. WILKINSON: Objection, form. Foundation.
THE WITNESS: I don't recall the details around that. I know that -- that Congress was weighing in on many of the e-vapor issues. I don't remember the specifics of that.
MS. LONDON: All right. I'm -- I'm going to wrap up here, and then I think we can take a break in about five to seven minutes. Does that work?

Page 297

MR. LEVANDER: Yeah.
MS. LONDON: I think we have somebody not on mute.
BY MS. LONDON:
Q. All right.
Mr. Willard, we can agree that Juul created a youth usage epidemic; right?
A. I don't know what you mean by that. I don't know that I can agree to that.
MS. LONDON: I'm going to -- I am going to go ahead and mark Tab 44 as the next numbered exhibit.
THE VIDEOGRAPHER: It's been marked as Exhibit 23.
(Exhibit 23 was marked for identification and attached hereto.)
BY MS. LONDON:
Q. All right. Mr. Willard, take a look at Exhibit 23, please.
A. Okay. I think I generally reviewed the document.
Q. All right. What is Exhibit 23?
A. It looks like it's a document sent by Paige Magness, who is involved in our communication function, to myself and others in preparation for a

Page 298

town hall meeting in October of 2018 with Altria employees.
Q. What is a town hall meeting? What's that all about?
A. Well, it's generally a -- a meeting between Altria management and groups of employees who are invited to attend in a variety -- in a variety of different locations, to have discussions about where the company's strategy is headed, how the company is performing. And they are designed to be discussions. And so we also try and engage the organization in raising concerns they have or participating in the dialogue with leadership.
Q. Now, Ms. Magness, she prepared this script document as part of her work at Altria?
A. I am trying to see. Certainly, it's her responsibility to -- to organize these kinds of things. I don't know whether she ultimately described the script or not. And I don't --
Q. Right. So fair to say Ms. Magness, it was her responsibility to circulate to the team of people who would be participating in the town hall, you know, the kind of organizational steps in the script that would be used; right?
A. That's right. That was her -- one of her

Page 451

MR. LEVANDER: Yes.
(Exhibit 39 was marked for identification and attached hereto.)
THE WITNESS: And the document, who is this document sent from?
BY MR. SCHLESINGER:
Q. These are the Altria board of director notes, including your -- with three topics: Restructuring, FDA, and Tree. You are going to be making announcements. You are going to inform the board.
A. Yeah. From this -- from this document, I can't tell the date of the document or who authored it or who received it.
Q. Okay. Let's assume that I am right. These are the Altria board of director notes. And it says in here you were going to recommend to the FDA that the FDA require all pod products to be taken off the market until PMTAs are obtained. Pre-Market Tobacco Approvals.
Do you see that?
A. I see that, but I don't know the context for this note.
Q. Well, if you are going to recommend to the FDA in the upcoming meeting, we are going to

Page 452

recommend that you require all pod prods be taken off the market until PMTAs are obtained, and we are going to seriously consider taking MarkTen Elite off the market unilaterally. MarkTen generally was your pod-based product; right?
A. Where are you referencing? What part of this document?
Q. Page 2. Page 2. It's all on the screen.
Do you remember this call? Do you remember this board of directors' call? Sir?
MS. WILKINSON: Objection, form.
THE WITNESS: Yes, I -- I do recall that we had discussions both internally amongst management on a number of occasions in preparing for the meeting with the FDA. And I think we also had dialogue with our board of directors. I don't know whether this document was a draft or whether it was a final document. And I -- I can't -- I can't determine from the face of the document.
BY MR. SCHLESINGER:
Q. So October 4, 2018, Mr. Garnick writes an outline for your board of directors' call that was going to take place on October 5th.
Do you remember that day? That call? Did you talk to the board of directors on October 5th?

Page 453

Can you remember?
A. So you -- you stated that Mr. Garnick wrote an outline for a call with the board of directors?
Q. Can you remember talking to the board of directors on October 5th, Mr. Willard?
A. I recall having dialogue with the board of directors about the FDA meeting and the actions that we were proposing to take and then ultimately the actions that we did take.
Q. Did you --
A. I don't -- I don't remember the specific date of any call.
Q. Did you tell the board of directors in this early October time period "We are going to recommend the FDA take -- require all pod products to be taken off the market until PMTAs are obtained"?
A. I don't remember whether that was a discussion I had with the board of directors.
Q. You were also going to tell Commissioner Gottlieb that pod-based products were causing the epidemic of youth e-cigarette use. Did you tell the board of directors that?
A. I told you I don't remember the details of the discussion with the board of directors.
Q. The outline has something that you were

Page 454

planning on telling the board of directors internally that the reason for the recommendation is that pod-based products are causing the epidemic and the best way to deal with it is to ban, absent prior approval of FDA. Do you see what the next sentence says?
A. I don't know where in the document you're referring to.
Q. "This would have minimum impact on us, but devastate Juul in the short term."
Do you see that?
A. What page are you on?
Q. Page two. See it? Do you see it, sir?
A. What number is it? Is it under D?
Q. I am looking at the screen. It's --
A. And I -- I've downloaded the document, and I am inside the document. And I am asking you to direct me.
Q. It's under D. Meeting position.
A. Okay.
Q. Iii 1a, little "a."
Do you see it?
A. I do see that under point A.
Q. Did you tell the board of directors this, sir? Do you remember telling the board of directors

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---------------------------X

IN RE:

JUUL LABS, INC. MARKETING CASE NO.
SALES PRACTICES AND PRODUCTS 19-md-2913-WHO
LIABILITY LITIGATION

This Document Relates to:

ALL ACTIONS.

---------------------------X

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

REMOTE VIDEOTAPED 30(b)(6) DEPOSITION

OF ALTRIA

by and through their Designated Representative

KAITLIN LONGEST

Tuesday, March 2, 2021

10:42 a.m.

Eastern Standard Time

Reported by:

Denise Dobner Vickery, RMR, CRR, Notary Public

form.

THE WITNESS: I don't know.

BY MS. CRAICK:

Q. And you're here to testify not just about what you know but what Altria knows.

Do you understand that?

A. I do.

Q. And they signed an amended -- Altria and JUUL signed an amended services agreement that limited the scope of the services; is that right?

A. Yes. I have in front of me the amended agreement that was signed between KC Crosthwaite and William Gifford.

MS. CRAICK: Okay. Let's pull up tab 79.

(Document marked for identification as Exhibit 437.)

TRIAL TECH: This will be Exhibit 437.

MR. ROSENTHAL: Thank you.

THE WITNESS: Okay. I have the document in front of me.

Excuse me.

BY MS. CRAICK:

Q. Was this document you were just

# EXHIBIT D

#17

-

| | |
|---|---|
| **From:** | Gifford, William F. Jr (ALG) |
| **Sent:** | Thursday, August 09, 2018 1:49 PM |
| **To:** | nick@taocap.com; RValani@gacapital.com; kburns@juul.com |
| **Cc:** | Willard, Howard A. (ALG) |
| **Subject:** | Term Sheet |
| **Attachments:** | Draft Tree Revised Term Sheet WLRK draft CLEAN 8.9.18 v2.docx; Project Richard - Summary of Terms Cumulative Redline 8 9 18.pdf |

Confidential
Dear Nick, Riaz, and Kevin,

As Howard discussed with Kevin, the attached redline that shows our comments to your latest draft term sheet will serve as the basis of discussion at our upcoming meeting. I also have attached a clean version of the redline. Looking forward to seeing you.

Best regards,

Billy

CONFIDENTIAL – SUBJECT TO MUTUAL NONDISCLOSURE AGREEMENT
DRAFT 8/9/18

**Summary of Terms for Potential Transaction – Richard**[1]

***Purchase Agreement***

- Richard and Jack would enter into a purchase agreement (the "Purchase Agreement").[2] Richard would purchase shares of Jack for an aggregate of $__ in cash (the "Investment Amount"). Following such purchase (the "Purchase"), Jack would distribute or otherwise pay to the non-Richard stockholders an aggregate amount equal to the Investment Amount and the Company's net cash as of July 31, 2018 (the "Cash Payment").[3] If the Cash Payment is effected as other than a redemption, outstanding equity awards (unexercised options, RSAs and RSUs) would be equitably adjusted.

- The shares of Jack purchased by Richard would be Class C-1 non-voting convertible common stock ("Class C-1"), representing 45% of the outstanding capital stock of Jack as of the date of the Purchase (calculated as set forth below).

- The Class C-1 non-voting common stock held by Richard would convert into Class C common stock ("Class C") upon receipt of Antitrust Clearance.

- The Class C shares issued to Richard would represent 45% of the voting power of Jack's outstanding voting shares at closing, and would have the minority protective voting rights as set forth in "Protective Provisions" below. Except as otherwise provided herein, Richard shall be entitled to vote (1) in its discretion shares owned by it representing up to 35% of the voting power of Jack's outstanding voting shares; and (2) with respect to all remaining shares owned by it, in the same proportion as all shares owned other than by Richard are voted by the holders thereof. Upon transfer by Richard of any Class C share, the voting power of such Class C share shall remain unchanged. The remaining outstanding voting power would be held by

---

[1] Note to Draft: This term sheet is not binding on any party.

[2] Note to Richard: The transactional structure presented in this term sheet as the means for effecting Richard's investment is illustrative but not definitive – the optimal structure is still being assessed from a tax perspective, including how best to accommodate the spinoff of the international business to non-Richard stockholders. Under consideration is a structure in which Jack would create a Topco (possibly an LLC) that would hold 100% of international and 55% of Jack, with Richard holding the remainder of Jack directly. Nevertheless, the business terms presented in connection with this structure are intended to reflect the business terms of the proposed transaction, including the rights of the securities being issued. In the event a Topco is created, the standstill restrictions below would apply with respect to Topco as well. [Richard willing to discuss but wants to understand details and implications for Richard]

[3] Note to Draft: Minimum working capital to operate Jack's business to be discussed.

W/3193890

holders of Series C Preferred Stock, Series D Preferred Stock and Class B Common Stock (each entitled to ten votes per share), and holders of Series E Preferred Stock and Class A Common Stock (each entitled to one vote per share).[4]

- Subject to the remainder of this bullet, for purposes of determining the number of shares of Jack to be issued to Richard, only (i) shares that are issued and outstanding at the time of the Purchase (including unvested shares subject to forfeiture that will vest in the near term[5] ("Unvested Near-Term Equity Awards")), and (ii) options that are outstanding and vested at the time of the Purchase ("Vested Options"), shall be included in the calculation, using the treasury stock method. Shares will be issued to Richard with respect to Unvested Near-Term Equity Awards and Vested Options only if and when Unvested Near-Term Equity Awards vest and, in the case of Vested Options, if and when shares are issued upon exercise or settlement thereof following the Purchase, in which case Jack shall issue that number of shares to Richard (without additional consideration) so as to preserve the 45% ownership of outstanding shares of Jack described above. (For the avoidance of doubt, any issuances of capital stock other than upon the vesting of Unvested Near-Term Equity Awards and exercise of Vested Options will not result in the issuance of additional shares to Richard without additional consideration, but rather shall be subject to Richard's pre-emptive rights described in the "Standstill" provision below).

- Amounts to be distributed from the Cash Payment on unvested shares will vest only in tandem with the vesting of such shares and, if forfeited, will be distributed to the other stockholders entitled to participate in the Cash Payment distribution (i.e., non-Richard).

- All shares of common stock issued to Richard in the Purchase or pursuant to the immediately preceding bullets shall participate pro-rata in dividends and other distributions with Jack's other stockholders, provided however, that they shall not participate in the Cash Payment or any dividend or distribution effecting a spin-off of the international assets.

- Definitive documentation will contain provisions permitting Jack (without Richard's consent) to spin off its international business, including all international IP, by dividend or otherwise to its non-Richard stockholders. The definitive documentation shall include applicable inter-company agreements between Jack and spinco, including with respect to assets contributed,

---

[4] Note to Jack: This provision is subject to additional review once Richard has been provided with full details of Jack's capital structure and voting rights (including vesting schedule of awards). As part of its diligence, Richard expects to review the terms of current outstanding securities, shareholders' agreements and any other governance matters, including voting rights.

[5] Note to Jack: Length of time to be discussed.



CONFIDENTIAL

ALGFTC0000727181

PX1303-003

HIGHLY CONFIDENTIAL

8490002853

management, R&D, expense allocation, other transition arrangements and certain IP licenses.[6] It is anticipated that the spin-off of the international assets will occur at or following the closing of the Purchase. [Richard has no objection to a spin-off of the international business but needs to understand the details.]

- Receipt by Jack of the Investment Amount will not be subject to or conditioned upon any earn out, PMTA approval, or grant to Richard of a ROFR on any future financing or IPO (although Richard will have the right to maintain its pro-rata ownership as described under "Standstill" below).

- The closing of the Purchase will be a "simultaneous sign and close" to occur on or before September 15, 2018, without (for the avoidance of doubt) any due diligence, financing or regulatory approval conditions.

- Any representations and warranties made by Jack in the Purchase Agreement will not survive the Purchase. There will be no indemnification for breaches of representations or warranties or pre-closing taxes and Richard would need to rely on its diligence and obtain "buy-side" representation and warranty insurance if it wishes to seek protection for the same. The reasonable cost of the premium of any representation and warranty insurance would be shared equally by Jack and Richard.[7] [This provision requires further discussion between the parties.]

***Antitrust Clearance Matters***

- Subject to discussion between the parties, Richard, to the extent it has control over the non-trademark IP rights relating to the MarkTen products and the parties have received any requisite HSR clearance, will grant to Jack, an exclusive, royalty-free, fully paid-up, sub-licensable license to such IP, to make, have made, use, sell, offer for sale, import and otherwise exploit products and services in the field of vapor-based electronic nicotine delivery systems (the "Field") in the U.S. The exclusive license granted to Jack above shall terminate within [6] months following the Non-Compete Termination Date (as defined below).

---

[6] Note to Richard: Jack and spinco would enter into a cross-license under which each would license to the other, on an exclusive, perpetual, irrevocable, royalty-free, fully paid-up, and sublicensable basis, all IP rights relating to the Field (as defined in "Antitrust Clearance Matters") following the spinoff (with Jack having such rights in the U.S. and spinco having such rights ex-U.S.). Each of Jack and spinco will have its own R&D and product development groups that will contribute in perpetuity all of the IP rights relating to the Field developed by each respective company to the cross-license. Jack and spinco would also enter into a non-compete agreement, under which each would agree to refrain from competing in the electronic nicotine delivery system business outside their respective territories. Spinco and Jack would have the right to enforce and to control the prosecution of ex-U.S. licensed patents and IP and U.S. licensed patents and IP, respectively.

[7] Note to Richard: Parties to discuss the possibility of sharing in the deductible.

- Richard and Jack would be required to use reasonable best efforts to seek Antitrust Clearance, with the details related to such efforts to be discussed by the parties.
- During the Antitrust Clearance process, Richard and Jack will cooperate with the FTC and agree to the reasonable concessionary requirements of the FTC in connection with changes in Richard's e-vapor business.
- During the Antitrust Clearance process, the Purchase Agreement would provide that Richard would have such informational rights (historical) and consultative rights, if any, as are consistent with the restrictions imposed by the antitrust laws. [Parties to discuss provision of additional information to Richard for SEC filings and related purposes.]

***Richard Support Obligations***

- Richard agrees, effective on the closing of the Purchase and for a period of four years thereafter with subsequent two-year renewals by mutual agreement (as extended, the "Services Term"), to:
  - publicly support Jack's mission of reducing consumption of cigarettes and provide adults who want nicotine with potentially less harmful non-combustible alternative products;
  - provide distribution support by leasing in-store display space and space on trucks to Jack;
  - fully support Jack's efforts to gain distribution, display and in-store support for Jack's products, including support of point of sale prominence for Jack's products alongside Richard's;*
  - grant Jack access to Richard's best in class infrastructure (including distribution) to maximize the growth of Jack;*
  - fully support and collaborate with Jack on youth vaping prevention, including support for Jack's age verification efforts;
  - fully support, consult with and assist Jack in obtaining FDA PMTA, MRTP and other regulatory approval for its products (with Jack having control of the process);
  - publicly support efforts to petition for a national age limit of 21 for all nicotine products (often referred to as "T21"); and



CONFIDENTIAL

ALGFTC0000727183

PX1303-005

HIGHLY CONFIDENTIAL

8490002855

- provide Jack access to Richard's various databases of smoker customer lists.

* Items marked with an asterisk to be effective upon Antitrust Clearance and to run until expiration of the Services Term.

- Richard agrees, at closing of the Purchase, to issue a mutually agreed joint press release describing the support elements identified above.
- Any services provided by Richard to Jack will be on a cost plus pricing basis to be agreed by the parties.
- Richard agrees to refrain from competing anywhere in the U.S. in the e-vapor business (other than with respect to existing and under development products prior to the non-trademark IP license as described above). The non-compete will terminate upon the earliest of (i) failure to receive Antitrust Clearance, (ii) the expiration of the Services Term and (iii) if Richard ceases to own at least 20% of Jack's outstanding shares (such date, the "Non-compete Termination Date").

***Board of Directors/Related Party Transactions***

Prior to Antitrust Clearance[8], and for so long as, Richard owns at least 30% of Jack's outstanding shares, Richard shall be entitled to designate a director independent of Richard to sit on Jack's Board of Directors.

Upon Antitrust Clearance:

- The Jack Board of Directors shall consist of eight directors.
- If, and for so long as, Richard owns at least 30% of Jack's outstanding shares, the board will be comprised as follows:
  - Richard, as holder of the Class C shares, would have the Class C right to designate and elect, separately as a class, three directors;

[8] Note to Draft: Pre-clearance Board right subject to discussion among the parties' respective antitrust counsel.



CONFIDENTIAL



HIGHLY CONFIDENTIAL

  - Jack stockholders holding shares of classes other than Class C (i.e., the non-Richard stockholders) will have the right to designate and elect four directors; and
  - Then sitting CEO.

- In the event Richard's ownership drops below 30% but exceeds 15% of Jack's outstanding shares, Richard shall have the right to designate 2 directors, and in the event Richard's ownership drops below 15% but exceeds 5% of Jack's outstanding shares, Richard shall have the right to designate 1 director, and the right of Jack's non-Richard stockholders to designate directors shall be increased accordingly.
- Except as provided in Jack's Certificate of Incorporation, By-Laws and written agreement(s) between Jack and Richard, matters that come before the Jack Board of Directors shall be decided by a majority vote or unanimous written consent, except as provided below or as otherwise determined by the Board (which determination shall include a majority of the then-serving Richard designees).
- Richard's board designees will recuse themselves from any board discussions and from voting on any matters and the Jack Board may exclude them therefrom (including by forming a committee), regarding Jack's relationship or agreements with Richard or related to the standstill restrictions described below.
- Subject to any applicable regulatory requirements (including stock exchange rules), and except as set forth above so long as Richard is entitled to designate at least two directors, it shall be entitled to proportionate representation on each board committee of Jack.
- Approval of at least a majority of the non-Richard directors will be required for any transaction between Richard and Jack, and approval of a majority of the Richard directors will be required for any transaction between Jack and spinco or Jack and any affiliate of other major Jack stockholders.
- Subject to the other terms of agreement with Richard, Jack's board would be free to approve an IPO or other public offering, otherwise register Jack as a public reporting company, or raise equity or debt from third parties, spin-off Jack's international business to non-Richard stockholders, or adopt antitakeover measures, including adopting a staggered or classified board for the non-Richard directors, in each case so long as such approval includes a majority of the non-Richard directors.



CONFIDENTIAL

ALGFTC0000727185

PX1303-007

HIGHLY CONFIDENTIAL

8490002857

- If, and for so long as, Richard owns at least 30% of Jack's outstanding shares, Jack will not take any of the following actions without the approval of a majority of the Board of Jack, and such approval must include the approval of a majority of the Richard directors:
  - Change in strategy/youth vaping prevention plan;
  - Change in dividend policy to be adopted at closing;
  - Material related party transactions other than on arm's-length terms;
  - Transactions with [ ________, ________, ________] (the "Richard Competitors")[9];
  - Change of independent auditors or material discretionary changes in material accounting policies;
  - Voluntary bankruptcy/insolvency or dissolution; or
  - Other customary matters to be agreed by the parties.

***Protective Provisions***

After the issuance of Class C shares to Richard, without the consent of a majority of the outstanding shares of Class C, Jack, its board and its stockholders shall not:

- Amend Jack's certificate of incorporation so as to alter or change the Class C's powers, preferences or special rights so as to affect the Class C adversely;
- Increase or decrease the authorized size of the Board without proportional adjustment to Richard's board designation rights; or
- Authorize, approve or engage in any transaction, or take any other action which would, assuming that any associated preemptive rights are exercised in full, (i) result in any dilution (or the elimination) of the economic interest or voting power of

[9] Note to Draft: Specific parties to be listed here as agreed by the parties.



CONFIDENTIAL

ALGFTC0000727186

PX1303-008

HIGHLY CONFIDENTIAL

8490002858

the holders of Class C and/or (ii) directly or indirectly result in any Richard Competitor owning more than [4.9%] of Jack's outstanding shares or voting power.

***Standstill***

- For four years from closing, Richard shall not (and shall not request the board to amend, modify or waive any of the following in any manner that would require public disclosure):
    - acquire any beneficial interest in any additional Jack shares or indebtedness of Jack (except that Richard shall have the right to acquire shares (if prior to Jack's IPO, limited to Class C or C-1 shares as the case may be) to maintain pro rata ownership within a reasonable time period of any equity offering or with respect to any equity awards not counted for purposes of determining Richard's 45% equity interest as described in the "Purchase Agreement" section above, with the purchase price for such preemptive rights to be based upon the initial valuation at which Richard invested in Jack for two years from closing, and thereafter a valuation methodology to be discussed by the parties); or effect, seek, offer or propose any tender or exchange offer, merger or other business combination;
    - engage in any solicitation of proxies or consents or become a "participant" in a "solicitation" of proxies or consents (including, without limitation, any solicitation of consents to call a special meeting of stockholders), in each case, with respect to securities of Jack;
    - form, join or in any way participate in any "group" (within the meaning of Section 13(d)(3) of the Exchange Act) with respect to capital stock of Jack; or
    - make any proposal for consideration by stockholders at any annual or special meeting of stockholders of Jack, or make any offer or proposal (with or without conditions) with respect to a merger, acquisition, disposition or other business combination, except as provided below.
- Notwithstanding the foregoing, Richard may at any time, make an offer for a business combination relating to the acquisition of all outstanding shares of Jack, provided that any such proposal is only made on a confidential basis to the Jack board and is subject to a non-waivable condition that the offer be approved by an independent special committee of the Board (with no Richard representation) and a majority of the voting power held by stockholders other than Richard (a "Permitted Buyout Offer").

- If at any time the Jack Board authorizes Jack to negotiate with a third party outside the ordinary course of business or authorizes a formal auction process, in either case regarding a change of control of Jack or the acquisition of substantially all of Jack's assets, Jack shall notify Richard of the same and Richard may make a Permitted Buyout Offer during the pendency of such negotiations or auction process.

- If major stockholders propose to transfer shares constituting at least [●]% of Jack's outstanding shares in a single or series of related transactions, then Richard would have tag-along rights to participate in a pro rata fashion in such transfer and a right of first refusal with respect to such transfer. In addition, Richard will have a right of first refusal with respect to any equity issuances by Jack to third parties.

***Voting Agreement***

- All major stockholders, including Richard, will execute a voting agreement pursuant to which such stockholders shall agree to vote its shares in accordance with the matters described above under "Board of Directors/Related Party Transactions" and "Protective Provisions".

***Restrictions on Transfer***

- Richard may transfer its shares in compliance with applicable law subject, until four years after closing (or, if earlier, an IPO of Jack), to the following limitations: (i) no such transfer of shares would result in Richard's ownership of Jack falling below 35% of the then outstanding shares, and (ii) such transfer or series of related transfers may not account for more than 2.5% of Jack's then outstanding shares. All other transfers prior to four years after closing (or, if earlier, an IPO of Jack) would require the approval of the majority of the non-Richard directors.

- The transfer restrictions described in the preceding bullet shall terminate if the parties fail to obtain Antitrust Clearance. In such event, shares transferred to persons who are not competitors of Jack would automatically convert to voting shares, while shares transferred to competitors would remain non-voting.

- Upon any transfer of shares by Richard, the voting power of such shares (if any) shall not be diminished.

***Exclusivity***



CONFIDENTIAL

ALGFTC0000727188

PX1303-010

HIGHLY CONFIDENTIAL

8490002860

- Upon agreement in principle as to the terms set forth in this term sheet, parties to enter into an exclusivity agreement providing for an exclusive negotiating period ending on September 15, 2018 during which the parties will finalize diligence and negotiate definitive transaction agreements.



CONFIDENTIAL



HIGHLY CONFIDENTIAL

**Summary of Terms for Potential Transaction – Richard**[1]

| | |
|---|---|
| *Purchase Agreement* | • Richard and Jack would enter into a purchase agreement (the "Purchase Agreement").[12] Richard would purchase shares of Jack for an aggregate of $__ in cash (the "Investment Amount"). Following such purchase (the "Purchase"), Jack would distribute or otherwise pay to the non-Richard stockholders an aggregate amount equal to the Investment Amount and the Company's net cash as of July 31, 2018 (the "Cash Payment").[23] If the Cash Payment is effected as other than a redemption, outstanding equity awards (unexercised options, RSAs and RSUs) would be equitably adjusted.<br><br>• The shares of Jack purchased by Richard would be Class C-1 non-voting convertible common stock ("Class C-1"), representing 45% of the outstanding capital stock of Jack as of the date of the Purchase (calculated as set forth below).<br><br>• The Class C-1 non-voting common stock held by Richard would convert into Class C common stock ("Class C") upon receipt of Antitrust Clearance.<br><br>• ~~Each share of~~The Class C shares issued to Richard would represent ~~three votes per share~~45% of the voting power of Jack's outstanding voting shares at closing, and would have the minority protective voting rights as set forth in "Protective Provisions" below. Except as otherwise provided herein, Richard shall be entitled to vote (1) in its discretion shares owned by it representing up to ~~15~~35% of the voting power of Jack's outstanding voting shares; and (2) with respect to all remaining shares owned by it, in the same proportion as all shares owned other than by Richard are voted by the holders thereof. Upon transfer by Richard of any Class C share, the voting power of such Class C share shall ~~be one vote per share~~remain unchanged. The remaining outstanding voting power would be held by holders of Series C Preferred Stock, Series D Preferred Stock and Class B Common Stock (each entitled to ten votes per share), and holders of Series E Preferred |

[1] Note to Draft: This term sheet is not binding on any party.

[12] Note to Richard: The transactional structure presented in this term sheet as the means for effecting Richard's investment is illustrative but not definitive – the optimal structure is still being assessed from a tax perspective, including how best to accommodate the spinoff of the international business to non-Richard stockholders. Under consideration is a structure in which Jack would create a Topco (possibly an LLC) that would hold 100% of international and 55% of Jack, with Richard holding the remainder of Jack directly. Nevertheless, the business terms presented in connection with this structure are intended to reflect the business terms of the proposed transaction, including the rights of the securities being issued. In the event a Topco is created, the standstill restrictions below would apply with respect to Topco as well. [Richard willing to discuss but wants to understand details and implications for Richard]

[23] Note to ~~Richard~~Draft: Minimum working capital to operate Jack's business to be discussed.

~~4818-2897-7458.v1~~

Stock and Class A Common Stock (each entitled to one vote per share).[4]

- Subject to the remainder of this bullet, for purposes of determining the number of shares of Jack to be issued to Richard, only (i) shares that are issued and outstanding at the time of the Purchase (~~excluding~~including unvested shares subject to forfeiture that will vest in the near term[5] ("Unvested Near-Term Equity Awards")), and (ii) options that are outstanding and vested at the time of the Purchase ("Vested Options"), shall be included in the calculation, using the treasury stock method. Shares will be issued to Richard with respect to Unvested Near-Term Equity Awards and Vested Options only if and when Unvested Near-Term Equity Awards vest and, in the case of Vested Options, if and when shares are issued upon exercise or settlement thereof following the Purchase, in which case Jack shall issue that number of shares to Richard (without additional consideration) so as to preserve the 45% ownership of outstanding shares of Jack described above. (For the avoidance of doubt, any issuances of capital stock other than upon the vesting of Unvested Near-Term Equity Awards and exercise of Vested Options will not result in the issuance of additional shares to Richard without additional consideration~~.) Upon~~, but rather shall be subject to Richard's ~~exercise of its~~ pre-emptive rights described in the "Standstill" provision below~~, Richard shall be entitled to purchase an additional number of shares of Class C or C-1, as the case may be, as part of such equity offering (and at the same price per share) to maintain a 45% ownership relative to Jack shares issued at or prior to the time of such equity offering upon the exercise or settlement of equity awards (other than Vested Options) that were outstanding at the time of the closing of the Purchase ("Unvested Equity Awards"~~).

- Amounts to be distributed from the Cash Payment on unvested shares will vest only in tandem with the vesting of such shares and, if forfeited, will be distributed to the other stockholders entitled to participate in the Cash Payment distribution (i.e., non-Richard).

- All shares of common stock issued to Richard in the Purchase or pursuant to the immediately preceding ~~bullet~~bullets shall participate pro-rata in dividends and other distributions with Jack's other ~~common~~ stockholders, provided however, that they shall not participate in the Cash Payment or any dividend or distribution effecting a spin-off of the international assets.

[4] Note to Jack: This provision is subject to additional review once Richard has been provided with full details of Jack's capital structure and voting rights (including vesting schedule of awards). As part of its diligence, Richard expects to review the terms of current outstanding securities, shareholders' agreements and any other governance matters, including voting rights.

[5] Note to Jack: Length of time to be discussed.



~~4848-2507-7455 v1~~

<table>
<tr><td></td><td>

- Definitive documentation will contain provisions permitting Jack (without Richard's consent) to spin off its international business, including all international IP, by dividend or otherwise to its non-Richard stockholders. The definitive documentation shall include applicable inter-company agreements between Jack and spinco, including with respect to assets contributed, management, R&D, expense allocation, other transition arrangements and certain IP licenses.[36] It is anticipated that the spin-off of the international assets will occur at or following the closing of the Purchase. [Richard has no objection to a spin-off of the international business but needs to understand the details.]
- Receipt by Jack of the Investment Amount will not be subject to or conditioned upon any earn out, PMTA approval, or grant to Richard of a ROFR on any future financing or IPO (although Richard will have the right to maintain its pro-rata ownership as described under "Standstill" below).
- The closing of the Purchase will be a "simultaneous sign and close" to occur on or before September 15, 2018, without (for the avoidance of doubt) any due diligence, financing or regulatory approval conditions.
- Any representations and warranties made by Jack in the Purchase Agreement will not survive the Purchase. There will be no indemnification for breaches of representations or warranties or pre-closing taxes and Richard would need to rely on its diligence and obtain "buy-side" representation and warranty insurance if it wishes to seek protection for the same. The reasonable cost of the premium of any representation and warranty insurance would be shared equally by Jack and Richard.[47] [This provision requires further discussion between the parties.]

</td></tr>
<tr><td>Antitrust Clearance Matters</td><td>

- Concurrent with the Purchase, Richard will grant to Jack, a worldwideSubject to discussion between the parties, Richard, to the extent it has control over the non-trademark IP rights relating

</td></tr>
</table>

[36] Note to Richard: Jack will grant spinco an exclusive sublicense of the ex-U.S. non-trademark IP rights licensed from Richard. Jack and spinco would enter into a cross-license under which each would license to the other, on an exclusive, perpetual, irrevocable, royalty-free, fully paid-up, and sublicensable basis, all IP rights relating to the Field (as defined in "Antitrust Clearance Matters") following the spinoff (with Jack having such rights in the U.S. and spinco having such rights ex-U.S.). Each of Jack and spinco will have its own R&D and product development groups that will contribute in perpetuity all of the IP rights relating to the Field developed by each respective company to the cross-license. Jack and spinco would also enter into a non-compete agreement, under which each would agree to refrain from competing in the electronic nicotine delivery system business outside their respective territories. Spinco and Jack would have the right to enforce and to control the prosecution of ex-U.S. licensed patents and IP and U.S. licensed patents and IP, respectively.

[4] Note to Richard: Parties to discuss the possibility of sharing in the deductible.

[7] Note to Richard: Parties to discuss the possibility of sharing in the deductible.



4848-2507-7455v4

CONFIDENTIAL

ALGFTC0000727192

PX1303-014

HIGHLY CONFIDENTIAL

8490002864

| | |
|---|---|
| | to the MarkTen products and the parties have received any requisite HSR clearance, will grant to Jack, an exclusive, royalty-free, fully paid-up, ~~perpetual irrevocable,~~ sub-licensable license to such IP, to make, have made, use, sell, offer for sale, import and otherwise exploit products and services in the field of vapor-based electronic nicotine delivery systems (the "Field")~~. Such license would be non-exclusive in the U.S. and exclusive outside of the U.S. and would be to the non-trademark IP rights owned, controlled or licensable by Richard or any of its affiliates prior to or at the time of Purchase or at any time in the 15-year period thereafter. Jack would have the right to control patent prosecution and enforce in the Field outside of the U.S. such non-trademark IP rights~~ in the U.S. The exclusive license granted to Jack above shall terminate within [6] months following the Non-Compete Termination Date (as defined below).<br><br>• ~~Promptly and in no event later than nine months following the Purchase, subject to the license referenced above, Richard will divest (or if divestiture is not reasonably practicable, contribute at no cost to Jack and if such a contribution is not reasonably practicable, then cease to operate), all Richard assets relating to the Field in the U.S., including all electronic nicotine delivery systems and products it acquired, developed or has under development. For the avoidance of doubt, any such divestment will not affect the license referenced in the previous bullet.~~<br><br>• Richard and Jack would be required to use reasonable best efforts to seek Antitrust Clearance ~~for a period of at least nine months after the Purchase (the "Outside Date")~~, with the details related to such efforts to be discussed by the parties.<br><br>• During the Antitrust Clearance process, Richard and Jack will cooperate with the FTC and agree to the reasonable concessionary requirements of the FTC in connection with changes in Richard's ~~non-combustible reduced-risk products~~e-vapor business.<br><br>• During the Antitrust Clearance process, the Purchase Agreement would provide that Richard would have such informational rights (historical) and consultative rights, if any, as are consistent with the restrictions imposed by the antitrust laws. ~~For the avoidance of doubt, Richard would not have any board designation rights prior to Antitrust Clearance and its acquisition of Class C shares~~[Parties to discuss provision of additional information to Richard for SEC filings and related purposes.] |
| *Richard Support* | • Richard agrees, effective on the closing of the Purchase and ~~thereafter~~for a period of four years, |





CONFIDENTIAL





HIGHLY CONFIDENTIAL

| | |
|---|---|
| ***Obligations*** | thereafter with subsequent two-year renewals by mutual agreement (as extended, the "Services Term"), to:<br><br>• publicly support Jack's mission of reducing consumption of cigarettes and provide adults who want nicotine with potentially less harmful non-combustible alternative products;<br><br>• provide distribution support by leasing in-store display space and space on trucks to Jack;<br><br>• fully support Jack's efforts to gain distribution, display and in-store support for Jack's products, including support of point of sale prominence for Jack's products alongside Richard's;*<br><br>• grant Jack access to Richard's best in class infrastructure (including distribution) to maximize the growth of Jack;*<br><br>• fully support and collaborate with Jack on youth vaping prevention, including support for Jack's age verification efforts;<br><br>• fully support, consult with and assist Jack in obtaining FDA PMTA, MRTP and other regulatory approval for its products (with Jack having control of the process);<br><br>• publicly support efforts to petition for a national age limit of 21 for all nicotine products (often referred to as "T21"); and<br><br>• provide Jack access to Richard's various databases of smoker customer lists; and.<br><br>• assist with direct marketing programs including inserts.* Items marked with an asterisk to be effective upon Antitrust Clearance and to run until expiration of the Services Term.<br><br>• Richard agrees, at closing of the Purchase, to issue a mutually agreed joint press release describing the support elements identified above.<br><br>• Any services provided by Richard to Jack will be on a cost plus pricing basis to be agreed by the |

| | |
|---|---|
| | parties.<br><br>• Richard agrees~~, for so long as it owns at least 5% of Jack's outstanding shares,~~ to refrain from competing anywhere in the ~~world~~U.S. in the e-vapor business (other than with respect to ~~MarkTen and MarkTen Elite prior to their divestiture, shutdown or contribution~~existing and under development products prior to the non-trademark IP license as described above). The non-compete will terminate upon the earliest of (i) failure to receive Antitrust Clearance, (ii) the expiration of the Services Term and (iii) if Richard ceases to own at least 20% of Jack's outstanding shares (such date, the "Non-compete Termination Date"). |
| ***Board of Directors/Related Party Transactions*** | Prior to Antitrust Clearance[58], and for so long as, Richard owns at least 30% of Jack's outstanding shares, Richard shall be entitled to designate a director independent of Richard to sit on Jack's Board of Directors ~~shall invite a representative of Richard (the "Representative") to attend all meetings of the Jack Board of Directors in a nonvoting observer capacity; provided, however, that Jack reserves the right to exclude the Representative from access to any meeting or portion thereof (i) regarding agreements with Richard or related to the standstill restrictions described below, or (ii) if Jack's Board of Directors believes upon advice of counsel that such exclusion is reasonably necessary to preserve the attorney-client privilege between Jack and its counsel, would result in disclosure of a trade secret or conflict of interest, raises anti-trust concerns, or for other similar reasons.~~<br><br>Upon Antitrust Clearance:<br><br>• The Jack Board of Directors shall consist of ~~nine~~eight directors.<br><br>• If, and for so long as, Richard owns at least 30% of Jack's outstanding shares, the board will be comprised as follows:<br><br>    • Richard, as holder of the Class C shares, would have the Class C right to designate and elect, separately as a class, three directors;<br><br>    • Jack stockholders holding shares of classes other than Class C (i.e., the non-Richard stockholders) will have the right to designate and elect ~~five~~four directors; and |

[58] Note to ~~Richard~~ Draft: Pre-clearance Board ~~observer~~ right subject to discussion among the parties' respective antitrust counsel.



4848-2597-7455.v4

CONFIDENTIAL

ALGFTC0000727195

PX1303-017

HIGHLY CONFIDENTIAL

8490002867

  - Then sitting CEO.

- In the event Richard's ownership drops below 30% <u>but exceeds 15%</u> of Jack's outstanding shares, Richard~~'s right to designate directors shall be reduced proportionally to the nearest integer~~ <u>shall have the right to designate 2 directors, and in the event Richard's ownership drops below 15% but exceeds 5% of Jack's outstanding shares, Richard shall have the right to designate 1 director,</u> and the right of Jack's non-Richard stockholders to designate directors shall be increased accordingly.

- Except as provided in Jack's Certificate of Incorporation, By-Laws and written agreement(s) between Jack and Richard, matters that come before the Jack Board of Directors shall be decided by a majority vote or unanimous written consent, except as provided below or as otherwise determined by the Board (which determination shall include a majority of the then-serving Richard designees).

- Richard's board designees will recuse themselves from any board discussions and from voting on any matters and the Jack Board may exclude them therefrom (including by forming a committee), regarding Jack's relationship or agreements with Richard or related to the standstill restrictions described below.

- Subject to any applicable regulatory requirements (including stock exchange rules), and except as set forth above so long as Richard is entitled to designate at least two directors, it shall be entitled to proportionate representation on each board committee of Jack.

- Approval of at least a majority of the non-Richard directors will be required for any transaction between Richard and Jack<u>, and approval of a majority of the Richard directors will be required for any transaction between Jack and spinco or Jack and any affiliate of other major Jack stockholders</u>.

- <u>Subject to the other terms of agreement with Richard,</u> Jack's board would be free to approve an IPO or other public offering, otherwise register Jack as a public reporting company, or raise equity or debt from third parties, spin-off Jack's international business to non-Richard stockholders, ~~or approve a sale of Jack to a third party,~~ or adopt antitakeover measures, including adopting a staggered or classified board for the non-Richard directors, in each case so long as such approval includes a majority of the non-Richard directors.





CONFIDENTIAL



HIGHLY CONFIDENTIAL

| | |
|---|---|
| | • If, and for so long as, Richard owns at least 30% of Jack's outstanding shares, Jack will not take any of the following actions without the approval of a majority of the Board of Jack, and such approval must include the approval of a majority of the Richard directors:<br>• Change in strategy/youth vaping prevention plan;<br>• Change in dividend policy to be adopted at closing;<br>• Material related party transactions other than on arm's-length terms;<br>• ~~Material commercial transactions outside the ordinary course of business~~Transactions with [ ________, ________, ________] (the "Richard Competitors")[69];<br>• Change of independent auditors or material discretionary changes in material accounting policies;<br>• Voluntary bankruptcy/insolvency or dissolution; or<br>• ~~Dissolution~~ Other customary matters to be agreed by the parties. |

[69] Note to ~~Richard~~Draft: Specific parties to be listed here as agreed by the parties.

| | |
|---|---|
| *Protective Provisions* | After the issuance of Class C shares to Richard, without the consent of a majority of the outstanding shares of Class C, Jack, its board and its stockholders shall not:<br>• Amend Jack's certificate of incorporation so as to alter or change the Class C's powers, preferences or special rights so as to affect the Class C adversely; ~~or~~<br>• Increase or decrease the authorized size of the Board without proportional adjustment to Richard's board designation rights; or<br>• Authorize, approve or engage in any transaction, or take any other action which would, assuming that any associated preemptive rights are exercised in full, (i) result in any dilution (or the elimination) of the economic interest or voting power of the holders of Class C and/or (ii) directly or indirectly result in any Richard Competitor owning more than [4.9%] of Jack's outstanding shares or voting power. |
| ***Standstill***[7] | • For four years from closing, Richard shall not (and shall not request the board to amend, modify or waive any of the following in any manner that would require public disclosure):<br>  ◦ acquire any beneficial interest in any additional Jack shares or indebtedness of Jack (except that Richard shall have the right to acquire~~, following Antitrust Clearance,~~ shares (if prior to Jack's IPO, limited to Class C or C-1 shares as the case may be) to maintain pro rata ownership ~~on the primary portion~~within a reasonable time period of any equity offering or with respect to ~~Unvested Equity Awards~~any equity awards not counted for purposes of determining Richard's 45% equity interest as described in the "Purchase Agreement" section above, with the purchase price for such preemptive rights to be based upon the initial valuation at which Richard invested in Jack for two years from closing, and thereafter a valuation methodology to be discussed by the parties); or effect, seek, offer or propose any tender or exchange offer, merger or other business combination;<br>  ◦ engage in any solicitation of proxies or consents or become a "participant" in a "solicitation" of proxies or consents (including, without limitation, any solicitation of consents to call a special meeting of stockholders), in each case, with respect to securities of Jack; |

[7] ~~Note to Richard: Jack is sensitive to Richard's concerns regarding any potential sale process of Jack and is open to further discussion on the subject.~~

- form, join or in any way participate in any "group" (within the meaning of Section 13(d)(3) of the Exchange Act) with respect to capital stock of Jack; or
- make any proposal for consideration by stockholders at any annual or special meeting of stockholders of Jack, or make any offer or proposal (with or without conditions) with respect to a merger, acquisition, disposition or other business combination, except as provided below.

- Notwithstanding the foregoing~~:~~
  - ~~Following the 5th anniversary of the closing of the Purchase~~, Richard may at any time, make an offer for a business combination relating to the acquisition of all outstanding shares of Jack, provided that any such proposal is only made on a confidential basis to the Jack board and is subject to a non-waivable condition that the offer be approved by an independent special committee of the Board (with no Richard representation) and a majority of the voting power held by stockholders other than Richard (a "Permitted Buyout Offer").
- If at any time the Jack Board authorizes Jack to negotiate with a third party outside the ordinary course of business or authorizes a formal auction process, in either case regarding a change of control of Jack or the acquisition of substantially all of Jack's assets, Jack shall notify Richard of the same and Richard may make a Permitted Buyout Offer during the pendency of such negotiations or auction process.
- ~~During the [__] year period following the closing of the Purchase, Jack shall not enter into a transaction involving a change of control of Jack with, or the acquisition of substantially all of Jack's assets by, a Richard Competitor. The foregoing shall not apply (i) if Jack is publicly traded on the NYSE or NASDAQ, (ii) following a change of control of Richard or (iii) following the date on which Richard makes a Permitted Buyout Offer.~~
- If major stockholders propose to transfer ~~their~~shares constituting at least [•]% of Jack's outstanding shares in a single or series of related transactions ~~that would constitute a change of control of Jack~~, then Richard would have tag-along rights to participate in a pro rata fashion in such transfer and a right of first refusal with respect to such transfer. In addition, Richard will



~~4848-2597-7455.v1~~

CONFIDENTIAL

ALGFTC0000727199

PX1303-021

HIGHLY CONFIDENTIAL

8490002871

| | |
|---|---|
| | have a right of first refusal with respect to any equity issuances by Jack to third parties. |
| ***Voting Agreement*** | • All major stockholders, including Richard, will execute a voting agreement pursuant to which such stockholders shall agree to vote its shares ~~as follows:~~<br>• ~~In~~in accordance with the ~~Board structure~~matters described above under "Board of Directors/Related Party Transactions~~."~~<br>• ~~In favor of any change of control of the Company that is approved by (i) a majority of the Board (including a majority of directors other than those then serving and designated by Richard), and (ii) the holders of a majority of the voting power of all outstanding shares held by non-Richard stockholders.~~" and "Protective Provisions". |
| ***Restrictions on Transfer*** | • Richard may transfer its shares in compliance with applicable law subject, until four years after closing (or, if earlier, an IPO of Jack), to the following limitations: (i) no such transfer of shares would result in Richard's ownership of Jack falling below 35% of the then outstanding shares, and (ii) such transfer or series of related transfers may not account for more than 2.5% of Jack's then outstanding shares. All other transfers prior to four years after closing (or, if earlier, an IPO of Jack) would require the approval of the majority of the non-Richard directors.<br>• The transfer restrictions described in the preceding bullet shall terminate if the parties fail to obtain Antitrust Clearance. In such event, shares transferred to persons who are not competitors of Jack would automatically convert to voting shares, while shares transferred to competitors would remain non-voting.<br>• Upon any transfer of shares by Richard, the voting power of such ~~shares~~shares (if any) shall ~~be one vote per share~~not be diminished. |
| ***Exclusivity*** | • Upon agreement in principle as to the terms set forth in this term sheet, parties to enter into an exclusivity agreement providing for an exclusive negotiating period ending on September 15, 2018 during which the parties will finalize diligence and negotiate definitive transaction agreements. |

Document comparison by Workshare Compare on Thursday, August 09, 2018 12:32:03 PM

| Input: | |
|---|---|
| Document 1 ID | file://\\ibmrdecifs02\Users-C\beardsm1\S&BD\Project Tree\Project Tree Distribution\Project Richard - Summary of Terms v2 4848-2597-7455 v.1.docx |
| Description | Project Richard - Summary of Terms v2 4848-2597-7455 v.1 |
| Document 2 ID | file://\\ibmrdecifs02\Users-C\beardsm1\S&BD\Project Tree\Project Tree Distribution\Draft Tree Revised Term Sheet WLRK draft CLEAN 8.9.18.docx |
| Description | Draft Tree Revised Term Sheet WLRK draft CLEAN 8.9.18 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 97 |
| Deletions | 71 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 170 |

# EXHIBIT E

# Draft Script for October Townhall

---

***Intro:***

We've invited all of you to join in a conversation about change and the progress we want to make.

Show of hands…how many agree with me that a lot is changing and FAST?

We've made several recent decisions in e-vapor that result from and respond to change happening around us. Those decisions have probably raised a lot of questions for you, as they have for investors and other stakeholders. We thought now was a good time for an all-in conversation about those changes and how we intend to move forward.

As you know, we operate with a dichotomy…a mature core that fuels and funds our growth aspirations in still immature innovative products businesses. So, if you don't mind, I would like start this conversation with the situation analysis we've conducted and our viewpoint on both.

***Past 100 Days - Billy***

When we talked in May, we told you that this team was committed to repositioning Altria for success amid disruption in our industry and changing consumer preferences.

We've spent the past 100 days or so doing a deep situation analysis. We've looked at each product category and assessed our position honestly and objectively, looking at our successes and where we've come up short. We've identified those places where our business and talent strategies are really delivering for us. At the same time, we're being honest with each other about where we need to do better. And we've acknowledged a few areas where a change in direction is necessary for us to sustain our leadership for decades to come.

Let me give you some examples.

There is no future without the core. So we've looked at how can we get the core – our growth engine -- to fire on all cylinders.

In cigarettes, we successfully stabilized Marlboro share, launched Marlboro Ice, expanded distribution of Nats and increased L&M profitability. All really important steps to strengthen our smokeable business.

However, despite tremendous effort and new ideas, Benson and Hedges failed to gain market share. We were patient, but it's fallen short of objectives. So we've cancelled that initiative.



CONFIDENTIAL

In cigars, JMC is growing both volume and profit with Black & Mild, the profit leader. But, despite significant successes in growing volume and profit driven by the tipped segment, JMC is losing overall share in a category where growth is coming from natural wrap.

In smokeless, we stabilized the business and are growing share following the recall. The team filed an MRTP application for Copenhagen, the first for the company. And we significantly improved the efficiency of our promotions using revenue growth management, or RGM. These are some terrific accomplishments for the smokeless business.

But, the overall category is declining. The number of adult dippers is down as consumers migrate to new alternatives like Zyn oral tobacco-derived nicotine pouches. In fact, OTDN is emerging as a competitive threat. We have work to do here.

In heat-not-burn, the team is ready to launch in test market with terrific plans. But we're waiting for FDA authorization. We're using this time to expand our commercialization plans so that we take advantage of our first-mover position.

**Howard**

Then there's e-vapor – the subject of lots of dialogue lately and an area where we have truly felt competitive disruption. Innovative, reduced risk product leadership remains our greatest opportunity.

All of us here know that it takes more than commercial success to lead in our industry. This is a category that has developed in a way that threatens the future of harm reduction. We've decided to confront that situation head on.

JUUL is a radically disruptive e-vapor product. It took 10 years to develop JUUL as a product that could convert adult smokers. At the same time JUUL has created a youth usage epidemic. We cannot allow that to continue. The future of harm reduction for adult smokers is at stake. That's what we told Commissioner Gottlieb when we met last week and what we told investors yesterday.

The bottom line is…we agree with FDA that the rise in underage e-vapor use is alarming. E-vapor cannot realize its potential for reducing harm for adult smokers until underage use trends are reversed.

We announced the following actions:

1) Removing MarkTen Elite and Apex by MarkTen pod-based products from the market until we receive a market order from FDA or the youth problem is mitigated.



CONFIDENTIAL

2) Discontinuing the sale of all flavor variants within our cig-a-like portfolio with the exception of tobacco, menthol and mint varieties until we receive a marketing authorization from FDA or the youth problem is mitigated.

3) Supporting federal legislation to increase the minimum legal age to purchase tobacco products to age 21 and to set a national standard.

Leadership isn't easy and we know this is a difficult pill to swallow. We know that consumers, the trade, and other harm reduction allies probably won't understand our actions. But it's our job to communicate frequently and clearly about why we've taken these actions and how we want to contribute to reversing these trends.

How many of you were here in 1998? I can tell you that Craig and I were in the room when we made some very difficult decisions to preserve this business after rising youth smoking generated serious concern. History proved that those decisions were exactly right. We've been here before and we get it.

We can't allow the dramatic increase in underage use of e-vapor products to imperil the long-term opportunity of tobacco harm reduction or reverse the decades-long decline in youth smoking.

Let me be absolutely clear, we remain committed to investing in our future -- the development of satisfying reduced risk products and more choices that will convert adult smokers. We firmly believe these are necessary steps to preserve that future.

These latest decisions come after our announcement about the way forward for product innovation. After careful thought, we concluded that our strategy in e-vapor was wrong. We thought that we could compete with existing products that were on the market in August of 2016 and do fine. We were chasing the market and not following the consumer.

So, it's time to change our strategy and approach. It's time to shift our attention and resources to developing leap frog products that can win with consumers and getting those products authorized by FDA. And that's what drove our announcement on October 5.

It's not because we didn't try hard. It's not because we didn't put great people on the task. We've done a lot of soul searching on this and here's what we've concluded.

- We weren't clear about our desire to convert adult smokers to less risky products.
- We weren't focused on the importance of how certain products deliver nicotine satisfaction. So that meant we had a hard time translating our desire to offer less risky products into products that adult smokers wanted.

- We failed to give our teams the flexibility they needed to compete. These are some of the ways we've fallen short.

We're going to get it right this time. Let me recap our announcement ...

First, we believe meaningful progress on innovation will require an optimized talent structure. We're establishing four growth teams to tackle our must urgent product platforms.

Growth teams are now fully dedicated, empowered and supported by the leadership team. We've erased functional boundaries. We've put strong, diverse teams together and then we're giving them the resources and flexibility they need to succeed.

Second, we've concluded that winning in the future will require new skills -- inside and outside our company.

We brought in a tremendous innovation leader with a strong track record of success to help. Bassiouni Khalid – "BK" -- joined Altria on 10/15 as SVP, Innovative Product Development. BK has experience with leading tech companies, regulated industry and tobacco. He brings an extensive network of third-party vendors, universities and innovation outposts to drive product development.

Third, we will rely substantially on third-party manufacturers with experience in design, development and engineering for electronics consumer products. They bring experience, flexibility and supply chain management we will need to win in innovative products.

As a result, we have narrowed the focus for Nu Mark, which will continue to support MarkTen in the cig-a-like segment. Other innovative product work will be directed by the growth teams under BK's leadership.

We're convinced – and many of you agreed – that this is a much better approach. But we know that the impacts of these new plans and moving into a team structure cause uncertainty for many of you and will result in some really good people leaving us. We know that's hard.

As your leaders, we are accountable for the decisions that led us here. We're also accountable for righting the ship.

***Consumer Centricity***

Few companies get innovation right the first time. Thanks to our success in the core, we have another chance. Absolutely critical to getting innovation right this time will be what Pascal calls consumer obsession.

Billy and I described a goal of becoming 500% more consumer centric. We've gotten a lot of questions about what this even means. Here are some of the questions we should have answers to...

- Are we making the right investments to maintain leadership in the traditional tobacco categories?
- Are our innovative products satisfying enough to encourage adults to convert to them?
- What decisions does a consumer make on their journey to conversion?
- How do our products fit into a total lifestyle for adult tobacco consumers?

These are examples of the key questions that we should have at the center of our work. Getting these answers will move us a long way forward. We still have a long way to go. Insights will feed product development.

On the other end of the process is developing novel, go to market strategies and experiences. The adult tobacco consumer is changing the products they buy, where and how they buy them! Recognizing this, we created a new group led by Brian that draws on lots of terrific work done in digital marketing and the future of commerce. We need to develop absolutely world class capabilities in this area that delight our consumers beyond the products they enjoy.

[Suggest sending this video cut in two parts. The first part through 2:50 would go out with the invitation. The second part about the consumer could start at 2:50 and be played here.]

***Taking On Our Challenges - Billy***

So, if you had any question that this leadership team would be slow to act or make the necessary changes to better position us for the future, hopefully, now we've convinced you.

*[Billy to prompt a poll of the audience using Pigeonhole. "Is Altria moving in the right direction? Wrong direction? I'm still waiting to see.]*

Howard and I both have a passion for action. We've been talking about being bolder and we've realized that, collectively, we may not even know what that means. So we have a responsibility to model bolder action as we take on some of our challenges together.

This week we formed a series of demonstration teams. Each team is sponsored by a member of the leadership team and other volunteers who want to help. They'll tackle specific problems with diverse teams who will be empowered to address them in completely new ways, with radically different timelines than we're used to. In doing so, I hope we'll break new ground and learn a lot about what it takes to actually be bold to deliver more.

We'll tackle a range of demonstration projects – both business and culture designed to blast us out of old behaviors and actually solve problems. Here are a few examples:

- Piloting a direct-to-consumer model in a limited geography
- Making workplace flexibility real – something you've asked for and we've never really delivered
- Significantly increasing the point-of-sale scan data we receive

And, we're taking on 9 "big honking projects" - the pervasive problems and game changing opportunities that must be addressed. *[recommend listing those that we can share]*

Here's what I know for sure. When we put teams to work with a specific goal, nobody takes the hill like you all do. What we'll do differently than in the past, though, is point out the hill but NOT tell all of you HOW to take it!

So, we're very excited to see what happens when we confront some real issues creatively, aggressively and together with full support of the leadership team.

***Howard – Opportunity Statement***

So this has been a time of reflection. It's been sobering. I've even gotten emotional at times. It's also been very uplifting – Michael Thorne-Begland put out a call for volunteers who want to help drive transformation at Altria and he had hundreds of you immediately respond! The passion you all have for our great company makes all of us so proud. Michael and his volunteer army – named the Transformers stand up if you're a Transformer – have been honing in on what our business transformation is all about. I would like to invite him up to talk to you about it.

*[MTB and Transformers introduce opportunity statement in a "chorus" of readers. MTB ends with "What has to change." Audience will be invited to fill out "what has to change" cards and drop them in a bucket at the end of the program.]*

***Howard - What You Should Expect from Us***

For us to create the future we need to win, we have to be in it together. So, I'm asking my leadership team to continue this dialogue – this conversation – with you, starting with the areas you've identified as needing to change.

Let me also tell you some of the behaviors we've identified as essential among our Leadership Team to make this future possible. There are three things you should expect from us:

1. Greater candor and openness about our business. Because we're in it together.

2. That we model the behaviors we want to see from you -- take humility, for example. For us to continue to be successful, we have to be willing to acknowledge that we may not have all the answers – and that's ok. We need to recognize that and do the work to find them – and that starts with asking the right questions. That's leadership after all.

3. Action! A willingness to confront our challenges and pursue our opportunities. To take on the difficult work and get it done.

Hopefully you are seeing those from us now. But if you're not, we are counting on you to keep us honest. We need and expect you to let us know.

***Why We Can Win***

Let me close with a couple of things. These four charts are a reminder that we are winning....today. We spoke to investors yesterday about our performance for the quarter and we could confidently say that...

- We've stabilized Marlboro share
- Our adjusted diluted EPS is up X% year to date
- We grew our dividend 14% -- the 53rd dividend increase for our companies
- Our outlook for strong double digit EPS growth for 2018 remained unchanged

These are reminders that we are stewards of a remarkably successful company.

In fact this is a company that has emerged strong from several enormous challenges in its history. A number of us lived through some truly existential threats...Marlboro Friday and the litigation that led to the Master Settlement Agreement. We got through it because of leadership and hard work. Against what seemed like the impossible, we came together and we did what needed to be done.

Now, we are in a new stage of rapid and fundamental change that demands the same fortitude, leadership and bold action.

It isn't hard to see a future that is quite different than today -- a large consumer goods category in which non-combustible products are a major part. In this future, adults have moved to these products because:

- **we** developed the most satisfying products,

- **we** made them available with our distribution scale,
- **we** delighted them with terrific and unexpected brand experiences, and
- **we** made sure that they had accurate information about the relative risks of those products.

Core products will still be a major part of this industry for years to come because informed adults will still want those experiences. But with growing adult demand for less harmful products, there will be an abundance of less harmful product choices available to them.

Together we'll write this chapter.

We have a strong hand to play. The strength of our core provides rocket fuel for our future. If we play our hand right, I know we can win.



CONFIDENTIAL

# EXHIBIT F

Draft as of 5/10/2018

# Board of Directors Presentation

Billy Gifford

May 2018

Altria
Altria Client Services



CONFIDENTIAL

# Executive summary

- This presentation provides an update on (1) recent changes in e-vapor and cigarette category dynamics and (2) how the impact of these changes could be addressed with a potential JUUL transaction
- JUUL is rapidly growing volume, accelerating e-vapor category growth; based on current information, these trends are expected to continue
- Accelerating e-vapor category growth is forecasted to increase the cigarette decline rate, negatively impacting Altria's income and EPS forecasts vs. OB 3YP
- While Nu Mark has plans to introduce competitive e-vapor products, the pace of JUUL's growth creates a challenged pathway for Nu Mark to achieve e-vapor leadership in the near-term
- Under acceptable terms, a JUUL transaction could (1) enhance income and EPS vs. the updated forecast, (2) provide Altria / Nu Mark with a near-term pathway to e-vapor category leadership and (3) enhance Altria / Nu Mark's R&D capabilities for the future
- Our preliminary analysis indicates a standalone valuation of ~$19bn and an Altria partnership valuation of ~$30bn, subject to additional diligence
- Finally, while there are downside and upside risks to a transaction, we would propose using a multi-step transaction structure to mitigate certain key regulatory risks

# Tobacco Space Overview – 2018 OB

*3YP CAGR*







EQ Estimation – For purposes of this analysis the following are assumed to be equivalent: 1 pack of cigarettes = 1 can of MST/Snus/TDN = 10 Cigars = 1 E-Vapor cartridge

Altria
Altria Client Services

# E-vapor category growth has accelerated

*All trade classes; volume equivalized to cartridges (bn)*




| | | | | | | |
|---|---|---|---|---|---|---|
| % Δ vs. YAG | ~170% | ~70% | ~15% | (~9%) | ~12% | ~21% |

Altria
Altria Client Services



CONFIDENTIAL

# JUUL volume performance is driving category growth

*MOC Volume Sales in Millions, 4WM*




Source: IRI MOC Data Week Ending 04/29/18, as of 5/7/2018

Altria
Altria Client Services



CONFIDENTIAL

# Drivers of JUUL success




Source: ALCS – CI&E Evaluation – 5/2/18

# Tobacco Space Overview – Preliminary 2RF

*3YP CAGR*







EQ Estimation – For purposes of this analysis the following are assumed to be equivalent: 1 pack of cigarettes = 1 can of MST/Snus/TDN = 10 Cigars = 1 E-Vapor cartridge



CONFIDENTIAL

ALGAT0004206032

# U.S. tobacco space

*Annually | Total US | Preliminary 2RF*




Theoretical volume – CMI Estimates; Cigarettes and Cigars include Nat Sherman

EQ Estimation – For purposes of this analysis the following are assumed to be equivalent: 1 pack of cigarettes = 1 can of MST/Snus/TDN = 10 Cigars = 1 E-Vapor cartridge

Altria
Altria Client Services



CONFIDENTIAL

# Preliminary 2RF vs 2018 OB – OCI Impact

| *Volume and $ in millions* | 2018 | 2019 | 2020 |
|---|---|---|---|
| Smokeable Volume Impact[1]<br>*Sticks* | (1,500) | (2,800) | (3,800) |
| Smokeable OCI Impact | ~($165) | ~($330) | ~($480) |
| Operating Plan Changes[2] | 165 | - | - |
| **Net OCI Impact vs OB** | **$-** | **($330)** | **($480)** |

Source: Internal estimates
1 – Assumes ~4.8% annual cigarette volume decline
2 – Assumes 100% OCI impact can be covered by reduced spending in 2018

Altria
Altria Client Services

# 2018 3YP EPS impact of accelerated cannibalization of cigarettes due to e-vapor growth




| | 2018 | 2019 | 2020 |
|---|---|---|---|
| *2018 OB 3YP EPS* | $3.99 | $4.42 | $4.88 |
| *2018 Prelim. 2RF EPS* | $3.99 | $4.29 | $4.68 |

Altria
Altria Client Services



CONFIDENTIAL

# Future e-vapor category growth driven by hybrids

*All trade classes; volume equivalized to cartridges*




*Theoretical volume – CMI Estimates

Source: ALCS CMI: IRI Projected (through 4/29/2018), STARS (through 4/22/2018), Capstone, comScore, ATCT, Volume Equivalized to cartridges (1 disp= 1 cart= 1 mL e-liquid).

# Nu Mark 2018 commercially available products

**Cig-alike**




MarkTen®




Green Smoke®

**Hybrid**




MarkTen® Elite

CYNC™

Apex® by MarkTen®

VIM™ by MarkTen®

**Open System**

AVAIL®

Altria
Altria Client Services



CONFIDENTIAL

# Strategic acquisition of JUUL would help deliver against our e-vapor leadership aspiration and long-term EPS goals

***JUUL Investment Thesis***

- Immediately establish ALG as a leader in e-vapor market
- Generate material e-vapor OCI / offset potential future OCI losses in cigarettes
- Strengthen Nu Mark / ALCS's R&D capabilities and IP portfolio
- EPS accretive versus latest estimate
- Altria can help JUUL address youth vaping concerns and resulting regulatory and legal risks



Altria
Altria Client Services

CONFIDENTIAL

# JUUL proposal to Altria (April 20th, 2018)

- **Initial Minority Investment**
  - $6.4 BN for 40% non-voting common equity
  - Expectation that no HSR filing would be required in connection with this portion of transaction
- **Majority Investment**
  - Seek regulatory approval for 50.1% ownership immediately following minority investment; Altria pays additional $1.6 BN upon regulatory approval
  - Post regulatory approval, non-voting common equity converts into voting common equity
- **Subsequent Regulatory Payment**
  - $1 BN funded into escrow that would be released to JUUL upon PMTA approval
- **True-Up**
  - True-up payment of 50% imputed gain upon an IPO of JUUL

# Preliminary JUUL valuation approach

1. Discounted cash flow analysis

2. Impact on Altria EPS (including estimated impact to Altria Core businesses)

*All valuation and pro forma financial analyses subject to further review, pending due diligence process*

# Preliminary JUUL DCF valuation

**Base Scenario**

- Continued strong volume growth in near- to medium-term; modest volume growth post-2023
  - Volume adjustment for external considerations
- Strong revenue growth and income generation, in-line with current JUUL trajectory
- Assumes PMTA approval

---

**Altria Partnership Scenario**

- Sustained volume growth trajectory through 2027
  - Volume adjustment for external considerations
- Income generation enhanced by utilization of Altria infrastructure
- Assumes PMTA approval

# JUUL volume estimates

*Cartridges in millions*




| | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|
| *JUUL share of E-Vapor* | 6% | 32% | 33% | 41% | 43% |
| *JUUL proportion of Total Tobacco Space* | 0.4% | 2.5% | 33.5% | 5.2% | 6.3% |
| *E-Vapor proportion of Total Tobacco Space* | 6.7% | 7.7% | 10.4% | 12.8% | 14.7% |

Note: Volume includes e-commerce/other channel volume

# JUUL is forecasted to have strong growth and high margins

*JUUL estimated revenue and pre-tax income (Altria Base Scenario)*

**Revenue 4-Year CAGR: 93%**




Note: Revenues include e-commerce/other channel volume

# JUUL income can be improved with Altria partnership

*$ in Millions*




Altria
Altria Client Services



CONFIDENTIAL

ALGAT0004206044

# JUUL preliminary DCF valuation




Note: Valuation scenario assumes 10% discount rate

Altria
Altria Client Services



CONFIDENTIAL

# Altria proposed payment structure designed to mitigate key risks

1 Acquire 50.1% ownership position

| *$ in Billions* | Range |
|---|---|
| Altria initial investment at signing (33.3%) | $6.4 |
| Altria additional investment at closing (50.1% total) | $1.6 |
| Altria PMTA payment earn-out (2024) | $4.0 |
| **Total payment for 50.1%** | **$12.0** |

2 Pathway to remaining equity

- JUUL investors retain right to initiate IPO during period from closing until 12 mos. post PMTA deadline (2023);Altria has option to purchase shares at IPO price
- If no IPO, Altria obtains call option at growth adjusted EBITDA multiple

[redacted]

[redacted]

# U.S. tobacco space

*Annually | Total US |*







Theoretical volume – CMI Estimates; Cigarettes and Cigars include Nat Sherman

EQ Estimation – For purposes of this analysis the following are assumed to be equivalent: 1 pack of cigarettes = 1 can of MST/Snus/TDN = 10 Cigars = 1 E-Vapor cartridge

Altria
Altria Client Services



CONFIDENTIAL

# Project Tree external environment and challenges

- Significant increase in external pressure on youth issues over the two last months

**4.18.18 - Democratic Senators letter to K. Burns, CEO JUUL Labs**

*"Your company's popular vaping device (JUUL) and its accompanying flavored nicotine cartridges (JUUL pods) are <u>undermining our nation's efforts to reduce tobacco use among youth</u>…"*

**4.24.18 - Statement from Commissioner Gottlieb and JUUL information request**

- *"FDA also sent an official request for information directly to JUUL Labs, requiring the company to <u>submit important documents to better understand the reportedly high rates of youth use</u> and the particular youth appeal of these products."*

**4.26.18 - Colgate et al v. JUUL Labs (N.D. Cal.)**

- *Class action lawsuit filed against JUUL*

Altria
Altria Client Services



CONFIDENTIAL

# Addressing potential youth usage issues

- Work closely with all stakeholders to ensure effective measures against youth access
- Substantially increase JUUL's $30 million investment in educational programs
  - In partnership with credible 3rd parties
- Retail contracts to require training
- Ensure age-verification for e-commerce sales
- Prominent nicotine labels
- Monitor internet and take appropriate enforcement action





CONFIDENTIAL

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Other key terms

- Altria will be buying JUUL business, excluding international rights, which will be spun off by JUUL investors

- Altria requires a controlling interest in JUUL
  - Altria appoints majority of Board of Directors
  - Board decisions generally made by majority vote
  - Minority protections for JUUL investors for governance, anti-dilution and related party transactions
  - JUUL management team expected to remain in place



CONFIDENTIAL

ALGAT0004206058

# Most critical diligence items

- No product changes post 8/8/2016
- IP is protectable and will withstand any patent infringement litigation (i.e. Fontem)
- Analytical testing results on liquids/device are acceptable
- JUUL has attractive gross margins with potential for margin expansion
- Litigation risks

# Preliminary process & timeline

*June 1, 2018*

*~2 months*

*Negotiate LOI*

*~2 months*

*Diligence & Definitive Documents*

*~6-9 months*

*HSR approval & other conditions to closing*

***March - June 2019***



CONFIDENTIAL

# EXHIBIT G

**From:** Gifford, William F. Jr (ALG)
**Sent:** Saturday, April 14, 2018 4:41 AM
**To:** Willard, Howard A. (ALG)
**Subject:** Re: Follow Up Discussion

3 works for me. Thanks

Sent from my iPhone

On Apr 13, 2018, at 9:53 PM, Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com> wrote:

> Are you ok with 3pm
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** "Nicholas J. Pritzker" <njpritzker@taocap.com>
> > **Date:** April 13, 2018 at 5:41:36 PM EDT
> > **To:** "Willard, Howard A. (ALG)" <Howard_Willard_ALG@altria.com>
> > **Cc:** "Kevin Burns (kburns@juul.com)" <kburns@juul.com>, "Riaz Valani (rvalani@gacapital.com)" <rvalani@gacapital.com>, "Gifford, William F. Jr (ALG)" <William.F.Gifford@altria.com>
> > **Subject: Re: Follow Up Discussion**
> >
> > Howard: Thanks for getting back to us.
> > How about noonPT, 3ET monday? If you would rather do it at another time we can be flexible. Nick
> >
> > Sent from my iPad
> >
> > On Apr 13, 2018, at 12:13 PM, Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com> wrote:
> >
> > > **Highly Confidential #Secure**
> > >
> > > Billy and I have been working with our team to prepare for our next discussion and we recommend we have a call next Monday or early next week. We will be prepared to share the following:
> > >
> > > - A proposal for the structure and value sharing that creates a win / win partnership that enables us to fully collaborate to effectively manage challenges over the next few years and deliver maximum value in the long run
> > > - A proposal for a collaboration between our Antitrust Firms that frames the magnitude of the antitrust risk and creates a plan to manage that risk
> > > - A proposal for the timeline and next steps that establishes a rapid process that helps us gain agreement on the previous two

items and then proposes a way for us to collaborate on the remaining three critical items which includes: i) Sharing market and financial projections to gain agreement on the standalone and partnership value for the enterprise; ii) An efficient and appropriate due diligence process; and iii) A process to ensure that the strategy alignment and chemistry between our respective operating teams is supportive of a productive partnership that can create substantial value above what is achievable under a standalone scenario in a dynamic tobacco category environment.

I am sorry we couldn't get back to you sooner, but Billy and I had a number of other issues to deal with this week. We are confident that we will be prepared for a good conversation on Monday. Let me know if there is good time to connect on Monday or otherwise.



CONFIDENTIAL

# EXHIBIT H

**From:** Riaz Valani
**Sent:** Thursday, July 20, 2017 9:31 PM
**To:** Gifford, William F. Jr (ALG)
**Subject:** Re: Introduction

Billy,
That works well - I'll confirm venue. Looking forward to meeting.
Riaz

> On Jul 18, 2017, at 20:15, Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com> wrote:
>
> Riaz,
>
> Thanks for getting back to me. Hope all is going well. If still available, Friday the 28th works well, as we have our second quarter earnings call on the 27th. I would suggest mid-morning (10:30) if that works for you guys. Let me know if that works and where you would like to meet in New York. Thanks.
>
> Best regards,
>
> Billy
>
> -----Original Message-----
> From: Riaz Valani [mailto:RValani@gacapital.com]
> Sent: Thursday, July 13, 2017 1:27 PM
> To: Gifford, William F. Jr (ALG)
> Cc: Nick Pritzker; Isaac Pritzker; Zach Frankel
> Subject: Re: Introduction
>
> Billy,
> Thanks much. I'm in Europe the next 2 weeks but am planning to be in New York along with Nick, Zach, and Isaac on the 27/28th of this month.
> Perhaps we could all get together there then, if workable for you?
> Best,
> Riaz
>
> On 12/07/2017, 13:43, "Gifford, William F. Jr (ALG)"
> <William.F.Gifford@altria.com> wrote:
>
>> Riaz,
>>
>> Hope you enjoyed your break last week. I was just checking in to see
>> if you have any available dates for us to meet you and the management
>> team on the west coast.
>>
>> Best regards,
>>
>> Billy
>>

>> -----Original Message-----
>> From: Riaz Valani [mailto:RValani@gacapital.com]
>> Sent: Tuesday, June 06, 2017 7:04 AM
>> To: Dinyar Devitre
>> Cc: Gifford, William F. Jr (ALG)
>> Subject: Re: Introduction
>>
>> Dinny,
>> Thanks so much.
>>
>> Billy,
>> Pleasure to meet you. Do you have any plans to be on the west coast
>> late June or July?
>>
>> Best,
>> Riaz
>>
>>> On Jun 5, 2017, at 20:38, Dinyar Devitre <Dinyar@Devitre.net> wrote:
>>>
>>> Hi Riaz,
>>>
>>> Further to our conversation, this will introduce you to Billy
>>> Gifford, CFO Altria Group Inc.
>>>
>>> I hope that the two of you can connect.
>>>
>>> Best wishes,
>>>
>>> Dinny
>>>
>>> Sent from my iPad
>

# EXHIBIT I

**From:** Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com>
**Sent:** Monday, July 31, 2017 9:00 PM
**To:** Riaz Valani
**Cc:** Isaac Pritzker;Zach Frankel;nick@taocap.com
**Subject:** RE: <no subject>

**Follow Up Flag:** Flag for follow up
**Flag Status:** Flagged

Dear Riaz,

Thank you guys for your time. We enjoyed meeting you guys and the conversation as well. I will get with Howard and send a couple of dates for you guys to choose from to further the discussion.

Best regards,

Billy

---

**From:** Riaz Valani [mailto:RValani@gacapital.com]
**Sent:** Monday, July 31, 2017 1:18 PM
**To:** Gifford, William F. Jr (ALG)
**Cc:** Isaac Pritzker; Zach Frankel; nick@taocap.com
**Subject:** <no subject>

Dear Billy,

Thank you again for your time on Friday - we very much enjoyed meeting you both.

It was very interesting to get your perspective on the industry, the future of reduced risk products, and your thoughts on possible collaboration between ourselves.

As a next step, I wanted to connect you with my fellow director Nick Pritzker. We were hoping to find a mutually convenient time to continue our discussion, and are happy to come to Richmond.

Please convey our warm regards to Howard, as I do not have his email address.

Best,

Riaz

# EXHIBIT J

**From:** Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com>
**Sent:** Wednesday, August 30, 2017 2:24 PM
**To:** Nicholas J. Pritzker;Gifford, William F. Jr (ALG)
**Cc:** Isaac Pritzker;Zach Frankel;Riaz Valani
**Subject:** RE: Thanks!

Thank you for a great discussion and we look forward to reconnecting in Mid-September.

-----Original Message-----
From: Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
Sent: Tuesday, August 29, 2017 3:16 PM
To: Gifford, William F. Jr (ALG); Willard, Howard A. (ALG)
Cc: Isaac Pritzker; Zach Frankel; Riaz Valani
Subject: Thanks!

Billy/Howard: thanks so much for your time Friday: it was a fascinating conversation, and we look forward to continuing as planned.
Best, nick

Sent from my iPad

# EXHIBIT K

| | |
|---|---|
| **Subject:** | 11:00am PT / 2:00pm ET: Altria Conf. call w/ Howard & Billy (Nick/Isaac/Riaz/Zach) |
| **Location:** | Dial-in details enclosed |
| **Start:** | Tue 10/3/2017 6:00 PM |
| **End:** | Tue 10/3/2017 7:00 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Organizer:** | Gifford, William F. Jr (ALG) |

Please see below Dial-in and access code.
Dial-in 1-650-479-3207
Access code: 735 619 453

# EXHIBIT L

**From:** Lobosco-Seibert, Providence M. "Enza" (ALG) <Providence.M.Lobosco-Seibert@altria.com> on behalf of Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com>
**Sent:** Thursday, October 5, 2017 8:27 PM
**To:** Nicholas J. Pritzker
**Cc:** Willard, Howard A. (ALG); Zach Frankel; Riaz Valani; Isaac Pritzker; Gifford, William F. Jr (ALG)
**Subject:** RE: Meeting

Hello Mr. Pritzker,

This is to confirm the meeting with Billy and Howard on November 9th in NY. Please advise a time that works for all of you and I will coordinate travel.

Thank you.
Enza

---

**From:** Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
**Sent:** Thursday, October 05, 2017 3:04 PM
**To:** Gifford, William F. Jr (ALG)
**Cc:** Willard, Howard A. (ALG); Zach Frankel; Riaz Valani; Isaac Pritzker
**Subject:** Re: Meeting

Billy: thanks for the fast response. How about Thursday Nov 9 in NY, maybe at the Park Hyatt? We will have just had a board meeting and will be armed with current information. We will keep your list in mind and will share what we can with you when we are together.
Best wishes,
Nick

Sent from my iPad

On Oct 5, 2017, at 8:15 AM, Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com> wrote:

> Nick,
>
> We appreciate the dates; however, those two days happen to be when we are having our investor day conference this year. We will be unavailable both days. We are available on Nov. 3rd or any day the week following Nov 6th- 10th. Let me know if any of those days could possibly work for you guys.
>
> Additionally, the areas of questions we referred to on our previous phone conversations would be as follows:
>
> Financials (Historical and future plans)
> Regulatory assessment
> Manufacturing capacity and Production Forecast

Internal Capability assessment (R&D and management)
Product/technology pipeline
Intellectual property portfolio

I realize the depth of conversation is dependent on how comfortable you guys will be sharing information in these areas.

We look forward to hearing if any of the dates above work. We can do it in New York or San Francisco.

Best regards,

Billy

---

**From:** Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
**Sent:** Wednesday, October 04, 2017 7:12 PM
**To:** Willard, Howard A. (ALG); Zach Frankel; Gifford, William F. Jr (ALG); Riaz Valani; Isaac Pritzker
**Subject:** Meeting

Billy/Howard: We can all be in NY on Nov. 1st or 2nd if either of those days might work for you to get together.
Please let us know if that is convenient, and what the best times would be for you.
Best, nick

Sent from my iPad

# EXHIBIT M

| | |
|---|---|
| **Subject:** | Project Tree |
| **Location:** | HQ Boardroom |
| **Start:** | Thu 4/5/2018 2:00 PM |
| **End:** | Thu 4/5/2018 3:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Accepted |
| **Organizer:** | Gifford, William F. Jr (ALG) |
| **Required Attendees:** | Moore, Thomas J. III "Jay" (ALCS); Blaylock, Brian F. (ALCS); Fernandez, Pascal A. (ALCS); Begley, Jody L. (Nu Mark); Reale, Carmine A. "Anthony" - Law Dept. (ALCS); Garnick, Murray R. (ALG); Willard, Howard A. (ALG) |



CONFIDENTIAL

# EXHIBIT N

**From:** Willard, Howard A. (ALG) on behalf of Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com>
**To:** Nicholas J. Pritzker; Gifford, William F. Jr (ALG)
**CC:** Riaz Valani; Kevin Burns
**Sent:** 8/14/2018 6:02:13 AM
**Subject:** RE: meet?

**Confidential**

Our proposal is to meet at Noon on Saturday and we would be available on Saturday and the next day (if needed). My plan would be to come along with Billy, KC Crosthwaite (Chief Growth Officer and Strategy and Business Development) and Dinyar Devitre. Can you arrange a place to meet?

Who would you plan to bring to the meeting?

If another time works better, let us know.

Best regards,

Howard
804-484-8070 Office
804-310-0427 Cell

**From:** Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
**Sent:** Monday, August 13, 2018 7:17 PM
**To:** Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com>; Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com>
**Cc:** Riaz Valani <rvalani@gacapital.com>; Kevin Burns <kburns@juul.com>
**Subject:** meet?

Howard/Billy: I gather Riaz met with Dinny and that the two of you and maybe Dinny as well may be interested in meeting with us in SF this Saturday. We are happy to do so, and provide lunch and entertainment if desired. Please let us know if you want to confirm, and the best times for you.
Best, nick

# EXHIBIT O

**From:** Willard, Howard A. (ALG) on behalf of Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com>
**To:** Nicholas J. Pritzker
**CC:** Gifford, William F. Jr (ALG); Riaz Valani; Kevin Burns
**Sent:** 8/15/2018 7:52:34 AM
**Subject:** RE: meet?

**Confidential**

We have arranged to be available in SF this Saturday at 9AM and we will add Murray Garnick our General Counsel and two of our deal lawyers to the meeting.

**From:** Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
**Sent:** Tuesday, August 14, 2018 8:08 PM
**To:** Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com>
**Cc:** Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com>; Riaz Valani <rvalani@gacapital.com>; Kevin Burns <kburns@juul.com>
**Subject:** Re: meet?

howard/billy: let's tentatively schedule a meeting in SF Saturday. Is it possible to start earlier, say 9AM? I hope this isn't too difficult considering travel times. We will arrange a location including break out space. Tomorrow night or Thursday morning we will be sending you our position on a number of specific points to make sure that you that understand where we will need to draw the line before finalizing a commitment to meeting. Also, we believe we need to have counsel present with the goal of getting to an agreed upon term sheet in significant detail by the end of the weekend. Our thought is that we will include from our side our general counsel and no more than two outside lawyers and that you will include your legal team in proportion.
Thanks for your flexibility.
Best, nick

Sent from my iPad

On Aug 14, 2018, at 6:02 AM, Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com> wrote:

**Confidential**

Our proposal is to meet at Noon on Saturday and we would be available on Saturday and the next day (if needed). My plan would be to come along with Billy, KC Crosthwaite (Chief Growth Officer and Strategy and Business Development) and Dinyar Devitre. Can you arrange a place to meet?

Who would you plan to bring to the meeting?

If another time works better, let us know.

Best regards,

Howard
804-484-8070 Office
804-310-0427 Cell

**From:** Nicholas J. Pritzker [mailto:njpritzker@taocap.com]
**Sent:** Monday, August 13, 2018 7:17 PM
**To:** Willard, Howard A. (ALG) <Howard_Willard_ALG@altria.com>; Gifford, William F. Jr (ALG) <William.F.Gifford@altria.com>

**Cc:** Riaz Valani <rvalani@gacapital.com>; Kevin Burns <kburns@juul.com>
**Subject:** meet?

Howard/Billy: I gather Riaz met with Dinny and that the two of you and maybe Dinny as well may be interested in meeting with us in SF this Saturday. We are happy to do so, and provide lunch and entertainment if desired. Please let us know if you want to confirm, and the best times for you.
Best, nick

# EXHIBIT P

**From:** Garnick, Murray R. (ALG) <Murray.R.Garnick@altria.com>
**Sent:** Monday, October 22, 2018 8:25 AM
**To:** Willard, Howard A. (ALG); Gifford, William F. Jr (ALG); Crosthwaite, Kevin C. Jr "KC" (ALG)
**Cc:** Murillo, Jose Luis (ALCS); Wilson, Gregory B. (ALCS)
**Subject:** Revised FDA letter
**Attachments:** DRAFT FDA RESPONSE 10.22.18 (003).docx

**Importance:** High

**Highly Confidential #Secure**

I attached a redlined revised FDA letter. I have soften the letter somewhat. However, it still forcibly states our position. I believe that the letter taken as a whole is consistent with our objections with respect to Tree. I have alerted Jennifer that we may tweak our letter somewhat and they should in getting ready for their media campaign but obviously we should get back to them as quickly as possible. Let me know if you think this does the trick.

Murray R. Garnick
General Counsel
Altria Group Inc.
Office: 804-614-9540
Cell: 202.286.2361
Murray.Garnick@altria.com

# EXHIBIT Q

**From:** Tim Danaher on behalf of Tim Danaher <tim@juul.com>
**To:** Kelleners, Andre; Gross, Peter
**Sent:** 4/18/2018 7:31:22 PM
**Subject:** FW: Discussion Document for 3pm Call
**Attachments:** Payment Structure Proposal (Final for Distribution).pdf

Sent from my iPad

Begin forwarded message:

**From:** "Willard, Howard A. (ALG)" <Howard_Willard_ALG@altria.com>
**Date:** April 16, 2018 at 9:56:41 AM PDT
**To:** "Nicholas J. Pritzker (njpritzker@taocap.com)" <njpritzker@taocap.com>, "Riaz Valani (rvalani@gacapital.com)" <rvalani@gacapital.com>, "Kevin Burns (kburns@juul.com)" <kburns@juul.com>
**Cc:** "Gifford, William F. Jr (ALG)" <William.F.Gifford@altria.com>
**Subject: Discussion Document for 3pm Call**

**Highly Confidential #Secure**

I attach a document that might be helpful during our discussion at 3pm Eastern Time.

In addition, we are going to propose that our legal teams and Antitrust Counsel connect to assess antitrust risk. The contact on our end is Anthony Reale who can be reached 804-484-8479. Anthony is prepared to quickly set up a series of calls or meetings between our respective outside antitrust law firms.

The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Help Desk at Tel: 800-477-0770, Option 1, immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.

# EXHIBIT R

**From:** James Wappler <jwappler@pwpartners.com>
**Sent:** Sunday, September 24, 2017 8:24 PM
**To:** Wise, David A. (ALCS); Blaylock, Brian F. (ALCS)
**Cc:** Christopher Boffi; Kane Herrick
**Subject:** RE: Project Tree- Updated Draft
**Attachments:** Project Tree Discussion Materials -HW Analysis (9.24).pptx

Attached please find an updated version of the Project Tree presentation. I believe this incorporates the various edits we discussed this afternoon.

We checked the math on slide 15 and confirmed the model is working properly. The short(est) explanation is as follows...

- The Juul scenarios result in a net benefit through ~2020 because of the dramatic ramp up in Juul volume and market share
- That increase in Juul volume reduces industry cigarette volumes on a one-for-one basis, but only ~47% of that increased Juul volume comes from PM USA's volumes
- So when Altria acquires Juul, it is cannibalizing some of the existing PM USA volume but also stealing volume from competitors (net positive benefit to PM USA in near term)
- Over time, that benefit starts to fade primarily because: 1) we assume Juul market share (of vapor) declines beginning in 2021 due to increased competition, and 2) we assume constant pricing and margins in the Juul model, while the PM USA 10Y Plan assumes increasing pricing and margins over time. Those two factors cause the OCI with the acquisition to weaken over time, at least relative to the PM USA 10Y Plan
- Apologies for the email explanation – happy to discuss live if helpful

We're going to follow-up later tonight with some case study slides on situations where large cap companies acquired high growth targets.

Thanks,

James

---

**From:** Wise, David A. (ALCS) [mailto:David.A.Wise@altria.com]
**Sent:** Sunday, September 24, 2017 8:29 AM
**To:** James Wappler; Blaylock, Brian F. (ALCS)
**Cc:** Christopher Boffi; Kane Herrick
**Subject:** RE: Project Tree- Updated Draft

**Highly Confidential #Secure**

Thanks james – I'm reviewing and think this am. Thinking might be good to shoot for 1:00 for quick check in.

Team – pls Let me know if that works

**From:** James Wappler [mailto:jwappler@pwpartners.com]
**Sent:** Saturday, September 23, 2017 3:48 PM
**To:** Wise, David A. (ALCS); Blaylock, Brian F. (ALCS)
**Cc:** Christopher Boffi; Kane Herrick
**Subject:** Project Tree- Updated Draft

David and Brian – please see attached for the latest draft of the presentation for your review. A few call-outs:

- The model is working the way Billy prefers, such that the incremental growth in e-vapor volume directly reduces the industry cigarette volumes on a one for one basis. The bridge can be made by comparing pages 4 and 11. Page 11 shows the 2027 industry cigarette volume of 181 billion. Our Base Case scenario assumes that decreases to 167 billion (14 billion reduction). Flipping to slide 4, you'll see that our Base Case e-vapor volume increases from 277 now to 978 by 2027, or 701 million cartridges which equates to 14 billion sticks. The other scenarios tie out as well. One nuance is that the model does not currently assume e-comm growth in e-vapor reduces cigarette industry volumes. That's a small number (limited e-comm growth) and probably actually makes sense that e-comm won't reduce traditional cigarettes, but want to call that out
- Slide 18 is telling, in our opinion. You'll see that you're better off acquiring Juul if you believe the Base or Upside Cases will occur, but worse off if the Downside occurs. That generally makes sense to us but this slide shows it very clearly
- Slides 14 and 17 are also interesting, which highlight a potential $39 billion reduction in market value if you're in the Upside Scenario and don't do the deal. However, if you're in the Upside Scenario and do the deal then you have ~$11 billion downside (assuming multiple holds)

We're available to discuss at your convenience. Note that we're also developing case study slides and plan to send those tomorrow afternoon.

Thanks,

James

**JAMES R. WAPPLER**
*Managing Director*

**PERELLA WEINBERG PARTNERS**
767 Fifth Avenue
New York, NY 10153
T: 212.287.3245
M: 347.583.8288
jwappler@pwpartners.com

Partners have limited liability status

Please see important information regarding email disclosures

https://www.pwpartners.com/email-disclosures

Please see important information regarding email disclosures

https://www.pwpartners.com/email-disclosures

# EXHIBIT S

**From:** Grubb, Cynthia C. (ALCS) on behalf of Wise, David A. (ALCS)
**Sent:** Monday, November 26, 2018 10:52 AM
**To:** Willard, Howard A. (ALG); Gifford, William F. Jr (ALG); Garnick, Murray R. (ALG); Crosthwaite, Kevin C. Jr "KC" (ALG); Wise, David A. (ALCS)
**Subject:** PROJECT TREE CONFERENCE CALL

**Dial-in: 1-650-479-3207**
**Access code: 737 753 824**
**Host PIN: 3511 (KC is the HOST)**

A separate email with dial-in information will be sent by David Wise to Kevin Burns requesting the following individuals participate:

Tim Danaher <tim@juul.com>
Nicholas J. Pritzker <njpritzker@taocap.com>
Riaz Valani <RValani@gacapital.com>
Jerry Masoudi <jmasoudi@juul.com>



CONFIDENTIAL

# EXHIBIT T

NewsRoom

1/31/19 FD (Fair Disclosure) Wire 14:00:00

FD (Fair Disclosure) Wire
Copyright (c) 2019 Thomson Financial and ASC LLC

January 31, 2019

# Q4 2018 Altria Group Inc Earnings Call - Final

Presentation

OPERATOR: Good day, and welcome to the Altria Group 2018 Fourth Quarter and Full Year Earnings Conference Call. Today's call is scheduled to last about 1 hour, including remarks by Altria's management and a question-and-answer session. (Operator Instructions) I would now like to turn the call over to Ms. Paige Magness, Vice President of Communications for Altria Client Services. Please go ahead, ma'am.

PAIGE MAGNESS, VP OF COMMUNICATIONS - ALTRIA CLIENT SERVICES, ALTRIA GROUP, INC.: Good morning. Thank you for joining us. We're here this morning with Howard Willard, Altria's CEO; and Billy Gifford, our CFO, to discuss Altria's 2018 business results and provide a deeper dive on the JUUL opportunity and Cronos.

Earlier today, we issued a press release providing these results, which is available on our website at altria.com and through the Altria Investor App.

During our call today, unless otherwise stated, we're comparing results to the same period in 2017. Our remarks contain forward-looking and cautionary statements and projections of future results. Please review the forward-looking and cautionary statements section at the end of today's earnings release for various factors that could cause actual results to differ materially from projections. Future dividend payments and share repurchases remain subject to the discretion of Altria's board. The timing of share repurchases depends on marketplace conditions and other factors. Altria reports its financial results in accordance with U.S. Generally Accepted Accounting Principles. Today's call will contain various operating results on both a reported and adjusted basis. Adjusted results exclude special items that affect the comparability of reported results. Descriptions of these non-GAAP financial measures and reconciliations are included in today's earnings release.

With that, I'll turn the call to Howard.

HOWARD A. WILLARD, CHAIRMAN, CEO, COO & EXECUTIVE VP, ALTRIA GROUP, INC.: Thanks, Paige, and good morning, everyone. This morning, I'll focus on addressing key questions we've been getting, including our outlook for cigarette volumes, our strategic investments in JUUL and Cronos and the current regulatory environment. I'll also review our guidance for 2019. Billy will then briefly highlight our 2018 performance. We've included some slides to accompany some of my remarks.

Altria closed out 2018 with excellent full year adjusted diluted EPS growth of 17.7%. And we continue to reward shareholders by returning $5.4 billion in cash through dividends. PM USA stabilized Marlboro and strengthened our combustible business. We also took proactive steps that we believe uniquely position us for long-term success. Altria enters 2019 with an evolved business platform that includes our strong core tobacco businesses and new strategic investments with tremendous potential for growth.

First, our operating companies continue to give us the industry-leading portfolio in the U.S. through Marlboro, Black & Mild, Copenhagen and hopefully soon, iQOS. But now beyond these brands, our investments in JUUL as well as Cronos, once closed, give us exposure to new growth opportunities, while also further diversifying our future income streams.

The decision to pursue these investments stems from a desire to enhance Altria's long-term earnings and dividend growth, while also making progress on our harm-reduction aspiration to help adult consumers switch from combustible cigarettes to noncombustible alternatives. We believe that JUUL and Cronos present unique opportunities to meaningfully participate in fast-growing adjacent categories.

Before offering additional detail on the investments themselves, let's discuss the dynamics affecting U.S. cigarette category volumes and our outlook. The U.S. cigarette category is large and resilient and has absorbed many shocks over time. And despite significant e-vapor acceleration in 2018, the U.S. cigarette category volume decline rate accelerated only modestly from the recent long-term decline rate of 3% to 4%. Let's look at the last 2 years for some context. In 2017, we estimated that U.S. cigarette industry volume declined by 4%, which reflects the impact of a disruptive $2 per pack California state excise tax increase in the second quarter and initial signs of the e-vapor category returning to growth during the second half of the year. In 2018, record growth in e-vapor of approximately 35% and higher gas prices accelerated U.S. cigarette industry volume declines outside the 3% to 4% range to a decline of 4.5%.

Given the significant interest in cigarette category fundamentals, let me provide perspective on the specific drivers of the decline rate and our outlook for 2019. We previously cited a secular decline rate within a 2% to 3% range. This rate includes smokers who reduce their consumption, those who stop using tobacco products and smokers moving to other tobacco categories.

In 2018, we estimate that the secular decline rate was elevated due to increased movement by adult smokers across categories, which historically accounted for about 1 percentage point of the 2% to 3% secular rate. This acceleration is largely attributable to e-vapor category growth, especially in light of the decline in the smokeless category in 2018. In total in 2018, we believe e-vapor represented the vast majority of the 1 percentage point component plus an additional 3/10. Of course, other factors also affect the decline rate. In 2018, we believe macroeconomic factors, specifically gas prices, accounted for about 0.5 percentage point additional headwind on cigarette volumes. We believe the price elasticity component of the decline rate remains consistent with our long-term estimate of negative 0.3.

Looking forward, we'll continue to closely monitor the various factors at play. We watch, for example, excise taxes at both the federal and state level, gas prices, economic conditions affecting the adult tobacco consumer, like housing starts, unemployment rates and consumer confidence, and the regulatory environment. We also know that over half of adult smokers are looking for alternatives. With the recent e-vapor growth, almost entirely driven by JUUL in 2018, and more alternative tobacco products available in the marketplace, we expect the 2019 U.S. cigarette industry volume decline rate to be in a range of 3.5% to 5%. This range is wider range, covers a potential for higher levels of adult smoker trial of and conversion to noncombustible products similar to 2018. For 2019 through 2023, our estimate for average annual U.S. cigarette industry volume declines is 4% to 5%.

Let's now move to our recently announced strategic investments, starting with JUUL. Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also support and even accelerate transition to noncombustible alternative products by adult smokers. The JUUL investment provides Altria with a significant stake in the largest and fastest-growing e-vapor company with a highly talented management team, successful end-market products, a strong innovation pipeline and significant international opportunity. When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders.

We are excited about JUUL's domestic growth and international prospects and their potential impact on our investment. JUUL's 2018 growth was quite remarkable. JUUL had net revenues in excess of $1 billion in 2018, up from approximately $200 million in 2017. JUUL overwhelmingly reaccelerated the U.S. e-vapor category growth rate, growing JUUL's volume by nearly 600%

to over 450 million refill kit pods. We estimate JUUL represents over 30% of the overall e-vapor category across open and close systems and all trade classes. After e-vapor growth plateaued from 2015 to 2017, rapid growth was reignited in 2018, and we expect U.S. e-vapor volume to grow at a compounded annual rate of 15% to 20% through 2023.

As a reminder, Altria's share of JUUL's international e-vapor income would be 100% incremental to Altria. We believe the global e-vapor and heat-not-burn segments, with estimated sales of roughly $23 billion in 2018, have substantial room to grow. JUUL currently operates in 8 countries with plans for additional expansion this year. We expect the JUUL product features that have driven JUUL's success in switching adult smokers in the U.S. to strongly appeal to international adult cigarette smokers. And JUUL has designed

[Audio Gap]

in international markets to meet applicable regulatory requirements and also had significant new innovations in its pipeline.

Though still early days, some information from recent launch markets shows rapid growth and helps affirm our assumptions that JUUL's product development and commercialization capabilities can solve for different regulatory restrictions and adult consumer preferences.

Let's look at 2 examples. First, in Canada, while distribution is limited, JUUL reports that retail takeaway grew to more than 60% dollar share in stores selling their products after only 3 months in retail. JUUL is also seeing encouraging performance where they have achieved distribution in Europe. For example, in the Sainsbury chain in the U.K., JUUL tells us that it recently became the #1 e-vapor brand in the chain, with the dollar share in excess of 23% in less than 12 weeks after launch. And just to remind you, the U.K. operates under the Tobacco Products Directive adopted by many EU countries, which limits the nicotine concentration level. Ultimately, we expect the international revenue and income opportunity to end up being as large as or larger than the U.S. opportunity.

Our 35% investment was based on a deep strategic, operational and financial analysis of JUUL and the marketplace. Clearly, we look at this opportunity over the long term, but for context, let us provide a view 5 years out. Some of our independently developed key assumptions over the next 5 years that informed that analysis include: a U.S. e-vapor category that grows volume between 15% to 20% annually; JUUL continuing to be the primary growth driver for the e-vapor category; attractive JUUL operating margins that achieve current cigarette-like margins due to the benefits of increasing scale and automation in the supply chain; international revenues that equal domestic revenues by 2023; and international margins that approach current international cigarette margins.

Under our assumptions, our investment in JUUL would generate an after-tax return exceeding our weighted average cost of capital in 2023. Additionally, with 5-year e-vapor category volume growth in the range of 15% to 20% annually, we would expect the U.S. cigarette category volume decline rate to be consistent with the decline rate estimate of 4% to 5%. I'll remind you that in 2018 with e-vapor category volume growth of 35%, the cigarette category decline rate was 4.5%, including 0.5 of a percent headwind from gas prices.

Combined with the earnings and cash generation engine of our core tobacco business, we believe this investment in JUUL will support consistent returns over the long term by providing Altria with a significant stake in the fastest-growing -- in the fast-growing e-vapor category.

Briefly touching on the regulatory environment. The FDA and many others are concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue that we and others in the industry must continue to address aggressively and promptly. We understand that the long-term opportunity of tobacco harm reduction is threatened by continued underage use. JUUL has already taken significant action to address these concerns. Today, it remains the only e-vapor company to have stopped shipping flavored products other than tobacco, menthol and mint to retail. These shipments stopped on November 13. JUUL

has taken additional steps to enhance its online age verification processes for sales on its website to adult tobacco consumers 21 years of age or older as well as developing a restricted distribution system for retailers. JUUL has also halted all promotional use of U.S. social media platforms and will continue to monitor and remove inappropriate material from third-party accounts. And JUUL is developing new technologies to further restrict youth access.

We know more can and must be done. That's why we are engaged in unprecedented efforts at the federal and state level to raise the minimum legal age to purchase all tobacco products to 21. We believe it is the single most important step we can take today, and we'll be stepping up our efforts in the coming months. Already this year, we are supporting legislation raising the legal age in both Washington state and Virginia, and we continue to engage nationwide in this effort.

We recognize that some of these actions may impact the short-term growth of the e-vapor category. We also know that preserving the long-term opportunity of harm reduction for adults is critical. We remain committed to being part of the solution to this issue.

Harm reduction remains central to our view of the future for the tobacco industry. In addition to the significant opportunity presented by e-vapor, we remain very excited about the prospects for heat-not-burn in the U.S. It is now approaching 2 years since PMI submitted the iQOS PMTA, and we are fully prepared to commercialize iQOS in the U.S. We remain fully committed to the success of iQOS in the U.S. and are excited to deploy our robust commercialization plans. PM USA is establishing brick-and-mortar stores, including locations in multiple cities within the first year of launch. They've already hired personnel to support prelaunch activities and are collaborating with key partners to best position iQOS at retail.

Let's now turn to Cronos. While the transaction is subject to customary closing conditions and expected to close in the first half of 2019, Altria's agreement to acquire a 45% stake in Cronos with a warrant to achieve majority ownership will create a new growth opportunity in an adjacent category poised for rapid growth. It complements our strong core tobacco businesses and expands our income opportunity beyond the U.S.

After years of evaluating adjacent opportunities, the cannabis category is quite attractive and delivers on some key considerations, including accretion to our long-term financial performance and synergy with Altria's capabilities, allowing our combined resources to accelerate Cronos' growth.

While a range of estimates exist, a recent third-party report projects the 10-year global cannabis revenue opportunity to be in a range of $40 billion under a similar legal landscape to today to more than $250 billion assuming a fully legal market worldwide. We believe the growth opportunities are significant and will extend across the globe as cannabis markets open.

Selecting the right partner in this category was critical, and we've done just that. Cronos' strong management team has built unique capabilities to compete globally across the medicinal, recreational and nutraceutical categories. Our investment will allow Cronos to more quickly expand its global footprint and production capacity. We also expect it to accelerate the execution of its strategic initiatives, including investments in cannabinoid innovation and developing differentiated products and brands across medicinal and recreational categories. We look forward to helping Cronos realize its significant growth potential.

In summary, 2018 was a transformative year for Altria. We are pleased with the performance of our core tobacco businesses, as PM USA stabilized Marlboro through its equity investments. We made strategic investments in rapidly growing category that we believe strengthen our long-term financial profile, enhance our growth prospects and better position the company to deliver long-term value to shareholders through earnings growth and dividends. And of course, we had significant earnings growth and increased our dividend twice. We look forward to sharing more with you at CAGNY in a few weeks.

Turning to 2019 guidance, we expect to deliver full year 2019 adjusted diluted earnings per share of $4.15 to $4.27. This range represents a growth rate of 4% to 7% from a 2018 adjusted diluted EPS base of $3.99. Our guidance reflects our expectation for a higher full year adjusted effective tax rate, primarily resulting from lower dividends from AB InBev. It also includes increased interest expense from the debt incurred related to the Cronos and JUUL transactions, although we expect that expense to be

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

mostly offset by savings from our previously announced cost reduction program. Our plans also take into account increased investments related to PM USA's lead market plans for iQOS, once authorized by the FDA. And lastly, our guidance assumes little to no earnings or cash contributions from the Cronos and JUUL investments.

In the first quarter, we'll have the increased interest expense without the full benefits of our cost reduction program and 1 fewer shipping day in the smokeable segment. Therefore, we expect the growth to come in the last 3 quarters of the year.

We have a proven track record of delivering against our objectives, and we maintain our long-term financial goals to grow adjusted diluted EPS at an average annual rate of 7% to 9% and to maintain a dividend payout ratio target of approximately 80% of adjusted diluted EPS.

I'll now turn it over to Billy to provide more detail on our 2018 results.

WILLIAM F. GIFFORD, VICE CHAIRMAN, CFO & EXECUTIVE VP, ALTRIA GROUP, INC.: Thanks, Howard, and good morning, everyone. Although we had been busy securing these investments over the past few months, we continue to compete vigorously in the cigarette and smokeless tobacco categories, which still deliver substantially all of our earnings. We're quite pleased with the performance of our core tobacco businesses in 2018, and believe the equity investments we made using the benefits of the corporate tax reform set them up to deliver strong income growth in 2019 and beyond.

Here are some highlights. In the smokeable products segment, our strategy remains unchanged to maximize income, while maintaining momentum on Marlboro over time. We saw a slight decline in adjusted operating company's income for this segment, primarily driven by lower volume and higher cost, including additional investments. Those included brand equity investments behind product expansions, innovative packaging and a digital loyalty program that allowed PM USA to successfully stabilize Marlboro.

Following softness in 2017, Marlboro's full year 2018 cigarette retail share of 43.1% was unchanged compared to its fourth quarter 2017 share. As we discussed in the third quarter, we believe keeping Marlboro strong and relevant is important to the long-term profit maximization in cigarettes. This may mean that Marlboro retail share varies up or down quarter-to-quarter as we continue to balance momentum behind the brand and profitability.

Building off the success of Points West, Marlboro's limited-time rewards program in Texas, PM USA launched Marlboro rewards nationally this month, with the goal of increasing its digital leadership, brand engagement and Marlboro's already strong brand equity and loyalty. Within the first 10 days of the program, 700,000 adult smokers, 21 plus, enrolled and entered nearly 1.5 million pack codes. In the super-premium Tobacco and Water segment, Nat Sherman continued to deliver against its plan, and we're pleased with its performance following the regional expansion of Nat's across the Western U.S. in 2018.

In the fourth quarter, Nat's had a 0.3 share in the cigarette category in states selling the product. The team continues to evaluate further expansion opportunities, which we will share at the appropriate time.

In noncombustible products, our businesses invested in the regulatory sciences to support the MRTP following for Copenhagen Snuff, and our commercialization plans for the iQOS lead market. These are important steps on our journey towards tobacco harm reduction. USSTC will present the science supporting its application to the Tobacco Products Scientific Advisory Committee next week, and we look forward to engaging with the FDA on this application.

In the Smokeless Products segment, USSTC generated adjusted operating income growth of 7.5% in 2018, despite slowing category volumes. We continue to believe that smokeless industry volume is being affected by higher pricing and adult consumer movement among tobacco products, including e-vapor and other innovative products. USSTC has exciting plans for its portfolio in 2019. USSTC announced its plans to expand Skoal Long Cut cool Spearmint nationally. This offering provides adult dippers a flavorful experience and furthers USSTC's strong position in the mint and wintergreen segment. In the second quarter,

Copenhagen will open its first retail location in Nashville, Tennessee. The store will sell Copenhagen products and provide a unique opportunity to directly engagement with adult tobacco consumers 21-plus.

Turning to our alcohol assets. Ste. Michelle's adjusted OCI decreased significantly in the fourth quarter, so let me provide some additional information on these results. Results were negatively impacted by higher investments in marketing and sales, lower volume and inventory adjustments. As we've discussed previously, the growth rate in the premium wine category has slowed, and Ste. Michelle worked closely with its major distributors to reduce trade inventories.

In beer, adjusted earnings from our equity investment in AB InBev were $200 million in the fourth quarter, which reflects Altria's share of AB InBev's third quarter results. In the short time we've held an interest in AB InBev, there has been volatility in its earnings, resulting from the mark-to-market adjustments for hedging of share-based payment programs. A decrease in AB InBev's share price, as occurred last year, results in losses on these hedges, which are reflected in our underlying results. For the full year 2018, Altria's share of these losses was $128 million.

I'd like to provide some insight on the cost reduction program that we announced last month. To offset most of the interest expense associated with the debt incurred to finance the JUUL and Cronos investments, in the fourth quarter, we announced a cost reduction program expected to deliver approximately $575 million in annualized cost savings by the end of 2019. The savings from this program will ramp up through the year. This program includes third-party spending reductions across the business, such as professional and consulting services, information technology and product research and regulatory investments. The program also includes workforce reductions of approximately 900 people, particularly within our support services.

With that, we'll wrap up and Howard and I will be happy to take your questions. While the calls are being compiled, I remind you that today's earning release and our non-GAAP reconciliations are available on altria.com. We have also posted today's slides and our usual quarterly metrics, which include pricing, inventory and other housekeeping items. On that page, we've add quarterly shipping days and PM USA's menthol share to provide additional color around that part of our business.

With that, I'll open up the question-and-answer period. Operator, do we have any questions?

Questions and Answers

OPERATOR: (Operator Instructions) Our first question comes from Steve Powers of Deutsche Bank.

STEPHEN ROBERT R. POWERS, RESEARCH ANALYST, DEUTSCHE BANK AG, RESEARCH DIVISION: So, Howard or Billy, I guess, my first question is just how secure you see your fiscal '19 volume outlook in cigarettes to be? And maybe to help with that, I was just wondering if you're able to decompose some of the volume drivers that you provided as it relates to the fourth quarter, that down 5%. It was worse than the full year run rate. So I'm just wondering what the contribution from maybe macro-elasticity factors, the next -- which I'm assuming includes excise taxes as well as manufacture pricing and the cross category movement would have been in the fourth quarter. And then, I guess, more importantly, looking to '19, where do you see, within the context of those drivers, the potential improvement coming from?

HOWARD A. WILLARD: Yes, Steve, I think, if I understand your question correctly, if you look at, as we progressed through the year, we did have 2 SET increases. One was in Oklahoma and the other was in Kentucky. And so that had an effect because that was represented about 5% of cigarette industry volume. So as you progress through the year, of course, you have the initial drop for the price shock and then it returns to elasticity as you move through time. I would say as we move to this year, right now gas prices are a tailwind to the overall adult cigarette consumer as we experience gas prices drop. Last year, they were up 13% year-over-year, and we've seen them drop as we progress into the first part of this year, so we should see that impact through time.

STEPHEN ROBERT R. POWERS: Okay. So the big driver of incremental potential improvement '19 versus '18 is really your gas price outlook?

HOWARD A. WILLARD: That and the overall macroeconomic tailwinds that the consumer is experiencing.

STEPHEN ROBERT R. POWERS: Okay. Great. And I need to run the math, but with 15% to 20% category growth in e-vapor, the negative 4% to negative 5% category declines you call out in core combustible going forward, I'm assuming some positive contribution from iQOS and heat-not-burn in your outlook. I guess, my question is, as you look forward 5 years from now, are you expecting market-wide nicotine consumption to be higher or lower in the U.S. versus now? And maybe by what magnitude? And I guess, within that, there's an implied question about what the expected interplay between e-vapor and heat-not-burn maybe with smokeless?

WILLIAM F. GIFFORD: Yes. I think with regard to your question, our primary focus has been on estimating by individual category, and we provided that information to you. I think with regard to heat-not-burn, I think it's clearly going to have an impact going forward on cigarettes and likely e-vapor. But I think that we have not really included that in our calculations, and we're really waiting until we get some experience in the marketplace this year and certainly we can make adjustments to any of our estimates. But certainly, we believe that when we do get approval from the FDA to put iQOS through the market, it is an additional driver of growth in the noncombustible tobacco product segment.

STEPHEN ROBERT R. POWERS: Okay. Great. And if I could do one more, it's related to JUUL and I clearly thank you for the insight you provided in your slides and on the call today with respect to JUUL. But, I guess, kind of 3 following questions now that you've opened up on JUUL, I find myself a little bit greedy for more. So just based on your conversations with JUUL management recognizing that they are independent and private, I guess, as we go forward, what level of incremental disclosure do you expect you'll be able to share over time, whether in a few weeks at CAGNY or just in general? Question number one. And I guess, within that, related to that, 2 follow ons. The first one is, your fiscal '19 guidance assumes 0 -- effectively 0 EPS and cash contribution from Cronos and JUUL. And I guess, is that a firm estimate of breakeven or are you simply excluding JUUL and Cronos from guidance? Another way to ask that question is, given -- are you able to absorb volatility in Cronos, JUUL contributions within the 4% to 7% range? Or does that create risk of pushing you outside the range? And then lastly, sorry, the 5-year kind of breakeven return rate -- economic return that you called out on JUUL based on your expectations, is that -- what are you assuming in terms of like cash coming back to? Is that a theoretical return or is that actual -- do you expect to receive cash in the form of dividends from JUUL, so that you're cash breakeven over that 5-year time frame? Sorry for all the questions.

HOWARD A. WILLARD: Well, you're going to make us work hard this morning, aren't you? I'll take a crack at them, and if I miss something, I'm sure Billy will jump in. So with regard to the disclosure, as you pointed out, given the time since the closing, we put together significantly more information and shared it today. And obviously, as we get further questions, we'll look at -- we'll look for opportunities to share more relevant information with investors. And the other thing I would reference is that we expect at some point in the future, probably later this year, we will be accounting for the JUUL investment following antitrust approval using the equity income approach. And when we do that, there will be more disclosure in our SEC documents. So that's, I think, something to look forward to, and we do expect antitrust approval during this year. The second thing is, with regard to our statement about 2019 income, I think that what that really reflects is that with regard to JUUL, we're kind of waiting before it gets reflected in our income based on the equity income method. So we thought on the side of conservatism that it made sense to not guess as to the timing of antitrust approval. And then the second thing I would say is on Cronos, obviously, they are a publicly traded company, and so you have access to what their current income is and their income today is modest. The investment is really designed to rapidly accelerate their growth rate. And so we don't expect it to be a material contribution in 2019. With regard to the guidance range of 4% to 7%, that is designed, as it's always been in the past, to be a wide enough range to take into account the variety of changes that could occur. And that could reflect changes in our core business with regard to JUUL or with regard to Cronos. So it's designed to reflect our best all-in estimate of what could happen during the year.

Then you asked a question about the 5-year breakeven. And I think the way we calculated that, it was really taking the equity income we expect in 5 years, tax affecting it and then dividing it by the overall investment in JUUL. So it is an equity income

return, not a cash return, although, obviously, by that point, given the significant level of income, we would expect to have some dividends as well.

WILLIAM F. GIFFORD: The only thing I would add, Steve, I think it's important to remember under both JUUL or Cronos, as a business is growing in phases, significant opportunity to expand outside of the U.S. with huge growth potential, that reinvestments in the business for a period of time is appropriate.

HOWARD A. WILLARD: Yes, that's absolutely right. And I think we agree with the other JUUL investors that its growth prospects are so strong that now is the time to invest in -- and ultimately driving top line growth.

OPERATOR: Our next question comes from Pamela Kaufman with Morgan Stanley.

PAMELA KAUFMAN, SENIOR ANALYST, MORGAN STANLEY, RESEARCH DIVISION: I was just hoping to get a sense for how you're thinking about JUUL's midterm growth outlook, just given that the company is removing flavors from retail channels. And then what the impact is on the economics of the investment, if the category grows faster than 15% to 20%? Why is 15% to 20%, I guess, the right forecast, and what assumptions feed into that?

HOWARD A. WILLARD: Sure. I think with regard to the midterm forecast, one of the reasons why we selected a 5-year period to estimate the growth rate of the e-vapor category and JUUL is a significant driver of that growth is, I think, there is a bit of uncertainty as to whether or not there'll be a slowdown in growth in the next year or 2 as the industry works together with the FDA to drive down youth usage. And so I think that is to be determined. But I think even taking into account the fact that there could be some impact in the short run, I think we're confident in the long-term growth rate that we forecasted. It may just be that there's slower growth early on and more rapid growth later on. I think with regard to the significant action JUUL took in removing their flavors from retail, I do expect that, that is going to have some impact on their overall growth rate this year, but I think we also believe that adults will continue to buy the other flavored products at mainstream retail stores. And of course, with heightened age verification, those other flavors are available to adults on the JUUL website. So we still think they have pretty good growth prospects for this year even with those actions. I think we're pretty comfortable with our forecast of 15% to 20% compound annual growth rate over 5 years. And certainly with that level of growth, we believe the investment in JUUL is additive in a significant way to our income growth. If your question is, if it grows faster, is it still additive to our income growth? And I think that it could certainly grow faster than 20% and still be additive based on our estimates. I suppose there is some dramatically higher growth rate that, that may not be the case, but we're pretty comfortable that under a whole range of scenarios that financially this is a good thing for our income growth.

PAMELA KAUFMAN: And then just with respect to JUUL's international opportunity, how do you think about the impact of some of the differences in the regulatory backdrop, just given the nicotine caps in international markets and then just lower barriers to entry for competitors in the category relative to the U.S.?

HOWARD A. WILLARD: Sure. I think that when you look at various international markets, there are different regulatory requirements that have to be navigated. And frankly, there are different consumer expectations, given differences between the cigarettes in those markets that are purchased by adult vapor consumers over there compared to the U.S. So both of those things need to be navigated successfully in order to have a similar level of success internationally to what JUUL has had in the U.S. We are highly confident that JUUL has the technical capability, the current products and the products in the pipeline to navigate those differences and have strong success overseas. So I think frankly that there certainly is some work to be done there, but I think that they are already well on their way to having done that, and I think that we're encouraged by the products they have in their pipeline.

OPERATOR: Our next question is from Vivien Azer with Cowen.

VIVIEN NICOLE AZER, MD AND SENIOR RESEARCH ANALYST, COWEN AND COMPANY, LLC, RESEARCH DIVISION: So my first question is for you, Billy. You called out like the favorable macro backdrop in terms of your comfort around the 3.5% to 5% decline for 2019. I have a hard time reconciling that with the pretty consistent down trading that we're seeing at the low end of the category, where deep discount is consistently gaining share at the expense of discount. So can you help me reconcile that? That's my first question.

WILLIAM F. GIFFORD: Sure, it's a great question, Vivien. I think if you think about the economic recovery, it's a bit uneven, so it's a bit lumpy. So those consumers that were engaged in the branded discount, as we've increased the margins and profitability of our brand specifically, you can see some down trading that takes place because you can even think of the adult tobacco consumer with uneven economic recovery. Those at the lower end haven't recovered to the same extent as those at the higher end of the category. And so that's where you're seeing that churn within the discount category as the branded discount brands are taking increased profitability and margin.

VIVIEN NICOLE AZER: And you don't think that there is a risk over time that, that starts to kind of bleed up into the branded premium segment?

WILLIAM F. GIFFORD: Yes, based on our consumer research, Vivien, that we -- because of that and even we keep an eye on that group of consumers at that lower end to make sure that we feel comfortable with where we're at. We feel very strong with the premium segment. I think that's reminiscent, you can see with the flatness of the overall discount category and just churn within. So we don't see any signs at this point that would point to it moving up to the premium segment.

HOWARD A. WILLARD: Vivien, I'd refer you to the last couple of years. What has really happened is, you've had, particularly over the last year, a pretty nice performance by the premium brands, including Marlboro, but you had -- and you had a flat overall discount category from a market share perspective, but there's been significant movement from branded discount products to deep discount products. And of course, there's certainly market action that could be taken to try and address that, but given the nice margins that we have on L&M, I think that we're comfortable with the current trends in the marketplace.

VIVIEN NICOLE AZER: Okay, that's fair. My second question is around kind of the longer-term outlook for cigarette industry volume declines of 4% to 5%. It certainly makes sense that if you're expecting a deceleration in e-cig, it shouldn't be like incrementally that much worse for the cigarette category. That being said, I am curious to hear your thoughts around dual use within that e-cigarette revenue pool because if you've got JUUL users today that ultimately migrate to single-category use on the e-cigarette side, that would suggest that there would be some incremental degradation on cigarettes, if I'm thinking about it right. So I'd love to hear your thoughts on that.

HOWARD A. WILLARD: Yes, I think you have to consider, take 2018 as a guide, you had very substantial growth in e-vapor volume. And it was both people converting completely from cigarettes to e-vapor as well as a substantial amount of dual use as people tried e-vapor, in many cases JUUL, and are deciding whether to continue to dual use or convert completely. So I think that 2018 was a pretty active year for e-vapor category growth. And of course, as we know, the decline rate in cigarette category was only 4.5% and that was elevated 0.5 percentage point for -- by increase in gas prices. So I think it shows you that the cigarette category decline rate is pretty persistent and it can withstand a fair amount of growth from e-vapor. So we continue to be very comfortable with our forecasted decline rate of the cigarette category over the next 5 years of 4% to 5%.

WILLIAM F. GIFFORD: Yes, I think it's important to remember, Vivien, in the base 3% to 4%, that was historical, there was always 1% of that, that was included in secular decline of consumers doing exactly what you're saying, either replacing certain occasions or converting completely, as Howard mentioned. So that's, if you will, already in the 3% to 4% that was in the historical run.

OPERATOR: Our next question is from Chris Growe with Stifel.

CHRISTOPHER ROBERT GROWE, MD & ANALYST, STIFEL, NICOLAUS & COMPANY, INCORPORATED, RESEARCH DIVISION: Just to follow on Vivien's question there, see -- you've mentioned this 1 percentage point drag on volume from moving across categories, and I think you said it was around 1.4% drag on that category from e-vapor in 2018. That category, vapor is also pulling from smokeless tobacco as an example, I'm just curious how much of an overall volume effect it might have had on your business, like how much did it pull from smokeable, I think you defined that as well as smokeless, I think we're seeing some effect on that category as well?

WILLIAM F. GIFFORD: Yes, we don't have an exact number for you, but that's something that we'll provide in the future. But you're right, I think you also had dual usage between smokeless and the e-vapor category. And so you're right that, that is also pulling some of those consumers because the e-vapor experience was closer to what they were transitioning from, being an inherent pipe product versus a smokeless product.

HOWARD A. WILLARD: Chris, I'd also say on smokeless you've got 2 things going on, which is I do think you have some consumers that were smokeless users that are moving into e-vapor. Probably the bigger impact on the smokeless growth rate is that in the past, a lot of cigarette smokers were using smokeless as an alternative product, and I think a fair number of them have now said, "Boy, with the presence of JUUL in the marketplace, I've got a closer experience to my cigarette than smokeless that's attractive to me." So I think that has also contributed to the decline in the growth rate of smokeless.

CHRISTOPHER ROBERT GROWE: Okay. And as you think about your outlook for the -- through 2023, do you assume like e-cigarette starts to see excise taxes implemented? Is that a factor in that model? And then would you just assume, from a high-level, that JUUL grows in line with the category over that time?

HOWARD A. WILLARD: Yes. I think we're comfortable with that growth rate over a variety of excise tax assumptions. But I would tell you that I believe that it's a reasonable assumption to believe that you'll get some incremental excise taxes on e-vapor. But then it will not be a significant acceleration of what's happened over the last few years. And I think that the argument that's been made at the state level about the fact that given the potential for harm reduction that's offered by e-vapor, that, that is not a place where significant excise tax increases should be put in place. I think that's been fairly persuasive and I would expect it to continue to be. I think you had a second question. Remind me of it.

CHRISTOPHER ROBERT GROWE: And then just if JUUL would grow in line with the category, would that be your operating assumption in that 5-year model?

HOWARD A. WILLARD: Yes, I think our assumption is that the JUUL is going to grow faster in the category. I mean, if you look at 2018, JUUL growth represented more than the growth in the category, and I think that it's probably likely that it may moderate from being the whole growth of the category going forward, but we would expect it to be growing at a much more rapid rate than the other brands in the category.

OPERATOR: Our next question is from Michael Lavery with Piper Jaffray.

MICHAEL SCOTT LAVERY, PRINCIPAL & SENIOR RESEARCH ANALYST, PIPER JAFFRAY COMPANIES, RESEARCH DIVISION: On your decomposition on Slide 6, you show a modest deceleration in your projected or estimated impact from elasticity. But it looks like your pricing has actually accelerated in '18 versus '17. How do you reconcile that?

WILLIAM F. GIFFORD: Yes, I think when you look at that, Michael, you got to take into all -- the consideration of all factors. So you got to take in the total change to the consumers. So you have SET differentials that you'd annualize then across time. So that price elasticity is not just manufacturer list price, it's increase in list price to the consumer.

MICHAEL SCOTT LAVERY: Okay, that's helpful. And on iQOS, can you just specify what it is that you are assuming in guidance? Would it be right to think you're not accounting on any revenues until you get approval, but that there's some costs you are factoring in, and then would there be incremental spending if the revenues come? How should we think about that?

HOWARD A. WILLARD: We are optimistic and hopeful that iQOS is going to get approved fairly soon, and so we've got a full rollout of iQOS included in our guidance.

MICHAEL SCOTT LAVERY: Okay, that's great. And you -- so you did also mention both a lead market, but also stores in multiple cities, which sounds a little bit broader and faster and maybe a bigger launch than you've hinted at in the past. Have you expanded your plans? And you also said when you were reading through that slide related to it, you said that you are establishing stores. Are you doing that now ahead of approval? And how should we think about what your -- how you're positioned relative to that?

HOWARD A. WILLARD: You were listening carefully. Yes, I think -- I don't know that it's a change in our plans, but our belief is that iQOS is going to be quite a success, and that after the lead market we'll be moving quickly to other markets. And what we have learned as we've been focused on as to gaining access to and establishing retail locations is that it's not something you can do overnight. And so we've made the decision that it's worth the incremental investment in order to line up those locations in multiple markets in advance. And obviously, as time for the approval of iQOS drags on, it does cause us to incur a little bit of incremental expense. But we think the upside from commercializing iQOS is big enough that we want to be fully ready the minute we get FDA approval.

MICHAEL SCOTT LAVERY: Yes. And so you mentioned the Copenhagen store in Nashville. Is that one you would be able to quickly repurpose as a dual brand outlet, or would you want to separate those for brand identity and marketing purposes?

WILLIAM F. GIFFORD: I think that's something we'll consider long-term, Michael. I think the opportunity in Nashville is that's the home of the manufacturing base. And so we think it affords our consumer a great opportunity to engage with the brand and be right there where we're manufacturing the products. So we're really focused currently on the engagement with those adult dippers right there where the product is made.

MICHAEL SCOTT LAVERY: Okay, that's helpful. One real quick last one. You gave the share gains in the U.K. and Canada for JUUL. Is that also driving category growth or is it primarily market share momentum?

HOWARD A. WILLARD: I don't know that I have a good answer to that. I could speculate, but I will not.

OPERATOR: Your next question is from Judy Hong with Goldman Sachs.

JUDY EUNJOO HONG, MD, SENIOR ANALYST & CO-HEAD OF THE GIR ASIAN PROFESSIONALS NETWORK, GOLDMAN SACHS GROUP INC., RESEARCH DIVISION: One is just a quick clarification, the category volume for e-vapor that you laid out on Slide #8, is that equivalized volume to cigarette tax or what is the -- kind of how should we think about that relative to the cigarette volume?

WILLIAM F. GIFFORD: Yes, I think, Judy, that chart is trying to equivalize across open systems and closed. So if you think about it, that's the number of pods that are in the marketplace. If you think about the equivalization to total cigarettes, you have to think about what's the pod equivalent of a cigarette. And so a pod equivalent to a cigarette, we would estimated to be around 1 pod per pack of cigarettes.

JUDY EUNJOO HONG: So basically if you -- so JUUL at 0.5 million pods would be equivalent to roughly like 6% or 7% of the total cigarette volume equivalent?

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

WILLIAM F. GIFFORD: Yes, that would be the case.

JUDY EUNJOO HONG: Okay. So the total e-vapor category today is about 15% to 20% of the total cigarette equivalent volume in your estimate, just based on this math?

WILLIAM F. GIFFORD: That's correct, Judy.

JUDY EUNJOO HONG: Okay. So I guess, that seems like it's a pretty big number in the context of the cigarette category. And I guess, I'm still a little bit confused as to why it's not having a much bigger impact on the total cigarette volume, if the size of the e-vapor category is already 15% of the total.

WILLIAM F. GIFFORD: Yes. I think you have to think about it, Judy, is -- a base of that has been in place for quite a while. So if you think about the initial start, because we are including open systems in this overall equivalization, open systems have been in place going back a number of years. And I think that the point I was trying to raise is, it's important to remember within the cigarette category, the historical decline rate at 3% to 4% included 1% that was moving to other tobacco categories. And so part of the historical decline already assumed that there were going to be consumers progressing from cigarettes to other tobacco categories.

JUDY EUNJOO HONG: Got it. Okay. Anyway and then just going back to the international opportunity for JUUL, I mean, it sounds like based on the -- the assumptions would imply that your revenue for international market from JUUL is going to be a pretty sizable number at a margin that's also pretty attractive. So given some of the experience that we've seen, where we've seen some bumps along the way for iQOS and other players that have launched in markets outside the U.S., I guess, I'm just still wondering what gives you the confidence about sort of the big revenue contribution and margin contribution in 5 years?

HOWARD A. WILLARD: Yes. I mean, Judy, I think the way I would frame that is, I acknowledge that there've been a number of products, particularly in the e-vapor category, that have had some success and then that success has fizzled and so certainly that is something you have to be sensitive to. But I have to point out that JUUL's growth and success in the U.S. market last year was unique and first of its kind compared to other tobacco product successes both in the U.S. and overseas. I mean, the growth rate was dramatic, it represented the entire growth of e-vapor for the year, and it dramatically reaccelerated the growth of e-vapor. So I think the reason that we have confidence that it's going to have more success in overseas markets over the next 5 years than some of the other products that have been introduced over there is because it's had such dramatic success in the U.S. last year.

JUDY EUNJOO HONG: Got it. Okay. And then my last question just, Billy, when you think about Q1 combustible or smokeable volume, am I right in thinking that if you layer in the 1 less shipping day and then I think you're lapping a pretty big inventory level a year ago. So volume sounds like it could be down double digits in Q1, is that sort of in the ballpark?

WILLIAM F. GIFFORD: So, Judy, we're careful not to guide to the quarter level on volume. But I think you're thinking about trade inventories; that was a big component in the first quarter of last year, so it's important to pick that up. So you're exactly right from that standpoint, that it's important to consider how trade inventories were moving last year versus your expectations for this year.

OPERATOR: Our next question is from Bonnie Herzog with Wells Fargo.

BONNIE LEE HERZOG, MD AND SENIOR BEVERAGE & TOBACCO ANALYST, WELLS FARGO SECURITIES, LLC, RESEARCH DIVISION: I had a question on your EPS growth guidance. You guys now see a wide range in 2019, but you stated back in December that you expected your EPS growth to be slightly below your long-term 7% to 9% growth algorithm. So just wanted to understand what changed, or are you guys just being prudent with the wide range? And then I wanted to confirm your guidance assumes no buybacks this year, but just kind of wondering if there's a chance that could change or maybe what needs to happen to get you back in the market to buy back your stock?

HOWARD A. WILLARD: So I'll answer the first part of your question, and then I'll turn it over to Billy. The short answer on December versus today is nothing changed. We viewed 4% to 7% guidance as slightly below the 7% to 9% long-term trend. And you are right that it is a 3 percentage point wide range, but I think that we think it's prudent, given some of the increased volatility we've seen in our income in large part driven by volatility in the Anheuser-Busch InBev income stream, that in order to give the investment community the right confidence in our guidance that a bit of a wider range is prudent and appropriate.

WILLIAM F. GIFFORD: And as far as share buyback, Bonnie, remember we had about 350 million, I think it was 345 million to be exact, as we ended last year on the current program. And we expect to complete that by midyear, that is unchanged. And then we'll assess the situation and come forward if anything is appropriate after that.

BONNIE LEE HERZOG: Okay. And then I had a question on Marlboro. You guys successfully stabilized Marlboro share in 2018. So as we look forward, do you believe it's realistic that Marlboro could take share in a shrinking volume pool, especially given your new Marlboro rewards program? And then I also wanted to ask about the coupon inserts for JUUL and Marlboro packs. Can you guys help us understand the strategy with those? And how we should think about cannibalization of Marlboro versus maybe the opportunity to take share from competitive cig brands?

HOWARD A. WILLARD: Sure. I think with regard to Marlboro, you're right, we did stabilize it this year, and we think it's got very strong momentum and that, that will continue into this year. But I also think you have to consider the fact that our objective in the smokeable segment is to maximize income. And so I think you will see us balancing our desire to maximize income against the momentum of Marlboro, and we did that this year and I think we'll continue to do it. So I think with regard to your question about putting JUUL inserts on our cigarette packs, I would first of all say that I think the vast majority of the support that we will provide to JUUL is really going to be brand agnostic or company agnostic with regard to how it helps JUUL source volume. So if you think about them putting JUUL into much better display space at retail and having higher visibility, or you think about them potentially gaining access to some of our other services, I think, most of those services are not going to have a greater impact on our brands than they would on our competitors' brands. I think you could -- particularly with the onserts, obviously, we can only put onserts on our packs; they don't go on competitors' packs. And so theoretically, I guess, it could result in a bit more volume coming out of Marlboro. But I think that, that is unlikely to be the case. And I say that for really 2 reasons. I think there's already very high awareness amongst all cigarette -- adult cigarette smokers and, frankly, all Marlboro smokers about the availability of JUUL. So I think that a lot of that awareness has already been established. I wouldn't expect a big incremental uptick from those onserts. And then secondly, I would point out that I think JUUL tends to get more of its growth from the 21- to 29-year-old cigarette smoker than it does from the 30-plus cigarette smoker. And if you think about it, I think, as we've communicated in the past, Marlboro's share of those 21- to 29-year-old smokers is about equal to its overall share. But there are several other cigarette brands that are overdeveloped amongst 21- to 29-year-olds, such as Newport, Camel or Natural American Spirit that, frankly, might actually give up more volume on a relative basis than Marlboro.

BONNIE LEE HERZOG: Okay, that's really helpful. And then my final question for you guys is about the FDA. Just I was hoping you guys could give us some color from your perspective on the FDA's recent commentary surrounding harsher e-cig regulation. Was it a surprise to you that they are now putting threats out there, especially after your investment in JUUL? And then wondering if you've spoken to them recently? And you know what's your sense of how they're thinking about your ownership stake in JUUL as well as some of the initiatives JUUL's working on to help reduce youth e-cig use?

HOWARD A. WILLARD: Sure. I don't think we've been surprised at FDA's concern about youth usage of e-vapor products. I think, as you know, both JUUL and Altria, we were in talking to them in November. They had a high level of concern then. We shared that concern, and we've been interacting back and forth with the agency on the actions we're taking to try and reduce the levels of youth usage of e-vapor products. And frankly, I think their concern and their focus on the industry taking significant steps to drive down youth usage is appropriate and justified. And I think that we agree with JUUL that we need to take significant action. I think JUUL has already taken significant action, but we also agree that more must be done. And so I think that our view is that it's important to drive down youth usage in order to preserve this opportunity for adult cigarette smokers to be able

to switch to a very compelling noncombustible product, and I think we will ultimately achieve both. I think we'll drive down youth usage and still make this available to adult cigarette smokers as an alternative. And I just think we have some work to do and we're fully prepared to engage on that.

OPERATOR: Our next question comes from Adam Spielman with Citi.

ADAM JUSTIN SPIELMAN, MD AND EUROPEAN TOBACCO AND BEVERAGE ANALYST, CITIGROUP INC, RESEARCH DIVISION: First of all, can I say thank you for providing so much more data than usual. It really is appreciated, so thank you for that. I have 2 quick questions, I think they're quick. So if I take what you've said about the impact basically with growth of JUUL -- this is Slide 8, and equate that to cigarettes, it looks like the JUUL has grown about 0.4 billion units, which equates essentially to a 4% market share growth, and that's true for the whole e-cigarettes or e-vapor category. And yet you've also said that the impact of the growth of e-vapor on cigarettes is about 1.3%, 1.4%. So is there a right way of thinking about it, where basically 2/3 of vapor growth is incremental? Is that how we should think about it? And, I guess, if that is the right way of thinking about it, where is that increment coming from? Do you think it's mostly coming from people in their 20s or what? So that's one question.

HOWARD A. WILLARD: Okay. I'm not sure I'm tracking with -- exactly with your math, but let me try and answer the question in a more general way, which is you're right about the impact that we think it's having on the cigarette category. But beyond the impact that it's having on the cigarette category, we think it's also sourcing, as we said earlier, from the smokeless category, probably from the cigar category as well. And we also think that with all the trial that's going on, part of their volume is coming from increased youth educations by a variety of adult tobacco consumers and that may settle out over time. I think that given the increased availability of the product, I think you'll have a lot of people that are trying it, while still using their existing tobacco product, and I think over time they're going to make a decision and they'll either switch completely to JUUL. But I think you have some of that in the 2018 numbers as well.

ADAM JUSTIN SPIELMAN: Fine. I mean, just -- I mean, I am not sure how relevant it is, but math is. Basically, there was 400 incremental million pods of JUUL sold in 2018 and that equates to roughly 4% of the cigarette market, if 1 pod is 1 pack of cigarettes. But that's -- so that's how I think about it. But the second question is really coming back to this question about the onserts and the inserts on your packs. I mean, can you confirm that JUUL will be able to put or maybe deny that they'll be able to have coupons, so there might be, I'm making this up here, but let's say, $5 off advertise to somebody who buys a pack of Marlboro. So that's -- is that right that they'll be able to coupon this whether it's just market raise awareness?

WILLIAM F. GIFFORD: Yes, Adam, I think you're thinking about it right. I think it's important to remember what Howard said. If our Marlboro consumers -- so take it the one person that receives that in their pack, if they have a decision to switch, they would have switched anyway. And so we would want them to switch to the JUUL product, which we have an investment in, versus searching for other alternative products out there. So the awareness is already high. If the individual is making the decision to switch, we want them to switch to JUUL.

ADAM JUSTIN SPIELMAN: Fine. Okay. And -- so then sort of, is that something you sort of been able to sort of validate with focus groups or is that -- because for me, it's sort of quite a thing that you're potentially offering your smokers, let's say, $5 off to start JUUL?

HOWARD A. WILLARD: Yes, I mean, you are right that essentially we are cross promoting, which is a fairly common thing, and I think you may be thinking about the fact that we have a 35% economic interest in JUUL and we have a 100% economic interest in our cigarette business. And so that may be what's causing you to be surprised we would be willing to do this. I think I would frame it with a couple of thoughts. First of all, we think that even with the impact that JUUL could have on the overall volume growth and potential profit growth from our cigarette business going forward, even if it does impact it, we think when you take the sum of our cigarette profitability growth and you combine it with the economic contribution from JUUL over the next 5 years, we think that's a net positive to us. And it's a net positive even if there's a bit more growth in JUUL coming from

our brands than from the competitors. So that's the first reason. The second reason is, if you look at it, we were -- frankly, I've been with the company 26 years. Almost my entire career, we have believed that our business would be better in the long term if we could offer harm reduced products that would represent attractive alternatives to our adult cigarette smokers to switch. And we have invested billions of dollars in it and lots of effort. And ultimately until December this year, we really didn't have the product portfolio to fully achieve our harm reduction aspiration. And the opportunity to invest in JUUL, I think, really makes that harm reduction aspiration a reality. And if you look at it, we've got iQOS in the heat-not-burn category, the #1 product in brand in that category; we've got Copenhagen and Skoal in the oral tobacco products category; and we had a hole in the e-vapor category and we've now filled that with our 35% economic interest in JUUL. So I think that we are finally going to be able to achieve our harm reduction aspiration. And I think we can do that over the next 10 years and still deliver our long-term 7% to 9% EPS growth algorithm and give 80% of that adjusted EPS back to shareholders in the form of dividends. And I think our ability to achieve both harm reduction and secure our long-term financial performance was enhanced by the investment in JUUL.

ADAM JUSTIN SPIELMAN: Can I just very quickly ask, again, have you actually done focus groups and have found out what might happen if you put coupons or other material in your cigarettes?

HOWARD A. WILLARD: We've done a variety of work to understand the interaction between cigarette smokers and JUUL. I don't know that we've done anything specifically to what you're referencing, but we think we have a pretty firm understanding of what the interaction between the 2 categories is.

OPERATOR: Our last question is from Nik Modi with RBC Capital Markets.

SUNIL HARSHAD MODI, MD OF TOBACCO, HOUSEHOLD PRODUCTS AND BEVERAGES, RBC CAPITAL MARKETS, LLC, RESEARCH DIVISION: I'll try to make this quick because I know we're going a little long here. Howard, you've -- obviously, a lot of decisions have been made, lot of portfolio transformation. I am just curious whether wine business fits into that kind of your vision of the future of Altria? The second question is just on the pricing. I mean, very, very strong, at least, where we were looking, or maybe you can provide some context around that. Was that the loyalty program kind of making you a little bit more efficient in terms of promo spend? And then the third is just on Cronos. Is this a kind of a platform strategy, meaning you'll look to get into all types of products, or is this going to be really just focused on your existing categories?

HOWARD A. WILLARD: Sure. I think with regard to wine, I don't know that there's a real change there. I think that we have long said that we very much like the wine business, and we are committed to returning it to strong income growth. But we've also said that it's not core like the rest of our tobacco businesses are. And that's been the case for quite some time, and there hasn't been a change there. So we remain committed to running that business well. It has had a bit of a downturn over the last 2 years, but we're confident that the employees their have strategies in place to turn that around. With regard to Cronos, I think that you shouldn't assume that our existing product portfolio at Cronos is where we're going to stop. I think that both we and Cronos think there are opportunities really across the world in a variety of product categories, both recreational and medicinal, that would involve them entering new product forms and developing new products and new product brands. I think it's early days there, and we have really not restricted our thinking with regard to that. I think I'll hand over to Billy, the question on cigarette pricing.

WILLIAM F. GIFFORD: Yes, Nik, I would point you to -- on pricing, it's the process of data analytics that we've enhanced here that allows us to be more efficient and effective the way we think about the total value equation. It's specifically the promotional piece that we run at retail. So that drives the overall price realization up through time.

OPERATOR: Thank you. At this time, I would like to turn the call back over to Ms. Paige Magness for closing comments.

PAIGE MAGNESS: Thank you all for joining our call this morning. If you have any follow-up questions, please call us at investor relations. Thank you.

OPERATOR: Thank you. This concludes today's conference call. You may now disconnect.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2019 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2019 ASC LLC (www.ascllc.net) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or ASC's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and ASC so long as they provide conspicuous attribution to Thomson Financial and ASC as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]

**---- Index References ----**

Company: ANHEUSER BUSCH INBEV SA; ALTRIA GROUP INC; CITIGROUP INC; COWEN AND COMPANY LLC; CRONOS GROUP INC; DEUTSCHE BANK AG; GOLDMAN SACHS GROUP INC (THE); JUUL LABS INC; MORGAN STANLEY; PIPER JAFFRAY COMPANIES; RBC CAPITAL MARKETS LLC; J SAINSBURY PLC; STIFEL NICOLAUS AND CO INC; THOMSON REUTERS CORP

News Subject: (Business Management (1BU42); Corporate Events (1CR05); Drug Addiction (1DR84); Earnings Calls (1EA37); Health & Family (1HE30); Market Share (1MA91); Meeting Announcements (1ME17); Sales & Marketing (1MA51); Smoking (1SM71))

Industry: (Cigarettes (1CI04); Consumer Products & Services (1CO62); Press Releases (1PR19); Tobacco (1TO65))

Region: (Americas (1AM92); Central Europe (1CE50); Denmark (1DE14); Europe (1EU83); Eurozone Countries (1EU86); Germany (1GE16); North America (1NO39); Northern Europe (1NO01); Scandinavia (1SC27); Tennessee (1TE37); U.S. Southeast Region (1SO88); USA (1US73); Western Europe (1WE41))

Language: EN

Other Indexing: (ASC LLC; WELLS FARGO SECURITIES LLC; altria client services) (William F. Gifford; William Gifford; Michael Lavery; Vivien Azer; ADAM JUSTIN SPIELMAN; Michelle; Adam Spielman; BONNIE LEE HERZOG; Paige Magness; VIVIEN NICOLE AZER; Pamela Kaufman; William F. Gifford; William Gifford; Howard A. Willard; Howard Willard; HOWARD WILLARD; MICHAEL SCOTT LAVERY; Robert J. Powers; Robert Powers; Chris Growe; Judy Hong; CHRISTOPHER ROBERT GROWE; SUNIL HARSHAD MODI; Bonnie Herzog; Steve Powers; STEPHEN ROBERT; JUDY EUNJOO HONG)

Word Count: 11493

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT U

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: JUUL LABS, INC., MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION
______________________
THIS DOCUMENT RELATES TO ALL ACTIONS

Case No. 19-md-02913-WHO

TUESDAY, FEBRUARY 16, 2021

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

\- - -

Remote videotaped deposition of William P. Gardner, Ph.D., held remotely at the location of the witness in Richmond, Virginia, commencing at 12:45 p.m. Eastern time, on the above date, before Carrie A. Campbell, Registered Diplomate Reporter and Certified Realtime Reporter.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

MS. PENZA: Objection. Form.
THE WITNESS: All I know is what it says on the slide. The Wall Street Journal is stating that the schools and parents are fighting a JUUL e-cigarette epidemic.
QUESTIONS BY MR. GDANSKI:
Q. Do you have any reason to disagree with that? Have you been presented any data in all the time you spent with JUUL and PMTA that in the real world, schools and parents were fighting a JUUL e-cigarette epidemic?
MS. PENZA: Objection. Form.
THE WITNESS: I -- I'm not aware of it being true or not true.
You know, youth were using e-vapor products. No doubt.
QUESTIONS BY MR. GDANSKI:
Q. You're not aware of that being true?
A. I'm not -- I can't -- the Agency has said, clearly, that e-vapor products, pod-based products, including JUUL, were attractive to kids, and youth were using



the products.
Q. I mean -- right.
So when it comes to actual people and schools and parents, they were fighting a JUUL e-cigarette epidemic in 2018, right?
MS. PENZA: Objection. Form.
THE WITNESS: The youth epidemic was being fought by many people.
QUESTIONS BY MR. GDANSKI:
Q. Including parents and schools, right?
A. Parents, schools and regulators.
Q. Okay. And then there's also on the bottom right, "JUUL'ing. If you don't know what it is, ask your kids."
Do you see that?
A. I see that.
Q. And that is a video clip from The Washington Post, right?
MS. PENZA: Objection. Form.
THE WITNESS: I can't read it, where it's from, but it appears to be



a video.
QUESTIONS BY MR. GDANSKI:
Q. It even has like a little play button.
Do you see that?
A. I see the play button.
(Gardner Exhibit 236 marked for identification.)
QUESTIONS BY MR. GDANSKI:
Q. I'm going to mark as the next exhibit the actual video and have Corey play that, please.
MS. PENZA: Objection to the exhibit.
(Video played.)
QUESTIONS BY MR. GDANSKI:
Q. This is in the PowerPoint presentation that you received and participated in drafting parts of, right?
MS. PENZA: Objection. Form.
THE WITNESS: I participated in drafting the chemistry section. I did ultimately receive the entire document, but I did not review all sections.



QUESTIONS BY MR. GDANSKI:
Q. One part of that video talked about a school having to remove the bathroom doors.
Do you remember that? Do you see that?
A. I saw that.
Q. Do you think that was the only school that had to do that?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not aware.
QUESTIONS BY MR. GDANSKI:
Q. Have you ever spoken to your children about JUUL?
MS. PENZA: Form.
I -- I --
THE WITNESS: Can't hear you.
MS. PENZA: I couldn't hear -- I couldn't hear the question.
QUESTIONS BY MR. GDANSKI:
Q. Have you ever spoken to your children about JUUL?
A. I've spoken to my kids about tobacco products in general.
MS. PENZA: Objection. Form.

QUESTIONS BY MR. GDANSKI:
Q. And have they said to you, well, you know, there's vaping, everybody vapes, kids vape?
MS. PENZA: Objection. Form.
THE WITNESS: No. They are not attracted to tobacco products at all.
QUESTIONS BY MR. GDANSKI:
Q. Okay. Let's go to slide 87, please.
75, I'm sorry. Bad numbering.
Thank you. There you go.
So this is JUUL regulatory and social commentary. "Internally at Altria, they actually reflect on the fact that the current generation of youth nicotine addicts is called the JUUL and the guinea pig generation," right?
MS. PENZA: Objection. Form.
THE WITNESS: That appears to be a quote from the public health law center.
QUESTIONS BY MR. GDANSKI:
Q. Okay. And do you have any reason to dispute that, that there's -- this



new generation is the JUUL and the guinea pig generation?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure I understand the context of the guinea pig generation.
QUESTIONS BY MR. GDANSKI:
Q. Well, what's a guinea pig?
MS. PENZA: Objection. Form.
THE WITNESS: A rodent.
QUESTIONS BY MR. GDANSKI:
Q. Okay. Have you ever heard the term "guinea pig" utilized in reference to conducting a test on someone for the very first time without indicia or proof of what the results may be?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure. I would have to see the public health law center reference here in the context or what they mean.
QUESTIONS BY MR. GDANSKI:
Q. Have you ever heard the term "guinea pig" used referencing anything else other than the actual animal?



A. I'm not sure.
Q. Okay. And underneath that it says the truthinitiative.org.
Do you see that?
A. I see that.
Q. That's a public health agency, right?
A. I think so.
Q. It's actually funded, in part, by payments from the tobacco companies, right?
A. I think it may be funded by the FDA, which is funded by the tobacco industry.
Q. And the FDA's funded by the tobacco industry because the tobacco industry pays user fees to the FDA, right?
A. Yes.
Q. In the same way that anybody regulated by the FDA pays user fees. So if you're a cosmetics company, you have to pay a user fee to the FDA, right?
MS. PENZA: Objection. Form.
THE WITNESS: You have to pay a fee. I think the process, you pay a fee for an application to be reviewed.



For tobacco products, the industry pays a fee to be regulated.
QUESTIONS BY MR. GDANSKI:
Q. And do you think that's different than other regulated industries, or you're just not sure?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure.
QUESTIONS BY MR. GDANSKI:
Q. Okay. Here, the truth initiative has a statistic that 63 percent of youth are unaware that JUUL e-cigarettes contain nicotine.
Do you see that?
A. I see that.
Q. You have no reason to dispute that, do you?
MS. PENZA: Objection. Form.
THE WITNESS: I'm unaware of the studies that they reference. I'm not sure where that comes from.
QUESTIONS BY MR. GDANSKI:
Q. If you go to the next page, please. Business Insider has the title, "An e-cigarette with twice the nicotine of

Q. Okay. So suffice it to say that you've never seen any proof that this change in the MarkTen Elite product was reported to the FDA, right?
A. Correct.
MS. PENZA: Objection. Form.
THE WITNESS: I am unaware of any communication with the Agency about, you know, MarkTen Elite. It's just not my role.
QUESTIONS BY MR. GDANSKI:
Q. But it was a change that actually had a change on the product insofar as that it prevented leakage, right?
MS. PENZA: Objection. Form.
THE WITNESS: The gasket --
MS. PENZA: To the extent you're calling for a legal conclusion on top of other objections.
THE WITNESS: The gasket modification reduced leakage.
QUESTIONS BY MR. GDANSKI:
Q. And let's go up to the top.
It says, "I will halt the testing that was shipping out Monday."



Do you see that?
A. Yes.
Q. Okay. And what are you -- what are you halting?
A. I don't remember. I believe it refers to the statement to Willie to stop the PI process on the existing leak.
Q. PI -- sorry.
A. PI stands for product integrity. I don't remember what that testing was.
(Gardner Exhibit 241 marked for identification.)
QUESTIONS BY MR. GDANSKI:
Q. Okay. Let's take a look, please, at Tab 45.
I just want to confirm this is an e-mail from Maria Gogova to you where she attaches a series of slides that are in PDF form, right?
Do you see that?
A. Still downloading.
Q. Do you see it?
A. I'm only halfway there.
Q. Okay. All right. You let me



know when it's downloaded.
A. Okay.
Q. The first page is just an e-mail that's forwarded to you, right?
A. Yes.
Q. That it actually has a much larger, you know, document behind it, right?
A. Yes.
Q. Okay. And the person who forwards it to you is Maria Gogova again, correct?
A. Yes.
Q. And it says, "Pre-read on some logistics for Wednesday's planning meeting at the Cavalier."
Do you see that?
A. I do.
Q. What's the Cavalier?
A. I'm not sure.
Q. Okay. I want to look at what's -- Bates number in the document, so at the bottom of it, it is 888 on the ALGFTC number.
Here it is. Okay.
COREY SMITH: I believe that's



page 17 of the document, for the witness.
MR. GDANSKI: Thank you.
THE WITNESS: Okay.
QUESTIONS BY MR. GDANSKI:
Q. Is Cavalier a bar in San Francisco?
A. I am not familiar with Cavalier.
Q. Okay.
A. It may be a hotel in Richmond. I'm not sure.
Q. Okay. All right. So this is part of that document, and it's a NuMark document, but it's part of this slide deck that was aimed to guide the conversation from the initial e-mail.
And at the top it has a question -- not a question, a statement, which is, "They want to understand the role of nicotine satisfaction in overall product enjoyment."
Do you see that?
A. Yes.
Q. That -- let's just put

ourselves into perspective for a second.
This is Altria, the parent company of Philip Morris USA, in 2018, attempting to understand the role of nicotine?
MS. PENZA: Objection. Form.
THE WITNESS: Attempting to understand the role of nicotine in product enjoyment.
(Gardner Exhibit 242 marked for identification.)
QUESTIONS BY MR. GDANSKI:
Q. Okay. Let's keep this document and that comment in mind for a second, and take a look, please, at what's in the -- what's in the folder as 83, please.
Let me know when you're there.
MS. PENZA: Objection to this document.
QUESTIONS BY MR. GDANSKI:
Q. So this is -- at the top, do you see it says "Smoker Psychology Program Review"?
A. I see that.
Q. If you just go down to the



bottom right-hand corner, it's got a series of Bates numbers going down the right-hand side.
Do you see that?
A. Yes.
Q. Okay. And at the top it has some folks' names, top right corner, Dr. Osdine, Bill Dunn.
Do you see that?
A. I see that.
Q. And this is a Philip Morris document, 40 years before the one we were just looking at, which knew exactly why smokers smoke and exactly the role that nicotine plays in smoking, right?
MS. PENZA: Objection to form. Move to strike the counsel's testifying.
THE WITNESS: This document is related to smokers.
The prior slide you were asking about was specific to oral products.
QUESTIONS BY MR. GDANSKI:
Q. But about nicotine, right?
A. Nicotine satisfaction in oral



products.
Q. The prior slide says, "understand the nicotine satisfaction and overall product enjoyment"?
A. The line --
MS. PENZA: Objection. Form.
THE WITNESS: The line above that said oral.
QUESTIONS BY MR. GDANSKI:
Q. Okay. So let's then go back to that same document and go to the Bates number that ends in 3879 for a second, please.
A. I have to reopen it.
Q. Okay. We'll get it done. That's 3888. If we can go to 3879.
There you go.
This is vapor, right?
MS. PENZA: Mr. Gdanski, we're both still loading.
MR. GDANSKI: Okay. It's on the screen.
MS. PENZA: Please, let's get this done and not go through this again. We need the document accessible to us, not just your



screen.
MR. GDANSKI: Corey, what page number is this in the PDF?
COREY SMITH: It's page 8.
MR. GDANSKI: Okay. So it's page 8 of the PDF, Dr. Gardner.
THE WITNESS: Okay.
QUESTIONS BY MR. GDANSKI:
Q. So this section deals with vapor, right?
A. Yes.
Q. And it's "understand the role of nicotine satisfaction."
Do you see that?
A. Yes.
Q. Do you know for how long the term "satisfaction" was used as a euphemism for addiction in tobacco industry document?
MS. PENZA: Objection. Form.
THE WITNESS: I have no idea.
QUESTIONS BY MR. GDANSKI:
Q. Okay. And then the first little section there says, "Understand nic" --
And that's nicotine, right?

Page 418

A. Yes.
Q. -- "effects on sensory."
Right?
A. Yes.
Q. And then the second is, "Understand the effects on biology."
Right?
A. Yes.
Q. "May have a target date to try to answer those questions and understand that issue in quarter 1 of 2018"; is that right?
MS. PENZA: Objection. Form.
QUESTIONS BY MR. GDANSKI:
Q. I'm sorry, quarter 1, 2019.
A. That appears to be the timeline, yes.
Q. Okay. Now let's go back to the document from 1977, please. From the same company.
So this is 1977, and Philip Morris, which is the predecessor and changing names, but essentially it's Altria, right?
MS. PENZA: Objection. Form.
THE WITNESS: Philip Morris USA is part of Altria.

Page 419

QUESTIONS BY MR. GDANSKI:
Q. And at one point in time they just changed the name to this made-up name Altria.
Altria is not even a word, right?
MS. PENZA: Objection. Form.
THE WITNESS: They changed their name to Altria.
QUESTIONS BY MR. GDANSKI:
Q. But Altria is not -- it's actually not even a word. They invented the term, right?
MS. PENZA: Objection. Form.
THE WITNESS: I don't know.
QUESTIONS BY MR. GDANSKI:
Q. Okay.
A. They changed their name to Altria.
Q. Okay. So back then, the earlier version of Altria, then called Philip Morris USA, has a document called "Smoker Psychology Program Review," and they asked the question -- they say, I'm sorry, "Study the psychology of a smoker in search of

Page 420

information that can increase corporate profits."
Do you see that?
MS. PENZA: Standing objection to all questions related to this document.
THE WITNESS: I see it highlighted.
QUESTIONS BY MR. GDANSKI:
Q. It says, "Our charter is unique in that we are given the smoker to study."
So they're studying smokers, right?
A. That's what the document says.
Q. Let's go down, please.
On page number 3 they say, "Meanwhile, back in the lab, we continue to ask: What is it that the smoker derives from smoking?"
Right?
A. Yes.
Q. And Dr. Dunn writes, two paragraphs down, "There are some distinctive features about the cigarette market. We sell a product that is bought often and used from

Page 421

10 to 60 times a day, day in, day out. We provide a product that is the essential commodity in a habitual act. It is inevitable, therefore, that we focus upon habit formation and habit maintenance and that we make use of a conceptual model specifically designed to explain habit formation. The model is known within psychology as the Skinnerian operant conditioning model."
Do you see that?
A. I see that.
Q. And then he says, "You are all familiar with Pavlov's dog. Present a dog food, he salivates. Ring a bell each time you present the food, and in due time you can ring the bell without food and he will salivate. This is classical conditioning. The bell, a conditioned stimulus, will elicit the unconditioned response."
Do you see that?
A. I see it.
Q. Did I read it correctly?
A. I think so.
Q. Okay. And then at page 4,

Page 422

Dr. Dunn writes, "Consider the smoker."
So they're studying smokers, not all that differently than you-all are doing in 2017, right?
MS. PENZA: Objection. Form.
THE WITNESS: I don't know the context for the studies done back then.
QUESTIONS BY MR. GDANSKI:
Q. Okay.
A. I don't know what studies they were doing.
Q. Okay. But they're studying essentially why smokers smoke, right?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure the nature of this document and everything underneath it, but you have read what's highlighted.
QUESTIONS BY MR. GDANSKI:
Q. All right. He says, "Smoking a cigarette is the lever press. The effect of that smoking upon his person is the reward. The effect reinforces the smoking act."
Do you see that?

Page 423

A. I see that.
Q. And then go down to page 5, please.
Dr. Dunn writes, "Without the chemical compound," referring to nicotine, "the cigarette market would collapse, PM would collapse, and we'd all lose our jobs and consulting fees."
Do you see that?
MS. PENZA: Objection. Form.
THE WITNESS: I see that.
QUESTIONS BY MR. GDANSKI:
Q. So this is 1977, and Philip Morris is internally recognizing it's all about the nicotine.
Fast-forward 40 years and you-all are still studying the effects of nicotine?
MS. PENZA: Objection. Form.
THE WITNESS: We were studying the effects of nicotine in different product formats and what the experience was required to convert adult smokers away from cigarettes.

Page 424

QUESTIONS BY MR. GDANSKI:
Q. Now, drug addiction, the effect is -- that's why they're using the product, right?
MS. PENZA: Objection. Form.
THE WITNESS: We have seen with several products and many products that -- especially an e-vapor, that they did not convert adult smokers successfully. And we were tasked with developing products to convert adult smokers.
QUESTIONS BY MR. GDANSKI:
Q. All that may be good and well, but the idea that you still need to understand why people are smoking as a component to determine what to do about a public health problem seems incongruent with the long history of Philip Morris understanding the important role of nicotine, doesn't it?
MS. PENZA: Objection. Form.
THE WITNESS: We had studied -- we were tasked with developing e-vapor products to convert adult smokers, and

Page 425

the prior slide in the prior document highlighted topics of study to better understand what it would take to convert smokers to e-vapor.
One acronym was the DLSA, which represents, I think, deep, long stimulation. It's a sensorial effect from inhaling e-vapor aerosol, which is consistent with smoke, but most e-vapor aerosols did not deliver that.
QUESTIONS BY MR. GDANSKI:
Q. But all the details and all the studies and all the pharmacokinetics, you know, are interesting, but at the end of the day, Philip Morris, Altria, NuMark, they know: Deliver nicotine to the lungs and you're going to create drug addiction, right?
MS. PENZA: Objection. Form.
THE WITNESS: Cigarette smoking delivers nicotine to the lungs, which can be addicting.
QUESTIONS BY MR. GDANSKI:
Q. Okay. So you're going to look at the competitive e-vapor products, and there's one out there that has higher cMax,

higher tMax, uses a heretofore unknown or never-yet-put-together level of benzoic acid, that reduces the harshness of the products that create addiction through getting nicotine to the lungs, that's going to do it the best. I mean, that's it, right?
MS. PENZA: Objection. Form.
THE WITNESS: That is only part of the overall product experience.
The adult smokers, in addition to nicotine delivery, you know, need to like to use the product and want to use the product in order to switch from cigarettes.
(Gardner Exhibit 243 marked for identification.)
QUESTIONS BY MR. GDANSKI:
Q. Okay. Let's -- we'll finish on this, then let's make number 82, Tab 82, please.
This idea of it not just being the delivery of nicotine is also something that Philip Morris has looked at for this -- almost 50 years?
MS. PENZA: Objection. Form.



Not a question.
Please stop testifying, Mr. Gdanski.
QUESTIONS BY MR. GDANSKI:
Q. We'll do it this way.
Do you have exhibit -- I'm sorry. Do you have the document entitled "Motives and Incentives in Cigarette Smoking" up?
A. Yes.
Q. Okay. And have you ever been to the Philip Morris Research Center in Richmond, Virginia?
A. I used to work there, yes.
Q. Okay. And you know that Philip Morris has to make public documents on a publicly available database, and the documents there unique Bates numbers like the one here on the right side of the document, right?
A. Yes.
MS. PENZA: Objection. Form.
Standing objection to all questions related to this document.



QUESTIONS BY MR. GDANSKI:
Q. That's true for the last document as well, right?
MS. PENZA: Uh-huh.
THE WITNESS: I believe these documents are probably housed within the legacy database.
QUESTIONS BY MR. GDANSKI:
Q. All right. And they're housed in the legacy database and -- excuse me -- and these are clearly Philip Morris documents, right?
I mean, this one says "Philip Morris Research Center," right?
MS. PENZA: Objection. Form.
THE WITNESS: Yes. This says "Philip Morris Research Center."
QUESTIONS BY MR. GDANSKI:
Q. And it's "Motives and Incentives in Cigarette Smoking" is the title, right?
A. That's the title.
Q. Okay. And if we go down to page number 8 -- I'm sorry, page number 4, please -- Dr. Dunn at Philip Morris USA says,



"Without nicotine, the argument goes, there would be no smoking."
Right?
Do you see that?
A. That's what it says.
Q. That's just the truth, isn't it?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure if that's factual or not. I see it in the document, but for e-vapor products I'm not sure if that's true or not.
QUESTIONS BY MR. GDANSKI:
Q. Okay. "No one has ever become a cigarette smoker by smoking cigarettes without nicotine."
That's true, right?
MS. PENZA: Objection. Form.
THE WITNESS: In this time frame, I don't believe they existed.
QUESTIONS BY MR. GDANSKI:
Q. And then Dr. Dunn says, "The physiological response to nicotine can readily be elicited by cigarettes delivering in a range of 1 milligram of nicotine."

Do you see that?
A. I see that.
Q. If that's true, then that means that JUUL at 3 percent and 5 percent are exponentially higher than nicotine necessary to give a confirmed addicted smoker the physiological response they need, right?
MS. PENZA: Objection. Form.
THE WITNESS: I believe you're confusing units and variables. We can't compare the milligrams of nicotine in a cigarette to a JUUL, a cigarette under vaping -- sorry, smoking under machine testing.
QUESTIONS BY MR. GDANSKI:
Q. So how would you translate a cigarette delivering 1 milligram of nicotine in a comparison to the JUUL percentages?
MS. PENZA: Objection. Form.
THE WITNESS: I think it would be depend on the number of puffs usage per occasion for JUUL. And, you know, is 1 milligram under the machine smoking of cigarettes or what?
I don't know the history of



this document and what he's talking about.
QUESTIONS BY MR. GDANSKI:
Q. So you don't know what the term "1 milligram of nicotine" means when it comes to cigarettes?
MS. PENZA: Objection. Form.
THE WITNESS: I don't understand the context of 1 milligram nicotine. You know, that's measured in a laboratory under some kind of condition.
QUESTIONS BY MR. GDANSKI:
Q. Forget the context.
When it comes to cigarettes, do you understand the term "1 milligram of nicotine" or no?
A. I understand 1 milligram of nicotine to be a quantity of nicotine.
Q. If you go to page 5, Dr. Dunn says, "The product is nicotine."
Right? Do you see that?
A. That's what it says.
Q. That also is the truth. I mean, when you strip it all away, JUUL,



cigarettes, the product is nicotine, right?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure what the truth is here. I'm not familiar with these documents.
QUESTIONS BY MR. GDANSKI:
Q. If there's any lesson in the success of JUUL, it's that the product is nicotine. Right?
MS. PENZA: Objection. Form.
THE WITNESS: I think the lesson in the success of JUUL is their ability to convert adult smokers away from cigarettes.
QUESTIONS BY MR. GDANSKI:
Q. By delivering amounts of what?
A. By delivering sufficient nicotine for the smoker to quit or stop smoking. Convert.
Q. "The cigarette is but one of many package layers. There's the carton which contains the pack, which contains the cigarette, which contains the smoke. The smoke is the final product."
That's true, too, of a JUUL,



right, whether it's vapor or smoke, but it's that element that's inhaled that's the final product, right?
MS. PENZA: Objection to form.
THE WITNESS: It states, "The smoke is the final package."
QUESTIONS BY MR. GDANSKI:
Q. Sorry. Package.
A. That's the -- that's what the -- that's part of the overall consumer experience and enjoyment.
Q. Right.
But at the end --
A. Aerosol.
Q. At the end, the smoker doesn't consume the paper or the pod; they consume the smoke. They consume the aerosol, right?
MS. PENZA: Objection. Form.
THE WITNESS: They consume the aerosol with the -- but they use the product and the product branding and the product flavors. But they consume the aerosol.
QUESTIONS BY MR. GDANSKI:
Q. Those are all methods to get

Page 434

them to use the product, right?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure what you mean.
QUESTIONS BY MR. GDANSKI:
Q. Nobody buys a JUUL because they like to, you know, have that around but not smoke it. It's there to be smoked, right?
MS. PENZA: Objection. Form.
THE WITNESS: JUUL is there to convert adult smokers.
QUESTIONS BY MR. GDANSKI:
Q. Okay. "The smoker must strip off all these package layers to get to that which he seeks."
Obviously referring to what?
MS. PENZA: Objection. Form.
THE WITNESS: The cigarette.
QUESTIONS BY MR. GDANSKI:
Q. The cigarette which delivers what?
A. Smoke.
Q. Which delivers what drug?
MS. PENZA: Objection. Form.
THE WITNESS: It delivers

Page 435

nicotine.
QUESTIONS BY MR. GDANSKI:
Q. "Think of the cigarette pack as a storage container for a day's supply of" what?
A. It says "nicotine."
Q. "It is unobtrusively portable."
True of a JUUL, right?
MS. PENZA: Objection. Form.
THE WITNESS: Yes, it is portable.
QUESTIONS BY MR. GDANSKI:
Q. "The contents are instantly accessible."
True of a JUUL, right?
MS. PENZA: Objection. Form.
QUESTIONS BY MR. GDANSKI:
Q. You don't even need to light the JUUL.
MS. PENZA: Objection. Form.
You have a question pending.
QUESTIONS BY MR. GDANSKI:
Q. It's true that -- it's true that the contents of a JUUL are instantly accessible to a degree that exceeds the

Page 436

accessibility of a cigarette because a JUUL does not have to be lit, correct?
MS. PENZA: Objection. Form.
THE WITNESS: If the battery is charged, it can be used.
QUESTIONS BY MR. GDANSKI:
Q. "Think of the cigarette as a dispenser for a dose unit of nicotine."
Same thing can be said of JUUL, correct?
MS. PENZA: Objection. Form.
THE WITNESS: JUUL is a dispenser for a dose unit of nicotine; is that what you're asking?
QUESTIONS BY MR. GDANSKI:
Q. That's true, right?
A. JUUL delivers aerosol which contains nicotine.
Q. "Is readily prepped for dispensing nicotine."
"Dispensing is unobtrusive and most ongoing behavior."
Keep going.
MS. PENZA: Are those questions?

Page 437

MR. GDANSKI: Yeah, I'm going to ask him.
QUESTIONS BY MR. GDANSKI:
Q. Sorry. It says, "It's true that a JUUL is readily prepped for dispensing nicotine, and dispensing it is unobtrusive to most ongoing behaviors," correct?
A. That's what it says.
Q. All right. One second.
At the end of the day, Altria invested in JUUL because they wanted to stay profitable as possible and in the tobacco business for as long as possible, true?
MS. PENZA: Objection. Form.
THE WITNESS: I see the JUUL investment as a significant harm-reduction opportunity to reduce adult smoking.
QUESTIONS BY MR. GDANSKI:
Q. Well, has it been successful?
I mean, Altria has had to downgrade the investment, right?
MS. PENZA: Objection. Form.
THE WITNESS: So far, yes.

QUESTIONS BY MR. GDANSKI:
Q. Well, it's been --
A. We worked on their PMTA in the hopes of being successful.
Q. But so far Altria's attempt to -- sorry. So far Altria's investment in JUUL as an attempt to successfully reduce the burden of tobacco-related diseases and switch smokers, adult smokers, from your perspective, to noncombustible products has been a failure, correct?
MS. PENZA: Objection. Form.
THE WITNESS: We believe that JUUL represents a lot of promise in converting adult smokers. They have demonstrated adult smokers like their product and are willing to use it, therefore reducing tobacco harm.
QUESTIONS BY MR. GDANSKI:
Q. I understand that's what you're hoping for, but so far, the reality around it has demonstrated that the decision by Altria to invest $12.8 billion in JUUL as an attempt to convert adult smokers or to accomplish any public health goal has been a failure,



correct?
MS. PENZA: Objection. Form.
THE WITNESS: I do not believe it's been a failure. I believe it represents significant promise in harm reduction.
QUESTIONS BY MR. GDANSKI:
Q. Promise, opportunity, possibility. But practically speaking, thus far, all of those have not come to fruition, correct?
MS. PENZA: Objection. Form.
THE WITNESS: It's pending FDA authorization of the application as well as, you know, successfully preventing youth access to the product.
QUESTIONS BY MR. GDANSKI:
Q. And so far Altria's attempt to act in a manner to reduce tobacco-related diseases and convert adult smokers has cost them $11 billion, right?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure where the $11 billion came from,



but --
QUESTIONS BY MR. GDANSKI:
Q. I'm sorry if I got the number wrong.
How many billion have they had to downgrade the investment?
MS. PENZA: Objection. Form.
THE WITNESS: I'm not sure. I think maybe around 8. JUUL is valued around 10 million -- 10 billion, I think.
QUESTIONS BY MR. GDANSKI:
Q. So far the -- 13 minus 8 is what, 5?
Yeah. So, so far the decision to invest in JUUL as an attempt to convert adult smokers has been a success to the tune of a loss of $8 billion by Altria, fair?
MS. PENZA: Objection. Form.
THE WITNESS: So far the value of JUUL has decreased, but we believe that JUUL will be authorized by the FDA to market their products and will continue to reduce the harm of cigarettes.



MS. PENZA: Mr. Gdanski, we're well over when we said we would break. I need to take a dinner break, so...
MR. GDANSKI: Let's do it. We'll see you all tomorrow.
MS. PENZA: Any -- since you're East Coast also and you're starting out, is there any reason why we can't start earlier than noon?
MR. GDANSKI: As far as I'm concerned, no, but there are folks here from the West Coast, so, you know --
MS. PENZA: No, I know. I know, but we have -- I know, but I was communicating with you about your firm and about Thursday and Friday, and it was fine for that. So I'm just wondering if you can confer and see if we could start a little earlier, because obviously starting at noon is --
VIDEOGRAPHER: Do we want to go off the record, or do you want this on the record?

# EXHIBIT V

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: JUUL LABS, INC. ) Case No. 19-md-02913-WHO
MARKETING, SALES & PRACTICES, )
AND PRODUCTS LIABILITY )
LITIGATION )
)
_________________________________)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

HOWARD WILLARD, VOLUME II

(PAGES 251 - 612)

WEDNESDAY, JANUARY 13, 2021, 8:05 A.M. (PST)

Reported By:
Sudny Gallardo, CSR No. 14023
Job No. 124212



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: JUUL LABS, INC. ) Case No. 19-md-02913-WHO
MARKETING, SALES & PRACTICES, )
AND PRODUCTS LIABILITY )
LITIGATION )
)
_________________________________)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF HOWARD WILLARD, VOLUME II, taken remotely on Wednesday, January 13, 2021, at 8:05 a.m., before Sudny Gallardo, Certified Shorthand Reporter, in and for the State of California.



A P P E A R A N C E S:

(All parties appeared via videoconference)

For Plaintiffs:

LIEFF, CABRASER, HEIMANN & BERNSTEIN
BY: SARAH R. LONDON, ESQ.
PETER ROOS, ESQ.
275 BATTERY Street, 29th Floor
San Francisco, CA 94111
415.956.1000
slondon@lchb.com

GIRARD SHARP, LLP
BY: NINA GLIOZZO, ESQ.
601 California Street, Suite 1400
San Francisco, CA 94108
415.981.4800

SCHLESINGER LAW
BY: SCOTT SCHLESINGER, ESQ.
JONATHAN DGANSKI, ESQ.
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
954.467.8800

BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC
BY: JOSEPH VANZANDT, ESQ.
218 Commerce Street
Montgomery, Alabama 36104
800.898.2034
Joseph.vanzandt@beasleyallen.com

KELLER ROHRBACK LLP
BY: FELICIA J. CRAICK, ESQ.
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
206.623.1900
Fcraick@kellerrohrback.com



A P P E A R A N C E S (CONTINUED):

For the Plaintiffs:

MORGAN & MORGAN
BY: EMILY JEFFCOTT, ESQ.
220 West Garden Street, 9th Floor
Pensacola, FL 32502
850.316.9074
Ejeffcott@forthepeople.com

GOZA & HONNOLD, LLC
BY: BRADLEY D. HONNOLD, ESQ.
9500 Nall Avenue, Suite 400
Overland Park, KS 66207
913.451.3433
Bhonnold@gohonlaw.com

For the deponent:

DECHERT, LLP
BY: ANDREW J. LEVANDER, ESQ.
JEFFREY A. BROWN, ESQ.
MELANIE C. MACKAY, ESQ.
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
212.698.3500
Andrew.levander@dechert.com
Jeffrey.brown@dechert.com
Melanie.Mackay@dechert.com

For Defendant Juul Labs:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
BY: DAVID BERNICK, ESQ.
ALLISON PENFIELD, ESQ.
2001 K Street
NW, Washington, DC 20006-1047
apenfield@paulweiss.com
www.paulweiss.com

adult cigarette smokers. And if there were fewer of them each year, that's -- that's part of being in this industry, and our objective is not to bring new users into the category.
BY MR. SCHLESINGER:
Q. And there's -- I guess it's, you know, there's an old saying "Those who forget history are doomed to repeat it."
You've heard that; right?
MR. LEVANDER: Objection, form.
THE WITNESS: I think I've heard that phrase before.
BY MR. SCHLESINGER:
Q. In order to start at some point along the path of preventing youth from using cigarettes, you need to know as a person at a company like Philip Morris Altria, whether or not historically that company sought out, recruited, and enticed young people to become consumers of the product, such that they would become addicted and become lifelong customers repeatedly buying the product to which they were addicted. You need to know if historically your company did that?
MS. WILKINSON: Objection.
MR. SCHLESINGER: Do you agree?



MS. WILKINSON: Form. Objection, form.
THE WITNESS: What is your -- what is your question?
BY MR. SCHLESINGER:
Q. Isn't it true, sir, that historically Philip Morris wanted teenagers to smoke, got teenagers to smoke, targeted them, and got them as consumers, got them addicted, and sold them cigarettes for the duration of their smoking life? Isn't that true, historically? That's what your company used to do before you engaged in any prevention efforts? That was historically true, do you agree?
MR. LEVANDER: Objection.
THE WITNESS: I'm not -- I'm not aware of the details on the historical activity that you are talking about. I know there was significant amount of controversy about the company's historic activities, and I know that when I joined the company in the 90s, that the company believed they've learned and awful lot, and I think we continue to learn and improve the company's practices.
BY MR. SCHLESINGER:
Q. So did Philip Morris ever intentionally



seek out and sell cigarettes to young people under the age of 18, sir?
MR. LEVANDER: Objection.
THE WITNESS: Yeah, I am not aware of -- I am not aware of the activity before I joined the company. Certainly while I was at the company I never witnessed that.
BY MR. SCHLESINGER:
Q. Did -- did -- as a former or recently former chief executive officer of Altria, did Altria or its predecessor company, Philip Morris, ever do anything wrong?
MS. WILKINSON: Objection, form.
THE WITNESS: Yeah, I'm -- I'm aware of many criticisms of the company that have been leveled through time, and so I think that the record speaks for itself.
BY MR. SCHLESINGER:
Q. I am asking you, sir.
A. So you are asking if the company ever did anything wrong?
Q. Yes, sir.
A. I think that any company with a long history probably learns from its experience and finds opportunities to do things better in the



future.
Q. Okay. Is that a "yes"?
MS. WILKINSON: Objection, form.
THE WITNESS: You know, I think if learning from the past and deciding to take a different path is -- is learning that something was wrong in the past and taking a different direction, I think that probably certainly Altria has learned from its past.
BY MR. SCHLESINGER:
Q. Did Altria/Philip Morris ever deceive the public health community?
MS. WILKINSON: Objection, form.
MR. LEVANDER: Relevance.
THE WITNESS: I don't -- I am not aware of that, but I am not an expert on the long term history of Altria.
BY MR. SCHLESINGER:
Q. To your knowledge, did Philip Morris Altria companies ever withhold information regarding cigarettes, disease, and addiction?
MR. LEVANDER: Objection.
THE WITNESS: During the time I was -- I've been with the company, I haven't witnessed that.
///

10-year vision to not have cigarettes anymore, because "combustible" means cigarettes; right? Then how does it follow that the way to achieve that vision will be by making as much money as possible selling Marlboro cigarettes? Explain that.
MR. LEVANDER: Objection as to form.
THE WITNESS: No, I think in looking at this 10 -- 10-year vision at the time I was with the company, I think the view was that the company was focused on investing in products and developing products that were alternatives for cigarette smokers. We acknowledged the fact that it may take time to develop those products and convince adult cigarette smokers to transition out of the cigarette category into these other categories. And we also acknowledged that the profitability from the cigarette category was part of the funding we were using to invest in these alternative products that we ultimately hoped to convert all adult cigarette smokers to.
BY MR. SCHLESINGER:
Q. So we know that the cigarettes kill a lot of people, and the intention to get rid of the cigarettes is, we'll sell a lot of cigarettes, make a lot of money, which will kill a lot of people and



that's how we'll save people; is that --
MS. WILKINSON: Objection to form.
MR. LEVANDER: Objection. That's not a question. It's an argument.
BY MR. SCHLESINGER:
Q. Is that -- is that what you are telling us, Mr. Willard?
A. Can you please ask your question?
Q. Sure.
From yesterday I remember that you agreed that cigarettes kill people, hundreds of thousands of Americans every year. Since you sell half the cigarettes and there's at least 400 to 500,000 deaths a year, your -- your cigarettes are killing at least 200,000 people or more a year, just in the United States.
MS. WILKINSON: Objection, form.
Go ahead.
BY MR. SCHLESINGER:
Q. So with that -- and that's one of the reasons why you want to get rid of cigarettes, you are going to do it by selling a bunch of more cigarettes? So you are going to kill a bunch of more people before you are going to get around to saving the people? Is that -- is that how this is



going to work?
MS. WILKINSON: Objection, form.
THE WITNESS: I think the -- the strategy of the FDA is to -- is to help encourage adult cigarette smokers to switch to alternative products, and that's also the strategy of Altria and it has been for quite some time.
BY MR. SCHLESINGER:
Q. And so in order to protect the next generation, we are going to kill this generation?
MR. LEVANDER: Objection.
MS. WILKINSON: Objection, form.
BY MR. SCHLESINGER:
Q. I mean, why not -- in other words, if a company has a car with defective brakes, a defective brake system, and they find a functioning brake system, they don't leave the one with the defective brakes in the market. They take it off; right?
If you have a defective -- if you've got a fix for it, you put in the good airbag. You don't leave the defective airbag on the market. Whatever it is. But you leave your defective product that kills a lot of people on the market when you said you've got alternative products that are safer. So why not just stop making them now? Lead the way and



sell -- sell your non-combustibles. Sell your IQOS and your Juul and the things that are not as harmful, according to cigarettes. Why don't you just do that now?
MR. LEVANDER: Objection as to form. That's not a question.
MR. SCHLESINGER: It's a question.
MR. LEVANDER: It's a speech.
MR. SCHLESINGER: Okay. Why don't you just do that now, Mr. Willard?
MR. LEVANDER: Objection.
THE WITNESS: The FDA has laid out a strategy that allows adult tobacco consumers to continue to make the decision to use cigarette products. And they've also laid out an objective to convince consumers to switch from combustible cigarettes to alternative products. And Altria is engaged in -- in helping to contribute to that, switching from cigarettes to other products.
BY MR. SCHLESINGER:
Q. That's -- that's your strategy, this form -- this continuum of harm. Lead the deadly and lethal, defective, addictive cigarettes on the market, even though we've got something now that is just as good as a Marlboro, the Juul; just as

Page 391

powerful, if not more powerful for the addictive process, but we are still selling Marlboros. Why? Why not just sell the Juuls?
MS. WILKINSON: Objection, form.
BY MR. SCHLESINGER:
Q. You know, what's the justification for continuing to sell something you have acknowledged kills so many Americans?
MS. WILKINSON: Objection, form.
MR. SCHLESINGER: You can answer.
MR. BERNICK: Which question?
MR. SCHLESINGER: Please, no speaking objections.
Mr. Willard, please answer.
THE WITNESS: Would you repeat your question? You've -- you've said quite a lot in the last few minutes.
MR. SCHLESINGER: Can you read back my last question? Would the court reporter do that for me, please?
(Record read back as follows:
"QUESTION: What's the justification for continuing to sell something you have acknowledged kills so many Americans?")
MR. BERNICK: Well, for the record,

Page 392

Ms. Court Reporter, that may be the last of a series of questions. Are there a series of questions that -- that --
MR. SCHLESINGER: That's the question. Please, no speaking objections. That's the question.
MR. BERNICK: It's not speaking objections, Scott. You didn't give him a --
MR. SCHLESINGER: (Indiscernible.)
MR. BERNICK: What?
MR. SCHLESINGER: Don't obstruct, please.
Answer that question, Mr. Willard. Please.
THE WITNESS: No, I think that in the United States the federal government has evaluated the question of whether or not cigarettes to be available to adult consumers that would like to purchase them, and they put in place a federal regulatory system under the FDA that allows consumers that want cigarettes to purchase them. And at the same time, it equips the FDA to regulate the entire tobacco category and encourage over time consumers to voluntarily switch from less harmful products -- from the more harmful combustible cigarettes to less harmful products, but it also

Page 393

acknowledges that in order to accomplish that, FDA may need to work with and encourage the manufacturers to come up with products that will cause adult tobacco consumers to voluntarily shift to those new categories, and that's something that Altria and many other companies are working on doing.
BY MR. SCHLESINGER:
Q. But what about the manufacturer? What is your justification to continue selling a product that kills millions of Americans? Please, sir?
MR. LEVANDER: Asked and answered. Objection to form.
THE WITNESS: I think I answered that question to your previous question.
BY MR. SCHLESINGER:
Q. We've looked at this website where there's a vision for a smoke-free future. Why not do something to bring it about by stopping selling smokable cigarettes?
MR. LEVANDER: Objection. Asked and answered.
THE WITNESS: I think I've answered that question previously.
///

Page 394

BY MR. SCHLESINGER:
Q. My question stands, sir. If you would answer, please?
A. I think that Altria is one of several companies that are in the cigarette business. And I think if -- if we stopped selling our cigarettes, I think others would step in and fulfill the demand that consumers have for -- for cigarettes.
Q. But you would be leading the way.
A. Pardon me?
Q. Then Altria would be leading the way in achieving the vision of the smoke-free future, so why won't Altria do that?
MR. LEVANDER: Objection to form.
MS. WILKINSON: Objection, form.
THE WITNESS: I think Altria is engaged in helping to lead the way to encouraging adult cigarette smokers to try alternative products. And our hope is ultimately they'll make the decision to -- to switch over time as those products improve and as consumers try those products and are satisfied by them.
BY MR. SCHLESINGER:
Q. The nicotine product standard that render combustible cigarettes nonaddictive, if that was

# EXHIBIT W

Confidential - Pursuant to Protective Order

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

-----------------------------x
IN RE: )
JUUL LABS, INC. MARKETING ) CASE NO.
SALES PRACTICES AND PRODUCTS ) 19-md-2913-WHO
LIABILITY LITIGATION )
This Document Relates to: )
ALL ACTIONS. )
_____________________________x

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
V O L U M E I
REMOTE VIDEOTAPED 30(b)(6) DEPOSITION
OF ALTRIA DEFENDANTS,
by and through their Designated Representative,
JASON W. FLORA, Ph.D.
THURSDAY, FEBRUARY 18, 2021
10:08 A.M. EASTERN STANDARD TIME

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

Page 54

Q When did you stop using combustible cigarettes?
MS. PENZA: Outside the scope of this deposition, and object to form.
THE WITNESS: I haven't -- I haven't smoked a cigarette, I know, in at least five years, but I haven't been a regular smoker in well over 10, 12 years. No, probably longer than that. Since my kids were born. So it's probably been about 15 years since I've been a regular smoker, but at least five years since I ever even smoked a cigarette.
BY MR. GDANSKI:
Q How old are your kids?
A My oldest --
MS. PENZA: Outside the scope of the deposition.
THE WITNESS: They're --
THE REPORTER: I'm sorry. I didn't get your -- what was the objection? I'm sorry.
MS. PENZA: Outside the scope of the 30(b)(6) deposition.
THE WITNESS: My kids are in high school. High school age.
BY MR. GDANSKI:

Page 55

Q Have you ever spoken to them about JUUL or electronic cigarettes?
MS. PENZA: Object to form and outside the scope of this deposition.
THE WITNESS: Absolutely.
BY MR. GDANSKI:
Q Have they -- did they bring it up to you or you to them?
MS. PENZA: Object to form. Outside the scope of this deposition.
THE WITNESS: Probably both.
BY MR. GDANSKI:
Q Well, who brought it up first, I guess is the better question?
MS. PENZA: Object to form. Outside the scope of this deposition.
THE WITNESS: I would imagine it would be me.
BY MR. GDANSKI:
Q Okay. And why would you have to bring up JUUL to your teenage children?
MS. PENZA: Object to form. Outside the scope of this deposition.
THE WITNESS: I've had conversations with my kids about using tobacco products and the

Page 56

fact that I don't want them to use tobacco products.
BY MR. GDANSKI:
Q Do they say to you, But you work for a tobacco company?
MS. PENZA: Object to form. Outside the scope of this deposition. Please do not harass Dr. Flora.
MR. GDANSKI: Not a harassing deposition.
BY MR. GDANSKI:
Q Did they -- is it -- I mean, did they say, Dad, you work for a tobacco company, you know?
MS. PENZA: Object to form. Outside the scope of this deposition. Please do not harass Dr. Flora.
THE WITNESS: I have explained to my kids numerous times and -- that the products are intended for adults, they're not intended for kids, and that I don't approve of them using those products.
BY MR. GDANSKI:
Q Did your kids ever say to you, But, Dad, there's a lot of kids using JUUL?

Page 57

MS. PENZA: Object to form. Outside the scope of the deposition.
Mr. Gdanski, I'm not going to allow this to continue.
THE WITNESS: I -- my -- I know that there are kids that have used JUUL. My son commented the other day he doesn't see it very often anymore, but he has seen it. But kids shouldn't have access to these products. Kids shouldn't be using these products. They shouldn't use any tobacco product.
BY MR. GDANSKI:
Q You're aware --
MR. BERNICK: I'm sorry. Could I have the last answer -- the question and answer read back, please.
THE REPORTER: Oh, I'm sorry. I was on mute. I'm sorry.
"Did your kids ever say to you, But, Dad, there's a lot of kids using JUUL?
Answer: "I know that there are kids that have used JUUL. My son commented the other day he doesn't see it very often anymore, but he has seen it. But kids shouldn't have access to these products. Kids shouldn't be using these

Page 214

reduced harm products.
BY MR. GDANSKI:
Q Okay. But here it says it provides a pathway, and the first pathway is to attractive economics, correct?
MS. PENZA: Objection. Form, outside the scope. I'm skimming this document. It seems entirely outside the scope of the notice, but certainly everything that you have highlighted is outside the scope of the notice, including what's on the screen right now.
MR. GDANSKI: Thank you.
BY MR. GDANSKI:
Q Am I right, Dr. Flora, that the first pathway that Altria sees based on their analysis through closed tank products, which includes JUUL, is, quote, attractive economics, correct?
MS. PENZA: Objection. Form, outside the scope of the notice.
THE WITNESS: Yeah, that's one of two reasonable pathways. The second is regulatory authorization. I think you asked me a question a minute ago about converting adult smokers. Regulatory authorization through the FDA requires demonstrating that these products will convert

Page 215

adult smokers. So this is another example of where that's included, because that's a key component.
BY MR. GDANSKI:
Q And then it says: "Competitors are investing to build leadership in this rapidly growing product segment."
Do you see that?
MS. PENZA: Object to form, outside the scope of this deposition. I object to all reading out loud and asking Dr. Flora to confirm what is in this document, which is -- has nothing to do with what's been noticed.
BY MR. GDANSKI:
Q Do you see that, Dr. Flora?
A I do, yes.
Q Okay. Are you saying that Altria's review of and analysis of JUUL and the vapor market in May of 2017 revealed that the adult use of e-vapor products was rapidly growing?
MS. PENZA: Objection to form, foundation, outside the scope.
THE WITNESS: Yes, I am. This is the adult smokers -- so in this executive summary where it says: "AS are the largest accessible

Page 216

adult tobacco" --
BY MR. GDANSKI:
Q Addressable. Addressable. Not accessible. Okay.
A Addressable, right.
"AS, or adult smokers, are the largest addressable adult tobacco consumer segment."
Q Mm-hmm.
A So they're talking about adult smokers.
Q Yeah, I got no doubt, it says that at the top.
What I'm asking is, are you saying that the data available in May of 2017 demonstrates that the adult e-vapor market was rapidly growing?
MS. PENZA: Same objections.
MR. BERNICK: Objection. Lack -- lack of foundation.
THE WITNESS: I'm confused. I think that on the slide it says "a rapidly growing product segment." But I'm not --
BY MR. GDANSKI:
Q Product segment just means the product, right?
MS. PENZA: Object.
BY MR. GDANSKI:

Page 217

Q A closed tank -- the product segment on this slide is closed tank e-vapor products, right?
MS. PENZA: Object to form, foundation, outside the scope of this deposition.
BY MR. GDANSKI:
Q Right?
A Can you repeat the question?
Q Sure.
The product segment is closed tank e-vapor products, right?
MS. PENZA: Object to form, foundation, outside the scope.
THE WITNESS: Yes, I believe that's what they're talking about there, right.
BY MR. GDANSKI:
Q And then within product segment, there's product demographics, who's using the product in that product segment, right?
MS. PENZA: Object to form, foundation, outside the scope.
THE WITNESS: Right. And based on what they're saying in here, they say -- they use the AS multiple times, and in this context they're saying adult smokers. You asked me before what AS stands for, and I assumed it was analytical

Page 218

sciences because I'm here to talk about the sciences, not the -- the consumer data. So --
BY MR. GDANSKI:
Q You keep saying adult smokers. You keep saying --
A This is adult smokers, right.
MS. PENZA: Mr. Gdanski, I don't think you understand how depositions work.
MR. GDANSKI: I think that's rude.
MS. PENZA: You asked a question. He gets to answer it. He was answering and explaining to you that you -- without giving an opportunity to review the document, he didn't know what AS had stood for before. He's now explaining to you what it means. So I'd like you to let him finish.
BY MR. GDANSKI:
Q Okay. So, Dr. Flora, what I'm trying --
MS. PENZA: There's a -- there's a question -- there was a question pending before you interrupted him, Mr. Gdanski, and I would like Dr. Flora to have the opportunity to answer the question.
MR. GDANSKI: Okay.
THE WITNESS: I don't remember what the

Page 219

question was, though. Sorry.
BY MR. GDANSKI:
Q Dr. Flora, my question to you is this --
MS. PENZA: I would like the court reporter to read back the question, please.
MR. GDANSKI: I'm going to withdraw that question and move on.
BY MR. GDANSKI:
Q And my question to you is this: I understand AS may stand for adult smokers. I'm not asking you about that.
My question to you is this: In 2017, are you telling us that the analysis and investigation by Altria of the closed tank products, which includes JUUL, demonstrated that adult smoker use of closed tank e-vapor products was a rapidly growing product segment?
MS. PENZA: Objection. Form, foundation, outside the scope of this deposition.
THE WITNESS: I -- I think I need to read the whole slide to be able to say that, but I -- they're talking about adult smokers, and they're talking about a rapidly growing segment.
But I've only read what you highlighted, so I --

Page 220

MR. BERNICK: I would like a continuing objection to this. You're asking him apparently about this document. You haven't established that he wrote it, was involved in it, or anything. And then you're switching to a contention that he may or may not have about what happened in 2017.
MR. GDANSKI: Mr. Bernick -- Mr. Bernick --
MR. BERNICK: And so I once again -- excuse me. Excuse me, Mr. Gdanski.
I am going to ask you to take down these slides when you're asking him questions that don't have anything -- that he doesn't know have anything to do with the slide. It's very confusing.
MR. GDANSKI: I'm asking a literal question about the text that's highlighted on the slide. It's very simple.
MR. BERNICK: But -- no, no --
MR. GDANSKI: I'm not going to engage you --
MR. BERNICK: (Inaudible.)
MR. GDANSKI: Yeah, I'm not going to engage you. So your objection, even though it's a speaking objection, is definitely noted. But now

Page 221

my question is for the witness.
BY MR. GDANSKI:
Q My question is very simple. Are you able to say, based on Altria's analysis of JUUL, that in May of 2017, there was a rapidly growing adult use of closed tank vapor products?
MS. PENZA: Objection. Form, foundation, outside the scope. Dr. Flora also asked for the opportunity to review documents.
MR. GDANSKI: He all -- he always has that opportunity.
BY MR. GDANSKI:
Q So go ahead, Dr. Flora. You tell me what you need to look at to confirm whether there was or was not a rapidly growing use of adults using -- adult smokers using closed tank products in May of 2017.
MS. PENZA: Object to form, foundation, and outside the scope.
THE WITNESS: Can I -- can I have one minute to read the bullet points?
BY MR. GDANSKI:
Q You can have two.
A (Peruses document.) Okay.
Q Okay.

A So -- so your question is, does this -- are -- is this a rapidly growing segment for adult smokers?
Q In 2017, May, are you aware of whether or not there was a rapidly growing product segment for adult smokers switching to closed tank products?
MS. PENZA: Objection. Form, foundation, outside the scope.
THE WITNESS: It looks like a closed tank product for adult smokers is a near term priority for Newmark's product portfolio suggesting this is an important segment for them. They're talking about this is a rapidly growing segment.
I mean, I think, yes, this was a growing segment, and this was important -- this is an important opportunity for Newmark, because these closed tank products were meeting adult smokers' unmet needs from other e-vapor products.
BY MR. GDANSKI:
Q The reality is you know that the only demographic that was rapidly growing in the use of closed tank products in May of 2017 were kids.
MS. PENZA: Objection. Form,



foundation, outside the scope. Totally improper, Mr. Gdanski.
MR. GDANSKI: I'm not done.
BY MR. GDANSKI:
Q Thus -- let me start again.
The reality is --
MS. PENZA: Mr. Gdanski, we had this problem last time. I guess you're trying for a dramatic pause in the middle of your obnoxious questions, but it's not -- it's not working over Zoom, because I think that you're finished, and so then I object. So if you could just ask the question, then I will know you're finished, and then I can object.
MR. GDANSKI: I -- I -- I'm not going to dignify your objection with a response by calling it obnoxious. So that -- that's inappropriate.
BY MR. GDANSKI:
Q Dr. Flora, the reality is, is that the only demographic that was rapidly growing in the closed tank e-vapor market in May of 2017 were kids. Thus, in 2018, it was revealed by the National Youth Tobacco Survey that there was a youth nicotine addiction epidemic of closed tank e-vapor products. True?



MS. PENZA: Objection. Form, foundation, outside the scope.
THE WITNESS: If you're asking me in the context of the slide you're showing me, the slide is all about adult smokers.
Was youth use of e-vapor products a problem then? Yeah, and it's still a problem today. It's getting better, but it needs to get better than that.
They're talking about adult smokers in this -- in this slide, and the fact that pod products are appealing to adult smokers.
BY MR. GDANSKI:
Q 2017, was there a rapidly growing product segment of youth use of closed tank products, including JUUL?
MS. PENZA: Objection. Form, foundation, outside the scope.
THE WITNESS: Was -- if you're asking if the youth use of e-vapor products was a problem in 2017, it was. Youth use of any tobacco product at any point in time is a problem. It's -- it's -- kids shouldn't use these products.
BY MR. GDANSKI:
Q There -- there's no way to prevent kids



from using the products. Maybe the products shouldn't be sold.
MS. PENZA: Objection. Form, foundation, outside the scope.
BY MR. GDANSKI:
Q If one kid -- in other words, if one kid is too many, and kids shouldn't be using the products and there's no known way to prevent kids from using the products, that leads to the only logical conclusion.
MS. PENZA: Objection. Form, foundation, outside the scope.
Mr. Gdanski, again, that didn't even seem like a question, so I didn't even know when to object, but those are the objections.
MR. GDANSKI: Dr. Flora understood it.
MR. BERNICK: I think we took --
MS. PENZA: I don't --
MR. BERNICK: I think we should take a break.
MR. GDANSKI: Right.
BY MR. GDANSKI:
Q Let's go to slide number 12, please.
MR. BERNICK: I -- I would like to take a break in five minutes.

Page 226

MR. GDANSKI: Okay. That's fine.
BY MR. GDANSKI:
Q This slide here says: "Both JUUL and MY" -- do you know what MY stands for?
A I believe it was another e-vapor -- tank e-vapor product.
Q -- "performed well under AS research conducted to date."
AS is adult smoker there or analytical science? You don't know?
MS. PENZA: Objection. Form, foundation. The whole document is outside the scope.
THE WITNESS: When you asked me what AS stood for, I thought we were going to be talking about science and chemistry, which is my area of expertise. I didn't think we were going to be talking about the consumer research.
So I -- I apologize, I thought adult smokers stood for analytical sciences because we had just talked about something where it did.
In the context of this document, AS stands for adult smokers. There's not analytical data being presented here. It would -- wouldn't make sense that it would be analytical sciences

Page 227

because they -- those are the guys who do the chemistry. I haven't seen any chemistry in this document. So it's adult smoker in this document.
BY MR. GDANSKI:
Q Okay. And -- and let's go to slide 13 on this, please. This is a slide from Altria where they're analyzing and assessing the JUUL product in 2017, correct?
MS. PENZA: Objection. Form.
THE WITNESS: Can you repeat the question?
BY MR. GDANSKI:
Q Sure. This slide is part of Altria's analysis of the JUUL product in 2017, correct?
A Yes. So there's -- there is actual -- there's some analysis here and some chemical analysis here on this slide. Yes.
Q All right. And it has the amount of nicotine per puff at .18 milligrams per puff, correct?
A Yes, it does.
Q And the aerosol mass at 3.5 milligrams per puff, right?
A That's correct.
Q And it's using a 5 percent nicotine pod,

Page 228

right?
A That's right.
Q And now it's doing a five-second puff duration?
A Yeah, so this data was collected under a five-second puff duration.
Q And do you have access to the underlying data for this study?
A It does not reference the -- the LIMS report. So I would -- I am not -- I am not sure if I have -- if I have this data, but this would -- this would be a LIMS report. The underlying data at least.
Q This has aerosol mass of 3.5 milligrams per puff. What was the aerosol mass, if you can recall, on the four-second puff of the 5 percent slide from the LIMS data in 2015?
MS. PENZA: Objection. Form.
THE WITNESS: It was -- it was about the same. I think it was 3.5, if -- if I remember back.
BY MR. GDANSKI:
Q Does the length of the puff duration make a difference on the aerosol mass per puff?
A It can. It depends --

Page 229

Q Did it --
A It depends on the product design. If there is shutoff -- if there's any -- any device shutoff, then it may -- the aerosol may drop off towards the last few seconds of puff. So it would depend on how the device is designed and how it's delivering its aerosol. So it could.
Q Okay. How is the aerosol mass per puff the same if the puff is one second longer?
A It could be product design. It could be that the heating profile is changing. It could be the product -- different product tested at a different point in time.
Q Did -- did --
A I think there's a lot of factors that could go into that.
Q Were there changes made to the JUUL product that you saw at different points in time?
MS. PENZA: Objection. Form, foundation, outside the scope of this deposition.
THE WITNESS: I -- I have seen some -- some changes, yeah. So the 2015 data, for example, we looked at the benzoic acid or the -- the level -- the acid levels, and I know that in 2000 -- in early -- later in early 2016, we had

# EXHIBIT X

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-02913-WHO |
| This Document Relates to: ALL ACTIONS. | |

**THIRD AMENDED NOTICE OF PLAINTIFFS' FIRST ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF THE ALTRIA DEFENDANTS (REGARDING SELECT TOPICS THE TRANSACTION BETWEEN ALTRIA AND JLI) – NOTICE D**

ISSUING PARTY: Plaintiffs

PRODUCING PARTY: The Altria Defendants as defined on Schedule A

TO: Altria Group, Inc. and its Attorneys of Record

DATE: May 3, 2021 at 9:00 a.m. PST

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30, and *In Re: Juul Labs, Inc., Marketing, Sales Practices, And Products Liability Litigation*, Case No. 19-md-02913-WHO, Case Management Order Numbers 10 and 11 (CMO Nos. 10 and 11), Plaintiffs, by and through the undersigned counsel, intend to depose the Altria Defendants as defined in Schedule A via remote audio-video conference on the mutually agreed upon date indicated above between the parties via a remote platform meeting provided by Golkow Litigation Services. This deposition will continue across consecutive days until complete, and will be limited to approximately four (4) hours

daily to accommodate the witness' medical limitations.

The remote deposition will be coordinated by Golkow Litigation Services, with a business address of 1650 Market St, Suite 5150, Philadelphia, PA 19103. A link and any necessary credentials will be provided at least three days in advance of the deposition. The deposition will be conducted using teleconference and/or video conference technology, without a court reporter being physically present with the witness, consistent with CMO No. 11 and all existing governmental and court orders relating to COVID-19 and consistent with best practices recommended by the CDC to prevent the spread of COVID-19.

The Altria Defendants are directed to designate a person or persons to testify on its behalf on the matters listed in Schedule A attached to this Notice of Deposition and to produce the documents identified on Schedule B.

The deposition will be recorded stenographically and on videotape.

Dated: March 15, 2021

By: _/s/ Sarah R. London_
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: _/s/ Dena Sharp_
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: _/s/ Dean Kawamoto_
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: _/s/ Ellen Relkin_
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway

New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

## SCHEDULE A

## Definitions

1. **Altria Group** refers to Altria Group, Inc.

2. **Altria Defendants** collectively refers to Altria Group, Inc., Philip Morris USA Inc., Altria Enterprises LLC, Altria Client Services LLC and Altria Group Distribution Company.

3. **JLI** refers to JUUL Labs, Inc. (specifically including its predecessors Pax Labs, Inc., and Ploom, Inc.).

4. **Management Defendants** refers to James Monsees, Adam Bowen, Nicholas Pritzker, Hoyung Huh and Riaz Valani.

5. **Defendants** refers, respectively and collectively, to JLI, the Altria Defendants and the Management Defendants.

6. **ENDS** means electronic nicotine delivery system, including components and parts, but not related accessories.

7. **JUUL** refers as broadly as possible to any and every JUUL ENDS, including JUUL Pods and e-liquids, and it refers both to all finished products and design prototypes or models of JUUL.

8. **The Transaction** refers to the December 20, 2018, transaction involving on or more of the Altria Defendants' stock purchase agreement with JLI, pursuant to which Altria purchased for an aggregate price of $12.8 billion dollars shares of JLI stock resulting in a beneficial ownership interest in JLI.

9. **Due diligence** or **diligence activity** refers as broadly as possible to any investigation, appraisal, audit, assessment, review or exercise of care, whether formal or informal, related in whole or in part to The Transaction.

10. **Agreement** always includes any and all modifications, revisions or amendments.

11. The terms **or** and **and** should be construed disjunctively or conjunctively so as to give the broadest possible effect to a request.

12. The terms **you** and **your** refers to the **Altria Defendants**.

## Topics

Pursuant to Federal Rule of Civil Procedure 30(b)(6), you shall be prepared to testify regarding the following subjects:

1. To the extent such information is relevant or necessary to a full understanding of, or inquiry into, the other Topics in this Notice:[1]

   a. Your current and historical corporate/organizational structure, including departments, functions, divisions, subdivisions, and teams; and,

   b. the identities and responsibilities of Your personnel, senior managers, directors, or subcontractors.

2. Any assessment or analysis, whether formal or informal, performed by You (or a third party on your behalf) both prior to and after the Transaction related to:

   a. JUUL's appeal to youth/underage users;

   b. JLI's marketing, advertising and promotion of JUUL, including use of social and digital media. [2]

3. The details and substance of communications by and between You, JLI (including through any intermediaries or third parties) and/or the Management Defendants about a potential business/investment relationship by and between JLI and Altria, including but not limited to those communications leading to the Transaction and the details, terms, conditions of the Transaction and how they have changed and been implemented over time, including how and when the first such

---

[1] For the sake of clarity and to assist Altria in the preparation of its designated witness or witnesses:

Topic 1 is limited to inquiry by Plaintiffs' counsel about the identity and responsibilities of various departments and personnel that were involved at any time in some capacity relating to the other Topics in this Notice. In short, Topic 1 is included to safeguard against any objection that this Notice fails to alert Altria and its designated witnesses that Plaintiffs intend to ask routine "who, what, and when" questions that arise naturally in the course of deposing Your representatives about the Topics in this Notice. Plaintiffs include this Topic with the expectation that the routine sorts of questions encompassed by the Topic would arise organically in questioning witnesses on the remaining Topics in the Notice and those witnesses would likely have responsive information given their designation as Your corporate representative for this Notice. In other words, any witness who You designate to testify about the Topics in this Notice is expected to be familiar with—and likely already would be familiar with—Your historical/corporate organizational structure related to that witness's Topic.

[2] Topic 2(a-b) was previously Topic 5(b,d) in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

communications occurred. [3]

4. The details of the results of any diligence activity performed by You (or any of Your predecessors or related companies and agents, including any third party), related to the Transaction and when such diligence activity was performed and when results were received. [4]

5. The details of the Transaction or any Agreement related to Your right to appoint or to influence the appointment of members of JLI's Board of Directors. [5]

6. Your motivation and the reasons why You entered into the Transaction, including the identity of the persons who made the decision to enter into the Transaction. [6]

7. The reasons why You removed MarkTen line of ENDS from the market and discontinued your ENDS business, including the identity of the persons involved in making the decision. [7]

8. The details and substance of communications regarding JLI and JUUL (including demographic data regarding JUUL users) by and between You and anyone on Your behalf with Avail Vapor, prior to the Transaction. [8]

9. Information or data about JLI and JUUL including demographics of JUUL users, exchanged by and between You, or anyone on Your behalf and Avail Vapor, prior to the Transaction[9].

---

[3] Topic 3 was previously Topic 8A in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[4] Topic 4 was previously Topic 7B in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[5] Topic 6 was previously Topic 15 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[6] Topic 7 was previously Topic 16 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[7] Topic 8 was previously Topic 17 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[8] Topic 9 was previously Topic 19 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

[9] Topic 10 was previously Topic 20 in the Notice of Plaintiffs' First Oral and Videotaped 30(b)(6) Deposition of the Altria Defendants (Regarding the Transaction Between Altria and JLI), served on December 1, 2020.

**SCHEDULE B**

1. The witnesses' *curriculum vitae.*
2. Documents relied on by the witnesses in preparing to testify about the Topics set forth in Schedule A.
3. Documents evidencing, referring, or relating to each Topic in Schedule A.
4. At least 10 days in advance of the deposition, identify and produce to juulmdlplaintiffdiscovery@kellerrohrback.com all documents reviewed, considered, or relied upon in preparation for this deposition, as well as any summaries or demonstratives a witness will request to use at a deposition. If the documents have already been produced, please email a list of bates numbers to juulmdlplaintiffdiscovery@kellerrohrback.com.

Dated: March 15, 2021

By: */s/ Sarah R. London*
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: */s/ Dena Sharp*
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: */s/ Dean Kawamoto*
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: */s/ Ellen Relkin*
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway

New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2021, a true and correct copy of the foregoing *THIRD AMENDED NOTICE OF PLAINTIFFS' FIRST ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF THE ALTRIA DEFENDANTS (REGARDING SELECT TOPICS THE TRANSACTION BETWEEN ALTRIA AND JLI) – NOTICE D* was served via electronic mail upon the following:

Gregory P. Stone
Bethany Woodard Kristovich
Jeremy K Beecher
**MUNGER TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: 213-683-9100
Facsimile: 213-687-3702
gregory.stone@mto.com
Bethany.Kristovich@mto.com
jeremy.beecher@mto.com

Renee D. Smith
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: 312-862-2310
Facsimile: 312-862-2200
renee.smith@kirkland.com

Mike Brock
Peter A. Farrell
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-879-5000
mike.brock@kirkland.com
pfarrell@kirkland.com

David Horowitz
**KIRKLAND & ELLIS LLP**
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: 213-680-8400
david.horowitz@kirkland.com

David M. Bernick
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
dbernick@paulweiss.com

*Attorneys for Defendant JUUL Labs, Inc.*

John C. Massaro
Jason A. Ross
David E. Kouba
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
john.massaro@arnoldporter.com
Jason.ross@arnoldporter.com
David.Kouba@arnoldporter.com

Lauren S. Wulfe
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: 213-243-4000
Facsimile: 213-243-4199
lauren.wulfe@arnoldporter.com

*Attorneys for Defendants Altria Group, Inc. and Philip Morris USA Inc.*

James Thompson
James N. Kramer
**ORRICK HERRINGTON & SUTCLIFFE LLP**
The Orrick Building
405 Howard Street
San Francisco CA 94105
Telephone: 415.773.5923
Facsimile: 415.601.5488
jthompson@orrick.com
jkramer@orrick.com

*Attorneys for Defendant James Monsees*

Eugene Illovsky
Martha Boersch
Matthew Dirkes
**BOERSCH & ILLOVSKY LLP**
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Telephone: (415) 500-6643
eugene@boersch-illovsky.com
martha@boersch-illovsky.com
matt@boersch-illovsky.com

*Attorneys for Defendant Adam Bowen*

Michael J. Guzman
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
Sumner Square, 1615 M St., N.W., Suite 400

Washington, DC 20036
Telephone: (202) 326-7910
mguzman@kellogghansen.com

Karl Belgum
**NIXON PEABODY LLP**
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111
Telephone: (415) 984-8409
kbelgum@nixonpeabody.com

*Attorneys for Defendants Nicholas Pritzker, Riaz Valani, and Hoyoung Huh*

James E. Sell
Mitchell B. Malachowski
TYSON & MENDES, LLP
523 4th Street, Suite 100
San Rafael, CA 94901
Telephone: (628) 253-5070
Fax: (415) 785-3165
jsell@tysonmendes.com
mmalachowski@tysonmendes.com

*Attorneys for Defendants Mother Murphy's Labs, Inc., and Alternative Ingredients, Inc.*

Robert A. Scher
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016
Telephone: (212)338-3405
rscher@foley.com

*Attorney for Defendants Tobacco Technology, Inc., and Eliquitech, Inc.*

Michael L. O'Donnell
James E. Hooper
Marissa Ronk
**WHEELER TRIGG O'DONNELL LLP**
370 17th Street, Ste. 4500
Denver, CO 80202
Telephone: (303) 244-1850
Odonnell@wtotrial.com
hooper@wtotrial.com
Ronk@wtotrial.com

*Attorneys for Defendant McLane Company, Inc.*

Christopher J. Esbrook
David F. Pustilnik
Michael S. Kozlowski
**ESBROOK LAW LLC**

77 W. Wacker, Suite 4500
Chicago, IL 60601
Telephone: (312) 319-7681
christopher.esbrook@esbrooklaw.com
david.pustilnik@esbrooklaw.com
michael.kozlowski@esbrooklaw.com

*Attorneys for Defendants Eby-Brown Company, LLC, Circle K Stores, 7-Eleven, Inc., Speedway, LLC, and Walgreens Boots Alliance, Inc.*

David R. Singh
Bambo Obaro
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065
Telephone: (650) 802-3083
david.singh@weil.com
bambo.obaro@weil.com

*Attorneys for Defendants Core-Mark Holding Company, Inc.*

Charles C. Correll, Jr.
Matthew J. Blaschke
Alessandra M. Givens
**KING & SPALDING LLP**
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
ccorrell@kslaw.com
mblaschke@kslaw.com
agivens@kslaw.com

*Attorneys for Defendant Chevron Corporation*

Donald F. Zimmer, Jr.
Quyen L. Ta
Jennifer T. Stewart
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
fzimmer@kslaw.com
qta@kslaw.com
jstewart@kslaw.com

*Attorneys for Defendant Walmart*

By: */s/ Sarah R. London*
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: */s/ Dena Sharp*
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: */s/ Dean Kawamoto*
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: */s/ Ellen Relkin*
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | CASE NO. 19-md-02913-WHO<br><br>**CASE MANAGEMENT ORDER NO. 10: DEPOSITION PROTOCOL ORDER** |
| This Document Relates to:<br><br>*All matters* | HONORABLE JUDGE WILLIAM H. ORRICK |

This Order, agreed to after extensive negotiations and with the agreement of counsel, governs the conduct of depositions of fact witnesses on issues of general applicability to the litigation (as opposed to solely case-specific witnesses). This Order applies to all such depositions in the MDL and JCCP Proceedings ("Lead Actions") and those actions involving the same or similar subject matter as the MDL pending in other state and federal courts that adopt the Joint Coordination Order[1] ("Coordinated Actions"). The purpose of this Order is to gain the highest degree of efficiencies in the taking of fact witness depositions. At no time has it been, nor will it be, the intention of the Court or the parties that judges in any of the participating jurisdictions delegate their duties to any other judicial officer.

**1. General Provisions**

Counsel and all parties (both represented and *pro se*) shall comply with this Order, and to the extent consistent with this Order, with the applicable Rules of Civil Procedure and the Local Rules of the presiding court. Unless specifically modified herein, nothing in this Order shall be construed to abrogate the Rules of Civil Procedure or the Local Rules.

[1] Case Management Order No. 9: Joint Coordination Order ("Joint Coordination Order").

Conduct of all participants in depositions shall be in accordance with the Northern District of California Professional Guidelines and the customs and practices expected of lawyers and witnesses appearing before the presiding court in their home jurisdictions, including as if each was appearing personally before the Courts at the time of the depositions. Counsel shall not at any time conduct themselves in a manner not becoming of an officer of the court and not in full compliance with the civil rules of practice and all other orders of the Courts. Neither counsel nor witnesses shall, at any time, engage in inappropriate conduct that impedes, delays, or frustrates the examination of the witness. All counsel and deponents must be treated with civility and respect.

**2. Scope**

This Order shall apply to: (i) all fact depositions of witnesses who are currently or were formerly employees, agents, or contractors of Defendants; and (ii) all third-party witnesses, other than third-party witnesses who are relevant only to the claims of a particular plaintiff, i.e., case-specific witnesses (together, "Common Witnesses"). For the avoidance of doubt, this Order shall not apply to: (i) fact depositions of any Plaintiff, their representatives, employees, family members, personal acquaintances, healthcare providers, and all other case-specific fact witnesses; and (ii) expert depositions.

**3. Coordination of Depositions**

The protocols in this Order supplement the Joint Coordination Order. If the deposition protocols in this Order are deemed to conflict with any provisions in the Joint Coordination Order, the protocols in this Order shall control.

The parties, the Courts in the Lead Actions, and the Courts in the Coordinated Actions wish to minimize the expense and inconvenience of this litigation by minimizing the depositions of any Common Witness. Accordingly, as a general rule, a witness may be deposed once within the time limits set forth in this Order. Such deposition shall be noticed in the Lead Actions and shall be deemed to be cross-noticed in the Coordinated Actions as long as the Coordinated Action: (1) has adopted the Coordination Order and (2) receives notice of the deposition as described in Section 5. Depositions shall be noticed according to the Federal Rules of Civil Procedure. A witness may be deposed once in total across all Lead and Coordinated Actions and, following the deposition, shall not be re-deposed in a Lead or Coordinated

Action unless otherwise agreed by the parties or authorized by an order of Court upon a showing of good cause by the party seeking the additional deposition.

Plaintiffs' Counsel in the Lead Actions shall take reasonable efforts and engage in good faith efforts to coordinate with each other before serving deposition notices and with respect to which depositions to notice.

Depositions, in addition to those being taken in the Lead Actions, may also be taken in Coordinated Actions, but only upon leave of the Court in which the Coordinated Action is pending, obtained on noticed motion for good cause shown, including why the discovery sought could not have been obtained in coordinated discovery in the Lead Actions. Coordinated Action Plaintiffs' Liaison Counsel[2] and JLI Counsel in a Coordinated Action in which any such motion is filed shall promptly notify the MDL Court and Plaintiffs' Lead Counsel in the Lead Actions of such filing and provide a copy of the motion. If a deposition in a Coordinated Action has been cross-noticed by the Lead Actions, then parties in the Coordinated Action may not take a subsequent deposition of that witness except for good cause shown.

If the Lead Action Plaintiffs, or Defendants and their respective Counsel in any Coordinated Action have received at least 21 days' notice of a deposition in either of the Lead Actions or any Coordinated Action (or if (a) the parties agree in writing that such notice is not necessary or (b) upon order of the MDL Court, a deposition is permitted to be taken with fewer than 21 days' notice), such deposition may be used in the Lead Actions and each Coordinated Action for all purposes prescribed in Fed. R. Civ. P. 32, California Code of Civil Procedure 2025.620, et seq. or corresponding rule of civil procedure in a Coordination Action, or as otherwise permitted by the Federal, California, or Coordinated Action's state's Rules of Evidence, by or against any party including parties later added and parties in cases subsequently filed in, removed to, or transferred to this Court as part of this litigation, without regard to whether any Lead Actions' Plaintiffs' Counsel or any Defendants' Counsel or any counsel representing plaintiffs or defendants in any Coordinated Action attended or examined the witness at the noticed deposition.

Fed. R. Civ. P. 6(a) shall govern the computation of time periods set forth in this Order.

[2] *See* Joint Coordination Order.

**4. Length and Scope**

The following rules shall apply to depositions noticed pursuant to this Protocol (absent an agreement of the parties or further order of the Court on a showing of good cause):

(a) There may be two days of questioning by the Lead Actions—the first day will be limited to seven hours on the record and the second day will be limited to five hours on the record, exclusive of redirect examination as provided below if necessary.

(b) Any Counsel from a Coordinated Action who is designated as an examiner shall be permitted a reasonable amount of time to question the deponent (up to two hours combined for all Coordinated Actions that shall occur immediately following the examination by the Lead Actions), and shall be permitted to make objections during examination by other counsel, subject to the below provisions regarding objections and in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the Orders of the MDL Court, and in accordance with the terms and procedures set forth in subparts (i) through (iii) below providing the following:

(i) the Court in which the Coordinated Action is pending has adopted the Discovery Orders or has entered a Protective Order, ESI Order, Deposition Protocol Order or other discovery order substantially similar to the Discovery Orders;

(ii) Plaintiffs' Counsel from the Coordinated Action shall make best efforts to ask questions that are non-duplicative of questions already asked at the deposition, however, nothing shall prevent Plaintiffs' Counsel from a Coordinated Action to probe further into issues already covered during the questioning of Noticing Party; and

(iii) participation of Plaintiffs' Counsel from the Coordinated Actions shall be arranged so as not to delay discovery or other proceedings as scheduled in the Lead Actions.

(c) After questioning by the Lead and Coordinated Actions, the party defending the deposition ("Defending Party") may elect to ask follow up questions of the deponent for up to two hours. If Defending Party elects to question the deponent, then the Plaintiffs in the Lead and Coordinated Actions shall be entitled to an equal amount of time to perform redirect examination (up to two hours total). Absent

agreement of the parties or order by a Lead Action Court for good cause shown, no further examination will be permitted by any party after redirect examination.

(d) Depositions shall begin at 9:00 a.m. absent agreement of the parties.

(e) Absent agreement of the parties, the days of questioning will take place on consecutive business days to the extent possible.

(f) No speaking objections or other actions that unnecessarily delay depositions will be permitted, and will result in additional time being added to the deposition for the questioning party.

Counsel in the Lead Actions shall confer before the deposition concerning allocation of time to question the witness and collaborate to avoid needless duplication (i.e., asking the same questions). In the event that the deposition involves a translator requested by the witness, the maximum length of the deposition shall be increased as is reasonably necessary by up to 50% and the parties shall negotiate a reasonable allocation of the translator costs. Absent agreement otherwise, the parties should set aside two days for each Common Witness to account for sufficient time on the record in accordance with this Order. The parties are encouraged to make full and efficient use of each deposition day so as not to waste valuable time and incur unnecessary expenses. Not every witness will require an examination that lasts as long as the presumptive time limits set forth above, and no party will be prevented from using a deposition merely because it did not continue into a subsequent day. To the extent the parties can anticipate a witness will take less time, they will attempt to agree to lesser time limits and, for planning purposes, will provide other deposition attendees with advance notice of any agreement to lessen the examination time. This procedure may be particularly useful in the event that more than one deposition is scheduled on a given day.

**5. Scheduling, Logistics, and Service of Notices**

Cooperation in Scheduling. Lead Counsel for the MDL Plaintiffs, or their designee, Lead Counsel for the JCCP Plaintiffs, or their designee, Counsel for the Defendants, and Counsel for the deponent, if applicable, shall cooperate on selecting a mutually convenient date, time, and location for each deposition. Unless otherwise agreed by the parties or ordered by either the MDL or JCCP Court, depositions shall not be taken on Saturdays, Sundays, or federal or state court holidays.

Plaintiffs' Counsel in the Lead Actions must make best efforts to coordinate their deposition dates with each other, including providing three days written notice of proposed deposition dates to persons designated by the other Lead Action to schedule depositions before issuing the notice. If the non-noticing Lead Action does not object to the date within three days, the deposition may be noticed for that date.

Location. In the absence of agreement, a deposition may take place within (a) the county in which the deponent resides or (b) the county in which the deponent is employed.

Content of Notice. Each deposition notice subject to this Order shall comply with Fed. R. Civ. P. 30(b) or California Code of Civil § 2025.220, absent agreement of the parties or Court order. Depositions subject to this Order noticed in the Coordinated Actions shall be noticed and conducted pursuant to rules of the relevant jurisdiction and with this Order. The deposition notice shall include the name, address, and telephone number of an attorney point of contact designated by the party noticing the deposition, as well as the date, time, and location of the deposition. Any notice for the deposition of a corporate or organizational representative under Fed. R. Civ. P. 30(b)(6) or California Code of Civil Procedure § 2025.230 shall describe with reasonable particularity the matters for examination. This Order in its entirety shall be attached to any subpoena or deposition notice that pertains to a third-party witness covered by its terms. The notice shall clearly state whether the deposition will be videotaped in addition to being recorded by stenographic means.

Adequacy of Notice. After counsel, through consultation, have arrived on a date and location for a deposition, the Noticing Party shall serve an amended Notice reflecting the agreed upon date and location. Witnesses subpoenaed to produce documents shall be served with the document subpoena at least thirty calendar days before a scheduled deposition.

Costs. The Noticing Party shall be responsible for retaining and paying for a court reporter and videographer.

Service Manner and Timing. Notices for Depositions in the Lead Actions and Coordinated Actions shall be served by e-mail or other electronic means on Lead Actions' Co-Lead Counsel, State/Federal Liaison Counsel, and Counsel for the Defendants. Each Plaintiffs' Liaison Counsel in a Coordinated Action, or his or her designee, shall be responsible for distributing such documents to other counsel for

plaintiffs in their Coordinated Action. Notices served in accordance with this paragraph shall be deemed cross-noticed in the Coordinated Actions as long as the Coordinated Action: (1) has adopted the Coordination Order and (2) receives notice of the deposition as described above.

To allow for planning, preparation, and coordination between the Lead Actions and the Coordinated Actions, depositions must be noticed at least 21 days before they are scheduled to occur. Expedited depositions may be scheduled by agreement of the parties in writing or as ordered by the MDL or JCCP Courts, or a Court in a Coordinated Action, and in which event the time limitations for notice shall be lessened, as well as the time limitation for production of any documents sought by third-party subpoena in conjunction with said deposition.

Challenges to the Notice. Any party or witness receiving notice of a deposition that contends is not permitted by the terms of this Order shall have five business days from receipt of the notice within which to serve the noticing party with a written objection to the deposition.

Disputes. In accordance with this Order, all disputes regarding any matters arising under this Order, whether pertaining to a deposition in the Lead Actions or any Common Witness deposition in a Coordinated Action, shall be resolved pursuant to Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). In the event of such an objection, the deposition shall not go forward unless (a) the parties and the deponent reach an agreement in writing to resolve the objection or (b) the noticing party applies for and receives an order pursuant to the Section 7 of the Stipulated Joint Coordination Order granting leave to take the deposition. Before filing a discovery motion pursuant to Section 7 of the Stipulated Joint Coordination Order, the parties must first attempt to resolve the dispute in good faith.

**6. Means of Recording Depositions**

A certified court reporter shall stenographically record all deposition proceedings and testimony and provide a "real time" transcription feed to devices such as video monitors and computers at the deposition venue. A party seeking to transmit "real time" transcription feeds to computers not located at the deposition venue may do so at their own expense by making a request to the court reporting service five business days before the deposition; that party will ensure that any remote viewing is in compliance

with all applicable Protective Orders. The court reporter shall administer the oath or affirmation to the deponent. The written transcript prepared by the court reporter shall constitute the official record of the deposition for purposes of Fed. R. Civ. P. 30's requirements concerning filing, retention, certification, and the like. The Lead Actions can choose their own reporting service for depositions that they notice. All videotaped depositions shall be accompanied by a simultaneous audiotape recording and be stenographically recorded by a court reporter as provided in the previous paragraph. As noted above, the stenographically prepared transcript shall constitute the official record of the deposition.

Where the party wishing to videotape the proceeding did not notice the deposition, a request to videotape the deposition shall be submitted in writing to the Lead Actions Counsel, Counsel for the Defendants, and Plaintiffs' State/Federal Liaison Counsel, no later than seven days before the date on which the deposition is scheduled to occur. The party wishing to videotape the deposition, if not originally noticed as such, shall be responsible for arranging and paying for the videotaping and providing a copy to Lead Actions Counsel.

Services or products offered or provided by the operator of the videotape equipment must be offered to counsel for all parties, regardless of which party is financing the videotaping of the deposition. Further, any video operator is subject to the orders of this Court whether the deposition was noticed or cross-noticed in the MDL or JCCP Proceedings or in a Coordinated Action, including but not limited to the Confidentiality Order and Joint Coordination Order. The video operator shall be given a copy of all applicable orders at least five days before the deposition.

The operator of the videotape recording equipment is subject to the provisions of Fed. R. Civ. P. 28(c). At the start of the deposition, the operator shall swear or affirm to record the proceedings fairly and accurately.

Each witness, attorney, and other person attending the deposition (in person or telephonically) shall be identified on the record at the commencement of the deposition, however, a consulting expert who has signed the applicable protective order and is attending the deposition telephonically need not be identified on the record. The videotape recording shall include the court reporter administering the oath

or affirmation to the witness. Thereafter, the deponent and, if necessary, exhibits and any demonstratives will be videotaped.

The deposition will be conducted in a manner to replicate, to the extent feasible, the presentation of evidence at trial. Unless physically incapacitated, the deponent shall be seated at a table except when reviewing or presenting demonstrative materials for which a change in position is needed. To the extent practicable, the deposition will be conducted with the witness seated in front of a solid background with only such lighting as is required for accurate video recording. Lighting, camera angle, lens setting, and field of view will be changed only as might be reasonably necessary to record accurately the natural body movements of the deponent or to portray exhibits and materials used during the deposition. Sound levels will be altered only as necessary to record satisfactorily the voices of counsel and the deponent. The witness shall appear in ordinary business attire (as opposed to, for instance, a lab coat) and without objects such as a bible, medical equipment, or props.

Video recording will be suspended during all "off the record" discussions and the video operator shall note such suspensions.

The videotape operator shall use recording equipment with an appropriate timer and, unless otherwise agreed to by the parties, shall prepare and provide counsel with a log, cross-referenced with timestamps, that identifies the portion of the recording at which examination by different counsel begins and ends, when exhibits are used, and when there is any interruption of continuous tape recording, whether for recess, "off the record" discussions by counsel, mechanical failure, or other interruption.

The video operator shall maintain custody of the original video medium in its original condition, without editing in any fashion. No part of the video or audio record shall be released or made available to the public unless authorized by an order of the MDL or JCCP Court.

The parties shall meet and confer to determine whether an agreement can be reached to limit the number of independent court reporting and videography firms involved in recording the deposition proceedings covered by this Order and to develop a cost-sharing agreement between the various parties or party groups for the associated fees, including the cost of the facilities where depositions are conducted.

**7. Remote Participation via Telephone, Internet, or Video Streaming**

If requested at least ten days before a deposition, telephone facilities shall be provided so that parties wishing to participate in the deposition by telephone may do so at their own expense. By indicating in a deposition notice that it wishes to examine a witness over the telephone, a party shall be deemed to have moved for such an order under Fed. R. Civ. P. 30(b)(4). Unless an objection is filed and served within five days after such notice is received, the Court shall be deemed to have granted the motion. Other parties may examine the deponent telephonically or in person. However, all persons present in the location with the deponent shall be identified on the deposition record and shall not by word, sign, or other means coach or suggest answers to the deponent and shall act in accordance with applicable federal rules of civil procedure and professional conduct governing interaction with the deponent. In addition, the court reporter stenographically recording the deposition shall be located in the same room as the deponent.

Technical difficulties with telephonic participation shall not constitute grounds for postponing the deposition or for rendering inadmissible a deposition that otherwise would be admissible in evidence. If technical problems with the telephonic facilities create disruptions in the deposition, counsel attending a deposition in person may discontinue telephonic participation for such periods of time as necessary.

A party may request, at their own expense, to make the live deposition proceedings available to locations that are remote from the deposition venue through the use of video streaming over secure and encrypted Internet connections and to allow for remote real-time participation by interested counsel, such as through the use of a private group chat system that enables remote counsel to collaborate with their on on-site colleagues. A party seeking these services shall make a request to the court reporting service five business days before the deposition. The viewing of or participation in any deposition via the Internet is expressly subject to the [MDL Protective Order, Doc. 308 and JCCP CMO No. 3], or a substantially similar order in a Coordinated Action. The party participating remotely is responsible for providing his or her own Internet connection and shall not re-record the deposition by video or audio means.

**8. Appearances and Examination**

Unless otherwise agreed to by the parties or ordered under Fed. R. Civ. P. 26(c) and subject to the terms of the [Protective Order, Doc. #308 and JCCP CMO No. 3], depositions may be attended only by

the parties, the deponent, the deponent's attorney, attorneys of record in the MDL and JCCP Proceedings, attorneys of record in the Coordinated Actions, in-house counsel and corporate representatives, court reporters, videographers, and any person who is assisting in the litigation and whose presence is reasonably required by the aforementioned counsel of record who is bound by any applicable Protective Order (such as a consulting expert).

Upon motion, and for good cause shown, the MDL Court may permit attendance by a person who does not fall within any of the categories above.

For there to be adequate deposition space, counsel intending to attend a deposition noticed in the Lead Actions, or in a Coordinated Action, should advise all parties, including counsel for the Noticing Party, of their intention to attend in person at least two business days before the deposition.

Unnecessary attendance by counsel is discouraged and may not be compensated in any fee application to a court. Counsel who have only a marginal or slight interest in a noticed deposition or who expect their interests to be adequately protected by other counsel should not attend the deposition.

Lead Counsel for the Lead Actions shall designate up to two attorneys to serve as the examiners of each deponent on behalf of the Lead Actions. Given deposition time limits and in the interest of efficiency, the Court strongly encourages Plaintiffs' Counsel from the Coordinated Actions to designate one attorney to serve as the examiner of each deponent on behalf of all Plaintiffs in the Coordinated Actions. If Plaintiffs in the Coordinated Actions are unable to agree on that examiner for a given deponent, Lead Counsel for the MDL Plaintiffs and Lead Counsel for JCCP Plaintiffs shall assist in attempting to reach such an agreement. For those depositions where an agreement is not reached, Plaintiffs' Counsel shall diligently work together to ensure that questioning on behalf of Plaintiffs in the Lead Actions and in the Coordinated Actions proceeds in the most efficient manner possible.

One counsel representing each Defendant shall be permitted to examine deponents. Each Lead Actions Defendant should designate one attorney to conduct the principal examination of each deponent. Examination by other counsel for the Lead Actions Defendants shall make best efforts to ask questions that are non-duplicative of questions already asked at the deposition. Notwithstanding the number of

examiners, the time limits set forth above shall still apply. Counsel should cooperate so examinations by multiple attorneys do not result in a deposition exceeding the allotted time.

The parties shall meet and confer to develop supplemental protocols for (a) allotting examination time to various parties or party groups and (b) determining order of examination of a witness.

Counsel representing parties in the Lead Actions shall be entitled to attend the deposition of any witness whose deposition is taken in a Coordinated Action. The Plaintiffs in all Coordinated Actions shall designate one counsel to examine the witness. One counsel representing the MDL Plaintiffs, one counsel representing the JCCP Plaintiffs, and one counsel representing both the MDL and JCCP Defendants shall each be permitted to ask questions and make objections during examination by other counsel.

**9. Objections**

Unless otherwise specified, an objection by a single defendant shall be deemed an objection by all defendants; similarly, an objection by a single plaintiff shall be deemed an objection by all plaintiffs unless otherwise specified. However, unless otherwise specified, (a) an instruction not to answer by one defendant shall not be deemed an instruction not to answer by all defendants and (b) an instruction not to answer by one plaintiff shall not be deemed an instruction not to answer by all plaintiffs.

The only objections allowed during the deposition are those for the following bases: form of the question, privilege (the nature and grounds for which must be stated succinctly on the record), or a limitation imposed by court order. All objections, except as to form, privilege, or a limitation imposed by a court order, shall be preserved for ruling by the MDL Court, JCCP Court, or the Court in the Coordinated Action at trial or other use of the deposition.

Counsel shall comply with Fed. R. Civ. P. 30(c)(2) and the Northern District of California Guidelines on Professional Conduct concerning objections at a deposition. Counsel shall not engage in colloquy in objecting to a question or responding to an objection. Any objections to an examiner's questions shall be made in a concise manner, and counsel shall not suggest an answer to the witness. The phrases "objection as to form," or similar language are sufficient and shall preserve all objections as to form and foundation until a party seeks to use a deposition. However, to determine whether there is a need to cure a defect in a question, counsel conducting the examination may ask the attorney lodging the

form or foundation objection to identify the specific defect. The response shall be stated succinctly and shall be limited to the legal grounds for the form objection (e.g., "lacks foundation" rather than "the witness didn't work in that department and couldn't possibly know the answer"). Counsel shall refrain from all comments that could be perceived as instructive to a witness, such as "you can answer if you understand the question" or "you can answer if you know."

**10. Additional Provisions Relating to Corporate Witnesses**

The party producing a corporate witness pursuant to Rule 30(b)(6) and/or California Code of Civil Procedure § 2025.230 shall disclose the identity of that witness no later than 10 days before the deposition.

**11. Use of Exhibits and Documents During the Deposition**

Provided that plaintiffs notify the defendants at least 60 days in advance of the intended deposition of any present or former company employee of a Defendant whose custodial file has not been produced in its entirety, that Defendant will conduct a good-faith, reasonable search using search terms or other reasonable methods, and based on that search produce non-privileged, custodial file documents responsive to outstanding discovery requests at least 30 days in advance of the noticed deposition date. The Defendant will be obligated to produce only previously non-produced portions of the custodial file responsive to outstanding discovery requests if the Defendant's prior production included metadata identifying the deponent as a custodian of the previously produced custodial file documents. The scope of discovery related to custodial files will be determined at least 45 days before the deposition, subject to prior orders of the Court; applicable rules of civil procedure; agreements of the parties regarding the sequence, timing, and methods of discovery, including document production; and, if necessary, court order resolving any dispute regarding the scope of production. Unless the Parties agree or a court orders otherswise, the Defendant shall have at least 30 days to produced non-privileged responseive documents following determination of the scope of discovery, but no later than 30 days before the deposition is noticed. The custodial file of that employee shall be produced 30 days in advance of the scheduled deposition to the address specified by plaintiffs' counsel. If 100 or fewer pages are produced between 14 and 29 days prior to the scheduled deposition, the deposition shall proceed as scheduled. Any documents produced fewer than 14 days prior to the scheduled deposition must be delivered to the primary examiner,

if one has been designated by plaintiffs' counsel. If a primary examiner has not been designated, the documents shall be produced to the same address to which the previous documents were produced. The parties shall meet and confer regarding the impact, if any, of this production on the scheduled deposition. If the parties cannot agree, the matter shall be referred to the Courts for resolution pursuant to the protocol for Discovery Dispute Resolution set forth in Section 7 of the Joint Coordination Order.

Third-party witnesses subpoenaed to produce documents at a deposition shall be served with the document subpoena at least 30 days before a scheduled deposition, absent written agreement by the parties, time constraints due to orders by the Lead Actions' Court, or a shorter period authorized by the Lead Actions' Court. The requested documents shall be produced at least 14 days before the date noticed for the deposition. Any documents produced fewer than 14 days prior to the scheduled deposition must be delivered to the primary examiner, if one has been designated by plaintiffs' counsel. If a primary examiner has not been designated, the documents shall be produced to the same address to which the previous documents were produced. The parties shall meet and confer regarding the impact, if any, of this production on the scheduled deposition. If the parties cannot agree, the matter shall be referred to the Courts for resolution pursuant to the protocol for Discovery Dispute Resolution set forth in Section 7 of the Joint Coordination Order.

During the deposition, copies of documents about which counsel plan to examine the deponent shall be provided to counsel for the deponent and counsel for the other party participants. As a general rule, hard copies of the documents should be made available to the deponent, the deponent's attorney, and the principal examiners of the deponent. The documents may be provided to other attendees on electronic media such as USB drives or through a secure file sharing service. To the extent possible, all exhibits should have printed Bates or other document control numbers affixed before distribution, which shall remain constant throughout the litigation.

Counsel shall use best efforts to mark exhibits sequentially during each deposition and across depositions, consistent with Northern District of California Local Rule 30-2. All documents marked as exhibits will be attached to the original transcript and will be retained with the original transcript. The

court reporter for each deposition will include in each deposition transcript a list of the exhibits referenced in the deposition.

Objections to the relevance or admissibility of documents used as deposition exhibits are not waived, and are reserved for later ruling by the MDL or JCCP Court or the court in a Coordinated Action.

**12. Examination Concerning Confidential Information**

If a deponent is questioned about any document or exhibit stamped Confidential or Highly Confidential or the Information contained therein, persons to whom disclosure is not authorized under the Protective Order of this Court will be excluded from the deposition for that portion of the examination. Any portion of a deposition transcript containing Confidential Information or Highly Confidential Information shall be sealed so as not to waive confidentiality.

**13. Disputes During or Relating to Depositions**

All disputes regarding any matters arising under this Order, whether pertaining to a deposition in the Lead Actions or any Common Witness deposition in a Coordinated Action, shall be resolved pursuant to Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). Nothing in this Order shall deny counsel the right to suspend a deposition pursuant to Fed. R. Civ. P. 30(d)(3) and seek relief as set forth in Section 7 of the Stipulated Joint Coordination Order.

**14. Transcript and Time to Review Transcript**

Unless waived by the deponent, the deposition transcript shall be submitted to the deponent for correction and signature, and shall be corrected and signed within 45 days after the official transcript of the Court Report is made available to counsel for the party defending the deposition. This time period shall not be extended, absent good cause shown. Corrections to a deposition shall be listed on an errata sheet signed by the deponent and the court reporter shall serve copies of the errata sheet on all parties purchasing the transcript. Should the deponent fail to submit corrections within 45 days, the transcript will be presumed accurate, and all parties shall have the right to use the copy sent to the deponent as if it were final and signed with no corrections needed.

Counsel representing any party in the MDL or JCCP Proceeding or any Coordinated Action may obtain directly from the court reporter, at the requesting counsel's own expense, a transcript of any

deposition taken in the Lead Actions or in any other Coordinated Action, unless stated otherwise in this Order. The transcript of any deposition taken in the Lead Actions or a Coordinated Action shall not be used or disseminated except in accordance with the terms of this Order and the MDL Court's discovery orders.

**15. Use and Admissibility of Depositions**

Under the conditions prescribed in FED. R. CIV. P. 32(a) (1)- (4) CAL. C.C.P. § 2025.620; or as otherwise permitted by the Federal and California Rules of Evidence or the rules in the presiding jurisdiction, depositions taken in accordance with this order may be used against any party (including parties later added and parties in cases subsequently filed in any state court covered by this order, cases filed in, removed to or transferred to the federal court which is covered by this order; all of which are part of this litigation) who:

(a) was present or represented at the deposition; or

(b) had reasonable notice thereof; or

(c) within 30 days after the deposition is taken or within 45 days after becoming a party in one of the Lead or Coordinated Actions fails to show just cause why such deposition should not be used against such party.

This order does not address trial preservation depositions. Nor does it address the timing of any such trial preservation deposition. Such determinations shall be made in each coordinated proceeding.

**IT IS SO ORDERED.**

**DATE: May 20, 2020**

Hon. William H. Orrick
United States District Court Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

This Document Relates to:
ALL ACTIONS

Case No. 19-md-02913-WHO

**CASE MANAGEMENT ORDER NO. 11: RE REMOTE DEPOSITIONS**

The COVID-19 global pandemic has affected virtually every aspect of American society, including civil litigation in this Court and across the federal system. Governmental authorities have responded to this public health emergency by imposing travel restrictions, “stay at home” directives, and other social distancing measures designed to slow the communal spread of the disease. While the Parties may prefer to conduct in-person depositions in this litigation, social distancing restrictions and personal and public health concerns may sometimes preclude this option. Pursuant to Fed. R. Civ. P. 30(b)(4), this Court issues the following protocol to govern depositions where all, or most of the participants, including the court reporter and videographer, are attending remotely (“Remote Deposition”).

1. Subject to all of the conditions below, depositions for cases filed in *In Re Juul Labs, Inc., Marketing, Sales Practices, And Products Liability Litigation*, Case No. 2:19-md-02913, may be noticed to take place remotely via video or internet video conference technology.

2. The protocols in this Order supplement Case Management Order No. 10 Deposition Protocol (Dkt. 573) and Case Management Order No. 9 Joint Coordination Order

(Dkt. 572). If the deposition protocols in this Order are deemed to conflict with any provisions in the Joint Coordination Order or Deposition Protocol, the protocols in this Order shall control.

3. The protocols in this Order shall apply to depositions of fact witnesses, including those taken pursuant to the Deposition Protocol, and supplement that Order. For the avoidance of doubt, this Order shall not apply to expert depositions. Protocols for remote depositions not covered by this Order will be set forth in future order(s).

4. Any Remote Deposition taken pursuant to this Court's Orders must comply with the requirements in Fed. R. Civ. P. 30(b)(5). This includes the requirements that, (1) "[u]nless the parties stipulate otherwise, a deposition must be conducted before an officer appointed or designated under Rule 28," and (2) that officer must administer the oath or affirmation to the deponent. A Remote Deposition taken pursuant to this Case Management Order will be deemed to have been taken before an appropriate officer despite the court reporter not being in the same physical location as the witness—as long as the court reporter attends the deposition by the same remote means as the other participants and is able to hear and communicate with other attendees. To the extent permitted by the law of the state in which the witness is located, the witness may be sworn in remotely with the same effect as an oath administered in person.

5. The deposition notice for any Remote Deposition pursuant to Fed. R. Civ. P. 30 must list the location(s) (city and state) from where the witness, the court reporter, and the videographer will attend.

6. All deposition notices must identify the company that will host and record the Remote Deposition (the "Remote Deposition Vendor") and contain a general description of how those attending may access the remote connection being utilized (e.g., GoToMeeting, Zoom, WebEx). The party noticing the deposition must provide the witness and all other attendees with detailed instructions regarding how to participate in the Remote Deposition at least three business days before the deposition—and will use best efforts to provide the detailed instructions at least five business days before the deposition. The noticing party shall bear the costs of the Remote Deposition Vendor, except that if another party objects to the technology proposed by the

noticing party, and the noticing party is amenable to use another technology proposed by the objecting party, the objecting party shall bear the costs of the technology proposed.

7. To host a Remote Deposition, a Remote Deposition Vendor must have implemented adequate security measures to ensure the confidentiality of the Remote Deposition (e.g., video and audio feeds, exhibits). These security measures include using tools such as a "virtual waiting room" that allows the court reporter to admit only individuals authorized to attend the deposition.

8. At least 24 hours before the Remote Deposition is scheduled to start, noticing counsel, defending counsel, the witness, and the Remote Deposition Vendor must conduct a test of the system, equipment, and internet connection that will be used to conduct the Remote Deposition (the "Remote Deposition Technology"). If a witness noticed for a Videoconference Deposition does not have a webcam-equipped tablet, desktop or laptop computer that can be used during the deposition, counsel defending the deposition must provide the deponent with an agreed-upon tablet, desktop, or laptop computer containing the audio, webcam, and Wi-Fi connectivity needed to participate in the deposition. If a witness noticed for a Videoconference Deposition is not being defended by counsel for any Party to this action, the Parties will confer regarding a reasonable method for providing the deponent with an agreed-upon tablet, desktop, or laptop computer containing the audio, webcam, and Wi-Fi connectivity needed to participate in the deposition.

9. At the time of the deposition, the witness must advise the court reporter of his or her physical location. The witness should endeavor to participate in the deposition from a quiet, well-lit, indoor location, while seated in front of a neutral background, and facing the camera being used to record the witness. Only the witness's counsel and in-house counsel is/are permitted to be in the same location as the witness during remote testimony, if the witness consents and such attendance is consistent with social distancing restrictions. Unless otherwise stipulated by the noticing party and counsel for the witness, the deponent participating in a Remote Deposition must participate through video conference (or other remote means capable of producing audio-video transmission), as opposed to telephone or other audio-only means, so that

the officer and noticing party may properly identify and observe the witness throughout the deposition.

10. If counsel for the witness attends the deposition in person, that counsel shall also log into the Remote Deposition, so that all participants can see and hear the counsel for the witness at all times that the deposition is being conducted on the record. Both counsel and the witness shall also comply with any government law, regulation or guidance regarding public health and safety during the COVID-19 pandemic.

11. To avoid any potential disruptions of a Remote Deposition, those attending must enable "do not disturb" settings for applications not in use, including but not limited to, Skype, instant messaging, and/or e-mail notifications. While on the record, the witness must put away and not look at devices other than the device(s) being used for the Remote Deposition. While on the record, there shall be no other programs displaying images on the witness's screen other than the agreed-upon Remote Deposition platform and any exhibits that have been marked for the deposition. The Court recognizes that the microphones for certain attendees (such as the witness, the court reporter, the attorney taking the deposition, and the attorney defending the deposition) must remain on when the deposition is on the record. Other attendees should mute microphones when not speaking. The participating attorneys may be visible to all other participants during the deposition.

12. Each witness, attorney, or other person attending the deposition, either remotely or in-person, shall be identified on the record by name and physical location at the beginning of the deposition (except for consulting experts). Any individual participating remotely should not do so in a public space. Participants should ensure that they are acting in compliance with the governing protective order. After the deponent has been sworn, the deponent must confirm that he or she has either powered down or, at a minimum, temporarily disabled the listening function on any Google Home, Amazon Echo, or any other known "listening devices" placed within listening distance of the deponent.

13. A videographer employed by the Remote Deposition Vendor will record the witness's deposition testimony, by the best technological means available, including remote video

capture/recording. The video recording of the deposition may only be suspended during the deposition upon stipulation by counsel conducting and defending the deposition. With the exception of the videographer and the court reporter, the deposition may not otherwise be recorded electronically without the consent of the Parties. The videographer must only record (1) the audio and video of the witness's testimony; (2) the video of any documents being displayed or annotated for the witness during the deposition; (3) the audio of the attorney actively questioning the witness; and (4) audio of the defending attorney not actively questioning the witness (or any other attorney making an objection on the record).

14. <u>Acceptable Exhibit Formats</u>: During the deposition, full and complete copies of deposition exhibits must be provided to the witness and counsel who are attending the deposition. Deposition exhibits may be made available in physical (hardcopy) form or via the Remote Deposition Technology, file sharing software, or other electronic means.

15. <u>Electronic Exhibits</u>: Exhibits provided electronically shall be accessible such that the deponent and counsel may review the entire exhibit on their own computers or devices, without reliance on the noticing attorney's "share screen." In the case of electronic exhibits, a witness may be required to use a keyboard, mouse, or other similar means to open and/or advance the pages of an exhibit. In such instances, access to a full copy of the deposition exhibit electronically via iPad, tablet, laptop, or other devices, will be deemed to equate to hardcopy access. The fact that a witness was provided with only an electronic copy of an exhibit will be an insufficient basis, by itself, to object to the admissibility of that exhibit at trial.

16. <u>Hardcopy Exhibits</u>: Notwithstanding the foregoing and only if agreed in writing by the participants in a particular deposition, all documents any attorney expects to use as exhibits at a deposition that exceed 100 pages shall be sent to the witness in advance of the deposition in hard copy form. In addition, the Parties agree to work in good faith to reach agreements regarding the provision of hard copy exhibits to a deponent for whom electronic-only versions are particularly problematic. To the extent hardcopy exhibits are provided to the deponent, the package containing the documents shall be sealed, and the witness shall unseal it only when asked to do so on the record at the deposition.

17. While the deposition is on the record, no person aside from the attorney conducting the examination is permitted to communicate with the witness directly or indirectly by any means not recorded in the same manner as the deposition itself (e.g., no private messages, text messages or emails). However, the witness's counsel may communicate with the witness in person, telephonically, or by other electronic means during breaks (including, but not limited to, by means of the use of remote connection software), consistent with Federal Rule of Civil Procedure 30(c)(1). To the extent that the Remote Deposition Vendor's technology includes a "chat" feature or similar capabilities, the noticing party shall ensure that the Remote Deposition Vendor either: (a) disables the feature or (b) implements settings (if available) that require all communications to be seen by all Participants. Nothing in this provision is to be read as prohibiting otherwise appropriate communications among participants and/or attendees by other means.

18. During breaks in the deposition, the Parties may use the breakout room feature provided by the Remote Deposition Vendor, which simulates a live breakout room through videoconference. Conversations in the breakout rooms shall not be recorded. The breakout rooms shall be established by the Remote Deposition Vendor prior to the deposition and controlled by the Remote Deposition Vendor.

19. Technical difficulties, including but not limited to pauses, lags, and/or interruptions in Internet connection shall be addressed as they would be in any in-person deposition. The Parties shall go off the record and attempt to resolve the issue. Technical difficulties will not result in waiver of objections by any party. If any pauses, lags, and/or disruptions are persistent or prolonged, the Parties should: (1) extend the Remote Deposition by an amount of time equal to the duration of the pause, lag, and/or disruption, provided that the additional time is less than an hour; or (2) consider rescheduling the Remote Deposition for a later date, if the additional time required is an hour or more.

20. Any Remote Depositions conducted in accordance with these protocols may be admitted at trial with the same effect and pursuant to the same evidentiary rules as one recorded in-person. The "Confidential" or "Highly Confidential" designation of all or portions of Remote

Depositions will be governed by the provisions MDL Protective Order and the Deposition Protocol (ECF Nos. 308, 573).

21. The Parties acknowledge that Remote Depositions may take longer to complete than an in-person deposition due to logistical challenges beyond anyone's control, and because it may take time for everyone to adjust to the technology. While the Parties will endeavor in good faith to comply with the time limits set forth in the Deposition Protocol, there may be circumstances under which depositions may need to exceed those limits. The Parties will be respectful and collaborative under these circumstances and will make good faith efforts to make reasonable accommodations to allow all Parties adequate additional time to conduct a fair examination. Nothing in this Order prevents a Party from moving for a protective order under Fed. R. Civ. P. 26(c) to require that a given individual deposition proceed in person. However, where a Remote Deposition has been requested by the deponent, the court reporter, or an attorney, an in-person deposition may not be conducted without leave of the court, pursuant to the procedures laid out in Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). Further, nothing in this Order precludes counsel for a witness from being in the same room as the witness, if the witness consents and such attendance is consistent with social distancing restrictions.

SO ORDERED, on this 21st day of August, 2020.

Judge William H. Orrick
UNITED STATES DISTRICT JUDGE

# EXHIBIT Y

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

Case No. 3:19-md-02913-WHO

This Document Relates to:

ALL ACTIONS.

**NOTICE OF PLAINTIFFS' ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF THE ALTRIA DEFENDANTS REGARDING THE RELATIONSHIP BETWEEN ALTRIA AND JLI (NOTICE E)**

ISSUING PARTY: Plaintiffs

PRODUCING PARTY: The Altria Defendants as defined on Schedule A

TO: Altria Group, Inc. and its Attorneys of Record:

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30, and *In Re: Juul Labs, Inc., Marketing, Sales Practices, And Products Liability Litigation*, Case No. 19-md-02913-WHO, Case Management Order Numbers 10 and 11 (CMO Nos. 10 and 11), Plaintiffs, by and through the undersigned counsel, intend to depose the Altria Defendants as defined in Schedule A via remote audio-video conference on a date to be mutually agreed upon between the parties via Golkow Litigation Services.

The remote deposition will be coordinated by Golkow Litigation Services, with a business address of 1650 Market Street, Suite 5150, Philadelphia, PA 19103. A link and any necessary

credentials will be provided at least three days in advance of the deposition. The deposition will be conducted using teleconference and/or video conference technology, without a court reporter being physically present with the witness, consistent with CMO No. 11 and all existing governmental and court orders relating to COVID-19 and consistent with best practices recommended by the CDC to prevent the spread of COVID-19. This deposition is being taken for the purpose of discovery, for use at trial, or such other purposes as are permitted under the Rules. The deposition will be recorded by stenographic means and by audio and video.

The Altria Defendants are directed to designate a person or persons to testify on its behalf on the matters listed in Schedule A attached to this Notice of Deposition and to produce the documents identified on Schedule B.

The deposition will be recorded stenographically and on videotape.

Dated: March 15, 2021

By: _/s/ Sarah R. London_
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: _/s/ Dena Sharp_
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: _/s/ Dean Kawamoto_
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: _/s/ Ellen Relkin_
Ellen Relkin
**WEITZ & LUXENBERG**

700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

## SCHEDULE A

### Definitions

1. **Altria Group** refers to Altria Group, Inc.

2. **Altria Defendants** collectively refers to Altria Group, Inc., Philip Morris USA Inc., Altria Enterprises LLC, Altria Client Services LLC and Altria Group Distribution Company.

3. **JLI** refers to JUUL Labs, Inc. (specifically including its predecessors Pax Labs, Inc., and Ploom, Inc.).

4. **Management Defendants** refers to James Monsees, Adam Bowen, Nicholas Pritzker, Hoyung Huh and Riaz Valani.

5. **Defendants** refers, respectively and collectively, to JLI, the Altria Defendants and the Management Defendants.

6. **ENDS** means electronic nicotine delivery system, including components and parts, but not related accessories.

7. **JUUL** refers as broadly as possible to any and every JUUL ENDS, including JUUL Pods and e-liquids, and it refers both to all finished products and design prototypes or models of JUUL.

8. **The Transaction** refers to the December 20, 2018, transaction involving on or more of the Altria Defendants' stock purchase agreement with JLI, pursuant to which Altria purchased for an aggregate price of $12.8 billion dollars shares of JLI stock resulting in a beneficial ownership interest in JLI.

9. **Agreement** always includes any and all modifications, revisions or amendments.

10. The terms **or** and **and** should be construed disjunctively or conjunctively so as to give the broadest possible effect to a request.

11. The terms **you** and **your** refers to the **Altria Defendants**.

**Topics**

Pursuant to Federal Rule of Civil Procedure 30(b)(6), you shall be prepared to testify regarding the following subjects:

1. To the extent such information is relevant or necessary to a full understanding of, or inquiry into, the other Topics in this Notice:[1]

   a. Your current and historical corporate/organizational structure, including departments, functions, divisions, subdivisions, and teams; and,

   b. the identities and responsibilities of Your personnel, senior managers, directors, or subcontractors.

2. The details and substance of any advice, guidance, recommendations, plans, strategies, or other communications provided by you to JLI and/or the Management Defendants relating to JUUL and relating to any or all of the following, before or after the Transaction:

   a. design;

   b. research;

   c. development;

   d. testing;

   e. manufacturing;

   f. marketing;

   g. advertising;

   h. distribution;

---

[1] For the sake of clarity and to assist Altria in the preparation of its designated witness or witnesses:

Topic 1 is limited to inquiry by Plaintiffs' counsel about the identity and responsibilities of various departments and personnel that were involved at any time in some capacity relating to the other Topics in this Notice. In short, Topic 1 is included to safeguard against any objection that this Notice fails to alert Altria and its designated witnesses that Plaintiffs intend to ask routine "who, what, and when" questions that arise naturally in the course of deposing Your representatives about the Topics in this Notice. Plaintiffs include this Topic with the expectation that the routine sorts of questions encompassed by the Topic would arise organically in questioning witnesses on the remaining Topics in the Notice and those witnesses would likely have responsive information given their designation as Your corporate representative for this Notice. In other words, any witness who You designate to testify about the Topics in this Notice is expected to be familiar with—and likely already would be familiar with—Your historical/corporate organizational structure related to that witness's Topic.

i. sale;

j. youth prevention;

k. corporate management;

l. lobbying; and,

m. regulatory compliance.

4. The details and substance of any communications between you, JLI, and/or the Management Defendants relating to K.C. Crosthwaite assuming a leadership position within JLI.

5. The details and substance of any communications between you, JLI, and/or the Management Defendants relating to Joe Murillo assuming a leadership position within JLI.

6. The knowledge, understanding, writings, in internal business communications or public statements by Atria and their operating companies regarding their knowledge of nicotine, nicotine addiction, the role nicotine plays in continued smoking, internal Company statement related thereto and public statement related to same. This includes statements made by entities speaking for or on behalf of Altria or their operating companies publicly or in internal business records.

7. The details and substance of any communications, recommendations, guidance or assistance provided by Altria regarding JLI removing certain flavors from the market and the reasons for such recommendations and actions.

8. The details and decision making and reasons for the language included in drafts and the final version of Howard Willard's letter to the FDA on October 25, 2018, including any communications with JLI about the content, substance, or strategy underlying this letter.

**SCHEDULE B**

1. The witnesses' *curriculum vitae.*
2. Documents relied on by the witnesses in preparing to testify about the Topics set forth in Schedule A.
3. Documents evidencing, referring, or relating to each Topic in Schedule A.
4. At least 10 days in advance of the deposition, identify and produce to juulmdlplaintiffdiscovery@kellerrohrback.com all documents reviewed, considered, or relied upon in preparation for this deposition, as well as any summaries or demonstratives a witness will request to use at a deposition. If the documents have already been produced, please email a list of bates numbers to juulmdlplaintiffdiscovery@kellerrohrback.com.

Dated: March 15, 2021

By: */s/ Sarah R. London*

Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: */s/ Dena Sharp*

Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: */s/ Dean Kawamoto*

Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: /s/ Ellen Relkin

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2021, a true and correct copy of the foregoing *NOTICE OF PLAINTIFFS' ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF THE ALTRIA DEFENDANTS REGARDING THE RELATIONSHIP BETWEEN ALTRIA AND JLI (NOTICE E)* was served via electronic mail upon the following:

Gregory P. Stone
Bethany Woodard Kristovich
Jeremy K Beecher
**MUNGER TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: 213-683-9100
Facsimile: 213-687-3702
gregory.stone@mto.com
Bethany.Kristovich@mto.com
jeremy.beecher@mto.com

Renee D. Smith
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: 312-862-2310
Facsimile: 312-862-2200
renee.smith@kirkland.com

Mike Brock
Peter A. Farrell
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-879-5000
mike.brock@kirkland.com
pfarrell@kirkland.com

David Horowitz
**KIRKLAND & ELLIS LLP**
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: 213-680-8400
david.horowitz@kirkland.com

David M. Bernick
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990

dbernick@paulweiss.com

*Attorneys for Defendant JUUL Labs, Inc.*
John C. Massaro
Jason A. Ross
David E. Kouba
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
john.massaro@arnoldporter.com
Jason.ross@arnoldporter.com
David.Kouba@arnoldporter.com

Lauren S. Wulfe
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: 213-243-4000
Facsimile: 213-243-4199
lauren.wulfe@arnoldporter.com

*Attorneys for Defendants Altria Group, Inc. and Philip Morris USA Inc.*

James Thompson
James N. Kramer
**ORRICK HERRINGTON & SUTCLIFFE LLP**
The Orrick Building
405 Howard Street
San Francisco CA 94105
Telephone: 415.773.5923
Facsimile: 415.601.5488
jthompson@orrick.com
jkramer@orrick.com

*Attorneys for Defendant James Monsees*

Eugene Illovsky
Martha Boersch
Matthew Dirkes
**BOERSCH & ILLOVSKY LLP**
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Telephone: (415) 500-6643
eugene@boersch-illovsky.com
martha@boersch-illovsky.com
matt@boersch-illovsky.com

*Attorneys for Defendant Adam Bowen*

Michael J. Guzman

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
Sumner Square, 1615 M St., N.W., Suite 400
Washington, DC 20036
Telephone: (202) 326-7910
mguzman@kellogghansen.com

Karl Belgum
**NIXON PEABODY LLP**
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111
Telephone: (415) 984-8409
kbelgum@nixonpeabody.com

*Attorneys for Defendants Nicholas Pritzker, Riaz Valani, and Hoyoung Huh*

James E. Sell
Mitchell B. Malachowski
TYSON & MENDES, LLP
523 4th Street, Suite 100
San Rafael, CA 94901
Telephone: (628) 253-5070
Fax: (415) 785-3165
jsell@tysonmendes.com
mmalachowski@tysonmendes.com

*Attorneys for Defendants Mother Murphy's Labs, Inc., and Alternative Ingredients, Inc.*

Robert A. Scher
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016
Telephone: (212)338-3405
rscher@foley.com

*Attorney for Defendants Tobacco Technology, Inc., and Eliquitech, Inc.*

Michael L. O'Donnell
James E. Hooper
Marissa Ronk
**WHEELER TRIGG O'DONNELL LLP**
370 17th Street, Ste. 4500
Denver, CO 80202
Telephone: (303) 244-1850
Odonnell@wtotrial.com
hooper@wtotrial.com
Ronk@wtotrial.com

*Attorneys for Defendant McLane Company, Inc.*

Christopher J. Esbrook
David F. Pustilnik
Michael S. Kozlowski

Case 3:19-md-02913-WHO Document 1825-3 Filed 05/07/21 Page 12 of 36

**ESBROOK LAW LLC**
77 W. Wacker, Suite 4500
Chicago, IL 60601
Telephone: (312) 319-7681
christopher.esbrook@esbrooklaw.com
david.pustilnik@esbrooklaw.com
michael.kozlowski@esbrooklaw.com

*Attorneys for Defendants Eby-Brown Company, LLC, Circle K Stores, 7-Eleven, Inc., Speedway, LLC, and Walgreens Boots Alliance, Inc.*

David R. Singh
Bambo Obaro
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065
Telephone: (650) 802-3083
david.singh@weil.com
bambo.obaro@weil.com

*Attorneys for Defendants Core-Mark Holding Company, Inc.*

Charles C. Correll, Jr.
Matthew J. Blaschke
Alessandra M. Givens
**KING & SPALDING LLP**
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
ccorrell@kslaw.com
mblaschke@kslaw.com
agivens@kslaw.com

*Attorneys for Defendant Chevron Corporation*

Donald F. Zimmer, Jr.
Quyen L. Ta
Jennifer T. Stewart
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
fzimmer@kslaw.com
qta@kslaw.com
jstewart@kslaw.com

*Attorneys for Defendant Walmart*

By: /s/ Sarah R. London
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

By: /s/ Dena Sharp
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: /s/ Dean Kawamoto
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

By: /s/ Ellen Relkin
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | CASE NO. 19-md-02913-WHO |
| | **CASE MANAGEMENT ORDER NO. 10: DEPOSITION PROTOCOL ORDER** |
| This Document Relates to: *All matters* | HONORABLE JUDGE WILLIAM H. ORRICK |

This Order, agreed to after extensive negotiations and with the agreement of counsel, governs the conduct of depositions of fact witnesses on issues of general applicability to the litigation (as opposed to solely case-specific witnesses). This Order applies to all such depositions in the MDL and JCCP Proceedings ("Lead Actions") and those actions involving the same or similar subject matter as the MDL pending in other state and federal courts that adopt the Joint Coordination Order[1] ("Coordinated Actions"). The purpose of this Order is to gain the highest degree of efficiencies in the taking of fact witness depositions. At no time has it been, nor will it be, the intention of the Court or the parties that judges in any of the participating jurisdictions delegate their duties to any other judicial officer.

**1. General Provisions**

Counsel and all parties (both represented and *pro se*) shall comply with this Order, and to the extent consistent with this Order, with the applicable Rules of Civil Procedure and the Local Rules of the presiding court. Unless specifically modified herein, nothing in this Order shall be construed to abrogate the Rules of Civil Procedure or the Local Rules.

[1] Case Management Order No. 9: Joint Coordination Order ("Joint Coordination Order").

Conduct of all participants in depositions shall be in accordance with the Northern District of California Professional Guidelines and the customs and practices expected of lawyers and witnesses appearing before the presiding court in their home jurisdictions, including as if each was appearing personally before the Courts at the time of the depositions. Counsel shall not at any time conduct themselves in a manner not becoming of an officer of the court and not in full compliance with the civil rules of practice and all other orders of the Courts. Neither counsel nor witnesses shall, at any time, engage in inappropriate conduct that impedes, delays, or frustrates the examination of the witness. All counsel and deponents must be treated with civility and respect.

**2. Scope**

This Order shall apply to: (i) all fact depositions of witnesses who are currently or were formerly employees, agents, or contractors of Defendants; and (ii) all third-party witnesses, other than third-party witnesses who are relevant only to the claims of a particular plaintiff, i.e., case-specific witnesses (together, "Common Witnesses"). For the avoidance of doubt, this Order shall not apply to: (i) fact depositions of any Plaintiff, their representatives, employees, family members, personal acquaintances, healthcare providers, and all other case-specific fact witnesses; and (ii) expert depositions.

**3. Coordination of Depositions**

The protocols in this Order supplement the Joint Coordination Order. If the deposition protocols in this Order are deemed to conflict with any provisions in the Joint Coordination Order, the protocols in this Order shall control.

The parties, the Courts in the Lead Actions, and the Courts in the Coordinated Actions wish to minimize the expense and inconvenience of this litigation by minimizing the depositions of any Common Witness. Accordingly, as a general rule, a witness may be deposed once within the time limits set forth in this Order. Such deposition shall be noticed in the Lead Actions and shall be deemed to be cross-noticed in the Coordinated Actions as long as the Coordinated Action: (1) has adopted the Coordination Order and (2) receives notice of the deposition as described in Section 5. Depositions shall be noticed according to the Federal Rules of Civil Procedure. A witness may be deposed once in total across all Lead and Coordinated Actions and, following the deposition, shall not be re-deposed in a Lead or Coordinated

Action unless otherwise agreed by the parties or authorized by an order of Court upon a showing of good cause by the party seeking the additional deposition.

Plaintiffs' Counsel in the Lead Actions shall take reasonable efforts and engage in good faith efforts to coordinate with each other before serving deposition notices and with respect to which depositions to notice.

Depositions, in addition to those being taken in the Lead Actions, may also be taken in Coordinated Actions, but only upon leave of the Court in which the Coordinated Action is pending, obtained on noticed motion for good cause shown, including why the discovery sought could not have been obtained in coordinated discovery in the Lead Actions. Coordinated Action Plaintiffs' Liaison Counsel[2] and JLI Counsel in a Coordinated Action in which any such motion is filed shall promptly notify the MDL Court and Plaintiffs' Lead Counsel in the Lead Actions of such filing and provide a copy of the motion. If a deposition in a Coordinated Action has been cross-noticed by the Lead Actions, then parties in the Coordinated Action may not take a subsequent deposition of that witness except for good cause shown.

If the Lead Action Plaintiffs, or Defendants and their respective Counsel in any Coordinated Action have received at least 21 days' notice of a deposition in either of the Lead Actions or any Coordinated Action (or if (a) the parties agree in writing that such notice is not necessary or (b) upon order of the MDL Court, a deposition is permitted to be taken with fewer than 21 days' notice), such deposition may be used in the Lead Actions and each Coordinated Action for all purposes prescribed in Fed. R. Civ. P. 32, California Code of Civil Procedure 2025.620, et seq. or corresponding rule of civil procedure in a Coordination Action, or as otherwise permitted by the Federal, California, or Coordinated Action's state's Rules of Evidence, by or against any party including parties later added and parties in cases subsequently filed in, removed to, or transferred to this Court as part of this litigation, without regard to whether any Lead Actions' Plaintiffs' Counsel or any Defendants' Counsel or any counsel representing plaintiffs or defendants in any Coordinated Action attended or examined the witness at the noticed deposition.

Fed. R. Civ. P. 6(a) shall govern the computation of time periods set forth in this Order.

---

[2] *See* Joint Coordination Order.

**4. Length and Scope**

The following rules shall apply to depositions noticed pursuant to this Protocol (absent an agreement of the parties or further order of the Court on a showing of good cause):

(a) There may be two days of questioning by the Lead Actions—the first day will be limited to seven hours on the record and the second day will be limited to five hours on the record, exclusive of redirect examination as provided below if necessary.

(b) Any Counsel from a Coordinated Action who is designated as an examiner shall be permitted a reasonable amount of time to question the deponent (up to two hours combined for all Coordinated Actions that shall occur immediately following the examination by the Lead Actions), and shall be permitted to make objections during examination by other counsel, subject to the below provisions regarding objections and in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the Orders of the MDL Court, and in accordance with the terms and procedures set forth in subparts (i) through (iii) below providing the following:

(i) the Court in which the Coordinated Action is pending has adopted the Discovery Orders or has entered a Protective Order, ESI Order, Deposition Protocol Order or other discovery order substantially similar to the Discovery Orders;

(ii) Plaintiffs' Counsel from the Coordinated Action shall make best efforts to ask questions that are non-duplicative of questions already asked at the deposition, however, nothing shall prevent Plaintiffs' Counsel from a Coordinated Action to probe further into issues already covered during the questioning of Noticing Party; and

(iii) participation of Plaintiffs' Counsel from the Coordinated Actions shall be arranged so as not to delay discovery or other proceedings as scheduled in the Lead Actions.

(c) After questioning by the Lead and Coordinated Actions, the party defending the deposition ("Defending Party") may elect to ask follow up questions of the deponent for up to two hours. If Defending Party elects to question the deponent, then the Plaintiffs in the Lead and Coordinated Actions shall be entitled to an equal amount of time to perform redirect examination (up to two hours total). Absent

agreement of the parties or order by a Lead Action Court for good cause shown, no further examination will be permitted by any party after redirect examination.

(d) Depositions shall begin at 9:00 a.m. absent agreement of the parties.

(e) Absent agreement of the parties, the days of questioning will take place on consecutive business days to the extent possible.

(f) No speaking objections or other actions that unnecessarily delay depositions will be permitted, and will result in additional time being added to the deposition for the questioning party.

Counsel in the Lead Actions shall confer before the deposition concerning allocation of time to question the witness and collaborate to avoid needless duplication (i.e., asking the same questions). In the event that the deposition involves a translator requested by the witness, the maximum length of the deposition shall be increased as is reasonably necessary by up to 50% and the parties shall negotiate a reasonable allocation of the translator costs. Absent agreement otherwise, the parties should set aside two days for each Common Witness to account for sufficient time on the record in accordance with this Order. The parties are encouraged to make full and efficient use of each deposition day so as not to waste valuable time and incur unnecessary expenses. Not every witness will require an examination that lasts as long as the presumptive time limits set forth above, and no party will be prevented from using a deposition merely because it did not continue into a subsequent day. To the extent the parties can anticipate a witness will take less time, they will attempt to agree to lesser time limits and, for planning purposes, will provide other deposition attendees with advance notice of any agreement to lessen the examination time. This procedure may be particularly useful in the event that more than one deposition is scheduled on a given day.

**5. Scheduling, Logistics, and Service of Notices**

Cooperation in Scheduling. Lead Counsel for the MDL Plaintiffs, or their designee, Lead Counsel for the JCCP Plaintiffs, or their designee, Counsel for the Defendants, and Counsel for the deponent, if applicable, shall cooperate on selecting a mutually convenient date, time, and location for each deposition. Unless otherwise agreed by the parties or ordered by either the MDL or JCCP Court, depositions shall not be taken on Saturdays, Sundays, or federal or state court holidays.

Plaintiffs' Counsel in the Lead Actions must make best efforts to coordinate their deposition dates with each other, including providing three days written notice of proposed deposition dates to persons designated by the other Lead Action to schedule depositions before issuing the notice. If the non-noticing Lead Action does not object to the date within three days, the deposition may be noticed for that date.

Location. In the absence of agreement, a deposition may take place within (a) the county in which the deponent resides or (b) the county in which the deponent is employed.

Content of Notice. Each deposition notice subject to this Order shall comply with Fed. R. Civ. P. 30(b) or California Code of Civil § 2025.220, absent agreement of the parties or Court order. Depositions subject to this Order noticed in the Coordinated Actions shall be noticed and conducted pursuant to rules of the relevant jurisdiction and with this Order. The deposition notice shall include the name, address, and telephone number of an attorney point of contact designated by the party noticing the deposition, as well as the date, time, and location of the deposition. Any notice for the deposition of a corporate or organizational representative under Fed. R. Civ. P. 30(b)(6) or California Code of Civil Procedure § 2025.230 shall describe with reasonable particularity the matters for examination. This Order in its entirety shall be attached to any subpoena or deposition notice that pertains to a third-party witness covered by its terms. The notice shall clearly state whether the deposition will be videotaped in addition to being recorded by stenographic means.

Adequacy of Notice. After counsel, through consultation, have arrived on a date and location for a deposition, the Noticing Party shall serve an amended Notice reflecting the agreed upon date and location. Witnesses subpoenaed to produce documents shall be served with the document subpoena at least thirty calendar days before a scheduled deposition.

Costs. The Noticing Party shall be responsible for retaining and paying for a court reporter and videographer.

Service Manner and Timing. Notices for Depositions in the Lead Actions and Coordinated Actions shall be served by e-mail or other electronic means on Lead Actions' Co-Lead Counsel, State/Federal Liaison Counsel, and Counsel for the Defendants. Each Plaintiffs' Liaison Counsel in a Coordinated Action, or his or her designee, shall be responsible for distributing such documents to other counsel for

plaintiffs in their Coordinated Action. Notices served in accordance with this paragraph shall be deemed cross-noticed in the Coordinated Actions as long as the Coordinated Action: (1) has adopted the Coordination Order and (2) receives notice of the deposition as described above.

To allow for planning, preparation, and coordination between the Lead Actions and the Coordinated Actions, depositions must be noticed at least 21 days before they are scheduled to occur. Expedited depositions may be scheduled by agreement of the parties in writing or as ordered by the MDL or JCCP Courts, or a Court in a Coordinated Action, and in which event the time limitations for notice shall be lessened, as well as the time limitation for production of any documents sought by third-party subpoena in conjunction with said deposition.

Challenges to the Notice. Any party or witness receiving notice of a deposition that contends is not permitted by the terms of this Order shall have five business days from receipt of the notice within which to serve the noticing party with a written objection to the deposition.

Disputes. In accordance with this Order, all disputes regarding any matters arising under this Order, whether pertaining to a deposition in the Lead Actions or any Common Witness deposition in a Coordinated Action, shall be resolved pursuant to Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). In the event of such an objection, the deposition shall not go forward unless (a) the parties and the deponent reach an agreement in writing to resolve the objection or (b) the noticing party applies for and receives an order pursuant to the Section 7 of the Stipulated Joint Coordination Order granting leave to take the deposition. Before filing a discovery motion pursuant to Section 7 of the Stipulated Joint Coordination Order, the parties must first attempt to resolve the dispute in good faith.

**6. Means of Recording Depositions**

A certified court reporter shall stenographically record all deposition proceedings and testimony and provide a "real time" transcription feed to devices such as video monitors and computers at the deposition venue. A party seeking to transmit "real time" transcription feeds to computers not located at the deposition venue may do so at their own expense by making a request to the court reporting service five business days before the deposition; that party will ensure that any remote viewing is in compliance

with all applicable Protective Orders. The court reporter shall administer the oath or affirmation to the deponent. The written transcript prepared by the court reporter shall constitute the official record of the deposition for purposes of Fed. R. Civ. P. 30's requirements concerning filing, retention, certification, and the like. The Lead Actions can choose their own reporting service for depositions that they notice. All videotaped depositions shall be accompanied by a simultaneous audiotape recording and be stenographically recorded by a court reporter as provided in the previous paragraph. As noted above, the stenographically prepared transcript shall constitute the official record of the deposition.

Where the party wishing to videotape the proceeding did not notice the deposition, a request to videotape the deposition shall be submitted in writing to the Lead Actions Counsel, Counsel for the Defendants, and Plaintiffs' State/Federal Liaison Counsel, no later than seven days before the date on which the deposition is scheduled to occur. The party wishing to videotape the deposition, if not originally noticed as such, shall be responsible for arranging and paying for the videotaping and providing a copy to Lead Actions Counsel.

Services or products offered or provided by the operator of the videotape equipment must be offered to counsel for all parties, regardless of which party is financing the videotaping of the deposition. Further, any video operator is subject to the orders of this Court whether the deposition was noticed or cross-noticed in the MDL or JCCP Proceedings or in a Coordinated Action, including but not limited to the Confidentiality Order and Joint Coordination Order. The video operator shall be given a copy of all applicable orders at least five days before the deposition.

The operator of the videotape recording equipment is subject to the provisions of Fed. R. Civ. P. 28(c). At the start of the deposition, the operator shall swear or affirm to record the proceedings fairly and accurately.

Each witness, attorney, and other person attending the deposition (in person or telephonically) shall be identified on the record at the commencement of the deposition, however, a consulting expert who has signed the applicable protective order and is attending the deposition telephonically need not be identified on the record. The videotape recording shall include the court reporter administering the oath

or affirmation to the witness. Thereafter, the deponent and, if necessary, exhibits and any demonstratives will be videotaped.

The deposition will be conducted in a manner to replicate, to the extent feasible, the presentation of evidence at trial. Unless physically incapacitated, the deponent shall be seated at a table except when reviewing or presenting demonstrative materials for which a change in position is needed. To the extent practicable, the deposition will be conducted with the witness seated in front of a solid background with only such lighting as is required for accurate video recording. Lighting, camera angle, lens setting, and field of view will be changed only as might be reasonably necessary to record accurately the natural body movements of the deponent or to portray exhibits and materials used during the deposition. Sound levels will be altered only as necessary to record satisfactorily the voices of counsel and the deponent. The witness shall appear in ordinary business attire (as opposed to, for instance, a lab coat) and without objects such as a bible, medical equipment, or props.

Video recording will be suspended during all “off the record” discussions and the video operator shall note such suspensions.

The videotape operator shall use recording equipment with an appropriate timer and, unless otherwise agreed to by the parties, shall prepare and provide counsel with a log, cross-referenced with timestamps, that identifies the portion of the recording at which examination by different counsel begins and ends, when exhibits are used, and when there is any interruption of continuous tape recording, whether for recess, “off the record” discussions by counsel, mechanical failure, or other interruption.

The video operator shall maintain custody of the original video medium in its original condition, without editing in any fashion. No part of the video or audio record shall be released or made available to the public unless authorized by an order of the MDL or JCCP Court.

The parties shall meet and confer to determine whether an agreement can be reached to limit the number of independent court reporting and videography firms involved in recording the deposition proceedings covered by this Order and to develop a cost-sharing agreement between the various parties or party groups for the associated fees, including the cost of the facilities where depositions are conducted.

**7. Remote Participation via Telephone, Internet, or Video Streaming**

If requested at least ten days before a deposition, telephone facilities shall be provided so that parties wishing to participate in the deposition by telephone may do so at their own expense. By indicating in a deposition notice that it wishes to examine a witness over the telephone, a party shall be deemed to have moved for such an order under Fed. R. Civ. P. 30(b)(4). Unless an objection is filed and served within five days after such notice is received, the Court shall be deemed to have granted the motion. Other parties may examine the deponent telephonically or in person. However, all persons present in the location with the deponent shall be identified on the deposition record and shall not by word, sign, or other means coach or suggest answers to the deponent and shall act in accordance with applicable federal rules of civil procedure and professional conduct governing interaction with the deponent. In addition, the court reporter stenographically recording the deposition shall be located in the same room as the deponent.

Technical difficulties with telephonic participation shall not constitute grounds for postponing the deposition or for rendering inadmissible a deposition that otherwise would be admissible in evidence. If technical problems with the telephonic facilities create disruptions in the deposition, counsel attending a deposition in person may discontinue telephonic participation for such periods of time as necessary.

A party may request, at their own expense, to make the live deposition proceedings available to locations that are remote from the deposition venue through the use of video streaming over secure and encrypted Internet connections and to allow for remote real-time participation by interested counsel, such as through the use of a private group chat system that enables remote counsel to collaborate with their on on-site colleagues. A party seeking these services shall make a request to the court reporting service five business days before the deposition. The viewing of or participation in any deposition via the Internet is expressly subject to the [MDL Protective Order, Doc. 308 and JCCP CMO No. 3], or a substantially similar order in a Coordinated Action. The party participating remotely is responsible for providing his or her own Internet connection and shall not re-record the deposition by video or audio means.

**8. Appearances and Examination**

Unless otherwise agreed to by the parties or ordered under Fed. R. Civ. P. 26(c) and subject to the terms of the [Protective Order, Doc. #308 and JCCP CMO No. 3], depositions may be attended only by

the parties, the deponent, the deponent's attorney, attorneys of record in the MDL and JCCP Proceedings, attorneys of record in the Coordinated Actions, in-house counsel and corporate representatives, court reporters, videographers, and any person who is assisting in the litigation and whose presence is reasonably required by the aforementioned counsel of record who is bound by any applicable Protective Order (such as a consulting expert).

Upon motion, and for good cause shown, the MDL Court may permit attendance by a person who does not fall within any of the categories above.

For there to be adequate deposition space, counsel intending to attend a deposition noticed in the Lead Actions, or in a Coordinated Action, should advise all parties, including counsel for the Noticing Party, of their intention to attend in person at least two business days before the deposition.

Unnecessary attendance by counsel is discouraged and may not be compensated in any fee application to a court. Counsel who have only a marginal or slight interest in a noticed deposition or who expect their interests to be adequately protected by other counsel should not attend the deposition.

Lead Counsel for the Lead Actions shall designate up to two attorneys to serve as the examiners of each deponent on behalf of the Lead Actions. Given deposition time limits and in the interest of efficiency, the Court strongly encourages Plaintiffs' Counsel from the Coordinated Actions to designate one attorney to serve as the examiner of each deponent on behalf of all Plaintiffs in the Coordinated Actions. If Plaintiffs in the Coordinated Actions are unable to agree on that examiner for a given deponent, Lead Counsel for the MDL Plaintiffs and Lead Counsel for JCCP Plaintiffs shall assist in attempting to reach such an agreement. For those depositions where an agreement is not reached, Plaintiffs' Counsel shall diligently work together to ensure that questioning on behalf of Plaintiffs in the Lead Actions and in the Coordinated Actions proceeds in the most efficient manner possible.

One counsel representing each Defendant shall be permitted to examine deponents. Each Lead Actions Defendant should designate one attorney to conduct the principal examination of each deponent. Examination by other counsel for the Lead Actions Defendants shall make best efforts to ask questions that are non-duplicative of questions already asked at the deposition. Notwithstanding the number of

examiners, the time limits set forth above shall still apply. Counsel should cooperate so examinations by multiple attorneys do not result in a deposition exceeding the allotted time.

The parties shall meet and confer to develop supplemental protocols for (a) allotting examination time to various parties or party groups and (b) determining order of examination of a witness.

Counsel representing parties in the Lead Actions shall be entitled to attend the deposition of any witness whose deposition is taken in a Coordinated Action. The Plaintiffs in all Coordinated Actions shall designate one counsel to examine the witness. One counsel representing the MDL Plaintiffs, one counsel representing the JCCP Plaintiffs, and one counsel representing both the MDL and JCCP Defendants shall each be permitted to ask questions and make objections during examination by other counsel.

**9. Objections**

Unless otherwise specified, an objection by a single defendant shall be deemed an objection by all defendants; similarly, an objection by a single plaintiff shall be deemed an objection by all plaintiffs unless otherwise specified. However, unless otherwise specified, (a) an instruction not to answer by one defendant shall not be deemed an instruction not to answer by all defendants and (b) an instruction not to answer by one plaintiff shall not be deemed an instruction not to answer by all plaintiffs.

The only objections allowed during the deposition are those for the following bases: form of the question, privilege (the nature and grounds for which must be stated succinctly on the record), or a limitation imposed by court order. All objections, except as to form, privilege, or a limitation imposed by a court order, shall be preserved for ruling by the MDL Court, JCCP Court, or the Court in the Coordinated Action at trial or other use of the deposition.

Counsel shall comply with Fed. R. Civ. P. 30(c)(2) and the Northern District of California Guidelines on Professional Conduct concerning objections at a deposition. Counsel shall not engage in colloquy in objecting to a question or responding to an objection. Any objections to an examiner's questions shall be made in a concise manner, and counsel shall not suggest an answer to the witness. The phrases "objection as to form," or similar language are sufficient and shall preserve all objections as to form and foundation until a party seeks to use a deposition. However, to determine whether there is a need to cure a defect in a question, counsel conducting the examination may ask the attorney lodging the

form or foundation objection to identify the specific defect. The response shall be stated succinctly and shall be limited to the legal grounds for the form objection (e.g., "lacks foundation" rather than "the witness didn't work in that department and couldn't possibly know the answer"). Counsel shall refrain from all comments that could be perceived as instructive to a witness, such as "you can answer if you understand the question" or "you can answer if you know."

**10. Additional Provisions Relating to Corporate Witnesses**

The party producing a corporate witness pursuant to Rule 30(b)(6) and/or California Code of Civil Procedure § 2025.230 shall disclose the identity of that witness no later than 10 days before the deposition.

**11. Use of Exhibits and Documents During the Deposition**

Provided that plaintiffs notify the defendants at least 60 days in advance of the intended deposition of any present or former company employee of a Defendant whose custodial file has not been produced in its entirety, that Defendant will conduct a good-faith, reasonable search using search terms or other reasonable methods, and based on that search produce non-privileged, custodial file documents responsive to outstanding discovery requests at least 30 days in advance of the noticed deposition date. The Defendant will be obligated to produce only previously non-produced portions of the custodial file responsive to outstanding discovery requests if the Defendant's prior production included metadata identifying the deponent as a custodian of the previously produced custodial file documents. The scope of discovery related to custodial files will be determined at least 45 days before the deposition, subject to prior orders of the Court; applicable rules of civil procedure; agreements of the parties regarding the sequence, timing, and methods of discovery, including document production; and, if necessary, court order resolving any dispute regarding the scope of production. Unless the Parties agree or a court orders otherswise, the Defendant shall have at least 30 days to produced non-privileged responseive documents following determination of the scope of discovery, but no later than 30 days before the deposition is noticed. The custodial file of that employee shall be produced 30 days in advance of the scheduled deposition to the address specified by plaintiffs' counsel. If 100 or fewer pages are produced between 14 and 29 days prior to the scheduled deposition, the deposition shall proceed as scheduled. Any documents produced fewer than 14 days prior to the scheduled deposition must be delivered to the primary examiner,

if one has been designated by plaintiffs' counsel. If a primary examiner has not been designated, the documents shall be produced to the same address to which the previous documents were produced. The parties shall meet and confer regarding the impact, if any, of this production on the scheduled deposition. If the parties cannot agree, the matter shall be referred to the Courts for resolution pursuant to the protocol for Discovery Dispute Resolution set forth in Section 7 of the Joint Coordination Order.

Third-party witnesses subpoenaed to produce documents at a deposition shall be served with the document subpoena at least 30 days before a scheduled deposition, absent written agreement by the parties, time constraints due to orders by the Lead Actions' Court, or a shorter period authorized by the Lead Actions' Court. The requested documents shall be produced at least 14 days before the date noticed for the deposition. Any documents produced fewer than 14 days prior to the scheduled deposition must be delivered to the primary examiner, if one has been designated by plaintiffs' counsel. If a primary examiner has not been designated, the documents shall be produced to the same address to which the previous documents were produced. The parties shall meet and confer regarding the impact, if any, of this production on the scheduled deposition. If the parties cannot agree, the matter shall be referred to the Courts for resolution pursuant to the protocol for Discovery Dispute Resolution set forth in Section 7 of the Joint Coordination Order.

During the deposition, copies of documents about which counsel plan to examine the deponent shall be provided to counsel for the deponent and counsel for the other party participants. As a general rule, hard copies of the documents should be made available to the deponent, the deponent's attorney, and the principal examiners of the deponent. The documents may be provided to other attendees on electronic media such as USB drives or through a secure file sharing service. To the extent possible, all exhibits should have printed Bates or other document control numbers affixed before distribution, which shall remain constant throughout the litigation.

Counsel shall use best efforts to mark exhibits sequentially during each deposition and across depositions, consistent with Northern District of California Local Rule 30-2. All documents marked as exhibits will be attached to the original transcript and will be retained with the original transcript. The

court reporter for each deposition will include in each deposition transcript a list of the exhibits referenced in the deposition.

Objections to the relevance or admissibility of documents used as deposition exhibits are not waived, and are reserved for later ruling by the MDL or JCCP Court or the court in a Coordinated Action.

**12. Examination Concerning Confidential Information**

If a deponent is questioned about any document or exhibit stamped Confidential or Highly Confidential or the Information contained therein, persons to whom disclosure is not authorized under the Protective Order of this Court will be excluded from the deposition for that portion of the examination. Any portion of a deposition transcript containing Confidential Information or Highly Confidential Information shall be sealed so as not to waive confidentiality.

**13. Disputes During or Relating to Depositions**

All disputes regarding any matters arising under this Order, whether pertaining to a deposition in the Lead Actions or any Common Witness deposition in a Coordinated Action, shall be resolved pursuant to Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). Nothing in this Order shall deny counsel the right to suspend a deposition pursuant to Fed. R. Civ. P. 30(d)(3) and seek relief as set forth in Section 7 of the Stipulated Joint Coordination Order.

**14. Transcript and Time to Review Transcript**

Unless waived by the deponent, the deposition transcript shall be submitted to the deponent for correction and signature, and shall be corrected and signed within 45 days after the official transcript of the Court Report is made available to counsel for the party defending the deposition. This time period shall not be extended, absent good cause shown. Corrections to a deposition shall be listed on an errata sheet signed by the deponent and the court reporter shall serve copies of the errata sheet on all parties purchasing the transcript. Should the deponent fail to submit corrections within 45 days, the transcript will be presumed accurate, and all parties shall have the right to use the copy sent to the deponent as if it were final and signed with no corrections needed.

Counsel representing any party in the MDL or JCCP Proceeding or any Coordinated Action may obtain directly from the court reporter, at the requesting counsel's own expense, a transcript of any

deposition taken in the Lead Actions or in any other Coordinated Action, unless stated otherwise in this Order. The transcript of any deposition taken in the Lead Actions or a Coordinated Action shall not be used or disseminated except in accordance with the terms of this Order and the MDL Court's discovery orders.

**15. Use and Admissibility of Depositions**

Under the conditions prescribed in FED. R. CIV. P. 32(a) (1)- (4) CAL. C.C.P. § 2025.620; or as otherwise permitted by the Federal and California Rules of Evidence or the rules in the presiding jurisdiction, depositions taken in accordance with this order may be used against any party (including parties later added and parties in cases subsequently filed in any state court covered by this order, cases filed in, removed to or transferred to the federal court which is covered by this order; all of which are part of this litigation) who:

(a) was present or represented at the deposition; or

(b) had reasonable notice thereof; or

(c) within 30 days after the deposition is taken or within 45 days after becoming a party in one of the Lead or Coordinated Actions fails to show just cause why such deposition should not be used against such party.

This order does not address trial preservation depositions. Nor does it address the timing of any such trial preservation deposition. Such determinations shall be made in each coordinated proceeding.

**IT IS SO ORDERED.**

**DATE: May 20, 2020**



Hon. William H. Orrick
United States District Court Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

This Document Relates to:
ALL ACTIONS

Case No. 19-md-02913-WHO

**CASE MANAGEMENT ORDER NO. 11: RE REMOTE DEPOSITIONS**

The COVID-19 global pandemic has affected virtually every aspect of American society, including civil litigation in this Court and across the federal system. Governmental authorities have responded to this public health emergency by imposing travel restrictions, "stay at home" directives, and other social distancing measures designed to slow the communal spread of the disease. While the Parties may prefer to conduct in-person depositions in this litigation, social distancing restrictions and personal and public health concerns may sometimes preclude this option. Pursuant to Fed. R. Civ. P. 30(b)(4), this Court issues the following protocol to govern depositions where all, or most of the participants, including the court reporter and videographer, are attending remotely ("Remote Deposition").

1. Subject to all of the conditions below, depositions for cases filed in *In Re Juul Labs, Inc., Marketing, Sales Practices, And Products Liability Litigation*, Case No. 2:19-md-02913, may be noticed to take place remotely via video or internet video conference technology.

2. The protocols in this Order supplement Case Management Order No. 10 Deposition Protocol (Dkt. 573) and Case Management Order No. 9 Joint Coordination Order

(Dkt. 572). If the deposition protocols in this Order are deemed to conflict with any provisions in the Joint Coordination Order or Deposition Protocol, the protocols in this Order shall control.

3. The protocols in this Order shall apply to depositions of fact witnesses, including those taken pursuant to the Deposition Protocol, and supplement that Order. For the avoidance of doubt, this Order shall not apply to expert depositions. Protocols for remote depositions not covered by this Order will be set forth in future order(s).

4. Any Remote Deposition taken pursuant to this Court's Orders must comply with the requirements in Fed. R. Civ. P. 30(b)(5). This includes the requirements that, (1) "[u]nless the parties stipulate otherwise, a deposition must be conducted before an officer appointed or designated under Rule 28," and (2) that officer must administer the oath or affirmation to the deponent. A Remote Deposition taken pursuant to this Case Management Order will be deemed to have been taken before an appropriate officer despite the court reporter not being in the same physical location as the witness—as long as the court reporter attends the deposition by the same remote means as the other participants and is able to hear and communicate with other attendees. To the extent permitted by the law of the state in which the witness is located, the witness may be sworn in remotely with the same effect as an oath administered in person.

5. The deposition notice for any Remote Deposition pursuant to Fed. R. Civ. P. 30 must list the location(s) (city and state) from where the witness, the court reporter, and the videographer will attend.

6. All deposition notices must identify the company that will host and record the Remote Deposition (the "Remote Deposition Vendor") and contain a general description of how those attending may access the remote connection being utilized (e.g., GoToMeeting, Zoom, WebEx). The party noticing the deposition must provide the witness and all other attendees with detailed instructions regarding how to participate in the Remote Deposition at least three business days before the deposition—and will use best efforts to provide the detailed instructions at least five business days before the deposition. The noticing party shall bear the costs of the Remote Deposition Vendor, except that if another party objects to the technology proposed by the

noticing party, and the noticing party is amenable to use another technology proposed by the objecting party, the objecting party shall bear the costs of the technology proposed.

7. To host a Remote Deposition, a Remote Deposition Vendor must have implemented adequate security measures to ensure the confidentiality of the Remote Deposition (e.g., video and audio feeds, exhibits). These security measures include using tools such as a "virtual waiting room" that allows the court reporter to admit only individuals authorized to attend the deposition.

8. At least 24 hours before the Remote Deposition is scheduled to start, noticing counsel, defending counsel, the witness, and the Remote Deposition Vendor must conduct a test of the system, equipment, and internet connection that will be used to conduct the Remote Deposition (the "Remote Deposition Technology"). If a witness noticed for a Videoconference Deposition does not have a webcam-equipped tablet, desktop or laptop computer that can be used during the deposition, counsel defending the deposition must provide the deponent with an agreed-upon tablet, desktop, or laptop computer containing the audio, webcam, and Wi-Fi connectivity needed to participate in the deposition. If a witness noticed for a Videoconference Deposition is not being defended by counsel for any Party to this action, the Parties will confer regarding a reasonable method for providing the deponent with an agreed-upon tablet, desktop, or laptop computer containing the audio, webcam, and Wi-Fi connectivity needed to participate in the deposition.

9. At the time of the deposition, the witness must advise the court reporter of his or her physical location. The witness should endeavor to participate in the deposition from a quiet, well-lit, indoor location, while seated in front of a neutral background, and facing the camera being used to record the witness. Only the witness's counsel and in-house counsel is/are permitted to be in the same location as the witness during remote testimony, if the witness consents and such attendance is consistent with social distancing restrictions. Unless otherwise stipulated by the noticing party and counsel for the witness, the deponent participating in a Remote Deposition must participate through video conference (or other remote means capable of producing audio-video transmission), as opposed to telephone or other audio-only means, so that

the officer and noticing party may properly identify and observe the witness throughout the deposition.

10. If counsel for the witness attends the deposition in person, that counsel shall also log into the Remote Deposition, so that all participants can see and hear the counsel for the witness at all times that the deposition is being conducted on the record. Both counsel and the witness shall also comply with any government law, regulation or guidance regarding public health and safety during the COVID-19 pandemic.

11. To avoid any potential disruptions of a Remote Deposition, those attending must enable "do not disturb" settings for applications not in use, including but not limited to, Skype, instant messaging, and/or e-mail notifications. While on the record, the witness must put away and not look at devices other than the device(s) being used for the Remote Deposition. While on the record, there shall be no other programs displaying images on the witness's screen other than the agreed-upon Remote Deposition platform and any exhibits that have been marked for the deposition. The Court recognizes that the microphones for certain attendees (such as the witness, the court reporter, the attorney taking the deposition, and the attorney defending the deposition) must remain on when the deposition is on the record. Other attendees should mute microphones when not speaking. The participating attorneys may be visible to all other participants during the deposition.

12. Each witness, attorney, or other person attending the deposition, either remotely or in-person, shall be identified on the record by name and physical location at the beginning of the deposition (except for consulting experts). Any individual participating remotely should not do so in a public space. Participants should ensure that they are acting in compliance with the governing protective order. After the deponent has been sworn, the deponent must confirm that he or she has either powered down or, at a minimum, temporarily disabled the listening function on any Google Home, Amazon Echo, or any other known "listening devices" placed within listening distance of the deponent.

13. A videographer employed by the Remote Deposition Vendor will record the witness's deposition testimony, by the best technological means available, including remote video

capture/recording. The video recording of the deposition may only be suspended during the deposition upon stipulation by counsel conducting and defending the deposition. With the exception of the videographer and the court reporter, the deposition may not otherwise be recorded electronically without the consent of the Parties. The videographer must only record (1) the audio and video of the witness's testimony; (2) the video of any documents being displayed or annotated for the witness during the deposition; (3) the audio of the attorney actively questioning the witness; and (4) audio of the defending attorney not actively questioning the witness (or any other attorney making an objection on the record).

14. Acceptable Exhibit Formats: During the deposition, full and complete copies of deposition exhibits must be provided to the witness and counsel who are attending the deposition. Deposition exhibits may be made available in physical (hardcopy) form or via the Remote Deposition Technology, file sharing software, or other electronic means.

15. Electronic Exhibits: Exhibits provided electronically shall be accessible such that the deponent and counsel may review the entire exhibit on their own computers or devices, without reliance on the noticing attorney's "share screen." In the case of electronic exhibits, a witness may be required to use a keyboard, mouse, or other similar means to open and/or advance the pages of an exhibit. In such instances, access to a full copy of the deposition exhibit electronically via iPad, tablet, laptop, or other devices, will be deemed to equate to hardcopy access. The fact that a witness was provided with only an electronic copy of an exhibit will be an insufficient basis, by itself, to object to the admissibility of that exhibit at trial.

16. Hardcopy Exhibits: Notwithstanding the foregoing and only if agreed in writing by the participants in a particular deposition, all documents any attorney expects to use as exhibits at a deposition that exceed 100 pages shall be sent to the witness in advance of the deposition in hard copy form. In addition, the Parties agree to work in good faith to reach agreements regarding the provision of hard copy exhibits to a deponent for whom electronic-only versions are particularly problematic. To the extent hardcopy exhibits are provided to the deponent, the package containing the documents shall be sealed, and the witness shall unseal it only when asked to do so on the record at the deposition.

17. While the deposition is on the record, no person aside from the attorney conducting the examination is permitted to communicate with the witness directly or indirectly by any means not recorded in the same manner as the deposition itself (e.g., no private messages, text messages or emails). However, the witness's counsel may communicate with the witness in person, telephonically, or by other electronic means during breaks (including, but not limited to, by means of the use of remote connection software), consistent with Federal Rule of Civil Procedure 30(c)(1). To the extent that the Remote Deposition Vendor's technology includes a "chat" feature or similar capabilities, the noticing party shall ensure that the Remote Deposition Vendor either: (a) disables the feature or (b) implements settings (if available) that require all communications to be seen by all Participants. Nothing in this provision is to be read as prohibiting otherwise appropriate communications among participants and/or attendees by other means.

18. During breaks in the deposition, the Parties may use the breakout room feature provided by the Remote Deposition Vendor, which simulates a live breakout room through videoconference. Conversations in the breakout rooms shall not be recorded. The breakout rooms shall be established by the Remote Deposition Vendor prior to the deposition and controlled by the Remote Deposition Vendor.

19. Technical difficulties, including but not limited to pauses, lags, and/or interruptions in Internet connection shall be addressed as they would be in any in-person deposition. The Parties shall go off the record and attempt to resolve the issue. Technical difficulties will not result in waiver of objections by any party. If any pauses, lags, and/or disruptions are persistent or prolonged, the Parties should: (1) extend the Remote Deposition by an amount of time equal to the duration of the pause, lag, and/or disruption, provided that the additional time is less than an hour; or (2) consider rescheduling the Remote Deposition for a later date, if the additional time required is an hour or more.

20. Any Remote Depositions conducted in accordance with these protocols may be admitted at trial with the same effect and pursuant to the same evidentiary rules as one recorded in-person. The "Confidential" or "Highly Confidential" designation of all or portions of Remote

Depositions will be governed by the provisions MDL Protective Order and the Deposition Protocol (ECF Nos. 308, 573).

21. The Parties acknowledge that Remote Depositions may take longer to complete than an in-person deposition due to logistical challenges beyond anyone's control, and because it may take time for everyone to adjust to the technology. While the Parties will endeavor in good faith to comply with the time limits set forth in the Deposition Protocol, there may be circumstances under which depositions may need to exceed those limits. The Parties will be respectful and collaborative under these circumstances and will make good faith efforts to make reasonable accommodations to allow all Parties adequate additional time to conduct a fair examination. Nothing in this Order prevents a Party from moving for a protective order under Fed. R. Civ. P. 26(c) to require that a given individual deposition proceed in person. However, where a Remote Deposition has been requested by the deponent, the court reporter, or an attorney, an in-person deposition may not be conducted without leave of the court, pursuant to the procedures laid out in Section 7 of the Stipulated Joint Coordination Order ("Discovery Dispute Resolution"). Further, nothing in this Order precludes counsel for a witness from being in the same room as the witness, if the witness consents and such attendance is consistent with social distancing restrictions.

SO ORDERED, on this 21st day of August, 2020.



Judge William H. Orrick
UNITED STATES DISTRICT JUDGE