1   [*Submitting Counsel on Signature Page*]

2

3                      UNITED STATES DISTRICT COURT

4                     NORTHERN DISTRICT OF CALIFORNIA

5

6   IN RE: JUUL LABS, INC. MARKETING          Case No.  3:19-md-02913-WHO
    SALES PRACTICES, AND PRODUCTS
7   LIABILITY LITIGATION                      **PLAINTIFFS' AMENDED COMPLAINT**

8   THIS DOCUMENT RELATES TO:                 Judge: William H. Orrick
    *People of the State of Illinois, et al. v. JUUL*
9   *LABS, INC., et al.,*

10  Case No. 19-cv-06301
    United States District Court for Northern
11  District of Illinois, Eastern Division

12  Case No. 19 L 571
    Circuit Court of Lake County, Illinois[1]
13

14

15

16

17

18

19

20

21

22

23

24

25

26  ─────────────────────
    [1] Plaintiffs have completed briefing on a motion to remand the case to the Circuit Court of Lake
27  County, Illinois and await ruling. Plaintiffs neither waive the right to remand nor submit to this
    jurisdiction; this Amended Complaint is submitted in an abundance of caution in order to preserve
28  the claims against Defendants.

Plaintiffs bring this Second Amended Complaint and Demand for Jury Trial against Defendants JUUL Labs, Inc.; Altria Group, Inc.; Altria Client Services, LLC; Altria Group Distribution Company; Altria Enterprises, LLC; James Monsees; and Adam Bowen; and allege as follows:

## INTRODUCTION

1.      The tobacco industry has preyed on America's youth for decades, aggressively promoting tobacco products using tactics designed to appeal to children. The goal of its marketing campaign was simple: recruit new users at a young age, addict them, and make them life-long patrons. But while big tobacco companies reaped billions of dollars in profits off addicting America's youth to cigarettes, smoking became a public health epidemic, leading to widespread death and disease, pain and suffering, and massive amounts of money in healthcare costs. Beginning in the late 1990s, adolescent smoking rates finally began to fall. This was not, of course, because nicotine became any less addictive or because tobacco companies stopped preying on America's youth. Instead, it took years of legal battles and government regulation to blunt big tobacco's reach into youth populations.

2.      While falling addiction rates would be viewed as a remarkable accomplishment by any objective measure, JUUL saw it as an opportunity. In particular, JUUL sought to fill the void left by big tobacco by creating a new-age electronic cigarette, the "JUUL", that is so addictive it led to the "largest ever recorded [increase in substance abuse] in the past 43 years for any

adolescent substance used in the U.S."[2] By utilizing new technologies and social media, JUUL picked up right where the big tobacco companies left off.

3.      First, JUUL developed a nicotine-dispensing product even more addictive than traditional cigarettes. Nicotine itself affects brain development, attention, cognition, and raises the risk of addiction to other dangerous drugs. Nicotine acts directly on the neurotransmitter dopamine, causing a dependence similar to heroin and other deadly opiates that have similarly decimated American communities. Due to JUUL's innovative nicotine delivery system, the nicotine contained in a JUUL is even more potent than the nicotine in traditional cigarettes, which is even more pronounced when used by adolescents. By creating a high-quantity, rapid, nicotine delivery system, JUUL has turned a generation of adolescents into addicts, constantly craving their next hit off their JUUL. And while traditional cigarette smoke leaves an odor and is easily detectible, the JUUL device comes in candy flavors and produces a vapor, so it can be smoked almost anywhere and easily hidden from teachers, parents, and peers.

4.      Next, JUUL launched a massive online and social media advertising campaign. Because social media platforms, for example, are primarily used by adolescents, JUUL was able to easily target and manipulate youth by using advertisements designed to fulfill powerful psychological needs like popularity, peer acceptance, and a positive self-image. JUUL's ads consistently used attractive young models smoking JUULs and partying in provocative, sexual settings to lure the next generation of nicotine addicts. Additionally, JUUL saturated social media

---

[2] Vaping Surges: Largest Year-to-Year Increase in Substance Use Ever Recorded in the U.S. for 10th and 12th Grade Students, University of Michigan Institute for Social Research (Dec. 17, 2018), https://isr.umich.edu/news-events/news-releases/national-adolescent-drug-trends-in-2018/.

feeds with advertisements, hashtags, and paid influencers—all promoting JUUL's sleek new product.

5.     JUUL's predatory strategies were so obvious the United States Food and Drug Administration was compelled to open its own investigation into JUUL's youth targeting. In response, JUUL "shut down" its social media accounts and promised to stop selling flavored nicotine pods. JUUL's promises, however, have proven empty. Its social media campaign remains active and JUUL still sells flavored nicotine. Moreover, to a large extent the damage is already done. JUUL's deceptive and negligent practices have already led to widespread adolescent addiction to JUUL's dangerous product which can only be undone through expensive anti-addiction and cessation treatment.

6.     Now that JUUL controls nearly 75% of the e-cigarette market, it is changing course and attempting to brand itself as a "safe" alternative to smoking and as a means to stop smoking traditional cigarettes. JUUL's attempt to rewrite its history is nothing more than a façade, promulgating a false narrative designed to lure adults already addicted to nicotine and vulnerable children who have no understanding of the lifelong, adverse health consequences these devices impose. What's more, in December 2018, Altria, the corporate conglomerate formerly known as Phillip Morris—one of the world's largest producers and marketers of tobacco cigarettes—purchased a 35% stake in JUUL for approximately $12.8 billion. As such, JUUL is now backed, owned, emboldened, and beholden to big tobacco.

7.     This complaint seeks relief for the Lake County, Illinois children and teenagers who call it home. JUUL has caused a public health crisis that has already devastated millions of children's and family's lives. Accordingly, the People of Lake County, Illinois, by and through

Lake County State's Attorney Eric Rinehart, seek civil penalties and all appropriate injunctive relief to address, remedy, and prevent harm to Lake County, Illinois residents resulting from JUUL's misconduct.

## PARTIES

**Plaintiffs**

8.      Plaintiffs bring this action in the public interest for and on behalf of the People of Lake County, Illinois.

**JUUL Labs, Inc.**

9.      Defendant JUUL Labs, Inc. is a corporation existing under the laws of the State of Delaware, with its principal place of business located at 560 20th Street, San Francisco, California 94107. In 2015, Ploom, Inc. changed its name to PAX Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name PAX Labs, Inc. That new subsidiary PAX Labs, Inc. ("PAX"), was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

10.      JUUL designs, manufactures, sells, markets, advertises, promotes and distributes JUUL e-cigarettes devices, JUUL pods, and accessories. Prior to the formation of separate entities PAX Labs, Inc. and JUUL Labs, Inc. in or around April 2017, JUUL designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the name PAX Labs, Inc.

11.      Together with its predecessors, JUUL Labs, Inc. is referred to herein as "JUUL."

**Altria Defendants**

12.     Defendant Altria Group Inc., (together with its wholly owned subsidiaries and their predecessors, "Altria" or the "Altria Defendants") is a Virginia corporation, having its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco products, manufacturing and selling combustible cigarettes for more than a century.

13.     On December 20, 2018, Altria purchased a 35% stake in JUUL. Altria and JUUL executed a Services Agreement that provides that Altria, through its subsidiaries, Philip Morris, Altria Client Services LLC, and Altria Group Distribution Company, would assist JUUL in the selling, marketing, promoting, and distributing of JUUL, among other things.

14.     Defendant Altria Client Services LLC ("Altria Client Services" or "ACS") is a Virginia limited liability company with its principal place of business in Richmond, Virginia. Altria Client Services provides Altria Group, Inc. and its companies with services in many areas including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Pursuant to Altria's Relationship Agreement with JUUL, Altria Client Services assists JUUL in the sale, marketing, promotion, and distribution of JUUL products. Such services include database support, direct marketing support, and premarket product application support. On September 25, 2019, the former senior vice president and chief growth officer of Altria Client Services, K.C. Crosthwaite, became the new chief executive officer of JUUL.

15.     Defendant Altria Group Distribution Company ("AGDC") is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Richmond, Virginia. Altria Group Distribution Company provides sales, distribution, and consumer engagement services to Altria's tobacco companies. Altria Group Distribution

Company performs services under the Relationship Agreement to assist JUUL in the sale, marketing, promotion, and distribution of JUUL. Such services include JUUL distribution support, the removal by Altria Group Distribution Company of Nu Mark Products (such as Green Smoke or MarkTen) and fixtures in retail stores and replacing them with JUUL products and fixtures, and sales support services.

16.     Defendant Altria Enterprises LLC ("Altria Enterprises") is a wholly owned subsidiary of Altria Group, Inc. Altria Enterprises is a Virginia limited liability company with its principal place of business in Richmond, Virginia. Altria Enterprises is a party to the purchase agreement between Altria Group, Inc. and JUUL. Altria Enterprises purchased Altria's stake in JUUL on Altria's behalf. Collectively, Altria Group, Inc. and its subsidiaries named above will be referred to herein as "Altria." Upon information and belief, Altria conducted meetings, interviews, and inspections at the JUUL facilities in San Francisco and engaged in frequent communications regarding JUUL with JUUL in California and elsewhere prior to, during, and subsequent to its stock purchase.

**Management Defendants**

17.     Defendant James Monsees is a resident of the San Francisco Bay Area, California. In 2007, he co-founded Ploom with Defendant Bowen. He served as Chief Executive Officer of JUUL until October 2015. Since October 2015, he has been Chief Product Officer of JUUL. At all relevant times, he has been a member of the Board of Directors of JUUL until he stepped down in March 2020.

18.     Defendant Adam Bowen is a resident of the San Francisco Bay Area, California. In 2007, he co-founded Ploom with Defendant Monsees. At all relevant times, he has been Chief Technology Officer and a member of the Board of Directors of JUUL.

19.     Defendants Monsees and Bowen are referred to collectively as the "Management Defendants.

**JURISDICTION AND VENUE**

20.     The Circuit Court of Lake County in Illinois has jurisdiction over this matter pursuant to Article VI, Section 9 of the Illinois Constitution.

21.     The Circuit Court of Lake County has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209 because they conduct business transactions in Illinois, have committed tortious acts in Illinois, and have transacted substantial business in Illinois that caused harm in Illinois, including the businesses are the subject matter of this complaint.

22.     Venue is proper in the Circuit Court of Lake County under 735 ILCS 5/2-101, as the transactions and occurrences that form the basis for this complaint occurred in Lake County.

23.     On September 20, 2019, JUUL removed the action from the Circuit Court of Lake County, Illinois where it was pending as Case No. 2019-L-571 to the United States District Court for the Northern District of Illinois as Case No. 19-cv-06301. On October 18, 2019, Plaintiffs filed Plaintiffs' Motion for Remand to State Court and Plaintiffs' Memorandum in Support of Motion for Remand to State Court.  On November 18, 2019, JUUL filed its Opposition to Motion for Remand. On December 6, 2019, Plaintiffs filed Plaintiffs' Reply in Support of Motion for Remand

to State Court.  On February 4, 2020, a Transfer Order was entered over Plaintiffs' opposition transferring this case to the Northern District of California for inclusion in the coordinated or consolidated pretrial proceedings. The briefing as to Plaintiffs' Motion for Remand is completed and awaits ruling.

**FACTUAL ALLEGATIONS**

I.    **History of Tobacco Litigation and Regulation Leading to the Prohibition of Advertising and Marketing to Minors**

24.    The tobacco industry as a whole has a sordid history of deceptive marketing that made it one of the most profitable industries in the world. Since the late 19th and early 20th Century, tobacco companies have made use of advertisements to market their products to adolescent users. Over the last 75 years, however, litigation and regulation have effectively led to the prohibition of advertising and marketing cigarettes to minors.

25.    Beginning in the 1950s, individuals began bringing personal injury and wrongful death claims against big tobacco companies. In the 1960s, the U.S. Surgeon General began reporting on the dangers associated with smoking. In 1965, in response to the U.S. Surgeon General's reports, the United States Congress passed the Federal Cigarette Labeling and Advertising Act, requiring a surgeon general's warning on cigarette packs. In 1971, all broadcast advertising for cigarettes was banned. Despite these efforts, smoking remained rampant.

26.    In March 1994, the U.S. Surgeon General reported on the impact tobacco advertising and promotional activities has on tobacco consumption by youths and, among other things, found that the use of human models and cartoon characters in cigarette advertisements

conveyed themes that appealed to young people.[3] In a separate 1994 consensus study by the National Academies of Science, Engineering, and Medicine, various themes used by tobacco companies to market to children were studied. The report ultimately recommended forbidding the use of images and pictures which encouraged adolescent use, and allowing only text without slogans, scenes, or colors, as these marketing techniques encouraged adolescent use.[4]

27.    From 1994 through 1997, Attorneys General across the United States filed lawsuits against the tobacco industry, including the Attorney General from Illinois and also Attorneys General from Alabama, Alaska, California, Colorado, Connecticut, Florida, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Texas, Utah, Washington, and West Virginia.

28.    In 1998, a settlement agreement was reached, known as the Tobacco Master Settlement Agreement ("MSA"), that required cigarette companies to pay $368.5 billion over 25 years to compensate states for the costs of treating smoking-related illness, to finance nationwide anti-smoking programs, and to underwrite healthcare for millions of uninsured children. The settlement agreement was designed to "forever change the way cigarettes are marketed in the United States" by banning various marketing practices that targeted individuals under 18 years-old.

---

[3] Preventing Tobacco Use Among Young People: A report of the Surgeon General, Centers for Disease Control and Prevention (Mar. 11, 1994), https://www.cdc.gov/mmwr/pdf/rr/rr4304.pdf.

[4] Growing up Tobacco Free: Preventing Nicotine Addiction in Children and Youths (1994), https://www.ncbi.nlm.nih.gov/books/NBK236761/.

29.     In 2006, the United States District Court for the District of Columbia found that major U.S. cigarette companies, including Phillip Morris (now Altria, JUUL's largest shareholder), had violated the MSA by: (1) fraudulently claiming that "low tar" and "light" cigarettes were less harmful when the companies knew they were not and (2) by marketing their products to children.[5]

30.     In 2009, President Barack Obama signed into law the Family Smoking Prevention and Tobacco Control Act ("FSPTCA"), limiting the use of color on tobacco advertisements; limiting advertising in publications with significant teen readership to black text on white background only; establishing 18 as a federal nationwide minimum age for legal cigarette and smokeless tobacco sales; and prohibiting terms such as "light," "mild," and "low-tar" on tobacco product packages and advertisements. When drafting the FSPTCA, Congress revealed a number of interesting findings, including:

- Reducing the use of tobacco by minors by 50% would prevent well over 10,000,000 children from becoming regular, daily smokers, saving over 3,000,000 of them from premature tobacco-induced death. Such a reduction in youth smoking would also result in approximately $75,000,000,000 in savings attributable to reduced health care costs;

- Advertising, marketing, and promotion of tobacco products have been directed to attract minors to using tobacco products, and these efforts have resulted in increased use of such products by minors;

- The use of tobacco products in motion pictures and other mass media glamorizes its use for minors and encourages them to use tobacco products;

- Minors are more susceptible to advertisements promoting reduced cigarette prices; and

- Minors are generally more influenced by tobacco marketing than adults.

---

[5] *See United States v. Phillip Morris USA, Inc.*, 9 F. Supp. 2d 1 (D.D.C. 2006).

31.     Thanks to the above-referenced litigation and regulation, big tobacco's advertising practices of traditional cigarettes had been severely restrained. As a result, for example, 12th grade smoking rates plummeted from 24.6% in 1997 to 5.5% in 2015.[6] Unfortunately, however the same cannot be said for the recent rise of electronic smoking devices.

## II.     Electronic Nicotine Delivery Systems and E-Cigarettes

### A.     The Rise of Electronic Nicotine Delivery Systems and E-Cigarettes

32.     Electronic nicotine delivery systems ("ENDS") are hand-held products designed to deliver nicotine and other substances to a user in the form of vapor. ENDS typically consist of a battery-powered heating element, a replaceable cartridge that contains high levels of nicotine, and an atomizer. When heated, the liquid contents of the cartridge are converted into a vapor that the user inhales, delivering nicotine rapidly into their bloodstreams.

33.     ENDS come in many shapes and sizes and are colloquially referred to as vapes, vaporizers, vape pens, weed pens, hookah pens, electronic cigarettes, e-cigarettes, e-cigs, and e-pipes. ENDS may be manufactured to look like conventional cigarettes, cigars, pipes, pens, and USB flash drives, while others resemble canteens or portable hard drives (sometimes referred to as "tank systems"). The use of ENDS to inhale nicotine-infused vapor is commonly referred to as "vaping," "vaporizing," or—most recently and popularly—"JUULing."

34.     In 2014, the e-cigarette market was worth approximately $2.76 Billion, in 2015, it grew to $4.55 Billion, and in 2016, the market value raised to $7.1 Billion. Recent projections predict the e-cigarette industry as a whole will reach a valuation of $44.61 Billion by 2023.

---

[6]     Adolescents and Tobacco: Trends, U.S. Department of Health and Human Services, https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/ index.html.

35.     According to the British Journal of Medicine, "the increase in JUUL use among adolescents . . . [is] almost entirely responsible for the overall growth in the [United States] vaping market."[7]

**B.     Chemicals contained in ENDS and E-Cigarettes**

*i.     Nicotine*

36.     Nicotine is highly-addictive and acts directly on the neurotransmitter dopamine, causing a dependence similar to heroin and other deadly opiates. Nicotine's potency is even more pronounced when used by adolescents, affecting brain development, attention, cognition, and raising the risk of addiction to other drugs. The addictive nature of nicotine is widely known. A 2007 study found that nicotine was the third most addictive substance in the world behind heroin and cocaine.

37.     Nicotine's highly addictive nature stems from its effects on the central nervous system. When ingested, nicotine can accelerate blood pressure and pulse, affect mood, increase circulating levels of hormones and neurotransmitters, increase metabolic rate, constrict blood vessels, and cause muscle relaxation. Once nicotine enters the body through inhalation, it is distributed quickly through the bloodstream and crosses the blood-brain barrier, reaching the brain within 10-20 seconds after inhalation. The acute effects of nicotine, though, are fleeting and dissipate in a few minutes. This causes the user to continue dosing frequently throughout the day to maintain the drug's pleasurable effects and prevent withdrawal.

---

[7] https://www.bmj.com/content/365/bmj.l2219

38.     There is a frightening overlap between the effects of nicotine and opiates on dopamine signaling with the brain's rewards centers.[8] Studies have shown the severity of tobacco and nicotine addiction, equating its grip on the individual to that of heroin, as both nicotine and opiates act on the same structures and receptors in the human brain.[9]

39.     Nicotine has the potential to adversely affect the heart (ischemia and myocardial dysfunction), eyes (macular degeneration and cataracts), reproductive system (irregular menstrual cycles), lungs (asthma and emphysema), kidneys (chronic kidney disease), and has teratogenic side-effects (cognitive deficits and behavioral abnormalities). Exposure to nicotine, even from non-traditional tobacco sources such as nicotine e-cigarettes, produces an increased risk of cardiovascular disease, an increased risk of peripheral arterial disorders due to the increase in blood pressure and its constrictive effect on blood vessels, and an increased risk of stroke.

40.     The adolescent brain is exceptionally more vulnerable to the addictive effects of nicotine because the circuits of the brain underlying pleasure and the pursuit of novel and enjoyable experiences develop faster than the circuits in the brain that promote decision-making, impulse control, and rational thinking. Compared with adults, adolescents are generally more motivated by rewards, are less averse to risks, and are more influenced by peers. The same applies to the estimation of health risks relating to smoking—adolescents have a more optimistic attitude regarding their smoking behavior, believing that they "could smoke for a few years and then quit if they wished."[10]

---

[8] Opiate And Nicotine Have Surprisingly Similar Effect On Brain's Reward System, Science Daily (Feb. 19, 2008), https://www.sciencedaily.com/releases/2008/02/080212171131.htm.

[9] *Id.*

[10]  Arnett JJ. Optimistic bias in adolescent and adult smokers and nonsmokers. *Addict Behav.* 2000; 25(4): 625-32.

41.     Among adolescents, the use of nicotine is a psychiatric problem that cultivates addictive behaviors by rewiring and interfering with brain development. Several studies indicate that smoking and nicotine exposure during adolescence is associated with disturbances in working memory and attention, as well as reduced prefrontal cortex activation.[11] Studies show that adolescent tobacco and nicotine use are associated with later risk of developing mental and behavioral problems such as major depressive disorder, agoraphobia, panic disorder, addiction to other substances, antisocial personality disorder, and/or academic.[12] Not only does the use of nicotine by adolescents result in a greater level of addiction to nicotine itself, but it increases vulnerability to initiation and subsequent addiction to other drugs.

42.     Simply put, the adolescent brain is more vulnerable to the effects of nicotine than the adult brain. Adolescents progress faster to nicotine dependence than adults, find nicotine more rewarding, underestimate the risks of smoking, and are more influenced by smoking behavior in their social milieu. Dr. Sharon Levy, director of the Adolescent Substance Use and Addiction Program at Boston Children's Hospital, called the popularity of teen vaping an "entirely predictable problem," given adolescents' vulnerability to nicotine. Dr. Levy has treated numerous

---

[11] Jacobsen LK, Krystal JH, Mencl WE, Westerveld M, Frost SJ, Pugh KR. Effects of smoking and smoking abstinence on cognition in adolescent tobacco smokers. Biological Psychiatry. 2005;57:56–66; Musso F, Bettermann F, Vucurevic G, Stoeter P, Konrad A, Winterer G. Smoking impacts on prefrontal attentional network function in young adult brains. Psychopharmacology (Berl) 2007;191:159–169.

[12] Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortext Neuronal Network Function, Cold Spring Harb Perspect Med. (Dec. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069.

"vape-addicted" adolescents in her program, showing psychiatric symptoms rarely seen with traditional cigarettes or among adults.

   *ii.   Other chemicals and health issues associated with ENDS and e-cigarettes*

43.   Along with nicotine, e-cigarettes and vaping introduce other foreign substances into the lungs.

44.   In examining the vapor emitted from e-cigarettes, researchers have detected significant levels of at least 31 harmful chemical compounds, including propylene glycol, glycidol, formaldehyde, acetaldehyde, and acrolein—all either carcinogens or respiratory irritants.[13]

45.   The prolonged consumption of these chemicals is likely to produce chronic obstructive pulmonary disease (just like traditional cigarette smoke); immune responses associated with inflammatory lung diseases; constrict peripheral airways; impact the central nervous system, behavior, and spleen; and cause throat and mouth irritation, cough, nausea, and vomiting.

46.   JUUL fails to disclose that its products contain any of the above chemicals or the associated adverse health effects.

III.   JUUL

   A.   Background

---

[13] Study identifies two additional carcinogens not previously reported in e-cigarette vapor, Lawrence Berkeley National Laboratory (July 27, 2016), https://phys.org/news/2016-07-additional-carcinogens-previously-e-cigarette-vapor.html.

47.     JUUL's s co-founder James Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[14] Of course, this "successful" product has long been the world's leading cause of preventable death.

48.     Years of anti-smoking campaigns, including work by local government public health departments and school-based anti-tobacco programs, have made great strides towards de-normalizing cigarette smoking. But where public health officials and schools saw progress, others saw an opportunity.

49.     Citing "some problems" inherent in the cigarette, Defendants Monsees and Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[15] Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[16] Successfully capitalizing on this opportunity would mean not only billions of dollars in short-term revenue but lucrative acquisition by a cigarette industry power player.

50.     The Management Defendants took the first major step toward realizing their vision by deliberately creating an extremely potent nicotine product that looked nothing like a cigarette.

51.     The Management Defendants knew that their desire to create a massive new market for JUUL on their own would be aided if they could convert Altria, an experienced

---

[14] Kathleen Chaykowski, Billionaires-to-be: Cigarette Breakers–James Monsees and Adam Bowen Have Cornered the US E-Cigarette Market with Juul. Up Next: The World, FORBES INDIA (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1. No. 19-md-2913-WHO

[15] Josh Mings, Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods, SOLID SMACK (Apr. 23, 2014), www.solidsmack.com/design/ploom-modeltwo-slick-design-tobacco-pods.

[16] *Id.*

cigarette company with a history of marketing to youth and covering it up, into an ally. They turned to Altria in the Spring of 2017. While Defendants JUUL and the Management Defendants are relative newcomers to the tobacco industry, Altria has been manufacturing and selling "combustible" cigarettes for more than a century. Notwithstanding their different histories, JUUL and the Management Defendants, for their part, invited Altria into the fold as an ally with ample resources to further expand the market of nicotine-addicted e-cigarette users and to keep litigation and regulation at bay. While JUUL and the Management Defendants publicly claimed to be out to "disrupt" the industry, they privately negotiated and ultimately relinquished a 35% ownership stake in the company to a cigarette giant.

52.     Cigarette companies have long known that profitable growth requires a pipeline of "replacement" customers. Altria, after decades of tobacco litigation and regulation, had little ability to recruit new smokers in the ways that had driven Philip Morris's success through most of the 1900s. In 2017, Altria's combustible cigarette products were facing increasing regulatory pressures. In late July 2017, Altria's stock value plummeted shortly after the FDA announced that it would reduce the amount of nicotine allowed in cigarettes with an eye toward checking non-additive level.[17] In late 2017, Altria, and other major cigarette companies, also finally complied with a consent decree from the 1990s tobacco litigation that required them to issue corrective

---

[17] See Dan Caplinger, Altria Group in 2017: The Year in Review, THE MOTLEY FOOL (Dec. 18, 2017), https://www.fool.com/investing/2017/12/18/altria-group-in-2017-the-year-in-review.aspx.

advertising statements that highlighted the addictiveness and health impacts of smoking cigarettes.[18]

53.     Due in large part to this litigation and regulation, cigarette use has been declining in the United States in the last decade, especially among youth.[19] Altria estimates that the cigarette industry declined by 4% in 2017 and by 4.5% in 2018, and predicted a continued 4% to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.[20] Altria later adjusted the estimated rate of decline to 4% to 6% to reflect effort to increase the legal age for cigarette smoking to 21.[21]

54.     Altria had undertaken its own efforts at marketing an e-cigarette product. Altria had launched the MarkTen product nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for the market leader at that time, blu e-cigarettes.[22] Of the

---

[18] Chuck Stanley, Tobacco Cos. Settle Long-Running Health Warning Dispute, LAW360 (Apr. 25, 2018, https://www.law360.com/articles/1037281/tobacco-cos-settle-long-running-health-warning-dispute.

[19] Current Cigarette Smoking Among Adults In the United States, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (last visited May 5, 2020); Youth and Tobacco Use, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last visited May 5, 2020).

[20] Altria's Fourth-Quarter 2018 Earnings Conference Call, Altria (Jan. 31, 2019), http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.

[21] Altria Shares Slide As Cigarette Sales Continue to Decline, Tobacco Bus. (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.

[22] Jennifer Cantrell et al., Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace, 25 Tobacco Control e125 (10) (2015), http://dx.doi.org/10.1136/tobaccocontrol-2015-052532.

$88.1 million spent on e-cigarette advertising in 2014, nearly 40% of that was Altria's MarkTen campaign, at $35 million.[23]

55.    Altria was clear in its intent to dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at the time of MarkTen's launch.[24] The original MarkTen was a "cigalike," designed to mimic the look and feel of a combustible cigarette.

56.    Altria had also been acquiring small companies in the e-cigarette industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."[25] In 2016 Altria acquired a product called Cync, from Vape Forward.[26] Cync is a small e-cigarette device that uses prefilled pods in a variety of flavors, similar to the JUUL.

57.    In February 2017, Altria told investors at the 2017 Consumer Analyst Group of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made excellent progress toward its long-term aspiration of becoming a leader in e-vapor."[27] In his remarks,

---

[23] *Id.*

[24] Melissa Kress, MarkTen National Rollout Hits 60,000 Stores, CONVENIENCE STORE NEWS (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[25] Mike Esterl, Altria To Launch MarkTen E-Cigarette Nationally, WALL ST. J. (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378; Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth at 12 (Apr. 14, 2014),* https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

[26] Remarks by Jody Begley, 2017 Altria Investor Day (Nov. 2, 2017), http://media.corporate-ir.net/media_files/IROL/80/80855/2017InvestorDay/Remarks_and_Reconciliations.pdf.

[27] Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, CEO and President, and other members of Altria's senior management team 2017 Consumer Analyst Group of New York

---

Altria's current CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year. It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations." He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately $2.5 billion."[28] In 2017, Altria's MarkTen e-cigarettes had a market share of only 13.7%, well behind JUUL's growing market share of 40%.[29] Thus, despite its public statements to the contrary, Altria knew the popularity of JUUL stood in the way of Altria becoming the dominant force in the e-cigarette market.

58.    With smoking on the decline, litigation and regulatory controls were ramping up and threatening Altria's ability to attract new smokers, and JUUL outperforming Altria's products in the market, Altria's best bet for maintaining its sales by increasing the number of users, and especially minors, addicted to nicotine was to partner with JUUL: (1) to maintain or increase the number of users, and especially minors, hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first scheme.

59.    For those reasons and others, Altria began coordinating with JUUL and the Management Defendants in the Spring of 2017. Before then, Altria and JUUL were members of at

---

(CAGNY),    (2017),    http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.

[28] *Id.*

[29] Richard Craver, Vuse falls further behind Juul on e-cig sales, WINSTON-SALEM JOURNAL (Dec. 14, 2017), https://www.journalnow.com/business/vuse-falls-further-behind-juul-on-e-cig-sales/article_ed14c6bc-5421-5806-9d32-bba0e8f86571.html.

least one industry group that shared information and coordinated public statement regarding the

e-cigarette market, and Ploom's advisory committee included Altria's former growth officer. In

Altria's words, the company followed "JUUL's journey rather closely" from its early beginnings.[30]

60.    According to Howard Willard, Altria's CEO, Altria first contacted JUUL about a

commercial relationship in early 2017, with "confidential discussions" beginning in the Spring of

2017.[31] JUUL's pitch deck to investors at the time boasted that "Viral Marketing Wins," and that

JUUL's super potent nicotine formulation was "cornering" the consumables market *with the*

*highest customer retention rate, i.e. addictions rate, of any e-cigarette.*[32]

61.    JUUL and Atria's "confidential discussions" occurred "over a period of

approximately 18 months."[33] On July 30, 2018, in advance of a meeting between the lead

negotiators from JUUL and Altria, it was made clear that an end to competition from Altria's e-

cigarette products was a key term of any deal. On August 1, 2018, the companies' negotiators met

at the Park Hyatt Hotel in Washington, D.C., to discuss terms. By the Fall of 2017, JUUL, the

Management Defendants, and Altria had agreed to and had taken coordinated actions to maintain

and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and

growing customer base.

---

[30] Olivia Zaleski & Ellen Huet, Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions, BLOOMBERG (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.

[31] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[32] INREJUUL_00349529.

[33] *Id.*

62.     During the roughly 18-month negotiating period, it was JUUL, the Management Defendants, and Altria that primarily directed and conducted fraudulent acts designed to grow the market of youth nicotine-addicted e-cigarette users.

63.     Without the Management Defendant's control of JUUL and prior fraudulent conduct, the close coordination between JUUL and Altria, and Altria's investment in JULL, would not have been possible.

64.     In December 2018, Altria decided to take the next step in its coordination with JUUL and the Management Defendants by making a $12.8 billion equity investment in JUUL, the largest equity investment in United States history. This arrangement was profitable for both companies, as well as the Management Defendants. JUUL employees received $2 billion in bonuses, which, split among the Company's 1,500 employees, was approximately $1.3 million per employee,[34] and Altria received millions of loyal teen customers. In deciding to make a huge investment in JUUL, Altria took into account that the e-cigarette industry would see significant year-over-year growth in the near term, and that "JUUL continu[es] to be a growth driver for the e-vapor category."[35]

65.     In July 2018, JUUL's valuation was approximately $15 billion.[36] But in December 2018, Altria's investment of $12.8 billion for a 35% stake in the company reflected a valuation of

---

[34] Olivia Zaleski, Juul Employees to Get $2 Billion Bonus in Altria Deal, BLOOMBERG (Dec. 20, 2018),        https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus- in-altria-deal.

[35] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[36] Rachel Becker, Why Is Juul Worth $16 Billion? It's More Like a Cigarette Than You Think, THE VERGE (Jul. 3, 2018), https://www.theverge.com/2018/7/3/17529442/juul-vapes-nicotine-electronic- cigarettes-addiction-funding.

approximately $38 billion—more than two and a half times the valuation just five months earlier. The Management Defendants, thus, saw the value of their investments in JUUL skyrocket as a result of the Altria agreement, allowing them to cash out via a special dividend and bonus, as well as through stock sales that were not available to other of JUUL's minority shareholders."[37]

66.     This investment further intertwined JUUL and Altria. According to the terms of its investment, Altria may appoint one third of JUUL's board. And in October 2019, JUUL's CEO resigned to be replaced by another career Altria executive, K.C. Crosthwaite. The key JUUL negotiators of the Altria deal and other officers and directors, including the Management Defendants, would have been instrumental in bringing Crosthwaite on board at JUUL. Crosthwaite had most recently served as the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work to assist Altria's companies, including with digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Crosthwaite knows the cigarette industry's playbook all too well, having previously served as the president and CEO of Phillip Morris USA, the vice president and general manager at Marlboro—the leading cigarette brand among youth—and the vice president of strategy and business development of at Altria Client Services LLC.

67.     In addition, Joe Murillo, who headed regulatory affairs for Altria, and served as President and General Manager of Nu Mark, LLC (Altria's e-cigarette business), became JUUL's chief regulatory officer in October 2019.

---

[37] Tiffany Kary, *JUUL Founders Sued for Self-Dealing Over Altria's $12.8 Billion*, BLOOMBERG (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-deali ng-over-altria-s-12-8-billion.

68.     Both before and after Altria's investment, JUUL, through its employees and officers, provided Altria with critical information regarding the design and nicotine content of the JUUL product, the labeling of the JUUL product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor preferences, and regulatory strategies. Altria, for its part, guided JUUL and the Management Defendants in these areas and helped them devise and execute schemes to maintain and expand the e-cigarette market.

69.     JUUL, the Management Defendants, and Altria worked together to implement their shared goal of growing a new market in the image of the combustible cigarette market through a multi-pronged strategy to: (1) create a highly addictive product that users would not associate with cigarettes and that would appeal to the lucrative youth market; (2) deceive the public, and especially young people, into thinking the product was a fun and safe alternative to cigarettes that would help smokers quit; (3) actively attract young users through targeted marketing, and (4) use a variety of tools, including false and deceptive statements to the public and regulators, to delay regulation of e-cigarettes. As detailed more fully throughout this Amended Complaint, each of the Defendants played a critical role—at times overlapping and varying over time—in each of these strategies.

70.     JUUL along with the Management Defendants, worked together to maintain and expand the number of nicotine-addicted e-cigarette users, including young people in particular, in order to ensure a steady and growing customer base.

71.     That growing customer base was crucial to JUUL and the Management Defendants' long term objective—lucrative acquisition by another company. They recognized that JUUL's

product, with its potential to dominate the nicotine products market by hooking new users, would appeal to one segment of the economy in particular: the cigarette industry.

72.     JUUL and the Management Defendants also recognized that their business goal—becoming part of the cigarette industry—was unlikely to endear them to the consumers that they needed to purchase their products. Years of anti-smoking campaigns have successfully stigmatized cigarette smoking. When the Management Defendants presented their thesis and product design to their classmates, they included a clip from a South Park episode showing the characters assembled at the Museum of Tolerance and shaming a smoker.[38]

73.     The Management Defendants needed to shape social norms such that the public attitude towards e-cigarettes would allow people to use their product without the stigma and self-consciousness smokers experienced. The Management Defendants saw a market opportunity in a generation of non-smoking young people brought up on anti-smoking norms. In Monsees' words, they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with– cigarettes."[39]

74.     From the beginning, however, the Management Defendants actively sought the investment and assistance of major cigarette companies.

75.     JUUL and the Management Defendants retained the Investment Bank Stifel to help JUUL "establish strong international partnerships with leading tobacco companies ("LT") to accelerate JUUL."[40] According to Stifel, "JUUL could be a multi-billion opportunity to LT over

---

[38] Gabriel Montoya, Pax Labs: Origins with James Monsees, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/
[39] Id.

[40] INREJUUL_00016386

time," and Stifel offered to manage a process that: "Identified the best Partner(s) for JUUL"; "Best positions JUUL to each partner"; "Creates a catalyst for [LT] decision making"; and "drives strong economic value and terms through competition."[41] The end result of the process would be an exclusive agreement with the cigarette industry that would "maximize JUUL Growth Trajectory."

76.     Stifel's presentation to the JUUL Board of Directors, including the Management Defendants, emphasized the stagnant and declining cigarette market, and the sharply growing e-cigarette market."

77.     This goal—acquisition by a major cigarette company—was a motive that the JUUL and the Management Defendants would return to in making decisions about the manufacture and marketing of JUUL products. As an example, in a 2016 email exchange with JUUL employees regarding potential partnerships with e-cigarette juice manufacturers, Defendant Bowen reminded the employees that "big tobacco is used to paying high multiples for brands and market share."[42] Bowen knew that to achieve the ultimate goal of acquisition, JUUL and the Management Defendants would have to grow the market share of nicotine-addicted e-cigarette users, including youth in particular, regardless of the human cost.

78.     JUUL and the Management Defendants sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction, especially among young people; and, second, by marketing and

---

[41] Id.
[42] INREJUUL_00294198

misbranding that potent product to the broadest possible audience of potential customers, including young people, in particular, whose addiction would last the longest and be the most profitable for the Defendants.

79. Presently, JUUL has the largest market share of any e-cigarette in the United States. From 2016 to 2017, JUUL's sales increased 641%, rising from 2.2 million devices sold in 2016 to 16.2 million devices in 2017, giving JUUL 46.8% of the e-cigarette market. By 2018, JUUL's share of the market rose to 75.8%. JUUL is currently valued at over $38 Billion. Figure 1 on the following page depicts various e-cigarette manufactures' market share between 2014 to 2018.



*Figure 1: E-Cigarette Market Share 2014-2018*

**B.    The JUUL Product**

80. As shown in Figure 2, the JUUL e-cigarette has a rechargeable battery and heating element, which work together to heat the pre-filled JUUL pods.

1
2
3
4
5
6
7



*Figure 2: The JUUL device and accompanying JUUL Pods*

8
9
10

81.     The pre-filled JUUL Pods contain JUUL's patented nicotine solution, which slides

11

into the end of the JUUL device. These JUUL pods come in a variety of flavors, such as Virginia

12

Tobacco, Classic Tobacco, Mint (formerly Cool Mint), Menthol, Fruit (formerly Fruit Medley),

13

Mango, Cucumber (formerly Cool Cucumber), and Crème (formerly Crème Brûlée).

14

82.     The rectangular JUUL e-cigarette device consists of an aluminum shell, battery, a

15

magnet for the USB-charger, a circuit board, an LED light, and a pressure sensor. The JUUL pod

16

is a plastic enclosure containing 0.7 milliliters of JUUL's nicotine liquid and a coil heater. When a

17

sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod,

18

the battery activates the heating element which converts the nicotine solution in the JUUL pod

19
20

into a vapor. The light embedded in the JUUL device is a battery level indicator and lights up in a

21

"party mode" display of colors when waved around.

22

83.     In a thesis presentation the Management Defendants gave in 2004, Monsees

23
24

candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery

25
26
27
28

and addiction."[43] JUUL researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[44] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JUUL was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

84.   Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine. When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user. This experience is referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit." While some "harshness" would not have much impact on season cigarette smokers, it would deter newcomers.

85.   Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day. None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

86.   Around 2013, JUUL scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JUUL

---

[43] Jordan Crook, This is the Stanford Thesis Presentation That Launched Juul, TECH CRUNCH (Feb. 27, 2019), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/

[44] *Id.*

scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

87.    JUUL intentionally designed its product to minimize "throat hit" and maximize "buzz." JUUL's first known testing of JUUL-related products occurred in 2001, when it conducted "buzz" experiments that included non-smoker participants and measured "buzz" and throat harshness. Defendant Bowen served as one of the initial subjects in the "buzz experiments."

88.    JUUL obtained a patent for a nicotine salt liquid formulation for generating an inhalable aerosol in an electronic cigarette (Patent No. 9,215,895 ("the JUUL Patent")). JUUL's use of an aerosol, rather than a flame, to activate its nicotine solution results in a quick powerful burst of nicotine which causes users to feel the rapid onset of the nicotine upon inhalation. This mechanism also makes its nicotine exceedingly more addictive.[45]

89.    Nicotine salts are created by combining nicotine with an organic acid which allows manufacturers to pack more nicotine into their products, masks nicotine's naturally unpleasant taste, and allows the drug to be absorbed by the body quicker.[46]

90.    JUUL also engaged former cigarette industry researchers to consult on the design of their product. As Defendant Monsees noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty."[47] The WIRED

---

[45] https://www.nytimes.com/2018/04/24/health/fda-e-cigarettes-minors-JUUL.html?module=inline.

[46] https://www.cnn.com/2019/01/17/health/vaping-ecigarettes-kids-teens-brains-fda/index.html.

[47] David Pierce, This Might Just Be the First Great E-Cig, WIRED (Apr. 21, 2015), www.wired.com/2015/04/pax-juul-ecig/.

article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping

develop J[UUL]."[48]

91.     The JUUL Patent included a blood plasma study comparing the pharmacokinetic

effects of nicotine benzoate (nicotine salts) through an e-cigarette to nicotine through a traditional

cigarette. The study concluded that:

- nicotine absorption through the e-cigarette is between 1.25 and 2.7 times faster than traditional cigarettes;

- e-cigarettes deliver higher amounts of nicotine at a faster rate than a traditional cigarette; and

- because of JUUL's method of nicotine absorption, JUUL's nicotine solution would still be more addictive than traditional cigarettes even with lower concentrations.[49]

92.     The concentration of nicotine, however, is not low, especially compared to

traditional cigarettes. JUUL delivers doses of nicotine that are several times higher than those

allowed in traditional cigarettes. Blood test results in JUUL's 2014 patent application show that

JUUL's nicotine solution delivers more nicotine to the bloodstream than a traditional cigarette,

creates a peak nicotine blood concentration that is 36% higher than a traditional cigarette, and

increases the heart rate faster than a traditional cigarette.

93.     Defendants also knew that the use of benzoic acid and nicotine salts in JUUL pods

affects pH and facilitates "absorption of nicotine across biological membranes."[50] JUUL's e-liquid

formulation is highly addictive not only because it contains a high concentration of nicotine, but

---

[48] *Id.*

[49] https://patents.google.com/patent/CA2909967A1/en.

[50] Neal L. Benowitz et al., Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, 192 HANDB. EXP. PHARMACOL. 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/

because it contains a particularly potent form of nicotine, i.e., nicotine salts. Defendants knew this as Defendant Bowen advised the JUUL Board of Directors at an October 2015 Board meeting on JUUL's 'nicotine sales patent application."[51] And the Altria Defendants were aware of the research showing the potency of nicotine salts from their many years in the tobacco business.

94.     While touted as being safer than traditional cigarettes, studies have actually shown *higher* levels of cotinine—a breakdown product of nicotine—in the urine of adolescent vapers than had been reported in prior research of adolescent cigarette smokers.[52]

95.     Corinne Graffunder, DrPH, the director of Centers for Disease Control and Prevention's Office on Smoking and Health, has stated, "[t]here are no redeeming benefits of e-cigarettes for young people . . . The use of certain USB-shaped e-cigarettes is especially dangerous among youth because these contain extremely high levels of nicotine, which can harm the developing adolescent brain."[53]

96.     The U.S. Surgeon General, Jerome Adams, stated that JUUL's liquid nicotine mixture is specially formulated to give a smoother, more potent nicotine buzz that "can promote dependence in just a few uses."[54]

C.     **Defendants' Misleading and Fraudulent Statements Regarding their Product**

97.     The JUUL e-cigarette launched in 2015. After the launch, JUUL and the Management Defendants continued to collect information about the addictiveness of JUUL. This

---

[51] INREJUUL_00278408.

[52] https://www.cnn.com/2019/01/17/health/vaping-ecigarettes-kids-teens-brains-fda/index.html

[53] https://www.cdc.gov/media/releases/2018/p1002-e-Cigarettes-sales-danger-youth.html.

[54] https://chicago.suntimes.com/business/juul-teen-vaping-us-surgeon-general.

information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness, especially among youth.

98.     For example, on April 28, 2017, JUUL held a science meeting discussing the scientific information in JUUL's possession with outside scientists. Notes form the meeting state that "concern was raised that because the nicotine update [sic] is slightly faster the date could be interpreted as feed an addiction faster. Given the current climate with addictions to Oxycontin how the data is presented needs to be considered carefully."[55]

99.     Additionally, Defendant Bowen received correspondence in October 2017 stating that "single puff data from JUUL suggests that a small number of puffs at the beginning of the pod's lifetime, may contain 2-3X" the level of nicotine in the puffs from the rest of the pod." This is consistent with a central goal of the product's design: capturing "users with the first hit."[56]

100.    None of this information was a surprise, nor did it cause JUUL or the Management Defendants to change JUUL's products or marketing. In fact, they embraced it. On November 2, 2017, JUUL's Director of Consumer Insights described JUUL's "design and chemical formulation (fast acting nic salts) as JUUL's "ace in the hole" over the competition.[57]

101.    The following year, JUUL and the Management Defendants obtained even more evidence that the amount of nicotine in JUUL pods was needlessly high. By no later than May of 2018, JUUL had completed Phase I of "Project Bears," a JUUL study of smoker and vaper nicotine strength preferences. The results showed that "[a]cross the smoker segments, product likely is

---

[55] INREJUUL_00230416

[56] Chris Kirkham, Juul Disregarded Early Evidence it was Hooking Teens, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette.

[57] INREJUUL_00228928-INREJUUL_00228930

very similar[,]" and the "heaviest smokers (21+ cigs) like 1.7% more than higher strengths such as 3% and 5%."[58] Similarly, "for those who evaluated the 5% pod, when given the choice of lower level pod strength, at least half would choose a lower strength pod."[59]

102.     The same tests also showed that, contrary to JUUL's expectation, smokers did not increase their use of the 1.7% formulation relative to the 5% formulation in order to achieve nicotine satisfaction. "Smoking volume does seem to be a driver of vaping volume, but this does not vary much by strength within a given smoker type."[60]

103.     Thus, Project Bear revealed that 5% JUUL pods delivered more nicotine than necessary to satisfy cigarette smokers, even those characterized as "heavy" smokers.[61]

104.     At some point during the coordination between JUUL, the Management Defendants, and Altria, but no later than the due-diligence period for Altria's investment in JUUL, either JUUL or one or more the Management Defendants provided Altria with a copy of the Project Bears findings.[62]

105.     Nonetheless, JUUL, the Management Defendants, and Altria have maintained and promoted the 5% JUUL pods as JUUL's flagship offering of JUUL pods although they knew that even current smokers prefer a *lower* nicotine content. They pushed the 5% JUUL pod because it hooked users faster and kept them addicted to nicotine.[63]

---

[58] INREJUUL_00260068

[59] INREJUUL_00260065

[60] INREJUUL_00244200

[61] *Id.*

[62] *Id.*

[63] *Id.*

106.   In addition to Project Bears, JUUL and the Management Defendants (and potentially Altria) were aware of other internal studies that established that its 5% JUUL pod product would not be a successful cessation tool, as it was not attractive to an audience to reduce cigarette consumption.[64]

107.   Throughout its history, JUUL has repeatedly compared the contents of its pods to traditional tobacco products. Prior to JUUL's release in June 2015, PAX (JUUL's original name) released information about its product. Included in this material was a "commissioned study" comparing JUUL's blood nicotine levels to traditional combustion cigarettes and other e-cigarettes. The results were depicted in Figure 3 on the following page:



*Figure 3: Pre-release product information comparing nicotine levels to cigarettes*

108.   When JUUL's website debuted in 2015, it included a similar chart:

---

[64] *Id.*



*Figure 4: JUUL's website information comparing*
*nicotine levels to cigarettes*

109.     While the JUUL Patent indicates that JUUL's nicotine salt solution causes nicotine-blood levels approximately 30% *higher* than a traditional cigarette, the PAX and JUUL charts above indicate that JUUL delivers approximately 25% less nicotine to the blood than a cigarette, thereby creating the false impression that JUUL is less addictive than a traditional cigarette.

110.     JUUL's statements are false, materially misleading, and materially omit the fact that it is not just the amount of nicotine that should be considered when determining the product's narcotic effect, risk of addiction, and therapeutic use, but the efficiency with which the product delivers nicotine into the bloodstream.

111.     Because JUUL's nicotine salts increase the rate and magnitude of blood plasma nicotine compared to cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes.

112.     Despite such knowledge—which is evidenced by its own patent—none of the Defendants have ever warned or disclosed to consumers that JUUL pods' nicotine salt formulation

deliver an exceptionally potent dose of nicotine or that JUUL's nicotine salt formulation deliver a more potent dose of nicotine than traditional cigarettes. In fact, the Defendants has misled its customers into believing the opposite.

113.    JUUL and the Management Defendants knew that JUUL's studies indicated that their 5% solution product was more potent and more addictive than a typical cigarette. Yet, JUUL and the Management Defendants continued to market the JUUL as providing a nicotine experience on par with a cigarette, even though they designed JUUL to ensure that was not true. In reality, there were never any measured test results in accord with JUUL's marketing to distributors, retailers, and the public at large.

114.    By no later than October 30, 2016 (and likely earlier), the JUUL Website—which the Management Defendants reviewed and approved— advertised that "[e]ach JUUL pod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs."[65] The language on the website would later change, but still maintained the same fraudulent misrepresentation—i.e., that "[e]ach 5% JUUL pod is roughly equivalent to one pack of cigarettes in nicotine delivery."[66]

115.    JUUL also perpetuated such fraudulent and misleading statements through their social media:

---

[65] JUULpod, JUUL Labs, Inc. (Oct. 30, 2016), https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/.

[66] What is Vaping?, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/What-is-Vaping-How-to-Vape.

*Figure 5: June 19, 2018 Tweet from JUUL Comparing JUUL*
*to Traditional Cigarettes*

116.    JUUL and the Management Defendants directed and approved the content of the

JUUL website, and they also directed and approved the distribution channels for JUUL pods and

the deceptive, misleading and fraudulent statements regarding JUUL's nicotine content. And

although they knew that these statements, which they caused to be transmitted over the wires and

mails, were untrue, JUUL and the Management Defendants have made no effort to retract such

statements or correct their lies.

117.    Despite making numerous revisions to its packaging since 2015, JUUL did not add

nicotine warnings to its device or pods until forced to do so in August 2018 when the exterior

packaging was changed to add: "WARNING: This product contains nicotine. Nicotine is an

addictive chemical." While JUUL has finally begun to warn its consumers of the presence of

nicotine, it still fails to disclose the unique and highly addictive attributes of the JUUL products, including that:

- the JUUL pods nicotine salt formulation delivers an exceptionally potent dose of nicotine;

- the JUUL devices deliver doses of nicotine that are several times higher than those allowed in traditional cigarettes;

- the efficiency with which the JUUL devices deliver nicotine into the bloodstream increases its addictiveness;

- it can be more addictive than traditional cigarettes; and

- the chemicals (including, but not limited to, nicotine) pose serious health risks, such as cancer, stroke, COPD, and other diseases commonly associated with traditional cigarettes.

118.    JUUL delivers significantly more nicotine than a pack of cigarettes—both per pack and per puff—exacerbating nicotine addiction and other adverse health effects associated with nicotine consumption when compared to cigarettes.

119.    Similarly, JUUL's pods and technology "delivers higher concentrations of nicotine than conventional e-cigarettes."[67]

120.    Despite having actual and constructive knowledge of these facts, JUUL continues to fraudulently mislead its customers into thinking its product is safer and less addictive than traditional cigarettes.

121.    JUUL misrepresents the nicotine content of JUUL pods by representing them as 5% strength. However, JUUL pods contain more than 5% nicotine by volume and deliver it in a form that is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at

---

[67] https://www.bmj.com/content/365/bmj.l2219

odds with the industry standard of reporting concentration by volume, leading consumers to believe it contains less nicotine than other formulations as advertised as 6% nicotine, when JUUL pods in fact contain more nicotine than a solution that is 6% nicotine by volume. JUUL's "5% strength" statement misrepresents the most material feature of its product: the nicotine content.

122.    If JUUL and the Management Defendants did not know when JUUL released JUUL pods that the "5% strength" representation in Defendants' advertisements was misleading, they learned that there was widespread confusion about the JUUL pods' nicotine content. By 2017, studies revealed that users did not understand "5% strength," and some understood that phrase to mean 5% of a cigarette though this was identified as a "pain point" for new users,[68] JUUL and the Management Defendants (and later the Altria Defendants) did nothing to stop or correct this confusion about the nicotine content.

123.    The Altria Defendants greatly expanded the reach of this fraud by providing their retail and distribution might for JUUL products, causing millions of JUUL pods to be sent via U.S. mail with packaging stating that JUUL pods contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[69] JUUL, the Management Defendants, and the Altria Defendants knew that these statements were false and misleading, but nevertheless utilized JUUL product packing, marketing, and advertising to maintain their fraud.

124.    The Altria Defendants knew in 2017 that a JUUL pod delivered more nicotine than one pack of cigarettes. In 2017, the Altria Defendants launched its MarkTen Bold e-cigarette, a

---

[68] INREJUUL_00123540

[69] Juul Labs, Inc., Twitter, (Feb. 14, 2018),
https://twitter.com/JUULvapor/status/963844069519773698.

relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JUUL was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, the Altria Defendants chose to bring a less potent 4% formulation to market.

125.    According to the Altria Defendants own pharmacokinetic testing, a 4% less potent formulation was sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, the Altria Defendants' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.

126.    Based on its own internal knowledge, the Altria Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data they received from JUUL, the Altria Defendants' due diligence undoubtedly included a careful examination of JUUL's intellectual property, including the patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

127.    JUUL, the Management Defendants, and the Altria Defendants knew that the statement on JUUL pod packaging that each JUUL pod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead users, including youth. Neither the Altria Defendants nor JUUL or the Management Defendants have made any effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL pods. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving consumers.

D.    **Defendants' Targeted Advertising to Minors**

*i.   JUUL's advertising strategy to appeal to youth was copied directly from Big Tobacco*

128.    Seeking to enter this nascent youth market for e-cigarettes, JUUL intentionally targeted youth from its inception. In March 2015, the Management Defendants supervised the advertising campaigns that would accompany the launch of JUUL.

129.    Consistent with Defendant Monsees' position that he has no "qualms" with marketing to people that were not yet addicted to nicotine,[70] JUUL's marketing strategy targeted people that were "flavor-seeking, social 'vapers,'" and those who "have very limited experience with traditional tobacco cigarettes."[71]

130.    Taking pages out of the tobacco industry's playbook, JUUL, under the leadership of the Management Defendants, crafted its entire marketing strategy around practices that have been known to appeal directly to adolescent users.  JUUL adopted the same themes used by big tobacco companies to glamorize smoking while downplaying its addictiveness and deleterious health effects. James Monsees publicly admitted that JUUL looked at tobacco industry documents that were made public under the MSA; "[the tobacco industry] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time."[72] In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisement and that [the Stanford Research into the Impact of Tobacco

---

[70] David H. Freedman, How do you Sell a Product When You Really Can't Say What it Does?, Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company- marketing-dilemma.html (last visited Apr. 4, 2020).

[71] INREJUUL_00441209

[72] http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf

Advertising Project's] online tobacco advertising collection had been quite useful to them." *Id.* JUUL's advertisements over the course of its existence have played to similar themes (depicted below) and bear a striking resemblance to those of traditional tobacco companies.

      *1.*     *Attractive women*

 

      *2.*     *Relaxation*

 

      *3.*     *Social inclusion*




### 4. Romance




### 5. Flavors




### 6. New technologies and select terms (like "smart") to convey health and safety






131.    As JUUL knew, these advertising strategies were known to cause youth smoking addiction. JUUL's use of these same marketing strategies have already, and threaten to continue, to reverse decades of progress in protecting youth from nicotine addiction.

  ii.    *JUUL's social media campaign*

132.    The goal of a social media campaign is to exploit existing social networks to produce brand awareness through online word-of-mouth. Because of the nature and speed of the internet, social media campaigns can rapidly reach a large number of people. The best social media campaigns turn customers into salespeople who then repeat company representations and talking points. While the effects of social media campaigns may appear organic, in reality, they are the result of carefully orchestrated corporate advertising.

133.    Studies show that teenagers tend to be on social media far more than adults:

- 95% of teenagers aged 13-17 have access to a smartphone.[73]

- 89% of teens are online either "almost constantly" or "several times a day"
  *Id*.

- On average, teens spend approximately 9 hours per day online.[74]

- 70% of teens use social media multiple times a day.[75]

- As of April 2018, 63% of teens age 13-14 and 78% of 15-17 utilized Instagram.[76]

134.    Advertisers are of course well aware of these statistics. "Smart marketers realize that digital-first Generation Zers present a unique opportunity to instill brand loyalty early. As one marketing director noted . . . when someone becomes a customer at a young age, they will spend three times as much over their lifetime."[77]

135.    Prior to the tobacco-related regulations and litigation discussed above, tobacco companies took full advantage of these known facts. Today, however, tobacco companies are prohibited from:

- Using colored text and backgrounds in any advertisements;

- Utilizing colored advertising in publications with significant teen readership;

---

[73] http://www.pewinternet.org/2018/05/31/teens-social-media-technology-2018.

[74] https://www.washingtonpost.com/news/the-switch/wp/2015/11/03/teens-spend-nearly-nine-hours-every-day-consuming-media/?utm_term=.95a59dc01ead.

[75] https://www.commonsensemedia.org/social-media-social-life-infographic.

[76] http://www.statista.com/statistics/419372/us-teen-instagram-users-age-reach.

[77] https://www.forbes.com/sites/forbescommunicationscouncil/2018/07/03/why-gen-z-is-on-the-a-list-for-e-commerce-marketers/#4cfc8af2c7b4.

- Using outdoor advertising such as billboards;

- Sponsoring events;

- Giving free samples;

- Paying any person to use, display, make reference to, or use as a prop any tobacco product in any media; and

- Paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing.

136.    JUUL and its marketing agency (Cult Collective), on the other hand, have exploited these marketing tactics now unavailable to tobacco companies.

137.    To announce its release in June 2015, JUUL and Cult Collective launched a multimillion-dollar "Vaporized" advertising campaign. Cult Collective has been described as being "devoted to giving brands a cult-like following".[78] The marketing agency advertises itself as "audience engagement experts" with the promise, "We can help you win a sustainable competitive advantage by applying proven cult brand principles that results in enviable levels of brand attachment and advocacy."[79] As part of its campaign to obtain "cult like followers," JUUL utilized images (such as Figure 6) depicting young and stylish models, bold colors, and memorable images, which in turn, promote idealized adolescents using JUUL products – a strategy blatantly aimed at a youth audience.

---

[78] https://www.forbes.com/sites/mnewlands/2016/09/26/join-the-engagement-advertising-cult-an-interview-with-cult-collectives-ryan-gill/#44bbee071016

[79] https://cultldn.com/



*Figure 6: Images from JUUL's Vaporized Campaign*

138.   As shown in Figure 7, the campaign's color scheme was similar to colors used by Natural American Spirit Cigarettes, a leading brand of cigarettes among teenagers.



*Figure 7: Comparison of American Spirit Cigarettes*
*and JUULs' Color Scheme*

139.   Instead of warning about the dangers of nicotine described above, the campaign utilized phrases such as "Smoking Evolved" to appeal to youth fascination with high-tech, cool products, like iPhones – which also have been characterized as having a "cult like following."[80]

---

[80] https://www.forbes.com/sites/robinlewis/2014/09/02/how-apple-neurologically-hooked-its-customers/#57604f8ff001.



*Figure 8: Image from JUUL's 2015 Vaporized Campaign*

140.    The Management Defendants knew that the ads targeted youth, but "Juul's board of directors signed off on the company's launch plans[.]"[81] In addition, A senior manager later told the New York Times that "he and others in the company were well aware" that the marketing campaign "could appeal to" teenagers.[82]

141.    The Management Defendants were well aware that JUUL branding was oriented toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine.

---

[81] Ainsley Harris, How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?, Fast Company (Nov. 19, 2018), https://www.fastcompany.com/90262821/how-juul- founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018.

[82] Matt Richtel & Sheila Kaplan, Did Juul Lure Teenagers and Get 'Customers for Life'?, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

The Management Defendants directed and approved JUUL branding to be oriented toward teenagers.

142.    JUUL promoted the campaign on Facebook, Instagram, and Twitter. A report on the growth and marketing of the JUUL brand found that JUUL was one of the first major retail e-cigarette brands to heavily rely on social media to market its products:

> [O]ur study shows that the growth of JUUL was accompanied by innovative marketing across a variety of new media platforms. The marketing of other major retail e-cigarette brands, at least in their early stages, relied heavily on either advertising on TV (eg, Blu and Njoy) or promotional expenditures to retailers and consumers (eg, Vuse and MarkTen), or both. However, JUUL was one of the first major retail e-cigarette brands that relied heavily on social media to market and promote its products. In particular, we found the number of JUUL-related tweets was highly correlated with quarterly retail sales of JUUL. In addition to Twitter, JUUL was heavily marketed and promoted on Instagram and YouTube. The official JUUL account on Instagram, for example, used a variety of marketing and promotional schemes to attract, engage with and retain followers. The account used artsy, professional-grade photographs to display its products and evoke lifestyle feelings such as relaxation, freedom and sex appeal. Those posts also heavily emphasized JUUL's variety of flavors.[83]

143.    As part of the 'Vaporized' campaign, JUUL sponsored at least 25 parties and events across the country. Again, JUUL failed to include any disclaimers about the dangers of nicotine in their invitations. Instead, the invitations (as shown on the following page in Figure 9) promoted youth focused imagery and live music.

---

[83] https://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-054382.

*Figure 9: JUUL Product Launch Party Promotion*

144.   Cult Collective (JUUL's marketing agency), stated in its JUUL case study, "[w]e created ridiculous enthusiasm for the hashtag 'Vaporized'. . . [the campaign] aligned perfectly with those we knew would be our best customers."[84] Photographs from the JUUL launch events evidence who JUUL intended to be their best customers.

 

*Figure 10: Photos of JUUL Launch Party Attendees*

---

[84] https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

145.    At these launch events, JUUL regularly distributed free starter packs (*see* Figure

11*)*. As discussed above, the MSA forbids such conduct for tobacco companies as the practice

fosters nicotine addiction. After acknowledging in October 2017 that it is unlawful to distribute

free samples of its product at live events, JUUL began "charging" $1 for its product at "demo

events."



*Figure 11: JUUL's Free and $1 New York Launch Party Promotion*

146.    As discussed above, the ultimate goal of a viral social media campaign, like

'Vaporized,' is to generate significant online buzz about your product such that your customers

function as your spokesmen and promote your campaign through free online "word-of-mouth"

advertising. "Hashtags"[85] are an essential tool in creating this effect as brands can join in on

trending topics and engage with large numbers of readers. "Branded hashtags," that include the

---

[85] A hashtag is a type of metadata tag used on social media that makes it possible for others easily
to find messages with a specific theme or content.

company's name, provide additional benefit as every time someone uses a branded hashtag, the

company's social media presence increases.

147.    As evidenced in Figure 12, JUUL utilized hashtags throughout its existence.

Commonly used JUUL hashtags include: #juul, #juulvapor, #switchtojuul, #vaporized.



*Figure 12: 2015 and 2017 Social Media Posts by JUUL*
*with Commonly Used Hashtags*

148.    In fact, comparing JUUL's first year on the market with its third, JUUL actually

ramped up its hashtag use substantially. From October 17, 2018 to November 12, 2018, #juul alone

added 23,676 posts (or an average of 877 posts per day). As of January 21, 2019, JUUL's premier

hashtag (#juul) had 336,308 posts. Based on information and belief, JUUL was monitoring the uses

of its hashtags and would have seen the tens of thousands of posts being made by minors,

including thoseon the following page in Figure 13.











*Figure 13: Images tagged with "#JUUL"*[86]

149.    JUUL knew kids were picking up on its campaign, yet at no time did JUUL take any steps to discourage the use of JUUL hashtags by teenagers.

150.    In fact, in an effort to further spread its viral marketing on social media and encourage online word-of-mouth advertising, JUUL utilized it official social media handle[87], "@juulvapor", to actively comment on and encourage JUUL social media posts.

---

[86] The images displayed in Figures 13 A-D were not necessarily created by JUUL, but were tagged with a JUUL created hashtag.

[87] In the online world, a "handle" is another word for a username.



*Figure 14: June 4, 2015 Social Media Post,*
*not Created by JUUL, but Promoted by JUUL*

151. Figure 14 is an example of a social media post from a JUUL launch event. Based on information and belief, at least three of the individuals depicted were underage at the time the image was posted.

152. In a separate instance, CNN found that JUUL's Instagram reposted a photo of a JUUL in an outstretched hand, taken by a 17-year old, subsequently giving him credit for the photo by tagging him in the description. As of December 19, 2018, JUUL's Instagram account still followed the 17-year old.[88]

153. The Management Defendants knew that kids were marketing JUUL products on social media, and some even sought to take advantage of that to build the JUUL brand. For example, on July 16, 2016 Defendant Bowen emailed about social media posts by children about JUUL, stating, "I'm astounded by this 'ad campaign' that apparently some rich east coast boarding

---

[88] https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html.

school kids are putting on."[89] Defendant Bowen added that at least one JUUL board member "was thinking maybe we can leverage user generated content."[90]

154.    JUUL also gained online exposure to adolescents on social media by paying social media influencers to broadcast its product on newsfeeds. "Influencers" are individuals who have developed large social media followings and are viewed as trendsetters.[91] Generally, influencers post pictures of themselves using the product they are promoting, along with a company-endorsed hashtag.

155.    JUUL actively engaged with social media influencers, even posting job listings for influencers online. Figure 15 shows JUUL responding to an individual's inquiry about being a JUUL "influencer" and directing them to apply on JUUL's website.



*Figure 15: February 19, 2018 Tweet re JUUL's Search*
*for Social Media Influencers*

156.    Christina Zayas is an example of one such influencer. Thanks to her 57,700 followers, many of whom are under 18 years of age, Zayas joined JUUL's social media campaign in September 2017. According to Zayas, her primary appeal to JUUL was that she attracted a

---

[89] JUUL00382271

[90] *Id.*

[91] http://mediakix.com/2018/08/influencer-definition-marketing/#gs.awBGIprD.

1  younger market. Based on information and belief Zayas was paid $1,000 for a blog post and the

2  Instagram post depicted in Figure 16.



*Figure 16: Social Media Influencer*
*Christina Zayas' JUUL Instagram Post*

13  157.    JUUL's social media influencer campaign was widespread. A two-year

14  investigation from 2016 to 2018, led by the Campaign for Tobacco Free Kids, found that cigarette

15  companies, much like JUUL, were paying influencers to post pictures that glamorized smoking.

16  The investigation also found that companies guided influencers on how to take photos, what

17  hashtags to include, and when to post them to increase their visibility.[92]

19  158.    JUUL's posts were misleadingly presented without disclosure that JUUL was

20  paying the party making the post. As a result, JUUL's target audience were misled into thinking

21  that these attractive and popular people actually used and were endorsing JUUL products, when

22  in fact, the posts were bought and paid for by JUUL.

---

[92] https://www.takeapart.org/wheretheressmoke/#introduction.

159.    Along with paid social media influencers, JUUL also posted advertisements and

news stories about famous Hollywood celebrities using their products.[93] For instance, JUUL used

its social media accounts to promote images of Katy Perry with a JUUL. By tagging Katy Perry in

social media posts (*see* Figure 17), JUUL was able to introduce and promote its product to Ms.

Perry's 107,000,000 Twitter followers. Ms. Perry appeals to a very youthful audience.



*Figure 17: Katy Perry Images with JUUL*

160.    The Management Defendants knew that the JUUL marketing campaigns they

directed and approved were successful in targeting youth. As Reuters has reported, "the first

signs that JUUL had a strong appeal to young people came almost immediately after the sleek

device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where

they could buy more JUULs, along with the cartridge-like disposable 'pods' that contain the

liquid nicotine."[94]

---

[93] https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-JUULs-early-marketing-campaigns/#3a1f4dc14f9c.

[94] Chris Kirkham, Juul Disregarded Early Evidence it was Hooking Teens, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

161.     A former senior manager told the New York Times that "[s]ome people bought more JUUL kits on the company's website than they could individually use—sometimes 10 or more devices." He added that "[f]irst, they just knew it was being bought for resale," but later "when they saw the social media, in fall and winter of 2015, they suspected it was teens."[95]

162.     Defendant Bowen admitted that "he was aware early on of the risks e-cigarettes posed to teenagers[.]"[96]

163.     It was common knowledge within JUUL that JUULs were being sold to children.

164.     The Management Defendants continued to direct and approve misleading marketing campaigns long after launch. For example, JUUL deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns, and ads cross-promoting mango and mint. The Management Defendants were directly responsible for this marketing, as they had "final say" over all of JUUL's marketing activities.[97] In other words, JUUL and the Management Defendants controlled the messaging around JUUL products.

165.     While JUUL's competitors spent over of $16 million between 2015 and 2016 on traditional advertising, JUUL spent only $2.1 million between 2015 and 2017 and instead relied on the above-referenced social media strategy. As shown in Figure 18, JUUL continued to heavily

---

[95] Matt Richtel & Sheila Kaplan, Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[96] Id.

[97] Examining JUUL's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. On Econ. & Consumer Policy of the Comm. on Oversight & Reform, H.R, 116th Cong. 70 (2019) (statement of James Monsees, CPO, JUUL Labs).

rely on its social media strategy as time went on with the number of JUUL-related tweets increasing from 8,416 in 2015, to 21,292 in 2016, to 366,786 in 2017.



*Figure 18: Number of JUUL-Related Tweets (2015-2017)*

166.   The marketing strategy worked. As shown in Figure 19, JUUL outperformed its competitors from inception, and as time went on, did so exponentially.



*Figure 19: Total Sales of E-Cigarettes Among Largest Manufacturers (2011-2017)*

167.   Notwithstanding its knowledge about the decades of litigation and regulation relating to the marketing of nicotine-infused products, JUUL and the Management Defendants

persisted with its online marketing efforts until finally shutting down its social media sites in November 2018, approximately three years after its launch.

   iii.   *Other marketing techniques directed to youth*

168.   As discussed above, JUUL minimally used traditional marketing channels such as magazines, newspapers, billboards, radio, and television. In 2015, however, JUUL utilized a single magazine to launch its advertising campaign – *Vice. Vice* markets itself as the "#1 youth media company" with "a mission to empower young people," and promotes its print magazines as "defining global youth culture."[98] JUUL ran a full page spread in *Vice* magazine using young models in playful poses:



*Figure 20: JUUL's Vice Magazine Advertisement*

169.   Also as part of its 2015 launch, JUUL took over massive, brightly colored, 12-unit billboards in Times Square. The displays flashed images of attractive and fashionably causal young models smiling and kissing while enthusiastically vaping. Defendant Monsees, who was CEO at the time, personally reviewed images from the billboard photo shoot while it was in

---

[98] https://kit.vice.com.

session."[99] Examples of JUUL's Times Square billboards are depicted in Figure 21.





*Figure 21: JUUL's 2015 Times Square Billboard Advertisements*

170.     Again, while American tobacco companies agreed to stop using billboards in 1999,

JUUL has exploited the practice.

171.     As if the youth targeted marketing was not enough, for months JUUL's website

entrapped underage visitors through deceptive and faulty age verification techniques. To access

and browse JUUL's website initially, an individual needed only click on a box, pledging they were

of age and the website was open for use.

---

[99] *Id.*

172.     Now, in order to purchase a product from JUUL's website, an individual has to create a profile and pass a background check by providing his or her birthday and the last four digits of their social security number. If the person was not old enough, the site would deny access. However, even if they were denied access, JUUL would still add minors to its email listserv such that these interested minors would receive advertisements and notifications on promotional campaigns for new fruity flavors and large discounts off JUUL's $49.99 starter kit.

*iv.*     *JUUL's design and use of flavored vapor is intended to appeal to minors*

173.     The design of the JUUL is similar to a flash drive. It is discrete in size, shape, and emits a reduced odor – all of which makes it more appealable to youth users. JUUL's website once touted the JUUL as "the i-Phone of E-cigs," framing the device as cool, hip, fashionable, and more appealing for children and minors to own and use.

174.     While a pack of cigarettes contains 20 cigarettes that each need to be lit separately, JUUL can be inhaled continuously and often can be used indoors without detection by others, thus eliminating the need for smoking breaks (a feature promoted heavily in its advertisements). The design makes it easy to conceal and use without authority figures such as teachers, principals, and parents noticing.[100]

175.     JUUL products are also priced to appeal to adolescents, as one pack of four JUUL pods is almost as cheap as a single pack of cigarettes. A pack of four JUUL pods, which, according to JUUL is the equivalent of four packs of cigarettes, costs approximately $15.99 on the JUUL website. By contrast, a single pack of cigarettes in Chicago costs approximately $12.00.

---

[100] https://www.ncbi.nlm.nih.gov/pubmed/30219794.

176.   Further, unlike traditional cigarettes which can be irritating and cause an unpleasant feeling in the chest and lungs, JUUL's use of nicotine salt makes the vapor go down smoothly.[101]

177.   Along with its social media and advertising blitz, JUUL markets and sells its JUUL pods in a variety of sweetened flavors that appeal to youth, which then "hooks" underage "vapers."[102] As shown in Figure 22, JUUL promoted its flavored nicotine pods through social media and traditional marketing platforms.

  

 

*Figure 22: JUUL Pod Flavor Marketing*

---

[101] https://www.vox.com/science-and-health/2018/5/1/17286638/JUUL-vaping-e-cigarette.

[102] https://abcnews.go.com/Nightline/video/JUULing-trendy-vape-pen-popular-teens-56192940.

178.     Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine. A 1972 Brown & Williamson memorandum, Youth Cigarette – New Concepts, specifically noted the "well known fact that teenagers like sweet products."[103] A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers" candy company to determine which flavors enjoyed the widest appeal among youth.[104]

179.     Altria's subsidiary U.S. Smokeless Tobacco described the initial of new customers through flavored products as "the graduation theory":

> New users of smokeless tobacco—attracted to the product for a variety of reasons—are most likely to begin with products that are milder tasting, more flavored, and/or easier to control in the mouth. After a period of time, there is a natural progression of product switching to brands that are more full-bodied, less flavored, have more concentrated "tobacco taste" than the entry brand.[105]

180.     A sales manager who worked at U.S. Tobacco in the 1980s told the Wall Street Journal that "They talked about graduation all the time—in sales meetings, memos and manuals for the college program. It was a mantra."[106]

---

[103] Marketing Innovations, Inc., Brown & Williamson Tobacco Corp. Project Report: Youth Cigarette—New Concepts, U.C.S.F. Truth Tobacco Indus. Documents (Sept. 1972).

[104]    Flavored    Tobacco    FAQs,    Students    Working    Against    Tobacco, http://swatflorida.com/uploads/fightresource/Flavored%20Tobacco%20Industry%20Quotes%20and %20Facts.pdf (citing Sedgefield Idea Sessions 790606-790607 (June 8, 1979), Bates No. 81513681/3691) (last visited Mar. 27. 2020).

[105] G.N. Connolly, The marketing of nicotine addiction by one oral snuff manufacturer, 4 TOBACCO CONTROL 73-79 (1995), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1759392/pdf/v004p00073.pdf.

[106] Alix Freedman, Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,' WALL ST. J. (Oct. 26, 1994), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=mlch0185.

181.   A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[107]

182.   Researchers have stated that JUUL's emphasis on sweet flavors directly appeals to youth, a demographic who largely might never use tobacco products.[108] According to a 2013-2014 survey (a survey which JUUL would have had access to prior to its launch), 81% of current youth e-cigarette users cited the availability of appealing flavors as the primary reason for use.

183.   While the FDA banned flavored cigarettes other than menthol – such as cherry, chocolate, etc. – in 2009, JUUL has exploited the practice which it knows appeals to youth.[109]

184.   The United States Department of Health and Human Services Secretary, Alex Azar, stated, "Flavors are a major reason [high school and middle school students] use these products in the first place."[110]

185.   By at least early 2017, JUUL knew that its flavors had attracted young people and non-smokers in droves.[111]

---

[107] Gardiner Harris, Flavors Banned From Cigarettes to Deter Youth, N.Y. TIMES (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

[108] https://www.businessinsider.com/stanford-JUUL-ads-photos-teens-e-cig-vaping-2018-11

[109] https://www.fda.gov/tobaccoproducts/labeling/productsingredientscomponents/ucm2019416.htm

[110] https://www.usatoday.com/story/news/health/2018/11/15/fda-ban-vaping-flavors-electronic-cigarettes-menthol-cigars-scott-gottlieb/2003219002/

[111] INREJUUL 00265068

186.   Instead of taking corrective action or withdrawing the kid friendly flavors, JUUL capitalized on their popularity with kids and continued to promote JUUL's flavors.

187.   JUUL pods are offered in both 5% nicotine and 3% for select flavors. All of the non-traditional, more appealing, adolescent-friendly flavors, such as Mango, Cucumber, Crème, and Fruit are *only* offered in 5% Nicotine strength.

188.   In a social media post from August 2017, JUUL tweeted "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste."[112]  In another August 2017 tweet, JUUL compared JUUL to dessert: "Do you brulée? RT [re-tweet] if you enjoy dessert without the spoon with our Creme brulée #JUULpods."[113]

189.   A former JUUL manager, who spoke to The New York Times on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use— sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[114]

> With the shared goal to grow the number of nicotine-addicted users, including youth in particular, and as detailed further herein, JUUL, the Management

---

[112] JUUL Labs, Inc. (@JUULvapor), Twitter (Aug. 4, 2017), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_39.jpg.

[113] Kathleen Chaykowski, The Disturbing Focus of Juul's Early Marketing Campaigns, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of- juuls-early-marketing-campaigns/#3da1e11b14f9.

[114] Matt Richtel & Sheila Kaplan, Did Juul Lure Teenagers and Get 'Customers for Life'?, N.Y. TIMES (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

Defendants, and Altria set out to do whatever was necessary to create and preserve the lucrative market for flavors. In order to maximize the value of its mint line of JUUL pods, JUUL, with the support of the Management Defendants, chemically and socially engineered its mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

190.    In 2018, JUUL directly studied 13 to 17-year-old teens' e-cigarette flavor preferences. The studies, undertaken at a time when JUUL and Altria were coordinating their activities, asked teens to rank a variety of e-cigarette flavors in terms of appeal and included the names of current JUUL flavors, JUUL flavors under development, and flavors offered by JUUL's competitors. These surveys showed that the teens co-favorites were mango and mint.

191.    Because of these and other studies, JUUL, the Management Defendants, and the Altria Defendants knew that mint is an attractive flavor for kids.

192.    According to Siddharth Breja, who was senior vice president for global finance at JUUL, after JUUL pulled most flavored pods, including mango, from the market in a purported attempt to reduce youth usage of JUUL, then-CEO Kevin Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[115]

193.    If the purpose of these youth prevention studies was to "better understand how different flavor profiles appeal to different age groups to inform youth prevention," as stated, the lesson for JUUL, the Management Defendants, and the Altria Defendants was that teens like mint as much or more than any other JUUL flavor and more than a dozen other candy-like flavors produced by third parties.

---

[115] Sheila Kaplan and Jan Hoffman, Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say, N.Y. TIMES (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods- contaminated.html

194.    With that knowledge and with no genuine interest in youth prevention, JUUL, the Management Defendants, and Altria committed to work to preserve mint as a flavor for as long as possible.

195.    By keeping mint on the market long after other flavors were pulled, these Defendants continued to expand the number of addicted e-cigarette users, including youth.

**E.    The FDA's recognition that JUUL Targets Minors and JUUL's Insufficient Response**

196.    In April 2018, after growing concern of the popularity of e-cigarettes with children, the FDA demanded that JUUL turn over documents about the marketing and research behind its products and stated that it would investigate whether JUUL was intentionally appealing to the youth market.[116] In announcing the investigation, the FDA explained:

> We need to examine all the available information to understand why kids are finding these products so appealing – and address it. That's why today, the FDA also sent an official request for information directly to JUUL Labs, requiring the company to submit important documents to better understand the reportedly high rates of youth use and the particular youth appeal of these products. The information we're requesting includes: documents related to product marketing; research on the health, toxicological, behavioral or physiologic effects of the products, including youth initiation and use; whether certain product design features, ingredients or specifications appeal to different age groups; and youth-related adverse events and consumer complaints associated with the products. We don't yet fully understand why these products are so popular among youth. But it's imperative that we figure it out, and fast. These documents may help us get there.[117]

197.    In September 2018, the FDA issued a letter to JUUL threatening to pull its products from the market if it did not submit plans within 60 days describing how it will address the

---

[116] https://www.nytimes.com/2018/04/24/health/fda-e-cigarettes-minors-JUUL.html?module=inline

[117]https://www.fda.gov/downloads/TobaccoProducts/Labeling/RulesRegulationsGuidance/UCM605490.pdf.

widespread youth access and use of their products.[118] The FDA issued more than 1,300 warning letters and civil fines to retailers and distributors who illegally sold e-cigarette products to minors.[119]

198.   On November 15, 2018, Scott Gottlieb (the FDA Commissioner at the time) acknowledged that "[g]iven the startling and disturbing youth use rates . . . it's clear that [the FDA] must do more . . . to target what appear to be the central problems – youth appeal and youth access to flavored tobacco product."[120]

199.   Since the FDA initiated its investigation, JUUL has tacitly admitted wrongdoing. Ashley Gould, the chief administrative officer for JUUL, stated, "[w]e have to take ownership for what was done in the past . . . Could we have done things different in the past? Yes."[121] Separately, a former senior manager at JUUL told The New York Times that the company was "well aware" its devices could appeal to teens and that teens were posting images of themselves vaping with JUULs on social media.[122]

200.   Further responding to the FDA's investigation in November 2018, JUUL "shutdown" its social media presence. However, JUUL's Instagram account still has 86,500 followers and contains hyperlinks to the JUUL company website. Moreover, the social media

---

[118] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620184.htm

[119] https://www.cdc.gov/mmwr/volumes/67/wr/mm6745a5.htm?s_cid=mm6745a5_w

[120] https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access

[121] https://www.businessinsider.com/JUUL-e-cig-startup-marketing-appealed-to-teens-2018-7

[122] https://www.nytimes.com/2018/08/27/science/JUUL-vaping-teen-marketing.html

presence created by JUUL relies heavily on consumers' active involvement, which persists to this day. There remain over 335,000 posts using the JUUL created "#JUUL" hashtag and over 30,000 posts using #JUULnation.

201.    In November 2018, JUUL also promised that it would stop sales of fruit-flavored nicotine pods in retail stores. To date, however, JUUL flavored pods remain widely available.

202.    In terms of marketing, JUUL redefined its mission from creating a "luxury" product that appealed to youth to a smoking cessation device. JUUL removed many of the internet images depicting glamorous young models seductively exhaling clouds of vapors. Instead, JUUL's website now depicts middle-aged adults in non-glamorous settings and suggests that JUUL exists solely for the benefit of adult smokers looking for an alternative to traditional tobacco products. Of course, JUUL's well-documented history clearly demonstrates that this was never its true mission.

203.    Not only is JUUL's attempt to distance itself from its wrongful conduct disingenuous, it is superficial. JUUL's e-cigarettes are still as addictive as they ever were, are still sold in candy-like flavors, can still be ordered with a subscription service on JUUL's website, and JUUL continues to hide the truth about the actual nicotine content and addictiveness of its devices.

**F.    United States Congressional Finding that JUUL Recruited and Targeted Youth**

204.    According to a July 25, 2019 report by United States Congressional Subcommittee of Economic and Consumer Policy, JUUL "deliberately targeted children in order to become the nation's largest seller of e-cigarettes."[123]

---

[123]https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf

205.    The Subcommittee's findings were based on approximately 55,000 non-public JUUL documents showing that:

     a.      JUUL operated a program in which they paid schools for access to student class rooms and programs in which JUUL's messaging was that their product was "totally safe";

     b.      JUUL targeted teenagers by buying access to out-of-school programs and set up summer camps to recruit children as young as third graders; and

     c.      JUUL used a sophisticated and high-cost social media influencer program to promote online marketing to youth. *Id.*

**G.    JUUL's Transition from Targeted Marketing Efforts to Fraudulent Cessation Claims**

206.    JUUL, the Altria Defendants, and the Management Defendants recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus JUUL's staggering market share), was to mislead potential customers about the true nature of JUUL products. Defendants knew that if it became public that JUUL was designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash. Therefore, JUUL (with the knowledge and support of the Management Defendants) and the Altria Defendants repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device, and falsely and misleadingly used the mails and wires to spread the subterfuge. JUUL, the Management Defendants, and the Altria Defendants committed these deceptive, misleading, and fraudulent acts intentionally and knowingly. In making these representations, JUUL, the Management Defendants, and the Altria Defendants intended that consumers, the public, and regulators rely on misrepresentations that JUUL products were designed to assist smoking cessation.

207.    The most blatant evidence of the cover-up scheme was the January 2019, $10 million "Make the Switch" television advertising campaign. This campaign, which was a continuation of JUUL's web-based Switch campaign, was announced less than a month after the Altria Defendants announced Altria's investment in JUUL.

208.    The "Make the Switch" television ads featured former smokers aged 37 to 54 discussing "how JUUL helped them quit smoking."[124] According to JUUL's Vice President of Marketing, the "Make the Switch" campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company."[125]

209.    These statements were false as JUUL was not intended to be a smoking cessation device.

210.    Defendants continually sought to frame JUUL products as smoking cessation devices in their public statements and on their website. Defendant Monsees explained during his testimony before Congress:

> The history of cessations products have extremely low efficacy. That is the problem we are trying to solve here. So, if we can give consumers an alternative and market it right next to other cigarettes, then we can actually make something work.
>
> [T]raditional nicotine replacement therapies, which are generally regarded as the gold standard for tools, right, for quitting, those are nicotine in a patch or a gum form, typically, and the efficacy rates on those hover just below about 10 percent or so. JUUL - we ran a very large study of JUUL consumers, ex-smokers who had picked up JUUL, and looked at them, looked at their usage on a longitudinal basis, which is usually the way that we want to look at this, in a sophisticated fashion ... what we found was that after 90 days, 54 percent of those smokers had stopped smoking completely, for a minimum of 30 days already. And the most interesting part of this study is that if you follow it out further, to 180 days,

---

124 Angelica LaVito, JUUL combats criticism with new TV ad campaign featuring adult smokers who quit after switching to e-cigarettes, CNBC (Jan. 8, 2019), https://www.cnbc.com/2019/01/07/juul- highlights-smokers-switching-to-e-cigarettes-in-ad-campaign.html.

125 *Id.*

that number continues to go up dramatically, and that is quite the opposite of what happens with traditional nicotine replacement therapies.[126]

211.    In response to a direct question about whether people buy JUUL to stop smoking, Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[127]

212.    Other illustrative and non-exhaustive examples include the following: Statements by Defendant JUUL:[128]

- "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." (JUUL Website, April 2018 (or earlier)); [129]

- "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." (JUUL Website, September 19, 2019);[130] and

- "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JUUL Website, November 13, 2018).[131]

---

[126] Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii.

[127] Id.

[128] Although these statements are attributed to Defendant JUUL, JUUL's Board of Directors had "final say" over marketing, messagin and, accordingly, the Management Defendants are directly responsible for the transmission of these fraudulent statements.

[129] Our Mission, JUUL Labs, Inc. (2019), https://www.juul.com/mission-values.

[130] CONSUMER UPDATE: 9/19, JUUL Labs, Inc. (Sept. 19, 2019), https://newsroom.juul.com/consumer-update-9-19/.

[131] JUUL Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of then-CEO Kevin Burns).

213.   Statements by the Altria Defendants:

- "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Altria Website, December 20, 2018);[132]

- "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." (Letter to FDA Commissioner Gottlieb, 10/25/18);[133]

- "We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction. Through Juul, we are making the biggest investment in our history toward that goal." (Altria Press Release, Dec. 20, 2018);[134]

- "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also support and even accelerate transition to noncombustible alternative products by adult smokers." (Altria Earning Call, January 31, 2019);[135]

- We expect the JUUL product features that have driven JUUL's success in switching adult smokers in the U.S. to strongly appeal to international adult cigarette smokers. (Altria Earning Call, January 31, 2019).[136]

---

[132] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, BUSINESSWIRE (Dec. 20, 2018),

[133] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, at 2 (Oct. 25, 2018)

[134] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, (Dec. 20, 2018), BUSINESS WIRE , https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[135] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018, (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.

[136] *Id.*

214.   Defendants knew at the time of making these statements that they were false, deceptive and misleading.

215.   FDA rules prohibit e-cigarette companies from:

   a.   claiming their product is less harmful than other tobacco products without providing substantiation to the FDA and receiving FDA's authorization that their product is indeed a modified risk tobacco product.

   b.   making cessation claims without submitting a medicinal product application to FDA's Center for Drug and Evaluation Research and receiving FDA authorization.[137]

216.   JUUL is in direct violation of FDA rules. JUUL markets its product as safer than traditional cigarettes and as smoking cessation devices, yet it has neither participated in any FDA approval process nor received FDA approval as either a modified risk tobacco product or as a nicotine replacement therapy.

217.   In fact, the FDA has found no evidence that JUUL provides cessation benefits: "[t]here is no evidence to date that e-cigarettes are effective cessation devices . . . the number of cigarette smokers who actually quit tobacco product use with e-cigarettes is low." [138]

218.   What's more, Ari Atkins, a JUUL research and development engineer, said before JUUL's launch in 2015, "[w]e don't think a lot about addiction here because we're not trying to design a cessation product at all."[139]

---

[137] 21 C.F.R. § 1100, 1140, and 1143 (2016).

[138] https://tobacco.ucsf.edu/sites/tobacco.ucsf.edu/files/u9/FDA-comment-2014-06-02%20Ecigarette%20marketing%20cessation%20messages%20deeming%20rule-1jy-8cgs-l1sq.pdf.

[139] https://www.washingtonpost.com/news/to-your-health/wp/2018/07/30/e-cigarette-maker-juul-targeted-teens-with-false-claims-of-safety-lawsuit-claims/?utm_term=.60d5bcb180db

219.    Mr. Atkins statement is best explained by the fact that JUUL's own marketing research indicated that JUUL was not appropriate as a cessation device for adults. In 2014 JUUL, when it was called Ploom, hired a research firm to do research with prototypes of the JUUL e-cigarette. The testing showed that "the younger group is open to trying something new and liked [the JUUL prototype] for being smart, new techy, etc."[140] but that "qualitative findings suggest *this product isn't going to fit as well with consumers who are looking to cut back on the cigarette intake*"[141] and that "the delivery was almost too much for smokers, especially those used to regular e-cigarette."[142] The final results from this research were distributed to upper management, including to Defendant James Monsees.[143]

220.    Despite being in direct violation of FDA rules and their own research to the contrary, JUUL continues to market itself as a cessation device without FDA approval and is not even being made to apply for FDA approval until *August 2022*.

221.    As such, JUUL continues to urge smokers to switch to JUUL through its "Switch" campaign (*see* Figure 23). The tacit message being "switch because, unlike cigarettes, JUUL is harmless to your health."

---

[140] JUUL00365905

[141] *Id.* (emphasis added)

[142] JUUL00365709

[143] JUUL00364678

*Figure 23: Posted Instagram Images from JUUL's "Switch" Campaign*

222.    The Switch campaign further suggests that smoking and JUULing are mutually exclusive and that purchasing a JUUL will "switch" a smoker to a non-smoker. For example, as depicted in Figure 24, JUUL tweeted an image and quote from a JUUL user whose entire family smoked traditional tobacco products prior to "switching to JUUL" where he suggests he is permanently "staying."



*Figure 24: Posted Instagram Images from JUUL's "Switch" Campaign*

223.   Multiple studies, however, contradict JUUL's claims:

a.   One longitudinal population study of adult smokers in four countries (including the United States) found that e-cigarette use was not significantly associated with quitting conventional cigarettes.[144]

b.   In another longitudinal study of smokers in the United States, there was no relationship between e-cigarette use and quitting tobacco cigarettes after one year's time.[145]

c.   A third longitudinal study of young adults in the United States also found that e-cigarette use did not predict quitting smoking after one-year follow-up.[146]

d.   A fourth longitudinal study of quit-line users in the United States actually found that e-cigarette users were *less* likely to have quit smoking than non-e-cigarette users at 7-months follow-up.[147]

224.   As JUUL's cessation claims relate to minors, one study found that adolescents who use e-cigarettes are ***more*** likely to become traditional tobacco cigarette smokers than their peers who do not use e-cigarettes:

a.   Eighth grade students who use e-cigarettes are ten times more likely than their peers who do not use e-cigarettes to eventually smoke tobacco cigarettes.

b.   Tenth grade students who use e-cigarettes are eight times more likely than their peers who do not use e-cigarettes to eventually smoke tobacco cigarettes.

---

[144] Adkison et al, 2013, Electronic nicotine delivery systems: International tobacco control four-country survey. *American Journal of Preventive Medicine,* 44(3):207-215.

[145] Grana RA, Popova L, Ling PM. A longitudinal analysis of electronic cigarette use and smoking cessation. *JAMA Internal Medicine.* 2014;174(5):812-813.

[146] Choi, K., Forster, L, 2014. Response to Letter to the Editor Regarding "Beliefs and Experimentation with Electronic Cigarettes: A Prospective Analysis Among Young Adults." *American Journal of Preventive Medicine,* 46 (6): e58-359.

[147] Vickerman et al, *2013;* Use of electronic cigarettes among state tobacco cessation quitline callers. *Nicotine Tob Res,* 15 (10): 1787-1791.

c.   Twelfth grade students who use e-cigarettes are six times more likely than their peers who do not use e-cigarettes to eventually smoke tobacco cigarettes. [148]

**H.   Altria and JUUL Coordinate to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette.**

225.   In October 2017, JUUL and Avail Vapor ("Avail"), a chain of more than 100 high-end vape stores,[149] negotiated the first purchase order for Avail stores to sell JUUL products.[150]

226.   On November 2, 2017, Altria announced that it had acquired a minority interest in Avail.[151] Altria's comments to investors highlighted that the investment allowed Altria to access to Avail's "extensive data around adult vaper purchasing patterns," and "full-service analytical science laboratory," located in Altria's hometown of Richmond, Virginia.[152]

---

[148] https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html

[149] About Us, Avail Vapor, https://www.availvapor.com/about-us (last visited Apr. 4, 2020).

[150] INREJUUL_00066273.

[151] Rich Duprey, Is Altria Trying to Corner the E-Cig Market?, THE MOTLEY FOOL (Jan. 7, 2018), https://www.fool.com/investing/2018/01/07/is-altria-trying-to-corner-the-e-cig-market.aspx; Lauren Thomas, Altria shares plunge after FDA releases road map to curb tobacco-related deaths, CNBC (July 28, 2017), https://www.cnbc.com/2017/07/28/altria-shares-fall-after-fda-releases-roadmap-to- curb-tobacco-related-deaths-.html.

[152] Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, CEO and President, and other members of ALTRIA's senior management team, 2017 Consumer Analyst Group of New York (CAGNY) Conference (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.

227.    On November 21, 2017—three weeks after Altria announced its investment in Avail— JUUL and Avail entered into a distribution agreement, which has been renewed twice— once in November 19, 2018 and again on January 8, 2019.[153]

228.    Through its investment in Avail, Altria had access to sales data for JUUL products long before the companies exchanged diligence in connection with Altria's investment in JUUL. Although JUUL represented to Congress that "[JUUL's] data [from Avail] was not available to Altria,"[154] statements in Altria's October 2019 letter to Congress suggest otherwise.

229.    In that letter, Altria admitted that it possessed JUUL sales data that corresponds to the very same time period in which JUUL began selling its products at Avail stores, starting in late 2017.[155] The sales data showed that JUUL was dominating the e-cigarette market during this time period while Altria's own e-cigarettes trailed behind.[156] Altria sought to grow JUUL's market dominance and young customer base. JUUL, in the regulatory crosshairs, needed Altria's experience and its influence in Washington

230.    Altria recognized that JUUL had, against the backdrop of steadily declining cigarette sales, created the right product to addict a new generation to nicotine. JUUL faced existential threats, however, from regulatory and congressional scrutiny, and public outrage over the growing youth e-cigarette epidemic.

---

[153] Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy, 116th Cong. 28 (2019) (Responses of JUUL Labs, Inc. to Questions for the Record).

[154] Id.

[155] Letter from Howard A. Willard III, Altria to Senator Richard J. Durbin, 6 (October 14, 2019) (emphasis added).

[156] Id.

231.    JUUL, Altria, and the Management Defendants thus began to coordinate their activities in 2017 through Avail Vapor. This back-channel, and the information it provided Altria, allowed Altria to take actions to benefit itself, JUUL, and the Management Defendants without drawing the scrutiny of the public and regulators that they knew would inevitably follow a formal announcement of a partnership between JUUL and Altria.

232.    JUUL, the Management Defendants, and Altria's coordination continued in other ways throughout 2018 as they prepared for Altria's equity investment in JUUL.

233.    A key aspect of this early coordination was Altria's acquisition of shelf space that it would later provide to JUUL to sustain the exponential growth of underage users of JUUL products. By acquiring shelf space, Altria took steps to ensure that JUUL products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.[157]

234.    Altria's investment was not for its own e-cigarette products. Altria spent approximately $100 million in 2018 to secure shelf-space at retailers for e-cigarette products—purportedly for the MarkTen e-cigarette that Altria stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small sale in only 25,000 stores.[158] By comparison, the 2014 launch of the original MarkTen resulted in product placement in 60,000 stores in the first

---

[157] Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General, Centers for Disease Control & Prevention 161, 164 (2012), https://www.ncbi.nlm.nih.gov/books/NBK99237/.

[158] Sheila Kaplan, Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths, N.Y. TIMES (Oct. 25, 2018), https://www.nytimes.com/2018/10/25/health/altria-vaping-ecigarettes.html.

month in the western United States alone.[159] Yet Altria's payments for shelf space were a mixture of "cash and display fixtures in exchange for a commitment that its e-cigarettes would occupy prime shelf space for at least two years.[160]

235.    In reality, Altria spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JUUL's massive, ill-gotten market share. It has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction JUUL created, but because a non-compete was a "part of its deal with JUUL."[161]

236.    When Altria later announced its $12.8 billion investment in JUUL, part of the agreement between the two companies was that Altria would provide JUUL with this premium shelf space.[162]

237.    Altria's purchase of shelf space in 2018 and its subsequent provision of that space to JUUL shows how Altria, JUUL, and the Management Defendants were coordinating even before Altria announced its investment in JUUL. Altria's actions ensured that, even after public and regulatory scrutiny forced JUUL to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular

---

[159] Melissa Kress, MarkTen National Rollout Hits 60,000 Stores, CONVENIENCE STORE NEWS (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[160] Jennifer Maloney & John McKinnon, Altria-JUUL Deal Is Stuck in Antitrust Review, WALL ST. J. (Jan. 17, 2020), https://www.wsj.com/articles/altria-juul-deal-is-stuck-in-antitrust-review-11579257002.

[161] *Id.*

[162] *Id.*

brand of cigarettes among underage users—in a location they are most likely to buy them—retail establishments.[163]

238.    While JUUL and Altria remain separate corporate entities in name, following its equity investment in JUUL, Altria and JUUL forged even greater significant, systemic links, i.e., shared leadership, contractual relationships, financial ties, and continuing coordination of activities.

239.    In 2019, two key Altria executives became JUUL's CEO and head of regulatory affairs, respectively.

240.    K.C. Crosthwaite, who was president of Altria Client Services when the company carried out a study that would later be used by Altria to shield JUUL's Mint pods from federal regulation, is now JUUL's CEO. Before joining JUUL, Crosthwaite was Altria's chief growth officer.

241.    Joe Murillo, who launched the MarkTen line at Altria and more recently headed regulatory affairs for Altria, is now JUUL's chief regulatory officer.[164] A 24-year career Altria executive, Murillo previously ran Altria's e-cigarette business, Nu Mark, "before Altria pulled its e-cigarettes off the market as part of its deal with J[UUL]."[165]

242.    In addition to its effective takeover of JUUL, Altria provides services to JUUL in furtherance of their common goal of expanding the number of nicotine-addicted e-cigarette users,

---

[163] Laura Bach, Where Do Youth Get Their E-Cigarettes?, Campaign for Tobacco Free Kids (Dec. 3, 2019), https://www.tobaccofreekids.org/assets/factsheets/0403.pdf.

[164] Jennifer Maloney, JUUL Hires Another Top Altria Executive, Wall St. J. (Oct. 1, 2019), https://www.wsj.com/articles/juul-hires-another-top-altria-executive-11569971306.

[165] *Id.*

in the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs."[166]

These services include, among other things:

- "Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services;"

- "Making available [Altria's] previously contracted shelf space with certain retailers," thus allowing JUUL products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth;

- "Executing direct mail and email campaigns and related activities. . . .;"

- "Leveraging Altria's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon;" and

- "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."[167]

243.   Altria also worked with JUUL to cross-market JUUL and Marlboro cigarettes. For example, Altria offered coupons for JUUL starter kits inside packs of Marlboro cigarettes.[168]

244.   Altria's investment in JUUL was not only a financial contribution; rather, it was an important aspect of JUUL, Altria, and the Management Defendants' plan to continue growing the user base, stave off regulation, and keep JUUL's most potent and popular products on the market and available to kids and the public at large. Altria is and was working to actively help expand sales of JUUL's products. Altria's investment brings legal and regulatory benefits to JUUL, by

---

[166] Letter from Howard Willard III, Altria Senator Durbin, et. al., at 11 (Oct. 14, 2019).

[167] *Id.*, at 13

[168] Points for us!, Reddit (Sept. 16, 2019), (depicting an image of a Marlboro carton with a JUUL starter kit coupon inside).

helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure.

245.     Altria also brings lobbying muscle to the table, which has played an important role in JUUL, Altria, and the Management Defendants' scheme of staving off regulation by preventing new federal or state legislation targeting JUUL or the e-cigarette category more broadly. Altria "has a potent lobbying network in Washington [D.C.] and around the country."[169] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where Altria ends and JUUL begins."[170] While an Altria spokesman has denied that there was any contractual services agreement for lobbying between JUUL and Altria, he admitted that he did not know what informal advice and conversations Altria has had with JUUL about lobbying efforts. Since JUUL, the Management Defendants, and Altria joined forces, JUUL's spending on lobbying has risen significantly. JUUL spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.[171]

246.     In addition, Altria's arrangement with JUUL greatly expands JUUL's retail footprint. While JUUL products have typically been sold in 90,000 U.S. retail outlets, Altria reaches 230,000 U.S. outlets. Altria also brings its logistics and distribution experience (although, after increasing public scrutiny, Altria announced on January 30, 2020 that it would limit its support to

---

[169] Shelia Kaplan, In Washington, JUUL Vows to Curb Youth Vaping. Its Lobbying in States Runs Counter to That Pledge., N.Y. Times (Apr. 28, 2019), https://www.nytimes.com/2019/04/28/health/juul-lobbying-states-ecigarettes.html.

[170] *Id.*

[171] Client Profile: JUUL Labs, Center for Responsive Politics, https://www.opensecrets.org/federal- lobbying/clients/summary?cycle=2019&id=D000070920 (last visited Apr. 4, 2020).

regulatory efforts beginning in March 2020).[172] And importantly, as noted above, Altria gives JUUL access to shelf space that it had obtained under fraudulent pretenses. This is not just any shelf space; it is space near Altria's blockbuster Marlboro cigarettes, and other premium products and retail displays. The arrangement allows JUUL's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

247.     Altria decided to make a significant investment in JUUL to further its efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, which ultimately benefits Altria by ensuring a new generation of customers for its products. In fact, when announcing its investment, Altria explained that its investment in JUUL "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JUUL expand its reach and efficiency."[173] Altria has helped JUUL maintain and expand its market share—a market share that, based on Altria's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth e-cigarette use.

**I.     Defendants' Effects on E-Cigarette Usage Among Minors in Lake County**

248.     There are currently over two million students enrolled in pre-kindergarten through high school in public and private schools throughout Illinois. The unfortunate success of JUUL's early marketing campaign has lasting effects on this population that will continue.

---

[172] Nathan Bomey, Marlboro maker Altria distances itself from vaping giant JUUL amid legal scrutiny, USA Today (Jan. 31, 2020), https://www.usatoday.com/story/money/2020/01/31/juul-altria- distances-itself-e-cigarette-maker-amid-scrutiny/4618993002/.

[173] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, BusinessWire (Dec. 20, 2018),

249.   For instance, despite the recently included warnings on JUUL packaging, approximately two-thirds of JUUL users aged 15-24 do not know that JUUL pods contain nicotine.[174]

250.   While traditional cigarette use among Illinois minors has been steadily declining for years, e-cigarette usage between 2016 and 2018 has increased by 15% among 8th graders, 65% increase in 10th graders, and 45% among 12th graders.[175] (note, e-cigarette usage was not even tracked in Illinois prior to 2016).

251.   In 2018, only 1% of Illinois 8th graders, 2% of 10th graders, and 9% of 12th graders reported any cigarette usage in the past 30 days. When asked about e-cigarettes however, those percentages rose to 7%, 18%, and 27%, respectively.

252.   From 2014 to 2018, Lake County, Illinois' traditional cigarette usage declined by 300% among 8th graders, 100% among 10th graders, and 71% among 12th graders. By 2018, only 1%, 3%, and 7% of 8th, 10th, and 12th graders reported smoking cigarettes.[176]

253.   E-cigarette usage, however, was 800%, 733%, and 471% higher than traditional cigarette usage among each respective population.

---

[174] https://truthinitiative.org/news/JUUL-e-cigarettes-gain-popularity-among-youth.

[175] https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/state-reports/2016/Freq16_IYS_Statewide.pdf;
https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/state-reports/2018/Freq18_IYS_Statewide.pdf.

[176] https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/2014/cnty14_lake.pdf;
https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/2016/Cnty16_Lake.pdf;
https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/2018/Cnty18_Lake.pdf

254.   Between 2016 and 2018, those who reported using e-cigarettes within the past 30 days increased 40% among 8th graders, 82% among 10th graders, and 72% among 12th graders (again, e-cigarette usage was not tracked in Lake County, Illinois prior to 2016).

255.   Of the Lake County youth surveyed who admitted to using e-cigarettes in 2016, 18% of 10th graders and 22% of 12th graders reported using e-cigarettes more than once per day. For comparison, 0% reported using cigarettes more than once per day.

256.   By 2018, those reporting e-cigarette usage more than once per day rose to 25% among Lake County 10th graders and 35% among Lake County 12th graders, demonstrating a significant increase in prolonged addictive behavior.

257.   Moreover, the number of Lake County 10th and 12th graders who reported using cigarettes more than once per day was still 0% in 2018, demonstrating that this increase in e-cigarette usage was *not* the result of minors converting to e-cigarettes, but instead, that new users were picking up the habit.

258.   In response to these staggering numbers:

   a.   The National Institute on Drug Abuse found that the 2018 spike in nicotine vaping was the largest for any substance recording in 44 years;

   b.   FDA Commissioner, Dr. Scott Gottlieb, has stated that the data "shock[s] [his] conscience" and repeatedly referred to the growing rate of e-cigarette use among adolescents and teens as an epidemic; and

   c.   On December 18, 2018, the U.S. Surgeon General called the e-cigarette an epidemic among youth and singled out JUUL, the most popular electronic cigarette among young people, for fueling the epidemic.[177]

_____

[177] https://www.npr.org/sections/health-shots/2018/12/18/677755266/surgeon-general-warns-youth-vaping-is-now-an-epidemic.

259. This increased usage among Lake County youth has led to additional burdens on Lake County.

260. Individual Lake County schools report confiscating an average of 56 e-cigarettes per year.

261. Minors who are caught with e-cigarettes receive in-school suspensions, Saturday detentions, are placed social probation programs, and are required to attend meetings with health department representatives.

262. Lake County schools have been forced to hire private agencies to implement new education programs relating to e-cigarette usage.

263. The Lake County Health Department has also been tasked with abating e-cigarette usage among the youth, including offering private and group counseling (at $75-$150 per session) and providing nicotine replacement therapies to its addicted population.

264. On an individual basis, experts charge approximately $16,000 for 30-day inpatient treatment for nicotine addiction. Year-long outpatient treatments cost approximately $30,000.

**J.   No Federal Agency Action, Including by the FDA, Can Provide the Relief Plaintiffs Seek Here**

265. The injuries Plaintiffs have suffered and will continue to suffer cannot be addressed by agency or regulatory action. There are no rules the FDA could make or actions the agency could take that would provide Plaintiffs the relief they seek in this litigation.

266. Even if e-cigarettes were entirely banned today, millions of youth, including Plaintiff Lake County Illinois' residents, would remain addicted to nicotine.

267.    Regulatory action would do nothing to compensate Plaintiff Lake County for the money and resources it has already expended addressing the impacts of the youth e-cigarette crisis and the resources it will need in the future.

268.    Defendants' misconduct alleged herein is not a series of isolated incidents, but instead the result of a sophisticated youth marketing scheme and related cover-up scheme that has caused a continuing, substantial, and long-term burden on the people of the services provided by Plaintiff Lake County Illinois. The public nuisance created by Defendants and Plaintiffs' requested relief in seeking abatement further compels Defendants to compensate Plaintiff Lake County for the substantial resources it will have to expend to address the youth e-cigarette crisis.

## FIRST CAUSE OF ACTION
### Violation of Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1, *et seq.*

269.    Plaintiffs Lake County, Illinois and Eric Rinehart, as State's Attorney of Lake County, Illinois, incorporate the foregoing allegations as if fully set forth herein.

270.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, et seq. ("ICFA"), provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration should be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

271.    While conducting trade or commerce, Defendants engaged in the following

conduct constituting a deceptive act or practice declared unlawful under Section 2 of the ICFA:

a. Making deceptive fraud, false promises of material fact, and/or misrepresentations of material fact including, but not limited to, the following:

    i. Misrepresenting JUUL products as non-addictive nicotine delivery systems or less-addictive nicotine delivery systems than traditional cigarettes;

    ii. Misrepresenting the absorbed nicotine level for the use of JUUL products;

    iii. Misrepresenting JUUL as safer and less addictive than traditional cigarettes;

    iv. Misrepresenting the health benefits of switching from using traditional cigarettes to JUUL products;

    v. Misrepresenting the use of JUUL products as a way to quit using traditional cigarettes or to quit smoking in general;

    vi. Misrepresenting the concentration of nicotine salt containing absolute nicotine concentration of at least 1.2% higher than as stated;

    vii. Misrepresenting the nicotine content of JUUL pods by representing it as 5% strength;

    viii. Misrepresenting that a JUUL pod contains as much nicotine as a pack of cigarettes when the amount consumed via a JUUL pod is as much as twice as high as traditional cigarettes; and

    ix. Misrepresenting the nicotine content of JUUL pods as the same as a pack of cigarettes when the nicotine content is closer to 24 cigarettes or at least 20% more than one pack.

b. Concealing and/or suppressing material facts by:

    i. Failing to disclose the chemicals contained in JUUL products;

ii.     Failing for years to disclose that JUUL products contain any addictive chemicals;

iii.    Failing to disclose the adverse health effects of using JUUL products including, but not limited to, increased risk of heart disease and stroke, changes in brain functionality that lead to susceptibility to anxiety, depression and other addictions, decreased functionality of the endocrine system, heightened risk of cancer and negative effects on fertility;

iv.     Failing to disclose that JUUL products deliver higher amounts of nicotine at a faster rate than a traditional cigarette;

v.      Failing to disclose that because of JUUL's method of nicotine absorption, JUUL's nicotine solution is more addictive than traditional cigarettes even with lower concentrations;

vi.     Failing to disclose that JUUL's nicotine salts increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes;

vii.    Failing to disclose that JUUL's nicotine salt formulation delivers an exceptionally potent dose of nicotine;

viii.   Failing to disclose that the efficiency with which JUUL devices deliver nicotine into the bloodstream increases its addictiveness; and

ix.     Failing to disclose that non-smokers who then use JUUL products have a significant likelihood of using traditional cigarettes.

c.   Misrepresenting the product as having the characteristics, ingredients, uses, and benefits they do not have and engaging in conduct which creates a likelihood of confusion or misunderstanding.

272.     Defendants marketed a product that contained nicotine levels far in excess of what smokers need to comfortably switch from cigarettes with the intention of creating and fostering long-term addition to JUUL products.

273.     Defendants falsely and deceptively marketed, advertised, and sold JUUL products by misrepresenting their nicotine content, nicotine pharmacokinetics, and suitability as an alternative to cigarettes, and falsely implied that they were useful as a smoking or nicotine-use cessation device.

274.     Defendants falsely and deceptively advertised its products in a manner that lured underage smokers and non-smokers into using JUUL products.

275.     Defendants committed the deceptive acts and unfair practices with the intent that minors would rely upon the deceptive acts and unfair practices.

276.     Defendants' deceptive acts and unfair practices occurred in the course of conduct involving trade or commerce.

277.     Defendants' deceptive acts and unfair practices have violated and continue to violate the deceptive prong of the Illinois statutes because they extend to transactions that are intended to result, or which have resulted, in the sale or distribution of goods or services to consumers.

278.     Defendants' deceptive acts and unfair practices occurred through its advertising, offering for sale, and sale or distribution of merchandise for cash or on credit.

279.     Minors in Lake County, Illinois have seen the advertisements in Defendants' long, pervasive advertising campaign and were exposed to the false messages conveyed by the campaign.

280.     As described above, each of Defendants' advertisements share common elements that are designed specifically to resonate with minors, including the use of attractive young women in suggestive poses, romance, and social inclusion to convey the idea that the products would make one hip and attractive, and the use of flavors, relaxation, new technology, and select terms to depict the products as healthy and safe. A representative sample of these advertisements has been included throughout this complaint.

281.     Defendants' conduct offends public policy, is immoral, unethical, oppressive, and unscrupulous.

282.     Defendants' deceptive acts and unfair practices proximately caused actual damages and substantial injuries to consumers.

283.     Lake County, Illinois has and will continue to sustain damages the amount of which will be determined at trial.

284.     Pursuant to 815 ILCS 505/7(b), the penalty for violating the ICFA is a sum not to exceed $50,000, or, if the Court finds that Defendants' above-described practices were intended to defraud Lake County, Illinois residents, $50,000 per violation.

285.     Unless and until enjoined and restrained by order of this Court, Defendants will continue to cause injury to Plaintiff and the loss of money and property in that JUUL will continue to violate the laws of Illinois, unless specifically ordered to comply with the same.

**SECOND CAUSE OF ACTION**
**Negligence**

151.     Plaintiffs Lake County, Illinois and Eric Rinehart, as State's Attorney of Lake County, Illinois, incorporate the foregoing allegations as if fully set forth herein.

152.    At all relevant times, Defendants owed the citizens of Lake County, Illinois a duty to:

    a.  Exercise reasonable care in the marketing of its products;

    b.  Exercise reasonable care in ensuring its products are not sold and/or distributed to minors and are not designed or advertised in a manner that makes them unduly attractive to minors;

    c.  Use reasonable and adequate procedures that are compliant with industry-standard practices in ensuring that distributors and/or retailers of its products do not sell and/or distribute them to minors;

    d.  Implement processes to quickly detect whether its products are sold and/or distributed to minors and to timely act on this information to eliminate the sale and/or distribution of the products to minors;

    e.  Communicate accurate information;

    f.  Not create a foreseeable risk of harm to minors; and

    g.  Comply with the Prevention of Tobacco Used by Minors and Sale and Distribution of Tobacco Products Act, 725 ILCS 675/0.01 *et seq.*

153.    Defendants breached one or more of the above duties by:

    a.  Engaging in minor-based marketing to target minors;

    b.  Marketing the products as safe, candy-like products to which minors are attracted when in fact they contain more potent doses of nicotine than cigarettes, which make them particularly addictive;

    c.  Marketing the products as a healthy and fun activity as opposed to a means of delivering potent and addictive doses of nicotine;

    d.  Permitting the implementation of inadequate systems, protocols, and practices by itself and by its distributors and retailers that allowed minors to purchase and/or receive the products, thereby creating a foreseeable risk of harm;

    e.  Inducing the purchase of the products by minors through marketing its products to minors through the use of viral social media campaigns and fostering a cool, youthful image;

1

2       f.  Failing to comply with the minimal industry standards with respect to
its distributors and retailers;

3

4       g.  Failing to take timely, affirmative steps to eliminate the sale and/or
distribution of e-cigarettes to minors when it knew minors were

5            purchasing, receiving and/or using its products;

6       h.  Making the false statements by:

7                  i.  Misrepresenting Defendants' products as non-
8                     addictive nicotine delivery systems or less-addictive
nicotine delivery systems than traditional cigarettes;

9

10               ii.  Misrepresenting the absorbed nicotine level for the use
of Defendants' products;

11

12             iii.  Misrepresenting JUUL as safer and less addictive than
traditional cigarettes;

13

14             iv.  Misrepresenting the health benefits of switching from
using traditional cigarettes to JUUL products;

15

16              v.  Misrepresenting the use of Defendants ' products as a
way to quit using traditional cigarettes or to quit

17                 smoking in general;

18             vi.  Misrepresenting the concentration of nicotine salt
containing absolute nicotine concentration of at least

19               1.2% higher than as stated;

20

21             vii.  Misrepresenting the nicotine content of JUUL pods by
representing it as 5% strength;

22            viii.  Misrepresenting that a JUUL pod contains as much
nicotine as a pack of cigarettes when the amount

23               consumed via a JUUL pod is as much as twice as high

24               as traditional cigarettes; and

25              ix.  Misrepresenting the nicotine content of JUUL pods as
the same as a pack of cigarettes when the nicotine

26               content is closer to 24 cigarettes or at least 20% more

27               than one pack.

28

i.   Making omissions or concealments by:

    i.   Failing to disclose the chemicals contained in Defendants' products;

    ii.   Failing for years to disclose that Defendants' products contain any addictive chemicals;

    iii.   Failing to disclose the adverse health effects of using Defendants' products including, but not limited to, increased risk of heart disease and stroke, changes in brain functionality that lead to susceptibility to anxiety, depression and other addictions, decreased functionality of the endocrine system, heightened risk of cancer and negative effects on fertility;

    iv.   Failing to disclose that Defendants' products deliver higher amounts of nicotine at a faster rate than a traditional cigarette;

    v.   Failing to disclose that because of Defendants' method of nicotine absorption, Defendants' nicotine solution is more addictive than traditional cigarettes even with lower concentrations;

    vi.   Failing to disclose that Defendants' nicotine salts increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes;

    vii.   Failing to disclose that Defendants' nicotine salt formulation delivers an exceptionally potent dose of nicotine;

    viii.   Failing to disclose that the efficiency with which Defendants' devices deliver nicotine into the bloodstream increases its addictiveness; and

    ix.   Failing to disclose that non-smokers who then use Defendants' products have a significant likelihood of using traditional cigarettes

j.   Engaging in affirmative conduct that creates an unreasonable risk of harm and then failing to exercise reasonable care to prevent the harm.

154.     Defendants' false statements, omissions, and/or concealments were of past or existing material facts which were essential elements to the transaction.

155.     Defendants made the false statements and omissions and/or concealments without reasonable grounds for believing the statements to be true and with carelessness in ascertaining the truth of the statements.

156.     Defendants made the false statements and omissions and/or concealments with the intent to induce the reliance by minors on the false statements, omissions and/or concealments.

157.     Defendants did not act reasonably.

158.     Defendants knew or should have known the likelihood that minors would be attracted to their products and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors.

159.     Defendants knew or should have known that their marketing, distribution, and/or sales practices did not adequately safeguard minors from the sale and/or distribution of the products and, in fact, induced minors to purchase the products.

160.     Defendants were negligent in that it knew, or by the exercise of reasonable care, should have known that its products under ordinary use were harmful or would cause injury to minors but failed to use reasonable care to warn minors of the potentially harmful and injurious effects in a manner that a reasonable person would do so under the same or similar circumstances.

161.     The minors acted reasonably and justifiably in relying on the truth of the misrepresentations made by Defendants as the minors were not aware and would not have recognized the risk of using Defendants' products because Defendants intentionally downplayed,

misrepresented, concealed, and failed to warn of the risks of nicotine exposure and addiction that the products posed.

162.    The minors were particularly unable to appreciate the risk because of their youth, inexperience, and/or immaturity of judgment.

163.    If the minors had been aware of the truth, the minors would have acted differently.

164.    The Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act was intended and designed to protect human life or property.

165.    The Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act provides that a person, either directly or indirectly by an agent, employee, or by a vending machine owned by the person or located in the person's establishment may not sell, offer for sale, give or furnish any alternative nicotine product, or any cartridge or component of an alternative nicotine product, to a person under 18 years of age.

166.    Defendants violated Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act by selling, offering to sell, giving, or furnishing its products to people under 18 years of age.

167.    The minors are members of the class of people that the Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act was intended to protect.

168.    The Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act provides for punishment.

169.    The violations caused by Defendants  are the kind of harm the Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act.

170.    As a result of all of the above, Lake County, Illinois has and will continue to sustain

damages and injuries in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF ILLINOIS PUBLIC NUISANCE LAW**

171.   Plaintiffs Lake County, Illinois and Eric Rinehart, as State's Attorney of Lake County, Illinois, incorporate the foregoing allegations as if fully set forth herein.

172.   The Supreme Court of Illinois defines a public nuisance as "the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public."[178] A public nuisance affects an interest common to the general public, produces a common injury, is dangerous or injurious to the general public, is harmful to the public health, prevents the public from a peaceful use of their land and the public streets, or has a direct encroachment on public property.

173.   The Defendants' conduct constitutes a public nuisance.

174.   Defendants' acts and omissions have unreasonably interfered with the health, safety, peace, comfort, and convenience of the general public, have obstructed or caused inconvenience or damage to the public in the exercise of rights common to all, and/or caused substantial annoyance, inconvenience or injury to the public by creating a public health epidemic in the County.

175.   Defendants' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of the County and its residents. *See* Restatement

---

[178] *Vill. of Wilsonville v. SCA Servs., Inc.*, 86 Ill. 2d 1, 426 N.E.2d 824 (1981)

(Second) of Torts § 821B.[179]

176.    As the Restatement (Second) of Torts § 821B(2) (1979) explains, "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include" conduct that "involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience," that "is proscribed by a statute, ordinance or administrative regulation," or that "is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right."

177.    Illinois public nuisance law has long recognized that issues affecting the public health raise important public rights that require government protection.[180]

178.    The public nuisance that Defendants created unreasonably interferes with the public health by creating a public health emergency and urgent health crisis. It also interferes with the public health by causing skyrocketing nicotine addiction.

179.    The public nuisance caused by Defendants' conduct is a direct and proximate contributing cause of the injuries and harms sustained by Lake County, Illinois and its citizens.

180.    Defendants' actions were, at the very least, a substantial factor in e-cigarettes becoming widely used by Lake County, Illinois youth. Defendants' actions were, at the very least, a substantial factor in deceiving JUUL users about the risks and benefits of JUUL products.

---

[179] Illinois courts have held that "Illinois common law nuisance parallels the nuisance law outlined in the Restatement." *Gilmore v. Stanmar, Inc.*, 261 Ill. App. 3d 651, 660, 633 N.E.2d 985 (1st Dist. 1994). *See also Wheat v. Freeman Coal Mining Corp.*, 23 Ill.App.3d 14, 18, 319 N.E.2d 290 (5th Dist. 1974) ("Our courts have adopted the Restatement definition of nuisance.").

[180] *Mugler v. Kansas*, 123 U.S. 623, 672-673 (1887)

Without Defendants' actions, e-cigarette use, misuse, abuse, and addiction would not have become so widespread, and the epidemic that now exists would have been averted.

181. Defendants had control over their conduct in Lake County, Illinois as is described in this Complaint, and that conduct has had an adverse effect on the public. Defendants had sufficient control over, and responsibility for, the public nuisance they created. Defendants were in control of the "instrumentality" of the nuisance, namely their JUUL products, including the process of marketing, promotion, distribution, manufacturing, and demand for JUUL products at all relevant times.

182. The public nuisance caused by Defendants' actions is substantial and unreasonable. Defendants' actions caused and continue to cause the public nuisance, and the harms of that public nuisance outweigh any offsetting benefits. Defendants' actions have no offsetting benefits. Any purported offsetting benefits are significantly outweighed by the harm of the public health crisis they created.

183. Defendants knew that their products contain nicotine, that nicotine is highly addictive, and that it is illegal to sell or furnish such products to underage individuals. Defendants also knew that that their products were harmful to underage consumers, knew that their products specifically appealed to minors, and knew that their marketing was effective among underage consumers. Even so, Defendants knowingly and actively marketed their products to youth.

184. By directly marketing to youth, by continuing these marketing practices after it was evident that children were using JUUL products in large numbers, and by advertising, marketing, and distributing JUUL products at sampling events without providing any nicotine warning, Defendants JUUL and the Management Defendants directly facilitated the spread of youth e-

cigarette use and the public nuisance affecting Lake County, Illinois.

185.   By investing billions of dollars in JUUL and actively working to promote the sale and spread of JUUL products with knowledge of JUUL's practice of marketing its products to youth and failure to control youth access to its products, Altria directly facilitated the spread of the youth e-cigarette crisis and the public nuisance affecting the Lake County, Illinois.

186.   Defendants' conduct has affected and interfered with and continues to affect and interfere with the rights of a considerable number of young people and others in Lake County, Illinois, including but not limited to youth and others in Lake County, Illinois who have become and continue to become addicted to nicotine due to Defendants' products and marketing.

187.   This addiction has caused, is causing, and will continue to cause physical, sometimes fatal, harm, and mental harm, to those who are addicted and who use tobacco and nicotine products.

188.   Addicted individuals will require unknown amounts of medical and preventative care, in the future. This is worsened by the lack of approved tobacco cessation products for underage individuals.

189.   Public schools throughout Lake County, Illinois, are suffering from increased absenteeism, classroom disruptions, suspensions, loss of class time for students, increased nurse visits by students, diversions of and losses of critical funding to school districts, and many other harms and expenses directly due to Defendants' actions.

190.   County governments and Public Health Divisions throughout Lake County, Illinois, are required to spend increased time and resources combating the misinformation spread by Defendants, educating their communities about the addictive nature and harm caused by

Defendants' products, supporting, advocating for, and enacting policies designed to address the rise in youth e-cigarette use created by Defendants, and supporting and assisting schools overwhelmed by youth e-cigarette use.

191.    Defendants also created a public nuisance through the way in which they disposed of, and encouraged consumers to dispose of, JUUL waste items, which includes JUUL devices, pods, and chargers.

192.    The consequences of Defendants' conduct are not in the public interest.

193.    Defendants knew of the public health hazard their conduct would create.

194.    It was foreseeable to Defendants that their conduct would unreasonably interfere with the public health, public safety, public peace, public comfort, and/or public convenience.

195.    Defendants' conduct is unreasonable, intentional, unlawful, reckless, or negligent.

196.    Defendants' conduct and the e-cigarette epidemic they created is likely to continue to cause significant harm to Lake County, Illinois residents.

197.    Plaintiffs have suffered and continue to suffer special injuries distinguishable from those suffered by the general public. As discussed herein, they have incurred and continue to incur substantial costs from investigating, monitoring, policing, and remediating the e-cigarette epidemic.

198.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

199.    The public nuisance created, perpetuated, and maintained by Defendants can be

abated and further reoccurrence of such harm and inconvenience can be prevented. It is an ongoing public health crisis.

200.     Defendants must abate the public nuisance caused by their conduct in marketing, furnishing and selling their products to underage persons in Lake County, Illinois. Plaintiff requests an order from the Court providing for abatement of Defendants' ongoing and future violations. Accordingly, Plaintiff requests that the court order Defendants to create a fund that will be used to remediate the public health crisis of youth e-cigarette use that Defendants created. Plaintiff, through the County Counsel and associated counsel, requests abatement of the public nuisance created by Defendants in Lake County, Illinois.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**

201.     Plaintiff Lake County, Illinois and Eric Rinehart, as State's Attorney of Lake County, Illinois, incorporate the foregoing allegations as if fully set forth herein.

202.     As a direct and proximate result of Defendants' misconduct set forth above, the minors in Lake County, Illinois have conferred benefits and enrichments upon Defendants whereby Defendants has been unjustly enriched.

203.     By their misconduct as described above, Defendants have accepted a benefit to the detriment and harm and expense to the minors in Lake County, Illinois and hence, Lake County Illinois itself.

204.     Defendants have and continue to knowingly retain wrongful benefits and funds in relation to the harm to the minors in Lake County, Illinois and hence, Lake County Illinois itself.

205.     Defendants have retained these benefits under circumstances where it would be unjust to do so.

206.   Defendants' acceptance of the benefits and retention of monies paid violated the fundamental principles of justice, equity, and good conscience and have unjustly enriched Defendants.

207.   It is inequitable for Defendants to be permitted to retain the benefits they received without justification in an unfair, unconscionable, and oppressive manner. Such retention of funds under such circumstances make it inequitable and constitute unjust enrichment.

208.   As a direct and proximate results of the foregoing, Lake County, Illinois has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Declaratory and Injunctive Relief

209.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

210.   Pursuant to 735 ILCS 5/2-701, this Court "may make binding declarations of rights, having the force of final judgments . . . including the determination . . . of the construction of any statute, municipal ordinance, or other governmental regulation . . . and a declaration of the rights of the parties interested."

211.   Such a declaration of rights "may be obtained . . . as incident to or part of a complaint . . . seeking other relief as well." 735 ILCS 5/2-701(b).

212.   Plaintiffs Lake County, Illinois and Eric Rinehart, as State's Attorney of Lake County, Illinois seek a judgment declaring that Defendants have violated the ICFA.

213.   Unless and until enjoined and restrained by order of this Court, Defendants will continue to cause injury to Plaintiffs and the loss of money and property in that Defendants will continue to violate the laws of Illinois, unless specifically ordered to comply with the same.

1

## **PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order granting the

3

following relief:

4

5

A.      Declaring that Defendants' actions constitute violations of the ICFA;

6

B.      Fining Defendants $50,000 for violating the ICFA or, if the Court finds that

7

Defendants engaged in the above-described conduct with intent to defraud, $50,000 for each such

8

violation;

9

10

C.      Awarding the greater of actual or compensatory damages according to proof;

11

D.      Awarding monetary award, abatement, and equitable, and/or injunctive relief in

12

the form of a court-enforced and supervised fund and corrective action, programs,

13

communications and other appropriate relief to restore the public health, safety, peace, and honest

14

marketplace, which will require, at least, the following:

15

16
        1.    Funding and programs for health care services and programs associated
            with the early detection, ongoing testing, monitoring for detection of

17
            illness, disease process, or disease, diagnosis and treatment of resulting
            injuries and adverse health consequences of JUUL's conduct;

18

19
        2.    Funding and programs to combat the abuse and diversion of the use of
            e-cigarettes by minors including tobacco education programs, cessation

20
            programs for users, and public information campaigns to warn users of
            health effects and addictive nature of the product;

21
        3.    Funding, programs, studies, and research of the short and long-term
            effects of e-cigarette use in minors and the possible cures and treatments

22
            for the detrimental effects of using it;

23
        4.    Funding and programs for accumulating and analyzing relevant
            medical and demographic information from underage users, including

24
            the results of testing and diagnosis; and

25
        5.    Funding the police, prosecution, correction, and other services and costs
            associated with the harm done by JUUL to the public health and safety.

26

E.      Awarding punitive damages;

27

28
F.      Awarding forfeiture, disgorgement, restitution, rescission, and divesture of

Defendants' proceeds and assets;

       G.      Awarding injunctive relief including an injunction against Defendants from continuing to perform its wrongful conduct;

       H.      Awarding declaratory relief including a declaration that Defendants' practices constitute false, misleading, and deceptive advertising;

       I.      Awarding Plaintiffs' reasonable attorneys' fees and costs;

       J.      Awarding Plaintiffs pre- and post-judgment interest, to the extent allowable;

       K.      Awarding such and other injunctive and declaratory relief as is necessary; and

       L.      Awarding such other and further relief as the Court deems reasonable and just.

Dated: July 1, 2021                Respectfully Submitted,

                              */s/ Steven A. Hart*
                              Special Assistant State's Attorney of Lake County, Illinois

Steven Hart (ARDC 6211008)
Brian Eldridge (ARDC 6281336)
Carter Grant (ARDC 6306058)
John (Jack) Prior (ARDC 6306767)
**HART MCLAUGHLIN & ELDRIDGE, LLC**
22. W. Washington St., Suite 1600
Chicago, Illinois 60602
Tel: (312) 955-0545
Fax: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
cgrant@hmelegal.com
jprior@hmelegal.com

Antonio Romanucci (ARDC 6190290)
Robert Baizer (ARDC 0095710)
Joseph Kolar (ARDC 6191777)
David Nieman (ARDC 6300412)
Bryce Hensley (ARDC 6327025)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
aromanucci@rblaw.net
rbaizer@rblaw.net
jkolar@rblaw.net
dneiman@rblaw.net
bhensley@rblaw.net