1

2

3

4             UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7   IN RE: JUUL LABS, INC., MARKETING          Case No.  19-md-02913-WHO
    SALES PRACTICE AND PRODUCTS
8   LIABILITY LITIGATION                       **ORDER ON MOTIONS TO DISMISS**
                                               **PERSONAL INJURY BELLWETHER**
9                                              **COMPLAINTS**

10                                             Re: Dkt. Nos. 1500, 1501, 1502, 1503, 1799,
                                               1933, 1938
11

12        Three sets of defendants – the Altria entities,[1] the Founder Defendants,[2] and the Other

13   Director Defendants (ODDs)[3] – challenge claims asserted by each of the eighteen bellwether

14   personal injury plaintiffs.[4]  While the allegations regarding residence and use are particular to each

15   plaintiff, the substantive allegations regarding each defendant's conduct in the Amended Master

16   Complaint (Personal Injury) and repeated in each of the personal injury bellwether complaints at

17   issue here are materially consistent with those alleged in the Second Amended Consolidated Class

18   Action Complaint ("SACAC") and the Second Amended Public Entity Complaints (PECs).  Those

19   substantive and material allegations have been identified and discussed in depth in two of my prior

20   Orders and will not be repeated here.  *See In re JUUL Labs, Inc., Mktg., Sales Practices, and*

21   _____

22   [1] Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services LLC (ACS), and Altria Group
     Distribution Company (AGDC), collectively "Altria."  Altria MTD, Dkt. No. 1502.

23
     [2] James Monsees (Monsees MTD, Dkt. No. 1503) and Adam Bowen (Bowen MTD, Dkt. No.
24   1501), collectively "Founder Defendants."

25   [3] Nicholas Pritzker, Riaz Valani, and Hoyoung Huh, collectively "Other Director Defendants" or
     "ODDs." ODD MTD, Dkt. No. 1500.

26
     [4] 4 out of the 24 initial bellwether plaintiffs selected by the parties voluntarily dismissed their
27   cases (Potter, Smigiel, Dixon, Wilson).  One additional plaintiff was selected (Rosenfield), but
     then she and two others (Mangham and Arnett) voluntarily dismissed their cases.  18 bellwether
28   plaintiffs remain.

United States District Court
Northern District of California

*Products Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020) (*JUUL I*); *In re JUUL Labs, Inc.,*

*Mktg., Sales Practices, and Products Liab. Litig.*, 19-MD-02913-WHO, 2021 WL 1391540 (N.D.

Cal. Apr. 13, 2021) (*JUUL II*).[5]

Not surprisingly, my rulings on the pending motions to dismiss are consistent with those

prior orders. While the issues I address below are too numerous to summarize neatly, I am

dismissing with prejudice the strict products liability claims against the Founder Defendants and

ODDs, as well as some state law claims as required by particular state statutes. The other issues

raised in the motions are DENIED.

**THE PLAINTIFFS AND THEIR CLAIMS**

The only significant differences between the Amended Master Complaint (Personal Injury)

allegations and the bellwether complaints are those specific to each bellwether plaintiff.

Plaintiff Kerrigan Bagley, Member Case No. 20-cv-03770, is currently 20 years old and is

deployed at a joint task force base at Guantánamo Bay, Cuba. Bagley began using JUUL e-

cigarettes in 2015 when he was 15 years old. From his birth until his deployment in July 2020, he

resided with his family in Utah. Dkt. No. 1419-2 at ECF pg. 1621 *et seq.*

Plaintiff Lucas Willis Barnes, Member Case No. 20-cv-06599, is a resident of Arcadia,

Florida. Barnes first used JUUL in or around April 2017, when he was 14 years old. Dkt. No.

1419-2 at ECF pg. 2618 *et seq.*

Plaintiff Robin Bain is the mother and guardian of B.B., Member Case. No. 20-cv-03677.

B.B. is currently 15 years old and resides in McMinnville, Tennessee. B.B. began using JUUL e-

cigarettes in March of 2018 when she was 12 years old. Dkt. No. 1419-2 at ECF pg. 5189 *et seq.*

Plaintiff Nicole Dramis, Member Case No. 18-cv-02499, is a resident of Miller Place, New

York and sues as the mother of minor J.D. J.D. first used JUUL in or around January 2017, when

he was 13 years old. Dkt. No. 1419-2 at ECF pg. 2 *et seq.*

Plaintiff Mason Edwards, Member Case No. 20-cv-01866, is currently 25 years old and

---

[5] Altria uses the complaint of D.H. through her guardian Humphries as an exemplar for its
recitation of plaintiffs' facts while the Founder Defendants and ODDs use the complaint of Mason
Edwards (Member Case No. 3:20-cv-1866-WHO) as their exemplar. All citations herein are to the
Edwards Complaint, unless otherwise noted.

2

United States District Court
Northern District of California

United States District Court
Northern District of California

1   resides in Lawrenceville, Georgia.  Edwards began using JUUL e-cigarettes in or about November

2   2017 when he was 22 years old and a resident of the state of New York.  Dkt. No. 1419-2 at ECF

3   pg. 638 *et seq.*

4          Plaintiff Jacob Fairess, Member Case No. 20-cv-06765, is currently 24 years old and

5   resides in Orlando, Florida.  He began using JUUL e-cigarettes in or around April 2018 when he

6   was 22 years old, and at all relevant times of his JUUL usage, he was a resident of the state of

7   Louisiana.  Dkt. No. 1419-2 at ECF pg. 3589 *et seq.*

8          Plaintiff Graham Faulds, Member Case No. 20-cv-07255, is currently 16 years old and

9   resides in Connecticut.  Faulds began using JUUL e-cigarettes in September 2018 when he was 14

10  years old.  Dkt. No. 1419-2 at ECF pg. 5834 *et seq.*

11         Plaintiff Clark Fish, Member Case No. 20-cv-05653, is currently 20 years old and resides

12  in Nicholasville, Kentucky.  Fish began using JUUL e-cigarettes in 2017 when he was 17 years

13  old.  Dkt. No. 1419-2 at ECF pg. 2618 *et seq.*

14         Plaintiff Lauren Gregg, Member Case No. 20-cv-04595, is currently 20 years old and

15  resides in Salisbury Mills, New York.  Gregg first tried JUUL in September of 2017 and began

16  using JUUL e-cigarettes regularly in October of 2017 when she was 16 years old.  Dkt. No. 1419-

17  2 at ECF pg. 4548 *et seq.*

18         Plaintiff D.H., represented by her parent and Guardian Cheryl Humphries, Member Case

19  No. 19-cv-06497, is currently 17 years old and resides in Hot Springs, Arkansas.  D.H. began

20  using JUUL e-cigarettes in 2017 when she was 13 years old.  Dkt. No. 1419-2 at ECF pg. 5525 *et*

21  *seq.*

22         J.L.K, represented by his Mother and Guardian, K.K., Member Case No. 20-cv-04131, is

23  currently 17 years old and resides in High Point, North Carolina.  J.L.K. began using JUUL e-

24  cigarettes in August of 2017 when he was 14 years old.  Dkt. No. 1419-2 at ECF pg. 2291 *et seq.*

25         Timugen Keffer sues personally and as the representative of his deceased minor child,

26  M.K., Member Case No. 20-4356/20-cv-7164.  M.K was 17 years old at her time of death and

27  resided in Klamath Falls, Oregon.  M.K. began using JUUL e-cigarettes in or around November

28  2015 when she was 14 years old and began purchasing JUUL e-cigarettes in or around March

1   2016.  Dkt. No. 1419-2 at ECF pg. 4876 *et seq.*

2       Plaintiff Griffith A. Miles, Member Case. No. 19-cv-06546, is currently 24 years old and

3   resides in Falls Church, Virginia. Miles began using JUUL e-cigarettes in 2017 when he was 20

4   years old.  Case No. 19-cv-06546, Dkt. No. 16 ¶ 10.

5       Plaintiff Roberto Pesce, Member Case No. 20-cv-02658, is a 21-year old resident of

6   Charlestown, Rhode Island.  Pesce first used JUUL in or around April of 2016, when he was 16

7   years old.  Dkt. No. 1419-2 at ECF pg. 953 *et seq*.

8       Plaintiff Kristof Rest, Member Case. No. 20-cv-01330, is currently 27 years old and

9   resides in Miami, Florida.  Rest began using JUUL products in January 2017 when he was 23

10  years old.  Dkt. No. 1419-2 at ECF pg. 321 *et seq*.

11      Plaintiff Jayme Westfaul, Member Case No. 20-cv-06865, is currently 20 years old and

12  resides in Starkville, Mississippi.  Westfaul began using JUUL e-cigarettes in 2018 when she was

13  17 years old.  Dkt. No. 1419-2 at ECF pg. 3899 *et seq*.

14      Plaintiff Cameron Widergren, Member Case No. 20-cv-06608, is a 20-year old resident of

15  Tallahassee, Florida.  Widergren first used JUUL in or around September of 2016, when he was

16  16 years old.  Dkt. No. 1419-2 at ECF pg. 3257 *et seq*.

17      Plaintiff Nicco Wong, Member Case No. 20-cv-06912, is currently 15 years old and

18  resides in Altamonte Springs, Florida.  Wong began using JUUL e-cigarettes in or around January

19  of 2018 when he was 12 years old.  Dkt. No. 1419-2 at ECF pg. 4224 *et seq*.

20      Plaintiffs' opposition briefs identify numerous claims that they "do not intend to defend"

21  against with respect to these bellwether plaintiffs, while reserving the right to seek economic

22  damages related to some of those claims through the class cases.  *See, e.g*., Oppo. to Altria [Dkt.

23  No. 1800] at 16 n.10.  As a result, the claims at issue in these motions are limited to, generally,

24  strict liability claims, negligence claims, fraud and misrepresentation claims, and claims for

25  medical monitoring.[6]

26  _____

27  [6]  No party provides a clear answer to whether there is a need to engage in a choice of law analysis
    or how to apply that analysis to each of these cases.  No bellwether plaintiff is a California
28  resident but each "alleged in his or her short form complaint ('SFC') that, in the absence of the
    Direct Filing Order ('DFO'), he or she would have filed those claims in the Northern District of

4

United States District Court
Northern District of California

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

**I.   PRITZKER, HUH, AND VALANI'S MOTION TO DISMISS**

In their opposition to the ODD's motion to dismiss, plaintiffs clarify that they "will not

---

California and not his or her home district."  Altria Mot. at 1, 7.  Altria argues variously that "each Plaintiff's claims should be governed by the substantive law of his or her state of residence when those laws materially conflict with California law," *id*. at 21, but also that the "substantive law of the state where a Plaintiff resides also governs regardless of whether that Plaintiff filed his or her case in a different district and was transferred here, . . . or directly filed their case in this MDL." *Id*. at 21 n. 28 (citing cases).  The Founder Defendant and ODDs both contend that California's choice-of-law rules apply, and that California substantive law should apply unless plaintiffs prove there is a conflict with the substantive laws of a state where a bellwether plaintiff resides or resided at the operative time. *See* Dkt. No. 1501 at 6-7; Dkt. No. 1503 at 4-5.  Plaintiffs do not address whether they need to show a conflict under California's choice of law test to apply the law of each bellwether's state of residence.  Plaintiffs instead simply "adopt" the "choice-of-law analysis in Altria's Appendix and footnote 11" of Altria's motion, which is a list of the "residence" of each bellwether plaintiff.  Oppo. to Altria at 15-16 n.8.  For purposes of these motions, I look to the substantive laws of the state of residence of each bellwether plaintiff when she first began using JUUL.

defend" the bellwether plaintiffs' claims against the ODDs based on the following theories: (1) negligent failure to recall or retrofit, (2) unjust enrichment, (3) statutory consumer fraud, (4) breach of warranty, and (5) intentional infliction of emotional distress.  Oppo. to ODDs [Dkt. No. 1802] at 9.  The claims still at issue on the ODD's motion are: (1) strict product liability, (2) negligence, (3) fraud, (4) negligent misrepresentation, and (5) medical monitoring.  *Id*.[7]

### A.    Personal Participation

Pritzker, Valani, and Huh argue, as they did on their motions to dismiss the Consolidated Class Action Complaints and the Public Entity Complaints, that plaintiffs have failed to plausibly allege that each of them "personally participated" in wrongdoing sufficient to hold each of them liable under any of the claims.  They contend that plaintiffs' allegations regarding the ODD's control of the board are insufficient to allege "personal participation" and that plaintiffs' allegations amount to "benign" corporate activity insufficient to hold them liable for tort-based claims.

In my April 13, 2021 Order on the motions to dismiss the SACAC  and seven PECs, I addressed the fraud-based RICO claims, state law unfair competition/consumer protection claims, as well as negligence and nuisance claims asserted against the ODDs and concluded that plaintiffs' allegations regarding their individual conduct – repeated in the bellwether complaints at issue here – were sufficient.  I found that because of

> the numerical control of the Board, knowledge about JUUL's youth appeal and the growth of underage users, significant involvement in marketing decisions, and unusually active roles in management and decisions from which they profited billions of dollars, plaintiffs sufficiently allege the Other Director Defendants' personal participation to maintain the RICO and state law claims asserted against them.

*JUUL II*, 2021 WL 1391540, at *1; *see also id*. at *10-15.

Having had the benefit of reviewing the April 2021 Order, the ODDs argue in their Reply that because directors must be assumed to be independent, plaintiffs need to allege sufficient facts

---

[7] Each set of defendants makes overlapping arguments concerning the scope of certain causes of action.  I will analyze the claims in the first instance with respect to the ODDs, and then will address specific issues relevant to the Founder Defendants or Altria separately.

United States District Court
Northern District of California

demonstrating each defendant's "domination or control" over the other board members.  ODD Reply at 3.  But plaintiffs have plausibly alleged sufficient facts regarding each of the ODD's positions on and control over the Board and management that allegedly allowed these defendants to control and continue unabated JLI's efforts to grow the youth market – allowing JUUL to be deceptively marketed as a cessation device and failing to disclose the unique addictiveness and dangers of the product – to achieve their ultimate aim of cashing in on their JLI equity by positioning the company for investment by Altria.

The "demand futility" cases relied on by the ODDs in their Reply (ODD Reply [Dkt. No. 1938] at 3) are of questionable relevance to the claims here.  The strength of plaintiffs' allegations regarding the control of each ODD over the Board and/or management of JLI is better tested on summary judgment or determined by the trier of fact.  The same is true for the argument that plaintiffs have mischaracterized the meaning and significance of various documents.  ODD Reply at 4-6.  The import of those documents are matters in dispute not appropriate for resolution now.  Similarly, whether the ODDs actually had "unusually active roles in management and decisions" at JLI (*JUUL II*, 2021 WL 1391540, at *1) sufficient to prove their personal participation in or control over the conduct that caused the plaintiffs' harm cannot be resolved at this stage.  Plaintiffs have alleged sufficient facts to support the personal participation of the ODDs.

Finally, the lack of an allegation that Huh had appointment power over seats on the Board is not determinative.  Plaintiffs allege that he joined forces with Pritzker and Valani and that, through their combined and individual actions, he controlled the Board and management of JLI.

## B.    Standing

The ODDs argue that four bellwether plaintiffs lack standing to pursue youth-marketing claims against the ODDs as those plaintiffs were 18 years or older when they started using JUUL, and fifteen bellwether plaintiffs lack standing to pursue claims based on the Altria investment because they began their JUUL use either before the Altria negotiations began or before the Altria investment was finalized.  As a result, the ODDs contend that these plaintiffs cannot have suffered injury "traceable" to the ODDs conduct in support of youth marketing or the Altria investment.  ODD Reply at 8.

United States District Court
Northern District of California

1      This is a premature causation challenge.  Plaintiffs have plausibly alleged that their injuries

2  flow generally from the ODD's conduct.  How the alleged youth-marketing impacted the four

3  young adult plaintiffs cannot be resolved at this juncture.  Whether the fifteen plaintiffs the ODDs

4  identify can substantiate their claims that the ODDs intended – from the very beginning of their

5  involvement with JLI – to position JLI for investment or purchase by a "Big Tobacco" entity by

6  creating a new pipeline of youth and adult nicotine addicts, and whether that conduct in some part

7  caused their injuries, will be tested on summary judgment or determined by the trier of fact.

8      **C.      Strict Product Liability Claims**

9      Plaintiffs allege strict product liability claims against the ODDs based on allegations that

10  the JUUL product was unreasonably addictive and dangerous and for their failure to warn of these

11  defects.  *See* Edwards Compl. ¶¶ 756-776 (design defect); ¶¶ 777-793 (failure to warn); ¶¶ 794-

12  805 (manufacturing defect).  The plaintiffs allege that the ODDs are liable for the strict-liability

13  claims because JLI, the Founder Defendants, and the ODDs collectively, "designed, manufactured,

14  assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied,

15  distributed, and/or sold the JUUL Products that Plaintiff consumed."  *Id*. ¶ 758.

16      In their opposition to the ODD's motion, plaintiffs rephrase their contention and allege that

17  the ODDs are liable because they are "individuals who directly participated in a manufacturer's

18  defective product distribution."  Oppo. to ODD at 15 n.6; *see also id*. at 17 ("liability for the

19  defective JUUL products extends to Other Director Defendants because they directly participated

20  in JLI's tortious manufacture, marketing and distribution of the defective products, not because

21  Other Director Defendants, in their personal capacity, are the alleged manufacturer.").

22      The ODDs argue that corporate directors cannot, as a matter of law, be subject to these

23  strict liability claims.  I agree, at least with respect to the bellwether plaintiffs' strict product

24  liability claims.  Plaintiffs cite no case that has extended strict product liability claims in any of the

25  relevant jurisdictions to similarly situated corporate directors.  Their closest case is *Wellborn v.*

26  *Cobray Firearms, Inc*., 139 F.3d 913 (10th Cir. 1998).  There, the Tenth Circuit applied Wyoming

27  law and held that an officer and sole stock-holder of a corporation could be liable for strict product

28  liability, breach of warranty, and negligence claims where he admitted to "fabricating, designing,

manufacturing, packaging, and selling the flare launcher, as well as writing the instruction which accompanied" the product.  *Wellborn*, 139 F.3d at *5. That is a starkly different situation than presented here with respect to the ODDs, including the important difference that the ODDs are not officers or sole owners of a closely-held corporation.[8]

Plaintiffs argue, alternatively, that the ODDs may be liable for the strict product liability claims based on the "responsible corporate officer doctrine."  "The responsible corporate officer doctrine was developed by the United States Supreme Court to hold corporate officers in responsible positions of authority personally liable for violating strict liability statutes protecting the public welfare. . . . It is a common law theory of liability separate from piercing the corporate veil or imposing personal liability for direct participation in tortious conduct."  *People v. Roscoe*, 169 Cal. App. 4th 829, 831–32 (Cal. App. 3d Dist. 2008) (internal citations omitted).  "The responsible corporate officer doctrine applies to public welfare offenses which impose strict liability by plain language and intent. . . . A public welfare offense occurs where a statute is intended to improve the common good and the legislature eliminates the normal requirement for culpable intent, resulting in strict liability for all those who have a responsible share in the offense."  *Matter of Dougherty*, 482 N.W.2d 485, 489 (Minn. App. 1992) (citing *United States v. Park*, 421 U.S. 658, 672–73 (1975); *United States v. Dotterweich*, 320 U.S. 277, 284–85 (1943).

---

[8] Plaintiffs' other cases are inapposite, generally addressing potential imposition of liability in the sole-owner or closely-held corporate context or standing merely for the proposition that corporate directors may be held liable in tort for their own tortious conduct.  *See, e.g., Ruzzo v. LaRose Enterprises*, 748 A.2d 261, 270 (R.I. 2000) (the president of a corporation that operated a business could not be held liable for plaintiff's injury from a tool rented by the business where no evidence president "participated in the negligent inspection and maintenance of the" tool); *Melia v. Les Grands Chais De France*, CIV. A. 89-0320P, 1990 WL 288625, at *6 (D.R.I. Dec. 18, 1990) (finding strict product liability claims adequately alleged against "the President and [] major stockholder of defendant" because it was also alleged the individual "was a separate and distinct supplier of" of the product separate from the allegations against the company); *Oliva v. Bristol-Myers Squibb Co*., CIVA305CV00486 (JCH), 2005 WL 3455121, at *6 (D. Conn. Dec. 16, 2005) (holding that a doctor who acted as the pharmaceutical company's "detail man" could be individually liable as a seller under Connecticut's product liability statute); *Sullivan v. Leaf River Forest Products, Inc*., 791 F. Supp. 627, 631 (S.D. Miss. 1991) (finding "individual plant employees that were responsible for regulating discharge levels from the plant might be shown personally liable" for violation of environmental laws and negligence based on their individual conduct); *Sledge v. Indico System Resources, Inc*., 2:13-CV-2578-STA-CGC, 2016 WL 815348, at *13 (W.D. Tenn. Feb. 29, 2016) (noting that president and sole shareholder of defendant corporation was liable for securities claim "because he individually made all of the oral and written misrepresentations which form the bases for Plaintiffs' claims").

United States District Court
Northern District of California

United States District Court
Northern District of California

As an initial matter, the ODDs are not "corporate officers" but are board member directors of a large corporation (although, as I have already held, they may be liable for their personal participation in tortious conduct more generally). Plaintiffs cite no cases applying this unique doctrine to hold board members or directors liable for strict product liability claims. Their cases generally address officers who are in control of closely held corporations who violate environmental, consumer protection, and other types of public welfare statutes. *See, e.g., State ex rel. Miller v. Santa Rosa Sales and Mktg., Inc.*, 475 N.W.2d 210, 220 (Iowa 1991) (finding officer liable for acts in violation of a consumer fraud statute where officer had "complete control" of company and based on his own personal acts in perpetrating consumer fraud); *U.S. v. Am. Mercantile Corp.*, 889 F. Supp. 2d 1058, 1080 (W.D. Tenn. 2012) (finding defendant who was "the owner and president of each corporation" liable under the federal Food, Drug and Cosmetics Act); *Evans Packing Co. v. Dept. of Agric. and Consumer Services*, 550 So. 2d 112, 118 (Fla. 1st Dist. App. 1989) (dealer can be held strictly responsible under food purity statute "for the purity of the product on the theory that it controlled the processing that resulted in the adulteration, or it failed to exercise due diligence in ascertaining the purity of the product by testing before sale and shipment").[9]

Even if directors like the ODDs could be held liable in a non-closely held corporation, plaintiffs identify no specific "public welfare statute" and simply invoke unspecified "product liability statutes."[10] But plaintiffs cite no evidence that any strict product liability statute that could be invoked by a bellwether plaintiff contemplates imposing strict product liability on

---

[9] Plaintiffs' other case, *Tsimpedes v. Martin*, 1:06CV47 JCC, 2006 WL 2222393, at *2 (E.D. Va. Aug. 2, 2006), stands for the accepted proposition that a corporate officer can be liable for personal participation in defamatory conduct.

[10] *In re Fresenius Granuflo/Naturalyte Dialysate Products Liab. Litig.*, 76 F. Supp. 3d 321, 337 (D. Mass. 2015), the court assumed an "officer and director" of the company could possibly be liable under the responsible corporate officer doctrine but dismissed the individual where there was no evidence that defendant was personally involved in any tortious conduct. The court noted in a footnote that, "[p]laintiffs do not specifically articulate the operative California statute that would permit the application of the reasonable corporate officer doctrine and instead merely assert that Mr. Weisman 'allowed the subject defective products to remain freely distributed to patients throughout the world.'" *Id.*, 337 at n.15. That is similar to here where plaintiffs fail to specifically identify any strict product liability statute that could support application of the doctrine.

United States District Court
Northern District of California

1   directors by its "plain language and intent."  The responsible corporate officer doctrine cannot be

2   used to stretch strict product liability claims to the ODDs.

3          The ODD's motion to dismiss the strict product liability claims asserted against them by

4   bellwether plaintiffs is GRANTED.

5          **D.     Preemption of Other State Claims under Product Liability Statutes**

6          The ODDs argue that the state product liability acts of four states (Louisiana, Mississippi,

7   Connecticut, and Tennessee) preempt "many" of the state law claims of bellwether plaintiffs

8   Fairess (Louisiana), Westfaul (Mississippi), G.F. (Connecticut), and B.B. (Tennessee).

9                  **1.     Louisiana**

10         The ODDs contend that the Louisiana Products Liability Act (LPLA, La. Stat. Ann. §

11  9:2800.54) is the exclusive remedy for all claims sounding in product liability and allows only

12  claims (as relevant to claims against the ODDs) for manufacturing or design defect and failure to

13  warn.  Accordingly, ODDs contend all of Fairess's other claims (for negligence, fraud, negligent

14  misrepresentation, and medical monitoring) that are based on product defect must be dismissed.

15         Plaintiffs agree that the LPLA provides an "exclusive theor[y] of recovery against

16  manufacturers of a product for damages caused by their product,"[11] but argue that courts have

17  limited the statute to strict product liability claims asserted against a "manufacturer" and that

18  "other theories of liability against other actors" including sellers are not impacted.  Oppo. to ODD

19  at 36; *see also  Kelley v. Price-Macemon, Inc*., 992 F.2d 1408, n.9 (5th Cir. 1993) (LPLA allows

20  strict liability claims "only upon manufacturers" or non-manufacturers who hold the products out

21

22  [11] *See Whitener v. Pliva, Inc.*, No. 10-1552, 2010 WL 3021866, at *2 (E.D. La. July 29, 2010)
(allowing for alternative pleading that defendant was manufacturer *or* seller of defective
pharmaceuticals and explaining that the "LPLA provides the exclusive theories of recovery against
23  manufacturers of a product for damages caused by their product. . . .  Non–LPLA causes of action,
such as negligence, strict liability, or breach of express warranty, are not available against the
24  manufacturer of a product for damages caused by that product. [] However, the LPLA does not
govern claims against a non-manufacturing seller of a product."); *Pitre v. Yamaha Motor Co.,
25  Ltd*., 51 F. Supp. 3d 644, 661 (E.D. La. 2014) (The "LPLA [] provide[s] the exclusive theories of
recovery for defective products.  The LPLA does not provide causes of action for negligence,
26  fraudulent concealment, or unjust enrichment.  Thus, Plaintiffs may not individually maintain
actions under Louisiana law based on any of these theories" against the product manufacturer);
27  *Jefferson v. Lead Industries Ass'n, Inc*., 106 F.3d 1245, 1250–51 (5th Cir. 1997) ("A plaintiff may
not recover from a manufacturer for damage caused by a product on the basis of any theory of
28  liability not set forth in the LPLA.").

as their own or who qualify as "professional vendors"); *Tunica-Biloxi Indians of La. v. Pecot*, No. 2006 WL 1228902, at *2 (W.D. La. May 3, 2006) ("A non-manufacturer seller is not subject to the limited strict liability imposed by the LPLA," which "does not apply," but can still be liable under a "less stringent standard," such as "in tort for failure to warn"); *Chiasson v. Harbor Freight Tools, USA, Inc*., 2017 WL 6816704, at *3 (W.D. La. Dec. 18, 2017) (explaining that, while the LPLA does not provide for strict liability claims against sellers, liability is still available against sellers who knowingly sell defective products); *Whitener*, 2010 WL 3021866, at *2 ("[T]he LPLA does not govern claims against a nonmanufacturing seller of a product.").

Plaintiffs conclude, therefore, that "the LPLA does not preclude claims against the ODDs who are not alleged to be manufacturers, but rather corporate officers who directly participated in the manufacturer's (JLI's) tortious conduct." Oppo. to ODD at 35; *see also id*. at 15 n. 5 ("what we have here: individuals who directly participated in a manufacturer's defective product distribution."). However, by plaintiffs' own admissions with respect to the product liability claims, the ODDs *only* acted through the manufacturer (JLI). They are not alleged to have taken on duties separate from JLI or taken acts through non-JLI channels in support of the design, manufacture, or distribution of JLI's product. Plaintiffs provide no explanation, given their other allegations, how the ODDs could be analogous to "non-manufacturer sellers" or any other type of defendant that courts in Louisiana have recognized fall outside the scope of the LPLA.

The LPLA covers and limits the types of product-related claims Fairess can allege against the ODDs.

### 2. Mississippi

As with Louisiana, the ODDs argue that the Mississippi Products Liability Act (MPLA, Miss. Code. Ann. § 11-1-63) preempts any product-type claims asserted by Westfaul (negligence, fraud, negligent misrepresentation, and medical monitoring) and these other claims must be dismissed. The MPLA "provides the exclusive remedy for strict-liability claims against a manufacturer or seller for damages caused by a product that has a design defect rendering it unreasonably dangerous." *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011). But while "[t]he MPLA addresses what plaintiffs must prove to hold 'manufacturers' and 'sellers'

United States District Court
Northern District of California

liable for damages caused by a product," it says nothing about any other type of defendant. *Id*. at 1029. Plaintiffs emphasize that, "[b]ecause the statute applies only to manufacturers and sellers, a person or entity other than the manufacturer or seller … may be held liable for common-law negligence or under any other available theory of liability." *Id*. at 1029-30.[12] However, plaintiffs allege no conduct the ODDs engaged in related to their product claims other than acts they committed through manufacturer (JLI). Functionally, how the ODDs could be anything other than a manufacturer or seller (considering plaintiffs' own allegations) is not explained.

In addition, while plaintiffs claim the "MPLA also does not apply to 'fraud, misrepresentation, or … warranty' claims at all," Oppo. to ODDs at 37 n.19, the case they rely on does not support them with respect to Westfaul's personal injury claims. In *Elliott v. El Paso Corp.*, 181 So. 3d 263 (Miss. 2015), the plaintiff alleged that a natural gas manufacturer was liable because its "the warning odor" in its product "faded." The court held:

> A negligence claim alleging failure to warn, train, educate, or draft a warning plan about the dangers of odorant fade and the need for gas detectors indeed is a claim *based upon products liability*, and such a claim must be analyzed under the MPLA. If the plaintiffs in this case had alleged negligence claims against the manufacturer and seller that were unrelated to the odorant's alleged defects—for instance, fraud, misrepresentation, or breach of the implied warranty of merchantability—then the MPLA would not have applied and common-law principles would have controlled. But all of Plaintiffs' negligence or strict-liability claims are based on the damages purportedly caused by alleged defects in the odorant, so we must analyze those claims under the MPLA

*Elliott*, 181 So. 3d at 269 (emphasis in original). Here, Westfaul's product-type claims all relate to the alleged defects in JUUL that made it unreasonably dangerous and addictive and she seeks to recover damages caused by those defects.

---

[12] In *Lawson*, the court noted that the MLPA did not define "manufacturer" and so looked to the "common or popular meaning" to conclude that "the plain meaning of a product 'manufacturer' does not include a mere 'designer' of a product." *Id*. at 1028. The court explained that the statute "implies that the manufacturer of a good is the person or company who brings the good into its tangible form—the point at which the good is ready for sale, or resale, to the consuming public. When a company merely creates the design of a product, but does not bring the product 'into existence,' it is not functioning as a 'manufacturer,' under this Court's definition." *Id*. at 1029. The court, therefore, found that the defendant who designed a component of a seatbelt that malfunctioned was not liable for the "statutory design defect" claim but also that "MPLA does not preclude common-law negligence claims against nonmanufacturing designers who do not fall under the purview of the statute." *Id*. at 1030.

United States District Court
Northern District of California

The MPLA covers and limits the types of product-related claims Westfaul can allege against the ODDs.

### 3.      Connecticut

The ODDs contend that the Connecticut Products Liability Act (CPLA, Conn. Gen. Stat. § 52-572n) creates a unified "product liability claim" "in lieu of all other claims against product sellers." *Id.*; *see also Calzone v. Costco, Inc.*, CV106006342, 2011 WL 1168601, at *1 (Conn. Super. Feb. 23, 2011) ("Since the claim against Ocean Spray is within the scope of the Act, the exclusivity provision bars a negligence action.").  The ODDs argue that to the extent G.F. attempts to assert common-law claims based on injury stemming from the allegedly defective JUUL products, those should necessarily be dismissed as covered by the CPLA.

In response, plaintiffs rely on decisions where courts have found that the CPLA was "apparently was not meant to alter the substance of a plaintiff's rights or the facts a plaintiff must prove in order to prevail." *Lamontage v. E.I. DuPont De Nemours & Co., Inc.*, 41 F.3d 846, 855 (2d Cir. 1994); *see also id.* ("the CPLA was not meant to eliminate common-law substantive rights," merely to "consolidate[]" certain claims). *Id.*[13]  Therefore, even for defendants covered by the CPLA, common law-type claims survive, although they must be alleged under the CPLA.

Separately, plaintiffs argue that even though the statute "is the exclusive remedy for 'claims against product sellers,'" the CPLA "does not foreclose common law claims against those who are not product sellers." *Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 73 (1990). However, "sellers" as defined under the CPLA includes "any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption." *Id.*, 216 Conn. at 72.[14]  While plaintiffs assert that they do not seek to hold "Pritzker, Huh, and Valani [as] sellers in their

---

[13] Therefore, while the product-related claims must be asserted under the CPLA, the elements of those claims are still informed by the common law.  *Id.*, 41 F.3d at 856.

[14] In *Burkert*, the question was whether General Motor's "unusually limited" role as a trademark licensor where it permitted third parties to use G.M.'s trademark "on specific formulations of automatic transmission fluids meeting GM's performance standards."  In that context, G.M. was not a "seller" of the fluid manufactured and sold by another under the statute's broad definition. *Id.*, 216 Conn. at 68.

14

1    personal capacity," Oppo. to ODD at 36, the statute's definition is broad enough to bring their acts

2    with respect to the product-type claims within the CPLA's express definition of "seller."

3        The CPLA covers and limits the types of product-related claims G.F. can allege against the

4    ODDs as described above.

### 4.    Tennessee

6        The ODDs likewise contend that B.B.'s product-type claims asserted under Tennessee law

7    are preempted by the Tennessee Products Liability Act (TPLA, Tenn. Code § 29-28-102).

8    Plaintiffs agree that the TPLA provides a unified cause of action but point out again that the TPLA

9    only covers "manufacturers" and "sellers." *See id*. §§ 29-28-103, 106.  Plaintiffs rely on cases

10   demonstrating that Tennessee courts routinely hear claims against non-manufacturers/non-sellers

11   that "fall under the broad definition of 'product liability action,' i.e., that involve injuries traceable

12   to a product's "manufacture, construction, design, formula, preparation, assembly, testing, service,

13   warning, instruction, marketing, packaging or labeling." *Id*. § 29-28-102(6).

14       Plaintiffs rely on *Fox v. Amazon.com, Inc*., 930 F.3d 415 (6th Cir. 2019) where the Sixth

15   Circuit concluded that, given the structure of how Amazon advertises and facilitates sales, it could

16   not be considered a "seller" under the TPLA and therefore dismissed the TPLA claim.  *Id*., 930

17   F.3d at 425; *see also id*. at 423–24 (finding the TPLA covered as "sellers" "a 'retailer,' a

18   'wholesaler,' a 'distributor,' a 'lessor,' and a 'bailor,'" whom each "exercise[] a significant degree

19   of control over the products they sell, lease, or bail.").  The court found that Amazon could be

20   liable for failure to warn under a common law tort based on Amazon's affirmative acts

21   communicating with plaintiff and its own knowledge of the dangers presented by the product.  *Id*.

22   at 426-28.  This case does not help plaintiffs here where, as noted, the ODDs acted through the

23   manufacturer/seller JLI and according to plaintiffs' own allegations had a significant degree of

24   control over the products sold by JLI.

25       Plaintiffs also cite *Gaines v. Excel Indus., Inc*., 667 F. Supp. 569 (M.D. Tenn. 1987),

26   where the court permitted a claim that defendant "'assumed the role of safety advisor and

27   consultant' to its subsidiary by conducting safety inspections but then fail[ed] to see that a proper

28   program was established, including maintenance of devices, remedies of hazards, and education of

United States District Court
Northern District of California

workers." *Id.* at 571.  That claim was permissible against the manufacturer only because it was "not based on any actions defendant took in a role as 'manufacturer' or 'seller.'" *Id.* at 574.  Here, B.B.'s product-type claims against the ODDs are based on acts the ODDs committed through manufacturer (JLI) and are covered by the TPLA.

In conclusion, I agree that plaintiffs' product-type claims against the ODDs related to damages suffered as a result of their use of JLI's product fall under the unified statutory causes of action in Louisiana, Mississippi, Connecticut, and Tennessee.  However, to the extent the bellwether plaintiffs from these four states can allege *non*-strict product liability claims that are otherwise cognizable under and within those statutes against the ODDs (*e.g.*, negligent failure to warn claims), plaintiffs may pursue such claims under their state's unified statutory cause of action.[15]

### E.    Negligence

The ODDs argue that plaintiffs have failed to allege sufficient facts to state their claims against the ODDs for product-related negligence (negligent design, negligent failure to warn, and negligent manufacturing), as well as plain negligence and gross negligence.

#### 1.    Negligent Products Claims Generally

The ODDs contend, first, that the product-liability negligence claims remaining – the negligent design, negligent manufacturing, and negligent failure to warn claims – must all be dismissed because plaintiffs have failed to allege: (1) the duties the ODDs owned these plaintiffs; (2) sufficient facts showing personal participation or direction in the design or sale of the product; (3) that the ODDs placed products in the stream of commerce or were a link in chain of distribution as required in North Carolina and Virginia; and (4) that plaintiffs fail to plead an amount in dispute, as at least required by Tenn. Code § 29-28-107.[16]

---

[15] While I have concluded that the ODDs are "covered" by the statutes' definitions of manufacturers or sellers, I do not reach whether one or more of these statutes would allow multiple related entities or persons to be sued, *i.e.*, the corporate manufacturer or seller as well as directors serving on its board.

[16] The ODDs also argue, generally, that the negligence-based product claims should be dismissed for the same reasons that the strict product liability claims are being dismissed.  However, absent a statutory basis (*e.g.*, particular states have statutes expressly limiting product liability negligence-

United States District Court
Northern District of California

United States District Court
Northern District of California

Duty:  Considering the fairly uniform laws and requirements governing each bellwether plaintiff's negligence-based claims, the detailed allegations against the ODDs support a finding of duty whether utilizing the "policy factors" or the "foreseeability" variously required by certain states.  To recap, plaintiffs allege that the ODDs knew that: (1) the JUUL product was a highly-addictive nicotine product with features that appealed to young users (*e.g.*, fruity flavors, concealable, party mode) (Edwards Complaint ¶¶ 7, 148-70); (2) they were targeting youth without disclosing its nicotine content or risks of harm (*id*. ¶¶ 6, 251, 271, 421, 635); (3) their efforts were successfully luring children to start using the JUUL (*id*. ¶¶ 8, 189-190, 280); (4) they were falsely painting JUUL as a reasonable alternative to cigarettes (*id*. ¶¶ 267-69); and (5) they were wrongly suggesting JUUL could be used as a cessation product (*id*.).

Whether considered under foreseeability or public policy factors, these allegations support duty and have been adequately alleged.  *Compare JUUL I*, 497 F. Supp. 3d at 663 (finding duty for negligence claims adequately alleged against Founder Defendants but not ODDs) *with JUUL II*, 2021 WL 1391540, at *14 (the "added personal participation allegations in the SAPECs now plausibly support the theory that the Other Director Defendants' actions put them in the foreseeable zone of risk. The policy factors in the relevant states also weigh in favor of finding a duty based on these allegations.").[17]

North Carolina and Virginia:  The ODDs separately argue that under North Carolina and Virginia law, plaintiffs must allege, but have not alleged, that the ODDs placed the products into

---

based claims to exclude directors) or apposite caselaw on point, I will not wholly dismiss the negligence-based product liability claims at this juncture.  There are obvious distinctions between holding a party *strictly* liable versus holding them liable on a negligence basis (that requires additional showings, *e.g.,* of duty and breach).  There are also different policy justifications underlying strict liability (imposing strict liability on each entity or person that played a separate role in the chain) and negligence-based product claims. These distinctions weigh against a wholesale dismissal of the negligence-based product claims at this juncture.  Defendants are not foreclosed from arguing in favor of dismissal of the negligence-based product claims based on state-specific grounds on summary judgment.

[17] The ODD's argument that the negligence-based claims of G.F. (Connecticut), D.H. (Arkansas), and J.L.K. (North Carolina) should be dismissed because plaintiffs do not allege that the ODDs were adequately involved in the manufacture, design, and sales of the accused product (ODD Mot. at 29) is simply a variant on the "failure to plead" sufficient personal participation argument and will not be addressed again.

the stream of commerce or were a critical link in the chain of distribution.  *See Red Hill Hosiery Mill, Inc. v. Magnetek, Inc*., 530 S.E.2d 321, 326 (N.C. Ct. App. 2000) ("A products liability claim grounded in negligence requires the plaintiff to prove [] the product was defective at the time it left the control of the defendant . . . ."); *Virginia: Evans v. Nacco Materials Handling Grp., Inc*., 810 S.E.2d 462, 469 (Va. 2018) ("Whether a plaintiff proceeds under a theory of warranty or negligence, the plaintiff must prove . . . that the unreasonably dangerous condition existed when the goods left the defendant's hands." (internal quotation marks and citations omitted)).  But plaintiffs have sufficiently alleged and described the critical, personal activities that each of the ODDs took that directly supported, if not resulted in, the products being placed in the stream of commerce in the allegedly unreasonably dangerous way they were.  That is sufficient at this juncture.

Tennessee:  Under Tennessee law plaintiffs are required to set forth in their complaint the amount of damages sought.  *See Newcomb v. Kohler Co*., 222 S.W.3d 368, 384 (Tenn. App. 2006) (trial court appropriately exercised discretion to allow plaintiff to amend complaint mid-trial to satisfy requirement to state damages sought).  Plaintiffs admit that this disclosure, if required, is readily cured by amendment.  Oppo. to ODD at 38.  If B.B. is able to assert any product-type claims under the unified TPLA (or against Altria outside of the TPLA), the claim may proceed if B.B. files an amended complaint or other adequate disclosure identifying the amount of damages sought for his claims.[18]

### 2.   Negligent Design, Negligent Manufacture, and Failure to Warn under Utah Law

ODDs also argue that plaintiff Bagley cannot, under Utah law, hold the ODDs liable for negligent design, negligent manufacture, or failure to warn because in Utah liability for negligent product liability claims extends only to a product's "manufacturer/designer/tester/inspector" and the ODDs are none of those.  In opposition, plaintiffs rely on *Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35 (Utah 2003).  But there, the court simply recognizes what I have recognized

---

[18] Leave to amend is granted for B.B. to do so.  The parties may also agree to an errata amendment or other mechanism to reduce the burden related to this discrete amendment.

United States District Court
Northern District of California

before, that "when fraud is alleged, 'a director or officer of a corporation is individually liable for fraudulent acts or false representations of his own or in which he participates, even though his action in such respect may be in furtherance of the corporate business.' 37 Am.Jur.2d Fraud and Deceit § 322 (1968) (emphasis added)." *Id.* at 41.  That discussion of fraud and misrepresentations does not support including or excluding the ODDs as potentially liable "manufacturers/designers/testers/inspectors" for purposes of Utah's product liability law.

However, the source of the ODD's claim that Utah product liability law only extends to these specific groups is questionable.  *See* ODD Mot. at 30 (quoting Model Utah Jury Instruction CV1015).[19]  That is insufficient, for present purposes, to exclude the ODDs from liability under Utah law for the asserted non-strict product liability claims.[20]

### 3.    Gross Negligence

The ODDs contend that the gross negligence claims of the plaintiffs in Rhode Island, Mississippi, and Connecticut should be dismissed as their home jurisdictions do not recognize that claim.  Plaintiffs concede that Rhode Island does not recognize gross negligence.[21]  And the only case cited by either side under Mississippi law is *White v. Nelson*, 196 So. 3d 1039 (Miss. App. 2016), where the court held that it was not error for a trial court to reject a separate jury instruction on gross negligence as "a separate cause of action" but that the concept of gross negligence under Mississippi law "was more appropriate in the context of determining punitive damages only after a determination of liability against" the defendant.  *Id.* at 1049.  Under this authority, the Mississippi stand-alone gross negligence claim will be dismissed, but Westfaul may pursue punitive damages

---

[19] "Negligence means that a [manufacturer/designer/tester/inspector] did not use reasonable care in [designing/manufacturing/testing/inspecting] the product [to avoid causing a defective and unreasonably dangerous condition] [to eliminate any unreasonable risk of foreseeable injury]. Reasonable care means what a reasonably careful [manufacturer/designer/tester/inspector] would do under similar circumstances."  Model Utah Jury Instructions 2d CV CV1015.

[20] The ODDs also argue that under New York Law "claims for negligent design and for defective design are essentially identical." *Reis v. Volvo Cars of N. Am*., 18 N.E.3d 383, 386 (N.Y. 2014). Plaintiffs do not dispute that concept, noting simply that the New York strict products liability defective design claim survives.  Only one design claim – whatever its nomenclature – will proceed.

[21] Oppo. to ODD at 42 n.24.

United States District Court
Northern District of California

1   based on the same concept.  Finally, plaintiffs do not address or otherwise dispute that Connecticut

2   does not recognize a stand-alone claim for gross negligence.  That claim is also dismissed.

3       Whether or not the remaining gross negligence claims of the other bellwether plaintiffs

4   will succeed because the ODDs acted with "a total lack of care" cannot be determined at this

5   stage.  Conduct equivalent with a total lack of care has been sufficiently alleged.

6       The gross negligence claims of Pesce (Rhode Island), Westfaul (Mississippi), and Faulds

7   (Connecticut) are DISMISSED WITH PREJUDICE.

8   **F.    Fraud-Based Claims**

9       The ODDs challenge the fraud-based claims asserted by each of the bellwether plaintiffs,

10  arguing that plaintiffs have failed to meet Rule 9(b) by identifying the specific fraudulent acts of

11  each ODD – whether by representation or omission – and facts showing how those specific

12  fraudulent acts were relied on and harmed each of the bellwether plaintiffs.  Plaintiffs respond that

13  given my conclusion– for purposes of RICO – that plaintiffs had adequately alleged their fraud-

14  based mail and wire fraud claims, as well as the ODDs participation in the various fraudulent

15  schemes making the allegations under RICO sufficient as to them[22] the same result follows here.

16  *JUUL II*, 2021 WL 1391540, at *10-12.

17      The ODDs are correct that RICO liability is broader than under common-law fraud,

18  especially with respect to holding members of an Enterprise liable when they personally did not

19  commit specific fraudulent acts but other members of the Enterprise did.  But the facts that

20  plaintiffs have pleaded regarding the ODD's personal acts taken in support of the Fraudulent

21  Marketing Scheme, the Youth Access Scheme, and the Nicotine Content Scheme are sufficient to

22  allege the common-law fraud claims against each of the ODDs.  The allegations underlying the

23  personal injury bellwether plaintiffs' claims of fraud against each ODD are the same as in the

24  SACAC and PECs.  Those allegations are sufficient at this juncture.

25  —————————

26  [22] The three schemes directly involving the ODDs and Founder Defendants are: (1) the Fraudulent
    Marketing Scheme, where defendants allegedly directed and caused JLI to make false and
27  misleading advertisements that omitted references to JUUL's nicotine content and potency to be
    transmitted via the mail and wires, including the Vaporized campaign; (2) the Youth Access
    Scheme; and (3) the Nicotine Content Misrepresentation Scheme.  *See JUUL II*, 2021 WL
28  1391540, at *3.

1    I address the state-specific challenges below.

2              **1.    Negligent Misrepresentation**

3         Plaintiffs admit that there is no cause of action for negligent misrepresentation under

4    Arkansas and North Carolina law and that this claim should be dismissed as to D.H. and J.L.K.

5    Oppo. to ODD at 33.[23]   The ODDs contend that plaintiffs have failed to plead the required "special

6    relationship" under Louisiana (Fairess), New York (Edwards, J.D., Gregg), and Oregon law

7    (Keffer/M.K.).   Plaintiffs do not dispute that requirement generally exists under Louisiana or New

8    York law, but argue that a special relationship is not required where, as alleged here, the defendant

9    is in possession of unique or superior knowledge, which they have alleged.   The ODDs respond

10   that this theory only applies to disclosure of a hazardous situation (Louisiana) or where the duty to

11   speak has otherwise been established.[24] I find that both of those situations have been adequately

12   alleged, given the hazardous nature of the JUUL product and the ODD's alleged knowledge or

13   reckless disregard of that danger.

14        Under Oregon law, plaintiffs argue that the "special relationship" must be shown only

15   where the claim seeks economic damage.   They rely on *Nymax Products, Inc. v. MIPA AG*, 3:10-

16   CV-1336-JO, 2013 WL 504385 (D. Or. Feb. 8, 2013), where the court recognized "[a] claim of

17   negligent misrepresentation, where the plaintiff claims only economic damages, as in this case,

18   'must be predicated on some duty of the negligent actor to the injured party beyond the common

19   law duty to exercise reasonable care to prevent foreseeable harm.'" *Id*. at *3 (quoting *Onita

20   Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 159, 843 P.2d 890 (1992)).   The ODDs are

21   correct that in *Conway v. P. U*., 324 Or. 231 (1996), the court held that "for the duty to avoid

22   making negligent misrepresentations to arise, the parties must be in a 'special relationship,' in

23   which the party sought to be held liable had some obligation to pursue the interests of the other

24   _____

25   [23] *See also* Oppo. to Altria at 47 (admitted no negligent misrepresentation under Arkansas and
     North Carolina law).

26   [24] *Bunge Corp. v. GATX Corp*., 557 So. 2d 1376, 1385 (La. 1990) (recognizing "[a] hazardous
27   condition may or may not arise out of a defect, but the harm itself under these facts arises from the
     failure to disclose," including under negligence theory); *Brass v. Am. Film Techs., Inc*., 987 F.2d
28   142, 151 (2d Cir. 1993 (finding duty where defendant had superior knowledge).

United States District Court
Northern District of California

party." *Id.* at 237.  However, the court there considered only economic loss claims and itself relied exclusively on *Onita P. Corp. v. Trustees of Bronson*, 315 Or. 149, 159 (1992).  In *Onita*, the Oregon Supreme Court likewise addressed economic loss claims and nonetheless confirmed that under some circumstances, "one may be liable for economic loss sustained by others who rely on one's representations negligently made."  In the absence of authority addressing the type of personal injury claims alleged under Oregon law by Keffer/M.K., the negligent misrepresentation claim is not foreclosed.[25]

### 2.    Fraudulent Concealment

The ODDs argue that under each state at issue (except Kentucky), affirmative acts to conceal or intent to defraud must be, but have not been alleged for each ODD separately.  As noted above, I find that the acts and intent of the ODDs have been adequately alleged.  The ODDs also argue that while a duty may arise under some of the state laws when defendants are alleged to have had unique or special knowledge, that duty presupposes a relationship grounded in a transaction between the parties.  *See, e.g., Los Angeles Meml. Coliseum Com. v. Insomniac, Inc.*, 233 Cal. App. 4th 803, 831 (Cal. App. 2d Dist. 2015) (noting where there is no fiduciary relationship "the duty to disclose generally presupposes a relationship grounded in some sort of transaction between the parties. [.] Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement.").  Yet here, there is a transactional relationship between JLI – whom the ODDs acted through – and the plaintiffs.  That is sufficient at this juncture.[26]

---

[25] Plaintiffs admit that Connecticut has not clearly indicated whether it will adopt (and that Oregon has rejected) a duty to disclose based on a defendant's superior knowledge.  Oppo. to ODD at 29-30 n.16.  Whether actionable claims under Connecticut and Oregon law may nonetheless be stated based on partial misrepresentations attributable to each or any of the ODDs should be tested on an evidentiary basis.

[26] Plaintiffs admit that Connecticut, Louisiana, Oregon, and Virginia, do not recognize a separate tort for fraudulent concealment and instead treat it as a sub-species of fraud.  Oppo. to ODD at 43.  Plaintiffs argue that this two-count versus one count argument is form over substance and can be addressed with jury instructions and on the verdict form.  *Id.*  I agree, but I also agree with the ODDs that the stand-alone fraudulent concealment claims, where a fraud claim is also alleged, is unnecessary.  Therefore, the fraudulent concealment claims of plaintiffs G.F. (Connecticut),

United States District Court
Northern District of California

### 3.     Conspiracy

The ODDs argue that plaintiffs have pleaded "mere involvement" in the fraudulent acts but not facts supporting a conscious agreement or plan to commit unlawful acts that are required for a conspiracy claim.  However, the same allegations that satisfied the pleading standards for the RICO fraud-based claim and RICO conspiracy claim on the prior round of motions to dismiss plausibly support the conspiracy claim here with respect to the ODDs given their alleged personal participation in each of the Schemes and the allegations regarding their intent.  *JUUL II*, 2021 WL 1391540, at *12.  That there is some tension between plaintiffs' RICO allegation – that JLI was the RICO Enterprise and potentially passive victim to the RICO schemes – and the assertions in the bellwether plaintiffs' complaints that JLI was a co-conspirator with the ODDs on the common-law conspiracy claim, does not fatally undermine the plausibility of the conspiracy allegations at the pleading stage.

Finally, defendants argue that North Carolina, New York, and Tennessee do not recognize stand-alone conspiracy to commit fraud claims but instead only allow joint and several liability. They also contend that while Louisiana, Connecticut, Kentucky, Oregon, and Rhode Island recognize it as a separate tort, it must be tied it to the existence of an independent tort.  Plaintiffs do not really contest the issue, Oppo. to ODD at 44-45, pointing out that for the later jurisdictions they have and will tie the conspiracy claim to an independent tort and for the former jurisdictions they have alleged and will prove joint and several liability.  Therefore, the stand-alone conspiracy to defraud claims under North Carolina, New York and Tennessee law are DISMISSED, but plaintiffs' allegations therein are incorporated into the other fraud-based claims as appropriate and they may continue to seek joint and several liability for all relevant fraud-based claims against the ODDs and other defendants.

### G.     Claims by Representative or Decedent M.K.

The ODDs challenge the wrongful death and survival action claims asserted by Keffer on

---

Fairess (Louisiana), M.K. (Oregon), and Miles (Virginia) are DISMISSED, but the allegations thereunder are deemed to be included in each of those plaintiffs' existing fraud claims.  Absent persuasive authority, the separate fraudulent concealment claim asserted under Rhode Island law remains.

behalf of his deceased daughter M.K. under Oregon law because Keffer: (i) fails to identify the statutory basis for either claim; (ii) Keffer cannot assert both a wrongful death and a survival action; (iii) the loss of consortium claim is not a stand-alone claim; and (iv) the loss of consortium pleaded (on behalf of the parent and the decedent's siblings) is impermissible.

On the first point, the ODDs themselves identify the express statutory basis for the wrongful death and survival actions claims (ODD Reply at 22), so there is no harm to them from any oversight in the pleadings. Plaintiffs point out that the wrongful death and survival actions are pleaded as alternatives, which the ODDs do not contest is appropriate under Oregon law. Plaintiffs do not dispute that loss of consortium is not a stand-alone claim but a measure of damages they are allowed to and already do expressly allege in support of the wrongful death claim. As to the basis of the loss of consortium, plaintiffs contend it is based not just on M.K.'s death but from the injuries JUUL caused M.K. before her death and on the impact those injuries had on her family more broadly. But the ODDs submit authority restricting loss of consortium claims to spouses. *See Domion v. Triquint Semiconductor, Inc*., 3:16-CV-01852-SB, 2018 WL 3385904, at *5 (D. Or. June 11, 2018), *report and recommendation adopted*, 3:16-CV-01852-SB, 2018 WL 3385174 (D. Or. July 9, 2018) ("There is no language in ORS 30.010 or its history that evinces a legislative intent to include damages for loss of society and companionship from injuries to a child."). To the extent that Plaintiff Parents seek damages for loss of consortium in Count Five, it is disallowed as a matter of law."). Absent caselaw to the contrary, Keffer's loss of consortium stand-alone claim is DISMISSED WITH PREJUDICE.

### H.    Medical Monitoring

The ODDs and plaintiffs agree that "medical monitoring" is not a stand-alone claim in Kentucky and Mississippi but is instead a form of relief. These two stand-alone claims, therefore, are DISMISSED. Plaintiffs' allegations therein are incorporated as relevant to relief under their other claims. The parties dispute and cite contrary authority under Tennessee law; absent definitive authority, the claim is not dismissed at this juncture.[27] Finally, the ODDs initially

---

[27] *Sutton v. St. Jude Med. S.C., Inc*., 419 F.3d 568, 576 (6th Cir. 2005) ("we note that although Tennessee law is murky on the issue of whether claims for medical monitoring are cognizable,

challenged whether medical monitoring was a claim under Florida and Utah law, but in the face of plaintiffs' authority demonstrating that stand-alone claims exist in those jurisdictions, change tack and argue instead that plaintiffs have failed to adequately allege facts in support of the medical monitoring claims under Florida and Utah law.  ODD Reply at 24.  Those claims have been sufficiently alleged.  Whether plaintiffs meet their evidentiary burdens for them can be tested on summary judgment and at trial.

## I.      Personal Jurisdiction Over Huh

Huh separately challenges the exercise of personal jurisdiction over him, despite my prior conclusion concerning him specifically based on materially similar allegations that the "personal participation allegations that plaintiffs now state in their amended complaints and which I find sufficient for personal jurisdiction purposes."  *JUUL II*, 2021 WL 1391540, at \*15-16.  He argues that the allegations in the bellwether complaints fail to allege that he was a "primary participant" in conduct as opposed to impermissible allegations that "all three" ODDs acted in concert, which he alleges are insufficient to show his sole, primary participation in any specific conduct.  This challenge, again, is rejected.  Plaintiffs' allegations regarding (i) Huh's disproportionate control over JLI through his role as Chairman of the Board's Executive Committee, which he used to direct JLI's marketing, sales, and investment actions (Edwards Compl. ¶¶ 428-440), (ii) his use of his influence within the company to quash internal concerns about youth use of JUUL products (*id*. ¶ 413), and (iii) his efforts to perpetuate youth-oriented marketing campaigns (*id*. ¶ 419), make decisions on behalf of the Executive Committee (*id*. ¶ 434), and push even "more aggressive rollout and [marketing]" in order to grow JUUL for sale to or partnership with "Big Tobacco" (*id*. ¶ 435), plausibly show that he was a primary participant sufficient for personal jurisdiction purposes.

## II.     BOWEN AND MONSEES' MOTIONS TO DISMISS

In their combined opposition to defendants Monsees and Bowen's (the "Founder Defendants") separate motions, plaintiffs clarify that they "will not defend" their claims under the

there are reasons why such claims are most probably proper.").

United States District Court
Northern District of California

theories of: (1) breach of express or implied warranty, (2) statutory consumer fraud, (3) unjust enrichment, and (4) intentional infliction of emotional distress.  Opposition to Founder Defendants' Motions (Oppo. to FD, Dkt. No. 1801) at 6.   The claims remaining at issue against the Founder Defendants on these motions are: (1) negligence, (2) strict products liability, (3) fraud, (4) negligent misrepresentation, (5) and medical monitoring.  *Id.  See* Dkt. Nos. 1501, 1503; Monsees Reply, Dkt. Nos. 1932, 1934.[28]

### A.    Personal Participation

The Founder Defendants argue that the bellwether plaintiffs fail to sufficiently allege the Founder Defendants' personal participation in the acts these plaintiffs assert caused their harm.  As with the ODDs and consistent with my prior determinations, the acts the personal injury bellwethers allege that each Founder Defendant took plausibly support both of their personal participation (including their intent, aims, and control over) the testing, design, marketing, and sales of the product.  *See JUUL I*, 497 F. Supp. 3d at 663 (finding negligence claims adequately stated against Founder Defendants); *see also JUUL II*, 2021 WL 1391540, at *3 ("Plaintiffs provide more details in their allegations regarding Monsees and Bowen's roles in creating, testing, and then misrepresenting the addictiveness and nicotine levels delivered by the JUUL product with the specific aim of targeting youth."); *id*. at *11.

### B.    Strict Product Liability

The Founder Defendants also argue that as officers and employees of JLI, they cannot be separately liable under the strict product liability statutes at issue for the same reasons the ODDs cannot; strict products liability is statutorily limited and does not stretch to individuals like the Founder Defendants who worked exclusively inside the corporate defendant to bring the product to the market.  Plaintiffs point to language in the bellwether state statutes that "*any person or entity*, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products" maybe be liable.  Oppo. at Founder Defendants [Dkt. No. 1801] at 13-14

---

[28]  The Founder Defendants raise some of the same arguments addressed above with respect to the ODD's motion.  Where those arguments do not turn on facts related to the Founder Defendants' roles and actions (*e.g.*, the survival and loss of consortium action under Oregon law), I do not separately address them.

United States District Court
Northern District of California

(emphasis added).  They make much of the "any person" or "any individual" language connected to the general "or entity" language to argue that individuals operating within companies could be individually liable.  But they cite no cases in any of the relevant jurisdictions in support of the expansive interpretation they advance here to try to hold not only the manufacturing, distributing or retailing entities strictly liable but also their employees or officers as well.[29]

Plaintiffs' reliance on cases standing for the general proposition that officers who intentionally commit torts may be individually liable for their personal conduct is not persuasive. None of the cases cited by plaintiffs address the unique aspect of *strict* liability generally imposed by express statute.  And even though Monsees and Bowen were officers (and therefore closer to theoretical liability under the "responsible corporate officer doctrine"), the failure of plaintiffs to specifically identify public welfare statutes that manifest either in their plain language or intent the goal to impose strict liability on officers, *see supra*, dooms that argument.

As with the ODDs, the Founder Defendants' liability hinges on acts they personally took or directed as the founders, employees, or officers of JLI.  While those acts (as discussed in my prior Orders and below) may be sufficient to impose personal liability under general tort claims or negligence claims (that, at least for negligent product liability claims require a *higher* showing than strict liability), the position of these defendants within the manufacturer or seller defendant does not separately support individual strict liability.

I recognize that there are distinctions between the Founder Defendants and the ODDs.  The Founder Defendants are alleged to have directed the creation, design, prototyping, testing, and ultimate modification of the product at issue and have done so within a startup company.  Those facts are closer to those of the very few cases plaintiffs identify recognizing that sole owners or others in closely-held corporations might be liable for strict product claims. *See, e.g., Wellborn v.*

---

[29] The "or" language plaintiffs rely on rely on would appear necessary to cover, for example, individuals operating as wholesalers or distributors or retailers, etc.  That would be expected given the general aim of these statutes to capture the separate participants in the chain who are "responsible for passing the product down the line to the consumer" and requiring those involved to "apportion" between themselves and ultimately "bear the cost of compensating for injuries." *Arriaga v. CitiCapital Com. Corp.*, 167 Cal. App. 4th 1527, 1534-35 (Cal. App. 5th Dist. 2008) (relying on *Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 262 (1964).

United States District Court
Northern District of California

1    *Cobray Firearms, Inc.*, 139 F.3d 913 (10th Cir. 1998).  It is also true that some statutes

2    specifically impose strict liability on product designers, and much of the allegedly actionable

3    conduct of the Founder Defendants centers on their inception, design, testing, and modifications of

4    the product.  However, plaintiffs never squarely address why and how – as a matter of statutory

5    construction or public policy – designers who work within the corporate structure of the

6    manufacturer or seller defendant should be individually *strictly* liable *separate* and apart from the

7    manufacturer or seller defendant.

8        As with the ODDs, the strict product liability claims against the Founder Directors are

9    DISMISSED WITH PREJUDICE.

10       **C.    Negligence**

11       As an initial matter, Monsees (like the ODDs and Altria) argues that any non-strict

12   products claims alleged against the Founder Defendants are "preempted" under the unified product

13   liability acts of Connecticut, Louisiana, Mississippi, and Tennessee.  For purposes of this analysis,

14   the Founder Defendants as employees and officers are treated similarly to the Directors.  Because

15   all of their acts were through JLI, product claims under those states' laws against the Founder

16   Defendants are covered by the acts.  (Altria is in a different posture and its arguments are

17   addressed in more depth below).  Plaintiffs may, however, still allege their non-strict product

18   liability claims against the Founder Defendants to the extent those claims are cognizable under

19   their state's acts creating a unified claim.

20       More generally, similar to the analysis regarding the ODDs, the bellwether plaintiffs have

21   adequately alleged their negligence-based claims in terms of duty (under either a foreseeable or

22   public policy analysis) and breach.  *See supra*; *see also JUUL I*, 497 F. Supp. 3d 552, 663

23   (addressing negligence claim asserted in PECs against Founder Defendants, plaintiffs "plausibly

24   allege that Monsees and Bowen's actions created an illicit market for a product and marketed that

25   product to a group that regularly convenes on the school districts' property, such that it

26   foreseeably caused substantial harm to them. Their personal participation put the school districts

27   in the foreseeable zone of risk, and the policy factors in the relevant states weigh in favor of

28

United States District Court
Northern District of California

1    finding a duty given the allegations in the government entity complaints.").[30]

2    Similarly, other than for the claims in Rhode Island, Mississippi, and Connecticut

3    (jurisdictions that do not recognize the claim), the bellwether plaintiffs' gross negligence claims

4    have been adequately alleged.  Whether or not the plaintiffs will be able to prove up the showing

5    for gross negligence or establish that a particular defendant has sufficient control over any part of

6    the manufacturing or marketing process to be liable, for example, for a "failure to recall" claim,

7    are matters better tested on a full evidentiary record.[31]

8    ### D.    Fraud-based Claims

9    As determined in my previous Orders, plaintiffs have adequately alleged that both

10   Monsees and Bowen engaged in acts that had the intent and impact of misleading the public and

11   plaintiffs about the dangers of JUUL.  *See, e.g.*, *JUUL II*, 2021 WL 1391540, at *3 (noting

12   plaintiffs had identified specific fraudulent statements attributed to Monsees or Bowen and in

13   addition provided "more details in their allegations regarding Monsees and Bowen's roles in

14   creating, testing, and then misrepresenting the addictiveness and nicotine levels delivered by the

15   JUUL product with the specific aim of targeting youth"); *see also id.* at *9 (noting the "allegations

16   regarding Bowen's participation, at least in the design and misrepresentation of JUUL as a

17   particularly addictive product, were sufficient to show *his own* RICO conduct" (emphasis added)).

18   The fraud allegations against the Founder Defendants plausibly show duty, intent, falsity, reliance,

19   and damage to the personal injury plaintiffs to survive the motions to dismiss.

20   Furthermore, given the Founder Defendants' alleged involvement and positions within JLI,

21   the fraudulent concealment and omissions claims are sufficient, whether they arise under a duty to

---

[30] The Founder Defendants identify no bellwether-state law specific reasons that would require me to consider different standards or factors than I addressed in my prior Orders.

[31] The Founder Defendants' argument – that if I accept plaintiffs' theories any employee of a company could be liable for negligent-product claims, resulting in a vast and unwarranted expansion of product liability law – is unfounded.  The Founder Defendants are not "mere" employees of JLI.  They are both alleged to have been integral to the creation, design, testing, and modification of the product that resulted in its undisclosed dangerousness and then the marketing and sales of the product without disclosure of those dangers.  Whether plaintiffs can prove up their various non-strict product liability claims as a matter of fact or law against the Founder Defendants should be tested on a full evidentiary record.

United States District Court
Northern District of California

1    correct partial representations or where a defendant has superior knowledge.  *See JUUL I*, 497 F.

2    Supp. 3d 552, 629 ("plaintiffs plausibly allege that JLI had exclusive and superior knowledge of

3    specific and undisclosed or not adequately disclosed information, including the results from the

4    Phase 0 study (showing heightened nicotine delivery []), at the same time that it was marketing its

5    products without that disclosure, and likewise falsely stating on its packages that a pod was

6    "equivalent" in terms of nicotine to a pack of cigarettes.").

7        Finally, for the same reasons plaintiffs' allegations were sufficient to state substantive and

8    conspiracy RICO claims against the Founder Defendants, those materially similar allegations

9    suffice for purposes of fraudulent conspiracy.  The "intra-corporate conspiracy" doctrine does not

10   bar the allegations against the Founder Defendants because the conspiracy alleged is broader than

11   one simply between the Founders and JLI.  Moreover, given the allegations about Monsees and

12   Bowen's personal stake in positioning JLI for investment by Altria and ultimately securing its

13   investment, plaintiffs have adequately alleged that the Founder Defendants' personal stake in the

14   result of their fraudulent acts are sufficient separate and distinct from JLI's interests.  *See, e.g., In

15   re Parmalat Securities Litig.*, 479 F. Supp. 2d 332, 344–45 (S.D.N.Y. 2007) (applying North

16   Carolina law and finding, the "intracorporate conspiracy doctrine does not apply, however, where

17   the conspiring insiders had an independent personal stake in achievement of the illegal

18   objective.").[32]

19   **III.    ALTRIA'S MOTION TO DISMISS**

20       Plaintiffs clarify in opposition that they will not pursue "for purpose of [Altria's] motion to

21   dismiss" the following claims against Altria:  (1) breach of express warranty; (2) strict products

22   liability, other than in Florida and Rhode Island, (3) statutory consumer fraud; (4) negligent failure

23   to warn; (5) breach of the implied warranty; (6) intentional infliction of emotional distress; or (vii)

24   unjust enrichment.  Oppo. to Altria [Dkt. No. 1799-3] at 16.  The remaining claims at issue on

25

26   ───────────────
     [32] Moreover, it is questionable whether that doctrine applies given the allegations against the
27   Founder Defendants here.  *See Black v. Bank of Am.*, 30 Cal. App. 4th 1, 6 n. 4 (Cal. App. 1st Dist.
     1994 (explaining that the intra-corporate doctrine shields "employees who carried out but did not
28   create Bank policies," but noting that liability otherwise can attach to "directors and officers" for
     tortious conduct if they "directly ordered, authorized or participated in the tortious conduct.").

Altria's motion are: (1) negligence, (2) fraud, (3) negligent misrepresentation, (4) strict products liability under Florida and Rhode Island, and (5) medical monitoring. *Id*.[33]

### A.    Specific Jurisdiction

Altria claims that none of the remaining bellwether plaintiffs who assert claims against Altria allege sufficient facts to demonstrate that personal jurisdiction may be exercised over the Altria entities by this court.[34]  The dispute centers on whether each bellwether plaintiff's claims against Altria "arise out of or relate to" Altria's contacts with California.  As the Supreme Court recently clarified in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct*., 141 S. Ct. 1017, 1026 (2021), the "relates to" test does not require a causal nexus, but instead focuses on the relationship between the claims alleged against the defendant and the defendant's acts in the jurisdiction.

Here, reviewing plaintiffs' allegations regarding Altria's *own* conduct – acts the Altria entities took in coordination with California-based JLI and the California-based Founder and Director defendants to maximize the reach of and sales of the JUUL products, including steps to preserving the mint-flavored products, as well as its advertising and distribution services provided to JLI – as well as the alleged efforts it undertook to gain influence over the Director Defendants and control of JLI in order to maximize Altria's profits in the long-run, are sufficient.  These efforts were not only directed to California and implemented in California but were effectuated in part by meetings that took place in California, not to mention the hiring by JLI in California of Altria executives.  *See also In re JUUL Labs, Inc., Mktg., Sales Practices, and Products Liab. Litig*., 2021 WL 1391540, at *9, 677 (N.D. Cal. 2020) (*JUUL I*) (concluding there was personal jurisdiction over the Founder and Director Defendants for the public entities' claims given allegations regarding those defendants' "efforts to develop and maintain a nationwide youth nicotine market"); *In re Juul Labs, Inc., Mktg., Sales Practices, and Products Liab. Litig*., 19-MD-

---

[33] Altria raises some of the same arguments also raised and addressed above with respect to the ODD's motion.  Where those arguments do not turn on facts related to Altria's roles and actions (*e.g.*, existence of stand-alone medical monitoring, and the survival and loss of consortium action under Oregon law), I do not separately address them.

[34] Plaintiff Miles is a Virginia resident and does not allege claims against Altria.  Oppo. to Altria at 15 n.8.

1   02913-WHO, 2021 WL 1391540, at *1 (N.D. Cal. Apr. 13, 2021) (*JUUL II*) ("With added

2   allegations about Pritzker, Huh, and Valani's [] numerical control of the Board, knowledge about

3   JUUL's youth appeal and the growth of underage users, significant involvement in marketing

4   decisions, and unusually active roles in management and decisions from which they profited

5   billions of dollars, plaintiffs sufficiently allege the Other Director Defendants' personal

6   participation to maintain the RICO and state law claims asserted against them. Personal

7   jurisdiction is also proper given the Other Director Defendants' personal participation and their

8   forum-related contacts as directors of a San Francisco-based company."). The acts allegedly

9   committed by the Altria entities are sufficiently and directly connected to the claims asserted by

10  and injuries suffered by the bellwether plaintiffs.

11      Altria argues that specific jurisdiction cannot exist as a matter of law under the Supreme

12  Court's analysis in *Bristol-Myers Squibb Co. v. Super. Ct. of California, San Francisco County*,

13  137 S. Ct. 1773 (2017) (*BMS*). In *BMS*, the defendant was not a California resident and specific

14  jurisdiction could not be established where "the nonresident [plaintiffs] were not prescribed Plavix

15  in California, did not purchase Plavix in California, did not ingest Plavix in California, and were

16  not injured by Plavix in California. The mere fact that other plaintiffs were prescribed, obtained,

17  and ingested Plavix in California—and allegedly sustained the same injuries as did the

18  nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents'

19  claims." *Id.* at 1781. The Court emphasized the hinge for specific jurisdiction is connection

20  between plaintiffs' claims and acts in the forum. *Id*.

21      I find that there is a sufficient connection between Altria's acts in California and plaintiffs'

22  claims. Plaintiffs identify meetings that occurred between Altria and JLI in California regarding

23  the intent and eventual implementation of their business agreements and arrangements through

24  which Altria supported JLI's manufacturing, regulatory, marketing, and distribution efforts and

25  how Altria's efforts through JLI in California achieved their common goals. Those efforts and

26  goals implemented in and emanating from California resulted in the injuries the bellwether

27  plaintiffs allege. The facts and posture of this case are wholly unlike *BMS*. The material acts that

28  caused plaintiffs' injuries were committed by Altria either directly in California or through *its*

efforts in support of JLI in California.  This is not a case where non-resident plaintiffs try to attach jurisdiction based on advertising that eventually reached California or on a defendant's use of a California distributor.[35]  Altria remains free to argue based on the evidence at summary judgment or trial that, with respect to any specific plaintiff, its acts could not have caused her injuries.  But plaintiffs' plausible allegations establish specific jurisdiction in this forum over Altria.

**B.     Causation**

Altria next argues that "causation" between its alleged conduct and the injuries of the bellwether plaintiffs who started using JUUL before its December 2018 investment is lacking as a matter if law.  However, the relevant start date of Altria's conduct and coordination in support of JLI's efforts is Spring 2017, not December 2018.  Whether or not the pre-2018 allegations and the December 2018 and post allegations hold up or factually support a causation analysis with respect to each bellwether plaintiff will be tested on summary judgment and at trial.  For pleading purposes, they are sufficient.  For example, whether or not someone who started to use JUUL before Spring 2017 can establish that her injuries were nonetheless caused in some substantial way by Altria's subsequent conduct (under theories that Altria's efforts supporting JLI contributed to her continued or increased use in the period of Altria's involvement with JLI) cannot be determined at this juncture but will be subject to plaintiff's testimony and presumably expert testimony.

**C.     Preemption by State Products Liability Acts**

Altria, along with the ODDs, argues that the claims of each bellwether plaintiff residing in

---

[35] Altria's other cases are similarly unpersuasive.  For example, in *Harlow v. Children's Hosp.*, 432 F.3d 50 (1st Cir. 2005) the plaintiff was an "out-of-state plaintiff availing herself of [hospital] services in Massachusetts" but attempting to sue the hospital from her home jurisdiction.  Personal jurisdiction did not exist because, if so, "the Hospital would be subject to suit for merely taking a patient from elsewhere" and because the hospital was "not engaged in the interstate sale of tangible goods, capable of doing harm elsewhere," but instead "rendered medical care, a professional and highly personal service, and it did so entirely in Massachusetts." *Id.* at 63; *see also Halyard Health, Inc. v. Kimberly-Clark Corp.*, 43 Cal. App. 5th 1062, 1073 (Cal. App. 2d Dist. 2019), *as modified* (Jan. 2, 2020) (jurisdiction in California not established where dispute was "about how two non-California corporate entities intended to (or were legally permitted to) allocate risk associated with various pending and contemplated lawsuits as they parted ways" does "not establish the requisite connection between [California] and the specific [indemnification] claims at issue in this suit.").

United States District Court
Northern District of California

Louisiana, Mississippi, Connecticut, and Tennessee are preempted by those states' strict products liability laws.  In general, the preemption analysis discussed above applies to the claims asserted under these jurisdictions against Altria.  However, because Altria was a separate entity providing services to JLI, the analysis is slightly different than for the ODDs and Founder Defendants and the results are different.

### 1. Louisiana

As discussed, the LPLA covers only claims against manufacturers; therefore, sellers and other non-manufacturers can be liable under other non-strict liability product claims, like failure to warn.  *See, e.g., Tunica-Biloxi Indians of Louisiana v. Pecot*, CIV.A. 02-1512, 2006 WL 1228902, at *2 (W.D. La. May 3, 2006) (noting that the "less stringent standard imposed upon a non-manufacturing seller avoids the 'unduly onerous burden' of making it a 'guarantor against defects over which it had no control or responsibility.'").  While the ODDs and Founder Defendants are reasonably considered "manufacturers," given they necessarily acted through the manufacturer (JLI), Altria is a separate entity that may be liable for non-strict liability theories depending on the acts it undertook as a distributor or non-manufacturer seller of JUUL.  Fairess's non-strict products liability claims may proceed against Altria.

### 2. Mississippi

The MPLA covers "manufacturers" and "sellers" and precludes other product liability claims against those entities.  *Elliott v. El Paso Corp.*, 181 So. 3d 263, 270 (Miss. 2015) ("The MPLA provides the exclusive remedy 'in any action for damages caused by a product' against a product manufacturer or seller.").  However, the "MPLA, by its very terms, does not provide a cause of action against a common carrier that merely transports another company's product from a manufacturer to a seller."  *Id.* at 271.  Neither the plaintiffs nor Altria suggest how Altria's alleged role – providing distribution, regulatory, and retail services to JLI – lines up, but at this juncture it is plausible that Altria was more akin to a non-seller distributor as in *Elliott*, rather than a manufacturer or seller.  Westfaul's non-strict product liability claims against Altria may proceed.

### 3. Connecticut

As noted, the Connecticut statute defines "sellers" broadly as "any person or entity,

including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption." *Burkert v. Petrol Plus of Naugatuck, Inc*., 216 Conn. 65, 72 (1990).  To the extent the acts of Altria fall within this broad definition of a "seller," Faulds' negligence-based product claims against Altria would be extinguished *unless* they can otherwise be alleged under the CPLA.  *See LaMontagne v. E.I. Du Pont De Nemours & Co., Inc*., 41 F.3d 846, 855–56 (2d Cir. 1994) (noting that the CPLA did not eliminate the theories "of strict liability, warranty, negligence and contract" but instead "merged [them] into one cause of action which has been created by statute.").[36]

However, it is unclear whether the acts alleged against Altria (with respect to Faulds and the other personal injury bellwethers) fall outside the CLPA's definition of a seller.  Some of the acts alleged against Altria entities are ones they took as "service providers."  Neither side cites cases delineating under Connecticut law the extent to which a third-party like Altria (as opposed to the Founder and ODD defendants who were at all times were alleged to acting through the seller JLI) that provides services to a "seller" as defined by the CLPA can be otherwise liable for negligence-based product claims.  It may be that all acts Altria took were subsumed, as a matter of Connecticut law or common law, by the acts of JLI, but that is better determined on summary judgment or at trial.

### 4.      Tennessee

As noted above, the TPLA subsumes all actions brought on account of personal injury against "manufacturers" or "sellers" of products.  The cases cited by plaintiffs (also analyzed above) dealt with situations where a manufacturer, otherwise subject only to TPLA, took on inspection duties that brought it outside its status as a manufacturer and therefore liable for common law product liability claims (*Gaines v. Excel Indus., Inc*., 667 F. Supp. 569 (M.D. Tenn. 1987) or where a third-party offeror (Amazon) merely facilitated sales between the otherwise TLPA-covered entities.  *Fox v. Amazon.com, Inc*., 930 F.3d 415 (6th Cir. 2019).  As with Mississippi law, neither plaintiffs nor Altria provide persuasive caselaw addressing whether the

---

[36] As noted, the only strict product liability claims the bellwether plaintiffs are pursuing against Altria are under Rhode Island and Florida law.

acts of Altria are more akin to a covered "seller" or a party who acted sufficiently separate from the manufacturer or end-seller to escape coverage under the TPLA. Bain's non-strict product liability claims against Altria may proceed at this juncture.

### D. Negligence and Gross Negligence

#### 1. Negligence

Altria contends that plaintiffs have failed to adequately allege a duty against Altria to support their negligence claims.  I considered a similar question when addressing the public entity complaints.  *See JUUL I*, 2020 WL 6271173, at *76.  Here, as there, there are sufficient allegations to support duty.  Absent any state-specific reasons to reconsider or not apply the conclusion from the public entity claims to the personal injury bellwether claims (*i.e.*, that specific bellwether states at issue have different requirements or impose heightened standards to show duty or breach for negligence-based claims), these claims have been adequately alleged.[37]

#### 2. Gross Negligence

As noted above, gross negligence claims under Rhode Island, Mississippi, and Connecticut are not cognizable and are dismissed against all defendants.  Plaintiffs have plausibly alleged conduct by Altria that could violate other states' standards for gross negligence.  Whether Altria's conduct breached those standards cannot be adjudicated on this motion.

### E. Fraud-based Claims

#### 1. Direct Acts

Altria argues that none of the plaintiffs has adequately alleged fraud-based claims, including identifying the specific affirmative misrepresentations or omissions that Altria was responsible for and that each plaintiff saw and relied on the misrepresentation or would have altered her conduct had she known of the omitted information.  According to Altria, these alleged pleading failures are particularly important as Altria is not alleged to have participated in what it characterizes as the "overwhelming majority" of the advertisements or misrepresentations on

---

[37] Altria's arguments that specific plaintiffs' claims fail because they have not adequately alleged they were "exposed to or received any such statements or services" that were the result of Altria's conduct (*see, e.g.,* Altria Reply at 11-12) are better tested at summary judgment or at trial.  The allegations, while broad and somewhat opaque, suffice at the motion to dismiss stage.

1   which plaintiffs rely.

2       In their opposition, plaintiffs clarify that the only "direct" liability fraud-based claims they

3   assert against Altria are based on: (1) Altria's role in the "Make the Switch" campaign; (2) Altria's

4   role with the false nicotine content statements on the JUUL packages it distributed; and (3)

5   Altria's failure to disclose the risks of JUUL to its users.  Oppo. to Altria at 45.  Plaintiffs note that

6   in my prior Orders discussing the RICO fraud-based claims asserted in the SACAC and PECs, I

7   found that plaintiffs plausibly alleged that statements made by JLI and Altria as part of the Make

8   the Switch campaign and regarding the nicotine content of JUUL were fraudulent.  *See JUUL I*,

9   2020 WL 6271173, at *33 ("Plaintiffs allege that the defendants engaged in predicate acts of mail

10  and wire fraud [including] Altria attaching 'Make the Switch' advertisements to packages of

11  cigarettes."); *id*. (recognizing that Plaintiffs had described a pattern of mail and wire fraud

12  including Altria actions "helping JLI distribute JUUL product with deceptive packaging.); *id*. at

13  *45 ("[T]he specific 'switch' and 'alternative' claims must be considered in the context of the

14  advertisements and materials where they appear. Considering them there, for present purposes, the

15  inference that the comparison specifically and quantifiably means—when considered in context of

16  the advertisements as a whole—that JUUL was a healthier or less harmful alternative to

17  combustible cigarettes is adequately alleged.").

18      Altria argues that these prior conclusions cannot support potential liability for affirmative

19  misrepresentations by Altria here because RICO employs a broader concept of liability for

20  individuals involved with the alleged Enterprise than common law fraud where plaintiffs have to

21  show that they saw and relied on allegedly fraudulent misrepresentations.  It also contends that the

22  plaintiffs have failed to specifically allege that they saw and relied on Altria's affirmative

23  representations.  It disputes the significance of plaintiffs' reliance on cases decided in the context

24  of the long-term widespread false advertising by tobacco companies, given the relatively shorter

25  timeframe at issue here and the very limited, specific representations plaintiffs allege that Altria

26  made that were false.  *See In re Tobacco II Cases*, 207 P.3d 20, 40-41 (Cal. 2009) ("[w]here … a

27  plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead

28  with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or

United States District Court
Northern District of California

statements"); *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1211 (11th Cir. 2020) (explaining that reliance can be inferred "based on evidence that the plaintiff was exposed to the disinformation campaign[,] harbored a misapprehension about the health effects and/or addictive nature of smoking[, and] have behaved differently had he known the true facts" (internal quotation marks and alteration omitted)).

At this juncture, I conclude that plaintiffs have adequately alleged the fraudulent acts that are attributable to Altria. While the liability for participants in a RICO Enterprise is indeed broader and can, for example, lead to a defendant's liability for acts it did not perform, plaintiffs have alleged sufficient acts by Altria in the relevant Schemes identified above. That is enough to plead direct acts of fraud. Whether plaintiffs can prove their allegations against Altria – including whether the statements were fraudulent or misrepresented anything known by Altria – and whether the specific bellwether plaintiffs can establish the connection between their harms and the representations made or facilitated by Altria, will be tested at summary judgment or trial.[38]

With respect to omissions, as noted above, the claims in the jurisdictions at issue arise because Altria *either* had superior knowledge about the addictiveness and dangers of the JUUL product or made partial representations about the product that should have been accompanied by the disclosure of material information. With respect to its alleged role, Altria contends that plaintiffs do not adequately allege a sufficient "transactional" relationship between Altria and the end consumers that would create a duty to disclose omitted information, seeing as plaintiffs themselves allege that Altria mainly functioned in a support role or services provider to JLI.[39]

---

[38] The same analysis applies to the negligent misrepresentations claims, although plaintiffs admit that negligent misrepresentation claims are not cognizable under Arkansas and North Carolina law. Oppo. to Altria at 47. I have concluded above that the claim is viable at this juncture under Oregon law.

[39] Under California law, fraudulent concealment claims may be alleged, even in absence of a fiduciary relationship, when (1) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (2) when the defendant actively conceals a material fact from the plaintiff; and (3) when the defendant makes partial representations but also suppresses some material facts. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, 467 F. Supp. 3d 849, 860 (N.D. Cal. 2020) (citing *LiMandri v. Judkins*, 52 Cal.App.4th 326 (1997). In each of these three situations, liability "presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise" that must be "transactional" in nature. *Id.* at 861. In *In re Volkswagen "Clean Diesel*," the transactional relationship was missing

However, there were certainly transactions between JLI and the end-consumers.  Given plaintiffs' adequate allegations regarding Altria acts in alleged support of those sales, that is sufficient for pleading purposes.

### 2.   Indirect Acts - Conspiracy and Aiding and Abetting

Altria contends that neither conspiracy nor aiding and abetting liability can be alleged against it because plaintiffs do not allege acts demonstrating: (i) that Altria agreed to be conspirators with JLI or the individual defendants; (ii) acts Altria took in furtherance of the conspiracy or to specifically aid and abet JLI's wrongful action; and (iii) facts showing that Altria's specific acts caused plaintiffs injuries.

Altria's arguments boil down to a position that plaintiffs cannot recover against Altria for the acts JLI took prior to Altria's involvement (that plaintiffs repeatedly allege starts in Spring 2017 and not, as Altria contends, in December 2018 when its investment was finalized).  The very few acts that Altria is expressly alleged to have taken "in furtherance" of or to aid and abet in JLI's sales of JUUL thereafter are insufficient to state a claim, it contends.

These issues – what was Altria's actual role in the alleged Fraudulent Marketing Scheme, the Nicotine Content Misrepresentation Scheme, and the Cover-Up Schemes, and how did Altria's acts in support of those Schemes impact or not impact each bellwether plaintiffs' use of JUUL – cannot be determined at this juncture.  Where and how Altria's responsibility (if any) for acts by it or the alleged conspirators cuts off will not be determined at this time.[40]  The allegations are sufficient and plausible.

---

with respect to salespeople whose compensation suffered due to defendant manufacturer's and component manufacturer's fraudulent misrepresentation.  *Id*. at 860-61. However, in a similar case addressing fraudulent concealment of information regarding "Eco Diesel" cars from consumers and the government, another court found the fraudulent concealment claim adequately pleaded. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig*., 295 F. Supp. 3d 927, 989 (N.D. Cal. 2018).

[40] Plaintiffs admit that the state supreme courts of Mississippi, North Carolina, and Utah have not yet decided whether to recognize aiding and abetting liability.  Oppo. to Altria at 45 n.33.  This potential distinction does not change the resolution of the conspiracy-based claims at this juncture.

United States District Court
Northern District of California

### F.   Strict Products Liability Under Florida and Rhode Island Law

Altria challenges the strict product liability claims asserted by the five bellwether plaintiffs residing in Florida and Rhode Island (N.W., Barnes, Widergren, Rest, and Pesce).  As an initial matter, Altria argues that the claims must be dismissed absent allegations by plaintiffs that they purchased products distributed by Altria.  But at this juncture, plaintiffs' allegations regarding the nature and extent of Altria's conduct with respect to distribution and supporting JLI's sales are plausible.  Evidence regarding exactly how much impact on the market those efforts had (generally or in specific bellwether states) needs to be tested based on evidence.

Altria also notes that four of these five (Pesce, Rest, Widergren, and N.W.) started using JUUL before Altria's December 2018 investment was effectuated.  This defense can be tested after discovery, when the exact details of when, how, and where Altria provided assistance to JLI with distribution of JUUL products or other assistance that is relevant to their potential liability under these strict product liability laws will be known.  Any causation argument (*e.g.*, that Altria's acts taken subsequent to a plaintiff's initial use of JUUL cannot have caused a plaintiff harm) is premature.

Altria also argues that these plaintiffs fail to allege facts plausibly supporting the two sets of strict product liability claims alleged against it because Altria cannot be considered to have designed or manufactured the JUUL products as required because their actions were limited to distribution, disseminating advertising, and retail services.  *See Rivera v. Baby Trend, Inc*., 914 So. 2d 1102, 1104 (Fla. Ct. App. 2005); *Samuel Friedland Family Enters. v. Amoroso*, 630 So. 2d 1067, 1068 (Fla. 1994);[41] and *Ritter v. Narragansett Elec. Co*., 283 A.2d 255, 262 (R.I. 1971)).[42]

---

[41] In *Rivera*, that court explained that it must "also look at the relationship of the manufacturer, as well as others in the distribution chain, including retailers, wholesalers, distributors and lessors, to the product in determining whether to impose strict liability," and the "relevant queries are whether the person or entity placed the product in the stream of commerce, is in a position to 'control the risk of harm a product might cause once put into the stream of commerce,' or either created or assumed the risk of harm for the defective product."  *Rivera*, 914 So. 2d at 1104; *see also Samuel Friedland Fam. Enterprises v. Amoroso*, 630 So. 2d 1067, 1068 (Fla. 1994) (noting "Florida courts have expanded the doctrine of strict liability to others in the distributive chain including retailers, wholesalers, and distributors.").

[42] *Ritter* relies on California precedent and notes that courts have "extended the concept of strict liability in tort for injuries resulting from a defective designed product to the retailer selling the product" because "[r]etailers like manufacturers are engaged in the business of distributing goods

40

The cases cited by Altria, however, simply prove that whether a defendant is appropriately held liable under those states' strict product liability laws is fact dependent.  Whether plaintiffs are correct that Altria's acts were sufficient to show they could have or should have "controlled the risk of harm" to JUUL users or were equivalent to putting the products into the stream of commerce cannot be determined at the pleading stage.  The Florida and Rhode Island strict liability claims are adequately pleaded against Altria.

## IV.   MOTIONS TO SEAL

The ODDs filed their motion to dismiss (and Exhibits A and B), their reply and amended reply (and related exhibits) conditionally under seal because those documents cite (to some undisclosed extent) materials designated confidential by plaintiffs and defendants.  Dkt. Nos. 1500, 1933, 1938.  They have failed to comply with Civil Local Rule 79-5 because they conditionally filed under seal the whole briefs (and exhibits) without either narrowly tailoring their sealing requests to cover only the confidential portions of their documents or identifying what information in their briefs or the exhibits should remain under seal in whole or part.

Within seven days of the date of this Order, the parties shall meet and confer to determine what (if any) material cited in the ODD's submissions should remain under seal, and within fourteen days of the date of this Order the designating party of any information that should remain under seal shall submit a declaration identifying that information and the compelling justifications for its continued sealing.

Plaintiffs filed portions of their opposition to Altria's motion to dismiss and exhibits under seal because they reference specifically identified materials that Altria and the ODDs have designated as confidential.  Dkt. No. 1799-1.  With respect to the material referenced from paragraph 587 of the Westfaul complaint, that information concerns the amount of money the Director Defendants earned from the Altria investment.  I have, to this point, allowed that information to be sealed and this reference may remain under seal at this time.  However, I will

---

to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products." *Ritter*, 109 R.I. at 189–90 (internal citations omitted).

United States District Court
Northern District of California

1    not be inclined to seal this information to the extent it becomes relevant on summary judgment or

2    during trial.

3          The other information conditionally under seal are references to Exhibits 23, 38 and 39 of

4    Howard Willard deposition, designated as confidential by Altria.  Altria has not submitted a

5    declaration in support of continued sealing of those references or exhibits.  Within seven days of

6    the date of this Order, Altria shall submit a declaration identifying what information it believes

7    should remain under seal and the compelling justifications for its continued sealing.

8                                        **CONCLUSION**

9          Defendants' motions to dismiss with prejudice the claims plaintiffs have expressly

10   abandoned at this juncture – identified in Ex. A to the ODD reply [Dkt. No. 1938-2 at ECF pages

11   37-40] – are GRANTED and the identified claims are DISMISSED WITH PREJUDICE with

12   respect to the eighteen plaintiffs at issue.

13         The strict product liability claims of the bellwether plaintiffs are DISMISSED with

14   prejudice against the ODDs and Founder Defendants.

15         The product-type claims asserted against the ODDs and Founder Defendants related to

16   damages suffered as a result of their use of JLI's product that fall under the unified statutory

17   causes of action in Louisiana, Mississippi, Connecticut, and Tennessee are DISMISSED.  To the

18   extent the bellwether plaintiffs from these four states can allege non-strict product liability claims

19   that are otherwise cognizable under and within those statutes against the ODDs and Founder

20   Defendants, plaintiffs may pursue those claims and LEAVE TO AMEND is GRANTED as

21   necessary for Fairess (Louisiana), Westfaul (Mississippi), G.F. (Connecticut), and B.B.

22   (Tennessee) within 20 days of the date of this Order.

23         The gross negligence claims under Rhode Island (Pesce), Mississippi (Westfaul), and

24   Connecticut (Faulds) are DISMISSED against all defendants WITH PREJUDICE, but the facts

25   underlying those claims may be asserted in a claim for punitive damages.

26         The negligent misrepresentation claims under Arkansas (D.H.) and North Carolina (J.L.K.)

27   law are DISMISSED against all defendants WITH PREJDUICE.

28         The fraudulent concealment claims under Connecticut (G.F.), Louisiana (Fairess), Oregon

United States District Court
Northern District of California

1    (Keffer/M.K.), and Virginia (Miles) are DISMISSED against all defendants WITH PREJUDICE,

2    but the allegations thereunder are deemed to be included in each of those plaintiffs' existing fraud

3    claims.

4        The stand-alone conspiracy to defraud claims under North Carolina law (J.L.K.), New

5    York Law (Edwards, J.D., Gregg), and Tennessee (Bain) are DISMISSED against all defendants

6    WITH PREJUDICE, but these plaintiffs' allegations are incorporated into the other fraud-based

7    claims or as a basis for joint and several liability as appropriate.

8        The loss of consortium stand-alone claim under Oregon law (Keffer/M.K.) is DISMISSED

9    against all defendants WITH PREJUDICE.

10       The "medical monitoring" stand-alone claims under Kentucky (Fish) and Mississippi

11   (Westfaul) law are DISMISSED against all defendants WITH PREJUDICE, but those plaintiffs

12   are entitled to see that form of relief as appropriate under their other claims.

13       Defendants' motions to dismiss are otherwise DENIED.

14       **IT IS SO ORDERED.**

15   Dated: July 22, 2021

16

17

18   William H. Orrick
     United States District Judge

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California