1   DAVID M. BERNICK (*pro hac vice*)
    david.bernick@kirkland.com
2   PETER A. FARRELL (*pro hac vice*)
    peter.farrell@kirkland.com
3   KIRKLAND & ELLIS LLP
    1301 Pennsylvania Ave., N.W.
4   Washington, DC 20004
    Telephone: (202) 389-5000
5   Facsimile: (202) 389-5200

6   RENEE D. SMITH (*pro hac vice*)
    renee.smith@kirkland.com
7   KIRKLAND & ELLIS LLP
    300 North LaSalle
8   Chicago, IL 60654
    Telephone: (312) 862-2000
9   Facsimile: (312) 862-2200

10  GREGORY P. STONE (SBN 78329)
    gregory.stone@mto.com
11  DANIEL B. LEVIN (SBN 226044)
    daniel.levin@mto.com
12  BETHANY W. KRISTOVICH (SBN 241891)
    bethany.kristovich@mto.com
13  MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, 50th Floor
14  Los Angeles, CA 90071-3426
    Telephone: (213) 683-9100
15  Facsimile: (213) 687-3702

16  *Attorneys for Defendant Juul Labs, Inc.*

17

**UNITED STATES DISTRICT COURT**

18

**NORTHERN DISTRICT OF CALIFORNIA**

19

20

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 19-md-02913-WHO |
| | **BRIEF #1: DEFENDANT JUUL LABS, INC.'S OMNIBUS *DAUBERT* MOTION TO EXCLUDE CERTAIN MARKETING OPINIONS** |
| This Document Relates to: | |
| ALL ACTIONS | Judge: Hon. William H. Orrick |
| | Date: February 25, 2022 |
| | Ctrm.: 2 |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................3

I.  PLAINTIFFS' EXPERTS' OPINIONS ON CONSUMER PERCEPTIONS OF
    TOXICITY OR ADDICTIVENESS OR ON UNDERAGE YOUTH APPEAL ARE
    NEITHER RELEVANT NOR RELIABLE. ..................................................................3

    A.  Plaintiffs' Experts Do Not Reliably Assess Consumer Perception Of JUUL
        Toxicity Or Addictiveness. ..................................................................................5

    B.  Plaintiffs' Experts Do Not Reliably Assess Youth Perceptions Of JUUL
        Advertisements. ..................................................................................................10

        1.  Plaintiffs' Experts Have Failed To Conduct Reliable Studies To
            Determine Actual Youth Reactions To Ads And Whether The Ads
            Had Specifically Targeted Youth. ............................................................10

        2.  Plaintiffs' Experts Offer *Ipse Dixit*, *Ad Hoc* Interpretations Of Ads. ..........11

        3.  Plaintiffs' Experts' Incomplete And Selective Analyses Of Ads Are
            Unreliable And Do Not Fit This Case. ......................................................13

    C.  Plaintiffs' Experts Attempt To Hold JLI To An "Appropriateness" Standard
        That Is Not Rooted In, And In Fact Is Inconsistent With, Governing Law. ...........16

    D.  The Court Should Bar Plaintiffs' Experts' Opinions Regarding The Intent
        And Youth Perceptions Of—And Alternatives To—The JUUL Design Form
        ............................................................................................................................20

        1.  Plaintiffs' Experts Do Not Provide Reliable Evidence That The JUUL
            Design Was Intended To Or Targeted To Underage Consumers ................20

        2.  Plaintiffs' Experts Do Not Provide Reliable Evidence That JUUL
            Design Actually Appealed To Underage Youth. ........................................22

        3.  Opinions That Additional Design Features Should Have Been Used
            To Address Youth Access Should Excluded. ............................................25

    E.  Proctor's Marketing Opinions Should be Excluded For Additional Reasons. ..........26

II.  PLAINTIFFS' EXPERT OPINIONS THAT JLI'S WRONGFUL MARKETING
     CAUSED UNDERAGE YOUTH USE DO NOT SATISFY RULE 702 AND
     SHOULD BE EXCLUDED. ......................................................................................28

     A.  The Scientific Methods For Establishing Causation Are Well-Established. ...........29

     B.  There Are No Reliable Scientific Studies Demonstrating That JLI's
         Marketing (Much Less Wrongful Marketing) Caused Youth Initiation. ................31

     C.  Plaintiffs' Experts' Opinions That JLI's Wrongful Conduct Caused The 2018
         Increase In Youth Use Are Unreliable. ..................................................................32

**[Brief #1]** JLI's Brief Re Marketing

     1. The Assertion That "It's Obvious" Is *Ipse Dixit*. ...........................................33

     2. The Assertion That It Is "Impossible" To Prove Causation Concedes Plaintiffs' Failure To Meet Their Burden, And Is Unsupported. .................34

     3. Subjective "Syntheses" Of Cigarette And Non-Causal ENDS Research And Reliance On Company Documents Are Neither Scientific Nor Admissible. ...........................................................................36

     4. Cutler's Incomplete "But-For" and Pratkanis' So-Called "Bradford-Hill" Opinions Are Unreliable And Inconsistent With The Relevant Data. ...................................................................................................38

     5. Plaintiffs' Experts Fail To Consider Or Address Alternative Causes Of The Rise In Underage Use. ....................................................43

   D. "Virality" Concepts Confirm Rather Than Fill The Causal Void. .........................44

     1. JLI Neither Created Nor Controlled Third-Party JUUL-Related Social Media Posts Or Content On Which Plaintiffs' Experts Rely. .....................44

     2. There Is No Reliable Evidence That Vaporized Or Any Other JLI-Conduct Caused A JUUL Viral Phenomenon. ..............................................46

     3. There Is No Reliable Evidence That Virality, In Turn, Caused The 2018 Rise In Underage Use. ...................................................49

III. THE COURT SHOULD EXCLUDE SPECIFIC CAUSATION OPINIONS REGARDING THE IMPACT OF JUUL MARKETING AND DESIGN ON B.B.'S USE OF JUUL AND OTHER NICOTINE PRODUCTS.......................................................49

IV. PLAINTIFFS' OPINIONS REGARDING YOUTH PREVENTION LACK FIT AND ARE UNRELIABLE. ..................................................................................52

  A. Lack Of Fit ...............................................................................................52

  B. Lack Of Expertise And Unreliable Methods ..........................................................54

CONCLUSION .......................................................................................................................57

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Chamberlain v. R.J. Reynolds Tobacco Co.*,
    2013 WL 12156418 (M.D. Fla. Sept. 16, 2013) ...................................................... 28

*Claar v. Burlington N. R.R. Co.*,
    29 F.3d 499 (9th Cir. 1994) ............................................................................ 14

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ............................................................................ 6

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ...................................................................................... 6

*Disc. Tobacco City & Lottery, Inc. v. United States*,
    674 F.3d 509 (6th Cir. 2012) ........................................................................ 17

*Drake v. R.J. Reynolds Tobacco Co.*,
    2015 WL 12746105 (S.D. Fla. Jan. 29, 2015) ................................................ 28

*Erhart v. BofI Holding, Inc.*,
    445 F. Supp. 3d 831 (S.D. Cal. 2020) ...................................................... 13, 26

*FTC v. DIRECTV, Inc.*,
    2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) .................................................. 7

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...................................................................................... 6

*GPNE Corp. v. Apple, Inc.*,
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ............................................ 6, 12

*Krommenhock v. Post Foods, LLC*,
    334 F.R.D. 552 (N.D. Cal. 2020) .................................................................. 6

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) .................................................................................. 1, 17

*In re Roundup Prods. Liab. Litig.*,
    390 F. Supp. 3d 1102 (N.D. Cal. 2018) ..................................................... 18, 20

*Sowers v. R.J. Reynolds Tobacco Co.*,
    2015 WL 12843904 (M.D. Fla. Jan. 23, 2015) .............................................. 28

**Rules**

Fed. R. Evid. 403 ................................................................................................................ 17

Fed. R. Evid. 702 ........................................................................................................ 6, 9, 16

Fed. R. Evid. 702(a) ........................................................................................................... 17

## INTRODUCTION

Plaintiffs allege three principal theories of liability based on JUUL marketing efforts: (1) that JLI's marketing misled consumers about the health risks associated with JUUL; (2) that JLI's marketing misled consumers about the addictiveness of JUUL; and (3) that JLI's marketing unfairly targeted underage consumers and its sales channels lacked sufficient controls to limit teenage exposure and access to JUUL products. In support of those theories, Plaintiffs offer opinions from multiple purported marketing experts. But each of their opinions suffers from two critical flaws. **First**, they do not fit with viable liability theories or with the federal regulatory scheme governing ENDS products. **Second**, they are not supported by reliable empirical studies on consumer perception or causation of consumer behavior.

**The expert opinions do not fit with viable legal theories of liability.** Under the law of most states, to prove that JLI's marketing misled consumers about the health risks associated with JUUL, Plaintiffs must establish at the least that JLI's marketing would mislead a reasonable consumer and that the allegedly misleading claims were a substantial contributing factor to the alleged injuries. Plaintiffs' marketing experts do not offer opinions directed at these elements. Instead, Plaintiffs' experts insert themselves and their own judgments in place of the "reasonable consumer" and advance opinions that JLI "caused" product use without tying that use to allegedly improper marketing. JLI's marketing also took place against the backdrop of the TCA and the Food, Drug & Cosmetics Act. Plaintiffs' experts do not account for that regulatory framework or its constraints on JLI's marketing messages.

To establish that JLI unfairly marketed its products to underage consumers, Plaintiffs must show JLI targeted its advertising at underage consumers specifically. But Plaintiffs' experts fail to analyze whether or how JLI's marketing targeted adults and focus instead on establishing that some underage consumers may have found the ads appealing. In doing so, they also fail to grapple with First Amendment rights and the FDA's goal to "ensure that youth exposure is minimized, while at the same time not restricting access to adults." *The Public Health Rationale or Recommended Restrictions on New Tobacco Product Labeling, Advertising, and Promotion,* U.S. Food & Drug Administration (April 29, 2019); *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 561, 571

(2001).  Marketing that, as a factual matter, is neither intended, distinctly designed or skewed specifically toward youth is not unlawful or actionable.  Making it actionable based upon the fact that it may also have some appeal to youth—even if in service to a laudable political goal of minimal youth reach—is outside the realm of this Court's or jury's charter here.

**The proffered expert opinions are not based on reliable methodologies**.  It is uncontested that there are well-established and reliable methods for determining consumer perception and any resulting impact on consumer behavior.  Plaintiffs' marketing experts also generally agree they must follow the same standards when forming their opinions that they would use in their ordinary scientific work.  But they have failed to apply these widely accepted techniques to the advertising at issue.[1]  Nor have they cited such studies in the literature.  Instead:

- Jackler, Woolley, Emery, and Prochaska all offer *ipse dixit* opinions that they "recognize youth targeting in tobacco ads when I see it" or "you know it when you see it," or deride any study as a "bit of a waste of my time" because youth appeal is "***a really simple conclusion you can draw just from looking at it.***"[2]  Tellingly, the experts do not even agree on what they see.[3]

- Jackler offers an "eye ball" comparison of JUUL advertisements to old cigarette ads.[4]

- Pratkanis supposedly bases his opinions on "social influence theory" without actual social influence experiments or surveys.[5]

- Drumwright, Jackler, and Proctor opine that JLI's allegedly actionable conduct so obviously caused the dramatic rise in youth use that no proof is required.[6]

---

[1] *See, e.g.*, Ex. 40, Jackler Dep. 110:24-111:8; Ex. 36, 11/4/21 Emery Dep. 19:3-9; Ex. 47, 10/28/21 Prochaska Dep. 62:7-11.

[2] *See, e.g.,* Ex. 40, Jackler Dep. 98:10-14; Ex. 56, Woolley Dep. 107:19-108:5; Ex. 47, 10/28/21 Prochaska Dep. 267:20-268:1.

[3] *Compare*, Ex. 65, 7/30/21 Emery Dep. 153:2-5; *with* Ex. 40, Jackler Dep. 276:16-277:21.

[4] *See, e.g.*, Ex. 11, Jackler Rep. 56–61; Ex. 40, Jackler Dep. 242:10-23.

[5] Ex. 46, 11/8/21 Pratkanis Dep. 194:19-195:20; 243:15-244:20; 246:22-247:1.

[6] *See, e.g.*, Ex. 34, Drumwright Dep. 76:14-16; Ex. 40, Jackler Dep. 89:5-12; *id.* at 193:24-194:9; Ex. 49, Proctor Dep. at 83:9-19.

- Cutler, Pratkanis, and Shihadeh rely on cross sectional studies, which they candidly admit cannot establish causation.[7]

- Emery, Chandler, and Jackler rely on their personal "synthesis" of non-causal studies or company documents without any methodology to guide that ad hoc approach.[8]

- Emery and Jackler claim it is "impossible" to conduct causal studies that could actually link JLI's specific wrongful conduct to underage use using reliable studies,[9] even though they have not tried, and JLI experts have actually conducted such studies and refuted alleged causal links.[10]

- Jackler and Pratkanis fall back on assertions that JUUL products were involved in the rise of underage use.[11]  To be sure, they were.  But it is ***JLI's allegedly wrongful conduct in its marketing*** and a causal connection between that marketing and the Plaintiffs' alleged injuries that must be proven.

## **ARGUMENT**

**I.     PLAINTIFFS' EXPERTS' OPINIONS ON CONSUMER PERCEPTIONS OF TOXICITY OR ADDICTIVENESS OR ON UNDERAGE YOUTH APPEAL ARE NEITHER RELEVANT NOR RELIABLE.**

As described below, the established research methods for reliably determining consumer perceptions of advertising are widely known and deployed.  Ex. 36, 11/4/21 Emery Dep. 175:23-25.  Representative consumers are recruited for a study or survey.[12]  Specific ad content is displayed to them or their exposure to existing ads is elicited through survey questions.  *Id.*  They are then asked questions to elicit their perceptions, and data is systematically assessed using statistical methods.  *Id.*  JLI itself has sponsored such studies, which have been produced in discovery and

---

[7] Ex. 33, Cutler Dep. 119:21-122:15; *id.* at 399:6-24; Ex. 42, 11/9/21 Levy Dep. 247:17-248:2; Ex. 46, 11/8/21 Pratkanis Dep. 233:9-234:4; Ex. 110, 7/22/21 Shihadeh Dep. 86:7-21.

[8] Ex. 36, 11/4/21 Emery Dep. 100:2-101:3, 102:20-25; Ex. 32, 10/21/21 Chandler Dep. 40:17-41:7; Ex. 40, Jackler Dep. 111:18-20.

[9] Ex. 36, 11/4/21 Emery Dep. 132: 9-16; Ex. 40, Jackler Dep. 199:2-200:13, 206:22-208:10.

[10] Ex. 89, Rossi Rep. ¶¶ 31-63.

[11] *See, e.g.,* Ex. 40, Jackler Dep. 193:24-194:9; Ex. 17, Pratkanis Rep. 67.

[12] *See, e.g.,* McKelvey K., *Youth say ads for flavored e-liquids are for them,* Addictive Behaviors; at 164-170 (2019).

were available to Plaintiffs' experts.  *See, e.g.*, Ex. 102, JLI00174191 (12/17/2016 JUUL Consumer Insight Study).

Indeed, studies of ENDS advertising content have been conducted and published in the peer reviewed literature.  Plaintiffs' expert Emery has focused her non-litigation work on the youth appeal of advertisements for tobacco products.  She acknowledges that such scientific research has been conducted and published on specific ad content for ENDS products and admits it would be "relatively easy to do research on perceptions of an advertisement in a laboratory setting."  Ex. 36, 11/4/21 Emery Dep. 175:23-25; *id.* at 181:4-18.[13]  Plaintiffs' other experts agree that "[o]ne can do perception study amongst teenagers or adults and see how they respond to it.  That could be scientific."  Ex. 40, Jackler Dep. 77:8-11; *see also* Ex. 39, Halpern-Felsher Dep. 210:8-13 ("You can actually ask them; you know, give them a list of different marketing tools and advertisements. Have you seen these? Yes or no. And then look at their perceptions of the various answers based on whether or not they have seen a particular ad.").

Moreover, Plaintiffs' experts acknowledge that such research on combustible cigarette ads was extensive, Ex. 37, 11/19/21 Grunberg Dep. 95:9-13, 99:12-19 (agreeing literature regarding the appeal of cigarette advertisements included youth perception studies); Ex. 40, Jackler Dep. 131:17-19 (agreeing that studies were conducted to establish that cigarettes caused a rise in underage use), and such research was an important part of establishing that cigarette adverting appealed to youth, Ex. 37, 11/19/21 Grunberg Dep. 99:12-19 ("I agree they contributed, and I agree they were important."); *see, e.g*., Arnett, J.J. (1998). *Adolescents' responses to cigarette advertisements: links between exposure, liking, and the appeal of smoking*. Tobacco Control, 7(2), 129-33.  Indeed, Plaintiffs' expert and tobacco researcher Kurt Ribisl has, outside of this litigation, personally "published randomized control trials regarding [combustible] tobacco product messaging." Ex. 51, 10/26/21 Ribisl Dep. at 30:22-25.  Yet, neither Ribisl nor any other Plaintiffs' expert conducted such studies here.

---

[13] McKelvey K., *Youth say ads for flavored e-liquids are for them,* Addictive Behaviors; at 164-170 (2019).

A.     **Plaintiffs' Experts Do Not Reliably Assess Consumer Perception Of JUUL Toxicity Or Addictiveness.**

Plaintiffs' two theories of advertising deception concerning the health effects of JUUL—that JLI's advertisements were misleading with respect to toxicity and addictiveness—are indisputably testable.  But Plaintiffs' experts who purport to analyze whether JLI's marketing was misleading as to health effects—including Pratkanis, Jackler, and Grunberg—admit that they have done no such studies concerning JUUL advertising and are unaware of anyone else who has.  Ex. 46, 11/8/21 Pratkanis Dep. 37:10-16; 240:23-2401:4 (admitting he did not conduct any original primary data study designed to determine whether JUUL advertising caused anyone to start vaping and that he was unaware of secondary literature that showed the Vaporized campaign caused underage individuals to use JUUL); Ex. 40, Jackler Dep. 77:8-11; 106:5-17 (agreeing researchers could conduct consumer perception studies of JUUL marketing on either adults or teenagers which "could be scientific," but admits that he has not employed that "methodology" in this case); Ex. 37, 11/19/21 Grunberg Dep. 47:15-18 (admitting he did not cite any sources or scientific principles in his interpretation of his selected JUUL advertisements); *see also See* Ex. 17, Pratkanis Rep. (failing to cite any study concerning consumer perceptions of JUUL ads and health effects); Ex. 11, Jackler Rep. (same); Ex. 8, Grunberg Rep. (same).  Conversely, JLI has conducted perception studies regarding risk and addiction of the JUUL advertising content submitted in JLI's PMTAs, but Plaintiffs' experts do not cite to that research or rely on it.

Further, in assessing the messaging concerning toxicity and health effects of JUUL and other ENDS, the TCA and related public health policies must be considered.  A study co-authored by at two of Plaintiffs experts, Drs. Seth Noar and Kurt Ribisl, cautions: "it is critical that e-cigarette harm messages do not unintentionally prevent cigarette smokers from switching to vaping."  Ex. 51, 10/26/021 Ribisl Dep. at 188:3-189:24.  And Dr. Ribisl confirmed that his belief remains that "evidence suggests that e-cigarettes are likely less harmful than combustible cigarettes." *Id.*  None of the experts who Plaintiffs put forth to specifically opine on the alleged health or toxicity messages of JUUL addresses--let alone scientifically accounts for--this critical context.

Plaintiffs' experts' opinions based on *ipse dixit* do not suffice under *Daubert*.  They do not speak "clearly and directly" to an issue in this case.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) ("*Daubert I*") (*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*").  Nor are their opinions based on their own marketing training, or experience in practice.   They do not, for example, have the type of "in-depth experience" in the relevant field that this Court has found sufficient to qualify other experts "to opine on [such] matters" *See Krommenhock v. Post Foods, LLC,* 334 F.R.D. 552, 580 (N.D. Cal. 2020).  "Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." *Malletier v. Dooney & Bourke*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) (collecting cases).  Moreover, experience alone "does not constitute a sufficiently reliable and testable methodology to prevent exclusion under *Daubert*," *GPNE Corp. v. Apple, Inc*., 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014), and opinions "connected to existing data only by the *ipse dixit* of the expert" must be excluded because "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**Pratkanis:**  Pratkanis is an experimental[14] social psychologist who focuses on "social influence and belief formation."  Ex. 17, Pratkanis Rep. 1.  He is not trained or experienced in marketing.  Nor does Pratkanis apply any reliable, repeatable methodology.  Dr. Pratkanis reviews JLI's internal documents and then historical ads to look back and reverse engineer a USP.  This is a backwards and subjective approach that is contrary to the authorities upon which he relies.  Indeed, Dr. Prakanis acknowledges that the "trier of fact" may have a different interpretation of the ads.  *See* Ex. 72, Pratkanis Dep. 273:10-20; *id*. 123:10-124:16 (acknowledging multiple interpretations of "vaporized").  Thus, out of the gate, Dr. Pratkanis' misapplication of the methodology renders his opinions unreliable and inadmissible.

Nor did he do anything to test his USP.  Pratkanis admits that he failed to conduct or evaluate ***any*** objective data, studies, or consumer surveys regarding what message a reasonable consumer

---

[14] Pratkanis did no experimental work in connection with his opinions.  *See* Ex. 72, 7/15/21 Pratkanis Dep. 43:6-44:4

1   would have taken away from JLI's marketing let alone whether they would have been deceived or

2   misled by it.  *See* Ex. 72, 7/15/21 Pratkanis Dep. 42:1-13; 43:22-44:4; 193:15-194:15; 220:15-221:4;

3   313:12-22.   Ultimately, Pratkanis' conclusions rest on nothing but his personal *ipse dixit*.   His

4   remarkable conclusion—that JLI somehow drove home through the use of social influence tactics,

5   ***the same USP to all consumers across six years of diverse and varied advertising campaigns***—is

6   the product of only his own say-so.

7         Notably, another court in this District has already rejected Pratkanis' opinions, for much the

8   same reasons that this Court should reject them here.   *See FTC v. DIRECTV, Inc*., 2018 WL

9   3911196, at *11 (N.D. Cal. Aug. 16, 2018).   In *DIRECTV*, Judge Gilliam found that the ads at issue

10  were not facially deceptive, and then found Pratkanis' "social influence analysis" to be

11  "unpersuasive" because Pratkanis did not "do any content analysis that would support the conclusion

12  that his conclusions were generalizable to all of the ads at issue over the eight-year period at issue"

13  or any "copy testing or other empirical testing of how consumers perceive[d] Defendant's

14  advertisements."  *Id.*

15        ***Jackler***: Jackler—an ear, nose, and throat doctor with no formal marketing training—is also

16  unable to point to any research that actually asks consumers for their perceptions of JUUL ads, and

17  simply waves the problem away stating: "I don't do consumer perception research."  Ex. 40, Jackler

18  Dep. 106:3-4; *see also generally* Ex. 11, Jackler Rep.  Nor can his citation to a study that did ***not***

19  involve JUUL, or even e-cigarettes, fill this gap.  *Id.* at 250:5-18 (citing a study conducted before

20  JLI was on the market to support contention that JLI's "Smoking Evolved" ad will be viewed by

21  consumers as health reassurance claim); *id.* ("it was before JUUL came on the market . . . but you

22  know, the same methods that JUUL used . . . permeate cigarette advertising as health reassurance.").

23        Jackler proffers two substitutes for actual research, neither of which is admissible.  The first

24  is his own, individual assessment of how JUUL ads compare to cigarette ads going back to the

25  1950s, concluding it is "obvious" what JUUL ads are conveying and "doesn't require studying to

26  understand its message."  *Id.* at 250:19-252:3.  This *ipse dixit* does not even make common sense.

27  For instance, Jackler simply asserts that JLI's use of the tagline "Smoking Evolved" constitutes a

28

1   health claim[15] similar to a Phillip Morris advertisement with the tagline "[t]he cigarette that takes

2   the fear out of smoking!"  Ex. 11, Jackler Rep. 59; Ex. 40, Jackler Dep. 248:3-22 ("[T]he phrase

3   smoking evolved, obviously, it's evolved from what? … This is a breakthrough technology.  It is

4   evolved.  It is safer.  It is smart.  And if you use this, you're smart.  What does that mean?  It's

5   healthier for you.  It's better.  So I don't think there's any question. . . . I do see them as being birds

6   of a feather in that sense").  But Jackler concedes that there was no research of any kind evidencing

7   that consumers would have these perceptions, much less finding Smoking Evolved comparable to

8   combustible cigarette ads which made ***explicit*** claims regarding cigarettes' product's health and

9   safety.  *Id.* at 251:4-6 ("Have I seen a study of this ad, this specific ad?  I don't think so.").  There

10  is no empirical evidence, consumer data, scientific protocols, or objective criteria involved in this

11  approach.

12          Second, Jackler points to research he led and published in his "JUUL Advertising Over Its

13  First Three Years on the Market" article.  *Id.* at 87:13-88:6. This research also involved no

14  consumers and says nothing reliable about consumer perceptions.   Rather, his own research

15  assistants—three 19-year-old students—merely coded ads (based on a codebook Jackler created)

16  for youth-oriented content.   These hand-picked assistants are not appropriate stand-ins for the

17  "reasonable consumer."  Further, this was not even a study of JLI advertisements or JLI content.

18  Instead, it reviewed online content posted by third-parties, ***not*** JLI.  *See* JUUL Advertising Over its

19  First Three Years on the Market, at 3 (coding of "[u]ser generated JUUL-related images" and an

20  express criteria of inclusion was that the studied posts "were from the community ***rather than*** the

21

22  ---
    [15] Jackler is not qualified to offer such opinions regarding compliance with FDA regulations,
23  including whether JLI marketed its product as a "modified risk" product.  *See* Ex. 40, Jackler Dep.
    61:13-24 (Jackler does not have the expertise to say whether the FDA has exclusive regulatory
24  control over tobacco); *id.* at 126:9-16 (Jackler is not familiar with the standards of research for
    PMTA authorization orders); *see also id.* at 129:23-130:2 (Jackler is not familiar with the FDA's
25  internal PMTA process, has "not seen any PMTA applications or the FDA commentary for any
    except for the JUUL one" and his "attention to it was limited").  As Jackler has previously testified,
26  he is neither a lawyer nor an expert on FDA regulations. Ex. 68, Jackler NCAG Dep. 487:4-5 43:13-
    14; *id.* at 43:16-18; *id.* at 192:8-11 (is "familiar with the FDA drug and medical device approval
27  processing," but is  "not an expert in it, if you will, but I do know it, yes."); *id.* at 487:24-487:1 ("[I]f
    you say am I an inside expert to the FDA regulations, I would have to say no.").
28

1   company.") (emphasis added).  In addition, the three students did not assess whether the posts they

2   reviewed conveyed information about health or addiction.  Jackler's testimony related to health

3   effects messaging in JLI's advertising should be excluded.

4       *Grunberg*: Grunberg's opinions on JLI's marketing should be barred in full because he is

5   not qualified "by knowledge, skill, experience, training, or education" to offer them.  *See* Fed. R.

6   Evid. 702.  Grunberg is a professor of military and emergency medicine, medical and clinical

7   psychology, and neuroscience.  *See* Ex. 8, Grunberg Rep ¶ 1.  He describes his areas of specialty as

8   including nicotine and tobacco use, addiction, drug abuse, stress, and behavioral health—not

9   marketing strategies or product design.  *Id.* ¶ 2.  Grunberg does not have degrees in marketing,

10  product design, or business, and has no experience, training, or publications related to those topics.

11  *See id.* at Exhibit A; Ex. 37, 11/19/21 Grunberg Dep. 349:12-15.  Accordingly, Grunberg is not

12  qualified to offer any expert opinions on marketing issues, let alone those based on his own

13  perceptions of JLI's advertisements and marketing documents, as he does here.

14      Grunberg sees representations of health in the colors, shapes and "elements of simplicity" in

15  certain post-Vaporized JUUL ads, even though the same properties are used by marketers to sell

16  products like furniture with no conceivable tie to health claims.  Ex. 37, 11/19/21 Grunberg Dep.

17  46:15-23; 47:4-6; 48:8-11; Ex. 103, 11/19/21 Grunberg Dep. Ex. 10.  And, although Grunberg

18  purports to "analyze[] [JLI's] marketing methods and advertisements," *see* Ex. 8, Grunberg Rep. ¶

19  252, it turns out that he had not even seen some post-launch ads and does not describe any

20  methodology he would use to undertake such analysis. *See, e.g.*, Ex. 37, 11/19/21 Grunberg Dep.

21  65:7-20; 66:15-67:2 (testifying he had not analyzed or seen a Make the Switch ad); Ex. 37, Grunberg

22  Dep. 42:3-10 (claiming the scientific principles that predicate his work are not "relevant"); *id.* at

23  47:15-18 (admitting he did not cite any sources or scientific principles in his interpretation of the

24  JUUL advertisements he selected).

25

26

27

28

**[Brief #1]** JLI's Brief Re Marketing

**B.   Plaintiffs' Experts Do Not Reliably Assess Youth Perceptions Of JUUL Advertisements.**

**1.   Plaintiffs' Experts Have Failed To Conduct Reliable Studies To Determine Actual Youth Reactions To Ads And Whether The Ads Had Specifically Targeted Youth.**

Plaintiffs' experts' youth targeting opinions likewise fail because they are predicated on unreliable or absent methods, and are not tailored to the JUUL specific advertising content at issue or the law/regulations regarding youth targeting.

It is undisputed that there are scientifically verifiable methods to test youth perception.  But Plaintiffs' experts, including Emery, an experienced researcher, did not conduct—and candidly acknowledge that they cannot identify any other published—research on youth perceptions of JUUL ad content.  *See, e.g.,* Ex. 36, 11/4/21 Emery Dep. 176:17-177:1, 178:5-6.  The closest Emery's own research—or any research offered by Plaintiffs' experts—comes is the use of human review and machine learning to identify "youth related content," including for example, any content relating to flavors, in "JUUL related" social media posts.  Ex. 7, Emery Rep. 59, Ex. 36, 11/4/21 Emery Dep. 80:17-24.  But those posts not only include third party posts not controlled by JUUL, but they also fail to measure perceptions of any actual JUUL advertising content, much less the historical content at issue.  *Id.* at 95:5-6.

Although Plaintiffs offer multiple experts to testify as to exactly that, not one has conducted perception research.  *See* Ex. 40, Jackler Dep. 105:24-106:3 (claiming he has shown "young people" JUUL ads but conceding "Did I publish that?   No, because I don't do consumer perception research.");[16] *compare* Ex. 32, 10/21/21 Chandler Dep. 78:23-79:2 ("I am putting forth opinions about consumers' perception of JUUL's advertising as it relates to -- to whom that advertising appealed[.]") *with id.* at 79:24-80:2 ("I did not analyze, you know, this kind of image appealed to this specific consumer, or anything kind of along those lines."); Ex. 39, Halpern-Felsher Dep.

---

[16] While Cutler claims that his report cites to "literature that indicates that particularly the Vaporized campaign … had attributes that appealed to youth," Ex. 33, Cutler Dep. 118:9-12, the only "study" he references on that score is the report authored by Plaintiffs' expert Jackler, which is devoid of any research on consumer perceptions of JLI ads, and doesn't even examine JLI's content.  *See* Ex. 4, Cutler Rep. ¶ 168.

219:11-15 (confirming her consumer perception study did not show participants JUUL ads)[17]; Ex. 37, 11/19/21 Grunberg Dep. 107:7-12 (stating that he was unaware of whether anyone has conducted any perception testing of JLI ads); *id.* at 47:15-18 (admitting he did not cite any sources or scientific principles in his interpretation of his selected JUUL advertisements); Ex. 47, 10/28/21 Prochaska Dep. 273:17-22; 262:20-264:14 ("nothing [came] to mind" when asked if she was "aware of any research that was done to get consumer perceptions of individual [JUUL] ads").[18]

For his part, Jackler offers up supposed evidence of perception that cannot establish what underage individuals thought about JLI's advertising. He states that "the most important consumer perception study was the fact that JUUL sales rose dramatically amongst youth." Ex. 40, Jackler Dep. 89:5-12. Plaintiffs' other experts disagree. Ex. 32, 10/21/21 Chandler Dep. 194:15-18 ("[C]ertainly there were people who were not exposed to advertising at all and purchased JUUL, and some people who were exposed to advertising and didn't."); *id.* at 193:9-15 ("Absolutely. . . . the reason why people make product decisions come from a lot of different places . . . a number of things [ ] lead into a purchase decision, and advertising is just one of those things.").

### 2.   Plaintiffs' Experts Offer *Ipse Dixit*, *Ad Hoc* Interpretations Of Ads.

Plaintiffs' experts instead provide *ipse dixit* pronouncements as to how the launch campaign, Vaporized, would have been perceived and who it targeted, occasionally with a citation to their personal authority as an expert.[19]  *See* Ex. 47, 10/28/21 Prochaska Dep. 76:1-3 ("A. Well, I don't

---

[17] Jackler believed that Halpern-Felsher conducted consumer perception studies, but Halpern-Felsher confirmed she did not. Ex. 40, Jackler Dep. 77:20-78:3; Ex. 39, Halpern-Felsher Dep. 219:11-15.

[18] Cutler, one of Plaintiffs' experts whose report purports to offer opinions as to the youthful appeal of JLI's advertising, even acknowledges that he is "not enough of an expert on the marketing to say what exact attributes [of ads] matter" to youth. Ex. 33, Cutler Dep. 115:8-10.

[19] Winickoff, a pediatrician, claims he has "expertise in marketing and how youth perceived marketing," Ex. 54, 11/5/21 Winickoff Dep. 266:12-14, but had not conducted any consumer perception studies and could not identify any "reliable, objective criteria" for determining whether vaping ads appeal to underage people, *id.* at 268:2-9. Still his report is peppered with conclusory allegations and fact narration asserting that JLI's marketing appealed to youth. *See e.g.* Ex. 25, Winickoff Rep. 128-29 ("JLI leveraged celebrities and social media influencers that appealed to youth and young adults.); *id.* at 168 ("JLI continued marketing in a way that appealed to youth").

1   think they look like adults.  If you look at the 'Vaporized' campaign, they don't look like adults.");

2   Ex. 32, 10/21/21 Chandler Dep. 142:16-18 ("[A]s someone who is knowledgeable of event

3   marketing, you can tell that these are appealing to youth."); *id.* at 201:13-16 ("You know, I think it

4   seems kind of clear on the face of it that this is the sort of thing that would appeal to kids -- right?");

5   Ex. 40, Jackler Dep. 98:10-14 ("[I]s it statistical? Not necessarily. But it certainly, to me, I recognize

6   youth targeting in tobacco ads when I see it, and I recognize the degree of youth targeting in tobacco

7   ads from long and hard experience in study.") (emphasis added); Ex. 34, Drumwright Dep. 205:19-

8   23 (she did not conduct any studies but instead "looked at documents"); *id.* at 207 (claims JUUL

9   ads were attractive to youth based on her personal view of the campaigns and their language).

10      Plaintiffs' experts admit that they did not conduct research to support their personal

11   interpretations, and even go so far as to suggest that objective support is unnecessary.  Prochaska

12   even lamented that it would "be a bit of a waste of [her] time" to scientifically study consumer

13   perception of the Vaporized ads as the "campaign is out" and its appeal to youth is "a really simple

14   conclusion you can draw just from looking at it."  Ex. 47, 10/28/21 Prochaska Dep. 266:16-268:1;

15   *see also* Ex. 40, Jackler Dep. 251:25-252:3 ("***[I]t obviously is what it is.  To my mind it doesn't***

16   ***require studying to understand its message[.]*** [] I cannot tell you that there's a specific study of this

17   campaign."); Ex. 56, Woolley Dep. 107:19-108:5 ("I would say that it wasn't necessary for me to

18   do any kind of measurement of whether [JLI-created content] led to support … basically, like I said

19   earlier, ***you know it when you see it***[.]") (emphasis added); Ex. 39, Halpern-Felsher Dep. 260:21-

20   261:8 ("A. You know, again, I can't give you numbers.  I can't tell you the exact impact.  I can tell

21   you as an expert and somebody who has been working with youth and doing adolescent research

22   for 25 years, I know what influences teens.").

23      Plaintiffs' expert, Woolley, admits that Plaintiffs' conclusory mode of "interpretation" is not

24   capable of repetition by other experts.  Ex. 56, Woolley Dep. 368:22-7 ("Q. How would a social

25   scientist validate your analysis here? A. . . . they probably wouldn't be able to completely validate

26   it.").  This approach violates the requirement that "[e]xperts must follow some discernable

27   methodology, and may not be 'a black box into which data is fed at one end and from which an

28   answer emerges at the other.'"  *GPNE Corp.*, 2014 WL 1494247, at *4.  Courts do "not permit [an

expert] to simply rehash the evidence and assert that [their] analysis of the evidence leads to a particular conclusion." *Erhart v. BofI Holding, Inc.*, 445 F. Supp. 3d 831, 846–48 (S.D. Cal. 2020).

### 3. Plaintiffs' Experts' Incomplete And Selective Analyses Of Ads Are Unreliable And Do Not Fit This Case.

Plaintiffs' experts do not separately analyze each of JLI's distinct advertising campaigns and almost entirely ignore campaigns that ran in the years after the 2015 launch campaign. This too requires exclusion. Plaintiffs' experts admit that JLI's advertising changed over the years. Ex. 104, 7/12/21 Chandler Dep. 40:9-15, 73:13-25; Ex. 32, 10/21/21 Chandler Dep. 78:12-16; Ex. 34, Drumwright Dep. 312; Ex. 65, 7/30/21 Emery Dep. 112:10-15; 114:20-115:1; 120:10-20, 159:16-26; Ex. 37, 11/19/21 Grunberg Dep. 66:15-67:2; Ex. 49, Proctor Dep. 45:12-14. Still, none of Plaintiffs' experts conduct separate perception analyses for JLI's various ad campaigns (Vaporized, Hex, Simply Satisfying, and Make the Switch), let alone assess the content of each of those campaigns. *See* Ex. 3, Chandler Report (no separate perception analysis for JLI's various ad campaigns); Ex. 4, Cutler Report (same); Ex. 5, Drumwright Report (same); Ex. 7, Emery Rep. (same); Ex. 8, Grunberg Rep. (same); Ex. 10, Halpern-Felsher Rep. (same); Ex. 11, Jackler Report (same); Ex. 13, Levy Rep. (same); Ex. 17, Pratkanis Rep. (same); Ex. 18, Prochaska Report (same); Ex. 25, Winickoff Rep. (same); Ex. 29, Woolley Rep. (same).

Instead, Plaintiffs focused on and highlighted just those ads that they believed might have some youth appeal. Grunberg, for instance, is not able to explain how he selected the limited set of JLI marketing materials and advertisements on which his assessments are based. Ex. 37, 11/19/21 Grunberg Dep. 70:1-15. He admits that he only focused on ads that he "believe[d] were particularly relevant in [terms of] influence on kids," while conceding that looking at a more holistic overview of JLI's marketing over time "one can see the change in the ads." *Id.* at 66:15-67:2; *see also* Ex. 32, 10/21/21 Chandler Dep. 221:5-6, 219:4-7 (contending the "overall tilt" of the influencer program was youthful, but admitting his analysis omits the influencers in their "40s, 50s and 60s" because he was "focused on reach to youth"); *see also* Ex. 56, Woolley Dep. 296:9-14 (testifying he did not identify instances where JLI's marketing spoke to adult smokers since he "was focused in particular here on youth smokers and young people"). But "[c]oming to a firm conclusion first and then doing

1   research to support it," as Plaintiffs' experts do, "is the antithesis of [the scientific] method." *Claar*

2   *v. Burlington N. R.R. Co.*, 29 F.3d 499, 502–03 (9th Cir. 1994).

3         In line with this approach, Plaintiffs' experts focus exhaustively on Vaporized, but they pay

4   very little attention to any post-Vaporized content.  It turns out that certain of Plaintiffs' experts had

5   to admit that the later content was ***not*** youth oriented.  Emery did not even assess much of JUUL's

6   ad content post-Vaporized until she was asked about it in her class deposition, and then testified that

7   the core ad content from April 2016 onward was ***not*** youth oriented.  Ex. 65, 7/30/21 Emery Dep.

8   153:4-153:5 (Hex ad "would not be put in the youth appeal bucket"); *id.* at 153:22-154:6 (Simply

9   Satisfying has "no" youth appeal); *id.* at 155:5-7 (Testimonial ad is not "attractive to youth"); *id.* at

10  156:7-8, 156:21-22, 174:24-175:6 (Make the Switch ads are "[n]ot attractive to youth"); *id.* at

11  157:19-20 (What Parents Need to Know ads are "not appealing to youth").  Chandler, Jackler, Ribisl,

12  and Proctor also acknowledge that certain later campaigns were not aimed at or appealing to youth.

13  Ex. 32, Chandler Dep. 78:6-16 (testifying that later campaigns involved "older smokers"); Ex. 40,

14  Jackler Dep. 280:14-284:10, 329:21-23 (agreeing with Emery's perception of Simply Satisfying,

15  What Parents Need to Know, and Make the Switch campaigns as appropriately adult targeting); Ex.

16  49, 11/17/2021 Proctor Dep. at 45:5-14 (discussing "retreat" from earlier ad campaigns and move

17  to "more adult-themed" or "more adult-like" ads); Ex. 51, 10/26/21 Ribisl Dep. at 68:8-20 (the

18  "Make it Switch" campaign "had very little youth appeal").

19        Some Plaintiffs' experts could not even agree on their personal perceptions of post-

20  Vaporized advertising.   Jackler disagreed with Emery and Chandler, espousing his personal

21  perception that Hex advertisements could appeal to youth.  *See* Ex. 40, Jackler Dep. 276:16-277:21.

22  Drumwright's personal perception also conflicted with all of the other experts: She expressed a

23  "possibility" that all of the later campaigns might be attractive to youth.  Ex. 34, Drumwright Dep.

24  315:9-19 (opining without studying the campaign that there is an unquantified "risk" that Smoking

25  Evolved could appeal to kids); *id.* at 317:18-20 (same for Simply Satisfying); *id.* at 316:9-16 ("I

26  think there is a possibility [Make the Switch]"—the content that the vast majority of consumers

27  saw—"would be [unduly attractive to kids]. I think less so than the others, but certainly a

28  possibility.").  Of course, this speculation is not admissible under Rule 702.  But the internal conflict

reflected in the experts' personal opinions (and resulting from their failure to conduct any testing)
highlights the problems with their analyses: They are not reliable.[20]

Finally, none of Plaintiffs' experts assessed, through quantitative analysis or even a
comprehensive study, whether JLI's specific marketing outreaches—including the events it hosted,
the digital marketing channels it used, the content that JLI itself posted on social media, and the
influencers it actually controlled—ultimately appealed to youth, much less that they were targeted
to youth.[21]   Instead, most of Plaintiffs' experts offer one-off self-selected examples of social media
posts or influencers that they believe, based on their own subjective personal views, are youth-
appealing.  *See, e.g.*, Ex. 3, Chandler Rep. 30-32 (identifying Katy Perry as an isolated example of

---

[20] Some experts fail to maintain *internal* consistency in their personal impressions of the ads.  For
instance, Jackler simultaneously opines that the Switch campaign is "[s]quarely adult targeted,"
Ex. 40, Jackler Dep. 329:13-24, but also perhaps inappropriate because "any marketing appearance
of JUUL products was reinforcing to underage users and potential users."  Ex. 11, Jackler Rep.
104.  Likewise, some 2015 radio Vaporized content "would have little attraction to non-smoking
teenagers," because it contains express references to existing smoking habits, *id.* at 112, but also
JLI's "core marketing slogan, 'Improve the Lives of a Billion Smokers'" conveys a message that
may be "particularly resonant" with youth.  *Id.* at 116, 118.  Again, none of this characterization is
supported by any actual research on JLI's marketing materials, only an ear nose and throat doctor's
say-so.  This is precisely the unreliability that *Daubert* eschews.

[21] Ex. 32, 10/21/21 Chandler Dep. 146:7-13 (" I don't know what -- like how -- what size subset it
is, whether it's kind of all but one event or 80 percent of the events, but I would expect it to be
noncomprehensive."); *id.* at 232:17-21 ("I would reinterpret your question as saying, did I undertake
a comprehensive and systematic analysis of all unpaid influencers?  I did not do that[.]"); *id.* at
265:16-20 ("Q. And you didn't do a comprehensive study of the content of unpaid influencer posts
about JUUL, just asked whether they were positive, negative, neutral, right? A. Right."); Ex. 34,
Drumwright Dep. 174:16-22 ("Q. Did you assess the total number of influencers JUUL had? A.  I
don't think I assessed the total number."); *id.* at 180:25-181:3 ("Q. Did you assess the content of
JUUL's influencers['] posts in any comprehensive way to see the coding or anything along those
lines? A. I -- I did not."); Ex. 36, 11/4/21 Emery Dep. 130: 22-24 ("Q: Have you systematically
gathered all of the reasonably available data on the level or frequency of the activities that you
describe as 'seeds' for JUUL's social media campaign? A: [N]o, I have not systematically gathered
all of the data in the universe."); *Id.* at 131:11-15 ("I did not measure the amount of all the different
types of marketing that goes into a comprehensive marketing campaign."); Ex. 56, Woolley Dep.
270:220271:1 ("It seems like what you're asking me is . . . to say that I can measure the reach of
JUUL's influencers in 2015, and I did not do quantitative analysis of that sort in this report."); Ex.
32, 10/21/21 Chandler Dep. 170:14-17 ("Q: Did you assess the number of attendees at JUUL events,
including sampling events, who were underage?" A: I did not[.]").

youth-appeal); Ex. 5, Drumwright Rep. 63 (same); Ex. 7, Emery Rep. 46 (same); Ex. 11, Jackler Rep. 203 (same); Ex. 29, Woolley Rep. 28-29 (same).   This is not a sufficiently rigorous methodology to pass muster under Rule 702 and *Daubert*.  In other cases, Plaintiffs' experts say that the methods of outreach JLI employed could have youth appeal, but they do so without looking at the details of JLI's specific marketing and any safeguards that were put in place to prevent youth exposure and appeal.  *See, e.g.* Ex. 34, Drumwright Dep. 190:17-20 (testifying she was not aware of when JLI put age gates on any of its social media accounts); Ex. 36, 11/4/21 Emery Dep. 42:18-21 ("So do I think it's appropriate? I don't think it's great because social media is a venue that appeals to youth in and of itself."); Ex. 39, Halpern-Felsher Dep. 172:10-18 ("But the overall strategy of influencer marketing, viral marketing, word of mouth, social media marketing, creating this brand where it was easy to share content online, create communities online through the use of, like, hashtags and things like that is very much a part of JUUL's strategy and the type of marketing that reaches youth directly."); Ex. 56, Woolley Dep. 104:16-24 ("And so, for instance, if you wanted to manufacture consensus amongst a youth audience, making something look cool or widely accepted or appealing to social media and all kinds of social media-oriented things, like so, saying 'building it for Instagram' would definitely appeal more to a young audience.").   Plaintiffs' experts' speculative assertions regarding JLI's marketing approaches do not fit the facts of *this case*, would confuse the jury about what is actually at issue, and should be excluded.

### C.    Plaintiffs' Experts Attempt To Hold JLI To An "Appropriateness" Standard That Is Not Rooted In, And In Fact Is Inconsistent With, Governing Law.

Plaintiffs define actionable conduct in reference to targeting *underage youth*, defined by Plaintiffs as those under 18, *e.g.* Dkt. No. 1772-25.  But Plaintiffs' marketing expert opinions do not actually fit the issue framed by the applicable laws and regulations: whether JUUL ads were targeted to and have specific, distinct appeal to youth under 18.  *Mangini*, 21 Cal. Rptr. 2d at 240 (finding RJR's Joe Camel cartoon advertising campaign violated state law due to targeted ads that "exploit[] minors by luring them" into purchasing cigarettes); *see also The Public Health Rationale or Recommended Restrictions on New Tobacco Product Labeling, Advertising, and Promotion,* U.S. Food & Drug Administration (April 29, 2019) (permitting "the continued marketing of new tobacco

products" and emphasizing the Agency's goal in "ensur[ing] that youth exposure is minimized, while at the same time not restricting access to adults").   Marketing that *indirectly and unintentionally* appeals to youth is not actionable.   Like other companies, "tobacco retailers and manufacturers have an interest in conveying truthful information about their products to adults, and adults have a corresponding interest in receiving truthful information about tobacco products." *Lorillard Tobacco Co.*, 533 U.S. at 564; *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 547-48 (6th Cir. 2012) (striking down FDA ban on bright, colorful tobacco advertising). Expert opinion that fits with this framework requires a precise analysis of whether the advertising and marketing channels were selected to communicate with adult smokers or to specifically reach and resonate with youth.

Nonetheless, several experts opine that ads targeted to legal, adult purchasers, are not "appropriate." These experts fail to conduct such an analysis. Plaintiffs' experts either apply no discernable standard at all or employ standards that are inconsistent with legal requirements.

**Drumwright:**  Drumwright opines that JLI "acted unreasonably, and recklessly, and failed to act as a reasonable company would" in three ways: (1) it used marketing and advertising that attracted youth ***and young adults*** to its product, (2) it knew or should have known its marketing and advertising would attract youth ***and young adults*** to its product, and (3) it failed to adequately and timely mitigate youth ***and young adult use***.   Ex. 5, Drumwright Rep. 7-8.  These opinions should be excluded because they do not fit the facts of the case and would only serve to confuse and mislead the jury.  Fed. R. Evid. 403, 702(a).

*First*, Drumwright fails to focus her analysis on the claims at issue here.  Instead, she opines that JLI's marketing was improper and unreasonable because it "attracted youth ***and young adults***." She admitted that her assessment even includes "21- to 25-year-old adult smokers," Ex. 34, Drumwright Dep. 69:20-70:4, 195-196—individuals who are not alleged to have been improperly harmed by JLI's conduct.  And she does no work to measure or isolate the "attractiveness" of JLI's marketing (or exposure or impact for that matter) for individuals under 18, as compared to those 18

to 25.[22]  Drumwright explained that she has "a problem with" marketing strategies that made the product appealing to young adult smokers.  *Id.* at 70:5-10.  Yet, JUUL's marketing/advertising to young adults is not at issue and not unlawful.  Drumwright's opinions, therefore, are inadmissible because they do not "speak[] squarely to the issue the [jury] must decide."  *See In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1115 (N.D. Cal. 2018).

*Second*, Drumwright relies on irrelevant codes and standards.  Ex. 5, Drumwright Rep. 85-88.  She considered codes from the American Marketers Association (AMA), American Association of Advertising Agencies (4As), International Chamber of Commerce (ICC), Children's Advertising Review of the Better Business Bureau (CARU), Public Relations Society of America (PRSA), Digital Marketers Organization (DMO), and Direct Marketers Association (DMA),[23] *id.* at 36-43, even though she concedes that JLI was not a member of any of these organizations and was not bound to their codes.  *See* Ex. 34, Dep. 95: 1-5 (AMA), 101:21-25, 105: 19-21 (4As), 107: 18-20 (ICC), 129:15-18, 130:4-7 (PRSA), 137:14-18 (DMO), 144:5-7 (DMA), 149:1-8 (UN).[24]

---

[22] She also testified that the codes are self-regulatory and acknowledged that she did not compare these codes to any state consumer protection laws.  Ex. 34, Drumwright Dep. 87:12-22, 97:1-4, 96:17-20, 96:12-16.  And Drumwright agrees that she is not opining that any of these codes provide the legal standards to be applied in this case.  *Id.* at 146:18-24.  Nor did she compare the codes to FDA regulations, Section 3 to the California Consumer Legal Remedies Act, California False Advertising laws, or any state products liability or consumer protection laws.  *Id.* at 90:1-6, 89:3-7, 96:12-16, 96:17-20, 97:1-4.  Drumwright's paper thin analysis does not get at which age demographics JLI's marketing actually targeted.  To the extent adult targeting, which she condemns, resulted in some spillover of exposure and even appeal to younger demographics, she does not measure that or show how that would fit with Plaintiffs' allegations in this case.

[23] In addition to these codes, Drumwright analyzes laws, regulations, and legal documents and concludes that JLI also violated certain legal obligations.  Ex. 34, Drumwright Dep. 146:18-24; Ex. 5, Drumwright Rep. 88-89; Ex. 34, Drumwright Dep. 68:22-24.  Drumwright is not a lawyer and agrees that such legal opinions, coming from her, are improper.  Ex. 5, Drumwright Rep. 81, 88-89.  These improper legal opinions are also inadmissible, as described in *Daubert* Brief #5.

[24] Moreover, the codes vary in other important respects from the issues in the case.  For example, the ICC and CARU's child marketing codes defines children as those under age 12, which Drumwright acknowledges is different from the definition she uses in her opinions.  *Id.* at 113: 17-22 (ICC), 120: 23-121:3, 122:24-123:8 (CARU).  She likewise agreed, obviously, that "the UN is made up of member states," that "JUUL is not a nation state," *id.* at 149:1-8, and that the "Guiding Principles on Business and Human Rights" against which she measures JLI's conduct do not specifically address marketing or advertising whatsoever.  *Id.* at 150:11-151:5.  Yet Drumwright at

1      *Third*, Drumwright testified that in her view, "if there is youth exposure it would need to be

2  very minimal for a product like this. . . . Three percent, four percent, five percent."  Ex. 34,

3  Drumwright Dep. 153:15-154:16.   But the FDA does not prohibit ENDS manufactures from

4  advertising across multiple marketing channels.   While the FDA does call for limiting youth

5  exposure, Plaintiffs' experts offer no standard or method in reaching their conclusion that youth

6  exposure to JLI's marketing was excessive.  Opinions that JLI's actions were inappropriate are based

7  on nothing more than personal judgment without an applicable standard is improper.  Ex. 36, 11/4/21

8  Emery Dep. 46:1-25; *see also id.* 42:2-44:21; 45:10-24 (unable to specify as an expert the level or

9  scope of social media presence that is acceptable); Ex. 34, Drumwright Dep. 156:7-19 (testifying

10  she's basing her standard of appropriateness "on my experience, my judgment as someone who has

11  been in this arena").

12      *Chandler* similarly admits that he has no idea what *is* required (or even feasible) with regard

13  to viewership demographics for age-gated products' advertising, but that he "can imagine what []

14  responsible marketing" might look like and that he doesn't "think it is what has happened here."

15  Ex. 32, 10/21/21 Chandler Dep. 191:25-192:9, 191:2-5.  Without applying any actual standard, he

16  offered that bleed into youth markets is unavoidable but "I feel like something north of 99 percent"

17  adults or "very close to 100 ***should*** be the standard."  *Id.* at 191:14-24.

18      Chandler (along with several other Plaintiffs' experts) also relies upon "marketing

19  experience" to conclude that the print outlets in which JLI ran ads during 2015—VICE, Gawker,

20  Hypebeast, and Thrillist/Supercompressor "skewed young"—though none actually analyze or

21  confirm audience demographics of the sites.[25]  *Id.* at 121:24-:122:4; *see also* Ex. 11, Jackler Rep.

22  123–126; Ex. 29, Woolley Report 22–23; Ex. 7, Emery Rep. 41; Ex. 5, Drumwright Report 132.

23  But when pressed on his definition of "skew young," Chandler described it as "the majority of

---

25  her deposition still maintained—without any analysis or support—that JLI's conduct violated the
human rights of children and "that human rights is involved in this case…."  *Id.* at 149:16-150:10.

26  [25] Had Chandler (or any of Plaintiffs' experts) reviewed audience demographics (or critically
27  analyzed the document cited in their reports), they would have learned that, for example, according
to Vice, 100% of its readership was over 18. Ex. 76, Chandler Dep. Ex. 5; Ex. 32, 10/21/21 Chandler
28  Dep. 124:6-125:15.

readership of those sites is under 30"—a standard that doesn't even correlate to the "youth" demographic at issue in this case.  Ex. 32, 10/21/21 Chandler Dep. 122:5-8.  And Chandler confirmed he "didn't make any opinions about the fraction of JUUL's audience during launch that was reaching . . . kids who were too young to buy tobacco."  *Id*. at 122:24-123:3; *see also* Ex. 56, Woolley Dep. 120:-121:4 (explaining that his analysis "took into consideration also people that were near underage, people that were in their early 20s, etcetera").  While Plaintiffs' experts may personally find marketing to legal-aged smokers under thirty problematic, these subjective opinions do not fit this case and would confuse the jury.  Plaintiffs cannot bring claims under a theory that JLI broke the law by marketing to adult smokers.  Plaintiffs' case rests on allegations of marketing to underage individuals.  Plaintiffs' experts' opinions regarding whether JLI advertised in "youthful" marketing channels that are not limited to underage individuals are inadmissible because they do not "speak[] squarely to the issue the [Court] must decide."  *See In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1115 (N.D. Cal. 2018).

### D.  The Court Should Bar Plaintiffs' Experts' Opinions Regarding The Intent And Youth Perceptions Of—And Alternatives To—The JUUL Design Form

Plaintiffs include in their youth use liability theory the appearance and design of the product and alternative device features that they contend would have reduced youth use.  Plaintiffs must demonstrate that the appearance and design of the JUUL device were tailored and selected to appeal to youth.  Plaintiffs' experts provide no reliable support for this opinion, including no empirical data that the design of JUUL had particular or unique appeal to youth.

#### 1.  Plaintiffs' Experts Do Not Provide Reliable Evidence That The JUUL Design Was Intended To Or Targeted To Underage Consumers.

Several of Plaintiffs' experts opine that the JUUL device looked "cool," was concealable, and had other attributes that were purportedly attractive to youth.  But the form of the JUUL device was determined based on the needs of adult smokers, not youth.  For instance, the record is clear that cool was not a design factor, non-cigarette design was.  Ex. 70, 10/12/21 Monsees Dep. 51:13-25 ("That replication of cigarette iconography, the look, the feel, the smell, et cetera, of cigarettes would continue to perpetuate that iconography and put it on a pedestal, so to speak.  And that was exactly what we wanted to eliminate, was all attributes of cigarettes, so that people could freely

move away from them.").  And, as intended, adult smokers found that the product shape and size was convenient, as shown by many of the sources upon which Plaintiffs' experts rely.

**Grunberg:** Grunberg admitted that he did no research on adult smokers to see what they think "cool" means or about the "coolness" of smoking. Ex. 37, 11/19/21 Grunberg Dep. 77:11-25. In fact, he cites studies confirming the importance of size and convenience to adult smokers. *See* Ex. 107, JLI00342150 cited as Ex. 8, Grunberg Rep. n. 270 at 13 (study where adult users of cigarettes or e-cigarettes report "I think for e-cigarettes in general, portability and convenience mean a lot" and "If it's not convenient, you're not going to bother with it"); Keamy-Minor E, McQuoid J, Ling PM. Young adult perceptions of JUUL and other pod electronic cigarette devices in California: a qualitative study. BMJ Open 2019 cited at Ex. 8, Grunberg Rep. n. 295 (study including participants aged 18-29 years old who explain one of the many reasons they prefer pod-based devices is convenience).  Grunberg also opines that "JLI was aware that its device had characteristics consistent with youth appeal, such as its sleek nature, ease of concealment, and the lack of any resemblance to tobacco cigarettes, which youth are taught to associate with negative outcomes." *Id.* at 106. Grunberg does not provide any research supporting these points, does he address whether any of these design features were and are important to adults.

**Eissenberg:** Eissenberg opines that "JLI inappropriately designed the JUUL product specifically so … it could be used discretely," which "facilitated use by youth and young adults" and that "JLI acted inappropriately in designing the JUUL pod/liquid" by "releasing a liquid that produced an aerosol that, by virtue of its appearance and dissipation rate (once exhaled) facilitated concealed use." Ex. 6, Eissenberg Rep. 106.  Additionally, Eissenberg's recognition that the same factors were attractive to young adults demonstrates that the design was not uniquely attractive to youth.  Eissenberg does not address adult preferences for e-vapor productions and his opinion on the amount of e-vapor produced by JUUL products is undercut by other of Plaintiffs' experts, who make the opposite argument and criticize JUUL for producing large amounts of vapor.  For example Levy opines that "JUUL clouds make JUUL into a toy that can be played with." Ex. 13, Levy Rep. 28-29.  Eissenberg also admitted that the JUUL device's appearance was not unique; he recognized that other ENDS devices appeared sleek, tech, and would also be easy to conceal. Ex. 35, Eissenberg

Dep. 307:19-308:6; Ex. 35, Eissenberg Dep. 303:11-15; *See, e.g.*, Ex. 108, 1/29/21 Perfetti Dep. 595:22-596:11.

***Noar:*** Noar opines that "the JUUL product was appealing to youth because of its novel, sleek design, availability of flavors, and suitability for discreet use." Ex. 16, Noar Rep. 24. Noar admitted that several of his opinions are also applicable to young adults in the 18-25 year old range. Ex. 45, Noar Dep. 35:24-36:2. Although Noar does cite a study for this opinion, that study refers to "[m]odern e-cigarettes and pod mod devices like JUUL" rather than JUUL specifically. Fadus et al. 2019. Nowhere does Noar reference any research that the JUUL product is unique amongst other cartridge-based ENDS products, or was specifically aimed at youth.

> ## 2.      Plaintiffs' Experts Do Not Provide Reliable Evidence That JUUL Design Actually Appealed To Underage Youth.

None of Plaintiffs' experts explains their methodology or identify any reliable evidentiary support as to how any device design features made the product "cool" or specifically appealing to youth. Since Plaintiffs' experts do not rely on scientific data, such as youth perception studies or comparative product analyses, they do not offer the jury anything beyond speculation and their own, subjective definition of the word "cool."

***Eissenberg:*** Eissenberg does not explain how the JUUL device was "cool" to youth in a different way than it was "cool" to adults. Eissenberg even admitted that he has not done any scientific research on what appearances of products are attractive to kids, and by including "young adults" in his analysis, Eissenberg admits that "cool" is not a youth-specific trait. Indeed, the record reflects that the word "cool" is not limited to youth appeal. Eisenberg points to no evidentiary support suggesting that this design "facilitated use" by youth.

***Grunberg:*** Grunberg similarly admitted that he did no research on adult smokers to see what they think "cool" means or about the "coolness" of smoking. Ex. 37, 11/19/21 Grunberg Dep. 77:11-25. Grunberg does not provide his methodology for determining that the device's "cool" appearance is specifically appealing to youth, rather than generally appealing to anyone. In fact, the 2014 Tragon Study that Grunberg cites where participants called the device "cool" only included adults who already used tobacco, e-cigarettes, or both at least once every week. Ex. 109,

JLI00211957 at 3.   During his deposition, Grunberg was presented with survey data from the National Institute on Drug Abuse's "Monitoring the Future" (MTF) survey.   Ex. 37, 11/19/21 Grunberg Dep. 80:24-81:22.   Grunberg admitted that out of the 10 self-reported reasons that teens reported using ENDS, the device looking "cool" was the 7th cited reason, accounting for only about 15% of responses.   *Id.*; Ex. 80, 11/19/21 Grunberg Dep. Ex. 7.   Grunberg also admitted that he did not have any data contrary to this finding.   Ex. 37, 11/19/21 Grunberg Dep. 82:2-5.

*Jackler:* Jackler opines that "an additional factor in JUUL's success included its attractive small, pod design … that appealed to youth and young adults."   Ex. 11, Jackler Rep. 386.   Jackler does not explain how he was able to reach this conclusion.   During his deposition, Jackler admitted (1) that there were devices that he thinks of as "JUUL-a-likes" that existed before JUUL, (2) there were "lots" of other devices that were "easy to fit in a pocket or backpack sleeve" at the time JUUL launched, and (3) JUUL was not the only product on the market beginning in 2015 that had a sleek and modern appearance.   Ex. 40, Jackler Dep. 184:1-186:8; 170:24-171:4; 169:25-170:9.   Jackler also could not identify any empirical consumer research that establishes that kids perceived the JUUL device to be more attractive than other "JUUL-a-like" devices.   *Id.* at 186:9-22.

*Levy*: Levy opines that "features introduced by JLI made JUUL particularly and uniquely attractive to youth…."   Ex. 13, Levy Rep. 333.   Levy does not point to a single source to support her assertion that the design aesthetic of JUUL was "uniquely attractive to youth."   When asked, Levy could not identify any data on underage users that says the appearance of the JUUL device is significantly different to them than the appearance of other ENDS devices on the market today.   Ex. 42, 11/9/21 Levy Dep. 260:3-10.   Levy also opines that device features such as "party lights" and "skinz" "make the device particularly attractive to children, adolescents and young adults."   Ex. 13, Levy Rep. 33, 36-37.   Levy does not identify any research regarding what she refers to as "party lights"; her only reference is to an article from "vapebeat.com."   With regard to "skinz," not only does Levy not present any research or methodology, but she even states in her report that "'skinz' were not made or sold by JLI."   *Id. at* 37.   The Court has already held that JLI is not "vicariously liable" for "the unfair and unlawful conduct of third parties that were promoting and selling its

1    products to minors." *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 760 (N.D. Cal. 2019).  Thus,

2    Levy's testimony on this score has no place at trial.

3           **Shihadeh:** Shihadeh opines that "[d]esigning JUUL … without the cool appearance …

4    would have substantially reduced or prevented the epidemic of youth JUUL use."  Ex. 23, Shihadeh

5    Rep. 54.  Shihadeh cites no facts or data to support this position, nor does he explain how he could

6    possibly know what "would have" had any impact on youth JUUL use.

7           **Prochaska:**  Prochaska does not identify any research supporting how she determined that

8    the product being "cool" caused youth usage.  Nor did she identify any consumer perception data,

9    adult or youth, on the JUUL device.  Indeed, "nothing [came] to mind" when asked if she was

10   "aware of any research that was done to get consumer perceptions of individual [JUUL] ads."  Ex.

11   47, 10/28/21 Prochaska Dep. 273:17-22; 262:20-264:14; 266:16-268:1.  Prochaska also opines that

12   "JUUL's … discrete design … caused young people to start and continue using JUUL and other

13   nicotine products."   Ex. 18, Prochaska Rep. 6.   Prochaska does not refer to any scientific

14   methodology or empirical research supporting her conclusion that there was a causal connection.

15          **Winickoff:** Winickoff, a pediatrician with no marketing experience or research, opines that

16   "JUUL's physical design that is cool and high-tech … is unreasonable when combined with the

17   above features that appeal to youth, and adds to JUUL's excessive abuse liability, especially among

18   youth." Ex. 25, Winickoff Rep. 184.  Winickoff also opines that "JUUL's physical design" is "easily

19   concealed, and [] allows it to be hidden easily and used freely throughout each day and night."  Ex.

20   25, Winickoff Rep. 184.  Winickoff does not explain his methodology or demonstrate what scientific

21   research he relied upon to reach the opinion that any of the design features are specifically attractive

22   to youth, nor is he qualified to offer such opinions.  Nor does Winickoff explain how the JUUL

23   product's "ability to be concealed" is either different from convenience for adults or unique

24   compared to other ENDS products (which according to the study he cites, Ramamurthi et al 2018,

25   is not true) or uniquely appealing to youth and not adults.

26

27

28

### 3.   Opinions That Additional Design Features Should Have Been Used To Address Youth Access Should Excluded.

Many of Plaintiffs' experts opine that JLI should have implemented additional design features, including tobacco-only flavor, consistent TPM delivery, a lower nicotine concentration, a cig-a-like design, dosage restriction, a lockout feature, geo-fencing, or a locked device.  *See, e.g.*, Ex. 6, Eissenberg Rep. 127-145; Ex. 23, Shihadeh Rep. 54; Ex. 25, Winickoff Rep. 229-230; Ex. 8, Grunberg Rep. 108; Ex. 18, Prochaska Rep. 17.  Importantly, these opinions are not supported by any reliable science and run counter to the TCA regulatory scheme.[26]  Plaintiffs' experts acknowledge that, under the Deeming Rule, JLI could not change the JUUL device after the deeming date.  Thus, any allegations that JLI should have incorporated an alternative design element must rest on three assumptions: (1) such changes were feasible and could have been implemented before the Deeming Rule, (2) such changes would otherwise have been appropriate under regulatory standards, and (3) the design feature would have incrementally prevented or limited youth use and not adult use.  Plaintiffs' experts do not explain how they determined that any of these assumptions were met.

In order for JLI to incorporate an additional design feature, it must have been demonstrably feasible for JLI to both design and launch a device with the suggested technology before the deeming date.  No expert's analysis demonstrates that their proposed alternative technology design elements were feasible prior to the deeming date.[27]  Grunberg testified that since he is not an engineer, he does not know which product features that he discusses could have actually been put into effect.  Ex. 37, 11/19/21 Grunberg Dep 113:8-17.  This limitation is a crucial one, as history shows that

---

[26] JUUL flavors were selected for broad distribution focused on their appeal to adults.  And they did in fact appeal to adults.  *See* 7/6/21 Bowen Dep. 68:19-23 ("JUUL's flavors were developed with adult smokers in mind.  When survey data first appeared that mint had disproportionate youth use, mint was withdrawn."); *see* Leventhal et al. 2019 (study analyzing youth JUUL flavor preference); 10/12/21 Monsees Dep. 132:8-22.  Additional analysis of Plaintiffs' experts' opinions regarding flavors is provided in JLI's *Daubert* Brief #3.

[27] As JLI's witnesses testified, the company filed IP related to designs that were "part of ongoing discussions for future products and future feature set needs," but that the company "didn't [necessarily] have the capabilities to do at that time."  8/20/2020 White Dep at 156:18-158:3, 159:4-159:10.

feasibility remains elusive.  Adam Bowen testified that the addition of technological features is "quite difficult to implement technically" and involved hardware and firmware challenges: "So, first, you need to have radio communication presumably wireless radio communication between the device and the smartphone, probably over Bluetooth.  That requires additional components and perhaps antenna in the device, which has a metal exterior shell or housing that makes radio transmission difficult.  There was just a lot of steps to implement – and that's just kind of the hardware level.  Firmware – there's a lot of development work that needs to go into demonstrating and implementing a lot of these features."  5/10/2021 Bowen Dep. 129:5-129:17; *see also* Ex. 62, 9/9/2021 Christensen Dep. 129:9-17 ("My understanding is that the features as we finally implemented them make heavy use of Bluetooth technology that went from impractical to include to practical to include over time.  My understanding … was, yeah, it was super impractical to implement when we were working on it and became more practical over time, and eventually we did it as it became practical."); 8/20/2020 White Dep. at 159:4-159:10 (indicating that as of 2015, JLI "did not have internal capabilities around wireless device development.").

Similarly, giving users control over the amount of nicotine administered through the JUUL device was not possible at launch.  *See* Bowen Dep. at 338:10-25 (testifying that JLI "conducted some brainstorming, drafted patent applications and so forth," but that it was not possible to "develop, implement, test in advance of 2015," especially given that dosage control is "something that's very difficult to implement in a way that would be reliable.").  And White testified that many ideas were discussed, but, at bottom:  "a lot of these [] relied on having [] a Bluetooth or wirelessly-enabled device."  8/20/2020 White Dep. at 161:1-161:13.  As discussed above, that was not possible for the company in 2015.  Once again, Plaintiffs' experts do not address or contend with the fact that their preferred features weren't feasible at launch.

### E.   Proctor's Marketing Opinions Should be Excluded For Additional Reasons.

The Court should exclude Proctor from testifying altogether.  As set forth in JLI's *Daubert* Brief No. #4, the opinions offered by Proctor, a historian, follow no sound methodology and instead constitute nothing more than pure fact narration and argument that must come from counsel, not a testifying expert on the stand.  *Erhart*, 445 F. Supp. 3d at 846–48.

Proctor should further be excluded because he offers numerous opinions that are both irrelevant to the issues in this case and highly prejudicial.  Proctor repeatedly and confusingly conflates JLI with combustible cigarette companies and implies concerted action (and misdeeds) that have not even been alleged by Plaintiffs.  Thus, Proctor opines that one "cannot understand the rise of Juul without understanding" cigarette history, including, amongst other things, "the history of the distinctive chemistry that made cigarettes so popular," "the discovery and denial of the harms caused by cigarettes," "a common language of reassurance and misdirection that pervades Big Tobacco, old and new," and "efforts by the tobacco industry more broadly to trivialize the harms of nicotine delivery, including the harm of addiction."  Ex. 20, Proctor Rep. 9.  He goes on to discuss each of these allegations lodged at "Big Tobacco" in detail—opinions that that are so extensive and focused on conduct of other companies that occurred decades—or even centuries ago—that they are completely unhelpful, and any minimal relevance is outweighed by risks of jury confusion and undue prejudice.  *Id.* at 15-34.

Proctor, for example, offers opinions alleging destruction of documents in the past by certain cigarette manufacturers, noting that the phrase "please destroy" appears 5,517 times in a certain cigarette repository of documents and says "document destruction is discussed explicitly in ***the industry's*** files."  *Id.* at 88.  Again, this has nothing to do with JUUL or JLI.  *See* Ex. 49, Proctor Dep. 42:6-12 (admitting that the statements have nothing to do with JUUL-related documents).  Using this Big Tobacco "conduct" as support, Proctor leaps to the conclusion that JUUL is the "culmination" of Big Tobacco's "conspiracy" and supposed "decades-long effort to create a perfect engine of addiction."  Ex. 20, Proctor Rep. 14; Ex. 20, Proctor Rep. 55 ("[JLI Board member] Pritzker was no stranger to conspiracy—and his subsequent position leading the board of Pax/Juul helps explain some of the nefarious directions taken by the company after his involvement.").[28]

---

[28] *See also* Ex. 20, Proctor Rep. 3 ("Cigarette makers have been in the business of addicting kids for more than a century, and Juul continues and perfects this same business model.  Most smokers start as kids and Juul exploits this fact, reversing decades of public health progress."); *id.* at 4 ("Juul continues several of the chief deceptions of traditional tobacco, including a significant (and deadly) confusion between inhalation and ingestion. … Juul trivializes the hazards of inhaling food-like substances into the lungs—another long-standing deception of the older industry."); *id.* at 5 ("Juul still today is using many of the same deceptive techniques used by Big Tobacco, including the recent

These opinions are not the product of any reliable principles or methods. Instead they are inadmissible "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 157 (1999).

Courts have excluded and otherwise curtailed similar opinions by Proctor for their lack of relevance, being beyond his qualifications as a historian, and as improper as a matter of law. *See, e.g.*, *Drake v. R.J. Reynolds Tobacco Co.*, 2015 WL 12746105, at *2 (S.D. Fla. Jan. 29, 2015) ("[A]t no point may Proctor testify that Defendants are engaged in an ongoing 'conspiracy,' nor may he evaluate their litigation conduct."); *Sowers v. R.J. Reynolds Tobacco Co.*, 2015 WL 12843904, at *1 (M.D. Fla. Jan. 23, 2015) ("Dr. Proctor's opinions that Defendants have failed to admit certain facts has little if any relevance to the issues in Phase I and is prejudicial."); *Chamberlain v. R.J. Reynolds Tobacco Co.*, 2013 WL 12156418, at *1 (M.D. Fla. Sept. 16, 2013) ("Dr. Proctor is precluded from testifying regarding cigarette design in terms of research and development, alternative designs, and his recommendations or suggestions as to how a better design might be achieved. Proctor is further precluded from offering his opinion with respect to the state of mind or intent of the authors of tobacco industry documents."). These decisions concerning combustible cigarette manufacturers apply *a fortiori* here. Ex. 97, Transcript of Trial at 906:10-911:12, 922:12-924:8 *In re: Engle Progeny Cases Tobacco Litig.* (*Hess*) Tr. (Fla. 17th Cir. Ct. 12/4/2008).[29]

## II.   PLAINTIFFS' EXPERT OPINIONS THAT JLI'S WRONGFUL MARKETING CAUSED UNDERAGE YOUTH USE DO NOT SATISFY RULE 702 AND SHOULD BE EXCLUDED.

It is undisputed (and in fact conceded by Plaintiffs' experts) that the methods for scientifically demonstrating causation of consumer use are well-established and are employed by Plaintiffs' experts themselves outside the courtroom. The Bradford-Hill criteria—including reliably

---

purchase of an entire issue of a scientific journal to influence the science surrounding the hazards posed by Juul products.").

[29] Courts have found Proctor's antics and tactics on the stand so inappropriate that it has led them to declare that "[H]e will never testify live again in any case that I have anything to do with. And I will sign an order to that effect after the trial is over with." Ex. 96, Transcript of Proceedings 1780:3-6, *In re: Engle Progeny Cases Tobacco Litig.* (*Warrick*) Tr. (Fla. 4th Cir. Ct. 7/20/2010).

linking the conduct at issue with subsequent behavior on a statistically-significant and replicable basis—are among the cornerstones of such analyses.  And longitudinal surveys or econometric studies are the principal tools available to test causal hypotheses in the marketing arena as they are in other areas of behavior science.

Plaintiffs' experts admit that they have conducted no such studies to determine whether JLI's conduct caused underage use.  Nor has anyone else.  Such studies and research, they claim, simply do not exist, or would be impossible to complete, as if this absolves Plaintiffs of their burden of proving causation burden.  It does not.

Plaintiffs' experts fare no better in demonstrating that JLI's alleged wrongful conduct caused the 2018 rise in youth e-cigarette use.  Without the appropriate studies, they exert themselves to propose substitutes.  Some revert to *ipse dixit*, literally opining that the causal connection is "obvious."  Others claim it is simply not possible to research this issue—a demonstrably incorrect position.  While others engage in subjective syntheses of other non-ENDS, non-JUUL research, they do not come close to satisfying Rule 702.

Finally, the experts resort to a "viral" social media presence theory that is neither tethered to JLI-created nor sponsored content, nor causally connected through reliable research to any actual increase in underage use.

### A.   The Scientific Methods For Establishing Causation Are Well-Established.

The scientific study of causal factors in consumer behavior is well established.  As with medical causation and other fields of inquiry, causation in the marketing context must be grounded in the scientific method.  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001); *see also* Fed. R. Evid. 702.  Plaintiffs' experts agree.  *See* Ex. 33, Cutler Dep. 21:15-22:13; Ex. 42, 11/9/21 Levy Dep. 232:10-15 (identifying the Bradford-Hill criteria as looking for statistically significant relationship between the potential cause and the effect).  Ribisl agreed that "in [his] work outside of the courtroom, [he] follow[s] the scientific method" and that he "follow[s] an evidence-based approach."  Ex. 51, Ribisl Dep. 25:19-26:6.  Winickoff "totally" "agrees that empirical data has to be gathered reliably, [and] has to be repeatable," and notes that identifying a statistically

1  significant relationship is important for evaluating causation.  Ex. 54, 11/5/21 Winickoff Dep.

2  206:17-19; 101:10-102:5. [30]

3          Cutler, Pratkanis, Prochaska, and Ribisl further agree that longitudinal studies are a "good

4  way" and "preferred method" to study causation.  Ex. 46, 11/8/21 Pratkanis Dep. 37:10-38:2; Ex.

5  33, Cutler Dep. 104:19-105:18; Ex. 46, 11/8/21 Pratkanis Dep. 234:6-235:4; Ex. 47, 10/28/21

6  Prochaska Dep. 290:6-17; 10/21/21 Ribisl Dep. 31:1-24.  Cutler agrees that time-series regression

7  analyses are "common econometric tools used to study causation," Ex. 33, Cutler Dep. 399:25-

8  400:10—an opinion echoed by Emery and others.  *See* Ex. 36, 11/4/21 Emery Dep. 112:9-21

9  (agreeing multiple regression is "an accepted and reliable methodology" that can be used to

10  "determine potential causes of an event that's occurred").  Jackler similarly acknowledges that there

11  are existing scientific methodologies, like multiple regression analysis and longitudinal studies, that

12  permit scientists to study causation where multiple factors are at play, including in the context of

13  the effects of advertising on youth.  Ex. 40, Jackler Dep. 213:12-17 (agreeing multiple regression

14  analysis is useful to study causation involving multiple factors).  Indeed, Jackler agrees that

15  longitudinal studies were used to demonstrate the role of tobacco advertising on youth uptake of

16  combustible cigarettes.  *Id.* at 231:3-236:15.

17          Cross-sectional studies alone are not sufficient to demonstrate causation, as Emery

18  acknowledged in her published research, when she wrote that her "use of cross-sectional data leaves

19

20

21

---

22  [30] Ex. 33, Cutler Dep. 104:19-105:18 (agreeing a longitudinal study along with establishing a

23  statistically significant relationship is a technique for establishing causation); *id.* at 399:25-400:10 (testifying time-series analysis and cross-sectional analysis are two most common econometric tools

24  used to study causation); Ex. 36, 11/4/21 Emery Dep. 112:9-21 (agreeing multiple regression analysis is "an accepted and reliable methodology" that can be used to "determine potential causes

25  of an event that's occurred"); Ex. 42, 11/9/21 Levy Dep. 232:10-15 (identifying the Bradford Hill criteria as looking for statistically significant relationship between the potential cause and the

26  effect); Ex. 46, 11/8/21 Pratkanis Dep. 234:6-235:4 (agreeing that a longitudinal study is a generally accepted methodology to examine causation).; Ex. 47, 10/28/21 Prochaska Dep. 290:7-17 (agreeing

27  a longitudinal study is the preferred method for examining causation); Ex. 54, 11/5/21 Winickoff Dep. 101:10-102:5 (agreeing that identifying a statistically significant relationship is important for

28  evaluating causation).

us unable to make direct causal inferences about whether mean exposure to anti-tobacco advertisements resulted in changes in youths' smoking-related attitudes, beliefs, or behaviors."[31]

**B.      There Are No Reliable Scientific Studies Demonstrating That JLI's Marketing (Much Less Wrongful Marketing) Caused Youth Initiation.**

Plaintiffs' experts admit that there is ***no study*** that shows any causal association between ***JUUL marketing*** (wrongful or otherwise) on the one hand and underage use on the other.

***Emery*** cannot point to any empirical research drawing a causal connection between JLI's conduct and youth use of e-cigarettes.  Ex. 36, 11/4/21 Emery Dep. 184:11-21 ("I think that there is not a single study, as I had said before, that equates Vaporized specifically with specific youth behavior."); *id.* at 186:7-25 (admitting the "research doesn't exist" to determine "the impact of the Vaporized campaign specifically on anything").

***Grunberg*** is not aware of any published papers showing a causal connection between the at-issue Vaporized campaign and the rise in underage vaping.  *See* Ex. 37, 11/19/21 Grunberg Dep. 78:1-7 (admitting he "cannot think of any" empirical research that "focuses specifically on the youth appeal of JUUL advertising").

***Jackler*** does not know of a methodology to "squarely separate each of the various drivers" determine whether a specific component of the JUUL product or marketing "was the primary driver" of youth uptake.  Ex. 40, Jackler Dep. 207:13-19; *see also id.* at 217:24-218:4 ("I have difficulty in parsing the different attributes of JUUL into this causation versus that. There's certainly strong correlation of the increase in social media, and I can infer causation, but I don't know of a study that specifically."); *id.* at 211:1-2 (testifying he couldn't identify a single causation study because "it is a complex, behavioral choice that teens make").

---

[31] Emery, S. *et al*. "Televised State-Sponsored Antitobacco Advertising and Youth Smoking Beliefs and Behavior in the United States, 1999-2000 *Arch Pediatr Adolesc Med.* 2005;159(7):639-645. doi:10.1001/archpedi.159.7.639 *available at* https://jamanetwork.com/journals/jamapediatrics/full article/486062.

C.     **Plaintiffs' Experts' Opinions That JLI's Wrongful Conduct Caused The 2018 Increase In Youth Use Are Unreliable.**

Plaintiffs are undeterred by the absence of research demonstrating any impact on youth use, and go further to assert that JLI wrongfully caused the underage use metrics in 2017 and 2018. Failure in this is inevitable.  Ex. 33, Cutler Dep. 101:25-102:7 ("Q. Okay. Have you tried [to do a time-series analysis]? A. No, I have not tried."); *id.* at 125:4-17 ("I have not done a cross-section study . . . ."); *id.* at 400:25-401:10 (testifying that "[i]n terms of data analysis," time-series and cross-section analysis are "really the two ways" he would "consider to be available in looking for the causes of the rise in underage use"); *see also* Ex. 37, Grunberg Dep. at 103:8-20, 104:5-11 ("The type of analysis you're describing, whether econometric or whether or not they were particularly breaking down those issues with regard to sales data and the like, no, I have not done that type of analysis").

***Grunberg*** admits he did not "actually do an analysis which demonstrates that vaporized actually caused or contributed to the rise in underage use three years later."  Ex. 37, 11/19/21 Grunberg Dep. 117:10-22; *see also id.* at 103:8-20, 104:5-11 ("The type of analysis you're describing, whether econometric or whether or not they were particularly breaking down those issues with regard to sales data and the like, no, I have not done that type of analysis.").

***Cutler*** is not aware of any cross-sectional study that "links on the one hand any JUUL misconduct or any JUUL conduct on the one hand with rise in underage use in 2018 on the other." Ex. 33, Cutler Dep. 119:21-120:15.  He does not "know of any study that says, here is what percentage of the increase youth use was a result of the marketing campaigns, say Vaporized campaign." Ex. 33, Cutler Dep. 96:6-97:5; *id.* at 100:10-101:5 ("No one has done, to my knowledge, a time series analysis . . . .").

***Levy*** admits she "can't cite a study" that shows "the Bradford Hill criteria of causation have been met with the factors that you say are causal contributors in your report for the underage -- rise in underage use."[32]  Ex. 42, 11/9/21 Levy Dep. 259:5-1.

---

[32] As discussed *infra*, Plaintiffs' expert Pratkanis purports to apply the Bradford-Hill criteria in forming his causation opinions but admits he has never used the criteria before to study causation

*Winickoff* admits that he is "not aware of a specific JUUL study" that quantifies the amount of increase caused by JLI conduct.   Ex. 54, Winickoff Dep. 175:8-18.

Underscoring their failure of proof, Plaintiffs' experts employ at least three different tactics to circumvent their inability to demonstrate causation through traditional and generally accepted methodologies.   First, they resort to filling in their analytical gaps with their own say-so.   Second, they declare the use of traditional methodologies "impossible" on  the facts of this case.   Third, subjectively "synthesize" other data and studies unrelated to JLI's conduct.   None of these efforts is successful in evading the bite of Rule 702's reliability requirements.

### 1.    The Assertion That "It's Obvious" Is *Ipse Dixit.*

Plaintiffs' experts' primary response to the lack of scientific data is *ipse dixit.*   Effectively, they turns decades of *Daubert* jurisprudence on its head by contending that the causal question simply did not need to be tested because causation of the 2018 rise in underage use is obvious.   For example:

- *Woolley* "would say that it wasn't necessary for me to do any kind of measurement of whether it led to support … basically, like I said earlier, *you know it when you see it*, and this is the type of content that leads to that kind of change."   Ex. 56, Woolley Dep. 107:19-108:5 (emphasis added).

- *Halpern-Felsher* bluntly declares that JLI's "role in causing a Youth Epidemic is indisputable" while failing to show any reliable way she reached that conclusion.   Ex. 10, Halpern-Felsher Rep. 164.

- *Jackler* opines that JLI's marketing strategies, including the Vaporized campaign "undoubtedly sustained the craze and furthered JUUL's ability to attain a fevered pitch" and observes that "[w]e know that by the end of 2018 there was a viral uptake of JUUL amongst American teenagers," but explains there is no reason to study empirically the reason *why* this occurred because "we know the answer of the research project."   Ex. 11, Jackler Rep. 387; Ex. 40, Jackler Dep. 193:24-194:9.

- *Proctor* is unable to cite any empirical evidence in support of his causation opinion and simply proclaims it is "pretty clear who created the JUUL epidemic and that marketing was key to that."   Ex. 49, Proctor Dep. 82:16-23.   Pressed on what causal analysis he performed to reach that opinion, Proctor, again, could only provide the conclusory opinion that it is "obvious" to him: "It's pretty clear that the marketing led to the epidemic . . . I think it's

in these circumstances, is not aware of anyone else who has, and that he has never published any peer-reviewed work using this methodology before.

pretty obvious there's a causal connection.  I don't see how there couldn't be."  *Id.* at 83:9-19.

- ***Levy*** opines that JLI's marketing was "understood to be a cause of the youth JUUL epidemic."  Ex. 13, Levy Rep. 33, 46; *see also id.* 12, 35, 49 ("In my opinion, the increase in child and adolescent nicotine addiction . . . has been drive almost exclusively by JUUL . . . .").

- ***Prochaska*** makes the analytical leap that correlation equals causation without performing any work to bridge that gap.  When pressed repeatedly for a scientific study showing that JLI's conduct caused underage e-cigarette use, Prochaska could only cite the statement of former FDA Commissioner Scott Gottlieb, whom she has "confidence" in, and her belief that the "FDA's got a ton of data" and they "know what's going on."  Ex. 47, 10/28/21 Prochaska Dep. at 307:5-309:10.

### 2.     The Assertion That It Is "Impossible" To Prove Causation Concedes Plaintiffs' Failure To Meet Their Burden, And Is Unsupported.

Plaintiffs' experts also contend that the question of causation simply cannot be researched or studied.  But this answer concedes that Plaintiffs cannot meet their burden.  This assertion is insufficient under *Daubert* and has been shown to be unsupportable.  Available methods have been used for precisely this purpose.  Ex. 88, Orszag Rep. at 13.

***Jackler*** admits he made no effort to empirically study the cause of youth use of JUUL products and could not identify a single empirical study doing so because he deems the task "impossible."  Ex. 40, Jackler Dep. 199:2-200:13; *see also id.* at 206:22-208:10 (testifying that an empirical study examining the cause of the rise in underage use of JUUL products "may well be impossible")*.*  When pressed for empirical evidence that JLI's conduct caused the rise in underage use in 2018, Jackler repeatedly declared the reasons for underage use too complex to study scientifically, and went further to assert that the mere fact that the rise in underage youth occurred proves his opinion is correct.[33]   "But this, by itself, shows correlation, not causation."'  *Liaw v.*

---

[33] *Id.* at 202:12-204:18 (testifying that "teens are very influenced by other teens" and he "would argue" that JLI's marketing and social media conduct "seed[ed]" that behavior); *id.* at 208:22-210:13 (opining that empirical methods could not be employed "because it's a complex human behavior that leads to a viral uptake of a product" but the "reality is we know the results, right?"); *id.* at 210:14-211:18 (reiterating that youth uptake involves a "complex, behavioral choice" which makes empirical study impossible but he is "confident that JUUL's marketing and its use of social media channels and other factors were a principal driver of the youth use of its product"); *id.* at

*United Airlines, Inc.*, 2019 WL 6251204, at *4 (N.D. Cal. Nov. 22, 2019) (excluding causation expert).

**Cutler** claims there are insufficient data and too many confounding variables to perform a "scientifically credible" causation analysis using regularly accepted methods.[34]  But an expert who discards generally accepted methodologies in lieu of another must still demonstrate that his chosen methodology is reliable.  *See In re TMI Litig.*, 193 F.3d 613, 668 (3d Cir. 1999) (affirming exclusion of expert who "discarded standard and generally accepted" methodologies and failed to show methodologies he used were generally accepted or contained sufficient indicia of reliability).  His alternative is to rely on studies of cigarette advertising and the limited and on-causal studies of ENDS advertisements that do not involve JUUL ad content.

**Halpern-Felsher** claims we "can't do a causal study.  You can't ethically do certain manipulations to young people or anybody, [s]o we did not study the role of marketing in influencing—specifically, JUUL ads in influencing their behavior."  Ex. 39, Halpern-Felsher Dep. at 186:6–9; *id.* at 241:21–23.

The impossibility approach also means that Plaintiffs' experts should not testify as to cause.  If the data or science do not exist, then the opinions cannot be presented to the jury.  This is *Daubert* 101.  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("[T]he courtroom is not the

---

216:17-217:13 (testifying it is "very hard to parse" causation but "we know the reality of what occurred" and "social media was a primary driver of it, and that's clear").

[34] Ex. 33, Cutler Dep. 82:18-83:13 ("So, I could not think of any way that I thought was scientifically credible to try and look at what was the impact of prior marketing on youth use up to 2017, youth use after 2017 . . . ."); *id.* at 88:25-90:10 ("[T]he time series here is so short, that that is just not scientifically a feasible thing to do."); *id.* at 91:3-13 (admitting he "could not think of a way" to perform a regression analysis for "when various marketing campaigns were going on, what was the impact on JUUL sales"); *id.* at 100:10-102:12 (testifying econometric analysis was not possible because "there were so many things that were happening" that one "couldn't take account of them all"); *id.* at 398:18-399:5 ("For a time series regression, there are too many theories relative to data points."); *id.* at 402:17-404:9 ("I couldn't think of a way that was both possible to do and for which the data existed that I could do it."); *id.* at 137:11-138:7; *see also id.* at 399:6-24 (testifying that in his opinion it is not possible to perform a cross-sectional analysis to identify any cause of the rise in youth e-cigarette use).

place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it. Law lags science.").

In any event, while Plaintiffs' experts neither tested nor examine empirical data on the effect of Vaporized on underage use, JLI's expert *did*.  Peter Rossi, Ph.D., a professor of Marketing, Statistics and Economics at the Anderson School of Management at UCLA, examined real world market date (Nielsen retail scanner data) to test the hypothesis that the Vaporized campaign targeted and materially impacted youth.  Ex. 89, Rossi Rep. ¶¶ 9, 32.  This scientific examination showed that JUUL sales did not substantially increase during the Vaporized time-period, *id.* ¶ 32, and the data and standard statistical tests reflect that growth in JUUL sales was at least partially driven by improved distribution and the number of retailers carrying JUUL product, *id.* ¶¶ 33, 59.  In fact, the Nielsen retail scanner data showed demand for JUUL was ***greater among adults*** than youth and concludes that JUUL demand is not driven by underage users.  *Id.* ¶¶ 37-38, 42.  Plaintiffs' experts' failure to conduct their own empirical work, and their failure to address the extant data that is contrary to their assumptions, also requires exclusion.

> ### 3. Subjective "Syntheses" Of Cigarette And Non-Causal ENDS Research And Reliance On Company Documents Are Neither Scientific Nor Admissible.

Plaintiffs' experts' subjective syntheses of anecdotal evidence, reflections on one-off studies, or summaries of company documents are not methodologically sound ways to establish causation.  The fact that they are unreliable further confirms that Plaintiffs cannot meet their burden on causation.

*Emery* admits "[n]one of the methodologies that are transparent and verifiable are the methodology that is your synthesis."  Ex. 36, 11/4/21 Emery Dep. 100: 11-14.

*Levy* relies on her own anecdotal experience as proof that JLI is to blame for a rise in underage use of e-cigarettes.  Ex. 13, Levy Rep. 12 ("[A] number of my patients have described how they were attracted to JUUL by images on social media").[35]  These "few anecdotal reports,

---

[35] *Id.* at 33 ("This is commensurate with my clinical experience. Many of my patients would refer to JUUL as 'safe cigarettes' and did not understand my recommendation that they quit."); *id.* at 35 ("Many of my patients told me they started using JUULs to "taste" the flavors."); *id.* at 37 ("Among

1   which do not themselves assess cause and effect . . . do not rise to the level of reliability,

2   methodology or validation required by *Daubert*."  *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380,

3   1385 (N.D. Cal. 1995); *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1254 (11th Cir.

4   2005) (affirming exclusion of expert opinions based on "anecdotal evidence"); *Soldo v. Sandoz

5   Pharms. Corp.*, 244 F. Supp. 2d 434, 542 (W.D. Pa. 2003) ("This Court concludes that plaintiff's

6   experts' reliance on anecdotal case reports to support their causation opinions is contrary to both

7   good scientific practice and the *Daubert* case law.").   When pressed for scientific evidence

8   establishing a causal connection between JLI's conduct and underage use, Levy could only fall back

9   on "the history of combustible cigarette[]" advertising and a simple temporal correlation of JLI's

10  challenged marketing activities taking place before "enormous youth uptake."  Ex. 42, 11/9/21 Levy

11  Dep. 248:4-249:19; *id.* at 249:20-250:19 ("I don't need to say it again about what we know about

12  tobacco advertising.  So that is where my conclusion comes from.").

13       ***Winickoff*** has done no empirical research on these issues, and instead simply summarizes

14  the factual record, points to testimony of one witness at launch, the fact that youth use of JUUL

15  rose, and declares that JLI's conduct caused youth initiation of e-cigarette use.  Winickoff claims

16  that ***historical*** evidence establishes what science does not.  Ex. 54, 11/5/2021 Winikcoff Dep.

17  176:16-177:6.  Winikcoff's pure *ipse dixit* opinions do not pass muster under *Daubert*.  *Joiner*, 522

18  U.S. at 146; *Westfield*, 2012 WL 1611311, at *6.

19       ***Noar*** relies on reports which also disclaim whether the perceptions of risk had any role in

20  causation of youth using e-cigarettes.  Ex. 16, Noar Rep. at n.128 at 9 (Strombotne et al., *Do JUUL

21  and e-cigarette flavors change risk perceptions of adolescents? Evidence from a national survey*,

22  Tob. Control, 2021 March; 30(2): 199-205, doi:10.1136/tobaccocontrol-2019-055394) ("[b]ecause

23  the data is cross-sectional, we are unable to determine causation: namely, if the reported perceptions

24  directly affect future product uptake or use.").)

25

26

27  ─────────────────────
    the patients in my clinic, JUUL was far and away the most common product mentioned, almost to

28  the exclusion of any other brand.").

**[Brief #1]** JLI's Brief Re Marketing

1    In sum, the subject syntheses, which are unmoored from the research or documents

2    selectively cited should be excluded.  *See* Fed. R. Evid. 702 advisory committee's note to the 2000

3    amendments (considerations include "[w]hether the expert has unjustifiably extrapolated from an

4    accepted premise to an unfounded conclusion").

5                   **4.      Cutler's Incomplete "But-For" and Pratkanis' So-Called "Bradford-**
                 **Hill" Opinions Are Unreliable And Inconsistent With The Relevant**
6                   **Data.**

7    Plaintiffs' experts' results-oriented and conclusion-driven methods do not pass *Daubert*

8    muster, and also require exclusion.

9    ***Cutler*** purports to use three methods to forecast what youth vaping rates would have been

10   "in the absence of JUUL." Ex. 4, Cutler Rep. ¶ 145.  Each of the methods fails.  The first method

11   assumes that the e-cigarette market had reached equilibrium by January 2017 and was not expected

12   to grow or contract in a world where JUUL was not on the market.  Ex. 4, Cutler Rep. ¶ 151-53.

13   This method is fundamentally unreliable for at least three reasons.  For one, Cutler derives his market

14   equilibrium assumption entirely from a quote by a single market analyst at a March 2017 tobacco

15   industry expo commenting that the e-cigarette market was not anticipated to see further growth.  Ex.

16   4, Cutler Rep. ¶ 152 & n.220.  But that market analyst did not predict the market would come to a

17   standstill and in the very same article expressed she was "bullish" on e-cigarettes.  2017 State of the

18   Industry at 2 (https://tobaccobusiness.com/tpe-2017-state-industry-vape-tobacco/ 1/2).  Indeed, just

19   two months earlier, the very same market analyst forecasted the vaping industry sales to more than

20   double in size between 2017 and 2020.[36]  Thus, the core assumption is not only unsupported by the

21   single source he cites but directly contradicted by it.

22   Cutler's second method employs a regression analysis based on a 2016 youth use survey that

23   seeks to predict propensity to vape in a "but-for" world where the relationship between certain

24   demographic information (age, sex, attitudes toward risky behavior) did not change going forward.

25

26   ───────────────────
[36] Diane Caruana, *Positive predictions about the vaping market from TPE 2017* (Jan. 31, 2017),
27   https://www.vapingpost.com/2017/01/31/positive-predictions-about-the-vaping-market-from-tpe-
     2017 ("[S]he still predicts growth for this industry. Herzog forecasts up to $4.4 billion in sales by
28   2017, from $4.1 in 2016, and up to **$10 billion by 2020**." (emphasis in original).)

1   Ex. 4, Cutler Rep. ¶¶ 154-158; Ex. 88, Orszag Rep. ¶ 70.  Cutler's model yields results predicting

2   "essentially no change in youth vaping after 2017" which are "virtually identical" to the results of

3   his first method.  Ex. 4, Cutler Rep. ¶¶ 157-59.  His third method purports to use survey and

4   economic data to forecast "youth demand for e-cigarettes" in a "but-for" world without JUUL and

5   again spits out a predestined result: that in the "but for world" there would have been "essentially

6   no change in youth vaping between 2017 and 2019."  Ex. 4, Cutler Rep. ¶¶ 159-161.

7         Both of these methods are also fundamentally unreliable because the explanatory variables

8   Cutler decides to select in forecasting youth vaping rates—demographics (age, sex, race, parents'

9   education, home living arrangement) and behaviors with respect to risky activities—"show little

10  variation from year to year," even among years with large differences in youth vaping rates.  Ex.

11  88, Orszag Rep. ¶¶ 51, 75-76.  The unreliability of these methods was exposed by JLI's expert,

12  Jonathan Orszag, who performed Cutler's regression analysis twice: once using 2015 survey data

13  on Cutler's selected explanatory variables, and once using 2017 survey data.  Ex. 88, Orszag Rep.

14  ¶ 74.  This analysis predicted very similar youth vaping rates in 2015 and 2017 using Cutler's

15  method, *id*. at 82-89, but, in reality, youth vaping rates in 2015 and 2017 differed dramatically.  In

16  other words, a test replicating Cutler's method demonstrates that it predicted no change in youth

17  vaping rates in years where there were, in fact, large changes in youth vaping rates.  A model that

18  produces predictions that are contradicted by real world data is inherently unreliable and should be

19  excluded.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 501

20  (S.D.N.Y. 2018) (excluding expert whose "nonsensical results produced by these criteria when it

21  was applied to actual LIBOR submission"); *Crescenta Valley Water Dist. v. Exxon Mobile Corp.*,

22  2013 WL 12116333, at *1 (C.D. Cal. Jan. 8, 2013) ("In its role as gatekeeper, the Court must exclude

23  Dr. Wheatcraft's testimony" based in part on "the inability of Dr. Wheatcraft's model to replicate

24  real-world data").

25        Cutler's only means of linking his takeaway from his calculations—that "it is clearly JUUL

26  that is the driving force to the increase in youth vaping rates"—to JLI's conduct is his *ipse dixit*

27  declaration that his findings are "consistent with data on JUUL's product and marketing strategies."

28  *Id.* ¶ 162.  With respect to his second and third methods, ***Cutler admits that his analysis can only***

1   ***tell him that the explanatory variables he assessed do not explain the rise in underage e-cigarette***

2   ***use, not that it was caused by any of JLI's conduct.***  Ex. 33, Cutler Dep. 201:17-203:1.  ***In other***

3   ***words, while he has purported to rule out a limited set of variables, he is unable to "rule in" any***

4   ***cause of the rise in youth use of e-cigarettes, including JLI's actions.***[37]  *Id.* at 398:9-17.

5   Ultimately, Cutler admits that his inability to apply standard econometric techniques is due

6   to the occurrence of "so many things" during the relevant time period.  Ex. 33, Cutler Dep. 91:3-13,

7   100:10-102:12.  That is, there were numerous variables at play that could have impacted youth

8   vaping rates, and Cutler did not reliably account for those variables using standard econometric

9   techniques.  One obvious alternative cause Cutler recognizes but admittedly failed to examine is the

10   interplay between the rise in adult e-cigarette use and a parallel rise in underage e-cigarette use.[38]

11   Cutler agrees these trends mirror one another but testified he made no effort to examine whether

12   "the one is causal to the other."  Ex. 33, Cutler Dep. 79:3-16.[39]

13   ***Pratkanis*** purports to use the Bradford-Hill criteria[40] to arrive at his conclusion that "JLI

14   caused a youth nicotine epidemic."  Ex. 17, Pratkanis Rep. 66-69.  But Pratkanis has never before

15   performed any peer-reviewed work utilizing the Bradford-Hill criteria and is not aware of anyone

16   else who has applied these "criteria to understanding or attempting to understand the causes of youth

17   vaping of e-cigarettes."  Ex. 46, 11/8/21 Pratkanis Dep. 40:25-41:25.  Indeed, he says the idea of

---

[37] Cutler's calculations about JLI's share of underage users and the amount of JLI's overall sales attributable to underage users are similarly detached from any conduct in this case.  *See* Ex. 4, Cutler Rep. ¶¶ 35, 95 & Ex. 15.

[38] Youth may have been interested in it for a host of reasons unrelated to any alleged misconduct by JLI, including simple curiosity or peer influence.  Ex. 85, Arnett Rep. 36-42; Ex. 90, Steinberg Rep. 12-18.

[39] *See also id.* at 143:17-144:10 ("I never present a regression saying to what extent -- you know, what -- how much of the increase in youth vaping can I explain with adult vaping."); *id.* at 145:25-146:15 ("No, I do not draw anything between adult JUUL vaping and youth JUUL vaping.").

[40] The Bradford-Hill criteria is a nine-factor test used by epidemiologists to study causal relationships, typically related to disease or illness.  *See* Austin Bradford Hill, "The Environment and Disease: Association or Causation?", *Proceedings of the Royal Society of Medicine*, 58 (1965), 295-300.

1  using this methodology to study the cause of underage e-cigarette use is "original" to him and that

2  he "discover[ed]" it.  *Id.*  His attempt does not withstand scrutiny.

3      Rather than using empirical methods, he merely remarks on the correlation of events over

4  time and makes no effort to show, through the application of scientific methods, that there is a causal

5  link to JLI's alleged conduct.  *E.g.*, Ex. 17, Pratkanis Rep. 68 (observing that "JUUL marketing

6  began just before the youth nicotine epidemic started and JUUL's sales data map onto the rise in the

7  use of nicotine by youth"); *id.* (observing that JLI's "decline in sales" correlated with removal of

8  social media accounts and suspension of certain flavors).  This observation of correlation does not

9  provide the Court with "sufficient indicia of reliability" required to satisfy Rule 702, particularly

10 given the use of this methodology in uncharted waters.  *Metabolife Int'l, Inc.*, 264 F.3d at 840.

11     Pratkanis' causation analysis is also unreliable because it is premised on assumptions that

12 are either unjustified or incorrect.  This is ground for exclusion.  *Buscaglia v. United States*, 25 F.3d

13 530, 533 (7th Cir. 1994) (holding expert testimony is inadmissible where it is "based upon

14 speculation, unsupported assumptions, or conclusory allegations"); *Whitney Nat'l Bank v. Air

15 Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 817 (S.D. Tex. 2007) ("Incorrect

16 assumptions critical to an expert's opinion make that opinion unreliable.").

17     For example, Pratkanis makes the analytical leap that JLI's rising sales were evidence of its

18 effect on underage youth.  Ex. 17, Pratkanis Rep. 68-69.  But he offers no basis to use JLI's sales as

19 a proxy for how JLI's marketing was perceived by or impacted youth.  Ex. 86, Hanssens Rep.

20 ¶¶ 121-22 ("[T]his framework alone cannot be used to explain how advertising affects product

21 adoption and diffusion.  That is, this framework does not indicate the contribution that advertising

22 in a specific situation will have on the diffusion (and sales) of a specific product.").  He similarly

23 makes the unfounded assumption that JLI's marketing was "consistent" from 2015 to 2019—an

24 assumption that is untethered to any research or basic facts and belied by even a quick glance at the

25 range of marketing campaigns JLI ran, as readily acknowledged by Plaintiffs' other experts.

26 *Compare* Ex. 17, Pratkanis Rep. 67 *with* Ex. 3, Chandler Rep. 33 (branding in 2016 and 2017

27 "moved to campaigns that focused on the devices themselves") *and* Ex. 11, Jackler Rep. 111 ("In

28

contrast to its earlier advertising campaigns, the Switch campaign used mature adult models, made clear that they were smokers, and kept its central message on switching.").

Pratkanis also does not account for the existence of a sharp rise in youth use of e-cigarettes in the years before the JUUL product was brought to market.  He admits that it is "critical" to his opinion that JLI's marketing "started before . . . the youth vaping epidemic," but had no answer to evidence showing that a "youth vaping epidemic"—as defined by Plaintiffs' own experts—existed before any of JLI's challenged conduct.  Ex. 46, 11/8/21 Pratkanis Dep. 43:7-18; 43:24-44:6, 110:7-24; 47:12-49:19; Ex. 17, Pratkanis Rep. 68.  Pratkanis simply explained this inconvenient empirical evidence away as a "mini" or "minor" epidemic—something he admitted was not a scientific term of art.  Ex. 46, 11/8/21 Pratkanis Dep. 115:22-116:23.

Pratkanis also fails to address alternative causes in any serious way, despite recognizing it is necessary to assess whether other explanations may be at play before making an assessment of causation, as required under any valid Bradford-Hill analysis.  Ex. 17, Pratkanis Rep. 67.  But the supposed analysis he undertakes to address alternative causal factors is cursory and unscientific. Pratkanis purports to rule out "the two strongest competing explanations" for youth vaping which are nothing more than hypotheses he "[came] up with."  *Id.*; Ex. 46, 11/8/21 Pratkanis Dep. 56:15-58:13.  The first alternative is that "it just happened"—meaning, in effect, any explanation for youths using JUUL other than it being caused by the Vaporized campaign.  Ex. 17, Pratkanis Rep. 102. Pratkanis dismisses that anything else could be involved because he submits without citation to any authority that "[t]he leading contender for the 'somehow' [alternative] is that youth inadvertently saw JUUL marketing communications designed for adult smokers such as in social media or at a retail store" which led to youths trying the product.  Pratkanis concludes this is "impossible" because "JUUL's marketing communications were not designed to target adult smokers, but to target youth." *Id.*  This conclusory and circular reasoning fails to account for any of the non-marketing avenues of product information that consumers receive and consider,[41] continues to offer no information about actual youth ad exposure or perceptions, and fails to account for other obvious explanations such as

---

[41] *See generally* Ex. 86, Hanssens Rep. Sections VI.C, D.

youth use increasing in parallel with adult use due to increased exposure as a result of increased adult use.  Pratkanis' second "alternative" hypothesis—that JUUL's competitors' marketing is to blame—is also without sufficient scientific basis.  He summarily concludes that JLI's marketing, rather than anything related to its competitors, must be the cause of youth use because JUUL eventually became more popular, and competitors' products were less popular. Ex. 17, Pratkanis Rep. 104-108.  This circular logic lacking any empirical analysis does not satisfy an expert's obligation to examine and eliminate plausible alternatives.

### 5. Plaintiffs' Experts Fail To Consider Or Address Alternative Causes Of The Rise In Underage Use.

Plaintiffs' experts' conclusions are further undercut by other causes that they neither considered nor addressed.  The absence of this methodological step also requires exclusion.

- *Grunberg* did not consider and analyze the extent to which other e-cigarette manufacturers earlier contributed to the rise in youth vaping.  This is so notwithstanding the fact that he testified during his deposition that (1) prior to 2015, the number of youth using e-cigarettes increased by a "very large number"; (2) from 2015 to 2016, when JUUL launched, the number of youth using e-cigarettes remained relatively flat; (3) and that JLI's market share did not meaningfully increase until 2017.  *See* Ex. 37, Grunberg Dep. 100:23-101:6, 216:16-18, 221:12-1524.

- *Halpern-Felsher's* causation opinion is also unreliable because, like Plaintiffs' other experts, she does not attempt to eliminate other causes of the rise in underage vaping, which she admits "had increased before JUUL's launch." Ex. 10, Halpern-Felsher Rep. 169.

- *Proctor* also fails to account for alternative causes.  He admits that youth initiate e-cigarette use based on a variety of factors, but that he did not make any attempt to "disaggregate those factors" to specifically measure or isolate what effect JLI's marketing, if any, plays.  Ex. 49, Proctor Dep. 84:15–85:10.

- *Emery* admits that the only JLI-created marketing that was "attractive to youth was *before* 2017," while the actual sales of JUUL "increase[d] precipitously *after* 2017." Ex. 65, 7/30/21 Emery Dep. 153:2-10; 153:22-154:5; 155:1-7; 155:23-157:20; 159:20-24.  She further admits that by 2016, there was little or no "inappropriate" social media content posted by JLI. Ex. 36, 11/4/21 Emery Dep. 48:8-11; 52:1-10.

An expert who fails to address obvious alternative causes in reaching a causation opinion does not satisfy *Daubert*.  *See Chung v. Washington Interscholastic Activities Ass'n*, 2021 WL 1978698, at *4 (W.D. Wash. May 18, 2021) ("By not engaging with any of the academic literature on factors that affect [the subject data], the Report fails to address 'obvious alternative explanations'

for the data results on which [the expert] bases his findings.  For these reasons, [the offering party] has not met its burden to demonstrate the reliability of the Report."); *see also Daubert II,* 43 F.3d at 1319 (affirming exclusion where expert failed to explain how "he was able to eliminate all other potential causes of birth defects"); *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1037 (N.D. Cal. 1999) (excluding expert opinion because it "departs from accepted scientific principles of interpretation by failing to consider and exclude likely explanations of the data").

> **D.     "Virality" Concepts Confirm Rather Than Fill The Causal Void.**

Plaintiffs ultimately stake their fallback case on "virality"—a popular phrase that Emery defines empirically as the point at which "the rate of increase in the number of posts begins to approximate a quadratic equation."  Ex. 36, 11/4/21 Emery Dep. 69:204.[42]   Emery opines that JUUL-related media reached virality the summer of 2017.  *Id.* at 60:2-3.  Each step of her virality analysis is unreliable and requires exclusion.  *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.,* 858 F.3d 787, 800 (3d Cir. 2017) ("*[A]ny* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*) (original emphasis); *see also Hardeman v. Monsanto Co.,* 997 F.3d 941, 961 (9th Cir. 2021).

> **1.     JLI Neither Created Nor Controlled Third-Party JUUL-Related Social Media Posts Or Content On Which Plaintiffs' Experts Rely.**

Plaintiffs' experts present their viral JUUL phenomenon as an amalgamation of  (i) JLI created and posted content and (ii) user-generated third party content which was neither created nor posted by JLI, but is related to or refers to JUUL.  No expert attempts to or does isolate JLI-created content from the sea of social media created and posted by non-parties.  For example:

**Emery** did not isolate JLI- owned social media content, and concedes in one study, 65% of the over 5,200 users posting about JUUL were "organic users," *i.e.,* third party individuals with no connection to JLI.  *See, e.g.,* Ex. 7, Emery Rep. 58-60; Ex. 36, 11/4/21 Emery Dep. 59:7-11.

---

[42] Only one other Plaintiffs' expert defined "virality"—Woolley broadly defined it as "getting spread."  Ex. 56, Woolley Dep. 118:16-18.

1    **Jackler** collected JLI-owned social media posts from 2015 to 2018[43] in connection with his

2    SRITA database, but conducted no analysis isolated to JLI-owned social media content.  He instead

3    focuses on over half-a million social media posts with JUUL-related hashtags[44] and two third party

4    social media audits of the "entire social population *discussing* Juul."  Ex. 11, Jackler Rep. 149-151;

5    162-169 (emphasis added); 163.

6    **Chandler** focuses on social media posts from non-JLI third parties.  This includes social

7    media content on TikTok which mentions the word "JUUL," all collected after JLI had exited all

8    social media and marketing channels and from a social media platform JLI never used.  *See* Ex. 3,

9    Chandler Rep. 68-74; Ex. 32, 10/21/21 Chandler Dep. 267:5-6.  Chandler attributes this content to

10   JLI because he did not identify instances of JLI "reaching out" to encourage the removal of youthful

11   postings—though Chandler conceded that he had not in fact sought to identify any of JLI's efforts

12   to do exactly that.  Ex. 32, 10/21/21 Chandler Dep. 268:21-269:16; 279:18-23.  Chandler agreed

13   that he had not seen evidence suggesting JLI affirmatively reached out to TikTok.  *Id.* at 267:7-

14   268:10, 274:2-16 (agreeing he had seen no evidence that JLI ever worked with or paid or provided

15   any product to influencers on TikTok, advertised on the app, or interacted with any of the content).

16   And notably, he also agreed that JLI's own marketing content never even *resembled* the type of

17   content Chandler was citing from TikTok, and that he had not seen any content on TikTok that

18   included JUUL marketing content.  Ex. 32, 10/21/21 Chandler Dep. 270:2-5, 273:21-25.

19   ─────────────────────────

20   [43] Jackler's Report acknowledges that JLI-controlled social media was modest—JLI tweeted a total
     of 2,691 times, posted 248 times on Facebook, and created 187 Instagram posts.  Ex. 11, Jackler

21   Rep. 142.

22   [44] Jackler relies upon two research studies he conducted prior to this litigation.  Jackler conducted
     one study in mid-July 2019, after JLI had exited Instagram and Facebook and halted promotional

23   marketing on Twitter.  Using a social media real time tracker called Keyhole, Jackler identified a
     set of 7,442 posts to #juul with 706,267 likes and comments across Instagram, Facebook and Twitter

24   over a seven-day period.  Ex. 11, Jackler Report 163.  According to Jackler's study, the number of
     community (*i.e.*, third party) posts with the #juul hashtag increased.  *Id.* at 166.  His finding, that

25   JUUL-related hashtags were used more frequently following JLI's exit from Facebook and
     Instagram, raise serious questions concerning the alleged relationship between JLI's owned social

26   media content and third party content.  Jackler doesn't address this apparent inconsistency.  *Id.*

27   Jackler's second study entailed a content analysis of 526 posts with the #juul hashtag and 116 posts

28   tagged @juulvapor.  Ex. 11, Jackler Rep. 164.

1    *Woolley* also relies heavily upon third-party content, *see* Ex. 29, Woolley Rep. 35, 45-48,

2    which he does not claim were "caused" by JLI.  Ex. 56, Woolley Dep. 339:17-18 ("I'm not saying

3    that JUUL caused this post"); *id.* at 340:16-17 ("I'm not saying that [JUUL] caused this post.").

4    Furthermore, according to Woolley, "it wasn't necessary" for him "to do any kind measurement of

5    whether [JLI's social media strategies]" actually led to third party posts because he had studied other

6    social media campaigns and "you know it when you see it," and "this is the type of content that

7    leads to that kind of change."  Ex. 56, Woolley Dep. 107:19-108:5.

8        *Drumwright* likewise assesses all "JUUL-related content," rather than content posted by JLI

9    itself.  *See, e.g.*, Ex. 5, Drumwright Rep. 100 (discussing analysis of "posts … that reference

10   JUUL"); 102 ("JUUL-related" posts by individuals); Ex. 34, Drumwright Dep. 233:3-18

11   (acknowledging that she did not study or isolate the percentage of third-party content that was

12   associated with JLI's alleged improper conduct).[45]

13       Opinions that artificially collapse all JUUL-related content (as opposed to JLI-generated and

14   -approved and -posted content) cannot be squared with the Court's recognition that JLI is not

15   "vicariously liable" for "the unfair and unlawful conduct of third parties that were promoting and

16   selling its products to minors."  *Colgate*, 402 F. Supp. 3d at 760.

17           **2.       There Is No Reliable Evidence That Vaporized Or Any Other JLI-**
              **Conduct Caused A JUUL Viral Phenomenon.**

18

19       The experts' attempt to tie JLI conduct to non-JLI created posts and JUUL-related virality

20   by alleging that JLI "sow[ed] the seeds."  *See, e.g.*, Ex. 36, 11/4/21 Emery Dep. 50:10-12.  But that

21   unsupported "analytical gap" cannot satisfy *Daubert*.  *Joiner*, 522 U.S. at 146.

22

23

      ─────────────────────

24   [45] In addition, Drumwright did not conduct a comprehensive content analysis of JLI's social media
     content to determine whether it was in fact youth-appealing, *id.* at 180:25-181:11, and did not study

25   youth perception of any social media content.  Ex 34, Drumwright Dep. 205:19-23.  At the end of
     the day, Drumwright's social media-related opinions involve cherry-picking record documents,

26   characterizing them, and adding her personal views and speculation.  *See, e.g.*, *id.* at 327:13-23
     (highlighting seeding product to Leonardo DiCaprio as "the sort of thing" JLI "shouldn't be doing"

27   even though he was a well-known smoker in his 40s since he is a "glamour person for young adults
     and youth" that she believes looks young).

28

*First*, the experts do not connect early JLI marketing conduct, including the five-month Vaporized campaign, to the social media growth.

*Pratkanis* admitted that Vaporized itself was viewed by only a "tiny fraction" of consumers. Ex. 72, 7/15/21 Pratkanis Dep. 361:24-362:10.

*Cutler* "could not think of any way that I thought was scientifically credible to try and look at what was the impact of prior marketing" on social media.  Ex. 33, Cutler Dep. 82:18-83:13.  And neither Cutler nor anyone else explains the lag between the end of the Vaporized campaign in 2015 and the rise in e-cigarette use years later.

*Emery* does not conduct a quantitative analysis linking JLI's early marketing activities to later viral JUUL-related discussion because, according to Emery, "such an analysis is not feasible." Ex. 36, 11/4/21 Emery Dep. 132: 9-16.  She admits the "research doesn't exist" to determine "the impact of the Vaporized campaign specifically ***on anything***."  *Id.* at 186:7-25.  And Emery's seeding theory fails as well.  She did not conduct independent research confirming her causation opinion and no single study she relied upon established causation between JLI's conduct and virality of JUUL-related content.  Indeed, Emery admits "it is true that there is no single article that establishes causation" and that such a study is "not possible."  *Id.* at 108:2-7.  Instead, while she claims to "synthesize" literature to support her opinion, in reality, she merely applies her personal, subjective views, rather than a transparent or verifiable methodology.  *Id.* at 100:11-14; 100:21-101:3*; id*. at 93:20-94:94 ("I studied what happened.  And it's consistent with what JUUL stated they intended to do, what they did, the results they hoped for.").

Emery agreed that "none of the methodologies that are transparent and verifiable are the methodology that is your synthesis" and that her synthesis is "simply a judgment" she is making based on her 25 years as a researcher in tobacco communications and marketing.  *Id.* at 100:11-14; 100:21-101:3.  When pressed on how she concluded JLI's conduct caused virality, Emery explained she developed a "logical case" based on the fact that virality occurred and JLI "take[s] credit internally for establishing a viral marketing through their early efforts at seeding."  *Id.* at 91:11-21.

Thus, in essence, Emery "assume[d] a conclusion and 'reverse-engineered a theory' to fit that conclusion"—this type of predetermined analysis is not admissible.  *In re Mirena IUD*

*Levonorgestel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) (quotation omitted); *see also In re Zoloft (Seratraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d at 796-800 (affirming exclusion of "conclusion-driven" analysis).

**Second**, the experts offer no acceptable methodology or reliable evidence to show that *any JLI marketing or misconduct at any time* caused viral JUUL-related content.

**Jackler** does not do anything scientific to establish that JLI's own marketing led to viral discussion of the product online.  Ex. 11, Jackler Rep. 386 (stating that "[t]he ultimate metric of success of efforts to spur viral marketing is creation of a fad - an intense and widely shared enthusiasm for the company's product" without confirming that JLI's actions in fact spurred the virality he observes).  His mere say-so is not enough.

**Woolley** also admits he "didn't measure whether any of these social media strategies by JUUL actually led to increase in support."  Ex. 56, Woolley Dep. 107:15-108:10; *id*. at 122:9-123:23 (admitting that his conclusion that content was spread or generated by youth was not based on any comprehensive or quantitative content analysis, but was instead premised on his personal review of selected images, social media accounts, and case documents).  According to Woolley, "it wasn't necessary" for him "to do any kind measurement of whether [JLI's social media strategies]" actually led to third party posts because he had studied other social media campaigns and "you know it when you see it," and "this is the type of content that leads to that kind of change."  *Id.* at 107:19-108:5.  As discussed above, "I know it when see it" is not a reliable methodology.

**Chandler** tries to hold JLI responsible for all Tweets that ever mentioned the word "JUUL" by comparing the total number of Tweets using that word to the number of Tweets mentioning other e-cigarette brands to unilaterally conclude JLI "caused" "vape-related discourse on Twitter."  Ex. 3, Chandler Rep. 76-80.[46]  But this unsupported surmise is insufficient.

---

[46] Chandler's methodology is also unreliable and doesn't fit the facts of the case because he only looks at Twitter data beginning in 2017—thus he isn't addressing the full scope of the relevant time period, and, in particular, doesn't look at any of JLI's early social media activity, including social media activity associated with the Vaporized campaign, which is at the heart of Plaintiffs' case.

### 3.    There Is No Reliable Evidence That Virality, In Turn, Caused The 2018 Rise In Underage Use.

Finally, the virality causation theory fails because there is simply no reliable evidence that viral JUUL-related social media activity (regardless of the cause of the virality) *actually caused underage use.*

***Jackler*** is not aware of any such empirical evidence showing "the rise of social media regarding JUUL . . . caused the rise in underage use in 2018."  *Id.* at 217:16-218:5 ("I don't know of a study that specifically.").

***Emery*** admitted that "science has not yet tested" the "relationship between Juul social media on the one hand and purchasing decision by underage people of the Juul product on the other."  Ex. 65, 7/30/21 Emery Dep. 67:16-18.  Emery admittedly does not rule out, for instance, that the increase in sales and product use caused the increase in posts, instead of the other way around.  *Id.* at 211:11-212:15; *id.* at 213:13-17; *see also* Ex. 36, 11/4/21 Emery Dep. 126:3-131:15 ("I did not measure the amount of all the different types of marketing that goes into a comprehensive marketing campaign. I measured the result on social media."); *see also* Ex. 36, 11/4/21 Emery Dep. 125:13-20 (admitting she did not gather any empirical data on impact of point-of-sale advertising).

## III.   THE COURT SHOULD EXCLUDE SPECIFIC CAUSATION OPINIONS REGARDING THE IMPACT OF JUUL MARKETING AND DESIGN ON B.B.'S USE OF JUUL AND OTHER NICOTINE PRODUCTS.

Casey, Grunberg, Levy, Prochaska and Winickoff each opine that JLI's conduct caused B.B.'s to use JUUL or other nicotine products.  Ex. 2, Casey B.B. Rep. 9; Ex. 9, Grunberg B.B. Rep. 3; Ex. 14, Levy B.B. Rep. 9-11; Ex. 19, Prochaska B.B. Rep. 12; Ex. 28, Winickoff B.B. Rep. 17. JLI incorporates its arguments made in JLI's *Daubert* Motions with respect to these experts' general reports: namely, these experts' opinions on JLI's alleged conduct fall outside their expertise, offer improper opinions on corporate knowledge and intent, and/or are not based on reliable methodologies.

These experts' specific opinions with respect to B.B. should be excluded for additional reasons.  *First,* the bases for certain of their opinions are entirely inconsistent with the record testimony from B.B. herself, making the opinions fundamentally unreliable.  As the Supreme Court

observed, "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or ***when indisputable record facts contradict or otherwise render the opinion unreasonable***, it cannot support a jury's verdict."   *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993) (emphasis added).   Courts thus routinely exclude expert opinion when that opinion is predicated on factual premises that are contradicted by record evidence. *See, e.g., Dickenson v. Cardiac & Thoracic Surgery of E. Tenn. P.C.*, 388 F.3d 976, 982 (6th Cir. 2004) (upholding exclusion of expert based on "lack of [factual] support for Johnson's opinion and the contrary evidence found in the affidavits of the local physicians"); *Borges v. Serrano-Isern*, 605 F.3d 1, 8 (1st Cir. 2010) (excluding expert's opinion when it was premised on assumption that "the fetal heart rate was low," but "the evidence belies the assumption of a persistently low fetal heart rate").   Several experts base their opinions that JLI's conduct caused B.B.'s alleged injuries on B.B.'s alleged exposure to JUUL packaging and advertising prior to her first use:

- "Before trying JUUL, [B.B.] had been exposed to JUUL packaging and advertising at convenience stores in and around her town."  Ex. 9, Grunberg B.B. Rep. 1.

- "[B.B.] observed JUUL advertising in her town, which made the product appear safe."  Ex. 19, Prochaska B.B. Rep. 12.

- "[B.B.'s] first exposure to JUUL was seeing JUUL product packaging on counters near the cash registers in convenience stores she frequented in her community.  She also saw JUUL advertisements that were pervasive in these stores."  Ex. 28, Winickoff B.B. Rep. 1.

The experts then opine that B.B.'s alleged injuries were caused by JLI's conduct in promoting and packaging the product.  *See, e.g.*, Ex. 19, Prochaska B.B. Rep. 13.  But B.B. "never really paid attention to the warnings."  Ex. 57, B.B. Dep. 119:2–120:1.  And while she testified that she had seen JUUL advertisements in gas stations around her home prior to her use of JUUL products, she "never paid any attention to" them.  *Id.* at 117:9–15.  She also "didn't pay any attention" to the warnings on those advertisements.  *Id.* at 118:2–120:1.  Nor has she identified the advertisements that she saw.  Although B.B. produced 94 advertisements, B.B. admits that these ads are not necessarily the ones she saw.  *Id.* 115:25–116:2.  Because these experts' opinions based on B.B.'s alleged observations of JUUL packaging and advertising contradict the record evidence that

1  ***she never paid attention to packaging or advertising prior to her first JUUL use***, they are wholly

2  unreliable and should be excluded.  Ex. 48, 10/29/21 Prochaska Dep. 50:2-13.

3  *Second*, these experts' opinions that JLI's conduct related to JUUL—including its design,

4  marketing, flavoring, promoting, and manufacturing—caused B.B.'s alleged initiation and alleged

5  injuries is based upon no discernable methodology at all, much less one with a reliable scientific

6  basis.  Grunberg, for example, has a one-sentence opinion that is unsupported by any analysis:

7  "[B.B.'s] initiation of JUUL and the harms from using JUUL were the result of Defendants' conduct

8  related to JUUL, including designating, marketing, promoting, manufacturing JUUL products, as

9  set forth fully in my general report."  Ex. 9, Grunberg B.B. Rep. 3.  Prochaska offers a nearly

10  identical one-sentence opinion, also unsupported by any analysis. Ex. 19, Prochaska B.B. Rep. 13.

11  Levy opines, consistent with her general report, that "Defendants' deceptive tactics, youth-appealing

12  device, liquids, marketing, and design, and failures to take reasonable steps to avoid youth appeal

13  and access influenced [B.B.]."  Ex. 14, Levy B.B. Rep. 9.

14  These experts' opinions are conclusory and not "supported by appropriate validation,"

15  *Daubert I*, 509 U.S. at 590; indeed, they are not derived from any reliable principles and methods,

16  but rather based upon "subjective belief [and] unsupported speculation." *Id.* at 590.  Levy admitted

17  that she did not include any discussion of the warnings that B.B. saw, what B.B. thought of them,

18  or the actual content of JLI's marketing in her report. Ex. 43, 11/20/21 Levy Dep. 58:13-23.  She

19  further agreed that initiation of tobacco use is "multi-factorial," but did not evaluate these other

20  factors.  *Id.* at 115:8-24.  Grunberg ignored his own writings in reaching his conclusory opinion

21  linking JLI's alleged conduct to B.B.'s case.  Grunberg authored a 2005 treatise chapter called

22  "Adolescent Tobacco Use," in which he listed psychosocial factors relevant to the initiation of

23  tobacco smoking in adolescence.  Ex. 38, 12/13/21 Grunberg Dep. 568:12-17.  He conceded that

24  nowhere in his report did he discuss how those factors specifically apply to B.B.  *Id.* at 579:23-

25  580:1.  His failure to follow his own methodology employed outside the litigation context renders

26  his opinion unreliable.

27  The Court should exclude the marketing-B.B.-specific opinions because "there is simply too

28  great an analytical gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146.

**IV.    PLAINTIFFS' OPINIONS REGARDING YOUTH PREVENTION LACK FIT AND ARE UNRELIABLE.**

Plaintiffs' experts contend that JLI's youth prevention activities failed to adhere to standards established by the 1998 Tobacco Master Settlement Agreement ("MSA"), and ultimately were "too little, too late."  Ex. 10, Halpern-Felsher Rep. 222; Ex. 11, Jackler Rep. 22; Ex. 5, Drumwright Rep. 105.  Because each of Plaintiffs' experts' opinions on this topic are unhelpful under Rule 702 and pose substantial risk of confusing the issues and misleading the jury, they must be excluded. *Daubert I,* 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").

**A.    Lack Of Fit**

Eleven of Plaintiffs' experts opine about the terms and restrictions in the Master Settlement Agreement ("MSA"), concluding, either directly or indirectly, that JLI was  obliged to follow the terms of the MSA in its youth prevention efforts and that it failed to do so.  Ex. 5, Drumwright Rep. 7, 10, 80-81; Ex. 7, Emery Rep. 19; Ex. 8, Grunberg Rep. 102; Ex. 10, Halpern-Felsher Rep. 63–64; Ex. 11, Jackler Rep. 17, 353; Ex. 12, Kelder Rep. 111–12; Ex. 15, Lindblom Rep. 31–32; Ex. 17, Pratkanis Rep. 6; Ex. 18, Prochaska Rep. 6; Ex. 20, Proctor Rep. 41; Ex. 25, Winickoff Rep. 127.  For instance, Drumwright contends that "one of the ***major regulatory forces*** is the Master Settlement Agreement," Ex. 34, Drumwright Dep. 16:20–21, and "the Master Settlement Agreement ***sets the standards of care*** for any company that is dealing with a product that contains nicotine," (*id.* at 17:10–13) (emphasis added).  Similarly, Halpern-Felsher opines that "JLI was not only aware of [the MSA] but ***should have conformed its conduct*** to the substantive restrictions that are set forth there at the time it launched its product."  Ex. 39, Halpern-Felsher Dep. 146:23–147:3 (emphasis added).  These opinions lack support, both because they are legal conclusions the experts are unqualified to make,[47] and because they are plainly wrong on the law.  Plaintiffs' experts' MSA-based opinions should be excluded in full.

---

[47] *See* JLI's *Daubert* Brief #4.

1    The terms of the MSA do not and never have applied to JLI.  Rather, it is uncontested that

2  the terms of the MSA bind its signatories—approximately fifty participating cigarette

3  manufacturers.[48]  *See, e.g.*, Ex. 5, Drumwright Rep. 80 ("JUUL was not a party to the tobacco Master

4  Settlement Agreement (MSA)."); Ex. 7, Emery Rep. 21 ("[T]he MSA does not mention electronic

5  cigarettes."); Ex. 10, Halpern-Felsher Rep. 15 ("This MSA agreement now extends to over 50

6  cigarette manufacturers."); Ex. 18, Prochaska Rep. 89 ("JLI is not a party to the MSA."); Ex. 20,

7  Proctor Rep. 41 ("Manufacturers of electronic cigarettes … had not signed onto the MSA.").

8  Neither the FDA nor any legislative body has ever extended the terms of the MSA to apply beyond

9  its signatories—either to the tobacco product category generally, or to e-cigarette manufacturers or

10  JLI, specifically.  *See, e.g.*, Ex. 39, Halpern-Felsher Dep. 142:1–11, 148:4–10; Ex. 47, 10/28/2021

11  Prochaska Dep. 65:16–7.  And JLI has never become a signatory to the MSA.  Ex. 39, Halpern-

12  Felsher Dep. 138:22–139:2.  As a result, JLI has never been legally bound by the terms of the MSA,

13  nor could JLI in turn violate the terms of the MSA.  Ex. 5, Drumwright Rep. 80 (acknowledging

14  that "JUUL … ***was not bound by*** [the MSA] in a strictly legal or technical sense.") (emphasis

15  added); Ex. 11, Jackler Rep. 374–75 ("JUUL also had relevant marketing guidelines available to it

16  from the MSA governing advertising tobacco products that it could have followed in advertising

17  JUUL, ***although not required***.") (emphasis added); Ex. 25, Winickoff Rep. 127 ("JLI was not and

18  obviously still is not a party to, ***or subject to***, the MSA.") (emphasis added).

19    Moreover, the TCA itself confirmed that the MSA does not govern or bind JLI or JUUL

20  products as a matter of statutory law.  The TCA gives the FDA broad authority to adopt marketing

21  restrictions and labeling requirements.  21 U.S.C. §§ 387f(d)(1)-(d)(4).  As part of the premarket

22  tobacco product application process, the FDA is supposed to exercise that authority by closing

23  scrutinizing an applicant's proposed labeling and marketing plans.  21 C.F.R. § 1114.7(f); 86 Fed.

24  Reg. 55,300, 55,323-30 (Oct. 5, 2021); 84 Fed. Reg. 50,566, 50,581 (Sept. 29, 2019).  None of these

25

26

27  [48] *See generally* National Association of Attorneys General Participating Manufacturers List

28  (available at https://tinyurl.com/4ydfteyf) (last accessed Dec. 16, 2021).

statutory and regulatory provisions mention—much less expressly incorporate—the terms of the MSA.

In light of these limitations, Plaintiffs' experts' opinions that benchmark JLI's conduct against the MSA are not helpful in answering any question at issue in the case, are bound to mislead and confuse the jury, and must be excluded. *See Aegis Therapies, Inc.*, 2015 WL 1541491, at *8 (excluding expert testimony reached "[b]y repeatedly using a standard—either in its regulatory sense or in its ordinary sense—that [was] decidedly at odds with the actual governing standard" because such "analysis and conclusions rest upon repeated and erroneous evaluations of Defendants' [conduct]").

## B.       Lack Of Expertise And Unreliable Methods

Halpern-Felsher, Drumwright, Jackler and Ribisl also purport to opine, uniformly, that JLI's youth prevention activities were "too little, too late."  Ex. 10, Halpern-Felsher Rep. 222; Ex. 11, Jackler Re. 22; Ex. 5, Drumwright Rep. 105.  However, Halpern-Felsher, Drumwright and Jackler have no experience or training in assessing youth prevention programs for age-gated products, and none of these four experts applied any methodology whatsoever to assessing JLI's youth prevention activities.  Accordingly, these opinions should also be excluded.  *See United States v. Chang*, 207 F.3d 1169, 1172-74 (9th Cir. 2000)).

Here, Drumwright, Halpern-Felsher, and Jackler do not draw from any specialized "knowledge, skill, experience, training, or education" in the assessment of youth-prevention programs for age-gated products in drawing their uniform conclusion that JLI's activities were "too little, too late."  Drumwright, an advertising professor, acknowledged that a "comprehensive study of all of JUUL's youth prevention efforts over time" was "not [her] specialty," that she's never implemented a youth prevention program for an age-restricted product, that she does not "assert that … age prevention programs are a part of [her] expertise," and that she is not an expert in online age verification systems (nor does she know what JLI's age verification systems were at launch).  Ex. 34, Drumwright Dep. 216:1–5; 220:18–23, 211:13-213:1.  Nonetheless, Drumwright opines, among other critiques, that JLI's age-verification system did not provide "sufficient protections" because "they were not increased."  *Id*. at 211:13-213:1.  Similarly, Halpern-Felsher, a developmental

psychology professor, has never been employed by a company that sells age-gated products, nor has she ever been retained "to advise on how to reduce … access by minors to [a company's] commercial products." Ex. 39, Halpher-Felsher Dep. 65:15–17, 66:1–4.  Notably, though she opines that JLI's age-verification systems were "problematic" because JLI did not "us[e] all age verification processes offered by its age verification provider," Ex. 10, Halpern-Felsher Rep. 110, 112, Halpern-Felsher, like Drumwright, claims no expertise in the construction and operation of age verification systems online and has not published any research in that area.  Ex. 39, Halpern-Felsher Dep. 66:14–20; 68:16–19; 69:12–25.  For his part, Jackler is a medical doctor and a professor of surgery—not a youth prevention expert.  Ex. 11, Jackler Rep. Ex. A 1-2.  The lack of relevant expertise in the assessment of youth-prevention programs for age-gated products, alone, requires exclusion.  *See Chang*, 207 F.3d at 1173.

These opinions should also be excluded for the independent reason that they are not the product of any reliable methodology, or any methodology at all.  *See Metabolife Int'l, Inc.*, 264 F.3d at 840.  Halpern-Felsher, Drumwright, and Jackler all fail to identify any objective measure or criteria under which JLI's youth prevention activity could reliably be assessed (beyond misapplying the terms of the MSA, as explained above).  None of these experts identifies whether any of the allegedly late or lacking youth prevention activities were required by the FDA, or otherwise a standard in the industry.  *E.g.*, Ex. 39, Halpern-Felsher Dep. 120:4-10 ("Q. … [H]ave you looked at whether any other e-cigarette companies had undertaken any of these actions at this point in time, other than JLI?  A. I have not—was not asked to, nor did I look at what other e-cigarette companies were doing.").  Moreover, none of these experts systematically assessed what all of JLI's youth prevention efforts were.  *See, e.g.*, Ex. 34, Drumwright Dep. 216:21–24, 218:7–10, 220:2–4 (no analysis of JLI's bulk purchase limits, the amount of money JLI committed to youth prevention, or JLI's support for T21 laws; Ex. 39, Halpern-Felsher Dep. 269:18–24 ("Q. Did you ever—in your work in this case, did you ever go look into what the nature of the age-verification process was that was in place at the time JLI launched its online sales of the JUUL product? A. I don't know exactly what they had at the time."); Ex. 11, Jackler Rep. 373–78 (no analysis of JLI's age verification practices for online sales, bulk purchase limits, retailer interventions such as Mystery Shop and

1    RACS, or support for T21).  As a result, these experts were not "in a position to give an opinion [on

2    JLI's conduct] given … that [they] lacked the information … needed to evaluate [JLI's conduct.]"

3    *Seawell v. Brown*, 2010 WL 11561287, at *7 (S.D. Ohio Sept. 9, 2010).

4         Nor did any of these experts conduct an empirical analysis of what youth prevention

5    activities and approaches work, or how any alleged inactivity or delayed youth prevention efforts

6    actually would have impacted youth use.  For instance, when asked whether she concluded whether

7    the steps she suggested JLI should have taken would have been more effective than the steps JLI

8    undertook, Drumwright responded: "Well, I was just giving examples of the kinds of things that I

9    think they could have done."  Ex. 34, Drumwright Dep. 243:13–19.  Drumwright could not explain

10   how any of the suggestions made in her report would actually impact youth use in terms of numbers;

11   rather, her suggestions were based only on her "common sense" that "those would have helped

12   dramatically."  *Id.* at 231:7–13.    And while Drumwright suggests that JLI should have

13   "suspended[ed] sales of all of its products until the youth epidemic was brought under control," Ex.

14   5, Drumwright Rep. 106, she could not explain when JLI should have taken this step, only providing

15   that "earlier is better."  Ex. 34, Drumwright Dep. 226:20-229:4.  Nor could Drumwright quantify

16   how the actions JLI did, in fact, undertake impacted youth use.  *Id.* at 230:24–231:6 ("Q. Do you

17   have any -- did you do any analysis of how any of JUUL's marketing restrictions or other youth

18   prevention efforts impacted youth use? … [D]id you show how anything JUUL did on the youth

19   prevention front impacted youth use of the product? A.  No.  And I'm not an expert in that, so I leave

20   that to others."); *id.* at 234:4–8, 236:5–9 (no analysis of the impact of JLI's withdrawal from social

21   media or cessation of broadcast, print, and digital media).

22         While Ribisl is qualified in certain youth prevention activities and metrics, he similarly

23   concedes that he has "not quantified what effect, if any, modifications on age verification processes"

24   for online purchases or at retail "would have had on underage use of JUUL products" *E.g.*, Ex. 51,

25   10/26/21 Ribisl Dep. 166:20-167:5.  And while Ribisl opines that a 5%-10% failure rate (rate of

26   sales to minors) for an online age verification system is acceptable—neither he nor any other expert

27   investigated what the percentage of online sales to minors and there is no evidence whatsoever that

28   it approached five or ten percent.  *Id.* at 85:9-15.

1    These same flaws also characterize Halpern-Felsher's and Jackler's youth prevention

2    opinions.  *See generally* Ex. 10, Halpern-Felsher Rep. 110–15, 220–83; Ex. 11, Jackler Rep. 373–

3    78.  For example, Halpern-Felsher suggests that JLI's age verification processes, bulk purchase

4    limits, and RACS program were flawed, but never quantifies the impact of any alleged flaw on

5    youth use.  *See generally* Ex. 10, Halpern-Felsher Rep. 110–15.  Similarly, Halpern-Felsher asserts

6    that JLI's early marketing efforts (use of social media and launch parties) were unreasonable, but

7    she never quantifies the scope or duration of these programs, or their impact (if any) on youth vaping

8    rates.  Ex. 39 Halpern-Felsher Dep. 76:22-77:7, 78:23-79:9; Ex. 10, Halpern-Felsher Rep. 223; *see*

9    *also id.* at 220–83 (critiquing Three Pillar Plan, alleged "delayed" support for T21, and education

10   youth prevention program without quantifying the scope of the program or impact of any alleged

11   flaws on youth use).  Likewise, Jackler asserts that JLI should have conducted any number of youth

12   prevention activities—including pre-launch market testing, avoiding certain marketing channels,

13   establishing a "youth surveillance program" and "Social Responsibility Advisory Board,"

14   eliminating flavors, adding various device design elements, and not offering product coupons.  Ex.

15   11, Jackler Rep. 373–78.  But in neither his report nor at his deposition did Jackler provide any

16   empirical analysis of how these activities, or any delay in implementing these activities, impacted

17   youth use.  *Id.*; *see also, e.g.*, Ex. 40, Jackler Dep. 181:21–182:7, 186:9–187:1 (failing to identify

18   any studies showing adolescents thought the JUUL device was more attractive to them than other

19   devices that were on the market); *id.* at 222:12–225:21 (failing to identify any empirical evidence

20   that JUUL product attributes caused youth use).

21   Finally, none of the experts address the technical, feasibility, or fundamental problems of

22   social sourcing or retail compliance.  Nor do they analyze the evolving size and scope of this

23   multifaceted problem.

24   Accordingly, expert opinions that JLI's youth prevention activities were "too little, too late"

25   should be excluded.  *Kumho Tire Co.,* 526 U.S. at 157.

26   **CONCLUSION**

27   For the foregoing reasons, JLI respectfully requests the Court exclude certain Plaintiffs'

28   experts' opinions regarding marketing and youth prevention.

1

2   Dated: December 27, 2021                    Respectfully submitted,

3                                               By: */s/ Renee D. Smith*
                                                Renee D. Smith (*pro hac vice*)
4                                               KIRKLAND & ELLIS LLP
                                                300 N. LaSalle
5                                               Chicago, IL 60654
                                                Telephone: (312) 862-2310
6

7                                               By: */s/ David M. Bernick*
                                                David M. Bernick (*pro hac vice*)
8                                               Peter A. Farrell (*pro hac vice*)
                                                KIRKLAND & ELLIS LLP
9                                               1301 Pennsylvania Ave, N.W.
                                                Washington D.C. 2004
10                                              Telephone: (202) 389-5959

11
                                                *Attorneys for Defendant Juul Labs, Inc.*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.  I also caused a copy of the under-seal documents to be served via electronic mail on all parties.

By: */s/ Renee D. Smith*

Renee D. Smith