# EXHIBIT 45

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No.: 19-md-02913-WHO<br><br>**EXPERT REPORT OF STEVEN B. BOYLES** |

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Respectfully submitted this 20th day of September 2021:

Steven B. Boyles, ASA

- Subsequent Regulatory Payment – Altria would fund an additional $1B in escrow that would be payable to JLI upon regulatory (PMTA) approval;
- True-Up – Altria would make an additional payment to JLI equal to 50% of its imputed gain upon an IPO of JLI.

17. On May 30, 2018, Altria's CEO (Howard A. Willard III) wrote to JLI with a potential deal structure (despite the fact that Altria had still not conducted any due diligence).[16] The proposed structure was similar to that put forth by JLI on April 20 with a few adjustments to mitigate key risks identified by Altria.[17] The broad terms of Altria's proposed structure (which implied a company valuation to approximate as much as $22B) were as follows:[18]

- Initial Minority Investment – Altria would receive a 40% non-voting common equity stake for a $6.4B payment;
- Majority Investment – Altria would seek regulatory approval for a 50.1% voting interest for an additional $1.6B payment;
- Subsequent Regulatory Payment (PMTA Top-Up Payment) – Altria would fund an additional $1B to $3B payment upon PMTA approval with the range based upon EBITDA performance in relation to JLI's financial plan;

18. As of August 2018, Altria's proposal included a reduction in ownership to 45% but an increase in the upfront payment to $12.6B (implying a $28B company valuation).[19] The prior proposed structure as well as the August 2018 proposed structure is reflected in the following chart:

[16] ALGAT0004031785 – 787.

[17] May 2018 Board of Directors Presentation, p. 33 ALGAT0004720943_CONFIDENTIAL.

[18] ALGAT0004031785 – 787.

[19] ALGAT0005465249.

**Chart 2 – August 2018 Key Deal Terms of Altria Proposal**[20]

Key deal terms – Altria proposal

| | May | August |
|---|---|---|
| ***Total Payment*** | $9.0 - $12.0BN* | $12.6 BN |
| ***Altria Economic Ownership*** | 50.1% | 45.0% |
| ***Altria Upfront Payment*** | $8.0 BN | $12.6 BN |
| ***PMTA Earnout*** | $1.0 BN - $4.0 BN | None |
| ***Pathway for full ownership*** | 1) ROFR on IPO or 2) Call option on growth adjusted EBITDA | In Discussion |
| ***Geographic Scope*** | U.S. only | U.S. only |
| ***IP / R&D Capabilities*** | Reside in U.S. business | Reside in U.S. Business |

*Does not include payment for remaining 49.9%

Altria
Altria Client Services

Altria Client Services | S&BD | August 2018 | Final | Highly Confidential

19. The increased valuation by Altria and increased offer were based upon continued demonstrative growth in JLI's volume sales and revenues. Brian Blaylock testified, on behalf of Altria, that the cause for the change in valuation was due to the fact that JLI "had demonstrated another three months of the ability to convert adult smokers to a noncombustible product."[21] This demonstrated growth is reflected in the following chart (which was included in Altria's August 2018 Board Presentation):

[20] ALGAT0005465249.

[21] Deposition transcript of Brian Blaylock dated March 16, 2021, p. 269 at 8-14.

**Chart 3 – JLI Volume Performance is Driving e-vapor Category Growth**[22]




20. We can compare this chart (from August 2018) to the earlier version of the chart above (from January 2018) and see the significant growth in JLI's volume sales over the additional eight-month period (2.3 million pods per week as of November 2017 versus 8.1 million pods per week as of July 2018)**.**

21. Altria walked away from negotiations briefly in September 2018 due to concerns over JLI's valuation and governance.[23] As Brian Blaylock testified, Altria was "reassessing whether we wanted to do a deal at the valuations that were being contemplated at that time, or the stake of that time."[24] At this point Altria was proposing a deal with JLI that suggested JLI's US business value

[22] ALGAT0005465214.

[23] ALGAT0005525391.

[24] Deposition transcript of Brian Blaylock dated March 16, 2021, p. 278 at 21-24.

approximated $28B while JLI seemed to be focused on a deal closer to its anticipated IPO value of $35B. However, we now know that Altria was able to further bridge this valuation gap and re-engaged with JLI in early October to discuss accomplishing a deal.

22. On October 5, 2018, Altria's CEO again wrote to JLI (specifically to Nicholas Pritzker, Riaz Valani, and Kevin Burns) stating Altria's intention to re-engage in negotiations by proposing consideration of, *inter alia*, a 35% economic and voting interest in both the US and international business of JLI.[25]

23. By November 2018, Altria had participated in limited due diligence meetings with JLI but had yet to receive financial projections beyond 2019 / 2020.[26] Based on this due diligence, Altria identified the following "key findings:"[27]

- JLI anticipated ~60% annual growth in pod sales between 2018 and 2019 (greater than Altria's previous projections);
- Annual revenue growth of ~77% between 2018 and 2019 was anticipated, including the impact of an ~30% loss in customer base following the FDA flavor announcement.

24. In December 2018, Altria indicated internally that its due diligence was nearly complete and that its findings to date supported its valuation and investment thesis, which included the following points:[28]

- Altria to generate material e-vapor earnings which would offset potential future losses in its cigarette business;
- Altria gaining significant ownership and influence in U.S. e-vapor leader;
- An investment in JLI would provide favorable economics when compared to scenarios without JLI.

---

[25] ALGAT0004320292 – 293.

[26] ALGAT0002822901.

[27] Project Tree November 2018 presentation, page 3. ALGAT0003495242_CONFIDENTIAL. At this point, JLI had not provided US forecast data beyond 2019 nor international forecast data beyond 2020. Project Tree November 2018 presentation, page 3 and 4.

[28] ALGAT0005525390 and ALGAT0005525391.

25. This investment thesis would support Altria's strategy that it "aspire[d] to be the U.S. leader in authorized, non-combustible, reduced-risk products."[29] As such, Altria proposed terms to JLI that would provide Altria with a 35% interest in the company at a $38.4 billion valuation, as reflected in the following chart:[30]

**Chart 4 – December 2018 Selected Transaction Terms[31]**

Project Tree selected transaction terms

| | |
|---|---|
| *Transaction* | ▪ Altria to acquire initial 35% non-voting economic stake in Tree parent (U.S. + international)<br>▪ Simultaneous sign and close<br>▪ Parties to promptly seek HSR approval for conversion to voting shares after close<br>▪ Proceeds used to provide liquidity to existing shareholders (Tree to maintain ~$1 billion on balance sheet to fund future growth) |
| *Valuation* | ▪ $38.4 billion valuation (fully-diluted basis)<br>▪ $12.8 billion for 35% stake (based on Day 1 share count)<br>▪ Preemptive rights to maintain 35% stake |
| *Governance / Other* | ▪ 35% economic interest with 35% voting rights following HSR approval<br>▪ Right to appoint one-third of Board after HSR approval<br>▪ Altria commits not to compete in the e-vapor business and to provide Tree with various commercial services for an initial term of six years<br>▪ Right to terminate non-compete/services and exit investment over time following six year period |

Altria
Altria Client Services

26. As referenced in the discussion above, JLI appeared to hold steadfast with its perceived value of its business during negotiations with Altria, focusing on an IPO in the $35B range

[29] ALGAT0002405543.

[30] ALGAT0005525392.

[31] ALGAT0005525392.

or a deal structure that included immediate liquidity but upside value with an anticipated IPO. On the other side of the negotiation, Altria's estimates of value began modest compared to JLI's but steadily grew based on JLI's continued demonstration of robust volume and revenue growth along with Altria's desire to be a leader in the e-vapor space. The following chart summarizes the broad changes in valuation that Altria placed on JLI in contrast to JLI's own indications (from a potential IPO):

**Chart 5 – Progression of JLI's Value during Negotiations (Altria v. JLI)**

| ($B) | Altria Proposed Value | JUUL Perceived IPO Value |
|---|---|---|
| April 2018 | $ 16.0 | $ 35.0 |
| May 2018 | $ 22.0 | $ 35.0 |
| August 2018 | $ 28.0 | $ 35.0 |
| December 2018 | $ 38.0 | $ 35.0 |

### C. Summary of JLI's Ultimate Valuation and Altria's Investment

#### a) Overview

27. Ultimately, on December 19, 2018, Altria and JLI consummated a deal where Altria acquired a 35% interest in JLI for an upfront cash payment of twelve billion and eight hundred million dollars ($12,800,000,000).[32] Post transaction, this investment implied an equity valuation of JLI approximating thirty-eight billion and four hundred million dollars ($38,400,000,000).[33] This valuation is consistent with the testimony of Brian Blaylock (senior director of strategy and business development at Altria Ventures, Inc. and Altria's corporate representative), wherein he testified that Altria placed a $38B valuation on JLI when it signed the deal at the end of December 2018.[34]

[32] Class C-1 Common Stock Agreement by and among Juul Labs, Inc., Altria Group, Inc, and Altria Enterprises LLC dated December 20, 2018, Section 1.2.

[33] This valuation is based upon a fully-diluted ownership interest of 33.3% as referenced at ALGAT0005525392, ALGAT0005525414, ALGAT0005525420, ALGAT0005525424, and JLI06801435_CONFIDENTIAL.xlsx ("Summary" worksheet).

[34] Deposition transcript of Brian Blaylock dated March 16, 2021, p. 350 at 16-19.

28. This implied equity valuation is also referenced within Altria's December 2018 Strategy Update document.[35] This Strategy Document includes summarized valuation discussions and slides from both Perella Weinberg Partners ("PWP") and J.P. Morgan (both advisors to the transaction).[36]

29. The PWP valuation analysis utilized three methodologies in what it referred to as a preliminary analysis. Namely, a discounted cash flow analysis ("DCF"), a comparable company trading analysis (based on projected net revenue), and an analysis based upon what it referred to as precedent minority stake transactions. The following chart reflects the range of values that each of these methods indicated (with the DCF utilizing differing assumptions as to regulatory bans and related discount rates).

---

[35] ALGAT0005525387 – 457.

[36] In addition to consulting with Altria on the value of JLI and the ultimate transaction between the parties, both PWP and J.P. Morgan provided Altria with "fairness opinions" that the consideration paid by Altria ($12.8B) was fair, from a financial point of view, to Altria in relation to the interest it was to receive in JLI (35%). However, in addition to stating that the consideration was fair, J.P. Morgan stated, in part that "In giving our opinion, we have relied upon and assumed the accuracy and completeness of all information that was publicly available or was furnished to or discussed with us by the Seller and Company or otherwise reviewed by or for us. We have not independently verified any such information or its accuracy or completeness and, pursuant to our engagement letter with the Company, we did not assume any obligation to undertake any such independent verification. We have not conducted or been provided with any valuation or appraisal of any assets or liabilities, nor have we evaluated the solvency of the Seller, the Company or Investor Sub under any state or federal laws relating to bankruptcy, insolvency, or similar matters. In relying on financial analyses and forecasts provided to us or derived therefrom, we have assumed that they have been reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Seller to which such analyses or forecasts relate. We express no view as to such analyses or forecasts or the assumptions on which they were based." ALGAT0003911858 - 862.

**Chart 6 – December 2018 Preliminary Valuation Summary (PWP)[37]**




30. As the chart reflects, the proposed transaction price ($38.4 billion) was at the low end of the range ($34B to $56B) generated by PWP's DCF (Latest Estimate scenario) and at the high end of the range ($22B to $41B) for the comparable companies trading analysis (Latest Estimate scenario). Each of the approaches utilized by PWP were based on projected revenues.

31. Similar to PWP, J.P. Morgan also utilized multiple methodologies to validate the purchase price for Altria's investment in JLI in December 2018.[38] Specifically, J.P. Morgan relied upon a DCF method as well as a trading multiples method (based on projected net revenue). The following chart reflects the range of values that each of these methods indicated.

---

[37] ALGAT0005525414.

[38] The discussion materials from J.P. Morgan's analysis are dated December 11, 2018. ALGAT0005525418 – 432.

**Chart 7 – JLI Preliminary Valuation Analysis (J.P. Morgan)**[39]




32. Consistent with the results provided by PWP, per J.P. Morgan's analysis, the implied equity value of the transaction ($38.4 billion) was at the low end of the range ($37.0B to $48.4B) generated by the DCF and above the range of values derived from the 2019 trading multiples analysis ($13.3B to $32.0B).

**b) Altria's Discounted Cash Flow Method**

33. The J.P. Morgan presentation referenced above includes details (including utilized projections, details of the developed discount rates, and comparable companies selected) in support of its range of values of JLI at the transaction date.[40] The attached **Schedules 1** through **6** are a

---

[39] ALGAT0005525424.

[40] ALGAT0005525422 - 430.

recreation of J.P. Morgan's DCF valuation models in support of the transaction value (i.e., $38.4B implied equity value).

34. J.P. Morgan provided a separate DCF model for each of the U.S. and International operations and combined the results of the two in deriving its range of supportable values. The underlying assumptions utilized in the projections are as follows:

**Chart 8 – Assumptions Utilized in Altria DCF Valuation Model**[41]

| Projection Category | US Business | International Business |
|---|---|---|
| * Net Sales | Based upon a detailed build up and projection of equalized volumes across tobacco and NGP categories. Cigarette volumes assumed to be cannibalized by NGP. | Based upon a detailed country by country build which reflects JUUL's stated roll out plan and go-forward cigarette dynamics in each country. |
| * Cost of Goods Sold ("COGS") | Assumes continued improvement in gross margin driven by sales mix shift, product innovation, process automation and growing negotiation power with contract manufacturers as the company scales, assumes a steady state COGS as a % of net sales of 16%. | Assumes continued improvement in gross margin driven by sales mix shift, product innovation, process automation and growing negotiation power with contract manufacturers as the company scales, assumes a steady state COGS as a % of net sales of 25%. |
| * Operating Expense | Anticipated continued operating margin improvement over time driven by fixed cost leverage; assumes a steady state opex as a % of net sales of 16%. | Anticipated continued improvement in operating margin driven by fixed cost leverage; assumes a steady state opex as a % of new sales of 17%. |
| * Tax Rate | 25% marginal tax rate | 28% marginal tax rate |
| * Capital Expenditures | Expect capex growth to moderate after 2020 and gradually step down to 2%. | Expect capex growth to moderate after 2020 and gradually step down to 2%. |
| * Change in Net Working Capital | Continuous cash outflow from change in net working capital. | Continuous cash outflow from change in net working capital. |

35. The terminal year of the DCF utilizes different perpetuity growth rates ranging from (1.0%) to 0.0% for the US business and (0.5%) to 0.5% for the international business.[42] The terminal year of a DCF model represents the period beyond the specifically forecasted period. It assumes that the business will continue to grow at a constant rate, based upon the perpetual growth rate utilized, forever. As is the case with the terminal year of J.P. Morgan's DCF model, the terminal year of the DCF often reflects the largest component of value. For example, the terminal year value of the mid-

[41] ALGAT0005525422 and 423.

[42] ALGAT0005525424.

point valuation provided by J.P. Morgan (wherein it used a perpetual growth rate of (0.5%) for the US business and 0.0% for the international business) represents more than 44% of the total value derived by its DCF model.[43]

36. Finally, J.P. Morgan's DCF utilizes discount rates ranging from 11% to 13% of the US business and 14% to 16% for the international business.[44] The discount rate range utilized in the DCF is based upon a capital asset pricing model (CAPM) that starts with a risk free rate of return (3.1%)[45] and adds a beta adjusted equity risk premium (ranging from 6.3% to 12.5%) to derive a cost of equity ranging from 9.4% to 15.6% for the US business.[46] After accounting for debt in the capital structure, the calculated discount rate ranged from 9.1% to 15.0%, but was narrowed by J.P. Morgan to a range of 11.0% to 13.0% for the US business.[47] For the international business, a country risk premium (1.2%) was added to the cost of equity resulting in a range for such of 10.6% to 16.8%. This range was then narrowed by J.P. Morgan to a range of 14.0% to 16.0% for the international business.[48] The following chart reflects the build-up of the U.S. risk-based discount rate utilized in the valuation:

---

[43] The terminal year value for the US business approximated $12.3B while the international business approximated $6.3B, totaling $18.6B. This $18.6B amounts to more than 44% of the consolidated firm value of $42B derived by the model.

[44] ALGAT0005525424.

[45] Based upon the US 10-year treasury bond yield as of November 15, 2018.

[46] The beta is a measure of a stock's volatility (how much the stock price moves in relation to the market as a whole) and was derived by J.P. Morgan by referring to companies deemed "comparable" from the high growth consumer, tech, and biotech spaces. ALGAT0005525429.

[47] ALGAT0005525429.

[48] ALGAT0005525430.

*US*

**Discount rate summary**

| | | | |
|---|---|---|---|
| Risk free rate[1] | | 3.1% | |
| Equity risk premium | 5.25% | — | 6.25% |
| Levered beta | 1.20 | — | 2.00 |
| Country risk premium | 0.0% | — | 0.0% |
| **Cost of equity** | **9.4%** | — | **15.6%** |
| Pre-tax cost of debt | | 5.0% | |
| Post-tax cost of debt | | 3.8% | |
| Debt/total cap target | | 5.0% | |
| **Calculated discount rate** | **9.1%** | — | **15.0%** |
| **Selected discount rate** | **11.0%** | — | **13.0%** |

37. During his deposition, Brian Blaylock testified, on behalf of Altria,that the discount rate was a way to help make sure that the appropriate amount of risk was being placed on the investment in JLI.[49] Mr. Blaylock identifies some of these risks as including the risk that kids will continue using the JUUL products and JLI may not be granted its PMTA, resulting in JLI losing its license to operate.[50] I note that the build-up of the discount rate does not include any additional costs (i.e., increase in the rate) for any specific risk factors associated with JLI (outside of general market

[49] Deposition transcript of Brian Blaylock dated March 16, 2021, p. 291 at 9-14.

[50] Deposition transcript of Brian Blaylock dated March 16, 2021, p. 292 at 10-25.

based systematic risk or those risks that it may share with the utilized comparable companies in the high growth consumer, tech, and biotech spaces – as reflected in the applied betas) or its financial projections. There is no reference in the documents reviewed that Altria accounted for or even considered risks associated with the alleged risk-based theories of harm in the forecasts or possibility that the forecasts included revenues and profits from underage consumers. Nor is there any reference in the build-up of the discount rate (as reflected in the discount rate summary chart reflected above) that such includes the risk that JLI will not be granted the PMTA.

38. When asked during his deposition if the valuations or projections provided by JLI considered the effect of youth usage, Vittal Kadapakkam testified that they were "not explicitly" factored in JLI's growth scenarios and that "underage usage would have been a very small portion of any historical sales of the company and would never be forecast."[51] It is clear from this testimony that JLI was aware that a portion of its historical revenues were derived from underage consumers. Accordingly, while its forecasts may not have "explicitly" factored in or projected growth of in revenues from underage consumers, its forecasts would have inherently included revenues from underage consumers due to the fact that such forecasts were based off of growth scenarios derived from historical results that explicitly included revenues from underage consumers.

39. The following table reflects the calculated values derived from the DCF model utilized by J.P. Morgan based upon the above referenced assumptions, perpetual growth rates, and risk-based discount rates:

[51] Deposition transcript of Vittal Kadapakkam dated May 25, 2021, p. 183 at 2-25. Mr. Kadapakkam indicated that historical usage approximated 10% or more of historical sales of JLI's products.

**Chart 9 – Matrix of Altria's Range of Values from DCF**[52]

| US / Int'l discount rate | US / Int'l perpetuity growth rate: (1.0%)/(0.5%) | (0.5%)/0.0% | 0.0%/0.5% |
|---|---|---|---|
| 11.0% / 14.0% | $ 46,385 | $ 47,336 | $ 48,368 |
| 12.0% / 15.0% | $ 41,292 | $ 42,032 | $ 42,830 |
| 13.0% / 16.0% | $ 36,987 | $ 37,570 | $ 38,195 |

**c) Altria's Trading Multiples Method**

40. As referenced above J.P. Morgan also assessed JLI's value by applying trading multiples of comparable companies to JLI's 2019 projected net revenue. J.P. Morgan's trading multiple method (commonly referred to as the guideline public company method) is a method within the market approach whereby market multiples are derived from the market prices of stocks of companies that are engaged in in the same or similar lines of businesses (and/or who have similar risk and growth profiles) and that are actively traded on a free and open market.[53]

41. The projected net revenue utilized for the valuation indicator was $2,667 million and was comprised of $2,192 million from the US business and $475 million from the international business.[54] Applying the multiples it derived from deemed comparable companies in the high growth consumer, tech, and biotech spaces (5.0x to 12.0x) to the projected 2019 net revenue figures resulted in company value ranging from $13.3B to $32.0B.[55] I note that the multiples derived by J.P. Morgan from companies in the tobacco and alcoholic beverage space averaged 5.3x and had a median FV/net sales multiple of 5.2x (at the low end of the ultimate range selected by J.P. Morgan).[56]

---

[52] ALGAT0005525428.

[53] Valuation of Privately Held Company Equity Securities Issued as Compensation, Glossary.

[54] I note that this is the virtually the same projected net revenue figure utilized by PWP ($2.7B) in its comparable company analysis.

[55] ALGAT0005525424.

[56] ALGAT0005525425.

**d) Revenue was a Key Driver of Altria's Valuation of JLI**

42. As referenced above, the methods utilized to support the $38.4B valuation of JLI in December 2018 relied on a forecast of the anticipated future benefits of the Company; namely revenues. As discussed extensively above, a significant element of the negotiations between Altria and JLI dealt with the revenues of the Company and the growth of those revenues both currently (in 2018) and prospectively. A number of valuations were conducted during the months leading up to Altria's investment in JLI. Each valuation, and related presentation, focused on the revenue prospects of JLI into the future as support for each iterative valuation and proposed offer.

**D. DISTRIBUTIONS TO JLI'S INDIVIDUAL INVESTORS FROM ALTRIA PROCEEDS**

43. As discussed, Altria acquired its 35% interest in JLI for a total purchase price of twelve billion and eight hundred million dollars ($12,800,000,000).[57] This purchase price was funded by Altria in one single wire transfer to JLI's bank account in December 2018.[58]

44. The Common Stock Agreement further specified that under no circumstance was the Company allowed to effect any cash distribution that would result in the cash balance of JLI being less than $950,000,000 immediately following the completion of the cash distribution.[59] Maintaining this level of cash on hand was intended to ensure that JLI had sufficient cash to effectuate its operating plan going forward.[60] Prior to the transaction, JLI had a cash balance in excess of $750 million.[61] Accordingly, per the terms of the Common Stock Agreement, JLI was required to hold back no more than $200 million of the transaction proceeds.

45. As referenced in Section 4.4 of the Class C-1 Common Stock Agreement, following the closing of the transaction with Altria, JLI was permitted to make a cash distribution to the holders of its outstanding capital stock and other equity securities, including outstanding options, as of

---

[57] Class C-1 Common Stock Agreement by and among Juul Labs, Inc., Altria Group, Inc, and Altria Enterprises LLC dated December 20, 2018, Section 1.2.

[58] Deposition Transcript of Timothy S. Danaher dated July 22, 2021, p. 140 at 7 – 20.

[59] Class C-1 Common Stock Agreement by and among Juul Labs, Inc., Altria Group, Inc, and Altria Enterprises LLC dated December 20, 2018, Section 4.4.

[60] Deposition transcript of Timothy Danaher dated July 22, 2021, p. 142 at 13 – 17.

[61] Deposition transcript of Timothy Danaher dated July 22, 2021, p. 141 at 13 – 14.

**Chart 11 – Specific Investor Special Dividend Distributions**[73]

| Investor Name | | Total | % of Total |
|---|---|---|---|
| Ploom Investment LLC | $ | 2,349,484,583 | 18.5% |
| JL Special LLC | $ | 1,826,970,382 | 14.4% |
| James Monsees | $ | 640,973,962 | 5.1% |
| Marianas Opportunity Fund LP | $ | 598,265,498 | 4.7% |
| Adam Bowen | $ | 593,811,742 | 4.7% |
| Ploom Investment II, LLC | $ | 155,601,553 | 1.2% |
| Ashley Gould | $ | 107,831,880 | 0.9% |
| Riaz Valani | $ | 105,225,943 | 0.8% |
| Timothy Danaher | $ | 103,619,248 | 0.8% |
| Hoyoung Huh | $ | 67,394,925 | 0.5% |
| Zachary Frankel | $ | 67,394,925 | 0.5% |
| Charles (Bob) Robbins Jr | $ | 29,953,300 | 0.2% |
| Kevin Burns | $ | 20,592,894 | 0.2% |
| Chelsea L. Kania | $ | 10,442,319 | 0.1% |
| Tevi Troy | $ | 2,340,102 | 0.0% |
| Subtotal | $ | 6,679,903,255 | 52.7% |

## IV. IMPACT OF CHANGES IN REVENUES ON ALTRIA'S VALUATION OF JLI AND DISTRIBUTIONS TO INDIVIDUAL INVESTORS

### A. OVERVIEW

49. As referenced above, I have been asked by Plaintiffs' Counsel to develop an analysis capable of identifying the portion of Altria's $12.8B investment in JLI that was tied to Plaintiffs' allegations of wrongdoing, namely that:

[73] **Schedule 7 and 8**. I understand that in addition to personally investing in the Company, Riaz Valani maintained ownership (and received distributions) through at least Ploom Investment LLC and Ploom Investment II, LLC while Nicholas Pritzker maintained an ownership interest (and received distributions) through JL Special LLC and Hoyoung Huh maintained an ownership interest (and received distributions) both personally and through Hannol Ventures LLC.

- Defendants withheld information relating to the risk that its products created and sustained addiction, misleading Class Members as to the addictiveness of JUUL products;[74]
- Defendants misled Class Members regarding the safety risk of its product;[75] and
- JUUL products were marketed and sold to minors.[76]

50. As further discussed in this section, my analysis is based upon the actual valuation models utilized by Altria (discussed above) in support of the $38.4B valuation it assigned to JLI in making its investment. Specifically, my analysis starts with the DCF model prepared by J.P. Morgan (which generated a range of value for JLI of $37B to $48.4B) and adjusts such model to account for the decline in revenues that Hal J. Singer, PH.D ("Dr. Singer") opines would have been experienced had JLI disclosed the addictiveness and/or safety risks associated with its products (my analysis can also be applied to estimate the portion of Altria's investment attributed to minor consumers).[77] Utilizing Altria's own DCF valuation models and applying the percentage price reduction proffered by Dr. Singer allows us to isolate the portion of JLI's value (and Altria's investment) that relates to the wrongful acts alleged by Plaintiffs. As further discussed below, the analysis described herein can be applied to any matrix of wrongful acts and level of percentage price reduction proffered by Dr. Singer.

---

[74] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 1; Second Amended Consolidated Class Action Complaint, Case No.: 19-md-02913-WHO, In Re: Juul Labs, Inc. Marketing, Sales Practices, and Product Liability Litigation.

[75] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 1; Second Amended Consolidated Class Action Complaint, Case No.: 19-md-02913-WHO, In Re: Juul Labs, Inc. Marketing, Sales Practices, and Product Liability Litigation.

[76] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 58; Second Amended Consolidated Class Action Complaint, Case No.: 19-md-02913-WHO, In Re: Juul Labs, Inc. Marketing, Sales Practices, and Product Liability Litigation.

[77] I understand that Plaintiff has engaged Hal J. Singer, PH.D. as its damages expert to assess whether damages can be reliably determined using data and methods common to the Class. Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 1.

### B. UNDERSTANDING OF DR. SINGER OPINIONS

#### a) Damages Due to Risk Theories of Harm

51. I understand from reviewing Dr. Singer's Expert Report that his analysis currently focuses on the two theories of harm referenced above: (1) Addiction-Risk Theory of Harm; and (2) Safety-Risk Theory of Harm.[78] As Dr. Singer explains, consumer injury under both theories of harm flows from how consumers would have responded had they received the information that was allegedly misrepresented and/or omitted with respect to JUUL's marketing communications.[79]

52. In Dr. Singer's initial analysis, he conducts two Choice-Based Conjoint studies ("CBC") to evaluate each of the two theories alleged.[80] Dr. Singer utilizes CBC to quantify consumer valuations of product attributes that are not priced separately by using survey responses to quantify the tradeoffs that consumers reveal they are willing to make when selecting among different products comprised of different combinations of attributes.[81] I understand that Dr. Singer has utilized CBC to solve for the market-wide percentage discount from the retail price that consumers would require to compensate them for the disutility experienced.[82] In the case of the Addiction-Risk Theory of Harm, Dr. Singer calculates the discount for the disutility experienced from the increase in the addictiveness measure to be 37.6%.[83] In other words, Dr. Singer's analysis indicates that had certain addiction risks been revealed at or prior to the point of purchase, the market price paid by consumers would have declined by 37.6 percent.[84] In the case of the Safety-Risk Theory of Harm, Dr. Singer calculates the discount from list price required to compensate for the disutility experienced from the information communicated by a certain disclaimer to be 24.9%.[85] To be clear, I understand that Dr. Singer

[78] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 1.

[79] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 2.

[80] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 15.

[81] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 18.

[82] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 36.

[83] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 40.

[84] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 41.

[85] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 40. I understand that Dr. Singer's initial CBC analysis targeted only JUULpods, rendering his damage

(Footnote Cont'd on Following Page)

calculates these initial overcharge estimates (37.6% and 24.9%) using a traditional, consumer-driven conjoint damages framework, which posits a but-for world in which JLI would have supplied the same quantity of JUUL products, at the same cost as in the actual world.[86]

**b) Supply-Side Considerations**

53. Dr. Singer provides additional supply-side models of an alternative but-for world in which JLI may have reduced the supply of the Class Products in the but-for world which may have allowed it to charge a higher price than it otherwise could have (yet still lower than the price actually charged).[87] Applying this potential response by JLI to his analysis, Dr. Singer provides alternative discounts required to compensate for the disutility experienced to be 18.8% for the Addiction-Risk Theory of Harm and 12.4% for the Safety-Risk Theory of Harm.[88]

**c) Assessment of Damages to Underage Purchasers**

54. Dr. Singer also provides a measure of damages based upon the allegation that minors should not have been marketed to or sold Defendant's products. He quantifies the damage by estimating the number of JUUL devices and pods that were sold to minors.[89] The following table reflects Dr. Singer's assessment of damages for this category:

---

figures conservative in nature as they excluded JUUL device purchases. However, Dr. Singer states that he is able to design and implement a survey to examine the analogous decline in market price associated with harmful characteristics of JUUL devices at the merits phase if necessary. Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, footnote 42.

[86] Dr. Singer explains that "[t]his is a traditional approach that has been employed to estimate damages using CBC analysis in several litigation matters. The traditional approach does not ignore the supply side, but instead assumes that the supply curve for the Class Products would have remained fixed (vertical) in the but-for world. The traditional CBC approach is therefore consistent with a consumer-driven theory of harm, as JLI clearly could have supplied the same quantity of the Class Products in the but-for world that it supplied in the actual world, at the same cost." *Id.* ¶4.

[87] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 45.

[88] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 50.

[89] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, par. 58.

**Chart 12 – Dr. Singer's Summary of Damages from Underage Purchasers & JLI Revenue from Audited Financial Statements**[90]

| Year | JUUL Device Damages ($m) | JUULpod Damages ($m) | Total Damages ($m) | Total Revenue ($m) | Damages as % of Total Revenue |
|---|---|---|---|---|---|
| 2016 | $ 0.4 | $ 9.3 | $ 9.7 | $ 27.7 | 35.0% |
| 2017 | $ 1.6 | $ 45.0 | $ 46.6 | $ 212.5 | 21.9% |
| 2018 | $ 13.9 | $ 358.3 | $ 372.2 | $ 1,308.1 | 28.5% |
| 2019 | $ 11.8 | $ 623.8 | $ 635.6 | $ 2,038.0 | 31.2% |
| Totals | $ 27.7 | $ 1,036.4 | $ 1,064.1 | $ 3,586.3 | 29.7% |

55. As reflected in Chart 12 above, using Dr. Singer's estimates, I calculate that approximately 29.7% of the total revenue earned by JLI were derived from sales of devices and pods to minors for the four years reflected.[91]

### C. Lower Gross Revenues Lead to a Lower Valuation

#### a) Addictiveness and Safety-Risk Theories of Harm

56. I utilize Dr. Singer's opinions on the appropriate discounts from list price to adjust the forecasted revenues utilized in the DCF models provided by Altria in support of its investment. For example, in **Schedule 1** we can see that Altria projects revenues (and growth rates in revenues) as follows:

[90] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, Table 7. The Total Revenue figures were derived from the audited financial statements conducted by Price Waterhouse Coopers LLP and include the statements referenced as 2017 JLI01348818, 2018, JLI01399686, and 2019 JLI01101951.

[91] I understand that additional sales data was produced by JLI after Dr. Singer submitted his expert report. To the extent such data alters figures in any year, the resulting percentage can easily be adjusted and my methodologies would not be impacted.

**Chart 13 – JLI's Projected Revenues (per Altria DCF Model)**[92]

| ($mm) | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $ 2,192 | $ 3,400 | $ 4,306 | $ 5,397 | $ 6,371 | $ 7,275 | $ 8,376 | $ 8,945 | $ 9,497 | $ 10,082 | $ 10,702 | $ 11,196 |
| % growth | 74.8% | 55.1% | 26.6% | 25.3% | 18.0% | 14.2% | 15.1% | 6.8% | 6.2% | 6.2% | 6.1% | 4.6% |

57. Utilizing the above forecasted revenues and flowing them through its DCF model (inclusive of its other relevant assumptions regarding JLI's expenses, capital requirements, and discount rate) is how Altria estimated JLI's value to be $37B on the low end.[93]

58. As stated, my analysis is based upon Altria's own DCF model but adjusts the above referenced revenues downward to account for the discount required per Dr. Singer. For example, utilizing Dr. Singer's discount from list price of 37.6% (related to Plaintiffs' Addiction-Risk Theory) suggests forecasted revenues of JLI should have been as follows:

**Chart 14 - JLI's Projected Revenues (per Altria DCF Model) as Adjusted**[94]

| ($mm) | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $ 2,192 | $ 3,400 | $ 4,306 | $ 5,397 | $ 6,371 | $ 7,275 | $ 8,376 | $ 8,945 | $ 9,497 | $ 10,082 | $ 10,702 | $ 11,196 |
| % growth | 74.8% | 55.1% | 26.6% | 25.3% | 18.0% | 14.2% | 15.1% | 6.8% | 6.2% | 6.2% | 6.1% | 4.6% |
| Discount | (824) | (1,278) | (1,619) | (2,029) | (2,395) | (2,735) | (3,149) | (3,363) | (3,571) | (3,791) | (4,024) | (4,210) |
| Net Sales | 1,368 | 2,122 | 2,687 | 3,368 | 3,976 | 4,540 | 5,227 | 5,582 | 5,926 | 6,291 | 6,678 | 6,986 |

59. Using the same DCF model utilized by Altria but applying the lower level of revenue reflected in the table above (discounted the forecasted revenues by 37.6%) reduces the calculation of JLI's value to $9.0B. (a reduction of approximately $28B, or 76%).[95] A reduction in value of approximately 76% from a decline in revenue of 37.6% is due to the fact that the reduced revenue is coming directly from JLI's forecasted free cash flows (i.e., profit) which we can see in the terminal

[92] ALGAT0005525422.

[93] See **Schedule 1** and ALGAT0005525424. The $38.4B transaction value is approximately 3.8% higher than Altria's low end valuation result of $37B.

[94] See for example, **Schedule 12**.

[95] **Schedule 12**.

year, for example, is 50.8%.[96] This is because, per Dr. Singer, the discount in revenue assumes no change to volume sales or other expenses or investments of the company. Accordingly, a 37.6% decline in revenue represents 74.0% of the terminal year's 50.8% free cash flow (i.e., profit).

60. **Schedules 12** through **17** reflect my analysis (based on Altria's DCF model but adjusted for Dr. Singer's calculated discounts) based on Dr. Singer's 37.6% discount. Accordingly, applying this 37.6% decline in revenue to Altria's total investment of $12.8B would suggest that approximately $9.8B of such investment was due to the Addiction-Risk Theory of Harm.[97] The analyses reflected in these Schedules can be applied utilizing any level of revenue discount derived by Dr. Singer or determined by the trier-of-fact.[98]

61. As discussed, the above analysis utilizes the actual DCF valuation models and assumptions derived by Altria and its experts that are embodied in those models (inclusive of quantity of products sold) that derived the values supporting the $38.4B implied valuation of JLI. The purpose of my analysis was to identify and isolate the portion of Altria's investment ($12.8B) that pertained to the alleged wrongful acts of JLI. Accordingly, as Dr. Singer's initial analysis and opinions involve no change to volume sales of JUUL products, but instead a reduction in the price at which those products would be sold in the market but-for JLI's wrongdoing, my analysis makes the same assumption. That is to say, my application of a lower revenue forecast in the DCF models utilized by Altria assume that such reduction comes from a discount to the price with no change to the volume of product sold.

**b) Underage Purchasers Harm**

62. As discussed above, Dr. Singer provides a measure of damages based upon the allegation that minors should not have been marketed to or sold Defendant's products and quantifies the damage as follows:

---

[96] See for example, **Schedule 1**.

[97] $38.4B - 9.0B (**Schedule 12**) = $29.4B ÷ $38.4B = 76.56% x $12.8B = $9.8B.

[98] This includes application of Dr. Singer's other current opinions related to the Safety-Risk Theory of Harm (24.9% and 12.4% considering supply side). However, based on JLI's forecasted margins, a 49.7% discount to revenues (leaving volume and other costs fixed) would generate a valuation of $0.

**Chart 15 – Dr. Singer's Summary of Damages from Underage Purchasers & JLI Revenue from Audited Financial Statements**[99]

| Year | JUUL Device Damages ($m) | JUULpod Damages ($m) | Total Damages ($m) | Total Revenue ($m) | Damages as % of Total Revenue |
|---|---|---|---|---|---|
| 2016 | $ 0.4 | $ 9.3 | $ 9.7 | $ 27.7 | 35.0% |
| 2017 | $ 1.6 | $ 45.0 | $ 46.6 | $ 212.5 | 21.9% |
| 2018 | $ 13.9 | $ 358.3 | $ 372.2 | $ 1,308.1 | 28.5% |
| 2019 | $ 11.8 | $ 623.8 | $ 635.6 | $ 2,038.0 | 31.2% |
| Totals | $ 27.7 | $ 1,036.4 | $ 1,064.1 | $ 3,586.3 | 29.7% |

63. As reflected in Chart 15 above, using Dr. Singer's assessment of damages along with JLI's audited financial statements, I calculate that approximately 29.7% of the total revenue earned by JLI during the years 2016 through 2019 was derived from underage purchasers.

64. Dr. Singer's damage analysis, as well as the assessment of those damages in relation to revenues, are based on actual historical results whereas my analysis deals with JLI's forecasted revenues, profits, and cash flows and how such translates into the investment that Altria made in the Company. A base assumption in my analysis is that the forecasted revenues, profits, and cash flows are operationally consistent with JLI's actual historical operations. That is to say, I have assumed that since the actual historical operations of JLI necessarily include sales to underage consumers (estimated to be 29.7% of total sales per Chart 15 above and at least 10% per JLI), the forecasted revenues, profits, and cash flows necessarily include sales to underage consumers. In addition to referring to the testimony of Vittal Kadapakkam (discussed above), to validate the reasonableness of this assumption I have referred to the historical financial statements, board presentations, and forecasted results of JLI.

[99] Class Certification Expert Report of Hal J. Singer, PH.D. dated April 28, 2021, Table 7. The Total Revenue figures were derived from the audited financial statements conducted by Price Waterhouse Coopers LLP and include the statements referenced as 2017 JLI01348818, 2018, JLI01399686, and 2019 JLI01101951.

65. Specifically, the forecasted revenues for JLI that were utilized by Altria as a basis for its $12.8B investment forecast revenues (i.e., Net sales) and growth in revenues to be as follows:

**Chart 16 – Selected Forecasted Revenues (per Altria DCF Model)**[100]

| ($mm) | 2018E | 2019E |
|---|---|---|
| A Net sales | $1,254 | $2,192 |
| % growth | 490.2% | 74.8% |

66. The forecasted revenues for 2018 were prepared prior to the end of the 2018 calendar year but were estimated to approximate $1,254 million (actual results were not materially different at $1,308 million) and represented a 490.2% increase over the 2017 actual results. This 490.2% growth rate in revenues reported in the Altria forecast suggests that 2017 revenues would have approximated $212.5 million.[101] In fact, this is exactly how much revenue was reported in 2017 per JLI's audited financial statements.[102] As can be seen in Chart 15 above, sales to underage consumers in 2017 are estimated at approximately 21.9% of JLI revenue. As the forecasted revenues were projected from sales that included revenues earned from underage consumers, it is reasonable to infer that those forecasted revenues also included sales to underage consumers.

67. However, I have further reviewed the various board presentations in an attempt to identify any evidence that would suggest underage consumers are explicitly excluded from the forecasts utilized in Altria's DCF model. While the presentations indicate Altria's awareness of youth usage, none of the presentations reflect adjustments to either historical or forecasted sales volumes for that youth usage (nor significant enough adjustments to the discount rate to account for such risk in those forecasted sales volumes).[103]

---

[100] ALGAT0005525422.

[101] $1,254 ÷ (1 + 490.2%) = $212.5

[102] JLI01348818.

[103] The only exception is a downward adjustment to the 4th quarter 2018 sales volume (reflecting a 6.5% quarter over quarter reduction) due to an "assumed decline following FDA announcement on flavors." ALGAT0002822906.

68. As part of its "Investment considerations" section of the December 2018 Strategy Update, Altria identified as part of its most significant risks, the possibility that "Youth usage goes unmitigated."[104] Additionally, Altria included a slide with bullet points on JLI's plan to eliminate youth usage as follows:

**Chart 17 – JLI's Plan to Eliminate Youth Usage**[105]




69. Although there is recognition of youth usage of the JUUL product and an apparent concern of such being a risk factor, nowhere in this same document does Altria attempt to identify the financial impact of such youth usage or quantify the existence of such within the forecasted figures in which it was investing.

70. Utilizing the estimate from Chart 15 above of the percentage of damages attributed to underage usage in relation to JLI's revenues for the same time frame (29.7% during the years 2016 through 2019) and assuming a similar ratio in the forecasted figures, we can estimate the portion of

[104] ALGAT0005525447.

[105] ALGAT0005525448.

Altria's investment potentially related to underage usage to be 29.7%.[106] Accordingly, applying this 29.7% figure to Altria's total investment of $12.8B suggests that approximately $3.8B of such investment was due to underage purchasers.[107]

**c) Applicable Formula**

71. As described above, there are two primary elements contemplated in calculating the total portion of Altria's investment that relate to the alleged wrongful acts. The first element is the separately evaluated (and potentially combined) Addictiveness-Risk and Safety-Risk Theories of Harm that are assessed based upon a discount to the list price (i.e., decrease in revenue) of JLI's products without reducing the volume of products sold. The second element relates to the underage usage theory of harm where a portion of JLI's products are sold to and/or used by underage consumers. These two elements are not additive in nature as there is some level of duplication in their measurement. Accordingly, to eliminate any potential duplication, the following formula can be used to accurately quantify the total portion of Altria's investment due to any combination of the two elements:

$$= (((V \times UPH) + (V - (V \times UPH)) \times (RTH) \div V) \div V) \times AI$$

Where:

AI - Altria Investment

V - Implied Value

UPH - Underage Purchaser Harm

RTH - Risk Theory Harm

72. Below, I have provided an example of how the above formula works in practice utilizing the previously discussed examples. As the formula reflects, the portion of Altria's $12.8B investment attributed to JLI's alleged wrongful acts amounts to $10.6B (approximately 82.8% of the total investment by Altria):

---

[106] This assumes that every dollar of revenue earned will incur a pro rata share of every dollar of expense and capital investment incurred.

[107] $12.8B x 29.7% = $3.8B.

AI - \$12.8B

V - \$38.4B

UPH - 29.7%

RTH - \$29.1B (\$38.4B - \$9.33B)

= (((V x UPH) + (V - (V x UPH)) x (RTH) ÷ V) ÷ V) x AI

= (((\$38.4B x 29.7%) + (\$38.4B - (\$38.4B x 29.7%)) x (\$29.1B ÷ \$38.4B)) ÷ \$38.4B) x \$12.8B

= (((\$11.4B) + (\$38.4B - (\$11.4B)) x (75.7% ÷ \$38.4B) x \$12.8B

= (((\$11.4B) + (\$27.0B)) x (75.7%) ÷ \$38.4B) x \$12.8B

= (((\$11.4B) + (\$20.4B) ÷ \$38.4B) x \$12.8B

= (\$31.8B ÷ \$38.4B) x \$12.8B

= 82.9% x \$12.8B

= \$10.6B

73. As discussed above, utilizing the estimated portion of Altria's investment related to underage usage of 29.7% suggests that approximately \$11.4B (29.7%) of JLI's \$38.4B total value was due to underage purchasers.[108] The other portion of the formula, as reflected in the above example, deals with the Addictiveness-Risk Theory (but can also be applied the same to the Safety-Risk Theory) and first carves out the value attributed to the underage purchasers. In other words, as the above example assumes 29.7% of the value (and Altria's investment pertained to underage purchasers), the remainder of the calculation applicable to the Addictiveness-Risk Theory is applied to only 70.3% of the total value (and investment).[109] The portion of the value allocated to the Addictiveness-Risk Theory (\$29.1B in the example) is then multiplied by the 70.3% portion of value that was not already allocated by underage purchasers, resulting in a value of \$20.4B. Accordingly, \$31.8B of the \$38.4B (or 82.8%) value of JLI was due to underage purchasers (at \$11.4B) and Addictiveness-Risk Theory (at \$20.4B) in the above example. Accordingly, applying the 82.8% result to Altria's investment suggests that \$10.6B of its \$12.8B investment was due to underage purchasers and the Addictiveness-Risk Theory alleged by Plaintiffs.

[108] \$38.4B x 29.7% = \$11.4B.

[109] 100.0% - 29.7% = 70.3%.