# EXHIBIT 48

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: )
)
JUUL LABS, INC. MARKETING, ) CASE NO.
SALES PRACTICES AND PRODUCTS ) 19-md-2913-WHO
LIABILITY LITIGATION )
)
_________________________ )

__ __ __

Thursday, October 7, 2021

__ __ __

HIGHLY CONFIDENTIAL
OUTSIDE COUNSEL ONLY

__ __ __

Remote Video-Recorded Oral Deposition of KEVIN C. CROSTHWAITE, JR., held before SPECIAL MASTER STEPHEN LARSON at the location of the witness, commencing at 10:06 a.m. EDT on the above date, before Michael E. Miller, Fellow of the Academy of Professional Reporters, Certified Court Reporter, Registered Diplomate Reporter, Certified Realtime Reporter and California CSR No. 13649.

__ __ __

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Outside Counsel Only

What do you recall about the promotional offers that you were involved with, with respect to Marlboro combustible cigarettes?

A. Recall like what were they? I'm just trying to be clear.

Q. Yeah.

A. Okay. I mean, at the time, the brand utilized, I believe, during this time period, a product promotion, like a -- you know, buy two, get one free would be an example of a product promotion.

The brand would utilize a coupon for money off of a purchase, would be an example of tools.

Q. So how is it that a discount would be a promotion of your products?

A. I'm not sure, Ms. London, I understand the question.

Q. I asked you about promotional offers. You talked to me about coupons and buying two, getting one free, and percentages off of the price. Those sound like discounts, right?

A. It would be a discount to what

A. Yeah, I -- like I said, I would -- there were definitely scenarios that were looked at even before my time coming into the chief growth officer role, all different sorts of levels of potential investment, and there was a point in time I'm sure there were scenarios looked at where they would own more than 35%, but in -- like any negotiation between two companies, you've got to arrive at a set of terms that ultimately works for both parties.

BY MS. LONDON:

Q. Is it your testimony that Altria did not influence JUUL's strategy in any way?

MS. PENZA: Objection, form.

A. Yeah, I --

MR. BERNICK: Can I -- this is before or after the investment?

MS. PENZA: And strategy on what?

MS. LONDON: Folks, stop with the speaking objections. Mr. Crosthwaite, you can answer the question.

THE WITNESS: I'm sorry to ask you, Ms. London. Do you mind repeating it? I lost track of it with the conversation.

MS. LONDON: Sure.

BY MS. LONDON:

Q. Is it your testimony that Altria never wanted to influence JUUL?

MR. BERNICK: Objection to form and foundation, given lack of time frame.

A. Yeah, I don't -- I guess it depends specifically on what you're talking about, about influence and on what topic.

BY MS. LONDON:

Q. So there are some topics upon which Altria wanted to influence JUUL?

MS. PENZA: Objection, form.

A. Yeah, I guess to me, are we talking about when negotiating for a transaction? I think there was lots of arguments made in negotiating transaction terms that I would characterize as you're trying to influence the other side in terms and -- or are we referring to, you know,

post -- I'm just trying to get a sense for what it is you're referring to.

BY MS. LONDON:

Q. I just wanted to get your testimony on the record of whether you are going to come in to tell the jury Altria never had any intent to influence JUUL's business.

It sounds like you're not going to say that, are you?

MR. BERNICK: Objection, same objections as before. It's the same question.

A. Ms. London, I think for me, I think it just depends on what it is we're referring to.

BY MS. LONDON:

Q. All right. Now, we talked about technology.

Long before Altria invested in JUUL, Altria saw that the future in tobacco products would depend on harnessing technology, right?

A. I'm sorry, you cut out the first part. Do you mind repeating the first

Highly Confidential - Outside Counsel Only

A. I would sit in weekly -- I think they're called executive leadership team -- I think that's what they were called -- meetings then, where various heads of operating companies, CEO, CFO, and there would be business reviews at a pretty high level that would talk about what's going on in the broader space in the United States market.

And in those settings I would observe and see the -- all the things happening in different categories, including JUUL.

Q. Got it.

And so you would have seen -- in January '18, you would have seen that JUUL was growing by 700% around that time frame, right?

MR. BERNICK: Objection, lack of foundation.

A. Yeah, I'd have to go back and look at exactly what growth was happening in January. I know there was a lot of growth for JUUL in 2018. I don't recall it really in January, but there was a lot of growth

Highly Confidential - Outside Counsel Only

happening for JUUL throughout 2018.
BY MS. LONDON:
Q. Okay. A lot of growth happening in JUUL in 2018. Did that surprise you based on what you had seen in early 2017, when you last visited JUUL?
A. Yeah, I don't recall if I visited them -- maybe it was early 2017. Again, I'm getting the dates confused.
I think the growth that I saw of JUUL was unlike other -- anything I had seen for other alternatives to combustion products in the market. So in that case, I think the growth was surprising because I hadn't seen anything resonate so much with an adult smoker.
Q. Now, at that time, while you were the CEO of Philip Morris USA, were you concerned that JUUL's growth was going to cut into your core business of combustible cigarettes?
A. I don't recall being concerned, you know, at PM USA.
Q. All right. Now, moving into June of 2018 -- well, let me ask you this.

Q. Up 140%, right?
A. That is what it says.
Q. And then below in the next bullet point, three down, it says: Approximately 75% of JUUL blend volume has shifted to JUUL mint/menthol at retail at this time.
Do you see that?
A. Yes, I see that.
MS. LONDON: Okay. We can take that down.
BY MS. LONDON:
Q. Now, at that time, did you consider telling JUUL, in your role as board observer, hey, you might want to think about being careful with mint?
A. I think the conversation, from my recollection as a board observer in 2019, is the company was trying to be careful with everything, not just mint. There was a lot of attention towards addressing the issue where youth were getting access to e-vapor.
Q. Did you tell the company -- did you tell JUUL that they should take mint off the market when you saw this report in

February of 2019?
A. At that time in -- I did not say to take mint off the market.
Q. And instead, you were focused on making sure that the company kept mint and menthol packs in stock, right?
A. I don't recall having that -- having that particular conversation. I think generally, you know, having their product available in retail stores was important to do.
So there could have been a conversation about the brand's distribution or retail store coverage. I just don't remember the specifics that you mentioned.
Q. I'm going to pull up Tab 94, 45048.
(Whereupon, Deposition Exhibit Crosthwaite-45048, E-mail(s) re: JUUL Inventory Constraints, JLI01392499, was marked for identification.)
BY MS. LONDON:
Q. I'm showing you an e-mail from yourself to Mr. Burns at JUUL from March of 2019.