[Submitting Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 19-md-02913-WHO |
| | **PLAINTIFF'S OPPOSITION TO JLI'S MOTION FOR SUMMARY JUDGMENT** |
| This Document Relates to: | **Judge:**   **Hon. William H. Orrick** |
| | **Date:**   **February 16, 2022** |
| *Bain v. JUUL Labs, Inc., et al.* | **Time:** |
| | **Ctrm.:**   **2** |

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION .................................................................................................... 1

II.  COUNTER-STATEMENT OF FACT ..................................................................... 1

    A.   Background ................................................................................................... 1

    B.   Summary Overview of JLI's Marketing ...................................................... 2

        1.   Branding at Launch ............................................................................ 2

        2.   Digital Media Campaign. .................................................................. 3

    C.   B.B. Was Heavily Exposed to JLI Marketing Material ................................ 6

        1.   B.B.'s exposure prior to JUUL initiation. ......................................... 6

        2.   B.B.'s exposure during her JUUL initiation. ..................................... 7

        3.   B.B.'s exposure to JLI's marketing continued after her JUUL
             initiation. .......................................................................................... 10

III. ARGUMENT ......................................................................................................... 11

    A.   The Jury Can Find That JLI Committed Fraud. .......................................... 11

        1.   The jury can find that JLI misrepresented its product to B.B. ......... 12

        2.   The jury can find that B.B.'s addiction resulted from her reliance on
             JLI's misrepresentation. ................................................................... 16

    B.   The Jury Can Find for B.B. on Her Failure to Warn Claims. ...................... 17

    C.   The Jury Can Find for B.B. on Her Fraudulent Concealment Claim ........... 19

    D.   B.B.'s failure to warn claim is not preempted. ........................................... 19

        1.   B.B.'s failure to warn claim does not present any obstacle to a
             specific goal of the FDA. ................................................................. 20

        2.   The express preemption clause precludes JLI's obstacle preemption
             arguments. ........................................................................................ 23

        3.   JLI's compliance with FDA regulation is irrelevant to B.B.'s failure
             to warn claim. .................................................................................. 24

    E.   A Jury Could Find That Using JUUL Exacerbated B.B.'s GERD and
        Asthma ........................................................................................................ 25

IV.  CONCLUSION ..................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Acad. of Pediatrics v. FDA*,
379 F. Supp. 3d 461 (D. Md. 2019) .................................................................................... 22

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) .......................................................................................................... 18

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
870 F.3d 1140 (9th Cir. 2017) ........................................................................................... 21

*Bearden v. Honeywell Int'l, Inc.*,
2010 WL 1223936 (M.D. Tenn. Mar. 24, 2010) ............................................................... 11

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) .......................................................................................................... 23

*Cal. Hotels & Lodging Ass'n v. City of Oakland*,
393 F. Supp. 3d 817 (N.D. Cal. 2019) ......................................................................... 17, 18

*Chamberlan v. Ford Motor Co.*,
314 F. Supp. 2d 953 (N.D. Cal. 2004) ............................................................................... 22

*Chrisman v. Hill Home Dev., Inc.*,
978 S.W.2d 535 (Tenn. 1998) ............................................................................................ 19

*Colgate v. JUUL Labs., Inc.*,
402 F. Supp. 3d 728 (N.D. Cal. 2019) ............................................................................... 14

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) .............................................................................................. 20, 21, 24

*Goodall v. Akers*,
2009 WL 528784 (Tenn. Ct. App. Mar. 3, 2009) .............................................................. 16

*Head v. N.M. Bd. of Exam'rs in Optometry*,
374 U.S. 424 (1963) .......................................................................................................... 23

*Holley v. Gilead Sci., Inc.*,
379 F. Supp. 3d 809 (N.D. Cal. 2019) ............................................................................... 23

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) ................................................................. 14, 15, 20, 23

*In re Volkswagen*,
959 F.3d 1201 (9th Cir. 2020) ................................................................................ 20, 23, 24

*Lee v. Metro. Gov't of Nashville & Davidson County*,
596 F.Supp.2d 1101 (M.D. Tenn. 2009) ........................................................................... 17

*Mutual Pharm. Co., Inc. v. Bartlett*,
570 U.S. 472 (2013) .......................................................................................................... 24

*Nat'l Fed. of the Blind v. United Airlines Inc.*,
813 F.3d 718 (9th Cir. 2016) ............................................................................................. 24

*Nolen v. C.R. Bard Inc.*,
533 F. Supp. 3d 584 (M.D. Tenn. 2021) ........................................................................... 17

*Shah v. Racetrac Petroleum Co.*,
338 F.3d 557 (6th Cir. 2003) ............................................................................................. 19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Williams v. Gerber Prod. Co.*,
  552 F.3d 934 (9th Cir. 2008)............................................................................................ 15

*Williamson v. Mazda*,
  562 U.S. 323 (2011) ......................................................................................................... 21

**STATUTES**

21 U.S.C. § 387p(a)(2)(B) .................................................................................................... 23

21 U.S.C. § 387p(b) ............................................................................................................... 24

Pub. L. 111-31, 123 Stat. 1776 (2009)................................................................................... 22

Tenn. Code Ann. § 29-28-104 ............................................................................................... 25

Tenn. Code Ann. § 29-28-104(a) ........................................................................................... 25

**TREATISES**

*Restatement (Third) of Torts: Prod. Liab.* § 2, cmt. a (1998) .............................................. 19

**REGULATIONS**

81 Fed. Reg. 28,973-01 (May 10, 2016) ................................................................................ 20

81 Fed. Reg. 28,990 (May 10, 2016) ..................................................................................... 20

## I.    INTRODUCTION

JLI's motion for partial summary judgment presents a hodge-podge of jury arguments. Addressing all fraud claims, JLI pronounces that its youth marketing blitz played no role in B.B.'s use of JUUL. This assertion cannot satisfy JLI's burden of production, let alone negate th evidence in the record that B.B. was misled by JLI and suffered injury as a result. For the reason set forth below, JLI's motion should be denied as to B.B.'s fraud and failure to warn claims.

## II.    COUNTER-STATEMENT OF FACT

### A.    Background

Plaintiff B.B. is a sixteen-year-old girl from McMinnville, Tennessee. Ex. 1, *Transcript of B.B. Deposition* at 17:16-18:17. At all relevant times, B.B. has lived in McMinnville with both her parents and her younger sister. *Id.* B.B. started using JUUL in the fall of 2017. *Id.* at 123:25-124:4. At that time, she was twelve years old and had just started the seventh grade. *Id.* at 73:3-6; 74:11-3.. B.B. became addicted to JUUL over the course of approximately four to six weeks. *See* Ex. 2, *Generic Expert Report of Neil E. Grunberg*, ¶ 23 ("Grunberg Rpt.") (explaining that, while potentially shorter for adolescents, the typical period of regular use necessary to develop nicotine dependence ranges from "a few weeks to a few months"). Within two months of first trying the JUUL product, B.B.'s addiction ballooned and she was inhaling one to two JUULpods—or more than a pack and a half of cigarettes worth of nicotine—per day. B.B. Depo. Trx. at 104:8-22; *see also* Grunberg Rpt. at 54-59. B.B.'s addiction became instantiated over time and she continued to inhale up to one to two JUULpods per day for approximately three years. *Id.* As a result of her JUUL use, B.B. is severely addicted to nicotine. *See* Ex. 3, Grunberg, *Case Specific Expert Report of Neil E. Grunberg* at 3. B.B. has tried and failed to quit nicotine several times. *Id.* at 2. Anytime she abstains from nicotine B.B. suffers withdrawal symptoms, ranging from severe anxiety to sickness. *Id.*; B.B. Depo. Trx. 199:16-25. In addition, B.B.'s regular use of JUUL has caused her to suffer from shortness of breath, difficulty breathing, exacerbation of asthma, exacerbation of GERD, headaches, stomach pain and nausea, fatigue, anxiety and depression, anger/outburst, mood swings, irritability, lack

of concentration, and lack of motivation.   Ex. 4, *Medical Evaluation and Case Specific Report of Jonathan P. Winickoff* at 4, 6, 16-21.

Prior to using JUUL, B.B. was an honor roll student who played on her school's basketball and softball teams.  B.B. Depo. Trx. at 65:9-66:1; Ex. 5, *Transcript of Robin Bain Deposition* at 188:22-191:1.  She also played in a year-round softball league, which required her to travel to games in various locations across Tennessee.  B.B. Depo. Trx. at 65:22-66:7; *B.B. Decl.*, ¶2.

**B.      Summary Overview of JLI's Marketing**

1.      Branding at Launch

JLI launched the JUUL product in June of 2015.  The initial launch campaign, "Vaporized," included digital ads, sampling tours, parties and other launch events, billboards (including in Times Square), seeding products with "influencers," social media posts, use of hashtags, posters and other materials in convenience stores, display cases at the point of sale with marketing videos playing on a loop, radio advertisements, and more.  Ex. 6, Anthony Pratkanis, *Merits Report on JUUL's Marketing Communications* ("Pratkanis Rpt.") at 23-36.[1] "JLI documents indicate that the target market for this campaign were young people viewed as the cool crowd or cool kids."  *Id.* at 24; *see also* Ex. 23, *Deposition Transcript of Kate Morgan* at 130:13-17; 358-359.  The imagery was bright and colorful, featuring young, hip-looking models.  *Id.* at 24, 29.  "The use of playful 20-something models, whom teens seek to emulate, is a youth-targeting formula long practiced by cigarette marketers." Ex. 7, *Expert Report and Declaration of Dr. Robert K. Jackler* ("Jackler Rpt.") at 18. JLI also used "Celebrities and other Influencers, and bloggers who were well-known to teens to promote JUUL, thereby enticing teens to believe that JUUL was an acceptable product to use."  Ex. 8, *Expert Report and Declaration of Bonnie*

---

[1] *See also* Ex. 22, at JLI00483923 (Vaporized digital banner ad); JLI01049647 (recap of events and experiential marketing summarizing sampling tours and events); INREJUUL_00442779; INREJUUL_00442805 (2015 Juul Times Square Billboard Ads); INREJUUL_00114290; JLI00483925 (2015 Juul OOH Billboard Ads); INREJUUL_00442645; INREJUUL_00442626; INREJUUL_00442701; JLI01026741; INREJUUL_00442716;); JLI01028406; JLI01044206; JLI00869693; JLI01044203; JLI00869692 (2015 Juul Posters); JLI01044089; JLI01044091 (2015 Juul Change Mats); JLI00349557; JLI00349557; JLI01046862 (2015 Juul Floor Mats); JLI01044210; JLI01044242; JLI00359422 (Juul Counter Display Units with the Vaporized Video)

PLAINTIFF'S OPP. TO JLI DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. 19-MD-02913-WHO

*Halpern-Flesher* ("Halpern-Flesher Rpt.") at 10.  Flavors at launch included stylized spellings of fruit, crème brulee, mint, and tobacco, with other flavors like mango and cucumber added later. Jackler Rpt. at 295; *see also* Ex. 24, JLI00463290 (2015 Juul Sampling Deck describing flavors)

The obvious youth appeal of both the Vaporized campaign and JUUL's fruity flavors was roundly criticized (*see* Jackler Rpt. at 371-72, 419-22) culminating in a segment on Stephen Colbert's television show in October 2015 lambasting a Vaporized campaign video where young, attractive models danced with and used the JUUL device.  *Id*. at 81-83. Only after Colbert's piece did JLI pull down its colorful images of young models, replacing them with colorful cropped images of the hands of those models holding JUULs.  *Id*.; *see also* Ex. 25, *Deposition Transcript of Richard Mumby*, at 655-656.  While models' faces were removed from most of the marketing produced after October 2015, the Vaporized campaign videos of bouncy youths continued to play—on a loop—from the screens of approximately 13,000 point-of-sale display cases (or "counter-top" displays) in convenience stores across the country.  Pratkanis Rpt. at 32; *see also, e.g.*, Ex. 25 JLI00325504.  In addition to Vaporized themed materials, JLI supplied retailers with promotional posters, signs and displays. *See e.g.* Ex. 26 at JLI08248506; JLI01046633.  This prominent material emphasized the JUUL flavors and typically contained no warnings that nicotine was addictive or that JUUL contained toxic chemicals.

### 2.     Digital Media Campaign.

In addition to the promotion at retail locations, JLI deployed a wildly successful digital media campaign built on the viral spread of its branded material.  "JUUL planned for its brand to dominate the digital marketplace, and it succeeded unequivocally."  Ex. 9, *Expert Report of John Chandler* ("Chandler Rpt.") at 7.  The message JLI sought to seed in digital channels was that the JUUL product was cool, safe and came in fun flavors.  *See* Jackler Rpt. at 381; *see also* Halpern-Felsher Rpt. at 116-27.

Executing on this viral strategy requires developing an audience of people inclined to share and generate brand-related content.  Chandler Rpt. at 5-6.  The brand exposure generated by the content this audience shares or creates is called "earned media."  It is well known that earned media fosters "hyper-growth" within a market at very little cost, because "once a product

- 3 -

is seeded in fertile ground, the advertising will be generated [by the community] automatically." *Id*. To achieve their goal of viral earned media, JLI "carefully and tenaciously targeted groups and individuals . . . most likely to adopt and disseminate not only information, but [JLI] brand image." *Id*. at 5. These targeted groups and individuals were young people on social media, who could influence other young people. *See* Jackler Rpt. at 18-19; *see also* Chandler Rpt. at 8 ("JUUL co-opted user-generated content on social media to proliferate awareness of its products in markets dominated by youth consumers"); Ex. 10, *see also Dr. Samuel C. Woolley Expert Report* ("Wooley Rpt.") at 87-88. In other words, successfully executing JLI's chosen marketing strategy would necessarily foster a youth audience that would self-perpetuate and increasingly expand the youth market for the JUUL product. Chandler Rpt. at 7.

JLI sustained this marketing strategy and monitored messaging on social media in order amplify "the 'cool to JUUL' message" for years. Pratkanis Rpt. at 109. JLI's internal marketing documents reveal a highly disciplined approach, cultivating core messages over digital channels such as Twitter and Instagram. *Id*.

By 2017, JLI's viral strategy was a wild success and had developed an enormous social media audience. Yet, despite the growing criticisms that this audience was spawning a youth nicotine addiction epidemic, JLI continued "promote their social media campaign in a manner that appealed to younger consumers." Pratkanis Rpt. at 41. In other words, JLI doubled-down and in a December 2017 presentation, JLI described its efforts to expand its digital reach like this:

> JUUL cultivates relationships and has developed a cult-like following from countless Celebrities, Content Creators and Word-Of-Mouth advocates. JUUL will be expanding the influencer outreach program, and in 2018, we expect to massively scale our presence via press and social media, which currently already has a massive reach of over +175mm on social and +600mm estimated earned media reach.

Chandler Rpt. at 34-44.

Aside from flooding social media advertising channels—heavily trafficked by teenagers—with JLI's brand messaging, the creation of a massive "cult like" online community projected the impression that "everyone is doing JUUL." Read in combination with JLI's "cool

kids" brand, the impression for youth was that *all the cool kids* are doing JUUL. Creating this impression had two relevant downstream effects. First, it rapidly normalized using the JUUL product among young people. Halpern-Flesher Rpt. at 141 ("Whenever something is so pervasive in youth lives through memes, conversations, reposts, and so on, youth hear about it. JUUL became normative."). Second, it generated peer pressure to start using JUUL, to fit in and be cool. *See* Halpern-Flesher Rpt. at 133-42 ("Marketing both directly and indirectly influences youth usage of a product and creates social reasons to use the product including peer pressure.").

JLI's sustained viral marketing created a runaway train. Effectively deputizing countless youth as product ambassadors, the JUUL product itself began to spread virally within youth peer networks. This peer-to-peer viral spread of the product itself was a foreseeable result of the online campaign. As Dr. Culter explains "[e]ven temporary misconduct in the market for vaping products can have long-term consequences for youth vaping and smoking," for four reasons: 1) vaping products are addictive, so it's easier to start than stop; 2) misconceptions about the product are difficult to change; 3) youth are sensitive to peer behavior, so use by some youth generates later use by others; and 4) misconduct creates "thick markets" (with many buyers and sellers), and "[m]ore users means greater opportunity to borrow or purchase a vaping device, making initiation much easier." Ex. 11, *Report of Professor David M. Cutler* ("Cutler Rpt.") at 4-5, 39-52. In addition to creating youth ambassadors, the "thick markets" JLI fostered online created a pipeline for socially sourcing the JUUL product in communities across the country. *Id*. The overall effect was to make youth initiation more likely to occur and much easier to sustain. *Id*.

In the end, JLI's digital campaign was "highly effective" and "JUUL succeeded in expanding brand engagement in youth-dominated markets on a large scale." Chandler Rpt. at 7. By late-2018, JLI had captured 70% of the market for e-cigarette products, instigating a youth nicotine addiction crisis along the way. Ex. 12, *See Expert Report and Declaration of Dr. Sherry Emery* ("Emery Rpt.") at 7-8, 65; *see also* Cutler Rpt. at 4-5 ("JUUL has an outsized role in the vaping crisis"); Halpern-Flesher Rpt. at 11; Pratkanis Rpt. at 5-6; Wooley Rpt. at 87-88; Jackler Rpt. at 400-416.

PLAINTIFF'S OPP. TO JLI DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. 19-MD-02913-WHO

**C.      B.B. Was Heavily Exposed to JLI Marketing Material**

1.      B.B.'s exposure prior to JUUL initiation[2].

In the year preceding her use of JUUL, B.B. was routinely exposed to JLI's marketing material in convenience stores.  In addition to her hometown convenience store, which she frequented to purchase candy, B.B. was exposed to JUUL ads in convenience stores across Tennessee.  While traveling for softball games, B.B. would take advantage of stops for gas to purchase snacks.  B.B. Decl., ¶ 2.  Over the course of these visits, B.B. saw many different JUUL ads hanging in stores, and specifically remembers the following:



*Id.*

In addition, B.B. has vivid memories of watching Vaporized videos on the screens of JUUL display cases often located at the cash register.  *Id.* ¶ 5  A representative display case (pictured below), which plays the video B.B. remembers seeing will be lodged with the Court as Exhibit 13 to this opposition.

---

[2] As discussed further below, B.B.'s use of the JUUL product and her resulting addiction to nicotine progressed steadily over approximately six weeks following her first use.



## 2. B.B.'s exposure during her JUUL initiation.

In Fall of 2017, after softball practice, B.B. tried JUUL for the first time. B.B. Depo. Trx. 73:11-14. Her then thirteen-year-old friend E.S. was using a JUUL and asked B.B. if she wanted to take an inhale of vapor—known as a "hit"—from it. B.B. Decl., ¶ 8. Curious about the JUUL from the ads she had seen in stores, B.B. immediately accepted E.S.'s offer and took a hit from the JUUL. *Id.* The vapor was mint flavored and B.B. remembers enjoying the feeling of the rush the hit created. *Id.* ¶ 9. Immediately following that first hit, B.B. went home and searched for the JUUL product on Google.com. B.B. Depo. Trx. at 192:13-194:1. B.B. located JLI's website and was immediately greeted by the image of a mango JUUL pod surrounded by mangos and the tagline "Experience intensely satisfying vapor." *Id.*; B.B. Decl., ¶ 10.



Review of JUUL's website from the fall of 2017 reveals that the only warning on the website appeared at the very bottom of the page, in fine print. B.B. Depo at 195:21-196:7; Ex. 14, Plaintiff's Exhibit 1 to B.B. Depo.



B.B. did not scroll to the bottom of the page and thus did not observe this fine print warning. *Id.* Thereafter, having searched for JUUL on her phone, B.B. began seeing banner ads for JUUL products when she browsed websites. B.B. Decl. ¶ 14. B.B. cannot recall the exact dates she saw these online advertisements or the details of all advertisements, but she specifically recalls seeing the following ads:

*JLI01042049*





*JLI01042073*

PLAINTIFF'S OPP. TO JLI DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. 19-MD-02913-WHO

Over the next day, before she used JUUL again, B.B.'s interest in JUUL grew and looked up and viewed JUUL's official Instagram page, where she saw JUUL Instagram posts that included images of JUUL devices in front of "pretty landscapes" and promotions for JUUL flavors including Mint, Mango, and Crème Brulé.  B.B. Decl. ¶ 11.  She is unable to recall *all* of the JUUL Instagram posts she scrolled through on this occasion, but she recalls the two JUUL Instagram post from this timeframe featuring Crème Brulé pods beside a dessert and a box of Mango JUULpods:



*Id.*

B.B.'s experience on JUUL's website and JUUL's Instagram page, combined with the pleasant experience of her first hit of JUUL reassured her that JUUL was cool, fun, and safe.  *Id.* ¶ 12.  B.B.'s second use of JUUL came "a day or two" after her first hit. B.B. Depo at 78:10-16. This time, while in the school bathroom, at B.B.'s request, E.S. allowed B.B. to use her JUUL. B.B. Depo at 78:10-79:13; B.B. Decl. ¶ 12.  B.B. continued taking hits of her friends' JUULs for about a week.  B.B. Depo at 82:18-25; B.B. Decl. ¶ 20.  During this time, B.B. saw the packaging of her friends' JUUL pods, which did not have warnings about addiction.  B.B. Depo. at 186:7-186:25.

 

When E.S. obtained a new JUUL device, B.B. purchased E.S.'s old JUUL device. *Id.* at 83:7-10. B.B.'s JUUL usage increased to 15-20 puffs each day. *Id.* at 102:20-103:21. Shortly thereafter, the device B.B. purchased from E.S. stopped working and B.B. immediately purchased a JUUL starter kit from a student at her school. B.B. Decl. ¶ 20. The packaging of the JUUL starter kit B.B. obtained did not provide any warning that the nicotine in JUUL was highly addictive and could be harmful to the developing brain of anyone under 26 years old; it did not even warn that nicotine was addictive. *Id.* The only indication that JUUL contained nicotine was in small print on the back of the package. *Id.*

Within approximately two months of acquiring her first device, B.B. was inhaling 1-2 JUUL pods—or the equivalent to 200-400 puffs—per day. B.B. Depo. at 103:15-104:22. During this initiation stage, B.B. was regularly purchasing packs of JUUL pods that failed to adequately warn her about the risks of using. *See* JLI Mot. at 4:9-10 (indicating JUUL packages did not contain nicotine addiction warnings until May 2018).

3.    B.B.'s exposure to JLI's marketing continued after her JUUL initiation.

Following B.B.'s 1-2 month initiation stage, B.B. continued using 1-2 JUUL pods per day until the fall of 2020 when she stopped using JUUL exclusively and began using other brands of e-cigarettes. B.B. Depo. Trx. at 104:8-22. Over the course of her first year of using JUUL, B.B. continued to be exposed to JUUL ads in stores, visited JUUL's Instagram page frequently, and was exposed to JUUL Instagram promotional activities. B.B. Decl. ¶¶ 15, 19. B.B. also saw numerous JUUL advertisements on Snapchat. *Id.* at ¶ 16. B.B.'s continued exposure to JUUL marketing messages continued to further her belief that using JUUL was safe, cool, and fun. *Id.* at ¶¶ 15, 19.

B.B. saw many, if not hundreds of JUUL advertisements before JUUL initiation, during her JUUL initiation stage, and throughout the course of her JUUL usage that led her to believe that JUUL was safe, fun, cool, and appropriate for youth. *See* Ex. 15, *B.B.'s Responses to JLI's First Set of Interrogatories*, at 4; *see* Ex. 16 (Appendix of Images). B.B. recalls seeing these JUUL advertisements, or similar advertisements, although she cannot recall specifically when or where she saw them. B.B. Decl. at ¶ 19.

- 10 -

B.B. obtained at least three starter kits during her JUUL usage. One of the starter kits she obtained included a tri-fold pamphlet with information about JUUL, which B.B. read and kept.



## III.    ARGUMENT[3]

### A.    The Jury Can Find That JLI Committed Fraud.

To prove a Tennessee fraud claim, a plaintiff must show six elements: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation. *Bearden v. Honeywell Int'l, Inc.*, 2010 WL 1223936, at *5 (M.D. Tenn. Mar. 24, 2010).

JLI contends that the evidence in the record precludes a jury finding for B.B. on elements one, five and six—misrepresentation, reliance, and causation. Mot. at 6-9. The crux of JLI's argument is that there is no evidence B.B. had "any understanding of JUUL devices" before her first puff, and therefore no jury can find that she "had a misunderstanding of those products based on misrepresentations by JLI." Mot. at 8 (emphasis original). This argument lacks merit.

At the threshold, JLI does not explain why its representations to B.B. should be ignored if they occurred after her first puff. A tacit premise of JLI's argument is that the first puff of a JUUL renders the user so addicted that any impressions of the product gathered thereafter are irrelevant to their future decision making. It is unsurprising that this premise is tacit. Nevertheless, this premise is inconsistent with the evidence in the record of how nicotine

---

[3] Plaintiff agrees that summary judgment can be granted on B.B.'s warranty, medical monitoring, failure to recall, manufacturing defect, and negligent misrepresentation claims.

addiction develops.  *See*, *e.g.*, Grunberg Rpt., ¶ 23 (explaining that, while potentially shorter for adolescents, the typical period of regular use necessary to develop nicotine dependence ranges from "a few weeks to a few months").  It is also inconsistent with JLI's previous position in this proceeding.  Dkt. No. 2309, JLI's Opposition to Class Cert. at 1 ("From experimentation [with nicotine], to adoption, to frequent use, and to addiction, all consumers pursue their own journeys. Those journeys vary by individual at each step.").

JLI's argument is also inaccurate.[4]  B.B. was exposed to JLI's misrepresentations before, during and after her nicotine addiction "journey," and the evidence supports a triable fraud claim.

        1.      <u>The jury can find that JLI misrepresented its product to B.B.</u>

The JLI marketing material B.B. saw represented the JUUL device as safe and appropriate for youth.  It is undisputed that this representation was, at all relevant times, false. B.B. gathered this representation from her exposure to at least three types of JLI marketing material.

***First***, B.B. watched (multiple times) JLI's Vaporized video, which portrays young, bouncy models dancing with colorful triangles and puffing the JUUL device.  *See* Ex. 13 (a representative display, displaying the same video B.B. saw).  Despite B.B. identifying this video in her initial discovery responses (*see* Ex. 17, BBAINPL-Ad&Image-000010; BBAINPL-Ad&Image-000073,), JLI's counsel ignored it at deposition.  The video B.B. saw is a distillation of the youth-centric Vaporized campaign that was widely criticized for misrepresenting the JUUL product as appropriate for youth.  *See, e.g.* Jackler Rpt. at 244 ("The videos that played on the kiosk . . . mainly play a loop of trendy, playful young models from the Vaporized campaign"); Pratkanis Rpt. at 32-36 (explaining how Vaporized marketing communicated safety messages and appealed to youth).  Further, the context in which B.B. viewed the video underscores the misrepresentation.  B.B. saw this colorful video display on convenience store

---

[4] The core of JLI argument is that B.B. did not actually see any ads. Curiously, to support this assertion, JLI cites B.B.'s own experts' testimony, refusing to adopt this statement of counsel. *See* Mot. at 7, (citing Ex. 18, Dr. Grunberg ("but exactly the way you said it, I'm neither agreeing or denying it. I don't know the answer to that"); Ex. 11, Dr. Prochaska, testifying that—based solely on the testimony counsel provided—*she* could not "detail the ads [B.B.] was exposed to before she started using").

PLAINTIFF'S OPP. TO JLI DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. 19-MD-02913-WHO

counter-tops.  B.B. Declaration, ¶ 5.  JLI ensured these displays would be in this position, where stores also display brightly colored candy.  *See* Ex. 18.  This colorful parallel of the JUUL display contributed to B.B.'s belief that JUUL looked "cool and fun…[ ]something that would be okay for young people to use."  B.B. Declaration, ¶ 5; *see also* Jackler Rpt. at 375 (explaining that by placing JUUL products on the counter "close to the candy and other items commonly purchased by teens," JLI "created even more opportunity to put JUUL in front of the faces of youth with an implicit suggestion that JUUL was a product for youth").  While the looped video of over six minutes contains a seconds long, interstitial, fine print warning, B.B. did not see this warning.  *See* Ex. 13 (display case itself); *see also* B.B. Declaration, ¶ 5.  B.B.'s exposure to this marketing tactic—of playing colorful videos of youthful, active people using JUUL *next* to the candy in convenience stores—*by itself* creates a triable issue as to whether JLI misrepresented their product to her as safe or appropriate for youth.

Second, starting in 2016, B.B. was exposed to ubiquitous JUUL posters and decals that marketed the JUUL with bright colors, and emphasized their flavors with splashy depictions of fruit.  B.B. Declaration, ¶ 2.  These posters typically had fine print warnings at the bottom that B.B. did not see, but also did not warn that nicotine is addictive or that JUUL contained toxic chemicals (beyond nicotine), that can cause injury.  B.B. Depo. Trx. at 119:2-14.



The wallpapering of convenience stores with these effectively warningless materials gave B.B. the impression that the product was safe, normal and increased her curiosity.  *Id.*, ¶¶ 3, 8;

*see also* Halpern-Flesher Rpt. at 141 (noting the repeated exposure to JUUL-related material normalizes JUUL for young people).

*Finally*, B.B. was exposed to JLI's digital materials during her JUUL initiation and for a more than a year thereafter. For example, JLI's website—which B.B. visited the same day she first tried JUUL—reinforced the impression that the product was safe by emphasizing the tasty mango flavor, depicting the JUULpod among actual mangos, and referring to the vapor as "intensely satisfying." B.B. Declaration, ¶10. At age twelve, B.B. associated fruit depictions with healthy food or candies. *Id.*, ¶¶ 3, 10. This impression that JUUL was akin to candy—and therefore safe—was reinforced by B.B.'s yearlong exposure to JLI's promotion of its product over Instagram, which routinely depicted the JUUL as a desert replacement or treat. *Id.*, ¶ 15; *see also e.g. id.,* ¶ 11. Taken together, this evidence of B.B.'s exposure to JLI's youth-oriented marketing is more than sufficient to raise a dispute of material fact as to whether JLI misrepresented their product to B.B.

Putting aside JLI's assertion that "there is no evidence"[5] that B.B. saw any of JLI's marketing material, JLI contends that summary judgment is appropriate because (1) B.B. testified at deposition that she did not know "precisely" what JUUL was before she started using it; and (2) the aesthetics of JLI's ads—"bright colors, clean lines, [] eye-catching graphics"— cannot constitute a misrepresentation, as a matter of law. Mot. at 8 (quoting *Colgate v. JUUL Labs., Inc.* (*Colgate II*), 402 F. Supp. 3d 728, 748 n.4 (N.D. Cal. 2019). Both of these arguments fail.

First, the testimony that JLI relies on does not support the absolutist proposition that B.B. had no concept or impression of what a JUUL device was prior to using it. When asked if she "knew what JUUL was before [E.S.] offered" it to her, B.B. responded "No." Depo. At 75:22-24. There were no follow-ups on what B.B. understood that question to mean. Under the

---

[5] To the extent JLI contends that summary judgment is appropriate because B.B. did not produce the *actual* precise advertisements she observed at ages eleven and twelve, this argument fails. As the Court noted, the "actual advertisement or marketing material a [minor] plaintiff saw does not (*for obvious reasons*) need to be reproduced but the specific or materially similar words or text that form the basis of their affirmative misrepresentation claim should be identified." *In re JUUL,* 497 F. Supp. 3d at n.47 (emphasis added).

circumstances, it is reasonable that B.B. would understand that question to mean:  did she know that JUULs *were nicotine inhalers* before she used one.  B.B. testified that while she did not understand everything about the JUUL she "recognized the JUUL from the ads [she] had seen in stores, and [] was curious about it and wanted to try it."  B.B. Declaration, ¶ 9.

Moreover, even if B.B. had no detailed understanding of what a JUUL device was at that time, this would not negate the evidence of her past exposure to JLI's marketing.  *See* Halpern-Flesher Rpt. at 10, 133-42 (explaining that adolescents form unconscious impressions and desire for products based on marketing).  Nor can it negate the evidence that B.B. was continuously exposed to JLI's marketing material *after* her first puff, which informed her choice to pursue habitually using the JUUL.  *See* B.B. Depo Trx at 190:5-191:9.

Second, JLI's argument that the aesthetics of its ads cannot support B.B.'s fraud claims misunderstands the record and the Court's previous orders.  B.B. did not gain the impression that JUUL was safe and appropriate for young people from JLI's use of "clean lines" or "vague terms" (Mot. at 8), she gained it from—*inter alia*—(1) JLI's video of bouncy young people dancing and puffing JUULs, (2) the placement of the colorful, warningless pods in stores, (3) the text of the ads which emphasized "satisfaction" and fruit (*e.g.* "Mango")—which twelve year old B.B. associated with health or candy—and (4) the comparisons to desserts, both explicit ("Crème Brulee") and implicit.  All of this contributed to B.B.'s overall impression of JLI's marketing. *See* Depo. 118:4-23 (explaining that her overall impression from JLI's ads and store set-up was that the product was safe).  This is precisely the sort of actionable impression the Court described last time it rejected JLI's bowdlerized reading of its *Colgate II* order.  *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 626 (N.D. Cal. 2020) (rejecting JLI's argument and explaining that the *Colgate II* order "did not rule on the use of specific phrases in JLI's marketing materials. Nor did [it] rule out the relevance of the overall features of an advertisement (including its use bright of eye-catching colors) to the context of whether an advertisement, *when considered in whole*, is misleading or false.") (emphasis added).  It is also the sort of impression that courts have held are actionable.  *See, e.g., Williams v. Gerber Prod. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (explaining that packaging that pictured "a number of

different fruits, potentially suggesting (falsely) that those fruits or their juices are contained in the product" could sustain claim for deceptive marketing).

> ### 2. The jury can find that B.B.'s addiction resulted from her reliance on JLI's misrepresentation.

JLI contends that a finding that B.B. relied on JLI's marketing is precluded as a matter of law because (1) B.B. fails to identify any misrepresentation on which reliance is reasonable; and (2) B.B. relied on E.S., not JLI, in making her decision to use JUUL. *See* Mot. at 7-8 ("B.B.'s decision to use a JUUL device did not require any persuasion by JLI" . . . "she tried it because E.S. asked her to").  Neither of these arguments have merit.

As addressed above, B.B. identified the representative (if not the specific) JLI marketing material she saw that represented the JUUL product as safe and appropriate for youth. *See* III.A.1.  B.B. further testified that she relied on this misrepresentation in her choice to use JUUL. B.B. Depo. Trx. at 190:5-191:9.  Whether B.B.—at age twelve—reasonably relied on this misrepresentation is a question for the jury and "not appropriate for resolution at the summary judgment stage." *Goodall v. Akers*, 2009 WL 528784, at \*7 (Tenn. Ct. App. Mar. 3, 2009); *see also City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996) (a fact-finder must "take into account the specific situation of a plaintiff in evaluating the reasonableness of reliance").

JLI's next argument—that B.B.'s interaction with E.S. precludes a finding that B.B. relied on JLI's marketing—fails on multiple levels.  As an initial matter, it mischaracterizes the record:  E.S. did not *ask* B.B. to try JUUL—she offered it to her.  B.B. Depo. Trx. at 75:25-76:3. And B.B. testified that she accepted this offer because JLI's marketing had piqued her curiosity. B.B Decl., ¶ 8.  Whether B.B. accepted E.S.'s offer for different reasons is a fact question not appropriate for disposition at summary judgement.

Moreover, this argument—that E.S. is the *true* culprit behind B.B.'s addiction—is premised on JLI's faulty theory that B.B.'s addiction to nicotine occurred at the moment of her first puff.  As discussed, the record shows that (or at a minimum, raises a triable issue of fact as to whether) B.B.'s addiction built over an extended period time, during which she was exposed

to further marketing material from JLI.  B.B Decl., ¶¶ 10, 11, 12, 14, 15.  Moreover, B.B. was continuously exposed to JLI material and product that reaffirmed and sustained her addiction. Ex. 19, *Case Specific Expert Witness Report of Judith J. Prochaska* ("Prochaska Case Rpt.") at 12 ("Every JUUL pod that [B.B.] consumed contributed to sustaining her addiction.").  If JLI seeks to blame E.S. for B.B.'s addiction, it may raise that argument at trial.  But notably, on this record, even if the jury determined that E.S. caused B.B. to use JUUL, it could *still* find that JLI is ultimately responsible, given the extensive evidence that JLI's marketing was designed to, and did create peer-to-peer viral spread of the JUUL product among minors.  *See* II.C.; *see also* Ex. 20, *Transcript of Deposition of E.S.* at 105:6-109:12 (E.S. testifying that she too was exposed to JUUL's advertising around this time in stores and on Instagram).  JLI's preferred (if fanciful) view of the record does not preclude—as a matter of law—a finding in B.B.'s favor and thus cannot warrant summary judgment.  *Cal. Hotels & Lodging Ass'n v. City of Oakland*, 393 F. Supp. 3d 817, 822-23 (N.D. Cal. 2019) ("On summary judgment, the court draws all reasonable factual inferences ***in favor of the non-movant***") (emphasis added).

### B.    The Jury Can Find for B.B. on Her Failure to Warn Claims.

To recover on a failure to warn claim, a plaintiff must show that (1) the warnings at issue were defective; (2) the defective warning made the product unreasonably dangerous; and (3) the inadequate warning proximately caused the claimed injury.  *Lee v. Metro. Gov't of Nashville & Davidson County*, 596 F.Supp.2d 1101, 1127 (M.D. Tenn. 2009).

JLI argues that no reasonable jury can find—under either a product liability or a negligence theory—that JLI's insufficient warnings were the proximate cause of B.B.'s addiction injury.  Specifically, JLI argues that B.B.'s testimony that she "didn't pay any attention" to warnings *negates* any evidence that B.B "would have changed her behavior based on any additional information provided by JLI," and thus any evidence that JLI's failure to warn was the proximate cause of her injury. Mot. at 7-8.  This argument fails.  B.B. testified explicitly that had she been warned of how addictive and harmful JUUL is, she would have ceased or never started using it.  B.B. Depo Trx at 189:4-191:12; 194:110-195:16.  This evidence is sufficient at this stage.  *See Nolen v. C.R. Bard Inc.*, 533 F. Supp. 3d 584, 591 (M.D. Tenn. 2021) (denying

- 17 -

summary judgment on a failure to warn claim and noting that testimony of a purchaser's decision making is best evidence of proximate cause).  Purported inconsistencies in a teenager's testimony are not a basis for summary judgement.  *City of Oakland*, 393 F. Supp. 3d at 823 ("In deciding a motion for summary judgment, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).  To the extent there is any meaningful conflict in B.B.'s testimony that is an issue for the jury to consider, and not an appropriate basis for granting summary judgment on her claims.

Alternatively, JLI argues that because B.B. "did not receive packaging the first or second time she used the JUUL device" she was not exposed to any deficient warnings.  Mot. at 7.  In support of this argument, JLI oddly cites B.B.'s testimony that she did *not* see any warnings on certain JUULpod products for the proposition that "B.B. does not dispute that warnings were on [that] packaging."  Mot. at 7 (citing depo 186:23-25).  But even this Orwellian interpretation of B.B.'s testimony cannot save JLI's argument.  As discussed, during her JUUL initiation period, B.B. observed the packaging of the JUUL starter kit, JUULpods, and other JUUL products that had deficient warnings.  B.B. Decl., ¶¶ 4-5, 20-23.  And even JLI acknowledges that JUUL packaging did not contain nicotine addiction warnings until May 2018.  *See* JLI Mot. at 4:9-10. She also observed a variety of marketing material with insufficient warnings.  B.B. Decl., ¶¶ 2-5, 10-12, 14-15.

In a separate section of its motion, JLI argues that B.B. saw a warning on its website the first day she used JUUL.  *See* Mot. at 12-13.  At deposition, B.B. testified that she did not remember seeing this warning.  B.B. Depo. Trx. at 194:10-21.  The Wayback Machine archive supports B.B.'s recollection.  *See* Ex. 21, Declaration of Joseph VanZandt (noting that the warning does not appear in the archives of JLI's website for September of 2017, but does appear at later dates).  To the extent JLI wants to argue that their evidence is more persuasive, or any inconsistencies in B.B.'s testimony, those argument are for the jury and not appropriate for summary judgement.  *City of Oakland*, 393 F. Supp. 3d at 823.

**C.      The Jury Can Find for B.B. on Her Fraudulent Concealment Claim.**

Under Tennessee law, fraudulent concealment is committed "when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538–39 (Tenn. 1998)).

Beyond the duplicative challenge to causation[6] (addressed in III.B.), JLI's motion poses only a narrow challenge to the "resulting misrepresentation" element of B.B.'s fraudulent concealment claim.  Specifically, JLI argues that—absent evidence that B.B. saw any JLI advertisements—B.B. cannot show any misrepresentation *resulting* from JLI's omissions from those advertisements.  Mot. at 6-7.  As discussed above, B.B. has identified a great deal of marketing material that she saw.  This material did not sufficiently disclose that the JUUL is a nicotine vapor inhaler, that nicotine is a dangerous and addictive substance, that JUUL contains toxic chemicals, and can cause or exacerbate pulmonary injuries.  This information was either missing entirely (*e.g.* JLI's banner ads and Instagram posts), partially disclosed in fine print at the bottom (*e.g.* JLI's posters and website), or partially disclosed in a seconds long snippet between three-minute video loops (as with the counter-top display).  As B.B. testified, the omission of this material information resulted in the misrepresentation that the JUUL device was safe and non-addictive.  B.B. Decl., ¶¶ 5, 7, 9, 10; B.B. Depo. Trx. at 187:16-25; 189:4-191:12.

**D.      B.B.'s failure to warn claim is not preempted.**

JLI contends that "much of Bain's failure-to-warn claims fails" is impliedly preempted by the FDA's warning requirement. Mot. at 9. As an initial matter, this is not a basis for summary judgment, as JLI concedes that Plaintiff may maintain failure to warn claims not based "on nicotine addiction." Mot. at 10-11. B.B.'s claim is based also on JLI's failure to warn her

---

[6] JLI seemingly advances a misguided challenge to the reliance element of this claim.  For obvious reasons, no such element exists. *See generally Restatement (Third) of Torts: Prod. Liab.* § 2, cmt. a (1998) (failure to warn claims "cannot be determined by reference to the manufacturer's own design or marketing standards because those standards are the very ones that plaintiffs attack as unreasonable"). But in all events, their broadside challenge to reliance is addressed above. *See* III.A.1.

that JUUL was inappropriate and dangerous for minors, and that it could cause or exacerbate pulmonary injuries. Regardless, even focusing on nicotine addiction alone, B.B.'s failure to warn claim is not preempted.

        1.     <u>B.B.'s failure to warn claim does not present any obstacle to a specific goal of the FDA.</u>

Obstacle preemption is not a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than courts that preempts state law." *In re Volkswagen*, 959 F.3d 1201, 1206 (9th Cir. 2020). Rather, the Court must "infer[] … a deliberate choice to preclude state regulation when a federal enactment clearly str[ikes] a particular balance of interests that would be disturbed or impeded by state regulation." *Id.* at 1212 (internal quotation marks omitted). There must "clear evidence" of an "actual conflict." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884-85 (2000); *see also In re MTBE*, 725 F.3d 65, 101 (2d Cir. 2013) ("mere fact of tension between federal and state law is generally not enough") (citation omitted). In this Court's words, preemption requires that "a specific goal of the FDA would be frustrated by allowing specific state law claims to proceed." *In re JUUL*, 497 F. Supp. 3d at 593.

Here, JLI asserts that B.B.'s addiction failure-to-warn claim would frustrate a goal of "national standards … for tobacco labeling." Mot. at 10. That general policy (one of ten listed in the purpose section of the statute), is not a "specific goal of the FDA" that is "frustrated" by an addiction-related failure-to-warn claim. The FDA regulation does not establish national uniformity. Instead, the agency-promulgated standard is a "*Minimum* Required Warning Statement" that "is not intended to prevent tobacco product manufacturers from including truthful, non-misleading warnings on their products' packaging or advertisements voluntarily or as a result of FDA guidance." Deeming Rule, 81 Fed. Reg. 28,973-01, 28,990 (May 10, 2016). JLI suggests that regulations that "provide only a floor" are not preempted (Mot. at 11) but that is all that the "Minimum Required Warning" is.

*Geier* does not support preemption. In *Geier*, the plaintiff claimed that "to be safe, a car must have an airbag." 529 U.S. at 886. This claim conflicted with the express purpose of a

federal regulation that "sought a gradually developing mix of alternative passive restraint devices." *Id.* at 879. Manufacturer discretion was key to the agency's efforts to avoid "backlash," "help develop data on comparative effectiveness," permit "the industry time to overcome the safety problem and high production costs associated with airbags," and "build public confidence." *Id.* at 879. In "sum, as DOT now tells us through the Solicitor General," the regulation "embodies the Secretary's policy judgment that safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car." *Id.* at 881 (internal quotation marks omitted). Nothing about the Minimum Required Warning reflects a similar federal goal of manufacturer discretion; instead, the warning is a minimum, nothing more. *See Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1153 (9th Cir. 2017) ("[W]e should not seek out conflicts between state and federal regulation where non clearly exists.") (internal quotation marks omitted).

This case is instead better informed by *Williamson v. Mazda*, 562 U.S. 323 (2011). There, like *Geier*, a federal regulation gave manufacturers a choice: lap belts or lap-and-shoulder belts. *Id.* at 326. And, like *Geier*, the plaintiff imposed tort liability for those who made a particular choice (lap belt). *Id.* But, unlike *Geier*, the claim was not preempted. The Court explained: "At the heart of *Geier* lies our determination that giving auto manufacturers a choice among different kinds of passive restraint devices was a *significant objective* of the federal regulation." *Id.* at 330. In *Williamson*, conversely, while the regulation did leave manufacturers a choice, there was no indication that manufacturer discretion related to "a significant safety concern." *Id.* at 334. The manufacturer argued that the agency necessarily balanced the costs and benefits of lap-and-shoulder belts in a way that preempted the tort suit, but the Court disagreed: "to infer from the mere existence of such a cost-effectiveness judgment that the federal agency intends to bar States from imposing stricter standards would treat all such federal standards as if they were *maximum* standards, eliminating the possibility that the federal agency seeks only to set forth a *minimum* standard potentially supplemented through state tort law." *Id.* at 335.

An asserted general federal interest in uniformity does not suffice for conflict preemption. While JLI cherry-picks one purpose of the TCA, the statute's overarching goal is

PLAINTIFF'S OPP. TO JLI DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. 19-MD-02913-WHO

"[t]o protect the public health." Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat. 1776, 1776 (2009).  Permitting injured persons to sue over injuries caused by inadequate warnings promotes public health. *See Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 963 (N.D. Cal. 2004) (rejecting conflict preemption, and explaining that "[T]he primary congressional objective … is safety. While legislative history demonstrates a federal interest in uniformity of motor vehicle safety regulation and administration of recalls, uniformity is at best a secondary goal. Allowing consumers to pursue State remedies for a dangerous manifold defect would likely advance the federal interest in highway safety.").

The fact that, as JLI argues (Mot. at 10), the FDA included precise language and placement of the warning does not mean that a claim seeking additional warnings is a clear obstacle to the regulation's policy objectives. Such a claim need not require JLI to alter the federal warning (and the jury can be instructed on JLI's federal regulatory obligations). If national uniformity in addiction warnings were a significant objective of the FDA, then the agency would have made the warning requirement a ceiling as well as a floor. Instead, the agency made it a "Minimum" requirement only.

Two other facts show that B.B.'s claim is consistent with the objectives of the Minimum Required Warning.  *First*, the Deeming Rule applied to the entire class of tobacco products made subject to federal regulation in that regulation.  It did not consider, let alone account for, variations in the design, marketing, or danger of any particular product. *See* Deeming Rule, 81 Fed. Reg. at 28,989-90 (explaining that the FDA would consider additional "exposure warnings" as part of "premarket authorization"); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 492 (D. Md. 2019) (FDA did not "address[] public health concerns"). At minimum, then, summary judgment is inappropriate because trial will establish the extent to which any duty imposed by B.B.'s failure to warn claim is based on facts specific to JUUL.  *Second*, B.B.'s initial and early use of JUUL occurred before May 2018, which is when JLI claims it complied with the federal regulation.  Mot. at 11.  Claims based on a product that, at the time, was *un*regulated and did not carry federal warnings, cannot pose a threat to the objectives of the federal regulation.  *Cf.*

*Holley v. Gilead Sci., Inc.*, 379 F. Supp. 3d 809, 821-25 (N.D. Cal. 2019) (no preemption related to design features resulting from manufacturer's "independent action").

Finally, even if B.B.'s nicotine-addiction failure-to-warn claim regarding the label were preempted, her claim regarding advertising would not. That is so because Congress specifically anticipated state regulation of tobacco-product advertising. *See* 21 U.S.C. § 387p(a)(2)(B) (excepting from preemption "requirements relating to the … advertising and promotion of … tobacco products"); *see also In re JUUL*, 497 F. Supp. 3d at 590-91 (rejecting the argument that advertising claims are preempted); *Volkswagen*, 959 F.3d at 1219 (rejecting implied preemption argument where "[t]he language of the" the statute "indicates that Congress foresaw the likelihood of a continued meaningful role for state enforcement") (internal quotation marks omitted); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) ("The case for federal preemption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them.") (internal quotation marks omitted); *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 432 (1963) (holding that a state law did not stand "as an obstacle to the full effectiveness of the federal statute" because the federal government "apparently viewed state regulation of advertising as complementing its regulatory function, rather than in any way conflicting with it").

2. The express preemption clause precludes JLI's obstacle preemption arguments.

Plaintiff recognizes that the Court has determined that implied preemption of a product-liability claim is at least possible, notwithstanding the express preemption and non-preemption language. *JUUL*, 497 F. Supp. 3d at 592-93. Plaintiff sets out argument on this point briefly, and preserves the issue for further review.

The comprehensive express preemption provision in the Tobacco Control Act ("TCA"), coupled with the unambiguous intent in the "rule of construction" to exempt from preemption "any action or the liability of any person under the product liability law of any State," 21 U.S.C. § 387p(b), together preclude any obstacle preemption of a product liability claim. *See, e.g.*,

- 23 -

*Volkswagen*, 959 F.3d at 1211 (finding no obstacle preemption where statute directly addressed state law, and explaining that "[i]f the statute contains an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."); *Cf. Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 492 (2013) (applying conflict preemption, but explaining that the statute at issue "includes neither an express pre-emption clause … nor an express non-preemption clause" and so "[i]n the absence of that sort of 'explicit' expression of congressional intent, we are left to divine Congress' will from the duties the statute imposes").

Through two rounds of briefing, JLI has never offered any plausible interpretation of the rule of construction—which states that "this chapter," meaning the TCA, does not preempt product liability claims—that would authorize preemption. Instead, JLI relies on *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000), but in that case, the Court interpreted the "saving clause" to not actually be a non-preemption provision, but instead to "simply bar a special kind of defense." *Id.* at 869; *see also Volkswagen*, 959 F.3d at 1214 (explaining that the "unremarkable principle" articulated in *Geier* "means only that a court must interpret a saving clause as it would any statutory language"); *see also, e.g.*, *Nat'l Fed. of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir. 2016) (exploring implied preemption only after finding that the saving clause preserved only "remedies," not claims, and so was inapplicable on its terms).

3.    JLI's compliance with FDA regulation is irrelevant to B.B.'s failure to warn claim.

JLI argues that B.B.'s failure to warn claim "premised on nicotine addiction after May 2018" fails because Tenn. Code Ann. § 29-28-104(a) entitles them to a rebuttable presumption that their JUUL product was not unreasonably dangerous *while* it was in compliance with FDA regulations. Mot. at 11. According to JLI, B.B. cannot rebut this presumption and thus summary judgment is warranted. This argument is meritless.

At the threshold, B.B.'s failure to warn claims premised on nicotine addiction are rooted in JLI's conduct prior to May of 2018 (*see* III.A.), when JLI was not in compliance with FDA labeling regulation 21 C.F.R. § 1143.3. Thus, on its face, § 29-28-104(a) does not apply. Tenn.

Code Ann. § 29-28-104(a)) ("Compliance by a manufacturer or seller with any federal or state statute or administrative regulation existing *at the time a product was manufactured*") (emphasis added). While B.B.'s addiction injury continued to grow after May of 2018, JLI points to nothing in § 29-28-104(a) that would limit damages, or retroactively apply.

Here, based on the evidence of B.B.'s exposure to JLI's warningless marketing over social media after May of 2018[7], a jury could reasonably conclude that JLI's product remained defective for failure to warn. In anticipation of this point, JLI argues that these marketing efforts should not be considered because by May of 2018 the influencers they employed to promote JUUL to teens over social media "were all over the age of 28." Mot. at 12. But whether evidence of JLI's 29 year old influencers is *actually* exculpatory is a question for the jury and not appropriate for disposition on summary judgment.

**E.      A Jury Could Find That Using JUUL Exacerbated B.B.'s GERD and Asthma**

JLI's challenge to B.B.'s exacerbation injuries—as to GERD and asthma—is simply a repetition of the arguments it advances in its *Daubert* motion seeking the exclusion of the supportive expert opinions of Dr. Winickoff, Dr. Casey and Dr. Levy. *Compare* Health Effects *Daubert*"[8]), at 19-21, 24-26, *with* JLI Mem. at 21-25. By JLI's own admission, the testimony of any one of these experts creates a jury question as to her claims regarding GERD and asthma exacerbation. Mot. at 21-25. Therefore, absent their exclusion, summary judgment is inappropriate. Plaintiffs incorporate the arguments set forth in their forthcoming Plaintiff's Omnibus Opposition to JLI's *Daubert* Motions, and submit that if JLI's Health Effects *Daubert* motion is denied, its motion for summary judgment with respect to B.B's exacerbation claims must be denied as well.

[7] Chandler Rpt. at 61-67 (citing internal documents and explaining that JLI used company social media accounts until November 2018, and after deactivating relied on user generated content, noting "JUUL-related messaging was deeply entrenched in social media channels, on Twitter in particular, and it continued to proliferate even after the company's own accounts were shut down."); *id.* at 39-40 (JLI amplified content of users who engaged with hashtags primarily used by teens, like #JUULgang, which—as of September 2021, has—67,000 posts, and videos with the hashtag #juulgang had 560 million views on TikTok); *see also* Ex. 16, Appendix at pp. 22, 94, 93, 114, 116, 117, 90, 115, 127-29,72 (setting forth ads that appeared after May of 2018).

[8] *See* Dkt. No. 2702 JLI Daubert Brief #3 – Omnibus Daubert Motion to Exclude Certain Opinions on Toxicity and Health Effects (referred to herein as the "Health Effects *Daubert*").

## IV.   CONCLUSION

JLI's motion should be denied as to B.B.'s fraud and failure to warn claims.


Dated: January 21, 2022

Respectfully submitted,


By: /s/ *Sarah R. London*

Sarah R. London
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
slondon@lchb.com


By: /s/ *Dena C. Sharp*

Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
dsharp@girardsharp.com


By: */s/ Dean Kawamoto*

Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
dkawamoto@kellerrohrback.com

By: */s/ Ellen Relkin*

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
erelkin@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

PLAINTIFF'S OPP. TO JLI DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. 19-MD-02913-WHO

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: /s/ *Sarah R. London*
Sarah R. London

PLAINTIFF'S OPP. TO JLI DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. 19-MD-02913-WHO