1    [*Submitting Counsel on Signature Page*]

2                    **UNITED STATES DISTRICT COURT**

3                   **NORTHERN DISTRICT OF CALIFORNIA**

4

5    IN RE: JUUL LABS, INC., MARKETING,        Case No. 19-md-02913-WHO
     SALES PRACTICES, AND PRODUCTS
6    LIABILITY LITIGATION                       **DEFENDANTS' NOTICE OF MOTION
                                                 AND MOTIONS IN LIMINE**
7

8    _____

9    This Document Relates to:

10   *Robin Bain, individually, and as the legal*
     *Guardian of her minor child, B.B. v. Juul Labs,*
     *Inc., et al.*
11
     Case No. 3:20-cv-07174
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that on a day to be determined by the Court, in Courtroom 2 of this Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California, Defendant Juul Labs, Inc. ("JLI") and Defendants Altria Group, Inc., Philip Morris USA Inc., Altria Client Services LLC, Altria Group Distribution Company, and Altria Enterprises LLC (collectively, "Altria")[1] will and hereby do move the Court to enter an order *in limine* limiting evidence or argument regarding the topics specified in the following motions and their accompanying Table of Contents.

The Motion is based on this Notice of Motion and the following Motions in limine.

Dated: March 21, 2022                              Respectfully Submitted,

DAVID M. BERNICK, P.C. *(pro hac vice)*
david.bernick@kirkland.com
RENEE D. SMITH *(pro hac vice)*
renee.smith@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

PETER A. FARRELL, P.C. *(pro hac vice)*
peter.farrell@kirkland.com
JASON M. WILCOX, P.C. *(pro hac vice)*
jason.wilcox@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W. Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

GREGORY P. STONE (SBN 78329)
gregory.stone@mto.com
DANIEL B. LEVIN (SBN 226044)
daniel.levin@mto.com
BETHANY W. KRISTOVICH (SBN 241891)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426

---

[1] The parties have stipulated that for purposes of the B.B. summary judgment motions and at trial, the five named Altria Defendants will be treated as a single defendant. (ECF No. 2756.). "Altria" refers to these defendants collectively. "AGI" refers to Altria Group, Inc. and "PM USA" refers to Philip Morris USA Inc.

Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Juul Labs, Inc.*

Lauren S. Wulfe (SBN 287592)
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, Forty-Fourth Floor
Los Angeles, California 90017
Telephone: 213-243-4000
Facsimile: 213-243-4199
Lauren.Wulfe@arnoldporter.com

Paul W. Rodney (*admitted pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
1144 15th Street, Suite 3100
Denver, CO 80202
Telephone: 303-863-1000
Facsimile: 303-832-0428
Paul.Rodney@arnoldporter.com

John C. Massaro (*admitted pro hac vice*)
Daphne O'Connor (*admitted pro hac vice*)
Jason A. Ross (*admitted pro hac vice*)
David E. Kouba (*admitted pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Telephone: 202-942-5000
Facsimile: 202-942-5999
John.Massaro@arnoldporter.com
Daphne.OConnor@arnoldporter.com
Jason.Ross@arnoldporter.com
David.Kouba@arnoldporter.com

Angela R. Vicari (*admitted pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: 212-836-8000
Facsimile: 212-836-8689
Angela.Vicari@arnoldporter.com

*Attorneys for Defendants Altria Group, Inc.,*
*Philip Morris USA Inc., Altria Client Services LLC,*
*Altria Group Distribution Company, and*
*Altria Enterprises LLC*

Defendants' Notice of Motion and Motion To

# <u>TABLE OF CONTENTS</u>

INTRODUCTION..............................................................................................................1

MOTIONS IN LIMINE ...................................................................................................2

II.     MOTION IN LIMINE NO. 1: EVIDENCE AND ARGUMENT RE NICOTINE DISCLOSURES ON LABELS AND PACKAGING .........................................2

III.    MOTION IN LIMINE NO. 2:  MARKETING THAT B.B. WAS NOT EXPOSED TO.......................................................................................................3

IV.    MOTION IN LIMINE NO. 3:  THIRD PARTY SOCIAL MEDIA CONTENT .................7

V.     MOTION IN LIMINE NO. 4:  EDUCATION AND YOUTH PREVENTION PROGRAM INTERACTIONS WITH YOUTH AND RELATED CONGRESSIONAL TESTIMONY ...................................................................11

VI.    MOTION IN LIMINE NO. 5:  JLI'S ONLINE AGE VERIFICATION PROCESSES ......................................................................................................14

VII.    MOTION IN LIMINE NO. 6:  HEARSAY "THRILLER" BOOKS ...............................15

VIII.    MOTION IN LIMINE NO. 7:  DEFENDANT'S OR WITNESSES WEALTH OR FINANCIAL CONDITION ...........................................................................17

IX.    MOTION IN LIMINE NO. 8:  HISTORICAL CONDUCT CONCERNING COMBUSTIBLE CIGARETTES ..........................................................................19

X.     MOTION IN LIMINE NO. 9:  JUDICIAL FINDINGS AND OPINIONS IN CIGARETTE LITIGATION ................................................................................22

XI.    MOTION IN LIMINE NO. 10:  EVIDENCE CONCERNING CIGARETTE COMPANIES' SETTLEMENTS WITH STATE ATTORNEYS GENERAL ..................23

XII.    MOTION IN LIMINE NO. 11:  ALTRIA CONDUCT UNRELATED TO B.B.'S INJURIES...............................................................................................23

XIII.    MOTION IN LIMINE NO. 12:  FRANKEL EMAIL (JLI01129881–84)..........................24

XIV.    MOTION IN LIMINE NO. 13:  THE "MORALITY" OF SELLING CIGARETTES ......................................................................................................25

XV.    MOTION IN LIMINE NO. 14:  MISCHARACTERIZATION OF ALTRIA AND JLI'S RELATIONSHIP ...........................................................................26

XVI.    MOTION IN LIMINE NO. 15: PROTECTED COMMUNICATIONS WITH THE GOVERNMENT ...........................................................................................27

XVII.    MOTION IN LIMINE NO. 16:  CHANGES TO THE MARKTEN PRODUCT ...............28

XVIII.    MOTION IN LIMINE NO. 17:  PHILIP MORRIS INTERNATIONAL...........................28

XIX.    MOTION IN LIMINE NO. 18:  ALTRIA'S ACQUISITION OF CRONOS ....................28

1

XX.   MOTION IN LIMINE NO. 19:  FDA'S CRITICISM OF ALTRIA'S INVESTMENT IN JLI .................................................................................................................29

2

3

XXI.  MOTION IN LIMINE NO. 20:   FOREIGN REGULATION OF TOBACCO PRODUCTS ......................................................................................................29

4

CONCLUSION ...............................................................................................................30

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Notice of Motion and Motion To

## INTRODUCTION

Defendants Juul Labs Inc. ("JLI") and Altria move *in limine* to exclude prejudicial material having little relevance to the claims of B.B., who is the only plaintiff in this bellwether lawsuit. B.B. is one plaintiff who tried JUUL products in Tennessee. She was never exposed to material that might be at issue for other plaintiffs in this MDL. She never saw print "Vaporized" advertising; she never participated in JLI's "Education and Youth Prevention Program"; she never purchased JUUL products online or at retail, and she never smoked cigarettes.

Plaintiff's counsel has nevertheless indicated that they may introduce evidence on irrelevant and prejudicial topics, seeking to try not just B.B.'s specific claims, but instead all of the ills Defendants ever (purportedly) created. But such blunderbuss trial tactics are impermissible. Federal Rule of Evidence 401 and 402 make clear that evidence is only relevant and admissible if it goes to facts that are actually "of consequence" to the claims at issue; here, controversies or misdeeds occurring far from Tennessee or many years ago are not at issue in the case of *B.B.* And Plaintiff's counsel's trial strategy, if permitted, risks extraordinary prejudice—confusing the jury, and inviting them to punish Defendants on account of harms best addressed by *other* plaintiffs, not by B.B. Neither JLI nor Altria can be condemned for "nationwide" conduct, rather than "conduct directed toward the [plaintiff]," *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 420-23 (2003), and Plaintiff cannot present irrelevant evidence merely to "appeal[] to the jury's sympathies, arouse[] its sense of horror, [or] provoke[] its instinct to punish" *United States v. Skillman*, 922 F.2d 1370, 1374 (9th Cir. 1990). Defendants' motions in limine should be granted.

## LEGAL STANDARDS

The Federal Rules of Evidence impose standards governing the admission of evidence. Evidence must be "relevant," meaning it must make "a fact . . . of consequence" "more or less probable than it would be without the evidence." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Additionally, even relevant evidence may be excluded if whatever probative value that it has is "substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, misleading the jury, undue delay, [and] wasting time." Fed. R. Evid.

403.  Finally, hearsay is "not admissible" unless the Federal Rules or congressional statute provide otherwise.  Fed. R. Evid. 802.

## MOTIONS IN LIMINE

### I.   MOTION IN LIMINE NO. 1: EVIDENCE AND ARGUMENT RE NICOTINE DISCLOSURES ON LABELS AND PACKAGING

The Court should preclude evidence or argument that JLI should have provided additional or different nicotine warnings on its labeling or packaging.  As JLI previously explained, the Court should enter summary judgment against B.B.'s failure-to-warn claims to the extent that they are based on nicotine disclosures because these claims are preempted, JLI MSJ at 10 (ECF No. 2651).  But even beyond that, the Court should prevent Plaintiff from arguing that JLI's nicotine disclosures were improper or insufficient in support of any other claim.  Allowing Plaintiff to make preempted arguments regarding JLI's nicotine labeling would needlessly confuse the jury, and would prejudice JLI.

Claims related to the nicotine disclosures made on JLI's product packaging and labeling are preempted by the TCA and federal regulations.  The Court has already explained that the FDA's nicotine-warning regulations (21 C.F.R. § 1143.3) impose "strict requirements" for the "language and placement of the nicotine warning label, down to the font and placement of the label."  *Colgate v. JUUL Labs., Inc.* (*Colgate I*), 345 F. Supp. 3d 1178, 1188 (N.D. Cal. 2018) (quoting § 1143.3).  Thus, personal injury plaintiffs like B.B. should not be permitted to make claims that would require JLI to deviate from the labeling that the FDA required; "requir[ing] JLI to make a different or additional disclosure on that specific topic" would necessarily frustrate the purposes of the TCA.  *In re JUUL Labs, Inc.*, 497 F. Supp. 3d 552, 594 (N.D. Cal. 2020).  Allowing a flood of state-law product liability claims—each of which might demand different warnings or warnings above-and-beyond what the FDA required—would frustrate Congressional intent, and undermine the FDA's attempt to impose a uniform warning standard "effective in helping consumers better understand and appreciate the risks of [tobacco] products."  81 Fed. Reg. at 29062–74; *see also CTIA - The Wireless Assoc. v. City of Berkeley*, 487 F. Supp. 3d 821, 833 (N.D. Cal. 2020) (noting "risk of overwarning").

Evidence (such as expert testimony) or argument contending that JLI should have imposed additional or different nicotine warnings, above and beyond what the FDA required, should thus be excluded under Federal Rules 402 and 403.  Such evidence is not relevant because it cannot be probative of any permissible claim.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible"); *see also Sanjiv Goel, M.D., Inc. v. Mot. Picture Indus. Pension & Health Plan*, 2015 WL 12656910, at *1 (C.D. Cal. Feb. 13, 2015) (granting motion in limine, where plaintiffs' claims were preempted in part by ERISA).  And even if B.B.'s evidence regarding additional nicotine labeling were somehow minimally probative of a permissible claim, that evidence would still require exclusion under Rule 403:  any "probative value" B.B. can identify would plainly be outweighed by "confusing the jury," "wasting time," and "prejudice" to JLI.  There is no reason to divert this trial or occupy jurors with attacks on warnings that complied with FDA regulations.  Doing so would confuse the issues, with prejudice to JLI as the predictable result.

## II.     MOTION IN LIMINE NO. 2:  MARKETING THAT B.B. WAS NOT EXPOSED TO.

Evidence of or references to marketing and certain other media which Plaintiff B.B. was not exposed to should be excluded.  This includes, but is not limited to, (i) all marketing, such as promotional events and billboards, that ran in New York City and other locations outside the state of Tennessee, (ii) evidence or references to content from the 2015 "Vaporized" launch campaign, (iii) evidence from JLI's later "Save Room For JUUL" campaign, and (iv) an October 6, 2015 clip from *The Late Show with Stephen Colbert* featuring and commenting on Vaporized content.  This marketing and media content, which B.B. does not claim to have seen, has no probative value, and would only confuse the issues and unfairly prejudice the jury against JLI.  *See* Fed. R. Evid. 402, 403.

***Marketing Activities Outside of Tennessee:***  ████████████████

████████████████████████████████████████, her complaint focuses heavily on experiential marketing from the summer of 2015, *see* B.B. Second Am. Compl. at ¶¶ 351-352, 407 (ECF No. 2299), including billboards and other activities, that took place in New Your City and other locations outside of Tennessee, *id.* at ¶¶ 8, 347-351, 387-393.  For instance, throughout the case, B.B. has emphasized certain rotating billboards that ran in Times

1   Square in New York City for 28 days from June 15, 2015 to July 13, 2015—billboards that she

2   never saw.  Ex. 2, JLI00219318.  She has also referred to static billboards in Pennsylvania, Ohio,

3   Florida, and Arizona that ran briefly in 2015 and that she was never exposed to.  *See* B.B. Second

4   Am. Compl. at ¶¶ 8, 347-351, 387-393 (ECF No. 2299); Ex. 3, JLI00483925.  Finally, B.B. and her

5   experts discuss at length promotional events and parties, including the JUUL launch party that took

6   place on June 4, 2015 in New York City.  B.B. does not contend that she attended any of these

7   events.  These JUUL marketing activities, which B.B. was not exposed to and, therefore, did not

8   influence her JUUL use, are irrelevant to her claims and would only serve to confuse and inflame

9   the jury.

10          That prejudice is only underscored by extraterritoriality principles:  JLI cannot be punished

11   under Tennessee law for actions that took place only elsewhere.   "[S]tatutes can have no

12   extraterritorial effect."  73 Am. Jur. 2d Stat. § 243; *see Bigelow v. Virginia*, 421 U.S. 809, 822-23

13   (1975) (one state cannot regulate activity in another state); *Sullivan v. Oracle*, 254 P.3d 237, 248

14   (Cal. 2011) (applying the "presumption against extraterritorial application" to an Unfair

15   Competition Law claim).  Thus, a State may police conduct within its own borders, but "is not

16   permitted ... to extend its unfair competition law to other states." *Allergan, Inc. v. Athena Cosmetics,*

17   *Inc.*, 738 F.3d 1350, 1359 (Fed. Cir. 2013).  B.B. may invoke Tennessee law to address conduct

18   relevant to her injuries in Tennessee—but constitutional principles as well as sheer prejudice and

19   the Federal Rules of Evidence underscore that she may not turn this proceeding into a trial about the

20   claims of other consumers exposed to other marketing, in other places in the country.

21          **"*Vaporized*":**  In discovery Plaintiff's counsel has focused on the "Vaporized" campaign,

22   which they allege depicted "bold colors" and "young models."  B.B. Second Am. Compl. at ¶¶ 345,

23   350 (ECF No. 2299).  But "Vaporized" advertisements ran online and in print between June 2015

24   and October 2015 only—years before B.B. started using JUUL—on a limited advertising budget.

25   *See* Ex. 4, Hanssens Rep. 15; Ex. 5, R. Mumby Dep. 754:6-21 (minimal budget and reach), *id.* at

26   860:3-19 (Vaporized materials removed online on October 7, 2015); Ex. 2, JLI00219318 (print ad

27   ran in one magazine Plaintiff does not claim to have seen).   B.B. claims to have seen only one type

28   of advertisement bearing any relationship to the "Vaporized" campaign: in-store video kiosks.  In

Defendants' Notice of Motion and Motion To

her declaration, B.B. is alleged to have seen "store display cases with video screens that showed videos of colorful triangles and young people dancing and using JUUL." 1/21/2021 B.B. Declaration at ¶4. That is it—there is no evidence apart from this declaration that B.B. saw this kiosk advertising, and there is no evidence that B.B. saw any other forms of "Vaporized" advertising at all. B.B. has offered no evidence, for example, that she ever viewed "Vaporized" print ads, online ads, radio ads, or billboards, or that she ever attended promotional events associated with that campaign.[2]

Given this, the Court should exclude evidence relating to these forms of "Vaporized" marketing and should preclude Plaintiff from showing "Vaporized" materials that B.B. did not see to the jury without the Court's prior approval. Although B.B. may present the particular kiosk advertising that she claims to have seen to the jury, that advertisement does not justify a mini-trial on the entire "Vaporized" campaign—there is no need for extended prejudicial proceedings on Vaporized print ads, billboards, and online advertisements that B.B. does not claim to have seen. Indeed, B.B. admits that she ignored what ads that she did see, Ex. 1 (B.B. Dep.) at 117:13–15 (admitting that "I never paid any attention to it"), underscoring the limited relevance of "Vaporized" to her claims. Arguments pertaining to "Vaporized" advertisements that ran in print or online and any events associated with the campaign should be excluded as extraneous, prejudicial, and a waste of time. *See*, *Mathew Enter., Inc. v. Chrysler Grp. LLC*, 2016 WL 11432038, at *7 (N.D. Cal. Sept. 21, 2016) (rejecting "mini-trials" over evidence of "little probative value" that "would be a waste of time").

***Save Room For JUUL***: The Court should also exclude materials from JLI's winter 2015 "Save Room for JUUL" campaign. This campaign, which featured three professional chefs and flavor-pairings like "baked camembert" and "sweet potato gnocchi," was limited in duration and scope—involving only a small number of posts on JLI's website and social media, and a few direct emails. See Ex. 51, Mumby PX 4083, Ex. 52, Mumby PX 4085, and Ex. 53, Mumby PX 4087. But

---

[2] To the extent B.B. contends that she was exposed to "Vaporized" via viral social media content, she has not identified any third-party posts she allegedly saw which reflect or resemble the Vaporized materials, or any Vaporized content that went "viral" online.

B.B. does not contend that she was ever exposed to JLI advertising by email, nor exposed to JUUL's social media or website until years after this campaign.   B.B. Decl. at ¶¶ 10-12, 15, 19.   Nor has B.B. ever alleged she was exposed to content resembling these materials.   All evidence and argument pertaining to "Save Room for JUUL" is irrelevant, prejudicial, a waste of time, and should be excluded.

     *The Late Show With Stephen Colbert:*   Finally, the Court should bar B.B. from showing an October 6, 2015 clip from *The Late Show With Stephen Colbert* making fun of and criticizing JLI's 2015 advertising, which B.B. is not alleged to have seen prior to filing this case.   B.B. Second Am. Compl. at ¶¶ 350, 463 (ECF No. 2299).   Plaintiff has introduced and utilized this irrelevant and inflammatory media clip as an exhibit in at least five depositions.   *See* The Late Show with Stephen Colbert, *Vaping is So Hot Right Now* (Oct. 7, 2015).[3]   Even if B.B. could identify some relevance related to the contents of the clip—which she cannot because she never saw it—the clip should be excluded because it is highly prejudicial given Colbert's fame and the fact that it is plagued with inaccuracies.   *See* Fed. R. Evid. 403 and 802.   In particular, the clip contains numerous inadmissible hearsay statements, such as that JLI offered "vape flavors like cotton candy, gumm[y] bears, and skittles," and jokes that JLI marketing materials included hip television ads for "poison steam," which decrease "lung strength," that are patently untrue.   *Compare* B.B. Second Am. Compl. at ¶¶ 350, 464 (ECF No. 2299) *with* Ex. 6, Monsees Dep. 454:9-475:9 (explaining inaccuracies); Ex. 5, Mumby Dep. 859:24-860:2 (Vaporized did not include television ads).   Such a "sensational and inflammatory" broadcast adds no probative value and should be excluded as substantially more prejudicial than probative.   *Chaudhry v. Smith*, 2020 WL 869115 at *17 (E.D. Cal. Feb. 21, 2020) (excluding media reports containing "highly sensational and inflammatory statements"); *see also Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 2013 WL 4411237, at *2 (E.D. Tex. Aug. 14, 2013) (excluding clip from "60 Minutes" show alleging suppression of evidence "on grounds of hearsay and unfair prejudice").

---

[3]   Video containing substantially the same audio as was played at Henderson's deposition is publicly available at https://www.youtube.com/watch?v=PMtGca_7leM

1      **III.      MOTION IN LIMINE NO. 3:  THIRD PARTY SOCIAL MEDIA CONTENT**

2          The Court should also exclude evidence and argument relating to third party social media posts

3      about JUUL.  JLI did not post or control this content, and therefore it is not relevant to JLI's liability

4      and is unduly prejudicial.  B.B. has made clear that she intends to base her claims at least in part not

5      on JLI's own marketing conduct, but rather on the social media posts of individuals who were not

6      employed, controlled, or directed by the company.   For example, instead of focusing on JLI-

7      controlled social media content, Plaintiff's expert, Robert Jackler, focuses on over half-a million

8      social media posts with JUUL-related hashtags and two third party social media audits of the "entire

9      social population *discussing* Juul." Ex. 7, Jackler Rep. 149-151, 162-169 (emphasis added), 163.

10     Similarly, Plaintiff's marketing analytics expert John Chandler relies on social media posts from

11     non-JLI third parties. This includes social media content on TikTok mentioning the word "JUUL,"

12     all collected after JLI had exited all social media and marketing channels and from a social media

13     platform JLI never used.  *See* Ex. 8, Chandler Rep. 68-74; Ex. 9, Chandler Dep. 267:5-6.  And in

14     depositions, B.B.'s counsel marked as exhibits inflammatory social media posts of third parties not

15     employed by or subject to JLI's control. Ex. 10, Walker Dep. 231:3–242:4.  The Court should reject

16     this strategy, and exclude evidence or argument relating to third party social media posts, including

17     (i) general references to and arguments regarding social media content about JUUL that include

18     posts by unaffiliated third parties, and (ii) references to specific third party posts that were not

19     controlled by JLI and that are plainly prejudicial.

20          ***First,*** social media posts by individuals, organizations, and entities (third parties) that JLI

21     did not control are not relevant because they could never form a basis for JLI's liability.  As this

22     Court already decided, JLI is not "vicariously liable for . . . conduct of third parties that were

23     promoting and selling its products" because JLI is not in an agency relationship with third party

24     social media-users.  *Colgate v. Juul Labs, Inc.* (*Colgate II*), 402 F. Supp. 3d 728, 760 (N.D. Cal.

25     2019).  Agency relationships require "control" as a key element—"[i]t is the right to control the

26     means and manner in which the result is achieved that is significant in determining whether a

27     principal-agency relationship exists." *Cislaw v. Southland Corp.*, 4 Cal. App. 4th 1284, 1288 (Cal.

28     1992); *see also Nidiffer v. Clinchfield R. Co.*, 600 S.W.2d 242, 245 (Tenn. Ct. App. 1980) ("It is

said this right of control is the primary or the essential test of an agency relationship without which no agency exists."). Neither B.B. nor any other plaintiff in this MDL has explained how JLI could have exercised "control" over a great mass of independent social media users—and so evidence relating to the acts of these non-agents is irrelevant and prejudicial, and should be excluded.

*Second*, given that JLI did not control third party social media content, allowing Plaintiff to introduce this content is unduly prejudicial, including because it is bound to mislead the jury to believe that such posts are evidence of marketing misconduct by JLI. That is especially true where Plaintiff's counsel may use third-party social media content to introduce inflammatory material that was never even viewed by B.B. At multiple depositions, counsel for B.B. attempted to discuss cherry-picked inflammatory social media activity by third parties, including persons with unusual aliases, such as the "rapper and internet personality known as 'Yung Turd.'" Ex. 10, Walker Dep. 231:3–242:4. Presenting obscenely-named internet personalities and their social media content to the jury would be extraordinarily prejudicial. "Yung Turd," for example, is actually a person named "Nick Coletti," who at one point made a tweet about JUUL that garnered 48,777 likes. *Id.* at 235:6–21. There is no evidence that JLI had any relationship with Mr. Coletti—JLI learned of his tweet only after the fact, *Id.* at 236:12–13 ("Did you know who this Nick Coletti was before you saw this report? A. No, I did not")—nor does B.B. contend that she saw any posts by Mr. Coletti that influenced her use of JUUL.

Similarly, Plaintiff's experts have collected and presented numerous prejudicial third-party social media posts that have no connection to JLI or its marketing content. Jackler for example, relies on posts by unaffiliated third-parties, including posts stating "when you unplug your grandfather's life support to charge your juul," and "to be cool, You gotta hit the Juul!." *See, e.g.*, Ex. 7, Jackler Rep. 164. There is no evidence that JLI or its own marketing content had any relation to these and other similar posts. Nor is there any evidence that B.B. viewed or was impacted by these posts.

Plaintiff's experts provide no evidence that JLI exercised editorial control over or was in an agency relationship with the vast swaths of social media posts that they examine. Jackler, for example, discusses social media hashtags used by 5,000 unique users, none of whom are shown to

have had any particular relationship with JLI, Ex. 7, Jackler Rep. 164, and also opines on social media content mentioning JUUL, even though that content was created after JLI had discontinued all social media marketing, *id.* at 166.  Nor is Jackler alone in blaming JLI for the acts of others; Chandler, for example, relies heavily on social media content related to JUUL on the platform "TikTok," Ex. 8, Chandler Rep. 68-74, even though JLI never had a TikTok account or posted on the platform. Ex. 9,Chandler Dep.204:11-204:16, 267:5-267:16 (JLI never used a TikTok account, never paid for ads on TikTok, and never worked with influencers on TikTok).  There is no evidence that JLI generated, controlled, or even motivated this user generated content on TikTok, or that B.B. was influenced by the content. *See*, *e.g.*, Ex. 12, Berger Rep. ¶¶ 58 (explaining that the timing, content, and hashtags of third-party content indicates no relationship to JLI marketing).

Even if the third party social media content that Plaintiff relies has some limited probative value, any such value is greatly outweighed by severe prejudice to JLI.  There are hundreds of millions of third-party social media posts made every day and allowing Plaintiff to present the jury with a cherry-picked set of obscene and vulgar content that JLI did not influence or control would improperly inflame the jury.  This is especially true given that there is no indication that B.B. viewed the content at issue or that it influenced her purchase.  Allowing Plaintiff to parade this third-party (non-JLI) content in front of the jury will create an unnecessary sideshow to which JLI will be forced to respond, confusing the jury and wasting critical trial time, which Rule 403 aims to prevent.  For these reasons, the Court should exclude reference to and evidence and argument based on third-party social media posts at trial.[4]

**Finally**, while most third party content on social media had no connection whatsoever with JLI, Plaintiff maintains that a small subset of third-party posts—those made by third parties to whom JLI provided free or discounted product—were controlled by JLI.  But like other third-party content

---

[4] To the extent Plaintiff argues that JLI's allegedly improper marketing conduct somehow caused "viral" JUUL-related social media content by third parties, there is no evidence to support this argument.  None of Plaintiff's experts even attempt to link JLI marketing content and posts to the third-party content they rely on.  And, on the flip side, JLI's expert's analyses show that JLI's marketing activities were not connected to the broad array of third-party social media content about JUUL. *See*, *e.g.*, *Id.* at 54-55 (finding third parties did not consistently re-share JLI-created content); *id.* at 56 (finding JUUL-related third party content rarely referenced JLI influencers); *id.* at 77 (empirical model finding store distribution more strongly correlated with volume of third-party JUUL-related posts than JLI marketing activities).

these "influencer" posts are also irrelevant and unduly prejudicial under Rules 402 and 403.  To begin, although JLI provided product samples to so called "influencers," these individuals were not contractually obligated (or obligated in any way) to post content about the product and there is no evidence that JLI exercised editorial control over the content or form of influencers' posts. Moreover, there is no evidence that any "influencers" were directed by JLI to post any misleading or deceptive information of the kind that B.B. claims injured her.  This defeats vicarious liability and renders posts by "influencers" entirely irrelevant.  *See*, *e.g.*, *Lindley v. Alyzen Med. Physics, Inc.*, 2021 WL 4429199, at *4 (E.D. Ark. Sept. 27, 2021) ("any alleged misrepresentations made by nonparties cannot support an action for fraud against defendants."); *Spies v. Deloach Brokerage, Inc.*, 169 F. Supp. 3d 1365, 1380 (S.D. Ga. 2016) (rejecting concealment claim based on deception of mere independent contractor).

Even if Plaintiff could establish that JLI did control influencers' posts (which they cannot), such posts should be excluded because B.B. did not see them and they did not cause B.B. to use the product. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Even B.B.'s self-serving affidavit, filed after summary judgment briefing and discovery, and claiming that B.B. saw videos by "influencers" on TikTok, B.B. Decl. at ¶ 17 (ECF No. 2791), does not establish that she saw any social media posts that JLI controlled.  B.B. does not specify who posted the videos or what the content was.  And JLI itself never had a TikTok account or posted any content on TikTok.  Ex. 9, Chandler Dep. 204:11-204:16, 267:5-267:16.  B.B. thus does not provide any evidence that the unspecified content that she saw was somehow controlled by JLI, and her unsubstantiated allegations regarding influencer posts on TikTok do not provide a basis for importing the inflammatory statements of thousands of nonparty non-agents into this case.

1  **IV.   MOTION IN LIMINE NO. 4:   EDUCATION AND YOUTH PREVENTION PROGRAM INTERACTIONS WITH YOUTH AND RELATED CONGRESSIONAL TESTIMONY**

2

3      Defendant JUUL Labs, Inc. ("JLI") moves pursuant to Federal Rules of Evidence 402 and

4  403 to preclude (i) evidence of or references to JLI's Education and Youth Prevention Program

5  ("EYP Program") activities with students, and (ii) Congressional testimony by teenagers or parents

6  purporting to discuss in-school activities by JLI.   EYP Program interactions with youth outside of

7  Tennessee have no relevance to B.B.'s claims, and diverting the trial with evidence about them

8  would be unduly prejudicial to JLI.

9      To start, B.B. never interacted with JLI's EYP Program, which was limited in scope and

10 which never operated in Tennessee.  As part of the EYP program JLI employees or representatives

11 only interacted with high school students on four occasions: Twice to conduct focus groups, and

12 twice after accepting invitations from school principals or administrators to participate in school

13 anti-vaping events. *See* Ex. 14, Henderson Dep. (7/31/2021) 359:3–25; Ex. 15, Henderson Dep.

14 (2/11/2021) 631:16–632:13.   The focus groups, which took place in California and Arizona in

15 December 2017 and February 2018 respectively, "were social science research focus groups, not

16 the advertising variety, but the kind in which we were trying to figure out what kids were doing so

17 we could stop it." *Id.* at 359:15–21. ████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 ████████████████████████████████████ Thus evidence regarding these

20 focus groups, including audio recordings of the sessions, should be barred from trial.

21      Relatedly, evidence regarding JLI's participation in two other youth-facing education

22 events—(i) a health fair at an Illinois high school in March 2018, and (ii) a presentation by a JLI

23 affiliated consultant at a New York high school, the Dwight School, in April 2018—have no place

24 in the B.B. trial.  *Id.* at 372:4–373:3, 385:9–14. ████████████████████████

25 ████████████████████████████████ Evidence regarding these

26 events should be excluded, as should Congressional testimony by parents and students about JLI's

27 purported activities at the Dwight School, which is also inadmissible hearsay.  *See* Ex. 14,

28

1    Henderson Dep. 295:17-296:3; Oversight Committee, Examining JUUL's Role in the Youth

2    Nicotine Epidemic, 7/24/2019 (1:18:00-1:24:30).[5]

3        Finally, evidence regarding JLI's "Moving Beyond Curriculum" and the deployment of that

4    curriculum should also be excluded.  This anti-vaping curriculum, which was developed by JLI for

5    use by educators in schools, was only used in a single school district:  the Augua Fria school district

6    in Arizona.  *See* Ex. 15, Henderson MDL Dep. 618:6–9; Ex. 17, Harter MDL Dep. 633:25–634:6.

7    The curriculum was never used in a Tennessee school, *id.*, and B.B. was never exposed to it, either

8    in her school or otherwise.  Any attempt by Plaintiff to inject issues related to the curriculum into

9    the trial would be a complete side-show and a waste of trial time.  *See* Fed. R. Evid. 402 and 403;

10   *Mathew Enter., Inc. v. Chrysler Grp. LLC*, 2016 WL 11432038, at *7 (N.D. Cal. Sept. 21, 2016)

11   (excluding evidence where that would result in "mini-trials" and that would provide "little probative

12   value and would be a waste of time"); *Estate of Le Baron, Sr. v. Rohm & Haas Co.*, 506 F.2d 1261,

13   1263 (9th Cir. 1974) (affirming exclusion of evidence with "questionable probative value" where

14   admission "would have resulted in extensive cross-examination and substantial countering

15   evidence" that would "obliterat[e] the basic issues of the case and confus[e] the jury").

16       Ultimately, none of the allegations pertaining to EYP's involvement with students relate to

17   activities in Tennessee,[6] and Plaintiff does not establish (or even allege) that EYP program events

18   had any connection with B.B.  Such evidence, therefore, is irrelevant to the claims at issue.  *See*

19   *Grant v. Allstate Ins. Co.*, 2010 WL 11519538, at *1 (C.D. Cal. July 16, 2010) (excluding evidence

20   of acts unrelated to the specific plaintiffs' claims).  Moreover, introducing evidence of JLI youth

21   prevention efforts that involve JLI contacts with students other than B.B. at schools outside of

22   Tennessee would confuse and mislead the jury, whose focus must remain on JLI's alleged contacts

23   with and any harms to B.B.  *See Sims v. State Farm Mut. Auto. Ins. Co.*, 894 F.3d 941, 946–47 (8th

24   Cir. 2018) (excluding evidence of an "institutional practice," where even if it had some probative

25

26   _____

27   [5]  Video containing substantially the same audio as was played at Henderson's deposition is publicly available at
     https://www.youtube.com/watch?v=m3iEMrAd83o

28   [6]  In January 2018, Dr. Henderson identified six target locations for the EYP porgram—Tennessee was not included on
     the list. Ex. 14, Henderson NC-AG Dep. 357:8–358:12.

value, that value was "substantially outweighed by a danger of confusing the issues and distracting the jury from the task at hand"). And the same rule against extraterritoriality that requires excluding Times Square Billboards and non-Tennessee marketing parties also underscores why the EYP Program should not be part of B.B.'s trial—the EYP student program has no connection to Tennessee whatsoever and B.B. cannot invoke Tennessee law to police this out-of-state conduct. *See* MIL No. 2, *supra*; *Bigelow*, 421 U.S. at 822-23.

Finally, Congressional testimony by parents and students claiming exposure to JUUL products or JUUL programs in schools should be excluded for the same reasons. Plaintiff's counsel has raised such testimony at depositions, *e.g.*, Ex. 15, Henderson MDL Dep. 321:17–19 ("are you asserting that these two kids that testified in front of Congress were lying"). But the testimony of potential plaintiffs, parents, or others who are *not* B.B. or her family members about their interactions with JLI is irrelevant and would confuse the issues *in this case*, creating undue prejudice to the Defendants. This trial is about B.B.'s claims, not claims by other individuals she has never met or interacted with. In addition, Congressional testimony by individuals who are not witnesses in *B.B.* and do not have any connection to this case is also inadmissible hearsay.[7] Courts have regularly excluded Congressional testimony in similar circumstances. *See*, *e.g.*, *In re General Motors LLC*, 2015 WL 8578945, at *4–5 (S.D.N.Y. Dec. 9, 2015) (excluding hearsay congressional testimony of persons not officers of GM); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2009 WL 2900028, at *1 (E.D. La. Sept. 3, 2009) ("GRANT[ING] this motion to the extent that any party seeks to introduce evidence, by way of documentation or testimony, about Congressional hearings, proceedings, inquiries, or other legislative branch events," and allowing impeachment evidence only if counsel do not "stat[e] that such testimony was offered before a Congressional

---

[7] Out-of-court statements by nonparties offered for the truth of the matter asserted are hearsay, Fed. R. Evid. 801, and are generally "not admissible," Fed. R. Evid. 802.

1  committee").[8]  This Court should similarly exclude Congressional testimony by students and parents

2  here.[9]

3  **V.      MOTION IN LIMINE NO. 5:  JLI'S ONLINE AGE VERIFICATION PROCESSES**

4          The Court should exclude evidence or argument regarding JLI's online age verification

5  processes, including contentions that JLI's online age verification was insufficient to prevent youth

6  access.  This is for a simple and straightforward reason:  B.B. never purchased JUUL products

7  online.

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████

19 ████████████████████████████████████████████

20         Thus, there is no evidence that connects B.B.'s claims either directly or indirectly to online

21 purchases or JLI's age verification systems.  To the extent there is any evidence, it is only that JLI's

22 age verification system successfully blocked her purchases, not that it enabled them.  Ex. 1, B.B.

23 Dep. 112:25–113:1. ███████████████████████████████  Plaintiff's complaint

24 alleges JLI worked with a third-party age verification vendor to implement "intentionally permissive

25

---

26 [8]  Although courts at times allow Congressional testimony to be used for impeachment purposes, impeachment is not
27 relevant here, where none of the students or parents who have testified in front of Congress will be witnesses at the trial
   of B.B.

28 [9]  Congressional testimony by other persons purportedly injured by JUUL would also run afoul of the parties' stipulation,
   which bars admitting allegations of harm by other potential plaintiffs.  *See* Dkt. No. 2942.

age verification practices."  Compl. ¶ 486; *see also id.* at ¶¶482-506.  And Plaintiff's experts Ribisl, Halpern-Felscher, and Grunberg also opine that JLI's online age verification was inadequate.  *See* Ex. 18, Ribisl Rep. 45-50; Ex. 19, Halpern-Felscher Rep. 10 ("…JUUL's Age Verification Processes were problematic."); Ex. 20, Grunberg Rep. 125 ("…JLI also failed to implement strong age verification methods to prevent youth and minor purchases online.").

These attacks have no relevance to B.B.'s claims, and any evidence regarding JLI's online age-verification processes is therefore inadmissible.  Fed. R. Evid. 402.  Likewise, allowing Plaintiff to attack those systems would only confuse the issues, inviting jurors to hold JLI liable for conduct that did not affect this plaintiff in this case—thus any probative value would be clearly outweighed by prejudice to JLI.  Fed. R. Evid. 403; *see also*, *e.g.*, *Speer v. County of San Bernardino*, 2021 WL 5969521, at *5 (C.D. Cal. Aug. 9, 2021) (excluding evidence relating to other plaintiffs' claims, where those claims were "unrelated to the events at issue . . . and unduly prejudicial").  Further, JLI's online age verification process, a process that was in place even before the JUUL product was launched in 2015, involves complicated technology that evolved and changed over time.  *See* Ex. 21, Jarae Rep. 3-5.  The system has been constantly modified with the help of many different vendors since 2015.  *Id.*  If Plaintiff is permitted to argue JLI's online age verification system was insufficient, the complex and evolving nature of JLI's online age verification system would be put at issue, and would be explored and explained for no reason.

## VI.     MOTION IN LIMINE NO. 6:  HEARSAY "THRILLER" BOOKS

The Court should also exclude references and evidence, argument, or testimony based on to certain popular books written by journalists or experts in this case, which are plainly inadmissible under Rule 403 and the Rules governing hearsay.  In particular, the Court should exclude references to (i) Jamie Ducharme's *Big Vape: The Incendiary Rise of JUUL*, as well as to (ii) Lauren Etter's *The Devil's Playbook:  Big Tobacco, JUUL, and the Addiction of a New Generation*, and (iii) Robert Proctor's *Golden Holocaust:  Origins of the Cigarette Catastrophe And the Case For Abolition*.  Plaintiff's counsel focused extensively on these books in several depositions, *see*, *e.g.*, Ex. 22, Cohen Dep. 546:3-4 ("Have you read The Devil's Playbook?"); Ex. 23,  Gould Dep. 316:3-6 ("Q.

1   The book by -- I think one is called "The Devil's Hand -- Playbook" and the other one is called "Big

2   Vape."  Have you ever read any of those? A.   No."), but none of them should be admitted at trial.

3       Each book is prejudicial hearsay and so is inadmissible.  Fed. R. Evid. 403, 802.  To begin,

4   *Big Vape* and *The Devil's Playbook* are little more than long-form sensationalist journalism and so

5   are inadmissible under well-established precedent governing the exclusion of hearsay publications

6   by the press.  "Newspaper articles have been held inadmissible hearsay as to their content"; such

7   publications are out-of-court statements and so cannot prove the truth of the matter asserted.  *Young*

8   *v. Wolfe*, 2017 WL 985632, at *4 (C.D. Cal. Mar. 14, 2017) (quoting *Larez v. City of Los Angeles*,

9   946 F.2d 630, 642 (9th Cir. 1991); *see also Shenwick v. Twitter, Inc.*, 2021 WL 1232451, at *9 (N.D.

10  Cal. Mar. 31, 2021) (excluding hearsay *Vanity Fair* article).  Even quoted statements in such

11  publications are often only double hearsay, underscoring the hearsay problem.  *Green v. Baca*, 226

12  F.R.D. 624, 637–38 (C.D. Cal. 2005).  And even apart from hearsay rules, both *Big Vape* and *The*

13  *Devil's Playbook* are also plainly prejudicial publications that make no pretenses of objectivity: *Big*

14  *Vape's* inside cover declares that it it "reads like a nonfiction thriller…to tell a larger story…of a

15  product that was too good to be true"; *The Devil's Playbook*, for its part, claims to "tell[] a riveting

16  story of greed and deception."  Ex. 24, 25.  Such sensationalist accounts have a "likelihood of

17  confusing the jury," and should be excluded.  *Young*, 2017 WL 985632, at *4 (excluding newspaper

18  article); *see also Retractable Techs., Inc.*, 2013 WL 4411237, at *2 (excluding "60 Minutes" clip,

19  where "[a]ny relevant evidence in the broadcast is definitely outweighed by the risk of unfair

20  prejudice").

21      Finally, Proctor's *Golden Holocaust* should also be excluded, for the same reasons and

22  additional ones as well.  *Golden Holocaust* is hearsay too, and there is no reason to admit that book,

23  when Proctor himself is available to testify.  Worse, *Golden Holocaust* is not even about JUUL;

24  rather, it is a book about the cigarette industry, and and was published in 2012, years before JUUL

25  was even launched.  Admitting this book could thus serve only to prejudicially tar JLI with the

26  purported misdeeds of tobacco companies long ago, which is impermissible.  *See infra* MIL No. 8.

27  Plaintiff may argue that Proctor's publication of the book goes to his qualifications—but that

28  argument at best only justifies referencing *Golden Holocaust* on Proctor's CV, not introducing it

Defendants' Notice of Motion and Motion To

into evidence or subjecting it to any extended testimony.  Substantive discussion of the book should

be excluded.

## VII.   MOTION IN LIMINE NO. 7:   DEFENDANT'S OR WITNESSES WEALTH OR FINANCIAL CONDITION

The Court should also preclude Plaintiff from offering evidence or argument related to

certain financial information.  ***First***, the personal net worth or spending patterns of any individual—

including JLI and Altria's current and former employees, directors, officers, and investors—should

be excluded.  Individual witnesses' or former officers' and directors' net worth or spending has no

relevance to B.B.'s claims and would be prejudicial if introduced.  How much money an individual

has is "ordinarily irrelevant to any issue of liability or compensatory damages," *Bridget McCarthy*

*v. Loyola Marymount Univ.*, 2021 WL 3164190, at *1 (C.D. Cal. Jan. 8, 2021); *Williams v. Lorenz*,

2018 WL 5095165, at *2 (N.D. Cal. Oct. 17, 2018) (similar); *see also Cummings v. Amtrak Nat'l*

*R.R. Passenger Corp.,* 199 F.3d 1331, at *2 (9th Cir. 1999) (affirming order excluding all references

to the parties' comparative wealth), nor are nonparty witnesses' finances relevant to punitive

damages or for any other purpose.  Such financial information is therefore inadmissible at the outset.

Fed. R. Evid. 402.

Likewise, that personal wealth has no place in this trial is also confirmed by Federal Rule of

403, which permits the Court to exclude evidence where the probative value is likely to be

outweighed by confusing the jury, wasting time, and unfair prejudice.  That is plainly true here—

detouring into the wealth and spending of individual non-defendants would needlessly divert this

trial and would be plainly inflammatory.  Courts recognize that financial information is "far more

likely to be prejudicial than to be probative," and so exclude regularly exclude "evidence about

the wealth of Sophos's founders or employees."  *Finjan, Inc. v. Sophos, Inc.*, 2016 WL 4560071, at

*14-15 (N.D. Cal. Aug. 22, 2016); *see also Kolay Flooring Int'l, LLC v. Fuente,* 2021 WL 4702429,

at *3 (C.D. Cal. Sept. 10, 2021) (precluding reference to wealth of Defendant because "the probative

value of the evidence is substantially outweighed by the danger of unfair prejudice that may result

from the jury basing their decision on his wealth."); *Friedman v. Medjet Assistance*, LLC, 2010 WL

9081271, at *12 (C.D. Cal. Nov. 8, 2010) ("evidence and argument [regarding Plaintiff's wealth]

are likely to result in unfair prejudice."); *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Group, Inc.*, 2016 WL 10706086, at *2 (N.D. Ind. Oct. 28, 2016) (excluding CEO's compensation information, where that information could "appeal . . . to class prejudice"); *Kinsey v. Cendant Corp.*, 588 F. Supp. 2d 516, 518–19 (S.D.N.Y. 2008) (similar). This Court should follow the same course and exclude evidence regarding individuals' financial condition that has no relevance to B.B.'s claims and risks inflaming the jury.

*Second*, in addition to excluding information about individuals' net worth, the Court should also exclude information relating to the amounts of money individuals received as a result of Altria's investment in JLI. Plaintiffs raised this issue at several depositions, *e.g.*, Ex. 6, Monsees Dep. 145:2-7 ("[Altria] put close to $13 billion into JUUL in 2018, correct? A. That's correct. Q. And you made over $650 million from that, correct?"); Ex. 54, 9/9/21 Christensen Dep. 99:6-7 ("how much did you receive from the $13 billion equity purchase by Altria"); Ex. 55, 7/28/2021 Kania Dep. 35:22-36:2 ("Can you tell me, what was the amount that you received with respect to the Altria purchases? A. … about $10 million."); Ex. 5, Mumby Dep. 434:14-15 ("And as a result of [the Altria investment] you made a lot of money, about $51 million, correct?"), but whatever probative value these amounts may have is greatly outweighed by prejudice to JLI and Altria—the Court should keep this case focused on Defendants' relevant conduct and how it affected (or did not affect) B.B., not on prejudicial financial information related to a legal investment that Altria made in JLI.

*Finally*, the Court should also preclude evidence or argument related to JLI or Altria's revenue, profits, or other financial condition—at least during any liability phase of this case. Plaintiff may argue that a defendant's financial condition is relevant to punitive damages, but that is no reason to admit this prejudicial evidence during the liability phrase of the case. *See Romero v. County of Santa Clara*, 2014 WL 12642166, at *4 (N.D. Cal. Oct. 3, 2014) (Orrick, J.) ("The financial condition of the individual defendants and the prospect of punitive damages are not relevant to liability, and even if they were, their probative value would be substantially outweighed by the danger of unfair prejudice"); *Contour IP Holding LLC v. GoPro, Inc.*, 2021 WL 75666, at *3

1  (N.D. Cal. Jan. 8, 2021) (Orrick, J.) (similar).[10]  This includes any reference to alleged inaccuracies

2  in the confidential/non-public financials of any Altria company.  *See* Ex. 30, Johnson Nov. 10, 2021

3  Rep. 1; *see also* Ex. 31, Johnson Dep. 196-99, 205, 213.

4  **VIII.  MOTION IN LIMINE NO. 8:   HISTORICAL CONDUCT CONCERNING**
   **COMBUSTIBLE CIGARETTES**

5
       As this Court commented, "this is not going to be a tobacco trial . . . ."  Feb. 25, 2022 Hrg.

6
   Tr. 6:15-16 (ECF No. 2920).  Yet Plaintiff's counsel has made clear that they intend to tell a story

7
   that Altria previously engaged in decades of misconduct dating back to the 1950s related to

8
   combustible cigarettes, and that JLI somehow followed in Altria and other tobacco companies'

9
   footsteps.  Plaintiff's pleadings and discovery responses thus repeatedly cite historical cigarette

10
   documents and allegations.[11]  Plaintiff's counsel questioned Altria witnesses extensively about

11
   decades-old documents related to combustible cigarettes,[12] often reading long passages from those

12
   documents into the record.[13]  Several Plaintiff experts offer a lengthy, one-sided history of alleged

13
   tobacco industry conduct—indeed, one expert (Dr. Proctor) even submitted as an Appendix II to his

14
   generic report an 89 page report that he submits in cigarette litigation about "a history of tobacco

15
   industry knowledge of—and efforts to cover up—harms caused by cigarettes in the United States."[14]

16
   And Plaintiffs have also indicated that they may attempt to put prejudicial hearsay congressional

17
   testimony into the record—plaintiffs have questioned JLI and Altria's former officers on "the

18

19

20  [10]  *See also State Farm*, 538 U.S. at 417 ("[T]he presentation of evidence of a defendant's net worth creates the potential
   that juries will use their verdicts to express biases against big business . . . ."); *Honda Motor Co. v. Oberg*, 512 U.S.

21  415, 432 (1994) (same); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 464 (1993) ("We agree with TXO that
   the emphasis on the wealth of the wrongdoer increased the risk that the award may have been influenced by prejudice

22  against large corporations, a risk that is of special concern when the defendant is a nonresident."); *BMW of North
   America, Inc. v. Gore*, 517 U.S. 559, 591 (1996) (Breyer, J., concurring) (evidence of financial position of defendant

23  "provides an open-ended basis for inflating awards when the defendant is wealthy").

24  [11]  *See e.g.*, Second Amended Complaint ¶¶ 49, 320-325, 548; ECF 2784 Pl. Opp. to Altria Summary Judgment Mot. at
   13, 15-16, 19-20; ECF 2785 Pl. Opp. to Daubert Mot. at 58; Ex. 26, Pl. Resp. to Altria Interrog. at 56, 68.

25  [12]  *See e.g.*, Ex. 27, Gardner Dep.  98-104; 416:17–441:5; Ex. 28, Willard Dep. 331-35; 338-41; 349-50, 387-89, 393,
   603-06; Ex. 29, Flora Dep. 77-78, 215-27; Ex. 32, Garnick Dep. 101-07; 111-119; 125-126; Ex. 33, Melvin Dep. 419-

26  421; Ex. 34, Romyak Dep. 134, 339-345; Ex. 35, (Devitre Dep. 555-562; Ex. 29, (Flora II Dep. 41-87;115-66.

27  [13]  *See e.g.*, Ex. 28, Willard Dep. 331-35; 338-41; 349-50, 387-89, 393, 603-06; Ex. 29, Flora II Dep. 41-87;115-66; Ex.
   35, Devitre Dep. 37:21-38:1; Ex. 27, Gardner Dep., 98-104; 416:17–441:5.

28  [14]  *See e.g.*, Ex. 36, Winickoff Rep.  45-55; Ex. 20, Grunberg Rep. 26-28; Ex. 37, Proctor Rep. 67-68; App. II; Ex. 7,
   Jackler Rep. 13-14; 257-259.

Waxman hearings," where "seven chief executive officers of big tobacco to testify about the addictiveness of the nicotine cigarettes and the harmfulness of cigarettes." Ex. 6, Monsees Dep. 602:8–11; *see also* Ex. 28, Willard Dep. 334:20—335:11.  As Plaintiffs acknowledged, these hearings occurred "back in 1994," Ex. 6,Monsees Dep. 602:8–11, decades before B.B. ever tried JUUL or brought her claims.

The court should exclude evidence or argument of purported misconduct regarding combustible cigarettes.  Although it may be necessary to refer to cigarettes (*e.g.*, that they are also tobacco products, or that they have different risks than ENDS products), evidence of misconduct relating to them is well-beyond the scope of B.B.'s trial.  The purpose of this evidence is clear: Plaintiff hopes to inflame the jury with allegations of cigarette conduct such that it will taint the jury's consideration of the claims in *this* case.  Evidence of alleged decades-old conduct regarding cigarettes is irrelevant: ███████████████████████████████████████ ████████████████████████████████████████ B.B. did not rely upon decades-old Altria's cigarette advertising in choosing to use JUUL.  In fact, Plaintiff concedes that Altria's conduct *did not* cause B.B. to first use JUUL, Ex. 26, Pl. Resp. Altria Interrog. at 84, and the actions of other historical tobacco producers certainly did not either.  The testimony of other companies' officers in front of Congress 28 years ago regarding other alleged misconduct is likewise irrelevant and prejudicial, in addition to being hearsay.  *See* MIL No. 4, *supra*.

Rule 404's limits on "propensity" evidence  also offer powerful reasons for excluding evidence regarding historical tobacco conduct.   Under Rule 404(b), courts routinely exclude evidence and argument that a defendant should be found liable because the defendant has allegedly engaged in bad acts in the past.  *See, e.g.*, *Kramas v. Sec. Gas & Oil Inc.*, 672 F.2d 766, 772 (9th Cir. 1982) ("It was not reversible error for the trial court to refuse to admit evidence of consent decree entered in a prior SEC enforcement proceeding"); *World Famous, Inc. v. Schoettle*, 2007 WL 845910 (D. Or. Mar. 14, 2007) (excluding under Rule 404(b) evidence of plaintiff's alleged tortious business practices).  Such evidence risks "overpersuade[ing]" the jury and leading them to "prejudge one with a bad general record." *Michelson v. United States*, 335 U.S. 469, 475-76 (1948).  Yet that is precisely what Plaintiff seeks to do here; for example, arguing that Altria intended that youth

Defendants' Notice of Motion and Motion To

would use JUUL because "[t]argeting youth through brand visibility, perceived popularity, and social acceptance via an expanded retail footprint is a *proven Altria strategy*." Dkt. 2784 at 13.

This Court has suggested that some "relatively limited" historical evidence might be relevant to "what [defendants] knew or should have known, issues regarding attractiveness to youth their marketing design choices meant." Feb. 25, 2022 Hrg. Tr. at 6 (ECF No. 2920). But even if there were such relevance, it would be greatly outweighed by the substantial prejudice to Defendants. As an initial matter, most of the historical evidence referenced by Plaintiffs does not touch on the issue of alleged youth marketing. Rather, the vast majority of the historical evidence focuses on other decades-old alleged misconduct by Altria, such as the fact that it previously lied about the health risks of cigarettes, and is being offered for the purpose of prejudicing the jury against Altria (and JLI). Moreover, Plaintiff does not need to allege that cigarette companies such as Altria intentionally targeted youth in marketing—as they have asserted repeatedly over the course of this litigation—to establish whether a defendant should have known that a particular piece of advertising by JLI might be appealing to youth. Plaintiffs can try to make this showing in far more probative ways, such as displaying the particular marketing or offering admissible expert proof about the effect of the marketing. By contrast, allowing these types of allegations would be extremely prejudicial to Altria, given that it is both a defendant in this case and the party alleged to have engaged in misconduct in the past.

Courts exclude prejudicial evidence of alleged historical misconduct in circumstances like these. *See, e.g.*, *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1335 (9th Cir. 1985), *op. corrected*, 773 F.2d 1049 (9th Cir. 1985) (evidence of fraud in reporting pregnancy rates properly excluded as unduly prejudicial because "the overwhelming thrust of this evidence was to have the jury believe that because defendant lied about the effectiveness of the Dalkon Shield, it lied about the safety of the device as well"); *In re Bendectin Litig.*, 857 F.2d 290, 322 (6th Cir. 1988) (agreeing with trial court "that references to Thalidomide would be extremely prejudicial"); *Tesoro Refin. & Mktg. Co. v. Pacific Gas & Elec. Co.*, 2016 WL 158874, at *17 (N.D. Cal. Jan. 14, 2016) (excluding evidence that "needlessly introduces a risk that jurors would, consciously or unconsciously, seek to punish [for that event] rather than resolve the case based on the evidence related to the [case at issue]"); *In*

re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & PMF Prods. Liab. Litig., 2011 WL 6740391, at *3 (S.D. Ill. Dec. 22, 2011) (excluding "incendiary historical evidence" for most purposes and "strongly caution[ing]" for the parties about using it for impeachment); In re Richardson-Merrell Inc. "Bendectin" Prods. Liab. Litig., 624 F. Supp. 1212, 1249 (S.D. Ohio 1985) (defendant's alleged falsification of data from clinical investigation of different drug inadmissible). [15]

Admitting this evidence would also waste time.  At a minimum, Defendants  would be entitled to offer competing evidence and placee decades-old evidence concerning combustible cigarettes in context.  The resulting "mini-trials" would provide "little probative value and would be a waste of time" and offer independent grounds to exclude this evidence.  Mathew Enter, 2016 WL 11432038, at *7 (excluding such evidence); see also, e.g.,  Estate of Le Baron, Sr., 506 F.2d at 1263   (affirming exclusion of evidence with "questionable probative value" where admission "would have resulted in extensive cross-examination and substantial countering evidence" that would "obliterat[ed] the basic issues of the case and confus[e] the jury").  This  trial should not transform into one about Altria or other tobacco companies past misconduct; the Court should ensure that the evidence and argument focuses instead on B.B.'s use of JUUL beginning in 2017 and alleged injuries from such use.

## IX.    MOTION IN LIMINE NO. 9:    JUDICIAL FINDINGS AND OPINIONS IN CIGARETTE LITIGATION

Plaintiff also has made clear her intention to introduce evidence of court decisions in prior litigation involving cigarettes, particularly the judicial findings in United States v. Philip Morris USA Inc., 449 F. Supp. 2d 1 (D.D.C. 2006), 566 F.3d 1095 (D.C. Cir. 2009). See e.g., ECF 2784 at 13, 15-16, 19-20; Ex. 28, Willard De[. 338-41.

Independent of whether allegations of historical conduct could ever be relevant, judicial findings in a case about cigarettes are plainly inadmissible.  Judicial findings are inadmissible both because they are hearsay and because they are prejudicial:    "[J]urors are likely to defer to findings

---

[15]  Moreover, Plaintiff seeks punitive damages, but allowing evidence of unrelated cigarette conduct to influence the jury's decision on that question would violate due process.  See, e.g., Philip Morris USA v. Williams, 549 U.S. 346, 353 (2007) (due process forbids punitive damages aware based on injuries suffered by "strangers to the litigation").

1   and determinations relevant to credibility made by an authoritative, professional factfinder rather

2   than determine those issues for themselves." *Sine*, 493 F.3d at 1033; *see also Ensource Invs. LLC*

3   *v. Willis*, 2020 WL 532376, at *1 (S.D. Cal. Feb. 3, 2020) ("[T]he section of the transcript containing

4   Judge Jones's statements is inadmissible under Rule 403").

5   ## X.   MOTION IN LIMINE NO. 10:   EVIDENCE CONCERNING CIGARETTE COMPANIES' SETTLEMENTS WITH STATE ATTORNEYS GENERAL

6

7       Similar principles apply to foreclose the introduction of evidence that, in the 1990s, cigarette

    companies such as Altria's subsidiary PM USA were sued by state attorneys general, resulting in

8   settlements involving billions of dollars and substantial restrictions.[16]

9

10      Courts routinely exclude similar evidence as irrelevant or prejudicial,[17] and this Court should

    do the same.  Combustible-cigarette litigation occurred before any e-vapor product was even on the

11   market.  Given the clear risk of prejudice to Altria, Plaintiff should not be permitted to tell the jury

12   that an Altria subsidiary was sued by nearly every state attorney general in the country and ultimately

13   settled.  Moreover, this evidence might prompt the jury to impose liability based on the efforts of

14   cigarette companies to defend themselves at trial in violation of the *Noerr-Pennington* doctrine and

15   would constitute improper propensity evidence under Rule 404.

16

17   ## XI.   MOTION IN LIMINE NO. 11:   ALTRIA CONDUCT UNRELATED TO B.B.'S INJURIES

18      For a limited period of time in 2019 and early 2020, Altria provided certain retail and

19   distribution services to JLI and disseminated coupons for JUUL in cigarette packages and to adult

20   smokers listed in Altria's database.  Plaintiff intends to present evidence of these actions and has

21   offered numerous experts to discuss them. ████████████████████████████████████████

22

23   [16] Cigarette companies such as PM USA reached a Master Settlement Agreement ("MSA") with 46 states on November 23, 1998.  Under the terms of the MSA, PM USA did not agree to "any liability or any wrongdoing whatsoever."  *See* MSA § XVIII(e). (*available at* https://www.naag.org/our-work/naag-center-for-tobacco-and-public-health/the-master-settlement-agreement/).  PM USA separately settled with the four other states.

24

25   [17] *See e.g.*, *Calloway v. Hayward*, 2017 WL 363000, at *3 (E.D. Cal. Jan. 24, 2017) ("[T]he probative value of this evidence is substantially outweighed by a danger of unfair prejudice to Defendants."); *In re Homestore.com, Inc.*, 2011 WL 291176, at *1 (C.D. Cal. Jan. 25, 2011) ("[R]eference to or evidence of [party's] involvement in other litigation prior to this Action is also irrelevant and carries with it a high risk of prejudice."); *Am. Home Assurance Co. v. Merck & Co., Inc.*, 462 F. Supp. 2d 435,446 (S.D.N.Y. 2006) (similar); *Lewis v. Ethicon, Inc.* (*In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*), 2014 WL 505234, at *6 (S.D. W. Va. Feb. 5, 2014) ("Evidence of other lawsuits is likely to confuse and mislead the jury . . . and it is highly prejudicial to Ethicon."); *Language Line Servs. Inc.*, 2016 WL 3566980, at *3 (N.D. Cal. June 30, 2016) (similar).

26

27

28

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████   Under these circumstances, evidence of these services is irrelevant to *this*

4 *Plaintiff's* claims.  Fed. R. Evid. 401, 402.

5          At a minimum, any marginal relevance would be outweighed by the risk of undue prejudice

6 to Altria and confusion to the jury.  Plaintiff's only possible reasons for offering this evidence—to

7 inflame and mislead the fact-finder about Altria's impact on Plaintiff and obtain a verdict based on

8 conduct unrelated to her claims—are entirely improper.  *See supra* at 21*; see also, e.g.*, *State Farm*,

9 538 U.S. at 421 (suggesting trial court erred by refusing to exclude "national scheme" evidence and

10 noting defendant "was being condemned for its nationwide policies rather than for the conduct

11 directed toward the [plaintiffs]").

12 **XII.   MOTION IN LIMINE NO. 12:  FRANKEL EMAIL (JLI01129881–84)**

13          Plaintiff should be precluded from introducing a July 31, 2017 email from Zachary Frankel

14 (JLI01129881–84) that purports to summarize what unnamed Altria employees supposedly said in

15 a meeting with JLI to discuss a potential investment.  On its face, the document is double hearsay –

16 it is an out-of-court statement offered to prove "the truth" of what Altria employees supposedly said

17 *Duncan v. Woodford*, 2003 WL 27388812, at *6 (C.D. Cal. Dec. 24, 2003).

18          No hearsay exception is applicable here.  *First*, the document is not a present sense

19 impression because the author could not recall whether he wrote the substance of the email at the

20 time of the meeting it describes.  *Id.* at *7 (present sense impression exception inapplicable where

21 documents did "not indicate how much time passed from the time [the author] made the phone calls

22 the exhibits describe to the time he prepared the exhibits"); Ex. 38, Z. Frankel Dep. 483:2-8.  *Second*,

23 the document is not a recorded recollection because Plaintiff cannot meet "the foundational

24 requirement" that Mr. Frankel lacks sufficient recollection of the matters in the document to testify

25 fully and accurately about them.  *Duncan*, 2003 WL 2738812, at *8; Ex. 38,Z. Frankel Dep. 484:18-

26 490:13 (describing his recollection of the meeting)).  Additionally, courts require the declarant to

27 be a witness at trial to permit a recorded recollection to be admitted and Mr. Frankel is not on a

28 witness list.  *Willis v. Mullins*, 2019 WL 1116200, at *5 (E.D. Cal. Mar. 11, 2019).  *Third*, the

document cannot be admitted as a business record because a subjective interpretation of the views of others lacks the "trustworthiness" of business records. *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1469 (N.D. Cal. 1996) (excluding analyst's notes from private conversation with defendant's executives because "a company obviously has no control over the way its statements are transcribed in an individual's notes. . . ."); *Alotech, Ltd. v. N. Star Imaging, Inc.*, 2016 WL 1122024, at *1 (D. Minn. Mar. 22, 2016) (court expressed "reluctan[ce] to admit the notes under any [hearsay exception] because the notes are [the witness]'s subjective interpretation of (unknown) others' statements to him throughout the day that he considered important"); *Winslow v. Gen. Motors Corp.*, 2003 WL 25676481, at *3 (E.D. Ark. Mar. 20, 2003) (finding "statement inherently untrustworthy and any relevance the statement may have is substantially outweighed by the potential for unfair prejudice" where speaker testified that "the handwritten notations were not his words but rather were the words of someone else"). *Fourth*, the document cannot be offered as a statement by Altria because the document is not an Altria document—it was written by a JLI board member, not Altria. *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. at 1469 (excluding notes because "there is no way to distinguish [the analyst's] own statements and opinions from those of the [] executives"). *Finally,* the document's lack of "trustworthiness" bars its admission under the co-conspirator hearsay carveout. Fed. R. Evid. 801(d)(2)(E) removes from the realm of hearsay a statement that "was *made by the party's coconspirator* during and in furtherance of the conspiracy" (emphasis added). But when the statement is layered hearsay in which a party distills "the words of someone else," the statement is "inherently untrustworthy" and should not be admitted—even if it is "undisputed that each of [the potential declarants] were [Altria's] employees at the time the statement was made." *Winslow*, 2003 WL 25676481, at *3. The statements are either attributed to JLI alone as its own employee's impressions of a meeting—in which case they cannot be admitted against Altria— or not admissible at all because "the true source of the statement," even if definitively an Altria representative, is unknown. *Id*.

## XIII.   MOTION IN LIMINE NO. 13:  THE "MORALITY" OF SELLING CIGARETTES

Plaintiff should be precluded from offering evidence of the morality of selling cigarettes, why Altria has not stopped selling cigarettes, and the number of deaths deemed acceptable for a

1    company to continue selling cigarettes.  Ex. 28, Willard Dep. 381-96; Ex. 27, (Gardner Dep. 38-44;

2    Ex. 35, Devitre Dep. 517-20; Ex. 29, Flora Dep. 574-578.  Such evidence would imply that selling

3    cigarettes in inherently unlawful or tortious, an implication in clear conflict with Congress's intent

4    to allow tobacco products to remain on the market and therefore barred by implied conflict

5    preemption. *Hunter v. Philip Morris USA,* 582 F.3d 1039, 1047-48 (9th Cir. 2009).  In addition,

6    given that it is legal for Altria to sell cigarettes, these kinds of questions on cigarette injuries have

7    no relevance and would only "appeal[] to the jury's sympathies, arouse[] its sense of horror,

8    provoke[] its instinct to punish, or otherwise may cause a jury to base its decision on something

9    other than the established propositions in the case." *Skillman*, 922 F.2d at 1374.  Such irrelevant

10   evidence thus risks unfairly prejudicing the jury, and should be excluded under Rule 401, 402, and

11   403.

12   **XIV.  MOTION IN LIMINE NO. 14:  MISCHARACTERIZATION OF ALTRIA AND
        JLI'S RELATIONSHIP**

13

14          On December 20, 2018, AGI purchased a 35% interest in JLI.  *See* Ex. 39, Altria 10-K

15   Annual Report at 65.  Altria purchased non-voting shares.  *Id*.  Although Altria's shares could

16   eventually convert to voting shares, that has not occurred, and even after conversion, Altria's voting

17   rights may not exceed 20%. *Id.*  Plaintiff therefore should not be allowed to mischaracterize Altria's

18   investment in JLI as a controlling interest or a "merger" or to incorrectly refer to JLI as "Altria-

19   West," or to PM USA or Altria as "JUUL's corporate affiliate."  Ex. 26, Pl. Responses to Altria

20   Interrogatories No. 20 at 85; Second Amended Compl. ¶ 323.  These and similar terms would

21   confuse and mislead the jury concerning the nature of Altria and JLI's relationship and prejudice

22   jury's determinations and therefore should be excluded.  *See, e.g.*, *RCHFU, LLC v. Marriott

23   Vacations Worldwide Corp.*, 445 F. Supp. 3d 1327, 1333-34 (D. Colo. 2020) (precluding term

24   "merger" where it "could confuse or mislead the jury concerning the nature of the parties'

25   relationship"), *reconsideration denied*, 2021 WL 603053 (D. Colo. Feb. 16, 2021); *Sec. & Exch.

26   Comm'n v. Am. Growth Funding II, LLC*, 2019 WL 1748186, at *3 (S.D.N.Y. Apr. 19, 2019)

27   (precluding the term "Ponzi scheme" because "the jury would conflate this case with high-profile

28

1   cases involving Ponzi schemes even though there [was] no allegation in this case that [defendant] is

2   a Ponzi scheme").

3        The Court should also preclude reference to Altria's "failure" to compel JLI to take or not

4   take certain actions.  Before the investment, Altria and JLI had no formal relationship and Altria

5   could not have "compelled" JLI to do anything.  As a minority shareholder, Altria also had no such

6   authority.[18]  Allowing Plaintiff to argue that Altria failed to require that JLI take certain actions thus

7   would be misleading and mischaracterize Altria's minority investment in JLI and should be

8   excluded.  *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 4129193, at *2 (N.D. Cal. July 8,

9   2015) (excluding derogatory or misleading characterizations of business).

10  **XV.   MOTION IN LIMINE NO. 15: PROTECTED COMMUNICATIONS WITH THE**
    **GOVERNMENT**

11

12       Plaintiff intends to argue that Altria's October 25, 2018 letter to the FDA misled the agency

13  and that Altria participated in lobbying activity related to vapor products.  *See, e.g.*, SJ Opp. at 10-

14  12; SAC ¶¶ 529, 568, 572, 682-696.  These communications—and any other petitioning or lobbying

15  activity (or lack thereof) by either Defendant—are protected by the First Amendment.  *E. R.R.*

16  *Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1960); *United Mine Workers of Am.*

17  *v. Pennington*, 381 U.S. 657, 669-70 (1965).  The protection afforded *Noerr-Pennington* is broad

18  and immunizes even false statements.[19]  In addition, such "fraud-on-the-agency" theories are

19  preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001).

20       Although *Noerr-Pennington* and *Buckman* are rules of liability, courts have excluded

21  lobbying evidence where the purpose of the evidence would be to impose liability upon the act of

22  lobbying itself.  *See*, *e.g.*, *Baxley-DeLamar Monuments, Inc. v. Am. Cemetery Ass'n*, 938 F.2d 846,

23  854 (8th Cir. 1991) (district court correctly "interpreted the *Noerr-Pennington* doctrine" in

24

---

25  [18]  *See, e.g.*, Ex. 40, Bowen Dep.  483:15-484:1 (July 7, 2021) ("A. So we did not want to do, for instance, a deal where
    Altria took majority—a majority position in the company and control of the company, nor did we want a—there to be
26  really a path for them to someday obtain control."); Ex. 41, N. Pritzker Dep. 652:15-24 ("I would say that I never would
    have supported a deal where they had control."); Ex. 42, R. Valani Dep. 696:16-697:9 (Oct. 1, 2021) (similar);  Ex. 43,
27  Drumwright Dep. 360:2-3 ("Q.  And without making any assumptions, do you know if Altria can require JUUL to take
    any action? A. I know that it's a minority stake and so they don't control"); Ex. 44, Eissenberg Dep. 332:19-24 (similar).

28  [19]  *See, e.g.*, *E. R.R. Presidents Conf.*, 365 U.S. at 145; *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492,
    499-500 (1988); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

"excluding evidence"); *Weit v. Cont'l Illinois Bank & Tr. Co. of Chicago*, 641 F.2d 457, 466-67 (7th Cir. 1981) (similar); *U.S. Football League v. National Football League*, 634 F. Supp. 1155, 1171 (S.D.N.Y. 1986) (similar); *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984) (similar).[20]  That is what Plaintiff seeks to do here.

## XVI.   MOTION IN LIMINE NO. 16:  CHANGES TO THE MARKTEN PRODUCT

Plaintiff has questioned Altria employees about a 2018 change to a gasket of an e-vapor product manufactured by Altria's subsidiary Nu Mark LLC, implying that the change violated FDA regulations.  *E.g.*, Ex. 32, Garnick Dep. 90:16-91:20, 328:20-343:12.  Any such evidence at trial should be foreclosed under Rules 401, 402, and 403.  B.B. never used the product and does not contend that she was injured by this gasket change.  Ex. 45, PFS ¶¶ 25-27.

## XVII.   MOTION IN LIMINE NO. 17:  PHILIP MORRIS INTERNATIONAL

Plaintiffs have sought to introduce evidence about Philip Morris International ("PMI").  *See* SAC ¶¶ 46, 306, 545; Ex. 7, Jackler Rep. 429; Ex. 46, Woolley Rep. 59-65, 82; Ex. 47, Blaylock Dep. 245:16-246:2; Ex. 35, Devitre Dep. 183:7-185:19; Ex. 48, Schroder Dep. 126:2-4).  PMI is wholly separate from Altria; it is traded separately on the stock market and unlike Altria operates in overseas markets.  The only purpose of this evidence to be to confuse the jury by tainting Altria with conduct of PMI, and thus this evidence should be excluded.  *Beckett v. State*, 730 So.2d 809, 811 (Fla. 4th Dist. Ct. App. 1999) ("evidence of wrongdoing on the part of a third party is inadmissible as irrelevant to a given case") (citation omitted); *see also Borges v. City of Hollister*, 2005 WL 6019704, at *3 (N.D. Cal. Aug. 24, 2005).

## XVIII. MOTION IN LIMINE NO. 18:  ALTRIA'S ACQUISITION OF CRONOS

The Court also should exclude evidence of Altria's December 2018 acquisition of a 45% interest in Cronos, Group, Inc. ("Cronos"), a cannabinoid company headquartered in Toronto, Canada.[21]  ███████████████████████████████  and Cronos is not a defendant in

---

[20]  Courts in tobacco litigation repeatedly have excluded such evidence.  *E.g.* Ex. ## (orders in  *Carter v. Philip Morris, Inc. Lucier v. Philip Morris Inc.*; *Inzerilla v. Am. Tobacco Co.*; *Anderson v. Fortune Brands, Inc.*; *Karbiwnyk v. R.J. Reynolds Tobacco Co.*; *Raulerson v. R.J. Reynolds Tobacco Co.*).

[21]  Ex. 27, Gardner Dep. 81:4-18; Ex. 29, Flora Dep. 317:22-319:15; Ex. 50, Wise Dep. 123:16-130:13.

1    this case.  Evidence regarding Cronos or Altria's investment in Cronos is therefore irrelevant,

2    prejudicial, and likely to confuse or mislead the jury and should be excluded.  *See supra* at 21.

3    **XIX.  MOTION IN LIMINE NO. 19:  FDA'S CRITICISM OF ALTRIA'S INVESTMENT
           IN JLI**

4

5             Altria anticipates that Plaintiff might seek to introduce evidence regarding the FDA's

      criticism of Altria's investment in JLI in an effort to suggest that Altria engaged in wrongdoing.

6

7    Second Amended Complaint ¶ 693-95.  Such evidence is entirely irrelevant, constitutes inadmissible

      hearsay, and would only create prejudice and confusion.

8

9             Courts routinely preclude evidence of government investigations offered as evidence of

10   illegal activity given these concerns.  *See, e.g.*, *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770,

11   778 (9th Cir. 2010) (affirming exclusion of non-final report from Department of Labor on hearsay

     grounds); *In re Urethane Antitrust Litig.*, 2016 WL 475339, at *6 (D.N.J. Feb. 8, 2016) (precluding

12

13   evidence of DOJ investigation given risk of undue prejudice); *Cutis v. M&S Petroleum, Inc.*, 174

14   F.3d 661, 673 (5th Cir. 1999) (excluding evidence in part because agency's evidence of likely

     violation of environmental regulations would have been "unduly prejudicial due to its apparent

15

16   official nature"); *Smith v. I-Flow Corp.*, 2011 WL 12627557, at *2 (N.D. Ill. June 15, 2011)

17   (excluding FDA warning letter as unfairly prejudicial).  This Court should do the same as to any

     FDA criticism of Altria's investment offered here.

18

19   **XX.   MOTION IN LIMINE NO. 20:   FOREIGN REGULATION OF TOBACCO
            PRODUCTS**

20            Plaintiff has sought to elicit testimony regarding foreign regulations of tobacco and vapor

21   products.  Ex. 49, Ribisl Dep. 218:23-222:5.  But these regulations are irrelevant because they do

22   not apply to the products in this case—B.B. is a United States resident and did not purchase JUUL

23   outside of the U.S.  Nor is there any allegation she saw advertisements about JUUL outside the U.S.

24   As such, foreign regulations should be excluded as irrelevant and unfairly prejudicial because they

25   could confuse or mislead the jury into believing Altria acted improperly in the U.S.  Fed. R. Evid.

26   403; *Agricola Cuyuma SA v. Corona Seeds, Inc.*, 2020 WL 7034596, at *3 (C.D. Cal. Oct. 15, 2020);

27   *Apple iPod iTunes Antitrust Litig.*, 2014 WL 12719192, at *3.

28

Defendants' Notice of Motion and Motion To

1

**CONCLUSION**

2

The Court should grant Defendants' motions in limine.

3

4

Dated: March 21, 2022                                    Respectfully submitted,

5

6

RENEE D. SMITH (*pro hac vice*)
renee.smith@kirkland.com

7

DAVID M. BERNICK, P.C. (*pro hac vice*)
david.bernick@kirkland.com

8

KIRKLAND & ELLIS LLP
300 North LaSalle

9

Chicago, IL 60654
Telephone: (312) 862-2000

10

Facsimile: (312) 862-2200

11

PETER A. FARRELL, P.C. (*pro hac vice*)
peter.farrell@kirkland.com

12

JASON M. WILCOX, P.C. (*pro hac vice*)
jason.wilcox@kirkland.com

13

KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W. Washington, DC 20004

14

Telephone: (202) 389-5000

15

Facsimile: (202) 389-5200

16

GREGORY P. STONE (SBN 78329)
gregory.stone@mto.com

17

DANIEL B. LEVIN (SBN 226044)

18

daniel.levin@mto.com

19

BETHANY W. KRISTOVICH (SBN 241891)
bethany.kristovich@mto.com

20

MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor

21

Los Angeles, CA 90071-3426
Telephone: (213) 683-9100

22

Facsimile: (213) 687-3702

23

*Attorneys for Defendant Juul Labs, Inc.*

24

Lauren S. Wulfe (SBN 287592)

25

ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, Forty-Fourth Floor

26

Los Angeles, California 90017
Telephone: 213-243-4000

27

Facsimile: 213-243-4199
Lauren.Wulfe@arnoldporter.com

28

Paul W. Rodney (*admitted pro hac vice*)

-30-

Case No. 19-md-02913-WHO

1   ARNOLD & PORTER KAYE SCHOLER LLP
    1144 15th Street, Suite 3100
2   Denver, CO 80202
    Telephone: 303-863-1000
3   Facsimile: 303-832-0428
    Paul.Rodney@arnoldporter.com
4
    John C. Massaro (*admitted pro hac vice*)
5   Daphne O'Connor (*admitted pro hac vice*)
    Jason A. Ross (*admitted pro hac vice*)
6   David E. Kouba (*admitted pro hac vice*)
    ARNOLD & PORTER KAYE SCHOLER LLP
7   601 Massachusetts Ave, NW
    Washington, DC 20001
8   Telephone: 202-942-5000
    Facsimile: 202-942-5999
9   John.Massaro@arnoldporter.com
    Daphne.OConnor@arnoldporter.com
10  Jason.Ross@arnoldporter.com
    David.Kouba@arnoldporter.com
11
    Angela R. Vicari (*admitted pro hac vice*)
12  ARNOLD & PORTER KAYE SCHOLER LLP
    250 West 55th Street
13  New York, NY 10019
    Telephone: 212-836-8000
14  Facsimile: 212-836-8689
    Angela.Vicari@arnoldporter.com
15
    *Attorneys for Defendants Altria Group, Inc.,*
16  *Philip Morris USA Inc., Altria Client Services LLC,*
    *Altria Group Distribution Company, and*
17  *Altria Enterprises LLC*

18

19

20

21

22

23

24

25

26

27

28

Defendants' Notice of Motion and Motion To

1

## CERTIFICATE OF SERVICE

2
3
4
5

     I hereby certify that on March 21, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.  I also caused a copy of the under-seal documents to be served via electronic mail on all parties.

6

                  By: */s/ Renee D. Smith*          

7

                      Renee D. Smith

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28