UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No.  19-md-02913-WHO<br><br>**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT REGARDING B.B.** |

This Order addresses JLI's[1] motion for partial summary judgment and Altria's[2] motion for summary judgment.[3]  With the exception of the claims that plaintiff abandoned during the briefing of these motions, defendants' motions are DENIED.

## I.      JLI MOTION FOR PARTIAL SUMMARY JUDGMENT

B.B. pleads seventeen causes of action: (1) Strict Liability - Design Defect against JLI under the Tennessee Products Liability Act (TPLA); (2) Strict Liability - Failure to Warn against JLI under the TPLA; (3) Strict Liability - Manufacturing Defect against JLI under the TPLA; (4) Products Liability - Negligent Design against JLI under the TPLA; (5) Products Liability – Negligent Failure to Warn against JLI under TPLA; (6) Products Liability – Negligent

---

[1] Juul Labs, Inc.

[2] By stipulation of the parties, and for purposes of the B.B. trial only, defendants Altria Group, Inc., Phillip Morris USA, Inc., Altria Client Services LLC, Altria Group Distribution Company, and Altria Enterprises LLC will be treated as one defendant and are referred to herein collectively as "Altria."  Dkt. No. 2756.

[3] All other defendants initially named by B.B. in this case have been dismissed by stipulation of the parties.  The Clerk shall terminate the motions at Dkt. Nos. 2649, 2649, 2650, 2652, 2653, 2657, 2686, 2687, 2688, 2713, 2714, 2725, 2805, 2810 as moot.  Materials filed by the individual defendants conditionally under seal in support of their motions for summary judgment may remain under seal as those materials were not considered by the Court.  However, declarations submitted by the individual defendants in support of sealing materials submitted by other parties have been considered below.

1   Manufacturing against JLI under TPLA; (7) Negligence and/or Gross Negligence against JLI

2   under the TPLA and against Altria under the common law; (8) Negligent Failure to Recall/

3   Retrofit against JLI under TPLA; (9) Negligent Misrepresentation against JLI under TPLA and

4   against Altria under the common law; (10) Fraud against JLI under the TPLA and against Altria

5   under the common law; (11) Fraudulent Concealment against JLI under the TPLA and against

6   Altria under the common law; (12) Joint and Several Liability for Fraud and Fraudulent

7   Concealment against JLI under the TPLA and against Altria under common law; (13) Breach of

8   Express Warranty against JLI under the TPLA; (14) Breach of an Implied Warranty of

9   Merchantability against JLI under the TPLA; (15) Medical Monitoring against JLI under the

10  TPLA and against Altria under common law; (16) Intentional Infliction Of Emotional Distress

11  against JLI under the TPLA; and (17) Negligent Infliction of Emotional Distress against JLI under

12  the TPLA. *See* Second Amended Complaint ("SAC") Case No. 20-cv-07174-WHO Dkt. No. 10.[4]

13  B.B. does not dispute that Tennessee law applies to the substantive elements of her claims.

14          JLI moves for partial summary judgment on B.B.'s claims for fraud (Counts 9-12), failure

15  to warn (Counts 2, 5), breach of warranty (Counts 13-14), manufacturing defect (Counts 3, 6),

16  failure to recall and retrofit (Count 8), and medical monitoring (Count 15).  B.B. does not oppose

17  entry of summary judgment on her "warranty, medical monitoring, failure to recall, manufacturing

18  defect, and negligent misrepresentation claims."  Oppo. to JLI MSJ at 11 n.3.  The claims

19  remaining in dispute on JLI's motion for partial summary judgment are B.B.'s claims for fraud,

20  fraudulent concealment, joint and several liability for fraud, strict liability and negligent failure to

21  warn.

22          **A.      Fraud Claims**

23          JLI argues that B.B.'s inability to show reliance or causation is fatal to her remaining

24  fraud-based claims under the TPLA: fraud under Count 10; fraudulent concealment under Count

25  11; and joint and several liability for fraud and fraudulent concealment under Count 12.[5]

26  _____

27  [4] B.B.'s claims against the Founder and Director and Other Director Defendants were dismissed
    with prejudice by stipulation.  Case No. 20-cv-07174, Dkt. No. 27.

28  [5] As noted, B.B. has agreed that summary judgment is appropriate on her negligent

United States District Court
Northern District of California

1

### 1. Sufficiency of Identification of Advertising and Marketing Materials Seen and their Message

JLI contends that it is entitled to summary judgment on these fraud claims because B.B. was not able to identify any specific advertisement that she saw prior to her first use or purchase of JUUL and because she consistently testified that she either ignored warnings or did not rely on them. According to JLI, in her deposition B.B. testified that she could not identify whether specific advertisements shown to her were ones she saw prior to her use, she "didn't know" what JUUL was prior to her first use, that she tried JUUL at her friend's suggestion, and based her belief that JUUL was "safe" only on the fact that JUUL advertisements used "colors" and other unspecified elements that made it look safe and fun. Given that testimony, JLI argues that B.B. cannot satisfy the reliance and causation elements of her fraud-based claims: Tennessee law requires not only that B.B. identify the materially false statements or partial representations that omitted material information that she saw but also prove that she relied on those statements or incomplete representations in a way that caused her injuries.[6]

In her declaration submitted with her opposition, B.B. provides further details on the types of advertisements and marketing materials to which she was exposed prior to her first use and where she was exposed to those materials. *See generally* Declaration of B.B. [Dkt. No. 2791-28];

_____

misrepresentation claim against JLI. JLI does not move for summary judgment on B.B.'s strict and negligent design liability claims (Counts 1 and 4), negligence and gross negligence claim (Count 7), or intentional and negligent infliction of emotional distress clams (Counts 16, 17).

[6] Under Tennessee law, "'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action" and the Tennessee Supreme Court refers to "the cause of action as a claim for intentional misrepresentation." *Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012). To recover "for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation." *Id.* at 343. "The tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury. . . . Once properly supported, the burden shifts to the non-moving party to 'set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact.'" *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538–39 (Tenn. 1998) (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997)).

United States District Court
Northern District of California

1   *see also id.* ¶¶ 2-3; (identifying advertisements using phrases "simply satisfying," "the smoking

2   alternative," "start fresh," and "smoking evolved" and advertising mango flavoring).  She also

3   provides examples of the JUUL counter-displays she saw at stores, often located next to the cash

4   registers.  *Id.* ¶¶ 4-6.  She declares that before she first used the product she "did not know exactly

5   what it was or what was in it, but I knew it was some kind of vape that you smoked, as the videos

6   in the stores showed. I never saw anything on the in-store JUUL advertisements and product

7   packaging that said JUUL was potentially harmful or addictive, before or soon after I started using

8   it." *Id.* ¶ 7.  B.B. states what she saw on JLI's website and Instagram page regarding JUUL –

9   including the type of pictures and advertisements she believes she saw – and that those images

10  "made me sure that JUUL was safe and something that could be used by young people without

11  anything bad happening." *Id.* ¶¶ 10-12.  She details the types of advertisements she continued to

12  see – and noticed more once she was using JUUL – over the course of her use, as well as what was

13  on the packaging when she procured starter kits.  *Id.* ¶¶ 14-21; *see also* Oppo. to JLI MSJ at 6-11.[7]

14      B.B. also relies on her expert's opinions, as well as testimony from JLI's own witnesses

15  and documents, that describe JUUL's branding at launch and marketing strategies (including JLI's

16  digital media campaign), to support her testimony about the types of marketing to which she was

17  exposed and the message or aim of that marketing.  *See* Oppo. to JLI MSJ at 2-5.[8]

18      I conclude that B.B. has adequately identified the sources for the alleged

19

20  ─────────────────────

21  [7] JLI moved to strike B.B.'s declaration in support of her opposition to JLI's motion, arguing that
    her detailed description contradicts her deposition testimony and belatedly provides more details
    about what and how she was exposed to JUUL advertising and marketing than she provided in her

22  interrogatory responses.  Dkt. No. 2836.  I denied that motion, Dkt. No. 2892, but allowed
    defendants to depose B.B. regarding the advertisement and marketing materials that she declared

23  were similar to the ones she saw in stores on online.

24  [8] Relying on Expert Report of Dr. Anthony Pratkanis [Dkt. No. 2699-6] at 5-6, 23-36, 41; Expert
    Report of  Dr. Robert K. Jackler [Dkt. No. 2691-1] at 18-19, 81-83, 295, 371-72, 400-16, 419-22;

25  Expert Report of Professor Bonnie Halpern-Felsher [Dkt. No. 2696-12] at 10-11, 116-27, 133-42;
    Expert Report of Dr. John Chandler [Dkt. No. 2690-7] at 5-8, 34-44; Expert Report of Dr. Samuel

26  Woolley [Dkt. No. 2791-11] at 87-88; Expert Report of Dr. David Cutler [Dkt. No. 2785-53] at 4-
    5, 39-52; Expert Report of Dr. Sherry Emery [Dkt. No. 2696-9] at 7-8, 65.  Defendants have

27  moved to exclude in whole or in part some of these experts.  The motions to exclude will be
    addressed in a separate order.  But for purposes of this motion, there is sufficient admissible expert

28  opinion that supports B.B.'s testimony about what she saw and what those advertising and
    marketing materials conveyed to her.

United States District Court
Northern District of California

1   misrepresentations and omissions underlying her fraud-based causes of action.

2   ## 2.    Puffery, Opinion, and the First Amendment

3        In reply, JLI argues that each of the full or partial "representations" B.B. identifies in her

4   declaration cannot preclude summary judgment because the only elements of JLI's advertisement

5   and marketing materials that B.B. has identified are not independently fraudulent and actionable.

6   As characterized by JLI, the elements of the advertisement and marketing materials that B.B.

7   claims to have seen and relied on – advertisements showing "bouncy" young models, using bright

8   colors, including words like "satisfaction," and promoting JUUL in dessert and fruit flavors – are

9   mere "puffery" or otherwise not-actionable opinion that cannot satisfy the fraudulent

10  misrepresentation standards under Tennessee law or are protected speech under the First

11  Amendment.

12       JLI first contends that B.B. cannot rely on the common marketing elements as actionable

13  affirmative misrepresentations under the analysis contained in two of my prior orders.  In *Colgate*,

14  defendants argued that while their "ads might resemble prior cigarette advertising, the use of

15  'bright' colors, 'clean lines,' 'minimal text,' 'eye-catching graphics,' FDA-regulated flavors,

16  attractive adult models, and other common advertising practices are not grounds for a

17  misrepresentation claim." *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 748 (N.D. Cal. 2019).

18  I did not accept those arguments in whole, given that plaintiffs identified other specific

19  misrepresentations.  *Id.*  In a footnote I provided "guidance" that at the motion to dismiss stage:

20           JUUL's use of common advertising practices and its ads that follow
             the predominant marketing aesthetic of the last few years ('bright'
21           colors, 'clean lines,' 'minimal text,' 'eye-catching graphics,') would
             not by itself constitute any sort of misrepresentation.  Also, claims
22           based on themes and vague terms in JUUL's advertising are, as JUUL
             argues, nothing more than non-actionable puffery. *In re Fontem*, 2016
23           WL 11503066, at *9 (C.D. Cal. Apr. 22, 2016) ('Courts enter
             dangerous territory when they consider representations actionable
24           based not on what they actually say, but on what plaintiffs claim
             defendants seem to be stating. This goes beyond viewing the
25           allegations in the light most favorable to the plaintiff.').

26  *Id.*, at 748 at n.4.  But as I explained in an order from this MDL, in *Colgate* I "did not rule on the

27  use of specific phrases in JLI's marketing materials. Nor did I rule out the relevance of the overall

28  features of an advertisement (including its use bright or eye-catching colors) to the context of

5

1   whether an advertisement, when considered in whole, is misleading or false. Instead, I warned

2   plaintiffs that design elements would not 'by themselves' constitute an actionable

3   misrepresentation." *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F.

4   Supp. 3d 552, 626 (N.D. Cal. 2020).

5          We are well beyond the motion to dismiss stage.  Considering the advertising and

6   marketing materials identified by B.B. as a whole with respect to the materials B.B. declares she

7   saw and was influenced by and the support provided by plaintiff's experts concerning similar

8   advertisement and marketing materials of the type seen by B.B., I will not dismiss B.B.'s fraud

9   claims on non-actionability grounds.

10          There is support, although disputed, for B.B.'s position that a reasonable juror could find

11   that the advertisements and marketing materials in totality conveyed specific health or safety

12   messages to B.B.  From prior to her first use and through when she started to use, these included

13   the design elements like the bright colors and the use of young models, the context of the

14   advertisements (what was shown) and the actual words used, how and where the devices and the

15   marketing materials were displayed and located in stores, and the media channels used more

16   broadly.  B.B.'s subjective beliefs that JUUL was safe and appropriate for young people to use is,

17   on this more complete evidentiary record, supported by expert testimony and references to

18   defendants' own documents.

19          JLI's mere puffery and non-actionable cases are inapposite.  *See, e.g., In re Fontem US,*

20   *Inc. Consumer Class Action Litig.*, No. SACV1501026JVSRAOX, 2016 WL 11503066, at *9

21   (C.D. Cal. Apr. 22, 2016) (dismissing purported health claims as non-actionable in part because

22   "Plaintiffs also do not allege any facts suggesting that the context of where these advertisements

23   can be found relates to a health-based message. There are no allegations in the CAC that the online

24   advertisements were ever associated with healthy lifestyle oriented content or that the way these

25   advertisements appeared conveyed some implied health message."); *Warren v. Warrior Golf Cap.,*

26   *LLC*, 126 F. Supp. 3d 988, 997 (E.D. Tenn. 2015) (finding advertisement that at defendant's resort

27   "we blend a familiar, family atmosphere with a passion for golf and hospitality. We pride

28   ourselves on treating guests right and making sure every dollar entrusted to us is well spent" were

1    non-actionable "sales talk or opinion rather than to a factual statement."); *Bennett v. CMH Homes,*

2    *Inc.*, 661 F. App'x 329, 336 (6th Cir. 2016) ("statements concerned the durability and quality of

3    the type of home on the CMH lot, where she was attempting to sell homes.  This type of comment

4    falls squarely within the common understanding of 'puffing or other sales talk,' which is generally

5    not actionable," in part because salespeople are making direct sales pitches are obviously self-

6    interested); *Pooshs v. Philip Morris USA, Inc.*, 904 F. Supp. 2d 1009, 1027 (N.D. Cal. 2012)

7    (granting summary judgment on fraud claim where "at most" plaintiff's testimony "was that

8    various advertisements presented smoking in a way that made it appear attractive or glamorous"

9    given that "such representations are not affirmative statements about the health effects of

10   smoking" but allowing fraudulent concealment claim concerning undisclosed health effects of

11   smoking to continue).

12            While JLI spends much time picking out and separately challenging discrete design or

13   content elements identified by B.B., her exposure to contemporaneous advertisement and

14   marketing materials must be viewed as a whole, along with information about their placement and

15   JLI's own documents demonstrating the intent and purpose of those materials.  Given B.B.'s

16   testimony, JLI's own documents and plaintiff's expert support, B.B.'s evidence at this juncture

17   appears to satisfy Tennessee law, requiring that the "quality of the evidence must not be such to

18   lead to a verdict based on conjecture, surmise or speculation," and must be sufficient to rebut the

19   presumption of "good faith and honesty and against fraud." *Jarmakowicz v. Suddarth*, 2001 WL

20   196982, at *10–11 (Tenn. Ct. App. Feb. 28, 2001) (relying on *Gold v. National Sav. Bank*, 641

21   F.2d 430, 435 (6th Cir.1981), *A.J. White v. Bettis & Capps*, 56 Tenn. 645 (1872), *Short v.*

22   *Louisville and Nashville R.R. Co.*, 213 F. Supp. 549, 551 (E.D.Tenn.1962)).  JLI is free to

23   challenge B.B. on cross-examination and point out that specific advertisements contained

24   warnings or other evidence that could undermine B.B. and her experts' testimony about the

25   meaning and impact of those elements and the campaigns as a whole.  JLI will also be free to

26   challenge B.B. and her experts regarding changes in JLI's advertising and marketing campaigns

27   over time and argue that those changes defeat B.B.'s reasonable reliance on the message she

28   perceived JLI (and eventually Altria) to be making regarding JUUL.

Finally, if the jury returns a verdict against JLI on B.B.'s fraud-based claims, JLI may argue post-trial that any verdict was based on conjecture, surmise or speculation and that the evidence is more "fairly and reasonably reconcilable with fair dealing and honesty of purpose" than fraud. *Jarmakowicz*, 2001 WL 196982, at *11. That will depend on the evidence, most particularly the testimony from B.B. and other witnesses. At this juncture, there are material disputes of fact that preclude summary judgment on B.B.'s fraud claims.[9]

### 3.    Reliance

JLI challenges B.B.'s intentional misrepresentation claim (not her omissions-based claim), arguing that B.B. is precluded from establishing reliance on any affirmative statements made by JLI given her admission in her declaration that she did not "consciously pay attention to ads." B.B. Decl. ¶ 2.[10] When read in full, B.B. explained in the declaration that prior to her first use, she "did not consciously pay attention to the ads, but I noticed them and still remember some of the ads and what they made me believe about JUUL." B.B. Decl. ¶ 2. What B.B. meant by "consciously" can be probed at trial. It is plausible that she was not seeking out the JUUL advertisements or studying them carefully (prior to her first use) but that she did notice them and that they conveyed information to her. Similarly, when presented in her deposition with copies of

---

[9] JLI's argument that its conduct is protected by its First Amendment right to convey truthful information about JUUL does not weigh in favor of summary judgment. Whether the information JLI intended to convey and conveyed in various advertising and marketing campaigns as a whole was truthful or was instead false or misleading to reasonable consumers is in dispute. The Supreme Court's recognition in *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 564 (2001), that "tobacco retailers and manufacturers have an interest in conveying truthful information about their products to adults, and adults have a corresponding interest in receiving truthful information about tobacco product" does not require summary judgment. There, the Court considered blanket bans on forms of outdoor and indoor advertising of tobacco products, not whether particular advertising was false and misleading. *See also Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012 (striking down Smoking Prevention and Tobacco Control Act's ban on use of color and imagery in most tobacco advertising as "vastly overbroad, and thus violated First Amendment by burdening more commercial speech than necessary to advance government's interest in alleviating effects of tobacco advertising on juveniles")).

[10] "In order to succeed in any action based upon fraudulent or negligent misrepresentation, the plaintiff must prove that it relied justifiably on the defendant's statements. [] The burden is not upon the defendant to show that it was not negligent, but rather, the burden is upon the plaintiff to show that its reliance upon any statements defendants may have made was reasonable." *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000) (internal citations omitted).

some of the advertisements used by JLI in or around 2017, B.B. admitted that she "never really paid attention to the warning. I've never really seen them" but went onto explain why; in her view the warnings were "not in very obvious places, I guess.  I don't know.  It's not the first thing that catches your attention."  B.B. Depo. Tr. at 118-19.  Instead, she saw the other eye-catching elements identified above that, together, conveyed and reinforced the idea that using JUUL was safe and appropriate for youth.  In her deposition, she confirmed that if she been warned about how dangerous JUUL was and that it was inappropriate for use by minors, she would have ceased or stopped using it.  B.B. Depo. Tr. at 194-95.

These statements raise, at most, a credibility issue that JLI may explore at trial concerning whether B.B. truly relied on JLI's representations and whether that reliance was reasonable.[11]

JLI's motion for partial summary judgment on B.B's remaining fraud claims is DENIED.[12]

## B.      Failure to Warn

JLI contends that B.B.'s strict liability and negligent failure to warn claims fail because, as with the fraud claims, B.B. fails to show reliance or causation with respect to JLI.  It also contends that B.B.'s failure to warn claims are preempted in full or part by FDA regulations and fail because B.B. was adequately warned by JLI that JUUL contained nicotine.

### 1.       Reliance and Causation

In B.B.'s deposition, she testified that she did not see the warnings JLI placed on the packaging and advertisements for JUUL or on JLI's website and would not have paid much attention to them if they had been more prominent because she "never really paid attention" to

---

[11] The parties dispute whether, in the alternative, B.B. can rely on representations seen and relied on by E.S. (the friend who offered the JUUL that B.B. first used) as a form of indirect or third-party reliance.  *See* B.B. Oppo. to JLI at 17; JLI Reply at 7-8.  If B.B. introduces evidence from E.S. in support of this theory at trial (and whether E.S. actually and reasonably relied on JLI's misrepresentations is material and disputed, not foreclosed by E.S. purported admission that she did not pay "much" attention to advertisements), JLI may challenge it post-trial both on whether that is a viable theory for fraud-based claims and also on proximate causation.  At this juncture, however, JLI has not shown that these theories are barred under Tennessee law.

[12] JLI also contends that B.B.'s fraudulent concealment and omissions claims are foreclosed because of B.B.'s deposition testimony that she "never really" paid attention to any JLI warnings either before or after she began using JUUL.  JLI Reply at 8-10.  This argument is addressed, and rejected, with respect to the failure to warn claims.

United States District Court
Northern District of California

1    warnings.  JLI also notes that B.B. testified that when she first used a JUUL device, she saw no

2    packaging, did not know what nicotine was, and did not know that a JUUL was.  This testimony,

3    according to JLI, prevents B.B. from proving her failure to warn claims, as well as her fraudulent

4    concealment and omissions claims, because she cannot show that if JLI had made "proper

5    warnings," she would not have sustained her injuries.[13]

6          The deposition transcript excerpts on which JLI relies are incomplete and somewhat

7    misleading.  B.B. testified that the warnings defense counsel showed her during her deposition

8    were either not prominently displayed or not readily seen given the methods B.B. used (*i.e.*,

9    visiting JLI's website on her cell phone).  *See, e.g.*, B.B. Depo. Tr. [Dkt. No. 2791-2] at 118-120,

10   194-196, 208 (warnings "not in very obvious places. . . . It's not the first thing that catches your

11   eye," would not have read "fine print," did not see any warning on the JUUL website she first

12   visited, did not scroll down to bottom of page).  In addition, she said that if she been warned about

13   how addictive JUUL was, that it was inappropriate for use by minors, and was dangerous because

14   it could cause or exacerbate pulmonary injuries, she would have ceased or stopped using it.  *Id.* at

15   194-95.

16         B.B.'s deposition testimony is admittedly somewhat ambiguous, but a reasonable juror

17   could find that it supports her position that she would have more carefully read, noticed, and

18   ultimately altered her actions if JLI's warnings had been more prominent, accessible and

19   informative.  What B.B. would have done – and how significant her deposition testimony is

20   regarding her failure to notice warnings regarding JUUL and her general practice of not viewing

21   or acting on warnings on other types of products – is a dispute to be resolved by the jury assessing

22   B.B.'s credibility.

23

24   [13] "To establish products liability based on a failure-to-warn theory, the plaintiff must show that:
     (1) the warnings at issue were defective; (2) the defective warning made the product unreasonably
25   dangerous; and (3) the inadequate labeling proximately caused the claimed injury. *Barnes v. Kerr
     Corp.*, 418 F.3d 583, 590 (6th Cir.2005). Generally, courts considering the adequacy of product
26   warnings consider: (1) whether the warning adequately indicates the scope of the danger; (2)
     whether it communicates the seriousness of the harm that could result from misuse; (3) whether
27   the physical aspects of the warning alert a reasonably prudent person to the danger; and (4) the
     means used to convey the warning.  *Id.*"  *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 596 F.
28   Supp. 2d 1101, 1127 (M.D. Tenn. 2009), *aff'd in part on other grounds*, 432 F. App'x 435 (6th Cir.
     2011).

1    JLI's motion for summary judgment on B.B.'s strict liability and negligent failure to warn

2    claims and her fraudulent concealment and omissions claims for lack of reliance and causation is

3    DENIED.

### 2.        Preemption of Failure to Warn Claims

5        JLI also seeks summary judgment on B.B.'s strict liability and negligent failure to warn

6    claims because the claims are preempted in whole or in part and because JLI adequately warned

7    B.B. about JUUL's nicotine content.

8        JLI contends that claims based on nicotine addiction are impliedly preempted by its

9    compliance in May 2018 with the FDA's mandated warning: "WARNING: This product contains

10   nicotine. Nicotine is an addictive chemical."  JLI asserts that the Tobacco Control Act's ("TCA")

11   savings clause for product liability claims still allows for a determination of implied conflict

12   preemption of plaintiff's failure to warn claim given that plaintiff's failure to warn theories

13   conflict with the express warnings approved by the FDA.  I briefly addressed this argument with

14   respect to generic "failure to warn" claims in *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod.*

15   *Liab. Litig*., 497 F. Supp. 3d 552 (N.D. Cal. 2020).  There, considering the TCA's preemption

16   provision (21 U.S.C. § 387p(a)(2)(A)) and equally strong "savings clause" for "product liability

17   claims" (21 U.S.C. § 387p(b)), I acknowledged the "difficult question [] whether 'failure to warn'

18   claims that are product liability claims are nonetheless subject to preemption to the extent that they

19   touch upon JLI's past or future failures to disclose the FDA's now-approved nicotine addiction

20   warning in 21 C.F.R. § 1143.3."  *Id*. at 587.  I recognized that:

21           the nicotine addiction warning that has been promulgated [21 C.F.R.
             § 1143.3] might conflict-preempt an otherwise saved product liability
22           claim if the specific relief sought by a personal injury plaintiff []
             would require JLI to make a different or additional disclosure on that
23           specific topic *and* it would either frustrate Congressional intent or it
             would be impossible to comply with both the FDA standard and a
24           standard imposed as a matter of state product liability law.  As neither
             side has fully briefed this narrow issue, I will address it when the state
25           law product liability claims or bellwether plaintiffs' claims are tested.

26   *Id*. at 594 (emphasis in original).

27       Now is the time to address this issue.  Neither side disputes that B.B.'s failure to warn

28   claims are product liability claims under Tennessee law.  Both sides also appear to agree that

1   preemption considerations only apply to B.B.'s failure to warn claims with respect to an alleged

2   failure by JLI to sufficiently warn about the addictiveness of or presence of nicotine on JUUL's

3   labels.[14]  *See* JLI MSJ [Dkt. No. 2651-3] at 9 ("*much* of B[.'s] failure-to-warn claims fail due to

4   JLI's compliance with the FDA's nicotine-warning regulation") (emphasis added); Oppo. to JLI

5   MSJ [Dkt. No. 2791] at 19-20, 23 (preemption not relevant to B.B.'s claim of failures to warn

6   "JUUL was inappropriate and dangerous for minors" and "could exacerbate pulmonary injuries,"

7   and cannot reach her claims based on advertising); *see also In re JUUL Labs, Inc., Mktg., Sales*

8   *Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d at 590-91 (advertising claims not preempted).

9          The start of the analysis, as applied to B.B.'s claims, is that the only regulation regarding

10   nicotine required by the FDA is the "minimum" required warning that JLI used as of May 2018.

11   The FDA noted that nothing in its regulation was intended to preclude additional warnings.  *See*

12   *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as*

13   *Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale*

14   *and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*,

15   81 FR 28973-01 at 28990 ("Additionally, FDA notes that some ENDS product manufacturers

16   have voluntarily included exposure warnings on their products. Accordingly, FDA has changed

17   the heading of part 1143 from 'Required Warning Statements' to 'Minimum Required Warning

18   Statements' in order to clarify that part 1143 is not intended to prevent tobacco product

19   manufacturers from including truthful, non-misleading warnings on their products' packaging or

20   advertisements voluntarily or as a result of FDA guidance.").[15]

21

22   _____

[14] Finally, it bears emphasizing that this discussion only applies to "product liability claims" that

23   are covered by the TCA's savings clause.  Other claims that fall outside the express savings clause

24   (*e.g.*, failure to warn labelling claims that arise under consumer protection statutes) are analyzed
     differently with respect to preemption.

25   [15] JLI argues that the court in *In re Fontem US, Inc.*, No. SACV1501026JVSRAOX, 2016 WL
     6520142, at *4 (C.D. Cal. Nov. 1, 2016), rejected the idea that because the FDA-mandated

26   warning was a minimum, state standards imposing different requirements should not be preempted
     in the context of state consumer protection claims.  *Id.* at *6; JLI MSJ Reply at 11.  JLI ignores

27   that the *In re Fontem* court itself noted that the minimum-standard argument "would be a
     persuasive argument if the issue was whether the state requirement conflicted with the federal

28   requirement."  *Id.* at *4.  That is the precise question here given the savings clause for product
     liability claims.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    B.B.'s nicotine-addiction-based failure to warn claims are based on either the absence of

2    any warnings when she first used and/or purchased the products or that warnings (made on the

3    packaging, on JLI's website, or in JUUL advertising) were insufficient to warn her of the

4    undisclosed but high risk of addiction from using JUUL given its formulation and design

5    characteristics.  These claims are not conflict-preempted because they do not appear to frustrate

6    the FDA's regulatory goals that only require a minimum warning.  JLI spends much of its

7    argument noting the expansiveness of the FDA's potential regulatory authority with respect to

8    ENDS.  But, to date, that authority has not been exercised regarding JUUL except for the

9    mandatory nicotine warning and the requirement to submit the PMTA.  When the FDA takes final

10   action on JLI's still-pending PMTA application, the analysis might change.  But for now, JLI has

11   not shown how allowing B.B. to proceed with her failure to warn product liability claims "would

12   either frustrate Congressional intent or it would be impossible to comply with both the FDA

13   standard and a standard imposed as a matter of state product liability law."  *In re JUUL Labs, Inc.,*

14   *Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d at 594.

15   As I recognized in *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F.

16   Supp. 3d 552, 593 (N.D. Cal. 2020), there are significant distinctions in the posture and regulatory

17   schemes addressed by the Supreme Court in *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861,

18   874–75 (2000) and the posture of the FDA action and regulatory scheme here.  *See* 497 F. Supp.

19   3d at 593 (noting in *Geier*, the "Court agreed that allowing a state law products liability action

20   based on the failure of a manufacturer to adopt one of the allowed (but not required) passive

21   restraint standards (use of air bags) 'conflicts with the objectives of' the federal standard to allow a

22   mix of restraints and if allowed would stand as an 'obstacle to the variety and mix of devices that

23   the federal regulation sought.'").  No showing similar to the one in *Geier* has been made by JLI.

24   While it continually asserts that the FDA has made various "determinations" about what is

25   appropriate for ENDS generally or JUUL specifically, the authority it relies on demonstrates that

26   while the FDA's permissible regulatory authority may be broad, the FDA repeatedly recognized

27   that it did not have "sufficient evidence" about ENDS at the time of the Deeming Rule to consider

28   different or additional warnings other than the "minimum" it adopted.  JLI MSJ Reply at 13 (citing

United States District Court
Northern District of California

81 Fed. Reg. at 29,063).  In the context of product liability claims that fall within the savings clause ("saved product liability claims"), that is significant.  The context here – considering specifically-saved product liability claims – also distinguishes B.B.'s claims from those addressed in *Colgate*, where I indicated that the express preemption provisions of the TCA applied retroactively to consumer protection claims that sought to impose different or additional nicotine-warning requirements.  *Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178, 1189 (N.D. Cal. 2018) (relying on *In re Fontem US, Inc.*, 2016 WL 6520142, at *4 (C.D. Cal. Nov. 1, 2016)).

At this juncture and on this record, B.B.'s expressly saved product liability failure to warn claims, to be redundant, are saved.  There is no basis to conclude that conflict preemption applies in light of the FDA's minimum required nicotine warning.

Separately, JLI more narrowly argues that the failure-to-warn claims based on nicotine addiction fail after May 2018 – when JLI put the FDA-mandated minimum warning on its packaging as required by 21 C.F.R. § 1143.3 – because under the TPLA, "(a) Compliance by a manufacturer or seller with any federal or state statute or administrative regulation existing at the time a product was manufactured and prescribing standards for design, inspection, testing, manufacture, labeling, warning or instructions for use of a product, shall raise a rebuttable presumption that the product is not in an unreasonably dangerous condition in regard to matters covered by these standards."  Tenn. Code Ann. § 29-28-104(a).

This argument by definition impacts injury to B.B. only after May 2018 because there was no mandated warning "existing at the time a product was manufactured" before that time.  And, as JLI acknowledges, the presumption of compliance under the TPLA is rebuttable.[16]  B.B. contends

---

[16] *See, e.g., Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521 (Tenn. 2008)

> It is equally true, for the reasons stated above, that the evidence in this case thoroughly rebutted that presumption. Tennessee Code Annotated section 29–28–104 was designed "'to give refuge to the manufacturer who is operating in good faith and [in] compliance of what the law requires him to do.'" *Tuggle v. Raymond Corp.*, 868 S.W.2d 621, 625 (Tenn.Ct.App.1992) (alteration in original). The statute was not designed to provide immunity from punitive damages to a manufacturer who is aware that compliance with a regulation is insufficient to protect users of the product. While evidence of compliance with government regulations is certainly evidence that a manufacturer was not reckless, it is not dispositive. *See O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1446 (10th Cir.1987); *Silkwood v. Kerr–McGee Corp.*, 769 F.2d 1451, 1457–58 (10th Cir.1985); *Dorsey v.*

14

1  that the defense is not available given JLI's continuation of its conduct and use of allegedly

2  deficient warnings despite its alleged knowledge about the dangers of abuse of the product, its

3  alleged knowledge of abuse by underage youth, and its alleged continued failure to sufficiently

4  warn of the other health risks.  I agree.  Applicability of the TPLA safe harbor to JLI's conduct

5  depends on resolution of disputed material facts.

6        For all of these reasons, the motion for summary judgment on B.B.'s failure to warn claims

7  is DENIED.[17]  Except for the warranty, medical monitoring, failure to recall, manufacturing

8  defect, and negligent misrepresentation claims that B.B. abandons in her opposition, JLI's motion

9  for summary judgment is otherwise DENIED.

10  **II.       ALTRIA MOTION FOR SUMMARY JUDGMENT**

11        Altria moves for summary judgment on all of B.B.'s claims asserted against it: Negligence

12  and/or Gross Negligence under the common law (Count 7); Negligent Misrepresentation under the

13  common law (Count 9); Fraud under the common law (Count 10); Fraudulent Concealment under

14  the common law (Count 11); Joint and Several Liability for Fraud and Fraudulent Concealment

15  under the common law (Count 12); and Medical Monitoring under the common law (Count 15).

16  Altria MSJ [Dkt. No. 2655-3].  B.B. concedes that summary judgment should be granted on her

17  claims against Altria for negligent misrepresentation and medical monitoring.   Oppo. to Altria

18  MSJ [Dkt. No. 2785-3] at 15.

19      **A.       Personal Jurisdiction**

20        Altria argues that this court lacks personal jurisdiction over Altria for B.B.'s Tennessee-

21  based claims because Altria's specific contacts with California – that according to Altria started

22  with "sporadic" negotiations with JLI in Spring 2017, but were not finalized in any formal

23

24      *Honda Motor Co.*, 655 F.2d 650, 656 (5th Cir.1981). To hold otherwise would create an
    overly inflexible rule that would allow some manufacturers knowingly engaged in

25      reprehensible conduct to escape the imposition of punitive damages.

26  *Id.* at 536.

27  [17]  JLI also moved for summary judgment contending that B.B. "lacked evidence" to support her
claims for exacerbation of her gastroesophageal reflux disease (GERD) and asthma.  At oral

28  argument, B.B.'s counsel confirmed that B.B. is no longer seeking recovery for claims based on
exacerbation of her GERD or asthma.

United States District Court
Northern District of California

1    agreement until December 2018 – occurred well past B.B.'s undisputed "Fall 2017" JUUL-use

2    start and could not have contributed or led to B.B.'s injury in Tennessee.  As such, B.B.'s injury

3    could not arise out of or relate to conduct by Altria in California sufficient to confer specific

4    jurisdiction over Altria.

5         Altria also contends that even if B.B.'s Fall 2017 start date does not automatically bar

6    jurisdiction, she identifies no Altria conduct that led to any continuing injury.  Altria argues that

7    mere investment in a company cannot create personal jurisdiction in the investee's forum, the

8    alleged "conspiracy" cannot create jurisdiction absent evidence of forum-related acts that were

9    personally committed by Altria, mere "meetings" in California cannot create personal jurisdiction

10   absent connection between the subject matter of the meetings and resulting harm to B.B., and

11   retail services provided by Altria cannot sustain jurisdiction because B.B. never purchased at

12   retail.

13        The date of B.B.'s initial use of JUUL does not preclude specific jurisdiction against

14   Altria.  Each side has a different gloss on the intent, meanings, and duration of the parties' Spring

15   2017 and continuing communications and their efforts prior to December 2018, including those

16   conducted formally or allegedly through "back channel" communications between executives and

17   board members.  There is a sharp dispute whether there was an agreement between those with

18   control at California-based JLI and those with control at Virginia-based Altria that Altria would

19   take steps throughout 2017 and 2018 to "assist" or to "influence" JUUL's actions pre-December

20   2018 (including but not limited to efforts to keep mint on the market).  Altria argues that the lack

21   of any direct evidence to support plaintiff's theories of influence, control, and informal agreement

22   dooms specific jurisdiction.  But it will be up to the jury to determine whether to draw the

23   inferences from the thin but existent circumstantial evidence on which plaintiff relies.

24        More significantly, while B.B. started vaping in Fall 2017, a reasonable jury could

25   determine that Altria's efforts in support of JLI – including the retail distribution services Altria

26   formally provided JLI, including efforts in Tennessee[18] – are sufficient for personal jurisdiction

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [18] *See, e.g.*, Kraft Decl. ¶ 10 (discussing evidence that in 2019, Altria sent sales representatives
     throughout Tennessee, including into 65 stores in B.B.'s hometown, to increase the presence of

United States District Court
Northern District of California

and contributed to B.B.'s injuries under the common law claims left at issue.  While it may be undisputed that B.B. herself did not purchase at retail, B.B. continued to view JUUL marketing materials, including onsite at retail establishments in Tennessee.[19]  It is up to the jury to determine whether the nature and extent of the services Altria allegedly provided JLI starting in December 2018 or earlier had a sufficient connection to B.B.'s injuries to hold Altria liable.

Drawing reasonable inferences in favor of B.B. at this juncture, there is sufficient evidence regarding Altria's conduct in California and directed through and emanating from JLI in California to support specific jurisdiction over Altria.[20]

## B.    TPLA

Altria next argues that all of B.B.'s claims against it are barred by the Tennessee Products Liability Act (TPLA).  In my July 2022 Order discussing claims arising under the TPLA, I explained:

> Plaintiffs agree that the TPLA provides a unified cause of action but

---

JUUL and JUUL sales).  Altria objects to the Kraft declaration as impermissible opinion evidence from an attorney and argues that plaintiff should have, instead, proffered case-specific expert testimony summarizing Altria's data.  Altria Reply at 6 n.2.  However, that data was likewise analyzed, albeit in aggregate form, by plaintiff's expert Dr. David Cutler.  *See* Expert Report of Dr. David Cutler [Dkt. No. 2785-53] at 20, 113, 118, 123, 125.

[19] *See, e.g.*, B.B. Decl. [Dkt. No. 2791-28] ¶ 19 ("During the time that I primarily used JUUL from Fall 2017 to Fall of 2020, I continued to see JUUL ads frequently in stores, online, and on social media. Continuing to see these ads made me think JUUL was safe and that everybody was doing it.").

[20] Altria's cases are not to the contrary.  Unlike *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017), where neither plaintiffs nor defendants were California residents and no acts related to plaintiffs' injuries took place in California, JLI (who Altria is alleged to have worked with and to some extent through) is a California resident and significant acts took place in California that Altria allegedly influenced, controlled, or made that resulted or contributed to B.B.'s injuries.  Nor is this a case where specific jurisdiction is premised simply on an investment.  *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000 ("We join other courts in finding that stock ownership in or affiliation with a corporation, without more, is not a sufficient minimum contact.").  Here, it was not simply Altria's investment, but its alleged efforts to influence, assist, or control JLI that provide the hook for jurisdiction.  The conspiracy cases on which Altria relies are similarly inapposite.  *See, e.g., CenterPoint Energy, Inc. v. Superior Ct.*, 157 Cal. App. 4th 1101, 1118 (2007 ("an exercise of personal jurisdiction must be based on forum-related acts that were personally committed by each nonresident defendant").  Plaintiffs do allege that Altria could be liable for fraud and fraudulent concealment claims based either on an aiding and abetting or conspiracy basis, as well as for negligence based on direct conduct or aiding and abetting JLI, but they have also identified sufficient forum-related acts for Altria.

point out again that the TPLA only covers "manufacturers" and "sellers." *See id*. §§ 29-28-103, 106. Plaintiffs rely on cases demonstrating that Tennessee courts routinely hear claims against non-manufacturers/non-sellers that "fall under the broad definition of 'product liability action,' i.e., that involve injuries traceable to a product's "manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling." *Id*. § 29-28-102(6).

Plaintiffs rely on *Fox v. Amazon.com, Inc*., 930 F.3d 415 (6th Cir. 2019) where the Sixth Circuit concluded that, given the structure of how Amazon advertises and facilitates sales, it could not be considered a "seller" under the TPLA and therefore dismissed the TPLA claim. *Id*., 930 F.3d at 425; see also id. at 423–24 (finding the TPLA covered as "sellers" "a 'retailer,' a 'wholesaler,' a 'distributor,' a 'lessor,' and a 'bailor,'" whom each "exercise[ ] a significant degree of control over the products they sell, lease, or bail."). The court found that Amazon could be liable for failure to warn under a common law tort based on Amazon's affirmative acts communicating with plaintiff and its own knowledge of the dangers presented by the product. *Id*. at 426-28. This case does not help plaintiffs here where, as noted, the ODDs acted through the manufacturer/seller JLI and according to plaintiffs' own allegations had a significant degree of control over the products sold by JLI.

Plaintiffs also cite *Gaines v. Excel Indus., Inc*., 667 F. Supp. 569 (M.D. Tenn. 1987), where the court permitted a claim that defendant " 'assumed the role of safety advisor and consultant' to its subsidiary by conducting safety inspections but then fail[ed] to see that a proper program was established, including maintenance of devices, remedies of hazards, and education of workers." *Id*. at 571. That claim was permissible against the manufacturer only because it was "not based on any actions defendant took in a role as 'manufacturer' or 'seller.'" *Id*. at 574. Here, B.B.'s product-type claims against the ODDs are based on acts the ODDs committed through manufacturer (JLI) and are covered by the TPLA.

In conclusion, I agree that plaintiffs' product-type claims against the ODDs related to damages suffered as a result of their use of JLI's product fall under the unified statutory causes of action in Louisiana, Mississippi, Connecticut, and Tennessee. However, to the extent the bellwether plaintiffs from these four states can allege non-strict product liability claims that are otherwise cognizable under and within those statutes against the ODDs (e.g., negligent failure to warn claims), plaintiffs may pursue such claims under their state's unified statutory cause of action.

*In re JUUL Labs, Inc., Mktg. Sales Prac. & Prod. Liab. Litig*., No. 19-MD-02913-WHO, 2021 WL 3112460, at *10–11 (N.D. Cal. July 22, 2021).  Regarding Altria, I concluded:

As noted above, the TPLA subsumes all actions brought on account of personal injury against "manufacturers" or "sellers" of products. The cases cited by plaintiffs (also analyzed above) dealt with situations where a manufacturer, otherwise subject only to TPLA, took on inspection duties that brought it outside its status as a

1
2
3
4
5

> manufacturer and therefore liable for common law product liability claims (*Gaines v. Excel Indus., Inc*., 667 F. Supp. 569 (M.D. Tenn. 1987) or where a third-party offeror (Amazon) merely facilitated sales between the otherwise TLPA-covered entities. *Fox v. Amazon.com, Inc*., 930 F.3d 415 (6th Cir. 2019). As with Mississippi law, neither plaintiffs nor Altria provide persuasive caselaw addressing whether the acts of Altria are more akin to a covered "seller" or a party who acted sufficiently separate from the manufacturer or end-seller to escape coverage under the TPLA. Bain's non-strict product liability claims against Altria may proceed at this juncture.

6       *Id*. at *23.[21]

7       The question now is whether there is an evidentiary basis – disputed or undisputed – to

8  find that Altria falls outside of the scope of the TPLA given the acts and services it performed for

9  JLI. There is. Altria mistakenly argues that to the extent B.B. alleges that Altria was acting

10 "through or in concert with" JLI, the claims against it should be subsumed with the TPLA (as

11 were those alleged against the officer and director defendants). *See* July Order *supra*. While

12 Altria may have been acting with or in support of JLI, unlike the officer and director defendants

13 Altria is a wholly separate corporate entity. In this way, it is more akin to Amazon in *Fox*. Altria

14 allegedly provided advice, influence, and eventually contractual services to facilitate JUUL sales,

15 but there is no evidence that in doing so Altria acted as the manufacturer or seller of JUUL itself.[22]

16       Altria's cases do not demonstrate that, unlike the non-manufacturing and non-selling

17 defendants in *Gaines* and *Fox*, Altria should be covered by (and effectively protected from B.B.'s

18 claims by) the TPLA. Altria relies heavily on *Orr v. Ethicon, Inc*., No. 2:20-CV-110-TAV-HBG,

19 2020 WL 9073528, at *2 (E.D. Tenn. Sept. 11, 2020) to imply that its "marketing" conduct is

20 covered by the TPLA. Altria Reply at 3-4. However, the *Orr* court did not consider the status of a

21 defendant who was separate from a seller or manufacturer, nor was that question addressed in the

22

23 ──────────────
24 [21] I gave B.B. leave to amend to attempt to assert claims against the ODDs and the ODDs moved again moved to dismiss the amended claims. Dkt. Nos. 2721, 2728. Because the individual
25 defendants were voluntarily dismissed from B.B.'s case, I did not reach that second round of arguments. Dkt. No. 2751.

26 [22] Altria also argues that plaintiff's new "aiding and abetting" and conspiracy theories of liability sweep the claims against Altria that might otherwise fall outside the TPLA under the TPLA. The
27 focus, however, remains on Altria's own acts as an entity separate from the manufacture or sale of JUUL. That said, as noted below, depending on how B.B. presents evidence at trial in support of
28 an aiding and abetting or conspiracy theory of Altria-liability, Altria may raise the TPLA preemption argument post-trial.

*United States District Court*
*Northern District of California*

1    only authority relied on by the *Orr* court or in any other authority relied on by Altria.  *See*

2    *Strayhorn v. Wyeth Pharms., Inc.*, 737 F.3d 378, 403 (6th Cir. 2013) (noting that the generic drug

3    manufacturer there "undertook no separate duties as did the parent corporation in *Gaines*."); *see*

4    *also Durham v. Johnson & Johnson*, 2021 WL 3745730 (E.D. Tenn. Aug. 24, 2021) (claim

5    asserted against manufacturer only); *Meadow v. Nibco, Inc.*, 2016 WL 2986350, at *1 (M.D.

6    Tenn. May 24, 2016) (same).

7          In sum, the common law claims against Altria are not subsumed by the TPLA.

8    **C.      Negligence**

9          Altria moves for summary judgment on B.B.'s negligence claim, arguing that it had no

10   duty to B.B. and that its limited, post-B.B.-initiation conduct caused B.B. no injury.  B.B. opposes,

11   contending that there are material disputes of fact that, if proven, would result in Altria's liability

12   for negligence under both direct and aiding and abetting theories of liability.

13        **1.      Duty**

14         In determining the existence of duty, Tennessee law "necessarily favors imposing a duty of

15   reasonable care where a 'defendant's conduct poses an unreasonable and foreseeable risk of harm

16   to persons or property.' . . .   When conducting this analysis, the courts have considered, among

17   other factors: (1) the foreseeable probability of the harm or injury occurring; (2) the possible

18   magnitude of the potential harm or injury; (3) the importance or social value of the activity

19   engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility

20   of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer

21   conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative

22   conduct."  *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 365 (Tenn. 2008).[23]

23

24   ───────────────

[23] Altria relies on a different line of cases for its formulation of the duty element under Tennessee
25   law.  Altria MSJ at 18-19 (relying on *Grogan v. Uggla*, 535 S.W.3d 864, 874 (Tenn. 2017) and its
     discussion of § 324A of the Restatement (Second) of Torts, requiring evidence defendant assumed
26   a duty owed by a different party to a third-person who was ultimately injured).  As the *Grogan*
     court explained, Section 324A applies where the defendant's actions themselves "did not create a
27   risk of harm" thereby requiring an analysis "under theories of affirmative duties rather than the
     more generalized duty of care evaluated by the *Satterfield* duty factors."  *Grogan*, 535 S.W.3d at
28   872.  However, here, plaintiff's theory is that Altria's own conduct – directly or in aiding and
     abetting JLI – created a risk of harm to B.B. and injured B.B.

United States District Court
Northern District of California

1    "Although all the balancing considerations are important, the foreseeability prong is

2    paramount. . . ." *Biscan v. Brown*, 160 S.W.3d 462, 480 (Tenn. 2005).  While "foreseeability is an

3    element of duty and duty is a matter of law to be determined by the court, 'at the summary

4    judgment stage [the trial court] must view the evidence of foreseeability, risk and burden in the

5    light most favorable to the non-moving party.'" *Eden W. ex rel. Evans v. Tarr*, 517 S.W.3d 691,

6    699–700 (Tenn. Ct. App. 2015) (quoting *Martin v. Melton*, No. M2012-01500-COA-R3-CV, 2013

7    WL 6206865, at *4 (Tenn. Ct. App. Nov. 26, 2013)).

8        Viewing plaintiff's evidence regarding Altria's own conduct in terms of foreseeability,

9    risk, and burden in the light more favorable to plaintiff, duty is satisfied at this juncture.  Altria

10   does not address or dispute the *Satterfield* factors, and even a cursory review of those factors

11   supports plaintiff with respect to an allegedly uniquely addictive and attractive to youth product

12   like JUUL.

13       Altria likewise does not dispute that foreseeability is the most critical factor and fails to

14   point to undisputed evidence that would foreclose foreseeability for B.B. as a matter of law (*e.g.*,

15   evidence showing Altria's conduct in Tennessee specifically or nationally could not have

16   contributed to B.B.'s initial or continued use of JUUL).  Given the inferences plaintiff draws from

17   the disputed evidence regarding Altria's conduct, inferences a reasonable juror could draw,

18   Altria's motion for summary judgment on the negligence claim does not succeed on a purported

19   lack of duty to B.B.  Altria's alleged knowledge of JUUL's addictiveness and use by youth, its

20   alleged encouragement for JLI to continue digital marketing and other strategies that caused and

21   sustained youth-use, and its direct efforts to keep mint on the market and support and expand

22   JUUL sales through its Services Contract are all matters for the jury to evaluate.

23                    2.    **Causation for B.B.'s Injuries**

24       Altria's more substantive argument in support of summary judgment on negligence is

25   causation.  Two types of causation are required for negligence under Tennessee law, cause in fact

26   and proximate causation.  *King v. Anderson Cty.*, 419 S.W.3d 232, 246 (Tenn. 2013).  Cause in

27   fact looks to whether the injury or harm would not have occurred "but-for" the defendant's

28   negligent conduct, referring to the "cause and effect" relationship between the tortious conduct

United States District Court
Northern District of California

21

and the injury.  *Id.*  Proximate cause looks to "whether the policy of the law will extend responsibility for that negligent conduct to the consequences" and considers three factors:

> 1) the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of; and 2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and 3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Id.* at 247 (quoting *Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn.2005)).  The "substantial factor" requires that a defendant's conduct be a 'substantial factor' in bringing about the harm complained of," determinations that "tend to be extremely fact dependent and are reviewed on a case-by-case basis."  *King*, 419 S.W.3d at 247.

Altria argues that because there is no evidence that B.B. ever purchased JUUL at a store supplied or serviced by Altria –she never purchased at retail – and because plaintiff started using JUUL before Altria entered into any express agreement with JLI, causation in fact and proximate causation both fail as a matter of law.  B.B. responds that causation is not cut off because every JUUL pod she consumed "sustain[ed] her addiction."[24]  That Altria did not take any direct action in Tennessee until after B.B. started to use JUUL does eliminate causation.  A reasonable juror could find that Altria's conduct was a substantial factor in contributing to B.B.'s continued use and exacerbated her injuries.

B.B. also points to inferences from her evidence that Altria – through communications between the directors working to solidify a formal deal between Altria and JLI – encouraged JLI to continue with its youth-impacting digital marketing.  The growing youth-market was key to Altria's interest in JLI.  Altria's valuation of JUUL continued to rise despite growing evidence that youth-use was fueling that rise.  Once the agreement was formalized under the Altria and JLI Service Agreement, Altria pushed JUUL into more stores (or in more quantities) in Tennessee including in and closely around B.B.'s hometown.[25]

---

[24] *See* Case Specific Expert Report of Dr. Judith J. Prochaska [Dkt. No. 2699-8] at 12.

[25] *See, e.g.*, Pls. Ex. 41 (Blaylock Ex. 2413); Expert Report of Dr. John Chandler [Dkt. No. 2690-7] at 57-59.  Altria and JLI object to the attorney declaration describing the data produced by Altria regarding its efforts to distribute, increase sales, and otherwise support JUUL sales in

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Drawing reasonable inferences in favor of B.B., Altria's motion for summary judgment on

2    her direct negligence claim is DENIED.  There is enough evidence of the conduct Altria directed

3    to Tennessee that a reasonable jury may find Altria liable to some extent for B.B.'s ongoing

4    injuries.  Whether that liability exists only for Altria's conduct in and after December 2018, or

5    whether the jury believes there is sufficient inferential evidence of Altria's efforts to control or

6    influence JLI's decisions before that time to suffice for a direct negligence claim, will be

7    determined at trial and may be challenged post-trial.

8    ### 3.    Aiding and Abetting

9    As an alternate theory to direct negligence, B.B. argues that Altria may be liable for aiding

10   and abetting JLI's negligence.  *See, e.g., Mark IV Enterprises, Inc. v. Bank of Am., N.A.*, 2018 WL

11   3146305, at *2 (Tenn. Ct. App. June 26, 2018) (aiding and abetting liability rests where defendant

12   "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or

13   encouragement to the other so to conduct himself").  B.B. testified that mint was the flavor the

14   fueled her addiction.  She contends that her evidence supports inferences that Altria's efforts in

15   preserving mint as a flavor on the market was in aid of maintaining and growing JUUL's market

16   (including the youth market) and that its efforts to maximize sales of mint and the other JUUL

17   pods after the Service Agreement became effective helped JUUL continue to "filter through" the

18   non-retail market to her and other users.

19   Altria objects to B.B.'s reliance on the unpleaded aiding and abetting theory of liability,

20   arguing that it is prejudiced by its insertion into the case at this juncture.  It asserts that had aiding

21   and abetting been expressly alleged in B.B.'s complaint, it would have challenged it on a motion

22   to dismiss and sought discovery to undermine that theory of liability.  At the hearing, I asked

23   Altria to identify the source of its prejudice: namely, what discovery it would have taken had it

24   known about the aiding and abetting theory of liability.  Altria argued that it would have asked

25

26   Tennessee.  Altria Reply at 6 (objecting to the Kraft Declaration).  But Altria does not dispute that

27   it has produced data that will be admissible through one of its witnesses or through another source
     that shows the extent of Altria's operations in Tennessee; indeed, that data was analyzed on an
     aggregate basis by plaintiff's expert Dr. David Cutler.  *See* Expert Report of Dr. David Cutler

28   [Dkt. No. 2785-53] at 20, 113, 118, 123, 125.

questions at depositions differently (identifying the example of notes JLI executives took during meetings with Altria), would have moved for summary judgment on the aiding and abetting claim, and would have argued an aiding and abetting theory is barred by the TLPA.  *See* 2/16/2022 Transcript at 48-52.  Of course, Altria did oppose and address the aiding and abetting theory, and its implications under the TLPA, in its reply and at the hearing.[26]

Fundamentally, I see no significant distinction between discovery that would have been secured under a direct or conspiracy theory of liability as opposed to aiding and abetting.  Plaintiff has pursued a conspiracy theory as a basis for Altria's liability since the inception of this case, albeit for fraud and not for negligence.  Aiding and abetting may have different legal implications for Altria's potential liability (*e.g.*, potentially with respect to TPLA or damages) but that does not fundamentally alter the shape of the case or alter the scope of fact or expert discovery in a way that causes Altria any identifiable prejudice.  B.B. may pursue and argue at trial both a direct and aiding and abetting theory of liability for negligence under Tennessee law.

Finally, Altria argues that an aiding and abetting theory is barred because "substantial assistance" under Tennessee law requires a showing that "the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort." *Aetna Cas. & Sur. Co. v. Leahey Const. Co*., 219 F.3d 519, 537 (6th Cir. 2000) (quotation omitted).  Altria contends that given its limited role that started after B.B. was using JUUL, it could not have been any part of the proximate cause of B.B.'s injuries, especially because she has no evidence that she purchased any product at any of the Tennessee stores to which Altria provided distribution services.  Those arguments fail for the reasons the causation defenses discussed above fail.

Altria's motion for summary judgment on negligence is DENIED.

---

[26] I agree with Altria that an aiding or abetting negligence theory raises the possibility that the claim falls within the TPLA for similar reasons that B.B.'s claims against the officer and director defendants were swept into the TPLA.  But there are significant distinctions between Altria, as a separate corporate entity, and the officer and director defendants serving and working for JLI. Potential applicability of the TPLA to an aiding and abetting claim against Altria is better determined post-trial depending upon how the testimony and other evidence comes in and whether, in the end, an aiding and abetting theory is necessary to support a potential verdict against Altria.

United States District Court
Northern District of California

United States District Court
Northern District of California

**D.      Fraud and Fraudulent Concealment**

Altria moves for summary judgment on B.B.'s fraud and fraudulent concealment claims, arguing that there is no evidence that B.B. ever saw or relied upon any statement or representation made by Altria.  In opposition, B.B. argues that the jury can find for her on fraud and fraudulent concealment claims under either an aiding and abetting or conspiracy theory of liability; she dropped any "direct" fraud claim against Altria.

The conduct on which B.B. relies is Altria's knowledge of JLI's youth sales and its encouragement of those youth sales by JLI (both before and after their deal was finalized) through its: (i) direction or encouragement that JLI continue to use of digital media and other youth-popular channels; (ii) efforts to maintain mint on the market; (iii) and work to expand the prominence and frequency of JUUL's point of sale advertising through its distribution services and provision of prime shelf space, including its "blitz" into Tennessee in 2019 that it knew would reach and influence youth-users like B.B.

The standard for aiding and abetting under Tennessee law is identified above.  The standard for conspiracy is:

> The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury.

*Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).  B.B. asserts that the jury may reasonably infer from Altria's knowledge of JUUL's growth due to youth uptake that the youth market was a prime motivator for Altria's investment in JLI and that Altria's acts, including efforts to keep mint on the market and reserving the prime shelf-space for JUUL, were intended to further the growth in that market.  That is sufficient to support liability for fraudulent conduct under either an aiding and abetting or conspiracy theory.

Regarding the timing of the alleged conspiracy, B.B. argues that the date of the express conspiratorial agreement between JLI and Altria is irrelevant under Tennessee law because "a person who joins an existing conspiracy will be held liable for what was previously done pursuant to the conspiracy" where it is "shown that he or she joined the conspiracy with knowledge of the

25

United States District Court
Northern District of California

1    unlawfulness of its object or of the means contemplated." *Chenault v. Walker*, 2000 WL 145062,

2    at *9 (Tenn. Ct. App. Feb. 9, 2000), *aff'd,* 36 S.W.3d 45 (Tenn. 2001). B.B. also argues that she

3    will present evidence that Altria and JLI reached an implicit agreement before December 2018 that

4    further cements Altria's liability for conduct prior to December 2018. Even if her conspiracy

5    theory does not extend liability to the pre-December 2018 period, B.B. contends that Altria could

6    share responsibility for some of JLI's liability for that time frame under her aiding and abetting

7    theory.

8        Altria vigorously challenges the inferences B.B. draws from the evidence she identifies in

9    her Opposition. It contends that the evidence shows that Altria was concerned by the youth uptake

10   of JUUL and worked to stop youth use instead of encouraging it. Altria Reply at 9-11. The

11   inferences to be drawn from the documents and testimony identified by B.B. are left to the jury,

12   which will decide whether Altria's (and JLI's) explanations of what the documentary and

13   circumstantial evidence reveals are more credible than B.B.'s.

14       **E.      *Noerr-Pennington***

15       Finally, Altria argues that it cannot be liable for any conduct based on its communications

16   with the FDA regarding its position on ENDS generally or its efforts to keep mint on the market

17   specifically.

18       At the motion to dismiss stage, I addressed defendants' *Noerr-Pennington* defense.

19           Defendants claim that these statements cannot, as a matter of law, be
20           actionable frauds because they are petitioning conduct protected
             under the *Noerr-Pennington* doctrine. This "doctrine derives from the
21           First Amendment's guarantee of 'the right of the people ... to petition
             the Government for a redress of grievances.' U.S. Const. amend. I."
22           *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

23           Under the *Noerr–Pennington* doctrine, "those who petition any
             department of the government for redress are generally immune from
24           statutory liability for their petitioning conduct." *Sosa*, 437 F.3d at 929.
             Defendants rely on *Sosa*, where the Ninth Circuit determined that
25           plaintiff's lawsuit, which sought to impose RICO liability on
             DIRECTV for sending prelitigation demand letters, would "quite
26           plainly burden DIRECTV's ability to settle legal claims short of filing
             a lawsuit" and therefore implicated the *Noerr-Pennington* doctrine
27           directly. *Id.* at 932.

28           Plaintiffs dispute the impact of *Noerr-Pennington*, arguing that the
             statements to Congress and the FDA were intentionally false

26

United States District Court
Northern District of California

statements that fall within Noerr-Pennington's "sham" exception. *See Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009) (noting that the *Sosa* court "suggested that the question of whether there would be absolute immunity for conduct including intentional misrepresentations or fraud should be analyzed under the sham exception"); *see also Clipper Exxpress v. Rocky Mt. Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982) ("It is unquestionably true, as defendants assert, that *Noerr-Pennington* confers antitrust immunity for conduct genuinely intended to influence governmental action. Whether something is a genuine effort to influence governmental action, or a mere sham, is a question of fact.").

Whether or not an otherwise non-actionable statement falls within the sham exception is generally a question of fact not appropriate for resolution on a motion to dismiss. Plaintiffs concede that JLI and Altria genuinely sought to influence the government through these statements (to defer regulation and allow them to keep JLI's mint pods on the market), even if the information they used to achieve those ends was fraudulent. It is unclear whether the sham exception stretches to cover this scenario. That said, even if the representations to Congress and the FDA are not actionable as predicate acts, they are nonetheless evidence of the alleged overall scheme to defraud. *See In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) (Noerr-Pennington provides immunity from liability for simply petitioning government, but doctrine does not foreclose use of communications to government as evidence, *e.g.*, of knowledge, intent, state of mind).

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 613–14 (N.D. Cal. 2020).

Neither side, at this juncture, really engages with my prior analysis. Altria argues that its conduct is absolutely immune and B.B. responds that there are material fact issues over whether Altria made intentionally false or misleading statements that would not merit protection under the doctrine and, even if the doctrine protected Altria from direct liability based on its outreach to government officials, the evidence regarding Altria's efforts to preserve mint and its other attempts to influence government officials go to its intent and so that evidence will come in at trial in any event.

This issue is better determined after the evidence comes in at trial and on post-trial motions. Whether and how the *Noerr-Pennington* doctrine applies may depend on what findings of fact are made by the jury concerning Altria's intent and whether its acts were fraudulent. Depending on the jury's answers to those questions, post-trial briefing will be able to definitively resolve whether Altria's allegedly fraudulent conduct – as part of a conspiracy or as aiding and

abetting conduct by JLI – is immunized and, if so, to what extent.

Altria's motion for summary judgment based on *Noerr-Pennington* immunity is DENIED.

Except for B.B.'s claims against Altria for negligent misrepresentation and medical monitoring that she abandons in opposition, Altria's motion for summary judgment is otherwise DENIED.

## III.    PENDING MOTIONS TO SEAL

There are numerous pending administrative motions to file under seal submitted with the parties' motions for summary judgment and motions to exclude under Rule 702 or Daubert.  *See* Admin. Mots. Dkt. Nos. 2651, 2655, 2656, 2672, 2684, 2685, 2687, 2688, 2690, 2696, 2704, 2725, 2726, 2738, 2748, 2785, 2789, 2790, 2792, 2793, 2805, 2806, 2807, 2808, 2810, 2821, 2822, 2826, 2831/2837, 2834, 2844, 2862, 2863, 2965, 2867, 2868, 2871, 2877, 2879, 2880, 2883, and 2884.

I recognize the parties have attempted to narrow the scope of some of these administrative motions and have in some instances filed more narrowly redacted documents.  However, much of the information designated as confidential and filed conditionally under seal does not meet the compelling justifications standard at this juncture of the case: B.B.'s case is on the verge of trial and much of the information both sides seek to remain under seal is central to B.B.'s theory of the case and claims, as well as defendants' defenses.  Therefore, I provide the parties with the following guidance:

- Personal email addresses may be redacted.  Work or company email addresses that are publicly disclosed may not be redacted.  *See, e.g.*, Dkt. No. 2725-1, Appx A.
- Names of minors, including those referenced in emails and expert reports, may be redacted or initials used if referring to a party who is a minor.  *See, e.g.*, Dkt. No. 2725-1, Appx. A.  However, names of adults (even third parties), may not be redacted.  *Id.*  Generally, information about relationships between minors (whose names may be redacted) or adults and defendants in this case shall not be redacted unless other compelling justifications are presented.  *See id*.

United States District Court
Northern District of California

- The amounts and structure of the Altria deal with JLI – including the amounts received by individual defendants and how those amounts were received – will no longer be sealed. There is no compelling justification to seal that central information at this point in the MDL proceedings.  *See, e.g.*, Dkt. No. 2805-1 (referring to Opp. Ex. 45).  Account or routing numbers may be redacted.

- Past financial projections regarding JLI's value and evidence regarding JLI's past value (including those made by Altria, JLI itself, or third-parties) as well as financial projections and structures regarding Altria's investment in JLI in 2018 do not appear to meet the compelling justifications standard at this juncture, given the centrality of that information to issues to be litigated in B.B.'s case.   Much of the information defendants seek to seal (for example, in Dkt. No. 2748-1, Appx. A) does not come close to satisfying the compelling justifications standard.  See id. at page 5 (seeking to seal "analyses from 2017 had suggested that JUUL sales growth was pulling volume away from combustible cigarettes, sales data after 2017 pointed to 'JUUL volume [being] more incremental to aggregate cigarette category sales than cannibalistic'" and "An Altria presentation described JUUL's first customers as 'the foundation of all future growth.'").  Unless defendants can show that disclosure of specific pieces of information, particularly those reviewed and relied on by plaintiffs' experts, would cause them current injury, that information may not remain under seal.

- Most of the information regarding advertising, marketing, distribution, and sales of JUUL prior to its launch and during the time period of B.B.'s use of JUUL may not be redacted. Much of what JLI seeks to seal in the administrative motions identified above (for example, the seemingly stale and time-specific financial transactions, sales data and projections, and market distribution "tactics" identified in Dkt. No. 2807-1) is information that is central to B.B.'s claims and theory of the case.  It may not be sealed unless JLI can show disclosure would cause it current injury.

- I am not inclined to seal medical information regarding B.B. that will be presented at trial and that is relevant to B.B.'s claimed injuries.  That information is central to B.B.'s claims

29

that she will be litigating in open court.  Plaintiff shall re-review the medical information regarding B.B. that has been filed conditionally filed under seal in connection with the motions for summary judgment and the motions to exclude and identify by type and category any compelling justifications that would justify closing the courtroom to the public and on that basis should remain under seal.

With this guidance, the parties are ordered to prepare a joint chart identifying the specific parts of documents submitted conditionally under seal in connection with each of the administrative motions identified above should remain under seal.  That joint chart shall be submitted within thirty (30) days of the date of this Order and shall:

- Identify each document (by ECF docket number and sub-docket number) containing information a party contends should remain under seal under the compelling justification standard, and identifying the information they wish to keep sealed by paragraph or page/line number.

- For each such document or part of a document identified, the party seeking to keep the information under seal shall provide:
    - a description of the information they seek to keep under seal;
    - the compelling justification for sealing, with a citation to a declaration from a party representative establishing a compelling justification.

- For any document that is conditionally sealed under an administrative motion identified above that the parties agree may be unsealed, the ECF docket number, including each sub-docket number.

When submitting the joint chart, the parties should not e-file revised redacted versions of documents.  After I rule on the sealing requests, I will instruct the parties to e-file revised redacted versions, redacting only the information that I determine may remain under seal.

The Administrative Motions to Seal at Dkt. Nos. 2712 and 2714 (Monsees' and Bowen's joinders in defendants' Motions to Exclude under Rule 702 or Daubert) are DENIED.  There is no information contained in either of those two filings that merits sealing under the compelling

1    justifications standard.  The Clerk shall UNSEAL Dkt. Nos. 2712-2 & 2714-3.

2        **IT IS SO ORDERED.**

3    Dated: April 29, 2022

4

5                                          _____
6                                          William H. Orrick
                                           United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California