1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7                                              Case No.  19-md-02913-WHO

8    IN RE JUUL LABS, INC., MARKETING
     SALES PRACTICES AND PRODUCTS        **ORDER ON MOTION FOR CLASS**
9    LIABILITY LITIGATION                **CERTIFICATION AND RELATED**
                                         **DAUBERT MOTIONS**
10                                        Re: Dkt. Nos. 1772, 2303, 2308, 2309, 2381,
                                         2438, 2439, 2497, 2503, 2534, 2536, 2550,
11                                        2589, 2601.

12          Plaintiffs seek to certify four classes of purchasers of JUUL products on theories that

13   defendants' marketing of JUUL was unlawfully deceptive, JUUL was unlawfully marketed to

14   youth, and JUUL products are not fit for ordinary use.  Each of the four sets of defendants – JLI,

15   the Altria entities,[1] the Founder Defendants,[2] and the Other Director Defendants (ODDs)[3] –

16   opposes.  The overarching theme of their opposition is that no class can be certified given the

17   "heterogeneity" of the class members: each named plaintiff and each proposed class member were

18   exposed to different advertisements over different periods of time; each had different impressions

19   of the impact (or materiality) of the misrepresented or information omitted by JLI; each

20   experienced different levels of alleged economic injury; and each had their own "nicotine journey"

21   given their unique use of JUUL products (as well as other nicotine delivery products like

22   cigarettes or other e-cigarette products) and unique experiences with possible addiction.

23

24   [1] Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services LLC (ACS), and Altria Group
     Distribution Company (AGDC), collectively "Altria."  Altria MTD, Dkt. No. 1502.
25
     [2] James Monsees (Monsees MTD, Dkt. No. 1503) and Adam Bowen (Bowen MTD, Dkt. No.
26   1501), collectively "Founder Defendants."

27   [3] Nicholas Pritzker, Riaz Valani, and Hoyoung Huh, collectively "Other Director Defendants" or
     "ODDs." ODD MTD, Dkt. No. 1500.
28

United States District Court
Northern District of California

The individual differences defendants identify or attempt to create do not preclude class certification. Some of the identified differences – for example, differences in advertisements that the named plaintiffs or class members may have seen over time or differences in the amount of JUUL product purchased – are simply not *material*. Given the legal standards applied to plaintiffs' claims, other identified differences – what an advertisement meant or portrayed to a specific named plaintiff or class member – are not material for purposes of class certification. Still more purported differences hinge on classic "battles of the experts" that must be resolved by the trier of fact. For example, will the trier of fact believe plaintiffs' experts that JLI's marketing campaigns conveyed a Unique Selling Proposition ("USP") that made JLI's alleged failures to disclose material? Or will the trier of fact believe JLI's experts that no such USP can be inferred from JLI's marketing, especially given changes in JLI's marketing materials over the whole class period? At base, defendants' attacks on plaintiffs' experts present common questions that cannot be resolved at this juncture and do not preclude certification. For the reasons set out in detail below, plaintiffs' motion for class certification is GRANTED. Each of the *Daubert* motions made by the parties is DENIED.

## BACKGROUND

The classes plaintiffs seek to certify, and the laws underlying each class's claims, are:

1.  Nationwide Purchaser Class (All Plaintiffs): All persons who purchased, in the United States, a JUUL product – based on the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962) ("RICO").

2.  Nationwide Youth Class (C.D., Krauel, and L.B): All persons who purchased, in the United States, a JUUL product and were under the age of eighteen at the time of purchase – based on RICO.

3.  California Purchaser Class (Colgate, C.D., and L.B.): All persons who purchased, in California, a JUUL product – based on California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) ("UCL"), California Consumers Legal Remedies Act (Cal. Civ. Code § 1750) ("CLRA"), California False Advertising Law (Cal. Bus. & Prof. Code § 17500) ("FAL"), Common Law Fraud, Unjust Enrichment, Implied Warranty of Merchantability,

1    and Magnuson-Moss Warranty Act (15 U.S.C. § 2301) ("Mag-Moss").

2    4.    California Youth Class (C.D. and L.B.): All persons who purchased, in California, a JUUL

3          product and were under the age of eighteen at the time of purchase – based on California

4          UCL and Unjust Enrichment.

5          The classes are limited to individuals who purchased JUUL products from brick and

6    mortar or online retailers.  The damages, restitution, and/or disgorgement sought are based on

7    retailer purchases and prices.  The proposed classes do not include any individuals who purchased

8    JUUL products only secondarily from non-retailers.  In addition, excluded from the proposed

9    classes are defendants, their employees, co-conspirators, officers, directors, legal representatives,

10   heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel

11   and their employees; and the judicial officers and their immediate family members and associated

12   court staff assigned to this case.[4]

**DISCUSSION**

I.    **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

A.    **Legal Standard**

16         "Before certifying a class, the trial court must conduct a rigorous analysis to determine

17   whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda

18   Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotations omitted).  The party

19   seeking certification has the burden to show, by a preponderance of the evidence, that certain

20   prerequisites have been met.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-50 (2011);

21   *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

22         Certification under Rule 23 is a two-step process.  The party seeking certification must first

23   satisfy the four threshold requirements of Rule 23(a).  Specifically, Rule 23(a) requires a showing

24   that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are

25   questions of law or fact common to the class; (3) the claims or defenses of the representative

26

27   ───────────────

28   [4] The parties are familiar with the factual allegations underlying the claims plaintiffs seek to
     certify.  Those facts will not be repeated for purposes of background.  Disputed or undisputed
     allegations or facts material to resolution of the motions will be discussed below.

United States District Court
Northern District of California

3

1  parties are typical of the claims or defenses of the class; and (4) the representative parties will

2  fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

3       Next, the party seeking certification must establish that one of the three grounds for

4  certification applies.  *See* Fed. R. Civ. P. 23(b).  Plaintiffs seek certification under Rule 23(b)(3),

5  which requires them to establish that "the questions of law or fact common to class members

6  predominate over any questions affecting only individual members, and that a class action is

7  superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

8  R. Civ. P. 23(b)(3).  In the alternative to the (b)(3) class, plaintiffs seek certification under Rule

9  23(c)(4) for any issues that I determine are fit for class treatment.

10       The process of class-certification analysis "may entail some overlap with the merits of the

11  plaintiff's underlying claim."  *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455,

12  465–66 (2013) (internal quotations omitted).  However, "Rule 23 grants courts no license to

13  engage in free-ranging merits inquiries at the certification stage."  *Id.* at 466.  "Merits questions

14  may be considered to the extent—but only to the extent—that they are relevant to determining

15  whether the Rule 23 prerequisites for class certification are satisfied."  *Id.*

16     **B.**    **Rule 23(a)**

17       **1.**    **Numerosity**

18       Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is

19  impracticable."  Fed. R. Civ. P. 23(a)(1).  The party seeking certification "do[es] not need to state

20  the exact number of potential class members, nor is a specific number of members required for

21  numerosity."  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005).

22  However, courts within the Ninth Circuit generally agree that numerosity is satisfied if the class

23  includes forty or more members.  *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605-06 (N.D.

24  Cal. 2014); *In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).

25       Defendants do not dispute that numerosity is satisfied for each of the four proposed

26  classes.  As noted by plaintiffs' expert, Hal J. Singer, unit sales of JUUL products in 2019 alone

27  exceeded $2.8 billion, and in conducting his surveys of JUUL users Singer was able to identify

28  several thousand individuals, including many hundreds of residents of California and many

4

1   hundreds of individuals who used JUUL products as youths.  *See generally* Class Certification

2   Report of Hal J. Singer ("Singer Report," Dkt. No. 1772-19).

3   **2.     Commonality**

4   FRCP 23(a) requires that "there are questions of law or fact common to the class."  Fed. R.

5   Civ. P. (a)(2).  "A common contention need not be one that 'will be answered, on the merits, in

6   favor of the class.'  It only 'must be of such nature that it is capable of class-wide resolution.'"

7   *Alcantar v. Hobart Servs.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret.*

8   *Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) and *Wal-Mart Stores*, 564 U.S. at 350).

9   Commonality, however, "only requires a single significant question of law or fact." *Mazza v. Am.*

10  *Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012).

11  Plaintiffs identify several questions of law and fact that will be determined on a common

12  basis based on classwide evidence and proof:

13  - **RICO Claim**: common questions of fact include the existence of a RICO Enterprise and

14     whether each defendant engaged in a scheme to defraud;

15  - **Statutory Fraud (UCL, FAL, & CLRA) Claims**: common questions include whether a

16     significant number of reasonable consumers would likely have been deceived by

17     defendants' misrepresentations or omissions about JUUL and would have found the

18     misrepresented or omitted information material, as well as whether plaintiffs are entitled to

19     a presumption of reliance;

20  - **Common Law Fraud Claim**: common questions include whether defendants' statements

21     and omissions were deceptive and whether a presumption of reliance exists given their

22     materiality;

23  - **Unfair Conduct Claims**: common questions include whether defendants' conduct

24     qualifies as "unfair" under the UCL, *i.e.*, whether the conduct violates public policy or is

25     immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers;

26  - **Unjust Enrichment Claim**: common questions include whether defendants received

27     benefits through their fraudulent and youth-focused marketing, whether the retention of

28     those benefits would be unjust, and whether the benefits defendants received were at the

5

United States District Court
Northern District of California

expense of class members; and

- **Implied Warranty Claim**: common questions include whether JUUL products are fit for their ordinary use.

Defendants do not dispute that some significant common, classwide questions are raised by the operative class complaint. Instead, and as addressed in detail below, they contend that individualized issues undermine the predominance of common questions and preclude certification of any of the four classes sought by plaintiffs. Commonality is satisfied.

### 3.     Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020). A plaintiff may not be typical if she is "subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. However, "[d]iffering factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n. 9 (9th Cir. 2011) (citing *Hanon*, 976 F.2d at 508)).

Plaintiffs ask me to appoint Bradley Colgate, C.D. (through Joseph DiGiacinto), Lauren Gregg, Tyler Krauel, and L.B. (through Jill Nelson) as representatives of the Nationwide Class; C.D., Krauel, and L.B. as representatives of the Nationwide Youth Class; Colgate, C.D., and L.B. as representatives of the California Class; and C.D. and L.B. as representatives of the California Youth Class. Defendants argue that typicality cannot be established, however, pointing to their chart ("Appendix F," Dkt. No. 2313-2) that shows numerous differences between each of the proposed class representatives and deposed class members regarding: (i) when and why each proposed representative or class member first used JUUL; (ii) what each knew about JUUL prior

United States District Court
Northern District of California

1     to their use or their first purchase; (iii) their experiences with cigarettes or other nicotine products;

2     (iv) when each became aware of JUUL containing nicotine and its addictiveness; and (v) how each

3     was impacted by the purported-addictiveness of the product.

4          It is undisputed that there are differences among the proposed class representatives and

5     class members, and differences in the "nicotine journey" of each, such as when they learned about

6     nicotine in JUUL or other e-cigarette products, why they first used or continued to use JUUL or

7     other products containing nicotine, and whether they are addicted to nicotine as a result of their

8     use of JUUL or other nicotine products.  But these differences do not decide the question.  What

9     matters, and what could be determinative, is whether specific differences identified by defendants

10    are *material* to the claims at issue and the legal theories underpinning each of the four classes

11    plaintiffs seek to certify and whether any potentially material differences preclude certification in

12    whole or part considering the predominance requirement.  Typicality under Rule 23(a)(3) focuses

13    on whether a proposed named plaintiff has some unique injury or is subject to a unique defense

14    that the other class members do not have or are not subject to that would make a particular

15    proposed named plaintiff atypical and an inappropriate class representative.

16         The differences defendants identify among the proposed class representatives and other

17    deposed class members are differences in the "factual scenarios resulting in a claim of the same

18    nature."  *Ellis*, 657 F.3d at 985 n. 9.  The differences do not preclude typicality.  Nonetheless, I

19    will briefly address them.

20         Colgate (proposed representative for the Nationwide RICO and California Purchaser

21    classes): Defendants point out that Colgate is the sole adult-initiator in the California class, was a

22    pack-a-day smoker for seven years prior to purchasing JUUL, knew JUUL contained nicotine, was

23    familiar with nicotine products, was influenced by the "testimonials" marketing about making a

24    switch, and states that the products helped him stop smoking for 2.5 years.  *See* Appendix F; *see*

25    *also* May 13, 2021, Deposition of Bradley Colgate ("Colgate Depo. Tr.") [Dkt. No. 2308-14] at

26    38, 62-63, 67, 70-77, 82, 115.

27         These differences do not preclude a finding of typicality with respect to the RICO and

28    California claims.  Colgate testified that he saw and relied on JLI's marketing before starting to

United States District Court
Northern District of California

use JUUL (Colgate Depo. Tr. at 32-33), that those marketing materials made it seem like JUUL was safer and easier to use than cigarettes, and that if defendants had disclosed the risks, he would not have purchased the product.  *Id*. at 74-76, 131, 168, 281; *see also* Pls. Ex. 22 [Colgate Responses to Interrogatories, Dkt. No. 2439-7] at 65-66, 70, 74.[5]

Plaintiffs' claims are based on the theory that had defendants disclosed the safety and addiction risks of using JUUL products, they would have paid less or purchased different products.  There are no atypical differences raised by Colgate's testimony.

Krauel (proposed representative for the Nationwide RICO and Youth classes): Defendants argue that because Krauel testified that he had no idea JUUL products contained nicotine and he had never smoked before, he could not have relied on the challenged affirmative misrepresentation that a JUUL-pod contains the same amount of nicotine as a pack of cigarettes or that using JUUL was a reasonable alternative to smoking combustible cigarettes.  April 11, 2021, Deposition of Tyler Krauel ("Krauel Depo. Tr.") [Dkt. No. 2308-7] at 83-86, 93.  That argument does not raise a unique defense or fact scenario that would make Krauel atypical for the RICO or Youth classes. His lack of knowledge that JUUL contained nicotine and his lack of prior history of smoking are fairly common among the Youth class members, as defendants' own chart acknowledges.   More significantly, defendants fail to directly connect any of these supposed unique or atypical facts to specific requirements of the claims underlying each of the proposed classes.

Defendants also point out that Krauel initially testified that he had never seen a JUUL advertisement before he used a JUUL, but later stated that he had seen advertisements prior to his first use.  *Compare id*. at 217-219 *with id*. at 324.[6]  Defendants argue that the newer testimony is not credible – making him atypical – pointing out Krauel testified that first use was in 2014, which

---

[5] Whether Colgate saw JUUL marketing materials prior to his first purchase or use of JUUL products is an example of a material fact that impacts Colgate's standing to represent the California Purchaser class claims arising under the California consumer protection statutes.

[6] While contending it is not directly relevant to Krauel's typicality or standing to represent the RICO classes, plaintiffs point to Krauel's interrogatory response that prior to his first use of JUUL products, Krauel had seen online promotions of JUUL that led him to believe JUUL was harmless, widely accepted, and the "cool" new thing to do.  Pl. Appx. B, Ex. 22 at 200.

United States District Court
Northern District of California

was prior to the product launch.  ODD Oppo. at 24 n.21.  However, Krauel explained that he was confused during his original testimony and confirmed that he started using JUUL in his freshman high school year, that ran from 2014 through 2015 (post-product launch).  Krauel Depo. Tr. at 54-55.  This can be explored on cross-examination. Whether Krauel started using JUUL in August 2014 (which would be an impossibility) or in August 2015 or at some other point can be explored at trial.  That he was confused and gave ambiguous testimony about conduct that happened at least six years prior does not make him atypical.

Finally, defendants argue that Krauel is subject to atypical defenses because he never attempted to purchase JLI products online (never encountering the allegedly deficient age-verification system that forms part of the youth marketing claims) and was prevented from buying PAX products by the same system when he fraudulently attempted to use someone else's identification.  *Id*. at 166-167, 189-190, 194-195, 210-211.  But the illegality of the youth purchases is a common issue among the youth class and is not unique to any particular Youth class member.  Examples of other illegal conduct, such as the use of someone else's identification or the use of false identification, do not undermine the typicality of Krauel (or as discussed below, for L.B.) because these individuals were allegedly injured by the defendants' conduct in the same way.  Whether and how these unclean hand defenses may undercut the substantive claims asserted by plaintiffs is better considered at summary judgment, trial, or post-trial when the full evidentiary record can be weighed in the context of each of the claims asserted.

C.D. (proposed representative for the Nationwide RICO, Nationwide Youth, California, and California Youth classes): Defendants point out that C.D. never smoked before first using JUUL products, did not know that JUUL contained nicotine (because his brother told him it was "safe" and did not contain nicotine), tried other vaping products before JUUL, used JUUL in part because of others who used it and he wanted to blow smoke tricks, and only saw the allegedly "youth-targeted" JUUL advertisements after he had started using the products (although C.D. testified he had seen posters advertising JUUL products in the windows of at least three stores and a billboard advertisement prior to his first use).  May 4, 2021, Deposition Transcript of C.D. ("C.D. Depo. Tr.") [Dkt. No. 2308-24] at 46-48, 53-56, 63-64, 81-82, 86-87, 149-156, 189-190,

244.[7]  Defendants also contend that C.D. never attempted to purchase from JLI's online site and, therefore, never encountered the allegedly deficient age-verification system that is part of the youth marketing claims, and that C.D. knew his retail purchases were illegal.  *Id.* at 17, 73, 111, 124-125, 285.  Therefore, defendants contend, he is subject to the unique defense of unclean hands and other unique defenses to his equitable claims.

The significant material fact that matters for C.D.'s standing for the California consumer protection claims is C.D.'s testimony that he saw JUUL advertisements prior to his first use and purchase (including point-of-sale materials as well as a billboard).  Particularly relevant is C.D.'s testimony that the promotional materials he saw and JUUL flavors led him to believe that JUUL was fun and harmless.  *See also* Pls. Ex. 22 at 91, 94, 97, 101.  As noted above, whether C.D. and other members of the Youth classes are subject to an unclean hands defense, given knowledge that sales to minors were illegal, is a common and not unique issue that is better tested at summary judgment or by the trier of fact who will weigh equities to determine whether JLI's conduct was unfair with respect (at least) to the California Youth class.

L.B. (proposed representative for the Nationwide RICO, Nationwide Youth, California, and California Youth classes): Defendants point out that L.B. never smoked before first using JUUL products, did not know that JUUL contained nicotine, did not know what nicotine was, could not identify specific JUUL advertising she had seen prior to her use or purchase (although she testified she noticed JUUL advertisements before she first tried JUUL), knew purchasing JUUL as a youth was illegal (and used her mother's identification to get around JLI's age-verification system), and did not read warning labels about nicotine in JUUL products in emails or on the JLI website.  June 22, 2021, Deposition Transcript of L.B. ("L.B. Depo. Tr.") [Dkt. No. 2308-8] at 87-89, 96-98, 104, 120, 125-126, 129-130, 136-144, 219.  Defendants argue that these

---

[7] The ODDs argue that while C.D. testified he saw JUUL ads in three stores prior to first using JUUL, that testimony is "contradicted" by his other testimony that he did not see any JUUL advertisements or packing until after he had first used JUUL.  ODD Oppo. at 22-24 (citing C.D. Depo. Tr. 46, 81, 190).  Any alleged contradictions in C.D.'s testimony can be explored on cross-examination.  Similarly, it will be up to jurors to decide whether to believe C.D. that he did not see any age restriction for JUUL products when he first used them and that if he knew JUUL contained nicotine he would not have used it, or whether the age restrictions and nicotine disclosures on JUUL's packaging in 2017 when C.D. began his use undermine his credibility.

United States District Court
Northern District of California

admissions mean L.B. is not typical because she did not adequately rely on specific JLI advertisements before using the product, would not have been impacted by the warnings on JUUL products regarding nicotine, and is subject to unique defense of unclean hands and other unique defenses to her equitable claims.

As with C.D., the only potentially material fact is L.B.'s exposure to representations and omissions for purposes of standing (and not necessarily typicality) for the California consumer protection claims.  Plaintiffs point to L.B.'s interrogatory responses that prior to her first JUUL use, L.B. had seen point of sale materials in stores near her home and that she had seen advertisements prior to her first use.  Pls. Ex. 22 at 25; L.B. Depo. Tr. at 219.  Any ambiguities or alleged departures from that testimony in her deposition may be explored at summary judgment or trial, but do not undermine L.B.'s typicality with respect to the claims underlying the Nationwide RICO, Nationwide Youth, California, and California Youth classes.  For the same reasons as with C.D., the potential unclean hands defense is not a unique defense that makes L.B. atypical.

Gregg (proposed representative for the Nationwide RICO class): Defendants point out that Gregg did not know JUUL contained nicotine when she first started to use it, had never smoked before she used JUUL products, did not know whether JUUL pods had more nicotine than cigarettes, and only began to really notice JUUL advertisements after she started to use JUUL. April 30, 2021, Deposition Transcript of Lauren Gregg ("Gregg Depo. Tr.") [Dkt. No. 2308-23] at 78-81, 108-111.  However, her interrogatory responses and consistent deposition testimony are that prior to her first use in September 2017, she had seen JUUL advertisements on TV that implied the product was safe. Before and during her use she encountered hundreds of other advertisements.  Pls. Ex 22 at 141-142; Gregg Depo. Tr. at 78-81, 108-111.

In sum, typicality has been satisfied for each of the proposed class representatives.

### 4.    Adequacy

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  JLI and the ODDs argue that the following proposed class representatives are inadequate because of lack of honesty and credibility – given

1    alleged illegal behavior or alleged perjury[8] – as well as their lack of familiarity with the allegations

2    in the case and their misunderstanding of the role of a class representative.[9]

3        Colgate: According to his deposition testimony, Colgate had not been informed or does not

4    appreciate the nature of the class claims asserted, incorrectly characterizing his role as

5    representing the "people in California who are previous cigarette smokers who are now addicted to

6    JUUL."  Colgate Depo. Tr. at 155.  That slight misunderstanding regarding the scope of the class

7    claims in this complex case does not rise to the level of making Colgate inadequate.

8        C.D.: Defendants point to a contradiction between C.D.'s testimony that he is currently

9    addicted to nicotine and C.D.'s brother's testimony that C.D. quit vaping in late 2019 or early

10   2020 to challenge his credibility.  JLI Oppo. at 57.  This, at most, raises a potential ground for

11   cross-examination and does not fatally undercut C.D.'s credibility.  Defendants also note that

12   C.D.'s father filed the suit on C.D.'s behalf and that C.D. was not fully knowledgeable about the

13   relief plaintiffs seek.  But C.D. accurately testified that the goal of the litigation was to force

14   defendants "to stop marketing towards minors and some form of compensation on money spent on

15   JUUL products."  C.D. Depo. Tr. at 294.  That C.D. personally wants the product off the market,

16   *id*. at 298, also does not make him an inadequate representative.

17       L.B.: L.B. is alleged to be inadequate because her mother filed her claim without

18

19   [8]  *See In re Arris Cable Modem Consumer Litig*., 327 F.R.D. 334, 356 (N.D. Cal. 2018):

20       A putative class representative's "credibility may be a relevant consideration with respect
        to the adequacy analysis" and courts "must be concerned with the integrity of individuals it
21      designates as representatives for a large class of plaintiffs." *Marsh v. First Bank of
        Delaware*, 2014 WL 554553, at *9 (N.D. Cal. Feb. 7, 2014) (citations omitted). However,
22      "the 'most important issue' remains whether the class representative's 'interests are
        antagonistic to those of the class members.'" *Id*. (quoting *In re Computer Memories Sec.
23      Litig*., 111 F.R.D. 675, 682 (N.D. Cal. 1986)). "Only when attacks on the credibility of the
        representative party are so sharp as to jeopardize the interests of absent class members
24      should such attacks render a putative class representative inadequate." *Harris v. Vector
        Mktg. Corp*., 753 F.Supp.2d 996, 1015 (N.D. Cal. 2010). More precisely, a district court
25      should find inadequacy "only where the representative's credibility is questioned on issues
        directly relevant to the litigation or there are confirmed examples of dishonesty, such as a
26      criminal conviction for fraud." *Id*.

27   [9]  *See Moeller v. Taco Bell Corp*., 220 F.R.D. 604, 611 (N.D. Cal. 2004), *amended in part*, 2012
     WL 3070863 (N.D. Cal. July 26, 2012) ("The threshold of knowledge required to qualify a class
28   representative is low; a party must be familiar with the basic elements of her claim[], and will be
     deemed inadequate only if she is 'startlingly unfamiliar' with the case.").

United States District Court
Northern District of California

12

disclosing it to L.B., was not informed early enough in the case to avoid destroying relevant information, was unfamiliar with Altria, and never saw her initial Plaintiff Fact Sheet ("PFS") that contained many errors, including when she started using marijuana.  None of these arguments mean that L.B. is inadequate.  Her testimony shows that she is sufficiently informed about the general nature of this litigation and her role and duties as a class representative, and she has provided an updated PFS.

Krauel: Krauel is alleged to be inadequate because he admitted to not having read the operative class complaint or motion for class certification despite plaintiffs' assertion that he had "dedicated substantial time and effort to this litigation." Defendants also argue he is inadequate because in his deposition he was not familiar with the inadequate age-verification process allegations that plaintiffs assert in support of their youth marketing claims.  That Krauel has not reviewed the consolidated class action complaint (that runs over 700 pages) or the class certification motion (that runs 49 pages) or is not familiar with every factual basis relevant to the youth marketing RICO claim does not show that he fails the "low" but important bar of adequacy or that he is startling unfamiliar with the claims asserted or the class he would represent.

Defendants also argue that Krauel is not credible given his contradictory statements regarding the date he started using JUUL.  His somewhat ambiguous testimony may be clarified or confirmed at trial, but it does not impact his credibility sufficiently to disqualify him as inadequate.[10]

Gregg: Gregg is alleged to be inadequate because she was unaware of the precise scope of the class she is proposed to represent (the Nationwide RICO class) other than "all the people who purchased JUUL products." Gregg Depo. Tr. at 295.  In layperson terms, that is a more than adequate description of the Nationwide RICO class, no more is expected or required.

In sum, the proposed representatives of each class are adequate.

---

[10] Defendants separately argue that an arrest for possession of drugs – and alleged lies regarding possession that Krauel made while being arrested – similarly damage his credibility and make him an inadequate plaintiff.  Those allegations have nothing to do with the facts alleged in this case or Krauel's exposure to and use of JUUL.  Absent evidence of serious misconduct in this case, or misconduct that relates to the allegations in this case, Krauel is not inadequate.

Plaintiffs also ask me to appoint the four individuals who have been acting as Co-Lead Plaintiffs' Counsel, and their firms, as Co-Lead Class Counsel. These individuals and their firms, along with the Court-appointed members of the Plaintiffs' Steering Committee, will continue to work for the benefit of the class. Defendants make no challenge to the adequacy of Co-Lead Class Counsel. Based on their thorough and robust advocacy to date, I find that they are adequate.[11]

### C.    Rule 23(b)(3)

Defendants' main attack is that plaintiffs have failed to show that common issues predominate sufficiently to justify the use of the class action device. While many of defendants' arguments are untethered to or mix the various legal claims underlying each of the four proposed classes, I will address them in turn.

### 1.    Predominance of Common Issues

The following factors are "pertinent" to the predominance and superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Predominance under Rule 23(b)(3) asks whether a putative class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Predominant questions make up "a significant aspect of the case" and clearly justify "handling the dispute on a

---

[11] In its opposition, Altria argues that determining class membership raises predominant individualized inquiries because class members are unlikely to have "objective proof" of purchases. Altria. Oppo. at 29-30. This argument is a variant on ascertainability that the Ninth Circuit has determined is no stumbling block to certification. *Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121, 1124-25 (9th Cir. 2017) (rejecting defendants' argument that plaintiffs could not meet Rule 23(a) criteria where "Plaintiffs did not propose any way to identify class members and cannot prove that an administratively feasible method exists because consumers do not generally save grocery receipts and are unlikely to remember details about individual purchases of a low-cost product like cooking oil."). And Altria's argument that JLI has no objective proof of sales to brick-and-mortar establishments or online retailers is unsupported by the record.

United States District Court
Northern District of California

representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).  Predominance is not a counting game, though.  "Rather, more important questions apt to drive the resolution of the litigation" carry greater weight than less significant individualized questions.  *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).  So, "even if just one common question predominates, 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.'"  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (*en banc*) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)).  An "assessment of predominance begins, of course, with the elements of the underlying cause of action."  *Walker v. Life Ins. Co. of the Southwest*, 953 F.3d 624, 630 (9th Cir. 2020) (internal quotations omitted).

Defendants' overarching theme is that because purchasers of JUUL are heterogenous, certification of any class is unwarranted.  Defendants spend much time arguing that predominance cannot be established as a matter of law because: (i) "both adult and underage consumers follow individualized paths in deciding to try and (sometimes) continuing to use JUUL"; (ii) the "relevant facts relating to JLI conduct varied substantially through evolution" of the JUUL product (designs, flavors, and nicotine content), packaging and sales (changes in labels regarding "equivalency" and "nicotine disclosures," different sales channels were used for different flavors), marketing and media (use of several differently themed campaigns, various use of print, radio, website and digital channels); (iii) JUUL's underage use and prevention efforts "evolved" over time and reached greater numbers of youth as time went on; (iv) the competitive marketplace evolved over time, allowing consumers greater access to other nicotine delivery devices; and (v) government and public scrutiny, as well as risk perception, increased over time.  JLI Oppo. at 6-18.  Given these differences, defendants contend that predominance cannot be established "because (i) individual issues of reliance will predominate, given the lack of classwide exposure to allegedly actionable conduct and the absence of classwide, common materiality; (ii) there is no proof of classwide injury; and (iii) Plaintiffs' damages models neither satisfy *Comcast*, nor demonstrates classwide causation."  *Id*. at 24.

In support of defendants' arguments, JLI repeatedly mischaracterizes the deposition

1    testimony of plaintiffs' experts (often citing their own counsel's question, as opposed to the full

2    answer of the expert being deposed) or cites supposed "admissions" of plaintiffs' experts on topics

3    those experts did not address.  *See, e.g.*, JLI Oppo. at 2-3, 18-20, 22.  This is decidedly unhelpful.

4            JLI and the other defendants also point to the deposition testimony of the class

5    representatives and other putative class members to show that they had different "journeys" in

6    terms of prior nicotine use, different understandings of whether JUUL had nicotine and when they

7    developed those understandings, different knowledge of the risks of nicotine, different reasons for

8    starting to use JUUL, different exposures to different (if any) forms of JUUL advertising or

9    product labels, and exposure to different information from relatives or friends (who may have

10   provided the plaintiffs access to their JUUL products).  *See generally*, Appendix F, Dkt. No. 2313-

11   2; JLI Oppo. at 22-23.  Distinctions in the proposed class representatives' and proposed class

12   members' journeys were addressed above with respect to typicality.  As noted there, the

13   differences identified by JLI and the other defendants are largely undisputed and largely

14   immaterial when considering the legal standards for the claims the proposed classes rest on: (i) a

15   Nationwide Class and a Nationwide Youth Class, based on deceptive marketing and youth

16   marketing in violation of RICO; and (ii) a California Class and a California Youth Class, based on

17   deceptive and youth marketing in violation of the UCL, CLRA, FAL, common law fraud and

18   unjust enrichment, and violation of the implied warranty of merchantability and Magnuson-Moss

19   Warranty Act because JUUL was not fit for ordinary use.

20           For instance, while JLI asserts "plaintiffs impermissibly lump together former nicotine

21   users and those with no prior nicotine experience, addicted and non-addicted users, and users of

22   cigarettes, smokeless tobacco, and other ENDS products" and "also combine individuals who

23   were exposed to different messaging about JUUL at different times and who started using the

24   product for a variety of reasons, largely unrelated to JLI's advertising or packaging," JLI Oppo. at

25   18, those distinctions are mostly immaterial under the legal theories asserted.  The significant

26   questions asserted – *e.g.*, whether JLI's marketing presented a consistent USP, whether reasonable

27   consumers would find misrepresented or omitted information material, whether the reach of those

28   marketing materials was sufficient to support a presumption of reliance, whether JLI's marketing

1    was "youth-oriented", and how much of the youth-driven consumption can be linked to JLI's own

2    conduct – are subject to plaintiffs' and defendants' experts' "dueling" opinions.  Resolution of

3    these fact-driven disputed issues raises common predominant issues that will likely be resolved by

4    the trier of fact.  Remaining differences can be addressed by well-recognized case management

5    and trial plan strategies.

6         Plaintiffs bring four "types" of fraud-based claims: (1) misrepresentations in advertising,

7    (2) omissions in advertising, (3) misrepresentations on the product labels, and (4) omissions from

8    the product labels.[12]  Plaintiffs' Reply in Support of Class Certification ("Pls. CC Reply") [Dkt.

9    No. 2438] at 18 (discussing California fraud-based claims).  They allege that defendants'

10   "fraudulent scheme conveyed that JUUL products were less addictive than combustible cigarettes,

11   and omitted material information to the contrary."  Pls. Motion for Class Certification ("CC

12   Mot.") [Dkt. No. 1772-2] at 15.  The basis of plaintiffs' misrepresentation claims regarding

13   marketing is their contention that "JUUL marketing [] contained deceptive statements and

14   omissions because (1) JUUL branding and marketing was pervasive and JUUL purchasers were

15   exposed to Defendants' messaging and (2) the messaging, although using different imagery and

16   wording, conveyed consistent messages about JUUL products that would be likely to deceive

17   reasonable consumers in similar ways."  CC Mot. at 24-28 (with "reach" supported by Chandler's

18   opinions and "message" supported by Pratkanis's opinions).

19        As to labeling, the basis of plaintiffs' misrepresentation claims is "[t]he fact that the

20   product labels consistently compared the nicotine content of JUUL pods with" about one pack of

21   combustible cigarettes, when that comparison was false or materially misleading, and the

22   statements on packages that JUUL is an "alternative for adult smokers."  CC Mot. at 21, 24.

23        The omissions-based claims are based on: (1) JLI's failure (prior to mid-2018) to state that

24   nicotine was addictive, (2) failure to disclose that JUUL products used a unique formulation and

25   design that was highly effective at creating and maintaining addiction; and (3) failure to disclose

26

27   _____

     [12] "[C]ognizant of the Court's preemption ruling, Plaintiffs are not advancing a labeling omission
28   claim related to addiction.  *See* SACC, ¶ 709 (labeling failure to disclose theory limited to risk of
     physical injury)."  Pls. CC Reply at 26 n.11.

United States District Court
Northern District of California

that use of the products poses a significant risk of injury and disease.  CC Mot. at 12, 24 (omission of "nicotine potency, addictiveness, and safety").

As further discussed below, all of these claims predominate.

### a.      Prior Class Certification Orders Involving Tobacco or Other Addictive Products

Defendants contend that no class of purchasers of nicotine or other addictive products could ever be certified because the "highly individualized nature of decision-making surrounding purchases of products that contain an addictive ingredient" precludes "any finding of common reliance, materiality, and injury, given class members' different reasons for use and levels of addiction."  JLI Oppo. at 25.  They assert that I should follow decisions that have declined to certify proposed classes involving tobacco or other addictive products because those decisions recognize the "inherently individualized and often illogical consumer behavior in the setting of addiction that poses insurmountable challenges to predominance."  JLI Oppo. at 2.  But defendants paint with too broad a brush.  They ignore the specific facts and legal theories here that distinguish the cases they rely on and the expert support provided by plaintiffs that was missing in those cases.  *See* JLI Oppo. at 25-27.

In *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015), the district court concluded that an advertising campaign that lasted in total 475 days, that focused on Los Angeles markets (for radio and television) or were sporadically included over the course of ten months in magazines that a majority of consumers would not have seen prior to purchasing the product, was not sufficiently pervasive to demonstrate that nearly all class members had been exposed to the marketing to support the classwide presumption of reliance.  *Id.* at 1106-11.  Here, as discussed below and as disputed by defendants, plaintiffs have made a showing of the pervasive reach of JLI's advertising, including the use of social media marketing, through their experts Dr. John Chandler and Dr. Sherry Emery.  They have also made a showing (disputed by defendants) through Dr. Anthony Pratkanis that JLI's marketing strategy created a USP that remained consistent and carried through the various marketing and advertising campaigns JLI undertook during the class period.  Whether the jury agrees with those experts' opinions on reach and USP

remains to be seen, but those experts have put forward defensible and admissible methodologies to support classwide proof.  The record in *NJOY* was markedly different.

Another problem for the court in *NJOY* was the damages expert's failure to address the "fair market value of NJOY's e-cigarettes absent the misrepresentations and omissions," and a failure to address supply-side factors that go into product pricing.  *Id*. at 1119-22.  As noted in more detail below, plaintiffs' damages expert Dr. Hal J. Singer proffers a damages model that adequately takes into account significant supply-side factors.  The *NJOY* court's reasons for denying class certification do not apply persuasively on this record.

The court in *In re Light Cigarettes Mktg. Sales Pracs. Litig*., 271 F.R.D. 402 (D. Me. 2010) declined to certify classes of smokers of light cigarettes that alleged defendants misrepresented the health risks of light cigarettes where the issue of compensation – whether smokers "compensated" by smoking more light cigarettes or smoking them differently than non-light cigarettes – was tied to their ability to prove injury.  The compensation issue created inherently individualized issues.  *Id*. at 410 & n.9.[13]  Here, plaintiffs' theories of liability and recovery are not connected to and do not rely on how each plaintiff used JUUL devices (or how frequently or even why), but instead on JLI's failure to disclose key information about its products, on its intentional marketing of a product that plaintiffs claim (and defendants dispute) had a particular USP, and on its targeting of youth.  Moreover, in *In re Light Cigarettes* plaintiffs did not propose a methodology to show classwide injury and, as a result, damages.  Plaintiffs do so here.

In *McLaughlin v. Am. Tobacco Co*., 522 F.3d 215 (2d Cir. 2008), plaintiffs pursued RICO claims based on mail and wire fraud predicate acts, contending that they were misled into

---

[13] *Id*. at 416 (finding common proof could not support causation because "[i]f smokers did not fully compensate, they were not injured by the misrepresentations because they received lower levels of tar and nicotine.  There is also significant record evidence that many smokers did not believe the Defendants' claims that light cigarettes had lower tar and nicotine and smoked light cigarettes for reasons unrelated to the alleged health benefits."); *see also id*. at 417 (rejecting presumption of materiality under CLRA where record demonstrated that "light cigarettes smokers were provided with a variety of information: there was significant information in the media about the health risks associated with smoking light cigarettes, [] and the Defendants have increasingly disclosed the health risks of smoking light cigarettes.").

United States District Court
Northern District of California

believing that "light" cigarettes were healthier than "full-flavored" cigarettes. *Id*. at 220. The Second Circuit reversed the district court's certification of a class. It found that common issues did not predominate for reliance or loss causation because under the RICO mail and wire fraud claims, "reliance on the misrepresentation [] cannot be the subject of general proof. Individualized proof is needed to overcome the possibility that a member of the purported class purchased Lights for some reason other than the belief that Lights were a healthier alternative." *Id*. at 223; *see also id*. at 226 ("the issue of loss causation, much like the issue of reliance, cannot be resolved by way of generalized proof. As we noted above, individuals may have relied on defendants' misrepresentation to varying degrees in deciding to purchase Lights; some may have relied completely, some in part, and some not at all.").

Those holdings were undermined by the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639 (2008), as recognized in my prior orders in this case. *See In re JUUL Labs, Inc. Mktg., Sales Pracs., and Prods. Liab. Litig*., 497 F. Supp. 3d 552, 620 n.41 (N.D. Cal. 2020) (repeatedly noting that *McLaughlin* has been "rejected" and "persuasively" distinguished); *see also id*. at 623 (noting that reliance is not required under *Bridge*); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig*., 295 F. Supp. 3d 927, 970 (N.D. Cal. 2018) (following *Bridge* and holding "reliance is not a necessary element of a RICO claim"). In *Bridge*, the Court clarified that "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud," and that "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id*. at 649. Having rejected the proposition that "reliance is an element of a civil RICO claim based on mail fraud," the Court foreclosed defendants' attempt to "let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim." *Id*. at 656.

The *McLaughlin* court also concluded that damages were not predominant, rejecting both the "loss of value theory" and the "price impact model" as implausible as a matter of law "because both would lead to an impermissible fluid recovery, and because the acceptable measure of

20

injury—out-of-pocket damages—would require individualized proof, class-wide issues cannot be said to predominate."  522 F.3d at 227; *see also id*. at 229 (rejecting loss of value/benefit of the bargain theory because it asked court to "conceptualize the impossible—a healthy cigarette—and then to imagine what a consumer might have paid for such a thing"); *id*. at 229-230 (rejecting price impact theory because "plaintiffs have not come forward with any meaningful means of estimating how the market has changed or might change in the future in response to fluctuations in the demand for light cigarettes" and because, in part, light cigarettes "have always been priced the same as full-flavored cigarettes").  Here, discussed in more detail below, plaintiffs have used an accepted economic model – the conjoint study – to demonstrate the price premium class members paid for JUUL products.

JLI contends that the "relevant holding" in *McLaughlin* is "analysis of issues like reliance and causation require individualized proof in cases involving addictive products."  JLI Oppo. at 26 n. 41.  But simply because a product is addictive does not obviously alter the analysis for the legal claims at issue.  The arguments JLI *actually* makes – different people had different reasons for using JUUL and different understandings of whether nicotine was in the product or whether nicotine was addictive or otherwise dangerous – would apply to most types of consumer products cases that are certified.  As explained below, the legal and factual disputes in the more apposite consumer protection cases turn on whether defendants' conduct was fraudulent and whether the fraudulent conduct (misrepresentations or omissions) would have been material to reasonable, objective consumers.  If, instead, JLI is primarily arguing that this case is uncertifiable because its product is addictive, JLI ignores that even addicted consumers had other product options (traditional tobacco products, other e-cigarette brands, nicotine patches or other cigarette substitute products) that reasonable consumers could have preferred if JLI had disclosed the alleged health risks and high degree of addictiveness and potent nicotine delivery from using JUUL products.[14]

---

[14]  Defendants' expert agrees that "abuse liability" of nicotine products can be evaluated on an "aggregate basis" and that general statements can be made regarding a product's potential for abuse, based on factors alleged to be critical in this case – design features and method of delivery. September 23, 2021, Deposition Transcript of Jack E. Henningfield [Dkt. No. 2439-20] at 101-103.

United States District Court
Northern District of California

1    JLI argues that its position – that the "unique nature" of addictive products (which is a

2    distinction) and different consumers' reasons for using addictive products (which is arguably

3    present in every consumer protection case where consumers have different products they can

4    choose from) "obliterate predominance" – is supported by the Ninth Circuit's decision in *Poulos v.*

5    *Caesars World, Inc*., 379 F.3d 654 (9th Cir. 2004).  There, the Ninth Circuit rejected certification

6    of a class comprised of nearly "everyone who has played video poker or electronic slot machines

7    within the last fifteen years." *Id*. at 658.  The panel, prior to the Supreme Court's *Bridge* decision

8    discussed above, addressed the "extent to which a class action plaintiff must establish

9    individualized reliance to meet the causation requirement of a civil [RICO] claim predicated on

10   mail fraud—an issue that bears heavily on a plaintiff's ability to meet the predominance and

11   superiority requirements of class certification." *Id*.  It found that, "[d]ue to the unique nature of

12   gambling transactions and the allegations underlying the class claims, this is not a case in which

13   there is an obvious link between the alleged misconduct and harm.  Rather, linking the Casinos'

14   alleged misrepresentations to plaintiffs' losses requires forging a chain of inferences that, viewed

15   together, amount to individualized reliance." *Id*. at 665.

16   The court's conclusion flowed from the scope of the claims asserted: those claims made

17   the different types of gambling machines at issue (electronic slot machines, video poker machines,

18   etc.) as well as each plaintiff's different experience with non-electronic gambling and knowledge

19   of the electronic games legally significant. *Id*.  That significance and the significantly different

20   types of electronic gambling devices at issue led to a case-specific conclusion "that gambling is

21   not a context in which we can assume that potential class members are always similarly situated.

22   Gamblers do not share a common universe of knowledge and expectations—one motivation does

23   not 'fit all.' . . .  Thus, to prove proximate causation *in this case*, an individualized showing of

24   reliance is required." *Id*. at 665-66 (emphasis added).

25   The panel was careful to note its decision was limited to its context and that its conclusion

26   flowed from the fact that plaintiffs framed their claims as hinging on what the machines

27   themselves disclosed as affirmative representations:

28   the Class Representatives contend that, to no small extent, it is the

22

1
2
3
4

> trade dress of the electronic slot machines that makes them misleading—for example, the affirmative placement of symbols on the reels and the affirmative advertisement of the opportunity to "buy" more than one "line" at a time by placing additional coins in the machine. That the machines neglect to specify that they operate differently than their older mechanical counterparts is but one part of a much broader claim. Simply put, the Class Representatives' claims are based as much on what is there as what is purportedly missing.

5

*Id*. at 667. The court did not consider whether, in a primarily omissions-based RICO claim, a

6

presumption of reliance could be applied. *See also id*. at 668 ("Indeed, there may be no single,

7

logical explanation for gambling—it may be an addiction, a form of escape, a casual endeavor, a

8

hobby, a risk-taking money venture, or scores of other things. The vast array of knowledge and

9

expectations that players bring to the machines ensures that the 'value' of gambling differs greatly

10

from player to player, with some people playing for 'entertainment value' or for any number of

11

other reasons as much as to win. Consequently, we conclude that classwide circumstantial

12

evidence would not suffice to prove causation in this case.").[15]

13

Most significantly for the present discussion, *Poulos* was decided prior to the Supreme

14

Court's decision in *Bridge*. There, the Court made clear that first-party reliance is not necessary

15

for RICO class claims. *See, e.g., Custom Hair Designs v. Central Payment Co*., 984 F.3d 595, 602

16

(8th Cir. 2020) (affirming certification of RICO class and noting that *Poulos* was decided prior to

17

*Bridge*).

18

Defendants' heavy reliance on these cases is not persuasive.

19

### b.    Damages Model and Comcast Fit

20

The other major argument by defendants is that plaintiffs' damages models fail the

21

---

22

[15] *Poulos* was recently distinguished by another judge in this District who, in certifying a RICO

23

misrepresentation and omissions case, noted the unique multitude of different representations at issue in *Poulos* on the different types of machines and distinguished that from the case before him,

24

where the allegations were that defendant "withheld options from customers by obfuscating the true availability of 4G in most markets" which "hindered customers' ability to make informed

25

choices about their purchases and, as a result, Cricket could charge more for phones and plans than the price warranted by the value of their offerings*." Postpichal v. Cricket Wireless, LLC*, C 19-

26

07270 WHA, 2021 WL 3403146, at *8 (N.D. Cal. Aug. 4, 2021). Here too, plaintiffs allege that by withholding information regarding the health risks and particularly addictive nature of the JUUL products, consumers who were looking for nicotine products to replace cigarettes – what

27

defendants repeatedly characterize as the purpose of the JUUL products, JLI Oppo. at 26 –were deprived of the necessary information to make informed choices in choosing between other

28

nicotine replacement products or other e-cigarettes. *See* Pls. CC Reply at 4, 16.

United States District Court
Northern District of California

*Comcast* fit requirement, noting that in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court clarified that as part of the predominance inquiry under Rule 23, plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." *Id*. at 34. As such, plaintiffs must present a damages model consistent with their theory of liability; that is, a damages model measuring "only those damages attributable to that theory." *Id*. at 35. "Calculations, need not be exact," but "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Id*. (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)).

Defendants argue that the conjoint analyses conducted by Dr. Singer did not test deceptive acts that are "equivalent" to plaintiffs' theories of liability.[16] Defendants assert that: (i) Singer's analyses did not test plaintiffs' core "deceptive marketing" theory and instead only tested the labelling theory based on unsupported cigarette equivalency and safety warning labels; (ii) Singer's surveys do not match plaintiffs' theories of liabilities because they do not distinguish between any of the five different RICO schemes (fraudulent marketing, youth access, nicotine content misrepresentation, mint flavor preservation, and cover up) or the state law claims; (iii) Singer's surveys do not address the time and content-limited role of Altria and assess the same level of damages with or without Altria's specific involvement in three of the RICO schemes (nicotine content misrepresentation, flavor preservation, and cover up); and (iv) Singer's analysis disproves classwide damages as 18% of respondents in the Addition-Risk survey preferred the "twice as addictive" product and 40% of the Safety-Risk respondents preferred the product with a safety disclaimer as opposed to a product with undisclosed safety risks.[17] The last argument is

---

[16] Singer's analyses are described and discussed in greater detail later in this Order when I address the *Daubert* motions.

[17] Using "Choice-Based Conjoint ('CBC') analysis" Singer developed two studies to test an Addiction-Risk theory and one to test a Safety-Risk theory based on surveys conducted in March and April 2021. Class. Class Certification Report of Hal J. Singer ("Singer Report," Dkt. No. 1772-19), ¶¶ 25-32. As discussed more with respect to defendants' motion to strike and exclude, Singer modified his conjoints in response to defendants' criticisms, rerunning part of the analysis and, with respect to the Safety-Risk study, developing new surveys to further test his opinions. Class Certification Reply Expert Report of Hal. J. Singer ("Singer Reply Report," Dkt. No. 2439-8.

United States District Court
Northern District of California

addressed later in connection with JLI's standing argument and the *Daubert* motions.

### i.      Addiction-Risk

Defendants assert that Singer's Addiction-Risk conjoint is deficient for multiple reasons. First, defendants challenge Singer's testing of five different labels with different levels of addiction-related warnings, arguing that the addiction-risk labels rest on preempted theories of liabilities that cannot form the basis of any claim or damages estimate. *See Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178, 1189 (N.D. Cal. 2018) ("*Colgate I*") (dismissing claims "based on the product label failing to disclose the greater potency and addictiveness of JUUL's benzoic acid and nicotine salt formulation" as expressly preempted by the TCA); *In re Juul Labs, Inc., Mktg., Sales Pracs, and Prods. Liab. Litig.*, 497 F. Supp. 3d at 587-588 (noting nicotine addiction-based labeling claims that "implicate[] the nicotine addiction warning specifically approved and required by the FDA" were preempted but declining to reach whether other disclosures are preempted to the extent they are "different from or in addition to" the "minimum" nicotine addiction warning mandated by the FDA). But the labels Singer tested for his addiction-risk survey were based on JLI's own non-FDA mandated disclosure that one pod was "equivalent" to one pack of cigarettes. Singer's analysis does not directly implicate the FDA's mandated nicotine warning (adopted by JLI in mid-2018) and instead aims to test how demand would have shifted if consumers had not been misled by JLI's voluntary statements.

Second, defendants contend that Singer had no scientific or academic basis to test statements about products being two or four times "more addictive than cigarettes," as plaintiffs' own addiction expert (Dr. Alan Shihadeh) testified that he had never seen a "numerical scale" quantifying addictiveness and that such a concept made little sense to him. *See* July 22, 2021, Deposition Transcript of Alan Shihadeh ("Shihadeh Depo. Tr.") [Dkt. No. 2310-1] at 282-84 (explaining he was not aware of a "numerical scale for addictiveness," would not use a statement regarding a product being twice or half "as addictive as cigarettes," but would need to "see that statement in context to be able to fully evaluate it"). But Shihadeh's qualified statement does not fatally undermine Singer's use of the challenged labels to test consumer's general understanding of risk of addiction. At most, it creates a ground for cross-examination.

United States District Court
Northern District of California

Defendants also challenge Singer's addition-risk survey because Singer failed to define "addiction" to the survey participants. Defendants argue that without a definition of "addiction" or evidence that addiction is as linear as Singer's tests suggest (twice or four times as addictive), Singer's analysis study does not mesh with plaintiffs' theory of liability based on inadequacy of nicotine-content disclosures and other health risk disclosures and not on failure to disclose "addictiveness." This criticism also goes to weight, not admissibility of Singer's addiction-risk survey for purposes of class certification. This is not a situation – as in the many cases cited by defendants – where plaintiff's expert failed to test the theory of liability at the heart of the claims.[18]

### ii. Safety-Risk

Defendants claim that Singer's Safety-Risk conjoint also misses the mark and confirms that there is no *Comcast* fit because his survey – testing warnings about a "small subset" of health claims that are not alleged in the operative class action complaint – ignores plaintiffs' class action claims, which are based on RICO mail and wire fraud theories and consumer protection claims resulting in economic loss and not failure to warn personal injury theories. But the safety risks Singer tests – in his initial survey and revised survey – are adequately encompassed by the allegations in plaintiffs' operative Consolidated Class Action Complaint. *See, e.g.*, Dkt. No. 1358

---

[18] *See, e.g., Davidson v. Apple, Inc.*, 16-CV-04942-LHK, 2018 WL 2325426, at *23 (N.D. Cal. May 8, 2018) ("Boedeker's survey questions only asked respondents about a generic defect instead of one specifically affecting a phone's touchscreen. That necessarily assumed that respondents would value all defects equally. That assumption is inconsistent with *Comcast's* requirement that damages models measure "only those damages attributable" to Plaintiffs' theory of liability because it unmoors Plaintiffs' damages from the specific touchscreen defect alleged to have harmed them."); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) (excluding conjoint where expert "did not isolate a low emissions premium because the information provided to respondents required them to consider certain vague effects going beyond low emissions."); *McMorrow v. Mondelez Intl., Inc.*, 17-CV-2327-BAS-JLB, 2020 WL 1157191, at *9 (S.D. Cal. Mar. 9, 2020) (excluding survey "that does not tell the Court whether the respondents would pay a price premium because the product is advertised as being "nutritious," or because it is advertised at providing "steady energy," or a combination of the two."); *see also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1025 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) (rejecting hedonic regression analysis that "does not satisfy *Comcast* because it does not isolate the price premium attributable to consumers' belief that ConAgra's products did not contain GMOs" but *accepting* a combination of that hedonic regression with a conjoint analysis that using "consumer surveys to segregate the percentage of the price premium specifically attributable" to challenged misrepresentation).

United States District Court
Northern District of California

¶¶ 787, 789.

Singer's conjoint analyses (both original and as amended) support plaintiffs' motion for class certification. They are closely-enough tethered to plaintiffs' theories of liability, have been shown that they can be adjusted (if necessary and as necessary) for the merits stage, and establish sufficient fit under *Comcast* at this juncture.

### iii.    Youth

Next, defendants attack Singer's use of a "full refund" model for the Youth Purchaser classes, arguing that there is no support for that type of model under RICO, the UCL, or any of the other statutes at issue. Defendants rely on cases under California consumer protection laws rejecting the "full refund" model where the mis-advertised or misrepresented products still provided some value to consumers. They confirm that what consumers may recover, in those circumstances, is the difference between what plaintiff paid and the value of what plaintiff received. *See, e.g., In re POM Wonderful LLC*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014 ("Because the Full Refund model makes no attempt to account for benefits conferred upon Plaintiffs, it cannot accurately measure classwide damages.").

None of defendants' cases deal with underage or otherwise allegedly inherently unfair or illegal sales. *See, e.g., Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (Cal. App. 2 Dist. 2010), *as modified on denial of reh'g* (Feb. 8, 2010) (approving a full refund model in a case where product was advertised as legal but contained illegal ingredients).[19] Plaintiffs' theory is that because it was illegal or inherently unfair to market and sell the JUUL product to youth, youth purchasers received no value from it at all. *See Ortega v. Nat. Balance, Inc.*, 300 F.R.D. 422, 430 (C.D. Cal. 2014), *order reinstated sub nom. Lambert v. Nutraceutical Corp.*, CV 13-05942-AB (EX), 2020 WL 12012559 (C.D. Cal. Jan. 8, 2020) (approving full refund model where product

---

[19] JLI argues that the *Steroid Hormone Prod. Cases* decision is inapposite because there, class purchasers did not know the product was illegal, whereas here, many youth purchasers knew they were illegally purchasing JUUL. However, the inclusion of consumers who knew the product was illegal did not preclude certification of the CLRA claim in that case. *Id.* at 157 ("And even if there may be some people who bought androstenediol products from GNC with the knowledge that the products were unlawful to sell or possess in California without a prescription—and there is no evidence in the record that there are—their existence would not defeat class certification.").

United States District Court
Northern District of California

was advertised as providing beneficial health and aphrodisiac properties and where "Defendant argues that this introduces an individualized defense because each plaintiff's monetary recovery should be reduced to account for the actual value of the product to him.  But Plaintiffs argue that the product was valueless because it provided none of the advertised benefits and was illegal."). Plaintiffs' full refund model, with respect to the Youth Classes, supports certification.

Defendants separately argue that not every youth purchase was "caused" by JLI's conduct because JLI should not be held responsible for the illegal conduct of others such as brick and mortar or online retailers who sold to youth.  They contend that Singer's model wholly fails to isolate the value of sales based on JLI's misconduct and, therefore, that the *Comcast* fit is missing. But plaintiffs' theory – as to which Singer's Youth Damages estimates fit – is that defendants caused the product to be marketed to youth with the knowledge that youth would end up finding ways to purchase the product, even if not directly from JLI.  For the Youth RICO class, defendants will be able to test causation at summary judgment, trial, or post-trial, arguing, presumably, that there is not a sufficiently direct causal chain between JLI's conduct and the youth purchases for the Youth RICO class.  For the UCL, however, the causal defense to the restitution model is irrelevant.  *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (recognizing that "under the UCL is available without individualized proof of deception, reliance and injury" (internal quotation omitted)).[20]  The caused-based arguments do not support defendants' argument that the *Comcast* fit is missing as to the Youth Classes.

### iv.    Altria Damages

Altria notes that it is only implicated in three of the five alleged RICO schemes – the flavor preservation, cover-up, and nicotine misrepresentation schemes – and only for a limited time,

---

[20] JLI also argues that "overwhelming majority" of JLI advertising content according to plaintiffs and their experts did not appeal to youth.  That argument may be accepted by the trier of fact.  For present purposes, it ignores Emery's and Pratkanis's admissible-for-class-certification opinions that the initial youth-directed campaigns (including the explicit marketing content, the use of social media and influencers, the design of device, and the flavors offered) laid the seeds for the subsequent exponential growth in youth use and despite that changing content, the USP in the marketing remained consistent.  *See generally* Emery Report [Dkt. No. 1772-22]; Supplemental Emery Report [Dkt. No. 2439-9]; Pratkanis Report [Dkt. No. 1772-20]; Pratkanis Reply Report [Dkt. No. 2439-10].  JLI may dispute those opinions, but they are admissible at this juncture.

United States District Court
Northern District of California

allegedly joining the schemes in Spring 2017 at the earliest. Defendants argue that plaintiffs and their damages expert (Singer) make no effort to measure any "overcharge" resulting specifically from Altria's RICO conduct or otherwise show how that measure can be established with class-wide proof against Altria. As such, defendants contend that plaintiffs failed to show that certification of the RICO claims against Altria is appropriate and also demonstrate that their damages model is overboard in violation of *Comcast*.

Altria separately complains that Singer attempts to measure the price premium associated with JLI's failure to warn of its products' addictiveness or other health risks instead of attempting to estimate damages hinged to each scheme or to the limited time period of Altria's involvement to isolate the impact Altria's conduct had on the RICO damages. Altria argues that its alleged conduct is not "linked" in any way to its alleged role in the RICO Enterprise (other than perhaps the nicotine misrepresentation scheme, where even Singer admitted his testing was not related to "nicotine" dosages, but addiction risk) and fails the *Comcast* fit requirement. It notes that Singer's model produced the exact same "overcharge" regardless of whether a purchase was pre- or post-Altria involvement. That shows the weaknesses in Singer's damages estimates, says Altria, and that those RICO Claims should not be certified. The ODDs similarly point out that plaintiffs' damages are the exact same whether the jury credits or rejects the existence of the various RICO schemes or liability under the various California causes of action (CLRA, FAL, common law fraud), failing *Comcast*. *See Leyva v. Medline Industries Inc*., 716 F.3d 510, 514 (9th Cir. 2013) ("plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.").

On a similar theme, Altria argues that it cannot be liable under RICO for large chunks of the purchases at issue and that the *Comcast* fit fails as to it because: (i) only those class members who purchased mint JUUL could have been injured by the "flavor preservation scheme"; (ii) only a fraction of the class started using JUUL before or continued to use JUUL after Altria's "make the switch" campaign that was part of the "cover up scheme"; and (iii) many class members were either using JUUL prior to Altria's entry into any of the schemes or were unaware of any "nicotine

content misrepresentations" occurring after Altria's alleged entry into that scheme.[21]

Each of these arguments fails to undermine class certification with respect to Altria for the same reason. The five schemes identified by plaintiffs, interrelated and *together,* establish the overall pattern of racketeering activity alleged. That Altria was only directly involved in *some* of the racketeering activity is not significant. Under Ninth Circuit precedent, all defendants who participated in the RICO enterprise are liable for the entire injury caused by the enterprise's illegal conduct, regardless of whether they personally participated in every aspect of the conspiracy. *See Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002) ("[T]he damage wrought by the conspiracy 'is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'"); *see also United States v. Umagat*, 998 F.2d 770, 772 (9th Cir. 1993) ("'One may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him.'") (quoting *United States v. Bibbero*, 749 F.2d 581, 588 (9th Cir.1984)).[22] Singer was not required to – and did not – separate out damages according to Altria's alleged involvement in only some aspects of the racketeering activity.

Separately, Altria argues that Singer's damages model fails under *Comcast* to fit plaintiffs' revamped RICO theory, which is that JLI was the RICO Enterprise (and not liable under RICO) and that Altria and the Founders and ODDs were the RICO defendants who are allegedly liable under RICO. *See In re JUUL Labs, Inc., Mktg., Sales Practices, and Products Liab. Litig.*, 19-

---

[21] Altria also argues that it cannot be held liable for plaintiffs' Youth Class full refund model because it is not alleged to have been part of the Youth Access Scheme. But its liability for any Youth Class damages is a common, classwide issue. Altria will be free at summary judgment, trial and/or post-trial to argue that its liability for specific claims should be reduced or cut-off at a specific point in time.

[22] Altria will be able to argue on summary judgment and at trial that it should not be directly liable under RICO because its conduct did not cause harm to plaintiffs (although conspiracy liability could remain) and that it should not be liable because the conduct that injured plaintiffs was completed by the time Altria joined the alleged RICO enterprise. *See, e.g., Oki Semiconductor Co.*, 298 F.3d at 774 (rejecting direct liability for conspirator who laundered funds after robbery (the event that caused plaintiff's harm), but noting conspiracy liability remained); *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) ("a defendant cannot be held [criminally] liable for substantive offenses committed before joining or after withdrawing from a conspiracy" but conspiracy liability remains).

MD-02913-WHO, 2021 WL 1391540, at *7 (N.D. Cal. Apr. 13, 2021).  The use of the exact same damages models to estimate the same damages for the separate California-claims (adjusted only for California sales) to show what JLI is allegedly liable for simply makes no sense, according to defendants.

Plaintiffs respond that their damages model appropriately establishes the price premium paid by every class member, regardless of which persons or entities are responsible for paying those damages.  Because the *harms* flowing from the RICO claims and the separate state law claims are the same – although liability for defendants differs under the claims – a damages model that focuses on estimating the harm to class members is appropriate.  For purposes of class certification, I agree.  Altria's arguments regarding the start or cessation of its liability are better determined on an evidentiary record considering the requirement of the different claims.  How any appropriate reduction might be made – through an analysis by Singer or otherwise – cannot and need not be determined at this juncture.

### v.     ODD Damages

The ODDs separately argue that the damages model proposed concerning them (which applies only to a small fraction of the alleged class members over the narrow period just before December 2018 when the ODDs received billions of dollars as a result of the completed Altria investment) is deficient under *Comcast* because plaintiffs "make no effort" to specify which class members "deserve" restitution from them under the UCL and unjust enrichment claims.  The ODDs also contest whether plaintiffs will be able to show that the ODDs received any funds from plaintiffs through JLI, which is required to establish a right to restitution against them.  Plaintiffs and the ODDs characterize the benefit the ODDs received from the Atria investment as funds resulting from the ODDs sale of stock that diminished their equity interests in JLI.  The ODDs contend that the diminishment of their equity interest in JLI and receipt of funds from Altria cannot constitute restitution recoverable under the UCL or the unjust enrichment claim.  *See, e.g., Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 336 (2011) (under the UCL, "[a] restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other"); *ESG Capital Partners, LP*

1    *v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) (to "allege unjust enrichment as an independent

2    cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at

3    the plaintiff's expense"). Even if plaintiffs could trace some identifiable funds the ODDs received

4    as a result of the Altria investment that theoretically otherwise belonged to plaintiffs as restitution

5    or unjust enrichment, that fraction of funds has not been identified by Singer or plaintiffs.

6        Whether plaintiffs can establish their right to restitution under UCL and unjust enrichment

7    claim against the ODDs, and if so how, are common questions that cannot be resolved on this

8    motion. I have expressed reservations about whether plaintiffs will be able to adduce evidence

9    and support a theory that would allow plaintiffs to secure restitution from the ODDs. *In re JUUL*

10   *Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig*., 497 F. Supp. 3d at 640, but that issue must be

11   determined on an evidentiary record at summary judgment, trial, or post-trial. *Id*.

12        Finally, the ODDs argue that Singer's full refund model overstates damages in significant

13   ways: it ignores that e-cigarettes were already popular among youth prior to the introduction of

14   JUUL and double-counts pod purchases where a youth buys from a friend who bought from a

15   retailer store. ODD Oppo. at 15-16.[23] Those arguments do not undermine predominance or raise

16   *Comcast* fit issues. They can be raised on cross-examination and argued to the trier or fact.

17        In sum, defendants' *Comcast* fit arguments fail. The other challenges to Singer's conjoint

18   surveys, including the criticisms of defendants' responsive experts, will be addressed with respect

19   to defendants' *Daubert* seeking to exclude Singer's initial and reply class certification reports.[24]

20                **c.**      **RICO**

21        Altria and the ODDs challenge the certification of the two RICO classes: the Nationwide

---

[23] In his Reply Report, Singer argues that alleged double counting is a non-issue because he bases his model in part on survey respondents' answers that would not likely include purchases for resale that disclose average patterns. *See* Singer Reply Rep. ¶ 141; *see also id*. ¶¶ 152, 155 (Singer limited his youth data set to users 18 years old and younger when they made their purchases).

[24] JLI's argument that Singer did not test for consumer preferences between the 5% pods and the 3% pods (that accounted for 8% of the pods in the class period) and that some material difference between the two products means that the 3% pod sales should be removed from the damage models is at most an argument for cross-examination.

United States District Court
Northern District of California

United States District Court
Northern District of California

RICO Purchaser Class and the Nationwide Youth Purchaser Class.[25]  Altria repeats its argument that plaintiffs' RICO theory and damages models do not fit considering that Altria's involvement only began in Spring 2017 and only touched on three of the five fraudulent RICO schemes: the Flavor Preservation, Cover-Up, and Nicotine Misrepresentation Schemes and not the earlier-in-time Fraudulent Marketing and Youth Access schemes.  But Singer was not asked to and for present purposes did not need to isolate Altria's conduct from the other RICO participants or conduct of the Enterprise.  Moreover, Altria's arguments go to the *scope* of the aggregate damages/restitution award and, relatedly, to what amount might be appropriately assessed against it if Altria is liable under the RICO claims.

The defendants' more significant arguments are that RICO's reliance, causation, and injury to business or property requirements create predominant individual issues that preclude certification of the RICO claims.

### i.      Reliance

Defendants argue that individualized issues of reliance predominate and preclude certification of the RICO classes.  Each class member deposed testified differently concerning why each started using JUUL, what they knew about JUUL and its nicotine content, and whether they had seen any marketing materials or labels prior to their use (because, according to defendants, many had not).  Due to these differences in each person's purchase and use of JUUL, defendants say that individual questions of reliance on JLI's misrepresentations and individualized beliefs about the materiality of the information omitted by JLI preclude certification of the RICO claims.  Altria Oppo. at 13-25; ODD Oppo. at 4-9.

I disagree.  As noted above, in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), the Supreme Court rejected the first-party requirement for reliance in a RICO claim based on mail fraud and rejected defendants' attempts to bring reliance in the "backdoor" under the causation analysis.  The Honorable William H. Alsup in this District rejected a similar argument in

---

[25] I refer to Altria's and the ODDs' arguments to as being made by "defendants."  The RICO arguments are joined by the other two RICO defendants, Monsees and Bowen.  Dkt. Nos. 2314, 2315.

*Postpichal v. Cricket Wireless, LLC*, 2021 WL 3403146 (N.D. Cal. Aug. 4, 2021). Judge Alsup explained that differences in "marketing materials across different regions" did not preclude predominance in a RICO false advertising case because "neither commonality nor predominance require that plaintiffs' have the same exact experience leading up to the harm." *Id.* at *6; *see also id.* ("The Supreme Court has said that RICO plaintiffs need not prove first-party reliance but do need to prove proximate cause and that in most cases this requires reliance by *someone*. In this case it would be acceptable for plaintiffs to try to prove that while not everyone relied on Cricket's representations, on their fraudulent scheme theory, a critical mass of consumers relied on Cricket's representations about 4G so as to artificially support a higher price for both phones and plans. Therefore, all customers paid more than they should have because they purchased 4G phones and plans supposedly worth more than they actually were." (emphasis in original)).[26]

Here, plaintiffs have shown through their experts how JLI used a USP consistently through its marketing materials, how it disclosed and failed to disclose information regarding nicotine content and addictiveness on its labelling and other marketing materials, and how those actions led to the exponential growth and use of JUUL products by the class members. Defendants and their experts disagree with those opinions, but that disagreement does not preclude certification. Plaintiffs' theory that JLI intentionally pursued a strategy of viral and explosive uptake of its products is based on the expert evidence and confirmed by at least *some* of the class members who *themselves* saw and relied on JLI's marketing and labelling statements, as well as other class members who may not have seen or directly relied on JLI's marketing and labelling statements at the inception of their use but who procured JUUL products from others who had seen and relied. It is sufficient at this juncture. It satisfies *Bridge's* requirement that "someone" in the chain relied sufficient for purposes of showing common, predominate proof.[27]

---

[26] The ODDs' reliance on *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at *9 (C.D. Cal. Dec. 12, 2011) is not persuasive. That case did not acknowledge *Bridge's* holding that first-person reliance was not required for RICO claims based on mail or wire fraud and addressed allegations that recruiter defendants failed to disclose the existence of a second set of recruitment fees that some class members "may have been willing to pay [] for a chance to teach in the United States, to reunite with family members in the United States, or to leave the Philippines."

[27] Altria separately argues that because "many" class members started using JUUL products before

United States District Court
Northern District of California

I acknowledge defendants' argument – supported mostly by out of circuit authority – that *Bridge's* rejection of first-party reliance should apply only in cases where circumstantial evidence makes it "reasonable to infer that each class member would only have taken the action leading to its injury if it had relied on the defendant's alleged misrepresentation. Such an inference may be available if, for example, the class members all faced 'the same more-or-less one-dimensional decisionmaking process,' such that the alleged misrepresentation would have been 'essentially determinative' for each plaintiff.'"  *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88 (2d Cir. 2015).  Defendants argue that this case is not one-dimensional, given each individual's different nicotine journey.  But here, JLI was marketing directly to consumers.  That does not raise the same concerns as those presented in the prescription drug cases (like *Sanofi*) given the lack of an intermediary prescribing physician.  Moreover, plaintiffs have presented evidence of JLI's intent to create a viral uptake in the use of its product through its marketing of youthful and healthy themes, supported by the disputed conclusions on reach, method, and content by Chandler, Emery, and Pratkanis.  At this juncture, plaintiffs have plausibly shown that "a critical mass of consumers" were likely misled by defendants' conduct.  *Postpichal*, 2021 WL 3403146 at *6.  Reliance issues do not preclude certification.

### ii.  Proximate Causation

In addition, defendants argue that the class claims fail RICO's stringent proximate causation requirement because of the class members' disparate experiences concerning when, why, and how they started using JUUL, as well as that "many" of the proposed representatives and other class members saw no JUUL marketing or labelling statements prior to their use.  *See* Altria

---

Spring 2017 when Altria was alleged to have joined the conspiracy, and 97 out of 100 plaintiffs identified in Defendants' Appendix A started using JUUL products before Altria's December 2018 formal investment in JLI, few plaintiffs could have "relied" on anything Altria did.  Altria Oppo. at 14.  To the extent this is an attribution of damages argument, that is addressed above.  To the extent Altria characterizes this as a failure of proximate cause, with respect to Altria's conduct, its reliance on *Oki Semiconductor Co.* 298 F.3d at 774 is inapposite.  There, the Ninth Circuit concluded that the "direct and proximate cause" of plaintiff's loss was not the alleged co-conspirator's acts of money laundering, it was the theft that occurred before, and therefore while the money launderer's role was "important" it was not a "substantial factor in the sequence of responsible causation."  *Id*.  Here, while Altria is directly implicated in only three of the five interrelated racketeering schemes, its role is arguably a "substantial factor" in the sequence of responsible causation.

Oppo. at 18-25; ODD Oppo. at 4-10.

Proximate cause for RICO purposes "should be evaluated in light of its common-law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged,'" and links that are "too remote," "purely contingent," or "indirec[t]" are insufficient. *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010); *see also Bridge*, 553 U.S. at 658 (proximate cause satisfied where injury was "direct result of petitioners' fraud," a "foreseeable and natural consequence of petitioners' scheme," and where there were "no independent factors that account for" the claimed injury, and "no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue."). The "proper referent of the proximate-cause analysis" is the predicate acts alleged. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id*. at 461.

Here, Altria and the ODDs attempt to bring in a first-person reliance element through RICO's proximate cause requirement, arguing that "reliance is necessary to prove causation in a RICO mail and wire fraud case such as this one." Altria Oppo. at 20-25; *see also* ODD Oppo. at 4-10. That approach has been rejected by both the Supreme Court in *Bridge* and the Ninth Circuit. In *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, consumers and a health insurer sued defendant for its failure to warn about associated risks with its diabetes drug under product liability and RICO mail fraud theories. 943 F.3d 1243 (9th Cir. 2019), *cert. denied sub nom. Takeda Pharm. Co. Ltd. v. Painters & Allied Trades Dist. Council 82 Health Care Fund*, 141 S. Ct. 86 (2020). The Ninth Circuit explained that allegations of RICO mail fraud do not require reliance. *Id*. at 1250-1251. Discussing *Bridge*, the court held:

> [T]he Supreme Court has explained [in *Bridge*] that if there is a direct relationship between a defendant's wrongful conduct and a plaintiff's alleged injury, a RICO plaintiff who did not directly rely on the defendant's omission or misrepresentation can still satisfy the requirement of proximate causation.... [T]he civil RICO statute has no reliance requirement on its face, and a person may be injured "by reason of" another person's fraud even if the injured party did not rely on any misrepresentation. Nonetheless, ... it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must

> establish at least indirect reliance in order to prove causation. This is because, logically, a plaintiff cannot even establish but-for causation if no one relied on the defendant's alleged misrepresentation.

*Id.* at 1259 (citations and quotations omitted).  The Ninth Circuit ultimately held that the plaintiffs had adequately alleged proximate cause sufficient to warrant class certification even though they had not shown that all patients who took defendant's drug directly relied on information about associated risks.  *Id.*; *see also Postpichal*, 2021 WL 3403146, at *7 ("*Takeda* makes explicit that a lack of evidence that consumers relied on a RICO defendant's misrepresentations does not foreclose a RICO theory, as long as the plaintiffs establish proximate clause somehow.").

Altria distinguishes *Bridge* and *Takeda* as excusing first-party reliance and adopting a relaxed proximate cause standard because the misrepresentations that caused plaintiffs' injuries were made to third parties.  This case, on the other hand, implicates false advertising and a "classic" first-party reliance requirement.  *See, e.g., Badella v. Deniro Mktg. LLC*, C 10-03908 CRB, 2011 WL 5358400, at *7 (N.D. Cal. Nov. 4, 2011) (where plaintiff's complaint alleged express reliance on fraudulent messages, "[d]emonstrating reliance is still an issue for the claims as alleged by Plaintiffs and brings up the problem of individualized issues predominating").[28] Altria's unduly narrow view of *Bridge* and *Takeda* has been rejected by others in this District. *See, e.g., Postpichal*, 2021 WL 3403146, at *6 ("In this case it would be acceptable for plaintiffs to try to prove that while not everyone relied on Cricket's representations, on their fraudulent scheme theory, a critical mass of consumers relied on Cricket's representations about 4G so as to artificially support a higher price for both phones and plans.  Therefore, all customers paid more than they should have because they purchased 4G phones and plans supposedly worth more than they actually were.").

As the Fifth Circuit explained in *Torres v. S.G.E. Mgt., L.L.C.*, 838 F.3d 629 (5th Cir. 2016), "this understanding of the causation requirement for fraud-based RICO claims—that such

---

[28] In *Badella*, the complaint's allegations centered wholly on affirmative misrepresentations necessarily made directly to each purported class member.  *Id.* at *7.  Here, however, the nature of the scheme alleged implicates direct and indirect reliance, considering the manner in which plaintiffs contend JLI created viral social media campaigns as well as its more traditional media campaigns that (disputedly) focused on youth and conveyed the product as a high-tech lifestyle product without disclosing its dangers.

claims, unlike most common law fraud claims, do not require proof of first-party reliance—largely dooms the Defendants' attempt to identify individual issues of causation sufficient to preclude a finding of predominance," especially where the pyramid scheme at issue there was inherently fraudulent. *Id*. at 638. Here, plaintiffs have contested evidence that their losses – overpayment for JUUL product – were caused by defendants' omissions and misrepresentations in a sufficiently direct manner as a result of JLI's intentional deployment and promotion of viral campaigns promoting messages of health and encouraging youth use. There is also evidence that JLI *intended* to create a viral sensation that would result in third-party promotion of JUUL, both through social media channels and by word of mouth. Therefore, even if some significant portion of the class did not see or rely on JLI marketing materials before their first purchase – a question debated by the parties and their experts – the particular allegations in this case may nonetheless fit within the recognized third-party proximate causation line of cases.

Plaintiffs have shown through their experts that for purposes of this motion – subject to defendants' objections at summary judgment or trial – JLI employed a consistent message/USP in its marketing as well as opinions on the methods and reach of that messaging. That showing is combined with evidence that some significant portion of class members actually saw and relied on representations and messages conveyed in JLI's marketing and labelling (first-party reliance) and the testimony of others who relied on third parties (reliance allegedly intended, promoted, and expected by JLI). As a result, proximate causation could be shown on a classwide basis. That some debatable portion of the class may not have seen or cannot recall the specific advertisements they saw prior to their first purchase, or that some may have started using JUUL because they were offered the product by friends, does not defeat certification given RICO's strict proximate causation requirement at this juncture.[29]

_____

[29] Altria cites a number of unremarkable cases holding that consumers who did not see misrepresentations until after suffering injury or who continued to purchase product after they learned of the fraud could not show that defendants' misrepresentations were a cause of their injury. Altria Oppo. at 21-22. As noted above, here injury occurs at the time a class member *purchased* a JUUL product and, as relevant for the California claims (but arguably not for the RICO claims), each of the proposed class representatives has testified that she or he saw JUUL marketing before their first purchase. Whether class members would have continued purchasing product but for their first purchases is a disputed matter subject to expert testimony as well as

United States District Court
Northern District of California

### iii.    Damage to Business or Property

Altria argues separately that RICO damages raise predominant, individualized questions precluding certification.  First, Altria argues that because many class members testified they continued purchasing JUUL after learning of the alleged RICO fraud, their harm flowed from their voluntary decision and does not suffice for injury under RICO.  *See, e.g., Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 187-88 (3d Cir. 2000) ("Unlike an ordinary RICO victim, in this case the allegedly injured plaintiffs, *i.e.*, the players, can avoid any injury simply by walking away from the alleged wrongdoers, the casinos, by not playing blackjack in casinos . . .  If the appellants have played blackjack in the past, aware of the casinos' countermeasures, and if they continue to play blackjack in the future in the hope of profiting by counting cards, they have suffered and will suffer self-inflicted wounds.").  Because identifying these individuals would require individualized inquiries, it argues, predominance is not established.

Plaintiffs' damages model is based on a price premium theory.  Plaintiffs contend that only a small fraction of class members might now know of the true dangers of using JUUL but did not know it during the largest segment of their purchases.  Regardless, purchasers may still have chosen JUUL after learning about its dangers but would have paid less for that product.  Moreover, defendants may argue that their RICO liability should terminate at some point if they can adduce proof that some widespread segment of consumers knew of the dangers as of a specific date.  This argument is akin to mitigation of harm, a defense defendants acknowledge has not been adopted under RICO in the Ninth Circuit and is not appropriately resolved at this juncture.

Altria also contends that because RICO damages are limited to damage "to business or property," RICO does not cover damages for personal injuries and therefore purchases based on or because of a user's addiction are not recoverable.  *See, e.g., City and County of San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1139 (N.D. Cal. 1997) ("Financial losses resulting from personal injury unquestionably are not recoverable under RICO."); *Varney v. R.J. Reynolds Tobacco Co.,* 118 F. Supp. 2d 63, 73 (D. Mass. 2000) ("The only economic harms recounted in

individual testimony.  This argument presents no bar to certification and is more appropriately addressed on summary judgment, at trial, or post-trial.

1    the complaint are the accumulated costs of purchasing cigarettes during plaintiff's many years of

2    smoking.  While these harms are certainly pecuniary, they are not the sort of economic harms

3    actionable under RICO.  They are instead harms that derive from personal injuries.").  Because

4    many class members testified that they were addicted to JUUL by the time of Altria's involvement

5    in the alleged RICO schemes, Altria argues that it cannot be liable to those class members who

6    would need to be identified through individualized evidence, defeating predominance.

7         But plaintiffs are not seeking recovery because of their addiction or for their personal

8    injuries.  Instead, they are seeking recovery of the price premium they allegedly paid based on the

9    theory that consumers would have paid less for JUUL products, or chosen different products, had

10   they known about the undisclosed dangers of using JUUL.

11        Altria next contends that because many of the purchases covered by the RICO class

12   definitions (purchases from brick-and-mortar or online retailers) were then resold – as supported

13   by the testimony of many minor class members who testified they bought in part from non-

14   retailers – the class-members' resold-purchases must be excised from the class and proposed

15   aggregate damages models, requiring individualized evidence precluding predominance.  This is

16   so, according to Altria, because the reselling class members suffered no economic loss by passing

17   along any overcharge and because those who resold to minors would have their claims barred

18   under the *in pari delicto* doctrine given their own wrongful conduct.  *See, e.g., Off. Comm. of*

19   *Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1155 (11th Cir. 2006) (noting "the

20   application of *in pari delicto* to bar [plaintiff's] complaint advances the policy of civil liability

21   under the federal RICO statute.").  Altria concedes that the Ninth Circuit has not adopted the *in*

22   *pari delicto* doctrine as a defense to RICO claims and district courts in the Ninth Circuit are

23   mixed.  Altria Oppo. at 29 n.30.  As with some of Altria's other suggested but unsettled

24   affirmative defenses, this one does not preclude certification.  It can be raised on summary

25   judgment or post-trial for resolution on a full evidentiary record.[30]

26   _____

27   [30] As to the claims arising under California law, plaintiffs assert that because the alleged harm is
     overpayment for the product as a result of defendant's conduct, the doctrine cannot apply because
28   class members did not engage in the *same* conduct.  *See, e.g., Casey v. U.S. Bank Nat. Assn.*, 127
     Cal. App. 4th 1138, 1143 n.1 (Cal. App. 4 Dist. 2005) ("'The doctrine of *in pari delicto* dictates

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Regarding resellers, Singer has accounted for that issue in his analysis, and defendants'

2    reseller arguments provide, at most, grounds for cross-examination.  *See* Singer Reply Rep. ¶¶

3    141, 165.

4    As a broader matter, Altria argues that the RICO Youth Class damages position (that youth

5    purchasers are entitled to full refunds) fails because RICO requires proof of "a concrete financial

6    loss" as opposed to a speculative injury; seeking a full refund is not warranted because plaintiffs

7    cannot prove that JUUL had no concrete economic value to anyone.  *See Steele v. Hosp. Corp. of*

8    *Am.*, 36 F.3d 69, 71 (9th Cir. 1994) ("We have held that speculative injuries do not serve to confer

9    standing under RICO, unless they become concrete and actual.").  In this case, however, the Youth

10   Class members by definition paid for JUUL devices as a result of the RICO activity as *purchasers*.

11   This is not a situation where there was no harm from alleged illegal conduct[31] or where any direct

12   harm flowed only to government entities or others.  *See, e.g., Rezner v. Bayerische Hypo-Und*

13   *Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010) ("It was the United States that lost tax revenue

14   as a direct result of HVB's fraud.  Rezner's asserted injury only indirectly resulted from HVB's

15   fraudulent activity against the United States.").  Here, the Youth Class members were allegedly

16   harmed themselves.

17   Altria notes that plaintiffs' main case in support of a full refund is a California Court of

18   Appeal case that arose under the UCL (seeking restitution) and not under RICO (seeking

19   damages).  *See, e.g., Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 157.  But the contrary

20

21   that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another
     participant in that conduct, the parties are deemed *in pari delicto*, and the law will aid neither, but
22   rather, will leave them where it finds them." (quoting *Smith ex rel. Boston v. Arthur Andersen*
     *L.L.P.*, 175 F. Supp. 2d 1180, 1198 (D. Ariz. 2001)).

23   [31] *Dumas v. Major League Baseball Properties, Inc.*, 104 F. Supp. 2d 1220, 1223 (S.D. Cal. 2000),

24   *aff'd sub nom. Chaset v. Fleer/Skybox Intern., LP*, 300 F.3d 1083 (9th Cir. 2002) (where there was
     no allegation of fraudulent conduct by defendants that caused plaintiffs harm, the fact that
25   defendants' conduct – selling a pack of cards with a chance to win – might be construed as "illegal
     gambling" under state law did not injure plaintiffs in their business or property to confer RICO
26   standing); *Adell v. Macon County Greyhound Park, Inc.*, 785 F. Supp. 2d 1226, 1239-40 (M.D.
     Ala. 2011) ("Hence, even if the chance to win that Plaintiffs paid for was illegal under state law,
27   such illegality in and of itself would not transform Plaintiffs' gambling losses into civil RICO
     property losses," and noting plaintiffs "fail to plead facts connecting the alleged rigging of any
28   electronic bingo machine (i.e., the alleged fraudulent and dishonest conduct) to an injury suffered
     by them.").

cases Altria relies on under California's UCL that reject full refund models are "mislabeling" cases where, despite the misrepresentation, consumers did not contest that there was some value to consuming the mislabeled product. The inapplicability of those cases to the claims here has been addressed above. Altria cites no RICO cases rejecting a full refund model.[32]

### d.   UCL, CLRA, FAL

Defendants argue that plaintiffs have failed to provide sufficient evidence that every member of each class was exposed to the allegedly misleading marketing material JLI promoted. They contend that consumers of JUUL products were exposed to differing and varied advertising campaigns and those campaigns were not sufficiently widespread to justify the application of the *In re Tobacco II*[33] presumption in support of the consumer protection fraud-based claims under the UCL, FAL, and CLRA.[34]

As recognized in *In re Tobacco II*, and reiterated by numerous Ninth Circuit opinions that followed, as long as named plaintiffs are able to demonstrate reliance on JLI's marketing that caused them injury, a presumption of reliance arises to on behalf of all class members. *Walker v. Life Ins. Co. of the S.W.*, 953 F.3d 624, 630-31 (9th Cir. 2020).[35] In the case of misrepresentations, that "conclusive presumption" of reliance arises only where "the defendant so

---

[32] Finally, Altria argues that class members who continued to purchase JUUL after learning of the alleged fraud "failed to mitigate" their RICO damages. Altria Oppo. at 22 n.26. Altria acknowledges that the Ninth Circuit has not addressed whether mitigation is a defense to a RICO claim, *id.*, and I will not consider this theory as a reason to deny class certification.

[33] *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009).

[34] The California Youth Class claim under the UCL requires a separate analysis below.

[35] Defendants contend and plaintiffs do not dispute that the three named plaintiffs put forward to represent the two California classes must eventually prove actual reliance on defendants' affirmative misrepresentations and the materiality of omitted information to have standing on behalf of the class under the fraud-based UCL, FAL and CLRA causes of action. *Walker*, 953 F.3d at 630 ("The California Supreme Court interpreted this statute to mean that named plaintiffs, but not absent ones, must show proof of 'actual reliance' at the certification stage.'"). The ODDs argue that such actual reliance must be proved, as opposed to alleged, at the class certification stage. Plaintiffs, however, have adduced sufficient proof for this juncture. *See supra* (noting plaintiffs' reliance on named plaintiffs' interrogatory responses to support reliance at the class certification stage). While defendants point to deposition testimony in an attempt to show that C.D. and L.B. gave contradictory or inconsistent testimony about what they saw and relied on, those cites do not definitely resolve the question and create at most a dispute of material fact that can be explored at trial.

United States District Court
Northern District of California

pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them." *Id.*at 631 (UCL).

"To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision." *Daniel v. Ford Motor Co*., 806 F.3d 1217, 1225 (9th Cir. 2015) (CLRA). "That one would have behaved differently can be presumed, or at least inferred, when the omission is material." *Id*. (citing *Tobacco II*, 93 Cal. Rptr. 3d 559). An omission is material if a reasonable consumer "would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question. *Id*.

### i.   Marketing – Presumption of Reliance

Plaintiffs allege that defendants' "fraudulent scheme conveyed that JUUL products were less addictive than combustible cigarettes, and omitted material information to the contrary." CC Mot. at 15. The basis of plaintiffs' misrepresentation claims regarding marketing is their contention that "JUUL marketing [] contained deceptive statements and omissions because (1) JUUL branding and marketing was pervasive and JUUL purchasers were exposed to Defendants' messaging and (2) the messaging, although using different imagery and wording, conveyed consistent messages about JUUL products that would be likely to deceive reasonable consumers in similar ways." CC Mot. at 24-28; CC Reply at 18-29 (with "reach" supported by Chandler's opinions and "message" supported by Pratkanis's opinions).

Defendants argue that there can be no presumption of materiality under the California consumer protection statutes because there is insufficient evidence that the same misrepresentation reached all or substantially all of the purchasers in the class. JLI Oppo. at 28-37. They note the variations in the themes between JLI's different marketing campaigns over the course of the class period and the variations over time in the channels used and amount spent on those channels.

Defendants rely, first, on plaintiffs' experts and class members' testimony to substantiate their position that JLI's campaigns were often "short-lived," utilized different channels (*e.g.,* print, television, social media, or point-of-sale), and had different "themes" over time to reach different

43

United States District Court
Northern District of California

1    audiences undermining any presumption of reliance.  JLI Oppo. at 28-30.  While the named class

2    representatives testified that they saw, or recalled seeing, or could not recall seeing different parts

3    of JLI's various marketing campaigns disseminated through different channels, that does not

4    defeat a presumption of reliance.  The proposed California class representatives testified to seeing

5    *some* JLI marketing material prior to their first purchase and to the misleading impressions that

6    material made on them.  Of course, at trial each of the named representatives of the California

7    class will have to prove their adequate reliance on full or partial misrepresentations.

8         More significantly, JLI mis-characterizes the testimony of plaintiffs' experts who opine

9    that JLI's strategy was to initially lay the groundwork through traditional media and more-heavily

10   through social media to make JUUL a viral sensation.  *See generally* Emery Report [Dkt. No.

11   1772-22]; Supplemental Emery Report [Dkt. No. 2439-9]; Chandler Report [Dkt. No. 1772-21];

12   Pratkanis Report [Dkt. No. 1772-20].  These experts support plaintiffs' position that given the

13   early efforts of JLI in 2015 and 2016, supported by more modest marketing spends in 2017 and

14   2018, the groundwork had been laid for a "bigger phenomenon" and for JUUL's "exponential

15   growth."  They also support plaintiffs' point that JLI continued to support its social media

16   marketing, even while creating some campaigns to capture different demographics (like older,

17   exiting smokers) using more traditional media channels.  As discussed more below in connection

18   with defendants' *Daubert* motions concerning Chandler, Emery, and Pratkanis, for purposes of

19   class certification plaintiffs have shown how through common, classwide proof they can

20   demonstrate the widespread reach of JLI's very successful campaigns.  Defendants are entitled to

21   attack those opinions on summary judgment or trial.[36]

22        JLI and the ODDs argue that this case is distinguishable from the *In re Tobacco II Cases*

23

24   [36] Disputes about how much social media content was from JLI or sponsored by JLI – or was the
     result of third-party conduct not under JLI's control – likewise do not defeat predominance.  JLI
25   will be free to cross-examine Emery or any of plaintiffs' other experts to determine whether they
     distinguish the impact of JLI-controlled or sponsored content from third-party content and, if not
26   why not.  As discussed at various points in this Order, the parties dispute whether Emery was
     required to separately analyze JLI's own social media content versus third-party content.  Part of
27   Emery's opinion supported by the references she relies on and her research is that a main purpose
     of corporate use of social media to introduce and market a product is to spur third-party content to
28   create the viral response JUUL allegedly achieved.

because the JUUL advertising campaign was not decades long (as it was there).  But the

appropriateness of applying the "presumption of reliance" does not depend on the *length* of

marketing campaigns containing or furthering the impact of a misrepresentation as much as on the

campaigns' "reach."  Here, there is classwide proof showing the "message" or USP of JUUL was

received by a significant portion of the class members – Californians who purchased JUUL

products from brick and mortar or online retailers – that supports the presumption.[37]

　　　　With respect to content, plaintiffs' expert Pratkanis opines that all of JLI's campaigns

convey a similar message or USP (of a tech lifestyle and product that satisfies, that is free of

health and safety risks), despite variations in words, themes, or target audiences.  Pratkanis Report

at 6.  Chandler opines that JLI's marketing (and therefore the USP described by Pratkanis) would

have reached nearly all purchasers.  Chandler Report at 3, 112-113.

　　　　As discussed below, defendants vigorously attack these experts' opinions.  The vast

majority of those attacks bear on the weight and not the admissibility of these opinions.  For

example, defendants repeatedly attack Pratkanis's conclusions that JLI's marketing conveyed a

similar "USP" by contending that Pratkanis improperly skimmed over the variations in the content

of the advertisements: For example, the Vaporized campaign used bright colors, young models,

---

[37] JLI relies on *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 644 (N.D. Cal. 2018).  There, where an alleged securities misinformation campaign was at issue, the court declined to apply the presumption of reliance on multiple grounds.  One was that the "campaign" lasted less than two years.  *Id*. at 644.  The court found that comparable to "the roughly three-year campaign" that was insufficient in *Mazza v. Am. Honda Motor Co*., 666 F.3d 581 (9th Cir. 2012); the 16–month advertising campaign that was insufficient in *In re Clorox Consumer Litigation*, 301 F.R.D. 436, 439 (N.D. Cal. 2014); the two-and-one-half-year advertising period in *In re MyFord Touch Consumer Litig*., No. 13-cv-03072-EMC, 2016 WL 7734558, at *22 (N.D. Cal. Sept. 14, 2016); and the one-year class period in *Ehret v. Uber Techs., Inc*., 148 F. Supp. 3d 884 (N.D. Cal. 2015).  However, in each of those cases, the *Tobacco II* presumption was rejected for a number of reasons beyond the mere duration of the advertising campaigns.  For example, the *Colman* court also relied on the fact that plaintiffs offered "little evidence to suggest that the nature of Theranos's publicity campaign warrants a presumption of exposure and reliance."  325 F.R.D. at 644–45.  Here, there is ample disputed evidence.  In *Ehret*, the court did not rely solely on the duration of the campaign but also rejected the claim based on the manner in which Uber advertised the challenged 20% gratuity representations.  *Id*. at 900-901 (no evidence class was "highly likely" to have been exposed where many Uber users may have never visited the website or blogs were the misrepresentation was made and even if they did the actionable language was not highly visible).  Finally, the campaigns at issue in this case lasted at least four years (through Chandler's 2019 reach estimates), although defendants dispute the consistency of those campaigns and whether any USP flows from the different campaigns over those years.

and "encouraged" fun whereas the "Make the Switch" advertisements were "staid" and aimed at current smokers 35 and over.  They say that Pratkanis and Chandler admitted in deposition that the different advertising campaigns and branding initiatives changed over time.  Those challenges are either not well-taken (mischaracterizing Pratkanis's testimony) or provide grounds for cross-examination but not exclusion.[38]

Defendants also argue that Emery admitted in her deposition that the youth-directed advertising was limited in time and that the majority of JLI advertising was not youth-directed.  *See* JLI Oppo. at 11; ODD Oppo. at 10-11.  Plaintiffs respond that Emery was discussing the advertisements shown to her only in her deposition through the lens of the Tobacco Master Settlement agreement ("MSA") that prohibited use of cartoonish imagery and advertisements that were beyond the timeframe of her analysis.  And she testified that "Juul's owned campaign changed somewhat over time in certain elements of the execution.  There's a brand consistency that remains across the campaign."  July 30, 2021, Deposition Transcript of Dr. Sherry L. Emery ("Emery Depo. Tr.") [Dkt. No. 2310-3] at 153, 158.  The discussion of the later advertisements likewise does not undermine her opinions based on the earlier marketing strategies and advertisements that fueled the explosive growth of social media content in 2017.  *Id.* at 158-160, 163.

Similarly, Chandler recognized JLI's "rebranding" efforts, clarifying that JLI was changing the "marketing mix" of the channels and target-audiences for particular advertisements and other

---

[38] For example, JLI contends that Pratkanis admitted that later advertisements did not look like the earlier advertisements.  JLI Oppo. at 33.  But Pratkanis testified that even though words and terms changed in various advertisements (*e.g.*, "Vaporized" was followed by "Smoking Evolved") the advertisements still carried the same implication that the product was "good for your lifestyle" and were still part of the "overall marketing communications to drive home that what we have called the unique selling proposition."  July 15, 2021, Deposition Transcript of Dr. Anthony Pratkanis [Dkt. No. 2310-4] at 330-335.  Defendants' cases recognize – assuming the trier of fact agrees with Pratkanis and plaintiffs' other experts – that where advertisements are "similar enough" in the material aspects, the presumption of reliance can apply.  *See Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1050 (N.D. Cal. 2014) ("if a plaintiff alleges a long-term advertising campaign, the advertisements at issue should be similar enough to be considered as part of one campaign, or the delivery of a single message or set of messages, rather than a disparate set of advertising content published in the ordinary course of commerce."); *but see Campion v. Old Republic Home Protec. Co., Inc.*, 272 F.R.D. 517, 538 (S.D. Cal. 2011) rejecting presumption of reliance where plaintiffs alleged defendants made different *types* of  misrepresentations and the misrepresentations were made through materially different means).

1    marketing initiatives. July 12, 2021, Deposition Transcript of John Chandler ("Chandler Depo.

2    Tr.") [Dkt. No. 2310-2] at 111-112.  That does not undermine Chandler's estimates of the

3    pervasive reach of JLI's marketing.  *Id.*

4         That the "look" of particular advertisements varied, that different text was used, or that

5    different channels delivered the messages, does not necessarily undermine plaintiffs' experts'

6    opinions that the themes and USP were consistent across the relevant time periods.  Defendants

7    disagree with the conclusions of Pratkanis, Emery, and Chandler, but as explained below, the

8    experts' methodology is reliable and their background is sufficient to make their opinions

9    admissible at this juncture.

10        JLI's argument about "the mix of information and cluttered environment" in which it

11   marketed its product in competition with traditional tobacco and other e-cigarette products does

12   not defeat certification.  Nor does the start of investigations by the government and media of the

13   health and safety of e-cigarettes at some undefined point during the class period, or that JLI began

14   using a "black box warning" about nicotine in mid-2018.  JLI will be free to argue at the

15   appropriate points (on summary judgment, trial, post-trial) that a reasonable consumer who

16   purchased after a certain date could not have been misled by its representations or omissions about

17   its products given the other information in the market or given the addition of the "black-box"

18   nicotine warning on JUUL's packaging.  *See, e.g., Broomfield v. Craft Brew All., Inc*., 17-CV-

19   01027-BLF, 2018 WL 4952519, at *12 (N.D. Cal. Sept. 25, 2018) ("Likewise, CBA's argument

20   regarding class members' potential exposure to other information about the brewing location is

21   irrelevant, as the fundamental question that predominates is whether the packaging was materially

22   misleading to a *reasonable* consumer." (emphasis in original)).

23        JLI relies on *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc*., CV 14-7242-DMG (KSx), 2016

24   WL 5920345, at *7 (C.D. Cal. June 23, 2016), where the court refused to certify a class

25   challenging defendants' product packaging.  There "defendants' product packaging and

26   advertising confirms that there was a lack of uniformity" as to the alleged misrepresentation.  *Id*. at

27   *7.  The defendants there presented unrebutted "surveys" showing that "consumers relied on a

28   variety of factors in choosing a TV and undermining common materiality of statements regarding

United States District Court
Northern District of California

47

1    LED-TV labels." *Id*.  While defendants make similar augments here regarding each plaintiff's

2    individualized nicotine journey, plaintiffs respond that for purposes of this economic loss case the

3    injury is the same; had consumers known about the health and addiction risks of JUUL they would

4    have paid less or purchased other nicotine products.

5          Additionally, that a consumer may consider many factors in determining whether to

6    purchase a product does not mean that misrepresented or omitted information cannot be material.

7    For example, in *Broomfield v. Craft Brew Alliance, Inc*., 17-CV-01027-BLF, 2018 WL 4952519,

8    at *10 (N.D. Cal. Sept. 25, 2018), defendants argued that purchasing beer was a "multifactorial"

9    process for which class members' "state of mind" were too varied for common issues to

10   predominate as to materiality and reliance. *Id*. at *10.  As the Honorable Beth L. Freeman of this

11   court explained, "the question at this stage is not whether Plaintiffs have successfully proven

12   materiality, but rather whether the materiality inquiry is a common question susceptible to

13   common proof that helps to establish predominance." *Id*.  Significant to this discussion,

14   "Plaintiffs need not prove that the alleged misrepresentation is the only material factor to their

15   purchasing decisions to prove materiality," it just has to be a material one. *Id*. at *12; *see also id*.

16   ("[Defendant] is simply incorrect when it argues that the class members' subjective preferences or

17   individual beliefs about the packaging will be at issue. The consumer claims require an objective

18   test, asking what the reasonable consumer would believe or think upon exposure to the misleading

19   statement."); *Hadley v. Kellogg Sales Co*., 324 F. Supp. 3d 1084, 1116-17 (N.D. Cal. 2018)

20   (rejecting argument that because consumers buy a product for a variety of reasons predominance is

21   not met, because under "California law, Plaintiff is not required to prove that the challenged health

22   statements were "'the sole or even the predominant or decisive factor influencing'" the class

23   members' decisions to buy the challenged products" and noting justifications for purchase are a

24   merits dispute as to materiality that can be "resolved classwide").

25          The cases defendants rely on are distinguishable.  In *Walker*, the Ninth Circuit reiterated

26   that "in UCL cases, (1) exposure is relevant to predominance, but only to establish reliance, and

27   (2) a district court does not err *per se* by not considering the class-membership question under the

28   predominance prong."  953 F.3d at 632.  The Ninth Circuit affirmed the district court's order that

United States District Court
Northern District of California

(i) declined to certify a broad class of all plaintiffs who purchased specific insurance policies but (ii) granted certification of a more limited class of plaintiffs who received pre-application illustrations that allegedly violated California law *despite* defendants' objections that certification failed the predominance test because plaintiffs should be required to prove that each class member "saw the illustrations, had the alleged misunderstandings, and did not receive other information to eliminate the potential misunderstandings." *Id.* at 631.

In *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012), the Ninth Circuit concluded that the alleged misrepresentations in that case (regarding the Collision Mitigation Braking System ("CMBS")) did not support a presumption of reliance "because it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited." *Id.* at 595. The advertising regarding the CMBS in *Mazza* was limited to a brochure, on-site videos, a limited magazine advertisement, and two television ads (one that ran for a week in 2005 and another that ran from February to September 2006). That fell short of the "extensive and long-term [fraudulent] advertising campaign" at issue in *Tobacco II*. *Id.* at 596.[39] Here, as demonstrated by the disputed opinions of Emery, Pratkanis, and Chandler, the extent and reach of JLI's marketing campaigns regarding the central characteristics of the product was significantly deeper than the marketing regarding the one aspect of the braking system in *Mazza*.

In *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011), the court recognized that "[i]f the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified." *Id.* at 1022-23. The court agreed with the district court that materiality could not be presumed

---

[39] Nor is this a case like *Philips v. Ford Motor Co.*, 14-CV-02989-LHK, 2016 WL 7428810, at *16 (N.D. Cal. Dec. 22, 2016), *aff'd*, 726 Fed. Appx. 608 (9th Cir. 2018) (unpublished). There, looking not to the general mix of information in the marketplace but to defendant's own affirmative warning about the alleged defect plaintiffs sued over, the court declined to find a presumption of reliance sufficient for class certification under the CLRA. Other than the mid-2018 black box nicotine warning – the meaning and efficacy of which is disputed by plaintiffs – JLI points to no disclosures *by JLI* regarding the addictiveness of their particular product or disclosures regarding the way nicotine was delivered by their particular product that would undermine a presumption of reliance on JLI's own misrepresentations or the materiality of the information JLI omitted to disclose.

49

classwide in large part because the class definitions were fatally overbroad and included class members who intended to be enrolled in the service challenged by plaintiffs. *See id*. at 1024 ("Notable are the myriad reasons that someone who was not misled and intentionally signed up might have chosen not to take advantage of the available product by actually printing a coupon or obtaining a rebate for some period. Perhaps, for example, the person had been ill, or distracted by family emergencies, or just did not see anything that he really wanted during that time. Or, perhaps, a person decided after a few months that the premiums were not worth the price of admission. But all of those people would have been swept willy-nilly into the class."). Because "it might well be that there was no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant," given how the sign-up process for the service occurred, certification was not appropriate. *Id*. at 1020.

The record here is markedly different. There is significant (contested) expert support for materiality and the presumption of reliance. That alone distinguishes this case from defendants' remaining cases. *See In re 5-Hour Energy Mktg. and Sales Pracs. Litig*., ML132438PSGPLAX, 2017 WL 2559615, at *7 (C.D. Cal. June 7, 2017) (declining to apply presumption of reliance because plaintiffs "have not shown that they are entitled to the presumptions because they have not made a sufficient showing that the statements on the 5HE label were material to the class" in response to an unrebutted defense survey showing immateriality); *Berger v. Home Depot USA, Inc*., 741 F.3d 1061, 1069 (9th Cir. 2014), abrogated by *Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) (no classwide evidence that significant portion of class members were exposed to misrepresentations and given different contracts used by defendants and no evidence of common oral misrepresentations, "[i]t was logical, plausible, and supported by the record for the district court to determine that any common questions shared by Berger's primary class do not predominate over the individual questions of contract interpretation."); *In re Clorox Consumer Litig*., 301 F.R.D. 436, 445-446 (N.D. Cal. 2014) (plaintiffs failed to rebut defendants significant evidence that the challenged representation did not reach any significant amount of consumers, precluding a presumption of reliance); *Zakaria v. Gerber Products Co*., LACV1500200JAKEX, 2016 WL 6662723, at *8 (C.D. Cal. Mar. 23, 2016) (declining to find a presumption of reliance

where "the alleged misrepresentations were not prominently displayed"); *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1050 (N.D. Cal. 2014) (dismissing case where plaintiff had failed to provide enough specifics regarding the content, duration, or dissemination of allegedly misleading advertisements); *Todd v. Tempur-Sealy Intl., Inc.*, 13-CV-04984-JST, 2016 WL 5746364, at *12 (N.D. Cal. Sept. 30, 2016) (rejecting presumption of reliance where vast majority of products sold by third-parties who did not make alleged misrepresentation); *Butler v. Porsche Cars N.A., Inc.*, 16-CV-2042-LHK, 2017 WL 1398316, at *11 (N.D. Cal. Apr. 19, 2017) ("because Plaintiff never clearly defines the nature of the defect in this case, Plaintiff also never clearly defines what information Porsche failed to disclose to consumers.  Furthermore, Plaintiff never states what Porsche material class members viewed prior to purchase, or whether class members interacted with a Porsche representative prior to purchase.  In the absence of any such allegations or evidence, Plaintiff has given the Court no basis to find that all class members were exposed to a Porsche representation with omissions.").

For purposes of certification of the California UCL, FAL, and CLRA claims, named plaintiffs have shown actual reliance and materiality of the omitted information from JLI's marketing.  Similarly, through the disputed but admissible expert opinions of Emery, Pratkanis, and Chandler, plaintiffs have shown the pervasiveness of JLI's successful marketing strategy and the consistency of the message or USP of JUUL to support a presumption of reliance for absent class members on JLI's marketing materials.[40]

### ii.     Labelling – Presumption of Reliance

The basis of plaintiffs' misrepresentation claims are "[t]he fact that the product labels consistently compared the nicotine content of JUUL pods with" about one pack of combustible cigarettes, when that comparison was false or materially misleading, and the statements on packages that JUUL is an "alternative for adult smokers."  CC Mot. at 21, 24.  Defendants contend that plaintiffs' claims that JLI's labelling statements were likely to deceive a reasonable consumer

---

[40] Defendants do not directly engage with plaintiffs' omission-based theory in support of certification of their California classes.  Materiality for the omissions-based claim is established, for purposes of class certification, based on the same presumption of reliance sufficient for the misrepresentation-based claims.

into believing that JUUL products would not be more addictive than combustible cigarettes are preempted. *See Colgate v. JUUL Labs, Inc*., 345 F. Supp. 3d at 1189 (dismissing claims "based on the product label failing to disclose the greater potency and addictiveness of JUUL's benzoic acid and nicotine salt formulation" as expressly preempted by the TCA); *In re Juul Labs, Inc., Mktg., Sales Pracs, and Prods. Liab. Litig.*, 497 F. Supp. 3d at 587-588 (noting nicotine addiction-based labeling claims that "implicate[] the nicotine addiction warning specifically approved and required by the FDA" were preempted but declining to reach whether other disclosures are preempted to the extent they are "different from or in addition to" the "minimum" nicotine addiction warning mandated by the FDA).

Plaintiffs respond that this issue does not defeat certification but, at most, is a merits issue to be addressed at summary judgment. In any event, it is incorrect because "false and misleading" labels are not preempted. I agree. It is true, as discussed elsewhere, that Singer's surveys use disclaimers that products are "as addictive" as "about 1 pack of cigarettes." But the use of those "as addictive" disclosures, based on JLI's own packaging statement that is not the FDA mandated nicotine-addiction warning, does not mean that plaintiffs' claims are not certifiable or that Singer's analysis is excludable.

JLI also argues that the statements do not support class certification because the labelling statements (regarding equivalency to a pack of cigarettes and an alternative to cigarettes) were only on product labels for parts of class period and varied over time. Those arguments, if proven on an evidentiary basis, might require a narrowing of the scope of certain classes on summary judgment or post-trial. They do not defeat certification.

Finally, JLI argues that because the label disclosures it did make were discrete and not prominent on the packaging, the presumption of reliance cannot apply. I thoroughly considered and rejected that defense to certification (as well as the cases JLI relies on here) in another recent labelling case. *See Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 565 (N.D. Cal. 2020) (concluding that prominence of statements on a label is not relevant to a presumption of reliance and, at most, is a dispute as to materiality to be resolved by the jury). JLI identifies no new

precedent or other reason why I should reexamine that conclusion; I will not do so.[41]

### iii.     Materiality – Presumption of Reliance

JLI likewise attacks plaintiffs' showing in support of materiality to support the presumption of reliance, contending that materiality differs depending on whether each class member was a longtime adult-smoker, a nicotine addict, an individual who had never smoked before, or a youth, and whether class members knew JUUL was addictive prior to their use.  JLI Oppo. at 37-38.  But the apposite legal standard is whether the misrepresented or omitted information would be material to a reasonable consumer.  *See, e.g., Hadley v. Kellogg Sales Co*., 324 F. Supp. 3d 1084, 1115-16 (N.D. Cal. 2018) ("the questions of whether the challenged health statements were misleading and material must be evaluated according to an objective 'reasonable consumer' standard . . . Further, because deception and materiality under the FAL, CLRA, and UCL are objective questions, they are 'ideal for class certification because they will not require the court to investigate class members' individual interaction with the [challenged] product[s].'" (internal citations omitted)).

While testimony from class members about what they understood is not irrelevant, plaintiffs do not have the "burden to establish that there is a uniform understanding among putative class members as to the meaning of [the information at issue], or that all or nearly all of them shared any specific belief."  *Pettit v. Procter & Gamble Co*., 15-CV-02150-RS, 2017 WL 3310692, at *3 (N.D. Cal. Aug. 3, 2017) (relying on *Ebner v. Fresh, Inc*., 838 F.3d 958, 965 (9th Cir. 2016)).  Instead, plaintiffs will bear the burden of showing a "significant portion" of the relevant consumers acting reasonably "could be misled."  *Id*.; *see also Hadley v. Kellogg Sales*

---

[41] Defendants argue briefly that online purchasers would not have been exposed to any product labelling prior to their online purchases and, therefore, the presumption of reliance cannot extend to them and they should be excised from the classes.  JLI Oppo. at 37.  Given the context and record in this case – especially considering that class members were typically repeat purchasers of a product whose sole purpose is the delivery of nicotine – that some online purchasers may not have viewed the package prior to one or more purchases is not significant at this juncture (although possibly relevant to damages or restitution).  JLI's large item or one-time purchasing cases where the representations are not received until post sale are not persuasive. *See Daniel v. Ford Motor Co*., 806 F.3d 1217 (9th Cir. 2015) (where misrepresentations contained in documents provided post-sale); *McCrary v. Elations Co., LLC*, EDCV 13-00242 JGB OP, 2014 WL 1779243, at *11 (C.D. Cal. Jan. 13, 2014) (excising online purchasers of supplement from class definition).

United States District Court
Northern District of California

1    *Co.*, 324 F. Supp. 3d 1084, 1095 (N.D. Cal. 2018) (the question is how an objective "reasonable

2    consumer" would react to a statement, and not whether individual class members saw or were

3    deceived by statements).  Nonetheless, for each of the proposed California class representatives,

4    plaintiffs identify why the misrepresented and omitted information would have been material to

5    them.  *See* Pls. Appendix B [Dkt. No. 2439-6] at 4, 45-47, 120-121.  Plaintiffs' experts – primarily

6    Emery and Pratkanis – likewise provide a basis for classwide proof of materiality under the

7    reasonable consumer standard.

8         Defendants' cases are inapposite.  Some failed for lack of classwide proof that plaintiffs

9    have provided here.  The classes sought in *Stearns* (including consumers who intentionally and

10   with full knowledge signed up for the challenged rewards program) were not only fatally

11   overbroad but reliance could not be presumed because class members were exposed to "quite

12   disparate information from various representatives" given how the sign-up process occurred.

13   *Stearns*, 655 F.3d at 1020, 1024; *see also In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129,

14   134 (2009) (materiality could not be presumed because the "decision to prescribe Vioxx is an

15   individual decision made by a physician in reliance on many different factors, which vary from

16   patient to patient"); *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1047 (C.D. Cal.

17   2018) (no classwide presumption of materiality where plaintiffs' expert's results showed the

18   challenged statement only factored into a small percentage of consumers' purchasing decisions);

19   *Jones v. ConAgra Foods, Inc.*, C 12-01633 CRB, 2014 WL 2702726, at *15 (N.D. Cal. June 13,

20   2014) (no classwide presumption of materiality where expert did not substantiate her opinion as to

21   a reasonable consumer's reliance on the term "natural" or provide any opinion regarding a

22   "controlling definition of the word 'natural.'"); *In re: First Am. Home Buyers Prot. Corp. Class

23   Action Litig.*, 313 F.R.D. 578, 607 (S.D. Cal. 2016), *aff'd*, 702 Fed. Appx. 614 (9th Cir. 2017)

24   (court concluded plaintiffs failed to submit evidence in support and it was "implausible" that three

25   separately situated categories of individuals (home sellers, real estate agents, and buyers/owners)

26   would have attached "the same importance" to representations in home warranty marketing

27   materials).

28         Defendants' arguments on materiality ignore the claims that plaintiffs are actually making.

54

1    The question is whether it would have been material to a reasonable consumer – someone who

2    purchased JUUL – that JUUL products were portrayed as healthy but engineered and designed to

3    make them more addictive and that use of those products created health hazards.  Defendants

4    provide no evidence or argument how the fact that some purchasers knew JUUL had nicotine and

5    some did not undermines the materiality of the alleged misstatements and omissions.  Nor do they

6    explain how the misrepresented or undisclosed information was immaterial for a significant

7    portion of the class simply because some purchasers were new to nicotine and others were

8    cigarette smokers.

9           The undisputed fact that each individual will have a unique journey to nicotine addiction

10   likewise does not mean the misrepresented or omitted information was not material in part to a

11   reasonable consumer's decision to purchase the product.  Similarly, defendants' expert's opinion

12   that the majority of JUUL users were exposed to nicotine before their first use of JUUL (either

13   through traditional cigarettes or other e-cigarettes, especially in the early lifecycle of JUUL),

14   Expert Report of Dominique Hanssens [Dkt. No. 2310-10] ¶ 73, does not diminish materiality

15   where there were other products on the market that were – according to plaintiffs – less subject to

16   abuse, more likely to help those whose intent was to transition away from nicotine addiction, and

17   less expensive.[42]

18          Finally, materiality does not have to be the sole or even causal factor that triggers a

19   consumer's purchase.  Under California law, "a misrepresentation is deemed material "if 'a

20   reasonable man would attach importance to its existence or nonexistence in determining his choice

21   of action in the transaction in question' [citations], and as such materiality is generally a question

22   of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not

---

[42] Defendants' reliance on *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 134 (Cal. App. 2 Dist. 2009) is perplexing.  There, classwide materiality could not be shown given that the benefits of *Vioxx* for those with gastrointestinal risk outweighed the risks from cardiovascular death (and given the role of doctors in prescribing Vioxx that interrupted any showing of materiality as to the end consumer).  Here, defendants do not identify any evidence – expert or otherwise – of a particular benefit to their product that outweighs the *undisclosed* risks challenged by plaintiffs. That an existing smoker might want to use JUUL to ween herself off cigarettes and decrease the health risks from traditional tobacco will obviously be important to those class members, but had the undisclosed risks that plaintiffs have shown been disclosed, those existing-smokers could have selected a different product to help them.

United States District Court
Northern District of California

1    reasonably find that a reasonable man would have been influenced by it.'" *Steroid Hormone Prod.*

2    *Cases*, 181 Cal. App. 4th at 157 (quoting *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th

3    951, 977 (1997)).

4    　　　There will always be differences between purchasers of consumer products.  Unless those

5    differences cause them to view the misrepresentations or react of the omitted information in a

6    significantly different matter, those distinctions do not undermine the disputed but sufficient

7    showing by plaintiffs of a presumption of classwide materiality.

8    　　　　　　　　　　　**iv.**　　　**California Youth Class Claims**

9    　　　Defendants spend little time addressing the certifiability of the California Youth Class

10   claims, other than the general attack on causation and the challenge to full refund

11   damages/restitution model discussed above.  They do argue that the California Youth Class cannot

12   be certified under a presumption of exposure because plaintiffs' experts testified that the youth-

13   oriented advertising campaigns were short lived.  But that misconstrues plaintiffs' experts'

14   testimony that the Vaporized and early social media and point of sale campaigns laid groundwork

15   for exponential growth in use (*see* Emery Reply Report at 3-4, 23, 27, 36; Pratkanis Reply Report

16   [Dkt. No. 2439-10] at 35-37).  Further, it ignores that part of plaintiffs' claim is based on JLI's

17   intentional use of flavors and design features (including the light up party mode, the concealability

18   of the device even when used) to appeal to youth.  *See, e.g.*, Emery Report at 11-12.

19   　　　　　　　　　　　**e.**　　　**Common Law Fraud**

20   　　　The common law fraud claims underlie *in part* only the California Purchaser Class.  JLI

21   attacks them, relying on *Colman*, which recognized that "[b]y its nature, reliance is an

22   individualized inquiry that demands individualized proof unless a presumption of reliance applies"

23   and the "precedent in the context of false advertising claims for inferring reliance where large-

24   scale advertising makes it highly likely that all putative class members were exposed to a material

25   misrepresentation." 325 F.R.D. at 641.

26   　　　Of course, plaintiffs' theory is that large-scale advertising created exposure to JLI's

27   material misrepresentations.  That is the exact theory that was recognized by the California

28   Supreme Court in *Tobacco II Cases*. As with the claims discussed above, defendants may dispute

United States District Court
Northern District of California

and challenge the opinions of Chandler, Emery, and Pratkanis regarding the reach, impact, and message of JLI's marketing activities, but those arguments at this juncture are sufficient to support a method of showing classwide impact.

### f.        Unjust Enrichment

Separate from the *Sonner*/duplicative damages issue discussed below, JLI contends that the unjust enrichment claim cannot be certified because whether receipt of a benefit was unjust depends on individualized determinations about the circumstances between each proposed class member and each defendant.  *See, e.g., Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 684 (9th Cir. 2009) ("The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it.") (*quoting First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1663 (Cal. App. 6 Dist. 1992)); *Ono v. Head Racquet Sports USA, Inc.*, CV 13-4222 FMO (AGRx), 2016 WL 6647949, at *15 (C.D. Cal. Mar. 8, 2016) (determination of whether there was an unjust benefit "necessarily rests on individualized determinations about the exposure of the purchasers to the advertisements in question."); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 995 (C.D. Cal. 2015) (recognizing under Florida law it is "not difficult to conceive of significant equitable differences between class members" (internal quotation omitted)).  For the reasons discussed, exposure will be addressed on a classwide basis through plaintiffs' experts.  That allegedly common exposure puts this case in a different posture than the ones on which defendants rely.  Moreover, generally, "unjust enrichment claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members."  *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 568 (S.D. Cal. 2012).

### g.        Implied Warranty/Magnuson-Moss

JLI does not address in much substance the predominance of plaintiffs' implied warranty claim, asserted as a basis of liability for the California Purchaser Class, other than arguing that it cannot be certified because plaintiff have failed to identify what the "ordinary use" of JUUL was, such as being a replacement for more dangerous cigarettes or one of many e-cigarettes on the market.  Accordingly, it contends that there is no damages model to support the claim.  But "[a]n

United States District Court
Northern District of California

1   implied warranty claim requires an objective standard, and is 'therefore susceptible of common

2   proof.'" *Zakaria v. Gerber Products Co.*, LA CV 15-00200-JAK (Ex), 2016 WL 6662723, at *13

3   (C.D. Cal. Mar. 23, 2016) (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 485

4   (C.D. Cal. 2012)).  Plaintiffs will present common evidence in support of the claim and it will be

5   determined on a classwide basis.  JLI identifies no damages issues specific to the implied warranty

6   claim for California purchasers that cannot be addressed by JLI's own sales data or that otherwise

7   would require individualized determinations precluding certification.

8         JLI also argues that the privity required by this claim raises individualized issues and is

9   lacking for class members, including California Youth Class members, who did not purchase

10   directly from JLI or one of its authorized retailers.  Whether privity is required between JLI and

11   differently situated *classes* of purchasers can be determined on a common basis and might result in

12   a narrowing of specific classes or class claims.  It does not preclude certification.

13                    **2.       Equitable Claims and Standing**

14         JLI raises a number of other arguments – separate from predominance – that they believe

15   precludes certification of some of the classes or claims.

16                          ***a.       Sonner***

17         JLI argues that the Youth Class, and all other equitable-only claims like the California

18   Purchaser Class's claims based on unjust enrichment, cannot stand under the Ninth Circuit's

19   decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020).  It asserts that the

20   restitutionary relief the California Youth Class seeks (under the UCL and unjust enrichment

21   claims) fully overlaps with the damages sought in the California Purchaser Class.  The ODDs

22   similarly argue that they cannot be subject to equitable-based restitution under the UCL or unjust

23   enrichment claims brought by both proposed California classes because they have complete

24   theoretical relief under the CLRA or RICO claims.

25         In *Sonner*, the Ninth Circuit held that the plaintiff's request for restitution under the UCL

26   and CLRA must be dismissed because "the operative complaint does not allege that Sonner lacks

27   an adequate legal remedy."  *Id*. at 844.  The court went on to say that, "[m]ore importantly, Sonner

28   concedes that she seeks the same sum in equitable restitution as 'a full refund of the purchase

United States District Court
Northern District of California

1    price' . . . as she requested in damages to compensate her for the same past harm.  Sonner fails to

2    explain how the same amount of money for the exact same harm is inadequate or incomplete, and

3    nothing in the record supports that conclusion."  *Id.*

4         Addressing this issue at the motion to dismiss stage in this MDL, I provided plaintiffs

5    leave to amend to allege inadequate remedies at law, which they did.  *See, e.g., In re JUUL Labs,*

6    *Inc., Mktg., Sales Practices, and Products Liab. Litig.*, 497 F. Supp. 3d at 638–39 ("[P]laintiffs are

7    given leave to amend to expressly allege that their remedies at law are inadequate and to support

8    their claim to equitable restitution under the UCL and FAL," noting that hurdle was likely to be

9    cleared given that "the allegations regarding unfair conduct are not otherwise coextensive with

10   plaintiffs' legal claims and given the preliminary stage of these proceedings").

11        At this juncture, JLI contends that Singer's conjoint analysis demonstrates that any

12   equitable relief sought by the California Youth Class is duplicative of the damages sought in the

13   California Purchaser Class.  In that circumstance the equitable claims must be dismissed. *See e.g.,*

14   *Williams v. Apple, Inc.*, 19-CV-04700-LHK, 2020 WL 6743911, at *10 (N.D. Cal. Nov. 17, 2020)

15   (dismissing FAL and UCL claims under *Sonner* where "Plaintiffs seek relief under the FAL and

16   UCL, which 'must properly be considered equitable, rather than legal, in nature.' []  Plaintiffs also

17   fail to demonstrate that they lack an adequate legal remedy.  To the contrary, Plaintiffs concede

18   that their FAL and UCL claims are 'duplicative' of their 'breach of contract claim for money

19   damages.'").  Finally, defendants contend that the Youth Classes' perhaps intentional decision to

20   not allege a CLRA claim cannot make the equitable claims non-duplicative because that claim

21   could have been brought.

22        How *Sonner* applies is a common issue, at least when weighed against the different causes

23   of action at issue.  As such, it is not a reason to deny class certification.  Similarly, whether

24   plaintiffs' equitable claims fully overlap their damages claims concerning each set of defendants

25   cannot be resolved at this juncture, especially because each set of defendants repeatedly argues

26   that they are differently situated with respect to the timeframe of their conduct and the types or

27   amount of damages/restitution potentially available to the classes under the various claims.

28             **b.       Standing and Uninjured Consumers**

United States District Court
Northern District of California

Relying on *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), JLI contends that plaintiffs' classes impermissibly include uninjured purchasers, defeating certification.  In *Trans Union*, the Court confirmed that "in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.' [] And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id*. at 2208.  After determining that the majority of class did not have standing to pursue certain claims and only named plaintiff had standing to purse one of the claims, the Court remanded to the Ninth Circuit to "consider in the first instance whether class certification is appropriate in light of our conclusion about standing." *Id*. at 2214.

JLI argues, initially, that because many purported class members were addicted to nicotine, they received exactly what they intended and expected (nicotine) while receiving reduced risks from those associated with combustible cigarettes.  Those consumers, JLI argues, could not be harmed.  However, consumers had a range of e-cigarettes or other nicotine-delivery devices that were available.  Plaintiffs have plausibly alleged and for purposes of this motion offer (contested) expert evidence showing that had JLI not misrepresented its product and omitted material information, consumers would have paid less for JUUL products or have chosen different nicotine-containing products.

More significantly, JLI argues that Singer's original and supplemental Safety-Risk surveys show that a significant portion of the class – 40% in the original Safety-Risk survey and 20% in the amended Safety-Risk survey – would have chosen a more "addictive" product and paid more for it even if they had known about its purported risk.  JLI argues that these individuals could not have been harmed by JLI's conduct and lack standing, defeating predominance.  Defendants contend that Singer's findings in this respect are not irrational because class members have testified that JUUL was better at delivering the nicotine to satisfy their cravings and the result of other rational choices (such as ease of use or design) that led them to prefer JUUL over other products.  Preference for JUUL's nicotine delivery aside, Singer disputes that his analysis shows statistically significant irrational behavior (that could call into question the reliability of his

1   revised Safety-Risk survey) or that consumers were not injured.  Singer's (disputed) analysis

2   shows that all consumers paid more for JUUL than they would have otherwise.

3          Finally, JLI contends that none of plaintiffs' experts, including Singer, attempts to identify

4   or address those class members who purchased for resale and presumably "passed on" any

5   overcharge.  Therefore, it argues, aggregate damages are overstated and some component of the

6   classes was not "injured."  JLI points to Youth Class member testimony indicating that a large

7   number of the youth purchases were the result of reseller conduct.  *See, e.g*., April 15, 2021,

8   Deposition Transcript of E.V. ("E.V. Depo. Tr.") [Dkt. No. 2310-27] at 29 (explaining when

9   youth purchased through an older classmate).  It asserts that inclusion of those uninjured resellers

10  – who JLI contends would not have standing – likewise precludes certification.  *See, e.g., Beaty v.*

11  *Ford Motor Co*., C 17-5201 TSZ, 2021 WL 3109661, at *13 (W.D. Wash. July 22, 2021)

12  (rejecting damages model where class members that resold cars at issue "would not have suffered

13  any damages at all because they would have passed on any overpayment at the original point of

14  sale to the Class Vehicle's unwitting new owner.  Calculating damages based on this proposed

15  conjoint model would thus result in a windfall for Former Class Vehicle Owners; and Plaintiffs

16  have not otherwise explained how they would account for such a windfall").

17          Under the consumer protection claims at issue here, injury is the payment of an overcharge

18  at the time of purchase.  *Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 989 (9th Cir.

19  2015) ("under the UCL and FAL, the focus is on the difference between what was paid and what a

20  reasonable consumer would have paid at the time of purchase without the fraudulent or omitted

21  information.");  *Miller v. Peter Thomas Roth, LLC*, C 19-00698 WHA, 2020 WL 363045, at *4

22  (N.D. Cal. Jan. 22, 2020), *on reconsideration*, C 19-00698 WHA, 2020 WL 1433184 (N.D. Cal.

23  Mar. 24, 2020) (recognizing the "low bar" for injury under the UCL as "the extra money paid"

24  that affords the consumer standing to sue); *see also Kwikset Corp. v. Super. Ct*., 51 Cal. 4th 310,

25  334 (2011) ("But in the eyes of the law, a buyer forced to pay more than he or she would have is

26  harmed at the moment of purchase, and further inquiry into such subsequent transactions, actual or

27  hypothesized, ordinarily is unnecessary.").  And under RICO, defendants provide no Ninth Circuit

28  authority recognizing a pass-on defense.  *See State Farm Mut. Auto. Ins. Co. v. Kugler*, 11-80051,

United States District Court
Northern District of California

61

2011 WL 4389915, at *10 (S.D. Fla. Sept. 21, 2011) ("where the directly defrauded party presses a RICO claim against the alleged wrongdoer, there is no viable "pass on" defense, *i.e.* defendants cannot argue that plaintiffs not entitled to recover damages for costs which it has theoretically already passed on to its subscribers in the form of premium adjustments."); *see also In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., and Prods Liab. Litig*., 295 F. Supp. 3d 927, 949 (N.D. Cal. 2018) (recognizing that overpayment "at the time of sale" is a cognizable RICO injury and finding arguments concerning lack of defect manifestation were "not persuasive"). Applying one could raise issues considering RICO's stringent proximate cause requirements. Standing is adequately shown at this juncture.

### 3.    Superiority

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).  The Rule provides that the following factors are "pertinent" to the predominance and superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under [Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1190 (9th Cir. 2001) (internal quotation marks omitted).

Plaintiffs propose a Trial Management Plan (Declaration of Dena Sharp ("Sharp Decl."), Pl. Ex. 21 [Dkt. No. 1772-24]) to show that trying these claims on a classwide basis is far superior to trying them on an individual basis.  Under the Plan, plaintiffs suggest utilizing a two-phase trial for liability.  In Phase I, plaintiffs propose a joint bench/jury trial where the jurors (for legal claims) and the court (for equitable claims) determine liability, award aggregate compensatory damages, and determine entitlement to multiple and punitive damages, as applicable, with supplemental evidence concerning restitution or disgorgement presented outside the presence of

United States District Court
Northern District of California

the jury.[43]  In Phase II (assuming liability has been found in Phase I), the jury will determine the amount of punitive damages owed by defendants.  Following trial, plaintiffs propose that damages will be allocated to individual members of the Classes through a claims administration process.[44]  *Id*.

JLI and Altria argue that plaintiffs' trial plan is unlawful.  They contend that allowing an aggregate damages award and preventing defendants from contesting each class member's entitlement to damages or restitution violates defendants' due process and Seventh Amendment rights as well as the Rules Enabling Act.  JLI focuses particularly on wanting to test whether class members purchased JUUL as opposed to other products or purchased products for resale or purchased from a friend, which JLI contends would put the purchasers outside of the class of injured consumers.  Altria particularly focuses on its right to contest whether each class member purchased JUUL at retail during the time period Altria was participating in the RICO Enterprise and whether particular class members resold the JUUL products to others.  Both JLI and Altria argue that they cannot be stripped of their right to argue their affirmative defenses to certain purchases, including illegality, failure to mitigate damages, and resale for profit.  JLI Oppo. at 60-62; Altria Oppo. at 30-32.

The aggregate damages award here will be based on JLI's own available sales data.  Defendants may introduce evidence regarding the amount of reseller activity and illegal purchases by members of the youth class, assuming those arguments are relevant defenses to the amount of aggregate damages or equitable relief sought under plaintiffs' claims, legal issues I need not resolve at this juncture.  Any resulting reduction in aggregate damages to account for that activity is a common, not individualized issue.  Similarly, defendants may introduce evidence that JLI or

---

[43] Plaintiffs will present class-wide proof of damages as to adult Class Members, using a price premium calculation methodology and class-wide proof of damages as to youth Class Members, using a full refund calculation methodology.  Similar proof will be provided to the court for determination of restitution and/or disgorgement.  *Id*. at 4-6.

[44] Under the proposed Claims Administration Protocol, plaintiffs propose that class members will submit information to substantiate their membership in particular classes and their right to compensatory damages, restitution, and/or disgorgement under the verdict.  *Id*. at 7.

United States District Court
Northern District of California

1    other retailers sold significant amounts of product at discount to argue that any aggregate damages

2    or restitution award should be reduced.  That too is a common, not individualized, issue.  Finally,

3    if there is an aggregate damages or restitution award, during the claims process defendants may

4    contest any particular class member's entitlement to participate in that process.[45]  That is sufficient

5    to protect defendants' Seventh Amendment rights.

6         The Ninth Circuit cases JLI relies on do not support its argument.  *See, e.g., Jimenez v.*

7    *Allstate Ins. Co*., 765 F.3d 1161, 1167 (9th Cir. 2014) (noting that Ninth Circuit precedent

8    establishes that damages determinations are "individual" in nearly all wage-and-hour class actions;

9    that fact alone does not defeat class certification because in those cases classwide treatment of

10   liability is followed by individual damage determinations is appropriate); *In re Hotel Tel. Charges*,

11   500 F.2d 86, 89 (9th Cir. 1974) (denying certification of Sherman Act claims, challenging

12   surcharge practice of hundreds of hotels that varied in amount and existence between hotels such

13   that "each member of the class seeking recovery would then be required to prove that he

14   patronized the hotel while the surcharge was in effect and that he absorbed the cost of the

15   surcharge [ ] to compute the amount of damages due the class member," a process that would take

16   "approximately one hundred years" to adjudicate the claims).[46]  Here, any aggregate damages or

17   restitution awards will be based on JLI's own sales data, potentially offset by applicable defenses

18   (*e.g*., unclean hands, exclusion of reseller sales) *if* those defenses are determined to apply to the

19   claims certified.  How much each individual class member would be entitled to from those

20   aggregate awards can readily be determined in a claims administration process.

21        JLI argues that plaintiffs' Trial Management Plan also ignores that some portion of

22   purchasers who purchased directly from JLI would be bound by an arbitration and class action

23   waiver.  JLI, however, has not asserted this argument or otherwise raised in within the context of

24

25   [45] JLI points to studies that establish "frequent product misidentification of e-cigarettes" amongst
     consumers.  JLI Oppo. at 61-62.  There is no evidence that JUUL products – that to this point
26   neither side has disputed have a very unique and obvious design – are included in that consumer
     confusion regarding brands of e-cigarettes.  If such evidence is adduced, the claims process could
27   address it in a number of ways.

28   [46] Altria relies on inapposite authorities outside the Ninth Circuit.  Altria Oppo. at 31.

*this* MDL.  If JLI timely raises this issue for determination, the class definition can be readily altered to account for any class members whose sales might be excluded as subject to arbitration.

Finally, JLI contends that class treatment is not superior as demonstrated by the individual litigation of the personal injury claims in this MDL and the related JCCP proceedings.  That argument wholly ignores the significant distinction between the economic loss claims raised in the operative class action complaint, which can be resolved through aggregate damages or restitution awards based on the price premium model of recovery, versus the personal injury claims raised in the individual cases filed in this MDL and in the related JCCP proceedings.[47]

Plaintiffs have adequately demonstrated the superiority of resolving the economic loss claims collectively through a class process that protects defendants' ability to fully raise and resolve potential defenses to those economic loss claims.

For the foregoing reasons, plaintiffs' motion for class certification is GRANTED.

## II.   DEFENSE *DAUBERT* MOTIONS

JLI moves to exclude the opinions of five experts on whom plaintiffs rely in support of class certification: Dr. Alan Shihadeh, Dr. John Chandler, Dr. Anthony Pratkanis, Dr. Sherry Emery, and Dr. Hal Singer.  JLI's Omnibus Motion to Exclude ("JLI Omnibus Mot."), Dkt. No. 2309-9.[48]  Its motion is DENIED.

### A.   Legal Standard

Federal Rule of Evidence ("FRE") 702 allows a qualified expert to testify "in the form of an opinion or otherwise" when: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

---

[47] In the alternative, plaintiffs request certification under Rule 23(c)(4) for any issues that can be resolved on a classwide basis.  Defendants object to consideration of certification of discrete liability-only issues because plaintiffs fail to identify what issues would be appropriate for classwide resolution and certification of unspecified liability issues would be unlikely to materially advance dispositive of the litigation.  I need not consider the Rule 23(c)(4) argument because I find that plaintiffs have satisfied the requirements for certification under Rule 23(b)(3).

[48] Each defendant filed a joinder in JLI's Omnibus *Daubert* Motion.  *See* Dkt. Nos. 2314, 2315, 2327, 2397.

United States District Court
Northern District of California

United States District Court
Northern District of California

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if it is both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.  To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id*. These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id*. (internal quotation marks and footnotes omitted).  "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

The inquiry into the admissibility of expert testimony is "a flexible one" in which "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.  With respect to surveys evidence the Ninth Circuit has "long held that survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.' . . . Furthermore, we have made clear that 'technical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting *Wendt v. Host Int'l, Inc*., 125 F.3d 806, 814 (9th Cir. 1997) & *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir.1988); other internal citations omitted).

The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell*

*Dow Pharm., Inc*., 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Committee Note.  However, the Ninth Circuit has made clear that, at the class certification stage, a district court need only consider 'material sufficient to form a reasonable judgment on each [Rule 23(a)] requirement," but the "court's consideration should not be limited to only admissible evidence."  *Sali v. Corona Reg'l Med. Ctr*., 909 F.3d 996, 1004 (9th Cir. 2018).  However, "[w]hen conducting its 'rigorous analysis' into whether the Rule 23(a) requirements are met, the district court need not dispense with the standards of admissibility entirely.  The court may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence.  Indeed, in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*. [] But admissibility must not be dispositive."  *Id*. at 1006.

### B.      Dr. Shihadeh's Opinions

Dr. Alan Shihadeh in an engineer specializing in tobacco products.  He was retained by plaintiffs to offer an opinion on whether or not the "abuse liability" of JUUL products (*i.e*., the risk of these products causing addiction) could be determined using attributes common to all JUUL devices, and, if so, how that would be done.  Specifically, Shihadeh opined as follows:

> At this time, I have been asked to opine as to whether JUUL's fitness for its ordinary use as a tobacco product (or lack thereof due to abuse potential) can be evaluated using reliable methodologies and evidence common to all JUUL Products sold in the United States. The answer is "yes." Nicotine containing products and their abuse potential are regularly and routinely on a population basis, meaning their findings are applicable to all users. This report describes the methodologies that can be used for such an evaluation and analysis of JUUL Products. I will be employing these same product-specific and population-based methodologies.

> My analysis of JUUL's utility as a tobacco product is dependent upon its potential for abuse given that it contains nicotine. In my opinion, abuse liability is, in turn, a function of the form of nicotine delivered, the speed and quantity of nicotine delivered, and other features of the product's design. The evidence needed to analyze JUUL's fitness is largely, if not entirely, based on analyses of JUUL Products themselves. JUUL's design and operation are central to this inquiry, and I routinely analyze these features of tobacco products and their use in my capacity as a regulatory scientist and as an academic, using reliable and broadly accepted methodologies.

> In this report, I am not offering opinions as to the ordinary purpose

United States District Court
Northern District of California

> for which JUUL Products are sold or whether JUUL Products are in fact fit for any particular purpose—only whether such questions can be answered for all JUUL Products using evidence common to all the devices. I reserve the right to offer such opinions in any subsequent expert reports I may submit in this matter.
>
> My initial analysis suggests, however, that all JUUL Products sold in the United States deliver nicotine in quantity and quality that fosters and aggravates addiction.

*See* Shihadeh Report, Dkt. No. 1772-23 at 2.

JLI moves to exclude Dr. Shihadeh's opinions, arguing that his testimony undercuts the appropriateness of class certification because: (i) he admits there is wide variability across the class; (ii) his opinions on possible warnings are both unscientific and illegal (as contrary to federal requirements); (iii) his analysis confirms that while plaintiffs characterize their injury as economic loss claims from overpayment, their real complaint and central to their class certification theories is addiction; and (iv) even on the issues he does address (the design aspects that can be analyzed to show abuse liability on a common basis), he admits those aspects do not matter as much as the "individual user experience" and markedly varied manner of consumer use.  JLI Omnibus Mot. at 17-20.

Shihadeh's opinions in support of class certification will not be excluded on these grounds.  As an initial matter, Shihadeh's opinions will not be excluded on the basis of JLI's argument that his testimony on subjects that he was not designated to opine on (*e.g.*, warnings, addictiveness of nicotine, differences in an individual's "nicotine journey") somehow "admits" that class certification is not proper.  Those arguments go to weight and not admissibility.  JLI's challenge to Shihadeh's opinions regarding use of design aspects to opine on abuse liability, and whether they are undercut by contrary testimony regarding variance in user use, are matters for cross-examination at the merits stage.

Finally, JLI argues that Dr. Shihadeh's opinions are "so incomplete" that they are inadmissible because he does not actually offer an opinion on abuse liability but instead simply opines on how that showing could be made (using a method that lacks detailed steps or a reliable methodology) without actually performing it or providing any real analysis.  JLI Omnibus Mot. at 20-22.  But Shihadeh's role at this juncture was simply to show how he would and could assess

abuse liability based on common design elements.  That he had not performed that analysis does not require exclusion of his class certification opinions, absent some counterevidence (expert or otherwise) that his approach would be rejected by others in his field; defendants do not attempt to make such a showing.[49]

JLI's motion to exclude unspecified portions of Dr. Shihadeh's opinions is DENIED.

## C.     Dr. Chandler's Opinions

Dr. John Chandler, a Clinical Professor of Marketing at the University of Montana and former Research Director at Microsoft Advertising, was retained by plaintiffs to assess JUUL's marketing and opine on its pervasiveness or "reach" meaning the number of individuals who were exposed to JUUL's advertising.  Chandler outlines his assignment as:

> At this stage, I have been asked both to analyze how JUUL marketed its products and to assess the pervasiveness of that marketing. Specifically, I estimate the portion of the class, comprising purchasers of JUUL products, that was reached by JUUL advertising. I offer the following observations and opinions:
>
> 1. JUUL products were marketed through a series of campaigns that expanded as the product gained traction and as JUUL had more money to devote to branding and customer acquisition.
>
> 2. JUUL intended for its marketing to be pervasive and widespread, and to maximize consumers' exposure to, and awareness of, JUUL products.
>
> 3. JUUL implemented marketing strategies that were designed both to spread brand awareness widely and to target specific audiences.
>
> 4. JUUL's marketing strategies succeeded in increasing brand awareness in the general population and in targeted audiences.
>
> 5. JUUL reached all or nearly all media consumers through its advertising.
>
> 6. Because of its use of targeted advertising, JUUL reached a higher portion of nicotine users than of Americans generally.
>
> 7. Because of its use of targeted advertising, display retargeting, and point-of-sale advertising, JUUL reached an even higher portion, still, of JUUL product owners.

Chandler Report, Dkt. No. 1772-21 at 3.

---

[49] JLI's arguments regarding Shihadeh's merits opinions about abuse liability are not appropriately addressed here.

United States District Court
Northern District of California

1    JLI challenges Dr. Chandler's opinions because: (i) he merely repeats "reach" estimates he

2    found in JLI's internal documents, many of which were estimates of the impact of campaigns; (ii)

3    there is a disconnect between the information upon which he relies and his conclusory opinions

4    because he fails to match "exposure" of any actual class members to the alleged message JLI was

5    supposedly conveying and that changed over time; (iii) his opinions that JLI "intended" its

6    marketing to be "pervasive" and "targets specific audiences" are inadmissible; and (iv) his

7    opinions are irrelevant and do not "fit" plaintiffs' claims, including because he does not analyze

8    any advertisement beyond 2019, even though the class extends through the present.

9    At base, JLI criticizes Chandler for not making opinions on matters he was not asked to

10   address.  Chandler was asked to opine on "reach" and not how many advertisements or marketing

11   campaigns were actually seen by any specific individuals or groups of individuals or about

12   purported differences in the content of the campaigns.  Next, that he made his "reach"

13   determinations in large but not exclusive part by using JLI's own documents does not make his

14   opinions excludable.  The documents and evidence he relied on are not the type of self-

15   explanatory documents that jurors can comprehend based on common knowledge; expert analysis

16   is helpful to interpret and explain them.  Even if they were, Chandler did not rely solely on those

17   documents, but analyzed them and ran his own calculations and simulations using data from those

18   documents and other sources.  That is common and typically helpful and admissible expert

19   analysis that is not, contrary to JLI's assertions, "just basic math" that needs no expert analysis or

20   explanation.  In addition, that some campaigns may not have been carried out in the manner JLI's

21   documents suggest or that some of the results were "estimates" are matters for cross-examination,

22   not exclusion.  Significantly, JLI presents no contrary evidence to undermine the bulk of

23   Chandler's reach estimates, based either on JLI's own documents or on Chandler's separate

24   calculations.  At this juncture, the record is sufficient (although it may be disputed on the merits)

25   to show that JLI's marketing reached (as that term is used in the industry) all or nearly all media

26   consumers.  Because "of its use of targeted advertising, JUUL reached a higher portion of nicotine

27   users than of Americans generally" and because "of its use of targeted advertising, display

28   retargeting, and point-of-sale advertising, JUUL reached an even higher portion, still, of JUUL

United States District Court
Northern District of California

1    product owners."  Chandler Report at 3.

2          To the extent that JLI attacks Chandler's statements about brand awareness, Chandler

3    relied on contemporaneous JLI documents as well as marketing and sales data as additional

4    sources for those opinions.  That is sufficient for present purposes.  Chandler's opinions about

5    JLI's "intent" to target certain audiences and "pervasiveness" are not excludable and are, instead,

6    matters that should be tested on cross-examination.  There is sufficient foundation for Chandler to

7    opine on these topics at this juncture.[50]  Finally, that Chandler did not look at any advertising

8    campaigns after 2019, yet the class period extends beyond that time, does not require his exclusion

9    in whole; advertising in 2019 may be relevant to purchasing patterns in 2020 and 2021.

10   Defendants may, of course, argue at summary judgment or trial that the class period or liability

11   should be trimmed based on a purported lack of evidence about advertising campaigns in 2020 and

12   2021.

13         JLI's motion to exclude Chandler is DENIED.

14         **D.     Dr. Pratkanis's opinions**

15         Dr. Anthony Pratkanis, an experimental social psychologist and Emeritus Professor of

16   Psychology at the University of California-Santa Cruz, was retained by plaintiff to analyze JUUL

17   marketing to determine the USP common to all of JLI's marketing campaigns and apply his

18   experience studying the science of social influence and marketing.  Pratkanis opines for purposes

19   of class certification that:

20             JLI's marketing communications sought to create demand for JUUL
21             products by using a unique selling proposition of "A tech lifestyle

22   ────────────────
[50] JLI's cases regarding intent are particularly unhelpful as they discuss situations where intent is
23   irrelevant, where the purported expert's intent opinions were not based on sufficient facts or
     expertise, or where intent was a question of fact for the jury.  *See, e.g., Stone Brewing Co., LLC v.*
24   *MillerCoors LLC*, No. 18-CV-00331-BEN-LL, 2020 WL 907060, at *4 (S.D. Cal. Feb. 25, 2020)
     (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004)); *In re*
25   *Twitter, Inc. Sec. Litig.*, No. 16-CV-05314-JST, 2020 WL 9073168, at *3 (N.D. Cal. Apr. 20,
     2020).  As the Court in *Stone Brewing* recognized, "'courts in the Ninth Circuit have allowed such
26   expert testimony about the actions and motivations of a party when based on industry experience
     and the review of record evidence.'" 2020 WL 907060, at *3 (S.D. Cal. Feb. 25, 2020) (quoting
27   *United Food and Com. Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1194
     (N.D. Cal. 2017) (allowing expert testimony about "intent" of parties based on a review of record
28   evidence and public-facing statements made where an expert had insights due to experience in the
     industry)).

United States District Court
Northern District of California

product that satisfies." In other words, JUUL was sold to consumers as a technological breakthrough that would allow them to consume a satisfying product as part of living a desired lifestyle and obtaining a desired identity and to do so in a safe and healthy manner.

A reasonable consumer would take away from JLI's marketing communications that JUUL products have compelling and immediate benefits – enjoy a satisfying product that would become part of the consumer's desired lifestyle and identity. By portraying the product in this way (through wording and imagery in JLI's marketing communications) and by omitting important health and safety information about the nature of the product, JLI led consumers to take away a message that JUUL does not have health, safety, or addictiveness concerns, unlike a tobacco product. This message was driven home to the consumer using a variety of effective social influence tactics reminiscent of now-banned historical tobacco marketing.

To the extent JUUL products are not safe and healthy, a reasonable consumer would likely be misled by the marketing communications that I have reviewed because this message is not conveyed to the consumer and because of the unique selling proposition that is conveyed to consumers.

JLI used the unique selling proposition of "A tech lifestyle product that satisfies" coupled with effective marketing and persuasion to diffuse JUUL throughout the marketplace.

JLI's use of warnings, disclosures, and disclaimers (and lack of warnings, disclosures, and disclaimers) is ineffective for alerting consumers to key addiction, health, and safety risks from consuming JUUL products.

Pratkanis Report, Dkt. No. 1772-20 at 6.

JLI argues that Pratkanis's opinions are inadmissible and unpersuasive because: (i) each "step" in his methodology is *ipse dixit* and intended to reach his preferred conclusion, and his opinions are unsupportable and unreliable because he failed to use an empirical method (such as consumer surveys or other empirical analysis of consumer preferences or concerns) to support his opinions; (ii) actual consumer testimony demonstrates that consumers' understanding of the JUUL advertisements varied depending on what advertisements or other marketing materials they saw, but Pratkanis never considered or studied any actual consumer's response or possible alternative USPs and failed to consider that consumers' understanding about JUUL and dangers of vaping increased over time; (iii) plaintiffs have failed to provide an expert to discuss materiality of Pratkanis's USP and Pratkanis cannot do so given his lack of experience in tobacco or nicotine-product advertising; and (iv) his "capacity to deceive" opinions are not relevant.

United States District Court
Northern District of California

JLI argues that Pratkanis's methodology used to determine the USP is based on nothing more than review of JLI documents and historical advertisements to "reverse engineer" the USP Pratkanis wanted to reach. It contends that approach is without an adequate methodology, suffers from bias because he used documents selected by plaintiffs' attorneys, and resulted in at least slightly differently phrased USPs. These errors were compounded, according to JLI, by his failure to actually run any sort of consumer survey or quantitative content analysis to show the impact that any of the JUUL advertising campaigns had on actual consumers or how that impact changed over time. Instead, he used "social influence techniques," social cognition principles, and his view of the context of the advertisements to reach his subjective conclusion. JLI Omnibus Mot. at 31-39.

JLI does not dispute a few key issues. First, Pratkanis's approach – based on his long experience and research in social influence, social psychology and particularly consumer psychology and supported by academic studies and principles – provides a basis for both his approach and his opinions (although JLI contests the efficacy of the approach and conclusions he reached). *See* Pratkanis Report, Appendices D, E, F.[51] Second, the foundation for Pratkanis's USP and related analyses are JLI's own marketing communications. To the extent JLI believes Pratkanis ignored some campaigns or relied on internal JLI documents not seen by consumers (that Pratkanis testified supported his USP conclusion), those issues are appropriately explored on cross-examination. Third, Pratkanis was not required to perform customer surveys or empirical research – at least at the class certification stage under the caselaw relevant to the claims which plaintiffs seek to certify – to show that actual class members received or understood that USP he

---

[51] JLI does not explain why although USP is typically used to formulate and develop marketing campaigns (a point not disputed by plaintiffs), the same concept cannot be identified by analyzing the content of developed marketing campaigns based on the campaigns' actual consumer-facing advertisements and internal company records. The parties dispute whether Pratkanis considered actual, consumer-facing marketing materials and an adequate number of JLI internal documents as part of identifying the USP. To the extent that dispute exists – or as plaintiffs argue is merely a mischaracterization based on where in his Report Pratkanis listed his references – it can be explored on cross-examination. The full list of references and materials identified in his Report appears to be adequate at this juncture.

United States District Court
Northern District of California

identifies as the "reasonable consumer" message.[52]  *See Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 580 (N.D. Cal. 2020) (rejecting argument that marketing expert should be excluded for failure to use an "adequate methodology" and failure to conduct focus group or consumer surveys, because such "extrinsic evidence" is not required for California claim that public is likely to be misled by a representation and the marking expert appropriately based his opinions on "many years of marketing experience and his review of [defendant's] own internal consumer research and other documents") (internal citations omitted).

At summary judgment and trial, JLI will be free to offer evidence that actual consumers had a different understanding of JLI's USP, that JLI's advertisements did not convey any consistent USP, or that consumers took away a wholly different message from JLI's actual marketing campaigns to show that some significant portion of consumers would not have been misled by JLI's marketing or would have found omitted material regarding health impacts immaterial.  At this juncture, however, Pratkanis's approach and opinions provide an adequate basis for his USP and, relatedly, class certification under the reasonable consumer standard.

JLI's motion to exclude Pratkanis is DENIED.

### E.    Dr. Emery's Opinions

Dr. Sherry Emery, Senior Fellow in the Public Health Group and Director of the Social

---

[52] JLI relies heavily on a decision from this District, where Pratkanis was an expert on behalf of the Federal Trade Commission.  *Fed. Trade Comm'n v. DIRECTV, Inc.,* No. 15-CV-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018).  The court following a bench trial found that Pratkanis's "social influence analysis" was unpersuasive on the question of whether a reasonable consumer likely would be misled because Pratkanis did not perform empirical testing of how consumers perceived the challenged advertisements, did not analyze defendant's advertisements to determine their net impression, or do any content analysis that would support his approach generalizing his opinions to all of the advertisements over the eight-year period at issue.  With respect to the advertisements that Pratkanis analyzed, the court found them not misleading because the "true terms are adequately and accurately disclosed in the advertisements Dr. Pratkanis testified about."  *Id*. at *11-12.  The main reason this case is not persuasive – in addition to the fact that the claims were tested under federal law – is that those conclusions were drawn on a full factual record following trial.  Pratkanis's opinions were not excluded but were determined not to be persuasive to the trier of fact because only a "small fraction" of the challenged advertisements were analyzed and the FTC failed to "articulate what common net impression is conveyed by the over 40,000 challenged advertisements (which spanned several different formats), or to explain how and why that impression would be likely to mislead a reasonable consumer."  *Id*. at *5.  The posture of this case, the amount of advertising campaigns considered by Pratkanis, and the need to consider case-specific content undermine JLI's reliance on that case.

Data Collaboratory at NORC at the University of Chicago who currently studies the impact of media marketing on the sales of e-cigarettes for the Centers for Disease Control and Prevention (CDC), was retained by plaintiffs to review JUUL marketing strategies and their appeal to youth.

Emery opines, for purposes of class certification that:

> JUUL's advertising strategy appealed to youth and caused youth to use JUUL. The tactics used by JUUL to promote its products on social media were remarkably similar to the marketing strategies used by the tobacco industry during the 1980s and 1990s to promote cigarette brands to youth. Those strategies, which included product giveaways, couponing, sponsorship of youth-oriented events, and product promotion involving youthful brand ambassadors, were found to be highly effective for attracting the attention of youth, fostering brand-recognition among young children and teenagers, and contributing to smoking initiation among teenagers.

> JUUL deployed these well-known methods of youth-targeted marketing on social media, which had the effect of making them especially potent. First, youth are more likely to see promotions on social media, compared to adults, because they are more likely than adults to use social media, and youth social media users spend significantly more time on social media platforms than do adult social media users, as most teens have nearly unimpeded access to social media with their smartphones. Second, the algorithms used by social media platforms to grow membership and user engagement among key audiences significantly enhance the ability of brands and influencers to target youth audiences and thus engender what is often called 'electronic word of mouth,' wherein regular social media users become brand ambassadors when they engage with branded content. JUUL's marketing leveraged such algorithms to specifically reach youth via hashtags, and community/influencer marketing. Third, social media marketing is particularly effective among youth audiences because the social nature of marketing on these platforms directly appeals to the neurological and social developmental stages of adolescence, where the need to belong and connect with peers is greatest. Thus, JUUL's social media marketing was exceptionally effective because youth have greater opportunities for exposure to promotional posts; youth-targeted algorithms multiplied the likelihood of youth exposure to JUUL's promotional posts; and both the message (JUUL promotion with youth-appealing themes) and the medium (social advertising) are particularly potent among adolescents. It is my opinion that the exponential growth in popularity of JUUL use among youth is largely due to JUUL's promotional messaging that directly appealed to youth culture and their strategic use of the unique mechanisms of social media marketing.

Emery Report, Dkt. No. 1772-22 at 4-5.

In her Supplemental Expert Report, responding to defendants' expert Dr. Berger, Emery opines: (i) "JUUL's youth-oriented marketing strategy was intended to, and did, drive

viral earned media" given "JUUL targeted youth in its point-of-sale promotions," "JUUL

sponsored youth-appealing events," "JUUL used youth appealing product placement with

influencers and youth appealing Brand Ambassadors," "JUUL used outdoor advertising and

opportunities to expose youth to its product," "JUUL used social media platforms, which are

virtual billboards that are heavily utilized by youth," and that JUUL's marketing strategy was

intended to, and did, "go viral"; (ii) "JUUL's successful viral strategy resulted in a pervasive

social media presence that appealed to the adolescent brain as a result of its emphasis on novelty

and peer-influence"; (iii) "Empirical evidence demonstrates that JUUL's corporate marketing

strategy caused purchases"; (iv) "The fact that companies who do not target youth market on

social media does not undercut the fact that JUUL's social media campaign effectively targeted

youth"; and that (v) "Inferences of causation are supported" by her references to articles analyzing

"real world events" that were published in peer-reviewed journals and based on disclosed detailed

"descriptions of the data collection, analytic methodologies, and bases for its inferences."  Emery

Supp. Report, Dkt. No. 2439-9 at 2, 9, 13, 21, 23, 29, 33, 38, 41.

JLI seeks to exclude Emery's opinions as not reliable or relevant because she: (i)

conducted no original research for purposes of this litigation; (ii) failed to differentiate between

content-created by JLI and the more expansive content created by third parties, which I have found

could not form an independent basis for liability under the UCL on a "ratification" theory, *see*

*Colgate v. JUUL Labs, Inc*., 402 F. Supp. 3d 728, 760 (N.D. Cal. 2019), except for a three month

period in 2018 (reviewing JLI-Instagram posts); (iii) did not assess the impact from JLI's decision

in 2017 to stop producing advertisement attractive to youth, while admitting that youth-use

increased precipitously after 2017, essentially failing to account for the fact that content, volume

and channels of media used by JLI to market JUUL significantly changed over time; (iv) did not

address youth "purchases" as opposed to youth use (presumably securing JUUL products through

family or friends); and (v) failed to perform any analysis to show a causal link between youth-

related content in general to youth-use in general much less youth purchases in California (which

is the only youth-related claim JLI is a defendant on).

JLI does not directly challenge Emery's opinions regarding youth-oriented marketing

76

United States District Court
Northern District of California

strategies more generally (*e.g*., youth-oriented events, product promotion involving youthful brand ambassadors, design characteristics targeted to youth, and use of flavors attractive to youth).  Its primary objection is to Emery's opinions on the "youth focus" of JLI's early campaigns and the impact of JLI's use of social media employing these and other strategies.  JLI's arguments that Emery conducted no "new" research or failed to consider certain points do not require exclusion.  JLI does not contest that the research Emery considered (both her own and the research of others) was relevant to and supports the topics she opines on. Any missed research or failure to consider points JLI feels are significant (*e.g.,* JLI's belief that later campaigns had a different look and feel or were otherwise not youth focused) are topics for cross-examination or arguments that limit the persuasiveness of her opinions as to specific timeframes.[53]

Similarly, the distinction between "users" and "purchasers" is not apparent.  All purchasers who are within the defined classes were presumably a subset of users (as users includes youth who did not purchase but otherwise received devices from family or friends).  That is relevant at most to the size of the class and possible recovery under the different classes certified.  It is not a reason to exclude Emery's opinions in whole or part.  Likewise, Emery's failure to perform "causal-link" analysis does not require exclusion given the nature of the claims her opinions support (fraudulent or unfair youth-marketing conduct under RICO and the UCL).  The trier of fact will get to weigh Emery's analysis of JLI's own or "seeded" social media impact against the purported causal-link-based analyses of defendants' experts.

The alleged failure to differentiate between JLI and third-party content is potentially more problematic.  JLI argues that Emery's failure to test the relationship between JUUL's direct social media efforts and underage usage by an empirical method to tether JLI's conduct to the posts Emery relied on that were made by third parties not under the control of JLI means her opinions should be excluded.  But the thrust of her opinions is that JLI's own, intentional youth-focused-

---

[53] Similarly, whether or not Emery was analyzing marketing materials presented to her during her deposition within the context of the MSA (that addressed youth-content akin to inclusion of cartoons) or more broadly testified that the specific materials did not on their face have broader youth-appeal can be explored on cross-examination.

marketing and its own use of social media to push out those campaigns were intended to and did "seed" significant third-party content.  Emery's analysis of sales data and user interaction/response to various phases of JLI's-own campaigns is not, therefore, trying to hold JLI liable for another's content.  It is instead showing why JLI's own actions and content intended and caused the subsequent content.  Defendants' experts may attack these opinions – presumably based on their own empirical research, by criticizing Emery's correlation analysis, or by distinguishing the methodology and approaches of the articles Emery relied on – but at this juncture Emery's opinions will not be excluded.[54]

JLI's motion to exclude Emery is DENIED.

### F.        Dr. Singer's Opinions

Dr. Hal J. Singer, managing director at Econ One, senior fellow at the George Washington Institute of Public Policy, and an adjunct professor teaching advanced pricing to MBA candidates at the McDonough School of Business at Georgetown University, was retained as plaintiffs' damages expert to offer an opinion on whether economic injury as to the Nationwide and California Classes and aggregate damages as to all Class Members can be reliably determined using data and methods common to the Class.  Class Certification Report of Hal J. Singer ("Singer Report," Dkt. No. 1772-19).  Along with plaintiffs' reply in support of class certification, Singer filed a "Class Certification Reply Expert Report" ("Singer Reply Report") from Singer.  Dkt. No. 2439-8.

Defendants seek to exclude Dr. Singer's opinions because: (i) the conjoint study is irrelevant because it does not match plaintiffs' theory of liability; (ii) the conjoint study is based

---

[54] This is not contrary to the question addressed in *Colgate* where, on a motion to dismiss and in determining whether plaintiffs had adequately alleged instances of actionable misrepresentations and otherwise unfair conduct underlying their UCL claims, I rejected the theory that JLI could be liable based solely on third-party content under a ratification/agency theory.  *But see Colgate*, 402 F. Supp. 3d at 760 (rejecting plaintiffs "claim that JUUL ratified the unfair and unlawful conduct of third parties that were promoting and selling its products to minors and is vicariously liable for those acts").  The evidence and expert testimony presented by Emery arises in a significantly different posture and addresses a significantly different scenario in support of plaintiffs' youth marketing claims; that JLI is liable for its own youth marketing conduct that allegedly was intended to and did create a viral response particularly but not exclusively through social media channels.

on unreliable survey data; (iii) the conjoint study methodology is flawed and biased; and (iv) the youth survey is unreliable.

### 1.      Original Report

In support of class certification, Singer submitted a 71-paragraph report concluding that economic injury and aggregate damages can be reliably demonstrated using methods and data common to the class.  Singer Report ¶ 71.  He focused on two theories of harm: (i) an "Addiction-Risk Theory of Harm," based on the assumptions that defendants designed a nicotine-delivery device and accessories intended to create and sustain addiction, withheld information relating to this risk from Class Members, and misled Class Members regarding the addictiveness of JUUL products; and (ii) the "Safety-Risk Theory of Harm," based on the assumption that defendants misled Class Members regarding the safety risk of its product, including with respect to cardiovascular and lung injury and disease, as well as seizures.  *Id*. ¶ 1.  Under both theories, Singer assumed that consumer injury flows from discrepancies between how JUUL marketed its products to consumers in the "actual world" and how JUUL's products would have been marketed to consumers in the "but-for world."  For class certification he provides preliminary estimates of aggregate damages based on "assumptions regarding how JUUL's products would have been marketed to consumers in the but-for world."  *Id*. ¶ 2.

Using "Choice-Based Conjoint ('CBC') analysis" Singer developed two studies to test the Addiction-Risk theory and one to test the Safety-Risk theory based on surveys conducted in March and April 2021.  *Id*. ¶¶ 25-32.  The Addiction-Risk theory respondents were questioned about five different levels of addictiveness of the JLI products.  *Id*. ¶ 28.  The Safety-Risk theory respondents were questioned about a disclaimer regarding potential lung and cardiovascular injuries and a heightened risk of seizures from using the JLI products.  *Id*. ¶ 29.

Using those studies, Singer estimates aggregate damages employing two alternative methods: (i) estimating "consumer disutility" for the relevant JUUL products, meaning the downward shift in consumer demand that would have resulted from disclosure to consumers of the risks associated with each theory of harm in the but-for world assuming that the supply curve for the products would have remained fixed (vertical – same supply, same price) in the but-for world

("traditional method"); and (ii) incorporating more complex supply-side considerations "by using the output of the CBC analysis as a starting point, and then applying standard methods that account for JUUL's costs and price-cost margins," in order to allow for the possibility that JLI could have reduced the supply of its products in the but-for world (incurring lower costs) and allowing it to charge a higher price than it otherwise could have (but still lower than the price of the products in the "actual world") ("supply-side method").  *Id*. ¶¶ 4-5.

Under the traditional method, Singer preliminarily estimated class damages as $1.9 billion under the Addiction-Risk Theory of Harm, and $1.3 billion under the Safety-Risk Theory of Harm.[55]  Under the supply-side method, Singer's preliminary aggregate damages estimates range from $971 million under the Addiction-Risk Theory of Harm to $643 million under the Safety-Risk Theory of Harm.  *Id*. ¶ 6.

Finally, Singer employed a methodology to address the damages to Youth Class purchasers under the theory that JLI's products should not have been sold to youth but were nonetheless marketed to youth.[56]  Singer thus assumed that all expenditures by minors constitute overpayment and he provides a "a formulaic classwide method to estimate expenditures by minors on Defendant's products based on a survey of the consumption patterns of minor users of JUUL products."  *Id*. ¶ 7.

### 2.   Singer Reply Report

In support of their reply on their motion for class certification, plaintiffs submitted a 188-

---

[55] For the Addiction-Risk survey under the traditional method, Singer calculated the average discount that consumers would require to make them indifferent between the increase in addictiveness from "as addictive as" to "twice as addictive as" as $6.01 for a package of four JUULpods, whose retail price is $15.99.  *Id*. ¶ 37.  For the Safety-Risk survey under the traditional method, Singer calculated the discount a consumer would "require to compensate for disutility experienced from the information communicated by the disclaimer," at an average discount of $3.98 for a package of four JUULpods, whose retail price is $15.99.  *Id*. ¶ 39.

[56] Singer estimated damages using five elements – (1) the total number of electronic cigarette users under 18 years old, as reported by the [National Youth Tobacco Survey, conducted by the FDA]; (2) the proportion of total electronic cigarette users under 18 who used JUUL specifically; (3) the proportion of JUUL users under 18 who made their own JUUL purchases; (4) the average annual consumption of JUUL users under 18 who made their own JUUL purchases; and (5) JUUL product prices.  *Id*. ¶ 61.  He gathered data response to items (2) through (4) from responses to a survey between 18 and 23 years old who indicated they used e-cigarettes before they turned 18 years old.  *Id*. ¶ 62.

80

United States District Court
Northern District of California

paragraph "Class Certification Reply Expert Report" from Singer.  Dkt. No. 2439-8.  In that report, Singer addresses the criticisms each of defendants' rebuttal experts (Rossi, Murphy, Orszag, Marais, and Henningfield) made against Singer's opinions.  Singer does not change any of his prior opinions, but he did "put a revised model back into the field to test certain conjectures" that resulted in "new survey results" for the Safety-Risk group.  Singer Reply Report ¶¶ 1, 8. Singer did so in response to defendants' criticism that he should have allowed a negative discount to allow a great price range and to clarify, also in response to defendants' criticisms, that respondents in the Safety-Risk survey were being asked to make decisions about two distinct products with different disclaimers.  *Id.* ¶ 8 & n.15.[57]

The new Safety-Risk survey also offered users "an example of the no purchase option" in the "event that the respondent would prefer a different brand over the options displayed."  *Id.* ¶ 79. The new Safety-Risk survey also changed the font color of the positive and negative attributes in order to address defendant's alleged "focus illusion bias."  *Id.* ¶ 60.  Finally, the new survey collected some additional basic demographic information to address defendants' argument that there was no evidence that the survey was administered to a representative sample of class members.  *Id.* ¶¶ 12, 18.  And the other significant further analysis conducted by Singer – also in response to defendants' criticism – was to incorporate unit sales, market shares, and prices of e-cigarettes sold by manufacturers other than JUUL in his "nonlinear demand model" that already took into account various supply-side factors.  Singer Reply Report ¶¶ 35 n. 137, 190.

Defendants moved to strike portions of Singer's Reply Report – the opinions regarding the New Safety Risk survey (Singer Reply Report ¶¶ 8, 203-206 & Appendix 3) and his amended supply-side analysis to his non-linear demand model (*id.* ¶¶ 189-202).  *See* Motion to Strike ("MTS") [Dkt. No. 2479] at 1.  I concluded that the challenged portions of the Singer Reply Report were properly considered rebuttal, but nonetheless gave defendants the opportunity to file supplemental reports and allowed plaintiffs to a sur-reply from Singer.  Dkt. No. 2496.  The

---

[57] As a result of the revised survey, only 20% (as opposed to 40% in the prior round) of respondents "appeared to express a preference for safety risk, relative to a product represented to be safe and healthy."  *Id.* ¶ 9 n.17.

1    parties were able to present arguments regarding these supplemental and sur-reply reports during

2    the oral argument on the motion for class certification and motions to exclude.  *See, e.g.*, Dkt. Nos.

3    2534-2, 2536-2, 2536-4.

### 3.    JLI's Motion to Exclude under *Daubert*

5        In its omnibus *Daubert* motion, JLI seeks to exclude Dr. Singer's opinions in his initial

6    Report.  The modifications made in Singer's Reply Report were addressed by two of defendants'

7    experts and discussed at the hearing and in JLI's Omnibus Reply.  All of JLI's material arguments,

8    no matter where or when raised, have been considered.[58]

9        The parties do not dispute that CBC methodology is, generally, a recognized, reliable, and

10   approved scientific method for estimating how consumers value different attributes or a product.

11   Instead, the parties dispute the reliability of the Safety-Risk, Addition-Risk and Youth use surveys

12   designed by Singer and carried out by Qualtrics and dispute whether Singer's use of that data was

13   a product of a reliable methodology.

### a.    Relevance

15       JLI contends that Singer's conjoint study is irrelevant and should be excluded on two

16   grounds.  First, it argues that what Singer tested is not sufficiently connected to plaintiffs'

17   allegations.  It contends that plaintiffs' theory of JLI's liability is based on failures to disclose

18   nicotine dosage while Singer tested "addictiveness," a concept disclaimed by plaintiffs in order to

19   avoid preemption of labelling claims and a concept not tethered to plaintiffs' claims.  JLI also

20   contends that the Safety-Risk disclaimer used by Singer (warning of possible, lung,

21   cardiovascular, or seizures conditions) is not defined nor tied to plaintiffs' allegations.  These

22   "mis-matches," according to JLI, require exclusion of Singer's opinions.

23       Plaintiffs respond that failing to disclose nicotine levels versus failing to disclose

---

[58] In allowing defendants to file supplemental reports responding to Singer's Reply Report, I instructed them that "no briefing addressing the supplemental defense or Singer sur-reply reports will be allowed."  Dkt. No. 2496.  Nonetheless, JLI referred to the Supplemental Reports by Murphy and Rossi in their Reply in support of the Omnibus *Daubert*.  Plaintiffs objected to that, as well as to JLI's citation for the first time to eight of plaintiffs' merits reports, which were not referenced in plaintiffs' opposition to JLI's Omnibus Motion.  Dkt. No. 2545.

United States District Court
Northern District of California

United States District Court
Northern District of California

"addictiveness" is a distinction without a difference because nicotine levels and addiction risk correlate and, at base, what Singer has done – analyzing what level of discount a consumer would need to purchase a "more addictive" product – is relevant to their claims and fits their price premium theory. While JLI challenges Singer's use of the concept of addictiveness on a scale (a "quarter as addictive" or "half as addictive" relative to "about 1 pack of cigarettes"), it was JLI who used the "approximately equivalent to 1 pack of cigarettes" on its packaging. Singer's use of that concept is not without basis.[59] Similarly, the "warning" language tested in Singer's Safety-Risk attribute is tied to plaintiffs' characterization of JLI's marketing campaigns portraying JUUL as a safer alternative to cigarettes and is based on the sorts of injuries that plaintiffs allege can be caused by use of JLI's products. Defendants can, of course, dispute a reasonable consumer's understanding of both the meaning of "more addictive" and the potential injuries disclosed in the tested labels if Singer's surveys (or similar surveys) are admitted at trial. But for purposes of this motion, I find there is sufficient fit between what Singer tested for and plaintiffs' theories of liability in the class case.

JLI's second relevance challenge is based on Singer's use of an "average discount" to estimate damages, as opposed to differences in "market price" allegedly caused by JLI's omissions regarding nicotine and health dangers. The latter, according to JLI, is the typical measure in "benefit-of-the-bargain" claims. JLI contends that Singer's focus on "average discount" ignores what should have been the focus, "the 'discount' required by the marginal consumer" in Singer's but for world. JLI Omnibus Mot. at 51.

Defendants' rebuttal-expert Peter E. Rossi ("Rossi Rebuttal") [Dkt. No. 2310-12] clarified

---

[59] JLI notes that the "labels" used for Singer's Addiction-Risk survey – asking about products "a quarter as addictive" or "half as addictive" relative to "about 1 pack of cigarettes" – are not used in plaintiffs' complaints or defined by Singer himself. JLI also contends that this concept of relative addictiveness was disclaimed by plaintiffs' nicotine expert Dr. Shihadeh. However, claims about undisclosed nicotine content and uptake are included in the operative class complaint. Moreover, the "approximately equivalent to 1 pack of cigarettes" was used by JLI on its packaging, presumably because it gave consumers who smoked cigarettes a readily understood comparison. Finally, Shihadeh was not opining on Singer's use of that concept for his addiction-risk survey to estimate damages. Instead, he questioned the use of some kind of "numerical scale" for addictiveness. He admitted only that he could not fully evaluate those sorts of disclaimers without seeing the full context. July 22, 2021, Deposition of Alan Shihadeh ("Shihadeh Depo. Tr.") [Dkt. No. 2310-1] at 282-285.

United States District Court
Northern District of California

that the main complaint with Singer's "average discount" approach is that Singer failed to account for the real consumer who preferred (in Singer's survey) the "twice as addictive label" or the products with the safety risk disclaimer.  JLI Omnibus Mot. at 51-52; Rossi Rebuttal ¶¶ 84-86; *see also* Rossi Rebuttal ¶ 84 ("What Dr. Singer fails to disclose in his report is that for the 40% of respondents in the Safety-Risk survey and 18% of respondents in the Addiction-Risk Survey that prefer the 'twice as addictive' label or the safety risk disclaimer, Dr. Singer assigns a discount of zero, rather than account for the fact that these respondents are willing to pay more for a JUUL pod in his but-for world, despite acknowledging that it is perfectly rational for respondents to have such preferences.  Dr. Singer claims to be generous by including these respondents with zero discount in his calculation of the average discount.  In fact, he is not being 'generous', but biasing his calculations to give larger purported damages to the point that his methodology can only result in purported damages, regardless of what the data showed.").

JLI argues that by treating the average discount as a fixed "downward shift in consumer demand," contrary to the actual data, Dr. Singer's damages calculations are fatally flawed.  JLI Omnibus Mot. at 51-52.  In response, plaintiffs point to Singer's Reply Report.  Dkt. No. 2439-8.  There, Singer notes that some conjoint practitioners would discard such "positive increases" but asserts that he appropriately included them as a discount of "zero," making the price premium smaller overall, "given that these respondents would have purchased JUUL without any discount in the but-for world."  *Id.* ¶ 7.

Nonetheless, Singer "adjusted" for JLI's critique by recalculating aggregate damages for in the surveys to account for negative and positive discounts for respondents who indicated a preference for higher risk.  *Id.* ¶ 8.  In the Safety-Risk survey, the truncation at zero was an "unintended by-product" of the price range surveyed that was "not wide enough" to allow for negative discounts.  Therefore, Singer conducted an "updated Safety-Risk survey" to allow the prices to vary more widely.  The result of the updated Safety-Risk survey was an increase in the discount required to make respondents indifferent and a corresponding increase in aggregate damages.  *Id.* ¶¶ 6-8.

Defendants' supplemental expert reports criticize Singer's adjusted damages and his

1    redesigned Safety-Risk survey (*see* Dkt. Nos. 2534-2, 2536-4).  Their criticisms are aimed at

2    alleged "unsupported assumptions" considering theoretical price reductions and alleged

3    overstatements of damages.  Those go to the weight of Singer's analyses and not their

4    admissibility.

5          Finally, JLI complains about Singer's failure to account for volume of individual purchases

6    as opposed to considering gross purchases across the class given the plaintiffs' acknowledgement

7    that some (presumably addicted users) purchased high volumes and other consumers purchased

8    low volumes.  Plaintiffs contend that sales volume per consumer is not typically considered, and

9    Singer's approach is the standard practice for calculating willingness-to-pay of the marginal

10   consumer.  Singer Reply Report ¶ 12 (pg. 20 n.54).  This ground is at most an argument to be

11   explored on cross-examination.

12                          **b.        Unreliable Survey Data**

13         JLI next challenges Singer's conjoint study, arguing that it is based on unreliable survey

14   data.  Singer used Qualtrics to administer the survey and report the data, an entity that "regularly

15   conducts such surveys on behalf of business schools and large corporations."  *Id.* ¶ 25 & n. 31.

16   JLI argues that the survey data is inherently unreliable because Singer admitted in his deposition

17   that he was not "familiar" with the methods used by Qualtrics to administer the survey or collect

18   the results (for example how Qualtrics identified or screened the participants, whether they

19   collected basic demographic data on respondents, or the information regarding the proprietary

20   model Qualtrics uses to translate survey results into data).[60]  JLI does not connect any alleged

21   deficiencies in the way Qualtrics administered the survey or compiled the data to alleged

22

23   _____

24   [60] Defendants' expert, Rossi, is relied on in this section of JLI's Omnibus Motion to argue that by using Qualtrics and Qualtrics' "proprietary Hierarchical Bayesian model," Singer did not have adequate control over to control the accuracy and reliability of the results.  Rossi Report ¶¶ 147-148.  Rossi's only opinion why that process produced unreliable results, however, is his opinion that "Dr. Singer's estimates of individuals' utilities exhibit irrationality and inconsistencies with market data."  *Id.* ¶ 148.  But Rossi does not tie the evidence of irrationality and inconsistency to alleged deficiencies in the way Qualtrics administered the surveys or obvious deficiencies in Qualtrics' use of the Hierarchical Bayesian model.  The alleged irrationality and inconsistencies JLI and Rossi discuss are alleged results of the design of the surveys and Singer's handling of the resulting data.

United States District Court
Northern District of California

deficiencies in the CBC analyses conducted by Singer. As noted, the primary alleged deficiencies in Singer's analyses stem from survey design and "zeroing out" survey responses addressed above (and debated again in the experts' supplemental and sur-reply reports).

JLI also argues that the survey is unreliable because there is no evidence that the population of survey respondents is demographically or otherwise representative of the classes and, as such, is excludable.[61] But JLI does not dispute that random samples from a target population of JUUL purchasers (resulting in over 1000 responses) is standard practice. *Id.* ¶¶ 52, 54-55.[62]

JLI complains that surveys were conducted in 2021 but that the class starts in 2015. Because beliefs about risks and understandings of e-cigarettes over time have changed, JLI contends that the survey should have been designed to account for those shifts. The alleged failure to account for shifting beliefs, however, goes to weight and not admissibility, and any suggestion that conducting surveys post-challenged timeframes is improper is not sensible given that CBC-litigation motivated surveys necessarily are conducted after the challenged conduct occurred.[63]

JLI also complains that there was no information collected (or disclosed) about the respondents' backgrounds (other than their states of residence and age ranges), including smoking history, so Singer cannot say whether the population of respondents matches the proposed classes.

---

[61] JLI's cases are readily distinguishable. *See Kwan Software Engr., Inc. v. Foray Techs*., LLC, C 12-03762 SI, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014) (excluding survey, where "VeriPic has not shown that any of the members of the survey are people who would see the alleged misrepresentations—Foray's audience—or people who are potential purchasers of the products—those whose decision to purchase the product could be influenced."); *Marlo v. United Parcel Serv., Inc*., 639 F.3d 942, 949 (9th Cir. 2011) (affirming rejection of surveys where proponent knew nothing about methodology used to conduct surveys or whether surveys were limited to supervisorial position at issue in case); *High Sierra Hikers Assn v. Weingardt*, 521 F. Supp. 2d 1065, 1076 (N.D. Cal. 2007) (rejecting survey results where "design was flawed and the results subject to manipulation").

[62] Singer did, however, incorporate demographic questions on gender, race, and education in his revised Safety-Risk survey, and notes that it would be straight-forward to do so in support of any surveys in support of the merits. Singer Reply Report at 18-19.

[63] As Singer points out in reply, if JLI's claim that public perception of health risks of e-cigarettes has shifted over time, testing back in 2015 when the risks of e-cigarettes were less well-known and publicized would have likely led to greater damages. At most, Singer's current measures of assumed past behavior leads to more conservative damage estimates. Singer Reply Report at 16.

United States District Court
Northern District of California

1   This ignores that the classes themselves are broadly defined classes of purchasers (nationwide

2   class, California class) and that survey respondents had to be past-purchasers of JUUL products in

3   specific age ranges and from specific states.  JLI does not demonstrate why other attributes were

4   required for survey respondents.  It has not shown why, for example, not finding out about

5   respondents' histories of smoking undermines the price premium results based on a survey of

6   based on past e-cigarette purchases.  Even if they did, those challenges would at most go to weight

7   and not admissibility.

8       JLI further contends that the survey is unreliable because Singer was not familiar with the

9   steps (if any) Qualtrics took to find out why non-responders (individuals who were offered to take

10  the survey but did not) declined to do so and failed to ensure that Qualtrics tracked that

11  information in the first place.  *See In re: Autozone, Inc*., No. 10-md-02159-CRB, 2016 WL

12  4208200, at *18 (N.D. Cal. Aug. 10, 2016), *aff'd sub nom. In re AutoZone, Inc., Wage and Hour*

13  *Empl. Practices Litig*., 789 Fed. Appx. 9 (9th Cir. 2019) (unpublished) (excluding survey where

14  "low response rate" where refusals to take survey outnumbered responses by two-thirds because of

15  expert-supported risk of "nonresponse bias, which is a form of bias that can occur when particular

16  systematic segments of the target population or sample do not provide responses to a survey");

17  *Wallace v. Countrywide Home Loans Inc*., No. SACV 08-1463-JST (MLGx), 2012 WL 11896333,

18  at *4 (C.D. Cal. Aug. 31, 2012) ("A survey that 'begins with a random sample,' but does not 'take

19  measures to assure that nonresponses are random and provide analysis of the reasons of

20  nonresponse,' is not 'the product of reliable principles and methods.'") (quoting *Marlo v. United*

21  *Parcel Serv., Inc*., 251 F.R.D. 476, 485 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011)).

22      JLI's cases deal with identifying demographics of class members and not with surveys

23  conducted for conjoint analyses.  For that reason alone, these cases are largely irrelevant.  In

24  addition, the surveys in many of defendants' cases had abnormally low response rates, raising the

25  specter that the surveys were poorly constructed and calling into question their reliability.  Neither

26  of those issues is apparent here.  Singer contends that there "is no maximum acceptable ratio of

27  dropped respondents to respondents who complete the survey," and notes his "pre-test

28  questionnaire describes precisely how a respondent was dropped from the survey."  Singer Reply

United States District Court
Northern District of California

87

United States District Court
Northern District of California

Report at 22-23. Even with that information defendants' experts were not able to identify any actual bias. Finally, as Singer's supplemental survey efforts show, other, significant demographic data could be collected at the merits stage if necessary. If that is not done, defendants will be able to cross-examine Singer regarding potential for bias and why demographic data was or was not collected.

Relatedly, JLI challenges Singer's survey on the ground that the survey questions were badly written and confusing. For example, with respect to the Safety-Risk survey, defendants note that in his deposition Singer was supposedly unable to describe or explain in detail the lung and cardiovascular "injuries" referenced in the disclaimer he tested. As another example, defendants contend that the Safety-Risk survey did not make it clear to respondents whether they were being asked to choose between identical products with different labels or between products with different attributes. JLI challenges the Addition-Risk survey on similar grounds, arguing that its usefulness is undermined because Singer did not define "addiction" and failed to define what it meant for products to be "twice as" or "half as" addictive as a pack of cigarettes. Defendants also complain that Singer did not attempt to account for the different experiences individuals had with nicotine and/or addiction. All of these arguments to go weight and not admissibility. Defendants are free to argue at trial that the utility of the surveys is diminished because a reasonable or typical consumer would not be able gauge either the intent of the questions or the meaning of addiction, the relative degrees of addictiveness, or the risk of specific physical injuries.[64]

In addition to the use of undefined terms, JLI argues that the failure of Qualtrics or Singer to "pretest" the surveys – to make sure the questions were not confusing, misleading, and accurately measure the respondent's preferences – is a fatal flaw. Instead, Singer conducted a "soft launch" or "pilot test" where he reviewed the first 200 responses and felt good about what he was seeing and did not conduct any further investigation to make sure the respondents understood the questions. Rossi Report ¶ 100. JLI contends that Singer's failure to conduct a more thorough,

---

[64] Singer, in his revised Safety-Risk survey, did address the confusion criticism and included "language to further clarify to respondents that products with different disclaimers are being represented to them as distinct products." Singer Reply Report ¶ 22.

formal pretest is a serious issue considering Singer's own admission that survey respondents made "economically irrational choices" at high rates, *e.g.*, 50-54% of respondents in both surveys "violated the basic economic principle that, all else equal, a consumer prefers to pay lower prices for the same product." JLI Omnibus Mot. at 62; Rossi Report ¶¶ 143-144. According to defendants, a formal pretest and investigation into the high level of irrationality was required to make the results reliable. *See MacDougall v. Am. Honda Motor Co., Inc*., No. SACV 17-1079 JGB (DFMx), 2020 WL 5583534, at *7-8 (C.D. Cal. Sept. 11, 2020) (excluding survey in part where respondents expressed confusion over survey questions and some respondents chose absurd or illogical responses that reflected a misunderstanding of the survey choices and instructions, concluding "the irrationality exhibited in individual survey responses evidences a deeply flawed conjoint study that produced unreliable results unreflective of actual WTP").

Singer's "soft launch," where he reviewed 200 initial survey responses (a significant sample size according to defendants' expert Rossi to identify structural errors)[65] and did not detect any flaws in the survey design is sufficient. Singer Reply Report at 10-11. Any further criticisms, such as the failure to use a focus group in advance, create a weight argument for defendants to make at trial but does not require exclusion.

### c.    Flawed Conjoint Study Methodology

JLI identifies a singular but significant error in how Singer handled the data; that, as discussed above, Singer "zeroed out" the answers of respondents who "refuted" plaintiffs' damages theory by preferring a product that was "twice as addictive" as cigarettes. Thus, while Singer was attempting to focus on "disutility" (respondents who expressed a lower willingness to pay for a "more addictive" product), these respondents – 40% in the Safety-Risk survey and 18% in the Addiction-Risk survey – expressed a net utility and willingness to pay more for a more addictive product. According to JLI, rather than factoring those responses into his price premium calculations, Singer reset them to zero, effectively rewriting almost half of the data creating a results-oriented analysis that is inherently unreliable under Rule 702 (in addition to the irrelevant

---

[65] October 4, 2021, Deposition Transcript of Peter Rossi ("Rossi Depo. Tr.") [Dkt. No. 2439-19] at 99-108.

1    under Rule 401 discussed above).

2          As above, Singer defends his use of a zero discount (as opposed to a negative discount) as

3    being based on economic rational theory.  Nonetheless, Singer re-ran his numbers for the

4    Addiction-Risk theory to account for a negative discount and "deployed a new" version of his

5    Safety-Risk theory to allow for a wider price range and account for the net utility of these

6    respondents.  At base, plaintiffs discount the 40% of respondents who expressed some net utility

7    and willingness to pay more for more dangerous products because Singer's CBC analysis

8    determines (as JLI acknowledges) the marginal consumer's willingness to pay.  Under that

9    analysis plaintiffs contend they have shown why but for defendants' omissions, all purchasers

10   would have paid less.  As noted above, the remaining disputes between the experts – as crystalized

11   in their supplement and sur-reply reports – go to weight and not admissibility.  See Dkt. Nos.

12   2534-2, 2536-4, 2550-2.

13         JLI also faulted Singer for using only three product variables (price, flavor,

14   addictiveness/safety label), ignoring supposedly other significant variables, and for placing the

15   addictiveness/safety labels in bright red lettering, focusing the respondents' attention and biasing

16   the results.  The selection of the variables (that appear to be in line with standard conjoint

17   guidelines) goes to the weight of the survey and not its admissibility.  *See, e.g., TV Interactive*

18   *Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1026 (N.D. Cal. 2013) ("the literature on

19   conjoint analysis condones testing six or fewer variables to produce results with a better predictive

20   value, and the Court will not exclude the [] surveys for failing to depart from this accepted

21   methodology.").  JLI has failed to show that some key or critical variable was omitted such that

22   there is no utility or relevance to Singer's analysis.[66]  The alleged "focus illusion bias" was fully

23   addressed in Singer's revised Safety-Risk survey and Reply Report.  *See* Singer Reply Report ¶

24   60.  Singer will not be excluded on these grounds.

25

26   _____

[66] This case, therefore, is unlike *Oracle Am., Inc. v. Google Inc*., No. C 10-03561 WHA, 2012 WL
27   850705, at \*10 (N.D. Cal. Mar. 13, 2012) where the expert's own testing showed significant to 39
     features but studied only seven (only three of which were covered by the patented functionality)
28   and where the particular selection used likely forced an artificial focus on a few key features
     leading to unreliable results.

United States District Court
Northern District of California

### d.      Unreliability of Youth Survey

Finally, JLI argues that Singer's youth survey is unreliable because inadequate steps were taken to make sure that representative class members – youth who purchased from a brick-and-mortar store or online while underage – were captured by the survey.  Instead, JLI complains that Singer's survey targeted non-youth users between 18 and 23 years of age who indicated they used e-cigarettes before they turned 18 years old, failed to collect demographic information (other than age range and state of residence), and included users who purchased from friends or family and other sources that place them outside the class definition.  These contentions that the respondents are overinclusive considering the narrower class definition and Singer's damages are resultingly overestimated go to weight and not admissibility.

In sum, JLI's motion to exclude Singer is DENIED.

## III.      PLAINTIFFS' *DAUBERT* MOTION

Dr. Dominique M. Hanssens, the Distinguished Research Professor of Marketing at the UCLA Anderson School of Management, was retained by JLI to review and evaluate the expert reports and opinions of Pratkanis that JLI's marketing communications sought to create demand for the JUUL product by using a "unique selling proposition" of a "tech lifestyle product that satisfies," and the report and opinions of Chandler that JLI reached all or nearly all media consumers through its advertising.  Hanssens Report [Dkt. No. 2310-10] ¶ 16.

Hanssens concludes that Pratkanis's report and opinions are based on the following critical flaws: (i) he ignored that JUUL's advertising and messaging changed over time such that JUUL could not have had a "unique selling proposition"; (ii) due to marketing messages and disclosure regarding JUUL varying over time, there were necessarily "differential impacts" of JLI's alleged misrepresentations and omission; (iii) because JUUL consumers are heterogeneous, the impact of JUUL's marketing messages would have varied across consumers, necessitating an "individualized inquiry into consumers' purchase decisions" in order to establish a causal relationship between JLI's misrepresentations and consumers' purchase decisions; and (iv) because JUUL users' perceptions of health and addiction risks shifted over time, "individualized inquiry" is required to determine whether any particular purchaser would have been affected by

1    JLI's alleged misrepresentations and omissions.  *Id.* ¶¶ 10-14.  Hanssens also concludes that the

2    opinions of plaintiffs' "reach" expert, Chandler, are unreliable because Chandler failed to consider

3    "reach estimates" from years prior to 2019 and the documents on which Chandler relies do not

4    support his assertion.  *Id.*¶ 15.

5            Plaintiffs move to exclude the opinions of Hanssens.  They argue, first, that his opinions

6    that marketers do not study or recognize the impact on "reasonable consumers" is false, contrary

7    to established marketing theory, and made only for the misdirected purpose of attempting to

8    undermine Pratkanis's opinions regarding "reasonable consumers."  *See e.g.*, *id.* ¶ 39.  Plaintiffs

9    note multiple cases and numerous marketing treatises recognizing the concept of "consumers

10   acting reasonably," including cites from Hanssens own publications.  Pls. *Daubert* [Dkt. No.

11   2439-3] at 3-4.  Plaintiffs contend that Hanssens's critique of the reasonable consumer standard is

12   contradicted by the general practice of marketing academics, and should be rejected as "an

13   unreliable personal opinion."  *Id.* at 4.  JLI's responds that Hanssens's opinion that "reasonable

14   consumer" is a legal construct and not independently recognized in marketing theory or research is

15   well grounded in his experience and does not create a basis to exclude.  Dkt. No. 2490.

16           At base, as discussed above, there is adequate support for Pratkanis's opinions regarding

17   the alleged USP as well as Chandler's reach opinions to support certification.  Hanssens's position

18   – most narrowly construed – that marketers do not utilize the concept of the "reasonable

19   consumer" – is not relevant to the standards applied to determine whether to certify the classes

20   sought by plaintiffs.  What Hanssens will be able to testify about on the merits – before the trier of

21   fact – will be circumscribed by the jury instructions and applicable legal standards.  I need not

22   delve into those questions at this juncture.

23           Plaintiffs separately challenge Hanssens's conclusions based on his "cherry-picking"

24   materials to review.  Pls. *Daubert* at 1.  Plaintiffs argue that Hanssens admits that he failed to

25   review all of the potentially relevant information at issue, limiting his review to documents that

26   would help him rebut the opinions of Pratkanis and Chandler, and that he ignored JLI's own

27   documents and research that contradicted his opinions.  *Id.* at 5.  Because Hanssens chose to be

28   end-result oriented in the information he reviewed, plaintiffs argue his methodology was biased

United States District Court
Northern District of California

1    and his conclusions unreliable.

2          Defendants respond that Hanssens was allowed as a rebuttal expert to constrict his review

3    of materials to those that were material to Pratkanis's or Chandler's own opinions.  As they say, at

4    most, this goes to the weight to be given to Hanssens's opinions but is not a ground to exclude.

5          Hanssens will not be excluded on these arguments at this juncture.  Plaintiffs may, of

6    course, renew their argument at summary judgment or *in limine*.[67]

7                                    **CONCLUSION**

8          For the foregoing reasons, the parties' motions to exclude under Daubert are DENIED.

9    Plaintiffs' motion for class certification is GRANTED.  The following classes are hereby certified

10   under Federal Rule of Civil Procedure 23(a) and 23(b)(3):

11   • Nationwide Class: All persons who purchased, in the United States, a JUUL product.

12   • Nationwide Youth Class: All persons who purchased, in the United States, a JUUL product

13      and were under the age of eighteen at the time of purchase.

14   • California Class: All persons who purchased, in California, a JUUL product.

15   • California Youth Class: All persons who purchased, in California, a JUUL product and

16      were under the age of eighteen at the time of purchase.

17         The classes are limited to individuals who purchased their JUUL products from brick and

18   mortar or online retailers.  The damages, restitution, and/or disgorgement sought are based on

19   retailer purchases and prices.  The proposed classes do not include any individuals who purchased

20   JUUL products only secondarily from non-retailers.  In addition, excluded from the proposed

21   classes are Defendants, their employees, co-conspirators, officers, directors, legal representatives,

22   heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel

23   and their employees; and the judicial officers and their immediate family members and associated

24   court staff assigned to this case.

25         The Court appoints Bradley Colgate, Joseph DiGiacinto on behalf of C.D., Lauren Gregg,

26   Tyler Krauel, and Jill Nelson on behalf of L.B. as representatives of the Nationwide Class; C.D.

27

28   ───────────────
[67] The rulings on the administrative motions to seal submitted in connection with the class
certification and related *Daubert* briefing will be handled in a separate order.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Krauel, and L.B. as representatives of the Nationwide Youth Class; Colgate, C.D., and L.B. as

2   representatives of the California Class; and C.D. and L.B. as representatives of the California

3   Youth Class.  The Court appoints Sarah London, Dena Sharp, Dean Kawamoto, and Ellen Relkin,

4   as Co-Lead Class Counsel, with the Plaintiffs' Steering Committee continuing to work for the

5   benefit of the class alongside, and under the direction of, Co-Lead Class Counsel.

6          Plaintiffs shall propose a Notice and Notice Plan, after meeting and conferring with

7   defendants, absent stipulation between the parties, within forty-five days of the date of this Order.

8   As part of that process, plaintiffs shall propose a Class Period for the classes certified.  To the

9   extent defendants have remaining objections to the Notice, Notice Plan, or Proposed Class Period,

10  after meeting and conferring, the parties shall submit a joint filing, not to exceed 10 pages

11  exclusive of exhibits, for my ultimate determination.

12         **IT IS SO ORDERED.**

13  Dated: June 28, 2022



William H. Orrick
United States District Judge