DAVID M. BERNICK (*pro hac vice*)
david.bernick@kirkland.com
RENEE D. SMITH (*pro hac vice*)
renee.smith@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

PETER A. FARRELL (*pro hac vice*)
peter.farrell@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

GREGORY P. STONE (SBN 78329)
gregory.stone@mto.com
DANIEL B. LEVIN (SBN 226044)
daniel.levin@mto.com
BETHANY W. KRISTOVICH (SBN 241891)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Juul Labs, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 19-md-02913-WHO |
| | **MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S ABATEMENT EXPERTS** |
| This Document Relates to: | Judge:    Hon. William H. Orrick |
| *San Francisco Unified School District v. Juul Labs, Inc., et al.* | |
| Case No. 19-cv-08177-WHO | |

# NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on a day to be determined by the Court, in Courtroom 2 of this Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California, Defendant Juul Labs, Inc. ("JLI") will and hereby does move the Court for an order excluding the testimony of the abatement experts of the San Francisco Unified School District ("SFUSD" or the "School District") as outlined below and according to the proposed schedule set forth herein. The Motion is based on this Notice of Motion and the following Motion to Exclude Testimony of Plaintiff's Abatement Experts.

Dated: August 15, 2022

Respectfully submitted,
By: */s/ David M. Bernick*
David M. Bernick (*pro hac vice*)
Renee D. Smith (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-231

By: */s/ Peter A. Farrell*
Peter A. Farrell (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave, N.W.
Washington, DC 20004
Telephone: (202) 389-5959

*Attorneys for Defendant Juul Labs, Inc.*

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................................... i

ISSUES TO BE DECIDED ................................................................................................ vi

BACKGROUND ........................................................................................................... 3

    A.    SFUSD's Nuisance Claim Is Based On Students Allegedly Vaping JUUL
    Products In Its Schools.................................................................................. 3

    B.    SFUSD's Experts Have Designed An Abatement Remedy Disconnected From
    The School District's Alleged Injuries And Defendants' Alleged Misconduct. ............... 4

        1.    Winickoff's Anti-Nicotine Cessation Programs. ..................................... 4

        2.    Kelder's Anti-Vaping Prevention Programs. ......................................... 5

        3.    Cutler's Cost Estimate Opinions. ..................................................... 7

ARGUMENT .............................................................................................................. 7

I.    WINICKOFF, KELDER, AND CUTLER HAVE NO METHODOLOGY FOR
    DETERMINING THE PREDICATE OF THEIR ABATEMENT PROGRAMS: THE
    EXISTENCE OF A YOUTH VAPING EPIDEMIC WITHIN SFUSD'S SCHOOLS. ................. 8

    A.    Winickoff Admits That His Opinion About The Existence Of An Epidemic Turns
    On Subjective "Feeling," Not Scientific Assessment. ........................................... 9

    B.    Kelder's Epidemic Opinion Is Not Based On Any Reliable Methodology. .................. 10

    C.    Cutler's Epidemic Opinion Is Based On His Subjective "Qualitative Sense"
    Rather Than Any Reliable Methodology. ......................................................... 11

II.    WINICKOFF, KELDER, AND CUTLER'S ABATEMENT PROGRAMS DO NOT FIT
    THE FACTS OF THIS CASE. ................................................................................ 12

    A.    Winickoff's Opinions Advocating Community-Wide Cessation And Treatment
    Programs Do Not Fit The Facts Of This Case. ................................................... 13

    B.    Kelder's Opinions Regarding Community-Wide Prevention Programs Fail The Fit
    Requirement. ......................................................................................... 15

    C.    Cutler's Opinions Confirm The Lack Of Fit Between His Estimates of Program
    Costs And The Facts Of This Case. ............................................................... 15

III.    THE "PROJECTIONS" OF FUTURE E-CIGARETTE USE UNDERLYING
    WINICKOFF, KELDER, AND CUTLER'S 15-YEAR PROGRAM DURATION ARE
    UNRELIABLE AND NOT BASED ON ANY PRINCIPLED METHODOLOGY. ................... 16

    A.    Winickoff, Kelder, And Cutler's 15-Year Opinions All Fail To Consider Real-
    World Data. ........................................................................................... 18

JLI's Motion To Exclude Testimony Of Plaintiff's Abatement Experts

**TABLE OF CONTENTS (CONT'D)**

Page

1.     SFUSD's Experts Ignore The Most Current Data On ENDS Use Generally And JUUL Use Specifically.................................................................. 18

2.     SFUSD's Experts Failed To Consider Structural Changes Affecting The ENDS Market........................................................................................... 18

B.    The Length of the Abatement Program Is The Product Of Purely Discretionary Judgment, Not Any Principled Methodology. ................................................... 20

CONCLUSION............................................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                    <u>Page(s)</u>

*Alpha GRP, Inc. v. Subaru of Am., Inc.*,
  2021 WL 1146029 (C.D. Cal. Feb. 8, 2021).........................................................................17

*Butt v. State of California*,
  4 Cal. 4th 668 (1992) ...........................................................................................................13

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007) ...............................................................................................12

*Daubert. James River Ins. Co. v. Rapid Funding LLC*,
  658 F.3d 1207 (10th Cir. 2011) ........................................................................................8, 10

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).................................................................................................. *passim*

*Daubert v. Merrell Dow Pharms., Inc. ("Daubert II")*,
  43 F.3d 1311 (9th Cir. 1995) ..........................................................................................8, 12, 13

*Diviero v. Uniroyal Goodrich Tire Co.*,
  114 F.3d 851 (9th Cir. 1997) .................................................................................................9

*El Ansari v. Graham*,
  2019 WL 3526714 (Aug. 2, 2019) .......................................................................................10

*Ely v. Cabot Oil & Gas Corp.*,
  2016 WL 4169220 (M.D. Penn. Feb. 17, 2016) ..................................................................10

*Grodzitsky v. Am. Honda Motor Co.*,
  957 F.3d 979 (9th Cir. 2020) .............................................................................................7, 8

*In re Incretin-Based Therapies Products Liability*,
  524 F. Supp. 3d 1007 (S.D. Cal. 2021).................................................................................17

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137, 119 S. Ct. 1167 (1999)................................................................................7, 12

*Laber v. Long View R.V., Inc.*,
  454 F. Supp. 3d 158 (D. Conn. 2020)....................................................................................10

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No. II)*
  892 F.3d 624 (4th Cir. 2018) ................................................................................................17

*O'Connell v. Superior Court*,
  141 Cal. App. 4th 1452 (2006) .............................................................................................13

*Otis v. Doctor's Assocs., Inc.*,
    1998 WL 673595 (N.D. Ill. Sept. 14, 1998) ......................................................................17

*Papadopoulos v. Fred Meyer Stores, Inc.*,
    No. C04-0102RSL, 2006 WL 1375074 (W.D. Wash. May 17, 2006) ...................................17

*People v. Padilla-Martel*,
    78 Cal. App. 5th 139 (2022) ...........................................................................................13

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*,
    2016 WL 5496340 (D. Minn. Sept. 28, 2016) ...................................................................16

*Tardif v. City of New York*,
    344 F. Supp. 3d 579 (S.D.N.Y. 2018)...............................................................................10

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
    949 F.3d 825 (3rd Cir. 2020) ...........................................................................................12

*United States v. Hermanek*,
    289 F.3d 1076 (9th Cir. 2002) ............................................................................................7

*Unwired Planet, LLC v. Apple Inc.*,
    2017 WL 589195 (N.D. Cal. Feb. 14, 2017) ..................................................................8, 16

## ISSUES TO BE DECIDED

Whether the Court should exclude the opinions of SFUSD's experts David Cutler, Steven Kelder, and Jonathan Winickoff advancing a suite of 15-year, county-wide, nicotine cessation and prevention programs styled as "abatement" of a nuisance allegedly caused by JLI, because these experts (1) predicate the need for abatement on the existence of an "epidemic" of youth vaping in SFUSD, but have no reliable (or even consistent) methodology for determining that the claimed epidemic exists, when it started, or when it will end; (2) make no attempt to tie the programs they advance to any alleged misconduct by JLI; and (3) lack a reliable approach for determining when their abatement programs should end, and instead set the plan's 15-year duration on an arbitrary and purely judgmental basis.

# INTRODUCTION

The public nuisance claim that Plaintiff San Francisco Unified School District is pursuing is necessarily circumscribed by the fact that it is *a school district*. SFUSD is not the legal representative of the students in its schools, the cities in which those students live, or the people of California. That is precisely why SFUSD attempted to limit its nuisance allegations to injuries "different in kind from those suffered by the general public, including, but not limited to, those arising from expending, diverting and increasing resources to make physical changes *to schools* and/or address property damage *in schools*." ECF 9, 3:19-cv-08177, Am. Compl. ¶ 756 (emphasis added). And it is why SFUSD expressly limited its complaint to seek only "relief to which it is entitled in its own right . . . not in any representative or *parens patriae* capacity." *Id.* ¶ 757.

As discovery unfolded, SFUSD made the strategic choice to forego calculating compensatory damages for the injuries on which its public nuisance claim was purportedly premised. To be sure, some of SFUSD's fact witnesses claimed that the School District's schools had suffered harms like lost classroom time or increased attention to disciplining students who vaped—claims that SFUSD's experts dutifully repeated in their reports. But SFUSD never came forward with records from which damages for those injuries could actually be quantified, and it elected not to have any of its retained experts do so.

Instead, the School District developed a case focused solely on abatement, an equitable remedy available to halt a public nuisance created by a defendant. But it is now clear that what SFUSD's experts call "abatement" has no connection to the supposed nuisance in SFUSD's schools, its alleged injuries, or to JLI's conduct. SFUSD's experts Winickoff, Kelder, and Cutler propose a massive and unprecedented public health initiative: community-wide cessation and prevention programs comprising in- and out-patient treatment, industry surveillance, community organization, mass media campaigns, and sundry other policy initiatives. The experts freely concede that these programs are in no way limited to past, present, or future student populations within SFUSD; to the contrary, they are available to the entire community, including all adults up to the age of 25 and people who pass through the San Francisco area at any point during the program's 15-year span. And all three abatement experts admit that they have not even attempted to tailor the remedies they advance to any claimed misconduct by JLI or even to JUUL products. Their programs are to be made available to all comers, regardless of whether a person has *ever*

used a JUUL product or saw any JLI marketing, and regardless of whether the person has *ever* set foot in a school run by SFUSD. According to Kelder and Cutler, these programs are to run for fifteen years, at a present-day cost █████████████.

In contrast with these cessation and prevention services for the public at large, two of SFUSD's experts opine about in-school infrastructure upgrades. Michael Dorn and Robert Rollo lay out a $60 million infrastructure campaign to impose digital and physical surveillance systems on the student population, ranging from cameras, location detectors, nicotine swabs, and lockdown systems. While these draconian measures have no precedent and the experts offer no reliable methodology to support their use in this case, as JLI will lay out in a separate *Daubert* motion,[1] they are at least ostensibly connected to SFUSD's schools.

Together, the abatement plans advanced by SFUSD's experts amount to an attempt to create a ████████ windfall divorced from the narrow scope of the School District's claimed injury—and ignoring entirely the obvious reality that it is not the remit of *any* school district to design, implement, and fund public health programs for the broader community. As JLI's contemporaneously-filed motion for summary judgment explains, California law compels judgment as a matter of law for defendants on SFUSD's nuisance claim. But even if there were some basis for the nuisance claim to proceed to trial, the abatement opinions of the School District's experts flunk the fundamental requirements of Rule 702 and *Daubert*: the experts have failed to come forward with any coherent scientific methodology for determining the existence, duration, or endpoint of the student vaping "epidemic" that is said to be the nuisance requiring abatement; the expansive programs they argue for are untethered from the School District's alleged injuries or JLI's alleged misconduct, and thus fail to fit the facts of this case; and the 15-year tenure of those programs was set not by any principled scientific analysis, but by discretionary judgment in order to ensure that all three abatement experts reached the same conclusion.[2]

---

[1]  The parties have agreed and will file a stipulation that JLI's motion regarding the related opinions of Messrs. Dorn and Rollo will be filed after Mr. Dorn's deposition, which was rescheduled to August 24 due to health issues.

[2]  Winickoff, Kelder, and Cutler's generic abatement opinions are the subject of JLI's previously-filed motion, ECF 2708, 3:19-md-02913, on which the Court deferred judgment. ECF 3327, 3:19-md-02913 at 1. All three experts reference and incorporate their generic opinions in their SFUSD reports. Accordingly, JLI respectfully refers the Court to its prior motion for additional bases on which their opinions should be excluded.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

A.   **SFUSD's Nuisance Claim Is Based On Students Allegedly Vaping JUUL Products In Its Schools.**

From the outset of the case, SFUSD's nuisance claim has, as one would expect, been directly linked to what the School District claims is happening inside its schools. Its complaint alleges the existence of "a public health crisis *in Plaintiff's schools*." *See e.g.*, ECF 9, 3:19-cv-08177 ¶ 716 (emphasis added). In its complaint, SFUSD parroted the "special injury" requirement that allows private persons (but not public entities like SFUSD) to bring public nuisance claims, representing that it was seeking damages exclusively "in its own right *and relating to the special damage or injury it has suffered*, and not in any representative or *parens patriae* capacity on behalf of students . . . ." ECF 9, 3:19-cv-08177, ¶ 757 (emphasis added); Cal. Civ. Code § 3493. To that end, the School District defined its injuries flowing from the nuisance as "expending, diverting and increasing resources to make physical changes to schools and/or address property damage in schools." *Id.* ¶ 756. Likewise, SFUSD alleged its injuries included classroom "disruption" and the "diver[sion of] staff resources away from classroom instruction and [to] addicted students." *Id.* ¶ 715.

At the motion to dismiss phase, the government entity plaintiffs relied on school-centered allegations like SFUSD's to avoid the dismissal of their nuisance claims. The bellwether plaintiffs successfully argued in to this Court that they were entitled to pursue nuisance claims because they had "suffered injuries different from those suffered by the community at large," including "harm to property and significant disruption in classrooms" that was "*unique to schools*" and "occurred *almost entirely on school property*." ECF 817 at 21 (emphasis added). SFUSD maintained that position throughout fact discovery, asserting that the nuisance for which it sued was a "public health crisis *in Plaintiff's schools*" arising from "student use of e-cigarettes on or near *school property*," and that the abatement of that nuisance called for "all resources necessary to address and remedy the e-cigarette epidemic *in Plaintiff's schools*." *See* Ex. 1, SFUSD 8/6/2021 R&Os, Resp. No. 2, 6 (emphasis added).

**B.    SFUSD's Experts Have Designed An Abatement Remedy Disconnected From The School District's Alleged Injuries And Defendants' Alleged Misconduct.**

The 15-year, community-wide abatement plan sponsored by SFUSD's experts is not tied in any meaningful way to the School District's alleged injuries, to conduct by JLI or any defendant, or even to JUUL products. The opinions of each expert are described below.

**1.    Winickoff's Anti-Nicotine Cessation Programs.**

Dr. Jonathon Winickoff is a pediatrician and a professor of pediatrics. Ex. 2, 1/28/22 Winickoff Rep. 2. Neither Winickoff's professional experience nor his academic training have anything to do with the assessment of abatement strategies or the design and operation of community abatement plans.

According to Winickoff, a ████████████████████████████ *Id.* at 10. Winickoff describes his abatement programs as ████████████████ to treat the use of and addiction to *all* nicotine and tobacco products, rather than JUUL vaping products. *Id.*; *see also id.* at 41-42 (████████████████████████████████████ Winickoff recommends pharmacologic treatment for those who are using tobacco products, with three different drug regimens administered in 12-week courses of treatment. *Id.* at 47-48. Because school districts do not administer prescription drugs to their students, Winickoff posits that SFUSD should contract with ██ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████ *Id.* at 49-50. Winickoff does not identify any ██████ ████████████ currently existing in California, nor does he point to any instance, anywhere, in which a school district has been responsible for contracting with such a facility to implement a treatment program like the one he recommends. Rather, his report acknowledges that this is typically the responsibility of ████████████████ (*id.* at 51) or a state's department of health. *Id.* at 52.

Winickoff goes on to state that his abatement proposal includes the cost of developing and implementing professional education and training programs for ████████████████ ████████████████████████████████████ ████████ *Id.* at 57.

███████████████████████████████████████████████████

████████████████████████████████ *Id.* at 62.

The rest of the ambitious public health agenda Winickoff advances under the banner of a nuisance remedy for the School District includes ██████████████████████████████ ███████████████ (*id.* at 65-66); ███████████████████████ (*id.* at 67); ███████ ████████████████████████████████████████████████████ ██████████████████████████ (*id.* at 70); █████████████████████████ (*id.* at 76-78, 82); and ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* at 81.

Winickoff's suite of cessation programs would be available to everyone in the county age 25 or younger, whether or not a person had any prior connection to the School District or ever used a JUUL product. *Id.* at 70. Like all of SFUSD's experts, Winickoff concludes that his proposed abatement program must run for 15 years, a duration he pegs qualitatively as having ████████████████████████ ████████████████████████████████████ *Id.* at 44.

Winickoff makes no effort to determine the cost of his plan. Instead, he relies on Cutler to determine the cost of his proposed treatment programs.

### 2. Kelder's Anti-Vaping Prevention Programs.

Dr. Steven Kelder is a professor of behavioral epidemiology at the University of Texas-Austin School of Public Health. Like Winickoff, Kelder opines that abatement is required to address a youth vaping "epidemic" in SFUSD. Ex. 3, 2/1/22 Kelder Rep. 16.

Kelder's report recommends what he characterizes as "strategies and interventions that should be implemented from a prevention perspective" to reduce all e-cigarette use—as opposed to use of JUUL products specifically—by people aged 25 or younger. *Id.* at 9. Kelder's "strategies and interventions" begin with "[s]urveillance and evaluation," which he describes as having the School District "contract[] with an outside health research organization" to conduct bi-annual assessments not only of its students but of "19-25-year-olds[] and parents to provide local stakeholders the information they need to make precise abatement decisions." *Id.* at 47-48. In similar fashion, Kelder's plan calls for hiring "personnel to serve as

the program management arm of abatement program planning and implementation," then contracting with yet another outside organization "to develop a blueprint of a community-based participatory research and implementation stakeholder organization." *Id.* at 51. Kelder eventually identifies those stakeholders as including state, city, and county organizations responsible for developing and executing initiatives, among them the state legislature and department of health. *Id.* at 53.

Kelder also calls for the School District's abatement recovery to include the expense of funding a community-wide mass media campaign, the details of which would, again, be outsourced by contracting with "an experienced counter-vaping media organization" (*id.* at 57); hiring and paying an unspecified vendor to develop an "[e]ducation and parent engagement" strategy whose content he declines to describe (*id.* at 60-61); and contracting "with advocacy organizations to discuss, plan for, improve upon and advocate local or state youth anti-vaping policies." *Id.* at 66. Kelder does not explain why SFUSD could be expected to have the expertise to oversee such a massive counter-vaping media campaign, or the hiring and supervision of any anti-vaping advocacy organization.

Kelder's consideration of the duration of this program is based on his assertion that it should run until there are five consecutive years in which e-cigarette prevalence rates are at no higher than 4.5%—a figure he plucks from 2013 that is *half* of the real-world rates that existed when JUUL launched in 2015. *Id.* at 43. From that premise, along with some assumptions about initial prevalence, Kelder performs arithmetic using twenty different rates of decline to identify twenty different potential program durations. *Id.* at 44. From that menu, Kelder plucks out 15 years as his final answer—not coincidentally, exactly the same time span chosen by the School District's other experts. *Id.* at 43. Fifteen years also happens to be the same abatement timeframe Kelder opined to in his September 20, 2021, generic expert report—a coincidence difficult to justify on any principled basis in light of the lower youth prevalence data published since Kelder's 2021 work[3] as well as the fact that he now assumes a lower initial prevalence (15% in his case-specific report as opposed to 20% in his generic report). Ex. 4, 9/20/21 Kelder Rep. 16, 85.

---

[3]    *Youth and Tobacco Use*, CDC,
       https://www.cdc.gov/tobacco/data_statistics/fact_sheets/Youth_data/tobacco_use/index.htm.

### 3. Cutler's Cost Estimate Opinions.

David Cutler is a professor of applied economics. Cutler disclaims any opinion on the correct approach to either cessation or prevention. Ex. 5, 1/28/22 Cutler Rep. 23-24. As is relevant to the abatement claim, Cutler opines on the cost of Winickoff's programs, then adds that figure to Kelder's calculations to arrive at a total price tag. *Id.* at 58.

Cutler's cost calculation uses the same 15-year span selected by SFUSD's other experts. He calculates the cost of Winickoff's abatement plan over that time based on two varying assumptions about the annual decline in youth vaping. *Id.* at 55. Cutler estimates the cost of implementing Winickoff's prevention program at ███████████████████████ When added to the cost of implementing Kelder's prevention program ████████████████ he calculates a total claim of ███████████████ *Id.* at 58.

## ARGUMENT

The abatement testimony of SFUSD's experts does not satisfy the requirements of Rule 702 or the Supreme Court's decision in *Daubert* and its progeny. Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if":

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

"It is well settled that bare qualifications alone cannot establish the admissibility of . . . expert testimony." *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002). Rather, Rule 702 requires that "[e]xpert testimony is . . . both relevant and reliable." *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) (internal quotation marks omitted). A proposed expert's testimony, then, must "have a reliable basis in the knowledge and experience of his discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138, 119 S. Ct. 1167, 1169 (1999) (internal quotation marks omitted). This requires district courts, acting in a "gatekeeping role," to assess "whether the reasoning or methodology underlying the

testimony" is valid and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993) ("*Daubert I*"). It is not "the conclusions that they generate" that matters, but that the "principles and methodology used by [the] expert [be] grounded." *Grodzitsky*, 957 F.3d at 984-85 (internal quotation marks omitted). Fed. R. Evid. 702.

Expert testimony is admissible only when it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert I*, 509 U.S. at 597; Fed. R. Evid. 702(a); *Unwired Planet, LLC v. Apple Inc.*, No. 13-cv-04134-VC, 2017 WL 589195, at *1 (N.D. Cal. Feb. 14, 2017) (excluding damages model that did not "fit the facts" of the case). "Under the relevance or 'fit' prong, the testimony must be 'relevant to the task at hand,' *i.e.*, that it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc. ("Daubert II")*, 43 F.3d 1311, 1315 (9th Cir. 1995) (quoting *Daubert I*, 509 U.S. at 597).

Winickoff, Kelder, and Cutler's testimony regarding the cessation and prevention components of the proposed abatement plan should be excluded because none of them offers a reliable methodology for determining the existence of a youth vaping "epidemic" within the School District—the predicate of the abatement plan—or when it began or will end; because their opinions do not fit the facts of the case, as they admit to not even attempting to tailor the remedy to any alleged misconduct by JLI or even to JUUL products; and because the 15-year endpoint of their public health programs is not the product of any principled, scientific methodology.

## I.   WINICKOFF, KELDER, AND CUTLER HAVE NO METHODOLOGY FOR DETERMINING THE PREDICATE OF THEIR ABATEMENT PROGRAMS: THE EXISTENCE OF A YOUTH VAPING EPIDEMIC WITHIN SFUSD'S SCHOOLS.

The ███████ abatement plan that Winickoff, Kelder, and Cutler sponsor is premised on their opinion that there is a "youth vaping epidemic" in SFUSD's schools.[4] But viewed individually or collectively, the School District's experts have failed to provide a coherent, principled methodology for determining that the claimed epidemic exists, or to supply any criteria for determining when it started, whether it has ended, and if not, when it will. The subjective judgments on which SFUSD's experts rely—

---

[4]   Ex. 2, 1/28/22 Winickoff Rep. 10 ████████████████████████████████████████
████████████████████████   Ex. 3, 2/1/22 Kelder Rep. 7 ("I concluded, to a reasonable degree of professional and scientific certainty, that a vaping epidemic exists in among [sic] youth in the United States."); Ex. 5, 1/28/22 Cutler Rep. 2 ████████████████████████████████████████).

by their own account, a matter of "feeling" in the community—fall woefully short of the bar set by Rule 702 and *Daubert*. *James River Ins. Co. v. Rapid Funding LLC*, 658 F.3d 1207, 1211 (10th Cir. 2011) ("*Daubert* and Rule 702 require more than a 'feeling.'"); *Daubert I,* 509 U.S. at 590 (expert testimony must be premised on "more than subjective belief or unsupported speculation"); *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) ("Rule 702 demands that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs.").

### A.   Winickoff Admits That His Opinion About The Existence Of An Epidemic Turns On Subjective "Feeling," Not Scientific Assessment.

Winickoff, the pediatrician and sponsor of the ████████ cessation and treatment plan, made no pretense of having a scientific basis for identifying an epidemic in SFUSD or anywhere else. In his opinion, declaring an e-cigarette epidemic comes down to what Winickoff describes as "really a matter of people in the community *feeling* like they were just overwhelmed with all of the youth e-cigarette use that was happening." Ex. 6, 4/29/22 Winickoff Dep. 159:16–160:16 (emphasis added). While Winickoff referred in passing to an epidemic connoting some level of frequency and intensity of product use, *id.* at 176:11-12, he ultimately disclaimed relying on *any* prevalence data to identify the alleged epidemic: "Now I can't point to one specific . . . piece of data, other than people saying it's an epidemic . . . [because] you know, this *feels* overwhelming." *Id.* 180:19-23. Consistent with that approach, Winickoff retreated to the assertion that the defining criteria of an epidemic is "not a number. It's a—it is how it's perceived." *Id.* 164:16-17. Winickoff's aversion to grounding his "epidemic" conclusion in any data was so complete that he refused to describe the approximately 900% rise in youth vaping between 2011 and 2015—pre-dating JUUL's launch—as an epidemic. *Id.* 162:11-163:14. The missing ingredient, in Winickoff's telling, is that "I did not hear the same types of language. It was of concern. It was—it was growing." *Id.* 163:12-14.

Tellingly, while he opines that there is an epidemic within the School District today, requiring the adoption of his abatement plan, Winickoff cannot tell when the epidemic started (*id.* at 225:6-22), nor could he offer any sort of yardstick that could be applied to determine when the epidemic may be over— a question he considered "beyond the scope of my report." *Id.* at 195:5-21. This concession is startling: it

precludes Winickoff from presenting any objective basis from which to conclude that *any* of his cessation or treatment programs would actually abate the epidemic he posits.

Having performed no analysis of community sentiment to inform his "feeling overwhelmed" opinion, and having identified no objective criteria that could be applied to such an analysis had he done one, Winickoff's opinions are both circular—the epidemic necessitates the programs, the programs are said to end the epidemic, but there is *no objective way* to determine the start or end of the epidemic—and unavoidably subjective. An expert's "feeling[s]" are "not a sound methodology under *Daubert*." *El Ansari v. Graham*, No. 17-CV-3963, 2019 WL 3526714, at *5 (S.D.N.Y. Aug. 2, 2019) (quoting *Tardif v. City of New York*, 344 F. Supp. 3d 579, 599 (S.D.N.Y. 2018)). Opinions based on an expert's subjective feelings, like Winickoff's sense that the community "feels overwhelmed", "fall well short of what is required of expert opinion testimony under *Daubert* and Rule 702." *Ely v. Cabot Oil & Gas Corp.*, No. 09-cv-2284, 2016 WL 4169220, at *4 (M.D. Penn. Feb. 17, 2016); *see also James River Ins. Co.* 658 F.3d at 1211 ("*Daubert* and Rule 702 require more than a 'feeling.'"); *Laber v. Long View R.V., Inc.*, 454 F. Supp. 3d 158, 167 (D. Conn. 2020) (an "inherent feeling" "does not withstand scrutiny under *Daubert*").

### B.   Kelder's Epidemic Opinion Is Not Based On Any Reliable Methodology.

Kelder, the proponent of the community-wide prevention programs, couched his opinion about the existence of an e-cigarette epidemic within the School District as a matter of "my professional and scientific opinion." Ex. 4, 2/1/22 Kelder Rep. 9. When pressed to explain what scientific approach guided that assessment, Kelder asserted that "what we do is we look at data and we use professional consensus and we also have fieldwork to determine whether there is an epidemic or not." Ex. 7, 5/3/22 Kelder Dep. 20:2-8. Setting aside the generality of that response, in the work he actually did for this case, Kelder did not identify any such sources—no data, no professional consensus, no fieldwork—as providing the framework for his opinion that an epidemic exists. To the contrary, Kelder admitted that he applied no statistical procedure to determine when the alleged epidemic arose. *Id.* at 196:2-6. He conceded that no reliable, consistent data shows that youth are vaping more frequently today than they did when JUUL launched. *Id.* at 183:2-12. And Kelder admitted that he is not aware of any consensus organization that considers a youth vaping epidemic to exist today. *Id.* at 184:7-14.

Kelder's lack of methodology is betrayed by his inability to square his conclusion with real-world data. He could not use his approach to determine when the epidemic began, offering that "the beginnings and endings of epidemics are a little challenging to place a precise date on." *Id.* 20:2-8. And Kelder conceded at deposition that from 2017 to 2018—the exact period in which he claims to be confident that an epidemic existed in the School District—youth vaping rates specific to SFUSD not only *declined* but declined to rates *lower* than they had been when JUUL launched in 2015. *Id.* at 157:12-159:20. An objective methodology for identifying an epidemic within the School District should have allowed Kelder to test whether the epidemic existed at earlier points in time than the post-JUUL date he cherry-picked. And a reliable methodology certainly would not have led him to opine that an epidemic attributable to JUUL products existed at a time he admits usage was below pre-JUUL levels and falling. Kelder's epidemic opinions should be excluded.

### C. Cutler's Epidemic Opinion Is Based On His Subjective "Qualitative Sense" Rather Than Any Reliable Methodology.

Like the School District's other experts, Cutler links the abatement plan to his opinion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ including SFUSD. Ex. 5, 1/28/22 Cutler Rep. 2. According to Cutler, there simply is no objective methodology to direct that assessment:

> So it's a qualitative description. So that is—so we have *a sort of qualitative sense*, that is, you can't just say anything is an epidemic. But at the same time there is not a number that says that when it reaches this percent, there's, therefore an epidemic and if it's not this percent, it's not yet an epidemic.

Ex. 8, 5/6/22 Cutler Dep. 83:14-23 (emphasis added). Like his counterparts, Cutler cannot pinpoint when the supposed epidemic began; he insists that an epidemic existed by 2018 and 2019, but cannot tell how much earlier than that it started. *Id.* at 86:13-87:7. Nor can he say when it will end, as his approach does not provide even "a conceptual measure" to make that determination on an objective basis. *Id.* at 87:8-21. "[W]hen an epidemic starts is difficult. When an epidemic ends is even more difficult to say." *Id.* at 87:21-24.

As Cutler acknowledged, the elimination of any objective approach and reliance on this "sort of qualitative sense" leaves the door open to draw conflicting conclusions about the same situation: whoever might be considering the question "makes a decision as to when they believe it has become an epidemic or not, and it's not—there is not a single measure that you can say we have all agreed that this is the

measure we are going to use . . . one analyst could say I believe this is an epidemic and another analyst could say I don't believe we've met that definition yet." *Id.* at 84:25-85:6, 85:19-22.

Critically, when asked whether there is an epidemic of JUUL use in particular within SFUSD, Cutler tiptoed around making product-specific conclusions with an admission that damns his broader epidemic opinion: "*there is not a scientific way to decide* whether—*there is not a scientific criteria* for whether there is a youth vaping epidemic—for a particular product. *One person may believe one thing and one may believe another.*" *Id.* at 98:18-24 (emphasis added). That is precisely the problem with the smell-test approach to the "qualitative sense" Cutler pegged as the determinant of a youth vaping epidemic. An analytical framework that permits divergent conclusions based on the conflicting judgment of individual analysts is no framework at all.

The abatement proposals of Winickoff, Kelder, and Cutler are all premised on the existence of a youth vaping epidemic. But these experts freely admit that they have no scientific, non-arbitrary basis for determining whether an epidemic exists, when it purportedly began, or how long it may last. In the absence of any scientific methodology for determining the existence or duration of an epidemic, the District's experts should not be permitted to speculate that a ███████ mass media, prevention, and treatment program is necessary to abate an epidemic whose existence and duration is supported only by "feelings" and conjecture.

## II.     WINICKOFF, KELDER, AND CUTLER'S ABATEMENT PROGRAMS DO NOT FIT THE FACTS OF THIS CASE.

To be admissible under Rule 702, expert abatement testimony must be reliable and "fit" the facts of the case. *Daubert II*, 43 F.3d at 1321 n.17. The "fit" requirement demands that expert testimony be "tied to the facts" of the case. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (quoting *Kumho Tire Co.* 526 U.S. 137 at 150 (1999). The "fit" requirement is not "merely a reiteration of the general relevancy requirement of Rule 402" but rather a more exacting one. *Daubert II*, 43 F.3d at 1321 n.17. Its premise is that expert testimony "carries special dangers to the fact-finding process because it can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* (internal quotation marks omitted). These requirements are equally applicable to issues tried to the bench or to the jury. *See UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,* 949 F.3d 825, 832-33 (3rd Cir. 2020).

In turn, relevance questions regarding the public nuisance claim implicate California substantive law, which holds that "principles of comity and separation of powers place significant restraints on courts' authority to order or ratify acts normally committed to the discretion of other branches or officials." *O'Connell v. Superior Court*, 141 Cal. App. 4th 1452, 1464 (2006). Consequently, California law requires that an abatement remedy for a public nuisance must be "proper and suitable to the facts of [the] case," "the least disruptive remedy adequate to its legitimate task," and "tailor[ed]" to the harm at issue. *People v. Padilla-Martel*, 78 Cal. App. 5th 139, 151 (2022) (internal citations omitted); *Butt v. State of California*, 4 Cal. 4th 668, 695-96 (1992) (same).

Winickoff, Kelder, and Cutler's abatement opinions lay out a broad array of public health initiatives that, by their own admissions, are not tethered to the facts of this case but instead aimed at nicotine use writ large. Their treatment and prevention plans apply to adults and to youth; to those who initiated use for any reason, at any time, on any product; and to those who currently use any vaping product. As a result, their programs apply to people who have never been exposed to any of the JLI marketing that SFUSD challenges (and never will be) and those who have never touched a JUUL product or set foot in a SFUSD school. In short, they are a legislative agenda for the entire county rather than a remedy tailored to the School District's allegations against JLI. The pervasive disconnect between the experts' programs and the alleged nuisance or SFUSD's purported injuries reveals the claim to simply be one for a JLI-funded account from which remedies for the community at large could be funded, eviscerating any connection to SFUSD's alleged injuries and reneging on the School District's express disclaimer of any claim in a representative capacity. Winickoff, Kelder, and Cutler's programs do not "fit" the facts of this case, and their testimony should be excluded under Rule 702 and *Daubert*. *See Daubert II*, 43 F.3d at 1321 n.17.

### A.    Winickoff's Opinions Advocating Community-Wide Cessation And Treatment Programs Do Not Fit The Facts Of This Case.

Winickoff's abatement programs are neither linked to any claims of misconduct by JLI nor do they seek to abate harms associated with the use of or initiation with JUUL products. According to Winickoff, he was never asked to consider what JLI might be found liable for or what injuries its conduct might have caused. Ex. 6, 4/29/22 Winickoff Dep. 134:13-22. His treatment and cessation programs thus cover

everyone in the county up to age 25 (and those who will meet that bar at any point for the next 15 years), regardless of any impact JLI had—or did not have—on their nicotine usage. *Id.* at 117:5-23; 119:21-120:3. For example, it is irrelevant to Winickoff whether a person initiated vaping on a JUUL product or that of some other manufacturer. *Id.* at 113:7-114:4. It is irrelevant to Winickoff whether a person is currently using a JUUL product, or ever has; thus, under his plan, JLI would pay for the treatment of people who had *never* come into contact with JUUL products. *Id.* 80:13-25, 82:9-17. "Even if they personally have never vaped with JUUL," Winickoff maintains, "they would still be eligible for treatment by virtue of being in the community." *Id.* at 93:4-7. Indeed, Winickoff's programs are framed to apply to all users of all nicotine products in the community—combustible cigarettes, chewing tobacco, lozenges, gum, vaping devices of any brand—rather than targeting users of JUUL products (which have not been sold in San Francisco since January 2020).[5] *See* Ex. 2, 1/28/22 Winickoff Rep. 47-82.

Winickoff's programs also lack any connection to the marketing content that SFUSD alleges was improper—or to any marketing content whatsoever. In his view, "as a practical matter, separating out those who saw JUUL ads . . .that would be very difficult." Ex. 6, 4/29/22 Winickoff Dep. 141:24-142:1. Instead, Winickoff decided to design a program that would simply "abate the problem generally." *Id.* As a result, "[t]here is no litmus test for what you happen, as an individual, to have been exposed to, to get treatment if you are in this community." *Id.* at 150:5-10.

Winickoff's decision to design a program utterly disconnected from JLI's marketing or its products leads to predictably absurd results. Winickoff admits that his programs would require JLI to pay over $166 million to "abate" the use of products authorized by the FDA that are made and sold by other companies (*i.e.*, JLI's competitors). *Id.* at 73:17-74:9. And he concedes that his abatement plan would require JLI to pay to "abate" the lawful use of e-cigarettes by adults. *Id.* at 75-77. In other words, Winickoff's programs would saddle JLI with a nine-digit bill to "abate" the use of indisputably lawful products by their legal adult users over the next decade and a half, irrespective of any contact whatsoever with JUUL's products or marketing at any time. *Id.* at 75-82. An opinion more lacking in fit is difficult to imagine.

---

[5]   *Environmental Health, E-Cigarettes Restrictions,* San Francisco Department of Public Health, https://sfdph.org/dph/EH/Tobacco/ecigarettes.asp.

**B.     Kelder's Opinions Regarding Community-Wide Prevention Programs Fail The Fit Requirement.**

Kelder's ▮▮▮▮▮ prevention programs suffer from the same flaws. When asked if he was familiar with the claims for which he was asked to design a remedy, Kelder candidly conceded that "the exact nature" of the case was "a little beyond me." Ex. 7, 5/3/22 Kelder Dep. 13:17-19. Indeed, Kelder embraced the lack of connection between his opinions and the allegations against JLI, emphasizing that he "was asked to create an abatement plan, not a JUUL plan." *Id.* at 59:24-60:2.

Kelder admits that his programs are not specific to SFUSD or its schools, but would instead sweep in everyone in the county in which they sit, including "[s]tudents, nonstudents, youth, [and] adults . . ." *Id.* at 75:8-18. Like Winickoff, there is no link between Kelder's abatement plan and any JUUL advertising. *Id.* at 145:8-146:11. Nor are his programs limited to, or targeted at, JUUL users; they apply to users of all e-cigarettes. *Id* at 146:16-18. Kelder was never asked by SFUSD "whether there is appropriate abatement relief that's focused on JUUL," and he admitted that it is impossible to determine from his report what that relief might be. *Id.* at 202:25-203:8. Simply put, Kelder's abatement opinions fail to fit this case because he, too, has come forward with a prevention campaign to address vaping generally and in across-the-board fashion, rather than the use of JUUL products specifically or any aspect of JLI's conduct.

**C.     Cutler's Opinions Confirm The Lack Of Fit Between His Estimates of Program Costs And The Facts Of This Case.**

Cutler's role with respect to the abatement claim was to project the 15-year cost of the programs Winickoff and Kelder designed. Cutler had no opinion on the substantive content of either program, but as the sponsor of Plaintiffs' bottom-line cost opinion he was obviously familiar with their scope and design. Ex. 8, 5/6/22 Cutler Dep. 23:13-24:21.

Cutler acknowledged the requirement that an abatement plan must be tailored to the wrongful conduct at issue, but went on to confirm that the plans proposed here do not even attempt to connect the remedy to anything JUUL-related. *Id.* 58:8-15. As he put it, "This is a plan to abate youth vaping. It is not specific to youth vaping of JUUL." *Id.* 66:15-17. Consistent with the testimony of the other experts, Cutler confirmed that the plan is not connected to the marketing campaigns SFUSD complains of. *Id.* 64:14-18 ("[I]t's a part of what's going into the abatement plan in terms of the marketing and so on. But it's not that

if JUUL hadn't done that, you wouldn't need to do that."). Nor is the plan tied to use of JUUL products in the past, currently, or in the future, much less to use of a JUUL product by a student at a school within SFUSD. *Id.* 66:6-17; 73:23-74:2; 77:11-17. In the most extreme articulation of any of the SFUSD experts, Cutler suggested that it would be *impossible* to design an abatement remedy tailored to the allegations in this case:

> Q. Isn't it true that—maybe you've said it's not necessary, but isn't it true there is no part of the abatement plan that's tailored to injury that's been caused by JUUL marketing in particular?
>
> ***
>
> A. The abatement plan here was designed to address the epidemic of youth vaping so it's a plan to reduce youth vaping. It's not a—it was not designed to say, nor could it—*nor would it even be possible* to design something to say this plan is designed to address youth vaping due to X. It's not—once you have youth vaping, you kind of—*it kind of doesn't matter how you got there. All the efforts to abate it would all have to be the same.*

*Id.* 63:10-64:4 (emphasis added); 62:17-22 ("I also think it's difficult to separate out in an abatement plan, it's virtually impossible to say this component of the plan is only because of this, and this component is only because of that.").

*Daubert*'s fit requirement does not allow an expert to throw up his hands and declare that a connection between his opinions and the facts of the case "kind of doesn't matter." The decision of the SFUSD experts to abdicate any effort at drawing that connection compels the exclusion of their opinions. *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, No. 13–2451, 2016 WL 5496340, at *6 (D. Minn. Sept. 28, 2016) (excluding damages testimony from experts during a bench trial where damages were not attributable to defendant's alleged misconduct); *see also Unwired Planet, LLC*, 2017 WL 589195, at *1 (excluding damages model that did not "fit[] the facts" of the case because the damages model was "targeted at an invention other than the one at issue in this litigation.").

## III.   THE "PROJECTIONS" OF FUTURE E-CIGARETTE USE UNDERLYING WINICKOFF, KELDER, AND CUTLER'S 15-YEAR PROGRAM DURATION ARE UNRELIABLE AND NOT BASED ON ANY PRINCIPLED METHODOLOGY.

Winickoff and Kelder both opine that their abatement programs must stay in effect for 15 years, and Cutler accepts that timespan as the basis of his cost calculations. To justify the 15-year duration, Cutler and Kelder each provide projections of the purported impact of the abatement on e-cigarette usage over the next decade and a half. They begin that exercise from the same point—each assuming a current

1   rate of 15%—then take markedly different approaches: ████████████████████

2   ██████████████████████████████████████ Ex. 5, 1/28/22 Cutler Rep. 55, while

3   Kelder calculates *twenty* different and far larger declines (from 11% to 30%) spiked with periodic

4   increases, a pattern of "natural variation" that he professes to draw from e-cigarette use. Ex. 3, 2/1/22

5   Kelder Rep. 43-44. After coordinating with Cutler, Kelder then picked the one scenario out of those twenty

6   that corresponds most closely to Cutler's projection and dubbed it the basis of his 15-year plan duration.

7   Ex. 8, 5/6/22 Cutler Dep. 127:4-10.

8           These conveniently converging projections should be excluded now, at the gatekeeper stage. All

9   expert opinions must be based on sound data and capable of being assessed for reliability. Without a

10  reliable basis, opinions are merely "result-driven analysis, or cherry-picking." *In re Incretin-Based*

11  *Therapies Products Liability*, 524 F. Supp. 3d 1007, 1036 (S.D. Cal. 2021) (quoting *In re Lipitor*

12  *(Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624,

13  634 (4th Cir. 2018)); *Papadopoulos v. Fred Meyer Stores, Inc.*, No. C04-0102RSL, 2006 WL 1375074,

14  at *2 (W.D. Wash. May 17, 2006) (an opinion with no identified methodology is "barred under *Daubert*

15  because [the opinions] cannot reasonably be assessed for reliability"). Long-term forecasts are particularly

16  prone to reliability problems. They must be based on "reasonably reliable evidence," not "unsubstantiated

17  assumptions." *Alpha GRP, Inc. v. Subaru of Am., Inc.*, No. CV182133, 2021 WL 1146029, at **10-11

18  (C.D. Cal. Feb. 8, 2021); *see also Otis v. Doctor's Assocs., Inc.*, No. 94 C 4227, 1998 WL 673595, at *6

19  (N.D. Ill. Sept. 14, 1998).

20          The lack of fit discussed above between SFUSD's abatement program and the conduct at issue in

21  this case taints its experts' projections from the outset: like the substantive scope of their cessation and

22  intervention programs, their future usage projections are not linked in any way to JUUL usage or to the

23  reduction of any harms allegedly attributable to JLI's conduct. While the Court need not go beyond that

24  lack of fit, the projections should also be excluded as unreliable because they fail to account for real-world

25  evidence regarding the ENDS marketplace, and because the endpoint of the programs is based on arbitrary

26  selection rather than a principled methodology.

27

28

**A.    Winickoff, Kelder, And Cutler's 15-Year Opinions All Fail To Consider Real-World Data.**

**1.    SFUSD's Experts Ignore The Most Current Data On ENDS Use Generally And JUUL Use Specifically.**

SFUSD's experts begin their projections with the shared assumption that today's baseline prevalence of youth e-cigarette use is 15%, for any use in the past 30 days. Ex. 5, 1/28/22 Cutler Rep. 54; Ex. 3, 2/1/22 Kelder Rep. 43. But that assumption is contrary to—and greatly exceeds—the most current usage data available when the experts prepared their reports: the 2021 National Youth Tobacco Survey ("NYTS") reported just 7.6% past 30-day usage among middle and high school students, and usage by adults aged 19-25 was nearly as low, at only 8.8%, in the National Health Interview Survey.[6] Those real-world rates were even lower for more frequent use; in the 2021 NYTS, only 3% of youth reported usage in 20 or more days of the past month, and 1.8% reported daily use.[7] These rates reflect a continued, substantial decline from 2019 peaks.

In keeping with their fit-free approach, the experts also failed to consider current data reflecting a substantial drop in the use of JUUL products. While the overall share of students who reported current e-cigarette use fell by about 60% from 2019 to 2021 (from 20% to 7.6%), the share who reported usually using JUUL fell by *more than 90%* (from 11.4% to 0.5%). Accordingly, the share of e-cigarette users who reported usually using JUUL also fell: in 2021, only 6.8% of current youth e-cigarette users in the NYTS reported usually using JUUL, a share well behind those of Puff Bar (26.8%), VUSE (10.5%), and SMOK (8.6%).[8]

**2.    SFUSD's Experts Failed To Consider Structural Changes Affecting The ENDS Market.**

The rate reductions "modeled" by the School District's experts to determine the duration of abatement are also unreliable because none of them considered known, structural changes *other* than their proposed interventions that continue to affect rates of e-cigarette use.

---

[6]   Park-Lee, Eunice et al., "Notes from the Field: E-Cigarette Use Among Middle and High School Students - National Youth Tobacco Survey, United States, 2021," *MMWR*, October 1, 2021, Vol. 70, no. 39.

[7]   *Id.*

[8]   *Id.*

For example, Winickoff admitted that he failed to take into account a variety of factors that have contributed to the already-observed decline in prevalence. Winickoff acknowledged that "Tobacco 21" laws raising the minimum age for purchase—like the one in effect in San Francisco since 2016—reduce vaping rates, but conceded that he did not take those laws into account in considering how long his abatement program should run. Ex. 6, 4/29/22 Winickoff Dep. 35:6-14, 37:21-40:3. Winickoff ignored the fact that there are fewer products on the market today than when rates peaked in 2019 (*id.* at 39:16-40:3), as well as the removal of flavored products from the marketplace. *Id.* at 29:20-25. Nor did he consider the effect that FDA regulation would have on the duration of his abatement program. *Id.* at 43:5-44:16. In particular, Winickoff acknowledged that under the PMTA process, when an e-cigarette product is authorized it will necessarily be marketed in a manner allowed by the FDA, but did not account for that regulatory regime in designing his 15-year plan. *Id.* at 57:16-22.

Kelder took the same blinkered approach. He did not consider the impact of the PMTA process and FDA regulation on the marketing of vaping products (Ex. 7, 5/3/22 Kelder Dep. 209:6-214:2; the removal of flavored products—a "detail" Kelder admitted he had never heard of before his deposition (*id.* at 209:25-211:2); or the effect of Tobacco 21 laws, which Kelder freely conceded "had an impact, yeah. I don't know how much." (*Id.* at 211:9-212:2)) Kelder did not attempt to measure the effect of *any* of these known events on prevalence rates, and instead ran his projections as if none of them had ever happened. *Id.* at 216:7-217:17. When asked to explain how his calculations could be factually grounded in the reality of how e-cigarette products are sold, Kelder retorted "That was not pertinent to my projections." *Id.* at 217:20-218:2.

Cutler's calculations suffer from the same flaws. He did not identify the impact of Tobacco 21 laws on vaping rates. Ex. 8, 5/6/22 Cutler Dep. 187:8-14. Nor did he determine any impact specifically attributable to the PMTA process or FDA regulation. *Id.* at 187:15-188:1. Indeed, Cutler did not quantify the individual impact of *any* policy (or *any* conduct by the defendants) to determine impact on future rates. *Id.* at 188:2-16. Cutler's only response was to insist that, while he had not quantified the impact of *any* known, real-world developments, his projections somehow reflected *all* of them: "I judged it more scientifically appropriate to consider the policies as a whole than to consider them independently." *Id.* at 187:11-14. As he put it, his two reduction curves silently incorporate any impacts of government policy

or company conduct because, in Cutler's view, "it was best to do them in aggregate." *Id.* at 189:11-12. The obvious problem with that black-box approach is that it makes it impossible to verify the approach Cutler took to account for any of these events—or even to verify the fact that he accounted for any of them at all.[9]

### B.     The Length of the Abatement Program Is The Product Of Purely Discretionary Judgment, Not Any Principled Methodology.

The 15-year span over which SFUSD's experts opine that the programs must remain in place does not embody any reliable methodology. First, the exercise is doomed from the outset by the experts' arbitrary selection of an endpoint that has no connection to the alleged impact of JUUL products or marketing. On the cessation and treatment side, Winickoff opines that a 15-year program would ███████

███████████████████████████████████████████████████████████████████████████

pointing to 2014 youth use levels ██████████ Ex. 2, 1/28/22 Winickoff Rep. 43-44. Cutler accepts Winickoff's "recommended" 15-year program for purposes of his prevalence and cost projections. Ex. 5, 1/28/22 Cutler Rep. 53-54. ████████████████████████████████████████████████

█████████████████████████████████ Ex. 5, 1/28/22 Cutler Rep. 56. For his part, Kelder sets the goal for his prevention programs as five consecutive years of prevalence rates at 4.5% or lower, a figure for which he goes back even earlier than Winickoff, to 2013 NYTS results. Ex. 3, 2/1/22 Kelder Rep. 43.

None of the rates these experts set up as the finish line is grounded in any consideration of the allegedly harmful impact of JLI's conduct that the programs purport to be abating. To the contrary, the prevalence rates that Kelder and Winickoff pluck from 2013 and 2014 survey data predate JUUL's mid-2015 launch by as much as two-plus years. And the post-2015 data flatly contradicts the experts' approach. SFUSD's experts ignore the fact that current national youth prevalence rates are lower than when JUUL entered the market, and much lower than they were the year *before* JUUL entered the market. CDC data from the NYTS indicate that prior to JUUL's entry into the market in 2015, the 30-day youth prevalence

---

[9]     In addition to the above, not one of the District's abatement experts mentions the July 21, 2018, passage of the San Francisco Health Code's Article 19Q, which prohibited the sale of flavored tobacco products. Ex. 9, 7/21/2028 San Francisco Health Code's Article 19Q.

rate was 11.3%.[10] After JUUL's entry into the market, the youth prevalence figure fell to 8.2% in 2016.[11] Today, the CDC reports that the youth prevalence rate is at 7.6%, lower than the pre-JUUL rate.[12] Kelder's proposal to run the abatement programs until youth use rates reach 4.5% for five years would make JLI underwrite a campaign to lower rates to less than *one-half* the level they were when JUUL products were introduced. *See* Ex. 3, 2/1/22 Kelder Rep. 40.

As Kelder conceded, there is no rational basis to hold JLI responsible for e-cigarette usage at levels that predate JUUL's existence and, thus, the conduct at issue in this case:

> Q.      It wouldn't be appropriate to blame JUUL for the percentage of teen usage in 2013 at 4.5 percent, right?
>
> A.      No.
>
> Q.      Whoever's product caused that, it was somebody else, right?
>
> A.      Yes.
>
> Q.      Pretty simple, right? It's not that complicated, is it?
>
> A.      Yeah.
>
> ***
>
> Q.      Okay, same with regard to 2014, right?
>
> A.      Yes.
>
> Q.      Didn't have a product, whatever the vaping levels were, couldn't have been them, right?
>
> A.      Yes.

Ex. 7, 5/3/22 Kelder Dep. 113:20-114:15. And Kelder went on to confirm that because JUUL did not enter the market until mid-2015 and took time to gain acceptance, it would be unfair to attribute to JLI even youth prevalence levels in the 2015 survey data. *Id.* at 114:23-115:12.

---

[10]   Tushar Singh et al., "Tobacco Use Among Middle and High School Students – United States, 2011–2015," Morbidity and Mortality Weekly Report, 65(14), 2016, pp. 361–367. The data collection for the 2015 NYTS was was completed in June 2015, the same month that JUUL launched. Consequently, the 2015 NYTS figures are reflect youth vaping prevalence that is "pre-JUUL."

[11]   Ahmed Jamal et al., "Tobacco Use Among Middle and High School Students – United States, 2011–2016," *Morbidity and Mortality Weekly Report*, 66(23), 2017, pp. 597–603

[12]   *Youth and Tobacco Use*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/Youth_data/tobacco_use/index htm

Second, the experts' convergence on 15 years is the product of discretion and apparent off-the-record coordination rather than independent application of any scientific methodology. For the cessation program, Cutler took at face value Winickoff's recommendation of a 15-year program and calculated prevalence rates over that span with two different (but constant) rates of decline: 2.6% (based on assumed uptake and success of the cessation programs) or 6.8% (based on the history of combustible cigarette usage after the tobacco Master Settlement Agreement). Ex. 5, 1/28/22 Cutler Rep. ¶ 56; Ex. 8, 5/6/22 Cutler Dep. 109:25-111:15, 112:7-113:1; 124:5-125:11. As noted above, the latter scenario is the one that leaves his projected 15-year prevalence at 5.2%, in the neighborhood of Winickoff's "low single digits" goal.

Kelder's approach differs from Cutler's in almost every single respect—except the result. Starting from an assumed 15% prevalence baseline, Kelder calculates yearly reductions ranging from 11% to 30%—nearly twice to almost five times Cutler's higher rate—and, instead of constant reductions, assumes periodic two-year reversals in which rates rise. Ex. 3, 2/1/22 Kelder Rep. 43-44; Ex. 7, 5/3/22 Kelder Dep. 226:1-22. Kelder calls this pattern of reversals—which are diametrically opposed to Cutler's steady decline scenario—"natural variation." He claims to derive this phenomenon from the trajectory of e-cigarette use, standing again in contrast to Cutler's use of combustible cigarette history as the basis for his projections. *Id.* at 227:24-228:24; Ex. 8, 5/6/22 Cutler Dep. 125:3-11.

Kelder then does the arithmetic to lay out all twenty scenarios, taking the baseline prevalence down at a rate from 11 to 30%, then periodically back up with "natural variation." Ex. 3, 2/1/22 Kelder Rep. 42, 44, Table 4. The result is an array of twenty different paths; in the three with the lowest annual decline rates, the goal Kelder posits of five consecutive years at 4.5% is never achieved, but in the other seventeen, that endpoint is reached between 10 and 22 years. *Id.* As Kelder admitted, there was no scientific reason for choosing the range of annual declines from 11% to 30%; for example, the only reason he didn't include even lower rates is "that wouldn't achieve the abatement goal." Ex. 7, 5/3/22 Kelder Dep. 234:19-235:7. Likewise, no statistical analysis or other modeling informed Kelder's choice from among the many options that met his goal condition. *Id.* at 254:14-25. Instead, as Kelder confirmed, "there is no established methodology for making the judgment" between those options; the choice boils down to "saying here's

1    what I think is more likely to happen." *Id.* at 264:17-25; 249:4-20 ("That's where you have to basically

2    exercise your judgment about where to go, right? A. Yes, this is illustrative in that regard.").

3         Remarkably, for all of the differences in the experts' approaches, the fifteen-year scenario Kelder

4    selects happens to be the timespan that not only matches the Winickoff recommendation but also the one

5    in which his "natural variation" leads to a 5.3 % prevalence in year 15 that matches Cutler's 5.2% almost

6    exactly:



20   Or perhaps it is less remarkable than it might seem; according to Cutler, the two experts conferred about

21   their approaches while drafting their reports, on a call with SFUSD's counsel. Ex. 8, 5/6/22 Cutler Dep.

22   127:4-15. When asked directly whether the two experts had discussed the fact that Kelder would land at

23   the same endpoint, Cutler was instructed not to answer. *Id.* at 132:20-133:4. Cutler went on to dismiss the

24   near-exact correspondence of their curves as "just a coincidence." *Id*. at 133:5-10.[13]

---

[13]  Cutler's projection is not the only one with which Kelder's opinion fortuitously converges. In his generic report, Dr. Kelder
      projected the duration of abatement using a higher baseline rate (20%) and a lower prevalence goal (2.5%)—allowing him
      to arrive at a 15-year duration, just as he does here. Ex. 4, 9/20/21 Kelder Rep. 79.

Irrespective of what may have been discussed on that coordinating call, the fact remains that Cutler and Kelder arrived at the same result using conflicting assumptions and approaches unified, in the end, only by Kelder's admittedly unscientific exercise of discretionary judgment. That is the antithesis of the reliable, principled methodology that *Daubert* requires.

## CONCLUSION

For the foregoing reasons, JLI respectfully requests that the Court exclude the abatement opinions of SFUSD's experts Winickoff, Kelder, and Cutler.

Dated: August 15, 2022

Respectfully submitted,

By: */s/ David M. Bernick*
David M. Bernick (*pro hac vice*)
Renee D. Smith (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2310

By: */s/ Peter A. Farrell*
Peter A. Farrell (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave, N.W.
Washington, DC 20004
Telephone: (202) 389-5959

*Attorneys for Defendant Juul Labs, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record. I also caused a copy of the under-seal documents to be served via electronic mail on all parties.

By: /s/ Renee D. Smith
Renee D. Smith

JLI's Motion To Exclude Testimony Of Plaintiff's Abatement Experts