# EXHIBIT 212

Page 1

1       IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4   IN RE: JUUL LABS, INC., MARKETING,:
    SALES PRACTICES, AND PRODUCTS     : No.
5   LIABILITY LITIGATION              : 19-MD-02913-WHO
    _____:
6

7

8            REMOTE VIDEO-RECORDED

9          DEPOSITION OF QUARRY PAK

10                  Volume I

11               October 7, 2021

12

13

14

15

16

17

18

19

20  Job No. 200253

21  Stenographically reported by:
    LAURA AXELSEN, CSR NO. 6173
22       RMR, CCRR, CRR, CRC

23

24

25

Page 34

1  available to the teachers and the parent workshops
2  and the staff workshops to help recognize this
3  because they've asked for it.
4          So that's -- you know, the presentations
5  would be, I guess, the evidence that would be
6  responded to a need.  And then I go to school sites
7  extensively because I -- I supervise, uhm, staff.
8  So in my conversations with them, they've just noted
9  that, you know, the younger that we start -- because
10 the younger that people start using, the more likely
11 they're going to be addicted.
12         So in my conversations with school social
13 workers, they're, like, oh, I have parents --
14 because their kids are still talking to them -- for
15 the 5th graders -- when they're middle school, high
16 schoolers, they're just with their friends and
17 things like that.  So they were asking me for more
18 resources how to talk to parents earlier on to --
19 like, in terms of preventing their kids from
20 actually even starting.
21         MR. OSBORNE:   Q.   Okay.  So besides --
22    A.   That's what I mean by reports.  I'm -- I'm
23 just going to clarify what you were asking.
24    Q.   Okay.  So besides the anecdotes that you
25 just described from your personal experience, does

Page 35

1  the District have any data related to the reports
2  that it's received from teachers regarding the youth
3  e-cigarette epidemic in the District?
4          MR. DOUGLAS:  Object to form.
5          THE WITNESS:  Those anecdotes are my
6  examples of what we have used to drive our
7  information in addition to the qualitative and
8  quantitative data from the surveys, our youth
9  leaders.  And so the teachers I work with, the
10 teachers in special assignment, uhm, they work
11 closely with health teachers, you know, in school
12 sites.  And so they would have similar experiences
13 to social workers and nurses that I work with in my
14 office.  They have also similar experiences.  So
15 together, even as of last month, you know, we
16 discussed what resources there are out there for
17 interventions.  Because now we're back in person, so
18 it's a persistent problem.
19         MR. OSBORNE:  Q.  Okay.  What are the
20 names of the social workers that have had the
21 experiences that you described?
22     A.  They're about 250 social workers that we
23 have at all school sites K-12.  So I wouldn't recall
24 the names exactly, but they're just -- they're
25 central social workers that we work with and there's

Page 77

1  you know, what you're asking, individual students in
2  that detail.  I have to say that that kind of
3  information is not something we ask the providers or
4  school staff or providers to record.
5      Q.  Is the District aware of any individual
6  student who has reported to the District that it
7  is -- that the student is addicted to nicotine?
8      A.  We provide information and resources for
9  our staff to address that issue.  So the staff were
10 telling us yes, they have reported that they have
11 contact with students who do report that they are
12 addicted.  They can't stop using.  They want to know
13 more about how they can stop using, and, uhm, also
14 our student leaders have told us that as well.  And
15 our PSAs have demonstrated, like, what they've seen
16 in class and outside of class.  Our public service
17 announcements --
18      Q.  For the record, motion to strike as
19 non-responsive.
20          Ms. Pak, is the District aware of a single
21 student who has reported to the District that they
22 are addicted to nicotine?
23          MR. DOUGLAS:  Objection; asked and
24 answered.
25          THE WITNESS:  I would say the District is

1  aware of many students who have reported this and
2  have met with social workers and nurses and
3  counselors.
4          MR. OSBORNE:  Q.  Okay.  Can the District
5  identify a student who has reported that they are
6  addicted to nicotine?
7          MR. DOUGLAS:  Objection; asked and
8  answered.  The District doesn't have to identify
9  individual -- every individual student.  That's not
10 the rule.
11         MR. OSBORNE:  Q.  Mr. Douglas, if this
12 deposition is going to continue today, you have to
13 stop testifying, sir.  You're taking up valuable
14 time, and we have very limited time.  The
15 question --
16         MR. DOUGLAS:  Your --
17         MR. OSBORNE:  The question -- the question
18 was not an ambiguous question.  The question was
19 very clear.  The witness can answer the question if
20 she knows the answer.  If she doesn't, she can say
21 she doesn't know and we can move on.
22         MR. DOUGLAS:  I will say this, and then I
23 will try to stop and just object to form.  You keep
24 asking her the same question and she keeps giving
25 the same answer.

Page 83

1  was specifically about addiction, not use. Does the
2  District have any documents that would show which
3  social workers received reports of students being
4  addicted to nicotine?
5      A.  When I say use, I include addiction use or
6  possible addiction. We -- there's no way of us
7  knowing if the students, when they're referred,
8  until we talk to them, if they are experiencing
9  addiction or not. So that's why I'm trying to be
10 very specific about the records because we don't
11 have records of that that I know of.
12     Q.  You don't have records of which social
13 workers have received reports of students being
14 addicted to nicotine?
15     A.  Not that I'm aware of.
16     Q.  Ms. Diamond, could we scroll to Paragraph
17 718. So Paragraph 718 says in the first sentence,
18 "Plaintiff has had to devote and divert staff
19 resources to conduct staff training on e-cigarette
20 use. And that plaintiff's, teachers, administrators
21 have had to become educated about defendants'
22 products and their dangers."
23         What, if any, staff resources have been
24 diverted to conduct staff training on e-cigarette
25 use?

Page 84

1        A.   Staff resources in terms of time.  Their
2   time to develop PowerPoints and Google slides and to
3   do research and use the materials that were designed
4   for students to be used with staff and parents and
5   caregivers.  And so the time also -- that we had to
6   make the time at each school during a faculty
7   meeting or a parent workshop night, parent and
8   caregiver workshop night, to have time dedicated on
9   their very packed agendas to discuss, uhm, what it
10  is when we talk about e-cigarettes because they're
11  a different product than a cigarette or even a cigar
12  or any combustible, like traditional cigarette.
13            These are new products.  So there was very
14  little knowledge, and the amount of education we had
15  to do was a large amount of sort of developing.  And
16  there was nothing out there initially to explain
17  this, so we had to develop it ourselves.  And as the
18  products were coming out -- new curriculum
19  development is very slow process, so there was very
20  little to no information about that.  So we had to
21  develop it ourselves from like random flyers and
22  just the advertisement was out there that we could
23  become aware of.
24            And also each school site, you know, has
25  limited time.  It might have like an hour like every

Page 85

1   other week or month to talk to their staff about
2   everything that you need to run a school in terms of
3   curriculum, safety, logistics, football games, you
4   know, all the things -- hiring, and all of the
5   things that you need to run a school. So we had to
6   set aside time to stay. And the teachers wanted to
7   know more about what they were seeing in their
8   classrooms and what the policies were.
9         So reviewing the School District policies
10  and what they should do and what supports that are
11  available to meet with the students and talk with
12  the families. And just all of the time because
13  these products were very new and people didn't know
14  anything about them.
15      Q. And has the District quantified the amount
16  of time that was diverted toward staff training on
17  e-cigarette use away from all these other things
18  that you listed?
19      A. We know it took our time that -- for each
20  school site. I wouldn't have a total quantity time.
21  It's probably just an estimate.
22      Q. Okay.
23      A. But it's -- I don't have hard number, if
24  that's what you're asking. I'm not sure of what
25  you're asking.

Page 90

1         MR. DOUGLAS:  Object to form.
2         THE WITNESS:  The sentences that we just
3    read refer to substance use prevention.
4         MR. OSBORNE:  Q.  Okay.
5         A.  So all of the things that we just read
6    together, parent education involvement, these are
7    known protective factors to prevent, uhm, students,
8    young people from using substances in place of
9    having healthy relationships and coping skills and,
10   uhm, academic achievement, you know, involvement in
11   community activities or athletics.  So it's a
12   comprehensive prevention plan.
13        Q.  Okay.  And my question is if -- if the --
14   well, am I correct that the District is required to
15   follow this policy?
16        A.  Yes.
17        Q.  Okay.  So if the District is required to
18   follow this policy, my question for you is how are
19   the e-cigarette programs that you described a
20   diversion of time away from the District's
21   requirements?
22        A.  So if we're talking about prevention, which
23   is what you're highlighting, it doesn't really
24   address the question that you're asking.  Uhm, what
25   you're asking more is about intervention --

Page 91

1  prevention, intervention, and discipline.  Uhm, what
2  we found is that the amount of education that we had
3  to do was more -- substantively more than what we
4  had to do previously before ENDS became available
5  and Juul became available and all the other new
6  products because there was no knowledge -- there's
7  no knowledge of what even the products look like.
8           There was no knowledge of what the effects
9  were.  There still isn't sufficient knowledge of the
10 consequences.  So we have already the knowledge of
11 the tobacco products and cigarettes, and we provide
12 that education.  As explained in the previous
13 question, there was nothing out there.  So we were
14 having to develop things as things were coming
15 out -- educational resources.  And we were in
16 communication with UCSF, basically the world class
17 researchers on tobacco nicotine, and they were
18 telling us that they didn't know.
19          So there was nothing out there to educate
20 people on other than the things that were coming out
21 that we saw in terms of students using and the
22 advertisements and the science that was coming out
23 after that and the curriculum that was coming out
24 way after that.
25          So that is what we mean by, like, having

Page 92

1  time to even figure out what was going on and become
2  aware of what's going on and also learning that --
3  taking what we know about nicotine and effects of
4  nicotine on the teenage brain and younger, like
5  younger adolescents and pre-teens.  So we had to put
6  all that information together ourselves, uhm,
7  because that information was not out there.
8       Q.   So doesn't this policy also talk about
9  intervention, ma'am?
10      A.   Yes.
11      Q.   And doesn't it also talk about enforcement
12 and discipline?
13      A.   Yes.
14      Q.   Okay.  So if this policy requires the
15 District to work on instruction and prevention,
16 intervention, non-punitive self-referral and
17 self-disclosure, recovering student support, and
18 enforcement and discipline, how is it a diversion of
19 resources for the District to provide education to
20 students and parents and teachers in the community
21 regarding instruction and prevention, intervention,
22 non-punitive self-referral and self-disclosure,
23 recovering student support, and enforcement
24 discipline as it relates to vapor products?
25           MR. DOUGLAS:  Object to form.

Page 93

1      THE WITNESS:  I don't think it's an
2  either/or answer to your question, Mr. Osborne.  I
3  think that is our responsibility and duty as a
4  school district and a society responsibility not to
5  have young people use nicotine.  So on behalf of the
6  School District, we have to be responsible for their
7  health and safety while they're at school.  It is
8  our obligation, and it is our policy to provide
9  these services, education, prevention, intervention,
10 et cetera.
11       MR. OSBORNE:  Q.  Thank you for that,
12 ma'am.  Uhm, and so what I'm kind of focusing on is
13 what the District alleges in the complaint, which is
14 that providing those services was a diversion as it
15 relates to vapor products.  And so my question is,
16 uhm, how if -- if the policy requires the District
17 to provide all those tools related to vapor, is it a
18 diversion for the District to provide the tools
19 related to vapor?
20       MR. DOUGLAS:  Object to form.
21       THE WITNESS:  So let me be clear.  Yes, it
22 is our obligation.  And yes, it was also a
23 diversion.
24       MR. OSBORNE:  Q.  Okay.  So can you
25 explain why it was a diversion?

Page 94

1           MR. DOUGLAS:  Objection; asked and
2    answered.
3           THE WITNESS:  Because it took an inordinate
4    amount of time.  It took additional time
5    substantively because we did not know about these
6    products.  No one knew about these products, but
7    what we did know was the effect of nicotine.  So we
8    had to educate -- and when I say "we," it's the
9    School District, the teachers, administrators, the
10   nurses, social workers, the principals.  A variety
11   of people -- we're talking thousands of people --
12   had to become educated on a new -- new product.  A
13   new way of delivering nicotine, which had not been
14   seen before.
15           So yes, it is an obligation.  And yes, it
16   was also a diversion.  I'm trying to be clear to
17   answer your question.
18           MR. OSBORNE:   Q.  Thank you.  And so you
19   mentioned that it took an inordinate amount of time.
20   Does the District know how much time it took to
21   develop the resources as it relates to vapor
22   products?
23      A.   Years.  And we're still working on it.
24      Q.   Okay.  And is that years of -- of employees
25   working full-time on vapor products?

Page 114

1  like that.  But actual people are funded by a
2  variety of funding.
3      Q.  Okay.  And when you said "we" regarding the
4  posters, postcards, and slides, are you referring to
5  TUPE funded staff members?
6      A.  Yes.
7      Q.  Okay.  What are youth outreach workers?
8      A.  They're middle and high school students who
9  are trained to become peer health educators.
10     Q.  Are the youth outreach workers paid for
11 their time working on vapor issues?
12     A.  Yes, they're given a stipend.
13     Q.  Okay.  What is the funding source for the
14 stipend that youth outreach workers receive?
15     A.  It varies.  It's usually the Department of
16 Children, Youth, and Families.  It could have been
17 PEEF, or in the past it could have been the tobacco
18 use prevention grant.
19     Q.  Are there currently any youth outreach
20 workers funded by TUPE?
21     A.  No, because that is not an allowable
22 expense anymore.
23     Q.  Okay.  What do you mean by allowable
24 expense?
25     A.  An expense allowed by the Department of

1  Education, the California Department of Education.

2      Q.  And is the District aware of a reason why
3  it is no longer allowable to pay youth outreach
4  workers from the TUPE grant?

5      A.  No, we weren't given an explanation other
6  than it's not allowed.

7      Q.  And does the District know approximately
8  when that message was communicated that it was no
9  longer allowed to use TUPE funding to pay for youth
10 outreach workers?

11     A.  Sometime between 2018 and 2019.

12     Q.  Ms. Diamond, could you go back to
13 Exhibit 3, and we'll be in Paragraph 720.  By the
14 way, Ms. Pak, we've been going for over another
15 hour, so whenever you are ready for a break please
16 let me know.

17     A.  Okay.  I think I'll need to have a break in
18 about 5, 10 minutes depending on what this is.

19     Q.  All right.  Okay.  So in Paragraph 720, the
20 complaint states, "The work that plaintiff does to
21 educate students and parents is particularly
22 important and necessary as a result of the
23 widespread misinformation about e-cigarette
24 products."

25         And then it states, "Many students in

1    MR. DOUGLAS: Object to form.
2    THE WITNESS: We don't have records of
3 individual students that I know of. We have records
4 of what the students have reported and the surveys
5 and what the teachers have reported to us that
6 they're seeing in schools and class, some of the
7 materials that they need to educate the students.
8    MR. OSBORNE: Q. Okay. And so from the
9 different examples you provided, a survey or what a
10 teacher is reported, uhm, are you aware of any
11 survey response indicating that an individual
12 student was deceived by Juul's marketing materials?
13    MR. DOUGLAS: Object to form.
14    MR. OSBORNE: Q. And when I say "you," I
15 mean the District, of course.
16    A. Sure. Of course. We're aware that
17 students were not aware of the harms and the risks.
18 That they didn't know about nicotine in Juuls or
19 e-cigarettes. So that was our responsibility to
20 provide that information. Again, it's many
21 students. I cannot name an individual student.
22 This is reports from surveys and observations of
23 teachers and our staff.
24    Q. Okay. And so, again, you're answering --
25 you're providing helpful information, but it's

1  counselors to follow up on that referral.
2         MR. OSBORNE:   Q.   Does the District know
3  how many students were disciplined for e-cigarette
4  use in District schools in the year 2014?
5      A.   Can you repeat that question?
6      Q.   Sure.  Does the District know how many
7  students were disciplined for using e-cigarettes on
8  campus in District schools in the year 2014?
9      A.   I'm not aware of that number.  But I would
10 say that number would be very little to none, in my
11 experience and estimation, because we didn't have
12 that information.  What we had was the policy, and
13 we had the policy so we could prevent that from
14 happening.  Sorry.  There's an airplane passing by.
15         So we were advised that it was a
16 requirement of our tobacco use prevention education
17 grant to be aware of this, uhm, new technology of
18 e-cigarettes and to include that in -- or ENDS
19 specifically, electronic nicotine delivery systems,
20 all inclusive, and to include that in our board
21 policies in 2014.  So I would say we had little to
22 none.
23     Q.   You had little to none incidents of
24 discipline for students related to using
25 e-cigarettes on campus in 2014?

1      A.   Correct.

2      Q.   And does the District know how many

3 discipline incidents there were for e-cigarette use

4 in District schools in 2015?

5      A.   I would say the numbers were very few.

6      Q.   And what's that based on, your testimony

7 that the numbers are very few?

8      A.   The rates of usage that we have reported on

9 the surveys and also the information in Synergy and

10 BASIS and the SIS systems.  Just if you look at --

11 if we were to take the review of all the database

12 systems from 2014, 2015, you would -- you would get

13 those numbers.  I don't have it off the top of my

14 head.  But I can see what the numbers, in

15 correlation of what the survey results and what we

16 hear from our students, and, again, what the

17 incidents on the student information system and

18 BASIS.  Our records are there as well.

19      Q.   Have you previously reviewed the

20 information in Synergy for the year 2015 to

21 determine how many students were disciplined for

22 e-cigarette use on campus in 2015?

23      A.   No, I have not.  I think the search would

24 have to be done more, uhm, like, targeted for

25 looking for that information.

1          MR. DOUGLAS:  Object to form.
2          THE WITNESS:  Schools have asked what
3  they're supposed to do with these products because
4  they don't have a mechanism for disposal or
5  processing, or they can't hold onto them.  They
6  don't want to hold onto them.  So it's a dilemma
7  what to do with all of these products.
8          MR. OSBORNE:  Q.  Uhm, have -- does the --
9  does the District have any reports of specific
10 parents who have complained about there being a
11 hazardous waste problem from Juul products?
12     A.  Not that I'm aware of.
13     Q.  Does the District have any records of
14 reports from students that there's a hazardous waste
15 problem from Juul products?
16     A.  Not specific students.  And not that I'm
17 aware of, no.
18     Q.  Okay.  Is the District aware of any
19 complaints from the maintenance departments of
20 schools of a hazardous waste problem caused by Juul
21 products?
22     A.  Not that I'm aware of.
23     Q.  Okay.  Is there anyone at the District
24 working on addressing this alleged issue with
25 hazardous waste?