# EXHIBIT 333



Howard A. Willard III
Chairman and Chief Executive Officer

October 14, 2019

The Honorable Richard J. Durbin
United States Senate
711 Hart Senate Office Building
Washington, DC 20510-1304

The Honorable Patty Murray
United States Senate
154 Russell Senate Office Building
Washington, DC 20510-4704

The Honorable Richard Blumenthal
United States Senate
706 Hart Senate Office Building
Washington, DC 20510-0704

The Honorable Edward J. Markey
United States Senate
255 Dirksen Senate Building
Washington, DC 20510-2104

The Honorable Jeffrey A. Merkley
United States Senate
313 Hart Senate Office Building
Washington, DC 20510-3705

The Honorable Sherrod Brown
United States Senate
503 Hart Senate Office Building
Washington, DC 20510-3505

The Honorable Jeanne Shaheen
United States Senate
506 Hart Senate Office Building
Washington, DC 20510-2906

The Honorable Tom Udall
United States Senate
531 Hart Senate Office Building
Washington, DC 20510

The Honorable Elizabeth Warren
United States Senate
309 Hart Senate Office Building
Washington, DC 20510-2103

Dear Senators:

I write in response to your October 1, 2019 letter. We appreciate the opportunity to answer your questions and provide additional information about Altria and its tobacco operating companies as well as our long-standing commitment to tobacco harm reduction and underage tobacco prevention.[1] We firmly believe in the long-term harm reduction opportunity that e-vapor products offer adult smokers who are interested in migrating from cigarettes to non-combustible tobacco products. In fact, this commitment to tobacco harm reduction drove our investment in

---

[1] For purposes of this response, "Altria" is defined to include Altria Group, Inc. and any one or more of its operating and service companies.

JUUL. At the same time, we recognize that this harm reduction opportunity for adult smokers is at risk because of high rates of youth use of e-vapor products.

To be clear, at Altria, we find the current youth vaping rates and trends entirely unacceptable, and we are committed to helping reverse those trends. We firmly believe all tobacco products should be regulated and kept out of the hands of kids, which is why we have called on Congress and the states to pass legislation raising the minimum age to purchase tobacco products to 21 and why we support FDA's plan to remove flavored e-vapor products from the market pending a marketing authorization decision.

Nearly 20 years ago, Altria was the only major tobacco manufacturer that supported federal regulation of tobacco. We pursued FDA regulation of tobacco products for several reasons, including the belief that tobacco product manufacturers should be held to a common set of high standards to market and sell tobacco products to adult consumers. We also believed FDA regulation of tobacco products would create a meaningful framework for evaluating potentially less harmful tobacco products and determining how to communicate truthful and accurate information to adult tobacco consumers. Ultimately, in 2009, Congress enacted a new regulatory framework through the Tobacco Control Act ("TCA"). The TCA accomplished many of these goals, not the least of which was the creation of pathways for bringing innovative, potentially reduced-harm products to the market.

As you know, in 2017, the FDA announced its current Comprehensive Plan for Tobacco and Nicotine Regulation under the leadership of then-Commissioner Gottlieb. This plan recognizes a continuum of risk for tobacco products. Further, the plan recognizes that adults who need or want nicotine should have access to nicotine, but through less harmful, non-combustible products. Within that framework, we believe that e-vapor products offer a significant reduced harm opportunity for adult smokers. As former Commissioner Gottlieb stated, "[e]-cigarettes may present an important opportunity for adult smokers to transition off combustible tobacco products and onto nicotine delivery products that may not have the same level of risks associated with them."[2]

Of course, no single product will satisfy all adult smokers looking for alternatives. That is why our tobacco operating companies offer a portfolio of non-combustible tobacco products to meet the interests of adult tobacco consumers. We offer the leading moist smokeless tobacco and oral pouch products. Through our partnership with Philip Morris International ("PMI"), we offer the world's leading heat-not-burn product, *IQOS*, here in the U.S. As you may know, *IQOS* is the

---

[2] Press Release, Statement from FDA Commissioner Scott Gottlieb, M.D., on new steps to address epidemic of youth e-cigarette use (September 11, 2018), *available at* https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-steps-address-epidemic-youth-e-cigarette-use (last visited October 11, 2019).

Page 2

5185547865

first next-generation tobacco product to receive FDA authorization through its Pre-Market Tobacco pathway ("PMTA") as appropriate for the protection of public health. And, through our investment in JUUL, we participate in the e-vapor category with a leading e-vapor product for adults. Of course, these products are – and should be – subject to extensive regulation by the FDA.

All of this provides backdrop to the central point: we know that youth use of e-vapor products jeopardizes the long-term harm reduction opportunity that e-vapor products present to adult smokers. We will continue to work with the members of Congress, FDA, and others to find real solutions that will reverse the current youth usage trends.

## QUESTIONS AND RESPONSES

Q. **When did Altria, or any of its employees, consultants, or contractors first discuss with JUUL, or any of its employees, consultants, or contractors, the potential for a corporate investment from Altria in JUUL?**

A. As part of our ongoing responsibilities to our shareholders, Altria's leadership regularly examines strategies for growth that may include exploring investment in or acquisition of companies or technologies that can advance our commitment to tobacco harm reduction.

Although our preliminary outreach to JUUL was in early 2017, it wasn't until the Spring of 2017 that we entered into confidential discussions with JUUL to explore some type of strategic relationship. Those discussions took place over a period of approximately 18 months. Those talks broke down numerous times before one or both parties renewed the discussions. Ultimately, conversations renewed in late October 2018, leading to a December 20, 2018 public announcement.

Q. **Why did Altria pursue its investment in JUUL?**

A. For several years, Altria has focused on building a leading portfolio of potentially reduced harm products for adult smokers. We believe there are three categories of non-combustible products that are particularly relevant to current adult smokers: oral, e-vapor and heat-not-burn products. Through the U.S. Smokeless Tobacco Company, we have a leading position in the smokeless tobacco category and 80% ownership of *on!* nicotine pouch products. We also have an exclusive U.S. license to commercialize PMI's leading heat-not-burn product, *IQOS*.

In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our

5185547866

ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products.

Of course, at the time of the transaction with JUUL, FDA had publicly raised concerns over youth use of e-vapor products. We were committed then – and continue to be – to playing a leadership role in reversing the trends among youth. Altria has more than 20 years of experience addressing underage tobacco prevention, and we believed this could benefit JUUL. In the late 1990s as youth smoking rates reached record levels, we launched a youth smoking prevention effort to (1) support programs and organizations that positively influence kids and their decision not to engage in risky behaviors like tobacco use; (2) provide parents with the tools to help them raise kids who don't use tobacco; (3) support retail trade programs to provide retailer training and legislative efforts to help prevent underage access to tobacco products; and (4) take steps to limit the reach of our brands and marketing materials to unintended audiences. These actions and those of many other stakeholders helped to reverse the trend in youth smoking rates. I am pleased to report that the most recent national data from the government, including the National Youth Tobacco Survey, show that youth smoking rates are at a generational low.

Our commitment to underage tobacco prevention extends to our marketing practices. We have a long history of focusing our marketing practices, including for e-vapor products, on adult tobacco consumers 21 and older while limiting the reach of our communications to unintended audiences. Further, we have long engaged retailers to maintain responsible retailing practices, implement strong age verification efforts, and help prevent youth access to all tobacco products.

In response to the youth issue, and before our transaction with JUUL, Altria took certain actions related to youth prevention and our MarkTen products: we removed non-traditional flavored cig-a-like products (other than tobacco, menthol and mint) from the marketplace and removed our company's pod-based products from the marketplace.[3] We took these actions because we believed that pod-based products were contributing to the rise in youth use of e-vapor products. That view did not change when we entered into the transaction with JUUL. Rather, we believed that the transaction would give Altria an unprecedented opportunity to share our experience in underage tobacco prevention with JUUL to help address youth usage, while at the same time preserving the availability of JUUL's products for adult smokers to accelerate their conversion from cigarette smoking. Achieving these goals was particularly important given our belief that more smokers had

---

[3] Ultimately, we discontinued all MarkTen products for a variety of other reasons, including lack of profitability and technical and regulatory problems.

Page 4

5185547867

the potential to convert to JUUL products than had converted to any other non-combustible tobacco product.

We believed that addressing the youth concerns would require significant action from Altria, JUUL, and others. For Altria, that action also included strengthening our advocacy for increasing the minimum age to purchase tobacco products to 21 at the state and federal levels. Through our efforts and those of other key stakeholders, more than 50% of this country's population is now covered by a law increasing the age to 21, and federal legislation has been introduced. Additionally, we announced the investment of an additional $100 million dollars over the next 2-3 years above our current spending in underage tobacco prevention focused specifically on addressing underage access to and use of e-vapor products. Further, Altria has publicly supported FDA's proposal to finalize e-vapor guidance that would require the removal of flavored e-vapor products, including menthol and mint, pending PMTA review and authorization. We remain committed to solutions like these that can reverse the trends associated with youth use of e-vapor products and preserve the long-term harm reduction potential of these products for adult cigarette smokers.

With respect to JUUL, as noted above, we also offered to JUUL services relating to underage tobacco prevention efforts. To date, however, JUUL has not accepted Altria's offers of assistance in addressing underage vaping related issues.

Q. When considering the investment in JUUL, did Altria, or any of its employees, consultants, or contractors, ask JUUL if individuals under the age of 18 were using JUUL products? If so, what was the response?

Q. When considering the investment in JUUL, did Altria, or any of its employees, consultants, or contractors, ever request sales data, market research, or survey data on the percentage of minors that comprised JUUL's market share, revenue, or user base? If so, please provide such figures and supporting documentation.

    a. If not, please provide the age and demographic breakdown of JUUL's market share, revenue, or user base at that time, including the percentage comprised of adult smokers, dual users of e-cigarettes and tobacco cigarettes, new users of nicotine, and former smokers.

A. We combined the above questions from your October 1, 2019 letter and provide the following response.

As part of the due diligence process associated with our transaction with JUUL, we requested from JUUL any materials related to underage use prevention, appeal and use of JUUL products. In response, JUUL produced to Altria materials relating to a youth usage study conducted in 2018 as part of its ongoing adult behavioral research program.

5185547868

The documents provided details of JUUL's work, through contract consumer research vendors, to develop a study plan to survey youth, with parental permission, on youth usage of vapor products, including JUUL. JUUL requested and was granted a meeting with FDA on August 2, 2018, to discuss its study proposal and to obtain FDA's feedback. In conjunction with the meeting, FDA provided written suggestions about the study and its design to JUUL and affirmed that JUUL should proceed with the study. In November 2018, JUUL provided a summary of the results to FDA along with a draft manuscript and additional study materials.

The study-related correspondence between JUUL and FDA that was produced to Altria as part of the due diligence process is attached.

Altria did not conduct its own research with youth or anyone under the legal age to purchase tobacco products. We generally rely on published literature and the youth-related data collected and disseminated by the government. While brand-specific youth use data for e-vapor products post 2016 were not yet available in the government survey data, we were aware, through media reports and published studies, of the significant rise in youth use of, and access to, e-vapor products, driven in part by cartridge and pod e-vapor products, which included JUUL.

With respect to our internal data on adult tobacco consumers and e-vapor products, in late 2017 and early 2018, we saw that JUUL products over-indexed to adult smokers age 21-29, and we learned that JUUL had a significant number of consumers aged 30-39. We could also see in our tracking data that as JUUL volume increased, there appeared to be a corresponding volume decrease in cigarettes indicating that adult smokers seemed to be switching to JUUL.

That dynamic reaffirmed our belief that JUUL was a compelling product for adult cigarette smokers interested in non-combustible alternatives. An investment in JUUL would add an important element to a compelling portfolio of non-combustible products in the U.S. Our goal in pursuing a stake in JUUL was to enhance our portfolio of non-combustible products for adult smokers, while also offering our experience in addressing underage tobacco prevention.

Q. When considering the investment, what percentage of JUUL's sales did Altria estimate or find to be: (a) flavored products (please provide a breakdown across flavors); (b) online compared to sold in retail locations (convenience stores, gas stations, etc.); (c) sold within a 1-mile radius of schools; and (d) made through bulk purchases.

A. Altria routinely monitors the marketplace, including the competitive landscape, as part of the management of our businesses. We rely on a monthly tracking study to understand adult tobacco consumer use patterns.

Using data measured in traditional retail outlets, non-traditional flavors (other than tobacco, menthol or mint) accounted for approximately 60% of JUUL's volume as of the third quarter of 2018. These data breakdown as follows: classic (6%), mint (32%), menthol (2%), mango (36%), fruit (5%), vanilla (4%), cucumber (6%) and other (9%).[4]

Using our methodology for estimating the percentage of volume sold in various channels across the e-vapor category in 2018, we estimated that traditional retail stores accounted for 43% of e-vapor product volume, vape stores represented 47% and online sales represented 10% of volume. We did not have a specific breakdown for JUUL.

We believe that flavors play a critical role in migrating adult smokers to non-combustible forms of tobacco products, and we have shared data to this effect with FDA and at scientific conferences. However, we believe underage use of e-vapor products is further compounded by flavors, particularly those that go beyond traditional tobacco flavors. To that end, we support FDA's announced intention to finalize e-vapor guidance that would require the removal of all flavored e-vapor products pending a PMTA authorization decision by FDA. While this may present a short-term setback for tobacco harm reduction, we think such action is necessary to preserve the long-term viability of the e-vapor category for adult smokers. Importantly, the PMTA pathway creates the opportunity for a manufacturer to provide data and evidence, including that related to flavors, to support its request for marketing authorization and to demonstrate that its product is "appropriate for the protection of public health" as required under the TCA.

With respect to sales among youth, FDA's PATH data in wave 2 (2014-2015) showed that 47% of 15-17 year-olds who bought e-vapor products in person or who gave money to someone else to buy for them did so at vape shops. By wave 3 (2015-2016), that percentage had grown to 82%, with only 12% indicating purchase at convenience stores. According to the FDA's PATH data, the number one way in which youth obtain tobacco products is through social sources – meaning from a friend or family member who is of legal age to purchase tobacco products. This insight informed Altria's support at the state and federal levels for increasing the legal age to purchase tobacco products to 21. Approximately 80% of high school students in the U.S. turn 18 years of age before they graduate. By raising the age to 21, almost no high school student should be able to purchase tobacco products legally.

With respect to the proportion of MarkTen, JUUL, or any other e-vapor product, sold within a one-mile radius of elementary, middle or high schools, we do not generate or have that data. In instances where geographic sales restrictions are in place, we rely on retailers to manage their inventory consistent with local laws.

---

[4] IRI MOC Week Ending September 30, 2018.

5185547870

Q. When considering the investment, what information did JUUL provide to Altria regarding the company's signature health claim that JUUL products are a safer alternative to smoking? Please provide a copy of all research, health information, medical data, or other relevant clinical information.

A. JUUL did not state to Altria that it had made a "signature health claim that JUUL products are a safer alternative to smoking." As part of the due diligence process, JUUL did provide to Altria information related to comparison of its products to combustible cigarettes and heat-not-burn products. Those attached documents show the Pharmacokinetic curve comparison between JUUL and other nicotine containing products. In addition, the attached documents show a comparison of Harmful or Potentially Harmful Constituents ("HPHC") between JUUL and reference cigarettes as well as an HPHC comparison among JUUL, IQOS, and combustible cigarettes.

Q. You have been quoted as saying, "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers that we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver…at risk." It is well known from internal tobacco industry documents, made public as part of the Master Tobacco Settlement, that corporations such as Marlboro have targeted children in order to build a lifelong customer. In fact, according to the CDC, Marlboro cigarettes are the most popular cigarette brand among children in the United States, with 48.8 percent of high school smokers preferring Marlboro cigarettes.

   a. Given the popularity and use of Marlboro cigarettes among youth, are you concerned about JUUL "cannibalizing" this customer base?

   b. Do you view JUUL's e-cigarette product as a smoking cessation device?

   c. In an October 25, 2018 letter to the FDA, Altria said, "Based on the publicly available information from FDA and others, we believe that pod-based products significantly contribute to the rise in youth use of e-vapor products." Your letter further state that, to avoid the risk of youth use, Altria would remove its pod-based products from the market until it received a marketing order from FDA or the youth issue was otherwise addressed. Was there a point in time between this October 25, 2018, letter and the announcement of Altria's $12.8 billion investment in JUUL, when you changed your mind that "pod-based products significantly contribute to the risk in youth use of e-vapor products"? If so, please explain what information contributed to that shift.

A. We are concerned by youth usage of any tobacco product, including Marlboro, JUUL or any other brand. We believe that the actions we've taken to support underage tobacco

Page 8

5185547871

prevention, including advancing access prevention at retail, marketing to adult tobacco consumers 21 and older, and advocating for a minimum legal age of 21, reflect that concern.

In entering into the transaction with JUUL, we believed that Altria was taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes. Further, Altria agreed to provide certain limited services to JUUL, including communications to adult smokers 21 or older using our proprietary database with the goal of accelerating their conversion from cigarette smoking. Additionally, Altria agreed to make certain of Nu Mark's previously contracted premium shelf space available on retail fixtures to best position JUUL's products where adult smokers make purchase decisions. Again, our goal was to add valuable resources to accelerate adult smokers' conversion to non-combustible products.

With the right focus, the right regulatory and policy environment and continuing adult smoker interest in alternative non-combustible products, we believe that over the next decade we will see non-combustible tobacco products surpass combustible products as the preferred choice for adult tobacco consumers.

As you know, all e-vapor products are subject to PMTA review and authorization by FDA. E-vapor products are not generally considered smoking cessation devices by the FDA. We view JUUL's product as an e-vapor product alternative that many adult smokers find to be a satisfying alternative to smoking cigarettes. Our data show that, as of the end of the second quarter of 2019, 13.8 million adults use e-vapor and more than 7 million use e-vapor and do not also smoke, indicating the highest levels of exclusive use since the advent of e-vapor products. Importantly, in the same time period, we noted a steeper decline in cigarette category volumes than historical trends and attributed that change in trend to increasing migration among adult smokers to e-vapor products.

In response to the youth issue, and before our transaction with JUUL, Altria took certain actions related to our MarkTen products: we removed non-traditional flavored cig-a-like products (other than tobacco, menthol and mint) from the marketplace and removed our company's pod-based products from the marketplace.[5] We took these actions because we believed that pod-based products were contributing to the rise in youth use of e-vapor products. That view did not change when we entered into the transaction with JUUL. Rather, we believed that the transaction would give Altria an unprecedented opportunity to share our experience in underage tobacco prevention with JUUL to help address youth usage, while at the same time preserving the availability of JUUL's products for adult smokers to accelerate their conversion from cigarette smoking. Achieving these goals

---

[5] Ultimately, we discontinued all MarkTen products for a variety of other reasons, including lack of profitability and technical and regulatory problems.

5185547872

was particularly important given our belief that more smokers had the potential to convert to JUUL products than had converted to any other non-combustible tobacco product.

We believed that addressing the youth concerns would require significant action from Altria, JUUL and others. For Altria, that action also included strengthening our advocacy for increasing the minimum age to purchase tobacco products to 21 at the state and federal levels. Through our efforts and those of other key stakeholders, more than 50% of this country's population is now covered by a law increasing the age to 21, and federal legislation has been introduced. Additionally, we announced the investment of an additional $100 million dollars over the next 2-3 years above our current spending in underage tobacco prevention focused specifically on addressing underage access to and use of e-vapor products. Further, Altria has publicly supported FDA's proposal to finalize e-vapor guidance that would require the removal of flavored e-vapor products, including menthol and mint, pending PMTA review and authorization. We remain committed to solutions like these that can reverse the trends associated with youth use of e-vapor products and preserve the long-term harm reduction potential of these products for adult cigarette smokers.

With respect to JUUL, as noted above, we also offered to JUUL services relating to underage tobacco prevention efforts. To date, however, JUUL has not accepted Altria's offers of assistance in addressing underage vaping related issues.

Q. **Many Wall Street investors were surprised by the $38 billion valuation. When considering the investment, how did Altria anticipate JUUL's market share, revenue, and user base growing over the next year, three years and five years? What was the explanation and growth strategy underlying such projections?**

   a. **Please provide a copy of all projections, estimates and sales data that JUUL provide to Altria during the process of considering the investment.**

A. Traditionally, we lead Altria's businesses with a view to the long term, and our assessment of a possible transaction with JUUL was no different. That said, the e-vapor industry had been evolving significantly over the preceding 7-8 years before our transaction with JUUL. In fact, over several years, the leading vaping product among adult consumers changed frequently, with blu and Vuse each holding leading positions at different times between 2014-2017. From 2015 to 2017, the e-vapor category was relatively flat before returning to rapid growth in late 2017 and early 2018, attributable in part to JUUL's growing popularity among adult smokers. As a result of that dynamic environment, we developed key five-year assumptions (2019-2023) that informed our analysis, including:

- Projections for a U.S. e-vapor category that grows volume between 15% and 20% annually;

5185547873

- JUUL continuing to be a growth driver for the e-vapor category;
- JUUL achieving cigarette-like margins due to the benefits of increasing scale and automation in the supply chain;
- International revenues that equal domestic revenues by 2023; and
- International margins that approach current international cigarette margins.

Under these assumptions, an investment in JUUL would generate an after-tax return exceeding our weighted average cost of capital in 2023.

At the time, we also outlined expectations that U.S cigarette category volumes would decline at an average annual rate of 4% - 5%. We have since revised our cigarette category assumptions. At the end of the second quarter of 2019, we updated our expectation for 2019 cigarette industry declines to be down 5% - 6%, driven primarily by increased adult smoker movement to the e-vapor category. We also revised our long-term cigarette category decline estimate to be 4% - 6%.

Q. **Please provide a copy of the contract materials, terms of agreement, and any other information, not presently found on the Securities and Exchange Commission (SEC) website, that formalized Altria's investment in JUUL.**

A. By way of background, on December 20, 2018, as part of the transaction, Altria and JUUL executed a services agreement in which Altria agreed to provide JUUL certain services to accelerate JUUL's ability to expand sales of its products to adult smokers.[6] The agreement runs for a six-year term, with renewal periods of three years. The geographic scope of the services agreement is based on the scope of Altria's operations at the time of the services agreement, which is throughout the United States. Related key documents are attached.

While the initial services offered covered a variety of areas, JUUL only elected for limited services related to direct marketing; sales, distribution and fixture services; and regulatory affairs. Altria is not providing government affairs or youth prevention services to JUUL.

Q. **In an April 25, 2019 response letter to Congress, JUUL states that, "An investor would have to back up its commitment with tangible actions and real value outside of its financial investment. Altria did that by agreeing to provide us services that will accelerate our ability to get JUUL products in the hands of adult smokers. Altria will provide [JUUL] access to Altria's premier tobacco products retail shelf space." And, Altria's 8-K form filed with the SEC on December 19, 2018, stipulates**

---

[6] The attached services agreement and related documents have been redacted in terms of financial information.

that, "Altria and JUUL have also entered into a services agreement pursuant to which Altria has agreed to provide JUUL with certain commercial services…to JUUL with respect to logistics and distribution, access to retail shelf space…regulatory matters and government affairs."

a. Since the investment was finalized, what is the nature of the daily relationship between JUUL and Altria?

b. Through which specific "services" is Altria fulfilling its "commitment" to JUUL?

c. Has Altria or any of its employees, consultants, or contractors provide legal, government relations, lobbying, or regulatory assistance to JUUL, or any of its employees, consultants, or contractors, since the investment was finalized? If so, please describe such specific services in detail.

   i. In particular, has Altria, or any of its employees, consultants, or contractors provided any such assistance with respect to communications, engagement, or submissions to FDA? If so, please describe such specific services in detail.

   ii. Did Altria, or any of its employees, consultants, or contractors provided any such assistance with respect to Mr. Monsees' Congressional testimony on July 24, 2019?

d. Has Altria, any of its employees, consultants, or contractors provided media, marketing, advertising, or communications assistance, guidance or recommendations to JUUL, or any of its employees, consultants, or contractors, since the investment was finalized? If so, please describe such specific services in detail.

e. Has Altria, any of its employees, consultants, or contractors provided sales, customer, business contracting/purchasing, retail, distribution, or any other business assistance, guidance or recommendations to JUUL, or any of its employees, consultants, or contractors, since the investment was finalized? If so, please describe such specific services in detail.

f. Has Altria, any of its employees, consultants, or contractors ever provided scientific, medical, technological, research, health, or any other clinical assistance, guidance or recommendations to JUUL, or any of its employees, consultants, or contractors, since the investment was finalized? If so, please describe such specific services in detail.

5185547875

A.  Although the transaction between Altria and JUUL was announced on December 20, 2018, it has not yet received Federal Trade Commission ("FTC") approval based on an antitrust review. As part of the transaction, Altria and JUUL executed a services agreement based on arms-length negotiations, pursuant to which Altria agreed to provide JUUL certain limited services at JUUL's request. While the initial services offered covered a variety of areas, JUUL only elected to receive limited services related to direct marketing; sales, distribution and fixture services; and regulatory affairs.

The limited services Altria is providing to JUUL include:

- Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services.
- Making available Nu Mark's previously contracted shelf space with certain retailers.
- Executing direct mail and email campaigns and related activities using Altria's adult smoker database (restricted to adult smokers 21+) to offer information about JUUL's products with the goal of accelerating adult smoker conversion from cigarettes.
- Leveraging Altria's field sales force to address out-of-stocks, close distribution gaps within retail accounts, and provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon.
- Providing regulatory affairs consulting and related services to JUUL as it prepares its PMTA application.

Altria is not providing government affairs services to JUUL. And, Altria did not assist with Mr. Monsees' recent Congressional testimony.

JUUL did not accept Altria's offers of assistance in addressing underage vaping related issues.

Q.  According to Altria's 8-K form, the investment "entitles Altria to immediately designate one board observer to the JUUL board of directors…and once antitrust clearance has been obtained, to designate one-third of the members of the JUUL board of directors."

  a.  Please provide the name of the board observer designated to the JUUL board of directors.

  b.  Has Altria designated board members yet? If so, please provide the names of such board member designees and the dates of their designations.

5185547876

A. Mr. Crosthwaite, Altria's former Senior Vice President and Chief Strategy & Growth Officer, served as the JUUL board observer on Altria's behalf prior to his departure to accept the JUUL CEO position. As a result of Mr. Crosthwaite's resignation from Altria, we provided notice to JUUL that Mr. Billy Gifford, Altria's Vice Chairman and Chief Financial Officer, would serve as the new board observer, effective September 25, 2019. The transaction is still pending antitrust review by the FTC. Upon approval of the transaction, Altria expects to convert its economic interest to a voting interest and would appoint a third of the JUUL board of directors. Altria has not yet designated its board members.

Q. **To your knowledge, is JUUL a manufacturer of e-cigarettes or electronic nicotine delivery systems?**

A. In FDA's recent PMTA guidance, the agency indicated that an "e-cigarette refers to an electronic device that delivers e-liquid in aerosol form into the mouth and lungs when inhaled; it is also referred to as an aerosolizing apparatus. For example, FDA considers vapes or vape pens, personal vaporizers, cig-a-likes, e-pens, e-hookahs, e-cigars, and e-pipes to be e-cigarettes. For the purposes of this guidance, e-cigarettes may either be open e-cigarettes or closed e-cigarettes. An open e-cigarette, also referred to as a refillable e-cigarette, is an e-cigarette that includes a reservoir that a user can refill with an e-liquid of their choosing. A closed e-cigarette is an e-cigarette that includes an e-liquid reservoir that is not refillable, such as a disposable cig-a-like, or that uses e-liquid contained in replaceable cartridges or pods that are not intended to be refillable. Also, for the purposes of this guidance, if an e-cigarette contains e-liquid it is referred to as a prefilled e-cigarette."

Under this definition, a JUUL device is consistent with the commonly referenced FDA definition of "e-cigarette," which FDA includes as a subcategory of ENDS. To our knowledge, JUUL manufactures JUUL devices.

Q. **Please describe how the decision was made for Mr. Crosthwaite to lead JUUL.**

  a. **Prior to September 25, 2019, did Mr. Crosthwaite have personal oversight or responsibility for Altria's investment in JUUL?**

A. Mr. Crosthwaite became well acquainted with JUUL leadership beginning with the investment analysis and negotiations that led to Altria's investment in JUUL, when he served as Altria's Senior Vice President and Chief Strategy & Growth Officer. Following our investment, Mr. Crosthwaite served as a board observer on Altria's behalf and oversaw the relationship, including provision of services to JUUL consistent with the terms of our agreements. Ultimately, JUUL made a completely independent decision to offer Mr. Crosthwaite the position of CEO, which he accepted and notified Altria of his decision to resign.

5185547877

Q. **What will be Mr. Crosthwaite's relationship with Altria going forward? Will Mr. Crosthwaite maintain any responsibilities at Altria?**

A. Mr. Crosthwaite is no longer employed by Altria and, as such, has no remaining responsibilities at or to Altria.

Q. **As part of the September 25, 2019 press reports, it was announced that Altria and Philip Morris International ended talks for a potential merger.**

    a. **Why did those discussions begin?**

    b. **Why did those discussions end?**

A. On August 27, 2019, Altria and PMI confirmed discussions of a possible all stock merger of equals. Further, the companies indicated at the time that there could be no assurance that any agreement or transaction would result from the discussions. Any transaction would have been subject to the approval of the two companies' boards and shareholders, and regulators, as well as other conditions.

Although Altria believed the creation of a new merged company had the potential to create incremental revenue and cost synergies, we could not reach agreement, and we communicated publicly that we terminated merger discussions on September 25, 2019.

## CONCLUSION

We appreciate the opportunity to respond to your questions and hope the information we provided is helpful.

As I mentioned above, Altria and its tobacco operating companies have a long-standing commitment to tobacco harm reduction and underage tobacco prevention. And, we firmly believe in the long-term harm reduction opportunity that e-vapor products offer adult smokers who convert from cigarette smoking. At the same time, we know that youth use of e-vapor products jeopardizes that long-term harm reduction opportunity.

We will continue to work with you and your colleagues in Congress, the FDA and other stakeholders to find real solutions that will reverse the current youth e-vapor usage trends.

Sincerely,

*[signature]*

Howard A. Willard III

5185547878