David M. Bernick (*pro hac vice*)
david.bernick@kirkland.com
Renee D. Smith (*pro hac vice*)
renee.smith@kirkland.com
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000

Peter A. Farrell,C. (*pro hac vice*)
peter.farrell@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 389-5000

Gregory Stone (SBN 78329)
gregory.stone@mto.com
Bethany W. Kristovich (SBN 241891)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Ave, 50th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

*Attorneys for Defendant Juul Labs, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>Relates to: SFUSD | Case No. 19-md-02913-WHO<br><br>**DEFENDANT JUUL LABS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF LARRY MEFFORD**<br><br>Judge:   Hon. William H. Orrick |

# TABLE OF CONTENTS

Page

I.   MEFFORD HAS EXTENSIVE EXPERIENCE THAT IS DIRECTLY RELEVANT TO
     DORN'S SURVEILLANCE AND SECURITY PLAN. .................................................. 7

II.  MEFFORD'S OPINIONS ARE PROPER REBUTTAL OPINIONS, GROUNDED IN
     HIS EXTENSIVE  EXPERIENCE, THE RECORD, AND HIS ANALYSIS OF DORN'S
     SURVEILLANCE AND SECURITY PLAN ........................................................... 122

III. MEFFORD'S OPINIONS ARE NOT SPECULATIVE BUT ARE BASED ON
     RELEVANT EXPERIENCE, RESEARCH, AND HIS ANALYSIS OF DORN'S
     SURVEILLANCE AND SECURITY PLAN AND DORN'S EXPLANATIONS. .................... 145

# TABLE OF AUTHORITIES

**Federal Cases**

**Page(s)**

*Hangarter v. Provident Life & Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ....................................................7

*Henkel v. Wagner*,
    2016 WL 1271062 (S.D.N.Y. Mar. 29, 2016) .........................................13

*Montera v. Premier Nutrition Corp.*,
    2022 WL 1225031 (N.D. Cal. Apr. 26, 2022) .........................................12

*Rearden LLC v. Walt Disney Co.*,
    2021 WL 6882227 (N.D. Cal. July 12, 2021) ..........................................8

*Teradata Corp. v. SAP SE*,
    570 F. Supp. 3d 810 (N.D. Cal. 2021) (Orrick, J.) .............................7, 10

*Thomas v. Newton Int'l Enters.*,
    42 F.3d 1266 (9th Cir. 1994) ....................................................7

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab.
    Litig.*,
    978 F. Su 2d 1053, 1069 (C.D. Cal. 2013) ...........................................6

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab.
    Litig.*,
    978 F. Supp. 2d 1053 (C.D. Cal. 2013) ..........................................12, 13

*United States v. 4.0 Acres of Land*,
    175 F.3d 1133 (9th Cir. 1999) ...............................................6, 12, 13

*United States v. Garcia*,
    7 F.3d 885 (9th Cir. 1993) ......................................................7

## INTRODUCTION AND BACKGROUND

Plaintiff's expert Michael Dorn is a former law enforcement officer who worked for a police department in Georgia for nearly 20 years, graduated from the FBI Academy, and eventually founded his own consultancy focused on campus safety and security consulting. *See* Ex. 1, 8/19/2022 Dorn Rep. 1-2, 124-26. Dorn opines that in order "to significantly reduce or eliminate the problem of student e-cigarette use," this Court must award Plaintiff San Francisco Unified School District ("SFUSD") $85 million to fund an extensive electronic surveillance and security infrastructure that will create a police-state within SFUSD's schools.[1] *Id.* at 1; *see* Ex. 2, 8/18/2022 Rollo Rep. 5. Specifically, Dorn proposes that SFUSD build a surveillance system that includes hundreds of internal and external high-definition "smart" security cameras in each secondary school, including multiple cameras in every classroom, in every hallway and common area, and at the entrance of every bathroom. Ex. 1 at 73-93 He proposes that Defendants fund SFUSD's $64 million acquisition of *thousands* of vape detectors for its secondary schools. *Id.* at 5, 14-15, 29, 78-82. He proposes that SFUSD install an electronic door sensor, lock, and hall pass system designed to sequester students, restrict their movements to zones within the schools, and prevent them from accessing restrooms without prior approval. *Id.* at 73-93. And he proposes that a trained surveillance team working from a central surveillance hub monitor the high-definition cameras and vape detectors installed throughout SFUSD's secondary schools, with personnel standing ready to descend on students and detain and investigate them (aided by high-definition surveillance video and nicotine detection swabs) whenever a vape detector is triggered. *Id.* at 73-93. In sum, Dorn proposes a draconian, intrusive surveillance and security system that will allow for entire student body at SFUSD's secondary schools to be monitored on a minute-by-minute basis, all so SFUSD can identify, investigate, and intervene in any instance of student vaping.

Not surprisingly, Dorn admits that no school or school district has ever implemented the surveillance and security proposals he insists are required here. Ex. 3, 8/24/2022 Dorn Dep. 114:25–115:6. He also admits that his surveillance and security plan has not been tested. *Id.* at 186:17–23. Nor has he measured the effectiveness of any of his proposals on youth e-cigarette usage. *Id.* at 187:10–19. And he

---

[1]    SFUSD's expert Robert Rollo submitted an expert report estimating the cost of implementing Dorn's proposals. Ex. 2, 8/18/2022 Rollo Rep. 1. Dorn testified that he adopted Rollo's figures without changing them. Ex. 3, 8/24/2022 Dorn Dep. 29:23-30:11.

cannot point to a single example where any of these strategies has shown a measurable effect in reducing student e-cigarette usage. *Id.* at 187:24–188:9.[2] Nonetheless, Dorn is adamant that his surveillance and security proposals "will, in [his] experience, more likely than not significantly and effectively deter student e-cigarette use at school and will enable school officials to detect and identify" student vapers, Ex. 1 at 11, although he has not measured and cannot quantify the impact his proposals may actually have on student vaping – and he admits that the goal of his proposals is to reduce current student vaping rates to their 2015 levels, which, according to the data cited in his own report, they have already reached. Ex. 3, 8/24/2022 Dorn Dep. 201:15-203:2; Ex. 1, 8/19/2022 Dorn Rep. 18. To evaluate Dorn's extraordinary surveillance and security proposals, Defendant JUUL Labs, Inc. ("JLI") unsurprisingly engaged a surveillance and security expert, Larry Mefford, who reviewed Dorn's proposals, opinions, and explanations therefor, and concluded that Dorn's proposals are not the product of reliable or measurable processes, will not work, and will have substantial negative consequences. Ex. 4, 8/29/2022 Mefford Rep. 13-14. To support his opinions, Mefford brings to bear 48 years of experience in law enforcement, national security, corporate security, contingency and emergency response planning and training, cyber security, and surveillance and security design, implementation, and oversight.

Contrary to SFUSD's hand-waving dismissal, Mefford is far more than just a "retired FBI agent and current security consultant in the casino industry." Mot. 2. Mefford's law enforcement service (1972–2003) includes experience leading and training law enforcement personnel in San Francisco in emergency preparedness and response, including in schools, and a period in which he was the agent in charge of *all* FBI operations in this judicial District. Ex. 4, 8/29/2022 Mefford Rep. 74-75. Mefford also helped create and was the first head of the FBI's cyber division, a position in which he was responsible for all FBI global cyber-related investigations. *Id.* Shortly after 9/11, he became Executive Assistant Director at the FBI, overseeing all counterterrorism and counterintelligence operations worldwide; at the time, he was the third highest ranking officer in the agency. *Id*. at 3-4, 75-76. From 2004 to 2022, Mefford directed or assisted in global security efforts for large-scale casinos, banks, hotels, and similar facilities, conducting security

---

[2]   As set forth in JLI's separate motion, ECF 3462, the speculative nature of Dorn's proposals, which have never been implemented, tested, or subjected to peer review, renders his testimony inadmissible under Fed. R. Evid. 702 and *Daubert*.

assessments, designing, implementing, and overseeing complex surveillance and security systems, and identifying and remedying flaws in such systems. *Id.* at 76–77. As Senior Vice President of Global Security for Wynn Resorts International (2003-2007), he designed, implemented and oversaw the surveillance and security systems (including cyber security) and personnel for all Wynn Resorts International facilities worldwide. *Id.* at 76. Similarly, as Chief Security Officer for Barclays Bank (2007–2010), Mefford designed, implemented, and oversaw the surveillance and security systems and personnel for the bank worldwide, including facilities in 35 countries, and he specifically assessed and helped restructure the systems at numerous facilities in locations ranging from San Francisco to Johannesburg. *Id.* At MGM Resort International (2013–2015), he led global security efforts for a company with 80,000 employees, as well as assisted with cyber security measures and the acquisition of advanced security technology. *Id.* at 76-77. Mefford has vast experience with surveillance and security operations involving masses of subjects in public settings ranging from schools to political conventions to Winter Olympic venues to large-scale entertainment, hotel, and banking facilities. *Id.* at 75-77. Mefford amply supports his critiques of Dorn's recommendations with, *inter alia*, his wealth of experience, research and academic literature, produced documents, governmental data, deposition testimony, public press publications, and Dorn's own explanations.

Mefford relies on this extensive experience in law enforcement, surveillance, facility security, and cyber security to opine as follows:

*First*, Mefford opines that Dorn's surveillance and security recommendations are likely to be ineffective. *Id.* at 13. SFUSD's argument that Mefford cannot critique Dorn's proposals because Mefford is not an expert on youth vaping is a red herring; Dorn admits that, prior to this case, he also had no experience with youth vaping. Ex. 3, 8/24/2022 Dorn Dep. 63:22-64:12. As a recognized expert in surveillance and security, with experience in school settings and with detecting, investigating, and intervening in a variety of illicit activities in many other more complex, heavily trafficked public settings, Mefford can plainly assist the trier of fact in understanding how Dorn's proposals would fare in the real world. As Mefford explains, Dorn's proposals fail what may be the most basic test a security industry professional would apply: none of Dorn's schemes have ever been tested to show their efficacy (or lack thereof) in reducing vaping, and none have ever been used in the real world to do so. Ex. 4, 8/29/2022

Mefford Rep. 13. And the evidence from the few schools and other entities that have tried to implement some of the measures proposed by Dorn indicates that they are easily circumvented. *Id.* Moreover, Dorn's proposals would require enormous resources to maintain—a fact that Dorn's report completely ignores.

*Second,* Mefford draws on his decades of experience designing and implementing surveillance and security systems to explain that Dorn's proposals for a heavy surveillance and security presence in SFUSD's secondary schools are counter-productive, as they pose excessive risks to the subject population (students and school staff). This is because the collection of video (and potentially audio) data by scores of electronic devices throughout SFUSD schools would constitute a massive invasion of student and staff privacy. *Id.* Schools are increasingly a target for hackers,[3] and such a system would make SFUSD a greater target, yet Dorn does not specify any security mechanisms to prevent his surveillance system from being hacked. *Id.* Certainly the former head of the FBI's cyber security division is qualified to address the extent to which Dorn's technological plan both makes SFUSD a greater target and increases its vulnerability. Similarly, Dorn's proposals for electronic door sensor, lock, and hall pass systems to sequester students and restrict their movements increase risk in emergency scenarios such as active shooter situations (a point Dorn inadvertently bolsters when he points out that students in some active shooter scenarios have been unable to take refuge in locked areas – an outcome for which he baselessly blames JLI). *Id.* at 28-30. Relatedly, Mefford points out that because Dorn's proposed surveillance and security system is subject to being hacked, it could be externally commandeered, thus magnifying the risk (and there is precedent, as Mefford explains, for an active shooter using cameras to facilitate his actions). *Id.* at 13. Mefford also draws on his decades of experience observing, responding to, and setting policy regarding the impacts of surveillance and security on surveilled populations, along with research and analysis, to conclude that, not surprisingly, the heavy surveillance and security measures Dorn proposes are likely to be disruptive and have a negative impact on the surveilled population of SFUSD students and staff. *Id.* at 13-14.

*Third*, Mefford concludes that Dorn's desire to create a police state in SFUSD's schools is likely to encounter enormous resistance from necessary stakeholders such as students, parents, teachers, and

---

[3]     *See* https://www.cnn.com/2022/09/06/politics/us-schools-ransomware-warning/index.html (last visited Oct. 3, 2022) (discussing FBI cybersecurity agency, previously headed by Mefford, warning that schools are increasingly targets of cyber-attacks).

administrators. *Id.* at 14. Although Dorn disregards it, the record establishes that Dorn's proposals would require the approval of stakeholders Dorn never consulted.[4] *Id.* Dorn also has made no attempt to determine whether negative responses from parents, teachers, and students would prevent his plan from being effective. *Id.*

*Fourth*, Mefford opines that Dorn's recommendations are out of proportion to the purported problem he claims to address and are not the product of a reasoned cost-benefit analysis. Taking Dorn's schemes and explanations at face value, Mefford notes that Dorn never defines what constitutes a "significant issue" with e-cigarette use at a school and cannot quantify the extent to which his schemes will supposedly "significantly and effectively deter student e-cigarette use," Ex. 4, 8/29/2022 Mefford Rep. 6, Ex. 1, 8/19/2022 Dorn Rep. 1, perhaps because Dorn's assertion is based on no testing or reliable data or analysis. Ex. 3, 8/24/2022 Dorn Dep. 186:17-188:6. Mefford also points out that Dorn struggles to define the problem and his goal, as Dorn says he wants to reduce student vaping to 2015 levels but, according to the data Dorn cites, that goal has already been reached. Ex. 4, Mefford Rep. 57. Mefford thus concludes that Dorn's own explanations are arbitrary and inconsistent and his analysis (or lack thereof) fails to show that his surveillance and security plan will have any impact whatsoever on student vaping as compared to the status quo. *Id.* at 17. Mefford also correctly concludes that Dorn failed to show that vaping poses a problem to any schools significant enough to justify the heavy surveillance and security he recommends, and that Dorn did not meaningfully consider or analyze any less disruptive or costly alternatives. *Id.* at 27.

---

[4]   Dorn never spoke to any school board members or parents whose approval of his proposals would be vital to their implementation. Instead, he insisted that his proposals could simply be implemented by the district and individual schools. Ex. 3, 8/24/2022 Dorn Dep. 348:19-350:3; 352:19-353:3. Unfortunately for Dorn, this *ad hoc* testimony was directly contradicted by Quarry Pak, who served as the program administrator for school-based health and mental health support services in SFUSD. She testified that even if funding were made available, SFUSD does *not* have discretion to apply those funds without school board approval. Ex. 5, 5/16/2022 Pak Dep. 55:2-10. Pak's testimony is consistent with school board policy, which requires SFUSD to "show a complete plan and itemized statement of *all* proposed expenditures and *all* estimated revenues for the following fiscal year . . . ." *See* ECF 3462, (citing SFUSD Board Policy 3100, Budget (adopted May 14, 2019) (emphasis added). That budget can only be approved after it is "accepted for first reading at a regular Board meeting, scheduled for discussion at a Committee of the Whole and acted upon at a subsequent Board meeting," and after it is presented to parents and community stakeholders at a public hearing. *Id.*

SFUSD first argues that Mefford's opinions should be excluded because he somehow lacks relevant experience, arguing that Mefford has never previously addressed student vaping or designed a security system for a school. Mot. at 5. But this case is also Dorn's first involvement with student vaping, Ex. 3, 8/24/2022 Dorn Dep. 14:5-15:1, 35:3-36:3, 40:13-23, 63:22-64:12, and the "relevant discipline" here, Mot. at 4, is surveillance and security because what Dorn proposes is a surveillance and security system to detect, identify, and intervene in instances of student vaping in SFUSD's secondary schools. SFUSD's entire Motion is based on a misstatement of the issues and of Mefford; Mefford has nearly half a century of law enforcement, security, and surveillance experience at the highest, most complex levels, which renders SFUSD's complaint meaningless. SFUSD next argues that Mefford lacks a reliable methodology and "merely critiqued" Dorn. *Id.* at 3, 8. But a rebuttal expert's role is to "expose flaws" in the testimony of the expert whose opinions he is rebutting. *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1141 (9th Cir. 1999). In so doing, he "may rely largely on other expert reports" and the opposing expert's explanations, together with his own expertise. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Su 2d 1053, 1069 (C.D. Cal. 2013) (citing *4.0 Acres of Land*, 175 F.3d at 1141)). Last, SFUSD contends that Mefford merely "speculat[es]" that Dorn's draconian surveillance and security system will be disruptive and have a negative impact on the surveilled population if imposed in a school setting. Mot. at 10-11. Here, SFUSD asks the Court to ignore Mefford's decades of experience observing and responding to the impacts of heavy surveillance and security interventions on surveilled populations, including a policy-making role at the highest level of our country's counterintelligence structure post-9/11 and roles designing, implementing, and supervising surveillance and security systems in larger, more complex ecosystems than SFUSD's secondary schools. Each of SFUSD's attacks on Mefford, addressed in turn below, fails. Mefford has nearly half a century's worth of directly relevant experience, and SFUSD's attempt to prevent Mefford from testifying is entirely misplaced and its Motion should be denied.

## ARGUMENT

Federal Rule of Evidence 702 provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education . . . ." The Advisory Committee notes for Rule 702 underscore that experience may "provide a sufficient foundation for expert testimony. [Indeed,] the text

of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, 2000 Advisory Committee Notes.

Here, SFUSD's expert Dorn proposes that a vast, invasive, multi-million dollar electronic surveillance and security plan be installed in SFUSD's secondary schools. Mefford—who has decades of directly relevant experience in law enforcement and with designing, implementing, overseeing, and identifying weaknesses in complex surveillance and security systems—is eminently well-qualified to opine on the likely effectiveness of Dorn's proposals and their unforeseen consequences.

## I.   MEFFORD HAS EXTENSIVE EXPERIENCE THAT IS DIRECTLY RELEVANT TO DORN'S SURVEILLANCE AND SECURITY PLAN.

SFUSD insists that despite his many decades of experience in law enforcement, surveillance, security, and systems management, which includes the design, installation, supervision, and testing of complex surveillance and security systems in a variety of public settings and facilities, Mefford's opinions must be excluded because he lacks expertise in "school safety, climate, and culture." Mot. 5. But nothing in Rule 702 or *Daubert* supports SFUSD's narrow parsing of the expertise that can assist the trier of fact in this case, and Mefford's decades of experience are directly relevant to the task of evaluating the likely effectiveness of Dorn's proposed surveillance and security plan.

Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). The notes of the advisory committee explicitly emphasize that "Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004). And courts have repeatedly made clear that a claimed "lack of particularized expertise goes to weight rather than admissibility." *Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810, 833 (N.D. Cal. 2021) (Orrick, J.); *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (same); *Rearden LLC v. Walt Disney Co.*, 2021 WL 6882227, at *4 (N.D. Cal. July 12, 2021) (same).

Here, notwithstanding SFUSD's attempts to mischaracterize the relevant expertise so that only Dorn can qualify, the fact remains that Dorn is a former law enforcement official who is proposing technological surveillance and security measures and security personnel to detect, investigate, and

intervene in a particular type of behavior in a particular setting – student vaping in SFUSD secondary schools. Mefford has extensive, directly relevant experience overseeing and setting policy for the most complex of surveillance and security operations, and with designing, implementing, overseeing, and identifying flaws in surveillance and security systems and training and managing large numbers of security personnel. Ex. 4, 8/29/2022 Mefford Rep. 71-77. Mefford is eminently qualified to evaluate the likely effectiveness and collateral consequences of Dorn's plan because this is what he has been doing for most of his 48-year career, in far more complex settings and to address many types of human behavior. *Id.* For example, Mefford has spent nearly the last 20 years supervising or assisting in the design, implementation, and testing of major surveillance and security initiatives, "including . . . upgrading technical security components" and training and overseeing staff on a global basis for major entertainment, hospitality, and financial institutions in order to ensure that facilities under his care "were safeguarded against . . . criminal conduct, everything from theft to violent crime." Ex. 6, 9/8/2022 Mefford Dep. 55:1–10.

Mefford also has specialized knowledge about the use of interior and exterior "smart" surveillance camera systems like those proposed by Dorn to detect and investigate particular activities. He opines, for example, that based on his "experience working within both the US law enforcement and hotel/casino security environment . . . surveillance cameras are often ineffective in deterring illegal or otherwise dangerous behavior." Ex. 4, 8/29/2022 Mefford Rep. 23. This experience directly rebuts Dorn's insistence that his plan will "significantly and effectively deter student e-cigarette." Ex. 1, 8/19/2022 Dorn Rep. 11. Mefford further testified that "[p]eople that are . . . focused on illegal activity are going to do what they do . . . whether there's cameras or not. And that's based on my experience, over you know, 48 years in the business."  Ex. 6, 9/8/2022 Mefford Dep. 103:10–14. These opinions are supported by Mefford's independent research and analysis, which revealed that camera systems and vape detectors can be easily circumvented by individuals' intent on vaping.[5] Ex. 4, 8/29/2022 Mefford Rep. 18-21. Mefford also rebuts Dorn's claim that cameras will be an effective means of identifying and investigating student vapers,

---

[5]   Indeed, notwithstanding Dorn's insistence that Defendants fund his $85 million surveillance and security system, a SFUSD student could easily circumvent the entire system while vaping throughout the day simply by, for example, vaping in restrooms during break periods and using one of the several methods detailed in Mefford's report to avoid triggering a vape detector. *See* Ex. 4, 8/29/2022 Mefford Rep. 18-21.

concluding that in "[his] experience, the historical review of surveillance video is not as effective as it might sound, especially given poor images, low light conditions, the angle of the face to the camera, and other relevant factors." Ex. 4, 8/29/2022 Mefford Rep. at 26. These opinions are all well-grounded in Mefford's professional experience.

Mefford also has specific experience relevant to his opinions about the durability of technology— a subject that Dorn ignores, even though his proposed surveillance and security plan is expected to last 15 years. Mefford has firsthand knowledge that components of surveillance systems "wear out" and are intentionally or accidentally broken. Ex. 6, 9/8/2022 Mefford Dep. 114:7–13. He knows that the locks used with access control systems "wear out, sometime they're intentionally damaged." *Id.* at 114:14–16. Based on his experience, Mefford opines that Dorn has failed to take into account the degree to which SFUSD will be forced to audit and maintain the technology he proposes: "Every single day, someone has to audit all the cameras, all the doors, everything that's on [Dorn's] smart system to ensure it's working." *Id.* at 114:21–24. In addition, based on his experience, Mefford opines that Dorn's failure to address the time-consuming auditing process required to keep his proposed surveillance and security system functioning renders Dorn's technology proposals "totally worthless." *Id.* at 115:8. He further opines that "within five years of installing the $223 million vape detection systems that Mr. Dorn proposes, each of the five districts' systems could be rendered obsolete. Mr. Dorn did not disclose this limitation of his proposal in his report . . ." Ex. 4, 8/29/2022 Mefford Rep. 29. SFUSD mischaracterizes this criticism by stating that "one reason Mefford believes Dorn's plan would be ineffective is due to the required ongoing maintenance of these technologies." Mot. at 6. That is incorrect; Mefford's criticism is not that the required maintenance would make the system ineffective, it is that Dorn failed to account for or address required testing, auditing, and maintenance, did not account for the lifespans of his proposed technology, and that without addressing these defects (which Mefford has overseen on a far larger scale), Dorn's proposed system will fail. Ex. 4, 8/29/2022 Mefford Rep. 28-32. These are all points that Mefford, who, unlike Dorn, has extensive experience managing and supervising complex electronic surveillance and security systems, is well qualified to make.

SFUSD attacks Mefford by creating strawmen and mischaracterizing Mefford's experience and opinions. For example, SFUSD argues that Mefford does not have prior experience with JUUL devices or

youth vaping, "never previously reviewed data from the National Youth Tobacco Survey" ("NYTS"), and does not have expertise about "whether nicotine exposure during adolescence can harm the developing brain," Mot. at 5-6, as if any of these criticism had a thing to do with reviewing and responding to Dorn's surveillance and security plan. Dorn himself admittedly had no prior experience with youth vaping or JUUL devices, Ex. 3, 8/24/2022 Dorn Dep. 14:5-15:1, 35:3-36:3, 40:13-23, 63:22-64:12; was so confused about questions concerning the NYTS that he disclaimed knowledge about what "prevalence" means,[6] *id.* at 171:5-25; 173:2–6; 178:12—23; and is not a medical doctor, neurologist, or nicotine expert and certainly knows nothing about how nicotine impacts a developing brain. Dorn is a former law enforcement officer who holds himself out as an expert in surveillance and security with a focus on campus settings and is proposing an $85 million electronic surveillance and security system for SFUSD. Mefford is former law enforcement officer of the highest caliber who has spent his career dealing with surveillance and security systems in far more complex settings than has Dorn. Even if Dorn had the experience SFUSD faults Mefford for lacking (and Dorn does not), this criticism would still go to particularized expertise, and thus weight, rather than admissibility. *See Teradata Corp.* 570 F. Supp. 3d at 833.

SFUSD also criticizes Mefford for opining that Dorn's draconian surveillance and security system will create a "state of surveillance" in SFUSD schools that will be disruptive in such an environment and may negatively impact the mental health and well-being of the surveilled population, claiming that Mefford cannot offer such opinions because he is not an expert in "school safety, climate, or culture" – buzzwords that Dorn likes to repeat but for which he provides no principled, reliable meaning. Mot. at 1, 3, 5-6, 8, 12. But SFUSD is wrong that Mefford does not have relevant experience with school safety – indeed, Mefford once served as the agent in charge of all FBI operations in this very district, including school safety and emergency situations, and was responsible for training all local police agencies on how

---

[6]   Dorn cited to and discussed NYTS vaping prevalence data at length in his report. Ex. 1, 8/19/2022 Dorn Rep. 17-18, 53-54, 65, 71-72. At deposition, he claimed that the goal of his proposed surveillance and security plan is to reduce current youth vaping rates to their 2015 levels, apparently unaware that, based on the very data he cites, current youth vaping rates are presently *less* than they were in 2015, without any school in the country ever implementing or even piloting his plan. Ex. 3, 8/24/2022 Dorn Dep. 200:24-203:2; Ex. 4, 8/29/2022 Mefford Rep. 57. Certainly, it is fair game for a rebuttal expert to take such testimony at face value and highlight the lack of consistency and analytical rigor in Dorn's explanations, as Mefford does. *See* Ex. 4, 8/29/2022 Mefford Rep. 5–12.

to respond to incidents in schools, which necessarily involved consideration of how to interact with existing school systems, infrastructure, and personnel. Ex. 4, 8/29/2022 Mefford Rep. 74-76.

More importantly, Mefford has vast experience with the impact that heavy surveillance and security measures have on surveilled populations, in settings far more complex than a secondary school. Indeed, Mefford was once responsible for helping set our nation's counterterrorism and counterintelligence policies based on exactly such considerations, and has testified before Congress, often about such issues. Ex. 4, 8/29/2022 Mefford Rep. 75-76. Again, following his law enforcement career, Mefford has spent nearly the last 20 years of his life designing, implementing, overseeing, and testing surveillance and security systems for global enterprises in many different types of heavily-trafficked environments and determining the best way to detect, investigate, and intervene in various types of human activity while balancing the impact of such surveillance and security systems on the general population in such environments. *Id.* at 76-77. For his entire professional life, Mefford has accumulated experience with the disruptions and consequences that surveillance and security activities have on subject populations; the fact that Dorn holds himself out as having particular expertise with how such measures impact "climate" and "culture" at schools is, if anything, once again an issue that goes to weight rather than admissibility. In reality, Mefford has far more experience with the impact of heavy surveillance and security on subject populations than does Dorn, having set national policy and actually implemented and tested such systems on a large scale in much more complex environments, while Dorn has never even tested, much less implemented, the surveillance and security plan he sponsors. SFUSD criticizes Mefford for referencing his "common sense," Mot. at 11, but to an expert who has actually overseen and managed complex surveillance and security systems in heavily-trafficked environments, it is common sense to conclude that Dorn's proposal to surveil all students and, if a vape detector is triggered, to have security personnel descend on the scene to detain and investigate students who were in the area, will have a disruptive and deleterious effect on the surveilled population. And, once again, Mefford relies on more than just his vast experience to reach this conclusion – he also conducted independent research and analysis which corroborated his views that Dorn's system will be disruptive and may have negative impacts on the mental health and well-being of the surveilled student and teacher population. *See* Ex. 4, 8/29/2022 Mefford Rep. 23-24. If SFUSD wishes to cross examine Mefford on whether his experience and research are consistent

with the opinions he has expressed about Dorn's proposals, it is welcome to do so, but its arguments provide no basis to exclude him.

## II. MEFFORD'S OPINIONS ARE PROPER REBUTTAL OPINIONS, GROUNDED IN HIS EXTENSIVE EXPERIENCE, THE RECORD, AND HIS ANALYSIS OF DORN'S SURVEILLANCE AND SECURITY PLAN.

SFUSD next argues that Mefford's opinions lack foundation and are not based on a reliable methodology because, for example, Mefford did not do an "on-site assessment," interview party employees or other stakeholders, review the "250,000 pages of documents produced by SFUSD," or "attempt to assess independently the current level of e-cigarette use by students at SFUSD." Mot. at 9. As with SFUSD's other arguments, these criticisms are red herrings because Dorn himself did not do most of the things for which SFUSD faults Mefford and, more importantly, as a rebuttal expert Mefford is permitted to take Dorn's opinions and explanations therefor at face value and review and comment on their viability, legitimacy, consistency, and accuracy (or, more to the point, the lack thereof) based on his experience in the relevant discipline. SFUSD's arguments about foundation and methodology also fail.

A rebuttal expert's role is to "expose flaws" in an affirmative expert's opinion; in performing that role, a rebuttal expert may accept an affirmative expert's "data" and "basic assumptions." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1141 (9th Cir. 1999). As such, a rebuttal expert "may rely largely on other expert reports" and "point out flaws in their methodologies or conclusions." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013) (citing *4.0 Acres of Land*, 175 F.3d at 1141)). A rebuttal expert is not required, as SFUSD contends, to present "specific alternatives," Mot. at 7; his opinions may properly focus on critiquing the opinions presented by the affirmative expert. *Id.*; *Montera v. Premier Nutrition Corp.*, 2022 WL 1225031, at *11 (N.D. Cal. Apr. 26, 2022). Consequently, a rebuttal expert does not "does not need a 'model or theory' to identify purported flaws in [an affirmative expert's report]. Rather, she needs only her expertise and the 'method' identified at the beginning of her report—namely, reviewing the documents in this case, along with [the affirmative expert's] report, and arriving at an opinion as to [the affirmative expert's] analysis." *Henkel v. Wagner*, 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016).

Mefford has substantial, directly relevant experience and expertise that easily qualifies him to accept Dorn's proposed surveillance and security plans and Dorn's explanation for them at face value and

-12-

Case No. 19-md-02913-WHO

evaluate them. SFUSD's criticisms that Mefford did not review SFUSD's entire production or quantify "the effectiveness of those measures currently in place," Mot. at 9, are beside the point (and neither did Dorn) – Mefford meaningfully analyzed Dorn's reports, the materials Dorn relied upon, and Dorn's explanations of his methodology and process, and that is all that is required of a rebuttal expert. Ex. 4, 8/29/2022 Mefford Rep. 5-12 . However, Mefford went further by considering not just his own extensive professional experience, but also independent research and academic literature, produced documents and data, deposition testimony, expert reports, legal reports, and public press. *See* Ex. 4, 8/29/2022 Mefford Rep. 84–92. Any criticisms about whether Mefford reviewed all of the documents produced by SFUSD and whether those documents bear directly on these experts' analyses (SFUSD doesn't say) is an issue for cross examination, not admissibility.[7]

SFUSD's remaining criticisms are similarly faulty. SFUSD argues that because Mefford did not "perform any on-site assessment," did not speak to party employees, did not interview other stakeholders such as students, parents, or teachers' unions, and "did not attempt to assess independently the current level of e-cigarette use by students at SFUSD," his methodology does not allow him to critique Dorn. Mot. at 9. SFUSD's apparent argument that a rebuttal expert must match an affirmative expert task-for-task is not only legally incorrect, it also fails on its own terms because Dorn himself did few of these things. Dorn admits that he did not speak to important stakeholders such as parents, teachers, teachers' unions, or the school board, and while he admits that whether teachers' unions will support his surveillance and security plan is an "important question to ask," Ex. 3, 8/24/2022 Dorn Dep. 138:25, he admits that he did not ask it of any teachers' unions. *Id.* at 140:23–141:5. SFUSD claims that Mefford improperly critiques Dorn's failures to verify key stakeholders' support, but Mefford was well within his right as a rebuttal expert to rely on SFUSD administrators' confirmation that various stakeholders, including the

---

[7]   SFUSD criticizes Mefford for not publishing on topics related to "school safety, climate, or culture" and for "only publish[ing] one article on any topic—concerning chemical biological warfare, approximately 30 years ago." Mot. at 5. Here again, SFUSD misconstrues the role of a rebuttal expert, who is permitted to simply "expose flaws" in an affirmative expert's testimony and "may rely largely on other expert reports" to do so. *See 4.0 Acres of Land*, 175 F.3d at 1141; *In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1069. It is also worth noting that despite claiming to have "authored and co-authored hundreds of blogs, feature articles, journal articles and columns for publications," Dorn lists only one peer-reviewed publication on his resume – an article about terrorism, not vaping. Ex. 1, 8/19/2022 Dorn Corrected Rep. 1. Dorn does not list a single article about vaping.

school board and the public at large, will play a role in whether Dorn's surveillance and security plans are accepted and implemented. Indeed, teachers have protested surveillance technology in the past. *See* Ex. 4, 8/29/2022 Mefford Rep. 41–48.[8] SFUSD's criticism that Mefford did not quantify the current level of student vaping within SFUSD or the effectiveness of existing interventions is similarly beside the point – neither did Dorn. This did not stop Dorn from claiming that his surveillance and security proposals "will, in [his] experience, more likely than not significantly and effectively deter student e-cigarette use at school and will enable school officials to detect and identify" student vapers. Ex. 1, 8/19/2022 Dorn Rep. 11. Yet, Dorn admits that he has not measured and cannot quantify the impact his proposals may actually have on student vaping, Ex. 3, 8/24/2022 Dorn Dep. 184:13-18, and he asserts that the goal of his proposals is to reduce current student vaping rates to their 2015 levels, which, according to the NYTS data he cites in his report, they have already reached. Ex. 4, 8/29/2022 Mefford Rep. 60. Given Dorn's *ipse dixit* explanations and inconsistencies, Mefford was well within his right as a rebuttal expert to observe that "Dorn has not demonstrated that his proposals are more likely to have a greater impact on youth vaping rates than simply relying on existing measures."[9] Mot. at 9.

---

[8] *See, e.g.*, Mowen T. J. and A. Freng, "Is More Necessarily Better? School Security and Perceptions of Safety Among Students and Parents in the United States," American Journal of Criminal Justice, Vol. 44 (3), 2019, pp. 376–394 at 391; Birnhack, M. and L. Perry-Hazan, "School Surveillance in Context: High School Students' Perspectives on CCTV, Privacy, And Security," *Youth & Society*, Vol. 52 (7), 2020, pp. 1312–1330; "New York City Students Protest School Surveillance Cameras," K-12 Drive, March 25, 2019, available at https://www.k12dive.com/news/new-york-city-students-protest-school-surveillance-cameras/551193/; "Walpole Students Petition Against School Surveillance Cameras," Boston Globe Media, March 14, 2013, available at https://www.boston.com/uncategorized/noprimarytagmatch/2013/03/14/walpole-students-petition-against-school-surveillance-cameras/; "Cameras in the Classroom: Is Big Brother Evaluating You?" National Education Association, January 23, 2015, available at https://www.nea.org/advocating-for-change/new-from-nea/cameras-classroom-big-brother-evaluating-you.

[9] SFUSD's contention that Mefford "did not perform any site assessment," Mot. at 9, is also irrelevant and gives Dorn far too much credit. As discussed in Defendants' motion to exclude Dorn's opinions, Dorn's staff gathered information from the schools selectively; neither Dorn nor his staff communicated with key stakeholders; Dorn and his staff were inconsistent in their determinations of which schools had a "significant" e-cigarette problem, prioritizing their own views over schools'; and witnesses even disclaimed providing the information Dorn and his staff credited them with providing. ECF 3462 at 10-11.

### III.   MEFFORD'S OPINIONS ARE NOT SPECULATIVE BUT ARE BASED ON RELEVANT EXPERIENCE, RESEARCH, AND HIS ANALYSIS OF DORN'S SURVEILLANCE AND SECURITY PLAN AND DORN'S EXPLANATIONS.

Finally, SFUSD contends that Mefford's opinions are speculative, but Mefford relies on his professional experience and relevant evidence, research, and analysis in reaching his conclusions in this matter, as the examples cited by SFUSD illustrate.

For example, SFUSD claims that Mefford lacks factual support for the proposition that the electronic surveillance and security system Dorn designed may be a target for hacking. Mot. at 11. SFUSD forgets that Mefford was the head of the FBI's Cyber Division. Ex. 4, 8/29/2022 Mefford Rep. 3-4, 70-77. The former head of the FBI's Cyber Division is certainly qualified to offer an opinion about whether or not a proposed surveillance and security system may be a target for hacking and the increased risks that may result from such an event.

SFUSD also criticizes Mefford for opining that "Dorn fails to consider how his technology could be misused by bad actors, including during school shootings." Ex. 4, 8/29/2022 Mefford Rep. 32. SFUSD argues that by anticipating the possibility that a would-be shooter could hack into a school security system in order to facilitate a school shooting, Mefford is speculating. Mot. at 11. But anticipating contingencies is part of the job of a security professional, and Mefford's opinions on this issue are well supported. For example, a 2018 report by the Federal Bureau of Investigations ("A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013"), cited by Mefford, indicates that active shooters, particularly the ones with no known connection to the active site, spend substantial time planning and preparing for their attacks, including "selecting specific or random targets, conducting surveillance, and addressing all ancillary practical issues such as victim schedules, transportations and site access."[10] Ex. 4, 8/29/2022 Mefford Rep. 41, 89. And Dorn is well aware of instances in the past where school cameras have been hacked.[11] In addition, Mr. Mefford personally worked on a response to the 2017 sniper

---

[10]   "A Study of Pre-Attack behaviors of Active Shooters in the United States Between 2000 and 2013," Federal Bureau of Investigation, June 2018, available at https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.

[11]   Ex. 7, 8/19/2022 Dorn Amended Palm Beach Rep. 46. School camera systems have even been hacked by students in the past. See "Inadequate' Password Allows Student to Hack High School Security Cam," 06 News, May 3, 2018, available at https://www.wtvr.com/2018/05/02/student-hacks-colonial-heights-high-school-security-camera/.

incident at Mandalay Bay,[12] in which the sniper had "a system of cameras set up inside and outside his hotel room, presumably to alert him when law enforcement arrived to take him down."[13] Mefford is not speculating when he identifies the surveillance and security system proposed by Dorn, for which Dorn fails to address cyber security risks, as a potential target, nor is he speculating about the risks the system could create if hacked in an active shooter scenario. He is identifying, based on his extensive experience, one of the many risks that students would face if those proposals were adopted—risks that Dorn should have anticipated.

SFUSD also argues that Mefford's assertion that students may activate vape detectors on purpose to create disturbances is not grounded in facts. Mot. at 10. However, as Mefford explained during his deposition, that scenario is based on his review of "the literature of student conduct with technology." Ex. 6, 9/8/2022 Mefford Dep. 132:4–14. That literature includes the "School Safety Technology" report prepared for the National Institute of Justice, a report that was cited by Dorn himself, which observes, "[t]here are ways to misuse duress alarms and cause false alarms. One of the more common misuses is a mischievous child deciding to trigger a duress alarm as a prank. Schools may need to implement disciplinary actions for persons who intentionally trigger a false alarm. . . ."[14]

In sum, Mefford relied on his professional experience and extensive supporting research and materials in order to arrive at his conclusions. SFUSD's Motion should be denied.

## CONCLUSION

For the foregoing reasons, SFUSD's motion should be denied and, to the extent Dorn is allowed to testify, Mefford's rebuttal opinions should be admitted.

---

[12] Ex. 6, Mefford Dep. 57:2–3.

[13] "The Las Vegas gunman meticulously planned his attack with chilling precision, down to a camera hidden in a food-service cart in the hallway," Business Insider, October 4, 2017, available at https://www.businessinsider.com/las-vegas-gunman-stephen-paddock-meticulously-planned-shooting-attack-cameras-2017-10

[14] "A Comprehensive Report on School Safety Technology," Johns Hopkins University Applied Physics Laboratory [JHUAPL], October 2016, available at https://www.ojp.gov/pdffiles1/nij/grants/250274.pdf.

1    Dated: October 3, 2022                                    Respectfully submitted,

2                                                              By: */s/ Renee D. Smith*
3                                                              Renee D. Smith (*pro hac vice*)
                                                               David M. Bernick (*pro hac vice*)
4                                                              KIRKLAND & ELLIS LLP
                                                               300 N. LaSalle
5                                                              Chicago, IL 60654
                                                               Telephone: (312) 862-2310
6                                                              By: */s/ Peter A. Farrell*
7                                                              Peter A. Farrell (*pro hac vice*)
                                                               KIRKLAND & ELLIS LLP
8                                                              1301 Pennsylvania Ave, N.W.
                                                               Washington D.C. 2004
9                                                              Telephone: (202) 389-5959
10                                                             *Attorneys for Defendant Juul Labs, Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record. I also caused a copy of the under-seal documents to be served via electronic mail on all parties.

By: */s/ Renee D. Smith*

Renee D. Smith

JLI'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF LARRY MEFFORD