Volume 7

Pages 912 - 1144

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

```
                              )
IN RE: JUUL LABS, INC.,       )  No. 19 MD 2913 WHO
MARKETING, SALES PRACTICES,   )
AND PRODUCTS LIABILITY        )  San Francisco, California
LITIGATION                    )  Monday
                              )  May 1, 2023
_____)  8:00 a.m.
```

**<u>TRANSCRIPT OF JURY TRIAL PROCEEDINGS</u>**

<u>APPEARANCES</u>:

**For Plaintiffs:**

        LIEFF, CABRASER, HEIMANN & BERNSTEIN
        275 Battery Street
        29th Floor
        San Francisco, California 94111
  **BY:**  **SARAH R. LONDON, ESQ.**
        **CAITLIN NELSON, ESQ.**
        **REILLY T. STOLER, ESQ.**

        GIRARD SHARP
        601 California Street
        Suite 1400
        San Francisco, California 94108
  **BY:**  **DENA C. SHARP, ESQ.**

        WAGSTAFF & CARTMELL LLP
        4740 Grand Avenue
        Suite 300
        Kansas City, Missouri 64112
  **BY:**  **THOMAS P. CARTMELL, ESQ.**
        **NINA GLIOZZO, ESQ.**

      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:* Debra L. Pas, CSR 11916, CRR, RMR
        Ana Dub, CSR 7445, CRR, RMR
        *Official Reporters - US District Court*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**          GOZA & HONNOLD
                            9400 Nall Avenue
                            Suite 400
                            Overland Park, Kansas 66207
                    **BY:   KIRK J. GOZA, ESQ.**


                            LEVIN SEDRAN & BERMAN, LLP
                            510 Walnut Street
                            Suite 500
                            Philadelphia, Pennsylvania 19106
                    **BY:   MICHAEL WEINKOWITZ, ESQ.**



**For Defendants Altria Group, Inc. and Philip Morris USA Inc.:**
                            WILKINSON STEKLOFF
                            2001 M Street, NW
                            Washington, D.C. 20036
                    **BY:   BETH WILKINSON, ESQ.**
                            **BRIAN L. STEKLOFF, ESQ.**
                            **MOIRA K. PENZA, ESQ.**



**For Nicholas Pritzker:** KELLOGG HANSEN TODD FIGEL & FREDERICK
                            Summer Square
                            1615 M. Street, N.W.
                            Suite 400
                            Washington, DC 20036
                    **BY:   MICHAEL J. GUZMAN, ESQ.**


                            —   —   —

# I N D E X

Monday, May 1, 2003 - Volume 7

**PLAINTIFF'S WITNESSES**                                    **PAGE**   **VOL.**

**OLIN, CHRISTOPHER**
VIDEOTAPED TESTIMONY                                          934      7


**PRITZKER, NICHOLAS**
(SWORN)                                                       935      7
Direct Examination by Ms. Sharp                               935      7
Cross-Examination by Ms. Wilkinson                           1017      7
Redirect Examination by Ms. Sharp                            1103      7

- - -

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 67 | | 967 | 7 |
| 85 | | 1103 | 7 |
| 86 - conditionally | | 1108 | 7 |
| 118 | | 934 | 7 |
| 119 | | 934 | 7 |
| 120 | | 934 | 7 |
| 121 | | 934 | 7 |
| 122 | | 934 | 7 |
| 123 | | 934 | 7 |
| 125 | | 934 | 7 |
| 127 | | 934 | 7 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 128 | | 934 | 7 |
| 135 | | 1136 | 7 |
| 193 | | 1004 | 7 |
| 453 | | 1004 | 7 |
| 982 | | 1078 | 7 |
| 1271 | | 965 | 7 |
| 1279 | | 983 | 7 |
| 1368 | | 977 | 7 |
| 1379 | | 1000 | 7 |
| 1380 | | 1002 | 7 |
| 1846 | | 952 | 7 |
| 1853 | | 974 | 7 |
| 1899 | | 1107 | 7 |
| 1900 - conditionally | | 1111 | 7 |
| 1915 | | 976 | 7 |
| 2067 | | 985 | 7 |
| 2591 | | 998 | 7 |
| 2643 | | 1011 | 7 |
| 2721 | | 955 | 7 |
| 2722 | | 946 | 7 |
| 2728 | | 1087 | 7 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2730 | | 1088 | 7 |
| 2731 | | 1089 | 7 |
| 2920 | | 1015 | 7 |
| 2981 | | 993 | 7 |
| 3280 | | 934 | 7 |
| 3305 | | 954 | 7 |
| 3313 conditionally | | 972 | 7 |
| 3326 | | 948 | 7 |
| 4037 | | 985 | 7 |
| 4038 | | 1006 | 7 |
| 4040 | | 959 | 7 |
| 4041 | | 959 | 7 |
| 4051 | | 950 | 7 |
| 4054 conditionally | | 970 | 7 |
| 4056 | | 1121 | 7 |
| 4057 | | 1124 | 7 |
| 6074 | | 1049 | 7 |
| 6081 | | 1058 | 7 |
| 6153 | | 1093 | 7 |
| 6491 | | 1064 | 7 |
| 7130 | | 1084 | 7 |

PROCEEDINGS

```
 1   Monday, May 1, 2003                               8:01 a.m.

 2                     P R O C E E D I N G S

 3                          ---oOo---

 4      (Proceedings were heard out of the presence of the jury.)

 5         THE COURT:  Good morning, everybody.  Please be

 6   seated.

 7      All right.  Mr. Stekloff, are you standing just for

 8   exercise?

 9         MR. STEKLOFF:  I'm taking my seat, Your Honor.

10         THE COURT:  All right.  Good morning, everybody.

11      There are a couple of things hanging fire.  One is the

12   motion regarding Flora.  I think I preempted all of that with

13   the rulings that I made on the deposition transcript; so I

14   don't think there's anything left to discuss.

15      With Drumwright, I need a response from the plaintiffs,

16   and I'm interested in when she will be testifying.

17         MS. LONDON:  Your Honor, she'll be testifying

18   tomorrow.

19         THE COURT:  Okay.

20         MS. LONDON:  And we do have a response prepared.

21   I believe it's probably --

22      I believe we have a response -- we do have a response.

23   I believe it'll be filed within the hour.

24         THE COURT:  Okay.  So I'll take it up tomorrow

25   morning, then.
```

PROCEEDINGS

1          MS. LONDON:  Thank you.

2          THE COURT:  I think I am waiting for briefing on

3    Exhibits 86 and 1900, which were the FDA letters.

4       Ms. Sharp?

5          MS. SHARP:  Your Honor, I have good news for

6    the Court.  The parties worked through their issues on those

7    yesterday, and we do have an agreed set of redactions.

8          THE COURT:  Great.

9          MS. SHARP:  Those will be reflected in the trial

10   exhibits when they're brought up today.

11         THE COURT:  Terrific.  Okay.

12         MS. SHARP:  Thank you.

13         THE COURT:  Wonderful.  Thank you.

14      Then I have not given -- I told you before we selected --

15   before we started voir dire that I was going to say something

16   about the video depositions and the rules of federal procedure

17   which basically allow witnesses not to come unless they can be

18   compelled to come.  They have to be within 100 miles.

19      Anyway, I've written that out.  I told you I was going to

20   give it.  I think I'll give it this morning, just to give some

21   clarity to what's going on.

22      Mr. Stekloff?

23         MR. STEKLOFF:  Good morning, Your Honor.  Brian

24   Stekloff on before of Altria.

25      One thing that I noticed on Friday, which is not --

**PROCEEDINGS**

1    I think was -- I am sure was completely unintentional, is that

2    when Mr. Cartmell introduced the witnesses, he would say that

3    both sides were being played.

4         When he would introduce the exhibits, he would say that

5    "plaintiffs admit."

6         So I was just wondering if you could add one sentence of

7    clarification that says, "When the depositions were played,

8    both sides" -- "it included testimony that both sides

9    designated; and when exhibits were admitted, it included

10   exhibits that both sides admitted."

11        That's a simple request we were going to make.

12            **THE COURT:**  Sure.

13   Okay.

14            **MR. CARTMELL:**  Your Honor?

15            **THE COURT:**  Yes.

16            **MR. CARTMELL:**  Pardon me.

17            **THE COURT:**  Mr. Cartmell.

18            **MR. CARTMELL:**  Tom Cartmell.

19        I think today there are some depositions, just so you

20   know, that are only our designations, and they don't have any.

21        I'll say, if you'd like me to, "These are plaintiff's

22   designations only."

23            **THE COURT:**  Okay.  Why don't you do that to clarify.

24        But Mr. Stekloff is correct with respect to the other

25   things.  I can say --

PROCEEDINGS

 1          **MR. CARTMELL:**  Yeah.

 2          **THE COURT:**  Okay.  Good.

 3      I'm going to remind you, and remind the jury, that this

 4  Friday will be a dark day.

 5      And let's have the jury instruction conference next

 6  Monday.  And at the moment, I'm going to set it for 3 o'clock.

 7  I have a pretrial conference at 2:00 that may -- I may learn

 8  something about that later on this week.  But at the moment,

 9  let's do that at 3 o'clock on the 8th.

10      And those are all the things that I wanted to say.

11      Ms. Sharp, looks like you have something you want to say.

12          **MS. SHARP:**  I do, Your Honor.

13      Two more items, in addition to the redacted documents, as

14  it relates to Mr. Pritzker's testimony today.

15      The parties have agreed, subject, of course, to

16  the Court's input, on a 1006 summary as it relates to certain

17  documents that Mr. Pritzker will be looking at.  We intend to

18  introduce that summary after we've handed him a binder and

19  examined him.

20      We just wanted to let the Court know that we think that

21  that's agreed, both with Altria and also with Mr. Pritzker's

22  counsel, wherever he may be.  We've conferred on that.

23          **THE COURT:**  Okay.

24          **MS. SHARP:**  Maybe Mr. Stekloff has something to add on

25  that.  But I just wanted to flag that for the Court.

**PROCEEDINGS**

1    The second thing that I wanted to flag for the Court on

2  the Pritzker testimony is that Mr. Pritzker did provide

3  testimony, both in a deposition and at trial in the FTC matter.

4    Now, we understand the sensitivities to referencing that

5  matter overtly; and so if it's acceptable to the Court, if we

6  need to introduce those -- those bits of testimony, what I

7  would propose is that we just refer to it as "another matter"

8  or something equally vague, as opposed to introducing

9  deposition testimony from this MDL that I would be clear about.

10  We just -- we don't want to touch a nerve inadvertently on

11  those things.

12         **THE COURT:**  All right.

13         **MS. WILKINSON:**  I appreciate counsel's sensitivity to

14  that.  Perhaps we could even do it in a simpler way that I've

15  seen in other cases where we just say, "On July 27th, 1991," or

16  whatever the date is, "you testified.  Let's look at page"

17  whatever.

18    So you can just refer to the date and the transcript.

19  That way, whether it's a deposition or testimony in a trial,

20  nobody knows.  And we all know it doesn't matter anyway.

21         **THE COURT:**  Yeah, that's fine.

22         **MS. WILKINSON:**  Is that okay, Ms. Sharp?

23         **MS. SHARP:**  Absolutely.  Thank you.  That's fine.

24         **THE COURT:**  Perfect.

25         **MR. STEKLOFF:**  And, Your Honor, on the 1006 exhibit,

**PROCEEDINGS**

1   what Ms. Sharp described is accurate in the sense that we agree

2   that it is a proper 1006 exhibit.

3       The only thing is that we still, as we discussed yesterday

4   when we were discussing all of this, still think she needs to

5   lay the proper foundation for the exhibit, Mr. Pritzker's

6   knowledge of the events summarized in the exhibit.

7       And, for example, there are two events where there are

8   calls that are scheduled in advance, and there are -- there

9   certainly are calendar entries or other e-mails suggesting a

10  call may take place.  We're not -- we don't -- both sides

11  looked.  And we collaborated on this.  No one is certain that

12  those two specific calls did, in fact, take place.  So we're

13  happy for Ms. Sharp to sort of work through that with

14  Mr. Pritzker.

15      All of this was designed to create efficiency and a

16  summary, but I don't want to suggest that we don't think the

17  proper foundation or understanding from Mr. Pritzker has to be

18  established.

19          **THE COURT:**  Okay.  So in general, you agree to the

20  admission of the document, but there may be some line entries

21  that you disagree with?

22          **MR. STEKLOFF:**  Exactly.

23          **THE COURT:**  Okay.

24          **MR. STEKLOFF:**  And we flagged the two -- we had a very

25  constructive back and forth.  We flagged the two that we have

1  remaining concerns about.  I think Ms. Sharp is aware of those.

2  And if Mr. Pritzker is aware of them, they can be included.  If

3  he's not, I think she could edit on the fly, or we'll see how

4  it goes.

5          THE COURT:  Okay.  All right.  Is there anything else?

6          MR. STEKLOFF:  There's one issue, while I'm standing

7  here, that we wanted to raise.

8          THE COURT:  Yes.

9          MR. STEKLOFF:  So my understanding is that after

10  Mr. Pritzker testifies, the plaintiffs intend to play the

11  deposition designation of Scott Dunlap, who is a Juul employee.

12  This is not revisiting any of the designations themselves.

13      But one of the exhibits that Mr. Dunlap is shown is an

14  April 14th, 2015, e-mail.  It is Trial Exhibit 50.  It's an

15  e-mail from Gal Cohen to Mr. Dunlap and Mr. Bowen, who's one of

16  the founders, and others.  And in it, you can see in the second

17  paragraph -- I appreciate it, Evan -- it says (as read):

18          "Attached please find what the Attorneys General

19      have proposed.  We probably want a subset of their

20      recommendations."

21      And this is in the context of the FDA considering the

22  deeming regulations.  So as part of that process, the

23  Attorneys -- or many Attorneys General -- I don't know that it

24  was all 50 -- submitted a 37-page -- or 36 -- I guess the

25  substance is actually a 31-page single-spaced letter that lays

**PROCEEDINGS**

1  out in detail the history of terrible things that tobacco

2  companies have done, terrible things other e-cigarette

3  manufacturers have done.  It touches on cigars.  It touches on

4  little cigars.  It is a hearsay advocacy piece because it is

5  not a public record.

6      And I understand, I suspect, that plaintiffs will come up

7  and say that it goes to notice; but this is also notice to JLI

8  before the alleged conspiracy started, not notice to Altria.

9      And I think given Dr. Grunberg's testimony -- I mean, in

10  sort of a high level, this would be like putting in

11  Dr. Grunberg's report, which obviously itself is inadmissible.

12  This is the sort of, like, report about all these historical

13  issues of the -- of the approximately 30 Attorneys General, and

14  we think that the exhibit in total should not come in.

15      What we would -- what we would propose would come in would

16  be part of the first page that establishes what the document is

17  and that the Attorneys General were concerned about what the

18  FDA should do in its deeming regulation.

19      There's one page, I think it is page 7, that is then

20  referenced in the questioning of Mr. Dunlap that talks about a

21  proposed flavor ban that the Attorneys General think should

22  apply to e-cigarettes when the FDA establishes its rule.

23      And then at the end, Mr. Dunlap is shown the signatures of

24  the many Attorneys General who signed on to this letter.

25      So we think those portions that are shown in the

**PROCEEDINGS**

1   deposition to the witness, sort of like you've done with the

2   Surgeon General report -- although, to be clear, I think this

3   is different than the Surgeon General report because it's not a

4   public record -- could be admitted as an exhibit.

5        What we're concerned about is the entire document coming

6   in.  I mean, there are even sections about the litigation that

7   led to the MSA.

8        And so if you don't agree on the three-page approach,

9   we've also prepared, I will concede, substantial redactions,

10  given what we think are the prejudicial and cumulative portions

11  of the letter.  So I'm happy to hand that up, if helpful, so

12  you can see, if you don't agree with my full relief, the sort

13  of middle relief that we're proposing.

14        **THE COURT:**  Okay.  Thank you.  Yes, I'd be interested

15  in that.

16       Mr. Weinkowitz?

17        **MR. STEKLOFF:**  And I've handed that already to

18  Mr. Weinkowitz.

19        **THE COURT:**  Okay.

20        **MR. WEINKOWITZ:**  Good morning, Your Honor.

21        **THE COURT:**  Good morning.

22        **MR. WEINKOWITZ:**  Mike Weinkowitz for the plaintiffs.

23       I'd like to just point out one thing that Mr. Stekloff

24  failed to mention.  If you look at page 2 of the document, you

25  will see that what you have is Steve Callahan from Altria,

**PROCEEDINGS**

 1   right there (indicating).

 2        What this is, is an industry trade group that is getting

 3   together and talking about the deeming regulations and

 4   circulating this Attorney General letter.  That is Altria at a

 5   meeting in 2015 with Juul.

 6        So the entire letter goes to notice to the JLI -- to JLI,

 7   notice to Altria.  And Mr. Bowen is on this letter; so it's one

 8   of the RICO co-conspirators.

 9        The letter -- and that is in Mr. Dunlap's testimony.  I

10   asked him about that.

11        The redactions aren't necessary because it is -- it lays

12   out just a basic history of what Attorney Generals have done in

13   the United States, and it goes into why flavors should not be

14   part of e-cigarettes and the science that goes into

15   e-cigarettes.

16        Redacting this whole thing, when Altria is actually on the

17   e-mail where this is circulated and this goes to the notice of

18   Altria and Mr. Bowen, is simply unnecessary.  There's nothing

19   prejudicial in this letter.  There's not a lot of history in

20   this letter.

21        There's an introduction that basically says

22   Attorney Generals have helped the public, and how we've done

23   this is we sued them.  There was an MSA.  It's just a very

24   basic introduction.  And then it goes into the very things that

25   e-cigarettes should not do.

**PROCEEDINGS**

 1     In the context, it's relevant in this case, deeming, and

 2   with Altria right there on the e-mail at the meeting in 2015

 3   with Juul.  So it goes to notice.

 4       **THE COURT:**  And so how are you planning to use this

 5   exhibit?  You can't use it with Dunlap -- or you can use the

 6   portions that you have with Dunlap.  Are you going to be using

 7   it with other witnesses?

 8     And what I'm really thinking about is:  How much time do I

 9   have to look at the exhibit and figure it out?

10       **MR. WEINKOWITZ:**  Well, at this point, I am using it

11   with Mr. Dunlap.  I used the first page.

12     And if you can turn to the first page of the letter.

13       **THE COURT:**  Right.  So the stuff that you've --

14   there's no dispute about what you've done in the video.  The

15   question is:  Am I going to see this exhibit again before the

16   end of the case?

17       **MR. WEINKOWITZ:**  You may see it with an expert,

18   Your Honor.

19       **THE COURT:**  Okay.  And --

20       **MR. WEINKOWITZ:**  So --

21       **THE COURT:**  And when would I see that expert?

22       **MR. WEINKOWITZ:**  In the next two days or so.

23       **THE COURT:**  Okay.  So I will look at this.

24     So I'll conditionally allow -- I'll allow the exhibit in,

25   to the extent that it has been agreed to, which is the narrow

PROCEEDINGS

1    portions that you used in the depo of Dunlap.

2          And then I'll look at this, and tomorrow morning I'll let

3    you know what I think.

4          **MR. WEINKOWITZ:**  Okay.  And, Your Honor, there is one

5    issue, I think, that Mr. Stekloff is probably going to jump up

6    about, which is the first page of the letter is shown to

7    Mr. Dunlap in the deposition and I think that there are

8    objections by Altria.

9          And they're asking us to redact out, I think, the first

10   paragraph that starts with -- yeah, they're asking us to redact

11   out this first paragraph, which is basically a summary of what

12   the Attorney Generals have done.  It talks about the MSA.  It's

13   just very basic stuff, historical stuff.  We think that that is

14   just basic stuff that shouldn't be redacted, Your Honor.

15         **THE COURT:**  Mr. Stekloff?

16         **MR. STEKLOFF:**  We were actually just asking Your Honor

17   for the part that says "for example" in the second line of that

18   paragraph through "including," three lines down, to be redacted

19   because I think that your ruling before, while the MSA has come

20   in, the reason for the MSA has not come in.  So we were asking

21   for exactly that and then through "including" to come in -- to

22   be redacted on that page.

23         On page 7, which I think also was shown to the witness,

24   there are other redactions, however.  This is Evidence 50.10,

25   yeah.  And so I think here, we thought that really all that was

**PROCEEDINGS**

1  needed was that paragraph that starts "We urge."  I think that

2  is sort of what the context of the questioning of Mr. Dunlap,

3  which is that the Attorneys General were urging the FDA to ban

4  flavors.

5      I think the rest of it -- if you go even further down on

6  the page, it's --

7          **THE COURT:**  I'm sorry.  You're saying that the first

8  sentence is okay and that everything else should be --

9          **MR. STEKLOFF:**  We were actually saying that first

10 paragraph.  So everything in that first paragraph, "We urge"

11 down to "adulterated" --

12         **THE COURT:**  Okay.

13         **MR. STEKLOFF:**  -- would be okay because it gives the

14 context around the deposition; but then, I mean, the rest --

15 and if you go -- starts to get into cigars and little cigars.

16     At the top of the page, there's discussion about

17 (as read):

18         "By 2007, flavored little cigar brands

19     compromised [sic] nearly four-fifths of the little

20     cigar market share."

21     And I think in order to give context about the very short

22 testimony that Mr. Dunlap provides on this page, that that one

23 paragraph was more than sufficient.

24     We don't dispute that the Attorneys General were asking

25 for a flavor ban in this letter, and I think that paragraph

PROCEEDINGS

 1   makes that very clear.

 2          **THE COURT:**  Okay.

 3          **MR. WEINKOWITZ:**  On page 7, Your Honor, if you look at

 4   the second paragraph, it's talking about characterizing

 5   flavors.  Even though it is about cigars, the context is it's

 6   about flavors and kids.  And so we think that the paragraph

 7   should stay because it gives context to the entire letter.

 8       We also think that the paragraph above should stay because

 9   it talks -- it gives context about flavors and how that impacts

10   kids.

11       On the first page, Evan, the first paragraph, it's just a

12   basic introductory paragraph about the Master Settlement

13   Agreement and the state Attorney Generals having sued them.

14   That's the context that the jury has heard.  It's an

15   introductory paragraph.  There's nothing prejudicial about it.

16   It's not excessive.  It gives context to the entire document,

17   and we don't think that it should be redacted, Your Honor.

18          **THE COURT:**  So with respect to this, I'm inclined to

19   let these pages be shown.  And I will look at the rest of the

20   letter, particularly in light of the potentially cumulative

21   nature, and see what I think.

22          **MR. WEINKOWITZ:**  Thank you, Your Honor.

23          **THE COURT:**  All right.  Anything else?

24     Mr. Stoler?

25          **MR. STOLER:**  Bradley Stoler for the plaintiff.

**PROCEEDINGS**

1    Yes, Your Honor.  One quick thing on Flora, Dr. Flora's

2  opinions.

3        **THE COURT:**  Yeah.

4        **MR. STOLER:**  So understanding what Your Honor said

5  initially, just wanted to give a little bit of background on

6  how the dispute sort of bubbled up.

7    So we reached out to the other side to let them know that,

8  you know, in the deposition designation process, we wanted to

9  brief the issue of the expert opinions.  We, of course,

10  maintained our objections.  It's, you know, the lawyerly thing

11  to do.  But we think that it's better to -- this sort of

12  detailed issue, cumulative issue is better dealt with through a

13  motion.  So that's sort of the background here.

14    In terms of the merits, I wasn't quite sure if your

15  comment that it had been preempted spoke to the merits of the

16  issue.  But on the merits, we think that these sorts of

17  opinions really just go well beyond the 701, which is,

18  you know, of course, the process of reasoning familiar in

19  everyday life.  And Dr. Flora, at least based on his deposition

20  testimony, seems to be offering, you know, highly technical

21  opinions; specifically, regulatory opinions, you know, as to

22  how the FDA would look at something, what the FDA thinks of

23  things, you know, how -- you know, where, for example, the Juul

24  would fall on an FDA risk spectrum.

25    So we think these are not everyday life -- the result of

**PROCEEDINGS**

1    reasoning from everyday life, and would ask you to exclude it.

2         THE COURT:  Okay.  Well, I appreciate the argument;

3    but you're assuming that when I was reading the deposition, I

4    wasn't looking at the merits of the issue as opposed to --

5         MR. STOLER:  No, Your Honor.

6         THE COURT:  -- anything else, and I was.

7      And I think he said -- the position that he had gave him

8    the basis to give answers in the way that he did.  His bias is

9    certainly clear.  You were able to examine him.  And I think

10   it's fine.

11        So I'm going to deny the motion.  Thank you.

12        MR. STOLER:  Thank you, Your Honor.

13        THE COURT:  Anything else?

14      All right.  When the jury is here, I will return.

15              (Recess taken at 8:22 a.m.)

16           (Proceedings resumed at 8:32 a.m.)

17      (Proceedings were heard out of the presence of the jury.)

18        THE COURT:  Are we all set?

19      Bring in the jury.

20      (Proceedings were heard in the presence of the jury.)

21        THE COURT:  Please be seated, everybody.

22      Ladies and gentlemen, good morning.  Welcome back.

23   Thank you.  I hope you had a good weekend.  We're going to

24   start up in just a second.

25      We have had a lot of video testimony, and I wanted to

**PROCEEDINGS**

1  explain it to you a little bit.

2       The Federal Rules of Civil Procedure limit the ability of

3  the parties to require somebody to come personally to court to

4  testify at trial.

5       Basically, someone within a hundred miles of the

6  courthouse can be compelled.  And many of the witnesses in this

7  case are outside of that limit and could not be compelled to

8  testify live, and so they're not coming live.

9       As a result, their testimony was taken by videotape during

10  the course of discovery.  They were sworn to tell the truth,

11  examined and cross-examined by the lawyers, and you should

12  treat their testimony just the same as if it was taken in open

13  court.

14       In the videotapes that you've seen so far, all of the

15  exhibits that have come in were -- came in from both sides.

16  And when an exhibit is coming just from a particular side, you

17  will be informed of that.

18       The other thing I wanted to remind you of, which you may

19  not have caught when I started -- when you started voir dire,

20  is this Friday will be a dark day, meaning you will not be able

21  to come into court to hear testimony.

22       But the case is moving at the speed that I hoped, and

23  we're right on schedule.

24       So with that, who is the next witness?

25            **MR. CARTMELL:**  Your Honor, plaintiff calls Christopher

1    Olin by video.  Mr. Olin is Nicholas Pritzker's son-in-law.

2    The video is 23 minutes long, and this is only testimony

3    designated by plaintiff.

4         **THE COURT:**  Okay.

5                        **CHRISTOPHER OLIN**,

6    called as a witness for the Plaintiff herein, testified via

7    videotaped deposition played in open court, not reported.)

8         (Time noted: 8:36 a.m. until 8:59 a.m.)

9         **MR. CARTMELL:**  Your Honor, plaintiff offers the

10   following exhibits:

11       Deposition Exhibit 18502, Trial Exhibit 121.

12       Deposition Exhibit 18503, Trial Exhibit 122.

13       Deposition Exhibit 18506, Trial Exhibit 123.

14       Deposition Exhibit 18509, Trial Exhibit 125.

15       Deposition Exhibit 18512, Trial Exhibit 127.

16       Deposition Exhibit 18519, Trial Exhibit 128.

17       Deposition Exhibit 18522, Trial Exhibit 3280.

18       Deposition Exhibit PM14030, Trial Exhibit 118.

19       Deposition Exhibit PM14042, Trial Exhibit 119.

20       And Deposition Exhibit PM14203, Trial Exhibit 120.

21       Ms. Sharp will introduce the next witness.

22         **THE COURT:**  All right.  So all of those exhibits will

23   be admitted.

24       (Trial Exhibits 121, 122, 123, 125, 127, 128, 3280, 118,

25   119, and 120 received in evidence.)

1          **MS. SHARP:**  Thank you, Your Honor.  Plaintiff calls

2     our next witness, Mr. Nicholas Pritzker.

3      (Witness enters the courtroom and steps forward to be sworn.)

4          **THE COURT:**  Come on up, Mr. Pritzker.

5          **MR. GUZMAN:**  Your Honor, nice to be here.  I'm Mike

6     Guzman.  I represent the witness, Mr. Pritzker.

7          **THE COURT:**  Mr. Guzman.

8                    **NICHOLAS PRITZKER**,

9     called as a witness for the Plaintiff, having been duly sworn,

10    testified as follows:

11         **THE WITNESS:**  I do.

12         **THE CLERK:**  Thank you, sir.

13       You can begin, please, by stating your full name and

14    spelling it for the court reporter.

15         **THE WITNESS:**  Nicholas Pritzker.  Last name is

16    P-r-i-t-zed-k-e-r.

17       Do you need the first name spelled also?

18       N-i-c-h-o-l-a-s.

19                   **DIRECT EXAMINATION**

20    BY MS. SHARP:

21    **Q.**  Good morning, Mr. Pritzker.

22    **A.**  Good morning.

23    **Q.**  My name is Dena Sharp.  Thank you for being here today.

24    **A.**  Thank you.

25    **Q.**  Mr. Pritzker, you're currently a member of the board of

1   directors of the company called Juul; correct?

2   **A.**   Correct.

3   **Q.**   And Tao Capital Partners is the name of your family

4   business office or family investment vehicle.  Is that fair?

5   **A.**   That's fair.

6   **Q.**   Your family invested in Juul by way of Tao Capital through

7   an entity called JL Special; is that right?

8   **A.**   JL Special was an LLC owned by trusts for the benefit of

9   members of my family, to be precise on that.

10  **Q.**   Thank you.

11      And that entity invested back in 2011 in the company

12  that's now known as Juul; is that right?

13  **A.**   Yes.

14  **Q.**   And Juul has been called Ploom and Pax in the past, as the

15  jury has heard.  To keep things simple, I'll refer to it

16  generally as Juul.  Is that okay?

17  **A.**   Okay.

18  **Q.**   Now, in my questioning, I'm going to refer to your

19  investment in Juul generally, but that's shorthand for the

20  investment vehicle that we just discussed.  Is that all right?

21  **A.**   Thank you.

22  **Q.**   Now, when you invested in 2011, your investment vehicle

23  was given a seat on Juul's board of directors; right?

24  **A.**   That's right.

25  **Q.**   And you personally have occupied that board seat since the

PRITZKER - DIRECT / SHARP

1    year of 2013; correct?

2    **A.**    That's right.

3    **Q.**    Now, you were the second-largest shareholder in Juul at

4    the time the Juul product launched in 2015; right?

5    **A.**    Right.

6          Ms. Sharp, may I ask a favor?  Could I get some water,

7    please?

8    **Q.**    Absolutely.  Actually, I'll allow Ms. Davis to.

9    **A.**    Sorry to interrupt you.

10   **Q.**    Not at all.  Not a problem.  We don't want you to be

11   thirsty.

12   **A.**    You're welcome to go ahead with your questioning, if you'd

13   like --

14   **Q.**    Thank you.

15   **A.**    -- while I'm waiting for that.

16   **Q.**    I'll do that.  Thank you.  I didn't want to get ahead of

17   myself.

18         All right.  Now --

19   **A.**    Thank you.

20   **Q.**    Take your time.

21         All right.  You were the second-largest shareholder in

22   Juul at the time the Juul product launched in 2015?

23   **A.**    And, again, you said that "you" is shorthand for the

24   entity that I described; correct?

25   **Q.**    That's right.  That's right.

```
 1   A.   Good.   Thank you.
 2        Yes, I believe the second-largest shareholder at that
 3   time.
 4   Q.   And the largest shareholder at the time of Juul's launch
 5   was Riaz Valani; is that right?
 6   A.   I believe that's true, yes.
 7   Q.   He also sat on Juul's board of directors; correct?
 8   A.   Yes.
 9   Q.   And Mr. Valani is also currently a member of Juul's board;
10   right?
11   A.   He is.
12   Q.   Now, when you -- now, in December of 2018, Altria paid
13   $12.8 billion to purchase a 35 percent stake in Juul; right?
14   A.   In the -- what month did you say that was?
15   Q.   December.
16   A.   December.
17   Q.   December 20 --
18   A.   That's right.
19   Q.   -- 2018.
20   A.   Paid $12.8 billion for a 35 percent --
21   Q.   Exactly.
22   A.   -- stake, yes.
23   Q.   That's right.
24        And using a portion of that money that Altria invested,
25   there was a payout that went to existing shareholders in Juul;
```

**PRITZKER - DIRECT / SHARP**

1 correct?

2 A.   Yes.

3 Q.   All right.  And the total amount of that payout on your

4 family's investments that we just discussed was approximately

5 $1.8 billion; right?

6 A.   Correct.

7 Q.   And that's billion with a "B"; correct?

8 A.   That's right.

9 Q.   All right.  Now, the Juul product launched in 2015, as I

10 said; right?

11 A.   Correct.

12 Q.   And that payment that came from the Altria transaction

13 came three and a half years after Juul came to the market;

14 correct?

15 A.   That's right.

16 Q.   Now, so within three and a half years, your family made

17 nearly $2 billion on the product; right?

18 A.   Yes.

19 Q.   And --

20 A.   That was a gross amount, I might add.  Gross in the sense

21 of pretax and so on.

22 Q.   Understood.  Thank you.

23 A.   Yes.

24 Q.   We can agree, I think, that that return on the investment

25 was pretty amazing; right?

```
 1   A.   It was unusual, yes.  Not -- not unique, but unusual.

 2   Q.   And you still own a portion of Juul; correct?

 3   A.   A trust still own the portion of Juul that was not sold in

 4   that transaction, yes.

 5   Q.   Now, Juul today doesn't sell flavors like it did first

 6   three and a half years ago -- or strike that.

 7        Juul today doesn't sell flavors like it did when it first

 8   launched in 2015; correct?

 9   A.   That's right.

10   Q.   And Juul doesn't promote its product on social media

11   anymore either, does it?

12   A.   No, it does not.

13   Q.   All right.  Mr. Pritzker, Altria reached out to Juul in

14   the summer of 2017 to initiate discussions about a possible

15   deal.  Is that right?

16   A.   All I could tell you for sure is that they did reach out

17   for a conversation in that -- you said summer of 2017?

18   Q.   That's right.

19   A.   That's right.  That's the time frame of the first -- the

20   first meeting that I knew about.

21   Q.   And from the time that you got that first inquiry from

22   Altria in the middle of 2017 until the transaction happened in

23   December of 2018, there was about an 18-month span.

24   A.   That's right.

25   Q.   Sound about right?
```

1    **A.**    Mm-hmm.

2    **Q.**    Now, over the course of that 18 months, you and Mr. Valani

3    led the negotiations with Altria for Juul; right?

4    **A.**    Certainly at the beginning of that time, we were the

5    committee -- the board committee that was designated to -- to

6    direct those conversations.

7    **Q.**    And on the Altria side, you dealt primarily with gentlemen

8    named Howard Willard and Billy Gifford; right?

9    **A.**    Yes, primarily.

10   **Q.**    And Howard Willard became the chief executive officer of

11   Altria during the course of those negotiations; correct?

12   **A.**    The chairman and CEO, yes.

13   **Q.**    That's right.  And he has since retired; isn't that right?

14   **A.**    I believe that's right.

15   **Q.**    And Billy Gifford became the chief financial officer of

16   Altria during the course of those negotiations; correct?

17   **A.**    Correct.

18   **Q.**    And today Billy Gifford is the chief executive officer of

19   Altria; right?

20   **A.**    Today he is the CEO, yes.

21   **Q.**    Now, you also dealt with a gentleman named Dinny Devitre,

22   who sat on Altria's board at the time; correct?

23   **A.**    I did meet Mr. Devitre on a few occasions.

24   **Q.**    And another gentleman you dealt with in the course of

25   those negotiations was named K.C. Crosthwaite, who at the time

1   was the chief growth officer of Altria; correct?

2   **A.**   That's right.

3   **Q.**   Now, he, K.C. Crosthwaite, today is the chief executive

4   officer of Juul; right?

5   **A.**   He is.

6   **Q.**   Now, during the 18-month time period of those

7   negotiations, you or Mr. Valani, or both of you, had a meeting

8   or a phone call with someone at Altria dozens of times.  Is

9   that fair?

10  **A.**   I think "dozens" might be overstating the number of times.

11  If you made me guess, it might have been ten or so in-person

12  meetings, maybe another ten or so phone calls, maybe some more

13  than that.

14  **Q.**   Great.  Well, maybe I can help.  We have some documents --

15  **A.**   Okay.

16  **Q.**   -- and other things to perhaps assist us with this.

17       So I'd like to go through a timeline, just to see if we

18  can agree on at least some of the times that you all

19  connected --

20  **A.**   Okay.

21  **Q.**   -- just to set the table a bit.

22            **MS. SHARP:**  Now, Your Honor, may I approach with a

23  binder?

24            **THE COURT:**  Yes.

25  \\\

1  BY MS. SHARP:

2  **Q.**   Mr. Pritzker, you have in front of you a binder now with

3  documents that we've collected from the files that have been

4  produced.   It includes calendar entries and e-mails regarding

5  in-person meetings and calls.

6       So please take a moment to page through it.   Feel free to

7  take your time.   And what we're looking to do is really for you

8  to just take a look at the documents and see if you agree that

9  they reflect several meetings that took place over an 18-month

10  time period.

11  **A.**   (Witness examines document.)

12        **MS. WILKINSON:**   Your Honor, could I just clarify that

13  Mr. Pritzker is going to be asked about the specific --

14              (Official Reporter clarifies.)

15        **MS. WILKINSON:**   I just want to ensure that

16  Mr. Pritzker is going to be asked about the specific dates and

17  not just to look at all of them and say does it reflect all the

18  calls or meetings that Ms. Sharp is trying to prove.

19        **THE COURT:**   Well, let's see what happens.

20        **MS. WILKINSON:**   Okay.   Thanks.

21                  (Laughter.)

22        **THE WITNESS:**   So, Ms. Sharp, could you just please ask

23  me what you're asking me to -- tell me what you're asking me to

24  confirm in looking at these numerous documents right now.

25  \\\

PRITZKER - DIRECT / SHARP

**BY MS. SHARP:**

**Q.**   No problem at all.  Thank you for asking.

What we are looking for you to confirm is that the
exhibits that are in the binder in front of you document the
occurrence of phone calls and meetings that took place between
June 5th, 2017, and October 29, 2018.

And as a bit of a spoiler alert, I can tell you that we
have a document that, in our view, summarizes the calls and the
dates -- the meetings and dates on which they occurred.  And so
I hope we can just reach agreement on that quickly and be
efficient with your time and the jury's.

**A.**   Good.  I certainly am in favor of efficiency.

Yes, from the documents I see, they seem to be a very
careful list of -- documenting at least some of the calls and
meetings that took place.

**Q.**   And do you agree, having looked through these documents,
that the meetings all involved at least one of yourself or
Mr. Valani, from JLI, meeting with leadership from Altria or
proposing meetings with Altria?

**A.**   Yes.

**Q.**   Now, you personally were involved in most of those calls
and meetings, Mr. Pritzker; correct?

**A.**   Yes, I seem to be.

**Q.**   And the meetings and calls that took place that are in the
binder in front of you were part of Juul's effort to determine

1   whether it was going to enter some sort of transaction with

2   Altria or not.

3   **A.**   That's right.

4   **Q.**   Is that fair?

5   **A.**   That would be fair.

6   **Q.**   Now, if I tell you that there are 35 meetings and phone

7   calls documented in that binder, do you have any reason to

8   doubt that?

9   **A.**   I -- I can see you've been very careful in assembling

10   these.  So if that's the number, that would not surprise me.

11   **Q.**   We've tried to be as careful as we can, but, of course, we

12   want to make sure we do it right.

13        I will first turn your attention, if I may, to a couple of

14   dates where the exact time of the meeting may not be totally

15   clear.  So let us start with Trial Exhibit 2722, which is -- we

16   have a couple of different binders; so please bear with me for

17   one moment -- Tab 11, please, in the binder in front of you,

18   sir.

19   **A.**   Mm-hmm.

20   **Q.**   All right.  So in front of you, Mr. Pritzker, and on the

21   screen in front of you as well, is a document that's dated --

22   it's an e-mail chain dated April 13 and April 14, 2018.  Do you

23   see that?

24   **A.**   Yes, I do.

25   **Q.**   Now, I'm going to focus your attention first on an e-mail

1    from you to Howard Willard on April 13 in which you say

2    (as read):

3              "Howard:  Thanks for getting back to us.  How

4         about noon Pacific Time, 3ET Monday?  If you would

5         rather do it at another time, we'll [sic] be

6         flexible."

7         Do you see that?

8    **A.**   I do.

9    **Q.**   And that's in response to an e-mail from Mr. Willard;

10   correct?

11   **A.**   Yes.

12   **Q.**   Great.  We'll talk about that e-mail in one moment.

13        Now, I've --

14        **THE COURT:**  Ms. Sharp, let me interrupt you.

15        Is this a document that has been agreed to its admission

16   so that it should be shown to the jury, or are you laying a

17   foundation for the document?

18        **MS. SHARP:**  I am laying a foundation for it right now;

19   and actually, having done so, Your Honor, I would move to admit

20   this document, with Mr. Pritzker having recognized it.

21        **THE COURT:**  All right.  Any objection?

22        **MS. WILKINSON:**  No, Your Honor.

23        **THE COURT:**  All right.  It's admitted.

24        (Trial Exhibit 2722 received in evidence.)

25        **MS. SHARP:**  All right.  So this document can now be

1   shown to the jury, please, Evan.

2   **Q.**   All right.  Now, Mr. Pritzker, you say to Mr. Willard on

3   April 13, as I just said (as read):

4            "How about noon [on] . . . Monday?"

5       And having used the wonders of Google to figure out what

6   days of the week were at issue here, I can tell you that

7   April 13 was a Friday, and you're suggesting a call on Monday,

8   April 16.

9       Does that look right to you?

10  **A.**   I will take your word for those days and dates.

11  **Q.**   Thank you.

12      You need not, as Mr. Willard responds and he says

13  (as read):

14           "3:00 p.m. sounds good."

15      And so do you have any reason to doubt that you indeed had

16  a phone call with Mr. Willard on April 16, 2018?

17  **A.**   No, I don't -- I don't doubt that.

18  **Q.**   Thank you.

19      All right.  We'll take a look at one more document in your

20  binder for the moment.  That's Trial Exhibit 3326.

21      If you could bring that up, Evan, please.

22      I believe that's Tab 17 in your binder.

23      Now, Tab 17 is -- excuse me.  Trial Exhibit 3326 is an

24  e-mail exchange again between yourself and Mr. Willard.  This

25  one is dated May 12, 2018.  And you write to Mr. Willard asking

1    for a call.

2         Do you see that, Mr. Pritzker?

3    **A.**   I do.

4              **MS. SHARP:**   Great.

5         I'll move to admit this document into evidence.

6              **MS. WILKINSON:**   No objection.

7              **THE COURT:**   All right.   It's admitted.

8         (Trial Exhibit 3326 received in evidence.)

9              **MS. SHARP:**   Thank you.   It can be published to the

10   jury, please.

11   **Q.**   And we're looking at this one largely for the purpose of

12   establishing that you asked Mr. Willard and Mr. Gifford for a

13   phone call early in the week.

14        And Mr. Willard responds and says:   We can be available on

15   Tuesday at 11:00 a.m.

16        And you write back and say (as read):

17             "Riaz and I are good with that time, Tuesday

18        11:00 a.m. Eastern."

19        Having seen that, Mr. Pritzker, do you have any reason to

20   doubt that you had a phone call with Altria, you and Mr. Valani

21   did, on May 15, 2018?

22   **A.**   No reason to doubt that, no.

23   **Q.**   Now, if I may, I will hand you a chart that summarizes the

24   35 meetings and phone calls that are described in more detail

25   in that binder.

```
 1          It is -- oh, actually, it's in the front page of your

 2    binder.  So I need not --

 3    A.    I do see that --

 4    Q.    -- even do that.

 5    A.    -- chart.

 6          MS. SHARP:  And I hope it's for the Court as well.

 7          THE WITNESS:  Yes.

 8    BY MS. SHARP:

 9    Q.    Now, take your time looking at that chart that we have

10    created.

11          Do you have any reason to doubt that any of the entries on

12    that chart are accurate, Mr. Pritzker?

13    A.    I don't.  I'd be, honestly, a bit surprised at the

14    earliest of these dates.  I don't remember contacts that early

15    in 2017, but I wouldn't doubt it if you have evidence of those

16    calls.  Certainly possible.

17    Q.    And feel free to look at the first few tabs in your

18    binder, as those are the communications that reflect those

19    earlier dates in June, July of 2017.

20    A.    True.  Yes.  My memory was weak on that, but I certainly

21    see that I had communications in June and July, as indicated.

22          MS. SHARP:  Unless you have any other questions or

23    open issues about that chart, Mr. Pritzker, Your Honor, I'd

24    like to move Exhibit 4051 into evidence as a summary exhibit

25    under Rule of Evidence 1006.
```

 1              MS. WILKINSON:  No objection, Your Honor.

 2              THE COURT:  All right.  It's admitted.

 3         (Trial Exhibit 4051 received in evidence.)

 4    BY MS. SHARP:

 5    Q.   All right.  Having established that timeline,

 6    Mr. Pritzker, we'd like to look at just a few of your

 7    interactions at the time of these meetings to help give some

 8    context.

 9         Let's move to July of 2017.  And if we could please pull

10    up Trial Exhibit 182.  This document is already in evidence.

11         Now, on the e-mail in front of you, Mr. Pritzker, you can

12    see that Mr. Valani sends to you an e-mail in July 2017, and he

13    writes (as read):

14              "Dinny just called stressing that Altria and PMI

15         would be great partners for us."

16         "Dinny" refers to Mr. Devitre, whom we discussed earlier;

17    is that right?

18    A.   I'm sure he did, yes.

19    Q.   And Mr. Valani continues and he says (as read):

20              "Howard the COO and Billy the CFO are coming."

21         Correct?

22    A.   Yes.

23    Q.   And you respond to Mr. Valani.  And you have a little bit

24    of colorful language that you need not replicate, but can you

25    perhaps read into evidence your words without necessarily using

PRITZKER - DIRECT / SHARP

1    that particular word?

2    **A.**    I do apologize for my obscenity.  I don't usually talk

3    like that.

4    **Q.**    Happens to all of us.

5    **A.**    Yes.  So, I'm sorry.  What was the question?  I do see it.

6    **Q.**    Yes.  And if you --

7    **A.**    You want me to read it and expurgate the obscenity?

8    **Q.**    That would be fine.  Thank you.

9    **A.**    (As read):

10            "Honestly that is . . . awesome."

11   **Q.**    Thank you.

12        All right.  Why don't we pull up next Trial Exhibit 1846,

13   please.  And this document, which is not yet in evidence, is a

14   February 8 -- is an e-mail exchange that occurs over February 7

15   and February 8, 2018.  And the "subject" line is "Congrats!"

16   And you can see that you are involved in that e-mail chain.

17        Do you see that, Mr. Pritzker?

18   **A.**    I do.  I have to look through the whole chain again, if

19   you don't mind --

20   **Q.**    No problem.

21   **A.**    -- to remind myself.

22        (Witness examines document.)  Aah, okay.

23        Okay.  I do see this.

24        **MS. SHARP:**  I'll move to admit this document into

25   evidence.

PRITZKER - DIRECT / SHARP

1           MS. WILKINSON:  No objection.

2           THE COURT:  It's admitted.

3      (Trial Exhibit 1846 received in evidence.)

4           MS. SHARP:  Thank you.

5  Q.   Let's please scroll to the e-mail from Mr. Willard at the

6  bottom of the first page that spills over into the second.  And

7  Mr. Willard, from Altria, there writes (as read):

8           "Billy and I are excited about continuing to

9           contribute to Altria's long . . . record of success."

10      And then he writes (as read):

11           "Billy and I were hoping to have one last call

12           with you and Riaz."

13      Do you see that?

14  A.   Yes, I do.

15  Q.   And he also writes (as read):

16           "We are comfortable with a much higher initial

17           price, although it falls short of the valuation Peter

18           is targeting for the private placement."

19      Correct?

20  A.   Yes.

21  Q.   He goes on to say (as read):

22           "We continue to believe that our offer and

23           structure combined with the ability to drive higher

24           revenue growth and higher margins with lower risk

25           makes our offer your best path going forward."

1     Correct?

2  **A.**   Correct.

3  **Q.**   Now, and then he goes on and says (as read):

4         "Even if we are going to part company at this

5     point, we would like to have one final call."

6     Right?

7  **A.**   Right.

8  **Q.**   Now, we're still on this exhibit, but let's please scroll

9  to the very first-in-time e-mail, if we can.

10     And this is an e-mail from you on February 6, 2018, that

11  begins the chain.  And what you write is (as read):

12         "Howard/Billy:  Sorry for the late

13     congratulations to you both!  From our short but

14     sweet experience, you are a great team and the

15     promotions are well deserved!  Hope to see you soon.

16     Nick."

17     Correct?

18  **A.**   Correct.

19  **Q.**   All right.  Let's please pull up Trial Exhibit 3305.

20     This -- the first page of this document is an e-mail from

21  your assistant, Mary Ryan, to you on March 15, 2018, and the

22  subject is "Note from Howard Willard."

23     Do you see that?

24  **A.**   I do.

25        **MS. SHARP:**  I'll move to admit this document into

PRITZKER - DIRECT / SHARP

```
 1  evidence.
 2           MS. WILKINSON:  No objection.
 3           THE COURT:  Admitted.
 4      (Trial Exhibit 3305 received in evidence.)
 5  BY MS. SHARP:
 6  Q.   All right.  Let's scroll to the second page, in which you
 7  can find a handwritten note to you from Howard Willard of
 8  Altria, and it's dated March 3, 2018.
 9       So even though the last e-mail we looked at from
10  Mr. Willard suggested that you might part ways, as he put it,
11  this note is dated less than a month later; correct?
12  A.   Yes.
13  Q.   All right.  And Mr. Willard writes (as read):
14           "Dear Nick, many thanks to you and the team for
15           the hard work to try and find common ground to
16           support a potential partnership."
17           Right?
18  A.   Right.
19  Q.   And he goes on and says (as read):
20           "Billy and I really enjoyed getting to know you.
21           We are all facing an exciting time to be in the
22           Tobacco Business."
23           And he uses a capital T and a capital B; right?
24  A.   He does.
25  Q.   All right.  Let's pull up Trial Exhibit 2721, please.
```

1    This exhibit is an April 8, 2018, e-mail from you to Howard

2    Willard, Mr. Gifford, and copying Mr. Valani and Mr. Burns.

3    And the subject is "Thanks."

4         Do you see that?

5    A.   Yes.

6              MS. SHARP:  I'll move to admit this document.

7              MS. WILKINSON:  No objection.

8              THE COURT:  It's admitted.

9         (Trial Exhibit 2721 received in evidence.)

10             MS. SHARP:  Thank you.

11   Q.   Now, in early April, Altria's executives hosted you and

12   Mr. Valani in Richmond, Virginia, where Altria is located;

13   right?

14   A.   Correct.

15   Q.   And you write (as read):

16             "The dinner was amazing, both the cuisine and

17        the setting.  Thanks also for the very constructive

18        conversation.  We are looking forward to hearing from

19        you, and are working on our side to be prepared to

20        respond quickly."

21        Correct?

22   A.   Correct.

23   Q.   Let's pull back up Trial Exhibit 2722, please, which we

24   looked at just a few moments ago.  And this one's been admitted

25   already.

1    I'd like to focus -- now, this is the e-mail that we

2    looked at in which you're setting a call with Mr. Willard in

3    mid-April of 2018.

4    I'd like to focus on Mr. Willard's e-mail to you on

5    April 13, 2018.  In that e-mail, Mr. Willard writes (as read):

6         "Billy and I have been working with our team to

7         prepare for our next discussion and we recommend we

8         have a call next Monday or early next week."

9    He says (as read):

10        "We will be prepared to share the following."

11   I'll focus on the first bullet in which he says (as read):

12        "A proposal for the structure and value sharing

13        that creates a win/win partnership that enables us to

14        fully collaborate to effectively manage challenges

15        over the next few years and deliver maximum value in

16        the long run."

17   Did I read that correctly?

18 **A.**   You did.

19 **Q.**   Now, he goes on and talks about proposals for

20   collaboration.  I want to focus on the third bullet point, in

21   which he says (as read):

22        "A proposal for the timeline and next steps that

23        establishes a rapid process that helps us gain

24        agreement on the previous two items and then proposes

25        a way for us to collaborate on the remaining three

PRITZKER - DIRECT / SHARP

1          critical items which include:  (i) Sharing market and

2          financial projections to gain agreement on the

3          standalone and partnership value for the enterprise."

4          Did I read that correctly?

5     A.   Would you mind showing me the parties to whom this --

6     Q.   Sure.

7     A.   -- was sent?

8     Q.   No problem.

9          We can go all the way to the top, please, Evan.

10         It's a little bit unclear, maybe because there were

11    iPhones involved.

12    A.   I see.

13    Q.   But we know that at least you and Mr. Willard were

14    involved in that e-mail chain.

15    A.   Yes.  Yes.

16    Q.   Is that fair?

17    A.   And then I can't quite see who Howard Willard sent this

18    to.

19    Q.   Neither can we --

20    A.   Oh, yes.

21    Q.   -- unfortunately.

22    A.   Okay.  Good.  I do see it, and I'm trying to remember

23    whether I actually saw this or not.

24         But please proceed.

25    Q.   Sure.  In any event, did I read Mr. Willard's --

PRITZKER - DIRECT / SHARP

1   A.    You did read it correctly, yes.

2   Q.    Thank you.

3         And we'll turn to the next page, in which on Item (iii)

4   Mr. Willard says (as read):

5             "A process to ensure that the strategy alignment

6         and chemistry between our respective operating teams

7         is supportive of a productive partnership that can

8         create substantial value above what is achievable

9         under a standalone scenario in a dynamic tobacco

10        category environment."

11        Correct?

12  A.    Correct.

13            MS. SHARP:  All right.  Next, we'll pull up two

14  exhibits together, please, Trial Exhibit 4040 and 4041, please,

15  Evan.

16  Q.    Now, you can see that these are text messages,

17  Mr. Pritzker, between yourself and Mr. Devitre.

18  A.    Mm-hmm.

19  Q.    Do you see that?

20  A.    Yes.

21  Q.    All right.  And they are dated August 18, 2018; correct?

22  A.    Correct.

23            MS. SHARP:  I'll move to admit.

24            MS. WILKINSON:  No objection.

25            THE COURT:  They're admitted.

1          (Trial Exhibits 4040 and 4041 received in evidence.)

2   **BY MS. SHARP:**

3   **Q.**   All right.  So first Mr. Devitre says to you (as read):

4          "Hi, Nick.  We made very good progress today.

5      Thanks for your open and forthright approach.  We

6      trust Riaz and you 100 percent."

7      Right?

8   **A.**   Right.

9   **Q.**   He goes on (as read):

10          "Lots more work to be done, but I am confident

11      that we will get there."

12      Right?

13  **A.**   Right.

14  **Q.**   Now, what do you write back to Mr. Devitre, if you don't

15  mind reading it, Mr. Pritzker?

16  **A.**   I wrote (as read):

17          "Thanks, Dinny.  Honestly, we have very warm

18      feelings for you, Howard and Billy.  In fact, the

19      entire team we have met so far.  Appreciate your

20      excellent and wise intermediation.  Nick."

21  **Q.**   Thank you.

22      All right.  Mr. Pritzker -- oh, one last thing.

23      Could we please call up Trial Exhibit 4051.

24      I realize that the jury didn't get a chance to see the

25  chart that summarized all the meetings that we've been talking

 1    about so far.

 2              (Trial Exhibit 4051 displayed for the jury.)

 3         **MS. SHARP:**  Thank you.

 4    **Q.**   All right.  Shifting gears a bit, Mr. Pritzker, when it

 5    came to partnering with a tobacco company, you've testified in

 6    this case before that for Juul, the question always was not if

 7    but when and what kind of association would be appropriate; is

 8    that right?

 9    **A.**   Would you mind repeating that?  I would like to be

10    accurate in responding --

11    **Q.**   No problem.

12    **A.**   -- to that question, Ms. Sharp.

13    **Q.**   I appreciate that.

14         When it came to partnering with a tobacco company, you

15    testified in this case that for Juul, the question always was

16    not if but when and what kind of association would be

17    appropriate; right?

18    **A.**   Well, if I could comment on that, I can't comment too

19    quickly on it because there are a couple of parts I'd like to

20    address.

21         One is the question of partnership.  I see that

22    Mr. Willard used the word "partnership" on several occasions,

23    but I don't think it was a partnership that I ever looked at as

24    being the nature of a transaction that would happen.  I don't

25    want to be overly picky about it, but I would say "investment"

1    is the right -- would be the right term.  But that's okay.  We

2    could let that go.

3        The second part of it was, I said a question of not if but

4    when a transaction would occur?  Did I testify that that was

5    said?  Because, in my mind, I don't think there was any -- ever

6    any inevitability about a transaction happening with a tobacco

7    company or anybody.  I certainly thought that something like

8    that might happen; but if I ever testified that it was not a

9    question of if but when, implying that I knew that there would

10   be a transaction with a tobacco company, that would not be

11   right.  That was never my preconception.

12       It was certainly possible and we were approached by a

13   number of tobacco companies; so it might well have been.

14   **Q.**   I can help with that.

15   **A.**   I'm sorry to go on at great length, but I want to be

16   precise.

17   **Q.**   That's all right.  I can help a bit.

18       You have given sworn testimony before in this case; right,

19   Mr. Pritzker?

20   **A.**   I have.

21   **Q.**   And your deposition was taken on July 13 and 14, 2021;

22   right?

23   **A.**   Sounds right, yes.

24   **Q.**   You were under oath at the time; correct?

25   **A.**   Yes.

PRITZKER - DIRECT / SHARP

1  Q.   You're under oath today; right?

2  A.   Yes.

3         MS. SHARP:  All right.  Your Honor, if I may approach.

4         THE COURT:  Yes.

5         MS. SHARP:  Your Honor, it's 474 at lines 4 through 12

6  of the MDL transcript.

7         MS. WILKINSON:  Your Honor, can we just wait one

8  second.

9      I just brought my own transcript, if you don't mind,

10 Ms. Sharp.  And could you tell me again -- I'm sorry -- which

11 day is it?  On the --

12        MS. SHARP:  No problem.

13        MS. WILKINSON:  -- 13th or the 14th?

14        MS. SHARP:  Day 2.

15        MS. WILKINSON:  Day 2.  Yes, ma'am.

16        MS. SHARP:  That's right.  Page 474 at 4 through 12.

17        MS. WILKINSON:  Thank you.

18        THE COURT:  You may proceed.

19 BY MS. SHARP:

20 Q.   All right.  Now, in your deposition in this matter,

21 Mr. Pritzker --

22     You okay?

23        MS. WILKINSON:  Yes.  Thanks.

24        MS. SHARP:  Great.

25 Q.   -- you were asked the following question and provided the

 1   following answer.

 2         (As read):

 3         "QUESTION:  Was there a disagreement between yourself and

 4         Mr. Valani, as major investors, and Mr. Monsees, as the

 5         chief executive officer, about the desirability of

 6         partnering or working with a major tobacco firm?"

 7         And you replied (as read):

 8              "The question always was when and what kind of

 9         association would be appropriate."

10         MS. WILKINSON:  I'm going to object, if it's

11   impeachment, to read the full answer, not just the portion of

12   the answer, Your Honor.

13         THE COURT:  Sustained.  I think that's fair.

14         MS. SHARP:  Sure.

15   Q.  (As read):

16              "An association with a cigarette company in

17         which the cigarette company used its power to further

18         the goals of Juul and to disrupt its own cigarette

19         business in favor of switching to what I knew to be a

20         better and safer product, that would be an alliance

21         that would be helpful, especially where the cigarette

22         company had no control over the operations of Juul.

23         We never would have, I think, had a disagreement

24         about that.  And, in fact, that's what the Altria

25         investment turned out to be.  So as I say, I think

1          any comment any of us would have made about an

2          association with a tobacco company would depend on

3          the nature of that association."

4          That was the testimony that you provided in the

5     deposition; correct?

6  **A.**   Correct.

7          And if I might --

8               **THE COURT:**  Mr. Pritzker, actually, other people may

9     ask you questions.  But this is a question-and-answer thing,

10    and you've answered the question.  Thank you.

11              **THE WITNESS:**  There was a prior question, though,

12    Your Honor, I just -- I thought before that, that I was about

13    to address but...

14              **THE COURT:**  Okay.  Why don't you just wait for the

15    question and then --

16              **THE WITNESS:**  I will.

17              **THE COURT:**  -- provide the answer.

18              **THE WITNESS:**  Good.

19              **THE COURT:**  Thank you.

20  **BY MS. SHARP:**

21  **Q.**   Now, Mr. Pritzker, I want to focus on four particular

22    moments in time during the course of your 18-month negotiations

23    with Altria leading up to the deal.

24          Let's talk about July 2017 first.  We're going to start

25    with what the public health authorities were doing related to

1    nicotine products at that time.

2        Let's pull up Trial Exhibit 1271, please.

3        There we are.

4        In front of you, Trial Exhibit 1271 is a press release

5    from the FDA dated July 27, 2017.  Do you see that?

6    **A.**   I do.

7            **MS. SHARP:**  All right.  I'll move to admit.

8            **THE COURT:**  Any objection?

9            **MS. WILKINSON:**  I don't think I have any objection,

10   Your Honor.  I just haven't --

11       Can I just ask -- Ms. Sharp, can I ask you one question?

12           **MS. SHARP:**  Sure.

13       (Discussion off the record between Ms. Wilkinson and

14   Ms. Sharp.)

15           **MS. WILKINSON:**  Your Honor, I'm not going to object.

16   If there's some issue, Ms. Sharp and I can work it out.

17           **THE COURT:**  All right.

18           **MS. WILKINSON:**  I just was checking with her it's the

19   same document.

20           **THE COURT:**  All right.  It's admitted.

21       (Trial Exhibit 1271 received in evidence.)

22           **MS. SHARP:**  Thank you.

23   **Q.**   All right.  In the first line of this document, the FDA

24   announced a comprehensive regulatory plan to shift trajectory

25   of tobacco-related disease, death.

1          Do you see that?

2     A.    Yes.

3     Q.    All right.  And let's scroll to the second page and look

4     at the third paragraph, please.

5          And there, what the press release notes is that (as read):

6               "In order to further explore how to best protect

7          public health in the evolving tobacco marketplace,

8          the agency will also seek input from the public on a

9          variety of significant topics, including approaches

10         to regulating kid-appealing flavors in e-cigarettes

11         and cigars."

12         Do you see that?

13    A.    I do.

14    Q.    All right.  Now, do you recall, Mr. Pritzker, around this

15    same time that your son-in-law Chris Olin expressed concern

16    that use among teens was rampant?

17    A.    Yes, I do remember he was concerned about that.

18    Q.    Now, also in July of 2017, there was an in-person meeting

19    between Juul and Altria leaders.  You did not attend it in

20    person.  Your son Isaac did.  But you did receive notes about

21    it.  Do you recall that?

22    A.    Yeah, I do recall there was such a meeting, yes.

23    Q.    Thank you.

24         Let's pull up Trial Exhibit 67, please.

25         The subject of this e-mail is "Some Notes from Altria

1    Meeting."  And the e-mail chain is dated July 30, 2017, and it

2    includes yourself, Mr. Valani, Mr. Frankel, Mr. Goldman, and

3    your son Isaac; correct?

4    **A.**    Correct.

5              **MS. SHARP:**  I'll move to admit.

6              **MS. WILKINSON:**  Subject to the Court's rulings, no

7    objection.

8              **THE COURT:**  All right.  It's admitted.

9         (Trial Exhibit 67 received in evidence.)

10   **BY MS. SHARP:**

11   **Q.**    Now, Tyler Goldman was the CEO of Juul at this time;

12   right?

13   **A.**    Yes.

14   **Q.**    And your son Isaac Pritzker attended this particular

15   meeting in your place; correct?

16   **A.**    Well, he attended the meeting, yes.  I wouldn't say in my

17   place, but he was there.

18   **Q.**    A good parent.

19        All right.  So let's take a look at the very bottom of

20   page 1 here, which is the start of Mr. Frankel's e-mail.  And

21   what he says is (as read):

22             "These notes are disjointed but just a

23        transcription of what I have jotted down."

24        Right?

25   **A.**    Correct.

PRITZKER - DIRECT / SHARP

1  Q.   Now, let's turn to page 3 of this document, please.  Near

2  the top, it writes -- it says (as read):

3            "And Altria could help with (1) access to

4       distribution and sales team, (2) FDA plus regulatory

5       engagement as well as whole government affairs org,

6       (3) expertise in brand building and maintenance."

7       Correct?

8  A.   I took this to mean things that Altria were -- was

9  proposing or offering.

10 Q.   Thank you.

11      And a couple lines down from that it says (as read):

12           "Believes" -- "Believers" -- "there may be an

13      opportunity where the two of us working together is

14      highly complementary."

15      Correct?

16 A.   Yes.  Correct, that's what it says.

17 Q.   Now, near the bottom of this same page, there's a note

18 that says (as read):

19           "Would invest at 'EXCESS OF TOBACCO MULTIPLES.'"

20      Right?

21 A.   It says that, yes.

22 Q.   And the words "excess of tobacco multiples" are in all

23 caps; right?

24 A.   Yes.

25 Q.   And right below that it says (as read):

1              "Provide Access to other Altria Resources."

2      Right?

3  A.   Right.

4  Q.   And the last line of this page says (as read):

5              "Distribution across 150K doors that matter."

6      Right?

7  A.   It does.

8  Q.   Now, going back to page 1 quickly, your son Isaac Pritzker

9  near the top writes (as read):

10             "Thanks for note-taking, forgot some of that.

11       Tacking on a few thoughts."

12     And then in the first sentence, he says (as read):

13             "Although they proposed an equity investment and

14       collaboration on distribution, marketing, et cetera,

15       they also intimated that they had done deals with

16       every structure under the sun and were very open to

17       discussion along other lines."

18     Right?

19  A.   It says that.

20  Q.   All right.  Let's pull up Trial Exhibit 4054, please.

21     Now, shortly after that July meeting with Altria in 2017,

22  Juul decided to raise some capital; is that right?  Do you

23  remember?

24  A.   What was the date we have on that?

25  Q.   I will bring it up shortly.

PRITZKER - DIRECT / SHARP

1          There's an e-mail in front of you now that's dated

2     November 20, 2017.

3     **A.**   Yes.

4     **Q.**   And you can see that's an e-mail from Mr. Danaher to the

5     board.

6     **A.**   Yes.

7     **Q.**   Do you see that?

8     **A.**   Mm-hmm.

9     **Q.**   All right.  And you were on the board and received that

10    e-mail; correct?

11    **A.**   I did.

12          **MS. SHARP:**  I'll move to admit.

13          **MS. WILKINSON:**  Your Honor, my only concern is it's a

14    very long document.  I haven't read through it.  So I will --

15          **THE COURT:**  Okay.  It's conditionally --

16          **MS. WILKINSON:**  -- not oppose on the condition we can

17    work out any --

18          **THE COURT:**  Yeah.  It's conditionally admitted, then.

19        (Trial Exhibit 4054 conditionally received in evidence.)

20          **MS. SHARP:**  Thank you.

21    **Q.**   All right.  And I will focus on the e-mail that

22    Mr. Danaher sends on Monday, November 20, to the board.  And he

23    writes (as read):

24          "Nick and Riaz hereby provide notice of a

25          special meeting of the board of directors."

PRITZKER - DIRECT / SHARP

1       Right?

2   A.  Right.

3   Q.  Nick is you; correct, Mr. Pritzker?

4   A.  I assume so, yes.

5   Q.  Riaz is Mr. Valani presumably?

6   A.  Presumably, yes.

7   Q.  All right.  And he writes that (as read):

8           "The purpose of the meeting is to discuss the

9       offering and sale of subordinated convertible

10      promissory notes by Juul up to an aggregate amount of

11      150 million."

12      Correct?

13  A.  Correct.

14  Q.  That's a fancy way of saying that the company was going to

15  sell some notes to raise some money.  Is that fair?

16  A.  That's fair.

17  Q.  Now, let's scroll to Point 3 of this document, please.

18  And you can see that there is a cover page of a slide deck.

19  And I'll note that this is a draft.  Do you see that?

20      Well, do you see the cover page that's in front of you,

21  Mr. Pritzker?

22  A.  I do, yes.

23  Q.  Great.  And it says "Project Jericho"; right?

24  A.  It does.

25  Q.  And underneath it, it says "Private Placement Memorandum"?

PRITZKER - DIRECT / SHARP

1   **A.**   Yes.

2   **Q.**   All right.  Now, if we could pull up Trial Exhibit 3313,

3   please.  3313 is a more legible version of the document that we

4   just looked at.

5        And looking at this cover slide, does this look like the

6   same document that we just looked at, perhaps a more cleaned-up

7   version?

8   **A.**   Yes.

9   **Q.**   All right.  And this says "Project Jericho - Confidential

10   Private Placement Memorandum" as well; correct?

11   **A.**   Correct.

12        **MS. SHARP:**  All right.  I will move to admit this one,

13   and I'm fine doing it on the same conditional grounds.

14        **MS. WILKINSON:**  No objection, then.

15        **THE COURT:**  All right.  It's admitted conditionally.

16        (Trial Exhibit 3313 conditionally received in evidence.)

17        **MS. SHARP:**  Thank you.

18   **Q.**   So this is a slide deck that's meant to explain why an

19   investor should consider investing in Juul.  Is that fair?

20   **A.**   I'm not looking at the document.

21        So, generally, is that my impression of such memorandums?

22   Yes.

23   **Q.**   Thank you.  That is fair.  Why don't we get more specific.

24   **A.**   Okay.

25   **Q.**   Let's go to page 6 of this document, please.  And the

1   title is "Opportunity Overview."

2       All right.  Now, the Opportunity Overview slide here

3   explains a bit about the product and the company in the first

4   bullet; is that right?

5   A.   That's right.

6   Q.   All right.  Now, let's look at the bullet that says

7   "Strategic Value."

8       Behind that it says (as read):

9           "Traditional cigarette sales volumes have

10          steadily declined, so Big Tobacco players have turned

11          to the aerosolized nicotine segment (commonly

12          referred to as the vapor category) to fuel future

13          growth."

14      Correct?

15  A.   It says that, yes.

16  Q.   All right.  And then the next bullet down says "Committed

17  existing shareholders," if you can see that.

18  A.   Yes.

19  Q.   And it says (as read):

20          "Fidelity Investments and Nick and Isaac

21          Pritzker (Tao Capital Partners) remain committed to

22          supporting the business's rapid growth trajectory and

23          capacity expansion pursuits."

24      Correct?

25  A.   It does say that.

PRITZKER - DIRECT / SHARP

1    **Q.**   And that was true in November of 2017; right?

2    **A.**   That we were committed shareholders?

3    **Q.**   Yes.

4    **A.**   I suppose so.

5    **Q.**   And that you and your son and Tao Capital were committed

6    to the business's rapid growth trajectory and capacity

7    expansion pursuits; right?

8    **A.**   Correct.

9    **Q.**   All right.  Let's fast-forward in time now to April and

10   May of 2018.

11        Let's pull up Trial Exhibit 1853, please.

12        Now, on April 23, 2018, the FDA made an announcement about

13   youth vaping and it named Juul specifically.

14        You sent around -- if we scroll up a little bit, you can

15   see that you sent around that announcement on April 24 to a few

16   people.  Can you see that, Mr. Pritzker?

17   **A.**   Yes.

18             **MS. SHARP:**  All right.  I'll move to admit.

19             **MS. WILKINSON:**  No objection.

20             **THE COURT:**  It's admitted.

21        (Trial Exhibit 1853 received in evidence.)

22   **BY MS. SHARP:**

23   **Q.**   Let's take a look.  We can scroll down now, and let's just

24   take a look at the bullet points under "For Immediate Release."

25        And the headline says (as read):

1              "Statement from FDA Commissioner Scott Gottlieb,

2        M.D., on new enforcement actions and a Youth Tobacco

3        Prevention Plan to stop youth use of, and access to,

4        Juul and other e-cigarettes."

5        Now, in the second bullet it says (as read):

6              "Agency takes new action to examine youth appeal

7        of Juul."

8        Right?

9    A.   Right.

10   Q.   Sorry.  That was the third bullet.

11        And the fourth bullet under that says (as read):

12             "Agency takes steps to foreclose online sales of

13        Juul to minors."

14        Correct?

15   A.   Correct.

16   Q.   So this is the FDA in April of 2018 identifying Juul as a

17   product of concern as it related to youth usage; right?

18   A.   Yes.

19   Q.   Let's turn to page 2, please.  Now, this is a long press

20   release.  I won't ask us all to sit through all of it.  But

21   let's focus on the third full paragraph on the second page in

22   which the FDA notes that (as read):

23             "The troubling reality is that electronic

24        nicotine delivery systems (ENDS) such as e-cigarettes

25        have become wildly popular with teens."

PRITZKER - DIRECT / SHARP

1         Did I read that correctly?

2    **A.**   You did.

3    **Q.**   Except it says "kids," not "teens."  Pardon me.

4    **A.**   Yes.

5    **Q.**   All right.  Let's pull up Trial Exhibit 1915, please.

6         After the FDA's announcement on April 23, two days later,

7    on April 25, Juul put out a press release announcing its

8    strategy to combat underage use.

9         Do you see that in front of you, Mr. Pritzker?

10   **A.**   I do.

11            **MS. SHARP:**  I'll move to admit.

12            **MS. WILKINSON:**  No objection.

13            **THE COURT:**  Admitted.

14        (Trial Exhibit 1915 received in evidence.)

15   **BY MS. SHARP:**

16   **Q.**   Now, in this press release, Juul is telling the public

17   that it is committed to combating underage use of its products;

18   right?

19   **A.**   That's right.

20   **Q.**   The press release also says (as read):

21            "Our objective is to provide the 38 million

22        American adult smokers with meaningful alternatives

23        to cigarettes while also ensuring that individuals

24        who are not already smoking, particularly young

25        people, are not attracted to nicotine products such

1        as Juul."

2        Correct?

3   **A.**   Correct.

4   **Q.**   Let's pull up Trial Exhibit 1368, please.

5        Now, right around the same time, in April of 2018, you're

6   in contact with your son-in-law Chris Olin about Juul as well.

7   **A.**   Yes.

8   **Q.**   The e-mail that is in front of you is between Mr. Olin and

9   yourself, including Mr. -- your sons Isaac and Joby, as well as

10  others, and the date is April 21, 2018.  Do you see that?

11  **A.**   Yes.

12       **MS. SHARP:**  Now, the jury just recently this morning

13  saw another e-mail in this chain, but this is a different

14  version.  And so I'm going to move to admit this document into

15  evidence.

16       **MS. WILKINSON:**  No objection.

17       **THE COURT:**  It's admitted.

18       (Trial Exhibit 1368 received in evidence.)

19  **BY MS. SHARP:**

20  **Q.**   Now, in the first e-mail in the thread, Mr. Olin writes

21  (as read):

22           "Recently our investment in Juul has become

23       increasingly challenging for me."

24       Do you see that?

25  **A.**   Yes.

1   Q.   Let's turn to page 2, please.

2        I won't repeat everything the jury heard earlier in

3   Mr. Olin's deposition but want to focus on what he says at the

4   very top of page 2, in which he writes (as read):

5            "Within the last few months, Urban and

6        Lick-Wilmerding, two leading private high schools in

7        San Francisco" -- "SF, published articles about

8        widespread use of Juul among their student bodies on

9        their campuses."

10       Did I read that correctly?

11  A.   You did.

12  Q.   So at a minimum, you knew in April of 2018 from your

13  son-in-law's e-mail that Juul was not just impacting schools

14  generally, but schools in San Francisco in particular; correct?

15  A.   He did -- he did report that, yes.

16  Q.   Now, at the bottom of the page, the very last full

17  paragraph, Mr. Olin writes (as read):

18           ". . . I believe the company should take

19       aggressive action."

20       Right?

21  A.   Yes.

22  Q.   And the very first bullet that he includes under the

23  aggressive action that he suggests is (as read):

24           "Eliminate flavored versions."

25       Right?

1   **A.**   Right.

2   **Q.**   And at this time in April of 2018, Juul was still

3   available in a variety of flavors; correct?

4   **A.**   In several flavors, yes.

5   **Q.**   That's right, as it had been since it had launched in June

6   of 2015; correct?

7   **A.**   Yes.

8   **Q.**   Now, let's go to the top of page 3, the first full

9   paragraph, in which the second sentence Mr. Olin writes

10  (as read):

11          "CEH and other environmental health

12      organizations will likely target Juul as they have

13      become the market leader and synonymous with teen

14      vaping."

15      Correct?

16  **A.**   I see that, yes.

17  **Q.**   Let's pull up Trial Exhibit 128, please.

18      The e-mail that you'll see in front of you is your

19  response to Mr. Olin.  It's on a different thread, but it's

20  dated May 5, 2018, and you can see it's between yourself,

21  Mr. Olin, and others in your family; correct?

22  **A.**   Correct.

23          **MS. SHARP:**  I'll move to admit.

24          **THE COURT:**  It's already been moved.

25          **MS. SHARP:**  Aah.

PRITZKER - DIRECT / SHARP

1          **THE COURT:**  It's admitted.

2          **MS. SHARP:**  Even better.  Thank you.

3    **Q.**   In the middle of the page, on May 5, 2018, you write to

4    Mr. Olin (as read):

5              "You're right.  I never anticipated the scale of

6         the adoption of the devices or its popularity with

7         kids.  You and Regan saw the threat long before I

8         appreciated it."

9         Right?

10   **A.**   Right.

11   **Q.**   Now, the jury saw this as well, so I won't belabor the

12   point, but I do want to place it in context a bit.

13        You continue on and talk about (as read):

14             "Whether the positive outweighs the negative

15        depends on a number of factors, including one's own

16        point of view and experience, the long-term damage

17        caused by using Juul, which is obviously not yet

18        known . . . ."

19        Right?

20   **A.**   Right.

21   **Q.**   So at this point in May of 2018, the Juul product had been

22   on the market for nearly three years; right?

23   **A.**   Right.

24   **Q.**   Let's look at the bottom of the e-mail in which you point

25   Mr. Olin to an April 18th open letter from several

1    U.S. senators.  That was -- there was one to the FDA and

2    another to Juul, expressing their concern about vaping,

3    especially about Juul and especially in regard to youth.

4    Correct?

5    **A.**    Correct.

6    **Q.**    Now, let's take a look at Senator Durbin's letter.

7          Let's pull up Trial Exhibit 4035, please.

8          This is an April 18th, 2018, press release from

9    Senator Durbin and other senators.  Do you see that,

10   Mr. Pritzker?

11   **A.**    Yes.

12          **MS. SHARP:**  I'll move to admit.

13          **MS. WILKINSON:**  I object, unless there's a foundation

14   that Mr. Pritzker actually read this article.  I don't know

15   that he did.

16          **MS. SHARP:**  Well, he flagged it in an e-mail to his

17   son.  And at a minimum, it comprises notice to Altria's

18   co-conspirator.

19          **THE COURT:**  I think the foundation is laid by that.

20       Overruled.

21   **BY MS. SHARP:**

22   **Q.**   We'll focus on just a couple of statements in this press

23   release.  Let's focus on the second full paragraph in which the

24   press release states (as read):

25              "Your company's popular vaping device (Juul) and

1          its accompanying flavored nicotine cartridges

2          (Juulpods) are undermining our nation's efforts to

3          reduce tobacco use among youth and putting an entire

4          new generation of children at risk of nicotine

5          addiction and other health consequences."

6     Right?

7  A.   He says that, yes.

8  Q.   The last sentence of that paragraph says (as read):

9          "Your company's product purports to help people

10         quit smoking cigarettes, yet we are concerned that

11         Juul -- with its kid-appealing design and

12         flavorings -- will only lead to further nicotine

13         addiction and adverse health consequences."

14    That's what it says; right?

15 A.   It does say that.

16 Q.   Around this time in April of 2018, do you recall receiving

17 a diligence report that reported that "Juul owns teens,"

18 Mr. Pritzker?

19 A.   I'm not sure I remember that specifically, but if you

20 could remind me of that.  Was that a press report?

21 Q.   It was not.  We'll come back to it --

22 A.   Okay.

23 Q.   -- shortly, if that's all right.

24    All right.  Let's pull up Trial Exhibit 1279, please.

25    Trial Exhibit 1279 is an e-mail from Kevin Burns, then CEO

PRITZKER - DIRECT / SHARP

1    of Juul, to Howard Willard at Altria, copying yourself,

2    Mr. Gifford, Mr. Valani, and himself.  It's April 20, 2018.

3         Do you see that?

4    A.   Correct.  Yes.

5              MS. SHARP:  All right.  I will move to admit this

6    document.

7              MS. WILKINSON:  No objection.

8              THE COURT:  Admitted.

9         (Trial Exhibit 1279 received in evidence.)

10   BY MS. SHARP:

11   Q.   Attached to Mr. Burns' e-mail is a letter from Juul to

12   Altria; correct?

13   A.   Yes.

14   Q.   And it says (as read):

15             "We appreciate the opportunity to further

16        discuss with you a process for exploring a potential

17        transaction between the companies."

18        Right?

19   A.   Yes.

20   Q.   Now, I'll turn your attention to the second page of the

21   document, Point 3 for Evan, and just note, without going into

22   too much detail, that under "Investments," what Juul is

23   proposing to Altria at this time in the first bullet is, in

24   exchange for 6.4 billion, Altria would acquire non-voting

25   common equity ownership; correct?

PRITZKER - DIRECT / SHARP

1    **A.**   Correct.

2    **Q.**   And then in the next bullet, it sets out that Altria would

3    pay, after certain events occur, an additional 1.6 billion;

4    correct?

5    **A.**   Yes.  That was his idea.

6    **Q.**   And then below that, in the third bullet, it says that

7    (as read):

8            "In addition to, and concurrent with, the

9        closing of the initial minority investment, Altria

10       would fund 1 billion into an escrow

11       [account] . . . ."

12       Correct?

13   **A.**   Of course, it never turned out that way, but that was --

14   that was his idea at the time, yes.

15   **Q.**   Sure.  And so by my math, 6.4 billion, plus 1.6 billion,

16   plus 1 billion would be a 9 point -- excuse me -- a

17   $9.0 billion investment from Altria, which is what Juul is

18   proposing at this time on April 20, 2018.  Sound right?

19   **A.**   Yes.

20   **Q.**   And I'll note that in the "Majority Investment" bullet,

21   the second bullet we just looked at, this letter from Juul to

22   Altria proposes that (as read):

23           ". . . Altria would seek regulatory approval to

24       obtain a 50.1 percent fully diluted ownership

25       interest in Juul . . . ."

PRITZKER - DIRECT / SHARP

1      Right?

2  **A.**   It does say that.  I don't think that the company ever

3  would have entered into that transaction.  So, but at this

4  point, that was -- there were various ideas being put forward.

5  **Q.**   And that was the idea that was put forward in April of

6  2018 by Juul to Altria; correct?

7  **A.**   By the CEO, yes.

8  **Q.**   All right.  Let's pull up Trial Exhibit 4037, please.

9      This is a May 3rd, 2018, e-mail from Mr. Willard to

10  Mr. Burns, yourself, Mr. Valani; and he copies Mr. Gifford and

11  also Murray Garnick, who was general counsel at Altria.  And

12  the subject is "Proposal Letter."  Do you see that?

13  **A.**   Yes.

14      **MS. SHARP:**  I'll move to admit, please.

15      **MS. WILKINSON:**  Your Honor, I would only ask that the

16  full exhibit be introduced, which is the proposal that was

17  attached.  I think we have it labeled all as one exhibit.

18      **MS. SHARP:**  Yes.  Thank you.  That's a great point.

19  That's Trial Exhibit 2067, which we can pull up and admit

20  together, if that's acceptable to the Court.

21      **THE COURT:**  All right.

22      **MS. WILKINSON:**  No objection to that.

23      **THE COURT:**  They're both admitted, 4037 and 2067.

24      (Trial Exhibits 4037 and 2067 received in evidence.)

25      **MS. SHARP:**  Thank you.

**PRITZKER - DIRECT / SHARP**

1   Q.   All right.  So attached to Mr. Willard's May 3rd e-mail is

2   a letter from Altria to Juul, and it begins (as read):

3            "We appreciate the continuing dialogue with

4        Juul, and thank you for your letter of April 20,

5        outlining Juul's expectations for a potential

6        transaction."

7        Correct?

8   A.   Correct.

9   Q.   Now, this letter is again describing a potential

10  investment, a counterproposal, and it outlines Altria's view of

11  a potential transaction; correct?

12  A.   Yes.

13  Q.   Let's take a look.  Beginning Number 1 at the very bottom

14  of page 1, it suggests that Altria would pay 500 million as an

15  initial payment; right?

16  A.   Yes.

17  Q.   And then in Item 2 at the top of page 2, it says upon

18  certain conditions being met, Altria would pay an additional

19  5 billion; right?

20  A.   Yes.

21  Q.   And it says (as read):

22            ". . . to receive 50.1 percent of the equity and

23        voting rights of Juul."

24        Correct?

25  A.   Correct.

PRITZKER - DIRECT / SHARP

1   Q.   And then in the Item 3, it suggests that upon further

2   conditions being met, there would be a further payment of

3   3.5 billion; right?

4   A.   Correct.

5   Q.   So, again, by my math, which I hope is right, those

6   numbers, 3.5 billion, plus 500 million, plus 5 million would be

7   9 billion.  Does that sound correct?

8   A.   That sounds right.

9   Q.   Now, it goes on at some length, but I'd like to focus on

10  the last paragraph on page 4.

11       And there Altria writes (as read):

12           "First, the valuation is, in our view,

13       compelling to your investors, particularly taking

14       into account the substantial regulatory and legal

15       contingencies relating to the eVape" -- excuse me --

16       "to eVapor generally and Juul products specifically."

17       Correct?

18  A.   I see that.

19  Q.   And do you understand that the regulatory and legal

20  contingencies referred to here referred to the recent negative

21  attention from Congress and the FDA because of youth use of

22  Juul?

23  A.   Well, I don't know if that was specifically what he was

24  referring to.

25  Q.   Any reason to doubt it?

PRITZKER - DIRECT / SHARP

1    **A.**    He might have been.

2            **MS. WILKINSON:**  Objection, Your Honor.

3            **THE WITNESS:**  I don't know.  I didn't write the words;

4    so I don't know what inspired him.  Certainly possible that it

5    was that.

6            **THE COURT:**  Overruled for now.

7    **BY MS. SHARP:**

8    **Q.**    Now, it says (as read):

9            "Second, we share with you a strategic vision as

10            to how to grow the Juul business rapidly . . . ."

11           Right?

12   **A.**    He says that, yes.

13   **Q.**    And he goes on to note that Altria's proposal will, quote

14   (as read):

15           ". . . position Altria to actively support the

16           Juul business, further enhancing its growth

17           opportunities."

18           Right?

19   **A.**    Yes.

20   **Q.**    So that means that under this proposal, Altria could

21   position itself to help grow Juul's business rapidly; right?

22   **A.**    Right.

23   **Q.**    Now, Altria sent this proposal to Juul less than two weeks

24   after Congress and the FDA publicly sounded the alarm about

25   youth use of Juul in April of 2018; right?

```
 1   A.   That's -- that's the timing, yes.

 2        THE COURT:  Ms. Sharp, when you're ready to go on to a

 3   next topic, we're going to take a break.

 4        MS. SHARP:  If I may just complete one more letter --

 5        THE COURT:  Yes.

 6        MS. SHARP:  -- that would be perfect.

 7        Thank you very much.

 8        Let's pull up Trial Exhibit 9, please.

 9   Q.   Trial Exhibit 9 is a May 30th letter from Altria, and this

10   one is to yourself and Mr. Valani.

11        Do you see that, Mr. Pritzker?

12   A.   I do.

13        MS. SHARP:  I will move to admit this one into

14   evidence.

15        MS. WILKINSON:  I think it's admitted, but if not, I

16   have no objection.

17        THE COURT:  All right.

18        MS. SHARP:  Even better.  Thank you.

19   Q.   And I'll note that in this letter, Altria is yet again

20   discussing proposed deal terms.  And in the first full

21   paragraph, it says (as read):

22             "First, there would be a $6.4 billion

23        payment . . . ."

24        Correct?

25   A.   It says that, yes.
```

1  **Q.**   And then it says that payment would be followed by a

2  $1.6 billion payment upon certain conditions being met.

3  **A.**   Yes.

4  **Q.**   And, again, it suggests a 50.1 percent common equity

5  voting interest; right?

6  **A.**   It does suggest that, yes.

7  **Q.**   All right.  And then under the heading below that says

8  "PMTA Top-Up," it says -- it suggests an additional $2 billion

9  payment, assuming certain conditions are met; correct?

10 **A.**   It does.

11 **Q.**   Now, by my math, those figures together would amount to

12 $10 billion.  Does that sound right?

13 **A.**   I think your math is right.

14 **Q.**   Thank you.

15     And then on the next page, there are some additional

16 provisions, including a potential for earning the 2 billion

17 with regard to the PMTA payment.

18     And then under "Key Areas for Agreement On Governance," I

19 want to focus on the first paragraph which says (as read):

20     "As noted above, we believe that the most compelling

21 partnership between our two companies can occur only if we

22 fully leverage Juul's current management team, capabilities,

23 expertise and innovative culture and Altria's best-in-class

24 infrastructure."

25     Did I read that correctly?

PRITZKER - DIRECT / SHARP

 1   **A.**   You did.

 2          **MS. SHARP:**  Okay.  Thank you.

 3       This is a great time for a break.

 4          **THE COURT:**  All right.  Ladies and gentlemen, let's

 5   take our first morning break.  We'll come back at 10:20.

 6   Please remember the admonitions.

 7       (Proceedings were heard out of the presence of the jury.)

 8          **THE COURT:**  All right.  We'll be in recess.

 9       (Whereupon there was a recess in the proceedings

10          from 10:06 a.m. until 10:22 a.m.)

11          **THE COURT:**  Ms. Sharp, please go ahead.

12          **MS. SHARP:**  Thank you, Your Honor.

13   **BY MS. SHARP**

14   **Q.**   All right.  Mr. Pritzker, we left off with some events

15   that were transpiring in April of 2018.  Let's fast forward now

16   to September and October of 2018.

17       Let's please pull up Trial Exhibit 971.  This is a

18   document that's already in evidence.  It's a September 12, 2018

19   statement from FDA Commissioner Scott Gottlieb concerning the

20   epidemic of youth e-cigarette use.

21       (Document displayed.)

22   **Q.**   Now, Mr. Pritzker, the jury has seen this document before,

23   but we'd like to cover a few points with you, if we may.

24       Let's turn to Page 3, please.

25       And Dr. Gottlieb writes in the third paragraph from the

1  bottom in the last sentence:

2        "The FDA won't tolerate a whole generation of young

3     people becoming addicted to nicotine as a tradeoff for

4     enabling adults to have unfettered access to these same

5     products."

6     Right?

7  A.   Right.

8  Q.   Now, you would agree with me that addicting young people

9  to nicotine is an unacceptable tradeoff for making a nicotine

10 product widely available to adults; right?

11 A.   I'm not sure I see "tradeoff" as being the right word,

12 Ms. Sharp, but certainly it's not tolerable to have a

13 generation of people being addicted.  That's not acceptable.

14 Q.   And any company that sought to profit off the rapid growth

15 of a nicotine product's customer base would be unacceptable if

16 it meant addicting a generation of young people?

17 A.   Could you please repeat that for me, Ms. Sharp?

18 Q.   Absolutely.

19     Any company that sought to profit off the rapid growth of

20 a nicotine product's customer base is unacceptable if it means

21 addicting a generation of young people; right?

22 A.   Yes.  Any company that sought to do that; correct.

23 Q.   Let's look at Page 6.  Mr. Gottlieb notes as follows:

24        "I've been" --

25     It's Dr. Gottlieb.  Excuse me.

1          "I've been warning the e-cigarette industry for more

2     than a year that they needed to do much more to stem the

3     youth trends.  In my view, they treated these issues like

4     a public relations challenge, rather than seriously

5     considering their legal obligations, the public health

6     mandate, and the existential threat to these products.

7     And the risks mounted."

8     Right?

9  A.  He says that.

10 Q.  Do you recall reviewing Dr. Gottlieb's comments in

11 September of 2018, Mr. Pritzker?

12 A.  I'm sure I read them at the time.

13 Q.  Let's turn please to Trial Exhibit 2981.

14     This is a September 12, 2018 Juul press release right

15 around the same time as Dr. Gottlieb's comments that we just

16 reviewed?

17     (Document published to the witness.)

18 A.  Yes.

19 Q.  Do you see that, Mr. Pritzker?

20 A.  I do.  Uh-huh.

21       MS. SHARP:  I'll move to admit.

22       THE COURT:  It's admitted.

23     (Trial Exhibit 2981 received in evidence.)

24     (Document displayed.)

25 \\\

PRITZKER - DIRECT / SHARP

1    BY MS. SHARP

2    Q.   Now, Juul issues its own press release the same day and

3    says that it will work, quote, "Proactively with FDA;" right?

4    A.   Right.

5    Q.   And Juul also says that it wants to be, quote, "Part of

6    the solution;" right?

7    A.   Absolutely.

8    Q.   And then in this press release Juul also repeats its

9    mission of providing adult smokers, quote, "A true alternative

10   to combustible cigarettes."

11        And the press release goes on to note that, "Flavors play

12   an important role in helping adult smokers switch."

13        Right?

14   A.   He says that, yes.

15   Q.   Yes.  The press release does; correct?

16   A.   Yes.

17   Q.   And now for context, Juul's flavor offerings were still on

18   the market in September of 2018; right?

19   A.   They were.

20   Q.   And that was more than three years after the Juul product

21   had launched in June of 2015; correct?

22   A.   Correct.

23   Q.   Let's pull up Trial Exhibit 2596, please.

24        (Document displayed.)

25   Q.   This document is already in evidence and it's an email

1   from Mr. Willard to yourself, Mr. Valani and Mr. Burns, dated

2   October 5, 2018, and there is an attachment.

3        The subject line is "Letter from Richard."  And we will

4   take a look at the October 5 letter from Altria that is

5   attached.

6        Now, this letter sent by Altria just a few weeks after

7   Dr. Gottlieb's public comments and after Juul's press release

8   says the following.  I'm looking at the first paragraph a

9   couple sentences in:

10            "We continue to believe that, by working together, as

11        partners, we can not only protect the substantial value

12        that you have already created but also create

13        significantly more value for your shareholders than is

14        achievable on a stand-alone basis."

15        Right?

16  A.   It says that, yes.

17  Q.   Now, this two-page letter goes on to set out some proposed

18  terms from Altria, but there's no specific dollar amount that

19  Altria proposes in this letter.

20        Does that seem right, Mr. Pritzker?

21  A.   That's right.

22  Q.   Now, directing your attention to the second-to-last

23  paragraph, Altria notes that it's setting a deadline of

24  October 12 for Juul to respond to the terms that are set out in

25  this October 5 letter; is that right?

```
 1   A.   That's right.

 2   Q.   Now, you had phone calls in the week that followed to

 3   discuss this proposal.  Do you remember that?

 4   A.   Yes.

 5   Q.   Let's pull up Trial Exhibit 45, please.

 6        (Document displayed)

 7   Q.   Now, these are text messages that are already in evidence.

 8        I'll tell you, Mr. Pritzker, these -- you are not a party

 9   to these text messages, but I'm putting them in front of you to

10   help provide a little bit of context.

11        So I'll begin at the top of Page 7 here where Mr. Willard,

12   you can see on October 12, is writing a text message to

13   Mr. Devitre.  And Mr. Willard writes:

14             "Spoke to Nick last night.  Tentative agreed to a

15        call on Monday to agree on terms.  Agreed on term in the

16        letter."

17        And Mr. Devitre writes back and he says:

18             "Sounds good.  Well done, Howard."

19        Right?

20   A.   Yes.  I see that.

21   Q.   Now, do you recall speaking to Mr. Willard and agreeing on

22   the terms in the October 5 letter that we just looked at?

23   A.   Well, I wouldn't say agreed on the terms, if I could,

24   again, be precise.

25   Q.   Sure.
```

1  **A.**    The call I remember, actually, was before the letter.

2  This was the one after the letter that you're referring to.

3  Because we had spoken before he sent the letter and he had

4  listed these terms and asked if it was worth sending the

5  letter, and I told him that I thought it was worth sending the

6  letter to the company.

7        So I had already said that I thought that the terms

8  were -- the potential foundation of a deal that could happen.

9  I wouldn't say I agreed, but I did encourage him to send the

10  letter.   I don't remember the call afterwards specifically, but

11  the letter was consistent with what he had told me generally.

12        So I wouldn't say there was -- certainly wouldn't say

13  there was an agreement at that point of the terms, but there

14  was, I think, an understanding that it was on the right track,

15  put it that way.

16  **Q.**    Thank you.

17  **A.**    Sorry to go on at length, but --

18  **Q.**    It's helpful.

19  **A.**    -- it's complicated.

20  **Q.**    Well, it's helpful context, thank you.

21        Now let's pull up Trial Exhibit 2591, please.

22        (Document published to the witness.)

23  **Q.**    Following the FDA's announcement in September of 2018

24  about the youth vaping epidemic and after Altria had sent its

25  October 5 letter proposal, do you recall that Juul had a

PRITZKER - DIRECT / SHARP

1    meeting with the FDA in mid-October of 2018?

2    **A.**    I do.  I was not at that meeting, but, yes, I -- I

3    definitely remember that sequence of work with the FDA and the

4    meeting.

5    **Q.**    And do you recall that the company made some slides for

6    that meeting?

7    **A.**    I -- I vaguely remember slides.

8    **Q.**    Maybe I can help.

9    **A.**    Yeah, please help.  I know you can.  I'm sure -- I was

10   aware of the -- what was going to be said at the meeting, so I

11   might -- might remember slides.

12   **Q.**    Right.  Trial Exhibit 2591 that's on the screen in front

13   of you is an email from Gerry Masoudi, who was general counsel

14   for Juul, to yourself and Mr. Valani among others.  It's an

15   October 13, 2018, email.  Do you see that?

16   **A.**    October 13.  Yes.

17             **MS. SHARP:**  I'll move to admit this email.

18             **MS. WILKINSON:**  No objection.

19             **THE COURT:**  It's admitted.

20        (Trial Exhibit 2591 received in evidence.)

21        (Document displayed)

22   **BY MS. SHARP**

23   **Q.**    Now, as you can see, there's an attachment, and we'll turn

24   to the attachment in just a moment.  They are not attached to

25   this slide.

1        But do you see that the subject line of this email said

2   "Slides for Call."  Do you see that?

3   **A.**   Yes.

4   **Q.**   Now, do you -- you had a call where you and Mr. Valani

5   reviewed and discussed the slides; right?

6   **A.**   I -- I can't tell you sitting here that I remember that

7   specific call.

8   **Q.**   Sure.  You recall reviewing the slides though?

9   **A.**   Perhaps if I see the slides I could remember.  I don't

10  really remember slides specifically.

11  **Q.**   We'll get there in just a moment.

12  **A.**   Good.

13  **Q.**   Now, as part of your review and discussions in preparation

14  for that FDA presentation, do you recall Mr. Valani questioning

15  the choice to characterize the mint flavor as a traditional

16  tobacco flavor?

17  **A.**   I don't recall that specific interaction.  Mr. Valani's

18  view about that, I don't remember specifically, no.

19  **Q.**   Let's pull up Trial Exhibit 1379, please.

20        (Document published to the witness.)

21  **Q.**   Now on the screen in front of you is an email that you did

22  not receive.  This is an October 15, 2018, email from

23  Mr. Valani to himself and his notes, some comments on the draft

24  slides that were discussed during the call that was referenced

25  in the email we just looked at.

```
 1              MS. SHARP:  I'll move to admit this document into

 2   evidence.

 3              MS. WILKINSON:  Objection, Your Honor.  This is an

 4   email from Mr. Valani to Mr. Valani.  So there's a lack of

 5   foundation with this witness.

 6              THE COURT:  What is the foundation?

 7              MS. SHARP:  Well, Your Honor, first, I would equate

 8   this to the situation we encountered on Friday, where

 9   Ms. Lingrell was asked about an email that did not include her,

10   but bore on a meeting and some information that she may have

11   had.

12        I would also note that this is a statement of a

13   co-conspirator in an alleged RICO conspiracy and a party

14   admission.

15              THE COURT:  All right.  On that latter basis

16   sustained -- I'll overrule the objection.

17        (Trial Exhibit 1379 received in evidence)

18   BY MS. SHARP

19   Q.   Now, Mr. Valani's email to himself on October 15, 2018,

20   makes a number of notes.

21        First he says:

22             "Overall much improved."

23        Correct?

24   A.   Yes.

25   Q.   And under "Slide 2," he writes:
```

1              "Social media" --

2          MS. SHARP:  Oh, I'm sorry.  Can we get that pulled up

3    for the jury?

4          (Document displayed.)

5          MS. SHARP:  Thank you.

6    BY MS. SHARP

7    Q.   The second slide says:

8              "Social media.  Do we have to get rid of it?"

9          That's a question he asks; right?

10   A.   Yes.

11   Q.   Now let's look at what he says about Slide 3.  He writes

12   as follows:

13             "Mint is listed under tobacco and menthol.  Will

14        someone from the FDA think that's disingenuous?"

15        That's what he wrote on October 15, 2018; correct?

16   A.   Yes.  I see that.

17   Q.   Let's pull up Trial Exhibit 1380, please.

18        (Document published to the witness.)

19   Q.   The document that's in front of you is an email from

20   Mr. Valani to you, Mr. Pritzker.  The subject says "Final" and

21   the attachment is "Juul - FDA Presentation, October 16, 2018";

22   right?

23   A.   Right.

24          MS. SHARP:  I'll move to admit.

25          MS. WILKINSON:  No objection.

PRITZKER - DIRECT / SHARP

1              **THE COURT:**  It's admitted.

2         (Trial Exhibit 1380 received in evidence.)

3    **BY MS. SHARP**

4    **Q.**   Now, let's take a look at the slides as you requested.

5    Okay.  We can take a look at the second page, please.

6         (Document displayed.)

7    **Q.**   That's the cover.  Down in the left-hand side it says "FDA

8    Presentation October 16, 2018"; right?

9    **A.**   That's -- yes.

10   **Q.**   Now, let's turn to the fourth page, please.

11        Now you can see on the right-hand side where it says:

12             "Current Juul Pod Offerings."

13        Do you see that?

14   **A.**   Yes.

15   **Q.**   On the top row there, it says:

16             "Tobacco and Menthol Products."

17        Right?

18   **A.**   It does.

19   **Q.**   Okay.  And what is included in those four is Virginia

20   Tobacco; right?

21   **A.**   Right.

22   **Q.**   Classic Tobacco.

23   **A.**   Right.

24   **Q.**   Mint?

25   **A.**   Right.

PRITZKER - DIRECT / SHARP

1    **Q.**   Menthol?

2    **A.**   It does.

3    **Q.**   All right.  Underneath that, it says "Flavored Products";

4    correct?

5    **A.**   Correct.

6    **Q.**   And the flavored products that are included in this slide

7    that was presented to the FDA in October of 2018 says cucumber;

8    right?

9    **A.**   Right.

10   **Q.**   Mango?

11   **A.**   Yes.

12   **Q.**   Creme?

13   **A.**   Yes.

14   **Q.**   And fruit?

15   **A.**   It does.

16   **Q.**   All right.  Let's go to Trial Exhibit 193, please.

17       (Document published to the witness.)

18   **Q.**   193 is an email from Mr. Willard to yourself,

19   Mr. Pritzker, Mr. Valani and Mr. Burns and Mr. Gifford.  The

20   subject is "FDA Letter."  It's dated October 25, 2018, at

21   8:25 a.m.; correct?

22   **A.**   Correct.

23   **Q.**   Mr. Willard writes:

24       "Attached is our letter to the FDA, which we sent and

25       made public today."

PRITZKER - DIRECT / SHARP

```
 1        Right?
 2   A.   Right.
 3   Q.   Now he attaches that letter, which we will pull up --
 4             MS. SHARP:  I'm sorry.  I move to admit this email
 5   into evidence.
 6             MS. WILKINSON:  193?
 7             MS. SHARP:  Yes.
 8             MS. WILKINSON:  No objection.
 9             THE COURT:  It's admitted.
10             MS. SHARP:  Thank you.
11        (Trial Exhibit 193 received in evidence)
12   BY MS. SHARP
13   Q.   And now we'll turn to the attachment, which is Trial
14   Exhibit 453.
15        (Document published to the witness.)
16   Q.   Exhibit 453 is the October 25, 2018 letter from Altria to
17   Dr. Gottlieb at the FDA; correct?
18   A.   Correct.
19             MS. SHARP:  I'll move to admit.
20             MS. WILKINSON:  No objection.
21             THE COURT:  It's admitted.
22        (Trial Exhibit 453 received in evidence.)
23        (Document displayed)
24   BY MS. SHARP
25   Q.   In the October 25 letter, in the second paragraph, Altria
```

1   writes:

2           "Importantly, we are alarmed about the reported rise

3       in youth e-vapor use to epidemic levels."

4       Right?

5   A.   Right.

6   Q.   Now, let's go to Page 2.  The second-to-last paragraph

7   begins:

8           "We believe underage use of e-vapor products is

9       further compounded by flavors in these products that go

10      beyond traditional tobacco flavors."

11      Right?

12  A.   Yes, it says that.

13  Q.   And then in the next paragraph, Altria advises in the

14  second sentence:

15          "For our remaining MarkTen and Green Smoke Cigalike

16      products, we will sell only tobacco, menthol and mint

17      varieties."

18      Do you see that?

19  A.   I do.

20  Q.   So in October 2018, as shown in this exhibit and the slide

21  deck from Juul that we just looked at, both Juul and Altria,

22  within about ten days of each other, presented the FDA with a

23  proposal that mint pods should be categorized as traditional

24  tobacco flavors; right?

25  A.   Right.

PRITZKER - DIRECT / SHARP

1   **Q.**   Have you ever heard of a mint cigarette, Mr. Pritzker?

2   **A.**   No.

3   **Q.**   Let's pull up Trial Exhibit 4038.

4        (Document published to the witness.)

5   **Q.**   This is an October 29 -- 30, 2018 email exchange between

6   yourself, Mr. Willard and Mr. Gifford; right, Mr. Pritzker?

7   **A.**   Yes.

8   **Q.**   Subject line is "Thanks"; correct?

9   **A.**   Yes.

10        **MS. SHARP:**  I'll move to admit.

11        **MS.WILKINSON:**  No objection.

12        **THE COURT:**  It's admitted.

13        (Trial Exhibit 4038 received in evidence)

14        (Document displayed)

15   **BY MS. SHARP**

16   **Q.**   You write:

17        "Howard/Billy, thanks so much for your tenacity,

18        flexibility and creativity.  We couldn't be more

19        excited at the prospect of a partnership with you and

20        your team.  To the future.  Best wishes, Nick."

21        Right?

22   **A.**   I said that.

23   **Q.**   Now, Mr. Willard responds and he says:

24        "Thanks back to you and the team.  We are looking

25        forward to a long and successful partnership."

PRITZKER - DIRECT / SHARP

1          Right?

2  **A.**    Right.

3  **Q.**    Let's pull up Trial Exhibit 45, please.

4          Having looked at this email that we just looked at, do you

5  believe that you and Altria had reached agreement on terms by

6  October 29, 2018?

7  **A.**    I'd say we had agreed on the general outlines of the deal.

8  There were still a long way to go before I would say to you

9  there was an agreement on terms.

10 **Q.**    Trial Exhibit 45 is already in evidence.

11         Let's look at Page 7, please, where Mr. Devitre writes:

12             "How is it going" --

13         **MS. SHARP:**  Sorry.  It's October 29, for Evan, at

14 5:53 p.m.  Sorry about that.

15         (Document displayed.)

16         **MS. SHARP:**  There we are.

17 **BY MS. SHARP**

18 **Q.**    Now, you recall we looked earlier at a text message

19 exchange between Mr. Devitre and Mr. Willard; right?

20 **A.**    Yes.

21 **Q.**    Now we're moving forward in time to October 29, 2018.  And

22 Mr. Devitre asks Mr. Willard:

23             "How is it going?"

24         Right?

25 **A.**    Yes.

1   **Q.**   And Mr. Willard returns -- or replies, and he says:

2            "We have reached agreement on terms."

3        Right?

4   **A.**   I think he was referring again to what it said before,

5   which I think it said "terms in the letter."

6        So, once again, I think the agreement was based on the

7   very basic, you know, six -- five or six terms that were

8   mentioned in the letter, as opposed to an overall agreement.

9   **Q.**   Sure.  And the Juul/Altria deal ultimately closed on

10  December 20, 2018; right?

11  **A.**   Yes.

12  **Q.**   So less than two months after this text exchange occurred;

13  correct?

14  **A.**   Right.

15  **Q.**   Let's pull up now Trial Exhibit 4038, please.  I'm sorry,

16  we already did that.

17       Let's pull up Trial Exhibit 983.

18       (Document published to the witness.)

19  **Q.**   983 is a November 13, 2018, Juul Labs Action Plan.  Do you

20  see that?

21  **A.**   Yes.

22       **MS. SHARP:**  I'll move to admit, if it's not already

23  admitted.

24       **MS. WILKINSON:**  Your Honor, we have no problem.  We

25  have different exhibit numbers.

PRITZKER - DIRECT / SHARP

1          **THE COURT:**  Okay.  I believe this document -- I

2    believe this document is in evidence.

3          So you may proceed.

4          **MS. SHARP:**  Thank you.

5          (Document displayed.)

6    **BY MS. SHARP**

7    **Q.**   Okay.  In this press release, Juul -- Mr. Burns, on behalf

8    of Juul, says the following:

9               "Juul Labs is committed to improving the lives of the

10         world's 1 billion adult smokers, with the ultimate goal of

11         eliminating cigarettes.  While we have been working to

12         solve that problem, another unintended and serious problem

13         has developed - underage use of e-cigarettes, including

14         Juul."

15         Right?

16   **A.**   Exactly.

17   **Q.**   Now, at the bottom of Page 1, the press release says:

18              "What we are doing now with flavors."

19         And it says:

20              "Stopping flavored Juul pod sales to all 90,000-plus

21         retail stores."

22         Correct?

23   **A.**   Correct.

24   **Q.**   So retail sales were the majority of Juul's sales as

25   opposed to online sales at this time; right?

PRITZKER - DIRECT / SHARP

1   **A.**   That's right.

2   **Q.**   The vast majority; correct?

3   **A.**   I don't know "vast."  I don't know that number exactly,

4   but certainly the majority.

5   **Q.**   Sure.  And at this time Juul was announcing that it was

6   stopping flavored Juul pod sales in retail stores, but Juul did

7   not pull the mint flavor out of retail stores at this time in

8   November of 2018; right?

9   **A.**   That's -- that's right.

10  **Q.**   And all of the flavor offerings that Juul had continued to

11  be available on online sales; right?

12  **A.**   I think that's right.

13  **Q.**   Let's look at Page 2.

14       (Document displayed.)

15  **Q.**   You may recognize the graphic here as similar to the

16  graphic that was provided to the FDA in the slide deck that we

17  looked at from October 2018; right?

18  **A.**   Yes.

19  **Q.**   Now, once again, in Juul's press release it includes mint

20  right alongside traditional tobacco flavors; correct?

21  **A.**   Yes, it does.

22  **Q.**   And not alongside the flavored products; right?

23  **A.**   True.

24  **Q.**   Now, Juul is, once again, representing to the public that

25  mint is a traditional tobacco flavor in this press release;

```
 1    correct?

 2    A.    I could explain that, but yes.

 3    Q.    Not for now.  Thank you.

 4    A.    Okay.

 5    Q.    Now, and Altria did the same thing in its October 25

 6    letter to the FDA that Mr. Willard shared with you; right?

 7    A.    Independently, yes.

 8    Q.    Okay.  Let's move ahead in time now to December of 2018.

 9          Let's pull up Trial Exhibit 2643, please.

10          (Document published to the witness.)

11    Q.    This email is a document on December 16, 2018 that was

12    originally sent from a Daniel Cruise at Juul to Riaz Valani and

13    Zach Frankel, and then forwarded to you, and you responded to

14    Mr. Valani on December 17.  Do you see that?

15    A.    I do.

16              MS. SHARP:  I move to admit.

17              MS. WILKINSON:  No objection.

18              THE COURT:  It's admitted.

19          (Trial Exhibit 2643 received in evidence)

20          (Document displayed.)

21    BY MS. SHARP

22    Q.    Now, Mr. Cruise, from Juul, is forwarding a December 13,

23    2018 email from a gentleman named Tevi Troy at Juul.

24    A.    Yes.

25    Q.    Mr. Troy writes as follows:
```

1              "Hi, Surgeon General Jerome Adams called me in for a

2       meeting to let me know that he will be issuing an advisory

3       on Tuesday to raise awareness on the issue of youth usage

4       of vaping products."

5       Right?

6  **A.**   Right.

7  **Q.**   He goes on to say:

8              "He said" --

9       And now he's talking about Surgeon General Jerome Adams --

10 who said:

11             "...that they have new data indicating that

12      75 percent of youth usage of ENDS is with Juul devices."

13      Right?

14 **A.**   Right.

15 **Q.**   Now, so by December 17, 2018 you and Mr. Valani knew,

16 beyond any doubt, that a significant portion of Juul's user

17 base, its customers, were kids; right?

18 **A.**   Could you ask that question again?

19 **Q.**   Sure.  By December 17, 2018 --

20 **A.**   Yes.

21 **Q.**   -- this information caused you and Mr. Valani to know,

22 beyond any doubt, that a significant portion of Juul users were

23 kids; right?

24 **A.**   Well, that's -- the data talks about the percentage of

25 youth usage.  It doesn't talk about the percentage of Juul

1   products that were being used by underage people.  Just to be

2   clear.

3   Q.   That's a fair point.  75 percent of youth users of

4   electronic nicotine delivery systems at this time were Juul

5   users; right?

6   A.   That was the data that was being presented.  That's right.

7   Q.   And this email was dated December 17, 2018, and the Juul

8   Altria transaction closed three days later, on December 20,

9   2018?

10  A.   Well, the date I see here is December 13th.

11  Q.   Fair enough.  And the email that you sent about it --

12  A.   Oh, that's above.

13  Q.   -- to Mr. Valani was dated December 17?

14  A.   December.  I see.  Now I see.

15       Yes.  You're right with those dates.

16  Q.   In any event --

17  A.   Okay.

18  Q.   -- within a week of this email about Surgeon General

19  Jerome Adams being sent, the Juul/Altria deal closed; right?

20  A.   That's right.

21  Q.   And that was the deal in which Altria paid Juul

22  $12.8 billion for a 35 percent stake in the company; right?

23  A.   That's right.

24  Q.   Let's pull up Trial Exhibit 2920, please.

25       (Document published to the witness.)

1    Q.   This a December 20, 2018, press release that reads:

2              "Juul's statement about Altria minority

3         investment and service agreements."

4         Right?

5    A.   Correct.

6    Q.   In the third paragraph this press release reads:

7              "We have made huge progress and are showing

8         unprecedented signs of success in our mission."

9         Right?

10   A.   It says that, yes.

11   Q.   Let's turn to Page 2.  The press release says:

12             "Today we have been joined by an unlikely and

13        seemingly counterintuitive investor in our journey."

14        Right?

15   A.   Right.

16   Q.   It says:

17             "Altria today announced a minority investment of

18        $12.8 billion into Juul for a 35 percent ownership stake

19        in the company along with services to accelerate our

20        mission.  We understand the controversy and skepticism

21        that comes with an affiliation and partnership with the

22        largest tobacco company in the U.S."

23        Right?

24   A.   That's right.

25             MS. SHARP:  I forgot to move to admit this.

1          MS. WILKINSON:  No objection.

2          THE COURT:  All right.  It's admitted.

3       (Trial Exhibit 2920 received in evidence)

4          MS. SHARP:  I'm sorry.  Thank you.

5       (Document displayed.)

6  BY MS. SHARP

7  Q.   It goes on, and it says:

8           "We were skeptical as well."

9       Right?

10  A.   Yes.

11  Q.   And that's Juul in its press release talking about the

12  Altria transaction; right?

13  A.   That's right.

14  Q.   Okay.  And it goes on:

15           "But over the course of the last several months, we

16       were convinced by actions, not words, that, in fact, this

17       partnership could help accelerate our success switching

18       adult smokers."

19       Right?

20  A.   That's right.

21  Q.   Let's look at the bottom part of this page under Number 2,

22  where the press release sets forth some of the terms of the

23  deal.

24       In 2(a) it says:

25           "Altria will provide Juul access to its premier

1              innovative tobacco products retail shelf space, allowing

2              Juul's tobacco and menthol-based products to appear

3              alongside combustible cigarettes."

4         Right?

5    A.   Right.

6    Q.   So that's in reference to the wall in convenience stores

7    where Juul could be placed next to Altria products; right?

8    A.   Yes.

9    Q.   Like Marlboro cigarettes; right?

10   A.   Yes, exactly.

11   Q.   And that was an exclusive right that Juul got as part of

12   the deal with Altria; right?

13   A.   I wouldn't say "exclusive."  I don't know exactly what

14   that means, but that was a right that -- that Juul received,

15   yes.

16   Q.   No other e-cigarette company enjoyed that right; correct?

17   A.   I don't remember if there was that kind of exclusivity,

18   honestly.  I would like to think that there was, but I'm not

19   sure if it was exclusive in that sense.

20   Q.   Let's look at term (c) here, where it says:

21              "Altria will apply its logistics and distribution

22         experience to help Juul expand its reach and efficiency,

23         and Juul will have the option to be supported by Altria's

24         sales organization which covers more than 230,000 retail

25         locations."

1         Right?

2   **A.**   That was an option that Juul had as part of the deal, yes.

3   **Q.**   I have no further questions at this time, Mr. Pritzker.

4   Thank you very much.

5   **A.**   Thank you.

6         **MS. WILKINSON:**   Your Honor, we just need a minute to

7   put up the old timeline.

8         **THE COURT:**   That's just fine.  Cross-examination when

9   you're ready.

10        (Brief pause.)

11                       <u>**CROSS-EXAMINATION**</u>

12  **BY MS. WILKINSON**

13  **Q.**   Good morning, Mr. Pritzker.  I'm trying to get organized

14  so we can use your time efficiently, but I know today you did

15  not want to be here to testify; correct?

16  **A.**   I have other things that I would prefer to be doing.

17  **Q.**   Most people would.  But you were subpoenaed by us, and you

18  are here to tell the truth; right?

19  **A.**   I'm happy to be here.

20  **Q.**   And even though you're here under a subpoena, you are

21  going to tell the truth, and you have been, and answer

22  everybody's questions; right?

23  **A.**   Of course, yes.

24  **Q.**   And there were some questions, many questions, you didn't

25  get asked and some you couldn't give complete answers to.  So

1  as I go along, I want to ask you my own questions; but if

2  there's something you need to add, you just let me know.

3  **A.**    Okay.

4  **Q.**    Okay.  Now, one of the most basic things I think you

5  didn't get to say is:  Why did you ever invest in Juul in the

6  first place?

7  **A.**    I have had friends and relatives die from the use of

8  cigarettes.  I have members of my family that were addicted to

9  cigarettes and whose health was impaired by cigarettes.  And

10  when I saw -- I say when we saw, particularly my sons and I

11  saw, that a product could be developed that would be

12  significantly less harmful or, perhaps, totally not harmful,

13  that could get people off of cigarettes, that seemed to me to

14  be a tremendous, maybe the most important thing that you could

15  do for the health of the country and the world.

16      So I saw it as a tremendous opportunity to support

17  something that could have those significant benefits.

18  **Q.**    What was the mission of Juul once you -- let me start

19  again.

20      Before you invested and after you invested in and joined

21  the Board, what was the mission of Juul?

22  **A.**    I don't think the mission has ever changed from my first

23  conversations with the cofounders.  Monsees and Bowen, which

24  was to provide a better product for the smokers of the country

25  and the world.

PRITZKER - CROSS / WILKINSON

1   Q.   Was it ever the company's intention to target youth to get

2   them to start using Juul or nicotine products?

3   A.   Absolutely not.  Never -- never was.  Is not to this day.

4   Q.   You understand that plaintiffs came into the courtroom in

5   the opening and accused you, along with Juul and Altria, of

6   intentionally trying to target youth with your Juul product?

7   A.   I'm aware of those allegations, and it's very hurtful to

8   me to be a target in that manner because it's just not true.

9   Q.   Is there any basis for those allegations?

10  A.   There's no basis for -- for those allegations.

11  Q.   Indeed, were you quite skeptical about dealing with Altria

12  or any tobacco company when you first invested in Juul?

13  A.   Very, very.  The tobacco companies' main product was

14  cigarettes.  Those were the products that we, at that time and

15  always, intended to kill, if possible.  We wanted to disrupt

16  and eliminate cigarettes from the world.  That was the goal.

17  Q.   Before you sought any investment from Altria or any other

18  tobacco company, did you want to determine whether the company

19  supported your mission to transfer or switch cigarette smokers

20  to Juul?

21  A.   Yes.

22  Q.   Why was that important to you?

23  A.   Well, while skeptical and cautious in how Juul might deal

24  with cigarette companies, I did see the possibility that

25  cigarette companies might be in a great position to actually

1   help grow Juul to be able to actually attack their own core

2   products.  And we had seen this in our experience with other

3   tobacco companies.  Japan Tobacco, as an example.

4   **Q.**   Did the company work with or have some kind of partnership

5   or investment with Japan Tobacco at some point?

6   **A.**   Japan Tobacco, early on, made an investment in the

7   company, which included the option to -- to distribute Juul

8   products internationally.

9   **Q.**   Despite the investment in Japan Tobacco, did you at Juul,

10  the Board of Directors and the management, have sole control

11  over the company?

12  **A.**   Always.

13  **Q.**   And is that -- has that been true for the entire time you

14  have been on the Board of Juul?

15  **A.**   Yes.

16  **Q.**   Did Altria ever control or direct the activities of Juul?

17  **A.**   Absolutely not.

18  **Q.**   Would you have let them?

19  **A.**   I don't think so.  There were certainly conversations

20  early on in the -- as was shown today, that whether a control

21  or even an absolute purchase of the domestic company might be

22  something to consider.

23       I had serious qualms about that ever happening.  I don't

24  think I ever would have supported a transaction where Juul gave

25  up control because of the concern, honestly, that the tobacco

1    company, Altria in the case we're talking about, might actually

2    not do its best ultimately to support those products against

3    its core business of selling cigarettes.

4    Q.   So have you ever heard the phrase "trust but verify"?

5    A.   "Catch and kill" was the word -- was the phrase that --

6    that haunted me.

7    Q.   We'll go into this in more detail, but you've said before

8    that ultimately you became comfortable with Altria being a

9    minority investor; correct?

10   A.   Yes, absolutely.

11   Q.   But you didn't want them to become a majority investor

12   because you still wanted to be in control of Juul?

13   A.   That's how this was structured, for that reason.

14   Q.   And, in fact, when Altria tried several times to propose

15   that they buy a majority share, you rejected that ultimately?

16   A.   Yes.

17   Q.   We'll get to these details.  I just want to go back a

18   little bit in time, if we could, and talk about what was going

19   on when you put and Juul put its products on the market.

20        Altria already had an e-cigarette product that is commonly

21   referred to as a Cigalike on the market before Juul introduced

22   its product; correct?

23   A.   It did.

24   Q.   And that was a product that looked more like a cigarette?

25   A.   Yeah, I believe so.  Yes.

1   **Q.**   But it was an e-vapor product; right?

2   **A.**   Yes.

3   **Q.**   And then later, in 2018, they actually introduced their

4   own pod product; right?

5   **A.**   That's right.

6   **Q.**   And I'm not sure it's been explained to the jury, but is

7   Juul a pod product as well?

8   **A.**   Yes.  Juul is a pod product.

9   **Q.**   And so that -- that's what we've seen, where you take out

10  a little plastic device that has a liquid in it and put it into

11  the Juul device?

12  **A.**   That's right.

13  **Q.**   All right.  And Altria didn't have that on the market when

14  you first -- when Juul was first introduced in 2015?

15  **A.**   That's right.

16  **Q.**   Okay.  Back then in 2015, you considered Altria a

17  competitor with its Cigalike product; correct?

18  **A.**   Yes, they -- strictly speaking, a competitor.

19  **Q.**   And even though -- you're a very experienced negotiator;

20  right?

21  **A.**   Well, perhaps -- I'm not sure I would say that, but I

22  guess I have experience in negotiation.

23  **Q.**   Let's put it this way.  You've negotiated a lot of deals

24  and investments; right?

25  **A.**   Over time, yes.

1    Q.    And you know how to make sure that your preferences are

2    documented in the deal documents --

3    A.    Yes.

4    Q.    -- right?

5          You know how to look at the voting shares and the control

6    of the company in terms of how that's documented?

7    A.    Yes, I do.

8    Q.    And you know that sometimes you end up negotiating with

9    someone who could be a competitor, sometimes those negotiations

10   proceed and sometimes they fail; right?

11   A.    Right.

12   Q.    When you're negotiating with anyone, you don't provide

13   internal secret, trade secret information to the other party,

14   do you?

15   A.    Usually not.

16   Q.    And if you do, you have to have something called an NDA?

17   A.    That's right.

18   Q.    When you're dealing with a competitor, you certainly don't

19   provide information about your product if you're trying to

20   negotiate with a competitor; right?

21   A.    Definitely.

22   Q.    And you certainly weren't providing Altria your internal

23   emails or any trade secrets about Juul when you started to talk

24   to them about a possible investment; right?

25   A.    I think the company was very careful about that, for

1    obvious reasons.

2    **Q.**    So there were things going on inside of Juul, whether it

3    was developing additional products or how you were going to

4    market or sell these products, that Altria didn't have any

5    access to; right?

6    **A.**    That's right.

7    **Q.**    And that was true the entire time throughout the

8    negotiations?

9    **A.**    Yes.

10   **Q.**    Okay.  So go back to 2015, when you guys were starting the

11   competition, let's say.  At that time Altria had a greater

12   share of the e-cigarette market because its product had been on

13   the market longer; right?

14   **A.**    That's right.

15   **Q.**    And it -- it took awhile for Juul's product to become more

16   successful?

17   **A.**    Yes.

18   **Q.**    Did you have any idea why it became more successful over

19   time?

20   **A.**    I do.

21   **Q.**    Why?

22   **A.**    I think -- I think Juul had a significantly better product

23   than anybody in the market.

24   **Q.**    Why did you -- on what do you base that?

25   **A.**    Well, for example, my wife, who was a secret cigarette

1    addict, had tried every product on the market and had failed.

2    So when she tried Juul, she was able to entirely get off of

3    cigarettes, as were all three of my sons.

4         So I saw it work when other products had failed.  So

5    for -- from that experience, and also from the general rise in

6    popularity of the product, I think it was reasonable to assume

7    it was because the product was better.

8    **Q.**   So you had personal experience watching adult smokers

9    convert to Juul?

10   **A.**   Firsthand, yes, I did.

11   **Q.**   Let's take a look a slide deck, which is based on Trial

12   Exhibit 7 and 887 showing Altria's MarkTen products, please.

13        (Document displayed.)

14   **Q.**   Mr. Pritzker, we're trying, despite my terrible

15   handwriting --

16        **THE COURT:**  Is this document admitted?  What are we on

17   doing here?  Let's take it down for a moment.

18        (Document removed from display.)

19        **MS. WILKINSON:**  It's just a demonstrative, Your Honor.

20   You can have my copy.

21        (Document tendered to the Court.)

22        **THE COURT:**  All right.

23        (Document displayed.)

24   **BY MS. WILKINSON**

25   **Q.**   We're trying to fill in, Mr. Pritzker, some of the general

1    dates, if we could.

2         So when Juul came on the market in 2015, I'm going to put

3    over here, Altria already had its MarkTen product, the Cigalike

4    on the market; right?

5    **A.**   Right.

6    **Q.**   I'm sorry.  You can't see this.

7    **A.**   It's a little hard to see around there, and I might need

8    to put my glasses on for this.

9    **Q.**   It's pretty lousy handwriting on my part.  I'm going to

10   put "MarkTen" here.  Okay?

11   **A.**   Yes.

12   **Q.**   And your product came on the market June 4th, 2015; right?

13   **A.**   Within --

14   **Q.**   Around that time?

15   **A.**   Within a few days of that, yes.

16   **Q.**   All right.  We heard a little bit earlier about a

17   campaign, a marketing campaign called Vaporized.  You're

18   familiar with that; right?

19   **A.**   Yes.

20   **Q.**   That was on the market for -- or that was used for about

21   six or seven months by Juul?

22   **A.**   I'd say four months.

23   **Q.**   Four months.  How about if I do an approximate, just to --

24   **A.**   That's a good idea.  Yes.

25   **Q.**   Sounds like you're not exactly sure.

```
 1   A.   Yes.

 2   Q.   Altria had nothing to do with Vaporized; right?

 3   A.   Right.

 4   Q.   No involvement, no responsibility for it?

 5   A.   For sure, yes.

 6   Q.   And this may be obvious to you, too, but Altria didn't

 7   have anything to do with the formula or the nicotine content or

 8   anything related to the Juul product itself --

 9   A.   That's correct.

10   Q.   -- right?

11        Now, we talked about later, in early 2018, the MarkTen

12   Elite product came out, which was Altria's pod product.  Do you

13   see that on the left?

14   A.   Yes.

15   Q.   Now, that product was designed to compete directly against

16   the Juul; right?

17   A.   Well, I don't know.  I would assume so.

18   Q.   It looks like it?

19   A.   It appeared so.

20   Q.   And there, do you know whether the MarkTen Elite had

21   nicotine salts in its product?

22   A.   I don't know that.

23   Q.   Okay.  You do know that ultimately that product didn't

24   seem to do very well on the market; right?

25   A.   Yes.
```

1   Q.   When it first came out, you and the others at Juul took it

2   seriously; right?

3   A.   Yes.

4   Q.   Because Altria was marketing it; right?

5   A.   Yes.

6   Q.   They had a big sales force?

7   A.   Yes.

8   Q.   A distribution system; right?

9   A.   Yes.

10  Q.   And they put all their resources into trying to sell the

11  MarkTen Elite; right?

12  A.   Well, I don't know.  I assume.  I assume they did.

13  Q.   You assume they did in terms of -- you thought they were

14  going to be a serious, serious competitor; right?

15  A.   Yes.

16  Q.   But did you find out over a relatively short time that

17  consumers, despite all of that, did not like the MarkTen Elite

18  product?

19  A.   I remember seeing data that suggested that, yes.

20  Q.   Now, you were shown a summary chart of some calls and

21  meetings?  Do you remember that?  Ms. Sharp showed you.

22  A.   Yes.

23  Q.   Did the negotiations between Altria and Juul, were they

24  continuous for 18 straight months?

25  A.   No.  On again, off again, is what I would say about it.

```
 1   Q.    Okay.  And if you -- if we start with the first document I
 2   think she showed you about those negotiations, it's TX-67.
 3        MS. WILKINSON:  If we could pull that up, Randall?
 4        (Document displayed)
 5   BY MS. WILKINSON
 6   Q.    And these were notes that you received about a meeting
 7   between Altria and Juul on July 30th, 2017.
 8        Do you remember that?
 9   A.    Yes.
10   Q.    I don't know what tab that is in your notebook.
11        MS. WILKINSON:  Maybe Ms. Sharp can help me with that.
12        MS. BOHANON:  Tab 1.
13        MS. WILKINSON:  Excuse me?
14        MS BOHANON:  Tab 1.
15        MS. WILKINSON:  Thank you.
16   BY MS. WILKINSON
17   Q.    Tab 1.  If you want, you can look at Tab 1 or you can look
18   at the screen.
19        You did not attend this meeting in the summer of 2017;
20   right?
21   A.    I did not.
22   Q.    You believe that was the first time there were any real
23   meetings about -- between Altria and Juul to discuss
24   possible --
25   A.    As far as I -- as far as I know.
```

1   Q.   Okay.  And you were shown just a few items from this

2   document.  And I want to show you some other things.

3        But start up at the top.  This was Tyler Goldman who was

4   an employee of Pax, which was also Juul; right?

5   A.   Yes.

6   Q.   And these are being sent Isaac Pritzker, that's your son?

7   A.   Yes.

8   Q.   And you were on the cc list, as well as Mr. Frankel and

9   Mr. Valani; right?

10  A.   Yes.

11  Q.   Mr. Frankel worked at the company as well?

12  A.   He was a director of the company.  I'm not sure at that

13  date whether he was, but he ultimately became a director.

14  Q.   Okay.  These -- this email is entitled "Some Notes from

15  Altria Meeting."  Right?

16  A.   Yes.

17  Q.   And if we start at the top here, which is really the last

18  response from your son, Mr. Pritzker, Isaac, he goes through

19  and he describes some of the -- his kind of takeaways from the

20  meeting; right?

21  A.   Yes.

22  Q.   Do you see that?

23       I think you were -- read the first section, yes, I

24  highlighted here:

25            "Although the proposed equity investment and

1          collaboration on distribution, marketing, et cetera, they

2          also intimated they had done deals with every structure

3          under the sun and were very open to discussions along

4          those lines -- or other lines."

5     A.   Yes.

6     Q.   The structure of the deal was ultimately very important to

7     you; right?

8     A.   Critical, yes.

9     Q.   Not the valuation, but the structure was the most

10    important issue for you?

11    A.   Yes.  I would say structure was even more important

12    than -- than price, although, obviously, we had to be cognizant

13    of the shareholders on all points.

14    Q.   Why was the structure of the deal the most important to

15    you?

16    A.   Well, my simple comment is because it had to work.  And I

17    would say beyond that, because it was critical to me that

18    whatever the structure was, that Juul would maintain autonomy

19    and control over its -- over its future and over the

20    relationship.

21    Q.   Now, look down at the second-to-last paragraph in Isaac's

22    note that says "I wasn't convinced."

23    A.   Uh-huh.

24    Q.   And I don't think you were shown this part.  It says:

25          "I wasn't convinced they were sufficiently aware of

1          growth and product advantage of Juul to create the

2          conditions for a particularly favorable deal."

3          Do you see that?

4   **A.**   I do see that.

5   **Q.**   And did you understand that what Isaac was telling you was

6   that they didn't really understand how great your product was

7   and how much growth potential it had?

8   **A.**   I would -- I would take it to mean exactly that.

9   **Q.**   And that, therefore, he didn't think that there was a deal

10  that could be done because it wouldn't match your expectations?

11  **A.**   I -- I would take it to mean that.  At least, at that

12  point.

13  **Q.**   Would it be fair to say ever since 2015, when you

14  introduced the product, you and the others at Juul were very

15  confident that you had a product that was different than

16  everything else on the market?

17  **A.**   Yes.

18  **Q.**   That it would convert adult smokers to Juul?

19  **A.**   Yes.

20  **Q.**   That that would allow smokers to be exposed to less

21  harmful constituents than those that they are exposed to when

22  they smoke?

23  **A.**   That's right.

24  **Q.**   That that would be good for smokers?

25  **A.**   That's right.

1    Q.   And that there was a huge growth potential in your

2    business because there were a lot of smokers you were hoping to

3    convert?

4    A.   That's right.

5    Q.   And that's something you were sure of from the beginning;

6    right?

7    A.   We had growing confidence that we had the product that

8    could do that.

9    Q.   So plaintiffs have also alleged that it was Altria that

10   recognized this growth and they were giving you money because

11   they wanted to fuel the targeting of youth users.  Is there any

12   truth to that?

13   A.   None.

14   Q.   Okay.  And at this point, at least according to your son,

15   they didn't really even understand kind of the unique --

16   uniqueness of your product; is that fair?

17   A.   That's -- that was what he believed.

18   Q.   Okay.  Let's go back to some of the other notes that

19   Mr. Frankel took that were shared with you on Page 2 of this

20   document.

21        MS. WILKINSON:  And, Randall, if you could start with

22   "Other Things That Altria Does," and go down to "Use of Data,"

23   that whole section.

24        (Document displayed)

25        MS. WILKINSON:  Thanks.

1    BY MS. WILKINSON

2    **Q.**   Mr. Frankel was supposed to be just jotting down notes, as

3    he said, of things that were discussed during the meeting;

4    right?

5    **A.**   Yep.

6    **Q.**   Plaintiffs didn't show you this, but they were

7    specifically talking about youth prevention issues; right?

8    **A.**   Yes.

9    **Q.**   And they talked about providing point of sales material

10   for anti-youth as well --

11   **A.**   Yes.

12   **Q.**   -- right?

13         That's something Altria does, and they wanted Juul to do

14   or suggested they would do?

15   **A.**   Yes.

16   **Q.**   And merchandising and in-depth training on those issues?

17   **A.**   Yes.

18   **Q.**   That they suggested positive youth development at

19   organizations like the YMCA?

20   **A.**   Yes.

21   **Q.**   That they suggested that you be responsible and judicious

22   in marketing the product?

23   **A.**   Yes.

24   **Q.**   They suggested that you avoid flavored products and where

25   you have flavors, use complex flavors?

1    A.    Yes.

2    Q.    Right?

3          They said: Be careful, names of products should not appeal

4    to children; right?

5    A.    Yes.

6    Q.    And that you use -- you should use an age gate of 21,

7    because the use of data and technology to market only to adult

8    tobacco consumers; right?

9    A.    Right.

10   Q.    And that means, the good thing about online sales is you

11   have the technology to do age verification; right?

12   A.    That's right.  Exactly.

13   Q.    And that's why you treated online sales different than

14   retail sales; right?

15   A.    That's exactly why.

16   Q.    In fact, you saw at the retail level, some of the retail

17   establishments weren't as careful with checking IDs as you were

18   using the online verification system; right?

19   A.    Definitely.

20   Q.    And you know that Altria has an adult smoker database;

21   correct?

22   A.    Yes.

23   Q.    And you wanted access to that technique ultimately?

24   A.    Yes.

25   Q.    So that you could target adult smokers?

1    **A.**    That's right.

2    **Q.**    And Altria agreed to that when you ultimately took their

3    investment?

4    **A.**    Yes, they did.

5    **Q.**    And there you could be sure, because of age verification,

6    you were aiming directly at adult smokers; right?

7    **A.**    That's right.

8    **Q.**    So they shared all this information from you from the very

9    beginning in July of 2017?

10    **A.**    Yes.

11    **Q.**    At any time did Altria suggest that they weren't concerned

12    about youth usage or, you know, youth marketing?

13    **A.**    On the contrary.  They were always in -- in my

14    conversations, representatives of Altria were very concerned

15    about -- about underage use, concerned about it and wanted to

16    get rid of it.

17    **Q.**    Did they tell you why they were concerned about underage

18    use?

19    **A.**    Well, for one thing, it's certainly a legal issue.  But

20    even beyond that, I think that from an ethical standpoint

21    neither company wanted anything do with underage users.

22    **Q.**    After that July meeting that you didn't attend, there

23    weren't many significant conversations about an investment for

24    many, many months; right?

25    **A.**    Well, not that I know.

1  Q.   And you and Mr. Valani were in charge of negotiations in

2  terms of being the Board's subcommittee overseeing those

3  negotiations; right?

4  A.   Yes.

5  Q.   When they did get more serious, you and Mr. Valani got

6  directly involved?

7  A.   We did.

8  Q.   Right?

9       And I think you told counsel that you had gotten involved

10 in the kind of April/May timeline when you had some

11 conversations, and there was some correspondence of proposals

12 between you and Altria?

13 A.   There were meetings.  There were at least a couple of

14 meetings prior to that time, and probably phone calls, too.

15      But, yes, I think the time frame that you're talking about

16 is when I would say that the conversations became serious and

17 it became a negotiation.

18 Q.   Now, there were times when you -- you were looking for

19 other investments and you discussed that, I think, about

20 capital investments that were smaller than what you ultimately

21 did with Altria, but where you had to put out a deck and a

22 proposal to folks to see if they wanted to invest; right?

23 A.   The -- the convertible note document that was put up?

24 Q.   Yes.

25 A.   I'm not sure how far that actually got.  I don't think

1   there was a convertible note done.  So I don't believe -- I

2   don't know how much was done on that after that draft was done,

3   as I saw it.

4   **Q.**   Well, let's take a look at that deck.  It's Trial Exhibit

5   3313, and it was attached to that proposal from November 20th,

6   2017.  And Ms. Sharp showed from you Page 6 a few excerpts, and

7   I want to point out a few others, if we could.

8       Now, this is something you didn't share with Altria;

9   right?

10  **A.**   I'm sure not.  I mean, I don't know that, but I don't know

11  why we would have.

12  **Q.**   And when you're looking for investments, you want to put

13  out information about what your product does, why it's a good

14  investment; right?  And what the issues are surrounding the

15  investment?

16  **A.**   Yes.

17  **Q.**   You're supposed to do that; right?

18  **A.**   Yes, hopefully.

19  **Q.**   Let's look at Page 6 "Opportunity Overview," if we could.

20          **MS. WILKINSON:**  Do I need the Elmo?

21      Ms. Davis, do you mind switching?

22      (Brief pause.)

23      (Document displayed.)

24  **BY MS. WILKINSON**

25  **Q.**   This is the exhibit number.  You see that?  You looked at

1   it earlier.  And this is the section that I want to take a

2   look, if we could.  Do you see that?

3   **A.**   I do.

4   **Q.**   All right.  Now, I tried in yellow here to show what

5   Ms. Sharp showed you, and I want to show you some of the other

6   portions that you weren't shown.

7        So right above this, you're talking about the "Opportunity

8   Overview"; right?  This is to give the kind of simple story of

9   the company and the product; right?

10  **A.**   This -- again, this was a draft of something that I don't

11  know got beyond a draft, but that's what this section says,

12  yes.

13  **Q.**   Let's make sure the draft is accurate.  Let's look at the

14  sentence in orange.  This is the one I wanted to point out.

15       "Differentiated proprietary - nicotine salt

16       formulation."

17       That's true, right, that the product had a nicotine salt

18  formulation?

19  **A.**   Yes.

20  **Q.**   (As read:)

21       "Design and temperature control system result in an

22       experience that is designed to create a true alternative

23       to cigarettes for adult smokers."

24       That was true; right?

25  **A.**   Yes.

1    Q.    And that's how you were selling this investment?

2    A.    Exactly.

3    Q.    If you go down below, you specifically point out support

4    you believe you were getting from the regulatory community and

5    say:

6              "Regulatory Developments.  In July 2017 the FDA

7         announced a comprehensive plan for tobacco and nicotine

8         regulation that encouraged the development of innovative,

9         less harmful tobacco products, such as electronic nicotine

10        delivery systems (e-cigarettes) otherwise known as ENDS."

11        Right?

12   A.    Right.

13   Q.    And that was true.  You were excited to see that come out

14   in 2017, that Commissioner Gottlieb was saying:  You have to be

15   very careful.  You have watch out for youth, but this is an

16   excellent innovation in terms of trying to convert adult

17   smokers?

18   A.    Yes.

19   Q.    And he said that repeatedly, even during 2018, when he was

20   trying to get your attention and everyone else's about the

21   youth epidemic; right?

22   A.    Yes.  As his message changed somewhat over the years,

23   so -- you know, it -- it differed later.

24   Q.    Okay.  Well, we'll look at that as well.

25        So when the negotiations got more serious, around the

1    May -- early May timeline, Altria wrote you a letter.

2    Mr. Willard did.

3    **A.**   That's right.

4    **Q.**   And proposed, among other things, a 50.1 percent purchase;

5    right?

6    **A.**   Yes.

7    **Q.**   Let's take a look TX-4037 and Slide 2, please.

8          **MS. WILKINSON:**  Ms. Davis, do you mind switching me

9    back?  Thank you.

10         (Document displayed.)

11         **MS. WILKINSON:**  Sorry.  It should be May 3rd, not

12   May 30th.  That's a different letter.  Sorry.

13   **BY MS. WILKINSON**

14   **Q.**   There's two letters that Altria writes you, Mr. Pritzker,

15   and I want to start with the first one.  This is the May 3rd

16   letter.

17   **A.**   Yes.

18   **Q.**   And you reviewed some of that with Ms. Sharp.  This says

19   that Altria wants to own 50.1 percent; right?

20   **A.**   Yes, it does.

21   **Q.**   And if you had agreed to that, that would have given them

22   control over Juul; right?

23   **A.**   That's right.

24   **Q.**   And you got on the phone after that and very nicely said:

25   I doubt that's going to happen; right?

1    A.    Yes.

2    Q.    I mean, you were trying to negotiate a deal, but you were

3    not going to let them take control?

4    A.    That's right.

5    Q.    But they tried again; right?  They wrote you on May 30th

6    and they tried again?

7    A.    Yes.

8    Q.    Okay.  First, let's take a look that, the whole document,

9    if we could.

10   A.    Okay.

11   Q.    And that's TX-9, which is in evidence.

12         (Document displayed.)

13   Q.    And do you see this letter is addressed to you and

14   Mr. Valani?

15   A.    Yes.

16   Q.    And if you look at this, this is where they are writing

17   after speaking to you during May; right?

18   A.    Yes.

19   Q.    So they are trying to refine their proposal and see if

20   you'll accept it; right?  At least as a way to go -- a basis of

21   going forward; right?

22   A.    Yes.

23   Q.    So let's look at -- down in the second full paragraph, and

24   in the middle there it says they would start with a 40 percent

25   non-voting interest, but would convert to a 50.1 common equity

1    voting interest; right?

2    **A.**   Yes.

3              **MS. WILKINSON:**   All the way down to "50.1 percent,"

4    please, Randall.   There we go.

5         (Document highlighted.)

6    **BY MS. WILKINSON**

7    **Q.**   Now I want to highlight the rest of that paragraph and go

8    through it with you so we can read the whole thing.

9         It said:

10            "We would then be in a position to work together with

11        Altria providing its best-in-class infrastructure to

12        maximize the growth of Juul."

13        Right?

14   **A.**   Right.

15   **Q.**   There they made it clear that they also wanted to address

16   the serious youth vaping issues; right?

17   **A.**   Yes.

18   **Q.**   So they put that in writing.   They wanted you to

19   understand that they would help use their infrastructure, which

20   was the distribution and things like that, and let you put

21   onserts into Marlboro or have your devices next to Marlboro and

22   other cigarettes; but they expected you, and they would work

23   with you, to address the youth vaping issues; right?

24   **A.**   Yes.

25   **Q.**   Was that true from that point on?   Did they always want to

1   work with you on the youth vaping issues?

2   **A.**   That was always an issue that was addressed from the

3   beginning.

4   **Q.**   That wasn't just because they are good people; right?  It

5   was good business to do that because you needed to get a PMTA

6   approved by the FDA; right?

7   **A.**   I think it was both of those things, really.

8   **Q.**   Same for you; right?

9   **A.**   Yes.

10  **Q.**   Then if you look at that, it says:

11          "And, (b), the Juul management team retaining

12      significant discretion to apply its formidable

13      expertise to run the day-to-day operations of Juul

14      and to maintain Juul's innovative and mission-driven

15      culture."

16      Right?

17  **A.**   Yes, that was their idea.

18  **Q.**   And you understood that, that the innovative culture is

19  the startup culture that Juul had, right, to address and

20  hopefully combat cigarette smoking?

21  **A.**   Yes.

22  **Q.**   And that was something they admired because they were kind

23  of a big ole East Coast company; right?

24  **A.**   Yes, exactly.

25  **Q.**   Not very innovative?

1   **A.**   They described it as such, yes.

2   **Q.**   Okay.  And then they said that they wanted you to be able

3   to maintain the mission-driven culture?

4   **A.**   Yes.

5   **Q.**   I think you've said that you had to get comfortable with

6   whether these people were really interested in the mission?

7   You've said that before; right?

8   **A.**   Yes.  We had to get comfortable with that.  I really did

9   believe that they -- they could embrace that mission, but there

10  was potentially a conflict with their -- their main business,

11  and any -- any control that they could assert.

12      I think they were sincere.  Always thought they were

13  sincere in believing that the mission was a good one.

14  **Q.**   And then they said:

15          "We believe that Juul and Altria have a historic

16      opportunity to work together in a manner wholly consistent

17      with stated FDA policy."

18      Right?

19  **A.**   Yes.

20  **Q.**   This is after 2017, when Commissioner Gottlieb said, you

21  know, these -- the innovation of these alternative products is

22  a good idea.

23      And so they are saying to you there, they think this can

24  all be done consistent with what the FDA policy is; right?

25  **A.**   Correct.

PRITZKER - CROSS / WILKINSON

1   **Q.**   You agreed with that?

2   **A.**   Yes, I did.

3   **Q.**   And you agreed that, of course, the policy is to reduce

4   consumption of cigarettes and provide adults who want nicotine

5   with potentially less harmful combustible-alternative products?

6   **A.**   Yes.  Noncombustible, yes.

7   **Q.**   Thank you.

8        Ideally, people should stop smoking altogether; right?

9   **A.**   For sure.

10  **Q.**   I mean, you wish your wife didn't even use the Juul

11  device; right?

12  **A.**   Excuse me?

13  **Q.**   You wish your wife didn't even use the Juul device; right?

14  **A.**   Umm, I -- I think it's fine that she does.  All three of

15  my sons have actually stopped using Juul and did not return to

16  smoking.  I actually think that's better.

17  **Q.**   But if people can't quit or don't want to quit, you

18  certainly think Juul is a better alternative?

19  **A.**   I know it is.

20  **Q.**   Okay.  Even though Altria said it would support the

21  mission, it would, you know, work with you to be consistent

22  with FDA policy, you still weren't going to let them have

23  control, were you?

24  **A.**   This was a non-starter.

25  **Q.**   So from May until the very end of July, you had on-and-off

1    discussions with Altria?

2    **A.**    I'm sorry.  Between what time frame again?  I'm sorry.

3    **Q.**    End of May, when you received this letter, through the end

4    of July?

5    **A.**    Yeah.  I -- I believe that's true.  I'm not really -- I

6    can't recall specific dates in that time frame, but that --

7    that sounds right.

8    **Q.**    You recall that you didn't send any proposed terms from

9    Juul after that until July 30th, when you were going to meet

10   with Mr. Willard and Mr. Gifford in Washington, D.C. --

11   **A.**    Yes.

12   **Q.**    -- I think it was August 1st; right?

13   **A.**    Yes.

14   **Q.**    So you didn't send a counterproposal after the May 30th

15   letter?

16   **A.**    Right.  Yes.  I think there was no counterproposal.

17   **Q.**    Okay.  And in the summer of 2018, Juul continued to

18   compete in the marketplace and your sales continued to increase

19   dramatically; right?

20   **A.**    That's right.

21   **Q.**    That was true the whole time that you talked to Altria

22   from the middle of 2017 --

23   **A.**    Yes.

24   **Q.**    -- through the end of 2018?

25   **A.**    Yes.

1   **Q.**   And into about the first half of 2019; right?

2   **A.**   That's right.

3   **Q.**   And then they started to go down?

4   **A.**   Yes.

5   **Q.**   Okay.  At the time that you were in these on-and-off

6   negotiations with Altria, were you also receiving information

7   showing you that Juul was converting adults?

8   **A.**   Yes.

9   **Q.**   Okay.  Do you remember -- I think you were asked or

10   Mr. Olin talked about whether you did -- or Juul did any

11   research or commissioned or paid for any research about these

12   issues?  Do you recall that?

13   **A.**   I'm not sure I was asked that question.

14   **Q.**   Okay.  Juul did pay for some research to get done by an

15   independent research facility over in the UK; right?

16   **A.**   I'm not sure of that.  It may well be.  But if so, I

17   don't -- I can't tell you I remember a specific study.

18   **Q.**   Okay.  Let me see if I can show you the documents then.

19   I'm going to start with an email that was internal at Philip

20   Morris, but it contains a Juul press release.

21       So if you can take a look at that document, and that is

22   Tab 5 in the binder we gave you.  And it's TX-6074.

23       (Document published to the witness.)

24   **Q.**   And if you could, just to get you familiar, look at the

25   second page first, and you'll see about halfway down that there

1    is a press release from Juul.  Do you see that?

2    **A.**   Yes.

3    **Q.**   June 28th.  Does that refresh your recollection that

4    you -- that Juul issued a press release about research it had

5    sponsored?

6    **A.**   Oh, right.  I do remember this now.

7    **Q.**   All right.

8         **MS. WILKINSON:**  Your Honor, we would move for

9    admission of TX-6074.

10        **MS. SHARP:**  No objection.

11        **THE COURT:**  All right.  It's admitted.

12    (Trial Exhibit 6074 received in evidence.)

13   **BY MS. WILKINSON**

14   **Q.**   Okay.  Let's go back to the first page so we can show the

15   jury and orient them and ourselves a bit.

16    (Document displayed.)

17   **Q.**   You see that about the middle of the page, it says from

18   Maria Gogova.  Do you see that?  And it's highlighted "ALCS,"

19   which is Altria?

20   **A.**   Yes.

21   **Q.**   And this was sent on June 29, 2018.  And you know Murray

22   Garnick, the general counsel of Altria; right?

23   **A.**   I do.

24   **Q.**   You've met him.

25        And this was forwarding Mr. Garnick the press release from

1    Juul; right?  The subject is "Juul Press Release"?

2  **A.**    Right.

3  **Q.**    And Ms. Gogova says two things.

4        Number one:

5            "After reading the entire study report, I have to say

6        that this study, despite its limitations that is

7        associated with any cross-sectional study (association

8        versus causation) would be a very strong and compelling

9        piece of evidence for PMTA filing."

10        Do you see that?

11  **A.**    Yes.

12  **Q.**    And that's true; right?  You have to submit a lot of

13   studies and information in your PMTA to try to get approval?

14  **A.**    That's right.

15  **Q.**    And number two, she says to Mr. Garnick.

16            "Interestingly in the discussion, authors indicate

17        that additional research is underway to assess use

18        patterns and transitions among Juul users who purchase

19        their product in the brick and mortar stores, since the

20        current sample was only sourced from Juul website

21        purchasers only.  So more to come."

22        Right?

23  **A.**    I see it.

24  **Q.**    So she's telling him this first study is done looking at

25   online purchasers; right?

1    **A.**    Yes.

2    **Q.**    And this information in the press release was shared with

3    the public.  That's the nature of a press release; right?

4    **A.**    Right.

5    **Q.**    Turn to Page 2, if we could.

6        And you will see that she's forwarding an email from

7    someone else at Altria or from someone at PW Partners, and

8    it -- it actually prints the press release; right?

9        And it's titled "New Survey Results."  Right in the middle

10   above "San Francisco."

11       (Document displayed)

12   **Q.**    Right at the very top.

13            "New survey results address impact of Juul use on

14       eliminating or reducing cigarette consumption."

15       Do you see that?

16   **A.**    I do.

17   **Q.**    And it was issued here in San Francisco; right?

18   **A.**    Yes.

19   **Q.**    By the way, Juul was in San Francisco for a very long

20   time; right?

21   **A.**    Yeah.  It was headquartered here.  It's still here, but

22   not headquarters, yeah.

23   **Q.**    And you live here in San Francisco; right?

24   **A.**    I do.

25   **Q.**    And it says that:

1              "Juul Labs issued a statement from its CEO,

2       Mr. Burns, about the largest survey to date of 18,799 U.S.

3       adults who have purchased Juul."

4       Right?

5   A.   Yes.

6   Q.   These are excellent results here; right?

7   A.   Yes.

8   Q.   (As read):

9              "It shows that 64.3 percent of the adults age 21

10      years or older who participated in the survey were smokers

11      when they first used Juul and, also, report they no longer

12      smoke."

13      Right?

14  A.   That's right.

15          MS. SHARP:  Objection, Your Honor.  Hearsay.  This

16  entire email is hearsay.

17          MS. WILKINSON:  It's an admission.

18          THE COURT:  It is.  Overruled.

19  BY MS. WILKINSON

20  Q.   So that's -- that's saying what you have been telling us;

21  that the science is showing that a large percentage of smokers

22  are actually switching to Juul?

23  A.   That's right.

24  Q.   In this particular study?

25  A.   Yes.

1    Q.   All right.  And then you go down, it says:

2              "Almost 50 percent, 49.5 percent reported they

3    completely stopped smoking cigarettes by switching to

4    Juul."

5         Right?

6    A.   Yes.

7    Q.   (As read):

8              ""And only .3 percent reported that they were never

9    smokers when they first used a Juul and are now current

10   smokers."

11        Right?

12   A.   Yes.

13   Q.   So if you go down to "About the Survey," it says:

14             "Juul Labs commissioned CSUR" -- which is the

15   research establishment; right?

16   A.   Yes.

17   Q.   (As read:)

18             "-- to independently design, administer and analyze

19   the survey results."

20        Correct?

21   A.   Correct.

22   Q.   And that's important; right?  Juul had to pay for the

23   research?

24   A.   Yes.

25   Q.   It's your product; right?  You don't think the government

1  should have to pay for the research.  You should pay for it;

2  right?

3  **A.**   Yes.

4  **Q.**   But it's also good to have an independent research

5  facility run the study?

6  **A.**   Yes.

7  **Q.**   All right.  Let's take a look TX-7111, which is the actual

8  study.

9        And, Mr. Pritzker, you can see from the email and the

10  press release that not only did Juul issue a press release, you

11  could also find the study itself.  It was available for

12  scientists and anybody in the public health community or anyone

13  else who was interested; right?

14  **A.**   Right.

15  **Q.**   That was important, also, to share that information?

16  **A.**   Of course.

17  **Q.**   Other people could critique it?

18  **A.**   Yes.

19  **Q.**   Take issue with the science or the study?

20  **A.**   That's right.

21  **Q.**   Or do alternative studies if they so chose; right?

22  **A.**   Correct.

23        **MS. WILKINSON:**  Your Honor, we move -- well, we don't

24  move for admission.  We'll show, and it's marked for

25  identification purposes 7111.  I can show it to the jury?

 1          MS. SHARP:  We have a standing objection to this.

 2          MS. WILKINSON:  To showing it?

 3          MS. SHARP:  Showing is fine.

 4          MS. WILKINSON:  I thought we weren't moving in

 5    scientific articles but we were showing them.

 6          THE COURT:  And remember who is testifying at the

 7    moment, but go ahead.

 8          MS. WILKINSON:  Yes.

 9          THE COURT:  Go ahead.

10    BY MS. WILKINSON

11    Q.   I just want to show you the front and back page,

12    Mr. Pritzker.

13    A.   Yes.

14    Q.   So let's show the front page of 7111.

15         (Document displayed.)

16    Q.   And this is the research center, right, that did this

17    study?

18    A.   Yes.

19    Q.   And if you look at the Page 57 under the "Disclosure"

20    section, which is at the back of this article.  We'll put that

21    up on the screen for you.

22         (Document displayed)

23          MS. SHARP:  Your Honor, I object on the basis of lack

24    of foundation and personal knowledge.

25          THE COURT:  Sustained.  Please take it down.

1        **MS. WILKINSON:**  Pardon?

2        **THE COURT:**  Please take it down.

3     (Document removed from display.)

4        **THE COURT:**  Thank you.

5 **BY MS. WILKINSON**

6 **Q.**   To the best of your knowledge, Mr. Pritzker, Juul was

7 not -- didn't have any control over this study or the design of

8 this research; right?

9 **A.**   As far as I know that's the case.

10 **Q.**   Now, you saw from the email that Altria was aware of this

11 research that you did because it was published; right?

12 **A.**   Yes.

13 **Q.**   And did you provide information during your discussions

14 with Altria that you were seeing data showing that adult

15 consumers were -- smokers were switching to Juul?

16 **A.**   I don't remember having that specific conversation.

17 **Q.**   Did you tell them that you believed that was happening?

18 **A.**   I -- I imagine I did, but I can't tell you that I remember

19 the -- a specific occasion when I provided that information or

20 referred to it.

21 **Q.**   Did you share any internal data you had about whether Juul

22 was converting adult smokers or not?

23 **A.**   I don't believe I did.  It's certainly possible the

24 company did in their detailed conversations, but -- but I don't

25 remember passing on any information or documents.

1    Q.    Let's turn to when you sent a proposal to Altria on

2    July 30th, 2018.

3          And we'll look at TX-6081, please.  And this is Tab 6,

4    please.

5               MS. WILKINSON:  And if you could blow that up a little

6    bit?

7          (Document published to the witness.)

8    BY MS. WILKINSON

9    Q.    And you see at the bottom you're emailing Mr. Willard?

10   A.    Yes.

11   Q.    And you're emailing Mr. Willard.  You say you're a bit

12   delayed, but you're sending him a proposal; right?

13   A.    That's right.

14   Q.    And the proposal was a summary of terms?

15   A.    Yes.

16   Q.    For Project Richard?

17   A.    Yes.

18   Q.    Can you tell the jury what you mean by "Project Richard"?

19   A.    That was the negotiation with Altria.

20   Q.    So that was a code name that you used --

21   A.    That's right.

22   Q.    -- commonly?

23         And among the terms that you sent was what percentage you

24   thought perhaps they could own and what voting power they would

25   have; right?

1    **A.**   Well, it's not in front of me right now, but I -- I do

2    seem to remember that those were terms.

3            **MS. WILKINSON:**  Well, Your Honor, I'm going to move in

4    Exhibit 6081, which includes the email and the deck, which is

5    the summary of the proposed transaction.

6            **MS. SHARP:**  No objection, Your Honor.

7            **THE COURT:**  It's admitted.

8       (Trial Exhibit 6081 received in evidence.)

9    **BY MS. WILKINSON**

10   **Q.**   So this is your email; right?

11   **A.**   Yes.

12   **Q.**   And let's take a look at terms.

13           **MS. WILKINSON:**  If we could go to Page 2, which I

14   think we have on Slide 6.

15      There you go.

16      (Document displayed)

17   **BY MS. WILKINSON**

18   **Q.**   Yeah.  It's the "Shares of Jack" -- yep -- "would be a

19   Class 1."

20      And "Jack" is Juul; right?

21   **A.**   Yes.  That's how we referred --

22   **Q.**   So when I say that -- unless I make a mistake, can I say

23   "Juul" when it's referred to "Jack" and "Altria" when it says

24   "Richard"?

25   **A.**   For sure.

1    Q.   Okay.

2              "So the shares of Juul purchased by Altria would be

3         class C-1 non-voting convertible common stock representing

4         45 percent of the outstanding capital stock."

5         Right?

6    A.   Yes.

7    Q.   So here you were proposing you can pay for 45 percent of

8    the investment; right?

9    A.   Yes.

10   Q.   And what that means is there was a valuation of the

11   company, total valuation; right?

12   A.   Yes.

13   Q.   And ultimately when you did the investment with Altria,

14   that was $38 billion; right?

15   A.   In some of the -- just to be precise, in some of these

16   proposals that went back and forth, we were talking about or

17   Altria was talking about the U.S. company only and in some

18   cases the whole company.  And that was one of those factors

19   that changed around a bit.

20        And I can't -- and I'm not sure exactly what stage this

21   was and whether it was the whole company or just the U.S.

22   Q.   Sure.  I don't think I was being clear.  I'm not talking

23   about the valuation at this point because it did fluctuate, and

24   we'll talk about your concerns.

25        But on December 20th --

1    **A.**    Yes.

2    **Q.**    -- when the investment finally went through, the valuation

3    was $38 billion?

4    **A.**    Of the whole company, that's right.

5    **Q.**    Now, you just mentioned one of the things you were very

6    concerned about.  You wanted them to invest in the whole

7    company, international and domestic, not just domestic; right?

8    **A.**    That came to be a condition, yes.

9    **Q.**    And that became so important that at the end of August

10   that was one of the reasons the negotiations broke down?

11   **A.**    That's right.

12   **Q.**    Okay.  The next thing that was important to you was that

13   they had a minority ownership and here you represented that as

14   45 percent; right?

15   **A.**    Yes.

16   **Q.**    So that's a large percentage, but it was going to be

17   non-voting?

18   **A.**    That's right.

19   **Q.**    Which meant they could not have any control over the

20   company; right?

21   **A.**    That's right.

22   **Q.**    So despite their offering twice to have control with

23   50.1 percent, when you wrote back, ultimately with terms, you

24   said:  No, it will have to be 45 percent?

25   **A.**    That's right.

1   Q.   And it ultimately turned out to be even less; right?

2   A.   Yes.

3   Q.   Okay.  And it says here further down, I think in the next

4   paragraph:

5            "Altria will hold approximately 5 percent of the

6       total outstanding voting power."

7   A.   That's right.

8   Q.   So that meant even if all this went through, Juul would

9   still have 95 percent of the voting power, giving Altria no

10  influence, right, over the company?

11  A.   Right.  That was my -- that was our thinking when I wrote

12  this.

13  Q.   And ultimately you didn't even give them that 5 percent

14  voting power; right?

15  A.   Well --

16  Q.   Why don't we wait -- I'll show you the documents.

17  A.   Yeah.

18  Q.   Maybe that's --

19  A.   That did not turn out to be the arrangement specifically.

20  Q.   The deal?

21  A.   Correct.

22  Q.   And, in fact, you had conversations and meetings

23  throughout almost all of August trying to negotiate these deal

24  terms; right?

25  A.   Yes.

**PRITZKER - CROSS / WILKINSON**

1    **Q.**   You met in person?

2    **A.**   Yes.

3    **Q.**   You got on the phone?

4    **A.**   Yes.

5    **Q.**   You got lawyers involved?

6    **A.**   Yes.

7    **Q.**   And ultimately, around August 27th, the negotiations fell

8    apart; right?

9    **A.**   That's right.

10   **Q.**   Were you at the meeting in New York when they -- the last

11   meeting before the discussions were terminated?

12   **A.**   I was.

13   **Q.**   And that was in a law office --

14   **A.**   Yes.

15   **Q.**   -- in New York?

16   **A.**   Yes.

17           **THE COURT:**  Ms. Wilkinson, at some point I would like

18   to take a break.  So when you come to a convenient place.

19           **MS. WILKINSON:**  This is a perfect time, Your Honor.

20           **THE COURT:**  I was thinking.

21       Ladies and gentlemen, we will take our second break, 15

22   minutes, and we'll come back at five past noon.

23       (Whereupon there was a recess in the proceedings

24        from 11:50 a.m. until 12:06 p.m.)

25           **THE COURT:**  All right.  Please be seated.

1           Ms. Wilkinson, go ahead.

2               **MS. WILKINSON:**  Thank you, Your Honor.

3   **BY MS. WILKINSON**

4   **Q.**   Mr. Pritzker, I just put on the board the meetings and

5   letters you have been talking about with me and with counsel,

6   so just to make sure I got it accurately.

7           The meeting that your son attended was on July 28th, 2017;

8   right?

9   **A.**   Yes.

10  **Q.**   And over March to May of 2018, that's when you were

11  telling us you had the meetings and the letters about the

12  50.1 percent; right?

13  **A.**   Yes.

14  **Q.**   And now we're about -- we were just talking about you sent

15  terms on July 30th and you negotiated with them through letters

16  and meetings until August 27th, 2018; right?

17  **A.**   Yes.

18  **Q.**   And after that you had decided that negotiations were not

19  proceeding; right?

20  **A.**   That's right.

21  **Q.**   And, in fact, you were so frustrated by that, there was a

22  formal discussion at the Board and it was documented in the

23  minutes of the Juul Board meeting; right?

24  **A.**   Yes.

25  **Q.**   Okay.  Turn to Tab 7, please.

PRITZKER - CROSS / WILKINSON

```
 1            (Witness complied.)
 2     Q.    And we're looking at Trial Exhibit 6491.
 3            MS. WILKINSON:  I'd like to move that into evidence.
 4            MS. SHARP:  No objection.
 5            THE COURT:  It's admitted.
 6            (Trial Exhibit 6491 received in evidence)
 7            (Document displayed.)
 8     BY MS. WILKINSON
 9     Q.    Mr. Pritzker, are you ready to answer some questions about
10     that?
11     A.    Yes, I am.
12     Q.    As a Board, you documented the meetings you had with other
13     Board members?
14     A.    You said I documented?
15     Q.    You had them documented?
16     A.    Correct.
17     Q.    It's a typical procedure of a Board to create minutes?
18     A.    That's right.
19     Q.    So they know what they discussed and what decisions they
20     made; right?
21     A.    Exactly.
22     Q.    And this set of minutes shows that it was a telephonic
23     meeting of the Board of Directors of Juul Labs on
24     September 8th, 2018; right?
25     A.    That's right.
```

1    **Q.**   If you look down at the "Directors Present," you,

2    Mr. Frankel, Mr. Monsees, Mr. Handelsman, Mr. Valani and

3    Mr. Burns were all present; right?

4    **A.**   Yes.

5    **Q.**   And on the other side it talks about some other people,

6    lawyers and other people from the company were present; right?

7    **A.**   Yes.

8    **Q.**   If we turn the page to Number 3, there is an entire

9    section about what's called "Project Richard"; right?

10   **A.**   Yes.

11   **Q.**   And I want to show you -- let's start right where it says

12   "Project Richard."  That is Altria; right?

13   **A.**   Yes.

14   **Q.**   And it says:

15          "The Board then discussed recent developments on

16          Altria.  Mr. Burns, Valani and Pritzker described in

17          detail their discussions with members of Altria since the

18          last Board meeting."

19          That's true; right?

20   **A.**   Yes.

21   **Q.**   You had been very active in those negotiations?

22   **A.**   Yes.

23   **Q.**   And down in the second part of the highlighted paragraph,

24   you lay out the specific reasons why you thought it was no

25   longer in the best interests of Juul to negotiate with Altria;

1    right?

2    **A.**    Specifically I didn't lay them down, but this was based on

3    reports that the company had been given.

4    **Q.**    And you and the other Board members agreed to cease

5    discussions with Altria; right?

6    **A.**    That's right.

7    **Q.**    And so let's look at the reasons that you gave at the

8    time.  And when I say "you," I mean the entire Board of

9    Directors, okay?

10   **A.**    Yes.

11   **Q.**    Number one:  You said:

12            "There was a lack of progress in negotiations."

13        That was true; right?

14   **A.**    That's true.

15   **Q.**    So at that time you weren't making progress?

16   **A.**    Right.

17   **Q.**    Despite all your efforts?

18   **A.**    That's right.

19   **Q.**    Two:

20            "There were a number of remaining significant,

21        unresolved, outstanding issues between the parties."

22        That was true?

23   **A.**    That's true.

24   **Q.**    Number three:

25            "The ongoing distraction and burden on the company's

PRITZKER - CROSS / WILKINSON

1    management of further negotiations with Altria at a time

2    when the company was experiencing extraordinary growth."

3    That was true?

4  A.   That's true.

5  Q.   And that growth had nothing to do with Altria, did it?

6  A.   Nothing.

7  Q.   And number four:

8         "The increase in valuation of the company during the

9    course of its discussions with Altria and its prospects

10    for future growth and further increases in valuation."

11    That was true; right?

12  A.   Yes.

13  Q.   And it expressly says:

14         "Independent of any transaction with Altria."

15    Right?

16  A.   Yes.

17  Q.   So you -- Juul was on a path of increasing sales and

18  growth?

19  A.   Yes.

20  Q.   And you're saying that had nothing to do with Altria?

21  A.   That's right.

22  Q.   And it wasn't going to have anything to do with Altria,

23  whether you did the deal or not?

24  A.   That's right.

25  Q.   And you said -- you also said there was a problem that:

1              "That growth was not adequately reflected in the

2         Altria investment offer."

3         That was true; right?

4    **A.**   That was certainly one of the problems with the

5    conversations with Altria at that time.

6    **Q.**   So Altria wasn't willing to pay what you thought was a

7    fair price for what you thought the valuation of the company

8    should be at that time?

9    **A.**   Yeah.  Right.  That was one of the elements of a

10   disagreement at that time.

11   **Q.**   At that time, though, there was no disagreement that if

12   the deal had gone forward, Altria would only own a minority

13   investment; right?

14   **A.**   I think those had been the conversations up until that

15   time, but none of these terms were set in stone at that time, I

16   have to say.

17   **Q.**   But Altria was no longer pressing a majority interest;

18   right?

19   **A.**   That's -- that's correct.

20   **Q.**   They got the message from you?

21   **A.**   I think they got the message on that.

22   **Q.**   On these issues, there wasn't even any basic agreement;

23   right?

24   **A.**   I don't think there was a disagreement.

25   **Q.**   And so you said:

1          "The company should cease discussions of an

2     investment or strategic relationship with Altria."

3     Right?

4  A.    Yes.

5  Q.    And you didn't have any meaningful discussions with Altria

6  from that time on until they reached out to you in October of

7  2018; right?

8  A.    I don't remember any conversations in that period of time

9  up until a call in October.

10  Q.    You had other deals that you've done where you've engaged

11  in serious negotiations and then it hasn't ended in a deal;

12  right?

13  A.    Often.

14  Q.    And that can happen up to the very last minute?

15  A.    Yes, that's right.

16  Q.    Even when you think you have a deal?

17  A.    That's right.

18  Q.    So at this point you didn't think you were going to have a

19  deal with Altria?

20  A.    We did not think so, no.

21  Q.    And at that time -- I know this sounds like a preposterous

22  question, but at that time did Altria have any influence over

23  Juul?

24  A.    No.  Of course not.

25  Q.    Did it have any control over Juul?

1    **A.**    No.

2    **Q.**    Did it direct any of Juul's activities?

3    **A.**    Not at all.

4    **Q.**    Do you know that plaintiffs have an expert that's going to

5    come in and say that you did give Altria control or gave them

6    influence over Juul?

7              **MS. SHARP:**  Objection.

8              **THE COURT:**  Sustained.  Rephrase, please.

9              **MS. WILKINSON:**  Okay.

10   **BY MS. WILKINSON**

11   **Q.**    Have you ever been contacted by any expert on behalf of

12   the plaintiff to interview about whether Altria had control or

13   influence over Juul at any time?

14   **A.**    I don't recall any such conversation, no.

15   **Q.**    You have given sworn testimony under oath that's

16   consistent with what you're telling the jury today; right?

17   **A.**    For sure.

18   **Q.**    Now, you talked with counsel about the FDA coming out

19   September 12th and saying they were very, very concerned about

20   the youth epidemic; right?

21   **A.**    Yes.

22   **Q.**    In fact, they were so concerned they asked to meet with

23   each company individually; right?

24   **A.**    Yes.

25   **Q.**    Not together, but they met with Juul separately; right?

1    **A.**    That's right.

2    **Q.**    And Altria?

3    **A.**    Yes.

4    **Q.**    R.J. Reynolds, NJOY?

5    **A.**    There were five, I believe, total.

6    **Q.**    Did you talk to any of those companies about what you were

7    going to say to the FDA?

8    **A.**    Absolutely not.

9    **Q.**    Okay.  In fact, in the document that counsel showed you,

10   and I'm going to see if I can find it -- I think it was the

11   draft -- yes, the final draft FDA presentation.  Let's look at

12   that again, TX-1380.

13        **MS. WILKINSON:**  Randall, can you show that?

14        (Document displayed.)

15   **BY MS. WILKINSON**

16   **Q.**    This was admitted into evidence.  And if you look at the

17   email right before that, it is the email from Mr. Valani to you

18   forwarding the FDA final presentation; right?

19   **A.**    Yes.

20   **Q.**    And this was what was delivered to the FDA on October 16,

21   2018?

22   **A.**    I -- I would assume so, but --

23   **Q.**    Well, let's look at Page 2 of this document, and I think

24   it will be clear.

25        Do you see down at the bottom, it says "FDA Presentation"?

PRITZKER - CROSS / WILKINSON

1  A.    Yes.

2  Q.    And take a look over to the right.  Specifically what Juul

3  says about this information.

4         "The presentation contains trade secrets and other

5         information that Juul Labs considers privileged and

6         confidential (collectively called Protected Information).

7         Juul Labs requests that the Protected Information not be

8         disclosed outside of the FDA."

9         Correct?

10  A.    That's right.

11  Q.    So you made it clear to the FDA that you didn't want this

12  shared with anybody else, certainly not with Altria; right?

13  A.    With anybody else.

14  Q.    Not with Reynolds, who made the Vuse products?

15  A.    Right.

16  Q.    And you were sharing your own confidential information?

17  A.    That's right.

18  Q.    Let's look at Page 3 and see what you told the FDA.

19        (Document displayed.)

20  Q.    And right at the top you address the youth issue; right?

21  A.    Yes.

22  Q.    And it starts by saying:

23        "We are adamantly opposed to youth use and are

24        committed to reducing the potential on-ramp to nicotine."

25        And number one, you say you will adopt or you -- and you

 1    expect others to adopt a 21-year-plus restricted distribution

 2    system for flavored products; right?

 3    **A.**    Yes.

 4    **Q.**    And you said you will stop shipment of all flavored

 5    products to the 90,000 retail outlets; right?

 6    **A.**    Right.

 7    **Q.**    You say you will restrict sales of flavored products

 8    initially to Juul.com and Juul-controlled retail outlets;

 9    right?

10    **A.**    Yes.

11    **Q.**    And you'll distribute through Juul RDS-certified retailers

12    that meet strict requirements in the future.

13    **A.**    That's right.

14    **Q.**    Right?

15         You go on to tell the FDA that you will continuously

16    update Juul.com's robust age verification capabilities; right?

17    **A.**    Yes.

18    **Q.**    Number three, you say you will increase the financial

19    consequences on retailers who sell to minors --

20    **A.**    Yes.

21    **Q.**    -- or permit bulk sales.

22         That had been a problem; right?

23    **A.**    That's right.

24    **Q.**    Number four, you say you will exit U.S.-based Juul social

25    media; right?

1    **A.**    Yes.

2    **Q.**    You will deploy technological solutions; right?

3    **A.**    Yes.

4    **Q.**    You will establish a governance structure, including a

5    dedicated executive reporting to the CEO to oversee the

6    implementation of the actions described above; right?

7    **A.**    Yes.

8    **Q.**    And that's a fancy way to say Mr. Burns was going to

9    report to you, the Board, his boss; right?  That's a -- the CEO

10   reports to the Board; right?

11   **A.**    Well, it's true the CEO reports to the Board.  I believe

12   this is talking about a dedicated executive reporting to the

13   CEO.

14   **Q.**    You're right.  You're right.

15        So the people who were putting these into place were going

16   to have to report directly to the CEO; right?

17   **A.**    That's right.

18   **Q.**    And the CEO reports directly to you, the Board?

19   **A.**    To the Board, yes.

20   **Q.**    That's one of the main functions, is to oversee, hire,

21   fire, compensate a CEO; right?

22   **A.**    That's right.

23   **Q.**    And then most importantly, perhaps, you say:  We will

24   pursue these efforts regardless of category-wide actions;

25   right?

1   A.   That's right.

2   Q.   So you're saying even if your competitors don't do this,

3   you're going to do it?

4   A.   That's right.

5   Q.   And, in fact, this was October 16th that you told the FDA

6   this; right?

7   A.   Yes.

8   Q.   You hadn't come to any agreement on terms of any sort with

9   Altria when you told this to the FDA in private; right?

10  A.   It was unilateral, yes.  We had not talked to anybody.

11  Q.   And you had no idea what Altria was going to do; right?

12  A.   We did not.

13  Q.   You didn't know what Reynolds was going to do?

14  A.   No.

15  Q.   You didn't know what any of your competitors were going to

16  do?

17  A.   We didn't.

18  Q.   And, in fact, Altria pulled all of its pod products;

19  right?

20  A.   Yes.

21  Q.   That surprised you; right?

22  A.   It did.

23  Q.   They pulled their flavored Cigalike products; right?

24  A.   That's right.

25  Q.   And, in fact, you announced yours publicly after Altria

PRITZKER - CROSS / WILKINSON

1    made its announcements; right?

2    **A.**    I'm not really sure the order of the announcements.    I

3    don't remember who was first.

4    **Q.**    Okay.  You looked at, with counsel, your announcement.

5    We'll look at it again.  But Juul's announcement was

6    November 14, 2018.

7    **A.**    Is that right?  I don't recall that date.

8    **Q.**    You don't have to take my word for it.  We'll look at in

9    it a moment.

10   **A.**    Good.  Thank you.

11   **Q.**    And Altria took its flavors off.  You took yours.  None of

12   the competitors took their flavors off, did they?

13   **A.**    I don't believe any of them did.

14   **Q.**    So Reynolds, through all of its Vuse products, was still

15   selling flavored products in 2019 at retail establishments when

16   you weren't; right?

17   **A.**    Yes.  That's right.

18   **Q.**    So you knew when you were taking flavors off the market it

19   was going to hurt your sales; right?

20   **A.**    We did.

21   **Q.**    And did that bother you?

22   **A.**    Well, it was a decision that we made to -- to take

23   whatever economic hit that was.

24   **Q.**    Why did you make that decision, Mr. Pritzker?

25   **A.**    Well, the company made the decision, but I certainly

1    supported the decision.

2    **Q.**    Why?

3    **A.**    Well, because of the concern that, for example, flavors

4    and social media were exacerbating the amount of underage use

5    of the product.  I felt that actions needed to be taken along

6    these lines.

7    **Q.**    The FDA had made it loud and clear in the public arena

8    that they were concerned about Juul and other products being

9    used by underage folks; right?

10   **A.**    Yes.

11   **Q.**    And that was no secret in 2018 to anyone in the

12   e-cigarette business?

13   **A.**    No.

14   **Q.**    It wasn't a secret to the public health community; right?

15   **A.**    It wasn't.

16   **Q.**    And after you had the meetings with the FDA, Mr. Gottlieb,

17   Commissioner Gottlieb, released another public statement about

18   those meetings.  Do you recall that?

19   **A.**    I'm not sure I remember that specific statement.

20   **Q.**    All right.  Let's take -- sure.  Let's take a look at

21   TX-982, which for you is going to be Tab 9 in your binder,

22   please.

23   **A.**    Okay.

24           **MS. WILKINSON:**  If this is not already in evidence, I

25   would like to move it in evidence.

1          **MS. SHARP:**  No objection.

2          **THE COURT:**  It's admitted.

3      (Trial Exhibit 982 received in evidence)

4      (Document displayed.)

5  **BY MS. WILKINSON**

6  **Q.**   Do you see that at Tab 9, Mr. Pritzker?

7  **A.**   Yes, I do.  I have it.

8  **Q.**   Okay.  Let's start at the front, if we could.

9  **A.**   Okay.

10 **Q.**   And this shows it's a press release from Mr. Gottlieb on

11 October 31st, 2018; right?

12 **A.**   Yes.

13 **Q.**   And he references the September letter, right, in the

14 first sentence, and he says:

15         "Last month I issued a call to action to the FDA and

16     to the e-cigarette industry to stem the alarming increase

17     in youth use of e-cigarettes."

18     Right?

19 **A.**   Right.

20 **Q.**   And go down to the bottom of the second paragraph, the

21 last sentence.  And he says:

22         "Everyone involved in this market has shared

23     responsibility to address this public health crisis."

24     Right?

25 **A.**   Right.

1   **Q.**   You agreed with that; right?

2   **A.**   Yes.

3   **Q.**   And Juul was going to do its part and take its

4   responsibilities seriously?

5   **A.**   Yes.

6   **Q.**   Then he goes on to say in the next paragraph:

7          "Following that call to action, I have met in the

8       past several weeks with leadership of five companies:

9       Altria, Juul, Reynolds, Fontem, Japan Tobacco.  These have

10      been constructive meetings."

11      Do you see that?

12  **A.**   Yes.

13  **Q.**   So he's saying he had the meeting with each of the

14  companies and they were useful; right?

15  **A.**   Yes.

16  **Q.**   And he says:

17          "The companies acknowledged the serious public health

18      consequences associated with youth use of tobacco

19      products."

20      Right?

21  **A.**   Right.

22  **Q.**   (As read):

23          "They presented thoughtful proposals."

24      Right?

25  **A.**   Right.

1   Q.   And the proposal that we just looked at that you shared

2   with the FDA that was thoughtful; right?

3   A.   I hope so, yes.

4   Q.   And they said it consisted not only of steps they would

5   take, but also steps that they think the FDA and other

6   policymakers can take; right?

7   A.   That's right.

8   Q.   Because the FDA has a different role than companies in

9   overseeing e-cigarettes; right?

10  A.   Yes.

11  Q.   You can't make your competitors take their products off

12  the market; right?

13  A.   We can't.

14  Q.   Let's go down to the bottom of Page 2.  Last paragraph,

15  please.

16       And here, Commissioner Gottlieb references again the

17  pronouncement he made in July 2017 about the continuum of risk

18  and that these alternative products could be beneficial to

19  smokers; right?

20  A.   Right.

21  Q.   And in the last sentence, he says:

22       "We still believe that noncombustible forms of

23       nicotine delivery" -- that would include Juul; right?

24  A.   Yes.

25  Q.   (As read):

1             "-- may be less harmful alternatives for currently

2      addicted adult smokers who still seek nicotine, without

3      the risks associated with combustible cigarettes."

4      Right?

5  **A.**  Yes.

6  **Q.**  So he's saying even though that we have this horrible

7  youth crisis, he wants to make sure adults have access to this

8  type of product; right?

9  **A.**  That's right.

10  **Q.**  And he says:

11        "And we want to keep this option for adults open."

12  Right?

13  **A.**  That's right.

14  **Q.**  So did you understand that despite the youth problem and

15  despite the steps that you were trying to take to address the

16  youth market, that there was more that you needed to do?

17  **A.**  Yes.

18  **Q.**  And did you understand one of the purposes for that was to

19  make sure adult smokers had access to your product?

20  **A.**  That's right.

21  **Q.**  All right.  You looked at this a bit so we're not going to

22  spend of time on it, but on November 14th the Juul Action Plan

23  was announced.  Remember, we said we weren't sure about the

24  date?

25  **A.**  Yes.

1  **Q.**   And I think I was wrong.  It's November 13th, not

2  November 14th.  So it's a good thing you said you wanted to

3  look at the document.

4  **A.**   Right.

5  **Q.**   And it's TX-983, which is Exhibit 6138.

6        **MS. WILKINSON:**  And, Your Honor, that's the number

7  that was already admitted.  I think plaintiff had a different

8  number.

9        **THE COURT:**  Okay.

10        **MS. WILKINSON:**  But it's the same document.

11     (Document displayed.)

12  **BY MS. WILKINSON**

13  **Q.**   So you see this is your press release --

14  **A.**   Yes.

15  **Q.**   -- that announces the same things that you told

16  Commissioner Gottlieb Juul would do; right?

17  **A.**   Right.

18  **Q.**   You made this public?

19  **A.**   Yes.

20  **Q.**   So you made a public commitment to do these things?

21  **A.**   We did.

22  **Q.**   Did Juul do it?

23  **A.**   Yes.  I believe.

24  **Q.**   Do you need some water, sir?

25  **A.**   I am okay.  Thank you.

1    Q.    Now, counsel showed you that summary document of meetings,

2    and it ended in October of 2018.  Let me see if we can pull

3    that up.

4         And let me see if we can pull this up or I can put it on

5    the Elmo.

6              **MS. WILKINSON:**  This is already admitted, Your Honor.

7              **THE COURT:**  It's coming.

8         (Document displayed.)

9    **BY MS. WILKINSON**

10   Q.    Okay.  Thank you.

11        So you see it's titled "Communications From June 2017 to

12   October 2018"?

13   A.    Yes.

14   Q.    And you recall that counsel was asking you:  Weren't you

15   really finished negotiating in October of 2018?  And you said

16   no; right?

17   A.    I said no.

18   Q.    That was true when you said it; right?

19   A.    Yes, that was true.

20   Q.    So there could be many more communications listed here for

21   November and December; right?

22   A.    Yes.

23   Q.    And you have lawyers talking to their lawyers,

24   negotiating?

25   A.    Lawyers and the CEO, Mr. Burns, and other members of the

PRITZKER - CROSS / WILKINSON

1    company continued the negotiations and documentation.

2    **Q.**   Okay.  And you, yourself, were in touch with Mr. Willard

3    and others to continue the negotiations; right?

4    **A.**   I don't directly remember on which occasions, but that

5    would not surprise me.

6    **Q.**   Well, let me show you some of the documents that show

7    that --

8    **A.**   Go ahead.  Yeah.

9    **Q.**   -- that are similar to the ones that counsel showed you.

10   **A.**   Okay.

11   **Q.**   Let's look at your Tab 14, and it's TX-7131.

12           **MS. WILKINSON:**  And we would like to move this into

13   evidence.

14           **MS. BOHANON:**  It's 7130.

15           **MS. WILKINSON:**  Okay, 7130.  I'm sorry.  It's a

16   December 5th, 2018 email.

17           **MS. SHARP:**  No objection.

18           **THE COURT:**  It's admitted.

19       (Trial Exhibit 7130 received in evidence.)

20       (Document displayed.)

21   **BY MS. WILKINSON**

22   **Q.**   All right.  So this is an email from you; right?

23   **A.**   Yes.

24   **Q.**   To Mr. Willard?

25   **A.**   Yes.

1   Q.   And this is over a month later; right?

2   A.   Yes.

3   Q.   And it shows that you're trying to have a quick call with

4   Mr. Willard?

5   A.   I see that.

6   Q.   Okay.  So does that refresh your recollection that you

7   were continuing to communicate?

8   A.   It does.

9   Q.   All right.  And you weren't just communicating.  There

10  were still terms that were at issue; right?

11  A.   There were certainly terms at issue.

12  Q.   Let's take a look Tab 15, please.  And this is TX-6149.

13       And you're not on this email, so I just want to show it to

14  you, not to the jury right now.

15       (Document published to the witness.)

16  Q.   Do you see this email from Mr. Garnick to Mr. Masoudi?

17  A.   I do.

18  Q.   Mr. Masoudi was the general counsel of Juul at the time;

19  right?

20  A.   That's right.

21  Q.   And --

22          THE COURT:  You're just trying to refresh his

23  recollection?

24          MS. WILKINSON:  Yes, yes.

25  \\\

| | |
|---|---|
| 1 | BY MS. WILKINSON |
| 2 | Q.   Take a look and read the email, please. |
| 3 | A.   (As read): |
| 4 | "I want to give you a heads up we" -- |
| 5 | Q.   No, no.  Not out loud. |
| 6 | THE COURT:  No, don't read it out loud. |
| 7 | THE WITNSS:  I'm sorry. |
| 8 | THE COURT:  Read it to yourself and see if it |
| 9 | refreshes your recollection of a conversation that you had. |
| 10 | THE WITNESS:  I see.  Thank you. |
| 11 | (Brief pause.) |
| 12 | A.   I see that -- |
| 13 | BY MS. WILKINSON |
| 14 | Q.   Don't just say "yes" -- just say "yes" or "no." |
| 15 | Does it remind you whether you had a meeting and calls |
| 16 | with them during December of 2018? |
| 17 | A.   It appears that I did.  I can't tell you I recollect those |
| 18 | specific conversations though. |
| 19 | Q.   Fine.  Let's take a look at TX-2728, please.  And that is |
| 20 | Tab 16. |
| 21 | (Document published to the witness.) |
| 22 | Q.   And this is an email from you again? |
| 23 | A.   Yes. |
| 24 | MS. WILKINSON:  We move 2728 into evidence. |
| 25 | MS. SHARP:  No objection. |

1        **THE COURT:**  It's admitted.

2        (Trial Exhibit 2728 received in evidence.)

3        (Document displayed.)

4   **BY MS. WILKINSON**

5   **Q.**   And this is an email on December 11th directly to

6   Mr. Willard from you; right?

7   **A.**   Yes.

8   **Q.**   And it's entitled "Language and Call"?

9   **A.**   Yes.

10  **Q.**   You had very significant negotiations, even over the press

11  releases you all were going to put out if you did the deal;

12  right?

13  **A.**   When you say "you," the company --

14  **Q.**   Yes.

15  **A.**   Mostly the company was dealing with -- the two

16  communications departments were talking about the -- what the

17  press release or releases would be, yes.

18  **Q.**   It was very important to Juul that it was clear to the

19  public that Juul would be independent of Altria; right?

20  **A.**   Yes.  I would say that was one of the things that was

21  important for Juul to be known.

22  **Q.**   Let's take a look at -- let me make sure I have the

23  right...

24        (Brief pause.)

25  **Q.**   Sorry.  Just be patient with me, Mr. Pritzker.

1          Take a look at TX-2730, which is Tab 17.  And it's another

2    email from you.

3               MS. WILKINSON:  We move in TX-2730, Your Honor.

4               THE COURT:  Any objection?

5               MS. SHARP:  No objection.

6               THE COURT:  It's admitted.

7          (Trial Exhibit 2730 received in evidence.)

8    BY MS. WILKINSON

9    Q.   This is December 14th, just a week before the deal --

10   A.   Yes.

11   Q.   -- was finally done; right?

12   A.   Yes.

13   Q.   And it shows you trying to have calls over the weekend

14   about the deal; is that right?

15   A.   Yes, that's right.

16   Q.   Do you recall what was at issue, Mr. Pritzker, that

17   late --

18               THE COURT:  Hang on just a second.  This document can

19   be shown to the jury.

20               MS. WILKINSON:  Oh, yes.  They said -- didn't you say

21   no objection?

22               MS. SHARP:  I said no objection.

23               THE COURT:  Yeah, yeah.  It's --

24               MS. WILKINSON:  Oh, I thought you said it can't be.

25               THE COURT:  No.  It was not being.

1                  **MS. WILKINSON:**  Sorry.

2                  **THE COURT:**  Now it is being.

3          (Document displayed.)

4   **BY MS. WILKINSON**

5   **Q.**   It's not a long email, is it, Mr. Pritzker?

6   **A.**   No, it's not long.

7   **Q.**   But were you having meetings over the weekend or calls

8   with Altria?

9   **A.**   Apparently so, yes.

10  **Q.**   Do you remember what was at issue at that time?

11  **A.**   I remember there were a number of issues still open at the

12  end, and that was a very tight time frame; but I can't -- I

13  can't tell you what those issues were looking back on it.

14  **Q.**   Let me show you one final document that is another email

15  of yours and see if that helps.

16          Let's take a look TX, Trial Exhibit 2731.  And that's at

17  Tab 18.

18                  **MS. WILKINSON:**  We move TX-2731 into evidence.

19                  **MS. SHARP:**  No objection.

20                  **THE COURT:**  All right.  It's admitted.

21          (Trial Exhibit 2731 received in evidence)

22                  **THE COURT:**  It can be published.

23          (Document displayed.)

24  **BY MS. WILKINSON**

25  **Q.**   Is that an email from you to Mr. Willard on Sunday,

1    December 16th?

2    **A.**    Yes.

3    **Q.**    And do you say to Howard and Billy:

4             "Based on various conversations that are occurring,

5        it appears that the primary (or even sole) topic for our

6        call today is the equitable adjustment issue"?

7    **A.**    Yes.

8    **Q.**    You recall that issue; right?

9    **A.**    Yes.

10   **Q.**    And you say there:

11            "So that we can adequately present our strong views

12       on this."

13       Right?

14   **A.**    That's right.

15   **Q.**    So you still had very strong views about this particular

16   issue four days before the transaction; right?

17   **A.**    Yes.

18   **Q.**    You resolved those issues?

19   **A.**    Yeah.

20   **Q.**    Okay.  And on the day that the transaction was announced,

21   Juul issued its own press release; right?

22   **A.**    Yes.

23   **Q.**    Let's take a look TX-6138.  And that's Tab 13.

24       (Document published to the witness.)

25            **MS. WILKINSON:**  I believe this was already admitted.

1              MS. BOHANON:  This is the November 1 document.

2              MS. WILKINSON:  Oh, you're right.  I have the wrong

3    one.  I meant the December 1.

4         So you're going to look at --

5              MS. BOHANON:  7129.

6              MS. WILKINSON:  Thank you, Alysha.

7         -- Trial Exhibit 7130, which is Tab 14.

8              MS BOHANON:  7129.

9              MS. WILKINSON:  Did I say -- it should be Tab 13,

10   Exhibit 7129.

11             THE COURT:  That is in evidence.

12             MS. WILKINSON:  If it's not already admitted, we would

13   move to admit.

14             THE COURT:  It's admitted.

15        (Document displayed.)

16   BY MS. WILKINSON

17   Q.   So this was the press release that Juul issued; correct?

18   A.   Yes, appears to be.

19   Q.   And if we can take a look just on the second page.  On

20   number one, this is where you explain the investment; right?

21        And you say:

22             "An investor would have to adopt and support our

23        mission."

24        Right?

25   A.   That's right.

PRITZKER - CROSS / WILKINSON

1    Q.    (As read):

2              "Today Altria did that with its largest investment."

3         Is that true?

4    A.    Umm.

5    Q.    They adopted and supported your mission?

6    A.    Yes.

7    Q.    So by December 20th, 2018 you were confident that Altria

8    would have only a minority investment; right?

9    A.    Yes.

10   Q.    Would have no control or ability to direct the activities

11   of Juul?

12   A.    That's right.

13   Q.    No influence over you or the other Board members or the

14   management of Juul?

15   A.    That's right.

16   Q.    And Juul would be run independently?

17   A.    That's right.

18   Q.    Okay.  Now, let's talk just briefly about the terms of the

19   investment.  Not only was the -- were the terms clear, but the

20   fact that they had -- they would have no control, that was also

21   included in the deal documents; right?

22   A.    That's right.

23   Q.    Let's take a look TX-6153, which are dated December 20th,

24   2018.

25        (Document published to the witness.)

1          **MS. WILKINSON:**  And, Your Honor, we'll move that into

2     evidence.  It's the entire document.  Counsel and I can agree

3     later what should go back.

4          **MS. SHARP:**  Sounds like a plan.

5          **MS. WILKINSON:**  We'll move that into evidence.

6          **THE COURT:**  It is -- it's admitted.

7          (Trial Exhibit 6153 received in evidence)

8     **BY MS. WILKINSON**

9     **Q.**   Mr. Pritzker, is that why you needed the lawyers

10    (indicating)?

11    **A.**   Desperately.

12    **Q.**   I don't do this kind of work, so I'm going to ask you to

13    look at one page and talk about the control of the company.

14    And let's look at Section 6.4, which is on Page 40.

15         (Document displayed.)

16    **Q.**   I believe it's on 40.  I'm not sure it is.  The slide says

17    it's on 40, but I don't -- it's on 36.  Go to Page 36, please.

18         We put it in a slide so it's easy for people to see.

19    That's Slide 12.  Just going to blow up that section.

20         And you see that it specifically talks about:

21              "No investor control of the company"?

22    **A.**   That's right.

23    **Q.**   Did you insist that that be part of any agreement?

24    **A.**   That was -- yes, absolutely.

25    **Q.**   And it makes clear:

1          "The investor shall have no right, directly or

2      indirectly, as a result of its investment in the

3      company or otherwise to direct or control the

4      company."

5  **A.**   That's right.

6  **Q.**   And did Altria follow that --

7  **A.**   They did.

8  **Q.**   -- instruction?

9          Now let's look at Slide 11, which was a demonstrative

10 shown in opening about the actual investment.

11         (Document displayed.)

12 **Q.**   You see that?

13 **A.**   Yes.

14 **Q.**   As of December 20th, 2018, Juul controlled or owned

15 65 percent of the equity and Altria owned 35 percent; right?

16         Meaning other shareholders, other than Altria, controlled

17 65 percent?

18 **A.**   That's right.

19 **Q.**   Is that a better way to say it?

20 **A.**   Yes.

21 **Q.**   So Altria owned only 35 percent of stock; right?

22 **A.**   That's right.

23 **Q.**   They put their money in, and they don't get anything back;

24 right?  They don't get dividends?

25 **A.**   No right to dividends, that's right.

1  **Q.**   No profits; right?

2  **A.**   Right.

3  **Q.**   So they didn't make a single dollar off of any sale of any

4  Juul device; right?

5  **A.**   That's right.

6  **Q.**   Okay.  And not only did they have a 35 percent passive

7  investment, they had zero votes when the deal closed; right?

8  Zero percent of the votes, and other shareholders had

9  100 percent of the votes; right?

10 **A.**   That's right.

11 **Q.**   And when we turn to 2019, after the investment is

12 consummated, there was some -- someone who was called a Board

13 Observer; right?

14 **A.**   That's right.

15 **Q.**   Can you tell the jury what a Board Observer is?

16 **A.**   A Board Observer is not a member of the Board of

17 Directors, but somebody who has the right and ability to attend

18 Board meetings and hear most of the data about a company,

19 although is excused for certain strategic conversations.

20 **Q.**   The Board Observer did not change the structure of the

21 deal; right?

22 **A.**   No.

23 **Q.**   He had no voting ability?

24 **A.**   That's right.

25 **Q.**   And so Altria never had the upper hand in the

1    negotiations; right?  You ended up getting exactly the

2    structure you wanted?

3    **A.**    We got the -- well, yes.  Yes.  I -- it was --

4    negotiations is a two-way street.  But on the control issue, we

5    got exactly what we wanted in that, yes.

6    **Q.**    You also got access to some of their services, if Juul

7    wanted to pay for those services; right?

8    **A.**    That's right.

9    **Q.**    They had to pay for them?

10   **A.**    That's right.

11   **Q.**    And there were a few that you thought were important;

12   right?

13   **A.**    I thought they were all important.  Some more important

14   than others.

15   **Q.**    And the company chose to only use a few of the services;

16   right?

17   **A.**    Yes.  The company picked which ones it wanted.

18   **Q.**    Okay.  And do you recall which services those were?

19   **A.**    My memory would be the regulatory services, advice and

20   help on regulatory matters, shelf space for the product next to

21   tobacco products.

22   **Q.**    Can I stop you there?

23   **A.**    Yes.

24   **Q.**    Tell the jury why it was so important to you that Juul

25   would be right next to Marlboro and other Altria cigarettes in

1    a store?

2    **A.**    Well, the purpose of Juul was to convert cigarette smokers

3    to Juul.  So by placement of Juul products next to cigarettes,

4    like Marlboro, consumers would be in a good position to

5    understand they had an alternative.

6    **Q.**    So you wanted the consumer to walk into the store and if

7    they were, let's say, a Marlboro smoker, to look up and see the

8    Juul device right next to their cigarettes; right?

9    **A.**    That's right.

10   **Q.**    And hope they would choose Juul instead of Marlboro?

11   **A.**    That's right.

12   **Q.**    And even though Marlboro is an Altria product that they do

13   make profit off of, they were willing to let you put the Juul

14   product right next to Marlboro; right?

15   **A.**    They were.

16   **Q.**    And those products, because they are cigarettes, are

17   behind the cashier in retail; right?

18   **A.**    That's right.

19   **Q.**    So Juul before sometimes was in front of the cashier, and

20   now it was going to be behind the cashier right next to the

21   Marlboro products; right?

22   **A.**    I'm not sure if and when Juul products were in front of

23   the -- where the placement was before.  I couldn't -- I

24   couldn't state that.

25   **Q.**    You thought putting them next to Marlboro and other Altria

1    cigarettes was a very good idea?

2    **A.**    Putting them in a prominent position next to Marlboro, the

3    best selling cigarette by far, yes.

4    **Q.**    Did you also think it would be advantageous to use

5    Altria's adult database so you could market directly to those

6    folks to get them to switch to Juul?

7    **A.**    Yes.   This was another service that the company was

8    interested in opting into.

9    **Q.**    Did Juul also want to put what's called inserts or

10   onserts, little folded pieces of paper with messages or

11   advertisements on the Marlboro package, so if a smoker did buy

12   the cigarette, they would learn about Juul and hopefully not

13   buy another pack --

14   **A.**    That's right.

15   **Q.**    -- of cigarettes and buy a Juul; right?

16   **A.**    Yes.

17   **Q.**    And Altria allowed Juul to do that as well; right?

18   **A.**    Yes.

19   **Q.**    And you also thought Altria could get your product out to

20   more retail establishments; right?

21   **A.**    Yes.

22   **Q.**    They had a greater distribution network?

23   **A.**    Yes.

24   **Q.**    And Juul for a short time took advantage that service;

25   right?

**PRITZKER - CROSS / WILKINSON**

1  A.    I'm not sure about that.  Perhaps that's the case.  I'm

2  not sure whether marketing or sales and distribution services

3  were pursued by Juul.  It could be.  I'm not sure.

4  Q.    If they were, was the idea to get the product to more

5  youth or to more adult smokers --

6  A.    To more adult smokers for sure, of course.

7  Q.    In 2019 at some point you and the Board decided that you

8  needed to replace Mr. Burns, who was the CEO; right?

9  A.    Yes.

10  Q.    And ultimately you hired K.C. Crosthwaite, who had worked

11  at Altria; right?

12  A.    Yes.

13  Q.    Did you decide, along with the Board, that it was time for

14  Mr. Burns to leave in September 2019?

15  A.    Yes.

16  Q.    Did Altria have anything to do with having Mr. Burns leave

17  as the CEO?

18  A.    No.

19  Q.    Okay.  Despite that, did Mr. Willard and other people from

20  Altria, on occasion, raise issues with you and others about

21  encouraging Juul to continue to engage in methods to prevent

22  youth from using its product?

23  A.    Yes.

24  Q.    And how to communicate with the regulator?

25  A.    That's right.

**PRITZKER - CROSS / WILKINSON**

1  **Q.**   And once you decided you needed to remove Mr. Burns, who

2  decided that K.C Crosthwaite would be the new CEO?

3  **A.**   The Board.

4  **Q.**   Did Altria have any influence over that decision?

5  **A.**   None.

6  **Q.**   Why did you hire K.C. Crosthwaite if he was working at

7  Altria at the time?

8  **A.**   We got to know K.C. somewhat in the negotiations through

9  the deal, although he was not very prominently involved in that

10 as far as I knew.  Maybe later, he was.  But, also, he was the

11 Board Observer for Altria.

12     So I got to know him socially and professionally through

13 that, as did other directors.

14 **Q.**   Was he always focused on responsible marketing and

15 avoiding youth usage of Juul?

16 **A.**   Totally.

17 **Q.**   Once you hired him, did he come in within a month and

18 remove mint flavors --

19 **A.**   Yes.

20 **Q.**   -- from retail?

21 **A.**   That was one of the first things he did.

22 **Q.**   In November, two months after he came in, did he remove

23 sale of those flavored pod products even from the online

24 system?

25 **A.**   He did.

1  **Q.** Did Reynolds or Vuse remove their products that were

2  flavored at that time?

3  **A.** I don't believe so, no.

4  **Q.** Later in January of 2020 the FDA imposed a national ban;

5  right?

6  **A.** I'm not sure of the date.

7  **Q.** And that's when the competitors had to remove their

8  flavored products; right?

9  **A.** Whatever that date is, I can't attest to that.

10 **Q.** But you know it happened?

11 **A.** Yes, it did.

12 **Q.** I just want to ask you some closing questions, if I could.

13    The Board of Directors is responsible for the supervision

14 of the Juul CEO; right?

15 **A.** Yes.

16 **Q.** And I think, as you told us, when you believe the CEO is

17 no longer doing the job you want him or her to do, it's your

18 job to remove and replace that person; right?

19 **A.** That's right.

20 **Q.** And it was Juul and the Board's job to oversee the CEO

21 throughout the time the product was on the market and until

22 today; right?

23 **A.** By "oversee," do you mean to -- to know what the CEO is

24 doing generally and to be a sounding board for that CEO?  Yes.

25 **Q.** Yes.  You also give him a review; right?

1    **A.**    That's true.

2    **Q.**    You decide his compensation?

3    **A.**    Yes.

4    **Q.**    So you are responsible, meaning the Board, for the CEO's

5    conduct, compensation and management of the company?

6    **A.**    Yes, that's true.

7    **Q.**    And throughout this time period, Altria never controlled

8    Juul; right?

9    **A.**    That's right.

10   **Q.**    The Board and management had -- of Juul had control over

11   Juul; right?

12   **A.**    That's right.

13   **Q.**    And with that control comes responsibility; correct?

14   **A.**    True.

15   **Q.**    So Juul was responsible for its design of its products;

16   right?

17   **A.**    Yes.

18   **Q.**    Juul was responsible for the formula and the nicotine

19   content in its e-cigarettes?

20   **A.**    That's right.

21   **Q.**    Only Juul was responsible for the marketing of its

22   products?

23   **A.**    That's right.

24   **Q.**    And Juul was responsible for the sale of all of its

25   products?

```
 1   A.    Right.

 2   Q.    Juul was responsible even for responding to FDA's

 3   regulatory concerns?

 4   A.    That's right.

 5   Q.    So simply put, Altria was not responsible for Juul, was

 6   it?

 7   A.    No.  Altria was not in charge of that.

 8   Q.    Thank you, Mr. Pritzker.

 9   A.    Thank you.

10         THE COURT:  All right.  Redirect.

11                    REDIRECT EXAMINATION

12   BY MS. SHARP

13   Q.    Hello again.

14         Mr. Pritzker, let's talk a little bit about what the FDA

15   had to say about Juul and Altria in 2019.

16         Let's pull up Trial Exhibit 85, please.

17         (Document published to the witness.)

18   Q.    This is a February 6, 2019, letter from the FDA to Kevin

19   Burns.

20         MS. SHARP:  I will move to admit.

21         MS. WILKINSON:  No objection.

22         THE COURT:  It's admitted.

23         (Trial Exhibit 85 received in evidence)

24         (Document displayed.)

25   \\\
```

1   BY MS. SHARP

2   Q.   On February 6, 2019, which is less than two months after

3   the Altria and Juul transaction, Dr. Gottlieb, who is still

4   Commissioner of the FDA, writes a letter to Kevin Burns and he

5   says he's requesting a meeting:

6          "...regarding representations that you made in a

7      meeting with the FDA senior leadership on October 16, 2018

8      and in an Action Plan that followed in which you described

9      steps that Juul Labs would take to help address the

10     mounting epidemic of youth addiction to tobacco products."

11     Do you remember the Action Plan that we talked about

12  earlier?

13  A.   Yes.

14  Q.   And you remember the October meeting we talked about;

15  right?

16  A.   That's right.

17  Q.   The one in which Mr. Valani asked before the meeting if

18  the inclusion of mint as a traditional tobacco flavor was

19  disingenuous; right?

20  A.   Yes.

21  Q.   Dr. Gottlieb goes on and he says:

22         "After Altria Group, Inc.'s acquisition of a

23     35 percent ownership interest in Juul, many of Juul's

24     public statements seem inconsistent with its previous

25     representations to the FDA.  Dr. Gottlieb notes how aware

1          he is that youth use of Juul products represents a

2          significant proportion of the overall use of e-cigarette

3          products by children."

4          Right?

5    A.    Yes.

6    Q.    And he goes on to say:

7               "I have no reason to believe these youth patterns of

8          use are abating in the near term, and they certainly do

9          not appear to be reversing."

10         Right?

11   A.    He does say that.

12   Q.    Now, Dr. Gottlieb then writes something important.  He

13   says:

14              "Manufacturers have an independent responsibility to

15         take action to address the epidemic of youth use of their

16         products."

17         You would agree with that statement; right?

18   A.    I do.

19   Q.    As it relates to Juul; right?

20   A.    Yes.

21   Q.    As it relates to Altria; right?

22   A.    Yes.

23   Q.    Now, it's up to the manufacturer of a nicotine product to

24   take responsibility to make sure youth don't get addicted;

25   right?

1    **A.**   Is that -- are those your words?  Would you repeat that?

2    You're asking me to agree with a statement by --

3    **Q.**   By the Commissioner, yes.

4    **A.**   (As read):

5           "That manufacturers have an independent

6           responsibility to take action to address the epidemic

7           of youth use of their products."

8           Absolutely.

9    **Q.**   That's right.

10          The FDA has a lot to do.  It's not up to them to tell

11   nicotine businesses how to do their business; right?

12          **MS. WILKINSON:**  Objection, Your Honor.

13          **THE COURT:**  If you want to rephrase.

14          **MS. SHARP:**  Withdrawn.  Sure.

15   **BY MS. SHARP**

16   **Q.**   Dr. Gottlieb closes the letter by saying:

17          "We intend to schedule a joint meeting to include

18          both Juul and Altria."

19          Right?

20   **A.**   I see that, yes.

21   **Q.**   Let's pull up Trial Exhibit 1899, please.

22          (Document published to the witness.)

23   **Q.**   This is an email from Mr. Masoudi forwarding some

24   information to the Board at Juul; right?  And that's an email

25   group that includes you; correct?

**PRITZKER - REDIRECT / SHARP**

1   **A.**   Yes.

2           **MS. SHARP:**  I'll move to admit.

3       The subject is FDA --

4           **MS. WILKINSON:**  I don't have a copy yet.

5           **MS. SHARP:**  I forgot.  Sorry.  It's Tab 69.

6       (Document tendered to counsel.)

7           **MS. WILKINSON:**  Thank you.  Subject to our -- your

8   previous rulings, Your Honor.

9           **THE COURT:**  All right.  It's admitted.

10      (Trial Exhibit 1899 received in evidence)

11      (Document displayed.)

12  **BY MS. SHARP**

13  **Q.**   Mr. Masoudi writes:

14          "Dear Board Members:  Please find attached a warning

15      letter and document request from FDA."

16      And there are at least two attachments.  One called

17  "9/9/2019 FDA Letter to Juul."  And another that says "Warning

18  Letter - JLI."  Right?

19  **A.**   Yes.

20  **Q.**   All right.  Let's pull up Trial Exhibit 86, please.

21  Tab 68.

22      (Document published to the witness.)

23  **Q.**   This is one of two letters that Juul received from the FDA

24  on September 9, 2019.

25          **MS. SHARP:**  I'll move to admit.

1          MS. WILKINSON:  Subject to the --

2          THE COURT:  I think we're still working through parts

3     of this.

4          MS. SHARP:  Yes.

5          THE COURT:  Are we not?

6          MS. SHARP:  Absolutely.  And the version that will

7     appear reflects the portions of it that we have worked through

8     already.

9          THE COURT:  Okay.  With that, it's admitted

10    conditionally, at least, in part.

11         (Trial Exhibit 86 - conditionally received in evidence)

12         MS. SHARP:  Thank you.

13         (Document displayed.)

14    BY MS. SHARP

15    Q.   This is one of two letters that Juul received from the FDA

16    on September 9, 2019.

17         And just to help place that in context in our timeline,

18    September 9, 2019 is about nine months after the Altria/Juul

19    deal was consummated; right?

20    A.   Yes.

21    Q.   And just a few weeks before K.C. Crosthwaite moved from

22    Altria to Juul, as you just discussed with Ms. Wilkinson;

23    right?

24         Now, the FDA reviewed various materials.  And what it says

25    in the bottom paragraph on the first page is:

1           "Based on our review of the information described

2      above, FDA has determined that Juul adulterated its

3      products under Section 902(8)" -- and there is a bunch of

4      numbers -- "by selling or distributing them as

5      modified-risk tobacco products without a FDA order in

6      effect that permits such sale or distribution."

7      So FDA is raising some concerns with Juul.

8      On Page 2, in the bottom paragraph, the last sentence that

9  appears on that page the FDA says:

10          "Our concern is amplified by the epidemic rate of

11     increase in youth use of ENDS products, including Juul's

12     products, and evidence that ENDS products contribute to

13     youth use of, and addiction to, nicotine, which youth are

14     especially vulnerable."

15     Right?

16  **A.**   I see that, yes.

17  **Q.**   Now, in the conclusion of that letter, which appears on

18  the third page -- actually, I'm sorry.

19     Let's look first at the very top line of the third page,

20  in which the FDA flags a comment in a letter from the CEO,

21  which states:

22          "Juul's simple and convenient system incorporates

23     temperature regulation to heat nicotine liquid and deliver

24     smokers the satisfaction that they want without the

25     combustion and the harm associated with it."

1       Right?

2   **A.**   That's right.

3   **Q.**   We'll come back to that statement in a moment.  But to

4   complete this document, in the conclusion the FDA states:

5           "The violations discussed in this letter do not

6       necessarily constitute an exhaustive list."

7       Right?

8   **A.**   Yes.  It says that.

9   **Q.**   And on the next page at the top the FDA reminds Juul:

10          "It is your responsibility to ensure that your

11      tobacco products, all related labeling and advertising,

12      and all other activities by Juul directed to consumers,

13      such as in any media in which you advertise and any retail

14      establishments, comply with each applicable provision of

15      the FD&C Act and FDA's implementing regulations."

16      Right?

17  **A.**   Right.

18  **Q.**   Let's pull up Trial Exhibit 1900, please.

19      (Document published to the witness.)

20  **Q.**   Trial Exhibit 1900 is the second letter that was attached

21  to Mr. Masoudi's September 9 email.

22          **MS. SHARP:**  Once counsel has had a chance to look,

23  I'll move to admit.

24          **MS. WILKINSON:**  Same agreement.

25          **THE COURT:**  All right.  Same conclusion.

| | |
|---|---|
| 1 | **MS. SHARP:**  Thank you. |
| 2 | **THE COURT:**  Admitted, in part anyway, for now. |
| 3 | (Trial Exhibit 1900 - conditionally received in evidence) |
| 4 | **MS. SHARP:**  Thank you.  For now. |
| 5 | (Document displayed.) |
| 6 | **BY MS. SHARP** |
| 7 | **Q.**  This is another letter to Mr. Burns in which the FDA |
| 8 | writes in September 2019 after the Altria acquisition: |
| 9 | "I am writing to request documents and information |
| 10 | from Juul Labs regarding Juul's marketing, advertising, |
| 11 | promotional and education campaigns, as well as certain |
| 12 | product development activity." |
| 13 | The letter goes on to reiterate that the FDA is still: |
| 14 | "Deeply concerned by the epidemic rate of increase in |
| 15 | youth use of ENDS products, as well as the uncertainty |
| 16 | regarding their immediate and long-term effects on the |
| 17 | public health." |
| 18 | Do you see that? |
| 19 | **A.**  I do. |
| 20 | **Q.**  So that is the FDA in September 2019 still expressing |
| 21 | concern both about public -- about youth use and the public |
| 22 | health; right? |
| 23 | **A.**  Yes. |
| 24 | **Q.**  The FDA emphasizes again that: |
| 25 | "We believe that you have a continuing |

1            responsibility."

2        Right?

3   A.   That's right.

4   Q.   On Page 2, if we can turn to that, the FDA in the first

5   full paragraph says:

6            "This letter describes statements and activities

7        about which we are requesting documents and information."

8        And then to look at the third sentence, it says:

9            "Furthermore, it appears to us that despite previous

10       document requests from FDA that were substantially similar

11       to ones from the Subcommittee" -- referring to Congress --

12       "(see the section below on previous document requests),

13       you submitted more documents to the Subcommittee than the

14       FDA."

15       Right?

16  A.   It says that.

17  Q.   Now, in that paragraph, it also says:

18           "We also have questions related to Juul's product

19       design."

20       Right?

21  A.   Right.

22  Q.   This is a long letter.  I won't take you through the whole

23  thing, but I will turn your attention now to Page 8, please.

24       On Page 8 the FDA is establishing -- excuse me, noting

25  Juul's Make the Switch campaign consists of several

1  advertisements with the tagline "Make the Switch" and then

2  raises some questions that are listed here under 12 items.  Do

3  you see that?

4  **A.**   Yes, I do.

5  **Q.**   Now, Number 10.  Ms. Wilkinson asked you a fair amount

6  about Juul's mission.  Do you remember that?

7  **A.**   Yes.

8  **Q.**   Juul's mission to improve the lives of the world's smokers

9  and to convert smokers?

10  **A.**   That's right.

11  **Q.**   Number 10, the FDA writes:

12       "Additional Juul advertisements include

13       statements and representations, such as."

14       And then Number 10 is just that mission.  It says:

15       "Juul Labs is on a mission to improve the lives

16       of the world's 1 billion adult smokers by eliminating

17       cigarettes."

18       Right?

19  **A.**   That's right.

20  **Q.**   Now, if you look at Page 9, the next page, in conclusion

21  on those 14 line items that the FDA is raising with Juul in

22  September 2019, the FDA says:

23       "FDA requests that you provide the agency all

24       documents and information that relate to the statements,

25       representations, and events referenced above."

1          Right?

2     **A.**    Yeah.

3     **Q.**    So the FDA is at least raising questions about Juul's

4     mission statement at that time; correct?

5     **A.**    Well, they are requesting additional documents and

6     information, yes.

7     **Q.**    Right below that it says "nicotine salts."  Do you see

8     that?

9     **A.**    Yes.

10    **Q.**    All right.  And the FDA points out:

11             "During the hearing, testimony also focused on Juul's

12        use of nicotine salt e-liquids in its products and the

13        concentration of nicotine in its products."

14        Right?

15    **A.**    I see that.

16    **Q.**    Now, Ms. Wilkinson asked you a number of questions about

17    other e-cigarette products, like Vuse and NJOY; right?

18    **A.**    Yes.

19    **Q.**    None of them had the 95 percent super-charged nicotine

20    salts that Juul has, did they?

21             **MS. WILKINSON:**  Objection.  Foundation.

22             **THE COURT:**  If you know.

23             **THE WITNESS:**  I don't know.

24    BY MS. SHARP

25    **Q.**    None of those products allowed the users not to experience

1   the throat hit that had traditionally been experienced with

2   combustible cigarettes, did they?

3            MS. WILKINSON:  Objection.  Foundation.

4            THE COURT:  If you know, you can answer the question.

5   A.   I don't know that to be true, no.

6   BY MS. SHARP

7   Q.   If we turn to the next page, on Page 10, the FDA says,

8   still under the topic of Nicotine Salts:

9            "Please explain why Juul uses nicotine salt e-liquids

10       in its products."

11       Right?

12   A.   Yes.

13   Q.   And the FDA also says:

14           "Please explain why Juul uses a nicotine

15       concentration of 5 percent in its products."

16       Right?

17   A.   Yes.

18   Q.   Now, the FDA is sending this letter to Juul in September

19   of 2019, which is more than four years after Juul launched;

20   right?

21   A.   Yes.

22   Q.   And the nicotine salts that were featured in Juul were one

23   of their -- was one of the product's unique features; is that

24   fair to say?

25           MS. WILKINSON:  Objection.  Foundation.

1              **THE COURT:**  Overruled.  You can answer, if you know.

2   **A.**   I -- I don't know if I would say "unique feature."  I

3   don't know whether it was -- nicotine salts were unique to

4   Juul.  I don't think so.  I don't think they were unique to

5   Juul, but perhaps you're right.

6   **BY MS. SHARP**

7   **Q.**   Do you know if any of those other products were shaped

8   like a USB drive?

9   **A.**   Juul was not shaped like a USB drive in any intentional

10  way, if that's what you're implying.  And I -- I do believe

11  that other products that are on the market, I don't know which

12  ones, are shaped very much like Juul intentionally so.

13      So I -- I don't think that any of this is unique to Juul,

14  as far as I know.

15  **Q.**   Do you know if any of those other products constituted

16  75 percent of the youth user base of electronic nicotine

17  delivery systems in late 2018, as pointed out by the Surgeon

18  General to a staff member at Juul?

19  **A.**   Well, looking at the statistic that you gave before, I

20  think there could only be one 75 percent product, kind of by

21  definition.

22      So I don't know what the -- but to answer your question, I

23  don't know what percentage of the underage market any of these

24  products represented.  I don't know that.

25  **Q.**   Ms. Wilkinson asked you about K.C. Crosthwaite a little

1    bit.

2    **A.**    Yes.

3    **Q.**    Now, you and Mr. Valani were in touch with

4    Mr. Crosthwaite, who were still -- who was still with Altria in

5    early September of 2019; right?

6    **A.**    That's right.

7    **Q.**    And Mr. Valani shared the warning letters from the FDA

8    with Mr. Crosthwaite, didn't he?

9         **MS. WILKINSON:**  Objection.  Foundation.

10        **MS. SHARP:**  Let's go to Trial Exhibit 1899, please.

11        **THE COURT:**  I guess I'm sustaining that objection.

12        **MS. SHARP:**  Yes.

13        (Laughter.)

14        **MS. WILKINSON:**  Thank you, Your Honor.

15        **MS. SHARP:**  My apologies, Your Honor.

16        (Document published to the witness.)

17   **BY MS. SHARP**

18   **Q.**    Before you is an email dated September 9, 2019.  And you

19   can see at the top that Mr. Valani forwards these letters to

20   Mr. Crosthwaite; right?

21   **A.**    Can I see farther down on that email?

22   **Q.**    Sure.  That's the email that we just looked at in which

23   Mr. Masoudi sent some FDA letters.

24   **A.**    I see.  Yes.

25   **Q.**    Now, Mr. Crosthwaite had not yet been hired as CEO of Juul

1   on September 9, 2019; right?

2   **A.**   I'm trying to remember now what the date was.  So I do

3   believe that was before he was officially hired.

4   **Q.**   That's right.  September 25th was the date that it was

5   publicly announced?

6   **A.**   Good.

7   **Q.**   So he was still an executive at Altria when Mr. Valani

8   shared this information with him; right?

9   **A.**   That's right.

10  **Q.**   But a couple weeks later, he was installed as CEO at Juul;

11  right?

12  **A.**   Yes.

13  **Q.**   And along with him came a gentleman named Joe Murillo who

14  had been the regulatory affairs guy at Altria for many years?

15  **A.**   When was you say "along with him came," I believe

16  Mr. Murillo was hired by K.C. sometime after K.C. began.  So it

17  was not like a package deal.

18  **Q.**   Fair enough.  Thank you.

19       But Mr. Murillo is now an executive at Juul; right?

20  **A.**   That's right.

21  **Q.**   Along with Mr. Crosthwaite, who is still the CEO; right?

22  **A.**   That's right.

23  **Q.**   Now, you considered hiring Mr. Crosthwaite before

24  September of 2019; right?

25  **A.**   Yes.

1   **Q.**   In fact, in April of 2019 Mr. Crosthwaite and his wife

2   stayed with you for the weekend in the Bay Area; right?

3   **A.**   They were in the Bay Area, yes.  They -- we saw them, and

4   they didn't stay with us specifically at our house.

5   **Q.**   And do you recall that Mr. Crosthwaite had expressed

6   concerns about Juul's leadership at that time?

7   **A.**   That Mr. Crosthwaite had?

8   **Q.**   Yes.

9   **A.**   I'm not sure.  Mr. Willard had expressed concerns, but I

10  don't remember Mr. Crosthwaite specifically expressing

11  concerns.  He might have done that, I don't remember.

12  **Q.**   And when we're talking about expressing concerns about

13  Juul's leadership, we're talking about the very same leadership

14  that was in place when Altria paid $12.8 billion to Juul in

15  December of 2018; right?

16  **A.**   If you're talking about Mr. Burns, yes.

17  **Q.**   That's right.

18       Do you recall a meeting in the summer of 2019 when

19  Mr. Devitre said that Burns had to go?

20  **A.**   I'm not sure I remember that specific meeting or him using

21  those words, but he might have.

22  **Q.**   Now, Ms. Wilkinson asked if Altria had anything to do with

23  Mr. Crosthwaite's installation as the CEO at Juul.  Do you

24  remember that?

25  **A.**   I think she used words like that, yes.

1   Q.   Now, he had spent 20 years at Altria before he was

2   installed as the CEO at Juul; right?

3   A.   Well, I think at Altria and then at PMI before that maybe,

4   but that time sounds right.

5   Q.   Now, Ms. Wilkinson pointed out that -- or she said

6   Mr. Crosthwaite removed mint flavors from the market in the

7   fall of 2019 when he joined Juul.  Do you remember that?

8   A.   I think he did that, yes.

9   Q.   Now, but you recall, based on the FDA letters that we just

10  looked at from September of 2019, fair to say that the public

11  outcry over youth usage of Juul was still very much on fire at

12  that time; right?

13  A.   Well, there were a lot of articles and, yes, I would say

14  there was outcry.

15  Q.   Now, let's talk a little bit about the removal of mint

16  from the market in 2019.  But to set the table a little bit,

17  you recall whether you just were talking with Ms. Wilkinson

18  about Board Observers?

19  A.   Yes.

20  Q.   Do you recall that Billy Gifford from CEO -- excuse me,

21  from Altria, with whom you had negotiated the Altria deal, at

22  some time became a Board Observer for Juul?

23  A.   Yes.

24  Q.   And Ms. Wilkinson pointed out that he had no voting

25  ability at that time; right?

1   **A.**    Yes.  He had no voting ability at any time.

2   **Q.**    All right.  Let's pull up Trial Exhibit 4056, please.

3         (Document published to the witness.)

4   **Q.**    4056 is a November 7, 2019, minutes of a Board meeting.

5   And it appears you attended; correct?

6   **A.**    Yes.

7            **MS. SHARP:**  I'll move to admit.

8            **MS. WILKINSON:**  No objection.

9            **THE COURT:**  It's admitted.

10        (Trial Exhibit 4056 received in evidence)

11  **BY MS. SHARP**

12  **Q.**    And let's take the look portion, Number 3, that says

13  "Regulatory Update."  Okay?

14  **A.**    Yes.

15  **Q.**    All right.  Now these notes state that:

16            "Juul's Chief Regulatory Officer, Mr. Murillo"

17        -- about whom we just spoke -- "summarized for the

18        Board recent events, including anticipated FDA

19        actions and the 2019 National Youth Tobacco Survey

20        and monitoring the Future Survey."

21        Right?

22  **A.**    Yes.

23  **Q.**    Now, it goes on.

24            "In light of the studies, management proposed to

25        announce that the company will immediately stop accepting

1          orders from our retail partners for mint Juul pods in the

2          U.S. and cease the sale of mint Juul pods in the U.S.

3          through the company's E-commerce site."

4          Right?

5    A.    Yes.

6               "Questions were asked, discussion ensued, after which

7          the Board indicated its support of management's decision."

8          Right?

9    A.    That's right.

10   Q.    All right.  So the Board decided in November of 2019 to

11   finally take mint off the market; right?

12   A.    The company decided to do it.  The Board agreed.

13   Q.    And that was a year after Juul had taken all of the other

14   flavors off the market in retail stores; right?

15   A.    That's correct.

16   Q.    More than four years after the product had launched;

17   correct?

18   A.    Yes.

19   Q.    Now, the Board minutes discuss two surveys.  Do you

20   remember looking at those surveys at all?

21   A.    I -- I don't remember.  I remember the surveys.  I'm not

22   sure I read them cover to cover, but I generally remember them.

23   Certainly the NYTS one.  I'm not sure monitoring the Future

24   Survey, I don't remember that one.

25   Q.    Do you remember generally that the surveys showed that

1    more than half of the teens who vaped used Juul, and Juul mint

2    pods were the number one most popular youth flavor with high

3    school and middle school students?

4    **A.**   I remember generally that mint was a very popular flavor

5    for sure in that study.

6    **Q.**   Now, do you remember the next day that Billy Gifford, who

7    at the time was Altria's Chief Financial Officer, emailed the

8    Board about Juul's future cash flow in light of the decision to

9    remove mint pods?

10   **A.**   I don't.  I don't remember that email.

11   **Q.**   Let's mark trial exhibit -- let's pull up Trial

12   Exhibit 4057, please.

13       (Document published to the witness.)

14   **BY MS. SHARP**

15   **Q.**   You'll see that this is an email chain that begins on

16   November 8, 2019, which is the day after the Board meeting;

17   correct?

18   **A.**   Yes.

19   **Q.**   And it's from Mr. Gifford; correct?

20   **A.**   Yes.

21   **Q.**   To a number of people.  And you're on the list, right,

22   Mr. Pritzker?

23   **A.**   I can't see that here, but --

24   **Q.**   I'm sorry.  If we look at the bottom email, you can see.

25   **A.**   I see.  Yes.

```
 1            MS. SHARP:  All right.  I move to admit.

 2            MS. WILKINSON:  No objection.

 3            THE COURT:  It's admitted.

 4       (Trial Exhibit 4057 received in evidence)

 5       (Document displayed.)

 6  BY MS. SHARP

 7  Q.   Now, Mr. Gifford writes:

 8            "Dear Board members:  As you know, the company

 9       yesterday announced that it would no longer sell mint

10       pods.  Given that mint pods are responsible for much of

11       domestic sales, I am concerned that there is a need to cut

12       costs significantly beyond those cuts made to date."

13       Right?

14  A.   Yes.

15  Q.   So Mr. Gifford is saying:  I'm worried about the resulting

16  cash flows as a consequence of pulling mint from the market;

17  right?

18  A.   Yes.

19  Q.   Now, in fact, he uses the word "cash flows."  The very

20  bottom bullet point says:

21            "Potential cash sourcing plans if the resulting cash

22       flows are deemed not sufficient."

23       Right?

24  A.   Yes.

25  Q.   So in this email do you see Mr. Gifford expressing any
```

```
 1   concern about teen use of the mint pods?

 2            MS. WILKINSON:  Objection.  Foundation.

 3            THE COURT:  No.  Overruled.  You can answer.

 4            THE WITNESS:  Would you mind repeating the question?

 5   BY MS. SHARP

 6   Q.   No problem.

 7        In this email that's on the screen, do you see Mr. Gifford

 8   expressing any concern about youth usage of the mint pods?

 9   A.   Am I looking at the entire email?

10   Q.   No.  Just the email that's in front you right here.

11   A.   That is part of the email?

12   Q.   Yes.

13   A.   No.  I don't see any -- any link to that, no.

14   Q.   He was focused on cash flows; right?

15        Withdrawn.

16   A.   Yes.

17   Q.   The next email up is from K.C. Crosthwaite, who is now the

18   CEO of Juul in November of 2019; right?

19   A.   That's right.

20   Q.   So Mr. Gifford is emailing Mr. Crosthwaite and other Board

21   members at Juul about the Juul Board's decision to remove mint

22   pods; right?

23   A.   I -- I'm sorry.  All I can tell you is what I see here, is

24   that to discuss the topics that he raised and a few other

25   relevant items.
```

```
 1        So I don't know which topics or which items, but -- so
 2   I -- I don't know specifically what he was thinking about.
 3   Q.   All right.  Sticking with this time period generally,
 4   you're aware that Dr. Gottlieb, the FDA Commissioner, maintains
 5   a Twitter account; right?
 6   A.   I think I remember that.
 7   Q.   In fact, you were on occasion sent updates about
 8   Dr. Gottlieb's Tweets.  Do you remember that?
 9   A.   I vaguely remember that, yes.
10   Q.   No reason to doubt it; right?
11   A.   No, no.  I wouldn't doubt it.
12        MS. SHARP:  All right.  Let's mark Trial Exhibit 4043,
13   please.
14        (Document published to the witness.)
15   BY MS. SHARP
16   Q.   4043 is a Tweet from Scott Gottlieb, M.D. dated
17   November 5, 2019.  I will note that he was no longer the
18   Commissioner of the FDA at that point.
19        MS. SHARP:  Move to admit.
20        MS. WILKINSON:  Objection, based on --
21        THE COURT:  Yeah.  Foundation, first of all.
22        MS. SHARP:  All right.  Why don't we go back?
23        THE COURT:  I don't know whether Mr. Pritzker has ever
24   seen this document before.  If he has not, I'm not letting it
25   in.
```

1          **MS. SHARP:**  Fair enough.  We'll move on.

2     **BY MS. SHARP**

3     **Q.**   All right.  Now, in her examination of you, Mr. Pritzker,

4     Ms. Wilkinson asked you if the Juul product was different than

5     everything else; right?  Do you remember that?

6     **A.**   Something like that, yeah.

7     **Q.**   And you agreed with her, it with as something totally

8     different; right?

9     **A.**   I'm not sure.  You might have to read me back exactly what

10    I said.

11    **Q.**   Fair enough.  Fair enough.

12         Fair to say that it was quite the phenomenon?

13    **A.**   You're asking me new questions.  Do you want to phrase the

14    question to me and ask me my thoughts?  Is that what you're

15    doing?

16    **Q.**   Sure.  Sure.  Let's bring up Trial Exhibit 125, please.

17    I'll try a different way.

18    **A.**   Please.

19         (Document published to the witness.)

20    **Q.**   This is an email from your son-in-law Christopher Olin,

21    that was sent to you on December 9, 2016; correct?

22    **A.**   That's correct.

23    **Q.**   And the subject line is "Surgeon General Sounds the Alarm

24    on Teens and e-cigarettes"; right?

25    **A.**   Yes.

```
 1   Q.    And Mr. Olin writes:
 2               "I find the explosion in vaping among teens to be
 3         deeply disturbing, as it is creating another generation of
 4         nicotine addicts."
 5         Right?
 6   A.    Yes.
 7   Q.    And he says:
 8               "I'm glad to see the Surgeon General woke up."
 9         Right?
10   A.    Yes.
11   Q.    Did you ever see any Surgeon General reports about
12   MarkTen, Altria's product, that you talked about with
13   Ms. Wilkinson?
14   A.    I don't think I -- I don't know if I ever saw such a
15   report.
16   Q.    Do you recall reviewing any Surgeon General reports in
17   your time at Juul?
18   A.    I might have seen the Surgeon General report.  I remember
19   an early one that I was aware of in 2015, 2016, something like
20   that.
21   Q.    And you recall -- or do you remember that on the website
22   Juul says -- under the "Health Effects" section of the website
23   that Juul defers to the expertise of public health officials,
24   like the Surgeon General?
25   A.    I don't remember that specific statement.
```

1   **Q.**   Any reason -- any reason to doubt that?

2   **A.**   It sounds like it may well be on there.

3   **Q.**   Let's pull up Trial Exhibit 102, please.

4        (Document published to the witness.)

5   **Q.**   Do you recall looking at a Surgeon General report from

6   2012, which would have been after your family office invested

7   in Juul?

8        **MS. WILKINSON:**   Your Honor, I'm going to object to

9   beyond the scope.

10        **THE COURT:**   Overruled.

11  **A.**   I can't tell you I remember this particular report.   It

12  may well be I saw it.   I can't remember.

13  **BY MS. SHARP**

14  **Q.**   Let's take a look at --

15        **MS. SHARP:**   I'll move to admit.

16        **MS. WILKINSON:**   Objection.

17        **MS. SHARP:**   It's Trial Exhibit 102.

18        **MS. WILKINSON:**   I think it's already admitted.

19        **THE COURT:**   I think it's in.

20        **MS. SHARP:**   Okay.   Then I don't move to admit.

21        **THE COURT:**   Okay.

22        (Document displayed.)

23  **BY MS. SHARP**

24  **Q.**   Let's look at Page 102.4.

25        "Let's look at the problem.   Let's look at the

1          problem? Today's teens and young adults can access

2          information on millions of subjects almost instantly.  But

3          many of the same media that warn of the dangers of tobacco

4          use also carry messages that smoking is cool, edgy,

5          adult."

6          Right?

7     A.   Yes.

8     Q.   This was information that was in the public realm well

9     before Juul ever launched; right?

10    A.   Yes.  This was before.

11    Q.   And let's look at the next page, at the causes.  The

12    causes:

13               "Young people start tobacco for many important

14          reasons."

15          Under "Tobacco Industry," it explains that:

16               "Fewer adults are smoking today."

17          Right?

18    A.   Yes.

19    Q.   And let's move down to the "Susceptibility of Youth and

20    Young Adults."

21          Meanwhile:

22               "Adolescence and young adulthood are the times when

23          people are most suspectable to starting tobacco use."

24          Right?

25    A.   It says that.

1    Q.   It goes on:

2              "Young people are more vulnerable and more influenced

3         by marketing than adults."

4         Right?

5    A.   Yes.

6    Q.   But as late as September of 2019, we saw that the FDA was

7    questioning some of Juul's marketing; correct?

8    A.   They were.

9    Q.   Let's look at 102.12, please.

10        (Document displayed.)

11   Q.   The Surgeon General in 2012 pointed out:

12             "Tobacco companies use multiple methods and spend

13        lots of money to convince young people that using tobacco

14        is okay, even attractive.  Their business depends on

15        getting these young consumers to try, and to keep using,

16        their products.  Young people are responsive to marketing,

17        making them vulnerable to messages that encourage tobacco

18        use."

19        Right?

20   A.   Right.

21   Q.   Let's look at 102.14, please.

22        (Document displayed.)

23   Q.   As to quality retail marketing, the Surgeon General

24   pointed out that:

25             "Even the locations where tobacco products    are" --

1          MS. WILKINSON:  Excuse me.  I'm going to object to

2    cumulative and just reading.

3          THE COURT:  Overruled.  This issue was raised during

4    the testimony.  It's fair -- fair redirect.

5    BY MS. SHARP

6    Q.   (As read):

7              "Even in the locations where tobacco products are

8         sold can have an impact on tobacco use by young people."

9         Right?

10   A.   Yes.

11   Q.   And looking at the next column, the Surgeon General points

12   out "Digital Media" and says:

13             "Many cigarette companies use websites to promote

14        their products."

15        Right?

16   A.   Yes.

17   Q.   And that was in 2012, when social media was not yet a

18   phenomenon; correct?

19   A.   I don't know when it was a phenomenon.

20   Q.   That's fair.

21   A.   I don't know those dates.

22   Q.   Neither do I.

23        But Juul used social media to promote its product

24   beginning in June 2015 when it launched; right?

25   A.   I believe so.

1    Q.    And it continued using social media until after the public

2    outcry in September of 2018; correct?

3    A.    Yes.

4    Q.    Now, Mr. Pritzker, you were asked by Ms. Wilkinson --

5    well, were you ever a Board member of a tobacco company before

6    Juul?

7    A.    No.

8    Q.    Never?

9    A.    No.

10   Q.    Let's turn back to Trial Exhibit 67.

11         (Document displayed.)

12   Q.    You recall that these were the notes that Mr. Frankel took

13   in July of 2017; correct?

14   A.    Yes.

15   Q.    You went through this in some detail with Ms. Wilkinson.

16   I won't -- I'll try not to retread any ground.

17   A.    Okay.

18   Q.    Two points.  And you recall that your son and others

19   attended a meeting with Altria in July of 2017; right?

20   A.    Yes.

21   Q.    Now, on Page 67.2, Ms. Wilkinson went through with you

22   some of the youth prevention things Altria does; right?

23   A.    Yes.

24   Q.    Now, the second-to-last arrow there says:

25         "Most responsible marketing should be invisible."

1        Right?

2    A.   Right.

3    Q.   In all capitals; correct?

4    A.   Right.

5    Q.   Was Juul's Vaporized campaign invisible, from your

6    perspective?

7    A.   By "invisible" you mean not seen by people?  It was not

8    invisible.

9    Q.   Now, in these notes looking at 67.3, Altria also noted,

10   according to these notes, that it was:

11            "Interested in a minority investment where we

12        continue operations as is without their interference, but

13        with their help."

14        Right?

15   A.   Yes.

16   Q.   And that was in July of 2017, at the very beginning of the

17   negotiations that led ultimately to the December 2018 deal;

18   right?

19   A.   Yes.

20   Q.   Now let's pull up Exhibit 6491, please.

21        (Document displayed.)

22   Q.   And looking at Section 3, please.

23        Ms. Wilkinson took you through some of the information

24   that was in these minutes, and she focused on the fact that

25   with regard to the Altria negotiations and the discussion

1    thereof, there is a description here of the:

2            "Ongoing distraction and burden on the company's

3        management of further negotiations with Richard at a time,

4        quote, when the company was experiencing extraordinary

5        growth."

6        Right?

7    A.    Yes.

8    Q.    And that's in September of 2018; correct?

9    A.    Yeah.  I think that was the date.

10   Q.    Now, that extraordinary growth was occurring concurrent

11   with the September 2018 press release that Juul issued, Trial

12   Exhibit 2981, where Juul tells the public:  We've switched

13   1 million smokers; right?

14   A.    I'm not sure that was the number that was -- that was

15   claimed.

16   Q.    And if we -- there we go.

17       (Document displayed.)

18   Q.    1 million smokers?

19   A.    Okay.  Good.  Uh-huh.

20   Q.    All right.  And if we could pull up Trial Exhibit 135.

21       At the same time in September of 2018, the NYTS, New York

22   Tobacco Survey -- National Youth Tobacco Survey, pardon me,

23   showed that over 3.6 million kids were using e-cigarettes;

24   right?

25   A.    I see that.

1          (Document published to the witness.)

2     **Q.**   We can agree that 3.6 million kids is more than 1 million;

3     correct?

4     **A.**   That's correct as a statistic, yes.

5          **MS. SHARP:**  And Trial Exhibit 135 is a 2018 NYTS data.

6     And I'll move to admit, please.

7          **MS. WILKINSON:**  Your Honor, I haven't looked through

8     it, but I don't have any reason to object.

9          **THE COURT:**  Okay, it's admitted.

10         **MS. SHARP:**  Thank you.

11         (Trial Exhibit 135 received in evidence)

12         (Document displayed.)

13    **BY MS. SHARP**

14    **Q.**   Focusing still on end of 2018, you recall that Juul

15    received an email that 75 percent of youth use was Juul; right?

16    **A.**   I don't remember what date that was, if that was

17    consistent with this time frame.

18    **Q.**   That's right.  So at the same time that Juul -- that

19    Juul's Board was saying internally that the company was

20    experiencing extraordinary growth, there was public outcry

21    about just how many kids were using Juul; right?

22    **A.**   Yes.

23    **Q.**   Now, in your negotiations --

24         **THE COURT:**  Let me ask you:  How much longer do you

25    think you'll be?

1            MS. SHARP:  I would hope not too long.

2            THE COURT:  That doesn't help me.  Because if I

3   prevail on the jury to wait for a short period of time, I would

4   like to know that Mr. Pritzker could be done as a witness.

5   So -- and that short period of time, I would ask if the jury

6   could wait 15 minutes if, in fact, both you and Ms. Wilkinson

7   would be finished by then.

8            MS. SHARP:  I can do that, Your Honor.

9            MS. WILKINSON:  I'm happy to do that, Your Honor.

10           THE COURT:  Is the jury okay with an extra 15 minutes?

11  And then we'll --

12       (Jurors responding affirmatively.)

13           THE COURT:  Great.  Okay.  We're going to do that.

14           MS. SHARP:  Okay.  Thank you.  Thank you very much.

15           THE WITNESS:  Thank you.

16           MS. SHARP:  We want to not keep you any longer than we

17  must.

18           THE WITNESS:  Thank you.

19  BY MS. SHARP

20  Q.   Did Altria, in your negotiations, ever require as a term

21  of investment that Juul spend one dollar on youth prevention?

22  A.   I don't remember any specific requirement.  I will say

23  that Altria always was encouraging in terms of youth

24  prevention, always expressed that as a primary concern, but I

25  don't remember them ever demanding, insisting or requesting any

1   specific expenditure in that regard.

2   **Q.**   Now, do you recall looking at a scientific study that

3   Ms. Wilkinson showed you and an email that was associated with

4   it?

5   **A.**   Yes.

6   **Q.**   Yes.  And that was an email from a Ms. Gogova saying that

7   CSUR switching study had limitations, including that it was

8   cross sectional.  Do you remember that?

9   **A.**   I wasn't sure exactly what that meant, but I did see that.

10  **Q.**   That's right.  So -- and do you feel qualified to assess

11  and report to this jury the methodological plans or limitations

12  in any Juul switching study?

13  **A.**   No.  I don't even know what those terms mean.

14  **Q.**   I hardly do either, and we hope that others in this trial

15  can explain that.

16         **THE COURT:**  All right.  All right.  Just ask

17  questions, please.

18         **MS. SHARP:**  Sorry.

19  **BY MS. SHARP**

20  **Q.**   Now, you mentioned your personal experience with four

21  people in your family using Juul to quit cigarettes; right?

22  **A.**   Yes.

23  **Q.**   Do you know from 2017 to 2019, when Juul sold more than

24  $5 billion worth of its product, adult smoking rates remained

25  flat?

1          **MS. WILKINSON:**  Objection.  Foundation.

2          **THE COURT:**  Overruled.

3     You can -- if you know, you can answer.

4  **A.**   My recollection is that the data I saw in smoking rates

5  suggested that smoking rates were, in fact, declining, kind of

6  relative to adoption of Juul.

7          In other words, more use of Juul appeared to be resulting

8  in fewer people smoking.

9  **BY MS. SHARP**

10 **Q.**   It would --

11 **A.**   That was my recollection of the data, but I couldn't cite

12 it.

13 **Q.**   We've talked about statistics a bit.  It wouldn't make

14 sense for adult smoking numbers to stay flat if smokers were

15 also switching to Juul; right?

16         **MS. WILKINSON:**  Objection.  Foundation.

17         **THE COURT:**  You can answer.

18 **A.**   As I say, my recollection is that I believed in what I was

19 shown; that -- and I can't tell you the time frame, 2017, 2018.

20 Certainly when we were negotiating with Altria, I thought it

21 was evident from the numbers that -- that adoption of Juul by

22 adult smokers was resulting in fewer cigarette sales.

23 **BY MS. SHARP**

24 **Q.**   Okay.

25 **A.**   But perhaps you have different data, so I don't know.

1  **Q.**   Now, you testified earlier that you, Mr. Monsees and

2  Mr. Bowen, who were the founders of the company, shared a

3  mission to use your company to help adult smokers; right?

4  **A.**   Yes.

5  **Q.**   And that you never wanted to attract new users to

6  nicotine, especially youth; right?

7  **A.**   That's right.

8  **Q.**   And let's pull up Trial Exhibit 176, please.  This is a

9  document that's already in evidence.

10      (Document displayed.)

11  **Q.**   It is an email from May 18, 2015 between yourself

12  Mr. Valani and a gentleman named Alex Assely?

13  **A.**   Yes.

14  **Q.**   I want to focus on one statement in this document.  Let's

15  go to 176.2, please.

16      Under "Historic Opportunity - Unique," this is one of the

17  concepts that you at least read about in 2015 in an email;

18  correct?

19  **A.**   Yes.

20  **Q.**   And one of the points that's made here under the second

21  bullet point is as follows:

22          "We can bring the pleasures of tobacco (not smoking)

23      to everyone."

24      Right?

25  **A.**   That's what it says.

PRITZKER - REDIRECT / SHARP

1  **Q.**   Right.  Not just smokers, but everyone; right?

2        Now, let's please pull up a document that's been marked as

3  Trial Exhibit 220 -- actually, strike that.

4        I'm going to skip that and do a different one.  Thank you.

5            **THE COURT:**  Okay.

6            **MS. SHARP:**  In the interests of time.

7  **BY MS. SHARP**

8  **Q.**   Ms. Wilkinson asked you about whether Altria ever had --

9  whether a term of the deal between Altria and Juul was that

10 Altria could have voting rights.  Do you remember that?

11 **A.**   That's right.  I'm not sure that's exactly what she asked

12 me.

13 **Q.**   That's fair.

14       Generally you spoke about whether Altria had voting rights

15 or not; correct?

16 **A.**   Well, I think she was talking about a particular time

17 frame after the deal was done.  Specifically that's what she

18 asked, whether there were voting rights at that time, and there

19 weren't.

20 **Q.**   Now, let's pull up Trial Exhibit 4058, please.

21       (Document published to the witness.)

22 **Q.**   This is a relatively recent press release in which --

23            **MS. WILKINSON:**  I'm sorry.  Before you read it, I'm

24 going to object.  There is, from what I see -- I don't see the

25 date and it's also a topic, I think, Your Honor, depending on

 1    the date, has ruled isn't relevant.

 2              **THE COURT:**  I think you should go on from this

 3    document.

 4              **MS. SHARP:**  All right.

 5    **BY MS. SHARP**

 6    **Q.**   Trial Exhibit 6153 is the relationship agreement, I

 7    believe, that Ms. Wilkinson asked a bit about, and she focused

 8    on Section 6.4.  Do you remember that?

 9         And she focused on that section with regard to the lack of

10    control that Altria had; right?

11    **A.**   Yes.

12    **Q.**   Now, I'd like to look at that same page, which is 53-040,

13    but I'd like to look at the provision that appears just above

14    it, Section 6.3(b).

15         (Document displayed.)

16    **Q.**   And while it's lawyerly, what it says is:

17              "Permitted Buyout Offer.  Notwithstanding anything to

18         the contrary set forth in Section 6.1, following the

19         four-year anniversary of the date hereof, the investor may

20         deliver to the Board a proposal to acquire all outstanding

21         shares not beneficially owned by the investor."

22              **MS. WILKINSON:**  Your Honor, I'm sorry.  But I'm going

23    to object because it's four years from the date, which would be

24    2022.

25              **THE COURT:**  No, not on this.  Overruled.

1    **BY MS. SHARP**

2    **Q.**   With regard to this term --

3    **A.**   Yes.

4    **Q.**   -- I'm not asking about what has happened.  All I'm asking

5    is this is a term that appears in the deal that you negotiated

6    on behalf of Juul for Altria; correct?

7    **A.**   Yes.  Could I elaborate on what this provision says, or

8    can you make it clear what the provision says before I agree to

9    it?

10   **Q.**   The provision provides, as far as I can tell, that Altria

11   has the right:

12          "To deliver to the Board a proposal to acquire all

13       outstanding shares."

14       Meaning, acquiring ownership of the company?

15   **A.**   Which the company is under no obligation to accept, as far

16   as I can tell, just to be clear.

17   **Q.**   But it was a term that was available to Altria; correct?

18   **A.**   That they could make an offer, of course, but that the

19   company was under no obligation ever to accept such an offer.

20   I just want to be clear.

21   **Q.**   Did Altria ever convert it's shares in Juul to voting

22   shares?

23          **MS. WILKINSON:**  Objection.

24          **THE COURT:**  Yeah.  It's sustained.

25   \\\

PROCEEDINGS

1    **BY MS. SHARP**

2    **Q.**   Mr. Pritzker, I think you testified about this earlier,

3    but there was never a time that Altria required Juul to spend a

4    single dollar on youth prevention and conditioned the

5    transaction on that; correct?

6    **A.**   I think I said I don't recall ever hearing any such demand

7    or requirement.

8    **Q.**   Thank you.  No further questions at this time.  We

9    appreciate your time.

10           **THE COURT:**  Okay.  Thank you.

11           **MS. WILKINSON:**  No questions, Your Honor.

12           **THE COURT:**  All right.  Mr. Pritzker, you're excused.

13           **THE WITNESS:**  Thank you.

14       (Witness excused.)

15           **THE COURT:**  And, ladies and gentlemen of the jury,

16   you're excused.

17       Remember, please, the admonitions.  There's still much

18   more to come.  Don't discuss, don't research, have a good

19       Come back as promptly as you have been.  I look forward to

20   seeing you in the morning.

21       (Jury exits the courtroom at 1:41 p.m.)

22           **THE COURT:**  And I look forward to seeing you in the

23   morning.

24       (Whereupon at 1:41 p.m. further proceedings were

25        adjourned until Tuesday, May 2, 2023, at 8:00 a.m.)

## CERTIFICATE OF REPORTERS

   We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR


_____

Ana Dub, CSR 7445, CRR, RMR, RDR

Monday, May 1, 2023