## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

-----------------------------------------------------------

IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

MDL No. 2913

The Hon. William H. Orrick

Hearing Date: August 9, 2023, at 2:00 p.m.

Objectors below are class members and the basis for their membership in the class is described in EXHIBIT A to the attached OBJECTION OF PLAINTIFFS MATTHEW MURPHY, CADE BEAUPARLANT, AND MARIANNE SAVAGE TO PROPOSED JUUL CLASS ACTIONSETTLEMENT AGREEMENT.

I declare under the penalty of perjury under the laws of the United States of America that my clients, Matthew Murphy, Cade Beauparlant, and M, a minor by his mother and natural guardian Marianne Savage, are members of the class and Objectors to the Settlement Agreement.

Respectfully Submitted,

Mark A. Gottlieb (admitted *pro hac vice*)
mark@phaionline.org
PUBLIC HEALTH ADVOCACY INST.
360 Huntington Avenue, CU117
Boston, MA 02115
(617) 304-6052

Dated July 12, 2023

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

\-----------------------------------------------------------

IN RE: JUUL LABS, INC., MARKETING,
SALES PRACTICES AND PRODUCTS
LIABILITY LITIGATION

MDL No. 2913

The Hon. William H. Orrick

Hearing Date: August 9, 2023, at 2:00 p.m.

**OBJECTION OF PLAINTIFFS MATTHEW MURPHY,
CADE BEAUPARLANT, AND MARIANNE SAVAGE TO
PROPOSED *JUUL* CLASS ACTIONSETTLEMENT AGREEMENT**

Respectfully Submitted,

__*/s/ Andrew Rainer /s/*_____
Andrew Rainer (admitted pro hac vice)
arainer@phaionline.org
Mark A. Gottlieb (admitted pro hac vice)
mark@phaionline.org
PUBLIC HEALTH ADVOCACY INST.
360 Huntington Avenue, CU117 Boston,
MA 02115
(617) 304-6052

Dated July 12, 2023

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................ 1

    A. Background Regarding *Murphy* Litigation ................................ 1

    B. Background Regarding *In Re: Juul Labs* Multi-District Litigation........................................... 2

    C. The Juul Labs Inc. Settlement ................................................... 4

II.    LEGAL STANDARD........................................................................ 5

III.    ARGUMENT ................................................................................... 7

    A.   The Proposed Settlement Does Nothing to Address the Crisis of Youth Vaping Addiction. ...................................................................................... 7

    B.   $30 Million of the Proposed Settlement Should be Entrusted to a Nonprofit Clearly Chartered to Develop Effective Youth Vaping Cessation Interventions. ........................ 9

    C.   Attendance at Final Approval Hearing ................................. 13

IV.    CONCLUSION........................................................................... 13

V.    EXHIBITS ................................................................................... 15

    A.  COMPLAINT - *Murphy, et al v. JUUL Labs, Inc.,* Docket No. 1:19-cv-11755 (D. Mass.) ...............................................................................15

    B.  AFFIDAVIT OF DR. RACHEL BOYKAN, M.D. ...............................................48

    C.  AFFIDAVIT OF DR. JONATHAN D. KLEIN, M.D., M.P.H. ...........................51

    D.  AFFIDAVIT OF LAUREN KASS LEMPERT, J.D., M.P.H. ...........................54

    E.  AFFIDAVIT OF DR. SHARON J. LEVY, M.D., M.P.H. ...............................57

    F.  AFFIDAVIT OF DR. SUSANNE E. TANSKI, M.D., M.P.H., F.A.A.P. ...........60

    G.  AFFIDAVIT OF DR. KAREN M. WILSON, M.D., M.P.H. ...........................63

H.  IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION: TRANSCRIPT

OF PROCEEDINGS BEFORE THE HONORABLE DAN A. POLSTER,

UNITED STATES DISTRICT JUDGE 1/8/2018 .............................................66

I.  "EXHIBIT E" FROM OPOID DISTRIBUTORS SETTLEMENT ...................88

# TABLE OF AUTHORITIES

Cases

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974)................................ 7

*Fraser v. Asus Computer Int'l*, Case No. 12-cv-00652-WHA, 2012 WL 6680142, at *3 (N.D.

   Cal. Dec. 21, 2012)........................................................................................................ 5

*Hanlon v, Chrysler Corp.*, 150 F.3d 1011,1026 (9th Cir. 1998) ...................................... 5

*In re High–Tech Emp. Antitrust Litig.,* No. 11–CV–02509–LHK, 2014........................ 5

*Murphy, et al v. JUUL Labs, Inc.,* Docket No. 1:19-cv-11755 (D. Mass.) ..................... 1

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 525 (C.D. Cal. 2004)

   ................................................................................................................................... 6

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 526 (C.D. Cal. 2004)

   ............................................................................................................................... 6, 7

*Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco,* 688 F.2d

   615, 625 (9th Cir. 1982)................................................................................................ 6

*See Cotter v. Lyft, Inc.,* 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) ............................ 6

*Stanton v. Boeing*, 327 F.3d ............................................................................................. 5

Transcript of Record at 416, *In Re: National* .............................................................. 7

Other Authorities

Eric R. Kandel & Denise B. Kandel, *A Molecular Basis for Nicotine as a Gateway Drug* 371

   NEW ENG. J. MED. 932 (2014) ..................................................................................... 8

Amanda L. Graham, et al., *Effectiveness of a Vaping Cessation Text Message Program Among

   Young Adult E Cigarette Users: A Randomized Clinical Trial,* 181 JAMA INTERNAL MED. 7,

   923-930 (2021)…………….......................................................................................... 10

Carla J. Berg, et al., *A Synthesis of the Literature to Inform Vaping Cessation Interventions for Young Adults*, 119 ADDICTIVE BEHAVIORS 1-28 (2021) ............................................................... 9

Dearell Niemeyer et al., *The 1998 Master Settlement Agreement: A Public Health Opportunity Realized – or lost?* 5 HEALTH PROMOTION PRAC. 3, 21S-32S (2004) ...................................... 12

Mark Gottlieb, *Lawsuit Demands Juul Fund Treatment for MA Adolescents it Addicted,* PUBLIC HEALTH ADVOCACY INST. (Apr. 29, 2019), https://www.phaionline.org/2019/04/29/lawsuit-demands-juul-fund-treatment-for-the-ma-adolescents-it-addicted/ ........................................... 9

NAT'L ACAD. OF SCI., ENGINEERING, & MED., Public Health Consequences of E-Cigarettes .......... 9

Nat'l Inst. on Drug Abuse, *The Swiss Cheese Model of Drug Addiction*, NAT'L INST. HEALTH (Sep. 12, 2014), https://nida.nih.gov/videos/swiss-cheese-model-drug-addiction .................. 12

Rebecca L. Haffajee, *The Public Health Value of Opioid Litigation*, 48 J. L. MED. ETHICS 2, 279-292 (2020) ...................................................................................................................... 12

Richard A. Miech et al., *Monitoring the Future National Survey Results on Drug Use, 1975-2018: Volume 1, Secondary School Students*, Ann Arbor Institute for Social Research (2019), https://monitoringthefuture.org/wpcontent/uploads/2022/08/mtf-vol1_2018.pdf ...................... 2

S. Glantz, A. Jeffers, and JP Winickoff, *Nicotine Addiction and Intensity of e-Cigarette Use by Adolescents in the US, 2014 to 2021.* 5 JAMA NETW OPEN. 11 (Nov. 7, 2022) ....................... 9

Stephen R. Broderick, *What Does Vaping Do to Your Lungs?* JOHNS HOPKINS MEDICINE (2023) 9

Truth Initiative, *This is Quitting*, https://truthinitiative.org/thisisquitting .................................... 10

U.S. DEP'T HEALTH HUM. SERV., The Health Consequences of Smoking— 50 Years of Progress: A Report of the Surgeon General (Centers for Disease Control and Prevention eds., 2014). .... 8

Yingning Wang, et al., *Healthcare Utilisation and Expenditures Attributable to Current E-Cigarette Use Among US Adults*, TOBACCO CONTROL (2022) ................................................... 8

**Rules**

Federal Rule of Civil Procedure 23(e) ............................................................................. 5

Other Materials

5 Moore Federal Practice, § 23.85 (Matthew Bender 3d ed.) .......................................... 5

Plaintiffs' Co-Lead Counsel Announce Four Major Settlements with Juul Labs, Inc. Addressing

    U.S. Youth ECigarette Usage – Lieff Cabraser.pdf .................................................... 4

Richard A. Miech et al., *Monitoring the Future National Survey Results on Drug Use, 1975-*

    *2018: Volume 1, Secondary School Students*, Ann Arbor Institute for Social Research (2019) 2

Sarah London, *Plaintiffs' Co-Lead Counsel Announce Four Major Settlements with Juul Labs,*

    *Inc. Addressing U.S. Youth E-Cigarette Usage*, Lieff Cabraser Heimann & Bernstein, LLP

    (Dec. 7, 2022). ........................................................................................................... 4

Court Orders

*Colgate, et al., v. Juul Labs, Inc., et al.,* Order Appointing Plaintiffs' Leadership and Steering

    Committee Members, Case No. 3:19-md-02913-WHO, Document 341 ................................. 3

*In Re Juul Labs. Inc., Marketing, Sales Practices, and Products Liability Litigation* Transfer

    Order, Case MDL No. 2913 (D. Ma. Oct. 2, 2019) ................................................................ 2

## I.     __INTRODUCTION__

Matthew Murphy, Cade Beauparlant, and Marianne Savage on behalf of M ("Objectors"), by their counsel, the Public Health Advocacy Institute ("PHAI "), hereby respectfully object to final approval of the proposed Class Action Settlement Agreement ("the Settlement") because it consists entirely of the payment of small sums of money to individual class members and fails to provide *any* public health relief to address the crisis of vaping by young people that was spurred, in significant part, by Juul's marketing practices.  As set forth in the Affidavits of the distinguished public health professionals attached hereto,[1] there is currently a pressing public health need to develop and deliver effective treatment methods for nicotine addiction among adolescents.  PHAI, the Objectors and the Affiants respectfully urge the Court to deny approval to the Settlement unless $30 million of the proposed Settlement fund is dedicated to the development and delivery of these essential treatment methods.

### A.  Background Regarding *Murphy* Litigation

Objectors originally filed suit in 2019 against Juul Labs, Inc. ("Juul") in the United States District Court for the District of Massachusetts, seeking relief on behalf of a class of persons in Massachusetts who were under eighteen years when they initiated nicotine use with Juul e-cigarettes.  *Murphy, et al v. JUUL Labs, Inc.,* Docket No. 1:19-cv-11755 (D. Mass.).  The **sole** relief sought in their Complaint (a copy of which is attached as Exhibit A) was equitable relief, including the funding of a program that would "engage in clinical and public health research to evaluate the evidence base on youth e-cigarette use and treatment and to develop and establish best practices for prevention and treatment for addiction to e-cigarette-based nicotine."  Of the

---

[1] See Affidavits from Dr. Rachel Boykan; Dr. Jonathan D. Klein; Lauren Kass Lempert; Dr. Sharon J. Levy; Dr. Susanne E. Tanski; and Dr. Karen M. Wilson attached hereto as Exhibits B-G, respectively.

thousands of lawsuits filed against Juul, this was the only one seeking solely injunctive relief related to the public health harms caused by Juul's products.

The primary concern underlying the Objectors' class action was the proliferation of youth nicotine addiction.  That proliferation was also the source of massive public health concern garnering significant attention from the U.S. Centers for Disease Control and Prevention, U.S. Surgeon General, U.S. Food and Drug Administration, and organizations such as the American Lung Association, the Campaign for Tobacco Free Kids, the Truth Foundation, the American Academy of Pediatrics, and the American Medical Association. This is largely because the sales and marketing of Juul products resulted in the greatest ever increase in substance use among adolescents in a single year.[2]

In October of 2019, the Objectors' case was transferred with all related federal cases to this Honorable Court for multi-district litigation proceedings.[3]  In broad terms, the actions consolidated into the multi-district litigation requested two distinct forms of relief: individual monetary compensation *and* injunctive relief in the form of funding for public health remedies. The Objectors' case sought only the latter form of relief.

## B. Background Regarding *In Re: Juul Labs* Multi-District Litigation

The Judicial Panel on Multidistrict Litigation consolidated the *Juul Labs Inc.,* cases before this Court on October 2, 2019.[4]  Like the Objectors' complaint, the subsequent consolidated complaints alleged that: (1) Juul had marketed its Juul nicotine delivery products in a manner designed to attract minors; (2) Juul's marketing misrepresented or omitted that Juul

---

[2] Richard A. Miech et al., *Monitoring the Future National Survey Results on Drug Use, 1975-2018: Volume 1, Secondary School Students*, Ann Arbor Institute for Social Research (2019), https://monitoringthefuture.org/wpcontent/uploads/2022/08/mtf-vol1_2018.pdf
[3] *In Re Juul Labs. Inc., Marketing, Sales Practices, and Products Liability Litigation* Transfer Order, Case MDL No. 2913 (D. Ma. Oct. 2, 2019
[4] *Id.*

products are more potent and addictive than cigarettes; (3) Juul products are defective and unreasonably dangerous due to their attractiveness to minors; and (4) Juul promoted nicotine addiction.

At the initiation of the MDL, counsel for Objectors, the Public Health Advocacy Institute, applied for a leadership position, and proposed specifically to organize a public health advisory committee of leading experts on vaping, nicotine dependence, and approaches to treatment ("Advisory Committee"). The appointment of an Advisory Committee was meant to ensure the inclusion of meaningful public health measures in any resolution to these cases, such as the $30 million allocation that Objectors now request which is wholly absent from the proposed Settlement. Inspired by recent opioid settlements and guided by some unhappy lessons from tobacco litigation settlements, Objectors strongly believe that an express public health remedy is required, in addition to monetary relief, to meaningfully redress the well-documented harm caused by addicting thousands of adolescents to nicotine. Absent such a provision, the Settlement is unfair, inadequate, and, in fact, unreasonable.

Unfortunately, PHAI's application for a leadership position to ensure that any resolution of the cases in the MDL included meaningful public health measures was not approved by this Honorable Court.  Yet, in rejecting PHAI's leadership application, the Court encouraged Plaintiffs' lead counsel who were appointed to take account of the "important" need for public health relief.  This Court wrote that it "did not appoint many excellent counsel who offer important strengths to plaintiffs. For example, Mark Gottlieb from Public Health Advocacy Institute, Inc. was generally supported in his application to lead an Advisory Committee on Public Health Relief, which seems to be an important role."[5] Leadership rejected this suggestion.

---

[5] *Colgate, et al., v. Juul Labs, Inc., et al.,* Order Appointing Plaintiffs' Leadership and Steering Committee Members, Case No. 3:19-md-02913-WHO, Document 341.

**C. The Juul Labs, Inc. Settlement**

On December 7, 2022, Juul Labs Inc. and class counsel reached a proposed settlement of the cases consolidated into *In Re: Juul Labs, Inc.* multi-district litigation. *See* notice of Proposed Settlement of Class Action available at: https://www.lieffcabraser.com/2022/12/plaintiffs-co-lead-counsel-announce-four-major-settlements-with-juul-labs/.  The proposed Settlement demonstrates that this Honorable Court was, indeed, prescient in its statement that the role of a committee on public health relief, consisting of leading experts on vaping, adolescent nicotine dependence, and approaches to treatment, would have been important to the plaintiffs' and public's best interests. As it is, the proposed Settlement lacks *any* public health mitigation or prevention measures. Each affiant supporting the present Objection (*see* Exhibits B through G) found this omission to be surprising and deeply disappointing.  Instead, "[t]he consumer class action settlement" will remunerate consumers who purchased Juul products"[6] with payments estimated between $100 and $500, depending on when Settlement class members began using Juul products, documentation of purchase, how old they were at initiation, and how long their use continued.

Objectors strongly oppose the Settlement as currently structured because it does nothing to address the underlying public health crisis that prompted the surge of class actions and fails to provide any meaningful relief for the public health harms affecting class members associated with the design and marketing of Juul products.  Objectors urge that funds exceeding 10% of the total recovery through the Settlement be allocated to fund scientific research to develop and implement best practices to support consumers, particularly those who became addicted through use of Juul as adolescents, who want to quit. While Juul is no longer sold in its original flavors

---

[6] Sarah London, *Plaintiffs' Co-Lead Counsel Announce Four Major Settlements with Juul Labs, Inc. Addressing U.S. Youth E-Cigarette Usage*, Lieff Cabraser Heimann & Bernstein, LLP (Dec. 7, 2022).

nor utilizes the marketing tactics that appealed to adolescents, there is a large population of individuals who became nicotine-dependent through the use of Juul products who are still nicotine-dependent and want help treating their addiction.  And again, this was the **sole** remedy sought in Objectors' 2019 Class Action Complaint.

As set forth below, it addressing this omission need not unreasonably delay the ultimate approval of the Settlement or payments to the Settlement Class Members. It could be accomplished by simply setting aside a portion of the Settlement funds for the purpose of funding evidence-based and evidence-informed public health research aimed at reducing the burden of a generation who became addicted to the products marketed by the Settling Defendants. This could simply entail allocating $30 million to a non-profit organization or foundation with a clear charter to use the funds exclusively for a research program to improve the effectiveness and dissemination of vaping cessation interventions aimed at assisting addicted Settlement Class Members.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, reasonable, and accurate." *Stanton v. Boeing*, 327 F.3d 938, 959 (9th Cir. 2003) (quoting *Hanlon v, Chrysler Corp.*, 150 F.3d 1011,1026 (9th Cir. 1998)). In doing so, "[t]he focus must be on protecting the rights of absent class members" because "[t]heir rights are the rights to be extinguished by a class settlement." *Fraser v. Asus Computer Int'l*, Case No. 12-cv-00652-WHA, 2012 WL 6680142, at *3 (N.D. Cal. Dec. 21, 2012).

"District courts have interpreted Rule 23(e) to require a two-step process for the approval of class action settlements: 'the Court first determines whether a proposed class action settlement

deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted.' " *In re High–Tech Emp. Antitrust Litig.,* No. 11–CV–02509–LHK, 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 525 (C.D.Cal.2004)).

"The 'universally applied standard' in determining whether a court should grant final approval to a class action settlement is whether the settlement is 'fundamentally fair, adequate, and reasonable.' " *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 525 (C.D. Cal. 2004) (quoting 5 Moore Federal Practice, § 23.85 (Matthew Bender 3d ed.)). In reviewing a class action settlement agreement's fairness, the Ninth Circuit has considered, where applicable, the following non-exhaustive eight factors in determining whether a proposed settlement is fair, reasonable, and adequate: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) and the reaction of the class members to the proposed settlement. *See Cotter v. Lyft, Inc.,* 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016). Importantly, the "[d]istrict courts have wide discretion in assessing the weight and applicability of each factor." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 526 (C.D. Cal. 2004).

Furthermore, "[t]he relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting

*Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982)).

Importantly, this list of factors is not exhaustive.  This is because, "[u]ltimately, the district court's determination is nothing more than an 'amalgam of delicate balancing, gross approximations, and rough justice.' " *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974.  In a suit that carries broad public health implications, the Court should use its discretion to consider the efficacy of a settlement in abating the public health crisis that the defendant is alleged to have caused or to which it contributed. As Judge Dan Aaron Polster noted during proceedings in the National Prescription Opiate Litigation MDL, any settlement (in that MDL) should include measures to "do something meaningful to abate this crisis . . . " and reduce its adverse public health impact rather than simply " . . . moving money around." Transcript of Record at 09:15:51 and 09:23:37, *In Re: National Prescription Opiate Litigation*, MDL No. 2804, No. 1:17-CV-2804 N. Dist. Ohio (Jan. 9, 2018) attached hereto as Exhibit H.  Indeed, as part of the ultimate settlement of the opioid MDL, the Court *required* that the bulk of the settlement monies be spent on treatment interventions.  *See* https://nationalopioidsettlement.com/executive-summary/ (noting that "the overwhelming bulk of the proceeds [was] restricted to funding future abatement efforts) and "Exhibit E" of the Settlement with Opioid Distributors (listing opioid remediation uses for designated settlement funds) attached hereto as Exhibit I.

## III.   <u>ARGUMENT</u>

### A.   The Proposed Settlement Does Nothing to Address the Crisis of Youth Vaping Addiction.

Objectors filed the *Murphy* case seeking injunctive relief, not monetary remedies. Their goal from the start was to fund public health interventions to help members of the class who are struggling with nicotine dependence resulting from use of Juul e-cigarettes and who want to quit. This approach gets to the crux of the public health problem related to the sales and marketing of Juul products. The proposed Settlement, however, does nothing to address this underlying public health crisis: a generation of young Juul product users growing into adulthood addicted to nicotine.  It need not and should not be resolved this way.

Based on data from 2015 to 2018, researchers estimate that the annual healthcare burden from adults vaping (roughly four percent of the population) is $2 billion; each vape user costs the health care system roughly $2,000 annually more than a person who uses no nicotine products.[7] These estimates are already greater than those attributable to cigar and smokeless tobacco use, and as more young people who are class members continue to vape as adults due to the incredibly addictive quality of vaped nicotine, the negative impacts on healthcare costs are likely to increase greatly over time.[8] Data showing that from 2013 to 2018, e-cigarette use among high schoolers grew from roughly 5% to roughly 21% of all students drives this point home, and will drive our healthcare burden higher. Should the roughly 21% of high schoolers continue to vape into adulthood that would be more than 500 percent more adults burdening the healthcare system than this study evaluated. Following that calculation, we should anticipate a healthcare burden caused by vaping which is 5.5 times higher, or equal to more than $11 billion dollars annually as a result.

---

[7] Yingning Wang, et al., *Healthcare Utilisation and Expenditures Attributable to Current E-Cigarette Use Among US Adults*, Tobacco Control (2022).
[8] *Id.*

Beyond the financial burden inaction poses for the healthcare system, inaction also poses a serious threat to population health regardless of the cost to treat associated illness and disease. In 2014, the Surgeon General estimated that 5.6 million children would die prematurely of a smoking related illness.[9] More concerning is the growing body of evidence that shows that minors who develop a nicotine addiction from use of Juul products are more likely than their non-vaping peers to initiate smoking of conventional cigarettes and other substances of abuse.[10] While the negative health impact of conventional cigarette use is well-documented, the National Academy of Sciences (the "NAS") has published significant research demonstrating the mydiad of known detrimental health impacts of Juul/e-cigarette use. The NAS's research shows that use of e-cigarettes can cause endothelial dysfunction, oxidative stress, dependence, an increase in heart rate and blood pressure, and that the chemicals in e-cigarettes can cause DNA damage and mutagenesis.[11] Additional concerns by the medical community over cases of bronchiolitis obliterans (popcorn lung), vaping-related lipoid pneumonia, and primary spontaneous pneumothorax (collapsed lung)[12] in youths who vaped cry out for public health mitigation and prevention measures in the Settlement.

**B. $30 Million of the Proposed Settlement Should be Entrusted to a Nonprofit Clearly Chartered to Develop And Disseminate Effective Youth Vaping Cessation Interventions.**

As Harvard Medical School professor and pediatrician expert witness Dr. Jonathan Winickoff has noted, "a teen can easily inhale a cigarette pack's worth of nicotine in a Juul pod

---

[9] U.S. DEP'T HEALTH HUM. SERV., THE HEALTH CONSEQUENCES OF SMOKING— 50 YEARS OF PROGRESS: A REPORT OF THE SURGEON GENERAL (Centers for Disease Control and Prevention eds., 2014).

[10] See e.g., Eric R. Kandel & Denise B. Kandel, *A Molecular Basis for Nicotine as a Gateway Drug* 371 NEW ENG. J. MED. 932 (2014).

[11] Nat'l Acad. of Sci., Engineering, & Med., PUBLIC HEALTH CONSEQUENCES OF E-CIGARETTES (David L. Eaton et al. eds., 2018).

[12] Stephen R. Broderick, *What Does Vaping Do to Your Lungs?* JOHNS HOPKINS MEDICINE (2023), https://www.hopkinsmedicine.org/health/wellness-and-prevention/what-does-vaping-do-to-your-lungs

and, because the product's design almost eliminates the body's natural response to bronchial irritation caused by high doses of inhaled nicotine, addiction can occur very quickly."[13] The novel nature of Juul-induced nicotine addiction has revealed an inadequacy of current nicotine addiction treatment methods for youth.[14]  Indeed, most pediatricians and physicians have no training to assist adolescent nicotine addiction at all. And the addiction for young people can be especially acute. By 2019, more e-cigarette users were using their first tobacco product within five minutes of waking than users of cigarettes and all other tobacco products combined.[15]

Currently, low-cost or free cessation programs available to adolescents are extremely limited and have not been proven effective. The Truth Initiative has created a "This is Quitting" free mobile phone-based texting program tailored for thirteen to twenty four-year-old individuals addicted to nicotine.[16] This program has shown some promise as its evaluation has demonsted that abstinence from vaping among teens who were enrolled was roughly six percent more compared to those not enrolled.[17] However, a program with a success rate of more than six percent will be required to truly address the youth vaping epidemic. School-based programming is also a viable avenue of intervention, however only one program exists and there is limited data to support its efficacy in reducing vape initiation or promoting cessation.[18] **There is currently not a single, randomized controlled trial that has tested the effectiveness of strategies to**

---

[13] Mark Gottlieb, *Lawsuit Demands Juul Fund Treatment for MA Adolescents it Addicted,* PUBLIC HEALTH ADVOCACY INST. (Apr. 29, 2019), https://www.phaionline.org/2019/04/29/lawsuit-demands-juul-fund-treatment-for-the-ma-adolescents-it-addicted/

[14] Carla J. Berg, et al., *A Synthesis of the Literature to Inform Vaping Cessation Interventions for Young Adults*, 119 ADDICTIVE BEHAVIORS 1-28 (2021).

[15] S. Glantz, A. Jeffers, and JP Winickoff, *Nicotine Addiction and Intensity of e-Cigarette Use by Adolescents in the US, 2014 to 2021*. 5 JAMA NETW OPEN. 11 (Nov. 7, 2022).

[16] Truth Initiative, *This is Quitting,* https://truthinitiative.org/thisisquitting (accessed Mar 29, 2023).

[17] Amanda L. Graham, et al., *Effectiveness of a Vaping Cessation Text Message Program Among Young Adult E Cigarette Users: A Randomized Clinical Trial,* 181 JAMA INTERNAL MED. 7, 923-930 (2021).

[18] Truth Initiative, Kaiser Permanente, the American Heart Association, and EVERFI created "Vaping: Know the Truth" an 8th grade through 12th grade four lesson digital curriculum.

**control adolescent vaping use**, according to the attached Affidavit of pediatrician Susanne E. Tanski, M.D., M.P.H., F.A.A.P.[19] She states that, "there is a great need in the field of pediatrics for research to help determine what approaches to cessation are most likely to result in freeing our adolescents from addiction to nicotine."[20]

Pediatrician Rachel Boykan, M.D. states in her attached Affidavit that, "[w]e lack effective evidence-based treatments for this relatively new epidemic, and we are all scrambling to do the best we can to help our patients."[21] Pediatrician Jonathan D. Klein, M.D., M.P.H., F.A.A.P., puts it this way in his attached Affidavit: "A significant challenge in the field is to develop and implement effective cessation practices for adolescents who use e-cigarettes and young adults who became nicotine-dependent while using Juul products when those products dominated the youth market."[22] Pediatrician Karen W. Wilson, M.D., M.P.H. swears in her attached Affidavit that she, "is painfully aware that there is a great need for research to help us develop best practices to help adolescents and young adults who wish to quit."[23]

Public health attorney and e-cigarette scholar, Lauren Kass Lempert, J.D, M.P.H., in her attached Affidavit, discusses the legacy of Juul in today's youth and young adult marketplace. At one time, Juul commanded 75% of the total U.S. e-cigarette market. She notes a June, 2023 report from the Associated Press that there are now more than 5,800 flavored Juul-style products

---

[19] Affidavit of Dr. Suzanne Tanski, Associate Professor of Pediatrics at Dartmouth Hitchcock Medical Center, attached hereto as Exhibit F.
[20] Id.
[21] Affidavit of Dr. Rachel Boykan, Clinical Professor of Pediatrics at Stonybrook University Renaissance School of Medicine attached hereto as Exhibit B.
[22] Affidavit of Dr. Johnathan D. Klein, Associate Vice Chancellor for Research and the Savithri and Samuel Raj Professor of Pediatrics and vice head of Pediatrics at the University of Illinois Chicago attached hereto as Exhibit C.
[23] Affidavit of Dr. Karen M. Wilson, Professor of Pediatrics at the University of Rochester attached hereto as Exhibit G.

on the market and that, "although Juul may no longer be the most popular brand of e-cigarettes in the U.S., it has created a legacy of young adult users who crave replacement products."[24]

Given the inadequacy of available vaping cessation programs for adolescents, Objectors request that $30 million of the proposed Settlement funds be directed to a research-oriented non-profit organization or foundation with a clear charter to support clinical and public health research to better understand e-cigarette addiction among youth and to facilitate evidence-based prevention and treatment programs. The Chief of Addiction Medicine at Boston Children's Hospital, Sharon Levy, M.D., M.P.H., swears in her attached Affidavit that a scientific agenda is needed to best support youth who vape nicotine and that, "[t]his settlement should, in part, contribute to the development of such a scientific agenda.[25]

Among other potential best practices, the non-profit organization or foundation could facilitate research into comparing approaches to individual and group nicotine cessation counseling, telephone quit-line support, intensive nicotine cessation support services, and the provision of nicotine cessation medications. Potentially, the organization would also be able to partner with communities, hospitals, and schools to address the root causes of nicotine use through primary prevention efforts.

Objectors urge the Court to avoid the "dollars only" approach that substantially diminished the potential public health impact of the historic Tobacco Master Settlement Agreement two decades ago.[26] Objectors urge this Court to instead act in accordance with

---

[24] Affidavit of Lauren Kass Lempert, Specialist in the Department of Social and Behavioral Sciences at the University of California San Francisco School of Nursing attached hereto as Exhibit D.

[25] Affidavit of Dr. Sharon J. Levy, Chief, Addiction Medicine at Boston Children's Hospital and Associate Professor in Pediatrics at Harvard Medical School attached hereto as Exhibit E.

[26] Dearell Niemeyer et al., *The 1998 Master Settlement Agreement: A Public Health Opportunity Realized – or lost?* 5 HEALTH PROMOTION PRAC. 3, 21S-32S (2004) (finding that five years after the settlement most states had not committed a significant portion of the funds for tobacco prevention efforts but rather used the money to support other state needs and that tobacco companies continued aggressive marketing efforts to reach youth).

settlements stemming from opioid related litigation, regarded as representing progress over prior public health litigation campaigns, by designating specific funds to be used exclusively for supporting evidence-based and evidence-informed nicotine vaping treatment and prevention programs.[27] The trajectory of the youth vaping crisis could be altered by redirecting funds to support the abatement, mitigation, cessation, reduction, and prevention of the use of nicotine vaping products by adolescents. While no single intervention alone can address the unique characteristics of the youth vaping epidemic,[28] the requested allocation of $30 million of the proposed Settlement to fund the development of effective, evidence-based cessation interventions could save thousands of lives and billions of future healthcare dollars.  The attached affidavits are from extremely distinguished, experienced, and mainstream researchers and clinicians from around the country who are deeply familiar with the public health concerns arising in the litigation. All of these affiants are united in supporting Objectors' opposition to the settlement for the reasons stated herein and offer sworn statements so indicating in Exhibits B-G.

### C.  Attendance at Final Approval Hearing

Pursuant to Section 19 of the Settlement, the *Murphy* Plaintiff Objectors hereby provide notice that their counsel intends to appear at the final approval hearing currently set for August 9, 2023, at 2:00pm.

### IV.  CONCLUSION

The proposed Settlement would simply pay $100 to $500 to individual harmed class members.  It would do nothing to address the public health crisis caused by Juul, or to alleviate

---

[27] Rebecca L. Haffajee, *The Public Health Value of Opioid Litigation*, 48 J. L. MED. ETHICS 2, 279-292 (2020) (recounting the many public health benefits associated with opioid litigation including the fact that courts can act more independently in designating funds for mitigating public health efforts as opposed to other branches of the government more susceptible to political pressures and industry capture).

[28] Nat'l Inst. on Drug Abuse, *The Swiss Cheese Model of Drug Addiction*, NAT'L INST. HEALTH (Sep. 12, 2014), https://nida.nih.gov/videos/swiss-cheese-model-drug-addiction

the enormous physical and financial burden on class members resulting from youth vaping addiction. As such, it is not fundamentally fair, adequate, or reasonable. Objectors respectfully ask that the Court reject it in favor of the model of the opioid litigation and require that $30 million of the proposed Settlement funds to be entrusted to a non-profit organization or foundation clearly chartered to develop and disseminate effective youth vaping cessation interventions.

## V.    EXHIBITS

A.  COMPLAINT IN *MURPHY, ET AL V. JUUL LABS, INC.,* DOCKET NO. 1:19-CV-11755 (D. MASS.)

B.  AFFIDAVIT OF DR. RACHEL BOYKAN, M.D.

C.  AFFIDAVIT OF DR. JONATHAN D. KLEIN, M.D., M.P.H.

D.  AFFIDAVIT OF LAUREN KASS LEMPERT, J.D., M.P.H.

E.  AFFIDAVIT OF DR. SHARON J. LEVY, M.D., M.P.H.

F.  AFFIDAVIT OF DR. SUSANNE E. TANSKI, M.D., M.P.H., F.A.A.P.

G.  AFFIDAVIT OF DR. KAREN M. WILSON, M.D., M.P.H.

H.  IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION: TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE DAN A. POLSTER, UNITED STATES DISTRICT JUDGE 1/8/2018

I.  "EXHIBIT E" FROM OPOID DISTRIBUTORS SETTLEMENT

**EXHIBIT A**

**COMPLAINT -** ***Murphy, et al v. JUUL Labs, Inc.*****, Docket No. 1:19-cv-11755 (D. Mass.)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MATTHEW MURPHY, CADE
BEAUPARLANT, and M., a minor, by his
mother and natural guardian MARIANNE
SAVAGE on behalf of themselves and
those similarly situated,

        Plaintiffs,

v.

JUUL LABS, INC.,

        Defendant.

Civil Action No. _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

*Nature of the Action*

1. Plaintiffs MATTHEW MURPHY, CADE BEAUPARLANT, and M., a minor, by his

   mother and natural guardian MARIANNE SAVAGE (collectively "Plaintiffs") bring

   this class action individually and on behalf of all similarly situated persons ("Class

   Members") who purchased and became daily users of Juul e-cigarettes that were

   designed, manufactured, distributed, marketed, and sold by Defendant, JUUL Labs,

   Inc. ("Juul" or "Defendant"), and the parents and legal guardians of such persons.

   Plaintiffs bring this action for injunctive relief arising out of their injuries caused by

Defendant's wrongful conduct. Defendant's unfair and deceptive trade practices misled Class Members into use of its highly addictive e-cigarette products.

2.  During the time Plaintiffs used Juul e-cigarettes, they were designed, tested, manufactured, marketed, promoted, distributed, and sold by Defendant. Juul e-cigarettes were defective and unreasonably dangerous and should not have been sold to Plaintiffs at any time.

3.  During the time that Plaintiffs used Juul e-cigarettes, Juul Labs committed unfair and deceptive acts and practices, including, but not limited to: (1) breach of the implied warranty of merchantability by manufacturing, selling, and/or distributing Juul e-cigarettes in a defective condition unreasonably dangerous to minors and (2) unfairly designing and marketing its e-cigarettes for use by minors.

4.  Plaintiffs seek injunctive relief from the wrongful conduct alleged in this Complaint, which proximately caused them and Class Members to become regular users of Juul e-cigarettes.

*The Parties*

5.  Plaintiff Matthew Murphy is a resident of Reading, Massachusetts. Mr. Murphy became addicted to Juul e-cigarettes while living in Reading.

6.  Plaintiff Cade Beauparlant is a resident of Newburyport, Massachusetts. Mr. Beauparlant became addicted to Juul e-cigarettes while living in Newburyport.

7.  Plaintiff Marianne Savage is a resident of Bolton, Massachusetts. Her son, M., became addicted to Juul e-cigarettes while living in Bolton.

8.  Plaintiffs assert these claims on behalf of a class (the "Class") of all similarly situated persons in Massachusetts who became regular users of Juul e-cigarettes before the

age of 18, and the parents and legal guardians of such persons. The proposed Class does not include persons who were regular users of conventional cigarettes prior to using Juul e-cigarettes.

9. Defendant Juul Labs, Inc. is a California corporation that conducts business in the Commonwealth of Massachusetts. Juul Labs (and its predecessor corporations PAX Labs, Inc. and Ploom, Inc.) designs, manufactures, markets, distributes, and sells e-cigarettes throughout the United States, including in the Commonwealth of Massachusetts.

*Jurisdiction and Venue*

10. Defendant has done and continues to do business in the Commonwealth of Massachusetts; made contracts to be performed in whole or in part in the Commonwealth; and/or manufactured, tested, sold, offered for sale, supplied e-cigarettes, or placed cigarettes in the stream of commerce, or in the course of business, materially participated with others in so doing; and performed such acts as were intended to and did result in the sale and distribution in the Commonwealth of e-cigarette devices, their components, including but not limited to JUULpods ("pods"), and related products from which the Defendant derived substantial revenue, directly or indirectly.

11. Defendant also caused injury by acts or omissions in the Commonwealth and/or caused injury in the Commonwealth by acts or omissions outside the Commonwealth.

12. This Court has diversity jurisdiction over this case under 28 U.S.C. § 1332 because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

3

*Class Allegations*

13. Matthew Murphy was born in 1999 and resides in Reading, Massachusetts. Mr. Murphy tried his first Juul e-cigarette at the age of 17. Shortly after trying his first Juul e-cigarette, Mr. Murphy became a regular and daily user of Juul e-cigarettes, using one or more Juul "pods" (pre-filled nicotine and flavor cartridges needed to operate a Juul e-cigarette) per day. Mr. Murphy became heavily addicted to nicotine through his use of Juul e-cigarettes and felt a need to use Juul e-cigarettes throughout the day. Mr. Murphy began to experience irritability and aggression as a result of his craving for the product and the high levels of nicotine it delivers. Mr. Murphy's near constant desire to use Juul e-cigarettes disrupted his ability to perform effectively in academic and athletic affairs. Mr. Murphy attempted to quit "Juuling" many times, but would experience severe discomfort each time and would quickly resume using the product. After many quit attempts, Mr. Murphy was finally able to quit using Juul e-cigarettes in June of 2018, roughly two years after he initially became a regular user. Even so, he still craves Juul e-cigarettes when he sees others using them.

14. Cade Beauparlant was born in 2001 and resides in Newburyport, Massachusetts. Mr. Beauparlant was about 16 years old when he began using Juul e-cigarettes. For roughly two years, Mr. Beauparlant used approximately one Juul pod per day, using many of the different flavored nicotine pods sold by Defendant, including "Mint," "Mango," and "Cucumber." Mr. Beauparlant used his Juul e-cigarette many times daily. He regularly used it shortly before he went to sleep and first thing in the morning as well as many times throughout the day. As a high school student, Mr. Beauparlant would regularly leave class to use his Juul surreptitiously in the high school's bathrooms or hallways, finding that he could not sit for the duration of a

4

class without taking a puff. Mr. Beauparlant's addiction to Juul disrupted his academic and athletic performance, but even after recognizing these impacts and wishing to stop his regular daily use of the product, he found that he was unable to. Beginning in roughly January 2019, Mr. Beauparlant has repeatedly attempted to quit using Juul products in multiple ways, including by seeking the advice of a pediatrician who specializes in youth nicotine cessation, using Nicorette gum, "weaning" himself off Juul, and taking part in counseling sessions. Since January 2019, Mr. Beauparlant has succeeded in cutting back on Juuling, but has found it to be extremely difficult to quit and is still regularly using Juul e-cigarettes.

15. Marianne Savage resides in Bolton, Massachusetts. Ms. Savage brings this suit on behalf of her son, M., a minor who is 16 years old and who began using Juul e-cigarettes at about the age of 15. In October of 2018, Ms. Savage found a number of already consumed "mint" and "menthol" flavored Juul "pods" in M.'s possession. Around the same time, Ms. Savage observed that M. was experiencing severe behavioral changes attributable to his addiction to Juul e-cigarettes. Due to this addiction, M. became increasingly angry, irritable, aggressive and anxious. M.'s regular use of Juul products affected his athletic performance and caused him to experience physical problems, including coughing, nausea, and vomiting. Ms. Savage has sought treatment for her son's symptoms, but has been unable to find health care providers who can help M. quit Juuling.

16. At all times relevant to this Complaint, Juul Labs acted willfully or negligently by designing, manufacturing, distributing, selling, and promoting its products in such a

way that was defective compared to available safer alternative designs, and in a manner that was designed and marketed to appeal to minors, including the Plaintiffs.

17. As a consequence of Juul Labs' conduct, Plaintiffs have suffered and/or continue to suffer from increased anxiety stemming from a near-constant desire to use Juul e-cigarettes.

18. Also as a consequence of Juul Labs' conduct, Plaintiffs have repeatedly purchased Juul e-cigarettes in order to maintain product use despite a desire to stop using Juul e-cigarettes regularly and daily.

19. The Class affected by Juul's conduct is estimated to include more than 50,000 minors in Massachusetts who became daily users of Juul e-cigarettes,[1] as well as their parents and young adults who are currently the age of majority who became addicted to e-cigarettes as minors. Due to the size of the Class, joinder of all of its Members would be impracticable.

20. The determination of this matter will rest on essentially the same determinations of law and fact as would be the case for any individual Class Member. Since this is not an action for damages, there is no need for individual determinations of harm, nor are there available defenses based on comparative fault. The questions of law and fact to

---

[1] It is estimated that 68,398 young people ages 14-17 across Massachusetts used e-cigarettes in the past 30 days. This estimate is based on a population of 328,838 14-17 year olds in Massachusetts (according to the 2017 U.S. Census) and the Centers for Disease Control and Prevention's determination that about 20.8% of high school students nationally have used an e-cigarette in the past 30 days. *See* United States Census Bureau, American FactFinder, *Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States, States, Counties, and Puerto Rico Commonwealth and Municipos: April 1, 2010 – July 1, 2017* (2017), https://factfinder.census.gov/bkmk/table/1.0/en/PEP/2017/PEPAGESEX; Centers for Disease Control & Prevention, *Youth and Tobacco Use*, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last updated Feb. 18, 2019). According to Nielsen data, Juul is, by far, the most popular e-cigarette brand, accounting for approximately 68% of the U.S. e-cigarette market in 2018, and a higher proportion of the youth e-cigarette market. See Jennifer Maloney, *Juul Raises $650 Million in Funding That Values E-Cig Startup at $15*, WALL STREET JOURNAL (July 10, 2018), https://www.wsj.com/articles/juul-raises-650-million-in-funding-that-values-e-cig-startup-at-15-billion-1531260832.

be determined are limited to the duties that Defendant owed to consumers of its products, whether Defendant's conduct breached any or all of those duties, and what the appropriate measures are for equitable relief, including providing funding for a statewide e-cigarette prevention and cessation program with a focus on developing best practices to assist Class Members to cease use of e-cigarettes and to prevent relapse.

21. The experiences of the Plaintiffs are representative of the experiences of the tens of thousands of Members of the Class who are struggling with their addiction to Juul e-cigarettes and would like access to resources to help them to quit. The claims or defenses presented by these parties will be typical of those which could be brought by any of the Members of the Class.

22. The Plaintiffs are dedicated to the prosecution of this action and have retained counsel with decades of experience in tobacco product liability and public health litigation. The representative parties are therefore adequate representatives of the Class.

23. The Plaintiffs and the Class meet the requirements of numerosity, commonality, typicality, and adequacy set forth in Fed. R. Civ. P. 23(a), and the Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the Class as a whole, thus satisfying FED. R. CIV. P. 23(b)(2) as well as the requirements of MASS. GEN. LAWS c. 93A.

*Breach of Implied Warranty of Merchantability*

24. Plaintiffs restate and incorporate herein the foregoing paragraphs 1–24 of their Complaint.

25. Defendant breached the implied warranty of merchantability because the Juul e-cigarette products it manufactured, marketed, distributed, and sold are unreasonably dangerous products, which Defendant impliedly warranted were merchantable and fit for the ordinary purposes for which they were intended.

26. Defendant engaged in the business of manufacturing, testing, designing, advertising, marketing, packaging, selling, and/or distributing Juul e-cigarettes, and placing these e-cigarettes into the stream of commerce in Massachusetts.

27. Juul e-cigarettes were expected to, and did, reach Plaintiffs in substantially the same condition they were in when originally manufactured and distributed and sold by Defendant.

28. The Juul e-cigarettes manufactured, sold, and distributed by Defendant to Plaintiffs were defective and unreasonably dangerous for reasons including, but not limited to:

   a. Despite Juul's claims of creating a product for adult smokers seeking to switch from conventional cigarettes, Juul designed its e-cigarettes to yield a physiological response and degree of "satisfaction" exceeding those of even traditional cigarettes.

   b. Juul designed, engineered, patented, and manufactured its e-cigarettes and proprietary vapor liquid to contain a proprietary blend of nicotine salts ("JUULSalts"), which facilitate the delivery of very high concentrations of the addictive chemical, nicotine, while simultaneously mitigating adverse taste and irritation and maintaining palatability, making Juul e-cigarettes particularly attractive and accessible to minors who have never smoked a single conventional

8

cigarette.[2] In its design of JUULSalts, Juul knowingly adopted and further
perfected methods pioneered by the tobacco industry in order to promote
inhalation, reduce throat irritation, and produce the desired nicotine "kick."[3] Juul
e-cigarettes are designed to allow for previously unpalatable concentrations of
nicotine to be inhaled by teens who are naturally sensitive to nicotine, with
negligible irritation or discomfort.[4] This design circumvents teens' natural
defense mechanisms, thereby facilitating exposure to levels of nicotine that
rapidly leads to early and significant nicotine dependence and addiction in
adolescents.[5]

    c.   Many of the design elements that encourage initiation and continued regular use
(*e.g.*, the blending of nicotine salts to increase inhalability and reduce irritation)
also increase the abuse liability (*i.e.*, risk for addiction) for teen use of Juul
products. Juul has designed its product to eliminate sensory feedback, the body's
natural defensive response that would otherwise occur with such a large dose of
nicotine, but for the use of JUULSalts and the design of the electronic delivery
system. By doing so, Juul's design fundamentally and deceptively impairs the
ability of Class Members to identify that they are inhaling something that they

---

[2] See Truth Initiative, *Behind the Explosive Growth of Juul: Social Influences and Flavors Drive Rising Teen Use of the Top E-cigarette* (Dec. 2018), https://truthinitiative.org/sites/default/files/media/files/2019/03/Behind-the-explosive-growth-of-JUUL.pdf.

[3] In U.S. patent No. 9,215,895, Pax Labs, Inc., a predecessor to Juul Labs, describes its process for combining nicotine with benzoic acids to produce nicotine salts (JUULSalts), a formulation that is based on a nicotine salt additive that R.J. Reynolds Tobacco Company developed decades earlier. *See* U.S. Patent No. 9,215,895 (filed Dec. 22, 2015).

[4] See Jessica L. Barrington-Trimis & Adam M. Leventhal, *Adolescents' Use Of "Pod Mod" E-Cigarettes - Urgent Concerns,* 379(12) N. ENGL. J. MED. 1099 (2018).

[5] See Maciej Lukasz Goniewicz et al, *High Exposure To Nicotine Among Adolescents Who Use Juul And Other Vape Pod Systems ('Pods'),* TOBACCO CONTROL (Sept. 2018), https://tobaccocontrol.bmj.com/content/early/2018/08/30/tobaccocontrol-2018-054565.

would not otherwise inhale, fostering and further facilitating initiation of unwanted regular daily product use.

d.  Juul designed, engineered, patented, and manufactured its products to contain especially high concentrations of nicotine, touting a "5% concentration" that is still palatable to such a degree that young users report being able to titrate dosage to achieve a "buzz" without irritation.[6] This 5% concentration of nicotine is approximately three times the maximum nicotine concentration level permitted to be used in e-cigarettes sold in the European Union.[7] Yet recent research demonstrates that the extremely high nicotine concentration reported by Juul and listed on product packaging is, in actuality, likely higher. In one study, researchers found that JUULpods contained a concentration of 6.2% nicotine salt, rather than 5% nicotine as advertised – a relative increase of more than 20%.[8] Other studies have reported even higher actual concentrations of nicotine in JUULpods.[9] Coupled with more benzoic acid to increase inhalability (as described in ¶ 44), Juul e-cigarettes used by Class Members (or their minor children) deliver an absolute concentration of – and form of – nicotine that is unreasonably dangerous, especially to young consumers.

e.  Juul designed the nicotine salt formation of the JUULSalts used in its e-cigarettes to yield a physiological response exceeding those of conventional cigarettes,

---

[6] See Emma I. Brett et al., *A Content Analysis of Juul Discussions on Social Media: Using Reddit to Understand Patterns and Perceptions of Juul Use*, 194 DRUG & ALCOHOL DEPENDENCE 358, 360 (2019).
[7] See European Parliament and the Council of 3 April 2014, *Directive 2014/40/EU*, Section 38. J. OF THE EUR. UNION (2014), https://ec.europa.eu/health//sites/health/files/tobacco/docs/dir_201440_en.pdf.
[8] James F. Pankow et al., *Benzene Formation in Electronic Cigarettes*, 12.3 PLOS ONE e0173055 (2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0173055
[9] See, e.g., Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, NICOTINE & TOBACCO RES. (2018), https://academic.oup.com/ntr/advance-article/doi/10.1093/ntr/nty221/5139734

thereby increasing the potential for addiction and other adverse health effects as compared to traditional cigarettes.[10] Juul e-cigarettes deliver levels of nicotine higher than that of conventional cigarettes.[11] Research has shown that a puff from a Juul will contain a third more nicotine than a puff from the leading conventional cigarette, Marlboro.[12] These design features contribute to the dosage and rate of administration of nicotine from Juul e-cigarettes exceeding those of conventional cigarettes.

 f. The design of the Juul e-cigarette system including the disposable pods ("JUULPods") containing the nicotine solution and the electronics that aerosolize and administer the drug have a fundamental impact on the dosage of nicotine and titration of the dosage. Juul's design controls the temperature, the duration of a puff, the airflow of the puff, and, obviously, the content of the pods to precisely determine the amount of nicotine that the product delivers to users. In one patent application, Juul e-cigarette designers describe such control over dosage: "A device that is part of a vaporizer system as defined above can be used for any of one or more functions, such as controlling dosing (*e.g.* dose monitoring, dose setting, dose limiting, user tracking, etc.), . . ."[13] In contrast to a conventional

---

[10] See U.S. Patent 9,215,895 (filed Dec. 22, 2015). The patent's description states that "certain nicotine salt formulations provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette. The satisfaction effect is consistent with an efficient transfer of nicotine to the lungs of an individual and a rapid rise of nicotine absorption in the plasma. . . . [T]he peak concentration of the nicotine in the blood and total amount of nicotine delivered [from nicotine salt formulations] appears comparable to a traditional cigarette. . . . Nicotine from a nicotine salts formulation appears to generate a heartbeat that is nearly 1.2 times that of a normal heart rate for an individual approximately 40 seconds after the commencement of puffing; whereas the nicotine from a nicotine freebase formulation appears to generate a heartbeat that is nearly 1.2 times that of a normal heart rate for an individual approximately 110 seconds after the commencement of puffing. Id. at col. 7-8, 24.

[11] See Reilly et al., *supra* note 9.

[12] See id.

[13] U.S. Patent Application No. 15/827,159 (filed 2017), Publication No. 2018/0093054 Al (published April 5, 2018).

cigarette, which will self-extinguish as the cigarette is consumed, Juul devices

contain no "off" switch, allowing for and encouraging nonstop nicotine

consumption only limited by the device's rechargeable battery capacity. In

contrast to a cigarette smoker who needs to individually light 20 cigarettes with a

match or lighter to initiate combustion in order to consume a pack, a Juul user can

puff frequently and almost continuously from the device until it needs to be

recharged. This design programs the brain to require frequent dosing in a way that

conventional cigarettes do not.

g. Juul also designed, engineered, patented, and manufactured its vapor liquids to

contain chemical flavorings, which have been found to serve as a primary reason

for youth initiation of e-cigarette use. Sweet flavors (including "Mango," "Fruit

Medley," "Crème Brulee," and "Cucumber"), as well as its menthol-derived

flavors ("mint," "cool mint," and "classic menthol"), cater to the preferences of

non-smoking minors, whose palates are innately averse to the harsh, bitter taste of

unflavored nicotine products and whose brains are particularly susceptible to the

appeal of sweet tastes.[14] These flavors allow for the initiation of e-cigarette use

among minors, as well as rapid, continuous use of e-cigarettes, leading to

unwanted regular and daily use of these Juul e-cigarettes.[15] In one national

survey, more than 80 percent of youth e-cigarette users said they used e-cigarettes

---

[14] See, e.g., Melissa B. Harrell et al., *Flavored E-cigarette Use: Characterizing Youth, Young Adult, and Adult Users*, 5 PREVENTIVE MED. REP. 33 (2017); Suchitra Krishnan-Sarin et al., *Studying the Interactive Effects of Menthol and Nicotine Among Youth: An Examination Using E-cigarette*, 180 DRUG & ALCOHOL DEPENDENCE 193 (2017); Meghan E. Morean et al., *Preferring More E-Cigarette Flavors Is Associated With E-Cigarette Use Frequency Among Adolescents But Not Adults*, 13(1) PLOS ONE e0189015 (2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0189015.
[15] See Erin L. Mead et al., *E-Cigarette Palatability in Smokers as a Function of Flavorings, Nicotine Content and Propylthiouracil (PROP) Taster phenotype*, 91 ADDICT. BEHAV. 37 (2019).

12

"because they come in flavors I like," and the vast majority reported that they

used a flavored e-cigarette product the first time that they tried vaping.[16]

h.  Juul designed, engineered, patented, and manufactured its e-cigarettes effectively

   to deliver concentrations of nicotine with an unreasonably high abuse liability that

   would foreseeably lead to unwanted regular and daily product use by Class

   Members. Decades of medical research have demonstrated that adolescents are

   particularly vulnerable to nicotine addiction.[17] Nicotine can permanently alter

   children's and adolescents' brain chemistry, with long-term impacts on young

   people's physical and mental health.[18]

i.  Juul e-cigarettes have such a high abuse liability for teens that the increase in

   adolescent vaping in one year alone corresponded to the "largest ever recorded

   [increase] . . . for any adolescent substance use outcome in the U.S."[19] Thus, since

   coming into the market in 2015, Juul has reversed nearly two decades of reduction

   in teenage nicotine addiction, increasing the prevalence of teenage nicotine use to

---

[16] See Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314(17) JAMA 1871 (2015); see also Karma McKelvey et al., *Adolescents' and Young Adults' Use and Perceptions of Pod-Based Electronic Cigarettes*, 1.6 JAMA NETWORK OPEN e183535 (2018).

[17] See, e.g., Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013).

[18] See Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortex Neuronal Network Function*, 2(12) COLD SPRING HARBOR PERSPECTIVES IN MED. a012120 (2012), http://perspectivesinmedicine.cshlp.org/content/2/12/a012120.full; Menglu Yuan et al., *Nicotine and the Adolescent Brain*, 593(16) J. PHYSIOL. 3397 (2015); Yael Abreu-Villaça et al., *Nicotine Is A Neurotoxin In The Adolescent Brain: Critical Periods, Patterns Of Exposure, Regional Selectivity, And Dose Thresholds For Macromolecular Alterations*, 979(1-2) BRAIN RES. 114 (2003); Danielle S. Counotte et al., *Development Of The Motivational System During Adolescence, And Its Sensitivity To Disruption By Nicotine*, 1(4) DEV. COGNITIVE NEUROSCIENCE 430 (2011). See also Surgeon General of the United States, *Know the Risks: E-cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.htm; Erin Brodwin, *Experts Are Calling Out A Vape Pen With 'Scary' Nicotine Levels That Teens Love — Here's How It Affects The Brain*, BUSINESS INSIDER, (Apr. 19, 2018) (citing Francesco Musso et al., *Smoking Impacts On Prefrontal Attentional Network Function In Young Adult Brains*, 191(1) PSYCHOPHARMACOLOGY 159 (2007).

[19] Richard Miech et al., *Adolescent Vaping And Nicotine Use In 2017–2018 — U.S. National Estimates*, 380(2) N. ENGL. J. MED. 192 (2019) (emphasis added).

levels not seen since the early 2000s.[20] Because of Juul's conduct, youth nicotine addiction is once again an epidemic and has had a profound impact on Plaintiffs.

j.     There is strong emerging evidence that the Juul's high abuse liability for youth may result in minors' subsequent initiation of smoking conventional cigarettes[21] or that minors who regularly use Juul e-cigarettes may be more likely to use other substances of abuse.[22] Adolescent addiction to nicotine through Juuling permanently increases risk for other addictions. Class Members who first became regularly exposed to nicotine through Juul e-cigarettes, face increased health risks as a consequence, including those associated with conventional cigarette use, and therefore desire opportunities to effectively treat the resulting dependence.

29.   Juul's e-cigarettes were intentionally designed to deliver very high doses of nicotine with each puff. When Juul was introduced to the market in 2015, most nicotine solutions for e-cigarettes were in the 1-2% concentration range, with 3% as the upper limit offered for already heavily addicted smokers.[23] Each "pod" used to operate a Juul device (and sold by Defendant) delivers to the user as much nicotine as one or two packs of cigarettes. The defective and dangerous nature of Juul's e-cigarettes, along with deceptive and misleading marketing and advertising strategies, results in

---

[20] See Centers For Disease Control and Prevention, *Surgeon General's Advisory on E-Cigarette Use Among Youth. U.S. Centers for Disease Control and Prevention* (Apr. 9, 2019), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory/index.html.

[21] See Brian A. Primack et al., *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, 131(4) AM J. MED. 443.e1 (2019).

[22] See, e.g., Eric R. Kandel & Denise B. Kandel, *A Molecular Basis for Nicotine as a Gateway Drug*. 371 NEW ENG. J. MED. 932 (2014).

[23] Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL And The High-Nicotine Product Market*, TOBACCO CONTROL (Feb. 6, 2019), https://tobaccocontrol.bmj.com/content/early/2019/01/31/tobaccocontrol-2018-054796.full.

14

an intentionally designed product that would foreseeably be used by persons under
the age of 18 and that many of those users would become nicotine dependent. .

30. Juul knew or, by the exercise of reasonable care, should have known that Juul's
products under ordinary use were harmful or injurious, particularly to young people,
including Class Members. Nicotine has long been shown to be harmful to minors,
altering brain chemistry and causing addiction. Nevertheless, as described herein,
Juul designed and manufactured its products to deliver extremely high levels of
nicotine and optimized its products through engineering for use by minors, blatantly
ignoring evidence of the harmful impact that nicotine has on population health. Juul
additionally encouraged young people to buy and use its products, by methods such
as designing fruit, mint, and candy-flavored JUULpods, reducing the irritability of its
nicotine delivery system, and by designing sleek devices that appeal to tech-savvy
youth.

31. Juul has become the e-cigarette industry leader, dominating the e-cigarette market and
expanding the size of the e-cigarette market by cultivating a vast number of users who
are under the age of 18. In fact, 15-17 year-olds have more than 16 times greater odds
of reporting current use of Juul than do 18-24 year-olds[24] In 2018, the nation's
leading tobacco company Altria (parent of Philip Morris) acquired a 35% stake in
Juul for $12.8 billion, giving Juul a valuation of $35 billion and providing Altria with
potential special access to market to a new generation of non-smoking consumers
whom Juul has groomed and captured.

---

[24] Donna M. Vallone et al., *Prevalence And Correlates Of JUUL Use Among A National Sample Of Youth And Young Adults*, TOBACCO CONTROL (2018), https://tobaccocontrol.bmj.com/content/early/2018/10/30/tobaccocontrol-2018-054693.full.

32. Juul, through the sale and marketing of Juul products, impliedly warranted that Juul e-cigarettes were fit for their intended purposes.

33. At all times relevant to this Complaint, Class Members used the e-cigarettes manufactured, sold, and distributed by Juul in substantially the same manner in which Juul intended and expected such e-cigarettes to be used.

34. As a proximate result of Juul Labs' breach of warranty, Class Members have suffered injury, including, but not limited to, addiction to nicotine and the risk of the physiological and psychological harms associated with unwanted daily use of Juul e-cigarettes.

35. Juul marketed a dangerous product that never should have been sold to the Plaintiffs and the Class when, even for age appropriate users, there were available safer alternatives, e.g., such as e-cigarette products that already existed on the market that were not designed to maximize inhalation of high doses of nicotine and minimize irritation, ergo, not designed to create addiction.

*Marketing to Minors*

36. Plaintiffs restate and incorporate herein the foregoing paragraphs 1–35 of their Complaint.

37. Juul owed Class Members a duty to exercise reasonable care in the design, development, marketing, promotion, packaging, sale, and/or distribution of Juul e-cigarettes.

38. Juul failed to exercise reasonable care in the design and development of its products, and in the marketing and promotion of its products to minors.

16

39. Juul willfully and purposefully designed products specifically to appeal to minors as consumers, including by designing its e-cigarettes in such a way as to entice non-smoking minors to begin using its products and to facilitate ease of use by minors once nicotine addiction is established. These design features include but are not limited to: the design of the delivery device made to promote surreptitious consumption, which particularly appeals to the use of e-cigarettes by prohibited consumers such as minors; and the use of flavored vapor liquids which cater to the tastes of minors and allows for deeper inhalation of the product.

40. Juul breached the duty of care it owed to minors in its design of Juul e-cigarettes, including, but not limited to, the following breaches:

a. Juul designed its e-cigarettes to be compact, sleek, and high tech – a design that appeals to tech-savvy minors and makes the product appear to young audiences like a harmless, fun accessory.[25] For example, each Juul device's aluminum shell contains small lights that not only indicate battery power and product delivery when puffing, but also contains a hidden element in the design known by video game players as an "Easter Egg." This is an undocumented special feature designed for social use whereby after the user takes a puff, she can quickly wave the device around to create a rainbow of flashing colors.[26] A "cool" hidden feature such as "party mode" would foreseeably appeal particularly to adolescent consumers.

---

[25] Ramakanth Kavuluru et al., *On the Popularity of the USB Flash Drive-Shaped Electronic Cigarette Juul*, 28(1) TOBACCO CONTROL 110 (2019).
[26] John Hos, *Getting Your Juul Into Party Mode*, VAPE DRIVE (July 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode/

b.  As described in ¶ 28, Juul designed its vapor liquids to appeal to the preferences
of non-smoking minors, including by reducing any harsh flavors inherent to
nicotine solutions that may be unappealing to non-smokers and by intentionally
adding sweet flavors (such as "Mango," "Fruit," and "Crème Brulee") that appeal
to youth. These flavors enhance and encourage youth initiation of e-cigarette use,
with the overwhelming majority of young users reporting that their first use of an
e-cigarette was with a flavored product.[27]

c.  Flavors not only facilitate youth initiation by appealing to children's innate
attraction to sweets, but flavors such as "mint" also use menthol, a drug that
produces a cooling and numbing effect that allows for deeper inhalation[28] and
encourages continued use of e-cigarettes by minors, when compared with
unflavored or tobacco-flavored e-cigarette products.[29] Mint and menthol flavoring
has been used to enhance the palatability of tobacco products, such as Newport
and Salem cigarettes, for decades as a means to facilitate initiation.  Chemically,
Juul uses menthol as one means to engineer its pods to increase palatability by
suppressing the cough reflex that nicotine naïve users would normally experience
when administered a very high dose of nicotine such as that found in Juul. This is
similar to the use of menthol in cough suppressants on the market such as Halls,
Ricola, Cēpacol, as well as the topical cough suppressant, Vicks VapoRub.
Although established smokers have already developed a tolerance for inhaling
nicotine, this manipulation deliberately enables non-smokers to begin using Juul

---

[27] See Harrell et al., *supra* note 14.
[28] See Krishnan-Sarin et al., *supra* note 14.
[29] See Morean et al., *supra* note 14.

18

e-cigarettes without the harshness or irritation otherwise associated with inhaling such a large dose of nicotine.

d. Sweet flavors such as Juul's "Mango" and "Crème Brulee" rely on the efficacy of sucrose as an analgesic which is effective for youth but, interestingly, not adults. Research has shown that children experience a latency to perception of pain and greater pain tolerance when exposed to sweet tastes, a phenomenon that does not seem to apply to adults.[30] As with "Mint," sweet flavors increase palatability, especially for underage nicotine naïve users of Juul e-cigarettes.

e. Juul designed the physical structure of its e-cigarettes to encourage minors' continued use, thereby facilitating the process whereby minors and Class Members become regular users who are nicotine-dependent. For instance, the compact and concealable design of Juul e-cigarettes may be mistaken for a USB drive, enabling minors to carry and use the product discreetly. (See Figure 1: Juul vs. USB Drive). This discreet design allows for use in schools and dormitories, at home, and in other spaces where smoking and/or vaping may be prohibited. With this ability for discreet use comes the propensity for continuous – and thus generally increased – use of Juul e-cigarettes, as the product can be used

---

[30] Yanina M. Pepino & Julie A. Mennella, *Sucrose-Induced Analgesia Is Related To Sweet Preferences In Children But Not Adults*, 119(1-3) PAIN, 210 (2005).

19

inconspicuously in a wide variety of settings, including those where teachers, parents, and other adults may disapprove of use.



Figure 1
Juul Device (left) vs. Samsung DUO USB Drive (right)

f.  Despite Juul's current assertions that it designed and marketed a cessation device (despite never preparing or submitting an application with the U.S. Food and Drug Administration ("FDA") for either a therapeutic or modified risk tobacco product approval), the evidence demonstrates that Juul intended to design and market an attractive and sophisticated product for tech-savvy youth, not a smoking cessation aid. In 2015, one of Juul's research and development engineers made this quite clear when he stated: "We don't think a lot about addiction here because *we're not trying to design a cessation product* at all . . . . [A]nything about health is not on our mind."[31] (emphasis added).

41. Juul promoted its product to appeal to minors as consumers. Juul has used social media marketing campaigns to target teenagers and young adults. These social media advertisements frequently depict young, attractive, and smiling models holding and/or using Juul's e-cigarettes and serve an obvious purpose of attracting youth, including minors, to purchase the products. These marketing activities were maintained from 2015 to 2018.

---

[31] Nitasha Tiku, *Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette*, THE VERGE (Apr. 21, 2015), https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul.

42. When Juul launched its e-cigarette products in June of 2015, it held a launch party to promote its products in New York City. Promotional photographs from the event reveal a number of young looking attendees/invitees using Juul e-cigarettes. (See Figure 2). These Juul users are emblematic of the youth market that the company was seeking to entice when the product became available.





Figure 2
Juul Launch Party, June 2015

21

43. Juul also breached the duty of care it owed to minors in its marketing and distribution
of Juul e-cigarettes, including, but not limited to, the following breaches:

    a.   Since its products launched in 2015, Juul has used social media marketing
campaigns to target teenagers and young adults, despite its more recent claim that
its products are designed to be used by cigarette smokers seeking to switch from
conventional cigarettes. These social media advertisements frequently depicted
young, attractive, and smiling models holding and/or using Juul e-cigarettes, and
serve the obvious purpose of attracting young people, including minors, to
purchase Juul products.[32] As Juul's chief marketing officer, Richard Mumby
explained in an interview: in contrast to other marketing campaigns that may be
"overtly reliant on just the product," Juul's marketing features 20- and 30-
somethings using the product while dressed for a night out – a design that Juul
hoped would have a "dynamic energy."[33] Juul's marketing communicated to
young people that using Juul e-cigarettes is fun, sleek, and stylish – a "status
symbol" – while failing to disclose the nature or risks of using Juul products.

    b.   In 2015, Juul marketed the release of its product with the "Vaporized" campaign –
a campaign that employed young, models posing with the Juul e-cigarette.
"Smoking Evolved," was a phrase that implied a safer alternative to smoking that
would be likely to appeal to young non-smokers, including Class members. (See
Figure 3).

---

[32] See Jidong Huang, et al., *Vaping Versus JUULing: How the Extraordinary Growth and Marketing of JUUL Transformed the U.S. Retail E-cigarette Market*, 28(2) TOBACCO CONTROL 146 (2019); Kar-Hai Chu et al., *JUUL: Spreading Online and Offline*, 63(5) J. ADOLESCENT HEALTH 582 (2018).
[33] Declan Harty, *Juul Hopes To Reinvent E-Cigarette Ads With 'Vaporized' Campaign*, AD AGE (June 23, 2015), https://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142.



Figure 3
Juul "Vaporized" Campaign

    c.   The campaign included, among other elements, substantial social media pushes
(accounting for 74% of all e-cigarette smartphone advertising that year), a
billboard in Times Square, a prominent spread in *Vice* magazine, and a series of
pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons – activities
that would have been prohibited by law for a conventional cigarette company.[34]
The marketing consultant that Juul used for the "Vaporized" campaign, Cult
Collective, explained: "We created ridiculous enthusiasm for the hashtag
'Vaporized,' and deployed rich experiential activations and a brand sponsorship
strategy that aligned perfectly with those we knew would be *our best
customers*."[35] (emphasis added).

    d.   Juul additionally emphasized the tech-savvy and sleek design of its products in its
marketing, capturing the look and feel of Apple, Google, Samsung, and other tech

---

[34] Robert K. Jackler et al., *JUUL Advertising Over its First Three Years on the Market*, Stanford Research Into the
Impact of Tobacco Advertising, Stanford University School of Medicine (Jan. 31, 2019),
http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[35] Cult Ideas, *Juul: Launching A New Product To A Competitive Category*,
https://web.archive.org/web/20180828001349/http://cultideas.com/case-study/juul) (accessed Aug. 13, 2019).

giants. Juul even featured language directly comparing its device to Apple's
iPhone, stating on its website (quoting a review) that Juul is "the iPhone of e-
cigarettes."

e.  Juul has also emphasized its flavored pods in marketing campaigns, a move that
directly appeals to the youth market. When youth see e-cigarette ads that
emphasize flavors, they believe that the advertisements and products are intended
for them. Juul equated its "Crème Brulee" flavored pods to dessert by using the
advertising tag line "save room for Juul" and "indulge in dessert without the
spoon."[36]

f.  On social media, Juul has used both paid social media "influencers" and
celebrities to promote its products, while also using what is known as "hashtag
marketing" campaigns to encourage social media users to generate content that
amplifies Juul's marketing efforts. Through each of these strategies, Juul has been
able to create a viral marketing campaign that reaches young people and has
become self-sustaining, advertising Juul products without Juul itself posting on
social media. In 2017, there was a significant increase in Juul-related tweets using
the Twitter platform, and Juul managed to generate over 300,000 social media
posts that featured the hashtag, "#JUUL."[37] Although Juul ceased marketing on
social media platforms in 2018, the "#JUUL" branded hashtag continues to spread
and is used by young Juul users across popular social media platforms.

---

[36] See Karma McKelvey et al., *Youth Say Ads For Flavored E-Liquids Are For Them*, ADDICT. 91 BEHAV. 164 (2019).
[37] Jackler, *supra* note 34, at 23.

g.  By marketing its products as an "alternative" to cigarettes, Juul created a
    perception that its products are less addictive and less dangerous than cigarettes
    and other tobacco products.  While such marketing implied a low-risk product,
    Juul failed to disclose to its potential consumers the uniquely addictive impact of
    Juul's proprietary vaporizer and high concentration nicotine salts, as well as the
    health effects that product use could have for young people's lung, heart, and
    brain health.[38]

h.  In 2018, the FDA voiced statements of concern by regarding rising rates of youth
    addiction to Juul e-cigarettes, effectively forcing Juul to change its marketing
    strategies, at which point Juul shut down its social media accounts and largely
    abandoned its use of eye-catching graphics of young, glamorous models for more
    neutral photos of older models (including, in some cases, users' ages in the
    advertisements). It was only after being repeatedly threatened with further
    regulation by the FDA, however, that Juul changed it marketing campaigns to
    actually focus on adult smokers switching from traditional cigarettes (*e.g.*, "the
    SWITCH campaign") and began to use older models and less enticing graphics in
    its marketing. Regardless of these recent changes, Juul's actions have left an
    epidemic of youth vaping in its wake that must be addressed.[39]

i.  Juul's attempts to distance itself from its wrongful conduct are merely superficial.
    Juul has not fundamentally changed the design of its products, which are still
    highly addictive and engineered and distributed in such a way as to appeal to and

---

[38] See Esther E. Omaiye et al., *Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations*, BIORXIV (Dec. 2018), available at:
https://www.biorxiv.org/content/biorxiv/early/2018/12/09/490607.full.pdf.
[39] See *Surgeon General's Advisory on E-Cigarette Use Among Youth*, *supra* note 20.

25

to addict young, non-smokers. Juul's business model remains the same despite its recent public relations campaign. This campaign has no impact on Class Members, who are still struggling with nicotine dependence brought on by Juul use as minors.

j.   Although Juul currently markets its product as a smoking cessation device, it has not received FDA approval to market it as a modified risk tobacco product or as a nicotine replacement therapy. This practice falsely reassures Class Members, with the fraudulent notion that the product is safe.[40]

44. Juul's founders and current leaders learned directly from decades of tobacco industry research about how to manipulate nicotine to maximize addiction and how to market tobacco products to youth – the population that the tobacco industry regarded as the "base" of its business[41] and famously courted as "replacement smokers."[42] In fact, Juul's founders have indicated that they had accessed many of the thousands of tobacco industry documents that were made public in the 1990s, using these documents (and knowledge of subsequent regulation of the industry) to craft a blueprint for Juul's success. As one of Juul's co-founders admitted in an interview, "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up . . . to a huge, huge industry in no time. And then we started

---

[40] The U.S. Court of Appeals for the D.C. Circuit ruled that the FDA must approve e-cigarettes when they are "therapeutically marketed," since then such products would fall under the jurisdiction of the drug/device provisions of the Federal Food, Drug, and Cosmetic Act (FDCA). See Sottera Inc. v. Food and Drug Administration, 627 F. 3d 891 (U.S. App. DC 2010).

[41] Achey TL, Lorillard, *Product Information*, RJ Reynolds Records (Aug. 30, 1978), https://www.industrydocuments.ucsf.edu/docs/hrpk0094.

[42] Unknown. *Younger Adult Smokers: Strategies and Opportunities*, Marketing to Minorities, Military, and Gays MSA Collection (Feb. 29, 1984), https://www.industrydocuments.ucsf.edu/docs/rkvk0045.

building prototypes."[43] Like the tobacco industry before it, Juul recreated the  tobacco industry's well-honed methods to seduce new underage users, using a combination of flavors, nicotine manipulation, and sophisticated marketing to exploit the psychological vulnerabilities of adolescents and addict a new generation to grow its market. In July, 2019 Congressional testimony, that same co-founder sought to explain that he and his colleague actually had pored through the Stanford University archive of tobacco industry advertising "to familiarize ourselves with how not to run a business."[44] Yet Juul advertisements and package designs bore such a remarkable similarity to those used by cigarette manufactures that Philip Morris International legally challenged the similarity of the original Juul logo to the famous Marlboro logo. (See Figure 4).



Figure 4:
Similarities between Marlboro and Juul Designs[45]

[43] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND (Jan. 2015) https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.
[44] Testimony of James Monsees Before the House Committee on Oversight and Reforms Subcommittee on Economic and Consumer Policy's Hearing, *Examining JUUL's Role in the Youth Nicotine Epidemic: Part II*, YOUTUBE (July 25, 2019), https://youtu.be/xetCY0jEPAs?t=5460, Timestamp 1:31.
[45] Robert K. Jackler, *The Role Of The Company In The JUUL Teen Epidemic: Testimony For House Subcommittee On Economic And Consumer Policy:* Testimony for House Subcommittee on Economic and Consumer Policy (July

45. In addition to tobacco industry advertising, Juul's co-founders researched historical
cigarette company patents. These patents provided Juul with approaches to
manipulate the pH of its nicotine solution to reduce irritation caused by inhalation
while maximizing nicotine delivery to the user. By using benzoic acids to lower the
solution's pH to less than 6.0, Juul's vapor liquid reduces the irritation and cough
reflex that users would otherwise experience when vaping such a high nicotine
solution and reduces the freebase nicotine delivery that previous designs of e-
cigarettes used. This new design, nicotine salts, made it easier for non-smokers to
initiate and continue vaping with Juul products without experiencing negative side
effects such as coughing and throat or lung irritation.[46] This ability to deliver high
doses of nicotine that were never before possible without severe irritation is what sets
Juul apart from all prior e-cigarette designs and what gives the product its high abuse
liability, particularly for Class Members.

46. Through these numerous design elements, Juul engineered its product for non-
smokers who were not already tolerant of the nicotine inhalation discomfort to which
addicted cigarette smokers are already acclimated, thus encouraging initiation,
dependence, and addiction.

47. James Monsees, one of the co-founders of Juul, does not hide the ways in which Juul
has derived inspiration from the tobacco industry. He has described conventional
cigarettes as "the most successful consumer product of all time . . . an amazing

---

24, 2019), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

[46] See J.H. Lauterbach, *One More Time: Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There?*,
TOBACCO SCIENCE RESEARCH CONFERENCE (2018),
https://www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf; Anna K. Duell et al., *Free-Base
Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31(6) CHEM. RES. TOXICOL. 431,
431 (2018).

product."[47] With a focus on recreating the "ritual and elegance that smoking once exemplified," he and his fellow cofounder set out to capture consumers who were not users of conventional cigarettes.[48]

48. As a proximate result of Juul Labs' deliberate and deceptive design and marketing, Class Members have suffered injury, including, but not limited to, discomfort and cravings as a consequence of using Juul e-cigarettes.

*Violations of MASS. GEN. LAWS ch. 93A, §§ 2, 9*

49. Plaintiffs restate and incorporate herein the foregoing paragraphs 1–48 of their Complaint.

50. Juul Labs has committed unfair and deceptive acts and practices in violation of Massachusetts' Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2(a) and regulations promulgated thereunder. These violations include, but are not limited to, Defendant's breach of the implied warranty of merchantability, in violation of MASS. GEN. LAWS ch. 93A § 2, by manufacturing, selling and/or distributing Juul e-cigarettes in a defective condition unreasonably dangerous to users and consumers, including Members of the Class, because such e-cigarettes delivered nicotine in a form which induced physiological response and "satisfaction" well in excess of that of a conventional cigarette, when a safer alternative design was available.

51. Defendant also violated Massachusetts' Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2 by engaging in oppressive or otherwise unconscionable business

---

[47] Montoya, *supra* note 43.
[48] Shanelle Mullin, *Start Your Own Revolution: An Interview with James Monsees*, ONBOARDLY (Apr. 30, 2014), https://web.archive.org/web/20161108110231/http://onboardly.com/entrepreneur-interviews/an-interview-with-james-monsees.

practices, including and especially designing and marketing its products to appeal to minors as consumers.

52. Plaintiffs are entitled to bring this action as a class under MASS. GEN. LAWS ch. 93A § 9, as Juul's unfair and deceptive acts or practices caused similar injury to Plaintiffs and others similarly situated across the Commonwealth of Massachusetts.

53. By letter dated April 29, 2019, Plaintiffs sent a demand for relief to Defendant Juul Labs, in accordance with MASS. GEN. LAWS ch. 93A § 9(3). Defendant did not respond to Plaintiffs' demand for relief by making a written tender of settlement reasonable for the injuries suffered by the Class.

54. As a proximate result of the Defendant's violations of 93A, the Plaintiffs and the Members of the Class have suffered injury, including addiction to nicotine, and are entitled under MASS. GEN. LAWS ch. § 9 to the relief sought in the Complaint.

55. Class Members who are addicted to Juul e-cigarettes struggle to find health care providers who can help them quit Juuling.[49] Even medical providers who specialize in addiction or tobacco cessation report that they are currently ill-equipped to help young people who want to quit the use of Juul products and end their addiction to nicotine.[50]

*Prayer for Relief*

The Plaintiffs and the Class respectfully pray that the Court enter judgment against Defendant:

---

[49] See, e.g., Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have No Clear Path to Quitting*, NEW YORK TIMES (Dec. 19, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.
[50] Jamie Ducharme, *As Kids Get Hooked on Vaping, Parents Are Desperate for Treatment That Doesn't Exist*, TIME MAGAZINE (Mar. 21, 2019), https://time.com/5549340/vaping-addiction-treatment/.

A. Enjoining Defendant from continuing its unfair and deceptive acts and practices, and mandating that it provide adequate funding to establish an independent statewide clinical treatment and research program in the Commonwealth of Massachusetts for the prevention and treatment of nicotine addiction in young persons who use Juul e-cigarettes.[51]

B. Such an e-cigarette prevention and treatment program would offer medical services including, but not limited to:

1) Age-appropriate individual and group nicotine cessation counseling;

2) Promising behavior therapies and technologies;

3) Intensive nicotine cessation support services; and

4) The provision of nicotine cessation medications.

C. The statewide program would additionally engage in clinical and public health research to evaluate the evidence base on youth e-cigarette use and treatment and to develop and establish best practices for prevention and treatment programs for addiction to e-cigarette-based nicotine.

D. Grant such other and further relief as is just and proper.

Respectfully submitted,

Andrew A. Rainer, BBO #542067
Meredith K. Lever, BBO #691953
Juliana Shulman-Laniel, BBO #704165
Mark A. Gottlieb, BBO #627008

---

[51] Such relief is appropriate in this context, as it was in *Scott v. Am. Tobacco Co.*, 36 So. 3d 1046 (La. Ct. App. 2010), a class action brought against tobacco companies in which the court granted injunctive relief in the form of the establishment of a comprehensive cessation assistance program.

31

Case 1:19-cv-11755   Document 1   Filed 08/15/19   Page 32 of 32

Public Health Advocacy Institute
360 Huntington Avenue, #117CU
Boston, MA 02115
(617) 373-8066
arainer@phaionline.org
meredith@phaionline.org
juliana@phaionline.org
mark@phaionline.org

Dated August 15, 2019

**EXHIBIT B**

**AFFIDAVIT OF DR. RACHEL BOYKAN, M.D.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 2913 |
| | **PLAINTIFFS' OBJECTION TO PROPOSED *JUUL* CLASS ACTION SETTLEMENT AGREEMENT** |
| | The Hon. William H. Orrick |

### AFFIDAVIT OF DR. RACHEL BOYKAN, M.D.

I, Rachel Boykan, swear that the following are all true statements of facts and accurately represent my opinions.

I am a pediatric hospitalist and Associate Residency Director for the Stony Brook Children's Hospital Pediatric Residency Program where I am also Clinical Professor of Pediatrics. My office is located at HSC T 11-060, Stony Brook University Renaissance School of Medicine, Stony Brook, New York. I am a member of the American Academy of Pediatrics (AAP) Tobacco Consortium and serve as the Chair of the Executive Committee of the AAP's Section on Nicotine and Tobacco Prevention and Treatment.

My research has focused largely on adolescent use of tobacco products, including Juul e-cigarettes. For example, in 2018 my co-authors and I published "High exposure to nicotine among adolescents who use Juul and other vape pod systems ('pods')" in *Tobacco Control* and in 2019 we published "Evidence of Nicotine Dependence in Adolescents Who Use Juul and Similar Pod Devices" ( I*nternational Journal of Environmental Research and Public Health*) and  "Self-Reported Use of Tobacco, E-cigarettes, and Marijuana Versus Urinary Biomarkers" (*Pediatrics*). With this work we were among the first to demonstrate the high levels of a nicotine metabolite, cotinine, found in the urine of adolescents using high-nicotine content devices such as Juul. Subsequent work has corroborated the highly addictive nature of Juul e-cigarettes.

As a clinician, I have seen first-hand how hard it is for adolescents to stop using high nicotine content e-cigarettes such as Juul, and I have been struck by how many have tried to quit - unsuccessfully. We lack effective evidence-based treatments for this relatively new epidemic, and we are all scrambling to do the best we can to help our patients.

1

It is with this background that I strongly support the objection to the Juul Class Action Settlement Agreement. Juul e-cigarettes have had a profound impact on a generation of adolescents who came of age as Juul grew the youth market.  A relatively small monetary payment as the sole relief in the proposed settlement essentially abandons the many young people who became nicotine dependent by using Juul products and need help to finally achieve cessation.

My research and observations as a pediatrician have confirmed that adolescent vaping of nicotine is a public health problem that requires a real public health response.  Making resources meaningfully available to help these young people quit is needed for this to be a fair settlement.  The small monetary relief proposed in the class action settlement completely fails in that regard and, therefore, I support the objection.

Signed under the Pains and Penalties of Perjury on this ___7___ day of July 2023.

Rachel Boykan, M.D., FAAP

2

50

**EXHIBIT C**

**AFFIDAVIT OF DR. JONATHAN D. KLEIN, M.D., M.P.H.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 2913<br><br>**PLAINTIFFS' OBJECTION TO PROPOSED *JUUL* CLASS ACTION SETTLEMENT AGREEMENT**<br><br>The Hon. William H. Orrick |

**AFFIDAVIT OF DR. JONATHAN D. KLEIN, M.D., M.P.H.**

I, Jonathan D. Klein, swear that the following are all true statements of facts and accurately represent my opinions.

I am the Associate Vice Chancellor for Research and the Savithri and Samuel Raj Professor of Pediatrics and executive vice head of the Department of Pediatrics at the University of Illinois Chicago (UIC) College of Medicine. My office is located at UIC College of Medicine Room 301 AOB, 1737 W. Polk St., Chicago, IL 60612. I served as scientific director of the American Academy of Pediatrics Julius B. Richmond Center of Excellence where we conducted research on pediatric approaches to protect children from tobacco and tobacco smoke and also served as the associate executive director of the Academy. I am the current president of the International Association for Adolescent Health IAAH).

As a clinical and research specialist in adolescent health, much of my professional attention over the past several years has been focused on the impact of e-cigarettes on the health of teens. In a paper reviewing clinical and preclinical research I published in the journal *Pediatrics* in 2020, my colleagues and I found that nicotine exposure alone has the potential to cause developmental abnormalities, harm childhood health, and addict a new generation of adolescents and young adults. We particularly noted the impact of Juul on youth addiction to nicotine.[1]

In a meeting abstract published by *Pediatrics* in 2021, my colleagues and I found that, according to the Population Assessment of Tobacco and Health study (PATH), parents of teens are often unaware that

---

[1] McGrath-Morrow, Sharon A., et al. "The effects of nicotine on development." Pediatrics 145.3 (2020).

1

their children are using tobacco products, including e-cigarettes, and may, in fact, be nicotine-dependent or in the process of becoming nicotine-dependent.[2]

In a 2019 study my coauthors and I published in the American Journal of Health Promotion, we found that teens were not simply experimenting with Juul and similar pod-based e-cigarettes. At that time, 13.6% of current users (used within the past 30 days) were daily users of e-cigarettes.[3]

A significant challenge in the field is to develop and implement effective cessation practices for adolescents who use e-cigarettes and young adults who became nicotine-dependent while using Juul products when those products dominated the youth market.

As a researcher and clinician who deeply understands the impact that Juul has had on my patients and on the adolescent population as a whole, I support the objection to the Juul Class Action Settlement Agreement. A resolution to this dispute among class members and the manufacturer of the product at issue needs to do something to address the underlying public health issues that arose with the success of the Juul e-cigarette.

Signed under the Pains and Penalties of Perjury on this 6th day of July, 2023.

Jonathan D. Klein, MD, MPH, FAAP

---

[2] McMillen, R., et al. "Parents are not Aware of Their Adolescents' Cigarette and E-Cigarette Use." Pediatrics (2021) 147 (3_MeetingAbstract): 1004.

[3] Merianos, Ashley L., et al. "Characteristics of daily e-cigarette use and acquisition means among a national sample of adolescents." AMERICAN JOURNAL OF HEALTH PROMOTION 33.8 (2019): 1115-1122.

2

**EXHIBIT D**

**AFFIDAVIT OF LAUREN KASS LEMPERT, J.D., M.P.H.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 2913 |
| | **PLAINTIFFS' OBJECTION TO PROPOSED _JUUL_ CLASS ACTION SETTLEMENT AGREEMENT** |
| | The Hon. William H. Orrick |

### AFFIDAVIT OF LAUREN KASS LEMPERT, J.D., M.P.H.

I, Lauren Kass Lempert, swear that the following are all true statements of facts and accurately represent my opinions.

I am a Specialist in the Department of Social and Behavioral Sciences at the University of California San Francisco School of Nursing, which is located at 490 Illinois Street in San Francisco, CA 94158. I have published a variety of articles in the public health and medical literature concerning the use, policies, and impacts on adolescents and young adults of flavored electronic cigarettes, including Juul.

I have closely followed the scientific literature on e-cigarettes and Juul, in particular. From the time of its introduction to the US market in 2015 through 2018, Juul took over 75% of the total US e-cigarette market.[1] Flavored Juul e-cigarettes garnered massive appeal among adolescents.[2] Under pressure from regulators in late 2019, Juul ceased selling its flavors except for tobacco and menthol.[3] Shortly thereafter, FDA announced a policy that prioritized enforcement against pod-based flavored e-cigarettes, but explicitly excluded flavored disposable cigarettes.[4]

---

[1] Truth Initiative, Behind the Explosive Growth of JUUL: Social Influences and Flavors Drive Rising Teen Use of the Top E-cigarette, 2(2018) https://truthinitiative.org/sites/default/files/media/files/2019/03/Behind-the-explosive-growth-of-JUUL.pdf (accessed on June 20, 2023).

[2] G. Kong, K.W. Bold, M.E. Morean, H. Bhatti, D.R. Camenga, A. Jackson, et al. "Appeal of JUUL among adolescents." Drug and Alcohol Dependence, 205 (2019), p. 107691

[3] Kaplan, S., Hoffman, J. "Juul Suspends Selling Most E-Cigarette Flavors in Stores." New York Times. November 13, 2018. Accessed June 16, 2020, https://www.nytimes.com/2018/11/13/health/juul-ecigarettes-vaping-teenagers.html

[4] Food and Drug Administration, Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market without Premarket Authorization (Revised): Guidance for Industry, 2020. Accessed July 1, 2020a, https://www.fda.gov/media/133880/download

1

The very large underage user base of Juul that had become nicotine-dependent through use of the product needed a replacement product and, unfortunately, this regulatory loophole allowed just such a product to emerge.  Because disposable flavored e-cigarettes were available in similar designs and flavors, such as mint and fruit, that were previously available in Juul products, but without a pod cartridge, teens simply switched to flavored disposables, which became the most popular e-cigarette products among youth.[5]

In a 2021 survey-based study, my colleagues and I published in Environmental Research and Public Health, we found that flavored disposables were the most used e-cigarette device type across age groups, including users under the age of 21.[6]  A June 2023 CDC report based on US e-cigarette sales data found that e-cigarette unit sales increased by 47% between January 2020 and December 2022. Further, the report found that even after January 2020, when sales of mint and other flavored pod-based e-cigarettes like Juul ceased, disposable e-cigarettes in similar flavors increased, and disposable e-cigarettes in youth-appealing flavors are now more commonly sold than prefilled pod-based e-cigarettes.[7] Also based on US e-cigarette sales data, the AP reported in June 2023 that the number of different electronic cigarette devices sold in the US has nearly tripled to over 9,000 since 2020, driven almost entirely by a wave of unauthorized disposable e-cigarettes, and that more than 5,800 unique disposable products are now being sold in numerous flavors and formulations, up 1,500% from 365 in early 2020.[8]  What this means is that, although Juul may no longer be the most popular brand of e-cigarettes in the US, it has created a legacy of young users who crave replacement products.

The proposed Settlement Agreement is devoid of any provisions to address the impact that these products have had on public health and a generation of young people, including the members of the settling class. This is an unjust result. I support the objectors to the Settlement in their efforts to address this unfair, insufficient, and unjust deficiency in the Settlement as proposed.

Signed under the Pains and Penalties of Perjury on this 5th day of July, 2023.

Lauren Kass Lempert, J.D., M.P.H.

---

[5]  E. Park-Lee, C. Ren, M.D. Sawdey, A.S. Gentzke, M. Cornelius, A. Jamal, et al., "Notes from the Field: E-Cigarette Use Among Middle and High School Students — National Youth Tobacco Survey, United States, 2021."
MMWR. Morbidity and Mortality Weekly Report, 70 (39) (2021), pp. 1387-1389, 10.15585/mmwr.mm7039a4
[6] McCauley, D.M.; Gaiha, S.M.; Lempert, L.K.; Halpern-Felsher, B. "Adolescents, Young Adults, and Adults Continue to Use E-Cigarette Devices and Flavors Two Years after FDA Discretionary Enforcement." Int. J. Environ. Res. Public Health 2022, 19, 8747. https://doi.org/10.3390/ijerph19148747

[7] Ali FR, Seidenberg AB, Crane E, Seaman E, Tynan MA, Marynak K. E-cigarette Unit Sales by Product and Flavor Type, and Top-Selling Brands, United States, 2020–2022. MMWR Morb Mortal Wkly Rep 2023;72:672–677.
DOI: http://dx.doi.org/10.15585/mmwr.mm7225a1

[8] Perrone, M. Thousands of unauthorized vapes are pouring into the US despite the FDA crackdown on fruity flavors. June 26, 2023. https://apnews.com/article/fda-vapes-vaping-elf-bar-juul-80b2680a874d89b8d651c5e909e39e8f

2

**EXHIBIT E**

**AFFIDAVIT OF DR. SHARON J. LEVY, M.D., M.P.H.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 2913 |
| | **PLAINTIFFS' OBJECTION TO PROPOSED *JUUL* CLASS ACTION SETTLEMENT AGREEMENT** |
| | The Hon. William H. Orrick |

**AFFIDAVIT OF DR. SHARON J. LEVY, M.D., M.P.H.**

I, Sharon J. Levy, swear that the following are all true statements of facts and accurately represent my opinions.

I am a board-certified Addiction Medicine specialist, Chief of the Division of Addiction Medicine at Boston Children's Hospital and an Associate Professor of Pediatrics at Harvard Medical School. My office is located at Boston Children's Hospital, 300 Longwood Ave, Boston MA 02115. I am a past chair of the American Academy of Pediatrics Committee on Substance Use and Prevention, past-President of the Association for Multidisciplinary Education and Research in Substance use and Addiction (AMERSA), and serve on the board of directors of the American College of Academic Addiction Medicine (ACAAM). In 2016 I established the nation's first accredited Pediatric Addiction Medicine Fellowship training program at Boston Children's Hospital. My research involves the study of substance use in pediatric populations. I have published dozens of articles in the peer-reviewed literature on various aspects of substance use by children and adolescents.

I have found that the rapid rise of nicotine vaping among youth beginning with high dose and fast delivery products such as Juul effectively reversed decades of work to denormalize the use of nicotine. As a result, a large number of middle and high school students became regular e-cigarette users, a majority (57.8%) of whom expressing a desire to quit.[1] In 2019 I had agreed to serve on a committee to consider public health remedies as part of the Juul litigation. While that committee never materialized, I had thought that the resolution of the class action litigation in federal court would surely seek to address the addiction to nicotine affecting tens of thousands of young people who initiated with Juul e-

---

[1] Wang TW, Gentzke AS, Creamer MR, et al. Tobacco Product Use and Associated Factors Among Middle and High School Students —United States, 2019. MMWR Surveill Summ 2019;68(No. SS-12).1–22.

1

cigarettes and continue to vape today despite wanting to find a way to quit. I was both surprised and dismayed to learn that the proposed class action settlement did not include anything at all to help these young people.

As a result, I strongly support the objection to the Juul Class Action Settlement Agreement on the grounds that it fails to do anything to address the legacy of addiction stemming from what the U.S. Surgeon General declared was a vaping epidemic among youth.[2]

As my coauthors and I wrote in the Journal of Adolescent Health, "There is still much to learn about how best to support youth who vape nicotine. A scientific agenda is needed."[3] This settlement should, in part, contribute to development of such a scientific agenda.

Signed under the Pains and Penalties of Perjury on this 5th day of July, 2023.

Sharon J. Levy, M.D., M.P.H.

---

[2] U.S. Department of Health and Human Services, Office of Surgeon General. (2018). Surgeon General's advisory on e-cigarette use among youth Retrieved from https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf

[3] Sharon Levy, A Eden Evins, Randi M. Schuster, Leslie Green, Julie Lunstead, Alyssa Fuller, Emma W. Needles, Elissa R. Weitzman, "Virtual Group Therapy Programs—The Wave of the Future." Journal of Adolescent Health, Volume 69, Issue 3, 2021, Page 527.

**EXHIBIT F**

**AFFIDAVIT OF DR. SUSANNE E. TANSKI, M.D., M.P.H., F.A.A.P.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: JUUL LABS, INC., MARKETING,
SALES PRACTICES AND PRODUCTS
LIABILITY LITIGATION

MDL No. 2913

**PLAINTIFFS' OBJECTION TO
PROPOSED *JUUL* CLASS ACTION
SETTLEMENT AGREEMENT**

The Hon. William H. Orrick

### AFFIDAVIT OF DR. SUSANNE E. TANSKI, M.D., M.P.H., F.A.A.P.

I, Susanne E. Tanski, swear that the following are all true statements of facts and accurately represent my opinions.

I am an Associate Professor of Pediatrics, Section Chief and Vice Chair of General Pediatrics, and Associate Director, C. Everett Koop Institute, at the Geisel School of Medicine at Dartmouth.  My office is at Dartmouth Hitchcock Medical Center, One Medical Center Drive, Hinman Box 7925, Office: Rubin 834, Lebanon NH 03756.

One of my primary interests as a researcher as well as a pediatric clinician is in tobacco prevention and cessation. In recent years, this largely involves prevention and cessation of the use of e-cigarettes by adolescents. In mid-2014, prior to the explosive rise of e-cigarette use among youth, I testified on behalf of the American Academy of Pediatrics (AAP) before the U.S. Senate Committee on Commerce, Science and Transportation regarding concerns regarding aggressive e-cigarette marketing and its potential consequences for youth.[1]  Our concerns were founded, yet companies went unchecked. In early 2019, I testified to the Food and Drug Administration that 3.7 million U.S. adolescents were regular e-cigarette users and that products such as Juul were enticing teens to vape in ever greater numbers.[2]  In late 2019, I again testified to a Congressional committee (U.S. House of Representatives Committee on Energy and Commerce Health Subcommittee), noting again then 27.5% of high school students were current e-

---

[1] Senate Committee on Commerce, Science and Transportation hearing on "Aggressive E-Cigarette Marketing and Potential Consequences for Youth", June 18, 2014.

[2] Food and Drug Administration, Public Hearing on "Eliminating Youth Electronic Cigarette and Other Tobacco Product Use: The Role for Drug Therapies" Statement of Susanne E. Tanski, MD, MPH, FAAP on behalf of the American Academy of Pediatrics. January 18, 2019.

1

cigarette users, and that 27% of these users were vaping on 20 or more days in the last month.[3] This is suggestive of high levels of nicotine dependence among users.

In those 2019 statements I noted that there is very little data on how to treat an adolescent with e-cigarette dependence. As things then stood, there was not a single randomized controlled trial that had tested strategies to help teens quit e-cigarettes. That is, unfortunately, still the case.

The US Preventative Services Task Force found "inadequate evidence on the benefit of behavioral counseling interventions for tobacco cessation in school-aged children and adolescents" and "inadequate evidence on the benefits and harms of medications for tobacco cessation in children and adolescents, primarily because of an inadequate number of studies."[4]

With the large numbers of adolescents and young adults who initiated nicotine dependence from the use of e-cigarettes in the Juul era ('Juuling"), there is a great need in the field of pediatrics for research to help determine what approaches to cessation are most likely to result in freeing our adolescents from addiction to nicotine.

As I read about the proposed Juul class action settlement, I was profoundly disappointed that the only remedy provided to the many young people who struggle with nicotine dependence from vaping Juul e-cigarettes was to send them a small payment. Such a result will do absolutely nothing to address the fundamental problem with the product at the center of the dispute: it addicted a very large number of teens to nicotine, many of whom continue to vape nicotine to maintain that addiction.

The proposed settlement is not fair to those who began using the product as a teen. It is wholly inadequate. I therefore support the objection to the proposed settlement. My hope is that a resolution is included in a further iteration of the proposed agreement which specifically addresses the impact of these nicotine delivery products on the adolescent brain.

Signed under the Pains and Penalties of Perjury on this 7th day of July, 2023.

*Susanne E Tanski MD MPH*

Dr. Susanne E. Tanski, M.D., M.P.H.

---

[3] US House of Representatives Committee on Energy and Commerce Health Subcommittee "Legislation to Reverse the Youth Tobacco Epidemic", October 16, 2019

[4] US Preventive Services Task Force. Primary Care Interventions for Prevention and Cessation of Tobacco Use in Children and Adolescents: US Preventive Services Task Force Recommendation Statement. JAMA. 2020;323(16):1590–1598. doi:10.1001/jama.2020.4679

**EXHIBIT G**

**AFFIDAVIT OF DR. KAREN M. WILSON, M.D., M.P.H.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 2913 |
| | **PLAINTIFFS' OBJECTION TO PROPOSED *JUUL* CLASS ACTION SETTLEMENT AGREEMENT** |
| | The Hon. William H. Orrick |

**AFFIDAVIT OF DR. KAREN M. WILSON, M.D., M.P.H.**

I, Karen M. Wilson, swear that the following are all true statements of facts and accurately represent my opinions.

I am a Professor in the Department of Pediatrics and Pediatric Hospitalist at the University of Rochester Medical Center. I am also currently the Chair of the American Academy of Pediatrics Tobacco Consortium, which fosters collaboration among tobacco researchers addressing pediatrics. I recently co-edited a comprehensive guide to e-cigarettes and vaping products for clinicians.[1] My office is at the University of Rochester Medical Center School of Medicine and Dentistry, 601 Elmwood Ave, Box 667, Rochester, NY 14642.

In 2019, I co-authored a state-of-the-art review article in the journal, *Pediatrics*, titled: "A Public Health Crisis: Electronic Cigarettes, Vape, and JUUL."[2] Although Juul appears no longer to be active in engaging a pediatric population, its impact on a generation of youth who came of age during Juul's peak years is very much still with us today.

As a clinician who is keenly attuned to the research surrounding tobacco product and nicotine vaping cessation for adolescents, I am painfully aware that there is a great need for research to help us develop best practices to help adolescents and young adults who wish to quit. It would seem that the settlement of a national class of Juul users, many of whom began using the product during middle or high school years, should include at least some public health provisions. After all, the use of the

---

[1] Walley, Susan Chu, and Karen Wilson. Electronic Cigarettes and Vape Devices. Springer International Publishing, 2021.

[2] Susan C. Walley, Karen M. Wilson, Jonathan P. Winickoff, Judith Groner; A Public Health Crisis: Electronic Cigarettes, Vape, and JUUL. Pediatrics June 2019; 143 (6): e20182741. 10.1542/peds.2018-2741

1

underlying product by school age children and adolescents is what caused a public health crisis around vaping. Alas, the proposed settlement does nothing of the kind.

I support the Objectors to the Settlement. Without some measure of meaningful public health provisions, this settlement, which has the potential to help those affected by the vaping crisis, will accomplish very little more than providing funding for young adults addicted to nicotine from vaping to supply themselves with more e-cigarettes. That would be an unfair and completely inadequate way to resolve the class action litigation.

Signed under the Pains and Penalties of Perjury on this _9ᵗʰ_ day of _July_, 2023.

_Karen M. Wilson_

Dr. Karen M. Wilson, M.D., M.P.H.

2

65

**EXHIBIT H**

*IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION*: TRANSCRIPT OF
PROCEEDINGS BEFORE THE HONORABLE DAN A. POLSTER, UNITED STATES
DISTRICT JUDGE 1/8/2018

```
 1                    UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3     -------------------------------X
                                      :
 4     IN RE: NATIONAL PRESCRIPTION    :   MDL No. 2804
       OPIATE LITIGATION              :
 5                                     :   Case No. 1:17-CV-2804
                                      :   Cleveland, Ohio
 6                                     :
       APPLIES TO ALL CASES           :   Tuesday, January 9, 2018
 7                                     :   9:12 a.m.
       -------------------------------X

 8

 9

                          TRANSCRIPT OF PROCEEDINGS
10
                   BEFORE THE HONORABLE DAN A. POLSTER
11                    UNITED STATES DISTRICT JUDGE

12                                AND

13                 BEFORE THE HONORABLE DAVID A. RUIZ
                    UNITED STATES MAGISTRATE JUDGE
14

15

16     Court Reporter:      Donnalee Cotone, RMR, CRR, CRC
                            Realtime Systems Administrator
17                          United States District Court
                            801 West Superior Avenue
18                          Court Reporters 7-189
                            Cleveland, Ohio 44113
19                          216-357-7078
                            donnalee_cotone@ohnd.uscourts.gov
20

21

22

23

24

25
```

2

```
1    APPEARANCES (Continued):

2

3    For the Plaintiffs:      Paul T. Farrell, Jr., Esq.
                              Greene Ketchum Farrell, Bailey & Tweel
4                             419 Eleventh Street
                              Huntington, West Virginia 25724
5                             304-525-9115
                              paul@greeneketchum.com
6
     For the Plaintiffs:      Paul J. Hanly, Jr., Esq.
7                             Simmons Hanly Conroy LLC
                              112 Madison Avenue
8                             New York, New York 10016
                              212-784-6400
9                             phanly@simmonsfirm.com

10   For the Plaintiffs:      Joseph F. Rice, Esq.
                              Motley Rice LLC
11                            28 Bridgeside Boulevard
                              Mount Pleasant, South Carolina 29465
12                            843-216-9000
                              jrice@motleyrice.com
13
     For Defendants          Mark S. Cheffo, Esq.
14   Purdue Pharma L.P.,     Quinn Emanuel Urquhart & Sullivan, LLP
     Purdue Pharma Inc.,     51 Madison Avenue, 22nd Floor
15   and The Purdue          New York, New York 10010 212-849-7000
     Frederick Company       markcheffo@quinnemanuel.com
16   Inc.:

17   For Defendants          Enu Mainigi, Esq.
     Cardinal Health,        Williams & Connolly LLP
18   Inc.; Cardinal          725 Twelfth Street, NW
     Health 110, LLC:        Washington, DC 20005
19                           202-434-5000
                             emainigi@wc.com
20

21

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

|  | 1 | MORNING SESSION, TUESDAY, JANUARY 9, 2018 |
|---|---|---|
|  | 2 | (Proceedings commenced at 9:11 a.m.) |
|  | 3 | - - - |
|  | 4 | THE COURT:  Everyone can be seated.  Except I |
| 09:11:40 | 5 | apologize.  We brought in extra chairs, but I guess they ran |
|  | 6 | out of extra chairs. |
|  | 7 | All right.  Well, good morning, Everyone. |
|  | 8 | This is the first meeting of counsel in the opioid |
|  | 9 | MDL.  Judge Ruiz and I are here, and, again, I apologize. |
| 09:12:12 | 10 | The courtroom isn't big enough.  I've reserved the 16th |
|  | 11 | floor, those two courtrooms, for some private conferences |
|  | 12 | with counsel that we will probably go into. |
|  | 13 | I appreciate all of the submissions that I've |
|  | 14 | received.  Some have been exchanged.  Some were *ex parte*, as |
| 09:12:38 | 15 | I permitted.  I've given a lot of thought to what to do. |
|  | 16 | All of the submissions focused on how a judge should manage |
|  | 17 | this MDL and the 200 or more cases in sort of a traditional |
|  | 18 | manner.  I appreciate that. |
|  | 19 | I've handled and managed two other MDLs, and I'm |
| 09:13:13 | 20 | familiar with many of the others that my colleagues have |
|  | 21 | handled around the country.  But this is not a traditional |
|  | 22 | MDL.  It generally focuses on something unfortunate that's |
|  | 23 | happened in the past, and figuring out how it happened, why |
|  | 24 | it happened, who might be responsible, and what to do about |
| 09:13:40 | 25 | it. |

1        What's happening in our country with the opioid crisis

2   is present and ongoing.  I did a little math.  Since we're

3   losing more than 50,000 of our citizens every year, about

4   150 Americans are going to die today, just today, while

09:14:08  5   we're meeting.

6        And in my humble opinion, everyone shares some of the

7   responsibility, and no one has done enough to abate it.

8   That includes the manufacturers, the distributors, the

9   pharmacies, the doctors, the federal government and state

09:14:33 10   government, local governments, hospitals, third-party

11   payors, and individuals.  Just about everyone we've got on

12   both sides of the equation in this case.

13        The federal court is probably the least likely branch

14   of government to try and tackle this, but candidly, the

09:14:58 15   other branches of government, federal and state, have

16   punted.  So it's here.

17        So I don't think anyone in the country is interested

18   in a whole lot of finger-pointing at this point, and I'm not

19   either.  People aren't interested in depositions, and

09:15:21 20   discovery, and trials.  People aren't interested in figuring

21   out the answer to interesting legal questions like

22   preemption and learned intermediary, or unravelling

23   complicated conspiracy theories.

24        So my objective is to do something meaningful to abate

09:15:51 25   this crisis and to do it in 2018.  And we have here -- we've

1   got all the lawyers.  I can get the parties, and I can

2   involve the states.  So we'll have everyone who is in a

3   position to do it.  And with all of these smart people here

4   and their clients, I'm confident we can do something to

09:16:17  5   dramatically reduce the number of opioids that are being

6   disseminated, manufactured, and distributed.  Just

7   dramatically reduce the quantity, and make sure that the

8   pills that are manufactured and distributed go to the right

9   people and no one else, and that there be an effective

09:16:40 10   system in place to monitor the delivery and distribution,

11   and if there's a problem, to immediately address it and to

12   make sure that those pills are prescribed only when there's

13   an appropriate diagnosis, and that we get some amount of

14   money to the government agencies for treatment.  Because

09:17:10 15   sadly, every day more and more people are being addicted,

16   and they need treatment.

17        So that's what I am interested in doing.  I mean, I'm

18   really -- you know, if I've got to do it in a traditional

19   way, and -- I guess I'll have no choice.  I'll admit failure

09:17:32 20   and I'll say, All right.  We've just got to plow through

21   this, and, you know, if we can't accomplish something like

22   what I've talked about then, you know, I'll talk to

23   everyone.  But my present intention is to turn everyone

24   loose.  I'll turn the plaintiffs loose on the defendants;

09:17:56 25   I'll turn the defendants lose on the plaintiffs.  You'll,

1    you know, tear each other up way down in 2017 [sic] for

2    discovery.  You can go after the federal government, full

3    discovery there, too.  You know, FDA, DEA, have at it, and

4    in 2019, I'll try the Ohio case myself and see what happens,

09:18:21  5    after dealing with whatever motions, and I'm sure some of

6    the claims and theories are going to be knocked out and some

7    will survive.  And I'll try the case that I have

8    jurisdiction over, which is the Northern District of Ohio

9    group.  What that will accomplish, I don't know.  But I'd

09:18:42 10    rather not do that.

11        So that's really what I want to talk to everyone

12    today, and if we can get some agreement on both sides that

13    that's what we ought to do and that's how we should spend --

14    I mean, look around this room; an incredible amount of

09:18:59 15    talent.  I doubt if any judge has ever assembled this kind

16    of talent ever.  And I'm talking about you, certainly not --

17    and Judge Ruiz, not me.  Okay?

18        But that's what -- I think we have an opportunity to

19    do it, and it would be an abject abdication of our

09:19:19 20    responsibility not to try it.  And if we can't, then we've

21    got to do the other way.  And if we can get some general

22    agreement that we should try it, then we'll figure out

23    today, how do we organize that effort, who is not here that

24    we need to get involved, and we'll get about doing it and

09:19:46 25    what help I'll need.

1        As I indicated in my prior order, I haven't made a

2  final decision on what to do regarding Special Master or

3  Special Masters.  I looked carefully at the recommendations,

4  suggestions of the parties.  I had some preliminary

09:20:10 5  discussions with three people suggested, who I happen to

6  know because I've worked with them:  David Cohen,

7  Cathy Yanni, and Francis McGovern.

8        I asked David Cohen and Francis McGovern to listen in

9  by telephone today, and then I'll decide, after we have

09:20:35 10  probably some private discussions, what I'll do in that

11  regard.

12        So I know none of you were expecting what I just said,

13  but I certainly want to hear from you.  I mean, I knew what

14  I was going to say.  I have no idea what any of you are

09:20:56 15  going to say.

16        And so the one thing I would request, because,

17  obviously, we have a court reporter, is that anyone who

18  speaks, I think it will actually be better if you stay

19  seated by a microphone.

09:21:10 20        Is that right, Katie?

21        Or the podium, all right?  If you're not seated -- if

22  you're seated at a table by a microphone, the sound will

23  work better if you stay seated.  I know it's sort of

24  counterintuitive, you always stand in the court, but it

09:21:29 25  works better if you're seated.  If you're not seated by a

09:22:00
09:22:13
09:22:29
09:22:42
09:23:01

 1      microphone, then if you can use the lectern, because there's

 2      a microphone there, and then just please identify yourself

 3      and who you're representing.

 4          I hope someone speaks.  I don't -- I'd hate to listen

 5      to myself again.

 6          MR. RICE:  Good morning, Your Honor.

 7          Joe Rice with Motley Rice here on behalf of the

 8      plaintiffs.  Thank you for your comments.

 9          I think I can say on behalf of all the plaintiffs that

10      we share your feeling of urgency.  And I can tell you that

11      all of our clients are dealing with this every day at the

12      city, county level, everybody.

13          So we are here to give you the time and the talents

14      that we can have to try to bring something together as

15      quickly as possible.

16              THE COURT:  Thank you, Joe.

17              MR. HANLY:  Your Honor, if I may.

18          Yes, Judge.  My name is Paul Hanly.  I'm co-lead with

19      Mr. Rice and Mr. Farrell.

20          If I might just address the Court's comment about the

21      submissions.  The plaintiffs' submission does discuss

22      litigation options.  And I want to explain to the Court that

23      that's based upon good-faith discussions that we all had

24      with certain of the defendant representatives.

25          So we did not feel it was sufficient simply to agree

09:23:20

09:23:37

09:24:02

09:24:26

09:24:41

1   with the Court concerning the resolution track -- which we

2   are very, very much in favor of -- but we felt it important

3   also to present, from the plaintiffs' point of view,

4   possible litigation strategies, given that certain of the

5   defendants were talking in terms of litigation before they

6   wanted to discuss resolution.

7            THE COURT:  All right.  I understood that,

8   Paul.

9        But the resolution I'm talking about is really -- what

10  I'm interested in doing is not just moving money around,

11  because this is an ongoing crisis.  What we've got to do is

12  dramatically reduce the number of the pills that are out

13  there and make sure that the pills that are out there are

14  being used properly.  Because we all know that a whole lot

15  of them have gone walking and with devastating results.  And

16  that's happening right now.

17       So that's what I want to accomplish.  And then we'll

18  deal with the money.  We can deal with the money also and

19  the treatment.  I mean, that's what -- you know, we need a

20  whole lot -- some new systems in place, and we need some

21  treatment.  Okay?  We don't need -- we don't need a lot of

22  briefs and we don't need trials.  They're not going

23  to -- none of them are -- none of those are going to solve

24  what we've got.

25       So, again, you know, ideally, this should be handled

1    by the legislative and executive branches, our federal

2    government, and our state governments.  They haven't seemed

3    to have done a whole lot.  So it's here.  So . . .

4                   MR. CHEFFO:  Good morning, Your Honor.  This

09:25:14   5    is Mark Cheffo for --

6                   THE COURT:  Yes, Mark.

7                   MR. CHEFFO:  One of the liaison counsel for

8    the manufacturers.  I would, I think, just echo really what

9    Your Honor said and what counsel said.

09:25:24   10       I think from our perspective, we certainly welcome the

11    opportunity to talk in more detail with the Court.  It

12    sounds like that's what you have in mind.  I think all of us

13    recognize that there is issues in this country.  I think we

14    all, to the extent that we can, want to be part of the

09:25:39   15    solution and work with Your Honor in trying to hear about

16    some of the ways that we might move forward.

17       I think that Your Honor kind of articulated at a high

18    level some of the impediments that might be in our way to

19    try and get from here to where Your Honor's vision is.  So I

09:25:57   20    think we'd be interested in exploring that a little more.

21    You know, as you said, some of the issues include kind of

22    working through expectations, and also, you know, frankly,

23    making sure that the right folks are at the table, and many

24    of them are maybe not in this room as well.

09:26:12   25       So I think that, you know, we welcome the opportunity

09:26:29 1    to kind of sit down with the Court, hear your ideas, and try

2    to be as productive as we can.  And, you know, I'm sure, as

3    you know, there's a lot of defendants in this room, too, and

4    they'll all have their own specific issues and concerns.

09:26:29 5    But I think I'm very comfortable telling the Court that we

6    want to participate with Your Honor and at least try and

7    explore some of these ideas.

8                    THE COURT:  Okay.  Thank you, Mark.

9                    MS. MAINIGI:  Your Honor, Enu Mainigi from

09:26:44 10   Williams & Connolly on behalf of Cardinal Health.  And I'm

11   also liaison counsel for the distributors.

12       We echo Mr. Cheffo's comments.  We recognize that

13   there's a problem out there.  We're happy to have

14   discussions with Your Honor.  And we're pleased that

09:27:00 15  Your Honor has referenced the fact that there are state and

16   federal governments that are also involved here that may

17   need to be involved in the process.

18       I think as we've been having good-faith discussions

19   with plaintiffs' counsel in anticipation of today, and,

09:27:19 20  indeed, after the MDL was filed, I think that it's certainly

21   become clear to us that, as Your Honor has seen from various

22   papers that have been filed, that there are, in fact, the

23   impediments that Mr. Cheffo pointed out, certain threshold

24   issues that -- and they're not necessarily the same for

09:27:43 25  distributors, manufacturers, and other defendants, but there

09:28:00

09:28:20

09:28:41

09:29:09

09:29:37

1   are certain threshold issues that we think the resolution of

2   those, in some manner, and we're happy to work with the

3   Court and with plaintiffs' counsel to figure out how best to

4   get those issues decided.

5       But we actually think that the resolution of some of

6   those issues would be extremely helpful in then moving

7   forward with discussions about what can be done in a variety

8   of ways about this problem.

9       But we welcome the opportunity to speak to Your Honor,

10  either here in this group setting, or I think you alluded to

11  separate meetings at some point, but we're happy to

12  elaborate on that.

13              THE COURT:  All right.  Well, I appreciate

14  those comments.

15      As I presently thought through this, I'm not inclined

16  to tackle legal issues without a full factual record, and I

17  know what it will take to get a full factual record, how

18  much time and how much money.  And if I've got to do that,

19  we'll do that.  But I'm really not interested in deciding

20  legal issues in a vacuum just on motions.  I want to know

21  what the facts are, because the facts often drive the law.

22      So if we have to go down that route, my present

23  inclination is to just let each of you have at it, and go at

24  each other, all -- I don't know how many we've got -- 150,

25  200 of you, plus legions who aren't here, and, you know, the

1    plaintiffs will turn the manufacturers, distributors, and a

2    few doctors, upside down, inside out.  The defendants will

3    turn federal government, state government, counties, cities,

4    inside out, upside down over 2018, and then I'll probably

09:30:03  5    try the Ohio ones in 2019 after I decide the motion.

6         I really don't want to do that.  It isn't going to

7    resolve anything.  But my -- maybe you can convince me

8    otherwise, but I've given a lot of thought, and my present

9    feeling is I'm not going to decide these very interesting

09:30:21 10    and important legal issues in a vacuum without having a full

11    record.  So if we've got to go down that way, you know, we

12    all know how to do that.  I know how to do it and you all

13    know how to do it.

14         But while we do that, another 50- or 60,000 people are

09:30:43 15    going to die, and we'll be absolutely no closer to abating

16    that.

17         I mean, I read recently that we've managed in the last

18    two years, because of the opioid problem, to do what our

19    country has not done in 50 years, which is to -- for two

09:31:04 20    consecutive years, reduce, lower the average life expectancy

21    of Americans.  And if we don't do something in 2018, we'll

22    have accomplished it for three years in a row, which we

23    haven't done since the flu epidemic 100 years ago wiped out

24    10 percent of our population.  And this is 100 percent

09:31:27 25    manmade.  Now, I'm pretty ashamed that this has occurred

1       while I've been around.  So I think we all should be.

2            All right.  Does anyone want to say anything more

3       before we maybe have some separate caucuses?  And my plan is

4       to -- I'm going to use the 16th floor.  I've got two

09:31:52 5    courtrooms, and I think I'm going to put the plaintiffs'

6       leadership team in one room and the defendants' leadership

7       team in the other room.  And I guess -- I don't know how

8       much -- you know, if there's room for others, that's okay,

9       too.  But I want to have some candid discussions.

09:32:19 10                 MR. CHEFFO:  Your Honor.

11                 THE COURT:  Yes.

12                 MR. CHEFFO:  If I might, just one thing.

13           I think that's on.  Sorry about that.

14           I think, again, in the spirit of trying to work with

09:32:23 15   the Court on identifying -- so I think what we all need to

16      do -- and I think Your Honor, I'm sure, appreciates this --

17      is to just try and identify what we all may think are

18      impediments to get to where Your Honor wants.  One of the

19      issues is that -- probably unfortunately from our

09:32:38 20   perspective where we sit, the only -- this is not the only

21      place where activity is occurring, so --

22                 THE COURT:  Yeah, well, I can -- I can -- the

23      advantage of a federal judge is, I can order anyone in that

24      I want.  I, obviously, can pick up the phone and talk to

09:32:53 25   anyone I want.  I can pick up the phone and call any state

1   attorney general I want and invite him or them to be

2   involved, and I'm sure they will.  They've got the same

3   interests.

4        I do not control the DEA or the FDA.  I can

09:33:14  5   certainly -- if their involvement is necessary, I can invite

6   it.  I can invite it.

7                MR. CHEFFO:  Yeah, and that's -- that would

8   be -- I think, as we move forward, that would be extremely

9   helpful.  There's also the situation that many of the

09:33:28 10   extremely, as you said, talented lawyers on the plaintiffs'

11   side here also do have some state court cases.

12                THE COURT:  I understand that.

13                MR. CHEFFO:  So to the extent that we're doing

14   a stand down here, if it -- you know, if things kind of

09:33:38 15   progress in other places, that that might interfere with the

16   Court's ability to kind of get us to focus on these issues.

17        So I just throw that out as one of the issues the

18   Court might want to consider.

19                THE COURT:  I can understand that.  I can't --

09:33:52 20   I can make requests.  There's some things a federal judge

21   can order, but I can't order a state judge to do anything,

22   and -- I can make requests, and I think most -- I mean,

23   everyone should want to work together to abate the crisis

24   first and then figure out what to do.  But, again, I can

09:34:12 25   make requests.

```
                    MR. RICE:  Your Honor.
 1
 2                  THE COURT:  Yes.
 3                  MR. RICE:  Joe Rice.
 4                  THE COURT:  Yes, Mr. Rice.
09:34:23 5          MR. RICE:  There's one item of information
 6    that's available, but not available, is where the pills
 7    went, where they were sold and sort of the market share
 8    situation is in a database that the DEA has.  That there is
 9    a federal requirement that every time one of these pills is
09:34:40 10   sold, that it's reported where it was sold to.  Having that
11    database would give us a format, both sides, to know the
12    extent of involvement by any particular distributor and
13    where maybe we need to focus more of our efforts on, where
14    the pills went.
09:34:57 15        And that was discovery that was underway in the
16    Southern District of Ohio.  There had been a subpoena
17    issued.  There had been an objection filed.  There had been
18    a motion to compel filed, and the DEA -- or DOJ on behalf of
19    the DEA was to file a brief in support of their objection
09:35:19 20   with Judge Sargus.  And that was to be filed shortly after
21    the MDL panel ruled, and that got stayed.
22         But that matter is not a legal matter as far as, you
23    know, the overall party, but it is a piece of information
24    that would be extremely valuable to the Court and to all the
09:35:35 25   parties if we could proceed with the production of that
```

```
 1        ARCOS database.
 2                      THE COURT:  Well, that's one possibility.  If
 3        I think that we need that data, I can pick that up, and
 4        I'll -- if the Department of Justice has objections, I'll
 09:35:56 5    certainly consider them.  But that is a possibility.
 6            So I -- who provides -- the manufacturers and
 7        distributors both provide that input, or just the
 8        distributors?  Where does the input come from?
 9                      MR. RICE:  It comes just from the
 09:36:14 10   distributors.
11                      MS. MAINIGI:  Your Honor, if I may.
12                      THE COURT:  Yes.
13                      MS. MAINIGI:  At least on behalf of the
14        distributors, the ARCOS data is composed, in significant
 09:36:29 15   part, of data from distributors.  I think that there may be
16        some coming from the manufacturers, but I'll let them speak
17        to that.
18            In terms of what Mr. Rice indicated, I know -- I think
19        we are putting the cart before the horse.  I would suggest
 09:36:45 20   that to the extent --
21                      THE COURT:  Well, I'm not -- I just want to
22        know where the -- so obviously each distributor knows its
23        data, but --
24                      MS. MAINIGI:  Correct.
 09:36:55 25                   THE COURT:  -- you wouldn't know --
```

```
 1            MS. MAINIGI:  We do not have the ability.

 2            THE COURT:  -- the data that anyone else is

 3     inputting.  So you've got -- obviously, you know your data,

 4     and you know what you're transmitting.  Okay.  And then the

09:37:03  5     DEA compiles it.  So at the moment, they would be the only

 6     entity that has everyone's data --

 7            MS. MAINIGI:  Correct, Your Honor.

 8            THE COURT:  -- correct?

 9            MS. MAINIGI:  That's correct.

09:37:13 10            THE COURT:  Okay.

11            MS. MAINIGI:  And I know just procedurally,

12     the DEA had lodged an objection.  I don't know if that's

13     something they intend to renew if this request is renewed.

14            THE COURT:  Look, you know, I'm a former

09:37:29 15     prosecutor, and I can imagine that the DEA and the

16     Department of Justice may very well have ongoing

17     investigations as the result of the data.  They're not just

18     compiling that data for the heck of it.  Everyone knows why

19     the DEA would want to have that data.  And the last thing I

09:37:50 20     want to do is mess up an ongoing criminal investigation

21     and/or prosecution.  And that's the problem with just

22     willy-nilly making all of that data public.

23            MR. FARRELL:  Judge, this is Paul Farrell --

24            THE COURT:  Yes.

09:38:05 25            MR. FARRELL:  -- from West Virginia, and I was
```

counsel in the City of Cincinnati.  The Touhy letter that we

issued to the Department of Justice addresses some of those

concerns.  There's been -- the ARCOS data has been briefed

in the Madel case out of the Eighth Circuit that was pending

in Minnesota.  So it's a pretty well-defined argument on the

objections.

We believe that limiting the scope of the request to

the time frame in which the opioid epidemic arose and

eliminating, say, the last 12, 16, 24-months worth of data

preserves the ability of the Department of Justice --

THE COURT:  Well, you know, this is a

complicated issue.  Judge Sargus probably was considering

it.  I'm certainly not going to do anything on the fly.  I'm

not sure if it's necessary to have all that data to do the

kind of -- have the kind of discussions we're having.

I'd like to -- I think at this point, I'm going to

talk privately to each side and see where we go.  If we get

some traction, then we'll figure out what the next steps

are.

So let's just say this:  We'll have the plaintiffs'

leadership in Courtroom 16A and the defendants' leadership,

and that's -- I know we've got three tracks or groups of

defense counsel.  We've got a manufacturers' track, we have

a distributor track or group, and we have an individual

defendants' track or group, and my order may not have

1   been -- I added a couple of people, and they were being

2   added to the -- what I'll call the individual defendants'

3   steering committee or track.  And I think the individual

4   defendants are only doctors.

09:39:55  5   Are there any other individual defendants in the case?

6   I wasn't aware of any.

7   All right.  So the individual defendants are -- they

8   are four or five doctors.  Okay.  So I want all of the

9   defendants' leadership in 16B.  And I don't have a problem

09:40:16  10   with other lawyers coming in, but the primary spokespeople,

11   I think, will be the leadership team, which is why they were

12   created, just because it's unwieldy to have so many people,

13   and it's incredibly expensive, and, obviously, we

14   can't -- even if there are 200 people, it's not realistic

09:40:45  15   for 200 people to be addressing the Court and for me to be

16   talking to each of you, so -- but I do appreciate everyone

17   being here for the first meeting.

18   Okay.  And for those people on the phone, the

19   conference call will not continue for these private

09:41:09  20   discussions because these are not public proceedings.

21   If we come back together, I don't know if there'll be

22   a capability to get you back on the phone.  I don't know --

23   Do we know everyone who is on the phone?

24   All right.  So this may be -- probably be the last

09:41:37  25   time -- the last opportunity for those of you on the phone.

1    But I don't know if there are -- I'm not sure there's going

2    to be really a capability to call back in.

3         Although, maybe if and when we come back in, I'll put

4    a quick order out, and you can note -- access the ECF and

09:42:14  5    see when we're going back on the record and call back in.

6    That's about the best I can do.  So I'll try to do that.

7         Okay.  Then we will adjourn for private caucuses, and

8    I'll see you respectfully down on 16 in a few minutes.

9         Thank you.

09:42:34 10              DEPUTY CLERK:  All rise.

11                        - - -

12              (Proceedings adjourned at 9:42 a.m.)

13

14

15              **C E R T I F I C A T E**

16

17         I certify that the foregoing is a correct transcript

18    from the record of proceedings in the above-entitled matter.

19

20    */s/ Donnalee Cotone _____11th of January, 2018*
      DONNALEE COTONE, RMR, CRR, CRC                    DATE
21    Realtime Systems Administrator

22

23

24

25

87

# EXHIBIT I

## "EXHIBIT E" FROM NATIONAL OPOID DISTRIBUTORS SETTLEMENT

**https://www.dhcs.ca.gov/Documents/CSD/Exhibit-E-Final-Settlement-Agreement-082021.pdf**

**EXHIBIT E**

**List of Opioid Remediation Uses**

**Schedule A**
**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B.  However, priority shall be given to the following core abatement strategies ("*Core Strategies*").[14]

A. **NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

1. Expand training for first responders, schools, community support groups and families; and

2. Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B. **MEDICATION-ASSISTED TREATMENT ("*MAT*") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

1. Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2. Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3. Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4. Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

---

[14] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

C.   **PREGNANT & POSTPARTUM WOMEN**

   1.   Expand Screening, Brief Intervention, and Referral to Treatment ("*SBIRT*") services to non-Medicaid eligible or uninsured pregnant women;

   2.   Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("*OUD*") and other Substance Use Disorder ("*SUD*")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

   3.   Provide comprehensive wrap-around services to individuals with OUD, including housing, transportation, job placement/training, and childcare.

D.   **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME ("*NAS*")**

   1.   Expand comprehensive evidence-based and recovery support for NAS babies;

   2.   Expand services for better continuum of care with infant-need dyad; and

   3.   Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E.   **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

   1.   Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

   2.   Expand warm hand-off services to transition to recovery services;

   3.   Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

   4.   Provide comprehensive wrap-around services to individuals in recovery, including housing, transportation, job placement/training, and childcare; and

   5.   Hire additional social workers or other behavioral health workers to facilitate expansions above.

F.  **TREATMENT FOR INCARCERATED POPULATION**

1.  Provide evidence-based treatment and recovery support, including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.  Increase funding for jails to provide treatment to inmates with OUD.

G.  **PREVENTION PROGRAMS**

1.  Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.  Funding for evidence-based prevention programs in schools;

3.  Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.  Funding for community drug disposal programs; and

5.  Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H.  **EXPANDING SYRINGE SERVICE PROGRAMS**

1.  Provide comprehensive syringe services programs with more wrap-around services, including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

I.  **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE**

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE:  TREATMENT |
|---|

**A.   TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:[15]

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions.

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[15] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

8.   Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.   Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.   Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.   Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including, but not limited to, training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.   Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.   Disseminate of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service–Opioids web-based training curriculum and motivational interviewing.

14.   Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

**B.   SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the programs or strategies that:

1.   Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.   Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.   Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.      Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.      Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.      Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.      Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.      Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.   CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.  Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14.   Support assistance programs for health care providers with OUD.

15.   Engage non-profits and the faith community as a system to support outreach for treatment.

16.   Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.   ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.   Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1.   Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

    2.   Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

    3.   "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4.   Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

    5.   Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6.   Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.   Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.   Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

6.      Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including, but not limited to, parent skills training.

10.     Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

| PART TWO:  PREVENTION |
| --- |

**F.      PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including, but not limited to, improvements that:

1. Increase the number of prescribers using PDMPs;

2. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

3. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increasing electronic prescribing to prevent diversion or forgery.

8. Educating dispensers on appropriate opioid dispensing.

## G.   **PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Funding media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4. Drug take-back disposal or destruction programs.

5. Funding community anti-drug coalitions that engage in drug prevention efforts.

6. Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7. Engaging non-profits and faith-based communities as systems to support prevention.

8.  Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.  School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

**H.**   **PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Increased availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.  Public health entities providing free naloxone to anyone in the community.

3.  Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.  Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.  Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6.  Public education relating to emergency responses to overdoses.

100

7.     Public education relating to immunity and Good Samaritan laws.

8.     Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.     Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Supporting screening for fentanyl in routine clinical toxicology testing.

---

**PART THREE:  OTHER STRATEGIES**

---

## I.  FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.     Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.     Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.  LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment

intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.   A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.   Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.   Provide resources to staff government oversight and management of opioid abatement programs.

## K.   <u>TRAINING</u>

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1.   Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.   Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, pharmacies, PDMPs, etc.).

## L.   <u>RESEARCH</u>

Support opioid abatement research that may include, but is not limited to, the following:

1.   Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.   Research non-opioid treatment of chronic pain.

3.   Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.      Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.      Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.      Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

7.      Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("*ADAM*") system.

8.      Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.      Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.