Neville S. Hedley (SBN 241022)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 312-342-6008
Email: ned.hedley@hlli.org

*Attorneys for Objector Reilly Stephens*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION, | Case No. 19-md-02913-WHO |
| This Document Relates to: ALL CLASS ACTIONS | **OBJECTION OF REILLY STEPHENS TO PLAINTIFFS' ATTORNEYS' FEES REQUEST** |
| | Judge: Hon. William H. Orrick |
| | Courtroom: 2, 17th Floor |
| | Date: August 9, 2023 |
| | Time: 2:00 P.M. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................................i

TABLE OF AUTHORITIES ............................................................................................................ii

INTRODUCTION ...........................................................................................................................1

I.     Reilly Stephens is a member of the proposed settlement class and has standing to object. ...................2

II.    The district court has a fiduciary duty to the absent class members. ........................................2

III.   The Court should award fees of at most $38.25 million, which would return tens of millions of dollars to the class.................................................................................................................4

     A.    Based on the size of the settlement fund, 15% or $38.25 million is a far more reasonable fee award than the windfall Counsel seek .................................................4

     B.    It is preferable to calculate the attorney award net of settlement, administration, and litigation expenses. ..............................................................................................8

IV.   The Court should strike or disregard the Klonoff Declaration (Dkt. 4056-2).........................9

V.    The lodestar crosscheck does not support the requested fee............................................... 11

     A.    The lodestar is overstated by at least $38,741,884.84 because Class Counsel charged exorbitant rates for document review suited to less expensive staff attorneys........................ 11

     B.    The lodestar is likely overstated by even more than estimated because Class Counsel have failed to furnish objectors with sufficient billing summaries................................................. 14

     C.    A premium above benchmark is not appropriate here because Class Counsel bore little risk of non-payment and benefitted from objective indicia of liability by piggybacking off of government investigations and litigation. ....................................... 18

     D.    There must be consequences for Class Counsel's exorbitant overbilling. ............................... 25

CONCLUSION................................................................................................................................25

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 U.S. Dist. LEXIS 202526 (S.D.N.Y. Nov. 29, 2018) ................................................................................................................................5

*Alexander v. FedEx Ground Package Sys.*, 2016 U.S. Dist. LEXIS 78087 (N.D. Cal. June 15, 2016) .................................................................................................................................4, 7, 11

*Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015) .................................................................................4

*Arkansas Teacher Ret. Sys. v. State Street Bank & Trust Co.*, 25 F.4th 55 (1st Cir. 2022) ...................3, 6, 25

*Banas v. Volcano Corp.*, 47 F. Supp. 3d 957 (N.D. Cal. 2014) ...........................................................13

*Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018) ..........................................22

*Brown v. Stackler*, 612 F.2d 1057 (7th Cir. 1980) ..............................................................................25

*Chamber v. Whirlpool Corp.*, 980 F.3d 645 (9th Cir. 2020) ................................................................19

*Commonwealth Electric Co. v. Woods Hole*, 754 F.2d 46 (1st Cir. 1985) ............................................25

*Dial Corp. v. News Corp.*, 317 F.R.D. 426 (S.D.N.Y. 2016) .................................................................5

*Farrell v. Bank of Am. Corp., N.A.*, 827 Fed. Appx. 628 (9th Cir. 2020) ...........................................11

*Felix v. Northstar Location Servs.*, 290 F.R.D. 397 (W.D.N.Y. 2013) ................................................17

*Fraley v. Facebook, Inc.*, 2014 WL 806072 (N.D. Cal. Feb. 27, 2014) .................................................9

*Good v. W. Virginia-American Water Co.*, 2017 WL 2884535 (S.D. W. Va. July 6, 2017) ...................5

*GPF Waikiki Galleria v. DFS Group*, 2007 WL 3195089 (D. Haw. Oct. 30, 2007) ...........................10

*Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401 (S.D.N.Y. 2019) ...................................................5

*Gutierrez v. Wells Fargo, NA*, 2015 WL 2438274 (N.D. Cal. May 21, 2015) .....................................3, 7

*Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241 (C.D. Cal. 2003) ................................10

*IL Fornaio (America) Corp. v. Lazzari Fuel Co., LLC*, 2015 WL 2406966 (N.D. Cal. May 20, 2015) ...............................................................................................................................14

*In re Anthem, Inc. Data Breach Litig.*, 2018 U.S. Dist. 140137 LEXIS  (N.D. Cal. Aug. 17, 2018) ...............passim

*In re Beacon Assocs. Litig.*, 2013 WL 2450960 (S.D.N.Y. May 9, 2013) ..........................................12, 13

*In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) ...................4, 11, 19, 24

*In re Charles Schwab Corp. Secs. Litig.*, 2011 WL 1481424 (N.D. Cal. Apr. 19, 2011) .......................7

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F. Supp. 3d 456 (E.D. La. 2020) ...................5

*In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ............................................................3

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ............................................................ 2, 4

*In re Glumetza Antitrust Litig.*, 2022 U.S. Dist. LEXIS 20157 (N.D. Cal. Feb. 3, 2022) ...................... 4, 5

*In re High-Tech Employee Antitrust Litigation*, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ................ 6, 7

*In re HP Secs. Litig*, 2015 U.S. Dist. LEXIS 193707 (N.D. Cal. Nov. 13, 2015) .................................... 5

*In re Indymac Mortgage-Backed Secs. Litig.*, 94 F. Supp. 3d 517 (S.D.N.Y. 2015) ................................ 5

*In re Johnson & Johnson Derivative Litig.*, 2013 WL 6163858 (D.N.J. Nov. 25, 2013) ...................... 19, 24

*In re LendingClub Secs. Litig.*, 2018 WL 4586669 (N.D. Cal. Sept. 24, 2018) ...................................... 5

*In re MagSafe Apple Power Adapter Litig.*, 571 F. App'x 560 (9th Cir. 2014) ...................................... 24

*In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010) ............................... 2, 3, 14, 17

*In re NCAA Athletic Grant-in-aid Cap Antitrust Litig.*, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ....................................................................................................................................... 7

*In re Online DVD*, 779 F.3d 934 (9th Cir. 2015) .................................................................................. 8

*In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922 (9th Cir. 2020) .......................... passim

*In re Petrobras Secs. Litig.*, 317 F. Supp. 3d 858 (S.D.N.Y. 2018) ................................................... 19

*In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp 3d 985 (N.D. Ohio 2016) ............................ 12

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) ................................ 20

*In re Resistors Antitrust Litig.*, 2019 WL 5298143, 2019 U.S. Dist. LEXIS 174399 (N.D. Cal. Sept. 6, 2019) .............................................................................................................................. 15

*In re Stericycle Secs. Litig.*, 35 F.4th 555 (7th Cir. 2022) .................................................................... 4

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2019 U.S. Dist. LEXIS 206431 (N.D. Cal. Nov. 26, 2019) ..................................................................................................................... 8

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 1352859 (N.D. Cal. Apr. 12, 2017) ..................................................................................................... 1, 11, 16

*In re Washington Pub. Power Supply Sys. Litig.*, 19 F.3d 1291 (9th Cir. 1994) ........................... 2, 3, 11

*In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp. 3d 508 (N.D. Cal. 2020) ........... 7, 12

*In re Wells Fargo Sec. Litig.*, 157 F.R.D. 467 (N.D. Cal. 1994) ........................................................... 9

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 U.S. Dist. LEXIS 129939 (N.D. Cal. Jul. 22, 2020) ...................................................................................................................... passim

*Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614 (9th Cir. 1993) ............................................................ 15

*Kmiec v. Powerwave Tech.*, 2016 WL 5938709 (C.D. Cal. Jul. 11, 2016) ............................................. 9

*Knapp v. Art.com*, 283 F. Supp. 3d 823 (N.D. Cal. 2017) ........................................................3

*Laffitte v. Robert Half Int'l*, 376 P.3d 672 (Cal. 2016) ............................................................3

*Lane v. Wells Fargo Bank, N.A.*, 2013 WL 3187410 (N.D. Cal. June 12, 2013)......................14

*Lukov v. Schindler Elevator Corp.*, 2012 WL 2428251 (N.D. Cal. June 26, 2012) ..................10

*Myles v. AlliedBarton Security Servs., LLC*, 2014 WL 6065602 (N.D. Cal. Nov. 12, 2014)......9

*Nationwide Transport Finance v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008) .....................9

*Nevarez v. Forty Niners Football Co.*, 474 F. Supp. 3d 1041 (N.D. Cal. 2020).......................12

*New York State Teachers' Ret. Sys. v. GM Co.*, 315 F.R.D. 226 (E.D. Mich. 2016) ..................5

*Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 2423161 (N.D. Cal. June 5, 2017) .........7

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) ...............................................................8

*Perdue v. Kenny A.*, 559 U.S. 542 (2012) ...............................................................................19

*Piambino v. Bailey*, 757 F.2d 1112 (11th Cir. 1985) .................................................................3

*Pinal Creek Group v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037 (D. Ariz. 2005) ..............9

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2022 WL 816473, 2022 U.S. Dist. LEXIS
   47749 (N.D. Cal. Mar.17, 2022)...........................................................................................5

*Ramadan v. Gonzales*, 479 F.3d 646 (9th Cir. 2007) ..............................................................10

*Redman v. Radioshack Corp.*, 768 F.3d 622 (7th Cir. 2014) ..................................................8, 9

*Rodman v. Safeway Inc.*, 2018 WL 4030558 (N.D. Cal. Aug. 22, 2018) ...................................4

*Schoolcraft v. City of New York*, 2016 U.S. Dist. 183036, 2016 WL 4626568 (S.D.N.Y. Sept. 6,
   2016) ...................................................................................................................................15

*Seb Inv. Mgmt. AB v. Symantec Corp.*, 2022 WL 409702, 2022 U.S. Dist. LEXIS 24241 (N.D.
   Cal. Feb. 11, 2022)................................................................................................................5

*Silverman v. Motorola Solutions, Inc*, 739 F.3d 956 (7th Cir. 2013) ..................................19, 24

*Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170 (2d Cir. 2009) ...............................................12

*Stathakos v. Columbia Sportswear*, 2018 WL 1710075 (N.D. Cal. Apr. 9, 2018) .....................9

*Stobie Creek Invs. v. United States*, 81 Fed. Cl. 358 (Ct. Fed. Cl. 2008) ................................10

*United States ex rel. Palmer v. C&D Techs., Inc.*, 2017 WL 1477123 (E.D. Penn. Apr. 25, 2017) ...........12

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) ..................................................18

*Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115 (9th Cir. 2002)...............................................11, 20

*Yamada v. Nobel Biocare Holding AG,* 825 F.3d 536 (9th Cir. 2016) ............................ 17

*Young v. Smith*, 905 F.3d 229 (3d Cir. 2018) ............................ 25

**Rules**

Fed. R. Civ. Pro. 23(h) ............................ passim

Fed. R. Evid. 701 ............................ 9

Fed. R. Evid. 702 ............................ 9, 10

**Statutes**

42 U.S.C. § 1988 ............................ 19

**Other Authorities**

ABA Formal Opinion 08-451 ............................ 13

Advisory Committee Notes on 2003 Amendments to Rule 23. ............................ 3, 9

Press Release, MASS. ATTY. GEN., *AG Healey Announces Investigation into JUUL, Other Online E-Cigarette Retailers Over Marketing and Sale to Minors,* (Jul. 24, 2018) ............................ 22

Ahmed Jamal et al., *Tobacco Use Among Middle and High School Students — United States, 2011–2016*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Jun. 16, 2017) ............................ 20

Ana B. Ibarra, *The Juul's So Cool, Kids Smoke It In Schoo*l, THE WASHINGTON POST (Mar. 26, 2018) ............................ 19

ANN. MANUAL FOR COMPLEX LIT. § 11.491, 11.423 (4th ed.) ............................ 21

Annie Marie Chaker, *Schools and Parents Fight a Juul E-Cigarette Epidemic*, THE WALL STREET JOURNAL (April 4, 2018) ............................ 20

Bob Graff & Michelle Fivel, *Where Have All the Big Law Associates Gone?*, BLOOMBERG LAW (Mar. 21, 2017) ............................ 12

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010) ............................ 6

Christy Bieber & Mike Cetera, *JUUL Lawsuit Update July 2023*, FORBES ADVISOR (last updated May 22, 2023). ............................ 24

Dave Collins & Matthew Perrone, '*A world of hurt': 39 states to investigate Juul's marketing*, ASSOCIATED PRESS (Feb. 25, 2020) ............................ 23

DEPARTMENT OF HEALTH AND HUMAN SERVICES, *E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General—Executive Summary* (2016) ............................ 20, 23

*FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death,* FOOD & DRUG ADMIN. (Jul. 27, 2017) ............................ 20

*FDA Warning Letter to JUUL Labs, Inc.*, MARCS-CMS 590950, FOOD & DRUG ADMIN. (Sep. 9. 2019) ............................................................................................................... 23

*Federal Judicial Center, Manual for Complex Litigation—Fourth* (2004) ...................................7

Howard M. Erichson, *Coattail Class Actions: Reflections on Microsoft, Tobacco, and the Mixing of Public and Private Lawyering in Mass Litigation*, 34 U.C. DAVIS L. REV. 1 (2000) ...................20, 21, 23

Jennifer Maloney, *Federal Prosecutors Conducting Criminal Probe of Juul*, WALL STREET JOURNAL (Sep. 23, 2019) ................................................................................................... 23

Laura Klivans, *San Joaquin County DA Investigating JUUL Labs for Allegedly Marketing to Teens*, KQED (Sep. 26, 2019) ............................................................................................. 23

*Letter to JUUL Labs, Inc.*, FOOD & DRUG ADMIN., (Apr. 23, 2018) ..................................20, 23

Logan, Stuart, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 CLASS ACTION REPORTS (March-April 2003) ................................................................................. 6, 8

N.D. Cal. Procedural Guidance for Class Action Settlements ............................................. 14

Nicole Bradick, *Freelance Law: Providing Solutions to Modern Day Practice Dilemmas*, 27 MAINE BAR J. 23 (2012) ............................................................................................... 12

Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, BLOOMBERG (Feb. 22, 2019) ............................................................. 22

*Staff Attorney Salary*, Zippa: The Career Expert (Apr. 6, 2023) ...................................... 12

*Statement Regarding The Press Conference Held By The Massachusetts Attorney General*, JUUL Labs, Inc. (July 24, 2018) ...................................................................................... 24

Stephen J. Choi et al., *The Business of Securities Class Action Lawyering* (May 9, 2023), IND. L. J., forthcoming, available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=435097 ...................... 5, 19, 20, 21

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248 (2010) ...................................... 4, 8

Theodore Eisenberg, Geoffrey P. Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937 (2017) .....................................................................6

Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About Reasonable Fees in Common Fund Cases*, 18 GEO J. LEGAL ETHICS 1453 (2005) ................................................................................................... 11

## INTRODUCTION

Co-lead Counsel propose to pay themselves $76,500,000 in attorneys' fees, and to deduct $5 million more in expenses and service awards, a total Rule 23(h) request of about 32% of the JLI Settlement Fund, well above the 25% benchmark in this Circuit, and—more importantly—well above the 15 to 20 percent typical of a settlement of this size. This Court should look to empirical evidence, rather than the cherry-picked anecdotes of abnormally large fee awards Plaintiffs and their putative expert rely on. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, 2020 U.S. Dist. LEXIS 129939, at *151 (N.D. Cal. Jul. 22, 2020) (Koh, J.) (finding fee expert's "two published law review articles, which have no connection to the instant case, to be more reliable guides as to the average percentages of recovery awarded in similar cases" than counsel's cherry-picked sample); *see* Section III.A below.

Providing no more than the barest of detail, and substantially less information than Rule 23(h) and Ninth Circuit precedent require, Class Counsel bills the class for more than 363,000 hours from an unknown number of firms and billers. By contrast, recent massive and complex MDL cases in this district required only a fraction of the time and expense to litigate. *Compare Yahoo,* 2020 U.S. Dist. LEXIS 129939, at *116 (reducing and then approving just over 40,000 hours as reasonable for 4 year-old case); *In re Anthem Data Breach*, 2018 U.S. Dist. LEXIS 140137, at *76 (N.D. Cal. Aug. 17, 2018) (Koh, J.) (finding 78,892.5 billed hours to be excessive); *In re Volkswagen "Clean Diesel" Mkg. Sales Practices & Prod. Liab. Litig.*, 2017 U.S. Dist. LEXIS 39115, at *731-32 (N.D. Cal. Mar. 17, 2017) (noting that counsel expended only 98,000 hours). Hence, the bill for 363,000 hours is outrageously inflated on its face and is indicative of inefficiency that should not be rewarded with a disproportionate fee. *See* Section V.A-B below.  This is particularly true since there was no lack of takers to represent the class and Class Counsel pursued this litigation while riding in the slipstream of multiple government investigations and related litigation which eased the way towards settlement. Given the settlement's size and circumstances of these cases, a $76.5 million award would be a windfall.

Objector Reilly Stephens recommends a fee award of 15%, which would result in $38.25 million more in relief for class members less expenses and service awards. Indeed, the Court would be justified in awarding below 15%, because even that provides a positive multiplier on exaggerated billing for relatively low-risk litigation, as confirmed by the scores of firms who lined up for work in this case. *See* Section V.C-D below.

**I.  Reilly Stephens is a member of the proposed settlement class and has standing to object.**

Stephens is a U.S. resident who purchased JUUL products in the United States on or before December 7, 2022. *See* Stephens Decl. ¶ 3. His full name is Reilly Walsh Stephens; his address is 1952 3rd Street NE, Apt. 102, Washington, D.C., 20002; and his phone number is 443-791-6801. *See* Stephens Decl. ¶ 2. He does not fit within any of the exclusions to the proposed class. *See* Stephens Decl. ¶ 4. On July 5, 2023, Stephens submitted a claim through the settlement website. *See* Stephens Decl. ¶ 5. Thus, Stephens has standing to object to Plaintiffs' fee request. *See* Fed. R. Civ. P. 23(h)(2); *Stetson v. Grissom*, 821 F.3d 1157, 1164 (9th Cir. 2016).

Hamilton Lincoln Law Institute's Center for Class Action Fairness ("CCAF") represents Stephens *pro bono*, and CCAF attorney Neville Hedley intends to appear at the fairness hearing on his behalf. *See* Hedley Decl. ¶ 4. CCAF represents class members *pro bono* where class counsel employ unfair procedures to benefit themselves at the expense of the class. Since it was founded in 2009, CCAF has "develop[ed] the expertise to spot problematic settlement provisions and attorneys' fees." Elizabeth Chamblee Burch, *Publicly Funded Objectors*, 19 THEORETICAL INQUIRIES IN LAW 47, 55-57 & n.37 (2018). Over that time CCAF has recouped more than $200 million for class members by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. Frank Decl. ¶ 7 (citing examples). Stephens brings this objection through CCAF in good faith to protect the interests of the class. *See* Stephens Decl. ¶ 7. His objection applies to the whole class; he adopts any objections not inconsistent with this one.

**II.  The district court has a fiduciary duty to the absent class members.**

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013). Unlike ordinary settlements, "class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Id.* "[T]hus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.* To guard against this danger, a district court must act as a "fiduciary for the class . . . with 'a jealous regard'" for the rights and interests of absent class members. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (quoting *In re Washington Pub. Power Supply Sys. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994) ("*WPPSS*")).

At the fee-setting stage, the fiduciary role of this Court assumes added significance—it "requires close scrutiny" to prevent unreasonable and excessive depletion of the settlement fund. *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020); *see e.g.*, *Knapp v. Art.com*, 283 F. Supp. 3d 823, 835 (N.D. Cal. 2017) (Orrick, J.) (scrutinizing fee request to "determine whether [it] represent[ed] a disproportionate amount of the settlement" and deferring determination until actual value was known). When petitioning for fees, the relationship between class counsel and the class turns directly and unmistakably adversarial because counsel's "interest in getting paid the most for its work representing the class [is] at odds with the class's interest in securing the largest possible recovery for its members." *Mercury Interactive*, 618 F.3d at 994. Given this natural tension, there can be no deference to Class Counsel's recommendation, or to those of the Plaintiffs' handpicked Special Master, who subjected Class Counsel's billing records to minimal scrutiny.

Moreover, "in most common-fund cases, defendants have little interest in challenging class counsel's timesheets." *Gutierrez v. Wells Fargo*, 2015 WL 2438274, at *6 (N.D. Cal. May 21, 2015). "The defendant, having bought peace, ha[s] no dog in the hunt for fees." *Ark. Teacher Ret. Sys. v. State Street Bank & Trust Co.*, 25 F.4th 55, 65 (1st Cir. 2022). No individual class member has the financial incentive to object to an exorbitant fee request either; "[h]is gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992). Accordingly, the district court (and good-faith, public-minded objectors) are the last line of defense against overreaching fee requests.

"Public confidence in the fairness of attorney compensation in class actions is vital to the proper enforcement of substantive law." *Laffitte v. Robert Half Int'l*, 376 P.3d 672, 688-92 (Cal. 2016) (Liu, J., concurring). Exorbitant fees erode public confidence in the class action device. To prevent that erosion, "it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so." *Piambino v. Bailey*, 757 F.2d 1112, 1144 (11th Cir. 1985); *see also WPPSS*, 19 F.3d at 1298 (differentiating "reasonable" from "windfall" fees in megafund cases). In short, "[a]ctive judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23.

**III.** **The Court should award fees of at most $38.25 million, which would return tens of millions of dollars to the class.**

    **A.** **Based on the size of the settlement fund, 15% or $38.25 million is a far more reasonable fee award than the windfall Counsel seek**

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011). The benchmark for a reasonable award in the Ninth Circuit in a case alleging economic injury is 25% of the class benefit. *Id.* at 942. However, "to avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases." *Rodman v. Safeway Inc.*, 2018 WL 4030558, at *4 (N.D. Cal. Aug. 22, 2018) (simplified); *see also Bluetooth*, 654 F.3d at 942 (suggesting downward departure from the benchmark to prevent "windfall profits" in "mega-fund" settlements). Courts reviewing class-action settlements and fee awards must root themselves in "economic reality." *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015). "Cases are better decided on reality than on fiction." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) (discussing settlement value) (internal quotation omitted).

In megafund cases, "the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Alexander v. FedEx Ground Package Sys.*, 2016 U.S. Dist. LEXIS 78087, at *2-4 (N.D. Cal. June 15, 2016) (awarding fees totaling 16.4% of $226 million common fund). Stated differently, "due to economies of scale, it isn't ten times harder to try a $100 million case as it is a $10 million case." *In re Glumetza Antitrust Litig.*, 2022 WL 327707, 2022 U.S. Dist. LEXIS 20157, at *40 (N.D. Cal. Feb. 3, 2022). The Ninth Circuit thus instructs "courts [to] adjust the bench-mark percentage or employ the lodestar method instead" for megafund cases. *Bluetooth*, 654 F. 3d at 942. Indeed, "[t]he existence of [such a] scaling effect … is central to justifying aggregate litigation," and "should be a hallmark of a well-functioning class action system." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 263 (2010). Requesting fees from a megafund settlement as if just an ordinary application of the benchmark is "not consistent with a class representative's fiduciary duty to class members." *In re Stericycle Secs. Litig.*, 35 F.4th 555, 561 (7th Cir. 2022).

Shirking this basic principle, Plaintiffs cite a string of outlier cases where courts have approved disproportionately large fee requests in megafund settlements. *See* Fee Motion (Dkt. 4055) at 11 & n.6. Of course, "[l]aw firms can cite the fee percentages awarded in other cases as precedent, but they cherry pick cases with high fee percentages." Stephen J. Choi et al., *The Business of Securities Class Action Lawyering* (May 9, 2023), IND. L. J., forthcoming, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4350971 (*Securities Class Action Lawyering*). But "isolated string cites" are "not particularly meaningful." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 U.S. Dist. LEXIS 202526, at *14 (S.D.N.Y. Nov. 29, 2018). With hundreds of Rule 23(h) fee decisions, individual cites to cases with little reasoning are just anecdotes that prove little—it is just as easy to cite an equally lengthy list of cases going in the other direction and counseling a much lower award. *See, e.g.*, *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922 (9th Cir. 2020) (reversing 25% award of $124.5 million megafund).[1]

The better approach for assessing awards in similar cases, therefore, is not cherry-picking but looking at "empirical studies … which together survey hundreds of cases," for these "paint a far more comprehensive picture of the average percentage awarded to counsel in common fund settlements, thereby minimizing any potential sampling biases." *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019); *see also Yahoo*, 2020 U.S. Dist. LEXIS 129939, at *151 (finding fee expert's "two published law review articles, which have no

---

[1] *Glumetza*, 2022 U.S. Dist. LEXIS 20157, at *48 (rejecting $112m request from $453m settlement, awarding 11%); *Yahoo*, 2020 U.S. Dist. LEXIS 129939, at *149 (refusing to award 25.5% of $117.5 million; instead awarding 19.4% of fund); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F. Supp. 3d 456, 499-500 (E.D. La. 2020) (declining to award 30% of $248 million; awarding 19%); *In re LendingClub Secs. Litig.*, , 2018 WL 4586669 (N.D. Cal. Sept. 24, 2018) (awarding 13.1% of $125 million); *New York State Teachers' Ret. Sys. v. GM Co.*, 315 F.R.D. 226 (E.D. Mich. 2016) (awarding 7% of $300 million); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 437 (S.D.N.Y. 2016) (refusing to award 30% of $244 million; instead awarding 20% of fund); *Seb Inv. Mgmt. AB v. Symantec Corp.*, 2022 WL 409702, 2022 U.S. Dist. LEXIS 24241, *13 (N.D. Cal. Feb. 11, 2022) (awarding 19% of $70m settlement); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2022 WL 816473, 2022 U.S. Dist. LEXIS 47749, *18 (N.D. Cal. Mar.17, 2022) (16.33% of the $129m settlement); *In re HP Secs. Litig*, 2015 U.S. Dist. LEXIS 193707 (N.D. Cal. Nov. 13, 2015) (awarding 11% of $100 million settlement based upon a fee grid which varied based upon the amount recovered and the point during the litigation at which the settlement was achieved); *In re Indymac Mortgage-Backed Secs. Litig.*, 94 F. Supp. 3d 517, 523-25 (S.D.N.Y. 2015) (cataloging authorities and reducing 13% fee request to 8.2% of $346 million); *Good v. W. Virginia-American Water Co.*, 2017 WL 2884535 (S.D. W. Va. July 6, 2017) (criticizing a megafund fee request of 30% and denying preliminary approval).

connection to the instant case, to be more reliable guides as to the average percentages of recovery awarded in similar cases" than the selected sample); *In re High-Tech Employee Antitrust Litigation*, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015) (rejecting 19.5% fee request and instead awarding 9.8% of $415 million settlement because empirical research showed 10.2% median for megafund cases over $175 million).

Plaintiffs cite no empirical studies in support of their fee request.[2] Wholesale omission may be preferable to falsely claiming that a fee request is "right in line" with empirical surveys. *See Ark. Teacher Ret. Sys v. State St. Bank & Trust Co.*, 512 F. Supp. 3d 196, 250-51 (D. Mass. Feb. 27, 2020), *aff'd* 25 F.4th 55, 65-66 (1st Cir. 2022) (castigating class counsel for misleading the court by claiming that a 25% fee of a $300 million fund was "right in line" with Fitzpatrick's empirical survey). Still, it's not good; common fund fees proceedings are functionally "ex parte" and leave the court "vulnerable to being misled, whether by affirmative misrepresentation or by half-truths that deceive[] through their incompleteness." *Ark Teachers*, 25 F.4th at 65.

So what does the empirical evidence show? It shows that "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent." Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 838 (2010). For instance, in class actions in which the settlement equaled $100-$250 million, the median fee award was 16.9% and the mean was 17.9%. *Id.* at 839. Other surveys support this analysis. *See, e.g.,* Logan, Stuart, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 CLASS ACTION REPORTS (March-April 2003) (empirical survey showed average recovery of 15.1% where recovery exceeded $100 million); Eisenberg & Miller, 7 J. EMPIRICAL LEGAL STUD. at 265 tbl.7 (mean percentage fee in 68 class action settlements with recovery above $175.5 million was 12% and median award was 10.2% with standard deviation of 7.9%).[3]

---

[2] In contrast, plaintiffs' expert, Professor Klonoff, while providing his own table of outlier high-percentage megafund awards (over 90% of which are from outside this circuit, and thus are not subject to this circuit's benchmark rule), at least acknowledges that "empirical studies reflect that average and median fee awards in megafund cases are typically below 20 percent." Klonoff Decl. ¶¶ 72-74 (citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 845 (2010)).

[3] *See also* Theodore Eisenberg, Geoffrey P. Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 947 (2017) (mean and median for cases over $100 million ranged from 16.6% to 25.5%, but such variation was "probably due to significantly smaller number of very large cases in [the] data

Judges of this district rely on these empirical surveys as a matter of course. *See, e.g., Yahoo*, 2020 U.S. Dist. LEXIS 129939, at *147; *High-Tech*, 2015 WL 5158730, at *49-50; *Alexander*, 2016 WL 3351017, at *2; *In re Facebook Biometric Info. Privacy Litig.*, 522 F. Supp. 3d 617, 632 (N.D. Cal. 2021) (finding that the data suggested that a 15% award rather than the 16.9% requested was more reasonable for a fund of $650 million); *In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp. 3d 508, 526 (N.D. Cal. 2020) (declining to award 28% of $240 million recovery; awarding 22%); *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 2423161, at *12 (N.D. Cal. June 5, 2017) (citing literature). The fact that *High-Tech* and *Nitsch* were antitrust cases only underscores why the requested 30% percentage here is so excessive. An antitrust case is "arguably the most complex action to prosecute." *In re NCAA Athletic Grant-in-aid Cap Antitrust Litig.*, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017) (simplified). By contrast, this case involved less risk, having substantially benefitted from parallel government investigations and other objective indicia of liability. *See, post*, at 18-25.

To discount the importance of the settlement fund's size, Plaintiffs emphasize the lack of any bright line rule, stressing that courts *are not required* to reduce fee awards in megafund cases. *See* Fee Motion at 4. But just recently, the Ninth Circuit directed that courts "must refer" to "fund size" "in determining the fee award." *Optical Disk Drive*, 959 F.3d at 933 (internal quotation omitted). Not only do Plaintiffs seek to avoid a downward departure, they also seek an extraordinary upward one. But they cannot escape economic reality, which—at the very least—generates a strong presumption against the benchmark, in favor of downward departure. *See Facebook Biometric*, 522 F. Supp. 3d at 631 ("[a] 25% presumption is too big to be applied to common funds as large as this one"); *Alexander*, 2016 WL 3351017, at *2-3 (awarding fees 16.4% of $226 million common fund); *Nitsch*, 2017 WL 2423161, at *12 (awarding 11% of $150 million settlement in order to avoid "windfall profits" to class counsel owing to "achieved economies of scale"); *Gutierrez, v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *5 (rejecting 25% of $203 million, awarding only 9%); *In re Charles Schwab Corp. Secs. Litig.*, 2011 WL 1481424, at *8 (N.D. Cal. Apr. 19, 2011) (awarding attorneys' fees of 9.25% where fund equaled $235 million). At base, "the starting point of the analysis should not be the equivalent of a Willy Wonka golden ticket." *Facebook Biometric*, 522 F. Supp. 3d at 631.

---

set"); Federal Judicial Center, *Manual for Complex Litigation—Fourth* 188–89 (2004) (noting survey where "class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%").

Instead, a reasonable award for Class Counsel in this case is 15%, or about $38.25 million. After adding expenses and service payments, the total 23(h) award would amount to 16.9% of the settlement. Not only would this generously award Class Counsel, this figure is supported by empirical evidence and circuit practice.

A figure of 15% takes account of two important factors. First, Altria has separately settled with Plaintiffs in the MDL, and as such, the aggregation of settlements is actually over $300 million. *See* Dkt. 4055, Fee Motion at 2 n.3, 4 ("Class Counsel also anticipate seeking awards from the Altria settlement…"). That value reveals even further economies of scale justifying an even more modest percentage. *See Optical Disk Drive*, 959 F.3d at 933 (noting the correct frame of reference is the entire aggregation of settlements); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2019 U.S. Dist. LEXIS 206431, at *29 (N.D. Cal. Nov. 26, 2019) (calculating the "net award across all three settlements"). Second, as the net settlement fund is substantially greater than the largest funds included in Fitzpatrick's comprehensive study, a modest downward departure from his mean and median figures is justified.[4] Indeed—considering the mean percentage fee for class settlements above $175.5 million was 12%—a 15% fee is more than generous. *See Eisenberg & Miller* at 265 tbl.7. That Class Counsel seek 30%, over two standard deviations above the mean percentage, is plainly unreasonable. *See id.*

In short, Class Counsel's fee should not exceed $38.25 million (15% of the $255 million recovery), which would increase relief to class members by $38.25 million, less expenses and service awards.

## B.     It is preferable to calculate the attorney award net of settlement, administration, and litigation expenses.

The Ninth Circuit gives courts the discretion to calculate the percentage-of-recovery on the gross or net fund. *See In re Online DVD*, 779 F.3d 934 (9th Cir. 2015). But the better policy is fees based on the net settlement. The reason is simple: "Th[e]se costs are part of the settlement **but not part of the value received … by the members of the class**." *Redman v. Radioshack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) (Posner, J.) (emphasis added); *see, e.g., Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (excluding administration expenses in calculating fee percentage because such expenses are "costs, not benefits"). Accordingly, such expenses "shed no light on the fairness of the division of the settlement pie between class counsel and class members." *Redman*, F.3d at 630. This is critical, for the "fundamental focus is the result actually achieved for class

---

[4] A 15% fee award is also fully consistent with the finding that the mean percentage is 15.1%. for settlement funds greater than $100 million. *See Logan, Stuart, et al.*

members." 2003 Advisory Committee Notes to Amendments to Rule 23(h). This Court and others have agreed, excluding settlement and administration costs from the denominator of the fee calculation. *See, e.g.,* *Fraley v. Facebook, Inc.*, 2014 WL 806072, at *2 (N.D. Cal. Feb. 27, 2014); *Kmiec v. Powerwave Tech.*, 2016 WL 5938709, at *5 (C.D. Cal. Jul. 11, 2016) (finding "no principled reason to calculate a fee" by giving counsel a commission for their costs); *Myles v. AlliedBarton Security Servs., LLC,*  2014 WL 6065602, at *5 (N.D. Cal. Nov. 12, 2014) ("fees paid to the settlement administrator [are] not [] a benefit to the class members"). As an added bonus, this approach promotes judicial efficiency. By incentivizing Class Counsel to minimize expenses, courts need not waste resources monitoring settlement administration for cost overruns. "Put another way, incentives to minimize expenses and to allocate resources properly go much farther toward cost efficiency than can post hoc judicial review." *In re Wells Fargo Sec. Litig.*, 157 F.R.D. 467, 471 (N.D. Cal. 1994).

Here Plaintiffs request litigation expenses of $4.1 million and administrator-estimated costs between $3 and $6.5 million, depending on the numbers of claims submitted. Dkt. 3724-13 at 22. At the high end, that reduces the net settlement fund to $244.4 million such that a fee award of $38.25 million actually comes closer to 16% of the net settlement. Rather than rewarding Class Counsel with a multimillion-dollar commission on the costs paid to the settlement administrator and themselves, Class Counsel's fees should be calculated after costs are deducted from the settlement fund.

## IV.   The Court should strike or disregard the Klonoff Declaration (Dkt. 4056-2).

Stephens asks the Court to strike or, in the alternative, to disregard the Klonoff Declaration because it contains inadmissible legal conclusions and other legal arguments regarding the calculation of attorneys' fees. Testimony regarding matters of law is inadmissible under either Rule 701 or 702, for "[r]esolving doubtful questions of law is the distinct and exclusive province of the trial judge." *Nationwide Transport Finance v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (internal quotation omitted). Accordingly, it is well established that "expert testimony by lawyers, law professors, and others concerning legal issues is improper." *Pinal Creek Group v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1043 (D. Ariz. 2005); *accord Stathakos v. Columbia Sportswear*, 2018 WL 1710075, at *5 n.6 (N.D. Cal. Apr. 9, 2018) (striking paragraphs of a declaration that contained "improper legal opinions" on the topic of reasonable fees). Such legal opinions invade the Court's province as

the "sole arbiter of the law,"[5] and for no good reason: "the court is well equipped to instruct itself." *Stobie Creek Invs. v. United States*, 81 Fed. Cl. 358, 361 (Ct. Fed. Cl. 2008).

Here, the Klonoff Declaration seeks to usurp the judicial role by telling the Court which legal factors to evaluate in considering whether to deviate from the benchmark, the available methodologies it should apply in awarding fees, and concluding—under his review of the law and citation to cases—that "the attorneys' fee percentage sought (30 percent) is reasonable." Klonoff Decl. ¶ 50; *see also, e.g.*, ¶¶ 53, 59, 75, 83. The Klonoff Declaration predominantly analyzes law, not facts,[6] amounting to little more than one professor's reading of precedent.[7] Klonoff instructs the Court to "use the percentage-of-the-fund method." Klonoff Decl. ¶¶ 53. But "the court is well equipped to instruct itself." *Stobie Creek*, 81 Fed. Cl. at 361. He tells the Court how the lodestar crosscheck should be conducted. *See* Klonoff Decl. ¶¶ 53-55. He even applies, one by one, the relevant legal factors laid down by the Ninth Circuit to assess the reasonableness of attorneys' fees. *See* Klonoff Decl. ¶¶ 59-77. If this feels like an extended brief masquerading as an expert declaration, that's because it is. *See Ramadan v. Gonzales*, 479 F.3d 646, 648 (9th Cir. 2007) (*per curiam*) (finding "questions of law" to include the "application of law to undisputed facts, sometimes referred to as mixed questions of law and fact."). Klonoff's conclusions derive almost exclusively from caselaw and legal surveys. Such "expert testimony" that serves only to survey the law ought to be excluded under Rule 702. *See Lukov v. Schindler Elevator Corp.*, 2012 WL 2428251, at *2 (N.D. Cal. June 26, 2012) (excluding expert opinion based on "survey of state laws"); *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1260 & n.23 (C.D. Cal. 2003) (striking "interpretations of case law").

Posing as an expert declaration, Klonoff attempts to do the job of class counsel arguing for their fee award, and he does so while compensated to the tune of $1075/hr.  This Court should join others in refusing

---

[5] *GPF Waikiki Galleria v. DFS Group*, 2007 WL 3195089, at *5 (D. Haw. Oct. 30, 2007).

[6] Indeed, Klonoff's knowledge seemed largely to stem from Class Counsel's representations, rather than an independent review of the record. *See* Klonoff Decl. ¶¶ 45 ("I am advised by Class Counsel…"); 47 ("I am also advised…"); 89 ("I have not reviewed the time records…"); 90 ("it *appears* that each firm was careful to assign…") (emphasis added). Accordingly, Klonoff's Declaration suffers from the same deficiency as Class Counsel's fee request: representations of Class Counsel supported only by sparse billing records (that Klonoff didn't bother to review).

[7] To the extent the Klonoff Declaration relies on facts drawn from empirical studies, it discounts them in favor of cherrypicked datapoints, much akin to Plaintiffs. *Compare* Klonoff Decl. ¶¶ 73-75 *with* Fee Motion at 11, n.6.

to follow expert legal opinion and instead apply its own discretion to award a more reasonable fee than the windfall Plaintiffs seek. *See, e.g.*, *Yahoo*, 2020 U.S. Dist. LEXIS 129939, at *143; *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 1352859, at *3 (N.D. Cal. Apr. 12, 2017).

**V.    The lodestar crosscheck does not support the requested fee.**

The benchmark approach of this Circuit places primacy on the percentage method, but divorced from the relevant case context, that can become "like picking a number out of the air." *WPPSS*, 19 F.3d at 1297. Enter the lodestar cross-check. The lodestar cross-check will "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate," *Bluetooth*, 654 F.3d at 945, and "in megafund cases [it] assumes particular importance." *Alexander*, 2016 WL 3351017, at *2; *see also WPPSS*, 19 F.3d at 1298 (describing how percentage-based awards become particularly arbitrary in a megafund context). The crosscheck helps uncover the "disparity between the percentage-based award and the fees the lodestar method would support." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1124 n.8 (9th Cir. 2002). Unsurprisingly, then, "courts making common fund fee awards are ethically bound to perform a lodestar crosscheck." Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About Reasonable Fees in Common Fund Cases*, 18 GEO J. LEGAL ETHICS 1453, 1454 (2005). "Though circuit law does not necessarily require a cross check, it probably should"; "skipping this step breaches the district court's fiduciary duty to the class." *Farrell v. Bank of Am. Corp., N.A.*, 827 Fed. Appx. 628, 636 (9th Cir. 2020) (Kleinfeld, J., dissenting).

Here, the lodestar crosscheck confirms the excessiveness of Plaintiffs' fee request. First, the lodestar is overstated by millions of dollars because extensive document review was charged at exorbitant rates. When appropriate rates are assigned, the lodestar plummets by $38,741,884.84. Unfortunately, the extent of full overstatement cannot be determined due to the insufficient billing summaries submitted by Class Counsel. Even if the excessive rates and hours could be credited in full, the lodestar multiplier should reflect the low-risk nature of this litigation.

**A.    The lodestar is overstated by at least $38,741,884.84 because Class Counsel charged exorbitant rates for document review suited to less expensive staff attorneys.**

Bare-boned as they are, Class Counsel's records nonetheless demonstrate exorbitant billing rates for document review, of which they recorded 107,973.20 hours, more than any other category of work. *See* Sharp Decl. (Dkt. 4056) ¶ 122. The corresponding lodestar is $45,627,335.80, or 22.89% of the total lodestar figure.

*See id.* Class Counsel thus seek about $422.60/hour for a task typically delegated to "extremely low-cost, low-overhead temporary employees." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013). This is patently unreasonable and warrants substantial reduction. *See, e.g., Wells Fargo*, 445 F. Supp. 3d at 531 (incorporating contract attorney time into the lodestar at the average of $42.50 that they were paid rather than the markup rates of $295-$415); *Anthem,*, 2018 U.S. Dist. LEXIS 140137, at *136 (applying hourly rate of $250 for staff and contract attorneys, rejecting requested rates as high as $447); *Nevarez v. Forty Niners Football Co.*, 474 F. Supp. 3d 1041, 1050 (N.D. Cal. 2020) (declining to allow $30/hr staff attorneys to be marked up to $625/hr); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp 3d 985, 1013 (N.D. Ohio 2016) (reducing the hourly rate for contract attorneys from $389 to $150, and the total lodestar by 20%).

"There is little excuse in this day and age" for such exorbitant billing. *Beacon*, 2013 WL 2450960, at *18. After all, "much of the due diligence and discovery work that was previously handled by first and second year associates is now being handled by staff attorneys at much lower rates ($50/hour)." *See* Bob Graff & Michelle Fivel, *Where Have All the Big Law Associates Gone?*, BLOOMBERG LAW (Mar. 21, 2017). Reasonable fees accord to what reasonable, cost-conscious clients would pay. *See Wells Fargo*, 445 F. Supp. 3d at 529. And in today's legal market, clients refuse to tolerate law firms treating gigantic document review projects as profit centers. *See United States ex rel. Palmer v. C&D Techs.*, 2017 WL 1477123, at *6 (E.D. Pa. Apr. 25, 2017). Firms have proved receptive: Data from the career site Zippa reveals that staff and contract attorneys—those typically responsible for document review—are paid at much lower rates than associates and partners.[8] *See Staff Attorney Salary*, Zippa: The Career Expert (Apr. 6, 2023), https://www.zippia.com/staff-attorney-jobs/salary/ (finding mean national hourly rate of $52.90 and mean California rate of $63.77). In *Wells Fargo*, the rates ranged from $35-$50/hr. 445 F. Supp. 3d at 531. And in *Anthem,* they ranged from $25-$65/hr. 2018 U.S. Dist. LEXIS 140137, at *125. Yet Plaintiffs billed the vast majority (92.5%) of their contract or staff attorney hours at rates ranging from $100 to $500. *See* Sharp Decl. ¶ 129. This tells class members little, but the little it does tell is concerning. The vastness of the billing range renders it mostly uninformative. Indeed, the range is so vast as to suggest *at least some* staff attorneys were billed at higher hourly rates than *at least some* associates, senior

---

[8] This holds true even when staff and contract "lawyers are experienced, highly-qualified attorneys." Nicole Bradick, *Freelance Law: Providing Solutions to Modern Day Practice Dilemmas*, 27 MAINE BAR J. 23, 24 (2012).

counsel, and even partners. *See* Sharp Decl. ¶ 129. Moreover, $100/hour is a markup of the national hourly rate for staff attorneys of only 89.04%. $500/hour, meanwhile, constitutes a much larger markup of 845.18%. While both figures are astonishing, so too is the sheer breadth of the markup range, which leaves class members in the dark as to the standard rates being billed for what are supposed to be "extremely low-cost, low-overhead temporary employees." *Beacon*, 2013 WL 2450960, at *18.[9]

The best practice is to bill contract and staff attorneys at cost. *Wells Fargo*, 445 F. Supp. 3d at 531 (following the practice in the absence of proof of higher rate charged to paying clients); *Anthem*, 2018 U.S. Dist. LEXIS 140137, at *128 (commending the practice); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 980 (N.D. Cal. 2014) (awarding contract attorney time as "costs" at billing rate of $47 to $59 per hour). Indeed, it is likely unethical to charge more than cost. *See* ABA Formal Opinion 08-451 ("In the absence of an agreement with the client authorizing a greater charge, ***the lawyer may bill the client only its actual cost plus a reasonable allocation of associated overhead***, such as the amount the lawyer spent on any office space, support staff, equipment, and supplies for the individuals under contract." (emphasis added)). If the 107,973.20 hours in document review were billed at cost, using California's generous average hourly rate for staff attorneys, Class Counsel would have expended $6,885,450.96 on document review, an astonishing $38,741,884.84 less than the claimed lodestar. The $45,627,335.80 Class Counsel records is a markup of 562.66%. Even accepting that "counsel may be entitled to a reasonable markup to cover costs such as supervision and overhead," the markup in this case is "striking." *Cf. Anthem*, 2018 U.S. Dist. LEXIS 140137, at *130 (approximately 729% markup). Worse yet, the exorbitant rate sought for document review belies the Special Master's observation that "much of the preliminary work continued to be properly allocated to paralegals and associates at lower billing rates." Dkt. 4056-1 at 32. If that were true, one would expect the average billing rate for document review would fall closer to the $100 low-end of the range, not $422.60, which approaches the high end. While Class Counsel might justify their exorbitant rate by claiming that associates were involved in document review, "courts should also account for the 'wasteful use of highly skilled and highly priced talent for matters easily delegable to

---

[9] While her oversight was largely permissive, there was at least one occasion where Judge Andler "lack[ed] specific information regarding the experience level of the billers which could be potentially relevant to a determination that the number of hours expended was reasonable and necessary for the task," *i.e.*, "intensive document review." Dkt. 4056-1 at 40. Accordingly, the Special Master reserved the right to revisit her determinations as to reasonableness. Ultimately, it does not appear that any meaningful scrutiny resulted.

nonprofessionals or less experienced associates.'" *Hernandez v. Grullense*, 2014 WL 1724356, at *5 (N.D. Cal. Apr. 30, 2014) (Orrick, J.) (quoting *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983)). Because "[a] Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn," *id.*, many courts refuse to permit full lodestar rates to be charged under these circumstances. *See, e.g.*, *IL Fornaio (America) Corp. v. Lazzari Fuel Co., LLC*, 2015 WL 2406966, at *5 (N.D. Cal. May 20, 2015) ("It would be unjustified to charge the class senior-associate or partner-level rates for routine tasks like document review...."). In any event, the billing protocol does not allow it. *See* Dkt. 352 at 6 (listing "work performed by a person more senior than reasonably necessary for the task" under "other non-compensable work").

In sum, consistent with the reasonable rates for document review work, the lodestar is overstated by at least $38,741,884.84.

## B. The lodestar is likely overstated by even more than estimated because Class Counsel have failed to furnish objectors with sufficient billing summaries.

Though unreasonable billing rates for staff attorneys and document review inflate the lodestar on its face, the true extent of the overbilling cannot be calculated because Class Counsel have failed to provide sufficient detail in their billing summaries, as required by district procedure. *See generally* N.D. Cal. Procedural Guidance for Class Action Settlements ("All requests for approval of attorneys' fees awards **must** include detailed lodestar information, even if the requested amount is based on a percentage of the settlement fund." (emphasis added)). This is especially concerning here, where multi-firm collaboration has likely increased duplication, overstaffing, and "the [overall] inefficiency in keeping a multiplicity of law firms up to speed." which counsel's nebulous categorical billing likely shrouds. *Lane v. Wells Fargo Bank, N.A.*, 2013 WL 3187410, at *15 (N.D. Cal. June 12, 2013).

The information furnished by Class Counsel is bare-boned. All class members can gather is a breakdown by category of work, total lodestar, and total hours. *See* Sharp Decl. ¶ 122. But that is not enough: class members are entitled to determine *which* attorneys seek *what* fees for *what* work. *See In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010). It is therefore problematic that, as of the objection deadline, Stephens hasn't a clue *which firm* or *which attorney* of *which position* contributed to Plaintiffs' efforts, or the extent to which they did so. Take, for example, the recorded 107,973.20 hours in document review. Given the hours and the total claimed lodestar, Stephens can gather that Plaintiffs billed an average of about $422.60/hour. But

because of the massive and overlapping billing ranges for staff attorneys, senior counsel, partners, associates, and paralegals, Stephens can only hazard a guess as to who contributed or, for that matter, if their contribution was reasonably suited to the task and its sophistication. Lack of detailed billing submissions in their fee papers make it impossible for class members to precisely identify duplication and other inefficiencies. *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 623 (9th Cir. 1993) (time records should demonstrate "whether the time devoted to particular tasks was reasonable and whether there was improper overlapping of hours"). "No paying client would ever stand for it, and it is a disservice to the class and the Court." *In re Resistors Antitrust Litig.*, 2019 WL 5298143, 2019 U.S. Dist. LEXIS 174399, at *9 (N.D. Cal. Sept. 6, 2019).

Nevertheless, the basic facts of the fee application suggest immoderation akin to that complained of in *Anthem*, where bills included 329 billers from 53 law firms. 2018 U.S. Dist. LEXIS 140137, at *76. Indeed, deposition billing appears especially extravagant here, with over 55,000 "Fact Deposition" hours spent on around 120 depositions, a stunning rate of 441 hours per deposition.[10] *See* Sharp Decl. ¶¶ 45-47, 122. Limiting the billing to a reasonable amount per deposition reduces the lodestar substantially. For comparison, Judge Koh in *Anthem* deemed 71 hours per deposition (13,800 hours for 195 depositions) excessive and noted that the Special Master recommended at 10% haircut. 2018 U.S. Dist. LEXIS 140137, at *137, *146. Here, limiting the billing to about 64 hours per deposition (71 less 10% haircut) reduces the lodestar by at least $25 million.[11]

More generally, as in *Anthem*, "employing [so many law firms] likely resulted in unnecessarily duplicative or inefficient work by virtue of the fact that so many billers needed to familiarize themselves with the case and keep abreast of case developments." 2018 U.S. Dist. LEXIS 140137, at *135-*36. "Class Counsel could not 'possibly conduct effective oversight of this very large team'…especially because 'every time a new law firm was added to the group, those lawyers had to spend time learning the history, issues, and facts being litigated.'" *Id.* at *136 (quoting special master's report). Here, we don't even know how many billers or law firms have

---

[10] We use the figure of 120 fact depositions as a reasonable estimate, but it is unclear how many Class Counsel actually administered. *See* Sharp Decl. ¶ 45 (listing around 100 depositions of JLI-related witnesses, 20 depositions of Altria employees, and depositions of the individual defendants); Dkt. 1358 at 5-10 (listing several named defendants, including various Altria entities and subsidiaries). We also limit our analysis to fact depositions, as Stephens is unaware how many expert depositions Class Counsel administered. Were this information provided, additional bloat might well be revealed.

[11] This still overstates the lodestar. One court found that 42 hours per deposition was excessive. *Schoolcraft v. City of New York*, 2016 U.S. Dist. 183036, 2016 WL 4626568 at *9 (S.D.N.Y. Sept. 6, 2016).

been included in the fee submission. We only know that Class Counsel proclaims a total lodestar (before the Klonoff reductions) of nearly $200 million from 363,344.1 hours of work, and that the Special Master approved almost $156 million of that lodestar. Sharp Decl. ¶ 120; Hedley Decl, Exh. 5. Plaintiffs do not explain the $45 million discrepancy. It could be attributable to JCCP Plaintiffs' lodestar. But if so, how much time has been excised to prevent undue duplication between the state and federal consolidated litigations? And more importantly, what explains JCCP's far greater efficiency?

Co-Lead Counsel promised efficiency in their appointment applications. Ms. London promised that "LCHB has develop a work culture designed to minimize fees and expenses in the interest of the class." Dkt. 97 at 3. Mr. Kawamoto represented that he would "prosecute this matter efficiency and effectively." Dkt. 103 at 3. The "Consensus Plaintiffs" omnibus response promised to "ensure sufficient measures are in place to avoid waste, duplication, and over-billing." Dkt. 186 at 5. Yet somehow the result here is a true unparalleled cornucopia of hours (363,000), four times higher than the inefficient 78,892.5 hours in *Anthem*. 2018 U.S. Dist. LEXIS 140131, at *136. *Compare also Yahoo*, 2020 U.S. Dist. LEXIS 129939, at *116 (reducing and approving just over 40,000 hours as reasonable for a massive 4 year-old MDL and parallel JCCP action). Even in the truly massive *Volkswagen* MDL—where counsel billed firm attorneys for answering individual queries by class members that should have been handled at cost by third-party staffers—class counsel only expended 98,000 hours. *Volkswagen*, 2017 U.S. Dist. LEXIS, 39115, at *731-32. Here, 363,000 hours means 120 attorneys billing over 3000 hours each. What are the limits? Are there any?

Moreover, even if this Court were to agree with Professor Klonoff's proposed methodology for making lodestar reductions (for work spent outside the class action track of this MDL and for work spent pursuing Altria as a defendant), Klonoff Decl. ¶¶ 84-87, the sparse detail provided allows no such scrutiny by Klonoff, much less the class members entitled to this information. As a result, Professor Klonoff is left to the unsupported supposition that counsel expended one-third of the lodestar on the class-action track and that 15% of the hours were expended against Altria given the relative sizes of the settlement. The latter supposition is especially questionable given that counsel expended more than 33,000 hours during the final quarterly billing period, during much of which the litigation against JLI had settled, leaving only the Altria litigation on appeal. *See* Hedley Decl, Exh. 5.

Further, in providing billing ranges, Class Counsel use oddly arbitrary percentages. For example, "[f]or over **97%** of partner hours, rates range from $275 – $1,200." Sharp Decl. ¶ 129 (emphasis added). So, too, "[f]or over **88%** of paralegal hours, rates range from $75 – $425." *Id.* (emphasis added). Why Class Counsel selected 97% and 88% in presenting billing ranges is as uncertain as it is strange. Indeed, it is more common to break things down by 90th, 95th, and 99th percentile, suggesting a weird cherry-picking here to hide much more exorbitant billing rates. "If plaintiffs and their attorneys are acting like they have something to hide from absent class members, perhaps it's because they do." *Felix v. Northstar Location Servs.*, 290 F.R.D. 397, 408 (W.D.N.Y. 2013). Class Counsel admit that "[c]apping the hourly rates that exceed the above ranges (i.e., capping all partner rates at $1,200 and all paralegal rates at $425)" would reduce lodestar by $2.35 million. Sharp Decl. ¶ 129. The Court should do so in the absence of justification for higher billing rates.

Stephens understands that Class Counsel have been submitting regular billing records to the Special Master. *See* Dkt. 680 (appointing master). But Rule 23(h) demands that class members be afforded the opportunity to conduct their *own* assessments. *Anthem*, 2018 U.S. Dist. LEXIS 140137, at *182 (discussing related issue and noting "[a]lmost the entirety of each attorney's narrative descriptions is now publicly disclosed."); *see generally Yamada v. Nobel Biocare Holding AG,* 825 F.3d 536, 545 (9th Cir. 2016) ("The Due Process Clause requires that opposing counsel have access to the timesheets relied on to support the fee order").

Nor can the Court defer to the Special Master's review for at least two reasons. *First*, as discussed in Section II above, Rule 23(h) duties are non-delegable. This is especially true here, where Judge Andler will be compensated through private agreement with Class Counsel, beyond this Court's supervision. *See* Dkt. 680 at 3. It is thus unclear the extent to which Judge Andler and Class Counsel's pecuniary interests align. With a potential pecuniary interest, Judge Andler ought not to supplant the fiduciary duty this Court owes to absent class members, a duty that always necessitates "a jealous regard" for class members' interest in the settlement fund. *Mercury Interactive*, 618 F.3d at 994.

*Second*, there is no indication that Judge Andler zealously scrutinized the billing submissions of Class Counsel. Across her quarterly reports, the Special Master admits not having "examine[d] every separate time and expense entry for each timekeeper from each firm." *See, e.g.*, Dkt. 4056-1 at 11. Rather, she relied substantially on "professional judgment." *Id.* But in so doing, Judge Andler seems to have missed some red

flags. Take, for instance, her favorable observation that "much of the preliminary work continued to be properly allocated to paralegals and associates at lower billing rates," which is belied by the exorbitant rates Class Counsel billed for document review. *Compare* Dkt. 4056-1 at 32 *with* Sharp Decl. ¶ 122. On other occasions, Judge Andler left both class members and the Court in the dark about critical information. She often raised "concerns" about Class Counsel's billing practices, but rarely revealed what those concerns entailed, or how Class Counsel mitigated them. *See, e.g.*, Dkt. 4056-1 at 24 ("concerns were communicated … and all concerns of the Special Master were adequately addressed"); 39 ("concerns were communicated …, all concerns of the Special Master were responded to and adequately addressed to the satisfaction of the Special Master"); 74 ("the Special Master communicated in writing to Leadership concerns and anomalies she found with respect to certain entries in the time and expenses reports. … Leadership adequately addressed all concerns to the satisfaction of the Special Master"); 91-92 (substantially the same); 109 (substantially the same). Instead, Judge Andler made a habit of summarily affirming Class Counsel's fees with minimal indication of scrutiny. Indeed, there does not appear a single instance where the Special Master *actually reduced* Class Counsel's submitted fees, and if there were, Stephens is unaware. At her most thorough, Judge Andler reserved the right to revisit select entries, and on one occasion deferred approval of a select subset of entries related to depositions. *See* Dkt. 4056-1 at 40 (reserving right to revisit); 58 (deferring approval). Class members deserve a more searching inquiry.

### C.      A premium above benchmark is not appropriate here because Class Counsel bore little risk of non-payment and benefitted from objective indicia of liability by piggybacking off government investigations and litigation.

The Ninth Circuit has long held that an upward departure from the 25% benchmark is warranted when counsel achieves "exceptional" results and undertook "extreme risks" in doing so. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-49 (9th Cir. 2002). No such showing has been made here. Indeed, all the available evidence suggests the case posed comparatively little risk, and the result—while large in terms of dollars—is not particularly exceptional. Given the minimal risk of nonpayment and the helping hand of government scrutiny, Class Counsel are not entitled to the 25% benchmark, let alone the 30% they request. Likewise, even if one credits Professor Klonoff's adjusted lodestar (which does not account for Class Counsel's egregiously inflated

hours, and thus should be further discounted),[12] "there is a strong presumption that the lodestar is sufficient," and that upward departures should be "rare and exceptional," confined to those cases where the lodestar alone "would not have been adequate to attract competent counsel." *Perdue v. Kenny A.*, 559 U.S. 542, 546, 554 (2012).[13]

 "Courts uniformly hold that one of the primary factors in setting a fee award should be the riskiness of the litigation." *Business of Securities Class Action Lawyering* at 57. The Ninth Circuit is no exception. *See Optical Disk Drive*, 959 F.3d at 930. Thus, it might first be useful to clarify what this case *is not*. This is not a class action for which "no other law firm was willing to serve as lead counsel." *Silverman v. Motorola Solutions, Inc*, 739 F.3d 956, 958 (7th Cir. 2013). Quite the opposite. From the outset, "this was a promising case, holding the prospect of a large fee recovery from solvent defendants." *In re Johnson & Johnson Derivative Litig.*, 2013 WL 6163858, at *11 (D.N.J. Nov. 25, 2013). By April 26, 2018—when the first complaint in the MDL was filed—JUUL was already a public enemy. As in *Petrobras*, "this case involved [] allegations that were previously widely reported and heavily investigated," which "enhanced plaintiffs' bargaining position" *In re Petrobras Secs. Litig.*, 317 F. Supp. 3d 858, 876 (S.D.N.Y. 2018). The complaint proves as much, citing high profile national publications' reporting about JUUL and the predictable results of its abusive practices. *See, e.g.*, Class Action Complaint, *Colgate v. JUUL Labs, Inc.*, Dkt. 1 at 15-17 (N.D. Cal. Apr. 26, 2018) ("Colgate Cmplt.") (citing, *inter alia*, Ana B. Ibarra, *The Juul's So Cool, Kids Smoke It In School*, THE WASHINGTON POST (Mar. 26, 2018); Annie Marie

---

[12] Professor Klonoff settled on a lodestar figure of $56.38 million. Klonoff Decl. ¶ 87. Using that figure and his methodology—but adjusting it for the egregiously inflated document review and deposition hours, and applying the rate cap—yields a more reasonable lodestar of $37.9 million, similar to the $38.25 million fee Stephens suggests. To arrive at this figure, we summed the inflated document review lodestar ($38.74 million) and the inflated deposition lodestar ($25 million), and the rate cap of $2.35 million, which equals $66.1 million. Applying Klonoff's methodology, one-third applies in this case and further 15% reduction is required to account for the Altria portion of the settlement. This results in a $18.5 million inflation adjustment to Klonoff's lodestar, equaling $37.9 million ($56.38m less $18.5m).

[13] *Kenny A.*'s limitation on lodestar enhancements was made with respect to fees awarded pursuant to 42 U.S.C. § 1988, which provides that the prevailing party in certain civil rights cases may recover "a reasonable attorney's fee as part of the costs." The limitation on § 1988's "reasonable" fee awards should apply equally to reasonable fee awards made under Rule 23(h). *See Chamber v. Whirlpool Corp.*, 980 F.3d 645, 665-66 (9th Cir. 2020) (citing favorably *Kenny A.* in rejecting multiplier for non-coupon portion of settlement); *Bluetooth*, 654 F.3d at 942 n.7 (departure from a lodestar warranted only in rare and exceptional cases).

Chaker, *Schools and Parents Fight a Juul E-Cigarette Epidemic*, THE WALL STREET JOURNAL (April 4, 2018)). Indeed, just three days before Plaintiffs filed the Colgate complaint, the FDA sent JUUL a letter demanding information and threatening penalties for noncompliance. *See* FOOD & DRUG ADMIN., *Letter to JUUL Labs, Inc.* (Apr. 23, 2018). Before that, a Surgeon General report flagged the risks of youth e-cigarette use (U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General—Executive Summary* (2016)); the CDC reported on tobacco use by middle and high-school students (Ahmed Jamal et al., *Tobacco Use Among Middle and High School Students — United States, 2011–2016*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Jun. 16, 2017)); and an FDA news release announced a comprehensive regulatory plan for e-cigarettes (FOOD & DRUG ADMIN., *FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death* (Jul. 27, 2017) ("The agency plans to issue … [a] new enforcement policy [] affect[ing] … newly-regulated tobacco products such as cigars and e-cigarettes.")).

A fee award must account for this litigation background. *See generally* Hedley Decl. Exhs. 1 & 2. "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 337 (3d Cir. 1998) (internal quotation and citation omitted); *cf. Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1124 (9th Cir. 2002) (abuse of discretion to award fees on basis of entire fund when class counsel is only partially responsible for creation of fund). JUUL faced a tidal wave of potential liability on all fronts before this litigation began; riding the wave does not entitle counsel to the same fee as swimming the English Channel solo.

Evidently, plaintiffs' attorneys perceived that wave and jumped aboard, sending in at least 40 separate applications for leadership positions. *See* Hedley Decl. Exh. 3. *Cf. Anthem*, U.S. Dist. LEXIS 140137, at *159 ("[T]here was little risk that the class clients here would otherwise be denied access to counsel. Indeed, this Court received 18 separate motions to serve as lead counsel in this action."); *Business of Securities Class Action Lawyering* at 59-60 ("in more promising cases, more law firms will fight for the lead counsel role"). Plaintiffs' law firms didn't fear non-payment. They feared missing out.

Just as "[g]overnment litigation provides impetus and information to further [] class actions," so too does government investigation. Howard M. Erichson, *Coattail Class Actions: Reflections on Microsoft, Tobacco, and the Mixing of Public and Private Lawyering in Mass Litigation*, 34 U.C. DAVIS L. REV. 1, 46 (2000) [hereinafter *Coattail*

*Class Actions*]; *accord* ANN. MANUAL FOR COMPLEX LIT. § 11.491 (4th ed.) ("Access to [relevant government reports] can reduce the need for discovery and assist in defining and narrowing issues."); § 11.423 (4th ed.) (recommending that "[w]hen information is available from public records," courts should "consider requiring the parties to review those materials before undertaking additional discovery"). Governmental scrutiny, in other words, is "objective indicia going to the merits of the claims that are available at the time the complaint is filed," and "[t]he lawyers filing these claims understand that [it] make[s] recovery more likely." *Business of Securities Class Action Lawyering* at 60. When government investigation predates or parallels a class action, Class Counsel's life is made substantially easier in four ways.

*First*, public scrutiny "give[s] lawyers … the idea for the private suit, or spur[s] to action those who had been considering such a suit." *Coattail Class Actions* at 6. Accordingly, it should come as no surprise that the Colgate complaint was filed just three days after the FDA issued an ominous warning letter, or that it invokes the FDA probe in support of its assertions. *See* Colgate Cmplt (Dkt. 1) at 15-17.

*Second*, government investigations "suggest ideas or language for the complaint." *Coattail Class Actions* at 6. It is thus unremarkable that the Colgate complaint piggybacks off of an FDA probe, *see* Colgate Cmplt (Doc. 1) at 15-17, or that the operative complaint dedicates an entire section to how "The FDA Warned JUUL and Others that Their Conduct Is Unlawful." *See* Second Amended Consolidated Class Action Complaint (Dkt. 1358) at 160-62.

*Third*, government investigations "generate documentary discovery or other information that private litigants use in their lawsuits." *Coattail Class Actions* at 6. Take, for instance, how the operative complaint avails itself of congressional testimony to substantiate charges of misrepresentation. *See* Second Amended Consolidated Class Action Complaint (Dkt. 1358) at 163.

*Fourth* and finally, government investigation "facilitate[s] private claims by altering public attitudes about the defendants' liability." *Coattail Class Actions* at 6. Here, intense public scrutiny of JUUL served to focus the public's attention, likely expanding the scope of notice without necessitating additional investment in settlement administration. In these four ways, government scrutiny of JUUL made Class Counsel's job easier. Having been predated by damning research and aggressive investigation, the present action is simply not "as valuable as breakthrough litigation," and "the lawyers should [not] earn as much as they would have had their task been more formidable." *Coattail Class Actions* at 6.

The helping hand of government aside—and notwithstanding the sheer size of the settlement fund—Class Counsel stake out the extraordinary position that their fee award should be adjusted *upward* from this Circuit's 25% benchmark. *See* Fee Motion at 9. Their main justification is that the present action carried "substantial risk of non-payment *presented throughout the course of the litigation*." *Id.* (emphasis added). But therein lies the problem: "the analysis should be based on the risk that existed **when the litigation began—not at the time of settlement**." *Stericycle*, 35 F.4th at 563 (emphasis added). Only this is consistent with the district court's duty to "approximate the fees that the lawyers and their clients **would have agreed to at the outset of the litigation given the suit's risk**." *Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792, 796-97 (7th Cir. 2018) (Easterbrook, C.J.) (emphasis added). Accordingly, the analysis must begin in April 2018, when the litigation began. Then, JUUL's "possibility of insolvency" was negligible. Fee Motion at 9. In Spring 2018, the company was doing quite well for itself. *See, e.g.,* Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, BLOOMBERG (Feb. 22, 2019). Indeed, JUUL was making record revenues *despite* a recent ban on flavored e-cigarettes. *Id.* This litigation thus presented an ideal opportunity for Class Counsel: a deep-pocketed defendant caught in the cross-hairs of multiple government investigations. That "JLI's PMTA [was] denied by the FDA" or that "Altria had written down the value of its investment in JLI" is of no moment, for as Class Counsel freely admit, these developments occurred "as the litigation proceeded." Fee Motion 9.

It is thus curious that Plaintiffs omit developments that *decreased* the risk of nonpayment "as the litigation proceeded." Fee Motion at 9. In July 2018—barely three months after the filing of the Colgate Complaint and before this Court appointed class counsel—Massachusetts became the first state to announce an investigation of JUUL. *See* Press Release, MASS. ATTY. GEN., *AG Healey Announces Investigation into JUUL, Other Online E-Cigarette Retailers Over Marketing and Sale to Minors*, (Jul. 24, 2018). In September 2019—over two years before the Second Amendment Complaint was filed—the FDA accused JUUL of "engag[ing] in labeling, advertising, and/or other activities directed to consumers" that "explicitly and/or implicitly [] represented that JUUL products are free of a substance, have a reduced level of or exposure to a substance, and/or that JUUL products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products." FOOD & DRUG ADMIN., *FDA Warning Letter to JUUL Labs, Inc.*,

MARCS-CMS 590950 (Sep. 9, 2019).[14] And that same month, there were reports of criminal probes into the company. *See, e.g.*, Jennifer Maloney, *Federal Prosecutors Conducting Criminal Probe of Juul*, WALL STREET JOURNAL (Sep. 23, 2019),; Laura Klivans, *San Joaquin County DA Investigating JUUL Labs for Allegedly Marketing to Teens*, KQED (Sep. 26, 2019).

By March 11, 2020—when the first consolidated class action complaint was filed—seven states and the District of Columbia had sued JUUL, and a bipartisan coalition of 39 states had launched a sprawling investigation into the company's practices. *See* Hedley Decl. Exh. 1, 2. Indeed, the sheer "scope of the[se] investigation[s] … le[ft] Juul with little choice but to change its marketing practices." Dave Collins & Matthew Perrone, '*A world of hurt': 39 states to investigate Juul's marketing*, ASSOCIATED PRESS (Feb. 25, 2020), As a former state attorney general put it at the time, JUUL was "in a world of hurt" and "can't seriously litigate this." *Id.* Before Plaintiffs filed their first amended class complaint in June 2020, Arizona and New Mexico also joined the fray. *See* Hedley Decl. Ex 1, 2. And while Colorado and Washington were late in the game, their lawsuits still predated this case's operative complaint by several months. *See id.*

Now, to recap: JUUL faced intense government scrutiny even before the Colgate Complaint's April 2018 filing. The FDA was already focusing on the company's controversial practices, and a solid foundation of public research detailing the deleterious effects of e-cigarette use already existed. *See Letter to JUUL Labs, Inc.*, FOOD & DRUG ADMIN., (Apr. 23, 2018); DEPARTMENT OF HEALTH AND HUMAN SERVICES, *E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General—Executive Summary* (2016). Before this MDL formed in late 2019 and before dozens of counsel moved for appointment, multiple states launched investigations. As the litigation proceeded, but before Plaintiffs filed their initial consolidated complaint, several states launched lawsuits of their own, each to the benefit of Class Counsel. Extensive government involvement in related litigation allowed Class Counsel to take advantage of discovery state attorneys general produced. *See, e.g.*, Second Amended Consolidated Class Action Complaint (Dkt. 1358) at 120 (citing New York discovery). Plaintiffs also availed themselves of the valuable publicity stemming from state-sponsored litigation. *See, e.g.*,

---

[14] The FDA thus laid out the essence of Plaintiff's case before the first class complaint was even filed. Accordingly, Class Counsel "did not spend the time to draft their pleadings from scratch, sensibly preferring" instead to piggyback off the labors of a government agency. *Coattail Class Actions* at 45; *see, e.g.*, Second Amended Consolidated Class Action Complaint (Dkt. 1358) at 160-62.

*id.* at 164 (quoting interactions from *Statement Regarding The Press Conference Held By The Massachusetts Attorney General*, JUUL Labs, Inc. (July 24, 2018)). Relatedly, the deluge of cases placed tremendous pressure on JUUL to settle this litigation, lending Class Counsel a substantial bargaining advantage.

Perhaps recognizing a safe bet, Class Counsel occlude the relevant analysis with the irrelevant. According to Plaintiffs, "[i]t is well-recognized that representation on a contingency basis weighs in favor of an upward adjustment from the 25% benchmark." Fee Motion at 10. But the Ninth Circuit recognized this factor as obsolete nearly twelve years ago. *See Bluetooth,* 654 F.3d at 942 n.7 ("At least one factor is no longer valid—whether the fee was fixed or contingent."). Next, Class Counsel rely on "awards in similar cases," but as explained above, this effort is little more than a meaningless exercise in cherry picking, a game two can play.[15] Turning to the "tobacco industry" at large, which is "notorious for aggressively defending itself and is willing to fight for decades," Plaintiffs next use the identity of the Defendants to support their unreasonable fee request. Fee Motion at 8. But the sheer number of suits filed and settlements reached belie Plaintiff's argument. *See* Hedley Decl. Exh. 1, 2. Indeed, as of July 2023, JUUL has faced over 5,000 lawsuits and agreed to pay nearly $1 billion in settlements, if not more. *See* Christy Bieber & Mike Cetera, *JUUL Lawsuit Update July 2023*, FORBES ADVISOR (last updated May 22, 2023). Such is not the stuff of a "notoriously aggressive" defendant, but one ready, willing—and indeed, desperate—to settle.

With active investigations and lawsuits across the country, many of them prosecuted by states in their sovereign capacities, this was always a "promising case." *In re Johnson & Johnson Derivative Litig.*, 2013 WL 6163858, at *11 (internal quotations omitted). Class Counsel recognized this, as evidenced by the zeal with which they sought MDL leadership positions.[16] *See* Hedley Decl. Exh. 3. *Contrast Silverman*, 739 F.3d at 958 (affirming risk enhancement when "no other law firm was willing to serve as lead counsel" at the case's inception). In short, Class Counsel are mistaken: they are not entitled to a risk multiplier or an upward departure from this Circuit's 25% benchmark. Multipliers are not granted as a matter of course,[17] and on this record, little

---

[15] *See* note 1 above.

[16] In their own words, "Following centralization in this Court, **dozens of firms** applied to the Court seeking to be appointed as Lead or Co-Lead Counsel, or on the PSC." Sharp Decl. ¶ 26 (emphasis added).

[17] *See, e.g. In re MagSafe Apple Power Adapter Litig.*, 571 F. App'x 560, 564 (9th Cir. 2014) (remanding where a 1.5 multiplier was applied without an explanation of why it was "necessary to adequately compensate class counsel").

rebuts the strong presumption that the lodestar provides sufficient compensation. "[E]ven if class counsel carried the … ball across the goal line," they received a helping hand that "strengthen[ed] the plaintiffs' case and substantially reduc[ed their] risk of recovering nothing." *Stericycle*, 35 F.4th at 565. Class Counsel should not receive a windfall for reading the writing on the wall.

### D.   There must be consequences for Class Counsel's exorbitant overbilling.

"[I]t is absolutely imperative that attorneys submit honest and accurate fee petitions." *Young v. Smith*, 905 F.3d 229, 234 (3d Cir. 2018). Especially so in class action proceedings where there is a need for "an elevated level of candor." *Ark. Teacher Ret. Sys.*, 25 F.4th at 65. If the only consequence for claiming an outrageous 363,000-hour lodestar in service of an unreasonable $76.5 million fee request is that counsel receive what they would have been entitled to had they submitted a fair fee request in the first place, there is no reason counsel should not first try for a "free roll" and selfishly seek an excessive initial fee. On the rare occasions counsel gets caught, they would be no worse off than if they had not tried; if no objector investigates and the district court fails to scrutinize the request, they receive a windfall. In the parlance of the gambler, this is playing with house money. If "the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful." *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980). In short, an "outside-chance opportunity for a megabucks prize must cost to play." *Commonwealth Electric Co. v. Woods Hole*, 754 F.2d 46, 49 (1st Cir. 1985).

### CONCLUSION

Objector Stephens recommends a reasonable fee would be no more than $38.25 million, or 15.6% of the net settlement fund (15% of the gross), and the Court may consider awarding less because of the lodestar overbilling and the minimal risk of nonpayment. In addition, the Court should deny final approval until Class counsel disclose further billing detail and how the fee will be allocated among counsel.

Dated: July 14, 2023                    Respectfully submitted,

                                        */s/ Neville S. Hedley*
                                        Neville S. Hedley  (SBN 241022)
                                        HAMILTON LINCOLN LAW INSTITUTE
                                        CENTER FOR CLASS ACTION FAIRNESS
                                        1629 K Street NW, Suite 300
                                        Washington, DC 20006
                                        Voice: 312-342-6008
                                        Email: ned.hedley@hlli.org

                                        *Attorneys for Objector Reilly Stephens*

IN RE JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

1

<u>PROOF OF SERVICE</u>

2

I hereby certify that on this day I electronically filed the foregoing Objection using the CM/ECF filing

3
system thus effectuating service of such filing on all ECF registered attorneys in this case.

4
DATED this 14th day of July

5
*/s/ Neville S. Hedley*

6
Neville S. Hedley

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Reilly Walsh Stephens, am the objector. As required by ¶ 19 of Court's Preliminary Approval Order, I sign this written objection drafted by my attorneys from Hamilton Lincoln Law Institute, whom I retained to represent me in this matter.

_Reilly Stephens_
Reilly W. Stephens