Neville S. Hedley (SBN 241022)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 312-342-6008
Email: ned.hedley@hlli.org

*Attorneys for Objector Reilly Stephens*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>ALL CLASS ACTIONS | Case No. 3:19-md-02913-WHO<br><br>Judge:      Hon. William H. Orrick III<br>Courtroom: 2, 17th Floor<br>Date:        August 9, 2023<br>Time:       2:00 P.M. |

DECLARATION OF THEODORE H. FRANK

I, Theodore H. Frank, declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. My business address is Hamilton Lincoln Law Institute ("HLLI"), 1629 K Street NW, Suite 300, Washington, DC 20006. My telephone number is (703) 203-3848. My email address is ted.frank@hlli.org. I am admitted to the bars of the District of Columbia and the states of Illinois and California, as well as the Northern District of California.

3. I am Director of Litigation at the non-profit Hamilton Lincoln Law Institute ("HLLI"), and a Senior Attorney with its Center for Class Action Fairness ("CCAF"). My firm represents Reilly Stephens in objecting to the proposed fee request.

4. This declaration is not relevant to the merits of the objection. Unfortunately, it is the experience of CCAF that, when we object to fee requests, class counsels engage in abusive and false *ad hominem* attacks against us, almost certainly copied boilerplate from a document circulated among class-action attorneys. Such attacks are irrelevant to the fairness of the settlement, and are indicative of class counsel's unwillingness to engage us on the merits. To protect the record, we submit this declaration. Though we are preempting many of these falsehoods in advance, we can predict that class counsel is likely to repeat the falsehoods anyway without any acknowledgment of the refutation. This Court is already familiar with the work CCAF has done, upholding our objection (Dkt. 84) in *Knapp v. Art.com*, No. 3:16-cv-00768-WHO, to the failure of the settlement to comply with the Class Action Fairness Act, 28 U.S.C. § 1712. If the Court is inclined to rule solely on the merits and disregard irrelevant *ad hominem* attacks, it need not review the rest of the declaration, which simply provides factual background about the history of CCAF.

### Center for Class Action Fairness

5. I founded the non-profit Center for Class Action Fairness ("CCAF"), a 501(c)(3) non-profit public-interest law firm based out of Washington, DC, in 2009. In 2015, CCAF merged into the non-profit Competitive Enterprise Institute ("CEI") and became a division within their law and litigation unit. In January 2019, CCAF became part of the Hamilton Lincoln Law Institute, a new non-

Declaration of Theodore H. Frank
Case No. 3:19-md-02913-WHO                2

profit public-interest law firm I founded in 2018.

6. CCAF's mission is to litigate on behalf of class members against unfair class action procedures and settlements. CCAF represents class members *pro bono* where class counsel employs unfair procedures to benefit themselves at the expense of the class. *See, e.g., In re Stericycle Sec. Litig.*, 35 F.4th 555, 572, 572 n.11 (7th Cir. 2022) (citing cases); *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (CCAF's client's objections are "detailed, and substantive"); *see also* Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013 (calling Frank "[t]he leading critic of abusive class action settlements"); The Editorial Board, *The Anthem Class-Action Con*, WALL ST. J., Feb. 11, 2018 (opining "[t]he U.S. could use more Ted Franks" while covering CCAF's role in exposing "legal looting" in the Anthem data breach MDL). Since it was founded in 2009, CCAF has "develop[ed] the expertise to spot problematic settlement provisions and attorneys' fees." Elizabeth Chamblee Burch, *Publicly Funded Objectors*, 19 THEORETICAL INQUIRIES IN LAW 47, 55-57 & n.37 (2018). Over that time CCAF has recouped over $200 million for class members by driving settling parties to reach an improved bargain or by reducing outsized fee awards. *E.g., In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp. 3d 508 (N.D. Cal. 2020) (reducing fees by more than $15 million and proportionally increasing shareholder recovery); *see also In re EasySaver Rewards Litig.*, No. 09-cv-02094-BAS-WVG, 2020 U.S. Dist. LEXIS 77483, 2020 WL 2097616 (S.D. Cal. May 1, 2020) (reducing fees by 40%); Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017) (more than $100 million at time); *cf. Ark. Teacher Ret Sys. v. State St. Corp.*, 25 F.4th 55 (1st Cir. 2022) (resulting decision from *Boston Globe* exposé, upholding sanctions against Lieff Cabraser).

7. The Center has been successful, winning reversal or remand in over two dozen federal appeals decided to date in courts of appeals and the Supreme Court. *E.g., Frank v. Gaos*, 139 S. Ct. 1041 (2019); *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243 (11th Cir. 2023); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769 (9th Cir. 2022); *In re Stericycle Sec. Litig.*, 35 F.4th 555 (7th Cir. 2022);

1  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594 (9th Cir. 2021); *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir.
2  2021); *Berni v. Barilla S.P.A*, 964 F.3d 141 (2d Cir. 2020); *Pearson v. Target Corp.*, 968 F.3d 827 (7th Cir.
3  2020); *In re Lithium Ion Batteries Antitrust Litig.*, 777 Fed. Appx. 221 (9th Cir. 2019) (unpublished); *In re
4  Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316 (3d Cir. 2019); *In re EasySaver Rewards
5  Litig.*, 906 F.3d 747 (9th Cir. 2018); *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017); *In
6  re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608 (8th Cir. 2017); *In re Walgreen Co. Stockholder
7  Litig.*, 832 F.3d 718 (7th Cir. 2016); *In re EasySaver Rewards Litig.*, 599 Fed. Appx. 274 (9th Cir. 2015)
8  (unpublished); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060 (8th Cir. 2015); *Pearson v. NBTY, Inc.*,
9  772 F.3d 778 (7th Cir. 2014); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *In re MagSafe
10 Apple Power Adapter Litig.*, 571 Fed. Appx. 560 (9th Cir. 2014) (unpublished); *In re Dry Max Pampers
11 Litig.*, 724 F.3d 713 (6th Cir. 2013); *In re HP Inkjet Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013); *In
12 re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013); *Dewey v. Volkswagen*, 681 F.3d 170 (3d
13 Cir. 2012); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012); *Nachshin v. AOL, LLC*, 663
14 F.3d 1034 (9th Cir. 2011); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). While,
15 like most experienced litigators, we have not won every appeal we have litigated, CCAF has won the
16 majority of them. Our appeals and certiorari petitions are often supported by amicus briefs from state
17 attorneys general.

18       8.      We frequently represent law professors in court, and have also been appointed amicus
19 in district court and appellate court proceedings where there was no adversary presentation. *E.g.,*
20 *Arkansas Teacher Ret. Sys. v. State St. Corp.*, 25 F.3d 55 (1st Cir. 2022); *McKnight v. Uber Techs.*, No. 14-
21 05615-JST, Dkt. 256 (N.D. Cal. Mar. 21, 2022) (requesting CCAF's amicus participation regarding a
22 novel issue of class action procedure).

                        **Pre-empting *Ad Hominem* Attacks**

24       9.      In my experience, class counsel often responds to CCAF objections by making a
25 variety of *ad hominem* attacks, often wildly false. The vast majority of district court judges do not fall
26 for such transparent and abusive tactics. In an effort to anticipate such attacks and to avoid collateral
27 litigation over a right to file a reply, I discuss and refute the most common ones below. If the Court

Declaration of Theodore H. Frank
Case No. 3:19-md-02913-WHO            4

is inclined to disregard the *ad hominem* attacks, it can avoid these collateral disputes entirely.

10. HLLI pays me on a salary basis that does not vary with the result in any case. HLLI and CCAF attorneys do not receive a contingent bonus based on success in any case, a structure that would be contrary to I.R.S. restrictions.

11. Class counsel often try to tar CCAF as "professional objectors," and then cite court opinions criticizing for-profit attorneys who threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of attorneys' fees. But this is not the non-profit CCAF's *modus operandi*, so the court opinions class counsel rely upon to smear CCAF are inapposite. *See* D. Brooks Smith, *Class Action and Aggregate Litigation: A Comparative International Analysis,* 124 PENN ST. L. REV. 303, 321-30 (2020) (distinguishing between professional objectors and objecting public interest groups); Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF refuses to engage in *quid pro quo* settlements, and has never withdrawn an objection in exchange for payment. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees. The difference between a for-profit "professional objector" and a public-interest objector is a material one. As the federal rules are currently set up, "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection. In contrast, a public-interest objector such as myself has to triage dozens of requests for *pro bono* representation and dozens of unfair class action settlements, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a "baseless objection." CCAF objects to only a small fraction of the number of unfair class action settlements or excessive fee requests it sees.

12. CCAF feels strongly enough about the problem of bad-faith objectors profiting at the expense of the class through extortionate means that it successfully initiated litigation to require such objectors to disgorge their ill-gotten gains to the class. *See Pearson v. Target Corp.*, 968 F.3d 827 (7th Cir. 2020); *see generally* Jacob Gershman, *Lawsuits Allege Objector Blackmail in Class Action Litigation*, WALL ST.

J., Dec. 7, 2016.

13. A no-longer live website purporting to list other cases where I acted as an attorney or objector is inaccurate, listing me in several cases where I had no role, made no appearances, and had no attorney-client relationship with the objector, and falsely attributing to me filings I had nothing to do with. The website was further inaccurate in omitting dozens of my successful objections, falsely characterizing successful objections as having been overruled entirely, and misrepresenting the substance of court filings and testimony.

14. While one district court called me a "professional objector" in a broader sense, that court stated that it was not meant pejoratively, and awarded CCAF fees for a successful objection and appeal that improved the settlement for the class. *Dewey v. Volkswagen*, 909 F. Supp. 2d 373, 396 n.24 (D.N.J. 2012). Similarly, the Seventh Circuit in *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017) referred to me non-pejoratively as a "professional objector" in an opinion agreeing with my objection and reversing a settlement approval and class certification.

15. A number of objectors I have no affiliation with have filed briefs plagiarizing my work or CCAF's work in other cases without consulting with me. At least one objector has incorrectly represented to a court that I have agreed to represent him before a retainer agreement was signed.

16. In *In re Equifax, Inc. Customer Data Breach Litigation*, No. 17-md-2800-TWT (N.D. Ga.), the district court's approval order stated that I am a "serial objector" who objected merely to benefit myself or my attorney. It further accused me of making "misleading" statements about the settlement. The order did not cite any evidence or reason to support this finding, and I have reason to believe the court used this language only because it adopted nearly verbatim a proposed order that was submitted *ex parte* by plaintiffs' counsel, without exercising independent judgment to make these findings. (The parties refused to make public the *ex parte* submission and the Eleventh Circuit assumed on appeal that the attorneys wrote the opinion rather than order disclosure.) The allegation made by the district court is false. Our objection in *Equifax* was meritorious, similar to successful objections we've made elsewhere that have won millions of dollars for class members, and supported on appeal by an amicus brief by a prominent plaintiffs' attorney that agreed with our analysis. I did not make any false or

Declaration of Theodore H. Frank
Case No. 3:19-md-02913-WHO                6

misleading statements about the settlement, and on appeal, plaintiffs failed to identify any false or misleading statements I made, and admitted that I have never engaged in extortion. Ultimately, although the Eleventh Circuit denied our appeal on the merits, it observed that "often times objectors play a beneficial role in opening a proposed settlement to scrutiny and identifying areas that need improvement." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1257 (11th Cir. 2021) (internal quotation omitted).

17. In *Exum v. National Tire and Battery*, No. 9:19-cv-80121 (S.D. Fla. 2020), one of HLLI's attorneys, Melissa Holyoak (who now serves as the Solicitor General of Utah and has since been nominated by President Biden to become one of five Commissioners at the Federal Trade Commission) mistakenly misconstrued the release clause in the settlement agreement and filed an objection with an argument that relied on that erroneous reading. Once she became aware of the error, she withdrew that portion of the objection and has publicly expressed contrition and embarrassment that her work did not live up to the high standards she sets for herself. The district court issued an order to show cause why she should not be sanctioned, stating that the "false statements and representations" "appear[] to be reckless or negligent." The court also referred to the HLLI attorney as a "serial" or "professional" objector but made no finding that she or any other HLLI attorney has ever withdrawn an objection in exchange for payment. HLLI filed a response to the order explaining that this error was made in good faith, with no intent to delay or otherwise interfere with the court proceedings and again expressing contrition. The court subsequently issued an order discharging the order to show cause in which it stated that "it is clear to the Court that [the HLLI attorney] does hold herself to high standards" and the court was "satisfied and impressed" by HLLI's "prompt and candid response." The court found that the HLLI attorney "did not engage in bad faith conduct and did not knowingly or intentionally make a false statement or misrepresentation to the Court."

18. Until 2015, I had a private practice unrelated to my non-profit work. One of my former clients, Christopher Bandas, is a professional objector who has settled objections and withdrawn appeals for cash payments. I withdrew from representation of Mr. Bandas in 2015 when he undertook steps that interfered with my non-profit work. Mr. Bandas was criticized by the Southern District of

New York after I ceased to represent him, and class counsel in other cases often cites that language and attempts to attribute it to me. Class counsel in multiple cases, using boilerplate language, has tried to make it seem like my paid representation of Mr. Bandas was somehow scandalous, using language like "forced to disclose" and "secret." There is nothing scandalous about that, unless one believes it is scandalous for an attorney to be paid to perform successful high-quality legal services for a client. And the sneering is false: my representation of Mr. Bandas was not secret, as I filed declarations in my name on his behalf in multiple cases, noting under oath that I was being paid to perform legal work for him; I filed notices of appearances in cases where he had previously appeared; and my declaration in the *Capital One* case ending the relationship was filed voluntarily at great personal expense to myself, as I had been offered and refused to take a substantial sum of money to accede to a Lieff Cabraser fee award of over $3400/hour. I only worked for Mr. Bandas in cases where I believed there was a meritorious objection to be made, had no role in any negotiations he made to settle appeals, and my pay was flat-rate or by the hour and not tied to his ability to extract settlements. I argued two appeals for Mr. Bandas and won both of them. In 2019, the Northern District of Illinois recognized the quality of the work I did with Mr. Bandas by awarding us substantial attorneys' fees for our success in winning an appeal over an approval of a settlement with Pella Windows that ultimately resulted in a substantially improved settlement for the class. CCAF had no attorney-client relationship with Mr. Bandas, and Mr. Bandas never paid CCAF, other than for his share of printing expenses when he was an independent co-appellant representing clients unrelated to CCAF.

19. Firms whose fees we have objected to have previously cited *City of Livonia Employees' Ret. Sys. v. Wyeth*, No. 07 Civ 10329 (RJS), 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013), in efforts to tar CCAF. While the *Wyeth* court did criticize our client's objection (after mischaracterizing the nature of that objection), it ultimately agreed with our client that class counsel's fee request was too high, and reduced it by several million dollars to the benefit of shareholder class members.

20. Adversaries frequently cite another decade-old case, *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 804 (N.D. Ohio 2010), where the district court criticized a policy-based argument by CCAF as supposedly "short on law"; however, CCAF ultimately was successful in the Seventh and

1  Ninth Circuits on that same argument. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th
2  Cir. 2011) (agreeing that reversionary clauses are a problematic sign of self-dealing); *Pearson v. NBTY,*
3  *Inc.*, 772 F.3d 778 (7th Cir. 2014) (same). Moreover, the court in *Lonardo* stated its belief that "Mr.
4  Frank's goals are policy-oriented as opposed to economic and self-serving" and even awarded CCAF
5  about $40,000 in attorneys' fees for increasing the class benefit by $2 million. *Lonardo*, 706 F. Supp.
6  2d at 813-17.

7      21.    CCAF has no interest in pursuing "baseless objections," because every objection we
8  bring on behalf of a class member has the opportunity cost of not having time to pursue a meritorious
9  objection in another case. We are confronted with many more opportunities to object (or appeal
10 erroneous settlement approvals) than we have resources to use, and make painful decisions several
11 times a year picking and choosing which cases to pursue, and even which issues to pursue within the
12 case. CCAF turns down the opportunity to represent class members wishing to object to settlements
13 or fees when CCAF believes the underlying settlement or fee request is relatively fair. This is especially
14 true now that HLLI has expanded into successful litigation over other issues that our attorneys care
15 about. We have successfully litigated regulatory and first-amendment cases. *E.g., CEI v. FCC*, 970 F.3d
16 372 (D.C. Cir. 2020); *Greenberg v. Goodrich*, 593 F. Supp. 3d 174 (E.D. Pa. 2022) (granting summary
17 judgment and enjoining rule of professional conduct that would chill free speech). We also frequently
18 file amicus briefs in the Supreme Court on constitutional issues. There is thus substantial opportunity
19 cost with every class-action objection we file.

20     22.    While I am often accused of being an "ideological objector," the ideology of CCAF's
21 objections is merely the correct application of Rule 23 to ensure the fair treatment of class members.
22 Likewise, I have often seen class counsel assert that I oppose all class actions and am seeking to end
23 them, not improve them. The accusation—aside from being utterly irrelevant to the legal merits of
24 any particular objection—has no basis in reality. I have been writing and speaking about class actions
25 publicly for over a decade, including in testimony before state and federal legislative subcommittees,
26 and I have never asked for an end to the class-action device, just proposed reforms for ending the
27 abuse of class actions and class-action settlements. That I oppose class-action abuse no more means
28

that I oppose class actions than someone who opposes food poisoning opposes food. As a child, I admired Ralph Nader and consumer reporter Marvin Zindler (whose autographed photo was one of my prized childhood possessions), and read every issue of *Consumer Reports* from cover to cover. I have focused my practice on conflicts of interest in class actions because, among other reasons, I saw a need to protect consumers that no one else was filling, and as a way to fulfill my childhood dream of being a consumer advocate. I have frequently confirmed my support for the principles behind class actions in declarations under oath, interviews, essays, and public speeches, including a January 2014 presentation in New York that was broadcast nationally on C-SPAN and in my Supreme Court briefing in *Frank v. Gaos*, No. 17-961. On multiple occasions, successful objections brought by CCAF resulted in new class-action settlements where the defendants pay substantially more money to the plaintiff class without CCAF objecting to the revised settlement. And I was the putative class representative in a federal class action, represented by a prominent plaintiffs' firm. *Frank v. BMOCorp., Inc.*, No. 4:17-cv-870 (E.D. Mo.).

23. On October 1, 2015, after consultation with its board of directors and its donors, CCAF merged with the much larger Competitive Enterprise Institute ("CEI"). Prior to its merger with CEI, CCAF never took or solicited money from corporate donors other than court-awarded attorneys' fees. CEI, which is much larger than CCAF, does take a percentage of its donations from corporate donors. As part of the merger agreement, I negotiated a commitment that CEI would not permit donors to interfere with CCAF's case selection or case management. In the event of a breach of this commitment, I was permitted to treat the breach as a constructive discharge entitling me to substantial severance pay. CCAF attorneys made several filings in several cases opposed by CEI donors.

24. CEI was willing to merge with CCAF because it claimed to support CCAF's pro-consumer mission and success in challenging abusive class-action settlements and fee requests. But it is a large organization affiliated with dozens of scholars who take a variety of controversial positions. Neither I nor CCAF's clients agree with all of those positions, and they should not be ascribed to me, my clients, or this objection, any more than my support for a Pigouvian carbon tax should be ascribed to CEI scholars who have publicly opposed that position.

Declaration of Theodore H. Frank
Case No. 3:19-md-02913-WHO          10

25. While at CEI, CCAF was supported by preexisting donors and revenues, and brought in more money to CEI than CEI budgeted to CCAF. The fact that a particular corporation or foundation had been giving money to CEI before CCAF became part of CEI had no effect on our litigation decisions; we frequently successfully litigated against CEI donors, including Google.

26. CCAF has since left CEI, and is now part of the Hamilton Lincoln Law Institute, which receives no corporate funding. We did not consult any of our donors about our objection to this settlement.

27. Some class counsels have accused us of improper motivation because CCAF has on occasion sought attorneys' fees. While CCAF is funded entirely through charitable donations and court-awarded attorneys' fees, the possibility of a fee award never factors into the Center's decision to accept a representation or object to an unfair class-action settlement or fee request.

28. CCAF's history in requesting attorneys' fees reflects this approach. Despite having made dozens of successful objections and having won over $200 million on behalf of class members, CCAF has not requested attorneys' fees in the majority of its cases or even in the majority of its appellate victories. CCAF regularly passes up the opportunity to seek fees to which it is legally entitled. In *Classmates*, for example, CCAF withdrew its fee request and instead asked the district court to award money to the class; the court subsequently found that an award of $100,000 "if anything" "would have undercompensated CCAF." *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 WL 3854501, at *11 (W.D. Wash. June 15, 2012). In other cases, CCAF has asked the court for a fraction of the fees to which it would be legally entitled based on the benefit CCAF achieved for the class and asked for any fee award over that fractional amount be returned to the class settlement fund. In *Petrobras*, despite winning tens of millions of dollars for the class, we requested less than $200,000 in fees. *See In re Petrobras Secs. Litig.*, 786 Fed. Appx. 274, 277 (2d Cir. 2019). In *Wells Fargo*, our good-faith objection on behalf of a shareholder aided the court in increasing benefit to shareholders by $15 million, and we requested only $250,000 (and received under $100,000) in fees through a court approval process—even though a fellow objector in the same case negotiated and received a payment of $1.75 million from Wells Fargo directly for settling his objections. *See In re Wells Fargo & Co, Shareholder Derivative*

1  *Litig.*, 523 F. Supp. 3d 1108, 1117-19 (N.D. Cal. 2021).

2  29.  Moreover, under federal non-profit law, attorney fees cannot be used to support more than 50% of our program expenses. None of our attorneys' salaries are tied to fee awards in any case, and all of our attorneys have salaries that are a fraction of what they could make in private practice.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on July 14, 2023, in Houston, Texas.



Theodore H. Frank