1  [Submitting counsel on signature page]

2

3

4

5

6

7

8

9

10

11                      UNITED STATES DISTRICT COURT

12                      NORTHERN DISTRICT OF CALIFORNIA

13                          SAN FRANCISCO DIVISION

14

15  IN RE JUUL LABS, INC., MARKETING,          CASE NO. 19-md-02913-WHO
    SALES PRACTICES, AND PRODUCTS
16  LIABILITY LITIGATION                        **REPLY IN SUPPORT OF MOTIONS FOR
                                                FINAL APPROVAL OF JLI CLASS
17                                              ACTION SETTLEMENT AND
                                                ATTORNEYS' FEES, EXPENSES, AND
18  This Document Relates to:                   SERVICE AWARDS**

19  All Class Actions                           **<u>MOTION HEARING</u>**

20
                                                DATE: August 9, 2023
21                                              TIME: 2:00 PM
                                                LOCATION: Courtroom 2
22

23                                              HON. WILLIAM H. ORRICK III

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................... 1

II.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT AND
      CERTIFY THE SETTLEMENT CLASS ................................................................. 2

      A.    The Response of the Class ........................................................................... 2

      B.    The Objections Provide No Basis to Reject the Settlement ............................. 4

            1.    The PHAI Objection (Dkt. 4062) Is Legally Unsupportable and Seeks
                  Relief That is Both Unrelated to the Economic Loss Claims in the Class
                  Action and Provided Through Other Settlements in the MDL ...................... 4

                  a)    Distribution of Settlement Funds to Class Members is Preferable to
                        *Cy Pres* Distributions .............................................................. 5

                  b)    The Relief PHAI Objectors Was Never Part of this Class Action ............ 6

            2.    The Gugliotta Objection (Dkt. 4026) Should be Overruled for the Reasons
                  Provided in the Final Approval Motion ................................................ 7

            3.    The Ashak and Marcom Objections (Dkts. 4086-1 and 4033) Express
                  Disagreement with the Litigation, But Not the JLI Settlement ................... 7

            4.    The ClaimClam Objections (Dkts. 4087-90) Are Irrelevant to the Fairness
                  of the JLI Settlement and Class Counsel's Decision to Disallow Third-Party
                  Filed Claims Was Reasonable .......................................................... 8

                  a)    ClaimClam Background .............................................................. 9

                  b)    Class Counsel Have Valid Concerns About Third-Party Filers ............. 10

                  c)    ClaimClam Validates Class Counsel's Concerns ................................ 12

            5.    The Ready, Stampdfer, Stawicki, and Toole Objections (Dkts. 4086-2,
                  4086-3, 4077, 4086-4) Provide No Basis for Their Objections .................... 14

III.  THE COURT SHOULD GRANT THE REQUEST FOR ATTORNEYS' FEES,
      EXPENSES, AND SERVICE AWARDS ................................................................ 14

      A.    Stephens' Challenges to the Percentage Fee Award Are Unfounded ............. 15

            1.    There is No Rule in the Ninth Circuit that Percentage Awarded Should
                  Decrease as the Size of the Settlement Increases ................................... 15

                  a)    A Formulaic Fee Analysis is Contrary to Ninth Circuit Precedent ........ 16

ii

|   |   | b) | Surveys Averages Are Not Instructive in this Case | 17 |

b) Surveys Averages Are Not Instructive in this Case................................. 17

c) The Cases Class Counsel Cite Confirm the Reasonableness of the Requested Fee Award ............ 18

2. Stephens' Contention That This Litigation Was Low-Risk and Based on Government Investigations Is Counter-Factual .................... 20

a) Class Counsel Overcame Significant Risks............................. 20

b) Government Investigations and Litigation Did Not Decrease the Risk to Class Counsel; if Anything, They Increased It.......................... 24

i. The FDA's Actions Increased Litigation Risk.......................... 25

ii. The Class Case Was Not Based on FDA Findings .................... 26

iii. Class Counsel Did Not Rely on State AGs ................................ 27

iv. Government Lawyers Did Not Create the Benefit to the Class ... 31

3. Fees are Appropriately Calculated Based on the Gross Settlement Fund, Not the Net Fund........................ 32

B. Stephens' Arguments Concerning the Lodestar Crosscheck Are Baseless ................. 33

1. Stephens Does Not Show That the Fee is Unreasonable Based on a Lodestar Crosscheck ................ 34

2. Stephens' Contentions Concerning Hourly Rates for Document Review are Misguided and Seek to Impose an Unreasonable Hourly Rate.......................... 37

3. Stephens' Argument that the Lodestar is "Likely Overstated" is Contrary to the Record and Based on Speculation................................ 39

a) The Lodestar Reflects the Amount of Work Conducted by Class Counsel ........................ 39

b) Stephens' Complaints About Class Counsels' Billing Records Are Unfounded.......................... 40

c) Stephens' Other Assertions Are Baseless ................................ 42

C. The Court May Consider Professor Klonoff's Opinions in Arriving at An Independent Conclusion Regarding a Reasonable Fee Award .......................... 44

IV. CONCLUSION................................ 47

iii

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Adkins v. Facebook, Inc.*,
  2021 WL 1817047 (N.D. Cal. May 6, 2021) ...............................................................41

4

5

*Alexander v. FedEx Ground Package System, Inc.*,
  2016 WL 3351017 (N.D. Cal. June 15, 2016) .............................................................18

6

7

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
  2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ................................................................45

8

*Andrews v. Plains All American Pipe L.P.*,
  2022 WL 4453864 (C.D. Cal. Sept. 20, 2022) ...........................................................33

9

10

*Asghari v. Volkswagen Grp. of Am., Inc.*,
  2015 WL 12732462 (C.D. Cal. May 29, 2015) ...........................................................44

11

12

*Att'y Gen. of Ok. v. Tyson Foods, Inc.*,
  565 F.3d 769 (10th Cir. 2009).....................................................................................46

13

14

*Bellinghausen v. Tractor Supply Co.*,
  306 F.R.D. 245 (N.D. Cal. 2015) ................................................................................15

15

*Benson v. DoubleDown Interactive, LLC*,
  2023 WL 3761929 (W.D. Wash. June 1, 2023).........................................................19

16

17

*Broomfield v. Craft Brew Alliance, Inc.*,
  2020 WL 1972505 (N.D. Cal. Feb. 5, 2020) ................................................................2

18

*Carlsen v. Glob. Client Sols., LLC*,
  542 F. App'x 594 (9th Cir. 2013) ...............................................................................41

19

20

*Chambers v. Whirlpool Corp.*,
  980 F.3d 645 (9th Cir. 2020)........................................................................................40

21

22

*Churchill Village, L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004)......................................................................................2, 3

23

*City of Livonia Employees' Ret. Sys. v. Wyeth*,
  2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013) ..............................................................20

24

25

*Cleary v. Philip Morris USA, Inc.*,
  265 F.R.D. 289 (N.D. Ill. 2010) .................................................................................22

26

*Critcher v. L'Oreal USA, Inc.*,
  959 F.3d 31 (2d Cir. 2020).........................................................................................26

27

28

*DeMarco v. Avalonbay Communities, Inc.*,
  2017 WL 960355 (D.N.J. Mar. 13, 2017)......................................................................8

*Earl v. Bowing Co.*,
   53 F. 4th 897 (5th Cir. 2022) ...................................................................................23

*Edwards v. National Milk Producers Federation*,
   2017 WL 3616638 (N.D. Cal. June 26, 2017), *objections overruled*, 2017 WL 3623734 (N.D.
   Cal. June 26, 2017), *aff'd sub nom. Edwards v. Andrews*, 846 F. App'x 538 (9th Cir. 2021) ...........6

*Fraser v. Asus Comp. Int'l*,
   2013 WL 359594 (N.D. Cal. July 12, 2013) ...............................................................2

*Freitas v. Cricket Wireless, LLC*,
   2022 WL 3018061 (N.D. Cal. July 29, 2022) ............................................................23

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) ....................................................................................9, 11, 14

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) .....................................................................25

*Hale v. State Farm Mut. Auto. Ins. Co.*,
   2018 WL 6606079 (S.D. Ill. Dec. 16, 2018)...............................................................17

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...............................................................................................6

*Hartless v. Clorox Co.*,
   273 F.R.D. 630 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x 716 (9th Cir. 2012) .........................40

*Heekin v. Anthem, Inc.*,
   2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) .............................................................17

*Hefler v. Wells Fargo & Co.*,
   2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) .........................................................34, 42

*In re Anthem Inc. Data Breach Litig.*,
   327 F.R.D. 299 (N.D. Cal. 2018) ...............................................................................5

*In re Anthem, Inc. Data Breach Litigation*,
   2018 WL 3960068 (N.D. Cal. Aug. 17, 2018)...................................................21, 39, 43

*In re Apple Inc. Device Performance Litig.*,
   50 F.4th 769 (9th Cir. 2022) ...................................................................................33

*In re Apple iPhone/iPod Warranty Litig.*,
   40 F. Supp. 3d 1176 (N.D. Cal. 2014) .......................................................................42

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
   792 F. Supp. 2d 1028 (N.D. Ill. 2011) ......................................................................44

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

*In re Bluetooth Headset Prod. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011)...............................................................................4, 34

*In re Broiler Chicken Antitrust Litig.*,
   2022 WL 6124787 (N.D. Ill. Oct. 7, 2022)........................................................24, 44

*In re Capacitors Antitrust Litig.*,
   2018 WL 4790575 (N.D. Cal. Sept. 21, 2018) .........................................................40

*In re Capacitors Antitrust Litig.*,
   2020 WL 6544472 (N.D. Cal. Nov. 7, 2020).............................................................41

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 WL 4126533 (N.D. Cal. Aug. 3, 2016).............................................................41

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 WL 721680 (N.D. Cal. Jan. 28, 2016), *report and recommendation adopted in part*, *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 4126533, (N.D. Cal. Aug. 3, 2016)...........17

*In re Checking Acct. Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) .....................................................................46

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*,
   277 F.R.D. 586 (S.D. Cal. 2011)................................................................................23

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014)........................................................................................9

*In re Dynamic Random Access Memory Antitrust Litig.*,
   2014 WL 12879521 (N.D. Cal. June 27, 2014) ........................................................41

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   2020 WL 256132 (N.D. Ga. Mar. 17, 2020), *aff'd in part, rev'd in part on other grounds*,
   999 F.3d 1247 (11th Cir. 2021)..............................................................9, 10, 11, 45

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   999 F.3d 1247 (11th Cir. 2021)..............................................................................9, 45

*In re Facebook Biometric Information Privacy Litigation*.
   522 F. Supp. 3d 617 (N.D. Cal. 2021) .................................................................19, 35

*In re Facebook Internet Tracking Litig.*,
   2022 WL 16902426 (N.D. Cal. Nov. 10, 2022)...........................................................8

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
   4 F. Supp. 3d 94 (D.D.C. 2013) .................................................................................46

*In re Genetically Modified Rice Litig.*,
   764 F.3d 864 (8th Cir. 2014)......................................................................................41

vi

*In re Glumetza Antitrust Litig.*,
  2022 WL 327707 (N.D. Cal. Feb. 3, 2022) ...................................................................37

*In re Google Plus Profile Litig.*,
  2021 WL 242887 (N.D. Cal. Jan. 25, 2021) ....................................................................4

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  142 F.R.D. 588 (S.D.N.Y. 1992) ...................................................................................24

*In re Gypsum Antitrust Cases*,
  565 F.2d 1123 (9th Cir. 1977)........................................................................................11

*In re High-Tech Employee Antitrust Litig.*,
  2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ..........................................................18, 35

*In re Johnson & Johnson Derivative Litig.*,
  2013 WL 6163858 (D.N.J. Nov. 25, 2013) ....................................................................31

*In re JUUL Labs, Inc. Mkt'g, Sales Pracs., and Prods. Liab. Litig.*,
  609 F. Supp. 3d 942 (N.D. Cal. 2022) ............................................................................22

*In re Lidoderm Antitrust Litig.*,
  2018 WL 4620695 (N.D. Cal. Sept. 20, 2018) ........................................................18, 19

*In re Light Cigarettes Mkt'g Sales Pracs. Litig.*,
  271 F.R.D. 402 (D. Me. 2010) .......................................................................................22

*In re Linkedin User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015).....................................................................................2

*In re Loestrin 24 Fe Antitrust Litig.*,
  2020 WL 4038942 (D.R.I. July 17, 2020), *report and recommendation adopted*,
  2020 WL 5201275 (D.R.I. Sept. 1, 2020)................................................................44, 46

*In re MacBook Keyboard Litig.*,
  2023 WL 3688452 (N.D. Cal. May 25, 2023) ..............................................................3, 37

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
  2017 WL 6040065 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019) ...................18

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
  768 Fed. App'x 651 (9th Cir. Apr. 17, 2019) .................................................................41

*In re Nat'l Football League Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016)............................................................................................45

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) ..........................................................................22

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

*In re Oil Spill by Oil Rig Deepwater Horizon*,
 295 F.R.D. 112 (E.D. La. 2013)...................................................................44

*In re Omnivision Techs., Inc.*,
 559 F. Supp. 2d 1036 (N.D. Cal. 2008) .........................................................3

*In re Online DVD-Rental Antitrust Litig.*,
 779 F. 3d 934 (9th Cir. 2015)................................................................15, 32, 33

*In re Optical Disk Drive Prods. Antitrust Litig.*,
 959 F.3d 922 (9th Cir. 2020)......................................................................16

*In re Petrobras Sec. Litig.*,
 317 F. Supp. 3d 858 (S.D.N.Y. 2018).......................................................25, 27

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
 148 F.3d 283 (3d Cir. 1998).......................................................................31, 34

*In re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*,
 2012 WL 12840260 (W.D. Tenn. Jan. 4, 2012)...........................................46

*In re School Asbestos Litigation*,
 842 F.2d 671 (3d Cir.1988)........................................................................11, 14

*In re Syngenta AG MIR 162 Corn Litig.*,
 2018 WL 6839380 (D. Kan. Dec. 31, 2018)...............................................44

*In re Syngenta AG MIR 162 Corn Litig.*,
 357 F. Supp. 3d 1094 (D. Kan. 2018).......................................................18, 44

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) ............................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
 2012 WL 13209696 (N.D. Cal. Nov. 9, 2012) ...........................................37

*In re Tobacco II*,
 240 Cal. App. 4th 779 (2015) ....................................................................23

*In re Toyota Corp. Unintended Marketing, Sales Pracs. and Prods. Liab. Litig.*,
 2013 WL 12327929 (C.D. Cal. July 24, 2013) .........................................5, 16

*In re Transpacific Passenger Air Trans. Antitrust Litig.*,
 2019 WL 6327363 (N.D. Cal. Nov. 26, 2019).............................................37

*In re: Urethane Antitrust Litig.*,
 2016 WL 4060156 (D. Kan. July 29, 2016).................................................17

*In re: Volkswagen "Clean Diesel" Mkt., Sales Prac., & Prods. Liab. Litig.*,
 2017 WL 1474312 (N.D. Cal. Apr. 24, 2017) .........................................24, 32

viii

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  2017 WL 2212783 (N.D. Cal. May 17, 2017) .................................................. 44

*In re Wells Fargo & Co. Shareholder Derivative Litig.*,
  445 F. Supp. 3d 508 (N.D. Cal. 2020) ............................................................. 18

*Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Gen. Motors
  Corp.*,
  497 F.3d 615 (6th Cir. 2007) .......................................................................... 45

*Jabbari v. Wells Fargo & Co.*,
  2018 WL 11024841 (N.D. Cal. June 14, 2018) ............................................... 44

*Kang v. Wells Fargo Bank, N.A.*,
  2021 WL 5826230 (N.D. Cal. Dec. 8, 2021) ................................................... 34

*Knisley v. Network Assocs., Inc.*,
  312 F.3d 1123 (9th Cir. 2002) .......................................................................... 4

*Ko v. Natura Pet Prods., Inc.*,
  2012 WL 3945541 (N.D. Cal. Sept. 10, 2012) .................................................. 8

*Krommenhock v. Post Foods*,
  2021 WL 2910205 (N.D. Cal. June 25, 2021) ................................................. 32

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................................ 46

*Kurzweil v. Philip Morris Cos.*,
  1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) .................................................. 24

*Larsen v. Trader Joe's Co.*,
  2014 WL 3404531 (N.D. Cal. July 11, 2014) .................................... 15, 32, 42

*Lawson v. Spirit AeroSystems, Inc.*,
  2020 WL 6343292 (D. Kan. Oct. 29, 2020) .................................................... 38

*Martin v. Toyota Motor Credit Corp.*,
  2022 WL 17038908 (C.D. Cal. Nov. 15, 2022) ............................................... 38

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) ............................................................................ 22

*Miller v. Cincinnati*,
  709 F. Supp. 2d 605 (S.D. Ohio 2008) ........................................................... 46

*Moore v. Verizon Commc'ns Inc.*,
  2012 WL 12920712 (N.D. Cal. Feb. 28, 2012) ................................................ 8

ix

*Moreno v. City of Sacramento*,
    534 F.3d 1106 (9th Cir. 2008)..................................................................38

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008)..................................................................45

*Nitsch v. DreamWorks Animation SKG Inc.*,
    2017 WL 2423161 (N.D. Cal. June 5, 2017) ...........................................18

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*,
    688 F.2d 615 (9th Cir. 1982)......................................................................4

*Parkinson v. Hyundai Motor Am.*,
    796 F. Supp. 2d 1160 (C.D. Cal. 2010) .............................................44, 46

*People ex rel. James v. Juul Labs., Inc.*,
    2022 WL 2757512 (N.Y. Sup. Ct. July 14, 2022) ...................................30

*Perkins v. Linkedin Corp.*,
    2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ..............................................7

*Phillips v. Philip Morris Companies, Inc.*,
    298 F.R.D. 355 (N.D. Ohio 2014) ...........................................................22

*Pike v. Cnty. of San Bernardino*,
    2020 WL 1049912 (C.D. Cal. Jan. 27, 2020) ..........................................38

*Pinal Creek Grp. v. Newmont Mining Corp.*,
    352 F. Supp. 2d 1037 (D. Ariz. 2005).....................................................45

*Powers v. Eichen*,
    229 F.3d 1249 (9th Cir. 2000)............................................................32, 33

*Quiruz v. Specialty Commodities, Inc.*,
    2020 WL 6562334 (N.D. Cal. Nov. 9, 2020)..........................................3, 7

*Razo v. AT&T Mobility Servs., LLC*,
    2022 WL 4586229 (E.D. Cal. Sept. 29, 2022)...........................................8

*Reid v. I.C. Sys. Inc.*,
    2021 WL 4710779 (D. Ariz. Sept. 2, 2021)...............................................5

*Rodman v. Safeway Inc.*,
    2018 WL 4030558 (N.D. Cal. Aug. 22, 2018)....................................17, 18

*Rodriguez v. Nike Retail Services, Inc.*,
    2022 WL 254349 (N.D. Cal. Jan. 27, 2022) ............................................41

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009)......................................................................3

x

*Ross v. Trex Co., Inc.*,
    2013 WL 6622919 (N.D. Cal. Dec. 16, 2013) ...................................................................6

*Savani v. URS Pro. Sols. LLC*,
    2014 WL 172503 (D.S.C. Jan. 15, 2014)..........................................................................44

*Schneider v. Chipotle Mexican Grill, Inc.*,
    336 F.R.D. 588 (N.D. Cal. 2020) .......................................................................................2

*Senne v. Kansas City Royals Baseball Corp.*,
    2023 WL 2699972 (N.D. Cal. Mar. 29, 2023) ..................................................................33

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990)...........................................................................................15

*State ex rel. Weiser v. Juul Labs, Inc.*,
    517 P.3d 683 (Col. 2022) ..................................................................................................30

*Stathakos v. Columbia Sportswear*,
    2018 WL 1710075 (N.D. Cal. Apr. 9, 2018) ....................................................................45

*Stetson v. Grissom*,
    821 F.3d 1157 (9th Cir. 2016)...........................................................................................14

*Stetson v. West Publishing Corp.*,
    714 Fed.App'x 681 (9th Cir. Oct. 30, 2017) .....................................................................14

*Stonebrae, L.P. v. Toll Bros.*,
    2011 WL 1334444 (N.D. Cal. Apr. 7, 2011), *aff'd*, 521 F. App'x 592 (9th Cir. 2013) ...................38

*UFCW Loc. 880-Retail Food Emps. Joint Pension Fund v. Newmont Min. Corp.*,
    352 F. App'x 232 (10th Cir. 2009) ...................................................................................41

*United States v. Brown*,
    415 F.3d 1257 (11th Cir. 2005).........................................................................................46

*United States v. Philip Morris, Inc.*,
    449 F. Supp. 2d 1 (D.D.C. 2006) .....................................................................................23

*Uziel v. Super. Ct.*,
    2021 WL 5830040 (C.D. Cal. Oct. 19, 2021) ..................................................................37

*Vianu v. AT&T Mobility LLC*,
    2022 WL 16823044 (N.D. Cal. Nov. 8, 2022) ...................................................................6

*Vizcaino v. Microsoft Corporation*,
    290 F.3d 1043 (9th Cir. 2002).......................................................................15, 16, 27, 34, 35

*Wagh v. Metris Direct, Inc.*,
    348 F.3d 1102 (9th Cir. 2003), *overruled on other grounds*, *Odom v. Microsoft Corp.*,
    486 F.3d 541, 551 (9th Cir. 2007) ..................................................................................21

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ........................................................................................16

*Wininger v. SI Mgmt L.P.*,
    301 F.3d 1115 (9th Cir. 2002) ......................................................................................31

*Winterrowd v. Am. Gen. Annuity Ins. Co.*,
    556 F.3d 815 (9th Cir. 2009) ........................................................................................44

*Yamada v. Nobel Biocare Holding AG*,
    825 F.3d 536 (9th Cir. 2016) ........................................................................................40

**Statutes**

18 U.S.C. § 1962 ...............................................................................................................21

**Other Authorities**

Howard M. Erichson, *Coattail Class Actions: Reflections on Microsoft, Tobacco, and the Mixing
    of Public and Private Lawyering in Mass Litigation*, 34 U.C. Davis L. Rev. 1, 7 (2000) ...............32

Theodore Eisenberg and Geoffrey Miller, *Attorney Fees in Class Action Settlements: An
    Empirical Study*, 1 J. Empirical L. Stud. 27, 35 (2004) ...................................................18

William B. Rubenstein, 4 Newberg on Class Actions § 13:42 (6th ed.) ...............................45

**Rules**

Fed. R. Civ. P. 23 .....................................................................................................11, 46

Fed. R. Civ. P. 23(c) ........................................................................................................10

Fed. R. Civ. P. 23(c)(2)(B) ..........................................................................................11, 12

Fed. R. Civ. P. 23(c)(3) ....................................................................................................10

Fed. R. Civ. P. 23(f) .........................................................................................................23

Fed. R. Civ. P. 23(h) .........................................................................................................41

Fed. R. Civ. P. 53 ..............................................................................................................41

Fed. R. Civ. P. 53(g)(2) ....................................................................................................41

Fed. R. Civ. P. 54(d)(2)(D) ...............................................................................................41

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1  **I.       INTRODUCTION**

2         On June 23, 2023, Class Plaintiffs filed a motion seeking final approval of the Class Action

3  Settlement with JUUL Labs, Inc. ("JLI") and the Released Parties (the "JLI Settlement" and the "Final

4  Approval Motion," Dkt. 4054) and Class Counsel filed a motion seeking the payment of attorneys' fees,

5  expenses, and service awards (the "Fee and Expense Motion," Dkt. 4055). In contrast to the few

6  objections received, the positive response from the class confirms the fairness and adequacy of the JLI

7  Settlement and the reasonableness of the requested fees, expenses, and service awards.

8         Out of millions of class members, the only objections to final approval of the settlement were

9  filed by one public-interest organization that does not challenge the fundamental fairness, suggesting

10  instead that a portion of the money be spent differently. Other objectors challenge the rejection of

11  aggregated claims submissions by a third-party filer, voice disagreement with the premise of the

12  lawsuit, or provide no basis at all for their objections. The relative lack of objections addressing the

13  terms of the settlement reflects the significant value it delivers to the class: a $255 million non-

14  reversionary cash fund, and resolution of hotly contested litigation. The millions of claim forms

15  submitted to date reflect the strong response from the class.

16         No objections to the requested expense payments or service awards were filed, and only one

17  class member, Reilly Stephens, objected to the requested fee award. Contrary to Mr. Stephens' belief,

18  success in this litigation was by no means assured. The case became even riskier as JUUL appeared

19  destined for bankruptcy court. Stephens is also wrong to believe that the $255 million settlement before

20  the Court is attributable to government investigations or other extrinsic factors, rather than Class

21  Counsel's skill and creativity in bringing this case to trial, and manifest willingness to bear the risk of a

22  loss at trial. Under Ninth Circuit authority, both the results and the work performed to achieve those

23  results support an upward adjustment from the 25% benchmark. The Ninth Circuit's well-settled

24  approach to attorneys' fees is case-specific and should not be supplanted with a context-blind reliance

25  on average fee awards from a spectrum of other cases. Stephens' challenges to counsel's lodestar are

26  misguided, and in any event, even if applied, do not change the result: the requested fee award is

27  reasonable.

28

1

2

3

In light of the robust response from the class and the lack of sustainable objections, Class Plaintiffs request that the Court grant final approval of the JLI Settlement and Class Counsel requests that the Court grant their requested attorneys' fee, expense, and service awards.

4

5

## II.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT AND CERTIFY THE SETTLEMENT CLASS

6

### A.   The Response of the Class

7

8

9

10

11

12

In the Final Approval Motion, Class Plaintiffs described how the relevant factors, including "the reaction of class members to the proposed settlement," weighed strongly in favor of approval of the JLI Settlement. Dkt. 4054 at 7-19; *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). Now that the deadline for claims, opt-out requests, and objections has passed, Class Plaintiffs can more fully assess the reaction of the Class. As set forth below, the response from Class Members was overwhelmingly positive and supports approval of the JLI Settlement.

13

14

15

16

17

18

***Claims***: Of the estimated six to eleven million Class Members (Sharp Reply Decl., ¶¶ 24–25), approximately 2.7 million received direct notice of the JLI Settlement, and the remainder received indirect publication notice. Supplemental Declaration of Cameron R. Azari ¶ 6. In response to the settlement notice, Epiq received 6,349,982 claims. *Id.* ¶ 36. The process of reviewing these claims is ongoing and, while many appear invalid, even if only 20% of the claims are paid to Class Members, the overall claims rate for the Class will be between 12% and 21%.

19

20

21

22

23

24

25

By any measure, these claims rates represent a positive reaction from the Class, and thus support the JLI Settlement. *See Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 599 (N.D. Cal. 2020) ("0.83% claims rate" was "on par with other consumer cases"); *Broomfield v. Craft Brew Alliance, Inc.*, 2020 WL 1972505, at *7 (N.D. Cal. Feb. 5, 2020) (finding claims rate "of about two percent" to be consistent with the rates in other large class actions); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) (6% claims rate represented a "positive reaction by the class"); *Fraser v. Asus Comp. Int'l*, 2013 WL 3595940, at *2 (N.D. Cal. July 12, 2013) ("[T]he large number of class members

26

27

28

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

wishing to participate in the settlement is evidence that the settlement is reasonable and should be approved.").[1]

**Opt-Outs**: Out of the millions of Class Members, 2,620—or between 0.02% and 0.04% of the class—have sought to exclude themselves from the JLI Settlement. Supp. Azari Decl. ¶ 37. The low number of opt-out requests relative to the estimated range in the size of the Class also weighs strongly in favor of approval. *See In re MacBook Keyboard Litig.*, 2023 WL 3688452, at *9 (N.D. Cal. May 25, 2023) (finding that the "low number . . . of opt-outs relative to the size of the class weighs in favor of approving the Settlement" where 1,733 exclusion requests we received out of 718,651 eligible class members); *Quiruz v. Specialty Commodities, Inc.*, 2020 WL 6562334, at *7 (N.D. Cal. Nov. 9, 2020) (approving settlement with 0.09% opt-out rate, and noting that "[o]pt-out percentages of nearly 5% have been deemed so 'overwhelmingly positive' as to support approval").

**Objections**: Of the 451 objections to the JLI Settlement,[2] only two address the substance of the JLI Settlement. Neither of those objections calls into question the sufficiency of the key components of the JLI Settlement: the $255 million cash payment in the face of substantial litigation risk, and a release of economic loss claims. The lack of substantive objections to the JLI Settlement—particularly in comparison to the millions of Class Members and claims received—itself "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (approving district court's finding that the class reacted favorably where there were "only fifty-four submitted objections" out of 376,301 class members); *Churchill*, 361 F.3d at 577 (affirming approval of class action settlement where 45 out of 90,000 class members objected to the settlement); *Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125

---

[1] The high volume of claims—and the work that will be needed to screen invalid claims—further supports Class Plaintiffs' request for the payment of up to $7 million to Epiq for settlement notice and administration costs. Final Approval Motion at 23-24.

[2] In total, 452 objections were submitted, only one of which—the Stephens objection, addressed below—takes issue with the requested attorneys' fees, rather than approval of the JLI Settlement. Class Plaintiffs' July 21 notice provided a slightly lower number of objections (*see* Dkt. 4075), because untimely objections (addressed in the context of the third-party filer discussion below) were received by counsel after the July 21 filing.

1  (9th Cir. 2002) (dismissing objection after approval of settlement to which six class members out of

2  roughly 150,000, or 0.004%, objected).

3        The other 449 objections consist of: (1) two objections that voiced disagreement with the

4  premise of the lawsuit, (2) four that provided no basis for the objection at all, and (3) 443 form

5  objections submitted by "ClaimClam"—a third-party filer that sought to submit claims on behalf of tens

6  of thousands of alleged class members—and its clients. Even if these objections were legitimate

7  critiques of the JLI Settlement (they are not, for the reasons detailed below), the total number of

8  objections is small in light of the class size and volume of claims. *See In re Google Plus Profile Litig.*,

9  2021 WL 242887, at *4 (N.D. Cal. Jan. 25, 2021) (approving settlement with 761 objections out of

10  millions of class members).

11        Each of the objections to the JLI Settlement is addressed in detail in the following section. For

12  the Court's reference, Appendix A includes a chart that identifies where in the record each objection (or

13  group of related objections) can be found on the docket.

14      **B.**    **The Objections Provide No Basis to Reject the Settlement**

15          **1.**    **The PHAI Objection (Dkt. 4062) Is Legally Unsupportable and Seeks Relief**
16               **That is Both Unrelated to the Economic Loss Claims in the Class Action and Provided Through Other Settlements in the MDL**

17        Matthew Murphy, Cade Beauparlant, and Marianne Savage, who are represented by the Public

18  Health Advocacy Institute ("PHAI Objectors"), argue that the JLI Settlement is not fair, reasonable, and

19  adequate unless $30 million of the proposed Settlement Fund is allocated to a non-profit *cy pres*

20  recipient "dedicated to delivery" of "effective treatment methods for nicotine addiction among

21  adolescents." Dkt. 4062 at 1. In essence, the PHAI Objectors request that the Court modify the JLI

22  Settlement to divert funds from Class Members to a *cy pres* recipient.[3] The Court should deny the PHAI

23  Objectors' request because the JLI Settlement is fair, reasonable, and adequate, particularly because all

24  or virtually all available Settlement Funds will be distributed directly to injured Class Members. In

25

26  _____

27  [3] PHAI Objectors ask too much of the Court, as courts "may not delete, modify, or substitute certain
provisions" of a settlement agreement. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948

28  (9th Cir. 2011) (quoting *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 630
(9th Cir. 1982).

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

addition, the relief the PHAI Objectors seek is outside the scope of Class Plaintiffs' economic loss claims and is already provided in large part by the other settlements, inside and outside of this MDL, as described below.

a)  **Distribution of Settlement Funds to Class Members is Preferable to** ***Cy Pres*** **Distributions**

After years of hard-fought litigation, Class Plaintiffs and JLI reached an agreement to create a $255 million fund to compensate Class Members for the economic losses they suffered through JLI's alleged conduct. *See generally* Final Approval Motion, § II.A.–B. The JLI Settlement provides substantial monetary recovery to injured Class Members, avoids the risks of continued litigation, and releases JLI from the threat of future economic loss claims. *Id.*, §§ II.B., III.A.

The PHAI Objectors' argument to allocate $30 million of the Settlement Fund to a *cy pres* recipient is contrary to the "strong preference for distribution to class members instead of *cy pres* distributions." *Reid v. I.C. Sys. Inc.*, 2021 WL 4710779, at *3 (D. Ariz. Sept. 2, 2021) (authorizing second cash distribution to class members over *cy pres* distribution despite settlement agreement not containing provision for second distribution); *In re Anthem Inc. Data Breach Litig.*, 327 F.R.D. 299, 333 (N.D. Cal. 2018) (Koh, J.) (describing "the law's general preference for *cy pres* awards to be limited to scenarios where it is not feasible to make further distributions to class members"). The JLI Settlement is in-line with numerous other settlements of economic loss claims that provide for cash distributions to class members. *See e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2013 WL 12327929, at *2 (C.D. Cal. July 24, 2013) (granting final approval of settlement resolving economic loss claims that provided cash distribution and "eliminated" spillover *cy pres* contributions in favor of remaining settlement funds escheating pursuant to applicable State law). That the Settlement Fund will likely be exhausted through distribution to Class Members, rather than resorting to a less-preferred *cy pres* distribution, itself supports the finding that the JLI Settlement is fair, reasonable, and adequate.

Even if a *cy pres* distribution was preferable to paying injured class members, the Ninth Circuit has made clear that just because a settlement could have been better, or could have offered a different form of relief, does not mean the settlement is not fair, reasonable, and adequate. *Hanlon v. Chrysler*

*Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this possibility does not mean the settlement presented was not fair, reasonable or adequate."); *see also Ross v. Trex Co., Inc.*, 2013 WL 6622919, at *4 (N.D. Cal. Dec. 16, 2013) (noting court's role is not to examine whether a settlement "could have been better by providing different or additional relief."). For example, in *Edwards v. National Milk Producers Federation*, the Court granted final approval over an objection "that the settlement does not provide for 'a new program to encourage, fund, and foster small local dairy producers'" and instead provided cash compensation. 2017 WL 3616638, at *6 (N.D. Cal. June 26, 2017), *objections overruled*, 2017 WL 3623734 (N.D. Cal. June 26, 2017), *aff'd sub nom. Edwards v. Andrews*, 846 F. App'x 538 (9th Cir. 2021). The court noted that the Ninth Circuit has made clear that its inquiry "is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Id.* (citing *Hanlon*, 150 F.3d at 1027). Similarly, in *Vianu v. AT&T Mobility LLC*, the court granted final approval of a settlement over an objection that the settlement was inadequate because it lacked injunctive relief, finding cash compensation was sufficient. 2022 WL 16823044, at *8 (N.D. Cal. Nov. 8, 2022). PHAI Objectors' preference for a different form of relief does not, and cannot, undermine the reasonableness of the JLI Settlement.

>            **b)    The Relief PHAI Objectors Was Never Part of this Class Action**

The relief PHAI Objectors seek—equitable relief to redress harm to addicted persons and to public health—may be laudable, but was never part of this class litigation. The consolidated class action complaints at all times focused exclusively on providing compensation for economic injuries to JUUL purchasers. The release is similarly tailored to claims arising out of "economic loss." Settlement, § 1.29. So the equitable fund the objection requests is not something that the Class could have achieved at trial. While a settlement can provide for relief that could not have been obtained through litigation, the fact that this case was litigated with a sole focus on compensation for economic harm demonstrates that the JLI Settlement's redressing of those injuries is fair and reasonable. Moreover, the PHAI objection does not acknowledge that the injuries to persons and to public health are redressed by the substantial government entity, tribal, and attorney general settlements reached with JLI. The MDL settlements

6

1  provide funds to more than 1,400 government entities and 32 tribes, helping them to prevent and

2  mitigate youth use of e-cigarettes across the United States. In addition, in the wake of work performed in

3  the MDL (described further below), attorneys general from numerous states have recovered

4  approximately $1 billion in settlements and injunctive relief regulating JLI's conduct going forward.[4]

5
6
### 2.    The Gugliotta Objection (Dkt. 4026) Should be Overruled for the Reasons Provided in the Final Approval Motion

7         John Gugliotta submitted an objection in May 2023 and Class Plaintiffs addressed that objection

8  in their Final Approval Motion. Dkt. 4054 at 15-16. As set forth in the motion, similar objections by

9  Gugliotta (*i.e.,* that JLI should have admitted fault as part of a private settlement, and that the JLI

10  Settlement should have addressed the conduct of the entire e-cigarette industry) have been rejected by

11  other courts and have no bearing on whether the relief provided to the class is adequate.

12
13
### 3.    The Ashak and Marcom Objections (Dkts. 4086-1 and 4033) Express Disagreement with the Litigation, But Not the JLI Settlement

14         Two objections—submitted by Olin Ashak and Samuel Marcom (Dkts. 4086-1 and 4033)—do

15  not take issue with any aspect of the JLI Settlement, but instead express disagreement with the premise

16  of the lawsuit (suggesting it never should have been brought in the first place). Marcom's preferred

17  outcome is not for the JLI Settlement to be rejected, but for the "case to be thrown out" (which he at the

18  same time recognizes would not happen). Dkt. 4033.[5] And Ashak likewise wishes to "voice my

19  disagreement and objection to the lawsuit." Dkt. 4086-1. Disagreement with the litigation itself "is not a

20  basis for denying the motion for final approval." *Quiruz*, 2020 WL 6562334, at *8; *see also Perkins v.*

21  *Linkedin Corp.*, 2016 WL 613255, at *4 (N.D. Cal. Feb. 16, 2016) (overruling objections that "oppose

22

---

23  [4] https://ag.ny.gov/press-release/2023/attorney-general-james-secures-462-million-juul-its-role-youth-
24  vaping- epidemic#:~:text=As%20part%20of%20a%20multistate,abatement%20programs%20
    across%20the%20state (describing six-state settlement with JLI for $462 million and injunctive relief
25  aimed at addressing the youth nicotine epidemic); https://www.texasattorneygeneral.gov/news
    /releases/paxton-announces-439-million-multistate-settlement-juul-deceptive-marketing-and-sales-
26  practices (describing 34-state settlement with JLI providing $438.8 million in compensation);
    https://www.nytimes.com/2021/06/28/health/juul-vaping-settlement-north-carolina.html (describing $40
27  million settlement between JLI and the State of North Carolina).

28  [5] Class Counsel also addressed the Marcom objection in their Final Approval Motion. Dkt. 4054 at 15.

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

the claims alleged" and "appear to support no recovery for the Class"); *Ko v. Natura Pet Prods., Inc.*, 2012 WL 3945541, at *6 (N.D. Cal. Sept. 10, 2012) ("[A]n objection based on a concern for the Defendants and an apparent non-substantive assessment of the frivolity of the action are not germane to the issue of whether the settlement is fair.").

The Ashak objection also asserts that the objection process was "difficult" without any further specificity. *Id*. Courts routinely overrule challenges to the objection procedures. *See In re Facebook Internet Tracking Litig.*, 2022 WL 16902426, at *6 (N.D. Cal. Nov. 10, 2022) (signature requirement and disclosure of personal information not unreasonable); *DeMarco v. Avalonbay Communities, Inc.*, 2017 WL 960355, at *3 (D.N.J. Mar. 13, 2017) ("the procedure of requiring opt-outs and objections to be sent to the Clerk of the Court and to counsel for the parties to this federal action is neither onerous nor unusual in a class action"). Orders preliminarily certifying settlement classes have set forth similar procedures. *See, e.g.*, *Moore v. Verizon Commc'ns Inc.*, 2012 WL 12920712, at *5 (N.D. Cal. Feb. 28, 2012) (objection procedure requiring "a detailed statement of objections to be made, including all factual and legal support for such objection . . . any evidence supporting the objection that is intended to be introduced in support of the objection, including evidence of the objector's membership in the Settlement Class . . . whether the objector or objector's counsel intends to appear at the Final Approval Hearing."); *Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *18 (E.D. Cal. Sept. 29, 2022) (similar).

### 4.     The ClaimClam Objections (Dkts. 4087-90) Are Irrelevant to the Fairness of the JLI Settlement and Class Counsel's Decision to Disallow Third-Party Filed Claims Was Reasonable

The next set of objections come from a third-party filer, ClaimClam, and hundreds of its clients, who object to the requirement that Class Members submit their claims individually, as opposed to through ClaimClam. Class Counsel directed the Settlement Administrator to reject the claims submitted *en masse* by ClaimClam based on concerns about third-party filers in general—concerns that were borne out by ClaimClam's misleading and incomplete communications to Class Members.

The Court has discretion to set procedures for the claims process and it is well within that discretion to impose requirements designed to ensure due process and to prevent unauthorized or fictitious claims, opt-outs, and objections. *See, e.g.*, *In re Equifax Inc. Customer Data Sec. Breach Litig.*,

1    999 F.3d 1247, 1266 (11th Cir. 2021) ("The District Court was well within its broad discretion to

2    impose the requirements" for such purposes); *In re Deepwater Horizon*, 739 F.3d 790, 809 (5th Cir.

3    2014) (proof of class membership requirement imposed on objector a "legitimate exercise" of court's

4    discretion to minimize abuse); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) ("Because of the

5    potential for abuse, a district court has both the duty and the broad authority to exercise control over a

6    class action and to enter appropriate orders governing the conduct of counsel and parties."). The Court

7    should exercise that discretion here and affirm Class Counsel's decision to disallow third-party filed

8    claims.

9            The Court should also overrule the hundreds of nearly identical objections submitted by

10   ClaimClam's clients, which were solicited by and follow a template provided by ClaimClam. *See In re*

11   *Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *14 (N.D. Ga. Mar. 17, 2020),

12   *aff'd in part, rev'd in part on other grounds*, 999 F.3d 1247 (11th Cir. 2021) (rejecting 718 form

13   objections "submitted en masse by . . . a class action claims aggregator that created a website . . . that

14   encouraged individuals to object based on [] erroneous information").

15           Class Counsel's priority is to ensure that Class Members receive accurate information about the

16   JLI Settlement and, if they then choose to submit a claim, receive their fair share of the Settlement.

17   Thus, if the Court overrules ClaimClam's objection, Class Counsel will nonetheless permit affected

18   Class Members an opportunity to resubmit their claims on their own behalf, and to treat those

19   resubmitted claims as timely, subject to the Court's approval.

20                          a)      **ClaimClam Background**

21           Zimin Hang objected to the JLI Settlement "both as a Class Member" and "as the CEO of

22   Communion Inc. (DBA ClaimClam)." Sharp Reply Decl., Ex. 3 ("Hang Objection").[6] ClaimClam is a

23   third-party filer, soliciting and submitting claims *en masse* to various class action settlements for its

24

25

26   _____
     [6] Although Zimin Hang electronically signed the correspondence and it otherwise appears to be from

27   him, the attestation provides: "I declare under penalty of perjury under the laws of the United States of
     America that Heather Aubuchon is a member of the Class." *Id*. Class Counsel presume this was a copy-
     paste error, as Heather Aubuchon has not otherwise submitted an objection to the JLI Settlement. Even

28   setting aside this procedural deficiency in Hang's objection, the Court should reject it on the merits.

1    clients in exchange for 15% of their recoveries. *Id.*, ¶ 28 & Ex. 4 at 34. Hang objects to the JLI

2    Settlement based on the rejection of third-party filer claims.

3         In addition to the objection by Hang, ClaimClam solicited objections to the JLI Settlement from

4    its clients and drafted objections for them based on a template objection form. *See Id.*, ¶¶27, 33 & Ex.

5    8. ClaimClam clients ultimately submitted 442 objections to the Settlement Administrator regarding the

6    rejection of claims submitted by ClaimClam, all of which appear to have been created using

7    ClaimClam's template. *Id. See Equifax*, 2020 WL 256132, at *10 (placing little weight on objections

8    made "at the behest" of others). Importantly, none of the ClaimClam objections argue that the JLI

9    Settlement itself is unfair or inadequate, and instead they protest only the rejection of claims submitted

10   through an agent. Many of these 442 template objections have significant procedural deficiencies.[7] But

11   because they provide no basis to reject the JLI Settlement, the Court should overrule on the merits all

12   objections related to ClaimClam.

13                  **b)       Class Counsel Have Valid Concerns About Third-Party Filers**

14        When the issue of third-party filers arose in this case, Class Counsel considered the relevant law

15   and then directed the Settlement Administrator to reject claims submitted by third-party filers based on

16   legitimate concerns about allowing such claims.

17        To protect Class Members' due process rights, rule 23(c) requires the Court to "direct to class

18   members the best notice that is practicable under the circumstances," and provides that "[t]he notice

19   must clearly and concisely state in plain, easily understood language:

20        (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims,
21        issues, or defenses; (iv) that a class member may enter an appearance through an attorney
          if the member so desires; (v) that the court will exclude from the class any member who
22        requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding
          effect of a class judgment on members under Rule 23(c)(3).
23

24

25
     _____
26   [7] 137 of the 442 ClaimClam client objections are procedurally deficient in one or more ways. *See* Order,
     Dkt. 3779 (setting requirements for information objectors must provide). 129 objections were untimely.
27   Eighteen did not include the required attestation that the objector is a Class Member, eleven fail to
     include the name and contact information of the objector, and seven objections do not include the
28   template's narrative describing the basis of their objection, or any other basis. Sharp Reply Decl., ¶ 27.

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1   Fed. R. Civ. P. 23(c)(2)(B). The purpose of these requirements is "is to present a fair recital of the

2   subject matter of the suit and to inform all class members of their opportunity to be heard." *In re*

3   *Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977). In its Order directing notice of the JLI

4   Settlement to the Class, the Court evaluated and approved the Notice Plan here, "including the form,

5   method, and content of the proposed notices (as revised), as well as the proposed claim forms." Dkt.

6   3779 at 7. It made a preliminary finding that the notice complies with Due Process and Rule 23. *Id.*

7        Third-party filers and claims aggregators like ClaimClam are bound by none of these rules or

8   requirements, and thus can frustrate the Court approved communications to the Class. "Misleading

9   communications to class members concerning the litigation pose a serious threat to the fairness of the

10  litigation process, the adequacy of representation and the administration of justice generally." *In re*

11  *School Asbestos Litigation*, 842 F.2d 671, 680 (3d Cir.1988) (citing *Gulf Oil Co. v. Bernard*, 452 U.S.

12  89, 101 n.12 (1981)). "[U]napproved communications to class members that misrepresent the status or

13  effect of the pending action also have an obvious potential for confusion and/or adversely affecting the

14  administration of justice." *Gulf Oil*, 452 U.S. at 101 n.12. The risk of unfairness or confusion is

15  significant because there is no assurance that a third-party filer's communications are accurate and

16  complete.

17       In addition, because they receive a percentage of all settlement proceeds obtained for their

18  clients, entities like ClaimClam have little incentive to ensure the claims it solicits are authentic. Courts

19  often cite similar concerns in rejecting mass objections and opt-outs of class settlements. For example,

20  the court in *Equifax* rejected objections to a personal signature requirement, noting it was "of particular

21  importance in this case, to ensure that the objection is made in the objector's personal capacity, and not

22  at the behest of others. And, the personal signature requirement decreases the likelihood that services

23  encouraging mass objections or opt-outs file unauthorized or fictitious objections." 2020 WL 256132, at

24  *26. The *Equifax* court further noted:

25           While technology provides an avenue for filing claim forms more easily, it also makes it
26           easier for third parties and their counsel to file unauthorized 'mass opt-outs,' which are
             sometimes 'highly indicative of a conclusion that such counsel did not spend much time
27           evaluating the merits of whether or not to opt-out in light of the individual circumstances
             of each of their clients and in consultation with them.'
28

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1    *Id.* Aggregated claims submitted by a financially-interested third-party filer raise similar concerns to

2    mass opt-outs and objections.

3                    **c)      ClaimClam Validates Class Counsel's Concerns**

4            ClaimClaim's communications with Class Members turned out to be incomplete and

5    misleading, creating confusion amongst the Class and ClaimClam's clients.

6            ClaimClam solicited Class Members to submit claims without first providing any of the required

7    notice content. The home page of ClaimClam's website, https://www.getclaimclam.com, prompts users

8    to "get what you're entitled to" from class action settlements. Sharp Reply Decl., ¶¶ 28-29 & Ex. 4 at 1.

9    After clicking a button to "get started," users are provided with the following information: "Juul Labs,

10   Facebook, and other US companies have agreed to pay over $1 billion as a result of class action

11   settlements. Your claim value could be worth $300 or more. Complete the intake form to find out how

12   much you're entitled to." *Id.*, ¶ 29 & Ex. 4 at 7. If a user indicates that they did purchase JUUL

13   Products before December 7, 2022 (*id.* at 8), the user is automatically taken through a webform that

14   asks for the data points on the claim form in this case, such as the volume of retail purchases and dates

15   of first and last purchase (*id.*, ¶ 29 & Ex. 4 at 9-17). On the page in the form where users can upload

16   documentation of their purchases, ClaimClam tells Class Members—inaccurately—that "without

17   documentation the amount of money you receive from your claim will be limited to a maximum of

18   $300." *Id.*, ¶ 29 & Ex. 4 at 17. Only after all this information is provided by the user does ClaimClam

19   indicate that continuing through the form will result in their filing a claim "on your behalf." *Id.*, ¶ 29 &

20   Ex. 4 at 21. It collects the user's contact information, terms of service, and finally, acceptance of an

21   "Authorized Agent Agreement," before submitting the claim. *Id.*, ¶ 29 & Ex. 4 at 22-30. At no point

22   before users commit to having ClaimClam submit a claim for them are Class Members informed of a

23   single piece of key information about the case (*id.*, ¶ 29)—not what the lawsuit was about, that they will

24   be releasing claims against certain defendants if they submit a claim, which claims they will release,

25   how the class is defined, not even the name of the court case. *Cf.* Fed. R. Civ. P. 23(c)(2)(B) (requiring

26   notice include "the nature of the action," "the definition of the class," "the class claims, issues, or

27   defenses," "that the court will exclude from the class any member who requests exclusion" and more).

28

1    Responses by Class Members confirm that ClaimClam's approach caused significant confusion.

2  Sharp Reply Decl., ¶¶ 30–31 & Exs. 5–7. At least one Class Member received an email from

3  ClaimClam and forwarded it to the Settlement Administrator to "verify its validity," saying "I'm

4  concerned with it being potential spam, but I'm unsure how they would have gathered my personal

5  information in order to contact me." *Id.*, ¶ 30 & Ex. 5. Other Class Members posted screenshots of the

6  email in a Facebook group for class action settlements asking if it was a scam. *Id*., ¶ 31 & Exs. 6–7.

7    ClaimClam also provided false, incomplete, and misleading information in direct

8  communications with Class Members. For example, when ClaimClam informed its clients that the

9  Settlement Administrator rejected third-party claims, it included 1) a misrepresentation of the value of

10  their claim if they were to opt out of the JLI Settlement (listing what appears to be the estimated value

11  of the Class Member's JUUL purchases), 2) a promise to "work with a law firm in TX to help you file a

12  new suit and recover the maximum compensation, at no cost to you" for their clients who opt out,

13  without any reference to the possibility that a claim may be time barred, 3) an estimate of the payment

14  the Class Member would receive if they refile their claim directly, repeating the incorrect assertion that

15  Class Members with no documentation of their purchases will receive $300. *See, e.g.*, *id.*, ¶ 32 & Ex. 5.

16    ClaimClam also appears to have told its clients that the official claims process would be too

17  difficult and confusing for them to complete on their own. The template objection that ClaimClam

18  drafted for each objecting client coaches the Class Member to say: "I find the class action claims filing

19  process to be unduly burdensome" and that ClaimClam "made the filing easier for me by simplifying

20  the language and breaking it down into smaller, more manageable pieces." *Id*., ¶ 33 & Ex. 8

21  (forwarding directly ClaimClam's email with the draft objection). But ClaimClam simplified the

22  language only by removing the entire content of the Court-approved notice. *See id.*, ¶ 29. Some Class

23  Members recognized this disconnect. For example, one Class Member submitted ClaimClam's template

24  objection, but later withdrew it, telling the Settlement Administrator that they "filed the claim on my

25  own as needed without the help of my advisor as was the original problem" and that "the process on the

26  website was easier than anticipated and did not need [ClaimClam's] assistance as I thought." *Id*., ¶ 34 &

27  Ex. 9.

28

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1    Each of the above examples reinforce that Class Counsel's concerns about allowing third-party

2    filers to submit claims *en masse* are well-founded. ClaimClam's incomplete and misleading

3    communications to Class Members "pose a serious threat to the fairness of the litigation process," *In re*

4    *School Asbestos Litigation*, 842 F.2d at 680, caused real confusion, and risk "adversely affecting the

5    administration of justice." *Gulf Oil*, 452 U.S. at 101 n.12. Those Class Members whose claims

6    ClaimClam attempted to submit will be given an opportunity to make a fully informed decision to

7    resubmit their claims directly. The Court should deny ClaimClam's objections and each of the template

8    objections of its clients.

9           **5.**      **The Ready, Stampdfer, Stawicki, and Toole Objections (Dkts. 4086-2, 4086-3,**

10                      **4077, 4086-4) Provide No Basis for Their Objections**

11       The final four objections to the JLI Settlement all state that they "respectfully object" to the

12   settlement without providing any reason why. Such bare-bones objections provide no basis to question

13   the fairness of the JLI Settlement. In addition, the Stawicki objection is untimely, as it was dated July 18

14   (Dkt. 4077), four days after the applicable deadline.

15   **III.**    **THE COURT SHOULD GRANT THE REQUEST FOR ATTORNEYS' FEES,**

16           **EXPENSES, AND SERVICE AWARDS**

17       Only one objection (from Reilly Stephens) takes issue with Class Counsel's requested award of

18   attorneys' fees. Stephens' objection does not challenge the fairness or reasonableness of the JLI

19   Settlement, or the requested expense reimbursement and service awards. Dkt. 4063. Stephens' focus is

20   attorneys' fees, but none of the arguments he offers warrants the reduction in fees he proposes.

21       Given the results achieved, the considerable litigation risks, the skill and quality of work

22   performed, and the contingent nature of the representation,[8] Ninth Circuit authority supports an upward

23   adjustment from the 25% benchmark here. Stephens' reliance on average fee awards in other cases is

24   

---

25   [8] Stephens argues this factor is obsolete based on the Ninth Circuit's decision 2011 decision in

26   *Bluetooth*. Stephens Obj. at 24. The Ninth Circuit has subsequently reaffirmed the relevance of "delays
     in payment inherent in contingency-fee cases," which allows for enhancements to historical hourly rates

27   (which were used here) or current rates for all hours. *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir.
     2016); *see also Stetson v. West Publishing Corp.*, 714 Fed.App'x 681, 682 (9th Cir. Oct. 30, 2017)

28   ("[t]he district court erred by failing to update the lodestar calculation to compensate for the delayed
     payment").

<div align="center">14</div>

contrary to the Ninth Circuit's directive to consider the circumstances of the case at issue and the work performed to achieve the results. And as to the lodestar cross-check, Stephens misses the point that a cross-check is not a forensic exercise but a discretionary and "quick" means for the Court to confirm the reasonableness of the fee award, *In re Online DVD-Rental Antitrust Litig.*, 779 F. 3d 934, 955 (9th Cir. 2015), and requires "entail neither mathematical precision nor bean counting," *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264 (N.D. Cal. 2015). Moreover, Stephens' proposed adjustments are neither well-founded nor would they change the ultimate conclusion that the requested fee is reasonable. Overall and considering the facts of this case and the work performed, Stephens offers no convincing reason why a 30% fee award would be a "windfall," much less why an award of a mere 15% would be warranted.

### A.    Stephens' Challenges to the Percentage Fee Award Are Unfounded

Class Counsel and Stephens agree that the Court has a duty to ensure that fee awards are reasonable and do not result in a windfall to class counsel to the detriment of the class. *See* Stephens Obj. at 2-3. As discussed below, consideration of the relevant Ninth Circuit factors supports the requested fee award in this case.

### 1.    There is No Rule in the Ninth Circuit that Percentage Awarded Should Decrease as the Size of the Settlement Increases

Stephens contends that a 15% fee award is warranted "based on the size of the settlement fund." Stephens Obj. at 4. Looking to nothing other than the size of the settlement is at odds with Ninth Circuit precedent, however. The Ninth Circuit has repeatedly emphasized that the size of the settlement fund is *one factor* among many that courts are to consider when analyzing a fee request. *Vizcaino v. Microsoft Corporation*, 290 F.3d 1043, 1047 (9th Cir. 2002). The size of the fee award should be based on whether "circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Relevant factors include: "(1) the result achieved; (2) the risk involved in the litigation; (3) the skill required and quality of work by counsel; (4) the contingent nature of the fee; and (5) awards made in similar cases." *Larsen v. Trader Joe's Co.*, 2014 WL 3404531, at *9 (N.D. Cal. July 11, 2014) (citing *Vizcaino*, 290 F.3d at 1048-50). This multifactored approach is

15

1  necessary to prevent arbitrary fee awards that are either too high or too low.

2              a)      A Formulaic Fee Analysis is Contrary to Ninth Circuit Precedent

3       Stephens does not mention or engage with the relevant factors or Class Counsel's discussion of

4  them. Instead, he asks this Court to ignore decades of Ninth Circuit law and employ what Stephens

5  describes as the "better approach": basing the fee award on academic surveys of what happened in *other*

6  cases. Stephens Obj. at 5-7.[9] Stephens bases his proposed 15% fee award on what he describes as

7  "empirical evidence and circuit practice" regarding awards in other cases, rather than the facts of this

8  case. Stephens Obj. at 8.

9       The Ninth Circuit has cautioned against the formulaic approach Stephens advocates for, because

10 "courts cannot rationally apply any particular percentage—whether 13.6 percent, 25 percent or any other

11 number—in the abstract, without reference to all the circumstances of the case." *In re Wash. Pub. Power*

12 *Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1298 (9th Cir. 1994). To be sure, a district court "must refer" to

13 the size of the fund, but the Ninth Circuit has declined to "adopt a bright-line rule requiring the use of

14 sliding-scale fee awards for class counsel in megafund cases" that dictates a downward adjustment as

15 the settlement size increases. *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 933 (9th

16 Cir. 2020); *see also Toyota*, 2013 WL 12327929, at *34 ("no rule in the Ninth Circuit [] requires a court

17 to decrease the percentage of the fee award as the size of the settlement increases") (citing *Vizcaino*, 290

18 F.3d at 1047). Stephens' argument for a "strong presumption against the benchmark, in favor of

19 downward departure" (Stephens Obj. at 7) ignores controlling Ninth Circuit authority and "flies in the

20 face" of a court's obligation to "consider[] all the circumstances of the case and reach[] a reasonable

21 percentage." *Vizcaino*, 290 F.3d at 1048. The Court should decline Stephens' invitation to disregard

22 Ninth Circuit precedent.

23      Stephens argues that larger settlements do not always require more work than smaller ones.

24 Stephens Obj. at 4. Whatever the validity of that principle as a general matter, it is inapposite here. As

25 discussed below, overcoming the risks inherent in this case took both significant work and creative

26

27 [9] Although Stephens argues that a district court's assessment of the appropriate fee is nondelegable
   (Stephens Obj. at 10, 17), at the same time, he suggests that courts should simply apply the results of
28 academic surveys.

1   lawyering. Numerous strategic decisions by Class Counsel paved the way for successful oppositions to
2   dispositive motions, claims against the Released Parties, a nationwide claim with joint and several
3   liability, and certification of multiple classes even though certification had been almost universally
4   denied in tobacco products litigation. *See* Section III.A.2.a. These successes, combined with the factual
5   and expert evidence developed by Class Counsel, created the litigation value that ultimately drove the
6   JLI Settlement. If the size of the class alone determined the settlement amount, then this case would
7   have resolved years ago. Instead, it took years of litigation to reach settlement as the parties were
8   preparing for trial**.**

9                      **b)**      **Surveys Averages Are Not Instructive in this Case**

10          The averages reflected in the surveys Stephens relies on reveal nothing about the facts and
11   circumstances in this case. The "empirical evidence" Stephens relies on does not, for example, provide
12   information about whether cases assessed had certified classes, dealt with potentially dispositive
13   preemption issues, involved defendants in precarious financial straits, required unique legal theories, or
14   other key considerations that may inform the reasonableness of a fee award in a particular case.

15          While Stephens cites a small handful of cases that have found surveys informative, courts have
16   rejected surveys in favor of a case specific approach. *See, e.g.*, *In re: Cathode Ray Tube (CRT) Antitrust*
17   *Litig.*, 2016 WL 721680, at *43 (N.D. Cal. Jan. 28, 2016) (noting existence of surveys but
18   recommending upward adjustment from the benchmark to 30% of $173 million settlement), *report and*
19   *recommendation adopted in part*, *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 4126533, at
20   *6 (N.D. Cal. Aug. 3, 2016) (awarding 27.5% fee); *Rodman v. Safeway Inc.*, 2018 WL 4030558, at *5-6
21   (N.D. Cal. Aug. 22, 2018) (cited by Stephens, the court examined the same surveys Stephens offers here
22   and awarded fees totaling 28% of the recovery); *see also Heekin v. Anthem, Inc.*, 2012 WL 5878032, at
23   *2 (S.D. Ind. Nov. 20, 2012) (acknowledging surveys but noting that they  "do not replace the analysis"
24   for determining a reasonable fee); *Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at *11
25   (S.D. Ill. Dec. 16, 2018) (similar).

26          The authors of one survey that Stephens cites underscored the need to consider the circumstances
27   of each case, finding in a different study that a 33% fee is reasonable in contingent cases that proceed to
28   trial. *See In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *5 & n.5 (D. Kan. July 29, 2016) (citing

17

Theodore Eisenberg and Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical L. Stud. 27, 35 (2004), and awarding one-third of $835 million settlement); *see also In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1115 n. 11 (D. Kan. 2018) (noting that the author of a different study Stephens cites, Professor Brian Fitzpatrick, stated in a declaration in the *Deepwater Horizon* case that "that he (like many courts and commentators) 'do[es] not endorse this bigger-settlement-smaller-fee approach because it creates bad incentives for class counsel.'") (alteration in original). Stephens argues that courts "rely on [] empirical surveys as a matter of course." Stephens Obj. at 7. But in none of the cases Stephens cites did the court mechanically apply survey results without analysis of whether the award was appropriate given the circumstances of the case.[10]

### c)   The Cases Class Counsel Cite Confirm the Reasonableness of the Requested Fee Award

Stephens argues that Class Counsel's fee request is based on the "cherry picked" cases that Class Counsel cites. Stephens Obj. at 5. The cases Class Counsel cites are not "outliers," however, as even in the context of large settlements, courts have "routinely awarded class counsel fees in excess of the 25% 'benchmark.'" *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *5 & n.30 (N.D. Cal. Dec. 6, 2017), *aff'd,* 768 F. App'x 651 (9th Cir. 2019); *see also In re Lidoderm Antitrust Litig.*, 2018 WL 4620695, at *2-4 (N.D. Cal. Sept. 20, 2018) (fee award of 33.3% of $104.75 million settlement); *Benson v. DoubleDown Interactive, LLC*, 2023 WL 3761929, at *3 (W.D. Wash. June 1, 2023) (awarding 29.3% fee on a $415 million settlement fund); *In re TFT-LCD (Flat*

---

[10] *See In re Yahoo! Inc. Customer Data Security Breach Litig.*, 2020 WL 4212811, at *37-38 (N.D. Cal. July 22, 2020) (court principally applied the lodestar method, and discussed the "circumstances" of the case when performing a percentage-of-recovery crosscheck); *In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730, at *9-11 (N.D. Cal. Sept. 2, 2015) (principally applying the lodestar method, and awarding a 2.2 multiplier); *Alexander v. FedEx Ground Package System, Inc.*, 2016 WL 3351017, at *2-3 (N.D. Cal. June 15, 2016) (applying the lodestar method and reducing the fee award to a 3.0 multiplier after finding that circumstances did not warrant a 4.0 multiplier); *In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp. 3d 508, 526 (N.D. Cal. 2020) (holding that the "studies' 'data does not replace the 25 percent benchmark, nor does it negate the positive factors assessed above'") (quoting *Rodman v. Safeway Inc.*, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 22, 2018)); *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 2423161, at *10-12 (N.D. Cal. June 5, 2017) (applying the lodestar method and, with respect the percentage crosscheck, finding that the "'economies of scale' effect is especially relevant in the instant case" based on the specific facts of the case).

18

1    *Panel) Antitrust Litig.*, 2011 WL 7575003, at *1 (N.D. Cal. Dec. 27, 2011) (approving 30% fee award of

2    $405 million settlement). And more to the point, the cases Class Counsel cite don't provide the basis for

3    the requested award; instead, the fee request here is based on the relevant Ninth Circuit factors as

4    applied to *this case*: the results achieved, the significant litigation risks undertaken, the skill and quality

5    of work performed by counsel, and the contingent nature of the work performed. Fee and Expense Mot.

6    at 7-11. Only one paragraph in the Fee and Expense Motion discusses cases involving fee awards in

7    excess of 25%, and the point of that paragraph is to emphasize that a 30% award is "within the range of

8    awards in similar cases" (Fee and Expense Mot. at 11)—an assertion that Stephens does not contest.

9        The arbitrariness and dangers of Stephens' approach are obvious. He conducts *no analysis* of

10   whether the requested fee award would result in a windfall *in this case*. While some "megafund" cases

11   in this Circuit have resulted in fee awards below the 25% benchmark, those cases frequently involved

12   substantial lodestar multipliers. It was courts' desire to avoid an even higher multiplier—not reliance on

13   surveys or a wholesale rejection of the 25% benchmark in megafund cases—that drove the results in

14   those matters. Stephens repeatedly cites, for example, *In re Facebook Biometric Information Privacy

15   Litigation*. 522 F. Supp. 3d 617 (N.D. Cal. 2021). But in *Facebook*, a 25% fee award would have

16   resulted in a 5.3 multiplier. *Id*. at 633. The court entered an order awarding fees at a multiplier of 4.71.

17   As discussed below, any calculation of counsel's lodestar in this case leads to a multiplier significantly

18   less than 4.71.

19       Adoption of Stephens' approach will also lead to untenable results: courts would award the

20   "average" fee percentage regardless of whether the circumstances warranted a different outcome. Class

21   counsel could receive an unreasonable award based on the work performed to achieve the result in a

22   particular case. This Court's decision in *Lidoderm* provides an illustrative example. There the recovery

23   was $104.75 million, and the Court awarded $34.9 million in fees, which was one-third of the settlement

24   fund and a 1.37 multiplier. 2018 WL 4620695, at *1-2. Had the Court arbitrarily held that a 15% fee was

25   appropriate based on Stephens' rationale, the fee award would have represented a .62 negative

26   multiplier, a manifestly unjust result given the recovery and complexity of that matter.

27       The Court should reject Stephens' invitation to depart from well-settled Ninth Circuit law and

28   arbitrarily set fees in this matter based on average awards in other cases. It should instead be guided by

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1   the specific considerations of this case, as dictated by Ninth Circuit precedent. Stephens' objection

2   provides "no availing reason why the Court should reduce attorneys' fees in *this* action" and the Court

3   should "therefore reject[] as entirely unreasonable [the] dogmatic objection to counsel's fee award in

4   this action." *City of Livonia Employees' Ret. Sys. v. Wyeth*, 2013 WL 4399015, at *5 (S.D.N.Y. Aug. 7,

5   2013) (emphasis in original).

6                   **2.**      **Stephens' Contention That This Litigation Was Low-Risk and Based on**
                              **Government Investigations Is Counter-Factual**
7

8           Stephens argues that counsel faced no risk due to government investigations and litigation. He

9   ignores the unique risks this case posed, as well as the challenges inherent to the class claims—none of

10   which were or could have been alleviated by government enforcement actions.

11                   **a)**      **Class Counsel Overcame Significant Risks**

12          ***The Initiation of the Lawsuit***: According to Stephens, JLI was a well-funded corporation and

13   plaintiffs' counsel, seeing an obvious payday, piled on with lawsuits. Stephens Obj. at 19-20. The truth

14   is that JLI was a startup company whose long-term financial condition was uncertain, and whose

15   financial viability relied on contributions from its key investors and a desire to seek *future* investments

16   from a large tobacco company. By the time MDL leadership had been appointed in late 2019, JUUL's

17   popularity had peaked and JLI's financial prospects had deteriorated significantly against headwinds of

18   lawsuits, subpoenas, investigations, and public outcry. Sharp Reply Decl., ¶ 21 & Ex. 2 (citing NYT,

19   *How Juul Hooked a Generation in Nicotine*). Of Altria's $12.8 billion investment in JLI in late 2018,

20   less than $200 million was retained by the company, with the vast majority of the Altria money having

21   been paid out to stakeholders and employees. Sharp Decl., ¶ 14. JLI's fate rested in large part in the

22   FDA's hands. Sharp Reply Decl., ¶ 22. These facts were known when Class Counsel committed to this

23   risky case. *Id.* That risk came to fruition: the FDA's denial of JUUL's PMTA in late June 2022 meant

24   bankruptcy was widely anticipated. *Id.* By July 2022, having already recorded a series of write-downs

25   on its initial investment, Altria further wrote its investment in JLI down to a mere $450 million, which

26   was below the threshold for Altria to exit a noncompete agreement and invest in other ENDS products.

27   *Id.* The consequences for JLI—teetering at the edge of bankruptcy as it was—could have been

28   devastating.

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1    That a number of law firms sought leadership positions in the case is no reason to conclude that

2    the litigation was riskless either. Stephens Obj. at 20, 24. Stephens relies heavily on the *In re Anthem,*

3    *Inc. Data Breach Litigation*, where the court noted that while many firms sought leadership

4    appointments, "the risks attendant to maintaining [the] litigation weigh in favor of granting Class

5    Counsel's request for a fee award of more than 25%." 2018 WL 3960068, at *13 (N.D. Cal. Aug. 17,

6    2018). In general, many class cases draw leadership applications from a wide variety of counsel. At the

7    same time, many of those cases turn out poorly—the class is not certified or loses on the merits. The

8    assumption that a large number of applications means no risk does not reflect the reality of contingent

9    litigation.

10    ***Nationwide RICO Claim***: The reality of JLI's financial condition made it crucial to establish,

11    maintain, and certify claims against the Directors. Plaintiffs alleged that it was they who controlled JLI,

12    and they who took most of Altria's money out of the company. Those claims were difficult: as this

13    Court's motion to dismiss opinions recognized, suing a company's managers is not the norm, and

14    requires difficult showings of personal involvement and active control. Those claims gave the Class

15    significant leverage it would not otherwise have. Sharp Reply Decl., ¶ 23. As important, it made

16    bankruptcy a less palatable option because such a move would have left the Directors at risk of (1) their

17    own liability remaining after insolvency proceedings ended or (2) their payments from Altria being

18    clawed back. *Id.* Maintaining the case against the Directors required developing legal theories and

19    causes of action that could be asserted against them. *Id.* Class Plaintiffs' claim under the Racketeer

20    Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962) not only provided a claim for

21    joint and several liability against the Directors, it also allowed Class Plaintiffs to assert a nationwide

22    claim instead of relying on a series of state-specific bellwethers. *Id.* The presence of this nationwide

23    claim created exponentially higher risks for the Directors at trial. *Id.*

24    Framing a RICO claim was difficult, and there was a substantial risk it would not survive. The

25    Ninth Circuit applies a heightened standard of review for RICO allegations. *See Wagh v. Metris Direct,*

26    *Inc*., 348 F.3d 1102, 1108 (9th Cir. 2003) quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.

27    1990) (explaining courts should "'strive to flush out frivolous RICO allegations at an early stage of the

28    litigation'" given the "consequent 'stigmatizing effect on those named as defendants'"), *overruled on*

21

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1   other grounds, *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007). The Court initially

2   dismissed Class Plaintiffs' RICO claims against all Defendants. Dkt. 1084. One month later, Class

3   Plaintiffs filed an amended complaint, recasting their RICO claims and adding allegations regarding the

4   conduct of Altria and the individual Defendants. Dkt 1135. After a second round of motion to dismiss

5   briefing, the Court upheld the claims, stating: "Plaintiffs assert a plausible theory to maintain their RICO

6   claims against Altria and the Founder and Director Defendants." Dkt. 1694 at 1. The Court warned that

7   the viability of Plaintiffs' RICO enterprise theory, as well as whether the RICO Defendants were

8   pursuing enterprise goals outside of JLI's ordinary course of business, could be revisited at summary

9   judgment. *Id*. at 13.

10      It bears emphasis: if Stephens' narrative of a corporate defendant flush with cash and eager to

11   settle was accurate, then there was no point to the RICO claim that dominated this litigation. JLI *was not*

12   *even named in the RICO claim* that survived the motion to dismiss. The reason the parties and the Court

13   dedicated such resources to that claim was the crucial importance of the claims against the Directors and

14   Altria. Stephens does not acknowledge those claims, let alone explain how they are consistent with his

15   portrayal of this litigation as low-risk.

16      ***Class Certification***: As detailed in the Fee and Expense Motion, class certification has been

17   almost universally denied in cases asserting claims involving tobacco products, leading Defendants to

18   argue "that no class of purchasers of nicotine or other addictive products could ever be certified." *In re*

19   *JUUL Labs, Inc. Mkt'g, Sales Pracs., and Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 969 (N.D. Cal.

20   2022). This trend of class certification denials was so well-known that Class Counsel recognized the

21   need to proactively address it. *See* Dkt. 1772-2 at 42-45 (Class Certification Motion) (citing cases that

22   have denied class certification, *e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008); *In re*

23   *NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015); *Phillips v. Philip*

24   *Morris Companies, Inc.*, 298 F.R.D. 355 (N.D. Ohio 2014); *In re Light Cigarettes Mkt'g Sales Pracs.*

25   *Litig.*, 271 F.R.D. 402 (D. Me. 2010); *Cleary v. Philip Morris USA, Inc.*, 265 F.R.D. 289 (N.D. Ill.

26   2010)). Certifying RICO claims also presents significant challenges: as McLaughlin on Class Actions

27   recognizes, "[d]espite the ease with which commonality is satisfied in most RICO actions, individual

28   issues of elements such as reliance, causation and proof of damages frequently predominate in putative

22

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1   RICO class actions and prevent certification." 1 McLaughlin on Class Actions § 4:13 (19th ed.); *see also*

2   *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, 277 F.R.D. 586, 609 (S.D. Cal. 2011)

3   (denying motion to certify nationwide RICO claims because individual issues predominated regarding

4   racketeering activity element). The Court certified other claims that typically do not survive, or are not

5   even asserted, in other cases: application of a conjoint model to non-labeling claims and a full refund

6   model of damages for youth purchasers. At class certification, nationwide damages stemming from the

7   conjoint model exceeded $1 billion and the full refund youth damages were several hundred million in

8   additional potential damages. And underscoring the challenges and risks of obtaining certification, the

9   Ninth Circuit granted Defendants' Rule 23(f) petitions, which often leads to the reversal of the

10  underlying certification decision. *See* Sharp Decl., Ex. 2 (Klonoff Decl.) at 21-22 (discussing Rule 23(f)

11  appeal reversal rates).

12          Class certification in this case, therefore, did not happen on its own. As the Court recognized, the

13  "legal theories" and "expert support provided by plaintiffs that was missing in [other tobacco

14  litigations]" led the Court to certify the classes (Dkt. 3327 at 18) and a favorable resolution. In

15  particular, Class Counsel presented credible experts opinions on classwide exposure to products

16  marketed through social media (Professor Chandler), the consistency of marketing messages (Dr.

17  Pratkanis), and the common nature of abuse liability (Dr. Shihadeh). Class Counsel is aware of no other

18  case with similar experts, and these novel approaches were key to overcoming the previously

19  insurmountable risks at class certification. Stephens ignores both the class certification risks and Class

20  Counsel's efforts to overcome them. The risks materialized in other cases, such as ones relied on by the

21  Court in its class certification order. *See Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061 (N.D. Cal.

22  July 29, 2022) (decertifying class); *Earl v. Bowing Co.*, 53 F. 4th 897 (5th Cir. 2022) (same). And of

23  course, these risks were faced solely by the class action, and not by any government enforcement action.

24          ***Tobacco Litigation***: Aside from the certification challenges, litigation against the tobacco

25  industry is notoriously hard-fought, and this case was no different. *See generally United States v. Philip*

26  *Morris, Inc.*, 449 F. Supp. 2d 1, 28 (D.D.C. 2006) (discussing history); *In re Tobacco II*, 240 Cal. App.

27  4th 779, 785-87 (2015) (after eighteen years of litigation, denying restitution from Philip Morris due to

28  lack of competent economic evidence, despite tobacco company's advertising violations of UCL and

23

FAL); *Kurzweil v. Philip Morris Cos.*, 1999 WL 1076105, at *1-2 (S.D.N.Y. Nov. 30, 1999)) (because tobacco cases are so aggressively defended and plaintiffs' success rate is so low, the risk factor supported a 30% fee award of $123 million settlement). The defendants here have been represented by some of the most successful firms and lawyers in the country that specialize in tobacco litigation: Kirkland & Ellis LLP; Munger, Tolles & Olson LLP; Arnold & Porter Kaye Scholer LLP; Wilkinson Stekloff LLP; Kellogg, Hansen, Todd, Figel & Frederick PLLC; Orrick Herrington & Sutcliffe LLP; and Boersch & Illovsky LLP. Succeeding against such highly-qualified counsel and well-funded defendants required an enormous investment of time and energy by Class Counsel. *See In re Broiler Chicken Antitrust Litig.*, 2022 WL 6124787, at *3 (N.D. Ill. Oct. 7, 2022) (granting 33% fee award in part because "Plaintiffs have been opposed by many defendants, including a number of very large and well-funded corporations, which have retained some of the most prominent and sophisticated law firms in the United States").

        **b)**       **Government Investigations and Litigation Did Not Decrease the Risk to Class Counsel; if Anything, They Increased It**

Stephens also asserts that this was "relatively low-risk litigation" in large part because it purportedly "substantially benefitted from parallel government investigations." Stephens Obj. at 1, 7. This superficial account relies on federal policy statements on youth e-cigarette use generally, an FDA letter requesting information from JLI, and various state attorney general actions to somehow make the $255 million class settlement an inevitable outcome. According to Stephens, years of adversarial litigation (at astonishing expense to both sides) were largely a pretext to eventually justify a fee.

Class Counsel in this case cannot "be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992) (awarding 30% as "eminently reasonable"). The record and the facts in this litigation, unlike Stephens' assumptions, confirm that Class Counsel "did all the work on their own." *Id*; *see also In re: Volkswagen "Clean Diesel" Mkt., Sales Prac., & Prods. Liab. Litig.*, 2017 WL 1474312, at *4 (N.D. Cal. Apr. 24, 2017) (rejecting similar argument even where, unlike here, government agencies litigated the case in tandem with private counsel and the settlement was tied to multiple consent decrees). *Cf. In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 876-77

1  (S.D.N.Y. 2018) (awarding 1.78 multiplier on lodestar-based fees due to "risk of non-recovery" even

2  where "much of the work that might otherwise have been required of plaintiffs' counsel had already

3  been done, and done in a way that enhanced plaintiffs' bargaining position.").

4                     i.       **The FDA's Actions Increased Litigation Risk**

5         The FDA's ongoing regulation of JUUL made Class Counsel's job more risky, not less. The

6  FDA's policy of deferred enforcement of the PMTA requirement meant that, at any time, the FDA could

7  have ordered JUUL products off the market, as the FDA threatened to do. *See* Statement from FDA

8  Commissioner Scott Gottlieb, M.D., on New Steps to Address Epidemic of Youth E-Cigarette Use

9  (Sept. 11, 218) (threatening to "revisit the FDA's exercise of enforcement discretion for products

10  currently on the market").[11] Such FDA action would have forced JLI into bankruptcy, threatening little

11  or no return to the Class, and to Class Counsel.

12         What the FDA *did* do created risk too. FDA enforcement policy and the PMTA process were the

13  bases for a motion to stay this litigation indefinitely on the grounds of primary jurisdiction (a stay that, if

14  granted, would still be in place today). *See* Dkt. 1084 at 10-17 (denying stay). Even more significant, the

15  FDA's exercise of regulatory authority over ENDs supported a colorable motion to dismiss *all* of the

16  Class claims as preempted. *See id.* at 18-33. While Class Counsel defeated that motion in significant

17  part, preemption cast a pall through certification and would have continued to pose risks at summary

18  judgment and trial. Most obviously, the Court repeatedly emphasized that its ruling would be revisited if

19  and when the FDA issued a determination on JLI's PMTAs. *Id.* at 15. The potential for greater, or even

20  complete, preemption of the Class claims was always present—from inception onward.

21         Moreover, the Court's determination that "labelling claims based on nicotine addiction are

22  preempted," *id.* at 25, exempted from liability the most potent and regularly certified form of false

23  advertising: crucial omissions via the medium guaranteed to reach consumers. *See Hadley v. Kellogg*

24  *Sales Co.*, 324 F. Supp. 3d 1084, 1099 (N.D. Cal. 2018) (explaining that class certification is easier in

25  labelling cases because "[e]xposure to statements displayed on the outside of a product's packaging is

26  clearly more likely"). No doubt, at summary judgment and trial Defendants would have argued both that

27

28  ──────────────
[11] *Available at* https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-steps-address-epidemic-youth-e-cigarette-use

1   (1) the addiction warning made any advertising misrepresentations immaterial and (2) that preemption

2   principles precluded false advertising claims that required the jury to evaluate the effectiveness of the

3   federal warning. *See Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 36 (2d Cir. 2020) (finding claims

4   preempted where their premise was that "compliance with" the federal warning "has the effect of

5   making the packaging misleading"). In the *SFUSD* trial, Altria maintained credible arguments based on

6   the Court's preemption order through the motion in limine stage, *see* Dkt. 3901 at 2; no doubt all

7   Defendants would have done the same in the Class trial.

8                              ii.      **The Class Case Was Not Based on FDA Findings**

9            Stephens' claim that "[t]he FDA … laid out the essence of Plaintiff's case before the first class

10   complaint was even filed" is unsupported. Dkt. 4063 at 23 n.14. To start, this argument relies on a

11   September 9, 2019, warning letter that was sent 17 months *after* the first class complaint was filed.

12   Moreover, this letter concerned whether JUUL was marketed as a modified risk tobacco product, *i.e.*,

13   whether JUUL products are "safer than cigarettes." FDA, Warning Letter to Juul Labs, Inc. (Sept. 9,

14   2019).[12] The Class claims, by contrast, focused on specific deceptive conduct that had nothing to do

15   with whether JUUL was a modified risk product or the specific affirmative statements that triggered the

16   FDA's concern.

17            In particular, the Class alleged that JUUL marketing failed to disclose material information

18   concerning the products' addictiveness and potential for adverse health effects that were material to

19   purchasing decisions. These claims were painstakingly developed through discovery and consultation

20   with industry experts, and not based on FDA letters. Among other things, Class Counsel had to develop

21   a deep understanding of the features of JUUL Products that contribute to their addictiveness and risk of

22   personal injury. Only a portion of the fraud claims involved comparisons of JUUL and cigarettes, and

23   the Court dismissed the most potent of those claims (based on omissions on the product label). Beyond

24   these deceptive marketing claims, Class Plaintiffs also argued that JUUL marketing targeted minors.

25   FDA warning letters therefore did not, and could not, provide a basis for liability. In fact, warning letters

26   like this were relied on by Defendants as a basis to *deny* class certification, and so, if anything, *added*

27

28   ──────────────
[12] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

risk to Class Counsel's efforts. *See* Dkt. 2309-2 at 17 (citing "government and public scrutiny" and the "resulting" variation in "risk perception of JUUL Products") (capitalization omitted); Dkt. 2309-3 at 7-8 (arguing that increasing "regulatory scrutiny" refuted Plaintiffs' experts common causation opinions).

### iii.   Class Counsel Did Not Rely on State AGs

Stephens claims that the class litigation rode "in the slipstream" of the state attorney general investigations and litigation. Stephens Obj. at 1. This is false.

***State AG Litigation Trailed the MDL***. *Colgate* was filed in April 2018, and the MDL was formed on October 2, 2019. By the time the first AG complaint was even filed (California—November 18, 2019), this Court had (1) overseen initial class-wide discovery in *Colgate*; (2) adjudicated two motions to dismiss in *Colgate*; (3) ordered an initial MDL census, Dkt. 193; and (4) appointed co-lead counsel, Dkt. 250. Meanwhile, class-wide discovery, which had begun in *Colgate*, continued in the MDL. Dkt. 291 at 2. The remaining state AG complaints trickled in over the ensuing months and years as lawyers in this MDL conducted comprehensive fact and expert discovery and certified the classes.

Stephens opines on one hand that the Court must consider only a myopic view of the risk this litigation posed the day *Colgate* was filed. Stephens Obj. at 22.[13] On the other hand, he urges the Court to find a lack of risk based on state AG complaints filed long after this MDL was in full swing, and *years* after *Colgate* initiated the class claims. *Id.* at 23 (discussing Arizona, New Mexico, Colorado, and Washington complaints).

***Class Counsel, not AGs, Developed and Litigated this Case***. Class Counsel obtained and reviewed their own documents, took their own depositions, retained and presented their own experts, created their own damages models, and certified their own classes. *See* Sharp Reply Decl., ¶ 3. AGs did none of that work, all of which carried significant risks.[14] *See id.*, ¶¶ 3–4. Stephens selects a few

---

[13] This argument cites Seventh Circuit authority, but, as Stephens does not acknowledge, that Circuit employs a "market rate" approach to calculating fees that is not the law of the Ninth Circuit. *Vizcaino*, 290 F.3d at 1049. In any event, the excessive focus on a particular date makes no sense: later-in-time events (like JLI's PMTA being denied) can help to determine that ex ante risk was real and significant.

[14] This distinguishes this case from *Petrobras*, 317 F. Supp. 3d at 876-77, where "much of the work that might otherwise have been required of plaintiffs' counsel had already been done, done in a way that enhanced plaintiffs' bargaining position." As noted above, *Petrobras* found a risk multiplier warranted in any event.

1   paragraphs from an amended complaint to make it look like the key allegations in this case were based

2   on AG findings. Stephens Obj at 23-24. In reality, the 649-page Consolidated Class Action Complaint

3   (Dkt. 386-4) was almost entirely based on review of the hundreds of thousands of documents produced

4   in *Colgate* and here—as evidenced by the 131 paragraphs and 21 footnotes that required redactions.

5   Sharp Reply Decl., ¶ 13. In particular, the subsequent amended complaints—which set out the factual

6   basis for the Director liability that drove resolution—were based on tireless analysis of documents

7   produced in this litigation, as well as groundbreaking legal theories, not cribbing from anyone else's

8   work. *See id*.

9          MDL counsel secured a volume of discovery that vastly exceeded the discovery produced to

10   government investigators. *Id.*, ¶ 7. From an early stage in this MDL, Plaintiffs had standing discovery

11   requests for documents produced to government agencies. *Id.*, ¶ 5; *see* Dkt. 291 at 2; Dkt. 397 at 3-4.

12   But this limited universe was not even close to sufficient to certify the classes and prove liability and

13   damages. Instead, Plaintiffs served (on JLI alone) hundreds of additional requests for production, and

14   served more than 190 third-party subpoenas, spent months negotiating independent sets of search terms,

15   and obtained documents from dozens of additional custodians. Sharp Reply Decl., ¶ 5.

16          In particular, Plaintiffs doggedly pursued custodial discovery that the AGs never did. *Id.* While

17   JLI maintained a limited list of search terms used for AG/regulator productions, in the MDL Plaintiffs

18   spent months negotiating a sweeping list of hundreds of search terms to ensure comprehensive discovery

19   beyond the limited amount produced in the AG litigations. *Id.*, ¶ 6. The same was true of custodians and

20   sources of information: Plaintiffs negotiated dozens of additional custodians and sources, including

21   crucial Slack messages. *Id.*, ¶ 7; *see* Dkt. 672 at 8-9 (discussing Slack); Dkt. 904 at 11 (discussing

22   additional custodians); *cf*. Sharp Reply Decl., ¶ 7 & Ex. 1 (JLI refused to produce complete Slack data to

23   the North Carolina AG even after a motion to compel was granted on April 30, 2021). Due to these

24   efforts, MDL counsel secured critical evidence that AGs did not, or could not, acquire. Plaintiffs, not

25   AGs, for example, secured production of JLI's PMTA and all communications with the FDA, Dkts.

26   1036, 1999 (granting motions to compel). Each production went well beyond what State AGs were

27   willing or forced to accept. *See* Dkt. 1022 at 6 (JLI arguing for significantly reduced productions on the

28   basis that "two State Attorneys General[] agree that [JLI's proposed] compromises [avoid] infringing on

JLI's ongoing PMTA-related work or invading the FDA's exclusive authority over the standards for marketing and labeling of JUUL products.").

The scope of depositions in this case likewise went far beyond what any AG did. Consider *Minnesota v. Juul Labs, Inc.*, No. 19-19888 (Minn. Distr. Ct.), the only AG action to go to trial. In that trial, the AG presented testimony from five defense witnesses—Murray Garnick, Nicholas Pritzker, Christopher Olin, Adam Bowen, and James Monsees. Sharp Reply Decl., ¶ 10. *All* of those witnesses testified at the Minnesota trial via *depositions taken in the MDL*. *Id*. By contrast, of the 16 witnesses whose video depositions were played during the *SFUSD* trial against Altria (which required a prove-up of the same RICO conspiracy at issue in the Class case), every single deposition was taken in the MDL. *Id*., ¶ 9. And the North Carolina AG, whose case settled on the eve of trial, deposed only one of those witnesses in its own case. *Id*. The bigger picture: Plaintiffs—through years of disciplined, hard, effective work—secured the discovery they needed from defendants; Plaintiffs did not (and could not have) rested on their laurels, waiting for the AGs to do their work for them. The North Carolina AG, for example, claimed that JLI ignored orders granting motions to compel, failed to respond to certain discovery requests and then, shortly before trial, produced millions of documents, "much of which [were] almost assuredly non-responsive," placing on the government litigators "the Herculean task of reviewing these three million documents four weeks before trial." *Id*., ¶ 7 & Ex. 1. None of that happened here because Class Counsel were persistent in pursuing discovery and presenting disputes to Judge Corley. As a result, for example, Plaintiffs secured production of nearly 1,000,000 pages of additional documents (including the FDA communications) after the North Carolina AG case had concluded. *Id*.

***The MDL Was Solely Responsible for the Crucial Litigation Against the Directors***. It was Class Counsel, not AGs, who established and successfully prosecuted the novel Director claims that, as discussed above, gave the Class its settlement leverage. This is no knock on the AGs: their mission is enforcement and deterrence and so, for most, JLI was the primary target. But Class Counsel had a duty to secure compensation for the Class; to do that, they had to go far beyond what any AG did.

Apart from one terse personal injury complaint in the JCCP, the first complaints in the country to name a Director as a Defendant were the Class and other master complaints filed in this case in early 2020. The few AGs that later sued the Directors did so only in the wake of this MDL establishing the

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

factual bases for individual liability. For example, North Carolina (one of the most aggressive JUUL AG litigants) did not sue the Directors until November 16, 2021, and then did so almost entirely *the MDL complaints*. Sharp Reply Decl., ¶ 16.[15] Other AGs failed where Class Counsel succeeded. *See State ex rel. Weiser v. Juul Labs, Inc.*, 517 P.3d 683, 695 (Col. 2022) (dismissing claims against Directors and rejecting this Court's reasoning); *People ex rel. James v. Juul Labs., Inc.*, 2022 WL 2757512, at *3-6 (N.Y. Sup. Ct. July 14, 2022) (same); *People v. JUUL Labs, Inc.*, No. RG19043543 (Cal. Super Ct. Oct. 19, 2022) (filed at Doc. 3631-1) (same, as to Dr. Huh). Yet another AG *did* keep alive claims against the Directors—but that AG was represented by MDL co-lead counsel, who relied on the MDL work product in drafting the complaint and prosecuting the litigation. *Hawai'i v. Juul Labs, Inc.*, No. 20-933 (Haw. Cir. Ct. May 10, 2021).

The unique focus on the Directors—essential to the Class case; more of a footnote for the AGs—was reflected in discovery. Plaintiffs obtained document productions from Mr. Pritzker, Mr. Valani, and Dr. Huh; as far as Class Counsel is aware, Plaintiffs were the first, and possibly the only, litigants to do so. Sharp Reply Decl., ¶ 15. In all events, the documents Plaintiffs obtained were the result of their own requests for productions and their own search terms; not requests by the AGs. *See Id.* ¶ 14–15. Plaintiffs deposed key witnesses who—it appears—were never before questioned by AGs, such as K.C. Crosthwaite, Mr. Pritzker, and Mr. Valani, all of whose testimony was crucial for the RICO case. *Id.* ¶ 17. In fact, it was only by analyzing Mr. Pritzker's documents that Plaintiffs became aware that his son-in-law, Christopher Olin, was a relevant witness. *Id.* ¶ 15. Mr. Olin's testimony was crucial in the *SFUSD* trial to establish Mr. Pritzker's intent, rebut Mr. Pritzker's self-serving narrative, and support the allegations of a RICO conspiracy. *Id.*. Class Counsel tracked down former employee Scott Dunlap in Austria and then secured—over Mr. Dunlap's objection—an order authorizing alternative service under the Walsh Act. *Id.* ¶ 18. Mr. Dunlap's testimony was crucial in establishing both the personal role the

---

[15] The North Carolina complaint copies, almost verbatim, the allegations describing the parties in the Second Amended Consolidated Class Action Complaint ("SACAC"), uses many of the same images regarding the Directors (*e.g.*, the same org charts), many of the same quotes from the same sources, and generally relies heavily on the MDL for both historical tobacco industry material and, more important, the crucial evidence about the role and involvement of the Directors. Sharp Reply Decl., ¶ 16.

Directors played in JLI's activities. *Id*. Class Counsel are not aware of any AG (or anyone else, for that matter) who deposed Messrs. Olin and Dunlap. *Id*. ¶¶ 15, 18.

### iv.   Government Lawyers Did Not Create the Benefit to the Class

The claim that the FDA and AG actions were in any way "responsible for creation of [the] fund" is simply not supported by the record. Stephens Obj. at 20. No government regulator secured compensation for the Class. This is not a case where Class Counsel seek compensation for "the benefits created by public agencies." *Id*. (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 337 (3d Cir. 1998)). *Prudential*, cited by Stephens, stands in perfect contrast to this case. There, the class plaintiffs sought credit for (and fees in proportion to) a settlement reached between a multi-state insurance regulator task force and the insurer defendant. *Id.* at 290-91. On appeal, the court was understandably skeptical of the class plaintiffs' claim that they had served as a "catalyst" of the entire government program. *Id.* at 336-37. In fact, the "evidence . . . suggest[ed] that, absent the institution of the class action proceedings," the government settlement would have happened anyway. *Id.* at 337.[16]

Here, there is no colorable claim, let alone evidence, that the result for the Class is traceable to anything but Class Counsel's efforts. Stephens recounts media speculation (from early 2020, well after this litigation began) that JLI would face settlement pressure from AG investigations. Stephens Obj. at 23. But that same article emphasized what such a settlement could look like: JLI would "change its marketing practices." *Id.* (quoting Collins & Perrone article). But changing JLI's marketing practices did

---

[16] *Wininger v. SI Mgmt L.P.*, 301 F.3d 1115 (9th Cir. 2002), is a variation on same theme, albeit with unusual facts. There, class counsel successfully sued to block the dissolution of a partnership, later entered into a class settlement permitting a dissolution, and then sought fees based on the increase in value of limited partners' shares as between the blocked plan and the settlement plan. *Id.* at 1118. The court found that much of the increase in value was caused not by the litigation but by the independent increase in value of the company, and so there was no true "quantifiable" fund against which to award a percentage fee. *Id.* at 1123-25. The court accordingly remanded to apply the lodestar method. *Id*. at 1127. Stephens also cites *In re Johnson & Johnson Derivative Litig.*, 2013 WL 6163858 (D.N.J. Nov. 25, 2013), but that case is distinguishable. *See id.* at *11 (explaining that "federal … investigations had progressed substantially at the time of the filing, … there was no groundbreaking issue[, the defendant] is solvent, and the individual directors and officers were the beneficiaries of an insurance policy").

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

not provide compensation to anybody (as noted above, those changes were used as arguments *against* class certification); only this class litigation did that. *See Volkswagen*, 2017 WL 1474312, at *4 (rejecting a similar argument, and noting that government enforcement did not compensate consumers).

Stephens relies on a law review article for the proposition that a risk enhancement is not justified when government litigation precedes or parallels class litigation. Stephens Obj. at 20-21. But the article is premised on two examples that—for opposite reasons—disprove Stephens' point. The first is the Microsoft litigation. Howard M. Erichson, *Coattail Class Actions: Reflections on Microsoft, Tobacco, and the Mixing of Public and Private Lawyering in Mass Litigation*, 34 U.C. Davis L. Rev. 1, 7 (2000). There, a wave of class litigation came only *after* complete "findings of fact" in the government's case established liability. *Id.* Any comparison between this litigation and that case is baseless. The second example is the state tobacco litigation. *Id.* at 9-13. Those proceedings illustrate how, even when (unlike here) government litigation generates game-changing "discovery and momentum," private litigation can remain risky business. *Id. See* Section III.A.2.a, *supra* (discussing failed tobacco products class actions).[17]

### 3. Fees are Appropriately Calculated Based on the Gross Settlement Fund, Not the Net Fund

As noted above, the Ninth Circuit directs courts to award reasonable attorneys' fees based on the unique circumstances of the case. *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000). A reasonable fee can be based on a percentage of the gross or net settlement fund because "the reasonableness of attorneys' fees is not measured by the choice of the denominator." *Id.* Thus, "the district court may calculate the fee award using the gross settlement amount." *Id.* The Ninth Circuit and this Court have repeatedly approved fee requests based on the gross fund, if the resulting fee is reasonable. *E.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015); *Krommenhock v. Post Foods*, 2021 WL 2910205, at *2 (N.D. Cal. June 25, 2021) (approving attorneys' fees at 30% of the gross settlement fund); *Larsen*, 2014 WL 3404531, at *8–9 (approving attorneys' fees at 28% of the total settlement fund).

---

[17] Stephens' application of Erichson's article is a stretch in many ways, including the non sequitur that "intense public scrutiny of JUUL" might reduce "settlement administration" costs. Stephens Obj. at 21.

32

1    Stephens argues that the Court should exclude settlement and litigation expenses from the fee

2    calculation because they are not part of the value received by members of the Class. Stephens Obj. at 8-

3    9. The Ninth Circuit rejected this same objection from Stephens' counsel in *In re Online DVD*. 779 F.3d

4    at 953 (rejecting argument that "the $4.5 million in notice and administrative costs . . . do not inure to

5    the benefit of the class"). The Ninth Circuit explained that "administrative costs in particular make it

6    possible to distribute a settlement award 'in a meaningful and significant way.' Similarly, notice costs

7    allow class members to learn about a settlement and litigation expenses make the entire action possible."

8    *Id.* Stephens likewise provides no basis for his assertion that litigation expenses—which are essential to

9    the creation of a class recovery in the first place—do not benefit the Class. While Stephens argues that

10   the better "policy" is to base fees on the net settlement, the Ninth Circuit in *Powers* rejected that bright

11   line rule (229 F.3d at 1258), and district courts have consistently granted awards based on the gross

12   settlement where the circumstances warrant it. Nor does the policy of incentivizing efficient cost

13   expenditures apply here: as Class Counsel explained, the requested expense payment of $4.1 million—

14   which Stephens does not challenge—is reasonable and reflects substantial cost-savings and efficiencies

15   due to the nature and conduct of this litigation. Fee and Expense Motion at 18-19. Stephens' general

16   policy preferences cannot serve as a substitute for what is reasonable in this case.

17       **B.    Stephens' Arguments Concerning the Lodestar Crosscheck Are Baseless**

18       Stephens argues that a "lodestar crosscheck does not support the requested fee." Stephens Obj. at

19   11. As a threshold matter, use of a crosscheck of any kind is discretionary, *In re Apple Inc. Device*

20   *Performance Litig.*, 50 F.4th 769, 784 (9th Cir. 2022), especially in situations like this where the Court

21   is intimately familiar with the litigation and the work performed. *Andrews v. Plains All American Pipe*

22   *L.P.*, 2022 WL 4453864, at *2 (C.D. Cal. Sept. 20, 2022) (finding a cross-check unnecessary in light of

23   the "exceptional circumstances of this case and the Court's extensive involvement in supervising" the

24   litigation); *see also Senne v. Kansas City Royals Baseball Corp.*, 2023 WL 2699972, at *18 (N.D. Cal.

25   Mar. 29, 2023) ("a cross-check is not required so long as the court achieves a reasonable result using the

26   method it selects.").

27       Given that a crosscheck is discretionary, there is no basis for Stephens' assertions that there is a

28   "strong presumption" that the lodestar amount reflects an appropriate fee award. Stephens Obj. at 18-19.

33

1    The case he relies on for this proposition arose in the context of statutory fee-shifting, not common fund

2    cases, as Stephens himself acknowledges. *Id*. at 19 n.13. In common fund cases, the Ninth Circuit has

3    recognized that the preferred approach is to use the percentage method "in lieu of the more time-

4    consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942.

5        Stephens overlooks two other important considerations as well. First, even if it were required, the

6    purpose of a crosscheck is to ensure that the multiplier on Class Counsel's lodestar is not

7    "extraordinarily high or low." *Kang v. Wells Fargo Bank, N.A.*, 2021 WL 5826230, at *16 (N.D. Cal.

8    Dec. 8, 2021) (reducing a requested 6.24 multiplier to 5.47 after conducting a cross-check). The

9    crosscheck should "do rough justice" to confirm the reasonableness of an award but should "not result in

10   a second major litigation." *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *14 (N.D. Cal. Dec.

11   18, 2018). Second, regardless of the level of deference given to the lodestar figure, the Ninth Circuit has

12   recognized that in the vast majority of megafund cases, fee awards exceed the lodestar (often by a

13   significant amount). *Vizcaino,* 290 F.3d at 1047; *see also In re Prudential Ins. Co. Am. Sales Practice*

14   *Litig.*, 148 F.3d 283, 341 (9th Cir. 1998) ("[W]e are cognizant that [m]ultiples ranging from one to four

15   are frequently awarded in common fund cases when the lodestar method is applied(.]").

16       With respect to the calculation of the lodestar itself, there is no basis for Stephens' proposed

17   adjustments and, even if there were, substantial adjustments would still result in a multiplier well within

18   the ranges endorsed by the Ninth Circuit and in this District—all of which confirms the reasonableness

19   of the requested fee award.

20       **1.    Stephens Does Not Show That the Fee is Unreasonable Based on a Lodestar**

21            **Crosscheck**

22       In the Fee and Expense Motion, Class Counsel offered various metrics to evaluate the lodestar in

23   this case given the services provided by counsel for various plaintiff groups. Dkt. 4055 at 14-16. Each of

24   those metrics shows that the requested fee award is reasonable, even if reduced in the ways Stephens

25   suggests.

26       *Lodestar for Class Committee and Other Firms Focused on Class Claims*: Considering *only* time

27   incurred by the six firms whose efforts focused predominantly on the Class claims, the requested fee

28   award amounts to a 2.91 multiplier on the $26,328,149.75 lodestar—a multiplier routinely awarded in

34

similarly complex litigation. Dkt. 4055 at 15. Even reducing document review and fact deposition time conducted by these firms time by 75%, the result would be a lodestar of $20,523,481.33 and a 3.7 multiplier—still well within the range of approval, as illustrated by the Ninth Circuit's affirmance of a fee award in *Vizcaino* that was 28% of the common fund and resulted in a 3.65 multiplier. 290 F.3d at 1050-52.

Of course, considering only the time spent by six class firms dramatically understates the lodestar incurred to the benefit of the Class, which itself suggests that the requested fee award is well within the range of acceptance in the Ninth Circuit. Consider expert work in this MDL, which proceeded in two phases: expert reports on common issues (such as the addictiveness of JUUL and its propensity to addict minors), followed by case-specific experts (such as specific causation reports for bellwether personal injury plaintiffs). *See* Sharp Decl., ¶¶ 95-98. The first phase of common expert work, much of which redounded to the benefit of the Class, was completed in December 2021. *Id.* Plaintiffs' counsel other than the six firms primarily focused on class-specific issues spent more than $12.5 million in time working with experts, defending their depositions, reviewing defendants' competing expert reports, and deposing defendants' experts. Sharp Reply Decl., ¶ 37. Adding that expert-specific time to the $20.5 million attributable to these six firms yields a 2.3 multiplier, again consistent with the range recognized by the Ninth Circuit, and consistent with or well below the multipliers awarded in cases that Stephens cites. *See Vizcaino*, 290 F.3d at 1051 n.6 (vast majority of multipliers in megafund cases fall between 1.0 and 4.0)*; Facebook*, 522 F. Supp. 3d at 633 (4.71 multiplier, which was "in line with comparable settlements"); *In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730, at *11 (N.D. Cal. Sept. 2, 2015) (2.2 multiplier). Taking into account other common benefit categories (*e.g.*, discovery of defendants and third-parties, including analysis and negotiation of responses, and briefing disputed issues), further increases the lodestar and decreases the multiplier.

*Klonoff Calculation*: Professor Robert H. Klonoff, a law professor (and former dean) at Lewis & Clark Law School, submitted a declaration proposing a method of evaluating the lodestar in light of the multiple types of cases in the MDL, which resulted in a 1.36 multiplier if the Court awarded the requested fees. Dkt. 4055 at 15. Applying Stephens' proposed adjustments, the result is a $37.9 million lodestar (Stephens Obj. at 19 n.12), which is roughly a 2.0 multiplier, and thus consistent with the cases

35

Stephens relies on and other Circuit precedent.

*Lodestar in Discrete Common-Benefit Categories*: Class Counsel's lodestar for several discrete categories (Factual Investigation, Discovery of Defendants, Document Review, Scientific Research, Fact Depositions, Class Certification, and Experts) is $107,351,217.50 (.71 multiplier). Adjusting the lodestar for the Document Review and Fact Deposition categories in the manner suggested by Stephens yields a lodestar of $43,609,332.66 and a multiplier of 1.75.

*Total Lodestar*: The requested fee award is a .38 multiplier on the total lodestar incurred in the MDL through the date of settlement ($199,336,544.05). Dkt. 4055 at 14-15. Even if the lodestar is calculated using the deductions Stephens advocates and all other time is reduced by 25%, the resulting lodestar would be $99,933,325.28, which translates to a substantial negative multiplier of .77. For Class Counsel's award to match their lodestar, the Court would need to apply Stephens' deductions and reduce the remaining lodestar by an unreasonable 42%. And even if the Court applied the staff attorney rate of $63.77 that Stephens says should be applied to document review hours to *all* hours across the board in the MDL, the result would be a lodestar of $23,170,453.26—an untenable scenario that even Stephens does not advocate for that would still result in a 3.3 multiplier, which again is within the range of accepted multipliers. For bigger picture context, even assuming an award of the full 30% fee requested by Class Counsel, the attorneys' fees attributable to the Class fund and the common benefit holdback under Case Management Order 5(A) will amount to less than a 1.0 multiplier on the full lodestar of common benefit time incurred by all firms in the MDL. Sharp Reply Decl., ¶ 39. Again, there is no windfall here.

Stephens argues that any multiplier in this case should be minimal because the litigation was purportedly low-risk. Stephens Obj. at 18-25. But as shown above, Stephens' contention is contrary to the record. For all the reasons discussed in the Fee and Expense Motion and above, Class Counsel earned their fee here. *See*, *e.g.*, *Facebook*, 522 F. Supp. 3d at 632 (awarding a 4.71 multiplier in light of "how hard fought this case was and the substantial factual disputes that remained for trial"); *High-Tech*, 2015 WL 5158730, at *10 (2.2 multiplier where "Class Counsel devoted considerable time and effort litigating this case over a period of four years").

Stephens also argues that the Court should consider the value of the Altria settlement. Stephens

36

Obj. at 8. The Court of course has discretion to consider the total value of the aggregate settlements, but should do so in the context of a pending fee motion related to the final Altria settlement, as the authority Stephens relies on did. *See In re Transpacific Passenger Air Trans. Antitrust Litig.*, 2019 WL 6327363, at *1 (N.D. Cal. Nov. 26, 2019) (considering aggregate amounts of settlements in the context of the "third and final settlement"). It is premature at this point, however, for the Court to take into account the potential fees on a settlement that has not even been preliminarily approved. Nor is Stephens correct that the lodestar reflects time billed after the Settlement. The lodestar data used to generate the relevant lodestar figures was limited to time billed through December 6, 2022. Sharp Reply Decl., ¶ 41. It is worth noting, however, that Girard Sharp (the Co-Lead Counsel with primary responsibility for the class litigation) billed over $190,000 between December 6, 2022, and January 31, 2022, finalizing the settlement and related documentation, but has not included that time in the lodestar calculations. *Id*.

## 2. Stephens' Contentions Concerning Hourly Rates for Document Review are Misguided and Seek to Impose an Unreasonable Hourly Rate

According to Stephens, Class Counsel have overstated their lodestar by almost $39 million by billing at excessive rates for more than 100,000 hours of document review. Stephens Obj. at 11-13. He argues that the average $422.58 hourly rate for document review is unreasonable because it greatly exceeds the lower hourly rates typically charged for contract or staff attorneys. *Id.* One problem with Stephens' argument is that the average rate in this case is consistent with rates approved in this district and elsewhere in California for contract and staff attorneys. *See In re MacBook Keyboard Litig.*, 2023 WL 3688452, at *15 (N.D. Cal. May 25, 2023) (approving $425 for contract attorneys); *In re Glumetza Antitrust Litig.*, 2022 WL 327707, at *8 (N.D. Cal. Feb. 3, 2022) (finding $400 for staff attorney reasonable); *Uziel v. Super. Ct.*, 2021 WL 5830040, at *8 (C.D. Cal. Oct. 19, 2021) (contract attorney rates of $375 to $450 an hour reasonable). Focusing on the average billing rate as Stephens does is also misguided because it erroneously assumes that most of the work was, or should have been, undertaken by contract attorneys. Document review in this complex case was conducted in a variety of contexts and required a substantial amount of second or third level review involving attorneys with higher levels of experience, which is expected in complex litigation. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.,* 2012 WL 13209696, at *8 (N.D. Cal. Nov. 9, 2012) ("higher-billing lawyers would be expected

37

1    to perform some document review"); *Martin v. Toyota Motor Credit Corp.*, 2022 WL 17038908, at *13

2    (C.D. Cal. Nov. 15, 2022) (declining to reduce hours or rates where partners were involved in high level

3    document review); *Lawson v. Spirit AeroSystems, Inc.*, 2020 WL 6343292, at *12 (D. Kan. Oct. 29,

4    2020) ("[A] party is not required to entirely exclude mid- and senior-level attorneys from high-level

5    involvement in document review."). And even with respect to first-level document review, courts have

6    approved of the use of staff attorneys. *See* Sharp Rely Decl., Ex. 10 (*United States, et al. v. Allergan*,

7    No. 8:18-cv-00203, Dkt. 195 at 3 (C.D. Cal. July 24, 2023) (approving a $475 hourly rate and rejecting

8    argument that first-level review should have been done by contract attorneys instead of staff attorneys)).

9    Stephens' argument that staff attorneys should be billed "at cost" also makes no sense; staff attorneys

10   are law firm employees.

11        While Stephens insists that all document review is created equal and should have been delegated

12   across the board to contract attorneys at a rate of no more than $63.77, a court "may not attempt to

13   impose its own judgment regarding the best way to operate a law firm, nor to determine if different

14   staffing decisions might have led to different fee requests. The difficulty and skill level of the work

15   performed, and the result achieved—not whether it would have been cheaper to delegate the work to

16   other attorneys—must drive the district court's decision." *Moreno v. City of Sacramento*, 534 F.3d 1106,

17   1115 (9th Cir. 2008). The "[u]se of more experienced attorneys for certain tasks can be more efficient

18   than deploying less senior attorneys." *Stonebrae, L.P. v. Toll Bros.*, 2011 WL 1334444, at *13 (N.D.

19   Cal. Apr. 7, 2011), *aff'd*, 521 F. App'x 592 (9th Cir. 2013).

20        Document review in this case was not straightforward. JLI produced more than 26 million pages

21   of documents while the Altria Defendants produced another 6.6 million pages. Sharp Decl., ¶ 49. A

22   discovery committee was charged with organizing and supervising the document review teams and

23   developed a multi-tier document review structure designed to identify key documents and potential

24   deponents. *Id.* Staffing second and third level document review with more experienced attorneys was

25   thus reasonable and necessary. *See Pike v. Cnty. of San Bernardino*, 2020 WL 1049912, at *5 (C.D. Cal.

26   Jan. 27, 2020) ("[T]he [C]ourt does not agree that document review is menial or mindless work; in

27   complex civil litigation such as the instant case, it is a critically important and challenging task.")

28   (citation omitted). Stephens cites to no case imposing an across-the-board rate of anywhere close to $64

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

for all document review time. Even the cases Stephens relies on the most found that a $240 hourly rate would be at the "low end" of rates for contract and staff attorneys. *Anthem*, 2018 WL 3960068, at *20. And setting all this aside, as discussed above, applying the unreasonable adjustments Stephens suggests still does not materially alter the results of the lodestar cross-check.

3. **Stephens' Argument that the Lodestar is "Likely Overstated" is Contrary to the Record and Based on Speculation**

a) **The Lodestar Reflects the Amount of Work Conducted by Class Counsel**

Looking solely at the total number of hours spent, Stephens argues that the number of hours spent is "outrageously inflated on its face." Stephens Obj. at 1. The record confirms otherwise. The Court has closely overseen this litigation, holding monthly status conferences and often entertaining appearances multiple times per month (including before then-Magistrate Judge Corley for discovery matters). Based on these firsthand observations, the Court has frequently commented on both the tremendous volume of work that occurred in the MDL, and the expeditious and professional manner in which that work was carried out. At a January 12, 2022, conference, for example, Judge Corley stated that she was "super impressed" with "how much [counsel] have accomplished." Dkt. 2767 at 10. And in an August 18, 2021, discovery conference, Judge Corley remarked that the parties' efforts to complete "this much discovery" under tight deadlines "is a model, a model MDL." Dkt. 2281 at 21. These efforts directly led to the expeditious pace at which these cases were prepared for trial, a key pressure point that facilitates settlement. As this Court recognized, throughout the litigation there was "so much work going on" (Dkt. 3430 at 10) and those efforts put "these cases into a place where they can be resolved" (Dkt. 3772 at 40).

The objective facts also provide no basis for speculation that the lodestar is overstated: over 33 million pages reviewed, over 100 fact depositions taken, discovery of over 80 class representatives conducted, depositions of 20 class representatives defended, 43 combined plaintiff and defense experts who rendered reports and were deposed, extensive briefing across a panoply of topics (including motions to strike 22 of plaintiffs' experts spanning hundreds of pages, multiple rounds of motions to dismiss, highly contested class certification proceedings), and of course, preparation for the Class trial,

39

1    and pretrial work in personal injury and government entity bellwether cases that also served to advance

2    the class case towards trial readiness. Sharp Decl., ¶ 42. Stephens makes no mention of these facts.

3    Without any actual review or acknowledgement of the record, Stephens has no basis for asserting that

4    too many hours were spent in the litigation or that the lodestar is overstated.

5              **b)       Stephens' Complaints About Class Counsels' Billing Records Are**

6                         **Unfounded**

7              Stephens' contention that Class Counsel failed to provide detailed billing records is likewise

8    baseless. As explained in the Fee and Expense Motion, as part of Judge Andler's review, Class Counsel

9    provided her with detailed billing records showing the amount billed by each lawyer, for each task, on

10   each day. Sharp Decl., ¶ 121. Those billing records were then provided to Judge Orrick throughout the

11   course of the litigation. *E.g.*, *id.*, Ex. 1 at 1-3 (letter transmitting time reports to the Court). Judge

12   Andler's assessment of the time billed after reviewing those records was that "the tasks, hours and

13   expenses incurred were appropriate, fair and reasonable and for the common benefit." *E.g.*, Sharp Decl.,

14   Ex. 1 at 12. Thus, Stephens' objection amounts to an assertion that the Court should not accept the

15   lodestar calculation because he did not have access to the records, but Stephens cites no case suggesting

16   that Class Counsel is required to provide their detailed billing record to objectors. *See Chambers v.*

17   *Whirlpool Corp.*, 980 F.3d 645, 672 (9th Cir. 2020) (rejecting contention that objector was "entitled to

18   full access to class counsel's billing records" even where the fee is lodestar-based and distinguishing

19   *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536 (9th Cir. 2016), on which Stephens relies);

20   *Hartless v. Clorox Co.*, 273 F.R.D. 630, 644–45 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x 716 (9th

21   Cir. 2012) ("The Court overrules the objectors' request for complete time records and postponement of

22   the issue until they are received. Neither California courts or federal courts require counsel to submit

23   complete time records when requesting an attorneys' fee award.").

24            As noted above, Stephens' approach overlooks the principle that a lodestar cross-check should

25   not be a line-by-line review to re-calculate the lodestar or to set a fee based on the lodestar, and instead

26   must be sufficient "to ensure that class counsel has done the work necessary to justify the fee sought." *In*

27   *re Capacitors Antitrust Litig.*, 2018 WL 4790575, at *6 (N.D. Cal. Sept. 21, 2018). As part of this

28   analysis, "district courts may rely on summaries submitted by the attorneys and need not review actual

billing records." *Id*. (quotation omitted); *see also Rodriguez v. Nike Retail Services, Inc.*, 2022 WL 254349, at *5 (N.D. Cal. Jan. 27, 2022); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 Fed. App'x 651, 654 (9th Cir. Apr. 17, 2019). Thus, even if Judge Andler did not personally review *every* time entry, her review was more than adequate for the purposes of a lodestar cross-check.

Neither of the reasons Stephens offers for disregarding Judge Andler's review has merit. *First*, Stephens is incorrect that review of time records is "non-delegable." Stephens Obj. at 17. Rule 23(h) is explicit that "[t]he court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D)." Appointing a special master to oversee the review of common benefit fees is common in complex litigation, and Circuit courts have repeatedly approved of the use of special masters in reviewing attorneys' fees. *E.g.*, *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014) (district court did not abuse its discretion when it adopted special master's analysis on attorneys' fees); *Carlsen v. Glob. Client Sols., LLC*, 542 F. App'x 594, 595 (9th Cir. 2013) (affirming "an order granting and approving attorney fees as recommended by the [special master's] Report"); *UFCW Loc. 880-Retail Food Emps. Joint Pension Fund v. Newmont Min. Corp.*, 352 F. App'x 232, 237 (10th Cir. 2009) ("[A]dditional insurance for protecting the interests of the class is provided where, as here, fee applications are referred to a special master."). Courts in this district also routinely rely on special masters to assist with fee requests. *E.g.*, *Adkins v. Facebook, Inc.*, 2021 WL 1817047, at *7 (N.D. Cal. May 6, 2021); *In re Capacitors Antitrust Litig.*, 2020 WL 6544472, at *2 (N.D. Cal. Nov. 7, 2020); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 4126533, at *3 (N.D. Cal. Aug. 3, 2016); *In re Dynamic Random Access Memory Antitrust Litig.*, 2014 WL 12879521, at *2 (N.D. Cal. June 27, 2014). The fact that Special Master Andler was appointed and carried out her duties during the litigation, as opposed to post-settlement, is irrelevant. And there is no basis for Stephens' suggestion that a retired judge abdicated her court-appointed responsibilities in exchange for a payout for Class Counsel. Stephens Obj. at 17. There is nothing unusual about a special master being compensated by plaintiffs' counsel, as Rule 53 expressly contemplates that one side may be responsible for paying a special master's fees. *See* Fed. R. Civ. P. 53(g)(2) (compensation may be paid either from a fund within the court's control or "by a party or parties[.]").

1     *Second*, Stephens' insinuation that Judge Andler did not "zealously scrutinize the billing

2     submissions" (Stephens Obj. at 17-18) is similarly baseless. Judge Andler provided feedback to Class

3     Counsel on the time records and issued reports regularly and in accordance with her Court-appointed

4     duties. *See* Sharp. Decl., Ex. 1. This review is well beyond the type of "rough justice" that a lodestar

5     crosscheck should accomplish, as opposed to a fuller inquiry that a lodestar-based fee award might

6     require. *Hefler v. Wells Fargo & Co., 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018)*; *see also In*

7     *re Apple iPhone/iPod Warranty Litig.*, 40 F. Supp. 3d 1176, 1181 (N.D. Cal. 2014) (lodestar information

8     was sufficient to show that "applying a percentage based fee recovery is within reason" even if it would

9     be "woefully insufficient" under the lodestar method). Courts, including this Court, have rejected the

10    notion that a crosscheck must "achieve auditing perfection" or transform courts into "green-eyeshade

11    accountants." *Hefler*, 2018 WL 6619983, at *14; *Larsen,* 2014 WL 3404531, at *9 ("The lodestar cross-

12    check calculation need entail neither mathematical precision nor bean counting[.]") (quotation omitted).

13    Stephens' quibbles with Judge Andler reserving the right to revisit certain entries are immaterial and, as

14    Stephens points out, when Judge Andler did raise concerns, they were adequately addressed by counsel.

15    Stephens Obj. at 18.

16    Stephens also mischaracterizes Judge Andler's work. Judge Andler *was* provided with the full

17    lodestar amount. Sharp Reply Decl., ¶ 46. Stephens attempts to add up the lodestar figures in Judge

18    Andler's reports and arrived at, what he claims, is only $156 million in reviewed time. Stephens Obj. at

19    16 (citing Hedley Decl, Exh. 5); Sharp Reply Decl., ¶ 46. But this analysis is riddled with errors. For

20    example, Stephens' calculation includes zero dollars in lodestar attributable to Judge Andler's sixth

21    report even though the report clearly says the time review was roughly $32 million. Sharp Decl., Ex. 1 at

22    80; Sharp Reply Decl., ¶ 46.

23                    c)        **Stephens' Other Assertions Are Baseless**

24    Stephens contends that the billing rate ranges provided are "arbitrary." But the rates are well

25    within the ranges regularly approved in this District, and Stephens does not suggest otherwise. He also

26    suggests that billing rate ranges should have been provided based on more standard percentiles, and that

27    because Class Counsel did not present the information in this format, they must have been "cherry

28    picking." Stephens Obj. at 17. Stephens misconstrues the information Class Counsel provided. Class

1   Counsel identified well-accepted billing rate ranges and provided the Court with information showing

2   what percentage of hours billed were within those ranges, which allows the Court to assess the extent of

3   any potential outlier rates. Class Counsel then reported the resulting percentages (regardless of what

4   they were). Stephens' approach of reporting just the outlier rates does not provide any information about

5   what share of the rates are within widely-accepted ranges. In any event, these issues are moot as Class

6   Counsel showed that capping all hourly rates at these ranges had a minimal effect on the lodestar. Fee

7   and Expense Motion at 17-18.

8        Stephens also argues that the number of hours billed in the "Fact Deposition" category was

9   excessive given the number of depositions conducted. Stephens Obj. at 15. The number of hours

10  expended on depositions resulted in substantial efficiencies in other parts of the case. First, many of the

11  depositions were conducted with the expectation they would be used at trial, which requires an

12  additional degree of preparation and coordination in setting the goals of the deposition. Sharp Reply

13  Decl., ¶ 44. And many of the depositions were in fact played in the SFUSD trial (and, as noted, the

14  Minnesota AG trial). *Id*., ¶¶ 9–10. Second, the presence of lawyers at depositions—in addition to the

15  lawyer taking the deposition—resulted in greater familiarity with the record, more efficient preparation

16  for related depositions, more effective briefing, and reduced later time reviewing transcripts. *Id.,* ¶ 45. In

17  any event, as detailed above, revising the hours in the Fact Depositions categories as Stephens suggests

18  does not impact the lodestar crosscheck analysis.

19       And while Stephens heavily relies on *Anthem* and that court's concern with excessive billing and

20  the number of firms involved, the court found that the "novel legal issues" in the case made use of a

21  lodestar unhelpful and granted a 27% fee award. 2018 WL 3960068, at *5, 16. *Anthem* is also factually

22  distinguishable. There, the court rejected an eight-firm leadership team in favor four co-leads, yet 53

23  firms billed time. *Id*. at *3. Here, after considering the complexity and multifaceted nature of this case,

24  the Court appointed lawyers from 21 firms to leadership positions. Dkt. 341 at 1-2. Eighty-eight percent

25  of the lodestar was billed by these firms. Sharp Reply Decl., ¶ 38. The balance was of the lodestar was

26  largely incurred by JCCP counsel, firms representing bellwethers clients, and a firm whose contributions

27  were limited to the non-duplicative task of overseeing and organizing class plaintiff discovery. *Id*.

28

43

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1

2

C.   **The Court May Consider Professor Klonoff's Opinions in Arriving at An Independent Conclusion Regarding a Reasonable Fee Award**

3

4

In support of the Fee and Expense Motion, Class Counsel submitted a declaration from Professor

5

Klonoff who, in addition to being a law professor, is the author or co-author of several texts on

6

aggregate litigation (including the Wright & Miller *Federal Practice and Procedure* volumes on class

7

actions and attorneys' fees) and has personally handled more than 100 class actions as a lawyer with a

8

major international law firm and thereafter. Klonoff Declaration, Dkt. 4056-2, ¶¶ 2-6.

9

Stephens seeks to strike Professor Klonoff's declaration, arguing it is impermissible expert

10

testimony. Stephens Obj. at 9-11. But numerous courts have held that "expert testimony regarding

11

attorneys' fees is appropriate." *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172 (C.D. Cal.

12

2010) (citing *Winterrowd v. Am. Gen. Annuity Ins. Co.*, 556 F.3d 815, 827 (9th Cir. 2009)). Courts

13

routinely rely on expert testimony from law professors and other attorneys when evaluating the

14

reasonableness of a fee request, and courts in this district and across the country have cited Professor

15

Klonoff's opinions and analysis in class settlements and attorneys' fees requests. *See, e.g.*, *In re*

16

*Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 2212783, at *21 (N.D.

17

Cal. May 17, 2017); *Jabbari v. Wells Fargo & Co.*, 2018 WL 11024841, at *7 (N.D. Cal. June 14,

2018).[18]

18

19

20

21

22

23

24

25

26

27

28

[18] *See also Broiler Chicken*, 2022 WL 6124787, at *2 and n.4 (noting that "[a]t the Court's invitation" the plaintiffs had "submitted an expert declaration on the previous [fee] motion by Professor Robert Klonoff" and that the court "referenced and cited" the declaration as support for its findings); *Syngenta*, 357 F. Supp. 3d at 1112 ("The Court notes at the outset that counsel have supported their request with an expert declaration from Professor Robert Klonoff. The Court agrees with Professor Klonoff that the facts and circumstances of this case . . . distinguish this case from other common fund cases with large settlements and warrant a substantial fee award."); *In re Syngenta AG MIR 162 Corn Litig.*, 2018 WL 6839380, at *4 (D. Kan. Dec. 31, 2018) (crediting the analysis of Professor Klonoff over that of five other professors that submitted declarations); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1037 (N.D. Ill. 2011) ("credit[ing] Klonoff's opinions regarding the fairness of the fee request); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 165 (E.D. La. 2013) (offering declarations "regarding the certifiability of the Class and the fairness of the Settlement"); *In re Loestrin 24 Fe Antitrust Litig.*, 2020 WL 4038942, at *5 (D.R.I. July 17, 2020) (court relied in part on a "comprehensive and helpful declaration" from a law professor in analyzing fee request), *report and recommendation adopted*, 2020 WL 5201275 (D.R.I. Sept. 1, 2020); *Savani v. URS Pro. Sols. LLC*, 2014 WL 172503, at *8 (D.S.C. Jan. 15, 2014) (noting law professor's "expert testimony has been accepted by District Courts in the region on the matter of reasonableness of

44

1    Stephens does not question Professor Klonoff's qualifications, but asks the Court to strike or

2    ignore his declaration because it purportedly contains improper legal conclusions. Stephens Obj. at 8-9.

3    But the *Daubert* standard Stephens invokes concerns the admissibility of expert testimony *at trial*, and

4    "[c]ourts have held that Rule 702 is flexible at the final approval stage." *In re Equifax Inc. Customer*

5    *Data Sec. Breach Litig.*, 999 F.3d 1247, 1268 n. 14 (11th Cir 2021) (citing *Int'l Union, United Auto.,*

6    *Aerospace, and Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 636–37 (6th Cir.

7    2007) ("The Rule 702 argument, again, overlooks the differences between a full trial and a fairness

8    hearing. In a trial, the judge must strictly screen expert opinions for evidentiary relevance and reliability

9    because a jury often has difficulty assessing such evidence. In a fairness hearing, the judge does not

10   resolve the parties' factual disputes but merely ensures that the disputes are real and that the settlement

11   fairly and reasonably resolves the parties' differences.") (quotation marks and citation omitted); William

12   B. Rubenstein, 4 Newberg on Class Actions § 13:42 (6th ed.) ("The court has wide discretion in

13   establishing the procedures of the fairness hearing, which need not resemble a trial. Accordingly,

14   traditional rules of evidence do not necessarily apply to the fairness hearing.").[19] Accordingly, "*Daubert*

15   does not govern at the final approval stage" and the Court may consider Professor Klonoff's opinions.

16   *See In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 443 (3d Cir. 2016)

17   ("[W]e have never held that district courts considering the fairness of a class action settlement should

18   consider the admissibility of expert evidence under *Daubert*."); *Am. Int'l Grp., Inc. v. ACE INA*

19   *Holdings, Inc.*, 2012 WL 651727, at *20 (N.D. Ill. Feb. 28, 2012) ("[T]he Federal Rules of Evidence and

20   the requirements of *Daubert* and its progeny do not apply at a fairness hearing—and similarly do not

21   apply at a hearing on fees and costs. . . ."). Doing so would not usurp the role of the Court, as Stephens

22

23   attorney's fees awards"); *Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 WL 12732462, at *43 (C.D.

24   Cal. May 29, 2015).

25   [19] The cases Stephens cites are inapposite as they concern the admissibility of expert testimony *at trial*.
     *See, e.g.*, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (appeal

26   concerning district court's rulings on motions in limine excluding expert testimony prior to trial); *Pinal*
     *Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1042 (D. Ariz. 2005) (excluding certain

27   law professor testimony at trial). In another case, the court simply assumed that *Daubert* applies at the
     final approval stage. *See Stathakos v. Columbia Sportswear*, 2018 WL 1710075, at *5 n.6 (N.D. Cal.

28   Apr. 9, 2018).

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

suggests (Stephens Obj. at 10), because the Court will make a decision regarding Class Counsel's fee request based on "its own independent judgment." *See Equifax*, 2020 WL 256132, at *43 (rejecting similar argument and declining to strike Professor Klonoff's and other experts' declarations).

Even if *Daubert* did apply here—and it does not—Professor Klonoff's declaration satisfies the standard for admissibility, because it is helpful to the Court and based on his experience litigating, teaching, and writing about class actions, as well as from participating in the 2018 amendments to Rule 23 while serving on the Federal Civil Rules Advisory Committee. *See, e.g., Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999) (district court has "broad latitude" to admit expert testimony based on "professional studies or personal experience").[20] Moreover, "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005); *cf. Att'y Gen. of Ok. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) ("[W]hile *Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial.").

In addition, a crucial part of Professor Klonoff's opinion involves practical suggestions for how to divide up the total JUUL lodestar among multiple cases, a fact-based challenge that is particularly well-suited for a fee expert because no case law is completely analogous. If the Court believes that any portion of Professor's Klonoff's declaration amounts to a legal conclusion, the Court may simply disregard that portion, rather than rejecting the entire declaration. *See Parkinson*, 796 F.Supp.2d at 1172 & n.6 (denying defendant's motion to strike declaration from professor, but noting that the court would disregard any legal conclusions); *In re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*, 2012 WL 12840260, at *6 (W.D. Tenn. Jan. 4, 2012) ("the district judge is capable of sifting through the

---

[20] Stephens also criticizes Professor Klonoff's conclusions because they are based on surveys of law, but courts have relied on expert opinions based on similar surveys. *See, e.g.*, *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 111 (D.D.C. 2013) ("empirical study" of fee awards in class actions discussed in law professor's declaration supported reasonableness of fee); *In re Loestrin*, 2020 WL 4038942, at *7; *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011).

declarations, disregarding these parts that may simply be legal argument, and focus on the pertinent portions"); *Miller v. Cincinnati*, 709 F. Supp. 2d 605, 619-20 (S.D. Ohio 2008) (a court "is fully able to disregard the implication of any impermissible legal conclusion").

The request to strike or disregard Professor Klonoff's declaration should be denied.

## IV.    CONCLUSION

For the foregoing reasons, Class Plaintiffs respectfully requests that the Court grant final approval of the JLI Settlement and Class Counsel respectfully requests that the Court grant their motion for attorneys' fees, expenses, and service awards.

Dated:  July 28, 2023                                Respectfully submitted,


                                                     By: /s/ *Dena C. Sharp*

                                                     Dena C. Sharp
                                                     **GIRARD SHARP LLP**
                                                     601 California St., Suite 1400
                                                     San Francisco, CA 94108
                                                     Telephone: (415) 981-4800
                                                     dsharp@girardsharp.com

                                                     *Co-Lead Counsel and Proposed Settlement
                                                     Class Counsel*

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

1

2

**APPENDIX A**

3

4

5

| Objector(s) | Location of Objection in the Record | Objects to Substance of JLI Settlement? | General Description of Objection | Section Below in Which Objection is Addressed |
|---|---|---|---|---|
| Cade Beauparlant, Matthew Murhphy, and Marianne Savage | Dkt. 4062 | Yes | Request that $30 million of the JLI Settlement be distributed as *cy pres* to a non-profit organization | II.B.1 |
| John Gugliotta | Dkt. 4026 | Yes | Various objections to the notice and the absence of non-monetary relief | II.B.2 |
| Olin Ashak | Dkt. 4086-1 | No | Disagrees with the basis of the lawsuit and the process for objecting | II.B.3 |
| Samuel Marcom | Dkt. 4033 | No | Disagrees with the basis of the lawsuit and JUUL being singled out among e-cigarettes | II.B.3 |
| Third-party filer ClaimClam and numerous ClaimClam clients | Dkts. 4087-90 | No | Objection to Class Counsel's decision to disallow claims to be filed through third-party filer ClaimClam | II.B.4 |
| Lawanda Ready | Dkt. 4086-2 | No | No basis provided | II.B.5 |
| John Stampfer | Dkt. 4086-3 | No | No basis provided | II.B.5 |
| Melisa Stawicki | Dkt. 4077 | No | No basis provided | II.B.5 |
| Austin Toole | Dkt. 4086-4 | No | No basis provided | II.B.5 |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY ISO MOTIONS FOR FINAL APPROVAL OF JLI CLASS ACTION SETTLEMENT AND
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 19-md-02913-WHO

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2023, because the CM/ECF system was inoperable at the time of filing, I sent the foregoing document via email to the Court and to each of the objectors and objectors' counsel listed below. On July 29, 2023, once the CM/ECF system becomes operable again, I caused the foregoing document to be electronically filed with the Clerk of the Court using, which will automatically send notification of the filing to all counsel of record.

Andrew Rainer (admitted pro hac vice)
arainer@phaionline.org
Mark A. Gottlieb (admitted pro hac vice)
mark@phaionline.org
PUBLIC HEALTH ADVOCACY INST.
360 Huntington Avenue, CU117
Boston, MA 02115
(617) 304-6052

*Attorneys for Objectors Matthew Murphy, Cade Beauparlant, And Marianne Savage*

Neville S. Hedley (SBN 241022)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 312-342-6008
Email: ned.hedley@hlli.org

*Attorneys for Objector Reilly Stephens*

Individual objectors:

John D. Gugliotta (johng@inventorshelp.com)

Samuel Marcom (Sammarcom123@gmail.com)

Melisa Stawicki (missyfourniea@yahoo.com)

Zim Hang (zim@getclaimclam.com)

Olin Ashak (olin.ashak@hotmail.com

Austin Toole (austintoole15@gmail.com)

Lawanda Ready (Lawandaready@gmail.com)

John Stampfer (johnstampfer@gmail.com)

By: /s/ *Dena C. Sharp*
Dena C. Sharp