[Submitting counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>All Class Actions | CASE NO. 19-md-02913-WHO<br><br>**REPLY IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF ALTRIA CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES AND EXPENSES**<br><br>**MOTION HEARING**<br><br>DATE: March 6, 2024<br>TIME: 2:00 PM<br>LOCATION: Courtroom 2<br><br>HON. WILLIAM H. ORRICK III |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. THE COURT SHOULD GRANT FINAL APPROVAL OF THE ALTRIA SETTLEMENT AND CERTIFY THE SETTLEMENT CLASS ................................................. 2

    A. The Response of the Class ................................................................................ 2

    B. The Objections Provide No Basis to Reject the Settlement ............................... 4

        1. The Orr Objection (Dkt. 4194) ............................................................... 4

        2. The Addeo Objection (Dkt. 4195-1) ....................................................... 8

    C. Settlement Administration Expenses ............................................................... 10

III. THE COURT SHOULD GRANT THE REQUEST FOR ATTORNEYS' FEES AND EXPENSES .................................................................................................................. 12

IV. CONCLUSION ................................................................................................................... 12

i

REPLY ISO MOTIONS FOR FINAL APPROVAL OF ALTRIA CLASS ACTION SETTLEMENT
AND ATTORNEYS' FEES AND EXPENSES
CASE NO. 19-md-02913-WHO

# TABLE OF AUTHORITIES

**Cases**

*Broomfield v. Craft Brew Alliance, Inc.*,
  2020 WL 1972505 (N.D. Cal. Feb. 5, 2020) ................................................................. 3, 6, 8

*Churchill Village, L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ......................................................................................... 2, 4

*Edenborough v. ADT, LLC*,
  2018 WL 9514899 (N.D. Cal. Mar. 29, 2018) ................................................................... 7

*Fitzhenry-Russell v. Coca-Cola Co.*,
  2019 WL 11557486 (N.D. Cal. Oct. 3, 2019) .................................................................... 8

*Grayson v. Gen. Elec. Co.*,
  2020 WL 4282185 (D. Conn. July 27, 2020) ................................................................. 6, 7

*In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*,
  333 F.R.D. 364 (E.D. Pa. 2019) ......................................................................................... 6

*In re Google Plus Profile Litig.*,
  2021 WL 242887 (N.D. Cal. Jan. 25, 2021) ...................................................................... 4

*In re Groupon, Inc. Mktg. and Sales Practices Litig.*,
  2012 WL 13175871 (S.D. Cal. Sep. 28, 2012) .................................................................. 8

*In re MacBook Keyboard Litig.*,
  2023 WL 3688452 (N.D. Cal. May 25, 2023) ................................................................... 3

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................................. 4

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 4212811 (N.D. Cal. July 22, 2020), *aff'd*, 2022 WL 2304236 (9th Cir. June 27,
  2022) .................................................................................................................................. 6

*Knisley v. Network Assocs., Inc.*,
  312 F.3d 1123 (9th Cir. 2002) ........................................................................................... 4

*Quiruz v. Specialty Commodities, Inc.*,
  2020 WL 6562334 (N.D. Cal. Nov. 9, 2020) ..................................................................... 3

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ............................................................................................. 4

*Schneider v. Chipotle Mexican Grill, Inc.*,
  336 F.R.D. 588 (N.D. Cal. 2020) ....................................................................................... 3

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ................................................................................................................. 7

I.    INTRODUCTION

Class Plaintiffs previously settled their claims against JLI and other parties in December 2022 for $255 million, and the Court has granted final approval of the JLI Settlement. Dkt. 4138. After entering the JLI Settlement and midway through a bellwether trial against Altria, Class Plaintiffs reached an agreement to settle all remaining class claims against Altria[1] for $45,531,250. On January 16, 2024, Class Plaintiffs filed a motion seeking final approval of the Class Action Settlement with Altria (the "Altria Settlement" and the "Final Approval Motion," Dkt. 4191) and Class Counsel filed a motion seeking the payment of attorneys' fees and expenses (the "Fee and Expense Motion," Dkt. 4192).

The Altria Settlement has received an overwhelmingly positive response from the class, garnering millions of additional claims. The more than 14.4 million claims that have been filed in both settlements is nearly five times the figure Epiq anticipated, though a substantial portion of these claims will be deemed invalid once the claims review process is completed. By contrast, the Altria settlement received only two objections and 197 requests to opt out. One objection posits that the Plan of Allocation should be structured differently, and the other questions whether the settlement website was sufficiently accessible to disabled Class Members.[2] As explained below, neither objection undermines the ultimate fairness of the settlement. And no Class Member has objected to the requested fees and expenses. The response of the class confirms the fairness and adequacy of the Altria Settlement and the reasonableness of the requested fees and expenses.

The unexpectedly high volume of claims in this case is in large part the result of an unfortunate explosion of innovation by fraudulent claimants. The related costs of winnowing out illegitimate claims will likely cause settlement administration expenses to exceed the amount previously approved by the Court. Class Counsel has worked closely with Epiq on controlling costs and ensuring a fair claims administration process, and will continue to limit or reduce expenses where possible and complete the

---

[1] "Altria" refers to Defendants Altria Group, Inc., Altria Client Services LLC, Altria Enterprises, LLC, Altria Group Distribution Company, Philip Morris USA, Inc.

[2] Capitalized terms are intended to have the same meaning as defined in the Altria Class Settlement Agreement and Plan of Allocation except as otherwise noted.

claims review process in a cost-effective manner. Much of the additional costs concern identification and processing of potentially fraudulent claims, whose separation from legitimate claims will ultimately redound to the benefit of the class by increasing the *pro rata* share of each legitimate claimant. Class Counsel will seek Court approval for documented, necessary costs beyond the $6 million already approved by the Court.

Class Plaintiffs request that the Court grant final approval of the Altria Settlement and Class Counsel requests that the Court grant their requested attorneys' fee and expense awards.

## II.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE ALTRIA SETTLEMENT AND CERTIFY THE SETTLEMENT CLASS

### A.    The Response of the Class

In the Final Approval Motion, Class Plaintiffs described how the relevant factors, including "the reaction of class members to the proposed settlement," weighed strongly in favor of approval of the Altria Settlement. Dkt. 4191 at 7-18; *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). Now that the deadline for claims, opt-out requests, and objections has passed, Class Plaintiffs can more fully assess the reaction of the Class. As set forth below, the response from Class Members was overwhelmingly positive and supports final approval of the Altria Settlement.

*Claims*: Approximately 7.7 million potential Class Members received direct notice of the Altria Settlement, and many more received indirect publication notice. Supplemental Declaration of Cameron R. Azari ("Supp. Azari Decl.") ¶¶ 21-22, 25. In response to the settlement notice, Epiq received 8,104,614 Claims during the Altria settlement claims period,[3] in addition to the 6,349,982 Claims

---

[3] A small number of additional claims may be received following the claims deadline. Potential Class Members who sent questions to the settlement email address or website contact form received an auto response email that included the answers to frequently asked questions. Epiq identified and corrected a typographical error in the auto response, which listed the prior JLI claim filling deadline rather than the updated Altria claim filing deadline. Supp. Azari Decl. ¶ 31. The deadline was correctly listed in every other place it appeared, such as the website, the long form notice, and email notices. There were 481 unique email addresses that received the auto response with the old claims deadline, but were not associated with a filed claim. *Id.* While none of inquiries sought information about the claim filing deadline, and a significant number were actually junk, in an abundance of caution Class Counsel directed Epiq to send a corrective notice to the 481 affected email addresses and provide limited additional time for those individuals to file a claim. Class Counsel submit that any claims filed in response to the corrective notice should be considered timely, subject to the Court's approval.

2

REPLY ISO MOTIONS FOR FINAL APPROVAL OF ALTRIA CLASS ACTION SETTLEMENT
AND ATTORNEYS' FEES AND EXPENSES
CASE NO. 19-md-02913-WHO

received during the JLI claims period. *Id.* ¶ 35. While a total of over 14.4 million claims is significantly more than what was anticipated, Epiq is in the process of conducting a complete review and audit of all Claim Forms received. The analysis performed to date indicates that some of the claims are duplicative and that the majority of claims have one or more indicia of fraud, so the total number of valid claims will likely be significantly further reduced. *Id.* Even so, participation has been so robust that if 20% of the submitted claims are ultimately approved for payment, the overall claims rate for the Settlement Class will likely exceed 15%.[4]

By any measure, the volume of claims submitted represent a positive reaction from the Class, and thus supports final approval of the Altria Settlement. *See Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 599 (N.D. Cal. 2020) ("0.83% claims rate" was "on par with other consumer cases"); *Broomfield v. Craft Brew Alliance, Inc.*, 2020 WL 1972505, at *7 (N.D. Cal. Feb. 5, 2020) (finding claims rate "of about two percent" to be consistent with the rates in other large class actions).

**Opt-Outs**: Out of the millions of Class Members, 197—or under 0.005% of the class—have sought to exclude themselves from the Altria Settlement. Supp. Azari Decl. ¶ 37. There were 2,620 Class Members who sought to exclude themselves from the JLI Settlement, but 12 requested to opt back into the Settlement Class during the Altria Settlement notice period. *See* Dkts. 4195, 4195-3 (list of opt-ins). Across both settlements, the total number of opt-outs is 2,805, still a fraction of one percent of the Settlement Class. The low number of opt-out requests relative to the estimated range in the size of the Settlement Class also weighs strongly in favor of approval. *See In re MacBook Keyboard Litig.*, 2023 WL 3688452, at *9 (N.D. Cal. May 25, 2023) (finding that the "low number . . . of opt-outs relative to the size of the class weighs in favor of approving the Settlement" where 1,733 exclusion requests we received out of 718,651 eligible class members); *Quiruz v. Specialty Commodities, Inc.*, 2020 WL 6562334, at *7 (N.D. Cal. Nov. 9, 2020) (approving settlement with 0.09% opt-out rate, and noting that "[o]pt-out percentages of nearly 5% have been deemed so 'overwhelmingly positive' as to support approval").

---

[4] Although the precise size of the Class is unknown, it has previously been estimated to include six to eleven million Class Members. *See* Sharp JLI Reply Decl., Dkt. 4091-1, ¶¶ 24–25.

***Objections***: Only two objections to the Altria Settlement were filed. One concerns the functionality of the notice and website, and the other addresses the fairness of the Plan of Allocation. Neither of the objections calls into question the sufficiency of the key components of the Altria Settlement: the $45.5 million cash payment in the face of substantial litigation risk, and a release of economic loss claims. The lack of objections to the core components of the Altria Settlement—particularly in comparison to the millions of Class Members and claims received—itself "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (approving district court's finding that the class reacted favorably where there were "only fifty-four submitted objections" out of 376,301 class members); *Churchill,* 361 F.3d at 577 (affirming approval of class action settlement where 45 out of 90,000 class members objected to the settlement); *Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (dismissing objection after approval of settlement to which six class members out of roughly 150,000, or 0.004%, objected). Even if these objections were legitimate critiques of the Altria Settlement (they are not, for the reasons detailed below), the total number of objections is small in light of the class size and volume of claims. *See In re Google Plus Profile Litig.*, 2021 WL 242887, at *4 (N.D. Cal. Jan. 25, 2021) (approving settlement with 761 objections out of millions of class members).

The two objections to the Altria Settlement are addressed in the following section.

**B.     The Objections Provide No Basis to Reject the Settlement**

**1.     The Orr Objection (Dkt. 4194)**

Edward Orr argues that the Altria Settlement should not be approved because of alleged inadequacies in the notice and settlement website. The Orr Objection makes three central assertions: first, that the settlement website must have been hacked because Mr. Orr contends that certain links redirected to another website, Dkt. 4194 at 4; second, that the website is not "properly handicap accessible" for disabled Class Members like Mr. Orr, who is physically, visually, and hearing impaired, *id.*; and third, that there was a typo in the address of this Court provided in the long form notice and on the website, which might have prevented Class Members from submitting objections to the Court, Dkt.

4
REPLY ISO MOTIONS FOR FINAL APPROVAL OF ALTRIA CLASS ACTION SETTLEMENT
AND ATTORNEYS' FEES AND EXPENSES
CASE NO. 19-md-02913-WHO

1  4194-3 at 4-8.[5] The Court should overrule the Orr Objection because, as detailed below, the settlement
2  website was not hacked, the notice and website meets standard guidelines for accessibility, and Class
3  Counsel and Epiq corrected the typo—which did not prevent any Class Members, including Mr. Orr,
4  from being able to file an objection—as soon as it was brought to their attention. The Orr Objection
5  provides no basis for the Court to conclude that the Altria Settlement is not fair, reasonable, and
6  adequate.

7  **Website Security**. Mr. Orr's assertion that "the class action website was redirecting to another
8  site - the latter of which was an unauthorized site" is inaccurate. Orr Objection at 4. Epiq has extensive
9  security protocols in place and actively monitors settlement websites for any possible security issues.
10 Supp. Azari Decl. ¶ 40. Epiq has researched and investigated Mr. Orr's assertion, and was unable to
11 replicate the objection's reference to the site redirecting to any other site and/or unauthorized website.
12 *Id.* No other Class Member has complained of or reported a similar issue for either the Altria or JUUL
13 Settlements and the shared case website. *Id.* Simply put, it is unclear what the objection's exhibits
14 purport to show, but the website does not redirect to any unauthorized website.[6]

15 **Website Accessibility**. While the accessibility of class action settlement websites is an important
16 issue that merits proper consideration in every case, Mr. Orr is also mistaken regarding the settlement
17 website here, which was designed to effectively communicate information to the Settlement Class while
18 meeting basic standards provided by the Web Content Accessibility Guidelines ("WCAG"). *See* Supp.
19 Azari Decl. ¶ 41 (noting that the website uses Epiq's template designed to "meet basic compliance
20 standards under the current WCAG 2.1 Level A best practices and most Level AA best practices").
21 Website accessibility requires balancing of interests, as meeting even higher accessibility standards can
22 degrade the website experience for general users. *Id.* As a consequence, Epiq's standard practice is to
23 not implement on each of the highest accessibility standards unless the demographics or needs of a class

---

[5] When they serve a copy of this reply on Mr. Orr, Class Counsel will also inform him that the Court's standard procedures for hearings accessible via Zoom include an option to participate by telephone, as Mr. Orr has requested permission to do. *See* Dkt. 4194 at 2 n.1.

[6] The Orr exhibits regarding website security include a reference to www.facebook.com. Dkt. 4194 at 21–33. As part of the notice program, settlement notice ads were placed on websites including Facebook that would redirect users *to* the settlement website, but not the other way around. Supp. Azari Decl. ¶ 40.

1   justify the tradeoff in website utility for Class Members who do not use accessibility tools—a reasonable
2   balancing of interests that was not required here. *Id.* The website is sufficiently accessible and was also
3   one of many sources of information available to Class Members, including the telephone information
4   hotline, written notice documents, and the option to ask questions of the settlement administrator via
5   email. In addition to submitting an objection, Mr. Orr filed a claim form, which suggests he was able to
6   successfully navigate the website and claims process. *Id*.

7         Mr. Orr's assertion that he received no response to his inquiries is also incorrect. Epiq has
8   confirmed that all emails and web form messages sent using the contact information on the website,
9   including the messages described in his objection, received an automated response containing the
10  answers to frequently asked questions and an embedded link for potential Class Members to escalate
11  their question if it was not addressed. *Id.* ¶ 42. Because that email includes plain text, it is readily
12  accessible and compatible with assistive technologies. *Id.* Mr. Orr did not respond or use the link to
13  further communicate with Epiq. *Id.*

14        Mr. Orr appears to be a frequent objector to class action settlements, and similar objections by
15  Mr. Orr regarding the accessibility of settlement websites have been rejected by other courts. *See, e.g.*,
16  *Broomfield v. Craft Brew All., Inc*., No. 17-CV-01027-BLF, 2020 WL 1972505, at *18–19 (N.D. Cal.
17  Feb. 5, 2020) (overruling Orr objection that website is not compliant with the Americans with
18  Disabilities Act because settlement administration websites are not subject to ADA requirements and the
19  website was sufficiently accessible); *Grayson v. Gen. Elec. Co*., No. 3:13-CV-01799-MPS, 2020 WL
20  4282185, at *1 (D. Conn. July 27, 2020) (overruling Orr objection because "the Settlement website was
21  sufficiently accessible to individuals with disabilities such that the Class Members received the best
22  practicable notice"); *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig*., No. 16-MD-02752-
23  LHK, 2020 WL 4212811, at *15-16 (N.D. Cal. July 22, 2020), *aff'd*, No. 20-16633, 2022 WL 2304236
24  (9th Cir. June 27, 2022) (overruling Orr objection challenging choice of law analysis and finding there
25  was no evidence to support Orr's objection that handicapped class members would be disproportionately
26  affected by the settlement's cap for time spent remedying the Data Breaches); *In re Comcast Corp. Set-
27  Top Cable Television Box Antitrust Litig*., 333 F.R.D. 364, 381 (E.D. Pa. 2019) (overruling Orr
28  objection "that the Settlement does not properly take into consideration the needs of handicapped Class

1  Members" because "[b]oth handicapped and non-handicapped Class Members were impacted in the
2  same manner"); *Edenborough v. ADT, LLC*, No. 16-CV-02233-JST, 2018 WL 9514899, at *1 (N.D.
3  Cal. Mar. 29, 2018) (overruling Orr objection that "the class settlement does not distinguish
4  handicapped members of the class," because no evidence supported the assertion that the defendant
5  charged disabled persons more for its services).

6        Class Counsel acknowledge the importance of accessibility in the administration of class action
7  settlements. But in this case, as other courts have found, "Epiq's efforts to ensure the functionality and
8  accessibility of the Settlement website were reasonable" and the result of those efforts adequate.
9  *Grayson*, 2020 WL 4282185, at *1 (citing *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 113-
10 14 (2d Cir. 2005) ("the standard for the adequacy of a settlement notice in a class action under either the
11 Due Process Clause or the Federal Rules is measured by reasonableness")).

12       **Notice regarding Objection Procedures**. As Mr. Orr points out, the Long Form Notice
13 contained a typographical error in the address for the Court, listing the zip code as 94012 instead of
14 94102. Dkt. 4194-3. As soon as the error was brought to the attention of Epiq and Class Counsel, it was
15 promptly corrected on the website and notice. Supp. Azari Decl. ¶ 43. The Court's address is publicly
16 available, and Mr. Orr himself successfully sent his objection to the Court. There is no prejudice in any
17 event, as the notice clearly required (consistent with the Court's preliminary approval order) that all
18 objections be sent both to the Court *and* the Settlement Administrator, whose contact information was
19 correctly listed in the notice. The Settlement Administrator thus would have received a copy of any
20 objections regardless of whether they were properly addressed to the Court. If Epiq had received any
21 other objections that were not properly addressed to the Court, those objections would have been
22 docketed by Class Counsel (as was done with the Addeo objection, which was sent directly to Class
23 Counsel but not the Court) and the objectors given an opportunity to be heard. Epiq received no
24 additional objections, and is not aware of any potential Class Member who sought to object but was
25 unable to do so as a result of the zip code typo. *Id.*

26       In sum, Epiq's efforts to ensure the functionality and accessibility of the Settlement website were
27 reasonable, the notice was fair and adequate, and the Orr Objection has no bearing on the overall
28 fairness of the settlement. The Court should overrule it.

## 2. The Addeo Objection (Dkt. 4195-1)

Jaclyn Addeo submitted an objection on January 26, 2024, by sending an email to Class Counsel, who subsequently lodged the objection on the docket. Dkt. 4195-1. Epiq did not independently receive a copy of the Addeo Objection, nor did Ms. Addeo purport to send the objection to the Court as required by the Court's preliminary approval order. The Court can and should overrule the objection based on this procedural deficiency alone. But in the alternative, the Court should also overrule the Addeo Objection on its merits.

The Addeo Objection expresses three concerns about the Plan of Allocation, which was preliminarily approved by the Court and also received final approval (without objection) in connection with the JLI Settlement. Ms. Addeo first asserts that because documentation of indirect purchases of JUUL products is difficult to gather, particularly for purchases dating back several years, it is unfair to cap undocumented Retail Expenditures at $300. In general, caps on undocumented claims are commonly used in consumer class action settlements to balance ease of participation with the need to ensure that documented claims are adequately compensated,. *See, e.g.*, *In re Groupon, Inc. Mktg. and Sales Practices Litig.*, No. 11md2238 DMS (RBB), 2012 WL 13175871, at *5 (S.D. Cal. Sep. 28, 2012) (holding requirement of a voucher number or other proof of purchase serves "to ensure that money is fairly distributed for valid claims"); *Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2020 WL 1972505, at *21 (N.D. Cal. Feb. 5, 2020) (approving settlement with cap on no-proof claims); *Fitzhenry-Russell v. Coca-Cola Co.*, No. 5:17-cv-00603-EJD, 2019 WL 11557486, at *7 (N.D. Cal. Oct. 3, 2019) (approving settlement with cap for claims without proof of purchase, stating that such a claim process "would be no different than that required after trial.").

Here, the $300 cap on undocumented purchases was the result of careful consideration by Class Counsel in light of the claims and evidence in this case, experience administering class settlements, and the advice of the settlement administrator. Class Counsel aimed, based on the information available at the time, to select an amount that balanced the interest in paying out valid Class Member claims against avoiding payment of fraudulent claims. Too high of a cap would encourage fraudulent or exaggerated claims, while a lower cap may chill legitimate Class Member claims. To inform the decision, Class Counsel analyzed direct purchase data provided by JLI, and the average purchasing habits reflected in

that data also supported setting the cap for undocumented Retail Expenditures at $300. Further, no documentation is required for JUUL products purchased directly from JLI, as evidence of those purchases was produced in the litigation.

Now that the claims period for the Altria Settlement is complete, preliminary audits validate Class Counsel's decision to implement a cap for undocumented claims and that unduly high caps can invite fraudulent claims. The number of claims received exceeds the estimated size of the class. The analysis performed to date indicates that a substantial number of claims have one or more indicia of fraud. Supp. Azari Decl. ¶ 35. And before the fraud review has been completed, the vast majority of claimants claim Retail Expenditures above $300 but submitted no documentation. *Id*. ¶ 45. An even higher cap would have further increased the risk of fraud and potentially further depressed the value of legitimate claims for all Class Members, especially for Class Members with documentation. The $300 cap represented a careful balancing of interests, and any higher cap would result in unfairness. Indeed, once the audit of claims is complete, Class Counsel may ask the Court to consider adjusting the Plan of Allocation to bolster payments for documented claims.

Next, Ms. Addeo objects that minors are unlikely to submit claims, so the Plan's allocation of extra points for Youth Purchases "could result in a high distribution of unspent funds." She further objects to the provision that after redistribution, any remaining funds may be paid to an "appropriate recipient" with Court approval, asserting that "appropriate recipient" is insufficiently defined. Neither point undermines the fairness and adequacy of the Altria Settlement. To start, extra points for Youth Purchases are fair because the procedure reflects the claims brought by the Class, which sought a full refund for youth purchases and only a partial refund for purchases by adults. In addition, the objection misunderstands the Plan of Allocation. There is not a set amount of money set aside for the payment of Youth Purchases. Instead, there is a single fund available to all eligible claimants, and certain claimants may receive more *pro rata* if they claimed Youth Purchases. Given the high volume of claims, there will not be a pool of unspent funds regardless of the number of Youth Purchases claimed. Thus, the only way a portion of the settlement fund would be distributed to an "appropriate recipient" is if there is a balance remaining after redistribution that is so low as to be uneconomical to distribute. In that case, any distribution will be subject to Court approval, a final backstop to ensure fairness.

1    In sum, each of the arguments raised in the Addeo Objection challenge the careful and measured
2    decisions Class Counsel made in crafting the same Plan of Allocation that the Court has already
3    preliminarily approved in connection with this settlement, and finally concluded was fair in connection
4    with the JLI Settlement. The objection should be overruled.

5    **C.    Settlement Administration Expenses**

6    As of February 12, 2024, across both the JLI and Altria Settlements, Eqiq has incurred
7    $4,553,239.40 in costs related to administering the settlements, a significant portion of which is
8    attributable to processing the more than 14.4 million claims that have been submitted. The Court
9    previously authorized the payment of up to $6 million to Epiq for settlement notice and administration
10   costs across both the JLI and Altria settlements, and noted that, "if needed, Class Counsel may seek
11   approval of payment of additional costs with supporting documentation." Dkt. 4138 at 19.

12   Epiq has advised Class Counsel that, due to the large volume of claims, which far exceed the
13   claims rates that Class Counsel and Epiq reasonably estimated, the total administration costs in this case
14   (including both the JLI and Altria Settlements) will likely exceed $6 million. But Epiq does not believe
15   that the total costs will approach—let alone exceed—the maximum settlement administration costs
16   included in the notices provided to Settlement Class members for the JLI and Altria Settlements ($7
17   million for the JLI Settlement and $4.5 million for the Altria Settlement), to which no Class Member
18   objected. Class Counsel remains focused on controlling administration costs wherever possible, while
19   ensuring that settlement funds end up in the hands of valid claimants.

20   The original cost estimates provided by Epiq were based on a range of 500,000 to 2 million
21   claims in the JLI Settlement, and as many as 1 million additional claims in the Altria settlement. *See*
22   Azari Declaration in Support of JLI Preliminary Approval, Dkt. 3724-13 ¶ 64; Azari Declaration in
23   Support of Altria Preliminary Approval, Dkt. 4082-16 ¶ 63. These estimates in turn were reasonably
24   based on an estimate that the size of the class was under 11 million, which itself was never a certain
25   figure. *See* Sharp Reply Decl. in Support of JLI Final Approval, Dkt. 4091-1, ¶¶ 24–25. Simply put, cost
26   estimates did not account for the possibility that over 14 million claims would be filed.

27   The volume of claims submitted here reflects well on the Class Members' reactions to the Altria
28   Settlement, but also includes a substantial number of claims that, based on a preliminary audit, are

obviously fraudulent (and many more that are very likely fraudulent). Epiq and Class Counsel have spent significant time and effort working to prevent claims by bots or other bad actors from being filed in the first place, and those efforts did successfully screen out a substantial number of obviously invalid claims (and in turn, reduced processing costs to the class). But given the advancing sophistication of fraudulent claimants and the use of AI technologies, both the JLI and Altria Settlements faced a barrage of suspect claims that is unfortunately becoming the new normal in consumer class action settlements.

The work that will be needed to facilitate the payment of *legitimate* claims—*i.e.*, analyzing the full universe of claims, evaluating indicia of fraud, and rejecting invalid claims—is the largest factor in determining the future administration costs for the class settlements. At the outset of the Altria settlement, Epiq estimated that, as a result of efficiencies from combining certain notice elements and the claims review and distribution of the JLI and Altria Settlements, the total combined administration costs would be approximately $7.62 million, far less than the possible high end costs included in the long form notices for each Settlement. Supp. Azari Decl. ¶ 48. Now, as a direct result of receiving 480% more claims than expected, Epiq estimates that the total cost to provide notice and administration for both Settlements will range between $8.55 million and $9.66 million. *Id.* ¶¶ 45, 48. The updated estimate is based on assumptions regarding the claims review process, including that the total number of payable Claims will likely be approximately "20% of total Claims received, based on [Epiq's] past experience with high fraudulent activity, defective cure rates, and our preliminary review of facially valid and complete Claim submissions." *Id.* ¶ 45. Epiq also explains how different approaches in the review and rejection of invalid claims would further impact administration costs. For example, using less stringent questionable claim criteria could increase the payable claim rate to approximately 30% of total Claims, which in turn would add an estimated $500,000 in costs, *id.* ¶ 46, and sending a rejection notice to the *entire* population of the estimated 11.2 million questionable and/or denied Claims—which includes a substantial number of claims that are obviously invalid or fraudulent—would add over $600,000 in additional costs, *id.* ¶ 47. Importantly, as noted in the Final Approval Motion at 6-7, n.4, while auditing claims may be costly, such auditing ultimately redounds to the benefit of Settlement Class Members by winnowing out fraudulent claims and increasing the relative payout to each eligible claimant.

Class Counsel and Epiq are mindful of and share the Court's interest in controlling administration costs, and continue to work together to proceed in a cost-effective manner designed to maximize recoveries by eligible claimants and limit or reduce expenses where possible without impacting the quality of the administration. Cost mitigation measures have included: new and updated Frequently Asked Questions posted to the website and in an auto response email to reduce call center and email correspondence costs (which were becoming significant); leveraging data from prior administration projects to assist with identifying questionable claims, reducing manual claims processing and removing questionable claims; and, employing unique identifiers to link claimants to underlying purchase data. *Id.* ¶ 49. Once Class Counsel and Epiq are able to more precisely quantify their costs and with supporting documentation, Class Counsel anticipates seeking approval for additional payments to Epiq from the Court (beyond the $6,00,000 the Court previously approved) as needed and anticipates that representatives from Epiq will be available for any hearing the Court may wish to hold on additional administration costs. Class Counsel will, in no event, authorize additional payments to Epiq absent Court approval and documented expenses actually incurred by Epiq.

### III. THE COURT SHOULD GRANT THE REQUEST FOR ATTORNEYS' FEES AND EXPENSES

There were no objections to Class Counsel's requested award of attorneys' fees and expenses. As described in the Fee and Expense Motion, given the results achieved, the considerable litigation risks, the skill and quality of work performed, and the contingent nature of the representation, Ninth Circuit authority supports the requested fees and expenses here.

### IV. CONCLUSION

For the foregoing reasons, Class Plaintiffs respectfully requests that the Court grant final approval of the Altria Settlement and Class Counsel respectfully requests that the Court grant their motion for attorneys' fees and expenses.

Dated: February 20, 2024    Respectfully submitted,

By: /s/ *Dena C. Sharp*

Dena C. Sharp
**GIRARD SHARP LLP**

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
dsharp@girardsharp.com

*Co-Lead Counsel and Settlement Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2024, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record. I also sent the foregoing document via email to each of the objectors listed below.

Individual objectors:

    Edward W. Orr (eanddorr2@gmail.com)

    Jaclyn R. Addeo (jacaddeo@yahoo.com)

                                  By: /s/ *Dena C. Sharp*
                                              Dena C. Sharp