1

2

3    [Submitting Counsel on Signature Page]

4

5                        UNITED STATES DISTRICT COURT

6                     NORTHERN DISTRICT OF CALIFORNIA

7                          SAN FRANCISCO DIVISION

8

9    IN RE JUUL LABS, INC., MARKETING,        Case No. 19-md-02913-WHO
     SALES PRACTICES, AND PRODUCTS
10   LIABILITY LITIGATION                      **PLAINTIFF'S CONSOLIDATED**
                                               **OPPOSITION TO DEFENDANTS'**
11                                             **MOTIONS FOR SUMMARY JUDGMENT**

12   This Document Relates to:                 **Judge:    Hon. William H. Orrick**
                                               **Date:     October 7, 2022**
13   *San Francisco Unified School District v.* **Time:     1:30 PM**
     *JUUL Labs, Inc., et al.*                 **Ctrm.:    2**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................ 4

   A.   The RICO Defendants are the founders, shareholders, and decision-
        makers who directed the affairs of JLI................................................... 4

        1.   Bowen and Monsees studied Big Tobacco and created JUUL
             hoping to court investment by a traditional cigarette company. ................ 4

        2.   Pritzker, Valani, and Huh invested in JLI, joined its Board, and
             directed the affairs of JLI with Monsees and Bowen................................ 5

        3.   The ODDs shared the Founders' goal of Big Tobacco investment. ........... 7

        4.   Altria had immense power over JLI, both before and after the
             investment. .................................................................................................. 8

   B.   Defendants told employees, the public, and regulators that JLI was a
        company focused exclusively on a mission to help existing smokers. .............. 11

   C.   In reality, from the beginning Defendants intentionally positioned the
        company to create and benefit from a new market of non-nicotine users,
        including youth. .................................................................................... 16

        1.   The JUUL device was designed to be sleek, to deliver more
             nicotine than was necessary to switch adult smokers, and with
             catchy features that were clearly appealing to youth. ............................... 16

        2.   Defendants deceived the public regarding how addictive JUUL was....... 17

        3.   The JUUL Board positioned JUUL to be cool, hip, and appealing to
             youth................................................................................................ 19

             a.   Before launch, Defendants discussed how to get JUUL
                  products into the hands of "everyone," including by
                  promoting the product as "cool, responsible, safe," and
                  "chill." ................................................................................... 19

             b.   The JUUL launch campaign set out to make young,
                  influential trendsetters JUUL "evangelists."................................ 20

             c.   Once JUUL became cool, the Board poured resources into
                  expanding the brand image on social media and through
                  other aggressive marketing efforts. ............................................ 23

   D.   Despite clear signs that JUUL was creating a youth nicotine epidemic,
        the JLI Board stressed aggressive sales growth and increased product
        distribution at all costs. .................................................................... 24

   E.   Defendants exploited the youth appeal of flavored e-cigarettes. ..................... 27

        1.   After cultivating a market of new, young JUUL users, Defendants
             conspired to preserve flavored JUUL products........................................ 29

**TABLE OF CONTENTS**
(continued)

Page

2.   Weeks before Altria's $12.8 billion investment in JLI, Defendants conspired to keep JUUL's most popular flavor, mint, on the market, by falsely claiming it was a traditional tobacco flavor that helped adult smokers switch from combustibles. .................................................. 31

3.   The JLI Board did not remove all flavored products until late 2019, by which time the next generation of nicotine addicts was already hooked. ..................................................................................................... 32

F.   Altria helped the JLI Board expand the youth nicotine market. ....................... 33

1.   Altria knew that JUUL was a powerful tool for addicting youth to nicotine. .................................................................................................... 33

2.   Altria knew that JUUL was expanding youth use, not converting adult smokers, and so more JUUL sales meant more youth use. .............. 36

3.   Altria encouraged the Individual Defendants to expand sales and digital marketing as fast as possible to secure Altria's payoff. ................. 37

4.   After the investment, Altria turbocharged JUUL sales, worsening the epidemic. ............................................................................................. 38

G.   To avoid scrutiny, Defendants denied marketing to youth and claimed to be engaged in youth prevention, but this was a sham that shows Defendants knew the risk their conduct posed to schools ................................. 40

H.   Defendants' conduct has harmed and continues to harm SFUSD. ................... 42

1.   SFUSD lacks the resources to address a youth vaping crisis. ................... 42

2.   The JUUL-caused youth vaping crisis exists in SFUSD's schools .......... 43

3.   The JUUL-caused youth vaping crisis has caused substantial harm and property damage to SFUSD. ............................................................... 45

4.   Responding to the vaping epidemic requires a comprehensive and multi-disciplinary strategy. ...................................................................... 50

III.   ARGUMENT ................................................................................................................ 53

A.   Defendants' motions for summary judgment on Plaintiff's RICO claims should be denied. ............................................................................................... 53

1.   JLI is a RICO enterprise that was used as a vehicle by the RICO Defendants to engage in a scheme to defraud. ......................................... 56

2.   There is sufficient evidence that each RICO Defendant conducted the enterprise's affairs through a pattern of racketeering activity ............ 59

a.   Adam Bowen. .................................................................................. 60

b.   James Monsees. ............................................................................... 63

c.   Pritzker, Valani, and Huh. .............................................................. 65

**TABLE OF CONTENTS**
(continued)

Page

d.    Altria. ....................................................................... 69

3.    The enterprise's scheme to defraud caused harm to SFUSD that was the foreseeable and natural consequence of Defendants' scheme. ........... 77

4.    SFUSD has incurred injury to property and a concrete financial loss. ......................................................................................... 81

a.    Infringement on the use and enjoyment of property constitutes an injury to property under California law.................. 81

b.    SFUSD has suffered physical damage to and the loss of use of and enjoyment of school property. ........................................ 82

c.    SFUSD has also suffered a "concrete financial loss," including past expenses, lost employee time, and the need to invest in measures to remedy the untenable existing conditions on school grounds...................................................... 85

d.    Defendants' additional arguments about *Canyon County* and abatement are meritless. ............................................... 87

5.    The evidence supports a jury finding that the RICO Defendants participated in a RICO conspiracy. ............................................. 89

a.    All RICO Defendants agreed to facilitate the RICO conspiracy. ............................................................................. 89

b.    Altria may be liable for conduct that occurred before it joined the RICO conspiracy. ....................................................... 91

6.    The PSLRA bar does not apply because Plaintiff has made no allegations about fraud in the sale of securities. ......................... 92

B.    Defendants' motion for summary judgment on Plaintiff's ordinary negligence claims should be denied. .................................................. 95

1.    Altria, Bowen, and Monsees owed a duty of care to SFUSD. ................. 96

2.    There is sufficient evidence of compensatory damages......................... 101

a.    SFUSD can prove both past and future damages........................ 101

b.    Recoverable damages can overlap with abatement costs............ 103

c.    The municipal cost recovery rule does not preclude Plaintiff's claims for damages for negligence or abatement for nuisance. .................................................................................. 104

3.    Plaintiff's negligence claim against Bowen is timely. ............................. 107

C.    Defendants' motions for summary judgment on Plaintiff's nuisance claims should be denied. ................................................................... 112

1.    SFUSD has standing to bring a public nuisance claim. ......................... 112

**TABLE OF CONTENTS**
**(continued)**

Page

a.   Defendants' reliance on *Rincon* is misplaced. ............................ 112

b.   SFUSD has standing as a "person" who suffered property
damage under Cal. Civ. Proc. Code § 731. ................................. 113

c.   Alternatively, SFUSD has standing as an authorized party
under Cal. Civ. Code § 3494. .................................................... 118

2.   Altria expanded youth access to JUUL products in the area around
SFUSD, perpetuating the nuisance and harming SFUSD. ...................... 120

3.   Money damages do not provide an adequate remedy for the
prospective abatement demand. ................................................................ 124

D.   The Court may exercise personal jurisdiction over Dr. Huh. .......................... 126

IV.   CONCLUSION ......................................................................................................... 127

APPENDIX – EXAMPLES OF MAIL AND WIRE FRAUD ................................................ A-1

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aliff v. Vervent Inc.*,
No. 20-597, 2022 WL 3588322 (S.D. Cal. Aug. 22, 2022) ...................................................... 89

*Allwaste, Inc. v. Hecht*,
65 F.3d 1523 (9th Cir. 1995) .............................................................................................. 76, 77

*Andino v. Apple, Inc.*,
20-01628, 2021 WL 1549667 (E.D. Cal. Apr. 20, 2021) ...................................................... 126

*Andrews v. Plains All Am. Pipeline, L.P.*,
No. 15-4113, 2020 WL 1650031 (C.D. Cal. Mar. 17, 2020) .................................................. 81

*Attia v. Google LLC*,
No. 17-06037, 2018 WL 2971049 (N.D. Cal. June 13, 2018) ................................................ 84

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*,
189 F.3d 321 (3d Cir. 1999) .................................................................................................. 92

*Bally v. State Farm Life Ins. Co.*,
536 F. Supp. 3d 495 (N.D. Cal. 2021) .................................................................................. 108

*Beacon Res. Cmty. Ass'n v. Skidmore, Owings & Merrill LLP*,
59 Cal. 4th 568 (2014) .......................................................................................................... 97

*Berg v. First State Ins. Co.*,
915 F.2d 460 (9th Cir. 1990) ................................................................................................ 85

*Bily v. Arthur Young & Co.*,
3 Cal. 4th 370 (1992) ............................................................................................................ 97

*Boyens v. Juul Labs, Inc.*,
No. 19-577875 (Cal. Sup. Ct.) ............................................................................................ 109

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ...................................................................................................... passim

*Brooks v. Thomson Reuters Corp.*,
21-01418, 2021 WL 3621837, (N.D. Cal. Aug. 16, 2021) .................................................. 126

*Cabral v. Ralphs Grocery Co.*,
51 Cal. 4th 764 (2011) ................................................................................................... 95, 100

*Cal. Hwy. Patrol v. Sup. Ct.*,
135 Cal. App. 4th 488 (2006) .............................................................................................. 106

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) .............................................................................................................. 64

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (2008) ....................................................................................................... 80, 87

*Castaic Lake Water Agency v. Whittaker Corp.*,
272 F. Supp. 2d 1053 (C.D. Cal. 2003) ................................................................ 114, 115, 120

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ...................................................................................... 56, 57, 58, 59

*Cisneros v. Petland, Inc.*,
341 F. Supp. 3d 1365 (N.D. Ga. 2018) .................................................................................. 59

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*City & County of San Francisco v. Purdue Pharma L.P.*,
491 F. Supp. 3d 610 (N.D. Cal. 2020) .............................................................. 88, 105, 120, 122

*City of Bos. v. Smith & Wesson Corp.*,
No. 99-2590, 2000 WL 1473568 (Mass. Super. Ct. July 13, 2000) ........................................ 106

*City of Flagstaff v. Atchison, Topeka & Santa Fe. Ry. Co.*,
719 F.2d 322 (9th Cir. 1983)........................................................................................ 104

*City of L.A. v. Shpegel-Dimsey*,
198 Cal. App. 3d 1009 (1988).................................................................................... 113

*City of Los Angeles v. City of San Fernando*,
14 Cal. 3d 199 (1975).......................................................................................... 115, 117

*City of Oakland v. Abend*,
No. 07-2142, 2007 WL 2023506 (N.D. Cal. July 12, 2007)...................................................... 84

*City of San Diego v. Monsanto Co.*,
No. 15-578, 2017 WL 5632052 (S.D. Cal. Nov. 22, 2017).................................................... 116

*Clemente v. State*,
40 Cal. 3d 202 (1985) ............................................................................................ 101

*County of San Luis Obispo v. Abalone All.*,
178 Cal. App. 3d 848 (1986).............................................................................. 105, 106, 116

*County of Santa Clara v. A. Richfield Co.*,
137 Cal. App. 4th 292 (2006) ..................................................................................... 116

*DeFalco v. Bernas*,
244 F.3d 286 (2d Cir. 2001)......................................................................................... 57

*Diaz v. Gates*,
420 F.3d 897 (9th Cir. 2005)............................................................................ 81, 83, 84, 86

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014)........................................................................................ 53

*Edison v. United States*,
822 F.3d 510 (9th Cir. 2016)........................................................................................ 95

*Eidson v. Medtronic, Inc.*,
40 F. Supp. 3d 1202 (N.D. Cal. 2014) ..................................................................... 108, 109

*Fieldstone Co. v. Briggs Plumbing Prods, Inc.*,
54 Cal. App. 4th 357 (1997) ....................................................................................... 100

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005).............................................................................................. 108

*Franckowiak v. Scenario Cockram USA, Inc.*,
20-8569, 2020 WL 9071697 (C.D. Cal. Nov. 30, 2020) ...................................................... 125

*Garcia v. Duro Dyne Corp.*,
155 Cal. App. 4th 92 (2007) ....................................................................................... 101

*Gardner v. Starkist Co.*,
418 F. Supp. 3d 443 (N.D. Cal. 2019) ............................................................................. 59

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)............................................................................................. 53, 58

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Harris v. County of Riverside*,
904 F.2d 497 (9th Cir. 1990).............................................................................. 82, 84

*Hernandez v. Jensen*,
61 Cal. App. 5th 1056 (2021) ................................................................................... 98

*In Farmers Insurance Exchange v. First Choice Chiropractic & Rehabilitation*,
No. 13-01883, 2015 WL 4506401 (D. Or. July 22, 2015)....................................... 85

*In re Bartoni-Corsi Produce, Inc.*,
130 F.3d 857 (9th Cir. 1997)................................................................................... 117

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ............................................................. passim

*In re Financial Corp. of America Shareholder Litigation*,
796 F.2d 1126, 871 (9th Cir. 1986)........................................................................... 93

*In re Juul Labs, Inc. Mktg., Sales Practice & Prods. Liab. Litig.*,
No. 19-02913, 2022 WL 1814440 (N.D. Cal. June 2, 2022) (*JUUL IV*)......................... 78, 123

*In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*,
19-02913, 2022 WL 1601418 (N.D. Cal. Apr. 29, 2022) (*JUUL III*) ................. passim

*In re JUUL Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) (*JUUL I*) ................................................ passim

*In re JUUL Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*,
533 F. Supp. 3d 858 (N.D. Cal. 2021) (*JUUL II*) ............................................... passim

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
No. 00-1898, 2005 WL 1500893 (S.D.N.Y. June 24, 2005) .......................... 119, 120

*In re Nat'l Prescription Opiate Litig.*,
No. 17-2804, 2022 WL 3443614 (N.D. Ohio Aug. 17, 2022)............................ passim

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
MDL 2672, 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)................................ passim

*In re: Gen. Motors LLC Ignition Switch Litig.*,
No. 14-2543, 2016 WL 3920353 (S.D.N.Y. July 15, 2016) .................................... 59

*J.P. v. Carlsbad Unified Sch. Distr.*,
232 Cal. App. 4th 323 (2014) ................................................................................ 101

*J'Aire Corp. v. Gregory*,
24 Cal. 3d 799 (1979) ........................................................................................ 98, 99

*Johnson ex rel. Malone v. United States*,
No. 07-7973, 2009 WL 3520125 (C.D. Cal. Oct. 23, 2009)................................... 102

*Johnson v. Am. Standard, Inc.*,
43 Cal. 4th 56 (2008) ...................................................................................... 114, 117

*Johnson v. V. D. Reduction Co.*,
175 Cal. 63 (1917) ................................................................................................. 118

*Klein v. Altria Grp., Inc.*,
525 F. Supp. 3d 638 (E.D. Va. 2021)................................................... 92, 93, 94, 95

*Koll-Irvine Ctr. Prop. Owners Assn. v. County of Orange*,
24 Cal. App. 4th 1036 (1994) .................................................................................. 81

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lamont Storm Water District v. Pavich*,
  78 Cal. App. 4th 1081 (2000) ................................................................ 114, 115, 119

*Lewis v. Ukran*,
  36 Cal. App. 5th 886 (2019) ..................................................................... 102

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...................................................................................... 77

*Los Angeles Unified Sch. Distr. v. S&W Atlas Iron & Metal Co., Inc.*,
  506 F. Supp. 3d 1018 (C.D. Cal. 2020) ..................................................... 104

*Madani v. County of Santa Clara*,
  16-07026, 2017 WL 1092398 (N.D. Cal. Mar. 23, 2017) ......................... 110

*Marshall & Ilsley Tr. Co. v. Pate*,
  819 F.2d 806 (7th Cir. 1987) ........................................................................ 78

*McDonald v. Antelope Valley Cmty. Coll. Dist.*,
  45 Cal. 4th 88 (2008) .................................................................................. 110

*Menzies v. Seyfarth Shaw LLP*,
  197 F. Supp. 3d 1076 (N.D. Ill. 2016) .................................................... 92, 94

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*,
  651 F.3d 268 (2d Cir. 2011) .................................................................... 92, 95

*Modisette v. Apple Inc.*,
  30 Cal. App. 5th 136 (2018) ......................................................................... 96

*Monterey Bay Military Hous., LLC v. Ambac Assurance Corp.*,
  No. 17-04992, 2018 WL 3439372 (N.D. Cal. July 17, 2018) ................ 94, 95

*N. Improvement Co. v. United States*,
  398 F. Supp. 3d 509 (D. Ariz. 2019) ......................................................... 117

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994) ...................................................................................... 57

*NBCUniversal Media, LLC v. Sup. Ct.*,
  225 Cal. App. 4th 1222 (2014) ................................................................... 108

*New York v. Juul Labs, Inc.*,
  No. 452168/2019 (N.Y. Sup. Ct. July 14, 2022) ....................................... 127

*Ocasio v. United States*,
  578 U.S. 282 (2016) ...................................................................................... 89

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*,
  298 F.3d 768 (9th Cir. 2002) ........................................................................ 91

*Orange County. Water Dist. v. Sabic Innovative Plastics US, LLC*,
  14 Cal. App. 5th 343 (2017) .............................................. 81, 83, 115, 117

*Orozco v. WPV San Jose, LLC*,
  36 Cal. App. 5th 375 (2019) ....................................................................... 102

*Oscar v. Univ. Students Co-op. Ass'n*,
  965 F.2d 783 (9th Cir. 1992) ................................................................... 83, 85

*Ott v. Alfa-Laval Agri, Inc.*,
  31 Cal. App. 4th 1439 (1995) ..................................................................... 100

TABLE OF AUTHORITIES
(continued)

Page(s)

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*,
   943 F.3d 1243 (9th Cir. 2019).................................................................................. 77, 78

*People v. ConAgra Grocery Prods. Co.*,
   17 Cal. App. 5th 51, 133 (2017) ................................................................................ passim

*People v. Ethical Treatment of Animals, Inc. v. Cal. Milk Producers Advisory Bd.*,
   125 Cal. App. 4th 871 (2005) ........................................................................................ 117

*People v. Purdue Pharma L.P.*,
   No. 14-725287, 2021 WL 5227329 (Cal. Sup. Nov. 01, 2021)........................................ 122

*Ray v. Spirit Airlines, Inc.*,
   836 F.3d 1340 (11th Cir. 2016)................................................................................... 58, 59

*Regalado v. Callaghan*,
   3 Cal. App. 5th 582 (2016) ............................................................................................. 101

*Relevant Group LLC v. Nourmand*,
   No. 19-05019, 2022 WL 2916860 (C.D. Cal. July 25, 2022)............................................ 90

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993).................................................................................................. 59, 60

*Rezner v. Bayerische Hypo-UND Vereinsbank AG*,
   630 F.3d 866 (9th Cir. 2010) ...................................................................................... 93, 94

*Rincon Band of Luiseño Mission Indians etc. v. Flynt*,
   70 Cal. App. 5th 1059 (2021) ..................................................................................... passim

*Salinas v. United States*,
   522 U.S. 52 (1997)................................................................................................... 89, 90

*Santa Clarita Water Agcy. v. Whittaker Corp.*,
   No. 18-6825, 2021 WL 2549066 (C.D. Cal. Apr. 5, 2021) ................................................ 103

*Schmuck v. United States*,
   489 U.S. 705 (1989).................................................................................................. 58, 76

*Selma Pressure Treating Co. v. Osmose Wood Preserving*,
   221 Cal. App. 3d 1601 (1990) ..................................................................... 114, 115, 116, 117

*Sever v. Alaska Pulp Corp.*,
   978 F.2d 1529 (9th Cir. 1992)......................................................................................... 57

*SFUSD v. Juul Labs, Inc.*,
   No. 19-8177 (N.D. Cal.) .............................................................. 94, 107, 110, 114

*Smith v. United States*,
   568 U.S. 106 (2013).................................................................................................. 90, 91

*So. Cal. Gas Leak Cases*,
   7 Cal. 5th 391 (2019) ...................................................................................................... 99

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020)........................................................................................... 125

*Squaw Valley Dev. Co. v. Goldberg*,
   375 F.3d 936 (9th Cir. 2004).......................................................................................... 85

*State ex rel. Harris v. PricewaterhouseCoopers*,
   39 Cal. 4th 1220 (2006) ................................................................................................ 116

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

3

*Swartz v. KPMG LLP,*
476 F.3d 756 (9th Cir. 2007)..................................................................... 93, 94

4

*Torrance Redevelopment Agency v. Solvent Coating Co.,*
763 F. Supp. 1060 (C.D. Cal. 1991) .............................................................. 113

5

6

*United States v. Apex Oil Co.,*
579 F.3d 734 (7th Cir. 2009)......................................................................... 126

7

*United States v. Fernandez,*
388 F.3d 1199 (9th Cir. 2004)......................................................................... 89

8

*United States v. Garcia,*
497 F.3d 964 (9th Cir. 2007)........................................................................... 91

9

*United States v. Jaimez,*
No. 19-50253, 2022 WL 3590561 (9th Cir. Aug. 23, 2022) .......................... 90

10

*United States v. Philip Morris USA, Inc.,*
449 F. Supp. 2d 1 (D.D.C. 2006) .................................................................... 69

11

12

*United States v. Rone,*
598 F.2d 564 (9th Cir. 1979)...................................................................... 57, 58

13

*United States v. Saavedra,*
684 F.2d 1293 (9th Cir. 1982)......................................................................... 91

14

*United States v. Shields,*
No. 12-410, 2014 WL 4744617 (N.D. Cal. Sept. 23, 2014) .......................... 76

15

16

*United States v. Stapleton,*
293 F.3d 1111 (9th Cir. 2002)......................................................................... 62

17

*United States v. Turkette,*
452 U.S. 576 (1981)......................................................................................... 58

18

*United States v. Umagat,*
998 F.2d 770 (9th Cir. 1993)........................................................................... 91

19

20

*United States v. Woods,*
335 F.3d 993 (9th Cir. 2003)........................................................................... 76

21

*Virden v. Graphics One,*
623 F. Supp. 1417 (C.D. Cal. 1985) ............................................................... 61

22

*Walnut Creek Manor, LLC v. Mayhew Ctr., LLC,*
No. 07-5664, 2010 WL 653561 (N.D. Cal. Feb. 22, 2010) .................... 103, 126

23

*Walter v. Drayson,*
538 F.3d 1244 (9th Cir. 2008)......................................................................... 70

24

*Wells v. One2One Learning Foundation,*
39 Cal. 4th 1164 (2006) ................................................................................. 116

25

*Zeiger v. WellPet LLC,*
526 F. Supp. 3d 652 (N.D. Cal. 2021) .................................................... 124, 125

26

27

**STATUTES**

28

18 U.S.C. § 1961(1) ............................................................... 53

18 U.S.C. § 1961(4) ............................................................... 56

**TABLE OF AUTHORITIES**
(continued)

Page(s)

18 U.S.C. § 1964(c) ............................................................................... 77, 81, 92

Cal. Civ. Code § 3283 ....................................................................................... 101

Cal. Civ. Code § 3493 ....................................................................................... 112

Cal. Civ. Code § 3494 ................................................................................ 112, 118

Cal. Civ. Code § 4 ............................................................................................. 115

Cal. Civ. Proc. Code § 731 ............................................................................... 112

Cal. Educ. Code § 35160.1(b) ........................................................................... 118

Cal. Educ. Code § 35162 ................................................................................... 118

Cal. Educ. Code § 35183(a)(1) ......................................................................... 119

Cal. Educ. Code § 48901(a) .............................................................................. 118

Cal. Educ. Code § 49400 ................................................................................... 119

Cal. Educ. Code § 49401.5 ................................................................................ 119

Cal. Educ. Code § 49410(a)(6) ......................................................................... 119

**RULES**

Fed. R. Civ. P. 56(f) .......................................................................................... 112

**OTHER AUTHORITIES**

*Consumer Update: 9/19*, JUUL Labs, Inc. (Sept. 19, 2019) ............................... 15

*Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the H. Comm. on Oversight & Reform*, 116th Cong. 70 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.) ........................................... 15, 29

FDA, *FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death* (July 27, 2017) ............................................................................ 29

FDA, *Regulation of Flavors in Tobacco Products*, 83 Fed. Reg. 12,294 (Mar. 21, 2018) ........... 30

Jen Christensen, *Juul Stops Sales of Mint Flavored Pods*, CNN (Nov. 7, 2019) ...................... 32

Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods, Solid Smack* (Apr. 23, 2014) .......................................................................................... 4

JUUL Labs, Inc., *Our Mission* (2020) ............................................................... 12

JUUL Labs, Inc., *Our Responsibility*, (July 26, 2018) ....................................... 12

KA Cullen et al, *e-cigarette Use Among Youth in United States, 2019*, 322 JAMA 21, 2095 (Dec. 3, 2019) ...................................................................................................... 32

Kathleen Chaykowski, *Billionaires-to-be: Cigarette Breakers–James Monsees and Adam Bowen Have Cornered the US E-Cigarette Market with Juul. Up Next: The World*, Forbes India (Sept. 27, 2018) ....................................................................................... 4

Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), .................................................................................... 13

Kevin Roose, *JUUL's Convenient Smoke Screen*, N.Y. Times, Jan. 11, 2019 ........................... 65

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018) ......................................................................................... 15, 41

Michael Coren, *Tech Investors Have Found Something Even More Addictive Than Social Media*, Quartz, Oct. 28, 2018 ......................................................................................... 65

Office of the Surgeon General, U.*S. Department of Health and Human Services, Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General* (2012)........ 28

Philip Morris Inc., *Today's the day to make the switch!* (1996)..................................................... 13

Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth* (Apr. 14, 2014) ........................................... 28

I.      **INTRODUCTION**

This action seeks to hold an e-cigarette company, its leaders, and its business partner accountable for igniting and perpetuating an epidemic of youth nicotine addiction. The consequences of their actions have affected schools across the nation, including here in San Francisco. Overwhelmed by student addiction and its corrosive effects, Plaintiff San Francisco Unified School District ("SFUSD") brings these claims to redress its injuries and abate the harms caused by Defendants' conduct.

One company stands far above the rest in causing the epidemic of youth e-cigarette use: JUUL Labs, Inc. ("JLI"). This was no accident. Five individuals (the major investors and leaders of the company), and a tobacco giant, Altria, conspired to use JLI as a vehicle to achieve expand the market for nicotine, including youth use. The Defendants' fraudulent scheme and egregious misconduct caused a public nuisance and significant harm to property in SFUSD's schools.

JLI launched JUUL in 2015 and saw sales rise exponentially through 2019. JLI achieved staggering sales by offering JUUL in kid-friendly flavors and mass marketing through organized ad campaigns, launch parties, and a social media blitz. Defendants' viral marketing campaign spread like wildfire the supposed virtues of this new product. Internally, JLI's founders and leaders admitted that they wanted to portray JUUL as new, cool, safe, and mysterious to grow sales. But externally, they claimed the device was intended exclusively for existing addicted adult cigarette smokers. As they plotted the quickest route to make billions by cashing in from a big tobacco company, teen e-cigarette use skyrocketed. And, even after it was clear that JUUL was causing a youth nicotine epidemic, JLI's leaders conspired with Altria to keep sales of JUUL devices growing through deception. Through this multi-year course of conduct, the five individual defendants became multi-millionaires or billionaires, Altria has obtained access to a new market of millions of youth nicotine addicts, and SFUSD was left to deal with the fallout.

At the pleading stage, this Court found that similar government entity claims for negligence, public nuisance, and RICO were viable legal theories and plausibly alleged. Discovery is now complete, and the evidence supports those same allegations. Defendants' arguments for summary judgment are based on a mischaracterization of the law and a disregard

1   for the record evidence. When SFUSD's evidence is properly considered and all reasonable

2   inferences are drawn in SFUSD's favor, as required, a jury could find for SFUSD on all claims.

3   At most, Defendants' arguments raise genuine disputes of material facts—disputes that the jury

4   should decide.

5       **RICO**. As to RICO, Defendants raise six main arguments, but none have merit.

6       1.   Defendants say that JLI cannot be a RICO enterprise. But JLI, as a corporation, is

7   an "enterprise" under the plain language of the RICO statute. Under Supreme Court precedent, a

8   person can be held liable under RICO for using a corporation as a vehicle to engage in a pattern of

9   racketeering activity. The Supreme Court also rejected the notion that the corporation must be

10  the victim of the fraud scheme and has held that the pattern of racketeering activity can be the

11  corporation's regular way of conducting business.

12      2.   The RICO Defendants all contend they did nothing wrong. Each RICO Defendant

13  conducted the affairs of the enterprise, and together they did so through a pattern of racketeering

14  activity. The evidence shows that each of the RICO Defendants was intimately involved in

15  directing the fraudulent conduct at JLI, and each benefitted substantially.

16      3.   The RICO Defendants' fraudulent scheme foreseeably caused a youth nicotine

17  epidemic, which caused substantial harms to SFUSD. The evidence shows that JUUL was the

18  dominant market leader in sales to youth, and JUUL played a major role in the issues at SFUSD.

19  If the RICO Defendants had actually designed, promoted and sold an adult smoking cessation

20  device exclusively to help addicted adult smokers switch, as they repeatedly represented to the

21  public and regulators, then the key drivers of the youth nicotine epidemic—kid-friendly flavors,

22  youth-friendly design, and youth-focused marketing—never would have happened. Similarly, if

23  the public and regulators knew of JLI's leaders and Altria's true intentions—to create and expand

24  a youth market of new nicotine users before regulations applied—the outcry and regulations that

25  now exist would have occurred much faster.

26      4.   Defendants claim that SFUSD suffered no cognizable harm to business or

27  property. But SFUSD sustained physical property damage, loss of staff resources, and a general

28

1    loss of the use and enjoyment of its property. Each of these constitutes an injury to property

2    under California law.

3        5.       SFUSD's conspiracy claim under § 1962(d) is well-supported by evidence. Altria

4    joined an on-going fraud scheme and conspired with JLI's leaders. Thus, it is liable for all of the

5    enterprise's illegal conduct that caused harm to SFUSD's property.

6        6.       The PSLRA bar does not apply. This case has nothing to do with securities, and

7    SFUSD's claim does not depend on any conduct that establishes a securities claim.

8        **Negligence**. As to negligence, Defendants raise three main arguments, but each is flawed.

9        1.       Some Defendants contend that they owed no duty to SFUSD. At the motion to

10    dismiss stage, this Court which concluded that all Defendants, including Altria, Bowen and

11    Monsees, owed a legal duty of care to SFUSD. Defendants do not identify any factual

12    developments that undermine the Court's reasoning.

13        2.       There is sufficient evidence of compensatory damages. The epidemic requires

14    SFUSD to spend millions of dollars that it does not have on modifications and improvements to

15    school infrastructure, and on the staffing necessary to counter student vaping on school grounds.

16    It does not matter that some damages may overlap with abatement costs. And the municipal cost

17    recovery rule does not apply for the reasons this Court has already explained.

18        3.       SFUSD's negligence claim against Bowen is timely. There are no disputed

19    material facts, and no basis for a jury to conclude that the limitations period for suing Bowen

20    expired. Summary judgment should be granted in SFUSD's favor on this issue.

21        **Nuisance**. Finally, as to the public nuisance claim, Defendants raise three main

22    arguments, but they similarly rest on flawed logic and inapplicable case law.

23        1.       SFUSD has standing to bring a public nuisance claim under California law for

24    two independent reasons. SFUSD is a person who suffered property damage under the first

25    sentence of Cal. Civ. Proc. Code § 731, and it also is an authorized party able to sue under Cal.

26    Civ. Proc. Code § 3494. Defendants rely on an erroneous reading of *Rincon Band of Luiseño*

27    *Mission Indians etc. v. Flynt*, 70 Cal. App. 5th 1059 (2021), and ignore the applicable case law.

28

2.      Altria's intentional conduct directly contributed to the harm at SFUSD. Altria exacerbated the nuisance by joining JLI's leaders to boost JUUL sales and conspire to expand youth access to JUUL products in the area around SFUSD.

3.      Money damages do not provide an adequate remedy for the prospective abatement demand. Abatement that goes beyond damages, including community-based solutions and treatment of addicted youth, is required to clean up the public health crisis affecting SFUSD.

The Court should deny Defendants' motions for summary judgment (with the exception of Plaintiff's gross negligence claims).

## II.     STATEMENT OF FACTS

### A.      The RICO Defendants are the founders, shareholders, and decision-makers who directed the affairs of JLI.

#### 1.      Bowen and Monsees studied Big Tobacco and created JUUL hoping to court investment by a traditional cigarette company.

As students in Stanford's master's program, James Monsees and Adam Bowen saw an opportunity to revitalize what Monsees described as "the most successful consumer product of all time … an amazing product."[1] Recognizing "some problems" with combustible cigarettes, Monsees and Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category"[2] and "'take tobacco back to being a luxury good.'" Ex. 1 (Drumwright Sept. 2021 Rpt.) at 12; Ex. 2 (Bowen Ex. 11121) at slide 19 ("[T]he words [external audiences] will use" include "magical," "luxury," and "stigma removing"); Ex. 3 (Bowen Dep.) at 186:16-21 (He wanted to "remov[e] or reduc[e]" the "stigma" around smoking).

To begin, Monsees and Bowen ("the Founders") "carefully studied the strategies and tactics revealed in tobacco industry documents that were made public through the tobacco Master Settlement Agreement ("MSA") in 1998." Ex. 1 (Drumwright Sept. 2021 Rpt.) at 12.

---

[1] Kathleen Chaykowski, *Billionaires-to-be: Cigarette Breakers–James Monsees and Adam Bowen Have Cornered the US E-Cigarette Market with Juul. Up Next: The World*, Forbes India (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.
[2] Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*, Solid Smack (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods.

1   Monsees said that tobacco industry documents "'had so much information that you wouldn't

2   normally be able to get in most industries,' and they allowed the company 'to catch up to a huge,

3   huge industry in no time.'" *Id.* After their careful study of the strategies that made big tobacco

4   successful, in 2005 Bowen and Monsees founded the company that would later become JLI. Ex.

5   3 (Bowen Dep.) at 28:6-22, 34:23-35:15.

6        From the beginning, Bowen and Monsees, and the Other Director Defendants ("ODDs,"

7   and, collectively, the "Individual Defendants,") sought to position JLI for partnership with a

8   tobacco company.[3] The "question always was when," not if, they would partner with big

9   tobacco. Ex. 4 (Pritzker Dep.) at 474:4-12. According to Monsees, "where [JLI] comes in for

10  [the tobacco companies] is maintaining the youth culture market. Where do the young Camel

11  Light smokers go?" Ex. 5 (Valani Ex. 40105); *see also* Ex. 6 (JLI00380274) (Monsees in late

12  2016: "Soon enough [JUUL's success] will catch the eyes of big tobacco ….").

13        **2.    Pritzker, Valani, and Huh invested in JLI, joined its Board, and**
         **directed the affairs of JLI with Monsees and Bowen.**

14

15        Throughout the events underlying Plaintiff's claims, the ODDs controlled the majority of

16  JLI's seven-member Board of Directors. Valani, investor and Board member since 2007, and

17  Pritzker, investor since 2011 and Board member since 2013, controlled four of JLI's seven Board

18  seats. Ex. 7 (JLI01365601) at 5706-07; Ex. 8 (JLI01426794); Ex. 9 (JLI00417815); Ex. 10

19  (JLI01440776). Defendant Huh, investor since April 2015, occupied a Board seat by September

20  2015 until resigning in May 2018. Ex. 11 (JLI01366459); Ex. 12 (JLI00206172); Ex. 13

21  (Pritzker Ex. 14115). Bowen and Monsees each occupied a seat, giving the Individual

22  Defendants complete control. Ex. 1 (Drumwright Sept. 2021 Rpt.) at 122.

23

24  _____
    [3] Ex. 14 (Cohen Dep.) at 81:3-6 ("The company has looked for investment from a range of
25  sources, including big tobacco, throughout its history."); *id.* at 81:20-82:4 (interest in partnering
    with big tobacco went back to at least 2008); Ex. 15 (Cohen Ex. 26002) (2009 emails from
26  Cohen, forwarded to Bowen, regarding "we are totally kicking ass" on "partnership discussions"
    with "major tobacco companies"); Ex. 16 (Cohen Ex. 26003) (2008 email between Cohen,
27  Valani, Bowen, and Monsees about trying to get Altria to invest, mentioning "bidding war
    strategy" regarding tobacco companies); Ex. 17 (Atkins Ex. 2) at slide 23 (When JLI was
28  preparing to launch JUUL, its business plan called for a massive distribution to be accomplished
    "by the four largest US tobacco distributors").

The Individual Defendants directed and controlled the affairs of JLI. *Id.* at 123 ("JUUL's board had extraordinarily broad and sweeping power to run the company."). Former JLI Chief Operating Officer Scott Dunlap testified that JLI's Board was "very hands on with regard to the marketing" and all aspects of the business, and that "this was a highly involved Board at [JLI]." Ex. 18 (Dunlap Dep.) at 143:13-144:8, 148:2-13. JLI Director Alex Asseily added that the JLI Board would unanimously agree on marketing and other decisions. Ex. 19 (Asseily Dep.) at 199:14-200:8. JLI's Board also met far more frequently than is typical, with weekly Board calls and monthly meetings. Ex. 20 (JLI00210436); Ex. 21 JLI00380098).

In particular, Pritzker, Valani, and Huh exercised more control over JLI's operations than is usual for corporate directors. Ex. 1 (Drumwright Sept. 2021) at 122-24.[4] As early as 2014, Pritzker participated in granular planning discussions with Monsees and Valani about JUUL media strategy. Ex. 22 (Valani Ex. 40081). In January 2015, Monsees, Bowen, Valani, and Pritzker—four of five Directors at the time—met to discuss JLI's marketing. Ex. 23 (Pritzker Ex. 14020). The entire marketing strategy for JUUL, including reliance on influencers and a planned partnership with *Vice* (the No. 1 youth media magazine), was presented to the Board for pre-launch approval. *Id.* Around the same time, Monsees, Bowen, Pritzker, and Valani discussed how to market JUUL and the product's nicotine content. Ex. 22 (Valani Ex. 40081). They dictated specific goals for the company's messaging and gave "direction … on [the board's] comfort level with" the way nicotine was addressed in JLI's marketing, including dictating specific language. *Id.*; Ex. 23 (Pritzker Ex. 14020); Ex. 24 (JLI01121750).

Not long after JUUL's launch, in October 2015, the Individual Defendants restructured JLI's Board "to usher in the next phase of growth for the business." Ex. 25 (Valani Ex. 40100). Monsees resigned as CEO, becoming Chief Product Officer, and an Executive Committee was formed "to provide more consistent and focused direction to the company." Ex. 26 (INREJUUL_00061347) at 00061377-78; Ex. 25 (Valani Ex. 40100). The committee consisted of Pritzker, Valani, and Huh, with Huh the "lead director with executive authority" and Pritzker

---

[4] *See also* Ex. 29 (JLI00206239) (Pritzker, Valani, and Huh were involved at such a granular level that Dunlap worried that "the board [will] try and write copy" for branding materials).

1    the Co-Chairman. Ex. 27 (Huh Ex. 28015); Ex. 25 (Valani Ex. 40100). Huh was empowered to

2    "make decisions on behalf of the Exec[utive] Comm[ittee]." Ex. 28 (INREJUUL_00061853) at

3    61856. JLI executives now "report[ed] to" Huh." Ex. 27 (Huh Ex. 28015). Pritzker and Huh were

4    in JLI's offices "three to four days a week to operate the business—an extraordinary level of

5    operational control." Ex. 1 (Drumwright Sept. 2021 Rpt.) at 123-24.

6         Although JLI hired a new CEO in August 2016, the ODDs continued to exercise control

7    over JLI's affairs. Ex. 30 (INREJUUL_00100719) (JLI's media plan put on hold in 2017 because

8    the Board did not approve); Ex. 31 (JLI00308379) (Valani supervised plans to sell JUUL devices

9    in vending machines, asking for early design images and constructs); Ex. 4 (Pritzker Ex. 14083)

10   (Pritzker dictated specific changes to the content on JUUL's corporate website in May 2017);

11   Ex. 33 (JLI00322485) (in October 2017, Pritzker rejected a specific marketing campaign

12   proposal); Ex. 34 (JLI11015358) (Pritzker personally involved in customer service issues); Ex.

13   35 (JLI00382271) (Valani proposed JLI find ways to "leverage user generated content" on social

14   media in July 2016). Pritzker and Valani also controlled JLI's public relations and media

15   strategies, dictating JLI's messaging in response to negative press and requesting a week-by-

16   week progress report. Ex. 36 (Valani Ex. 40110).

17        **3.    The ODDs shared the Founders' goal of Big Tobacco investment.**

18        As the ODDs joined JLI, they aligned with the Founders' goal to partner with Big

19   Tobacco. Ex. 4 (Pritzker Dep.) at 474:4-12. Defendants knew that "big tobacco is used to paying

20   high multiples for brands and market share." Ex. 37 (Bowen Ex. 11138) at 4198. They also knew

21   that cigarette companies had long sought the highly profitable youth market. *See* Ex. 3 (Bowen

22   Dep.) at 34:23-35:15, 77:10-21 (studied tobacco industry documents); Ex. 38 (Monsees Dep.) at

23   96:8-14 (same). As such, Bowen, Monsees, and Valani began courting the "big 8" tobacco

24   companies no later than early 2009. Ex. 39 (Bowen Ex. 11139); Ex. 3 (Bowen Dep.) at 470:10-

25   71:16. Also in 2009, Valani, Bowen, and Monsees met Altria's Research and Development team

26   in Richmond. Ex. 3 (Bowen Dep.) at 472:22-473:6; Ex. 40 (Devitre Dep.) at 83:1-84:23.[5]

27   _____

28   [5] "Altria" refers to defendants Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services
     LLC (ACS), and Altria Group Distribution Company (AGDC).

1    In 2011, JLI—controlled by Monsees, Bowen, and Valani—partnered with the tobacco

2    industry by selling an interest in Ploom to Japan Tobacco International. Ex. 3 (Bowen Dep.) at

3    471:9-72:20, 477:16-78:2; Ex. 1 (Drumwright Sept. 2021 Rpt.) at 13. The Individual Defendants

4    continued their pursuit in 2015, when Monsees and Hank Handelsman—occupying Pritzker's

5    second Board seat—met with former Altria subsidiary Phillip Morris International ("PMI"). Ex.

6    41 (Pritzker Ex. 14046); Ex. 4 (Pritzker Dep.) at 448:18-51:4). Pritzker and Valani debated

7    whether it was the right time to "get in bed with the monster, PMI." Ex. 42 (Pritzker Ex. 14037);

8    Ex. 4 (Pritzker Dep.) at 455:13-456:6. Both preferred to grow JUUL alone before "getting

9    serious with tobacco companies," with Pritzker noting "I don't think their ardor will diminish for

10    a while." Ex. 43 (Pritzker Ex. 14051) Ex. 41 (Pritzker Ex. 14046). In August 2015, JLI's

11    investment bank told the JLI Directors: "an exclusive agreement with LT [leading tobacco

12    companies] will … Maximize JUUL Growth Trajectory [and] Drive Strong Value to PAX

13    Shareholders." Ex. 44 (INREJUUL_00016383) at 6386. At a December 2015 board meeting,

14    Huh was explicit: the goal was to grow JUUL for sale to or joint venture with "Big tobacco." Ex.

15    45 (INREJUUL_00278288) at 8358.

16          **4.    Altria had immense power over JLI, both before and after the
           investment.**

17

18    As JUUL sales and JLI's valuation grew through aggressive youth-oriented marketing

19    and product design, the JLI-Altria partnership talks took off. Altria reached out to the JLI

20    Directors no later than "early 2017," with "confidential discussions" beginning by Spring 2017

21    and continuing for approximately 18 months.[6] In June 2017, following a conversation between

22    Altria board member Dinyar Devitre and Valani, Devitre introduced Valani to Altria's CFO,

23    William Gifford. Ex. 45 (Valani Ex 40107). A month later, Devitre and Valani spoke again, with

24    Devitre "stressing that Altria and PMI would be great partners for us" and that Altria "look[s]

25

26    _____

27    [6] Letter from Altria to Senator Durbin et al. (Oct. 14, 2019), https://www.altria.com/-
      /media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-
      filings/documents/Altria-Response-to-October-1-2019-Senate-Letter.pdf; Ex. 47
28    (ALGAT0002821849) at slide 4.

1    forward to building a relationship." Ex. 48 (Pritzker Ex. 14085). Addressing the potential

2    partnership with Altria, Pritzker exclaimed: "Honestly that is fucking awesome." *Id.*

3        Before and after its investment, Altria sought to "influence" and "guide" JLI. Before the

4    investment, Altria executive (and future JLI CEO) K.C. Crosthwaite told Altria's Board that "a

5    strategic investment in JUUL" would give Altria "[s]ignificant ownership and influence in U.S.

6    e-vapor leader." Ex. 49 (ALGAT0003327931) at 7933. Altria CEO Billy Gifford admitted that

7    Altria's goal at the inception of negotiations was to control JLI. Ex. 50 (Gifford Dep.) at 74:16-

8    18. After the investment, Crosthwaite, who "had responsibility for overseeing the overall return

9    on Altria's minority investment," Ex. 51 (Willard Ex. 22) at 900, confirmed Altria's focus on

10   "ensur[ing] JUUL maintains long-term leadership in global E-vapor by … providing strategic

11   guidance through board participation." Ex. 52 (ALGAT0002856951) at 6951. Altria viewed

12   itself as JLI's "[v]alued partner" and sought to "[g]uide [JLI's] strategic direction through board

13   engagement," including providing "ongoing" "strategic advice and expertise." Ex. 53

14   (ALGAT0002856956) at slide 1.[7] No passive investor, Altria aimed to be "a strategic partner in

15   supporting JUUL's mission." Ex. 54 (ALGAT0000772561) at slide 6; *see also* Ex. 55

16   (ALGAT0003889812) (Pritzker telling Altria "we truly appreciate our partnership, and look

17   forward to an even deeper collaboration in the future."); Ex. 56 (Garnick Ex. 2342) at 4560

18   (calling the partnership a "marriage").

19       As Altria knew, the endgame—the pay-off—for JLI's investors was always partnership

20   with a cigarette company. *See* Ex. 47 (ALGAT0002821849) at slide 4 ("[r]umored to be meeting

21   with every major tobacco company"). Knowing that the investors controlled JLI, Altria pitched

22   the deal as "a compelling, near-term liquidity event for the JUUL investors." Ex. 57 (Blaylock

23   Ex. 1727) at 1785. Devitre, the self-described "facilitator of the deal," initiated negotiations

24   directly with Valani, and through the 18 months of confidential discussions, dealt with Valani

25

26   _____

     [7] *See also, e.g.*, Ex. 58 (ALGAT0003279064) (then-CEO Howard Willard providing direct
27   feedback to Burns, Valani, and Pritzker on a "Youth Vaping Protection Plan," including warning
     that "you should be very careful when trying to execute a major change at retail that will create
28   big winners and big losers").

1  and Pritzker only. Ex. 40 (Devitre Dep.) at 123:8-125:20, 128:23-129:18, 255:8-19.[8] Pritzker and

2  Valani conveyed to Altria that they had "high value expectations," even though JLI "[d]oes not

3  need capital." Ex. 59 (ALGAT0000112523) at slides 4, 7.

4          On December 20, 2018, Defendants announced the Altria-JLI partnership, including

5  Altria's $12.8 billion cash payout to JLI and extensive services Altria would provide to expand

6  JUUL's reach and grow sales. It was the largest equity investment in U.S. history. The deal was

7  deliberately structured so that almost "100% of the proceeds would be distributed to investors."

8  Ex. 60 (Crosthwaite Ex. 45035) at slide 10.Only $200 million of the $12.8 billion was invested

9  in JLI. The remaining $12.6 billion was distributed to investors and employees as a special

10 dividend and bonuses. Ex. 61 (JLI01388029). The Individual Defendants took the lion's share,

11 receiving astronomical returns on their investments. *Id.* Monsees received approximately $641

12 million, Bowen $593 million, Huh $97 million personally and through his company (22,986%

13 ROI),[9] Valani $105 million personally and $2.35 billion through his company (51,248% ROI),

14 and Pritzker approximately $1.8 billion through his company (17,853% ROI). *Id.*; Ex. 62

15 (JLI41165687); Ex. 63 (JLI42587640).

16         After the investment, Altria had an even greater ability to direct and manage JLI as its

17 largest shareholder and through its "strategic alignment with JLI's existing board members who

18 also had significant ownership interests." Ex. 64 (Drumwright May 2022 Rpt.) at 12. Dr.

19 Drumwright explains that Altria "capitalized on various forms of non-coercive power in

20 managing, operating, and directing JLI," including: providing its "expertise" on management,

21 distribution, sales, and regulatory affairs to guide JLI decision making; utilizing "reward power"

22 to compensate the Directors; and supplying "marketing and advertising assets," such as the

23 "Make the Switch" campaign (discussed further below in SOF § B). *Id.* at 47-67. Private

24 communications continued between Crosthwaite, Willard, Pritzker, and Valani, including Altria

25 ---

[8] *See also* Ex. 65 (Willard Ex. 7) at slide 3 (internal goal: "[b]uild relationship/rapport" with
26 Valani and Pritzker); Ex. 66 (Devitre Ex. 31515) at 1958 (Altria board member to Pritzker: "We
   trust Riaz and you 100%."); Ex. 40 (Devitre Dep.) at 345:20-23 ("Riaz and Nick were the ones
27 who were principally leading the negotiations."); Ex. 67 (Devitre Ex. 31524) ("He is calling Riaz
   and will let us know").

28 [9] In addition to his $67 million dividend, the deal enabled Huh to sell $30 million of JLI shares.

strategizing with Valani to "get the right result" by cutting out "JUUL management." Ex. 68 (Frankel Ex. 17781).[10] Altria's influence was confirmed by its installation of Crosthwaite as CEO after Willard repeatedly told Pritzker and Valani in private calls "his opinion that JLI would benefit from a new direction." Ex. 69 (Crosthwaite Ex. 45016) at 6859.

### B.   Defendants told employees, the public, and regulators that JLI was a company focused exclusively on a mission to help existing smokers.

From the beginning, Defendants conveyed that JLI was focused exclusively on helping adult smokers stop smoking combustible cigarettes. Just prior to launch, an April 21, 2015, press release described JUUL as a "technology breakthrough in smoking alternatives," a "compelling alternative to traditional cigarettes," and "the product that smokers want."[11] Defendants have consistently represented that they were trying to ensure that JUUL was marketed only to adult smokers, never to youth. That was false. Instead, Defendants intentionally chose the course of action that would attract the widest audience of users, including non-smokers.

Knowing this path was inevitably going to lead to JUUL uptake by nicotine-naïve youth, Defendants repeated the cover story that JUUL was intended to help existing addicted adult cigarette smokers. JUUL's oft-repeated "founders' story" claimed: "JUUL Labs was founded by former smokers … with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely…"[12] An April 2018 press release stated:

> Our company's mission is to eliminate cigarettes and help the more than one billion smokers worldwide switch to a better alternative . . . [W]e are committed to deterring young people, as well as adults who do not currently smoke, from using our products. We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL.

---

[10] *See also* Ex. 70 (ALGAT0000114034) (1/2019: Crosthwaite making sure Willard knows he "agreed to have dinner with Nick and Riaz"); Ex. 71 (ALGAT0003285214) (5/2019: Pritzker planning meeting with Valani and Willard).
[11] Ex. 107 (JLI11033856) (PAX Labs press release).
[12] JLI Website, April 26, 2018, https://web.archive.org/web/20180426225130/https://www.juul.com/mission-values.

… Our objective is to provide the 38 million American adult smokers with meaningful alternatives to cigarettes while also ensuring that individuals who are not already smokers, particularly young people, are not attracted to nicotine products such as JUUL.[13]

Similarly, JUUL's website has, for much of its existence, proclaimed that JLI's "mission is to transition the world's billion adult smokers away from combustible cigarettes."[14]

One of JUUL's "Key Corporate Messages" stated: "We market our products responsibly and follows [sic] strict guidelines so that material is exclusively directed towards adult smokers and never to youth audiences." Ex. 72 (JLI06661407). The Founders reviewed this Key Message and participated in media training with a public relations firm on how to communicate its messages to the public.[15] Defendants repeatedly communicated this (false) message to the public. For instance, a March 14, 2018, post on JUUL's twitter account stated: "We market our products responsibly, following strict guidelines to have material directed exclusively toward adult smokers and never to youth audiences." Ex. 73 (JLI00684459).[16] The same message was communicated in May 2018 to a parent that inquired about JUUL orders placed by their daughter. Ex. 74 (INREJUUL_00036432). The statement was also posted on JUUL's website.[17]

In a June 15, 2018, letter to the FDA, JLI represented that "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to

---

[13] Ex. 108 (Richardson Ex. DX 2).

[14] JUUL Labs, Inc., *Our Mission* (2020), https://web.archive.org/web/20200405092451/https://www.juul.com/mission-values

[15] Ex. 75 (JLI06661405); Ex. 76 (JLI06661406); Ex. 72 (JLI06661407); Ex. 77 (JLI11864641); Ex. 78 (JLI11864642); Ex. 79 (JLI45500221); Ex. 80 (JLI45500223); Ex. 81 (JLI45500227). Bowen and Monsees also vetted and revised JLI's response in July 2017 to a "Northwestern student" that included this language. Ex. 82 (JLI01120481); Ex. 83 (JLI40349449).

[16] The same or nearly the same language appeared in JUUL social media posts in at least February, March and July of 2018. Ex. 84 (JLI00682788); Ex. 85 (INREJUUL_00114839); Ex. 86 (JLI01047512); Ex. 87 (JLI00682979); Ex. 88 (JLI00684219).

[17] Ex. 89 (JLI04311776); *Our Responsibility*, JUUL Labs, Inc. (July 26, 2018), https://web.archive.org/web/20180726021743/http://www.juul.com/our-responsibility ("We invest our time and resources in new ways to deliver JUUL exclusively to adult smokers…."); https://web.archive.org/web/20180726021743/https://www.juul.com/our-responsibility ("We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers. … We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. We invest our time and resources in new ways to deliver JUUL exclusively to adult smokers….").

youth."[18] On November 13, 2018, the Individual Defendants posted a "JUUL Labs Action Plan"

on the JUUL website, stating: "JUUL Labs is committed to improving the lives of the world's

one billion adult smokers," "[w]e don't want anyone who doesn't smoke, or already use nicotine,

to use JUUL products," and "[o]ur intent was never to have youth use JUUL products."[19] Days

later, Monsees stated: "We will never market to [underage consumers]. We never have."[20]

When Altria announced its $12.8 billion partnership with JLI in December 2018, Altria

immediately reinforced the mantra, touting "JUUL's mission to switch adult smokers to e-vapor

products" and that "Altria and JUUL are committed to preventing youth from using any tobacco

products."[21] In January 2019, the RICO Defendants (the Individual Defendants and Altria)

caused JLI to launch the deceptive "Make-the-Switch" campaign borrowed from Altria's

advertisements for Merit cigarettes. *See* Philip Morris Inc., *Today's the day to make the switch!*

(1996).[22] The goal was to "show the public-at-large that JUUL is a mission-driven company

seeking to improve the lives of the world's 1 billion adult smokers" in order to "inspire broad

gen-pop support for the JUUL mission." Ex. 90 (JLI11389086). Prior to launching the campaign,

on December 27, 2018, Kevin Burns, JLI's then-CEO, forwarded an e-mail to Pritzker and

Valani with "assets for the [Make the Switch] campaign including 20/60 radio spots and 30/60 tv

spots." The next day Valani directed which videos should be aired as part of the campaign." Ex.

91 (JLI10071280); Ex. 92 (JLI10071228).

In the following months, Altria disseminated millions of Make-the-Switch advertisements

in four main channels: package inserts, direct mailers, e-mail campaigns, and point-of-sale

advertisements. Altria distributed 20 million package inserts in Altria's L&M and Parliament

branded cigarettes and 30 million in Marlboro packages (the brand most popular with youth). Ex.

---

[18] Ex. 330 (JLI01143553).

[19] Ex. 331 (JLI01413814) (*JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018)). *See* Ex. 93 (Burns Ex. 8505) (Action Plan included in November 6, 2018 "Board of Directors Discussion" materials).

[20] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/?sh=661cede614f9.

[21] Ex. 351 (Longest Ex. 471).

[22] https://www.industrydocuments.ucsf.edu/docs/pjxy0157

1   94 (Longest Dep.) at 189:11-191:2, 193:7-11;[23] Ex. 95 (Garnick Dep.) at 143:2-143:10

2   (confirming Marlboro's popularity with youth). Altria sent 15,000 e-mails in February 2019,

3   250,000 e- in March 2019, and 52,000 in June 2019. Ex. 94 (Longest Dep.) at 338:6-339:25,

4   362:9-12.[24] Altria also mailed 1.5 million Make-the-Switch direct mailers in March 2019, 2.5

5   million Make-the-Switch direct mailers in September 2019, and 3.8 million direct mailers in

6   December 2019 touting that JUUL was "designed for smokers." *Id.* at 258:6-20, 306:22-307:8,

7   318:3-13.[25] This latest came even after the FDA halted the Make-the-Switch campaign. Ex. 96

8   (ALGAT0005410671) (Valani sending Crosthwaite FDA's warning letter about Make-the-

9   Switch, while Crosthwaite was still at Altria). Altria also placed Make-the-Switch advertising in

10  stores across the nation. Ex. 97 (Daviduke Sept. Dep.) at 650:16-651:7; Ex. 98 (JLI10343911)

11  (before and after Altria's sales visit, showing Make-the-Switch signage installed). Demonstrating

12  that the campaign was more about public relations than actually converting adult smokers, the

13  redemption rates for these JUUL advertisements were abysmally low: redemption rates ranged

14  from a high of 1.8% for the first direct mail campaign to 0.0071% and 0.0053% for later

15  mailings. Ex. 94 (Longest Dep.) at 511:20-518:16, 272:23-273:6 (from her previous experience

16  working on Altria's direct mail campaigns, she is more used to seeing redemption rates "in the

17  double digits"). Defendants explained low redemption rates for the L&M and Parliament

18  package inserts due to the "age and income demographics" of those customers—i.e., Defendants

19  knew they were older than JUUL's young customer base. Ex. 106 (Longest Ex. 436).

20          With the deceptive Make-the-Switch campaign ongoing, Monsees represented to

21  Congress on July 25, 2019 that Defendants "never wanted any non-nicotine user, and certainly

22  nobody under the legal age of purchase, to ever use JLI products. … Our company has no higher

23  ─────────────────────

[23] Ex. 99 (Longest Ex. 455) (inserts read "Switching can be simple. JUUL is a satisfying
24  alternative to cigarettes for adult smokers" and "Try the satisfying alternative to cigarettes").
[24] Ex. 100 (Longest Ex. 452) (June email campaign saying "Pat smoked for 34 years and switched
25  to JUUL in 2017. 'I was looking to find something to replace cigarettes. The switch was easy.'"
    and "JUUL is a satisfying alternative to cigarettes"); Ex. 101 (Longest Ex. 448) (February email);
26  Ex. 102 (Longest Ex. 449) (March email).
[25] Ex. 103 (Longest Ex. 440) (March mailer); Ex. 104 (Longest Ex. 445) (September mailer); Ex.
27  105 (Longest Ex. 453) (December mailer); *see also* Ex. 94 (Longest Dep.) at 90:23-91:20
    (confirming the direct mailers were sent via USPS).

28

priority than combatting underage use."[26] In August 2018, Monsees told the *New York Times* that selling JUUL products to youth was "antithetical to the company's mission."[27] Bowen also stated that JLI had tried to make JUUL "as adult-oriented as possible."[28] On September 19, 2019, the following statement appeared on JLI's website: "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes."[29] On September 25, 2019, Defendants placed a similar message on the website, claiming that JLI's "mission since it was founded" has been to switch adult smokers to JUUL.[30] In an October 14, 2019, letter to Senator Durbin, Altria defended its partnership with JLI, representing that its investment in JLI "would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products."[31] For years, the JUUL website has falsely stated: "JUUL was designed with adult smokers in mind."[32]

As detailed below, Defendants' statements that they were focused exclusively on helping adult smokers switch from combustible cigarettes were false. Defendants committed thousands of acts of mail and wire fraud by disseminating those statements over a span of several years.

---

[26] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. 1 (2019), https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-GouldA-20190725.pdf.

[27] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times, Aug. 27, 2018, https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.htm.

[28] *Id.*

[29] *Consumer Update: 9/19*, JUUL Labs, Inc. (Sept. 19, 2019), https://www.juullabs.com/about/newsroom/page/6/

[30] Ex. 332 (5185927880) ("Juul Labs Names New Leadership, Outlines Changes to Policy and Marketing Efforts").

[31] Ex. 333 (5185547864) (Letter from Howard A. Willard III, Altria, to Senator Richard J. Durbin (Oct. 14, 2019)) at 6.

[32] https://web.archive.org/web/20180525185816/https://www.juul.com/shop/devices (May 25, 2018); https://web.archive.org/web/20200125185518/https://www.juul.com/shop/devices (January 25, 2020).

- 15 -

**C.**     **In reality, from the beginning Defendants intentionally positioned the company to create and benefit from a new market of non-nicotine users, including youth.**

**1.**     **The JUUL device was designed to be sleek, to deliver more nicotine than was necessary to switch adult smokers, and with catchy features that were clearly appealing to youth.**

Bowen and Monsees designed JUUL to deliver massive amounts of nicotine—more than was needed to switch adult smokers—and gave JUUL an appearance, flavors, and special features that appealed to youth.

Under Bowen's leadership, JLI conducted studies that confirmed JUUL's nicotine benzoate formulation delivered large doses of nicotine to a user's blood stream much faster than a combustible cigarette, significantly amplifying JUUL's "buzz" (and the risks of abuse and addiction). Ex. 113 (INREJUUL_00002903); Ex. 140 (Asseily Ex. 11002) ("A single hit from a JUUL is like a lot of puffs from a cigarette."). In 2014, JLI's Board discussed Phase 0 and Phase 1 pharmacokinetic nicotine studies showing potency of the 2% formulations tested. Ex. 115 (Valani Ex. 40075) (July 9, 2014 Board deck) at slides 25, 27; Ex. 141 (Valani Ex. 40073) (May 2014 Board deck) at slides 2, 28, 33; Ex. 143 (Valani Ex. 40074) at 25943 & slides 4, 7. Per Monsees, JUUL testing produced higher nicotine levels per puff "than any product on market." Ex. 143 (Valani Ex. 40074). Despite knowing that lower concentrations satisfied adult smokers, Bowen and Monsees forged ahead with the 5% formulation.[33] Early consumer feedback confirmed that JUUL delivered more nicotine than adult smokers wanted or needed. Ex. 145 (Dunlap Ex. 29004) (consumers wanted "low/no nicotine pods," "[a]s soon as they release the new pods with lower nicotine levels, the market is theirs;" "[W]ish you built in a rate limiter").

JLI also incorporated and marketed certain design features that, while ostensibly unrelated to nicotine delivery, were sleek, cool, and mysterious, and attractive to a wide audience of potential users, including youth. The JUUL device is small, easily concealed, and looks like a flash drive—not a cigarette. Ex. 146 (Grunberg Sept. 2021 Rpt.) at 106. Bowen testified that

---

[33] Defendant Huh also contributed to the JUUL product design, working with JLI's Research & Development team, including on the product's nicotine profile, consulting with specialists on "pharmacokinetic and pharmacodynamic profile of the JUUL platform in delivering nicotine." Ex. 144 (Huh Dep.) at 51, 104, 128.

- 16 -

1  "our goal was to create – was to design the product such that people wouldn't know what it is."

2  Ex. 3 (Bowen Dep.) at 198. Bowen testified further that JUUL was designed to be "discreet," to

3  "be used in a way that would not draw – draw attention," and that he sought to make the device

4  quieter for when he was "trying to be stealthy." *Id.* at 193-94, 196; Ex. 147 (Bowen Ex. 11122).

5  The covert nature of JUUL products, their sleek, high-tech design, and the fact they looked

6  nothing like a cigarette all contributed to youth uptake of JUUL. Ex. 146 (Grunberg Sept. 2021

7  Rpt.) at 105-09; Ex. 148 (Halpern-Felsher Sept. 2021 Rpt.) at 76; Ex. 149 (Coates Dep.) at 45:1-

8  18 (noting the "covert element" of JUUL as one reason why "JUUL is a particular problem" "in

9  SFUSD schools"). The device also would light up in "party mode," which appealed to youth. Ex.

10  148 (Halpern-Felsher Sept. 2021 Rpt.) at 54-58.

11  **2.**    <u>**Defendants deceived the public regarding how addictive JUUL was.**</u>

12  Having developed JUUL to provide a wide range of potential consumers with palatable

13  access to high nicotine concentrations, JLI sought to deceive those potential consumers regarding

14  the highly addictive nature of JUUL.

15  The Individual Defendants knew, prior to JUUL's launch, not only that JUUL products

16  contained nicotine, but that the product's nicotine delivery profile raised valid health concerns.

17  Pritzker acknowledged in January 2015 that "there will be valid health concerns around the [e-

18  cigarette] product and potentially strict liability." Ex. 151 (Pritzker Ex. 14009). They knew that

19  JUUL's proprietary "5%" nicotine salt formulation was "capable of delivering larger doses of

20  palatable nicotine than combustibles and other products on the market" at JUUL's launch. Ex.

21  152 (Shihadeh Rpt.) at 17-18. JLI's Phase 0 study "indicated that *4%* benzoate … in the hands of

22  an experienced user, could easily exceed the pharmacokinetic profile of a Pall Mall cigarette."

23  *Id.* at 35 (emphasis added).

24  Although the Individual Defendants claimed the 5% formulation was necessary to

25  achieve the buzz required to attract adult cigarette smokers, consumer research commissioned by

26  JLI in 2014 found that the least important product attribute for the adult smokers and non-

27  smokers in that group was "buzz." Ex. 153 (JLI00365176); *see* Ex. 154 (JLI00364487) (results

28

1    of same research distributed to upper management, including then-CEO Monsees); *see also* 155

2    (INREJUUL_00245835) (Bowen, Monsees and others discussing, in May 2018, internal study

3    showing test subjects reported similar levels of satisfaction at 1.7%, 3% and 5% nicotine levels).

4    JLI also discussed the need for a dosage control mechanism but incorporated no such feature

5    with JUUL. Ex. 140 (Asseily Ex. 11002); Ex. 18 (Dunlap Dep.) at 354, 410 (stating that feature

6    such as "kill switch was something that was easily possible" and "technologically feasible" but

7    JLI "put it on our backlog, which is what we called the features we could build someday"). In

8    addition, nicotine spikes resulting from inserting a new JUUL pod or manipulating the product,

9    i.e., "pod popping"—practiced by two-thirds of JUUL users according to JLI's internal data—

10   increased JUUL's addictiveness. Ex. 152 (Shihadeh Rpt.) at 28-30; Ex. 156 (Rpt.) at 4; Ex. 120

11   (Eissenberg Rpt.) at 138-139.

12       Despite the above, Defendants failed to include warning labels on JUUL (despite making

13   numerous revisions to the products' packaging) until forced to do so in May 2018. Ex. 150

14   (INREJUUL_00444332) (2015 image of JLI packaging); Ex. 120 (Eissenberg Rpt.) at 33.

15   Defendants also failed to adequately disclose JUUL's unique nicotine delivery profile, including

16   spikes in nicotine delivery that greatly increased JUUL's abuse liability. Those decisions were

17   incompatible with JLI's claim that it was only targeting adult smokers. A warning label would be

18   familiar to adult smokers. Nicotine-naïve youth and young adults, however, might have been

19   deterred, to the detriment of JLI's bottom line. Even when Defendants were forced to include a

20   warning on the labels in 2018, they never fully disclosed the unique properties of JUUL that

21   increased the products' addictiveness.

22       Each RICO Defendant was a knowing participant in this scheme. As discussed above,

23   JUUL's nicotine content and delivery profile was discussed within JLI. *See* Ex. 22 (Valani Ex.

24   40081) (Monsees, Pritzker, and Valani discussing "the addiction concern (particularly in

25   relationship to kids)"). Bowen personally participated in studies regarding the nicotine content of

26   JUUL pods. Ex. 113 (INREJUUL_00002903); Ex. 142 (INREJUUL_00350930); Ex. 157

27   (INREJUUL_00024437). Monsees, Pritzker, and Valani knew about JUUL nicotine content and

28   potency through direct communications with Bowen and through JLI-commissioned consumer

research provided to management. Ex. 143 (Valani Ex. 40074); Ex. 22 (Valani Ex. 40081); Ex. 144 (Huh Dep.) at 51, 104, 128; Ex. 154 (JLI00364487); Ex. 115 (Valani Ex. 40075). In July 2015, JLI Board member Alex Asseily advised that they should "accept that we must put legal disclaimers on our products because long term studies have yet to conclude anything definitive on vaping products like ours." Ex. 158 (Valani Ex. 40106). And, in April 2018, Pritzker's son-in-law lamented the lack of warnings in a private family email exchange, demanding that JUUL "[i]nclude warning labels on the package about the level of nicotine in the product, that [n]icotine is highly addictive, and that JUUL delivers so much nicotine so rapidly that new users become addicted quickly." Ex. 159 (Regan Pritzker Ex. 18517).

Altria, too, was familiar with JUUL's nicotine content and delivery both from its own e–cigarette product and from its own pharmacokinetic testing of JUUL. Ex. 160 (Willard Dep.) at 595:15-601:1 (awareness of amount of nicotine in product); Ex. 161 (ALGAT0002412177) at slide 11 (2017 Altria presentation reporting JUUL's nicotine per puff); Ex. 162 (Willard Ex. 52) at slide 105 (Altria's highest nicotine product, the MarkTen Bold, offered only 4% nicotine-content, "nicotine delivery at levels approaching that of cigarettes").

### 3. The JUUL Board positioned JUUL to be cool, hip, and appealing to youth.

#### a. Before launch, Defendants discussed how to get JUUL products into the hands of "everyone," including by promoting the product as "cool, responsible, safe," and "chill."

In December 2014, Alex Asseily, future Pritzker-representative Board member, discussed JUUL's design and marketing strategy. Asseily commented that, combined with JUUL's emphasis on product design that would set JUUL apart from other tobacco products on the market, JUUL marketing should seek to capture the "moment … of wonder that exists when someone who would never seek out your products is nonetheless enchanted when they are introduced to it." Ex. 163 (Pritzker Ex. 14018). The goal was to attract "people who don't seek but can be convinced to become customers." *Id.* Asseily continued: "a key element of marketing must be a seeding and viral programme that educates and empowers your early users to become evangelists wherever they go, and not to hide their discovery from anyone." *Id.* Pritzker

1   "completely agree[d]." *Id.* As JUUL's product launch approached, Valani, Pritzker, Asseily and

2   Frankel discussed JUUL branding and how JLI can "bring the pleasures of tobacco … to

3   everyone." Ex. 140 (Asseily Ex. 11002) (emphasis added). Asseily again emphasized the

4   importance of a "[s]eeding program … get the word out to the best people, inspire them to

5   become evangelists." *Id.* Pritzker appreciated Asseily's advice. *Id.*

6       Though the Individual Defendants knew JUUL presented "valid health concerns" (Ex.

7   151 (Pritzker Ex. 14009), Asseily noted that one of JUUL's "principles that we stand for" was

8   "cool, responsible, safe, chill," and he encouraged JLI to "own[]" the "[m]assive positive Public

9   Health impact" and "[s]ynchronise [public relations] with the [JUUL] guerilla campaign and

10  public health message." Ex. 140 (Asseily Ex. 11002). Frankel commented that "such a campaign

11  is kind of dangerous [because] it might be perceived we are healthier than cigarettes." Ex. 158

12  (Valani Ex. 40106). Yet, Defendants promoted JUUL in a manner that spread virally, increasing

13  JUUL's popularity and use among youth. Indeed, June 2015 Board materials indicate JLI chose

14  to delay "[e]xpanded safety & population related studies." Ex. 164 (Dunlap Ex. 29028).

15      As indicated in pre-launch discussions, Defendants were not interested in further

16  confirmation of the negative health impact of JUUL. Ex. 165 (Joby Pritzker Ex. 15004) ("[l]et

17  others do the research"). They promoted JUUL as a healthy alternative to smoking despite a lack

18  of scientific support. When public outcry and regulatory scorn forced Defendants to modify

19  marketing, they nonetheless continued to convey to consumers that JUUL was a safe alternative

20  to cigarettes through marketing campaigns such as Smoking Evolved and Make the Switch.

21          **b.**    **The JUUL launch campaign set out to make young, influential**
            **trendsetters JUUL "evangelists."**
22

23      Consistent with Asseily's advice, the Individual Defendants positioned JUUL as cool,

24  hip, safe, and appealing to youth. In addition to a sleek, easily concealed product design that

25  appealed to consumers' interests in a tech lifestyle, Ex. 120 (Eissenberg Rpt.) at 37, 69-70, and

26  product packaging that "evoke[d] themes of status, health and freshness, excitement, and …

27  health and innocence." Ex. 146 (Grunberg Sept. 2021 Rpt.) at 105, Defendants developed a

28  marketing plan to further those perceptions. Per Dr. Chandler: "As it prepared for its launch in

1    2015, JUUL adopted advertising strategies to grow a hip, viral product that would appeal

2    especially to youth." Ex. 166 (Chandler Sept. 2021 Rpt.) at 9. In January 2015 the JLI Board

3    debated their "comfort level" with how nicotine would be marketed. Ex. 24 (JLI01121750).

4    Apparently, they were comfortable with it. *See id.* The January 2015 Board presentation on

5    launch plans included a partnership with the No. 1 youth media magazine, *Vice*. Ex. 23 (Pritzker

6    Ex. 14020). "Key pillars" of the launch plans included "win[ing] with the 'cool crowd' in critical

7    markets," "us[ing] external audiences to communicate nuanced messages around early adoption

8    'coolness' and product performance," and "build[ing] loyal consumer community via social

9    media"—a media channel dominated by youth. *Id.* The goal was the "own the 'early adopter'/

10   'cool kid' equity" and use "the voices of influencers" to "build strong demand." Ex. 126 (Walker

11   Ex. 602); Ex. 167 (JLI00218454) (listing entertainment options for JUUL launch parties

12   including a "downtown cool kid and big social media following" and other "models and cool

13   kids"); Ex. 168 (JLI00475310) (laying out influencer strategy for JUUL including "local heroes"

14   who are the "cool kid at school or the [c]aptain of the local football team"). JLI and the

15   Individual Defendants sought to "position JUUL as a cool brand and unique product," "drive

16   product trial," and "generate e-commerce sales." Ex. 166 (Chandler Sept. 2021 Rpt.) at 10.

17        The Individual Defendants employed several tactics that made combustible cigarettes

18   remarkably successful, including among youth. For example, as part of JUUL's first major ad

19   campaign, called Vaporized, Defendants utilized billboard advertising featuring both roadside

20   billboards in select cities and massive digital billboards in Times Square. *See id.* at 23-24. With

21   initial placements in New York and Los Angeles, the Vaporized campaign utilized young-

22   looking trendy models, in fun, dynamic poses with bright-bold colors. *See* Ex. 1 (Drumwright

23   Sept. 2021 Rpt.) at 7, 54-61; Ex. 148 (Halpern-Felsher Sept. 2021 Rpt.) at 71-75; Ex. 169

24   (Pritzker Ex. 14033). Defendants also advertised at retail locations frequented by adolescents.

25   For example, the Defendants placed counter displays at convenience stores and gas stations near

26   the check-out register next to candy and bubble gum that played a looping video of the

27   Vaporized models having fun and dancing with JUUL. Ex. 1 (Drumwright Sept. 2021 Rpt.) at 7,

28   20-22, 76; Ex. 170 (Ribisl Sept. 2021 Rpt.) 35, 60-77 (discussing JLI's push to expand JUUL's

1   retail marketing presence and knowledge that underage youth were purchasing JUUL at

2   convenience stores); *see also* Ex. 171 (Richardson Ex. 5005) (2012 Report of the Surgeon

3   General, Chapter 5, discussing role of convenience stores in tobacco marketing).

4        In March 2015, JLI's Board—Bowen, Monsees, Valani, Pritzker, and Handelsman—

5   received information that "Influencer Marketing has begun" and approved specific marketing

6   materials used in JUUL's launch. Ex. 172 (Pritzker Ex. 14023). The JLI Board reviewed

7   Vaporized marketing images and made "some commentary at the youthfulness of the models[,]"

8   but "nobody disliked them" and "everybody agreed they are pretty 'effective[.]'" Ex. 173

9   (Mumby Ex. 4074); *see* Ex. 140 (Asseily Ex. 11002) (JUUL marketing "show[s] hip young

10  people" and "hot and hip millennials looking cool with the product"). Bowen, Monsees, Pritzker,

11  and Valani knew that the ads targeted youth but signed off on the company's launch plans. Ex.

12  18 (Dunlap Dep.) at 88-89, 92, 143, 318. ████████████████████████████

13  ██████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████

15       JUUL's launch campaign featured experiential marketing—an effective strategy for an

16  addictive product. Ex. 1 (Drumwright Sept. 2021 Rpt.) at 7, 17-20, 68-71. Mimicking Big

17  Tobacco, Defendants held high-profile, trendy sampling and tasting events complete with DJs,

18  open bars, and guests lists full of young lifestyle and culture influencers. Ex. 175 (Berger Ex.

19  52005). The first JUUL "launch party," June 2015 in New York City, resulted in significant

20  reach: more than 200 press attendees; more than 100 "influencers," professionally photographed;

21  and 200 attendees who touched an additional 26,000 people via social media. Ex. 166 (Chandler

22  Sept. 2021 Rpt.) at 13. JLI invited youth, including several who were under the legal drinking

23  and/or smoking age in New York City; introduced them to Bowen and Monsees; provided them

24  with free drinks; and encouraged them to take as much free JUUL product as they could carry.

25  Ex. 176 (Wakefield Sworn Statement); Ex. 177 (Chandler Jan. 2022 Rpt.) at 24-43. JUUL

26  worked with "a casting director … who specializes in youth recruiting, imagery, and lifestyle

27  branding." Ex. 177 (Chandler Jan. 2022 Rpt.) at 24-26. One 17-year old attendee tweeted about

28  the event and JUUL "liked" her tweets to amplify the message. Ex. 166 (Chandler Sept. 2021

Rpt.) at 16-22. As intended, these attendees, including one with over 12,000 followers on youth-dominated Instagram, then spread the word about JUUL amongst their friends. Ex. 176 (Wakefield Sworn Statement) at 38-41; Ex. 177 (Chandler Jan. 2022 Rpt.) at 33, 41-48.

**c.    Once JUUL became cool, the Board poured resources into expanding the brand image on social media and through other aggressive marketing efforts.**

The Individual Defendants pushed aggressively to create evangelists for the JUUL, particularly by encouraging and facilitating JUUL promotion on social media channels known to be popular with youth. Following the June 2015 launch party, JLI organized, promoted, and executed several more promotional JUUL sampling events targeting young trendsetters, including several events in California. Ex. 175 (Berger Ex. 52005). JUUL products were also promoted and sampled at events headlined by PAX products. *Id.* For example, during the August 2015 Outside Lands festival—held annually in San Francisco—JLI held a surprise "after party" where it handed out JUUL starter kits. *Id.* at 117037. The event garnered 594,000 impressions on Instagram and 423,000 timeline deliveries on Twitter. Ex. 178 (PAXMDL00130847) at 130858. JLI celebrated the reach of its 2015 promotional sampling events in a recap video circulated within JLI highlighting the campaign's broad reach: 12 states, 20 cities, 41,567 start kits distributed, 88,540 coupons distributed, 51 events, 207,520 consumer interactions, 336,567 consumers samples, and 466,000 onsite sampling impressions. Ex. 179 (Richardson Dep) at 446:06-448:24 (discussing Richardson Ex. 5037).[34]

JLI also used influencers to push JUUL products online. JLI actively cultivated social media influencers by providing artists, models, and entertainers with incentives such as highly discounted products to promote JUUL on social media. Ex. 166 (Chandler Sept. 2021 Rpt.) at 30-32, 35-39, 53-56; Ex. 1 (Drumwright Sept. 2021 Rpt.) at 7, 61-68. Some influencers were underage themselves, such as Luka Sabbat, who promoted JUUL at age 17. Ex. 166 (Chandler Sept. 2021 Rpt.) at 29-30; Ex. 1 (Drumwright September 2021 Rpt.) at 62-63. JLI also courted Katy Perry, who had more than 90 million Twitter followers and 51 million on Instagram, social media platforms that skew young. Ex. 1 (Drumwright Sept. 2021 Rpt.) at 63, 74. JLI got to Perry

---

[34] The precise numbers appear in a video exhibit that Plaintiff is prepared to lodge with the Court.

1   by "seeding" her hair stylist, and after she was photographed with JUUL at the Golden Globes,

2   Bowen commented: "Glad to hear we were behind this." Ex. 180 (Richardson Ex. 5061). JLI's

3   celebrity influencer program generated a social media reach of over 175 million and an "earned

4   media" reach of over 600 million. Ex. 181 (Richardson Ex. 5062) at 386643.

5       JLI also took direct action on social media to advertise. JLI had corporate accounts on

6   Instagram, Twitter, Facebook, and YouTube, all of which are popular among adolescents. Ex.

7   148 (Halpern-Felsher Sept. 2021 Rpt.) at 87. Hashtags such as #JUUL and #juulvapor were

8   pervasive on social media platforms such as Twitter and Instagram, and JUUL dominated the

9   social media conversation around vaping, including in San Francisco. *Id.* at 120-21; Ex. 177

10   (Chandler Jan. 2022 Rpt.) at 62-72. JUUL hashtags amplified JUUL's own advertising and

11   encouraged users to create their own hashtags, further expanding the reach of JUUL's social

12   media content. Ex. 166 (Chandler Sept. 2021 Rpt.) at 39-44, 46-48; Ex. 156 (Prochaska Rpt.) at

13   66. Thanks to Defendants' efforts, the number of JUUL-related tweets exploded between early

14   2017 and the end of 2018. Ex. 166 (Chandler Sept. 2021 Rpt.) at 74-80. The number of JUUL

15   tweets strongly correlated with JUUL's retail sales, as both increased exponentially over that

16   period. Ex. 166 (Chandler Sept. 2021 Rpt.) at 77-78; Ex. 182 (Cutler Sept. 2021 Rpt.) at 14-15.

17       Defendants knew that social media users were disproportionately youth. Ex. 148

18   (Halpern-Felsher Sept. 2021 Rpt.) at 79-87. Indeed, even prior to running the Vaporized

19   campaign, Bowen and JLI knew that at least 30% of JUUL's website traffic was ages 18-24. Ex.

20   183 (Cohen Ex. 26070). Shortly after JUUL's launch, then-COO Dunlap reported to Monsees

21   concerning signs regarding the company's use of social media and indications of youth JUUL

22   usage. Ex. 18 (Dunlap Dep.) at 99:5-101:22.

23       **D.**     **Despite clear signs that JUUL was creating a youth nicotine epidemic, the JLI**
24            **Board stressed aggressive sales growth and increased product distribution at**
              **all costs.**

25       Inside JLI, confirmation that JUUL appealed strongly to youth came almost immediately

26   after JUUL's launch. Dunlap agreed that "a number of data points that came into the company"

27   in the months following JUUL's launch raised concerns of youth using JUUL. Ex. 18 (Dunlap

28   Dep.) at 93:8-96:18; *see also id.* at 304-05 (signs of youth use "came up in … the weekly board

meetings" around JUUL's launch). For example, JLI's June 2015 Board meeting minutes note a discussion of the "JUUL launch" and "approach to advertising and marketing and portrayal of the product, which led to a discussion of the Company's longer-term product strategy led by Mr. Monsees." Ex. 220 (JLI01426553) at 4. A June 2015 internal social media report titled "Voice of the Consumer" showed consumer feedback from social media sites heavily used by youth. Ex. 145 (Dunlap Ex. 29004) at 7 ("Might make for an excellent stealth vape").

In late June 2015, Dunlap emailed JLI's Chief Marketing Officer about a theme in recent JLI Board meetings, namely a "trend in a line of questions about 'are we sure the current brand for JUUL is the right one.'" Ex. 221 (INREJUUL_00055999). Dunlap recounted comments from Pritzker and Valani during Board meetings that the JUUL brand "'feels too young.'" *Id.* Dunlap "advised the company to slow down and take the time needed to fix the problems" with JUUL, including concerns about youth access and appeal. Ex. 18 (Dunlap Dep.) at 309:20-310:4. Alexander Asseily "spoke to James [Monsees]" and Pritzker and Valani "at length" on the "JUUL approach." Ex. 222 (JLI00214617). Asseily told Pritzker and Valani that "our fears around tobacco/nicotine are not going away…. [T]hese substances are almost irretrievably connected to the shittiest companies and practices in the history of business." *Id.* He stated that "an approach needs to be taken that actively, if implicitly, distances us from [Big Tobacco]: what we say, the way we sell, the way we run the company, what we emphasi[z]e, who we hire, etc." *Id.* That "could mean not doing a lot of things we thought we would do like putting young people in our poster ads." *Id.* He pushed for an alternative marketing plan targeting only "existing smokers" and laid out a vision for the company "making products based in science and with a state goal of doing right by our customer." *Id.*

But Defendants rejected calls to slow down or rebrand with integrity because they "understood that the long-term benefit of young users on [JLI's] bottom line was something that would make [JLI] more profitable." Ex. 18 (Dunlap Dep.) at 259:23-260:4. Defendants "were very aggressive, [it] was sales grows at all costs." *Id.* at 247:10-248:13. The concern was not JUUL's impact on youth, but "hitting sales numbers." *Id.* at 247:10-20. As it had been since the beginning, "the overriding goal and objective of the board of directors was sales, increasing sales

1   over almost anything else." *Id.* at 258:6-13. In fact, former COO Dunlap testified he "cannot

2   come up with one conversation where that wasn't the case." *Id.* at 258:6-13.

3         Rejecting calls for a new direction, Defendants ensured that JLI would continue pursuing

4   the youth market. In October 2015, Monsees became Chief Product Officer, and the ODDs

5   appointed themselves as an Executive Committee to run JLI in the place of a CEO. Ex. 25

6   (Valani Ex. 40100). The ODDs continued to push marketing that they knew was appealing to

7   youth and dismissed dissenting voices in management. Ex. 225 (INREJUUL_00178377) (Huh

8   approving branding changes); Ex. 223 (JLI00219757) (same); Ex. 18 (Dunlap Dep.) at 176:23-

9   177:9 (confirming that Pritzker and Valani fired "anybody who wasn't in lockstep with them or

10  who didn't display the willingness or ability to keep pace"). Keeping the company's youth

11  marketing on track was critical to the Individual Defendants' goal of accelerating JLI's growth

12  and expanding its customer base and profits. Ex. 18 (Dunlap Dep.) at 259:23-260:4 (confirming

13  that company leaders "understood that the long-term benefit of young users on its bottom line

14  was something that would make it more profitable"). Indeed, when Mr. Dunlap was fired, he

15  asked Huh and Pritzker, "what are your intentions for the business?" *Id.* at 154:25-156:22.

16  Consistent with the company's mission from inception, Huh responded: "gross sales, our

17  intention is to get sales on track." *Id.*

18        Around this time, JLI's branding shifted from the explicitly youth–oriented Vaporized

19  campaign to a more subtle approach.[35] This new campaign, approved by Huh, did not venture too

20  far from Vaporized and included themes that previous litigation against the cigarette industry,

21  and Philip Morris in particular, proved were effective in increasing youth sales. Ex. 223

22  (JLI00219757); Ex. 224 (Drumwright Dep.) at 85:14-25. JLI also expanded the JUUL portfolio

23  in late 2015 and early 2016, adding several new products, despite clear evidence of youth use of

24  JUUL. Ex. 226 (JLI01363147). Further, JLI's extensive viral seeding, influencer campaign, and

---

25  [35] JLI did not pull Vaporized down out of any genuine intent to stop attracting youth. Rather, it
26  finally garnered too much negative press for even JLI to ignore. The final straw was an October 7,
    2015 airing of The Late Show that ridiculed JUUL's youth marketing and flavors. Ex. 179
27  (Richardson Dep.) at 546:11-19, 551:17-552:21; Ex. 227 (Richardson Ex. 5052); Ex. 228
    (Richardson Ex. 5054). JLI began bringing Vaporized materials down the following morning. *Id.*
28  However, Vaporized videos remained in store kiosks until 2017. Ex. 131 (Valani Dep.) at 324-25.
    Valani admitted that JLI could have pulled Vaporized six months earlier. *Id.* at 326:17-21.

direct promotion and interactions on social media resulted in prolific online conversation and promotion of JUUL among youth. Ex. 148 (Halpern-Felsher Sept. 2021 Rpt.) at 87, 120-21; Ex. 177 (Chandler Jan. 2022 Rpt.) at 62-72. The number of JUUL-related tweets exploded between early 2017 and the end of 2018. Ex. 166 (Chandler Sept. 2021 Rpt.) at 74-80. JLI's efforts paid off. By 2018, JLI had over 40% of the e-cigarette market. JUUL sales grew 135% from 2017 to 2019. Unsurprisingly, JUUL's meteoric sales increase strongly correlated with the increased number of JUUL-related tweets. Ex. 166 (Chandler Sept. 2021 Rpt.) at 77-78; Ex. 182 (Cutler Sept. 2021 Rpt.) at 15-16.

As youth use of e-cigarettes rose, Chris Olin, Pritzker's son-in-law, reacted as many outside JLI did: "I find the explosion in vaping among teens to be deeply disturbing as it is creating another generation of nicotine addicts." Ex. 135 (Olin Ex. 18509). Again and again, Defendants received confirmation that JUUL—the product that made smoking cool again—was responsible for the epidemic. For example, in April 2018, with negotiations between JLI and Altria ongoing, Valani and Pritzker, along with others at JLI, received a study detailing youth usage and social media engagement around JUUL. Ex. 229 (Valani Ex. 40118); Ex. 230 (Valani Ex. 40119); Ex. 231 (JLI21575209). The study confirmed that JUUL's meteoric rise was fueled by "trendy teen/young adults/Millennials whose use starts with Juul rather than cigarettes." Additional findings included:

- "The highest volume of those engaging around Juul are those who started with Juul and never smoked traditional cigarettes;"
- "Juul Owns Teens;"
- "Juul is The Most Popular Teen Behavior and Meme-driver With Fortnight The Only Challenger On The Horizon;"
- "Juul's hyper-growth and 50%+ market share coming in no small part from Teen Trend-Followers."

Ex. 230 (Valani Ex. 40119). But rather than express concern about growing evidence that JUUL was creating an epidemic of youth use, Valani downplayed the harms, telling Frankel "[a]mazing that kids can be trans but not buy Juuls." Ex. 354 (MDL_RV0038450).

### E.    Defendants exploited the youth appeal of flavored e-cigarettes.

When Congress passed the 2009 Family Smoking and Tobacco Control Act ("TCA"), it banned flavors other than tobacco in combustible cigarettes, a prohibition that the Surgeon

1  General three years later identified as a key factor in reduced youth tobacco use.[36] The TCA did

2  not initially apply to e-cigarettes. But by 2014, the proliferation of flavored e-cigarettes and

3  marketing led to legislators sounding the alarm,[37] and the FDA opened a notice and comment

4  period for a proposed rule that would deem e-cigarettes subject to federal regulation.

5      Aware of the risks flavored e-cigarettes posed to youth, the Individual Defendants sought

6  to profit from the lack of federal regulations governing e-cigarette marketing and flavors by

7  rushing several flavored JUUL products to market. *See* Ex. 18 (Dunlap Dep.) at 49:18-50:22,

8  53:17-54:15 (Pritzker and Valani were putting pressure on Dunlap and JLI to launch the JUUL

9  product as soon as possible, in part, to get the product out in advance of deeming regulations,

10  including any restrictions on marketing and flavors). Bowen oversaw JLI's pre-launch flavor

11  development and was the ultimate decision-maker on what flavors would be sold, including

12  JUUL's original four flavors (Tobacco, Fruit Medley, Creme Brulee, and Cool Mint), and the

13  three additional flavors JLI later introduced (Cool Cucumber, Mango, and Menthol). Ex. 3

14  (Bowen Dep.) at 155:03-158:03, 349:07-349:12; Ex. 110 (Atkins Dep.) at 272:08-13.

15      Consistent with the known risks of e-cigarette flavors to youth, Defendants anticipated

16  regulations limiting flavors in e-cigarettes, or prohibiting them entirely. *See* Ex. 232

17  (JLI08058644) (September 2013 Ploom Board of Directors draft slide deck).[38] JLI's head of

18  regulatory science, Gal Cohen, wrote that the "key issues" concerning the regulatory future of

19  flavors included (1) flavors' impact on youth initiation, and (2) flavors' role in adult smokers'

20  "transition & cessation." Ex. 233 (JLI00513149). Indeed, in June 2015, the Campaign for

21  Tobacco Free Kids contacted Defendant Valani with concerns about the teen appeal of flavored

22  products in JUUL's Vaporized campaign. Ex. 234 (Pritzker Ex. 14142). Four days later, Pritzker

23

---

24  [36] Office of the Surgeon General, U.*S. Department of Health and Human Services, Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General* (2012).

25  [37] See Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth* (Apr. 14, 2014),

26  https://www.durbin.senate.gov/imo/media/doc/Report - E-Cigarettes with Cover.pdf (JLI02260723).

27  [38] For example, in a March 2015 memorandum regarding the introduction of new JUUL flavors,

28  three of the memo's eight pages fall under a heading titled "Regulatory/Legal Analysis," and are fully redacted. Ex. 236 (INREJUUL_00044734).

1   wrote that flavored JUULpods were teen oriented and they needed to figure out "where we draw

2   the line." Ex. 235 (Pritzker Ex. 14042). Yet JLI did not remove any flavors, instead adding

3   Mango and other flavors to its portfolio. Ex. 182 (Cutler Sept. 2021 Rpt.), Ex. 11 at 47.

4        In 2016, JLI marketed JUUL's flavored pods on social media sites like Instagram and

5   Twitter, where, as of June 2017, almost 25% of the followers of JUUL's corporate account were

6   13-17 years old. Ex. 237 (Walker Dep.) at 137:6-13. Examples of JLI's flavor-based promotions

7   include "Beat The August Heat with Cool Mint," Ex. 348 (JLI00546938), and "Double tap if this

8   #JUULpod lets you endulge in dessert without the spoon." Ex. 239 (JLI00546996). On

9   Instagram, JLI further amplified the youth appeal of its marketing by adding the #juulnation tag

10  to an August 2017 promotion for Mint JUULpods, Ex. 238 (JLI00546938), which generated "a

11  lot of memes and ... imagery that was very appealing to young people" and accounts that

12  "participated in illegal activities where they sold JUULpods and gave away JUULpods for free"

13  through Instagram. Ex. 237 (Walker Dep.) at 370:8-18. At all times, the Board of Directors had

14  "final say" over JLI's marketing decisions, including JLI's flavor-based advertisements.[39]

15          **1.    After cultivating a market of new, young JUUL users, Defendants
                    conspired to preserve flavored JUUL products.**

16

17          On July 27, 2017, the FDA announced a plan for "regulating kid-appealing flavors in e-

18  cigarettes," which would begin with collecting data on "the role that flavors (including menthol)

19  in tobacco products play in attracting youth and may play in helping some smokers switch."[40]

20  Weeks later, a series of meetings were organized involving executives from Altria, JLI, Avail (an

21  Altria subsidiary) and others, to plan a response to the FDA and to develop "a coalition and

22  common agenda to influence or challenge the FDA's approach." Ex. 240 (Cohen Ex. 26073).

23  Avail offered to help "collect data for flavor ANPR" by supplying data on the demographics and

24  other characteristics of JUUL purchasers. Ex. 241 (JLI10679069) at 2. A second meeting

25  involving Altria, Avail and JLI executives concerning flavor regulations was scheduled for

---

[39] *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the H. Comm. on Oversight & Reform*, 116th Cong. 70 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.).

[40] FDA, *FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death* (July 27, 2017).

PLAINTIFF'S OPP  TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
CASE NO 19-MD-02913-WHO

1    Altria's offices on October 24, 2017. Ex. 110 (Xu Ex. 10004); Ex. 111 (Xu Ex. 10005). Within a

2    week of this second meeting, JLI and Avail entered a commercial relationship, with Avail to

3    serve as a "data supplier" for JLI. Ex. 109 (Gould Ex. 60) at 1. Following these meetings,

4    Pritzker and Valani maintained regular contact with Willard and Gifford, discussing the

5    regulatory landscape. Ex. 66 (Devitre Ex. 31515); Ex. 242 (Pritzker Ex. 14091).

6         In March 2018, the FDA published an Advance Notice of Proposed Rulemaking (the

7    "Flavor ANPRM"), seeking "studies or information regarding the role of flavors (other than

8    tobacco) in initiation and/or patterns of use of noncombusted tobacco products, particularly

9    among youth and young adults."[41] By this point, JLI and Altria knew that most of JUUL's

10   purchasers were not adult smokers, and that JUUL's flavored products were overwhelmingly

11   being purchased by youth and young adults. Ex. 156 (Prochaska Rpt.) at 76-83 (reviewing

12   evidence in detail, including that 603 transactions were made the week of the buyer's 18th

13   birthday and the data also reflected evidence of diversion and reselling); Ex. 243 (Xu Dep.) at

14   225:10-15 (JUUL user demographics data elicited a strong reaction from Altria executives).

15        These findings were reinforced by JLI-commissioned studies, which further confirmed

16   that youth were driving JUUL flavor sales. In April 2018, McKinsey conducted a "Youth Flavor

17   Study" and found Mint and Mango to be very popular flavors among the more than 600 13- to

18   17-year-olds surveyed, trailing only "Cotton Candy" and "Gummy Bears." Ex. 244 (Pulido Ex.

19   47005) at slides 3, 11. This study corroborated prior JLI research, which found "that former

20   menthol smokers are not the driver behind the popularity of mint flavored products." Ex. 245

21   (JLI00105221) at 89.

22        In July 2018, JLI submitted its response to the Flavor ANPRM, but omitted the

23   information and studies it had collected on the e-cigarette flavor preferences of youth and young

24   adults through Avail, McKinsey, and other sources. Ex. 246 (JLI01148265). Instead, JLI

25   suggested that "more work" was needed to understand the risks JUUL's flavors posed to youth

26   and young adults. *Id*. In the same breath, JLI told the FDA that JUUL flavors were effective in

27   helping adult smokers switch from combustible cigarettes to e-cigarettes, a claim based on a

28   ---
     [41] FDA, *Regulation of Flavors in Tobacco Products*, 83 Fed. Reg. 12,294 (Mar. 21, 2018).

1 single, cherry-picked study that JLI's Vice President of Regulatory and Clinical Affairs refused

2 to sign, "because we had no data at the time that said that flavors had an impact" on smoking

3 rates. Ex. 247 (Rouag Dep.) at 622:3-7. JLI's ANPRM comments were eventually signed, not by

4 a scientist, but by JLI's General Counsel Ashley Gould, who ultimately received $82 million

5 from the Altria investment. Ex. 248 (Gould Dep.) at 62:16-24.

6         **2.**    **Weeks before Altria's $12.8 billion investment in JLI, Defendants**

7               **conspired to keep JUUL's most popular flavor, mint, on the market,**
              **by falsely claiming it was a traditional tobacco flavor that helped adult**

8               **smokers switch from combustibles.**

9       On September 7, 2018, JLI CEO Kevin Burns wrote to FDA Commissioner Gottlieb,

10 seeking a meeting to discuss JLI's "youth prevention efforts and the opportunity to switch more

11 adult smokers from combustible cigarettes." Ex. 249 (INREJUUL_00298614). He also told the

12 Commissioner that users of flavors such as Mango and Mint "stop using cigarettes completely at

13 higher rates than those using tobacco products." *Id.* at 615. These statements failed to make any

14 mention of the data, known to JLI, showing that Mint was driving an epidemic of youth vaping.

15       On September 12, 2018, the FDA sent Altria and JLI letters requesting detailed action

16 plans "to address and mitigate widespread use by minors." Ex. 250 (JLI01378208) at 210; Ex.

17 251 (Willard Ex. 36) at 3. The day after receiving the FDA's letter, JLI held an emergency board

18 meeting to consider responses to the FDA's request. Ex. 252 (JLI41398032). Pritzker and Valani

19 were instrumental in developing JLI's response to the letter, and met daily in the week leading

20 up to the meeting with the FDA. Ex. 118 (JLI10519903).

21       Altria, also concerned about the letter, recognized that JUUL products were at the heart

22 of the issue: "it was identified that what was contributing to the youth issue were pods and

23 nontraditional flavors. By that I mean flavors other than tobacco and menthol." Ex. 253 (Garnick

24 FTC Dep.) at 102:18-21. Instead of disclosing what it knew, Altria recommended that the FDA

25 remove all flavored products from the market except for Tobacco, Menthol, and Mint (which

26 Altria characterized as a menthol variant). Ex. 352 (Garnick Ex. 2332); Ex. 254 (Gifford Ex.

27 31008) at 3. Responding to the FDA on October 25, 2018, Willard stated that underage e-

28 cigarette use is compounded by flavors "that go beyond traditional tobacco flavors," and reported

- 31 -

that Altria would discontinue all flavors with the exception of three "traditional" flavors:

Tobacco, Menthol, and Mint. Ex. 257 (Willard Ex. 44). When Willard made these statements,

Altria knew that Mint was a non-tobacco flavor, and that non-traditional flavors were driving

youth usage. Ex. 258 (Devitre Ex. 31503); Ex. 40 (Devitre Dep. at 152:3-8, 162:2-4).

On October 16, 2018, the FDA met with JLI to discuss JLI's proposed "Action Plan," Ex.

255 (JLI01111968), which, like Altria's presentation to the FDA, proposed to preserve Mint as a

"tobacco and menthol product." *Id.* at slide 3. Valani wrote that the FDA might find it

"disingenuous" for JLI to characterize Mint as a traditional tobacco flavor. Ex. 256

(MDL_RV0028377). The Board nevertheless approved sending the Action Plan to the FDA. JLI

also cited the "critical importance of flavored products in helping adult smokers switch," but

nonetheless announced that it would stop accepting retail orders for Mango, Fruit, Crème, and

Cucumber. Ex. 255 (JLI01111968).

### 3. The JLI Board did not remove all flavored products until late 2019, by which time the next generation of nicotine addicts was already hooked.

Defendants' efforts to keep mint on the market had their intended effect. On November 5,

2019, the annual National Youth Tobacco Survey revealed that, with all other non-traditional

products off the shelves, mint products had skyrocketed in popularity with middle- and high-

school students.[42] Two days later, JLI pulled mint from the market.[43] By that time, however, the

youth market had exploded with millions of teenagers already addicted to nicotine. Tellingly, the

vast majority of JUUL's sales prior to November 2019 were flavored products that were long

ago banned from combustible cigarettes, and many mint users switched to the one remaining

flavor, menthol:

---

[42] KA Cullen et al, *e-cigarette Use Among Youth in United States, 2019*, 322 JAMA 21, 2095
(Dec. 3, 2019).
[43] Jen Christensen, *Juul Stops Sales of Mint Flavored Pods*, CNN (Nov. 7, 2019),
https://www.cnn.com/2019/11/07/health/juul-mint-pods-bn.



Exhibit 11: JUUL Monthly Retail Pod Sales, by Flavor

Source: IRI retail sales data adjusted for inflation using the consumer price index. Note that a product's retail sales can continue after JUUL stops shipping it until inventories held by wholesalers and retailers run out.

Ex. 182 (Cutler Sept. 2021 Rpt.) at Ex. 11. Dr. Cutler estimates that JLI made more than $500 million in 2019 by keeping mint on the market, even after it was obvious that flavored products such as mint were driving the youth nicotine epidemic. *Id.* at 131.

### F.    Altria helped the JLI Board expand the youth nicotine market.

Altria had a problem. Now as ever, tobacco use begins in youth and young adulthood: the younger people are when they start using nicotine, the more likely they are to become addicted and lifelong consumers. Ex. 160 (Willard Dep.) at 51:17-52:4, 58:7-14. But by 2017, youth cigarette use neared all-time lows. *Id.* at 46:1-47:3. And Altria's own e-cigarette, the MarkTen, was a failure. Ex. 50 (Gifford Dep.) at 372:17-373:14. Altria found a solution in JUUL.

#### 1.    Altria knew that JUUL was a powerful tool for addicting youth to nicotine.

From JUUL's introduction in 2015, Altria studied every aspect of JLI's business. Ex. 259 (Fernandez Dep.) at 180:1-2 ("[W]e already had interest on JUUL's performance in July 2015."). Altria conducted in-depth research into JUUL's design, marketing, and market performance. As a result, Altria knew exactly what it was getting when it approached JLI's controlling shareholders: a product with a demonstrated track record of hooking youth and untapped potential to scale up, potential that Altria could unlock. *In re JUUL Labs, Inc. Mktg., Sales*

1   *Practices, & Prods. Liab. Litig.*, 19-02913, 2022 WL 1601418, at *14 (N.D. Cal. Apr. 29, 2022)

2   (*JUUL III*) (denying summary judgment and discussing sufficient evidence of "Altria's alleged

3   knowledge of JUUL's addictiveness and use by youth").

4      **Designed to Maximize Addiction**. Altria carefully analyzed JUUL's design (including

5   nicotine per puff and aerosol mass), beginning immediately after the product came to market in

6   2015. Ex. 260 (Flora Dep.) at 152:17-25, 227:13-24; *see also* Ex. 261 (Schroder Dep.) at 261:11-

7   24, 270:04-24, 321:07-16 (device teardowns of JUUL and testing of the aerosol or components

8   of the device). Altria performed pharmacokinetic studies on JUUL and knew that JUUL

9   contained more nicotine than was necessary to satisfy a smoker's addiction. Ex. 160 (Willard

10  Dep.) at 595:15-601:1 (awareness of amount of nicotine in product); Ex. 161

11  (ALGAT0002412177) at slide 11 (2017 Altria presentation reporting JUUL's nicotine per puff);

12  Ex. 162 (Willard Ex. 52) at slide 105 (Altria's highest nicotine product, the MarkTen Bold, with

13  only 4% nicotine-content, "nicotine delivery at levels approaching that of a cigarette").

14     **Youth Targeting**. Altria knew that "JUUL has created a youth usage epidemic." Ex. 262

15  (Garnick Ex. 2336) at 3357; Ex. 95 (Garnick Dep.) at 54:11-15 (Altria knew before investment

16  that "JUUL had a significant youth usage problem."); Ex. 50 (Gifford Dep.) at 115:5-15 (Q:

17  "And you knew JUUL was causing a significant uptick in youth nicotine use, right?" A: "Yes.");

18  Ex. 259 (Fernandez Dep.) at 458:11-19 (in Spring 2018, SVP for Marketing and Insights

19  reported to colleagues and supervisors data on high levels of JUUL youth usage).

20     Internal Altria presentations highlighted JUUL's popularity with teenagers. *See, e.g.*, Ex.

21  263 (Gifford Ex. 31004) at slide 17 (JUUL has "gone viral" on high school and college

22  campuses; "Teenagers Embrace JUUL, Saying It's Discreet Enough To Vape In Class";

23  "Juuling" was "popular with teens"); Ex. 264 (ALGAT0004376152) at slide 48 ("E-Cigarette

24  Use In Classrooms Booms As Teachers Blame Juul Vape"). Altria received industry reports

25  highlighting the young age of much of JUUL's customer base. Ex. 265 (Blaylock Ex. 2407) at

26  4713-4714; *see also* Ex. 266 (Hunter Dep.) at 238:4-18 (Altria had data in 2018 that about half

27  of high school e-vapor users used JUUL). And Altria's regulatory due diligence consultant noted

28  that "[t]he attractive technology …, the wide variety of available flavors, and a perception by

1   adolescents and young adults that [JUUL] is 'safe,' may lead to higher initiation rates,"

2   questioned JLI's "ability to act as a responsible FDA-regulated company," and flatly concluded

3   that JLI's "business plans are inconsistent with the FDA Commissioner's emphasis on reducing

4   youth initiation and use." Ex. 267 (Gifford Ex. 31012) at slide 3. Finally, Altria received data

5   from Avail Vapor that presented a clear message: "JUUL's products were predominantly

6   attracting young people." Ex. 156 (Prochaska Rpt.) at 76-80.

7       **Mint**. Altria knew that flavors, especially mint, were uniquely appealing to youth. *See*

8   Ex. 160 (Willard Dep.) at 79:12-22 (acknowledging that Altria "thought that flavors were one of

9   the contributors to youth usage"); Ex. 253 (Garnick FTC Dep.) at 102:18-21 ("[I]t was identified

10  that what was contributing to the youth issue were pods and nontraditional flavors. By that I

11  mean flavors other than tobacco and menthol."). Altria reviewed research in 2018 reporting that

12  "[t]eens strongly prefer fruit (39%) and mango (27%) and then mint (17%)" and "only 1% of

13  Teens prefer tobacco." Ex. 265 (Blaylock Ex. 2407) at 4725. Other data highlighted internally

14  showed that 81.1% of youth identified flavors as the top reason for using e-vapor. Ex. 259

15  (Fernandez Dep.) at 409:23-410:2; Ex. 268 (Fernandez Ex. 2223) at 46. Mint was not about

16  converting smokers: According to Altria's own research, only 11-12% of adult smokers

17  preferred mint.[44]

18      JUUL's flavor edge was not something Altria overlooked or even just tolerated; it was an

19  essential part of the value Altria perceived in JLI. In December 2017, a study commissioned by

20  Altria reported that the "most popular JUUL pods were Mango and Mint," and "Virginia

21  Tobacco was a distant third in popularity." Ex. 269 (Gardner Ex. 230) at slide 28; *see also* Ex.

22  270 (Romyak Ex. 17021) (Altria analysis showing JUUL product with largest sales was mint,

23  followed by mango). The weekly JUUL data provided to Willard included breakdown of sales by

24  flavor. Ex. 271 (Romyak Dep.) at 146:5-148:21. Internally, Altria "pushed for higher and higher

25  volume estimates," achievable only with continued growth in flavors. Ex. 270 (Romyak Ex.

26  17021). In spring 2018, Devitre emailed Valani with the subject "Mint percentage?" and asked,

27  ---
[44] https://sciences.altria.com/library/-

28  /media/Project/Altria/Sciences/library/conferences/2018%20TSRC%20J%20Zdniak%20Presentation.pdf.

1  "What proportion of total sales is in non tobacco flavor for J"? Valani replied, "A majority. We

2  can discuss live [i.e., not in writing] when we next meet." Ex. 272 (Valani Ex. 40112).

3          **2.    Altria knew that JUUL was expanding youth use, not converting adult**
                **smokers, and so more JUUL sales meant more youth use.**
4

5          Altria knew that JUUL's growth potential was in youth vaping, not in converting adult

6  smokers. Altria's internal presentations and documents confirmed that JUUL "is not

7  cannibalizing current smokers" and that "vapour growth actually shows evidence of growth in

8  nicotine users." Ex. 273 (Devitre Ex. 31519) at 1. In early 2018, Altria identified that JUUL's

9  recent growth was due to the introduction of mango (a fruity flavor Altria knew was popular with

10  youth), and was not accompanied by either a corresponding increase in the number of adults

11  using e-cigarette products or a corresponding decline in cigarette use. Ex. 274 (Romyak Ex.

12  17022) (data showing massive JUUL growth); Ex. 275 (Romyak Ex. 17023) at 8953 ("[T]he

13  latest growth of Juul doesn't appear to be sourcing from cigarettes like it once did."); Ex. 276

14  (Romyak Ex. 17033) at 6628 (reporting "a hard time … detecting interactions with cigarette

15  volume"); Ex. 277 (ALGAT0002819763) at 9763 ("[T]here is no longer a noticeable correlation

16  between JUUL's recent success and traditional combustible cigarettes' woes."); *see also* Ex. 278

17  (Crosthwaite Dep.) at 365:17-23 ("I don't recall being concerned" that JUUL's growth was

18  going to cut into Philip Morris USA's core business of combustible cigarettes).

19          Similarly, Altria reviewed reports noting that there was "inconclusive (and at best,

20  mixed) evidence … supporting the idea that JUUL/e-vapor usage has facilitated smoking

21  reduction/cessation." Ex. 265 (Blaylock Ex. 2407) at 4714. More data that Altria highlighted in

22  presentations showed that the overwhelming majority of e-cigarette users ages 12-17 had not

23  previously used tobacco, and that large numbers of teenagers reported recognizing and using

24  JUUL. Ex. 259 (Fernandez Dep.) at 388:14-390:20; Ex. 268 (Fernandez Ex. 2223) at slide 27.

25  Still more: "While we still see JUUL volume continue to grow and grow, our measurement

26  systems of [legal age plus adult vapors] doesn't seem to reflect this growth …. Similarly, in the

27  marketplace we were having a hard time in the most recent time period (since January 2018)

28  detecting interactions with cigarette volume." Ex. 276 (Romyak Ex. 17033) at 6628.

- 36 -

1    Given its knowledge of JUUL's unique appeal to youth, Altria knew that more JUUL

2    growth and more JUUL sales meant more youth use. Indeed, Altria's own due diligence

3    consultant reported that JLI's "leaders seem unable or unwilling to make the connection that a

4    dramatic increase in product availability will almost certainly have a negative impact on FDA's

5    efforts to reduce youth cigarette use." Ex. 276 (Gifford Ex. 31012) at slide 29.

6         **3.     Altria encouraged the Individual Defendants to expand sales and
             digital marketing as fast as possible to secure Altria's payoff.**
7

8    Through the roughly 18-month negotiating period, Altria made clear to the Individual

9    Defendants that growth, including capture and retention of youth, was key to securing Altria's

10   lucrative investment. Notes from a July 2017 meeting between Altria's Willard and Gifford and

11   JLI's Valani, Pritzker, and Frankel reflect that Altria "[w]ould invest at 'EXCESS OF

12   TOBACCO MULTIPLES.'" Ex. 139 (Frankel Ex. 17789) at 9883. But Altria "think[]s [JUUL]

13   should develop … very good digital reach." *id.* Message received: JLI's marketing exploded

14   beginning Fall 2017. Ex. 166 (Chandler Sept. 2021 Rpt.) at 57-59 (documenting how JLI's

15   "direct marketing" budget, including social media, was $500,000 in Q4 2017, $5 million in Q1

16   2018, and $10-20 million in Q2 2018); Ex. 181 (Richardson Ex. 5062) at 386647 (detailing plans

17   for 2018 "Social Media Reach" through influencers).[45]

18   This message—grow, grow, grow, necessarily including increasing youth usage—was a

19   constant underlay during the year and a half of confidential negotiations. The value of Altria's

20   potential investment was pegged to projected future earnings from the sale of JUUL products,

21   projections that were largely based on the historic sales of those same products. Ex. 279 (Boyles

22   Rpt.) at ¶¶ 18-42.[46] But that growth—as Altria knew—was obtainable only through youth use of

23   the product. *Id.* at ¶¶ 49-73; *see also* Ex. 50 (Gifford Dep.) at 123:13-23 (Altria did not "back out

24

---

25   [45] Frankel now claims that by "digital reach," Altria meant "one-to-one communications with …
     adult tobacco consumers" in Altria's "database." ODD Mot. at 7 n.8. This post hac interpretation
     is implausible: Altria, the leading expert on the efficacy of mass marketing of tobacco products
26   did not see the key to JUUL's success as spam emails to individual smokers. And it is
     irreconcilable with what Altria knew: that JUUL was not converting adult smokers and did not
27   pose any threat to Altria's combustible cigarette business.
     [46] *See also* Ex. 271 (Romyak Dep.) at 346:14-347:12 (Romyak never made any effort to remove
28   youth sales from data presented to Willard and others).

1    sales to youth" when it forecasted future sales, nor did it "back out income growth based on

2    income from youth use of JUUL" when it forecasted future income growth).

3        Altria confirmed internally that the "[b]ase scenario" necessary for the investment was

4    "[c]ontinued strong volume growth in near- to medium-term" and "[s]trong revenue growth and

5    income generation, in-line with current JUUL trajectory." Ex. 280 (Blaylock Dep.) at 209:3-

6    210:3; Ex. 281 (Blaylock Ex. 1724) at slide 28. Altria continually sent this message to the

7    Individual Defendants: as JUUL sales grew in 2018, Altria's valuation of JLI only went up. Ex.

8    282 (Blaylock Ex. 1716) at slide 46 (showing large jump in valuation from May to August

9    2018); Ex. 50 (Gifford Dep.) at 414:17-414:20 (Altria did not decrease valuation after the FDA

10   diagnosed the epidemic).[47] Valuation peaked right after the FDA's raid on JLI. *See* Ex. 283

11   (Blaylock Ex. 1734) at 4320333.

12                    **4.    After the investment, Altria turbocharged JUUL sales, worsening the
                            epidemic.**

13

14       After investing in JLI, Altria conducted two sales efforts that successfully maximized

15   JUUL's retail footprint and increased JUUL sales and, consequently, youth sales and youth use.

16       First was shelf space. In August 2018, Altria touted to the JLI Directors its new $100

17   million investment to provide JUUL with premium shelf space. Ex. 199 (ALGAT0004314953) at

18   slide 5; Ex. 200 (ALGAT0004205132) at slide 5. Although the shelf space was purportedly for

19   Altria's own e-cigarette product, the MarkTen, Altria knew at the time that MarkTen was not a

20   "JUUL fighter" and Altria was not planning to pursue a PMTA. Ex. 201 (Devitre Ex. 31517) at

21   4052774. After the investment, Altria promptly made the coveted shelf space available to JUUL,

22   expanding the product's footprint by approximately 40,000 stores. The number of JUUL

23   products with prominent placement increased by 10-12 new boxes visible to the customer per

24   store. Ex. 202 (ALGAT0004284893) at 4284894. This gave "JLI products significantly

25   improved visibility . . . [Previously] JLI products were typically found wherever they could get

26   space in the store, which would be on a fixture or display, at the bottom of a fixture, or even

27

28   ---
[47] *See also* Ex. 280 (Blaylock Dep.) at 269:8-25 (jump based on another three months of sales growth); Ex. 284 (Wise Dep.) at 515:17-517:9 (valuation went up over time).

1    under the store counter. [Now] JLI products [are typically] placed in a two-foot fixture behind

2    the counter – a much more favorable location." Ex. 51 (Willard Ex. 22) at 8490000895.

3        Second was sales support. Altria's sales force employed its relationships to convince tens

4    of thousands of stores to buy and stock more JUUL products. *See* Ex. 170 (Ribisl Sept. 2021

5    Rpt.) at 88-102 (reviewing evidence in detail). During 2019, Altria sent its 1,500 sales

6    representatives to retail stores to further increase JUUL sales. Ex. 182 (Cutler Sept. 2021 Rpt.) at

7    ¶ 194. Projects included reducing out-of-stock problems; a sales campaign known as the "Blitz"

8    which sent representatives to "77,000 stores across the county, encouraging them to increase the

9    number of JUUL products they carried, extending pre-book offers, … and solving inventory and

10    distribution problems;" and a "pre-book program targeted to 7-Eleven … which resulted in

11    shipments of 100,000 cartons of JUUL products to 8,000 7-Eleven stores." *Id.* at ¶ 195.

12        These efforts had a dramatic effect on JUUL sales, including around SFUSD. Ex. 182

13    (Cutler Sept. 2021 Rpt.) at ¶¶ 187-99; Ex. 203 (Cutler Jan. 2022 Rpt.) at ¶¶ 39-46. As Altria

14    knew, this necessarily meant a dramatic increase in both youth sales and youth use. Ex. 182

15    (Cutler Sept. 2021 Rpt.) at ¶¶ 35, 189 (explaining that Altria "significantly raised JUUL pod

16    sales, in a period when a large share of sales volume was going to youth."). This was inevitable

17    not only as a matter of mathematics (where sales include youth use, more sales means more

18    youth use), but as the natural and foreseeable result of the specific actions Altria took.

19        Altria knew that exposure to the "Tobacco Power Wall" in retail locations increases

20    youth desire to use tobacco products, including e-cigarettes. Ex. 204 (ALGAT0002001887) at

21    2054-55; *see also* Ex. 182 (Cutler Sept. 2021 Rpt.) at ¶ 183 ("Exposure to the tobacco wall has

22    been found to … increase youth willingness to use cigarettes."). This is why Altria was warned

23    that "a dramatic increase in product availability will almost certainly have a negative impact on

24    FDA's efforts to reduce youth e-cigarette use." Ex. 205 (Blaylock Ex. 2406) at 8237.

25    Nevertheless, Altria committed to "increase the availability of JUUL products" and "help JUUL

26    increase sales." Ex. 50 (Gifford Dep.) at 193:7-12, 202:5-8.

27

28

1

**G.**     **To avoid scrutiny, Defendants denied marketing to youth and claimed to be engaged in youth prevention, but this was a sham that shows Defendants knew the risk their conduct posed to schools.**

2

3      Defendants sought to stave off regulation and public outcry portraying JUUL as a

4   smoking cessation device and denying that the company ever marketed to youth.

5      In late 2017, JLI hired two former California school district superintendents to develop

6   JLI's first formal youth prevention program. Ex. 184 (Harter Dep.) at 26:9-12; 31:9-16; 45:19-

7   46:7. One, Bruce Harter, with the assistance of JLI's Public Relations department, scoured the

8   internet for media identifying any school districts concerned with student e-cigarette uses. Ex.

9   185 (Harter Ex. 305). Harter contacted approximately 300 schools and school districts across the

10   county, offering a grant of $10,000 if the district would present JLI's youth prevention

11   curriculum to its students. Ex. 186 (Harter Ex. 334). Harter feigned concern about the youth e-

12   cigarette crisis that was "spreading like wildfire" in schools. Ex. 187 (Harter Ex. 373); *see also*

13   Ex. 188 (Harter Ex. 358) (Harter communicating within JLI that "teenagers find JUULs

14   irresistible"). To further entice participation by school districts, Harter promised exclusive access

15   to a device he claimed JLI was developing called the "Beacon." Ex. 189 (Harter Ex. 336); Ex.

16   190 (Harter Ex. 341). According to Harter, the device would disable JUUL devices being used

17   on school property. Ex. 190 (Harter Ex. 341).

18      JLI's youth prevention program was a sham, another page from the Big Tobacco

19   playbook and part of a scheme to cover up Defendants' targeting of youth. Harter had never

20   "developed any sort of youth prevention curricula around tobacco or e-cigarettes." Ex. 184

21   (Harter Dep.) at 78:5-10. Nevertheless, JLI highlighted Harter's background as a former educator

22   when responding to press inquiries about youth JUUL use. Ex. 191 (Harter Ex. 303) (December

23   2017). In April 2018, JLI asked Harter if any school district would agree to be named in the press

24   as working with JLI, admitting that it needed a "lifeline" and was "in dire need of something re

25   [a school] working with us." Ex. 192 (Harter Ex. 359); Ex. 193 (Harter Ex. 360).

26      Harter's interactions with students show the goal was never youth prevention. In a

27   student focus group led by Harter, conducted without school supervision or parent permission,

28   Mr. Harter asked students what needs smoking met and where in their school could students get

1    away with smoking. Ex. 184 (Harter Dep.) at 141:21-142:03, 163:17-164:17. Harter then told

2    students, more than once, that JUUL was "95% safer" than combustible cigarettes. Ex. 194

3    (Harter Ex. 308); Ex. 184 (Harter Dep.) at 152:24-153:12, 156:15-22. Mr. Harter's plans for

4    these focus groups were shared in advance with senior executives at JLI. Ex. 184 (Harter Dep.)

5    at 751:12-752:20, 761:20-762:16. Internally, JLI acknowledged that its actions mirrored those of

6    Big Tobacco, an industry that notoriously marketed to youth through sham youth education

7    programs. Ex. 195 (Harter Ex. 356); Ex. 188 (Harter Ex. 358). JLI was no different. Indeed, a

8    requirement of the grant offered to schools was that JLI be allowed to observe the presentations

9    to students and review survey data collected from the students. Ex. 189 (Harter Ex. 336) at 6037.

10         JLI's Board was intimately involved in the sham youth prevention programs. For

11    example, in April 2018, Valani and Pritzker sent edits to a youth prevention press release, noting

12    that they "don't want to get these small items wrong" and "think it's critical to get this right." Ex.

13    196 (JLI00151300). Pritzker and Valani also approved a press release in response to U.S.

14    Senators' inquiry, which falsely detailed JLI's alleged youth vaping prevention efforts, *see* Ex.

15    136 (JLI10529705), and approved then-CEO Kevin Burn's op-ed in the Washington Post

16    claiming that JLI was only targeting adult smokers. Ex. 197 (JLI10064121). Monsees also

17    repeated this lie to both congress and the press.[48] As did Altria.[49] Bowen too.[50]

18         In addition to a sham youth prevention program, JLI's leadership employed a strategy of

19    distraction and misinformation. At Valani's direction, JLI sought to attack and undermine studies

20    linking JUUL with the youth vaping crisis and to misdirect the focus on youth smokers who

21    allegedly had switched to JUUL—a misinformation campaign designed to stave off regulation or

22    the ban of JUUL products. Ex. 36 (Valani Ex. 40110); *see also* Ex. 138 (JLI00024566) (Pritzker

23    directing response to a teacher about youth use of JUUL in schools).

24

25    [48] Richtel & Kaplan, *supra*; *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. On Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th

26    Cong. 1 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.), https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-

27    MONSEESJ-20190725.pdf.
      [49] Ex. 351 (Longest Ex. 471); Ex. 353 (Gifford Ex. 31010) (letter to FDA).

28    [50] Richtel & Kaplan, *supra*.

For its part, Altria, while providing distribution and sales services that rapidly increased JUUL's reach, did nothing to curb the youth problem. *See* Ex. 156 (Prochaska Rpt.) at 6, 90. Contrary to public statements that Altria would help JUUL's youth prevention efforts, Altria did not require any of its investment to be used for youth prevention. Ex. 94 (Longest Dep.) at 648:13-649:15. And while Altria claimed that JLI could use Altria's youth prevention services, that term was "drop[ped]" from the deal, and Altria never provided such services or took any other reasonable steps to mitigate the youth usage problem.[51]

## H.    Defendants' conduct has harmed and continues to harm SFUSD.

### 1.    SFUSD lacks the resources to address a youth vaping crisis.

SFUSD is an urban school district serving the City and County of San Francisco. It is the only public school district in the city, with an enrollment of approximately 52,000 students across its 107 schools. This includes 32 schools with students in the middle and high school grades, serving approximately 27,500 students. Ex. 203 (Cutler Jan. 2022 Rept.) at 3. About 53% of SFUSD's students come from a socioeconomically disadvantaged population.[52] The district is comprised of "open" campus schools, many of which are situated adjacent to or among neighborhoods or commercial properties, creating unique challenges for SFUSD staff to ensure the safety and well-being of SFUSD students. Ex. 208 (Dorn Rpt.) at 19.

SFUSD's budget for the 2022-23 school year is approximately $1.1 billion, with a $125 million budget deficit requiring the district to cut significant costs. Ex. 292 (2022-23 Budget Press Release). Approximately 80% of the district's budget is personnel costs. Ex. 293 (Wallace Dep. 9/28/21, 47:1-23). SFUSD employs nearly 9,200 people.[53]

SFUSD's mission statement is: "Every day we provide each and every student the quality instruction and equitable support required to thrive in the 21st century.[54] This includes an emphasis on "foster[ing] personal wellbeing and social and emotional skills that benefit students

---

[51] *See, e.g.*, Ex. 198 (Kadapakkam Dep.) at 204:5-206:11 (discussing how Altria put up "roadblocks" and did not make "good faith" effort); *See* Ex. 95 (Garnick Dep.) at 280:7-14 (investing in JUUL without taking some action was not acceptable or appropriate).
[52] https://www.sfusd.edu/about-sfusd/facts-about-sfusd-glance
[53] https://www.sfusd.edu/about-sfusd/facts-about-sfusd-glance
[54] https://www.sfusd.edu/about-sfusd/our-mission-and-vision

1    in and outside of school." Ex. 294 (Student and Family Handbook, August 2020) at 10. To that

2    end, SFUSD's Student and Family Services Division is primarily responsible for programs

3    addressing the safety, health, and wellness of its students, including tobacco and nicotine

4    prevention and education. Ex. 149 (Coates Dep.) at 21:18-22:24).

5            SFUSD is a tobacco-free school district and specifically prohibits the use of e-cigarettes

6    such as JUUL. Its policy "prohibits the use of products containing tobacco and/or nicotine,

7    including … electronic nicotine delivery systems, such as electronic cigarettes, any time, in

8    charter school or school district-owned or leased buildings, on school or district property, and in

9    school district vehicles." Ex. 295 (SFUSD_001325). SFUSD's approach to student discipline

10   emphasizes restorative practices and school-wide positive behavior intervention and support. Ex.

11   294 (Student and Family Handbook, August 2020) at 163. Suspensions are a last resort and

12   utilized only in limited circumstances, after other options have been exhausted. *Id.* at 185. For

13   students caught using tobacco, including e-cigarettes, SFUSD employs intervention services

14   delivered by community health outreach workers, school counselors, school district nurses,

15   deans, or school social workers. *Id.* at 182-84; Ex. 296 (Pak 5/13/21 Dep.) at 88:7-14.

16           **2.      The JUUL-caused youth vaping crisis exists in SFUSD's schools.**

17           The student e-cigarette epidemic that exploded at SFUSD arrived at a time of historically

18   low combustible cigarette usage rates. SFUSD achieved that reduction through years of sustained

19   effort in student and parent education, community involvement, media literacy, and development

20   of extensive support programs. Ex. 211 (Lingrell Dep.) at 142:5-11; Ex. 208 (Dorn Rpt.) at 22.

21   SFUSD had succeeded in reducing the percentage of high school students who ever tried a

22   combustible cigarette from 60.0% in 1997 to 18.6% in 2019, and high school students who

23   smoked at least one cigarette in the past thirty days from 19.1% in 1997 to 6.5% in 2019. Ex. 299

24   (HS YRBS Results, 1997-2019).

25           SFUSD changed its tobacco-free policy to include an e-cigarette prohibition in the 2014-

26   15 school year. Ex. 297 (Pak 4/8/21 Dep.) at 99:5-7. Usage among students was relatively low at

27   the time. Ex. 212 (Pak 10/7/21 Dep.) at 125-26). But beginning in about the 2017-18 school year,

28   e-cigarette use, led by JUUL, grew at an alarming rate. Reports of increased e-cigarette use

among SFUSD students came from students, teachers, nurses, and social workers. Ex. 212 (Pak 10/7/21 Dep.) at 34-35; Ex. 149 (Coates Dep.) at 36-38, 49. Requests from principals, nurses, and social workers poured into the SFUSD Central Office, seeking information about training, education, and policies related to e-cigarettes. Ex. 213 (Pak 5/27/21 Dep.) at 18-19.

There was and continues to be an epidemic of e-cigarette use at SFUSD's schools. Ex. 209 (Pak 10/15/21 Dep.) at 273-75, 417:8-18. Within the district, the percentage of high school students who had ever tried an e-cigarette rose from 25.0% in 2017 to 31.1% in 2019, and those who had used an e-cigarette at least once in the past thirty days more than doubled from 7.1% to 16.0% in the same timeframe. Ex. 299 (HS YRBS Results, 2019).

JUUL devices led the e-cigarette craze at SFUSD. JUUL was the most predominantly known and widely used e-cigarette at SFUSD. Ex. 213 (Pak 5/27/21 Dep.) at 23). JUUL was "the most popular product" and the "most familiar product to our students and staff." Ex. 209 (Pak 10/15/21 Dep.) at 309, 350; *see also* Ex. 149 (Coates Dep.) at 45) (noting that JUUL products are a particular problem at SFUSD schools and explaining the attraction of JUUL to young people, including their concealability); Ex. 211 (Lingrell Dep.) at 46-47 (describing SFUSD's emphasis on JUUL in response to the rise in student e-cigarette use because they were identified as a particular problem by students and wellness staff).

Addressing the explosion in student e-cigarette use became a top priority at SFUSD in part because of its prevalence of use in and around schools. Kimberly Coates, Executive Director of the Student and Family Services Division, testified that, "[u]nlike some of the other problems that may not be happening in the midst of a classroom, we can have students with JUUL devices in school, while they are in the classroom, while they're in the hallway, while they're in the bathroom." Ex. 149 (Coates Dep.) at 35-36). In a survey conducted by SFUSD's expert Michael Dorn of the school district's secondary schools, 74% reported that students had been caught or reported vaping in restrooms, 67% answered affirmatively for stairwells, and 61% for classrooms. Ex. 208 (Dorn Rpt.) at 38; *see also* Ex. 298 (SFUSD 2d Supp. Rog. Responses, No. 2) at 14 ("Plaintiff's staff have observed student e-cigarette use throughout school property, such as bathrooms, hallways, stairwells, classrooms, and outdoor areas."); Ex. 300 (Henderson Ex.

206) (May 2018 email from Bay Area pediatrician to JLI reporting treating "more teens addicted to nicotine than I have seen in my professional lifetime, that "Juul is ubiquitous," and that "90% of kids in high school have reported to me that there is constant use in the bathrooms and frequent use in the classrooms.").

Accounts of former students are consistent with the survey results and the experiences of SFUSD employees. One, a former Youth Outreach Worker who graduated in 2018, saw students using JUUL devices daily during the student's senior year, including in classrooms, hallways, restrooms, and outside, and commonly saw students selling JUULpods during class. Ex. 301 (Lehr-Love Decl.) at ¶ 5, 8. Another former student, Ms. Cho, the Senior Class President and a 2021 graduate, had a similar experience. Upon transferring to SFUSD for the 2018-19 school year, she was shocked by the prevalence of e-cigarette use among students. Ex. 218 (Cho Decl.) at ¶ 3. She recalls students charging and using JUUL devices openly in class, restrooms, and hallways, a thick, "fruity fog" from e-cigarette vapors in school bathrooms, and students becoming ill ("nic sick") from consuming too much nicotine too quickly. *Id.* at ¶¶ 5. Both students recalled that JUUL was the primary device used by SFUSD students. Ex. 301 (Lehr-Love Decl.) at ¶ 4; Ex. 218 (Cho Decl.) at ¶ 6.

### 3. The JUUL-caused youth vaping crisis has caused substantial harm and property damage to SFUSD.

The impact on SFUSD has been significant and is ongoing. While SFUSD had a break from on-campus issues while students were at home due to Covid, the students are back on campus, and so is the JUUL-led vaping crisis. When asked in October 2021 whether SFUSD had a current vaping epidemic, Quarry Pak, a supervisor in SFUSD's Student and Family Services Division ("SFSD"), replied: "I don't know the formal definition of epidemic, but it is a large number of schools that are handling vaping and nicotine, uhm -- tobacco use currently right now on campus as we are returning in person." Ex. 209 (Pak 10/15/21 Dep.) at 273:12-19. She added that a "large and growing number" of students are vaping, that it is "spreading," and that she agrees with the characterization of an "epidemic." *Id.* at 274:6-20. Kimberly Coates, executive director of the SFSD, classified e-cigarette use as the "top" current concern at SFUSD, due in

part to widespread use during the school day. Ex. 149 (Coates Dep.) at 35:19-36:4. *See also* Ex.

212 (Pak 10/7/21 Dep.) at 35:17-18 (calling e-cigarette use "a persistent problem").

This rampant use of JUUL and other ENDS products has caused multiple serious

problems for schools within SFUSD. One visible impact is the damage to SFUSD property. For

instance, at Balboa High School, the largest restroom in the school was damaged when students

trying to find a place to vape were desperate enough to destroy a door leading to the restroom,

requiring the school to board up the door because of the damage (see photos below).



Ex. 215 (Dorn site notes – Balboa HS) at 6, 8.

Staff at two high schools that share common grounds, Ruth Asawa San Francisco School

of the Arts and the Academy San Francisco at McAteer, reported that an area adjacent to the

schools known as "the canyon" is a popular vaping area. Ex. 319 (Dorn site notes – Ruth Asawa)

at 9; Ex. 216 (Dorn site notes – McAteer) at 3, 20, 21. To combat this vaping hotspot, the district

installed a locked fence to keep students out. Ex. 216 (Dorn site notes – McAteer) at 3, 20, 21.

But students cut the fence to allow themselves access to the canyon to vape (see photos below).

| **1.3.2** Designation of "No Go" zones during certain times of day? (Clarification: A "No Go zone" is a designated physical space/area where students are not allowed to enter or pass through during specific time frames.) | Yes | The canyon is understood to be the "no go" zones. |
|---|---|---|

| Question | Answer | Comments |
|---|---|---|
| **1.6.12** Areas off of but close to school property during school hours (Clarification: In this usage, these include areas just off school property such as vacant lots, business parking areas, city streets etc. where students have been vaping.) | Yes | There are areas like the dance studio in the gym, the area outside around the school and the area where they call the canyon located right on the school property fence are known areas where students have been caught vaping. |

On-Site Assessment for The Academy San Francisco @ McAteer

| Question | Answer | Comments |
|---|---|---|
| **1.6.13** Leaving school to vape at other off-campus locations while truant from school. | Yes | There is a park adjacent to the school and they call it the "Canyon" This area is a known area where students have be caught vaping. A locked fence have been put up, however, there is an area in the fence where it has been cut for easy access. |



*Id.* at 4, 21.

Vaping has also caused disruptions and reduced access to areas of school property, risking the safety and wellbeing of students. For instance, a student at Aptos Middle School stole a master key to unlock the gym to vape. Ex. 320 (Dorn site notes – Aptos MS) at 17. All of the restrooms at Aptos are locked unless opened by a teacher. *Id* at 6. At Balboa High School, students regularly manipulate the lock mechanism to gain access to the auditorium, a well-known location for student vaping in the school. Ex. 215 (Dorn site notes – Balboa HS) at 3. Staff from

Downtown High School reported that vaping devices have been found in seat cover holders and in the cover for the water main valve. Ex. 217 (Dorn site notes – Downtown HS) at 12. James Denman Middle School was forced to shut down its garden area in part because of student vaping issues. Ex. 321 (Dorn site notes – Denman MS) at 16. Similarly, Presidio Middle School chained and locked a doorway to a balcony stairwell because of an incident involving student vaping. Ex. 219 (Dorn site notes – Presidio MS) at 7. Another school, George Washington High School, scrapped a planned policy to lock restrooms during class after Ms. Cho e-mailed the principal to protest that the measure would infringe on student privacy, make students uncomfortable, and be ineffective. Ex. 322 (SFUSD_164949).

In addition, the prevalence of e-cigarette use interferes with the air breathed by SFUSD's students every day. Ms. Cho described walking into a bathroom in the morning or at lunch as walking into the "fruity fog" of exhaled e-cigarette aerosol. Ex. 218 (Cho Decl.) at ¶ 5. The former Lowell High School principal, Dacotah Swett, testified that she had conversations with security guards about the unmistakable "sweet sickly smell" of nicotine vaping that emanated from bathrooms when students were vaping inside. Ex. 323 (Swett Dep.) at 65:19-66:20. High schoolers almost unanimously agreed in their discussions with a local pediatrician that there was constant vaping in the bathrooms and frequent use in classrooms. Ex. 300 (Henderson Ex. 206). And the aerosol emitted by the JUUL device is not harmless. The aerosol created during the heating process in the use of a JUUL device contains chemicals known to cause respiratory disease and tissue damage that results in respiratory injury. *See, e.g.* Ex. 324 (Tackett Rpt.) at 5.

Once JUUL use took off, SFUSD had to quickly develop materials to educate its school staff, students (including SFUSD's Youth Outreach Workers, who provided education to other students), parents, caregivers, and guardians. Ex. 208 (Dorn Rpt.) at 27. Ms. Pak and Erica Lingrell, a SFUSD program administrator, were responsible for SFUSD's health education programs, including its tobacco and e-cigarette education and prevention programs. Ex. 149 (Coates Dep.) at 22:21-23:5, 24:12-21; Ex. 211 (Lingrell Dep.) at 21:5-16. Ms. Pak and Ms. Lingrell were also responsible for bringing tobacco prevention education to school sites,

1    educating school nurses and teacher leaders, who would then educate staff and students. Ex. 211

2    (Lingrell Dep.) at 21:20-24:4.

3        For instance, SFUSD developed and distributed vaping prevention resources for SFUSD

4    schools, including resources for elementary through high school to train staff and families to

5    recognize new vaping technology, implement health education lessons in the classroom to teach

6    students about the risks of usage, and develop a school wide plan to connect students to

7    intervention services as an alternative to suspension. Ex. 302 (SFUSD_001589). Other vaping

8    education resources, developed by SFUSD's nursing staff, include "Vaping 101" to educate high

9    school, middle school, and elementary school staff and teachers. Ex. 303 (SFUSD_001793); Ex.

10   304 (SFUSD_001859); Ex. 305 (SFUSD 001803). Also, because of JUUL's prominence among

11   the district's students, a fall 2018 professional development training presented to SFUSD's

12   health educators and physical education teachers was titled "JUUL School." Ex. 210

13   (SFUSD_001936); *see also* Ex. 149 (Coates Dep.) at 33:6-15 (describing how the district

14   changed its tobacco education programs in response to feedback from school sites and data

15   showing that students were increasingly using e-cigarettes and "Juuling"). Youth Outreach

16   Workers and other student leaders made presentations focused on vaping to raise awareness

17   among students.[55] And, SFUSD purchased tobacco cessation training for its Youth Outreach

18   Workers. Ex. 306 (SFUSD_14279).

19       The greatest diversion of staff resources was time: "Their time to develop PowerPoints

20   and Google slides and to do research and use the materials that were designed for students to be

21   used with staff and parents and caregivers" and "mak[ing] the time at each school during a

22   faculty meeting or a parent workshop night." Ex. 212 (Pak 10/7/21 Dep.) at 83:23-85:14.

23   Because e-cigarettes were new, it took an inordinate amount of time to educate thousands of staff

24   about vaping and e-cigarettes. *Id.* at 83:23-85:14, 93:24-94:17. Unlike combustible cigarettes and

25   other tobacco products for which educational materials already existed, SFUSD has largely had

26   to develop its own for e-cigarettes because they were not readily available. *Id.* at 83:23-85:14,

---

[55] Youth Outreach Workers are provided a stipend for their time working on vaping-related issues. That stipend is no longer an allowable expense under the TUPE grants as of 2018 or 2019. Ex. 212 (Pak 10/7/21 Dep.) at 114:7-115:11.

90:17-92:7. SFUSD found was that the amount of tobacco education required was substantially greater after JUUL use soared because of the limited knowledge among students and staff about JUUL products, including what they looked like, what were in them, and the effects from their usage. *Id.* at 90:17-92:7. When asked how much time it took to develop the district's resources relating to vapor products, Quarry Pak testified: "Years. And we're still working on it." *Id.* at 94:18-23. As detailed below, Mr. Dorn has quantified the positions that SFUSD needs to fill to combat the JUUL-led vaping crisis, and has priced those positions. Ex. 208 (Dorn Rpt.) at 92-96.

The vaping crisis has also caused direct expenditures by SFUSD. For instance, purchase orders and expenditure reports show that SFUSD expended $2,306.42 on informational pamphlets about vaping and e-cigarettes,[56] $4,230.40 on informational posters about vaping and e-cigarettes,[57] $4,273.55 on additional informational materials about vaping and e-cigarettes,[58] $1,880 for prizes for the district-wide anti-vaping public service announce context,[59] $142.52 on supplies for lessons on vaping,[60] $4,920 for a consultant to develop materials and provide trainings related to vaping,[61] and $17,123.70 for a three-tenths portion of a Community Health Outreach Worker's salary to coordinate bi-weekly Student Health Advisory Board meetings for students to organize the district-wide anti-vaping public service announcement contest.[62]

### 4. Responding to the vaping epidemic requires a comprehensive and multi-disciplinary strategy.

Despite its enormous efforts, SFUSD cannot adequately address the vaping epidemic in its schools without additional strategies and resources. Mr. Dorn found that "[s]tudent e-cigarette use on school property at SFUSD has created a pervasive and highly negative impact on the safety, learning, and social environment at schools in [SFUSD]." Ex. 208 (Dorn Rpt.) at p. 52. Mr. Dorn also explained:

---

[56] Ex. 307 (SFUSD_115020); Ex. 308 (SFUSD_070725); Ex. 309 (SFUSD_026084).
[57] Ex. 310 (SFUSD_115021); Ex. 311 (SFUSD_115022); Ex. 308 (SFUSD_070725).
[58] Ex. 312 (SFUSD_001336).
[59] Ex. 313 (SFUSD_026783).
[60] Ex. 314 (SFUSD_221100); Ex. 315 (SFUSD_085395); Ex. 317 (SFUSD_085396).
[61] Ex. 317 (SFUSD_056836); Ex. 306 (SFUSD_014279).
[62] Ex. 318 (SFUSD_017742).

1

2

3

> While SFUSD has expended significant efforts to prevent and address the problem of e-cigarette use by secondary school students on school property, the inability to effectively address the key driving factors of e-cigarette use among students demonstrate that the current measures in SFUSD secondary schools are woefully inadequate to properly address the problem.

4   *Id.* Another expert, Dr. Halper-Felsher, explained that the "severity and pervasiveness of the

5   epidemic of youth e-cigarette use that JLI created will require comprehensive, multi-pronged,

6   and sustained resources to mitigate and reduce youth use and corresponding harms to San

7   Francisco Unified School District." Ex. 207 (Halpern-Felsher Jan. 2022 Rpt.) at 11. These costs,

8   all quantified by Plaintiff's experts, break into the following categories:

9         **Infrastructure**. Schools "need technology to help monitor, detect, and deter youth use of

10  e-cigarettes on and around school campus." *Id.* at 193-94; *see also* Ex. 326 (Winickoff Jan. 2022

11  Rpt.) at 72-75 ("[A]ppropriate technology to reliably monitor, deter and detect e-cigarette use

12  should be installed and maintained over time in a reliable functional state."). Mr. Dorn has

13  identified infrastructure improvements and modifications that SFUSD needs to employ to curtail

14  the JUUL-infused vaping crisis. These measures include: an e-hall pass system to improve

15  student supervision; vape sensors and smart cameras to detect and respond to e-cigarette use at

16  schools; access control systems for difficult-to-supervise areas; and nicotine and THC detection

17  swabs to investigate e-cigarette violations. Ex. 208 (Dorn Rpt.) at 73. With the aid of SFUSD's

18  expert Robert Rollo, Mr. Dorn has placed a valued these improvements at $78,834,213. *Id.* at 92.

19        **School-specific prevention personnel and programs.** Infrastructure alone is not enough

20  to prevent e-cigarette use in schools. *Id.* at 91 ("Without proper human support, technology will

21  not work effectively to provide the value required. As just one example, the installation of

22  cameras and vape detectors alone will not effectively reduce vaping in SFUSD secondary

23  schools without the assistance of staff to promptly respond to the alerts provided by those

24  technologies."); Ex. 207 (Halpern-Felsher Jan. 2022 Rpt.) at 191-99 (describing staffing,

25  training, and educational needs); Ex. 326 (Winickoff Jan. 2022 Rpt.) at 72 ("Comprehensive

26  student supervision, deterrence and detection involves both human and technology resources.);

27  Ex. 325 (Kelder Feb. 2022 Rpt.) at 60-64 (similar). Mr. Dorn has also laid out specific personnel

28

1    that the district should hire "to effectively address the problem of student e-cigarette use" and

2    has estimated the cost of each position. Ex. 208 (Dorn Rpt.) at 92-96.

3          **Community prevention, outreach, and education**. The youth nicotine epidemic is the

4    root cause of the harms incurred by SFUSD. To reverse the course of the epidemic, it is

5    necessary to shift youth normative beliefs, and, ultimately, prevent experimentation and

6    continued use of e-cigarettes. Ex. 325 (Kelder Feb. 2022 Rpt.) at 40-56. Expert Dr. Steven

7    Kelder has identified evidence-based strategies to address and reduce the prevalence of, and

8    harms associated with, youth-cigarette use, including dependence and addiction. *Id.* at 8-9

9    (summary). These strategies include enhanced e-cigarette surveillance and evaluation;

10   community organization and information exchange to include hiring and integrating new staff

11   within the existing organizational structure; counter-vaping mass media, including social media

12   and paid advertising; e-cigarette education and engagement; enhanced youth anti-vaping

13   policies; and availability of cessation services to refer youth and young adults. *Id.* at 9, 47-69.

14   Dr. Kelder has estimated the cost for SFUSD to implement his strategies at $163,051,936 over

15   the recommended fifteen-year duration. *Id.* at 79-83.

16         **Youth cessation and treatment**. Finally, SFUSD's harms can be addressed through

17   measures that "ensure that more youth in SFUSD avoid tobacco product addiction." Ex. 326

18   (Winickoff Jan. 2022 Rpt.) at 41. Plaintiff's expert Dr. Jonathan Winickoff has detailed

19   evidence-based strategies that can be implemented at the community level in SFUSD focused on

20   cessation and treatment. Dr. Winickoff's strategies include: pharmacologic treatment for tobacco

21   users, including establishing an e-cigarette control coordinating center to help connect users with

22   available clinical treatment; clinical education and training tailored for use in the school

23   community; efficient and sustainable clinical screening and tracking systems; expansion of

24   treatment and services, including expanded access to existing programs and creation of

25   specialized treatment capacity; and routine screening in school for nicotine use and referral for

26   treatment. *Id.* at 11, 41-71. Dr. Cutler has estimated the discounted cost of Dr. Winickoff's

27   strategies over a fifteen-year period to be between $109.0 million and $145.0 million, depending

28   on the average annual decline in vaping prevalence. Ex. 203 (Cutler Jan. 2022 Rpt.) at 58.

III.    **ARGUMENT**

   A.    **Defendants' motions for summary judgment on Plaintiff's RICO claims should be denied.**

Plaintiff's RICO claims require that each RICO Defendant "participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). Here, Plaintiff alleges that the RICO Defendants' pattern of racketeering activity involved mail or wire fraud. *See* 18 U.S.C. § 1961(1). Two or more instances of mail or wire fraud establish the required "pattern." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). The "gravamen" of a claim for mail or wire fraud is the "scheme to defraud." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).

SFUSD's civil RICO claim seeks to hold the RICO Defendants (the Individual Defendants plus Altria) liable for using JLI as a vehicle for a multi-year fraudulent scheme to enrich themselves by increasing JUUL sales and youth use through deception. SFUSD has alleged a series of inter-related schemes that "had the goals of growing the market of nicotine-addicts, most specifically youth addicts, to ensure a new pipeline for Altria and to enrich the Founder and Director Defendants." *In re JUUL Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*, 533 F. Supp. 3d 858, 861 (N.D. Cal. 2021) (*JUUL II*). Summarized, the evidence shows the following components of the larger scheme:

**Concealing Health Risks to Youth.** The RICO Defendants designed JUUL to deliver a substantial amount of nicotine, fueling addiction, while limiting the harshness—the "throat hit"—thereby making the product both palatable and addictive to youth. Meanwhile, the RICO Defendants provided no warnings about the nicotine content of JUUL or the risk of addiction until forced by the FDA to add a basic warning in 2018. SOF § II.C.2. For instance, Bowen told JLI employees that "the trick is to downplay the *amount* of nicotine." Ex. 112 (JLI04475468). As a result, many young people were confused about the nicotine content in JUUL. In fact, in one survey 75% of those aged 15-24 who could recognize a JUUL did not know that JUUL always contained nicotine. Ex. 148 (Halpern-Felsher Sept. 2021 Rpt.) at 64-65.

**Preserving Flavors.** JUUL flavors played a major role in attracting youth to JUUL and getting them hooked. The RICO Defendants knew that flavors were popular with youth but continued to insist, falsely, that flavors aided with switching adults off of smoking. Eventually, it became clear that the FDA would ban flavored pods, so the RICO Defendants worked in concert to persuade regulatory authorities that "mint" was a traditional tobacco flavor that was not attractive to youth. The RICO Defendants knew that to be false, as they possessed information showing that mint was actually one of the most popular flavors among youth. Mint sales soared after other flavors were banned but mint was not. SOF § II.E.

**Deceptive mass marketing.** The RICO Defendants mass marketed JUUL to everyone, including youth, without including information about JUUL's dangers. JLI's youth-focused advertising, as directed by the Individual Defendants, took many forms, including launch parties where young people were given free products; formal ad campaigns with young models having fun, such as Vaporized; celebrity "influencers," who touted their use of JUUL; and "seeding" third-party JUUL content through social media. SOF § II.C.3.

**Cover-Up.** As discussed in detail above, from the beginning the RICO Defendants were adamant that JUUL was designed exclusively to help adult cigarette smokers switch. JLI's leaders portrayed JUUL as having a public health benefit and downplayed its youth appeal to stave off public and regulatory scrutiny. The cover-up scheme continued when the RICO Defendants instituted the "Make the Switch" campaign, patterned after an old campaign involving combustible cigarettes. This ad campaign falsely presented JUUL as a device designed only to help adults switch from combustible cigarettes to e-cigarettes such as JUUL. SOF § II.B.

As explained above and below in more detail, every RICO Defendant was essential to the fraud scheme, and each defendant acted through JLI to achieve self-interested goals. Founders Monsees and Bowen designed the JUUL product that appealed to youth with its high-tech, easily concealable appearance, flavored pods, and special features such as "party mode." The Individual Defendants approved and directed the marketing strategy to capture the "cool kids," using young models, launch parties, influencers, and social media to hook America's youth on JUUL. The Individual Defendants also concealed information about the nicotine content and

- 54 -

1   addictive properties of JUUL. Meanwhile, the public faces of JLI—particularly Bowen and

2   Monsees—continued to insist that JUUL was an adult-focused product, to fend off public and

3   regulatory scrutiny. In late 2015, the ODDs—Pritzker, Huh, and Valani—seized operational

4   control of JLI and pushed forward with JLI's aggressive, youth-focused marketing. Aided by a

5   viral marketing campaign and branding messages that blanketed social media, the company's

6   sales had a meteoric rise.

7          From the beginning, Bowen and Monsees sought a partnership with "big tobacco."

8   Starting in 2017, Pritzker and Valani drove that effort, negotiating with Altria. Altria had

9   substantial power and influence over the Individual Defendants because of its ability to enrich

10  them by paying huge sums for a stake in JLI. Eventually, Altria paid $12.8 billion, almost half of

11  which went to the Individual Defendants, and less than 5 percent of which went into the

12  business. Once Altria joined the enterprise, it massively increased sales and distribution of JUUL

13  and conspired with the Individual Defendants to deceive regulators to keep mint-flavored JUUL

14  pods on the market. Altria and the Individual Defendants knew that mint was popular among

15  youth, but they refused to pull it from the market even as they pulled other flavored products,

16  claiming to the FDA it was an adult flavor. Then, Altria disseminated the "Make the Switch"

17  campaign to millions of people, which continued the ruse of JUUL as an adult switching device.

18  Again, the goal was to deceive the public and regulators to protect market access and sales.

19         While the RICO Defendants engaged in this scheme, JUUL use skyrocketed among

20  youth. The impact on SFUSD property was stark. Schools suffered property damage such as cut-

21  up fences and boarded-up bathrooms; spent district funds on education programs, signs, and

22  other vaping-related costs; lost substantial staff and teacher time to the JUUL problem; and were

23  deprived of the "use and enjoyment" of district property through a massive disruption to the

24  school's activities.

25         Based on the evidence, there is a genuine fact dispute as to whether the RICO Defendants

26  conducted the affairs of the JLI enterprise through a pattern of racketeering activity, thereby

27  causing damage to SFUSD's property. The details of Defendants' scheme are laid out in the

28  Statement of Facts above, and the role of each RICO Defendant is addressed in more detail

below. Many of the communications involved in the fraud scheme used the mail or wires. Attached as an Appendix is a chart showing several examples of false or misleading statements by RICO Defendants disseminated through the mail or wires. There are many other examples of deceptive marketing materials disseminated through the mail or wires referenced in the Statement of Facts above and in the argument below.

SFUSD's conspiracy claim under § 1962(d) is also well-supported by evidence. Altria joined an on-going fraud scheme and conspired with JLI's leaders, and thus is liable for the fraud scheme that caused harm to SFUSD's property. Finally, this case has nothing to do with securities, so the PSLRA bar does not apply.

### 1.    JLI is a RICO enterprise that was used as a vehicle by the RICO Defendants to engage in a scheme to defraud.

The RICO Defendants' arguments that this case does not involve a cognizable RICO enterprise are baseless. Under the RICO statute, the term "enterprise" includes "any … corporation." 18 U.S.C. § 1961(4). JLI, a corporation, is an "enterprise" under the plain language of the statute. Under Supreme Court precedent, Defendants can be held liable under RICO for using a corporation—a legitimate enterprise—as a vehicle to engage in a pattern of racketeering activity. The Supreme Court has made clear that the RICO enterprise need not exist separately from the corporation or be the victim of the fraudulent scheme. The pattern of racketeering activity can be the corporation's regular way of conducting business.

In *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001), a rival boxing promotor sued Don King for violating RICO. The promoter alleged that King used his corporation, an enterprise, to conduct illegal activities. King moved to dismiss, arguing that the corporation was not a separate, distinct entity that he had victimized. The Supreme Court allowed the RICO claim, holding that "RICO both protects a legitimate enterprise from those who would use unlawful acts to victimize it ... and also protects the public from those who would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which unlawful ... activity is committed." *Id.* at 164 (citations omitted). The same is true here. The

1  enterprise element is by evidence showing that the RICO Defendants used JLI as a vehicle

2  through which they conducted a fraudulent scheme to enrich themselves.

3      The RICO Defendants' arguments to the contrary are meritless. This Court previously

4  rejected Defendants' arguments on the enterprise issue. *JUUL II*, 533 F. Supp. 3d at 869.

5  Although the Court stated that the Defendants may revisit their arguments, no Defendant has

6  addressed *Cedric Kushner*. Instead, Defendants cite to inapposite cases involving an association-

7  in-fact enterprises or cases decided before *Cedric Kushner*. For example, Defendants rely on

8  *DeFalco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001). As plaintiffs previously explained in

9  motion-to-dismiss briefing, *DeFalco* illustrates the concept of several defendants using an

10  enterprise (a town) to engage in a fraudulent scheme. Defendants, however, argue that the town

11  in *DeFalco* was a separate, passive instrument or victim of the defendants' racketeering activity.

12  Here, JLI is a named Defendant on other claims. Defendants claim that SFUSD cannot show a

13  distinct RICO enterprise separate from the general business of JLI. ODD Mot. at 22-23. This

14  argument does not accord with either Ninth Circuit or Supreme Court precedent.

15      First, even if *DeFalco* required that the enterprise be passive, the Ninth Circuit has not

16  adopted this view. *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992); *see also*

17  *United States v. Rone*, 598 F.2d 564, 568 (9th Cir. 1979) ("Congress gave the term enterprise a

18  very broad meaning" and "the Act clearly encompasses not only legitimate businesses but also

19  enterprises which are from their inception organized for illicit purposes.") (citation omitted).

20      Second, *DeFalco* preceded *Cedric Kushner*. In that case, the Supreme Court rejected the

21  Second Circuit's approach and the notion that the enterprise must be a passive vehicle or a victim

22  of the fraudulent scheme. *Cedric Kushner*, 533 U.S. at 164-66 (explaining that RICO statute

23  protects the public from those who would use a corporation in a scheme to defraud and rejecting

24  the Second Circuit's contrary analysis); *see also Nat'l Org. for Women, Inc. v. Scheidler*, 510

25  U.S. 249, 259 n.5 (1994) ("One commentator uses the terms 'prize,' 'instrument,' 'victim," and

26  'perpetrator' to describe the four separate roles the enterprise may play in § 1962.").

27      Moreover, *Cedric Kushner* is consistent with the well-established principle that the RICO

28  statute applies equally to legitimate and illegitimate enterprises. *United States v. Turkette*, 452

1    U.S. 576, 591 (1981); *Rone*, 598 F.2d at 568. The statute requires "no more than the formal legal

2    distinction between 'person' and 'enterprise' (namely, incorporation)." *Cedric Kushner*, 533

3    U.S. at 164-65. Here, there is a clear legal distinction between the Individual Defendants and

4    Altria, on the one hand, and the enterprise (JLI), on the other.[63]

5          The evidence shows that the fraudulent scheme was primarily designed to use JLI to

6    serve the RICO Defendants' self-interests. The Individual Defendants collectively made billions

7    of dollars by pushing to JLI sales growth at all costs, including the creation of a youth market.

8    SOF § II.A.4. Altria saw the potential to attract a new generation of nicotine addicts and

9    partnered with the Individual Defendants to use JLI to expand the nicotine market. SOF

10   §§ II.A.4, II.F. The RICO Defendants' argument that they were merely acting in the "ordinary

11   course" of JLI's business conflicts with well-established Supreme Court and Ninth Circuit law.

12   A scheme to defraud is never routine business. *See Schmuck v. United States*, 489 U.S. 705, 715

13   (1989). And, the Supreme Court has held that racketeering activity "may be established by

14   showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing

15   business." *H.J.*, 492 U.S. at 242. This is true even when "the predicates themselves" are "part of

16   the regular way of doing business for an ongoing entity such as a … legitimate business." *Id.* at

17   230.

18         Other than pre-*Cedric Kushner* cases, Defendants' distinctness arguments about the

19   RICO enterprise rest entirely on an association-in-fact enterprise theory, which Plaintiff no

20   longer alleges. *See* ODD Br. at 23 (relying on the Court's 2020 motion to dismiss order).

21   Defendants rely on cases in which the plaintiffs alleged association-in-fact enterprises with a

22   corporate participant, rather than facts here where a corporation *is* the enterprise. That distinction

23   makes all the difference. For instance, in *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir.

24   2016), the alleged association-in-fact enterprise consisted of defendant Spirit and several

25   _____

26   [63] Moreover, even if the Court believes that the enterprise, JLI, must be the victim of the RICO defendants' racketeering activity—which was rejected by the Supreme Court in *Cedric Kushner*—there is still evidence to create a fact dispute on that point. In particular, as laid out

27   above, some JLI employees and officers sought to steer JLI away from its youth marketing plans in 2015. But then the ODDs took over the Board and "cleaned house," eliminating those not in

28   line with their plans to prioritize sales. Ex. 18 (Dunlap Dep.) at 176-77.

individuals. The court rejected the proposed association-in-fact enterprise, and explained that the

"distinctiveness requirement" *would* be met "where an individual defendant acts through a

corporation" because then that entity is "distinct from himself." *Id.* at 1356-57 (citation omitted);

*see also Cedric Kushner*, 533 U.S. at 164-65 ("A corporate employee who conducts the

corporation's affairs through an unlawful RICO 'pattern ... of activity,' uses that corporation as a

'vehicle' whether he is, or is not, its sole owner.") (citation omitted).

Other cases Defendants cite are similarly based on claimed association-in-fact enterprises

involving a corporation and its agents or officers. *See Cisneros v. Petland, Inc.*, 341 F. Supp. 3d

1365, 1369-70 (N.D. Ga. 2018); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-2543,

2016 WL 3920353, at *13 (S.D.N.Y. July 15, 2016).[64] Defendants cite no case on point

involving a corporate enterprise theory. *That* theory is controlled by *Cedric Kushner*.

### 2.    There is sufficient evidence that each RICO Defendant conducted the enterprise's affairs through a pattern of racketeering activity.

The scheme to defraud—and the component schemes within—provide important context

for the RICO Defendants' arguments regarding the "conduct" and "racketeering activity"

elements of RICO. Defendants' arguments often treat different acts in isolation, while ignoring

that all Defendants were acting together toward a common goal. All Defendants claim they did

not "conduct the affairs" of the enterprise, and disclaim their participation in a "pattern of

racketeering activity." The Court should reject these arguments.

The evidence—laid out in the Statement of Facts and below—shows that the RICO

Defendants "participated in the conduct of enterprise's affairs." *Reves v. Ernst & Young*, 507

U.S. 170, 185 (1993). To conduct the affairs of an enterprise, a defendant "must have *some part*

in directing those affairs." *In re JUUL Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*,

497 F. Supp. 3d 552, 594 (N.D. Cal. 2020) (*JUUL I*) (quoting *Reves*, 507 U.S. at 179) (emphasis

added). This "requirement does not limit RICO liability 'to those with primary responsibility for

---

[64] Defendants also cite *Gardner v. Starkist Co.*, 418 F. Supp. 3d 443 (N.D. Cal. 2019), but there
the RICO claims failed due to a failure to allege any "acts towards [the] alleged common
purpose." *Id.* at 461. Here, Plaintiff has alleged specific acts of mail and wire fraud in furtherance
of the common purpose of boosting JLI's sales and creating and maintaining an illicit youth
market by deceptively describing the product and the company's true intentions.

1    the enterprise's affairs,' nor does it require a participant to exercise 'significant control over or

2    within an enterprise.'" *Id.* (quoting *Reves*, 507 U.S. at 179 & n.4). Certain Defendants claim that

3    they did not engage in two acts of mail or wire fraud, but "that is not the standard" to establish

4    participation in a pattern of racketeering activity. *Id.* at 616. Rather, SFUSD must show that each

5    Defendant was "(1) a knowing participant in a scheme to defraud, (2) that [each Defendant]

6    participated in the scheme with the intent to defraud, and (3) that a co-schemer's acts of mail and

7    wire fraud occurred during [each Defendant's] participation in the scheme and were within the

8    scope of the scheme." *Id.* (citing *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, &*

9    *Prods. Liab. Litig.*, MDL 2672, 2017 WL 4890594, at *13 (N.D. Cal. Oct. 30, 2017)).

10          Under the proper legal standard, all RICO Defendants conducted the affairs of the JLI

11    enterprise, in that they had some part in directing those affairs. The facts also support findings

12    that all Individual Defendants and Altria were knowing participants in a scheme to defraud with

13    the intent to defraud. Finally, all RICO Defendants were involved in the scheme while they

14    and/or a co-schemer committed acts of mail and wire fraud. Summary judgment, therefore,

15    should be denied on the conduct and racketeering activity elements as to all RICO Defendants.

16                              **a.    Adam Bowen.**

17          As a JLI founder who designed the JUUL product, Bowen was at the center of the fraud

18    scheme from the beginning. Bowen designed JUUL to deliver potent quantities of nicotine

19    without irritation; he concealed the addictive power of JUUL; he approved youth-focused

20    marketing campaigns and participated in discussions on influencer seeding; and he carried

21    JUUL's deceptive message in his interviews. This Court held that Plaintiff's RICO allegations

22    against Bowen were legally sufficient. *JUUL I*, 497 F. Supp. 3d at 606. The evidence has only

23    compounded since.

24                        **i.    Bowen conducted the affairs of JLI and participated in**
                                 **the scheme to defraud.**

25          Bowen claims that "the evidence does not establish that Bowen controlled or directed

26    JLI's activities." Bowen Mot. at 4. But again, SFUSD need only show that he played "some part"

27    in the management of JLI. *JUUL I*, 497 F. Supp. 3d at 594. Given that Bowen founded the

28

1    company, designed JUUL, served as an executive officer of JLI, and sat on JLI's Board, it would

2    be illogical to conclude otherwise.

3         Bowen designed JUUL to give consumers "buzz" and create a "smooth[]" product,

4    giving the highest amount of nicotine without a harsh throat hit. Ex. 113

5    (INREJUUL_00002903). Bowen created the product based on his experience and instincts,

6    rather than public health research. Ex. 114 (JLI00213143). Internal research on JUUL revealed a

7    nicotine hit more than three times more powerful than the next leading e-cigarette brand. Ex. 115

8    (Valani Ex. 40075) at 463). Afraid this nicotine strength might scare off customers, Bowen was

9    intimately involved in the fraudulent and misleading messaging JUUL used to convey product

10   strength, telling JUUL employees "the trick is to downplay the *amount* of nicotine." Ex. 112

11   (JLI04475468). In 2018, Bowen directed Ashley Gould to tell the Washington Post that JLI's

12   studies "support that nic strength and pack equivalence holds true." Ex. 116 (JLI10499253).

13        Bowen underwent media training to represent JUUL as a legitimate company and deflect

14   attention from its growing youth use problem, covering up the company's scheme to defraud and

15   misrepresenting the product. Ex. 79 (JLI45500221). Bowen orchestrated "the deceitful

16   concealment of material facts" to JUUL customers and regulators. *Virden v. Graphics One*, 623

17   F. Supp. 1417, 1422 (C.D. Cal. 1985); *see also In re Chrysler-Dodge-Jeep Ecodiesel Mktg.,*

18   *Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 976 (N.D. Cal. 2018) (executives

19   who make misleading public statements about their corporation's intent and actions contribute to

20   a scheme to defraud).

21        Bowen says he did not participate in JUUL marketing (Bowen Mot. at 4), but that is not

22   true. JLI's board, of which Bowen was an active member, reviewed Vaporized ad content. The

23   board then unanimously approved the Vaporized campaign with only minor notes. Ex. 18

24   (Dunlap Dep.) at 88:21-89:7. Moreover, Bowen continued to be very involved in early marketing

25   campaigns after the initial launch. *Id.* at 143:4-144:8. In 2016, when Katy Perry brought her

26   JUUL to the Golden Globe awards, Bowen told other Board members he was trying to get

27   Vanity Fair to mention the product by name, and he had a plan for future seeding. Ex. 117

28   (Bowen NCAG Ex. 11). As noted above, Bowen oversaw JLI's pre-launch flavor development

1    and was the ultimate decision-maker on what flavors would be sold, including JUUL's original

2    four flavors (Tobacco, Fruit Medley, Creme Brulee, and Cool Mint), and the three additional

3    flavors JLI later introduced (Cool Cucumber, Mango, and Menthol). Ex. 3 (Bowen Dep.) at

4    155:03-158:03, 349:07-349:12; Ex. 119 (Atkins Dep.) at 272:08-13. Bowen made these

5    decisions while Pritzker and Valani were pushing to get JUUL on the market with flavors before

6    any countervailing regulatory action. *See* Ex. 18 (Dunlap Dep.) at 49:18-50:22, 53:17-54:15.

7         This evidence establishes that Bowen was not merely engaged in the "routine affairs

8    expected from a founder and the Chief Technology Officer of JLI." Bowen Mot. at 13. In similar

9    cases, courts have held that defendants who designed and developed instruments essential to the

10   scheme to defraud, and then exercised control over those instruments, participated in the RICO

11   enterprise. *See In re Ecodiesel*, 295 F. Supp. 3d at 974; *see also JUUL I*, 497 F. Supp. 3d at 605

12   ("Bowen's role and personal conduct at the initial design and engineering of the JUUL product

13   and then the subsequent development and rollout of the JUUL product are sufficient *as to him* for

14   RICO conduct."). And, Bowen's assertion that he did not interact with anyone at SFUSD is

15   immaterial, as "no showing of reliance is required to establish that a person has

16   violated § 1962(c) by conducting the affairs of an enterprise." *Bridge*, 553 U.S. at 649.

17                    **ii.    Bowen engaged in racketeering activity.**

18        Bowen is also wrong in claiming that "Plaintiff has no evidence that Bowen, individually,

19   made any false or misleading statements that Plaintiff claims are predicate acts of mail or wire

20   fraud." Bowen Mot. at 19. Bowen misstates the legal standard. Again, Plaintiff need not show

21   "that each RICO defendant including Bowen *personally* committed at least two acts of mail or

22   wire fraud …." *JUUL II*, 533 F. Supp. 3d at 871. Plaintiff need only prove that Bowen

23   knowingly participated in the scheme to defraud, and that some member of that enterprise

24   committed two acts of mail or wire fraud in furtherance of that scheme. *Id.*; *see also United

25   States v. Stapleton*, 293 F.3d 1111, 1116-17 (9th Cir. 2002) (defendant "need not personally have

26   mailed the letter or made the telephone call").

27        The evidence above shows that Bowen played a key role in the fraud scheme by

28   designing a youth-friendly product that was highly addictive, and by supporting youth-focused

1    marketing privately while publicly representing JUUL as an adult-focused product. *See, e.g.*,

2    SOF § II.B (describing Bowen's role in the design of JUUL and quoting Bowen as claiming JLI

3    had tried to make JUUL "as adult-oriented as possible"). JUUL was sold with no warnings until

4    May 2018, when the FDA required one. Ex. 120 (Eissenberg Rpt.) at 33. Bowen (and other

5    RICO Defendants) supported aggressive marketing of a highly addictive, youth-friendly product

6    with no warnings for years. This and other evidence supports the conclusion that Bowen

7    knowingly participated in a scheme to defraud, with the intent to defraud, while he and/or co-

8    schemers engaged in mail or wire fraud.

9                                          **b.      James Monsees.**

10       James Monsees also conducted the affairs of the JLI enterprise through a pattern of

11   racketeering activity. *See JUUL I*, 497 F. Supp. 3d at 607 (holding the allegations as to Monsees,

12   allegations now backed by evidence, sufficient to show RICO conduct). Monsees participated in

13   the scheme to defraud when he steered the company away from action on youth use and flavors,

14   guided marketing that was intended to attract young people, and acted as a front-man in

15   spreading a false message about JUUL.

16       Monsees held himself and JLI out as committed to preventing youth JUUL use. *See*

17   Richtel & Kaplan, *supra* (stating that selling to youth is "antithetical to the company's mission").

18   In reality, Monsees received early warnings about the addictive power of JUUL, and particularly

19   the effect flavors could have on youth. Valani e-mailed Monsees and other board members in

20   August 2014, attaching an article raising concerns about the effect e-cigarettes had on children

21   and stating, "attorneys general urged the federal government to prohibit the sale of most e-

22   cigarette flavoring, fearing their appeal to children." Ex. 121 (JLI80376620). Instead of

23   expressing concern, Monsees responded: "I view this positively," grateful the federal

24   government was not discussing banning e-cigarettes generally. Ex. 122 (JLI80376621). In

25   November 2014, Monsees and other board members received further warning against marketing

26   flavors. Nathan Wolfe at Stanford indicated that companies who put out flavors that appeal to

27   youth, like "bubble gum," were unethical. Ex. 22 (Valani Ex. 40081). Less than a year later,

28   Monsees took JUUL to market with introductory flavors such as "fruut." Further, when

1    providing topics for an offsite meeting of high-level JUUL employees Monsees asked "How

2    aggressive do we want to be about controlling vs promoting against underage use? Do we

3    believe this is our job…?" Ex. 123 (INREJUUL_00264755). Like the other RICO Defendants,

4    Monsees concealed material information about the impact of JUUL flavors on youth.

5            Monsees was heavily involved in JUUL marketing. Monsees was CEO when JLI's board

6    voted unanimously to approve the Vaporized campaign unanimously with limited notes. Ex. 18

7    (Dunlap Dep.) at 88:21-89:7, 143:4-144:8, 143; *see also* SOF §§ II.C.3.a, II.C.3.b (detailing

8    Monsees' collaboration with other directors on JLI's early marketing plans). Monsees and

9    Bowen also carefully studied the game plan of traditional cigarette manufacturers and used their

10   playbook. *See* SOF § II.A.1 They hoped to gain the attention of big tobacco and form a

11   partnership, prompting Monsees to state: "where [JLI] comes in for [the tobacco companies] is

12   maintaining the youth culture market." *See id.* The creative force behind Vaporized, Cult

13   Collective owner Ryan Gill, collaborated with Monsees long after the Vaporized launch, and

14   Monsees coordinated with Gill on messaging when public opinion turned. Ex. 124

15   (JLI48334366). When the launch campaign turned to seeding, or giving products to influencers

16   in exchange for press, a JUUL staffer reached out to the Founders asking for names. Monsees

17   made sure the list included his preferred names, stating, "I'm going to have a fairly long list."

18   Ex. 125 (Monsees Ex. 45068). Monsees also controlled the list of influencer and VIPs who

19   received JUUL e-mails, adding names himself. Monsees and Bowen also sanctioned JUUL

20   "launch parties" that seeded teens with free product, which they distributed to friends, as

21   evidenced by their presence at the launch party attended by Tabitha Wakefield and many other

22   underage guests. *See* SOF §§ II.C.3.a, II.C.3.b.

23           Monsees also acted as the front-man for the scheme to defraud. Monsees repeatedly

24   appeared in the media attempting to legitimize JLI, and has made false statements to Congress.[65]

25   ──────────────
     [65] Monsees claims that his false and misleading statements to Congress are protected under
26   *Noerr- Pennington*. These were sworn statements and there is no First Amendment protection for
     perjury. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 512 (1972). Monsees
27   told Congress "we do not claim for JUUL to be a cessation product," and that the products "are
     … not designed for youth." Monsees knew these statements were untrue when he made them. *See*
28   Ex. 122 (JLI80376621); Ex. 33 (JLI00322485); Ex. 126 (Walker Ex. 602). In any event, the

Monsees acted as the face of JUUL, telling the story of a Silicon Valley founder making good. Like Bowen, Monsees had media training to help him answer the difficult questions he knew he would face. Ex. 78 (JLI11864642). Monsees used this media training to lie and conceal material facts. For example, in 2019 Monsees told the New York Times that JUUL was a device for switching from combustible cigarettes. Kevin Roose, *JUUL's Convenient Smoke Screen,* N.Y. Times, Jan. 11, 2019.[66] JUUL employees flagged this quote as one of potential concern ahead of Monsees's congressional testimony because JUUL was not approved as a cessation device. Ex. 127 (JLI09529647). Monsees also falsely stated in 2018 that JUUL was not creating new customers. Michael Coren, *Tech Investors Have Found Something Even More Addictive Than Social Media*, Quartz, Oct. 28, 2018.[67] In reality, a 2018 JLI-commissioned study revealed three times more consumers began using JUUL despite having never smoked a cigarette than those who used JUUL as a means to stop smoking. Ex. 128 (Pritzker Ex. 14109).

### c.    Pritzker, Valani, and Huh.

The Court should also reject the ODDs' assertion that there is no evidence of them fraudulently conducting or directing the affairs of the enterprise. The evidence shows they took control of JLI in October 2015 and pressed forward with aggressive youth marketing plans. Previously, this Court held there were sufficient allegations that the ODDs had "numerical control of the Board, knowledge about JUUL's youth appeal and the growth of underage users, significant involvement in marketing decisions, and unusually active roles in management and decisions from which they profited billions of dollars." *JUUL II*, 533 F. Supp. 3d at 861. The evidence supports all these allegations and more. The ODDs were also at the center of the fraudulent conduct.

The ODDs had numerical control of JLI's board at all relevant times. *See* SOF § II.A.2. JLI's Board was "very hands on with regard to the marketing" and all aspects of the business; "this was a highly involved Board at JUUL." Ex. 18 (Dunlap Dep.) at 143:4-44:8, 147:3-48:13;

---

statements are permissible "evidence of the overall alleged scheme to defraud." *JUUL I*, 497 F. Supp. 3d at 614.

[66] https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.

[67] https://qz.com/1348245/tech-investors-has-finally-found-something-even-more-addictive-than-social-media

1    *see also* Ex. 129 (Pritzker Ex. 14036) (e-mail describing JLI's Board members as "more

2    involved than most"). The company itself described Pritzker and Valani as "active on the board

3    as well as providing strategic advice to the company on a weekly basis." Ex. 130 (JLI01356237).

4         Pritzker and Valani, with the rest of the Board, were involved in the planning and

5    marketing decisions leading up to JUUL's launch. In November 2014, the Board discussed "the

6    additional concern (particularly in relationship to kids)" with JUUL and worked on "defining our

7    strategy" for marketing. Ex. 22 (Valani Ex. 40081). Valani testified that the addiction issue and

8    JLI's "conduct standards was … very much always on our mind." Ex. 131 (Valani Dep). at

9    245:2-10. In March 2015, management presented the planned Vaporized campaign to the Board.

10   Ex. 18 (Dunlap Dep.) at 88:21-89:7. The youth appeal of the campaign was obvious: Dunlap

11   testified, "I recall Nick Pritzker saying the campaign looks very young and are we sure that all of

12   these models are over the age of 21," and "he said we wouldn't want that to come back to bite

13   us." *Id.* at 90:25-92:3, 317:16-18:8. But the Board approved the campaign despite the lack of any

14   nicotine warning, with only "some suggestions," which were "all quite minor." *Id.* at 88:21-89:7.

15        The youth appeal of JUUL's marketing became a "common conversation" at weekly

16   Board meetings (now including Huh). Ex. 129 (Pritzker Ex. 14036); Ex. 18 (Dunlap Dep.) at

17   144-46. JLI's marketing team even worried that the Board would "try and write copy" for

18   branding changes. Ex. 129 (Pritzker Ex. 14036); Ex. 18 (Dunlap Dep.) at 149:19-50:24. The

19   Board received information from several sources that JUUL was appealing to youth and actually

20   being used by youth. Ex. 18 (Dunlap Dep.) at 94:1-96:18 (describing sources of data indicating

21   youth were using JUUL), 304:11-05:13 (Dunlap discussed these signs with the Board).

22        In October 2015, when faced with a crossroads and internal debate about the fate of the

23   company, the ODDs rejected efforts to curb youth sales and took over JLI to ensure its continued

24   growth. At the October 5, 2015 Board meeting, JLI's management presented to the Board

25   proposed corrective actions that would "lessen the risk of appealing to youth" and address other

26   operational issues, but which would also "slow down the business ... and bring down the sales

27   forecasts." Ex. 18 (Dunlap Dep.) at 245:1-49:3. Dunlap testified that the ODDs opposed this

28

1    proposal, and that "Hoyoung [Huh] and Nick [Pritzker] and Riaz [Valani] were very aggressive,

2    [it] was sales grows at all costs, you know, lean on that side of the risk equation." *Id.* at 248:5-13.

3        The next day, the ODDs removed Monsees as CEO and fired Dunlap. *Id.* at 248:5-13; *see*

4    *also* Ex. 4 (Pritzker Dep.) at 312:5-19. After being fired, Dunlap asked, "what are your intentions

5    for the business," to which Huh responded "gross sales" and "get sales on track." Ex. 18 (Dunlap

6    Dep.) at 154:25-57:3. When Dunlap asked how they planned to do that, Pritzker said that they

7    would be "taking executive control of the business." *Id*. Dunlap confirmed that Pritzker, Valani,

8    and Huh "cleaned house" and "axed anybody who wasn't in lockstep with them or who didn't

9    display the willingness or an ability to keep pace." *Id.* at 176:19-77:9.

10        In October 2015, Pritzker, Valani, and Huh took executive control of JLI. They formed

11    the Executive Committee "to provide more consistent and focused direction to the company" and

12    to "usher in the next phase of growth for the business." Ex. 25 (Valani Ex. 40100). Huh became

13    the "lead director with executive authority," with JLI's executives "reporting to Hoyoung." Ex.

14    27 (Huh Ex. 28015). Other Board members referred to Huh as "the leader of our efforts." Ex.

15    132 (Valani Ex. 40098). On October 6, 2015, Mumby acknowledged that their seizing power

16    would help JLI grow. He said to Huh, Pritzker, and Valani, "[m]any thanks for the candid

17    conversation yesterday. Not an easy moment for PAX Labs, but I'm excited about the future that

18    these changes will afford. ... Clearly, improving our sales strategy and integrating

19    sales/marketing better is crucial to our growth." Ex. 133 (JLI00214159).

20        As laid out above, the JLI Board had more involvement in the day-to-day management of

21    the company than is common, even before JUUL's launch. *See* SOF § II.A.2. Even after JLI

22    hired a new CEO in 2016, the ODDs remained highly involved in JLI's operations and

23    marketing. In 2017, for example, a JLI marketing employee reported to JLI's media vendor that

24    JLI's "CMO presented the entire media plan to the board," but "we need to put the plan on hold"

25    because the Board over which Pritzker, Valani, and Huh had numerical control, did not approve.

26    Ex. 30 (INREJUUL_00100719). In October 2017, the Board, including Pritzker, Valani, and

27    Huh, approved content for the misleading "Make the Switch" campaign. Ex. 33 (JLI00322485)

28    (the Board reviewed sample marketing campaign materials, and Pritzker alone nixed a specific

1    one). In July 2018, Valani helped Frankel prepare a detailed plan for managing JLI, which

2    included recruiting and hiring JLI staff, marketing, and pricing. Ex. 134 (MDL_RV0027010). In

3    December 2018, then-CEO Kevin Burns sought approval from Valani and Pritzker on a specific

4    advertising campaign. Ex. 91 (JLI10071280). Valani, copying Pritzker, approved only certain

5    videos, deciding "[w]e shouldn't air the short form ones." Ex. 92 (JLI10071228). Pritzker even

6    personally involved himself in customer service issues. Ex. 34 (JLI11015358).

7          There is also ample evidence that each ODD engaged in a pattern of racketeering

8    activity—i.e., that each ODD knowingly participated in a scheme to defraud, with the intent to

9    defraud, while he and/or co-schemers engaged in acts of mail or wire fraud. *JUUL I*, 497 F.

10    Supp. 3d at 616. As with the Founders, the ODDs sought to position JUUL for a major

11    investment by a tobacco company. SOF § II.A.3 They knew that JUUL flavors were attractive to

12    youth, and that JLI's ad campaigns were youth focused. *Id.* § II.E. Even Pritzker's son-in-law

13    commented that the "explosion in vaping among teens" was "deeply disturbing." Ex. 135 (Olin

14    Ex. 18509). And yet, the ODDs pressed on. They took control of the company and steered it

15    toward aggressive marketing, firing anyone who disagreed. *See* SOF § II.D. The ODDs approved

16    Vaporized before their takeover, and the aggressive JUUL campaigns involving influencers and

17    social media marketing occurred directly under their watch. *Id.* § II.C.3.b.

18          The ODDs further aided the scheme by directing company responses to emerging

19    criticism of JLI's role in the youth nicotine epidemic. In 2017, JLI management made "copy

20    updates to the [JLI corporate website] from discussions I had with Nick on Friday." Ex. 32

21    (Pritzker Ex. 14083). In January 2018, Valani ordered a detailed messaging strategy and action

22    items to respond to negative press, including running "strategic media analysis [to] see where

23    these articles are coming from" and "debunk[ing] the studies" drawing a connection between

24    teens using e-cigarettes and then trying cigarettes. Ex. 36 (Valani Ex. 40110). In April 2018,

25    CEO Burns sought Pritzker and Valani's approval on a draft response to an inquiry by U.S.

26    Senators and a press release regarding youth prevention efforts. Ex. 136 (JLI10529705). Valani

27    edited the press release about JLI's supposed "Comprehensive Strategy to Prevent Underage

28    Use" and sent his redline to Burns. Ex. 196 (JLI00151300). Pritzker and Valani tightly controlled

1   JLI's public relations and media, including directing a specific and personal response to an e-

2   mail from a teacher regarding youth use in schools. Ex. 138 (JLI00024566). When the heat

3   turned up regarding use of flavors, JLI—still controlled by the ODDs—hid results of its own

4   studies, which showed that flavors were popular with youth, and instead falsely claimed that

5   flavors were effective in switching adult smokers. *See* SOF § II.E.1.

6        Finally, Pritzker and Valani were the lead negotiators for JLI's 2018 deal with Altria.

7   Pritzker and Valani (and Bowen and Monsees) approved the distribution plan knowing that

8   approximately $5.5 billion of Altria's $12.8 billion investment would go directly to them and

9   Huh. This distribution was not business as usual or in the best interest of JLI. *See* SOF § II.A.4.

10  As detailed above, during negotiations Pritzker and Valani greatly expanded JUUL sales and

11  youth-focused marketing to set themselves up for financial gain. *Id.* Both also worked closely

12  with Altria on a deceptive campaign to keep mint-flavored JUUL pods on the market. *See id.*

13  § II.E.2.

14              **d.    Altria.**

15                   **i.    Altria directed the affairs of the enterprise.**

16       This Court previously found sufficient allegations that Altria had "some part" in directing

17  and controlling the JLI enterprise. *JUUL II*, 533 F. Supp. 3d at 870. SFUSD now has evidence to

18  prove those allegations. When "the evidence is analyzed from a practical business perspective,

19  Altria, no doubt, played a key role in directing, operating, and managing the affairs of JLI during

20  the relevant time period." Ex. 64 (Drumwright May 2022 Rpt.) at 14.

21       Altria need not have occupied a position above or even equivalent to JLI's Board to play

22  some part in directing JLI. RICO liability does not require "significant control over or within an

23  enterprise." *Reves*, 507 U.S. at 179 n.8. Courts "have held that *Reves* is satisfied by evidence that

24  lower-rung members of an enterprise implemented decisions directed by those higher up the

25  ladder in the enterprise or committed racketeering acts which furthered the basic goals of the

26  enterprise at the direction of other members of the enterprise.'" *JUUL I*, 497 F. Supp. 3d at 604

27  (quoting *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 580, 876 (D.D.C. 2006)).

28  "A defendant can satisfy this 'conduct' element by simply 'coordinating and causing the public

1   dissemination of false, misleading or deceptive statements' in support of the RICO conspiracy."

2   *Id.* (quoting *Philip Morris*, 449 F. Supp. 2d at 877).

3       **Altria guided JLI's strategic direction.** Altria was far more than a mere service

4   provider to JLI. Altria viewed itself as JLI's "[v]alued partner" and sought to "[g]uide [JLI's]

5   strategic direction through board engagement," including providing "ongoing" "strategic advice

6   and expertise." Ex. 53 (ALGAT0002856956) at slide 1. No passive investor, Altria aimed to be

7   "a strategic partner in supporting JUUL's mission." Ex. 54 (ALGAT0000772561) at slide 6.

8   Altria accomplished this goal via its Board Observer and JLI's eventual CEO, K.C. Crosthwaite,

9   frequent private calls with Pritzker and Valani, and in-person meetings. Ex. 64 (Drumwright

10  May 2022 Rpt.) at 50.

11      Dr. Drumwright evaluated the relationship between Altria and JLI from a practical

12  business perspective and concluded that "Altria managed, operated, and directed JLI in ways that

13  were disproportionate to its ownership stake." *Id.* at 47. For example, when Altria disagreed with

14  JLI CEO Burns about a regulatory issue, Altria communicated with Valani about the dispute,

15  telling him "[p]ls do not send this note to JUUL management" and indicating they would "push

16  Kevin" on the issue. Ex. 68 (Frankel Ex. 17781). Valani responded, "Of course. Please let us

17  know where you end up, and if/how we should engage to get the right result." *Id.*

18      **Altria directed JLI by offering the Individual Defendants enormous sums of money.**

19  Altria also offered the Individual Defendants billions of dollars to get what it wanted out of JLI.

20  *See* Ex. 64 (Drumwright May 2022 Rpt. at 13, 54-59 ("It is naïve, simplistic, and ignorant of

21  business dynamics to think that rewarding JLI board members personally with enormous sums of

22  money … would not result in a significant form of influence and direction."). One way in which

23  a party can "participate, directly or indirectly, in the conduct of such enterprise's affairs" is

24  through actions akin to bribery. *Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008) (finding

25  no operation or management because there was "no inference that [the defendant] tried to control

26  the enterprise by anything akin, for example, to bribery"). Altria was able to direct JLI to grow

27  sales by offering its co-Defendants vast sums of money. From the beginning of Altria's

28  involvement with the other RICO Defendants, Altria offered to provide them "'EXCESS OF

1    TOBACCO MULTIPLES.'" Ex. 139 (Frankel Ex. 17789); *see also* SOF §§ II.A.4, II.F.3

2    (recounting evidence of back-channel negotiations). To maximize their own profits, the

3    Individual Defendants understood that they had to grow JLI's sales, knowing it would increase

4    sales to youth. Altria told Pritzker and Valani that Altria was aligned with them on "a strategic

5    vision as to how to grow the JUUL business rapidly." Ex. 345 (ALGAT0004031644). At all

6    times, as JUUL sales grew, so did Altria's valuation. *See* SOF § II.F.3.

7         Ultimately, Altria paid handsomely for those growing sales: Valani received $2.6 billion,

8    Pritzker and his family trust received $1.82 billion, Bowen received $580 million, Monsees

9    received $464 million, and Huh received $95.5 million. Ex. 64 (Drumwright May 2022 Rpt.) at

10   56-57. "[E]normous personal rewards for members of a board of directors can create conflicts of

11   interest that interfere with the directors' fiduciary responsibilities to the company." *Id.* at 57. Its

12   promise of money gave Altria the power to direct JLI's affairs even before it had a formal role

13   with JLI. This dynamic led to more aggressive marketing of JUUL and a major increase in sales,

14   including among youth. *See* SOF § II.F.3.

15        **Altria installed Crosthwaite as JLI's CEO.** Altria's ability to direct JLI's affairs is

16   further evidenced by its successful installation of Altria's own career executive, K.C.

17   Crosthwaite, as CEO and member of JLI's Board of Directors. Altria's goal at the beginning of

18   negotiations was to control JLI. Ex. 50 (Gifford Dep.) at 74:16-18. After the investment,

19   Crosthwaite, who "had responsibility for overseeing the overall return on Altria's minority

20   investment," Ex. 51 (Willard Ex. 22) at 900, confirmed Altria's focus on "ensur[ing] JUUL

21   maintains long-term leadership in global E-vapor by … providing strategic guidance through

22   board participation." Ex. 52 (ALGAT0002856951) at 6951.

23        In spring 2019, Altria became unhappy with Kevin Burns, JLI's CEO, and began

24   discussing his replacement with Pritzker and Valani. Ex. 40 (Devitre Dep.) 286:20-288:15; Ex.

25   328 (Willard FTC Dep.) 159:2-162:7. Altria believed one way of fixing the problem "was to get

26   rid of the JUUL CEO and install a new CEO." Ex. 40 (Devitre Dep.) 291:21-24, 478:7-479:14

27   (describing a meeting between Willard, Gifford, Devitre, Valani, Pritzker, and others during

28   which they decided to replace Burns). "[T]he person that was selected to do that was the former

1    CEO of Philip Morris USA and then chief growth officer of Altria K.C. Crosthwaite." *Id.* at

2    292:1-5; *see also id.* at 292:14-293:2 ("We had concluded, or at least the management of [Altria]

3    had concluded that K.C. was the right person to go to JUUL").

4    　　　Crosthwaite taking over as CEO gave Altria even more power in directing JLI. Altria

5    paid Crosthwaite $5.6 million to go to JLI, including the possibility of $1.37 million at the end of

6    2019. Ex. 64 (Drumwright May 2022 Rpt.) at 51. Principles of "[e]xecutive socialization indicate

7    that Crosthwaite would have adopted the norms, goals, values, and modes of thinking and

8    behaving that are specific to Altria during his more than 20 years of employment at Altria" as

9    well as have "personal networks at Altria that would continue to affect his decision making and

10   interpretation of new information." *Id.* Whether Crosthwaite owed fiduciary duties to JLI rather

11   than Altria (Altria Mot. at 30), is immaterial to replacing JLI's CEO with a career Altria

12   executive is evidence of Altria playing some part in directing JLI's affairs.

13   　　　**Delaware corporate law does not supply the relevant legal standard.** Altria and its

14   expert, Professor Rock, focus on the wrong question: whether the deal gave Altria the legal right

15   to control JLI as a matter of Delaware corporate law. *See* Altria Mot. at 28 (stating that "Altria

16   lacked legal control over JLI under the applicable corporate law"); Ex. 329 (Rock Dep.) at

17   73:18-74:15 ("[A]s a matter of the principles of Delaware corporate law and the policies

18   underling those principles, it's inconceivable to me that Altria could be considered a controller,

19   controller, of JLI prior to December 2018."). The applicability of Delaware corporate law is not

20   the question before the Court. Rather, the question is whether Altria played "some part" in

21   directing the affairs of JLI. Altria and its expert do not answer this question. *See, e.g.*, Ex. 329

22   (Rock Dep.) at 107:25-108:24 (Q: "Do you believe that you can give someone direction without

23   having legal control over them?" A: "It's not a question that I've examined in my report."). At

24   most, Professor Rock's opinions create disputed factual questions.

25

26

27

28

ii.  **Altria perpetuated the scheme to defraud using the mails and wires to cover up youth targeting, to protect against regulation and public outcry, and to keep mint on the market.**

Altria next argues that Plaintiff has failed to show that it committed at least two predicate acts of mail or wire fraud, but as this Court has held, "that is not the standard." *JUUL I*, 497 F. Supp. 3d at 616; Altria Mot. at 31. Again, SFUSD need only show that each defendant was "(1) a knowing participant in a scheme to defraud, (2) that [defendant] participated in the scheme with the intent to defraud, and (3) that a co-schemer's acts of mail and wire fraud occurred during [defendant's] participation in the scheme and were within the scope of the scheme." *Id.* at 616.

The jury can conclude that Altria knew the other RICO Defendants designed and marketed JUUL to youth and covered it up, and that Altria knowingly participated in that scheme. *See* SOF § II.F; *JUUL III*, 2022 WL 1601418, at *17 ("[T]he jury may reasonably infer from Altria's knowledge of JUUL's growth due to youth uptake that the youth market was a prime motivator for Altria's investment in JLI and that Altria's acts, including efforts to keep mint on the market and reserving the prime shelf-space for JUUL, were intended to further the growth in that market. That is sufficient to support liability for fraudulent conduct.").

Altria also committed its own acts of mail and wire fraud. Altria mailed and e-mailed millions of "Make the Switch" advertisements to the public. Ex. 64 (Drumwright May 2022 Rpt.) at 60; Ex. 94 (Longest Dep.) at 311:10-22 (confirming that Altria sent out a direct mail campaign in featuring the "Make the Switch" campaign and featuring statements like "Stacey smoked for 33 years and switched to JUUL in September 2016," and the claim that JUUL is "Designed for adult smokers"), Ex. 100 (Longest Ex. 452) at 3369 (e-mail campaign saying "Pat smoked for 34 years and switched to JUUL in 2017. 'I was looking to find something to replace cigarettes. The switch was easy.'" and "JUUL is a satisfying alternative to cigarettes for adult smokers"). The goal of the "Make the Switch" campaign was to "show the public-at-large that JUUL is a mission-driven company seeking to improve the lives of the world's 1 billion adult smokers" in order to "inspire broad gen-pop support for the JUUL mission." Ex. 90 (JLI11389086). The evidence supports this Court's prior articulation that the "Make the Switch"

1    campaign was designed to "mislead consumers into thinking that JLI products were benign

2    smoking cessation devices, even though JUUL was never designed to break addictions" and was

3    not designed solely for adult smokers. *JUUL II*, 533 F. Supp. 3d at 870 (holding that there were

4    sufficient allegations that Altria participated in a scheme to "cover up" youth targeting).

5         Altria contends that its "Make the Switch" statements are non-actionable puffery. Altria

6    focuses only on the statement describing JUUL as "an alternative to cigarettes," but "the specific

7    'switch' and 'alternative' claims must be considered in the context of the advertisements and

8    materials where they appear." *JUUL I*, 497 F. Supp. 3d at 626. In context, these advertisements

9    convey that "JUUL could and was designed to help people stop smoking," rather than being an

10   on-ramp for youth nicotine use. Ex. 156 (Prochaska Rpt.) at 89. Altria's witnesses conceded that

11   Altria did not believe JUUL was a smoking cessation device and knew that JUUL users often

12   ended up using more combustible cigarettes than before. *E.g.*, Ex. 287 (Gifford Ex. 31021) at

13   9518 (September 2018 report sent to Altria stating that "60% of smokers who use JUUL report

14   that they are smoking more since they started using JUUL").

15        Altria also published additional fraudulent messages claiming that JUUL was a product

16   for adult smokers and that Altria was committed to preventing youth use of JUUL. *See, e.g.*, Ex.

17   288 (ALGAT0003490032) at 90034 (December 20, 2018 statement that "Altria and JUUL are

18   committed to preventing kids from using any tobacco products. ... As JUUL previously said,

19   'Our intent was never to have youth use JUUL products.'"); Ex. 289 (ALGAT0004029004) at

20   29047 (January 29, 2019 statement that "[t]hrough JUUL, we have found unique opportunity to

21   not only participate meaningfully in the e-vapor category but to also support and even accelerate

22   transition to noncombustible alternative products by adult smokers."). But Altria encouraged JLI

23   to grow sales and digital reach, knowing it would worsen the youth problem. *See* SOF §§ II.F.2,

24   II.F.3. Altria also expanded the prominence and frequency of JUUL point-of-sale advertising

25   despite knowing that doing so would increase youth use. *Id.* § II.F.3.

26        Finally, Altria used the mails and wires to effectuate the RICO Defendants' scheme to

27   keep mint-flavored JUULpods on the market. *See* SOF § II.E.2. As Altria told Pritzker and

28   Valani, it had the "[e]xperience and resources to navigate a complex [regulatory] environment,"

1    experience that JLI's leadership lacked. Ex. 65 (Willard Ex. 7) at slide 6; *see also* Ex. 50

2    (Gifford Dep.) at 76:21-77:5 (JLI's leadership "didn't have that regulatory know-how or

3    experience in dealing with the FDA"). For that reason, Altria's assistance to Pritzker, Valani, and

4    JLI leadership was crucial to carrying out the mint scheme. *See In re Ecodiesel*, 295 F. Supp. 3d

5    at 983 (holding that individuals "responsible for orchestrating the scheme" played a sufficient

6    part in directing the enterprise's affairs).

7        Altria knew mint JUUL products were attractive to youth. *See* Ex. 160 (Willard Dep.) at

8    79:12-22 (acknowledging that Altria "thought that flavors were one of the contributors to youth

9    usage"); Ex. 265 (Blaylock Ex. 2407) at 4725 (identifying mint as a favorite flavor with youth).

10   Altria and the Individual Defendants also knew that the FDA was planning to regulate flavors of

11   e-cigarettes. Ex. 64 (Drumwright May 2022 Rpt.) at 33 (describing how Altria and

12   representatives from JLI met to "build a coalition and a common agenda to influence or

13   challenge FDA's approach" to regulating flavors). Altria discussed the popularity of mint

14   directly with Valani over the wires. *See* Ex. 272 (Valani Ex. 40112) (Devitre e-mailed Riaz

15   Valani with the subject "Mint percentage?" and asked, "What proportion of total sales is in non

16   tobacco flavor for J"? Valani replied, "A majority. We can discuss live when we next meet.").

17   After the FDA threatened to crack down on JUUL and stated that "we may take steps to curtail

18   the marketing and selling of flavored products," Altria, Pritzker, and Valani reengaged in

19   negotiations. Ex. 64 (Drumwright May 2022 Rpt.) at 35. Before either JLI or Altria met with the

20   FDA, Altria used the wires to confirm that the deal with Pritzker and Valani for a large stake in

21   JLI was still alive. Ex. 40 (Devitre Dep.) at 358:5-13.

22       JLI then met with the FDA, categorizing mint as a "[t]obacco and menthol product"

23   rather than a "[f]lavored product." Ex. 64 (Drumwright May 2022 Rpt.) at 36. Valani admitted

24   this characterization may be seen as "disingenuous." Ex. 256 (MDL_RV0028377). On October

25   25, 2018, Altria wrote a letter to the FDA and posted the letter on its website. Rather than

26   disclose its knowledge of JUUL's popularity with youth or marketing success, Willard claimed,

27   "We believe e-vapor products present an important opportunity to adult smokers to switch from

28   combustible cigarettes." Ex. 290 (Blaylock Ex. 1751) at 7828. Willard portrayed mint as a

1    traditional tobacco flavor and asserted that the youth epidemic was caused in part by products

2    that "go beyond traditional tobacco flavors," even though Altria knew mint was a favorite flavor

3    of teens. *Id*. at p. 7829. That same day, Willard e-mailed the letter with Pritzker and Valani. Ex.

4    291 (Willard Ex. 43). These communications serve both as evidence of Altria's intent to defraud

5    and predicate acts furthering Altria's pattern of racketeering. *See Bridge*, 553 U.S. at 647 (Any

6    "mailing that is incident to an essential part of the scheme satisfies the mailing element").

7         Altria's claim that its statements were true does not change this result. Altria Mot. at 31,

8    33. There is a genuine dispute over whether the statements are false; regardless, falsity is not

9    required: "Proof of a scheme or artifice to defraud [] may or may not involve any specific false

10   statements." *United States v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003) (citation omitted); *see*

11   *also Schmuck*, 489 U.S. at 715 (mailing element satisfied even where mailing "contain[s] no

12   false information"). The "intent to defraud need not be shown for each alleged use of the mails or

13   wires as long as there is evidence that the use of mails or wires was done to further the

14   overarching scheme to defraud." *JUUL I*, 497 F. Supp. 3d at 612. Here, the jury can infer an

15   intent to defraud due to the mismatch between what Altria knew and sent in the mail/wires.[68]

16        Finally, Altria contends that its racketeering activity was insufficiently continuous,

17   arguing that "the period of time over which the Altria Defendants engaged in alleged

18   racketeering activity would barely exceed one year." Altria Mot. at 34. However, the Ninth

19   Circuit has stated that showing that "the predicate acts occurred over a substantial period of time,

20   as much as thirteen months … would have satisfied the continuity requirement." *Allwaste, Inc. v.*

21   *Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995). Altria also focuses only on its own alleged predicate

22   acts. When evaluating the pattern of racketing, "it is only necessary that plaintiffs allege that

23   each defendant knowingly participated in the scheme to defraud, with the requisite intent, and

24   that some member or members of the Enterprise commit at least two acts of mail or wire fraud."

25

26   [68] Altria also contends that its statements were not material. Altria Mot. at 31. The jury can
     conclude that had Altria been honest about what it knew of JUUL's youth friendly design, youth
27   marketing, or the appeal of mint to youth, SFUSD, the public, the FDA, and other regulatory
     bodies would have acted differently. *See United States v. Shields,* No. 12-410, 2014 WL 4744617,
28   at *2 (N.D. Cal. Sept. 23, 2014), *aff'd*, 673 F. App'x 625 (9th Cir. 2016) (communications
     designed to reassure victims and postpone inquiries are acts furthering the fraudulent scheme).

*JUUL II*, 533 F. Supp. 3d at 871-72. As described above, the jury can find the RICO Defendants engaged in a pattern of racketing activity for multiple years, satisfying the continuity requirement. Similarly, given Altria's consistent statements since announcing its investment in JLI, the jury can conclude that Altria would have continued to lie and attempt to cover up JUUL's youth targeting and youth appeal indefinitely if it were not named as a RICO Defendant. *See Allwaste*, 65 F.3d at 1529 ("[F]ortuitous interruption of criminal acts"—such as "the commencement of the RICO action"— "does not preclude a finding of open-ended continuity.").

### 3. The enterprise's scheme to defraud caused harm to SFUSD that was the foreseeable and natural consequence of Defendants' scheme.

To establish civil RICO standing, a plaintiff must show that it suffered an injury "by reason of" the defendant's RICO violation. 18 U.S.C. § 1964(c). This showing requires "both proximate and but-for causation." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019). The proximate cause requirement "bar[s] suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (citation omitted). RICO requires the plaintiff to show "*some direct relation* between the injury asserted and the injurious conduct alleged." *Painters*, 943 F.3d at 1249 (emphasis added, citation omitted). Put another way, RICO defendants are liable for the "foreseeable and natural consequence[s] of [their] scheme." *Bridge*, 553 U.S. at 658.

Monsees and Altria inaccurately assert that a RICO plaintiff must establish a causal link between each defendant's particular misconduct and SFUSD's damages. Monsees Mot. at 19; Altria Mot. at 23. As this Court previously held, RICO does *not* require Plaintiff to show that "each individual predicate act" caused it injury, but rather that "the pattern of racketeering activity"—that is, the fraud scheme in which the RICO Defendants engaged through the enterprise—did so. *JUUL I*, 497 F. Supp. 3d at 618 (citation omitted); *see also Painters*, 943 F.3d at 1250-51 (causation sufficiently alleged where there was "direct relation" between plaintiffs' harm and defendants' fraudulent scheme); *Marshall & Ilsley Tr. Co. v. Pate*, 819 F.2d

- 77 -

1   806, 809 (7th Cir. 1987) (plaintiff need only establish "an injury directly resulting from some or

2   all of the activities comprising the [RICO] violation").[69]

3       Under the correct standard, SFUSD's evidence creates triable questions of fact regarding

4   causation. The record contains ample evidence that, by engaging in a scheme to defraud,

5   Defendants caused specific, concrete harm to SFUSD. As detailed above, the RICO Defendants

6   engaged in an intentional scheme to market JUUL to youth while deceiving the public and

7   regulators about their intentions and the addictiveness of the device. *See* Argument § A.2. The

8   scheme involved designing a product enticing to youth, using flavors that were extremely

9   popular with youth; marketing that product through several channels that heavily targeted youth,

10  such as launch parties full of teens obtaining handfuls of free product, the Vaporized campaign,

11  celebrity influencers, and social media; concealing information about the nicotine in JUUL, as

12  well as information about the draw of youth to flavors; engaging in sham youth prevention

13  efforts in schools; falsely claiming that JUUL was designed *solely* to switch adult smokers;

14  falsely claiming that flavors were effective for switching adult smokers; and falsely claiming that

15  mint was not a flavor popular with youth, when the RICO Defendants knew that it was. *See id.*

16      There should be little doubt that JUUL caused a vaping epidemic, nationally and in

17  SFUSD. In addressing a JLI *Daubert* motion that focused, in part, on causation, this Court held

18  that it was "a battle of the experts to be resolved by the jury." *In re Juul Labs, Inc. Mktg., Sales*

19  *Practice & Prods. Liab. Litig.*, No. 19-02913, 2022 WL 1814440, at *5 (N.D. Cal. June 2, 2022)

20  (*JUUL IV*). Here, Plaintiff has far more than expert opinion to support causation as to SFUSD.

21  But even standing alone, Plaintiff's experts make that case as to the RICO Defendants, who

22  controlled JLI. For instance, Dr. Ribisl opines that "JLI's sales and marketing practices have led

23  to epidemic rates of e-cigarette use, which have disrupted schools, including those in the

24  SFUSD." Ex. 170 (Ribisl Rpt.) at 5. Dr. Chandler opines that "the company's marketing

---

25  [69] Monsees and Altria also argue that SFUSD or its students must have relied on false statements.
    Monsees Mot. at 19; Altria Mot. at 23-24. This is incorrect. As the Supreme Court has made

26  clear, "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an
    element of its claim or as a prerequisite to establishing proximate causation, that it relied on the

27  defendant's alleged misrepresentation." *Bridge*, 553 U.S. at 661; *see also Painters*, 943. F3d at
    1260 (rejecting the argument that a plaintiff must plead the specific individuals who relied on

28  their fraudulent statements, causing the third parties' harm).

1    ultimately caused a mass epidemic of e-cigarette use and addiction in high schools across the

2    United States." Ex. 177 (Chandler Jan. 2022 Rpt.) at 6. Dr. Halpern-Felsher agreed and further

3    opined that "[a]dolescents and young adults use JUUL because of its product features and JLI's

4    marketing of those features." Ex. 207 (Halpern-Felsher Jan. 2022 Rpt.) at 10.

5            Given the evidence about the RICO Defendants' scheme to defraud, the jury can find that

6    the scheme foreseeably harmed SFUSD. The Individual Defendants knew the attractiveness of

7    its product, and particularly flavors, to youth. *See* SOF §§ II.C, II.D. They knew they were

8    selling an addictive product. Yet, as Bowen said, "the trick is to downplay the *amount* of

9    nicotine." Ex. 112 (JLI04475468). They provided no warnings until required to do so by the

10   FDA in 2018. Ex. 120 (Eissenberg Rpt.) at 33. They used marketing channels that appealed to

11   youth. *See* SOF §§ II.C.3.bII.C.3.c. After Altria joined the enterprise, the RICO Defendants

12   increased their marketing and distribution of JUUL, and they misrepresented the purpose of

13   flavors, and particularly mint, to keep JUUL generally, and mint specifically, on the market. *Id.*

14   §§ II.E.2, II.F.3, II.F.4. Then they developed "Make the Switch" to further the ruse that JUUL

15   was an adult switching product. *See* SOF § II.B. Based on those actions, it was foreseeable that

16   huge numbers of school-aged children would use JUUL; in turn, the vaping crisis at SFUSD was

17   the "foreseeable and natural consequence of [the RICO Defendants'] scheme." *See Bridge*, 553

18   U.S. at 658.

19           It is no surprise that this national crisis also hit hard in the major public school district in

20   JLI's home city. Mr. Dorn notes that the number of SFUSD high school students who had used

21   e-cigarettes jumped to more than 31% in 2019, and the number of current users more than

22   doubled from 7.1% to 16% from 2017 to 2019. Ex. 208 (Dorn Rpt.) at 23. Middle school users

23   who had tried e-cigarettes rose to 8.8%, with 3.7% being current users. *Id.* Ms. Pak agreed that

24   vaping at SFUSD is an "epidemic" because health officials have described it as such, and

25   because there are a "large number and a growing number" of students vaping at SFUSD. Ex. 209

26   (Pak 10/15/21 Dep.) at 273:24-274:14.

27           Testimony from SFUSD officials demonstrates that JUUL was the primary driver of this

28   vaping epidemic at SFUSD. Per Ms. Pak, JUUL products were "the most popular," such that

1    SFUSD instituted an educational program specifically called "Juul School." *Id*; Ex. 210

2    (SFUSD_001936). Kim Coates, executive director of SFUSD's Student and Family Services

3    Division, testified that SFUSD staff had to spend a "disproportionate amount of time" addressing

4    "Juuling," and that JUUL products specifically were a "particular problem" in SFUSD schools.

5    Ex. 149 (Coates Dep.) at 45:1-21; 151:23-152:6. Erica Lingrell, an SFUSD program

6    administrator who focuses on student wellness, listed several vaping-related issues at SFUSD not

7    covered by external grants, after clarifying that she was talking about JUUL-caused problems

8    specifically. Ex. 211 (Lingrell Dep.) at 70:11-72:11.

9           Defendants' deception succeeded. SFUSD "students were not aware of the harms and the

10   risks" of using JUUL, and that "they didn't know about nicotine in Juuls or e-cigarettes." Ex.

11   212 (Pak 10/7/21 Dep.) at 117:14-19. This mirrors the national data showing that young people

12   have not understood JUUL's nicotine content. Ex. 148 (Halpern-Felsher Sept. 2021 Rpt.) at 64-

13   65. Ms. Pak also testified that JUUL was "the predominantly known product and most widely

14   used," that JUUL is "marketed as the iPhone of vapes or e-cigs," and that "the ads were

15   predominantly in our city." Ex. 213 (Pak 5/27/21 Dep.) at 23:1-7, 24:21-25:1.

16          Finally, contrary to Bowen's and Monsees's arguments (Bowen Mot. at 11; Monsees

17   Mot. at 20), SFUSD's injuries are "wholly distinct" from those caused to SFUSD students.

18   *JUUL I*, 497 F. Supp. 3d at 621 (stating that even if end users cannot prove damages, "that would

19   not undercut the damages sought by the [government entities] such as the costs of hiring and

20   training staff to address e-cigarette use, development of programs and materials to address e-

21   cigarette use, ... [and] physical alterations to their properties to address and deter further e-

22   cigarette use"). SFUSD's injuries are not injuries "passed on" from students. *See Canyon County*

23   *v. Syngenta Seeds, Inc.*, 519 F.3d 969, 983 (2008) (describing "passed-on" harm as injury to a

24   third party that has "flowed through" another victim). Instead, SFUSD has provided concrete

25   evidence of the injury to SFUSD itself, including physical property damage, costs of signage,

26   stipends for youth leaders, and extensive training for staff. *See* SOF § II.H.3.

27

28

**4.  SFUSD has incurred injury to property and a concrete financial loss.**

Generally, RICO plaintiffs must establish that they have suffered "harm to a specific business or property interest," and "concrete financial loss." *In re Ecodiesel*, 295 F. Supp. 3d at 957 (citations omitted). However, while out-of-pocket losses can establish property injury for RICO purposes, "[a]n out-of-pocket loss is not required … for a financial loss to be tangible or concrete." *In re Volkswagen*, 2017 WL 4890594, at *5.

Plaintiff has evidence of "damage to business or property" in several forms. The evidence shows property damage such as: cut fences and damaged bathroom doors; district expenditures for items such as signs and vaping education programs; diminished access to property, through locking doors to prevent vaping, creating a safety risk; employees paid by SFUSD devoting considerable amounts of time to this problem; and massive disruption JUUL has caused on school campuses, all of which infringes on the SFUSD's use and enjoyment of its property. That damage to property, in turn, has caused concrete financial loss.

**a.  Infringement on the use and enjoyment of property constitutes an injury to property under California law.**

To obtain RICO standing, SFUSD must have evidence that it was "injured in [its] business or property." 18 U.S.C.A. § 1964(c). That inquiry is conducted in reference to state law. *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc). In California, a property interest does not require an ownership interest. *Orange County. Water Dist. v. Sabic Innovative Plastics US, LLC*, 14 Cal. App. 5th 343, 416 (2017). One way to show an injury to property is to show "an injury specifically referable to the use and enjoyment of [the plaintiff's] land." *Koll-Irvine Ctr. Prop. Owners Assn. v. County of Orange*, 24 Cal. App. 4th 1036, 1041 (1994). There need not be direct damage or loss of use to constitute the necessary interference. *Andrews v. Plains All Am. Pipeline, L.P.*, No. 15-4113, 2020 WL 1650031, at *4 (C.D. Cal. Mar. 17, 2020). For example, noise, smoke, vibrations, and odors constitute property damage under California law. *Id.*

While there is physical property damage in this case, neither RICO precedents nor California law require *physical* property damage to establish a property injury. *See Diaz* , 420 F.3d at 899-901 (lost wages due to false imprisonment); *In re Ecodiesel*, 295 F. Supp. 3d at 959

(overpayment). For example, the Ninth Circuit has held that a county's decision to rezone a property owner's land deprived the landowner of a "protected property interest," due to the "[l]oss of the use and enjoyment of his land." *Harris v. County of Riverside*, 904 F.2d 497, 503 (9th Cir. 1990).

### b.     SFUSD has suffered physical damage to and the loss of use of and enjoyment of school property.

Vaping, predominantly JUUL, is a constant problem at SFUSD schools. Ms. Coates described vaping at SFUSD as "an emerging crisis." Ex. 149 (Coates Dep.), at 111:11-13. Ms. Pak agreed that vaping at SFUSD is an "epidemic." Ex. 209 (Pak 10/15/21 Dep.) at 273:24-274:14. Ms. Lingrell testified that vaping "has been a huge problem" at SFUSD and, therefore, a focus for professional development. Ex. 211 (Lingrell Dep.) at 36:2-11. Mr. Dorn, whose team visited every school at SFUSD in developing his report, testified that student vaping is "having a catastrophic effect" on SFUSD's ability to educate students, and "is impacting every aspect of their operation, particularly in their secondary schools." Ex. 214 (Dorn Dep.) at 126:6-17.

The "injury to property" that SFUSD has suffered due to the vaping has taken many forms. All of these harms have occurred, and continue to occur, on SFUSD's property.

### i.     Physical property damages.

First, there is physical property damage directly linked to vaping. In one school, students rushing into a bathroom to vape broke the bathroom door, requiring the door being to be boarded up. Ex. 215 (Dorn site notes – Balboa HS) at 7. Two schools have had a boundary fence destroyed because students cut it open to reach "the canyon," a popular vaping area. Ex. 216 (Dorn site notes – McAteer) at 21. JUUL devices have been hidden in seat covers and water valves, causing damage. Ex. 217 (Dorn site notes – Downtown HS) at 12. Student vaping creates what one student has described a "fruity fog" that other students must walk through. Ex. 218 (Cho Decl.) at ¶ 5. One middle school chained and locked a doorway to a balcony stairwell because of an incident involving student vaping. Ex. 219 (Dorn site notes – Presidio MS) at 7. SFUSD personnel are constantly having to clean up spent JUUL pods, which are hazardous waste. Ex. 206 (Ribisl Jan. 2022 Rpt.) at 5. Defendants claim that this is a non-issue because

1   SFUSD employees collect vaping devices in "red boxes" and treat them like "medical waste."

2   Monsees Mot. at 6. But the fact that SFUSD cleans up the hazardous waste does not mean it is a

3   non-issue. *See* Ex. 212 (Pak 10/7/21 Dep.) at 185:2-7 (stating that it's "a dilemma" for schools

4   "what to do with all these products"). Some schools have had to close areas where vaping

5   routinely occurs, such as restrooms. Ex. 208 (Dorn Rpt.) at 15. Locking restrooms reduces access

6   to school property and creates a safety hazard. *Id.* at 15-16. Locked restrooms also create an

7   accessibility issue. Ex. 149 (Coates Dep.) at 110:7-13.

8                           **ii.    Loss of use and enjoyment of property.**

9        A more constant concern is the massive disruption of the educational environment and

10  teaching process, and the threat to the safety on school campuses caused by JUUL. *See, e.g.*,

11  *Orange County Water Dist.*, 14 Cal. App. 5th at 416 (water district had property claim based on

12  loss of enjoyment even though it was not actively using the water).[70]

13       SFUSD's mission is to educate students and protect their safety and well-being. In fact,

14  safety and wellness is such a large part of the district's mission that it has an entire division

15  devoted to student and family services. *See, e.g.*, *id.* 18:13-14, 20:10-12. Vaping, and especially

16  JUUL, has caused a severe problem for SFUSD in its effort to provide a safe and productive

17  learning environment for students on school property, affecting "every aspect of [SFUSD's]

18  operation." Ex. 214 (Dorn Dep.) at 126:1-7.

19       Per Ms. Lingrell, vaping impacts SFUSD's mission because "our goal is to make sure

20  that all of our students show up, that they are ready to learn, that they attend school." Ex. 211

21  (Lingrell Dep.) at 41:11-17. Instead, because of the vaping issue on campuses, "it means our

22  staff can't focus on other things. They need to focus on figuring out why the students are taking

23  substances or how it's affecting their work, their behavior, their relationship to school." *Id.* at

24  41:18-22. Because of the strain on staff, the district needs additional personnel. Right now, the

25  district's wellness staff and health teachers are "just overburdened." *Id.* at 170:5-25.

26  ───────────────────────

[70] "Use and enjoyment" damages may not be available to *individuals*, as RICO does not support

27  personal injury claims. *See, e.g.*, *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 787 (9th
    Cir. 1992), *overruled*, *Diaz*, 420 F.3d at 898-99. Such cases, even if they are good law after *Diaz*,

28  are inapplicable here. *See JUUL I*, 497 F. Supp. 3d at 650 n.78 ("The government entities' claims
    are … not derivative of harms to ... individual plaintiffs.").

1    Ms. Coates testified that e-cigarettes are "right at the top" among student health concerns

2    within SFUSD. Ex. 149 (Coates Dep.) at 33:20-25. Vaping creates a distraction unlike any other

3    substance abuse issue because it occurs during the school day and in the classroom. "[W]e can

4    have students with JUUL devices while they're in school, while they're in the classroom, while

5    they're in the hallway, while they're in the bathroom." *Id.* at 35:19-36:4. JUUL is a particular

6    problem in schools, as compared with other e-cigarettes, because of its advertising to young

7    people and the "covert" nature of the device, which makes it difficult for teachers and staff to

8    detect student use. *Id.* at 45:1-21. Per Ms. Pak, the district receives consistent reports that

9    students are addicted to vaping and looking for help. Ex. 212 (Pak 10/7/21 Dep.) at 77:5-78:3.

10    Based on site visits, the testimony of SFUSD officials, surveys, other evidence, and his

11    substantial expertise, Mr. Dorn laid out several ways in which the JUUL crisis impacts SFUSD's

12    ability to complete its educational and safety mission. SFUSD staff have observed e-cigarette use

13    throughout school property, and JUUL has been of particular concern. Ex. 208 (Dorn Rpt.) at 26-

14    27. SFUSD has expended substantial time and costs to address the issue, including developing

15    education programs such as "JUUL School" from scratch. *Id.* at 27-28. The district has also

16    worked on educating parents. *Id.* at 29. Rampant vaping in SFUSD schools has caused major

17    disruption in classrooms and common areas; diverted resources from student instruction and

18    supervision; caused students to miss valuable class time; and affected other students by removing

19    staff resources. *Id.* at 29. The "disproportionate amount of time" devoted to "Juuling" prevents

20    staff from attending to many other needs facing students. *Id.* at 30.

21    All of these harms represent injury to property under California and Ninth Circuit law.

22    Just as with the zoning regulation in *Harris*, 904 F.2d at 503, the false imprisonment in *Diaz*, 420

23    F.3d at 899-901, or the fraudulent auto sales in *In re Ecodiesel*, 295 F. Supp. 3d at 959, SFUSD

24    suffered an injury to property that goes beyond physical property damage (which SFUSD has

25    also suffered). *See also Attia v. Google LLC*, No. 17-06037, 2018 WL 2971049, at *14 (N.D.

26    Cal. June 13, 2018) (loss of trade secret). Due to the vaping epidemic caused by JUUL, SFUSD

27    suffered loss in the ability to use and enjoy its property for its intended purpose of educating

28    students and protecting their safety. This loss deprived SFUSD of "a property interest." *Harris*,

904 F.2d at 503; *see also City of Oakland v. Abend*, No. 07-2142, 2007 WL 2023506, at *5 (N.D. Cal. July 12, 2007) ("The Ninth Circuit has 'recognized a constitutionally protected property interest in a landowner's right to devote [his or her] land to any legitimate use.'") (quoting *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 949 (9th Cir. 2004)).

         **c.**      **<u>SFUSD has also suffered a "concrete financial loss," including past expenses, lost employee time, and the need to invest in measures to remedy the untenable existing conditions on school grounds.</u>**

Plaintiff can also establish that it has suffered concrete financial loss in three ways.

         **i.**      **<u>Past expenditures.</u>**

SFUSD has catalogued specific expenditures that relate directly to the JUUL vaping epidemic. Specifically, SFUSD has spent money for signage, vaping education programs, youth outreach coordinators, and incentive programs for students. *See* Exs. 308, 312, 318) (SFUSD_070725; SFUSD_001336; SFUSD_017742); *see also* Ex. 212 (Pak 10/7/21 Dep.) at 90:17-91:18; Ex. 211 (Lingrell Dep.) at 71:20-21; 172:14-21 (discussing the need for education programs, signage, and student incentives).

SFUSD paid all of these expenses itself. The Court should reject Defendants' argument that these expenditures do not represent financial loss because SFUSD has also received grant money. *E.g.*, Altria Mot. at 21. Defendants rely primarily on inapposite cases in which the plaintiffs paid nothing themselves. *See, e.g.*, *Oscar*, 965 F.2d at 787 n.5 (explaining hypothetical scenario in which insurance paying for loss would not constitute RICO damages); *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990) (holding that losing the "security" of an insurance policy is a personal injury claim for emotional distress not cognizable under RICO).[71] In any event, the grants at issue fall far short of covering all of SFUSD's expenses related to vaping. Ex. 211 (Lingrell Dep.) at 64:4-65:20. And, as Ms. Pak testified, the grants are tobacco-specific but not task-specific. Ex. 296 (Pak 5/13/21 Dep.) at 124:17-126:2 (indicating that not all

---

[71] *In Farmers Insurance Exchange v. First Choice Chiropractic & Rehabilitation*, No. 13-01883, 2015 WL 4506401, at *12 (D. Or. July 22, 2015), the court denied claims based on money directly reimbursed to the plaintiff. That specific reimbursement is different from the situation here, where SFUSD relies almost entirely on public funding, grants are simply one form of that funding, and the grants do not require that they be used for something specific, such as signage. Regardless, Farmers is not binding on this Court.

grant money went to ENDS-related education). Any money that SFUSD spends in one place cuts short expenditures in some other area.

### ii. Diversion of staff time to protect school property.

SFUSD has also suffered a concrete financial loss due to the time and effort staff have had to devote to the vaping issue, rather than the learning process or other issues. SFUSD pays its employees to teach and administer school programs; instead they spend substantial time on combatting vaping. When asked why grant money does not cover the district's financial needs related to vaping, Ms. Lingrell noted that their TUPE grant covers two positions and part of a program administrator position, in a district of 152 schools and 55,000 students. Ex. 211 (Lingrell Dep.) at 64:8-13. She then explained the problems caused by JUUL:

> [I]t's not just wellness coordinators. It's teachers and security staff. And I have heard several teachers complain that their students are leaving the classroom for long periods of time to go smoke Juuls in the bathroom or wherever they go; that they're losing their learning, and then the teacher has to take time away from the class to get on the phone and talk to the security person or wellness staff or principal to locate those kids. So it's a complicated issue.

> … Combustible cigarettes have not been a problem for many years now. … That's not what we're seeing. We're seeing vaping Juuls.

> … [H]ow do you measure learning loss? … Then you have to hire a teacher, a study-hall teacher, to … help them make up their credits because they have missed so much class or they've gotten behind.

> … You know, the nurses having to spend more time sharing information with families about vaping is a cost. They have a lot on their plates. And so to … take away from everything else that they are doing, especially now with COVID, and we really rely on them.

*Id.* at 70:16-73:2. Ms. Pak added that addressing JUUL use was time-consuming because of the novelty of the product, so district and school personnel had to engage in the difficult effort to develop new programs. Ex. 212 (Pak 10/7/21 Dep.) at 90:17-91:18.

Plaintiff has established understaffing as an additional concrete financial loss, and its expert has placed a specific value on those losses. SFUSD employees are being diverted from their jobs, lost opportunities comparable to the lost opportunity to earn wages that supported a RICO claim in *Diaz. See Diaz*, 420 F.3d at 899-901. While SFUSD would pay these salaries

1    regardless of what the employees were doing, "[a]n out-of-pocket loss is not required ... for a

2    financial loss to be tangible or concrete." *In re Volkswagen*, 2017 WL 4890594, at *5. Mr. Dorn

3    has determined the positions needed to handle the increased demand for vaping-related services,

4    and has laid out what each position would cost per year. Ex. 208 (Dorn Rpt.) at 92-96.

### iii.    Property-based measures needed to address the vaping crisis.

6    Finally, Mr. Dorn has laid out (and priced out) measures that SFUSD needs to employ to

7    curtail the JUUL-infused vaping crisis on its property. These include: an e-hall pass system for

8    better student monitoring; vape sensors to detect e-cigarette use at schools; smart cameras to

9    allow for more efficient intervention when students are vaping; access control systems for

10   exterior doors and difficult to supervise areas; and nicotine and THC detection swabs to

11   investigate e-cigarette violations. *Id.* at 73 (summary).

12   Defendants' arguments hold SFUSD's difficult financial circumstances against it. For

13   instance, Defendants argue that the Court should ignore the need for vape sensors because

14   SFUSD has not already purchased vape sensors/detectors. Altria Mot. at 22; ODD Mot. at 1. The

15   fact that they are not yet purchased does not mean that they are not needed. Again, an out-of-

16   pocket loss is not required to establish damages. *Volkswagen*, 2017 WL 4890594, at *5. Mr.

17   Dorn explains in detail why SFUSD needs vape sensors. *See* Ex. 208 (Dorn Rpt.) at 78-82. More

18   generally, Defendants' briefs try to characterize SFUSD as failing to address the issues caused

19   by vaping. But SFUSD has to deal with a $125 million budget deficit. Thus, the absence of a past

20   expenditure does not indicate that the expenditure is unnecessary. SFUSD needs additional funds

21   to afford new personnel and technology. *See* Ex. 211 (Lingrell Dep.) at 170:5-171:13.

### d.    Defendants' additional arguments about *Canyon County* and abatement are meritless.

24   Defendants make two other arguments, neither of which has merit: (1) that *Canyon

25   County*, 519 F.3d at 975, precludes the claim, and (2) that SFUSD is improperly seeking

26   abatement on a RICO claim.

27   In *Canyon County*, the injuries at issue were to a municipality's health care and criminal

28   justice services. *Id.* at 975. As a result, the services were untethered to any property interest, and

1    the Ninth Circuit held that the county did not have any property interest in these services. This

2    case is different. SFUSD has physical property damage and additional injury to its property

3    interests, based on the untenable situation created by rampant JUUL use in SFUSD schools.

4         This is not a claim based on a municipality having to write larger checks for existing

5    services to additional people in the county caused by a fraudulent scheme, as alleged in *Canyon*

6    *County*. It is a claim by a school district for harm to property. All of the harm is occurring on

7    school grounds, including vaping devices creating a "fruity fog" and dealing with locked

8    bathrooms; destruction of bathroom doors and fences; teachers and staff devoting substantial

9    time away from normal tasks, on school property, to deal with vaping issues; and a severe

10   disruption to the district's mission, on school property, of educating students and keeping them

11   safe. Further, the solutions to these problems involve new technologies, so this is not a case of

12   simply spending more on the same services, as in *Canyon County*. *See* Ex. 208 (Dorn Rpt.) at 73.

13        SFUSD is not seeking compensation for government services; it is seeking damages to

14   remedy a dangerous condition that exists on its school properties. *Canyon County* does not

15   preclude such damages. *See City & County of San Francisco v. Purdue Pharma L.P.*, 491 F.

16   Supp. 3d 610, 651 (N.D. Cal. 2020) (holding that *Canyon County* permitted municipality's claim

17   based on property damage); *JUUL I*, 497 F. Supp. 3d at 622 (recognizing the distinction, and

18   holding that public entity plaintiffs had standing to bring RICO claims based on allegations of

19   damage to their property).

20        Finally, SFUSD is seeking damages to remedy an injury to property, not abatement.

21   SFUSD is not seeking equitable relief under RICO. SFUSD's public nuisance claim seeking

22   abatement, not damages, is wholly separate. Defendants have not cited any authority holding that

23   a plaintiff may not pursue RICO and nuisance claims in the same action. In the absence of any

24   such authority, the Court should reject Defendants' unprecedented argument.

25

26

27

28

5.     **The evidence supports a jury finding that the RICO Defendants
participated in a RICO conspiracy.**

a.     **All RICO Defendants agreed to facilitate the RICO conspiracy.**

Defendants argue they cannot be found liable under § 1962(d) unless Plaintiff has
established a substantive violations of § 1962(c). As set forth above, Plaintiff has provided "more
than a scintilla of evidence that the Defendants" conduct violated § 1962(c), and that the
Defendants "conspired to further a RICO enterprise" in violation of § 1962(d). *Aliff v. Vervent
Inc.,* No. 20-597, 2022 WL 3588322, at *6 (S.D. Cal. Aug. 22, 2022) (denying summary
judgment). Accordingly, Plaintiff's proof that Defendants violated § 1962(c) is enough to
establish a conspiracy claim under § 1962(d). *See In re Volkswagen*, 2017 WL 4890594, at *17
("The same allegations that demonstrate Bosch's participation in the enterprise support the …
conspiracy claim.").

Moreover, contrary to Defendants' argument, they can be liable under § 1962(d) for
conspiring to violate § 1962(c) even if they did not actually conduct or participate under
§ 1962(c). A "defendant need not 'have actually conspired to operate or manage the enterprise'
but rather may be guilty of a conspiracy to violate § 1962(c) if it 'knowingly agree[d] to facilitate
a scheme which includes the operation or management of a RICO enterprise.'" *Aliff*, 2022 WL
3588322, at *5 (quoting *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004)); *see
also Salinas v. United States*, 522 U.S. 52, 65 (1997) ("One can be a conspirator by agreeing to
facilitate only some of the acts leading to the substantive offense. It is elementary that a
conspiracy may exist and be punished whether or not the substantive crime ensues, for the
conspiracy is a distinct evil, dangerous to the public and so punishable in itself.").

Next, Defendants suggest that their agreements to engage in "lawful behavior" cannot
support a RICO conspiracy claim. Defendants are wrong. Evidence of Defendants' agreement to
facilitate the alleged RICO conspiracy is enough to find that the Defendants joined the
conspiracy itself. *See Salinas*, 522 U.S. at 64 ("If conspirators have a plan which calls for some
conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as

2457788.16

the perpetrators."). In *Ocasio v. United States,* 578 U.S. 282 (2016), the Supreme Court

expanded on how potentially "lawful behavior" could give rise to conspiracy liability:

> Entering a dwelling is historically an element of burglary, … but a person may conspire to commit burglary without agreeing to set foot inside the targeted home. It is enough if the conspirator agrees to help the person who will actually enter the dwelling, perhaps by serving as a lookout or driving the getaway car.

*Id.* at 288. Accordingly, the person who drives the getaway car is liable as a co-conspirator, even

if he obeys the speed limit and stops at red lights. The fact that he has engaged in "legal

behavior" is irrelevant if the purpose was to facilitate an illegal conspiracy.

Defendants also suggest that SFUSD must prove that each Defendant itself "commit[ted]"

predicate acts." Altria Mot. at 36. This is not the law. To find that Defendants participated in a

RICO conspiracy under § 1963(d), Plaintiff need not provide evidence that each defendant

performed the underlying predicate acts. *See United States v. Jaimez*, No. 19-50253, 2022 WL

3590561, at *9 (9th Cir. Aug. 23, 2022) ("A pattern of racketeering activity requires proving at

least two predicate acts of racketeering …. For a RICO conspiracy conviction the [plaintiff] need

not prove that the defendant himself performed the predicate acts."). Plaintiff has offered

sufficient evidence of predicate activity to support its RICO conspiracy claim, and that, at a

minimum, Defendants "knew about and agreed to facilitate the substantive racketeering

scheme." *Relevant Group LLC v. Nourmand*, No. 19-05019, 2022 WL 2916860, at *20 (C.D.

Cal. July 25, 2022) (citation omitted); *see also Salinas*, 522 U.S. at 64 ("[S]o long as they share a

common purpose, conspirators are liable for the acts of their co-conspirators.").[72]

Finally, Defendants suggest that they cannot be found liable for acts of the conspiracy

occurring outside of their active participation. Again, this misstates basic conspiracy law: "Upon

joining a criminal conspiracy, a defendant's membership in the ongoing unlawful scheme

continues until he withdraws." *Smith v. United States*, 568 U.S. 106, 107 (2013). "Since

conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate

the law 'through every moment of [the conspiracy's] existence,' and he becomes responsible for

---

[72] In *Salinas,* the Supreme Court rejected the argument that § 1962(d) requires "prov[ing] each conspirator agreed that he would be the one to commit two predicate acts." *Id.*

the acts of his co-conspirators in pursuit of their common plot." *Id.* at 111 (citations omitted). Defendants never argue that they withdrew from the conspiracy, and "[p]assive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy.[73] To "avert a continuing criminality, there must be affirmative action to disavow or defeat the purpose of the conspiracy." *Id.* at 112-13 (citation and alteration omitted).

### b.    Altria may be liable for conduct that occurred before it joined the RICO conspiracy.

Altria argues without elaboration that its liability under § 1962(d) would be "limited." Altria Mot. at 24. But Altria cannot escape liability for the periods that pre-date 2017. Regardless of when Altria joined the enterprise, conspiracy liability under § 1962(d) extends to all co-conspirators for all injuries arising from the conspiracy, regardless of when they joined.

Because "liability under RICO is purposefully 'joint' and 'several,'" once a defendant is found to have joined a RICO conspiracy, they "may be liable for conduct throughout the whole Enterprise." *JUUL I*, 497 F. Supp. 3d at 623. This includes "'liability for acts committed by co-conspirators both prior to, as well as during the defendant's participation.'" *United States v. Garcia*, 497 F.3d 964, 967 n.1 (9th Cir. 2007) (citation omitted); *see also United States v. Saavedra*, 684 F.2d 1293, 1301 (9th Cir. 1982) ("Further[,] a conspirator who joins a preexisting conspiracy is bound by all that has gone on before in the conspiracy."); *see also United States v. Umagat*, 998 F.2d 770, 772-73 (9th Cir. 1993) ("One may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him."); *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002) ("[I]f a RICO conspiracy is demonstrated, '[a]ll conspirators are liable for the acts of their co-conspirators.'") (citation omitted).

---

[73] The fact that the Defendants never withdrew from the ongoing conspiracy (let alone withdrew beyond the applicable statute of limitations period) means that Defendants' statute of limitations defense is also ineffective. *See Smith v. United States*, 568 U.S. 106, 111 (2013) ("Withdrawal also starts the clock running on the time within which the defendant may be prosecuted.").

**6.      The PSLRA bar does not apply because Plaintiff has made no allegations about fraud in the sale of securities.**

Defendants' argument regarding the Private Securities Litigation Reform Act ("PSLRA")
contradicts logic, the act's purpose, and Altria's prior filings. *See* ODD Mot. at 14-16. SFUSD
has not brought anything resembling a securities claim against the RICO Defendants. Altria's
disclosures to investors in connection with its purchase of 35% of JUUL are unrelated to the
scheme to defraud consumers that lies at the heart of this case. Plaintiff has made no allegations
regarding Altria's investors or the sale of securities to Altria investors. Tellingly, no Defendant
asserted this argument at the outset of this case, when PSLRA arguments usually are raised. The
complaint did not support such a claim. Defendants' argument arises now only because Altria's
investors brought an independent securities claim after this case was filed. Critical to that
securities case are allegations about statements made to, and information concealed from,
Altria's investors, causing them harm. *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 648 (E.D.
Va. 2021). Those allegations are not in this case, so there is no basis to conclude that Plaintiff's
RICO claim is a disguised securities claim.

The PSLRA prevents litigants from disguising securities claims as RICO claims to obtain
treble damages. *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011).
Defendants invoke the provision that "no person may rely upon any conduct that would have
been actionable as fraud in the purchase or sale of securities to establish a violation of § 1962
[the RICO statute]." 18 U.S.C. § 1964(c). The phrase "would have been actionable" is key, in
that this exception only applies where the complaint states a viable claim for fraud in the
purchase or sale of securities. *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321,
330 (3d Cir. 1999) ("[T]he proper focus of the analysis is on whether the conduct pled as
predicate offenses is 'actionable' as securities fraud—not on whether the conduct is 'intrinsically
connected to, and dependent upon' conduct actionable as securities fraud."); *see also Menzies v.
Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1115 (N.D. Ill. 2016) (stating that
"the PSLRA exception to RICO draws upon a known and closed set of unlawful actions in
defining its boundaries, rather than some amorphous standard broadly prohibiting any predicate

1    activity merely involving mail or wire fraud in which some form of a security interest might

2    otherwise appear").

3         Defendants' argument is based on a later-filed, unrelated securities fraud case involving

4    Altria's purchase of 35% of JLI. *Klein* includes some similar allegations but many additional and

5    critical allegations that are not part of this case, claiming fraud on Altria's investors. *See Klein*,

6    525 F. Supp. 3d at 648. In *Klein*, Altria moved to dismiss the shareholders' claims, asserting that

7    the shareholders alleged only corporate mismanagement, failed to allege scienter because Altria

8    believed it was paying a fair price, and failed to allege causation. *Id.* at 654. In direct contrast to

9    those arguments, Defendants argue here—where Plaintiff alleges nothing about securities

10   fraud—that Plaintiff has stated a valid securities claim. *See* Altria Br. at 37 & n.26; *Klein*, 525 F.

11   Supp. 3d at 648. Altria has it backwards. Here, Plaintiff has no valid securities claim because it

12   has made no allegations about statements made to, or information concealed from, Altria's

13   investors. Nor has it alleged harm to those investors. Indeed, this case has nothing to do with

14   Altria's investors.

15        Defendants do not address binding case law that confirms their PSLRA argument is

16   meritless. In *Rezner v. Bayerische Hypo-UND Vereinsbank AG*, 630 F.3d 866 (9th Cir. 2010),

17   the Ninth Circuit held that a mere relationship between a claim and a sale of securities is

18   insufficient to invoke the PSLRA bar. The *Rezner* defendant executed a series of loan

19   transactions to help the plaintiff avoid federal income taxes. *Id.* at 868. After this scheme failed,

20   the plaintiff brought a RICO claim against several parties involved in the transactions. *Id.* at 869-

21   70. The defendants asserted that the plaintiff's pledge of municipal bonds as security for the

22   loans implicated the PSLRA. The Ninth Circuit rejected that argument because the alleged

23   misrepresentations were not made "in connection with" the sale of any securities. *Id.* at 871.

24        The *Rezner* court relied on *In re Financial Corp. of America Shareholder Litigation*, 796

25   F.2d 1126, 871-72 (9th Cir. 1986). *Rezner*, 630 F.3d at 871-72. In *Financial Corp.*, an

26   accounting firm's advice about accounting for securities transactions did not invoke the

27   securities laws because it "had nothing to do with the intrinsic nature of the [company], or with

28   risks related to the method of their purchase or, indeed, to any factor reasonably linked to the

1   purchase and to plaintiffs' ultimate loss." 796 F.2d at 1130. Comparing that ruling, the *Rezner*

2   court held that the link between the transactions at issue and the securities laws was "even more

3   tenuous" than the link in *Financial Corp.* 630 F.3d at 872. Because the securities were "merely a

4   happenstance cog in the scheme," there was no securities claim, and the PSLRA did not bar the

5   RICO claim. *Id.* The court distinguished *Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007),

6   because in *Swartz* the sale of securities was the "lynchpin of the … scheme," such that the "fraud

7   and security were directly connected." *Rezner*, 630 F.3d at 872 (citing *Swartz*, 476 F.3d at 761).

8   Accordingly, there is no securities claim where the complaint in the RICO case does not depend

9   on a securities violation. *See id.*; *see also Monterey Bay Military Hous., LLC v. Ambac*

10  *Assurance Corp.*, No. 17-04992, 2018 WL 3439372, at *9 (N.D. Cal. July 17, 2018) (PSLRA did

11  not bar RICO claim where plaintiffs had no interest in bonds at issue, and the complaint

12  contained no allegations that third-party investors were harmed by defendants' conduct);

13  *Menzies*, 197 F. Supp. 3d at 1116 (rejecting PSLRA argument where case was "in both form and

14  substance … about tax shelter fraud, not securities fraud").

15      Here, any claim of securities fraud is far less viable than in *Rezner* and *Financial Corp.*

16  This case is, in form and substance, about a scheme to sell JUUL products to youth. For the

17  PSLRA bar to apply, the RICO complaint must support a securities claim by *someone*. Both in

18  *Rezner* and in *Swartz*, the Ninth Circuit evaluated whether the RICO plaintiff's petition—not

19  some other real or hypothetical petition—stated a viable securities claim. *Rezner*, 630 F.3d at

20  872; *Swartz*, 476 F.3d at 761. Here, Plaintiff does not allege anything about fraud on Altria's

21  investors. There are no allegations about whether Altria paid a fair price or about the information

22  Defendants provided—or failed to provide—to Altria's investors.

23      The securities case, *Klein*, includes critical allegations not present here—namely that

24  Defendants withheld information from Altria's investors, causing them to lose money. *Klein*, 525

25  F. Supp. 3d at 648. Here, Defendants reference only three of the amended complaint's 940

26  paragraphs. ODD Mot. at 16. The first cited paragraph says nothing about the terms of Altria's

27  purchase of 35% of JLI, beyond the price and the stake acquired. *SFUSD v. Juul Labs, Inc.*, No.

28  19-8177 (N.D. Cal.), Doc. 9, at ¶ 9. There is no allegation of fraud in the transaction, and no

1    allegation that any Altria shareholders were harmed. *Id.* In fact, Plaintiff alleges elsewhere that

2    Altria profited from the transaction, which contradicts a securities claim. *See id.* at ¶ 562. The

3    other cited paragraphs relate to the motivation of the ODDs, who are not even defendants in

4    *Klein*. *See* ODD Br. at 16; *Klein*, 525 F. Supp. 3d at 648.

5         As in *Monterey Bay*, because there are no allegations of fraud in the sale of securities or

6    of harm to investors, Plaintiff does not state a claim for violation of the securities laws. *See*

7    *Monterey Bay*, 2018 WL 3439372, at *9. Whether Altria acquired some degree of control over

8    JLI through a proper sale, a fraudulent sale, or some other method not involving securities is

9    immaterial to Plaintiff's claims. Again, Altria has argued that there was no fraud in its purchase

10   of 35% of JLI. *Klein*, 525 F. Supp. 3d at 654. If Altria is right, then clearly there are no

11   allegations that "would have been actionable" under the securities laws. But even if Altria is

12   wrong, *Klein* was only viable because of allegations not present here, regarding fraud on Altria's

13   investors that harmed them. *Id.* at 671 (ruling based in part on allegations that defendants "chose

14   not to" disclose certain information "to investors").

15        Applying the PSLRA in these circumstances also would contravene the law's intent.

16   Congress aimed "to prevent litigants from using artful pleading to boot-strap securities fraud

17   cases into RICO cases, with their threat of treble damages." *MLSMK*, 651 F.3d at 274. This

18   Plaintiff does not have a securities case to plead around. If the PSLRA bar were applied here,

19   then any publicly traded company could avoid any RICO claim by asserting that its fraud harmed

20   its investors. This could not have been Congress's intent.

21        **B.    Defendants' motion for summary judgment on Plaintiff's ordinary negligence claims should be denied.**

22

23        Plaintiff concedes that summary judgment can be granted on its claims for gross

24   negligence, reserving the right to prove that Defendants' conduct meets any standard for an

25   award of punitive damages. Otherwise, Defendants' motion for summary judgment on Plaintiff's

26   negligence claims should be denied. In addition, the Court should grant summary judgment in

27   SFUSD's favor on Adam Bowen's statute of limitations defense.

28

### 1.    Altria, Bowen, and Monsees owed a duty of care to SFUSD.

Altria, Bowen, and Monsees argue that Plaintiff's negligence claims against them fail the duty element. Altria Mot. at 38-39; Bowen Mot. at 22-23; Monsees Mot. at 21-22. That is incorrect. California "employs a strong presumption in favor of finding that … all persons[] have duty to use ordinary care to prevent injury to others." *Edison v. United States*, 822 F.3d 510, 519 (9th Cir. 2016); *see also Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 711 (2011) (calling the presumption of duty "a general rule in California"). This Court has already held that all Defendants owed a duty to public entities under California law. *JUUL I*, 497 F.3d at 655-56 (JLI), 662 (Altria), 663 (Monsees and Bowen); *JUUL II*, 533 F. Supp. 3d at 877-78 (ODDs). No reason exists to depart from those rulings here.

**Altria**. This Court, applying California law, has already determined that Plaintiff's allegations (allegations now supported by fact and expert evidence) established a duty on the part of Altria. *JUUL I*, 497 F. Supp. 3d at 662. Altria now contends that even if the harm caused to SFUSD by its actions was foreseeable, Altria did not owe a duty of care because Altria did not "directly injure Plaintiff." Altria Mot. at 39. For this, Altria relies on *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136 (2018), in which the court held that Apple did not have a duty to install lockout devices in iPhones to prevent FaceTiming while driving at high speeds, causing accidents. *Id.* at 141-42. That decision is distinguishable on multiple grounds.

*First*, the court's holding that the connection between the conduct and the harm was too tenuous rested on the involvement of an unrelated "third party" (the driver using the phone) whose tortious conduct ("reckless driving") was the direct cause of the harm. *Id.* at 145-47. Here, the tortious third parties (the Directors and Altria) are directly related to Altria as partners to and the subject of a tortious scheme, respectively. *See JUUL III*, 2022 WL 1601418, at *15 (denying summary judgment, and finding a duty to an addicted teenager based on Altria's knowledge and actions influencing and assisting JLI). The connection between Altria's conduct and SFUSD's harm is, accordingly, much more direct than in *Modisette*.

*Second*, the *Modisette* court relied on additional factors that weighed against a finding of duty: "the burden a contrary conclusion would place upon cell-phone manufacturers and the

1    consequences to the community." 30 Cal. App. 5th at 148. Specifically, the court recognized that

2    a finding of duty would likely prompt all cell phone manufacturers to "design it in such a manner

3    that a user is incapable of using it while driving," an outcome not only burdensome on the

4    manufacturers, but contrary to public policy articulated by "California law that expressly permits

5    such uses under certain circumstances." *Id.* at 150-52.

6        Here, those policy considerations cut the other way. Altria's expansion of JUUL sales has

7    no "social utility." *Id.* at 148 (citation omitted). Society, through the MSA and federal regulation,

8    has determined that traditional cigarette companies have an affirmative obligation to avoid

9    contributing to youth nicotine use. *See* Ex. 285 (Gottlieb 2/6/19 Ltr. to Altria) (noting Altria's

10   "obligation to take action to help address the mounting epidemic" and asserting "your newly

11   announced plans with JUUL contradict the commitments you made to the FDA and the public

12   regarding your plans to stop marketing e-cigarettes and to address the crisis of youth use of e-

13   cigarettes"). Prompting Altria to avoid encouraging, assisting, and maximizing the sales of a

14   product known to cause high levels of youth usage is sound public policy.

15       Next, Altria argues that finding a duty here would create "infinite duties of care" for "any

16   company or business … that provides services to the manufacturer." Altria Mot. at 39. But Altria

17   is a tobacco company, not a distribution or marketing company providing its services to the

18   public on an indiscriminate basis. The duty assigned to it is based on knowledge, motives, and

19   actions unique to a cigarette company. *See JUUL III*, 2022 WL 1601418, at *14 n.23 (finding a

20   duty, and rejecting Altria's attempt to portray itself as a mere service provider that owes no

21   duties to third parties); *JUUL I*, 497 F. Supp. 3d at 660-61 (holding that giving the school

22   districts "their day in court" would not raise unlimited liability concerns).

23       Neither case Altria cites supports finding otherwise. Altria cites *Beacon Res. Cmty. Ass'n*

24   *v. Skidmore, Owings & Merrill LLP*, 59 Cal. 4th 568 (2014), but in that case the California

25   Supreme Court explained that "liability *has* been imposed … upon suppliers of good and

26   services" where conduct produced a "foreseeable risk." *Id.* at 574 (citation omitted; emphasis

27   added). Altria also relies on *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370 (1992), in which the

28   court held that auditors owe no duty to third party users of their reports. *Id.* at 398. That case

1    relied on policy considerations inapplicable here, including the unbounded nature of the

2    "economic losses from investment and credit decisions," that the "generally more sophisticated

3    class of plaintiffs in auditor liability cases … permits the effective use of contract rather than tort

4    liability to control and adjust the relevant risks," and the "probable consequences of expanded

5    liability," including "increased expense and decreased availability of auditing services." *Id.*

6        Finally, Altria asserts perfunctorily that it did not breach its duty. Altria Mot. at 38. Even

7    if Altria had an argument on the breach element, it would have to be rejected: "The elements of

8    breach of duty and causation are ordinarily questions of fact for the jury's interpretation."

9    *Hernandez v. Jensen*, 61 Cal. App. 5th 1056, 1064 (2021).

10       **Bowen and Monsees**. As with Altria, this Court has already rejected Bowen and

11   Monsees' duty arguments: "Monsees and Bowen[] … put the school districts in the foreseeable

12   zone of risk, and the policy factors in the relevant states [including California] weigh in favor of

13   finding a duty." *JUUL I*, 497 F. Supp. 3d at 663. Bowen and Monsees' new arguments fail.

14       *First*, Bowen argues that assigning him a duty "would impermissibly impose 'infinite'

15   duties of care onto any party participating in product design for his employer." Bowen Mot. at

16   23. But Bowen was not a mere "employee" working at the direction of his employer. Rather, he

17   was JLI's co-founder, CTO, and Board member, the visionary behind JUUL's revolutionary—

18   and uniquely youth-friendly—design; and a member of the management team that exercised

19   close control over JUUL's youth-friendly marketing. SOF §§ II.A.1, II.C.2, II.C.3. Holding

20   Bowen responsible for the foreseeable consequences of his actions hardly equates to unbounded

21   liability for every engineer at Apple.

22       *Second*, Bowen and Monsees argue that they had no duty to prevent SFUSD's economic

23   harm. But as detailed above, SFUSD has suffered property damage as a result of Defendants'

24   actions. SOF § II.H.3; Argument § A.4.b.i. Plaintiff acknowledges this Court's determination

25   that the "gravamen of the school districts' complaints clearly involves economic losses." *JUUL*

26   *I*, 497 F. Supp. 3d at 659. Defendants, including Bowen and Monsees, owed a duty either way.

27       In California, courts consider the following factors in determining whether a defendant

28   owes a duty of care in an economic-loss case:

(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

*JUUL I*, 497 F. Supp. 3d at 655 (quoting *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979)) (the "*Biakanja* factors"). Bowen and Monsees largely ignore the factors, in particular saying not a word about foreseeability, the "primary consideration in establishing the element of duty." *Id.* (quoting *J'Aire*, 24 Cal. 3d at 806). *J'Aire* is instructive because the California Supreme Court held that a restaurant had a valid negligence claim against a construction company based on delays. *J'Aire*, 24 Cal. 3d at 802. The court rejected application of the economic loss doctrine, noting the foreseeability of the injury and the policy considerations. *Id.* at 804-05. Here, the injuries to SFUSD are every bit as foreseeable, the policy considerations are stronger, and there is property damage—an additional factor not present in *J'Aire*.

Bowen and Monsees rely on *So. Cal. Gas Leak Cases*, 7 Cal. 5th 391 (2019), but ignore that this Court already explained why *Gas Leak* is distinguishable. *JUUL I*, 497 F. Supp. 3d at 660-61. Each of the reasons the Court explained at the pleading stage are supported by the complete factual record. School districts such as SFUSD are not "simply incidental victims;" Defendants knew that schools would be harmed, as evidenced by their own actions taking the "marketing scheme directly into schools." *Id.* Defendants' demonstrated knowledge and intent makes this case one involving "more than mere foreseeability." *Id.* (citation omitted). And, given the unique pattern of misconduct, the case "does not run into the same unlimited liability concerns at issue in the *Gas Leak Cases*." *Id.*

Bowen and Monsees misstate applicable law, arguing that a finding of duty requires that SFUSD "identif[y] a particular transaction for which it was the intended beneficiary." Monsees Mot. at 21. Bowen and Monsees misstate the *Biakanja* factor: the correct language is that a transaction be intended "to *affect*" the plaintiff, not benefit it. *J'Aire Corp.*, 24 Cal. 3d at 804. Here, the scheme orchestrated by Bowen and Monsees "was intended to 'affect' school children, which necessarily caused harm on school district property." *JUUL I*, 497 F. Supp. 3d at 655-56. And even if this factor were neutral or weighed against a finding of duty, it is not dispositive

- 99 -

1    under California law. *See Gas Leak*, 7 Cal. 5th at 401 (duty determination is a "subtle enterprise"

2    that requires careful evaluation of *all* of the *Biakanja* factors); *JUUL I*, 497 F. Supp. 3d at 660

3    (noting that "deciding whether to impose a duty of care turns on careful consideration of the sum

4    total of the policy considerations at play") (citation omitted).

5           Monsees cites cases finding that product manufacturers generally do not owe a duty of

6    care to prevent economic harm arising from defective products. But those cases also relied on

7    other factors, including a lack of foreseeability, *Ott v. Alfa-Laval Agri, Inc.*, 31 Cal. App. 4th

8    1439, 1455 (1995), and policy concerns, *Fieldstone Co. v. Briggs Plumbing Prods, Inc.*, 54 Cal.

9    App. 4th 357, 368 (1997) ("If a duty of care to avoid economic injury existed in the

10   circumstances of the present case, every manufacturer would become an insurer, potentially

11   forever, against economic loss from negligent defects ...."). In addition, recognizing a duty in

12   those circumstances would supplant well-established causes of action for breach of contract or

13   warranty that govern the relationship between product manufacturers and purchasers. None of

14   those considerations apply here; as the Court concluded at the motion to dismiss stage, the

15   relevant public policy considerations favor a finding of duty.

16          *Third*, Monsees argues that "SFUSD cannot show any connection between Mr. Monsees'

17   purported misconduct and its claimed harms." Monsees Mot. at 21. Whether SFUSD can identify

18   students who were "deceived by JLI's marketing materials" is irrelevant to the duty analysis.

19   This factor asks not whether as a matter of fact the conduct caused the harm—that is a causation

20   question, which is usually (and here) for the finder of fact—but instead whether the causal chain

21   is too attenuated. *See Cabral*, 51 Cal. 4th at 779 ("[T]he closeness of the connection between the

22   defendant's conduct and the injury suffered is strongly related to the question of foreseeability

23   itself.") (citation and alteration omitted). It is not. The evidence shows that Defendants, including

24   Monsees, directly caused a youth nicotine epidemic in SFUSD's schools. *See* Argument § A.3;

25   *see also JUUL I*, 497 F. Supp. 3d at 655 ("[T]here is a close connection between JLI's conduct

26   that created the youth vaping market and the harms suffered by the school districts.").

27          *Fourth*, Monsees argues that, because he is no longer a JLI officer or director, a duty on

28   his part "would not further the policy of preventing future harm." Monsees Mot. at 22. This

1    factor is not about whether the particular actor will be deterred in the future, but instead about

2    whether "imposing the costs of negligence conduct upon those responsible" is "outweighed …

3    by laws or mores indicating approval of the conduct or by the undesirable consequences of

4    allowing potential liability." *Cabral*, 51 Cal. 4th at 327. Monsees does not make any argument

5    on the actual legal standard.

**2.    There is sufficient evidence of compensatory damages.**

**a.    SFUSD can prove both past and future damages.**

8    Defendants contend that SFUSD's negligence claims fail due to a failure of proof of

9    damages. JLI Mot. at 20-22; Altria Mot. at 39-40; ODD Mot. at 21-22; Bowen Mot. at 22;

10   Monsees Mot. at 11. This contention is incorrect. SFUSD has produced substantial evidence of

11   past and current harm that has resulted in quantifiable damages that have already been incurred

12   or will be incurred in the future.

13   As an initial matter, Defendants assume that SFUSD can recover only expenses for which

14   it has already written a check. That is not so. There are also recoverable future damages. In

15   California, "[d]amages may be awarded … for detriment … certain to result in the future." Cal.

16   Civ. Code § 3283. Courts interpret this statute "to mean that a plaintiff may recover if the

17   detriment is 'reasonably certain' to occur." *Garcia v. Duro Dyne Corp.*, 155 Cal. App. 4th 92, 97

18   (2007) (internal quotation marks omitted). It "is for the jury to determine the probabilities as to

19   whether future detriment is reasonably certain to occur in any particular case." *J.P. v. Carlsbad

20   Unified Sch. Distr.*, 232 Cal. App. 4th 323, 341-42 (2014) (citation omitted). For example,

21   California courts have sustained future economic damages awards based on testimony such as "It

22   is reasonable to assume he is going to have trouble in the future. Just how much, I don't know.

23   Just what the course of that trouble will be, I don't know." or "Frequently in this type of neck

24   injury a patient will continue to have symptoms indefinitely. It may last forever; it may get

25   worse; he may improve somewhat." *Regalado v. Callaghan*, 3 Cal. App. 5th 582, 602-03 (2016)

26   (alternations and citations omitted).

27   The "fact that the amount of future damages may be difficult to measure or subject to

28   various possible contingencies does not bar recovery." *Id*; *see also, e.g.*, *Clemente v. State*, 40

1    Cal. 3d 202, 219 (1985) (Although "it is desirable that there be definiteness of proof of the

2    amount of damage as far as is reasonably possible, it is even more desirable that an injured

3    person not be deprived of substantial compensation merely because he cannot prove with

4    complete certainty the extent of harm he has suffered.") (alterations and internal quotation marks

5    omitted). Nor does entitlement to future damages depend on any type or amount of past

6    damages. *E.g.*, *Lewis v. Ukran*, 36 Cal. App. 5th 886, 892 (2019) ("[P]roof of the plaintiff's prior

7    earnings, while relevant to demonstrate earning capacity, is not a prerequisite to the award of

8    [future] damages.") (citation omitted); *Johnson ex rel. Malone v. United States*, No. 07-7973,

9    2009 WL 3520125, at *3, *6 (C.D. Cal. Oct. 23, 2009) (awarding the cost of remodeling

10   plaintiff's daughter's home "to accommodate his wheelchair" where plaintiff "would prefer to

11   live with one of his daughters and … to live in the Atlanta area").

12       In light of those legal principles, SFUSD has produced sufficient evidence of damages.

13   These include costs incurred (such as vaping education and curriculum materials) and costs that

14   it is reasonably certain will be incurred, both to address the harms that already exist and those

15   that are reasonably certain to occur in the future due to the ongoing vaping epidemic. These costs

16   include the necessary infrastructure and personnel to prevent e-cigarette use in schools. *See* Ex.

17   208 (Dorn Rpt.) at 73, 92-96 (describing and estimating costs of specific infrastructure

18   improvements and modifications and personnel positions in the schools).

19       Defendants assert that Plaintiff has produced no evidence of damages, but that is plainly

20   untrue. Even if Defendants had made specific challenges to the fact and expert evidence in

21   support of damages, those challenges would have to be rejected. SFUSD has made an

22   overwhelming showing that the youth nicotine epidemic has caused it substantial harm that is

23   ongoing in the schools. SOF § II.H. Whether a given category of resulting damages has been

24   proven to the necessary degree of certainty is, generally and here, a matter for the jury. *See, e.g.*,

25   *Orozco v. WPV San Jose, LLC*, 36 Cal. App. 5th 375, 398-99 (2019) ("Where the *fact* of

26   damages is certain, the amount of damages need not be calculated with absolute certainty. The

27   law requires only that some reasonable basis of computation of damages be used, and the

28   damages may be computed even if the result reached is an approximation.") (citation omitted).

### b.    Recoverable damages can overlap with abatement costs.

The ODDs argue that "[a]batement is not available for negligence," ODD Mot. at 21,
implying that because asserted future costs may also be part of Plaintiff's proposed abatement
plan, they are not available as damages for negligence. That is not true.

Future damages and abatement are distinct concepts subject to different standards, but
that does not mean that an expense item might not independently qualify as part of both. If the
factfinder "estimates, to a reasonable degree of certainty, the various losses the plaintiff will
suffer in the future" and "awards the plaintiff an amount of money that will compensate it for
those losses," then "the damages award makes the wronged party whole," the purpose of
compensatory damages. *In re Nat'l Prescription Opiate Litig.*, No. 17-2804, 2022 WL 3443614,
at *18 (N.D. Ohio Aug. 17, 2022). That an expense might also be necessary to ameliorate the
problem does not change the standard applicable to future damages on a negligence claim.[74]

There is no rule that an anticipated expense cannot qualify as a reasonably certain and
recoverable future cost in a negligence action, even though that expense might also be a
permissible element of an abatement plan in a nuisance action. There is, of course, a prohibition
on double recoveries, but that is a matter to be addressed, if necessary, post-trial (or as part of the
bench trial on abatement). *Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*, No. 07-5664, 2010
WL 653561 (N.D. Cal. Feb. 22, 2010), is instructive. In that case, the plaintiff alleged the
defendant had contaminated the soil on the plaintiff's property, asserting claims including both
negligence and nuisance. At trial, the jury found for the plaintiff on all claims and awarded future
damages for "the remediation of the contaminated soil." *Id.* at *4. The court upheld this award as
"supported by the evidence." *Id.* The court did order additional briefing on how to avoid a double
recovery given that (1) the jury had been instructed that the court "will issue" an abatement order
and (2) a third-party government agency had the independent authority to order the defendant to
remediate the nuisance. *Id.* at *5-6. But there was nothing inherently erroneous about the award

---

[74] Elsewhere in their briefing, Defendants cite the rule that future damages are generally not
permitted on a claim for a "continuing nuisance." Altria Mot. at 18-19. But Plaintiff does not seek
damages on its nuisance claim, only abatement. Plaintiff seeks damages only on its negligence
and RICO claims. Different claims are governed by different legal standards.

1  of remediation costs as future damages. *See, also, e.g.*, *Santa Clarita Water Agcy. v. Whittaker*

2  *Corp.*, No. 18-6825, 2021 WL 2549066, at \*14-16 (C.D. Cal. Apr. 5, 2021) (denying summary

3  judgment in negligence and nuisance action where plaintiff sought "damages for future

4  remediation costs," and explaining that the "mere possibility" of a double recovery was a post-

5  trial issue and "does not require the Court to completely bar the requested damages at the

6  summary judgment stage"); *Los Angeles Unified Sch. Distr. v. S&W Atlas Iron & Metal Co.,*

7  *Inc.*, 506 F. Supp. 3d 1018, 1028 (C.D. Cal. 2020) (denying motion to stay claims for "future

8  remediation costs" as damages where "Defendants cite to no existing remediation plan or

9  reasonably anticipated regulatory orders").

10       **c.    The municipal cost recovery rule does not preclude Plaintiff's
11             claims for damages for negligence or abatement for nuisance.**

12       Defendants argue that Plaintiff's negligence and nuisance claims impermissibly seek

13  relief in connection with government expenditures. Altria Mot. at 18-19, 39-40. This argument

14  misapprehends California law and should be rejected.

15       To begin with, Defendants assume the municipal cost recovery rule applies to school

16  districts, even though no case says so. SFUSD is not a municipality and has no ability to impose

17  taxes to cover the costs resulting from Defendants' misconduct. *Cf. City of Flagstaff v. Atchison,*

18  *Topeka & Santa Fe. Ry. Co.*, 719 F.2d 322, 323-24 (9th Cir. 1983) (applying the rule under

19  Arizona law and noting "the city['s] power to fix the burden and rate of taxation"). There is no

20  reason to assume the California Supreme Court would apply the rule to SFUSD.

21       Even assuming the rule could apply to a school district, it does not apply on the facts of

22  this case. In denying Defendants' motion to dismiss, this Court explained that decisions

23  restricting government entities from recovering costs were generally distinguishable on two

24  grounds. First, those cases do not apply to nuisance claims seeking abatement, such as the one

25  Plaintiff asserts here. *JUUL I*, 497 F. Supp. 3d at 643 ("Recovery has been allowed where the

26  acts of a private party create a public nuisance which the government seeks to abate.") (citation

27  and alterations omitted). Second, those cases are generally limited to "a single, discrete

28  incident," resulting in damages that "a government entity can reasonably expect to incur." *Id.* at

1    645. The municipal cost recovery rule does not apply to cases involving "ongoing and persistent"

2    misconduct resulting in "expenses that [] school boards could not have reasonably anticipated to

3    incur." *Id.* Both conclusions apply here and require denial of Defendants' motions on this point.

4        **Nuisance**. It is clear under California law that the municipal cost recovery rule does not

5    preclude a government from seeking abatement of a nuisance, even if the abatement remedy

6    takes the form of a fund to pay the costs of remediation. *See People v. ConAgra Grocery Prods.*

7    *Co.*, 17 Cal. App. 5th 51, 133-34 (2017) (affirming an equitable abatement order requiring

8    defendant to prefund a county's remediation costs of removing lead-based paint from homes);

9    *see also, e.g.*, *City and County of San Francisco v. Purdue Pharma L.P.*, No. 18-7591, 2022 WL

10   3224463, at *8-10 (N.D. Cal. Aug. 10, 2022) (finding nuisance liability and recounting various

11   government expenditures resulting from the nuisance).

12       Defendants rely on *County of San Luis Obispo v. Abalone All.*, 178 Cal. App. 3d 848

13   (1986), which found a county's claim for recovery of certain law enforcement costs already

14   spent to be precluded by the municipal cost recovery rule. But *ConAgra* explained that the

15   nuisance analysis in *San Luis Obispo* rested on the particular language of the statute authorizing

16   a county's representative nuisance claim (language that restricted the available remedies to

17   abatement) and the facts of the case (a nuisance claim for past damages). *ConAgra*, 17 App. 5th

18   at 133. The relief sought by the nuisance claim here—"an order requiring defendants to pay

19   money to abate harm going forward," *In re Opiate*, 2022 WL 3443614, at *16—is an abatement

20   remedy, not the past damages sought in *San Luis Obispo*, and so is available to a government

21   entity. *See also In re Opiate*, 2022 WL 3443614, at *15 (explaining the distinction between

22   compensatory damages and an abatement remedy that requires "a defendant to spend money to

23   eliminate, remediate, or mitigate the nuisance-causing condition it created").

24       **Negligence**. The municipal cost recovery rule does not govern Plaintiff's negligence

25   claim because Plaintiff does not seek damages arising from "a single, discrete incident,"

26   resulting in damages that "a government entity can reasonably expect to incur." *JUUL I*, 497 F.

27   Supp. 3d at 645. As this Court explained, the weight of authority distinguishes cases like *San*

28   *Luis Obispo* from circumstances, like those here, involving "an ongoing and persistent course of

1    intentional misconduct [that] creates an unprecedented, man-made crisis that a governmental

2    entity plaintiff could not have reasonably anticipated as part of its normal operating budget." *Id.*

3    (quoting *In re Nat'l Prescription Opiate Litig.*, No. 17-2804, 2019 WL 3737023, at *8 (N.D.

4    Ohio June 13, 2019)).

5          In *San Luis Obispo*, the plaintiff county sought costs it incurred when the defendants'

6    environmental blockade of a nuclear power plant required the county's "sheriff's deputies … to

7    protect people in the area." 178 Cal. App. 3d at 856-57. The court emphasized repeatedly that the

8    county's damages were "incurred in its exercise of police power" and reflected the ordinary

9    "costs of law enforcement." *Id.* at 858-59; *see also id.* at 859 (discussing how "[u]nder the

10   general law, the expense of capture, detention, and prospection of persons charged with a crime

11   is to be borne by the county") (citation omitted); *see also Cal. Hwy. Patrol v. Sup. Ct.*, 135 Cal.

12   App. 4th 488, 508 (2006) (distinguishing *San Luis Obispo* as involving "such traditional law

13   enforcement costs as the expense of the capture, detention, and prosecution of persons charged

14   with a crime").

15         Altria contends that the rule nevertheless applies to the negligence claims against it

16   because its alleged misconduct did not begin until 2017 and (it says) ceased in 2020. Altria Mot.

17   at 19. This misunderstands the cases finding the municipal cost recovery rule inapplicable.

18   Application of the rule turns not on whether a defendant's misconduct spanned three years versus

19   six. Rather, the question is whether the circumstances of the case implicate "an accident or an

20   emergency situation necessitating the normal provision of police, fire and emergency services,"

21   *In re Opioid Litig.*, No. 400000/2017, 2018 WL 3115102, at *12 (N.Y. Sup. Ct. June 18, 2018)

22   (internal quotation marks omitted), or instead conduct so unusual and devastating that the

23   resulting harm dramatically exceeds the scope of expenses the government entity could "have []

24   reasonably anticipated." *JUUL I*, 497 F. Supp. 3d at 644; *see also, e.g.*, *City of Bos. v. Smith &*

25   *Wesson Corp.*, No. 99-2590, 2000 WL 1473568, at *8 (Mass. Super. Ct. July 13, 2000)

26   (analyzing cases and noting that "acts causing the damage were of the sort the municipality

27   reasonably could expect might occur, and each of the results was a discrete emergency").

28

1      This case plainly falls in the latter bucket. It involves "intentional misconduct [that]

2  created the sort of ongoing and persistent man-made crisis that could not have been reasonably

3  anticipated." *JUUL I*, 497 F. Supp. 3d at 644. The resulting costs required to address the

4  resulting damages—including property damage, loss of access to school areas, expenditures on

5  new programs, massive amount of lost staff and teacher time, and an ongoing and severe

6  disruption on school grounds—are "new and additional costs for protecting the public welfare

7  that [go] far beyond what a government entity might ordinarily be expected to pay." *In re Nat'l*

8  *Prescription Opiate Litig.*, No. 17-2804, 2020 WL 2090355, at *12 (N.D. Ohio Apr. 30, 2020)

9  (internal quotation marks omitted).

10     Even if the test did require misconduct of a certain duration or moral turpitude, Altria's

11 conduct qualifies as such. Altria's investment in and influence over JLI occurred with full

12 knowledge of the implications for youth use, and spanned *years*. Moreover, the evidence

13 supports a conclusion that Altria's actions were the continuation of its proven, decades-long

14 mission to capture youth as customers.

### 3.      Plaintiff's negligence claim against Bowen is timely.

16     Bowen asserts that SFUSD's negligence claim against him is untimely because SFUSD

17 did not name Bowen as a defendant until its amended complaint, which Bowen says was

18 operative on March 11, 2021. This argument fails.[75]

19     **The amended complaint was effective on December 29, 2020, not March 11, 2021**.

20 As an initial matter, Bowen's argument is premised on an incorrect date (even assuming that the

21 SFUSD amended complaint is the relevant pleading). In order to save the parties from filing

22 seriatim sealing motions and supporting documentation, the parties agreed that "Plaintiffs do not

23 need to file any amended government entity complaints on the public docket and can instead just

24 serve them on the Defense counsel." Doc. 1191 at 7. That service date was, by agreement, set on

25 December 29, 2020. *Id.* As required, SFUSD served its amended complaint naming Bowen on

26 that date, Ex. 286 (12/29/20 service e-mail), and only later, on March 11, 2021, filed a redacted

---

[75] Monsees purports to join Bowen on this issue, Monsees Mot. at 21 n.8, but does not make any
argument about when the claims against him accrued or when any applicable limitations period
expired. This argument is not developed and so is waived.

1    complaint on the public docket after sealing issues were resolved, *SFUSD v. Juul Labs, Inc.*, No.

2    19-8177 (N.D. Cal.), Doc. 9. Bowen's argument is premised on SFUSD's amended complaint

3    being filed on March 11; but as Bowen knows, that complaint was served on his counsel three

4    months earlier on December 29, 2020.

5        **SFUSD's negligence claim against Bowen did not accrue before December 29, 2018.**

6    In California, "the discovery rule delays the commencement of the running of the statute until the

7    plaintiff is aware of [its] injury and its negligent cause." *Eidson v. Medtronic, Inc.*, 40 F. Supp.

8    3d 1202, 1217-19 (N.D. Cal. 2014) (citation omitted). This means that the limitations period

9    begins to run only when "a reasonable investigation … *would* have disclosed a factual basis for

10   … the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808-09 (2005)

11   (emphasis added).

12       California courts emphasize that "[a] plaintiff's inability to discover a cause of action

13   may occur when it is particularly difficult for the plaintiff to observe or understand the breach of

14   duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could

15   be expected to understand." *NBCUniversal Media, LLC v. Sup. Ct.*, 225 Cal. App. 4th 1222,

16   1232 (2014). Just so here. As this Court has explained, the common-law claims against Bowen

17   are not grounded in vicarious liability, but instead on evidence that he "authorized, directed or

18   participated in the allegedly tortious conduct." *JUUL I*, 497 F. Supp. 3d at 663 (citation omitted).

19       SFUSD had no way to learn of "all facts essential to," *Bally v. State Farm Life Ins. Co.*,

20   536 F. Supp. 3d 495, 515 (N.D. Cal. 2021) (citation omitted), the "torts or other acts" that Bowen

21   "specifically authorized or directed." *JUUL* I, 497 F. Supp. 3d at 634. The specifics of individual

22   contributions to JUUL's mission were internal, confidential corporate information. SFUSD had

23   no access to JLI and Altria documents that set out the basis of Bowen's liability. *See id.* at 635,

24   653 (discussing internal communications about seeking investment from a cigarette company,

25   internal "buzz" and nicotine experiments, and internal studies about JUUL's appeal to youth and

26   nonsmokers); *see also JUUL II*, 533 F. Supp. 3d at 864 (relying on allegations derived from

27   confidential board meeting information); *see also* Doc. 386-1 (identifying confidential

28   information in the master complaints).

1     The history of JUUL litigation proves this. As far as Plaintiff is aware, the first action in

2     federal court or California state courts naming Bowen as a defendant was a personal injury

3     action filed on July 23, 2019. *Boyens v. Juul Labs, Inc.*, No. 19-577875 (Cal. Sup. Ct.). The first

4     substantial recounting of Bowen's personal role in JLI's misconduct was the master personal

5     injury and consolidated class action complaints filed in this Court on March 11, 2020. Doc. 386.

6     The first time a municipality or school district sued Bowen was the May 2020 bellwether

7     complaints. Even state AGs—who are in as good a position to investigate as any—did not sue

8     Adam Bowen until mid-2020 or 2021. *See* Doc. 3338-2 at 1-7. SFUSD cannot be held to a

9     reasonable investigation standard higher than that applicable to state law enforcement agencies.

10     Bowen points to (and misleadingly excerpts) a statement from SFUSD's fact sheet. The

11     full question and answer is reproduced here:

> Question:     Identify the approximate date (*i.e.*, month and year) when You claim You
> were first injured and began to incur damages as a result of Defendants'
> alleged conduct. This request is not designed to require an expert
> evaluation.
>
> Answer:     Plaintiff has experienced a significant and increasing problem with student
> use of electronic-cigarettes on campus for the last several school years.
> Although Plaintiff is unable to pinpoint a specific month and year when
> the problem began, it continued and increased throughout the 2017-2018
> and 2018-2019 school years and it remains a significant problem. Plaintiff
> later became aware of statements by public health authorities and
> regulators attributing the cause of the youth vaping epidemic primarily to
> the actions of JUUL Labs, Inc.

19     Bowen Mot., Ex. M at 9. The only permissible inference from this statement is that SFUSD did

20     *not* know of its claims against Bowen before the limitations period expired. To the contrary,

21     SFUSD confirms that the existence of a youth vaping problem in its schools did not, standing

22     alone, reveal that the epidemic had a "negligent cause." *Eidson*, 40 F. Supp. 3d at 1217-19

23     (citation omitted). Instead, it was only "statements by public health authorities and regulators"

24     that gave SFUSD any indication JLI's "actions" played a role. Again: nothing about this would

25     have led a reasonable school district to an investigation that would have revealed Bowen's role.

26     Even assuming that the fact sheet refers to 2018 regulator statements, if those revealed the

27     essential facts of Bowen's negligence, then some school district or municipality would have sued

28     Bowen before May 2020, and state AGs long before that.

1    Finally, Bowen argues that scattered allegations in SFUSD's original complaint show it

2    knew "the role Bowen purportedly played in the development of JUUL products." Bowen Mot.

3    at 22. Even if this were accurate, it would not matter: that complaint was filed in December 2019

4    and is not probative of what SFUSD knew or should have known before December 2018. It is

5    also inaccurate. The three paragraphs in the 160-paragraph complaint that reference Bowen are

6    anodyne background information, nothing close to the facts required to support a claim against

7    him. *See SFUSD v. Juul Labs, Inc.*, No. 19-8177 (N.D. Cal.), Doc. 1 at ¶¶ 22-24 (alleging that

8    Bowen attended Stanford University, co-founded JLI and served as its CTO). If anything, this

9    limited pleading confirms that SFUSD did *not* know Bowen's role at that time.

10    **If necessary**, **SFUSD's claims against Bowen and Monsees were equitably tolled**

11    **when the bellwether complaints were filed**. Even if SFUSD's claims against Bowen accrued in

12    late 2018 (there is no evidence they did), the Court should find that the limitations period was

13    tolled from May 2020, when the operative government entity complaints, selected and amended

14    for the purposes of testing Plaintiffs' legal theories, were filed (Doc. 537), to December 2020,

15    when the remaining government entities amended in response to the motion to dismiss ruling.

16    The "equitable tolling of statutes of limitations is … designed to prevent unjust and

17    technical forfeitures of the right to a trial on the merits when the purpose of the statute of

18    limitations—timely notice to the defendant of the plaintiff's claims—has been satisfied."

19    *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal. 4th 88, 99 (2008). To apply tolling, the

20    plaintiff must show (1) notice of the claim, (2) lack of prejudice to the defendant, and (3)

21    reasonable and good faith conduct on the part of the plaintiff. *Madani v. County of Santa Clara*,

22    16-07026, 2017 WL 1092398, at *7 (N.D. Cal. Mar. 23, 2017). Each element is satisfied here.

23    Leading up to the first round of motions to dismiss, Plaintiffs, JLI, and Altria all agreed

24    that "given the demands being placed on governmental entities by the Covid-19 pandemic,"

25    including that "school districts are largely shut down while still trying to provide important

26    services for their students," it made sense to identify "vehicles for testing legal theories and

27    claims" while putting off the trial bellwether selection process. Doc. 442 at 12-13. Those parties

28    expressly "anticipate[d] that rulings on certain legal issues from the states identified through this

1    process may apply to the claims of government entities from analogous states." *Id.* at 13. The

2    parties selected seven complaints for the motion to dismiss briefing. Doc. 483.

3        Those complaints were filed on May 8, 2020, each naming Adam Bowen as a defendant.

4    All parties (Bowen included) then agreed that, for the "non-operative Government Entity

5    complaints" (including SFUSD), "the amendment deadline should occur after resolution of" the

6    "pending motions to dismiss." Doc. 803. The plain purpose of this agreement was to preserve the

7    Court's and the parties' resources (especially in light of the COVID-19 pandemic, which

8    everyone agreed was adversely affecting school district plaintiffs) by limiting pleaded legal

9    theories and claims to those that the Court had determined could move forward.

10        In light of this history, every element of equitable tolling is satisfied as of the May 8,

11    2020 date. *First*, notice. The seven complaints filed on May 8, 2020 set out the allegations used

12    to support government entity negligence claims against Bowen. *See JUUL I*, 497 F. Supp. 3d at

13    663 (denying motion to dismiss negligence claims against Bowen). *Second*, no prejudice. As the

14    Court explained in ordering that motions to dismiss proceed on a limited number of bellwether

15    complaints: "There is no prejudice to defendants from proceeding in this manner, given that they

16    are aware of the scope of the government entity claims and the defendants who have been or will

17    [be] named in those suits." Doc. 400 at 2-3. And Bowen never challenged the shared operating

18    assumption: that "rulings on certain legal issues from the states identified through this process

19    may apply to the claims of government entities from analogous states." Doc. 442 at 13. *Third*,

20    SFUSD acted reasonably and in good faith in waiting to amend its complaint until the deadline

21    selected by the parties for doing so. Its compliance with party-agreed and Court-ordered

22    procedures promoted efficient and organized adjudication of the threshold legal questions in the

23    government entity complaints, and saved Bowen resources that would have been spent filing

24    unnecessary case-specific motions to dismiss.

25        **Bowen's motion for summary judgment should be denied, and summary judgment**

26    **on this issue should be granted in Plaintiff's favor.** As explained above, the undisputed

27    evidence affirmatively establishes that SFUSD was *not* on inquiry notice of its claim against

28    Bowen before December 29, 2018. Accordingly, Bowen cannot carry his burden at summary

1    judgment to show that the statute of limitations ran before SFUSD sued Bowen. Given that the

2    material facts outlined above are undisputed, and do not support Bowen even in the light most

3    favorable to him, the Court should grant summary judgment in SFUSD's favor on this issue. *See*

4    Fed. R. Civ. P. 56(f) (court can "grant summary judgment for a nonmovant" or "consider

5    summary judgment on its own" if opposing party has "notice and a reasonable time to respond").

6    **C.    Defendants' motions for summary judgment on Plaintiff's nuisance claims**
         **should be denied.**

7    **1.    SFUSD has standing to bring a public nuisance claim.**

8

9    Relying on an overly broad view of the California Fourth District Court of Appeal's

10   decision in *Rincon*, 70 Cal. App. 5th 1059, Defendants assert that SFUSD lacks standing to bring

11   a public nuisance claim under California law. *See* Mot. at 2-3, 7-12; Altria Mot. at 12-13; ODD

12   Mot. at 16-18; Bowen Mot. at 6-7; Monsees Mot. at 10-11. This argument should be rejected.

13   SFUSD has standing as: (1) a "person" who suffered property damage under Cal. Civ. Proc.

14   Code § 731; and, in the alternative, as (2) an authorized party under Cal. Civ. Code § 3494.

15   **a.    Defendants' reliance on *Rincon* is misplaced.**

16   Defendants argue that *Rincon* stands for the overarching proposition that government

17   entities like SFUSD have no authority under § 731 or Cal. Civ. Code § 3493 or § 3494 to sue for

18   public nuisance. JLI Mot. at 7-11; Altria Mot. at 12-13; ODD Mot. at 16-18; Bowen Mot. at 6-7;

19   Monsees Mot. at 10-11. But *Rincon*'s reach is much narrower. *Rincon* concerns whether certain

20   "sovereign government entities" (tribal nations and arms of the tribes) have standing as "private

21   persons" under one statute (§ 3493) to pursue claims to address an alleged nuisance existing only

22   *outside* of tribal land. *See Rincon*, 70 Cal. App. 5th at 1089, 1100-03. Defendants ignore that

23   *Rincon*'s findings hinged on distinct facts not present here, and that *Rincon* confirmed the

24   authority of government entities to bring public nuisance claims as a general matter. *Id.*

25   For example, *Rincon* prefaced its public nuisance analysis by noting that allowing the

26   Tribes to sue for a public nuisance "on nontribal land" would "create inequities" contrary to

27   legislative intent:

28   Just as the State of California cannot sue the Tribes or their affiliated entities operating

gaming enterprises on tribal land under the public nuisance or UCL statutes, the Tribes cannot sue the commercial entities operating gaming enterprises *on nontribal land* under those same statutes. As we will explain further, to hold otherwise could create inequities not intended by Congress or the California Legislature.

*Id.* at 1088-89 (emphasis added).

When evaluating the Tribes' standing to bring a public nuisance claim, *Rincon* confirmed that "the Tribes, *just like any other governmental entity*, would have authority to address any alleged nuisance presented by banked card games within their own communities." *Id.* at 1101 (emphasis added). On the facts of that case, however, the Tribes did not have standing to bring a public nuisance claim under § 3493 because permitting them "to seek redress of an alleged public harm that is *not* within their own jurisdiction by bringing a public nuisance claim as a 'private person,' would circumvent the clear jurisdictional limits on governmental entities set forth in Code of Civil Procedure § 731." *Id.* at 1102 (emphasis in original). In short, *Rincon* is not a barrier to SFUSD's public nuisance claim.[76] Rather, *Rincon* confirms the unremarkable proposition that governmental entities, including SFUSD, have standing to pursue a public nuisance claim relating to a harm within their communities.

**b.** **SFUSD has standing as a "person" who suffered property damage under Cal. Civ. Proc. Code § 731.**

Cal Civ. Proc. Code § 731 provides two separate authorizations for a public nuisance claim:

An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor. A civil action may be brought in the name of the people of the State of California to abate a public nuisance, as defined in Section 3480 of the Civil Code, by the district attorney or county counsel of any county in which the nuisance exists, or by the city attorney of any town or city in which the nuisance exists.

Here, SFUSD has standing to bring a public nuisance claim under the first sentence, because its property has been injured and its enjoyment lessened through disruption in its operations as a result of the public health crisis of youth vaping. *See* SOF § II.H.3 & Argument § A.4

---

[76] Defendants' additional authorities are likewise distinguishable. JLI Mot. at 7. For example, both *City of L.A. v. Shpegel-Dimsey*, 198 Cal. App. 3d 1009, 1020 (1988) and *Torrance Redevelopment Agency v. Solvent Coating Co.*, 763 F. Supp. 1060, 1065 (C.D. Cal. 1991) discuss a public entity's recovery of damages for public nuisance under § 3493. Plaintiff here does not seek such relief.

1    (describing damaged bathroom doors, destroyed fences, and other physical property damage; lost

2    access to property; expenditures to address the vaping crisis; lost teacher and staff time on school

3    property; and JUUL's infringement on SFUSD's ability to provide a productive and safe learning

4    environment on SFUSD property).

5    　　　　Defendants contend that SFUSD lacks standing under § 731 because (1) it is not one of

6    the public officials explicitly authorized to bring a "civil" public nuisance action "in the name of

7    the people of the State of California" in the second sentence of the statute. JLI Mot. at 8; Altria

8    Mot. at 12-13; ODD Mot. at 16-17; Bowen Mot. at 6-7; Monsees Mot. at 10-11; and (2) SFUSD

9    cannot be considered a "person" under § 731. JLI Mot. at 10-11; ODD Mot. at 17-18; Bowen

10   Mot. at 7. These arguments misapprehend the basis of SFUSD's nuisance claim and misapply the

11   relevant case law.

12   　　　　*First*, SFUSD's public nuisance claim is brought in a non-representative capacity, on its

13   own behalf, not in the name of the people of California. *SFUSD v. Juul Labs, Inc.*, No. 19-8177

14   (N.D. Cal.), Doc. 9. Because SFUSD is not bringing a representative claim, the second sentence

15   of § 731, and *Rincon*'s observation that "as a general rule, only public prosecutors authorized by

16   statute may sue for a public nuisance on behalf of the community," *Rincon*, 70 Cal. App. 5th at

17   1100, do not apply. *See Selma Pressure Treating Co. v. Osmose Wood Preserving*, 221 Cal. App.

18   3d 1601, 1614 (1990) ("Properly viewed, [§731], and cases interpreting the statute, limit the

19   State only when it acts in its representative capacity protecting the public interest generally.").[77]

20   　　　　Altria also misstates the law in claiming that California courts have repeatedly held that

21   governmental entities *other* than those explicitly assigned a representative cause of action in

22   § 731's second sentence lack standing to sue. Altria Mot. at 12-13 (citing *Lamont Storm Water*

23   *District v. Pavich*, 78 Cal. App. 4th 1081, 1084-86 (2000) and *Castaic Lake Water Agency v.*

24   *Whittaker Corp.*, 272 F. Supp. 2d 1053, 1070-71 (C.D. Cal. 2003)). There are two problems with

25   Altria's argument. First, *Lamont* and *Castaic* only address the second sentence in § 731, to the

26   limited extent they discuss § 731 at all. *See Lamont*, 78 Cal. App. 4th at 1084-85; *Castaic*, 272 F.

27   Supp. 2d at 1071. Second, both cases recognize that public entities outside those enumerated in

28   [77] *Disapproved of on other grounds*, *Johnson v. Am. Standard, Inc.*, 43 Cal. 4th 56, 70 (2008).

PLAINTIFF'S OPP TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
CASE NO 19-MD-02913-WHO

the second sentence of § 731, including "special districts," "sanitary districts," and "Mosquito Abatement and Vector Control Districts," in fact can be authorized to bring public nuisance claims. *See Lamont*, 78 Cal. App. 4th at 1085; *Castaic*, 272 F. Supp. 2d at 1070-71. Nothing in those cases supports the negative inference that Altria gives to § 731's authorization of representative claims.

*Second*, SFUSD qualifies a "person" under the first sentence of § 731. *See City of Los Angeles v. City of San Fernando*, 14 Cal. 3d 199, 276-77 (1975) ("[G]overnmental agencies have been held subject to legislation which by its terms applies simply to any 'person.'"). *Selma* squarely addressed this issue. 221 Cal. App. 3d at 1615-16. There, the State and Regional Water Control Board sought, among other things, damages stemming from a public nuisance of hazardous waste. After analyzing the legislative intent, statutory construction, and relevant case law, *Selma* concluded "We can envision no possible impairment of sovereign powers by interpreting the term "person" in Code of Civil Procedure § 731 to include governmental units." The court explained:

> Conversely, if a governmental property owner cannot pursue the tortfeasor for damages to its property interests, *the governmental entity suffers under a disadvantage felt by no other property owner—it cannot recover for any injury to its property interest when another maintains a public nuisance. No public interest would be served by such a limitation;* it merely would relieve a tortfeasor of some of the consequences of his tortious behavior where the property injuriously affected happened to be owned by a public entity. We do not think this is a logical interpretation of the law. Where a public entity can show it has a property interest injuriously affected by the nuisance, then, like any other such property holder, it should be able to pursue the full panoply of tort remedies available to private persons.

*Id*. at 1615-16 (emphasis added); *see also* Cal. Civ. Code § 4 (Code's "provisions are to be liberally construed with a view to effect its objectives and promote justice.").

Post-*Selma* cases have reinforced that government entities like SFUSD constitute "persons" under § 731, permitted to bring claims for public nuisance when asserting property damage. In *Orange County Water Dist. v. Sabic Innovative Plastics US, LLC*, 14 Cal. App. 5th 343 (2017) (relied on by Defendants), for example, the court reversed the trial court's granting of defendants' motion for summary judgment on a water district's nuisance claim, based on damage to its own property resulting from contamination. *Id*. at 416-17. The court explained that "[a]

1    property interest sufficient to support a cause of action for private nuisance is generally sufficient

2    to support a cause of action for public nuisance as well." *Id.* In that case, the parties agreed that "a

3    public agency may bring a nuisance cause of action on its own behalf to the same extent as a

4    private plaintiff, and under theories of both private and public nuisance, where the public

5    agency's own property rights are affected by the nuisance . . . . The statutory basis for such an

6    action is found in the first sentence of Code of Civil Procedure § 731**.**" *Id*. at 402 n.26; *see also*

7    *City of San Diego v. Monsanto Co*., No. 15-578, 2017 WL 5632052, at *8 (S.D. Cal. Nov. 22,

8    2017) (permitting a city to bring a "non-representative public nuisance claim" under the first

9    sentence of § 731); *County of Santa Clara v. A. Richfield Co*., 137 Cal. App. 4th 292, 313 (2006)

10   (agreeing with *Selma* in a case where plaintiffs, SFUSD among them, brought a public nuisance

11   claim for abatement that "[w]here a public entity can show it has a property interest injuriously

12   affected by the nuisance, then, like any other such property holder, it should be able to pursue the

13   full panoply of tort remedies available to private persons.").

14       Applying § 731 to permit a school district to bring an action for public nuisance when it

15   can establish property damage does not "eviscerate" or "reject" *Rincon* or any binding precedent.

16   JLI Mot. at 11; ODD Mot. at 17. The two cases interpreted different statutes: § 731 in *Selma* and

17   § 3493 in *Rincon*. And in different factual circumstances: harm to property in *Selma* and a

18   nuisance occurring *outside* of the tribes' property in *Rincon*. The discussion of § 731 in *Rincon* is

19   non-binding dicta and should be disregarded. It is also inapplicable: *Rincon* was clearly focused

20   on the second sentence of § 731, not the first. Specifically, *Rincon* cited *San Luis Obispo* for the

21   proposition that "person" in § 731 does not include government entities, but that case, as

22   discussed above in the municipal cost recovery rule analysis, is only about the remedies available

23   in a representative nuisance action, not the definition of "person" in a property-injury nuisance

24   action. 178 Cal. App. at 860.

25       Defendants further cite cases holding that government entities are not "persons" under the

26   state False Claims Act, but those cases were limited to the statute at issue. *See Wells v. One2One*

27   *Learning Foundation*, 39 Cal. 4th 1164, 1190 (2006) (state False Claims Act); *State ex rel.*

28   *Harris v. PricewaterhouseCoopers*, 39 Cal. 4th 1220, 1223, 1238 (2006) (same). *Selma*

1   explained the California law on this point: "While the term 'person' is not generally interpreted

2   to include governmental entities, it can be." *Selma*, 221 Cal. App. 3d at 1615; *see also City of*

3   *Los Angeles*, 14 Cal. 3d at 276-77 ("[T]his rule excludes governmental agencies … only if their

4   inclusion would result in an infringement upon sovereign governmental powers."). The cases

5   cited by Defendants did nothing more than apply a statute-specific analysis and do not

6   undermine *Selma*'s analysis of § 731. *See Wells*, 39 Cal. 4th at 1193 (acknowledging the

7   continuing validity of the *City of Los Angeles* rule, but relying on "the language, structure, and

8   history of the particular statute before us"); *see also People v. Ethical Treatment of Animals, Inc.*

9   *v. Cal. Milk Producers Advisory Bd.*, 125 Cal. App. 4th 871, 879 (2005) (holding that the Unfair

10  Competition Law's definition of "person" seemed to deliberately omit "municipal or other public

11  corporation").

12          Defendants attempt to undercut *Selma*'s validity as precedent. JLI Brief at 10-11. But the

13  cases cited by Defendants do not challenge *Selma*'s § 731 public nuisance analysis. *See Orange*

14  *Cnty. Water Dist.*, 14 Cal. App. 5th at 407 (noting "contrary to *Selma*," the State's interest in

15  groundwater is "a nonproprietary, regulatory one."); *Johnson*, 43 Cal. 4th at 70 (clarifying that

16  *Selma* is consistent with the court's adoption of the sophisticated user defense, but "disprov[ing]

17  it "to the extent that it may cause confusion"). *Selma*'s interpretation of § 731 remains good law

18  and directly on point. *See In re Bartoni-Corsi Produce, Inc.*, 130 F.3d 857, 861 (9th Cir. 1997)

19  ("[W]here there is no convincing evidence that the state supreme court would decide differently,

20  a federal court is obligated to follow the decisions of the state's intermediate appellate courts.")

21  (citation omitted); *N. Improvement Co. v. United States*, 398 F. Supp. 3d 509, 520 (D. Ariz.

22  2019) ("The Court is obligated to follow intermediate state appellate court decisions on point.").

23          Defendants also try to limit *Selma* to cases involving private nuisances rather than public.

24  JLI Mot. at 10. But *Selma* clearly dealt with *public* nuisance action, as emphasized repeatedly in

25  the opinion itself. *E.g., Selma*, 221 Cal. App. 3d at 1616 (discussing a government property

26  owner's recovery for "public nuisance"). And other California decisions confirm that the

27  authorization in § 731 extends to public nuisances. *See Orange Cnty. Water Dist.*, 14 Cal. App.

28  5th at 402 n.26 ("public nuisance"); *City of San Diego*, 2017 WL 5632052, at *8 ("public

1   nuisance"). Indeed, the California Supreme Court has expressly rejected the contention that

2   § 731's authorization of nuisance claims for those "whose property is injuriously affected" is

3   limited to private nuisance claims. *Johnson v. V. D. Reduction Co.,* 175 Cal. 63, 66 (1917).

4   There, the argument was made that the addition of the second sentence to § 731 (creating the

5   representative cause of action) meant that the first sentence (the pre-existing authorization for

6   persons injured in their property) must be interpreted to apply only to private nuisances. *Id.* at

7   65-66. The court disagreed, holding that "it was not the intention of the legislature" to limit a

8   party's availability to bring a public nuisance claim under the first sentence. *Id.*

9        Here, SFUSD is a "person" under § 731 whose property is substantially and negatively

10   affected by a public nuisance. Therefore, SFUSD has standing to bring a claim under § 731.

       **c.    Alternatively, SFUSD has standing as an authorized party
              under Cal. Civ. Code § 3494.**

13        Under § 3494, "a public nuisance may be abated by any public body … authorized

14   thereto by law." Cal. Civ. Code § 3494. Here, numerous California statutes, viewed collectively,

15   demonstrate a legislative intent to grant SFUSD the power to abate the public nuisance of e-

16   cigarettes within its schools.

17        California law assigns school districts the power to sue, and gives them the front-line role

18   of ensuring a safe, healthy, and adequate school environment, specifically one free of youth

19   tobacco use, including the express authority to take all steps to discourage underage smoking:

20   - "In the name by which the district is designated the governing board may
         sue and be sued, and hold and convey property for the use and benefit of
21       the school district." Cal. Educ. Code § 35162.

22   - "No school shall permit the smoking or use of a tobacco product by pupils
         of the school while the pupils are on campus, or while attending school-
23       sponsored activities or while under the supervision and control of school
         district employees." (b): "The governing board of any school district
24       maintaining a high school shall take all steps it deems practical to
         discourage high school students from smoking." Cal. Educ. Code
25       § 48901(a).

26   - "[It]t is the intent of the Legislature to give school districts, county boards
         of education, and county superintendents of schools broad authority to
27       carry on activities and programs, including the expenditure of funds for
         programs and activities which, in the determination of the governing board
28       of the school district, the county board of education, or the county

superintendent of schools are necessary or desirable in meeting their needs and are not inconsistent with the purposes for which the funds were appropriated. It is the intent of the Legislature that Section 35160 be liberally construed to effect this objective." Cal. Educ. Code § 35160.1(b)

- "It is the intent of the Legislature in enacting this section to express its concern for the health and safety of school pupils and school personnel at schools where hazardous materials are stored on the school premises, and to encourage school districts to take steps to ensure hazardous materials are properly used and stored." Cal. Educ. Code § 49401.5.

- "The governing board of any school district shall give diligent care to the health and physical development of pupils." Cal. Educ. Code § 49400.

- "The children of this state have the right to an effective public school education. Both students and staff of the primary, elementary, junior and senior high school campuses have the constitutional right to be safe and secure in their persons at school." Cal. Educ. Code § 35183(a)(1).

- "In view of the fact that the State of California has compulsory attendance laws for children of school age, and these *children must be educated in a safe and healthy environment,* the hazard presented by asbestos materials in the schools is of special concern to the Legislature." (emphasis added). Cal. Educ. Code § 49410(a)(6).

Taken together, these statutes are grant SFUSD the power to abate a public nuisance. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. 00-1898, 2005 WL 1500893, at *5 (S.D.N.Y. June 24, 2005) (applying § 3494, and explaining that it is not necessary that statutes use the words "abate" and "nuisance").

Relying on *Lamont*, Defendants contend that SFUSD lacks standing under § 3494 because "no statute specifically authorizes school districts to abate a public nuisance." JLI Mot. at 8-9. That is not the standard. *Lamont* does not require an authorizing statute under § 3494 to explicitly authorize the "abate[ment] of a public nuisance." *Lamont*, 78 Cal. App. 4th at 1084-86. In *Lamont*, the Court of Appeals upheld the dismissal of public nuisance claims brought by a water district because no statute "specifically and in clear terms" authorized the water district to abate public nuisance. *Id*. In so holding, *Lamont* provided examples of statutes that did meet this standard. *Id*. For instance, "sanitary districts" may abate public nuisances, even though their enabling statutes did not mention the terms "abatement" or "public nuisance." *Id*. at 1085 (finding statutes that gave sanitary districts the right to "sue and be sued"; do "as the board deems necessary and proper, and in the performance [of the district's] functions"; and "petition

- 119 -

the superior court for the issuance of a preliminary or permanent injunction … restraining any person from the continued violation of any ordinance of the district" were specific to grant the power to abate a nuisance).

Defendants' heightened standard derives not from *Lamont* itself, but from *Castaic Lake*, which interpreted *Lamont* to mean "that only public bodies *explicitly* authorized to abate a public nuisance may do so." *Castaic Lake*, 272 F. Supp. 2d at 1070. But as *MTBE* explained, *Castaic* misunderstood *Lamont*:

> *Lamont* does not require dismissal of plaintiff's nuisance cause of action because that court was considering a different statute with different language. In contrast to the Lamont Storm Water District's power to do "any and all other acts," OCWD's authority "to prevent interference with water . . . or diminution of . . . pollution or contamination of the water supply" is sufficiently specific and clear to include the abatement of a public nuisance. It appears that the *Castaic Lake* court misinterpreted *Lamont* to mean that the authorizing statute must explicitly use the terms "abate" and "nuisance." However, the *Lamont* court made no such ruling, and in fact, found that the authorizing statute for sanitary districts (as opposed to storm water districts)—which does *not* explicitly say "abate a nuisance"—was sufficient to authorize public nuisance actions.

2000 WL 1500893, at *5.

Defendants' cramped interpretation of § 3494 would mean that the State has assigned SFUSD primary responsibility for ensuring the health, safety, and success of students and the educational mission, but has deprived SFUSD of the critical tool to solve a massive problem within the school district. Paired with Defendants' similarly narrow understanding of § 731, this argument would result in a remarkable inequity: private schools could sue to abate the youth e-cigarette epidemic in their schools, but public schools could not. California law does not require that outcome.

### 2. Altria expanded youth access to JUUL products in the area around SFUSD, perpetuating the nuisance and harming SFUSD.

Altria's causation challenge should be rejected. The causation standard for public nuisance requires only that the defendant be a substantial factor in contributing to the nuisance. *JUUL I*, 497 F. Supp. 3d at 663. This "standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." *San Francisco*, 2022 WL 3224463, at *54 (quoting *ConAgra.*, 17 Cal. App. 5th at 101). A "force which plays only an

1    'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial

2    factor, but a very minor force that does cause harm is a substantial factor." *Id.*; *see also JUUL I*,

3    497 F. Supp. 3d at 664 n. 86.

4          The jury can find that Altria's actions were at least "a very minor force" in causing the

5    harm to SFUSD. *JUUL I*, 497 F. Supp. 3d at 664 n. 86. As in B.B.'s case, "[a] reasonable juror

6    could find that Altria's conduct was a substantial factor in contributing to" the public nuisance

7    harming SFUSD. *JUUL III*, 2022 WL 1601418, at *15. There is evidence "that Altria – through

8    communications between the directors working to solidify a formal deal between Altria and JLI

9    – encouraged JLI to continue with its youth-impacting digital marketing. Once the agreement

10   was formalized under the Altria and JLI Service Agreement, Altria pushed JUUL into more

11   stores (or in more quantities) in" the San Francisco area. *Id.* at *15. The same evidence is present

12   here. SOF §§ II.F.3, II.F.4; Ex. 182 (Cutler Sept. 2021 Rpt.) at 15 (showing dramatic increase in

13   JUUL retail sales after July 2017); Ex. 50 (Gifford Dep.) at 407:6-12, 414:17-20, 415:5-416:9

14   (Altria's valuation of JUUL only ever went up despite growing evidence of the youth problem).

15         Altria knew this expansion was likely to cause more youth to start using tobacco

16   products. *See* Ex. 160 (Willard Dep.) at 65:16-66:3 ("[T]obacco advertising can influence youth

17   to use tobacco products."); Ex. 267 (Gifford Ex. 31012) at slide 2 ("[A] dramatic increase in

18   [JUUL] product availability will almost certainly have a negative impact on FDA's efforts to

19   reduce youth cigarette use."). Despite that knowledge, in 2019, Altria's sales team conducted a

20   "Blitz" of stores in San Francisco and across the county, "encouraging them to increase the

21   number of JUUL products they carried, extending pre-book offers, ... getting JUUL products

22   back into neat order and filling empty slots[], and identifying and solving inventory and

23   distribution problems." Ex. 182 (Cutler Sept. 2021 Rpt.) at 122; Ex. 203 (Cutler Jan. 2022 Rept.)

24   at 6, 44-45, 71 (Altria's visits to 93 stores in San Francisco "had a significant positive effect on

25   sales" of JUUL in San Francisco, corresponding with a rise in youth use in SFUSD).[78]

---

26   [78] Bowen makes a cursory causation argument, claiming that SFUSD did not suffer harm to its
     property and therefore cannot show that Bowen caused harm to its property. Bowen Br. at 7. As

27   explained above, there is ample evidence of harm to SFUSD and its property as a result of the
     Defendants actions. Bowen played a key role in designing JUUL to be unreasonably addictive

28

1      Altria also incorrectly contends that Plaintiff must prove causation through direct, rather

2   than circumstantial, evidence. Altria Mot. at 15 (claiming no evidence of Altria providing "retail

3   or distribution service to any store where a SFUSD student purchased JUUL or that any student

4   ever saw JUUL marketing distributed by the Altria Defendants"), 16 (claiming school district

5   witnesses must be able to connect Altria's actions directly to expenditures). But "California law

6   is crystal clear that '[d]irect proof of each link in a chain of causation is not required.'" *San*

7   *Francisco*, 2022 WL 3224463, at *55 (quoting *City of Modesto v. Dow Chem. Co.*, 19 Cal. App.

8   5th 130, 153 (2018)). "Causation may in many instances be inferred from evidence that does not

9   itself constitute direct evidence of reliance on an individual basis." *Modesto*, 19 Cal. App. 5th

10   153-54 (citation omitted).

11      Aggregate proof can satisfy this burden. Judge Breyer recently rejected the argument that

12   the City of San Francisco had to "directly prove that Walgreens San Francisco pharmacies

13   dispensed [] illegitimate prescriptions." *San Francisco*, 2022 WL 3224463, at *55. Instead,

14   relying on "aggregate evidence" of Walgreens misconduct, the court found that "evidence

15   presented at trial supports a reasonable inference that Walgreens dispensed large volumes of

16   illegitimate opioid prescriptions and that it made the opioid epidemic in San Francisco worse

17   than it otherwise would have been." *Id.* The court explained that *People v. Purdue Pharma L.P.*,

18   No. 14-725287, 2021 WL 5227329 (Cal. Sup. Nov. 01, 2021) ("*Orange County*") did not compel

19   a different result: in *Orange County*, plaintiffs' "theories of liability involved extended chains of

20   causation that the plaintiff failed to prove." *San Francisco*, 2022 WL 3224463, at *56. They

21   "required proof that the defendants' marketing contained false and misleading statements about

22   the safety and efficacy of opioids, that these statements reached prescribers, and that the

23   falsehoods in the statements caused prescribers to write medically unnecessary prescriptions." *Id.*

24   In contrast, "[t]he causal link that Plaintiff had to prove here is much shorter. Plaintiff had to

25   show that Walgreens' unreasonable noncompliance with CSA regulations resulted in the filling

26

27   _____

28   and attractive to youth and marketing JUUL to youth, contributing to that harm. SOF §§ II.A.1,
     II.C.3.a.

1    of large volumes of illegitimate prescriptions that caused harm in San Francisco. Ample evidence

2    supports this conclusion." *Id.* at *57.

3          The same is true here. The chain of causation is shorter here than in the *Orange County*

4    case: in this case, "[t]here are no issues with interim links of physicians and pharmacists." *JUUL*

5    *I*, 497 F. Supp. 3d at 622. And there is also no legitimate use of JUUL by youth—all youth use is

6    illegitimate. Ex. 95 (Garnick Dep.) at 86:4-86:6 ("Q: JUUL should never be used by a kid, right?

7    A: I agree with that."). SFUSD has provided ample evidence Altria increased youth use of

8    JUUL. Between 2017 and 2019, when Altria was actively increasing sales of JUUL in the San

9    Francisco area (both directly with its sales team and indirectly through its encouragement to

10   expand youth sales), JUUL sales to youth rose from 35.2% to 47.9% of JUUL's total retail sales.

11   Ex. 182 (Cutler Sept. 2021 Rpt.) at 25.[79] At the same time, the percent of SFUSD high school

12   students reporting they "had used an e-cigarette in the past 30 days more than doubled from

13   7.1% to 16%." Ex. 207 (Halpern-Felsher Jan. 2022 Rpt.) at 85; *see also* Ex. 203 (Cutler Jan.

14   2022 Rpt.) at 6 ("The share of 12th graders who had vaped in the past 30 days rose from 10% in

15   2017 to 17% in 2019."). Dr. Cutler concluded that "[h]ad Altria not provided these types of

16   support for JUUL growth, the flow of JUUL products to youth in the Bellwether Areas would

17   have been smaller, and the youth vaping epidemic would not have reached the proportions it did.

18   Altria clearly had a substantial and meaningful impact on the increase of youth vaping rates, in

19   the Bellwether Areas." Ex. 203 (Cutler Jan. 2022 Rpt.) at 47. As explained in Plaintiff's

20   opposition to Altria's *Daubert* motion, San Francisco's flavor ban does not undermine Dr.

21   Cutler's analysis.

22

23

24   [79] Contrary to Altria's insinuation, Dr. Cutler did not testify that he "guessed" as JUUL sales to
     youth. Altria Mot. at 16. He calculated an "estimate of youth sales" based on the best data
25   available to him. Ex. 327 (Cutler Dep.) at 369:13-375:15. Dr. Cutler laid out his methodology for
     calculating youth sales in Appendix 5 of his September 2021 report, including the data he relied
26   on, the previous published work he built on, and the various calculations he ran to confirm his
     estimates. Ex. 182 (Cutler Sept. 2021 Rpt.) at 185-200. Altria did not file a *Daubert* challenge
27   against this or any other portion of Dr. Cutler's September 2021 report, and this Court concluded
     that JLI's criticisms of Dr. Cutler's report went "to weight, not admissibility." *In re Juul Labs,*
28   *Inc. Mktg., Sales Practices and Products Liab. Litig.*, 19-02913, 2022 WL 1814440, at *20 (N.D.
     Cal. June 2, 2022) (*JUUL IV*).

**3.**     **Money damages do not provide an adequate remedy for the prospective abatement demand.**

Defendants argue that SFUSD cannot receive abatement because damages provide it with an adequate remedy at law. JLI Mot. at 18-19; Monsees Mot. at 11. But "[t]he core equitable rule is that simply having any remedy at law is not sufficient to foreclose equitable relief; instead, the remedy must be adequate." *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 687 (N.D. Cal. 2021). Abatement provides "a more speedy, effectual, and permanent remedy, than can be had at law." *In re Opiate*, 2022 WL 3443614, at *7 (citation omitted). SFUSD is seeking only abatement, and not damages, for its public nuisance claim. Damages for SFUSD's other claims are not an adequate remedy to address the nuisance the Defendants have created.

The "distinction between an abatement order and a damages award is stark." *ConAgra*, 17 Cal. App. 5th at 132. Damages awards compensate the Plaintiff for past or future costs incurred while abatement requires Defendants "to clean up the hazardous conditions that they assisted in creating." *Id.* at 120. "The Supreme Court has often affirmed that retrospective money damages play a markedly different role than prospective injunctive relief." *Zeiger*, 526 F. Supp. 3d at 687. Abatement is prospective relief: the "purpose of an abatement remedy [is] eliminating a hazard that continues to cause prospective harm to a plaintiff." *In re Opiate*, 2022 WL 3443614, at *15.

Plaintiff's abatement remedy goes beyond the school walls to remedy the hazard at its source through community-based measures, cessation, and treatment. *See* Ex. 325 (Kelder Feb. 2022 Rpt.) at 9, 47-69; *see also* Ex. 326 (Winickoff Jan. 2022 Rpt.) at 41-82. For example, Dr. Kelder recommends counter-advertising mass media campaigns across San Francisco County. As he explains, "peer use is one of the most important predictors of youth e-cigarette use, and a potent prevention strategy is countering mass media that spreads misinformation, normalizes e-cigarette use and depicts vaping as attractive and satisfying." Ex. 325 (Kelder Feb. 2022 Rpt.) at 81. "Applying mass media at the county level will ensure the peers of and youth most likely to influence the students in San Francisco Unified School District will be exposed to counter vaping mass media, thereby helping to inoculate the youth of San Francisco Unified School District." *Id.*

1    Dr. Winickoff recommends needed treatment measures for addicted youth, including connecting

2    youth users to community clinical treatment; medication for addicted youth; clinical education

3    and training in the local community; efficient and sustainable clinical screening and tracking

4    systems; expansion of treatment and services; and routine screening for nicotine use. Ex. 326

5    (Winickoff Jan. 2022 Rpt.) at 11, 41-71. The need for these measures shows damages alone are

6    not adequate to "to clean up the hazardous conditions" associated with the e-cigarette epidemic

7    that are causing SFUSD harm. *See ConAgra*, 17 Cal. App. 5th at 120.

8        As discussed further in the Argument § B.2.b above, certain expenses (e.g., infrastructure

9    modifications) might be necessary both to compensate SFUSD for harm incurred and to abate the

10   nuisance. Such overlap, if it occurs, does not convert abatement into damages or damages into

11   abatement. Instead, it can be resolved by the Court when crafting the appropriate abatement

12   remedy. *E.g.*, *ConAgra*, 17 Cal. App. 5th at 132 ("An abatement of a nuisance is accomplished

13   by a court of equity by means of an injunction proper and suitable to the facts of each case.")

14   (citation omitted).

15       The cases cited by Defendants involved retrospective relief: plaintiffs seeking restitution

16   for UCL claims, in addition to damages, all of which compensated for the same past harm. *See,*

17   *e.g.*, *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (adequate remedy at

18   law existed when the plaintiff sought both damages and restitution "to compensate her for the

19   same past harm"); *Franckowiak v. Scenario Cockram USA, Inc.*, 20-8569, 2020 WL 9071697, at

20   *3 (C.D. Cal. Nov. 30, 2020) (same). It "makes sense that *Sonner* may sometimes bar equitable

21   restitution when damages are available because, as in *Sonner* itself, equitable restitution may

22   seek to compensate a plaintiff for the same past harm as monetary damages." *Zeiger*, 526 F.

23   Supp. 3d at 687. But when, as here, Plaintiff seeks prospective relief, a legal remedy to

24   compensate for past harm alone is adequate. *Id.*[80]

---

[80] Defendants cite some unpublished trial court decisions indicating that despite being prospective relief, injunctive relief is also barred by *Sonner* if the plaintiff has damages available. JLI Br. at 19. But this court has rejected that interpretation, following Supreme Court precedent to conclude that "California's consumer protection laws permit courts to issue injunctions that serve different purposes and remedy different harms than retrospective monetary damages." *Zeiger*, 526 F. Supp. 3d at 687; *Brooks v. Thomson Reuters Corp.*, 21-01418, 2021 WL 3621837, at *11 (N.D. Cal.

1    Seeking an abatement fund to eliminate the harms created by defendants does not convert

2    SFUSD's abatement request into a damages demand. An "abatement fund is 'not a thinly-

3    disguised damages award', but rather an equitable remedy designed to eliminate the nuisance."

4    *JUUL I*, 497 F. Supp. 3d at 653 (quoting 17 Cal. App. 5th at 132). It "is well-established that an

5    order requiring defendants to pay money to abate harm going forward does not convert an

6    equitable remedy into a damages award." *In re Opiate*, 2022 WL 3443614, at *16; *United States*

7    *v. Apex Oil Co.*, 579 F.3d 734, 736 (7th Cir. 2009) ("That equitable remedies are always orders

8    to act or not to act, rather than to pay, is a myth; equity often orders payment."); *ConAgra*, 17

9    Cal. App. 5th at 134 (Damages "are intended to compensate a party for an injury suffered or

10   other loss. . . . The funding of a diagnostic study in the present case, though it would require

11   monetary payments, would be preventive rather than compensatory . . . [and would be the first

12   step in] abating an existing but growing toxic hazard.") (citation omitted).

13   Notably, there is case law from this court permitting a nuisance action for abatement and

14   a negligence action for damages to go forward together. *See Walnut Creek Manor*, 2010 WL

15   653561, at *4-6. By contrast, Defendants have not cited a single case from *any court* holding that

16   a negligence claim precluded a public nuisance claim from going forward. *See* Altria Mot. at 18-

17   20; Bowen Mot. at 8; Monsees Mot. at 11. This Court should not be the first to take that

18   unprecedented action.

19   **D.    The Court may exercise personal jurisdiction over Dr. Huh.**

20   Dr. Huh asserts that the Court lacks personal jurisdiction over Dr. Huh because "[t]here is

21   no evidence that Dr. Huh was a primary participant in any claim-related activity." ODD Mot. at

22   30. As detailed in the Statement of Facts, this is not true: Dr. Huh was not only a member of the

23   ODD Executive Committee, but specifically empowered to make decisions on its behalf. SOF

24   § II.A.2. JLI executives reported to him, and he led Board meetings. *Id*. He contributed to the

25   product design, including its nicotine profile, approved branding changes, and was part of the

26   ODD's plan to maximize sales at all costs. *Id*. §§ II.A.2, II.C.1 n.35, II.A.3. Dr. Huh relies on

27

28   Aug. 16, 2021) (same); *Andino v. Apple, Inc.*, 20-01628, 2021 WL 1549667, at *5 (E.D. Cal. Apr. 20, 2021) (same).

1   *New York v. Juul Labs, Inc.*, No. 452168/2019 (N.Y. Sup. Ct. July 14, 2022), but that decision

2   rested only on pleadings, not the fulsome factual record here, and is in any event inconsistent

3   with this Court's decision in *JUUL II* finding the allegations sufficient to support personal

4   jurisdiction over Dr. Huh even in non-California fora. 553 F. Supp. 3d at 879.

5   **IV.    CONCLUSION**

6       The motions for summary judgment should be denied.

7

8   Dated: September 12, 2022

    Respectfully submitted,

9       By: */s/ Sarah R. London*

10      Sarah R. London

11      **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**

12      275 Battery Street, Fl. 29
    San Francisco, CA 94111

13      Telephone: (415) 956-1000
    slondon@lchb.com

14

15

16      By: */s/ Dena C. Sharp*

17      Dena C. Sharp
    **GIRARD SHARP LLP**

18      601 California St., Suite 1400
    San Francisco, CA 94108

19      Telephone: (415) 981-4800
    dsharp@girardsharp.com

20      By: */s/ Dean Kawamoto*

21      Dean Kawamoto

22      **KELLER ROHRBACK L.L.P.**
    1201 Third Ave., Ste. 3200

23      Seattle, WA 98101
    Telephone: (206) 623-1900

24      dkawamoto@kellerrohrback.com

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Ellen Relkin*

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
erelkin@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

**APPENDIX**

**EXAMPLES OF MAIL AND WIRE FRAUD**

| From | To | Date | Description | Source |
|------|-----|------|-------------|--------|
| JLI | Public (via internet) | April 21, 2015 | April 21, 2015, press release describing JUUL as a "technology breakthrough in smoking alternatives," a "compelling alternative to traditional cigarettes," and "the product that smokers want." | Ex. 107 (JLI11033856) |
| JLI | Members of the public on JLI's email distribution list | June 2015 to April 7, 2016 | 171 promotional emails were sent to members of the public with no mention of JUUL's nicotine content. For example, on July 11, 2015, JLI sent an email from JUUL's email address advertising JUUL's promotional events: "Music, Art, & JUUL. What could be better? Stop by and be gifted a free starter kit." | E.g., Ex. 334 (7/11/15 Email); Ex. 335 (JLI07783624). |
| JLI | Public (via internet) | June 2015 to Oct. 6, 2017 | JLI's Twitter feed, @JUULvapor, and its 2,691 tweets, did not contain a nicotine warning. For example, on August 7, 2015, the @JUULvapor Twitter account published a tweet advertising the Cinespia "Movies. All Night Slumber Party" and captioned it "Need tix for @cinespia 8/15? We got you. Follow us and tweet #JUULallnight and our faves will get a pair of tix!" | Ex. 336 (Twitter 8.7.15) |
| JLI | Public (via CBS News) | Oct. 17, 2016 | "Our Marketing Efforts are Adult-targeted. . . Any media is focused on 21+ adult smokers and we always adhere to or exceed all tobacco guidelines for advertising in home, radio and digital." | Ex. 337 (INREJUUL_00178123) |
| JLI | Public (via internet) | July 28, 2017 | The @JUULvapor Twitter account published a tweet, showing an image of a Mango JUULpod next to mangos, and captioned "#ICYMI: Mango is now in Auto-ship! Get the #JUULpod flavor you love delivered & save 15%. Sign up today." This tweet did not mention that JUUL contained nicotine. | Ex. 338 (Twitter 7.28.17) |
| JLI | Public (via internet) | Aug. 4, 2017 | The @JUULvapor Twitter account published a tweet promoting Mint JUULpods with an image stating: "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste," captioned "A new month means you can stock up on as many as 15 #JUULpod | Ex. 339 (Twitter 8.4.17) |

| From | To | Date | Description | Source |
|------|-----|------|-------------|--------|
| | | | packs. Shop now." This tweet did not mention that JUUL contained nicotine. | |
| JLI | Public (JLI website) | April 25, 2018 (dates of captures, existed before and after) | "Our mission" is to "improve the lives of the world's one billion adult smokers." | https://web.archive.org/web/201804250 45933/https://www.juul.com/mission-values (April 25, 2018)<br><br>https://web.archive.org/web/201904111 81910/https://www.juul.com/mission-values (April 11, 2019) |
| JLI | Public (via internet) | July 5, 2017 | The @JUULvapor Twitter account published a tweet stating: "Here at #JUUL our corporate goal is driving innovation to eliminate cigarettes." | Ex. 340 (Twitter 7.5.17) |
| JLI | Public (via internet) | Aug. 28, 2017 | The @JUULvapor Twitter account published a tweet comparing JUULpods to dessert with an image and stating: "Do you brulee? RT if you enjoy dessert without a spoon with our Creme Brulee #JUUL pods." | Ex. 341 (Twitter 8.28.17) |
| Ashley Gould (JLI Chief Admin. Officer) | Public (via interview with CNBC, later posted on internet) | Dec. 14, 2017 | "It's a really, really important issue…. We don't want kids using our products." | Ex. 342 (JLI05142325) |
| JLI | Public (via internet) | March 14 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." | Ex. 73 (JLI00684459) |
| JLI | Public (JLI website) | April 25, 2018 (dates of website captures, existed before and after) | "JUUL was founded by former smokers, James and Adam, with the goal of improving the lives of the one billion adults [sic] smokers. We envision a world where fewer people use cigarettes, and where people who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." | https://web.archive.org/web/201804262 25130/https://www.juul.com/mission-values (April 26, 2018)<br><br>https://web.archive.org/web/201904111 81910/https://www.juul.com/mission-values (April 11, 2019) (minor variations) |
| JLI | Public (via internet) | April 25, 2018 | "Our company's mission is to eliminate cigarettes and help the more than one billion smokers worldwide switch to a | Ex. 108 (JLI00004457) |

| From | To | Date | Description | Source |
|---|---|---|---|---|
| | | | better alternative." "[W]e are committed to deterring young people, as well as adults who do not currently smoke, from using our products. We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL." "Our objective is to provide the 38 million American adult smokers with meaningful alternatives to cigarettes while also ensuring that individuals who are not already smokers, particularly young people, are not attracted to nicotine products such as JUUL." | |
| JLI | Public (JLI website) | Since at least May 25, 2018 (dates of website captures, existed before and after) | "JUUL was designed with adult smokers in mind." | Ex. 343 (JLI52785861) (2017) https://web.archive.org/web/201805251 85816/https://www.juul.com/shop/devi ces (May 25, 2018) https://web.archive.org/web/202001251 85518/https://www.juul.com/shop/devi ces (January 25, 2020) https://www.juul.com/shop/devices (last visited, Sept. 8, 2022) |
| JLI | Public (via internet – social media) | May 25, 2018 | "We market our products responsibly, following strict guidelines to have material directed exclusively toward adult smokers and never to youth audiences." | Ex. 74 (INREJUUL_00036432) |
| JLI (via counsel) | FDA (via U.S. mail and electronic transmission) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." | Ex. 330 (JLI01143553) |
| JLI | Public (JLI website) | July 24, 2018 | "[W]e too, are committed to preventing underage use of JUUL. … Furthermore, we have never marketed to anyone underage." | Ex. 346 (JLI01413779) |

A-3

| From | To | Date | Description | Source |
|------|-----|------|-------------|--------|
| JLI | Public (via internet) | July 26, 2018 (dates of website captures, existed before and after) | "We invest our time and resources in new ways to deliver JUUL exclusively to adult smokers"<br><br>"We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers"<br><br>"We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. We invest our time and resources in new ways to deliver JUUL exclusively to adult smokers…." | https://web.archive.org/web/20180726021743/http://www.juul.com/our-responsibility (July 26, 2018)<br><br>https://web.archive.org/web/20190715140953/http://www.juul.com/our-responsibility (July 15, 2019) (minor variations)<br><br>https://web.archive.org/web/20200604214444/http://www.juul.com/our-responsibility (June 4, 2020) (minor variations) |
| James Monsees | Public (via statement to New York Times – later posted on internet) | Aug. 27, 2018 | Monsees said selling JUUL products to youth was "antithetical to the company's mission." | Ex. 349 (JLI11366279) |
| Adam Bowen | Public (statement to New York Times – later posted on internet) | Aug. 27, 2018 | JLI had tried to make JUUL "as adult-oriented as possible." | Ex. 349 (JLI11366279) |
| JLI | FDA (via email); Public (JLI website) | Oct. 16, 2018 (FDA)<br><br>Nov. 13, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers.<br><br>"We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal - preventing youth from initiating on nicotine. … Our intent was never to have youth use JUUL products." | Ex. 255 (JLI01111968-JLI01111969) (Oct. 16, 2018)<br><br>Ex. 331 (JLI01413814) (Nov. 13, 2018) |
| Howard Willard | FDA (via U.S. mail or email) | Oct. 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and | Ex. 353 (Gifford Ex. 31010) |

A-4

| From | To | Date | Description | Source |
|---|---|---|---|---|
| (Altria Group CEO) | | | menthol product, suggesting that it was a product for adult smokers.<br><br>"We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes."<br><br>"[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." | |
| JLI | FDA (via email) | Nov. 5 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. | Ex. 344 (Engelke Ex. 2537) |
| Kevin Burns (former JLI CEO) | Public (JLI Website) | Nov. 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the off-ramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." | Ex. 331 (JLI01413814) |
| James Monsees | Public (via statement to *Forbes*, later published on internet) | Nov. 16, 2018 | "Any underage consumers using this product are absolutely a negative for our business. We don't want them. We will never market to them. We never have." | Ex. 348 (JLI11364798) |
| Howard Willard (Altria Group CEO) | Public (via internet) | Dec. 20, 2018 | "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers…. We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." | Ex. 351 (Longest Ex. 471) |
| Altria | Public (via internet) | Dec. 20, 2018 | "Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. As JUUL previously said, 'Our intent was never to have youth use JUUL products.'" | Ex. 351 (Longest Ex. 471) |
| Altria | Public (via Earnings Call) | Jan. 31, 2019 | "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to | Ex. 289 (ALGAT0004029004) |

2459019.2

| From | To | Date | Description | Source |
|------|-----|------|-------------|--------|
| | | | also support and even accelerate transition to noncombustible alternative products by adult smokers." | |
| Kevin Burns (former JLI CEO) | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." | Ex. 350 (JLI11593507) |
| James Monsees | Congress ( via U.S. mail or email) | July 25, 2019 | Written Testimony of James Monsees provided to Congress, stating: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products.... That is a serious problem. Our company has no higher priority than combatting underage use." | *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the H. Comm. on Oversight & Reform*, 116th Cong. 70 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.) |
| JLI | Public (JLI website) | Aug. 29, 2019 | "[W]e have no higher priority than combating youth use. …[W]e have taken a series of escalating steps to combat youth access, appeal, and use of vapor products. … Our target market is the one billion adult smokers globally." | Ex. 347 (JLI01414116) |
| JLI | Public (JLI Website) | Sept. 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes…." | *Consumer Update: 9/19*, JUUL Labs, Inc. (Sept. 19, 2019), https://www.juullabs.com/about/newsroom/page/6/ |
| K.C. Crosthwaite (JLI CEO) | Public (JLI website) | Sept. 25, 2019 | "I have long believed in a future where adult smokers overwhelmingly choose alternative products like JUUL. That has been this company's mission since it was founded, and it has taken great strides in that direction." | Ex. 332 (5185927880) |
| Howard Willard | Congress (via U.S. mail or email) | Oct. 14, 2019 | "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." | Ex. 333 (5185547864) |

A-6

| From | To | Date | Description | Source |
|---|---|---|---|---|
| JLI | Public (JLI website) | April 5, 2020 (dates of website captures, existed before and after) | "[O]ur mission is to transition the world's billion adult smokers away from combustible cigarettes…." | https://web.archive.org/web/202004050 92451/https://www.juul.com/mission-values (April 5, 2020)<br><br>https://web.archive.org/web/202103310 54729/https://www.juullabs.com/ (March 31, 2021)<br><br>https://www.juul.com/about-juul (last visited September 8, 2022) |
| JLI | Public (JLI website) | June 3, 2020 | "JUUL Labs was founded by former smokers, James and Adam, with the goal of eliminating cigarettes among adult smokers." | https://web.archive.org/web/202006031 50737/https://www.juul.com/our-story |

1

## **<u>CERTIFICATE OF SERVICE</u>**

2

     I hereby certify that on September 12, 2022, I electronically filed the foregoing document

3

with the Clerk of the Court using the CM/ECF system, which will automatically send

4

notification of the filing to all counsel of record.

5

                           */s/ Sarah R. London*
                           Sarah R. London

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPP TO ALTRIA DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO 19-MD-02913-WHO