1  [*Submitting Counsel's on Signature Page*]

2

3

4

5

6

7

8

9  **UNITED STATES DISTRICT COURT**

10  **NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

11

12
|  |  |
|---|---|
| IN RE JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | **Case No. 19-md-02913-WHO** |
| | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE** |
| This Document Relates to: | |
| *San Francisco Unified School District v. Juul Labs, Inc. et al.,* | |
| Case No. 3:19-cv-08177-WHO | |

13

14

15

16

**Judge: Hon. William H. Orrick**

17  **Date: October 24, 2022**

18  **Time: 2:00 P.M.**

19  **Ctrm.: 2**

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 1* (FDA'S STAYED INTERIM DENIAL OF JUUL'S PMTA) ................................................................................ 1

II.     PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 2* (HEARSAY CONCERNING STUDENTS' ALLEGED VAPOR USE AND THE IMPACT OF VAPOR USE AT SCHOOLS) ..................................................................................................................... 7

III.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 3* (CERTAIN MARKETING NOT DISTRIBUTED IN SAN FRANCISCO) ......................................... 9

VI.     PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 6* (FLAVORS NOT SOLD IN SAN FRANCISCO) ............................................................................................ 13

VII.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 7* (EVIDENCE AND ARGUMENT REGARDING NICOTINE DISCLOSURES ON LABELS/PACKAGING (EXPRESS PREEMPTION) ........................................................................................... 15

VIII.   PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 8* (EVIDENCE REGARDING YOUTH THC USAGE) ....................................................................... 17

IX.     PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 9* (EDUCATION AND YOUTH PREVENTION PROGRAMS IN OTHER SCHOOL DISTRICTS) ......................... 18

X.      PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 10* (ONLINE AGE-VERIFICATION PROCESSES AND PURCHASES BY UNDERAGE PERSONS) ..................... 20

XI.     PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 11* (JUUL ADVERTISEMENTS AND COUPONS FOR JUUL DISSEMINATED BY ALTRIA) .................. 22

XII.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 12* (ALTRIA'S RETAIL AND DISTRIBUTION SERVICES) ...................................................................... 23

XIII.   PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 13* (ARGUMENTS THAT INVESTMENT PROVIDES CONTROL OR CREATES LIABILITY FOR INVESTOR) .... 25

XIV.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 14* (OPINIONS THAT VAPOR USE CONTRIBUTED TO SCHOOL SHOOTING DEATHS OR INJURIES) .................. 26

XV.     PLAINTIFF'S OPPOSITION TO DIRECTOR DEFENDANTS *MOTION IN LIMINE 15* (MR. MONSEES' CONSTITUTIONALLY-PROTECTED CONGRESSIONAL TESTIMONY) ............. 29

XVI.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 16* (EXPERT TESTIMONY CONTAINING PEJORATIVE LANGUAGE, FACTUAL NARRATIVES, OR NEW OPINIONS) ..................................................................................................................... 31

XVII.   PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 17* (EXPERT TESTIMONY REGARDING ABATEMENT PLANS AND ALLEGED DAMAGES) ..................... 34

XVII.   PLAINTIFF'S OPPOSITION TO DEFENDANT'S *MOTION IN LIMINE 18* (DIVIDENDS RECEIVED FROM THE ALTRIA TRANSACTION) ...................................................... 35

XVIII.  PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 19* (NICHOLAS PRITZKER'S FAMILY TIES TO THE TOBACCO INDUSTRY) ........................................... 37

XIX.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 20* (EVIDENCE OF CHEMICALS IN  JUUL OTHER THAN NICOTINE AND OF HEALTH CONDITIONS OTHER THAN ADDICTION) ............................................................................................ 38

XX.     PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 21* (EVIDENCE REGARDING MR. MONSEES' RECORDING OF CONVERSATION WITH STANTON GLANTZ) ................................................................................................................................ 41

XXI.    CONCLUSION ..................................................................................................... 42

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS IN
LIMINE
CASE NO  19-md-02913-WHO

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

<u>Cases</u>

3

4   *3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885,
    2021 WL 765019 (N.D. Fla. Feb. 28, 2021)................................................................. 33

5   05CV633 JLS (CAB),
    2010 WL 11508761 (S.D. Cal. Jan. 27, 2010) ..................................................... 19, 22

6   *8 Pers. Inj. Litig.*,
    2016 WL 3064124 (S.D. Ohio May 30, 2016) ....................................................... 38, 39

7   16-00782-PHX-DGC,
    2018 WL 1876896 (D. Ariz. Apr. 18, 2018) ................................................................. 28

8   469 U.S. 884 (1984).......................................................................................................... 31

9   *All Alaskan Seafoods, Inc. v. TYCO Elecs. Corp.*,
    83 F. App'x 948 (9th Cir. 2003)...................................................................................... 14

10  *Allergan, Inc. v. Athena Cosms., Inc.*,
    738 F.3d 1350 (Fed. Cir. 2013) ...................................................................................... 10

11  *AYA Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    2020 WL 2553181 (S.D. Cal. May 20, 2020) ................................................................ 33

12  *Banga v. Kanios*,
13  2020 WL 9037179 (N.D. Cal. Dec. 9, 2020)................................................................. 33

    *Bates v. Dow Agrosciences LLC*,
14  544 U.S. 431, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005)............................................. 16

15  *Bayer v. Neiman Marcus Grp., Inc.*,
    861 F.3d 853 (9th Cir. 2017) ........................................................................................... 34

16  *Bowoto v. Chevron Corp.*,
    621 F.3d 1116 (9th Cir. 2010) ......................................................................................... 40

17  *Brady v. Wal-Mart Stores, Inc.*,
    531 F.3d 127 (2d Cir. 2008) ............................................................................................ 31

18  *Brazos River Auth. v. GE Ionics, Inc.*,
19  469 F.3d 416 (5th Cir. 2006) ............................................................................................. 8

    *Brewer v. BNSF Ry. Co.*,
20  2016 WL 11709319 (D. Mont. Apr. 22, 2016)................................................................ 19

21  *City of Cleveland v. Cleveland Elec. Illuminating Co.*,
    538 F. Supp. 1257 (N.D. Ohio 1980) .............................................................................. 30

22  *City of Huntington v. AmerisourceBergen Drug Corp.*,
    2021 WL 1986425 (S.D.W. Va. May 18, 2021).............................................................. 31

23  *City of Newport v. Fact Concerts, Inc.*,
    453 U.S. 247, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981)............................................... 36

24  *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) ......................................................................................... 29

25  *Colo v. NS Support, LLC*,
    2022 WL 4386706 (D. Idaho Sept. 22, 2022) .................................................................. 8

26  *Contreras Fam. Tr. v. U.S. ex rel. Dep't of Agric. Farm Serv. Agency*,
27  205 F. App'x 580 (9th Cir. 2006).................................................................................... 8

    *DataTreasury Corp. v. Wells Fargo & Co.*,
28  2010 WL 11538713 (E.D. Tex. Feb. 26, 2010) .............................................................. 30

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS IN
LIMINE
CASE NO 19-md-02913-WHO

*Dees v. Cnty. of San Diego*,
   2017 WL 168569 (S.D. Cal. Jan. 17, 2017) ............................................................... 11
*Doe v. Young*,
   664 F.3d 727 (8th Cir. 2011) ..................................................................................... 5
*Dollar v. Long Mfg., N.C., Inc.*,
   561 F.2d 613 (5th Cir. 1977) ............................................................................. 28, 38
*E.E.O.C. v. Evans Fruit Co.*,
   2013 WL 4498747 (E.D. Wash. Aug. 21, 2013) ......................................................... 8
*Focal Point Films, LLC v. Sandhu*,
   2020 WL 5760355 (N.D. Cal. Sept. 28, 2020) ......................................................... 32
*Garcia v. Cnty. of Riverside*,
   2019 WL 4282903 (C.D. Cal. June 7, 2019) ............................................................ 33
*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*,
   2021 WL 1080688 (S.D. Cal. Mar. 18, 2021) .......................................................... 31
*In re Cysive, Inc. S'holders Litig.*,
   836 A.2d 531 (Del. Ch. 2003) ................................................................................ 26
*In re Glumetza Antitrust Litigation..*,
   2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) .................................................... 32, 33
*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   2022 WL 1814440 (N.D. Cal. June 2, 2022) ............................................................ 32
*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   497 F. Supp. 3d 552 (N.D. Cal. 2020) ............................................................ Passim
*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   533 F. Supp. 3d 858 (N.D. Cal. 2021) .................................................................... 23
*In re Polyurethane Foam Antitrust Litig. Direct Purchaser Class*,
   2015 WL 12747961 (N.D. Ohio Mar. 6, 2015) .......................................................... 6
*In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   181 F. Supp. 3d 278 (E.D. Pa. 2016) ..................................................................... 30
*In re: Gen. Motors LLC Ignition Switch Litig.*,
   14-MD-2543 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) ......................................... 31
*Koike v. Starbucks Corp*,
   2007 WL 9710389 (N.D. Cal. May 10, 2007) ............................................................ 8
*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ....................................... 28
*Langer v. Kiser*,
   495 F. Supp. 3d 904 (S.D. Cal. 2020) ............................................................... 22, 23
*Lego v. Stratos Int'l, Inc.*,
   2004 WL 5518162 (N.D. Cal. Nov. 4, 2004) ........................................................... 33
*Los Angeles News Serv. v. CBS Broad., Inc.*,
   305 F.3d 924 (9th Cir. 2002) .................................................................................... 8
*Mathew Enter., Inc. v. Chrysler Grp. LLC*,
   2016 WL 11432038 (N.D. Cal. Sept. 21, 2016) ....................................................... 15
*Medtronic, Inc v. Lohr*,
   518 U.S. 470 (1996) ............................................................................................... 16
*Moore v. Principi*,
   2002 WL 31767802 (N.D. Ill. Dec. 10, 2002) ........................................................... 6
*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
   909 F.2d 1245 (9th Cir. 1990) ................................................................................ 21

*Newman ex rel. Newman v. McNeil Consumer Healthcare*,
  2013 WL 4460011 (N.D. Ill. Mar. 29, 2013) ............................................................. 6
*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014) .................................................................................... 32
*Onyx Pharms., Inc. v. Bayer Corp.*,
  863 F. Supp. 2d 894 (N.D. Cal. 2011)....................................................................... 21
*Persian Gulf, Inc. v. BP West Coast Prods. LLC*,
  2022 WL 4830698 (S.D. Cal. Sept. 30, 2022)............................................................. 8
*Pollard v. FCA US LLC*,
  2018 WL 10701619 (C.D. Cal. June 25, 2018) ......................................................... 32
*Reves v. Ernst & Young*,
  507 U.S. 170, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)......................................... 25
*Rogriguez-Landa*,
  2019 WL 653853 (C.D. Cal. Feb. 13, 2019) ............................................................... 5
*Santa Clarita Valley Water Agency v. Whittaker Corp.*,
  2021 WL 6107023 (C.D. Cal. Nov. 12, 2021) ........................................................... 32
*Shenon v. New York Life Ins. Co.*,
  2020 WL 1317722 (C.D. Cal. Mar. 16, 2020)............................................................. 2
*Sinegal v. Martin Marietta Materials, Inc.*,
  2020 WL 2106694 (S.D. Tex. Apr. 9, 2020) ............................................................... 8
*Speer v. Cnty. of San Bernardino*,
  2021 WL 5969521 (C.D. Cal. Aug. 9, 2021) ...................................................... 21, 28
*Sumlin*,
  2022 WL 1664256 (C.D. Cal. May 23, 2022) ............................................................. 2
*Talley v. Burt*,
  2019 WL 5842857 (W.D. Pa. Nov. 7, 2019) ............................................................... 6
*Tennison v. Circus Circus Enter.*,
  244 F.3d 684 (9th Cir. 2001) .................................................................................... 41
*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v.*
  *Teikoku Pharma USA*,
  296 F. Supp. 3d 1142 (N.D. Cal. 2017)..................................................................... 33
*United States v. Abel*,
  469 U.S. 45 (1984).................................................................................................... 36
*United States v. Alpine Land & Reservoir Co.*,
  887 F.2d 207 (9th Cir. 1989) .................................................................................... 34
*United States v. Bonds*,
  608 F.3d 495 (9th Cir. 2010) .................................................................................... 19
*United States v. Boros*,
  668 F.3d 901 (7th Cir. 2012) .................................................................................... 11
*United States v. Canan*,
  48 F.3d 954 (6th Cir. 1995) ........................................................................................ 8
*United States v. Chavez*,
  229 F.3d 946 (10th Cir. 2000) .................................................................................. 40
*United States v. Dowie*,
  411 F. App'x 21 (9th Cir. 2010) ................................................................................ 36
*United States v. Espinoza-Baza*,
  647 F.3d 1182 (9th Cir. 2011) .................................................................................. 14

*United States v. Ewings*,
  936 F.2d 903 (7th Cir. 1991) ........................................................................... 37
*United States v. Hankey*,
  203 F.3d 1160 (9th Cir. 2000) ........................................................................... 5
*United States v. Harris*,
  185 F.3d 999 (9th Cir. 1999) ........................................................................... 36
*United States v. Mitchell*,
  172 F.3d 1104 (9th Cir. 1999) ........................................................................... 36
*United States v. Naranjo*,
  634 F.3d 1198 (11th Cir. 2011) ........................................................................... 37
*United States v. Holmes*, No. 5:18-cr-00258-EJD-1,
  2021 U.S. Dist. LEXIS 98060, at *16-17 (N.D. Cal. May 21, 2021) ...................... 37
*United States v. Reyes*,
  660 F.3d 454 (9th Cir. 2011) ........................................................................... 36
*United States v. Stockheimer*,
  157 F.3d 1082 (7th Cir. 1998) ........................................................................... 36
*United States v. Terry*,
  760 F.2d 939 (9th Cir. 1985) ........................................................................... 40
*United States v. Waters*,
  627 F.3d 345 (9th Cir. 2010) ........................................................................... 4
*United States v. Welch*,
  327 F.3d 1081 (10th Cir. 2003) ........................................................................... 36
*United States v. Yang*,
  2019 WL 5536213 (N.D. Cal. Oct. 25, 2019) ........................................................................... 33
*United States v. Yang*,
  2019 WL 5579718 (N.D. Cal. Oct. 29, 2019) ........................................................................... 2
*Washington v. GEO Grp., Inc.*,
  2021 WL 4847662 (W.D. Wash. Sept. 28, 2021) ........................................................................... 32
*Williamson v. Cox Commc'ns, Inc.*,
  2006 WL 1586375 (Del. Ch. June 5, 2006) ........................................................................... 25

Statutes

21 U.S.C. § 387p(a)(2) ........................................................................... 16
21 U.S.C.A. § 387p(a)(2)(A) ........................................................................... 16
California Penal Code § 632 ........................................................................... 41

Rules

Fed. R. Evid. 401, 403 ........................................................................... 19
Fed. R. Evid. 702 ........................................................................... 33
Fed. R. Evid. 801(c) ........................................................................... 7
Fed. R. Evid. 801(c)(1) ........................................................................... 7

Regulations

21 C.F.R. § 1143.3 ........................................................................... 15

Plaintiff respectfully submits the following responses in opposition to Defendants' *in limine* motions. For the reasons set forth below, Defendants' *in limine* motions should be denied.

## I.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 1* (FDA'S STAYED INTERIM DENIAL OF JUUL'S PMTA)

Against the history of this litigation, Defendants' first *in limine* motion is remarkable. We have heard from Defendants, *ad nauseam*, the central and critical role FDA regulation generally, and its consideration of JUUL's PMTA specifically, would play in the trials in this matter. Indeed, Defendants' first move in this consolidated litigation was a motion to prevent *any proceedings whatsoever* on the basis that the FDA's actions, including its evaluation of "health risks" and "toxicology," "will inform all claims in this MDL."[1] Then, at *Daubert*, we heard that several of Plaintiff's experts should be prevented from testifying for "fail[ure] to consider the federal regulatory scheme" because that "the appropriate for the protection of public health standard … is *the key means by which to judge JLI's conduct*."[2] Finally, Defendants' argument on their proposed jury instructions in the *B.B.* trial set forth this exposition on the PMTA process:

> This case revolves around a product that is regulated by the FDA. Therefore, the topic of the FDA, its regulation of electronic nicotine products, and the PMTA process will undoubtedly arise repeatedly in this matter. JLI's proposed language provides background information which clarifies for the jury what the FDA is, what authority the FDA has, and what processes the FDA employs, much like how this Court's model patent jury instructions include a preliminary instruction that provides the jury with an overview of the Patent Office and its work. See, e.g., N.D. Cal. Model Patent Jury Instr. A.1. This relevant and necessary context about the FDA and the PMTA process is important for the jury to hear at the outset of the case to avoid jury confusion as they hear opening statements and the evidence.[3]

In short, the single most pervasive theme of Defendants' defense in this MDL has been the sanctity of the FDA's regulatory oversight, and how the PMTA process represents the ultimate verdict on the safety and effectiveness of JUUL products for their purported mission of switching adult smokers.

Now, the FDA has done something Defendants don't like. But Defendants may not present a one-sided narrative of federal regulation while preventing Plaintiff and witnesses from painting

---

[1] ECF 626 (Primary Jurisdiction Mot.) at 2, 15.
[2] ECF 2701 ("Roadmap" to JLI's Omnibus *Daubert* Motions) at 18-19 (emphasis added).
[3] ECF 3062-1 at 16.

the full picture. Nor may Defendants tout to the jury their claim that JUUL is less toxic than combustible cigarettes while concealing from the jury the FDA's findings (findings that have not been withdrawn) that that same evidence was incomplete, methodologically unsound, misleading, and ultimately insufficient to establish that JUUL is appropriate for the protection of public health—the same standard that Defendants have told the Court "will undoubtedly arise repeatedly in this matter."[4] There is no unfair prejudice to the jury hearing the full truth; any risk of prejudice can be mitigated with a neutral jury instruction.

      ***The scope of Defendants' motion is unclear***. In "order to exclude evidence on a motion in limine, the evidence must be inadmissible on all potential grounds." *United States v. Yang*, No. 16-CR-00334-LHK, 2019 WL 5579718, at *1 (N.D. Cal. Oct. 29, 2019) (internal quotation marks omitted). Accordingly, it is incumbent on the movant to "identify the evidence at issue and state with specificity why such evidence is inadmissible." *Shenon v. New York Life Ins. Co.*, No. 218CV00240CASAGRX, 2020 WL 1317722, at *1 (C.D. Cal. Mar. 16, 2020) (citation omitted). The "failure to specify the evidence" adequately "constitutes a sufficient basis on which to deny the motion." *United States v. Sumlin*, No. 18-473, 2022 WL 1664256, at *3 (C.D. Cal. May 23, 2022) (citation omitted).

      Defendants do not meet that initial burden. Their motion begins with the request to exclude "references to the marketing denial order."[5] But the "marketing denial order" is not the same as the fact that the FDA denied JLI's PMTA, not the same as the fact that the FDA's review of JUUL's application remains ongoing, and not the same as the findings and conclusions reached by the FDA in the MDO. Those findings include:

- To "conduct a full evaluation of the overall risks and benefits of a new tobacco product," i.e., to determine whether the APPH standard is met," requires "sufficient evidence of a product's toxicity risks."[6]

- JLI "did not provide sufficient information for FDA to assess the toxicological risks posed by the new products, and the information that [JLI] provided raised concerns."[7]

---

[4] ECF 3062-1 at 16.
[5] ECF 3556 at 2.
[6] Defs. Ex. 1 at 2.
[7] *Id.* at 2.

- The "evidence [JLI] provided was internally inconsistent; lacked key information; relied in significant part on methodological choices that, without adeq..... justification, ignored crucial indications of toxicity; and used a different methodology to assess the toxicity of the new products than it did for comparison products in key respects."[8]

- As "a result, FDA was unable to make any meaningful determinations regarding the risks of the new products relative to their benefits and compared to the risks of other tobacco products, including combustible cigarettes."[9]

- The "evidence [JLI] submit[ted] raises substantial toxicity concerns."[10]

- JLI's "data demonstrate that" JUUL products "induced clearly positive genotoxic responses."[11]

- JLI's "data submitted indicates that" JUUL products "induced a mutagenic response. …. HPHCs, mutagenic and genotoxic constituents within the eliquid can be transferred into the aerosol via the device."[12]

Defendants fail to specify which facts must be excluded (in the light of JLI witnesses who undoubtedly will testify that JUUL carries reduced short and long-term health risks) and could not possibly establish that all of the above is categorically inadmissible. This is manifestly insufficient.

**The fact that the FDA denied JLI's PMTA is relevant and necessary for a complete picture of the regulatory backdrop.** As discussed above, Defendants have made clear their intent to use the APPH standard and the PMTA process as part of their defense in this case. This is not a matter of objective, neutral, undisputed fact.

For example, in *B.B.*, Plaintiff moved to exclude argument misrepresenting the nature of federal regulation of JUUL, including that JUUL was FDA-authorized, that the FDA had approved of JUUL marketing, or that FDA regulations prevented JLI from supplying additional warnings.[13] Defendants opposed those motions,[14] which were granted over their objection.[15] Defendants maintain, as a factual matter, that it is relevant that the "FDA permitted the product to remain on

---

[8] *Id.*

[9] *Id.* at 2-3.

[10] *Id.* at 3-4.

[11] *Id.* at 9.

[12] *Id.* at 35.

[13] ECF 2945 (Pl. MILs) at 1-3.

[14] ECF 3025 (Defs. Opp'n to *B.B.* MILs).

[15] ECF 3170 at 7.

1    the market pending approval."[16] Plaintiff disagrees. *See* (April 2020 Guidance) at 3 (The FDA's

2    enforcement discretion "does not in any way alter the fact that it is illegal to market any new tobacco

3    product without premarketing authorization.").[17] Defendants intend to put on evidence that JLI's

4    "marketing was in accord with industry standards (as reflected the in FDA's guidance),"[18] and

5    argue that Plaintiff's evidence "conflicts with the FDA's digital marketing guidance."[19] Plaintiff

6    disputes whether the guidance referenced, which requires marketing to "be clearly tailored to appeal

7    to adults," is in any way consistent with Defendants' practices.[20] And so on.

8         Indeed, Defendants' efforts to present their own slanted view of federal regulation continue

9    in the motion itself. Defendants claim that the FDA "made no such determination" that "JUUL

10   products were toxic,"[21] when the FDA determined just that.[22] Defendants pretend the MDO was

11   just about missing data; again, false. *See id.* And Defendants imply that, except for the toxicological

12   concerns identified in the MDO, the FDA otherwise approved of JUUL.[23] In reality, the FDA made

13   clear it had "**not reached a final agency decision on other aspects of [JLI's] application, including**

14   **for example, the potential benefits to adults as compared to the risk to youth posed by your tobacco**

15   **or menthol products.**"[24]

16        Defendants' motion does not seek to remove a category of irrelevant or unfairly prejudicial

17   evidence, but instead to ensure that a set of facts presented to the jury contains only the portions

18   Defendants like, and excises the rest. This is not an appropriate basis for exclusion of evidence or

19   argument. *See, e.g.*, *United States v. Waters*, 627 F.3d 345, 357 (9th Cir. 2010) (reversing where

20   evidentiary rulings admitting some evidence on a topic and precluding other "assured the jury

21

22   [16] *Id.* at 3.

     [17] ECF 631-3.

23   [18] ECF 3556 at 3.

24   [19] ECF 2701 at 17.

     [20] FDA, *Public Health Rationale for Recommended Restrictions on New Tobacco Product Labeling,*

25   *Advertising,    Marketing,    and    Promotion* (Apr.    2019),    *available    at*
     https://www.fda.gov/media/124174/download.

26   [21] ECF 3556 at 3.

     [22] *See* Defs. Ex. 1 at 3-4, 9, 35.

27   [23] *See* ECF at 1 ("The MDO on its face denied approval for JLI's products for narrow reasons related to the
     toxicological data has submitted with its PMTAs.").

28   [24] Defs. Ex. 1 at 12.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
                                                        DEFENDANTS' MOTIONS IN LIMINE

would be provided with a one-sided picture"); *Doe v. Young*, 664 F.3d 727, 733 (8th Cir. 2011) (same, where the result of evidence exclusion was "the jury was allowed to hear only one side of the story").

**The FDA's toxicology findings are relevant as impeachment, even if not admitted as substantive evidence**. Another way in which Defendants' motion seeks to ensure a one-sided presentation of the evidence is with respect to the toxicology findings. Defendants have made no secret of their intent to present evidence regarding the relative toxicity of JUUL products.[25] Drs. Paustenbach, Henningfield, and Auguston are all identified as "will call" witnesses by Defendants and intend to testify as to the persuasiveness of JLI's toxicity evidence. The fact that this same evidence failed to persuade the FDA is directly responsive to that testimony. *See, e.g.*, *United States v. Rogriguez-Landa*, No., 2019 WL 653853, at *14-15 (C.D. Cal. Feb. 13, 2019) (denying motions in limine to exclude impeachment evidence as "premature," and explaining that "[a]dmissiblity of impeachment evidence depends on context").

**The MDO and its included findings present no risk of unfair prejudice**. Finally, JLI does not prove any unfair prejudice that would justify exclusion. The fact that the MDO casts doubt on JLI's toxicity evidence is undoubtedly prejudicial, but that is not enough. "Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (citation omitted, emphasis added). Defendants' passing arguments on unfair prejudice should be rejected. *First*, Defendants say that the MDO is "not final agency action."[26] But the same could be said about *all* of the FDA's efforts related to JUUL while the PMTA is pending. For example, the digital marketing guidance is not "final agency action," yet

---

[25] *See, e.g.*, Ex. 1 (JLI's 9/23/22 witness list) ("Dr. Paustenbach would provide testimony regarding … the toxicity of JLI products relative to combustible cigarettes."); Ex. 2, Henningfield Rpt. at 121 ("Studies included in JLI's PMTA also support that JUUL is a viable and harm reduction product. Clinical and nonclinical studies indicate that JUUL ENDS contain and emit substantially fewer and lower levels of toxicants as compared to cigarettes and substantially fewer and lower levels as compared to FDA-authorized heat not burn products."); *id.* at 60 ("The controlled temperature of the coil is critical to produce aerosol by assuring that the coil temperature is high enough to aerosolize the nicotine liquid for inhalation, but below temperatures that produce toxicants."); Ex. 3, Augustson Dep. at 802-04 during JLI's examination, testifying about the "results of a biomarker study" that assertedly "indicate[s], from the clinical research perspective, the use of JUUL did not add additional HPHC impact compared to the abstinent group.").

[26] ECF 3556 at 2.

Defendants rely on it just the same. *Second*, Defendants say that the MDO is "stayed and subject to further review."[27] But the FDA has not withdrawn the MDO or disavowed the conclusions set forth in it. Permitting JUUL to remain on the market during the FDA's continued evaluation does not undermine those findings, just as permitting JUUL to remain on the market while the PMTA was pending did not reflect an agency judgment that JUUL was appropriate for the protection of public health. *Third*, Defendants say that "[a]dmitting the MDO ... would result in enormous wasted time."[28] But it is Defendants who intend to turn this trial into a sideshow about the FDA. And they never explain what extensive "detail" is necessary to convey that cannot be stated in a neutral jury instruction covering the landscape of federal regulation and how it interacts with this case. Indeed, Plaintiff has proposed doing just that.[29]

Finally, none of the cases Defendants cite supports granting their motion. Defendants cite *Moore v. Principi*, No. 00 C 2975, 2002 WL 31767802 (N.D. Ill. Dec. 10, 2002), but in that employment case the defendant government agency sought to introduce its own internal investigation into the cause of the plaintiff's termination. *Id.* at *8. That self-serving, after-the-fact evidence (the court questioned its "reliability and trustworthiness") bears no comparison to the FDA's independent analysis in the MDO. Other cases concern the danger the jury hears about government investigations. *In re Polyurethane Foam Antitrust Litig. Direct Purchaser Class*, No. 1:10 MD 2196, 2015 WL 12747961, at *11 (N.D. Ohio Mar. 6, 2015); *Talley v. Burt*, No. 2:16-CV-01318, 2019 WL 5842857, at *8 (W.D. Pa. Nov. 7, 2019). But in this case, the jury is already going to hear about the "agency investigatory action,"[30] the question is whether Defendants get to unilaterally decide which elements of that investigation are disclosed to the jury and which are concealed.[31]

---

[27] *Id.*

[28] *Id.* at 4.

[29] ECF 3591 (proposed jury instructions) at 19-21.

[30] ECF 3556 at 3

[31] Defendants also cite *Newman ex rel. Newman v. McNeil Consumer Healthcare*, No. 10 C 1541, 2013 WL 4460011, at *17–18 (N.D. Ill. Mar. 29, 2013) was a decision about hearsay, not Rule 403.

1

2

## II.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 2* (HEARSAY CONCERNING STUDENTS' ALLEGED VAPOR USE AND THE IMPACT OF VAPOR USE AT SCHOOLS)

3

This Court should reject Defendants' attempt to exclude all SFUSD witness's testimony,

4

based on a claim of hearsay, as they are not offering out-of-court statements for the truth of the

5

matter asserted. *See* Fed. R. Evid. 801(c). Further, each of the witnesses referenced in Defendants'

6

motion appears on a party's witness list, so the Court should handle any hearsay objections in the

7

context of trial, through live objections or the deposition designation process.

8

Defendants' motion cherry-picks deposition testimony from four SFUSD employees

9

(Lingrell, Pak, Nelson, and Matthews), without context, to show how these witnesses received

10

information about JUUL's prevalence in SFUSD. Matthews and Nelson are on Defendants' witness

11

list, not Plaintiff's, and Pak and Lingrell will testify live at trial. Defendants' argument is

12

particularly ill-suited for Pak, as she is SFUSD's corporate designee under Rule 30(b)(6).

13

None of these witnesses intends to repeat out-of-court statements made to them by someone

14

else. Rather, they will testify about the information they have obtained about vaping at SFUSD

15

through their roles as a supervisor in SFUSD's Student and Family Services Division (Pak) and a

16

program administrator (Lingrell). At times in their depositions, Pak and Lingrell would explain that

17

they talked to co-workers and students as part of their jobs, in response to questions. But they will

18

testify about the information they have gained through their jobs, from a variety of sources, not

19

about specific statements made by another individual.[32]

20

Notably, the hearsay rules refer to "**a statement** the declarant does not make while testifying

21

at the current trial or hearing." Fed. R. Evid. 801(c)(1) (emphasis added). As used in the rule, "the

22

---

23

[32] *See, e.g.*, Ex. 4, Pak 10/7/21 Dep., at 77:5-78:2 (testifying that the district is aware of several students who

24

have sought treatment for nicotine addiction, without naming them or quoting them directly); *id.* at 33:9-34:20 (responding to question asking whether SFUSD had reports from teachers and parents by describing what the district has learned from teachers, parents, and other school staff such as social workers); Ex. 5,

25

Lingrell Dep., at 70:3-72:8 (responding to question about the district's needs that are not covered by grants by describing those needs, including information obtained from teachers); *id.* at 46:18-47:24 (explaining

26

that JUUL was particularly responsible for the issues at SFUSD, and then, in response to question, explaining the sources for that observation). Notably, the witness's testimony is based in part on personal observations

27

and hard data, such as surveys. *See id.* at 36:12-17 (noting that the focus of education programs will "depend on what we're seeing with our students and what problems are coming up with our students"); Ex 4, Pak

28

Dep., at 27:4-28:6 (discussing data the district relies on in assessing the vaping problem at SFUSD).

term 'statement' must mean 'a single declaration or remark' for purposes of all of the hearsay rules." *United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995). Notably, Defendants' cases involve a witness repeating a single statement made by someone else. *See Contreras Fam. Tr. v. U.S. ex rel. Dep't of Agric. Farm Serv. Agency*, 205 F. App'x 580, 582 (9th Cir. 2006); *E.E.O.C. v. Evans Fruit Co.*, No. CV-11-3093-LRS, 2013 WL 4498747, at *3 (E.D. Wash. Aug. 21, 2013); *Sinegal v. Martin Marietta Materials, Inc.*, No. 3:18-CV-00360, 2020 WL 2106694, at *3 (S.D. Tex. Apr. 9, 2020). By contrast, the SFUSD witnesses are relaying information they have learned through a variety of sources as part of their jobs, including but not limited to data, conversations, and observations.[33]

Further, Pak is a 30(b)(6) corporate designee witness, so the hearsay arguments are particularly inappropriate as to her. Corporate representatives have not just the opportunity but the **duty** to investigate matters relevant to their testimony, including by speaking with others in the organization. *See, e.g.*, *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 432–33 (5th Cir. 2006); *Persian Gulf, Inc. v. BP West Coast Prods. LLC*, No. 15CV1749-JO-AGS, 2022 WL 4830698, at *6 (S.D. Cal. Sept. 30, 2022). As such, Pak's testimony based on her investigation into the vaping situation at SFUSD is precisely what she is obligated to provide.

There are also good reasons to address this issue at trial, rather than through motion practice. *First*, context is important in evaluating alleged hearsay. *See Colo v. NS Support, LLC*, No. 1:20-CV-00437-DKG, 2022 WL 4386706, at *4 (D. Idaho Sept. 22, 2022) (stating that "objections to hearsay are best assessed when the statements are presented in context at trial"). *Second*, many challenged statements may be offered for a non-hearsay purpose, such as showing the effect on the listener. *See, e.g.*, *Koike v. Starbucks Corp*, No. C 06-3215 VRW, 2007 WL 9710389, at *3 (N.D. Cal. May 10, 2007) (quoting *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 925 (9th Cir. 2002) ("Out-of-court declarations introduced to show the effect on the listener are not hearsay."). Defendants' cases support only the general rule of hearsay being unreliable. Defendants have not shown, and could not show, how each statement will be used at trial.

For all of these reasons, the Court should deny MIL 2 and address any hearsay objections

---

[33] *See supra* n. 32.

1    while Pak and Lingrell are testifying at trial.

2    ### III.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 3* (CERTAIN MARKETING NOT DISTRIBUTED IN SAN FRANCISCO)

3    JLI's advertising materials and events are relevant to SFUSD's claims, and the Court should

4    admit them as part of Defendants' multi-pronged advertising approach that caused a youth vaping

5    epidemic at SFUSD. This Court has already denied a similar motion in limine in the *B.B.* case.[34]

6    This Court also explained that JLI's marketing is relevant to issues such as negligence and

7    foreseeability, to show "what [JLI] knew or should have known, issues regarding attractiveness to

8    youth their marketing design choices meant."[35] While that comment also referenced traditional

9    cigarettes, it envisions evidence about JLI's youth marketing efforts. These efforts included JLI's

10   billboards in Times Square and lavish parties with social media influencers and underage guests

11   that created a viral sensation among youth that harmed SFUSD.

12   Both billboards and parties were part of JLI's multi-pronged approach to achieve its viral

13   marketing goals.[36] This multiple-pronged approach led to considerable market exposure that

14   included youth. Specifically, the Time Square billboard campaign received **1.5 million impressions**

15   **per day and 42 million impressions over the course of the campaign.**[37] Defendants' choice of

16   location necessarily led to massive youth exposure.

17   Similarly, Defendants held parties for social influencers and expected those influencers to

18   post their experiences online and create a JUUL following. C. Tabitha "Tabby" Wakefield offers a

19   case study as to how JLI seeded viral marketing through word of mouth. Tabby attended JUUL's

20   New York launch party at age 18 and brought approximately two dozen friends, at the request of a

21   recruiter working on JLI's behalf.[38] Some of those friends were 17, and almost all were under 21.[39]

22

23   [34] *See* ECF 3170, Minute Order at 4 (denying Defendants' motion to exclude from trial marketing to which B.B. was not exposed).

24   [35] ECF 3021-3 (2/25/22 Hearing Tr.) at 6:9-15.

25   [36] *See* Ex. 6, Handelsman Dep. at 182:9-184:25 (Team hired by JLI through Richard Mumby had expertise in various media disciplines including "social media, print television radio billboards … ."); Ex. 7,

26   JLI00219318, Times Square buyout and launch party were part of "creative integrated marketing campaign – advertising campaign fell at the intersection of traditional, digital, experiential and influencer marketing in a way that is rarely done.").

27   [37] Ex. 8, INREJUUL_00093933; Ex. 9, Mumby 6/14/21 Dep., at 879-80.

28   [38] ECF 3021-5 (Wakefield Sworn Statement) at 8:8-11, 9:21-10:24.
     [39] *Id.* at 23:11-34:16.

1    JLI did not check age identifications and provided free JUUL products to all attendees.[40] One of

2    Tabby's friends was 17-year-old Mimi Sweeney, who posted her own experiences on social

3    media.[41] JLI liked pictures such as Mimi's and spread them virally on social media.[42] Thus, by

4    inviting one underage person to its launch party, JLI gained numerous "evangelists," leading to

5    many new customers, as intended. JLI estimated that it reached 26,000 new people through the 200

6    guests at this one launch party.[43]

7         Evidence of Defendants' multipronged, viral marketing approach is relevant to SFUSD's

8    claims against Defendants regardless of the physical location of a billboard or party. Defendants'

9    arguments otherwise ignore JLI's advertising approach, which is well-documented. JLI broadly

10    released its message into the world in various forms, in marketing and advertising channels (such

11    as social media) that reached the widest audience, including youth. It then watched the message

12    catch fire and spread virally. JLI influenced millions of youths through its marketing campaigns—

13    including its billboards and parties—and thereby created the youth vaping epidemic that harmed

14    SFUSD.[44]

15         The Court should again reject Defendants' argument that admitting evidence of conduct

16    that occurred out of state is against "constitutional" or "extraterritorial" principles.[45] As Defendants

17    concede, SFUSD can invoke California law to address conduct relevant to its injuries. And, as

18    shown above, Defendants' out-of-state actions are relevant to SFUSD's claims regarding the youth

19    vaping epidemic caused by Defendants.[46] JLI's cases are distinguishable because they involved

20    entirely extraterritorial sales.[47]

21         The jury should not be left with a sterilized version of Defendants' conduct that changes

22

---

23    [40] *Id*. at 15:18-16:15, 20:10-21:9.

24    [41] *Id.* at 13:15-22; ECF 3023-5, Chandler Gen. Rpt. at 16-22.

      [42] *See* ECF 3023-7, Jackler Gen. Rpt. at 55, 63-64.

25    [43] *Id.* at 13.

26    [44] ECF 3023-12, Pratkanis Gen. Rpt. at 60-108; *see e.g.,* ECF 3023-10, Emery Gen. Rpt. at 44-47, 56-57 (JLI cultivated in encouraged influencers through its billboard advertising and parties).

27    [45] *See* ECF 3170, Minute Order at 4 (denying motion in limine in which Defendants also raised the same extraterritorial argument).

28    [46] *See also* ECF 3556 at 8 (conceding this point).

      [47] *See, e.g., Allergan, Inc. v. Athena Cosms., Inc.*, 738 F.3d 1350, 1359 (Fed. Cir. 2013).

    PLAINTIFF'S REPONSE IN OPPOSITION TO
DEFNEDANTS' MOTIONS IN LIMINE

drastically with each case.[48] The Court should deny Defendants' motion to exclude evidence of JUUL advertising that originated outside of the San Francisco Bay Area.

## IV.  PLAINTIFF'S OPPOSITION TO DEFENDANT'S *MOTION IN LIMINE* 4 (VAPING-RELATED INCIDENTS NOT RELATED TO SFUSD OR SAN FRANCISCO)

This Court should admit evidence about the perils of youth vaping despite the Defendants' claims of prejudice. Evidence of other vaping incidents is relevant because it provides background and context regarding the impact of Defendants' actions and the youth vaping epidemic.[49] It is also relevant because it helped to form the basis of Plaintiffs' expert opinions. For example, Defendants object to evidence derived from an article in the Journal of the American Medical Association, which reported several adverse health effects for youth who use JUUL—including battery explosions and accidental nicotine overdose.[50] The CDC also has reported 2,668 hospitalizations as of January 2020 for e-cigarette, or vaping, product use-associated lung injury (EVALI), including some resulting deaths. Plaintiff's expert Dorn relies on these and other "widely reported" accounts of problems associated with students using JUUL in schools to inform his opinions regarding measures SFUSD should take.[51]

The Court should not be persuaded by Defendants' claims of unfair prejudice or waste of time. Plaintiff is not trying to "hold Defendants liable" for incidents that occurred outside of the Bay Area. Plus, background evidence is not a waste of time; it gives jury the context about SFUSD's claims. Defendants assert that these incidents "may" not have involved a JUUL device, but JUUL devices clearly instigated the vaping epidemic.[52] None of Defendants' contentions outweigh the relevance of such evidence, and the Court should admit it. At the very least, the Court should reserve ruling on this issue for the context of trial. SFUSD does not plan to focus on vaping THC

---

[48] *See Dees v. Cnty. of San Diego*, No. 3:14-CV-0189-BEN-DHB, 2017 WL 168569, at *8 (S.D. Cal. Jan. 17, 2017) (rejecting defendants' motion as "essentially a request to sanitize the case").

[49] *United States v. Boros*, 668 F.3d 901, 908 n.7 (7th Cir. 2012) ("[W]e are guided by Rule 401 and the advisory committee's note, which make background evidence generally admissible as an aid to understanding").

[50] *See* ECF 3550-6, Dorn Rpt., at 11.

[51] *See id.* at 12-14, 52-106.

[52] *See id.* at 12 ("It is widely reported that the epidemic that began with JUUL has grown to include vape devices more generally.") (citing multiple sources).

in Indiana, to use one of Defendants' examples. But a broad exclusion that traces the heading of Defendants' MIL 4 would risk capturing highly relevant evidence. So, the Court should decide this issue on a case-by-case basis.

**V.    PLAINTIFF'S RESPONSE TO DEFENDANTS' *MOTION IN LIMINE 5* (EVIDENCE AND MEDIA COVERAGE CHARACTERIZING JLI AS THE CAUSE OF SAN FRANCISCO'S 2019 ENDS BAN AND JLI'S LOBBYING RELATED TO SAN FRANCISCO'S 2019 "PROPOSITION C")**

Evidence of JLI's $18-million-dollar ballot initiative to overturn San Francisco's 2019 ENDs prohibition is clearly relevant and creates no prejudice against Defendants.  In 2019, San Francisco prohibited the sale of electronic cigarettes lacking US Food and Drug Administration ("FDA") authorization.[53] JLI then promoted a ballot initiative ("Proposition C") to "replace San Francisco's e-cigarette legislation with legislation JUUL wrote that required future legislation to be approved by the voters."[54] Essentially, Proposition C was "an initiative aimed at repealing sales restrictions of e-cigarettes within San Francisco city limits."[55] Campaign finance disclosures show that JLI "poured approximately $18 million" into the Proposition C initiative.[56]

On September 17, 2019, Shamann Walton, a member of the San Francisco Board of Supervisors, wrote to Mitchell Zeller, the Director of the Center for Tobacco Products at the FDA, to bring "attention to advertisements and other communications activities orchestrated by JUUL around its ballot initiative[.]"[57] In Mr. Walton's letter to the FDA, he highlighted the problematic efforts in JLI's ballot initiative, including: (1) online videos featuring a paid JLI consultant promotion "Yes on Proposition C"; (2) "unauthorized modified risk and therapeutic claims in the voter guide that will be mailed to nearly 500,000 registered voters in San Francisco"; and (3) unauthorized claims on JLI's campaign website.[58] Two weeks after Mr. Walton's letter to the FDA, on September 30, 2019, JLI abandoned its campaign, and the measure failed on election day, with

---

[53] *See, e.g.,* https://www.sfchronicle.com/business/article/San-Francisco-has-moved-to-ban-e-cigarettes-Juul-14016011.php.

[54] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7893333/.

[55] *See* https://www.courthousenews.com/juul-drops-fight-of-san-francisco-vaping-restrictions/.

[56] *Id.*

[57] *See* Ex. 10, JLI41914691.

[58] *Id.*

PLAINTIFF'S REPONSE IN OPPOSTION TO
DEFENDANTS' MOTIONS IN LIMINE

1    82% voting against it.[59]

2           Defendants' motion disingenuously downplays JLI's motives and activities related to its

3    Proposition C efforts. JLI's attempts to overturn the ENDs ban in San Francisco during the heart

4    of the vaping epidemic at SFUSD is plainly relevant. By fighting any effort to curb the sale of its

5    products at a time when JLI was keenly aware of youth usage, JLI once again showed that it placed

6    profit over youth protection in SFUSD. JLI's actions in San Francisco are obviously relevant, and

7    any perceived prejudice was of JLI's own making.

8           Finally, Defendants take another bite at the *Noerr-Pennington* apple.[60] This time, they seek

9    to twist JLI's public activism as somehow akin to direct Congressional interactions. But this is

10   clearly not the case. JLI directly spent $18 million to influence the people of San Francisco, so it

11   could sell more product. JLI only abandoned those efforts after intense backlash from the public

12   health and governmental bodies. Accordingly, Defendants's motion should be denied.

13   **VI.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 6*
            (FLAVORS NOT SOLD IN SAN FRANCISCO)**

14          Evidence of JLI's efforts to target underage users by way of "kid-friendly" flavors is clearly

15   relevant to prove Plaintiff's claim that JLI intentionally created a nationwide youth e-cigarette crisis

16   and that, as a result, "school districts spent significant and unexpected levels of time and resources

17   to address the pervasiveness of youth e-cigarette use and had to divert resources and deploy new

18   ones to combat the problem." *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497

19   F. Supp. 3d 552 (N.D. Cal. 2020). This Court previously noted that Plaintiffs have alleged that JLI

20   achieved ENDS market dominance through a "three-pronged approach: (i) product design to

21   maximize addiction; (ii) mass deception; and (iii) targeting youth." *Id.* at 576.  More particularly,

22   JLI sought to "actively attract young users" with "'kid friendly' flavors" that "would appeal to the

23   lucrative youth market" and resulted in creating the alleged *national* youth e-cigarette epidemic.

24   *Id.* at 576–77.

25          Defendants raise a relevance-undue prejudice argument, claiming evidence that JLI

26   intentionally sold certain kid-friendly limited-release flavors in order to preserve its ability to sell

27

28   [59] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7893333/.
     [60] *See infra* at 28 (Plaintiff's Opposition to Director Defendants' *Motion in Limine* 15).

PLAINTIFF'S REPONSE IN OPPOSTION TO
                                                        DEFNEDANTS' MOTIONS IN LIMINE

1  those flavors after the August 2016 Deeming Rule went into effect should be excluded because

2  Plaintiff has "failed to present any evidence that those flavors were used by any SFUSD students."[61]

3       However, this argument misconstrues the relevance of this evidence and ignores evidence

4  regarding the national scope of JLI's alleged scheme. The fact that JLI was taking steps to develop

5  and market kid-friendly flavors is relevant to prove the intent and scope of JLI efforts to target

6  youth users, including developing an  studying the marketability of dessert and fruit flavors.[62] The

7  fact that these particular kid-friendly flavors were not sold to SFUSD students is immaterial

8  because, as JLI was aware in real-time, its nationwide strategy allowed for teens who did use these

9  products and media to publicize the use of teen-friendly flavors to other youth and entice them to

10  become e-cigarette users.[63]

11       Defendants cite three cases where a Court excluded evidence that it claims supports its

12  argument that its sales of the limited-release kid-friendly flavors should be excluded. However,

13  none of those cases support JLI's argument because, unlike here, in each case, the Court first found

14  that the proffered evidence had no or very limited evidentiary value. *See, e.g., All Alaskan Seafoods,*

15  *Inc. v. TYCO Elecs. Corp.*, 83 F. App'x 948, 951 (9th Cir. 2003) (deferring to trial judge exclusion

16  of "prior occurrence evidence" in product liability claim involving a fire caused by a product (the

17  XL Trace heating cable) because proffered evidence of prior occurrences regarding other products

18  sold by defendant was not relevant: "the products at issue in the proposed 'prior occurrences'

19  evidence were not substantially similar to the XL Trace and thus were properly excluded."); *United*

20  *States v. Espinoza-Baza*, 647 F.3d 1182, 1188–89 (9th Cir. 2011) (in deportation hearing regarding

21  foreign born alien, court deferred to district court's Rule 403 exclusion of evidence that the

22  defendant's maternal grandfather was born in Texas because "the probative value of [this tangential

23

---

24  [61] ECF 3556 at 12.

25  [62] *See, e.g.,* Ex. 11, Bowen Dep. Ex. 11131 (e-mail to JLI founder Adam Bowen regarding the marketing of

26  Bruule flavor: "Enjoy our bruule pod flavor for a hint of vanilla cake, silky custard and crème bruulee for
those post-meal moments."; Ex. 12, Bowen Dep. Ex. 11132 ("flavor strategy & partner negotiation
approach" regarding JLI efforts to "build the optimal portfolio" by offering kid-friendly flavors)).

27  [63] *See, e.g.*, Ex. 13, Bowen Dep. Ex. 11134 (February 4, 2018 BuzzFeed article titled "24 Tweets About

28  JUUL That Only Teens Will Find Funny" circulated one day after its publication using
JLI Slack messaging system); ECF 3027-7, Jackler Rpt. at 292-302 (explaining role of kid-friendly flavors
to JLI youth marketing)). *See also* Ex. 14, Bowen Dep. at 420:10-423:7.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS IN LIMINE

and indirect] evidence is, at best, marginal"); *Mathew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 11432038 (N.D. Cal. Sept. 21, 2016) (Chrysler cars dealer bringing claim that surrounding dealers were favored by defendant to its disadvantage sought to introduce evidence regarding how Defendant treated dealers in other parts of the country. Court excluded the offered evidence, finding that because plaintiff "does not claim to compete with the Non-Surrounding Dealers, evidence concerning these dealers has little probative value and would be a waste of time, and should thus be excluded.").

In sum, the fact that JLI sold the limited flavors is relevant evidence in support of Plaintiff's claim that JLI devised and implemented an overarching nationwide scheme targeting youth users that resulted in creating a national youth e-cigarette epidemic that directly impacted Plaintiff. Accordingly, JLI's motion *in limine* should be denied.

## VII. PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 7* (EVIDENCE AND ARGUMENT REGARDING NICOTINE DISCLOSURES ON LABELS/PACKAGING (EXPRESS PREEMPTION)

The Tobacco Control Act's preemption provision precludes state-law claims imposing duties "different from, or in addition to" the "limited nicotine warning required by 21 C.F.R. § 1143.3." *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, 497 F. Supp. 3d at 583. SFUSD does not advance any such claims, so there is nothing to preempt. For example, Defendants rely on warnings proposed by B.B. in support of her failure-to-warn claims[64] even though this is not a personal injury case and there are no failure-to-warn claims. Undeterred, Defendants seek to use the limited preemption regime as a sword to preclude any "evidence or argument" about "appropriate nicotine addiction warnings" or "other hypothetical warnings."[65] Because there are no claims to preempt, Defendants' motion should be denied.[66] Plaintiff here explains some of the "evidence or argument" that conceivably would be encompassed by Defendants' motion, yet is entirely appropriate for this trial.

*RICO claims*. To start with the obvious, the TCA's preemption provision applies only to

---

[64] Defs. Ex. 16.

[65] ECF 3556 at 14.

[66] *See* ECF 3170 (*B.B.* MIL Rulings) at 3 (denying motion in limine "to the extent the Court has determined… claims are not preempted").

"certain State and local requirements." 21 U.S.C. § 387p(a)(2). It does not limit Plaintiff's federal RICO claims at all. So, for example, it raises no preemption issues for Plaintiff to argue and prove that an element of Defendants' scheme to defraud was to maximize the nicotine hit of JUUL while concealing its abuse liability from the public.[67]

*Failure to Include an Addiction Warning Before One Was Required*. Preemption does not apply to any argument or evidence that Defendants failed to warn that JUUL was an addictive product *before* doing so was required by the FDA. The TCA preempts only warnings "different from, or in addition to" the federal warning. 21 U.S.C.A. § 387p(a)(2)(A). This standard allows for state rules that are "equivalent" or "parallel" to federal requirements, in that the standard of conduct does not go beyond that which the federal requirement commands. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 433, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005) (permitting "equivalent" claims "even if they do not "explicitly incorporate FIFRA's standards as an element of a cause of action"); *Medtronic, Inc v. Lohr*, 518 U.S. 470, 485 (1996) (same, for "parallel" medical device claims). Any argument that Defendants failed to provide the warning "JUUL contains nicotine. Nicotine is an addictive chemical" before August 2018 is entirely consistent with the later-imposed FDA requirement.

*Warnings on Topics Other Than Nicotine Addiction*. Preemption principles are also irrelevant in connection with evidence or argument that JUUL labels failed to warn of something other than "nicotine addiction." *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, 497 F. Supp. 3d at 589. A "theoretical warning or disclosure that might be required under state common law on a wholly different topic (for example, regarding the amount of recommended use given a particular device's delivery method) is not different from or in addition to any existing FDA labeling requirement on that specific topic." *Id.* at 588-59. So, for example, warnings that might have dissuaded youth from using the product, such as "JUUL may harm the developing brain of anyone under 27 years old," does not concern the "specific topic" of the FDA warning and so cannot be the subject of any preemption argument.

---

[67] *See* ECF 3447, Pl. S.J. Opp'n at 17-19.

1

2  **VIII.   PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 8*
(EVIDENCE REGARDING YOUTH THC USAGE)**

3       Defendants seek to exclude evidence regarding youth THC usage, attributing to Plaintiff's

4  expert Michael Dorn an opinion that JLI is responsible for increased use of THC among school

5  children. Defendants misstate the extent of Dorn's observations following analysis of extensive

6  school site inspections, surveys, and interviews. Dorn's analysts visited all 31 secondary campuses

7  in SFUSD for an average of four hours per school.[68] They performed on-site physical inspections,

8  met with school administrators and staff, and conducted surveys about student e-cigarette use at

9  each school.[69] Based on the information they collected, including some 10,000 pages of data, Dorn

10  observed that JLI created a device that allows students to discreetly use THC more easily.[70] As he

11  explained in his deposition, Dorn's analysts were advised by school staff and officials that students

12  were using JUUL devices to inhale THC.[71]

13       In support of their motion, Defendants take the position that "evidence and testimony about

14  THC are irrelevant to SFUSD's claims."[72] But Defendants apparently intend to introduce evidence

15  and testimony about student THC use at trial, as reflected in their deposition designations from

16  SFUSD employees.[73]

17       Defendants should not be permitted to assert that evidence about THC is irrelevant and then

18  seek to introduce evidence about THC at trial. To the extent that Defendants intend to introduce

19  such evidence at trial, Dorn's observations from his extensive analysis involving each SFUSD

20  secondary school should also be permitted. However, if Defendants agree that they will not

21  introduce evidence and testimony about youth THC usage at trial, Plaintiffs will similarly agree not

22  to introduce evidence and testimony concerning Dorn's observations about youth THC usage.

23

24  _____

[68] ECF 3550-6, Dorn Report at pp. 30-33.

25  [69] *Id.*

[70] ECF 3549-8, Dorn Dep. at 288:5-289:7.

26  [71] *Id.* at 282:23-284:24, 288:5-289:7, 291:25-292:3, 293:8-294:21, 295:16-17.

[72] ECF 3556 at 5.

27  [73] *See, e.g.*, Ex. 15, Lingrell Dep. 8/19/21 / 9/17/22 at 23:12-25:14, 145:3-7, 190:25-191:9, 193:18-194:14,
206:10-207:5, 215:8-216:1; Ex. 16, Pak Dep. 4/8/21 at 75:20-76:11; Ex. 17, Pak Dep. 5/27/21 at 86:20-

28  87:16; Ex. 18, Pak Dep. 10/7/21 at 160:3-12.

PLAINTIFF'S REPONSE IN OPPOSITION TO
DEFNEDANTS' MOTIONS IN LIMINE

## IX.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 9* (EDUCATION AND YOUTH PREVENTION PROGRAMS IN OTHER SCHOOL DISTRICTS)

JLI's youth prevention efforts and interactions with students are relevant to JLI's intent, state of mind, and youth marketing tactics. They also show the disconnect between Defendants' purported youth prevention emphasis and the reality—that even though JLI knew that it catalyzed a youth vaping epidemic, it made no genuine attempt at youth prevention. For example, in late 2017 JLI hired two former California Superintendents and charged them with developing JLI's first formal youth prevention program.[74] JLI immediately exploited the superintendents' background to benefit its public image.[75] Audio recordings from student focus groups conducted by one of those retired Superintendents—Bruce Harter—underscore the illusory nature of JLI's youth prevention attempts. In one session, Harter emphasized how cool the JUUL is, falsely claimed that the device is "95% safer" than cigarettes, and provided an example of how to vape discreetly.[76] Harter also led a discussion with students about the needs that smoking meets and where the best places to get away with smoking in school were.[77] In short, the youth prevention efforts and programs deployed by JLI were a sham, and JLI's Executives and Board members knew it.[78] This feigned concern for youth prevention mirrored Big Tobacco's playbook—a fact that JLI internally acknowledged.[79]

Defendants' arguments against this evidence are unavailing. The jury can undoubtedly separate what JLI did at SFUSD schools with what JLI's company-wide behavior demonstrates

---

[74] ECF 3455-4 (Harter Dep.) at 26:9-12; 31:9-16; 45:19-46:7.

[75] Ex. 19, Harter Dep. at 55:15-61:24.

[76] *Id.* at 201:5-203:2.

[77] *Id.* at 146:16-148:7.

[78] ECF 3455-12, Harter Ex. 359 (JLI asked Harter if any school district would agree to be named in the press as working with JLI, admitting that it needed a "lifeline."); ECF 3455-13 (Harter Ex. 360) (due to the press, JLI was "in dire need of something re a school, working with us."); ECF 3455-4 (Harter Dep.) at 751:12-752:20, 761:20-762:16 (focus group plans were shared ahead of time with JLI senior executives); ECF 3455-16 (JLI00151300) (board members Valani and Pritzker provided edits for a youth prevention press release, stressing that they "don't want to get these small items wrong" and that they "think it's critical to get this right."); *see* ECF 3453-26 (JLI10529705) (Valani and Pritzker approved a press release in response to U.S. Senators' inquiry, which falsely detailed JLI's alleged youth vaping prevention efforts); ECF 3455-17 (JLI10064121) (Valani and Pritzker approved then-CEO Kevin Burns' op-ed in the Washington Post claiming that JLI was only targeting adult smokers).

[79] ECF 3455-15, Harter Ex. 356; ECF 3455-8, Harter Ex. 358.

about its youth prevention efforts. This evidence would not result in "mini-trials" because it is central to elements that Plaintiff must prove, including that Defendants had the requisite state of mind to support Plaintiff's claims of fraud (as to RICO) and for punitive damages. These sham youth prevention efforts are strong evidence of **intent** to market JUUL to youth.

Congressional testimony further demonstrates that JLI's youth prevention was disingenuous. In 2019, parents and students who were exposed to JUUL products and programs testified to the House Subcommittee on Economic and Consumer Policy. Two students reported that a JLI representative told them as ninth graders that JUUL was both "totally safe" and about to be declared "99 percent safer than cigarettes" by the FDA.[80] Unlike the *B.B.* personal injury case, this case is about a school district, so evidence of JLI's interactions with students is highly probative and should be admitted because it reveals the real intent behind JLI's youth prevention programs— to foster more customers and sales among youth. As to hearsay, there is a stronger argument for a non-hearsay purpose for such testimony here than in *B.B.* This testimony demonstrates Defendants' state of mind, which is directly at issue through the RICO claim. And the Court should wait for the context of trial to make any determination on hearsay.[81]

Finally, if JLI opens the door to such evidence by boasting about their youth prevention programming, then Plaintiff should be allowed to rebut that false narrative with evidence demonstrating the knowledge JLI possessed and the actions it took.[82] That JLI's youth prevention programs lacked sincerity speaks directly to Defendants' states of mind and the scope of their youth marketing. Evidence relating to the programs and their interaction with students is, therefore, both relevant and highly probative, and any prejudice would not be unfair.[83]

---

[80] ECF 3021-16 (House Subcommittee on Economic and Consumer Policy, July 24, 2019 Tr.) at 42-43.

[81] *Brewer v. BNSF Ry. Co.*, No. CV 14-65-GF-BMM-JTJ, 2016 WL 11709319, at *2 (D. Mont. Apr. 22, 2016) ("In relation to congressional hearing testimony…the Court will defer ruling on this motion until the time of trial so it can determine what testimony Mr. Brewer is offering and from whom and what BNSF's specific objections are to the proposed testimony."); *United States v. Bonds*, 608 F.3d 495, 501 (9th Cir. 2010) (the context of trial "provide[s] judges a 'fair degree of latitude' and 'flexibility' to admit statements that would otherwise be hearsay.").

[82] *See Iorio v. Allianz Life Ins. Co. of N. Am.*, No. 05CV633 JLS (CAB), 2010 WL 11508761, at *5 (S.D. Cal. Jan. 27, 2010) ("Once a party 'opens the door' to an issue, the opposing party may rebut false impressions presented by such evidence even if the evidence is otherwise inadmissible.").

[83] Fed. R. Evid. 401, 403.

1

2     **X.    PLAINTIFF'S OPPOSITION TO DEFENDANTS'** *MOTION IN LIMINE 10*
      **(ONLINE AGE-VERIFICATION PROCESSES AND PURCHASES BY**
3     **UNDERAGE PERSONS)**

4          Defendants repeat the same unpersuasive arguments that this Court rejected in *B.B.*[84]

5     Evidence related to JUUL's online age-verification processes is relevant to both describing the

6     development and present state of the problem with underage JUUL access at SFUSD, and the steps

7     necessary to remedy that problem. Plaintiff's abatement experts incorporate in their opinions

8     "enforcement activities to include on-line age verifications as well as compliance with delivery

9     laws of tobacco products to addresses within the community[,]"[85] and this Court should permit

10    Plaintiff to show how SFUSD students were able to purchase JUUL products online and to prove

11    its allegation that "[t]he failure of the JLI/Veratad age verification procedure was intentional."[86]

12         As Defendants note, Dr. Ribisl, whose "primary research area is tobacco regulator science

13    with a focus on the sales and marketing of tobacco products at retail and online vendors,"[87]

14    concluded that "JUUL's weak age verification efforts at retail outlets and their online JUUL.com

15    site allowed underage youth to gain access to their products."[88] Defendants are incorrect that "there

16    [is] no evidence to support" that JLI used "intentionally permissive age verification practices."[89]

17    As Dr. Drumwright describes:

18         JUUL was sold online on the com an  website  and "leadin  with di ital and
           ecommerce foundation" was ex licitl  singled out as an im ortant  art of JUUL's
19         marketin  strate    in Januar  of 2015. The com an  did nothing additional to
           increase a e- atin  for online sales with the launch of the JUUL  roducts and
20         campaigns. In September of 2015, shortly after the JUUL launch, Kelly Long,

21    _____

22    [84] *See* ECF 3271, Order on Motion to Exclude in *B.B.* at 4.

      [85] ECF 3076, Winickoff SFUSD Rep. (1-28-22) at 81.

23    [86] ECF 9, 3:19-cv-08177-WHO, Am. Compl. (SFUSD) at ¶ 479; *see id.* at ¶¶ 463-487 (describing the
      permissive Veratad age-

24    gating system that was "designed to maximize the number of prospective purchasers who 'pass' the process,
      rather than to minimize the number of undera e sales." ; *see* ECF 3550-6  Dorn SFUSD R t. at 16

25    (discussing technological options that JLI considered and abandoned to age-gate underage JUUL sales); ¶
      166 (discussing a NYTimes article where a former senior JUUL manager described how "within months of

26    JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding
      others who made the purchases for them" who would make bulk purchases for this reason).

27    [87] ECF 3571, Ribisl SFUSD Rpt. (4-28-22) at 2.

28    [88] ECF 3571 Ribisl SFUSD Rpt. (4-28-22) at 5.
      [89] ECF 3556. at 18.

PLAINTIFF'S REPONSE IN OPPOSTION TO
                                                      DEFENDANTS' MOTIONS IN LIMINE

1
2
3

Director of Customer Service  confirmed that "nothin_ new had been added to the
site in the last _ears as far as a_e verification is concerned" and made it clear that
increased a_e _atin_ would not be added to online sales websites unless JUUL was
"absolutel_ re_uired" to do so presumably by regulators because it would create a
'barrier' for customers.[90]

4
5
6
7
8
9
10
11

The failure to age-gate JUUL products predictably resulted in significant online purchases
by minors. In the November-December 2021 data survey Dr. Halpern-Felsher presents, 17.9% of
JUUL users between 13 and 17 years old reported that they purchased their JUUL products online.[91]
While "all JUUL products making their way to youth have to be purchased,"[92] even aside from
SFUSD students acquiring JUUL products online, this evidence would still be relevant and
admissible to show JLI's plan to grow the youth market, as evidence of JLI's knowledge that minors
were obtaining JUUL, and, to rebut any evidence suggesting that JLI acted responsibly by
implementing online age verification processes.

12
13
14
15
16
17
18
19
20
21
22
23

*JLI's Plan.* As part of JLI's effort to grow a youth market, Plaintiff alleges that "JLI planned
a 'consumer journey' that started with a consumer being exposed to misleading JUUL marketing
in stores, where JUUL's 'fun' and 'approachable' in-store marketing would lead consumers to JLI's
website for additional misrepresentations and omissions about JUUL products, an email
subscription sign-up, and purchases through JLI's ecommerce platform."[93] At trial, Plaintiff should
be permitted to present evidence of JLI's entire plan to create a youth market.[94] *See* Rule 404(b)(2)
(evidence of other wrongs or acts is admissible to prove motive, intent, plan, knowledge and
absence of mistake or accident); *Onyx Pharms., Inc. v. Bayer Corp.*, 863 F. Supp. 2d 894, 898 (N.D.
Cal. 2011) (denying motion *in limine* seeking to exclude "other allegedly improper conduct"
because the other conduct "if proven to be a part of a larger campaign … is probative to … motive
and conduct … for which damages are sought."); *Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
909 F.2d 1245, 1250 (9th Cir. 1990).[95]

24
25
26
27
28

---

[90] ECF 3023, Drumwright General Rpt. (9-20-21) at 22-23.
[91] ECF 3550, Halpern-Felsher SFUSD Rpt. (1-28-22) at 92-94.
[92] ECF 3026, Cutler BW Rpt. (1-28-22) at 37, FN 63.
[93] ECF 9, 3:19-cv-08177-WHO, Am. Compl. (SFUSD) ¶ 484.
[94] *See* ECF 3023, Chander Gen. R_t. _9-20-21) at 65 (discussin_ JUUL social media cam_ai_ns and how
"[i]n the age category for people who react to JUUL posts online, 16% were listed as under eighteen[.]").
[95] Defendants' lone case on this issue is inapposite. In *Speer v. Cnty. of San Bernardino*, No. EDCV 20-44

PLAINTIFF'S REPONSE IN OPPOSITION TO
DEFNEDANTS' MOTIONS IN LIMINE

1    *JLI's Motive, Knowledge and Intent.* In a similar vein, JLI's intentionally permissive

2    online age verification processes are probative of, and entwined with, JLI's knowledge that minors

3    were obtaining its JUUL products and should be admissible to show such knowledge.[96] Rule

4    404(b)(2).

5    *Rebuttal Evidence.* Finally, evidence of JLI's intentionally permissive online age

6    verification processes should be admissible if JLI opens the door by attempting to show that it acted

7    responsibly by implementing age verification processes. *Iorio*, 2010 WL 11508761, at *5 ("Once

8    a party 'opens the door' to an issue, the opposing party may rebut false impressions presented by

9    such evidence even if the evidence is otherwise inadmissible."). Defendants' motion should be

10   denied.

11   **XI.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 11* (JUUL
        ADVERTISEMENTS AND COUPONS FOR JUUL DISSEMINATED BY ALTRIA)**

12   In *Motions in Limine* 11 and 12, Altria asks this Court to exclude all evidence of the services

13   it provided to JLI. This Court should again deny these motions, as it did in *B.B.*[97] Evidence should

14   be "excluded on a motion in limine only if the evidence is clearly inadmissible for any purpose."

15   *Langer v. Kiser*, 495 F. Supp. 3d 904, 909 (S.D. Cal. 2020). "If evidence is not clearly inadmissible,

16   evidentiary rulings should be deferred until trial to allow questions of foundation, relevancy, and

17   prejudice to be resolved in context." *Id.*

18   Altria's dissemination of JUUL advertisements and coupons is plainly relevant to and

19   admissible in support of Plaintiff's RICO claim.[98] To stave off public scrutiny and regulation

20   resulting from their youth marketing, Defendants characterized JUUL as a switching product meant

21   only for adult smokers.[99] Altria helped this mantra both in public statements and through the very

22

23   JGB (SPX), 2021 WL 5969521 (C.D. Cal. Aug. 9, 2021), the court precluded unrelated incidents of police
     force as irrelevant to prove plaintiff's allegation of excessive force in a particular incident. *Id.* at *5. Here,
24   SFUSD students' access to JUUL products due to lax age-verification processes is directly relevant to how
     they acquired those products and Defendants' broader scheme to market and sell JUUL products to
25   adolescents.

     [96] *See e.g.*, ECF 9, 3:19-cv-08177-WHO, ⸺ ⸺, l. ⸺ ⸺, ¶ 3. 4, ⸺ ⸺ *id.* at ¶ 166; ⸺ 468; ⸺ 20,
26   INREJUUL_00300253-258 (May 25, 2016 email in which JLI employees became aware that a fifteen-year-
     old boy had failed age verification but was still able to order JUUL products).

27   [97] ECF 3170 (denying MIL 11 to exclude Altria's services).

28   [98] *See* ECF 3447, Pl.'s Opp. to Def. MSJ, at 73-74.
     [99] *Id.*

PLAINTIFF'S REPONSE IN OPPOSITION TO
                                                    DEFENDANTS' MOTIONS IN LIMINE

conduct it now seeks to exclude from evidence: Altria disseminated millions of *Make-the-Switch* advertisements and coupons in its cigarette package inserts, direct mailers, and e-mail campaigns.[100]

The campaign was designed to "mislead consumers into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions" and was not designed solely for adult smokers. *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 533 F. Supp. 3d 858, 870 (N.D. Cal. 2021) (holding that there were sufficient allegations that Altria participated in a scheme to "cover up" youth targeting). These advertisements and coupons were thus part of the fraudulent scheme that harm SFUSD, as explained in Plaintiff's Opposition to Defendant's motions for summary judgment.[101] Plaintiff has produced ample evidence of Defendants' fraudulent scheme and its impact on SFUSD.[102] The Court should allow SFUSD to present that evidence to the jury.

## XII.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 12* (ALTRIA'S RETAIL AND DISTRIBUTION SERVICES)

This Court should deny Altria's attempt to exclude evidence of its services to JLI, as it did in *B.B.*[103] As with *Motion in Limine* No. 11, this evidence should only be excluded on a motion *in limine* if it is "clearly inadmissible for any purpose." *Langer*, 495 F. Supp. 3d at 909. Altria's motion does not come close to meeting this standard.

Despite knowing that JUUL was causing a youth epidemic, Altria used its retail and distribution services team to further increase JUUL sales across the country and in San Francisco specifically.[104] Projects included reducing out-of-stock problems; a sales campaign known as the "Blitz" which sent representatives to "77,000 stores across the county, encouraging them to increase the number of JUUL products they carried, extending pre-book offers, … and solving inventory and distribution problems" and a "pre-book program targeted to 7-Eleven … which

---

[100] *Id.* at 13-14, 73-74.
[101] ECF 3447 at 79.
[102] *Id.*
[103] ECF 3170.
[104] ECF 3447 at 39.

resulted in shipments of 100,000 cartons of JUUL products to 8,000 7-Eleven stores."[105] These efforts had a dramatic effect on JUUL sales, including around SFUSD.[106] As Altria knew, this necessarily meant a dramatic increase in both youth sales and youth use.[107] Altria was specifically warned that "a dramatic increase in product availability will almost certainly have a negative impact on FDA's efforts to reduce youth e-cigarette use."[108] Nevertheless, Altria committed to "increase the availability of JUUL products" and "help JUUL increase sales."[109]

Altria should not be permitted to hide this conduct from the jury. Nor should Altria be allowed to give the jury the misleading impression that its assistance to JLI was limited to the San Francisco area alone. The nationwide scope of Altria's sales and distribution services is relevant and useful to the jury when evaluating Altria's motive, knowledge, and intent.

Altria's contention regarding flavored products ignores the reality of JUUL sales in San Francisco. In San Francisco, youth did not choose to purchase tobacco over mint; tobacco was the only product available in stores complying with the ban. Altria also ignores that Dr. Cutler acknowledged that Altria only stocked and increased sales of tobacco-flavored JUUL in San Francisco, factored that into his analysis, and still concluded that "[h]ad Altria not provided these types of support for JUUL growth, the flow of JUUL products to youth in the Bellwether Areas would have been smaller, and the youth vaping epidemic would not have reached the proportions it did. Altria clearly had a substantial and meaningful impact on the increase of youth vaping rates, in the Bellwether Areas," including San Francisco.[110] Dr. Cutler also concluded that JUUL was not just attractive to youth due to flavors, finding that as JUUL removed various flavors from the market, many users substituted to other flavors, including tobacco.[111]

---

[105] *Id.*

[106] *Id.* at 39, 121 ('Altria's visits to 93 stores in San Francisco 'had a significant positive effect on sales' of JUUL in San Francisco, corresponding with a rise in youth use in SFUSD').

[107] *Id.* explaining that Altria "significantly raised JUUL pod sales, in a period when a large share of sales volume was going to youth.").

[108] *Id.*

[109] *Id.*

[110] *Id.* at 123.

[111] *Id.* at Ex. 183 at 46.

Altria also repeats its flawed arguments from summary judgment, contending that Plaintiff needs direct evidence that SFUSD students purchased JUUL products from a store serviced by Altria.[112] As explained in Plaintiff's opposition to Altria's motion for summary judgment, this sort of individualized evidence is not required to prove the case.[113] But that is not even the question before the Court on this motion. Even if it were not sufficient to prove the case on its own, evidence of Altria's retail and distribution services is clearly relevant to all of Plaintiff's claims and is admissible at trial.

Finally, the services Altria provided to JLI are also relevant to the RICO and RICO conspiracy claims. Plaintiff alleges that Altria and JLI's leadership[114] worked together to use JLI to grow the youth vaping market, including by expanding JUUL's sales, digital marketing, and retail presence with fraudulent messaging.[115] The jury should be permitted to consider the full extent of collaboration between JLI's leadership and Altria when evaluating these claims.

## XIII. PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 13* (ARGUMENTS THAT INVESTMENT PROVIDES CONTROL OR CREATES LIABILITY FOR INVESTOR)

Altria's level of influence and control over JLI and its actions is a contested factual dispute. For Plaintiff's RICO claim, for example, the relevant question for the jury is whether Altria, *as a factual matter*, had *some part* in directing JLI's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). Plaintiff will not argue that Altria's $12.8 billion purchase of a 35% stake in JLI created automatic liability for Altria as a matter of corporate law. Plaintiff will, however, point to the significant investment and stake as one indication (among many) of the level of power or sway Altria held over JLI. The jury will not be confused or misled by such arguments.

If there is any risk of confusion, it is introduced by Altria's conflating the issue of control as a matter of corporate law with control for the purposes of RICO liability. Altria argues that it

---

[112] ECF 3556 at 21.

[113] ECF 3447 at 122-123.

[114] Riaz Valani, Nicholas Pritzker, Hoyoung Huh, Adam Bowen, and James Monsees.

[115] *See, e.g.*, ECF 3447 at 13-14, 37-39.

*cannot possibly* have controlled JLI because, essentially, 35% is below 50.1%.[116] If allowed, it would present similar arguments to the jury.  Even if corporate law were relevant here, a minority shareholder with a stake similar to Altria's 35% could be considered "controlling." *See, e.g., Williamson v. Cox Commc'ns, Inc.*, No. CIV.A. 1663-N, 2006 WL 1586375, at *1 (Del. Ch. June 5, 2006) (two stockholders with combined 17.1% stake may be controlling stockholders); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 555 (Del. Ch. 2003) (holder of 35% of outstanding stock was controlling shareholder). But this highly fact-specific inquiry under corporate law is irrelevant to the claims here.

Corporate law does not govern the question of whether Altria exercised sufficient control to establish RICO liability. Plaintiff's arguments and evidence will not introduce any confusion on this topic, and the jury should be allowed to consider all of the evidence, including the evidence of Altria's investment in JLI, in deciding the level of control that Altria exerted and Altria's ultimate liability.

## XIV. PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 14* (OPINIONS THAT VAPOR USE CONTRIBUTED TO SCHOOL SHOOTING DEATHS OR INJURIES)

JLI seeks to exclude Plaintiff's expert Michael Dorn's opinion that vaping counter measures can create a security risk, even though that assertion appeared in an official report and has also been deemed relevant by Defendants' counter expert. Previously, Dorn led a team of 23 analysts to conduct a school security, climate, culture, and emergency preparedness assessment for the Broward County, Florida School System, after the deadly shooting at Marjory-Stoneman Douglas High School in Parkland, Florida.[117] This assessment involved more than 1,000 site visits to 234 schools and 21 support facilities, and interviews with more than 3,000 employees.[118] Dorn produced more than 14,000 pages of reports for this project—constituting the most comprehensive school safety, security, climate, culture, and emergency preparedness assessment following a mass casualty school shooting in the United States.[119] Dorn's assessment for Broward County involved

---

[116] ECF 3556 at 22-23 (citing corporate law).
[117] ECF 3550-6, Dorn Rpt. at pp. 3-4.
[118] *Id*.
[119] *Id*. at p. 5.

developing cost estimates for over $500 million in security upgrades for the district.[120]

Dorn's assessment documented that student e-cigarette use was a pervasive problem at Marjory-Stoneman Douglas High School.[121] In an attempt to address that problem, the school had locked the student restrooms on the first and third floors of the building and diverted the school security personnel to the second-floor restrooms to monitor for vaping.[122] When the shooting began on the third-floor, students unsuccessfully attempted to gain refuge in the locked restrooms.[123] An official report for the state of Florida noted the concern that anti-vaping measures put students' safety at risk.[124] Dorn's assessment for Broward County included analyzing the problem of student e-cigarette use, its effect on school security, climate, culture, and emergency preparedness, and potential solutions to mitigate that issue. Broward County presently continues to seek Dorn's professional advice to address its problem with student e-cigarette use, including advice on the installation of vape detectors.[125]

Dorn testified that he believes there is a relation between student e-cigarette use at Marjory-Stoneman Douglas High School and the student injuries because some students were unable to seek refuge in the locked restrooms, and because school security personnel were tied up monitoring for students vaping.[126] This is one of the reasons why Dorn opines that the low-cost, low-tech approach of locking restrooms to combat student vaping is not a viable solution to the issue and is harmful to school climate and culture.[127] While JLI argues that Dorn describes an event that occurred in Florida, not San Francisco, this argument misses the point. The issue is the safety risk created by locking restrooms and diverting security personnel to combat vaping. And notably, more than 25%

---

[120] *Id.*

[121] ECF 3549-8, Dorn Dep., at 77:21-78:2, 81:21-83:18, 85:23-86:12.

[122] ECF 3550-6, Dorn Rpt. at pp. 15-16.

[123] *Id.*

[124] *Id.* at 15-16.

[125] ECF 3549-8, Dorn Dep., at 166:24-167:6.

[126] *Id.* at 76:24-77:5, 77:21-78:18, 81:13-83:25. This is consistent with the findings of the Marjory-Stoneman Douglas Public Safety Commission: "School administrators' decision to lock the first- and third-floor bathroom doors prevented students … from entering the bathroom as a place of safety to avoid being shot." MSD Public Safety Commission, "Initial Report Submitted to the Governor, Speaker of the House of Representatives and Senate President," (Florida Department of Law Enforcement, 2019), 32-47, http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf.

[127] ECF 3550-6, Dorn Rpt. at pp. 16, 43.

of SFUSD secondary schools have locked restrooms as an approach to prevent vaping.[128]

This testimony is also relevant to explain Dorn's previous professional experience in assessing the problem of student e-cigarette use, to show that he employed a similar methodology when he assessed SFUSD schools, and to counter JLI's incorrect argument that Dorn has no such prior expertise. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (The objective of *Daubert* "is to make certain that an expert, whether basing testimony upon professional studies or **personal experience**, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.") (emphasis added).

This testimony is also relevant to demonstrate the disruption to the school environment caused by student e-cigarette use and the effect that it can have on school security, climate, culture and emergency preparedness, and to counter JLI's argument that the impact of student e-cigarette use on schools is trivial. This testimony is further relevant for Dorn to explain why he is making the recommendations for infrastructure improvements and additional personnel, and why he does not recommend solutions such as locking restrooms. While JLI argues that the issue of school shootings in general is irrelevant, its own retained expert, Larry Mefford, opines on the issue, claiming that Dorn's recommendations could increase the risk of school shootings.[129]

Finally, JLI argues that Dorn's testimony would inflame the jury and prejudice Defendants.[130] But Dorn has not and will not opine that JUUL use caused a school shooting. Dorn's experience assessing student e-cigarette use at Marjory-Stoneman Douglas High School is being offered for a relevant and proper purpose as described above, and its probative value is not substantially outweighed by a danger of unfair prejudice or misleading the jury. *See Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) ("Virtually all evidence is prejudicial or it isn't material.

---

[128] *Id.* at 15, 40, 43.

[129] ECF 3461-3, Mefford Rpt., at pp. 39-41.

[130] The two cases cited by JLI are inapposite to the issue presented here. In *In re Bard IVC Filters Prod. Liab. Litig.*, No. CV-16-00782-PHX-DGC, 2018 WL 1876896 (D. Ariz. Apr. 18, 2018), the issue was whether deaths caused by a different product with different risks could be used to show a product defect in a later version of the product that did not have such risk of death. *Id.* at 3–4. In *Speer*, 2021 WL 5969521, the court precluded unrelated incidents of police force as irrelevant to prove plaintiff's allegation of excessive force in a particular incident. *Id.* at *5.

1 The prejudice must be 'unfair.'")

2 **XV.    PLAINTIFF'S OPPOSITION TO DIRECTOR DEFENDANTS *MOTION IN LIMINE 15* (MR. MONSEES' CONSTITUTIONALLY-PROTECTED CONGRESSIONAL TESTIMONY)**

3

4        There is uncertainty about whether Albert Einstein defined insanity as "doing the same thing

5 over and over again and expecting different results." Regardless of its origin, Defendants Bowen,

6 Monsees, Huh, Pritzker, and Valani's (collectively "Director Defendants") *in limine* motion to

7 exclude James Monsees's congressional testimony embodies the spirit of this quote. This is the

8 *third time* this Court has heard from Defendants that statements made on behalf of JLI in the course

9 of testimony before Congress cannot, as a matter of law, be actionable fraud because it is petitioning

10 conduct protected under the *Noerr-Pennington* doctrine. This Court has explicitly rejected this

11 same defense twice before, finding various statements defendants made at different times to

12 Congress and regulators at the FDA to be admissible evidence.[131] The Director Defendants do not

13 offer a compelling reason why this Court should reconsider its prior rulings and reach a different

14 result now.

15        The Director Defendants baldly state that the proffered misstatements that Mr. Monsees

16 made to Congress "as a matter of law, cannot serve as the basis for Plaintiff's RICO claims or

17 satisfy the requisite 'predicate act' element" because "courts have excluded evidence of lobbying

18 efforts where the purpose of the evidence would be to impose liability upon the act of lobbying

19 itself."[132] However, this formulation simply ignores this Court's prior holding regarding the

20 admissibility of this evidence. *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products

21 Liability Litigation*, 497 F. Supp. 3d at 614 (noting that it is a premature question of fact for the

22 Court to determine if the proffered Congressional testimony and regulatory statements are part of

23 a genuine effort to influence governmental action, or a mere sham, citing *Clipper Exxpress v. Rocky

24 Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1359 (9th Cir. 1982)).

25        This Court previously noted four reasons for allowing the proffered Congressional

26 _____

[131] ECF 3556 at 22-23 (citing corporate law). *See In re JUUL Labs, Inc., Marketing, Sales Practices, and
27 Products Liability Litigation*, 497 F. Supp. 3d at 613–616; ECF 3170, at 5 (denying Defendants' MIL 15
Protected Communications with the Government) deemed to apply in the SFUSD by Plaintiff, JLI, and
28 Altria but not the Director Defendants (ECF 3473, at 6-7 (Director Defendants' exclusion at n.11)).
[132] ECF 3556 at 25.

testimony and statements made to FDA regulators. *First,* as noted above, the statements may "fall within Noerr-Pennington's 'sham exception'" and determining "[w]hether or not an otherwise non-actionable statement falls within the sham exception is generally a question of fact." *In re JUUL,* 497 F.Supp.3d at 614. *Second*, even if "the representations to Congress and the FDA are not actionable as predicate acts, they are nonetheless evidence of the alleged scheme to defraud." *Id.* (citing *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016)). *Third*, the Court noted that the statements may be admissible evidence of Plaintiffs' RICO claim that defendants sought to "secure the money and property of the end consumers, in particular the new and youth users … by allegedly lulling Congressional legislators and the regulators at the FDA into inaction, or more limited action, to allow their products to remain on the market." *Id.* at 615. *Finally,* the Court held that a "fraud on the agency" defense does not apply here because the proffered "fraudulent statements made to the government officials" that are the "basis of [Plaintiffs'] mail or wire fraud claims" "were not specifically *required* by Congress or the FDA." *Id.* (emphasis added). More particularly, the Court noted that "the statements were voluntarily made by the speakers [(including Monsees)] with an alleged aim to deter or defer government action, placate the public, and preserve JLI's ability to continue to sell mint pods and continue to grow the youth market (contrary to its disclosed intent)." *Id.*

The Director Defendants' current argument does offer one additional unique twist, suggesting that because the proffered testimony is entitled to *Noerr-Pennington* immunity (which it is not), allowing it to come in would be unduly prejudicial. However, this argument also fails because the Director Defendants cannot use their defective *Noerr-Pennington* defense to bootstrap a Rule 403 relevance argument. As noted above, this Court has already held that applying the *Noerr-Pennington* doctrine to the proffered testimony is not only premature but also questionable at best. This fact makes the Director Defendants' reliance on *DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-CV-72 DF, 2010 WL 11538713 (E.D. Tex. Feb. 26, 2010), inapplicable because, in *DataTreasury*, the Court weighed whether evidence of activity that had already been determined to be protected by the *Noerr-Pennington* doctrine could still be admitted based on the "circumstances of the case." *Id*. at *15. *See also City of Cleveland v. Cleveland Elec. Illuminating*

*Co.*, 538 F. Supp. 1257, 1277 (N.D. Ohio 1980) (noting that "the trial judge is vested with broad discretion in determining the admissibility of evidence of conduct falling within the protection of the Noerr-Pennington doctrine."), cert. denied, 469 U.S. 884 (1984). Here, however, the Director Defendants cannot make the preliminary showing that the challenged evidence is entitled *Noerr-Pennington* protection *ab initio*.

Finally, the Director Defendants' concern that waiting to address any *Noerr-Pennington* and relevance concerns until trial or "post-trial" would result in "severe prejudice" should also be rejected. "The proper remedy is not exclusion of evidence that is otherwise relevant and admissible in connection with Plaintiff's claims." *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 8130449, at *2 (S.D.N.Y. Dec. 3, 2015). Instead, "the proper remedy for those concerns is care in instructing the jury with respect to what it must find in order to hold [Defendants] liable and, if [Defendants] request[] it, perhaps also curative instructions making clear to the jury on what it may not base its verdict." *Id.* (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008)). *See also City of Huntington v. AmerisourceBergen Drug Corp.*, No. CV 3:17-01362, 2021 WL 1986425, at *2 (S.D.W. Va. May 18, 2021).

**XVI.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 16* (EXPERT TESTIMONY CONTAINING PEJORATIVE LANGUAGE, FACTUAL NARRATIVES, OR NEW OPINIONS)**

Defendants ask this Court to exclude portions of Dr. Drumwright's expert opinion because they claim she uses "pejorative" language about JLI directors Pritzker and Valani.[133] Specifically, Defendants take issue that Dr. Drumwright characterized the Altria investment as an opportunity for Pritzker and Valani to "cash in on their investments," to "cash in to make big money," and regarding how they understood the transaction.[134] However, Dr. Drumwright's statements do not run afoul of this Court's previous ruling that "all experts should refrain from using *unduly prejudicial or pejorative terminology*."[135] Even if Dr. Drumwright's language was "pejorative" (which it is not), Defendants have not (and cannot) show how her statements are "*unduly* prejudicial or pejorative." *Id*. Indeed, courts in this Circuit have denied similar motions *in limine* and allowed

---

[133] Plaintiff has already agreed not make any comparisons of Pritzker and Valani to the Enron directors.
[134] ECF 3556 at 26.
[135] ECF 3270, Order on Mot. to Exclude in *B.B* at 60 n.44 (emphasis added).

plaintiffs great leeway to describe relevant conduct. *See, e.g.*, *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, No. 3:18-CV-02109-BEN-LL, 2021 WL 1080688, at *7 (S.D. Cal. Mar. 18, 2021) (denying defendants' motion *in limine* to exclude pejorative terms or phrases (i.e., that defendants "abused" plaintiff) and ruling that plaintiff could "describe or characterize" the [defendants' conduct] "however Plaintiff sees fit."); *see also Washington v. GEO Grp., Inc.*, No. C17-5769 RJB, 2021 WL 4847662, at *3 (W.D. Wash. Sept. 28, 2021) (denying defendant's motion *in limine* to exclude any pejorative and degrading remarks and counseling the parties to "avoid remarks and argument not supported by the evidence or lack of evidence.").[136] Again, here, Dr. Drumwright's statements merely describe Pritzker and Valani's relevant investment opportunity, without any gloss that would render them "*unduly* prejudicial or pejorative." Further, Defendants will have the opportunity at trial to respond to Plaintiff's characterization of the $5 billion share the directors received as a result of Altria's investment in JUUL.

Defendants also seek to exclude alleged "improper narrative evidence."[137] Initially, as this Court ruled prior, such "narrowed and targeted objections" are best addressed at trial. *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 19-MD-02913-WHO, 2022 WL 1814440, at *13 (N.D. Cal. June 2, 2022) (denying motions to exclude fact narrations); *see also Focal Point Films, LLC v. Sandhu*, No. 19-CV-02898-JCS, 2020 WL 5760355, at *7 (N.D. Cal. Sept. 28, 2020) (denying request to exclude "factual narrative" testimony as "premature" "without prejudice to [the party] objecting on this ground at trial"); *In re Glumetza Antitrust Litigation.* No. C 19-05822 WHA, 2021 WL 3773621, at *20 (N.D. Cal. Aug. 25, 2021) (finding that an objection to alleged "factual narrative" is "best raised as an objection at trial (should one be necessary)").

Regardless of the procedurally premature posture of Defendants' objection, the testimony cited by Defendants is *not* improper factual narrative. Rather, it involves "interpretations of []

---

[136] The cases cited by Defendants are unhelpful. *Ollier* discusses the admissibility of expert opinions in the context of a *Daubert* analysis. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860–861 (9th Cir. 2014). Defendants cannot get a second bite at the apple by disguising an untimely *Daubert* motion as a motion in limine. *See Pollard v. FCA US LLC*, No. 817CV00591JLSJCG, 2018 WL 10701619, at *1 (C.D. Cal. June 25, 2018). Moreover, *Santa Clarita Water Agency* concerned an expert who offered an opinion in "purely partisan terms." *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. 2:18-CV-06825-SB-RAO, 2021 WL 6107023, at *2 (C.D. Cal. Nov. 12, 2021). Dr. Drumwright's statements cannot be characterized similarly.
[137] ECF 3556 at 26.

1    documents and testimony" that support expert opinions. *United Food & Com. Workers Loc. 1776*

2    *& Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142,

3    1194 (N.D. Cal. 2017); *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, at *20 (holding that an

4    expert "must be allowed to discuss facts apropos to [his] opinions"). **Dr. Drumwright and Professor**

5    **Chandler describe events as necessary background to their expert analysis. Dr. Drumwright**

6    **highlight**ed Altria's show of its "referent power" **at a dinner** with JLI board members to describe

7    how Altria "capitalized on various forms of non-coercive power in managing, operating, and

8    directing JLI," including "us[ing] its reward **power to manage, operate, and direct JLI."**[138] Professor

9    Chandler commented that user-generated content was "imbedded in [JUUL's] corporate DNA"

10   **within a broader discussion of JUUL's 2019 use and the tracked impact** of non-traditional

11   marketing strategies.[139] These are "not unhelpful narrative accounts but are instead commentary on

12   evidence that explains the factual bases of their opinions […]". *In re 3M Combat Arms Earplug*

13   *Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 765019, at *41 (N.D. Fla. Feb. 28, 2021).[140]

14        Additionally, Defendants' request to exclude any opinions not expressed in their records is

15   premature and vague. *See Lego v. Stratos Int'l, Inc.*, No. C 02-03743 JW, 2004 WL 5518162, at *1

16   (N.D. Cal. Nov. 4, 2004) (denying motion *in limine* to preclude testimony by individuals not

17   disclosed as experts as vague). It is "blackletter law" that "an expert may not present new opinions"

18   on topics not prior disclosed, "and a motion in limine is unnecessary to address this point." *Garcia*

19   *v. Cnty. of Riverside*, No. CV51800839SJOASX, 2019 WL 4282903, at *10 (C.D. Cal. June 7,

20   2019). "As the Ninth Circuit has held, 'courts should not render advisory opinions upon issues

21   which are not pressed before the court, precisely framed and necessary for decision.'" *United States*

22   *v. Yang*, No. 16-CR-00334-LHK, 2019 WL 5536213, at *4 (N.D. Cal. Oct. 25, 2019) (denying

23

24   [138] *See* ECF 3023, Drumwright Rep. (5-2-22) at 47-67.

     [139] *See* ECF 3023-5, Chandler Rep. (9-20-21) at 66-68.

25   [140] The cases cited by Defendants are inapposite. Unlike here, the courts in *AYA Healthcare Servs., Inc.*, and

26   *Banga* considered *Daubert* challenges to narrative testimony and found the disputed testimony unhelpful
     under Fed. R. Evid. 702, an argument that this Court has already considered and rejected. Further, the fact

27   patterns of Defendants' proffered cases distinguish them on independent grounds. *See AYA Healthcare*
     *Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 2553181 (S.D. Cal. May 20, 2020) (considering expert's
     interpretation of a contract), *aff'd*, 9 F.4th 1102 (9th Cir. 2021); *see also Banga v. Kanios*, No. 16-CV-

28   04270-RS, 2020 WL 9037179 (N.D. Cal. Dec. 9, 2020) (involving factual findings by a physician discussed
     for medical expert opinions).

PLAINTIFF'S REPONSE IN OPPOSITION TO
                                              DEFENDANTS' MOTIONS IN LIMINE

1  motion *in limine* to preclude party from eliciting self-serving statements from witnesses) (citing

2  *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 214 (9th Cir. 1989)). This Court

3  should await trial to see *if* the need arises to limit the scope of Plaintiffs' experts' testimony.

4  **XVII.    PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 17* (EXPERT TESTIMONY REGARDING ABATEMENT PLANS AND ALLEGED DAMAGES)**

5

6  Regarding the issue raised by MIL 17, Defendants have taken so many bites at that apple,

7  they are down to the core. Defendants are once again claiming that Plaintiff's trial experts are not

8  really testifying about damages. They opposed Plaintiff's trial plan that explained which expert

9  witnesses would testify at trial about damages, and which would potentially testify later in the

10  abatement phase.[141] But the Court accepted Plaintiff's trial plan, largely mooting the issue raised

11  by MIL 17.[142] Defendants also argued in their summary judgment motions that Plaintiff could not

12  establish damages.[143] The Court has not ruled on those motions but has indicated that they would

13  likely be denied. Further, MIL 17 seeks to exclude expert testimony and Defendants have already

14  asked this Court to exclude the "abatement opinions" of SFUSD experts Michael Dorn and Robert

15  Rollo in *Daubert* motions.[144] This is, therefore, at least the fourth time Defendants have tried to

16  prevent SFUSD's experts from giving their damages testimony. The Court should reject them

17  again.

18  As laid out in Plaintiff's trial plan, damages "are measured by the harm the defendant has

19  caused the plaintiff. As such, their proper measure is that which will make good or replace the loss

20  caused by the injury." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 972 (9th Cir. 2017).

21  Plaintiff's experts, and particularly Dorn, will explain the injury caused by Defendants, the actions

22  SFUSD needs to take to overcome that harm, and how much those actions will cost.[145] Whether his

23  testimony might also fall into the abatement bucket is irrelevant, at least for now; the issue for trial

24  is whether the testimony is damages testimony, and it clearly is. Defendants' motion is also wholly

25  ────────────────
[141] *See* ECF 3534, 3545.

26  [142] *See* Minute Order, ECF 3579.

27  [143] *See, e.g.*, ECF 3384 (ODDs' Mot.) at 18-22; ECF 3405 (Altria's Mot.) at 39-40; ECF 3396 (JLI Mot.) at 18-23.

28  [144] *See* ECF 3462 at 17.

[145] *See* ECF 3550-6, Dorn Rpt., at 73 (summary of opinions).

PLAINTIFF'S REPONSE IN OPPOSTION TO
DEFNEDANTS' MOTIONS IN LIMINE

illogical. If the Court denies summary judgment and denies the *Daubert* motion against Dorn and Rollo,[146] then clearly they should be permitted to give their damages testimony to support Plaintiff's claims at trial.

Further, Defendants' argument that Dorn's testimony **about property dam**age **is hearsay or should** be **excluded because the property loss has not been valued** is meritless. Under Rule 703, Dorn can testify as to the notes associated with his investigation. Rule 703. He will lay the necessary foundation, that the notes showing **property da**mage **as the type of evidence used by experts in the field**.[147] *Id.* And, it is wholly immaterial that Plaintiff has not placed a dollar value on the property damage. Plaintiff is not seeking reimbursement for that specific damage. Rather, the property damage is further evidence of the serious situation on SFUSD campuses, and therefore it is further evidence of **the need to take the counter measures advocated by Dorn**.[148] This Court should deny MIL 17.

## XVII.  **PLAINTIFF'S OPPOSITION TO DEFENDANT'S *MOTION IN LIMINE 18* (DIVIDENDS RECEIVED FROM THE ALTRIA TRANSACTION)**

In the *B.B.* case, this Court ruled that evidence of money received from Altria was relevant, admissible evidence of the Defendants' scheme, motive, knowledge, intent, and bias.[149] The Court also rejected Defendant's attempt to exclude this evidence from trial phase 2 (punitive damages). *Id*. JLI and Altria stipulated that the *B.B.* ruling was deemed to here; the Individual Defendants reserved the right to challenge the Court's prior ruling,[150] which they now do without mentioning the Court's previous denial of an essentially identical motion.

As set forth in Plaintiff's Response to Defendants' MIL 7 in *B.B*,[151] money received from Altria is directly relevant to key issues in this litigation.

---

[146] Defendants' motion also mentions Dr. Cutler, Mot. at 30, but Dr. Cutler's **valuation testimony is based on the plans of Plaintiff's actual abatement experts, Drs. Winickoff and Kelder.** Dr. Cutler will not be giving his economic testimony at trial, as Plaintiff has explained.

[147] *See* ECF 3550-6, Dorn Rpt., ECF 3550-6, at 1-9 (explaining his extensive experience and process in forming his opinions as to SFUSD).

[148] *See id.* at 73 (summarizing countermeasures). Further, there is no merit to the assertion that Dorn did not reference property damage in his report. He references it generally on Page 95, and then he submitted all of the evidence upon which Plaintiff relies to the Defense with his report.

[149] ECF 3170 at 4-5 (denying in relevant part Defendants' MIL 7).

[150] ECF 3473 at 5 and n.7.

[151] ECF 3021 at 13.

**Defendants' Scheme.** Key employees and investors of JLI positioned JLI for acquisition by Big Tobacco to reap large returns on their investment by marketing JLI's nicotine products to an underage market.[152] Payouts from Altria's investment in JLI, and each Defendant's financial condition before and after that investment, are relevant evidence that the scheme succeeded.

**Motive, knowledge, and intent.** Each individual's payout from the Altria investment is directly relevant to that individual's motive, knowledge, and intent to grow the market for e-cigarettes, increase youth addiction, and make JLI an acquisition target. *See United States v. Reyes*, 660 F.3d 454, 464 (9th Cir. 2011) (permitting the introduction of evidence of the defendant's financial gains to show motivation for and knowledge of the overall scheme).

**Bias.** Each individual's payout—and potential future payoff from remaining investment in JLI—is evidence of potential bias. *See United States v. Abel*, 469 U.S. 45, 52 (1984) (finding that bias is almost always relevant); *United States v. Harris*, 185 F.3d 999, 1008 (9th Cir. 1999) ("Pecuniary interest may be shown to prove bias.").

**Punitive Damages.** The financial condition of each Defendant is relevant to punitive damages. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981) ("evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded").

The Individual Defendants falsely argue that the dividend payments they received from Altria are irrelevant to proving wire fraud. Not so. Even the cases Defendants cite in their motion support the admissibility of their financial gains from the Altria investment. The first cases—*United States v. Dowie*, 411 F. App'x 21, 25 (9th Cir. 2010); *United States v. Welch*, 327 F.3d 1081, 1106 (10th Cir. 2003); and *United States v. Stockheimer*, 157 F.3d 1082, 1087 (7th Cir. 1998)—were appeals of criminal convictions based on alleged failures to prove specific intent "to personally gain" from frauds. Plaintiffs agree that they are not *required* to prove an intent "to personally gain," but it does not follow that personal gain is irrelevant. Indeed, *Dowie*, 411 F. App'x at 25, notes that fraud requires "a specific intent to defraud," and Defendants' payout from the Altria investment makes the scheme's existence and their specific intent to promote it more likely. Similarly, *United*

---

[152] *See, e.g.,* ECF 9, 3:19-cv-08177-WHO, Am. Compl. (SFUSD) ¶¶ 43-46, 460, 527, 517-45.

*States v. Mitchell*, 172 F.3d 1104, 1108 (9th Cir. 1999) explicitly noted that enrichment following crime is evidence of involvement. And *United States v. Ewings*, 936 F.2d 903, 90 (7th Cir. 1991), admitted evidence of financial gain, holding that "in crimes where the object is financial enrichment, evidence that one has been enriched is probative of participation in the crime." *See also United States v. Schena*, No. 5:20-cr-00425-EJD-1, 2022 U.S. Dist. LEXIS 131030, at *54 (N.D. Cal. July 23, 2022) ("Evidence that the defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud."), quoting *United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011).

Defendants' Rule 403 argument fares no better. Because their payout from the Altria investment is a direct outcome of the alleged RICO scheme, it is highly probative, and there is no unfair prejudice to Defendants. The only case Defendants cite in support of exclusion under Rule 403—*United States v. Holmes*, No. 5:18-cr-00258-EJD-1, 2021 U.S. Dist. LEXIS 98060, at *16-17 (N.D. Cal. May 21, 2021)— rejected the exclusion they seek. There, the Court excluded generic references to the defendant's wealth but allowed evidence of her "salary, travel, celebrity, and other perks and benefits" obtained through her fraud as CEO. By that reasoning, the Altria dividends Individual Defendants obtained *via* their fraud are admissible.

## XVIII.   PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 19* (NICHOLAS PRITZKER'S FAMILY TIES TO THE TOBACCO INDUSTRY)

JLI's motion to exclude evidence of Nicholas Pritzker's family ties to the tobacco industry is overblown and misguided: Plaintiff will not introduce evidence of Pritzker family history that lacks relevance or any connection to Mr. Pritzker himself. In fact, Plaintiff designated a mere ten-lines of testimony on this subject from Mr. Pritzker's deposition, establishing simply that the Pritzker family sold its chewing tobacco company, Conwood, to R.J. Reynolds in 2005 after exploring the possibility of a sale to Philip Morris.[153] Defendants' discussion of testimony regarding land in the Mississippi Delta and an attempt by Mr. Pritzker's cousins to acquire RJR

---

[153] Ex. 21, Pritzker Dep. at 42:5-10 ("Q. And despite the conversation with Philip Morris, eventually Conwood was sold by the Pritzker family to Reynolds; is that right? A. That's right. Q. And that occurred in about 2005? A. I think that's the right date, yes."); *id.* at 42:20-23 ("Q. Okay. Any other involvement in tobacco by the Pritzker family after the sale of Conwood before Tao's investment in Ploom? A. Not that I know of."). Special Master Larson overruled Defendants' objections to this testimony, finding that it is "relevant to the witness's background and experience with the tobacco industry." Ex. 22, Larson Rpt.

1    Nabisco, which Plaintiff did not designate, is a red-herring.

2        The Court should reject JLI's request to exclude all evidence regarding "Pritzker's family

3    connections to *any* tobacco company,"[154] and allow the limited evidence that Plaintiff identifies

4    here to show Defendants' knowledge and motive. Central to SFUSD's claims is the fact that the

5    individual Defendants sought to position JLI for acquisition by a large tobacco company in order

6    to reap enormous returns on their personal investments. To that end, Pritzker's familiarity with this

7    business playbook through his family's lucrative sale of Conwood to R.J. Reynolds is clearly

8    relevant and therefore not unduly prejudicial. *See Dollar*, 561 F.2d at 618 ("Virtually all evidence

9    is prejudicial or it isn't material. The prejudice must be 'unfair.'"). Indeed, that familiarity was

10   likely one reason that Pritzker became one of the two primary negotiators for JLI in its investment

11   talks with Altria.  Pritzker, who himsel  financially benefitted from his family's sale of Conwood

12   to RJR, knew that making JLI an attractive investment opportunity for a large tobacco company

13   was the best way to maximize his own profit.  The jury should be able to weigh that fact in assessing

14   Pritzker's, and by extension JLI's, motive and intent.

15   **XIX.   PLAINTIFF'S OPPOSITION TO DEFENDANTS' *MOTION IN LIMINE 20***
         **(EVIDENCE OF CHEMICALS IN JUUL OTHER THAN NICOTINE AND OF**
16       **HEALTH CONDITIONS OTHER THAN ADDICTION)**

17       Defendants seek to exclude evidence of chemicals in JUUL other than nicotine, evidence

18   regarding health conditions other than addiction, and evidence regarding substances not in JUUL.

19   Plaintiff does not seek to introduce evidence in its case in chief of substances not in JUUL. Plaintiff

20   also does not intend to present evidence of other chemicals or health conditions to prove damages.

21   Defendants make no true argument regarding other chemicals but merely state this evidence is

22   irrelevant and a waste of time. The one case they cite, *In re: E.I. Du Pont De Nemours & Co. C-8*

23   *Pers. Inj. Litig.*, is readily distinguishable. In *Du Pont*, the plaintiff alleged he developed testicular

24   cancer from drinking water contaminated with C-8 from the defendant's plant. *In re: E.I. Du Pont*

25   *De Nemours & Co. C-8 Pers. Inj. Litig.*, 2016 WL 3064124 (S.D. Ohio May 30, 2016). The

26   defendant sought to introduce evidence of chemicals other than C-8 in the Ohio River and argued

27   this evidence was relevant to specific causation. *Id*. However, there was no evidence the other

28
---
[154] ECF 3556 at 32 (emphasis in original).

1    chemicals were ever in the plaintiff's drinking water. *Id*. This evidence was therefore clearly

2    irrelevant.

3          Here, evidence of other chemicals is required for Plaintiff to explain the JUUL product itself

4    to the jury. Defendants have asked this Court to exclude evidence of *any* chemicals in JUUL aside

5    from nicotine. To explain JUUL's nicotine salts—the preeminent component of the product—

6    Plaintiff will have to tell the jury about benzoic acid, which is a chemical other than nicotine. To

7    describe JUUL's pods, Plaintiff will have to tell the jury about flavor additives and menthol, which

8    are chemicals other than nicotine. This evidence is extremely relevant, and nothing about it is

9    unduly prejudicial to the defense. Rules 402 and 403.

10          Defendants will also undoubtedly open the door for Plaintiff to introduce evidence

11    concerning other chemicals in JUUL. Throughout this litigation, Defendants have offered evidence

12    regarding the safety of JUUL, repeatedly claiming JUUL is less harmful than combustible

13    cigarettes.[155] As part of this claim, Defendants' witnesses and experts have continually asserted

14    JUUL exposes users to fewer harmful chemicals than combustible cigarettes.[156] In his November

15    2021 report, defense expert Jack Henningfield states, "Clinical and nonclinical studies indicate that

16    JUUL ENDS contain and emit substantially fewer and lower levels of toxicants as compared to

17    cigarettes … Specifically, [harmful and potentially harmful constituents] are reduced by 98% or

---

18    [155] *See* Ex. 23, Bowen Dep. at 531:18-24 ("Our goal is to develop and sell a product that presents dramatically
19    reduced exposure to harmful compounds to the user, the intended user, who's a smoker."); Ex. 24, Monsees
      Dep. at 457:25-458:21 ("The key here is as a harm reduction technology … intended as a harm reduction
20    technology … In fact, relative to every other e-cigarette that we studied that was on the market at the time,
      we had substantial further reduction because of the substantial investment in things like closed loop
21    temperature control and other corner case mitigation technologies to ensure a substantially higher level of
      safety in this product …"); Ex. 25, Pritzker Dep. at 617:24-618; 660:7-9 ("The mission clearly was to get
22    people off of cigarettes and thus save lives by converting smokers to a different product."); ("Well, there's
      no doubt in my mind that – that JUULs are very significantly less harmful than cigarettes."); Ex. 26, Xing
23    Dep. at 495:2-4 ("So [the goal] was to develop a product that provided smokers to switch to a less harmful
      nicotine delivery system."); Ex. 27, Gould Dep. at 463:6-9 ("So the company's mission – which from my
24    perspective if a public health mission, is to convert combustible cigarette smokers from a very harmful
      product to a less harmful product."); Ex. 28, Crosthwaite Dep. 596:12-15 ("So if you compare JUUL to a
25    combustible cigarette, I do think the JUUL system has a potential to be less harmful than someone who is
      going to use a cigarette."); Ex. 29, Kania Dep. 581:10-21 ("When companies like JUUL and other vaping or
26    vaping products were allowed to exist by the FDA in-market, it was because there was an understanding that there
      is a possibility for our products to provide a harm reduction benefit meaning that because a product like a
27    cigarette which is very harmful was legally able to exist, there was also room for an opportunity for
      products that were less harmful to exist … So the goal of the company was to go for that opportunity in
28    smokers and attempt to switch them.").

      [156] *Id.*; *See also* Ex. 2, Henningfield Rpt. at 60-63; 121.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
                                      DEFENDANTS' MOTIONS IN LIMINE

more in JUUL ENDS as compared to cigarettes. …"[157] As recently as last month, JLI Senior Director of Scientific Affairs Erik Auguston testified that, in a biomarker study, "use of JUUL did not add additional HPHC impact" compared to people who did not use nicotine products during the studied time period.[158]

It is illogical for Defendants to make these claims while also asking this Court to preclude evidence of chemicals other than nicotine in the product. In saying JUUL contains or emits fewer harmful chemicals, Defendants will necessarily introduce evidence of the chemicals the product does contain or emit, thereby opening the door for Plaintiff to do the same. *See Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1130 (9th Cir. 2010); *See also United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) ("It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party.").

Defendants' safety arguments will also open the door for evidence regarding health conditions other than addiction. Defendants argue JUUL is intended for current cigarette smokers, making nicotine addiction presupposed in the majority of Defendants' alleged target consumers.[159] Therefore, by arguing JUUL is less harmful than combustible cigarettes, Defendants will convey to the jury JUUL has a lower risk of causing health conditions *other than* addiction. Any evidence Plaintiff then presents of other health conditions linked to JUUL is relevant to rebut Defendants' position. *See United States v. Terry*, 760 F.2d 939, 943–44 (9th Cir. 1985) (noting that evidence is relevant if it undercuts the testimony of a witness from the opposing side).

---

[157] Ex. 2, Henningfield Rpt. at 121.

[158] Ex. 30, Auguston Dep. at 802:5-804:2.

[159] *See* Ex. 23, Bowen Dep. at 82:13-17; 83:7-13 ("M. .oal was to hel. smokers, current smokers, who … started smokin. but are now conflicted and wished to stop or do somethin. about their health."); ("… helping them mi..ht include understandin. how to rid them of their addiction …"); Ex. 24, Monsees De. at 176:2-6 ("We were introducing a product into the market where the growth of this product would be determined .urel. b. switchin. adult tobacco consumers to this product."); Ex. 25, Pritzker De. at 453:2-3 "…JUUL's mission to convert smokers was critical …"); Ex. 26, Xing Dep., at 50:2-3 ("We are trying to have the addicted smokers switch to a reduced harm .roduct.", Ex. 27, Gould De. . at 94:20-95:1; 512:5-8 ("The entire mission of the company is to move adult combustible ci.arette smokers to a less harmful alternative. which includes nicotine."., "… the. develo. ed JUUL to replicate as close as possible the nicotine delivery of a ci.arette to enable smokers to actuall. sto. usin. ci.arettes.". Ex. 28, Crosthwaite Dep. at 314:15-19 ."I think Altria had several reasons to invest in JUUL, one of which was its .oal to have harm reduction and to have an effective .roduct that could convert smokers off of ci.arettes." Ex. 29, Kania De. . at 324:6-8 .So .the com.an. 's focus. was developing this product with the intent for adult smokers to be able to switch to a more satisfying vapor product.").

1 ███████

2 ██████████████████████████████████

3 ██████████████████████████████████████████

4 ████████████████████ This evidence is relevant to Plaintiff's case and not unduly

5 prejudicial to Defendants under Rules 402 and 403.

6 ███████████████████████████████████

7 ███████████████████████████████████████

8 ██████████████.[160] JLI employees Ashley Gould and Gal Cohen also attended the meeting. *Id.*

9 at 210:19-22. ██████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████████

13 ██████[163]

14 ██████████████████████████████████████████

15 ██████████████████████████████████████████

16 argue. The case Defendants cite for their mini-trial argument, *Tennison v. Circus Circus*

17 *Enterprises, Inc.,* involved exclusion of highly disputed witness testimony. *Tennison v. Circus*

18 *Circus Enter.,* 244 F.3d 684, 690 (9th Cir. 2001). By contrast, Cal. Penal Code § 632 is a

19 straightforward law the jurors can easily understand.

20 ██████████████████████████████████████

21 ████████████████████████████ Rather, Plaintiff offers this

22 evidence as probative of knowledge, intent, and motive. *See* Rule 404(b)(2) ("This evidence may

23 be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

24 knowledge, identity, absence of mistake, or lack of accident."). ██████████████████

25

---

26 [160] Ex. 24, Monsees Dep. at 210:7-10; 212:24-213:2.

27 [161] *Vaping increases the risk of lung disease by a third: U.S. study*: https://www.reuters.com/article/us-health-vaping-lungs/vaping-increases-the-risk-of-lung-disease-by-a-third-u-s-study-idUSKBN1YK260

28 [162] *Id.* at 210:25-213:5.

[163] Ex. 24, Monsees Dep. at 217:13-20. Ex. 31, Valani Dep. 509:13-527:18.

1    ████████████████████████████████████████████████████████████

2    ████████████████████████████████████████████████████████████

3    █████████████ █ ██████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    █████████████████████████████████████████ [165] This is not improper

6    character evidence but shows Defendants' motivations and intentions, including those behind

7    ████████████████████████████

8    **XXI.    <u>CONCLUSION</u>**

9        For the foregoing reasons, the Court should deny Defendants' *in limine* motions.

---

[164] Ex. 24, Monsees Dep. at 215:2-5.
[165] Ex. 31, Valani Dep. at 520:18-24.

1    October 17, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By: /s/ *Sarah R. London*
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
slondon@lchb.com

By: /s/ *Dena C. Sharp*
Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
dsharp@girardsharp.com

By: */s/ Ellen Relkin*
Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
erelkin@weitzlux.com

By: /s/ Dean Kawamoto
Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
dkawamoto@kellerrohrback.com

*Co-Lead Counsel for Plaintiffs*

PLAINTIFF'S REPONSE IN OPPOSITION TO
DEFNEDANTS' MOTIONS IN LIMINE