# Exhibit 35

LOUISE H. RENNE (SBN 36508)
lrenne@publiclawgroup.com
RYAN McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
RENNE PUBLIC LAW GROUP LLP
350 Sansome Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

Thomas P. Cartmell (*pro hac vice*)
Jonathan P. Kieffer (*pro hac vice*)
Tyler W. Hudson (*pro hac vice*)
WAGSTAFF & CARTMELL LLP
4740 Grand Ave., Ste. 300
Kansas City, MO 64112
Tel. (816) 701-1100
Fax (816) 531-2372
tcartmell@wcllp.com
jpkieffer@wcllp.com
thudson@wcllp.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>*San Francisco Unified School District v. Juul Labs, Inc., et al.*, No. 3:19-cv-08177-WHO | MDL No. 19-md-2913-WHO<br><br>**PLAINTIFF SAN FRANCISCO UNIFIED SCHOOL DISTRICT'S RESPONSES AND OBJECTIONS TO DEFENDANTS HUH, PRITZKER, AND VALANI'S FIRST SET OF INTERROGATORIES** |

ISSUING PARTY:         DEFENDANTS HUH, PRITZKER, VALANI

PRODUCING PARTY:      SAN FRANCISCO UNIFIED SCHOOL DISTRICT

SET NO:              ONE (1)

      Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff San Francisco Unified School District ("Plaintiff" or "SFUSD") provides the following objections and responses to the First Set of Interrogatories to Bellwether Government Entity Plaintiffs (the "Interrogatory" or "Interrogatories"), served on May 25, 2021, by Defendants Hoyoung Huh, Nicholas Pritzker, and Riaz Valani (the "Director Defendants").

## I.      PRELIMINARY STATEMENT

      Plaintiff has undertaken a reasonable effort to provide the information requested by these Interrogatories to the extent the requested information is not subject to objection, but Plaintiff has not yet received complete discovery from Defendants, and Plaintiff has not completed its investigation of the facts relating to this Action. Discovery is ongoing and additional information may be obtained that may alter these responses. The following responses and objections are based upon information that has been collected and reviewed to date for the purpose of responding to these Interrogatories and are not prepared from any personal knowledge of any single individual. Accordingly, all the following responses are given without prejudice to, and with the express reservation of, Plaintiff's right to supplement, review, correct, or modify its responses and objections to address additional information, and to rely upon any and all such information and documents at trial or otherwise. Likewise, Plaintiff shall not be prejudiced if any of its present responses and objections are based on incomplete knowledge or comprehension of the facts, events, or occurrences involved in this matter.

      By serving these objections and responses, Plaintiff does not waive any objections that it may have to the use at any hearings or at trial, or admission into evidence, of these responses, or any documents and things produced in response to the Interrogatories, on any applicable grounds.

## II.    OBJECTIONS

The following objections apply to each of Plaintiff's responses to the Interrogatories. Plaintiff's specific objections to each Interrogatory are in addition to the limitations and objections set forth below. These limitations and objections form a part of the response to each Interrogatory. The absence of a reference to these or any specific general objection in response to an Interrogatory is not and should not be construed as a waiver of any of these general objections.

1.    Plaintiff objects to each Interrogatory to the extent it is overly broad, vague, unduly burdensome, seeks information that is not relevant to any party's claim or defense, or seeks to impose obligations or require actions beyond those required by the Federal Rules of Civil Procedure, the local rules, and the Court's Orders in this Action ("Discovery Rules").

2.    These responses are made solely for the purpose of and in relation to this Action. Each answer is given subject to all appropriate objections, which would require the exclusion at trial of any statement contained or document provided herein. All such objections and the grounds therefore are hereby reserved.

3.    No admission of any nature whatsoever is to be implied or inferred by these responses. The fact that any of the Interrogatories have been answered should not be taken as an admission or a concession of the existence of any facts set forth or assumed by the Interrogatory, or that such answer constitutes evidence of any fact thus set forth or assumed.

4.    Whenever in the responses Plaintiff uses the phrase "subject to and without waiving," Plaintiff is responding to the Interrogatory as narrowed by the continuing objections and objections specifically referenced in its response to each Interrogatory without waiver of any objection.

5.    Plaintiff objects to each Interrogatory to the extent it is not proportional to the needs of the case when considering the parties' relative access to relevant information, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

discovery outweighs its likely benefit, and to the extent that it exceeds the scope of permissible discovery at this stage of this proceeding.

6.     Plaintiff objects to each Interrogatory to the extent that it contains terms that are not defined or terms that are defined in a vague, ambiguous, or unintelligible manner.

7.     Plaintiff objects to each Interrogatory to the extent that any Interrogatory, definition (or lack thereof), or instruction assumes facts and events or includes characterizations that are assumed to be accurate, contains legal conclusions, or presumes legal duties or obligations. By providing responses to these Interrogatories, Plaintiff does not admit or concede that any assumed fact, event, characterization, or legal conclusion is correct or accurate and Plaintiff expressly reserves the right to contest any and all assumed facts, events, characterizations, and legal conclusions.

8.     Plaintiff objects to each Interrogatory to the extent it seeks information that is protected from disclosure by any relevant privilege or protection, including and without limitation to, the work product doctrine, attorney-client privilege, information gathered or prepared in anticipation of litigation, settlement materials, the public interest privilege, law enforcement privilege, public official privilege, deliberative process privilege, and/or by any other privilege or immunity from disclosure, including arrest and other juvenile or minor records, school records, and private medical and other patient records and information protected from disclosure by federal, state, or local law (collectively, "Privileged Information"). In responding to each Interrogatory, Plaintiff will not provide Privileged Information.  Any statement to the effect that Plaintiff will provide information in response to an Interrogatory means that the response shall be limited to information that does not fall within the scope of Privileged Information. To the extent that any such Privileged Information is inadvertently disclosed in response to these Interrogatories, the provision of such information shall not constitute a waiver of Plaintiff's rights to assert the applicability of any such privilege or immunity, including as provided for by Case Management Order No. 4: Rule 502(d) and Privileged Materials Order, ECF No. 322, and Fed. R. Evid. 502(d).

1    Moreover, any order holding that disclosure in connection with this litigation shall not operate to

2    waive any privilege or protection is controlling and applies with equal force in any other federal

3    or state proceeding.

4            9.      Plaintiff objects to each Interrogatory to the extent that any Interrogatory, definition

5    (or lack thereof), or instruction: (a) is unduly or disproportionately burdensome, oppressive, overly

6    broad, ambiguous, confusing or vague; (b) is duplicative or unreasonably cumulative of other

7    discovery in this case; or (c) calls for Plaintiff to draw a legal conclusion in order to respond.

8            10.     Plaintiff objects to each Interrogatory that purports to require Plaintiff to identify

9    or provide discovery with regard to "any," "all," "each" or similar all-encompassing wording, on

10   the grounds that each such Interrogatory is overly broad, unduly burdensome, and disproportionate

11   to the needs of the case, seeks discovery that is not relevant to the claims and defenses in this

12   Action, and is beyond the scope of permissible discovery, particularly at this stage of the

13   proceeding. *See Former S'holders of Cardiospectra, Inc. v. Volcano Corp.*, No. 12-CV-01535-

14   WHO, 2013 WL 5513275, at *2 (N.D. Cal. Oct. 4, 2013).

15           11.     Plaintiff objects to each Interrogatory to the extent it seeks information concerning

16   substances other than ENDS products.  Plaintiff brings claims premised on the vaping epidemic

17   Defendants caused.  Interrogatories seeking information about substances other than ENDS

18   products and their use are overly broad, unduly burdensome, irrelevant, and disproportional to the

19   needs of the case.

20           12.     Plaintiff objects to each Interrogatory as vague, ambiguous, overly broad, unduly

21   burdensome, and disproportionate to the needs of the case to the extent it seeks information at the

22   individual-level concerning natural persons or information that could be used to identify natural

23   persons. Defendants misapprehends the nature of the Action; this is not a mass tort action. This

24   Action was brought by Plaintiff, a school district, for public nuisance, negligence, gross

25   negligence, and violations of the RICO Act for the harm Plaintiff suffered and continues to suffer

26   as a result of the Director Defendants' and other Defendants' conduct. Requiring Plaintiff to

27   No. 19-md-2913-WHO                          4                    PL. SFUSD'S RESPONSES AND
                                                                OBJECTIONS TO DEFENDANTS HUH,
28                                                              PRITZKER, AND VALANI'S FIRST SET
                                                                      OF INTERROGATORIES

provide the identity of, or individual-level information concerning natural persons would be overly broad, unduly burdensome, and disproportionate to the needs of the case when considered in relation to the probative value of such information to the claims and defenses in this Action.

13.     Plaintiff objects to each Interrogatory as unduly or disproportionately burdensome to the extent that it seeks information that is: (a) in Defendants' possession, custody, or control; (b) not in Plaintiff's possession, custody, or control, or otherwise not reasonably accessible to Plaintiff; (c) equally or more readily available from sources other than Plaintiff, including public sources or third parties to whom requests for information have been or may be directed; (d) obtainable from a more convenient, less burdensome, or less expensive source than what would be required of Plaintiff to provide the information; or (e) has already been provided by Plaintiff in discovery. Plaintiff's responses will be limited to relevant, responsive, nonduplicative, and nonprivileged information in its possession, custody, or control located after a reasonable search that is proportional to the needs of the case.

14.     Plaintiff objects to each Interrogatory to the extent it seeks disclosure of information protected by any confidentiality obligation owed to a third party. Plaintiff will not disclose or produce such information absent notice to and, if required, consent of the third party or entry of a court order compelling production.

15.     Plaintiff objects to each Interrogatory to the extent it seeks information requiring scientific, technical, or other specialized knowledge such that it is appropriately the subject of expert testimony, and/or to the extent it asks for or may be interpreted to encompass work performed by or information received from experts retained by Plaintiff in conjunction with this Action ("Expert Opinion"). Plaintiff will provide expert discovery and disclosures on the dates set by the Court in compliance with the Discovery Rules but assumes no further obligation in responding to these Interrogatories.

16.     Plaintiff objects to each Interrogatory to the extent that information sought is not maintained by Plaintiff in the ordinary course of business, and to the extent the Interrogatory seeks

1    documents to be produced in a manner and format not maintained in the ordinary course of

2    business.

3        17.    Plaintiff objects to each Interrogatory to the extent it seeks discovery beyond the

4    scope set by Judge Orrick or Magistrate Judge Corley in orders, rulings, hearings, and conferences

5    applicable to discovery in MDL No. 2913. Plaintiff further objects to each Interrogatory to the

6    extent it contradicts any agreement reached with Defendants or meet-and-confer discussions with

7    Defendants concerning the scope of discovery.

8        18.    Plaintiff objects to each Interrogatory as irrelevant, vague, overly broad, unduly

9    burdensome, and disproportionate to the needs of the case to the extent it is not limited to a time

10    period that is relevant to the claims and defenses in this Action. Unless otherwise stated in response

11    to a specific Interrogatory, Plaintiff will limit its response to the time period: 2012-2020.

12            **III.    OBJECTIONS TO DEFINITIONS**

13        1.    Plaintiff objects to the Director Defendants' definition of "Advertisement" as vague

14    and ambiguous because the terms used to define it, such as "artistic," "other medium," "features,"

15    "desirability," "product" and others are subject to multiple interpretations. Plaintiff further objects

16    to the definition as vague, ambiguous, and unduly burdensome as to the phrase "implicitly . . .

17    promoting," to the extent it requires Plaintiff to determine whether a particular thing was intended

18    to or otherwise "implicitly" promote a product. Plaintiff further objects to the definition as

19    irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case because

20    it is not limited to advertisements or advertising for the products at issue in this Action.  Plaintiff

21    will interpret "advertisements" and "advertising" to refer to advertisements, as that term is used in

22    common parlance, for JUUL Products, as Plaintiff interprets that term.

23        2.    Plaintiff objects to the Director Defendants' definition of "Concern" and

24    "Concerning" as vague, ambiguous, confusing, overly broad, unduly burdensome, and

25    disproportionate to the needs of the case.  Plaintiff will interpret the terms to mean "discussing or

26    referring to."

27    No. 19-md-2913-WHO                          6                    PL. SFUSD'S RESPONSES AND
                                                                       OBJECTIONS TO DEFENDANTS HUH,
28                                                                     PRITZKER, AND VALANI'S FIRST SET
                                                                       OF INTERROGATORIES

3.    Plaintiff objects to the Director Defendants' definition of "Identify" and "Identifying" as vague, ambiguous, and useless when not used in reference to a person, document, or location. Plaintiff further objects to the definition when applied to persons, documents, locations, or otherwise to the extent it seeks to impose obligations or require actions beyond those required by the Discovery Rules.

4.    Plaintiff objects to the Director Defendants' definition of "JUUL Product" and "JUUL Products" as overly broad to the extent it includes products manufactured, designed, advertised, sold, or distributed by JLI's parents, affiliates, or subsidiaries, such as Pax products. Plaintiff will construe "JUUL Product" and "JUUL Products" to refer to JUUL devices and JUUL pods.

5.    Plaintiff objects to the Director Defendants' definition of "Person" and "Persons" as vague, ambiguous, irrelevant, overly broad, and disproportionate to the needs of the case to the extent it includes any "firm association, partnership, joint venture, corporation, related or associated company, trust, municipal corporation, state government, local government, all governmental bodies or agencies thereof, and all other legal entities."

6.    Plaintiff objects to the Director Defendants' definition of "You," "Your," and "Plaintiff" as vague, ambiguous, irrelevant, overly broad, and disproportionate to the needs of the case to the extent it would require Plaintiff to respond to these Interrogatories on behalf of "each named Plaintiff" or "other persons acting on each Plaintiff's behalf." Plaintiff will construe the terms to mean San Francisco Unified School District, and responds to these Interrogatories based on information currently in the possession, custody, or control of San Francisco Unified School District.

## IV.    OBJECTIONS TO INSTRUCTIONS

1.    Plaintiff objects to Instructions 1 through 8 to the extent that each Instruction purports to impose obligations or require actions beyond those required by the Federal Rules of Civil Procedure, the Local Rules, or the Court's applicable orders.

PL. SFUSD'S RESPONSES AND OBJECTIONS TO DEFENDANTS HUH, PRITZKER, AND VALANI'S FIRST SET OF INTERROGATORIES

1

## V.    SPECIFIC RESPONSES AND OBJECTIONS

2    **INTERROGATORY NO. 1**:

3          Identify any public statements made by any Non-Management Director that You contend

4    form the basis of liability to You, including (i) the content of each particular statement; (ii) which

5    Non-Management Director made each particular public statement; (iii) when each public statement

6    was made; (iv) where each statement was made; (v) the audience to whom each statement was

7    made; (vi) how the statement was false or misleading, or otherwise was wrongful; and (vii) any

8    sources memorializing each public statement.

9    **RESPONSE TO INTERROGATORY NO. 1**:

10         Plaintiff incorporates by reference the Objections, including the Objections to Definitions

11    and Instructions, set forth above.

12         ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

13    because it contains multiple discrete subparts.

14         ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

15    impermissibly premature contention interrogatory.  *See, e.g.*, *Amgen Inc. v. Sandoz Inc.*, No. 14-

16    CV-04741-RS (MEJ), 2016 WL 1039029, at *3 (N.D. Cal. Mar. 15, 2016) (finding contention

17    interrogatories premature "before substantial documentary or testimonial discovery has been

18    completed") (collecting cases); *see also Kim v. City of Santa Clara*, No. C 09-0025 RS, 2009 WL

19    4021389, at *2 (N.D. Cal. Nov. 19, 2009) ("[I]n cases where defendants presumably have access

20    to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to

21    answer these kinds of questions, early in the pretrial period, is sufficiently likely to be productive

22    to justify the burden that responding can entail.").

23         ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

24    burdensome, and disproportionate to the needs of the case.  The Interrogatory contains multiple

25    subparts that seek granular details about allegations that are already developed and supported by

26    documentary evidence in the Complaint.  This Interrogatory, along with the other Interrogatories

27

28

PL. SFUSD'S RESPONSES AND
                                                                           OBJECTIONS TO DEFENDANTS HUH,
                                                                           PRITZKER, AND VALANI'S FIRST SET
                                                                           OF INTERROGATORIES

1  the Director Defendants have served, appear intended to "systematically track all the allegations

2  in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

3  abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

4  *Campbell v. Facebook Inc.*, No. 13-CV-0599-6PJH(MEJ), 2015 WL 3533221, at *4 (N.D. Cal.

5  June 3, 2015) (quoting *In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 337 (N.D. Cal. 1985)).

6      Plaintiff also objects to the Interrogatory as overly broad, unduly burdensome, and

7  disproportionate to the needs of the case because it seeks information about "***each*** statement," and

8  "***any*** sources memorializing each" such statement.  Courts find such interrogatories "are often

9  overly broad and unduly burdensome."  *Haggarty v. Wells Fargo Bank, N.A.*, No. 10-2416 CRB

10  JSC, 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) (construing requests for "each" and

11  "any" as seeking "each material" and "any material" facts and documents); *see also Kim*, 2009

12  WL 4021389, at *2 (finding responding party is not required to state "non-material matters");

13  *Mancini v. Ins. Corp. of N.Y.*, No. CIV. 07CV1750-L NLS, 2009 WL 1765295, at *3 (S.D. Cal.

14  June 18, 2009) (modifying the language in each interrogatory to seek the "material or principal

15  facts").  For this reason, Plaintiff will interpret the Interrogatory to seek the material or principal

16  facts and documents that identify the public statements made by the Director Defendants that form

17  the basis of liability in this action.

18      Plaintiff also objects to the Interrogatory as overly broad, unduly burdensome, and

19  disproportionate to the needs of the case to the extent it seeks information about public statements

20  made by any Director Defendant that may form the basis of liability to Plaintiff on issues beyond

21  the scope of the claims asserted in this action.

22      Plaintiff further objects to this Interrogatory as vague and ambiguous because it is unclear

23  whether the undefined phrase "public statements" refers to statements made to the public,

24  statements available publicly regardless of to whom they were made, or something else.

25      Plaintiff also objects to the use of "Identify" as vague, ambiguous, and useless as used in

26  this Interrogatory because the Director Defendants' supplied definition, "to provide information

27  No. 19-md-2913-WHO                      9                  PL. SFUSD'S RESPONSES AND
                                                              OBJECTIONS TO DEFENDANTS HUH,
28                                                            PRITZKER, AND VALANI'S FIRST SET
                                                              OF INTERROGATORIES

that specifically identifies . . . the information or item requested," does not clarify what information is sought.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving the foregoing objections, Plaintiff states, based on the information currently available to it following a reasonable, good faith search: None.

**INTERROGATORY NO. 2**:

Identify any specific affirmative actions by any Non-Management Director that you contend forms the basis of liability to You, including (i) each specific action taken; (ii) which Non-Management Director took each specific action; (iii) when that individual Non-Management Director took that specific action; and (iv) where the individual Non-Management Director took each specific action.

**RESPONSE TO INTERROGATORY NO. 2**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3 (finding contention interrogatories premature "before substantial documentary or testimonial discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial period, is sufficiently likely to be productive to justify the burden that responding can entail.").

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple subparts that seek granular details about allegations that are already developed and supported by documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories the Director Defendants have served, appear intended to "systematically track all the allegations in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'" *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

Plaintiff also objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case because it seeks information about "***any*** specific affirmative actions" and "***each*** specific action." Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any" and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the material or principal facts that identify the Director Defendants' affirmative actions that form the basis of liability in this action.

Plaintiff also objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks information about the Director Defendants' affirmative acts that may form the basis of liability to Plaintiff on issues beyond the scope of the claims asserted in this action.

Plaintiff also objects to the use of "Identify" as vague, ambiguous, and useless as used in this Interrogatory because the Director Defendants' supplied definition, "to provide information that specifically identifies . . . the information or item requested," does not clarify what information is sought.

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

**Objection – Privilege**. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

**Response**. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

Before JUUL Products launched and from at least November 2014, Pritzker and Valani shaped the misleading marketing regarding JUUL Products' nicotine content. In November 2014, Monsees, Pritzker, and Valani discussed "the addiction issue" with JUUL Products, working on "defining our strategy" for how to frame and market their nicotine product.[1] In January 2015, the Board, including Pritzker and Valani, gave directions to the marketing team on several key topics related to JLI's marketing approach regarding nicotine.[2] Sarah Richardson noted that "[a]fter yesterday's board meeting conversation," she and Gal Cohen sought to clarify "direction from the board on their comfort level with" aspects of the marketing approach. She noted that "sales materials are currently shown/spoken to only, not left behind" with retailers or customers, and that those materials reference JUUL Products' "cigarette-level nicotine satisfaction," "nicotine delivery akin to a cigarette," and "nicotine absorption rates." Unsure whether they had the Board's approval, the marketing team planned to ask the Board to clarify its "comfort level with 'satisfying' messaging," and "Is our goal still that we are champions of transparency, public health, and consumer interests? If so – at what level are we comfortable being proactive in achieving this?"[3] She also commented that JUUL Products' nicotine salts "patent is public. Patent features blood nicotine chart. Whether we publicize on our end, we need to at least be prepared to speak to it

---

[1] JLI01259728.

[2] JLI01121750.

[3] *Id.*

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

should people search and find it."[4] The Board, including Pritzker and Valani, gave affirmative input and approval on these questions.

The Board, including Pritzker and Valani, gave affirmative input and approval on JUUL Products' launch campaign and marketing strategy. Nick Pritzker testified that "Some of [Vaporized imagery] was for sure [presented to the Board before launch]. I don't know whether the -- how much detail, but it was presented."[5] In January 2015, JLI's marketing strategy, including the planned partnership with the #1 youth media magazine, Vice, was presented to the Board for their approval before its launch. The presentation to the Board focused on "key pillars" of the marketing strategy, such as "win[ing] with the 'cool crowd' in critical markets," "lead[ing] with digital and ecommerce foundation," "us[ing] external audiences to communicate nuanced messages around early adoption 'coolness' and product performance," and "build[ing] loyal consumer community via social media," by "leverage[ing] PR & event content to engage consumers & promote brand hype at launch."[6] On March 3, 2015, the directors were shown images of specific "Vaporized models."[7] On March 23, 2015, the Board, including Pritzker and Valani, held a Board meeting, where they "reviewed and discussed the Company's existing and proposed advertising and promotional materials and shared with Mr. Monsees and Mr. Dunlap their perspectives on some of the new collateral materials."[8] Former COO Scott Dunlap testified that at the Board meeting in March 2015, Mumby presented the entire "Vaporized" campaign to the Board, and "at the end of the meeting they approved the campaign with some suggestions," and those suggestions were "all quite minor."[9] Dunlap testified that Pritzker asked at that meeting, "have we checked the ages of all the models" included in "Vaporized" campaign, and commented

---

[4] *Id.*

[5] Pritzker Dep. Tr. at 61-62.

[6] JLI00212009.

[7] INREJUUL_00174386.

[8] JLI05156484.

[9] Dunlap Dep. Tr. at 77:12-23 [Rough Transcript].

13                    PL. SFUSD'S RESPONSES AND
                                                                OBJECTIONS TO DEFENDANTS HUH,
                                                                PRITZKER, AND VALANI'S FIRST SET
                                                                OF INTERROGATORIES

that "we wouldn't want that to come back and bite us."[10] Dunlap testified that JLI's Board in 2015 was "very hands on with regard to the marketing" and "this was a highly involved Board at JUUL."[11]

Since at least August 3, 2015, Valani, Pritzker, and Huh formulated a plan to take control of JLI and remove Monsees as CEO.[12] On October 5, 2015, Valani, Pritzker, and Huh implemented their plan to take control of JLI by removing Monsees as CEO and forming the Executive Committee to run the company in the place of a CEO. Pritzker, Valani, and Huh were members of the Executive Committee, which was "formed to provide more consistent and focused direction to the company" and to "usher in the next phase of growth for the business."[13] Huh served as the Executive Chairman and Pritzker as Co-Chairman.[14] The Board, including Pritzker, Valani, and Huh, removed Monsees as CEO; Huh became the "lead director with executive authority," with executives of JLI, including Monsees, Bowen, Danaher, and Mumby, "reporting to Hoyoung."[15] The next day, on October 6, 2015, Richard Mumby acknowledged that their seizing power would help JLI grow. He said to Huh, Pritzker, and Valani, "Many thanks for the candid conversation yesterday. Not an easy moment for PAX Labs, but I'm excited about the future that these changes will afford. … Clearly, improving our sales strategy and integrating sales/marketing better is crucial to our growth."[16] In the October 2015 Board meeting where signs of youth use of JUUL were addressed, Dunlap testified that Huh and Pritzker took the position of "sales grows at all costs."[17] When Huh and Pritzker fired Dunlap, Dunlap asked them, "what are your intentions for the business," to which Huh responded "gross sales" and "get sales on track"; when Dunlap asked

---

[10] Dunlap Dep. Tr. at 80:2-22 [Rough Transcript].
[11] Dunlap Dep. Tr. at 133:23-134:2, 137:25-138:12 [Rough Transcript].
[12] MDL_RV0033695.
[13] JLI01369470.
[14] *Id.*
[15] MDL_AA0000245.
[16] JLI00214159.
[17] Dunlap Dep. Tr. at 238:22-239:25 [Rough Transcript].

how they planned to do that, Pritzker said that Monsees would be removed from his position as CEO and they would be "taking executive control of the business."[18]

Just as planned, Pritzker, Valani, and Huh oversaw and ensured JLI's sales success and growth, as evidenced by examples of their specific control and involvement described below.

In March 2016, Huh approved JUUL Products' marketing rebrand retaining some colorful elements of "Vaporized" campaign.[19] Later, in October 2017, the Board, including Pritzker, Valani, and Huh also approved content for the misleading "Make the Switch" campaign.[20] In July 2018, Valani helped fellow Board member, Zach Frankel, prepare a detailed plan for managing JLI, which included recruiting and hiring JLI staff, marketing, and JUUL Products pricing.[21]

Valani ordered a detailed messaging strategy and action items to respond to negative press.[22] In January 2018, Ashley Gould, Chief Administrative Officer, reported directly to Valani, Monsees, and Kevin Burns about a study linking teen e-cigarette use to an increased likelihood of trying cigarettes. Valani directed JLI's response, including running "strategic media analysis [to] see where these articles are coming from," "debunk[ing] the studies, . . . ideally in coordination with independent researchers," supporting Tobacco 21 financially, hiring a "credible head" of youth policy, and estimating "the number of adult smokers that have switched."[23] Valani directed Gould to give a "week-by-week progress" report on these tasks.[24]

In April 2018, Burns suggested making several key hires to Valani and Pritzker, seeking their input; he also noted that he would seek Pritzker and Valani's approval on a draft response to

---

[18] Dunlap Dep. Tr. at 146:4-147:4 [Rough Transcript].

[19] JLI00219757.

[20] JLI00322485 (the Board reviewed sample marketing campaign materials, and Pritzker alone nixed a specific one, noting that he "didn't like 'smokers deserve better alternatives'").

[21] MDL_RV0027010 – MDL_RV0027022.

[22] MDL_RV0038390.

[23] JLI00147328.

[24] Id.

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

an inquiry by U.S. Senators and a press release regarding youth prevention efforts.[25]  Also in April 2018, Valani edited a press release about JLI's "Comprehensive Strategy to Prevent Underage Use" and sent his redline to Burns[26] In December 2018, Burns sought approval from Valani and Pritzker on a specific advertising campaign, saying, "I suggest we proceed" with specified television, print, and radio spots.[27] Valani, copying Pritzker, approved only certain videos, deciding "[w]e shouldn't air the short form ones."[28]

Pritzker and Valani negotiated the Altria deal in 2017 and 2018 at various locations. After which, Valani negotiated joint messaging between JLI and Altria regarding the Altria deal.[29]

**INTERROGATORY NO. 3**:

For each specific affirmative action identified in Interrogatory No. 2, identify each specific expense You have incurred due to that specific affirmative action, including (i) the type of expense; (ii) the date You incurred the expense; (iii) the amount of the expense; (iv) the sources of all funds used to pay the expense (e.g., insurance); and (v) Identify all documents that support your allegations as to the foregoing.

**RESPONSE TO INTERROGATORY NO. 3**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory.  *See, e.g., Amgen,* 2016 WL 1039029, at *3

---

[25] JLI10529705.

[26] JLI00151297; JLI00151298.

[27] JLI10071280.

[28] JLI10071228.

[29] MDL_RV0033422; MDL_RV0038439; MDL_RV0038391.

PL. SFUSD'S RESPONSES AND OBJECTIONS TO DEFENDANTS HUH, PRITZKER, AND VALANI'S FIRST SET OF INTERROGATORIES

1    (finding contention interrogatories premature "before substantial documentary or testimonial

2    discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

3    cases where defendants presumably have access to most of the evidence about their own behavior,

4    it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

5    period, is sufficiently likely to be productive to justify the burden that responding can entail.").

6       ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

7    burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

8    subparts that seek granular details about allegations that are already developed and supported by

9    documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

10   the Director Defendants have served, appear intended to "systematically track all the allegations

11   in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

12   abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

13   *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

14      Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and

15   disproportionate to the needs of the case because it asks Plaintiff to identify "***each*** specific

16   expense" Plaintiff incurred, the "source of ***all*** funds," and "***all*** documents" that support Plaintiff's

17   allegations. Courts find such interrogatories "are often overly broad and unduly burdensome."

18   *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking

19   material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party

20   is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the

21   language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff

22   will interpret the Interrogatory to seek the principal categories of expenses Plaintiff incurred.

23      Plaintiff also objects to the Interrogatory as unduly burdensome and disproportionate to the

24   needs of the case to the extent it would require Plaintiff to attribute specific expenses to specific

25   conduct. The Director Defendants and other Defendants, among other things, created a public

26   nuisance and wrongfully concealed information and have made false and/or misleading statements

27          PL. SFUSD'S RESPONSES AND
                                                    OBJECTIONS TO DEFENDANTS HUH,
28                                                  PRITZKER, AND VALANI'S FIRST SET
                                                    OF INTERROGATORIES

concerning the safety and/or use of JUUL Products and nicotine vaping, among other things, the totality of which caused Plaintiff to incur expenses. It would be unduly burdensome and disproportionate to the needs of the case to require Plaintiff to attribute specific acts to ***each*** expense incurred. With respect to Plaintiff's claims under RICO Act, the Interrogatory is also irrelevant because the Director Defendants are jointly and severally liable for the harm caused by the conspiracy they engaged in with others, not from each individual act taken to further the conspiracy.

Plaintiff also objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks information about the Director Defendants' affirmative actions that may form the basis of liability to Plaintiff on issues beyond the scope of the claims asserted in this action.

Plaintiff further objects to this Interrogatory as vague and ambiguous because the undefined phrases "type of expense" and "source of all funds" are subject to more than one interpretation.

Plaintiff also objects to the use of "Identify" as vague, ambiguous, and useless as used in this Interrogatory because the Director Defendants' supplied definition, "to provide information that specifically identifies . . . the information or item requested," does not clarify what information is sought.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search, Plaintiff states that Plaintiff has expended significant time and resources addressing the youth e-cigarette epidemic Defendants caused. Plaintiff has incurred lost

instructional time due to a rise in student e-cigarette incidents. Plaintiff has incurred time and costs to develop curriculum, education, and training for school staff, students (including Plaintiff's Youth Outreach Workers), and parents, guardians, and caregivers. For example, vaping prevention resources for schools developed and distributed by Plaintiff's School Health Programs staff, which included information and resources for elementary through high school staff. Materials included could be used to "train staff ... and families to recognize new vaping technology, understand the risks of usage, ... [i]mplement Health Education lessons in the classroom to teach students about the risk of usage ... [and to d]evelop a schoolwide plan to connect students to [Plaintiff's] Brief Intervention Services as an alternative to suspension."[30]

Other vaping education resources, developed by Plaintiff's nursing staff, include "Vaping 101" for high school, middle school, and elementary school staff, used for educating those staff and teachers regarding vaping.[31] Also, a Fall 2018 professional development training presented to Plaintiff's health educators and physical education teachers titled "JUUL School."[32] Plaintiff's Youth Outreach Coordinators, Youth Outreach Workers, Teens Tackle Tobacco leaders, each of which are paid a stipend for their work, made presentations focused on vaping to raise awareness among students. Plaintiff also purchased tobacco cessation training for its Youth Outreach Workers.[33] Plaintiff has also spent time developing middle school and high school lessons on e-cigarettes, including posters and visual aids. Plaintiff has incurred time and costs to offer support, intervention, and discipline to students, including Plaintiff's Brief Intervention Services, which Plaintiff previously hired a consultant to train its staff and Youth Outreach Workers on and still has a contract with the consultant for those same services. Plaintiff has incurred administrative time spent on developing new board policies and regulations to address vaping. Plaintiff has

---

[30] SFUSD_001589 ("Vaping usage rates are on the rise!").
[31] SFUSD_001793; SFUSD_001859; SFUSD_001803.
[32] SFUSD_001936.
[33] See, e.g., SFUSD_014279.

19                    PL. SFUSD'S RESPONSES AND OBJECTIONS TO DEFENDANTS HUH, PRITZKER, AND VALANI'S FIRST SET OF INTERROGATORIES

1    incurred time spent fielding additional media inquiries pertaining to e-cigarette use and vaping.

2    Plaintiff has incurred time and costs for installation of anti-vaping signage in school buildings.

3        Plaintiff has also incurred other harm not specifically itemized or accounted for as a

4    "specific expense" in a budget or other accounting line item and would have incurred additional

5    expenses had funds been available to do so, and will continue to incur additional expenses. These

6    expenses and costs include, but are not limited to, lost opportunity costs and other variable costs

7    that are not otherwise fixed in Plaintiff's budgets. While not specifically called for by this

8    Interrogatory, Plaintiff is seeking the equitable remedy of abatement.

9        Plaintiff receives funding from multiple sources, including federal, state, local, and private

10   funds.[34] Plaintiff's tobacco education program budget includes monies spent on staff time,

11   supplies, conference fees, and program evaluation relating to Plaintiff's tobacco prevention,

12   education, and awareness programs. Plaintiff's district-wide budget includes allocations for

13   staffing time, facilities, operations and other allocations that would include resources expended

14   relating to student use of ENDS products, including JUUL Products. Plaintiff's tobacco program

15   falls within the student, family, and community support department, specifically under health

16   education under restricted funds for the State. Since 2012, Plaintiff has received four grants related

17   to addressing vaping or e-cigarette use by students: (1) Tobacco Use Prevention Education (TUPE)

18   Grant (2012-Present); (2) County Technical Assistance for TUPE (2017-2020); (3) County

19   Technical Assistance Leadership Funds (2012-2020); (4) TUPE County Technical Assistance

20   Funds Grant (2020-21).

21   **INTERROGATORY NO. 4**:

22       Identify each specific omission or failure to act by any Non-Management Director that you

23   contend forms the basis of liability to You, including (i) the specific omission or failure to act; (ii)

24   which of the Non-Management Directors failed to act; (iii) when that individual Non-Management

25

26   _____
     [34] SFUSD_001342.

27

1    Directors failed to act; (iv) the source of any duty to act that you allege; and (v) any other individual

2    that you contend failed to act in the same respect.

3    **RESPONSE TO INTERROGATORY NO. 4**:

4        Plaintiff incorporates by reference the Objections, including the Objections to Definitions

5    and Instructions, set forth above.

6        ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

7    because it contains multiple discrete subparts.

8        ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

9    impermissibly premature contention interrogatory.  *See, e.g.*, *Amgen,* 2016 WL 1039029, at *3

10   (finding contention interrogatories premature "before substantial documentary or testimonial

11   discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

12   cases where defendants presumably have access to most of the evidence about their own behavior,

13   it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

14   period, is sufficiently likely to be productive to justify the burden that responding can entail.").

15       ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

16   burdensome, and disproportionate to the needs of the case.  The Interrogatory contains multiple

17   subparts that seek granular details about allegations that are already developed and supported by

18   documentary evidence in the Complaint.  This Interrogatory, along with the other Interrogatories

19   the Director Defendants have served, appear intended to "systematically track all the allegations

20   in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

21   abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

22   *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

23       Plaintiff also objects to the Interrogatory as overly broad, unduly burdensome, and

24   disproportionate to the needs of the case because it seeks information about "***each*** specific

25   omission or failure to act" and "***any*** other individual" that failed to act.  Courts find such

26   interrogatories "are often overly broad and unduly burdensome."  *Haggarty*, 2012 WL 4113341,

27

28

No. 19-md-2913-WHO                                21                    PL. SFUSD'S RESPONSES AND
                                                                       OBJECTIONS TO DEFENDANTS HUH,
                                                                       PRITZKER, AND VALANI'S FIRST SET
                                                                       OF INTERROGATORIES

at *2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that identify the Director Defendants' omissions and failures to act that are the bases of the claims in this action.

Plaintiff also objects to the Interrogatory as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks information about the Director Defendants' omissions or failures to act that may form the basis of liability to Plaintiff on issues beyond the scope of the claims asserted in this action.

Plaintiff also objects to the Interrogatory as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks information about "other individual[s] that . . . failed to act in the same respect" who are not Defendants in this action.

Plaintiff further objects to this Interrogatory as vague and ambiguous because the undefined term and phrases "omission," "failure to act," and "source of any duty" are subject to more than one interpretation.

Plaintiff also objects to the use of "Identify" as vague, ambiguous, and useless as used in this Interrogatory because the Director Defendants' supplied definition, "to provide information that specifically identifies . . . the information or item requested," does not clarify what information is sought.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

*Response*. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

Pritzker, Valani, and Huh allowed JUUL Products' marketing to continue, including the "Vaporized" campaign and later campaigns, despite misleading features and omissions regarding nicotine strength, content, potency, health, the JUUL Product as a cessation device, and despite knowing early marketing had youth appeal.[35] Pritzker and Valani omitted and allowed the omission of JLI's phase 0 nicotine study results from public discussion of JUUL Products' nicotine delivery.

The Director Defendants allowed JLI and co-conspirator Altria to make misleading statements regarding Mint being a traditional tobacco flavor to regulators and the public, and failed to correct such statements. In April 2018, JLI studied the flavor preferences of 13- to 17-year-old youth through two studies. The first study, carried out by McKinsey & Company ("McKinsey"), generated over 1,000 responses from teens aged 13 to 17 years old. The second study, conducted by DB Research, appears to have gathered data from a focus group of 16 kids in Bethesda, Maryland, and Baltimore, Maryland.[36] Both studies found that teens' co-favorite JUUL Products flavors were Mango and Mint, and that teens found only two third-party flavors more desirable than Mango and Mint: "Cotton Candy" (McKinsey) [37] and "Fruit Loops" (DB Research). [38] Consistent with the flavor studies and JUUL Products' wide youth appeal, JLI retail data showed

---

[35] Pritzker Dep. Tr. at 101-03 (JLI's Board did not order the end of "Vaporized" campaign anytime in the summer of 2015); Deposition of Alexander Asseily at 80-84 (JLI did not pull down "Vaporized" campaign in response to youth-oriented criticism in the summer of 2015).

[36] INREJUUL_00035325.

[37] INREJUUL_00124965.

[38] *Id.*

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

JUUL Products' most popular flavors were Mango and Mint.[39] Though the McKinsey study did not survey teens' preference for menthol, the DB Research study did and found that only 28% of teens found menthol appealing, whereas 72% of teens liked Mint.[40] This is unsurprising, as "JLI's Mint" flavor was designed not to taste like a Menthol cigarette. Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport" cigarette that "doesn't have that good peppermint taste like cool [M]int."[41] Similarly, a research study commissioned by JLI reported that there was "No Implied Relationship between Mint & Menthol" and "JUUL users under-index in menthol cigarette use or previous menthol cigarette use. This would imply that former-menthol smokers are not the driver behind the popularity of mint flavored JUULpods."[42]

In April 2018, Valani and Pritzker received and reviewed a JLI social media study performed by D1 Capital Partners ("the study"). The study showed that JUUL Products' popularity was in a large part attributed to "trendy teen/young adults/Millennials who's (sic) use starts with Juul rather than cigarettes."[43] The study further showed that 16% of social media users who posted about JUUL Products were under the age of 18.[44] In September 2018, Valani agreed that JUUL Products were a large factor in many high schools' vaping problem.[45]

On October 16, 2018, JLI presented an "Action Plan" to the FDA in response to then-FDA Commissioner Gottlieb's September 25, 2018 letter.[46] Despite knowing that Mint was a favorite

---

[39] 5185468678 (2018 JUULpods' retail volume data by flavor showing 35.9% of sales were Mint, 35.5% of sales for Mango, and only 9.1% and 1.5% of sales were Tobacco and Menthol, respectively).

[40] INREJUUL_00035325.

[41] Reddit, *How does Classic Menthol compare to Cool Mint*, https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_c ool_mint/ (last visited February 10, 2020).

[42] INREJUUL_00079307.

[43] MDL_NP007037 through MDL_NP007062.

[44] *Id*.

[45] MDL_RV0027747.

[46] JUUL Labs, Inc. *FDA Presentation*, 2 (Oct. 16, 2018); INREJUUL_00182989.

of youth, JLI's Action Plan proposed only partial restrictions on sales of its fruity and sweet flavor pods and no restrictions of Mint flavored products, asserting the "critical importance of flavored products in helping adult smokers switch." JLI's presentation to the FDA also fraudulently characterized its Mint flavored pods as a "tobacco and menthol product," as opposed to a "flavored product." Despite their control of the company, Pritzker, Valani, and Huh allowed these statements and omissions and failed to correct them.

The source of the duty to act comes from the federal and state statutory and common laws identified in Plaintiff's Complaint as well as the facts, as detailed above, that (a) the Director Defendants made and allowed JLI to make partial representations concerning that same subject matter; (b) the Director Defendants possessed superior, non-public information regarding the same subject matter; and (c) the omissions concerned central features of JUUL Products' safety.

**INTERROGATORY NO. 5**:

For each specific omission or failure to act identified in Interrogatory No. 4, identify each specific expense You have incurred due to that specific omission or failure to act, including (i) the type of expense; (ii) the date You incurred the expense; (iii) the amount of the expense; (iv) the sources of all funds used to pay the expense (e.g., insurance); and (v) Identify all documents that support your allegations as to the foregoing.

**RESPONSE TO INTERROGATORY NO. 5**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3 (finding contention interrogatories premature "before substantial documentary or testimonial discovery has been completed") (collecting cases).

**Objection – Scope**. Plaintiff objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple subparts that seek granular details about allegations that are already developed and supported by documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories the Director Defendants have served, appear intended to "systematically track all the allegations in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'" *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case because it asks Plaintiff to identify "*each* specific expense" Plaintiff incurred, the "source of *all* funds," and "*all* documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal categories of expenses Plaintiff incurred and principal documents supporting those allegations.

Plaintiff also objects to the Interrogatory as unduly burdensome and disproportionate to the needs of the case to the extent it would require Plaintiff to attribute specific expenses to specific omissions or failures to act. The Director Defendants and other Defendants, among other things, created a public nuisance and wrongfully concealed information and made false and/or misleading statements concerning the safety and/or use of JUUL Products and nicotine vaping, among other things, the totality of which caused Plaintiff to incur expenses. It would be unduly burdensome and disproportionate to the needs of the case to require Plaintiff to attribute specific omissions and failures to *each* expense incurred. With respect to Plaintiff's RICO Act claim, the Interrogatory is

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

also irrelevant because the Director Defendants are jointly and severally liable for the harm caused by the conspiracy they engaged in with others, not from each individual omission or failure to act taken to further the conspiracy.

Plaintiff also objects to the Interrogatory as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks information about "other individual[s] that . . . failed to act in the same respect" who are not Defendants in this action.

Plaintiff further objects to this Interrogatory as vague and ambiguous because the undefined term and phrases "omission," "failure to act," and "type of expense," and "source of all funds" are subject to more than one interpretation.

Plaintiff also objects to the use of "Identify" as vague, ambiguous, and useless as used in this Interrogatory because the Director Defendants' supplied definition, "to provide information that specifically identifies . . . the information or item requested," does not clarify what information is sought.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

Plaintiff has expended significant time and resources addressing the youth e-cigarette epidemic Defendants caused. Plaintiff has incurred lost instructional time due to a rise in student e-cigarette incidents. Plaintiff has incurred time and costs to develop curriculum, education, and training for school staff, students (including Plaintiff's Youth Outreach Workers), and parents, guardians, and caregivers. For example, vaping prevention resources for schools developed and distributed by Plaintiff's School Health Programs staff, which included information and resources

for elementary through high school staff. Materials included could be used to "train staff … and families to recognize new vaping technology, understand the risks of usage, … [i]mplement Health Education lessons in the classroom to teach students about the risk of usage … [and to d]evelop a schoolwide plan to connect students to [Plaintiff's] Brief Intervention Services as an alternative to suspension."[47]

Other vaping education resources, developed by Plaintiff's nursing staff, include "Vaping 101" for high school, middle school, and elementary school staff, used for educating those staff and teachers regarding vaping.[48] Also, a Fall 2018 professional development training presented to Plaintiff's health educators and physical education teachers titled "JUUL School."[49] Plaintiff's Youth Outreach Coordinators, Youth Outreach Workers, Teens Tackle Tobacco leaders, each of which are paid a stipend for their work, made presentations focused on vaping to raise awareness among students. Plaintiff also purchased tobacco cessation training for its Youth Outreach Workers.[50] Plaintiff has also spent time developing middle school and high school lessons on e-cigarettes, including posters and visual aids. Plaintiff has incurred time and costs to offer support, intervention, and discipline to students, including Plaintiff's Brief Intervention Services, which Plaintiff previously hired a consultant to train its staff and Youth Outreach Workers on and still has a contract with the consultant for those same services. Plaintiff has incurred administrative time spent on developing new board policies and regulations to address vaping. Plaintiff has incurred time spent fielding additional media inquiries pertaining to e-cigarette use and vaping. Plaintiff has incurred time and costs for installation of anti-vaping signage in school buildings.

Plaintiff has also incurred other harm not specifically itemized or accounted for as a "specific expense" in a budget or other accounting line item and would have incurred additional expenses had funds been available to do so, and will continue to incur additional expenses. These

---

[47] SFUSD_001589 ("Vaping usage rates are on the rise!").
[48] SFUSD_001793; SFUSD_001859; SFUSD_001803.
[49] SFUSD_001936.
[50] *See, e.g.*, SFUSD_014279.

PL. SFUSD'S RESPONSES AND
                                                                              OBJECTIONS TO DEFENDANTS HUH,
                                                                              PRITZKER, AND VALANI'S FIRST SET
                                                                              OF INTERROGATORIES

expenses and costs include, but are not limited to, lost opportunity costs and other variable costs that are not otherwise fixed in Plaintiff's budgets. While not specifically called for by this Interrogatory, Plaintiff is seeking the equitable remedy of abatement.

Plaintiff receives funding from multiple sources, including federal, state, local, and private funds.[51] Plaintiff's tobacco education program budget includes monies spent on staff time, supplies, conference fees, and program evaluation relating to Plaintiff's tobacco prevention, education, and awareness programs. Plaintiff's district-wide budget includes allocations for staffing time, facilities, operations and other allocations that would include resources expended relating to student use of ENDS products, including JUUL products. Plaintiff's tobacco program falls within the student, family, and community support department, specifically under health education under restricted funds for the State. Since 2012, Plaintiff has received four grants related to addressing vaping or e-cigarette use by students: (1) Tobacco Use Prevention Education (TUPE) Grant (2012-Present); (2) County Technical Assistance for TUPE (2017-2020); (3) County Technical Assistance Leadership Funds (2012-2020); (4) TUPE County Technical Assistance Funds Grant (2020-21).

**INTERROGATORY NO. 6**:

State the facts on which You base Your allegation in the Tucson Unified Complaint[52] at paragraph 201 (or the comparable allegation in Your Complaint) that Nicholas Pritzker and Riaz Valani "knew that the data JLI (then Ploom) was pushing on the public was false and misleading" and that they "ignored the Phase 0 study and omitted it from public discussion of JUUL's nicotine delivery," including (i) what data Nicholas Pritzker and Riaz Valani knew was misleading; (ii) how Nicholas Pritzker and Riaz Valani personally acquired the knowledge that the data JLI "was pushing on the public was false and misleading"; (iii) what specifically you allege Nicholas

---

[51] SFUSD_001342.

[52] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets references to the Tucson Unified Complaint to refer to the similar allegations in the SFUSD Complaint, which appear in paragraph 203.

29                    PL. SFUSD'S RESPONSES AND
                                                                              OBJECTIONS TO DEFENDANTS HUH,
                                                                              PRITZKER, AND VALANI'S FIRST SET
                                                                              OF INTERROGATORIES

1    Pritzker and Riaz Valani were told about "variability in puffing behavior" between the Phase 0

2    and Phase 1 studies; (iv) when Nicholas Pritzker and Riaz Valani personally acquired that

3    knowledge; (v) what specific actions Nicholas Pritzker and Riaz Valani took to "omit[]" the Phase

4    0 study from public discussion; (vi) when Nicholas Pritzker and Riaz Valani took each such action;

5    and (vii) Identify all documents that support your allegations as to the foregoing.

6    **RESPONSE TO INTERROGATORY NO. 6**:

7        Plaintiff incorporates by reference the Objections, including the Objections to Definitions

8    and Instructions, set forth above.

9        ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

10   because it contains multiple discrete subparts.

11       ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

12   impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

13   (finding contention interrogatories premature "before substantial documentary or testimonial

14   discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

15   cases where defendants presumably have access to most of the evidence about their own behavior,

16   it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

17   period, is sufficiently likely to be productive to justify the burden that responding can entail.").

18       ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

19   burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

20   subparts that seek granular details about allegations that are already developed and supported by

21   documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

22   the Director Defendants have served, appear intended to "systematically track all the allegations

23   in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

24   abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

25   *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

26

27                      PL. SFUSD'S RESPONSES AND
                                                                          OBJECTIONS TO DEFENDANTS HUH,
28                                                                        PRITZKER, AND VALANI'S FIRST SET
                                                                          OF INTERROGATORIES

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its allegations in paragraph 203 of the Complaint or "*all* documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the referenced allegations in paragraph 203 of the Complaint.

Plaintiff further objects to this Interrogatory as vague, ambiguous, and confusing because it is unclear what "specific acts" would be taken to "omit" or "otherwise ignore[] the Phase 0 study," because omissions, by definition, are marked by a failure to act. Plaintiff also objects to the Interrogatory as vague and ambiguous because the phrase "how [one] personally acquire[s] . . . knowledge" is subject to more than one interpretation.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

In 2014, JLI engineers ran a pilot pharmacokinetic study in New Zealand, called the Phase 0 Clinical Study.[53] The Board, including Pritzker and Valani, discussed the Phase 0 and Phase 1

---

[53] INREJUUL_00350930.

nicotine studies.[54] Ploom's May 2014 Board Presentation informed then-Board members Pritzker and Valani that "Phase 0 clinical trial results complete with exceptional results. JUULpod prototypes are yielding considerably more vapor per puff than any small form factor competitor,"[55] and that the company planned to "complete clinical study of JUUL nicotine chemistry by mid June."[56] In June of 2014, Monsees provided Valani with additional detail about the nicotine studies that was not included in the May Board presentation, telling Valani that "Device produces 4.5+ mg per puff even in detuned state, higher than any product on market but in a smaller form factor. Not shown is at full power Juul can deliver 8+ mg/puff, rivaling most large form factor tank-based products."[57] Huh testified that the Board discussed the "pharmacokinetic" properties of JUUL Products on numerous occasions, and that he and the Board reviewed summaries of Gal Cohen's discussions with an outside advisory board on nicotine and addiction.[58] The Board, including Pritzker and Valani, discussed JUUL Products' nicotine content, salts formulation, comparison to cigarettes profiles, and the "addiction issue" with selling a nicotine product.[59] Pritzker and Valani acquired the relevant knowledge from these discussions and other discussions within the company.

**INTERROGATORY NO. 7**:

State the facts on which You base Your allegation in the Tucson Unified Complaint at paragraph 205[60] (or the comparable allegation in Your Complaint) that the Non-Management Directors "directed and approved the content of the JUUL website," including (i) which Non-Management Directors "directed and approved the content of the JUUL website"; (ii) what specific

---

[54] INREJUUL_00016443-INREJUUL_00016507 (July 9, 2014 Board Deck); MDL_RV0000255 (May 2014 Board Deck).

[55] MDL_RV0000257.

[56] MDL_RV0000288.

[57] MDL_RV0025943.

[58] Huh Dep. Tr. at 123:17-128:8 [Rough Transcript].

[59] JLI01259728; JLI01121750

[60] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 207 in the SFUSD Complaint.

1   content on the JUUL website each individual Non-Management Director directed and approved;

2   (iii) what specific actions each individual Non-Management Director personally took to "direct[]"

3   or "approve[]" the "content of the JUUL website"; (iv) when each individual Non-Management

4   Director took each such action; and (v) Identify all documents that support your allegations as to

5   the foregoing.

6   **RESPONSE TO INTERROGATORY NO. 7**:

7       Plaintiff incorporates by reference the Objections, including the Objections to Definitions

8   and Instructions, set forth above.

9       ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

10  because it contains multiple discrete subparts.

11      ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

12  impermissibly premature contention interrogatory. *See, e.g.*, *Amgen,* 2016 WL 1039029, at *3

13  (finding contention interrogatories premature "before substantial documentary or testimonial

14  discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

15  cases where defendants presumably have access to most of the evidence about their own behavior,

16  it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

17  period, is sufficiently likely to be productive to justify the burden that responding can entail.").

18      ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

19  burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

20  subparts that seek granular details about allegations that are already developed and supported by

21  documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

22  the Director Defendants have served, appear intended to "systematically track all the allegations

23  in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

24  abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

25  *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

26

27           PL. SFUSD'S RESPONSES AND
                                                    OBJECTIONS TO DEFENDANTS HUH,
28                                                  PRITZKER, AND VALANI'S FIRST SET
                                                    OF INTERROGATORIES

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its allegations in paragraph 207 of the Complaint and "**all** documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the referenced allegations in paragraph 207 of the Complaint.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

Pritzker, Valani, and Huh—through the Executive Committee—acted as JLI's CEO from 2015-2016, and were generally involved at a granular level even after a new CEO was hired. This involvement included, for example, Huh approving marketing materials that would appear publicly, including on the website[61]; Pritzker directly involved in editing the content of JLI's corporate website in May 2017[62]; and in April 2018, Valani and Pritzker editing a youth prevention press release, noting that "we took a close look at the last draft and don't want to get these small

---

[61] JLI00219757.
[62] JLI01345258.

items wrong" and "think it's critical to get this right."[63] Valani continued with his involvement in editing JLI's youth prevention material into 2019.[64] Their granular involvement, combined with examples of direct involvement with the website and public statements, show that Pritzker, Valani, and Huh directed and approved the content of the JLI's website.

**INTERROGATORY NO. 8**:

State the facts on which You base Your allegation in the Tucson Unified Complaint at paragraph 205[65] (or the comparable allegation in Your Complaint) that the Non-Management Directors "directed and approved the distribution channels" for JUUL Products, including (i) which Non-Management Directors "directed and approved the distribution channels" for JUUL Products; (ii) which specific distribution channel(s) for JUUL Products each individual Non-Management Director directed and approved; (iii) what specific actions each individual Non-Management Director personally took to "direct[]" or "approve[]" the "distribution channels" for JUUL Products; (iv) when each individual Non-management Director took each such action; and (v) Identify all documents that support your allegations as to the foregoing.

**RESPONSE TO INTERROGATORY NO. 8**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3 (finding contention interrogatories premature "before substantial documentary or testimonial

---

[63] JLI00151300.

[64] MDL_RV0032132

[65] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 207 in the SFUSD Complaint.

1    discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n
2    cases where defendants presumably have access to most of the evidence about their own behavior,
3    it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial
4    period, is sufficiently likely to be productive to justify the burden that responding can entail.").

5         ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly
6    burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple
7    subparts that seek granular details about allegations that are already developed and supported by
8    documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories
9    the Director Defendants have served, appear intended to "systematically track all the allegations
10   in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery
11   abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"
12   *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

13        Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and
14   disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its
15   allegations in paragraph 207 of the Complaint and "***all*** documents" that support Plaintiff's
16   allegations. Courts find such interrogatories "are often overly broad and unduly burdensome."
17   *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking
18   material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party
19   is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the
20   language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff
21   will interpret the Interrogatory to seek the principal facts that support the referenced allegations in
22   paragraph 207 of the Complaint.

23        ***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental
24   impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert
25   disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable
26   Court orders.

27
PL. SFUSD'S RESPONSES AND
                                                                                    OBJECTIONS TO DEFENDANTS HUH,
28                                                                                  PRITZKER, AND VALANI'S FIRST SET
                                                                                    OF INTERROGATORIES

**Response**. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

Pritzker, Valani, and Huh—through the Executive Committee—acted as JLI's CEO from 2015-2016, and were generally involved at a granular level even after a new CEO was hired. This involvement included, for example, Huh going on sales trips to distributor Sheetz with Scott Varner[66]. Various Board meeting minutes and slide decks also evidence review and discussion of distribution channels. In December 2017, Valani was involved in JLI's distribution and dissemination. For example, he initiated a conversation checking the progress on plans to sell JUUL devices in vending machines, asking for early design images and constructs.[67]

Their granular involvement, combined with other examples of direct involvement with growth and operations, show that Pritzker, Valani, and Huh participated in the direction and approval of JLI's distribution channels.

**INTERROGATORY NO. 9**:

State the facts on which You base Your allegation in the Tucson Unified Complaint at paragraph 225[68] (or the comparable allegation in Your Complaint) that, "with the knowledge and support of" the Non-Management Directors, JLI "made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device," including (i) each "false and misleading statement" by JLI "to the public that JUUL was created and designed as a smoking cessation device"; (ii) which Non-Management Directors had "knowledge" that each such statement was false and misleading; (iii) when each individual Non-Management Director personally acquired that "knowledge"; (iv) how each individual Non-Management Director

---

[66] MDL_HUH0000825.

[67] JLI00308379.

[68] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 227 in the SFUSD Complaint.

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

personally acquired that "knowledge"; (v) what each individual Non-Management Director personally did to provide "support" to any false or misleading statement; (vi) when each individual Non-Management Director personally provided that "support"; and (vii) Identify all documents that support your allegations as to the foregoing.

**RESPONSE TO INTERROGATORY NO. 9**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3 (finding contention interrogatories premature "before substantial documentary or testimonial discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial period, is sufficiently likely to be productive to justify the burden that responding can entail.").

***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple subparts that seek granular details about allegations that are already developed and supported by documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories the Director Defendants have served, appear intended to "systematically track all the allegations in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'" *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

1   allegations in paragraph 227 of the Complaint, "*each* false and misleading statement," and "*all*

2   documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly

3   broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests for

4   "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL

5   4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*,

6   2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or

7   principal facts")  For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts

8   that support the referenced allegations in paragraph 231 of the Complaint.

9       ***Response***. Subject to and without waiving Plaintiff's Specific and General Objections,

10  Plaintiff states, based on the information currently available to Plaintiff following a reasonable,

11  good faith search:

12      JLI made public statements, advertising, marketing, website content, etc. that stated or

13  implied that the JUUL Product was a cessation device, including the Make the Switch advertising

14  campaign. Pritzker, Valani, Huh, the rest of the Board, and the company wanted to market the

15  JUUL Product as a cessation device,[69] and JLI could have applied for approval to market the JUUL

16  Product as a cessation or reduced-risk device, but chose not to do so.[70] Pritzker, Valani, and Huh

17  knew that by regulation, they weren't allowed to explicitly call their device a cessation device or

18  imply that the JUUL Product is safer than cigarettes.[71] They also knew from the Phase 0 and Phase

19  1 nicotine studies that the JUUL Product delivered as much nicotine as a cigarette or more,[72] that

20

21

22  [69] Asseily Dep. Tr. at 109 ("we were creating a product, a smoking cessation device for adult
        smokers").

23  [70] Bowen Dep. Tr. at 292-94.

24  [71] Asseily Dep. Tr. at 107-108 ("I was frustrated that we were handcuffed somewhat in doing so
        by the rules and regulations around how you can market tobacco products.");

25      MDL_RV0026762 (Frankel noting to Valani that an ad campaign "claiming we are healthier
        than cigarettes" would be "dangerous").

26  [72] INREJUUL_00016443-INREJUUL_00016507.

27
PL. SFUSD'S RESPONSES AND
28                                                                OBJECTIONS TO DEFENDANTS HUH,
                                                                PRITZKER, AND VALANI'S FIRST SET
                                                                OF INTERROGATORIES

1  because the vapor emitted from the JUUL Product contained nicotine, the product was addictive.[73]

2  In February 2019, Valani admitted that a JUULpod "is indeed a full pack of cigarettes...[b]ut that

3  isn't messaged well."[74] In short, they knew that the JUUL Product was not truly a cessation device,

4  and that claims and implications they approved and permitted the company to disseminate to the

5  contrary were false and misleading.

6  **INTERROGATORY NO. 10:**

7       State the facts on which You base Your allegation in the Tucson Unified Complaint at

8  paragraph 289[75] (or the comparable allegation in Your Complaint) that, "under the leadership of"

9  the Non-Management Directors, JLI "marketed nicotine to kids," including (i) what specific

10  actions each individual Non-Management Director personally took to provide that "leadership"

11  with respect to each individual act of marketing to kids by JLI that You allege; (ii) when each such

12  action occurred; and (iii) Identify all documents that support your allegations as to the foregoing.

13  **RESPONSE TO INTERROGATORY NO. 10:**

14       Plaintiff incorporates by reference the Objections, including the Objections to Definitions

15  and Instructions, set forth above.

16       ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

17  because it contains multiple discrete subparts.

18       ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

19  impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

20  (finding contention interrogatories premature "before substantial documentary or testimonial

21  discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

22  cases where defendants presumably have access to most of the evidence about their own behavior,

---

24  [73] JLI01259728; JLI01121750

25  [74] MDL_RV0038219 – MDL_RV0038220

26  [75] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be
       referring to paragraph 291 in the SFUSD Complaint.

1    it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

2    period, is sufficiently likely to be productive to justify the burden that responding can entail.").

3        ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

4    burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

5    subparts that seek granular details about allegations that are already developed and supported by

6    documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

7    the Director Defendants have served, appear intended to "systematically track all the allegations

8    in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

9    abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

10   *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

11       Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and

12   disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

13   allegations in paragraph 291 of the Complaint and "***all*** documents" that support Plaintiff's

14   allegations. Courts find such interrogatories "are often overly broad and unduly burdensome."

15   *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking

16   material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party

17   is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the

18   language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff

19   will interpret the Interrogatory to seek the principal facts that support the referenced allegations in

20   paragraph 291 of the Complaint.

21       Plaintiff further objects to this Interrogatory as vague and ambiguous because the

22   undefined phrase "individual act of marketing" is subject to more than one interpretation.

23       ***Response***. Subject to and without waiving Plaintiff's Specific and General Objections,

24   Plaintiff states, based on the information currently available to Plaintiff following a reasonable,

25   good faith search:

26

27       No. 19-md-2913-WHO                              41                   PL. SFUSD'S RESPONSES AND
                                                                          OBJECTIONS TO DEFENDANTS HUH,
28                                                                           PRITZKER, AND VALANI'S FIRST SET
                                                                                  OF INTERROGATORIES

1     Pritzker, Valani, and Huh oversaw and controlled JLI while it marketed a product with

2     clear youth-appeal. They acted as CEO while serving on the Executive Committee, which was

3     "formed to provide more consistent and focused direction to the company" and to "usher in the

4     next phase of growth for the business."[76] Huh served as the Executive Chairman and Pritzker as

5     Co-Chairman.[77] The Board, including Pritzker, Valani, and Huh, removed Monsees as CEO; Huh

6     became the "lead director with executive authority," with executives of JLI, including Monsees,

7     Bowen, Danaher, and Mumby, "reporting to Hoyoung."[78]

8           As described above, the Director Defendants retained control of JLI even after a new CEO

9     was hired.[79] For example, Pritzker controlled several aspects of JLI's branding. He was directly

10    involved in creating JLI's corporate website in May 2017. Pritzker dictated specific changes to the

11    content on the site in a conversations with Ashley Gould.[80] Also in May 2017, Ashley Gould asked

12    the Board for their feedback on a proposed name for the parent company that JUUL Products

13    would be sold under, and Pritzker responded, "I'd like to discuss," evaluating potential names, and

14    seeking to ensure that the JUUL brand name would still be the most prominent on any packaging.[81]

15    In October 2017, the Board reviewed sample marketing campaign materials, and Pritzker alone

16    nixed a specific one, noting that he "didn't like 'smokers deserve better alternatives.'"[82]

17          Valani was actively involved in developing marketing strategies that "leverage user

18    generated content" on social media. On July 16, 2016, Adam Bowen emailed Tyler Goldman about

19    social media posts by children about JUUL Products, stating, "I'm astounded by this 'ad campaign'

20

21    ――――――――――
       [76] JLI01369470.

22     [77] *Id.*

       [78] MDL_AA0000245.
23
       [79] *See, e.g.*, JLI01345258; JLI00151300; JLI00417815 (Pritzker and Valani "are active on the
24         board as well as providing strategic advice to the company on a weekly basis").

       [80] JLI01345258.
25
       [81] JLI01345255.
26     [82] JLI00322485.

27                       PL. SFUSD'S RESPONSES AND
                                                                    OBJECTIONS TO DEFENDANTS HUH,
28                                                                  PRITZKER, AND VALANI'S FIRST SET
                                                                        OF INTERROGATORIES

1  that apparently some rich east coast boarding school kids are putting on."[83] Bowen added that

2  "Riaz [Valani] was thinking maybe we can leverage user generated content . . ."[84]

3      In January 2015, the Board, including Pritzker and Valani, gave directions to the marketing

4  team on several key topics related to JLI's marketing approach regarding nicotine.[85] Sarah

5  Richardson noted that "[a]fter yesterday's board meeting conversation," she and Gal Cohen sought

6  to clarify "direction from the board on their comfort level with" aspects of the marketing approach.

7  Unsure whether they had the Board's approval, the marketing team planned to ask the Board to

8  clarify its "comfort level with 'satisfying' messaging," and "Is our goal still that we are champions

9  of transparency, public health, and consumer interests? If so – at what level are we comfortable

10 being proactive in achieving this?"[86] The Board, including Pritzker and Valani, gave affirmative

11 input and approval on these questions.

12      The Board, including Pritzker and Valani, also gave affirmative input and approval on

13 JUUL Products' launch campaign and marketing strategy. Pritzker testified that "Some of

14 [Vaporized imagery] was for sure [presented to the Board before launch]. I don't know whether

15 the -- how much detail, but it was presented."[87] Former COO Scott Dunlap testified that at the

16 Board meeting in March 2015, Mumby presented the entire "Vaporized" campaign to the Board,

17 and "at the end of the meeting they approved the campaign with some suggestions," and those

18 suggestions were "all quite minor."[88] Dunlap testified that Pritzker asked at that meeting, "have

19 we checked the ages of all the models" included in the "Vaporized" campaign, and commented

20 that "we wouldn't want that to come back and bite us."[89] Dunlap testified that JLI's Board in 2015

21

22  [83] JLI00382271.

23  [84] *Id.*

     [85] JLI01121750

24  [86] *Id.*

25  [87] Pritzker Dep. Tr. at 61-62.

     [88] Dunlap Dep. Tr. at 77:12-23 [Rough Transcript].

26  [89] Dunlap Dep. Tr. at 80:2-22 [Rough Transcript].

27

                                                   PL. SFUSD'S RESPONSES AND
28                                                 OBJECTIONS TO DEFENDANTS HUH,
                                                   PRITZKER, AND VALANI'S FIRST SET
                                                   OF INTERROGATORIES

was "very hands on with regard to the marketing" and "this was a highly involved Board at JUUL."[90] In January 2015, JLI's marketing strategy, including the planned partnership with the #1 youth media magazine, Vice, was presented to the Board for their approval before its launch. The presentation to the Board focused on "key pillars" of the marketing strategy, such as "win[ing] with the 'cool crowd' in critical markets," "lead[ing] with digital and ecommerce foundation," "us[ing] external audiences to communicate nuanced messages around early adoption 'coolness' and product performance," and "build[ing] loyal consumer community via social media," by "leverage[ing] PR & event content to engage consumers & promote brand hype at launch."[91]

On March 3, 2015, the Board was shown images of specific "Vaporized" models on the company's teaser site.[92] Pritzker commented on the youthfulness of the models, and there was indication that management would not use models if the Board objected.[93] Ms. Kania noted that "we have quite the arsenal of model images to work with, and that they should let us know if the ones we selected are going to be problematic. So just waiting on any further feedback if they do a pass with the board."[94] Pritzker testified that he knew "Vaporized" was perceived as having youth appeal: "I don't know if it was attractive to kids. I know it was perceived as something that would be attractive to kids. I don't know if it actually was."[95] In fact, he did know it was attractive to kids, because his daughter and son-in-law also repeatedly warned him about the youth appeal of the advertising the JUUL Product's flavors around the time of JUUL Product's launch.[96]

Under the direction of Pritzker, Valani, and Huh, JLI continued to market a product that appealed to youth with its flavors, stealthy design, "party mode" flashing LED lights, and youth-

---

[90] Dunlap Dep. Tr. at 133:23-134:2 and 137:25-138:12 [Rough Transcript].

[91] JLI00212009

[92] INREJUUL_00174386

[93] Id.

[94] INREJUUL_00174387

[95] Pritzker Dep. Tr. at 671.

[96] See response to Interrogatory No. 12 (describing communications between Pritzker and his daughter and son-in-law).

oriented advertising. Despite knowing at least by the end of June 2015 that the "Vaporized" campaign and JUUL's fruity flavors were "clearly teen oriented,"[97] Pritzker, Valani, and Huh allowed the campaign to continue and took no action to end or change it until JLI was publicly criticized by Stephen Colbert.[98] Flavors that appealed to youth were never removed entirely. Even years later when JLI voluntarily limited the availability of some flavors, the popular Mint flavor, which studies showed teens favored, remained unrestricted on the market.

In 2017, the Board—controlled at that time by Pritzker, Valani, and Huh—continued to make decisions on the details of the media plans for marketing. For example, a JLI marketing employee reported to JLI's media vendor, Mediasmith, that JLI's "CMO presented the entire media plan to the board," but "we need to put the plan on hold" because the Board did not approve. She also acknowledged that JLI's Board was aware their message was reaching a youth audience, noting that "What we need to do now is educate the board" on "the ways we can ensure [the] message is NOT reaching an unintended, young audience."[99]

---

[97] MDL_NP000594; *see also* MDL_NP006775; MDL_AA0000343 (Valani receiving AdAge article).

[98] Pritzker Dep. Tr. at 101-03 (Board did not order the end of "Vaporized" campaign anytime in the summer of 2015); Asseily Dep. at 80-84 (JLI did not pull down "Vaporized" campaign in response to youth-oriented criticism in the summer of 2015); Mumby Dep. Tr. at 655-56 ("Vaporized" images were replaced with "updated creative concepts" after Colbert piece mentioning Juul aired).

[99] INREJUUL_00100719

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

In addition to internal documents and communications, there is circumstantial evidence reflecting the Director Defendants' leadership marketing nicotine to kids.[100] While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth. Through that same timeframe, youth e-cigarette rates nearly doubled from more than 11% in 2017 to more than 20% in 2018. Through October 5, 2019 (the last date for which data was available), rates of youth e-cigarette use continued to increase, tracking the growth of JUUL Products. This correlation is reflected in the graph below.



## INTERROGATORY NO. 11:

State the facts on which You base Your allegations in the Tucson Unified Complaint at paragraph 300[101] (or the comparable allegations in Your Complaint) that, in March of 2015, the

---

[100] *See* Nielsen: Tobacco All Channel Data; National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youthand-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey.

[101] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 302 in the SFUSD Complaint.

1   Non-Management Directors "supervised the advertising campaigns that would accompany the
2   launch of JUUL," including (i) the entire content of each advertising campaign that You contend
3   the Non-Management Director supervised; (ii) what each individual Non-Management Director
4   personally did to "supervise[]" each such campaigns; (iii) all affirmative actions taken by any
5   individual Non-Management Director to supervise each such campaign; (iv) when each such
6   action occurred; and (v) Identify all documents that support your allegations as to the foregoing.

7   **RESPONSE TO INTERROGATORY NO. 11**:

8       Plaintiff incorporates by reference the Objections, including the Objections to Definitions
9   and Instructions, set forth above.

10      ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound
11  because it contains multiple discrete subparts.

12      ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an
13  impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3
14  (finding contention interrogatories premature "before substantial documentary or testimonial
15  discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n
16  cases where defendants presumably have access to most of the evidence about their own behavior,
17  it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial
18  period, is sufficiently likely to be productive to justify the burden that responding can entail.").

19      ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly
20  burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple
21  subparts that seek granular details about allegations that are already developed and supported by
22  documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories
23  the Director Defendants have served, appear intended to "systematically track all the allegations
24  in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery
25  abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"
26  *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

27                     PL. SFUSD'S RESPONSES AND
28                                                         OBJECTIONS TO DEFENDANTS HUH,
                                                           PRITZKER, AND VALANI'S FIRST SET
                                                           OF INTERROGATORIES

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its allegations in paragraph 302 of the Complaint, a description of the "entire content of each advertising campaign," and the identity of "*all* documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the referenced allegations in paragraph 302 of the Complaint.

Plaintiff further objects to this Interrogatory as vague and ambiguous because the undefined phrase "individual act of marketing" is subject to more than one interpretation.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

Pritzker and Valani supervised the "Vaporized" campaign, reviewing models, images, and giving input before the campaign and product launched later that summer.

In January 2015, the Board, including Pritzker and Valani, gave directions to the marketing team on several key topics related to JLI's marketing approach regarding nicotine.[102] Sarah

---

[102] JLI01121750

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

Richardson noted that "[a]fter yesterday's board meeting conversation," she and Gal Cohen sought to clarify "direction from the board on their comfort level with" aspects of the marketing approach. Unsure whether they had the Board's approval, the marketing team planned to ask the Board to clarify its "comfort level with 'satisfying' messaging," and "Is our goal still that we are champions of transparency, public health, and consumer interests? If so – at what level are we comfortable being proactive in achieving this?"[103] The Board, including Pritzker and Valani, gave affirmative input and approval on these questions.

The Board, including Pritzker and Valani, also gave affirmative input and approval on the JUUL Product's launch campaign and marketing strategy. Pritzker testified that "Some of [Vaporized imagery] was for sure [presented to the Board before launch]. I don't know whether the -- how much detail, but it was presented."[104] In January 2015, JLI's marketing strategy, including the planned partnership with the #1 youth media magazine, Vice, was presented to the Board for their approval before its launch. The presentation to the Board focused on "key pillars" of the marketing strategy, such as "win[ing] with the 'cool crowd' in critical markets," "lead[ing] with digital and ecommerce foundation," "us[ing] external audiences to communicate nuanced messages around early adoption 'coolness' and product performance," and "build[ing] loyal consumer community via social media," by "leverage[ing] PR & event content to engage consumers & promote brand hype at launch."[105] On March 3, 2015, the Board was shown images of specific "Vaporized" models on the company's teaser site.[106] Former COO Scott Dunlap testified that at the Board meeting in March 2015, Mumby presented the entire "Vaporized" campaign to the Board, and "at the end of the meeting they approved the campaign with some suggestions," and those suggestions were "all quite minor."[107] Dunlap testified that Pritzker asked

---

[103] *Id.*

[104] Pritzker Dep. Tr. at 61-62.

[105] JLI00212009.

[106] INREJUUL_00174386.

[107] Dunlap Dep. Tr. at 77:12-23 [Rough Transcript].

PL. SFUSD'S RESPONSES AND OBJECTIONS TO DEFENDANTS HUH, PRITZKER, AND VALANI'S FIRST SET OF INTERROGATORIES

1  at that meeting, "have we checked the ages of all the models" included in the "Vaporized"
2  campaign, and commented that "we wouldn't want that to come back and bite us."[108] Dunlap
3  testified that JLI's Board in 2015 was "very hands on with regard to the marketing" and "this was
4  a highly involved Board at JUUL."[109]

5       On March 23, 2015, the Board, including Pritzker and Valani, held a Board meeting, where
6  they "reviewed and discussed the Company's existing and proposed advertising and promotional
7  materials and shared with Mr. Monsees and Mr. Dunlap their perspectives on some of the new
8  collateral materials."[110] Former COO Scott Dunlap testified that at the Board meeting in March
9  2015, Mumby presented the entire "Vaporized" campaign to the Board, and "at the end of the
10 meeting they approved the campaign with some suggestions," and those suggestions were "all
11 quite minor."[111] Pritzker asked at that meeting, "have we checked the ages of all the models"
12 included in "Vaporized" campaign, and commented that "we wouldn't want that to come back and
13 bite us."[112] Dunlap testified that JLI's Board in 2015 was "very hands on with regard to the
14 marketing" and "this was a highly involved Board at Juul."[113]

15 **INTERROGATORY NO. 12**:

16       State the facts on which You base Your allegations in the Tucson Unified Complaint at
17 paragraph 317[114] (or the comparable allegations in Your Complaint) that the Non-Management
18 Directors "knew that the ads" for the JUUL Product's launch "targeted youth" and that the Non-
19 Management Directors "had the authority to determine which models to use" during the launch of
20 the JUUL Product including (i) each specific ad that you contend "targeted youth," (ii) which of

---

[108] Dunlap Dep. Tr. at 80:2-22 [Rough Transcript].
[109] Dunlap Dep. Tr. at 133:23-134:2, 137:25-138:12 [Rough Transcript].
[110] JLI05156484.
[111] Dunlap Dep. Tr. at 77:12-23 [Rough Transcript].
[112] Dunlap Dep. Tr. at 80:2-22 [Rough Transcript].
[113] Dunlap Dep. Tr. at 133:23-134:2, 137:25-138:12 [Rough Transcript].
[114] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 319 in the SFUSD Complaint.

the Non-Management Directors "knew" that each such ad "targeted youth"; (iii) how each individual Non-Management Director personally acquired that knowledge with respect to each such ad; (iv) when each individual Non-Management Director personally acquired that knowledge; (v) which of the Non-Management Directors "had the authority to determine which models to use"; (vi) the facts underlying the assertion that those individual Non-Management Directors "had the authority to determine which models to use"; (vii) the source of any legal obligation that you contend the Non-Management Directors had to determine which models to use during the launch of the JUUL Product; and (viii) Identify all documents that support your allegations as to the foregoing.

**RESPONSE TO INTERROGATORY NO. 12**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3 (finding contention interrogatories premature "before substantial documentary or testimonial discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial period, is sufficiently likely to be productive to justify the burden that responding can entail.").

***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple subparts that seek granular details about allegations that are already developed and supported by documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories the Director Defendants have served, appear intended to "systematically track all the allegations

51                    PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'" *Campbell*, 2015 WL 3533221, at \*4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its allegations in paragraph 319 of the Complaint, a description of "***each*** specific ad," and the identity of "***all*** documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at \*2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at \*2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at \*3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the referenced allegations in paragraph 319 of the Complaint.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

The entire "Vaporized" campaign targeted youth, as did advertisements touting the fruity and desert flavors of JUUL Products.

The "Vaporized" campaign and its imagery was presented to the Board of Directors of JLI prior to the launch of the JUUL Product.[115] JLI's marketing department presented JLI's teaser site,

---

[115] Pritzker Dep. Tr. at 61-62 ("Some of it was for sure. I don't know whether the -- how much detail, but it was presented").

52                PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

noting there was commentary on the youthfulness of the models and indicating that management would not use models if Board objected.[116] Ms. Kania noted that "we have quite the arsenal of model images to work with, and that they should let us know if the ones we selected are going to be problematic. So just waiting on any further feedback if they do a pass with the board."[117] On March 23, 2015, the Board, including Pritzker and Valani, held a Board meeting, where they "reviewed and discussed the Company's existing and proposed advertising and promotional materials and shared with Mr. Monsees and Mr. Dunlap their perspectives on some of the new collateral materials."[118] Former COO Scott Dunlap testified that at the Board meeting in March 2015, Mumby presented the entire "Vaporized" campaign to the Board, and "at the end of the meeting they approved the campaign with some suggestions," and those suggestions were "all quite minor."[119] Pritzker asked at that meeting, "have we checked the ages of all the models" included in "Vaporized" campaign, and commented that "we wouldn't want that to come back and bite us."[120] Dunlap testified that JLI's Board in 2015 was "very hands on with regard to the marketing" and "this was a highly involved Board at Juul."[121]

Valani and Pritzker had authority to object as the two largest investors and Board members, and as Board members who controlled four of the seven Board seats. Huh was not on the Board prior to launch.

Pritzker knew the "Vaporized" campaign had youth appeal. He himself commented on the youthfulness of the models.[122] He testified that he knew the "Vaporized" campaign was perceived as having youth appeal: "I don't know if it was attractive to kids. I know it was perceived as

---

[116] INREJUUL_00174386.
[117] INREJUUL_00174387.
[118] JLI05156484.
[119] Dunlap Dep. Tr. at 77:12-23 [Rough Transcript].
[120] Dunlap Dep. Tr. at 80:2-22 [Rough Transcript].
[121] Dunlap Dep. Tr. at 133:23-134:2, 137:25-138:12 [Rough Transcript].
[122] INREJUUL_00174386.

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

something that would be attractive to kids. I don't know if it actually was."[123] In fact, he did know it was attractive to kids, because his daughter and son-in-law repeatedly warned him about the youth appeal of the advertising and the JUUL Product's flavors around the time of the JUUL Product's launch:

- Chris Olin forwarded to Pritzker on June 1, 2015, the day the JUUL Product launched, an exchange between himself and Pritzker's ███████████████, highlighting the youth appeal. Chris asked, "What age do think this marketing targets?" with a link to JLI's Instagram page. ████ responded, "That's disgusting."[124]

- Regan Pritzker told Pritzker, "Personally, I think banning the 'fruity flavors' would be a good place to start from a regulation standpoint. Clearly teen oriented, no?"[125]

- Olin said to Pritzker on October 7, 2015, in response to Stephen Colbert's criticism of the JUUL Product's youthful advertising: "It's tragic to see the mass adoption of vaping by teens after decades spent eradicating smoking."[126]

Pritzker shared these concerns with Valani, Huh, and the Board.[127] The Board also reviewed the Ad Age article which criticized the "Vaporized" campaign's youth appeal at the end of June 2015,[128] and in early July 2015, discussed the "ethical" approach to JLI's advertising and whether JLI should "not do[] a lot of things we thought we would do like putting young people in our poster ads" to avoid being "in the same ethical barrel" as Big Tobacco.[129] The Board discussed

---

[123] Pritzker Dep. Tr. at 671.

[124] MDL_NP006751.

[125] MDL_NP000594.

[126] MDL_NP006775.

[127] MDL_NP000487 (Pritzker noting that he forwarded Olin's concerns to Handelsman for Board discussion); MDL_RV0026762 (Pritzker's "shitfit" re youth appeal, the age of models used in advertising).

[128] MDL_AA0000343.

[129] MDL_RV0026762.

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

these issues with Mumby and other management, and Mumby agreed to implement changes in

JLI's marketing based on the Board's feedback.[130]

Despite this, Dunlap testified that while he and Monsees advocated more aggressive

action in response to signs of youth usage, the Non-Management Directors advocated a less

aggressive approach.[131] According to Dunlap, youth usage was one of many topics raised with

the Board in discussions about not hitting sales numbers.[132] He testified that the options

presented to the Board were to slow down to be cautious about youth usage, and get even worse

sales figures, or plow ahead and take the risk of youth use in the name of better sales.[133] Dunlap

testified that Huh and Pritzker's position was "sales grows at all costs."[134]

**INTERROGATORY NO. 13**:

State the facts on which You base Your allegations in the Tucson Unified Complaint at

paragraph 317[135] (or the comparable allegations in Your Complaint) that the JLI Board of Directors

"signed off" on the JUUL Product "launch plans," including (i) the content of the "launch plans"

that You contend the JLI Board of Directors signed off on; and for each part of the JUUL Product

launch plans: (ii) what specific action or actions the JLI Board of Directors took to "sign off" on

it; (iii) what specific action or actions each Non-Management Director took to "sign off" on it; (iv)

when each such specific action occurred; (v) where each such specific action occurred; (vi) where,

if it all, each such action is documented or memorialized; and (vii) Identify all documents that

support your allegations as to the foregoing.

---

[130] MDL_RV0026762.

[131] Dunlap Dep. Tr. at 238:22-240:16 [Rough Transcript].

[132] *Id.*

[133] *Id.*

[134] Dunlap Dep. Tr. at 238:22-239:25 [Rough Transcript].

[135] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 319 in the SFUSD Complaint.

PL. SFUSD'S RESPONSES AND
                                        OBJECTIONS TO DEFENDANTS HUH,
                                        PRITZKER, AND VALANI'S FIRST SET
                                        OF INTERROGATORIES

1    **RESPONSE TO INTERROGATORY NO. 13**:

2         Plaintiff incorporates by reference the Objections, including the Objections to Definitions

3    and Instructions, set forth above.

4         ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

5    because it contains multiple discrete subparts.

6         ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

7    impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

8    (finding contention interrogatories premature "before substantial documentary or testimonial

9    discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

10   cases where defendants presumably have access to most of the evidence about their own behavior,

11   it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

12   period, is sufficiently likely to be productive to justify the burden that responding can entail.").

13        ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

14   burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

15   subparts that seek granular details about allegations that are already developed and supported by

16   documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

17   the Director Defendants have served, appear intended to "systematically track all the allegations

18   in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

19   abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

20   *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

21        Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and

22   disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

23   allegations in paragraph 319 of the Complaint and "***all*** documents" that support Plaintiff's

24   allegations. Courts find such interrogatories "are often overly broad and unduly burdensome."

25   *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking

26   material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party

27   No. 19-md-2913-WHO                    56                    PL. SFUSD'S RESPONSES AND
                                                                 OBJECTIONS TO DEFENDANTS HUH,
28                                                               PRITZKER, AND VALANI'S FIRST SET
                                                                 OF INTERROGATORIES

is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the referenced allegations in paragraph 319 of the Complaint.

Plaintiff also objects to this Interrogatory as vague and ambiguous because the undefined phrase "each part of the JUUL Product launch plans" is subject to more than one interpretation and it is unclear how Plaintiff should distinguish one part of the launch plans from another.

Plaintiff objects to subpart (vi) of the Interrogatory as duplicative of subpart (vii).

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion.  Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

The Board, including Pritzker and Valani, gave affirmative input and approval on JUUL Product's launch campaign and marketing strategy. Pritzker testified that "Some of [Vaporized imagery] was for sure [presented to the Board before launch]. I don't know whether the -- how much detail, but it was presented."[136] In January 2015, JLI's marketing strategy, including the planned partnership with the #1 youth media magazine, Vice, was presented to the Board for their approval before its launch. The presentation to the Board focused on "key pillars" of the marketing strategy, such as "win[ing] with the 'cool crowd' in critical markets," "lead[ing] with digital and ecommerce foundation," "us[ing] external audiences to communicate nuanced messages around early adoption 'coolness' and product performance," and "build[ing] loyal consumer community

---

[136] Pritzker Dep. Tr. at 61-62.

via social media," by "leverage[ing] PR & event content to engage consumers & promote brand hype at launch."[137]

On March 3, 2015, the Directors were shown images of specific "Vaporized models."[138] JLI's marketing department presented JLI's teaser site, noting there was commentary on the youthfulness of the models and indicating that management would not use models if Board objected.[139] Kania noted that "we have quite the arsenal of model images to work with, and that they should let us know if the ones we selected are going to be problematic. So just waiting on any further feedback if they do a pass with the Board."[140] On March 23, 2015, the Board, including Pritzker and Valani, held a Board meeting, where they "reviewed and discussed the Company's existing and proposed advertising and promotional materials and shared with Mr. Monsees and Mr. Dunlap their perspectives on some of the new collateral materials."[141] Former COO Scott Dunlap testified that at the Board meeting in March 2015, Mumby presented the entire "Vaporized" campaign to the Board, and "at the end of the meeting they approved the campaign with some suggestions," and those suggestions were "all quite minor."[142] Dunlap testified that Pritzker asked at that meeting, "have we checked the ages of all the models" included in the "Vaporized" campaign, and commented that "we wouldn't want that to come back and bite us."[143] Dunlap testified that JLI's Board in 2015 was "very hands on with regard to the marketing" and "this was a highly involved Board at JUUL."[144] To date, Plaintiffs are not aware of a document produced by Defendants that memorializes an official sign-off.

---

[137] JLI00212009.

[138] INREJUUL_00174386.

[139] INREJUUL_00174386.

[140] INREJUUL_00174387.

[141] JLI05156484.

[142] Dunlap Dep. Tr. at 77:12-23 [Rough Transcript].

[143] Dunlap Dep. Tr. at 80:2-22 [Rough Transcript].

[144] Dunlap Dep. Tr. at 133:23-134:2, 137:25-138:12 [Rough Transcript].

**INTERROGATORY NO. 14**:

State the facts on which You base Your allegations in the Tucson Unified Complaint at paragraph 379[145] (or the comparable allegations in Your Complaint) that the Non-Management Directors "directed and approved JUUL branding" and "directed and participated in every marketing campaign pushing the JUUL e-cigarette," including (i) which specific "JUUL branding" you contend the Non-Management Directors "directed and approved"; and for each specific instance of JUUL branding; (ii) which of the Non-Management Directors "directed and approved JUUL branding"; (iii) when each individual Non-Management Director "directed and approved JUUL branding"; (iv) what each individual Non-Management Director personally did to "direct[] and approve[] JUUL branding"; (v) the identity of each "marketing campaign pushing the JUUL e-cigarette"; (vi) the dates when each such marketing campaign ran (including beginning and end dates); (vii) where each specific "marketing campaign pushing the JUUL e-cigarette" ran, including particular states and political subdivisions thereof; (viii) what specific action or actions each individual Non-Management Director personally took to "direct" and "participate" in each such marketing campaign; (ix) when each individual Non-Management Director took each such action; and (x) Identify all documents that support your allegations as to the foregoing.

**RESPONSE TO INTERROGATORY NO. 14**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3 (finding contention interrogatories premature "before substantial documentary or testimonial

---

[145] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 381 in the SFUSD Complaint.

1    discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

2    cases where defendants presumably have access to most of the evidence about their own behavior,

3    it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

4    period, is sufficiently likely to be productive to justify the burden that responding can entail.").

5            ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

6    burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

7    subparts that seek granular details about allegations that are already developed and supported by

8    documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

9    the Director Defendants have served, appear intended to "systematically track all the allegations

10    in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

11    abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

12    *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

13            Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and

14    disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

15    allegations in paragraph 381 of the Complaint, "each specific instance of JUUL branding," and

16    "***all*** documents" that support Plaintiff's allegations. Courts find such interrogatories "are often

17    overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests

18    for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL

19    4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*,

20    2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or

21    principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts

22    that support the referenced allegations in paragraph 381 of the Complaint.

23            Plaintiff also objects to this Interrogatory as vague and ambiguous because it is unclear

24    what information is sought through the phrase "the identity of each 'marketing campaign," what

25    would constitute a "specific instance of JUUL branding," and how Plaintiff should distinguish one

26    instance of JUUL branding from another.

27

28

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

The "Vaporized" campaign and its imagery was presented to the Board, then including Pritzker and Valani, prior to the launch of the JUUL Product.[146] JLI's marketing department presented JLI's teaser site, noting there was commentary on the youthfulness of the models and indicating that management would not use models if the Board objected.[147] Kania noted that "we have quite the arsenal of model images to work with, and that they should let us know if the ones we selected are going to be problematic. So just waiting on any further feedback if they do a pass with the board."[148]

On March 23, 2015, the Board, including Pritzker and Valani, held a Board meeting, where they "reviewed and discussed the Company's existing and proposed advertising and promotional materials and shared with Mr. Monsees and Mr. Dunlap their perspectives on some of the new collateral materials."[149] Former COO Scott Dunlap testified that at the Board meeting in March 2015, Mumby presented the entire "Vaporized" campaign to the Board, and "at the end of the meeting they approved the campaign with some suggestions," and those suggestions were "all quite minor."[150] Dunlap testified that Pritzker asked at that meeting, "have we checked the ages of

---

[146] Pritzker Dep. Tr. at 61-62 ("Some of it was for sure. I don't know whether the -- how much detail, but it was presented").

[147] INREJUUL_00174386.

[148] INREJUUL_00174387.

[149] JLI05156484.

[150] Dunlap Dep. Tr. at 77:12-23 [Rough Transcript].

PL. SFUSD'S RESPONSES AND
                                        OBJECTIONS TO DEFENDANTS HUH,
                                        PRITZKER, AND VALANI'S FIRST SET
                                        OF INTERROGATORIES

all the models" included in the "Vaporized" campaign, and commented that "we wouldn't want that to come back and bite us."[151] Dunlap testified that JLI's Board in 2015 was "very hands on with regard to the marketing" and "this was a highly involved Board at JUUL."[152]

Valani and Pritzker had authority to object as the two largest investors and Board members, and as Board members who controlled four of the seven Board seats. Huh was not on the Board prior to launch, but did give feedback and approval for the advertising and marketing that occurred while he was on the Board.

Pritzker knew the "Vaporized" campaign had youth appeal. He himself commented on the youthfulness of the models.[153] He testified that he knew the "Vaporized" campaign was perceived as having youth appeal: "I don't know if it was attractive to kids. I know it was perceived as something that would be attractive to kids."[154] His daughter and son-in-law also repeatedly warned him about the youth appeal of the advertising and the JUUL Product's flavors around the time of the JUUL Product's launch. Pritzker shared these concerns with Valani, Huh, and the Board throwing a "shitfit."[155] The Board also reviewed the Ad Age article which criticized the "Vaporized" campaign's youth appeal at the end of June 2015,[156] and in early July 2015, discussed the "ethical" approach to JLI's advertising and branding and whether JLI should "not do[] a lot of things we thought we would do like putting young people in our poster ads" to avoid being "in the same ethical barrel" as Big Tobacco.[157] The Board discussed these issues with Mumby and other

---

[151] Dunlap Dep. Tr. at 80:2-22 [Rough Transcript].
[152] Dunlap Dep. Tr. at 133:23-134:2, 137:25-138:12 [Rough Transcript].
[153] INREJUUL_00174386.
[154] Pritzker Dep. Tr. at 671.
[155] MDL_NP000487 (Pritzker noting that he forwarded Olin's concerns to Handelsman for discussion); MDL_RV0026762 (Pritzker's "shitfit" regarding youth appeal and the age of models used in advertising).
[156] MDL_AA0000343.
[157] MDL_RV0026762.

PL. SFUSD'S RESPONSES AND
                                                                           OBJECTIONS TO DEFENDANTS HUH,
                                                                           PRITZKER, AND VALANI'S FIRST SET
                                                                           OF INTERROGATORIES

management, and Mumby agreed to implement changes in JLI's marketing based on the Board's feedback.[158]

Despite this, Dunlap testified that while he and Monsees advocated more aggressive action in response to signs of youth usage, the Non-Management Directors advocated a less aggressive approach.[159] According to Dunlap, youth usage was one of many topics raised with the Board in discussions about not hitting sales numbers.[160] He testified that the options presented to the Board were to slow down to be cautious about youth usage, and get even worse sales figures, or plow ahead and take the risk of youth use in the name of better sales.[161] Dunlap testified that Huh and Pritzker's position was "sales grows at all costs."[162]

When Huh and Pritzker fired Scott Dunlap, Dunlap asked them, "what are your intentions for the business," to which Huh responded "gross sales" and "get sales on track"; when Dunlap asked how they planned to do that, Pritzker said that Monsees would be removed from his position as CEO and they would be "taking executive control of the business."[163]

On October 5, 2015, Valani, Pritzker, and Huh removed Monsees as CEO and formed the Executive Committee to run the company in the place of a CEO. Pritzker, Valani, and Huh were members of the Executive Committee, which was "formed to provide more consistent and focused direction to the company" and to "usher in the next phase of growth for the business."[164] Huh served as the Executive Chairman and Pritzker as Co-Chairman.[165] Huh became the "lead director with executive authority," with executives of JLI, including Monsees, Bowen, Danaher, and

---

[158] MDL_RV0026762.

[159] Dunlap Dep. Tr. at 238:22-240:16 [Rough Transcript].

[160] *Id.*

[161] *Id.*

[162] Dunlap Dep. Tr. at 238:22-239:25 [Rough Transcript].

[163] Dunlap Dep. Tr. at 146:4-147:4 [Rough Transcript].

[164] JLI01369470.

[165] *Id.*

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

Mumby, "reporting to Hoyoung."[166] The next day, on October 6, 2015, Richard Mumby acknowledged that their seizing power would help JLI grow.[167]

The Executive Committee acted as the CEO of JLI, as evidenced by examples of their specific control and involvement described below.

In March 2016, Huh approved JLI's marketing rebrand retaining some colorful elements of "Vaporized" campaign.[168] In August 2017, JLI's "CMO presented the entire media plan to the Board"— controlled by Pritzker, Valani, and Huh—but noted "we need to put the plan on hold" because the Board did not approve.[169] Later, in October 2017, the Board, including Pritzker, Valani, and Huh also approved content for the misleading "Make the Switch" campaign.[170] Reviewing sample marketing campaign materials, Pritzker alone nixed a specific one, noting that he "didn't like 'smokers deserve better alternatives.'"[171]

Valani ordered detailed messaging strategy and action items to respond to negative press. In January 2018, Ashley Gould, Chief Administrative Officer, reported directly to Valani, Monsees, and Kevin Burns about a study linking teen e-cigarette use to an increased likelihood of trying cigarettes. Valani directed the Company's response, including running "strategic media analysis [to] see where these articles are coming from," "debunk[ing] the studies, . . . ideally in coordination with independent researchers," supporting Tobacco 21 financially, hiring a "credible head" of youth policy, and estimating "the number of adult smokers that have switched."[172] Valani directed Gould to give a "week-by-week progress" report on these tasks.[173]

---

[166] MDL_AA0000245.

[167] JLI00214159.

[168] JLI00219757.

[169] INREJUUL_00100719.

[170] JLI00322485.

[171] JLI00322485.

[172] JLI00147328.

[173] *Id.*

64                PL. SFUSD'S RESPONSES AND
                                                                OBJECTIONS TO DEFENDANTS HUH,
                                                                PRITZKER, AND VALANI'S FIRST SET
                                                                OF INTERROGATORIES

In asserting his control over JLI management, Valani coordinated with third party public relations companies such as Freuds in developing JLI's communications strategy.[174] Valani also personally prepared JLI's internal and external messaging.[175] In April 2018, Kevin Burns suggested making several key hires to Valani and Pritzker, seeking their input; he also noted that he would seek Pritzker and Valani's approval on a draft response to an inquiry by U.S. Senators and a press release regarding youth prevention efforts.[176] Also in April 2018, Valani edited a press release about JLI's "Comprehensive Strategy to Prevent Underage Use" and sent his redline to Kevin Burns[177] In December 2018, Burns sought approval from Valani and Pritzker on a specific advertising campaign, saying, "I suggest we proceed" with specified television, print, and radio spots.[178] Valani, copying Pritzker, approved only certain videos, deciding "[w]e shouldn't air the short form ones."[179]

These examples of Pritzker, Valani, and Huh exerting control over the company and reviewing, commenting on, and approving specific branding activity over the years support that they "directed and approved JUUL branding" and "directed and participated in every marketing campaign pushing the JUUL e-cigarette." Pritzker and Valani maintained control of JLI at all relevant times, and Huh participated in that control while a member of the Board. Defendants are both in the best position to know the exact dates and locations of JUUL's marketing campaigns and in possession of those documents.

---

[174] MDL_RV0029523.

[175] MDL_RV0027366; MDL_RV0034055.

[176] JLI10529705.

[177] JLI00151297; JLI00151298.

[178] JLI10071280.

[179] JLI10071228.

PL. SFUSD'S RESPONSES AND
                                                                                        OBJECTIONS TO DEFENDANTS HUH,
                                                                                        PRITZKER, AND VALANI'S FIRST SET
                                                                                        OF INTERROGATORIES

1

**INTERROGATORY NO. 15**:

2

State the facts on which You base Your allegations in the Tucson Unified Complaint at

3

paragraph 379[180] (or the comparable allegations in Your Complaint) that the Non-Management

4

Directors "had 'final say' over all marketing campaigns," including (i) which specific marketing

5

campaigns the Non-Management Directors "had 'final say' over"; (ii) the dates when each such

6

marketing campaign ran (including beginning and end dates); (iii) where each specific marketing

7

campaign ran, including particular states and political subdivisions thereof; (iv) the meaning of

8

"final say"; (v) which of the Non-Management Directors had "final say" over each specific

9

marketing campaign; (vi) what specific action or actions each individual Non-Management

10

Director took to exercise such "final say" as to each marketing campaign; (vii) the sources of each

11

individual Non-Management Director's authority to have "final say" over each specific marketing

12

campaign; and (viii) Identify all documents that support your allegations as to the foregoing.

13

**RESPONSE TO INTERROGATORY NO. 15**:

14

Plaintiff incorporates by reference the Objections, including the Objections to Definitions

15

and Instructions, set forth above.

16

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

17

because it contains multiple discrete subparts.

18

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

19

impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

20

(finding contention interrogatories premature "before substantial documentary or testimonial

21

discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

22

cases where defendants presumably have access to most of the evidence about their own behavior,

23

it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

24

period, is sufficiently likely to be productive to justify the burden that responding can entail.").

25

26

[180] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 381 in the SFUSD Complaint.

27

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,

28

                        PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

1    ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

2    burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

3    subparts that seek granular details about allegations that are already developed and supported by

4    documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

5    the Director Defendants have served, appear intended to "systematically track all the allegations

6    in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

7    abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

8    *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

9    Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and

10   disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

11   allegations in paragraph 381 of the Complaint and "***all*** documents" that support Plaintiff's

12   allegations. Courts find such interrogatories "are often overly broad and unduly burdensome."

13   *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking

14   material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party

15   is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the

16   language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff

17   will interpret the Interrogatory to seek the principal facts that support the referenced allegations in

18   paragraph 381 of the Complaint.

19   ***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental

20   impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert

21   disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable

22   Court orders.

23   ***Response***. Subject to and without waiving Plaintiff's Specific and General Objections,

24   Plaintiff states, based on the information currently available to Plaintiff following a reasonable,

25   good faith search: *see* response to Interrogatory No. 14, above.

26

27
PL. SFUSD'S RESPONSES AND
28                                                                      OBJECTIONS TO DEFENDANTS HUH,
                                                                       PRITZKER, AND VALANI'S FIRST SET
                                                                       OF INTERROGATORIES

1    **INTERROGATORY NO. 16**:

2    State the facts on which You base Your allegations in the Tucson Unified Complaint at

3    paragraph 386[181] (or the comparable allegations in Your Complaint) that the Non-Management

4    Directors "caused the Vaporized campaign . . . to be distributed via the mails and wires," including

5    (i) each specific element of the Vaporized campaign that you contend was distributed via the mail

6    and wires; (ii) the dates on which each such element of the Vaporized campaign was distributed

7    via the mail and wires; (iii) how each such element of the Vaporized campaign was distributed via

8    the mail and wires; (iv) each specific action or actions that each individual Non-Management

9    Director personally took to "cause" each element of the Vaporized campaign to be distributed via

10   the mail and wires; (v) when each such action or actions by each individual Non-Management

11   Director; and (vi) Identify all documents that support your allegations as to the foregoing.

12   **RESPONSE TO INTERROGATORY NO. 16**:

13   Plaintiff incorporates by reference the Objections, including the Objections to Definitions

14   and Instructions, set forth above.

15   ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

16   because it contains multiple discrete subparts.

17   ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

18   impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

19   (finding contention interrogatories premature "before substantial documentary or testimonial

20   discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

21   cases where defendants presumably have access to most of the evidence about their own behavior,

22   it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

23   period, is sufficiently likely to be productive to justify the burden that responding can entail.").

24

25   ───────────────

26   [181] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be
     referring to paragraph 388 in the SFUSD Complaint.

27                  PL. SFUSD'S RESPONSES AND
                                                                OBJECTIONS TO DEFENDANTS HUH,
28                                                              PRITZKER, AND VALANI'S FIRST SET
                                                                OF INTERROGATORIES

**Objection – Scope**. Plaintiff objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple subparts that seek granular details about allegations that are already developed and supported by documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories the Director Defendants have served, appear intended to "systematically track all the allegations in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'" *Campbell*, 2015 WL 3533221, at \*4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its allegations in paragraph 388 of the Complaint, "*each* specific element of the Vaporized campaign," and "*all* documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at \*2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at \*2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at \*3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the referenced allegations in paragraph 388 of the Complaint.

Plaintiff also objects to this Interrogatory as vague and ambiguous because it is unclear what would constitute a "specific element of the Vaporized campaign" and how Plaintiff should distinguish one element of the campaign from another.

Plaintiff further objects to this Interrogatory as confusing because it asks "how each such element of the Vaporized campaign was distributed" but specifies in the Interrogatory that the campaign was distributed "via the mail and wires." It is unclear what additional information, if any, is sought.

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

As described in response to the Interrogatories above, Pritzker and Valani approved the "Vaporized" campaign before launch, and Pritzker, Valani, and Huh ratified the "Vaporized" campaign after launch by failing to pull it down and ensuring it continued during the period where the Executive Committee acted as CEO.

The company caused "Vaporized" campaign advertisements to be published online, in magazines, on billboards, in stores where JUUL Products were sold, etc. Defendants are both in the best position to know the exact dates and locations of JLI's "Vaporized" campaigns and in possession of those documents.

**INTERROGATORY NO. 17**:

State the facts on which You base Your allegations in the Tucson Unified Complaint at paragraph 391[182] (or the comparable allegations in Your Complaint) that the "minutes" for meetings of the JLI Board of Directors are "highly sanitized," including (i) which specific Board minutes were "sanitized"; (ii) who "sanitized" each such set of Board minutes; (iii) when the identified Board minutes were "sanitized"; (iv) how the "sanitiz[ing]" was done; (v) the identity of each individual who gave directions for the Board minutes to be "sanitized," and who the directions were given to; (vi) when those directions were given; (vii) the specific content of the direction to sanitize the minutes; (viii) what specific information was removed from or not

---

[182] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 393 in the SFUSD Complaint.

1   included in each set of "sanitized" Board minutes; and (ix) Identify all documents that support

2   your allegations as to the foregoing.

3   **RESPONSE TO INTERROGATORY NO. 17**:

4       Plaintiff incorporates by reference the Objections, including the Objections to Definitions

5   and Instructions, set forth above.

6       ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

7   because it contains multiple discrete subparts.

8       ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

9   impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

10  (finding contention interrogatories premature "before substantial documentary or testimonial

11  discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

12  cases where defendants presumably have access to most of the evidence about their own behavior,

13  it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

14  period, is sufficiently likely to be productive to justify the burden that responding can entail.").

15      ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

16  burdensome, and disproportionate to the needs of the case.  The Interrogatory contains multiple

17  subparts that seek granular details about allegations that are already developed and supported by

18  documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

19  the Director Defendants have served, appear intended to "systematically track all the allegations

20  in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

21  abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

22  *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

23      Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and

24  disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

25  allegations in paragraph 393 of the Complaint and "***all*** documents" that support Plaintiff's

26  allegations. Courts find such interrogatories "are often overly broad and unduly burdensome."

27

28

*Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the referenced allegations in paragraph 393 of the Complaint.

Plaintiff also objects to this Interrogatory as vague and ambiguous because the question "how the sanitize[ing] was done" is subject to more than one interpretation.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

JLI's Board minutes generally contain little detail of the contents of discussions, including contentious discussions evidenced in other documents. For example, the Board asked Monsees to step down as CEO at a meeting on October 5, 2015.[183] Asseily described the discussion as a "pretty formidable debate," but the minutes reflect no such "vigorous debate."[184] There is no reference to Monsees stepping down as CEO at all in the minutes from October 5, 2015.[185] Further, JLI's Board minutes were written by the company's lawyers.[186]

---

[183] JLI00220988.

[184] Asseily Dep. Tr. at 194-95, 200.

[185] JLI00220988.

[186] Handelsman Dep. Tr. at 195 ("I believe that [lawyer] Jeff Patt acted as the secretary of the meeting and drafted the minutes to be circulated. I think it probably was typed at Katten Muchin").

PL. SFUSD'S RESPONSES AND OBJECTIONS TO DEFENDANTS HUH, PRITZKER, AND VALANI'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 18**:

State the facts on which You base Your allegations in the Tucson Unified Complaint at paragraph 395[187] (or the comparable allegations in Your Complaint) that the Non-Management Directors "continued to direct and approve" JUUL marketing campaigns "long after launch," including (i) the identity of each JUUL marketing campaign that each individual Non-Management Director "continued to direct and approve"; (ii) the dates when each such marketing campaign ran (including beginning and end dates); (iii) where each specific marketing campaign ran, including particular states and political subdivisions thereof; (iv) what specific action or actions each individual Non-Management Director personally took to "direct" and/or "approve" each such marketing campaign; (v) when each individual Non-Management Director took each such action; and (vi) Identify all documents that support your allegations as to the foregoing.

**RESPONSE TO INTERROGATORY NO. 18**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3 (finding contention interrogatories premature "before substantial documentary or testimonial discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial period, is sufficiently likely to be productive to justify the burden that responding can entail.").

---

[187] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 397 in the SFUSD Complaint.

***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple subparts that seek granular details about allegations that are already developed and supported by documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories the Director Defendants have served, appear intended to "systematically track all the allegations in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'" *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its allegations in paragraph 397 of the Complaint, a description of "***each*** marketing campaign," and "***all*** documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the referenced allegations in paragraph 397 of the Complaint.

Plaintiff also objects to this Interrogatory as vague and ambiguous because it is unclear what information is sought through the phrase "the identity of each JUUL marketing campaign."

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

1       ***Response***. Subject to and without waiving Plaintiff's Specific and General Objections,

2   Plaintiff states, based on the information currently available to Plaintiff following a reasonable,

3   good faith search: *see* response to Interrogatory No. 14, above.

4   **INTERROGATORY NO. 19**:

5       State the facts on which You base Your allegation in the Tucson Unified Complaint at

6   paragraph 485[188] (or the comparable allegations in Your Complaint) that the Non-Management

7   Directors "deceive[d] those purchasing a JUUL device and JUULpods as to how much nicotine

8   they were actually consuming," including (i) each specific action or actions that each individual

9   Non-Management Director personally took to "deceive those purchase a JUUL decide [sic] and

10  JUULpods as to how much nicotine they were actually consuming"[189]; (ii) when each such action

11  or actions occurred; (iii) how each individual Non-Management Director learned that the nicotine

12  content of each JUULpod was greater than disclosed; (iv) when each individual Non-Management

13  Director acquired that information about the nicotine content of each JUULpod; and (v) Identify

14  all documents that support your allegations as to the foregoing.

15  **RESPONSE TO INTERROGATORY NO. 19**:

16      Plaintiff incorporates by reference the Objections, including the Objections to Definitions

17  and Instructions, set forth above.

18      ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

19  because it contains multiple discrete subparts.

20      ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

21  impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

22  (finding contention interrogatories premature "before substantial documentary or testimonial

23  discovery has been completed") (collecting cases); *see also Kim v*, 2009 WL 4021389, at *2 ("[I]n

---

[188] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 487 in the SFUSD Complaint.

[189] This misquotes the Complaint, which reads "deceive those purchasing a JUUL device and JUULpods as to how much nicotine they were actually consuming."

1    cases where defendants presumably have access to most of the evidence about their own behavior,

2    it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

3    period, is sufficiently likely to be productive to justify the burden that responding can entail.").

4         ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

5    burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

6    subparts that seek granular details about allegations that are already developed and supported by

7    documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

8    the Director Defendants have served, appear intended to "systematically track all the allegations

9    in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

10   abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

11   *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

12        Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and

13   disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

14   allegations in paragraph 487 of the Complaint, "***each*** specific action or actions," and "***all***

15   documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly

16   broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (finding request for "every

17   fact" or "all facts" supporting identified allegation overly broad); *see also Kim*, 2009 WL 4021389,

18   at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL

19   1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal

20   facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that

21   support the referenced allegations in paragraph 487 of the Complaint.

22        ***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental

23   impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert

24   disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable

25   Court orders.

26

27   No. 19-md-2913-WHO                      76                PL. SFUSD'S RESPONSES AND
                                                              OBJECTIONS TO DEFENDANTS HUH,
28                                                            PRITZKER, AND VALANI'S FIRST SET
                                                              OF INTERROGATORIES

**_Response_**. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

Before launch, the Board, including Pritzker and Valani, discussed the Phase 0 and Phase 1 nicotine studies,[190] and JUUL Products' nicotine content, salts formulation, comparison to cigarettes profiles, and the "addiction issue" with selling a nicotine product.[191] Ploom's May 2014 Board Presentation informed then-Board members Pritzker and Valani that "Phase 0 clinical trial results complete with exceptional results. JUULpod prototypes are yielding considerably more vapor per puff than any small form factor competitor,"[192] and that the company planned to "complete clinical study of JUUL nicotine chemistry by mid June."[193] In June of 2014, Monsees provided Valani with additional detail about the nicotine studies that was not included in the May Board presentation, telling Valani that "Device produces 4.5+ mg per puff even in detuned state, higher than any product on market but in a smaller form factor. Not shown is at full power Juul can deliver 8+ mg/puff, rivaling most large form factor tank-based products."[194] Huh testified that the Board discussed the "pharmacokinetic" properties of JUUL Products on numerous occasions, and that he and the Board reviewed summaries of Gal Cohen's discussions with an outside advisory board on nicotine and addiction.[195]

Before the JUUL Product's launch and from at least November 2014, Pritzker and Valani shaped the misleading marketing regarding the JUUL Product's nicotine content. In November 2014, Monsees, Pritzker, and Valani discussed "the addiction issue" with JUUL Products, working

---

[190] INREJUUL_00016443-INREJUUL_00016507.

[191] JLI01259728; JLI01121750.

[192] MDL_RV0000257.

[193] MDL_RV0000288.

[194] MDL_RV0025943.

[195] Huh Dep. Tr. at 123:17-128:8 [Rough Transcript].

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

on "defining our strategy" for how to frame and market their nicotine product.[196] In January 2015, the Board, including Pritzker and Valani, gave directions to the marketing team on several key topics related to JLI's marketing approach regarding nicotine.[197]

Pritzker, Valani, and Huh approved and allowed JLI's marketing to continue, including the "Vaporized" campaign and later campaigns, despite misleading features and omissions regarding nicotine strength, content, potency, health, JUUL as a cessation device, and despite knowing early marketing had youth appeal.[198] Pritzker and Valani omitted and allowed the omission of JLI's phase 0 nicotine study results from public discussion of the JUUL Product's nicotine delivery.

Pritzker, Valani, and Huh knew how much nicotine the JUUL Product delivered, but approved JLI's marketing that was misleading with respect to the nicotine delivery and potential for addiction resulting from the use of JUUL Products. *See* response to Interrogatory No. 14, above.

**INTERROGATORY NO. 20**:

State the facts on which You base Your allegations in the Tucson Unified Complaint at paragraph 552[199] (or the comparable allegations in Your Complaint) that the Non-Management Directors "coordinated with Altria to pursue a fraudulent scheme to persuade the FDA into leaving the mint flavor on the market," including (i) each specific action or actions that each individual Non-Management Director personally took to "coordinate[] with Altria to pursue a fraudulent scheme to persuade the FDA into leaving the mint flavor on the market"; (ii) when each such action or action occurred; (iii) who at Altria each individual Non-Management Director coordinated with; (iv) what specific information you contend each individual Non-Management

---

[196] JLI01259728.

[197] JLI01121750.

[198] Pritzker Dep. Tr. at 101-03 (Board did not order the end of "Vaporized" campaign anytime in the summer of 2015); Asseily Dep. Tr. at 80-84 (JLI did not pull down "Vaporized" campaign in response to youth-oriented criticism in the summer of 2015).

[199] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 554 in the SFUSD Complaint.

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

Director possessed which made the allege[d] "scheme" fraudulent; (v) how each individual Non-Management Director acquired such information; (vi) when each individual Non-Management Director acquired such information; and (vii) identify all documents that support your allegations as to the foregoing.

**RESPONSE TO INTERROGATORY NO. 20**:

Plaintiff incorporates by reference the Objections, including the Objections to Definitions and Instructions, set forth above.

***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound because it contains multiple discrete subparts.

***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3 (finding contention interrogatories premature "before substantial documentary or testimonial discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial period, is sufficiently likely to be productive to justify the burden that responding can entail.").

***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple subparts that seek granular details about allegations that are already developed and supported by documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories the Director Defendants have served, appear intended to "systematically track all the allegations in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'" *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

1    allegations in paragraph 554 of the Complaint, "*each* specific action or actions," and "*all*
2    documents" that support Plaintiff's allegations. Courts find such interrogatories "are often overly
3    broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (finding request for "every
4    fact" or "all facts" supporting identified allegation overly broad); *see also Kim*, 2009 WL 4021389,
5    at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL
6    1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal
7    facts"). For this reason, Plaintiff will interpret the Interrogatory to seek the principal facts and
8    documents that support the referenced allegations in paragraph 554 of the Complaint.

9        ***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental
10    impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert
11    disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable
12    Court orders.

13        ***Response***. Subject to and without waiving Plaintiff's Specific and General Objections,
14    Plaintiff states, based on the information currently available to Plaintiff following a reasonable,
15    good faith search:

16        Through the Directors Defendants' control of JLI, JLI coordinated with Altria to pursue a
17    fraudulent scheme to persuade the FDA into leaving the mint flavor on the market.

18        On July 27, 2017, as JLI sales began to rise dramatically, the FDA announced that it would
19    be seeking input on "how best to protect public health in the evolving tobacco marketplace,"
20    including "approaches to regulating kid-appealing flavors in e-cigarettes and cigars."[200] This
21    included seeking comment on "the role that flavors (including menthol) in tobacco products play
22    in attracting youth."[201] Shortly after this announcement, representatives from both JLI (Gal Cohen)
23    and Altria (Phil Park) were invited to a meeting to "build a coalition and common agenda to

---

25    [200] https://www.fda.gov/news-events/press-announcements/fda-announces-comprehensive-
        regulatory-plan-shift-trajectory-tobacco-related-disease-death.
26    [201] *Id.*

1   influence or challenge FDA's approach" to regulating flavors.[202] With respect to flavors, the plan

2   was to discuss whether the industry could reach "a common approach and understanding," and

3   asked if the companies might find "a damage limitation option" concerning the regulation of e-

4   cigarette flavors.[203]

5       This meeting took place on September 15, 2017.[204] During the meeting the participants

6   discussed the opportunity to comment on the FDA's advanced notice of proposed rulemaking

7   ("ANPR" or "ANPRM") with respect to flavors.[205] Gal Cohen of JLI also suggested internally that

8   JLI should partner with a vape company called Avail Vapor. According to Cohen, Avail had "deep

9   customer analytics" and could "scan driver license[s] and track every SKU [a] customer buys."[206]

10  Cohen indicated this "[c]ould help gather their data for flavor ANPR as a means of building

11  relationship."[207]

12      On October 24, 2017, Phil Park of Altria met with Avail Vapor to discuss US Vape

13  Policy.[208] The first topic on the agenda was flavors and the first question to discuss was "[w]hat is

14  our common narrative as we prepare for the ANPRM?" (the notice of proposed rulemaking with

15  respect to flavored e-cigarettes).[209] Another topic on the agenda was "advocacy" and discussion of

16  "[c]oalition group for meeting(s) with FDA?"[210]

17      Plaintiffs contend that as a result of these meetings, the Altria and JLI leadership, including

18  the Director Defendants, settled on a strategy to protect mint from regulation. Before meeting with

19

20  _____

[202] JLI10678579.

21  [203] *Id.*

[204] JLI10679070.

22  [205] *Id.*

[206] *Id.*

23  [207] *Id.*

[208] AVAIL00000254.

25  [209] *Id.*

[210] *Id.*

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

the FDA and making public statements about Mint, both JLI, including the Director Defendants, and Altria knew that mint was not a traditional tobacco flavor and was instead a favorite of youth.

In April 2018, JLI studied the flavor preferences of 13- to 17-year-old youth through two studies. The first study, carried out by McKinsey & Company ("McKinsey"), generated over 1,000 responses from teens aged 13- to 17-years-old.[211] The second study, conducted by DB Research, appears to have gathered data from a focus group of 16 kids in Bethesda, Maryland, and Baltimore, Maryland.[212] Both studies found that teens' co-favorite JUUL Product flavors were Mango and Mint, and that teens found only two third-party flavors more desirable than Mango and Mint: "Cotton Candy" (McKinsey)[213] and "Fruit Loops" (DB Research).[214] Consistent with its wide youth appeal, JLI's most popular flavors were Mango and Mint.[215] Though the McKinsey study did not survey teens' preference for menthol, the DB Research study did and found that only 28% of teens found menthol appealing, whereas 72% of teens liked Mint.[216] This is unsurprising, as the "Mint" flavor was designed not to taste like a Menthol cigarette. Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport" cigarette that "doesn't have that good peppermint taste like cool [M]int."[217] Similarly, a research study commissioned by JLI reported that there was "No Implied Relationship between Mint & Menthol:" "JUUL users under-index in menthol

---

[211] INREJUUL_00121627 (preliminary slides); INREJUUL_00124965 (data).

[212] INREJUUL_00035325.

[213] INREJUUL_00124965.

[214] *Id.*

[215] 5185468678 (2018 JUULpods retail volume data by flavor showing 35.9% of sales were mint, 35.5% of sales for mango, and only 9.1% and 1.5% of sales were tobacco and menthol, respectively).

[216] INREJUUL_00035325.

[217] Reddit, *How does Classic Menthol compare to Cool Mint*, https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_cool_mint/ (last visited February 10, 2020).

82                    PL. SFUSD'S RESPONSES AND OBJECTIONS TO DEFENDANTS HUH, PRITZKER, AND VALANI'S FIRST SET OF INTERROGATORIES

cigarette use or previous menthol cigarette use. This would imply that former-menthol smokers are not the driver behind the popularity of mint flavored JUULpods."[218]

Altria also knew that mint was attractive to youth. On September 25, 2018, Altria received a study from DB Research – the same organization that provided the flavor study for JLI – analyzing the flavor preferences of JUUL Product users. The study reported that "[t]eens strongly prefer fruit (39%) and mango (27%) and then mint (17%)" and "only 1% of Teens prefer tobacco."[219] In addition, Altria knew that mint was not necessary to convert smokers to e-cigarettes. According to Altria's own research on adult smokers and vapers, a "quasi-experimental online survey," between 11 and 12% of adult smokers identified winter mint as the most appealing flavor.[220]

Altria knew that mint was a crucial flavor for JLI and was not a tobacco flavor. In December 2017, a study commissioned by Altria reported that the "most popular JUUL pods were Mango and Mint," and "Virginia Tobacco was a distant third in popularity."[221] This was confirmed directly from JLI a few months later. In the Spring of 2018, Altria Board Member Dinyar Devitre sent an email to JLI Board Member Valani with the subject "Mint percentage?" and asked "What proportion of total sales is in non tobacco flavor for J?" Valani replied "A majority. We can discuss live [i.e., not in writing] when we next meet."[222] Altria was also receiving data of JUUL Products sales by flavor from Avail Vapor. For example, on January 3, 2018, James Xu of Avail met with David Wise, Steven Schroder, and Zane Underwood of Altria and Avail shared JUUL Products

---

[218] INREJUUL_00079307.

[219] ALGAT0004584712.

[220] Jessica Parker Zdinak, Ph.D., *E-vapor Product Appeal Among Tobacco Users and Non-users and the Role of Flavor in Tobacco Harm Reduction*, 72nd Tobacco Science Research Conference (Sept. 18, 2018), https://sciences.altria.com/library/-/media/Project/Altria/Sciences/library/conferences/2018%20TSRC%20J%20Zdniak%20Presentation.pdf.

[221] ALGAT0003012781.

[222] MDL_RV0016578.

usage, flavor, and demographic data, including the fact that the majority of users of JUUL Products were under the age of 25, and a large portion were under the age of 20.[223] Mr. Xu also highlighted his "concern over youth appeal and marketing philosophies" of JLI.[224]

On September 11, 2018, then-FDA Commissioner Gottlieb issued a statement calling youth vaping an "epidemic" and noting that the FDA was "closely evaluating . . . the availability of characterizing flavors."[225] According to the FDA, "[w]e know that the flavors play an important role in driving the youth appeal. And in view of the trends underway, we may take steps to curtail the marketing and selling of flavored products. We're now actively evaluating how we'd implement such a policy."[226] On September 25, 2018, Commissioner Gottlieb sent letters to JLI and Altria demanding each company's plan to reduce youth use, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[227]

On October 16, 2018, JLI presented an "Action Plan" to the FDA in response to then-FDA Commissioner Gottlieb's September 25, 2018 letter.[228] Despite knowing that mint was a favorite of youth, JLI's Action Plan proposed only partial restrictions on sales of its fruity and sweet flavor pods and no restrictions of mint flavored products, asserting the "critical importance of flavored products in helping adult smokers switch."[229] JLI's presentation to the FDA also fraudulently characterized its Mint flavor pods as a "tobacco and menthol product," as opposed to a "flavored product."[230]

---

[223] Schroeder Dep. Tr. at 462:11-25; Xu Dep. Tr. at 218:24-226-11; 52111558606.

[224] 52111558606

[225] https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-steps-address-epidemic-youth-e-cigarette-use

[226] *Id.*

[227] https://www.fda.gov/media/119666/download; https://www.fda.gov/media/119669/download

[228] JUUL Labs, Inc. *FDA Presentation*, 2 (Oct. 16, 2018); INREJUUL_00182989.

[229] *Id.*

[230] *Id.*

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

On October 25, 2018, Altria submitted a letter in response to the FDA's call to combat the youth vaping epidemic, which it published to the public on its website.[231] Altria claimed to have "serious concerns" about youth access to e-cigarettes products and admitted that the use of e-cigarettes by youth had risen to "epidemic levels."[232] Altria claimed that youth use of e-cigarettes was "further compounded by flavors in these products that go beyond traditional tobacco flavors" and as a result, would only offer "traditional tobacco, menthol, and mint flavors" in their e-cigarette products.[233] But, as discussed above, Altria knew that mint was not a traditional tobacco flavor[234] and teenagers preferred mint flavored e-cigarettes. Altria also shared this letter with JLI's leadership, Pritzker and Valani, before JLI publicized it's "Action Plan."[235]

This deception was successful. On November 15, 2018, the then-FDA Commissioner Gottlieb directed the FDA to restrict the sale of flavored e-cigarettes to only age-restricted locations, but announced they would make an exception for mint and menthol products.[236] Commissioner Gottlieb reported that he would not require the same standard for mint and menthol flavored e-cigarettes because "data suggests that mint- and menthol-flavored [e-cigarettes] are more popular with adults than with kids."[237] Meanwhile, JLI's sale of Mint JUULpods rose from one third of its sales in September 2018 to approximately two thirds in February 2019. JLI's 2019

---

[231] https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/Altria-Response-to-FDA-E-vapor-October-25-2018.pdf.

[232] https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/Altria-Response-to-FDA-E-vapor-October-25-2018.pdf

[233] *Id.*

[234] Garnick FTC Preliminary Dep, 102:18-21 ("We were very concerned about the youth issue, and it was identified that what was contributing to the youth issue were pods and nontraditional flavors. By that I mean flavors other than tobacco and menthol.").

[235] JLIFTC00653389.

[236] https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access

[237] *Id.*

1  revenues were estimated to be between $2.36 billion and $3.4 billion, and Mint JUULpods

2  accounted for approximately 75% of JLI's total 2019 sales.

3  **INTERROGATORY NO. 21**:

4      State the facts underlying the allegation in the Tucson Unified Complaint at paragraph

5  797[238] (or the comparable allegations in Your Complaint) that the Non-Management Directors

6  "used JLI as a vehicle to further fraudulent schemes of targeting youth, misrepresenting and

7  omitting to users of all ages what JLI was really selling and to whom, and seeking to delay or

8  prevent regulation that would impede the exponential growth of JUUL's massive youth market

9  share," including (i) which Non-Management Director "used JLI as a vehicle to further" those

10 "fraudulent schemes"; (ii) the specific actions taken by each individual Non-Management Director

11 that "used JLI as a vehicle to further" each of those "fraudulent schemes"; (iii) when each

12 individual Non-management Director took each such action; and (iv) Identify all documents that

13 support your allegations as to the foregoing.

14 **RESPONSE TO INTERROGATORY NO. 21**:

15      Plaintiff incorporates by reference the Objections, including the Objections to Definitions

16 and Instructions, set forth above.

17      ***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

18 because it contains multiple discrete subparts.

19      ***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

20 impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

21 (finding contention interrogatories premature "before substantial documentary or testimonial

22 discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

23 cases where defendants presumably have access to most of the evidence about their own behavior,

24

25

26 _____

[238] Consistent with footnote 1 in the Interrogatories, Plaintiff interprets the Interrogatory to be referring to paragraph 797 in the SFUSD Complaint.

27

PL. SFUSD'S RESPONSES AND
28                                                    OBJECTIONS TO DEFENDANTS HUH,
                                                     PRITZKER, AND VALANI'S FIRST SET
                                                     OF INTERROGATORIES

1    it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

2    period, is sufficiently likely to be productive to justify the burden that responding can entail.").

3        ***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

4    burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

5    subparts that seek granular details about allegations that are already developed and supported by

6    documentary evidence in the Complaint. This Interrogatory, along with the other Interrogatories

7    the Director Defendants have served, appear intended to "systematically track all the allegations

8    in" the Complaint, which courts have repeatedly warned against as "a serious form of discovery

9    abuse" because such interrogatories can be "misused 'to impose great burdens on opponents.'"

10   *Campbell*, 2015 WL 3533221, at *4 (quoting *In re Convergent Techs.*, 108 F.R.D. at 337).

11       Plaintiff further objects to the Interrogatory as overly broad, unduly burdensome, and

12   disproportionate to the needs of the case to the extent it seeks all facts on which Plaintiff bases its

13   allegations in paragraph 797 of the Complaint, "***each*** such action," and "***all*** documents" that

14   support Plaintiff's allegations.  Courts find such interrogatories "are often overly broad and unduly

15   burdensome." *Haggarty*, 2012 WL 4113341, at *2 (finding request for "every fact" or "all facts"

16   supporting identified allegation overly broad); *see also Kim*, 2009 WL 4021389, at *2 (finding

17   responding party is not required to state "non-material matters"); *Mancini v*, 2009 WL 1765295,

18   at *3 (modifying the language in each interrogatory to seek the "material or principal facts").  For

19   this reason, Plaintiff will interpret the Interrogatory to seek the principal facts that support the

20   referenced allegations in paragraph 797 of the Complaint.

21       ***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental

22   impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert

23   disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable

24   Court orders.

25

26

27

28

PL. SFUSD'S RESPONSES AND
                                              OBJECTIONS TO DEFENDANTS HUH,
                                              PRITZKER, AND VALANI'S FIRST SET
                                              OF INTERROGATORIES

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

As described in response to Interrogatory Nos. 10, 12, and 20, amongst others, the Director Defendants personally participated in the targeting of youth, misrepresenting and omitting to consumers critical aspects of the product, and seeking to delay or prevent regulation that would impede the exponential growth of JLI's massive youth market share.

The Director Defendants used JLI as a vehicle to accomplish this fraudulent scheme. As noted by this Court, "[Director Defendants]' achievement of the goals that were primarily sought to advance their self-interests, and not necessarily or primarily to advance JLI's interests, are adequate to support the plausibility of the theory that JLI was the separate RICO Enterprise."[239]

The Director Defendants used JLI as a vehicle to further their goal of capitalizing on their investment in JLI, and their ultimate goal of monetizing that investment through an arrangement with a traditional tobacco company. To secure a large return on investment, the Director Defendants had to increase revenue, regardless of how that revenue was achieved. Scott Dunlap testified that while he and Monsees advocated more aggressive action in response to signs of youth usage, the Director Defendants advocated a less aggressive approach.[240] According to Scott Dunlap, youth usage was one of many topics raised with the Board in discussions about not hitting sales numbers.[241] He testified that the options presented to the Board were to slow down to be cautious about youth usage, and get even worse sales figures, or plow ahead and take the risk of youth use in the name of better sales.[242] Dunlap testified that Huh's and Pritzker's position was "sales grows at all costs."[243]

---

[239] Order on Second Round of Motions to Dismiss, ECF No. 1694, at 13 (Apr. 13, 2021).
[240] Dunlap Dep. Tr. at 238:22-240:16 [Rough Transcript].
[241] *Id.*
[242] *Id.*
[243] Dunlap Dep. Tr. at 238:22-239:25 [Rough Transcript].

PL. SFUSD'S RESPONSES AND
OBJECTIONS TO DEFENDANTS HUH,
PRITZKER, AND VALANI'S FIRST SET
OF INTERROGATORIES

When Huh and Pritzker fired Dunlap, Dunlap asked them, "what are your intentions for the business," to which Huh responded "gross sales" and "get sales on track"; when Dunlap asked how they planned to do that, Pritzker said that Monsees would be removed from his position as CEO and they would be "taking executive control of the business."[244]

Once sufficient gross sales had been achieved, Pritzker and Valani spearheaded negotiations with the largest traditional tobacco company in the United States—Altria. An internal Altria presentation reported on Altria's "continued dialogue with key [JLI] investors," noting that Valani and Pritzker "indicate that they control majority of voting power."[245] In April 2018, Howard Willard sent confidential "Exchange of Volume Information" to Pritzker, copying Valani.[246] Willard also sent a detailed email to Pritzker and Valani, regarding Altria's proposed "collaboration … [that] creates a plan to manage that [antitrust] risk," and "productive partnership that can create substantial value above what is achievable under a standalone scenario in a dynamic tobacco category environment."[247] Many other email exchanges related to the deal are between Altria's team, Pritzker and Valani.[248]

The Director Defendants goal was realized when Altria purchased a 35% stake in JLI for $12.8 billion.[249] The value of the benefits received by the Director Defendants is set forth in the method of allocation for the money received as a result of the Altria investment.[250] Pritkzer received approximately $1.8 billion. Valani received approximately $2.5 billion, and Huh received

---

[244] Dunlap Dep. Tr. at 146:4-147:4 [Rough Transcript].
[245] ALGAT0000280623.
[246] JLI10530188.
[247] JLI10530232.
[248] *See, e.g.*, JLI01389789; JLI10523767; JLI01389792; JLI10518886.
[249] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BUSINESSWIRE (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.
[250] JLI01388029.

1    approximately $68 million. Huh received an additional $28 million from the sale of a portion of

2    his shares around the time of the Altria investment.[251]

3    **INTERROGATORY NO. 22**:

4    　　　State whether You contend that any Non-Management Director received anything

5    belonging to You (including received anything to which You claim a superior legal right),

6    including (i) each thing belonging to You that was received by any Non-Management Director;

7    (ii) the value of each thing; (iii) the individual Non-Management Director who received each thing;

8    (iv) how each individual Non-Management Director received each thing; (v) the source of any

9    alleged claim of superior legal right; and (vi) Identify all documents that support your allegations

10   as to the foregoing.

11   **RESPONSE TO INTERROGATORY NO. 22**:

12   　　　Plaintiff incorporates by reference the Objections, including the Objections to Definitions

13   and Instructions, set forth above.

14   　　　***Objection – Compound***. Plaintiff objects to the Interrogatory as improperly compound

15   because it contains multiple discrete subparts.

16   　　　***Objection – Premature***. Plaintiff objects to this Interrogatory because it is an

17   impermissibly premature contention interrogatory. *See, e.g.*, *Amgen*, 2016 WL 1039029, at *3

18   (finding contention interrogatories premature "before substantial documentary or testimonial

19   discovery has been completed") (collecting cases); *see also Kim*, 2009 WL 4021389, at *2 ("[I]n

20   cases where defendants presumably have access to most of the evidence about their own behavior,

21   it is not at all clear that forcing plaintiffs to answer these kinds of questions, early in the pretrial

22   period, is sufficiently likely to be productive to justify the burden that responding can entail.").

23   　　　***Objection – Scope***. Plaintiff objects to the Interrogatory as overly broad, unduly

24   burdensome, and disproportionate to the needs of the case. The Interrogatory contains multiple

25

26   ───────────────
     [251] JLI01388029; JLI41165687.

27   No. 19-md-2913-WHO                        90                    PL. SFUSD'S RESPONSES AND
                                                                    OBJECTIONS TO DEFENDANTS HUH,
28                                                                  PRITZKER, AND VALANI'S FIRST SET
                                                                    OF INTERROGATORIES

subparts that seek granular details about "*each* thing belonging to" Plaintiff, "the value of *each* thing," "how . . . *each* thing" was received, "the source of *any* alleged claims," and "*all* documents" that support Plaintiff's allegations.  Courts find such interrogatories "are often overly broad and unduly burdensome." *Haggarty*, 2012 WL 4113341, at *2 (construing requests for "any," "all," and "each" as seeking material facts and documents); *see also Kim*, 2009 WL 4021389, at *2 (finding responding party is not required to state "non-material matters"); *Mancini*, 2009 WL 1765295, at *3 (modifying the language in each interrogatory to seek the "material or principal facts"). For this reason, Plaintiff will interpret the Interrogatory as seeking the principal facts that support any allegations that the Director Defendants received things belonging to Plaintiff.

Plaintiff also objects to this Interrogatory as vague and ambiguous because the phrases "belonging to you," "value of each thing," and "superior legal right" are subject to more than one interpretation.

Plaintiff also objects to this Interrogatory as irrelevant because it seeks information not relevant to the claims and defenses in this action.

***Objection – Privilege***. Plaintiff objects to this Interrogatory to the extent it calls for mental impressions of counsel or Expert Opinion. Plaintiff states that it will make appropriate expert disclosures in accordance with the Federal Rules of Civil Procedure, local rules, and applicable Court orders.

***Response***. Subject to and without waiving Plaintiff's Specific and General Objections, Plaintiff states, based on the information currently available to Plaintiff following a reasonable, good faith search:

Plaintiff is not aware of any items that any Director Defendant received directly from Plaintiff. But Plaintiff states that the Director Defendants have received millions of dollars in ill-gotten monies as a result of the wrongdoing alleged in Plaintiff's Complaint. The Director

Defendants each received significant monies as a result of the Altria investment.[252] Pritkzer received approximately $1.8 billion. Valani received approximately $2.5 billion. And Huh received approximately $68 million. Huh received an additional $28 million from the sale of a portion of his shares around the time of the Altria investment.[253]

Dated: August 16, 2021                    Respectfully Submitted,

                                          **WAGSTAFF & CARTMELL LLP**

                                          */s/ Thomas P. Cartmell*
                                          Thomas P. Cartmell

                                          Louise H. Renne
                                          **RENNE PUBLIC LAW GROUP LLP**

                                          Esfand Nafisi (SBN 320119)
                                          **MIGLIACCIO & RATHOD LLP**
                                          388 Market Stree, Ste. 1300
                                          San Francisco, CA 94111
                                          Tel. (415) 489-7004
                                          Fax (202) 800-2730
                                          Enafisi@classlawdc.com

                                          Danielle Marie Houck (SBN 197972)
                                          **CHIEF GENERAL COUNSEL**
                                          SAN FRANCISCO UNIFIED SCHOOL
                                          DISTRICT
                                          555 Franklin St Fl 3
                                          San Francisco, CA 94102-4414
                                          Phone Number: (415) 241-6054
                                          Fax Number: (415) 241-6371
                                          Email: daniellehouck@sfusd.edu

                                          ***Counsel for Plaintiff San Francisco Unified
                                          School District***

---

[252] JLI01388029.
[253] JLI01388029; JLI41165687.

1

## VERIFICATION

2

3    I, ___Angela Miller___, declare under penalty of perjury subject to 28 U.S.C. § 1746 that,

4    as to matters pertaining to the Plaintiff, the responses to NON-MANAGEMENT DIRECTORS'

5    FIRST SET OF INTERROGATORIES to San Francisco Unified School District, are true and

6    correct to the best of my knowledge.

7

8    _Angela Miller_                    ___Angela Miller___          ___8/12/21___
         Signature                          Print Name/Title              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    No. 19-md-2913-WHO                      93              PL. SFUSD'S RESPONSES AND
                                                             OBJECTIONS TO DEFENDANTS HUH,
28                                                           PRITZKER, AND VALANI'S FIRST SET
                                                             OF INTERROGATORIES

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on, August 16, 2021, a true and correct copy of the foregoing was

3    served via electronic mail upon the following:

4          MDL2913_JLI_Discovery_Comms@kirkland.com

5
     Gregory P. Stone, SBN 78329                    Renee D. Smith (pro hac vice)
6    Bethany W. Kristovich, SBN 241891              KIRKLAND & ELLIS LLP
     MUNGER, TOLLES & OLSON LLP                     300 North LaSalle Street
7    350 South Grand Avenue, Fiftieth Floor         Chicago, IL  60654
     Los Angeles, CA  90071-3426                    renee.smith@kirkland.com
8    gregory.stone@mto.com
     bethany.kristovich@mto.com
9
10   Peter A. Farrell, P.C. (pro hac vice)
     KIRKLAND & ELLIS LLP
11   1301 Pennsylvania Avenue, N.W.
     Washington, DC  20004
12   peter.farrell@kirkland.com

13   *Attorneys for Defendants Juul Labs, Inc.*

14
     Mark C. Hansen (pro hac vice)
15   Michael J. Guzman (pro hac vice)
     David L. Schwarz (CA Bar No. 206257)
16   KELLOGG HANSEN TODD FIGEL &
          FREDERICK, P.L.L.C.
17   1615 M Street, N.W., Suite 400
     Washington, DC  200036
18   mhansen@kellogghansen.com
     mguzman@kellogghansen.com
19   dschwarz@kellogghansen.com

20
     *Attorneys for Defendants Huh, Pritzker,*
21   *and Valani*

22

23

24

25

26

27   No. 19-md-2913-WHO                94                PL. SFUSD'S RESPONSES AND
                                                         OBJECTIONS TO DEFENDANTS HUH,
28                                                       PRITZKER, AND VALANI'S FIRST SET
                                                         OF INTERROGATORIES

1  John C. Massaro
2  Jason A. Ross
   David E. Kouba
3  ARNOLD & PORTER KAYE
      SCHOLER LLP
4  601 Massachusetts Avenue, NW
   Washington, DC  20001
5  john.massaro@arnoldporter.com
   Jason.ross@arnoldporter.com
6  David.Kouba@arnoldporter.com
7
8  *Attorneys for Defendants Altria Group, Inc.,
   and Philip Morris USA Inc.*
9
   Sarah Robin London
10 LIEFF CABRASER HEIMANN
   & BERNSTEIN LLP
11 275 Battery Street, 29th Floor
   San Francisco, CA  94111
12 slondon@lchb.com
13
   Ellen Relkin
14 WEITZ & LUXENBERG
   700 Broadway
15 New York, NY  10003
   erelkin@weitzlux.com
16
   *Co-Lead Counsel for Plaintiffs*
17
18
19
20
21
22
23
24
25
26
27
28

Sean Andrew McCormick
ARNOLD & PORTER KAYE
   SCHOLER LLP
777 S. Figueroa Street, Suite 4400
Los Angeles, CA  90017-5844
sean.mccormick@arnoldporter.com

Dena C. Sharp
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA  94108
dsharp@girardsharp.com

Dean Kawamoto
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
dkawamoto@kellerrohrback.com

*/s/ Thomas P. Cartmell*
Thomas P. Cartmell