# Exhibit 1

1         UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2
   IN RE:  JUUL LABS,          :
3  INC., MARKETING, SALES      :  Case No.
   PRACTICES, AND PRODUCT       :  3:19-md-2913-WHO
4  LIABILITY LITIGATION        :

5

6

7
   ********************************************
8            -HIGHLY CONFIDENTIAL-

9        SUBJECT TO PROTECTIVE ORDER

10  HYBRID VIDEOTAPED / REALTIMED DEPOSITION

11       MINETTE E. DRUMWRIGHT, Ph.D.

12             JUNE 1, 2022

13  ********************************************

14

15

16

17

18

19

20

21

22

23  Reported By:

24  Pat English-Arredondo, CSR, RMR, CRR, CLR

25  JOB NO:  211783

1          A.      Yes, I do.  You will see them

2     in -- as players in my opinions, or at least

3     I describe their behavior in the -- in the

4     report.

5          Q.      Okay.  Terrific.  Now, can we

6     agree that the report is mostly a critique of

7     Professor Rock, an expert for Altria?

8          A.      No.  I would not characterize

9     it that way.

10         Q.      How would you characterize it?

11         A.      I would say that I respond to

12    Professor Rock's report, but then I go beyond

13    that and I -- I really try to understand the

14    underlying logic of the Altria investment,

15    which is what Dr. Rock said needed to be done

16    but didn't do.

17         Q.      All right.  Well, let's turn to

18    Page 9 of your report, please.

19              Towards the bottom you say that

20    "Professor Rock's analysis focuses only on

21    the question of legal control under Delaware

22    law rather than analyzing the evidence from a

23    practical business perspective."

24              Do you think that

25    Professor Rock was wrong to review the deal

Highly Confidential

1  lawyer.  But I do teach advertising law and

2  marketing law and those sorts of things.

3       Q.    Right.  And I take it you're

4  not an expert in corporate law.

5       A.    That's correct, I'm not an

6  expert in corporate law.

7       Q.    I take it you're not an expert

8  in mergers and acquisitions.

9       A.    Well, inasmuch as mergers and

10 acquisitions are a major part of business and

11 I'm a business professor, I would say that

12 that certainly is in the realm of the kinds

13 of things that I read about, research, write

14 cases about, teach about.

15            So in the broad arena of

16 business administration, it's certainly

17 something that I have some expertise in.

18            Is it my primary expertise?

19 No.

20       Q.    Well, for example, you don't

21 teach a course about mergers and

22 acquisitions.  Right?

23       A.    I do not teach a course about

24 mergers and acquisitions.

25       Q.    You do teach courses about

1    marketing and advertising.  Right?

2         A.    I teach courses about

3    marketing, advertising.  I teach courses --

4    I've taught a finance course a couple of

5    times in the last couple of years.  I teach a

6    leadership course.

7              So my teaching is rather broad.

8    I teach in MBA programs and leadership and

9    communication program, both broad programs

10   that equip students as well-rounded,

11   general -- general business administrators.

12        Q.    I take it you're not an expert

13   in corporate transactions.

14        A.    I'm not an expert in corporate

15   transactions, but I have certainly and

16   currently serve on a board where I have

17   advised a company on corporate transactions.

18   That's a very broad field.

19              But I certainly, as a person

20   who does consulting and teaching of business

21   cases that encompass many factors, that's

22   sometimes a factor that I consider.

23        Q.    The board you reference, that's

24   CWS Corporate Housing?

25        A.    It is.

Highly Confidential

Page 23

 1    are the primary board members.

 2         Q.    Do you consider yourself an

 3    expert in corporate strategic alliances?

 4         A.    That is -- yes, that is an area

 5    in which I have done research and teaching

 6    for a number of years, written cases, and

 7    that sort of thing.

 8         Q.    Do you consider yourself an

 9    expert in corporate joint ventures?

10         A.    Well, that's -- that's a field

11    that is broad and where I certainly have had

12    some experience.  Is it my primary expertise?

13    I would say no.

14              But certainly as a person with

15    a Ph.D. in business administration, plus an

16    MBA, plus years of consulting, it's certainly

17    something that I have encountered and thought

18    about, read about, and researched to some

19    degree.

20         Q.    Your résumé shows that you were

21    in the private sector in the '70s and '80s

22    for seven or eight years in marketing and

23    advertising.  Is that right?

24         A.    That's correct.  In healthcare

25    and universities and also in advertising and

1  he received 1.82 billion pursuant to the

2  special dividend.  Right?

3        A.      Correct.

4        Q.      Was it unethical for

5  Mr. Pritzker to receive that money in

6  exchange for 35 percent of the shares he

7  owned?

8        A.      Well, on the face of it I -- I

9  would not -- I would not say that it's

10  necessarily unethical.  But I would

11  need -- you know, ethical dimensions and

12  ethical judgments are judgments about which

13  one -- one would need much more information.

14              But I would say on the face of

15  it we don't have enough data to know just by

16  knowing that one fact.

17        Q.      Was it a breach of his

18  fiduciary duty to receive 1.82 billion by

19  selling 35 percent of his shares to Altria?

20        A.      Well, personally, if I were one

21  of the shareholders, I would like to see the

22  major investors plowing more money back into

23  the company.  So I -- I would personally want

24  to see that happen.

25        Q.      I don't understand your

Highly Confidential

1   response.  Mr. Pritzker owned shares, he sold

2   some to Altria, and he or his entities

3   received the proceeds.

4              And you're saying that what he

5   should have done with some of it was plow it

6   back into the company.

7       A.    Well --

8       Q.    What's the basis for that?

9       A.    One would hope to see a company

10  benefiting more than 200 million from a

11  transaction of this nature.

12             However, my overall point is

13  not to make ethical judgments about the

14  appropriateness of these payouts.

15             My point here is to make the

16  judgment that this creates a power dynamic

17  that enables Altria to have influence,

18  direction, and management of JLI.  That's my

19  point.

20      Q.    We will get there.  If you

21  would please just answer my questions, do the

22  best you can.  I know you disagree with the

23  premise of them.  But that's the nature of

24  the exercise.  So "yes" or "no" as best you

25  can.

1              Was it a breach of

2    Mr. Pritzker's fiduciary duty to sell

3    35 percent of the shares he held in JLI?

4              MR. HUDSON:  Object to the

5         form.  Asked and answered.  I think

6         she's answered that question.

7         A.    On the face of it selling --

8    the answer is no.  On the face of it, I don't

9    think there is anything inappropriate about

10   selling one's shares.

11        Q.    (By Mr. Guzman)  Do you have an

12   opinion that JLI should not have done this

13   deal?

14        A.    I do have an opinion that they

15   should not have done this deal in the manner

16   that they did in which they dramatically

17   expanded the sales, the distribution and

18   sales, of a dangerous product that was

19   targeting youth, attracting youth in the

20   midst of an epidemic of youth vaping.  So I

21   do have that opinion.

22        Q.    Okay.  So you don't think that

23   JLI should have done the deal.  I take it,

24   then, you don't think that the board of

25   directors should have authorized JLI to do

Highly Confidential

1    qualitatively I did.  I looked at many

2    documents.  I looked at many testimonies.

3             I looked at a whole host of

4    materials.  And I came up with -- with facts

5    that -- that I list in my document.

6             And -- and so I would say that

7    from a qualitative perspective from

8    synthesizing many materials, that there are

9    facts in my report.

10        Q.    Okay.  And so you -- you

11   evaluated the facts and you came to your own

12   judgment about the facts.  Is that fair?

13             MR. HUDSON:  Object to the

14        form.  Misstates her prior testimony.

15        A.    What I'm saying is that I read

16   many documents.  I read everything I could

17   get my hands on.

18             I synthesized it and identified

19   the patterns and the facts that supported

20   them and put them in this document.

21        Q.    (By Mr. Guzman)  Okay.  And to

22   the extent there is a discrepancy, person A

23   said something and person B said something

24   else, you result that by making credibility

25   determinations.

Highly Confidential

Page 46

1        Q.      That's what I want you to

2   identify.  What else was wrong with the

3   transaction?

4        A.      Well, I'm concerned about

5   the -- about some of the interactions around

6   the regulatory issues.

7        Q.      Such as?

8        A.      Well, such as the -- the

9   conspiring before -- and I know you don't

10  want to talk about before the transaction,

11  but the conspiring to have mint projected as

12  a -- you know, as a non -- as a tobacco-type

13  flavor, a nonflavor flavor, and the -- the

14  manner in which mint was promoted and the

15  manner in which the sales of mints

16  dramatically increased during the year after

17  Altria invested in JUUL.

18              So, you know, I think from a

19  regulatory perspective that's problematic.

20       Q.      Okay.  You think it was

21  problematic that Altria offered to help JUUL

22  get regulatory approval through the process

23  known as PMTA?

24       A.      I don't know that I would go so

25  far as to say I think it was inappropriate

Highly Confidential

Page 47

1    for them to help them with that.  I would

2    think that I would like to see more

3    consistent behavior.

4                    If you're trying to be

5    responsible, why would you promote mint when

6    you know that it's appealing to youth and

7    when you see the sales of mint increasing to

8    youth?  So -- so I think that's a very

9    problematic thing.

10        Q.    Are you aware that after the

11   transaction JLI dropped all advertising and

12   marketing?

13        A.    I am aware of the fact that

14   that happened.  It was a while after the

15   transaction.  I -- they paused the Instagram

16   and Facebook before the transaction; but, as

17   I recall, it was a while afterwards, before

18   the --

19        Q.    Are you aware that after the

20   transaction JLI dropped the mint flavor and

21   all flavors?

22        A.    That was sometime after the

23   transaction and that -- and in the year after

24   the transaction, the mint sales went from

25   something like one-third of JLI's sales to

Highly Confidential

1                    The -- the -- in what way did

2     they fall down in their duty of loyalty to

3     JLI by negotiating and then approving the

4     transaction?

5          A.      Well, I would like to see them

6     putting more money back into JLI, putting

7     more money into the kinds of things that

8     would make JLI a responsible, ethical

9     company.

10         Q.      Anything else?

11         A.      I think that is a broad set of

12    things and that that covers what I would like

13    to see.  I would like to see, as I said, more

14    money going into the company, into the kinds

15    of things that would make it more responsible

16    and ethical.  And that --

17         Q.      So they sold -- I'm sorry.  I'm

18    asking a question.

19                 So they sold 35 percent of

20    their shares, as did all the other investors,

21    and you're saying that they should have taken

22    some of the proceeds from the sale of their

23    shares and put it into the company.  Is that

24    right?

25         A.      I would think that would be a

Highly Confidential

1              I -- I do think ultimately --

2    as you know from my report, ultimately Altria

3    had -- had the ability to do what it wanted

4    to do in terms of influencing --

5         Q.    Not my question.  Not my

6    question.

7              So can we agree that if

8    Mr. Pritzker and Mr. Valani and Mr. Burns had

9    sold, say, 50 percent of the company, that

10   they would have made even more money.  Right?

11        A.    I assume they would, but I

12   don't know.  I don't know.

13        Q.    So 35 percent of their shares

14   and they received money you've catalogued in

15   your report.

16             If they had sold 50 percent of

17   their shares, they would have received even

18   more.  Right?

19        A.    It would depend upon how good a

20   negotiator Altria was.  So I wouldn't

21   speculate on -- on what would have happened

22   in a -- a different sort of transaction.

23        Q.    Uh-huh.  And by the way, let's

24   say that the board and the company had

25   decided to sell a controlling interest to

Highly Confidential

1    unethical in your view?

2         A.    Again, it -- it would depend

3    upon what -- what happened, if Altria would,

4    indeed, expand the sales and distribution.

5              Now, I guess you could argue

6    that JLI is washing its hands, but -- but

7    certainly it prepared the foundation and --

8    and laid the groundwork.

9              I -- I would certainly have a

10   problem still with -- with the dramatic

11   expansion of distribution and sales.

12        Q.    Okay.  So it's an ethical

13   problem to sell 100 percent of itself to

14   Altria; it's an ethical problem to sell

15   controlling stake, so 50.1 percent; and as

16   your report documents, it was an ethical

17   problem for the company to sell 35 percent of

18   the outstanding shares to JLI --

19        A.    No --

20        Q.    -- excuse me -- to Altria?  All

21   three.  Right?

22             MR. HUDSON:  Object to the

23        form.

24        A.    No.  I think that

25   mischaracterizes my testimony.  My testimony

Highly Confidential

1    has to do with the problematic nature of the

2    distribution and sales and the expansion of

3    distribution and sales of a -- of a product,

4    a dangerous product, targeting youth in the

5    midst of a youth vaping epidemic.  So that --

6    that's my testimony.

7         Q.    (By Mr. Guzman)  Oh, I see.

8    Okay.  So maybe I misunderstood.

9              So it wouldn't be a problem to

10   sell 100 percent of yourself.  It just

11   depends what happens later?

12        A.    I would say, yes, that I could

13   imagine -- I could -- since we're talking

14   hypothetically, I could imagine a scenario

15   where Altria acquires 100 percent of JLI and

16   does what it did to its own product, MarkTen,

17   completely pauses, takes it off the market.

18        Q.    You're right.  They could shut

19   it down.  They could donate all the assets to

20   charity.  They could do any number of things.

21              You wouldn't have a quibble

22   with that.  Right?

23        A.    There are some things -- you're

24   correct, there are some things that I would

25   not have a quibble with.  I wouldn't want to

Highly Confidential

Page 66

```
 1   operating.

 2        Q.    And we can agree that's a

 3   business question, not a legal question.

 4   Right?

 5        A.    It is a business question.

 6        Q.    You're not a legal expert.

 7   Correct?

 8        A.    Correct.

 9        Q.    You're not a RICO expert.

10   Correct?

11        A.    I am not.

12        Q.    And you're not an expert in the

13   elements of the RICO statute.  Correct?

14        A.    Correct.

15        Q.    And you are not offering any

16   opinion that Altria had a level of influence

17   that satisfied the RICO standard.  Correct?

18        A.    I don't know that that's the

19   case.  I think that I am offering opinions

20   that would influence someone, like a jury,

21   making determinations about a RICO claim.

22             So -- so, yes, I am -- I

23   am -- I make some opinions that I know have a

24   bearing on a RICO claim, but it's not my job

25   to make that determination.
```

Highly Confidential

1                    And so when you look at

2    managing, directing, and operating, you're

3    looking at, you know, determining what the

4    right things to do are and then implementing

5    those things.

6         Q.    Okay.  So -- well, let's start.

7    You said it's necessary but not sufficient.

8                    Do you have an opinion that

9    Altria influenced JLI?

10        A.    I do think that Altria had

11   influential power through the various -- you

12   know, various approaches that I detail.  So,

13   yes, I think they certainly had influence.

14        Q.    And when you say that's

15   "necessary but not sufficient," what do you

16   mean?

17        A.    Well, you know, you have to act

18   on influence.  You have to say what you think

19   the right things are to do.  And then you

20   have to actually do them or implement them or

21   be a part of operating and

22   influencing -- operating and managing.

23        Q.    Okay.  And then so do you -- do

24   you believe that Altria, through its

25   influence, directed, managed, and operated

Highly Confidential

1    JLI?

2         A.    I do.

3         Q.    In every respect?

4         A.    Not in every respect, but

5    certainly in important respects.

6         Q.    Okay.  What respects did it not

7    manage, direct, or operate JLI after the

8    transaction?

9         A.    Well, I did not really set out

10   to see where they didn't operate, manage, or

11   influence or direct.  It did seem to me there

12   were some times, as I mentioned earlier, when

13   there was some friction between the two.  But

14   Altria, from what I could tell, ended

15   up -- ended up carrying the day.

16              One example was when there was

17   some friction between JUUL and Altria people

18   about -- about regulatory issues and Altria

19   contacted Valani and said, Don't send this

20   message to JUUL management, but, you know,

21   we're trying to influence Ken Burns.

22              And Valani says, Of course.

23   And let us know how it turns out and what we

24   can do.

25              And so -- so from everything I

Highly Confidential

1    regulatory issues.

2              Are you trying to get around

3    the regulations?

4              Are you trying to meet the

5    regulations?

6         Q.    You have no evidence that

7    Altria or JLI were trying to get around the

8    regulations with the FDA, do you?

9         A.    Well, I would think that the

10   behavior before the deal about the mint and

11   getting mint categorized as a nonflavor or as

12   a tobacco flavor would -- would suggest

13   getting around them, the regulations.

14        Q.    We will come back to mint.

15             But other than that, you're not

16   suggesting that in the ongoing dealings with

17   the FDA that Altria and JLI have done

18   anything to try to -- try to avoid regulatory

19   scrutiny by the FDA?

20        A.    Well, I had a big problem with

21   Altria's interactions with -- with

22   Commissioner Gottlieb saying, we are

23   withdrawing our product, we don't want to be

24   a part of the problem of youth vaping at the

25   same time that they are making a deal with

Highly Confidential

1    JUUL to greatly expand distribution and

2    sales.  I think that is evidence of -- of not

3    having the right spirit about regulation.

4         Q.    Post investment, you're not

5    pointing to anything Altria or JLI did to try

6    to avoid regulatory scrutiny by the FDA.

7    Correct?

8         A.    Well, you know, I -- I point to

9    a lot of interactions and behavior that is

10   broad and -- and where it's hard to know what

11   the underlying intentions were.

12        Q.    Okay.  Just to go back to sort

13   of control versus influence, briefly.

14              You agree that Altria did not

15   have coercive power over JLI.  Correct?

16        A.    Correct.  And I also think they

17   didn't need it.

18        Q.    Understood.  You agree that

19   they did not have legal control.  Correct?

20        A.    I do agree.

21        Q.    You agree that they could not

22   shape JLI's decisions through command.

23   Correct?

24        A.    Correct.  Through -- and that

25   they couldn't make JLI do something that JLI

Highly Confidential

Page 82

1   didn't want to do.

2           That's why influence is so

3   important, to get folks to want to do what

4   you want them to do.

5       Q.     You agree that they never had

6   board seats that they voted with.  Correct?

7           Meaning Altria never had board

8   seats in JLI.  Right?

9       A.     They didn't have voting board

10  seats.

11      Q.     So your opinion is that they

12  had -- this is another phrase you

13  use -- noncoercive power.  Right?

14      A.     They had noncoercive power,

15  which I would be happy to elaborate on how

16  that happened with the board seats and other

17  dimensions.

18      Q.     I've read the pages

19  (indicating).

20           Okay.  Now, going back to

21  the -- not the regulatory services but the

22  youth services, would you say you didn't

23  really dig in on that question.  Right?

24      A.     I would say I didn't really dig

25  in on that question, that I was guided by

1    what Altria was touting and what JLI was

2    picking up on in the -- in the pre and post

3    negotiations and interactions.  And, you

4    know, Altria was really touting --

5         Q.     To --

6         A.     -- its -- its distribution,

7    sales, and regulatory kinds of things.

8         Q.     To understand the full scope of

9    Altria's noncoercive power, would -- would it

10   be helpful to better understand what happened

11   with the two companies about youth services?

12        A.     I don't think it's necessary

13   because I had such abundant data related to

14   that question of playing some part in

15   directing, managing, or operating.

16             So I -- I -- no, I don't think

17   it would be helpful.

18        Q.     So it's irrelevant whether

19   Altria had noncoercive power to influence JLI

20   to accept Altria's youth services and then

21   use them as part of its management and

22   operation?

23        A.     I would say that I have

24   abundant data in my report that indicates

25   that Altria was managing, directing, and

Highly Confidential

1    operating, at least in -- at least in part,

2    by playing some part in those things.  So I

3    would say I don't need that data.

4          Q.    That wasn't my question,

5    whether you need it or not.

6                My question is:  Is it

7    irrelevant?

8          A.    You know, I don't know that I

9    would say it's irrelevant, because anything

10   is potentially relevant.

11               But I would say that I feel

12   confident in my opinions based on the data

13   that was very readily available and

14   abundantly clear.  So I didn't need more data

15   on that -- on that topic.

16         Q.    Okay.  But the data

17   about -- the interactions between the

18   companies and their own thinking about

19   whether JLI was going to accept Altria's

20   youth services, that could be relevant to the

21   level of noncoercive power that Altria had.

22         A.    It certainly could be relevant,

23   but it's not necessary for my -- for the

24   arguments -- to make the argue -- to make the

25   determination I made, I did not need more

Highly Confidential

Page 85

1    data than what I had readily available.

2         Q.    Okay.  Now, you said time and

3    time again Altria got its way.  You agree

4    they didn't get their way with respect to

5    whether JLI would accept their youth

6    services.  Right?

7         A.    I think that probably is the

8    case.  My memory is not clear on that because

9    I was focusing on the things that I

10   documented here.

11        Q.    And you can't, sitting here,

12   tell me what youth services Altria offered.

13   Right?

14        A.    I don't know the specifics of

15   what they offered and -- you know, so I can't

16   give you those specifics.  But I certainly,

17   as I -- as you know from reading my report,

18   have abundant evidence that Altria played a

19   role in directing, influencing, and operating

20   JUUL.

21        Q.    Okay.  When did that

22   influence and that resulted in -- I want

23   to use your phrases correctly.

24              When did that influence that

25   resulted in some part directing, managing, or

Highly Confidential

Page 100

1  marketing.

2              But it still was a very

3  significant increase in distribution and the

4  kinds of marketing and advertising JUUL was

5  able to -- Altria was able to do for JUUL was

6  even more significant because JUUL couldn't

7  get away with the other things because of the

8  scrutiny.

9       Q.    It was good that there was

10 scrutiny at that time.  Right?

11      A.    Well, I think that -- that

12 scrutiny is good in terms of it was scrutiny

13 on, you know, the targeting of youth.

14      Q.    Okay.  And before when you were

15 talking with Mr. Guzman, you pointed out

16 how -- how -- I mean, is it essentially your

17 opinion that absent pulling the product from

18 the market this deal never should have

19 happened?

20              I mean, that -- that's what I

21 was taking away.

22              Is that fair assessment?

23      A.    Well, I don't know that I would

24 go that far.  I would say that, you know, I

25 would want to see a much -- you know, much

Highly Confidential

1  more responsible, much faster implementation

2  of the kinds of things that are responsible

3  and ethical.

4       Q.    Well, was it acceptable to be

5  doing any -- to be taking any steps to

6  increase sales post investment?

7       A.    I think there certainly are

8  some things -- and I talked about this in my

9  earlier deposition -- there's some things

10 that could be done where you're just so very

11 sure that you're targeting adults, that

12 you're targeting them responsibly with

13 the -- you know, with accurate information.

14            And so there certainly are some

15 things that can be done.

16      Q.    So if all --

17            MR. HUDSON:  Sorry to

18      interrupt.  But when you get to a good

19      break, whenever that is, let's take a

20      quick five-minute break.

21            MR. STEKLOFF:  Sure.

22            MR. HUDSON:  No hurry.

23            MR. STEKLOFF:  No problem.

24      Q.    (By Mr. Stekloff)  So if

25 Altria -- I want to use your language.

Highly Confidential

Page 103

```
 1   is some good chance that you're going to have

 2   bleed into younger age groups.

 3            So -- so, you know, I think

 4   that we would want to see -- we certainly

 5   would want to see more responsible behavior

 6   than what we saw.

 7        Q.    Okay.  Now, you -- you told me

 8   that Altria didn't have influence over all

 9   aspects of JLI's business.  Right?

10        A.    Right.  I was -- I did not set

11   out to make that estimation.

12        Q.    Right.

13        A.    Or -- or to make that -- to

14   make that assessment.  I was looking for some

15   part.

16        Q.    Just to use a random example,

17   you have no evidence that Altria was

18   influencing JLI's decisions about how to file

19   its taxes.  Right?

20        A.    I -- I didn't -- I didn't

21   investigate into that.

22        Q.    Okay.  And then even for those

23   areas, marketing, distribution, sales,

24   regulatory, do you agree that Altria's

25   influence over the direction, management, and
```

Highly Confidential

1    operation varied among those different

2    aspects of the business?

3            A.      Well, I would say that it -- it

4    could vary and probably did vary, but I saw,

5    you know, significant influence, direction,

6    operation, and management in -- in those

7    areas, you know, the regulatory affairs, the

8    distribution, the sales, the marketing that

9    supported the sales and distribution.

10           Q.      Okay.  And so you do agree that

11   the -- that there was significant influence

12   over the direction, management, and operation

13   of the regulatory -- over the regulatory

14   strategy that JLI was exercising?

15           A.      Yes, I saw evidence that Altria

16   had a team of people working on that and that

17   there were, you know, meetings and that sort

18   of thing.

19           Q.      Okay.

20           A.      And as well as in other areas,

21   like investor relations and things like that.

22   So I did not set out to make a determination

23   as to whether Altria was -- was influencing

24   every part, but just the parts that were

25   obvious as I looked at the data.

Highly Confidential

1        Q.        And with respect to

2   distribution, marketing, and sales, do you

3   know when Altria stopped providing those

4   services to JLI?

5        A.        I believe it was around

6   March of 2020.

7        Q.        Okay.  And so do you agree that

8   after March of 2020 Altria lost at least some

9   of its influence over the direction,

10  management, and operation of JLI's

11  distribution, marketing, and sales?

12       A.        That would be my assumption,

13  but I really didn't focus on the period after

14  2020, after March of 2020.

15       Q.        Okay.  So you don't know,

16  sitting here, whether Altria's influence

17  diminished or went away in that area after

18  March 2020?

19       A.        Given the relationships and

20  given the interactions that I saw among

21  Pritzker and Valani and Altria, I would

22  assume that as long as Pritzker and

23  Altria -- Pritzker and Valani are in the --

24  in the mix with Altria, that there is --

25  there is a basis for influence.

Highly Confidential

1      Q.      But that's an assumption --

2      A.      And a basis for -- but, you

3  know, my report deals primarily -- deals with

4  the period between, you know, mid-2017

5  to -- through the first quarter of 2020.

6      Q.      Okay.  And anything after that

7  would be -- you could guess, but it would be

8  speculative?

9      A.      That -- that's correct.  I

10  assumed that, as long as the relationships

11  are there, there is the basis for direction

12  and influence.

13      Q.      Okay.  And I'm almost done and

14  we can take a break.

15            You agree that there was

16  nothing fraudulent or illegal or -- let's

17  start with that.  Fraudulent or illegal about

18  Altria providing regulatory services to JLI?

19      A.      I'm not making those kinds of

20  judgments.  I'm looking at the business

21  questions of whether Altria played a --

22  played some part in managing, directing, and

23  operating JUUL.  It's not my job to make

24  those legal determinations.

25      Q.      Okay.  And it could be -- in

Highly Confidential

1          A.      I guess, in theory, it -- it

2    would be possible.

3          Q.      Okay.  And you're not -- you're

4    not providing any opinion that anything that

5    Altria did in the regulatory realm,

6    post-investment, led to growth in the youth

7    market.  Fair?

8                  MR. HUDSON:  Object to the

9          form.

10         A.      Well, I -- I don't know

11   because -- because what one does with respect

12   to regulation can certainly influence the

13   youth market.  And I would have liked to have

14   seen, you know, more dramatic and earlier

15   action on things like the mint flavor.  So,

16   you know --

17         Q.      (By Mr. Stekloff)  You just

18   don't know?

19         A.      I just don't know.

20                 MR. STEKLOFF:  Okay.  Let's

21         take a break.

22                 THE VIDEOGRAPHER:  The time is

23         11:01.  We are off the record.

24                 (Recess taken at 11:01 a.m.,

25         resuming at 11:23 a.m.)

Highly Confidential

1              Any time one teaches a business

2    case, one is generally trying to get the

3    students to analyze what the logic behind the

4    strategy is or behind the corporate actions.

5    In fact, Professor Rock says that he does

6    that with his students on every corporate

7    transaction.

8         Q.    Now, did -- in making that

9    assessment of the logic of the transaction,

10   did you have to make credibility

11   determinations of what the witnesses thought

12   at the time?

13        A.    No.  What I did was look at

14   what they said in contemporaneous documents,

15   what they said in their testimony, what they

16   actually did as reported in contemporaneous

17   documents or in their testimony.

18        Q.    So did you always just take

19   them at their word?

20        A.    Well, I would say no, I didn't,

21   because I would look at what they said and I

22   would look at what they did.  I would see

23   what actually happened, what actually

24   transpired.

25        Q.    So isn't that making a

Highly Confidential

Page 120

1    credibility determination?

2         A.    I don't think that's making a

3    credibility determination because I'm looking

4    at facts.  I'm looking at the fact, what

5    happened.

6         Q.    How is that not making a

7    credibility determination?  Looking -- you're

8    looking at different facts and deciding which

9    one you think was more significant at the

10   time.

11        A.    Well, what I would say --

12              MR. HUDSON:  Object to the

13        form.

14        A.    What I would say is I look at

15   what happened.  And I, you know, place -- I

16   report what happened and so I would just say

17   that I am looking at the facts and trying to

18   synthesize the materials that I have to

19   discern the facts.

20        Q.    (By Mr. Stekloff)  If one of

21   the executives at JLI or Altria or on the

22   board testified, were there times at which

23   you didn't accept the credibility of what

24   they said?

25        A.    Well, you know, I'm sure there

Highly Confidential

1  are times when -- well, I can -- in my

2  earlier report I cite all kinds of things

3  that the JLI board members said about how

4  they wanted to be the -- you know, the most

5  ethical company in this sphere, in this

6  arena, and then I looked at what happened.

7            And so, yes, there is some

8  conflict between what they said and what they

9  happened -- and what happened, what they did.

10  And so in that situation I would go with what

11  they did.

12            So they might say, we want to

13  be the most ethical company there is in the

14  arena of -- of our product.  And then I see

15  what they did in terms of targeting youth and

16  I see the -- I see the -- the actions they

17  approved and authorized.  And so I say, you

18  know, let's go with the facts.

19      Q.    So is that -- in doing that, is

20  that making a credibility determination that

21  their deposition testimony was not credible?

22      A.    No, I'm just looking at the

23  facts.

24      Q.    And ignoring their deposition

25  testimony or discrediting their deposition

Highly Confidential

1    testimony?

2         A.    I wouldn't say I'm discrediting

3    it.  I'm taking everything into account.  I'm

4    synthesizing everything.

5         Q.    Okay.  And if there are two

6    things that differ, what you think is a fact

7    based on an event that you think occurred

8    based on documents and deposition testimony,

9    and you believe those two things are at odds,

10   how did you decide which one to use?

11              MR. HUDSON:  Object to the

12        form.  Improper hypothetical.  If you

13        got an example.

14              MR. STEKLOFF:  She can answer

15        hypotheticals.

16        Q.    (By Mr. Stekloff)  You can

17   answer.

18        A.    Yes, I would like for you to

19   give a hypothetical.

20        Q.    You give me an example.  Well,

21   let's use the one you just used, that they

22   said they wanted to be the most ethical

23   company, that was their intent, and you said

24   you saw facts that you think belied that

25   intent.

1              How did you make a

2    determination of which one was right?

3         A.     Well, I think that's a pretty

4    easy call because, when you see people who

5    actually did and approved things that were

6    far from ethical by anybody's determination,

7    then I think that the facts are clear.

8              That's not really making a

9    credibility judgment.  That's just saying the

10   facts are the facts.

11        Q.     And saying -- so do you believe

12   that they -- in that instance that their

13   statement that they intended to be an ethical

14   company that was a leader in ethics was true

15   or false?

16        A.     Well, those of us who studied

17   behavioral ethics understand that people can

18   have intentions that they don't live up to.

19        Q.     So you're not questioning their

20   intentions?

21        A.     Well, it's not my job to judge

22   their intentions.  But the field of

23   behavioral ethics exists because there often

24   is a really gap -- a really big gap in what

25   people think their values are, say their

Highly Confidential

1      A.      Well, I don't remember.  But I

2  do -- I do agree with you that the terms were

3  agreed upon in late October and then the

4  investment was actually made in December.

5      Q.      Would it be relevant at all to

6  Altria's potential influence and soft power

7  in that -- in that October to December 2018

8  time frame whether the deal was still

9  uncertain?

10      A.      Well, I suppose it could be.

11  Anything is possible.  But, you know, I saw

12  the relationship developing, as I mentioned

13  to you beginning in 2017, continuing on

14  through the time of the services and then

15  continuing on after the services were

16  stopped, the Altria services.

17          So -- so, you know, the

18  relationship is there.  The sources of power

19  are developing before the deal is done.  And

20  then really, as I said earlier, flourishing

21  afterwards.

22      Q.      Right.  But if there's fits and

23  starts in a negotiation, deal is still

24  uncertain, doesn't that demonstrate in that

25  negotiation period that JLI actually had

Case 3:19-md-02913-WHO   Document 4393-1   Filed 03/19/25   Page 39 of 80

1  meaningful negotiation power?

2       A.    Well, it certainly -- it

3  certainly could mean that, yes. And -- and,

4  yet, we see Altria bearing some influence.

5       Q.    Okay.  Well -- but JLI also had

6  influence on whether the deal was going to be

7  finalized in that time period.  Correct?

8       A.    They did have the final say.

9  But I think the key to negotiation like this

10 is Altria convincing JLI and getting JLI

11 comfortable with Altria and Altria becoming

12 comfortable with JLI, that they are going to

13 be able to get JLI to do what they want them

14 to do, even with 35 percent investment rather

15 than a controlling investment.

16      Q.    So you think that at that point

17 Altria's only focus was whether they could

18 influence JLI?

19      A.    I think that Altria had to

20 become comfortable with the fact that they

21 had a relationship substantial and solid

22 enough with Pritzker and Valani, the

23 controlling shareholders, controlling board

24 members that -- that they were comfortable

25 with them, that they all wanted the same

1    thing and they'd be able to influence them to

2    do what they wanted them to do, even without

3    the 51 percent investment.

4              MR. STEKLOFF:  Can we mark this

5         as Exhibit 2, please.

6         (Marked was Drumwright Exhibit No. 2.)

7              THE WITNESS:  Thank you.

8         Q.    (By Mr. Stekloff)  And this is

9    a December 2018 document, Altria document,

10   titled "Strategy Update."

11             Do you see that?

12        A.    I do.

13        Q.    Have you reviewed this document

14   before?

15        A.    It's hard for me to say for

16   sure.  I have -- I have done -- I have

17   reviewed so many documents, it does look

18   familiar, I must say.

19        Q.    Okay.  And if you turn to

20   Page 5.

21        A.    Okay.

22        Q.    This is called "Project Tree

23   Backdrop."  Do you recall ever seeing this

24   page before?

25        A.    I can't say for sure.

Highly Confidential

Page 139

1  Altria.

2          Q.    Okay.

3          A.    So I don't think it was arm's

4  length.  I think there is evidence that -- I

5  know there is evidence that Pritzker and

6  Valani really wanted to get the job done and,

7  in fact, gave advice to Altria about

8  presenting itself in an appealing way.

9          Q.    Do you -- are you aware of

10  whether JLI was negotiating with other

11  tobacco companies in the 2017-2018 time

12  period?

13          A.    I don't know.  I don't recall

14  seeing evidence of that.

15          Q.    Okay.  If JLI was negotiating

16  with other tobacco companies in that period,

17  does that mean that they were also

18  influencing the management, direction, and

19  operation of JLI?

20          A.    I would have to look at those

21  data and see.  I just can't answer that in

22  the hypothetical.

23          Q.    Okay.  So you haven't looked at

24  at that at all?

25          A.    I -- that was not part of my

Highly Confidential

1    assignment.  I was looking at the Altria dual

2    relationship.

3         Q.    Okay.  Wouldn't that --

4    wouldn't that be relevant?  What actions --

5    you know, you say that Altria was influenced

6    all of these actions before the transaction

7    even took place.

8              Wouldn't it also be relevant

9    what discussions JLI was having with other

10   companies that it was potentially negotiating

11   a deal with?

12        A.    No, it would not be relevant.

13   And would you like for me to explain why?

14        Q.    No, it's okay.  I understand

15   your answer, that it would not be relevant.

16              You agree that Altria did want

17   majority control at various -- at most of the

18   points.  Correct?

19        A.    Well, we do know that they did

20   at some point.

21        Q.    Okay.

22        A.    But, you know, I can't speak

23   for all points.  And I can certainly see how

24   it might be advantageous for a company, like

25   Altria, to have less than majority interest

1   and to have plausible deniability in terms of

2   issues related to JUUL.

3        Q.     You saw numerous

4   contemporaneous documents that demonstrated

5   that Altria consistently wanted majority

6   control and were told no by JLI.  Correct?

7        A.     I don't know that I would

8   characterize it as consistent.  I saw some.

9        Q.     Did you see a single document

10  that evidenced the hypothetical speculation

11  that you just suggested, that they really

12  just wanted minority control to try to

13  hide --

14       A.     Well, they took minority --

15              MR. HUDSON:  Object to the

16       form.  Argumentative.

17       A.     They took the minority

18  investment, so that -- I think that speaks

19  for itself.

20       Q.     (By Mr. Stekloff)  Right.  Only

21  after being told there was no way that they

22  could get a majority investment.  Correct?

23       A.     I think they become comfortable

24  with the influence they had over Pritzker and

25  Valani and they knew that they could get

Highly Confidential

```
 1    it -- get what they wanted and had the

 2    direction, management, and influence absent

 3    minority control -- majority control.

 4         Q.    Did you review the deposition

 5    testimony of Pritzker and others who stated

 6    that their primary goal was to remain

 7    independent and not allow Altria to control

 8    JLI?

 9         A.    I do remember seeing that

10    testimony.

11         Q.    Okay.  And are you -- are you

12    saying that that testimony is false?

13         A.    I'm saying that, as I analyze

14    the facts in the case, as I analyze what

15    happened, I'm reporting that and relying on

16    that in my opinions.

17         Q.    I did not understand your

18    answer.  You're reporting what and relying on

19    what?

20         A.    Well, why don't you repeat your

21    question again?

22         Q.    Yes.

23               Are you saying that the

24    deposition testimony of Pritzker and others

25    who stated -- you told me you read their
```

Highly Confidential

1  testimony and they stated that their whole

2  goal was to remain independent and not allow

3  Altria to control JLI.  And you agreed that

4  you read that.

5           And then my question was:  Are

6  you saying that that testimony was false?

7       A.    I'm not.  And the reason is

8  because I think control -- I think they can

9  be using control in the same way that

10  Professor Rock was, where they are thinking

11  of legal control.  And what I'm looking at is

12  this business question.

13       Q.    Right.  But they maintained a

14  fiduciary duty and a duty of loyalty to JLI

15  after the transaction.  Correct?

16       A.    Well, in theory, they do and --

17       Q.    Not just in theory.  They have

18  that duty.  Correct?

19       A.    They do.

20       Q.    Okay.

21       A.    They do have that duty.

22       Q.    And you told me earlier that

23  you have no opinion -- beyond the fact that

24  they didn't put more money in -- which you

25  discussed with Mr. Guzman -- that they

Highly Confidential

Page 144

1   violated that duty?

2       A.      Well, it depends upon how --

3   how broadly one defines the duty of loyalty.

4   And I see that as a broad duty to

5   various -- to JUUL and its various

6   stakeholders.

7               And so I would say that I did

8   not see the kind -- I make the point in my

9   earlier report that, you know, I did not see

10  the type of responsible ethical behavior that

11  I would liked to have seen on their parts.

12      Q.      Right.  By not putting more

13  money back from the investment.  Correct?

14      A.      Right.  And not doing other

15  things that would have been responsible and

16  that would have taken into account

17  stakeholders, like the youth.

18      Q.      Okay.  And that's what you

19  discussed with Mr. Guzman.  Correct?

20      A.      Well, yes.  And when I did my

21  earlier deposition, we talked about that.

22      Q.      Okay.  Now, you are aware that

23  Altria had MarkTen products.  You mentioned

24  that before.  Right?

25      A.      I am aware.

Highly Confidential

Page 151

1       Q.      (By Mr. Stekloff)  My question

2    is simple.  I don't want you to repeat what

3    you said before.

4                Do you -- is it your expert

5    opinion that where Altria said it -- one of

6    the goals in entering the vaping space was to

7    convert adult smokers, that that -- that

8    those statements by Altria were false; and,

9    in fact, that they were trying to attract

10   youth vapors?

11      A.      It's not my job to make

12   determinations of the falsity or truthfulness

13   of Altria's statements.

14      Q.      So, sitting here, do you have

15   any reason to disagree with the statements

16   that you said you have seen in Altria

17   documents that Altria had a goal of obtaining

18   a product in the e-vapor space that was

19   converting adult smokers?

20      A.      I do see inconsistencies

21   between what they said and what they did.

22   And I have pointed to those inconsistencies

23   and, you know, I would have liked to have

24   seen a different set of actions, if that's

25   what they really are intending to do.

Highly Confidential

1  was a strategic reason for Altria to make the

2  investment.

3           So you don't have any cite to

4  say that one of the strategic reasons Altria

5  made the investment was because of JUUL's

6  youth foothold.  Right?

7      A.    Well, you know, I think I could

8  likely find something, but I thought that was

9  kind of self-evident that -- in fact, Monsees

10  had said earlier something about how -- you

11  know, where are all the Camel smokers going

12  to go?

13           And I think it's very clear

14  that, you know, having a youth market is an

15  important factor to compete for the future.

16           You know, I take your point

17  that I should have footnoted that, and I can

18  and would footnote that it's -- you know,

19  that JUUL has the youth market and that, for

20  most any company, getting young clients that

21  are going to have a lifetime of use is a

22  strategic move.

23      Q.    Right.  But this is the day I

24  get to question you.

25           So sitting here today -- and

Highly Confidential

1    please, you have that on October 18,

2    2018 -- I'm -- I'm sort of two lines up from

3    -- at the bottom of the first

4    paragraph -- Altria met with the FDA.  Do you

5    see that?

6            A.    I do.

7            Q.    And you have a Footnote 157.

8    So I wanted to ask you about that footnote.

9    It says in October 2018 Altria was also

10   creating and circulating a list of actions

11   JLI could take to address the youth issue as

12   requested by the FDA, including limiting the

13   sale of flavors other than tobacco, menthol

14   and mint, discontinuing use of social media

15   and establishing restrictions of bulk

16   transactions.

17            Do you see that?

18           A.    I do.

19           Q.    And then you go on to say when

20   JLI announced its youth action plan to the

21   public on November 13, 2018, these

22   suggestions were all included.

23            Do you see that?

24           A.    I do.

25           Q.    Do you have any evidence that

Highly Confidential

Page 176

1    Altria communicated to JLI what it should

2    include in that youth action plan?

3         A.    I assume that -- that this was

4    just a continuation of things they had said

5    earlier in terms of highlighting the

6    importance of these sorts of things and the

7    ability of Altria to address them.

8         Q.    But do you -- my question is a

9    little different.  Do you have any evidence

10   that -- I mean, I read your footnote to

11   suggest that Altria had -- had a say in the

12   actual youth action plan that was announced

13   to the public on November 13, 2018.  And my

14   question is, do you have any evidence that

15   Altria had specific communications

16   about -- with JLI about what it should

17   include in that youth action plan?

18        A.    I know they were reengaged in

19   negotiation.  I know they were talking about

20   those topics.  And -- and so my assumption is

21   that they -- that they did communicate that,

22   whether informally or formally.  I don't

23   remember the exact document.

24        Q.    Have you seen any documents in

25   which a communication like that occurred?

Highly Confidential

Page 177

```
 1        A.      Well, I can't -- I've seen so
 2   many documents, I can't recall specifically.
 3              But they were in negotiations,
 4   they were talking.  I don't think it's a
 5   stretch to assume that they were
 6   communicating.
 7        Q.      Did you look for any documents
 8   to see if Altria in fact -- that Altria in
 9   fact did not know what JLI would do as part
10   of the youth action plan?
11        A.      I -- I don't recall.
12        Q.      Okay.  If there are such
13   documents, would that suggest to you that
14   Altria was not managing, directing or
15   operating the November youth action plan that
16   was announced by JLI?
17        A.      No, because there are so many
18   ways to communicate priorities, and we saw
19   that happening as early as 2017.  So inasmuch
20   as there were continuing discussions and
21   negotiations, I don't think it's a stretch to
22   assume that -- that those sorts of priorities
23   were being communicated one way or the other.
24        Q.      Okay.  Now, put aside the mint
25   issue, which we'll discuss in a moment.  The
```

Highly Confidential

1  framing mint as a traditional tobacco flavor.

2  Correct?

3        A.      I think that was deceptive and

4  I think that if they didn't want to be

5  deceptive like that, they would have pulled

6  JUUL's mint product.

7        Q.      Well, in October 2018, Altria

8  did not have control to pull JUUL's mint

9  product.  Correct?

10       A.      That's right.  I was assuming

11  after the investment.

12       Q.      Okay.  But my question is

13  still -- I still -- we're talking past each

14  other again.

15              You make the -- you offer the

16  opinion that Altria was deceptive with the

17  FDA specific to mint.  Right?

18       A.      Correct.

19       Q.      Okay.  And my question is:  Is

20  it relevant to whether or not Altria was

21  deceptive with the FDA about mint -- is it

22  relevant whether or not Altria shared data

23  about mint and its role in JUUL's sales with

24  the FDA in the October meeting?

25       A.      It depends upon which data they

1    shared.  If they share in the very compelling

2    data that -- that JUUL and Altria had, that

3    would be an indication of trying to be

4    transparent.

5              I don't know if that happened.

6    And the fact that they -- and if that is,

7    indeed, the case, if they are sharing that

8    data, they should be saying, we don't want to

9    characterize that as tobacco products.

10              So if they shared that, then

11    they should have also said, you know, we are

12    not going to be characterizing that as a

13    tobacco flavor.

14        Q.    You agree with me that what

15    data they shared about mint is relevant to

16    whether or not they were deceptive with the

17    FDA?

18        A.    Well, I think it's relevant in

19    part, but the -- the real indication of being

20    straightforward about that would be to say,

21    we are categorizing mint as -- as a flavor

22    and not as a tobacco product.

23        Q.    And I -- I understand that

24    opinion but I -- the simple answer to my

25    question is:  The level of their deception is

1    Did you look into that?

2        A.    I don't recall having evidence

3    of that.

4        Q.    Okay.  And is it fair to say,

5    therefore, that you have no evidence that any

6    agreement between any two companies was

7    reached at that meeting?

8        A.    Well, that's the kind of thing

9    that we wouldn't typically find in documents.

10   You know, that's the kind of thing that --

11   that people would not be eager to share.

12       Q.    Did you -- did you read the

13   under oath deposition testimony of people who

14   attended that meeting?

15       A.    I read -- I certainly did read

16   many depositions.  I don't remember the

17   specific passages related to -- to that.  I

18   probably read it, but it's -- and I've read

19   so much in such -- over such a long period of

20   time I don't remember the specific passages.

21       Q.    Okay.  Do you have any reason

22   to question the veracity of any deposition

23   testimony by any individuals about what

24   actually occurred at that meeting?

25       A.    Well, you know, I would need to

Highly Confidential

1    see that deposition testimony and see -- and

2    know what actually happened.  That's the

3    process I go through where I, you know,

4    certainly read depositions, look at exhibits,

5    and then look at what actually happened.  And

6    I -- I would need to go through that process.

7         Q.    Okay.  But you didn't do that

8    here for this specific meeting?

9         A.    I -- I don't recall.

10        Q.    Okay.  In the same section, if

11   you can look at page -- back to Page 36.  And

12   we talked about Footnote 157.  But I just

13   want to ask more generally about that

14   paragraph.

15              I mean, my read of that para-

16   --

17        A.    Now, which -- which paragraph?

18        Q.    The first paragraph on Page --

19        A.    36?

20        Q.    -- 36.

21        A.    Okay.  Let me -- let me read it

22   again.

23        Q.    Sure.

24        A.    (Reviewing.)  Okay.

25        Q.    And just to sort of paraphrase,

Highly Confidential

1    A.    Well, there was -- there was

2   strategizing.

3    Q.    Okay.

4    A.    There was joint collaboration

5   and strategizing.

6    Q.    Okay.  Did you look to see

7   whether there were any contemporaneous

8   documents that were inconsistent with

9   coordinated strategizing?

10    A.    I don't recall seeing any.

11    Q.    Okay.  Would that be relevant

12   to -- to you determining, like you said, not

13   what was said but what actually happened?

14    A.    I certainly try to take into

15   account everything that I can, so I would

16   certainly consider --

17    Q.    Okay.

18    A.    -- something and -- and --

19    Q.    Okay.

20    A.    -- consider -- consider --

21   reconsider my opinion.  But --

22    Q.    Okay.  So if I showed you

23   something, you would reconsider your opinion?

24    A.    It's always -- I think one

25   always has to be open to that -- to that sort

1    of thing.  But from what I saw consistently,

2    it looked like both wanted mint on the

3    market, both kept mint on the market.  Mint

4    sales exploded and they exploded among young

5    people.  They continued to explode among

6    young people.

7         Q.     And you, to take it a step

8    further, believed that there was coordination

9    on taking that position, strategic position

10   in front of the FDA?

11        A.     It -- it certainly appears that

12   there was communication about that.  And

13   there certainly appears, since it was not

14   taken off the market by either of them, that

15   there was agreement on that.

16        Q.     Okay.  Verbal agreement where

17   they openly discussed this is how we should

18   -- this is the position we should take on

19   mint with the FDA --

20        A.     Well, there are all kinds of

21   ways --

22        Q.     -- in October of 2018?

23        A.     -- to communicate and -- and

24   sometimes the communication does not need to

25   be as overt as what you're talking about.

Highly Confidential

Page 201

1    Sometimes it could be as subtle as what I

2    cited where someone says what percentage is

3    mint and somebody else says majority.  So --

4    so, you know, there are all kinds of ways to

5    communicate and to -- to signal.

6         Q.    What was the level of

7    communication here on the mint issue in

8    October 2018?

9         A.    Well, on October 2018 they went

10   to a common meeting, they went to a meeting

11   to -- you know, to try to come up with --

12   with an industry position to limit the -- the

13   damage.

14        Q.    What is the common meeting that

15   you're referring to?

16        A.    Well, let's see.  The meeting

17   we were just talking about, was that --

18   wasn't that in this same time period or was

19   that shortly after?

20        Q.    Well, that was in July of 2017,

21   according to Footnote 139.

22        A.    Okay.

23        Q.    So that's year -- over a year

24   and three months beforehand.

25        A.    So, you know, I think that --

Highly Confidential

1    that given the relationship I saw between

2    Altria, Pritzker, Valani, other board

3    members, given the fact that we had

4    Crosthwaite and Murillo -- Murillo -- not

5    yet, not yet but -- but you're right.  You're

6    right.  You're right.  I --

7            Q.      You're confused --

8            A.      That was later.  That was

9    later.  But, you know, I -- I -- I think that

10   we -- I think that -- that it's reasonable,

11   given the relationship that I described

12   between Pritzker and Valani and Altria that

13   there's communication.

14           Q.      Okay.  So you -- so

15   your -- your -- your opinion, which I assume

16   you offer all of your opinions to a

17   scientific degree of certainty.  Right?

18           A.      Correct.

19           Q.      Okay.  So your opinion is to a

20   scientific degree of certainty, there was

21   coordination between JLI and Altria in

22   October 2018 on what to say to the FDA about

23   mint based on what you just described, the

24   relationships between board members and

25   Altria, and -- and -- and that -- and

Highly Confidential

1    therefore, that -- that allows you to say

2    that there was coord- -- direct coordination

3    on this issue?

4                    MR. HUDSON:  Object to the

5            form.

6            A.    I would not limit this time

7    period to October 2018.  You know, I talk

8    about how -- earlier I talk about how in June

9    there is this exchange between Demetri and

10   Valani.  So I would just say that the

11   relationship has developed.  Altria has

12   influence and -- and the power dynamics are

13   there for the two to share information and

14   share priorities.

15           Q.    (By Mr. Stekloff)  Okay.  Now,

16   if you go to -- we're still on the same

17   section, Page 37, if you look at -- if you

18   look at Footnote 165.  We talked before about

19   164.  Do you see Footnote 165?

20           A.    I do see it.

21           Q.    Okay.  And that is --

22                    MR. STEKLOFF:  Actually, maybe,

23           can we actually pull -- pull that

24           document up?

25           Q.    (By Mr. Stekloff)  I don't

Page 206

1   public document necessarily.  It's just been

2   a long time since I looked at it.

3         Q.     Okay.  If it was, is that

4   relevant?

5         A.     Well, you know, I don't know.

6   I would want to know how widely available it

7   was.  And -- and I still think -- even with

8   those documents available, I think it's

9   incumbent upon responsible, ethical companies

10  to take stands like what I would like for

11  Altria to have done and say, hey, we

12  characterize mint as a flavor that youth are

13  attracted to.

14        Q.     Right.

15        A.     It's a problem.  So that's what

16  I would have certainly recommended, that

17  Altria to do.

18        Q.     Does that document allow Altria

19  to know that teenagers preferred

20  mint-flavored cigarettes, if it was public

21  and Commissioner Gottlieb read it, he would

22  also have learned from that document that

23  teenagers preferred mint-flavored

24  e-cigarettes.  Right?

25        A.     I don't know what he had access

Page 208

1    whether it was public or not, to Commissioner

2    Gottlieb in the meeting?

3          A.      I don't recall seeing evidence

4    of that and I don't know that I would have

5    access to that information.

6          Q.      Well, what if there was

7    deposition testimony by Altria -- folks who

8    were at the meeting about whether or not they

9    gave the Deutsche Bank study to Commissioner

10   Gottlieb during their meeting?

11         A.      Well, I would certainly

12   consider that, but I think the manner in

13   which one gives that information and the

14   advice one gives really matter, too.

15                 Altria is an expert in the way

16   FDA commissioner is not on this particular

17   product in this particular market.  So I

18   still think it's incumbent upon a responsible

19   company to say, hey, we need to characterize

20   mint as a flavor that's attracting youth,

21   just like Creme Brulee.

22         Q.      And did you read any deposition

23   testimony by Altria employees or executives

24   about what they said about mint or that study

25   during the meeting with Commissioner

1   Gottlieb?

2        A.    Well, I don't recall off the

3   top of my head.  I read -- as I mentioned,

4   I've read a lot over a period of time.

5        Q.    Okay.  Do you agree that it

6   would be relevant to whether or not Altria

7   deceived -- what was said about the

8   Deutsche Bank study during the meeting would

9   be relevant to whether or not Altria deceived

10  Commissioner Gottlieb and the FDA regarding

11  mint?

12       A.    It certainly could be relevant.

13       Q.    Okay.  And you, sitting here

14  today, can't tell me what you read or didn't

15  read about that issue?

16       A.    That's correct.

17       Q.    Okay.

18       A.    But, again, as I have

19  explained, a responsible, ethical company in

20  the position of Altria, with much more

21  expertise on this product category than the

22  FDA, than Scott Gottlieb, should have

23  characterized mint differently than other

24  traditional tobacco flavors.

25                So I will stand by that

Highly Confidential

1    would just say why didn't it happen earlier.

2         Q.    Did you look at JUUL's market

3    share between 2018 and 2019?

4         A.    I'm sure I did at some point.

5    I don't remember exactly what it was then.

6         Q.    Okay.  But we agree that the

7    Altria nonregulatory services that we talked

8    about earlier ended, I think you said,

9    March 2020, was your understanding?

10        A.    Yes, but I would just say what

11   I am analyzing is really much -- much beyond

12   just formal service agreements and formal

13   contracts.  I'm looking at the influence of

14   Altria, particularly on Pritzker and Valani,

15   and how that directed and managed JUUL.

16             So I think we may have been

17   talking past each other earlier when we were

18   talking about the ending of the service

19   agreement in 2020.  Yes, that did end, but

20   the influence, the ability to manage and

21   direct JLI by Altria did not end then because

22   those relationships continued, the power

23   dynamics continued.

24        Q.    Okay.  That wasn't my question,

25   but I understand.  You very thoroughly laid

Page 227

1      Q.      Do you -- okay.  So would that

2    apply to any time any company offers billions

3    of dollars to another company for -- for a

4    share of the company, that is de facto

5    influence from one company to another?

6      A.      I would say that those

7    amount of -- that amount of money, those

8    amounts of money certainly are rewards that

9    form a basis for a type of power.  And what

10   becomes problematic is what happened after

11   that, the fact that, as I've said repeatedly,

12   that the distribution and sales of a -- of a

13   problematic product that was attracting youth

14   was greatly expanded.

15     Q.      Okay.  Now, you agree that

16   Altria offered billions of dollars for a

17   majority stake in JLI, right, initially?

18     A.      Well, I know they -- I know

19   they wanted a majority stake.  I don't know

20   what they offered.

21     Q.      You don't know if they offered

22   billions?

23     A.      I don't know what they offered

24   for a majority stake.  I assume it would be

25   billions since they offered billions for a

Highly Confidential

1   decision to only provide the company with the

2   $200 million.

3        A.      Well, you know, knowing the

4   power that Altria had, Altria is the

5   800-pound gorilla, I would imagine if Altria

6   wanted more to go to the company, they would

7   have had a way to -- to influence that.  So,

8   you know, that's what I -- I imagine.

9        Q.      I'm not asking what you

10  imagine.  I'm asking you about your opinions

11  to a reasonable degree of scientific

12  certainty.

13              Do you have any opinion that

14  Altria, to a reasonable degree of scientific

15  certainty, decided that only $200 million

16  could go to the company?

17       A.      I don't -- I don't know how

18  that decision came about, but I do know that

19  Altria knew what was happening and must have

20  agreed to it since it was in the contract.

21       Q.      Did you look to see if there

22  were any contracts that Altria wanted more

23  money to go into the company?

24       A.      I didn't see any.  And I looked

25  at a lot of documents.  That doesn't mean

Highly Confidential

Page 233

1    that it's not there somewhere, but in the

2    many documents I looked at I did not see

3    that.

4         Q.    Okay.  Now, turning to a new

5    topic, which is the services, do you agree

6    that Altria had no control under the services

7    agreement about which services JLI elected to

8    take and not take?

9         A.    You said "control," so that

10   suggests that they could force them to do

11   that.

12        Q.    Yes.

13        A.    What I would say is that, from

14   what I could tell, Altria had influence,

15   internal influence and --

16        Q.    But answer my question about

17   control.  I understand your opinion about

18   influence.

19        A.    So if your question is did

20   Altria have 51 percent ownership in JUUL and

21   ability to force them to use Altria service

22   -- services, we know they didn't.

23        Q.    Okay.

24        A.    But as I've made the point --

25              MR. STEKLOFF:  Judge Larson,

Highly Confidential

1    and operation, but if I'm not asking

2    about that, I don't need you to -- to

3    add it on.  I just want the answer to

4    my questions, if that's okay.

5            MR. HUDSON:  Okay.  And all

6    I'll say on the record is that I think

7    today she has been very responsive to

8    the questions that have been asked.

9    If there's one category where you're

10    unhappy about that it's fine to have

11    mentioned that, but I don't think it

12    needs to rise to the point of

13    escalating the situation.  We

14    understand and she'll do her very best

15    to answer your questions.

16        Q.    (By Mr. Stekloff)  Okay.  But

17   my question is just simple.  Yes or no.  Did

18   Altria -- I'm -- I'm conceding the -- the

19   point.  Simple question, did Altria have the

20   legal ability to force JLI to take any of its

21   services?

22        A.    It did not have the legal

23   ability.

24        Q.    Okay.  Thank you.  Is it also

25   true that JLI chose not to take many of the

Highly Confidential

Page 236

1    services that Altria offered?

2        A.    Well, I don't know that I have

3    a full understanding of what they didn't take

4    because what shows up in the record is what

5    they -- what they did take.

6        Q.    Okay.  Well, isn't it relevant

7    in assessing JLI's influence to direct,

8    manage or operate the company what services

9    Altria offered to JLI and wanted JLI to take

10   that JLI did not take?

11       A.    No.

12       Q.    Okay.  Are you aware that

13   Altria wanted JLI to take its youth services

14   that were offered?

15       A.    Yes.

16       Q.    Do you agree that Altria did

17   not have the influence to not legally force

18   but with it -- the noncoercive ability to

19   have JLI take its youth services and -- and

20   -- and then be part of the direction,

21   operation and management of youth services?

22       A.    So -- so my understanding of

23   the new day, new JUUL plan, is that it

24   involved those services and that it was

25   instituted in conjunction with K.C.

Highly Confidential

Page 245

1   because it was certainly seated by Altria in

2   making him its board observer.

3        Q.    Is it a bad thing to consider

4   hiring someone that you are exposed to

5   through company-to-company interactions who

6   you view as highly qualified and competent?

7        A.    Well, I think there is

8   certainly -- it would be hard to say that

9   it's necessarily a bad thing.  And what

10  I'm -- I'm not saying it's a bad thing.  I'm

11  just saying it's an evidence of influence,

12  direction, management, and operation, or some

13  part in it.

14       Q.    Okay.  Once Mr. Crosthwaite

15  went to JLI, are you saying that -- well, you

16  agree that he had his own fiduciary duty and

17  duty of loyalty to JLI.  Correct?

18       A.    Well, certainly that is

19  incumbent upon a CEO and a board member,

20  which he became.  So certainly that's the

21  case.  But, as you read in my report, I talk

22  about executive socialization and about how

23  he would be predisposed to be open to

24  Altria's influence.

25                Altria helped him prepare to

Highly Confidential

Page 249

1    Crosthwaite.  And I cite documentation

2    that -- that Altria helped prepare

3    Crosthwaite for that interview and for taking

4    on that position.

5                So I think it's pretty clear

6    that that's what Altria wanted and that

7    Altria was -- was directing.  Now, that

8    doesn't mean that JUUL didn't also want it.

9    Because the key to -- to informal influence,

10   the key to soft power is making others want

11   what you want so you don't have to force

12   them.

13               MR. STEKLOFF:  Can we maybe go

14        off the record?  I'm not -- I'm just

15        trying to get her to answer my

16        question.  I know she has, like, a lot

17        of other opinions that are very

18        thoroughly laid out, but we have moved

19        so far past the point of her answering

20        my questions that do you think a break

21        is a good idea?

22               MR. HUDSON:  We can take a

23        break.

24               THE WITNESS:  Yeah, I'd like to

25        take a break and go to the restroom.

Highly Confidential

1    Q.    And have you studied the

2  details of how distribution and -- and -- and

3  marketing services occurred between -- after

4  the Altria investment?

5    A.    Yes, as I think my report

6  explains, I have looked at many documents,

7  have synthesized those documents.

8    Q.    Did you look to see

9  whether -- let's focus on marketing -- a lot

10  of the marketing efforts that Altria provided

11  formally in services between early 2019 and

12  early 2020 were -- were actually failures,

13  that they didn't work well, they didn't

14  result in a lot more sales?

15    A.    Well, there were so many other

16  things going on in the market at that time.

17  I think it's hard to -- it's -- it's hard to

18  lay blame on their strategies.  And, you

19  know, I'm not arguing about whether what they

20  did worked or not.  I'm arguing that their

21  -- or I'm opining on the direction, influence

22  and operation.

23    Q.    Okay.  But so may -- some of

24  the -- even if they influenced the marketing

25  operations, some of it may have not worked

Highly Confidential

1  services that it provided to JLI beginning in

2  early 2019.  Right?

3       A.     Certainly.  And -- and probably

4  direction, operation and management peaked

5  when the services were at their peak.  But

6  they certainly didn't begin with the services

7  contract and they didn't end.  The influence

8  and management direction did not end with the

9  service contract because those relationships

10 pre-existed and post existed.

11      Q.     Well, you told me earlier you

12 didn't do any assessment of influence after

13 March 2020.  Right?

14      A.     Well, I think -- I think that

15 perhaps we were talking past each other at

16 that point.  And what I was intending to --

17 to say is that, you know, certainly the

18 ability to manage, influence and direct was

19 aided by those services contracts.

20             But because of the

21 relationships, they didn't begin with the

22 services contract and they didn't end with

23 the services contract.  They continued

24 because we still had Valani and Pritzker and

25 Altria with these -- with these relationships

Highly Confidential

1    and all of those sources of power still

2    existing for Altria.

3              In fact, you could argue that

4    some of those sources of power, like the

5    referent power where people developed deeper

6    relationships and like each other better,

7    appreciate each other more, those are likely

8    to deepen with time.

9        Q.    And during that entire time

10   period, JLI is still trying to obtain a PMTA

11   and a necessity of that is to address youth

12   vaping issues.  Correct?

13       A.    Yes.  That is part of the PMTA.

14       Q.    Okay.  Now, are you aware,

15   looking at Footnote 268 that you just pointed

16   to, of when that data is collected?

17       A.    Well, I don't recall off the

18   top of my head.  I would have to look at

19   those documents again.  One has a 2019 date;

20   one has a 2018 date.

21       Q.    Right.  You're certainly

22   implying that this -- goes through the end of

23   2019.  Right?

24       A.    What goes through the end of

25   2019?

Highly Confidential

Page 266

1   of 2019?

2        A.    I did not.  At least I didn't

3   cite that.  I probably looked at it, but

4   I -- may have looked at it.

5        Q.    And if that data -- if that

6   data showed the numbers were actually

7   decreasing, why didn't you include that in

8   your report?

9        A.    Well, I think that one thing

10  you could say -- in terms of thinking about

11  why they would be decreasing is because there

12  were so many external factors that were

13  depressing sales at that point.

14       Q.    Right.  And I'm not asking you

15  about why they may have been decreasing.  I'm

16  asking you -- it seems very -- is -- do you

17  think that it is misleading to put numbers in

18  here, suggesting that they run through the

19  end of 2019, when you had access to

20  2000- -- early 2020 data that would have, in

21  fact, shown that the numbers were decreasing

22  by the end of 2019?

23       A.    Well, I think that you've made

24  a good point, that I -- that I should have

25  gone on and presented the new data and

1   explained why they were probably less, but

2   this is a very egregious thing that we

3   see -- we see these numbers increasing.

4            And -- and, as I've mentioned,

5   I argue that the relationship and the

6   influence and the direction didn't start with

7   the service agreements, that those are, you

8   know, legal agreements and that the -- the

9   power dynamics began considerably earlier.

10       Q.     Right.  But you told me before,

11  under oath, that if I needed an absolute date

12  of when the influence was having a real

13  impact on the direction, management, and

14  operation of the JLI, it was the date that

15  the deal occurred.  Correct?

16            MR. HUDSON:  Object to the

17       form.  I think that mischaracterizes

18       her testimony.

19       A.     Yeah, I do think that

20  mischaracterizes.  If you looked at the -- if

21  I were only to have the preinvestment data,

22  if the investment didn't happen, it might be

23  a harder case to make.

24            But given -- but I think I did

25  demonstrate that influence was happening

Highly Confidential

Page 268

1    before the investment, when you take the pre

2    and the post investment.

3           Q.     Okay.

4           A.     Then we have, I think, a case

5    that's not a close call.

6           Q.     Okay.  And just looking at the

7    preinvestment, it's irrelevant to your

8    opinions about the preinvestment, what --

9    whether -- what Altria was doing

10   competitively with JLI, correct, with the

11   Elite pod products?

12                 That's irrelevant.  Right?

13          A.     Well, what I would say is that

14   I didn't feel like I needed to analyze

15   what -- what Altria was doing or what other

16   competitors were doing with their products in

17   order to understand the dynamics between

18   Altria and JLI.

19          Q.     Right.

20          A.     So I wouldn't say that it's

21   irrelevant, but I would say that I didn't --

22   I don't know that I would go so far as to say

23   it's totally irrelevant, but I didn't feel

24   like it was necessary to understand the

25   dynamics between these two parties.

Highly Confidential

1    continued to read documents since last

2    September and that I have read more documents

3    since then, yes.

4          Q.    Okay.  But how much work -- how

5    many hours have you spent working on this

6    case since last September?

7          A.    You know, I would have to go

8    back and look at my bills.  I don't know.  I

9    know that I have -- you know, I billed after

10   September, before the end of the year, and I

11   billed again after the -- the new year

12   started, so I -- I would just have to go back

13   and look at my records.  I don't know.  But I

14   have been working a lot on this.

15         Q.    Okay.  That's fine.

16         A.    I mean, I -- it's --

17         Q.    In your second -- I'm sorry.

18               Your second report in May of

19   this year, as I read it, only discusses the

20   work of Professor Rock.  Am I right about

21   that?

22         A.    I would disagree with that.  I

23   certainly respond to Professor Rock, but I do

24   a lot of analyses that he did not do that's

25   not in response to him.  I tried to look at

Highly Confidential

Page 283

1    the logic behind the investment and at the

2    interactions between JLI and Altria.  So I

3    would say that it's more than a response.

4         Q.    I'm sorry to interrupt you.

5    It's a little slow on the transmission.  So

6    if I talk over you I can assure you that it's

7    inadvertent.

8         A.    Same here.

9         Q.    So -- but if your

10   assignment -- I'm looking at your

11   assignment -- that you were asked -- this is

12   from your report in May of this year.

13             You say, "I was asked to review

14   professor Edward D. Rock's expert report

15   regarding Altria" -- and there is his name --

16   "that his relationship to JUUL Labs and to

17   evaluate the evidence from a practical

18   business perspective to determine whether

19   Altria had some part in directing the affairs

20   of JLI during the relevant period and, if so,

21   to explain the ways that Altria directed

22   JLI's affairs."

23             Did I get that right?

24        A.    I believe so.

25        Q.    Okay.  So it'd be fair to say

Highly Confidential

Page 398

1   any changes and the reasons therefor;

2   _____ was not requested by the deponent or a

3   party before the completion of the

4   deposition.

5        I further certify that I am neither

6   counsel for, related to, nor employed by any

7   of the parties or attorneys in the action in

8   which this proceeding was taken, and further

9   that I am not financially or otherwise

10  interested in the outcome of the action.

11       Certified to by me this 2nd day of

12  June, 2022.

13

14

15

16  _____

        Pat English-Arredondo,
17      CSR (TX), RMR, CRR, CLR
        Texas CSR 3828
18      Expiration Date:  4/30/2024

19  Local Affiliate Reporter for:
    TSG Reporting, Inc.
20  JBCC No.: 615 2016
    228 E. 44th Street, Suite 810,
21  New York, New York 10017
    Phone: 212-702-9580
22

23

24

25  Job No:  211783