# Exhibit 8

1      UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3        Case No. 19-MD-02913-WHO

4

5   IN RE:  JUUL LABS, INC.

6   MARKETING, SALES PRACTICES

7   AND PRODUCTS LIABILITY LITIGATION

8   _____/

9

10       VIDEOTAPED DEPOSITION

11        DAVID CUTLER PhD

12       Boston, Massachusetts

13        Friday, May 6, 2022

14

15

16

17   REPORTED BY:

18   DEBORAH ROTH, CSR, RPR

19   JOB NO. 210657

20

21

22

23

24

25

1    and third methods were regression --

2        Q. Right.

3        A. -- used regression analysis.

4        Q. So method 3 was a regression where

5    you considered various personal factors

6    and also state regulations and policies

7    and then you looked to determine whether

8    they explained the movement in underage

9    vaping in 2017 and '18, fair?

10        A. Yes.  That's a very good summary.

11    Thank you.

12        Q. And then in your -- in your

13    Bellwether report, you've also done, I

14    think you say that I'm using the same

15    method 3, and using that method you look

16    for but-for vaping results in the

17    specific Bellwether communities; is that

18    fair?

19        A. Yes.  That is correct.

20        Q. Okay.  Now, in your first report

21    you agreed that that method 3 regression

22    does not rule in a causal factor for

23    youth vaping, correct?

24        A. I'm sorry, I didn't understand what

25    you meant by the last part of the

1    A. That's correct, yes.

2    Q. But, in fact, the way that the

3    but-for vaping rates are -- are

4    determined for the Bellwether specific

5    communities does not use exactly the same

6    steps as the work that you did for making

7    the national prediction, correct?

8    A. I think that's incorrect.

9    Q. Okay.  So the first step of the

10   national regression was a model that --

11   estimating a model based upon individual

12   data.  The first step of the Bellwether

13   regression is not estimating a model,

14   correct?  You use the same coefficients

15   that you -- that you got from the first

16   regression that you did in your generic

17   report, right?

18   A. That's correct.  I used the same

19   regression as in the generic report.

20   Q. You used the results of the

21   regression.  You didn't do it in the same

22   -- you used coefficients that were

23   derived from individual responses in --

24   in the YRBS.  That estimated the model.

25        And the second exercise for your

Page 233

1    have been asked that I intend to offer.

2        Q. Is this research that you're

3    mentioning, is that consistent with your

4    keeping up with the literature that you

5    referred to when you were talking about

6    how you prepared?

7        A. Keeping up with the literature,

8    trying to write articles in the

9    literature and things like that.

10       Q. Is any of this research that you

11   are describing, is it specific to JUUL?

12       A. No.  None of the research is

13   specific to JUUL.

14       Q. Let's talk a little bit about your

15   opinions with respect to Altria.  And I'm

16   looking at your January report.  You

17   write that you considered the question:

18   Did the actions of Altria have a causal

19   impact on the use of vaping products by

20   youth in the Bellwether areas?

21           Is that the question that you've

22   considered with respect to Altria?

23       A. Yes, that is the question that I

24   considered with respect to Altria.

25       Q. Are there any other questions that

Page 234

1    you are considering with respect to

2    Altria in particular?

3       A. No, that -- that's the only

4    question about Altria.

5       Q. And then your opinions that

6    correspond to that question, those are

7    all contained in Section 4 and the

8    corresponding appendices of your January

9    report?

10      A. The specific ones about Altria,

11    yes.  For some of the context,

12    obviously, one needs the other parts of

13    the report, but those specific opinions

14    are in Section 4.

15      Q. And are you offing any other

16    opinions with respect to Altria that are

17    not contained in Section 4?

18      A. No.  Except, you know, except as

19    regards like I obviously have general

20    opinions about the marketing here that

21    are not specific to Altria, but some of

22    which would be applicable to the period

23    of time where Altria was involved.

24      Q. Yeah.  I think I understand you.

25    And hopefully you understand me.  I'm

1   really focusing just on making sure we're

2   identifying the opinions that are

3   specific to Altria --

4       A. Uh-huh.

5       Q. -- and it sounds like we are in

6   agreement that that's contained in

7   Section 4?

8       A. Yes, that's correct.

9       Q. With respect to Altria, you

10  examined two particular actions that it

11  took, some store visits and the ITP

12  program; is that correct?

13      A. That's correct.  As we discussed in

14  the last deposition, Altria did have

15  other things that it did, for example,

16  helping with the PMTA, and so on, but in

17  terms of what I analyzed specifically, I

18  analyzed those two sets of actions.

19      Q. So on that point you are not

20  offering any analyses with respect to

21  impact, if any, of Altria's help

22  regarding JUUL's PMTA, correct?

23      A. I have not offered a quantitative

24  opinion on that, no.  I -- I talk in

25  the, particularly in the September

1  effective.

2      Q. But, again, just to be clear, you

3  have not quantified that in any way?

4      A. I have not quantified the

5  independent impact of those specific

6  programs.

7      Q. And the same is true for Altria's

8  direct marketing services, you have not

9  quantified the impact of any of those

10  services?

11      A. That's correct.  I have not

12  quantified the impact of them.  To the

13  extent that they show up in, you know,

14  more sales, you know, some of them would

15  be captured by the impact of the Blitz,

16  and the ITP reset and the general

17  distribution, but I've not quantified

18  them empirically.

19      Q. And the empirical quantification

20  that you have done, that is limited to

21  the store visits and the ITP program,

22  correct?

23      A. That's correct.  The empirical

24  quantification looks at those with the

25  understanding that those other programs

Page 240

1  are, if you will, in the background

2  supporting them.

3      Q. And with respect to store visits

4  you've conducted a regression analysis,

5  right?

6      A. That's correct.  I use a regression

7  analysis similar to the September report

8  to look at the impact of the Blitz

9  program.

10     Q. And the store visits that you

11  looked at, to state the obvious, those

12  were to retail stores?

13     A. That's correct, yes, they were to

14  retail stores.

15     Q. Retail stores are required to

16  verify the age of customers who purchase

17  products, or e-cigarettes in this case?

18     A. Yes.  My understanding is they were

19  required to do age verification.

20     Q. Regressions that you provide with

21  respect to store visits, they estimate

22  retail sales with respect to certain

23  stores, right?

24     A. That's correct.  They look at

25  whether stores that received visits or

1    Q. In your regression analysis you

2    don't tell us who the consumer of the

3    product is, right?

4    A. They do not.  We have certain

5    indications about who the consumer is

6    because we know that the products that

7    are most influenced are the mint

8    products that are very heavily consumed

9    by youth.  So it's the flavored

10   products.  And flavored products had a

11   particular appeal to youth.

12        We also know that in 2019 based

13   on the September report, roughly -- my

14   estimate is that roughly half of JUUL

15   products were used by youth.

16        So I -- I have a strong basis

17   for believing that a lot of those sales

18   were to youth, but I don't have a

19   quantitative estimate of how many, of,

20   you know, saying, okay, this number of

21   the -- of the pods in this store were

22   consumed by youth.

23   Q. And, Professor Cutler, I appreciate

24   your point of view.  I think my question

25   was much simpler than that, and just in

1    CERTIFICATE

2    COMMONWEALTH OF MASSACHUSETTS )

3    COUNTY OF SUFFOLK            )

4        I, Deborah Roth, a Registered

5    Professional Reporter and Notary Public

6    duly commissioned and qualified in and

7    for the Commonwealth of Massachusetts, do

8    hereby certify: That DAVID CUTLER, the

9    witness whose deposition is hereinbefore

10   set forth, was duly identified and sworn

11   by me, and that the foregoing transcript

12   is a true record of the testimony given

13   by such witness to the best of my

14   ability.

15       I further certify that I am not

16   related to any of the parties in this

17   matter by blood or marriage, and that I

18   am in no way interested in the outcome of

19   this matter.

20       IN WITNESS WHEREOF, I have

21   hereunto set my hand and affixed my

22   notarial seal this 8th day of May 2022.

23   _____

24   Deborah Roth, CSR: 14700-S, RPR: 34250

25   My Commission Expires:  December 15, 2028