# Exhibit 10

# RULE 26 EXPERT REPORT
# OF MINETTE E. DRUMWRIGHT, Ph.D.

## JUUL Litigation

## May 2, 2022

_____

**Minette E. Drumwright, Ph.D.**

Communication and Leadership Degree, a degree that I was instrumental in creating. For 19 years, I have been chair or co-chair of the interdisciplinary Bridging Disciplines Programs in Leadership and Ethics. Before joining the faculty at UT Austin, I was an assistant professor at the Harvard Business School. I was also a faculty research associate in Harvard's College of Arts and Sciences. The universities and colleges where I have taught and conducted my research are all highly ranked, research institutions. For example, recent rankings put the Stan Richards School of Advertising & Public Relations #1 in the nation; the Moody College of Communication #2 in the nation; the undergraduate program at the McCombs School of Business #5 in the nation, the MBA program #15 in the nation; Harvard University #2 in the nation and the Harvard Business School's MBA program #4 in the nation.

My research and teaching are in the areas of marketing, advertising, ethics, and corporate social responsibility. I have published 30 articles in refereed journals, and I have edited a book, *Ethical Issues in Communication Professions: New Agendas in Communication*. I have published 14 book chapters and 29 refereed conference papers. I also have published 26 cases and teaching notes.

I have won national awards for my research. For example, I won a lifetime achievement award for my research on advertising ethics and social responsibility from the American Academy of Advertising: the Kim Rotzoll Award for Advertising Ethics and Social Responsibility. As another example, I won the Best Article Award from the *Journal of Advertising* for my article, "How Advertising Practitioners View Ethics: Moral Muteness, Moral Myopia, and Moral Imagination." I have won research awards at UT Austin. For example, I won the Joe and Bettie Branson Ward Excellence Award for Research, Teaching or Demonstration

on Academic Leadership. I have led in developing study abroad programs. For example, I helped launch the Maymester Study Abroad Program and taught International Advertising in Spain and in England. I won the President's Award for Global Learning in its inaugural year and taught in Accra, Ghana. I have conducted research on advertising ethics in the Middle East and North Africa.

### III.     My Assignment and Opinion

I was asked to review Professor Edward B. Rock's expert report regarding Altria Group, Inc. (Altria)'s relationship to JUUL Labs, Inc. (JLI), and to evaluate the evidence from a practical business perspective to determine whether Altria had "some part in directing" the affairs of JLI during the relevant time and, if so, to explain the ways that Altria directed JLI's affairs.

Professor Rock argued that Altria's motivation for investing in JLI was to make an "intermediate case" strategic investment that did not involve having "control" of JLI.[3] He described a spectrum of investments anchored at one extreme by a passive, arms-length investment:

> At one extreme, companies often have an excess of cash flow and need to find a productive way to put the money to use. Investing in stocks and bonds can be the best use of the cash. Thus, many companies with excess cash flow have large investment portfolios.[4]

The other extreme is anchored by an investment of more than 50 percent ownership that provides a controlling interest in a company and the ability to direct it:

> At the other extreme, companies sometimes decide that they want to acquire another company. . . . there are a variety of different transactional structures

---

[3] Government Entity Bellwether Case Specific Expert Report of Professor Edward B. Rock dated January 28, 2022 [hereinafter "Rock Rpt."] at ¶ 43.
[4] *Id.* at ¶ 36.

11

structured so that Altria had actual legal control of JLI, Professor Rock ignores entirely the real question at issue: did Altria have formal or informal business relationships with JLI, its Board of Directors and its executive leadership team that allowed it to have "some part in directing" the affairs of JLI during the relevant time period?

The clear answer to this fact-intensive question from a business perspective is yes—the evidence shows that Altria played a significant part in directing the affairs of JLI during the relevant time period in a number of ways and through a number of different relationships and strategic business maneuvers. Professor Rock ignores nearly all this evidence by setting up a construct in which he analyzes whether one company could force another company to do something against its will because it has control of the company from a legal perspective.[21] That construct ignores the evidence here, and basic business principles.[22] Altria did not make a hostile take-over bid for JLI, and then force JLI to take actions against its will. Instead, Altria made a strategic investment in JLI with the clear goal of being able to direct the company's future, which is exactly what happened as Altria installed new leadership, and managed and operated JLI, directly and indirectly, in a host of different ways. Importantly, the evidence shows that Altria spent considerable time to ensure that its interests were aligned with JLI's Board of Directors before investing $12.8 billion into the company.

In the report that follows, I will demonstrate the following:

- It is naïve, simplistic, and ignorant of business dynamics to expect that a company (Altria) making a $12.8 billion dollar investment, the largest private investment in Silicon

---

[21] *See* Rock Dep. at 122-23-123:9 ("[T]he governance structure created here makes it impossible for . . . [Altria] to force JLI to do anything whatsoever. . . . Altria has no ability, no power, to tell JLI, its directors, its officers, its senior executives or its junior executives what to do.").
[22] *See* Rock Dep. at 106:21-107:2 (acknowledging there is a difference between legal control and influence).

    Valley to date, in a company (JLI) would not exercise direction, operation and management over that company directly or indirectly. As the single largest shareholder with 35 percent of JLI's shares and strategic alignment with JLI's existing board members who also had significant ownership interests, Altria had the ability to manage and operate JLI in nearly all respects and played a significant part in directing the affairs of JLI during the relevant time period.

- It is naïve, simplistic, and ignorant of business dynamics to expect that a tobacco behemoth (Altria) with immense operating expertise and massive resources in regulatory affairs, distribution, marketing, and sales would not exercise direct or indirect operation or management of a company (JLI) with which it has a strategic partnership/strategic alliance.
    - Professor Rock's report does not take into account the influence, management, and direction that a minority investor can exert through a "toehold" investment that creates an equity alliance and a strategic partnership/strategic alliance.
    - Professor Rock's report ignores the multiple, compelling bases of power and influence that Altria as a minority investor used to manage, operate, and direct JLI as the largest investor and a tobacco behemoth with expertise and assets specific to the industry and markets in which JLI operates.
    - Professor Rock's report ignores the nature of the professional, consultative services that Altria committed to provide for JLI in its service agreement, which involved exerting influence, management, and direction over the operations of JLI in a variety of areas such as regulatory affairs, distribution, marketing, and sales.

direction and to influence members of JLI's Board of Directors to be favorably inclined toward Altria's influence and direction.

When the evidence is analyzed from a practical business perspective, Altria, no doubt, played a key role in directing, operating, and managing the affairs of JLI during the relevant time period.

## IV. Insights from Academic Research

Academic research from a variety of areas can inform the issues at play in understanding the manner in which Altria influenced, managed, operated, and directed JLI. Below I review some of the academic research related to the following areas: minority investments; equity alliances or strategic partnerships/strategic alliances; and power and influence.

### A. Toeholds are minority investments that give the investor opportunity to interact and collaborate with the target

Toeholds are minority equity stakes (i.e., investments of less than 50 percent) in a target company that give the investor opportunity to interact with the target and gain information about it.[30] Such experience with and information about the target company enable the investor to resolve uncertainties related to possible synergies between the two companies, assess the target's long-term growth potential, and determine whether a larger investment (e.g., an acquisition) would be beneficial.[31] Toeholds are typically significant minority investments. For example, in a recent study, the average toehold investment was 27 percent ownership.[32] Often toeholds include the right for the investor or "toeholder" to appoint a director and collaborate in meaningful ways

---

[30] Povel, P. and Sertsios, G., *Getting to Know Each Other: The Role of Toeholds in Acquisitions*, Journal of Corporate Finance, 2014 26: 201-224.
[31] Smit, H. T. J. and Kil, J. C. M., *Toehold Acquisitions as Behavioral Real Options*, California Management Review, 2017 59(3): 42-72.
[32] Povel and Sertisos, *Getting to Know Each Other*.

issues at all when it is not in their interest to do so; "moral myopia,"[106] when ethical issues do not come clearly into focus; and "moral disengagement,"[107] when people disengage from the self-regulatory processes that prevent them from behaving unethically in other contexts.

## V.     Understanding the Logic of the Transactions between Altria and JLI

As Professor Rock emphasizes to his students, "they cannot adequately serve their clients without understanding the logic of the transactions that their clients are pursuing."[108] In this section, I will examine what the documents and testimony reveal about the logic of Altria's investment in JLI. As will be demonstrated below, the documents and testimony show that Altria initially wanted to control JLI through a majority equity investment, but when that failed, Altria made a strategic minority investment to gain a toehold in the burgeoning youth e-cigarette market. It then used its role as a strategic partner in a strategic alliance to manage, operate, and direct JLI. Professor Rock also asserts that "one must look at all materials that provide insight into the intention of the transactional lawyers as well as how others understood the transaction."[109] As such, in this section, I will also examine how JLI Board members understood the transaction with Altria. As will be demonstrated below, they perceived Altria as a strategic partner that would collaborate in managing, operating, and directing JUUL.

---

[106] Drumwright, M.E. and Murphy, P.E. *How Advertising Practitioners View Ethics: Moral Muteness, Moral Myopia and Moral Imagination*. Journal of Advertising, 2004, 33(2): 7-24.

[107] Treviño L. K., Weaver, G. R., and Reynolds, S. J., *Behavioral Ethics in Organizations: A Review.* Journal of Management, 2006 32(6): 951-990.

[108] Rock Rpt., p. 3, paragraph 12. Despite making this statement, at his deposition Professor Rock said that he did not "need to understand th[e] different parties' motivations in order to understand the deal", did not "evaluate Altria's goals or motivations for entering into the deal," did not do an analysis of "what the logic of this particular transaction was," and "did not evaluate the strategic objections of Altria in this transaction." Rock Dep. at 199:8-17, 200:6-20, 202:11-14.

[109] Rock Rpt., p. 4, paragraph 15. However, Professor Rock "did not review the various materials produced by Altria indicating what they wanted to accomplish with this transaction," unless they happened to be deposition exhibits to the JLI depositions he reviewed. Rock Dep. at 202-15-21. He did not review any depositions of Altria witnesses. *Id.* at 112:14-19. Nor did he review Altria's investment thesis. *Id.* at 204:1-12.

### A. Background

In order to understand the context of the relationship between JLI and Altria, it is important to review Altria's corporate history. Altria is one of the world's largest tobacco companies and is the parent company of Philip Morris USA, among other tobacco companies. According to its CEO, Altria's market cap is approximately 85 billion dollars.[110] Altria's Philip Morris USA manufactures approximately 50% of all cigarettes sold in the United States. Philip Morris USA's Marlboro brand is "the most popular cigarette brand in the United States, with sales greater than the next seven leading competitors combined."[111] Marlboro is the most popular brand of cigarette with youth.[112]

After litigation by many state attorneys general, Philip Morris USA was a signatory to the Tobacco Master Settlement Agreement in 1998, which prohibited targeting youth in marketing or advertising either directly or indirectly.[113] I also understand that Altria and Philip Morris USA were previously found to have violated the Racketeering Influenced and Corrupt Organizations Act based on allegations that the companies marketed to youth and lied to the public.[114]

Before the JLI transaction, Altria had its own e-cigarette product on the market, called MarkTen.[115] On December 7, 2018, shortly before the deal with JLI was finalized, Altria shut down its own e-cigarette brand.[116]

---

[110] Gifford Dep. at 266:10-13.
[111] https://www.cdc.gov/tobacco/data_statistics/fact_sheets/tobacco_industry/brand_preference/index.htm.
[112] *Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General*, U.S. Department of Health and Human Services, Office of the Surgeon General, 2012 at 161 (https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf).
[113] https://www.philipmorrisusa.com/en/products/tobacco-settlement-agreements.
[114] U.*S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006).
[115] *See, e.g.*, ALGAT0005045480.
[116] Angelica La Vito, "Altria shutters its e-cigarette brands as it eyes Juul, awaits iQOS decision," CNBC (Dec. 7, 2018), https://www.cnbc.com/2018/12/07/altria-closes-e-cigarette-brands-as-it-eyes-juul-awaits-iqos-decision.html.

understood the role that Altria intended to play in influencing, operating, and directing its affairs, and since their goals were aligned, JLI appeared eager to engage in a strategic alliance with Altria through which Altria would be actively engaged in influencing, operating, and directing its affairs.

### VI. After its investment, Altria capitalized on various forms of non-coercive power in managing, operating, and directing JLI.

As the academic literature attests, minority investors and strategic partners can manage, operate, and direct their partners in ways that are disproportionately greater than their ownership by using various types of non-coercive or soft power, which are outlined in the review of the academic literature. As demonstrated below, Altria managed, operated, and directed JLI in ways that were disproportionate to its ownership stake.

#### A. Altria used its expertise power to manage, operate, and direct JLI.

As noted above, benefitting from an investor's expertise is one of the key motivations for a company to sell a minority stake. Various documents portraying Altria's "workstream" on behalf of JLI are testament to the wide variety of expertise and knowledge that Altria provided to manage, operate, and direct JLI. These areas included "Direct Marketing, Supply Chain, Investor Relations, Regulatory Affairs, Government Affairs, Legal and Related Services, and Fixture and Sales Support." Many of these collaborations involved regular meetings, which provided Altria ample opportunity to manage, operate, and direct JLI. For example, one workstream report cited "investor relations" as a general topic and noted that Atria would have "standing weekly calls"

### H. Altria had power from centrality because it was the hub of a network of important distributors and retail customers.

As a tobacco behemoth, Altria was the center or the hub of a vast network that encompassed its own sales force, distributors, and retailers. Altria had power due to its centrality, which gave it access to information and resources and enabled it to give or withhold rewards to various parties.

### I. Altria had power disproportionate to its ownership because it did not have conflicts of interest with JLI.

The academic literature indicates that a prime factor in predicting the power of a minority investors turns on whether or not conflicts of interest exist between the minority investor and the target company. As demonstrated above, both Altria and JLI were aligned with respect to their goals and objectives, and both would gain immensely from JLI's expansion in distribution and increase in sales and valuation.

## VII. Conclusion

No doubt, Altria played a role in managing, operating, and directing the affairs of JLI in myriad ways as its strategic partner in a strategic alliance. The evidence demonstrates that both Altria and JLI wanted a strategic alliance in which they would collaborate in ways that would enable Altria to bring its immense expertise and abundant resources to bear on behalf of JLI. Both companies were aligned with respect to goals and objectives, and both were devoted to enabling JLI's distribution and sales—and ultimately its marketplace success—to grow by leaps and bounds. Altria adeptly brought many approaches to gaining power and influence to bear in enabling it to use non-coercive or soft power effectively to manage, operate, and direct JLI.