# Exhibit 11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ) ) ) ) ) ) ) | Case No. 19-md-02913-WHO |

**Government Entity Bellwether Case Specific
Expert Report of Professor Edward B. Rock**

**January 28, 2022**

**CONFIDENTIAL**

22. The other bellwether government entity complaints make similar claims that Altria controlled JLI. See, e.g., Unified School District No. 265, Sedgwick County, Kansas v. JULL Labs Inc., et al, Case No. 3:19-cv-07852, Amended Complaint at ¶¶ 766, 770, [heading before] 795, 796, 798, 861, 880; King County v. JUUL Labs, Inc., et al, Case No. 3:19-cv-07324, First Amended Complaint at ¶¶ 770, 774, [heading before] 798, 799, 801, 864, 883; School Board of Palm Beach County, Florida v. JUUL Labs, Inc., et al, Case No. 3:19-cv-08081, Amended Complaint at ¶¶ 774, 778, [heading before] 803, 804, 806, 869, 888; City of Rochester, New Hampshire v. JUUL Labs, Inc., et al., Case No. 19-MD-02913-WHO, First Amended Complaint at ¶¶ 768, 772, [heading before] 797, 798, 800, 863, 882; Tucson Unified School District v. JUUL Labs, Inc., et al., Case No. 19-md-02913-WHO, Second Amended Complaint at ¶¶ 772, 776, [heading before] 800, 801, 803, 866, 885. In this report, I refer to the bellwether government entities collectively as "Plaintiffs."

### III. ASSIGNMENT AND SUMMARY OF OPINION

23. My Assignment. I have been asked to:

    a. Provide an overview of the governance and management structure created by the Delaware General Corporation Law;

    b. Describe the transactional structure created by the agreements governing Altria's investment in JLI; and

    c. Determine whether that transactional structure gives Altria control over JLI.

24. Summary of My Opinion:

    a. The contracts governing the Altria investment in JLI are a typical example of a strategic investment in a promising business.

    b. Altria's investment in JLI is structured to protect Altria's investment, while limiting Altria's role and preventing Altria from controlling JLI.

## IV. ANALYSIS

### A. The "default setting": the role of officers, directors and shareholders under the basic corporate statutes

25. The "corporation" is a specific enterprise form created by the basic corporation statute (in Delaware, the Delaware General Corporation Law (DGCL)). It has a specific structure that distinguishes it from a variety of other enterprise forms available to entrepreneurs in setting up a business, namely, the general partnership, the limited partnership, the LLC, the LLP, and a variety of other less popular forms. Each of these "forms" has a set of basic provisions that can be modified to a greater or lesser extent.

26. In the corporation, the center of management power is the board of directors. Under DGCL Section 141(a), "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors . . . ."

27. The board of directors appoints "officers" who are the senior managers of the firm. DGCL § 142.

28. The directors and officers owe fiduciary duties to the corporation for the benefit of the shareholders. These fiduciary duties are conventionally referred to as a "Duty of Care" and a "Duty of Loyalty." Furthering the interests of some other corporation is a classic violation of the Duty of Loyalty. As the Delaware Supreme Court held in a seminal case:

> There is no "safe harbor" for such divided loyalties in Delaware. When directors of a Delaware corporation are on both sides of a transaction, they

8

### C. Altria's investment in JLI: the key agreements

42. On December 20, 2018, Altria made a $12.8 billion investment in JLI.[5] Prior to entering the agreements in December 2018, Altria did not own or exercise control over JLI. This investment was heavily negotiated.

43. In reviewing the agreements entered into as part of Altria's investment in JLI, several things are clear:

   a. Altria's investment in JLI is not a simple investment in securities as part of its cash management program.

   b. Altria did not acquire, or purchase a controlling share of, JLI.

   c. Rather, Altria's investment in JLI is an example of what I referred to above as an "intermediate" case in which Altria made a strategic investment in JLI.

   d. As is typical in these sorts of intermediate cases, the relationship was defined and structured through a series of concurrent contracts.

   e. The agreements prevent Altria from controlling JLI.

44. The terms of the investment are reflected in six interrelated agreements that were executed concurrently, of which four are relevant:[6]

   a. The Stock Purchase Agreement

   b. The Relationship Agreement

   c. The Services Agreement

   d. The Voting Agreement

---

[5] Specifically, Altria Group, Inc., through a wholly owned subsidiary, invested in JLI.

[6] In addition, the Ninth Amended and Restated Investors' Rights Agreement provides the JLI investors' consent to the modifications to the Certificate of Incorporation that resulted from the other agreements, and the Ninth Amended and Restated Right of First Refusal and Co-sale Agreement provides the existing JLI investors' permission for Altria to purchase the Class C-1 Common Stock pursuant to the Stock Purchase Agreement.

12

45.     As I will explain below, these agreements collectively protect Altria's interests in JLI while preventing Altria from exercising control.

46.     **The Class C-1 Common Stock Purchase Agreement:** This is the agreement by means of which Altria purchased 41,571,928 non-voting shares of JLI (and however many additional shares are needed to give Altria 35% of JLI's outstanding stock) in exchange for $12.8 billion. Several additional features of the agreement are relevant:

    a. The agreement anticipates that the shares will eventually convert into voting shares. Under the agreement, this will occur automatically upon antitrust clearance or, as discussed below, by unanimous consent of the board and approval of any existing Class C shareholders. Purchase Agreement at p. 1 (4th Whereas clause), § 1.3 (e).

    b. The parties agree to make reasonable best efforts to secure antitrust approval. Purchase Agreement, § 4.1.

    c. The parties agree that, following antitrust clearance, JLI will take all steps necessary to convert the non-voting shares to voting shares and to take the other steps anticipated by the related agreements. Purchase Agreement, § 4.2

47.     **The Relationship Agreement:** This agreement structures the relationship between Altria and JLI. For our purposes, the critical provisions are:

    a. **Non-compete:** Altria agrees not to compete with JLI, other than with respect to Altria's then existing e-Vapor business. Relationship Agreement, § 3.1(a).

    b. **Preemptive rights:** JLI agrees that if JLI issues more shares, Altria may buy a pro rata share in order to maintain its 35% ownership. Relationship Agreement, § 4.1.

13

 c. **Standstill:** Altria agrees not to seek control of JLI without prior consent.

  i. Specifically, Altria agrees not to participate in any tender offer or to participate in any proxy contest "or otherwise to seek to remove any member of the Board." Relationship Agreement, § 6.1(a).

  ii. After four years, Altria is permitted to seek to acquire the shares in JLI that it does not own, but only if its offer is approved by a majority of the non-Altria directors or an independent special committee and by a majority of the non-Altria shareholders. Relationship Agreement, § 6.2(b).

 d. **No Altria control of JLI:** Altria is explicitly prohibited from directing or controlling JLI. Specifically, Section 6.4 provides that Altria "shall have no right, directly or indirectly, as a result of its investment in [JLI] or otherwise, to direct of control [JLI] . . . and shall have no power to direct the management or policies of [JLI] . . . whether through ownership of Shares, by contract or otherwise."

 e. **Information and inspection rights:** Altria is provided certain information rights so long as it holds at least 10% of JLI (although these rights are limited pending antitrust clearance). Relationship Agreement, § 8.3.

 f. **Approval rights:**

  i. So long as Altria holds at least 30%, it has a veto over sale of more than 4.9% of JLI shares to any of Altria's competitors and over JLI granting any Altria competitors any right to designate a director or any other special governance rights. Relationship Agreement, § 2.1(e).

14

      ii. So long as Altria holds at least 30%, it has a veto over the sale of JLI to one of Altria's competitors. Relationship Agreement, § 2.2.

  g. **Voting rights:** Altria initially held non-voting Class C-1 Common Stock. Even after the C-1 stock converts to Class C Common Stock with 1 vote per share, Altria's voting rights are capped at 20%, so long as the Investor Rights agreement is in effect. Definition of "Fixed Vote Percentage"; JLI Certificate of Incorporation, Art. IV.E.3(b)(1) and Art. IV.G.2.

  h. **Transfer restrictions:** Altria's ability to sell its shares in JLI are limited. Specifically:

      i. Altria may not sell its shares during the first six years without prior approval of the board, including approval by a majority of the non-Altria directors then in office. Relationship Agreement, § 7.1(b).

      ii. Even after the six-year lock-up period, Altria's transfer rights are limited. Relationship Agreement, § 7.1(c).

48.    **The Services Agreement:** Altria agreed to provide requested services to JLI on a cost + 3% basis. A number of features are significant:

  a. JLI has the right (but not the obligation) to request services from Altria. Services Agreement, § 2.1.

  b. Altria does not have any exclusive right to provide services. Services Agreement, § Section 2.1.

  c. In providing services, Altria commits to treat JLI the same as it treats its own subsidiaries and affiliates. Services Agreement, § 2.2(a).

15

    d. Altria agrees to provide services so long as doing so does not violate any applicable law. Services Agreement, § 2.2(b).

    e. JLI receives a credit of around $33 million per year ($20 million in 2019) towards the cost of services provided. Services Agreement, § 4.1.

49. **The Voting Agreement:** The Eighth Amended and Restated Voting Agreement gives Altria the right to designate a board observer until antitrust approval has been obtained and the shares have been converted into Class C common stock. Voting Agreement, § 2(g)(iii). Once antitrust approval is received, Altria has a right to designate 3, 4 or 5 directors, depending on the size of the board (roughly one-third and in no case a majority). Voting Agreement, § 2(b)(i) and Ex. B. A number of additional features are significant:

    a. By designating that certain seats on the board will be held by certain individuals or designees of certain (non-Altria) stockholders, Section 2 prevents Altria from dominating the board.

    b. Section 4, which governs the sale of JLI, explicitly provides that Altria be allowed to participate in any sale of control of JLI. Voting Agreement, § 4(d).

    c. The JLI board may exclude Altria's board observer from portions of any board or committee meetings when the board deems it necessary. Voting Agreement, § 2(g)(iii).

50. **JLI's Certificate of Incorporation:** Some of the commitments made in the Altria/JLI agreements are also reflected in JLI's Amended and Restated Certificate of Incorporation (COI). In particular:

    a. JLI has four classes of common stock: Class A, Class B, Class C-1 (until it converts) and Class C. COI Art. IVA. In addition, the Certificate of Incorporation authorizes preferred stock.

    b. These classes have different rights. In understanding the governance of JLI, the most important provisions relate to voting rights. The Certificate of Incorporation provides that the voting rights are as follows:

        i. Class A: 1 vote per share. COI Art. IV.C.3.

        ii. Class B: 10 votes per share. COI Art. IV.D.3.

        iii. Class C-1: non-voting. COI Art. IV.F.3.

        iv. Class C: 1 vote per share (capped as per the Relationship Agreement at 20%). COI Art. IV.E.3(b)(i); Relationship Agreement, Definition of "Fixed Vote Percentage." See also COI Art. IV.G.2. (Once the Investor Rights Agreement terminates, Class C stock has one vote per share with no cap.)

    c. The Certificate of Incorporation also provides that C-1 shares shall be convertible into Class C shares upon one of two occurrences:

        i. Antitrust clearance, as defined in the Purchase Agreement; or

        ii. A written agreement approved by a unanimous vote or consent of the JLI board and the holders of a majority of outstanding Class C common stock. COI, Art. IV.F.4.

**D. The relationship created**

51. The provisions described above collectively accomplish a number of goals in structuring the relationship between Altria and JLI that resulted from Altria's investment.

52. First, the agreements provide a framework for the development of a cooperative relationship between Altria and JLI:

   a. Altria invested $12.8 billion in JLI in exchange for 35% of the JLI cash flows.

   b. Altria agreed to a non-compete provision (with exceptions) that applied while it was providing services to JLI.

   c. Altria agreed to provide certain services to JLI, as JLI requested.

53. Second, the agreements provide guardrails that limit Altria's involvement:

   a. The Relationship Agreement's standstill provisions prevent Altria from increasing its position in JLI without the approval of JLI's board.

   b. The Voting Agreement's provisions on board composition limit Altria's membership on the board, even after antitrust clearance, to one-third.

   c. Relationship Agreement's standstill provisions prevent Altria from running any sort of proxy contest to replace directors.

   d. The Relationship Agreement caps Altria's voting rights at 20%, notwithstanding its 35% share of the economics.

   e. Finally, the Relationship Agreement explicitly prohibits Altria from directing or controlling JLI.

54. Third, the agreements protect the interests of each side:

   a. The Relationship Agreement protects Altria against dilution and provides certain information and inspection rights, including the right to appoint a board observer.

   b. The Relationship Agreement gives Altria a veto of certain major transactions.

      c. The Services Agreement requires that Altria offer JLI services on the same basis as their own affiliates, and gives JLI the right to purchases services elsewhere, if preferable.

55. Together, these provisions *prevent* Altria from controlling JLI, and were designed to do so. We can see this by contrasting these provisions with the different ways in which a "controlling shareholder" typically controls a corporation.

56. First, a controlling shareholder can choose allies and elect them to the board of directors. A shareholder with a majority of the votes can typically elect 100% of the directors. DGCL § 216. This is the primary means by which controlling shareholders control corporations.

57. As described above, the agreements between Altria and JLI prevent Altria from filling the board of directors with its designees. The composition of the board of directors is fixed in the agreements; Altria is limited to one observer while it holds C-1 shares; and then limited to no more than 1/3 of the directors after it converts to C shares. Moreover, Altria's voting power is capped at 20%.

58. Second, if a controlling shareholder disagrees with what the board is doing—say, the board is not listening to the controlling shareholder's ideas on optimal strategy—a controlling shareholder can remove obstreperous directors and replace them with allies. DGCL §§ 141(k), 223.

59. As described above, Altria has no power to remove directors and replace them with its own designees, other than the directors that it has a right to designate. Between the Voting Agreement and the caps on Altria's voting power, it has no way to remove other directors.

60. Third, a controlling shareholder can exercise control by using its control of the board and its voting power to freeze-out the remaining shareholders and assume 100% ownership.