Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
Fla Bar No. 98522
1212 SE Third Avenue
Fort Lauderdale, FL 33316
Tel: (954) 467-8800
scott@schlesingerlaw.com
jhaberman@schlesingerlaw.com
jgdanski@schlesingerlaw.com

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICE, AND PRODUCTS LIABILITY LITIGATION<br><br>**This Document Relates to**<br><br>*Erin NesSmith et al. v. Juul Labs, Inc. et al.*, Case No. 3:19-cv-06344-WHO<br><br>*Bailey Legacki v. Juul Labs, Inc. et al.*, Case No. 3:20-cv-01927-WHO<br><br>*Cole Aragona v. Juul Labs, Inc. et al.*, Case No. 3:20-cv-01928-WHO<br><br>*Matthew Tortorici v. Juul Labs, Inc., et al.* Case No. 3:20-cv-03847-WHO<br><br>*Jordan Dupree v. Juul Labs, Inc. et al.*, Case No. 3:20-cv-03850-WHO<br><br>*Carson Sedgwick v. Juul Labs, Inc. et al.*, Case No. 3:20-cv-03882-WHO<br><br>*Jennifer Lane et al. v. Juul Labs, Inc. et al.*, Case No. 3:20-cv-04661-WHO | Case No. 3:19-md-02913-WHO<br><br>**Plaintiffs' Notice of Motion and Motion to Modify Protective Order and Require Defendants to Show Good Cause for Continued Confidentiality with Memorandum of Law**<br><br>Re: Dkt. Nos. 308 & 1282 (No. 3:19-md-02913-WHO)<br><br>Hearing: TBD<br>Department: Courtroom 2, 17th Floor<br>Judge: Hon. William H. Orrick |

PLEASE TAKE NOTICE that on a time to be determined by the court in Courtroom 2, 17th Floor for the Northern District of California United States District Court, the Honorable Judge William H. Orrick presiding, located at 450 Golden Gate Avenue San Francisco, CA 94102, Plaintiff's will and do hereby move the Court to Modify Protective Order and Require Defendants to Show Good Cause for Continued Confidentiality.

Plaintiffs base this Notice of Motion and Motion to Modify Protective Order and Require Defendants to Show Good Cause for Continued Confidentiality, on the accompanying Memorandum of Law, the Declaration of Jeffrey L. Haberman, and all records and pleadings on file with the Court in this action, all other matters of which judicial notice may be taken, and all further evidence and argument that may be presented at or before the hearing on this Motion.

Dated: September 23, 2026

Respectfully submitted,

s/Jeffrey L. Haberman
Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
Fla Bar No. 98522
1212 SE Third Avenue
Fort Lauderdale, FL 33316
Tel: (954) 467-8800
scott@schlesingerlaw.com
jhaberman@schlesingerlaw.com
jgdanski@schlesingerlaw.com

**Memorandum of Law**

Nearly seven years ago, the parties stipulated to a protective order to move this litigation forward "in a speedy, collaborative, and efficient manner." Protective Order (ECF 308); Am. Protective Order (ECF 1282) ¶ 1. The bargain was practical: the defendants could produce documents in bulk "without a detailed confidentiality review," and the plaintiffs would honor the defendants' "confidential" designations while discovery proceeded. Am. Protective Order (ECF 1282) ¶ 31. But the bargain was never a license for permanent secrecy. The parties agreed that the order would balance "the public interest in access to information concerning the matters addressed in this litigation," that it "does not confer blanket protections," and that designations could be challenged. *Id.* ¶¶ 1, 4, 35. Both orders were entered by stipulation, without any judicial finding of good cause.

Today, good cause does not justify keeping most of the millions of discovery documents from the public. The Protective Order has grown stale. For one, millions of JLI's documents have been made public and are stored in an online repository hosted by UCSF pursuant to agreements reached with state Attorneys General. This includes documents and communications touching on broad categories of documents like marketing plans, board meeting minutes, nicotine salt pharmacokinetics, Altria's 35% acquisition, and FDA regulation. Two, JLI's documents are old. Documents that may be considered trade secret-worthy at one point in time, lost that status as time goes on and technology changes. Third, the public interest in disclosure is important. The Surgeon General recognizes that the release of the tobacco industry's internal documents advanced the science of tobacco control and helped drive down youth smoking.

The Court should order Juul Labs, Inc. (JLI), Altria Group, Inc. (Altria), and the other defendants to identify each document they contend still warrants protection, in whole or in part; to show particularized good cause for each; and to propose redactions for documents that can be partially disclosed. As to every document for which the defendants make no such showing, the Court should remove any protection from public disclosure.

## BACKGROUND

Through pretrial discovery, the defendants disclosed millions of documents bearing on the plaintiffs' claims that JLI falsely marketed its JUUL products as safe and cool, and free of the hazards of smoking cigarettes devices when, in fact, the products were designed to addict a new generation to nicotine. The documents fell into numerous categories, including internal communications, operational records, meeting materials, business plans, corporate financial and strategy records, and scientific research and laboratory reports. The defendants designated nearly every document as "confidential" of "highly confidential" under a protective order that permits designation in bulk and bars the plaintiffs from using designated material outside this litigation. Am. Protective Order (ECF 1282) ¶¶ 31, 39.

As JLI settled claims, it began making millions of these formerly "confidential" documents public. In June 2021, JLI settled with North Carolina and agreed to make its internal documents public through a depository operated by a North Carolina public university. Final Consent Judgment.[1] JLI deposited roughly 4 million internal documents from 2015–2019—internal correspondence, marketing plans, sales data, research and development materials, and multimedia files—into a public depository.[2] The depository is housed with, and modeled on, the tobacco industry document archives created from the 1990s tobacco litigation. In April 2023, JLI settled with California, five other states, and the District of Columbia. Consent Judgment.[3] That

---

[1] Final Consent Judgment, *State of North Carolina v. Juul Labs, Inc.*, No. 19-CVS-2885 (N.C. Super. Ct. Durham Cnty. June 28, 2021), available at https://ncdoj.gov/wp-content/uploads/2021/06/2021-06-28-JUUL-Consent-Judgment.pdf

[2] The University of North Carolina maintains the depository. *See* https://guides.lib.unc.edu/juul. *See also* UNC Libraries, *Origins of the Juul Labs Documents Collection*, https://guides.lib.unc.edu/c.php?g=1422351&p=10555776 (describing the North Carolina settlement's requirement that the documents be made public through a repository maintained by a North Carolina public university, hosted with the UCSF Industry Documents Library originally established for documents disclosed in tobacco litigation).

[3] Consent Judgment, *People v. JUUL Labs Inc.*, No. RG19043543 (Cal. Super. Ct. Alameda Cnty. Apr. 2023), available at https://oag.ca.gov/system/files/attachments/press-docs/2023-04-11%20Consent%20Judgment%2C%20signed%20%282%29.pdf.

settlement likewise required JLI to make its internal documents publicly accessible.[4] Millions more relevant documents were added to the public record. These disclosures were intended to help the public and regulators understand how JLI's sales and marketing practices fueled the youth vaping epidemic.

Once JLI made these documents public, the protective order no longer covered them. Am. Protective Order (ECF 1282) ¶ 10 (excluding information that "becomes part of the public domain after its disclosure"). The newly public documents include material JLI had designated "highly confidential," such as its Audit Committee minutes,[5] and even material designated "highly confidential – outside counsel only," such as a prospectus for investors.[6] Those designations represented that disclosure was "likely to cause serious economic harm or competitive disadvantage" or would put JLI "at a significant competitive disadvantage." Am. Protective Order (ECF 1282) ¶¶ 16–17. JLI then released the material itself. Time and JLI's own disclosures have eroded whatever secrecy these documents may have warranted.

Yet many documents of the same kind remain shielded, even though the same justification for secrecy has receded. Board minutes from one meeting may now sit in the public repository, while minutes from another meeting remain confidential by happenstance. Although the purported justification for nondisclosure (*e.g.*, trade secrets) is the same, some documents are public while materially identical documents remain sealed.

Moreover, the defendants' designations have never been systematically tested. The order allowed bulk designation "notwithstanding that some of the documents within the collection may not qualify," Am. Protective Order (ECF 1282) ¶ 31, and the plaintiffs devoted their resources to litigating and resolving claims rather than policing designations. Now that the litigation is winding

---

[4] *See* https://www.industrydocuments.ucsf.edu/tobacco/documents/?q=null%2Call%2Ccontains%2Ccollection%3A%22JUUL+Labs+Collection%22&db-set=documents&industry=tobacco&sort=relevance&pg=1&npp=20.

[5] *See* https://www.industrydocuments.ucsf.edu/docs/jnwx0321/

[6] *See* https://www.industrydocuments.ucsf.edu/docs/rlyl0322/

down, the defendants should show good cause to continue shielding their past conduct from public view.

## LEGAL STANDARD

"[D]iscovery is 'presumptively public.'" *Fierro Cordero v. Stemilt AG Services, LLC*, 142 F.4th 1201, 1207 (9th Cir. 2025) (quoting *San Jose Mercury News, Inc. v. U.S. Dist. Ct.—N. Dist. (San Jose)*, 187 F.3d 1096, 1103 (9th Cir. 1999)). "As a general rule, the public is permitted access to litigation documents and information produced during discovery." *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) (quotation omitted) ("*Roman Catholic*"). Access may be restricted only when "the party opposing disclosure shows 'good cause' why a protective order is necessary." *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002); Fed.R.Civ.P. 26(c)(1).

After a protective order is entered, a party or a member of the public may move to modify it to permit public release of protected documents. The party opposing public disclosure continues to bear the burden of persuasion that the documents should remain secret. *Roman Catholic,* 661 F.3d at 424 ("If a party takes steps to release documents subject to a stipulated order, the party opposing disclosure has the burden of establishing that there is good cause to continue the protection of the discovery material."); *see also* Am. Protective Order (ECF 1282) ¶ 38 ("The burden of persuasion in any such dispute shall be on the Designating Party."). Good cause remains the standard throughout; the plaintiffs need not show changed circumstances. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992) (holding that an "extraordinary circumstances" test for modifying a protective order "is incompatible with our circuit's law").

Courts assess "good cause" for protection from public access in four steps. *Fierro Cordero*, 142 F.4th at 1207. First, the party opposing disclosure must show prejudice, and the prejudice must be shown "for each particular document it seeks to protect." *Id.* (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id*. (quotations

omitted). Reliance on a protective order cannot, "without more, justify refusal to modify when there is a reasonable request for disclosure." *Beckman*, 966 F.2d at 476.

Second, if the "court finds particularized harm that would result from public disclosure[,] it must balance the public and private interests to decide whether a protective order is necessary." *Fierro Cordero*, 142 F.4th at 1207 (cleaned up). In striking that balance, courts consider the *Glenmede* factors, including "whether confidentiality is being sought over information important to public health and safety" and "whether the case involves issues important to the public." *Roman Catholic*, 661 F.3d at 424 n.5 (quoting *Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995)).

Third, even where the balance favors continued protection, the court must still consider whether redaction would permit partial disclosure rather than continued blanket sealing. *Roman Catholic,* 661 F.3d at 425.

Finally, the court must "identify and discuss the factors it considered in its 'good cause' examination."[7] *Fierro Cordero*, 142 F.4th at 1207.

## ARGUMENT

The defendants cannot show good cause to keep most of their documents from the public. The plaintiff recognizes that a limited set of documents should be redacted to remove protected health information or personally identifiable information, Am. Protective Order (ECF 1282) ¶ 10(d)–(e), and that some materials, such as nonpublic communications with regulators, may remain protected by statute or regulation, *id.* ¶ 10(c). But those narrow categories cannot justify a blanket prohibition on public disclosure resting on untested designations.

---

[7] The Court did not previously find good cause to hide discovery documents from the public. *See* Protective Order (ECF 308); Am. Protective Order (ECF 1282). No finding was made because the parties stipulated to the entry of the orders. *Roman Catholic*, 661 F.3d at 424; *Beckman Indus., Inc.*, 966 F.2d at 476 (noting the stipulated nature of the protective order meant the opposing party never had to show good cause). Since then, the Ninth Circuit has held that a "district court must find 'good cause' before issuing a protective order restricting access to discovered information." *Fierro Cordero*, 142 F.4th at 1207 (vacating a protective order entered without a finding of good cause).

**1. The defendants cannot show particularized harm from disclosing most of the documents**

Whatever basis for confidentiality existed in 2019 has largely dissipated. Millions of documents once designated confidential are now public, released by JLI itself. Documents of the same kind that remain designated cannot plausibly cause particularized harm when their public counterparts have not. And a federal court has already ordered Philip Morris and Altria to post the discovery materials they produced in this MDL on a public document website. *United States v. Philip Morris USA Inc.*, No. 1:99-cv-02496 (PLF), slip op. at 16, 18 (D.D.C. June 19, 2023) (ECF. No. 6526 (Exhibit A) (discussed below). The passage of time has also sapped the competitive value of corporate records that are, for the most part, the better part of a decade old. Nor is exposure to further litigation a cognizable harm: even if disclosure exposes a party "to additional liability and litigation," "a litigant is not entitled to the court's protection from this type of harm." *Foltz*, 331 F.3d at 1137. JLI and the other defendants therefore cannot make the particularized showing of prejudice required for most of the discovery documents.

**2. The public interest in understanding the youth vaping epidemic outweighs any remaining private interest**

Public health benefits outweigh any private interest in keeping the defendants' discovery documents secret. The tobacco litigation shows why. Only through public disclosure of the industry's internal documents could the public and regulators expose decades of deception, take meaningful steps to counteract it, and educate the public about tobacco's "truth." The disclosure of the tobacco companies' internal documents advanced public health and research into tobacco's harms. *See State ex rel. Humphrey v. Philip Morris Inc.*, 606 N.W.2d 676, 692 (Minn. Ct. App. 2000) (finding a "compelling public interest in the disclosure of the documents that address the addictive nature of nicotine, research by the tobacco industry into nicotine addiction, and advertising tobacco products to minors").

The federal government's own public health authorities have reached the same conclusion. The Surgeon General's 2012 report on youth tobacco use—the report most closely analogous to

the youth nicotine epidemic at issue here—identified litigation-driven disclosure as one of the developments that transformed tobacco control. Because the states and the U.S. Department of Justice sued the cigarette companies, the report explained, "internal documents of the tobacco industry have been made public, analyzed, and introduced into the science of tobacco control." The report credited these and related developments—including the Master Settlement Agreement—with having "in part, resulted in a sharp decrease in tobacco use among adults and among youth." U.S. Dep't of Health & Hum. Servs., *Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General*, Exec. Summ. at 1 (2012) ("*2012 SG Report*").[8] The Director of the Centers for Disease Control and Prevention likewise observed that the Master Settlement Agreement "resulted in the release of internal tobacco industry documents that have been analyzed by scientists," one of several "significant developments" that "resulted in a sharp decrease in tobacco use among adults and youth." *Id.* at iii (Foreword). And the disclosed documents did real work. The Surgeon General relied on them to find that "information explicitly revealed in tobacco industry documents makes clear the industry's interest in and efforts to entice young people to use their products," *id.* at 2, and rested the report's conclusion that industry marketing causes youth tobacco use in part on "evidence from tobacco industry documents on their marketing practices," *id.* at 5.

The Surgeon General returned to the point two years later in the fiftieth-anniversary report on smoking and health. That report recounted that the Minnesota litigation "resulted in the release of the industry's documents and their maintenance in two repositories," and that "as a result of the Minnesota Settlement and the MSA, tens of millions of pages of internal memoranda, reports, and other tobacco company documents initially acquired through litigation were made available to the public." U.S. Dep't of Health & Hum. Servs., *The Health Consequences of Smoking—50 Years of*

---

[8] The Executive Summary is available at https://www.hhs.gov/sites/default/files/preventing-youth-tobacco-use-exec-summary.pdf. The full report is available at https://www.ncbi.nlm.nih.gov/books/n/surgtobyouth/.

*Progress: A Report of the Surgeon General*, ch. 2 (2014) ("*2014 SG Report*").[9] It identified "a focus on the tobacco industry itself as a key influence on smoking behavior and the importance of countering its actions" as one of the factors "particularly crucial in altering social norms around cigarette smoking." *Id.* It concluded that the industry's "extensive campaign" to counteract public health efforts "is now well documented through the industry's internal documents." *Id.* And it described the decline in smoking brought about by tobacco control as "surely one of public health's greatest successes." *Id.* In short, the Surgeon General has twice recognized that the documents litigants pried loose from the tobacco industry's files became a public health asset. The defendants' documents here warrant the same treatment.

Courts have recognized the same public interest. After a nine-month bench trial, Judge Kessler found that the major cigarette manufacturers, including Philip Morris and Altria, violated RICO, and that their "suppression and concealment of information has been integral to the [RICO] Enterprise's overarching scheme to defraud." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 928 (D.D.C. 2006), *aff'd in part and vacated in part*, 566 F.3d 1095 (D.C. Cir. 2009) (per curiam). To remedy that concealment, she held that the defendants "must create and maintain document depositories and websites which provide the Government and the public with access to all industry documents disclosed in litigation from this date forward." *Id.* Disclosure, Judge Kessler explained, "will allow the public to monitor what Defendants are doing internally and to assess the accuracy of future information they may make available about their activities and their products," and "will act as a powerful restraint on Defendants' future fraudulent conduct." *Id.* at 928–29. Judge Kessler also required that the depositories include databases capable of searching individual documents by bibliographic fields such as Bates number, date, author, and title. *See id.* at 930.[10] The Final Judgment and Remedial Order then required Philip Morris to maintain a public

---

[9] Available at https://www.ncbi.nlm.nih.gov/books/NBK294310/ (Chapter 2, "Fifty Years of Change 1964–2014"). The quoted passages appear in the chapter's sections titled "Denormalization and the Tobacco Industry" and "Summary."

[10] Final Judgment and Remedial Order (Order #1015), *United States v. Philip Morris USA Inc.*, No. 1:99-cv-02496 (D.D.C. Aug. 17, 2006), ECF No. 5733; *see also* Order #1021, *id.*

Internet Document Website for fifteen years and to keep it current by adding "all documents produced on or after [August 17, 2006,] in any court or administrative action in the United States concerning smoking and health, marketing, addiction, low-tar or low-nicotine cigarettes, or less hazardous cigarette research." Order #1015 § III.C.8, 10.a.

That order reaches this very litigation. In 2023, the court, now Judge Paul L. Friedman, held that this MDL is a court action concerning "smoking and health, marketing, [and] addiction" within the plain text of Order #1015, and it ordered Philip Morris and Altria to "upload their discovery materials produced in the JUUL MDL to Philip Morris's Internet Document Website." *United States v. Philip Morris USA Inc.*, No. 99-2496 (PLF), slip op. at 16 (D.D.C. June 19, 2023).[11] The court extended the website's life so that those materials would remain public for twelve months after posting. *Id.* at 18. In doing so, it explained that Judge Kessler's injunction "was designed to allow the Court, the government, and the public to monitor defendants' future conduct with respect to old and new products," *id.* at 13, and it identified "striking similarities" between the conduct found unlawful in 2006 and the allegations in this MDL, *id.* at 14. A federal court has thus already required Altria and Philip Morris to make their discovery in this MDL available to the public. The same public interest applies with at least equal force to the documents of JLI, the company whose products and marketing sit at the center of the youth vaping epidemic.

No less important, the disclosure exposed tobacco's playbook—how the industry manipulated and addicted new generations. The same is true here. Public disclosure of the defendants' documents will help researchers, regulators, and the public understand how a new generation became addicted to nicotine, and guard against a repeat. As Judge Friedman noted, the parallel is not merely rhetorical: in 2018, Altria, the parent company of Philip Morris USA,

---

(D.D.C. Sept. 20, 2006), ECF No. 5765 (setting the website's September 1, 2021 expiration date); *United States v. Philip Morris USA Inc.*, No. 99-2496 (PLF), slip op. at 3–4 (D.D.C. June 19, 2023) (describing these obligations).

[11] Opinion, *United States v. Philip Morris USA Inc.*, No. 1:99-cv-02496 (PLF) (D.D.C. June 19, 2023) ECF No. 6526, Ex. A.

acquired a 35 percent stake in JLI. The *Glenmede* public-health and public-importance factors therefore weigh heavily in favor of disclosure. *See Roman Catholic*, 661 F.3d at 424 n.5.

**3. Redaction can protect any genuinely sensitive information**

Redaction can protect any legitimate private interest in nondisclosure. That a document mentions a Social Security number, a bank account, a mental health condition, or a home address is no reason to withhold the entire document. Those details can be redacted and the remainder released. *See Roman Catholic*, 661 F.3d at 425; *Foltz*, 331 F.3d at 1137 (holding that third-party medical and personnel records could "be redacted easily to protect third-party privacy interests while leaving other meaningful information").

**4. The Court should require document-specific showings on a set schedule**

The Court should require the defendants to make these showings on a defined schedule. Within 45 days, the defendants should serve a log identifying, by Bates number, each document (or narrowly defined category of documents) for which they seek continued protection; the ¶ 10 category invoked; the particularized harm disclosure would cause; and any proposed redactions, supported by declarations. The defendants cannot avoid that obligation by pointing to the volume of their own designations; any burden is the product of bulk designations that the order expressly made subject to challenge. Am. Protective Order (ECF 1282) ¶¶ 30–31. After the parties meet and confer, the Court should resolve any remaining disputes, make specific findings for each document or category, and order that all other documents be made available for public inspection.

## CONCLUSION

The plaintiffs respectfully requests that the Court order the defendants to identify each document produced in discovery that they contend should remain protected, in whole or in part; show for each particularized good cause for nondisclosure; and propose redactions for any document that can be partially disclosed, on the schedule described above. For every document as to which the defendants do not make that showing, the Court should permit public access.

Respectfully submitted,

s/Jeffrey L. Haberman

Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
Fla Bar No. 98522
1212 SE Third Avenue
Fort Lauderdale, FL 33316
Tel: (954) 467-8800
scott@schlesingerlaw.com
jhaberman@schlesingerlaw.com
jgdanski@schlesingerlaw.com